[Submitting counsel below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION,<br><br>This Document Relates to:<br><br>*Jaylynn Dean v. Uber Technologies, Inc., et al.*, No. 3:23-cv-06708 | Case No. 3:23-md-03084-CRB<br><br>**DEFENDANTS' MOTION TO STRIKE DR. MINETTE DRUMWRIGHT'S UNDISCLOSED EXPERT OPINIONS**<br><br>Judge:      Hon. Charles R. Breyer<br>Courtroom:  Courtroom 6 – 17th Floor<br><br>Date Filed: January 15, 2026<br><br>Trial Date: January 13, 2026 |

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

**PHOENIX DIVISION**

| | |
|---|---|
| JAYLYNN DEAN,<br><br>     Plaintiff,<br><br>v. UBER TECHNOLOGIES, INC., et al.,<br><br>     Defendants | CASE NO. 25-cv-4276-PHX-CRB<br><br>Judge:      Hon. Charles R. Breyer<br>Courtroom:  501 |

1 | LAURA VARTAIN HORN (SBN: 258485)
laura.vartain@kirkland.com
2 | **KIRKLAND & ELLIS LLP**
555 California Street, 30th Floor
3 | San Francisco, CA 94104
Telephone: (415) 439-1625
4 |
Kim Bueno (Pro Hac Vice admitted)
5 | **KIRKLAND & ELLIS LLP**
kim.bueno@kirkland.com
6 | 401 W. 4th St.
Austin, TX 78701
7 | Telephone: (512) 355-4390

8 | Allison M. Brown (Pro Hac Vice admitted)
**KIRKLAND & ELLIS LLP**
9 | alli.brown@kirkland.com
2005 Market Street, Suite 1000
10 | Philadelphia, PA 19103
Telephone: (215) 268-5000
11 |
JESSICA DAVIDSON (Pro Hac Vice admitted)
12 | **KIRKLAND & ELLIS LLP**
jessica.davidson@kirkland.com
13 | 601 Lexington Avenue
New York, NY 10022
14 | Telephone: (212) 446-4723

15 | SABRINA H. STRONG (SBN: 200292)
   sstrong@omm.com
16 | JONATHAN SCHNELLER (SBN: 291288)
   jschneller@omm.com
17 | **O'MELVENY & MYERS LLP**
400 South Hope Street, 19th Floor
18 | Los Angeles, CA 90071
Telephone: (213) 430-6000
19 | Facsimile: (213) 430-6407

20 | PATRICK L. OOT, JR. (*Pro Hac Vice* admitted)
   oot@shb.com
21 | **SHOOK, HARDY & BACON, LLP**
1800 K Street NW, 10th Floor
22 | Washington, DC 20006
Telephone: (202) 783-8400
23 | Facsimile: (202) 783-4211

24 | ALYCIA A. DEGEN (SBN: 211350)
   adegen@shb.com
25 | MICHAEL B. SHORTNACY (SBN: 277035)
   mshortnacy@shb.com
26 | 2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
27 | Telephone: (424) 285-8330
Facsimile: (424) 204-9093
28 |

-3-

1  CHRISTOPHER V. COTTON (*Pro Hac Vice* admitted)
     ccotton@shb.com
2  255 Grand Boulevard
   Kansas City, MO 64108
3  Telephone: (816) 474-6550
   Facsimile: (816) 421-5547
4
   Counsel for Defendants
5  UBER TECHNOLOGIES, INC.,
   RASIER, LLC, and RASIER-CA, LLC
6

DEFENDANTS' MOTION TO STRIKE
CASE NO. 3:23-md-03084-CRB

## I. Introduction

Plaintiff has compromised the fairness of this bellwether trial by using the first witness presented to the jury—Dr. Minette Drumwright—as a mouthpiece for Plaintiff's entire trial theory, offering a host of opinions that she did not disclose in her multiple expert reports and that are clearly and objectively beyond her expertise as a marketing professor.  Dr. Drumwright's reports disclosed eight opinions exclusively addressing Uber's marketing, strategic communications, and public relations. Her trial testimony, however, presented extensive undisclosed opinions—including what appear to be central Plaintiff trial themes—concerning Uber's business model, corporate culture, technology products, safety features, executive compensation, demographic targeting, and other topics.  Many of these opinions were based on "reliance" documents not mentioned in Dr. Drumwright's reports but instead disclosed to Uber the day before her testimony, when the Court was dark and Uber could not seek relief:

- First, Dr. Drumwright prominently opined that structural and cultural dynamics such as compensation metrics and reporting led Uber to systematically prioritize "grow[th] at the expense of other important criteria such as safety." Trial Tr. (hereinafter "Tr.") 334:23-335:12. Both the general opinion that Uber systematically prioritized growth over safety and the specific grounds Dr. Drumwright cited for that conclusion are wholly absent from her report.  While Dr. Drumwright's combined expert and supplemental reports (hereinafter "report"), totaling nearly 250 pages, referenced growth multiple times, they disclosed no such opinion.
- Second, again advancing a central Plaintiff trial theme, Dr. Drumwright extensively opined that the 2017 leadership transition from former CEO Travis Kalanick to current CEO Dara Khosrowshahi did not catalyze change due to factors such as the "sticky" nature of corporate behavior, Mr. Kalanick's

-4-
DEFENDANTS' MOTION TO STRIKE
CASE NO. 3:23-md-03084-CRB

appointment to Uber's Board, and Mr. Khosrowshahi's compensation metrics. None of this was disclosed in Dr. Drumwright's report.

- Third, Dr. Drumwright emphatically criticized Uber's RideCheck feature as ineffective—an opinion not mentioned in her reports and far beyond her expertise.
- Finally, Dr. Drumwright offered a wide variety of additional opinions—from Uber's purported targeting of Hispanic riders to the supposed association between cancelled trips and sexual assault—that her report did not disclose.

These opinions blindsided Uber and threaten the fairness of this proceeding. As the Court recognized at this trial's outset, "no one is served by a bellwether ambush." Pretrial Conference Tr. (Jan. 6, 2026), at 102:11-12. The Court's Pretrial Guidelines specifically anticipate and protect against the "recurrent problem" of "expert witnesses trying to go beyond the scope of their expert reports on direct examination" by cautioning that "the direct testimony of experts will be limited to matters disclosed in their reports," and that reports must be not only "complete" but also "sufficiently detailed" to give notice of the expert's opinions. PTO 38, at 4. Plaintiff has kicked off this trial by presenting a host of undisclosed opinions—which Uber did not have the opportunity to test by deposition or challenge ahead of trial—improperly "present[ing] a narrative of select . . . events through the summary of or selective quotation from internal . . . documents." *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *see In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008) ("Having an expert witness simply summarize a document (which is just as easily summarized by a jury) with a tilt favoring a litigant, without more, does not amount to expert testimony."). The jury can be instructed to disregard Dr. Drumwright's undisclosed testimony but cannot forget the undisclosed and tendentious trial narrative presented to it with expert imprimatur. If the Court condones this approach, it would effectively grant experts *carte blanche* to opine on any subject that advances a party's theory, rendering the scope of expert testimony unlimited. Both Rule 37 and the integrity of this proceeding require that Dr. Drumwright's undisclosed opinions be struck.

## II. Dr. Drumwright's Report Disclosed Eight Opinions Focused Exclusively on Uber's Marketing, Strategic Communications, and Public Relations.

Dr. Drumwright is a marketing and strategic communications expert who provided nearly 250 pages of opinions and multiple days of deposition testimony. *See* ECF No. 4351-1, Ex. 2 (Sep. 26, 2025 Drumwright Rep.) (hereinafter "Drumwright Rep.").[1] Plaintiff retained Dr. Drumwright to opine on how Uber "marketed the safety [of] its rideshare business with respect to sexual assault and sexual misconduct occurring on its platform, and to offer an opinion as to how Uber's conduct compared to its own internal, as well as industry and other, standards."[2] *Id.* Her overarching disclosed opinion is that "Uber's marketing and strategic communications were unreasonable, reckless, and irresponsible, and fell short of the norms, guidelines, and standards that Uber set for itself, as well as those described by numerous leading professional organizations." Drumwright Dep. Oct. 26, 2025 (hereinafter "Drumwright Dep.") at 83:14-84:2. Her expert report opined that Uber did this in "eight ways," *see id.*, for example, that Uber marketed the perception of safety over actual safety outcomes, Uber's safety and screening messaging was misleading, or that Uber used nonprofit partnerships to bolster its brand image. Drumwright Rep. ¶¶ 2.1, 2.2, 2.6.

Each of Dr. Drumwright's eight listed opinions states that Uber's "marketing," "public relations," or "strategic communications" were "unreasonable, reckless, and irresponsible." *Id.* ¶ 2. In particular, Dr. Drumwright's report states:

> 2. My opinions are as follows:
>
> 2.1 In focusing its marketing and strategic communications almost exclusively on the perception of Uber's safety and user safety sentiment, Uber's marketing and strategic communications were unreasonable, reckless, and irresponsible and failed to meet the norms, guidelines, and standards Uber had set for itself, as well as the those [sic] described by numerous leading professional organizations.

---

[1] Citations to "Ex. __" refer to the exhibits to the concurrently filed Declaration of Laura Vartain Horn.

[2] The Court granted Uber's motion to exclude Dr. Drumwright's report "to the extent [it] seek[s] to opine on Uber's adherence or lack thereof to external ethical standards." Pretrial Order 39 (Dkt. 4941) at 1.

2.2 Uber's marketing and strategic communications were unreasonable, reckless, and irresponsible in misleading the public regarding the safety of Uber's rides and the rigor of its background checks for drivers, and in doing so, Uber's marketing and strategic communications fell short of the norms, guidelines, and standards Uber had set for itself, as well as those described by numerous leading professional organizations.

2.3 Uber's marketing and strategic communications were unreasonable, reckless, and irresponsible when the company targeted multiple vulnerable segments of the public and failed to disclose the risks and dangers, and in doing so, Uber's marketing and strategic communications fell short of the norms, guidelines, and standards Uber had set for itself, as well as those described by numerous leading professional organizations.

2.4 Uber's marketing was unreasonable, reckless, and irresponsible in not implementing safety features in a timely manner, and in doing so, Uber's marketing fell short of the standards Uber had set for itself, as well as those described by numerous leading professional organizations.

2.5 Uber's public relations (PR) was unreasonable, reckless, and irresponsible when employing dark-PR tactics to attempt to "kill" and "squash and fog" media stories that would negatively impact passengers' perceptions of Uber's safety, and in doing so, Uber's PR fell short of the norms, guidelines, and standards Uber had set for itself, as well as those described by numerous leading professional organizations.

2.6 Uber's PR was unreasonable, reckless, and irresponsible in using dark-PR tactics to get its nonprofit partners to "safetywash" its brand image, and in doing so, Uber's marketing and strategic communications fell short of the norms, guidelines, and standards Uber had set for itself, as well as the those [sic] described by numerous leading professional organizations.

2.7 Uber's marketing and strategic communications were unreasonable, reckless, and irresponsible in downplaying the prevalence and extent of sexual violence incidents during Uber rides, creating anti-warnings, and failing to be transparent, disclose, or warn the public, and in doing so, Uber's marketing and strategic communications fell short of the

norms, guidelines, and standards Uber had set for itself, as well as those described by numerous leading professional organizations.

2.8 Uber's marketing and strategic communications were unreasonable, reckless, and irresponsible by 1) addressing Uber's "women issue" with unreasonable, reckless, and irresponsible marketing, strategic communications, and dark-PR tactics, and 2) creating false narratives and anti-warnings about Uber's "women issue," and in so doing, Uber's marketing and strategic communications buffered Uber from criticism and oversight internally and externally and had a negative effect on Uber's organizational culture.

While Dr. Drumwright's roughly 194-page expert report also includes an extensive factual discussion in support of her marketing opinions, that discussion is couched as a set of declarative fact statements—what Uber documents say, what Uber tracked, what Uber considered, and what segments it viewed as important for growth. For example, in formulating her opinion about Uber's marketing to women, she asserts that Uber viewed women as an important segment for growth and developed its approach accordingly. Drumwright Rep. ¶¶ 296–97. Dr. Drumwright nowhere discloses opinions on any subject beyond marketing. And as detailed below, on many of the subjects of her trial testimony her report says nothing at all.

### III.   Dr. Drumwright's Trial Testimony Presented Extensive Expert Opinion Not Disclosed to Uber in Her Report.

At trial, Dr. Drumwright prominently opined that structural factors drove Uber to prioritize growth over safety, that organizational dynamics prevented change in Uber's safety practices following the leadership transition from Mr. Kalanick to Mr. Khosrowshahi, and that Uber's RideCheck feature has no safety benefits. None of these opinions was previewed anywhere in Dr. Drumwright's report, which addressed only the propriety of Uber's marketing, strategic communications, and public relations.

#### A.   Dr. Drumwright's Opinion that Uber Prioritized Growth Over Safety Was Not Disclosed in Her Report.

A central theme of Dr. Drumwright's testimony was that Uber prioritized "grow[th] at the expense of other important criteria such as safety." Tr. 333:2-3, 335:2-3. Dr. Drumwright

-8-

attributed that alleged prioritization to structural dynamics such as Uber's compensation scheme and its alleged placement of safety decisions "in the very department that was the growth department," which she opined was an "inherent conflict" akin to "the fox guarding the henhouse." Tr. 330:14-22; *see also* Tr. 334:16-19. The manner in which she presented that opinion can only be described as expert opinion. *See* Tr. 350:3-5 ("**My overall conclusions** were that growth was still prioritized over safety.") (emphasis added). But neither Dr. Drumwright's overarching opinions nor the specifics she relied on to support them were disclosed to Uber in her expert report; rather, much of Dr. Drumwright's supporting narrative was spun together from reliance materials first identified to Uber the day before her testimony.

Dr. Drumwright's report discloses no opinions whatsoever about Uber's growth, let alone an opinion that corporate dynamics drove Uber to systematically prioritize growth over safety. And Dr. Drumwright's general opinions about corporate profit motives for certain marketing practices—which are not specific to Uber—do not plug that hole. In particular, Dr. Drumwright opined that companies' motives for "anti-warnings" "*typically* involve protecting their sales; that is profit maximization" and that companies that engage in "pseudo-corporate responsibility . . . [i]n essence . . . base their actions solely on profit maximization without concern for the negative impact of their activities on society." Drumwright Rep. ¶¶ 148-49 (emphasis added). Neither opinion expresses a view beyond the context of "anti-warnings" and "pseudo-corporate social responsibility," neither opinion relates to growth (as opposed to profit), and neither suggests an opinion that organizational dynamics systematically drove Uber to prioritize growth over safety. And although Dr. Drumwright's 500-paragraph, 846-footnote report includes scattered references to growth, all are factual recitations—for example, that Uber's internal documents showed growth was important to its business model. The observation that growth was important to Uber is entirely uncontroversial. But that is a far cry from Dr. Drumwright's trial opinion about how Uber balanced growth against safety, and the organizational dynamics she cited in support of that opinion.

Dr. Drumwright's occasional references to growth did not give Uber notice of her trial opinion. "[T]he factual assertions contained in [an expert's] report simply provide the foundation for [the expert's] opinion," and form "the predicate for [her] opinion testimony." *Reach Music*

*Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013). "[T]he factual recitations themselves are not evidence ***and are not opinions***." *Id.* (emphasis added); *see Templin v. United States*, 2013 WL 12133916, at *1 (D. Mont. Jan. 17, 2013) (expert reports must "lay out the reasoning that connects the facts to the experts' opinions."); *Rapp v. NaphCare Inc.*, 2023 WL 5844724, at *6 (W.D. Wash. Sept. 11, 2023) (facts recited in an expert opinion "comprise the groundwork on which an expert opinion is based; they are not themselves expert opinion."). Rule 26 obligated Plaintiff to disclose the opinions Dr. Drumwright presented at trial—it does not place the onus on Uber to infer every conceivable opinion that the facts cited in her massive report might later support. But at trial, Dr. Drumwright wove her report's factual description of Uber's business model into a never-disclosed opinion about its supposed prioritization of growth over safety. Uber had no notice that she would so opine.

Just as Dr. Drumwright's general opinion is absent from her report, so are many of the specifics she relied on to spin it at trial—indeed many derive from documents sprung on Uber the day before her testimony in a "Supplemental Materials Considered List," *see* Ex. A (January 12, 2026, Corrected Supplemental Materials Considered List of Dr. Minette E. Drumwright), comprising more than 100 **new** documents:

- Dr. Drumwright's report nowhere states that Uber placed safety-decision making "in the very department that was the growth department," nor does it include her trial opinion that such a placement was an "inherent conflict." Tr. 330:14-22.; *see also* Tr. 334:16-19 ("There is an inherent conflict between being in charge of growing new supply and managing compliance and a need for checks and balances. So this is the safety part. It's like the fox guarding the henhouse in terms of setting priorities.").

- Dr. Drumwright's report does not state or cite evidence supporting her trial testimony "that people within Uber were concerned about the focus on growth compromising safety." Tr. 333:24-334:2. The sole evidence she cited for that

claim at trial was a document disclosed only in her last-minute supplemental reliance list.  *See* Ex. B (P-00176).

- The report does not preview Dr. Drumwright's recurring testimony that Uber's compensation structure incentivized growth over safety.  *See* Tr. 363:22-364:4 ("Q. And were there KPIs within the company that had some relation to safety? A. Yeah, there were. In fact, Dara himself had a tiny percentage of his compensation tied to safety, but the much bigger part was tied to growth. Q. Okay. And . . . after Dara took over, did you find . . . that growth continued at the company? A. Yes. Astronomical growth, in fact."); Tr. 361:14-19 ("when a leader has to weigh competing safety and growth consideration, growth often wins, and Uber's current growth culture rewards that leader by tethering growth measures to that leader's [Key Performance Indicators].").[3]  Her report stated no opinions about Uber's compensation structure at all, and the documents she quotes from were, again, disclosed to Uber the day before her testimony.  *See* Ex. C (P-01572).

- Nor does the report anywhere discuss Uber's liability insurance, much less suggest that Uber is "making trade-offs between how much are we going to spend on safety programs in order to reduce our insurance costs versus the cost in terms of reducing supply." Tr. 350:8-351:23.  The exhibit Dr. Drumwright relied on for that testimony, too, was first disclosed to Uber as reliance material the day before her testimony.  *See* Ex. D (P-04506).

Dr. Drumwright's "growth over safety" narrative is the definition of trial by ambush.  Neither the opinion nor the basis she offered for it could be anticipated from her report.  And the prejudice to Uber is immense:  The first witness from which the jury has heard is an expert who

---

[3] The report's sole mention of "key performance indicators" relates to the categories of sexual assault and misconduct that Uber evaluated as part of its safety "key performance indicators." Drumwright Rep. at 174, n. 779.

-11-
DEFENDANTS' MOTION TO STRIKE
CASE NO. 3:23-md-03084-CRB

trumpeted Plaintiff's trial theme with extensive testimony that Uber had no meaningful opportunity to test by deposition and pretrial motion.

### B. Dr. Drumwright's Report Did Not Disclose Her Opinion that the "Sticky" Nature of Corporate Culture Impaired Change After CEO Dara Khosrowshahi.

Plaintiff has already made clear that she intends to pursue liability by associating Uber with controversial former CEO Travis Kalanick, who stepped down from that role more than six years before the alleged assault. Dr. Drumwright laid the foundation for that trial theme by offering multiple opinions about corporate dynamics that she asserted impaired change under current CEO Dara Khosrowshahi.

Dr. Drumwright testified that "how bringing Dara in as the new CEO" was "one of the things I really wanted to analyze," to "see if I saw changes in the documents, in what people were saying, in the kinds of trade-offs that were or were not being made." Tr. 349:21–350:1. Asked if "changing leadership can change how a company operates," Dr. Drumwright testified that "at best it's a long and slow process; and that's because certain patterns, certain policies, people have been entrenched and old ways of doing things are hard to change. So things are slow at best." Tr. 349:10–15. Referencing Mr. Kalanick's transition to Uber's Board, she added that such transitions "often fail, particularly if all you do is change one person and then you make them the boss of the CEO and the board." Tr. 349:15-17; *see* Tr. 349:18-19 ("Q. Because during this time Mr. Kalanick was – A. On the board."). Dr. Drumwright opined that certain post-2017 documents showed that "there are a lot of things that are sticky in an organization," meaning that "they are hard to change—especially when you have mechanisms like compensation tied to growth or more tied to growth than safety," adding that while Mr. Khosrowshahi "had a tiny percentage of his compensation tied to safety," the "much bigger part was tied to growth." Tr. 363:15-21, 363:24-364:1. Based on her review of Uber documents and such alleged structural features, she gave her "overall conclusions that growth was still prioritized over safety" under Mr.

Khosrowshahi.  Tr. 350:4.[4]

If Dr. Drumwright "really wanted to analyze" how Mr. Khosrowshahi's appointment affected Uber's culture and safety practices, Tr. 349:23–24, her opportunity to do so was her report.  She did not:  Her report did not opine on Uber's relative corporate practices over time, did not address the mechanics of leadership transitions, did not mention the "stickiness" of organizational culture, did not reference Mr. Kalanick's Board seat, and did not discuss Mr. Khosrowshahi's compensation incentives.  Uber did not learn that Dr. Drumwright would offer extensive expert validation for this trial theme until hearing her testimony at trial.

### C. Dr. Drumwright's Report Did Not Disclose Her Opinion that RideCheck "Does Nothing."

Dr. Drumwright's report mentioned RideCheck only in a catalog of Uber's safety features, offering no opinions about it other than speculation that an asserted increase in incidence of sexual assault and misconduct suggests that Uber's safety features as a whole—not RideCheck in particular—either "result[ed] in more vulnerable customers taking Ubers in risky contexts more frequently" or "could suggest that the safety features themselves were ineffective."  Drumwright Rep. ¶ 366.  At trial, by contrast, Dr. Drumwright testified that "[b]ased on what [she] could tell" from her "review of the marketing materials and also internal discussions of Ridecheck, . . . RideCheck does nothing."  Tr. 405:2-8.  Dr. Drumwright further testified that she "didn't see any evidence" in "internal Uber documents . . . that RideCheck actually made Uber rides safer," and that Uber's marketing of RideCheck was therefore "not truthful . . . safety washing."  Tr. 407:4-13.

Having disclosed nothing about RideCheck in her report other than that it coincided with an alleged increase in sexual assault and misconduct rates, Dr. Drumwright told the jury that,

---

[4] *See also, e.g.*, Tr. 346:16–19 ("Q. Now, you said that Mr. Kalanick was fired. Did he, in fact, remain on the board of Uber, however? A. He did. In fact, the board is the boss of the CEO. So you could argue he got promoted."); Tr. 347:6–13 ("Q. Now, was there a marketing campaign all about Mr. Khosrowshahi . . . stepping up or coming to the company to be the CEO? A. Yes, as part of its crisis management Uber had a campaign called 'Moving Forward,' which was a 60 million dollar campaign in the US in a three-and-a-half-month period to introduce the new CEO, to talk about safety, to argue that Uber has changed.").

1  based on her expert analysis of Uber documents, the feature does nothing and Uber misled the
2  public (and the jury) about its utility.  Nothing in the cherry-picked documents she reviewed
3  provides a basis to assess the actual efficacy of such features. Regardless, this opinion was not
4  disclosed in Dr. Drumwright's report.

      **D.    Dr. Drumwright's Report Did Not Disclose a Variety of Additional Opinions Presented at Trial.**

Dr. Drumwright offered a variety of additional opinions at trial that were never disclosed in her report:

- ***Driver Cancellation.***  Dr. Drumwright opined that a "driver cancel[ling] the trip midway" is a "big" risk factor that contributes to sexual assault, and that "what we fear in this context is the driver cancelled the trip to do something unseemly." *See* Tr. 380:16-21. Her report discusses other purported risk factors, but not driver cancellation, which Plaintiff apparently intends to use as a case-specific opinion about Mr. Turay.

- ***Targeting Hispanics.*** Dr. Drumwright testified that Uber was specifically "targeting its Hispanic population" in Phoenix. Tr. 397:19-398:9. Her report did not disclose that apparent case-specific opinion, either.

- ***Industry standards for Safety Reports***. Dr. Drumwright opined that Uber's Safety Report was not novel because "many companies release transparency reports," citing Google and Meta. Tr. 389:14-390:3. Her report does not disclose her strained comparison of Uber's disclosure of sexual assault and misconduct incidents to other companies' disclosures of user data disclosed to law enforcement–a false equivalency that serves only to mislead the jury.

- ***Consumer recall of "Themes" vs. "Ads."*** Dr. Drumwright testified that "What people remember, we hope, are the themes, the general themes of the ads," rather than specific advertisements. Tr. 378:4-9. This opinion regarding consumer psychology and recall was not disclosed. On the contrary, at her deposition, Dr.

-14-
DEFENDANTS' MOTION TO STRIKE
CASE NO. 3:23-md-03084-CRB

Drumwright admitted that this theory was "not a topic [she] really addressed in [her] report." *See* Drumwright Dep. at 56:7–58:6.

### E. Rule 37 Requires that Dr. Drumwright's Undisclosed Opinions Be Stricken.

Under Rule 37, the mandatory remedy for that trial ambush is striking of Dr. Drumwright's undisclosed testimony. An expert's report must include "a complete statement of all opinions [Plaintiff's expert] witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). "Expert disclosures under Rule 26 are intended to provide opposing parties fair notice of an expert's opinions." *Camenisch v. Umpqua Bank*, 763 F. Supp. 3d 871, 883 (N.D. Cal. 2025). "If a party fails to provide information or identify a witness as required by Rule 26(a)," the party "is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37 is "harsh" and "self-executing," "forbidding the use at trial of any information required to be disclosed . . . even when a litigant's entire cause of action or defense has been precluded." *Id.*, advisory committee's note to 1993 amendment (cleaned up); *see Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). "The burden is on the party facing exclusion of its expert's testimony" to prove the failure to disclose was justified or harmless. *Id.* at 1107.

Dr. Drumwright's extensive testimony on undisclosed topics certainly was not justified. None of Dr. Drumwright's new opinions related to late-breaking developments—she simply blindsided Uber with opinions that Plaintiff could have timely disclosed through a qualified expert, but did not. And it is implausible to believe that Dr. Drumwright's deviation from her report was inadvertent. Dr. Drumwright was Plaintiff's first trial witness and by all appearance one through whom Plaintiff hoped to introduce a variety of key trial themes—Plaintiff had every opportunity to craft a direct examination honoring the Court's admonition that "the direct testimony of experts at trial will be limited to the matters disclosed in their reports." PTO 38 at 4.

Far from harmless, her failure to do so threatens severe prejudice. The undisclosed testimony lends Dr. Drumwright's expert blessing to both Plaintiff's central trial themes and

disputed factual claims—many of which exceed her expertise, and none of which Uber had the opportunity to test in advance of trial. The Court should enforce its Rule 37(c)(1) and strike Dr. Drumwright's undisclosed opinions in their entirety.

Dated: January 15, 2026       **KIRKLAND & ELLIS LLP**

By: /s/ *Laura Vartain Horn*

      **KIRKLAND & ELLIS LLP**
      LAURA VARTAIN HORN
      KIM BUENO
      ALLISON M. BROWN
      JESSICA DAVIDSON

      **O'MELVENY & MYERS LLP**
      SABRINA H. STRONG
      JONATHAN SCHNELLER

      *Counsel for Defendants*

DEFENDANTS' MOTION TO STRIKE
CASE NO. 3:23-md-03084-CRB