1 | [*Submitting counsel below*]

UNITED STATES DISTRICT COURT
OF NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PORTIONS OF DRUMWRIGHT TESTIMONY**<br><br>Judge: Honorable Charles R. Breyer<br>Ctrm.: D. Ariz., 501 |
| This Document Relates to:<br><br>*Jaylynn Dean v. Uber Techs., Inc.*,<br>N.D. Cal. No. 23-cv-06708<br>D. Ariz. No. 25-cv-4276 | |

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| JAYLYNN DEAN,<br><br>    Plaintiff,<br><br>    v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>    Defendants. | No. 25-cv-4276-PHX-CRB<br><br>Judge: Honorable Charles R. Breyer<br>Ctrm.: 501 |

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ....................................................................................................................... 2

I.     Dr. Drumwright's trial testimony did not exceed the scope of her reports. ........................ 2

     A.     Uber's prioritization of growth over safety is part of Dr. Drumwright's disclosed opinions. ................................................................................................ 2

     B.     Dr. Drumwright's discussion of Uber's corporate history reflects fully-disclosed factual background to her opinions. ........................................................ 7

     C.     The contrast between how Uber marketed RideCheck and what it knew about RideCheck is within the scope as one example of Uber falsely marketing safety features. ................................................................................... 8

     D.     The scattered "opinions" Uber challenges are all within the scope of Dr. Drumwright's report. ............................................................................................. 8

II.     Any minor deviations from Dr. Drumwright's reports are harmless. .............................. 10

CONCLUSION .................................................................................................................. 12

|   |   |
|---|---|
| 1 | **INTRODUCTION** |

2  Dr. Drumwright testified within the scope of her disclosed opinions. She is a marketing expert who "review[ed] and evaluate[d] the actions and statements of Uber [] as they relate to how the company marketed the safety of its rideshare business." Drumwright Rpt. ¶ 1. A central method of her analysis was comparison between Uber's words in its marketing and strategic communications—what it told passengers and the public—and its actions—how its executives made decisions concerning Uber's business given the information available to them—and weighing the differences in light of self-stated and external marketing standards. *See id.* ¶¶ 18-25 (explaining methodology).

Uber's motion seeks to cleave Dr. Drumwright's opinions in half—to separate what Uber said from what Uber leaders and executives knew and what they did with respect to safety, including in making decisions that choose the business's growth objectives over user safety. But a critical question Dr. Drumwright sought to answer, and was permitted to opine on, is whether Uber's marketing was responsible or irresponsible. And that issue cannot be resolved in the abstract; rather, the propriety of "the promises that companies have made to their customers" depends on whether those companies in fact "fullfill" those "promises." *Id.* ¶ 31. One cannot evaluate the message "Uber rides are safe" without asking whether the messenger has information showing Uber rides are or are not safe. And one cannot evaluate the message that "Uber is committed to safety" without evaluating whether Uber is committed to safety. *See, e.g., id.* ¶ 163 ("The problem was not the amount of money Uber spent on marketing …. The problem was that Uber was spending billions of dollars marketing its rides as safe without disclosing the dangers and risk factors."). Relatedly, one cannot opine on whether Uber's "commitment to safety" messaging after the new CEO took over evidenced pseudo-corporate social responsibility without considering whether Uber continued to make such trade-offs even under new leadership. *See, e.g., id.* at ¶¶ 149, 431. Dr. Drumwright evaluated all of that information and used it to reach her opinions. She then provided trial testimony consistent with those opinions.[1]

---

[1] Uber's suggestion (at p.3) that Dr. Drumwright's testimony constituted impermissible narrative does not present a basis for striking trial testimony. Uber also never objected on this ground during

1   Uber's motion is also premised on the incorrect claim that Dr. Drumwright relied on
2   documents not included in her September 2025 materials considered list (MCL). As discussed
3   below, every example Uber cites was in fact identified, in September 2025, as a document on which
4   Dr. Drumwright relied.

5   The motion to strike should be denied.

## LEGAL STANDARD

Rule 26 requires that an expert witness's report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(b). Opinions offered at trial must be "either explicitly contained in" a "previously-provided expert report or a reasonable synthesis and/or elaboration of the opinions contained in that report." *Asetek Danmark A/S v. CMI USA, Inc.*, 2014 WL 6997670, at *1 (N.D. Cal. Dec. 9, 2014) (internal quotation marks omitted). In applying the rule, it bears emphasis that "[t]he purpose of expert reports is not to replicate every word that the expert might say on the stand." *Kanellakopoulos v. Unimerica Life Ins. Co.*, 2019 WL 2029071, at *5 (N.D. Cal. May 8, 2019) (internal quotation marks omitted). Rather, "[t]he purpose is … to convey the substance of the expert's opinion … so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Id.* For that reason, "Rule 26 does not limit an expert's testimony simply to reading his report, but rather contemplates that the expert will supplement, elaborate upon, and explain his report in his oral testimony." *Sandier v. Doe*, 2025 WL 723848, at *4 (E.D. La. Mar. 6, 2025). Even testimony that exceeds the scope of an expert's report is permissible if the late disclosure is substantially justified or harmless. *See* Fed. R. Civ. P. 37(c)(1).

## ARGUMENT

**I.    Dr. Drumwright's trial testimony did not exceed the scope of her reports.**

   **A.    Uber's prioritization of growth over safety is part of Dr. Drumwright's disclosed opinions.**

The principal portion of testimony that Uber challenges consists of statements concerning

---

the relevant portions of Plaintiff's examination of Dr. Drumwright. *See, e.g.*, *Jerden v. Amstutz*, 430 P.3d 1231, (9th Cir. 2005) ("An objection must be made as soon as the ground of it is known, or could reasonably have been known to the objector, unless some special reason makes its postponement desirable for him and not unfair to the offeror.") (citation omitted).

1  Uber's prioritization of growth over safety. Because the relationship between growth and safety is
2  core to Dr. Drumwright's report, the motion should be denied.

3        Dr. Drumwright opined that Uber's marketing was reckless because "the company was
4  focused exclusively on improving the perception of safety and safety sentiment rather than actual
5  safety." Drumwright Rpt. ¶ 194. Why did Uber disregard "actual safety" in favor of the "perception
6  of safety?" Because Uber is run by evil executives who are trying to hurt people? Of course not.
7  Dr. Drumwright explained: growth. *See id.* ¶ 163 ("Uber had information that safety and trust were
8  critical attributes for the usage and growth of its rideshare business. And so, in the face of its internal
9  knowledge about the sexual violence problem on Uber, Uber spent *billions* of dollars marketing
10 Uber rides in the U.S. as safe without disclosing the dangers and risk factors.").[2]

11       By promoting the "perception of safety" to fuel growth, Uber compromised actual safety—
12 for example, by targeting its marketing to "those most vulnerable to sexual violence during Uber
13 rides" with marketing that "emphasize[d] safety." *Id.* ¶¶ 297-98; *see also id.* ¶ 149 (explaining that
14 such "anti-warnings … contradict or eviscerate true warnings"); *id.* ¶ 227 ("False narratives such
15 as these can mislead not just passengers, who reduce their defenses, but also watchdog
16 organizations and regulators, who lessen their scrutiny."); *id.* ¶ 312 (explaining that Uber's "anti-
17 warnings" contradicted its "commitment to safety"); *id.* ¶ 266 (explaining that Uber's "anti-
18 warnings result[ed] in more vulnerable customers taking Ubers in risky contexts more frequently").
19 In other words, Uber prioritized growth over safety. *See Salvatora v. XTO Ener. Inc.*, 2023 WL
20 4137306, at *10 (W.D. Pa. June 2, 2023) ("Expert testimony is proper where it is a logical and
21 reasonable inference from language contained in the report.") (internal quotation marks omitted);
22 *Nichols v. Tillman*, 2012 WL 1934435, at *3 (S.D. Miss. May 29, 2012) (overruling scope objection
23 where report included "particular statements … which could be reasonably interpreted to form the
24 basis for [the expert's] testimony").

---

[2] *See also id.* ¶ 173 ("Unlocking trust and safety sentiments can lead to business growth and long-term good will."); *id.* ¶ 178 (identifying documents showing that "SAFETY = OPPORTUNITY FOR GROWTH" and calling for a "constant drumbeat of safety messaging"); *id.* ¶ 181 (finding that Uber concluded that "safety sentiment is strongly correlated to business usage, which supports the hypothesis that, if [safety sentiment] is unaddressed, growth will be harder").

In explaining how growth drove Uber's marketing choices, Dr. Drumwright's report discussed explicitly the nature of Uber's business model and how the needs of that model—the need to grow the supply of driver hours and the related need to grow the volume of ridership—shaped the company's marketing strategies. *See C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 698-99 (5th Cir. 2001) (finding no abuse of discretion in admitting expert testimony where the "objections were to questions on subjects which were mentioned in the expert report"). Her report includes a ten-page section titled "Uber's Rideshare Business Model." *Id.* § V. Uber says that this discussion is mere "factual description" and not properly included in trial testimony in support of Dr. Drumwright's opinions. Not so. In that section, Dr. Drumwright explains that "Uber's core value proposition is based on building a network of drivers (supply) and passengers (demand) …" *Id.* ¶ 63. She shows, using the exact same image displayed during her testimony, how "Uber must recruit both drivers and riders through aggressive marketing because the larger the network, the greater the value to Uber." *Id.* "As such, scale is essential, and recruiting many drivers quickly in every market is key to success." *Id.* ¶ 54. And she explained that, of Uber's self-identified "factors upon which its growth depended," the "first" was "grow supply [drivers] and demand [e.g., passengers] on our platform." *Id.* (alterations in original). This is not mere "factual description:" As explained above, Dr. Drumwright opines that the need for growth led Uber to engage in misleading and irresponsible safety communications with consumers and the public.

Dr. Drumwright also wrote extensively about how Uber contradicted its own express commitment to *stop* putting growth over safety. Specifically, her report discusses Uber's 2017 "Stand for Safety" campaign, which communicated that "Safety never stops" and "We embed safety in everything we do." *Id.* ¶ 194. As she explained at trial, the premise of the campaign, according to Mr. Khosrowshahi himself, was that "[w]hile we've made efforts to be safe, we've also made tradeoffs," meaning "trade-offs between safety and growth." Trial Tr. at 348:2-9. "Not anymore." Ex. 01572.00009; *see also* Drumwright Rpt. ¶ 486 (discussing Mr. Khosrowshahi's new mantra: "Do the right thing. Period.").

Dr. Drumwright's report explains how Uber's communications strategy contradicted those stated values because Uber in fact did not change its ways—among other examples, it continued to

promote safety sentiment rather than actual safety—because safety sentiment remained key to growth. *See, e.g., id.* ¶ 173. In other words, when Dr. Drumwright opined that Uber's conduct was inconsistent with the commitments made in "Stand for Safety" campaign, she concluded that the "tradeoffs" between growth and safety—that Mr. Khosrowshahi swore were in the past—in fact were still the company's lodestar.

Uber needed growth. *See id.* § V. Uber knew that safety marketing was key to growth. *See id.* ¶¶ 163, 173, 179, 181, 194. As a result, Uber promoted safety sentiment rather than actual safety. *See*, *e.g.*, *id.* 194. Therefore, Uber prioritized growth over safety. This reasoning permeates Dr. Drumwright's report and is logically connected to and supportive of her opinions concerning Uber's marketing. *See Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011) ("Although his testimony uses different words than the expert report, it was a reasonable elaboration of the opinion disclosed in the report …"); *Thompson v. Doane Pet Care co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) (rejecting "magic words" requirement).

Uber nitpicks Dr. Drumwright's testimony, as if every sentence an expert utters must appear in her report. That is not the rule. *See nCube Corp. v. SeaChange Int'l, Inc.*, 809 F. Supp. 2d 337, 347 (D. Del. 2011) ("[C]ourts do not require 'verbatim consistency with the report[.]'") (citation omitted). Uber does not cite a single case finding testimony outside the scope of an expert's report, let alone one that scrutinizes testimony, line-by-line, based on an overbroad "standing objection."[3] As the Court recognized in denying Uber's request to limit the scope of Dr. Valliere's testimony, experts are permitted to elaborate on their opinions and the bases for them, so long as the opposing party is given fair notice of the opinions. *See* Trial Tr. at 564:4-15 (permitting testimony on topics "not detailed in any manner" in report but which were "examples of that which was disclosed").

Regardless, each of Uber's examples is amply supported by Dr. Drumwright's report:

---

[3] After Uber sent Plaintiff objections to Dr. Drumwright's exhibits, Uber informed Plaintiff it would not file anything with the Court. Plaintiff, concerned about disruption during live examination, insisted on filing the parties' positions in a chart. *See* ECF 4989-1. Uber did nothing else. Uber could have filed a trial brief detailing its most critical objections, permitting the Court to resolve the issues before Dr. Drumwright testified. Uber declined to do so. Instead, at trial, Uber offered a "standing objection" to *all* of Dr. Drumwright's opinions. *See* Trial Tr. at 318:15-18 ("[M]ay I make a standing objection to all of the opinions as written as outside the scope?").

1    **Screening**. Dr. Drumwright's observation that "the screening was in the very department that was the growth department" was in response to a question about whether she identified "concerns within the company that the screening … was not as high quality as it should be because company was growing the number of drivers so quickly," (and in contrast to the company's external communications about its screening). Trial Tr. at 330:14-20. Dr. Drumwright's report has an entire opinion contrasting Uber's marketing about its background checks with internal concerns about the "quality" of those checks. Drumwright Rpt. ¶¶ 202-39. The observation at trial, based on an Exhibit (694) that was included in her MCL and that expressly recognized the "inherent conflict," is simply a fact that supports her fully-disclosed opinion.

**Internal Concerns**. Uber says that "Dr. Drumwright's report does not state or cite evidence supporting her trial testimony 'that people within Uber were concerned about the focus on growth compromising safety.'" Mot. at 10. The basis for this claim is the contention that Dr. Drumwright's testimony was based only on a document not in Dr. Drumwright's September 2025 MCL. Uber is doubly incorrect. The document (Exhibit 176) *was* included on Dr. Drumwright's original MCL as an exhibit to the Dobbs deposition (and was separately admitted when that deposition was played). More pertinently, her testimony on this point was actually supported by a quote in Exhibit 694. *See* Trial Tr. at 335:1-3 ("we are probably sub optimizing the trade-offs between on-boarding criteria and safety"). (Exhibit 694 too was included on Dr. Drumwright's September MCL.). In any event, experts may rely on new documents, so long as the testimony remains permissible elaboration of disclosed opinions. *See In re Stand "N Seal Prods. Liab. Litig.*, 636 F. Supp. 2d 1333, 1336 (N.D. Ga. 2009) ("The Defendants say that this is the first time that [the expert] has cited to this source. But she does not rely on this source to provide new opinions.").

**Compensation**. Uber says that "[t]he report does not preview Dr. Drumwright's recurring testimony that Uber's compensation structure incentivized growth over safety." Mot. at 11. *First*, two snippets hardly constitute "recurring testimony." *Second*, how executives are compensated (publicly available facts) is a subordinate point to Dr. Drumwright's larger discussion of growth incentivizing promotion of safety sentiment at the expense of actual safety. *Third*, Dr. Drumwright's report discussed and cited documents concerning how Uber tied safety into its "key

1  performance indicators" as part of analyzing how Uber portrayed its risk in its safety reports.
2  Drumwright Rpt. ¶ 457 n. 779. *Fourth*, Uber incorrectly contends that the document Dr.
3  Drumwright quoted was not disclosed. Uber is doubly incorrect. The document Uber references
4  (Ex. 1572) *was* disclosed in Dr. Drumwright's September 2025 MCL as an exhibit to the Kaiser
5  deposition. And the document Dr. Drumwright quotes is actually Exhibit 870, which was also
6  disclosed in September. *See* Trial Tr. at 361:14-19 (quoting Ex. 870).

**Insurance Tradeoffs**. Finally, Uber argues that Dr. Drumwright discussed Uber analyzing the tradeoffs between "insurance costs" and "cost in terms of reducing supply" based on a non-disclosed document. This is incorrect. The document—Exhibit 4506—*was* disclosed in September as an exhibit to the Hazelbaker deposition, which is among the depositions Dr. Drumwright considered in forming her opinions. And this portion of her testimony actually relied on Exhibit 195, which too was disclosed as an exhibit to the Dobbs deposition (and was separately admitted when that deposition was played). On the substance of the testimony, experts are permitted to select exemplar documents to explain their opinions to the jury. Here, Dr. Drumwright discussed this document as an example of Uber's pseudo-corporate social responsibility—wherein Uber's leadership indicated it would no longer make trade-offs when it came to safety but in fact made exactly those trade-offs.

**B.   Dr. Drumwright's discussion of Uber's corporate history reflects fully-disclosed factual background to her opinions.**

Uber objects to Dr. Drumwright's explanation that the evidence she saw of Uber's practices did not meaningfully vary with Uber's much-touted change in leadership, and that this lack of change was consistent with her general understanding of corporate practices (not Uber-specific). *See* Mot. at 12. But Dr. Drumwright's report discusses the corporate history of the company, including Mr. Kalanick's resignation. *E.g.*, Drumwright Rpt. at ¶ 80. It would be hard to analyze Uber's corporate practices in any sense, let alone its "corporate governance related to marketing and advertising," *id.* ¶ 13, without acknowledging and discussing this moment in time that the company itself represents (and has represented in this trial) was a sea-change in its approach to safety. In particular, as discussed above, Dr. Drumwright highlights the "Stand for Safety" initiative purported to be (but in fact not) a clean break from the Kalanick era. Most of the testimony excerpts

1  Uber cites are simply anodyne factual discussion of this background history. Indeed, testimony
2  Uber highlights includes discussion of Uber's 2017 "marketing campaign"—obvious fodder for a
3  marketing expert analyzing Uber's marketing. *See Gumbs-Heyliger v. CMW & Assocs. Corp.*, 2014
4  WL 5472567, at *4 (D.V.I. Oct. 29, 2014) ("Delman's report detailed Plaintiff's efforts to find a
5  job. While the report does not contain an opinion about the reasonableness of those efforts, this
6  testimony is consistent with the report and is a reasonable synthesis and/or elaboration of the
7  opinions contained therein.") (internal quotation marks omitted).

8       Dr. Drumwright's discussion on this point goes to show that her opinions did not change
9  from one time period to another. That conclusion is clearly laid out in her report, as her opinions
10 discuss practices that were consistent from before and after 2017. *See*, *e.g.*, Drumwright Rpt.
11 ¶¶ 204-13 (discussing Uber's background-check marketing from 2014 to 2021).

12      **C.**    **The contrast between how Uber marketed RideCheck and what it knew about RideCheck is within the scope as one example of Uber falsely marketing safety features.**

14      Dr. Drumwright opined that Uber's marketing was irresponsible because the company
15 promoted safety features that Uber knew did not improve safety, while declining to adopt safety
16 initiatives that it knew would have worked. *See* Drumwright Rpt. ¶¶ 329-81. As examples, Dr.
17 Drumwright explained that "Uber's marketing included a number of safety features (e.g.,
18 RideCheck, Share my trip, Realtime ID-check)" that did not show Uber made a meaningful
19 improvement in safety. *Id.* ¶ 366. So, it was appropriate for Dr. Drumwright to discuss at trial
20 Uber's marketing of RideCheck and its internal acknowledgement of the tool's limitations. Even if
21 she hadn't mentioned RideCheck specifically in her report (she did), it would have been appropriate
22 for her to identify it as an example of a larger opinion. *See* Trial Tr. at 564:4-15 (permitting
23 testimony on topics "not detailed in any manner" in report but which were "examples of that which
24 was disclosed"). Nor did Uber object to this testimony when given (RideCheck was not part of the
25 "standing objection").

26      **D.**    **The scattered "opinions" Uber challenges are all within the scope of Dr. Drumwright's report.**

27      Uber closes with a scattershot of testimony that it says veers too far from Dr. Drumwright's
28 report. Uber did not object to any of this testimony in the moment, and none were included in

1    Uber's "standing objection." Regardless, each example is appropriate expert testimony.

2        **Driver Cancellation**. Dr. Drumwright's report explains how Uber concealed "risk factors and predictors of safety problems," including "predictors of inappropriate driver behavior." Drumwright Rpt. ¶ 240. The document cited in her report on that point specifically included driver cancellation as a predictor. *See* Drumwright Rpt. ¶ 240 n. 454. That this fact is relevant to Ms. Dean's case (any facts not relevant to her case would, of course, be inadmissible) makes Dr. Drumwright's choice to highlight it helpful, not inappropriate.

        **Targeting Hispanics**. Dr. Drumwright's testimony on this point analyzed a document (Ex. 306) that she cited and discussed in her report. *See* Drumwright Rpt. ¶ 253 & n.474. The content of her testimony—that Uber's marketing targeted specific demographics—logically flows from the discussion in her report regarding how companies, including Uber, engage in sub-population targeting. *See id*. ¶¶ 240-311. That she references an example of Uber conduct that was specific to Phoenix does not render it impermissibly "case-specific" as Uber suggests. Her testimony helps the jury understand how advertising, especially Uber advertising, could target specific demographics, and thus elucidates on the points set out in her expert report, using a document specifically cited in that report. *See Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 2010 WL 2044931, at *2 (D. Del. May 20, 2010) (denying motion to strike where expert "provide[d] greater detail on the processes he had mentioned" in his report).

        **Other Companies Releasing Transparency Reports**. Dr. Drumwright's report explains and relies on the concept of "pseudo-corporate-social-responsibility," where a company adopts "strategic communication strategies[] that enable them to appear to be socially responsible while continuing to operate their businesses in ways that have a negative impact on consumers and society." *Id*. ¶ 148. She explains that one form of this is an "anti-warning," which can include things like "safety reports." *Id*. ¶ 149. In the testimony Uber challenges, Dr. Drumwright testifies to exactly what she said in her report: "many companies release transparency reports or safety reports or impact reports," generally "on the factors they're most criticized," which, of course, is not always "sexual assault information." Trial Tr. at 389:18-390:3.

        **Consumer Advertisement Recall**. Uber argues that Dr. Drumwright may not state that

1  people typically recall "general themes of ads" rather than "specific advertisements." Trial Tr. at
2  378:8-9. This is basic stuff for a marketing expert—Dr. Drumwright could not analyze Uber's
3  marketing without applying her expertise as to how marketing works on consumers. *See Thompson*,
4  470 F.3d at 1203 ("it may be assumed that [experts] base their … opinions on the normal general
5  standards of their profession"). Uber obviously appreciated that Dr. Drumwright opined on
6  consumer perception because it moved to exclude her opinions on "the impact of marketing on
7  consumer behavior," specifically criticizing her discussing how the bellwether Plaintiffs "were
8  recalling … themes in ads and not specific ads." ECF 4351 at 4. Uber further addressed this topic
9  with Dr. Drumwright at deposition: "Q: You also said that, as academics, you don't expect people
10 to remember specific ads. Do you remember saying that? A: I do. … What we find is that … people
11 tend to remember themes, if anything at all, even when they've seen ads. It's hard to remember
12 specific ads, because we are bombarded with so many, and so there certainly is academic literature
13 on how poorly people remember specific ads …." Drumwright Dep. at 54:20-55:1-6. Dr.
14 Drumwright's testimony on this point is therefore well within scope and wholly appropriate. *See*
15 *Lawes v. CSA Architects & Eng'rs LLP*, 963 F. 3d 72, 94 (1st Cir. 2020) ("At bottom, the district
16 court does not explain how, in view of the deposition excerpts available to it, CSA was surprised"
17 by expert testimony.); *nCube*, 809 F. Supp. 2d at 347 ("A key consideration when determining
18 whether testimony is beyond the scope of an expert report is whether the objecting party had notice
19 of the subject matter of the testimony based on the contents of the report and elaborations made
20 during any deposition testimony.").

**II.     Any minor deviations from Dr. Drumwright's reports are harmless.**

Even if the Court concludes (or assumes) that portions of Dr. Drumwright's testimony exceeded the scope of her reports, any such deviations are harmless. To start, the "thrust of| Dr. Drumwright's" testimony concerning Uber executives' weighing of growth versus safety "would not have been surprising to" Uber. *Withrow v. Spears*, 967 F. Supp. 2d 982, 1004 (D. Del. 2013) (denying motion to strike). Plaintiff's contention that Uber, using marketing as the vehicle, prioritized growth over safety has been in this case from the very beginning. *See, e.g.*, MC ¶ 346 ("Prioritizing profits over safety, Uber and its executive officers also made the conscious decision

-10-                                      PL'S OPPOSITION TO DEFS.'
                                          MOT. TO STRIKE DRUMWRIGHT
                                          N.D. CAL. NO. 3:23-MD-03084; D. ARIZ. NO. 25-CV-4276

not to warn its customers or users of the risk of being assaulted …"); *see also id.* ¶¶ 10-13, 133, 225-39, 372-73: PTO 17 at 3-4. In many ways, this is what the case is about, and plainly has been about all along. *See Schneider v. Molony*, 418 F. App'x 392, 396 (6th Cir. 2011) (affirming denial of motion for new trial where experts' undisclosed "statements concerning standard of care were not surprising revelations" and "[t]o the contrary, his statements described practices employed by almost any human being in daily life—weighing costs versus benefits when making decisions, consulting the normal approach taken in a certain situation, considering a variance from the normal approach when necessary"); *Lorme v. Delta Air Lines, Inc.*, 251 F. App'x 619, 692-93 (2d Cir. 2007) (affirming denial of motion to preclude where previous filings in the case "put [the plaintiff] on notice" of the substantive issue discussed in the expert's testimony).

Uber had every opportunity to challenge Dr. Drumwright's opinions. Notably, Uber did not serve a single expert rebuttal to Dr. Drumwright, and there is no evidence it would have done so had her report included even verbatim replication of her trial testimony. Uber also filed a *Daubert* motion challenging Dr. Drumwright's methodology of comparing Uber's actions and statements to its own stated standards of conduct (including the priorities committed to in "Stand for Safety"), a motion the Court denied in relevant part.

Uber also was able to explore Dr. Drumwright's testimony on cross-examination. *See Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 423 (3d Cir. 2006) ("whatever surprise there might have been was adequately cured by Hill's cross-examination of [the expert]"). Uber emphasizes that Dr. Drumwright was the first witness in the case, but that fact ameliorates rather than accentuates any prejudice. Uber had, and largely still has, an entire trial to develop whatever evidence it wants on the company's relative weighing of growth versus safety, an issue that has been front-and-center since the initiation of the case, and one fully explored through discovery.

Uber also cannot demonstrate any harm from the granular statements that it seeks to strike. There is no surprise or inadequate record on anything Dr. Drumwright said. For example, if Uber seeks to rebut the narrow contentions identified on pages 10-11 of its motion, it has countless hours of video testimony from its own executives to use. The company also has a live corporate witness, Sachin Kansal, designated to testify "concerning Uber's commitment to safety …." ECF 4840 at 3.

As to the question of whether Uber's practices remained consistent with the leadership transition to Mr. Khosrowshahi, Uber has made that transition key to its defense, already emphasizing it in testimony played to the jury. For example, Uber designated testimony from Jill Hazelbaker that:

> The company has been on, as we've discussed today, quite a journey. And from the early days where, obviously, there were things that we -- we needed to work on and systems that we needed to shore up. When Dara arrived, we invested in our safety products and our technology and our features. In fact, we shipped more product in the five years that followed than we had during my tenure at the company. And so, you know, we really took this -- this duty to our customers seriously. And that's not to say that we didn't in the early days, but we had learned more. We did – we'd grown as a company. We'd evolved. We had executives with expertise and experience to really take things to the next level….

Hazelbaker Played Dep. at 402; *see also* Hasbun Played Dep. at 559-62 (examining Mr. Hasbun regarding "how the company has changed during [his] tenure at Uber," with emphasis on the 2017 transition); *id.* at 557 ("And where we're at today compared to where we were back in the 2010s, it's a completely different experience.").

The other topics raised in the motion also have been or will be fully explored at trial, including Uber's conclusions about the efficacy of RideCheck, the risk factors Uber identified, the value or lack thereof of the Safety Reports, and the targeting and success of Uber's marketing.

## CONCLUSION

Plaintiff respectfully requests that Uber's motion to strike be denied.

Dated: January 18, 2026                         Respectfully submitted,

By: */s/ Sarah R. London*
    Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: */s/ Rachel B. Abrams*
    Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111

Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

## FILER'S ATTESTATION

I am the ECF User whose ID and password are being used to file this document. In compliance with N.D. Cal. L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: January 18, 2026      By:   */s/ Andrew R. Kaufman*
                                   Andrew R. Kaufman