# GZJ KDKV'B

# PLAINTIFF'S MOTION TO EXCLUDE PORTIONS OF HASSAN TURAY'S DEPOSITION TESTIMONY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 1

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

4

5    IN RE: UBER TECHNOLOGIES, INC.,   )
     PASSENGER SEXUAL ASSAULT          )
6    LITIGATION                        )
     _____  )
7                                      ) Case No.
                                       )3:23-md-03084-CRB(LJC)
8    This Document Relates to:         )
     Jaylynn Dean v Uber Technologies,)
9    Inc., et al.                      )
     (Case No. 3:23-cv-06708)          )
10   _____  )

11

12

13

14            VIDEOTAPED DEPOSITION OF HASSAN TURAY

15

                         Mesa, Arizona
16                       July 23, 2025
                           5:11 p.m.

17

18

19

20

21

22

23

     Reported by:
24   SHANNON STEVENSON,
     RPR, CCR
25   Certificate No. 50461        Job No. CS7503627

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 13

1    conversation, correct?

2        A    Yes.

3        Q    And what do you recall about that conversation?

4        A    Well, you and I, I think we spoke very briefly.

5    You know, you asked me about like when -- because I had

6    already talked with Michael, the other Michael,

7    previously and I had agreed to do the deposition.  I

8    think that's when he got you on the phone.  And you asked

9    me about, you know, if I could and when and what times,

10   you know.  So we talked about that.  I told you about my

11   availability for Wednesday and Thursday this week, and

12   you said we'll set it up.  I don't think we spoke for

13   more than 5 minutes.

14       Q    Okay.  And at any point during that

15   conversation I had with you, did I tell you anything

16   about what I intended to ask you at this deposition?

17       A    No, you did not.

18       Q    At any point did I ask you any questions about

19   what occurred between you and Ms. Dean back in

20   November 2023?

21       A    No, you did not.

22       Q    And so to be clear, Mr. Turay, you are here

23   voluntarily, right?

24       A    Yeah.

25       Q    And at no point during any conversations with

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 15

1      A     Well, my mom was a caregiver.  She was in a
2   different line of caregiving.  She worked mostly with
3   elderly, so the company that she worked for, I got -- I
4   got a couple of jobs from -- you know, from the guy, but
5   I wasn't getting enough hours.  And I remember one time I
6   went to pick up a paycheck from this guy.  I was getting,
7   like, maybe 20 or 30 hours, if even that.  But I went to
8   pick up my paycheck and I met this other lady who was
9   from Africa, and she was asking me, she said, how do you
10  like this job?
11           I said, well, you know, I like the job, you
12  know, it's okay, but I'm not getting the hours.
13           And then she told me about this company, and
14  she said, well, these guys will give you a lot of hours.
15  So that's how I got into like the, you know,
16  developmentally disabled aspect of it.
17           My mom was a caregiver, so that's what got me
18  into it in the first place.
19      Q     And do you find that work, being a caregiver,
20  did you find that to be rewarding?
21      A     Yeah.
22      Q     And where did you -- where did you work?  What
23  was the place of employment where you provided these
24  services?
25      A     So I worked at Aztec, I worked at Arizona

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 16

1    Mentor, I worked at Tungland, I worked at Valley Life.

2    Currently, I'm working at Consumer Advocacy Project, and

3    A New Beginning Group Homes.

4        Q    So other than the work you did as a caregiver,

5    and we'll talk about the Uber later, but did you have any

6    other jobs before you started driving for Uber?

7        A    I got -- I had gotten my real estate license,

8    but I feel like my game plan going into real estate was

9    not -- it wasn't a solid game plan.  Because I had the

10   idea of, okay, I'll be driving and having business cards

11   that I would pass out to my riders, but it wasn't like a

12   solid game plan, you know.

13       Q    Got it.

14       A    Nobody really wants to have their Uber driver

15   sell them a house, you know.  But that's -- you know,

16   that's -- I found that out.

17       Q    Mr. Turay, do you have any children?

18       A    I do have a daughter.  She's 18 years old.

19       Q    And do you currently care for your daughter?

20       A    Well, she -- not at the moment, no.

21       Q    Okay.

22       A    But she -- because she moved.  She moved out

23   when she turned 18 pretty much.  But, yeah, I have a

24   daughter.

25       Q    Are there any other -- do you have any family

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 17

1    members who live with you at your home?

2         A    No.

3         Q    So you live alone?

4         A    I have roommates.

5         Q    You have roommates, okay.

6              And who are your roommates?

7         A    I have a roommate called Vivian, she lives with

8    her daughter who is 20 years old; and I have another

9    roommate called Shante.

10        Q    Mr. Turay, have you ever been arrested before?

11        A    No.

12        Q    Have you ever -- so never arrested at all

13   through your --

14        A    No.

15        Q    -- forty -- how old did you say you were, 51?

16        A    51.

17        Q    51.   So never arrested at all through your 51

18   years?

19        A    No.

20        Q    In addition to, you know, kind of paid work, do

21   you -- have you done any volunteer work?

22        A    No.

23        Q    "No"?

24        A    No.

25        Q    All right.  So I want to talk and switch gears

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 30

1    the rides, I don't feel like they're that expensive to

2    where someone would try to get a refund.  I don't feel

3    like the refund would ever be like a motivation.

4        Q    Okay.

5        A    You know, because most times Ubers are not that

6    expensive.

7        Q    All right.  I want to show you another document

8    about this and ask you a couple questions.  We'll mark

9    this as Exhibit 3.  This is UBER-MDL3084-DFS00216676.

10           (Deposition Exhibit No. 3 was marked for

11   identification and attached hereto.)

12       Q    BY MR. VIVES:  And, Mr. Turay, I'll give you a

13   minute to just look at this document and look at the top

14   part of the document where you can see a complaint is

15   being made again by somebody named Jennifer.

16       A    Uh-huh.

17       Q    And you can see that this complaint being made

18   by Jennifer is on Monday, 25th of March 2019.

19           Do you see that?

20       A    Yes.

21       Q    And I'll represent to you that this is the same

22   person who made a complaint -- that prior complaint we

23   were just looking at related to you.  This is as to a

24   different driver.  Okay?

25       A    Oh.  Oh.  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 31

1        Q     If you look at those two documents, what jumps
2    out to you, Mr. Turay?
3              MR. PERKINS:   Objection.   Form.
4              THE WITNESS:   Well, it was -- oh, my goodness,
5    yeah.   It's like she says the exact same thing.   When I
6    saw this, I thought it was the same one.   I thought this
7    was the one for me, but it turns out -- so this is
8    someone else, okay.   Yeah.   Well, yeah.   That does stand
9    out on to me.
10       Q     BY MR. VIVES:   So the complaint -- the
11   complainant here is using the exact same language about
12   you as they are using about somebody else, correct?
13             MR. PERKINS:   Objection.   Form.
14             THE WITNESS:   Yeah.
15       Q     BY MR. VIVES:   And is that something that you
16   would have wanted to know in the moment when Uber was
17   investigating you that somebody had made the exact same
18   complaint about a different driver?
19             MR. PERKINS:   Objection.   Form.
20             THE WITNESS:   That would have been nice if Uber
21   had done that, but Uber does not do that.   And, in fact,
22   they -- you know, it's frustrating for me as a driver
23   sometimes, because they give me almost no information.
24       Q     BY MR. VIVES:   Based on your experience --
25   well, strike that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 39

```
 1      Q    BY MR. VIVES:  -- that this rider had made
 2   similar complaints against other drivers?
 3           MR. PERKINS:  Same objection.
 4           THE WITNESS:  It would have been nice to have
 5   known, but, like I said, Uber doesn't share any of that
 6   stuff, you know, so...
 7      Q    BY MR. VIVES:  But you did eventually learn
 8   that this complaint did not result in any action against
 9   you, correct?
10      A    Yeah.  Yeah.  I was -- I was allowed to go back
11   to work.
12      Q    All right.  And so I want to switch gears a
13   little bit, Mr. Turay.
14           You are here testifying under oath, correct?
15      A    Yes.
16      Q    And you are here providing your testimony
17   telling the whole truth and nothing but the truth, right?
18      A    Yes.
19      Q    And you are not receiving anything from Uber
20   for your testimony today, right?
21      A    No, I'm not.  I wish.
22      Q    You are here testifying voluntarily, right?
23      A    Yeah.
24      Q    And so why are you here, Mr. Turay?  Why did
25   you choose to come her and sit here and answer my
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 40

1   questions and questions from Ms. Dean's lawyers?

2       A    Well, you know, Michael reached out to me.  You

3   know, he talked, he told me that this is something that,

4   you know, you guys wanted to do, you know, and I agreed.

5   It's like, you know.

6       Q    And you understand that Ms. Dean has accused

7   you of rape, are you aware of that?

8       A    I -- I figured it out pretty much.

9       Q    So how did you figure it out?

10      A    Well, when the officer called me, his name was,

11  I believe, Detective Garcia, you know, and he wanted to

12  do a saliva swab, you know, he wanted a photograph of me,

13  and things like that.  Pretty much, you know, he asked me

14  a lot of questions, you know.  So at that point, yeah, I

15  figured out that's what was going on.

16      Q    And so just like you're here voluntarily

17  speaking to us, back in November 2023, you voluntarily

18  spoke to police about this incident, right?

19      A    Yeah.

20      Q    And do you recall a Detective Lopez?  Is that

21  who you are thinking of?

22      A    Lopez, yes.  Lopez, yes.

23      Q    Okay.  And he was with the Tempe Police

24  Department, right?

25      A    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 41

1      Q    All right.  I want to look at the police report
2  that summarizes both your conversation with
3  Detective Lopez as well as Ms. Dean's conversation with
4  Detective Lopez and just ask you some questions about the
5  facts so the jury can understand what happened.  Okay?
6      A    Okay.
7      Q    We will mark this as Exhibit 6.
8           (Deposition Exhibit No. 6 was marked for
9  identification and attached hereto.)
10     Q    BY MR. VIVES:  This is BW-DEAN_JAYLYNN_000026.
11          MR. PERKINS:  For the record, this is not the
12  complete police report.
13          MR. VIVES:  Okay.
14     Q    BY MR. VIVES:  Mr. Turay, do you have that
15  document in front of you?
16     A    I do.
17     Q    So before we focus on that, I just want to walk
18  through this incident in some detail, okay.  I want to
19  start at the beginning of the ride, all right.
20          So before Ms. Dean got into your car, did you
21  call her phone number or otherwise talk to anyone about
22  where to pick her up?
23     A    Before she got in my car?
24     Q    Before she got in the car.
25     A    No.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1      Q     Okay.   So, eventually, Ms. Dean did get in your

2   car, correct?

3      A     Yeah.

4      Q     And what do you recall about picking her up?

5      A     So it was late at night and she was with -- she

6   was with someone, you know.   She was standing like a

7   little bit far off from where the parking area was where

8   I was, and then she walked over, she got into my car.

9   She seemed very -- you know, just very bubbly.

10          We started talking right away.   She mentioned

11   to me that she -- she had thrown up in -- in her friend's

12   bathtub, the guy that she was with.   She said she threw

13   up in his bathtub.   She said she had sex with him twice,

14   you know.

15          I remember saying, well, you know, if you had

16   sex with him twice, he shouldn't be that upset that you

17   threw up in his bathtub, you know.

18          So we were just basically like, you know, just

19   talking.   You know, I would say like, you know, maybe a

20   little flirty, you know.   At some point -- okay.

21          So we talked about -- I -- I asked her if she

22   came, you know, when they had sex.

23          And she said, no.

24          And I said, oh, that's bad.   You know,

25   something along those lines.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 43

1          And she said, well, maybe you should, you know,
2    have sex with me.  You know, she said that.  I remember
3    that.
4          You know, so at some point -- you know, so like
5    I was like oh, yeah, you know, let's figure out somewhere
6    where I can go, you know.  And then so I pulled off the
7    freeway like before the area where I should have pulled
8    off as per the directions I was getting on the app.
9          So I pulled off and then I was looking for a
10   place, you know, like where I could park, and, you know,
11   we could have sex, basically.  And she was -- at this
12   time, she was like playing with herself in the back seat.
13   She was, you know, just like hurry, hurry, you know, that
14   type of thing.
15          I did touch her while -- you know, because I
16   was parked at the light, the light was red.  She had
17   taken off her shorts, you know.  And I do -- you know, I
18   turned around, you know, I touched her at that point.
19   And, yeah, she, you know, was like she was ready to go,
20   you know.
21          I went into -- like there was just as I got off
22   the freeway, there was like this big -- seemed like some
23   type of -- some type of, you know, like commercial place
24   like -- you know, like buildings that look like offices
25   and stuff like that.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 44

1          You know, so I had made a left.  I had gone
2    over there.  I drove, but you know too many lights, it
3    didn't seem like a place where we could park and not be
4    disturbed, definitely not get caught also, you know.  So,
5    you know, just seemed like it was too bright.  So I went
6    out of there and then I drove up the street a little bit
7    and then I saw like a kind of neighborhood.  There's an
8    apartment complex across the street.  So, you know, we
9    were on that side of the street.
10          I went and parked and got out of my car, she
11    was laying in the back seat, you know, on her back, you
12    know.  I go into the back door.  The first thing she says
13    to me is that we should have oral sex.  So I obliged, you
14    know.  Did oral sex for maybe like a minute, I don't
15    know.  And then I got on top of her.  We had sex.
16          While we were having sex, something else that I
17    recalled later, you know, while I was talking to -- you
18    know, with the detective, something that I did recall was
19    when I -- because she had her top on.  So when I touched
20    her chest, you know, trying to reveal her breasts, she
21    stopped me.  And this was -- this happened twice.  So,
22    you know.
23          It was like a little bit odd.  I don't know.
24    Something that -- something just didn't look like normal,
25    you know, about her, her nipple, you know.  I'm not sure

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 45

1    if it was like she's had any -- I don't really know what

2    was going on.  It just looked like off.  Like the little

3    part that I saw before she stopped me, it looked like

4    something was off.

5            And I told the detective this.  And the reason

6    why I told him this was I said because like when she was

7    doing the rape kit, she might have done the same thing.

8    Because I would assume like, you know, if they're doing a

9    rape kit, you would have to take your clothes off.  Maybe

10   she would show some shyness, you know what I'm saying.

11   Just something.  I was telling the detective like -- and

12   this isn't even like the first time I talked to him.

13   Because I had called him later and I was telling him, I'm

14   like, Detective Lopez, I want you to please look at all

15   of the evidence.  Don't just assume, you know, that I'm

16   guilty.  Because I was really, really -- you know, like I

17   was really scared, you know.  So I'm like please don't

18   just assume that I'm guilty.  Look at all the evidence.

19   I even told him about those buildings that I drove

20   through and I asked him, I'm like maybe there are cameras

21   there.  Like check those cameras, you know, see if you

22   could see anything.  You might be able to see something

23   like she's in the back seat and she's naked.  You know,

24   that wouldn't -- that would, you know, kind of, you know,

25   put a different perspective kind of, but yeah.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 46

1      Q     Yeah.  That's helpful.  I want to digest that
2  and kind of go through that piece by piece, if we can.
3  Okay?
4      A     Okay.  And something else that I do want to say
5  also is that when we were done.  Because when we -- when
6  I pulled off the freeway, when I pulled off the freeway,
7  I told her, I said, I'm going to turn the app off.  I'm
8  going to complete the ride.  Because if it's running, you
9  will be paying for the time that we're having sex.  I
10  mean, I didn't say all that, but I did say if it's
11  running, you would still be charged for the time, you
12  know.  So I'm going to turn the app off, you know.  And
13  when we were done, she had to give me the address of
14  where she was staying for me to drop her off, which she
15  did, you know what I'm saying.  I didn't know where I was
16  taking her, you know.  I also called the detective later
17  and, you know, told him that so...
18      Q     All right.  So let's take a step back.  I guess
19  at a big picture perspective, you are not disputing that
20  you and Ms. Dean had sexual intercourse that night,
21  correct?
22      A     No, I'm not.
23      Q     But from your perspective, Ms. Dean wanted to
24  have sex with you; is that right?
25          MR. PERKINS:  Objection.  Form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 47

1          THE WITNESS:  Yes, from my perspective that was

2    my perspective, yes.

3          Q    BY MR. VIVES:  All right.  So when you went to

4    pick her you up, when she was walking to the car, was she

5    stumbling in any sort of way?

6          A    No.

7          Q    Did she appear visibly intoxicated to you when

8    she got into the car?

9          A    She did not appear visibly intoxicated, but she

10   did say, and I remember this because we had a

11   conversation about it, she did say I am so drunk right

12   now.  She said it like almost verbatim those were the

13   exact words out of her mouth, I am so drunk right now.

14   She said that.  And she talked about throwing up, you

15   know.

16          Something that did strike me as odd, which I

17   didn't even recall until Detective Lopez himself asked me

18   specifically about it.  He said, did you smell alcohol on

19   the rider's breath?  And I thought about it and I

20   realized that I didn't smell any alcohol.  Because if I

21   had -- if I had smelt alcohol, like I would have

22   remembered like, okay, she had a beer breath or she had a

23   whiskey breath, you know.  I don't recall smelling

24   alcohol.  But it slipped my mind totally until when

25   Detective Lopez asked me because he did ask me.  I don't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 48

1    remember smelling alcohol.

2        Q    And did you and her -- did you kiss her during

3    this incident?  Did she kiss you?

4        A    I believe that I did kiss her.  I think I did,

5    you know.  Or maybe not, but I do know that our faces

6    were pretty close.

7        Q    Yeah.

8        A    You know, to where I should have smelled the

9    alcohol if she was actually drunk.  I mean, if she had

10   actually been drinking.  You know, I feel like I should

11   have smelt the alcohol, but I don't remember smelling

12   alcohol at all.

13       Q    Okay.  And you said that when she got into the

14   car -- well, strike that.

15            What is the first thing that you recall either

16   you saying to her or her saying to you when she got into

17   the car?

18       A    I believe that's the first thing she said, I'm

19   so drunk right now.

20       Q    Okay.

21       A    Yeah.  And then she started talking about, you

22   know, her boyfriend, and she threw up in his bathtub

23   twice, you know.  And I wonder if, you know, he's going

24   to be mad at me, and, you know, that type of thing.

25       Q    And who was the first person who brought up sex

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 49

1    during this encounter?

2         A     She first talked about having sex, you know.

3    She said she had sex with this guy twice, you know,

4    that's what she said.   And then she talked about, you

5    know, throwing up in the bathtub and all of that, you

6    know.

7         Q     Okay.

8         A     Yeah.

9         Q     So to the best of your recollection, Ms. Dean

10   brought up having sex first?

11        A     Yeah.

12        Q     And I want to look at -- if we look at this

13   police report --

14        A     Uh-huh.

15        Q     -- if we go to Page 2 -- well, really let's

16   look at Page 11, and it says -- again, this is the report

17   from Dr. -- Detective Oscar Lopez.

18              Do you see that?   It says his name -- Page 1,

19   I'm sorry.

20        A     On Page 1?

21        Q     Yeah.   At the top, Detective Lopez.

22        A     Yes.

23        Q     And there's a section that says detailed

24   forensic interview.

25              Do you see that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 50

1      A     "Dedicated forensic interview."

2      Q     Yeah.  You read better than me, dedicated

3   forensic interview.

4            And you can see here if you look down at this

5   third paragraph, Detective Lopez is summarizing a

6   conversation he had with Ms. Dean.

7            Do you see that?

8      A     On the next page?

9      Q     Yeah.  It says, "I introduced myself and asked

10   if she would be willing to do a forensic interview with

11   me, to which she stated she would?"

12      A     Where is that?

13      Q     It says it at the bottom of the first page.  I

14   think you are on the second page.

15      A     On the second page?  On the first page you

16   said?

17      Q     Bottom of the first pages, yeah, yeah.

18      A     Oh.

19      Q     So you can see it says down at the bottom, "I

20   introduced myself and asked if she would be willing to do

21   a forensic interview with me, to which she stated she

22   would.  We entered the interview room and I first asked

23   rapport building questions.  I then explained the

24   guidelines and she stated she understood them.  I asked

25   what she came to talk to me about and she related it was

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

1    regarding the incident with the Uber driver."

2                    Do you see that?

3        A    Yeah.

4        Q    All right.  And I want to look now at the

5    second page where she says "once" -- at the top of the

6    second page, it says, "Once in the Uber, she began to

7    tell the driver that she had sex with her friend and that

8    she was drink."

9                    Do you see that?

10       A    Yeah.

11       Q    And that's consistent with what you recall?

12       A    Yes.

13       Q    It says, "She stated she did not know why she

14   told the driver this information but mentioned she was

15   intoxicated and just had sex with her friend."

16                   Do you see that?

17       A    Yeah.

18       Q    And that's also consistent with what you were

19   just telling me that she first brought up having sex with

20   her friend to you once she got in the Uber?

21                   MR. PERKINS:  Objection.  Form.

22                   THE WITNESS:  Yeah.

23       Q    BY MR. VIVES:  It said -- it goes on to say,

24   "He went on to say he wishes he could have sex with her.

25   Jaylynn said she did not know how to respond to that and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 52

1    said 'ok' in a sarcastic tone."

2           Do you see that?

3      A    Uh-huh.

4      Q    Is that consistent with your recollection that

5    as part of your conversation she said, quote, okay in a

6    sarcastic tone?

7           MR. PERKINS:  Objection.  Form.

8           THE WITNESS:  No.  She said -- and this was

9    after I had asked her if she had an orgasm, and she said

10   no.

11          And I was like, oh, that's -- that's not cool,

12   you know, something to that effect.

13          And she said, well, maybe you should have sex

14   with me, you know.  But she didn't use exactly those

15   words, but that's what she meant.

16     Q    So it's your recollection that you and Ms. Dean

17   were flirting, and then she said you should -- something

18   along the lines of you should have sex with me?

19     A    Yes.

20     Q    And after that, what did you do?

21     A    Then I -- you know, I was looking -- I got off

22   the freeway.  I told her that I'm looking for a place to

23   park so we can have sex.  I drove her around that complex

24   I was saying, I drove her around there, it was too

25   bright, I found a place, you know, the apartment -- you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 56

1   she's doing her school for the airline and stuff like
2   that.  So I had suggested to her how about find a motel
3   that you would spend the night at.  This is before we
4   talked about sex.
5          Q    Okay.
6          A    I believe this is before we talked about sex.
7   Yeah.
8          Q    And what did she say in response to your
9   question?
10         A    Suggest I'm going to a motel, I don't believe
11  that was answered.
12         Q    Okay.
13         A    Yeah.  I don't believe she -- she responded, so
14  I just let it go.
15         Q    All right.  I want to look back at this police
16  report one more time.  If we look there it says, again on
17  that same page, it says, "The Uber driver then told her
18  he was going to pull over to find a place to park and
19  Jaylynn again said okay, quote, in a sarcastic tone at
20  which point the vehicle exited the main roadway and
21  entered an empty parking lot of a business complex later
22  determined to be 1035 West Rio Salado Parkway, Tempe."
23              Do you see that?
24         A    Yeah.
25         Q    And to be clear, Mr. Turay, this is what

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 57

1    Ms. Dean, herself, reported to the police.  You

2    understand that?

3             MR. PERKINS:  Objection.  Form.

4             THE WITNESS:  Uh-huh.

5        Q    BY MR. VIVES:   Is that a yes?

6        A    Yes.

7             MR. PERKINS:  Objection.  Form.

8        Q    BY MR. VIVES:  And so where it says here that

9    Jaylynn again said okay in a sarcastic tone, do you

10   recall any part of this conversation being sarcastic in

11   nature?

12       A    No.

13       Q    If Ms. Dean would have said okay in a sarcastic

14   tone, would you have pulled over?

15            MR. PERKINS:  Objection.  Form.

16            THE WITNESS:  No, I wouldn't have.  And if she

17   hadn't said, you know, you should have sex with me, I

18   wouldn't have -- you know, I wouldn't have none of --

19   like none of that would have happened, you know.

20       Q    BY MR. VIVES:  All right.  So after you stopped

21   the car -- you talked about this earlier, but at some

22   point you stopped the car in this parking lot, right?

23   Right, Mr. Turay?

24       A    Yeah.

25       Q    And you said you ended the Uber ride, right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 71

1    case?  What is Uber being accused of?

2              MR. VIVES:  Object to the form.

3              THE WITNESS:  If he did, I don't recall exactly

4    what he said.

5        Q    BY MR. PERKINS:  Do you know what Uber is being

6    accused of in this case?

7        A    No, I don't.

8        Q    And it looks like you guys had shared some

9    documents before today.  Did they send you any documents

10   to read?

11       A    No.

12       Q    Was this the first -- you are claiming this is

13   the first time you read the police report?

14       A    Yes.

15       Q    Was this the first time you read those incident

16   reports?

17       A    All of this?  Yeah, all of this.

18       Q    You are claiming that's the first time today,

19   correct?

20       A    Yes.

21             MR. VIVES:  Object to form.

22       Q    BY MR. PERKINS:  Did you provide that -- did

23   you provide the investigator with your email address?

24       A    I don't believe so.

25       Q    Okay.  What phone number?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 93

 1      A     Honestly, I didn't do much to make sure that

 2   she could consent, you know.  She said, you know, maybe

 3   you should have sex with me.

 4            I said, okay.

 5            From reading a little bit of what she wrote,

 6   because I didn't read the whole thing, but reading a

 7   little bit what she told the officer, she said she was

 8   being sarcastic.   I didn't perceive it that way.

 9      Q     Okay.  So --

10      A     You know, but that's what it was.

11      Q     Have you ever had another passenger in your

12   car, as you state, take off their skirt, begin touching

13   themselves, and saying they want to have sex with you

14   from the back seat of the car?

15      A     No.  But I've had another passenger -- this was

16   in Scottsdale -- it was three women and she took off all

17   her clothes, but she was with her friends.

18      Q     Okay.  Is that the behavior of a sober person

19   to remove their clothes in the back seat of a stranger's

20   car and demand to have sex?

21            MR. VIVES:  Object to form.

22            THE WITNESS:  Probably not.  I wouldn't say

23   that it would be the behavior of a sober person.  But at

24   the same time, I didn't think she was, like, that drunk,

25   you know.  Because it's just like if you go to a party

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 133

1    STATE OF ARIZONA        )

                             ) ss

2    COUNTY OF MARICOPA      )

3

4        BE IT KNOWN that the foregoing deposition was taken

5    before me, SHANNON STEVENSON, a Certified Reporter in and

6    for the County of Maricopa, State of Arizona; that the

7    witness before testifying was duly sworn to testify to

8    the whole truth; that the questions propounded to the

9    witness and the answers of the witness thereto were taken

10   down by me in shorthand and thereafter reduced to

11   computer-aided transcription under my direction; that the

12   foregoing 132 pages are a true and correct transcript of

13   all proceedings had upon the taking of said deposition,

14   all done to the best of my skill and ability.

15       I FURTHER CERTIFY that I am in no way related to any

16   of the parties hereto, nor am I in any way interested in

17   the outcome hereof.

18   (   )  Signature was requested.

19   (XXX)  Signature was not requested.

20       DATED at Phoenix, Arizona, this 25th day of July,

21   2025.

22

                             SHANNON STEVENSON, CR, RPR

23                           Certified Reporter

                             Certificate No. 50461

24                           VERITEXT LEGAL SOLUTIONS

                             Registered Reporting Firm

25                           RRF No. R1061