# EXHIBIT 1

# EXHIBIT A
# FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB |
| This Document Relates to:<br><br>*All Cases* | *(Assigned to Hon. Charles R. Breyer)* |

**SUPPLEMENTAL EXPERT REBUTTAL REPORT OF**
**VICTORIA STODDEN, PH.D.**

January 2, 2026

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Table of Contents

I.      Qualifications, Background, and Assignment ................................................. 2

II.     Summary of Opinions ..................................................................................... 4

III.    Dr. Chandler's and Ms. Keller's Claims about Risk Factors are Flawed and Suffer from the Same Issues that I Discussed in the Stodden Rebuttal Report ..................................... 7

        A.      Dr. Chandler and Ms. Keller Presented Misleading Conclusions Overwhelmingly Driven by Reported Incidents of Low-Severity Sexual Misconduct, and Not Sexual Assault .......................................................................................... 8

        B.      Dr. Chandler and Ms. Keller Presented Misleading Results Regarding Alleged Risk Factors Because They Did Not Consider That the Same Risk Factors Are Prevalent in Other Relevant Contexts .................................................................... 8

        C.      Ms. Keller's New Analyses Using the Flack Reported Incident Data Suffer from the Same Issues as the Analyses in Her Opening Report ................................. 11

        D.      Dr. Chandler's and Ms. Keller's Claims that the Reported Rates of SA/SM Incidents Have Increased Since 2021 are Flawed, Misleading, and Based on Arbitrary and Unsupported Assumptions ................................................................. 14

        E.      Dr. Chandler Presents Information from Internal Documents from Uber but Did Not Use This Information to Perform Any Calculations ................................... 24

IV.     Dr. Chandler's and Ms. Keller's Discussion of Uber's S-RAD Algorithm Misrepresented the Accuracy and Intended Use of the Statistical Tool .................................... 26

V.      Ms. Keller's Analysis of Repeated Drivers' Reports is Misleading and Incorrect Because She Conflated Prior Reports Across All the SA/SM Categories and Ignored that Most Drivers Did Not Receive More than One Report ............................................... 41

VI.     Dr. Chandler's Adjusted Risk Analysis of "Repeated Exposure" for Multiple Trips is Flawed, Incorrect, Misleading, and Produces Demonstrably Absurd Results ................. 47

        A.      Dr. Chandler's Analysis of Cumulative Risk is Conceptually Flawed, Rendering His Results and Opinions Incorrect .................................................................. 47

        B.      Dr. Chandler's Analysis of Cumulative Risk is Technically Flawed, and Based on Flawed Assumptions Leading to Highly Inflated Risk Estimates ..................... 51

VII.    Dr. Chandler's Review of the Five Bellwether Scenarios Did Not Contain Any Statistical Analyses ...................................................................................... 59

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## I.    Qualifications, Background, and Assignment

1.    I submitted an opening report on September 26, 2025 ("Stodden Opening Report"), which provides details on my qualifications.[1]  A copy of my curriculum vitae, setting forth my professional experience and qualifications, is attached as **Appendix A**, and a list of my prior testimony is attached as **Appendix B**.

2.    In the Stodden Opening Report, I was asked to assess how reported rates of alleged sexual assault and misconduct ("SA/SM") related to rides on the Uber platform compared to the rates of sexual assaults on other means of transportation, and to other relevant rates.  Based on my analysis, I concluded that:  (i) it was appropriate for Uber to report incident rates for the five most serious categories of sexual assault in its Safety Reports, (ii) the rate of reported incidents for rides on the Uber platform is orders of magnitude lower than rates reported for comparable public transportation options, specifically the rates reported by the ten largest transportation authorities in California,[2] and (iii) the reported rates of sexual assault and misconduct among users of Uber's rideshare platform are extremely low compared to other relevant rates.

3.    On September 26, 2025, Plaintiffs submitted reports by Ms. Lacey Keller ("Ms. Keller" and "Keller Opening Report")[3] and Dr. John Chandler ("Dr. Chandler" and "Chandler Opening Report").[4]  Following this, I submitted a rebuttal report on October 24, 2025 ("Stodden Rebuttal Report").  In my rebuttal report, I concluded that (i) Ms. Keller's conclusions were primarily driven by her unexplained and baseless inclusion of sexual misconduct categories in her analysis, (ii) Ms. Keller's claim regarding the frequency at which Uber received reports for sexual assaults or misconduct is misleading because it failed to consider the total number of rides on the Uber platform, (iii) Ms. Keller's claim that "the number and rates of Sexual Assault and Sexual Misconduct has increased" is based entirely on the arbitrary and unsupported assumption that analyzing a subset of the data from 2021–2024 was appropriate, despite the full dataset from 2017 demonstrating a statistically significant decrease in reported incident rates, (iv) Ms. Keller's claim that Uber disclosed only 3% of the incident reports it received failed to consider

---

[1] Expert Report of Victoria Stodden, Ph.D., September 26, 2025 ("Stodden Opening Report").
[2] As noted in the Stodden Opening Report, I included additional states (Arizona and North Carolina) in my search for publicly available data on sexual assault rates on public transportation systems but was unable to identify such data.  *See* Stodden Opening Report, footnote 23.
[3] Expert Report of Lacey R. Keller, September 26, 2025 ("Keller Opening Report").
[4] Expert Report of John Chandler, Ph.D., September 26, 2025 ("Chandler Opening Report").

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

best practices in data validation, auditing, and presentation, (v) Ms. Keller's claim that Uber analyzed but did not disclose risk factors for rides with reported incidents did not consider that any analysis conducted by Uber was exploratory and should only be interpreted with various caveats, and that the same risk factors are also prevalent in other relevant contexts such as public transportation, e.g. late-night hours or the presence of intoxicated individuals, (vi) Dr. Chandler's claim that Uber misrepresented data in its safety reports ignored that it is statistically appropriate and important to provide context and accuracy when presenting reported incident rates, and (vii) Dr. Chandler's approach to estimating the extent of underreporting sexual crimes that occurred during trips on the Uber platform relied on flawed assumptions, and an overly complex and inappropriately applied statistical model.[5]

4.      On December 2, 2025, Plaintiffs submitted an updated expert report by Ms. Lacey Keller ("Keller Updated Report"),[6] and a supplemental expert report by Dr. John Chandler ("Chandler Supplemental Report").[7]

5.      I was asked to review and evaluate the Keller Updated Report and, in particular, the conclusions it reaches regarding (i) the number of reported sexual assault and sexual misconduct incidents reported on the Uber platform in the U.S. from 2017 through 2024, (ii) the S-RAD algorithm, the data inputs used in the S-RAD algorithm, and the S-RAD scores for the bellwether scenarios, and (iii) the analysis of repeated reports against the same driver.

6.      I was also asked to review and evaluate the Chandler Supplemental Report and, in particular, the conclusions it reaches regarding (i) the trends over time for the number of reported sexual assault incidents on the Uber platform, (ii) the potential risk factors for sexual assaults and sexual misconduct incidents on the Uber platform, (iii) the calculation of "cumulative-risk estimates" based on riders' repeated use of the Uber platform, and (iv) the review of the bellwether scenarios.

7.      In carrying out my assignment, I relied on my experience and expertise in the fields of statistics and data science, as well as Plaintiffs' complaint, academic and industry literature, and publicly available information.  **Appendix C** contains the complete list of materials I relied on in forming my opinions in this report.

---

[5] Expert Rebuttal Report of Victoria Stodden, Ph.D., October 24, 2025 ("Stodden Rebuttal Report").
[6] Updated Expert Report of Lacey R. Keller, December 2, 2025 ("Keller Updated Report").
[7] Supplemental Report of John Chandler, Ph.D., December 2, 2025 ("Chandler Supplemental Report").

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

8.      I am being compensated at my standard billing rate of $1,000 per hour. Staff at
Cornerstone Research, a consultancy, worked under my direction and helped me prepare my
report. I receive compensation from Cornerstone Research based on its collected staff billings
for its support of me in this matter. Neither my compensation in this matter nor my
compensation from Cornerstone Research is in any way contingent or based upon the content of
my opinion or the outcome of this or any other matter.

9.      I hold all my opinions to a reasonable degree of professional and scientific certainty. My
work in this matter is ongoing. I reserve the right to revise or supplement my opinions in light of
any additional materials including data, documents, declarations of experts, and deposition or
other testimony, or if I am asked to perform further research or analysis.

## II.    Summary of Opinions

10.     Notwithstanding the new opinions in the Chandler Supplemental Report and the Keller
Updated Report, my opinion remains that Dr. Chandler's and Ms. Keller's analyses are
unreliable, misleading, and lead to flawed conclusions. I arrive at this opinion for the following
reasons, which I discuss in more detail in the rest of this report.

    a. Dr. Chandler and Ms. Keller presented claims related to the number of reported
       incidents of both sexual assault and sexual misconduct between 2017 and 2024.
       Their conclusions are primarily driven by the baseless and unexplained inclusion
       of the sexual misconduct categories in their analysis, and therefore the results are
       more indicative of trends in reported sexual misconduct (primarily by the
       "Comments or Gestures" and "Staring or Leering" categories) and not reported
       sexual assault, which comprise the categories at issue. Reported incidents for the
       sexual misconduct categories outnumbered those for the sexual assault categories
       by approximately

    b. Dr. Chandler and Ms. Keller presented claims about alleged risk factors for rides
       on the Uber platform. Their claims regarding alleged risk factors are misleading
       because they failed to show any *heightened risk* for riders using the Uber platform
       relative to any other means of transportation. Further, they did not present any
       relevant external benchmarks to contextualize their findings, nor did they consider

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

that these same risk factors are also prevalent in other relevant contexts such as public transportation.

c.  Ms. Keller conducted a series of new analyses using the Flack reported incident data, which replicate the analyses she previously conducted in the Keller Opening Report.  Ms. Keller's new analyses, along with her claim that Uber received "hundreds of thousands" of sexual assault and sexual misconduct incident reports in her updated report, are misleading.  Ms. Keller did not contextualize the number of reports received with the number of rides on the Uber platform as statistical best practices would indicate, nor did she compare Uber's incident rates with those of alternative transportation options or any other relevant rates.  Ms. Keller also failed to consider that it was statistically appropriate for Uber to report incident rates for the five most serious categories of sexual assault.  Finally, Ms. Keller's unexplained use of different denominators throughout her report can lead to a misleading presentation of the magnitudes of incident rates, and can make incident rates appear larger than they actually are.

d.  Dr. Chandler and Ms. Keller claimed that reported SA/SM incidents exhibited increasing trends since 2021.  Their claims are flawed, misleading, and based on arbitrary and unsupported assumptions due to (1) their failure to consider confounding factors when they estimated trends, and (2) their arbitrary and unsupported exclusion of relevant years of data (from 2017 to 2020) to focus only on the years 2021 to 2024.  Neither Dr. Chandler nor Ms. Keller acknowledged that between 2021 and 2024, the national rates of sexual assault in the U.S. increased more than the reported SA/SM incidents for rides on the Uber platform.  Contrary to their claims, I show that the rate of SA/SM reported against drivers has an overall *decreasing trend* from 2017 to 2024.

e.  Dr. Chandler claimed that Uber had access to analyses of the relative risk to riders across several variables.  His claim is flawed and unreliable because he applied findings from internal analyses by Uber conducted on historical data to reported incidents that were documented in different years, including as recently as 2024.  Further, he omitted any discussion of the limitations of the internal analyses.  Dr.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Chandler relied exclusively on Uber's internal documents and performed no
calculations of his own to determine whether relationships from earlier years
remained statistically meaningful in the Flack reported incident data. He provided
no justification for his assumption that results from nearly a decade ago are
relevant to the more recent bellwether Plaintiffs' contexts.

f.  Dr. Chandler and Ms. Keller described multiple alleged risk factors for SA/SM
incidents in the context of Uber's internal tool called "S-RAD" (Safety Risk
Assessed Dispatch) and provided a description of the S-RAD algorithm. They
both mischaracterized the S-RAD algorithm and failed to acknowledge that Uber
took into consideration about 50 different variables as input to the S-RAD
algorithm, including the subset discussed by Dr. Chandler and Ms. Keller. Dr.
Chandler and Ms. Keller failed to acknowledge that ██████████████

████████████████████████████████████████████████████

████████████████████████████████████. They ignored
that S-RAD is an overinclusive statistical model that flags a large number of rides,
including ones not correlated with elevated risk, because it is used in the context
of reducing the risk of extremely rare events. They also failed to acknowledge
that, through the S-RAD algorithm, Uber was able to reduce reported serious
SA/SM incidents.

g.  Ms. Keller claimed that drivers with a prior reported SA/SM incident are more
likely to be reported for SA/SM again. Ms. Keller's claim is misleading because
she incorrectly conflated prior reports across all the SA/SM categories. In fact,
the vast majority of drivers with "prior reports against them" have prior reports
*for sexual misconduct incidents, not sexual assaults*, and most drivers did not
receive further reports after the first one.

h.  Dr. Chandler claimed that a risk of sexual assault or misconduct accumulates for
riders across the number of rides they take on Uber over a year, and that this
novel metric of cumulative risk he introduced constitutes a "relevant measure."
Dr. Chandler's claim that the cumulative risk is a relevant measure is
unsupported, and the novel measure he proposed is flawed, misleading, and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

produces demonstrably absurd results. Dr. Chandler purported to estimate the cumulative annual risk for "typical" riders on the Uber platform, but instead he only evaluated a highly specialized scenario. Simple calculations show that his results lead to overestimates of annual incidents compared to calculations from an actual year in the data. He also failed to examine any comparative baseline or benchmark against which to contextualize the estimates from his novel metric. The estimates from his metric are also fatally flawed, and their results unreliable, because the inputs used by Dr. Chandler have at least four serious problems: (i) an unsupported risk multiplier for late-night weekend rides; (ii) an unsupported risk multiplier for female riders paired with male drivers; (iii) inappropriate adjustments of incident rates for false reporting; and (iv) inappropriate adjustments of incident rates for underreporting.

i.   Dr. Chandler claimed that Uber could have predicted high risk patterns for the five bellwether scenarios. These claims are unsupported and speculative, as he did not provide any statistical analyses to justify his conclusions or even attempt to assess relative risks for each scenario. Further, Dr. Chandler failed to provide any benchmark or assess the safety of rides on the Uber platform for the bellwether scenarios compared to alternative modes of transportation available to the riders.

### III.   Dr. Chandler's and Ms. Keller's Claims about Risk Factors are Flawed and Suffer from the Same Issues that I Discussed in the Stodden Rebuttal Report

11.   After the filing of their Opening Reports, Dr. Chandler and Ms. Keller used the Flack reported incident data to attempt to estimate certain aspects of relative risk, as the data include information such as trip-level timestamps, geographic information, ticket-level and internal classification fields, and alleged assailant classification fields.[8] In this section I show that Dr. Chandler's and Ms. Keller's claims about risk factors are flawed. Furthermore, the analyses in the Keller Updated Report and the Chandler Supplemental Report suffer from the same issues I previously discussed in the Stodden Rebuttal Report. Thus, the opinions and critiques of Dr.

---

[8] Chandler Supplemental Report, ¶ 6.4.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Chandler's and of Ms. Keller's reports that I put forward in the Stodden Rebuttal Report still apply.

### A.    Dr. Chandler and Ms. Keller Presented Misleading Conclusions Overwhelmingly Driven by Reported Incidents of Low-Severity Sexual Misconduct, and Not Sexual Assault

12.    Dr. Chandler and Ms. Keller presented claims related to the number of reported incidents without distinction between sexual assault and sexual misconduct for the years 2017 through 2024. However, their claims are flawed and misleading because of arbitrary and inappropriate choices they made when combining these two distinct groups of incidents, as I explain below.

13.    Dr. Chandler and Ms. Keller failed to justify their inclusion of the sexual misconduct categories with their analyses that also refer to sexual assault. This choice renders their conclusions based on the combined incident metric, i.e., sexual misconduct and sexual assault, misleading. This is because the reported incidents for the categories of sexual misconduct vastly outnumbered those for the categories of sexual assault by approximately ▮▮▮ as I discussed in the Stodden Rebuttal Report.[9] Thus, the results of such analyses are more indicative of trends in reported sexual misconduct, and more specifically the "Comments or Gestures" and "Staring or Leering" categories, and not trends in reported sexual assault, which comprise the categories at issue.[10]

### B.    Dr. Chandler and Ms. Keller Presented Misleading Results Regarding Alleged Risk Factors Because They Did Not Consider That the Same Risk Factors Are Prevalent in Other Relevant Contexts

14.    In the Chandler Supplemental Report and the Keller Updated Report several claims are presented about alleged risk factors for rides on the Uber platform, but no external benchmarks for any other means of transportation are provided to contextualize these claims.[11] Furthermore,

---

[9] Stodden Rebuttal Report, ¶ 9 ("For example, between 2017 and 2024, the number of reported incidents of sexual misconduct outnumbered the number of reported incidents of sexual assault with a ratio of approximately ▮▮▮ More specifically, reported incidents of sexual assault represent about ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ whereas reported incidents of sexual misconduct represent about ▮▮▮▮▮▮▮▮▮▮ unique rides with reported incidents.").

[10] Stodden Rebuttal Report, ¶ 9 ("'Comments or Gestures' represent about ▮▮▮▮▮▮▮▮ of the unique rides with reported incidents, and 'Staring or Leering' represent about ▮▮▮▮▮▮ of the unique rides with reported incidents.").

[11] Chandler Supplemental Report, Section VI; Keller Updated Report, Section VIII.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dr. Chandler and Ms. Keller did not consider that these same risk factors are also prevalent in other relevant contexts.

15.    Dr. Chandler and Ms. Keller presented claims about varying risk of SA/SM incidents based on day of the week, time of the day, gender of driver and rider, and intoxication and proximity with bars, as summarized below.

    a.  **Day of the week and time of the day**. Ms. Keller claimed that ███████████ ██████████████████████████████████████████████████ and "reports of Rape and Attempted Rape were ██████ more frequent during [w]eekend [l]ate [n]ights than during the same hours on weekdays."[12]  Dr. Chandler claimed that the relative risk of escalation from a SM incident to a SA incident is ███████████████ during evenings and especially weekend nights compared to his determination of the baseline risk on the Uber platform (i.e., the average risk for all rides matched on the Uber app).[13]

    b.  **Gender of driver and riders**. Both Dr. Chandler and Ms. Keller claimed that pairings of male drivers and female riders are correlated with higher risk of SA. Ms. Keller noted that ███████████████████████████████ while Dr. Chandler observed that "90% of sexual assault victims [on the Uber platform were] women."[14]

    c.  **Intoxication and proximity with bars**. Both Dr. Chandler and Ms. Keller claimed that bar proximity and intoxication are correlated with higher risk relative to other ride scenarios. Ms. Keller stated that ███████████████████████ ███████████████████████████████████.[15]  Dr. Chandler noted that around ████ of reporting riders were visibly inebriated or disoriented.[16]

16.    Dr. Chandler's and Ms. Keller's claims regarding alleged risk factors are misleading because they did not show any *heightened risk* for riders using the Uber platform relative to other means of transportation. They failed to show how any of the alleged risk factors they point out,

---

[12] Keller Updated Report, ¶¶ 55, 94.

[13] Chandler Supplemental Report, ¶¶ 17, 23.

[14] Keller Updated Report, ¶ 57; Chandler Supplemental Report, ¶ 32. Dr. Chandler estimated that weekend rides with female passengers and male drivers faced at least a 2.4x elevated risk of SA compared to the baseline risk. *See* Chandler Supplemental Report, ¶¶ 34–35, Figure 3.

[15] Keller Updated Report, ¶ 57.

[16] Chandler Supplemental Report, ¶¶ 46–50.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

including time of the day, day of the week, gender, or intoxication, impact risk on rides on the Uber platform compared to other means of transportation. They did not show that SA/SM risks on Uber exceed those for alternative means of transportation, after taking into consideration these risk factors.

17.     Further, Dr. Chandler and Ms. Keller did not provide any benchmarks with which to contextualize and assess their alleged risk factors, and without such benchmarks it is not possible to assess whether the risk factors differ for rides on the Uber platform compared to other means of transportation. As I discussed in the Stodden Rebuttal Report, accounting for other possible explanations and utilizing appropriate benchmarks are best practices in statistical and data analysis to avoid presenting misleading or incorrect results, and not doing so likely biases the results.[17] Without appropriate benchmarks the reader is left to assume an appropriate risk rate implicitly, with the unsupported implication that it might be zero. The provision of alternative relevant benchmarks, such as risk rates on alternative transportation options, would provide an appropriate way to understand, assess, and contextualize the alleged risk factors they present. However, they did not identify any benchmarks (and if they meant to imply a rate other than zero, there is no indication given of what it might be).

18.     Dr. Chandler and Ms. Keller failed to acknowledge that alleged risk factors such as late-night travel and gender are not unique to Uber, but are prevalent across other modes of transportation.[18] For example, they did not consider that women, compared to men, face disproportionately high rates of sexual violence in public transportation settings, and that sexual

---

[17] Stodden Rebuttal Report, ¶ 11.
[18] For example, it is well documented that safety perceptions decrease at nighttime. *See, e.g., LADOT Safety & Security Survey Findings and Recommendations*, Ilium Associates, Inc., December 16, 2024; *Los Angeles County Metropolitan Transportation Authority: Street Harassment Survey and Focus Groups*, Metro, March 2025, pp. 2, 6.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

assault rates are higher at night and on weekends.[19]  By failing to compare Uber's data against other relevant modes of transportation, both experts presented misleading analyses that ignored surrounding context, violating best practices in data analysis and giving misleading results.[20]

### C.    Ms. Keller's New Analyses Using the Flack Reported Incident Data Suffer from the Same Issues as the Analyses in Her Opening Report

19.    Ms. Keller conducted a series of new analyses using the Flack reported incident data, presented in Section X of the Keller Updated Report, that replicate the analyses she previously conducted in Section V of the Keller Opening Report.  Specifically, Ms. Keller used the Flack reported incident data to attempt to analyze trends related to reports made against drivers on the Uber platform.[21]  Ms. Keller estimated that, between 2017 and 2024, 432,638 SA/SM incidents were reported against drivers, which she alleged equated to one report "every ten (9.7) minutes" and "one Rape or Attempted Rape incident report [against a driver] every ▮▮▮▮."[22]  As she did in the Keller Opening Report, Ms. Keller again asserted that the rate of SA/SM incidents reported against drivers had increased since 2021.[23]  Further, Ms. Keller claimed that, while ▮▮▮ of incidents in the five most serious categories were reported against riders, ▮▮▮ of reports for "Rape and Attempted Rape" were against drivers.[24]

---

[19] Ceccato, V., et al. (2021), "Sexual Violence on the Move: An Assessment of Youth's Victimization in Public Transportation," *Women & Criminal Justice*, 31, 4, pp. 294–312 ("Ceccato (2021)") at pp. 294, 302–303; "When Does Crime Occur Most: An In-depth Guide," *Vivint*, https://www.vivint.com/resources/article/when-does-crime-occur-most.  Many riders report avoiding public transportation at nighttime due to safety concerns.  Across the biggest public transit providers in California, at least 16% of riders avoid nighttime transit, with even higher number for women.  *See Sacramento Regional Transit (SacRT) Street Harassment Outreach Summary*, AECOM, December 31, 2024, p. 16; "AC Transit Safety Survey_All Results_EXTERNAL final 12.24.24.xlsx," https://www.actransit.org/sites/default/files/2024-12/AC%20Transit%20Safety%20Survey_All%20Results_EXTERNAL%20final%2012.24.24.xlsx; "BARTStreetHarassmenSurveyResults2024," https://www.bart.gov/sites/default/files/2024-11/BARTStreetHarassmenSurveyResults2024.xlsx; *LADOT Safety & Security Survey Findings and Recommendations*, Ilium Associates, Inc., December 16, 2024; *Long Beach Transit Safety Survey Final Report*, ETC Institute, February 3, 2025, p. 44; *Los Angeles County Metropolitan Transportation Authority: Street Harassment Survey and Focus Groups*, Metro, March 2025, p. 6; *Transit Safety Survey Findings Report*, ETC Institute, Fall 2024, p. 46; *VTA Safety and Harassment Survey*, Santa Clara Valley Transportation Authority and EMC Research, July–August 2024, p. 25; "2024 Phase 1 Muni Rider Safety and Harassment Data.csv," https://web.archive.org/web/*/https://www.sfmta.com/media/41402/download*; Ceccato (2021), pp. 294, 302–303.
[20] Stodden Rebuttal Report, ¶¶ 8, 11.
[21] Keller Updated Report, ¶¶ 76, 78.
[22] Keller Updated Report, ¶¶ 74, 76, 78. Although the Flack report incident data contain data from as early as October 2013, I understand that they contain complete entries starting in 2017. Both Ms. Keller and Dr. Chandler typically conducted their analyses using data collected between 2017 and 2024, and Dr. Chandler included data from 2013 in some of his analyses. See, e.g., Chandler Supplemental Report, ¶ 35.
[23] Keller Opening Report, ¶ 31; Keller Updated Report, ¶ 80.
[24] Keller Updated Report, Section X.E.

20.     Ms. Keller's analyses and claims are similar to those in the Keller Opening Report,
except that her new analyses used the reported incident-level Flack data and presented claims
that specifically refer to incidents with reports against drivers. The outcomes and opinions she
presented based on her new analyses did not change. As I showed in the Stodden Rebuttal
Report, Ms. Keller's claims in the Keller Opening Report are unreliable and misleading, and so
are claims in the Keller Updated Report since they also suffer from the same issues I previously
identified. For example, the rate of reported incidents for rides on the Uber platform remains
extremely low when compared to other modes of transportation.[25] I found that the rate of
reported incidents of sexual assault for rides on the Uber platform is lower than the reported rates
of people having either witnessed or experienced sexual assault on public transportation by the
ten largest transportation authorities in California, even when analyzing all categories of sexual
assault and misconduct.[26] Another study shows that taxi and ride-sharing services are generally
safer than public transportation (e.g., bus, subway, metro, or train), with reported sexual
harassment incident rates on public transportation four times higher in 2019 than those of taxi
and ride-sharing services.[27] Therefore, Ms. Keller's claim that Uber received "hundreds of
thousands" of sexual assault and sexual misconduct incident reports in the Keller Updated
Report is misleading, as Ms. Keller did not contextualize the number of reports received with the
number of rides on the Uber platform, nor did she compare Uber's incident *rates* with those of
alternative public transportation options or other relevant rates.[28]

21.     Ms. Keller claimed that "an SA/SM Incident was reported against an Uber Driver the
equivalent of every ten (9.7) minutes" and that "⬛⬛⬛⬛⬛" had the highest volume of
overall SA/SM Incident reports from 2017 to 2024," among other claims about the frequency of
reported SA/SM incidents.[29] Ms. Keller's claims are misleading because they do not consider the
total number of rides on the Uber platform. As I discussed in the Stodden Rebuttal Report, it is
statistically inappropriate to present data on the number of reported incidents per year (or,
equivalently, the average number of minutes or hours between one reported incident and the
next, or the number of incidents in a city) instead of presenting the rate—i.e., without accounting

---

[25] Stodden Opening Report, ¶¶ 26, 28.
[26] Stodden Opening Report, ¶¶ 26, 28.
[27] Stodden Opening Report, ¶ 20.
[28] Keller Updated Report, Section VI.
[29] Keller Updated Report, ¶¶ 76, 97.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

for the total number of rides in a given year because the number of reported incidents is correlated with the number of rides.[30]

22.    Furthermore, Ms. Keller's claim that Uber disclosed 3% of the incident reports it received failed to consider that it was statistically appropriate for Uber to report incident rates for the five most serious categories of sexual assault. As I showed in the Stodden Rebuttal Report, Uber presented the statistical reliability results of its auditors' classification for five categories of reported sexual assault in its Safety Reports.[31]  I also understand that Uber decided to report data on these categories for three main reasons: (1) they are the five most serious categories of sexual assault based on Uber's taxonomy; (2) they are consistent with the categories for sexual assault already collected and reported by other surveys investigating the incidence of sexual assault, such as the National Intimate Partner and Sexual Violence Survey (sometimes referred to as the "NISVS") and consistent with the directions from experts partnering with Uber; and (3) doing so ensures a high level of reliability and accuracy of the reported data since these five categories have the highest degree of statistical reliability in classifications across Uber auditors.[32]

23.    As mentioned above, Ms. Keller claimed that, while ▆▆▆▆ of incidents in the five most serious categories between 2017 and 2024 were reported against riders, "▆▆▆ of [reports for] Rape and Attempted Rape were against Drivers."[33]  However, she failed to present the gender distribution for drivers and riders, which is important context to understand her comparison of reported incident rates against riders and drivers. In particular, she did not acknowledge that ▆▆▆ of drivers and ▆▆▆ of riders on the Uber platform in the U.S. are women.[34]

24.    Finally, Ms. Keller's figures showing alleged incident rates per year[35] are misleading and can make incident rates appear larger than they actually are. She presented figures with incident rates calculated "per 100 million trips"[36] and stated, for example, that the "SA/SM Incident rates per 100 million trips were 5,096 SA/SM Incidents and 5,482 SA/SM Incidents" in 2023 and 2024, respectively.[37]  Ms. Keller calculated the reported incident rates by dividing the number of

---

[30] Stodden Rebuttal Report, ¶ 13.

[31] Stodden Rebuttal Report, ¶ 31; Stodden Opening Report, ¶ 16.

[32] Stodden Opening Report, ¶ 16; *2017–2018 US Safety Report*, Uber, December 5, 2019 ("2017–18 Safety Report"), pp. 42, 46.

[33] Keller Updated Report, Section X.E.

[34] UBER_JCCP_MDL_000491422 at 23; UBER_JCCP_MDL_003219916 at 21.

[35] Keller Updated Report, Figures 3, 4, 5, 18, 19, 20.

[36] Keller Updated Report, Figures 3, 4, 5, 18, 19, 20.

[37] Keller Updated Report, ¶ 35.

reported incidents (i.e., the numerator) by the number of trips (i.e., the denominator), but then presented the numerators in the figures with respect to a different denominator, specifically 100 million trips. Because it is a ratio, the reported incident rate can be presented in many different but equivalent ways, for example as a percentage (e.g., 0.005482% per trip) or as a rate calculated with a different number of trips as denominator (e.g., 54.82 reported incidents per 1 million trips). The denominator value of "100 million trips" chosen by Ms. Keller for the rate calculations is unnecessarily large, and it directly impacts the numbers for the numerator shown in her charts which therefore could mislead the reader by presenting numbers that appear larger.[38] Furthermore, it is inconsistent with the presentation of reported incident rates elsewhere in the Keller Updated Report and in the Uber Safety Reports that she cited.[39]

25.     The same rates, calculated from the Flack reported incident data, can be presented using mathematically equivalent bar charts. In **Appendix D**, I provide the counterpart of Ms. Keller's exhibits, calculated as percentages "per ride" instead of rates "per 100 million rides," which shows that using different denominators can lead to a misleading presentation of the magnitudes of incident rates.

> ### D.     Dr. Chandler's and Ms. Keller's Claims that the Reported Rates of SA/SM Incidents Have Increased Since 2021 are Flawed, Misleading, and Based on Arbitrary and Unsupported Assumptions

26.     Dr. Chandler and Ms. Keller both claimed that reported SA/SM incidents exhibited increasing trends since 2021, but these claims are misleading. In fact, I show that the rate of SA/SM reported against drivers *has an overall statistically significant **decreasing trend** from 2017 to 2024*.

27.     Regardless, Dr. Chandler claimed to have "estimated the true monthly incidence of sexual assault and sexual misconduct from 2021 through 2024," that his "results show a rising trend in true driver-assailant incidents over 2023 and the first half of 2024," that "once the COVID-period anomaly is set aside, Uber's own data show that sexual-safety incidents per trip

---

[38] Yamagishi, K. (1997), "When a 12.86% Mortality is More Dangerous than 24.14%: Implications for Risk Communication," *Applied Cognitive Psychology*, 11, 6, pp. 495–506.
[39] Keller Updated Report, ¶ 120 ("I further conclude that approximately one in four SA/SM Incidents reported against Uber Drivers involved Drivers who had already been reported once to Uber for SA/SM."). Uber Safety Reports present incident rates with a numerator of 1 incident. *See* 2017–18 Safety Report, p. 59; *2019–2020 US Safety Report*, Uber, June 30, 2022 ("2019–20 Safety Report"), p. 56; *2021–2022 US Safety Report*, Uber, August 30, 2024, p. 21.

have been trending upward in the most recent years," and that "by 2024 the rape rate is at its highest level in the series."[40] Ms. Keller similarly claimed that the "number and rate of SA/SM Incidents reported against Drivers increased year-over-year every year from 2021 through 2024," that the "                                                                                    ," and that "[s]ince 2021, SA/SM Incidents reported against Uber Drivers have also

                                                    ."[41]  These claims are flawed due to (1) the failure to consider confounding factors when they estimated the trend, and (2) the arbitrary and unsupported exclusion of relevant years of data. Each of these flaws renders their analyses and the conclusions based on them unreliable.

28.     Although they analyzed several consecutive years of data, Dr. Chandler and Ms. Keller each failed to account for changes in incident reporting rates that are not specific to any ride-related risks that may have occurred over those years on the Uber platform, and which might have impacted the number of reported incidents on the Uber platform. They also did not make any attempt to use benchmarks, or to account for any confounding factors that might have impacted the frequency of reported incidents during rides on the Uber platform. Examples of potential confounding factors in this case include, but are not necessarily limited to, the time or location of the ride, seasonality, or changes in the reporting tools offered by Uber. The impact of such confounding factors would have been reflected in the incidents calculated in their reports, and therefore the trends they estimated and so omitting them renders Dr. Chandler's and Ms. Keller's trend analyses unreliable. Controlling for relevant factors that may influence the estimation of a model is a widely-accepted best practice in statistics and data science, which Dr. Chandler and Ms. Keller failed to follow.[42]  For example, neither Dr. Chandler nor Ms. Keller examined whether any changes occurred to the Uber app since 2021 that eased the reporting of incidents, which would plausibly have led to an increased number of reported incidents over time.[43]

---

[40] Chandler Supplemental Report, ¶¶ 118–121.

[41] Keller Updated Report, ¶¶ 80, 82, 84.

[42] Skelly, A. C., et al. (2012), "Assessing Bias: The Importance of Considering Confounding," *Evidence-Based Spine-Care Journal*, 3, 1, pp. 9–12 at p. 9.

[43] The Safety Toolkit, RideCheck, Dashcams, and Audio Recording are a few examples of the safety features that Uber launched on its platform in the U.S. since 2017. *See* Chandler Supplemental Report, ¶¶ 136–143. Changes to the Uber app may complement the innovations in safety features over recent years, which I describe in Section V of the Stodden Rebuttal Report.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

29.    Any changes in reported incidents in recent years may also reflect broader trends in reporting behavior occurring independently of Uber.  For example, the public's attitudes toward and propensity for reporting incidents may change in general over time, whether to police or over apps, and would thus also be reflected in the Uber platform reporting rates.[44]  Neither Dr. Chandler nor Ms. Keller even compared the trend estimated in their analyses to relevant national rates of sexual assault to understand and control for variables that may exogenously influence crime reporting rates.  Failing to control for confounding factors and to utilize benchmarks can bias the results of an analysis and inappropriately present misleading statistical conclusions.[45]

30.    Neither Dr. Chandler nor Ms. Keller acknowledged that between 2021 and 2024, the years discussed in their analyses, the national rates of sexual assault in the U.S. increased more than the reported SA/SM incidents for rides on the Uber platform, as shown in Figure 1.  The Department of Justice's National Criminal Victimization Survey ("NCVS")—a source that Dr. Chandler has himself relied upon for this matter[46]—reported that the rate per 1,000 respondents for "rape/sexual assault" across the United States increased from 1.2 in 2021 to 2.0 in 2024, representing a 67% increase.[47]  Figure 1 shows the percentage change of the reported incident rates from Uber and NCVS, relative to their respective rates in 2021, and shows that between 2021 and 2024 NCVS, the benchmark rate, increased more than the rate of SA/SM incidents reported to Uber.

---

[44] For an example of documented changes in long term trends, see Baumer, E., et al. (2003), "Changes in Police Notification For Rape, 1973–2000," *Criminology*, 41, 3, pp. 841–872 at p. 861; and for an example of changes in attitudes toward reporting, see Palmer, J., et al. (2021), "#MeToo for Whom? Sexual Assault Disclosures Before and After #MeToo," *American Journal of Criminal Justice*, 46, pp. 68–106 at pp. 70, 74.

[45] *See, e.g.*, Wooldridge, J. M. (2016), *Introductory Econometrics: A Modern Approach*, 6th Edition, Boston, MA: Cengage Learning, p. 78.

[46] Chandler Opening Report, Appendix D.

[47] "Criminal Victimization, 2024," *U.S. Department of Justice*, September 2025, https://bjs.ojp.gov/document/cv24.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**Figure 1: Rate of Reported SA/SM Incidents Per Year
U.S. NCVS and Uber Flack Reported Incident Data (2021–2024)**

Source: 2024 NCVS; Keller Updated Report, Figure 3

Note: Data for Uber is derived from Keller's analysis of Uber data, specifically Uber's recorded rate of sexual assault reports per 100 million rides on the Uber platform. Data for Department of Justice's National Criminal Victimization Survey ("NCVS") is derived from the NCVS's recorded rate of sexual assault reports per 1,000 U.S. households. All values measure the percentage change in each annual rate against the respective rate in 2021.

31.     I chose to focus on the years 2021-2024 in Figure 1 to directly compare to the analysis carried out in Dr. Chandler's and Ms. Keller's reports. I also performed similar comparisons that start from 2017 and extend through 2024, i.e., using 2017 as the base year for the percentage change calculations instead of 2021, and found that the gap between the NCVS percentage change from 2017 to 2024 and that for Uber is even greater. In fact, the percentage change in reported incidents from 2017 to 2024 for NCVS is a 43% increase, while for Uber it is a 20% decrease in reported incidents.[48] In addition, the percentage changes for NCVS since 2017 are

---

[48] 2024 NCVS; Keller Updated Report, Figure 3. The percentage change between 2017 and 2024 rates of reported SA/SM incidents are calculated with the following formula: (2024 Rate - 2017 Rate) / 2017 Rate. For Uber, this is (0.05482 – 0.06869) / 0.06869 = -0.20192, or about -20%. For NCVS, this is (2 - 1.4) / 1.4 = 0.42857, or about +43%.

### HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

higher than for Uber for each year except for 2020, and in that year the two percentage changes were within 7 percentage points of each other.[49]

32.     While Dr. Chandler and Ms. Keller failed to account for confounding factors that may have explained the trends they purported to find, they also inappropriately selected an arbitrary set of years to analyze and focused on misleading metrics.  Specifically, Dr. Chandler inappropriately limited his analysis of the trend in sexual misconduct and sexual assault, shown in Figure 7 of the Chandler Supplemental Report, to only four years of data, i.e. 2021–2024 instead of all the years available, and also inappropriately focused on the total number of incidents rather than the *rate* of incidents per rides.[50]  Although Dr. Chandler and Ms. Keller each reported incident rates of sexual assault and sexual misconduct from 2017 to 2024, in Figure 8 of the Chandler Supplemental Report and Figure 18 of the Keller Updated Report, respectively, they limited their discussion of the analysis only to the years 2020 to 2024, and 2021 to 2024, respectively.[51]  The choices of Dr. Chandler and Ms. Keller, separately and especially together, render Dr. Chandler's and Ms. Keller's analyses unreliable and misleading because their analyses dropped several years of data without an appropriate justification.

33.     Dr. Chandler's analysis in Figure 7, showing the estimated number of SA/SM incidents on the Uber platform, is additionally unreliable and misleading because it fails to account for the variation in total ridership across months and years.  Based on this figure alone, Dr. Chandler might wrongly conclude an increase in the frequency of incidents in one month, even if incidents were less frequent in that month.  That is because the failure to account for total ridership renders Dr. Chandler's analysis incapable of distinguishing between more incidents being reported simply because ridership has increased (even if the frequency of incidents being reported for the same number of rides has remained flat or decreased) and increases due to incidents being reported more frequently across all rides.  For example, if the reported incident rate in a month compared to the previous one decreased from 0.0050% to 0.0045% say, and the number of rides increased from 100 to 120 million, then the number of reported incidents would increase from

---

[49] 2024 NCVS; Keller Updated Report, Figure 3.  The percentage change between 2017 and 2020 rates of reported SA/SM incidents are calculated with the following formula: (2020 Rate - 2017 Rate) / 2017 Rate.  For Uber, this is (0.06386 - 0.06869) / 0.06869 = -0.07032, or about -7%.  For NCVS, this is (1.2 - 1.4) / 1.4 = -0.14286, or about -14%.  The difference between these two (-0.07032 - -0.14286) is 0.07254, or about 7 percentage points.

[50] Chandler Supplemental Report, Figure 7, ¶ 120.

[51] Chandler Supplemental Report, ¶ 120; Keller Updated Report, ¶ 80.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

5,000 to 5,400 despite the decrease in the reported incident rate.  In fact, such reversals in the direction of changes between incident reporting counts and rates of incidents reported per ride are common in the data.  Examining monthly changes for the years displayed in Dr. Chandler's Figure 7, in 17 of the 48 months between 2021 and 2024 (about one third of the months), the number of reported SA/SM incidents changed in the opposite direction of changes in the rate of reported SA/SM incidents (i.e., one increased and the other decreased for the same pair of months).[52]

34.      As I explained in Section III.C of the Stodden Rebuttal Report, arbitrarily selecting a subset of years for an overall trend analysis is statistically inappropriate.  In Figure 2A I show that the rate of all categories of reported sexual assault and sexual misconduct reported against drivers, comparable to Figure 18 in the Keller Updated Report, *has an overall statistically significant **decreasing trend** from 2017 to 2024.*[53]

---

[52] Workpaper 1; Chandler Supplemental Report, Figure 7.
[53] Workpaper 2.  These findings reinforce my conclusions based on Stodden Rebuttal Report, ¶ 20, Figure 1A, and more generally in Section III.C of the Stodden Rebuttal Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 2A:  There is a Statistically Significant Downward Trend for the Reported Incident Rate Against Drivers for Sexual Assault and Sexual Misconduct Between January 2017 and December 2024**



Source: Flack Reported Incident Data, 2017–2024

Note: The figure charts the monthly sexual assault and sexual misconduct rate for incidents reported against drivers on the Uber platform from January 2017 to December 2024.  The trend line shows the linear model fit for January 2017 to December 2024 (trend coefficient statistically significant, p<0.001).  *See* Workpaper 2.

35.    The downward trend estimated in my analysis is stable even when accounting for a "COVID window," shown in Figure 2B, which controls for shifts in ridership around the COVID pandemic without inexplicably excluding arbitrary years of data as done by Dr. Chandler.[54]

---

[54] *See* Figure 2B; Workpaper 3.  The results are stable across sensitivities that use a different month from 2022, January through December, to mark the end of the Covid window.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 2B:  There is a Statistically Significant Downward Trend for the Reported Incident Rate for Sexual Assault and Sexual Misconduct Against Drivers Between January 2017 and December 2024 — Including Controls for an Illustrative COVID Window**



Source: Flack Reported Incident Data, 2017–2024

Note: The figure charts the monthly sexual assault and sexual misconduct rate for incidents reported against drivers on the Uber platform from January 2017 to December 2024, with an indicator variable denoting a COVID window from March 2020 to December 2022.  The trend line shows the linear model fit for January 2017 to December 2024 (trend coefficient statistically significant, p<0.001).  *See* Workpaper 3.

36.    Dr. Chandler and Ms. Keller also conducted analyses focused on what they call "rape incidents" (i.e., claims of the category "Non-Consensual Sexual Penetration"), for the years 2017–2024.[55]  Dr. Chandler claimed that "by 2024 the rape rate is at its highest level in the series,"[56] and Ms. Keller similarly claimed that the "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[57]  However, I find that the "Non-Consensual Sexual Penetration" category had no statistically significant difference in reported rates between 2017 and 2024, which means that the value from 2017 is not statistically distinguishable from the

---

[55] Chandler Supplemental Report, Section X; Keller Updated Report, Figure 4, Figure 19, Figure 24.
[56] Chandler Supplemental Report, ¶ 121.
[57] Updated Keller Report, ¶ 82.

value in 2024, contradicting Dr. Chandler's and Ms. Keller's claims.[58] Dr. Chandler's new summary results presented in the Chandler Supplemental Report corroborated my conclusion, because he reported a statistically insignificant difference for what he calls the "Rape" rate when comparing 2017 and 2024.[59] In the context of the bellwether scenarios, the four scenarios from 2023 and earlier would not have had access to 2024 outcomes, leaving the specific 2017 to 2024 comparison by Dr. Chandler and Ms. Keller irrelevant for most of the bellwether scenarios.[60] In particular, for Ms. BM results from between 2021 and 2024 would not have been available since her alleged incident occurred in 2019.

37.    Ms. Keller claimed that "[s]ince 2021, SA/SM Incidents reported against Uber Drivers have also                                                                    "[61] However, Ms. Keller selected an arbitrary starting point (the year 2021) and ignored other historical data, which is problematic for the reasons explained above. This choice renders Ms. Keller's conclusions flawed because she did not limit her opinions to the years that she included for analysis. As I previously explained in the Stodden Rebuttal Report, widely accepted best practices in statistics and data science avoid the arbitrary deletion of data.[62] I show in Figure 3A that analyzing the full set of data from 2017 to 2024 reverses Ms. Keller's findings. The reported rate against drivers for the five most serious categories declined between 2017 and 2024, and that decrease is statistically significant.[63]

38.    As I found in the Stodden Rebuttal Report, the overall downward trend over time in the reported incident rate against drivers for the five most serious categories of sexual assault is also robust to accounting for a "COVID window."[64] Figure 3B shows a linear model that includes an indicator variable to control for a "COVID window," and also yields a statistically significant downward trend in the reported incident rate against drivers for the five most serious categories of sexual assault.[65]

---

[58] *See* Workpaper 4; Stodden Rebuttal Report, ¶¶ 22–23.

[59] Chandler Supplemental Report, ¶ 123.

[60] Chandler Supplemental Report, ¶¶ 71–80.

[61] Updated Keller Report, ¶ 84.

[62] Stodden Rebuttal Report, ¶ 24; Pesaran, M. H., et al. (2006), "Forecasting Time Series Subject to Multiple Structural Breaks," *The Review of Economic Studies*, 73, 4, pp. 1057–1084 at p. 1057.

[63] *See* Workpaper 5.

[64] Stodden Rebuttal Report, ¶ 26; Workpaper 6. The results are stable across sensitivities that use a different month from 2022, January through December, to mark the end of the Covid window.

[65] *See* Workpaper 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### Figure 3A:  There is a Statistically Significant Downward Trend for the Reported Incident Rate Against Drivers for the Five Most Serious Categories of Sexual Assault from January 2017 to December 2024



Source: Flack Reported Incident Data, 2017–2024

Note: The figure charts the monthly five most serious categories of sexual assault reported rate against drivers on the Uber platform from January 2017 to December 2024.  The trend line shows the linear model fit for January 2017 to December 2024 (trend coefficient statistically significant, p<0.001).  *See* Workpaper 5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 3B:  There is a Statistically Significant Downward Trend for the Reported Incident Rate Against Drivers for the Five Most Serious Categories of Sexual Assault from January 2017 to December 2024 — Including Controls for an Illustrative COVID Window**



Source: Flack Reported Incident Data, 2017–2024

Notes: The figure charts the monthly five most serious categories of sexual assault reported rate against drivers on the Uber platform from January 2017 to December 2024, with an indicator variable denoting a COVID window from March 2020 to December 2022. The trend line shows the linear model fit for January 2017 to December 2024 (trend coefficient statistically significant, $p < 0.001$). *See* Workpaper 6.

### E.    Dr. Chandler Presents Information from Internal Documents from Uber but Did Not Use This Information to Perform Any Calculations

39.    Dr. Chandler claimed that Uber had access to analyses of the relative risk to riders across several variables, including time of day and day of week of rides; rider and driver age; involvement of alcohol; driver feedback and ratings; prior reports of sexual misconduct, interpersonal conflict, aggressive or dangerous driving; ▮▮▮▮▮▮▮▮; pick-ups near bars; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[66]

---

[66] Chandler Supplemental Report, Section VI.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

40.    Dr. Chandler's analysis is flawed because he applied findings from internal analyses that Uber conducted largely between 2017 and 2019 to reported incidents that were documented in different years, including as late as 2024.[67]  Except for variables related to the time of day and day of week of rides, he did not perform any calculations or analyses to examine whether relationships from earlier years remained statistically meaningful in the Flack reported incident data.  Instead, Dr. Chandler simply cited to internal analyses conducted by Uber that are described in produced documents.[68]

41.    Further, Dr. Chandler omitted any discussion of the limitations of these analyses (even though such limitations have been discussed during this litigation by Uber employees),[69] and did not opine on whether the results of those analyses are statistically meaningful, or whether they would apply outside of the context of Uber's internal analyses.

42.    By relying exclusively on Uber's internal documents, Dr. Chandler implicitly assumed without providing any justification that results from nearly a decade ago are relevant to the more recent bellwether Plaintiffs' contexts.  In doing so, among other shortcomings, he failed to address the potential impact of platform changes implemented in the intervening years, as he acknowledged.[70]  Without performing the necessary pre-analysis work to validate that these historical alleged risk factors actually are predictive in the current dataset, his application of outdated patterns to more recent bellwether Plaintiffs is speculative at best.[71]  As such, Dr. Chandler offered no statistical approach for calculating these specific incident rates using a denominator narrowed by these risk factors, nor did he address the significant challenges involved in collecting such data.[72]

43.    By simply citing Uber's internal studies without attempting to recreate or validate them (for example using the Flack reported incident data), Dr. Chandler did not present any empirical

---

[67] Chandler Supplemental Report, ¶¶ 36–37, 41–42, 46, 50, 52, 56, 64, 66, 68, and Figure 4. Throughout the report I use initials to indicate the five bellwether plaintiffs (BM, BL, JD, AR, EM).  The five bellwether scenarios are from 2019 (BM), 2022 (BL), 2023 (JD, AR), 2024 (EM).  *See* Chandler Supplemental Report, Section VII.
[68] Chandler Supplemental Report, Section VI.
[69] Deposition of Katy R. McDonald, April 24, 2025, with Exhibits ("McDonald Deposition"), 110:24–111:17; Deposition of Todd Gaddis, Volume I, July 8, 2025, with Exhibits, 56:19–57:8.
[70] The Safety Toolkit, RideCheck, Dashcams, and Audio Recording are a few examples of the safety features that Uber launched on its platform in the U.S. since 2017. *See* Chandler Supplemental Report, ¶¶ 136–143.
[71] Chandler Supplemental Report, Section VII.
[72] Katy McDonald, a Data Science Director at Uber, stated calculating per-ride risk for factors like "passenger intoxication" or "proximity of a bar" involves significant data collection challenges. *See* McDonald Deposition, 110:24–111:17, 116:6–25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

conclusions, and did not verify his assertions empirically.[73]  His misapplication of findings from historical analyses without independent verification does not constitute a reliable statistical methodology for determining current relative risk.

## IV.  Dr. Chandler's and Ms. Keller's Discussion of Uber's S-RAD Algorithm Misrepresented the Accuracy and Intended Use of the Statistical Tool

44.    In his Supplemental Report, Dr. Chandler described multiple alleged risk factors for SA/SM incidents, and claimed that "Uber could have calculated the elevated risk faced by riders under high-risk conditions … as well as considered other factors that increase risk."[74]  He claimed that Uber "had access to information that demonstrated the utility of examining risk factors" and developed the internal tool "S-RAD" (Safety Risk Assessed Dispatch) "to estimate the probability of a sexual assault or sexual misconduct."[75]  Further, he claimed that, by not disclosing to the public the information about S-RAD, Uber "prevent[ed] potential benefits to Uber's riders, including [the bellwether Plaintiffs]."[76]

45.    Similarly, in her Updated Report, Ms. Keller described what she called "precursors" that are correlated with SA/SM incidents, including the day of the week, the time of the day, pickup location of the trip, and prior reports of SA/SM incidents against the driver.[77]  She then attempted to apply these factors in the context of S-RAD and concluded that these factors are "the most predictive of Driver-Rider pairings [i.e., potential ride events] with an elevated risk of SA/SM."[78]  Ms. Keller also provided her description of the S-RAD algorithm, including a mechanism to flag potential ride events associated with higher risk of SA/SM incidents.[79]

46.    Although the S-RAD algorithm was discussed in the Keller Opening Report and mentioned in the Chandler Opening Report, Ms. Keller and Dr. Chandler did not offer opinions about the S-RAD algorithm in their Opening Reports.[80]  For this reason, I did not previously

---

[73] Chandler Supplemental Report, Section VI.
[74] Chandler Supplemental Report, Section III.
[75] Chandler Supplemental Report, ¶ 12.
[76] Chandler Supplemental Report, ¶ 7.
[77] Keller Updated Report, Sections VIII and IX.
[78] Keller Updated Report, ¶ 103.  In my report I use the term "potential ride events" instead of "driver-rider pairing" because the S-RAD algorithm considers multiple variables beyond driver and rider specific metrics, as discussed below.  Ms. Keller's use of the term "Driver-Rider pairings" is misleading because it fails to include the situational factors that are used to evaluate each potential ride event.
[79] Keller Updated Report, Section XI.
[80] Chandler Opening Report, ¶ 159, 204; Keller Opening Report, Section VIII.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

address the S-RAD algorithm. The Keller Updated Report and Chandler Supplemental Report have discussed and offered opinions on the S-RAD algorithm in the context of the alleged risk or precursor factors that the algorithm considers.[81]

47.    S-RAD consists of a machine learning algorithm.[82] Machine learning models are first trained with pre-existing datasets, which are analyzed to identify trends and patterns.[83] Then the model is applied to new data, allowing it "to make decisions and predictions without explicit, hard-coded instructions."[84] Importantly, machine learning algorithms are not perfect predictors by design. Machine learning algorithms are probabilistic, not deterministic, and use patterns and probabilities identified from prior inputs to predict possible future outcomes with varying degrees of accuracy.[85] Further, when a statistical model is applied to the real-world, additional constraints or unobservable variables might limit its ability to predict and prevent. For example, the effectiveness of S-RAD can be impacted by the supply of available local drivers at a given time, as well as by local rider demand and the characteristics of local riders.[86]

48.    Machine learning algorithms are often used to help reduce risk. They are routinely used by banks to prevent fraud, by insurance companies to determine insurance rates, and by airlines

---

[81] Chandler Supplemental Report, Section VI; Keller Updated Report, Section X.

[82] "S-RAD Model Overview," July 2018, UBER_JCCP_MDL_003306684 at 684 ("Safety Risk Assessed Dispatch (S-RAD) -- consists of two components: Machine learning models that assess the safety risks associated with all potential driver-rider matches at the point of dispatch [and] [a] down-ranking procedure that incorporates safety risk scores when selecting the optimal driver for dispatch (subject to marketplace constraints).").

[83] "What is Machine Learning?" *IBM*, https://www.ibm.com/think/topics/machine-learning ("Machine learning is the subset of artificial intelligence (AI) focused on algorithms that can 'learn' the patterns of training data and, subsequently, make accurate inferences about new data. This pattern recognition ability enables machine learning models to make decisions or predictions without explicit, hard-coded instructions. … In essence, a trained model is applying patterns it learned from training data to infer the correct output for a real-world task").

[84] "What is Machine Learning?" *IBM*, https://www.ibm.com/think/topics/machine-learning.

[85] Li, J., et al. (2020), "Accurate Data-Driven Predictions Does Not Mean High Reproducibility," *Nature Machine Intelligence*, 2, pp. 13–15 at 13 ("A valid machine model is predictive, but a predictive model may not be valid.").

[86] "S-RAD Model Overview," July 2018, UBER_JCCP_MDL_003306684 at 685–686 ("Prediction, however, does not equal prevention. The actions and interventions triggered by the model predictions need to change real-world outcomes. The down-ranking strategy proposed here may not have any impact in supply-constrained markets where alternative matches do not exist. And even where there is a surplus of supply, down-ranking may not be sufficient to keep predators from eventually exploiting the platform. Finally, it may not be possible to implement model-based interventions without generating prohibitive costs on the marketplace, such as undermining the ability of drivers and riders to use the platform at specific times or locations, or if they belong to a particular gender.").

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to predict and preempt potential maintenance issues.[87] Companies typically create machine learning algorithms using internal data, and update and improve the algorithms over time through new data and improved statistical techniques.[88] Machine learning algorithms are often proprietary, only to be used by and for the companies in which they are made.[89] Uber worked on S-RAD for at least four years before its launch, both by testing the statistical effectiveness of the model and by meeting with major civil rights and sexual assault advocacy groups including the ACLU, Jane Doe, and the National Alliance to End Sexual Violence.[90]

49.    Dr. Chandler and Ms. Keller failed to consider that the score assigned by the S-RAD algorithm is not an assessment of the ▮▮▮▮▮▮▮▮▮, which they misrepresented it to be, but instead **the score represents** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[91] This "▮▮▮▮▮▮" is relevant only for that ▮▮▮▮▮▮▮▮ and cannot be compared

---

[87] *See e.g.*, "NAIC Survey: 88% of Insurers are Using AI or Machine Learning," *Insurance Newsnet*, March 14, 2023, https://insurancenewsnet.com/innarticle/naic-survey-88-of-insurers-are-using-ai-or-machine-learning, Figure 1 (34 respondents currently using AI/ML in underwriting); "Explained: The AI-Powered Predictive Maintenance Revolution," *Airways*, May 22, 2025, https://www.airwaysmag.com/new-post/ai-powered-predictive-maintenance-revolution. For example, J.P. Morgan, the largest bank in the United States, uses machine-learning algorithms to generate "Account Confidence Scores" to assess client risk and prevent fraud when processing payments. *See* "Enhancing our Trust & Safety Solutions with Account Confidence Score," *JP Morgan Chase & Co.*, May 14, 2025, https://www.jpmorgan.com/payments/newsroom/introducing-account-confidence-score. Progressive, one of the largest auto insurers in the United States, uses machine learning to analyze driver history to set rates through its "Snapshot" program. *See* "Get Snapshot from Progressive," *Progressive*, https://www.progressive.com/auto/discounts/snapshot/. *See also* "Progressive Uses H2O Predictive Analytics for UBI," *H2O.ai*, https://h2o.ai/resources/video/progressive-uses-h2o-predictive-analytics-for-ubi/. Delta, one of the largest airlines in the United States, uses its APEX program to collect and analyze real-time engine data through machine learning algorithms to predict repair needs and reduce repair turnaround time. *See* "AWN Recognizes Innovative, Transformative Engine Maintenance Operation at Delta TechOps," *Delta*, March 28, 2024, https://news.delta.com/awn-recognizes-innovative-transformative-engine-maintenance-operation-delta-techops.

[88] Amershi, S., et al. (2019), "Software Engineering for Machine Learning: A Case Study," Working Paper ("ML-centric software goes through frequent revisions initiated by model changes, parameter tuning, and data updates, the combination of which has a significant impact on system performance.").

[89] Sprankling, J. G. (2024), "Trade Secrets in the Artificial Intelligence Era," *South Carolina Law Review*, 76, 1, pp. 181–221 at 195 ("Many AI systems are proprietary and hence not available for use by others."). It is my understanding S-RAD is a proprietary algorithm used exclusively by Uber. *See* Deposition of Sunny Wong, April 16, 2025, with Exhibits ("Wong April Deposition"), Exhibit 2831, slide 50. It is also my understanding that the three examples of machine learning algorithms above (J.P. Morgan's "Account Confidence Scores," Progressive's "Snapshot," and Delta's "APEX") are proprietary models, with their inputs and weightings not available to the public.

[90] "Safety Risk Assessed Dispatch (SRAD)," June 2023, UBER_JCCP_MDL_002260211 at 0008 ("Impact 4 years in the making"); Deposition of Sunny Wong, June 25, 2025, with Exhibits ("Wong June Deposition"), Exhibit 1243, pp. 2, 7–8.

[91] Wong June Deposition, Exhibit 1243, p. 8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to scores calculated at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ for example.[92] The way that S-RAD flags potential ride events is based on the comparison between the score and a threshold (i.e., the score above which potential ride events will be flagged).[93] For each trip and potential ride event, the algorithm determines an "S-RAD score" measured on a ▓▓▓▓▓▓.[94] Although a higher score is associated with a higher estimated risk, these scores do not represent the likelihood of an incident taking place and do not map directly to probabilities of incidents.[95] By ranking scores on a scale of ▓▓▓▓, S-RAD classifies certain potential ride events as being high or low risk, without calculating the exact probability of an incident taking place. In fact, the interpretation of an S-RAD score varies based on the context, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓:

    a.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[92] Deposition of Sunny Wong, July 23, 2025, with Exhibits ("Wong July Deposition"), 323:7–17 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.").

[93] "Safety Risk Assessment Dispatch (S-RAD)," January 2021, UBER_JCCP_MDL_003224079 at slide 8 ("S-RAD will evaluate all supply plans and give a risk score based on the feature combination for that plan. Trip plans that are above the flagging threshold are considered to be more unsafe and would require S-RAD intervention.").

[94] Deposition of Sunny Wong, October 14, 2025, with Exhibits ("Wong October Deposition"), Exhibit 2068. The use of ▓▓▓▓ scales is not unique to Uber and S-RAD, but is a common practice amongst algorithms. This scoring system is valuable for an algorithm which seeks to make predictions about an incredibly complex problem where it is difficult or impossible to obtain true probability estimates, and is commonly used for making threshold-based classifications such as S-RAD. *See, e.g.,* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Provost, F. and T. Fawcett (2013), *Data Science for Business*, 1st Edition, Sebastopol, CA: O'Reilly Media, Inc., pp. 209–210 ("[One] strategy for making decisions is to rank a set of cases by these scores, and then take actions on the cases at the top of the ranked list. Instead of deciding each case separately, we may decide to take the top n cases (or, equivalently, all cases that score above a given threshold). There are several practical reasons for doing this. It may be that the model gives a score that ranks cases by their likelihood of belonging to the class of interest, but which is not a true probability.... More importantly, for some reason we may not be able to obtain accurate probability estimates from the classifier.... The classifier scores may still be very useful for deciding which prospects are better than others, even if a 1% probability estimate doesn't exactly correspond to a 1% probability of responding.").

[95] Internal Uber documents depict ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ While they have a positive relationship, they do not map directly to one another. *See* Wong October Deposition, 368:18–25 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓."); Wong October Deposition, Exhibit 2068.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



50.     Dr. Chandler and Ms. Keller also failed to consider that the S-RAD score represents only one of the elements of the process of filtering potential ride events. As is common with machine learning model output, S-RAD scores are compared to thresholds.[98] In this case, the thresholds depend on variables such as ▮

▮[99] Given that a potential ride event is assessed as either above the threshold or not, if the thresholds are low enough such that too many trips get flagged the program loses effectiveness by eliminating differentiability between the possible potential ride events.[100] I understand that in 2021, S-RAD was calibrated to flag the ▮ of potential ride events with the highest S-RAD scores for all U.S. trips ▮

▮.[102]

Prior to mid-2023, potential ride events with S-RAD scores above the cutoffs were "▮

▮.[103] After mid-2023, to accommodate changes to Uber's matching process, S-RAD was adjusted to ▮

---

[96] Wong October Deposition, Exhibit 2068.

[97] Wong October Deposition, Exhibit 2068 (showing an example where ▮
▮.

[98] Vuk and Curk (2006), p. 91 ("Probabilistic classifiers assign a score or probability to each example…. Normally a threshold … is selected for which the examples where [the score is above the threshold] are considered positive and the others are considered negative.").

[99] Wong October Deposition, Exhibit 2068.

[100] "Safety Risk Assessment Dispatch (S-RAD)," January 2021, UBER_JCCP_MDL_003224079 at slide 11 ("When all plans are flagged, S-RAD loses efficacy.").

[101] UBER_JCCP_MDL_005620999 ("The ▮ proxy trigger rate was selected.").

[102] "Baseline S-RAD Global Model," April 3, 2023, UBER_JCCP_MDL_005025910 at slide 8 ("United States – Day – ▮, United States – Night – ▮"); Wong July Deposition, Exhibit 1827, slide 38 ("Flagging rate changes between day and night because serious SA/SM rates also vary with time of day.").

[103] Wong July Deposition, Exhibit 1827, slides. 1, 9 ▮
▮).

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████████████████ [104] In some instances, the S-RAD algorithm allows a potential ride above the threshold, but even in those instances, the likelihood of an incident taking place remains low as discussed above.[105]

51.    In addition to their mischaracterization of how the S-RAD algorithm works, Dr. Chandler and Ms. Keller failed to consider the way in which the S-RAD algorithm took multiple factors into consideration, including the alleged risk factors discussed in their reports. In cherry-picking only specific variables related to the driver, Ms. Keller ignored the broader picture painted by Uber's internal data: that ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████.[106] Though the Keller Updated Report only listed a handful of input variables related to the driver for the S-RAD algorithm,[107] the algorithm in fact draws upon about 50 different input variables for each potential ride event to calculate scores and therefore reduce sexual assaults.[108] ████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████.[109] Although the exact number of variables varied over time, ████████████████ ████████████████████████████████████████ For example, the calculation of the S-RAD score related to Ms. JD's bellwether scenario considered ████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████.[110] **Appendix E** provides a complete list of variables considered for the bellwether scenarios. Tables 1A, 1B, and 1C below provide lists of variables from the bellwether scenarios

---

[104] Wong July Deposition, Exhibit 1827, slides 1, 13 ████████████████████████████

████████████████████████████████████████████████████████

[105] Wong June Deposition, Exhibit 1243, p. 5 ██████████████████████████████████

[106] "S-RAD Model Overview," July 2018, UBER_JCCP_MDL_003306684 at 697 ██████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

[107] Keller Updated Report, Table 12.

[108] "SRAD Data," November 15, 2023, UBER-MDL3084-BW-00048903.

[109] "SRAD Data," November 15, 2023, UBER-MDL3084-BW-00048903.

[110] "SRAD Data," November 15, 2023, UBER-MDL3084-BW-00048903.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

related to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, respectively, that Ms. Keller did not include in her aforementioned table.

### Table 1A:  Bellwether Plaintiff S-RAD Scores and Input Data:



Source:  "SRAD Data," November 15, 2023, UBER-MDL3084-BW-00048903; UBER-MDL3084-BW-00048904; UBER-MDL3084-BW-00048905; UBER-MDL3084-BW-00048906

Note:  Missing values in the source files are shown as "–."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### Table 1B:  Bellwether Plaintiff S-RAD Scores and Input Data:



Source:  "SRAD Data," November 15, 2023, UBER-MDL3084-BW-00048903; UBER-MDL3084-BW-00048904; UBER-MDL3084-BW-00048905; UBER-MDL3084-BW-00048906

Note:  Missing values in the source files are shown as "—."

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Table 1C:  Bellwether Plaintiff S-RAD Scores and Input Data:**



Source:  "SRAD Data," November 15, 2023, UBER-MDL3084-BW-00048903; UBER-MDL3084-BW-00048904; UBER-MDL3084-BW-00048905; UBER-MDL3084-BW-00048906

Note:  Missing values in the source files are shown as "–."

52.    Even though there are about 50 variables input to the S-RAD algorithm, Ms. Keller presented a table for the bellwether scenarios with only 7 variables, or about 14% of all the variables considered by the model.[111]  Ms. Keller provided no reason for why she displayed only this limited subset of ▮▮▮▮▮▮▮▮▮▮▮ among the long-list of S-RAD inputs for the bellwether scenarios.  Further, Ms. Keller omitted other ▮▮▮▮▮▮▮▮ from her analysis entirely, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮  For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[111] Keller Updated Report, Table 12.  *See* Appendix E for a complete list of the variables considered for the bellwether scenarios.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



53.     Ms. Keller's decision to focus solely on her chosen subset of ██████████

██████ is uninformed and misplaced.  Only ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████, as shown in Figure 4.[113]  Uber internal documents reveal that the

████████████████████████████████████████████████████████.[114]

---

[112] ██ █ █ ████████████████████████████████████████████████████████████████ ██ █

████████████████████████████████████████████████████████████████████ █ █

Mr. Turay was also "Pro Diamond" driver. *See* Brown
Deposition, Exhibit 1692 at 3.  To be a "Pro Diamond" driver, the top preferred perks level for Uber drivers, Mr. Turay had to drive a substantial amount and maintain "great service," including the following: (1) star rating of 4.85 or above; (2) acceptance rate of 85% or above; and (3) cancellation rate of 4% or lower.  *See* "Introducing Uber Pro," *Uber*, https://www.uber.com/dk/en/drive/uber-pro/.

[113] UBER_JCCP_MDL_005784097 at slide 1.

[114] "S-RAD Model Overview," July 2018, UBER_JCCP_MDL_003306684 at 697 █████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Figure 4:  S-RAD Top 20 Data Inputs, U.S. Model**



Source: UBER_JCCP_MDL_005784097 at slide 1
Note: Data input names are displayed according to the definitions of the variables in the source.

54.    Further, Ms. Keller did not consider that a high S-RAD score is not necessarily indicative of any one specific variable, and instead could be the result of a combination of or interplay between a wide array of differently weighted variables (e.g., ███████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████ ██ ██████████████████████████ ██ ██████████ ██ ██ ████████████████ ██ ████████████████ [119] Because the



---

[115] Table 1C.
[116] The values for ████████████████████████████████████ See Table 1B.
██ See Table 1B.
[117] The values ██████████████████████████████████████. See Table 1B.
[118] The ████████████████████████████████████████
██████ See Table 1B.
[119] The ████████████████████████████████████████
████ See Table 1B.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

S-RAD score depends on a number of variables related to the ███████████████████

█████████████████, a high S-RAD score is not necessarily indicative of any one specific

variable.[120]

55.    **S-RAD is a *low-precision* model because incidents are exceedingly rare.**  Ms. Keller

claims that "████████████████████" and that "█████████████████████████

██████████████."[121] █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████[122] ████████████████

████████████████████"[123] ██████████████████████████

████████████████████████████████████████████

█████████████[124] ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████[125] █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

56.    Further, neither Ms. Keller nor Dr. Chandler considered that S-RAD is by necessity a

low-precision model, meaning that it flags a larger number of rides (e.g., ██████ of the rides),

including ones not correlated with elevated risk, compared to a smaller number of incidents (e.g.,

less than 0.0002% of the rides) because of the extreme rarity of the events that the model

predicts.[126]  Since the risk of the events that S-RAD aims to reduce are so low, such a model

---

[120] UBER_JCCP_MDL_005784097 at slide 1.

[121] Keller Updated Report, ¶ 108.

[122] UBER_JCCP_MDL_003602459 at slide 12 ("Currently, ██████.).

[123] UBER_JCCP_MDL_003602459 at slide 23 ("████████████████████████████████████████
██████").

[124] Table 1A.

[125] UBER_JCCP_MDL_002622051 at 57.

[126] Wong June Deposition, 249:8 ("S-RAD is a very, very low precision model."); Wong June Deposition, Exhibit 1243, pp. 8, 12 ("Why is the precision so low? How do we plan to Improve the precision? This is something related to the inherent unpredictability of the safety incidents. The team's efforts will continue to improve the precision of the model gradually, however the low-precision nature of S-RAD is not expected to change for the foreseeable future. … ██████████████████ Stodden Opening Report, ¶ 31 ("Reported incident rates for the five most serious categories of sexual assault reported by Uber were… ~1 in 700,000 rides [i.e., less than 0.0002% of all the rides] in 2021–22. Furthermore, Uber's reported incident rate for all the categories of sexual assault and misconduct was ~1 in 20,900 in 2022 [i.e., less than 0.005% of all the rides].").

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

would need to be overinclusive, because the vast majority of the flagged rides do not have any reported incidents.[127] A reported SA/SM incident of any severity (including misconduct events such as asking personal questions or flirting), occurs around once in 20,900 rides, or less than 0.005% of all rides.[128] To account for this rarity, in the United States, S-RAD was calibrated to **flag the ▇▇▇ of rides with the highest S-RAD scores**, as shown in Figure 5.[129] This represents a volume of rides on the Uber platform that is vastly larger than the volume of reported SA/SM incidents, and is flagged by the model in order to increase the chance of capturing the small fraction of trips that might result in SA/SM incidents. By design, the vast majority of these flagged trips would be in fact safe. For instance, ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇ [130] In other words, ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

---

[127] Wong June Deposition, Exhibit 1243; Weiss, G. M. (2004), "Mining with Rarity: A Unifying Framework," *SIGKDD Explorations*, 6, 1, pp. 7–19 at p. 13 ("These methods can exploit the fact that the value of correctly identifying the positive (rare) class outweighs the value of correctly identifying the common class. For two-class problems this is done by associating a greater cost with false negatives than with false positives.").

[128] Stodden Opening Report, ¶ 31 ("Uber's reported incident rate for all the categories of sexual assault and misconduct was ~1 in 20,900 in 2022.").

[129] Wong June Deposition, Exhibit 1243 ▇▇▇▇▇▇▇▇▇▇▇▇

[130] Wong June Deposition, Exhibit 1243 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Figure 5:** Less than ▮▮▮ of Rides Flagged by the S-RAD Algorithm
Had Reports of Serious SA/SM Incidents



Out of the ▮▮▮ of rides flagged by the S-RAD algorithm,
on average only ▮▮▮ of them result in a serious SA/SM incident.

Source:  Wong June Deposition, Exhibit 1243
Notes:  The United States uses an average trigger rate of ▮▮▮ to flag potential ride events with higher S-RAD
scores. This trigger rate can vary locally due to factors ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮

57.    Dr. Keller misrepresented the process of flagging rides with relatively higher S-RAD
scores.  She wrongly claimed that "approximately ▮▮▮ of Uber trips are not evaluated as to
the risk of possible SA/SM Incidents."[131]  This claim is wrong because the S-RAD algorithm also
evaluates rides outside the ▮▮▮ that are flagged, and in fact uses the scores to determine which
potential ride events are below or above the threshold.[132]

---

[131] Keller Updated Report, ¶ 10.6.
[132] "Safety Risk Assessment Dispatch (S-RAD)," January 2021, UBER_JCCP_MDL_003224079 at slide 8 ("S-RAD will evaluate all supply plans and give a risk score based on the feature combination for that plan.  Trip plans that are above the flagging threshold are considered to be more unsafe and would require S-RAD intervention.").

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

58.    **Dr. Chandler and Ms. Keller failed to acknowledge that Uber developed the S-RAD algorithm to *reduce the risk of interpersonal conflicts*, for both drivers and riders.**[133]  Thus the tool was able to reduce the risk of sexual assault, as well as the risk of other incidents, such as sexual misconduct and other interpersonal conflicts.[134]  Internal analyses conducted by Uber show that S-RAD has been effective in reducing the risk of incidents: as of May 2022, ███

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████  [135]

59.    Ms. Keller incorrectly argued that the use of "holdout" groups (i.e., "control" groups to test the efficacy of the algorithm) enabled higher-risk potential ride events to be paired.[136]  Ms. Keller does not acknowledge that Uber's adherence to widely-accepted data and scientific practices ensures that the S-RAD algorithm is continuously refined and tested for accuracy amid real-world developments and random events that could otherwise skew the data.[137]  Uber measures the model's effectiveness by creating holdout groups that are ████████████████

████████████████████████████████████████████████████████, which is

---

[133] "S-RAD Model Overview," July 2018, UBER_JCCP_MDL_003306684 at 685 ("To protect our users from these crimes, the Safety & Insurance team has developed a data-driven intervention that uses machine learning to score the safety risks associated with all potential driver-rider matches at the point of dispatch. … called Safety Risk Assessed Dispatch (S-RAD)."); "Safety Risk Assessment Dispatch (S-RAD)," January 2021, UBER_JCCP_MDL_003224079 at slide 4 ("S-RAD in a nutshell … Purpose[:] Prevent sexual assaults (but will also potentially reduce sexual misconduct and other IPCs)."); "Stand for Safety Program Review - ELT," May 2022, UBER_JCCP_MDL_001730324 at slide 31.

[134] "S-RAD Model Overview," July 2018, UBER_JCCP_MDL_003306684 at 684 ("To support Uber's company-wide priority to reduce critical safety incidents, the Safety & Insurance team has developed a data driven intervention for preventing sexual assaults … called Safety Risk Assessed Dispatch (S-RAD)."); "Safety Risk Assessment Dispatch (S-RAD)," January 2021, UBER_JCCP_MDL_003224079 at slide 4 ("S-RAD in a nutshell … Purpose[:] Prevent sexual assaults (but will also potentially reduce sexual misconduct and other IPCs).").

[135] "Stand for Safety Program Review - ELT," May 2022, UBER_JCCP_MDL_001730324 at slide 42 ██████████████

████ ); "S&I+ Portfolio," UBER_JCCP_MDL_002656885 at slide 35 ████████████████████████████████████ ).

[136] Keller Updated Report, ¶ 109.1.

[137] "S-RAD Leadership Update," November 28, 2023, UBER_JCCP_MDL_001461771 at 089 ("S-RAD is maintaining 20% holdout. Team will review marketplace metrics across the region in ~4 weeks."), 114 ("Assuming no unexpected marketplace or fairness outcomes, all holdout cities will be transitioned to enhanced downranking post XP."), 249 ("MX team aligned on rolling out SRAD with 20% ███████████t."); "Introduction to S-RAD: Safety Risk Assessed Dispatch," UBER_JCCP_MDL_003602459 at slide 16 ██████████████████████████  ....  The holdout allows: … ██████████████████████████ … Unbiased data to develop new models … ███████████████████████████████████████, with 20% chance to be included to the holdout.").  Ms. Keller only presented a quote about how holdout groups "'[help] balance random events (e.g., weather, traffic, concerts) across treatment and control groups.'"  *See* Keller Updated Report, ¶ 109.1.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

necessary for Uber to compare model results to holdout data.[138]  The scientific logic of the holdout group is analogous to that of a clinical trial that divides its participants into "treatment" and "control" groups:  by removing a portion of the patients from the study to use as a baseline (the "control" group), the effectiveness of a treatment can be properly tested and quantified, reducing potential bias and allowing a statistical assessment of the effectiveness of treatment that would not be possible otherwise.[139] ▮

▮ The use of holdout groups is a standard industry practice when evaluating the accuracy of machine learning models and necessary for continual learning.[140] ▮

▮, about 20% of the total input data, as holdouts for continued testing of the model.[141]

## V.     Ms. Keller's Analysis of Repeated Drivers' Reports is Misleading and Incorrect Because She Conflated Prior Reports Across All the SA/SM Categories and Ignored that Most Drivers Did Not Receive More than One Report

60.     Ms. Keller claimed that drivers with a prior reported SA/SM incident are more likely to be reported for SA/SM again, citing internal documents from Uber.[142]  Ms. Keller claimed that approximately ▮ SA/SM incidents reported against drivers on the Uber platform involved drivers who had already been reported at least once.[143]

---

[138] "S-RAD Leadership Update," November 28, 2023, UBER_JCCP_MDL_001461771 at 056 ("The S-RAD team uses the holdout architecture to conduct experimentation. ▮

▮).

[139] "S-RAD Leadership Update," November 28, 2023, UBER_JCCP_MDL_001461771 at 330 ("The future holdout strategy is anchored on maintaining the integrity of 3 fundamental aspects of S-RAD product: 1. Track model performance and monitor potential drift  2. Create unadulterated population need for model retraining 3. Be a clean mechanism for necessary ongoing trigger threshold refresh.").

[140] Xiong, Z., et al. (2020), "Evaluating Explorative Prediction Power of Machine Learning Algorithms for Materials Discovery Using $k$-fold Forward Cross-Validation," *Computational Materials Science*, 171, pp. 1–12 at p. 2 ("In standard machine learning, three types of evaluation methods are commonly used (see Fig. 1). The first one is the holdout method which randomly divides the whole dataset into a training set, a validation set and a holdout/test set, then trains the predictive model over the training set, finds the best parameters for the model over the validation set and evaluates its performance on the holdout/test set. ... The second commonly used method is k-fold cross-validation, in which the data is divided into k subsets. Now the holdout method is repeated k times, such that each time, one of the k subsets is used as the validation/test set and the other $k-1$ subsets are put together to form a training set. ... It significantly reduces bias as we are using most of the data for fitting, and significantly reduces variance.").

[141] *See* Hastie et al. (2009), *The Elements of Statistical Learning*, New York: Springer, p. 222.

[142] Keller Updated Report, ¶ 59.

[143] Keller Updated Report, ¶ 65.

### HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

61.     Ms. Keller's claim is misleading because she incorrectly conflated prior reports across all the SA/SM categories.  As I show below, the number of drivers with "prior reports against them" largely have prior reports *for sexual misconduct incidents, not sexual assaults*, and most drivers did not receive further reports after the first one.  Furthermore, as Ms. Keller acknowledged, Uber bans drivers that are reported for an incident related to any of the five most serious categories of sexual assaults (which are included in the Uber Safety Reports).[144]

62.     Separately, Ms. Keller did not consider that drivers might have been reported even if there was no SA/SM incident.  In some instances, riders reported drivers for reasons that might not be SA/SM incidents, even if the complaints are classified as SA/SM reports.  Table 2 below contains some examples of lower taxonomy complaints, with more collected in **Appendix F**.  For example, one rider reported that the driver was "asking questions about [their] credit ratings and tried to sell [them] credit services, and repeatedly tried to get personal information."[145]  This incident was classified as "Comments or Gestures – Flirting."

---

[144] Keller Updated Report, ¶ 63; 2017–18 Safety Report, pp. 12–13; 2019–20 Safety Report, p. 30.
[145] *See* Table 2.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## Table 2:  Examples of Lower Taxonomy SA/SM Reports

| Subcategory | Content |
|---|---|
| Comments or Gestures – Asking Personal Questions | "My driver was asking me very personal questions and made me very uncomfortable. I refuse to pay for a trip where the driver made me so uncomfortable. I want a full refund" |
| Comments or Gestures – Comments About Appearance | "Assumed I was lazy because the train was 2 mins away, then said i look like dont exercise! That was extremely rude." |
| Comments or Gestures – Flirting | "The driver was asking questions about my credit ratings and tried to sell me credit services, and repeatedly tried to get personal information." |
| Comments or Gestures – Flirting | "she made comments and opinion which made me uncomfortable during the duration of the ride." |
| Comments or Gestures – Flirting | "Thank you. My wife right as she set foot onto the car she almost vomit from the overwhelming smell of Garlic and Body odor.... She said his driving was rushed and unsafe and the drive my wife said played vulgar music and look back at here and said... I know you like this." |
| Staring or Leering | "He didn't greet me when I got into the car and he kept looking at me through the mirror and it was silent the whole car ride at least a hello would be fine" |
| Staring or Leering | "Reckless driving, rude as I walked into the car. Very har stops and sharp turns and didn't go into the turning box but instead stopped in the middle of the street to turn but luckily there were no cars behind us but if there were he made a strong stop. As I got off i did not say thank you due to the time he was communicating me with and as I walked towards my destination he stared me down." |

Source:  Bliss/Jira SA/SM Incident Data

63.    More broadly, Ms. Keller did not attempt draw the distinction between "incidents" and "reports" of SA/SM.  This distinction is relevant because the number of reports against a driver might overstate the number of SA/SM incidents that actually occurred.  For example, according to Greg Brown, Director of Safety at Uber, Uber faces widespread "support abuse" from users "call[ing] in to Uber attempting to basically gain a refund for a trip they may have taken, a ride they may have participated in."[146]  As a part of this, many riders have "use[d] safety as a reason to request a refund" and "described to [Uber] safety incidents that never actually took place in an

---

[146] Deposition of Greg Brown, August 26, 2025, with Exhibits ("Brown Deposition"), 492:20–493:12 ("Q. In prior days of your deposition you have mentioned the phrase 'support abuse.' What is support abuse? A. Support abuse is unfortunately a phenomenon we see on our platform wherein users are writing in to Uber, calling in to Uber attempting to basically gain a refund for a trip they may have taken, a ride they may have participated in. They sometimes use safety as a reason to request a refund. They describe to us safety incidents that never actually took place in an attempt to get money back from, you know, Uber. Q. How common is support abuse? How big a problem is it for Uber? A. Unfortunately, it is fairly common. I've seen a lot of examples in my experience of this occurring. It's something that the teams are focused on better understanding and figuring out ways to mitigate.").

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

attempt to get money back."[147] None of Ms. Keller's analyses make any effort to disentangle incidents from reports, meaning that the number of drivers reported for SA/SM incidents could exceed the number of drivers that were actually involved in SA/SM incidents.

64.    Ms. Keller did not acknowledge that drivers in two of the bellwether scenarios did not have prior reported SA/SM incidents. The drivers for Ms. BL and Ms. BM had no prior reported SA/SM incidents, meaning that Ms. Keller's concerns about drivers with repeated reports would not apply to those two bellwether scenarios.[148]

65.    Ms. Keller did not acknowledge that only a small fraction of drivers was reported for more than one SA/SM incident.[149] Among drivers that had been reported at least once for any SA/SM incident category, ▮ of them had only one report, as shown in Figure 6 below.

---

**Figure 6:  Distribution of Total Incident Counts
Among Drivers with One or More SA/SM Reports**



Source: Flack Reported Incident Data, 2017–2024

---

[147] Brown Deposition, 493:2–5.
[148] Chandler Supplemental Report, Section VIII.
[149] *See* Figure 6.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

66.    Furthermore, Ms. Keller claimed that "approximately ▇▇▇▇▇▇ of all reported SA/SM incidents between 2017 and 2024 were against drivers who had already been reported to Uber,[150] but she ignored that the majority of these instances refer to prior reports for SM categories like "comments or gestures" and "staring and leering," which are inherently subjective and tend to be more difficult to classify consistently.[151] As shown in Figure 7 the percentage of reports against drivers with prior incidents decreases from ▇▇▇▇▇▇ when considering drivers with prior allegations other than comments/gestures or staring/leering.

### Figure 7:  Percent of Reported SA/SM Incidents Per Year Involving Drivers Who Had Already Been Reported to Uber for SA/SM



Source:  Flack Reported Incident Data, 2017–2024;  Keller Updated Report, Figure 14

67.    Similarly, Ms. Keller's analysis of prior reports by incident category is misleading because it conflated prior reports across all SA/SM categories.  She claimed that "▇▇▇ of trips [between 2017 and 2024] where a Rape or Attempted Rape was reported to Uber" involved a driver with a prior SA/SM incident report.[152]  Table 3 below contains the results presented by Ms. Keller for percentage of reports against drivers with prior reported incidents (in any SA/SM

---

[150] Keller Updated Report, ¶ 65.
[151] *See* Figure 7.
[152] Keller Updated Report, ¶ 67.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

category), as well as for prior reported incidents in SA/SM categories other than comments/gestures and staring/leering.[153] As in the charts presented above,[154] the results of Ms. Keller's analysis are sensitive to the assumption of what incident categories are included as prior report. For example, for the SA category of non-consensual sexual penetration, ▮▮ of reports involved drivers with any prior reported SA/SM incidents other than "comments or gestures" and "staring and leering" (compared to ▮▮ when these categories are included).

**Table 3:  Percent by Incident Category of Trips with SA/SM Reports Among Drivers with Prior SA/SM Reports**



Source: Flack Reported Incident Data, 2017–2024

---

[153] Table 3 contains statistics for all the incidents categories recorded according to the Uber taxonomy.  I do not opine on whether these incidents represent sexual misconduct.
[154] *See* Figure 7.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### VI.    Dr. Chandler's Adjusted Risk Analysis of "Repeated Exposure" for Multiple Trips is Flawed, Incorrect, Misleading, and Produces Demonstrably Absurd Results

68.    Dr. Chandler claimed that a risk of sexual assault or misconduct accumulates for riders across the number of rides they take on Uber over a year, and that this cumulative risk constitutes a "relevant measure." [155] He purported to quantify the cumulative annual risk for riders on the Uber platform by estimating a statistical model that relies on a set of rigid and unsupported assumptions.  Dr. Chandler concluded that, while the risks of individual trips may seem negligible, repeated exposure creates meaningful safety risks, especially for specific demographics, i.e., women riders paired with male drivers for late-night rides.[156]  However, Dr. Chandler's analysis is flawed, incorrect, and misleading.

69.    Dr. Chandler did not provide any support for considering his measure of cumulative risk as a "relevant measure" for riders.  Further, his model relies on assumptions on two key input parameters: the number of trips taken on the Uber platform per year, and the estimated risk associated with each trip.  Dr. Chandler's estimates do not apply to a "typical" rider on the Uber platform, and they are unreliable due to the flawed assumptions underpinning his model and the flawed assumptions he applied to adjust the inputs used in his model.

### A.    Dr. Chandler's Analysis of Cumulative Risk is Conceptually Flawed, Rendering His Results and Opinions Incorrect

70.    Without providing any support or evidence, Dr. Chandler claimed that for repeat riders, the "cumulative risk across all the trips they take in a year is a relevant measure."[157] Dr. Chandler did not explain or provide support for why cumulative risk is "relevant" to a rider.  For a rider who is either deciding whether to take their next trip, or deciding between modes of transport for a trip, it is not clear why this measure might be relevant.  Dr. Chandler did not acknowledge that annual cumulative risk might not be relevant for riders who have been on the Uber platform for less than one year, including one of the bellwether Plaintiffs, Ms. JD, who had

---

[155] Chandler Supplemental Report, ¶ 124.
[156] Chandler Supplemental Report, ¶ 130.
[157] Chandler Supplemental Report, ¶ 124.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

been on the platform for less than a year and had only two trips prior to the reported sexual assault.[158]

71.    Furthermore, Dr. Chandler failed to consider benchmarks of cumulative risk from modes of transportation that represent alternatives to rides on the Uber platform, such as rides on city buses, against which to compare his estimated cumulative risk.  Such a comparison would provide context for the rate at which risk accumulates for rides taken on Uber relative to rides taken on alternative modes of transportation.  In the Stodden Opening Report, I conducted a comparison of safety rates for rides on the Uber platform and riders on public transportation alternatives, specifically for the ten largest California transit authorities.[159]  I found that Uber is safer than public transportation alternatives in terms of risk of sexual assaults.[160]

72.    In addition to failing to support his cumulative risk metric as a relevant measure, Dr. Chandler failed to justify this introduction of a novel metric as his measure for cumulative risk.[161] He did not cite any academic study with estimates of cumulative risk, nor did he discuss other potential or even standard metrics to calculate cumulative risk.[162]  For example, Dr. Chandler did not consider that other methods to calculate cumulative risk include a richer set of parameters compared to the simple formula that he used in his analysis.[163]  Dr. Chandler's analysis also ignores, as I discussed above, comparing his measure of cumulative risks to benchmarks.[164]

73.    Without offering any opinions related to riders' behavior, the following simple example demonstrates the fatal flaw in Dr. Chandler's notion of cumulative risk as a relevant measure.

---

[158] *See* Table 1B.  Prior to the incident, Ms. JD had 215 days since signup and a count of two trips, calculated as $10^{0.30} = 2$ trips.

[159] The choice of transit authorities was based on data availability.  Under CA SB 434, the ten largest transit authorities in California conduct surveys and release reports regarding rider safety.  *See* Stodden Opening Report, ¶¶ 25, 28.

[160] Stodden Rebuttal Report, Table 2.

[161] Chandler Supplemental Report, ¶¶ 125–126

[162] *See, e.g.,* Williams, P.R.D., et al. (2012), "Cumulative Risk Assessment (CRA): Transforming the Way We Assess Health Risk," *Environmental Science Technology*, 46, 20, pp. 10868–10874 ("Williams, et al. (2012)").

[163] Williams, et al. (2012), p. 10869 ("Aggregate/Cumulative Exposure Models … These models also share many commonalities with respect to exposure routes and pathways, model inputs and outputs, model steps and capabilities, and model evaluation efforts.… [T]hese models follow the same general steps: (1) simulate an individual and their activity patterns throughout the day; (2) combine activity information, consumption patterns, residue concentrations, and exposure factors in exposure algorithms; and (3) simulate population estimates using probabilistic sampling (i.e., the variability in population exposures is accounted for by running simulations for many individuals and then aggregating across all individuals). However, specific features of these models may differ, including the reliance on different data sources, assumptions, or algorithms.").

[164] Williams, et al. (2012), p. 10870 ("Cumulative risks are estimated by comparing predicted exposures across multiple pathways to toxicity benchmarks.").

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Consider a rider who had seen Dr. Chandler's cumulative risk measure based on a known level of per-ride risk, and decided that they were comfortable with the level of risk per year associated with taking 50 trips a year on Uber.  Suppose this rider was committed to attending outings for work, errands, friends, etc., and suppose this rider reached 50 trips on Uber for such events halfway through the year.  If the cumulative risk metric was the relevant measure for riders' decisions, then that implies this rider would decide to stop using Uber for the rest of the year to avoid accumulating more risk.  However, this scenario absurdly implies that a rider who safely completed 50 consecutive rides would suddenly alter their transportation mode, say for taking a bus or walking (that might even be riskier than a ride arranged on the Uber platform), just because they reached the cumulative risk measure proposed by Dr. Chandler.  Yet, Dr. Chandler did not provide any evidence suggesting that riders make this type of decision based on cumulative risks.

74.     Setting the relevance of annual cumulative risk aside, Dr. Chandler's "typical pattern of Uber use" is not typical, neither in the number of trips per year that a rider on the Uber platform would take, nor in the type of trip used for his analysis, as I discuss below.  Dr. Chandler claimed that his cumulative risk measure estimated risk for "a typical Uber user, taking a reasonable number of trips per year."[165]  However, Dr. Chandler's analysis did not even attempt to measure risk for a "typical" Uber user.  Instead, Dr. Chandler stated, without support from the documents that he cited, that a typical rider takes approximately "60–70 trips per year,"[166] and proceeded to cherry-pick a very specific type of rider and a very specific type of trip for his analysis.  Specifically, he presented an analysis of female riders taking between 1 and 120 trips in a year, all during late-night hours of weekends, and all with male drivers.[167]

75.     Dr. Chandler claimed to show that "risk rises meaningfully across typical patterns of Uber use," by making the unsupported claim that a typical pattern of Uber use is a "female rider, male driver, late-night and weekend trips" occurring in succession up to 120 times in one year.[168]  Even if one interprets the hypothetical ride characteristics considered by Chandler as belonging to a common type of ride on Uber, Chandler offered no support that the repetition of such a ride

---

[165] Chandler Supplemental Report, ¶ 128.
[166] Chandler Supplemental Report, ¶ 124.
[167] Chandler Supplemental Report, ¶¶ 128–130 and Backup Materials.
[168] Chandler Supplemental Report, ¶ 129.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

up to 120 times in one year constitutes a *typical pattern* of Uber use. This ride-pattern was *not typical* in the five bellwether scenarios, as shown in Table 1B, where each showed fewer than 25% of rides being requested during late-night hours. Instead, the scenario is cherry-picked in such a way as to calculate a safety risk rate that is much larger than the average rate. The safety risk rate used in Dr. Chandler's analysis is unsupported, and its application in his model is flawed, as I explain in the next section.

76.    A simple application of Dr. Chandler's conclusions shows that his estimated risk is absurdly high, and his findings are disconnected from the reality of "typical" ridership on Uber. Dr. Chandler claimed that his repeated exposure analysis examines "the chance that a typical Uber user, taking a reasonable number of trips per year, is sexually assaulted by a driver at least once."[169] Based on this claim, Dr. Chandler concluded that about 15.6% women that are "heavier users taking around 120 late-night trips per year" are expected to experience a sexual misconduct or sexual assault incident each year.[170] I found that his model produces an egregious overprediction relative to the observed number of unique riders who reported incidents. Specifically, out of approximately 54 million unique riders on Uber in the U.S. in 2023,[171] 22.8 million of them would be women riders under the assumption that women represent at least 42.3% of all riders.[172] According to Dr. Chandler's estimates, about 15.6% of women, or 3.6 million women would have experienced a sexual misconduct or sexual assault incident in 2023 alone.[173] Thus, even after assuming that men did not experience any incidents and that women would not experience more than one incident per year, Dr. Chandler's model would predict about 3.6 million riders experiencing incidents. Yet, according to the Flack reported incident data, there were 70,530 unique rides involved in a reported incident of sexual misconduct or sexual

---

[169] Chandler Supplemental Report, ¶ 128.

[170] Chandler Supplemental Report, ¶ 129. Dr. Chandler estimated that 1 in 7 women that are heavier users of Uber (14.3%) will experience a sexual misconduct incident and 1 in 78 women that are heavier users of Uber (1.3%) will experience a sexual assault incident, which sums to roughly 15.6%.

[171] "Ride-Hailing 2023," *EMarketer*, October 31, 2023, https://www.emarketer.com/content/ride-hailing-2023 ("Millions of users [2023, Uber only] 41.1 [2023, Both Uber and Lyft] 13.3"). The total number of unique riders on Uber in the U.S. in 2023 is calculated by summing 41.1 and 13.3 million.

[172] UBER_JCCP_MDL_003219916 at 21.

[173] The estimated 3.6 million incidents are calculated by multiplying the estimated number of women riders (22.8 million) by the estimates from Dr. Chandler (15.6% of women).

assault in the U.S. in 2023.[174]  That means that Dr. Chandler's estimates would be more than *50 times higher* than the observed number of reported incidents.[175]

77.    In the next section, I examine the assumptions underpinning Dr. Chandler's cumulative risk calculation model and the selection of his inputs to that model, and I discuss the flaws with his model and inputs that render his results unreliable.

**B.    Dr. Chandler's Analysis of Cumulative Risk is Technically Flawed, and Based on Flawed Assumptions Leading to Highly Inflated Risk Estimates**

78.    In addition to the conceptual problems with Dr. Chandler's repeated exposure analysis, his calculations of cumulative risks are flawed because of the inappropriate assumption he made that underlies his cumulative risk model.  Further, Dr. Chandler's analysis suffers from four errors related to the input parameters used in his cumulative risk model.

79.    The core assumption required by the model, which does not hold in the context of rides arranged on the Uber platform, is that consecutive trips must be events with constant risk, and that trips must be independent risk events from each other for a given rider.  Dr. Chandler did not provide support for this assumption, and the assumption is unlikely to hold, as I discuss below. The four problems with Dr. Chandler's inputs relate to (i) an unsupported risk multiplier for late-night weekend rides, (ii) an unsupported risk multiplier for female riders paired with male drivers, (iii) inappropriate adjustments of incident rates for false reporting, and (iv) inappropriate adjustments of incident rates for underreporting.  I explain each of these issues below and show that after addressing the four problems, even Dr. Chandler's flawed model finds that the cumulative risk based on incident rates from the Flack reported incident data is dramatically lower than that estimated by Dr. Chandler in his report.

80.    Dr. Chandler's cumulative risk model is flawed because it requires the assumption that the risk of an incident occurring on any given trip is constant across all trips for a rider, and that

---

[174] Uber Incident Report Classification of Dominant Tickets for 2017–2024 (Flack Reported Incident Data).
[175] This calculation is conservative, as it assumes that all reported incidents in 2023 came from women.  The number of reports from women riders is less than 70,530 because part of the reports are from survivors who are drivers and/or males, which would imply Dr. Chandler's overprediction was by more than 50 times the observed number of reported incidents (calculated by dividing 3.6 million by 70,530). Even adjusting the reported incident counts for underreporting results in Dr. Chandler's estimates being higher than observed in the data.  Specifically, Dr. Chandler's adjustments for underreporting can be approximated by multiplying the observed incidents by a factor of four.  Doing so still results in estimates that would be more than *12 times higher* than the adjusted number of reported incidents.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

the risk of an incident during any one trip is unrelated to the risk of the previous trips taken by that rider on the Uber platform.[176] This assumption is unsupported and unrealistic. In fact, there are a number of reasons why the underlying risk of any given trip is likely to vary across trips for riders on the Uber platform, but also why a trip that is more or less risky could be expected to be followed by a trip that is similarly more or less risky. For example, a ride that occurs during daytime (which Dr. Chandler claims is associated with lower risks) for a given rider might be more likely to be followed by another daytime ride by the same rider (e.g., because a rider mostly uses Uber to find rides to work in the morning); similarly, a ride originating near a bar (which Dr. Chandler claims is associated with higher risks) might be more likely to have a destination at another bar, from which the rider will also request their next ride.[177] Given that rides are possibly linked by rider behavior, they cannot be assumed to be independent risk events. The cumulative risk model specified in Dr. Chandler's Supplemental Report is not designed to model series of such events.[178]

81.    Dr. Chandler's estimated cumulative risks are unreliable also because they take improperly calculated incident rates as inputs. The incident rates are miscalculated for four reasons, the first two of which are related to risk multipliers used by Dr. Chandler. Dr. Chandler applied these multipliers to purportedly model the risk accumulation of a specific type of ride, i.e., higher risk rides (according to Dr. Chandler) that are late-night weekend trips with a male-driver and female-rider pairing.[179]

82.    First, Dr. Chandler incorrectly applied a finding from his estimated relative risk index, calculated in a different section of the Chandler Supplemental Report, to set a multiplier for the risk of *late-night weekend trips* ("Late-Night Multiplier").[180] Specifically, Dr. Chandler claimed that the risk associated with late-night weekend trips is between 2 and 3 times higher than for trips overall, based on his "escalation analysis."[181] Dr. Chandler, on that basis, multiplied the

---

[176] Chandler Supplemental Report, ¶¶ 125–126.

[177] Chandler Supplemental Report, ¶ 46 ("Uber has had access to data analysis since at least 2017 that shows that being picked up within fifty meters of a bar, as well as being intoxicated to some degree, bear on the risk of sexual assault or misconduct.").

[178] Agresti, A. (2013), *Categorical Data Analysis*, 3rd Edition, Hoboken NJ: John Wiley & Sons, Inc., p. 54. Note that Dr. Chandler's data contradict an assumption of a constant rate of misconduct across the scenarios. *See* Chandler Supplemental Report, footnote 18.

[179] Chandler Supplemental Report, ¶¶ 127–128.

[180] Chandler Supplemental Report, ¶ 23 and Figure 1.

[181] Chandler Supplemental Report, ¶ 127.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

incident rate used in his model by 2.5 times.[182]  However, this approach is problematic because Dr. Chandler's model will produce incorrect incident rates if the absolute risk of a sexual misconduct incident is not the same across every hour of the day and day of the week, which he did not provide any evidence for and is most likely not the case.  This is because Dr. Chandler's relative risk analysis examined the likelihood at different hours of the day that sexual misconduct events "escalate" to sexual assault events, so the use of the 2.5 times multiplier requires an assumption that the same rate of sexual misconduct incidents is occurring in late-night weekend hours as on average across all rides.[183]

83.    Second, Dr. Chandler's second multiplier is supposed to account for the additional risk over baseline of *male-driver to female-rider paired trips* ("Gender Multiplier").[184]  Specifically, Dr. Chandler claims that the risk that "women riding with male drivers on weekend trips faced at least a 2.4x elevated risk."[185]  However, Dr. Chandler used an arbitrarily chosen multiplier of 3.5 in the calculation of the incident rate used in his cumulative risk calculations.[186]  Dr. Chandler provided no justification for this material increase in magnitude.

84.    Third, even if these two multipliers (the "Late Night Multiplier" and the "Gender Multiplier") were appropriate multipliers on their own, Dr. Chandler applied them to flawed adjustments of the incident rate from the Flack reported incident data for false reporting.  Specifically, Dr. Chandler's analyses assumed an arbitrary false reporting rate of 4.5%, which was drawn from the literature in the context of reporting behavior to the Los Angeles Police Department.[187]  However, because reporting to Uber is different from reporting incidents to law enforcement, and likely easier,[188] the false reporting rate to Uber may be different, and likely

---

[182] Chandler Supplemental Report, ¶ 17 and Backup Materials.
[183] Chandler Supplemental Report, Section V.
[184] Chandler Supplemental Report, Section V.B.
[185] Chandler Supplemental Report, ¶¶ 32–35.
[186] Chandler Supplemental Report, ¶ 127.
[187] Chandler Supplemental Report, ¶ 111;  Spohn, C., et al. (2014), "Unfounding Sexual Assault: Examining the Decision to Unfound and Identifying False Reports," *Law & Society Review*, 48, 1, pp. 161–192 ("Spohn (2014)") at p. 186.
[188] Stodden Rebuttal Report, ¶ 54.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

higher. The authors of the analysis cited by Dr. Chandler even suggest that 4.5% may be an underestimate of the false reporting rate.[189]

85.     Fourth, Dr. Chandler adjusted the incident rates for assumed under-reporting.[190] However, as I discussed in the Stodden Rebuttal Report, Dr. Chandler's adjustments for under-reporting are flawed, and likely overestimate the incidence of alleged sexual assault and sexual misconduct on the Uber platform.[191] The flawed incident rates are propagated in his model of repeated exposure, which takes them as inputs.

86.     The impact of these adjustments, and the errors that underlie them, on the risk rates used as inputs to Dr. Chandler's model is not trivial. For instance, Dr. Chandler calculated that the rate of experiencing a sexual assault or sexual misconduct incident, adjusting for underreporting and false reporting, was 1.25 per 100,000 rides for SA and 15 per 100,000 rides for all SA/ SM incidents.[192] However, calculations using just the Flack reported incident data filtered to incidents with driver assailants reveal that the unadjusted incident rates are closer to 0.42 per 100,000 rides, i.e. 0.00042% (about 33.6% of Dr. Chandler's estimate), and 4.72 per 100,000 rides, i.e. 0.00472% (about 31.5% of Dr. Chandler's estimate), for alleged sexual assault and sexual misconduct, respectively.[193] The risk estimates are inappropriately and excessively amplified by Dr. Chandler's cumulative risk model.

87.     Figure 8 shows results from when I re-estimate Dr. Chandler's model first at "baseline" (i.e., Figure 8A), then when I re-estimate his model after removing just the unsupported multipliers (i.e., Figure 8B), and finally when I re-estimate his model after removing the

---

[189] Spohn (2014), pp. 162, 186 ("According to Lonsway, Archambault, and Lisak (2009: 2), the more methodologically rigorous research finds that the percentage of false reports range from 2 to 8 percent.... We believe that this [4.5%] rate may underestimate the prevalence of false reports among all cases reported to the LAPD in 2008."). One reason that the occurrence of false reports may be underestimated in studies of police reporting is that law enforcement can sometimes avoid backlash from designating reports as "false," in favor of leaving them open. *See* "Unfounded Sexual Assaults: Recommended Processes for Investigations and Clearance Reporting," *Sexual Assault Kit Initiative*, https://evawintl.org/wp-content/uploads/13830SAKIBriefFalseReportingv7.pdf, p. 3 ("Law enforcement has faced public scrutiny for labeling various sexual assault reports as false. Although justified at times, the fear of negative publicity causes some law enforcement agencies to avoid using the unfounded designation.").

[190] Chandler Supplemental Report, ¶ 125.

[191] *See, e.g.*, Stodden Rebuttal Report, ¶ 54.

[192] Chandler Supplemental Report, ¶¶ 126–127.

[193] Workpaper 7. I understand that Dr. Chandler does not include in his analysis the following sub-categories of incidents: "Sexual Misconduct – Parent Category Usage Tracking," "Sexual Misconduct – Insufficient Information," "Sexual Misconduct – Self-Touching/Indecent Exposure," "Sexual Misconduct – Masturbation," "Sexual Assault – Parent Category Usage Tracking," and "Sexual Assault – Insufficient Information." *See* Chandler Production File, "05_repeated_exposures.r," lines 15–42.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

adjustments for supposed underreporting and false reporting (i.e., Figure 8C). This third figure plots Dr. Chandler's cumulative risk model using the incident rates in the Flack reported incident data. For each figure, the gray and red lines estimate the cumulative risk of any incident occurring, and for an incident of sexual assault specifically occurring, respectively, based on the total number of rides indicated on the horizonal axis.

88.     In practical terms, the estimated risks shown in Figure 8B demonstrate the impact of simply undoing the unsupported Late-Night Multiplier and Gender Multiplier, which when applied together as Dr. Chandler used them, resulted in an 8.8 scaling-up of the per-ride risk.[194] The result of removing these unsupported multipliers is much flatter plots. The risk of experiencing any incident (including of the lowest severity) after 120 rides in a year remains below 1.70%, as shown in Figure 8B, even without addressing the other flaws with Dr. Chandler's model that produce unreliable measures of risk. Similarly, the risk of experiencing a sexual assault after 120 rides only reaches 0.15%. In addition to removing unsupported multipliers, removing Dr. Chandler's unsupported adjustments for underreporting and false reporting, as in Figure 8C, decreases the cumulative risk after 120 rides even further, to 0.04% for sexual assault (instead of 1.28% estimated by Dr. Chandler), and 0.51% for any incident (instead of 13.96% estimated by Dr. Chandler).

---

[194] Dr. Chandler calculates a multiplier of 8.8 by improperly combining an asserted "2–3 times" higher risk "than the baseline" of an incident happening "at night on weekends" and a 3.5 times higher risk relative to the baseline of an incident happening for "female riders who have male drivers," solving 2.5 times 3.5 and rounding 8.75 to 8.8. Not only does this calculation violate statistical best practices by neglecting the possibility of any correlation between these two factors, this number is inflated by rounding up to the tenths place, losing precision unnecessarily, especially in light of the fact Dr. Chandler does not round intermediately elsewhere in his analyses. *See* Chandler Supplemental Report, ¶ 127; Chandler Production File, "05_repeated_exposures.r," line 114.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### Figure 8A: Dr. Chandler's Cumulative Risk Model Estimates for Annual Probability of Experiencing Sexual Assault and Sexual Misconduct Incidents by Number of Late-Night Weekend, Male-Driver, Female Passenger Trips



Source: Flack Reported Incident Data, 2017–2024; Chandler Supplemental Report

Note: This figure replicates Figure 10 from the Chandler Supplemental Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### Figure 8B: Dr. Chandler's Cumulative Risk Model Estimates for Annual Probability of Experiencing Sexual Assault and Sexual Misconduct Incidents by Number of Trips (Corrected for Unsupported Multipliers)



Source: Flack Reported Incident Data, 2017–2024; Chandler Supplemental Report

Note: This figure replicates Figure 10 from the Chandler Supplemental Report, without the unsupported relative-risk adjustment for time of day or gender, retaining unsupported adjustments for under- and false-reporting of incidents.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### Figure 8C: Dr. Chandler's Cumulative Risk Model Estimates for Annual Probability of Experiencing Sexual Assault and Sexual Misconduct Incidents by Number of Trips (Corrected for Unsupported Multipliers and Unsupported Adjustments for False Reporting and Under-reporting)



Source: Flack Reported Incident Data, 2017–2024; Chandler Supplemental Report

Note: This figure replicates Figure 10 from the Chandler Supplemental Report, removing unsupported time-of-day, gender, under- and false-reporting adjustments to the Flack reported incident data.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## VII.    Dr. Chandler's Review of the Five Bellwether Scenarios Did Not Contain Any Statistical Analyses

89.    Dr. Chandler described the five bellwether scenarios[195] in the context of relative risk variables which he had described earlier in his report.[196]  Dr. Chandler claimed that this information allowed him to "say with a reasonable degree of scientific certainty" that Uber "had access to information that would allow the company to predict high risk patterns" in the five bellwether scenarios.[197]  However, Dr. Chandler's claims are unreliable because he did not conduct any statistical calculations of risk using this information for any of the five scenarios, he failed to evaluate whether the drivers' characteristics from each scenario differed from drivers not implicated in assaults, and he failed to evaluate whether any scenario experienced higher risk relative to alternative means of transportation.

90.    Dr. Chandler claimed that the information described for each bellwether scenario allowed him to form his opinion that Uber could have predicted high risk patterns that would be relevant to the scenario.  However, his claims are unsupported and speculative because he did not conduct any statistical analyses using the information presented for each bellwether scenario to assess relative risks for these scenarios.  Instead, Dr. Chandler just presented selective characteristics from each of the five scenarios—for example, the time of day and day of the week;[198] any involvement of alcohol;[199] the counts of route deviations or long stops ever made by the driver[200]—and then restated his conclusions that "relative risk variables" increased the risk for each of the five bellwether scenarios.[201]  Dr. Chandler did not estimate any risk for riders in the five scenarios, and he just claimed that "Uber had access to information that would allow the company to predict high risk patterns."[202]

91.    Dr. Chandler also listed various measures for drivers' characteristics in the five bellwether scenarios, and claimed that these characteristics were related to the variables

---

[195] Chandler Supplemental Report, Sections VII and VIII.
[196] Chandler Supplemental Report, Sections V and VI.
[197] Chandler Supplemental Report, ¶¶ 89, 95, 99, 103, 108.
[198] Chandler Supplemental Report, ¶¶ 72, 74, 76, 78.
[199] Chandler Supplemental Report, ¶¶ 82, 91, 104.
[200] Chandler Supplemental Report, ¶¶ 83, 92, 105.
[201] Chandler Supplemental Report, Section VII, ¶¶ 89, 95, 99, 103, 108.
[202] Chandler Supplemental Report, ¶¶ 89, 95, 99, 103, 108.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

discussed in the context of risk evaluation in his report.[203]  Table 4 summarizes the drivers' characteristics described by Dr. Chandler for the five drivers from the bellwether scenarios.

92.    I find that no two drivers in the bellwether scenarios share the same profile of characteristics.  For example, comparing drivers in the JD and BM scenarios shows the differences between their characteristics.  The driver from the JD scenario had positive counts in most of the variables listed in the Chandler Supplemental Report, Section VIII, while the driver in the BM scenario had positive counts in just two—i.e., 1-star ratings and a "preference for late-night trips."  Comparing the counts of 1-star ratings, the driver from the JD scenario had 61 1-star rated trips, while the driver from the BM scenario had 6 1-star rated trips, which is just about one-tenth from the JD scenario count.  The drivers also differed in other obvious ways, for example the driver from the JD scenario had driven for Uber for almost 7 years and completed about 10,000 trips, while the driver from the BM scenario had driven for Uber for fewer than four months and completed about 1,000 trips.

---

[203] Chandler Supplemental Report, Section VIII.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### Table 4:  Summary of Driver Characteristics Presented by Dr. Chandler from the Five Bellwether Scenarios

| | JD | BL | BM | EM | AR |
|---|---|---|---|---|---|
| **Driver history summary** | | | | | |
| Total number of completed prior Uber rides | 9,757 | 579 | 1,054 | 23,313 | 4,161 |
| Number of years of Uber driving history | 6.9 | 0.1 | 0.3 | 6.7 | 1.0 |
| **Count of trips with the following characteristics** | | | | | |
| Off-route/deviation indicators | 24 | – | – | – | 3 |
| Long stop indicators | 119 | 1 | – | – | 11 |
| Ended midway or not at destination | 95 | 4 | – | – | 39 |
| GPS tracking showed the driver lingering at the destination | – | 4 | – | – | – |
| 1-star ratings | 61 | – | 6 | 160 | 12 |
| 2-star ratings | 12 | 2 | – | 60 | 2 |
| **Count of feedback tags and reports** | | | | | |
| Professionalism | 10 | 1 | – | – | – |
| Comfort | 2 | – | – | – | – |
| Conversation | 3 | – | – | – | – |
| Driver not polite | 7 | – | – | – | 3 |
| Unsafe or dangerous driving | 7 | 1 | – | 14 | – |
| SA/SM | 2 | – | – | 1 | 1 |
| **Other details** | | | | | |
| "Preference for late-night trips" | Yes | – | Yes | – | – |
| "High number of cleaning fees" | Yes | – | – | – | – |
| "History of cancelling trips outside of preferences" | Yes | – | – | – | – |

Source: Chandler Supplemental Report; UBER-MDL3084-BW-000050791; UBER-MDL3084-BW-000050792; UBER-MDL3084-BW-00050793; UBER-MDL3084-BW-00050794; UBER-MDL3084-BW-0050795

Notes: Characteristics, including their labeling, are reproduced as they appear in Dr. Chandler's Supplemental Report.  Counts of prior rides and number of years of history are computed from driver ride-level feedback logs.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

93.     In fact, each characteristic identified by Dr. Chandler shows variation across the five drivers.  Given how much the drivers across the bellwether scenarios differ from each other, a reasonable question is whether and how each bellwether driver differs from the set of drivers on the Uber platform at large.  However, Dr. Chandler failed to analyze whether the bellwether drivers' characteristics differed from the broader pool of drivers on the Uber platform.

94.     Besides having failed to make any risk calculations for the bellwether scenarios, Dr. Chandler further failed to consider whether rides on the Uber platform for these scenarios might have been safer compared to the alternative modes of transportation available to these riders.  As I explain at Section III.B of this report, and Section VI.C of the Stodden Opening Report, the reported incident rate for sexual assaults on alternative modes of transportation, such as city buses, is higher than the reported rate for rides on the Uber platform.[204]

Executed this 2 of January, 2026

Victoria Stodden, Ph.D.

---

[204] Stodden Opening Report, Table 2.

**Appendix A**

# Victoria Stodden
Associate Professor
Department of Industrial and Systems Engineering
University of Southern California
victoria@stodden.net
*http://stodden.net*

Victoria Stodden is an internationally recognized statistician and data scientist. Professor Stodden analyzes the reliability of scientific results, particularly in the context of sophisticated computational approaches to research. Her expertise includes statistical sampling and statistical data analyses, big data methods, the design and implementation of scientific validation systems, and openness standards for data and code sharing.

Professor Stodden has published in academic journals and conference proceedings, and co-edited two books: *Privacy, Big Data, and the Public Good: Frameworks for Engagement*, and *Implementing Reproducible Research*. She has served as associate editor for the *Harvard Data Science Review*, the *Annals of Applied Statistics*, and on the editorial advisory boards of a number of other statistics and data science journals.

Before joining USC, Professor Stodden held visiting and permanent faculty positions at the University of California, Berkeley; Columbia University; and the University of Illinois at Urbana-Champaign, where she received tenure. She was a Kauffman Fellow in Law and Innovation at Yale Law School and a fellow at Harvard Law School's Berkman Center for Internet & Society. She is currently a Visiting Professor in the Karlsruhe Institute of Technology (KIT) Computational and Data Science Graduate School (KCDS), supported by the International Excellence Award of KIT and the MathSEE (Mathematics in Sciences, Engineering, and Economics) Distinguished Fellowship.

## EDUCATION

**Stanford University**, Ph.D., Statistics

**Stanford Law School**, M.L.S.

**Stanford University**, M.S., Statistics

**University of British Columbia**, M.S., Economics

**University of Ottawa**, B.Soc.Sci., Economics, *magna cum laude*

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| **University of Southern California** | |
| Associate Professor, Department of Industrial and Systems Engineering Viterbi School of Engineering | 1/2021–present |
| **Karlsruhe Institute of Technology (KIT)** | |
| Visiting Professor in the KIT Graduate School Computational and Data Science (KCDS), supported by the International Excellence Award of KIT and the MathSEE (Mathematics in Sciences, Engineering, and Economics) Distinguished Fellowship | 1/2025–present |
| **Stanford University** | |
| Faculty Affiliate, Meta-Research Innovation Center (METRICS) | 2015–present |

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| **Stanford Law School** | |
| Affiliate Scholar, The Center for Internet and Society | 2014–present |
| **University of Illinois Urbana-Champaign** | |
| Associate Professor, School of Information Sciences, with courtesy appointments in the College of Law and Departments of Statistics and Computer Science | 8/2014–1/2021 |
| **University of California at Berkeley** | |
| Visiting Assistant Professor in the Statistics Department | 1/2014–6/2014 |
| **Columbia University** | |
| Assistant Professor, Department of Statistics, with affiliate appointment in the Institute for Data Sciences and Engineering | 7/2010–7/2014 |
| **Yale Law School** | |
| Kauffman Fellow in Law and Innovation | 8/2009–7/2010 |
| **MIT Sloan School of Management** | |
| Postdoctoral Researcher | 1/2009–7/2009 |
| **Harvard Law School** | |
| Fellow, Berkman Center for Internet & Society | 1/2008–12/2009 |

## HONORS AND RECOGNITIONS

| | |
|---|---|
| Professor Maurice H. Belz Fund Visiting Scholar, University of Melbourne, Australia | 6/25–8/25 |
| Karlsruhe Institute of Technology MathSEE (Mathematics in Sciences, Engineering, and Economics) Distinguished Fellowship | 1/25 |
| Alexander Humboldt Foundation Research Fellowship, Germany (€60,000) | 10/24 |
| International Excellence Award of KIT (Karlsruhe Institute of Technology), Germany | 9/24 |
| Stanford Centennial Teaching Award, Stanford University | 6/03 |
| Statistics Departmental Teaching Award, Stanford University | 6/03 |
| Statistics Departmental Teaching Award, Stanford University | 6/02 |
| Merit Scholarship, Association of Professors of the University of Ottawa | 1993–94 |
| Merit Scholarship, University of Ottawa | 1992–93 |
| Dean's Honor List for Outstanding Academic Performance, University of Ottawa | 1991–94 |

## PROFESSIONAL ACTIVITIES

| | |
|---|---|
| **Academic Journals/Editorial** | |
| Associate Editor for Reproducibility, *Technometrics* | 2024–present |
| Associate Editor, *Harvard Data Science Review* | 2019–present |
| Advisory Board Member, Research Ideas and Outcomes, *The Open Science Journal* | 2016–present |
| Associate Editor for Reproducibility, *IEEE Transactions on Parallel and Distributed Systems* | 2018–2022 |

2

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| Associate Editor for Reproducibility, *Journal of the American Statistical Association, Applications and Case Studies* | 2016–2018 |
| Associate Editor, Institute of Mathematical Statistics, *Annals of Applied Statistics* | 2015–2020 |

**External Advisory Boards and Committees**

| | |
|---|---|
| National Science Foundation, *Committee of Visitors (COV) for the Office of Advanced Cyberinfrastructure (OAC), Directorate for Computer and Information Sciences and Engineering (CISE)* | 7/2022–8/2022 |
| National Academy of Engineering (NAE), *Advisory Group for the Online Resource Center for Ethics Education in Engineering and Science* | 2014–2020 |
| Inaugural Chair, *ACM Emerging Interest Group on Reproducibility and Independent Verification* | 2020–2021 |
| Member, National Institute of Statistical Sciences (NISS) Board of Trustees | 2020–2021 |
| Advisory Committee for American Educational Research Association (AERA) & Council of Graduate Schools (CGS), "Examining Impact and Fostering Academic Support for Open Science Products" | 2020–2021 |
| National Information Standards Organization (NISO) Working Group Member: Taxonomy, Definitions, and Recognition Badging Scheme Working Group | 2019–2021 |
| Advisor to the Curating for Reproducibility (CURE) Consortium, Yale University | 2017–present |
| ACM Task Force on Data, Software, and Reproducibility in Publication | 2013–present |
| Social Science Research Council, Digital Culture Advisory Board | 2015–2020 |
| Advisory Board, Project TIER (Teaching Integrity in Empirical Research), Haverford University. Funded by the Alfred P. Sloan Foundation. | 2015–present |
| The International Mathematical Union, Committee on Electronic Information and Communication | 2014–2020 |
| Board of Advisors, American Statistical Association, *Statistical Analysis and Data Mining* | 2013–2016 |
| Transparency and Openness Promotion (TOP) Guidelines Coordinating Committee, Center for Open Science | 2016–2021 |
| IEEE CS Ad Hoc Committee on Open Science and Reproducibility, reporting to the Board of Governors | 2020–2021 |
| ACM Ethics & Plagiarism Committee | 2017–2019 |
| American Statistical Association, Committee on Professional Ethics | 2016–2019 |
| Advisory Group on Reproducibility to the Supercomputing Conference, ACM, and IEEE | 2015–2018 |
| Member, *NSF Advisory Committee for the Computing and Information Science and Engineering (CISE) Directorate* | 2014–2017 |
| American Statistical Association, Committee on Privacy and Confidentiality | 2013–2015 |
| American Statistical Association, Presidential Strategic Initiative, Developing a Prototype Statistics Portal | 2013–2014 |
| Co-chair, Committee on Data Sharing and Reproducibility, American Statistical Association | 2013–2014 |

3

**Appendix A**

**Victoria Stodden**
University of Southern California

*NSF Advisory Committee for Advanced CyberInfrastructure*, Office of Advanced
Cyberinfrastructure, Computing and Information Science and Engineering (CISE)
Directorate (ACCI)
- Co-Chair                                                                      2013–2014
- Member                                                                       2011–2015

# CONGRESSIONAL TESTIMONY

- Hearing on Scientific Integrity & Transparency, House Committee on Science, Space and Technology Subcommittee on Research, Washington, D.C., March 5, 2013.
- http://science.house.gov/hearing/subcommittee-research-scientific-integrity-transparency

# PUBLICATIONS: PEER-REVIEWED ARTICLES

- V. Stodden, "On Emergent Limits to Knowledge—Or, How to Trust the Robot Researchers: A Pocket Guide," *Harvard Data Science Review*, 6(1), 2024. DOI:10.1162/99608f92.dcaa63bc

- M. Parashar, M. A. Heroux and V. Stodden, "Research Reproducibility," *Computer*, Vol. 55, no. 8, Aug. 2022. DOI:10.1109/MC.2022.3176988.

- M. Schweinsberg, et al., "Same Data, Different Conclusions: Radical Dispersion in Empirical Results When Independent Analysts Operationalize and Test the Same Hypothesis," *Organizational Behavior and Human Decision Processes*, Vol. 165, July 2021. DOI:10.1016/j.obhdp.2021.02.003.

- M. Krafczyk, A. Shi, A. Bhaskar, D. Marinov, and V. Stodden, "Three Empirical Principles for Computational Reproducibility and their Implementation: The Reproduction Package," Philosophical Transactions of the Royal Society A: Mathematical, Physical, and Engineering Sciences, Mar. 29, 2021. DOI:10.1098/rsta.2020.0069.

- H. Fineberg, V. Stodden, and X.L. Meng, "Highlights of the US National Academies Report on 'Reproducibility and Replicability in Science'," *Harvard Data Science Review*, Issue 2.4, Fall 2020. DOI:10.1162/99608f92.cb310198.

- C. Willis and V. Stodden, "Trust but Verify: How to Leverage Policies, Workflows, and Infrastructure to Ensure Computational Reproducibility in Publication," *Harvard Data Science Review*, Issue 2.4, Fall 2020. DOI:10.1162/99608f92.25982dcf.

- D. Chapp, V. Stodden and M. Taufer, "Approaching a Vision of Reproducibility in Cyberinfrastructure: Building on Community Efforts," *Supercomputing Frontiers and Innovations*, 7(1), Jan. 2020. DOI:10.14529/js200106.

- V. Stodden, "The Data Science Life Cycle: A Disciplined Approach to Advancing Data Science," Communications of the ACM, 63(7), July 2020. DOI:10.1145/3360646.

- J. Jeschke, K. Börner, V. Stodden, and K. Tockner, "Open Access Journals Need to Become First Choice in Invasion Ecology and Beyond," *NeoBiota*, 52, Nov. 2019. DOI:10.3897/neobiota.52.39542.

- H. Monajemi, R. Murri, E. Jonas, P. Liang, V. Stodden, and D. Donoho, "Ambitious Data Science Can Be Painless," *Harvard Data Science Review*, Issue 1.1, July 2019. DOI:10.1162/99608f92.02ffc552.

- B. Ludäscher, K. Chard, N. Gaffney, M. B. Jones, J. Nabrzyski, V. Stodden, M. Turk, and K. Turner, "Computing Environments for Reproducibility: Capturing the 'Whole Tale'," *Future Generation Computer Systems*, 94(C), May 2019. DOI:10.1016/j.future.2017.12.029.

4

**Appendix A**

**Victoria Stodden**
University of Southern California

- F. Berman, S. Davidson, D. Estrin, B. Halipern, M. Franklin, M. Martonosi, P. Raghavan, R. Rutenbar, V. Stodden, and A. Szalay, "Realizing the Potential of Data Science," Communications of the ACM, 61(4), Apr. 2018. DOI:10.1145/3188721.

- V. Stodden, J. Seiler, and Z. Ma, "An Empirical Analysis for Journal Policy for Computational Reproducibility," Proceedings of the National Academy of Sciences, Mar. 2018. DOI:10.1073/pnas.1708290115.

- N. Kafkafi et al. "Reproducibility and Replicability of Rodent Phenotyping in Pre-clinical Studies," *Neuroscience & Biobehavioral Reviews*, Jan. 2018. DOI:10.1016/j.neubiorev.2018.01.003.

- R.C. Jiménez et al. "Four Simple Recommendations to Encourage Best Practices in Research Software," F1000Research 2017, 6(876), June 2017. DOI:10.12688/f1000research.11407.1.

- D. Greenbaum, J. Rozowsky, V. Stodden, and M. Gerstein, "Structuring Supplemental Materials in Support of Reproducibility," *Genome Biology*, 2017. DOI:10.1186/s13059-017-1205-3.

- V. Stodden, M. McNutt, D. H. Bailey, E. Deelman, Y. Gil, B. Hanson, M. A. Heroux, J. P. A. Ioannidis, and M. Taufer, "The 'Reproducibility Enhancement Principles' for Computational Methods," *Science*, 354(6317), Dec. 2016. DOI:10.1126/science.aah6168.

- B. Alberts, R. J. Cicerone, S. E. Fienberg, A. Kamb, M. McNutt, R. M. Nerem, R. Schekman, R. Shiffrin, V. Stodden, S. Suresh, M. T. Zuber, B. Kline Pope, and K. Hall Jamieson, "Self-correction in Science at Work," *Science*, 348(6242), June 2015, pp. 1420–22. DOI:10.1126/science.aab3847.

- V. Stodden, "Reproducing Statistical Results," *Annual Review of Statistics and Its Application*, Vol. 2, 2015, pp. 1–19. DOI:10.1146/annurev-statistics-010814-020127.
  **Chosen by Annual Reviews for Open Access in support of the 2019 National Academies of Science, Engineering and Medicine report, "Reproducibility and Replicability in Science."**

- V. Stodden, J. Seiler, and S. Miguez, "ResearchCompendia: CyberInfrastructure for Reproducibility and Collaboration in Computational Science," *IEEE Computing in Science and Engineering*, 17(1), Jan./Feb. 2015, pp. 12–19. DOI:10.1109/MCSE.2015.18.

- V. Stodden, "The Reproducible Research Movement in Statistics," *Statistical Journal of the International Association of Official Statistics*, 30(2), 2014, pp. 91–93. DOI:10.3233/SJI-140818.

- V. Stodden and S. Miguez, "Best Practices for Computational Science: Software Infrastructure and Environments for Reproducible and Extensible Research," *Journal of Open Research Software* 2(1), Page/Article e21, 2014, pp. 1–6. DOI:10.5334/jors.ay.

- V. Stodden, P. Guo, and Z. Ma, "Toward Reproducible Computational Research: An Empirical Analysis of Data and Code Policy Adoption by Journals," *PLOS ONE* 8(6), 2013. DOI:10.1371/journal.pone.0067111.
  **Chosen for inclusion in the PLOS Open Data Collection.**

- R. LeVeque, I. Mitchell, and V. Stodden, "Reproducible Research for Scientific Computing: Tools and Strategies for Changing the Culture," *IEEE Computing in Science and Engineering*, Vol. 14, Issue 4, 2012, pp. 13–17. DOI:10.1109/MCSE.2012.38.

- V. Stodden with Yale Roundtable Participants, "Reproducible Research: Addressing the Need for Data and Code Sharing in Computational Science," IEEE Computing in Science and Engineering, vol. 12, no. 5, pp. 8–13, Sep./Oct. 2010.

- V. Stodden, "Open Science: Policy Implications for the Evolving Phenomenon of User-Led Scientific Innovation*," Journal of Science Communication* 9(1), Mar. 2010. DOI:10.22323/2.09010205.

- V. Stodden with the Toronto International Data Release Workshop Authors, "Prepublication Data Sharing," *Nature*, 461(10), Sep.2009, pp. 168–70. DOI:10.1038/461168a.

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Stodden, "Enabling Reproducible Research: Open Licensing for Scientific Innovation," *International Journal of Communications, Law and Policy*, Issue 13, Winter 2008–09, pp.1–25.
  **Winner of the Access to Knowledge Kaltura prize.**
- V. Stodden, "The Legal Framework for Reproducible Research in the Sciences: Licensing and Copyright," *IEEE Computing in Science and Engineering*, 11(1), Jan. 2009, pp. 35–40. DOI:10.1109/MCSE.2009.19.
- D. Donoho, A. Maleki, I. Rahman, M. Shahram, and V. Stodden, "Reproducible Research in Computational Harmonic Analysis," *IEEE Computing in Science and Engineering*, 11(1), Jan. 2009, pp. 8–18. DOI:10.1109/MCSE.2009.15.
- E. Hurowitz, I. Drori, V. Stodden, D. Donoho, and P. Brown, "Virtual Northern Analysis of the Human Genome," *PLOS ONE*, May 23, 2(5), 2007. DOI:10.1371/journal.pone.0000460.
- I. Ur Rahman, I. Drori, V. Stodden, D. Donoho, and P. Schroeder, "Multiscale Representations of Manifold-valued Data," SIAM J. Multiscale Modeling and Simulation, 4(4), 2005, p. 1201–1232. DOI:10.1137/050622729.
- V. Stodden, *Model Selection When the Number of Variables Exceeds the Number of Observations*, Doctoral thesis, Stanford University Department of Statistics, 2006.

## PUBLICATIONS: EDITED WORKS

- V. Stodden, "Reproducibility and Replicability in Science," Guest Editor's Introduction, *Harvard Data Science Review* 2020. (Five contributed articles). Special Issue for the National Academies "Reproducibility and Replicability in Science" Report.
- D. Allison, R. Shiffrin, and V. Stodden, "Reproducibility of Research: Issues and Proposed Remedies," Guest Editor's Introduction, Proceedings of the National Academy of Sciences, 115(11), pp. 2561–2562, Mar. 2018. DOI: 10.1073/pnas.1802324115. (Twelve contributed articles). Co-organizers' edited volume from the National Academies Arthur M. Sackler Colloquium on Improving the Reproducibility of Scientific Research.
- V. Stodden, "Reproducible Research: Tools and Strategies for Scientific Computing," Guest Editor's Introduction, *IEEE Computing in Science and Engineering*, 4(4), pp. 11–12, 2012. DOI:10.1109/MCSE.2012.82. (Seven contributed articles).
- J. Lane, V. Stodden, S. Bender, and H. Nissenbaum, eds., *Privacy, Big Data, and the Public Good: Frameworks for Engagement*, Cambridge University Press, June 2014.
- V. Stodden, F. Leisch, and R. Peng, eds., *Implementing Reproducible Research (A Volume in the R Series)*, Taylor & Francis, Apr. 2014.

## PUBLICATIONS: BOOK CHAPTERS

- D. Donoho and V. Stodden, "Reproducible Research in Computational Mathematics," invited to *The Princeton Companion to Applied Mathematics*, edited by N. J. Higham; M. R. Dennis, P. Glendinning, P. A. Martin, F. Santosa, and J. Tanner, associate eds., 2015, pp. 916–925.
- D. Bailey, J. Borwein, and V. Stodden, "Facilitating Reproducibility in Scientific Computing: Principles and Practice," in *Reproducibility: Principles, Problems, Practices, Prospects*, H. Atmanspacher and S. Maasen, eds., Wiley, 2015. pp. 205–232.

**Victoria Stodden**
University of Southern California

- V. Stodden, "Enabling Reproducibility in Big Data Research: New Approaches to Intellectual Property and Privacy Law for Scientific Integrity," in *Privacy, Big Data, and the Public Good: Frameworks for Engagement*, J. Lane, V. Stodden, H. Nissenbaum, and S. Bender, eds., Cambridge University Press, 2014. pp. 112–132.

- C. Hurlin, C. Perignon, and V. Stodden, "RunMyCode.org: A Research-Reproducibility Tool for Computational Sciences," in *Implementing Reproducible Research*, V. Stodden, F. Leisch, and R., Peng, eds., Taylor & Francis, 2014. pp. 367–382.

- V. Stodden, "Policy and Intellectual Property Rights in Computational Science," in *Implementing Reproducible Research*, V. Stodden, F. Leisch, and R., Peng, eds., Taylor & Francis, 2014. pp. 325–342.

- V. Stodden, "What Computational Scientists Need to Know About Intellectual Property Law: A Primer," in *Opening Science: The Evolving Guide on How the Web is Changing Research, Collaboration and Scholarly Publishing*, S. Bartling and S. Friesike, eds., Springer, 2013. pp. 225–235.

- V. Stodden, "Innovation and Growth through Open Access to Scientific Research: Three Ideas for High-Impact Rule Changes," in *Rules for Growth: Promoting Innovation and Growth Through Legal Reform*, edited by The Kauffman Task Force on Law, Innovation, and Growth. Feb. 2011. pp. 409–432.

- V. Carey and V. Stodden, "Reproducible Research Concepts and Tools for Cancer Bioinformatics," *in Biomedical Informatics for Cancer Research*, M. F. Ochs, J. T. Casagrande, and R. V. Davuluri, eds., Springer, 2010. pp. 149–175.

## PUBLICATIONS: REFEREED CONFERENCE ARTICLES

- A. Bhaskar and V. Stodden. "Reproscreener: Leveraging LLMs For Assessing Computational Reproducibility Of Machine Learning Pipelines," ACM REP '24 ACM Conference on Reproducibility and Replicability, June 18–20, 2024. DOI:10.1145/3641525.3663629 (forthcoming)

- Y. Zheng and V. Stodden. "The Idealized Machine Learning Pipeline (IMLP) For Advancing Reproducibility In Machine Learning," ACM REP '24 ACM Conference on Reproducibility and Replicability, June 18–20, 2024. DOI:10.1145/3641525.3663630 (forthcoming)

- P. Zhang, Y. Jiang, A. Wei, V. Stodden, D. Marinov, and A. Shi, "Domain-Specific Fixes for Flaky Tests with Wrong Assumptions on Underdetermined Specifications," IEEE/ACM 43rd International Conference on Software Engineering (ICSE), 2021. DOI:10.1109/ICSE43902.2021.00018.

- V. Stodden, "Beyond Open Data: A Model for Linking Digital Artifacts to Enable Reproducibility of Scientific Claims," Third International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS20), June 2020. DOI:10.1145/3391800.3398172.

- W. Lam, S. Winter, A. Astorga, V. Stodden, and D. Marinov, "Understanding Reproducibility and Characteristics of Flaky Tests Through Test Reruns in Java Projects," 2020 IEEE 31st International Symposium on Software Reliability Engineering (ISSRE), 2020. DOI:10.1109/ISSRE5003.2020.00045.

- K. Chard, N. Gaffney, M. B. Jones, K. Kowalik, B. Ludäscher, J. Nabrzyski, V. Stodden, I. Taylor, T. Thelen, M. J. Turk, and C. Willis, "Application of BagIt-Serialized Research Object Bundles for Packaging and Re-execution of Computational Analyses," IEEE 15th International Conference on e-Science (e-Science), San Diego, 2019. DOI:10.1109/eScience.2019.00068.

- V. Stodden, V. Ferrini, M. Gabanyi, K, Lehnert, J. Morton, and H. Berman, "Open Access to Research Artifacts: Implementing the Next Generation Data Management Plan," Association for Information Science and Technology (ASIST19), 2019. DOI:10.1002/pra2.51.

- M. S. Krafczyk, A. Shi, A. Bhaskar, D. Marinov, and V. Stodden, \Scientific Tests and Continuous Integration Strategies," Second International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS19), June 2019. DOI:10.1145/3322790.3330595.

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Welch, E, Deelman, V. Stodden, and M. Taufer, "Initial Thoughts on Cybersecurity and Reproducibility," Second International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS19), June 2019. DOI:10.1145/3322790.3330593.

- K. Chard, N. Gaffney, M. B. Jones, B. Ludäscher, J. Nabrzyski, V. Stodden, M. Turk, and C. Willis, "Implementing Computational Reproducibility in the Whole Tale Environment," Second International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS19), June 2019. DOI:.10.1145/3322790.3330594.

- B. Mecum, S. Wyngaard, C. Willis, M. Turk, T. Thelen, I. Taylor, V. Stodden, D. Perez, J. Nabrzyski, B. Ludäscher, S. Kulasekaran, K. Kowalik, M. B. Jones, M. Hategan, N. Gaffney, K. Chard, and A. Brinckman, "Science, Containerized: Integrating Provenance and Compute Environments with the Whole Tale," AGU Fall Meeting Abstracts, 2018.

- V. Stodden, X.Wu, and V. Sochat, "AIM: An Abstraction for Improving Machine Learning Prediction," IEEE Data Science Workshop Proceedings, June 2018. DOI:10.1109/DSW.2018.8439914.

- V. Stodden, M. S. Krafczyk, and A. Bhaskar, "Enabling the Verification of Computational Results: An Empirical Evaluation of Computational Reproducibility," First International Workshop on Practical Reproducible Evaluation of Computer Systems (P-RECS18), June 2018. DOI:10.1145/3214239.3214242.

- V. Stodden and X. Wu, "Defining the AIM: An Abstraction for Improving Machine Learning Prediction," American Statistical Association Symposium on Data Science and Statistics, May 2018.

- H. Monajemi, D. L. Donoho, and V. Stodden, "Making Massive Computational Experiments Painless," IEEE BigData 2016, Open Science in Big Data (OSBD 2016), Dec. 5, 2016.

- B. Ludäscher, K. Chard, N. Gaffney, M. B. Jones, J. Nabrzyski, V. Stodden, and M. Turk, "Capturing the 'Whole Tale' of Computational Research: Reproducibility in Computing Environments," Science Gateways 2016.

- V. Stodden and S. Miguez, "Provisioning Reproducible Computational Science Information," reproducibility@XSEDE: An XSEDE14 Workshop, 2014.

- V. Stodden and H. Reich, "Software Patents as a Barrier to Scientific Transparency: An Unexpected Consequence of Bayh-Dole," Conference on Legal Empirical Studies, Stanford, CA, Nov. 2012.

- V. Stodden, C. Hurlin, and C. Perignon, "RunMyCode.org: A Novel Dissemination and Collaboration Platform for Executing Published Computational Results," IEEE International Conference on eScience, Workshop on Analyzing and Improving Collaborative eScience with Social Networks, 2012.

- V. Stodden, "Data Sharing in Social Science Repositories: Facilitating Reproducible Computational Research," NIPS workshop: Computational Science and the Wisdom of Crowds, Dec. 2010.

- V. Stodden and P. Meier, "A Global Empirical Evaluation of New Communication Technology Use and Democratic Tendency."
  **Nominated for Best Paper, 3rd IEEE/ACM International Conference on Information and Communication Technologies and Development, Doha, Qatar, Apr. 2009.**

- D. Donoho and V. Stodden, "Breakdown Point of Model Selection When the Number of Variables Exceeds the Number of Observations," IEEE World Congress on Computational Intelligence, 2006.

- E. Hurowitz, I. Drori, and V. Stodden, "Fast l1 Minimization for Genomewide Analysis of mRNA Lengths," IEEE International Workshop on Genomic Signal Processing and Statistics, 2006.

- D. Donoho and V. Stodden, "Breakdown Point of Model Selection When the Number of Variables Exceeds the Number of Observations," Proc. IEEE International Joint Conference on Neural Networks, Vancouver, BC, 2006.

- D. Donoho and V. Stodden, "When Does Non-Negative Matrix Factorization Give a Correct Decomposition Into Parts?" Proceedings NIPS 2003.

**Appendix A**

**Victoria Stodden**
University of Southern California

# PUBLICATIONS: OTHER SCHOLARLY WORKS

- V. Stodden with Committee Members, "Reproducibility and Replication in Science," National Academies of Sciences, Engineering, and Medicine, Apr. 2019.

- V. Stodden with Committee Members, "Fostering Integrity in Research," National Academies of Sciences, Engineering, and Medicine, Apr. 2017.

- V. Stodden, "How do I know the right level of abstraction at which to explain a phenomenon?", Reply to The Edge Annual Question 2018: What is the Last Question? Jan. 2018.

- V. Stodden, "Epsilon," Reply to The Edge Annual Question 2017: What scientific term ought to be more widely known? Jan. 2017.

- V. Stodden with Committee Members, "Realizing the Potential of Data Science," Final Report from the National Science Foundation Computer and Information Science and Engineering Advisory Committee Data Science Working Group, Dec. 2016.

- D. James, N. Wilkins-Diehr, V. Stodden, D. Colbry, and C. Rosales, "Standing Together for Reproducibility in Large-Scale Computing: Report on reproducibility@XSEDE, An XSEDE14 Workshop," Dec. 2014.

- V. Stodden, "Reproducibility," Reply to The Edge Annual Question 2014: What scientific idea is ready for retirement? Jan. 2014.

- J. Lane and V. Stodden, "What, Me Worry? What to Do about Privacy, Big Data, and Statistical Research," *Amstat News*, Dec. 2013.

- V. Stodden, "Resolving Irreproducibility in Computational and Empirical Research," invited *IMS Bulletin*, Dec. 2013.

- V. Stodden, D. Bailey, and J. Borwein, "'Setting the Default to Reproducible' in Computational Science Research," *SIAM News*, June 2013.

- D. Bailey, J. Borwein, and V. Stodden, "Set the Default to 'Open'," *Notices of the AMS*, June 2013.

- V. Stodden, D. Bailey, J. Borwein, R. LeVeque, W. Rider, and W. Stein "Setting the Default to Reproducible: Reproducibility in Computational and Experimental Mathematics," ICERM Workshop Report, 2013.

- V. Stodden, "Where did you get that fact?", Reply to The Edge Annual Question 2012: What should we be worried about? Jan. 2013.

- V. Stodden, "Fact, Fiction, and Our Probabilistic World," Reply to The Edge Annual Question 2011: What is your favorite deep, elegant, or beautiful explanation? Jan 2012. Published in *This Explains Everything: Deep, Beautiful, and Elegant Theories of How the World Works*, Harper Perennial, Jan. 22, 2013.

- V. Stodden, "Phase Transitions and 'Scale Transitions:' Conceptualizing Unexpected Changes Due to Scale," Reply to The Edge Annual Question 2010: What Scientific Concept Would Improve Everybody's Cognitive Toolkit? Jan 2011. Published in *This Will Make You Smarter: New Scientific Concepts to Improve Your Thinking*, Harper Perennial, Feb. 14, 2012.

- V. Stodden and S. Arbesman, "Scientists, Share Secrets or Lose Funding," Bloomberg View, Jan. 10, 2012.

- V. Stodden with Participants, "Changing the Conduct of Science: Summary Report of the Workshop," Held on Nov. 12, 2010," at the National Science Foundation Workshop Changing the Conduct of Science in the Information Age, June 2011.

- V. Stodden, "Trust your Science? Open Your Data and Code," *Amstat News*, July 1, 2011.

- V. Stodden, "White Paper for Expert Panel Discussion on Data Policies," for a Workshop of the National Science Board Expert Panel on Data Policies, Mar. 27–29, 2011.

**Appendix A**

**Victoria Stodden**
University of Southern California

- V. Stodden with Task Force co-authors, "Cyber Science and Engineering: A Report of the NSF Advisory Committee on Cyberinfrastructure," Task Force on Grand Challenges, Nov. 2010.
- V. Stodden, "Remarks," presented before The National Academies of Sciences, Engineering, and Medicine Committee on The Impact of Copyright Policy on Innovation in the Digital Era, Washington, D.C., Oct. 15, 2010.
- V. Stodden, "Cogitamus, Ergo Sum? The 'Difference Between Knowing the Name of Something and Knowing Something,'" Reply to The Edge Annual Question 2009: How Has the Internet Changed the Way You Think? Jan. 2010.

## PUBLICATIONS: TECHNICAL REPORTS

- M. A. Heroux, L. Barba, M. Parashar, V. Stodden, and M. Taufer, "Toward a Compatible Reproducibility Taxonomy for Computational and Computing Sciences," Sandia National Lab (SNL-NM), Albuquerque, NM, 2018.
- V. Stodden, "The Scientific Method in Practice: Reproducibility in the Computational Sciences," MIT Sloan Research Paper No. 4773-10. 2010. DOI:10.2139/ssrn.1550193.
- D. Donoho, V. Stodden, and Y. Tsaig, "About SparseLab," Stanford Department of Statistics Technical Technical Report, SparseLab 2.0, Mar. 2007.
- D. Donoho, V. Stodden, and Y. Tsaig, "SparseLab Architecture," Stanford Department of Statistics Technical Report, SparseLab 2.0, Mar. 2007.

## SOFTWARE DEVELOPMENT

| | |
|---|---|
| **Reproscreener.org**: The Center for Research and Education in AI and Learning (**REAL@USC**)-funded collaborative project developing an open-source tools to evaluate machine learning pipelines to improve efficiency and reproducibility. | 8/2023–present |
| **WholeTale.org**: NSF-funded collaborative project to develop an open-source platform that supports modern research tools such as the Jupyter notebook, and creates online "research compendia" that make available data and code as a novel standardized re-executable package called a "Tale." | 10/2017–2/2023 |
| **ezdmp.org**: NSF-funded collaborative project to develop an open-source next generation data management plan tool. | 9/2016–8/2018 |
| **ResearchCompendia**: Sloan Foundation-funded project to develop an opensource platform to support online "research compendia" that make available data and code alongside published results and verify findings in the cloud. | 4/2013–10/2014 |
| **RunMyCode.org**: Collaboration to develop open availability of code and data with published computational results. | 3/2012–10/2014 |
| Developed and maintained SparseLab webpage for the collaborative Matlab toolbox distribution from my dissertation (over 7,000 downloads in 2008). | 9/2005–1/2022 |

10

**Appendix A**

**Victoria Stodden**
University of Southern California

# SELECTED PRESENTATIONS

| | |
|---|---|
| **Invited Colloquium Presentation**, Heidelberg Institute of Theoretical Studies Colloquium, "*Verifying Correctness in AI-enabled Scientific Research – A New Frontier.*" | 3/2025 |
| **Invited Presentation**, International Excellence Talk and MathSEE Lecture, Karlsruhe Institute of Technology, "*AI and the Future of Research: Stakeholders, Process, and Practices.*" | 1/2025 |
| **Invited Presentation**, US-UK Scientific Forum: Science in the Age of AI. "*On Emergent Limits to Knowledge Or, How to Trust the Robot Researchers: A Pocket Guide.*" | 6/2024 |
| **Keynote**, Learning from Authoritative Security Experiment Results (LASER) Workshop, Annual Computer Security Applications Conference (ACSAC). "*A Decade Later: Reproducibility & Reliability of Research Results.*" | 12/2023 |
| Departmental Seminar, Alfred-Weber-Institut Für Wirtschaftswissenschaften, Heidelberg University, Germany. "*Automating Assessment of Machine Learning Research: Revisiting Arrow's Impossibility Theorem.*" | 11/2023 |
| **Invited Presentation**, Joint Statistical Meetings, Statistics and the Reproducibility Crisis. "*Automating Assessment of Computational Reproducibility in Machine Learning Research.*" | 8/2023 |
| **Invited Presentation**, The Center for Research and Education in AI and Learning (REAL@USC) First Anniversary Conference, "*Automating Machine Learning Model Checking.*" | 10/2022 |
| Building a Community Roadmap to Robust Science in High-Throughput Applications, SIAM Conference on Computational Science and Engineering (CSE21). "*Advancing Computational Scientific Discovery by Enabling Reproducibility and Transparency: Policies and Practice.*" | 3/2021 |
| **Invited Address**, Scholarship for a Post-Pandemic World: A Conversation; Council of Graduate Schools 60th Annual Meeting. "*Training and Scholarly Impact in a Digital World.*" | 12/2020 |
| Epstein Institute Seminar, University of Southern California. "*Two Projects for Advancing Scientific Reliability in Complex Computational and Human Systems.*" | 9/2020 |
| **Keynote**, Applied Human Factors and Ergonomics Conference: The Human-Side of Service Engineering. "*Toward a Computable Scholarly Record: Meta Science and Engineering Reproducibility in the Era of AI.*" | 7/2020 |
| **Invited Address**, IEEE CS Ad Hoc Committee on Open Science and Reproducibility. "*Reproducibility and Replicability in Science.*" | 6/2020 |
| The National Academies of Science, Engineering, and Medicine Committee | |
| • "Roundtable on Data Science Post-Secondary Education" | 2016–2019 |
| • "Reproducibility and Replicability in Science" | 2016–2019 |
| • "Responsible Science: Ensuring the Integrity of the Research Process" | 2014–2018 |
| **Invited Distinguished Speaker**, Northwestern Computer Science **Distinguished Lecture** Series, Northwestern University. "*The Lifecycle of Data Science: A Framework for Advancing Computational and Data-enabled Research.*" | 11/2019 |
| **Invited Distinguished Speaker**, Center for Data and Computing **Distinguished Speaker** Series, University of Chicago. "*Reproducibility is Not a Crisis. Now What? Next Steps for Advancing Computational and Data-enabled Science.*" | 11/2019 |

11

**Appendix A**

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| **Keynote**, Parallel Computing 2019: Symposium Tools and Infrastructure for Reproducibility in Data-Intensive Applications, Prague, Czech Republic. "*Advancing Reproducibility and Transparency in Data Inference Applications.*" | 9/2019 |
| **Invited Seminar**, Space Telescope Science Institute, Baltimore, MD. "*Reproducibility in Scientific Inference, Data Dissemination, and Computational Environments.*" | 7/2019 |
| **Keynote**, Computational Reproducibility at Exascale 2018 (CRE2018), Supercomputing18, Dallas, TX. "*Reproducibility in Computational and Data-enabled Science.*" | 11/2018 |
| **Plenary**, Ethics, law, and transparency. "Institute for the Secure Sharing of Online Data" (ISSOD) Workshop, Boston, MA. "*A Future of Research Transparency: Enabling Reproducibility in Repository Design.*" | 11/2018 |
| **Keynote**, The 27th International Symposium on High-Performance Parallel and Distributed Computing, Arizona State University. "*Reproducibility in Computational and Data-enabled Science.*" | 6/2018 |
| **Keynote**, IEEE Data Science Workshop, EPFL, Switzerland. "*Reproducibility and Generalizability in Data-enabled Discovery.*" | 6/2018 |
| **Keynote**, Northwestern Computational Research Day, Evanston, IL. "*Reproducibility in Computational Research: Code, Data, Statistics, and Implementation.*" | 4/2018 |
| **Invited Presentation**, Sandia National Laboratories, Oak Ridge National Laboratory, Swiss Institute of Technology (SOS) SOS-22 Workshop: HPC and Data Science, Waikoloa, HI. "*Reproducibility at Exascale.*" | 3/2018 |
| **Keynote**, Research Data Management Implementations (RDMI) Workshop, Arlington, VA. "*Research Data Management Implementations: Towards the Reproducibility of Science.*" | 9/2017 |
| **Invited Address**, European Alpbach Forum, Technology Symposium, Austria. "*Knowledge and Understanding in the Age of Data.*" | 8/2017 |
| **The Judith Resnik Year of Women in ECE Invited Seminar**, Carnegie Mellon University, Pittsburgh, PA. "*Reproducibility in Computationally-enabled Research.*" | 3/2017 |
| National Academy of Sciences, Arthur M. Sackler Colloquia, Reproducibility of Research: Issues and Proposed Remedies, Washington, D.C. "*Reproducibility in Computationally-enabled Research.*" | 3/2017 |
| Seance de reflexion of the Swiss National Research Council on "2050: A Science Odyssey," Interlaken, Switzerland. "*Science: Set the Default to Open.*" | 11/2016 |
| **Invited Talk**, SIAM Annual Meeting, Boston MA. "*Implementing Reproducibility in Computational Science.*" | 7/2016 |
| **Keynote**, Maria de Maeztu Annual Event: Data-driven Knowledge Extraction Workshop, Universitat Pompeu Fabra, Barcelona, Spain. "*Reproducibility in Computational Research.*" | 6/2016 |
| **Keynote**, Coalition for Networked Information Annual Meeting, San Antonio, TX. "*Defining the Scholarly Record for Computational Research.*" | 4/2016 |
| **Keynote**, AAAS Reproducibility Workshop: Modeling and Code, Washington, D.C. "*Software in Science.*" | 2/2016 |
| **Plenary Speaker**, SuperComputing15, Austin, TX. "*Reproducibility in High Performance Computing.*" | 11/2015 |

12

**Appendix A**

### Victoria Stodden
University of Southern California

| | |
|---|---|
| **Keynote**, Open Access Week, Virginia Tech, Blacksburg, VA. "*Scholarly Communication in the Era of Big Data and Big Computation.*" | 10/2015 |
| **Invited Talk**, AAAS Annual Meeting, San Jose, CA. "*Integrity, Reproducibility, and the Changing Technological Environment for Research.*" | 2/2015 |
| **Keynote**, Berkeley Initiative for Transparency in the Social Sciences Conference, University of California, Berkeley. "*Framing Transparency in Research: Issues and Opportunities.*" | 12/2014 |
| **Keynote**, OpenCon 2014, American University Washington College of Law, Washington, D.C. "*Open Data and Reproducibility in Research.*" | 11/2014 |
| **Keynote**, Computational and Simulation Sciences and eResearch, Annual Conference, Melbourne, Australia. "*Open Data and Reproducibility in Research.*" | 3/2014 |
| **Plenary Speaker**, Open Repositories 2013, Charlottetown, Prince Edward Island, Canada. "*Re-use and Reproducibility: Opportunities and Challenges.*" | 7/2013 |
| **Keynote**, PDE Software Frameworks, Muenster, Germany. "*Reproducible Results: Challenges for Computational Science and the Scientific Method.*" | 6/2012 |
| **Keynote**, 74th EAGE Conference & Exhibition: Open-source E+P Software - Six Years Later, Copenhagen, Denmark. "*The Central Role of Geophysics in the Reproducible Research Movement.*" | 6/2012 |
| **Dean's Lecture**, UC Berkeley School of Information, Berkeley, CA. "*The Credibility Crisis in Computational Science: An Information Issue.*" | 2/2012 |
| **Plenary Keynote**, Cyberinfrastructure Days, University of Michigan. "*The Credibility Crisis in Computational Science: A Call to Action.*" | 12/2011 |
| National Science Foundation, Advisory Committee on Cyberinfrastructure, Washington, D.C. "*Report on Journal Policy and Reproducible Computational Research.*" | 11/2011 |
| **Keynote**, Open Science Summit, Computer History Museum, Mountain View, CA. "*Transparency in Scientific Discovery: Innovation and Knowledge Dissemination.*" | 10/2011 |
| National Science Board Expert Panel Discussion on Data Policy, Washington, D.C. "*Scientific Reproducibility: First Steps and Guiding Questions.*" | 3/2011 |
| **Keynote**, ICML Workshop on Machine Learning Open Source Software, Haifa, Israel. "*Reproducible Research in Computational Science: Problems and Solutions For Data and Code Sharing.*" | 6/2010 |
| **Dean's Lecture**, UC Berkeley School of Information, Berkeley, CA. "*The Digitization of Science and the Degradation of the Scientific Method.*" | 5/2010 |
| The New Biology: Pathways to Convergence in the Life Sciences, MIT/Kauffman Seminar for Senior Congressional and Executive Branch Staff, MIT. "*Innovation and Openness in Science and the Exceptional Role of the Biological Sciences.*" | 4/2010 |
| **Invited Chaired Session** on Reproducibility: New England Statistics Symposium, Harvard University. "*Scientific Integrity and Reproducibility: Data and Code Sharing.*" | 4/2010 |
| **Invited Lecture**, UC Berkeley School of Information, Berkeley, CA. "*Open Licensing and Scientific Reproducibility.*" | 4/2010 |
| **Keynote**, Scientific Software Days, Texas Advanced Computing Center, University of Texas at Austin. "*The Impact of Computational Science on the Scientific Method.*" | 5/2009 |

13

**Appendix A**

**Victoria Stodden**
University of Southern California

**Neyman Invited Seminar**, Department of Statistics, UC Berkeley. *"The Reproducible Research Standard: Legal Barriers to Practicing the Scientific Method in Computational Research."*    2/2009

# TEACHING

---

**Courses Developed**

**University of Southern California, Department of Industrial and Systems Engineering**
- PhD Seminar on Modern Machine Learning    8/2024-12/2024
- Predictive Analytics, Graduate    1/2022-5/2024
- Engineering Statistics, Undergraduate    1/2022
- Discrete Systems Simulation, Undergraduate    8/2021

**University of Illinois Urbana-Champaign, School of Information Sciences**
- Concepts of Machine Learning, Undergraduate    8/2019
- Data Management, Curation & Reproducibility, Undergraduate    8/2019
- Legal Aspects of Information Systems, Undergraduate    8/2019
- Methods for Data Science, Master's    8/2018
- Introduction to Data Science, Master's, Departments of Computer Science (CS) and Statistics    8/2015
- Intellectual Property for Scholarship, Master's    8/2015
- Data Policy Seminar, Master's    8/2014

**Columbia University, Department of Statistics**
- Replicating Computational Results, Ph.D. Level Course, IGERT "From Data to Knowledge" crossover course, jointly offered between Statistics and EECS    1/2012
- Statistical Computing in SAS, Master's    8/2010
- Introduction to Data Science, Master's    8/2010

**University of California, Berkeley, Department of Statistics**
- Capstone Course in Data Science, Master's    1/2011

**Stanford University, Department of Statistics**
- Statistical Computing in SAS, Master's    6/2003

**Courses Taught**

**University of Southern California, Department of Industrial and Systems Engineering**
- Seminar on Modern Machine Learning    8/2024-12/2024
- Predictive Analytics, Master's    1/2022-5/2024
- Engineering Statistics, Undergraduate    1/2022
- Discrete Systems Simulation, Undergraduate    8/2020–2021

**University of Illinois Urbana-Champaign**
- Introduction to Data Science, Master's, crosslist with CS and Stats    Fall 2019
- Introduction to Data Science, Master's, crosslist with CS and Stats    Spring 2019
- Introduction to Data Science, Master's    Fall 2018
- Introduction to Data Science, Master's, crosslist with CS and Stats
- Methods for Data Science, Master's    Spring 2018
- Journal Club on Data Science and Reproducibility, all levels

14

**Victoria Stodden**
University of Southern California

| | |
|---|---|
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Fall 2017 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Spring 2017 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Fall 2016 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's, crosslist with CS and Stats | Spring 2016 |
| • Data, Statistics, and Information, Master's | |
| • Introduction to Data Science, Master's | Fall 2015 |
| • Data Policy Seminar, Master's | Spring 2015 |
| • Socio-technical Data Analysis, Master's, co-taught | Spring 2015 |

**Columbia University**

| | |
|---|---|
| • Applied Data Mining, Undergraduate | Fall 2014 |
| • Introduction to Data Science, Undergraduate | Summer 2014 |
| • Introduction to Probability, Undergraduate | Summer 2014 |
| • Linear Regression Models, Undergraduate | Fall 2013 |
| • Replicating Computational Results, Columbia University IGERT "From Data to Knowledge" crossover course, jointly offered between statistics and EECS | Spring 2012 |
| • Statistical Computing in SAS, Undergraduate | Fall 2012 |
| • Linear Regression Models, Undergraduate | Fall 2012 |
| • Statistical Computing in SAS, Undergraduate | Fall 2011 |
| • Linear Regression Models, Undergraduate | Summer 2011 |

**University of California, Berkeley**

| | |
|---|---|
| • Data Science, Capstone Master's Course | Spring 2014 |
| • Concepts in Computing with Data, Undergraduate | Summer 2013 |

**Stanford Law School**

| | |
|---|---|
| • Quantitative Methods: Statistical Inference | Spring 2007 |
| • Empirical Research Seminar, co-taught | Fall 2006 |

# MENTORING

**Postdoctoral Scholars**

| | |
|---|---|
| • Matthew Krafczyk, National Center for Supercomputing Applications, University of Illinois Urbana-Champaign | 8/2016–8/2019 |
| • Jennifer Seiler, Department of Statistics, Columbia University | 8/2013–8/2015 |

**Ph.D.**

| | |
|---|---|
| • Adhithya Bhaskar, Department of Industrial and Systems Engineering School of Engineering, University of Southern California; PhD Advisor | 8/2021–present |
| • Yantong Zheng, Department of Industrial and Systems Engineering School of Engineering, University of Southern California; PhD Advisor | 8/2021–present |
| • Becky Vandewalle, Geography University of Illinois Urbana-Champaign; Qualifying Exam Committee Member | 10/2020 |
| • Craig Willis, School of Information Sciences University of Illinois Urbana-Champaign; PhD Advisor | Graduated 8/2020 |

**Appendix A**

### Victoria Stodden
University of Southern California

| | |
|---|---|
| • Rutvik Chaudhury, Department of Computer Science<br>School of Engineering, University of Illinois Urbana-Champaign; PhD Advisor | 8/2019–1/2020 |
| • Kelechi Ikegwu, Informatics<br>Qualifying Exam Committee Member | 5/2019 |
| • Q. Chelsea Song, Psychology, Doctoral Committee Member; now Assistant Professor, Department of Psychology, Purdue University | Graduated 5/2018 |

**Master's**

| | |
|---|---|
| • Vaishnavi Guntupalli, Research Assistant, Department of Industrial and Systems Engineering, University of Southern California | 11/2022–5/23 |
| • Peilun Zhang, Thesis Primary Co-advisor, Department of Computer Science, University of Illinois Urbana-Champaign | 8/2019–7/2020 |
| • Yang Yu, Department of Statistics Summer Intern, University of Illinois Urbana-Champaign | 6/2019–8/2019 |
| • Xiaomian Wu, Department of Statistics, University of Illinois Urbana-Champaign; coauthored "AIM: An Abstraction for Improving Machine Learning Prediction," with V. Stodden and V. Sochat, 2018 IEEE Data Science Workshop, June 2018. | 8/2017–5/2018 |
| • Jennifer Beamer, Summer Intern, Library Sciences, University of Hawai'i at Manoa | 6/2017–8/2017 |
| • Yantong Zheng, Undergraduate and Master's<br>Department of Statistics, University of Illinois Urbana-Champaign | 1/2017–5/2018 |
| • William Pooler, School of Information Sciences, University of Illinois Urbana-Champaign | 8/2015–5/2016 |

**Undergraduate**

| | |
|---|---|
| • Mingzhe Wang, Undergraduate Summer Intern, Department of Computer Science, University of Illinois Urbana-Champaign | 6/2020–8/2020 |
| • Daniel Lee, Department of Statistics, University of Illinois Urbana-Champaign | 1/2017–5/2018 |
| • Kefu Zhu, James Scholar Honors Project Supervision, Department of Statistics, University of Illinois Urbana-Champaign | 8/2016–12/2016 |
| • Saumil Padhya, James Scholar Honors Project Supervision, Department of Statistics, University of Illinois Urbana-Champaign | 8/2016–12/2016 |
| • April Tang, Department of Statistics, University of Illinois Urbana-Champaign | 8/2015–5/2016 |
| • Pakwesi Taylor, Department of Statistics, Columbia University | 6/2014–8/2014 |
| • Christine Byun, Independent Study, Department of Statistics, Columbia University | 8/2013–12/2013 |
| • Zhaokun Ma, Department of Statistics, Columbia University; coauthored "Toward Reproducible Computational Research: An Empirical Analysis of Data and Code Policy Adoption by Journals," PLOS ONE 8(6), 2013; and "Journal Policy for Computational Reproducibility," Proceedings of the National Academy of Sciences, March 2018 | 6/2012–8/2012 |
| • Isabel Reich, Department of Statistics, Columbia University; coauthored "Software Patents as a Barrier to Scientific Transparency: An Unexpected Consequence of Bayh-Dole," Conference on Legal Empirical Studies, Stanford, Nov. 2012 | 6/2012–8/2012 |
| • Peixuan Guo, Department of Statistics, Columbia University; coauthored "Toward Reproducible Computational Research: An Empirical Analysis of Data and Code Policy Adoption by Journals," PLOS ONE 8(6), 2013 | 6/2011–8/2011 |
| • Michael Fusella, Department of Statistics, Columbia University | 6/2011–8/2011 |
| • Matthew Lewis, Department of Statistics, Columbia University | 6/2011–8/2011 |

16

**Victoria Stodden**
University of Southern California

# SERVICE

**School and Department Service**

**University of Southern California**

| | |
|---|---|
| • Chair, Departmental Chair Review Subcommittee, Viterbi School of Engineering, Engineering Faculty Council | 8/2023–8/2024 |
| • Merit Review Subcommittee Member, Viterbi School of Engineering, Engineering Faculty Council | 8/2022–8/2023 |
| • Industrial and Systems Engineering Departmental Representative, Viterbi School of Engineering, Engineering Faculty Council | 8/2022–8/2025 |
| • Inaugural Chair, Department of Industrial and Systems Engineering Diversity Committee | 8/2021–8/2025 |
| • Chair, Department of Industrial and Systems Engineering Hiring Committee | 8/2021–8/2022 |
| • Ph.D. Admissions Committee, Department of Industrial and Systems Engineering | 8/2021–8/2022 |
| • Ph.D. Curriculum Committee, Department of Industrial and Systems Engineering | 8/2020–8/2022 |
| • Chair, Department of Industrial and Systems Engineering Hiring Committee | Summer 2021 |

**University of Illinois Urbana-Champaign**

| | |
|---|---|
| • School of Information Sciences Diversity Committee | 8/2019–8/2020 |
| • School of Information Sciences Master's of Information Management Committee | 8/2019–8/2020 |
| • School of Information Sciences Curriculum Committee | 8/2016–8/2019 |
| • School of Information Doctoral Students Committee | 8/2014–8/2015 |

**University Service**

**University of Southern California**

| | |
|---|---|
| • Member, Affinity Group for Computational Science and Engineering within the School of Advanced Computing, Viterbi School of Engineering, University of Southern California | 8/2023–present |

**University of Illinois Urbana-Champaign**

| | |
|---|---|
| • Budget Committee | 8/2019–8/2022 |
| • Discovery Partners Institute (DPI) Culture & Society (C&S) Inaugural Working Subcommittee | 8/2018–8/2020 |
| • Scientific Advisory Board for the University of Illinois News Bureau | 10/2017–8/2020 |
| • IT Committee | 8/2015–8/2018 |

**Columbia University**

| | |
|---|---|
| • Senate IT Committee | 8/2016–8/2019 |

# RESEARCH GRANTS

| | |
|---|---|
| "ReproScreener: Enabling Robustness in Machine Learning at Scale via Automated Knowledge Verification," PI: Victoria Stodden $50,000. The Center for Research and Education in AI and Learning (REAL@USC). | 8/2022–7/2023 |
| "Collaborative Research: PPoSS: Planning: Performance Scalability, Trust, and Reproducibility: A Community Roadmap to Robust Science in High-throughput | 10/2020–9/2022 |

**Appendix A**

## Victoria Stodden
University of Southern California

| | |
|---|---|
| Applications," PI: Victoria Stodden $30,000. Part of collaborative award led by UTK (Entire award $150,000). National Science Foundation #2028881. | |
| Supplement to "CC*DNI DIBBS: Merging Science and Cyberinfrastructure Pathways: The Whole Tale," PI: Bertram Ludäscher (Illinois-led institution). Co-PIs: Victoria Stodden, Niall Gaffney (University of Texas at Austin), Matthew Turk (University of Illinois), Kyle Chard (University of Chicago). Supplement award: $304,774 with Illinois share $54,774 (sub-awards to University of Chicago ($150,000) and USC ($100,000)). National Science Foundation #1541450. | 3/2016–2/2022 |
| "EAGER: Reproducibility and Cyberinfrastructure for Computational and Data-Enabled Science," PI: Victoria Stodden. Co-PI: Michela Taufer (UTK), $300,000 ($149,997 to UTK). National Science Foundation #1941443. | 9/2019–8/2022 |
| "EAGER: Preserve/Destroy Decisions for Simulation Data in Computational Physics and Beyond," PI: Victoria Stodden. Co-PI: Darko Marinov (University of Illinois), $300,000. National Science Foundation #1839010. | 8/2018–7/2022 |
| Discovery Partners Institute. PI: Victoria Stodden, $3,000. University of Illinois Economic Development and Innovation (VPEDI) International Travel Grant. | 6/2018–8/2018 |
| "EAGER: Collaborative Proposal: Supporting Public Access to Supplemental Scholarly Products Generated from Grant Funded Research," PI: Victoria Stodden. Collaborative proposal with Illinois share: $59,991. National Science Foundation #1649555. | 9/2016–8/2019 |
| "CC*DNI DIBBS: Merging Science and Cyberinfrastructure Pathways: The Whole Tale," PI: Bertram Ludäscher (UIUC lead institution). Co-PIs: Victoria Stodden, Niall Gaffney (University of Texas at Austin), Matthew Turk (University of Illinois), Kyle Chard (University of Chicago). Cooperative proposal $5,887,240. National Science Foundation #1541450. | 3/2016–2/2021 |
| "CC*DNI DIBBS: Merging Science and Cyberinfrastructure Pathways: The Whole Tale," PI: Bertram Ludäscher (UIUC lead institution). Co-PIs: Victoria Stodden, Niall Gaffney (University of Texas at Austin), Matthew Turk (University of Illinois), Kyle Chard (University of Chicago), Jarek Nabryszki (University of Notre Dame), Matthew B. Jones (University of California, Santa Barbara). Supplement $293,559. National Science Foundation #1541450. | 7/2019–2/2021 |
| "Facilitating Transparency in Scientific Publishing," PI: Victoria Stodden. $420,640. Alfred P. Sloan Foundation. | 7/2012–11/2014 |
| "EAGER: Policy Design for Reproducibility and Data Sharing in Computational Science," PI: Victoria Stodden, $168,800. National Science Foundation #1153384. | 9/2011–12/2013 |
| "Community Forum on Reproducible Research Policies," PI: Victoria Stodden. $3,800. Alfred P. Sloan Foundation. | 7/2011 |

18

**Appendix B**

**Victoria Stodden, Ph.D.**                                    December 2025

# Prior Testimony[1]

*In re: <u>Uber</u> Technologies, Inc., Passenger Sexual Assault Litigation*, United States District Court, Northern District of California, San Francisco Division, Case No. 3:23-md-03084. Deposed October 21, 2025.

*In re: <u>Lyft</u> Rideshare Cases*, Superior Court of the State of California, County of San Francisco, Case No. CJC-20-005061. Deposed August 26, 2025.

*In re: <u>Uber</u> Rideshare Cases*, Superior Court of the State of California, County of San Francisco, Case No. CJC-21-005188. Deposed July 30, 2025. Trial testimony on September 19, 2025.

*In re <u>Apple</u> iPhone Antitrust Litigation*, United States District Court, Northern District of California, Oakland Division, Civil Action No. 4:11-cv-06714. Deposed July 17, 2025.

*Rumble, Inc., v. <u>Google LLC et al.</u>*, United States District Court, Northern District of California, Oakland Division, Case No. 4:21-cv-00229. Deposed September 27, 2024.

---

[1] The party that retained me is underlined.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Documents Considered List

## Academic Articles

- Amershi, S., et al. (2019), "Software Engineering for Machine Learning: A Case Study," Working Paper

- Baumer, E., et al. (2003), "Changes in Police Notification For Rape, 1973–2000," *Criminology*, 41, 3, pp. 841–872

- Ceccato, V., et al. (2021), "Sexual Violence on the Move: An Assessment of Youth's Victimization in Public Transportation," *Women & Criminal Justice*, 31, 4, pp. 294–312

- Li, J., et al. (2020), "Accurate Data-Driven Predictions Does Not Mean High Reproducibility," *Nature Machine Intelligence*, 2, pp. 13–15

- Palmer, J., et al. (2021), "#MeToo for Whom? Sexual Assault Disclosures Before and After #MeToo," *American Journal of Criminal Justice*, 46, pp. 68–106

- Pesaran, M. H., et al. (2006), "Forecasting Time Series Subject to Multiple Structural Breaks," *The Review of Economic Studies*, 73, 4, pp. 1057–1084

- Spohn, C., et al. (2014), "Unfounding Sexual Assault: Examining the Decision to Unfound and Identifying False Reports," *Law & Society Review*, 48, 1, pp. 161–192

- Skelly, A. C., et al. (2012), "Assessing Bias: The Importance of Considering Confounding," *Evidence-Based Spine-Care Journal*, 3, 1, pp. 9–12

- Sprankling, J. G. (2024), "Trade Secrets in the Artificial Intelligence Era," *South Carolina Law Review*, 76, 1, pp. 181–221

- Vuk, M. and T. Curk (2006), "ROC Curve, Lift Chart and Calibration Plot," *Metodološki Zvezki*, 3, 1, pp. 89–108

- Weiss, G. M. (2004), "Mining with Rarity: A Unifying Framework," *SIGKDD Explorations*, 6, 1, pp. 7–19

- Williams, P.R.D., et al. (2012), "Cumulative Risk Assessment (CRA): Transforming the Way We Assess Health Risk," *Environmental Science Technology*, 46, 20, pp. 10868–10874

- Xiong, Z., et al. (2020), "Evaluating Explorative Prediction Power of Machine Learning Algorithms for Materials Discovery Using *k*-fold Forward Cross-Validation," *Computational Materials Science*, 171, pp. 1–12

- Yamagishi, K. (1997), "When a 12.86% Mortality is More Dangerous than 24.14%: Implications for Risk Communication," *Applied Cognitive Psychology*, 11, 6, pp. 495–506

## Bates Stamped Documents

- UBER_JCCP_MDL_000491422

Appendix C

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- UBER_JCCP_MDL_001461771
- UBER_JCCP_MDL_001730324
- UBER_JCCP_MDL_002260211
- UBER_JCCP_MDL_002622051
- UBER_JCCP_MDL_002656885
- UBER_JCCP_MDL_003219916
- UBER_JCCP_MDL_003224079
- UBER_JCCP_MDL_003306684
- UBER_JCCP_MDL_003602459
- UBER_JCCP_MDL_005025910
- UBER_JCCP_MDL_005620999
- UBER_JCCP_MDL_005784097
- UBER-MDL3084-BW-000050791
- UBER-MDL3084-BW-000050792
- UBER-MDL3084-BW-00048903
- UBER-MDL3084-BW-00048904
- UBER-MDL3084-BW-00048905
- UBER-MDL3084-BW-00048906
- UBER-MDL3084-BW-00050793
- UBER-MDL3084-BW-00050794
- UBER-MDL3084-BW-00050795

**Books**

- Agresti, A. (2013), *Categorical Data Analysis*, 3rd Edition, Hoboken NJ: John Wiley & Sons, Inc.
- Hastie et al. (2009), *The Elements of Statistical Learning*, New York: Springer
- Provost, F. and T. Fawcett (2013), *Data Science for Business*, 1st Edition, Sebastopol, CA: O'Reilly Media, Inc.
- Wooldridge, J. M. (2016), *Introductory Econometrics: A Modern Approach*, 6th Edition, Boston, MA: Cengage Learning

Appendix C

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Data Sources**

- 2024 NCVS
- Bliss/Jira SA/SM Incident Data
- Uber Incident Report Classification of Dominant Tickets for 2017–2024 (Flack Reported Incident Data)

**Depositions**

- Deposition of Greg Brown, August 26, 2025, with Exhibits
- Deposition of Katy R. McDonald, April 24, 2025, with Exhibits
- Deposition of Sunny Wong, April 16, 2025, with Exhibits
- Deposition of Sunny Wong, June 25, 2025, with Exhibits
- Deposition of Sunny Wong, July 23, 2025, with Exhibits
- Deposition of Sunny Wong, October 14, 2025, with Exhibits
- Deposition of Todd Gaddis, Volume I, July 8, 2025, with Exhibits

**Expert Reports**

- Expert Rebuttal Report of Victoria Stodden, Ph.D., October 24, 2025
- Expert Report of John Chandler, Ph.D., September 26, 2025
- Expert Report of Lacey R. Keller, September 26, 2025
- Expert Report of Victoria Stodden, Ph.D., September 26, 2025
- Supplemental Report of John Chandler, Ph.D., December 2, 2025, with Backup Materials
- Updated Expert Report of Lacey R. Keller, December 2, 2025

**Reports**

- *2017–2018 US Safety Report*, Uber, December 5, 2019
- *2019–2020 US Safety Report*, Uber, June 30, 2022
- *2021–2022 US Safety Report*, Uber, August 30, 2024
- *LADOT Safety & Security Survey Findings and Recommendations*, Ilium Associates, Inc., December 16, 2024
- *Long Beach Transit Safety Survey Final Report*, ETC Institute, February 3, 2025
- *Los Angeles County Metropolitan Transportation Authority: Street Harassment Survey and Focus Groups*, Metro, March 2025

Appendix C

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- *Sacramento Regional Transit (SacRT) Street Harassment Outreach Summary*, AECOM, December 31, 2024
- *Transit Safety Survey Findings Report*, ETC Institute, Fall 2024
- *VTA Safety and Harassment Survey*, Santa Clara Valley Transportation Authority and EMC Research, July–August 2024

**Websites**

- "2024 Phase 1 Muni Rider Safety and Harassment Data.csv," https://web.archive.org/web/*/https://www.sfmta.com/media/41402/download*
- "AC Transit Safety Survey_All Results_EXTERNAL final 12.24.24.xlsx," https://www.actransit.org/sites/default/files/2024-12/AC%20Transit%20Safety%20Survey_All%20Results_EXTERNAL%20final%2012.24.24.xlsx
- "AWN Recognizes Innovative, Transformative Engine Maintenance Operation at Delta TechOps," *Delta*, March 28, 2024, https://news.delta.com/awn-recognizes-innovative-transformative-engine-maintenance-operation-delta-techops
- "BARTStreetHarassmenSurveyResults2024," https://www.bart.gov/sites/default/files/2024-11/BARTStreetHarassmenSurveyResults2024.xlsx
- "Criminal Victimization, 2024," *U.S. Department of Justice*, September 2025, https://bjs.ojp.gov/document/cv24.pdf
- "Enhancing our Trust & Safety Solutions with Account Confidence Score," *JP Morgan Chase & Co.*, May 14, 2025, https://www.jpmorgan.com/payments/newsroom/introducing-account-confidence-score
- "Explained: The AI-Powered Predictive Maintenance Revolution," *Airways*, May 22, 2025, https://www.airwaysmag.com/new-post/ai-powered-predictive-maintenance-revolution
- "Get Snapshot from Progressive," *Progressive*, https://www.progressive.com/auto/discounts/snapshot/
- "Introducing Uber Pro," *Uber*, https://www.uber.com/dk/en/drive/uber-pro/
- "NAIC Survey: 88% of Insurers are Using AI or Machine Learning," *Insurance Newsnet*, March 14, 2023, https://insurancenewsnet.com/innarticle/naic-survey-88-of-insurers-are-using-ai-or-machine-learning
- "Progressive Uses H2O Predictive Analytics for UBI," *H2O.ai*, https://h2o.ai/resources/video/progressive-uses-h2o-predictive-analytics-for-ubi/
- "Ride-Hailing 2023," *EMarketer*, October 31, 2023, https://www.emarketer.com/content/ride-hailing-2023

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- "Unfounded Sexual Assaults: Recommended Processes for Investigations and Clearance Reporting," *Sexual Assault Kit Initiative*, https://evawintl.org/wp-content/uploads/13830SAKIBriefFalseReportingv7.pdf

- "What is Machine Learning?" *IBM*, https://www.ibm.com/think/topics/machine-learning

- "When Does Crime Occur Most: An In-depth Guide," *Vivint*, https://www.vivint.com/resources/article/when-does-crime-occur-most

**Note: In addition to the documents on this list, I relied on all documents cited in the Stodden Opening Report, the Stodden Rebuttal Report, and in the current report to form my opinions.**

**Appendix D**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### Figure 9:  Rate of Reported SA/SM Incidents Per Year (2017–2024)



Source: Flack Reported Incident Data, 2017–2024; Keller Updated Report, Figure 3

### Figure 10:  Rate of Reported Rape Incidents Per Year (2017–2024)



Source: Flack Reported Incident Data, 2017–2024; Keller Updated Report, Figure 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 11:  Rate of Reported Five Safety Report Categories Incidents Per Year (2017–2024)**



Source: Flack Reported Incident Data, 2017–2024; Keller Updated Report, Figure 5

**Figure 12:  Rate of Reported SA/SM Incidents Reported Against Drivers Per Year (2017–2024)**



Source: Flack Reported Incident Data, 2017–2024; Keller Updated Report, Figure 18

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### Figure 13: Rate of Reported Rape Incidents Reported Against Drivers Per Year (2017–2024)



Source: Flack Reported Incident Data, 2017–2024; Keller Updated Report, Figure 19

### Figure 14: Rate of Reported SA/SM Incidents in the Five Safety Report Categories Reported Against Drivers Per Year (2017–2024)



Source: Flack Reported Incident Data, 2017–2024; Keller Updated Report, Figure 20

Appendix E

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Bellwether Plaintiff S-RAD Scores and Feature Values



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

# Examples of Lower Taxonomy SA/SM Reports

| Subcategory | Content |
|---|---|
| Comments or Gestures – Asking Personal Questions | "My driver was asking me very personal questions and made me very uncomfortable. I refuse to pay for a trip where the driver made me so uncomfortable. I want a full refund" |
| Comments or Gestures – Asking Personal Questions | "Rude driver, made comments about my nationality because I didn't look 'full Hispanic' and I was on my way to work and he kept asking my private professional business instead of respecting my privacy. I would like a fare credit for the unprofessionalism I had to deal with." |
| Comments or Gestures – Asking Personal Questions | "Dear Uber, Could you remove this driver for my future ride? He is nice but I dont feel comfortable that he asked me so too many personal questions during the ride this morning. Thank you." |
| Comments or Gestures – Asking Personal Questions | "The driver verbally assaultibe me about being a pet owner in ths country. He also tried to move move bag. He was ok driving with a small dog inside the bag. But during the ride he was being unimaginably rude and even said having a small dog is wrong. I noticed he does that because he notice I am not an Asian because he asked me questions like 'are you from this country? I' been in this country for a long time.' Obviously, he was saying and threatening me with verbal assaulta against being a pet owner because of my ethnicity. This guy is obviously racisy and has issues with anyone who owns pets in  United Satates." |
| Comments or Gestures – Asking Personal Questions | "The driver was verbally aggressive against me and my friend . My friend brought a small AC in the safe which was put properly with caution. Before putting it in the safe I asked the driver to come to help us (in case of driver who would feel uncomfortable ) . He refused to get out of the vhicule and then he change his mind and show us a hug scratche saying that was what we did.  It was not and I trying to communicate with the driver but he answered me aggressively" |
| Comments or Gestures – Asking Personal Questions | "Driver picked my parents up and asked if they were Chinese and wanted to refuse service until my parents said they were korean. Then he asks if they are north korean. And made them very uncomfortable." |
| Comments or Gestures – Asking Personal Questions | "My driver was very rude upon me entering the car music was loud " |
| Comments or Gestures – Asking Personal Questions | "My driver asked me uncomfortable questions. He asked about how much my parents make and what they do for a living. I was very uncomfortable, I feel like these are things uber drivers should never say to their riders." |
| Comments or Gestures – Asking Personal Questions | "the ride this morning started off bad when the driver first took off he had to break so hard that I went flying into the passenger seat. After we dropped off the first passenger he began asking me random questions about where I was going and If I was going to work and If I was born in the USA which made me feel uneasy." |
| Comments or Gestures – Asking Personal Questions | "My service dog wasn't denied but the Uber driver kept RUDELY asking me questions about what he helped with and kept insisting that I was lying. To add insult to injury - he was even eating while taking me back home." |
| Comments or Gestures – Asking Personal Questions | "[Driver] was extremely unprofessional. He kicked us out of his car and we have 4 large boxes. He had no idea where he was going, didn't follow directions and one block in was already asking questions about where we are going. He told us to get out of his car because he had another customer, and dropped us off with our 4 large boxes at a gas station. We told him we would pay him to take us to another location when he couldn't find the address, and he said 'no, you don't pay for the minute, you pay by the mile.'; He took out boxes out of his trunk, and as he was driving away, he flipped us off" |
| Comments or Gestures – Asking Personal Questions | "He kept asking me personal questions and it was hurting my feelings" |
| Comments or Gestures – Asking Personal Questions | "She got us lost three or more times! She was changing lanes without looking. She put us in danger. She could not focus! And to top it off, she made me uncomfortable by asking where my family is really from. I walked away feeling nauseous." |

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Subcategory | Content |
|---|---|
| Comments or Gestures – Asking Personal Questions | "First of all my driver was talking so rapidly and no stop it was very unprofessional. Not only this but he asked me multiple personal questions that made me feel very uncomfortable. I tried to disengage and sit quietly but it was non stop. I wasn't going to report the unprofessionalism until he changed the music and was on YouTube while driving. I'm very unsatisfied with this conduct, I ride Uber multiple times a day and expect more." |
| Comments or Gestures – Asking Personal Questions | "driver kept asking me questions about my house. my house is above average and he kept talking about it which can be really off putting and unprofessional." |
| Comments or Gestures – Asking Personal Questions | "Upon my drivers arrival I couldn't figure out how to open her trunk and struggled with it for a while. She didn't bother to get out and assist me. Then from the moment I got in she asked me all kinds of rapid fire personal questions about where I work, how long, where I live, any children, how old, where they work. On and on she went until I purposely made a phone call to stop her from talking at 5:30 in the morning. Then she drove extremely fast whipping turns and corners. Horrible ride. In addition, I was charged a $5 cancellation fee for the original ride request. I didn't cancel the ride the driver did. I needed a ride to the airport so why would I cancel just to have another driver come? Not logical at all. Please issue my refund. Thank you." |
| Comments or Gestures – Asking Personal Questions | "My driver made me feel uncomfortable asking me  am I on my way to the gym because I was breathing heavy. He then said I should exercise on the treadmill to lower my cholesterol. I told him my cholesterol is fine.  This driver really insulted me. This is really a shame. I felt so low after his comments." |
| Comments or Gestures – Asking Personal Questions | "He kept asking me as to why I am here in the United States and why am I studying here rather than studying back in my home country constant question made me feel violated" |
| Comments or Gestures – Asking Personal Questions | "My Uber driver car was stank like old mildew and rotten egg smell , it was disgusting but he was just asking so many questions like it was very weird . He kept asking questions on top of questions about me and my community." |
| Comments or Gestures – Asking Personal Questions | "Driver gave an anti-religion speech after finding out I was Jewish and then kept me in his car for several minutes after getting to my destination to talk about how the concept of the sabbath doesn't make sense. Made me feel very uncomfortable and unsafe." |
| Comments or Gestures – Asking Personal Questions | "He danced while driving for half of the trip. Kept staying at me in the mirror instead of paying attention on the road and most terrifying answered a call while driving. He also asked me for the remainder of directions to my destination after the call interrupted the GPS. Also asked personal questions pertaining to personal relationships and lacked professionalism. I was paying more attention to him on the road than he did as a driver. After telling him so he replied he bought a vehicle while in his mother's womb." |
| Comments or Gestures – Asking Personal Questions | "I think my driver rated me poorly because I didn't agree with his political views. I felt super uncomfortable because he kept asking me who I voted for and I kept saying I didn't wanna talk about it because politics are controversial. I'm so sad because I had such a good rating!" |
| Comments or Gestures – Asking Personal Questions | "My driver asked me alot of weird and personal questions such as my belief and religious status with god and went back and forth with me ans" |
| Comments or Gestures – Asking Personal Questions | "He kept asking personal questions about where I was from, which languages I speak, what states I had visited.  He started this out of the blue. It made me a little nervous." |
| Comments or Gestures – Asking Personal Questions | "My driver seemed nice, but he asked way too many personal questions. It made me feel very uncomfortable. Is it possible to request he never be a ride option again?" |
| Comments or Gestures – Comments About Appearance | "Assumed I was lazy because the train was 2 mins away, then said i look like dont exercise! That was extremely rude." |
| Comments or Gestures – Comments About Appearance | "I wrote you all an told you all this driver was dangerous pulled up with loud music an speeding when I was about to get in it smelled like alcohol an my son was really scared to get in the car nothing had happened yet this driver harassed me called me ugly an the car also had a weed smell this is unacceptable for a Uber driver I didn't take the trip pulled off an let me" |

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Subcategory | Content |
|---|---|
| Comments or Gestures – Comments About Appearance | "Ever since I opened the door to go into the car, she was saying 'This women is huge and my car is going break' like really? I don't need to be offended like that. I only weight 167. And she was driving horrible. She left me like almost in the middle of the road and she went all they way to my destination so Uber can know that she dropped me off when she didnt. She is so rude!!! I want my money back!!! I'm closing down my Uber app. This isn't fair. I thought Uber changed to the best that's why I stopped using lyft but I see that Uber didn't change... I want my money back!!!" |
| Comments or Gestures – Comments About Appearance | "They didn't want me to get in car said I was overweight that I had to sit in the backseat and not the front made me feel really uncomfortable the rest of my ride" |
| Comments or Gestures – Comments About Appearance | "Driver repeatedly called me fat and mad comments about my weight. It made me feel horrible and I can't stop thinking about it." |
| Comments or Gestures – Comments About Appearance | "the driver stated that he cannot take us to our destination because the amount of people would break his car and that we were too heavy. This upset my friend who suffers from an over eating disorder who is overweight." |
| Comments or Gestures – Comments About Appearance | "The driver made a comment about my weight. I am a bigger person and I had my son and my fianc with me (she also made a comment about my son) she accused me of almost breaking her door due to my weight and she made the ride super uncomfortable " |
| Comments or Gestures – Comments About Appearance | "This was a HORRIBLE ride! Driver practically insulted me and my weight which is unacceptable asking me if I was pregnant then once I told him no he says he can tell I love Meat wrong on so many levels for a man to say that to a woman HORRIBLE" |
| Comments or Gestures – Comments About Appearance | "Talk about my weight said I was too fat an tall to get in there car" |
| Comments or Gestures – Comments About Appearance | "My driver said that i was ugly and broke when i wouldnt give them a tip and they asked for a cash tip also started saying rude remarks" |
| Comments or Gestures – Comments About Appearance | "I've always fully supported you guys but sometimes I can be quite disappointed. This morning my driver was rude and made me feel uncomfortable. And when I refused to entertain his conversation he said 'whatever feo' calling me ugly. This was before the other passenger came in" |
| Comments or Gestures – Comments About Appearance | "My driver told me she wanted me to sit up front because she didnt want all my weight on her back struts. It made me feel uncomfortable as if my weight was too much to be in her car" |
| Comments or Gestures – Comments About Appearance | "Driver made inappropriate comments regarding my guests weight" |
| Comments or Gestures – Comments About Appearance | "The driver was yelling at me negatively commenting about my weight and odor but my odor was perfume but he was still yelling at me. I felt so threatened and self conscious about myself." |
| Comments or Gestures – Comments About Appearance | "My driver was very unprofessional . He making inaproprate comments about my weight saying this like he would never let his girlfriend become big like me and suggesting I should diet" |
| Comments or Gestures – Comments About Appearance | "Hello i had a ride with this driver an she discriminated me calling me ny family ugly n he asked me for my personal identification because he said i look to young an she was smoking i need some type of compensation" |
| Comments or Gestures – Comments About Appearance | "Called me ugly and told me to get my teeth straight i was offended" |
| Comments or Gestures – Comments About Appearance | "All he did was comment about my looks and called me ugly. It was the worst time in my life. He was overyl rude and aggresive towards me." |
| Comments or Gestures – Comments About Appearance | "My driver made an inappropriate comment about my appearance and weight that I was ugly and over weight and I felt bad about myself. I don't feel like I should pay for a ride that I felt attacked while using uber services. Please refund my money in uber credit please" |

**Appendix F**

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Subcategory | Content |
|---|---|
| Comments or Gestures – Comments About Appearance | "My Uber was disrespecting saying I have a ugly face I would like a refund" |
| Comments or Gestures – Comments About Appearance | "My driver was really rude and was laughing at me that I forgot my wallet and he was like you can get out and walk and pretty much telling me I was overweight and I need excersise" |
| Comments or Gestures – Comments About Appearance | "He started screaming at a lady that was crossing the street at the wrong time. He was saying 'get out of the road' then started saying 'that's why these women get killed.' Then started commenting on another lady on the street saying 'she's way too fat, it's disgusting' then started commenting on my girlfriends weight saying that her body is perfect the way it is. I felt extremely uncomfortable the whole time and I don't think I should pay for this ride. This driver should also be further investigated, it all seemed very normal to him." |
| Comments or Gestures – Comments About Appearance | "On this trip I went a long distance with this driver to stamford train station and my card was charged 17 bucks. I was very uncomfortable the whole trip as he kept making comments about my weight referring to me as pregnant which i am not and it just made the trip really uncomfortable" |
| Comments or Gestures – Comments About Appearance | "My driver said my tattoos were ugly and so was I inwant my money backkkkkkkkkkkk" |
| Comments or Gestures – Comments About Appearance | "This driver yelled at me when I dropped my empty can on the floor accusing me of spilling but there was nothing in my can to spill. Then before I got out he commented on my outfit saying I looked dirty and I should clean up. I thought it was very rude and inappropriate of him to accuse me of making a mess in his car and then saying I looked ugly in my outfit... I just want my money back on the cleaning fee. I barely ever have issues with Uber but this made me very upset to be an Uber customer." |
| Comments or Gestures – Flirting | "The driver was asking questions about my credit ratings and tried to sell me credit services, and repeatedly tried to get personal information." |
| Comments or Gestures – Flirting | "she made comments and opinion which made me uncomfortable during the duration of the ride." |
| Comments or Gestures – Flirting | "Thank you. My wife right as she set foot onto the car she almost vomit from the overwhelming smell of Garlic and Body odor.... She said his driving was rushed and unsafe and the drive my wife said played vulgar music and look back at here and said... I know you like this." |
| Comments or Gestures – Flirting | "He is annoying and nosy. He even ask some of my private matters. In fact we almost get lost on the track because he is not focused" |
| Comments or Gestures – Flirting | "I am currently on the ride with this driver and he is telling me how passengers Tonight are cheap and encouraging me to tip him...Asking me if I like him...And overall making me feel very uncomfortable." |
| Comments or Gestures – Flirting | "It made me very uncomfortable that this driver asked if I wanted children, and when I said no, told me that it was just a matter of me settling down and finding a husband. As a queer woman, and as a woman in general, this was particularly uncomfortable and presumptuous. I would suggest telling this driver to refrain from making heteronormative and sexist assumptions." |
| Comments or Gestures – Flirting | "My driver kept questioning me once my corider was dropped off which made me very uncomfortable and he also drove into incoming traffic on a two way street thinking it was a one way." |
| Comments or Gestures – Flirting | "I can everyone  boo he was rude the car was nasty and he put me in danger by speeding  u can pull up what I text him I say boo I didn't  talk to  him and the car you guys need to do a better background  check  on your driver's " |
| Comments or Gestures – Flirting | "She didn't go to the pick up location when I told her to come to where I was she stated traffic was too heavy to turn around it will be too much she'll just wait for me across the street. She was very rude and made inappropriate comments about the fragrance I was wearing and she cut 3 cars off" |
| Comments or Gestures – Flirting | "Being very  rude and disturbing and disrespectful 😑" |

**Appendix F**

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Subcategory | Content |
|---|---|
| Comments or Gestures – Flirting | "My driver was was being rude because I had crutches calling me a dumb ass very rude names " |
| Comments or Gestures – Flirting | "driver engaged me in a conversation hat made me feel uncomfortable. unwarranted, inappropriate conversation." |
| Comments or Gestures – Flirting | "I felt completely uncomfortable the entire ride. Not only could my driver not drive, but there was a second person in the passenger seat (a friend?) navigating for him. Meanwhile, I think the actual driver was not driving. They both asked super personal questions about if I was married and had kids out of nowhere and he missed three separate turns." |
| Comments or Gestures – Flirting | "The driver asked me if I had eaten lunch, I said yes I did, I just ate dinner. He then asked if I wanted to go to his house in N Buffalo for eat Indian food that his wife has prepared. I said no, I am ok, I am not hungry. He asked if I know Indian food, I said yes that I liked Buttered Chicken and simosa. He then said ok, maybe next time. When he dropped me off he asked if I lived there and I said no just visiting and then he said how long will you be here, maybe he would come back to pick me up." |
| Comments or Gestures – Flirting | "I didn't appreciate the fact he was calling me 'baby' instead of 'ma'am' or any other respective form of addressing a client. I found it insulting and highly unprofessional and inappropriate." |
| Comments or Gestures – Flirting | "My driver was very innapporiate he was calling me 'baby' im 38 weeks pregnant he got mad bcus i told him to pull up because he was at the wrong house i really was not comfortable at all hes very inappropriate |
| Comments or Gestures – Flirting | "I DESERVE A REFUND. MY DRIVER WAS RUDE TO ME ON MY WAY TO MY DESTINATION." |
| Comments or Gestures – Flirting | "As a driver , she should not be referring to other men as baby while they are riding with their woman. Plus she almost ran my foot over twice getting in , I had to chase her car and knock on her door as she was driving off , while I was opening the door . Usually much more professional service from Uber ." |
| Comments or Gestures – Flirting | "My driver did not follow the planned route, he said that it would be faster than the route we were supposed to take but it was longer and almost double the price of my predicted fare (predicted to be $50-$60 range with the surge). He asked when my flight was departing, and when I told him it was 5:30 pm, he said we had 'enough time' to take this longer route. Instead of taking I-376 (which only had light traffic at 2:45 pm on a Friday), he only took back roads, which involved many traffic lights and stop signs, as well as heavier traffic, and pointed out where his house was to me, which was uncomfortable, inappropriate, and out of the way. The route he took actually involved heavier traffic than I-376. I have been to the airport many times and have never taken this route, nor was I comfortable with my driver repeatedly ignoring the planned route and taking me for a longer ride. There were times when he stayed too long at stoplights or did not merge because he was looking back at me and talking, showing me pics of his dog on his phone, and just wasting time. It seems he just wanted to talk for longer, as he repeatedly mentioned that he was single and telling me a lot of personal information about his breakup and his ex, and how his dog is good to use for picking up women. The only reason I booked this trip was because it was supposed to be much less than the airport parking price, which is not the case thanks to this trip. I expected a slight fluctuation in price, but not DOUBLE the price, and I did not expect that my Uber driver would take me an inconvenient route for seemingly no reason. I am very upset with my Uber experience and felt very uncomfortable with the driver that I had. I will not be using uber to ride home from the airport." |
| Comments or Gestures – Flirting | "I would like a full refund for this trip, as this driver was disrespectful and annoying asking all me and my friends personal questions and made us uncomfortable. He also made a comment asking me that I shouldn't wear my cologne anymore as it was strong and he didn't like the smell of it. This was some uncalled for comments and therefore I would like to be refunded for this trip" |
| Comments or Gestures – Flirting | "He made unnecessary comments about my destination and how short the trip was and in a couple ways offended me" |
| Comments or Gestures – Flirting | "Once I got off at my stop he told me have a good day baby" |

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Subcategory | Content |
| --- | --- |
| Comments or Gestures – Flirting | "I FELT HE WAS VERY RUDE; USING PROFANITY A LOT OF IT, ALSO HE WASN'T GOING THE RIGHT WAY. HE ALSO GOT A LITTLE TOO PERSONAL ASKING IF I HAD A BOYFRIEND. THEN WENT ON TO SAY HOW DID I HAVE A BABY WITH NO BOYFRIEND. AND SO ON." |
| Comments or Gestures – Flirting | "Driver was rude, kept asking me uncomfortable questions although I gave him the I'm not in the mood to talk. I felt very uncomfortable. I need a full refund for this trip." |
| Comments or Gestures – Flirting | "You are refunding me!!! This guy was fucking horrible. He kept calling me baby. And said 'you want to get out of my car??' He didn't stop at the pickup. Zoomed by three blocks. I chased him down while it was pouring rain only to have him say I wasn't outside??? I was completely visible- he didn't stop. I would be happy to share the video I took of him being a complete ass. FUCK YOUR MISOGYNISTIC COMPANY. I want a refund NOW." |
| Staring or Leering | "He didn't greet me when I got into the car and he kept looking at me through the mirror and it was silent the whole car ride at least a hello would be fine" |
| Staring or Leering | "Reckless driving, rude as I walked into the car. Very har stops and sharp turns and didn't go into the turning box but instead stopped in the middle of the street to turn but luckily there were no cars behind us but if there were he made a strong stop. As I got off i did not say thank you due to the time he was communicating me with and as I walked towards my destination he stared me down." |
| Staring or Leering | "Right before I entered this uber drivers car he said 'your beverage is not allowed in my car!' Very firmly before I walked in and I proceeded to throw out my coffee. His car had an unpleasant smell of bad body odor so I opened the window to get some fresh air. Some few minutes later he said 'do you want me to turn the air up because we can't have both the air on and the window down' I kindly asked to keep the window down and he responded very aggressively and rudely with a 'NO!' While starring at me in his rear view mirror. I did not ask him of anything else during the car ride, I sat quietly and froze as he turned up the air and I did not want to interact with him again to receive an aggressive response! I was so disappointed with this uber driver. He was extremely disrespectful and hostile from the moment I got in!" |
| Staring or Leering | "When picking me up my Uber driver gave me a malicious look, continues driving. He fails to stop at nearly every stop sign we approach, he speeded through multiple lights. Also towards the end of the trip he then got confused and did not know where to proceed even though I attempted to give him directions. Whole entire ride I felt super uncomfortable. Would not want to drive with this Uber again." |
| Staring or Leering | "basically when i got in the car he was not speaking or looking at me . i said hello how are you he did not say anything back to me .. he made me feel very uncomfortable because he kept looking at my through the rear view mirror but wouldn't speak to me . our route took us on the high way and he kept swerving lanes and was not even going highway speed limit .. when asking the driver about the day and if he was okay he also did not respond . when we got to my job instead of following the route on the phone he went all the way to the back and just stopped the car and did not say anything . i think said goodbye he just looked at me and waited for me to get out the car and sped off " |
| Staring or Leering | "My driver gave me a head ache didn't stop talking didn't watch the road because she kept staring at me in the mirror which made her swerve so much the cops flashed the lights at her when she dropped me off I couldn't get out because she hadn't unlocked the doors and just kept talking he was parked in my neighbors driveway they were behind her waiting to pull in but she wouldn't stop talking my neighbors had to honk at her please give Full REFUND I deserve a peaceful safe calm ride" |

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Subcategory | Content |
|---|---|
| Staring or Leering | "He was very rude and had an attitude the moment my boyfriend and I got into the Uber. I got into the Uber with a small bag of fries, he then explained to me to not eat in the Uber and I apologized and put the food back quickly. Which I acknowledge that he's absolutely correct on that part. But then his following actions were highly unacceptable. He then sprayed the car with a very strong perfume then proceeded to open the windows then closed them to spray some more all while my boyfriend and I were coughing in the car. Awkwardly, the rest of the drive there we were all quiet and he was staring at me rudely through the reared view mirror that we almost crashed into a police car. I just want to let Uber know that I'm an ongoing customer with Uber I take Uber's every single day and I am not picky or rude by any means I've gotten into so many Uber's but this specific Uber driver was way out of line and disrespectful." |
| Staring or Leering | "Her car was clean that's why I gave five stars but she kept looking back speeding cause she was tired and was being rude" |
| Staring or Leering | "my driver gave me really weird vibes, he kept looking at me with a weird look, and he checked his phone constantly." |
| Staring or Leering | "Driver was distracted. The driver almost hit the car in front of them multiple times. The driver kept looking back while the riders were talking. The rider was very unsettled by this behavior." |
| Staring or Leering | "I sat in the front seat because there were other co-riders in the car and once they got dropped off he locked all the doors of the car then started driving real slow. He kept looking over and i get in danger. I had to call so many people to see if somebody in my house would know where i am and would make sure i got home safe. I want my money back please. Most terrifying experience." |
| Staring or Leering | "We waited 12 mins when initially the eta was 5 mins and then while driving he was very unprofessional and almost got into a car accident because he wasn't focusing on the road" |
| Staring or Leering | "Good morning. Picked up this rider I asked him to put on his mask he answered that he left it at home. I told him he needed a mask or I could not take home. He then took it out of his pocket and placed it under his nose. He kept looking at me as if he wanted to argue. When I dropped him he looked at my car as if wanting to find something wrong." |
| Staring or Leering | "Idk if he has problems or if thats just how he was cause he was wearing tight pants but he kept looking back and was driving with no hands when he took off from a red light and continued to drive fast" |
| Staring or Leering | "the driver kelp looking at me through the mirror, not really looking at the road , kelp swerving on the road I didn't feel safe at all or comfortable " |
| Staring or Leering | "My driver kept trying to curse ppl on the road like road rage and he kept looking at me in the mirror staring at me not the road" |
| Staring or Leering | "he was rude . and he stopped by the gas station to pump gas. That's why I cancelled the trip. and he didn't pay attention on the road . he kept turning around looking at me harassing me." |
| Staring or Leering | "I did not feel safe at all in my Uber ride, he almost hit a car on 95 and he also was driving like a maniac. I'm getting really tired of the service uber is giving me and I'm going to take my business elsewhere! I want a refund or something to accommodate my inconvenience!" |
| Staring or Leering | "Bad driver bad experience with him. He rushed me to put on my seat belt he swerved in and out of lanes driving in the middle of two lanes he didn't obey the speed limit he wasn't paying any attention to the road he constantly starred at his phone or me he didn't know where he was going for a little while and I had to direct him" |
| Staring or Leering | "He was not looking at road while driving but at me in back and his phone. Kept making crude comments and slamming on brakes constantly out of nowhere" |

**Appendix F**

# HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Subcategory | Content |
|---|---|
| Staring or Leering | "He was rude and unprofessional he also kept looking at me strangely. And his eyes were not on the road my driver almost hit the wall at the high over pass" |
| Staring or Leering | "He was complaining that he couldn't see me when I was clearly on the road and told him exactly where to go. For half of the ride he was taking to him self and making weird comments staring at me but I couldn't understand what he was saying it wasn't English." |
| Staring or Leering | "Speeding in the rain til the car started drifting den he started to slow down & drive slow" |
| Staring or Leering | "My driver put on a full monkey mask while driving and then turned around and stared at me. This involved him taking his eyes off the road. It terrified me. I thought he was going to kill me or rob a bank. It was unsafe driving, illegal for an adult to wear a mask while driving, and scary." |
| Staring or Leering | "Please don't match me again with this driver. This driver was so rude to me I had heavy bags on me my hands were full and he tells me speaking with an attitude that I had to put my bags in the truck I tell him I have personal stuff and he start cursing me out I get in the car I was very uncomfortable and he was on the phone just looking at me through the mirror and talking in his language . When I get to my destination I was getting off and he was trying to take off I almost fell down" |

Source: Bliss/Jira SA/SM Incident Data