# EXHIBIT 2

# EXHIBIT B

# FILED UNDER SEAL

**Uber Rideshare Cases, MDL No. 3084**

**January 2, 2026**

**Rebuttal Expert Report of Kristen M. Zgoba, Ph.D.**

**Highly Confidential – Subject to Protective Order**

## Table of Contents

Page

BACKGROUND AND QUALIFICATIONS.................................................................. 2

COMPENSATION.......................................................................................................... 3

MATERIALS CONSIDERED ...................................................................................... 3

ASSIGNMENT AND METHODOLOGY ..................................................................... 3

1. Introduction and Summary of Opinions.................................................................. 3

II. Relative Risk and the Structural Limits of Sexual-Violence Prevention ............ 5

III. "Predictors" of Sexual Assault and Contrast with S-RAD ............................... 6

IV. Case Study: The Persistent Risk Problem in Controlled Institutions ...............11

V. Classification and Reporting: Understanding Uber's Taxonomy ...................... 12

VI. The Scope and Effectiveness of Uber's Surveillance and Safety Infrastructure ........... 12

   1. Digital and Anonymous Reporting Systems Improve Detection, Not Elimination ...... 13

   2. Surveillance Tools Reduce but Cannot Erase Opportunity Structures ....................... 13

   3. Predictive Analytics Assist in Pattern Recognition but Cannot Forecast Spontaneous Misconduct ................................................................................................................... 13

   4. Background Checks Reduce Risk but Cannot Eliminate It............................................ 14

VII. Conclusion ............................................................................................................. 14

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**BACKGROUND AND QUALIFICATIONS**

My name is Kristen Zgoba. I received my Doctor of Philosophy (Ph.D.) in Criminology from Rutgers University, The State University of New Jersey, where I developed a specialized research focus on understanding the characteristics of sexual offending behavior, sexual assault recidivism, and the effects of policy interventions and prevention strategies for sexual violence. I am currently an Associate Professor at Florida International University in Miami, Florida, where I serve as Graduate Program Director and Chairperson of the Institutional Review Board. In these capacities, I oversee ethical review of human subject research and the academic training of graduate students in advanced criminological theory, statistical modeling, and program evaluation.

I teach graduate and undergraduate courses in sexual offending, corrections, research methods, and statistics, and have received formal certification in the administration and interpretation of the Static-99, the most widely used actuarial tool for assessing sexual offense recidivism risk. I was trained on this instrument directly by Dr. David Thornton, one of its co-authors. My scholarly expertise bridges both the clinical and empirical domains of sexual offending research, with emphasis on identifying risk factors, evaluating policy efficacy, and analyzing the real-world impact of sexual offense legislation.

Prior to joining academia, I served for fourteen years as Director of Research at the New Jersey Department of Corrections (NJDOC). During my tenure from 2004 through 2018, I directed large-scale research projects involving incarcerated and community-based correctional populations, including individuals convicted of sexual offenses housed at the Adult Diagnostic and Treatment Center—a facility nationally recognized for its treatment and evaluation of those convicted of sexual offenses. This experience provided extensive exposure to offender typologies, treatment outcomes, and longitudinal recidivism patterns. My applied research at the NJDOC emphasized evidence-based corrections, evaluation of policy reforms, and the measurement of violence and reoffending within high-risk populations.

Over the course of my career, my primary area has been sexual offending behavior and legislation, encompassing studies of the Sex Offender Registration and Notification Act, Megan's Law, and other federal and state-level statutory frameworks. I am the author of more than sixty-five peer-reviewed publications, and numerous technical and governmental reports and book chapters, the vast majority of which address sexual abuse, offender rehabilitation, and policy outcomes. Most recently, I authored a meta-analysis synthesizing twenty-five years of empirical evaluations of sexual offense laws, which offers one of the most comprehensive examinations to date of legislative efficacy in reducing sexual recidivism. I also serve on the editorial boards for the *American Journal of Criminal Justice*, *Homicide Studies*, *Policing: An International Journal and* the *Journal of Experimental Criminology*. I am slated to begin as Associate Editor of *Homicide Studies* in 2026, and Editor-in-Chief in 2027.

I have qualified or testified as an expert witness in approximately twenty-three judicial proceedings involving individuals convicted of sexual offenses, providing expert interpretation of risk assessment, policy application and effectiveness, and recidivism research. My testimony has also extended to national policy forums, including the United States Sentencing Commission, where I addressed empirical findings on failure-to-register (FTR) sex offenses under the Adam Walsh Act. I presented my research at over forty professional conferences and symposia, including academic, governmental, and practitioner venues. Recent presentations include invited talks at the Arizonans for

2

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Rational Sexual Offense Laws Conference and the Arizona State University Office of Gender-Based Violence, where I spoke on evidence-based strategies for reforming sexual offense policies.

In recognition of my scholarly contributions, I was awarded a Fulbright Research Scholarship in 2015 to study sexual offense prevalence and policy in the United Kingdom, enabling cross-national comparative analysis of registration and notification systems. As Principal Investigator, I have secured two federal research grants from the U.S. Department of Justice to evaluate the impact of Megan's Law and the Adam Walsh Act (AWA), focusing on their deterrent effects, cost-efficiency, and influence on community safety. Additionally, I recently obtained private research funding to examine the long-term recidivism outcomes of individuals removed from the Texas public sexual offense registry, a study that addresses one of the most important empirical questions in contemporary sex offense policy.

Across these professional experiences, I have maintained a consistent commitment to empirical rigor and methodological transparency in the study of sexual violence and offender management. My research integrates quantitative analysis with applied correctional knowledge, bridging academic inquiry and policy practice. Collectively, my education, professional appointments, research record, and expert testimony establish my qualifications to provide informed, evidence-based opinions in matters involving sexual assault, sexual offending behavior, and the evaluation of risk and recidivism. A complete curriculum vitae, including a full list of publications and grants from the last twenty years, and a list of testimony in the last four years were attached in the initial rebuttal report.

**COMPENSATION**

I am being compensated for my time at an hourly rate of $450.00. My compensation is not contingent upon the substance of my opinions, the nature of my findings, or the outcome of this matter.

**MATERIALS CONSIDERED**

1.) Expert reports authored by Dr. Chandler and Ms. Keller (Dated December 4, 2025, and December 2, 2025, respectively).
2.) References cited in the reference list attached as **Appendix A**.
3.) Materials considered in my original rebuttal report.

**ASSIGNMENT AND METHODOLOGY**

I was retained by counsel for Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC to evaluate the opinions of Dr. Chandler and Ms. Keller. I evaluated a number of their opinions utilizing the same methods I employ in my academic work, which is to consider the arguments made and sources referenced through logical analysis against the backdrop of empirical research and the knowledge I have gained in the field of sexual offense research after decades of experience.  Based on this review and analysis, I reached the following conclusions in response to the reports, which I explain further in the below sections of this rebuttal report:

**1. Introduction and Summary of Opinions**

This report examines certain aspects of Uber's sexual-violence prevention systems within the broader scientific understanding that risk must be measured against a real-world baseline. Contemporary

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

risk scholarship consistently demonstrates that harms such as sexual misconduct emerge from complex situational and behavioral conditions rather than from organizational intent or permissiveness. Critiques of Uber's safety framework, including those advanced by Chandler and Keller, assess Uber against an unrealistic ideal without articulating any operational model, institutional framework, or transportation modality that has achieved such an outcome.

Chandler and Keller do not consider that Uber has implemented a multilayered safety architecture in the transportation sector—continuous background checks, GPS tracking, real-time identity verification, trip-sharing tools, audio-recording features, S-RAD trip-matching, anomaly detection, and rapid reporting and deactivation protocols. Yet, like all systems, Uber cannot forecast or prevent spontaneous, opportunistic sexual assault or misconduct by individuals with no prior criminal charges or convictions for sexual assault or misconduct. Because risk is inherently comparative, not absolute, understanding Uber's safety performance requires situating it alongside the realistic alternatives riders face at the moment of travel: walking alone at night, driving while impaired, riding with an impaired acquaintance, waiting outdoors for taxis, or using late-night mass transit with minimal guardianship. These alternatives carry their own risks, and virtually none of them utilize risk-mitigation techniques present in rideshare environments such as GPS visibility, digital reporting, and two-way accountability. The purpose of this report is therefore to analyze Uber's safety systems within the empirical boundaries of what any institution can achieve, to evaluate the assumptions underlying expert criticisms, and to clarify how sexual-violence risk must be understood in a comparative and scientifically grounded framework. The following points outline the key considerations relevant to these issues.

- Keller's and Chandler's analyses include no real-world baseline for the risk of sexual assault and therefore do not consider the underlying risk riders would face in society generally or the risk that they would face in any transportation or institutional setting. Keller and Chandler espouse a standard that is unsupported by empirical research and unattainable.
- Sexual violence is situational, opportunistic, and often perpetrated by individuals with no prior criminal convictions, making first-time violations inherently unpredictable.
- No first-time risk prediction tool exists. S-RAD, and the data inputs considered by S-RAD, function differently from actuarial risk assessments and do not predict events.
- Keller and Chandler's assessment of alleged risk factors ignores that Uber has implemented multilayered safety architectures in the transportation sector, including continuous background checks, GPS tracking, real-time ID verification, S-RAD trip matching, audio recording, trip-sharing tools, anomaly detection, emergency in-app reporting, and rapid deactivation procedures.
- Neither expert identifies a transportation modality with lower risk or stronger safety systems; their critiques lack a comparative framework.
- Risk must be evaluated relative to real-world alternatives—walking alone, driving while impaired, riding with an impaired acquaintance, waiting outside for taxis, or using late-night transit—all of which may involve higher risk exposures than surveilled rideshare trips.
- Assertions that Uber "increases risk" are analytically empty without a defined baseline, because risk is inherently comparative, not absolute.
- Zero-tolerance and reporting systems cannot eliminate misconduct, as evidenced by the Prison Rape Elimination Act: despite two decades of intensive training, constant surveillance, audits, and strict sanctions, U.S. prisons still report sexual victimization.

4

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- Uber's taxonomy mirrors federal crime-classification systems (e.g., FBI UCR), which also report only higher severity categories publicly while retaining more granular internal classifications; Keller's allusions of "concealment" misinterprets standard reporting practice.
- Perfect reporting does not prevent harm, and Uber's taxonomy does not generate risk—it documents it; transparency does not eliminate opportunistic misconduct.
- Neither Keller nor Chandler proposes a feasible predictive, technological, or institutional alternative that could achieve zero incidents or outperform Uber's existing safety system.

## II. Relative Risk and the Structural Limits of Sexual-Violence Prevention

In different ways, Chandler and Keller each attempt to argue that reports of sexual assault are increasing on the Uber platform and that these rates were impacted by specific risk factors known to Uber. 12/02/2025 Updated Keller Rep. at Opinions 4-5; 12/04/2025 Supp. Chandler Rep., Corrected ("Chandler Rep.") at Sec. 5.

Chandler and Keller's analyses are fundamentally flawed because they include no real-world baseline. The aspiration to create a society in which harms such as sexual abuse are fully or nearly eliminated is normatively compelling but empirically unattainable. Contemporary risk scholarship consistently emphasizes that in complex social systems, risk can be reduced, redistributed, and better governed, but not eliminated (Tannert et al., 2007; Reason, 2000; Krug et al., 2002; Bureau of Justice Statistics, 2024).

Over the past two decades, particularly among large institutions subject to public scrutiny and legal exposure, there has been an increasing reliance on intensive training and advanced technological systems as tools of prevention. Yet decades of empirical research demonstrate that neither training nor technology, independently or in combination, can eliminate all instances of sexual violence. This reality does not diminish the importance of prevention efforts; rather, it underscores the necessity of evaluating them using realistic standards grounded in risk management rather than aspirational absolutes.

Neither the Keller Report nor the Chandler Report evaluates Uber's safety systems within a comparative risk framework. Risk is always contextual and inherently relative, yet both experts treat sexual-violence risk on the Uber platform as if it exists in a vacuum rather than as one option among a set of real-world transportation alternatives. For individuals seeking to return home late at night, particularly after alcohol consumption, a recurring focus of both reports, the realistic alternatives often include driving while impaired, riding with an impaired acquaintance, walking alone in low-visibility environments, waiting outdoors for transportation, or using late-night mass transit with limited staffing and guardianship. Each of these options carries risks of injury, victimization, or harm, including sexual victimization. For instance, driving drunk or riding with a drunk friend carries the risk of an alcohol-related crash. In the U.S., thirty percent of all traffic fatalities involve drunk drivers. *Drunk Driving: Statistics and Resources*, NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, https://www.nhtsa.gov/risky-driving/drunk-driving (last visited December 31, 2025). Many riders also report avoiding public transportation at nighttime due to safety concerns. *See Sacramento Regional Transit (SacRT) Street Harassment Outreach Summary*, AECOM, December 31, 2024, p. 16; "AC Transit Safety Survey_All Results_EXTERNAL final 12.24.24.xlsx," https://www.actransit.org/sites/default/files/2024-12/AC%20Transit%20Safety%20Survey_All%20Results_EXTERNAL%20final%2012.24.24.xlsx; "BARTStreetHarassmenSurveyResults2024," https://www.bart.gov/sites/default/files/2024-

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

11/BARTStreetHarassmenSurveyResults2024.xlsx; *LADOT Safety & Security Survey Findings and Recommendations*, Ilium Associates, December 16, 2024; *Long Beach Transit Safety Survey Final Report*, ETC Institute, February 3, 2025, p. 44; *Los Angeles County Metropolitan Transportation Authority: Street Harassment Survey and Focus Groups*, Metro, March 2025, p. 6; *Transit Safety Survey Findings Report*, ETC Institute, Fall 2024, p. 46; *VTA Safety and Harassment Survey*, Santa Clara Valley Transportation Authority and EMC Research, July–August 2024, p. 25; "2024 Phase 1 Muni Rider Safety and Harassment Data.csv," https://web.archive.org/web/*/https://www.sfmta.com/media/41402/download*. A critique that fails to compare Uber's risk profile to these alternatives is analytically incomplete.

This omission undercuts related claims that Uber failed to "tell the public" that risk is increased. Such assertions are analytically empty unless a relevant counterfactual is specified. Increased relative to what baseline—walking alone at night, riding with an impaired driver, using minimally supervised late-night transit, or waiting outdoors for transportation? Without a clearly articulated comparison group, the claim that Uber "increases risk" lacks an empirical reference point and functions more as rhetoric than as risk analysis.

The limits of prediction further constrain what any prevention system can accomplish. Criminological research consistently shows that some sexual violence is opportunistic and situational, and when so, arises in moments of anonymity, ambiguity, or fleeting opportunity (Wortley & Smallbone, 2006). Many individuals who commit sexual violence have no prior criminal convictions, leaving organizations without stable behavioral markers from which to forecast risk (Sandler et al., 2008). Predictive models, whether actuarial or clinical, require consistent past patterns to generate meaningful estimates. When offending is first-time and situational rather than premeditated, no background check, training module, psychological screen, or technological tool can reliably identify the precise moment at which misconduct will occur. Uber's reliance on multi-layered guardianship strategies reflects an evidence-based response to this reality. It aims to reduce situational opportunity even when individual behavior cannot be predicted in advance.

Finally, zero-tolerance frameworks often foster the mistaken belief that clearer rules and harsher sanctions will fully deter misconduct. Deterrence research, however, shows that behavior is shaped primarily by the perceived certainty of detection rather than the severity of punishment (Nagin, 2013). Sexual violence frequently occurs in private or semi-private settings where certainty of detection is inherently limited. Uber's safety architecture directly addresses this challenge by increasing visibility, documentation, and real-time oversight, yet environmental criminology makes clear that no system can eliminate every instance in which motivated offenders encounter situational opportunity without a capable guardian (Cohen & Felson, 1979). Notably, neither Keller nor Chandler identifies any transportation alternative with stronger, more consistent, or more technologically reinforced guardianship than that provided by Uber.

## III. "Predictors" of Sexual Assault and Contrast with S-RAD

Using Flack data and other information from Uber, Chandler and Keller attempt to highlight alleged "risk factors" or "predictors" for sexual assault on Uber's platform, such as time of day, prior complaints against drivers, and days of the week, among other things. 12/02/2025 Updated Keller Rep. at Opinions 4-5; 12/04/2025 Supp. Chandler Rep., Corrected ("Chandler Rep.") at Sec. 5. Chandler and Keller fail to consider how Uber does use this information in its Safety Risk Assessed Dispatch (S-RAD)

6

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

model and other prevention efforts, and they further misunderstand the purpose and limits of such data inputs.

Chandler and Keller's criticisms do not recognize that prevention efforts are utilized by Uber. Uber engaged in onboarding efforts such as background checks, identity verification, and education. Uber also made substantial safety investments in reducing situational risk. For example, Uber included each of the following:

- Address anonymization – After a trip ends, the Driver app will only show the general area where a trip started and ended, not the address. Dara Khosrowshahi, *Raising the Bar on Safety*, Uber Newsroom, https://www.uber.com/newsroom/raisingthebar/ (last visited Dec. 29, 2025).

- Audio recording – Riders can choose to allow the app to automatically record audio on some or all of their rides. Riders can also start recording at any moment by selecting "Record audio" in the Safety Toolkit. Uber, *Added safety on your rides with Audio Recording*, Uber, https://www.uber.com/us/en/ride/safety/audio-recording/ (last visited Dec. 29, 2025).

- Check Your Ride notifications – These are push notifications "to remind riders of the Check Your Ride steps just before their car arrives." Andrew Macdonald, *Uber's Campus Safety Initiative*, Uber Newsroom, https://www.uber.com/newsroom/campus-safety-initiative/ (last visited Dec. 29, 2025). The "Check Your Ride" steps include "making sure you're getting into the right car with the right driver by matching the license plate, car make and model, and the driver photo with what's provided in the app." Id.

- Cross street drop-offs for privacy – Riders can request trips using cross-streets instead of an exact street address. Dara Khosrowshahi, *Raising the Bar on Safety*, Uber Newsroom, https://www.uber.com/newsroom/raisingthebar/ (last visited Dec. 29, 2025).

- Emergency Button – The emergency button is used "to call authorities to get help if [the rider] need[s] it. The app displays [the rider's] location and trip details, so [the rider] can quickly share them with emergency services." Uber, *Safety with the Uber app*, Uber Newsroom, https://www.uber.com/us/en/drive/basics/staying-safe-with-the-uber-app/ (last visited Dec. 29, 2025).

- GPS tracking – GPS tracking allows the rider to track their trip by viewing the route on the map in the app. Chloe Cutten, *Prioritising your safety*, Uber Newsroom, https://www.uber.com/en-NG/newsroom/prioritising-your-safety/ (last visited Dec. 29, 2025). Uber also uses GPS to keep a record of where a driver-partner goes during the ride "so there's a record of [the rider's] trip if something happens." Uber, *Drive with confidence*, Uber, https://www.uber.com/us/en/drive/safety/ (last visited Dec. 29, 2025).

- Live Help from ADT Safety Agent – For situations that do not rise to the level of an emergency, users can "get help, via phone or text, from a live safety agent from ADT." Rebecca Payne, *Uber's new Safety Toolkit featuring Live Help from a safety agent*, Uber Newsroom, https://www.uber.com/newsroom/ubers-new-safety-toolkit/ (last visited Dec. 29, 2025). When a call or text exchange is requested, "the agent can monitor an ongoing trip, stay in contact through the duration of the trip, and even reach out to 911 on the user's behalf with the vehicle's make and model, license plate number, and GPS location." *Id.*

- On-trip reporting – This feature allows riders to use their Safety Toolkit to "report a non-emergency safety issue while still on the trip." Tracey Breeden, *Uber Launches New Discreet Reporting Option for Safety Incidents*, Uber Newsroom https://www.uber.com/en-CA/newsroom/on-trip-reporting-feature/ (last visited Dec. 29, 2025).

7

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- Phone number anonymization – This feature allows riders and drivers to communicate through the Uber app without sharing their real phone numbers. Dara Khosrowshahi, *Raising the Bar on Safety*, UBER NEWSROOM, https://www.uber.com/newsroom/raisingthebar/ (last visited Dec. 29, 2025).

- PIN verification – Riders "can choose to use a PIN on all trips or only at night (9pm to 6am)." Uber, *What's Verify my Ride?*, UBER, https://help.uber.com/riders/article/whats-verify-my-ride/?nodeId=2ddbb5e8-0dd3-4048-b9ee-f6b5e5311e25 (last visited Dec. 29, 2025). After opting in to PIN verification, the rider receives a unique, 4-digit PIN whenever they request a ride. *Id.* Before entering the driver's vehicle, the rider tells the driver their PIN. *Id.* If they are the correct driver, they'll be able to start the trip after the enter the rider's PIN in the app. *Id.*

- RapidSOS integration – This feature "makes certain trip details available to 911 dispatchers electronically. When a rider or driver uses the in-app emergency button to call 911, the car's make and model, license plate, and GPS location are made available to 911 dispatchers."[1] Uber, *Uber's Emergency Button*, UBER NEWSROOM, https://www.uber.com/newsroom/emergencybutton/ (last visited Dec. 29, 2025).

- Real-Time Driver ID – This feature verifies that the driver-partner who is picking up riders is the same person who underwent Uber's screening process. "Driver partners are selected at random to submit a selfie for verification. . Once a face is detected, Microsoft's Face API Verify feature compares the face with the verified picture associated with the driver's account. If the face is a match, the driver-partner is allowed to start picking up riders. If the face does not match, the driver is temporarily blocked while Uber investigate[s] the situation." Uber, *Engineering Safety with Uber's Real-Time ID Check*, UBER BLOG, https://www.uber.com/blog/real-time-id-check/ (last visited Dec. 29, 2025).

- Record My Ride – This feature allows drivers to automatically record trips through the Driver app. Uber, *Record My Ride – Frequently Asked Questions*, UBER, https://help.uber.com/en/driving-and-delivering/article/record-my-ride---frequently-asked-questions?nodeId=7f86cc51-2c3e-4888-8dc1-0ac2b6337b92 (last visited Dec. 29, 2025). If a driver chooses to turn on Record My Ride, the Driver app will use their phone's selfie camera to record the driver's trips automatically. Uber notifies riders that their trip will be recorded. *Id.*

- RideCheck – This feature checks in with riders and drivers in the event of a possible crash. "When a Ride Check is initiated, riders and drivers will be prompted to use our Safety Toolkit, which includes the option for 911 assistance. [Uber's] safety team can also follow up by phone to make sure everyone is safe." Dara Khosrowshahi, *Raising the Bar on Safety*, UBER NEWSROOM, https://www.uber.com/newsroom/raisingthebar/ (last visited Dec. 29, 2025).

- S-RAD – This feature "use[s] data to inform [Uber's] trip matching algorithm in an attempt to make better matches between riders and drivers." Hannah Nilles, *Uber's record on safety is clear*, UBER NEWSROOM, https://www.uber.com/newsroom/ubers-safety-record/ (last visited Dec. 29, 2025). For example, "if a brand-new rider requests a late-night trip in an area known for nightlife, [S-RAD] may prioritize more experienced drivers with a strong record of late-night trips and positive rider feedback." Id.

---

[1] RapidSOS "is available in around 1,200 markets, which covers over 74% of trips in the US[.]" Uber, *Uber's Emergency Button and the Technologies Behind It*, UBER BLOG, https://www.uber.com/blog/ubers-emergency-button-and-the-technologies-behind-it/ (last visited Jan. 2, 2025).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- Text-to-911 – This feature sends text messages to 911 in cities and counties that support this technology. The feature automatically drafts a text message that includes trip details like the car's make and model, license plate, and location so that 911 operators can respond quickly. Dara Khosrowshahi, *An Operating System for Everyday Life*, UBER NEWSROOM, https://www.uber.com/newsroom/everyday-life-os/ (last visited Dec. 29, 2025).
- Trip sharing for riders and drivers – This feature allows friends and family to follow the user's route. Uber, *Safety with the Uber app*, UBER, https://www.uber.com/us/en/drive/basics/staying-safe-with-the-uber-app/ (last visited Dec. 29, 2025).
- Trusted contacts – This feature allows riders to share live trip information with up to five trusted contacts "so there are multiple sets of eyes on each ride." Tony West, *Turning the lights on*, UBER NEWSROOM, https://www.uber.com/newsroom/turning-the-lights-on/ (last visited Dec. 29, 2025).
- Two-way ratings – "After each trip, riders and drivers have the opportunity to rate each other from 1 to 5 stars, based on their trip experience. Ratings are anonymous. You won't see individual ratings tied to a particular trip or person." Uber, *How star ratings work*, UBER, https://www.uber.com/us/en/drive/basics/how-ratings-work/ (last visited Dec. 29, 2025).

These safety investments reflect a layered risk-reduction strategy. This approach aligns with accepted prevention frameworks that emphasize risk identification, safeguards, and exposure mitigation. These measures demonstrate a substantial and ongoing investment in safety governance with more deterrence measures than taxis, public transportation, walking home alone, driving drunk, or riding with a drunk driver. For example, some taxi services offer video recording,[2] audio recording,[3] GPS tracking,[4] or location sharing,[5] Some public transportation companies use video recording,[6] audio recording,[7] GPS tracking,[8] or emergency call buttons.[9] Some public sidewalks are monitored by video.[10] None of these options, however, offer the full suite of safety measures that Uber provides.

---

[2] Stephanie Chuang, *Bay Area Taxi Cabs Add to Growing Trend of Using Dashcams*, NBC BAY AREA, https://www.nbcbayarea.com/news/local/bay-area-taxi-cabs-add-to-growing-trend-of-using-dashcams/76686/ (last visited Dec. 30, 2025).

[3] *See, e.g.,* VIP Taxi, *Non-Emergency Medical Transportation*, VIP TAXI, https://viptaxi.com/medical-transportation/ (last visited Dec. 30, 2025).

[4] *See, e.g.,* VIP Taxi, *VIP Taxi App: Your Gateway to Easy and Fast Bookings*, VIP TAXI NEWS https://viptaxi.com/mobile-taxi-app-phoenix-tucson-arizona-transportation/ (last visited Dec. 30, 2025); Buff City Taxi, *The Art and Science of Cab Driver and Passenger Tracking*, BUFF CITY TAXI, https://buffcitytaxi.com/the-art-and-science-of-cab-driver-passenger-pairing/#:~:text=Cab%2Ddriver%20pairing%20is%20an,for%20successful%20driver%2Dpassenger%20matching (last visited Dec. 30, 2025).

[5] The Curb app allows riders to share their location with a friend when requested by that user. Curb, *Curb Mobility Privacy Notice*, GO CURB, https://www.gocurb.com/privacy (last visited Dec. 30, 2025).

[6] *Security cameras*, CHICAGO TRANSIT AUTHORITY, https://www.transitchicago.com/security/cameras/ (last visited Dec. 31, 2025).

[7] Kim Zeiter, *Public Buses Across Country Quietly Adding Microphones to Record Passenger Conversations*, WIRED, https://www.wired.com/2012/12/public-bus-audio-surveillance/ (last visited Dec. 31, 2025).

[8] *Bus & Train Trackers*, CHICAGO TRANSIT AUTHORITY, https://www.transitchicago.com/howto/trackerexplained/ (last visited Dec. 31, 2025).

[9] Barbara Russo-Lennon, *'Point'-less: Over 1,000 emergency calls went unanswered through MTA 'Help Points' subway intercoms, report finds*, AMNY, https://www.amny.com/news/mta-help-points-emergency-unanswered-report/ (last visited Dec. 31, 2025).

[10] Steve Hern, *In More Cities, A Camera On Every Corner, Park and Sidewalk*, NPR, https://www.npr.org/sections/alltechconsidered/2013/06/20/191603369/The-Business-Of-Surveillance-Cameras (last visited Dec. 31, 2025).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

However, these efforts are starkly different from actuarial risk assessment tools. Actuarial risk assessment tools, such as the Static-99R, are designed to estimate the likelihood of future sexual offending by specific individuals based on empirically validated predictors derived from large, longitudinal samples of individuals with prior sexual offense convictions (Hanson & Thornton, 2000). These instruments are built through decades of peer-reviewed research examining which factors reliably distinguish individuals who reoffend from those who do not. The predictors included in the Static-99R—such as prior sexual offense convictions, number of prior sentencing occasions, age at release, and victim characteristics—are not selected intuitively or situationally; rather, they are retained because they demonstrate consistent, replicable associations with future offending across multiple populations and jurisdictions. Importantly, actuarial tools do not claim to predict the timing or circumstances of a specific offense. Instead, they generate probabilistic estimates of recidivism risk over defined follow-up periods, with established error rates and well-documented performance metrics, including area-under-the-curve (AUC) values typically around 0.70–0.80, reflecting good discriminatory accuracy between recidivists and non-recidivists (Hanson et al., 2014). These known limits and error rates are a defining feature of actuarial instruments and are precisely what allow them to satisfy accepted scientific standards for predictive validity.

By contrast, algorithmic systems such as Uber's S-RAD rely on situational characteristics present in trips where sexual assault or misconduct or other types of interpersonal conflict have been reported—such as time of day, location, rider–driver pairing, or prior platform complaints. (UBER-MDL3084-BW-00048903-906.) However, these factors are also present in drives that do not result in sexual assault or sexual misconduct. S-RAD optimizes matching so that the overall pairing has reduced levels of any kind of unfavorable interaction, but no algorithm can accurately predict an individual incident of sexual assault. Similar proprietary algorithms are used in other industries, such as risk assessment in the insurance industry[11] or predictive maintenance assessment in the airline industry.[12] These factors may be correlated with the contexts in which incidents are more likely to occur, but they are not empirically validated predictors of individual offending behavior, and S-RAD therefore does not (and could not) identify individual drivers or riders who are likely to engage in such behavior. To be clear, S-RAD cannot predict future safety incidents including criminal behavior. This helps explain why the model is not truly predictive in nature. For example, ██████████████████████████████ ████████████████████████████ (Wong Dep. Ex. 1243.)

The critical distinction is that factors used to trigger S-RAD identify situational or contextual conditions associated with heightened vulnerability at the trip level, whereas actuarial predictors, such as those incorporated into the Static-99R, consist of empirically validated, individual-level characteristics that have been shown, through repeated testing, to reliably discriminate future sexual offending risk across defined populations. Situational correlates are common to millions of uneventful interactions and therefore generate high false-positive rates when treated as predictive signals. Keller and Chandler do not present evidence that Uber should have adjusted the S-RAD model in any way, and this makes sense: S-RAD functions as a risk-management and harm-mitigation tool—intended to guide

---

[11] Sabine VanderLiden, *Algorithmic Underwritting 2.0: Revolutionizing Risk Assessment*, Medium, https://medium.com/@sabine_vdl/algorithmic-underwriting-2-0-revolutionizing-risk-assessment-71194df44e6b.

[12] Harshdeep Singh, *Explained: The AI-Powered Predictive Maintenance Revolution*, Airways, https://www.airwaysmag.com/new-post/ai-powered-predictive-maintenance-revolution#:~:text=Delta%20Air%20Lines%20(DL)%20has,;%20no%20more%2C%20no%20less.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

precautionary interventions in higher-risk contexts—rather than as a scientifically validated predictive model of sexual offending or interpersonal conflict.

Conflating these two fundamentally different approaches risks overstating what contextual data can reliably infer about future human behavior.

## IV. Case Study: The Persistent Risk Problem in Controlled Institutions

The most striking example of risk management is the Prison Rape Elimination Act (PREA), enacted in 2003 with the explicit goal of *eliminating* sexual assault in U.S. correctional settings. PREA resulted in mandatory nationwide training, extensive surveillance investment, risk-screening protocols, independent audits, enhanced staffing structures, and strict reporting obligations. Correctional systems introduced comprehensive instructional programs, expanded camera networks, redesigned physical layouts, and imposed stringent staff-misconduct sanctions. *Yet sexual victimization persists despite two decades of PREA enforcement.*

According to the most recent Bureau of Justice Statistics' national report released this week, *Sexual Victimization in Prisons*, 2023–24, 4.1% of adult prison inmates reported experiencing sexual victimization while incarcerated in the preceding year, including 2.3% victimized by other inmates and 2.2% by facility staff (BJS, 2024[13]). These figures illustrate that even in environments characterized by constant surveillance, regimented routines, exhaustive training, and extensive regulatory mandates such as zero-tolerance policies, sexual violence cannot be eradicated. If prisons—with 24-hour supervision, controlled movement, and full authority to restrict behavior—cannot achieve zero incidents, it is unrealistic to expect open, community-based environments such as rideshare platforms to eliminate risk entirely. This comparative framework highlights a core omission in both the Chandler and Keller reports: neither identifies a transportation system, institutional model, or prevention framework that has achieved lower sexual violence rates than Uber. Despite offering relative risk ratios, the critiques operate in a vacuum that ignores comparative risk realities.

That same limitation applies in the ride-sharing context, where the persistence of reported incidents must be interpreted in light of how prevention systems affect detection and disclosure rather than eradication. The absence of a decline in reported sexual assault allegations following Uber's implementation of multiple safety technologies does not indicate that those measures were ineffective. Many of the safety features Uber introduced reduce the practical and psychological barriers to reporting misconduct. When individuals have clearer evidence, easier reporting mechanisms, and greater confidence that their report will be documented and taken seriously, they are more likely to come forward. In everyday terms, safety tools can change whether people report an incident even if they do not immediately change whether misconduct occurs. This pattern is well documented in public-health and criminological research, which shows that improvements in reporting infrastructure and victim support are often associated with increases in reported incidents because previously hidden events become visible, not because underlying victimization has increased (Planty et al., 2013). Accordingly, the number of individuals reporting sexual assault cannot be interpreted as a direct measure of whether Uber's safety investments "worked," because those same investments are specifically designed to surface incidents that historically went unreported.

---

[13] Downloaded on December 10, 2025 at https://bjs.ojp.gov/document/svljri2324.pdf

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## V. Classification and Reporting: Understanding Uber's Taxonomy

Keller's principal assertion about Uber's taxonomy is that by using 21 internal subcategories, but publicly reporting only a subset of the most severe incidents, Uber is allegedly "concealing" the true volume and seriousness of sexual misconduct on its platform. The Federal Bureau of Investigation (FBI) has long utilized a tiered classification system that distinguishes among offenses according to their seriousness, a structure that closely parallels Uber's approach to reporting sexual misconduct. Under the Uniform Crime Reporting (UCR) Program, offenses are divided into Part I (Index) crimes—the most serious and consistently tracked offenses such as homicide, rape, robbery, and aggravated assault—and Part II offenses, which encompass a broad range of less severe crimes reported primarily through arrest statistics rather than full national incident counts. This hierarchical approach mirrors Uber's practice of publicly disclosing only its most severe categories while maintaining a more detailed 21-category internal taxonomy for investigative and analytical accuracy.

The assertion that Uber's choice to highlight only the highest-severity categories constitutes concealment reflects a misunderstanding of how crime-classification systems function in every major federal reporting framework. Not all crimes are equal, and valid reporting systems prioritize severity to preserve interpretability, comparability, and policy relevance. Just as the FBI publishes national statistics only for Part I offenses while relying on internal, far more granular classifications for operational purposes, Uber's public reporting distills complex information into a limited set of categories that are intelligible to the public and consistent over time. The FBI does not publish national totals for every internal category it codes, nor does it present the entirety of its classification architecture in public summaries; instead, it discloses clearance rates for the most serious offenses because public reporting requires interpretability, not exhaustive replication of internal data systems. Uber's model functions in precisely this way, the company investigates incidents using detailed subcategories and then reports aggregated totals for its most serious categories—analogous to the FBI's Part I crime summaries. By insisting that Uber must publicly disclose every subcategory to avoid "opacity," Keller imposes a standard that the FBI itself does not meet and that no national crime-reporting system has ever adopted. Her conclusion therefore rests not on a valid methodological objection, but on an incorrect assumption that internal classification granularity and public-facing summary formats must be identical.

Also absent from both Keller's and Chandler's critiques is any recognition that even perfect reporting does not eliminate risk. *Uber's taxonomy does not create risk; it reports risk.* Riders' actual decisions involve comparative judgments between taking a rideshare trip and viable alternatives at that moment, many of which may involve far greater uncertainty, weaker guardianship, and substantially less documentation or transparency. Put differently, even if Uber were to state the obvious explicitly, that a non-zero level of sexual-violence risk exists on its platform, this would say nothing about whether that risk is higher or lower than the risk associated with the alternatives that most riders realistically face. Keller's and Chandler's insistence that Uber has not announced that risk is "increased" sidesteps the central empirical question regarding the comparative risks of alternative transportation options.

## VI. The Scope and Effectiveness of Uber's Surveillance and Safety Infrastructure

As I addressed in my prior report, organizations increasingly deploy technology to strengthen sexual-violence prevention, but these tools operate within structural limits. Uber uses technologically advanced strategies, yet even its innovations—continuous background checks, predictive dispatching, anomaly detection, live safety agents, audio recording features, trip-share tools, cross-street drop-offs,

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

two-way ratings, and immediate offboarding—cannot overcome the fundamental constraints imposed by human unpredictability and situational context. These mechanisms reduce risk, but no surveillance system can eradicate opportunistic acts that arise spontaneously in situational conditions.

Crucially, neither Keller nor Chandler identifies a meaningful transportation alternative. Walking alone late at night, using taxis with no GPS traceability, entering a car with an impaired acquaintance, or relying on sparse late-night mass transit options typically presents greater, not lesser, exposure to unmonitored or ungated interpersonal environments. In this sense, the repeated claim that Uber "has not told the public that risk is increased" again fails to grapple with the comparative nature of risk: riders must choose among imperfect options, and the relevant inquiry is whether Uber's layered safety architecture reduces risk relative to those alternatives—not whether it eliminates risk altogether or uses the precise wording preferred by Keller or Chandler.

1. **Digital and Anonymous Reporting Systems Improve Detection, Not Elimination**

Online reporting platforms increase institutional visibility and lower disclosure barriers, but research suggests that reporting systems increase detection without reducing underlying victimization rates (Karjane, Fisher, & Cullen, 2002). Uber's in-app, real-time reporting competes favorably with systems used by universities, workplaces, transit agencies, and prisons. Visibility enhances responsiveness, but no reporting platform—digital or otherwise—can stop a spontaneous interpersonal act before it occurs. Notably, neither Chandler nor Keller identifies any transportation provider—taxis, limousines, shuttles, buses, or rail systems—with a more accessible or more effective reporting framework than Uber's. Their critiques focus on what reporting cannot do, while overlooking that Uber provides substantially more reporting infrastructure than the industries against which it can be realistically compared.

2. **Surveillance Tools Reduce but Cannot Erase Opportunity Structures**

As discussed, even correctional environments governed by PREA—institutions with 24-hour surveillance, controlled movement, and staff authority to restrict nearly every dimension of inmate behavior—retain gaps where sexual misconduct persists. Uber's safety architecture, though necessarily less coercive, mirrors many PREA-informed principles: continuous GPS tracking, route-verification technology, live trip monitoring, two-way accountability through ratings, and increasing adoption of audio-recording features. Yet, as with prisons, no institution can fully eradicate every opportunity structure without eliminating privacy and autonomy entirely. Keller and Chandler ignore this universal structural limitation and provide no comparative model showing how any other transportation modality achieves full situational visibility. In reality, most transportation environments have less surveillance than a rideshare vehicle, not more.

3. **Predictive Analytics Assist in Pattern Recognition but Cannot Forecast Spontaneous Misconduct**

Algorithmic tools improve the identification of repeated or patterned behaviors but cannot forecast actions that occur absent substantiated historical indicators. Uber's S-RAD framework integrates environmental risk variables to improve driver-rider matching and reduce situational risk. Yet spontaneous misconduct remains beyond predictive reach because predictive analytics require a historic baseline pattern from which to infer probability. Neither Keller nor Chandler proposes a viable

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

predictive model implemented anywhere in the transportation, workplace-safety, or public-safety sectors capable of forecasting spontaneous sexual misconduct by individuals with no prior record (charge, convictions or sentencing) because such a model does not exist. Their criticism is thus directed at a limitation inherent to all predictive systems, not a deficiency unique to Uber.

### 4. Background Checks Reduce Risk but Cannot Eliminate It

Most individuals who commit sexual violence have no prior convictions or documented behavioral history (Sandler et al., 2008). Uber's continuous background-check model—which includes criminal-history monitoring, motor-vehicle record checks, and identity verification, surpasses the static, one-time checks used in many employment sectors. However, background checks can only detect known official offenses, not individuals who have no record. Neither expert identifies an alternative background-screening system capable of identifying the probability of first-time offenders, because none exists in any sector. Uber's system, therefore, is not deficient; it reflects the empirical boundary of what any background-check regime can achieve.

## VII. Conclusion

In sum, the criticisms advanced by Keller and Chandler rest on an unrealistic expectation and fail to situate Uber's safety performance within the comparative realities that define actual rider decision-making. Reports demonstrate that sexual violence cannot be eradicated even in the most intensely monitored, tightly controlled institutional environments, underscoring the structural limits of any prevention framework. Uber's multi-layered safety architecture—encompassing continuous background screening, GPS visibility, trip sharing, audio recording, real-time ID verification, S-RAD trip matching, anomaly detection, and rapid deactivation—exceeds the safeguards available in taxis, public transit, or walking environments, yet neither expert acknowledges this differential or identifies a superior alternative. Risk is not absolute, but relative to the options riders face at the moment of travel, and on this metric, the available evidence strongly suggests that Uber reduces rather than increases exposure to sexual-violence risk. A scientifically grounded analysis therefore requires evaluating Uber not against a hypothetical ideal, but against the empirical constraints and comparative conditions that govern all real-world transportation choices.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX A**
**REBUTTAL EXPERT REPORT OF KRISTEN M. ZGOBA, PH.D.**
**List of Materials Cited and Considered**

| EXPERT REPORTS |
| --- |
| Expert Report of Dr. John Chandler, dated December 4, 2025, and all materials listed in Appendix A, attached thereto |
| Expert Report of Lacey Keller, dated December 2, 2025, and all materials listed in Appendix G, attached thereto |
| Expert Report of Dr. Veronique Valliere, dated September 26, 2025, and all materials listed in Exhibit A, attached thereto |
| Expert Report of Dr. Kristen Zgoba, dated October 24, 2025, and all materials listed in Appendix C, attached thereto |

| DEPOSITIONS |
| --- |
| June 25, 2025 Deposition of Sunny Wong + Exhibits |

| Bates Produced Documents |
| --- |
| UBER-MDL3084-BW-00048903 |

| PUBLICATIONS |
| --- |
| Bureau of Justice Statistics. (2024). *Sexual victimization in prisons reported by inmates, 2023–24* (SVLJRI2324) (NCJ 304477). U.S. Department of Justice. https://bjs.ojp.gov/document/svljri2324.pdf |
| Cohen, L. E., & Felson, M. (1979). *Social change and crime rate trends: A routine activity approach*. American Sociological Review, 588-608. |
| Hanson, R. K., & Thornton, D. (2000). *Improving risk assessments for sex offenders: A comparison of three actuarial scales*. Law and Human Behavior, 24(1), 119-136. |
| Hanson, R. K., Lunetta, A., Phenix, A., Neeley, J., & Epperson, D. (2014). *The field validity of Static-99/R sex offender risk assessment tool in California*. Journal of Threat Assessment and Management, 1(2), 102–117. https://doi.org/10.1037/tam0000014 |
| Karjane, H.K., Fisher, B.S., & Cullen, F.T. (2002). *Campus Sexual Assault: How America's Institutions of Higher Education Respond*. Final Report, NIJ Grant # 1999-WA-VX-0008. Newton, MA: Education Development Center, Inc. |
| Krug EG, Mercy JA, Dahlberg LL, Zwi AB. *The world report on violence and health*. Lancet. 2002 Oct 5;360(9339):1083-8. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| PUBLICATIONS |
| --- |
| Nagin, D. S. (2013). *Deterrence in the twenty-first century*. Crime and Justice, 42(1), 199-263. |
| Planty, M., Langton, L., Krebs, C., Berzofsky, M., & Smiley-McDonald, H. (2013). *Female victims of sexual violence, 1994-2010* (pp. 3-4). Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. |
| Reason, J. (2000). *Human error: models and management*. BMJ, 320(7237), 768-770. |
| Sandler, J. C., Freeman, N. J., & Socia, K. M. (2008). *Does a watched pot boil? A time-series analysis of New York State's sex offender registration and notification law*. Psychology, Public Policy, and Law, 14(4), 284. |
| Tannert, C., Elvers, H. & Jandrig, B. *The ethics of uncertainty*. EMBO Rep 8, 892–896 (2007). https://doi.org/10.1038/sj.embor.7401072 |
| Wortley, R., & Smallbone, S. (2006). *Applying situational principles to sexual offenses against children*. Crime Prevention Studies, 19, 7. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| MISCELLANEOUS DOCUMENTS |
| --- |
| "2024 Phase 1 Muni Rider Safety and Harassment Data.csv," https://web.archive.org/web/*/https://www.sfmta.com/media/41402/download* |
| "AC Transit Safety Survey_All Results_EXTERNAL final 12.24.24.xlsx," https://www.actransit.org/sites/default/files/2024-12/AC%20Transit%20Safety%20Survey_All%20Results_EXTERNAL%20final%2012.24.24.xlsx |
| "BARTStreetHarassmenSurveyResults2024," https://www.bart.gov/sites/default/files/2024-11/BARTStreetHarassmenSurveyResults2024.xlsx |
| Andrew Macdonald, *Uber's Campus Safety Initiative*, Uber Newsroom, https://www.uber.com/newsroom/campus-safety-initiative/ (last visited Dec. 29, 2025) |
| Barbara Russo-Lennon, *'Point'-less: Over 1,000 emergency calls went unanswered through MTA 'Help Points' subway intercoms, report finds*, AMNY, https://www.amny.com/news/mta-help-points-emergency-unanswered-report/ (last visited Dec. 31, 2025) |
| Buff City Taxi, *The Art and Science of Cab Driver and Passenger Tracking*, BUFF CITY TAXI, https://bluffcitytaxi.com/the-art-and-science-of-cab-driver-passenger-pairing/#:~:text=Cab%2Ddriver%20pairing%20is%20an,for%20successful%20driver%2Dpassenger%20matching (last visited Dec. 30, 2025) |
| *Bus & Train Trackers*, Chicago Transit Authority, https://www.transitchicago.com/howto/trackerexplained/ (last visited Dec. 31, 2025) |
| Chloe Cutten, *Prioritising your safety*, Uber Newsroom, https://www.uber.com/en-NG/newsroom/prioritising-your-safety/ (last visited Dec. 29, 2025) |
| Curb, *Curb Mobility Privacy Notice*, Go Curb, https://www.gocurb.com/privacy (last visited Dec. 30, 2025) |
| Dara Khosrowshahi, *An Operating System for Everyday Life*, Uber Newsroom, https://www.uber.com/newsroom/everyday-life-os/ (last visited Dec. 29, 2025) |
| Dara Khosrowshahi, *Raising the Bar on Safety*, Uber Newsroom, https://www.uber.com/newsroom/raisingthebar/ (last visited Dec. 29, 2025) |
| *Drunk Driving: Statistics and Resources*, National Highway Traffic Safety Administration, https://www.nhtsa.gov/risky-driving/drunk-driving (last visited December 31, 2025) |
| Hannah Nilles, *Uber's record on safety is clear*, Uber Newsroom, https://www.uber.com/newsroom/ubers-safety-record/ (last visited Dec. 29, 2025) |
| Harshdeep Singh, *Explained: The AI-Powered Predictive Maintenance Revolution*, Airways, https://www.airwaysmag.com/new-post/ai-powered-predictive-maintenance-revolution#:~:text=Delta%20Air%20Lines%20(DL)%20has,;%20no%20more%2C%20no%20less |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| MISCELLANEOUS DOCUMENTS |
| --- |
| Kim Zeiter, *Public Buses Across Country Quietly Adding Microphones to Record Passenger Conversations*, Wired, https://www.wired.com/2012/12/public-bus-audio-surveillance/ (last visited Dec. 31, 2025) |
| *LADOT Safety & Security Survey Findings and Recommendations*, Ilium Associates, December 16, 2024 |
| *Long Beach Transit Safety Survey Final Report*, ETC Institute, February 3, 2025 |
| *Los Angeles County Metropolitan Transportation Authority: Street Harassment Survey and Focus Groups*, Metro, March 2025 |
| Rebecca Payne, *Uber's new Safety Toolkit featuring Live Help from a safety agent*, Uber Newsroom, https://www.uber.com/newsroom/ubers-new-safety-toolkit/ (last visited Dec. 29, 2025) |
| Sabine VanderLiden, *Algorithmic Underwritting 2.0: Revolutionizing Risk Assessment*, Medium, https://medium.com/@sabine vdl/algorithmic-underwriting-2-0-revolutionizing-risk-assessment-71194df44e6b |
| *Sacramento Regional Transit (SacRT) Street Harassment Outreach Summary*, AECOM, December 31, 2024 |
| *Security cameras*, Chicago Transit Authority, https://www.transitchicago.com/security/cameras/ (last visited Dec. 31, 2025) |
| Stephanie Chuang, *Bay Area Taxi Cabs Add to Growing Trend of Using Dashcams*, NBC Bay Area, https://www.nbcbayarea.com/news/local/bay-area-taxi-cabs-add-to-growing-trend-of-using-dashcams/76686/ (last visited Dec. 30, 2025 |
| Steve Hern, *In More Cities, A Camera On Every Corner, Park and Sidewalk*, NPR, https://www.npr.org/sections/alltechconsidered/2013/06/20/191603369/The-Business-Of-Surveillance-Cameras (last visited Dec. 31, 2025) |
| Tony West, *Turning the lights on*, Uber Newsroom, https://www.uber.com/newsroom/turning-the-lights-on/ (last visited Dec. 29, 2025) |
| Tracey Breeden, *Uber Launches New Discreet Reporting Option for Safety Incidents*, Uber Newsroom, https://www.uber.com/en-CA/newsroom/on-trip-reporting-feature/ (last visited Dec. 29, 2025) |
| *Transit Safety Survey Findings Report*, ETC Institute, Fall 2024 |
| Uber, *Added safety on your rides with Audio Recording*, Uber, https://www.uber.com/us/en/ride/safety/audio-recording/ (last visited Dec. 29, 2025 |
| Uber, *Drive with confidence*, Uber, https://www.uber.com/us/en/drive/safety/ (last visited Dec. 29, 2025) |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| MISCELLANEOUS DOCUMENTS |
| --- |
| Uber, *Engineering Safety with Uber's Real-Time ID Check*, Uber Blog, https://www.uber.com/blog/real-time-id-check/ (last visited Dec. 29, 2025) |
| Uber, *How star ratings work*, Uber, https://www.uber.com/us/en/drive/basics/how-ratings-work/ (last visited Dec. 29, 2025) |
| Uber, *Record My Ride – Frequently Asked Questions*, Uber, https://help.uber.com/en/driving-and-delivering/article/record-my-ride---frequently-asked-questions?nodeId=7f86cc51-2c3e-4888-8dc1-0ac2b6337b92 (last visited Dec. 29, 2025) |
| Uber, *Safety with the Uber app*, Uber Newsroom, https://www.uber.com/us/en/drive/basics/staying-safe-with-the-uber-app/ (last visited Dec. 29, 2025) |
| Uber, *Uber's Emergency Button*, Uber Newsroom, https://www.uber.com/newsroom/emergencybutton/ (last visited Dec. 29, 2025  ) |
| Uber, *What's Verify my Ride?*, Uber, https://help.uber.com/riders/article/whats-verify-my-ride/?nodeId=2ddbb5e8-0dd3-4048-b9ee-f6b5e5311e25 (last visited Dec. 29, 2025) |
| VIP Taxi, *Non-Emergency Medical Transportation*, VIP TAXI, https://viptaxi.com/medical-transportation/ (last visited Dec. 30, 2025) |
| VIP Taxi, *VIP Taxi App: Your Gateway to Easy and Fast Bookings*, VIP Taxi News https://viptaxi.com/mobile-taxi-app-phoenix-tucson-arizona-transportation/ (last visited Dec. 30, 2025); |
| *VTA Safety and Harassment Survey*, Santa Clara Valley Transportation Authority and EMC Research, July–August 2024 |