[Submitting counsel below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION,<br><br>This Document Relates to:<br><br>*Jaylynn Dean v. Uber Technologies, Inc., et al.*, No. 3:23-cv-06708 | Case No. 3:23-md-03084-CRB<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR ESI SPOLIATION SANCTIONS**<br><br>Judge:      Hon. Charles R. Breyer<br>Courtroom:  Courtroom 6 – 17th Floor |

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

**PHOENIX DIVISION**

| | |
|---|---|
| JAYLYNN DEAN,<br><br>            Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>            Defendants | CASE NO. 25-cv-4276-PHX-CRB<br><br>Judge:      Hon. Charles R. Breyer<br>Courtroom:  501 |

1  Laura Vartain Horn (SBN 258485)
   **KIRKLAND & ELLIS LLP**
2  555 California Street, Suite 2700
3  San Francisco, CA 94104
   Telephone: (415) 439-1625
4  laura.vartain@kirkland.com

5  Kim Bueno (Admitted *Pro Hac Vice*)
   **KIRKLAND & ELLIS LLP**
6  401 W. 4th Street
7  Austin, TX 78701
   kim.bueno@kirkland.com
8
   Allison M. Brown (Admitted *Pro Hac Vice*)
9  **KIRKLAND & ELLIS LLP**
   2005 Market Street, Suite 1000
10 Philadelphia, PA 19103
   Telephone: (215) 268-5000
11 alli.brown@kirkland.com
12
   Jessica Davidson (Admitted *Pro Hac Vice*)
13 **KIRKLAND & ELLIS LLP**
   601 Lexington Avenue
14 New York, NY 10022
   Telephone: (212) 446-4800
15 jessica.davidson@kirkland.com
16
   *Attorneys for Defendants*
17 UBER TECHNOLOGIES, INC.,
   RASIER, LLC, and RASIER-CA, LLC
18

2

Gibson, Dunn & Crutcher LLP

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION                    CASE NO. 3:23-MD-03084-
FOR ESI SPOLIATION SANCTIONS                                    CRB / 25-CV-4276-PHX-CRB

# INTRODUCTION

Plaintiff's spoliation motion should be rejected for several reasons–but first and foremost, because it is moot. Plaintiff claims this motion is necessary because, without a spoliation instruction, Uber will argue that (1) Plaintiff cannot identify a specific, alternative driver-rider match that would have resulted in a lower "Safety Risk Assessed Dispatch" or "S-RAD" score than her match with Mr. Turay, and thus (2) Plaintiff has insufficient evidence to prove her case. But Uber will not make this insufficiency argument, either to the jury or in a Rule 50 motion to the Court. There are numerous other deficiencies with Plaintiff's case that Uber *will* raise, but it will not argue that Plaintiff has insufficient evidence to support her case because she cannot identify an alternative match with a lower S-RAD score. Simply put, Uber will not raise the argument that Plaintiff claims Uber should be precluded from raising, so Plaintiff's motion is moot and should be denied.

Plaintiff's motion should be rejected for numerous other reasons as well. Plaintiff claims Uber should have foreseen, before Plaintiff even filed suit, that Plaintiff would one day raise a novel theory of liability based on data about trip pairings that did not even happen (known as "supply plans"). Plaintiff herself did not demand this data until the very end of fact discovery in late 2025. And Judge Cisneros considered this issue fully and found that Plaintiffs had started receiving S-RAD discovery in 2024, held that Plaintiffs had taken far too long to seek additional S-RAD discovery (and concluded that Uber had "already produced extensive data regarding the S-RAD system"), and denied Plaintiff's requests related to S-RAD supply plans (aside from allowing an additional deposition of Sunny Wong). ECF 4060 at 7-8. Uber cannot be sanctioned for not preserving data about potential matches that never actually happened merely because Plaintiff came up with a theory that made this data supposedly relevant years later. And Plaintiff cannot move for sanctions *now*, in the middle of trial, when she knew about S-RAD data nearly two years ago (in 2024), and knew about Uber's supply plan retention policies months ago (no later than September 2025). Indeed, because Plaintiff waited to raise this motion until the middle of trial (at the Court's suggestion), Uber has not had the opportunity to fully investigate the technical burden that preserving supply plan S-RAD data would entail–and cannot present a fulsome analysis of the impact that retaining supply plan S-RAD data would have on Uber's ability to operate its resource-intensive safety and operational tools. The Court need not reach these

issues, because the motion is moot–as well as meritless and untimely. But if the Court is inclined to issue a substantive ruling, Uber requests additional time to complete an expert analysis of the technical burdens inherent in retaining supply plan S-RAD data, and to provide additional briefing and declaration(s) in support.

After Uber learned of Ms. Dean's lawsuit, filed on December 29, 2023, it preserved voluminous information and data about her trip—including the S-RAD data for that trip. Uber produced all this data to Plaintiff.[1] But Plaintiff is now claiming that on top of the other extensive data maintained and produced, Uber should also have preserved S-RAD data for other, hypothetical trips that never happened. Uber retains this data for 30 days because it has no actual value (unlike data for actual trips, which can be used to improve the efficacy of Uber's S-RAD model and is preserved for years). Yet Plaintiff says that immediately after learning of Plaintiff's report–and even *before* she filed suit–Uber should have preserved all the S-RAD data for trips that did not happen.

There was no reason for Uber to do that. Information about trips that never happened has no bearing on whether Uber took precautions to protect Plaintiff on the trip she *did* take. And in November 2023–when the alleged sexual assault occurred and before Plaintiff filed her complaint–Uber had no reason to believe that S-RAD data for trips that never happened would somehow be relevant to any claim that Plaintiff might bring. The allegations in Plaintiff's original individual complaint (which was filed after the 30-day retention period had expired) did not implicate this data. *See Dean v. Uber Techs.* ECF No. 1. Plaintiff alleged that Uber should have implemented a variety of *other* safety measures, such as camera monitoring, biometric background checks, and the option for female riders to connect with female drivers (and Uber preserved and produced documents relating to these allegations). *Id.* at ¶¶ 116-223. But Plaintiff did not allege that Uber should have made a different trip match. There is no mention of Uber's matching algorithm or any tool similar to S-RAD in Plaintiff's complaint whatsoever. Plaintiff did not even *ask* for this data until the very end of discovery. And despite

---

[1] Uber has produced more than 1.5 million documents in MDL common fact discovery, including over 5.5 million pages and *hundreds of millions* of cells of data, including safety incident reporting data. Dkt. 4369-2 (Nov. 12, 2025 Declaration of Christopher D. Cox) at ¶ 6. Uber has also produced thousands of documents containing data specific to Plaintiff's case, including but not limited to extensive account information and trip history, communications and message logs, GPS data, and data on ride feedback and ratings.

4

Gibson, Dunn & Crutcher LLP

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION                    CASE NO. 3:23-MD-03084-
FOR ESI SPOLIATION SANCTIONS                                    CRB / 25-CV-4276-PHX-CRB

knowing about Uber's 30-day data retention policy by no later than September 2025, Plaintiff did not move for sanctions until *now*, four months later , and only after the Court's *sua sponte* prompting. Plaintiff did not file any spoliation motion before because she knew it would be baseless. It is even more baseless now, given that Plaintiff did not raise this for months.

Moreover, Plaintiff's motion is moot—because Uber will not make the very argument that Plaintiff claims Uber should be precluded from making. Plaintiff says that, without the S-RAD data for trips that did not happen, she cannot identify a specific alternative match that she could have made on the night of November 15, 2023 that would have resulted in a lower S-RAD score than the S-RAD score for the match with Mr. Turay. But Uber will not argue to the jury (or argue in a Rule 50 motion) that Plaintiff has failed to prove her case because she has not identified an alternative match with a lower S-RAD score. Rather, Uber will explain to the jury that whether a match with a lower S-RAD score was possible or available is irrelevant. S-RAD is a powerful, cutting-edge tool that Uber has poured resources into to improve safety…and it works. To Uber's knowledge, no other rideshare marketplace—much less other forms of transportation, like taxis or public transit—has a similarly advanced safety tool. But S-RAD is not clairvoyant. It does not know that any sort of misconduct— much less assault—*will* occur on any particular trip. **It is not predictive**. To the contrary, *regardless* of the S-RAD score, the chance of misconduct occurring on *any* Uber ride is infinitesimally small. S-RAD tries to make the chances of misconduct even *more* minute (a 1 in 5,000,000 becoming a 1 in 8,000,000 for example), but that does not mean that a match with a "higher" S-RAD score is *likely* to result in misconduct (or that a match with a "low" S-RAD score is *guaranteed* to result in no misconduct–a "zero" scored trip could result in an incident). *All* trips are extraordinarily unlikely to result in any misconduct—much less assault. Plaintiff says that Uber should have configured S-RAD so that it would not allow a match to occur if it had an S-RAD score equal to or greater than the score of her match with Mr. Turay. But taking such an aggressive approach to S-RAD can harm rider safety– including the safety of riders late at night who may be tired, intoxicated, and desperate to get home – by eliminating numerous matches that, in all probability, would be perfectly safe, and making it difficult for riders to even obtain a ride.

In short, Uber had no reason to store the data Plaintiff says it should have stored; Plaintiff did not pursue this data in discovery; and even though Plaintiff knew the data was not stored, she waited for months—until the Court *sua sponte* raised it in the middle of trial—to move for sanctions. Moreover, Uber is not even going to make the argument that Plaintiff says she is concerned about.

The Court should thus deny Plaintiff's motion for sanctions and reject her request for an instruction stating or implying that Uber spoliated evidence. If the Court is nevertheless inclined to issue a substantive ruling on the spoliation issues, Uber requests additional time to conduct analysis of the burdens and technical issues with preservation of supply plan data, prepare declarations, and submit additional briefing.

## BACKGROUND

**S-RAD and Supply Plan Data.** S-RAD is a proprietary machine-learning tool that Uber developed to optimize safety in matching rides. When a rider requests a ride on the Uber app, Uber's matching algorithm—which is distinct from S-RAD—identifies all drivers within a certain radius that are able to provide a ride matching the rider's criteria. Tr. 2236:22–2237:6. For any single ride request, there are often multiple—if not hundreds—of potential driver matches. Mot., Ex. A (As-Played Jun. 25, 2025 Wong Dep.) at 133:01–133:06.

S-RAD assesses each potential match of rider and driver for each particular ride, and assigns the match a score from 0 to 1. Mot., Ex. C (As-Played Jan. 7, 2026 Wong Dep.) at 21:25–22:11. S-RAD scores are assigned based on underlying factors about (1) the trip environment (such as the location of the ride request and the time of day); (2) the rider (such as the rider's 1-star reviews); and (3) the driver (including some of the same information considered about the rider). Mot., Ex. C (As-Played Jan. 7, 2026 Wong Dep.) at 108:21–109:1; Tr. Ex. 3879. The score that S-RAD generates is not a score assigned to a driver—rather, it is the score assigned to the particular pairing based on *all* the factors considered. Mot., Ex. A (As-Played Jun. 25, 2025 Wong Dep.) at 139:19–24; Mot., Ex. C (As-Played Jan. 7, 2026 Wong Dep.) at 108:21–109:1. In fact, environmental considerations comprise the largest category of inputs into S-RAD. Tr. 2180:7–2181:1.

Once a potential ride match has been assigned a score, the S-RAD algorithm assesses whether that score is above a certain threshold in the given area at the time. Mot., Ex. C (As-Played Jan. 7, 2026 Wong Dep.) at 68:06–10. If so, that particular ride pairing is downranked in priority in the matching process; it jumps to the bottom of the queue in terms of ability to match with a rider. Mot., Mot., Ex. C (As-Played Jan. 7, 2026 Wong Dep.) at 58:04–09. Uber's algorithms then pair a driver based on the time of arrival.

As S-RAD operates, it generates an S-RAD score for all potential ride matches, including those that never occurred. The data on hypothetical rides that never occurred is known as "supply plan" data. ECF No. 4009-8 (Sept. 24, 2025 Wong Decl.) at 35. Because supply plans include every possible permutation of every theoretical ride pairing for every single ride, supply plan data is exceedingly voluminous. *Id.* at 37. The supply plan data across the U.S., for just 30 days alone, contains approximately 100 *billion* rows of data. *Id*. at ¶ 36.

While the S-RAD data for trips that *actually occur* can be used to improve and refine the S-RAD model, supply plan data cannot help with that. The S-RAD model is a "machine learning" algorithm that can be improved (or "trained") by reviewing the characteristics of the few actual trips that result in misconduct (and the characteristics of the numerous trips that do not) to determine what trip characteristics have some slight relation to misconduct. But knowing the S-RAD score attached to trips that did not happen is not relevant to the model—reviewing the potential characteristics of trips that did not happen does not help the model learn anything about what characteristics may be related to misconduct, because it is necessarily impossible for misconduct to occur on a trip that never happened. Accordingly, under Uber's data retention policies at the time of the alleged sexual assault, supply plan data was retained for 30 days. ECF No. 3009-8 (Sept. 24, 2025 Wong Decl.) at ¶ 36; Mot., Ex. C (As-Played Jan. 7, 2026 Wong Dep.) at 116:25–117:15.

**Production of S-RAD Data.** Since 2024, Uber has produced thousands of documents relating to or referencing S-RAD, provided written responses to several RFPs specifically about S-RAD, and produced comprehensive S-RAD data for Plaintiff's trip with Mr. Turay. Specifically, Uber has produced (1) the S-RAD score of Plaintiff's trip, (2) all the features that went into that score, (3) the

7

value assigned to each feature, (4) the applicable threshold during Plaintiff's trip, (5) whether Plaintiff's trip was flagged or actioned by S-RAD, (6) the trigger rates over the seven days preceding the trip, (7) the average score of other trips over the seven days preceding the trip, and (8) the median 1-star rating of other drivers in Phoenix over the seven days preceding the trip. Uber also produced information about (9) which S-RAD model was running during Plaintiff's trip, (10) the features used in that model, (11) the "weight" of the features, (12) the feature definitions, and even (13) the rationale or motivation for including each feature. Moreover, Plaintiff deposed Uber's representative Sunny Wong for over 25 hours over four days, questioning him extensively on S-RAD and S-RAD data.

On August 11, 2025, after the substantial completion deadline for fact discovery, Plaintiff requested supply plan data for the first time, via email. *See* ECF No. 4009 (Joint Letter Brief) at 6. Plaintiffs requested written confirmation of the unavailability of supply plan data. *Id*. Judge Cisneros denied that request, finding that Plaintiff could simply have Uber's 30(b)(6) witness, Sunny Wong, testify to Uber's retention policies in his subsequent depositions. ECF No. 4060 (Order on Joint Briefing) at 7. Indeed, Sunny Wong confirmed in his later deposition that supply plan data was retained for 30 days. Mot., Ex. C (As-Played Jan. 7, 202 Wong Dep.) at 116:13–19.

## ARGUMENT

**I.   Uber had no duty to preserve S-RAD data for hypothetical trips that Plaintiff or other users never took.**

Uber cannot be subject to sanctions for not storing data that has no business use and had no foreseeable relevance to this litigation. The duty to preserve arises only "when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Kachina v. Gutierrez*, 2023 WL 9896190, at *9 (D. Ariz. Aug. 23, 2023) (citation omitted); *see also* Fed. R. Civ. P. 37(e) (permitting sanctions only where electronically stored information "that should have been preserved in the anticipation or conduct of litigation is lost"). Uber satisfied that duty by retaining all evidence related to Plaintiff's actual trip with Mr. Turay, which Uber produced to Plaintiff.

Plaintiff's assertion that Uber should have *also* retained the specific S-RAD scores for dozens (or more) of hypothetical trips that Plaintiff never took is unreasonable and exceeds the scope of the duty to preserve. Courts repeatedly have held that even when litigation is reasonably foreseeable, "a litigant is under no duty to keep or retain every document in its possession." *Raymond v. City of N.Y.*, 2020 WL 7055572, at *6 (S.D.N.Y. Dec. 2, 2020) (citation omitted). The duty to preserve extends only to evidence that the party "knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." *Id.* (citation omitted). In other words, unless the evidence "is relevant to a claim or defense and proportionate to the needs of the case," there is no duty to preserve. *Bailey v. Mich. Dep't of Corrs.*, 342 F.R.D. 420, 424–25 (E.D. Mich. 2022).

Uber had no reason to know that S-RAD scores for trips that Plaintiff never took could be relevant to this litigation. Plaintiff reported that she had been sexually assaulted on November 15, 2023, and did not file a complaint until December 29, 2023—which did not suggest that data about hypothetical trips that did not happen could be relevant to this case (*see* ECF No. 1)—by which time the 30-day retention period for the supply plan data had already expired. Plaintiff's spoliation argument, therefore, depends on the claim that as soon as she reported she had been sexually assaulted, Uber should have saved all the supply plan data it had for every hypothetical match that Plaintiff could have made (but did not make) with a driver.

But Plaintiff does not cite anything suggesting that Uber should have believed in November 2023 that data about hypothetical trips that were never taken was relevant to this case. Plaintiff says that S-RAD is the "tool that Uber uses to reduce the risk of sexual assault or sexual misconduct through the pairing process"; that Uber and its counsel "conceded on the record that the company knows S-RAD data is relevant to litigation" because Uber preserved the S-RAD data for Plaintiff's trip after "Ms. Dean filed her lawsuit"; and that Uber produced the S-RAD scores *of trips that actually happened*

in response to Plaintiff's first set of RFPs. Mot. at 5-6.[2] But all this shows is that Uber reasonably understood, once it learned of Plaintiff's lawsuit, that S-RAD data *for Plaintiff's trip* was relevant. This makes sense—Plaintiff's lawsuit generally alleged that Uber did not take safety precautions to protect riders, so Uber preserved the data showing that it used its safety tool, S-RAD, to score Plaintiff's match with Mr. Turay and ensure that score was below the S-RAD threshold that night. *See generally* December 29, 2023 Compl., ECF No. 1. But Plaintiff does not point to any evidence that within 30-days after she reported the sexual assault—and before Plaintiff even filed suit—Uber should have known that the S-RAD scores of hypothetical trips that never happened would somehow be relevant to litigation.

Plaintiff's theory now is that (1) Uber should have lowered its S-RAD threshold to below 0.81, the score for the match between Plaintiff and Mr. Turay; (2) if Uber had lowered the threshold that far, Plaintiff would have received a different match; (3) Plaintiff would not have been assaulted on that different, hypothetical trip; and thus (4) Plaintiff must be provided with the supply plan data in order to show that at least some potential matches that night had an S-RAD score of lower than 0.81 (and thus would have been available to Plaintiff if the threshold were that low). But Plaintiff does not point to anything that should have suggested this theory to Uber back in November 2023. The theory depends on the claim that Uber should have known that a S-RAD threshold of above 0.81 was "too high," but there is no evidence in the record (even now) of why that would be. The actual threshold in Phoenix that night was 0.93, and Plaintiff identifies nothing that would have possibly suggested to Uber in November 2023 that she might claim the threshold should have been so much lower that it would drop below 0.81.

Of course, Uber now knows that Plaintiff is raising this theory, which she first articulated in her Amended Bellwether Complaint in early 2025. *See* ECF No. 2959-4 (Am. Bellwether Compl.) But Uber did "not have a duty to preserve evidence for a 'novel'" theory that it "could not have anticipated." *Oracle Am., Inc. v. Hewlett Packard Ent. Co.*, 328 F.R.D. 543, 550 (N.D. Cal. 2018) (quoting *Abcon*

---

[2] Plaintiff also points to PTO 2, which required preservation of "[s]tructured data." ECF 65 at 2. But PTO 2 did not mandate that Uber preserve any particular type of "[s]tructured data," much less S-RAD data for hypothetical trips.

*Assocs., Inv. v. Haas Najarian*, 2014 WL 4981440, at *11 (E.D.N.Y. Oct. 6, 2014)); *see also Schuring v. Cottrell, Inv.*, 2015 WL 8970631, at *2 (N.D. Ill. Dec. 16, 2015) (no duty where plaintiff could not have expected that the shoes he was wearing during the accident would be relevant later). By the time Plaintiff filed her original complaint, the S-RAD data for hypothetical rides Plaintiff might have taken on November 15, 2023 was already gone, consistent with Uber's reasonable retention policy for this voluminous data (again, billions of rows of data). And Plaintiff herself did not argue that Uber should have lowered its S-RAD threshold below the score for her match with Mr. Turay until 2025—well over a year after her original complaint was filed. To be clear, this was not because Plaintiff did not know about S-RAD until 2025—Uber produced evidence about S-RAD in 2024. ECF No. 4060 at 6 (Judge Cisneros finds that Plaintiff "do[es] not meaningfully dispute Uber's assertion that it has 'produced thousands of S-RAD documents starting in 2024'"). It took Plaintiff a year of strategizing and discussion with her experts to devise the theory that Uber should have lowered its S-RAD threshold below the score for Plaintiff's match with Turay. Uber could not, and certainly had no obligation to, come up with this theory itself in November 2023, when Plaintiff first reported that she had been sexually assaulted. The law is clear that a "party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of business." *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009); *accord United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). That is exactly what happened here.

Nor is it persuasive for Plaintiff to suggest that Uber's retention of S-RAD data for trips that *did* happen establishes that it should have retained S-RAD data for hypothetical trips that did *not* happen. Courts repeatedly have rejected such arguments, holding that the "duty to preserve *some* evidence from the night in question" does not establish that a defendant "should have preserved the specific piece of ESI at issue here." *E.g.*, *Nyerges v. Hillstone Rest. Grp. Inc.*, 2021 WL 3299625, at *7 (D. Ariz. Aug. 2, 2021); *see also In re Telescopes Antitrust Litig.*, 2021 WL 4148672, at *2 (N.D. Cal. Sept. 13, 2021) ("a general apprehension of litigation regarding a particular subject matter does not create a duty to preserve all documentation related to that subject matter").

*Nyerges* illustrates the point. There, the defendant restaurant retained camera footage that showed an intoxicated man choking just before being rushed to the hospital, where he later died. 2021 WL 3299625, at *6. The man's estate sued and later requested *all* footage from the bar, even the footage that did not depict the choking incident, because the estate believed that the man's choking and death was due to the bar negligently continuing to serve him alcohol after he was already seriously drunk. *Id.* The plaintiffs claimed that footage of the cash register would be relevant to showing that the bartenders continued to serve alcohol even though the decedent was obviously intoxicated. *Id.* And they requested an adverse instruction after the defendant informed them that it only retained footage that captured the choking incident. *Id.* The Court rejected the plaintiffs' request, holding that "even if it could be said that Hillstone had a duty to preserve some evidence from the night in question, Plaintiffs have not established that Hillstone should have preserved the specific piece of ESI at issue here—the bar footage." *Id.* at *7. "Hillstone had no reason to suspect, until it was served with Plaintiffs' complaint, that the identity of bartenders might be a relevant issue in future dram-shop litigation." *Id.* at *8; *see also Abcon Assocs., Inc.* 2014 WL 4981440, at *11 (plaintiff did not have a duty to preserve evidence for a "novel" defense to a breach of contract action); see also *Schuring,*, 2015 WL 8970631, at *2.

So too here. After Plaintiff alleged in her complaint that Uber failed to take safety measures to protect her, Uber reasonably anticipated that the S-RAD data related to Plaintiff's trip would be relevant in litigation to show that it used its safety tool on her trip, and it retained and produced that information. But Uber had no way of knowing *before* Plaintiff *even filed suit*—and years before she ever argued that Uber's S-RAD threshold should have been lowered—that S-RAD scores of trips that never occurred might become relevant. *Nyerges*, 2021 WL 3299625, at *7 ("A party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of business." (quoting *$40,955.00 in U.S. Currency*, 554 F.3d at 758). The fact that Plaintiff's experts and attorneys did not raise this theory themselves until 2025—despite knowing about S-RAD since 2024—only confirms that the relevance of that data was not reasonably foreseeable.

## II. Uber took reasonable measures to preserve supply plans, which are exceedingly costly to store and maintain.

Uber's preservation efforts were reasonable given the extraordinary amount of storage and costs required to manage S-RAD supply-plan data, and the fact that preserving the data for more than 30 days could threaten Uber's ability to keep riders and drivers safe. *See* Fed. R. Civ. P. 37(e) (permitting sanctions only where "a party failed to take reasonable steps to preserve it"). The law is clear that a "party seeking discovery of relevant, non-privileged information must show, before anything else, that [any] discovery sought is proportional to the needs of the case." *Gilead Scis., Inc. v. Merck & Co, Inc.*, No. 5:13-CV-04057-BLF, 2016 WL 146574, at *1 (N.D. Cal. Jan. 13, 2016). Requiring Uber to store massive amounts of data from trips that never occurred in violation of its retention policy is neither reasonable nor proportional to the needs of the case—so Uber's non-retention cannot be grounds for sanctions. The evidence already produced in this action establishes that this data is voluminous and retaining it would be burdensome. However, Uber has not had the opportunity in the short time since Plaintiff filed her mid-trial motion to obtain a full analysis of the volume of storage and burden that would be entailed by being forced to retain this data. If the Court is otherwise inclined to issue sanctions (and none are warranted, for all the other reasons articulated in this brief), Uber should be afforded time to complete and provide a full analysis of the burden–and impact on Uber's safety operations–that would occur if Uber were forced to retain this data.

Even just 30 days of supply plans in the U.S. alone takes up 100 *billion* rows of data. (Sept. 24, 2025 Wong Decl. 36). That makes sense: Plaintiff's own expert, Dr. Drumwright, testified that by 2023, Uber was "doing 10 billion trips per year." Tr. 364:9–16. And those are actual trips—not hypothetical ones. For any given trip, there could be dozens or even hundreds of supply plans, which are hypothetical trips and matches that never occurred. Mot. Ex. C (As-Played Jan. 7, 2026 Wong Dep.) at 24 ("I mean, at our scale now, we're doing billions and billions of trips . . . . And for each trip[], we're talking about many, many possible supply plans. So that's a lot of data.").

Even Uber's 30-day retention policy for supply plans has stretched Uber's storage capacities. If Uber were to increase its retention period for supply plans, the supply plan storage likely would take up so much available storage space that it could adversely impact the operations of Uber's systems, where

13

the supply plan data is stored. As such, Uber's ability to run and improve its safety tools—including S-RAD—could be impacted. It would be unreasonable–and make it more difficult for Uber to keep riders safe–for Plaintiff to require Uber to "preserve vast volumes of [S-RAD] data (in violation of [Uber's] retention policy)." *Griffith v. TikTok, Inc.*, 2024 WL 4875339, at *2 (C.D. Cal. Oct. 10, 2024).

Plaintiff's argument that Uber needed to retain only supply plan data for any trip where a serious assault is reported misses the point. Even if Uber lengthened its retention period for just the supply-plan data from incidents flagged in the app, that would still require Uber to store vast amounts of data and potentially impact safety operations. Rule 37(e) does not require companies to store mass amounts of data—only what is reasonable. *E.g.*, *Griffith*, 2024 WL 4875339, at *2. And Plaintiff's request is not reasonable, particularly when, again, Plaintiff did not articulate any theory that would implicate supply plan data until years after the 30-day retention period had expired.

Sanctions can be denied on this ground, too. At a minimum, if the Court is considering ruling on the spoliation issue more broadly, Uber should have the opportunity to present supplemental evidence regarding burden, such as an expert, third-party analysis of the storage capacity that would be required to preserve the supply plan data. Uber has not had the opportunity to obtain such an analysis mid-trial in the few days since Plaintiff filed her motion. And Uber is not even attempting to make the argument that Plaintiff says it should be precluded from making, *see infra* at p. 17, so there is no reason to make findings about the burden to Uber without a fully developed record including the volume of storage, and impact on Uber's safety operations, that retaining this data would require.

## IV.    Plaintiff's spoliation motion is untimely.

Plaintiff's spoliation motion fails for an additional independent reason—it was untimely. It is black-letter law that "delay can render a spoliation motion untimely." *Larios v. Lunardi*, 442 F. Supp. 3d 1299, 1305–06 (E.D. Cal. 2020); *see also, e.g.*, *Wine Educ. Council v. Arizona Rangers*, 2021 WL 3550213, at *2 (D. Ariz. Aug. 11, 2021) (collecting cases). Here, Plaintiff learned about Uber's 30-day retention period for S-RAD data no later than September, as evidenced by Plaintiff's request for written verification. But Plaintiff waited over four months—well past the close of discovery and on the ninth day of trial—to bring her motion for spoliation sanctions. Plaintiff had no apparent intention

14

of bringing a spoliation motion until the Court suggested it *sua sponte* during trial. The Court's suggestion does not make Plaintiff's motion timely—if Plaintiff believed she had grounds for a spoliation motion, she could have made it any time after Wong's deposition. Plaintiff's motion for spoliation sanctions is untimely by any measure—and can and should be denied on that basis as well.

### A.      Plaintiff's motion was brought after the close of discovery.

Plaintiff's motion is untimely because it was brought after the close of discovery–indeed, Plaintiff did not even request this data until the end of fact discovery, and her requests related to supply plan S-RAD data were denied as untimely back in October 2025. ECF 4060 at 7-8. Courts routinely reject requests for spoliation sanctions after the close of discovery. *See, e.g.*, *Rhabarian v. Cawley*, 2014 WL 546015, at *3 (E.D. Cal. Feb. 11, 2014) (collecting cases); *Mannion v. Ameri-Can Freight Sys. Inc.*, 2020 WL 417492, at *3 (D. Ariz. Jan. 27, 2020) (collecting additional cases). "Spoliation is a discovery offense, so issues surrounding alleged spoliation should be resolved during discovery— not on the eve of trial," and certainly not *during* trial. *Mannion*, 2020 WL 417492, at *3. Plaintiff did not raise the spoliation motion during the discovery period—and waited until over a week into trial to spring its spoliation motion on Uber upon the Court's prompting. But "the time to raise these issues was during discovery"—and Plaintiff is well "after the deadline." *Rhabarian*, 2014 WL 546015, at *3. "This, alone, justifies the rejection of Plaintiffs' proposed instruction." *Mannion*, 2020 WL 417492, at *3 (rejecting spoliation motion that was raised after discovery). Plaintiff's late motion can be rejected for this reason alone.

### B.      Plaintiff's motion was untimely by any other measure.

Even if Plaintiff were permitted to "raise issues of spoliation after discovery has closed," Plaintiff's motion here would still be untimely because it was the product of "unreasonable delay." *Larios*, 442 F. Supp. 3d at 1305–06 (rejecting spoliation sanctions sought after discovery because plaintiff failed to seek sanctions as soon as becoming aware of grounds for motion). "Motions for spoliation sanctions should always be made as soon as facts underlying the spoliation claim are discovered." *Sherwood v. BNSF Ry. Co.*, 2019 WL 1413747, at *1 (D. Idaho Mar. 28, 2019); *Larios*, 442 F. Supp. 3d at 1305–06 (party must raise a spoliation claim "as soon as reasonably possible after

[uncovering] the facts that underlie the motion"); *see Wine Educ.*, 2021 WL 3550213, at *2 (collecting cases). But Plaintiff failed to do so.

It is undisputed that Plaintiff knew of all the facts underlying the motion at the latest by September 2025, when Uber's counsel and its data scientist, Sunny Wong, confirmed in writing that Uber retained supply plan S-RAD data for 30 days. Yet Plaintiff did not move for spoliation sanctions then. Instead, Plaintiff asked Magistrate Judge Cisneros to order Uber to provide a "written, verified confirmation" of its 30-day retention policy. ECF No. 4009 (Joint Letter Brief) at 2. Magistrate Judge Cisneros denied this request—instead ruling that Plaintiff could ask Mr. Wong any additional questions she had about S-RAD data, and otherwise holding her requests were "unduly burdensome and disproportionate to the needs of the litigation," particularly given the "late stage" of discovery. ECF 4060 (Order on Joint Letter Brief) at 8–9. Magistrate Judge Cisneros explained that "Uber has already produced extensive data regarding the S-RAD system (particularly with respect to the particular rides at issue in the bellwether cases), and Plaintiffs have not shown substantial impediments to their pursuit of this discovery before the substantial completion deadline." *Id.* at 8. And Magistrate Judge Cisneros found that Plaintiff "appear[ed] to have identified S-RAD as significant ... well before the [substantial completion] deadline"—on June 16, 2025—and yet had failed to move expeditiously to seek any additional discovery about S-RAD (including supply plan discovery). *Id.* at 8. Plaintiff did not seek to reconsider Magistrate Judge Cisneros's order or otherwise move for sanctions. Even after Wong's January 7, 2026 deposition in which he confirmed again that Uber retained supply plan data for 30 days, Plaintiff did not file a motion. Instead, Plaintiff appeared to drop the matter until the Court raised it *sua sponte* during trial on January 23, 2026. Tr. 1702:11–17.

Plaintiff has provided no justification for her months' long delay in seeking sanctions—because there is no justification. Any party that seeks spoliation sanctions after discovery must do so "as soon as reasonably possible after [uncovering] the facts that underlie the motion." *Larios*, 442 F. Supp. 3d at 1305–06. Here, Plaintiff indisputably did not do that. Despite "identif[ying] S-RAD as significant" long before the substantial completion deadline in mid-2025 (ECF 4060 at 8), and despite knowing about Uber's retention policies by September 2025, Plaintiff did not do anything to seek spoliation sanctions until just now—months later. Plaintiff seemed to have dropped the matter and decided not

16

1  to pursue sanctions—and only filed this motion because the Court raised the possibility during trial.
2  But the Court's suggestion does not excuse Plaintiff for her long delay in filing a motion that she could
3  have filed months ago, and that is an independent ground to deny Plaintiff's motion. *See Larios*, 442
4  F. Supp. 3d at 1306 (denying spoliation motion that was filed nine months after grounds for motion
5  were apparent, without any explanation for the delay).

**III.   Sanctions Are Unwarranted Because Plaintiff Will Not Be Prejudiced**

Sanctions are also not warranted because Plaintiff will not suffer any prejudice—because Uber will not make the argument that Plaintiff demands Uber be precluded from making. According to Plaintiff, sanctions are necessary to prevent Uber from arguing to the jury that Plaintiff has not proven her case, because she cannot identify a specific potential match with a lower S-RAD score that was available when Plaintiff requested a ride on November 15, 2023. But Uber will not argue that, either to the jury or on Rule 50. Rather, Uber will argue that it acted more than reasonably in implementing the extraordinary safety tool that is S-RAD—a tool that is not available on any other transportation platforms—and that it should not be held liable just because Plaintiff says the tool should have been implemented differently. Because Uber is not going to make the argument that Plaintiff is concerned about, there is no prejudice to Plaintiff—and thus no basis for sanctions.

As Plaintiff acknowledges, sanctions based on the alleged non-preservation of electronic data (like the data at issue here) should be "no greater than necessary to cure the prejudice," absent a finding of willful destruction. Fed. R. Civ. P. 37(e)(1). And Plaintiff argues that the prejudice to her is that Uber will argue she cannot prove her case without evidence that a specific supply plan had a lower S-RAD score than the S-RAD score for Plaintiff's match with Mr. Turay. Mot. at 7.

But here, there is no prejudice, and no need for Plaintiff's instruction, because Uber will not make this argument. Uber will not argue to the jury (or to the Court) that Plaintiff has insufficient evidence to prove her case because she has not identified a supply plan with a lower S-RAD score than the match with Mr. Turay (of course, Uber intends to raise many other Rule 50 and insufficiency arguments). This moots Plaintiff's motion, and eliminates the only possible prejudice to her. For that reason as well, her motion should be denied.

17

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR ESI SPOLIATION SANCTIONS

CASE NO. 3:23-MD-03084-
CRB / 25-CV-4276-PHX-CRB

## V. Uber Did Not Act Willfully.

Plaintiff's motion should be denied for numerous reasons, as explained. But even if there were some basis to find spoliation and prejudice—and there is no such basis whatsoever—there is no grounds to award sanctions for willful spoliation under Rule 37(e)(2). Plaintiff all but admits (Mot. at 10) that there is no evidence that Uber's compliance with its 30-day retention policy was a willful destruction of evidence. Plaintiff argues that "[i]ntent may be inferred" because Uber should have known—before Plaintiff brought her lawsuit—that S-RAD scores for hypothetical rides that did not happen would be relevant to this litigation. For the reasons already explained, this argument does not withstand scrutiny. Plaintiff says that Uber "knows that many pairings are dangerous, that many dangerous pairings result in sexual assault, and that many sexual assault victims will file lawsuits as a result of their dangerous match." Mot. at 10. But the fact that Uber knows that some sexual assault victims will file a lawsuit does not provide any reason for it to believe that the S-RAD scores of hypothetical supply plans will be relevant. Again, the theory that Uber should have lowered its S-RAD threshold was not raised in this litigation until 2025—at least a year after Plaintiff already knew about S-RAD herself. *Supra* at p. 11. And Plaintiff did not even try to seek supply plan data until the *very end* of discovery. *Supra* at p. 3. Given her own failure to recognize that this data was relevant for years into this litigation, she cannot claim that Uber *willfully* deleted relevant evidence before her complaint was ever filed.

Plaintiff's smoking-gun evidence of Uber's state of mind is Uber's alleged failure to comply with discovery obligations in a single case from eight years ago, Mot. 11 (citing *Waymo LLC v. Uber Techs., Inc.*, 2018 WL 646701 (N.D. Cal. Jan. 30, 2018)), which only confirms that Plaintiff has no actual evidence that Uber willfully destroyed evidence in *this* case. Uber simply followed its retention policies, which were created for the purpose of ensuring that irrelevant data did not take up so much storage space as to prevent it from running its safety and insurance tools.

## CONCLUSION

The motion should be denied.

Dated: January 29, 2026         Respectfully submitted,

By:  */s/Laura Horn*

    Laura Vartain Horn (SBN 258485)
    **KIRKLAND & ELLIS LLP**
    555 California Street, Suite 2700
    San Francisco, CA 94104
    Telephone: (415) 439-1625
    laura.vartain@kirkland.com

    Kim Bueno (Admitted *Pro Hac Vice*)
    **KIRKLAND & ELLIS LLP**
    401 W. 4th Street
    Austin, TX 78701
    kim.bueno@kirkland.com

    Allison M. Brown (Admitted *Pro Hac Vice*)
    **KIRKLAND & ELLIS LLP**
    2005 Market Street, Suite 1000
    Philadelphia, PA 19103
    Telephone: (215) 268-5000
    alli.brown@kirkland.com

    Jessica Davidson (Admitted *Pro Hac Vice*)
    **KIRKLAND & ELLIS LLP**
    601 Lexington Avenue
    New York, NY 10022
    Telephone: (212) 446-4800
    jessica.davidson@kirkland.com

    *Attorneys for Defendants*
    UBER TECHNOLOGIES, INC.,
    RASIER, LLC, and RASIER-CA, LLC