# EXHIBIT 1

1

2 Walt Cubberly (SBN: 325163)

3 WILLIAMS HART BOUNDAS EASTERBY, LLP
8441 Gulf Freeway, Suite 600

4 Houston, TX 77017
E-mail: wcubberly@whlaw.com

5 Phone: (713) 230-2200

6 Fax: (713) 643-6226

7

8 Jessica Dayton (SBN: 231698)
ADZ LAW, LLP

9 2000 Alameda De Las Pulgas, Suite 161

10 San Mateo, CA 94063
E-mail: jdayton@adzlaw.com

11 Phone: (650) 458-2300

12 Fax: (650) 458-2319

13 ATTORNEYS FOR PLAINTIFF

14

15                 SUPERIOR COURT OF THE STATE OF CALIFORNIA
                   COUNTY OF SAN FRANCISCO — UNLIMITED CIVIL

16

17 JANE DOE, an Individual,                CASE NO. **CGC-20-584649**

18                                         COMPLAINT FOR DAMAGES
         *Plaintiff,*
19                                            1. Negligent Hiring,
    v.                                           Supervision, & Retention
20                                            2. Negligence by Misfeasance
    UBER TECHNOLOGIES, INC., a                3. Negligence by Nonfeasance
21  Delaware Corporation; RASIER, LLC, a      4. Fraud
    Delaware Limited Liability Company,       5. Assault
22  and Doe One                               6. Sexual Battery (Civ. Code
23                                               § 1708.5)
                                              7. False Imprisonment
24       *Defendants.*                        8. Intentional Infliction of
                                                 Emotional Distress
25                                            9. Ralph Act Violation (Civ. Code
                                                 § 51.7)
26                                           10. Negligence

27                                         JURY TRIAL DEMANDED

28

29

F I L E D
SUPERIOR COURT
COUNTY OF SAN FRANCISCO

JUN 0 8 2020

CLERK OF THE COURT
BY:_____
ANGÉLICA SUNGA    Deputy Clerk

FILE BY FAX

Plaintiff, Jane Doe, individually, through her attorney of record, Walt Cubberly of WILLIAMS HART BOUNDAS EASTERBY, LLP, alleges the following:

## INTRODUCTION

1.  Plaintiff, Jane Doe, was sexually assaulted by her Uber driver. This case is about that sexual assault, but it is also about the toxic-male culture at Uber Technologies, Inc. that caused that sexual assault. A culture that started at the very top of Uber and that prized growth above all else and in the process exploited, endangered, and hurt women, including Plaintiff.

## NATURE OF THE ACTION

2.  This is a civil action to recover damages suffered because of sexual assault. The assault occurred after the Plaintiff's eighteenth birthday. *See* CAL. CODE CIV. P. § 340.16.

3.  In January 2020, Plaintiff, Jane Doe, arranged for a ride through the ride-sharing software application (*the Uber App*) owned and controlled by Uber. At all relevant times Defendants, Uber Technologies, Inc. and Rasier, LLC owned, operated, and controlled the Uber App. While in the course and scope of his employment for Uber Technologies and Raiser, and while otherwise working on behalf of Uber Technologies, Inc., Uber driver, Defendant Doe One, sexually assaulted Plaintiff. The sexual assault occurred during an Uber trip, when the Uber driver, Defendant Doe One, was in the course and scope of his employment with Uber. Uber is a common carrier under California law. Because of Defendants' acts and omissions, Plaintiff has suffered damages that far exceed the jurisdictional floor of this Court.

4.  This is an unlimited action. The amount in controversy exceeds $25,000.00. Cal. Code Civ. P. § 85.

## PARTIES

5.  Plaintiff Jane Doe is a resident of Fresno County, California, and brings this action individually. She suffered bodily injuries and other damages as a direct and

proximate result of the wrongful acts and omissions of Defendants. Plaintiff files this action under a pseudonym because she is a sexual-assault victim, and she needs anonymity to protect her privacy in this sensitive and highly personal matter. Plaintiff proceeds in this manner to protect her legitimate privacy rights. Disclosure of her full name would expose her to stigmatization, it would invade her privacy, and it would make her vulnerable to retaliation. For these reasons, Jane Doe's need for anonymity outweighs both the prejudice to the Defendants and the public's interest in knowing her identity. Defendants are aware of the true name of Jane Doe and the circumstances surrounding these causes of action. After service of the Complaint, Plaintiff will provide the Defendants with a separate notice of her true identity. Plaintiff further anticipates seeking concurrence from Defendants for entry into a protective order to prevent the unnecessary disclosure of Jane Doe's real name in the public record.

6.    Defendant Uber Technologies, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1455 Market Street, Fourth Floor, San Francisco, San Francisco County, California, 94103. Defendant Uber Technologies, Inc. may be served with process through its registered agent, CT Corporation System. CT Corporation System is Uber Technology's agent, and Uber Technology has authorized it to accept service on Uber Technology's behalf within the State of California. CT Corporation System is located at 818 West Seventh Street, Suite 930, Los Angeles, California 90017. Plaintiff asks the Court to issue process for service.

7.    Defendant Rasier LLC (*Rasier*) is a Delaware limited liability company. Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its corporate headquarters, principal office, and principal place of business at 1455 Market Street, Fourth Floor, San Francisco, San Francisco County, California, 94103. Defendant Rasier may be served with process through its registered agent, CT Corporation System. CT Corporation System is Rasier's agent, and Rasier has

COMPLAINT FOR DAMAGES

authorized it to accept service on Rasier's behalf within California. CT Corporation System is located at 818 West Seventh Street, Suite 930, Los Angeles, California, 90017. Plaintiff asks the Court to issue process for service.

8.  Unless otherwise specified, this Complaint refers to Defendants Uber Technologies, Inc. and Raiser collectively as *Uber*.

9.  Defendant Doe One sometimes uses the name William or is otherwise referred to as William. But Defendant Doe One's true name is unknown to Plaintiff. And so she sues Defendant Doe One by a fictitious name. Defendant Doe One injured Plaintiff by sexually assaulting her. Plaintiff will amend this Complaint and include his real name when she learns it. She will also seek to serve Defendant Doe One.

10. All Defendants are liable for the acts of one another. Through principles of respondeat superior, joint venture, partnership, ostensible partnership, agency, ostensible agency, alter ego, the employer–employee relationship, or other forms of vicarious liability, the Defendants hold themselves out to the public, and held themselves out to Jane Doe, as a single entity.

11. Defendant Doe One was an agent, servant, and employee of Uber.

12. This Complaint refers to Defendant Uber Technologies, Inc., Defendant Raiser, LLC, and Defendant Doe One collectively, as *Defendants*.

## JURISDICTION & VENUE

13. The California Superior Court has subject-matter jurisdiction over this action, pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts."

14. Plaintiff seeks relief that is within the jurisdictional limits of this Court.

15. The California Superior Court has personal jurisdiction over the Defendants. It has general jurisdiction over Uber Technologies and Raiser because both have their principal places of business in California. This Court has specific juris-

diction over Defendant Doe One because he entered into a contract and agreement with Uber Technology — a California entity. This contract was governed by California law. Further he and Uber used the Uber app, which was developed in California; and he agreed to be bound by the control Uber exerted through its polices, which were created in California. Plaintiff's injuries arose out of these contacts. She was injured in the course and performance of the work Defendant Doe One was doing per his agreement with Uber. He was put in touch with Plaintiff through the Uber App. And he was under the control of Uber when he sexually assaulted her. And so Defendant Doe One, through these contacts with California sought to avail himself of the benefits of California and could reasonably anticipate being haled into court here.

16. This case is not removable. There is not complete diversity between the parties, and so there is no federal jurisdiction under 28 U.S.C. § 1332. Jane Doe is a citizen of California. She lives in and is domiciled in California; she has her true, fixed, and permanent home in California and intends to return to California whenever she is absent from California. Defendants Uber Technologies and Raiser are also citizens of California because they have their principal places of business in California.[1] A federal court would, therefore, not have subject-matter jurisdiction over this case under 28 U.S.C. § 1332 because there is not complete diversity between the Plaintiff and the Defendants.[2] The Defendants, therefore, cannot avail themselves of snap removal — alleging that they removed the case to federal court before a defendant was properly joined or served. Plaintiff is not relying on § 1441(b)(2) to oust federal-court jurisdiction. Federal-court jurisdiction never existed, and, by its terms, § 1441(b)(2) does not apply because there is no diversity jurisdiction under § 1332. But, alternatively, if § 1441 did apply, this case

---

[1] 28 U.S.C. § 1332(c)(1).

[2] *Strawbridge v. Curtiss*, 7 U.S. 267 (1806); *Owens Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978)

cannot be removed under § 1441(b)(2) because Uber Technologies and Raiser are citizens of California.

17.   A federal court would also not have jurisdiction under 28 U.S.C. § 1331. Plaintiff affirmatively disclaims any damages or actions arising under the Constitution, treaties, or laws of the United States. Federal law in no way forms an essential or potential ingredient of Plaintiff's claims, and federal law does not create any of Plaintiff's causes of action. Moreover, Plaintiff's right to relief does not depend on resolution of a substantial question of federal law.

18. Further, Plaintiff raises no claim of admiralty or maritime law, so there is no original federal-court jurisdiction under 28 U.S.C. § 1333. And Plaintiff sues no foreign state or agency, so there is no original federal-court jurisdiction under 28 U.S.C. § 1330. Nor is there original federal-court jurisdiction under 28 U.S.C. § 1346 because the United States is not a defendant.

19. Because a federal court does not have original jurisdiction over this matter, it is not removable under § 1441.

20. Venue is proper in the Superior Court of the County of San Francisco, California, pursuant to California Code of Civil Procedure §§ 395(a) and 395.5. Defendant Uber has its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, CA 94103 and has been, and still is, doing business within the County of San Francisco.

21. All other jurisdictional prerequisites and conditions precedent to suit have been satisfied.

## FACTS
### a. Uber's Toxic Male Culture

22. Uber is a transportation company. One of its founders, Travis Kalanick, became its second chief executive officer and, at one time, its largest shareholder. Uber drivers and Uber split the fare Uber charges riders for the riders' trips.

23. In 2014, Uber's executives in San Francisco started charging Uber passengers an extra $1 fee for each trip. Uber called this a *Safe Rides Fee*. When Uber announced the Safe Rides Fee, it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[3] The Safe Rides Fee wasn't split with drivers.[4] So it was pure revenue for Uber. Uber gave hundreds of millions of rides with the Safe Ride Fee attached to them, and made hundreds of millions in revenue from the fee.[5] But it never earmarked the money for improving safety or spent it on safety.[6] Instead, it pocketed the money it told the world it was going to direct toward safety. As a former Uber employee said "[w]e boosted our margins saying our rides were safer."[7] It "was obscene."[8]

24. Rider safety was never Uber's concern. Growth was. To increase growth, which required not only new riders, but new drivers, Travis Kalanick and the executives at Uber made it as easy as possible for Uber drivers to sign up. They used a background-check system designed to get drivers approved as quickly and conveniently as possible.[9] Uber hired Hirease, Inc. to do its background checks.[10]

---

[3] Uber, *What is the Safe Rides Fee*, https://web.archive.org/web/20140420053019/http://support.uber.com/hc/en-us/articles/201950566. (last visited October 6, 2019).

[4] MIKE ISAAC, SUPER PUMPED: THE BATTLE FOR UBER 136 (2019) ("The drivers, of course, got no share of the extra buck.").

[5] *See id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] Isaac, *supra* note 2, at 115 ("Uber made it as easy as possible for drivers to sign up.").

[10] Mike Isaac, *Uber's System for Screening Drivers Draws Scrutiny*, N.Y. TIMES, Dec. 9, 2014, at A1 (available at https://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html?searchResultPosition=1.)

Hirease brags that it can vet drivers within 36 hours.[11] To have such a short turn-around, Uber eschewed industry standards used by other taxi companies and livery services. For example, it abandoned fingerprinting — which takes weeks — and running applicant drivers against private databases, such as FBI records.[12] These shortcuts might have led to growth for Uber, but they also put people, including Plaintiff, in danger. Indeed, Uber was so fixated on growth that it began mailing cell phones to applicant drivers, so they could begin driving, before Uber's cursory background check was even complete.[13]

25. Uber's greed and complete disregard for rider safety or the rule of law is breathtaking. Uber's policy is that it won't report any criminal activity it learns of to law-enforcement authorities.[14] That includes allegations of sexual assault.[15] So Uber's policy is that if it learns from an Uber rider, such as Plaintiff, that she was sexually assaulted, Uber will not report this sexual assault to law enforcement.[16] Uber is proud of this policy and feels "very strongly" that it is not Uber's job to go to the police on behalf of customers when an Uber driver rapes an Uber passenger.[17]

26. Uber's greed, parochial focus on growth, and misogyny has had tragic consequences. In December 2014, a 26-year-old finance worker hailed an Uber to

---

[11] *Id.*

[12] *Id.*

[13] Isaac, *supra* note 2, at 218.

[14] *Uber Says Safety is its First Priority. Employees Aren't so Sure*, WASH. POST (Oct. 1, 2019) (available at  https://www.washingtonpost.com/podcasts/post-reports/uber-says-safety-is-its-first-priority-employees-arent-so-sure/.)

[15] *Id.*

[16] *Id.*

[17] *Id.*

COMPLAINT FOR DAMAGES

take her home from a work dinner near New Delhi, India.[18] When she fell asleep in the car, her Uber driver moved to the backseat and raped her.[19] The driver had previously been detained for rape.[20] The rape caused an international imbroglio and New Delhi temporary banned Uber.[21] Uber dealt with the situation by attacking the victim.

27. Eric Alexander was president of Uber in the Asia–Pacific region; he was Uber's "number three" and Kalanick's fixer.[22] He secured, possibly illegally, the New Delhi rape victim's medical records through a law firm.[23] The records contained the medical examination that doctors performed within hours of her rape.[24] Alexander shared these records with Mr. Kalanick and Uber's number two at the time, Emil Michael.[25] Many other Uber executives here in San Francisco either saw the records or learned of them.[26] Mr. Kalanick latched on to the fact that the victim's hymen was still intact.[27] (This despite two people pointing out to him that the victim could have been anally raped.[28]) He began cultivating and sharing a bizarre conspiracy that the woman wasn't raped; the whole incident was

---

[18] Ellen Barry and Suhasini Raj, *Uber Banned in India's Capital After Rape Accusation*, N.Y. TIMES, Dec. 8, 2014, at A4 (available at https://www.nytimes.com/2014/12/09/world/asia/new-delhi-bans-uber-after-driver-is-accused-of-rape.html?_r=0&module=inline.); Isaac, *supra* note 2, at 149.

[19] Isaac, *supra* note 2, at 149.

[20] Barry and Raj, *supra* note 16.

[21] *See id.*

[22] Isaac, *supra* note 2, at 260.

[23] Kara Swisher and Johana Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*, VOX (June 7, 2017), https://www.vox.com/2017/6/7/15754316/uber-executive-india-assault-rape-medical-records.

[24] Isaac, *supra* note 2, at 261.

[25] Swisher and Bhuiyan, *supra* note 21.

[26] *Id.*

[27] Isaac, *supra* note 2, at 261.

[28] *Id.* at 262.

9

a plot against Uber by Olga, Uber's major ride-sharing competitor in India.[29] No matter that the Uber driver had a history of sexual assault and had confessed the assault to police.[30]

28. Mr. Kalanick and Uber's leadership and board was the fountainhead of Uber's culture of reckless growth, misogyny, and lawlessness.[31] When Uber customers accused Uber drivers of sexual assault, something that happened with increasing frequency as Uber grew — given its lax supervision and shoddy background checks — Mr. Kalanick would pace around Uber headquarters, not wondering about how to improve rider safety but repeating the bromide, legally correct but a bromide nonetheless, "innocent until proven guilty."[32] When a sexual-assault victim decided not to endure the hardship of bringing a civil claim against Uber, or law enforcement decided the evidence was too inconclusive to bring criminal charges, "a round of cheers would ring out across the fifth floor of Uber HQ."[33]

29. This culture spread throughout Uber. One female Uber employee in Malaysia left work one night and noticed a gang was following her.[34] She was worried someone would rape her and started texting her fears to her boss at Uber.[35] He wrote back, "Don't worry, Uber has great health care. We will pay for your medical bills."[36]

---

[29] *Id.* at 261; Swisher and Bhuiyan, *supra* note 21.

[30] Barry and Raj, *supra* note 16.

[31] Isaac, *supra* note 2, at 194 ("The tone of Uber's culture was being set from the top. . . . The result was a workforce that largely reflected Kalanick.").

[32] Isaac, *supra* note 2, at 167.

[33] *Id.*

[34] Isaac, *supra* note 2, at 195.

[35] *Id.*

[36] *Id.*

COMPLAINT FOR DAMAGES

30. In Thailand, as they had done before, one night a group of Uber employees were up late at the Uber office snorting cocaine and drinking.[37] A female employee decided she didn't want to do drugs.[38] Her manager grabbed her head and shoved it into a mound of cocaine, forcing her to snort it.[39]

31. One night in South Korea, Mr. Kalanick and Mr. Michael took a female Uber employee and some South Korean Uber employees to a brothel where they sang karaoke.[40] Almost immediately upon arriving, the female Uber employee left, visibly shaken.[41] Although Mr. Kalanick and Mr. Michael left after singing Sweet Child O' Mine, the South Korean Uber employees stayed at the bar with the escorts they had picked out.[42] Mr. Kalanick, Mr. Michael, and the others expensed the night at the brothel to Uber's corporate account.[43]

32. Uber employees and executives started regularly throwing parties at topless bars, often expensing the trips to Uber's corporate account.[44] They called it "Tits on Travis" Kalanick.[45]

33. At a cocktail and dinner party with journalists in New York City, Mr. Michael attacked journalists who criticized Uber.[46] He was particularly angry with Sarah Lacy who had, in a recent story, accused Uber of "sexism and misogyny"

---

[37] Id.

[38] Id.

[39] Isaac, *supra* note 2, at 195.

[40] Isaac, *supra* note 2, at 250–51.

[41] Isaac, *supra* note 2, at 251.

[42] Id.

[43] Isaac, *supra* note 2, at 194.

[44] Isaac, *supra* note 2, at 194

[45] Id.

[46] Ben Smith, *Uber Executive Suggests Digging Up Dirt On Journalists*, Buzz Feed (Nov. 17, 2014) https://www.buzzfeednews.com/article/bensmith/uber-executive-suggests-digging-up-dirt-on-journalists.

COMPLAINT FOR DAMAGES

and had said she was going to delete her Uber app because she feared for her safety because of Uber's drivers.[47] Mr. Michael said that if any woman deleted her Uber app because of Ms. Lacy's story and was sexually assaulted, Ms. Lacy "should be held personally responsible."[48] He also floated the idea that Uber could spend a million dollars paying journalists and investigators to dig up dirt on journalists who wrote ill of Uber.[49] He then attempted to shame Ms. Lacy by suggesting that his hack journalists and investigators could find lots of dirt regarding Ms. Lacy and her romantic relationship with her partner.[50] He said Uber could get away with this because "[n]o body would know it was us."[51]

34. The actions of Uber's executives and board members demonstrate Uber's contempt for women and myopia. Uber only cares about growth. This culture oozes throughout the company and endangers Uber's female riders. Sarah Fowler wrote an explosive blog post, describing how pervasive this culture was at Uber.[52] Ms. Fowler was hired by Uber as a site-reliability engineer in 2015.[53] On her first day on the job, post-training, her manager sent her a message over the Uber chat system.[54] He said that he "was in an open relationship . . . and his girlfriend was having an easy time finding new partners but he wasn't. He was trying to stay out of trouble at work, he said, but he couldn't help getting in trouble, because he

---

[47] *Id.*

[48] *Id.*; Isaac, *supra* note 2, at 129.

[49] Smith, *supra* note 44.

[50] *Id.*; Isaac *supra* note 2, at 129.

[51] Smith, *supra* note 44.

[52] Susan Fowler, *Reflecting on One Very, Very Strange Year at Uber*, SUSAN J. FOWLER, (Feb. 19, 2017), https://www.susanjfowler.com/blog/2017/2/19/reflecting-on-one-very-strange-year-at-uber.

[53] *Id.*

[54] *Id.*

COMPLAINT FOR DAMAGES

was looking for women to have sex with."[55] Ms. Fowler felt it "was clear that he was trying to get [her] to have sex with him, and it was so clearly out of line that [she] immediately took screenshots of [the] chat messages and reported him to" Human Resources.[56] Uber Human Resources and "upper management" told her that "even though this was clearly sexual harassment and he was propositioning [her], it was this man's first offense, and that they wouldn't feel comfortable giving him anything other than a warning and a stern talking-to."[57] Upper management told her that her manager "was a high performer," so "they wouldn't feel comfortable punishing him for what was probably just an innocent mistake on his part."[58] Upper management told Ms. Fowler that she had two choices, join a new Uber team, or stay on her team, under the manager who propositioned her, but she "would have to understand that [the manager] would most likely give [her] a poor performance review when review time came around, and there was nothing [Human Resources] could do about that."[59] She was told that by Human Resources that if she chose to stick with the team she was on, that a poor review by her then manger wouldn't be retaliation because she had "been given an option."[60] Because working under a harassing manager was untenable to Ms. Fowler, she chose to switch teams.[61] She eventually learned, by talking to other women employees at Uber, that many of them had similar sexual-harassment stories and that the manager who sexually harassed her had sexually harassed others before he sexually harassed her.[62] That is, she learned that Human Resources and

---

[55] *Id.*

[56] *Id.*

[57] Fowler, *supra* note 50.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] Fowler, *supra* note 50.

1  upper management had been mendacious with her. "Within a few months, [the

2  harasser] was reported once again for inappropriate behavior, and those who re-

3  ported him were told it was still his 'first offense.' The situation was escalated as

4  far up the chain as it could be escalated, and still nothing was done" by Uber.[63]

5  But Uber's misogyny spread beyond aiding and abetting sexual harassment. Uber

6  bought leather jackets for some of its site-reliability engineers.[64] Male engineers

7  were given free jackets, female engineers had to pay for them.[65] When Ms.

8  Fowler complained, the director of engineering told her that if "women really

9  wanted equality, then [they] should realize [they] were getting equality by not get-

10  ting the [free] leather jackets. He said that because there were so many men in

11  the org, they had gotten a significant discount on the men's jackets but not on the

12  women's jackets, and it wouldn't be equal or fair . . . to give the women leather

13  jackets that cost a little more than the men's jackets."[66]

14      35. With the bad press Uber was getting because of the sexual assaults, Mr.

15  Michael's comments, and the Sarah Fowler affair, Uber realized it needed to ap-

16  pear that it was making changes and trying to eradicate its toxic-male culture, so

17  it held a company-wide meeting to announce changes. At the meeting, when

18  Uber announced that it was going to increase its diversity and sensitivity by

19  adding a female board member, David Bonderman, another Uber board member,

20  chimed in, announcing to the company that the addition of a woman to the

21  board meant "it's much likelier [there will] be more talking on the board."[67]

22

---

23  [63] *Id.*

24  [64] *Id.*

25  [65] *Id.*

26  [66] *Id.*

27  [67] Mike Isaac and Susan Chira, *David Bonderman Resigns From Uber Board After Sexist Remark*,
   N.Y. Times, June 13, 2017, at A16 (available at https://www.nytimes.com/2017/06/13/
28  technology/uber-sexual-harassment-huffington-bonderman.html?hp=&action=click&pg-
   type=Homepage&clickSource=story-heading&module=inline&region=top-news&WT.-
29  nav=top-news); Isaac, *supra* note 2, at 277.

Uber's "culture was poisoned from the very top."[68] Indeed, John William Gurley was a longtime board member of Uber and a close confidant of Mr. Kalanick. He sat on his hands and watched silently as Uber put in place a culture and policies that have hurt many innocent women, like the Plaintiff.

36. To further try to repair its tattered reputation, Uber also hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.[69]

37. During his investigation, as detailed in the publicly released "Holder Report," Attorney General Holder uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."[70]

38. Uber's sexual-assault and -harassment problems have become so big and so public that it has made pale and perfunctory attempts to act as though it is trying to confront them. In May 2018, Uber acknowledged its "deeply rooted problem" of sexual assault. It proclaimed it was committed to solving the problem, stating that "we're making some important changes today."[71] Included in these "important changes" was Uber's promise to publish a "safety transparency report that will include data on sexual assaults . . . that occur on the Uber platform."[72]

39. When Uber released the report, it was forced to acknowledge that in 2018 alone there were 3,045 sexual assaults in the United States during Uber trips – 235 sexual assaults of the "most serious kind."

---

[68] Isaac, *supra* note 2, at 280.

[69] Covington & Burling, LLP, *Covington Recommendations* (available at https://drive.google.com/file/d/0B1s08BdVqCgrUVM4UHBpTGROLXM/view.)

[70] Isaac, *supra* note 2, at 271.

[71] Uber, *Turning the Lights On*, https://www.uber.com/newsroom/turning-the-lights-on/.

[72] *Id.*

**b. The Sexual Assault**

40. This suit arises from the grave injuries suffered by Plaintiff Jane Doe from the wrongful acts of the Defendants.

41. Plaintiff grew up in California and was and is a lifelong California resident. While she was in Hawaii, on or about January 13, 2020, Plaintiff hired an Uber ride late at night to take her to a destination by using the Uber app. The Uber App is owned, operated, and controlled by Uber.

42. Through the Uber App, Uber assigned Defendant Doe One to drive to Plaintiff's location, pick her up, and then safely drive Plaintiff to her destination. After picking up Plaintiff, and before safely delivering her to her destination, Defendant Doe One sexually assaulted Plaintiff.

43. Defendant Doe One sexually assaulted Plaintiff while in the course and scope of his employment with Uber, and while he was still under the direction and control of Uber. These acts caused her unimaginable pain that persists to this day.

44. Defendant Doe One was acting on behalf of, for the benefit of, at the direction of, and within the course and scope of employment with Uber. Uber provided Defendant Doe One with their ride-sharing app platform, a tool necessary for Defendant Doe One to perform the work Uber assigned. Uber, through the Uber App, directed Defendant Doe One regarding the location of the pickup, time of the pickup, and routes for both the pickup of Plaintiff and transportation to her destination and much more, as discussed below.

45. Since the sexual assault, Plaintiff has returned to California, where she resides and is domiciled, from Hawaii.

**c. Uber**

46. Uber is a transportation company. Its core business is providing transportation to the public at large through its network of drivers. It connects its drivers to the public through the Uber App. Anyone from the public may download the

Uber App for free. Using the app, a customer may request a ride from one of Uber's drivers for a standardized charge unilaterally set by Uber. Uber directs one of its drivers to pick up the passenger and transport her to her destination.

47. Uber is a common carrier under California Civil Code § 2168 and the common law.[73] Uber holds itself out to the public generally and indifferently to transport persons from place to place for profit. And so Uber has a duty to use the utmost care and diligence for the safe carriage of its passengers. Further, Uber has an affirmative duty to protect its passengers from assault by one of its employees or contractors and is liable for its employees or contractors' assaults, regardless of whether such acts were committed within the course and scope of employment for Uber.

48. Uber drivers are largely nonprofessional, untrained, and use their own vehicles. Uber employs its drivers, including Defendant Doe One, in traditional at-will relationships, in which:

  a. Uber has the discretion to fire its drivers for any reason and at any time; that is, Uber maintains the right to discharge its drivers at will, and without cause;

  b. Drivers are not charged a fee by Uber to apply to become employees;

  c. There is no agreement between Uber and the driver designating that the driver is an independent contractor;

  d. Drivers are not charged a fee to download the app or to receive notifications from Uber that customers want rides;

  e. Fare prices for rides are set exclusively by Uber;

  f. Drivers have no input on fares charged to consumers;

---

[73] *See, e.g., Doe v. Uber Techs., Inc.*, 184 F. Supp.3d 774, 787 (N.D. Cal. 2016) ("Plaintiff's allegations support the claim that Uber 'offers to the public to carry persons,' thereby bringing it within California's definition of common carrier for tort purposes.").

COMPLAINT FOR DAMAGES

g.  Drivers are not permitted to negotiate with consumers on fares charged;

h.  Uber can and does modify charges to consumers; for example, if Uber determines that a driver has taken a circuitous route to a destination;

i.  Uber takes a fee of every ride charged to a consumer;

j.  Uber retains control over customer-contact information;

k.  Uber controls its drivers' contacts with its consumer base and considers its consumer list to be proprietary information;

l.  Drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber App;

m.  Driving for Uber is not a specialized skill;

n.  Uber's business model depends on having a large pool of non-professional drivers;

o.  Drivers must abide by a list of regulations to drive for Uber;

p.  Uber requires its drivers to pick up Uber customers on the correct side of the street;

q.  Uber forbids its drivers from talking on their cell phones while the drivers are driving customers;

r.  Uber drivers are not allowed to ask Uber customers for their contact information;

s.  Drivers who reject too many ride requests risk facing discipline, including suspension or termination;

t.  Consumers give feedback on rides they have taken, and rate drivers on a scale from one to five stars. These ratings are used by Uber to discipline and terminate drivers; and

u.  Such other acts of control that discovery will show.

49. Uber actively markets itself as a safe company that provides safe rides. Both before January 2020 and after, Uber actively and aggressively marketed the supposed safety of its transportation services.

50. Uber specifically markets its transportation services to young women who are too intoxicated to drive.

51. Uber employs a vast network of drivers. But, at all relevant times, Uber provided its drivers with inadequate training regarding sexual assault, sexual relations, sensitivity, and customer relations.

52. Uber has also provided inadequate background checks. Among other things, it doesn't fingerprint its drivers, it doesn't run the applicant drivers against public databases, and it doesn't do international background checks.

## CAUSES OF ACTION
### Direct Liability
### FIRST CAUSE OF ACTION:
### Negligent Hiring, Supervision, Training & Retention
### (Against Uber Technologies & Rasier)

53. Plaintiff incorporates here the earlier paragraphs.

54. Uber hired Defendant Doe One as a driver.

55. Uber knew or should have known that Defendant Doe One was unfit to be employed by it as transportation provider.

56. As a common carrier, Uber owed Plaintiff and the general public a duty of reasonable care in the hiring, training, and supervision of its drivers and is responsible for the negligent and tortious actions of its drivers.

57. Uber breached that duty of care in the hiring, retaining, training, and supervising Defendant Doe One. Defendant Doe One is unskilled, unfit, and too incompetent to provide safe, reliable rides. It was reasonably foreseeable to Uber that Defendant Doe One would expose riders, including Plaintiff, to an unreasonable risk of harm.

58. Uber's breach of its duty was a substantial factor in causing Plaintiff's injuries.

59. As a direct and proximate result of the negligence, carelessness, reckless-
ness, and unlawfulness of Defendants, Plaintiff sustained pain and suffering, seri-
ous emotional distress, mental anguish, embarrassment, and humiliation.

60. Accordingly, Plaintiff is entitled to recovery against Defendants in an
amount to be determined at trial.

SECOND CAUSE OF ACTION:
Negligence by Misfeasance
(Against Uber Technologies & Rasier)

61. Plaintiff incorporates here the earlier paragraphs.

62. As a common carrier, Uber owed Plaintiff, an Uber passenger, a height-
ened duty of care to ensure its passengers' safety.

63. Uber breached this duty by creating risks for Plaintiff through its business
practices. Uber's policies of prioritizing profits over safety while advertising its
commitment to safety worsened the position of Plaintiff as a female commuter.
By advertising and marketing itself as a safe alternative to driving and encourag-
ing women to take Uber rides, while knowing the widespread issue of sexual mis-
conduct and assaults by Uber drivers, Uber placed Jane Doe in foreseeable risk
created by Uber's own policies and business model.

64. Uber's breach of its duty was a substantial factor in causing Plaintiff's in-
juries.

65. As a direct and proximate result of the negligence, carelessness, reckless-
ness, and unlawfulness of Uber, Plaintiff sustained pain and suffering, serious
emotional distress, mental anguish, embarrassment, and humiliation.

66. Accordingly, Plaintiff is entitled to recovery against Defendants in an
amount to be determined at trial.

67. By 2020, Uber had objective and subjective knowledge that its policies and
its business model were putting women in danger of sexual assault. In the face of
this danger, Uber's negligence and recklessness was a "willful and conscious dis-

regard" of the safety of others; it warrants punitive damages pursuant to California Civil Code § 3294.

THIRD CAUSE OF ACTION:
Negligence by Nonfeasance
(Against Uber Technologies & Rasier)

68. Plaintiff incorporates here the earlier paragraphs.

69. As a common carrier, Uber owed its passengers, including Plaintiff, a heightened duty of care to ensure its passengers' safety.

70. Uber breached this duty by failing to take steps that could have prevented the harm caused to Plaintiff. By failing to institute policies and procedures to vet drivers, by failing to protect passengers from sexual assault, by failing to respond to sexual-assault victims' injuries and concerns, and by failing to institute true change in its in corporate philosophy by matching passenger safety with its advertising, Uber failed to provide the Plaintiff the care owed her. Uber put Plaintiff in the foreseeable danger posed by its business model, through which drivers repeatedly prey on riders. Uber also failed to deliver Plaintiff from this foreseeable danger.

71. As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Uber, Plaintiff sustained pain and suffering, serious emotional distress, mental anguish, embarrassment, and humiliation.

72. Accordingly, Plaintiff is entitled to recovery against Uber in an amount to be determined at trial.

73. Uber's negligence in failing to take action to intervene on the risks posed to women riders displayed a "willful and conscious disregard" of the safety of others and warrants the imposition of punitive damages pursuant to California Civil Code § 3294.

FOURTH CAUSE OF ACTION:
Fraud
(Against Uber Technologies & Raiser)

74. Plaintiff incorporates here the earlier paragraphs.

75. Uber told the general public and Plaintiff that it was taking steps to ensure that its rides were safe and reliable. For example, it told the public and Plaintiff that it was charging an extra dollar per ride for its Safe Rides Fee. It said this fee "supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[74] Uber never earmarked this money for safety, for background checks, for motor-vehicle checks, for driver-safety education, for insurance, or for developing safety features in the Uber app. Not all this money was spent on these safety features. And so Uber's statements regarding the Safe Rides Fee was a misrepresentation. Uber also said its drivers were properly screened. On its website, Uber described its background checks as "often more rigorous" than those in the traditional taxi industry.[75] They were not. Uber didn't do basic industry-standard background checks, such as fingerprinting, running applicants against public databases, or doing international background checks. Instead, Uber's goal was to get drivers approved and on the road as quickly and as conveniently as possible. And so Uber's statements that it properly, thoroughly, or adequately screened its drivers was a misrepresentation. Uber made other intentional misrepresentations of fact to Plaintiff and the general public that were false. For example, Uber said that Plaintiff would be safe taking Uber rides. Uber advertised, marketed, and held itself out as safe for young women, in particular those young women who may have been consuming alcohol.

---

[74] Uber, *supra* note 1.

[75] Isaac, *supra* note 8.

COMPLAINT FOR DAMAGES

76. Uber made these intentional misrepresentations knowing they had taken inadequate steps to train or enforce policies with respect to sexual assault of passengers. It also knew it did not and was not going to earmark the Safe Rides Fee for the things it said it would earmark them for. Uber made false statements concerning the safety of its drivers and the safety measures that it was taking. These false statements were made knowingly, willfully, and with wanton and reckless disregard for the truth. They were made with the intent to deceive and defraud Plaintiff into agreeing to take Uber rides.

77. The above-described misrepresentations were material. If Plaintiff and the public would have known that Uber was doing so little to screen, train, or supervise drivers, female passengers, like Plaintiff, would not have taken Uber rides. If the public and Plaintiff would have known that Uber wasn't taking the steps to ensure rider safety that Uber said it was taking, female passengers and Plaintiff would not have taken Uber rides.

78. The Defendants intended to induce Plaintiff and female members of the public to rely on these misrepresentations. The Defendants knew that by stating that Uber rides were safe, that by stating that it adequately screened, trained, and supervised drivers, and that by stating that it had taken and was actively taking steps to increase safety, women and Plaintiff would be more likely to take Uber rides. The Defendants had reason to expect members of the public and Plaintiff would rely on these representations.

79. Plaintiff saw public statements put forth by Defendants and actually and reasonably relied on the misrepresentations made by Defendants when she agreed to ride in an Uber.

80. Plaintiff was justified in relying on Defendants' misstatements. Uber took advantage of information asymmetries. That is, Uber was in a much better position than Plaintiff to know whether Uber was adequately training, screening, and

supervising drivers and what steps it had taken and was taking to make Uber rides safe.

81. As a result of Defendants' deliberate misrepresentation of material facts, Plaintiff suffered unimaginable pain, anguish, and other harm. That is, Defendants' acts proximately caused Plaintiff harm.

82. The conduct Uber engaged in was fraudulent, oppressive, and malicious. It was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff. And so Uber warrants punitive damages under California Civil Code § 3294.

83. Accordingly, Plaintiff is entitled to recovery against Uber in an amount to be determined at trial.

## RESPONDEAT SUPERIOR

### EMPLOYER–EMPLOYEE RELATIONSHIP & FORESEEABILITY

84. Plaintiff here incorporates the earlier paragraphs.

85. Uber retained the right to control the matter and means by which Defendant Doe One drove for Uber. As such, Uber was an employer of Defendant Doe One. And so, under California law, Uber can be held vicariously liability for torts committed by Defendant Doe One that were within the scope of his employment and that proximately caused injury to Plaintiff.

86. The sexual assault committed by Defendant Doe One, and the torts which that sexual assault amounted to — assault, battery, false imprisonment, and intentional infliction of emotional distress — were not so unusual or startling that they were unforeseeable to Uber. And so, as described below, Uber is vicariously liable for the torts of assault, battery, false imprisonment, and intentional infliction of emotional distress.

87. Uber is a common carrier. As such, it can be vicariously liable for its employees' and agents' intentional and negligent torts, whether or not those torts were committed within the scope of the agents' or employees' scope of employment and whether or not the torts were foreseeable.

88. And so, as described below, Uber is vicariously liable for the torts of assault, battery, false imprisonment, and intentional infliction of emotional distress.

FIFTH CAUSE OF ACTION:
Assault
(Against all Defendants)

89. Plaintiff incorporates here the earlier paragraphs.

90. The sexually egregious conduct committed by Uber driver Defendant Doe One while performing his job duties amounted to a series of events that created a reasonable apprehension in Plaintiff of immediate harmful or offensive contact to her. All this was done intentionally and without Plaintiff's consent. Plaintiff reasonably believed she was in danger of imminent unwanted touching and offensive contact. Defendant Doe One intended to take the actions that caused Plaintiff to reasonably believe she was in danger of imminent harmful or offensive contact. That is, he intended to make Plaintiff believe she was about to be imminently contacted without her consent.

91. Uber is directly liable for the actions of its agents and employees. It is also vicariously liable under the doctrine of respondeat superior.

92. Uber is a common carrier who must carry passengers safely. As a common carrier, Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.

93. Uber breached its duty of care in its actions toward Plaintiff.

94. As a direct and proximate result of the above conduct, Plaintiff has sustained and will sustain pain and suffering and serious psychological and emotional distress, mental anguish, embarrassment, and humiliation.

95. The conduct Uber engaged in was fraudulent, oppressive, and/or malicious, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff. And so Uber warrants punitive damages under California Civil Code § 3294.

96. Accordingly, Plaintiff is entitled to recovery against Defendants in an amount to be determined at trial.

SIXTH CAUSE OF ACTION:
Sexual Battery
(Against all Defendants)

97. Plaintiff incorporates here the earlier paragraphs.

98. Defendant Doe One, while in the course and scope of his employment with Uber, intentionally touched Plaintiff's sexual organs and engaged in other sexual acts without Plaintiff's consent. Defendant Doe One's actions caused offensive contact with Plaintiff's "intimate parts" as defined by Civil Code 1708.5(d).

99. This offensive contact harmed Plaintiff.

100. Uber is directly liable for the actions of its agents and employees. It is also vicariously liable under the doctrine of *respondeat superior*.

101. Uber is a common carrier who must carry passengers safely. As a common carrier, Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether such acts were committed within the scope of employment.

102. Uber breached its duty of care in its actions toward Plaintiff.

103. For the foregoing reasons, Defendants committed sexual battery against Plaintiff as defined in Civil Code § 1708.5.

104. As a direct and proximate result of the above conduct, Plaintiff has sustained and will sustain pain and suffering and serious psychological and emotional distress, mental anguish, embarrassment, and humiliation.

105. The conduct Uber engaged in was fraudulent, oppressive, and/or malicious, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff. And so Uber warrants punitive damages under California Civil Code § 3294.

106. Accordingly, Plaintiff is entitled to recovery against Defendants in an amount to be determined at trial.

SEVENTH CAUSE OF ACTION:
False Imprisonment
(Against all Defendants)

107. Plaintiff incorporates here the earlier paragraphs.

108. Uber's employee, Defendant Doe One, while he was performing his job duties, physically prevented Jane Doe from exiting his car for a significant period. His actions of physically preventing Plaintiff from leaving his car were intentional.

109. During her confinement, Jane Doe feared for her safety and was injured.

110. Uber is liable for the actions of its agents and employees directly and under the *respondeat superior* doctrine.

111. Uber is a common carrier that must carry passengers safely. As a common carrier, Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether such acts were committed within the scope of employment.

112. Uber breached its duty of care in its actions toward Plaintiff.

113. As a direct and proximate result of this conduct, Plaintiff has sustained and will sustain pain and suffering and serious psychological and emotional distress, mental anguish, embarrassment, and humiliation.

114. The conduct Uber engaged in was fraudulent, oppressive, and malicious, and was done with conscious disregard toward Plaintiff's rights and safety. And so Uber warrants punitive damages under California Civil Code § 3294.

115. Accordingly, Plaintiff is entitled to recovery against defendants in an amount to be determined at trial.

EIGHTH CAUSE OF ACTION:
Intentional Infliction of Emotional Distress
(Against all Defendants)

116. Plaintiff incorporates here the earlier paragraphs.

117. Uber's employee, Defendant Doe One, while he was performing his job duties, engaged in conduct to Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society, namely, he caused Plaintiff to experience mental suffering by forcing unwanted sexual contact on her.

118. Uber is liable for the actions of its agents directly and under the doctrine of respondeat superior.

119. Uber is a common carrier who must carry passengers safely. As a common carrier, Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether such acts were committed within the scope of employment.

120. Uber breached its duty of care in its actions toward Plaintiff.

121. As a direct and proximate result of the Defendants' conduct, Plaintiff has sustained and will sustain pain and suffering and serious psychological and emotional distress, mental anguish, embarrassment, and humiliation.

122. The conduct Uber engaged in was fraudulent, oppressive, and malicious, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff. Uber's conduct warrants punitive damages under California Civil Code § 3294.

123. Accordingly, Plaintiff is entitled to recovery against Defendants in an amount to be determined at trial.

NINTH CAUSE OF ACTION:
Freedom from Violence Pursuant to the Ralph Act
Violation of California Civil Code §§ 51.7 and 52
(Against all Defendants)

124. Plaintiff incorporates here the earlier paragraphs.

125. Defendants subjected Plaintiff to violence based on her sex, causing physical and psychological injuries to her. A motivating reason for their conduct was Plaintiff's gender.

126. Plaintiff will continue to suffer extreme mental and physical pain and suffering in the future as a result of her injuries.

127. As a further proximate result, Plaintiff has been damaged in that she has been required to expend money and incur obligations for medical services, drugs, and sundries reasonably required in the treatment and relief of the injuries alleged according to proof. As a further proximate result, Plaintiff will continue to incur medical and related expenses.

128. Defendants' conduct was a substantial factor in causing Plaintiff harm.

129. As a result of the aforementioned conduct, Plaintiff is entitled to a $25,000.00 penalty and/or punitive damages for Defendants' conduct in violation of Civil Code § 51.7, as well as attorney's fees and costs pursuant to Civil Code § 52.

130. This conduct was accomplished intentionally, recklessly, or both, with conscious disregard for Plaintiff's health, safety, privacy, freedom, and human dignity. This conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and should be regarded as despicable, atrocious, and utterly intolerable in a civilized community. The acts of Defendants alleged above were willful, wanton, malicious, oppressive, fraudulent, despicable, and outrageous and justify the awarding of exemplary and punitive damages.

TENTH CAUSE OF ACTION:
Negligence
(Against Defendant Doe One)

131. Plaintiff incorporates here the earlier paragraphs.

132. Defendant Doe One owed Plaintiff the duty of due care and a duty to protect her based on the special relationship of her being a passenger.

133. Defendant Doe One breached these duties when he negligently touched her sexual organs without her consent.

134. This touching without Plaintiff's consent proximately caused her injury.

135. As a direct and proximate result of the above conduct, Plaintiff has sustained and will sustain pain and suffering and serious psychological and emotional distress, mental anguish, embarrassment, and humiliation.

136. Accordingly, Plaintiff is entitled to recovery against Defendant Doe One in an amount to be determined at trial.

## PRAYER

For these reasons, Plaintiff, Jane Doe, prays for judgment against Defendants Uber Technologies, Inc., Raiser, LLC, and Defendant Doe One. She asks that this judgment be inclusive of both and that they be held jointly and severally liable, as follows:

1. For special damages, subject to proof;

2. For past and future general damages, including physical pain, mental anguish, disfigurement and physical impairment, subject to proof;

3. For past and future lost earnings and/or earning capacity, subject to proof;

4. For medical expenses, past and future, subject to proof;

5. For punitive and exemplary damages subject to proof;

6. For prejudgment interest from the date of the incident that occurred in 2020, to the date of Judgment, as provided by law, subject to proof at the time of trial;

7. For costs of litigation incurred herein;

8. For attorney's fees;

9. For damages under the Ralph Act; and

10. For such other and further relief as this Court may deem just and proper.

DATED: June 4, 2020

COMPLAINT FOR DAMAGES

1

2

3          WILLIAMS HART BOUNDAS EASTERBY, LLP

4

5

6          Walt Cubberly

7

8          ADZ LAW, LLP
           Jessica Dayton
9

10         COUNSEL FOR JANE DOE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

COMPLAINT FOR DAMAGES