# HELPING INDUSTRIES TO CLASSIFY REPORTS OF SEXUAL HARASSMENT, SEXUAL MISCONDUCT, AND SEXUAL ASSAULT

A JOINT REPORT OF RALIANCE AND THE URBAN INSTITUTE



Trial Exhibit No. P-02160

**Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault:** A Joint Report of RALIANCE and the Urban Institute

By Chad Sniffen, Julia Durnan, and Janine Zweig

This work is licensed under a Creative Commons Attribution 4.0 International License.

 



# ACKNOWLEDGMENTS

The authors would like to acknowledge the following contributors to this work:

- Numerous individuals representing the Safety and Insurance Team at Uber Technologies, Inc., and especially the Global Safety Support, Safety Product and Engineering, Community Operations, and Safety Data Science teams. For their help in telling this story, we are also grateful to the Safety Brand & Initiatives and Communications teams.

- Sally Laskey, Evaluation Coordinator, RALIANCE, who was an initial member of RALIANCE / Urban team and instrumental in the development of the draft taxonomy.

- Kristen Houser, Chief Public Affairs Officer, RALIANCE, for her review and feedback.

- Nancy La Vigne, Vice President of Justice Policy, Urban Institute, for her review and feedback.

- The Communications and Library Teams at RALIANCE, who contributed assistance with research, formatting, and editing.

## RECOMMENDED CITATION:

Sniffen, C., Durnan, J., & Zweig, J. (2018). *Helping industries to classify reports of sexual harassment, sexual misconduct, and sexual assault.* Washington DC: RALIANCE.

*This study was funded by Uber Technologies, Inc. The opinions, findings, conclusions, and recommendations expressed in this document are those of the authors and do not necessarily reflect those of the Urban Institute, its trustees, or its funders.*

# CONTENTS

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Use of Terms in this Paper. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Forewords . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Overview of Challenge and Opportunity . . . . . . . . . . . . . . . . . . . . . 13

Why Clear Categories Are Important . . . . . . . . . . . . . . . . . . . . . . . 18

    Specific vs. Non-Specific Categories . . . . . . . . . . . . . . . . . . . . . . . . 20

Taxonomy Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Mix-and-Match Exercise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

How Did We Develop the Taxonomy?. . . . . . . . . . . . . . . . . . . . . . . . 25

    Behaviorall Specific Questions Exercise . . . . . . . . . . . . . . . . . . . . . 28

Considerations for Sexual Violence Transparency Publications . . . . . . . 29

Key Transparency Publications Considerations. . . . . . . . . . . . . . . . . . 32

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

References. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

About the Organizations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

About the Authors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Appendix A: Developing the Sexual Misconduct and Violence Taxonomy . . 37

    Table A.1: Proposed Taxonomy . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    Table A.2: Implemented Taxonomy . . . . . . . . . . . . . . . . . . . . . . . . 40

    Validating the Sexual Misconduct and Violence Taxonomy . . . . . . . . . . 41

    Modifications after Extensive Review . . . . . . . . . . . . . . . . . . . . . . . 41

    Table A.3: Modifications to the Taxonomy after Review. . . . . . . . . . . . 42

Appendix B: Taxonomy Behavior-Based Definitions. . . . . . . . . . . . . . . 43

Appendix C: Ways to Learn More . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Appendix D: How Customer Service Works at Uber . . . . . . . . . . . . . . 47

    Example Snapshots of Customer Service Training Materials . . . . . . . . . 50

P-02160.00004



# USE OF TERMS
## IN THIS PAPER

**BEHAVIORALLY SPECIFIC QUESTION**: A question that is constructed using specific descriptions of behavior and does not require respondents to use subjective interpretation to understand concepts or experiences.

**CUSTOMER SERVICE AGENTS (AGENTS)**: As it relates to Uber, agents refers to Uber's team of trained professionals that receive, review, and respond to reported safety issues.

**REPORTS**: As it relates to Uber, reports refer to any information (of varying detail), from any source, that suggests a potential customer service or safety issue connected to the Uber app. A "reporter" is the individual or entity (e.g., law enforcement) that is the source of the report.

**SEXUAL ASSAULT**: Refers to unwanted sexual experiences that involve physical contact.

**SEXUAL HARASSMENT**: Refers to unwanted experiences that are sexually explicit or implicit in nature, do not involve physical contact, and happen between users (as defined below) in a business setting. It is not used in reference to experiences between employees, which imply expansive legal questions and power dynamics that the taxonomy in this paper was not designed to include.

**SEXUAL MISCONDUCT**: Refers to unwanted sexual experiences that do not involve physical contact. As used in the taxonomy, it is inclusive of sexual harassment as defined above.

**SEXUAL VIOLENCE**: A broad term that refers to any form of unwanted sexual experience. It includes, but is not limited to, acts of sexual harassment, sexual misconduct, and sexual assault as described above.

**TAXONOMY**: As it relates to Uber, a taxonomy is a hierarchy of categories that agents use to classify reports they receive. See Appendix D for a detailed description of this process.

**TRANSPARENCY PUBLICATION**: A published document that includes data on sexual violence and other incidents as they relate to a business.

**USER**: As it relates to Uber, user refers to the riders and driver partners who use the Uber platform.

P-02160.00005

# FOREWORDS

### KAREN BAKER, SANDRA HENRIQUEZ, and MONIKA JOHNSON-HOSTLER
### MANAGING PARTNERS, RALIANCE



*Karen L. Baker*

Karen Baker,
**Managing Partner**
RALIANCE



*Sara Henriquez*

Sandra Henriquez,
**Managing Partner**
RALIANCE



*Monika Johnson-Hostler*

Monika Johnson-Hostler,
**Managing Partner**
RALIANCE



Every day, as experts working on behalf of survivors of sexual violence, we talk and think about a topic that most people hope to never have to talk or think about. We have the unique privilege of encountering survivor after survivor, becoming familiar with their lives and stories, and learning from the harm that was done to them in a way that helps us better support the next survivor we meet. Wherever our work takes us, we remain rooted in the stories of survivors, and we rely on their experiences to guide us as we seek to create healthier systems, institutions, and environments for us all. When we share our specialized knowledge with partners outside of our field, we take another step towards a world without sexual harassment, sexual misconduct, or sexual assault, where people are empowered to reach their full potential.

RALIANCE has partnered with Uber Technologies, Inc. to help them improve their categorization system for reports of sexual harassment, sexual misconduct, and sexual assault on their platform. This has given us the opportunity to bring the perspective of experts on sexual violence into Uber's corner of the transportation industry and to share this work with business and corporate sectors, the larger transportation industry, and beyond. Though building partnerships requires time, effort, and learning, it is only by working with community partners – whether they are corporate, non-profit, health care, law enforcement or education – that we can help build safer communities for everyone.

We hope that this work will help not just Uber, but all of us identify the best ways to gather information about, and respond to, sexual violence. Through this partnership, we also hope to demonstrate the value that those working on behalf of survivors can bring to industries as they take critical steps to respond to and prevent sexual harassment, sexual misconduct, and sexual assault. With better information about the scale of sexual violence in all areas of life, we can better show the need for investment in response and prevention efforts and invite everyone to play a role in advancing our work. With better information about sexual violence comes the opportunity to trust and fulfill the potential that resides in all of us to create a better world. RALIANCE stands ready to build relationships across sectors, so that together we can become a part of the solution!

P-02160.00006





Nancy La Vigne, **Vice President**

<span style="color:red">JUSTICE POLICY CENTER,
URBAN INSTITUTE</span>

## NANCY LA VIGNE, VICE PRESIDENT, JUSTICE POLICY CENTER, URBAN INSTITUTE

The Urban Institute has conducted and disseminated objective, rigorous research to inform decision makers and improve policy for 50 years. Our goal has been and remains to discover the truth without agenda regardless of the project or funder, sharing the results of our research to inform evidence-based decision-making. When working with advocates and industries, that role does not change. It is our hope to lend our expertise to influential leaders across sectors, elevating the debate and equipping leaders to make the best possible choices in policy and practice changes. Our senior researchers have authoritative expertise in their fields, which can be hugely beneficial to business leaders who may not know how to collect or interpret research and data.

For this project, Urban provided a framework for the data collection and coding for development of a new taxonomy to collect, categorize, and report on sexual harassment, sexual misconduct, and sexual assault experiences on the Uber platform in collaboration with RALIANCE. Our sexual violence experts contributed expertise around sexual violence data collection and reporting in the development of the taxonomy. While our perspectives differed, our shared goal was to create a better system for categorizing and reporting on complaints of a sexual nature on the Uber platform to ultimately minimize the risk of sexual violence. Together, we constructed a taxonomy that was not only evidence-based and rigorously constructed, but usable and effective for Uber staff. Urban was able to bring evidence to bear in a relevant and actionable manner to effect practice on a large scale.

We hope to encourage and empower other companies to follow an evidence-based approach to better understand and minimize experiences of sexual violence across their platforms. This is the opportunity that partnerships with private entities provides: to empower decision makers with the information they need to make smarter, more effective choices in their policy and practice. We hope this project has accomplished this goal and made a small step toward a safer environment, for Uber and others across the industry.

P-02160.00007





Tony West
**Chief Legal Officer**

UBER TECHNOLOGIES, INC.

# PREFACE

## TONY WEST, CHIEF LEGAL OFFICER, UBER TECHNOLOGIES, INC.

Uber is committed to the safety of our entire community – driver partners, riders, employees, and the public. As a technology service that connects people in the real world, we have a responsibility to constantly work to improve the safety of our platform and contribute to safety in our communities. In 2018, CEO Dara Khosrowshahi made this clear when he announced safety as a top corporate priority. Since then, Uber has strengthened its driver screening process with new technology, launched several new safety features, including an in-app emergency button that connects to 911 assistance, and ended mandatory arbitration for individual claims of sexual harassment and sexual assault. The work outlined in the subject of this report is another step in our mission to go further on customer safety.

Our app reaches users across the U.S.; more than 80% of the U.S. population lives in areas with Uber service. We connected one billion trips in 2017, and have already connected over one billion trips so far in 2018 in the U.S. alone. Our business has grown quickly, which can be a challenge to our efforts to ensure consistency in identifying and categorizing harmful and inappropriate behavior so we can respond quickly and appropriately, and then in managing that data to improve our safety measures. At the same time, our technology and our scale provides an opportunity to capture information that will allow us to see and understand how, when, and where sexual violence occurs. This is critical, because better identification and measurement is an essential step for improvement – we cannot ultimately solve something we cannot fully see and understand.

This is especially true for sexual violence, which is a vastly underreported crime. There is no common definition of criminal sexual assault across the 50 states or in federal crime statistics. There is no common set of descriptive behaviors that businesses such as Uber can use to take in reports and capture data on sexual violence. This is often an area where society looks the other way and victims avoid coming forward, out of fear and belief that nothing will change. This is not the sort of metric that businesses look to report publicly. But at Uber, we believe that if we can play a role in bringing this issue out of the shadows and into the sunlight by providing data that will ultimately lead to solutions, then we need to step forward.

With very few examples available to rely upon, we recognized early on that even developing a taxonomy to identify, categorize, and count sexually violent behaviors was going to be an unprecedented challenge. That is why we partnered with

P-02160.00008

RALIANCE and the Urban Institute for their expertise and help in this complex, novel, and important effort. Our goal was to develop a suitable taxonomy that could be used to help understand conduct at scale and a methodology for our hundreds of customer service agents to apply those categories uniformly to a complex set of behaviors.

Our focus was on the user experience of both our riders and driver partners. The taxonomy is built to categorize the customer reports we receive, using the behaviors described by the reporter. It does not include the outcome of reports, including, for example, any law enforcement investigations (an outline of our reporting process and response is in Appendix D). We also know that users of our platform (and in any business) experience behaviors that make them feel threatened or uncomfortable such as flirting, leering, or asking overly personal questions, that may not rise to the level of criminal activity. We wanted a taxonomy that would capture those behaviors as well, as they are important to our efforts to make our user experience as safe and inclusive as we can.

And we needed a taxonomy based upon actual behaviors exhibited in the real world. It was important that we provide real examples to help capture actual experiences of riders and driver partners as they perceived and reported it to Uber. So our Uber team, RALIANCE, and the Urban Institute built the categories in this taxonomy from actual reports (with personal information removed) made to Uber. The categories were tested and refined in an effort to make sure that similar behaviors were consistently counted in the same category. This consistency is important to make sure that when we use the data to analyze trends and patterns, we are actually comparing the same type of reported incidents. This will be especially critical if, as we hope, this taxonomy is adopted and used by other businesses and organizations that deal with users and customers on a regular basis. We know that this information can be even more powerful if we share a common language which will allow us to work together

as a community to fully understand and confront this issue. That is why we are sharing this taxonomy publicly, even at this early stage of development and implementation.

The taxonomy that we – along with RALIANCE and Urban Institute – are introducing is specific to the platform experience relevant to Uber where our users experience temporary interactions with each other. This taxonomy reflects this, and was not developed to address other settings, such as in workplace environments. For example, the taxonomy does not take into account issues such as reporting structure, which would be critical to institute into the taxonomy for sexual harassment in the workplace.

When it comes to criminal conduct, Uber actively cooperates in any law enforcement investigation, where actions are taken based on varying definitions of criminal behavior. This taxonomy, however, accounts for more than just criminal descriptions because as a business, we need to address the issues of safety and security of users, which may not rise to the level of criminal behavior as it is defined in applicable laws.

We also understand that this is a first step, and that there will be trial and error involved in the process. For example, the categories of "leering," "flirting," and "touching of non-sexual body parts" have less of a track record of being clearly defined. At Uber we will continue to refine and learn as we implement this new process.

Ending sexual violence is a long and difficult journey, and we want to be part of the solution. Uber is grateful for the leadership and guidance of so many who have paved the way, including RALIANCE and the Urban Institute, whose expertise and dedication were essential to this effort. This taxonomy will help to name and count the human interactions on our platform, and is an important step on the journey to confront this issue meaningfully. At Uber, we know that there are many more steps to come as we strive toward our shared goal of safety and respect for all. We hope you join us on that journey.

P-02160.00009

# INTRODUCTION

- This taxonomy provides a structure or consistent classification of reports of sexual violence.

- Businesses need data-driven information about the problems of sexual misconduct and sexual assault in their own business and across their industry.

- Transparently sharing data drives accountability and may lead to enhanced safety for businesses and the communities they serve.

P-02160.00010



# INTRODUCTION

Sexual harassment, sexual misconduct, and sexual assault are among the defining issues of our time. The personal stories of survivors have prompted massive challenges to cultural norms, social expectations, and political will around these problems, which we collectively refer to in this paper as sexual violence or unwanted sexual experiences. More than one in three women and nearly one in five men have experienced some form of unwanted sexual experience in their lifetime (Smith et al., 2017). Given the prevalence of sexual violence in this country, customer-serving companies like Uber are facing an imperative to collect, measure, and respond appropriately to complaints of a sexual nature to improve safety in their businesses and beyond. These are age-old, albeit complex, societal problems, but today they exist in an entirely new information environment. Mobile phones and social media make it possible and practical to immediately report experiences of sexual violence to companies, and companies can take immediate action to address such situations. This provides a unique opportunity to gain actionable information about sexual violence, respond appropriately to each claim, and transparently report data to further accountability.

The question that businesses must answer is not *if* these issues affect their business, but *how* their business is affected by them and *what* they can do to address it. Finding this answer begins by understanding the scope of the problem, carefully measuring it, evaluating response and prevention efforts, and transparently reporting data to drive accountability. Sexual harassment,[1] sexual misconduct, and sexual assault are complex social problems. Although clear to the person harmed, communication about unwanted sexual experiences is often infused with fear, misunderstanding, judgment, cultural norms, and multiple interacting layers of past experiences related to sex and violence. Gaining useful, actionable information about these complex social problems requires consistent data collection methods, trauma-informed perspectives on these experiences, and structured measurement tools. Without data to understand the various ways sexual violence is manifested in the course of business activities, responses will be limited in their potential to address the problem.

Recognizing the need to better gather and respond to this data, Uber contracted with RALIANCE and the Urban Institute (Urban) to create an improved section of their customer service taxonomy to more effectively categorize reports of sexual harassment, sexual misconduct, and sexual assault. When a report is received by Uber's customer service system, it is evaluated and classified into a structured taxonomy categorizing a variety of customer service and safety issues (see Appendix D). The taxonomy helps define both the outreach and ultimate action taken in response to each report.

P-02160.00011



Collectively, the RALIANCE and Urban team has over forty years of experience working with survivors of sexual violence, advocating for their needs, and studying the impact of sexual violence and responses to it. The team's revision to the taxonomy described here underwent multiple rounds of validation and continuous review and revision, and reflects the best of what we know today about sexual violence data collection and reporting. Urban and RALIANCE believe sharing this data in transparent reporting, while potentially controversial, may lead to establishing trust with communities and improved understanding of and response to the problem of sexual violence.

> THE VALUE OF A CAREFULLY DEVELOPED TAXONOMY FOR REPORTED INCIDENTS OF SEXUAL HARASSMENT, SEXUAL MISCONDUCT, OR SEXUAL ASSAULT IS THAT IT CAN HELP IDENTIFY COMMONALITIES AND TRENDS AMONG REPORTS THAT CAN INFORM THE DEVELOPMENT OF RESPONSE AND PREVENTION EFFORTS.

This is most likely to happen if the taxonomy being used helps to effectively communicate the experience of the person who was harmed.

In this paper, we provide an outline for the development of such a taxonomy. First we provide an overview of the challenge of this project and the opportunity it presents by reviewing the impetus for this project and the context of reporting in the sexual violence field. This is followed by an explanation of our approach explaining why using clear categories for such efforts is important and by an overview of the taxonomy RALIANCE and Urban team developed. Then we detail how we developed the taxonomy, and its purpose and applications for businesses across industries. Finally, we conclude with a review of the benefits, challenges, and considerations for others interested in undertaking a similar project.

It's clear that sexual violence is not unique to any particular mode of transportation, business, or industry. To acknowledge the problem of sexual violence in the diverse spaces it occurs in, and to measure that problem in consistent ways, would be unprecedented in any sector of commerce and could substantially benefit communities in terms of awareness of the problem of sexual violence. The taxonomy and recommendations outlined in this paper aim to encourage such achievements.

---

[1] The use of the term sexual harassment in the context of this taxonomy does not refer to complaints handled by a human resources department, but rather in a customer service setting.

P-02160.00012

# OVERVIEW OF CHALLENGE AND OPPORTUNITY

- Sexual harassment, sexual misconduct, and sexual assault are prevalent experiences in the United States and sometimes overlap with business services.

- Differences in definitions and methodology make statistics about sexual violence from different sources difficult to compare.

- When effort is spent creating consistent and accessible ways for survivors to report sexual violence, the rate of reporting goes up.

- Though it may seem counterintuitive, initial increases in reports of sexual violence indicate increased effectiveness at addressing the problem.

P-02160.00013

## OVERVIEW OF CHALLENGE AND OPPORTUNITY

In the United States, one in five women (21%) and one in 14 men (7%) have experienced an attempted or completed rape in their lifetime. More than one in three women (37%) and nearly one in five men (18%) have had some form of unwanted sexual experience in their lifetime (Smith et al., 2017). A woman in the United States is far more likely to experience an attempted or completed rape than she is to develop breast cancer (which one in eight women experience – or 12%) (Breastcancer.org, 2018). Experiences of sexual harassment are so prevalent that they can be difficult to measure. One recent study (Kearl, 2018) found that 81% of women and 43% of men surveyed had experienced some form of sexual harassment.

Reports of sexual violence can be found in all sectors of society, and the struggle to gather consistent information and data is nearly as common across industries. In the past year, sexual violence in the entertainment sector has been of particular note and helped fuel the explosion of the #MeToo movement and the Time's Up response. Media reports have focused on sexual harassment on the streets of urban areas; sexual assault on cruise ships and airplanes; sexual violence in prisons, jails, and other correctional settings; sexual abuse within youth, club, collegiate, and professional sports; and sexual coercion in government. Each of these sectors has a responsibility (sometimes legally mandated) to gather information about sexual violence that occurs in them, and yet they often meet that responsibility in substantially different ways. Methods of reporting, ways to gather data, and the definitions of acts to be considered sexually violent vary widely both across and within sectors, including between branches of government (U.S. Government Accountability Office, 2016). These discrepancies, coupled with the unique challenges associated with collecting data about sexual violence, create widely varying reports on the true prevalence of sexual violence and a scattered picture of the impact of sexual violence on society and organizations. This scattered picture makes it difficult to gain a thorough understanding of factors that contribute to sexual violence or to assess the effectiveness of efforts to respond to it.

As challenging as gathering data about sexual violence remains today, efforts and systems to do that work have progressed remarkably over the past decades. A clear example of this progress can be seen in the passage of the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act) of 1990. Prior to the Clery Act (Clery Center, n.d.), there was no standardization in the way that colleges and universities collected or disclosed information about sexual violence occurring on their campuses and few incentives beyond moral obligation and good policy to do either.

P-02160.00014





**CAMPUSES THAT REPORT HIGH NUMBERS OF SEXUAL ASSAULT IN CLERY REPORTS TEND TO HAVE INVESTED SIGNIFICANT RESOURCES – FIRST IN MEASURING THE MAGNITUDE OF THE PROBLEM ON THEIR CAMPUS, THEN IN PROVIDING SUPPORT TO STUDENT VICTIMS/ SURVIVORS, MAKING STUDENTS AWARE OF THOSE SERVICES, GIVING CAMPUS LAW ENFORCEMENT SUFFICIENT RESOURCES FOR EFFECTIVE INVESTIGATIONS, AND MAKING SURE THAT STUDENT JUDICIAL AFFAIRS CAN DETERMINE AND ENFORCE APPROPRIATE SANCTIONS ON THOSE WHO COMMIT SUCH CRIMES.**

The Clery Act required colleges and universities receiving Federal financial aid to inform students of campus crime policies and victim resources, to publicly disclose standardized annual campus crime statistics that include rape and dating violence, and to provide timely warnings to students after a campus-based crime has occurred. Despite these improvements in campus reporting, many gaps remain in the information that campuses are required to provide. Only the most criminalized aspects of sexual violence (such as completed or attempted rape) are included in Clery mandated reports, so non-criminalized sexually violent behaviors, such as harassment, coercion, or intimidation, do not make it into the report.

There has been a paradoxical impact of Clery reports on the public reputation of campuses, such that campuses that report a high number of sexual assaults relative to the size of their student population (and relative to other campuses of similar size) are often labeled as "dangerous," while campuses that report low numbers of sexual assault may be labeled as "safe." In reality, sexual assault is an underreported problem across student populations of all sizes. The number of sexual assaults reported on a campus tends to increase with the amount of effort and attention focused on addressing sexual assault on that campus (Boyle, Barr, & ClayWarner, 2017).

These efforts create an environment where student survivors feel empowered to report the crimes against them with the hope that their report will result in a just outcome. Conversely, campuses with low reported numbers of sexual assault (or no reports of assaults at all) in an academic year tend to have made few, if any, significant investments in services for student survivors, awareness of services on campus, or resources for campus law enforcement or student judicial affairs, leading to a lack of student reporting.

P-02160.00015



Republished with permission. Becker, A. (2017, May 10). 89 percent of colleges reported zero incidents of rape in 2015. Retrieved from AAUW.org.

Uber's interest in developing a taxonomy to classify complaints of a sexual nature is similar to efforts described on campuses above, but it also is distinctly different:

- First, Uber is voluntarily addressing such issues on their platform, while colleges and universities are federally mandated to do so.

- Second, unlike Clery Act reporting requirements, Uber's customer service concerns represent not just those acts that rise to criminal behaviors, but all complaints of a sexual nature. Many of the most common unwanted sexual experiences, such as street harassment or sexual intimidation, are not criminalized. While not illegal, these experiences can be profoundly damaging to those who experience them, limiting the harmed person's ability to feel comfortable or safe in the setting in which it occurred. Gathering and responding to reports of non-criminal sexual acts (such as violations of company policy) may benefit their customers, employees, and the communities they work in just as much as doing so with criminalized acts. A comprehensive system of data collection should gather information on both (the figure on the next page shows examples of such criminal and non-criminal behaviors).

- Finally, the interaction between Uber and its users is quite different from a university's interaction with its students. Universities have extensive, years-long interactions with their students, while Uber has brief, episodic interactions with its users.

P-02160.00016



Still, despite distinctions, it can be helpful to think of how these issues affect a business in the context of how they have affected other settings.

## EXAMPLES OF HARMFUL BEHAVIORS

- Staring or leering
- Flirting
- Unwanted communication (phone calls, emails, etc.)
- Sexually suggestive comments or gestures
- Sexually explicit comments or gestures
- Requesting a hug, kiss, or other
- Physical contact

## EXAMPLES OF CRIMINAL BEHAVIORS

- Violent threats
- Refusing to allow someone to exit a vehicle (false imprisonment)
- Unwanted touch of a sexual body part
- Unwanted penetration of the mouth, vagina, or anus

The history of the Clery Act, its impact on campus reporting, and its effect on campus reputations can provide a valuable lesson for businesses who are considering gathering and publishing information about the impact of sexual violence on their work. Sexual assault is an underreported crime (National Research Council, 2014), and non-criminalized acts of sexual violence often go entirely unacknowledged. Creating structured systems to count and categorize experiences of sexual harassment, sexual misconduct, and sexual assault can result in helpful information that businesses can use to thoughtfully examine their current practices and share publicly, particularly in industries where addressing sexual violence is not yet common.

P-02160.00017

# WHY CLEAR CATEGORIES ARE IMPORTANT

- Clear categories for reports help businesses make informed decisions.

- Clear categories lead to consistent information, which businesses need to understand how their work is impacted by sexual violence.

P-02160.00018



## WHY CLEAR CATEGORIES ARE IMPORTANT

We need a method to consistently and accurately categorize experiences of sexual violence to understand the scope and nature of the problem. The challenge of any taxonomy of social interactions is to classify the personal experiences of participants in an interaction into clear categories that multiple people with different backgrounds, biases, and perspectives can quickly and consistently apply to any given situation. These categories must not overlap (be mutually exclusive) and yet be applicable to a vast array of possible scenarios (be collectively exhaustive).

If categories overlap and are not mutually exclusive, then observers will classify incidents in an unstructured way, and some may classify an interaction in one way while others classify the same incident in a different way. The different decisions that observers make about overlapping categories will be based on their individual biases, instead of being grounded in the data. In the end, the count of the number of incidents in any particular category will be inaccurate. Likewise, if categories are not collectively exhaustive, then some relevant interactions may not be counted at all, or be misclassified just because there is no logical category in which to put them in.

Another consideration around clarity is ensuring that this taxonomy, in particular, does not include experiences of a non-sexual nature. Instead, we developed categories that were only filled with experiences of sexual harassment, sexual misconduct, or sexual assault, and other kinds of non-sexual experiences (threatening or not) were channeled into other parts of Uber's larger customer support system.

P-02160.00019



# SPECIFIC VS. NON-SPECIFIC CATEGORIES

Below is an example of two categories that have not yet been made specific, demonstrating why specificity is necessary for clarity in the taxonomy and why definitions may expand over time to encompass scenarios that had not been considered at the time of their creation. According to the non-specific definitions, the quoted report could fit into either "Flirting" or "Comments About Appearance." Using the specific definitions, we see it clearly fits under "Comments about Appearance."

**USING THESE CATEGORIES, WHERE WOULD THIS REPORT FIT?**

**"MY DRIVER KEPT SAYING I WAS PRETTY. IT MADE ME FEEL AWKWARD."**

|  | FLIRTING | COMMENTS ABOUT APPEARANCE |
|---|---|---|
| **NON-SPECIFIC** | Someone makes verbally suggestive comments to user, in a way that makes them uncomfortable. | Someone makes uncomfortable comments on a user's appearance. |
| **SPECIFIC** | Someone makes verbally suggestive comments to the user about engaging in romantic or non-romantic activities. This also includes non-verbal, suggestive flirting, including becoming physically close to a person in a way the user felt was sexual or flirtatious. | Someone makes uncomfortable comments on the user's appearance. This includes both disparaging and complimentary comments. |

P-02160.00020

# TAXONOMY OVERVIEW

- There are 21 categories of reports, each with specific behavior-based definitions.

- Reports that could fit into multiple categories because multiple behaviors are identified are assigned based on the most severe behavior described.

P-02160.00021



# TAXONOMY OVERVIEW

The final taxonomy classifies acts of sexual violence into two overarching categories – sexual assault and sexual misconduct – which are further stratified by sub-categories and tertiary categories that correspond to behaviorally specific definitions (see Appendix B for definitions currently in use by Uber, the following section for details on how we developed the taxonomy, and Appendix D for how the Uber customer service system works). Defining specific categories of sexual misconduct and assaultive behaviors using behaviorally specific definitions is in line with best practices related to measuring sexual victimization (Basile, Smith, Breiding, Black, & Mahendra, 2014; Cook, Koss, Gidycz, Murphy, 2011; Fisher, 2009).

In total, the taxonomy includes 21 categories of sexual misconduct and sexual assault behaviors, which agents select from when categorizing reports of unwanted sexual experiences received from users through their customer service system. Each category corresponds to an initial type of response, which can become more involved as agents gather more information about the report. This list of categories is meant to be both mutually exclusive and collectively exhaustive; meaning, all possible sexually related incidents reported to Uber have a clear category and each report is defined by only a single category. Reports communicating more than one unwanted sexual experience are categorized based on the most severe experience described in the report.



Asking a person if they had been "raped" is not a straightforward question. It involves concepts and experiences that vary substantially from person to person, and the decision to call an experience a "rape" raises complex questions and emotions, including whether one is willing or able to label themselves as a victim (Donde, Ragsdale, Koss, Zucker, 2018). As such, asking someone about rape leads to subjective answers to the question that can vary from person to person.

Instead, the question, "Did someone penetrate your vagina or anus when you didn't want them to?" can be less emotionally difficult to respond to. It is a clear question that describes a specific action, without putting a label on the experience. This type of question is called "behaviorally specific," and such questions are standard in rigorous research about sexual violence (Cook, Koss, Gidycz, Murphy, 2011).

Sexual misconduct behaviors are non-contact unwanted experiences, and include any reported behavior of a sexual nature that is without consent or has the effect of threatening or intimidating a user against whom the conduct is directed. In this taxonomy, the sexual misconduct category encompasses behaviors which are usually described as sexual harassment. Non-contact categories include the following behaviors:

- staring or leering
- asking personal questions
- comments about appearance
- flirting
- explicit gestures
- explicit comments
- displaying of indecent material
- indecent photography/video without consent
- soliciting a sexual act
- masturbation or indecent exposure
- verbal threat of sexual assault

Each of these above categories is described further by a behaviorally specific definition, along with examples where appropriate. For instance, under "asking personal questions," the agent would see this clarifying definition:

SOMEONE ASKS SPECIFIC, PROBING, AND PERSONAL QUESTIONS OF THE USER. THIS WOULD INCLUDE QUESTIONS ABOUT THE USER'S PERSONAL LIFE, HOME ADDRESS, CONTACT INFORMATION (E.G. PHONE, EMAIL, SOCIAL MEDIA), OR ROMANTIC OR SEXUAL PREFERENCES.

Sexual assault behaviors include any reported attempted or completed physical contact of a sexual nature, as described by the reporter. This category includes:

- attempted touching of a non-sexual body part
- attempted kissing of a non-sexual body part
- attempted touching of a sexual body part
- attempted kissing of a sexual body part
- non-consensual touching of a non-sexual body part
- non-consensual kissing of a non-sexual body part
- attempted non-consensual sexual penetration
- non-consensual touching of a sexual body part
- non-consensual kissing of a sexual body part
- non-consensual sexual penetration

Each of these above categories is further defined using behaviorally specific language. For example, under attempted touching of a non-sexual body part, this definition appears:

SOMEONE ATTEMPTED TO TOUCH, BUT DID NOT COME INTO CONTACT WITH, ANY NON-SEXUAL BODY PART (HAND, LEG, THIGH) OF THE USER, AND THE USER PERCEIVED THE ATTEMPT TO BE SEXUAL.

P-02160.00023

# MIX-AND-MATCH EXERCISE

Match the text of the report on the left with the appropriate category on the right. Remember that reports describing multiple experiences are categorized based on the MOST severe experience. For the purposes of categorization, assume that categories are listed in increasing order of severity. For example: category D (Flirting), can be considered more severe than categories A, B, or C above it.

1. "My driver told me to smile, said I would be prettier if I smiled."

2. "The customer got into my passenger seat and we had a pleasant conversation for most of the ride. When I arrived at his destination, he put his hand on my thigh and then asked me to come upstairs with him to have a drink."

3. "Two customers got into the back seat; they both seemed very drunk. They immediately started kissing and groping each other. At one point I thought I heard the sound of a zipper, and while at a stoplight, I looked back and saw that one passenger had pulled out his penis and the other was going down on him."

4. "My driver asked me a lot of questions, like where I went to university, what I liked to do, and if he was driving me home or not. He asked me if I have a boyfriend. I told him yes, and he asked me if my boyfriend and I had gone 'all the way' yet or not. He asked me if I thought I would like that."

5. "The customer got into my passenger seat and was looking at his phone the whole ride. I could see and hear he was watching porn. At the end of the ride he looked at me and asked if I wanted to make an extra fifty bucks and pointed at his phone."

6. "My driver was very fast and aggressive in traffic, and I complained to him about it. He didn't say anything back, but I could tell he was really angry the whole ride. At the end of the ride, he said that I lived in a nice house, and that if I didn't give him five stars, I could get raped tonight."

a. Staring or Leering

b. Comments or Gestures > Asking Personal Questions

c. Comments or Gestures > Comments About Appearance

d. Comments or Gestures > Flirting

e. Comments or Gestures > Explicit Gestures

f. Comments or Gestures > Explicit Comments

g. Displaying Indecent Material

h. Indecent Photography / Video Without Consent

i. Soliciting Sexual Act

j. Masturbation / Indecent Exposure

k. Verbal Threat of Sexual Assault

l. Attempted Touching: Non-Sexual Body Part

m. Attempted Kissing: Non-Sexual Body Part

n. Attempted Touching: Sexual Body Part

o. Attempted Kissing: Sexual Body Part

p. Non-Consensual Touching: Non-Sexual Body Part

q. Non-Consensual Kissing: Non-Sexual Body Part

r. Attempted Non-Consensual Sexual Penetration

s. Non-Consensual Touching: Sexual Body Part

t. Non-Consensual Kissing: Sexual Body Part

u. Non-Consensual Sexual Penetration

These reports are fictitious, but informed by the authors' experience reviewing actual reports.

ANSWER KEY
1C / 2P / 3J / 4F / 5I / 6K

# HOW DID WE DEVELOP THE TAXONOMY?

- This taxonomy was created by first developing a conceptual framework and then using that framework to categorize over five hundred real user reports covering sexual misconduct and sexual assault.

- The taxonomy follows best practices in measuring unwanted sexual experiences by focusing on specific behaviors.

- This taxonomy was created using a dynamic process, and we expect that this taxonomy will continue to grow and improve over time.

P-02160.00025



# HOW DID WE DEVELOP THE TAXONOMY?

Staff from RALIANCE and Urban worked together to create the sexual harassment, sexual misconduct, and sexual assault taxonomy by:

- Reviewing a total of 362 reports made within the United States and Canada across three sets of randomly selected reports spanning the spectrum of unwanted sexual experiences (including behaviors like flirting, asking rude questions, and making inappropriate comments) categorized as either sexual misconduct or sexual assault, and identifying and coding common behaviors across reports. Personally identifying information, including potential identifiers of the people or places involved in these reports, was removed before being provided to RALIANCE and Urban team.

- Creating initial categories for the taxonomy based on the behaviors observed in these reports, as well as our own understanding of sexual violence. We updated the taxonomy categories continually throughout the coding process.

- Validating the taxonomy categories using two additional sets of randomly selected samples of reports (n=200 reports total), using the newly developed sexual misconduct and assault taxonomy.

We continuously reviewed, revised, and updated the taxonomy throughout the five rounds of coding and validation based upon the behaviors we observed in the reports. This process allowed us to refine the taxonomy over time, increasing its specificity as more and more data were applied to it, as well as broadening categories, or creating new ones, when the data indicated that was necessary. The final product represents a mutually exclusive and collectively exhaustive taxonomy to categorize these sexual violence reports. The wording and descriptions used to define and contextualize the elements of the taxonomy were developed in alignment with best practices (Cook, Koss, Gidycz, Murphy, 2011; Fisher, 2009) in measuring and categorizing experiences of sexual violence by using specific, behaviorally focused identifiers.

Notably, the multiple behaviors contained in the taxonomy can occur simultaneously during a single event, and are therefore not mutually exclusive in that regard; however, each report is assigned to only one category in the taxonomy. Each report is classified by the most severe behavior documented in it in order to prompt the most appropriate response to the report.

Our development process was guided by application and implementation concerns impacting the way the taxonomy was structured and defined. For instance, from the start, we understood the importance of defining each category with behaviorally specific language. This ensures definitions used

P-02160.00026

limited subjective decision-making, were universally understandable, and produced consistent results over time. In line with best practices in the sexual assault measurement field, we avoided language such as "street harassment," opting instead for specific definitions that centered on the behaviors described such as, "Someone makes uncomfortable comments on the user's appearance. This includes both disparaging and complimentary comments." Behaviorally specific language (Cook, Koss, Gidycz, Murphy, 2011; Fisher, 2009) is important not just for how the taxonomy is defined, but also for the training of staff. Definitions of this kind make the training process simpler and less vague and subjective.

In developing the taxonomy, we encountered three specific challenges to be solved. First, it became clear during the coding phase of taxonomy development that there would be unique reports throughout the life of this taxonomy that we would not be able to identify and plan for at the outset. We sought to include a collectively exhaustive list of possible sexual misconduct and assault behaviors, but we also understand that there will be reports that may not fit exactly into the categories as they are currently defined. For that reason, the taxonomy is a living document – open to revision as deemed appropriate, though revisions might be narrow so that the taxonomy does not lose its behaviorally specific focus, become overly granular, or prevent comparisons being made over time. Toward that end, revisions may involve expanding a category to include additional behavioral examples if something not previously captured comes up repeatedly.

Second, the lack of detailed information contained in some reports presents challenges. Several reports referenced vague transgressions, such as "(s)he harassed me," without providing further detail of the behaviors that occurred. The initial information provided in a report may not be sufficient to accurately categorize that report. For that reason, we also included a category to identify

the report as too vague, triggering follow-up procedures to better understand and eventually appropriately categorize the report. This procedure is intended to ensure that reports are categorized and responded to correctly.

A third implementation challenge was the need to balance the necessary granularity in the taxonomy and comprehensiveness of the categories with the accessibility of the system for agents and the feasibly of its implementation. It could be unduly challenging to find the correct category if the taxonomy included too fine a detail, ultimately running counterproductive to Uber's goal of accurately identifying and appropriately responding to every report. We collapsed some of the categories defined in our first draft (see Appendix A) of the taxonomy to maintain a balance between these two focuses and create a streamlined taxonomy that would contain the same level of detail, but in a more accessible format. This format also allows for more straightforward analysis on the types of reports. With overly specific categories, the extent of experiences occurring could be difficult to track over time.

While this taxonomy is comprehensive and represents the best information we have today regarding sexual violence reported by users of the Uber platform, it is not intended to be a static document. We found ways to continue to improve this taxonomy the more we used it, and we anticipate Uber will continue to refine and update this taxonomy as their data collection continues and expands, adding relevant behaviors not previously identified and refining the descriptive prompts for the taxonomy's various categories. See Appendix A for a fuller description of our method of creating this taxonomy.

P-02160.00027

# BEHAVIORALLY SPECIFIC QUESTIONS EXERCISE

## IS THIS A BEHAVIORALLY SPECIFIC QUESTION?

1. Was the person's behavior inappropriate?                                          YES/NO

2. Did the person make comments about your appearance that you
   were uncomfortable with?                                                          YES/NO

3. Were you touched on your breast or genitals without your permission?              YES/NO

4. Were you assaulted or raped?                                                      YES/NO

5. Are you a victim of domestic violence?                                            YES/NO

6. Has your partner ever hit you hard enough to cause pain or to leave a bruise?     YES/NO

7. Does your partner limit your ability to contact your friends or family?          YES/NO

8. Were you afraid that the other person would hurt you if you didn't say
   what they wanted to hear?                                                         YES/NO

9. Were you stalked by your partner?                                                 YES/NO

10. Does your partner know where you've been even though you haven't told them?      YES/NO

ANSWER KEY
1N / 2Y / 3Y / 4N / 5N / 6Y / 7Y / 8Y / 9N / 10Y

P-02160.00028

# CONSIDERATIONS FOR SEXUAL VIOLENCE TRANSPARENCY PUBLICATIONS

- Statistics about sexual violence are only truly meaningful in the context of the way those numbers were generated.

- Transparency in every aspect of how a statistic is generated is the responsible way to share such information with the public.

- All publications should categorize issues as users have reported them.

- Behaviorally specific wording should be used in transparency publications to enhance clarity in the reporting, just as it is used in the taxonomy.

- Transparency publications can be used to educate consumers about the ways a business responds to the problem of sexual violence.

P-02160.00029



## BENEFITS & CHALLENGES

Any business or institution that seeks to be transparent in its relationship with the communities it serves by publishing a report about sexual violence needs to consider not only the information it wants to report, but also how the numbers it reports will be compared to numbers from other businesses and institutions. As has been made evident with reporting for campuses and universities, even in an environment of legislatively enforced standardization of reporting, individual institutions can vary dramatically in their efforts to comply with existing requirements, which can generate significantly different results with very different impacts on public perception. If an industry uses a single taxonomy to document the scope of unwanted sexual experiences within it, then the information is more easily understood by businesses and the public alike.

For a business trying to take responsible action, the best way to approach such problems is to be as transparent as possible about every aspect of the process by which the numbers being reported are collected. Although such transparency cannot prevent controversy, transparency forms the basis for productive dialogue and narratives formed in response to controversy. Transparency is essential to establishing trust with the communities a business serves. As seen in campus reporting, "zero rapes on campus" may be a number that immediately sounds good, but after brief reflection, does little to encourage the trust a campus seeks to establish with its community, given potential doubt surrounding the accuracy of the report.

## CONSIDERATIONS

How, then, can a business that wants the public to trust that it is sincere and honest in its efforts to address sexual violence communicate those values in a transparency publication? The simple answer is to be transparent. We believe the following elements of a report are needed to communicate those qualities:

- **Accept reports at face value when counting and categorizing them.** Agents who respond to these reports should categorize each report they receive without subjective assessment of the credibility of the report. There should be no discretion to ignore a report. While businesses may have a need to investigate incidents beyond receiving a report, each and every report should be categorized as part of this process, and responded to according to the nature of the report. This helps users to feel that reporting is safe and meaningful – knowing that their report will not be immediately discredited by an agent, and followed up on appropriately. **It is important to remember that the most threatening experience after the violence itself is not being**

P-02160.00030

believed about the violence experienced. As such, ensuring that reports will be acknowledged creates a system that is responsive to the needs of users without expanding any harm they have experienced.

- **Define incidents in terms of specific behaviors, not abstract words.** The concepts and experiences that come to mind when hearing the word "rape" can vary substantially from person to person, and the decision to call an incident "a rape" begs complex questions that most businesses and institutions are not in a position to address. However, if an agent asks themselves the question, "Did someone penetrate the customer's vagina or anus without their permission?" when classifying an incident, then this is not complex. It is a clear question that describes a specific action. It does not ask an agent receiving a report to assign a legalistic, value-laden label to an incident. Such a question simply asks what happened.

  This type of question is called "behaviorally specific," and such questions are a standard in rigorous research about sexual violence. The taxonomy discussed in this paper was developed with specific behaviors in mind and uses behaviorally specific prompts in its definitions. We recommend that behaviorally specific questions and/or prompts be used by any business seeking to understand the impact of sexual violence on consumers of its services, and that such information be reported in a similar manner.

- **Be explicit about how data are gathered and received.** A complex business may have multiple points of contact with consumers and the public through which they may learn about incidents of sexual violence. These may include in-app messages and reports, phone calls, reviews on websites, social media posts, news reports, police investigations, and lawsuits. An honest transparency effort will be specific about which sources of information a business included in its transparency publication.

- **Show how numbers were determined.** Information about sexual violence is routinely scrutinized by the media, researchers, policymakers, and the general public. Corporate transparency publications risk being undeservedly criticized or mis-characterized if they sacrifice sufficient background information about the process of arriving at the numbers in their publication and statistics used. Companies must contend with a common perception that they are acting in bad faith or prioritizing their own interests when communicating about sexual violence. Transparency about how data are processed enhances the credibility of a publication.

- **Provide context to the numbers by relating them to the scope of the business's reach.** Transparency about the size and scope of a business's operations lends context and credibility to its transparency publication. To borrow a non-business example for illustrative purposes, a small private college of 2,000 students might reasonably receive fewer than 10 reports of sexual assault in a given academic year (a number aligned with known rates of sexual assault and reporting among college students) (Fisher, Cullen, & Turner, 2000). The same could not be said of a large public university with a student population of 40,000 or more. Such a reported number would simply not be believable, and likely say more about that university's reporting infrastructure and student services than the amount of sexual violence experienced by its students.

- **Be descriptive about the response process.** There are many ways a business might practically respond to acts of sexual harassment, sexual misconduct, and sexual assault, and many additional impractical ways the public may expect or assume a business might respond. It is important to detail the process by which a business responds to such incidents.

P-02160.00031



# KEY TRANSPARENCY PUBLICATIONS CONSIDERATIONS

☐ **STATEMENT OF ASSUMPTIONS.**

What assumptions go into the process of categorization?

☐ **SPECIFICITY OF WORDING.**

Give samples of tools used to gather information from both consumers and employees to clarify how items are worded. What thoughts and decisions went into these tools?

☐ **DESCRIPTION OF PROCESS.**

Is the publication clear about the different kinds of data that were available, what data were used, and how those data were processed to generate statistics and other information? How did the business get its information and what did it do with it?

☐ **DESCRIPTION OF RESPONSE.**

What are the different ways that the business responds to reports of incidents? How did it respond over the term of the transparency publication? How will the data help the business reevaluate or improve its procedures for responding to these types of reports?

P-02160.00032

# CONCLUSION

The threat of sexual harassment, sexual misconduct, and sexual assault inform the daily choices of people around the world. Businesses across every industry should take note of this prevalent issue and take action to improve the safety of their practices. One way to begin is to develop a consistent structured system for collecting, understanding, and reporting on ways sexual violence manifests in business practices. Taxonomies of this kind provide actionable information to prompt the most appropriate and helpful response a business can provide to the person who was harmed. If used effectively, they also can help businesses and communities understand that sexual violence is a widespread social problem potentially impacting many industries in similar ways.

**THIS HELPS TO FOCUS CONVERSATIONS AND EFFORTS ON THE ROOT CAUSES OF SEXUAL VIOLENCE, WHICH BECOME EASIER TO IDENTIFY AS INCREASING AMOUNTS OF DATA ABOUT THE PROBLEM ARE COLLECTED IN CONSISTENT WAYS.**

The best policies and practices to effectively address and prevent sexual violence are rooted in a broad view of the problem that is informed by the experiences of individual survivors, but not limited to those experiences in its scope.

**CONSISTENT TAXONOMIES, CONSISTENT DATA COLLECTION, AND THE PUBLIC DISCLOSURE OF THE INFORMATION LEARNED PROVIDES AN OPPORTUNITY FOR BUSINESSES TO BE TRANSPARENT ABOUT THE WAY SEXUAL VIOLENCE IMPACTS THEIR BUSINESS.**

We believe that this taxonomy and the process of its creation can be useful to any business that is impacted by sexual violence. Sexual violence is not unique to ride-sharing platforms, transportation, or any business or industry. This paper seeks to inform businesses on the impact of the problem of sexual violence and provide guidance on how to best categorize reports of such experiences. Meaningful collection of data on sexual violence is a real challenge, but it is necessary to inform conversations on the existence of and responses to sexual violence in diverse contexts. The consistent collection, categorization, and reporting of such data is paramount to progress on ending sexual violence, and it is our hope that this project is a meaningful step to progress on that goal.

P-02160.00033

# REFERENCES

Basile, K. C., Smith, S. G., Breiding, M. J., Black, M. C., & Mahendra, R. (2014). *Sexual violence surveillance: Uniform definitions and recommended data elements: Version 2.0.* Retrieved from the Centers for Disease Control and Prevention: https://www.cdc.gov/violenceprevention/pdf/sv_surveillance_definitionsl-2009-a.pdf

Boyle, K. M., Barr, A., & Clay-Warner, J. (2017) The effects of feminist mobilization and women's status on universities' reporting of rape. *Journal of School Violence*, 16, 317-330. doi: https://doi.org/10.1080/15388220.2017.1318580

BreastCancer.org. (2018). *U.S. breast cancer statistics.* Retrieved from BreastCancer.org

Clery Center. (n.d.). *Summary of the Jeanne Clery Act.* Retrieved from https://clerycenter.org/policy-resources/the-clery-act/

Cook, S.S., Koss, M.P., Gidycz, C., & Murphy, M. (2011). Emerging issues in the measurement of rape victimization. *Violence Against Women*, 17, 201-218. doi: 10.1177/1077801210397741

Donde, S. D., Ragsdale, S. K. A., Koss, M. P., & Zucker, A. N. (2018). If it wasn't rape, was it sexual assault? Comparing rape and sexual assault acknowledgment in college women who have experienced rape. *Violence Against Women.* doi: 10.1177/1077801217743339

Fisher, B. S. (2009). The effects of survey question wording on rape estimates: Evidence from a quasi-experimental design. *Violence Against Women*, 15, 133-147. doi: https://doi.org/10.1177/1077801208329391

Fisher, B. S., Cullen, F. T., & Turner, M. G. (2000). *The sexual victimization of college women.* Retrieved from the National Criminal Justice Reference Service: https://www.ncjrs.gov/pdffiles1/nij/182369.pdf

Kearl, H. (2018). *The facts behind the #MeToo movement: A national study on sexual harassment and assault.* Retrieved from Stop Street Harassment: http://www.stopstreetharassment.org/wp-content/uploads/2018/01/Full-Report-2018-National-Study-on-Sexual-Harassment-and-Assault.pdf

National Research Council. (2014). *Estimating the incidence of rape and sexual assault.* Available from The National Academies Press: https://www.nap.edu/catalog/18605/estimating-the-incidence-of-rape-and-sexual-assault

Smith, S. G., Chen, J., Basile, K. C., Gilbert, L. K., Merrick, M. T., Patel, N., ... Jain, A. (2017). *The National Intimate Partner and Sexual Violence Survey (NISVS): 2010-2012 state report.* Retrieved from the Centers for Disease Control and Prevention: https://www.cdc.gov/violenceprevention/pdf/NISVS-StateReportBook.pdf

U.S. Government Accountability Office. (2016, July). *Sexual violence data: Actions needed to improve clarity and address difference across federal data collection efforts* (GAO-16-546). Retrieved from https://www.gao.gov/assets/680/678511.pdf

P-02160.00034



# ABOUT THE ORGANIZATIONS

## RALIANCE

RALIANCE partners with a wide range of organizations to improve their cultures and create environments free from sexual harassment, misconduct and abuse. Every day, RALIANCE helps leaders establish safe workplaces and strong communities by advancing research, influencing policy, and supporting innovative programs. RALIANCE is based in Washington, DC and combines decades of experience and resources from three leading national sexual violence prevention organizations into a single, unified force.

RALIANCE Business's strategic and forward-thinking experts provide customized, data-driven solutions to help prevent and respond to sexual misconduct in the workplace and across all business operations. We partner with organizational leaders to create cultures that improve the safety of employees, customers, and organizations.

## URBAN INSTITUTE

For more than five decades, the Urban Institute has been a trusted source for unbiased, authoritative insights that inform consequential choices about the well-being of people and places in the United States. They are a nonprofit research organization that believes decisions shaped by facts, rather than ideology, have the power to improve public policy and practice, strengthen communities, and transform people's lives for the better. Urban Institute experts diagnose current challenges and look ahead to identify opportunities for change. The Urban Institute's Justice Policy Center is committed to developing evidence related to criminal justice challenges and has a long history of examining sexual assault, domestic violence, and other victimization experiences for the US Department of Justice, state governments, and local jurisdictions. Notably, Urban published the first national documentation of payment practices for sexual assault medical forensic exams and an assessment of the extent to which survivors are billed for such exams and the first national documentation of state departments of corrections' responses to the Prison Rape Elimination Act.

P-02160.00035

# ABOUT THE AUTHORS

JULIA DURNAN is a policy analyst at the Justice Policy Center at the Urban Institute. She provides research support to a range of projects related to justice policy reform and victimization. At Urban, her research focuses on comprehensive criminal and juvenile justice reforms, including work on the Justice Reinvestment Initiative, the American Civil Liberties Union 50 state blueprint project, and the Youth First initiative. She is currently pursuing a Master of Public Affairs at the Lyndon B. Johnson School at the University of Texas, and graduated from Duke University in 2015 with a BA with distinction in public policy.

CHAD SNIFFEN, MPH, is the Research and Evaluation Director for RALIANCE. He was the Online Resource Coordinator for the National Sexual Violence Resource Center from 2015-2021. He has worked or volunteered in the movements against sexual and domestic violence as a prevention educator, victim advocate, researcher, women's self-defense instructor, and board member since 1999. Prior to RALIANCE, he worked at the California Coalition Against Sexual Assault for eight years focusing on technical assistance to rape prevention education programs and building the PreventConnect online community of practice. He has also worked for community rape crisis and domestic violence programs in California and Arizona, as well as campus prevention programs at the University of Arizona and the University of California, Davis. He holds a Master of Public Health degree from the University of Arizona.

JANINE ZWEIG, PH.D., is Associate Vice President and a Senior Research Fellow in the Justice Policy Center at Urban Institute. She conducts both theoretical research and program and policy evaluations related to sexual violence and victimization, intimate partner and dating violence, substance use, and criminal justice policies. She has examined several provisions of the Violence Against Women Act and the Prison Rape Elimination Act. Before graduate school, Dr. Zweig served as a volunteer/intern for a Women-In-Crisis program. This shelter for battered women serves five rural counties, and she participated in legal and child advocacy, case management, and hotline operation. She holds a Ph.D. in Human Development and Family Studies from the Pennsylvania State University.

P-02160.00036



# APPENDIX A:

## DEVELOPING THE SEXUAL MISCONDUCT AND VIOLENCE TAXONOMY

RALIANCE and the Urban Institute (Urban) created the sexual misconduct and violence taxonomy. We relied upon data from past Uber reports categorized as sexual misconduct or sexual assault to define the scope of behaviors to include in the new revised taxonomy. Review of these reports helped us clarify distinctions between categories, with the ultimate goal of making a mutually exclusive and collectively exhaustive taxonomy.

Notably, the behaviors contained in the taxonomy can occur simultaneously during a single event and are therefore not mutually exclusive in that regard; however, each report is assigned to only one category in the taxonomy. In keeping with best practices in the field, each report is classified by the most severe behavior, prompting the most comprehensive response.

To create the most representative sample of past reports from throughout the United States and Canada, Uber provided three sets of randomly selected reports marked under their current categories of sexual assault or sexual misconduct between January and September 2017. Random selection was achieved by randomly assigning numbers to reports and then choosing the number needed for each sample.

In our first round of reviewing reports, three staff teams reviewed 150 reports (in which personally identifying information had been removed), coding them for 12 pre-defined behaviors:

- verbal harassment
- physical harassment
- staring/leering
- exposure
- masturbation
- non-consensual penetration

- attempted penetration
- soliciting further interaction
- unwanted encounter while impaired
- witness/third parties
- isolation/refusal to leave.

P-02160.00037

We also included a category for "no sexual violence," to capture those reports that we identified as incorrectly assigned to the sexual assault or misconduct categories.

We compared across coders once the first round of review was completed and identified sources of agreement and disagreement with the initial coding schema. This process revealed specific behaviors that had not been initially included in our schema specific to the Uber environment, and essential for inclusion, such as indecent photography or video recording of a person by positioning a camera at a specific angle (commonly referred to as "up-skirting").

The schema was revised to include the specific behaviors for subsequent rounds of coding and, at this point, we developed the first draft of the taxonomy. This initial draft taxonomy included four large categories, each containing four levels of severity as defined by specific behaviors identified in the first round of coding. The four categories were:

- communications of a sexual nature

- sexual comments

- non-contact/verbal interactions

- sexual contact

Next, the same three coding teams completed two more rounds of coding (first 100 reports, then 112 reports for a total of 212 reports) using the first draft of the taxonomy. The teams met after coding each set of reports to compare how individuals classified each report within the draft taxonomy and identify sources of agreement and disagreement. We used this information to update the initial taxonomy draft with clarifications of specific behaviors. This second round of review was critical in identifying edge cases falling between the different categories. For instance, the distinction between flirting and soliciting further contact through asking someone for their contact information was a source of disagreement among the coding teams. To clarify those categories, we added more specific descriptions of common flirting

behaviors to the taxonomy definitions. We also identified additional categories of behavior that had not been included in our first taxonomy draft. For example, we incorporated asking for exchange of money for sex into the taxonomy based on the second round of coding, identifying this behavior sufficiently distinct as to warrant its own category.

We then finalized a recommended taxonomy and shared it with Uber to solicit feedback on usability and feasibility. See Table A.1 for the full proposed taxonomy.

P-02160.00038

## TABLE A.1: PROPOSED TAXONOMY

### NON-VERBAL, NON-CONTACT SEXUAL INTERACTION

Reporter was stared or leered at

Reporter saw pornography or other sexual images inside the vehicle

Reporter saw sexually suggestive gestures

Someone else came close to the reporter in a sexual or flirtatious way

Reporter saw simulated sex acts, but did not see exposed genitals

Reporter was followed after feeling sexually threatened

A picture or video was taken of the reporter's sexual body part (down shirt, up skirt, etc.)

Reporter was not allowed to exit the vehicle, or someone else refused to leave, after feeling sexually threatened

Reporter saw someone engaging in sex acts (including masturbation), or saw exposed genitals

### SEXUAL COMMENTS

Reporter was talked to about sex or heard sexual comments directed at other people

Reporter was flirted with or heard unwanted comments on their appearance

Reporter heard non-threatening sexual comments, or sexual questions directed at them

Reporter heard threatening sexual comments, or talk of sexual violence directed at other people

Reporter wrote that they were sexually harassed

Reporter heard explicit threats of sexual violence directed at them

### REQUESTS AND OFFERS OF A SEXUAL NATURE

Reporter was asked for their contact information or other personal details after hearing sexual or flirtatious comments

Reporter was asked for a hug or other non-sexual contact after hearing sexual or flirtatious comments

Reporter was asked to go out on a date, have drinks, or engage in other activities

Reporter received unwanted communication (texting, calls) after hearing sexual or flirtatious comments

Reporter was asked for a kiss, displays of nudity, sex, or contact with a sexual body part (breast, genitals, etc.)

Reporter was offered money or favors in exchange for sex, nudity, or contact with a sexual body part (breast, genitals, etc.)

### UNWANTED SEXUAL CONTACT

Someone kissed, or attempted to kiss the reporter on their hand or cheek

Someone touched, or attempted to touch the reporter on a non-sexual (leg, arm, hand, head, etc.) or unspecified body part after hearing sexual or flirtatious comments

Someone kissed, or attempted to kiss the reporter on their mouth or other non-sexual body part (not including their hand or cheek)

Someone touched or kissed, or attempted to touch or kiss, the reporter on a sexual body part (breast, genitals, etc.)

Reporter wrote that someone in the vehicle was a rapist, or had sexually assaulted someone other than the reporter

Reporter wrote that they were raped or sexually assaulted

Someone attempted to penetrate the reporter's mouth, anus, or vagina with a body part or object

Someone penetrated the reporter's mouth, anus, or vagina with a body part or object, or said they were raped

P-02160.00039

## TABLE A.2: IMPLEMENTED TAXONOMY

The central feedback was that the taxonomy might be too complex for agents to accurately assess and assign a report consistently. RALIANCE/Urban team and representatives from Uber met several times to discuss edits and efficiencies to the recommended taxonomy, with the goal to increase usability and consistency for the large number of agents who categorize reports in the Uber system. We reached agreement on an updated taxonomy, which sought to balance the usability concerns with the need to maintain a comprehensive and behaviorally specific taxonomy. Some categories were collapsed or reorganized in this updated taxonomy (see Table A.2).

### SEXUAL MISCONDUCT

Staring or Leering

Comments or Gestures > Asking Personal Questions

Comments or Gestures > Comments About Appearance

Comments or Gestures > Flirting

Comments or Gestures > Explicit Gestures

Comments or Gestures > Explicit Comments

Displaying Indecent Material

Indecent Photography Without Consent

Soliciting Sexual Contact

Masturbation / Indecent Exposure

Verbal Threat of Sexual Assault

### SEXUAL ASSAULT

Attempted Touching: Non-Sexual Body Part

Attempted Kissing: Non-Sexual Body Part

Non-Consensual Touching: Non-Sexual Body Part

Non-Consensual Kissing: Non-Sexual Body Part

Attempted Touching: Sexual Body Part

Attempted Kissing: Sexual Body Part

Non-Consensual Touching Sexual Body Part

Non-Consensual Kissing: Sexual Body Part

Attempted Non-Consensual Sexual Penetration

Non-Consensual Sexual Penetration

P-02160.00040

## VALIDATING THE SEXUAL MISCONDUCT AND VIOLENCE TAXONOMY

The final step was validating the new taxonomy. Five Uber agents who regularly categorize reports underwent training on the updated taxonomy, and used the taxonomy to categorize two rounds of 100 randomly selected reports each. The RALIANCE/Urban team also completed a set of coding during each round, which was used as a key. We compared across coders after the first validation round and identified sources of disagreement in the taxonomy. As a result, we added a category for "no sexual violence" for those reports that did not fall into our taxonomy.

The Uber agents and the RALIANCE/Urban team coded a second set of user reports as a second round of validation. The RALIANCE/Urban team analyzed this round for inter-rater reliability, aiming for 80% agreement among coders. Coders achieved 79.3% agreement. One primary source of disagreement among the agents was the existence of a "too vague" category, which was not included in our original taxonomy. When excluding that category, we reached 84% agreement.

## MODIFICATIONS AFTER EXTENSIVE REVIEW

After alignment of the implemented taxonomy presented in Table A.2, Uber undertook a course of extensive internal testing, where nearly 100,000 past user reports across a wide range of safety and non-safety related customer service issue types were re-reviewed by a large number of agents. The taxonomy was applied to reports that were sexual in nature. This review revealed low alignment among agents in two areas. First, low alignment was found in the way agents used categories that included the phrase "attempted," likely due to the subjective nature of guessing the intent of described actions, as well as the taxonomy instruction that items were listed in ascending order of severity. In Table A.2, "attempted" items are in parallel order with their counterpart completed actions. This left agents with a choice between categorizing reports based on what actions agents thought the text implied might have happened or been attempted, and what actions the text stated had actually occurred. A secondary unintended effect of ordering the "attempted" categories this way was to undercount serious harmful actions that had actually taken place, in favor of counting attempts at even more serious harmful actions, though they did not actually occur.

Uber's internal data analysts made a recommendation to correct for this unforeseen consequence of the way "attempted" categories were ordered, and we agreed that this recommendation would refine the taxonomy by improving agents' ability to consistently categorize such reports. The affected portion of the taxonomy is restructured as shown in Table A.3. We agree that this ordering of categories (all of which are considered egregious by Uber and in need of an immediate response) is the best way to promote consistent taxonomy use across agents, as well as an accurate count of completed actions.

P-02160.00041

Second, the review found low alignment among agents reviewing reports involving unwanted kissing or oral penetration by objects that were not clearly sexual in nature (such as fingers or food items). We agreed with recommendations from Uber's internal data analysts that agent alignment could be improved by updating the taxonomy and instructional definitions so that:

**The definition of Non-Consensual Sexual Penetration be narrowed to include penetration of a user's mouth with a sexual organ or sexual body part excluding kissing with tongue, because:**

a.  Any type of kissing on the mouth will be defined in the category of Non-Consensual Kiss: Sexual Body Part, and

b.  All penetration of the mouth with an object that is not a sexual organ will be categorized as Non-Consensual Touching: Sexual Body Part.

The updated behavior-based definitions for the taxonomy currently in use by Uber appear in Appendix B of this paper.

## TABLE A.3: MODIFICATIONS TO THE TAXONOMY AFTER REVIEW

SEXUAL ASSAULT

| |
| --- |
| Attempted Touching: Non-Sexual Body Part |
| Attempted Kissing: Non-Sexual Body Part |
| Attempted Touching: Sexual Body Part |
| Attempted Kissing: Sexual Body Part |
| Non-Consensual Touching: Non-Sexual Body Part |
| Non-Consensual Kissing: Non-Sexual Body Part |
| Attempted Non-Consensual Sexual Penetration |
| Non-Consensual Touching: Sexual Body Part |
| Non-Consensual Kissing: Sexual Body Part |
| Non-Consensual Sexual Penetration |

P-02160.00042



# APPENDIX B:

## TAXONOMY BEHAVIOR-BASED DEFINITIONS

| CATEGORY | DEFINITION |
|---|---|
| SEXUAL MISCONDUCT | Non-physical conduct (verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a user against whom such conduct is directed. This includes explicit or non-explicit verbal comments (or non-verbal, non-physical) such as flirting, personal comments on appearance, and inquiries on relationship status. Catcalling (shouting, yelling, whistling) is also defined as sexual misconduct. |
| Staring or Leering | Someone gazed at a user in an unpleasant, uncomfortable, prolonged, or sexual manner. Staring or leering is constant and unwavering. This includes viewing both sexual and non-sexual body parts. |
| Comments or Gestures > Asking Personal Questions | Someone asked specific, probing, and personal questions of the user. This would include questions about the user's personal life, home address, contact information (e.g. phone, email, social media), or romantic or sexual preferences. |
| Comments or Gestures > Comments About Appearance | Someone made uncomfortable comments on the user's appearance. This includes both disparaging and complimentary comments. |
| Comments or Gestures > Flirting | Someone made verbally suggestive comments to the user about engaging in romantic or non-romantic activities. This also includes non-verbal, suggestive flirting, including becoming physically close to a person in a way the user felt was sexual or flirtatious. |
| Comments or Gestures > Explicit Gestures | Someone made sexually suggestive gestures at the user. |

P-02160.00043

| | |
|---|---|
| Comments or Gestures > Explicit Comments | Someone described or represented sexual activity or body parts in a graphic fashion. |
| Displaying Indecent Material | Indecent material, including pornography or other sexual images, was seen by the user. |
| Indecent Photography/ Video Without Consent | Someone has taken, without consent, an inappropriate photograph of a user's sexual body part (e.g. down shirt, up skirt, etc.). |
| Soliciting Sexual Act | Someone either directly asks for a kiss or displays of nudity, sex, or contact with a sexual body part (breast, buttock, genitals). This could be a direct solicitation or a solicitation in exchange for money or favors. |
| Masturbation / Indecent Exposure | Someone has exposed genitalia and/or is engaging in sexual acts in presence of a user. This excludes public urination where no sexual body part (buttock, penis, breast) was exposed. |
| Verbal Threat of Sexual Assault | Someone directed verbal explicit/direct threats of sexual violence at a user. |
| SEXUAL ASSAULT | Physical or attempted physical conduct that is reported to be sexual in nature and without the consent of the user. NOTE: 1. Sexual body parts are defined as the mouth, female breasts, buttocks, or genitalia. The phrase "between the legs" is considered to reference a sexual body part. All other body parts are characterized as non-sexual. 2. When only a non-sexual body part is involved, either of the following provides context for the 'sexual nature' of the contact/attempted contact:   • Sexual misconduct of any type   • Reporter's explicit perception that the contact was either flirtatious, romantic, or sexual |
| Attempted Touching: Non-Sexual Body Part | Someone attempted to touch, but did not come into contact with, any non-sexual body part (hand, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted Kissing: Non-Sexual Body Part | Someone attempted to kiss, lick, or bite, but did not come into contact with, any non-sexual body part (hand, leg, thigh) of the user, and the user perceived the attempt to be sexual. |
| Attempted Touching: Sexual Body Part | Someone attempted to touch, but did not come into contact with, any sexual body part (breast, genitalia) of the user, and the user perceived the attempt to be sexual. |

P-02160.00044

| | |
|---|---|
| Attempted Kissing: Sexual Body Part | Someone attempted to kiss, lick, or bite, but did not come into contact with the breast(s) or buttock(s) of the user, and the user perceived the attempt to be sexual. |
| Non-Consensual Touching: Non-Sexual Body Part | Without explicit consent from the user, someone touched or forced a touch on any non-sexual body part (hand, leg, thigh) of the user. |
| Non-Consensual Kissing: Non-Sexual Body Part | Without consent from the user, someone kissed, licked, or bit or forced a kiss, lick, or bite on any non-sexual body part (hand, leg, thigh) of the user. |
| Attempted Non-Consensual Sexual Penetration | Without explicit consent from a user, someone attempted to penetrate the vagina or anus of a user with any body part or object. Any attempted removal of another person's clothing to attempt to access a sexual body part will be classified as 'Attempted Non-Consensual Sexual Penetration.' This also includes attempted penetration of the user's mouth with a sexual organ or sexual body part; however, it excludes kissing with tongue or attempts to kiss with tongue. |
| Non-Consensual Touching: Sexual Body Part | Without explicit consent from the user, someone touched or forced a touch on any sexual body part (breast, genitalia, mouth, buttocks) of the user. |
| Non-Consensual Kissing: Sexual Body Part | Without consent from the user, someone kissed or forced a kiss on either the breast or buttocks of the user. This would include kissing on the lips or kissing while using tongue. |
| Non-Consensual Sexual Penetration | Without explicit consent from a user, someone penetrated, no matter how slight, the vagina or anus of a user with any body part or object. This includes penetration of the user's mouth with a sexual organ or sexual body part. This excludes kissing with tongue. |

P-02160.00045



# APPENDIX C:

## WAYS TO LEARN MORE

### RALIANCE - WWW.RALIANCE.ORG
- A collaborative initiative dedicated to ending sexual violence in one generation.

### URBAN INSTITUTE - WWW.URBAN.ORG

Urban Wire - urban.org/urban-wire
- The voices of Urban Institute's researchers and staff.

### UBER - WWW.UBER.COM

Commitment to Safety - uber.com/safety
- How safety is built into your experience.

P-02160.00046



# APPENDIX D:

## HOW CUSTOMER SERVICE WORKS AT UBER

### THE SAFETY TEAM
### UBER TECHNOLOGIES, INC.

Our partnership with RALIANCE and Urban Institute helped us embark on an important initiative and first step to better identify and measure sexual misconduct and sexual assault. In creating and implementing the taxonomy, we have the opportunity to better understand dangerous behaviors reported by users of the platform and the problems of sexual assault and sexual misconduct as a whole.

To understand our approach to implementation, it is first important to understand how a user report is handled within Uber.

**See image on page 49 to view how customer service works at Uber.**

Uber's customer support agents respond to a user's safety report by an email, or by calling the user's mobile phone and having a conversation with that person.

Our customer service agents receive substantial training to perform their duties, and the agents who handle reports of sexual misconduct or sexual assault receive additional training to respond appropriately, with empathy and understanding. An agent's interaction with a reporting user may begin with a particular response and means of contact based on the initial categorization of a report, but agents may freely elevate Uber's involvement and effort expended in response to any report as that agent gains more information about a particular incident through interaction with the user.

Since creating the taxonomy, with the help of RALIANCE and Urban Institute, we have worked to begin to implement this into our business. A key first step included the development of accompanying training materials to bring this into our customer service organization. This includes a training course (with both a presentation and written learning guide) and a full knowledge base with definitions, keywords, and salient examples for agents.

**See pages 50 - 51 for examples of customer service training materials.**

P-02160.00047

The taxonomy also helps agents better understand reports, and informs the appropriate response protocol – ranging from warnings, to education on Uber's community standards, to removal of a user's access to the platform.

In addition to training our agents on this new process, we have also taken first steps to implement the taxonomy into our data collection and analysis efforts, which serves as the baseline for prevention efforts.

While the work to implement this new taxonomy is a first step, over time, we are hopeful that this work will enable new intervention protocols and will help encourage even more reporting.

**The business principles that will continue to define this work include:**

- We are focused on the user's experience, so we accept all reports at face value with the behaviors as described by the reporter and respond to them with the appropriate protocol for that type of report. We seek to build an environment in which all users feel that reporting will make a difference and where more people report to Uber.

- We have many channels to receive reports and respond to those reports regardless of how it was reported. This includes gathering reports from sources that include in-app, in-person, phone, email, social media, law enforcement integration, and website comments.

- We develop methods of collecting and categorizing structured data about reported incidents. Properly categorized data helps us to quantify the problem.

- We use collected data and information about reported experiences to understand how the problem changes over time and evaluate and improve procedures for responding to reports.

- We believe that greater focus on the issues encourages more people to feel comfortable reporting, allowing us to more accurately quantify the problem.

We plan to promote awareness of response and prevention efforts by publishing data in an upcoming transparency report. An increased awareness of responses and prevention efforts encourages the further reporting of incidents, improving the volume and quality of data collected. Recognizing that other businesses may also find this effort valuable, we have worked to make our process transparent, in partnership with RALIANCE and Urban Institute, so that it can be used by others.

P-02160.00048

HOW CUSTOMER SERVICE WORKS AT UBER



# Uber

# Reporting a Safety Incident

**1**

## A safety issue can be filed many ways



**Help.Uber.com**

Visit **help.uber.com** for FAQs and to connect with customer support



**Uber Support**

**RIDERS** go to **Menu › Help** and tap **Report an issue with this trip**

**DRIVERS** tap **profile image › Help › Trips and Fare Review** to report



**Emergency Assistance**

If you call a 911 dispatcher right from the app, a report is automatically filed with Uber



**Additional Channels**

Any safety issues from social media, in-person support centers, and Law Enforcement are documented



**2**

## Reports are evaluated right away

We use advanced technology to enable safety-related reports to be acknowledged and given to a trained professional agent within minutes of receipt.



**3**



## Each safety issue is triaged and reviewed by a professional agent

Each incident is categorized based on our taxonomy and responded to appropriately.

**How we conduct reviews:**
Agents make outreach, by email or phone, to all parties and review Uber trip data

**How we take action:**
Warnings, temporary suspensions, or permanently removing riders and drivers if our community guidelines are violated



**4**

## Your safety is critical to us and we take action on every report

P-02160.00049

# EXAMPLE SNAPSHOTS OF CUSTOMER SERVICE TRAINING MATERIALS

## COMMENTS OR GESTURES > FLIRTING

Definition: Someone makes verbally suggestive comments to the user about engaging in romantic or non-romantic activities. This also includes non-verbal, suggestive flirting, including becoming physically close to a person in a way the user felt was sexual or flirtatious.

| QUALIFYING EXAMPLES OF COMMENTS OR GESTURES > FLIRTING | QUALIFYING JUSTIFICATION |
|---|---|
| "Trip started out fine with the driver telling me about some local bars. After a while, though, he kept getting really pushy and saying he wanted to be my tour guide. I'm really tired of getting hit on by drivers." | Making suggestive comments about romantic activities or non-romantic activities outside of the Uber app clearly meets the definition of flirting. In this case, the driver's offer to be the rider's "tour guide" is a suggestive offer to engage in romantic activities. |
| NON-QUALIFYING EXAMPLES OF COMMENTS OR GESTURES > FLIRTING | NON- QUALIFYING JUSTIFICATION |
| "My rider was talking about how much money he had...said he would make it worth my while if I gave him a blowjob. I don't think he should get to keep using Uber." | Offering a user money in exchange for sexual activities / favors is more serious than flirting. This report should be classified as: **Soliciting Sexual Act**. |

P-02160.00050

# EXAMPLE SNAPSHOTS OF CUSTOMER SERVICE TRAINING MATERIALS

## CONSENT: WHAT IT IS AND ISN'T

Consent means granting permission for something to happen or agreeing to do something. People often think consent is only important when it comes to sex. Really, consent is about always choosing to respect personal boundaries.

**When something is consensual, whether it's a hug or sex**, it means everyone involved has agreed to what they are doing and has given their permission. Non-consensual sexual behavior, or sex without someone's agreement or permission, is sexual assault. Some important things to know about consent:

- Only yes means yes. Consent is not the absence of a no. It is the presence of a clear, affirmative expression of interest, desire, and wants. The exchange of consent involves all parties. Each person sets their boundaries or shares their desires. Consent is respectful, mutual decision-making.

- Drugs and alcohol impact decision-making and blur consent. When drugs and alcohol are involved, clear consent cannot be obtained. An intoxicated person cannot give consent.

- Consent needs to be clear. Consent is more than not hearing the word "no." A partner saying nothing is not the same as a partner saying "yes." Don't rely on body language, past sexual interactions, or any other nonverbal cues. Never assume you have consent. Always be sure you have consent by asking.

- Consent is specific. Just because someone consents to one set of actions and activities does not mean consent has been given for other sexual acts. Similarly, if a partner has given consent to sexual activity in the past, this does not apply to current or future interactions. Consent can initially be given and later be withdrawn.

P-02160.00051

# RALIANCE
**BUSINESS**

🌐 www.raliance.org

**f** www.facebook.com/RalianceOrg

🐦 twitter.com/RALIANCEOrg

P-02160.00052