# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

## FORM 10-K

---

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from_____ to _____

**Commission File Number: 001-38902**

---

# UBER TECHNOLOGIES, INC.

**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **Delaware** | **45-2647441** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**1515 3rd Street**

**San Francisco, California 94158**

**(Address of principal executive offices, including zip code)**

**(415) 612-8582**

**(Registrant's telephone number, including area code)**

---

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.00001 per share | UBER | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark whether the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark whether the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Trial Exhibit No.
**P-02346**

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2021, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $90.5 billion based upon the closing price reported for such date on the New York Stock Exchange.

The number of shares of the registrant's common stock outstanding as of February 22, 2022 was 1,954,464,088.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Definitive Proxy Statement relating to the Annual Meeting of Stockholders are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. Such Definitive Proxy Statement will be filed with the Securities and Exchange Commission within 120 days after the end of the registrant's fiscal year ended December 31, 2021.

**UBER TECHNOLOGIES, INC.**

**TABLE OF CONTENTS**

| | | Pages |
|---|---|---|
| Special Note Regarding Forward-Looking Statements | | 2 |
| | | |
| **PART I** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 46 |
| Item 2. | Properties | 46 |
| Item 3. | Legal Proceedings | 46 |
| Item 4. | Mine Safety Disclosures | 47 |
| | | |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 47 |
| Item 6. | [Reserved] | 48 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 48 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 69 |
| Item 8. | Financial Statements and Supplementary Data | 70 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 146 |
| Item 9A. | Controls and Procedures | 147 |
| Item 9B. | Other Information | 147 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 147 |
| | | |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 147 |
| Item 11. | Executive Compensation | 147 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 148 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 148 |
| Item 14. | Principal Accounting Fees and Services | 148 |
| | | |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 148 |
| Item 16. | Form 10-K Summary | 148 |
| | Exhibit Index | 149 |
| | Signatures | 152 |

P-02346-0003

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements other than statements of historical facts contained in this Annual Report on Form 10-K, including statements regarding our future results of operations or financial condition, business strategy and plans, and objectives of management for future operations, are forward-looking statements. In some cases, you can identify forward-looking statements because they contain words such as "anticipate," "believe," "contemplate," "continue," "could," "estimate," "expect," "hope," "intend," "may," "might," "objective," "ongoing," "plan," "potential," "predict," "project," "should," "target," "will," or "would" or the negative of these words or other similar terms or expressions. These forward-looking statements include, but are not limited to, statements concerning the following:

- the impacts of COVID-19 or other future pandemics on our business, results of operations, financial position and cash flows;

- our ability to successfully defend litigation and government proceedings brought against us, including with respect to our relationship with drivers and couriers, and the potential impact on our business operations and financial performance if we are not successful;

- our ability to successfully compete in highly competitive markets;

- our ability to effectively manage our growth and maintain and improve our corporate culture;

- our expectations regarding financial performance, including but not limited to revenue, potential profitability and the timing thereof, ability to generate positive Adjusted EBITDA, expenses, and other results of operations;

- our expectations regarding future operating performance, including but not limited to our expectations regarding future Monthly Active Platform Consumers ("MAPCs"), Trips, Gross Bookings, and Take Rate;

- our expectations regarding our competitors' use of incentives and promotions, our competitors' ability to raise capital, and the effects of such incentives and promotions on our growth and results of operations;

- our anticipated investments in new products and offerings, and the effect of these investments on our results of operations;

- our anticipated capital expenditures and our estimates regarding our capital requirements;

- our ability to close and integrate acquisitions into our operations;

- anticipated technology trends and developments and our ability to address those trends and developments with our products and offerings;

- the size of our addressable markets, market share, category positions, and market trends, including our ability to grow our business in the countries we have identified as expansion markets;

- the safety, affordability, and convenience of our platform and our offerings;

- our ability to identify, recruit, and retain skilled personnel, including key members of senior management;

- our expected growth in the number of platform users, and our ability to promote our brand and attract and retain platform users;

- our ability to maintain, protect, and enhance our intellectual property rights;

- our ability to introduce new products and offerings and enhance existing products and offerings;

- our ability to successfully enter into new geographies, expand our presence in countries in which we are limited by regulatory restrictions, and manage our international expansion;

- our ability to successfully renew licenses to operate our business in certain jurisdictions;

- the availability of capital to grow our business;

- volatility in the business or stock price of our minority-owned affiliates;

- our ability to meet the requirements of our existing debt and draw on our line of credit;

- our ability to prevent and respond to disturbances to our information technology systems;

- our ability to comply with existing, modified, or new laws and regulations applying to our business;

- our ability to implement, maintain, and improve our internal control over financial reporting; and

- our ability to realize our climate change, net zero climate emissions and net zero company commitments and in their contemplated timeframes

Actual events or results may differ from those expressed in forward-looking statements. As such, you should not rely on forward-

2

P-02346-0004

looking statements as predictions of future events. We have based the forward-looking statements contained in this Annual Report on Form 10-K primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, operating results, prospects, strategy, and financial needs. The outcome of the events described in these forward-looking statements is subject to risks, uncertainties, assumptions, and other factors described in the section titled "Risk Factors" and elsewhere in this Annual Report on Form 10-K. Moreover, we operate in a highly competitive and rapidly changing environment. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Annual Report on Form 10-K. The results, events and circumstances reflected in the forward-looking statements may not be achieved or occur, and actual results, events or circumstances could differ materially from those described in the forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based on information available to us as of the date of this Annual Report on Form 10-K. While we believe that such information provides a reasonable basis for these statements, such information may be limited or incomplete. Our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely on these statements.

The forward-looking statements made in this Annual Report on Form 10-K speak only as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this Annual Report on Form 10-K to reflect events or circumstances after the date of this Annual Report on Form 10-K or to reflect new information, actual results, revised expectations, or the occurrence of unanticipated events, except as required by law. We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements.

P-02346-0005

**PART I**

## ITEM 1. BUSINESS

### Overview

Uber Technologies, Inc. ("Uber," "we," "our," or "us") is a technology platform that uses a massive network, leading technology, operational excellence and product expertise to power movement from point A to point B. We develop and operate proprietary technology applications supporting a variety of offerings on our platform ("platform(s)" or "Platform(s)"). We connect consumers ("Rider(s)") with independent providers of ride services ("Mobility Driver(s)") for ridesharing services, and connect Riders and other consumers ("Eater(s)") with restaurants, grocers and other stores (collectively, "Merchants") with delivery service providers ("Couriers") for meal preparation, grocery and other delivery services. Riders and Eaters are collectively referred to as "end-user(s)" or "consumer(s)." Mobility Drivers and Couriers are collectively referred to as "Driver(s)." We also connect consumers with public transportation networks. We use this same network, technology, operational excellence and product expertise to connect shippers with carriers in the freight industry.

Our technology is available in approximately 72 countries around the world, principally in the United States ("U.S.") and Canada, Latin America, Europe, the Middle East, Africa, and Asia (excluding China and Southeast Asia).

### Our Segments

As of December 31, 2021, we had three operating and reportable segments: Mobility, Delivery and Freight. Mobility, Delivery and Freight platform offerings each address large, fragmented markets.

#### Mobility

Mobility refers to products that connect consumers with Mobility Drivers who provide rides in a variety of vehicles, such as cars, auto rickshaws, motorbikes, minibuses, or taxis. Mobility also includes activity related to our financial partnerships offerings.

We believe that our ridesharing category position is a key indicator of our progress towards our massive market opportunity. We calculate our ridesharing category position based on the best available data within a given region. For example, in most cases we divide our Mobility Gross Bookings by our estimates of total ridesharing Gross Bookings generated by us and other companies with similar ridesharing products. We estimate our total ridesharing Gross Bookings in a given region by utilizing internal source data, including historical trip, bookings, product mix, and fare information, and external source data provided by publicly available information and marketing analytics firms. Based on these estimates, we believe we have a leading ridesharing category position in every major region of the world where we operate. We also participate in certain regions through our minority-owned affiliates. At the time of entering into such transactions, we believed based on our internal estimates using the information then available to us that each of Didi, Grab and Yandex.Taxi, on a pro forma basis, had the leading ridesharing category position in its respective market.

#### Delivery

Our Delivery offering allows consumers to search for and discover local restaurants, order a meal, and either pick-up at the restaurant or have the meal delivered and, in certain markets, Delivery also includes offerings for grocery, alcohol and convenience store delivery as well as select other goods. We launched our Delivery app over six years ago. We believe that Delivery not only leverages, but also increases, the supply of Drivers on our network. For example, Delivery enables Mobility Drivers to increase their utilization and earnings by accessing additional demand for trips during non-peak Mobility times. Delivery also expands the pool of Drivers by enabling people who are not Mobility Drivers or who do not have access to Mobility-qualified vehicles to provide delivery services on our platform. In addition to benefiting Drivers and consumers, Delivery provides Merchants with an instant mobile presence and efficient delivery capability, which we believe generates incremental demand and improves margins for Merchants by enabling them to serve more consumers without increasing their existing front-of-house expenses.

During 2021, we completed the acquisition of the remaining 45% ownership interest in Cornershop Cayman ("Cornershop") in an all-stock transaction. The acquisition was accounted for as an equity transaction, as we previously controlled and consolidated Cornershop. We also completed the acquisition of The Drizly Group, Inc. ("Drizly"), allowing us to expand alcohol offerings in our Delivery business with Drizly's leading platform, technology, scale, and expertise. The acquisition of Drizly has been accounted for as a business combination. For additional information, see Note 18 – Business Combinations included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

#### Freight

We believe that Freight is revolutionizing the logistics industry. Freight leverages our proprietary technology, brand awareness, and experience revolutionizing industries to connect carriers with shippers on our platform, and gives carriers upfront, transparent pricing and the ability to book a shipment. The freight industry is highly fragmented and deeply inefficient. It can take several hours, sometimes days, for shippers to find a truck and driver for shipments, with most of the process conducted over the phone or by fax. Procurement is highly fragmented, with traditional players relying on local or regional offices to book shipments. It is equally difficult for carriers to find and book the shipments that work for their businesses, spending hours on the phone negotiating pricing and terms. These inefficiencies adversely impact both shippers and carriers, and contribute to the number of non-revenue or "dead-head" miles,

4

which are miles driven by carriers between shipments. Freight greatly reduces friction in the logistics industry by providing an on-demand platform to automate and accelerate logistics transactions end-to-end. Freight connects carriers with shippers available on our platform, and gives carriers upfront, transparent pricing and the ability to book a shipment with the touch of a button.

We serve shippers ranging from small- and medium-sized businesses to global enterprises by enabling them to create and tender shipments with a few clicks, secure capacity on demand with upfront pricing, and track those shipments in real-time from pickup to delivery. We believe that all of these factors represent significant efficiency improvements over traditional freight brokerage providers.

During 2021, we completed the acquisition of Tupelo Parent, Inc. ("Transplace") in an all-cash transaction, allowing us to expand our Uber Freight business through Transplace's expertise in transportation management. The acquisition of Transplace has been accounted for as a business combination. For additional information, see Note 18 – Business Combinations included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

**Platform Synergies**

*Our Platform*

The foundation of our platform is our massive network, leading technology, operational excellence, and product expertise. Together, these elements power movement from point A to point B.

| | |
|---|---|
| **Massive Network** | Our massive, efficient, and intelligent network consists of tens of millions of Drivers, consumers, Merchants, shippers and carriers, as well as underlying data, technology, and shared infrastructure. Our network becomes smarter with every trip. In approximately 10,500 cities around the world (as of January 1, 2022), our network powers movement at the touch of a button for millions, and we hope eventually billions, of people. |
| **Leading Technology** | We have built proprietary marketplace, routing, and payments technologies. Marketplace technologies are the core of our deep technology advantage and include demand prediction, matching and dispatching, and pricing technologies. Our technologies make it extremely efficient to launch new businesses and operationalize existing ones. |
| **Operational Excellence** | Our regional on-the-ground operations teams use their extensive market-specific knowledge to rapidly launch and scale products in cities, support Drivers, consumers, Merchants, shippers, and carriers, and build and enhance relationships with cities and regulators. |
| **Product Expertise** | Our products are built with the expertise that allows us to set the standard for powering movement on-demand, provide platform users with a contextual, intuitive interface, continually evolve features and functionality, and deliver safety and trust. |

We intend to continue to invest in new platform offerings that we believe will further strengthen our platform and existing offerings.

We believe that all of these synergies serve the customer experience, enabling us to attract new platform users and to deepen engagement with existing platform users. Both of these dynamics grow our network scale and liquidity, which further increases the value of our platform to platform users. For example, Delivery attracts new consumers to our network—for the three months ended December 31, 2021, over 60% of first-time Delivery consumers were new to our platform. Additionally, for the three months ended December 31, 2021, consumers who used both Mobility and Delivery generated 12.6 Trips per month on average, compared to 5.0 Trips per month on average for consumers who used a single offering in cities where both Mobility and Delivery were offered. We believe that these trends will improve as we further leverage the power of our platform.

With our platform, we are making it even easier for our consumers to unlock convenience. During November 2021, we launched Uber One in the United States as our single cross-platform membership program that brings together the best of Uber. Uber One members have access to discounts, special pricing, priority service, and exclusive perks across our rides, delivery and grocery offerings. Our Uber Pass and Eats Pass membership programs continue to remain available in select cities as a subscription offering. Our membership programs are designed to make utilizing our suite of products a seamless and rewarding experience for our consumers. We exited 2021 with over 6 million members for our Uber One, Uber Pass, Eats Pass and Rides Pass membership programs. In 2020, we rolled out our "Super App" view on iOS and Android, which combines our multiple offerings into a single app and is designed to remove friction for our consumers.

We are also utilizing our data and scale to offer marketplace-centric advertising to connect merchants and brands with our platform network and unlocking cross-platform advertising formats. During the fourth quarter of 2021, active advertising merchants grew to over 170,000.

**Competitive Environment**

We compete on a global basis in highly fragmented markets. We face significant competition in each of the mobility and delivery industries globally and in the logistics industry in the United States and Canada from existing, well-established, and low-cost alternatives, and in the future we expect to face competition from new market entrants given the low barriers to entry that characterize

5

these industries. As we and our competitors introduce new products and offerings, and as existing products evolve, we expect to become subject to additional competition. While we work to expand globally and introduce new products and offerings across a range of industries, many of our competitors remain focused on a limited number of products or on a narrow geographic scope, allowing them to develop specialized expertise and employ resources in a more targeted manner than we do. The competition we face in each of our offerings includes:

- *Mobility*. Our Mobility offering competes with personal vehicle ownership and usage, which accounts for the majority of passenger miles in the markets that we serve, and traditional transportation services, including taxicab companies and taxi-hailing services, livery and other car services. In addition, public transportation can be a superior substitute to our Mobility offering and in many cases, offers a faster and lower-cost travel option in many cities. We also compete with other ridesharing companies, including certain of our minority-owned affiliates, for Drivers and riders, including Lyft, Ola, Didi, Grab, Bolt, and our Yandex.Taxi joint venture.

- *Delivery*. Our Delivery offering competes with numerous companies in the meal, grocery and other delivery space in various regions for drivers, consumers, and merchants, including DoorDash, Deliveroo, Glovo, Instacart, Gopuff, Rappi, iFood, Delivery Hero, Just Eat Takeaway, and Amazon. Our Delivery offering also competes with restaurants, meal kit delivery services, grocery delivery services, and traditional grocers.

- *Freight*. Our Freight offering competes with global and North American freight brokers such as C.H. Robinson, Total Quality Logistics, XPO Logistics, Convoy, Echo Global Logistics, Coyote, Transfix, DHL, and NEXT Trucking.

**Government Regulation**

We operate in a particularly complex legal and regulatory environment. Our business is subject to a variety of U.S. federal, state, local and foreign laws, rules, and regulations, including those related to Internet activities, privacy, cybersecurity, data protection, intellectual property, competition, consumer protection, payments, labor and employment, transportation services, transportation network companies, licensing regulations and taxation. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended, in a manner that could harm our business. Examples of certain laws and regulations we are subject to are described below.

*Mobility*

Our platform, and in particular our Mobility products, are subject to differing, and sometimes conflicting, laws, rules, and regulations in the numerous jurisdictions in which we operate. A large number of proposals are before various national, regional, and local legislative bodies and regulatory entities, both within the United States and in foreign jurisdictions, regarding issues related to our business model.

In the United States, many state and local laws, rules, and regulations impose legal restrictions and other requirements on operating our Mobility products, including licensing, insurance, screening, and background check requirements. Outside of the United States, certain jurisdictions have adopted similar laws, rules, and regulations while other jurisdictions have not adopted any laws, rules, and regulations which govern our Mobility business. Further, certain jurisdictions, including Argentina, Germany, Italy, Japan, South Korea, and Spain, six countries that we have identified as expansion markets, have adopted laws, rules, and regulations banning certain ridesharing products or imposing extensive operational restrictions. This uncertainty and fragmented regulatory environment creates significant complexities for our business and operating model.

Substantially all states in the United States and numerous municipalities in the United States and around the world have adopted Transportation Network Company ("TNC") regulations. These regulations generally focus on companies that operate websites or mobile apps that connect individual drivers with their own vehicles to passengers willing to pay to be driven to their destinations. These regulations often require TNCs to comply with rules regarding, among other things, background checks, vehicle inspections, accessible vehicles, driver and consumer safety, insurance, driver training, driver conduct, and other similar matters.

In addition, many jurisdictions have adopted regulations that apply to how we classify the Drivers who use our platform. For example, California's Assembly Bill 5 ("AB5"), which went into effect in January 2020, codified a test to determine whether a worker is an employee under California law. The California Attorney General, in conjunction with the city attorneys for San Francisco, Los Angeles and San Diego, filed a complaint under AB5, alleging that drivers are misclassified, and sought an injunction and monetary damages related to the alleged competitive advantage caused by the alleged misclassification of drivers. Although the Court issued a preliminary injunction enjoining Uber and Lyft from classifying drivers as independent contractors during the pendency of the lawsuit, the parties were granted a stipulation to dissolve the injunction in April 2021. In November 2020, California voters approved Proposition 22, a California state ballot initiative that provides a framework for drivers that use platforms like ours for independent work. Proposition 22 went into effect in December 2020 and we expect that Drivers will be able to maintain their status as independent contractors under California law and that we and our competitors will be required to comply with the provisions of Proposition 22. See the section titled "Risk Factors" included in Part I, Item 1A and "Note 15 – Commitments and Contingencies" to our consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

6

In addition, many jurisdictions have municipal bodies that adopted and will adopt regulations that govern our business. For example:

- In London, Transport for London ("TfL") scrutinizes our business on an on-going basis and we are subject to license reviews at renewal. In November 2019, TfL declined to issue us a license, finding that we were not "fit and proper," including with respect to confidence in our change and release management processes. We successfully appealed and in September 2020, Westminster Magistrates Court granted us an 18 month operating license on largely the same conditions as our previous license, finding us a fit and proper person.

- Since April 2019, Mexico City's Secretaría de Movilidad passed several amendments to existing ridesharing regulations implementing certain operational requirements, including a prohibition on the use of cash to pay for ridesharing services and, effective as of November 2019, a comprehensive TNC data sharing requirement and a requirement that Drivers in Mexico City obtain additional licenses and annual vehicle inspections to provide ridesharing services. Except for the vehicle inspection, we obtained an injunction against such operational requirements which, if implemented without modification, could have a negative impact on our business and our failure to comply with such regulations may result in a potential revocation of our license to operate in Mexico City.

- In January 2019, we suspended our Mobility products in Barcelona after the regional government enacted regulations mandating minimum wait times before riders could be picked up by ridesharing drivers. In March 2021, we returned to Barcelona via a taxi product.

- In addition, in August 2018, New York City approved regulations for the local for-hire market (which includes our ridesharing products), including a cap on the number of new vehicle licenses issued to drivers who offer for-hire services. In December 2018, New York City also established a standard for time and distance designed to establish a minimum pay standard for drivers providing for-hire services in New York City, such as those provided by Drivers on our platform. As another example, in October 2020, the Seattle City Council passed a minimum pay standard for drivers providing services on our platform that went into effect on January 1, 2021, and other jurisdictions have in the past considered or may consider regulations which would implement minimum wage requirements or permit drivers to negotiate for minimum wages while providing services on our platform. Similar legislative or regulatory initiatives are being considered or have been enacted in countries outside the United States.

See the section titled "Risk Factors" included in Part I, Item 1A, "Risk Factors". This uncertainty and fragmented regulatory environment creates significant complexities for our business and operating model.

As we continue to expand our offerings, we may be subject to additional regulations separate from those that apply to our Mobility products.

### Data Privacy and Protection

Our technology platform, and the user data we collect and process to run our business, are an integral part of our business model and, as a result, our compliance with laws dealing with the collection and processing of personal data is core to our strategy to improve platform user experience and build trust. Regulators around the world have adopted or proposed requirements regarding the collection, use, transfer, security, storage, destruction, and other processing of personally identifiable information and other data relating to individuals, and these laws are increasing in number, enforcement, fines, and other penalties. Two examples of such regulations that have significant implications for our business are the European Union's General Data Protection Regulation (the "GDPR"), a law which went into effect in May 2018 and implemented more stringent requirements for processing personal data relating to individuals in the EU, and the California Consumer Privacy Act (the "CCPA"), which went into effect in January 2020 and established new consumer rights and data privacy and protection requirements for covered businesses. U.S. state, city, and foreign regulators are expected to continue proposing and adopting significant laws impacting the processing of personally identifiable information and other data relating to individuals, such as the California Privacy Rights Act ("CPRA") passed in California in November 2020 (effective in January 2023), and a draft data protection bill pending in India.

### Payments and Financial Services

Most jurisdictions in which we operate have laws that govern payment and financial services activities. For example, our subsidiary in the Netherlands, Uber Payments B.V., is registered and authorized as an electronic money institution in support of certain payment activities in the European Economic Area (the "EEA"). Regulators in certain additional jurisdictions may determine that certain aspects of our business are subject to these laws and could require us to obtain licenses to continue to operate in such jurisdictions. In addition, laws related to money transmission and online payments are evolving, and changes in such laws could affect our ability to provide payment processing on our platform. We are continuing to evaluate our options for seeking further licenses and approvals in several other jurisdictions to optimize payment solutions and support future growth of our business.

### Antitrust

Competition authorities closely scrutinize us under U.S. and foreign antitrust and competition laws. An increasing number of governments are enforcing competition laws and are doing so with increased scrutiny, including governments in large markets such as

7

the EU, the United States, Brazil, and India, particularly surrounding issues of predatory pricing, price-fixing, and abuse of market power. In addition, governmental agencies and regulators may, among other things, prohibit future acquisitions, divestitures, or combinations we plan to make, impose significant fines or penalties, require divestiture of certain of our assets, or impose other restrictions that limit or require us to modify our operations, including limitations on our contractual relationships with platform users or restrictions on our pricing models.

**Intellectual Property**

We believe that our intellectual property is essential to our business and affords us a competitive advantage in the markets in which we operate. Our intellectual property includes the content of our website, mobile applications, registered domain names, software code, firmware, hardware and hardware designs, registered and unregistered trademarks, trademark applications, copyrights, trade secrets, inventions (whether or not patentable), patents, and patent applications.

To protect our intellectual property, we rely on a combination of copyright, trademark, patent, and trade secret laws, contractual provisions, end-user policies, and disclosure restrictions. Upon discovery of potential infringement of our intellectual property, we assess and when necessary, take action to protect our rights as appropriate. We also enter into confidentiality agreements and invention assignment agreements with our employees and consultants and seek to control access to, and distribution of, our proprietary information in a commercially prudent manner.

**Research and Development**

Because the industries in which we compete are characterized by rapid technological advances, our ability to compete successfully depends heavily upon our ability to ensure a continual and timely flow of competitive new offerings and technologies. We continue to develop new technologies to enhance existing offerings and services, and to expand the range of our offerings through research and development ("R&D") and acquisition of third-party businesses and technology.

**Seasonality**

*Mobility*

We typically generate higher revenue in our fourth quarter compared to other quarters due in part to fourth-quarter holiday and business demand, and typically generate lower revenue in our third quarter compared to other quarters due in part to less usage of our platform during peak vacation season in North America and Europe. We have typically experienced lower quarter-over-quarter growth in Mobility in the first quarter. In 2021, we experienced less seasonality as a result of the COVID-19 pandemic and related restrictions, which altered typical travel patterns. We expect that seasonality will eventually return to its historic patterns as recovery from the pandemic continues.

*Delivery*

We typically expect to experience seasonal increases in our revenue in the first and fourth quarters compared to the second and third quarters, although the historical growth of Delivery has masked these seasonal fluctuations. In 2021, we experienced less seasonality as a result of the COVID-19 pandemic and related restrictions, which accelerated the growth of Delivery in 2021 as cities impose various dining restrictions.

**Human Capital at Uber**

*Employees*

We are a global company and as of December 31, 2021, we and our subsidiaries had approximately 29,300 employees globally and operations in approximately 72 countries and approximately 10,500 cities around the world. Our human capital strategies are developed and managed by our Chief People Officer, who reports to the CEO, and are overseen by the Compensation Committee and the Board of Directors.

Our success depends in large part on our ability to attract and retain high-quality management, operations, engineering, and other personnel who are in high demand, are often subject to competing employment offers, and are attractive recruiting targets for our competitors.

*Adapting to a New Way of Working.* In 2021, the ever-evolving COVID-19 pandemic continued to have a significant impact on our employees and our workforce management strategy and caused us to continually adapt how we work. As a result of COVID-19, in 2020, we asked that all employees who were able to do so work remotely and while we subsequently announced return to office dates, the dynamic COVID situation disrupted our return to office plans—although many of our offices are open, we have not yet set an updated return to office date. Prolonged remote work, as well as COVID-19 more generally, introduced new dynamics into the households of many of our employees. As a result, we found that some employees were struggling with work-life balance and feelings of stress and social isolation, and we experienced higher levels of attrition. The issues of stress and balance were particularly exacerbated among caregivers of young children. To address some of these concerns, we strengthened our work-from-home policies and looked for new ways to support our employees as they navigated this crisis in their personal and professional lives. We provided

8

more attention and flexibility to caregivers by providing resources, tools, and support, and amplified our focus on mental health and well-being.

*Employee Engagement*. To attract and retain the best talent, we strive to establish a culture where people of all backgrounds can find a sense of belonging and are able to achieve to their highest capability. We measure how successful we have been in establishing the culture we need through employee engagement surveys and related tools. We historically conducted a semi-annual workforce survey that measures employee engagement, overall satisfaction, and well-being. But in 2021, we made a shift toward continuous listening by launching an employee survey, sent out to a rotating third of employees every month. We use the results of these regular checks to better understand employees' needs and support their teams on topics such as well-being, inclusivity, fairness, rewards and recognition, and growth opportunities. For example, our return-to-office plan, which will provide employees with more flexibility to work from home post-pandemic, was created based on employee feedback. In addition to the engagement survey results, we also monitor the health of our workforce and the success of our people operations through monitoring metrics such as attrition, retention, and offer acceptance rates, as well as sexual orientation, gender and ethnic diversity.

*Employee Development and Retention*. We believe that employees who have opportunities for development are more engaged, satisfied, and productive. Employees are empowered to drive their own growth, whether by learning on the job, finding stretch assignments, or identifying their next opportunity within Uber through internal mobility programs. Employees have access to an internal jobs marketplace for full-time jobs as well as short-term stretch assignments that enable them to have an impact on other areas of the business. Our goal is to help all employees be their best selves by providing programs and resources that promote wellness and productivity. This helps our diverse employee base manage life's expected and unexpected events. Globally, Uber offers competitive benefits packages to our employees and their families. We provide competitive benefits as well as offerings tailored to our unique populations.

For additional discussion, see the risk factor titled "—Our business depends on retaining and attracting high-quality personnel, and continued attrition, future attrition, or unsuccessful succession planning could adversely affect our business." included in Part I, Item 1A of this Annual Report on Form 10-K as well as our 2021 People and Culture Report, which is available on our website. The information in the 2021 People and Culture report is not a part of this Form 10-K.

### Diversity and Inclusion

We believe that great minds don't think alike, and we work hard to ensure that people of diverse backgrounds feel welcome and valued. We encourage different opinions and approaches to be heard, and then we come together and build. We believe that when employees feel empowered to succeed in a work environment that celebrates, supports, and invests in diversity, progress follows. To achieve our objective to increase diversity in who we hire, we implement processes throughout Uber and measure progress. For example, the Mansfield Rule was implemented by June 2021, to ensure that we have considered women, LGBTQIA+ individuals, people with disabilities, and racially underrepresented talent by requiring that a certain percentage of candidates considered for leadership roles come from historically underrepresented groups.

Our Board of Directors recognizes the strategic importance of these issues and incorporated employee diversity performance metrics into the compensation packages of our most senior executives.

We encourage employees who believe they, or any other employee, have been subjected to discrimination to notify their manager, Uber's People Team or the Integrity Helpline.

As a company that powers movement, it is our goal to ensure that everyone can move freely and safely, whether physically, economically, or socially. To do that, we strive to help fight the racism that persists across society, be a champion for equity, and create opportunities for all, both inside and outside our company. In July 2020, we announced 14 commitments to becoming a more anti-racist company and since then, we have taken action to move these commitments forward. Some of our commitments to anti-racism include:

- Ridding our platform of racism

- Fighting racism with technology

- Sustaining equity and belonging for all

- Driving equity in the community

For more information regarding our Diversity and Inclusion efforts, please see our 2021 People and Culture Report and our 2021 ESG Report, which are available on our website. The information in these reports is not a part of this Form 10-K.

### Driver and Courier Well-Being

In addition to employees discussed above, our business also depends on our ability to attract and engage Drivers, consumers, Merchants, shippers, and Couriers, as well as contractors and consultants that support our global operations.

In relation to those individuals who earn income on our platform, Uber is one of the largest open platforms for work in the world, providing accessible, flexible work in approximately 72 countries. Drivers are key parts of the marketplaces that Uber has created

9

through its apps. A diverse set of people choose to use our platform to earn income without having to apply for, or work the fixed schedules associated with, traditional employment. We believe this flexibility is an improvement over traditional work schedules and is something we believe can and should remain available to anyone who chooses platform-based work. Uber monitors regional and global driver attraction, retention and satisfaction rates.

Accessible, flexible, independent work has offered an option for many workers historically marginalized from the labor market and has enabled wide geographic coverage and reliable service offerings for consumers. However, it is increasingly clear that more can be done to improve the experience of using an app to connect with work opportunities. Although the situation varies across countries and cities, the benefits and protections for independent workers are generally patchy compared with those that employees receive. The current binary system of employment classification under some legal frameworks means that a worker is either an employee who is provided significant social benefits or an independent worker who has access to relatively few. This does not have to be the case. At Uber, we believe that being your own boss should not have to come at the expense of security and dignity in work. Around the world, Uber has found innovative ways to address these issues.

- **Advocacy**: We have advocated for wider policy solutions to improve access to protections and benefits for independent workers. We believe all work should be treated equally. We also believe that legislative reform is needed to modernize the social safety net. This includes requiring Uber—and other app based companies—to provide benefits and protections to their users without compromising the flexibility of their use of the app. Some examples of our advocacy to preserve flexibility of work while expanding access to benefits and protections are as follows:

  ◦ In the United States, European Union, and Canada, we put forward proposals to improve the quality of independent work, calling on policymakers, platform companies, and social representatives to work together on a new approach to platform work—one where having access to protections and benefits doesn't come at the cost of flexibility and job creation.

  ◦ In California, we welcomed the passage of Proposition 22, which introduced new requirements for platform companies like Uber to provide benefits, including healthcare stipends, injury protection insurance, and safety training, and implemented its requirements.

  ◦ In the UK, we announced that all UK drivers will be treated as workers and receive additional rights and protections going forward. Pursuant to this change, drivers who use Uber's platform in the UK will earn at least the National Living Wage for time spent actively working, be paid holiday pay, and will be enrolled into a pension plan if eligible. We have also announced a partnership with labor union GMB to provide an even stronger voice to drivers and to raise the standard of flexible work across the industry.

- **Protections and benefits**: We partner with leading insurance companies around the world to pioneer protections for independent workers, including implementing additional protections and benefits for Drivers in California pursuant to the passage of Proposition 22.

- **Earnings**: We are continually developing new technology that Drivers can use to acquire information that may help them save on costs and make informed choices about where and when to drive (based on when and where their earnings potential is highest).

- **Progression**: We have partnered with Arizona State University to offer eligible Drivers and their family members access to over 100 undergraduate degree programs, courses in English language learning, or a certificate in entrepreneurship. Through our partnership with Arizona State University, over 4,000 Drivers and their family members have enrolled in an undergraduate degree program.

- **Engagement**: We are focused on listening to and responding to the ideas and concerns of Drivers and Merchants who use our platform. We believe that the best ideas can come from anywhere, both inside and outside our company. In locations around the world, we are piloting innovative ways for Drivers to participate in meaningful dialogue with us. In markets across the world, we hold regular meetings with Driver associations and conduct regular surveys to gather feedback on our app, our support services, and other matters.

For additional discussion, see the risk factor titled "—If we are unable to attract or maintain a critical mass of Drivers, consumers, merchants, shippers, and carriers, whether as a result of competition or other factors, our platform will become less appealing to platform users, and our financial results would be adversely impacted." included in Part I, Item 1A of this Annual Report on Form 10-K as well our 2021 ESG Report and our 2021 People and Culture Report. The information in these reports is not a part of this Form 10-K.

**Additional Information**

We were founded in 2009 and incorporated as Ubercab, Inc., a Delaware corporation, in July 2010. In February 2011, we changed our name to Uber Technologies, Inc. Our principal executive offices are located at 1515 3rd Street, San Francisco, California 94158, and our telephone number is (415) 612-8582.

P-02346-0012

Our website address is www.uber.com and our investor relations website is located at https://investor.uber.com. The information posted on our website is not incorporated into this Annual Report on Form 10-K. The U.S. Securities and Exchange Commission ("SEC") maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC at www.sec.gov. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to reports filed or furnished pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") are also available free of charge on our investor relations website as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC.

We webcast our earnings calls and certain events we participate in or host with members of the investment community on our investor relations website. Additionally, we provide notifications of news or announcements regarding our financial performance, including SEC filings, investor events, press and earnings releases, as part of our investor relations website. The contents of these websites are not intended to be incorporated by reference into this report or in any other report or document we file.

## ITEM 1A. RISK FACTORS

*Certain factors may have a material adverse effect on our business, financial condition, and results of operations. You should carefully consider the following risks, together with all of the other information contained in this Annual Report on Form 10-K, including the sections titled "Special Note Regarding Forward-Looking Statements" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this Annual Report on Form 10-K. Any of the following risks could have an adverse effect on our business, financial condition, operating results, or prospects and could cause the trading price of our common stock to decline, which would cause you to lose all or part of your investment. Our business, financial condition, operating results, or prospects could also be harmed by risks and uncertainties not currently known to us or that we currently do not believe are material.*

**Risk Factor Summary**

**The following are some of these risks, any of which could have an adverse effect on our business financial condition, operating results, or prospects.**

- The COVID-19 pandemic and the impact of actions to mitigate the pandemic have adversely affected and may continue to adversely affect parts of our business.

- Our business would be adversely affected if Drivers were classified as employees, workers or quasi-employees instead of independent contractors.

- The mobility, delivery, and logistics industries are highly competitive, with well-established and low-cost alternatives that have been available for decades, low barriers to entry, low switching costs, and well-capitalized competitors in nearly every major geographic region.

- To remain competitive in certain markets, we have in the past lowered, and may continue to lower, fares or service fees, and we have in the past offered, and may continue to offer, significant Driver incentives and consumer discounts and promotions.

- We have incurred significant losses since inception, including in the United States and other major markets. We expect our operating expenses to increase significantly in the foreseeable future, and we may not achieve or maintain profitability.

- If we are unable to attract or maintain a critical mass of Drivers, consumers, merchants, shippers, and carriers, whether as a result of competition or other factors, our platform will become less appealing to platform users.

- Maintaining and enhancing our brand and reputation is critical to our business prospects. We have previously received significant media coverage and negative publicity regarding our brand and reputation, and while we have taken significant steps to rehabilitate our brand and reputation, failure to maintain and enhance our brand and reputation will cause our business to suffer.

- Our historical workplace culture and forward-leaning approach created operational, compliance, and cultural challenges and our efforts to address these challenges may not be successful.

- If we are unable to optimize our organizational structure or effectively manage our growth, our financial performance and future prospects will be adversely affected.

- Platform users may engage in, or be subject to, criminal, violent, inappropriate, or dangerous activity that results in major safety incidents, which may harm our ability to attract and retain Drivers, consumers, merchants, shippers, and carriers.

- We are making substantial investments in new offerings and technologies, and may increase such investments in the future. These new ventures are inherently risky, and we may never realize any expected benefits from them.

- We generate a significant percentage of our Gross Bookings from trips in large metropolitan areas, and these operations may be negatively affected by economic, social, weather, and regulatory conditions or other circumstances, including COVID-19.

11

- We may fail to offer autonomous vehicle technologies on our platform, fail to offer such technologies on our platform before our competitors, or such technologies may fail to perform as expected, may be inferior to those offered by our competitors, or may be perceived as less safe than those offered by competitors or non-autonomous vehicles.

- Our business depends on retaining and attracting high-quality personnel, and continued attrition, future attrition, or unsuccessful succession planning could adversely affect our business.

- We may experience security or data privacy breaches or other unauthorized or improper access to, use of, alteration of or destruction of our proprietary or confidential data, employee data, or platform user data.

- Cyberattacks, including computer malware, ransomware, viruses, spamming, and phishing attacks could harm our reputation, business, and operating results.

- We are subject to climate change risks, including physical and transitional risks, and if we are unable to manage such risks, our business may be adversely impacted.

- We have made climate related commitments that require us to invest significant effort, resources, and management time and circumstances may arise, including those beyond our control, that may require us to revise the contemplated timeframes for implementing these commitments.

- We rely on third parties maintaining open marketplaces to distribute our platform and to provide the software we use in certain of our products and offerings. If such third parties interfere with the distribution of our products or offerings or with our use of such software, our business would be adversely affected.

- We will require additional capital to support the growth of our business, and this capital might not be available on reasonable terms or at all.

- If we are unable to successfully identify, acquire and integrate suitable businesses, our operating results and prospects could be harmed, and any businesses we acquire may not perform as expected or be effectively integrated.

- We may continue to be blocked from or limited in providing or operating our products and offerings in certain jurisdictions, and may be required to modify our business model in those jurisdictions as a result.

- Our business is subject to numerous legal and regulatory risks that could have an adverse impact on our business and future prospects.

- Our business is subject to extensive government regulation and oversight relating to the provision of payment and financial services.

- We face risks related to our collection, use, transfer, disclosure, and other processing of data, which could result in investigations, inquiries, litigation, fines, legislative and regulatory action, and negative press about our privacy and data protection practices.

- If we are unable to protect our intellectual property, or if third parties are successful in claiming that we are misappropriating the intellectual property of others, we may incur significant expense and our business may be adversely affected.

- The market price of our common stock has been, and may continue to be, volatile or may decline steeply or suddenly regardless of our operating performance, and we may not be able to meet investor or analyst expectations. You may not be able to resell your shares at or above the price you paid and may lose all or part of your investment.

**Risks Related to Our Business**

*General Economic Risks*

***The coronavirus ("COVID-19") pandemic and the impact of actions to mitigate the pandemic have adversely impacted and could continue to adversely impact our business, financial condition and results of operations.***

In March 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. Since then, in an attempt to limit the spread of the virus, various governments around the world have implemented, lifted, and in some regions reinstated travel restrictions, business restrictions, school closures, limitations on social or public gatherings, and other measures that have, and may continue to have, an adverse impact on our business and operations, including, for example, by reducing the demand for our Mobility offerings globally, and affecting travel behavior and demand. Even as such restrictions are being lifted and many regions around the world are making progress in their recovery from the pandemic, end-user behavior and demand for our Mobility offering may not recover to pre-pandemic levels. Furthermore, we are experiencing and expect to continue to experience Driver supply constraints, and such supply constraints have been and may continue to be impacted by concerns regarding the COVID-19 pandemic, and we cannot predict when Driver supply levels will return to pre-pandemic levels. Additionally, the recent surge of COVID-19 primarily related to the rise of the Omicron variant in many markets in the United States and globally has affected and may continue to affect, among other things, travel and result in other COVID-19 related advisories and restrictions and may adversely affect both Driver supply and consumer demand for our Mobility offering. In addition, certain U.S. jurisdictions have issued emergency orders that require us to cap

12

fees charged to merchants on Delivery. Furthermore, to support social distancing, we temporarily suspended our shared rides offering globally for approximately one year, and our shared rides offering continues to be temporarily suspended in many regions.

Furthermore, as a result of the COVID-19 pandemic, we asked that all employees who are able to do so work remotely, and while we have since re-opened certain offices and announced a hybrid return-to-office plan for employees, plans to return to the office may be negatively impacted by ongoing spread of the COVID-19 virus, including positive tests for COVID-19 among some personnel who voluntarily returned to the office; these and any future instances of positive COVID-19 tests of personnel working in our offices, as well as continued widespread remote work arrangements could have a negative impact on our operations, the execution of our business plans, and productivity and availability of key personnel and other employees necessary to conduct our business, and of third-party service providers who perform critical services for us, or otherwise cause operational failures due to changes in our normal business practices necessitated by the outbreak and related governmental actions. If a natural disaster, power outage, connectivity issue, or other event occurred that impacted our employees' ability to work remotely, it may be difficult or, in certain cases, impossible, for us to continue our business for a substantial period of time. The increase in remote working may also result in privacy, cybersecurity and fraud risks, and our understanding of applicable legal and regulatory requirements, as well as the latest guidance from regulatory authorities in connection with the COVID-19 pandemic, may be subject to legal or regulatory challenge, particularly as regulatory guidance evolves in response to future developments.

We have responded to the COVID-19 pandemic by launching new, or expanding existing, services, features, or health and safety requirements on an expedited basis, particularly those relating to delivery of food and other goods. Our understanding of applicable privacy, consumer protection and other legal and regulatory requirements, as well as the latest guidance from regulatory authorities in connection with the COVID-19 pandemic, may be subject to legal or regulatory challenge, particularly as regulatory guidance evolves in response to future developments. In addition, our launch of new, or expanding existing, services, features, or health and safety requirements in response to COVID-19 may heighten other risks described in this "Risk Factors" section, including our classification of Drivers. These challenges could result in fines or other enforcement measures that could adversely impact our financial results or operations.

The COVID-19 pandemic has adversely affected our near-term financial results and may adversely impact our long-term financial results, which has required and may continue to require significant actions in response, including but not limited to, additional reductions in workforce and certain changes to pricing models of our offerings, all in an effort to mitigate such impacts. In light of the evolving nature of COVID-19 and the uncertainty it has produced around the world, we do not believe it is possible to predict with precision the pandemic's cumulative and ultimate impact on our future business operations, liquidity, financial condition, and results of operations. The extent of the impact of the pandemic on our business and financial results will depend largely on future developments, including the duration of the spread of the outbreak and any future "waves" or resurgences of the outbreak or variants of the virus, both globally and within the United States, the administration, adoption and efficacy of vaccines in the United States and internationally, the impact on capital and financial markets, the impact on global supply chains, foreign currencies exchange, governmental or regulatory orders that impact our business and whether the impacts may result in permanent changes to our end-users' behaviors, all of which are highly uncertain and cannot be predicted. Moreover, even after shelter at home orders and travel advisories are lifted, demand for our Mobility offering may remain weak for a significant length of time and we cannot predict when and if our Mobility offering will return to pre-COVID-19 demand levels.

In addition, we cannot predict the impact the COVID-19 pandemic will have on our business partners and third-party vendors, and we may be adversely impacted as a result of the adverse impact our business partners and third-party vendors suffer. Additionally, concerns over the economic impact of the COVID-19 pandemic have caused extreme volatility in financial markets, which has and may continue to adversely impact our stock price and our ability to access capital markets. To the extent the COVID-19 pandemic adversely affects our business and financial results, it may also have the effect of heightening many of the other risks described in this "Risk Factors" section. Any of the foregoing factors, or other cascading effects of the pandemic that are not currently foreseeable, could adversely impact our business, financial performance and condition, and results of operations.

*Operational Risks*

***Our business would be adversely affected if Drivers were classified as employees, workers or quasi-employees.***

The classification of Drivers is currently being challenged in courts, by legislators and by government agencies in the United States and abroad. We are involved in numerous legal proceedings globally, including putative class and collective class action lawsuits, demands for arbitration, charges and claims before administrative agencies, and investigations or audits by labor, social security, and tax authorities that claim that Drivers should be treated as our employees (or as workers or quasi-employees where those statuses exist), rather than as independent contractors. We believe that Drivers are independent contractors because, among other things, they can choose whether, when, and where to provide services on our platform, are free to provide services on our competitors' platforms, and provide a vehicle to perform services on our platform. Nevertheless, we may not be successful in defending the classification of Drivers in some or all jurisdictions. Furthermore, the costs associated with defending, settling, or resolving pending and future lawsuits (including demands for arbitration) relating to the classification of Drivers have been and may continue to be material to our business.

In addition, more than 150,000 Drivers in the United States who have entered into arbitration agreements with us have filed (or

13

expressed an intention to file) arbitration demands against us that assert similar classification claims. We have resolved the classification claims of a majority of these Drivers under individual settlement agreements, pursuant to which we have paid approximately $372 million as of December 31, 2021. Furthermore, we are involved in numerous legal proceedings regarding the enforceability of arbitration agreements entered into with Drivers. If we are not successful in such proceedings, this could negatively impact the enforceability of arbitration agreements in other legal proceedings, which could have an adverse consequence on our business and financial condition.

Changes to foreign, state, and local laws governing the definition or classification of independent contractors, or judicial decisions regarding independent contractor classification, could require classification of Drivers as employees (or workers or quasi-employees where those statuses exist) and/or representation of Drivers by labor unions. For example, California's Assembly Bill 5 became effective as of January 1, 2020. Government authorities and private plaintiffs have brought litigation asserting that Assembly Bill 5 requires Drivers in California to be classified as employees. For example, in May 2020, the California Attorney General, in conjunction with the city attorneys for San Francisco, Los Angeles and San Diego, filed a complaint against Uber and Lyft, alleging that drivers are misclassified, and sought an injunction and monetary damages related to the alleged competitive advantage caused by the alleged misclassification of drivers. In August 2020, the San Francisco Superior Court issued a preliminary injunction enjoining Uber and Lyft from classifying drivers as independent contractors during the pendency of the lawsuit, and while the California Court of Appeal subsequently affirmed the lower court's ruling, on April 12, 2021, the parties filed a stipulation to dissolve the injunction, which was granted on April 16, 2021.

In November 2020, California voters approved Proposition 22, a California state ballot initiative that provides a framework for drivers that use platforms like ours for independent work. Proposition 22 went into effect in December 2020 and we expect that Drivers will be able to maintain their status as independent contractors under California law and that we and our competitors will be required to comply with the provisions of Proposition 22. Although our stipulation to dissolve the California Attorney General's preliminary injunction was granted in April 2021, that litigation remains pending, and we also may face liability relating to periods before the effective date of Proposition 22. Legal challenges to Proposition 22 have been and may continue to be filed.

We face similar challenges in other jurisdictions. For example, in July 2020, the Massachusetts Attorney General filed a complaint against Uber and Lyft, alleging that drivers are misclassified, and seeking an injunction. If we do not prevail in current litigation or similar actions that may be brought in the future, we may be required to treat Drivers as employees and/or make other changes to our business model in certain jurisdictions. If, as a result of legislation or judicial decisions, we are required to classify Drivers as employees, we would incur significant additional expenses for compensating Drivers, including expenses associated with the application of wage and hour laws (including minimum wage, overtime, and meal and rest period requirements), employee benefits, social security contributions, taxes (direct and indirect), and potential penalties. In this case, we anticipate significant price increases for Riders to offset these additional costs; however, we believe that the financial impact to Uber would be moderated by the likelihood of all competitors raising prices. Additionally, we may not have adequate Driver supply as Drivers may opt out of our platform given the loss of flexibility under an employment model, and we may not be able to hire a majority of the Drivers currently using our platform. Further, any such reclassification would require us to fundamentally change our business model, and consequently have an adverse effect on our business, results of operations, financial position and cash flows.

Another example of a recent judicial decision relating to Driver classification is the Aslam, Farrar, Hoy and Mithu v. Uber B.V., et al. ruling by the Employment Appeal Tribunal in the United Kingdom, subsequently upheld by the UK Supreme Court, that found that the plaintiff Drivers were workers (rather than self-employed). Subsequent to the UK Supreme Court's ruling, we announced that we will treat all UK drivers as "workers" under UK labor law, going forward. Pursuant to this change, Mobility drivers that use our platform will earn at least the National Living Wage for time spent actively working and be paid holiday pay, and eligible drivers will be enrolled into a pension plan. Other examples of judicial decisions include a decision by the French Supreme Court that a driver for a third-party meal delivery service was under a "subordinate relationship" of the service, indicating an employment relationship, a decision by the French Supreme Court that reclassified an UberX Driver as an employee (which has been followed by inconsistent appellate decisions regarding employee status), decisions by several Swiss governmental bodies ruling that Drivers should be classified as employees for Swiss social security or regulatory purposes, a recent Spanish regulation of food delivery platforms that presumes employment status and a ruling in September 2021 by a Netherlands court that Mobility Drivers are employees within the meaning of the taxi collective bargaining agreement.

In addition, reclassification of Drivers as employees, workers or quasi-employees where those statuses exist, have and could lead to groups of Drivers becoming represented by labor unions and similar organizations. For example, in May 2021, we formally recognized a UK driver union. If a significant number of Drivers were to become unionized and collective bargaining agreement terms were to deviate significantly from our business model, our business, financial condition, operating results and cash flows could be materially adversely affected. In addition, a labor dispute involving Drivers may harm our reputation, disrupt our operations and reduce our net revenues, and the resolution of labor disputes may increase our costs.

In addition, if we are required to classify Drivers as employees, workers or quasi-employees, this may impact our current financial statement presentation including revenue, cost of revenue, incentives and promotions as further described in our significant and critical accounting policies in the section titled "Critical Accounting Estimates" included in Part II, Item 7 of this Annual Report on Form 10-K and Note 1 in the section titled "Notes to the Consolidated Financial Statements" included in Part II, Item 8 of this Annual Report

on Form 10-K.

***The mobility, delivery, and logistics industries are highly competitive, with well-established and low-cost alternatives that have been available for decades, low barriers to entry, low switching costs, and well-capitalized competitors in nearly every major geographic region. If we are unable to compete effectively in these industries, our business and financial prospects would be adversely impacted.***

Our platform provides offerings in the mobility, delivery, and logistics industries. We compete on a global basis, and the markets in which we compete are highly fragmented. We face significant competition in each of the mobility and delivery industries globally and in the logistics industry in the United States and Canada from existing, well-established, and low-cost alternatives, and in the future we expect to face competition from new market entrants given the low barriers to entry that characterize these industries. In addition, within each of these markets, the cost to switch between products is low. Consumers have a propensity to shift to the lowest-cost or highest-quality provider; Drivers have a propensity to shift to the platform with the highest earnings potential; restaurants and other merchants have a propensity to shift to the delivery platform that offers the lowest service fee for their meals and other goods and provides the highest volume of orders; and shippers and carriers have a propensity to shift to the platform with the best price and most convenient service for hauling shipments.

Further, while we work to expand globally and introduce new products and offerings across a range of industries, many of our competitors remain focused on a limited number of products or on a narrow geographic scope, allowing them to develop specialized expertise and employ resources in a more targeted manner than we do. As we and our competitors introduce new products and offerings, and as existing products evolve, we expect to become subject to additional competition. In addition, our competitors may adopt certain of our product features, or may adopt innovations that Drivers, consumers, merchants, shippers, and carriers value more highly than ours, which would render our products less attractive or reduce our ability to differentiate our products. Increased competition could result in, among other things, a reduction of the revenue we generate from the use of our platform, the number of platform users, the frequency of use of our platform, and our margins.

We face competition in each of our offerings, including:

- *Mobility.* Our Mobility offering competes with personal vehicle ownership and usage, which accounts for the majority of passenger miles in the markets that we serve, and traditional transportation services, including taxicab companies and taxi-hailing services, livery and other car services. In addition, public transportation can be a superior substitute to our Mobility offering and in many cases, offers a faster and lower-cost travel option in many cities. We also compete with other ridesharing companies, including certain of our minority-owned affiliates, for Drivers and riders, including Lyft, Ola, Didi, Grab, Bolt, and our Yandex.Taxi joint venture.

- *Delivery.* Our Delivery offering competes with numerous companies in the meal, grocery and other delivery space in various regions for Drivers, consumers, and merchants, including DoorDash, Deliveroo, Glovo, Instacart, Gopuff, Rappi, iFood, Delivery Hero, Just Eat Takeaway, and Amazon. Our Delivery offering also competes with restaurants, including those that offer their own delivery and/or take-away, meal kit delivery services, grocery delivery services, and traditional grocers.

- *Freight.* Our Freight offering competes with global and North American freight brokers such as C.H. Robinson, Total Quality Logistics, XPO Logistics, Convoy, Echo Global Logistics, Coyote, Transfix, DHL, and NEXT Trucking.

Many of our competitors are well-capitalized and offer discounted services, Driver incentives, consumer discounts and promotions, innovative products and offerings, and alternative pricing models, which may be more attractive to consumers than those that we offer. Further, some of our current or potential competitors have, and may in the future continue to have, greater resources and access to larger Driver, consumer, merchant, shipper, or carrier bases in a particular geographic market. In addition, our competitors in certain geographic markets enjoy substantial competitive advantages such as greater brand recognition, longer operating histories, larger marketing budgets, better localized knowledge, and more supportive regulatory regimes. As a result, such competitors may be able to respond more quickly and effectively than us in such markets to new or changing opportunities, technologies, consumer preferences, regulations, or standards, which may render our products or offerings less attractive. In addition, future competitors may share in the effective benefit of any regulatory or governmental approvals and litigation victories we may achieve, without having to incur the costs we have incurred to obtain such benefits.

We are contractually restricted from competing with our minority-owned affiliates with respect to certain aspects of our business, including in China through August 2023, Russia/CIS through February 2025, Southeast Asia through the later of March 2023 or one year after we dispose of all interests in Grab, India with respect to meal delivery through January 2023, and the United States, Canada, Australia, New Zealand and certain parts of Europe with respect to e-bikes and e-scooters through May 2023, while none of our minority-owned affiliates are restricted from competing with us anywhere in the world. Didi currently competes with us in certain countries in Latin America and in Australia. In addition, our Yandex.Taxi joint venture currently competes with us in certain countries in Europe and Africa. As Didi and our other minority-owned affiliates continue to expand their businesses, they may in the future compete with us in additional geographic markets. In addition, we are contractually restricted from competing with some of our

15

majority-owned affiliates with respect to certain aspects of our business, including competing against Uber Freight with respect to freight brokerage.

Additionally, if we are unable to obtain regulatory approval of our acquisitions, we may not ultimately consummate such acquisitions or may consummate them only in jurisdictions where antitrust approval is obtained. Further, in order to obtain regulatory approval of acquisitions, we may be required to divest all or part of our or the target company's operations or agree to other remedies. Any such remedies could result in additional competition in some or all markets.

For all of these reasons, we may not be able to compete successfully against our current and future competitors. Our inability to compete effectively would have an adverse effect on, or otherwise harm, our business, financial condition, and operating results.

***To remain competitive in certain markets, we have in the past lowered, and may continue to lower, fares or service fees, and we have in the past offered, and may continue to offer, significant Driver incentives and consumer discounts and promotions, which has adversely affected and may continue to adversely affect our financial performance.***

To remain competitive in certain markets and generate network scale and liquidity, we have in the past lowered, and may continue to lower, fares or service fees, and we have offered and may continue to offer significant Driver incentives and consumer discounts and promotions. At times, in certain geographic markets, we have offered, and may continue to offer, Driver incentives that cause the total amount of the fare that a Driver retains, combined with the Driver incentives a Driver receives from us, to increase, at times meeting or exceeding the amount of Gross Bookings we generate for a given Trip. In certain geographic markets and regions, we do not have a leading category position, which may result in us choosing to further increase the amount of Driver incentives and consumer discounts and promotions that we offer in those geographic markets and regions. We cannot assure you that offering such Driver incentives and consumer discounts and promotions will be successful. Driver incentives, consumer discounts, promotions, and reductions in fares and our service fee have negatively affected, and will continue to negatively affect, our financial performance. Additionally, we rely on pricing models to calculate consumer fares and Driver earnings, which have been modified over time and will likely in the future be modified, and pricing models at times vary based upon jurisdiction. We cannot assure you that our pricing models or strategies will be successful in attracting consumers and Drivers. For example, changes we have made in California to the information that Drivers see in the application, as well as pricing and offer structure changes, adversely impacted usage of the application. If we are unable to successfully manage these and similar kinds of changes in the future, our business may be adversely impacted.

The markets in which we compete have attracted significant investments from a wide range of funding sources, and we anticipate that many of our competitors will continue to be highly capitalized. Moreover, certain of our stockholders, including SoftBank (a large stockholder), have made substantial investments in certain of our competitors and may increase such investments, make new investments in other competitors, or enter into strategic transactions with competitors in the future. These investments or strategic transactions, along with other competitive advantages discussed above, may allow our competitors to compete more effectively against us and continue to lower their prices, offer Driver incentives or consumer discounts and promotions, or otherwise attract Drivers, consumers, merchants, shippers, and carriers to their platform and away from ours. Such competitive pressures may lead us to maintain or lower fares or service fees or maintain or increase our Driver incentives and consumer discounts and promotions. Ridesharing and certain other categories in which we compete are relatively nascent, and we cannot guarantee that they will stabilize at a competitive equilibrium that will allow us to achieve profitability.

***We have incurred significant losses since inception, including in the United States and other major markets. We expect our operating expenses to increase significantly in the foreseeable future, and we may not achieve or maintain profitability.***

We have incurred significant losses since inception. We incurred operating losses of $8.6 billion, $4.9 billion and $3.8 billion in the years ended December 31, 2019, 2020 and 2021, and as of December 31, 2021, we had an accumulated deficit of $23.6 billion. We will need to generate and sustain increased revenue levels and decrease proportionate expenses in future periods to achieve profitability in many of our largest markets, including in the United States, and even if we do, we may not be able to maintain or increase profitability. We may continue to incur losses in the near term as a result of substantial increases in our operating expenses, as we continue to invest in order to: increase the number of Drivers, consumers, merchants, shippers, and carriers using our platform through incentives, discounts, and promotions; expand within existing or into new markets; increase our research and development expenses; expand marketing channels and operations; hire additional employees; and add new products and offerings to our platform. These efforts may prove more expensive than we anticipate, and we may not succeed in increasing our revenue sufficiently to offset these expenses. Many of our efforts to generate revenue are new and unproven, and any failure to adequately increase revenue or contain the related costs could prevent us from attaining or increasing profitability. In addition, we sometimes introduce new products that we expect to add value to our overall platform and network but which we expect will generate lower Gross Bookings per Trip or a lower Take Rate. Further, we charge a lower service fee to certain of our largest chain restaurant partners on our Delivery offering to grow the number of Delivery consumers, which may at times result in a negative take rate with respect to those transactions after considering amounts collected from consumers and paid to Drivers. As we expand our offerings to additional cities, our offerings in these cities may be less profitable than the markets in which we currently operate. As such, we may not be able to achieve or maintain profitability in the near term, in accordance with our expectations, or at all. Additionally, we may not realize the operating efficiencies we expect to achieve as a result of our acquisition of Careem and Postmates, and may continue to incur significant operating losses in

16

the United States, Middle East, North Africa, and Pakistan in the future. Even if we do experience operating efficiencies, our operating results may not improve, at least in the near term.

***If we are unable to attract or maintain a critical mass of Drivers, consumers, merchants, shippers, and carriers, whether as a result of competition or other factors, our platform will become less appealing to platform users, and our financial results would be adversely impacted.***

Our success in a given geographic market significantly depends on our ability to maintain or increase our network scale and liquidity in that geographic market by attracting Drivers, consumers, merchants, shippers, and carriers to our platform. If Drivers choose not to offer their services through our platform, or elect to offer them through a competitor's platform, we may lack a sufficient supply of Drivers to attract consumers and merchants to our platform. We have experienced and expect to continue to experience Driver supply constraints in most geographic markets in which we operate, and such supply constraints have been and may continue to be impacted by concerns regarding the continuing COVID-19 pandemic. To the extent that we experience Driver supply constraints in a given market, we may need to increase or may not be able to reduce the Driver incentives that we offer without adversely affecting the liquidity network effect that we experience in that market. Similarly, if carriers choose not to offer their services through our platform or elect to use other freight brokers, we may lack a sufficient supply of carriers in specific geographic markets to attract shippers to our platform. Furthermore, if merchants choose to partner with other delivery services in a specific geographic market, or if merchants choose to engage exclusively with our competitors, other merchant marketing websites, or other delivery services, we may lack a sufficient variety and supply of restaurant and other merchant options, or lack access to the most popular restaurants, such that our Delivery offering will become less appealing to consumers and merchants. A significant amount of our Delivery Gross Bookings come from a limited number of large restaurant groups and other merchants, and this concentration increases the risk of fluctuations in our operating results and our sensitivity to any material adverse developments experienced by our significant restaurant partners. If platform users choose to use other ridesharing, meal delivery, or logistics services, we may lack sufficient opportunities for Drivers to earn a fare, carriers to book a shipment, or restaurants to provide a meal, which may reduce the perceived utility of our platform. An insufficient supply of platform users would decrease our network liquidity and adversely affect our revenue and financial results. Although we may benefit from having larger network scale and liquidity than some competitors, those network effects may not result in competitive advantages or may be overcome by smaller competitors. Maintaining a balance between supply and demand in any given area at any given time and our ability to execute operationally may be more important to service quality than the absolute size of the network. If our service quality diminishes or our competitors' products achieve greater market adoption, our competitors may be able to grow at a quicker rate than we do and may diminish our network effect.

Our number of platform users may decline materially or fluctuate as a result of many factors, including, among other things, dissatisfaction with the operation of our platform, the price of fares, meals, and shipments (including a reduction in incentives), dissatisfaction with the quality of service provided by the Drivers and merchants on our platform, quality of platform user support, dissatisfaction with the merchant selection on Delivery, negative publicity related to our brand, including as a result of safety incidents and corporate reporting related to safety, perceived political or geopolitical affiliations, a pandemic or an outbreak of disease or similar public health concern, such as the current COVID-19 pandemic, or fear of such an event, treatment of Drivers, perception that our culture has not fundamentally changed, dissatisfaction with changes we make to our products and offerings, or dissatisfaction with our products and offerings in general. In addition, if we are unable to provide high-quality support to platform users or respond to reported incidents, including safety incidents, in a timely and acceptable manner, our ability to attract and retain platform users could be adversely affected. If Drivers, consumers, merchants, shippers, and carriers do not establish or maintain active accounts with us, if a social media or other campaign encouraging users to cease use of our platform takes hold, if we fail to provide high-quality support, or if we cannot otherwise attract and retain a large number of Drivers, consumers, merchants, shippers, and carriers, our revenue would decline, and our business would suffer.

The number of Drivers and merchants on our platform could decline or fluctuate as a result of a number of factors, including Drivers ceasing to provide their services through our platform, passage or enforcement of local laws limiting our products and offerings, the low switching costs between competitor platforms or services, and dissatisfaction with our brand or reputation, pricing models (including potential reductions in incentives), ability to prevent safety incidents, or other aspects of our business. While we aim to provide an earnings opportunity comparable to that available in retail, wholesale, or merchant services or other similar work, we continue to experience dissatisfaction with our platform from a significant number of Drivers. In particular, as we aim to reduce Driver incentives to improve our financial performance, we expect Driver dissatisfaction will generally increase.

Often, we are forced to make tradeoffs between the satisfaction of various platform users, as a change that one category of users views as positive will likely be viewed as negative to another category of users. We also take certain measures to protect against fraud, help increase safety, and prevent privacy and security breaches, including terminating access to our platform for users with low ratings or reported incidents, and imposing certain qualifications for Drivers and merchants, which may damage our relationships with platform users or discourage their use of our platform. Further, we are investing in our autonomous vehicle strategy, which may add to Driver dissatisfaction over time, as it may reduce the need for Drivers. Driver dissatisfaction has in the past resulted in protests by Drivers in various regions, including India, the United Kingdom, and the United States. Such protests have resulted, and any future protests may result, in interruptions to our business. Continued Driver dissatisfaction may also result in a decline in our number of platform users, which would reduce our network liquidity, and which in turn may cause a further decline in platform usage.

17

Any decline in the number of Drivers, consumers, merchants, shippers, or carriers using our platform would reduce the value of our network and would harm our future operating results.

In addition, changes in Driver qualification and background-check requirements may increase our costs and reduce our ability to onboard additional Drivers to our platform. Our Driver qualification and background check process varies by jurisdiction, and there have been allegations, including from regulators, legislators, prosecutors, taxicab owners, and consumers, that our background check process is insufficient or inadequate. With respect to Drivers who are only eligible to make deliveries through Delivery, our qualification and background check standards are generally less extensive than the standards for Drivers who are eligible to provide rides through our Mobility products. Legislators and regulators may pass laws or adopt regulations in the future requiring Drivers to undergo a materially different type of qualification, screening, or background check process, or that limit our ability to access information used in the background check process in an efficient manner, which could be costly and time-consuming. Required changes in the qualification, screening, and background check process (including any changes to such processes of Careem, Postmates or other acquired companies) could also reduce the number of Drivers in those markets or extend the time required to recruit new Drivers to our platform, which would adversely impact our business and growth. Furthermore, we rely on a single background-check provider in certain jurisdictions, and we may not be able to arrange for adequate background checks from a different provider on commercially reasonable terms or at all. The failure of this provider to provide background checks on a timely basis would result in our inability to onboard new Drivers or retain existing Drivers undergoing periodic background checks that are required to continue using our platform.

***Maintaining and enhancing our brand and reputation is critical to our business prospects. We have previously received significant media coverage and negative publicity regarding our brand and reputation, and while we have taken significant steps to rehabilitate our brand and reputation, failure to maintain or enhance our brand and reputation will cause our business to suffer.***

Maintaining and enhancing our brand and reputation is critical to our ability to attract new employees and platform users, to preserve and deepen the engagement of our existing employees and platform users, and to mitigate legislative or regulatory scrutiny, litigation, government investigations, and adverse platform user sentiment.

We have previously received a high degree of negative media coverage around the world, which has adversely affected our brand and reputation and fueled distrust of our company. Previous negative publicity, particularly as a result of cultural issues in 2017, adversely affected our brand and reputation, which made it difficult for us to attract and retain platform users, reduces confidence in and use of our products and offerings, invites continued legislative and regulatory scrutiny, and results in additional litigation and governmental investigations. Concurrently with and after these events, our competitors raised additional capital, increased their investments in certain markets, and improved their category positions and market shares, and may continue to do so.

In 2019, we released a safety report, which provides the public with data related to reports of sexual assaults and other critical safety incidents claimed to have occurred on our platform in the United States. The continuing public responses to this safety report or any future safety reports or similar public reporting of safety incidents claimed to have occurred on our platform, which may include disclosure of reports provided to regulators and other government authorities, may continue to result in positive and negative media coverage and increased regulatory scrutiny and could adversely affect our reputation with platform users. Further unfavorable media coverage and negative publicity could adversely impact our financial results and future prospects. As our platform continues to scale and becomes increasingly interconnected, resulting in increased media coverage and public awareness of our brand, future damage to our brand and reputation could have an amplified effect on our various platform offerings. Additionally, some of our acquired and majority-owned companies, including Careem, Postmates and Cornershop, have or will continue to use their own brands and/or operate their own apps in parallel with our brand and apps, and any damage or reputational harm to their brands could adversely impact our brand and reputation.

Our brand and reputation might also be harmed by events outside of our control. For example, we have licensed our brand in connection with certain divestitures and joint ventures, including to Didi in China, to our Yandex.Taxi joint venture in Russia/CIS, and to Zomato in India, and while we have certain contractual protections in place governing the use of our brand by these companies, we do not control these businesses, we are not able to anticipate their actions, and consumers may not be aware that these service providers are not controlled by us. Furthermore, if Drivers, merchants, or carriers provide diminished quality of service, are involved in incidents regarding safety or privacy, engage in malfeasance, or otherwise violate the law, we may receive unfavorable press coverage and our reputation and business may be harmed. As a result, any of these third parties could take actions that result in harm to our brand, reputation, and consequently, our business.

While we have taken significant steps to rehabilitate our brand and reputation, the successful rehabilitation of our brand will depend largely on maintaining a good reputation, minimizing the number of safety incidents, continuing an improved culture and workplace practices, improving our compliance programs, maintaining a high quality of service and ethical behavior, and continuing our marketing and public relations efforts. Our brand promotion, reputation building, and media strategies have involved significant costs and may not be successful. We anticipate that other competitors and potential competitors will expand their offerings, which will make maintaining and enhancing our reputation and brand increasingly more difficult and expensive. If we fail to successfully maintain our brand in the current or future competitive environment or if events occur in the future which negatively affect public perception of our company, our brand and reputation would be further damaged and our business may suffer.

18

***Our historical workplace culture and forward-leaning approach created operational, compliance, and cultural challenges, and a failure to address these challenges would adversely impact our business, financial condition, operating results, and prospects.***

Our historical workplace culture and forward-leaning approach created significant operational and cultural challenges that have in the past harmed, and may in the future continue to harm, our business results and financial condition. Our prior failure to prioritize compliance, has led to increased regulatory scrutiny globally. Although we have since made changes in our company's cultural values and composition of our leadership team and have an ongoing commitment to promote transparency and collaboration, regulators may continue to perceive us negatively, which would adversely impact our business, financial condition, operating results, and prospects.

Our historical workplace culture also created a lack of transparency internally, which resulted in siloed teams that lacked coordination and knowledge sharing, causing misalignment and inefficiencies in operational and strategic objectives. Although we have since embraced a culture of enhanced transparency, these efforts may not be successful. Furthermore, many of our regional operations are not centrally managed, such that key policies may not be adequately communicated or managed to achieve consistent business objectives across functions and regions. Although we have reorganized some of our teams to address such issues, such reorganizations may not be successful in aligning operational or strategic objectives across our company.

***Our workforce and operations have grown substantially since our inception and we have implemented several reductions in workforce in 2019 and 2020. If we are unable to optimize our organizational structure or effectively manage our growth or any reductions in workforce, our financial performance and future prospects will be adversely affected.***

Since our inception, we have experienced rapid growth in the United States and internationally. This expansion increases the complexity of our business and has placed, and will continue to place, significant strain on our management, personnel, operations, systems, technical performance, financial resources, and internal financial control and reporting functions. We may not be able to manage our growth effectively, which could damage our reputation and negatively affect our operating results.

As our operations have expanded, we have grown from 159 employees as of December 31, 2012 to approximately 29,300 global employees as of December 31, 2021, of whom approximately 12,300 were located outside the United States. We expect the total number of our employees located outside the United States to increase as we expand globally. Properly managing our growth will require us to continue to hire, train, and manage qualified employees and staff, including engineers, operations personnel, financial and accounting staff, and sales and marketing staff, and to improve and maintain our technology. If our new hires perform poorly, if we are unsuccessful in hiring, training, managing, and integrating new employees and staff, or if we are not successful in retaining our existing employees and staff, our business may be harmed. Moreover, in order to optimize our organizational structure, we have implemented several reductions in workforce and restructurings, including in response to the COVID-19 pandemic and its impact on our business, and may in the future implement other reductions in workforce. Any reduction in workforce or restructuring may yield unintended consequences and costs, such as attrition beyond the intended reduction in workforce, the distraction of employees, or reduced employee morale and could adversely affect our reputation as an employer, which could make it more difficult for us to hire new employees in the future and increase the risk that we may not achieve the anticipated benefits from the reduction in workforce. Properly managing our growth or any reductions in workforce will require us to establish consistent policies across regions and functions, and a failure to do so could likewise harm our business.

Our failure to upgrade our technology or network infrastructure effectively to support our growth could result in unanticipated system disruptions, slow response times, or poor experiences for Drivers, consumers, merchants, shippers, and carriers. To manage the growth of our operations and personnel and improve the technology that supports our business operations, as well as our financial and management systems, disclosure controls and procedures, and internal controls over financial reporting, we will be required to commit substantial financial, operational, and technical resources. In particular, we will need to improve our transaction processing and reporting, operational, and financial systems, procedures, and controls. For example, due to our significant growth, especially with respect to our high-growth emerging offerings like Delivery and Freight, we face challenges in timely and appropriately designing controls in response to evolving risks of material misstatement. These improvements are and will be particularly challenging when we acquire new businesses with different systems. Our current and planned personnel, systems, procedures, and controls may not be adequate to support our future operations. If we are unable to expand our operations and hire additional qualified personnel in an efficient manner, or if our operational technology is insufficient to reliably service Drivers, consumers, merchants, shippers, or carriers, platform user satisfaction will be adversely affected and may cause platform users to switch to our competitors' platforms, which would adversely affect our business, financial condition, and operating results.

Our organizational structure is complex and will continue to grow as we add additional Drivers, consumers, merchants, carriers, shippers, employees, products and offerings, and technologies, and as we continue to expand globally. We will need to improve our operational, financial, and management controls as well as our reporting systems and procedures to support the growth of our organizational structure. We will require capital and management resources to grow and mature in these areas. If we are unable to effectively manage the growth of our business, the quality of our platform may suffer, and we may be unable to address competitive challenges, which would adversely affect our overall business, operations, and financial condition.

19

***If platform users engage in, or are subject to, criminal, violent, inappropriate, or dangerous activity that results in major safety incidents, our ability to attract and retain Drivers, consumers, merchants, shippers, and carriers may be harmed, which could have an adverse impact on our reputation, business, financial condition, and operating results.***

We are not able to control or predict the actions of platform users and third parties, either during their use of our platform or otherwise, and we may be unable to protect or provide a safe environment for Drivers and consumers as a result of certain actions by Drivers, consumers, merchants, carriers, and third parties. Such actions may result in injuries, property damage, or loss of life for consumers and third parties, or business interruption, brand and reputational damage, or significant liabilities for us. Although we administer certain qualification processes for users of our platform, including background checks on Drivers through third-party service providers, these qualification processes and background checks may not expose all potentially relevant information and are limited in certain jurisdictions according to national and local laws, and our third-party service providers may fail to conduct such background checks adequately or disclose information that could be relevant to a determination of eligibility. Further, the qualification and background check standards for Couriers are generally less extensive than those conducted for Mobility Drivers. In addition, we do not independently test Drivers' driving skills. Consequently, we expect to continue to receive complaints from riders and other consumers, as well as actual or threatened legal action against us related to Driver conduct. We have also faced civil litigation alleging, among other things, inadequate Driver qualification processes and background checks, and general misrepresentations regarding the safety of our platform.

If Drivers or carriers, or individuals impersonating Drivers or carriers, engage in criminal activity, misconduct, or inappropriate conduct or use our platform as a conduit for criminal activity, consumers and shippers may not consider our products and offerings safe, and we may receive negative press coverage as a result of our business relationship with such Driver or carrier, which would adversely impact our brand, reputation, and business. There have been numerous incidents and allegations worldwide of Drivers, or individuals impersonating Drivers, sexually assaulting, abusing, kidnapping and/or fatally injuring consumers, or otherwise engaging in criminal activity while using our platform or claiming to use our platform. Furthermore, if consumers engage in criminal activity or misconduct while using our platform, Drivers and merchants may be unwilling to continue using our platform. In addition, certain regions where we operate have high rates of violent crime, which has impacted Drivers and consumers in those regions. For example, in Latin America, there have been numerous and increasing reports of Drivers and consumers being victimized by violent crime, such as armed robbery, violent assault, and rape, while taking or providing a trip on our platform. If other criminal, inappropriate, or other negative incidents occur due to the conduct of platform users or third parties, our ability to attract platform users may be harmed, and our business and financial results could be adversely affected.

Public reporting or disclosure of reported safety information, including information about safety incidents reportedly occurring on or related to our platform, whether generated by us or third parties such as media or regulators, may adversely impact our business and financial results.

Further, we may be subject to claims of significant liability based on traffic accidents, deaths, injuries, or other incidents that are caused by Drivers, consumers, or third parties while using our platform, or even when Drivers, consumers, or third parties are not actively using our platform. On a smaller scale, we may face litigation related to claims by Drivers for the actions of consumers or third parties. Furthermore, operating a motor vehicle is inherently dangerous. In addition, the growth of our Delivery offering has led to an increase in Couriers on two wheel vehicles such as scooters and bicycles, who are more vulnerable road users and face a more severe level of injury in the event of a collision than that faced while driving in a vehicle. For example, urban hazards such as unpaved or uneven roadways increase the risk and severity of potential injuries. In addition, Couriers, in particular those on two wheel vehicles predominantly in metropolitan areas, need to share, navigate, and at times contend with narrow and heavily congested roads occupied by cars, buses and light rail, especially during "rush" hours, all of which heighten the potential risk of injuries or death. Our auto liability and general liability insurance policies may not cover all potential claims to which we are exposed, and may not be adequate to indemnify us for all liability. These incidents may subject us to liability and negative publicity, which would increase our operating costs and adversely affect our business, operating results, and future prospects. Even if these claims do not result in liability, we will incur significant costs in investigating and defending against them. As we expand our products and offerings, such as Freight, this insurance risk will grow.

***We are making substantial investments in new offerings and technologies, and may increase such investments in the future. These new ventures are inherently risky, and we may never realize any expected benefits from them.***

We have made substantial investments to develop new offerings and technologies, and we intend to continue investing significant resources in developing new technologies, tools, features, services, products and offerings. For example, through our acquisition of Cornershop, a provider of online grocery delivery in several countries including Mexico and Chile, we expanded our Delivery offering to grocery delivery. Additionally, in October 2021, we acquired The Drizly Group, Inc., which operates an on-demand alcohol marketplace in North America, in order to further expand our Delivery offering to alcohol. We also plan to invest significant resources to develop and expand new offerings and technologies in the markets in which Careem and Postmates operate. If we do not spend our development budget efficiently or effectively on commercially successful and innovative technologies, we may not realize the expected benefits of our strategy. Our new initiatives also have a high degree of risk, as each involves nascent industries and unproven business strategies and technologies with which we have limited or no prior development or operating experience. Because such

20

offerings and technologies are new, they will likely involve claims and liabilities (including, but not limited to, personal injury claims), expenses, regulatory challenges, and other risks, some of which we do not currently anticipate.

There can be no assurance that consumer demand for such initiatives will exist or be sustained at the levels that we anticipate, or that any of these initiatives will gain sufficient traction or market acceptance to generate sufficient revenue to offset any new expenses or liabilities associated with these new investments. It is also possible that products and offerings developed by others will render our products and offerings noncompetitive or obsolete. Further, our development efforts with respect to new products, offerings and technologies could distract management from current operations, and will divert capital and other resources from our more established products, offerings and technologies. Even if we are successful in developing new products, offerings or technologies, regulatory authorities may subject us to new rules or restrictions in response to our innovations that could increase our expenses or prevent us from successfully commercializing new products, offerings or technologies. If we do not realize the expected benefits of our investments, our business, financial condition, operating results, and prospects may be harmed.

***Our business is substantially dependent on operations outside the United States, including those in markets in which we have limited experience, and if we are unable to manage the risks presented by our business model internationally, our financial results and future prospects will be adversely impacted.***

As of December 31, 2021, we operated in approximately 72 countries, and markets outside the United States accounted for approximately 78% of all Trips. We have limited experience operating in many jurisdictions outside of the United States and have made, and expect to continue to make, significant investments to expand our international operations and compete with local and other global competitors. For example, our acquisitions of Careem and Cornershop may not be successful and may negatively affect our operating results.

Conducting our business internationally, particularly in countries in which we have limited experience, subjects us to risks that we do not face to the same degree in the United States. These risks include, among others:

- operational and compliance challenges caused by distance, language, and cultural differences;

- the resources required to localize our business, which requires the translation of our mobile app and website into foreign languages and the adaptation of our operations to local practices, laws, and regulations and any changes in such practices, laws, and regulations;

- laws and regulations more restrictive than those in the United States, including laws governing competition, pricing, payment methods, Internet activities, transportation services (such as taxis and vehicles for hire), transportation network companies (such as ridesharing), logistics services, payment processing and payment gateways, real estate tenancy laws, tax and social security laws, employment and labor laws, driver screening and background checks, licensing regulations, email messaging, privacy, location services, collection, use, processing, or sharing of personal information, ownership of intellectual property, and other activities important to our business;

- competition with companies or other services (such as taxis or vehicles for hire) that understand local markets better than we do, that have pre-existing relationships with potential platform users in those markets, or that are favored by government or regulatory authorities in those markets;

- differing levels of social acceptance of our brand, products, and offerings;

- differing levels of technological compatibility with our platform;

- exposure to business cultures in which improper business practices may be prevalent;

- legal uncertainty regarding our liability for the actions of platform users and third parties, including uncertainty resulting from unique local laws or a lack of clear legal precedent;

- difficulties in managing, growing, and staffing international operations, including in countries in which foreign employees may become part of labor unions, employee representative bodies, or collective bargaining agreements, and challenges relating to work stoppages or slowdowns;

- fluctuations in currency exchange rates;

- managing operations in markets in which cash transactions are favored over credit or debit cards;

- regulations governing the control of local currencies that impact our ability to collect fares on behalf of Drivers and remit those funds to Drivers in the same currencies, as well as higher levels of credit risk and payment fraud;

- adverse tax consequences, including the complexities of foreign value added and digital services tax systems, and restrictions on the repatriation of earnings;

- increased financial accounting and reporting burdens, and complexities associated with implementing and maintaining adequate internal controls;

21

- difficulties in implementing and maintaining the financial systems and processes needed to enable compliance across multiple offerings and jurisdictions;

- import and export restrictions and changes in trade regulation;

- political, social, and economic instability abroad, war, terrorist attacks and security concerns in general, and societal crime conditions that harm or disrupt the global economy and/or can directly impact platform users;

- public health concerns or emergencies, such as the current COVID-19 pandemic and other highly communicable diseases or viruses, outbreaks of which have from time to time occurred in various parts of the world in which we operate; and

- reduced or varied protection for intellectual property rights in some markets.

These risks could adversely affect our international operations, which could in turn adversely affect our business, financial condition, and operating results.

***We have limited influence over our minority-owned affiliates, which subjects us to substantial risks, including potential loss of value.***

Our growth strategy has included the restructuring of our business and assets by divesting our business and assets in certain jurisdictions and partnering with and investing in local ridesharing, and delivery companies to participate in those markets rather than operate in those markets independently. Our growth strategy has also included the divestment of certain lines of businesses in its entirety, and not just in certain jurisdictions, and instead partnering and investing in our competitors in those lines of businesses. As a result, a significant portion of our assets includes minority ownership positions, including in Didi, Grab, our Yandex.Taxi joint venture, Lime, Zomato and Aurora.

Our ownership in these entities involves significant risks that are outside our control. We are not represented on the management team or board of directors of Didi or Zomato, and therefore we do not participate in the day-to-day management of Didi or Zomato or the actions taken by the board of directors of Didi and Zomato. We are not represented on the management teams of Grab, our Yandex.Taxi joint venture, Lime or Aurora, and therefore do not participate in the day-to-day management of Grab, our Yandex.Taxi joint venture, Lime or Aurora. Although we are represented on each of the boards of directors of Grab, our Yandex.Taxi joint venture, Lime and Aurora, we do not have a controlling influence on those boards. As a result, the boards of directors or management teams of these companies may make decisions or take actions with which we disagree or that may be harmful to the value of our ownership in these companies. Additionally, these companies have expanded their offerings, and we expect them to continue to expand their offerings in the future, to compete with us in various markets throughout the world. While this could enhance the value of our ownership interest in these companies, our business, financial condition, operating results, and prospects would be adversely affected by such expansion into markets in which we operate.

Any material decline in the business of these entities would adversely affect the value of our assets and our financial results. Furthermore, the value of these assets is based in part on the market valuations of these entities, and weakened financial markets have adversely affected, and may in the future adversely affect such valuations. To the extent these businesses are or become publicly traded companies, volatility or fluctuations in the stock price of such companies could adversely impact our financial results. These positions could expose us to risks, litigation, and unknown liabilities because, among other things, these companies have limited operating histories in evolving industries and may have less predictable operating results; to the extent these companies are privately owned, limited public information is available and we may not learn all the material information regarding these businesses; are domiciled and operate in countries with particular economic, tax, political, legal, safety, regulatory and public health risks, including the extent of the impact of the COVID-19 pandemic on their business; are domiciled or operate in countries that may become subject to economic sanctions or foreign investment restrictions; depend on the management talents and efforts of a small group of individuals, and, as a result, the death, disability, resignation, or termination of one or more of these individuals could have an adverse effect on the relevant company's operations; and will likely require substantial additional capital to support their operations and expansion and to maintain their competitive positions. Any of these risks could materially affect the value of our assets, which could have an adverse effect on our business, financial condition, operating results, or the trading price of our common stock.

Further, we are contractually limited in our ability to sell or transfer these assets. For example, in connection with Aurora's November 2021 initial public offering, we are subject to a 4-year lock-up with respect to our shares in Aurora. Other than Aurora, Grab, Didi and Zomato, there is currently no public market for any of these securities, and there may be no market in the future if and when we decide to sell such assets. Furthermore, we may be required to sell these assets at a time at which we would not be able to realize what we believe to be the long-term value of these assets. For example, if we were deemed an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"), we may be required to sell some or all of such assets so that we would not be subject to the requirements of the Investment Company Act. Additionally, we may have to pay significant taxes upon the sale or transfer of these assets. Accordingly, we may never realize the value of these assets relative to the contributions we made to these businesses.

***We may experience significant fluctuations in our operating results. If we are unable to achieve or sustain profitability, our prospects would be adversely affected and investors may lose some or all of the value of their investment.***

22

Our operating results may vary significantly and are not necessarily an indication of future performance. These fluctuations may be a result of a variety of factors, some of which are beyond our control, such as the current COVID-19 pandemic. In addition, we experience seasonal fluctuations in our financial results. For Mobility, we typically generate higher revenue in our fourth quarter compared to other quarters due in part to fourth quarter holiday and business demand, and typically generate lower revenue in our third quarter compared to other quarters due in part to less usage of our platform during peak vacation season in certain cities, such as Paris. We have typically experienced lower quarter-over-quarter growth in Mobility in the first quarter. In 2021, we experienced less seasonality as a result of the COVID-19 pandemic and related restrictions, which altered typical travel patterns. For Delivery, we expect to experience seasonal increases in our revenue in the first and fourth quarters compared to the second and third quarters, although the historical growth of Delivery has masked these seasonal fluctuations; however, in 2021, we experienced less seasonality as a result of the COVID-19 pandemic and related restrictions, which accelerated the growth of Delivery in 2021 as cities imposed dining restrictions and shelter in place orders. Our growth has made, and may in the future make, seasonal fluctuations difficult to detect. We expect these seasonal trends to become more pronounced over time as our growth slows. Other seasonal trends may develop or these existing seasonal trends may become more extreme, which would contribute to fluctuations in our operating results. In addition to seasonality, our operating results may fluctuate as a result of factors including our ability to attract and retain new platform users, increased competition in the markets in which we operate, our ability to expand our operations in new and existing markets, our ability to maintain an adequate growth rate and effectively manage that growth, our ability to keep pace with technological changes in the industries in which we operate, changes in governmental or other regulations affecting our business, harm to our brand or reputation, and other risks described elsewhere in this Annual Report on Form 10-K. As such, we may not accurately forecast our operating results. We base our expense levels and investment plans on estimates, which has become more challenging in light of the COVID-19 pandemic. A significant portion of our expenses and investments are fixed, and we may not be able to adjust our spending quickly enough if our revenue is less than expected, resulting in losses that exceed our expectations. If we are unable to achieve sustained profits, our prospects would be adversely affected and investors may lose some or all of the value of their investment.

***If our growth slows more significantly than we currently expect, we may not be able to achieve profitability, which would adversely affect our financial results and future prospects.***

Our Gross Bookings and revenue growth rates (in particular with respect to our ridesharing products) have slowed in recent periods, and we expect that they will continue to slow in the future. We believe that our growth depends on a number of factors, including the duration and severity of the COVID-19 pandemic and our ability to:

- grow supply and demand on our platform;

- increase existing platform users' activity on our platform;

- continue to introduce our platform to new markets;

- provide high-quality support to Drivers, consumers, merchants, shippers, and carriers;

- expand our business and increase our market share and category position;

- compete with the products and offerings of, and pricing and incentives offered by, our competitors;

- develop new products, offerings, and technologies;

- identify and acquire or invest in businesses, products, offerings, or technologies that we believe could complement or expand our platform;

- penetrate suburban and rural areas and increase the number of rides taken on our platform outside metropolitan areas;

- reduce the costs of our Mobility offering to better compete with personal vehicle ownership and usage and other low-cost alternatives like public transportation, which in many cases can be faster or cheaper than any other form of transportation;

- maintain existing local regulations in key markets where we operate;

- enter or expand operations in some of the key countries in which we are currently limited by local regulations, such as Argentina, Germany, Italy, Japan, South Korea, and Spain; and

- increase positive perception of our brand.

We may not successfully accomplish any of these objectives. In addition, circumstances that have accelerated the growth of our Delivery offering stemming from continued stay-at-home order demand related to COVID-19 may not continue in the future. A softening of Driver, consumer, merchant, shipper, or carrier demand, whether caused by changes in the preferences of such parties, failure to maintain our brand, changes in the U.S. or global economies, licensing fees in various jurisdictions, competition, or other factors, may result in decreased revenue or growth and our financial results and future prospects would be adversely impacted. We expect to continue to incur significant expenses, and if we cannot increase our revenue at a faster rate than the increase in our expenses, we will not achieve profitability.

P-02346-0025

***We generate a significant percentage of our Gross Bookings from trips in large metropolitan areas and trips to and from airports. If our operations in large metropolitan areas or ability to provide trips to and from airports are negatively affected, our financial results and future prospects would be adversely impacted.***

In 2021, we derived 23% of our Mobility Gross Bookings from five metropolitan areas—Chicago, Miami, and New York City in the United States, Sao Paulo in Brazil, and London in the United Kingdom. We experience strong competition in large metropolitan areas, which has led us to offer significant Driver incentives and consumer discounts and promotions in these large metropolitan areas. As a result of our geographic concentration, our business and financial results are susceptible to economic, social, weather, and regulatory conditions or other circumstances in each of these large metropolitan areas. Outbreaks of contagious diseases or other viruses, such as COVID-19, could lead to a sustained decline in the desirability of living, working and congregating in metropolitan areas in which we operate. Any short-term or long-term shifts in the travel patterns of consumers away from metropolitan areas, due to health concerns regarding epidemics or pandemics such as COVID-19, could have an adverse impact on our Mobility Gross Bookings from these areas. An economic downturn, increased competition, or regulatory obstacles in any of these key metropolitan areas would adversely affect our business, financial condition, and operating results to a much greater degree than would the occurrence of such events in other areas. In addition, any changes to local laws or regulations within these key metropolitan areas that affect our ability to operate or increase our operating expenses in these markets would have an adverse effect on our business. Furthermore, if we are unable to renew existing licenses or do not receive new licenses in key metropolitan areas where we operate or such licenses are terminated, any inability to operate in such metropolitan area, as well as the publicity concerning any such termination or non-renewal, could adversely affect our business, financial condition, and operating results.

In addition, in August 2018, New York City approved regulations for the local for-hire market (which includes our ridesharing products), including a cap on the number of new vehicle licenses issued to drivers who offer for-hire services. In December 2018, New York City implemented a per-mile and per-minute minimum trip payment formula, designed to establish a minimum pay standard, for drivers providing for-hire services in New York City, such as those provided by Drivers on our platform. These minimum rates took effect in February 2019. Since implementation, these regulations have had an adverse impact on our financial performance in New York City and may continue to do so in the future. Additionally, in November 2019, a ballot measure to impose a surcharge on ridesharing trips in San Francisco was approved by voters in San Francisco. This surcharge took effect on January 1, 2020. In addition, other jurisdictions such as Seattle have passed, or may consider or pass regulations that would implement minimum wage requirements or permit drivers to negotiate for minimum wages while providing services on our platform. Further, we expect that we will continue to face challenges in penetrating lower-density suburban and rural areas, where our network is smaller and less liquid, the cost of personal vehicle ownership is lower, and personal vehicle ownership is more convenient. If we are not successful in penetrating suburban and rural areas, or if we are unable to operate in certain key metropolitan areas in the future, our ability to serve what we consider to be our total addressable market would be limited, and our business, financial condition, and operating results would suffer.

In 2021, we generated 11% of our Mobility Gross Bookings from trips that either started or were completed at an airport. As a result of this concentration, our operating results are susceptible to existing regulations and regulatory changes that impact the ability of drivers using our platform to provide trips to and from airports. In addition, as a result of the COVID-19 pandemic, travel behavior has changed and airline travel has slowed, reducing the demand for Mobility to and from airports. Sustained declines in air travel due to COVID-19, or other travel-related health concerns, could continue to suppress demand for airport-related Mobility and reduce our Mobility Gross Bookings from airport trips. Certain airports currently regulate ridesharing within airport boundaries, including by mandating that ridesharing service providers obtain airport-specific licenses, and some airports, particularly those outside the United States, have banned ridesharing operations altogether. Despite such bans, some Drivers continue to provide Mobility services, including trips to and from airports, despite lacking the requisite permits. Such actions may result in the imposition of fines or sanctions, including further bans on our ability to operate within airport boundaries, against us or Drivers. Additional bans on our airport operations, or any permitting requirements or instances of non-compliance by Drivers, would significantly disrupt our operations. In addition, if drop-offs or pick-ups of riders become inconvenient because of airport rules or regulations, or more expensive because of airport-imposed fees, the number of Drivers or consumers could decrease, which would adversely affect our business, financial condition, and operating results. While we have entered into agreements with most major U.S. airports as well as certain airports outside the United States to allow the use of our platform within airport boundaries, we cannot guarantee that we will be able to renew such agreements on favorable terms if at all, and we may not be successful in negotiating similar agreements with airports in all jurisdictions.

***If we fail to offer autonomous vehicle technologies on our platform or fail to offer such technologies on our platform before our competitors, or if such technologies fail to perform as expected, are inferior to those offered by our competitors, or are perceived as less safe than those offered by competitors or non-autonomous vehicles, our financial performance and prospects would be adversely impacted.***

We have invested, and we may continue to invest, substantial amounts in companies with whom we partner to offer autonomous vehicle technologies on our platform. For example, in January 2021, we completed the merger of our autonomous technologies business with Aurora, and included a $400 million investment in the combined company and a commercial agreement pursuant to which we and Aurora will collaborate with respect to the launch and commercialization of self-driving vehicles on our ridesharing

24

network. We believe that autonomous vehicle technologies may have the ability to meaningfully impact the industries in which we compete and that autonomous vehicles present substantial opportunities. Several companies other than Aurora, including Waymo, Cruise Automation, Tesla, Apple, Zoox (which Amazon has acquired), Aptiv, and Nuro, are developing autonomous vehicle technologies, either alone or through collaborations with car manufacturers, and we expect that they will use such technology to further compete with us in the mobility, delivery, or logistics industries. Waymo has already introduced a commercialized ridehailing fleet of autonomous vehicles, and it is possible that our competitors could introduce autonomous vehicle offerings earlier than we will be able to offer autonomous vehicles on our platform through our commercial agreement with Aurora or other partners. In the event that our competitors bring autonomous vehicles to market before we are able to offer autonomous vehicles on our platform, or their technology is or is perceived to be superior to the technology of parties with which we partner to offer autonomous vehicles on our platform, they may be able to leverage such technology to compete more effectively with us, which would adversely impact our financial performance and our prospects. For example, use of autonomous vehicles could substantially reduce the cost of providing ridesharing, delivery, or logistics services, which could allow competitors to offer such services at a substantially lower price as compared to the price available to consumers on our platform. If a significant number of consumers choose to use our competitors' offerings over ours, our financial performance and prospects would be adversely impacted.

Autonomous vehicle technologies involve significant risks and liabilities. Collisions, including fatal collisions, have happened. Failures of autonomous vehicle technologies that we may offer on our platform or crashes involving autonomous vehicles using the technology of our partners, could generate substantial liability for us, create negative publicity about us, or result in regulatory scrutiny, all of which would have an adverse effect on our reputation, brand, business, prospects, and operating results.

Federal and state government regulations specifically designed to govern autonomous vehicle operation, testing and/or manufacture are developing. These regulations could include requirements that delay or limit our ability to offer autonomous vehicles on our platform. If regulations of this nature are implemented, we may not be able to offer autonomous vehicle technologies on our platform in the manner we expect, or at all. Further, if we or parties with which we partner to offer autonomous vehicle technologies are unable to comply with existing or new regulations or laws applicable to autonomous vehicles, we and our partners could become subject to substantial fines or penalties.

***Our business depends on retaining and attracting high-quality personnel, and continued attrition, future attrition, or unsuccessful succession planning could adversely affect our business.***

Our success depends in large part on our ability to attract and retain high-quality management, operations, engineering, and other personnel who are in high demand, are often subject to competing employment offers, and are attractive recruiting targets for our competitors. Challenges related to our historical culture and workplace practices and negative publicity we experience have in the past led to significant attrition and made it more difficult to attract high-quality employees. Our employees have been working from home for almost two years in light of the COVID-19 pandemic, and although we announced our "return to office" plan, which includes shifting to a hybrid model where employees have flexibility to work from home, we have not yet set a return-to-office-date in light of the dynamic nature of the pandemic. A hybrid model may create challenges, including challenges maintaining our corporate culture, increasing attrition or limiting our ability to attract employees if individuals prefer to continue working full time at home or in the office, or if there are instances of COVID-19 at the office. Prolonged remote work, as well as COVID-19 more generally, introduced new dynamics into the households of many of our employees, including struggling with work-life balance and feelings of stress and social isolation, and we experienced higher levels of attrition. Future challenges related to our culture and workplace practices or additional negative publicity could lead to further attrition and difficulty attracting high-quality employees.

Future leadership transitions and management changes may cause uncertainty in, or a disruption to, our business, and may increase the likelihood of senior management or other employee turnover. The loss of qualified executives and employees, or an inability to attract, retain, and motivate high-quality executives and employees required for the planned expansion of our business, may harm our operating results and impair our ability to grow.

In addition, we depend on the continued services and performance of our key personnel, including our Chief Executive Officer Dara Khosrowshahi. We have entered into an employment agreement with Mr. Khosrowshahi, which is at-will and has no specific duration. Recently hired executives may view our business differently than members of our prior management team and, over time, may make changes to our personnel and their responsibilities as well as our strategic focus, operations, or business plans. We may not be able to properly manage any such shift in focus, and any changes to our business may ultimately prove unsuccessful.

In addition, our failure to put in place adequate succession plans for senior and key management roles or the failure of key employees to successfully transition into new roles, for example, as a result of reductions in workforce, organizational changes and attrition, could have an adverse effect on our business and operating results. The unexpected or abrupt departure of one or more of our key personnel and the failure to effectively transfer knowledge and effect smooth key personnel transitions has had and may in the future have an adverse effect on our business resulting from the loss of such person's skills, knowledge of our business, and years of industry experience. If we cannot effectively manage leadership transitions and management changes in the future, our reputation and future business prospects could be adversely affected.

To attract and retain key personnel, we use equity incentives, among other measures. These measures may not be sufficient to attract and retain the personnel we require to operate our business effectively. Further, the equity incentives we currently use to attract,

P-02346-0027

retain, and motivate employees may not be as effective as in the past, particularly if the value of the underlying stock does not increase commensurate with expectations or consistent with our historical stock price growth. If we are unable to attract and retain high-quality management and operating personnel, our business, financial condition, and operating results could be adversely affected.

***The impact of economic conditions, including the resulting effect on discretionary consumer spending, may harm our business and operating results.***

Our performance is subject to economic conditions and their impact on levels of discretionary consumer spending. Some of the factors that have an impact on discretionary consumer spending include general economic conditions, unemployment, consumer debt, reductions in net worth, residential real estate and mortgage markets, taxation, energy prices, interest rates, consumer confidence, and other macroeconomic factors. Consumer preferences tend to shift to lower-cost alternatives during recessionary periods and other periods in which disposable income is adversely affected. In such circumstances, consumers may choose to use one of our lower price-point products over a higher Gross Bookings per Trip offering, may choose to forgo our offerings for lower-cost personal vehicle or public transportation alternatives, or may reduce total miles traveled as economic activity decreases. Such a shift in consumer behavior may reduce our network liquidity and may harm our business, financial condition, and operating results. Likewise, small businesses that do not have substantial resources, including many of the merchants in our network, tend to be more adversely affected by poor economic conditions than large businesses. Further, because spending for food purchases from merchants is generally considered discretionary, any decline in consumer spending may have a disproportionate effect on our Delivery offering. If spending at many of the merchants in our network declines, or if a significant number of these merchants go out of business, consumers may be less likely to use our products and offerings, which could harm our business and operating results. Alternatively, if economic conditions improve, it could lead to Drivers obtaining additional or alternative opportunities for work, which could negatively impact the number of Drivers on our platform, and thereby reduce our network liquidity.

***Increases in fuel, food, labor, energy, and other costs due to inflation and other factors could adversely affect our operating results.***

Factors such as inflation, increased fuel prices, and increased vehicle purchase, rental, or maintenance costs, including increased prices of new and used vehicle parts as a result of recent global supply chain challenges, may increase the costs incurred by Drivers and carriers when providing services on our platform. Similarly, factors such as inflation, increased food costs, increased labor and employee benefit costs, increased rental costs, and increased energy costs may increase merchant operating costs, particularly in certain international markets, such as Egypt. Many of the factors affecting Driver, merchant, and carrier costs are beyond the control of these parties. In many cases, these increased costs may cause Drivers and carriers to spend less time providing services on our platform or to seek alternative sources of income. Likewise, these increased costs may cause merchants to pass costs on to consumers by increasing prices, which would likely cause order volume to decline, may cause merchants to cease operations altogether, or may cause carriers to pass costs on to shippers, which may cause shipments on our platform to decline. A decreased supply of Drivers, consumers, merchants, shippers, or carriers on our platform would decrease our network liquidity, which could harm our business and operating results.

***If we experience security or privacy breaches or other unauthorized or improper access to, use of, disclosure of, alteration of or destruction of our proprietary or confidential data, employee data, or platform user data, we may face loss of revenue, harm to our brand, business disruption, and significant liabilities.***

We collect, use, and process a variety of personal data, such as email addresses, mobile phone numbers, profile photos, location information, drivers' license numbers and Social Security numbers of Drivers, consumer payment card information, and Driver and merchant bank account information. As such, we are an attractive target of data security attacks by third parties. Any failure to prevent or mitigate security breaches or improper access to, or use, acquisition, disclosure, alteration or destruction of, any such data could result in significant liability and a material loss of revenue resulting from the adverse impact on our reputation and brand, a diminished ability to retain or attract new platform users, and disruption to our business. We rely on third-party service providers to host or otherwise process some of our data and that of platform users, and any failure by such third party to prevent or mitigate security breaches or improper access to, or use, acquisition, disclosure, alteration, or destruction of, such information could have similar adverse consequences for us.

Because the techniques used to obtain unauthorized access, disable or degrade services, or sabotage systems change frequently and are often unrecognizable until launched against a target, we may be unable to anticipate these techniques and implement adequate preventative measures. Our servers and platform may be vulnerable to computer viruses or physical or electronic break-ins that our security measures may not detect. Individuals able to circumvent our security measures may misappropriate confidential, proprietary, or personal information held by or on behalf of us, disrupt our operations, damage our computers, or otherwise damage our business. In addition, we may need to expend significant resources to protect against security breaches or mitigate the impact of any such breaches, including potential liability that may not be limited to the amounts covered by our insurance.

Security breaches could also expose us to liability under various laws and regulations across jurisdictions and increase the risk of litigation and governmental investigation. We have been subject to security and privacy incidents in the past and may be again in the future. For example, in May 2014, we experienced a data security incident in which an outside actor gained access to certain personal information belonging to Drivers through an access key written into code that an employee had unintentionally posted publicly on a

26

code-sharing website used by software developers (the "2014 Breach"). In October and November of 2016, outside actors downloaded the personal data of approximately 57 million Drivers and consumers worldwide (the "2016 Breach"). The accessed data included the names, email addresses, mobile phone numbers, and drivers' license numbers of approximately 600,000 Drivers, among other information. For further information on this incident, see the risk factors titled "—We currently are subject to a number of inquiries, investigations, and requests for information from the DOJ, state Attorney General ("AG") offices, and other U.S. and foreign government agencies, the adverse outcomes of which could harm our business" and "—We face risks related to our collection, use, transfer, disclosure, and other processing of data, which could result in investigations, inquiries, litigation, fines, legislative, and regulatory action, and negative press about our privacy and data protection practices," below. As we expand our operations, we may also assume liabilities for breaches experienced by the companies we acquire. For example, in April 2018, Careem publicly disclosed and notified relevant regulatory authorities that it had been subject to a data security breach that allowed access to certain personal information of riders and drivers on its platform, as of January 14, 2018. If Careem becomes subject to liability as a result of this or other data security breaches, or if we fail to remediate this or any other data security breach that Careem or we experience, we may face harm to our brand, business disruption, and significant liabilities.

***If we are unable to successfully introduce new or upgraded products, offerings, or features for Drivers, consumers, merchants, shippers, and carriers, we may fail to retain and attract such users to our platform and our operating results would be adversely affected.***

To continue to retain and attract Drivers, consumers, merchants, shippers, and carriers to our platform, we will need to continue to invest in the development of new products, offerings, and features that add value for Drivers, consumers, merchants, shippers, and carriers and that differentiate us from our competitors. For example, in January 2020, we introduced a number of product changes in California intended to, among other things, provide Drivers with more information about rider destinations, trip distance, and expected fares, display prices more clearly, and allow users to select preferred Drivers, all of which are intended to further strengthen the independence of Drivers in California and protect their ability to work flexibly when using the Uber platform.

Developing and delivering these new or upgraded products, offerings, and features is costly, and the success of such new products, offerings, and features depends on several factors, including the timely completion, introduction, and market acceptance of such products, offerings, and features. Moreover, any such new or upgraded products, offerings, or features may not work as intended or may not provide intended value to platform users. For example, some product changes in California have resulted in, and may continue to result in, reduced demand for rides and reduced supply of Drivers on our platform, Driver dissatisfaction, and adverse impacts on the operation of our platform. If we are unable to continue to develop new or upgraded products, offerings, and features, or if platform users do not perceive value in such new or upgraded products, offerings, and features, platform users may choose not to use our platform, which would adversely affect our operating results.

***We track certain operational metrics and our category position with internal systems and tools, and our equity stakes in minority-owned affiliates with information provided by such minority-owned affiliates, and do not independently verify such metrics. Certain of our operational metrics are subject to inherent challenges in measurement, and real or perceived inaccuracies in such metrics may harm our reputation and negatively affect our business.***

We track certain operational metrics, including key metrics such as MAPCs, Trips, Gross Bookings, and our category position, with internal systems and tools, and our equity stakes in minority-owned affiliates with information provided by such minority-owned affiliates, that are not independently verified by any third party and which may differ from estimates or similar metrics published by third parties due to differences in sources, methodologies, or the assumptions on which we rely. Our internal systems and tools have a number of limitations, and our methodologies for tracking these metrics may change over time, which could result in unexpected changes to our metrics, including the metrics we publicly disclose, or our estimates of our category position. If the internal systems and tools we use to track these metrics undercount or overcount performance or contain algorithmic or other technical errors, the data we report may not be accurate. While these numbers are based on what we believe to be reasonable estimates of our metrics for the applicable period of measurement, there are inherent challenges in measuring how our products are used across large populations globally. For example, we believe that there are consumers who have multiple accounts, even though we prohibit that in our Terms of Service and implement measures to detect and prevent that behavior. In addition, limitations or errors with respect to how we measure data or with respect to the data that we measure may affect our understanding of certain details of our business, which could affect our long-term strategies. If our operating metrics or our estimates of our category position or our equity stakes in our minority-owned affiliates are not accurate representations of our business, or if investors do not perceive our operating metrics or estimates of our category position or equity stakes in our minority-owned affiliates to be accurate, or if we discover material inaccuracies with respect to these figures, our reputation may be significantly harmed, and our operating and financial results could be adversely affected.

***In certain jurisdictions, we allow consumers to pay for rides and meal or grocery deliveries using cash, which raises numerous regulatory, operational, and safety concerns. If we do not successfully manage those concerns, we could become subject to adverse regulatory actions and suffer reputational harm or other adverse financial and accounting consequences.***

In certain jurisdictions, including India, Brazil, and Mexico, as well as certain other countries in Latin America, Europe, the Middle East, and Africa, we allow consumers to use cash to pay Drivers the entire fare of rides and cost of meal deliveries (including our service fee from such rides and meal or grocery deliveries). In 2021, cash-paid trips accounted for approximately 7% of our global

27

Gross Bookings. This percentage may increase in the future, particularly in the markets in which Careem operates. The use of cash in connection with our technology raises numerous regulatory, operational, and safety concerns. For example, many jurisdictions have specific regulations regarding the use of cash for ridesharing and certain jurisdictions prohibit the use of cash for ridesharing. Failure to comply with these regulations could result in the imposition of significant fines and penalties and could result in a regulator requiring that we suspend operations in those jurisdictions. In addition to these regulatory concerns, the use of cash with our Mobility products and Delivery offering can increase safety and security risks for Drivers and riders, including potential robbery, assault, violent or fatal attacks, and other criminal acts. In certain jurisdictions such as Brazil, serious safety incidents resulting in robberies and violent, fatal attacks on Drivers while using our platform have been reported. If we are not able to adequately address any of these concerns, we could suffer significant reputational harm, which could adversely impact our business.

In addition, establishing the proper infrastructure to ensure that we receive the correct service fee on cash trips is complex, and has in the past meant and may continue to mean that we cannot collect the entire service fee for certain of our cash-based trips. We have created systems for Drivers to collect and deposit the cash received for cash-based trips and deliveries, as well as systems for us to collect, deposit, and properly account for the cash received, some of which are not always effective, convenient, or widely-adopted by Drivers. Creating, maintaining, and improving these systems requires significant effort and resources, and we cannot guarantee these systems will be effective in collecting amounts due to us. Further, operating a business that uses cash raises compliance risks with respect to a variety of rules and regulations, including anti-money laundering laws. If Drivers fail to pay us under the terms of our agreements or if our collection systems fail, we may be adversely affected by both the inability to collect amounts due and the cost of enforcing the terms of our contracts, including litigation. Such collection failure and enforcement costs, along with any costs associated with a failure to comply with applicable rules and regulations, could, in the aggregate, impact our financial performance.

***Loss or material modification of our credit card acceptance privileges could have an adverse effect on our business and operating results.***

In 2021, 74% of our Gross Bookings were paid by either credit card or debit card. As such, the loss of our credit card acceptance privileges would significantly limit our business model. We are required by our payment processors to comply with payment card network operating rules, including the Payment Card Industry ("PCI") and Data Security Standard (the "Standard"). The Standard is a comprehensive set of requirements for enhancing payment account data security developed by the PCI Security Standards Council to help facilitate the broad adoption of consistent data security measures. Our failure to comply with the Standard and other network operating rules could result in fines or restrictions on our ability to accept payment cards. Under certain circumstances specified in the payment card network rules, we may be required to submit to periodic audits, self-assessments, or other assessments of our compliance with the Standard. Such activities may reveal that we have failed to comply with the Standard. If an audit, self- assessment, or other test determines that we need to take steps to remediate any deficiencies, such remediation efforts may distract our management team and require us to undertake costly and time consuming remediation efforts. In addition, even if we comply with the Standard, there is no assurance that we will be protected from a security breach. Moreover, the payment card networks could adopt new operating rules or interpret existing rules that we or our processors might find difficult or even impossible to follow, or costly to implement. In addition to violations of network rules, including the Standard, any failure to maintain good relationships with the payment card networks could impact our ability to receive incentives from them, could increase our costs, or could otherwise harm our business. The loss of our credit card acceptance privileges for any one of these reasons, or the significant modification of the terms under which we obtain credit card acceptance privileges, may have an adverse effect on our business, revenue, and operating results.

***Cyberattacks, including computer malware, ransomware, viruses, spamming, and phishing attacks could harm our reputation, business, and operating results.***

We rely heavily on information technology systems across our operations. Our information technology systems, including mobile and online platforms and mobile payment systems, administrative functions such as human resources, payroll, accounting, and internal and external communications, and the information technology systems of our third-party business partners and service providers, contain proprietary or confidential information related to business and personal data, including sensitive personal data, entrusted to us by platform users, employees, and job candidates. Cyberattacks that leverage computer malware, ransomware, viruses, spamming, and phishing have become more prevalent, have occurred on our systems in the past, and may occur on our systems in the future. Cyberthreats are constantly evolving and employing more sophisticated attack techniques. Our detection capabilities may not be sufficient to prevent or detect a sophisticated cyberattacker, such as a nation state using a zero day exploit or unknown malware. Breaches of our facilities, network, or data security could disrupt the security of our systems and platforms, impair our ability to protect data, compromise confidential or technical business information harming our reputation or competitive position, result in theft or misuse of our intellectual property or other assets, require us to allocate more resources to improve technologies, or otherwise adversely affect our reputation, business and operating results.

Various other factors may also cause system failures or security breaches, including power outages, catastrophic events, inadequate or ineffective redundancy, issues with upgrading or creating new systems or platforms, flaws in third-party software or services, errors by our employees or third-party service providers, or breaches in the security of these systems or platforms. For example, fraudsters may attempt to induce employees or platform users to disclose information to gain access to our data or the data of platform users. If our incident response, disaster recovery, and business continuity plans do not resolve these issues in an effective manner, they could result in adverse impacts to our business operations and our financial results. Because of our prominence, the

28

number of platform users, and the types and volume of personal data on our systems, we may be a particularly attractive target for such attacks. Although we have developed, and continue to develop, systems and processes that are designed to protect our data and that of platform users, and to prevent data loss, undesirable activities on our platform, and security breaches, we cannot guarantee that such measures will provide absolute security. Our efforts on this front may be unsuccessful as a result of, for example, software bugs or other technical malfunctions; employee, contractor, or vendor error or malfeasance; government surveillance; or other threats that evolve, and we may incur significant costs in protecting against or remediating cyber-attacks. Any actual or perceived failure to maintain the performance, reliability, security, and availability of our products, offerings, and technical infrastructure to the satisfaction of platform users and certain regulators would likely harm our reputation and result in loss of revenue from the adverse impact to our reputation and brand, disruption to our business, and our decreased ability to attract and retain Drivers, consumers, merchants, shippers, and carriers.

***Our platform is highly technical, and any undetected errors could adversely affect our business.***

Our platform is a complex system composed of many interoperating components and incorporates software that is highly complex. Our business is dependent upon our ability to prevent system interruption on our platform. Our software, including open source software that is incorporated into our code, may now or in the future contain undetected errors, bugs, or vulnerabilities. Some errors in our software code may only be discovered after the code has been released. Bugs in our software, third-party software including open source software that is incorporated into our code, misconfigurations of our systems, and unintended interactions between systems could result in our failure to comply with certain federal, state, or foreign reporting obligations, or could cause downtime that would impact the availability of our service to platform users. We have from time to time found defects or errors in our system and may discover additional defects in the future that could result in platform unavailability or system disruption. In addition, we have experienced outages on our platform due to circumstances within our control, such as outages due to software limitations. We rely on co-located data centers for the operation of our platform. If our co-located data centers fail, our platform users may experience down time. If sustained or repeated, any of these outages could reduce the attractiveness of our platform to platform users. In addition, our release of new software in the past has inadvertently caused, and may in the future cause, interruptions in the availability or functionality of our platform. Any errors, bugs, or vulnerabilities discovered in our code or systems after release could result in an interruption in the availability of our platform or a negative experience for Drivers, consumers, merchants, shippers, and carriers, and could also result in negative publicity and unfavorable media coverage, damage to our reputation, loss of platform users, loss of revenue or liability for damages, regulatory inquiries, or other proceedings, any of which could adversely affect our business and financial results. In addition, our growing use of artificial intelligence ("AI") (including machine learning) in our offerings presents additional risks. AI algorithms or automated processing of data may be flawed and datasets may be insufficient or contain biased information. Inappropriate or controversial data practices by us or others could impair the acceptance of AI solutions or subject us to lawsuits and regulatory investigations. These deficiencies could undermine the decisions, predictions or analysis AI applications produce, or lead to unintentional bias and discrimination, subjecting us to competitive harm, legal liability, and brand or reputational harm.

***We are subject to climate change risks, including physical and transitional risks, and if we are unable to manage such risks, our business may be adversely impacted.***

We face climate change related physical and transition risks, which include the risk of market shifts toward electric vehicles ("EVs") and lower carbon business models and risks related to extreme weather events or natural disasters. Climate-related events, including the increasing frequency, severity and duration of extreme weather events and their impact on critical infrastructure in the United States and elsewhere, have the potential to disrupt our business, our third-party suppliers, and the business of merchants, shippers, carriers and Drivers using our platform, and may cause us to experience higher losses and additional costs to maintain or resume operations. Additionally, we are subject to emerging climate policies such as a regulation adopted in California in May 2021 requiring 90% of vehicle miles traveled by rideshare fleets in California to have been in zero emission vehicles by 2030, with interim targets beginning in 2023. In addition, Drivers may be subject to climate-related policies that indirectly impact our business, such as the Congestion Charge Zone and Ultra Low Emission Zone schemes adopted in London that impose fees on drivers in fossil-fueled vehicles, which may impact our ability to attract and maintain Drivers on our platform, and to the extent we experience Driver supply constraints in a given market, we may need to increase Driver incentives.

***We have made climate related commitments that require us to invest significant effort, resources, and management time and circumstances may arise, including those beyond our control, that may require us to revise the contemplated timeframes for implementing these commitments.***

We have made climate related commitments, including our commitment to 100% renewable electricity for our U.S. offices by 2025, our commitment to net zero climate emissions from corporate operations by 2030, and our commitment to be a net zero company by 2040. In addition, our Supplier Code of Conduct sets environmental standards for our supply chain, and we recognize that there are inherent climate-related risks wherever business is conducted. Progressing towards our climate commitments requires us to invest significant effort, resources, and management time, and circumstances may arise, including those beyond our control, that may require us to revise our timelines and/or climate commitments. For example, the COVID-19 pandemic has negatively impacted our ability to dedicate resources to make the progress on our climate commitments that we initially anticipated. In addition, our ability to meet our climate commitments is dependent on external factors such as rapidly changing regulations, policies and related

29

interpretation, advances in technology such as battery storage, as well the availability, cost and accessibility of EVs to Drivers, and the availability of EV charging infrastructure that can be efficiently accessed by Drivers. Any failure to meet regulatory requirements related to climate change, or to meet our stated climate change commitments on the timeframe we committed to, or at all, could have an adverse impact on our costs and ability to operate, as well as harm our brand, reputation, and consequently, our business.

*Dependencies on Third Parties*

**The successful operation of our business depends upon the performance and reliability of Internet, mobile, and other infrastructures that are not under our control.**

Our business depends on the performance and reliability of Internet, mobile, and other infrastructures that are not under our control. Disruptions in Internet infrastructure or GPS signals or the failure of telecommunications network operators to provide us with the bandwidth we need to provide our products and offerings have interfered, and could continue to interfere with the speed and availability of our platform. If our platform is unavailable when platform users attempt to access it, or if our platform does not load as quickly as platform users expect, platform users may not return to our platform as often in the future, or at all, and may use our competitors' products or offerings more often. In addition, we have no control over the costs of the services provided by national telecommunications operators. If mobile Internet access fees or other charges to Internet users increase, consumer traffic may decrease, which may in turn cause our revenue to significantly decrease.

Our business depends on the efficient and uninterrupted operation of mobile communications systems. The occurrence of an unanticipated problem, such as a power outage, telecommunications delay or failure, security breach, or computer virus could result in delays or interruptions to our products, offerings, and platform, as well as business interruptions for us and platform users. Furthermore, foreign governments may leverage their ability to shut down directed services, and local governments may shut down our platform at the routing level. Any of these events could damage our reputation, significantly disrupt our operations, and subject us to liability, which could adversely affect our business, financial condition, and operating results. We have invested significant resources to develop new products to mitigate the impact of potential interruptions to mobile communications systems, which can be used by consumers in territories where mobile communications systems are less efficient. However, these products may ultimately be unsuccessful.

**We rely on third parties maintaining open marketplaces to distribute our platform and to provide the software we use in certain of our products and offerings. If such third parties interfere with the distribution of our products or offerings or with our use of such software, our business would be adversely affected.**

Our platform relies on third parties maintaining open marketplaces, including the Apple App Store and Google Play, which make applications available for download. We cannot assure you that the marketplaces through which we distribute our platform will maintain their current structures or that such marketplaces will not charge us fees to list our applications for download. For example, Apple Inc. requires that iOS apps obtain users' permission to track their activities across third-party apps and websites. If iOS users do not grant us such permission, our ability to target those users for advertisements and to measure the effectiveness of such advertisements may be adversely affected, which could decrease the effectiveness of our advertising, and increase our costs to acquire and engage users on our platform. We rely upon certain third parties to provide software for our products and offerings, including Google Maps for the mapping function that is critical to the functionality of our platform. We do not believe that an alternative mapping solution exists that can provide the global functionality that we require to offer our platform in all of the markets in which we operate. We do not control all mapping functions employed by our platform or Drivers using our platform, and it is possible that such mapping functions may not be reliable. If such third parties cease to provide access to the third-party software that we and Drivers use, do not provide access to such software on terms that we believe to be attractive or reasonable, or do not provide us with the most current version of such software, we may be required to seek comparable software from other sources, which may be more expensive or inferior, or may not be available at all, any of which would adversely affect our business.

**Our business depends upon the interoperability of our platform across devices, operating systems, and third-party applications that we do not control.**

One of the most important features of our platform is its broad interoperability with a range of devices, operating systems, and third-party applications. Our platform is accessible from the web and from devices running various operating systems such as iOS and Android. We depend on the accessibility of our platform across these third-party operating systems and applications that we do not control. Moreover, third-party services and products are constantly evolving, and we may not be able to modify our platform to assure its compatibility with that of other third parties following development changes. The loss of interoperability, whether due to actions of third parties or otherwise, could adversely affect our business.

**We rely on third parties for elements of the payment processing infrastructure underlying our platform. If these third-party elements become unavailable or unavailable on favorable terms, our business could be adversely affected.**

The convenient payment mechanisms provided by our platform are key factors contributing to the development of our business. We rely on third parties for elements of our payment-processing infrastructure to remit payments to Drivers, merchants, and carriers using our platform, and these third parties may refuse to renew our agreements with them on commercially reasonable terms or at all. If these companies become unwilling or unable to provide these services to us on acceptable terms or at all, our business may be

30

disrupted. For certain payment methods, including credit and debit cards, we generally pay interchange fees and other processing and gateway fees, and such fees result in significant costs. In addition, online payment providers are under continued pressure to pay increased fees to banks to process funds, and there is no assurance that such online payment providers will not pass any increased costs on to merchant partners, including us. If these fees increase over time, our operating costs will increase, which could adversely affect our business, financial condition, and operating results.

In addition, system failures have at times prevented us from making payments to Drivers in accordance with our typical timelines and processes, and have caused substantial Driver dissatisfaction and generated a significant number of Driver complaints. Future failures of the payment processing infrastructure underlying our platform could cause Drivers to lose trust in our payment operations and could cause them to instead use our competitors' platforms. If the quality or convenience of our payment processing infrastructure declines as a result of these limitations or for any other reason, the attractiveness of our business to Drivers, merchants, and carriers could be adversely affected. If we are forced to migrate to other third-party payment service providers for any reason, the transition would require significant time and management resources, and may not be as effective, efficient, or well-received by platform users.

***We currently rely on a small number of third-party service providers to host a significant portion of our platform, and any interruptions or delays in services from these third parties could impair the delivery of our products and offerings and harm our business.***

We use a combination of third-party cloud computing services and co-located data centers in the United States and abroad. We do not control the physical operation of any of the co-located data centers we use or the operations of our third-party service providers. These third-party operations and co-located data centers may experience break-ins, computer viruses, denial-of-service attacks, sabotage, acts of vandalism, and other misconduct. These facilities may also be vulnerable to damage or interruption from power loss, telecommunications failures, fires, floods, earthquakes, hurricanes, tornadoes, and similar events. Our systems do not provide complete redundancy of data storage or processing, and as a result, the occurrence of any such event, a decision by our third-party service providers to close our co-located data centers without adequate notice, or other unanticipated problems may result in our inability to serve data reliably or require us to migrate our data to either a new on-premise data center or cloud computing service. This could be time consuming and costly and may result in the loss of data, any of which could significantly interrupt the provision of our products and offerings and harm our reputation and brand. We may not be able to easily switch to another cloud or data center provider in the event of any disruptions or interference to the services we use, and even if we do, other cloud and data center providers are subject to the same risks. Additionally, our co-located data center facility agreements are of limited durations, and our co-located data center facilities have no obligation to renew their agreements with us on commercially reasonable terms or at all. If we are unable to renew our agreements with these facilities on commercially reasonable terms, we may experience delays in the provision of our products and offerings until an agreement with another co-located data center is arranged. Interruptions in the delivery of our products and offerings may reduce our revenue, cause Drivers, merchants, and carriers to stop offering their services through our platform, and reduce use of our platform by consumers and shippers. Our business and operating results may be harmed if current and potential Drivers, consumers, merchants, shippers, and carriers believe our platform is unreliable. In addition, if we are unable to scale our data storage and computational capacity sufficiently or on commercially reasonable terms, our ability to innovate and introduce new products on our platform may be delayed or compromised, which would have an adverse effect on our growth and business.

***Our use of third-party open source software could adversely affect our ability to offer our products and offerings and subjects us to possible litigation.***

We use third-party open source software in connection with the development of our platform. From time to time, companies that use third-party open source software have faced claims challenging the use of such open source software and their compliance with the terms of the applicable open source license. We may be subject to suits by parties claiming ownership of what we believe to be open source software, or claiming non-compliance with the applicable open source licensing terms. Some open source licenses require end-users who distribute or make available across a network software and services that include open source software to make available all or part of such software, which in some circumstances could include valuable proprietary code. While we employ practices designed to monitor our compliance with the licenses of third-party open source software and protect our valuable proprietary source code, we have not run a complete open source license review and may inadvertently use third-party open source software in a manner that exposes us to claims of non-compliance with the applicable terms of such license, including claims for infringement of intellectual property rights or for breach of contract. Furthermore, there is an increasing number of open-source software license types, almost none of which have been tested in a court of law, resulting in a dearth of guidance regarding the proper legal interpretation of such licenses. If we were to receive a claim of non-compliance with the terms of any of our open source licenses, we may be required to publicly release certain portions of our proprietary source code or expend substantial time and resources to re-engineer some or all of our software.

In addition, the use of third-party open source software typically exposes us to greater risks than the use of third-party commercial software because open-source licensors generally do not provide warranties or controls on the functionality or origin of the software. Use of open source software may also present additional security risks because the public availability of such software may make it easier for hackers and other third parties to determine how to compromise our platform. Additionally, because any software source code that we make available under an open source license or that we contribute to existing open source projects becomes publicly available, our ability to protect our intellectual property rights in such software source code may be limited or lost entirely, and we

31

would be unable to prevent our competitors or others from using such contributed software source code. Any of the foregoing could be harmful to our business, financial condition, or operating results and could help our competitors develop products and offerings that are similar to or better than ours.

*Financing and Transactional Risks*

**We will require additional capital to support the growth of our business, and this capital might not be available on reasonable terms or at all.**

To continue to effectively compete, we will require additional funds to support the growth of our business and allow us to invest in new products, offerings, and markets. If we raise additional funds through further issuances of equity or convertible debt securities, our existing stockholders may suffer significant dilution, and any new equity securities we issue may have rights, preferences, and privileges superior to those of existing stockholders. Certain of our existing debt instruments contain, and any debt financing we secure in the future could contain, restrictive covenants relating to our ability to incur additional indebtedness and other financial and operational matters that make it more difficult for us to obtain additional capital with which to pursue business opportunities. For example, our existing debt instruments contain significant restrictions on our ability to incur additional secured indebtedness. We may not be able to obtain additional financing on favorable terms, if at all. If we are unable to obtain adequate financing or financing on terms satisfactory to us when required, our ability to continue to support our business growth and to respond to business challenges and competition may be significantly limited.

**We have incurred a significant amount of debt and may in the future incur additional indebtedness. Our payment obligations under such indebtedness may limit the funds available to us, and the terms of our debt agreements may restrict our flexibility in operating our business.**

As of December 31, 2021, we had total outstanding indebtedness of $9.4 billion aggregate principal amount. In addition, up to approximately $238 million of Careem Convertible Notes remain subject to future issuance to Careem stockholders as of December 31, 2021. Subject to the limitations in the terms of our existing and future indebtedness, we and our subsidiaries may incur additional debt, secure existing or future debt, or refinance our debt. In particular, we may need to incur additional debt to finance the purchase of autonomous vehicles, and such financing may not be available to us on attractive terms or at all.

We may be required to use a substantial portion of our cash flows from operations to pay interest and principal on our indebtedness. Such payments will reduce the funds available to us for working capital, capital expenditures, and other corporate purposes and limit our ability to obtain additional financing for working capital, capital expenditures, expansion plans, and other investments, which may in turn limit our ability to implement our business strategy, heighten our vulnerability to downturns in our business, the industry, or in the general economy, limit our flexibility in planning for, or reacting to, changes in our business and the industry, and prevent us from taking advantage of business opportunities as they arise. We cannot assure you that our business will generate sufficient cash flow from operations or that future financing will be available to us in amounts sufficient to enable us to make required and timely payments on our indebtedness, or to fund our operations. To date, we have used a substantial amount of cash for operating activities, and we cannot assure you when we will begin to generate cash from operating activities in amounts sufficient to cover our debt service obligations.

In addition, under certain of our existing debt instruments, we and certain of our subsidiaries are subject to limitations regarding our business and operations, including limitations on incurring additional indebtedness and liens, limitations on certain consolidations, mergers, and sales of assets, and restrictions on the payment of dividends or distributions. Any debt financing secured by us in the future could involve additional restrictive covenants relating to our capital-raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital to pursue business opportunities, including potential acquisitions or divestitures. Any default under our debt arrangements could require that we repay our loans immediately, and may limit our ability to obtain additional financing, which in turn may have an adverse effect on our cash flows and liquidity.

In addition, we are exposed to interest rate risk related to some of our indebtedness, which is discussed in greater detail under the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations - Quantitative and Qualitative Disclosures About Market Risk - Interest Rate Risk."

**We may have exposure to materially greater than anticipated tax liabilities.**

The tax laws applicable to our global business activities are subject to uncertainty and can be interpreted differently by different companies. For example, we may become subject to sales tax rates in certain jurisdictions that are significantly greater than the rates we currently pay in those jurisdictions. Like many other multinational corporations, we are subject to tax in multiple U.S. and foreign jurisdictions and have structured our operations to reduce our effective tax rate. Currently, certain jurisdictions are investigating our compliance with tax rules. If it is determined that we are not compliant with such rules, we could owe additional taxes.

Certain jurisdictions, including Australia, Kingdom of Saudi Arabia, the UK and other countries, require that we pay any assessed taxes prior to being allowed to contest or litigate the applicability of tax assessments in those jurisdictions. These amounts could materially adversely impact our liquidity while those matters are being litigated. This prepayment of contested taxes is referred to as "pay-to-play." Payment of these amounts is not an admission that we believe we are subject to such taxes; even when such payments

P-02346-0034

are made, we continue to defend our positions vigorously. If we prevail in the proceedings for which a pay-to-play payment was made, the jurisdiction collecting the payment will be required to repay such amounts and also may be required to pay interest.

Additionally, the taxing authorities of the jurisdictions in which we operate have in the past, and may in the future, examine or challenge our methodologies for valuing developed technology, which could increase our worldwide effective tax rate and harm our financial position and operating results. Furthermore, our future income taxes could be adversely affected by earnings being lower than anticipated in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, changes in the valuation allowance on our U.S. and Netherlands' deferred tax assets, or changes in tax laws, regulations, or accounting principles. We are subject to regular review and audit by both U.S. federal and state tax authorities, as well as foreign tax authorities, and currently face numerous audits in the United States and abroad. Any adverse outcome of such reviews and audits could have an adverse effect on our financial position and operating results. In addition, the determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment by our management, and we have engaged in many transactions for which the ultimate tax determination remains uncertain. The ultimate tax outcome may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made. Our tax positions or tax returns are subject to change, and therefore we cannot accurately predict whether we may incur material additional tax liabilities in the future, which could impact our financial position. In addition, in connection with any planned or future acquisitions, we may acquire businesses that have differing licenses and other arrangements that may be challenged by tax authorities for not being at arm's-length or that are otherwise potentially less tax efficient than our licenses and arrangements. Any subsequent integration or continued operation of such acquired businesses may result in an increased effective tax rate in certain jurisdictions or potential indirect tax costs, which could result in us incurring additional tax liabilities or having to establish a reserve in our consolidated financial statements, and could adversely affect our financial results.

***Changes in global and U.S. tax legislation may adversely affect our financial condition, operating results, and cash flows.***

We are a U.S.-based multinational company subject to tax in multiple U.S. and foreign tax jurisdictions. U.S. tax legislation enacted in 2017, and modified in 2020, has significantly changed the U.S. federal income taxation of U.S. corporations. The legislation and regulations promulgated in connection therewith remain unclear in many respects and could be subject to potential amendments and technical corrections, as well as interpretations and incremental implementing regulations by the U.S. Treasury and U.S. Internal Revenue Service (the "IRS"), any of which could lessen or increase certain adverse impacts of the legislation. In addition, it remains unclear in some instances how these U.S. federal income tax changes will affect state and local taxation, which often uses federal taxable income as a starting point for computing state and local tax liabilities.

We are unable to predict what global or U.S. tax reforms may be proposed or enacted in the future or what effects such future changes would have on our business. Any such changes in tax legislation, regulations, policies or practices in the jurisdictions in which we operate could increase the estimated tax liability that we have expensed to date and paid or accrued on our balance sheet; affect our financial position, future operating results, cash flows, and effective tax rates where we have operations; reduce post-tax returns to our stockholders; and increase the complexity, burden, and cost of tax compliance. We are subject to potential changes in relevant tax, accounting, and other laws, regulations, and interpretations, including changes to tax laws applicable to corporate multinationals. We could become subject to digital services taxes in one or more jurisdictions where we operate. The governments of countries in which we operate and other governmental bodies could make unprecedented assertions about how taxation is determined in their jurisdictions that are contrary to the way in which we have interpreted and historically applied the rules and regulations described above in our income tax returns filed in such jurisdictions. New laws could significantly increase our tax obligations in the countries in which we do business or require us to change the manner in which we operate our business. As a result of the large and expanding scale of our international business activities, many of these changes to the taxation of our activities could increase our worldwide effective tax rate and harm our financial position, operating results, and cash flows.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2021, we had net operating loss carryforwards for U.S. federal income tax purposes and state income tax purposes of $14.9 billion and $12.4 billion, respectively, available to offset future taxable income. If not utilized, the federal net operating loss carryforward amounts generated prior to January 1, 2018 will begin to expire in 2031, and the state net operating loss carryforward amounts of $10.2 billion will begin to expire in 2022. As of December 31, 2021, we also had foreign net operating loss carryforwards of $10.6 billion, of which $507 million will begin to expire in 2023. Realization of these net operating loss carryforwards depends on our future taxable income, and there is a risk that our existing carryforwards could expire unused and be unavailable to offset future income tax liabilities, which could materially and adversely affect our operating results. In addition, under Sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three-year period, the corporation's ability to use its pre-change U.S. federal net operating loss carryforwards and other pre-change U.S. federal tax attributes, such as research tax credits, to offset its post-change income may be limited. Many U.S. states follow similar rules for restricting use of tax attributes after an ownership change. We may experience ownership changes in the future because of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-ownership change net operating loss carryforwards and other tax attributes to offset U.S. federal and state taxable income may be subject to limitations, which could potentially result in increased future tax liability to us.

33

***We are exposed to fluctuations in currency exchange rates.***

Because we conduct a significant and may conduct a growing portion of our business in currencies other than the U.S. dollar but report our consolidated financial results in U.S. dollars, we face exposure to fluctuations in currency exchange rates. As exchange rates vary, revenue, cost of revenue, exclusive of depreciation and amortization, operating expenses, other income and expense, and assets and liabilities, when translated, may also vary materially and thus affect our overall financial results. We have not to date, but may in the future, enter into hedging arrangements to manage foreign currency translation, but such activity may not completely eliminate fluctuations in our operating results due to currency exchange rate changes. Hedging arrangements are inherently risky, and we have limited experience establishing hedging programs, which could expose us to additional risks that could adversely affect our financial condition and operating results.

***If we are unable to successfully identify, acquire and integrate suitable businesses, our operating results and prospects could be harmed, and any businesses we acquire may not perform as expected or be effectively integrated.***

As part of our business strategy, we have entered into, and expect to continue to enter into, agreements to acquire companies, form joint ventures, divest portions or aspects of our business, sell minority stakes in portions or aspects of our business, and acquire complementary companies or technologies, including our Yandex.Taxi joint venture in Russia/CIS, our joint venture with an affiliate of SK Telecom Co., Ltd., and our acquisitions of Careem, Cornershop, Postmates, Drizly and Transplace. Competition within our industry for acquisitions of businesses, technologies, and assets is intense. As such, even if we are able to identify a target for acquisition, we may not be able to complete the acquisition on commercially reasonable terms, we may not be able to receive approval from the applicable competition authorities, or such target may be acquired by another company, including one of our competitors.

Further, negotiations for potential acquisitions or other transactions may result in the diversion of our management's time and significant out-of-pocket costs. We may expend significant cash or incur substantial debt to finance such acquisitions, and such indebtedness may restrict our business or require the use of available cash to make interest and principal payments. In addition, we may finance or otherwise complete acquisitions by issuing equity or convertible debt securities, which may result in dilution to our stockholders, or if such convertible debt securities are not converted, significant cash outlays. If we fail to evaluate and execute acquisitions or other strategic transactions successfully or fail to successfully address any of these risks, our business, financial condition, and operating results may be harmed.

In addition, any businesses we acquire may not perform as well as we expect. Failure to manage and successfully integrate acquired businesses and technologies, including managing internal controls and any privacy or data security risks associated with such acquisitions, may harm our operating results and expansion prospects. For example, Careem has historically shared certain user data with certain government authorities, which conflicts with our global policies regarding data use, sharing, and ownership. We have maintained our data use, sharing, and ownership practices for both our business and Careem's business, and doing so may cause our relationships with government authorities in certain jurisdictions to suffer, and may result in such government authorities assessing significant fines or penalties against us or shutting down our or Careem's app on either a temporary or indefinite basis. The process of integrating an acquired company, business, or technology or acquired personnel into our company is subject to various risks and challenges, including:

- diverting management time and focus from operating our business to acquisition integration;

- disrupting our ongoing business operations;

- platform user acceptance of the acquired company's offerings;

- implementing or remediating the controls, procedures, and policies of the acquired company;

- integrating the acquired business onto our systems and ensuring the acquired business meets our financial reporting requirements and timelines;

- retaining and integrating acquired employees, including aligning incentives between acquired employees and existing employees, managing cultural differences between acquired businesses and our business, as well as managing costs associated with eliminating redundancies or transferring employees on acceptable terms with minimal business disruption;

- maintaining important business relationships and contracts of the acquired business;

- integrating the brand identity of an acquired company with our own;

- integrating companies that have significant operations or that develop products where we do not have prior experience;

- liability for pre-acquisition activities of the acquired company;

- litigation or other claims or liabilities arising in connection with the acquisition or the acquired company; and

- impairment charges associated with goodwill, long-lived assets, investments, and other acquired intangible assets.

We have in the past and may in the future implement integration structures that do not fully integrate an acquired company's operating functions. For example, with respect to the integration of Careem and Drizly, each company's brand, product app(s) and

34

payments apps continue to operate in parallel with Uber's apps and each company's engineering, human resources, and operations teams will continue to operate independently and report to such company's own Chief Executive Officer. Such structures may delay the efficiencies that we expect to gain from the acquisition and our brand and reputation could be impacted by any damage or reputational harm to the acquired company's brand.

In addition, our acquisition of Careem has increased our risks under the U.S. Foreign Corrupt Practices Act ("FCPA") and other similar laws outside the United States. Our existing and planned safeguards, including training and compliance programs to discourage corrupt practices by such parties, may not prove effective, and such parties may engage in conduct for which we could be held responsible.

We may not receive a favorable return on investment for prior or future business combinations, and we cannot predict whether these transactions will be accretive to the value of our common stock. It is also possible that acquisitions, combinations, divestitures, joint ventures, or other strategic transactions we announce could be viewed negatively by the press, investors, platform users, or regulators, any or all of which may adversely affect our reputation and our business. Any of these factors may adversely affect our ability to consummate a transaction, our financial condition, and our operating results.

**Legal and Regulatory Risks Related to Our Business**

***We may continue to be blocked from or limited in providing or operating our products and offerings in certain jurisdictions, and may be required to modify our business model in those jurisdictions as a result.***

In certain jurisdictions, including expansion markets such as Argentina, Germany, Italy, Japan, South Korea, and Spain, our ridesharing business model has been blocked, capped, or suspended, or we have been required to change our business model, due primarily to laws and significant regulatory restrictions in such jurisdictions. In some cases, we have applied for and obtained licenses or permits to operate and must continue to comply with the license or permit requirements or risk revocation. In addition, we may not be able to maintain or renew any such license or permit. For example, TfL scrutinizes our business in London on an on-going basis and we are subject to license reviews at renewal. In November 2019, TfL declined to issue us a license, finding that we were not "fit and proper," including with respect to confidence in our change and release management processes. We successfully appealed and in September 2020, Westminster Magistrates Court granted us an 18 month operating license on largely the same conditions as our previous license, finding us a fit and proper person. Two new conditions (which we volunteered) include providing to TfL consolidated monthly reporting in relation to regulatory obligations and maintaining our current processes. Any inability to operate in markets such as London, as well as publicity concerning adverse judicial or licensing decisions, would adversely affect our business, revenue, and operating results. We cannot predict whether future regulatory decisions or legislation in other jurisdictions may embolden or encourage other authorities to take similar actions even where we are operating according to the terms of an existing license or permit. Additionally, since April 2019, Mexico City's Secretaría de Movilidad passed several amendments to existing ridesharing regulations implementing certain operational requirements, including a prohibition on the use of cash to pay for ridesharing services and, effective as of November 2019, a comprehensive TNC data sharing requirement and a requirement that Drivers in Mexico City obtain additional licenses and annual vehicle inspections to provide ridesharing services. Except for the vehicle inspection, we have an injunction against such operational requirements which, if implemented without modification, could have a negative impact on our business and our failure to comply with such regulations may result in a potential revocation of our license to operate in Mexico City.

Traditional taxicab and car service operators in various jurisdictions continue to lobby legislators and regulators to block our Mobility products or to require us to comply with regulatory, insurance, record-keeping, licensing, and other requirements to which taxicab and car services are subject. For example, in January 2019, we suspended our Mobility products in Barcelona after the regional government enacted regulations mandating minimum wait times before riders could be picked up by ridesharing drivers; in March 2021, we returned to Barcelona via taxis only. In December 2018, New York City's Taxi and Limousine Commission implemented a per-mile and per-minute minimum trip payment formula, designed to establish a minimum pay standard, for drivers providing for-hire services in New York City, such as those provided by Drivers on our platform. These minimum rates took effect in February 2019. Since implementation, these regulations have had an adverse impact on our financial performance in New York City and may continue to do so in the future. In August 2018, the New York City Council voted to approve various measures to further regulate our business, including driver earning rules, licensing requirements, and a one-year freeze on new for-hire vehicle licenses for ridesharing services like those enabled via our platform, while the city studies whether a permanent freeze would help reduce congestion. In August 2019, New York City's Taxi and Limousine Commission voted to extend such freeze on for-hire vehicle licenses and also voted to enact a new "cruising cap," intended to reduce the number of for-hire vehicles operating without passengers on platforms like ours in the central business district of New York City. Although such "cruising cap" was struck down by a New York state judge in December 2019, the freeze on for-hire vehicle licenses remains. Additionally, in November 2019, a ballot measure to impose a surcharge on ridesharing trips in San Francisco was passed by voters in San Francisco and such surcharge took effect on January 1, 2020. Also in January 2020, a new tax went into effect in Chicago that imposes a surcharge of up to $3 per ridesharing trip taken in Chicago. In addition, in October 2020, the Seattle City Council passed a minimum pay standard for drivers providing services on our platform that went into effect on January 1, 2021, and other jurisdictions have in the past considered or may consider regulations which would implement minimum wage requirements or permit drivers to negotiate for minimum wages while providing services on our platform. Similar legislative or regulatory initiatives are being considered or have been enacted in countries outside the United States. If other

35

jurisdictions impose similar regulations, our business growth could be adversely affected.

In certain jurisdictions, we are subject to national, state, local, or municipal laws and regulations that are ambiguous in their application or enforcement or that we believe are invalid or inapplicable. In such jurisdictions, we may be subject to regulatory fines and proceedings and, in certain cases, may be required to cease operations altogether if we continue to operate our business as currently conducted, unless and until such laws and regulations are reformed to clarify that our business operations are fully compliant. For example, in September 2020, the Hong Kong Court of Final Appeal issued a ruling against a group of drivers who used the Uber app, concluding that by driving for hire without a Hire Car Permit, they violated the local Road Traffic Ordinance. We are considering further legal challenges and possible policy solutions. However, these developments may adversely affect our ability to offer ridesharing services and negatively impact our financial performance in Hong Kong. As another example, in January 2020, we ceased offering our Mobility products in Colombia after a Colombian court ruled that we violated local competition laws. In response, we appealed the decision, made certain changes to our Mobility products in Colombia and re-launched Mobility in Colombia in February 2020, and in June 2020, the Appeals Court of Bogota revoked its order to block Mobility products in Colombia. Furthermore, in certain of these jurisdictions, we continue to provide our products and offerings while we assess the applicability of these laws and regulations to our products and offerings or while we seek regulatory or policy changes to address concerns with respect to our ability to comply with these laws and regulations. Our decision to continue operating in these instances has come under investigation or has otherwise been subject to scrutiny by government authorities. Our continuation of this practice and other past practices may result in fines or other penalties against us and Drivers imposed by local regulators, potentially increasing the risk that our licenses or permits that are necessary to operate in such jurisdictions will not be renewed. Such fines and penalties have in the past been, and may in the future continue to be, imposed solely on Drivers, which may cause Drivers to stop providing services on our platform. In many instances, we make the business decision as a gesture of goodwill to pay the fines on behalf of Drivers or to pay Drivers' defense costs, which, in the aggregate, can be in the millions of dollars. Furthermore, such business practices may also result in negative press coverage, which may discourage Drivers and consumers from using our platform and could adversely affect our revenue. In addition, we face regulatory obstacles, including those lobbied for by our competitors or from local governments globally, that have favored and may continue to favor local or incumbent competitors, including obstacles for potential Drivers seeking to obtain required licenses or vehicle certifications. In addition, an increasing number of municipalities have proposed delivery network fee caps with respect to our Delivery offering and caps on surge pricing with respect to our Mobility offering. We have incurred, and expect that we will continue to incur, significant costs in defending our right to operate in accordance with our business model in many jurisdictions. To the extent that efforts to block or limit our operations are successful, or we or Drivers are required to comply with regulatory and other requirements applicable to taxicab and car services, our revenue and growth would be adversely affected.

***Our business is subject to numerous legal and regulatory risks that could have an adverse impact on our business and future prospects.***

As of December 31, 2021, our platform is available in approximately 10,500 cities across approximately 72 countries. We are subject to differing, and sometimes conflicting, laws and regulations in the various jurisdictions in which we provide our offerings. A large number of proposals are before various national, regional, and local legislative bodies and regulatory entities, both within the United States and in foreign jurisdictions, regarding issues related to our business model. Certain proposals, if adopted, could significantly and materially harm our business, financial condition, and operating results by restricting or limiting how we operate our business, increasing our operating costs, and decreasing our number of platform users. We cannot predict whether or when such proposals may be adopted.

Further, existing or new laws and regulations could expose us to substantial liability, including significant expenses necessary to comply with such laws and regulations, and could dampen the growth and usage of our platform. For example, as we expand our offerings in new areas, such as non-emergency medical transportation, we may be subject to additional healthcare-related federal and state laws and regulations. Additionally, because our offerings are frequently first-to-market in the jurisdictions in which we operate, several local jurisdictions have passed, and we expect additional jurisdictions to pass, laws and regulations that limit or block our ability to offer our products to Drivers and consumers in those jurisdictions, thereby impeding overall use of our platform. We are actively challenging some of these laws and regulations and are lobbying other jurisdictions to oppose similar restrictions on our business, especially our ridesharing services. Further, because a substantial portion of our business involves vehicles that run on fossil fuels, laws, regulations, or governmental actions seeking to curb air pollution or emissions may impact our business. For example, in response to London's efforts to cut emissions and improve air quality in the city (including the institution of a toxicity charge for polluting vehicles in the city center congestion zone and the introduction of an "Ultra Low Emissions Zone" that went into effect in April 2019), we have added a clean-air fee of 15 pence per mile to each trip on our platform in London, and plan to help Drivers on our platform fully transition to electric vehicles by 2025. Moreover, in May 2021, California adopted a regulation requiring 90% of vehicle miles traveled by rideshare fleets in California to have been in EVs by 2030, with interim targets beginning in 2023. Additionally, proposed ridesharing regulations in Egypt and other jurisdictions may require us to share certain personal data with government authorities to operate our app, which we may not be willing to provide. Our failure to share such data in accordance with these regulations may result in government authorities assessing significant fines or penalties against us or shutting down our or Careem's app in Egypt on either a temporary or indefinite basis.

Additionally, effective January 1, 2021, the United Kingdom exited from the European Union ("EU"), an event commonly

P-02346-0038

referred to as Brexit. The UK represented approximately 8.3% of our global Mobility Gross Bookings in 2021.

In addition, we are currently involved in litigation in a number of the jurisdictions in which we operate. We initiated some of these legal challenges to contest the application of certain laws and regulations to our business. Others have been brought by taxicab owners, local regulators, local law enforcement, and platform users, including Drivers and consumers. These include individual, multiple plaintiff, and putative class and class action claims for alleged violation of laws related to, among other things, transportation, competition, advertising, consumer protection, fee calculations, personal injuries, privacy, intellectual property, product liability, discrimination, safety, and employment. For example, in May 2019, a class action was filed against us and certain of our subsidiaries in the Supreme Court of Victoria, Australia on behalf of participants in the taxi, hire-car, limousine, and charter vehicle industry who were licensed to operate in particular regions of Australia during certain periods between April 2014 and August 2017. The class action alleges that we operated unlawfully in such regions during such periods. These legislative and regulatory proceedings, allegations, and lawsuits are expensive and time consuming to defend, and, if resolved adversely to us, could result in financial damages or penalties, including criminal penalties, incarceration, and sanctions for individuals employed by us or parties with whom we contract, which could harm our ability to operate our business as planned in one or more of the jurisdictions in which we operate, which could adversely affect our business, revenue, and operating results.

In addition, while we divested certain assets of our dockless e-bikes and e-scooters business to Lime in May 2020, consumers continue to have access to dockless e-bikes and e-scooters through our app. We expect dockless e-bikes and e-scooters to subject us to additional risks distinct from those relating to our other Mobility, Delivery and Freight offerings. For example, consumers using dockless e-bikes or e-scooters face a more severe level of injury in the event of a collision than that faced while riding in a vehicle, given the less sophisticated, and in some cases absent, passive protection systems on dockless e-bikes and e-scooters. The occurrence of real or perceived quality problems or material defects in current or future dockless e-bikes or e-scooters available via our app could result in negative publicity, market withdrawals, regulatory proceedings, enforcement actions, or lawsuits filed against us, particularly if consumers are injured.

***Changes in, or failure to comply with, competition laws could adversely affect our business, financial condition, or operating results.***

Competition authorities closely scrutinize us under U.S. and foreign antitrust and competition laws. An increasing number of governments are enforcing competition laws and are doing so with increased scrutiny, including governments in large markets such as the EU, the United States, Brazil, and India, particularly surrounding issues of predatory pricing, price-fixing, and abuse of market power. Many of these jurisdictions also allow competitors or consumers to assert claims of anti-competitive conduct. For example, complaints have been filed in several jurisdictions, including in the United States and India, alleging that our prices are too high (surge pricing) or too low (discounts or predatory pricing), or both. If one jurisdiction imposes or proposes to impose new requirements or restrictions on our business, other jurisdictions may follow. Further, any new requirements or restrictions, or proposed requirements or restrictions, could result in adverse publicity or fines, whether or not valid or subject to appeal.

In addition, governmental agencies and regulators may, among other things, prohibit future acquisitions, divestitures, or combinations we plan to make, impose significant fines or penalties, require divestiture of certain of our assets, or impose other restrictions that limit or require us to modify our operations, including limitations on our contractual relationships with platform users or restrictions on our pricing models. Such rulings may alter the way in which we do business and, therefore, may continue to increase our costs or liabilities or reduce demand for our platform, which could adversely affect our business, financial condition, or operating results.

We expect that the U.S. antitrust enforcement agencies (e.g., the DOJ and the FTC) will continue to closely scrutinize merger activity, with a particular focus on the technology sector, and there can be no assurance that proposed, completed or future mergers, acquisitions and divestitures will not be the subject of an investigation or enforcement action by the DOJ or the FTC. Changes in antitrust laws globally, or in their interpretation, administration or enforcement, may limit our future acquisitions, divestitures, operations and growth.

***Our business is subject to extensive government regulation and oversight relating to the provision of payment and financial services.***

Most jurisdictions in which we operate have laws that govern payment and financial services activities. Regulators in certain jurisdictions may determine that certain aspects of our business are subject to these laws and could require us to obtain licenses to continue to operate in such jurisdictions. For example, our subsidiary in the Netherlands, Uber Payments B.V., is registered and authorized by its competent authority, De Nederlandsche Bank, as an electronic money institution. This authorization permits Uber Payments B.V. to provide payment services (including acquiring and executing payment transactions and money remittances, as referred to in the Revised Payment Services Directive (2015/2366/EU)) and to issue electronic money in the Netherlands. In addition, Uber Payments B.V. has notified De Nederlandsche Bank that it will provide such services on a cross-border passport basis into other countries within the EEA. We continue to critically evaluate our options for seeking additional licenses and approvals in several other jurisdictions to optimize our payment solutions and support the future growth of our business. We could be denied such licenses, have existing licenses revoked, or be required to make significant changes to our business operations before being granted such licenses. If we are denied payment or other financial licenses or such licenses are revoked, we could be forced to cease or limit business

37

operations in certain jurisdictions, including in the EEA, and even if we are able to obtain such licenses, we could be subject to fines or other enforcement action, or stripped of such licenses, if we are found to violate the requirements of such licenses. In some countries, it is not clear whether we are required to be licensed as a payment services provider. Were local regulators to determine that such arrangements require us to be so licensed, such regulators may block payments to Drivers, merchants, shippers or carriers. Such regulatory actions, or the need to obtain regulatory approvals, could impose significant costs and involve substantial delay in payments we make in certain local markets, any of which could adversely affect our business, financial condition, or operating results.

Starting in December 2020, payments made by platform users with payment accounts in the EEA for services provided through our platform may be subject to Strong Customer Authentication ("SCA") regulatory requirements. In many cases, SCA will require a platform user to engage in additional steps to authenticate each payment transaction. These additional authentication requirements in EEA or similar requirements, such as tokenization, in other countries may make our platform user experience substantially less convenient, and such loss of convenience could meaningfully reduce the frequency with which platform users use our platform or could cause some platform users to stop using our platform entirely, which could adversely affect our business, financial condition, operating results, and prospects. Further, as a result of implementing SCA, many payment transactions on our platform may fail to be authenticated due to platform users not completing all necessary authentication steps. Thus, in some cases, we may not receive payment from consumers in advance of paying Drivers for services received by those users. A substantial increase in the frequency with which we make Driver payments without having received corresponding payments from consumers could adversely affect our business, financial condition, operating results, and prospects.

In addition, laws related to money transmission and online payments are evolving, and changes in such laws could affect our ability to provide payment processing on our platform in the same form and on the same terms as we have historically, or at all. For example, changes to our business in Europe, combined with changes to the EU Payment Services Directive, caused aspects of our payment operations in the EEA to fall within the scope of European payments regulation. As a result, one of our subsidiaries, Uber Payments B.V., is directly subject to financial services regulations (including those relating to anti-money laundering, terrorist financing, and sanctioned or prohibited persons) in the Netherlands and in other countries in the EEA where it conducts business. Effective July 1, 2020, we transitioned all our payment operations to the Uber Payments B.V. regulated entity in the EEA countries in which we are required to do so by the European payments regulations.

In addition, as we evolve our business or make changes to our business structure, we may be subject to additional laws or requirements related to money transmission, online payments, and financial regulation. These laws govern, among other things, money transmission, prepaid access instruments, electronic funds transfers, anti-money laundering, counter-terrorist financing, banking, systemic integrity risk assessments, security of payment processes, and import and export restrictions. Our business operations, including our payments to Drivers and merchants, may not always comply with these financial laws and regulations. Historical or future non-compliance with these laws or regulations could result in significant criminal and civil lawsuits, penalties, forfeiture of significant assets, or other enforcement actions. Costs associated with fines and enforcement actions, as well as reputational harm, changes in compliance requirements, or limits on our ability to expand our product offerings, could harm our business.

Further, our payment system is susceptible to illegal and improper uses, including money laundering, terrorist financing, fraudulent sales of goods or services, and payments to sanctioned parties. We have invested and will need to continue to invest substantial resources to comply with applicable anti-money laundering and sanctions laws, and in the EEA to conduct appropriate risk assessments and implement appropriate controls as a regulated financial service provider. Government authorities may seek to bring legal action against us if our payment system is used for improper or illegal purposes or if our enterprise risk management or controls in the EEA are not adequately assessed, updated, or implemented, and any such action could result in financial or reputational harm to our business.

***We currently are subject to a number of inquiries, investigations, and requests for information from the DOJ, state Attorney General ("AG") offices and other U.S. and foreign government agencies, the adverse outcomes of which could harm our business.***

We are the subject of DOJ criminal and civil inquiries and investigations, as well as civil enforcement inquiries and investigations by other government agencies, including state AG offices in the United States and abroad. Those inquiries and investigations cover a broad range of matters, including our business practices, such as fees, pricing, and related disclosures, as well as data deletion and document retention policies related to the 2016 Breach, which involved the breach of certain archived consumer data hosted on a cloud-based service that outside actors accessed and downloaded. We have in the past and may in the future, settle claims related to such matters. For example, in September 2018, after investigations and various lawsuits relating to the 2016 Breach, we settled with the Attorneys General of all 50 U.S. states and the District of Columbia through stipulated judgments and payment in an aggregate amount of $148 million related to our failure to report the incident for approximately one year. In April 2018, we entered into a consent decree that lasts through 2038 covering the 2014 Breach and the 2016 Breach with the U.S. Federal Trade Commission (the "FTC"), which the FTC Commissioners approved in October 2018. In November and December 2018, U.K., Dutch and French regulators imposed fines totaling approximately $1.6 million related to the 2016 Breach. The 2016 Breach has led to, and may continue to lead to, additional costly and time-consuming regulatory investigations and litigation from other government entities, as well as potentially material fines and penalties imposed by other U.S. and international regulators. As another example, the California Public Utilities Commission (the "CPUC") issued a proposed $59 million fine against us for not producing certain information, including personal information related to incidents disclosed in our 2019 US Safety Report. We negotiated the total payment to $9.15

38

million ($150,000 as a fine and $9 million to fund safety initiatives), which was approved by the CPUC in December 2021. Investigations and enforcement actions from such entities, as well as continued negative publicity and an erosion of current and prospective platform users' trust, could severely disrupt our business.

We are also subject to inquiries and investigations by government agencies related to certain transactions we have entered into in the United States and other countries.

These government inquiries and investigations are time-consuming and require a great deal of financial resources and attention from us and our senior management. If any of these matters are resolved adversely to us, we may be subject to additional fines, penalties, and other sanctions, and could be forced to change our business practices substantially in the relevant jurisdictions. Any such determinations could also result in significant adverse publicity or additional reputational harm, and could result in or complicate other inquiries, investigations, or lawsuits from other regulators in future merger control or conduct investigations. Any of these developments could result in material financial damages, operational restrictions, and harm our business.

***We face risks related to our collection, use, transfer, disclosure, and other processing of data, which could result in investigations, inquiries, litigation, fines, legislative and regulatory action, and negative press about our privacy and data protection practices.***

The nature of our business exposes us to claims, including civil lawsuits in the United States such as those related to the 2014 Breach and the 2016 Breach. These and any future privacy or security incidents could result in violation of applicable U.S. and international privacy, data protection, and other laws. Such violations subject us to individual or consumer class action litigation as well as governmental investigations and proceedings by federal, state, and local regulatory entities in the United States and internationally, resulting in exposure to material civil or criminal liability. Our data security and privacy practices have been the subject of inquiries from government agencies and regulators, not all of which are finally resolved. In April 2018, we entered into an FTC consent decree pursuant to which we agreed, among other things, to implement a comprehensive privacy program, undergo biennial third-party assessments, and not misrepresent how we protect consumer information through 2038. In October 2018, the FTC approved the final settlement, which exposes us to penalties for, amongst other activities, future failure to report security incidents. In November and December 2018, U.K., Dutch and French supervisory authorities imposed fines totaling approximately $1.6 million. We have also entered into settlement agreements with numerous state enforcement agencies. In January 2016, we entered into a settlement with the Office of the New York State Attorney General under which we agreed to enhance our data security practices. In September 2018, we entered into stipulated judgments with the state attorneys general of all 50 U.S. states and the District of Columbia relating to the 2016 Breach, which involved payment of $148 million and assurances that we would enhance our data security and privacy practices. Failure to comply with these and other orders could result in substantial fines, enforcement actions, injunctive relief, and other penalties that may be costly or that may impact our business. We may also assume liabilities for breaches experienced by the companies we acquire as we expand our operations. For example, in April 2018, Careem publicly disclosed and notified relevant regulatory authorities that it had been subject to a data security breach that allowed access to certain personal information of riders and drivers on its platform as of January 14, 2018. If Careem becomes subject to liability as a result of this or other data security breaches or if we fail to remediate this or any other data security breach that Careem or we experience, we may face harm to our brand, business disruption, and significant liabilities. Our insurance programs may not cover all potential claims to which we are exposed and may not be adequate to indemnify us for the full extent of our potential liabilities.

This risk is enhanced in certain jurisdictions with stringent privacy laws and, as we expand our products, offerings, and operations domestically and internationally, we have, and may continue to become subject to amended or additional laws that impose substantial additional obligations related to data privacy and security. The EU adopted the GDPR in 2016, and it became effective in May 2018. The GDPR applies extraterritorially and imposes stringent requirements for controllers and processors of personal data. Such requirements include higher consent standards to process personal data, robust disclosures regarding the use of personal data, strengthened individual data rights, data breach requirements, limitations on data retention, strengthened requirements for special categories of personal data and pseudonymised (i.e., key-coded) data, and additional obligations for contracting with service providers that may process personal data. The GDPR further provides that EU member states may institute additional laws and regulations impacting the processing of personal data, including (i) special categories of personal data (e.g., racial or ethnic origin, political opinions, and religious or philosophical beliefs) and (ii) profiling of individuals and automated individual decision-making. Such additional laws and regulations could limit our ability to use and share personal or other data, thereby increasing our costs and harming our business and financial condition. Non-compliance with the GDPR (including any non-compliance by any acquired business) is subject to significant penalties, including fines of up to the greater of €20 million or 4% of total worldwide revenue, and injunctions against the processing of personal data. Other jurisdictions outside the EU are similarly introducing or enhancing privacy and data security laws, rules, and regulations, which will increase our compliance costs and the risks associated with non-compliance. For example, the California Consumer Privacy Act ("CCPA"), which provides new privacy rights for consumers and new operational requirements for businesses, went into effect in January 2020. The CCPA includes a statutory damages framework and private rights of action against businesses that fail to comply with certain CCPA terms or implement reasonable security procedures and practices to prevent data breaches. Other U.S. states have adopted, and likely will continue to adopt, similar laws that provide new consumer privacy rights and business operational requirements. Brazil provides another example, having passed the General Data Protection Law (Lei Geral de Proteção de Dados Pessoais, or LGPD) in 2018, which is now in effect. These laws may be subject to amendments and regulations that may change over time, or result in additional follow-on laws such as the California Privacy Rights Act ("CPRA")

39

passed in California in November 2020.

Additionally, we are subject to laws, rules, and regulations regarding cross-border transfers of personal data, including laws relating to transfer of personal data outside the EEA. We rely on transfer mechanisms permitted under these laws, including the EU Standard Contract Clauses. Such mechanisms have received heightened regulatory and judicial scrutiny and are undergoing modifications, and a 2020 decision by the Court of Justice of the European Union casts doubt on the adequacy of all of the formerly-approved mechanisms for transferring personal data from countries in the EEA to certain other countries such as the United States. If we cannot rely on existing mechanisms for transferring personal data from the EEA, the United Kingdom, or other jurisdictions, we may be unable to transfer personal data of Drivers, consumers, or employees in those regions, which could have an adverse effect on our business, financial condition, and operating results. In addition, we may be required to disclose personal data pursuant to demands from government agencies, including from state and city regulators as a requirement for obtaining or maintaining a license or otherwise, from law enforcement agencies, and from intelligence agencies. This disclosure may result in a failure or perceived failure by us to comply with privacy and data protection policies, notices, laws, rules, and regulations, could result in proceedings or actions against us in the same or other jurisdictions, and could have an adverse impact on our reputation and brand. In addition, Careem has historically shared certain user data with certain government authorities, which conflicts with our global policies regarding data use, sharing, and ownership. We expect to maintain our data use, sharing, and ownership practices for both our business and Careem's business, and doing so may cause our relationship with government authorities in certain jurisdictions to suffer, and may result in such government authorities assessing significant fines or penalties against us or shutting down our or Careem's app on either a temporary or indefinite basis. Further, if any jurisdiction in which we operate changes its laws, rules, or regulations relating to data residency or local computation such that we are unable to comply in a timely manner or at all, we may risk losing our rights to operate in such jurisdictions. This could adversely affect the manner in which we provide our products and offerings and thus materially affect our operations and financial results.

Such data protection laws, rules, and regulations are complex and their interpretation is rapidly evolving, making implementation and enforcement, and thus compliance requirements, ambiguous, uncertain, and potentially inconsistent. Compliance with such laws may require changes to our data collection, use, transfer, disclosure, and other processing and certain other related business practices and may thereby increase compliance costs. Additionally, any failure or perceived failure by us to comply with privacy and data protection policies, notices, laws, rules, orders and regulations could result in proceedings or actions against us by individuals, consumer rights groups, governmental entities or agencies, or others. We could incur significant costs investigating and defending such claims and, if found liable, significant damages. Further, these proceedings and any subsequent adverse outcomes may subject us to significant penalties and negative publicity. If any of these events were to occur, our business and financial results could be significantly disrupted and adversely affected.

***Adverse litigation judgments or settlements resulting from legal proceedings in which we may be involved could expose us to monetary damages or limit our ability to operate our business.***

We have in the past been, are currently, and may in the future become, involved in private actions, collective actions, investigations, and various other legal proceedings by Drivers, consumers, merchants, shippers, carriers, employees, commercial partners, competitors or, government agencies, among others. We are subject to litigation relating to various matters including Driver classification, Drivers' tips and taxes, the Americans with Disabilities Act, antitrust, intellectual property infringement, privacy, unfair competition, workplace culture, safety practices, and employment and human resources practices. The results of any such litigation, investigations, and legal proceedings are inherently unpredictable and expensive. Any claims against us, whether meritorious or not, could be time consuming, costly, and harmful to our reputation, and could require significant amounts of management time and corporate resources. If any of these legal proceedings were to be determined adversely to us, or we were to enter into a settlement arrangement, we could be exposed to monetary damages or be forced to change the way in which we operate our business, which could have an adverse effect on our business, financial condition, and operating results.

In addition, we regularly include arbitration provisions in our terms of service with end-users. These provisions are intended to streamline the litigation process for all parties involved, as arbitration can in some cases be faster and less costly than litigating disputes in state or federal court. However, arbitration may become more costly for us, or the volume of arbitrations may increase and become burdensome. Further, the use of arbitration provisions may subject us to certain risks to our reputation and brand, as these provisions have been the subject of increasing public scrutiny. To minimize these risks, we have in the past and may in the future voluntarily limit our use of arbitration provisions, or we may be required to do so, in any legal or regulatory proceeding, either of which could increase our litigation costs and exposure in respect of such proceedings. For example, effective May 15, 2018, we ended mandatory arbitration of sexual misconduct claims by platform users and employees.

Further, with the potential for conflicting rules regarding the scope and enforceability of arbitration on a state-by-state basis, as well as conflicting rules between state and federal law, some or all of our arbitration provisions could be subject to challenge or may need to be revised to exempt certain categories of protection. If our arbitration agreements were found to be unenforceable, in whole or in part, or specific claims were required to be exempted from arbitration, we could experience an increase in our litigation costs and the time involved in resolving such disputes, and we could face increased exposure to potentially costly lawsuits, each of which could adversely affect our business, financial condition, operating results, and prospects.

40

***We have operations in countries known to experience high levels of corruption and were previously subject to, and may in the future be subject to, inquiries, investigations, and requests for information with respect to our compliance with a number of anti-corruption laws to which we are subject.***

We have operations in, and have business relationships with, entities in countries known to experience high levels of corruption. We are subject to the FCPA and other similar laws outside the United States that prohibit improper payments or offers of payments to foreign governments, their officials, and political parties for the purpose of obtaining or retaining business. U.S. and non-U.S. regulators alike continue to focus on the enforcement of these laws, and we may be subject to additional compliance requirements to identify criminal activity and payments to sanctioned parties. Our activities in certain countries with high levels of corruption enhance the risk of unauthorized payments or offers of payments by Drivers, consumers, merchants, shippers or carriers, employees, consultants, or business partners in violation of various anti-corruption laws, including the FCPA, even though the actions of these parties are often outside our control. Our acquisition of Careem may further enhance this risk because users of Careem's platform and Careem's employees, consultants, and business partners may not be familiar with, and may not have been previously subject to, these anti-corruption laws. In addition, our existing and future safeguards, including training and compliance programs to discourage these practices by such parties, may not prove effective, and such parties may engage in conduct for which we could be held responsible. Additional compliance requirements may compel us to revise or expand our compliance program, including the procedures we use to verify the identity of platform users and monitor international and domestic transactions.

***Drivers may become subject to increased licensing requirements, and we may be required to obtain additional licenses or cap the number of Drivers using our platform.***

Many Drivers currently are not required to obtain a commercial taxi or livery license in their respective jurisdictions. However, numerous jurisdictions in which we operate have conducted investigations or taken action to enforce existing licensing rules, including markets within Latin America and the Asia-Pacific region, and many others, including countries in Europe, the Middle East, and Africa, have adopted or proposed new laws or regulations that require Drivers to be licensed with local authorities or require us or our subsidiaries to be licensed as a transportation company. Local regulations requiring the licensing of us or Drivers may adversely affect our ability to scale our business and operations. In addition, it is possible that various jurisdictions could impose caps on the number of licensed Drivers or vehicles with whom we may partner or impose limitations on the maximum number of hours a Driver may work, similar to recent regulations that were adopted in Spain and New York City, which have temporarily frozen new vehicle licenses for Drivers using platforms like ours. If we or Drivers become subject to such caps, limitations, or licensing requirements, our business and growth prospects would be adversely impacted.

***We may be subject to liability for the means we use to attract and onboard Drivers.***

We operate in an industry in which the competition for Drivers is intense. In this highly competitive environment, the means we use to onboard and attract Drivers may be challenged by competitors, government regulators, or individual plaintiffs. For example, putative class actions have been filed by individual plaintiffs against us for alleged violation of the Telephone Consumer Protection Act of 1991, alleging, among other things, that plaintiffs received text messages from us regarding our Driver program without their consent or after indicating to us they no longer wished to receive such text messages. In addition, in early 2017, we settled an investigation by the FTC into statements we made regarding potential Driver earnings and third-party vehicle leasing and financing programs. In connection with this matter, we agreed, among other things, to pay $20 million to the FTC for Driver redress. These lawsuits are expensive and time consuming to defend, and, if resolved adversely to us, could result in material financial damages and penalties, costly adjustments to our business practices, and negative publicity. In addition, we could incur substantial expense and possible loss of revenue if competitors file additional lawsuits or other claims challenging these practices.

***Our business depends heavily on insurance coverage for Drivers and on other types of insurance for additional risks related to our business. If insurance carriers change the terms of such insurance in a manner not favorable to Drivers or to us, if we are required to purchase additional insurance for other aspects of our business, or if we fail to comply with regulations governing insurance coverage, our business could be harmed.***

We use a combination of third-party insurance and self-insurance mechanisms, including a wholly owned captive insurance subsidiary. Insurance related to our Mobility products may include third-party automobile, automobile comprehensive and collision, physical damage, and uninsured and underinsured motorist coverage. We require Drivers to carry automobile insurance in most countries, and in many cases we also maintain insurance on behalf of Drivers. We rely on a limited number of ridesharing insurance providers, particularly internationally, and should such providers discontinue or increase the cost of coverage, we cannot guarantee that we would be able to secure replacement coverage on reasonable terms or at all. In addition to insurance related to our products, we maintain other automobile insurance coverage for owned vehicles and employee activity, as well as insurance coverage for non-automotive corporate risks including general liability, workers' compensation, property, cyber liability, and director and officers' liability. If our insurance carriers change the terms of our policies in a manner unfavorable to us or Drivers, our insurance costs could increase. The cost of insurance that we maintain on behalf of Drivers is higher in the United States and Canada than in other geographies. Further, if the insurance coverage we maintain is not adequate to cover losses that occur, we could be liable for significant additional costs.

In addition, we and our captive insurance subsidiary are party to certain reinsurance and indemnification arrangements that

41

transfer a significant portion of the risk from the insurance provider to us or our captive insurance subsidiary, which could require us to pay out material amounts that may be in excess of our insurance reserves, resulting in harm to our financial condition. Our insurance reserves account for unpaid losses and loss adjustment expenses for risks retained by us through our captive insurance subsidiary and other risk retention mechanisms. Such amounts are based on actuarial estimates, historical claim information, and industry data. While management believes that these reserve amounts are adequate, the ultimate liability could be in excess of our reserves. We also have requirements to post collateral for current and future claim settlement obligations with certain of our insurance carriers, which may have a significant impact on our unrestricted cash and cash equivalents available for general business purposes.

We may be subject to claims of significant liability based on traffic accidents, injuries, or other incidents that are claimed to have been caused by Drivers who use our platform, even when those Drivers are not actively using our platform or when an individual impersonates a Driver. As we expand to include more offerings on our platform, our insurance needs will likely extend to those additional offerings, including Freight. As a result, our automobile liability and general liability insurance policies and insurance maintained by Drivers may not cover all potential claims related to traffic accidents, injuries, or other incidents that are claimed to have been caused by Drivers who use our platform, and may not be adequate to indemnify us for all liability that we could face. Even if these claims do not result in liability, we could incur significant costs in investigating and defending against them. If insurers become insolvent, they may not be able to pay otherwise valid claims in a timely manner or at all. If we are subject to claims of liability relating to the acts of Drivers or others using our platform, we may be subject to negative publicity and incur additional expenses, which could harm our business, financial condition, and operating results.

In addition, we are subject to local laws, rules, and regulations relating to insurance coverage which could result in proceedings or actions against us by governmental entities or others. Legislation has been passed in many U.S. jurisdictions that codifies these insurance requirements with respect to ridesharing. Additional legislation has been proposed in other jurisdictions that seeks to codify or change insurance requirements with respect to ridesharing. Further, service providers and business customers of Freight and Uber for Business may require higher levels of coverage as a condition to entering into certain key contracts with us. Any failure, or perceived failure, by us to comply with local laws, rules, and regulations or contractual obligations relating to insurance coverage could result in proceedings or actions against us by governmental entities or others. These lawsuits, proceedings, or actions may subject us to significant penalties and negative publicity, require us to increase our insurance coverage, require us to amend our insurance policy disclosure, increase our costs, and disrupt our business.

***We may be subject to pricing regulations, as well as related litigation or regulatory inquiries.***

Our revenue is dependent on the pricing models we use to calculate consumer fares and Driver earnings. Our pricing models, including dynamic pricing, have been, and will likely continue to be, challenged, banned, limited in emergencies, and capped in certain jurisdictions. For example, we have agreed to not calculate consumer fares in excess of the maximum government-mandated fares in all major Indian cities where legal proceedings have limited the use of surge pricing. Further, in 2018, Honolulu, Hawaii became the first U.S. city to pass legislation to cap surge pricing if increased rates exceed the maximum fare set by the city. Additional regulation of our pricing models could increase our operating costs and adversely affect our business. Furthermore, our pricing model has been the subject of litigation and regulatory inquiries related to, among other things, the calculation of and statements regarding consumer fares and Driver earnings (including rates, fees, surcharges, and tolls), as well as the use of surge pricing during emergencies and natural disasters. In addition, an increasing number of municipalities have proposed delivery network fee caps with respect to our Delivery offering and caps on surge pricing with respect to our Mobility offering. As a result, we may be forced to change our pricing models in certain jurisdictions, which could harm our revenue or result in a sub-optimal tax structure.

***If we are unable to protect our intellectual property, or if third parties are successful in claiming that we are misappropriating the intellectual property of others, we may incur significant expense and our business may be adversely affected.***

Our intellectual property includes the content of our website, mobile applications, registered domain names, software code, firmware, hardware and hardware designs, registered and unregistered trademarks, trademark applications, copyrights, trade secrets, inventions (whether or not patentable), patents, and patent applications. We believe that our intellectual property is essential to our business and affords us a competitive advantage in the markets in which we operate. If we do not adequately protect our intellectual property, our brand and reputation may be harmed, Drivers, consumers, merchants, shippers, and carriers could devalue our products and offerings, and our ability to compete effectively may be impaired.

To protect our intellectual property, we rely on a combination of copyright, trademark, patent, and trade secret laws, contractual provisions, end-user policies, and disclosure restrictions. Upon discovery of potential infringement of our intellectual property, we assess and when necessary, take action to protect our rights as appropriate. We also enter into confidentiality agreements and invention assignment agreements with our employees and consultants and seek to control access to, and distribution of, our proprietary information in a commercially prudent manner. The efforts we have taken and may take to protect our intellectual property may not be sufficient or effective. For example, effective intellectual property protection may not be available in every country in which we currently or in the future will operate. In addition, it may be possible for other parties to copy or reverse-engineer our products and offerings or obtain and use the content of our website without authorization. Further, we may be unable to prevent competitors or other third parties from acquiring or using domain names or trademarks that are similar to, infringe upon, or diminish the value of our domain names, trademarks, service marks, and other proprietary rights. Moreover, our trade secrets may be compromised by third

42

parties or our employees, which would cause us to lose the competitive advantage derived from the compromised trade secrets. Further, we may be unable to detect infringement of our intellectual property rights, and even if we detect such violations and decide to enforce our intellectual property rights, we may not be successful, and may incur significant expenses, in such efforts. In addition, any such enforcement efforts may be time-consuming and may divert management's attention. Further, such enforcement efforts may result in a ruling that our intellectual property rights are unenforceable or invalid. Any failure to protect or any loss of our intellectual property may have an adverse effect on our ability to compete and may adversely affect our business, financial condition, or operating results.

Companies in the Internet and technology industries, and other patent and trademark holders, including "non-practicing entities," seeking to profit from royalties in connection with grants of licenses or seeking to obtain injunctions, own large numbers of patents, copyrights, trademarks, and trade secrets and frequently enter into litigation based on allegations of infringement or other violations of intellectual property rights. We have and may in the future continue to receive notices that claim we have misappropriated, misused, or infringed upon other parties' intellectual property rights.

Furthermore, from time to time we may introduce or acquire new products, including in areas in which we historically have not operated, which could increase our exposure to patent and other intellectual property claims. In addition, we, and companies we acquired or in which we have an interest, have been sued, and may in the future be sued, for allegations of intellectual property infringement or threats of trade secret misappropriation. If a company we acquire or in which we have an interest loses rights to valuable intellectual property or is found to infringe third party intellectual property rights in such lawsuits, the value of our investment may materially decline.

Any intellectual property claim against us, regardless of merit, could be time consuming and expensive to settle or litigate, could divert our management's attention and other resources, and could hurt goodwill associated with our brand. These claims may also subject us to significant liability for damages and may result in us having to stop using technology, content, branding, or business methods found to be in violation of another party's rights. Further, certain adverse outcomes of such proceedings could adversely affect our ability to compete effectively in existing or future businesses.

We may be required or may opt to seek a license for the right to use intellectual property held by others, which may not be available on commercially reasonable terms, or at all. Even if a license is available, we may be required to pay significant royalties or license fees, which may increase our operating expenses. We may also be required to develop alternative non-infringing technology, content, branding, or business methods, which could require significant effort and expense and make us less competitive. If we cannot license or develop alternative technology, content, branding, or business methods for any allegedly infringing aspect of our business, we may be unable to compete effectively or we may be prevented from operating our business in certain jurisdictions. Any of these results could harm our operating results.

***Our reported financial results may be adversely affected by changes in accounting principles.***

The accounting for our business is complicated, particularly in the area of revenue recognition, and is subject to change based on the evolution of our business model, interpretations of relevant accounting principles, enforcement of existing or new regulations, and changes in SEC or other agency policies, rules, regulations, and interpretations, of accounting regulations. Changes to our business model and accounting methods could result in changes to our financial statements, including changes in revenue and expenses in any period, or in certain categories of revenue and expenses moving to different periods, may result in materially different financial results, and may require that we change how we process, analyze, and report financial information and our financial reporting controls.

***If we are deemed an investment company under the Investment Company Act, applicable restrictions could have an adverse effect on our business.***

The Investment Company Act contains substantive legal requirements that regulate the manner in which "investment companies" are permitted to conduct their business activities. We believe that we have conducted our business in a manner that does not result in being characterized as an "investment company" under the Investment Company Act because we are primarily engaged in a non-investment company business. Although a significant portion of our assets constitute investments in non-controlled entities (including in China), referred to elsewhere in this Annual Report on Form 10-K as minority-owned affiliates, we believe that we are not an investment company as defined by the Investment Company Act. While we intend to conduct our operations such that we will not be deemed an investment company, such a determination would require us to initiate burdensome compliance requirements and comply with restrictions imposed by the Investment Company Act that would limit our activities, including limitations on our capital structure and our ability to transact with affiliates, which would have an adverse effect on our financial condition. To avoid such a determination, we may be required to conduct our business in a manner that does not subject us to the requirements of the Investment Company Act, which could have an adverse effect on our business. For example, we may be required to sell certain of our assets and pay significant taxes upon the sale or transfer of such assets.

**Risks Related to Ownership of Our Common Stock**

***The market price of our common stock has been, and may continue to be, volatile or may decline steeply or suddenly regardless of our operating performance, and we may not be able to meet investor or analyst expectations. You may not be able to resell your shares at or above the price you paid and may lose all or part of your investment.***

43

The market price of our common stock may fluctuate or decline significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in MAPCs, Trips, Adjusted EBITDA, Gross Bookings, revenue, or other operating and financial results;

- announcements by us or estimates by third parties of actual or anticipated changes in the number of Drivers and consumers on our platform;

- variations between our actual operating results and the expectations of our management, securities analysts, investors, the financial community;

- changes in accounting principles or changes in interpretations of existing principles, which could affect financial results;

- actions of securities analysts who initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our company, or our failure to meet these estimates or the expectations of investors;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures, or capital commitments;

- negative media coverage or publicity;

- changes in operating performance and stock market valuations of technology companies generally, or those in our industry in particular, including our competitors;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- lawsuits threatened, filed, or decided against us;

- developments in legislation or regulatory actions, including interim or final rulings by judicial or regulatory bodies (including any competition authorities blocking, delaying, or subjecting our pending acquisitions to significant limitations or restrictions on our ability to operate in one or more markets, or requiring us to divest our or any target company's assets or businesses in one or more markets);

- changes in accounting standards, policies, guidelines, interpretations, or principles;

- any major change in our board of directors or management;

- any safety incidents or public reports of safety incidents that occur on our platform or in our industry;

- statements, commentary, or opinions by public officials that our product offerings are or may be unlawful, regardless of any interim or final rulings by judicial or regulatory bodies; and

- other events or factors, including those resulting from war, incidents of terrorism, natural disasters, public health concerns or epidemics, such as the current COVID-19 pandemic, natural disasters, or responses to these events.

In addition, price and volume fluctuations in the stock markets have affected and continue to affect many technology companies' stock prices. Often, their stock prices have fluctuated in ways unrelated or disproportionate to the companies' operating performance. In the past, stockholders have filed securities class action litigation following periods of market volatility. For example, beginning in September 2019, several putative class actions were filed in California state and federal courts against us, our directors, certain of our officers, and the underwriters named in our IPO registration statement alleging violations of securities laws in connection with our IPO. Securities litigation could subject us to substantial costs, divert resources and the attention of management from our business, and seriously harm our business. In addition, the occurrence of any of the factors listed above, among others, may cause our stock price to decline significantly, and there can be no assurance that our stock price would recover. As such, you may not be able to sell your shares at or above the price you paid, and you may lose some or all of your investment.

***Delaware law and provisions in our amended and restated certificate of incorporation and amended and restated bylaws could make a merger, tender offer, or proxy contest difficult, thereby depressing the trading price of our common stock.***

Our amended and restated certificate of incorporation and amended and restated bylaws contain provisions that could depress the trading price of our common stock by acting to discourage, delay, or prevent a change of control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions include the following:

- our board of directors has the right to elect directors to fill vacancies created by the expansion of our board of directors or the resignation, death, or removal of a director, which prevents stockholders from being able to fill vacancies on our board of directors;

- advance notice requirements for stockholder proposals, which may reduce the number of stockholder proposals available for stockholder consideration;

- limitations on stockholder ability to convene special stockholder meetings, which could make it difficult for our

44

stockholders to adopt desired governance changes;

- prohibition on cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates; and

- our board of directors is able to issue, without stockholder approval, shares of undesignated preferred stock, which makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

Any provision of our amended and restated certificate of incorporation, amended and restated bylaws, or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock. In addition, under our existing debt instruments, we, and certain of our subsidiaries, are subject to certain limitations on our business and operations, including limitations on certain consolidations, mergers, and sales of assets. For information regarding these and other provisions, see the risk factor titled "-We have incurred a significant amount of debt and may in the future incur additional indebtedness. Our payment obligations under such indebtedness may limit the funds available to us, and the terms of our debt agreements may restrict our flexibility in operating our business."

***Sales, directly or indirectly, of shares of our common stock by existing stockholders could cause our stock price to decline.***

Sales, directly or indirectly, of a substantial number of shares of our common stock, or the public perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. We may issue our shares of common stock or securities convertible or exchangeable into or exercisable for our common stock from time to time in connection with a financing, acquisition, investments or otherwise. For example, on December 1, 2020, we completed the acquisition of Postmates for aggregate consideration of approximately 70 million shares of our common stock and equity awards covering approximately 13 million shares of our common stock. This and any other such issuance, including the issuance of additional shares of our common stock upon exercise of such equity awards, could result in substantial dilution to our existing stockholders and cause the trading price of our common stock to decline.

***We do not intend to pay cash dividends for the foreseeable future.***

We have never declared or paid cash dividends on our capital stock. We currently intend to retain any future earnings to finance the operation and expansion of our business, and we do not expect to declare or pay any cash dividends in the foreseeable future. In addition, certain of our existing debt instruments include restrictions on our ability to pay cash dividends. As a result, you may only receive a return on your investment in our common stock if the market price of our common stock increases.

***Our amended and restated certificate of incorporation provides that the Court of Chancery of the State of Delaware and, to the extent enforceable, the federal district courts of the United States of America are the exclusive forums for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, or employees.***

Our amended and restated certificate of incorporation provides that the Court of Chancery of the State of Delaware is the exclusive forum for the following types of actions or proceedings under Delaware statutory or common law:

- any derivative action or proceeding brought on our behalf;

- any action asserting a breach of fiduciary duty;

- any action asserting a claim against us or our directors, officers, or employees arising under the Delaware General Corporation Law, our amended and restated certificate of incorporation, or our amended and restated bylaws;

- any action regarding our amended and restated certificate of incorporation or our amended and restated bylaws;

- any action as to which the Delaware General Corporation Law confers jurisdiction to the Court of Chancery of the State of Delaware; and

- any action asserting a claim against us that is governed by the internal-affairs doctrine.

This provision would not apply to suits brought to enforce a duty or liability created by the Exchange Act or any other claim for which the U.S. federal courts have exclusive jurisdiction.

Our amended and restated certificate of incorporation provides that the federal district courts of the United States of America will be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act, subject to and contingent upon a final adjudication in the State of Delaware of the enforceability of such exclusive forum provision. Although the Delaware Supreme Court has held that such exclusive forum provisions are facially valid, courts in other jurisdictions may find such provisions to be unenforceable.

These exclusive-forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers,

45

and other employees. If any other court of competent jurisdiction were to find either exclusive-forum provision in our amended and restated certificate of incorporation to be inapplicable or unenforceable, we may incur additional costs associated with resolving the dispute in other jurisdictions, which could seriously harm our business.

**General Risk Factors**

***As a result of being a public company, we are obligated to develop and maintain proper and effective internal controls over financial reporting, and any failure to maintain the adequacy of these internal controls may adversely affect investor confidence in our company and, as a result, the value of our common stock.***

We are required, pursuant to Section 404 of the Sarbanes-Oxley Act ("Section 404"), to furnish an annual report by management on, among other things, the effectiveness of our internal control over financial reporting. In addition, our independent registered public accounting firm is required to attest to the effectiveness of our internal control over financial annually. We currently are required to disclose changes in internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting on a quarterly basis.

The process of compiling the system and processing documentation necessary to perform the evaluation needed to comply with Section 404 is costly and challenging, and we may not be able to complete evaluation, testing, and any required remediation in a timely fashion. As our business continues to grow in size and complexity, we are improving our processes and infrastructure to help ensure we can prepare financial reporting and disclosures within the timeline required for a public company. During the evaluation and testing process of our internal controls, if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal control over financial reporting is effective.

We cannot assure you that there will not be material weaknesses in our internal control over financial reporting in the future, particularly due to high growth offerings (such as with Delivery and Freight), which may cause challenges in consistent performance and timely designing new controls. Any failure to maintain internal control over financial reporting could severely inhibit our ability to accurately report our financial condition or operating results. If we are unable to conclude that our internal control over financial reporting is effective, or if we or our independent registered public accounting firm determines we have a material weakness in our internal control over financial reporting, we could lose investor confidence in the accuracy and completeness of our financial reports, the market price of our common stock could decline, and we could be subject to sanctions or investigations by the stock exchange on which our securities are listed, the SEC or other regulatory authorities. Failure to remedy any material weakness in our internal control over financial reporting, or to implement or maintain these and other effective control systems, could also restrict our future access to the capital markets.

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

Not applicable.

**ITEM 2. PROPERTIES**

As of December 31, 2021, we leased and owned office facilities around the world totaling 10.6 million square feet, including 2.6 million square feet for our corporate headquarters in the San Francisco Bay Area, California.

We believe our facilities, which are generally used by all of our reportable segments, are adequate and suitable for our current needs and that should it be needed, suitable additional or alternative space will be available to accommodate our operations.

**ITEM 3. LEGAL PROCEEDINGS**

We are a party to various legal actions and government investigations, and similar or other actions could be brought against us in the future. The most significant of these matters are described below.

**Legal Proceedings Described in Note 15 to Our Consolidated Financial Statements**

Note 15 – Commitments and Contingencies to our consolidated financial statements for the year ended December 31, 2021 contained in this Annual Report on Form 10-K includes information on legal proceedings that constitute material contingencies for financial reporting purposes that could have a material adverse effect on our consolidated financial position, liquidity or results of operations if they were resolved in a manner that is adverse to us. This item should be read in conjunction with Note 15 for information regarding the following material legal proceedings, which information is incorporated into this item by reference:

• Driver Classification

• State Unemployment Tax Proceedings

• Google v. Levandowski; Google v. Levandowski & Ron

**Legal Proceedings That Are Not Described in Note 15 to Our Consolidated Financial Statements**

In addition to the matters that are identified in Note 15 to our consolidated financial statements for the year ended December 31, 2021 contained in this Annual Report on Form 10-K, and incorporated into this item by reference, the following matters also constitutes material pending legal proceedings, other than ordinary course litigation incidental to our business, to which we are or any of our subsidiaries is a party.

46

*Australia Class Action*

In May 2019, an Australian law firm filed a class action in the Supreme Court of Victoria, Australia, against us and certain of our subsidiaries, on behalf of certain participants in the taxi, hire-car, and limousine industries. The plaintiff alleges that the Uber entities conspired to injure the group members during the period 2014 to 2017 by either directly breaching transport legislation or commissioning offenses against transport legislation by UberX Drivers in Australia. The claim alleges, in effect, that these operations caused loss and damage to the class representative and class members, including lost income and decreased value of certain taxi licenses. In March, April and October 2020, the same Australian law firm filed four additional class action lawsuits alleging the same claim. We deny these allegations and intend to vigorously defend against the lawsuit.

*Other Legal Proceedings*

While it is not possible to determine the outcome of the legal actions, investigations, and proceedings brought against us, we believe that, except for the matters described above, the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity, but could be material to our consolidated results of operations in any one accounting period. We are currently involved in, and may in the future be involved in, legal proceedings, litigation, claims, and government investigations in the ordinary course of business. In addition, the nature of our business exposes us to claims related to the classification of Drivers and the compliance of our business with applicable law. This risk is enhanced in certain jurisdictions outside the United States where we may be less protected under local laws than we are in the United States. Although the results of the legal proceedings, claims, and government investigations in which we are involved cannot be predicted with certainty, we do not believe that the final outcome of these matters is reasonably likely to have a material adverse effect on our business, financial condition, or operating results. Regardless of final outcomes, however, any such legal proceedings, claims, and government investigations may nonetheless impose a significant burden on management and employees and may come with costly defense costs or unfavorable preliminary and interim rulings.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

### Market Information for Common Stock

Our common stock has been listed on the New York Stock Exchange ("NYSE") under the symbol "UBER" since May 10, 2019. Prior to that date, there was no public trading market for our common stock.

### Holders of our Common Stock

As of February 22, 2022, there were 1,418 holders of record of our common stock. The actual number of stockholders is greater than this number of record holders and includes stockholders who are beneficial owners but whose shares are held in street name by brokers and other nominees.

### Dividend Policy

We have never declared or paid cash dividends on our capital stock. We intend to retain all available funds and future earnings, if any, to fund the development and expansion of our business, and we do not anticipate declaring or paying any cash dividends in the foreseeable future. The terms of certain of our outstanding debt instruments restrict our ability to pay dividends or make distributions on our common stock, and we may enter into credit agreements or other borrowing arrangements in the future that will restrict our ability to declare or pay cash dividends or make distributions on our capital stock. Any future determination regarding the declaration and payment of dividends, if any, will be at the discretion of our board of directors and will depend on then-existing conditions, including our financial condition, operating results, contractual restrictions, capital requirements, business prospects, and other factors our board of directors may deem relevant.

### Unregistered Sales of Equity Securities and Use of Proceeds

*Unregistered Sales of Equity Securities*

In October 2021, we issued 18,871,636 shares of our common stock in connection with our acquisition of The Drizly Group, Inc., a Delaware corporation ("Drizly"). These shares were exempt from registration pursuant to Section 4(a)(2) of the Securities Act.

In October 2021, we issued 398 shares of our common stock to holders of Careem Convertible Notes who elected to convert the balance of such notes to common stock at a conversion price of $55 per share. The shares were exempt from registration pursuant to Regulation S of the Securities Act.

47

**Performance Graph**

*This performance graph shall not be deemed "soliciting material" or to be "filed" with the SEC for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities under that Section, and shall not be deemed to be incorporated by reference into any filing of Uber Technologies, Inc. under the Securities Act, or the Exchange Act.*

The following graph compares the cumulative total return to stockholders on our common stock relative to the cumulative total returns of the Standard & Poor's 500 Index, ("S&P 500"), and the S&P 500 Information Technology Sector Index ("S&P 500 IT"). An investment of $100 (with reinvestment of all dividends) is assumed to have been made in our common stock and in each index on May 10, 2019, the date our common stock began trading on the NYSE, and its relative performance is tracked through December 31, 2021. The returns shown are based on historical results and are not intended to suggest future performance.



**ITEM 6. [RESERVED]**

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the consolidated financial statements and related notes included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K. We have elected to omit discussion on the earliest of the three years covered by the consolidated financial statements presented. Refer to Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations located in our Annual Report on Form 10-K for the year ended December 31, 2020, filed on March 1, 2021, for reference to discussion of the fiscal year ended December 31, 2019, the earliest of the three fiscal years presented.*

*In addition to our historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates, and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. You should review the sections titled "Special Note Regarding Forward-Looking Statements" for a discussion of forward-looking statements and in Part I, Item 1A, "Risk Factors", for a discussion of factors that could cause actual results to differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis and elsewhere in this Annual Report on Form 10-K.*

**Overview**

We are a technology platform that uses a massive network, leading technology, operational excellence, and product expertise to power movement from point A to point B. We develop and operate proprietary technology applications supporting a variety of offerings on our platform. We connect consumers with providers of ride services and merchants as well as delivery service providers for meal preparation, grocery and other delivery services. Uber also connects consumers with public transportation networks. We use this same network, technology, operational excellence, and product expertise to connect shippers with carriers in the freight industry. We are also developing technologies that provide new solutions to solve everyday problems.

P-02346-0050

*COVID-19*

In March 2020, the World Health Organization declared the outbreak of coronavirus ("COVID-19") a pandemic. The COVID-19 pandemic has rapidly changed market and economic conditions globally, impacting Drivers, Merchants, consumers and business partners, as well as our business, results of operations, financial position, and cash flows. Various governmental restrictions, including the declaration of a federal National Emergency, multiple cities' and states' declarations of states of emergency, school and business closings, quarantines, restrictions on travel, limitations on social or public gatherings, and other measures have, and may continue to have, an adverse impact on our business and operations, including, for example, by reducing the global demand for Mobility rides. Furthermore, we are experiencing and expect to continue to experience Driver supply constraints, and such supply constraints have been and may continue to be impacted by concerns regarding the COVID-19 pandemic.

*COVID-19 Response Initiatives*

We continue to prioritize the health and safety of our consumers, Drivers and Merchants, our employees and the communities we serve and continue to believe we will play an important role in the economic recovery of cities around the globe. We are focused on navigating the challenges presented by COVID-19 through preserving our liquidity and managing our cash flow by taking preemptive action to enhance our ability to meet our short-term liquidity needs. The pandemic has reduced the demand for our Mobility offering globally, while accelerating the growth of our Delivery offerings. We have responded to the COVID-19 pandemic by launching new, or expanding existing, services or features on an expedited basis, particularly those related to delivery of food and other goods.

To comply with social distancing guidelines of national, state and local governments, we have temporarily suspended our shared rides Mobility offering in most markets, and implemented "leave at door" delivery options for Delivery offerings. Additionally, we have asked that all employees who are able to do so, to work remotely.

As vaccination rates increase in the United States, we are observing that consumer demand for Mobility is recovering faster than driver availability, and consumer demand for Delivery continues to exceed Courier availability. During the first half of 2021, we announced that we are increasing investments in driver incentives to improve driver availability in the near-term.

While we continue to assess the impact from the COVID-19 outbreak, we are unable to accurately predict the full impact of COVID-19 on our business, results of operations, financial position, and cash flows due to numerous uncertainties, including the severity of the disease, the duration of the outbreak, any future waves or resurgences of the virus, variants of the virus, the administration, adoption and efficacy of vaccines in the United States and internationally, additional actions that may be taken by governmental authorities, the further impact on the business of Drivers, Merchants, consumers, and business partners, and other factors identified in Part I, Item 1A. "Risk Factors" of this Annual Report on Form 10-K.

**Driver Classification Developments**

The classification of Drivers is currently being challenged in courts, by legislators and by government agencies in the United States and abroad. We are involved in numerous legal proceedings globally, including putative class and collective class action lawsuits, demands for arbitration, charges and claims before administrative agencies, and investigations or audits by labor, social security, and tax authorities that claim that Drivers should be treated as our employees (or as workers or quasi-employees where those statuses exist), rather than as independent contractors. Of particular note are proceedings in California, where on May 5, 2020, the California Attorney General, in conjunction with the city attorneys for San Francisco, Los Angeles and San Diego, filed a complaint in San Francisco Superior Court (the "Court") against Uber and Lyft, alleging that drivers are misclassified, and sought an injunction and monetary damages related to the alleged competitive advantage caused by the alleged misclassification of drivers.

On August 10, 2020, the Court issued a preliminary injunction order prohibiting us from classifying Drivers as independent contractors and from violating various wage and hour laws. Following a stay of the injunction and our unsuccessful appeal of the injunction to a Court of Appeal, we were ordered to comply with the preliminary injunction. In November 2020, California voters approved Proposition 22, a state ballot initiative that provides a framework for drivers that use platforms like ours for independent work. Proposition 22 went into effect in December 2020. Although our stipulation to dissolve the California Attorney General's preliminary injunction was granted in April 2021, that litigation remains pending, and we also may face liability relating to periods before the effective date of Proposition 22.

In January 2021, a petition was filed with the California Supreme Court by several drivers and a labor union alleging that Proposition 22 is unconstitutional, which was denied. The same drivers and labor union have since filed a similar challenge in California Superior Court, and in August 2021, the court ruled that Proposition 22 is unconstitutional. On September 21, 2021, the State of California filed an appeal of that decision with the California Court of Appeal, and the Protect App-Based Drivers and Services has also filed an appeal.

To comply with Proposition 22, we have incurred and expect to incur additional expenses, including expenses associated with a guaranteed minimum earnings floor for Drivers, insurance for injury protection and subsidies for health care. We do not expect these changes will have a material impact on our business, results of operations, financial position, or cash flows.

Also of note, on October 28, 2015, a claim by 25 Drivers, including Mr. Y. Aslam and Mr. J. Farrar, was brought in the UK Employment Tribunal against us asserting that they should be classified as "workers" (a separate category between independent

49

contractors and employees) in the UK rather than independent contractors. The tribunal ruled on October 28, 2016 that the Drivers were workers whenever our app was switched on and they were ready and able to take trips, based on an assessment of the app in July 2016. The Court of Appeal rejected our appeal in a majority decision on December 19, 2018. We appealed to the Supreme Court and a hearing at the Supreme Court took place in July 2020.

On February 19, 2021, the Supreme Court of the UK upheld the tribunal ruling. Subsequently, we initiated a historical claims settlement process for UK drivers. Damages may include back pay including holiday pay and minimum wage. Additional claimants have also filed and each claimant will be required to bring their own separate action to an employment tribunal to determine whether they met the "worker" classification and if so, how much each claimant will be awarded.

On March 16, 2021, we announced that more than 70,000 drivers in the UK will be treated as workers, earning at least the National Living Wage when driving with Uber. They will also be paid for holiday time and all those eligible will be automatically enrolled into a pension plan. We have also completed a settlement process with drivers in the UK to proactively resolve historical claims relating to their classification under UK law.

On June 23, 2021, we received a compliance notice from the UK pension regulator to facilitate our auto-enrollment implementation. The pension regulator has confirmed that Uber will be required to pay historic company contributions, but that we are not required to pay the driver component of historic pension contributions unless we fail to comply in which case the amount equivalent to those contributions would be payable as a penalty. We have completed the enrollment of eligible drivers in the UK into a pension plan.

Our portal for drivers to register for a settlement of historical holiday pay and national minimum wage liabilities closed on July 22, 2021 and we have extended offers to all drivers eligible for settlement who are not already represented by an attorney and have made payments to the drivers who accepted our offers. We are currently in mediation with the drivers who are represented by one of three law firms who represent large cohorts of drivers. Compensation hearings will take place in 2022 for claimants who have not settled their historic claims, where the tribunal will assess our position on the correct approach to working time.

In September 2021, a Netherlands court ruled that Mobility drivers are employees within the meaning of the taxi collective bargaining agreement.

If, as a result of legislation or judicial decisions, we are required to classify Drivers as employees, workers or quasi-employees where those statuses exist, we would incur significant additional expenses for compensating Drivers, including expenses associated with the application of wage and hour laws (including minimum wage, overtime, and meal and rest period requirements), employee benefits, social security contributions, taxes (direct and indirect), and potential penalties. Additionally, we may not have adequate Driver supply as Drivers may opt out of our platform given the loss of flexibility under an employment model, and we may not be able to hire a majority of the Drivers currently using our platform. Any of these events could negatively impact our business, result of operations, financial position, and cash flows.

For a discussion of risk factors related to how misclassification challenges may impact our business, result of operations, financial position and operating condition and cash flows, see the risk factor titled "-Our business would be adversely affected if Drivers were classified as employees, workers or quasi-employees" included in Part I, Item 1A, "Risk Factors", and Note 15 – Commitments and Contingencies to our consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

In addition, if we are required to classify Drivers as employees, this may impact our current financial statement presentation including revenue, cost of revenue, incentives and promotions as further described in Note 1 – Description of Business and Summary of Significant Accounting Policies in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," and the section titled "Critical Accounting Estimates" in Part II, Item 7, of this Annual Report on Form 10-K.

50

**Financial and Operational Highlights**

| (In millions, except percentages) | Year Ended December 31, | | 2020 to 2021 % Change | Constant Currency [1] 2020 to 2021 % Change |
| | 2020 | 2021 | | |
|---|---|---|---|---|
| Monthly Active Platform Consumers ("MAPCs") [2], [3] | 93 | 118 | 27 % | |
| Trips [2] | 5,025 | 6,368 | 27 % | |
| Gross Bookings [2] | $ 57,897 | $ 90,415 | 56 % | 53 % |
| Revenue | $ 11,139 | $ 17,455 | 57 % | 54 % |
| Net loss attributable to Uber Technologies, Inc. [4] | $ (6,768) | $ (496) | 93 % | |
| Mobility Adjusted EBITDA | $ 1,169 | $ 1,596 | 37 % | |
| Delivery Adjusted EBITDA | $ (873) | $ (348) | 60 % | |
| Adjusted EBITDA [1], [2] | $ (2,528) | $ (774) | 69 % | |

[1] See the section titled "Reconciliations of Non-GAAP Financial Measures" for more information and reconciliations to the most directly comparable GAAP financial measure.

[2] See the section titled "Certain Key Metrics and Non-GAAP Financial Measures" below for more information.

[3] MAPCs presented for annual periods are MAPCs for the fourth quarter of the year.

[4] Net loss attributable to Uber Technologies, Inc. includes stock-based compensation expense of $827 million and $1.2 billion during the years ended December 31, 2020 and 2021, respectively.

**Highlights for 2021**

Overall Gross Bookings increased by $32.5 billion in 2021, up 56%, or 53% on a constant currency basis, compared to 2020. Delivery Gross Bookings grew 66% from 2020, on a constant currency basis, due to an increase in food delivery orders and higher basket sizes as a result of stay-at-home order demand related to COVID-19, as well as continued expansion across U.S. and international markets. Additionally, we saw an increase in Delivery revenue resulting from an increase in certain Courier payments and incentives that are recorded in cost of revenue, where we are primarily responsible for delivery services and pay Couriers for services provided. Mobility Gross Bookings grew 36%, on a constant currency basis, from 2020, due to increases in Trip volumes as the business recovers from the impacts of COVID-19.

Revenue was $17.5 billion, or up 57% year-over-year, reflecting the overall growth in our Delivery business and an increase in Freight revenue attributable to the acquisition of Transplace in the fourth quarter of 2021 as well as growth in the number of shippers and carriers on the network combined with an increase in volumes with our top shippers.

Net loss attributable to Uber Technologies, Inc. was $496 million, a 93% improvement year-over-year, driven by a $1.6 billion pre-tax gain on the sale of our ATG Business to Aurora, a $1.6 billion pre-tax net benefit relating to Uber's equity investments, as well as reductions in our fixed cost structure and increased variable cost efficiencies. Net loss attributable to Uber Technologies, Inc. also included $1.2 billion of stock-based compensation expense.

Adjusted EBITDA loss was $774 million, improving $1.8 billion from 2020 with Mobility Adjusted EBITDA profit of $1.6 billion. Additionally, Delivery Adjusted EBITDA loss of $348 million, improved $525 million and Delivery Adjusted EBITDA margin as a percentage of Delivery Gross Bookings improved to (0.7)% from (2.9)%, compared to 2020.

We ended the year with $4.3 billion in cash and cash equivalents.

**Other Developments for 2021**

*Acquisitions*

*Remaining Interests in Cornershop*

In August 2021, we completed the acquisition of the remaining 45% ownership interest in Cornershop Cayman ("Cornershop"), or 47%, on a fully-diluted basis, in an all-stock transaction.

*Drizly*

On October 12, 2021, we completed the acquisition of 100% ownership interest in The Drizly Group, Inc. ("Drizly"), an on-demand alcohol marketplace in North America, allowing us to expand alcohol offerings in our Delivery business.

51

P-02346-0053

*Transplace*

On November 12, 2021, we completed the acquisition of 100% ownership interest in Tupelo Parent, Inc. ("Transplace"), a leading transportation management and third-party logistics provider in North America. The acquisition of Transplace is expected to allow us to expand our Uber Freight business through Transplace's expertise in transportation management.

For additional information on acquisitions, see Note 18 – Business Combinations included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

### Divestitures

*ATG Business to Aurora*

On January 19, 2021, we completed the previously announced sale of Apparate USA LLC ("Apparate" or the "ATG Business"), a subsidiary focused on the development and commercialization of autonomous vehicle technology, to Aurora Innovation, Inc. ("Aurora"). As a result, our controlling interest and the non-controlling interests in the ATG Business were settled, and ownership of the ATG Business transferred to Aurora. For additional information, see Note 19 – Divestitures included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

### Other Developments

*MLU B.V. and Uber Russia/CIS Operations*

On August 30, 2021, we entered into an agreement (the "Framework Agreement") with Yandex N.V. ("Yandex") to restructure our joint ventures, MLU B.V. and Yandex Self Driving Group B.V. ("SDG"). Pursuant to the Framework Agreement, we completed the sale of our entire equity interest in SDG and 4.5% of our equity interest in MLU B.V. to Yandex during the third quarter of 2021. During the fourth quarter of 2021 and pursuant to the Framework Agreement, MLU B.V. completed the spin-off of its delivery businesses: Yandex.Eats, Yandex.Lavka and Yandex.Delivery (collectively, "Demerged Businesses"). Immediately following the demerger, Yandex acquired all of our equity interest in the Demerged Businesses. For additional information, see Note 4 - Equity Method Investments included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

*Legacy Auto Insurance Transfer*

On September 27, 2021, Aleka Insurance, Inc., our wholly-owned captive insurance subsidiary, entered into a Loss Portfolio Transfer Reinsurance Agreement (the "LPTA") with James River Group companies ("James River"), effective July 1, 2021. Pursuant to the LPTA, our captive insurance subsidiary reinsured certain automobile liability insurance risks relating to activity on our platform between 2013 and 2019 in exchange for payment by James River to our captive insurance subsidiary of a premium. For additional information, see Note 1 – Description of Business and Summary of Significant Accounting Policies included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

## Components of Results of Operations

### Revenue

We generate substantially all of our revenue from fees paid by Drivers and Merchants for use of our platform. We have concluded that we are an agent in these arrangements as we arrange for other parties to provide the service to the end-user. Under this model, revenue is net of Driver and Merchant earnings and Driver incentives. We act as an agent in these transactions by connecting consumers to Drivers and Merchants to facilitate a Trip, meal or grocery delivery service.

For additional discussion related to our revenue, see the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations - Critical Accounting Estimates - Revenue Recognition," "Note 1 – Description of Business and Summary of Significant Accounting Policies," and "Note 2 – Revenue" to our consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

### Cost of Revenue, Exclusive of Depreciation and Amortization

Cost of revenue, exclusive of depreciation and amortization, primarily consists of certain insurance costs related to our Mobility and Delivery offerings, credit card processing fees, bank fees, data center and networking expenses, mobile device and service costs, costs incurred for certain Delivery transactions where we are primarily responsible for delivery services and pay Couriers for services provided, costs incurred with carriers for Uber Freight transportation services, amounts related to fare chargebacks and other credit card losses.

We expect that cost of revenue, exclusive of depreciation and amortization, will fluctuate on an absolute dollar basis for the foreseeable future in line with Trip volume changes on the platform. As Trips increase or decrease, we expect related changes for insurance costs, credit card processing fees, hosting and co-located data center expenses, maps license fees, and other cost of revenue, exclusive of depreciation and amortization.

52

### Operations and Support

Operations and support expenses primarily consist of compensation expenses, including stock-based compensation, for employees that support operations in cities, including the general managers, Driver operations, platform user support representatives and community managers. Also included is the cost of customer support, Driver background checks and the allocation of certain corporate costs.

As our business recovers from the impacts of COVID-19 and Trip volume increases, we would expect operations and support expenses to increase on an absolute dollar basis for the foreseeable future, but decrease as a percentage of revenue as we become more efficient in supporting platform users.

### Sales and Marketing

Sales and marketing expenses primarily consist of compensation costs, including stock-based compensation to sales and marketing employees, advertising costs, product marketing costs and discounts, loyalty programs, promotions, refunds, and credits provided to end-users who are not customers, and the allocation of certain corporate costs. We expense advertising and other promotional expenditures as incurred.

As our business recovers from the impacts of COVID-19, we would anticipate sales and marketing expenses to increase on an absolute dollar basis for the foreseeable future but vary from period to period as a percentage of revenue due to timing of marketing campaigns.

### Research and Development

Research and development expenses primarily consist of compensation costs, including stock-based compensation, for employees in engineering, design and product development. Expenses includes ATG and Other Technology Programs development expenses prior to the divestiture of our ATG business in January 2021, as well as expenses associated with ongoing improvements to, and maintenance of, existing products and services, and allocation of certain corporate costs. We expense substantially all research and development expenses as incurred.

We expect research and development expenses to increase and vary from period to period as a percentage of revenue as we continue to invest in research and development activities relating to ongoing improvements to and maintenance of our platform offerings and other research and development programs, offset by a decrease in investments in our ATG and Other Technology Programs subsequent to the sale of our ATG Business.

### General and Administrative

General and administrative expenses primarily consist of compensation costs, including stock-based compensation, for executive management and administrative employees, including finance and accounting, human resources, policy and communications, legal, and certain impairment charges, as well as allocation of certain corporate costs, occupancy, and general corporate insurance costs. General and administrative expenses also include certain legal settlements.

As our business recovers from the impacts of COVID-19 and Trip volume increases, we expect that general and administrative expenses will increase on an absolute dollar basis for the foreseeable future, but decrease as a percentage of revenue as we achieve improved fixed cost leverage and efficiencies in our internal support functions.

### Depreciation and Amortization

Depreciation and amortization expenses primarily consist of depreciation on buildings, site improvements, computer and network equipment, software, leasehold improvements, furniture and fixtures, and amortization of intangible assets. Depreciation includes expenses associated with buildings, site improvements, computer and network equipment, leased vehicles, and furniture, fixtures, as well as leasehold improvements. Amortization includes expenses associated with our capitalized internal-use software and acquired intangible assets.

As our business recovers from the impacts of COVID-19, we would anticipate depreciation and amortization expenses to increase as we continue to build out our network infrastructure and building locations.

### Interest Expense

Interest expense consists primarily of interest expense associated with our outstanding debt, including accretion of debt discount. For additional detail related to our debt obligations, see "Note 7 – Long-Term Debt and Revolving Credit Arrangements" to our consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

### Other Income (Expense), Net

Other income (expense), net primarily includes the following items:

P-02346-0055

- Interest income, which consists primarily of interest earned on our cash and cash equivalents and restricted cash and cash equivalents.
- Foreign currency exchange gains (losses), net, which consist primarily of remeasurement of transactions and monetary assets and liabilities denominated in currencies other than the functional currency at the end of the period.
- Gain on business divestitures, net.
- Gain from sale of investments, which consists primarily of gain from the sale of our entire equity interest in the Yandex Self Driving Group B.V. ("SDG"), and the derecognition of our entire equity interest in the Demerged Businesses.
- Unrealized gain (loss) on debt and equity securities, net, which consists primarily of gains (losses) from fair value adjustments relating to our marketable and non-marketable securities.
- Impairment of debt and equity securities, primarily related to an impairment charge recognized on our Didi investment.
- Other, net.

### Provision for (Benefit from) Income Taxes

We are subject to income taxes in the United States and foreign jurisdictions in which we do business. These foreign jurisdictions have different statutory tax rates than those in the United States. Additionally, certain of our foreign earnings may also be taxable in the United States. Accordingly, our effective tax rate will vary depending on the relative proportion of foreign to domestic income, changes in the valuation allowance on our U.S. and Netherlands' deferred tax assets, and changes in tax laws.

### Equity Method Investments

Equity method investments primarily includes the results of our share of income or loss from our Yandex.Taxi joint venture.

### Results of Operations

The following table summarizes our consolidated statements of operations for each of the periods presented (in millions):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| **Revenue** | $ 11,139 | $ 17,455 |
| **Costs and expenses** | | |
| Cost of revenue, exclusive of depreciation and amortization shown separately below | 5,154 | 9,351 |
| Operations and support | 1,819 | 1,877 |
| Sales and marketing | 3,583 | 4,789 |
| Research and development | 2,205 | 2,054 |
| General and administrative | 2,666 | 2,316 |
| Depreciation and amortization | 575 | 902 |
| Total costs and expenses | 16,002 | 21,289 |
| Loss from operations | (4,863) | (3,834) |
| Interest expense | (458) | (483) |
| Other income (expense), net | (1,625) | 3,292 |
| **Loss before income taxes and loss from equity method investments** | (6,946) | (1,025) |
| Provision for (benefit from) income taxes | (192) | (492) |
| Loss from equity method investments | (34) | (37) |
| **Net loss including non-controlling interests** | (6,788) | (570) |
| Less: net loss attributable to non-controlling interests, net of tax | (20) | (74) |
| **Net loss attributable to Uber Technologies, Inc.** | $ (6,768) | $ (496) |

54

The following table sets forth the components of our consolidated statements of operations for each of the periods presented as a percentage of revenue [1]:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| Revenue | 100 % | 100 % |
| **Costs and expenses** | | |
| Cost of revenue, exclusive of depreciation and amortization shown separately below | 46 % | 54 % |
| Operations and support | 16 % | 11 % |
| Sales and marketing | 32 % | 27 % |
| Research and development | 20 % | 12 % |
| General and administrative | 24 % | 13 % |
| Depreciation and amortization | 5 % | 5 % |
| **Total costs and expenses** | 144 % | 122 % |
| **Loss from operations** | (44)% | (22)% |
| Interest expense | (4)% | (3)% |
| Other income (expense), net | (15)% | 19 % |
| **Loss before income taxes and loss from equity method investments** | (62)% | (6)% |
| Provision for (benefit from) income taxes | (2)% | (3)% |
| Loss from equity method investments | — % | — % |
| **Net loss including non-controlling interests** | (61)% | (3)% |
| Less: net loss attributable to non-controlling interests, net of tax | — % | — % |
| **Net loss attributable to Uber Technologies, Inc.** | (61)% | (3)% |

[1] Totals of percentage of revenues may not foot due to rounding.

***Comparison of the Years Ended December 31, 2020 and 2021***

*Revenue*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| (In millions, except percentages) | 2020 | 2021 | 2020 to 2021 % Change |
| Revenue | $ 11,139 | $ 17,455 | 57 % |

**2021 Compared to 2020**

Revenue increased $6.3 billion, or 57%, primarily attributable to an increase in Gross Bookings of 56%, or 53% on a constant currency basis. The increase in Gross Bookings was primarily driven by an increase in Delivery Gross Bookings of 71%, or 66% on a constant currency basis, due to an increase in food delivery orders and higher basket sizes as a result of stay-at-home order demand related to COVID-19, as well as continued expansion across U.S. and international markets. The increase was also driven by Mobility Gross Bookings growth of 38%, or 36% on a constant currency basis, due to increases in Trip volumes as the business recovers from the impacts of COVID-19. Additionally, we saw an increase in Delivery revenue resulting from an increase in certain Courier payments and incentives that are recorded in cost of revenue, where we are primarily responsible for delivery services and pay Couriers for services provided.

*Cost of Revenue, Exclusive of Depreciation and Amortization*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| (In millions, except percentages) | 2020 | 2021 | 2020 to 2021 % Change |
| Cost of revenue, exclusive of depreciation and amortization | $ 5,154 | $ 9,351 | 81 % |
| Percentage of revenue | 46 % | 54 % | |

**2021 Compared to 2020**

Cost of revenue, exclusive of depreciation and amortization, increased $4.2 billion, or 81%, mainly due to a $2.1 billion increase in Courier payments and incentives in certain markets, a $660 million increase in insurance expense primarily due to an increase in miles driven in our Delivery business, and a $873 million increase in Freight carrier payments.

55

*Operations and Support*

| (In millions, except percentages) | Year Ended December 31, | | 2020 to 2021 % Change |
| --- | --- | --- | --- |
| | **2020** | **2021** | |
| Operations and support | $ 1,819 | $ 1,877 | 3 % |
| Percentage of revenue | 16 % | 11 % | |

*2021 Compared to 2020*

Operations and support expenses increased $58 million, or 3%, primarily attributable to a $71 million increase in external contractor expenses and a $67 million increase in stock-based compensation expense, partially offset by an $82 million decrease in employee headcount costs.

*Sales and Marketing*

| (In millions, except percentages) | Year Ended December 31, | | 2020 to 2021 % Change |
| --- | --- | --- | --- |
| | **2020** | **2021** | |
| Sales and marketing | $ 3,583 | $ 4,789 | 34 % |
| Percentage of revenue | 32 % | 27 % | |

*2021 Compared to 2020*

Sales and marketing expenses increased $1.2 billion, or 34%, primarily attributable to a $681 million increase in consumer advertising expenses as well as an increase in consumer discounts, rider facing loyalty expense, promotions, credits and refunds of $384 million to $2.4 billion compared to $2.0 billion in the same period in 2020.

*Research and Development*

| (In millions, except percentages) | Year Ended December 31, | | 2020 to 2021 % Change |
| --- | --- | --- | --- |
| | **2020** | **2021** | |
| Research and development | $ 2,205 | $ 2,054 | (7) % |
| Percentage of revenue | 20 % | 12 % | |

*2021 Compared to 2020*

Research and development expenses decreased $151 million, or 7%, primarily attributable to a $211 million decrease in employee related costs and a $85 million decrease in restructuring and related charges, partially offset by a $137 million increase in stock-based compensation.

*General and Administrative*

| (In millions, except percentages) | Year Ended December 31, | | 2020 to 2021 % Change |
| --- | --- | --- | --- |
| | **2020** | **2021** | |
| General and administrative | $ 2,666 | $ 2,316 | (13) % |
| Percentage of revenue | 24 % | 13 % | |

*2021 Compared to 2020*

General and administrative expenses decreased $350 million, or 13%, primarily attributable to a $202 million decrease in employee headcount costs and a $193 million decrease in impairment charges related to our New Mobility reporting unit recorded during the first quarter of 2020 primarily related to COVID-19 impacts on certain markets, partially offset by a $102 million increase in stock-based compensation expense.

*Depreciation and Amortization*

| (In millions, except percentages) | Year Ended December 31, | | 2020 to 2021 % Change |
| --- | --- | --- | --- |
| | **2020** | **2021** | |
| Depreciation and amortization | $ 575 | $ 902 | 57 % |
| Percentage of revenue | 5 % | 5 % | |

*2021 Compared to 2020*

Depreciation and amortization expenses increased $327 million, or 57%, primarily attributable to additional amortization

56

expenses related to acquired intangible assets, primarily held by Postmates, Transplace, Drizly, and Cornershop, and an increase in building, site improvements, and leased server depreciation, partially offset by a decrease in amortization expense related to Careem fully amortized intangible assets.

### *Interest Expense*

| *(In millions, except percentages)* | Year Ended December 31, | | 2020 to 2021 % Change |
|---|---|---|---|
| | **2020** | **2021** | |
| Interest expense | $ (458) | $ (483) | 5 % |
| Percentage of revenue | (4)% | (3)% | |

#### *2021 Compared to 2020*

Interest expense increased by $25 million, or 5%, primarily due to additional interest expense resulting from the issuance of our $1.5 billion 2029 Senior Notes in August 2021.

### *Other Income (Expense), Net*

| *(In millions, except percentages)* | Year Ended December 31, | | 2020 to 2021 % Change |
|---|---|---|---|
| | **2020** | **2021** | |
| Interest income | $ 55 | $ 37 | (33)% |
| Foreign currency exchange gains (losses), net | (128) | (67) | 48 % |
| Gain on business divestitures, net | 204 | 1,684 | ** |
| Gain from sale of investments | — | 413 | ** |
| Unrealized gain (loss) on debt and equity securities, net | (125) | 1,142 | ** |
| Impairment of debt and equity securities | (1,690) | — | ** |
| Other, net | 59 | 83 | 41 % |
| Other income (expense), net | $ (1,625) | $ 3,292 | ** |
| Percentage of revenue | (15)% | 19 % | |

** Percentage not meaningful.

#### *2021 Compared to 2020*

Interest income decreased by $18 million or 33% primarily due to declining balances and yields in our money market fund investments, bank deposits, and available-for-sale securities.

Foreign currency exchange gains (losses), net decreased by $61 million due to both realized and unrealized gains (losses) on our treasury funding and accrued legal contingencies.

Gain on business divestitures, net increased by $1.5 billion due to primarily due to a $1.6 billion gain on the sale of our ATG Business to Aurora recognized in the first quarter of 2021. For additional information, see Note 19 – Divestitures included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

Gain from sale of investments increased by $413 million primarily due to the sale to Yandex of our (i) 4.5% equity interest in MLU B.V., (ii) our entire equity interest in Yandex Self Driving Group B.V. and (iii) all of our equity interest in the Demerged Businesses. For additional information, see Note 4 - Equity Method Investments included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

Unrealized gain (loss) on debt and equity securities, net increased by $1.3 billion primarily due to a $1.6 billion net unrealized gain on our Grab investment, a $1.6 billion unrealized gain on our Aurora Investments and a $991 million unrealized gain on our Zomato investment, partially offset by a $3.0 billion unrealized loss on our Didi investment. For additional information, see Note 3 – Investments and Fair Value Measurement included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

Impairment of debt and equity securities decreased by $1.7 billion due to nonoccurence of an impairment charge of $1.7 billion, primarily related to our investment in Didi recognized during the first quarter of 2020.

P-02346-0059

*Provision for (Benefit from) Income Taxes*

| (In millions, except percentages) | | Year Ended December 31, | | 2020 to 2021 % Change |
|---|---|---|---|---|
| | | 2020 | 2021 | |
| Provision for (benefit from) income taxes | $ | (192) | $ (492) | (156)% |
| Effective tax rate | | 2.8 % | 48.0 % | |

*2021 Compared to 2020*

Provision for (benefit from) income taxes increased by $300 million primarily due to the deferred China and U.S. tax impact related to our investment in Didi and the deferred U.S. tax impact related to our investments in Aurora, Grab, and Zomato.

*Loss from Equity Method Investments*

| (In millions, except percentages) | | Year Ended December 31, | | 2020 to 2021 % Change |
|---|---|---|---|---|
| | | 2020 | 2021 | |
| Loss from equity method investments | $ | (34) | $ (37) | 9 % |
| Percentage of revenue | | — % | — % | |

*2021 Compared to 2020*

Loss from equity method investments increased by an immaterial amount.

**Supplemental Disclosure Related to Restructuring and Related Charges**

During the second quarter of 2020, we initiated and completed certain restructuring activities in order to reduce our overall cost structure in response to the economic challenges and uncertainty resulting from the COVID-19 pandemic and its impact on our business. We also exited the JUMP business and incurred costs related to site closures, asset impairments and write-offs. As a result, during the year ended December 31, 2020, we recognized $362 million in total restructuring and related charges in the consolidated statement of operations. Total restructuring and related charges included $248 million of cash settled charges, primarily for severance and other termination benefits. The remaining costs related to these restructuring activities are expected to be immaterial.

These activities were designed to generate an aggregate cost savings of at least $1.0 billion annually when compared to our original fourth quarter 2020 planned cost structure, with the largest component of savings resulting from reductions in workforce. We do not believe these cost-saving measures will impair our ability to conduct any of our key business functions. As of December 31, 2021, we achieved these aggregate cost savings when compared to our original fourth quarter 2020 planned cost structure. Refer to Note 20 – Restructuring and Related Charges in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

**Segment Results of Operations**

We operate our business as three operating and reportable segments: Mobility, Delivery, and Freight. For additional information about our segments, see Note 14 – Segment Information and Geographic Information in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

*Revenue*

| (In millions, except percentages) | | Year Ended December 31, | | 2020 to 2021 % Change |
|---|---|---|---|---|
| | | 2020 | 2021 | |
| Mobility | $ | 6,089 | $ 6,953 | 14 % |
| Delivery | | 3,904 | 8,362 | 114 % |
| Freight | | 1,011 | 2,132 | 111 % |
| All Other [1] | | 135 | 8 | (94)% |
| Total revenue | $ | 11,139 | $ 17,455 | 57 % |

[1] Includes historical results of ATG and Other Technology Programs and New Mobility. Refer to Note 14 – Segment Information and Geographic Information and Note 19 – Divestitures for further information.

*Segment Adjusted EBITDA*

Segment Adjusted EBITDA is defined as revenue less the following expenses: cost of revenue, exclusive of depreciation and amortization, operations and support, sales and marketing, and general and administrative and research and development expenses associated with our segments. Segment adjusted EBITDA also excludes non-cash items, certain transactions that are not indicative of ongoing segment operating performance and/or items that management does not believe are reflective of our ongoing core operations.

P-02346-0060

For additional information, see Note 14 – Segment Information and Geographic Information to our consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

| (In millions, except percentages) | Year Ended December 31, | | 2020 to 2021 % Change |
|---|---|---|---|
| | 2020 | 2021 | |
| Mobility | $ 1,169 | $ 1,596 | 37 % |
| Delivery | (873) | (348) | 60 % |
| Freight | (227) | (130) | 43 % |
| All Other [1] | (461) | (11) | 98 % |
| Corporate G&A and Platform R&D [2], [3] | (2,136) | (1,881) | 12 % |
| Adjusted EBITDA [4] | $ (2,528) | $ (774) | 69 % |

[1] Includes historical results of ATG and Other Technology Programs and New Mobility. Refer to Note 14 – Segment Information and Geographic Information and Note 19 – Divestitures for further information regarding the sale of our ATG Business.

[2] Excluding stock-based compensation expense.

[3] Includes costs that are not directly attributable to our reportable segments. Corporate G&A also includes certain shared costs such as finance, accounting, tax, human resources, information technology and legal costs. Platform R&D also includes mapping and payment technologies and support and development of the internal technology infrastructure. Our allocation methodology is periodically evaluated and may change.

[4] See the section titled "Reconciliations of Non-GAAP Financial Measures" for more information and reconciliations to the most directly comparable GAAP financial measure.

**Mobility Segment**

**For the year ended December 31, 2021 compared to the same period in 2020, Mobility revenue increased $864 million, or 14% and Mobility adjusted EBITDA profit increased $427 million, or 37%.**

Mobility revenue increased primarily attributable to an increase in Mobility Gross Bookings due to increases in Trip volumes as the business recovers from the impacts of COVID-19. Mobility Take Rate was 19.0%, down from 22.9% compared to the same period in 2020, primarily due to an increase in Mobility Driver incentives, as Mobility Driver additions have been outpaced by higher demand recovery in the U.S. and other markets.

Mobility adjusted EBITDA profit increased primarily attributable to an increase in Mobility revenue, partially offset by variable costs attributable to the overall growth of the business.

**Delivery Segment**

**For the year ended December 31, 2021 compared to the same period in 2020, Delivery revenue increased $4.5 billion, or 114% and Delivery adjusted EBITDA loss improved $525 million, or 60%.**

Delivery revenue increased primarily attributable to an increase in Delivery Gross Bookings of 66%, on a constant currency basis, driven by an increase in food delivery orders and higher basket sizes as a result of stay-at-home demand related to COVID-19, combined with continued expansion across U.S. and international markets. Take Rate improved to 16.2% from 12.9% compared to the same period in 2020 driven by a decrease in incentive spend combined with an overall improvement in basket sizes. Additionally, we saw an increase in Delivery revenue and Take Rate resulting from an increase in certain Courier payments and incentives that are recorded in cost of revenue, where we are primarily responsible for delivery services and pay Couriers for services provided.

Delivery adjusted EBITDA loss improved, primarily attributable to an increase in Delivery revenue, partially offset by a $2.6 billion increase in cost of revenue as well as a $710 million increase in consumer promotions, brand marketing, and employee headcount costs.

**Freight Segment**

**For the year ended December 31, 2021 compared to the same period in 2020, Freight revenue increased $1.1 billion, or 111% and Freight adjusted EBITDA loss improved $97 million, or 43%.**

Freight revenue increased primarily attributable to the acquisition of Transplace in the fourth quarter of 2021. Additionally, the increase in Freight revenue is also driven by the growth in the number of shippers and carriers on the network combined with an increase in volumes with our top shippers.

Freight adjusted EBITDA loss improved, primarily attributable to a $135 million improvement in gross profit as a result of increased load margins, partially offset by an increase in employee headcount costs.

P-02346-0061

**All Other**

**For the year ended December 31, 2021 compared to the same period in 2020, All Other revenue decreased $127 million, or 94% and All Other adjusted EBITDA loss improved $450 million, or 98%.**

All Other revenue and All Other adjusted EBITDA loss improved primarily due to the favorable impact of the sale of our ATG Business in the first quarter of 2021 and the JUMP Divestiture in the second quarter of 2020.

**Certain Key Metrics and Non-GAAP Financial Measures**

*Adjusted EBITDA and revenue growth rates in constant currency are non-GAAP financial measures. For more information about how we use these non-GAAP financial measures in our business, the limitations of these measures, and reconciliations of these measures to the most directly comparable GAAP financial measures, see the section titled "Reconciliations of Non-GAAP Financial Measures."*

*Monthly Active Platform Consumers.* MAPCs is the number of unique consumers who completed a Mobility or New Mobility ride or received a Delivery order on our platform at least once in a given month, averaged over each month in the quarter. While a unique consumer can use multiple product offerings on our platform in a given month, that unique consumer is counted as only one MAPC. We use MAPCs to assess the adoption of our platform and frequency of transactions, which are key factors in our penetration of the countries in which we operate.



*Monthly Active Platform Consumers (in millions)*

*Trips.* We define Trips as the number of completed consumer Mobility or New Mobility rides and Delivery orders in a given period. For example, an UberPOOL ride with three paying consumers represents three unique Trips, whereas an UberX ride with three passengers represents one Trip. We believe that Trips are a useful metric to measure the scale and usage of our platform.



*Trips (in millions)*

60

*Gross Bookings.* We define Gross Bookings as the total dollar value, including any applicable taxes, tolls, and fees, of: Mobility and New Mobility rides; Delivery orders (in each case without any adjustment for consumer discounts and refunds); Driver and Merchant earnings; Driver incentives; and Freight revenue. Gross Bookings do not include tips earned by Drivers. Gross Bookings are an indication of the scale of our current platform, which ultimately impacts revenue.



*Gross Bookings (in millions)*

| (In millions) | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 |
|---|---|---|---|---|---|---|---|---|
| Mobility | $ 10,874 | $ 3,046 | $ 5,905 | $ 6,789 | $ 6,773 | $ 8,640 | $ 9,883 | $ 11,340 |
| Delivery | 4,683 | 6,961 | 8,550 | 10,050 | 12,461 | 12,912 | 12,828 | 13,444 |
| Freight | 198 | 212 | 290 | 313 | 302 | 348 | 402 | 1,082 |
| All Other | 21 | 5 | — | — | — | — | — | — |

*Take Rate* is defined as revenue as a percentage of Gross Bookings.

*Adjusted EBITDA.* See the section titled "Reconciliations of Non-GAAP Financial Measures" for our definition and a reconciliation of net loss attributable to Uber Technologies, Inc. to Adjusted EBITDA.

| | Year Ended December 31, | | |
|---|---|---|---|
| (In millions, except percentages) | 2020 | 2021 | 2020 to 2021 % Change |
| Adjusted EBITDA | $ (2,528) | $ (774) | 69 % |

### 2021 Compared to 2020

Adjusted EBITDA loss improved $1.8 billion, or 69%, primarily attributable to a $525 million improvement in Delivery Adjusted EBITDA loss, a $427 million increase in Mobility Adjusted EBITDA, a $255 million decrease in Corporate G&A and Platform R&D costs as well as the favorable impact of $450 million in our other business offerings driven by the sale of our ATG Business in the first quarter of 2021 and the JUMP Divestiture that occurred in the second quarter of 2020.

### Reconciliations of Non-GAAP Financial Measures

We collect and analyze operating and financial data to evaluate the health of our business and assess our performance. In addition to revenue, net income (loss), income (loss) from operations, and other results under GAAP, we use Adjusted EBITDA and revenue growth rates in constant currency, which are described below, to evaluate our business. We have included these non-GAAP financial measures because they are key measures used by our management to evaluate our operating performance. Accordingly, we believe that these non-GAAP financial measures provide useful information to investors and others in understanding and evaluating our operating results in the same manner as our management team and board of directors. Our calculation of these non-GAAP financial measures may differ from similarly-titled non-GAAP measures, if any, reported by our peer companies. These non-GAAP financial measures should not be considered in isolation from, or as substitutes for, financial information prepared in accordance with GAAP.

### Adjusted EBITDA

We define Adjusted EBITDA as net income (loss), excluding (i) income (loss) from discontinued operations, net of income taxes, (ii) net income (loss) attributable to non-controlling interests, net of tax, (iii) provision for (benefit from) income taxes, (iv) income (loss) from equity method investments, (v) interest expense, (vi) other income (expense), net, (vii) depreciation and amortization, (viii) stock-based compensation expense, (ix) certain legal, tax, and regulatory reserve changes and settlements, (x) goodwill and asset

61

impairments/loss on sale of assets, (xi) acquisition, financing and divestitures related expenses, (xii) restructuring and related charges and (xiii) other items not indicative of our ongoing operating performance, including COVID-19 response initiatives related payments for financial assistance to Drivers personally impacted by COVID-19, the cost of personal protective equipment distributed to Drivers, Driver reimbursement for their cost of purchasing personal protective equipment, the costs related to free rides and food deliveries to healthcare workers, seniors, and others in need as well as charitable donations.

We have included Adjusted EBITDA in this Annual Report on Form 10-K because it is a key measure used by our management team to evaluate our operating performance, generate future operating plans, and make strategic decisions, including those relating to operating expenses. Accordingly, we believe that Adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management team and board of directors. In addition, it provides a useful measure for period-to-period comparisons of our business, as it removes the effect of certain non-cash expenses and certain variable charges. To help our board, management and investors assess the impact of COVID-19 on our results of operations, we are excluding the impacts of COVID-19 response initiatives related payments for financial assistance to Drivers personally impacted by COVID-19, the cost of personal protective equipment distributed to Drivers, Driver reimbursement for their cost of purchasing personal protective equipment, the costs related to free rides and food deliveries to healthcare workers, seniors, and others in need as well as charitable donations from Adjusted EBITDA. Our board and management find the exclusion of the impact of these COVID-19 response initiatives from Adjusted EBITDA to be useful because it allows us and our investors to assess the impact of these response initiatives on our results of operations.

*COVID-19 Response Initiatives*

To support those whose earning opportunities have been depressed as a result of COVID-19, as well as communities hit hard by the pandemic, we have announced and implemented several initiatives, including, in particular, payments for financial assistance to Drivers personally impacted by COVID-19, the cost of personal protective equipment distributed to Drivers, Driver reimbursement for their cost of purchasing personal protective equipment, the costs related to free rides and food deliveries to healthcare workers, seniors, and others in need as well as charitable donations. The payments for financial assistance to Drivers personally impacted by COVID-19 and Driver reimbursement for their cost of purchasing personal protective equipment are recorded as a reduction to revenue. The cost of personal protective equipment distributed to Drivers, the costs related to free rides and food deliveries to healthcare workers, seniors, and others in need as well as charitable donations are recorded as an expense in our costs and expenses.

*Limitations of Non-GAAP Financial Measures and Adjusted EBITDA Reconciliation*

Adjusted EBITDA has limitations as a financial measure, should be considered as supplemental in nature, and is not meant to be a substitute for the related financial information prepared in accordance with GAAP. These limitations include the following:

- Adjusted EBITDA excludes certain recurring, non-cash charges, such as depreciation of property and equipment and amortization of intangible assets, and although these are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and Adjusted EBITDA does not reflect all cash capital expenditure requirements for such replacements or for new capital expenditure requirements;

- Adjusted EBITDA excludes certain restructuring and related charges, part of which may be settled in cash;

- Adjusted EBITDA excludes stock-based compensation expense, which has been, and will continue to be for the foreseeable future, a significant recurring expense in our business and an important part of our compensation strategy;

- Adjusted EBITDA excludes other items not indicative of our ongoing operating performance, including COVID-19 response initiatives related payments for financial assistance to Drivers personally impacted by COVID-19, the cost of personal protective equipment distributed to Drivers, Driver reimbursement for their cost of purchasing personal protective equipment, the costs related to free rides and food deliveries to healthcare workers, seniors, and others in need as well as charitable donations;

- Adjusted EBITDA does not reflect period to period changes in taxes, income tax expense or the cash necessary to pay income taxes;

- Adjusted EBITDA does not reflect the components of other income (expense), net, which primarily includes: interest income; foreign currency exchange gains (losses), net; gain (loss) on business divestitures, net; and unrealized gain (loss) on debt and equity securities, net; and impairment of debt and equity securities; and

- Adjusted EBITDA excludes certain legal, tax, and regulatory reserve changes and settlements that may reduce cash available to us.

The following table presents a reconciliation of net loss attributable to Uber Technologies, Inc., the most directly comparable GAAP financial measure, to Adjusted EBITDA for each of the periods indicated:

| | | Year Ended December 31, | |
|---|---|---|---|
| *(In millions)* | | 2020 | 2021 |
| **Adjusted EBITDA reconciliation:** | | | |
| Net loss attributable to Uber Technologies, Inc. | $ | (6,768) $ | (496) |
| Add (deduct): | | | |
| Net loss attributable to non-controlling interests, net of tax | | (20) | (74) |
| Provision for (benefit from) income taxes | | (192) | (492) |
| Loss from equity method investments | | 34 | 37 |
| Interest expense | | 458 | 483 |
| Other (income) expense, net | | 1,625 | (3,292) |
| Depreciation and amortization | | 575 | 902 |
| Stock-based compensation expense | | 827 | 1,168 |
| Legal, tax, and regulatory reserve changes and settlements | | (35) | 526 |
| Goodwill and asset impairments/loss on sale of assets | | 317 | 157 |
| Acquisition, financing and divestitures related expenses | | 86 | 102 |
| Accelerated lease costs related to cease-use of ROU assets | | 102 | 5 |
| COVID-19 response initiatives | | 106 | 54 |
| Gain on lease arrangement, net | | (5) | — |
| Restructuring and related charges, net | | 362 | — |
| Legacy auto insurance transfer [1] | | — | 103 |
| Mass arbitration fees | | — | 43 |
| Adjusted EBITDA | | $ (2,528) | $ (774) |

[1] For further information, refer to Note 1 – Description of Business and Summary of Significant Accounting Policies in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

### Constant Currency

We compare the percent change in our current period results from the corresponding prior period using constant currency disclosure. We present constant currency growth rate information to provide a framework for assessing how our underlying revenue performed excluding the effect of foreign currency rate fluctuations. We calculate constant currency by translating our current period financial results using the corresponding prior period's monthly exchange rates for our transacted currencies other than the U.S. dollar.

## Liquidity and Capital Resources

| | | Year Ended December 31, | |
|---|---|---|---|
| *(In millions)* | | 2020 | 2021 |
| Net cash used in operating activities | $ | (2,745) $ | (445) |
| Net cash used in investing activities | | (2,869) | (1,201) |
| Net cash provided by financing activities | | 1,379 | 1,780 |

### Operating Activities

Net cash used in operating activities was $445 million for the year ended December 31, 2021, primarily consisting of $570 million of net loss, adjusted for certain non-cash items, which primarily included $1.7 billion in gain on business divestitures, $1.2 billion of stock-based compensation expense, $1.1 billion of unrealized gain on debt and equity securities, $413 million of gain from sale of investments, depreciation and amortization expense of $902 million, as well as a $477 million decrease in cash consumed by working capital. The decrease in cash consumed by working capital and other operating activities was primarily driven by an increase in accrued expenses and other liabilities, an increase in our insurance reserves, partially offset by higher accounts receivable and prepaid expenses and lower operating lease liabilities. Net cash used in operating activities also reflects a $1.0 billion cash inflow related to a legacy auto insurance transfer. For additional information on the legacy auto insurance transfer, see Note 1 – Description of Business and Summary of Significant Accounting Policies included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

P-02346-0065

Net cash used in operating activities was $2.7 billion for the year ended December 31, 2020 , primarily consisting of $6.8 billion of net loss, adjusted for certain non-cash items, which primarily included $1.7 billion in impairment of non-marketable equity securities, $827 million of stock-based compensation expense, depreciation and amortization expense of $575 million, $404 million in impairment of goodwill, long-lived assets and other assets, as well as a $393 million decrease in cash consumed by working capital. The decrease in cash consumed by working capital and other operating activities was primarily driven by a decrease in our operating lease right-of-use assets, prepaid expenses and other assets and increase in accrued expenses and other liabilities, partially offset by lower accounts payable and operating lease liabilities.

*Investing Activities*

Net cash used in investing activities was $1.2 billion for the year ended December 31, 2021, primarily consisting of $2.3 billion in acquisition of businesses, net of cash acquired, $1.1 billion in purchases of marketable securities, $982 million in purchases of non-marketable equity securities, $297 million in purchases of notes receivable, and $298 million in purchases of property and equipment, partially offset by proceeds from maturities and sales of marketable securities of $2.3 billion, proceeds from the sale of equity method investments of $1.0 billion and proceeds from sale of non-marketable equity securities of $500 million.

Net cash used in investing activities was $2.9 billion for the year ended December 31, 2020, primarily consisting of $2.1 billion in purchases of marketable securities, $1.5 billion in acquisition of businesses, net of cash acquired and $616 million in purchases of property and equipment, partially offset by proceeds from maturities and sales of marketable securities of $1.4 billion.

*Financing Activities*

Net cash provided by financing activities was $1.8 billion for the year ended December 31, 2021, primarily consisting of $1.5 billion of proceeds from issuance of notes, net of issuance cost, $675 million of proceeds from the issuance and sale of subsidiary preferred stock units, partially offset by $307 million of principal repayment on the non-interest bearing unsecured convertible notes related to the acquisition of Careem ("Careem Notes") and $226 million principal payments on finance leases.

Net cash provided by financing activities was $1.4 billion for the year ended December 31, 2020, primarily consisting of $2.6 billion of proceeds from issuance of notes, net of issuance costs and $247 million of proceeds from issuance of subsidiary preferred stock units, partially offset by $891 million of principal repayment on Careem Notes and $527 million of principal repayment on term loan and notes.

*Other Information*

As of December 31, 2021, $2.2 billion of our $4.3 billion in cash and cash equivalents was held by our foreign subsidiaries. Cash held outside the United States may be repatriated, subject to certain limitations, and would be available to be used to fund our domestic operations. Repatriation of funds may result in immaterial tax liabilities. We believe that our existing cash balance in the United States is sufficient to fund our working capital needs in the United States. We are in compliance with our debt and line of credit covenants as of December 31, 2021, including by meeting our reporting obligations. We also believe that our sources of funding and our available line of credit will be sufficient to satisfy our currently anticipated cash requirements including capital expenditures, working capital requirements, collateral requirements, potential acquisitions, potential prepayments of contested indirect tax assessments ("pay-to-play"), and other liquidity requirements through at least the next 12 months. We intend to continue to evaluate and may, in certain circumstances, take preemptive action to preserve liquidity during the COVID-19 pandemic. As the circumstances around the COVID-19 pandemic remain uncertain, we continue to actively monitor the pandemic's impact to us worldwide including our financial position, liquidity, results of operations and cash flows.

*Purchase Commitments*

We have non-cancelable commitments for network and cloud services, background checks, and other items in the ordinary course of business. These amounts are determined based on the non-cancelable quantities or termination amounts to which we are contractually obligated. As of December 31, 2021, we had $394 million in non-cancelable commitments, with varying expiration terms through December 15, 2026.

## Critical Accounting Estimates

We believe that the following accounting policies involve a high degree of judgment and complexity and are critical to understanding and evaluating our consolidated financial condition and results of our operations. An accounting policy is considered to be critical if it requires judgment on a significant accounting estimate to be made based on assumptions about matters that are uncertain at the time the estimate is made, and if different estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur periodically, could materially impact the reported amounts of assets, liabilities, revenue and expenses, and related disclosures in our audited consolidated financial statements. We have based our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Although we believe that the estimates we use are reasonable, due to the inherent uncertainty involved in making those estimates, actual results reported in future periods could differ from those estimates.

64

We believe that the following critical accounting policies reflect the more significant judgments, estimates and assumptions used in the preparation of our consolidated financial statements. For additional information, see the disclosure included in Note 1 – Description of Business and Summary of Significant Accounting Policies in the notes to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

### Revenue Recognition

We derive our revenue principally from service fees paid by Drivers and Merchants for the use of our platform in connection with our Mobility products and Delivery offering provided by Drivers and Merchants to end-users. Our sole performance obligation in the transaction is to connect Drivers and Merchants with end-users to facilitate the completion of a successful ridesharing trip or delivery. Because end-users access our platform for free, except in certain markets, and we have no performance obligation to end-users, end-users are not our customers.

Judgment is required in evaluating the presentation of revenue on a gross versus net basis based on whether we control the service provided to the end-user and are the principal in the transaction (gross), or we arrange for other parties to provide the service to the end-user and are the agent in the transaction (net). We have concluded that we are the agent in most markets as we arrange for Drivers and Merchants to provide the service to the end user in Mobility and Delivery transactions. The assessment of whether we are considered the principal or the agent in a transaction could impact the accounting for certain payments and incentives provided to Drivers and end-users and change the timing and amount of revenue recognized.

In certain markets, consumers have the option to pay Drivers cash for trips, and we generally collect our service fee from Drivers for these trips by offsetting against any other amounts due to Drivers, including Driver incentives. We have concluded collectability of such amounts is not probable until collected. As such, uncollected service fees for cash trips are not recognized as revenue in our consolidated financial statements until collected.

*Driver Incentives*

We offer various incentive programs to Drivers. Judgment is required to determine the appropriate classification of these incentives. Incentives provided to customers are recorded as a reduction of revenue if we do not receive a distinct service in exchange or cannot reasonably estimate the fair value of the service received. Incentives offered in exchange for specific services, such as referral services are recorded as sales and marketing expenses.

*End-User Discounts and Promotions*

We offer discounts and promotions to end-users (that are not customers) to encourage use of our platform. Judgment is required to determine the appropriate classification of these incentives. End-user discounts and promotions are recorded as sales and marketing expenses with the exception of market-wide promotions which are recorded as a reduction of revenue.

### Business Combinations

We allocate the fair value of purchase consideration to the tangible assets acquired, liabilities assumed, and intangible assets acquired based on their estimated fair values. The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill. Such valuations require management to make significant estimates and assumptions, especially with respect to intangible assets. Significant estimates in valuing certain intangible assets include, but are not limited to, future expected cash flows from acquired advertiser, fleet, merchant, and end-user contracts, acquired technology, and trade names, based on expected future growth rates and margins, attrition rates, future changes in technology and royalty for similar brand licenses, useful lives, and discount rates.

Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. Allocation of purchase consideration to identifiable assets and liabilities affects our amortization expense, as acquired finite-lived intangible assets are amortized over the useful life, whereas any indefinite lived intangible assets, including goodwill, are not amortized. During the measurement period, which may be up to one year from the acquisition date, we may record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill. Upon the conclusion of the measurement period, any subsequent adjustments are recorded to earnings.

### Embedded Derivatives

During 2015, we had issued convertible notes that contain embedded features subject to derivative accounting. These embedded features are composed of conversion options that have the economic characteristics of a contingent early redemption feature settled in shares of our stock rather than cash, because the total number of shares of our common stock delivered to settle these embedded features will have a fixed value. These conversion options are bifurcated from the underlying instrument and accounted for and valued separately from the host instrument. Embedded derivatives are recognized as derivative liabilities on our consolidated balance sheet. We measure these instruments at their estimated fair value and recognize changes in their estimated fair value in other income (expense), net in our consolidated statement of operations and comprehensive loss during the period of change.

We value these embedded derivatives as the difference between the estimated value of these convertible notes with and without the Qualified Initial Public Offering ("QIPO") conversion option ("QIPO Conversion Option"). The fair value of these convertible

notes with and without the QIPO Conversion Option is estimated utilizing a discounted cash flow model to discount the expected payoffs at various potential QIPO dates to the valuation date. The key inputs to the valuation model include the probability of a QIPO occurring at various points in time and the discount yield, which was derived by imputing the fair value as equal to the face value on the issuance date of these convertible notes. The discount rate is updated during each period to reflect the yield of a comparable instrument issued as of the valuation date.

Upon closing of the IPO in May 2019, holders of these convertible notes elected to convert all outstanding notes into shares of common stock. For additional information, refer to Note 11 - Stockholders' Equity included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

### Investments—Non-Marketable Equity and Debt Securities

We hold investments in privately held companies in the form of equity securities and debt securities without readily determinable fair values and in which we do not have a controlling interest or significant influence. Investments in equity securities without readily determinable fair values are initially recorded at cost and are subsequently adjusted to fair value for impairments and price changes from observable transactions in the same or a similar security from the same issuer. Investments in material available-for-sale debt securities are recorded initially at fair value and subsequently remeasured to fair value at each reporting date with the changes in fair value recognized in other comprehensive income (loss), net of tax. We may elect the fair value option for financial instruments and account for investments in debt and equity securities at fair value with changes reported in net income (loss) from continuing operations.

Investments in privately held equity and debt securities are valued using significant unobservable inputs or data in inactive markets. This valuation requires judgment due to the absence of market prices and inherent lack of liquidity and are classified as Level 3 in the fair value hierarchy. In determining the estimated fair value of our investments in privately held companies, we utilize the most recent data available including observed transactions such as equity financing transactions of the investees and sales of the existing shares of the investees' securities. In addition, the determination of whether an observed transaction is similar to the equity and debt securities held by us requires significant management judgment based on the rights and preferences of the securities.

We assess our investment portfolio of privately held equity and debt securities quarterly for impairment. The impairment analysis for investments in equity securities includes a qualitative analysis of factors including the investee's financial performance, industry and market conditions, and other relevant factors. If an equity investment is considered to be impaired we will establish a new carrying value for the investment and recognize an impairment loss through our consolidated statement of operations. Investments in debt securities are evaluated for impairment quarterly based on whether its fair value has declined below its amortized cost. In circumstances where we intend to sell, or are more likely than not required to sell the security before it recovers its amortized cost basis, the difference between the fair value and amortized cost is recognized as a loss in the consolidated financial statement of operations, with a corresponding write-down of the security's amortized cost. In circumstances where neither condition exists, we then evaluate whether a decline is due to credit-related factors. The factors considered in determining whether a credit loss exists can include the extent to which fair value is less than the amortized cost basis, changes in the credit quality of the underlying loan obligors, credit ratings actions, as well as other factors. To determine the portion of a decline in fair value that is credit-related, we compare the present value of the expected cash flows of the security discounted at the security's effective interest rate to the amortized cost basis of the security. A credit-related impairment is limited to the difference between fair value and amortized cost, and recognized as an allowance for credit loss on the consolidated balance sheet with a corresponding adjustment to net income (loss). Any remaining decline in fair value that is non-credit related is recognized in other comprehensive income (loss), net of tax. Improvements in expected cash flows due to improvements in credit are recognized through reversal of the credit loss and corresponding reduction in the allowance for credit loss.

### Equity Method Investments

We account for investments in the common stock or in-substance common stock of entities that provide us with the ability to exercise significant influence, but not a controlling financial interest, using the equity method. Investments accounted for under the equity method are initially recorded at cost. Subsequently, we recognize through the consolidated statements of operations, and as an adjustment to the investment balance, our proportionate share of the investee entities' net income or loss, and the amortization of basis differences. In accounting for these investments, we record our share of the entities' net income or loss one quarter in arrears. Equity method investments for which the fair value option is elected are measured at fair value on a recurring basis with changes in fair value reflected in earnings.

We review our equity method investments for impairment whenever events or changes in business circumstances indicate that the carrying value of the investment may not be fully recoverable. Qualitative and quantitative factors considered as indicators of a potential impairment include financial results and operating trends of the investees, implied values in transactions of the investee's securities, severity and length of decline in value, and our intention for holding the investment, among other factors. If an impairment is determined to be other-than-temporary, the fair value of the impaired investment would have to be determined and an impairment charge recorded for the difference between the fair value and the carrying value of the investment. The fair value determination, particularly for investments in privately held companies, requires significant judgment to determine appropriate estimates and

66

assumptions. Changes in these estimates and assumptions could affect the calculation of the fair value of the investments and the determination of the impairment charges.

### Goodwill Impairment Assessment

We review goodwill for impairment annually (in the fourth quarter) and whenever events or changes in circumstances indicate that goodwill might be impaired. We make certain judgments and assumptions to determine our reporting units and in allocating shared assets and liabilities to determine the carrying values for each of our reporting units. Determination of reporting units is based on a judgmental evaluation of the level at which our segment managers review financial results, evaluate performance, and allocate resources.

Judgment in the assessment of qualitative factors of impairment include, among other factors: financial performance; legal, regulatory, contractual, political, business, and other factors; entity specific factors; industry and market considerations, macroeconomic conditions, and other relevant events and factors affecting the reporting unit. To the extent we determine that it is more likely than not that the fair value of the reporting unit is less than its carrying value, a quantitative test is then performed.

Performing a quantitative goodwill impairment test includes the determination of the fair value of a reporting unit and involves significant estimates and assumptions. These estimates and assumptions include, among others, revenue growth rates and operating margins used to calculate projected future cash flows, risk-adjusted discount rates, future economic and market conditions, and the determination of appropriate market comparables.

### Loss Contingencies

We are involved in legal proceedings, claims, and regulatory, indirect tax examinations, or government inquiries and investigations that may arise in the ordinary course of business. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages. We record a liability when we believe that it is both probable that a loss has been incurred and the amount can be reasonably estimated. If we determine that a loss is reasonably possible and the loss or range of loss can be reasonably estimated, we disclose the possible loss in the accompanying notes to the consolidated financial statements.

We review the developments in our contingencies that could affect the amount of the provisions that have been previously recorded, and the matters and related reasonably possible losses disclosed. We make adjustments to our provisions and changes to our disclosures accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information. Significant judgment is required to determine both the probability and the estimated amount of loss. These estimates have been based on our assessment of the facts and circumstances at each balance sheet date and are subject to change based on new information and future events.

The outcomes of litigation, indirect tax examinations and investigations are inherently uncertain. Therefore, if one or more of these matters were resolved against us for amounts in excess of management's expectations, our results of operations, financial condition, or cash flows, including in a particular reporting period in which any such outcome becomes probable and estimable, could be materially adversely affected.

### Income Taxes

We are subject to income taxes in the United States and foreign jurisdictions. We account for income taxes using the asset and liability method. The establishment of deferred tax assets from intra-entity transfers of intangible assets requires management to make significant estimates and assumptions to determine the fair value of such intangible assets. Significant estimates in valuing intangible assets may include, but are not necessarily limited to, internal revenue and expense forecasts, the estimated life of the intangible assets, comparable transaction values, and/or discount rates. The discount rates used to discount expected future cash flows to present value are derived from a weighted-average cost of capital analysis and are adjusted to reflect the inherent risks related to the cash flow. Although we believe the assumptions and estimates we have made are reasonable and appropriate, they are based, in part, on historical experience, internal and external comparable data and are inherently uncertain. Unanticipated events and circumstances may occur that could affect either the accuracy or validity of such assumptions, estimates or actual results.

We account for uncertainty in tax positions by recognizing a tax benefit from uncertain tax positions when it is more-likely-than-not that the position will be sustained upon examination. Evaluating our uncertain tax positions and determining our provision for income taxes are inherently uncertain and require making judgments, assumptions, and estimates. While we believe we have adequately reserved for our uncertain tax positions, no assurance can be given that the final tax outcome of these matters will not be different. We adjust these reserves in light of changing facts and circumstances, such as the closing of a tax audit. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences may impact the provision for income taxes and the effective tax rate in the period in which such determination is made.

The provision for income taxes includes the impact of reserve provisions and changes to reserves as well as the related net interest and penalties. In addition, we are subject to the continuous examination of our income tax returns by the IRS and other tax authorities which may assert assessments against us. We regularly assess the likelihood of adverse outcomes resulting from these examinations and assessments to determine the adequacy of our provision for income taxes.

67

### Insurance Reserves

We use a combination of third-party insurance and self-insurance mechanisms, including a wholly-owned captive insurance subsidiary, to provide for the potential liabilities for certain risks, including auto liability, uninsured and underinsured motorist, auto physical damage, general liability, and workers' compensation. The insurance reserves is an estimate of our potential liability for unpaid losses and loss adjustment expenses, which represents the estimate of the ultimate unpaid obligation for risks retained by us and includes an amount for case reserves related to reported claims and an amount for losses incurred but not reported as of the balance sheet date. The estimate of the ultimate unpaid obligation utilizes generally accepted actuarial methods applied to historical claim and loss experience. In addition, we use assumptions based on actuarial judgment related to claim and loss development patterns and expected loss costs, which consider frequency trends, severity trends, and relevant industry data. These reserves are continually reviewed and adjusted as experience develops and new information becomes known. Adjustments, if any, relating to accidents that occurred in prior years are reflected in the current year results of operations.

All estimates of ultimate losses and allocated loss adjustment expenses, and of resulting reserves, are subject to inherent variability caused by the nature of the insurance claim settlement process. Such variability is increased for us due to limited historical experience and the nature of the coverage provided. Actual results depend upon the outcome of future contingent events and can be affected by many factors, such as claim settlement processes and changes in the economic, legal, and social environments. As a result, the net amounts that will ultimately be paid to settle the liability, and when these amounts will be paid, may vary in the near term from the estimated amounts.

While management believes that the insurance reserve amount is adequate, the ultimate liability may be in excess of, or less than, the amount provided.

### Stock-Based Compensation

We have granted stock-based awards consisting primarily of stock options, restricted common stock, RSUs, warrants, and SARs to employees, members of our board of directors and non-employees. The substantial majority of our stock-based awards have been made to employees. The majority of our outstanding RSUs, as well as certain options, SARs, and shares of restricted common stock, contain a service-based vesting condition. A small portion of the awards contains service-based vesting condition as well as performance-based vesting condition and/or market-based vesting condition. The service-based vesting condition for the majority of these awards is satisfied over four years. The performance-based vesting condition is satisfied upon meeting predetermined targets of certain financial and operation metrics. The market-based vesting condition is satisfied upon reaching predetermined targets of fully diluted equity values.

We account for stock-based employee compensation under the fair value recognition and measurement provisions, in accordance with applicable accounting standards, which requires compensation expense for the grant-date fair value of stock-based awards to be recognized over the requisite service period. We account for forfeitures when they occur.

We have elected to use the Black-Scholes option-pricing model to determine the fair value of stock options, warrants, and SARs on the grant date. The Black-Scholes option-pricing model requires certain subjective inputs and assumptions, including the fair value of our common stock, the expected term, risk-free interest rates, expected stock price volatility, and expected dividend yield of our common stock.

These assumptions used in the Black-Scholes option-pricing model, other than the fair value of our common stock, are estimated as follows:

- *Expected term.* We estimate the expected term based on the simplified method for employees and on the contractual term for non-employees.

- *Risk-free interest rate.* The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant.

- *Expected volatility.* We estimate the volatility of our common stock on the date of grant based on the weighted-average historical stock price volatility of our own common shares within the same length of period as the expected term. Where, in some cases, our common share trading history is shorter than the expected term, we consider comparable publicly-traded companies in our industry group.

- *Expected dividend yield.* Expected dividend yield is zero percent, as we have not paid and do not anticipate paying dividends on our common stock.

We continue to use judgment in evaluating the expected volatility and expected term utilized in our stock-based compensation expense calculation on a prospective basis. As we continue to accumulate additional data related to our common stock, we may refine our estimates of expected volatility and expected term, which could materially impact our future stock-based compensation expense.

### Recent Accounting Pronouncements

See Note 1 – Description of Business and Summary of Significant Accounting Policies, to the consolidated financial statements included in Part II, Item 8, "Financial Statements and Supplementary Data," of this Annual Report on Form 10-K.

P-02346-0070

### ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to market risks in the ordinary course of our business. These risks primarily include interest rate risk, investment risk, and foreign currency risk as follows:

*Interest Rate Risk*

Our exposures to market risk for changes in interest rates relate primarily to our 2025 Refinanced Term Loan and 2027 Refinanced Term Loan Facilities. The 2025 and 2027 Refinanced Term Loan Facilities represent floating rate notes and are carried at amortized cost. Therefore, fluctuations in interest rates will impact our consolidated financial statements. A rising interest rate environment will increase the amount of interest paid on these loans. A hypothetical 100 basis point increase or decrease in interest rates would not have a material effect on our financial results.

The fair value of our fixed rate notes will generally fluctuate with movements of interest rates, increasing in periods of declining rates of interest and declining in periods of increasing rates of interest. A hypothetical 100 basis point increase in interest rates would have decreased the fair value of our notes by $317 million as of December 31, 2021.

*Investment Risk*

Our investment policy objective aims to preserve capital and meet liquidity requirements without significantly increasing risk. We had cash and cash equivalents including restricted cash and cash equivalents totaling $7.4 billion and $7.8 billion as of December 31, 2020 and December 31, 2021, respectively. We did not have any marketable debt securities classified as short-term investments as of December 31, 2021. Our cash and cash equivalents consist of money market funds and cash deposits. We do not enter into investments for trading or speculative purposes. Investments in fixed rate securities carry a degree of interest rate risk. Changes in rates would primarily impact interest income due to the relatively short-term nature of our investments. A hypothetical 100 basis point change in interest rates would not have a material effect on our financial results.

We are exposed to certain risk related to the carrying amounts of investments in other companies, including our minority-owned, privately-held affiliates and recently public companies, compared to their fair value. We hold privately held investments in illiquid private company stock which are inherently difficult to value given the lack of publicly available information. We also hold equity securities with readily determinable fair values which are subject to equity price risk. These investments in privately-held affiliates and recently public companies may increase the volatility in our net income/(loss) in future periods due to changes in the fair value of these investments. In certain cases, our ability to sell these investments may be impacted by contractual obligations to hold the securities for a set period of time after a public offering. As of December 31, 2021, the carrying value of our investments was $12.6 billion, including equity method investments.

*Foreign Currency Risk*

We transact business globally in multiple currencies. Our international revenue, as well as costs and expenses denominated in foreign currencies, expose us to the risk of fluctuations in foreign currency exchange rates against the U.S. dollar. We are exposed to foreign currency risks related to our revenue and operating expenses denominated in currencies other than the U.S. dollar. Accordingly, changes in exchange rates may negatively affect our future revenue and other operating results as expressed in U.S. dollars. Our foreign currency risk is partially mitigated as our revenue recognized in currencies other than the U.S. dollar is diversified across geographic regions and we incur expenses in the same currencies in such regions.

We have experienced and will continue to experience fluctuations in our net income/(loss) as a result of transaction gains or (losses) related to remeasurement of our asset and liability balances that are denominated in currencies other than the functional currency of the entities in which they are recorded. Foreign currency rates may also impact the value of our equity method investment in our Yandex.Taxi joint venture. At this time, we do not, but we may in the future, enter into derivatives or other financial instruments in an attempt to hedge our foreign currency exchange risk.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS AND SCHEDULE**

| | Pages |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID 238) | 71 |
| Consolidated Financial Statements | |
|    Consolidated Balance Sheets | 74 |
|    Consolidated Statements of Operations | 75 |
|    Consolidated Statements of Comprehensive Loss | 76 |
|    Consolidated Statements of Redeemable Non-Controlling Interests and Equity | 77 |
|    Consolidated Statements of Cash Flows | 80 |
|    Notes to the Consolidated Financial Statements | 82 |
| Financial Statement Schedule | |
|    Schedule II - Valuation and Qualifying Accounts for the Years Ended December 31, 2019, 2020 and 2021 | 146 |

P-02346-0072

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of Uber Technologies, Inc.

*Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the accompanying consolidated balance sheets of Uber Technologies, Inc. and its subsidiaries (the "Company") as of December 31, 2021 and 2020, and the related consolidated statements of operations, of comprehensive loss, of redeemable non-controlling interests and equity and of cash flows for each of the three years in the period ended December 31, 2021, including the related notes and financial statement schedule listed in the accompanying index (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO.

*Changes in Accounting Principles*

As discussed in Note 1 to the consolidated financial statements, the Company changed the manner in which it accounts for convertible instruments and contracts in an entity's own equity in 2021 and the manner in which it accounts for leases in 2019.

*Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As described in Management's Report on Internal Control over Financial Reporting, management has excluded The Drizly Group, Inc. ("Drizly") and Tupelo Parent, Inc. ("Transplace") from its assessment of internal control over financial reporting as of December 31, 2021 because they were acquired by the Company in purchase business combinations during 2021. We have also excluded Drizly and Transplace from our audit of internal control over financial reporting. Drizly and Transplace are wholly-owned subsidiaries whose total assets and total revenues excluded from management's assessment and our audit of internal control over financial reporting collectively represent approximately 3% and 4%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2021.

*Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding

71

prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

### *Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Presentation of Mobility and Delivery Revenue Agreements, Including Incentives, Discounts and Promotions to Drivers, Merchants and End-Users*

As described in Notes 1 and 2 to the consolidated financial statements, the Company derives its revenues principally from Drivers' and Merchants' use of the Company's platform, on-demand lead generation, and related services in connection with Mobility and Delivery services, as well as from direct fees charged to end-users for use of the platform and in exchange for Delivery services. Management applies judgment in determining whether the Company is the principal or agent in transactions with Drivers, Merchants and end-users. This determination impacts the presentation of revenue on a gross or net basis as well as the presentation of incentives provided to Drivers and Merchants and discounts and promotions offered to end-users, to the extent they are not customers. For the year ended December 31, 2021, the Company's Mobility and Delivery revenue, net of incentives, was $15.3 billion and discounts, loyalty programs, promotions, refunds, and credits provided to end-users who are not customers totaled $2.4 billion, of which a significant portion relates to discounts and promotions.

The principal considerations for our determination that performing procedures relating to the presentation of Mobility and Delivery revenue agreements, including incentives, discounts and promotions to Drivers, Merchants, and end-users is a critical audit matter are the significant judgment by management in assessing the presentation of revenue on a gross or net basis, as well as the presentation of incentives, discounts and promotions offered to Drivers, Merchants, and end-users, which in turn led to a high degree of auditor judgment, subjectivity and effort in performing procedures and evaluating audit evidence relating to whether transaction attributes were appropriately analyzed and presented by management.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the Company's revenue recognition process, including controls over the presentation of Mobility and Delivery revenue, incentives, discounts and promotions. These procedures also included, among others, testing, on a sample basis, trip transaction attributes and assessing management's classification of new or changed agreements by examining documentation related to the agreement terms, driver statements, rider receipts, and discount, promotion and incentive terms, and assessing the impact of those terms and attributes on the presentation of revenue and income statement classification.

*Valuation of Insurance Reserves*

As described in Note 1 to the consolidated financial statements, insurance reserves is the liability for unpaid losses and loss adjustment expenses, which represents the estimate of the ultimate unpaid obligation for risks retained by the Company and includes an amount for case reserves related to reported claims and an amount for losses incurred but not reported as of the balance sheet date. The estimate of the ultimate unpaid obligation utilizes generally accepted actuarial methods applied to historical claim and loss experience. In addition, management uses assumptions based on actuarial judgment related to claim and loss development patterns and expected loss costs, which consider frequency trends, severity trends, and relevant industry data. These reserves are continually reviewed by management and adjusted as experience develops and new information becomes known. The Company's short-term and long-term insurance reserves as of December 31, 2021 totaled $4.0 billion.

The principal considerations for our determination that performing procedures relating to the valuation of insurance reserves is a critical audit matter are the significant judgment by management when developing the estimate of the insurance reserves, which in turn led to a high degree of auditor judgment, subjectivity and effort in performing procedures and evaluating audit evidence relating to the actuarial methods and management's significant assumptions related to loss development patterns and expected loss costs. The audit effort also involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the Company's valuation of insurance reserves, including controls over the development of the significant assumptions related to loss development patterns and expected loss costs. These procedures also included, among others, the involvement of professionals with specialized skill

and knowledge to assist in (i) developing, for selected reserve components, an independent actuarial estimate of the insurance reserves, and comparison of this independent estimate to management's actuarially determined reserves, and (ii) testing, for other selected reserve components, management's process for estimating the insurance reserves. Developing the independent estimate involved independently developing the loss development patterns and expected loss costs and testing the completeness and accuracy of data provided by management. Testing management's process for estimating the insurance reserves involved evaluating the appropriateness of management's actuarial methods, evaluating the reasonableness of the significant assumptions used by management related to loss development patterns and expected loss costs used in those methods, and testing the completeness and accuracy of data used by management.

/s/ PricewaterhouseCoopers LLP
San Francisco, California
February 24, 2022

We have served as the Company's auditor since 2014.

73

**UBER TECHNOLOGIES, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(In millions, except share amounts which are reflected in thousands, and per share amounts)**

| | As of December 31, 2020 | As of December 31, 2021 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 5,647 | $ 4,295 |
| Short-term investments | 1,180 | — |
| Restricted cash and cash equivalents | 250 | 631 |
| Accounts receivable, net of allowance of $55 and $51, respectively | 1,073 | 2,439 |
| Prepaid expenses and other current assets | 1,215 | 1,454 |
| Assets held for sale | 517 | — |
| Total current assets | 9,882 | 8,819 |
| Restricted cash and cash equivalents | 1,494 | 2,879 |
| Collateral held by insurer | 860 | — |
| Investments (including amortized cost of debt securities of $2,281 and $—) | 9,052 | 11,806 |
| Equity method investments | 1,079 | 800 |
| Property and equipment, net | 1,814 | 1,853 |
| Operating lease right-of-use assets | 1,274 | 1,388 |
| Intangible assets, net | 1,564 | 2,412 |
| Goodwill | 6,109 | 8,420 |
| Other assets | 124 | 397 |
| Total assets | $ 33,252 | $ 38,774 |
| **Liabilities, redeemable non-controlling interests and equity** | | |
| Accounts payable | $ 235 | $ 860 |
| Short-term insurance reserves | 1,243 | 1,442 |
| Operating lease liabilities, current | 175 | 185 |
| Accrued and other current liabilities | 5,112 | 6,537 |
| Liabilities held for sale | 100 | — |
| Total current liabilities | 6,865 | 9,024 |
| Long-term insurance reserves | 2,223 | 2,546 |
| Long-term debt, net of current portion | 7,560 | 9,276 |
| Operating lease liabilities, non-current | 1,544 | 1,644 |
| Other long-term liabilities | 1,306 | 935 |
| Total liabilities | 19,498 | 23,425 |
| Commitments and contingencies (Note 15) | | |
| Redeemable non-controlling interests | 787 | 204 |
| **Equity** | | |
| Common stock, $0.00001 par value, 5,000,000 shares authorized for both periods, 1,849,794 and 1,949,316 shares issued and outstanding, respectively | — | — |
| Additional paid-in capital | 35,931 | 38,608 |
| Accumulated other comprehensive loss | (535) | (524) |
| Accumulated deficit | (23,130) | (23,626) |
| Total Uber Technologies, Inc. stockholders' equity | 12,266 | 14,458 |
| Non-redeemable non-controlling interests | 701 | 687 |
| Total equity | 12,967 | 15,145 |
| Total liabilities, redeemable non-controlling interests and equity | $ 33,252 | $ 38,774 |

*The accompanying notes are an integral part of these consolidated financial statements.*

74

**UBER TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except share amounts which are reflected in thousands, and per share amounts)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2020** | **2021** |
| Revenue | $ 13,000 | $ 11,139 | $ 17,455 |
| Costs and expenses | | | |
| Cost of revenue, exclusive of depreciation and amortization shown separately below | 6,061 | 5,154 | 9,351 |
| Operations and support | 2,302 | 1,819 | 1,877 |
| Sales and marketing | 4,626 | 3,583 | 4,789 |
| Research and development | 4,836 | 2,205 | 2,054 |
| General and administrative | 3,299 | 2,666 | 2,316 |
| Depreciation and amortization | 472 | 575 | 902 |
| Total costs and expenses | 21,596 | 16,002 | 21,289 |
| Loss from operations | (8,596) | (4,863) | (3,834) |
| Interest expense | (559) | (458) | (483) |
| Other income (expense), net | 722 | (1,625) | 3,292 |
| **Loss before income taxes and loss from equity method investments** | (8,433) | (6,946) | (1,025) |
| Provision for (benefit from) income taxes | 45 | (192) | (492) |
| Loss from equity method investments | (34) | (34) | (37) |
| **Net loss including non-controlling interests** | (8,512) | (6,788) | (570) |
| Less: net loss attributable to non-controlling interests, net of tax | (6) | (20) | (74) |
| **Net loss attributable to Uber Technologies, Inc.** | $ (8,506) | $ (6,768) | $ (496) |
| **Net loss per share attributable to Uber Technologies, Inc. common stockholders:** | | | |
| Basic | $ (6.81) | $ (3.86) | $ (0.26) |
| Diluted | $ (6.81) | $ (3.86) | $ (0.29) |
| **Weighted-average shares used to compute net loss per share attributable to common stockholders:** | | | |
| Basic | 1,248,353 | 1,752,960 | 1,892,546 |
| Diluted | 1,248,353 | 1,752,960 | 1,895,519 |

*The accompanying notes are an integral part of these consolidated financial statements.*

75

**UBER TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(In millions)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2020** | **2021** |
| Net loss including non-controlling interests | $ (8,512) | $ (6,788) | $ (570) |
| Other comprehensive income (loss), net of tax: | | | |
|     Change in foreign currency translation adjustment | (3) | (350) | 57 |
|     Change in unrealized gain (loss) on investments in available-for-sale securities | 4 | 2 | (46) |
| Other comprehensive income (loss), net of tax | 1 | (348) | 11 |
| Comprehensive loss including non-controlling interests | (8,511) | (7,136) | (559) |
| Less: comprehensive loss attributable to non-controlling interests | (6) | (20) | (74) |
| Comprehensive loss attributable to Uber Technologies, Inc. | $ (8,505) | $ (7,116) | $ (485) |

*The accompanying notes are an integral part of these consolidated financial statements.*

76

P-02346-0078

**UBER TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF REDEEMABLE NON-CONTROLLING INTERESTS AND EQUITY**
**(In millions, except share amounts which are reflected in thousands)**

| | Redeemable Non-Controlling Interest | Redeemable Convertible Preferred Stock Shares | Redeemable Convertible Preferred Stock Amount | Common Stock Shares | Common Stock Amount | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Non-redeemable Non-Controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2018 | $ — | 903,607 | $14,177 | 457,189 | $ — | $ 668 | $ (188) | $ (7,865) | $ — | $ (7,385) |
| Cumulative effect of adoption of new accounting standard (ASC 842) | — | — | — | — | — | — | — | 9 | — | 9 |
| Vesting and exercise of warrants | — | 923 | 45 | — | — | — | — | — | — | — |
| Lapsing of repurchase option related to Series E redeemable convertible preferred stock issued to a non-employee service provider | — | — | 2 | — | — | 10 | — | — | — | 10 |
| Conversion of warrant to common stock in connection with initial public offering | — | — | — | 150 | — | 7 | — | — | — | 7 |
| Conversion of convertible notes to common stock in connection with initial public offering | — | — | — | 93,978 | — | 4,229 | — | — | — | 4,229 |
| Repurchase of outstanding shares | — | — | — | (1) | — | — | — | — | — | — |
| Exercise of stock options | — | — | — | 6,924 | — | 21 | — | — | — | 21 |
| Exercise of put option on common stock held by Yandex | — | — | — | (1,528) | — | (47) | — | — | — | (47) |
| Repurchase of unvested early-exercised stock options | — | — | — | (32) | — | — | — | — | — | — |
| Stock-based compensation | — | — | — | — | — | 4,634 | — | — | — | 4,634 |
| Issuance of common stock under the Employee Stock Purchase Plan | — | — | — | 2,076 | — | 49 | — | — | — | 49 |
| Issuance of common stock in connection with initial public offering, net of offering costs | — | — | — | 180,000 | — | 7,973 | — | — | — | 7,973 |
| Conversion of redeemable convertible preferred stock to common stock in connection with initial public offering | — | (904,530) | (14,224) | 904,530 | — | 14,224 | — | — | — | 14,224 |
| Issuance of common stock in private placement | — | — | — | 11,111 | — | 500 | — | — | — | 500 |
| Issuance of common stock for settlement of RSUs | — | — | — | 98,328 | — | — | — | — | — | — |
| Shares withheld related to net share settlement | — | — | — | (36,249) | — | (1,573) | — | — | — | (1,573) |
| Reclassification of share-based award liability to additional paid-in capital | — | — | — | — | — | 21 | — | — | — | 21 |
| Repayment of employee loans collateralized by outstanding common stock | — | — | — | — | — | 14 | — | — | — | 14 |
| Issuance of common stock as consideration for investment and acquisition | — | — | — | 205 | — | 9 | — | — | — | 9 |
| Issuance of non-controlling interests | 333 | — | — | — | — | — | — | — | 667 | 667 |
| Unrealized gain on investments in available-for-sale securities, net of tax | — | — | — | — | — | — | 4 | — | — | 4 |
| Foreign currency translation adjustment | — | — | — | — | — | — | (3) | — | — | (3) |
| Net loss | (22) | — | — | — | — | — | — | (8,506) | 15 | (8,491) |
| Balance as of December 31, 2019 | $ 311 | — | $ — | 1,716,681 | $ — | $ 30,739 | $ (187) | $ (16,362) | $ 682 | $ 14,872 |

*The accompanying notes are an integral part of these consolidated financial statements.*

77

P-02346-0079

**UBER TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF REDEEMABLE NON-CONTROLLING INTERESTS AND EQUITY**
**(In millions, except share amounts which are reflected in thousands)**

| | Redeemable Non-Controlling Interest | Common Stock Shares | Common Stock Amount | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Non-redeemable Non-Controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2019** | $ 311 | 1,716,681 | $ — | $ 30,739 | $ (187) | $ (16,362) | $ 682 | $ 14,872 |
| Exercise of stock options | — | 16,821 | — | 80 | — | — | — | 80 |
| Stock-based compensation | — | — | — | 861 | — | — | — | 861 |
| Issuance of common stock under the Employee Stock Purchase Plan | — | 4,934 | — | 125 | — | — | — | 125 |
| Equity component of convertible notes, net | — | — | — | 243 | — | — | — | 243 |
| Issuance of common stock as consideration for acquisitions | — | 73,396 | — | 3,898 | — | — | — | 3,898 |
| Issuance of common stock for settlement of RSUs | — | 38,476 | — | — | — | — | — | — |
| Shares withheld related to net share settlement | — | (555) | — | (17) | — | — | — | (17) |
| Release of shares previously held in escrow related to prior business combination | — | 41 | — | 2 | — | — | — | 2 |
| Recognition of non-controlling interest upon acquisition | 290 | — | — | — | — | — | — | — |
| Issuance of Freight subsidiary preferred stock, net of costs to issue | 247 | — | — | — | — | — | — | — |
| Unrealized gain on investments in available-for-sale securities, net of tax | — | — | — | — | 2 | — | — | 2 |
| Foreign currency translation adjustment | — | — | — | — | (350) | — | — | (350) |
| Distributions to non-controlling interests | (9) | — | — | — | — | — | (13) | (13) |
| Net loss | (52) | — | — | — | — | (6,768) | 32 | (6,736) |
| **Balance as of December 31, 2020** | $ 787 | 1,849,794 | $ — | $ 35,931 | $ (535) | $ (23,130) | $ 701 | $ 12,967 |

*The accompanying notes are an integral part of these consolidated financial statements.*

78

**UBER TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF REDEEMABLE NON-CONTROLLING INTERESTS AND EQUITY**
**(In millions, except share amounts which are reflected in thousands)**

| | Redeemable Non-Controlling Interest | Common Stock Shares | Amount | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Non-redeemable Non-Controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2020 | $  787 | 1,849,794 | $  — | $  35,931 | $  (535) | $  (23,130) | $  701 | $  12,967 |
| Exercise of stock options | — | 9,440 | — | 101 | — | — | — | 101 |
| Stock-based compensation | — | — | — | 1,204 | — | — | — | 1,204 |
| Reclassification of the equity component of 2025 Convertible Notes to liability upon adoption of ASU 2020-06 | — | — | — | (243) | — | — | — | (243) |
| Reclassification of share-based award liability to additional paid-in capital | — | — | — | 4 | — | — | — | 4 |
| Issuance of common stock under the Employee Stock Purchase Plan | — | 2,770 | — | 107 | — | — | — | 107 |
| Issuance of common stock as consideration for acquisitions | — | 19,377 | — | 929 | — | — | — | 929 |
| Issuance of common stock for settlement of Careem Convertible Notes | — | 4,225 | — | 232 | — | — | — | 232 |
| Issuance of common stock for settlement of contingent consideration liability | — | 2,252 | — | 102 | — | — | — | 102 |
| Issuance of restricted stock awards, subject to repurchase, in connection with acquisition of non-controlling interest | — | 4,641 | — | — | — | — | — | — |
| Re-measurement of non-controlling interest | 1,052 | — | — | (1,058) | — | — | — | (1,058) |
| Acquisition of non-controlling interests | (1,194) | 20,641 | — | 1,327 | — | — | — | 1,327 |
| Recognition of non-controlling interest upon sale of Freight Holding preferred stock | — | — | — | — | — | — | 675 | 675 |
| Derecognition of non-controlling interests upon divestiture | (356) | — | — | — | — | — | (701) | (701) |
| Issuance of common stock for settlement of RSUs | — | 36,703 | — | — | — | — | — | — |
| Shares withheld related to net share settlement | — | (527) | — | (28) | — | — | — | (28) |
| Unrealized loss on investments in available-for-sale securities, net of tax | — | — | — | — | (46) | — | — | (46) |
| Foreign currency translation adjustment | — | — | — | — | 57 | — | — | 57 |
| Net income (loss) | (85) | — | — | — | — | (496) | 12 | (484) |
| Balance as of December 31, 2021 | $  204 | 1,949,316 | $  — | $  38,608 | $  (524) | $  (23,626) | $  687 | $  15,145 |

*The accompanying notes are an integral part of these consolidated financial statements.*

79

**UBER TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2020** | **2021** |
| **Cash flows from operating activities** | | | |
| Net loss including non-controlling interests | $ (8,512) | $ (6,788) | $ (570) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 472 | 575 | 902 |
| Bad debt expense | 92 | 76 | 109 |
| Stock-based compensation | 4,596 | 827 | 1,168 |
| Gain on extinguishment of convertible notes and settlement of derivatives | (444) | — | — |
| Gain from sale of investments | — | — | (413) |
| Gain on business divestitures, net | — | (204) | (1,684) |
| Deferred income taxes | (88) | (266) | (692) |
| Impairment of debt and equity securities | — | 1,690 | — |
| Impairments of goodwill, long-lived assets and other assets | — | 404 | 116 |
| Loss from equity method investments | 34 | 34 | 37 |
| Unrealized (gain) loss on debt and equity securities, net | (2) | 125 | (1,142) |
| Unrealized foreign currency transactions | 16 | 48 | 38 |
| Other | 15 | 2 | 4 |
| Change in assets and liabilities, net of impact of business acquisitions and disposals: | | | |
| Accounts receivable | (407) | 142 | (597) |
| Prepaid expenses and other assets | (478) | 94 | (236) |
| Collateral held by insurer | (1,199) | 339 | 860 |
| Operating lease right-of-use assets | 201 | 341 | 165 |
| Accounts payable | 95 | (133) | 90 |
| Accrued insurance reserves | 481 | (3) | 516 |
| Accrued expenses and other liabilities | 960 | 83 | 1,068 |
| Operating lease liabilities | (153) | (131) | (184) |
| Net cash used in operating activities | (4,321) | (2,745) | (445) |
| **Cash flows from investing activities** | | | |
| Purchases of property and equipment | (588) | (616) | (298) |
| Purchases of non-marketable equity securities | (100) | (10) | (982) |
| Purchases of marketable securities | (441) | (2,101) | (1,113) |
| Proceeds from maturities and sales of marketable securities | 2 | 1,360 | 2,291 |
| Proceeds from sale of non-marketable equity securities | — | — | 500 |
| Proceeds from sale of equity method investments | — | — | 1,000 |
| Proceeds from business disposal, net of cash divested | 293 | — | — |
| Acquisition of businesses, net of cash acquired | (7) | (1,471) | (2,314) |
| Return of capital from equity method investee | — | 91 | — |
| Purchase of notes receivables | — | (185) | (297) |
| Other investing activities | 51 | 63 | 12 |
| Net cash used in investing activities | (790) | (2,869) | (1,201) |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of common stock upon initial public offering, net of offering costs | 7,973 | — | — |
| Taxes paid related to net share settlement of equity awards | (1,573) | (17) | (27) |
| Proceeds from issuance of common stock related to private placement | 500 | — | — |

80

**UBER TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2020** | **2021** |
| Proceeds from issuance and sale of subsidiary preferred stock units | 1,000 | 247 | 675 |
| Proceeds from the issuance of common stock under the Employee Stock Purchase Plan | 49 | 125 | 107 |
| Issuance of term loan and notes, net of issuance costs | 1,189 | 2,628 | 1,484 |
| Principal repayment on term loan and notes | (27) | (527) | (27) |
| Principal repayment on Careem Notes | — | (891) | (307) |
| Principal payments on finance leases | (138) | (224) | (226) |
| Other financing activities | (34) | 38 | 101 |
| Net cash provided by financing activities | 8,939 | 1,379 | 1,780 |
| Effect of exchange rate changes on cash and cash equivalents, and restricted cash and cash equivalents | (4) | (92) | (69) |
| Net increase (decrease) in cash and cash equivalents, and restricted cash and cash equivalents | 3,824 | (4,327) | 65 |
| **Cash and cash equivalents, and restricted cash and cash equivalents** | | | |
| Beginning of period | 8,209 | 12,067 | 7,391 |
| Reclassification from (to) assets held for sale during the period | 34 | (349) | 349 |
| End of period, excluding cash classified within assets held for sale | $ 12,067 | $ 7,391 | $ 7,805 |
| **Supplemental disclosures of cash flow information** | | | |
| Cash paid for: | | | |
| Interest, net of amount capitalized | $ 332 | $ 412 | $ 449 |
| Income taxes, net of refunds | 133 | 82 | 87 |
| Non-cash investing and financing activities: | | | |
| Conversion of redeemable convertible preferred stock to common stock upon initial public offering | 14,224 | — | — |
| Conversion of convertible notes to common stock upon initial public offering | 4,229 | — | — |
| Conversion of convertible notes to common stock related to Careem | — | — | 232 |
| Finance lease obligations | 251 | 196 | 184 |
| Common stock issued in connection with acquisitions | 9 | 3,898 | 1,868 |
| Ownership interest received in exchange for divestitures | — | 171 | 1,018 |
| Issuance of Careem Notes including the holdback amount | — | 1,634 | — |

*The accompanying notes are an integral part of these consolidated financial statements.*

81

UBER TECHNOLOGIES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 1 – Description of Business and Summary of Significant Accounting Policies**

*Description of Business*

Uber Technologies, Inc. ("Uber," "we," "our," or "us") was incorporated in Delaware in July 2010, and is headquartered in San Francisco, California. Uber is a technology platform that uses a massive network, leading technology, operational excellence and product expertise to power movement from point A to point B. Uber develops and operates proprietary technology applications supporting a variety of offerings on its platform ("platform(s)" or "Platform(s)"). Uber connects consumers ("Rider(s)") with independent providers of ride services ("Mobility Driver(s)") for ridesharing services, and connects Riders and other consumers ("Eaters") with restaurants, grocers and other stores (collectively, "Merchants") with delivery service providers ("Couriers") for meal preparation, grocery and other delivery services. Riders and Eaters are collectively referred to as "end-user(s)" or "consumer(s)." Mobility Drivers and Couriers are collectively referred to as "Driver(s)." Uber also connects consumers with public transportation networks. Uber uses this same network, technology, operational excellence and product expertise to connect shippers with carriers in the freight industry. Uber is also developing technologies that will provide new solutions to solve everyday problems.

Our technology is used around the world, principally in the United States ("U.S.") and Canada, Latin America, Europe, the Middle East, Africa, and Asia (excluding China and Southeast Asia).

*Basis of Presentation*

The accompanying consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States ("GAAP"). We consolidate our wholly-owned subsidiaries and majority-owned subsidiaries over which we exercise control, and variable interest entities ("VIE") where we are deemed to be the primary beneficiary. Refer to Note 16 – Variable Interest Entities for further information. All intercompany balances and transactions have been eliminated.

*Use of Estimates*

The preparation of our consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions, which affect the reported amounts in the financial statements and accompanying notes. Estimates are based on historical experience, where applicable, and other assumptions which management believes are reasonable under the circumstances. On an ongoing basis, management evaluates estimates, including, but not limited to: fair values of investments and other financial instruments (including the measurement of credit or impairment losses); useful lives of amortizable long-lived assets; fair value of acquired intangible assets and related impairment assessments; impairment of goodwill; stock-based compensation; income taxes and non-income tax reserves; certain deferred tax assets and tax liabilities; insurance reserves; and other contingent liabilities. These estimates are inherently subject to judgment and actual results could differ from those estimates. We considered the impacts of the COVID-19 pandemic on the assumptions and inputs (including market data) supporting certain of these estimates, assumptions and judgments, in particular, our impairment assessment related to the determination of the fair values of certain investments and equity method investments as well as goodwill and the recoverability of long-lived assets. The level of uncertainties and volatility in the global financial markets and economies resulting from the pandemic as well as the uncertainties related to the impact of the pandemic on us and our investees' operations and financial performance means that these estimates may change in future periods, as new events occur and additional information is obtained.

*Concentration of Credit Risk*

Cash and cash equivalents, short-term investments, restricted cash and cash equivalents, other receivables, and accounts receivable are potentially subject to credit risk concentration. Cash, cash equivalents, and available-for-sale securities primarily consist of money market funds, cash deposits, U.S. government and agency securities, and investment-grade corporate debt securities. Our investment policy limits the amount of credit exposure with any one financial institution or commercial issuer. Cash deposits typically exceed insured limits and are placed with financial institutions around the world that we believe are of high credit quality. We have not experienced any material losses related to these concentrations during the periods presented. Our other receivables primarily consist of funds withheld by well-established insurance companies with high credit quality that may be used to cover future settlement of reserved insurance claims. We rely on a limited number of third parties to provide payment processing services ("payment service providers") to collect amounts due from end-users. Payment service providers are financial institutions or credit card companies that we believe are of high credit quality. No customers accounted for 10% or more of revenue for the years ended December 31, 2019, 2020 and 2021.

*Certain Significant Risks and Uncertainties*

We have incurred significant net losses since inception and had an accumulated deficit of $23.6 billion as of December 31, 2021. Our operations have historically been funded through equity and debt financings. While management currently anticipates that our available cash and cash equivalents, and revolving credit facility will be sufficient to meet our operational cash needs for at least the next twelve months from the date of issuance of these financial statements, additional capital may need to be raised or additional indebtedness incurred to continue to fund the operations and other strategic initiatives. We may not be able to obtain additional

82

financing on favorable terms, if at all, or our ability to incur additional indebtedness may be restricted by the terms of our existing debt instruments.

In March 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. COVID-19 has rapidly impacted market and economic conditions globally. In an attempt to limit the spread of the virus, various governmental restrictions have been implemented, including business activities and travel restrictions, and "shelter-at-home" orders, that have had an adverse impact on our business and operations by reducing, in particular, the global demand for Mobility offerings, while accelerating the growth of our Delivery offerings. In light of the evolving nature of COVID-19 and the uncertainty it continues to produce around the world, it is not possible to predict the COVID-19 pandemic's cumulative and ultimate impact on our future business operations, results of operations, financial position, liquidity, and cash flows. The extent of the impact of the pandemic on our business and financial results will depend largely on future developments, including: the duration of the spread of the outbreak (both globally and within the United States), including whether there will be further resurgences of the outbreak or variants of the virus; the distribution of vaccines in various regions; the impact on capital, foreign currencies exchange and financial markets; governmental or regulatory orders that impact our business; and whether the impacts may result in permanent changes to our end-users' behavior, all of which are highly uncertain and cannot be predicted.

### Cash and Cash Equivalents

Cash and cash equivalents consist of cash held in checking and savings accounts as well as investments in money market funds, commercial paper, U.S. government and agency securities, and corporate bonds. We consider all highly-liquid investments purchased with an original or remaining maturity of three months or less at the date of purchase to be cash equivalents. Cash includes amounts collected on behalf of, but not yet remitted to Drivers and Merchants, which are included in accrued and other current liabilities on the consolidated balance sheets.

### Restricted Cash and Cash Equivalents

Restricted cash and cash equivalents are pledged as security for letters of credit or other collateral amounts established by us for certain insurance policies and also include cash and cash equivalents that are unavailable for immediate use due to legal and/or contractual restrictions. Restricted cash and cash equivalents are classified as current and non-current assets based on the contractual or estimated term of the remaining restriction. The reconciliation of cash and cash equivalents and restricted cash and cash equivalents to amounts presented in the consolidated statements of cash flows are as follows (in millions):

|  | As of December 31, | | |
|---|---|---|---|
|  | 2019 | 2020 | 2021 |
| Cash and cash equivalents | $ 10,873 | $ 5,647 | $ 4,295 |
| Restricted cash and cash equivalents - current | 99 | 250 | 631 |
| Restricted cash and cash equivalents - non-current | 1,095 | 1,494 | 2,879 |
| Total cash and cash equivalents, and restricted cash and cash equivalents | $ 12,067 | $ 7,391 | $ 7,805 |

### Collateral Held by Insurer

Collateral held by insurer represents funds held by James River Group companies ("James River"). These funds, previously held in a trust account, were withdrawn by James River during the fourth quarter of 2019 upon notice of cancellation of their insurance policies (primarily auto insurance policies) issued to one of our subsidiaries. As of December 31, 2020, the funds served as collateral for us and our subsidiary's current and future claim settlement obligations under the indemnification agreements for these insurance policies as included in insurance reserves on the consolidated balance sheet. Accordingly, the amount withdrawn is presented as collateral held by insurer on the consolidated balance sheet as of December 31, 2020.

During the third quarter of 2021, in connection with the legacy auto insurance transfer as described below, James River returned funds, previously presented as collateral held by insurer, to the trust account where the funds were previously held. Accordingly, the funds were reclassified from collateral held by insurer to non-current restricted cash and cash equivalents on our consolidated balance sheet as of December 31, 2021.

### Legacy Auto Insurance Transfer

On September 27, 2021, Aleka Insurance, Inc., our wholly-owned captive insurance subsidiary, entered into a Loss Portfolio Transfer Reinsurance Agreement (the "LPTA") with James River effective July 1, 2021. Pursuant to the LPTA, our captive insurance subsidiary reinsured certain automobile liability insurance risks relating to activity on our platform between 2013 and 2019 in exchange for payment by James River to our captive insurance subsidiary of a premium in the amount of $345 million ("Premium"). Subsequent to the LPTA, we retain substantially all of the liabilities on these policies when taken together with previous risk transfer arrangements. In connection with the LPTA, claims currently administered by James River will be transferred to a third-party claims administrator for ongoing handling (the "Transferred Claims") at our expense. The liabilities associated with the Transferred Claims were re-evaluated as of September 30, 2021, and adverse development was recognized on certain of those liabilities. During the third quarter of 2021, we recognized a $103 million charge in our consolidated statement of operations consisting of the difference between

83

the Premium and the assumed liabilities (including the cost of future claims administration), expenses associated with the LPTA, and the adverse development on the Transferred Claims.

### Accounts Receivable and Allowance for Doubtful Accounts

Accounts receivable represents uncollected payments from end-users for completed transactions where (i) the payment method is credit card and includes (a) end-user payments not yet settled with payment service providers, and (b) end-user payments settled by payment service providers but not yet remitted to us, or (ii) completed shipments where we invoice Freight customers ("Shippers") and payment has not been received. The timing of settlement of amounts due from these parties varies by region and by product. The portion of the receivable to be remitted to Drivers and Merchants is included in accrued and other current liabilities. Refer to Note 10 – Supplemental Financial Statement Information for amounts payable to Drivers and Merchants.

Although we pre-authorize forms of payment to mitigate our exposure, we bear the cost of any accounts receivable losses. We record an allowance for doubtful accounts for accounts receivable that may never settle or be collected, as well as for credit card chargebacks including fraudulent credit card transactions. We consider the allowance for doubtful accounts for fare amounts to be direct and incremental costs to revenue earned and, therefore, the costs are included as cost of revenue in the consolidated statements of operations. We estimate the allowance based on historical experience, estimated future payments and geographical trends, which are reviewed periodically and as needed, and amounts are written off when determined to be uncollectible. Chargebacks and credit card losses were $195 million, $178 million and $246 million for the years ended December 31, 2019, 2020 and 2021, respectively.

### Property and Equipment, Net

Property and equipment are stated at cost, net of accumulated depreciation and amortization. Depreciation and amortization is computed using the straight-line method over the estimated useful lives of the assets, which are as follows:

| Property and Equipment | Estimated Useful Life |
| --- | --- |
| Land | Indefinite |
| Buildings | 30-45 years |
| Site improvements | 5-15 years |
| Leased vehicles | 3-10 years |
| Computer equipment | 3-5 years |
| Furniture and fixtures | 3-5 years |
| Dockless e-bikes | 3 years |
| Internal-use software | 2 years |
| Leased computer equipment | Shorter of estimated useful life or lease term |
| Leasehold improvements | Shorter of estimated useful life or lease term |

When assets are retired or otherwise disposed of, the cost, accumulated depreciation and amortization are removed from the accounts and any resulting gain or loss is reflected in the consolidated statements of operations in the period realized. Maintenance and repairs that do not enhance or extend the asset's useful life are charged to operating expenses as incurred.

We capitalize certain costs, such as compensation costs, including stock-based compensation, and interest incurred on outstanding debt, in developing internal-use software once planning has been completed, management has authorized and committed project funding, and it is probable that the project will be completed and the software will function as intended. Amortization of such costs occurs on a straight-line basis over the estimated useful life of the related asset and begins once the asset is ready for its intended use. Costs incurred prior to meeting these criteria, together with costs incurred for training and maintenance, are expensed as incurred. In addition, we capitalize interest incurred on outstanding debt during the period of construction-in-progress of certain assets.

Leased vehicle certain assets were stated at cost, net of accumulated depreciation. The vast majority of our leased vehicle assets were reclassified to assets held for sale as of December 31, 2018. In January 2019, an agreement was executed with Waydrive Holdings Pte. Ltd. ("Waydrive") to purchase the Lion City Rentals Pte. Ltd. ("LCR"), a wholly-owned vehicle solutions subsidiary of ours based in Singapore. Refer to Note 19 – Divestitures for further information. When leased vehicles are retired or otherwise disposed of, the cost and accumulated depreciation are removed and any resulting gain or loss is reflected in the consolidated statements of operations in the period realized. Maintenance and repair expenditures are charged to operating expenses as incurred.

84

*Leases*

We adopted Accounting Standards Codification ("ASC") 842, "Leases" ("ASC 842") on January 1, 2019, using the modified retrospective transition method and used the effective date as the date of initial application. We elected the "package of practical expedients," which permits us not to reassess under ASC 842 our prior conclusions about lease identification, lease classification and initial direct costs. We made a policy election not to separate non-lease components from lease components, therefore, we account for lease and non-lease components as a single lease component. We also elected the short-term lease recognition exemption for all leases that qualify.

We determine if a contract contains a lease at inception of the arrangement based on whether we have the right to obtain substantially all of the economic benefits from the use of an identified asset and whether we have the right to direct the use of an identified asset in exchange for consideration, which relates to an asset which we do not own. Right of use ("ROU") assets represent our right to use an underlying asset for the lease term and lease liabilities represent our obligation to make lease payments arising from the lease. ROU assets are recognized as the lease liability, adjusted for lease incentives received. Lease liabilities are recognized at the present value of the future lease payments at the lease commencement date. The interest rate used to determine the present value of the future lease payments is our incremental borrowing rate ("IBR"), because the interest rate implicit in most of our leases is not readily determinable. The IBR is a hypothetical rate based on our understanding of what our credit rating would be to borrow and resulting interest we would pay to borrow an amount equal to the lease payments in a similar economic environment over the lease term on a collateralized basis. Lease payments may be fixed or variable; however, only fixed payments or in-substance fixed payments are included in our lease liability calculation. Variable lease payments may include costs such as common area maintenance, utilities, real estate taxes or other costs. Variable lease payments are recognized in operating expenses in the period in which the obligation for those payments are incurred.

Operating leases are included in operating lease ROU assets, operating lease liabilities, current and operating lease liabilities, non-current on our consolidated balance sheets. Finance leases are included in property and equipment, net, accrued and other current liabilities, and other long-term liabilities on our consolidated balance sheets. For operating leases, lease expense is recognized on a straight-line basis in operations over the lease term. For finance leases, lease expense is recognized as depreciation and interest; depreciation on a straight-line basis over the lease term and interest using the effective interest method. As of December 31, 2020 and 2021, less than 12% of our operating lease ROU assets related to leased assets were outside of the U.S.

*Acquisitions*

We account for acquisitions of entities or asset groups that qualify as businesses in accordance with ASC 805, "Business Combinations" ("ASC 805"). The purchase price of the acquisition is allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values at the acquisition date. The excess of the purchase price over those fair values is recorded as goodwill. During the measurement period, which may be up to one year from the acquisition date, we may record adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill. Upon the conclusion of the measurement period or final determination of the values of assets acquired or liabilities assumed, whichever comes first, any subsequent adjustments are recorded in the consolidated statements of operations. Refer to Note 18 – Business Combinations for further information.

*Goodwill*

Goodwill represents the excess of the purchase price over the fair value of net assets acquired in a business combination and is allocated to reporting units expected to benefit from the business combination. We test goodwill for impairment at least annually, in the fourth quarter, or whenever events or changes in circumstances indicate that goodwill might be impaired. We evaluate our reporting units when changes in our operating structure occur, and if necessary, reassign goodwill using a relative fair value allocation approach. In testing for goodwill impairment, we first assess qualitative factors to determine whether the existence of events or circumstances leads to a determination that it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If, after assessing the totality of events or circumstances, we determine it is not more likely than not that the fair value of a reporting unit is less than its carrying amount, then additional impairment testing is not required. However, if we conclude otherwise, we proceed to the quantitative assessment.

The quantitative assessment compares the estimated fair value of a reporting unit to its book value, including goodwill. If the fair value exceeds book value, goodwill is considered not to be impaired and no additional steps are necessary. However, if the book value of a reporting unit exceeds its fair value, an impairment loss will be recognized in an amount equal to that excess, limited to the total amount of goodwill allocated to that reporting unit. Refer to Note 7 – Goodwill and Intangible Assets for further information.

*Intangible Assets, Net*

Intangible assets are carried at cost and amortized on a straight-line basis over their estimated useful lives, which range from one to 18 years. We review definite-lived intangible assets for impairment under the long-lived asset model described in the Evaluation of Long-Lived Assets for Impairment section. Refer to Note 7 – Goodwill and Intangible Assets for further information.

85

*Investments*

*Equity Securities*

Accounting for our equity securities varies depending on the marketability of the security and the type of investment. Our marketable equity securities in publicly traded companies are measured at fair value with unrealized gains and losses recognized in the consolidated statements of operations. Certain investments in non-marketable equity securities are measured at cost, with remeasurements to fair value only upon the occurrence of observable price changes in orderly transactions for the identical or similar securities of the same issuer, or in the event of any impairment. We reassess at each reporting period to determine whether non-marketable equity securities have a readily determinable fair value, in which case they would no longer be eligible for fair value measurement alternative. Non-marketable equity securities that we elected to apply the fair value option and equity securities with a readily determinable fair value are measured at fair value on a recurring basis with changes in fair value recognized in the consolidated statements of operations. We evaluate our non-marketable equity securities for impairment at each reporting period based on a qualitative assessment that considers various potential impairment indicators. Impairment indicators might include, but would not necessarily be limited to, a significant deterioration in the earnings performance, credit rating, asset quality, or business prospects of the investee, a significant adverse change in the regulatory, economic, or technological environment of the investee, a bona fide offer to purchase, an offer by the investee to sell, or a completed auction process for the same or similar securities for an amount less than the carrying amount of the investments in those securities. If an impairment exists, a loss is recognized in the consolidated statements of operations for the amount by which the carrying value exceeds the fair value of the investment. We include investments in equity securities within investments on the consolidated balance sheets.

*Debt Securities*

Accounting for our debt securities varies depending on the legal form of the security, our intended holding period for the security, and the nature of the transaction. Investments in debt securities are classified as available-for-sale and are initially recorded at fair value. Investments in marketable debt securities include commercial paper, U.S. government and agency securities and corporate bonds. As of December 31, 2020, certain investments in non-marketable equity securities with redemption, interest, or other debt-like features were classified as available-for-sale debt securities. Subsequent changes in fair value of available-for-sale debt securities are recorded in other comprehensive income (loss), net of tax. We record certain of our debt securities at fair value with the changes in fair value recorded in earnings under the fair value option of accounting for financial instruments.

As of December 31, 2020, we considered our marketable debt securities as available for use in current operations, including those with maturity dates beyond one year, and therefore classify these securities as short-term investments on the consolidated balance sheet. Certain investments in non-marketable debt securities classified as available-for-sale debt securities were included in investments on the consolidated balance sheet.

*Allowance for Credit Losses on Available-for-sale Debt Securities*

We account for credit losses on available-for-sale debt securities in accordance with ASC 326, Financial Instruments - Credit Losses ("ASC 326"). We adopted ASC 326 on January 1, 2020, on a modified retrospective basis. Under ASC 326, at each reporting period, we evaluate our available-for-sale debt securities at the individual security level to determine whether there is a decline in the fair value below its amortized cost basis (an impairment). In circumstances where we intend to sell, or are more likely than not required to sell, the security before it recovers its amortized cost basis, the difference between fair value and amortized cost is recognized as a loss in the consolidated statements of operations, with a corresponding write-down of the security's amortized cost. In circumstances where neither condition exists, we then evaluate whether a decline is due to credit-related factors. The factors considered in determining whether a credit loss exists can include the extent to which fair value is less than the amortized cost basis, changes in the credit quality of the underlying loan obligors, credit ratings actions, as well as other factors. To determine the portion of a decline in fair value that is credit-related, we compare the present value of the expected cash flows of the security discounted at the security's effective interest rate to the amortized cost basis of the security. A credit-related impairment is limited to the difference between fair value and amortized cost, and recognized as an allowance for credit loss on the consolidated balance sheet with a corresponding adjustment to net income (loss). Any remaining decline in fair value that is non-credit related is recognized in other comprehensive income (loss), net of tax. Improvements in expected cash flows due to improvements in credit are recognized through reversal of the credit loss and corresponding reduction in the allowance for credit loss.

**Equity Method Investments**

Investments in common stock or in-substance common stock of entities that provide us with the ability to exercise significant influence, but not a controlling financial interest, over the investee are accounted for under the equity method of accounting, unless the fair value option is elected. Investments accounted for under the equity method are initially recorded at cost. Subsequently, we recognize through the consolidated statements of operations and as an adjustment to the investment balance, our proportionate share of the investees' net income or loss and the amortization of basis differences. We record our share of the results of equity method investments one quarter in arrears as income (loss) from equity method investment, net of tax in the consolidated statements of operations. We evaluate each of our equity method investments at the end of each reporting period to determine whether events or changes in business circumstances indicate that the carrying value of the investment may not be fully recoverable. We recognize in the

86

consolidated statements of operations and as an adjustment to the investment balance, any required impairment loss. Evidence of a loss in value might include, but would not necessarily be limited to, absence of an ability to recover the carrying amount of the investment or inability of the investee to sustain an earnings capacity that would justify the carrying amount of the investment. This evaluation consists of several qualitative and quantitative factors including recent financial results and operating trends of the investee; implied values in recent transactions of investee securities; other publicly available information that may affect the value of our investments.

### Evaluation of Long-Lived Assets for Impairment

We evaluate our held-and-used long-lived assets for indicators of possible impairment when events or changes in circumstances indicate the carrying amount of an asset or asset group (collectively, the "asset group") may not be recoverable. We measure the recoverability of the asset group by comparing the carrying amount of such asset groups to the future undiscounted cash flows it expects the asset group to generate. If we consider the asset group to be impaired, the impairment to be recognized equals the amount by which the carrying value of the asset group exceeds its fair value.

### Fair Value Measurements and Financial Instruments

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. In accordance with ASC 820, Fair Value Measurement ("ASC 820"), we use the fair value hierarchy, which prioritizes the inputs used to measure fair value. The hierarchy, as defined below, gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. The three levels of the fair value hierarchy are set forth below:

Level 1    Observable inputs such as quoted prices in active markets for identical assets or liabilities.

Level 2    Observable inputs other than Level 1 prices such as quoted prices for similar assets or liabilities in active markets, quoted prices in markets that are not active or inputs other than the quoted prices that are observable either directly or indirectly for the full term of the assets or liabilities.

Level 3    Unobservable inputs in which there is little or no market data and that are significant to the fair value of the assets or liabilities.

Our primary financial instruments include cash equivalents, restricted cash and cash equivalents, receivables, investments, accounts payable, accrued liabilities, long-term debt, and, prior to 2021, marketable debt securities, embedded derivatives and warrants. The estimated fair value of cash equivalents, accounts receivable, accounts payable and accrued liabilities approximates their carrying value due to the short-term maturities of these instruments. Refer to Note 3 – Investments and Fair Value Measurement and Note 8 – Long-Term Debt and Revolving Credit Arrangements for further information.

### Variable Interest Entities

We evaluate our ownership, contractual and other interests in entities to determine if we have a variable interest in an entity. These evaluations are complex, involve judgment, and the use of estimates and assumptions based on available historical and prospective information, among other factors. If we determine that an entity for which we hold a contractual or ownership interest in is a VIE and that we are the primary beneficiary, we consolidate such entity in the consolidated financial statements. The primary beneficiary of a VIE is the party that meets both of the following criteria: (1) has the power to make decisions that most significantly affect the economic performance of the VIE; and (2) has the obligation to absorb losses or the right to receive benefits that in either case could potentially be significant to the VIE. Periodically, we determine whether any changes in the interest or relationship with the entity impacts the determination of whether we are still the primary beneficiary. If we are not deemed to be the primary beneficiary in a VIE, we account for the investment or other variable interests in a VIE in accordance with applicable GAAP. Refer to Note 16 – Variable Interest Entities for further information.

### Revenue Recognition

We recognize revenue when or as we satisfy our obligations. We derive our revenues principally from Drivers' and Merchants' use of our platform, on-demand lead generation, and related services, including facilitating payments from end-users. The service enables Drivers and Merchants to seek, receive and fulfill on-demand requests from end-users seeking Mobility or Delivery services (collectively the "Uber Service"). Beginning in 2020, in certain markets we also generate revenue from end-users. We charge a direct fee for use of the platform and in exchange for Delivery services. Additionally, we derive revenue from customers' use of Freight services.

We periodically reassess our revenue recognition policies as new offerings become material, and business models and other factors evolve.

87

*Mobility and Delivery Agreements*

We primarily enter into Master Services Agreements ("MSA") with Drivers and Merchants to use the platform. The MSA defines the service fee we charge Drivers and Merchants for each transaction. Upon acceptance of a transaction, Drivers and Merchants agree to perform the services as requested by an end-user. The acceptance of a transaction request combined with the MSA establishes enforceable rights and obligations for each transaction. A contract exists between us and the Drivers and Merchants after the Drivers and Merchants accept a transaction request and the Drivers' and Merchants' ability to cancel the transaction lapses.

The Uber Service activities are performed to satisfy our sole performance obligation in the transaction, which is to connect Drivers and Merchants with end-users to facilitate the completion of a successful transaction.

In 2020, we began charging Mobility end-users a fee to use the platform in certain markets. In these transactions, in addition to a performance obligation to Drivers, we also have a performance obligation to end-users, which is to connect end-users to Drivers in the marketplace. We recognize revenue when a trip is complete. We present revenue on a net basis for these transactions, as we do not control the service provided by Drivers to end-users. For the years ended December 31, 2020 and 2021, we recognized total revenue of $323 million and $336 million, respectively, associated with these fees charged to end-users.

Additionally, during the first quarter of 2020, we modified our arrangements in certain markets and as a result, concluded we are responsible for delivery services to end-users in those markets. We have determined that in these transactions, Merchants and end-users are our customers and revenue from these contracts shall be recognized separately for each under ASC 606. We recognize delivery service revenue associated with our performance obligation over the contract term, which represents its performance over the period of time the delivery is occurring. For the year ended December 31, 2020, we recognized revenue from end-users of $91 million and cost of revenue, exclusive of depreciation and amortization of $439 million associated with these delivery transactions. For the year ended December 31, 2021, we recognized revenue from end-users of $710 million and cost of revenue, exclusive of depreciation and amortization of $2.4 billion associated with these delivery transactions.

In all markets aside from the above two scenarios, end-users access the platform for free and we have no performance obligation to end-users. As a result, this class of end-users are not our customers.

*Principal vs. Agent Considerations*

Judgment is required in determining whether we are the principal or agent in transactions with Drivers, Merchants and end-users. We evaluate the presentation of revenue on a gross or net basis based on whether we control the service provided to the end-user and are the principal (i.e. "gross"), or we arrange for other parties to provide the service to the end-user and are an agent (i.e. "net"). This determination also impacts the presentation of incentives provided to Drivers and Merchants and discounts and promotions offered to end-users to the extent they are not customers.

For the majority of Mobility and Delivery transactions, our role is to provide the Uber Service to Drivers and Merchants to facilitate a successful trip or Delivery service to end-users. We concluded we do not control the good or service provided by Drivers and Merchants to end-users as (i) we do not pre-purchase or otherwise obtain control of the Drivers' and Merchants' goods or services prior to its transfer to the end-user; (ii) we do not direct Drivers and Merchants to perform the service on our behalf, and (iii) we do not integrate services provided by Drivers and Merchants with our other services and then provide them to end-users. As part of our evaluation of control, we review other specific indicators to assist in the principal versus agent conclusions. We are not primarily responsible for Mobility and Delivery services provided to end-users, nor do we have inventory risk related to these services. While we facilitate setting the price for Mobility and Delivery services, the Drivers and Merchants and end-users have the ultimate discretion in accepting the transaction price and this indicator alone does not result in us controlling the services provided to end-users.

In the vast majority of transactions with end-users, we act as an agent of the Driver or Merchant by connecting end-users seeking Mobility and Delivery services with Drivers and Merchants looking to provide these services. Drivers and Merchants are our customers and pay us a service fee for each successfully completed transaction with end-users. Accordingly, we recognize revenue on a net basis, representing the fee we expect to receive in exchange for us providing the service to Drivers and Merchants. In certain markets, we promise Delivery services to end-users for a fee and separately subcontract with Couriers to provide delivery services. In these markets, we are the principal for the Delivery services and present Delivery revenue on a gross basis because we are primarily responsible for the services.

*Mobility*

We derive our Mobility revenue primarily from service fees paid by Drivers for use of the platform and related service to connect with Riders and successfully complete a trip via the Platform. We recognize revenue when a trip is complete.

Depending on the market where the trip is completed, the service fee is either a fixed percentage of the end-user fare or the difference between the amount paid by an end-user and the amount earned by Drivers. In markets where we earn the difference between the amount paid by an end-user and the amount earned by Drivers, end-users are quoted a fixed upfront price for ridesharing services while we pay Drivers based on actual time and distance for the ridesharing services provided. Therefore, we can earn a variable amount and may realize a loss on the transaction. We typically receive the service fee within a short period of time following the completion of a trip.

88

In addition, end-users in certain markets have the option to pay cash for trips. On such trips, cash is paid by end-users to Drivers. We generally collect our service fee from Drivers for these trips by offsetting against any other amounts due to Drivers, including Drivers incentives, or via online payment methods. As we currently have limited means to collect our service fee for cash trips and cannot control whether Drivers will generate future amounts owed to them for offset, we concluded collectability of such amounts is not probable until collected. As such, uncollected service fees for cash trips are not recognized in the consolidated financial statements until collected from Drivers.

Mobility revenue also includes immaterial revenue streams such as our financial partnerships products and Vehicle Solutions.

*Delivery*

We derive our Delivery revenue primarily from service fees paid by Couriers and Merchants for use of the platform and related service to successfully complete a meal delivery service on the platform. In certain markets, Delivery also includes offerings for grocery, alcohol and convenience store delivery as well as select other goods. We recognize revenue when a Delivery transaction is complete.

In the majority of transactions, the service fee paid by Merchants is a fixed percentage of the meal price. The service fee paid by Couriers is the difference between the delivery fee amount paid by the end-user and the amount earned by the Couriers. End-users are quoted a fixed price for the meal delivery while we pay Couriers based on time and distance for the delivery. Therefore, we earn a variable amount on a transaction and may realize a loss on the transaction. We typically receive the service fee within a short period of time following the completion of a delivery.

*Freight*

We derive our Freight revenue from freight transportation services provided to Shippers. With the acquisition of Tupelo Parent, Inc. ("Transplace") during the fourth quarter of 2021, our Freight revenue also includes revenue from transportation management. Refer to Note 18 – Business Combinations for further information on the Transplace acquisition.

*Brokerage*

Brokerage revenue represents the gross amount of fees charged to Shippers for our services because we control the service provided to customers. Costs incurred with carriers for Brokerage are recorded in cost of revenue. Shippers contract with us to utilize our network of independent freight carriers to transport freight. We enter into contracts with Shippers that define the price for each shipment and payment terms. Our acceptance of the shipment request establishes enforceable rights and obligations for each contract. By accepting the Shipper's order, we have responsibility for transportation of the shipment from origin to destination. We enter into separate contracts with independent freight carriers and are responsible for prompt payment of freight charges to the carrier regardless of payment by the Shipper. We invoice the Shipper upon satisfaction of our sole performance obligation to transport a Shipper's freight using our network of independent freight carriers. We recognize revenue associated with our performance obligation over the contract term, which represents our performance over the period of time a shipment is in transit. While the transit period of our contracts can vary based on origin and destination, contracts still in transit at period end are not material. Payment for our services is generally due within 30 to 45 days upon receipt of invoice.

*Transportation Management*

We provide an integrated logistics and transportation service, which can include shipment planning, freight optimization, carrier assignment, load management, freight audit and payment processing and other related transportation services. Our sole performance obligation in these contracts is the integration of these services to transport the Shipper's freight on a shipment-by-shipment basis. The majority of our transportation management revenue is recognized on a gross basis in the amount of gross fees charged to Shippers upon satisfaction of our performance obligation because we control the service provided to customers. Costs incurred with carriers for these transactions are recorded in cost of revenue. In transactions where we do not control the service provided to customers, we recognize revenue on a net basis. Revenue is recognized as our performance obligation is satisfied, which generally represents the transit period from origin to destination by a third-party carrier. While the transit period of our contracts can vary based on origin and destination, contracts still in transit at period end are not material. Payment for our services is generally due within 30 to 60 days upon completion of our performance obligation.

*Principal vs. Agent Considerations*

Judgment is required in determining whether we are the principal or agent in transactions with Shippers. For each contract entered into with a Shipper where we are responsible for identifying and directing independent freight carriers to transport the Shipper's goods, we control the service before it is transferred to the Shipper. We are primarily responsible for fulfilling the contract with the Shipper, including having discretion in selecting a qualified independent freight carrier that meets the Shipper's specifications. We also have pricing discretion and negotiate separately the price(s) charged to Shippers and amounts paid to carriers. Accordingly, we are the principal in these transactions. In certain arrangements, we do not control the service provided to customers and recognize the related revenue on a net basis. Contracts where we do not control the service before it is transferred to the Shipper are not material for the years ended December 31, 2019, 2020 and 2021.

89

*All Other Revenue*

*E-Bikes and E-Scooters*

Prior to the second quarter of 2020, All Other revenue (formerly our Other Bets segment) consisted primarily of revenue from New Mobility products, which were derived from operating leases as defined within ASC 842. New Mobility refers to offerings and products that provided users access to rides through a variety of modes, including dockless e-bikes and e-scooters ("New Mobility"). Users contracted with us via a rental agreement at the inception of each trip. We were responsible for providing access to the e-bikes and e-scooters over the user's desired period of use. We recorded lease payments received upon completion of each trip. After the JUMP Divestiture during the second quarter of 2020, revenue from New Mobility products, including dockless e-bikes, was no longer material. Refer to Note 19 – Divestitures for further information on the JUMP Divestiture.

*Advanced Technologies Group ("ATG") and Other Technology Programs Collaboration Revenue*

In 2019, we entered into a three-year joint collaboration agreement with certain third parties to develop next–generation self-driving technology. Under this collaboration agreement, we received cash consideration over the three-year term. We have applied ASC 808, Collaborative Arrangements for recognition and presentation of the consideration received as collaboration revenue. Refer to Note 17 – Non-Controlling Interests for further information.

*Incentives to Customers*

Incentives provided to customers are recorded as a reduction of revenue if we do not receive a distinct good or service or cannot reasonably estimate the fair value of the good or service received. Incentives to customers that are not provided in exchange for a distinct good or service are evaluated as variable consideration, in the most likely amount to be earned by the customer at the time or as they are earned by customers, depending on the type of incentive. Since incentives are earned over a short period of time, there is limited uncertainty when estimating variable consideration.

Incentives earned by customers for referring new customers are paid in exchange for a distinct service and are accounted for as customer acquisition costs. We expense such referral payments as incurred in sales and marketing expenses in the consolidated statements of operations. We apply the practical expedient under ASC 340-40-25-4 and expense costs to acquire new customer contracts as incurred because the amortization period would be one year or less. The amount recorded as an expense is the lesser of the amount of the incentive paid or the established fair value of the service received. Fair value of the service is established using amounts paid to vendors for similar services. The amounts paid to customers presented as sales and marketing expenses for the years ended December 31, 2019, 2020 and 2021 were immaterial.

In some transactions, incentives and payments made to customers may exceed the revenue earned in the transaction. In these transactions, the resulting shortfall amount is recorded as a reduction of revenue.

*Advertising Revenue*

We derive the majority of our advertising revenue from sponsored listing fees paid by merchants and brands in exchange for advertising on our platform. Advertising revenue is recognized when an end-user engages with the sponsored listing based on the number of clicks. Revenue is presented on a gross basis in the amount billed to merchants as we control the advertisement before it is transferred to the end-user.

*End-User Discounts and Promotions*

We offer discounts and promotions to end-users (that are not our customers) to encourage use of our platform. These are offered in various forms of discounts and promotions and include:

*Targeted end-user discounts and promotions:* These discounts and promotions are offered to a limited number of end-users in a market to acquire, re-engage, or generally increase end-users use of the Platform, and are akin to a coupon. An example is an offer providing a discount on a limited number of rides or meal deliveries during a limited time period. We record the cost of these discounts and promotions to end-users who are not our customers as sales and marketing expenses at the time they are redeemed by the end-user.

*End-user referrals:* These referrals are earned when an existing end-user (the referring end-user) refers a new end-user (the referred end-user) to the platform and the new end-user who is not our customer takes their first ride on the platform. These referrals are typically paid in the form of a credit given to the referring end-user. These referrals are offered to attract new end-users to the Platform. We record the liability for these referrals and corresponding expenses as sales and marketing expenses at the time the referral is earned by the referring end-user.

*Market-wide promotions:* These promotions are pricing actions in the form of discounts that reduce the end-user fare charged by Drivers and Merchants to end-users who are not our customers for all or substantially all Mobility or meal deliveries in a specific market. This also includes any discounts offered under our subscription offerings and certain discounts within the Uber Rewards programs, which enable End-users to receive a fixed fare or a discount on all eligible rides. Accordingly, we record the cost of these promotions as a reduction of revenue at the time the transaction is completed.

90

*Refunds*

We record refunds to end-users that we recover from Drivers and Merchants as a reduction of revenue. Refunds to end-users due to end-user dissatisfaction with the Platform are recorded as marketing expenses and reduce the accounts receivable amount associated with the corresponding transaction.

*Other*

We have elected to exclude from revenue, taxes assessed by a governmental authority that are both imposed on and are concurrent with specific revenue producing transactions, and collected from Drivers, Merchants and end-users and remitted to governmental authorities. Accordingly, such amounts are not included as a component of revenue or cost of revenue.

*Practical Expedients*

We have utilized the practical expedient available under ASC 606-10-50-14 and do not disclose the value of unsatisfied performance obligations for contracts with an original expected length of one year or less. We have no significant financing components in our contracts with customers.

**Stock-Based Compensation**

We account for stock-based compensation expense in accordance with the fair value recognition and measurement provisions of GAAP, which requires compensation cost for the grant-date fair value of stock-based awards to be recognized over the requisite service period. We account for forfeitures when they occur. The fair value of stock-based awards, granted or modified, is determined on the grant date (or modification or acquisition dates, if applicable) at fair value, using appropriate valuation techniques.

*Service-Based Awards*

We record stock-based compensation expense for service-based stock options and restricted stock units ("RSU(s)") on a straight-line basis over the requisite service period, which is generally four years.

For stock options with service-based vesting conditions only and stock purchase rights provided under our employee stock purchase plan, the valuation model, typically the Black-Scholes option-pricing model, incorporates various assumptions including expected stock price volatility, expected term and risk-free interest rates. We estimate the volatility of common stock on the date of grant based on the weighted-average historical stock price volatility of our own shares or comparable publicly traded companies in our industry group. The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant with a term equal to the expected term. We estimate the expected term based on the simplified method for employee stock options considered to be "plain vanilla" options, as our historical share option exercise experience does not provide a reasonable basis upon which to estimate the expected term. We estimate the expected term for non-employees' options based on the contractual term. U.S. The expected dividend yield is 0.0% as we have not paid and do not anticipate paying dividends on our common stock.

*Performance-Based Awards*

We have granted restricted common stock awards ("RSA(s)"), RSUs, stock appreciation rights ("SAR(s)"), stock options, and warrants that vest upon the satisfaction of both service-based and performance-based conditions. The service-based condition for these awards generally is satisfied over four years. The performance-based conditions generally are satisfied upon achieving specified performance targets, such as our financial or operating metrics, and/or the occurrence of a qualifying event, defined as the earlier of (i) the closing of certain specific liquidation or change in control transactions, or (ii) an initial public offering ("IPO"). We record stock-based compensation expense for performance-based equity awards such as RSAs, RSUs, SARs, and stock options on an accelerated attribution method over the requisite service period, which is generally four years, and only if performance-based conditions are considered probable to be satisfied.

Prior to our IPO in May 2019, we had not recognized stock-based compensation expense for awards with performance-based conditions which include a qualifying event because the qualifying event described above had not yet occurred and was not considered probable. Upon the IPO, we recorded a cumulative one-time stock-based compensation expense of $3.6 billion, determined using the grant-date fair values. Stock-based compensation related to remaining service-based awards after the IPO is recorded over the remaining requisite service period. Refer to Note 11 – Stockholders' Equity for further information on our IPO.

For performance-based awards and RSUs, we determine the grant-date fair value to be the fair value of our common stock on the grant date.

For performance-based SARs, stock options, and warrants, we determine the grant-date fair value utilizing the valuation model as described above for service-based awards.

91

*Market-Based Awards*

We have granted RSUs and stock options that vest only upon the satisfaction of all the following conditions: service-based service conditions, performance-based conditions, and/or market-based conditions. The service-based condition for these awards generally is satisfied over four years. The performance-based conditions generally are satisfied upon achieving specified performance targets, such as the occurrence of a qualifying event, as described above for performance-based awards. The market-based conditions are satisfied upon our achievement of specified fully-diluted equity values, as determined based on our stock price.

For market-based awards, we determine the grant-date fair value utilizing a Monte Carlo valuation model, which incorporates various assumptions including expected stock price volatility, expected term, risk-free interest rates, expected date of a qualifying event, and expected capital raise percentage. We estimate the volatility of common stock on the date of grant based on the weighted-average historical stock price volatility of comparable publicly-traded companies in its industry group. We estimate the expected term based on various exercise scenarios. The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant. Prior to our IPO in May 2019, we estimated the expected date of a qualifying event based on third-party valuations of our common stock and estimated the expected capital raise percentage based on management's expectations at the time of measurement of the award's value.

We record stock-based compensation expense for market-based equity awards such as RSUs and stock options on an accelerated attribution method over the requisite service period, and only if performance-based conditions are considered probable to be satisfied. We determine the requisite service period by comparing the derived service period to achieve the market-based condition and the explicit service-based period, using the longer of the two service periods as the requisite service period.

*Employee Stock Purchase Plan ("ESPP")*

We recognize stock-based expenses related to shares issued pursuant to our 2019 ESPP on a straight-line basis over the offering period. The ESPP provides for twelve-month offering periods, and each offering period includes two purchase periods of approximately six months. The ESPP allows eligible employees to purchase shares of our common stock at a 15 percent discount on the lower price of either (i) the offering period begin date or (ii) the purchase date. We estimate the fair value of shares to be issued under the ESPP based on a combination of options valued using the Black-Scholes option-pricing model. In 2019, we determine volatility over an expected term of six months based on our historical volatility and twelve months based on the average of our historical volatility and our peer group. In 2020 and 2021, we determine volatility over an expected term of six months and twelve months based on our historical volatility. We estimate the expected term based on the contractual term.

*Common Stock Fair Value*

Subsequent to our IPO in May 2019, the fair value of common stock was determined on the grant date using the closing price of our common stock.

Prior to our IPO, the absence of an active market for our common stock required the Board of Directors, the members of which we believe have extensive business, finance and venture capital experience, to determine the fair value of our common stock for purposes of granting stock-based awards and for calculating stock-based compensation expense. We obtained contemporaneous third-party valuations to assist the Board of Directors in determining fair value. These contemporaneous third-party valuations used the methodologies, approaches and assumptions consistent with the American Institute of Certified Public Accountants Practice Guide, *Valuation of Privately-Held-Company Equity Securities Issued as Compensation*.

**Income Taxes**

We account for income taxes using the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in our consolidated financial statements.

We account for uncertainty in tax positions recognized in the consolidated financial statements by recognizing a tax benefit from an uncertain tax position when it is more likely than not that the position will be sustained upon examination, including resolutions of any related appeals or litigation processes, based on the technical merits. Income tax positions must meet a more-likely-than-not recognition threshold at the effective date to be recognized.

We recognize accrued interest and penalties related to unrecognized tax benefits in the provision for (benefit from) income taxes in the consolidated statements of operations.

Valuation allowances are established when necessary to reduce deferred tax assets to the amounts that are more-likely-than-not expected to be realized based on the weighting of positive and negative evidence. Future realization of deferred tax assets ultimately depends on the existence of sufficient taxable income of the appropriate character (for example, ordinary income or capital gain) within the carryback or carryforward periods available under the applicable tax law. We regularly review the deferred tax assets for recoverability based on historical taxable income, projected future taxable income, the expected timing of the reversals of existing temporary differences and tax planning strategies. Our judgment regarding future profitability may change due to many factors, including future market conditions and the ability to successfully execute the business plans and/or tax planning strategies. Should there be a change in the ability to recover deferred tax assets, our income tax provision would increase or decrease in the period in

which the assessment is changed. We elected the tax law ordering approach in assessing the realizability of net operating losses expected to offset future Global Intangible Low-taxed Income ("GILTI").

We have elected to treat any potential GILTI inclusions as a period cost.

The establishment of deferred tax assets from intra-entity transfers of intangible assets requires management to make significant estimates and assumptions to determine the fair value of such intangible assets. Significant estimates in valuing intangible assets may include, but are not necessarily limited to, internal revenue and expense forecasts, the estimated life of the intangible assets, comparable transaction values, and/or discount rates. The discount rates used to discount expected future cash flows to present value are derived from a weighted-average cost of capital analysis and are adjusted to reflect the inherent risks related to the cash flow. Although we believe the assumptions and estimates utilized are reasonable and appropriate, they are based, in part, on historical experience, internal and external comparable data and are inherently uncertain. Unanticipated events and circumstances may occur that could affect either the accuracy or validity of such assumptions, estimates or actual results.

### Expenses

Set forth below is a brief description of the components of our expenses:

- *Cost of revenue, exclusive of depreciation and amortization,* primarily consists of certain insurance costs related to our Mobility and Delivery offerings, credit card processing fees, bank fees, data center and networking expenses, mobile device and service costs, costs incurred for certain Delivery transactions where we are primarily responsible for delivery services and pay Couriers for services provided, costs incurred with carriers for Uber Freight transportation services, amounts related to fare chargebacks and other credit card losses.

- *Operations and support expenses* primarily consist of compensation costs, including stock-based compensation, for employees that support operations in cities, including the general managers, Driver operations, platform user support representatives and community managers. Also included is the cost of customer support, Driver background checks and the allocation of certain corporate costs.

- *Sales and marketing expenses* primarily consist of compensation costs, including stock-based compensation to sales and marketing employees, advertising costs, product marketing costs and discounts, loyalty programs, promotions, refunds, and credits provided to end-users who are not customers, and the allocation of certain corporate costs. We expense advertising and other promotional expenditures as incurred. Advertising expenses totaled $1.3 billion, $1.0 billion and $1.7 billion for the years ended December 31, 2019, 2020 and 2021, respectively. Discounts, loyalty programs, promotions, refunds, and credits provided to end-users who are not customers totaled $2.5 billion, $2.0 billion, and $2.4 billion for the years ended December 31, 2019, 2020 and 2021, respectively.

- *Research and development expenses* primarily consist of compensation costs, including stock-based compensation, for employees in engineering, design and product development. Expenses includes ATG and Other Technology Programs development expenses prior to the divestiture of our ATG business in January 2021, as well as expenses associated with ongoing improvements to, and maintenance of, existing products and services, and allocation of certain corporate costs.

- *General and administrative expenses* primarily consist of compensation costs, including stock-based compensation, for executive management and administrative employees, including finance and accounting, human resources, policy and communications, legal, and certain impairment charges, as well as allocation of certain corporate costs, occupancy, and general corporate insurance costs. General and administrative expenses also include certain legal settlements.

- *Depreciation and amortization expenses* primarily consist of depreciation on buildings, site improvements, computer and network equipment, software, leasehold improvements, furniture and fixtures, and amortization of intangible assets.

### Restructuring and Related Charges

Costs associated with management-approved restructuring activities, including reductions in headcount, exiting a market or consolidation of facilities are recognized when they are incurred and may include employee termination benefits, impairment of long-lived assets (including impairment of operating lease right-of-use assets), contract termination costs and accelerated lease cost for right-of-use assets that ceased to be used. We record a liability for employee termination benefits either when it is probable that an employee is entitled to them and the amount of the benefits can be reasonably estimated or when management has communicated the termination plan to employees and all of the following conditions have been met: management, having the authority to approve the action, commits to a plan of termination; the plan identifies the number of employees to be terminated, their job classifications and their locations, and the expected completion date; the plan establishes the terms of the benefit arrangement in sufficient detail to enable employees to determine the type and amount of benefits they will receive if they are involuntarily terminated; and actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn. We accrue for costs to terminate contracts other than a lease when we terminate the contract in accordance with the contract terms. Costs that will continue to be incurred for the remaining term of a contract that is not a lease, and provide no economic benefits to us are recognized at the cease-use date. Costs associated with lease contracts are accounted for under the leasing accounting guidance or under the long-lived assets accounting guidance.

93

Restructuring and related charges are recognized as an operating expense within the consolidated statements of operations and are classified based on our classification policy for each category of operating expense. Personnel costs are classified based on each employee's classification, lease costs (including impairments of right-of-use assets) are classified in the same expense line item where each lease's rent expense was recognized and impairment of other long-lived assets are recorded within general and administrative expenses.

### Foreign Currency

The functional currency of our foreign subsidiaries is the local currency or U.S. dollar depending on the nature of the subsidiaries' activities. Monetary assets and liabilities, and transactions denominated in currencies other than the functional currency are remeasured to the functional currency at the exchange rate in effect at the end of the period and are recorded in the current period consolidated statement of operations. Gains and losses resulting from remeasurement are recorded in foreign exchange gains (losses), net within other income (expense), net in the consolidated statements of operations. Subsidiary assets and liabilities with non-U.S. dollar functional currencies are translated at the month-end rate, retained earnings and other equity items are translated at historical rates, and revenues and expenses are translated at average exchange rates during the year. Cumulative translation adjustments are recorded within accumulated other comprehensive income (loss), a separate component of total equity (deficit).

### Net Income (Loss) Per Share Attributable to Common Stockholders

We compute net income (loss) per share using the two-class method required for participating securities. The two-class method requires income available to common stockholders for the period to be allocated between common stock and participating securities based upon their respective rights to receive dividends as if all income for the period had been distributed.

Our restricted common stock, and common stock issued upon early exercise of stock options are participating securities. We consider restricted common stock and any shares issued upon early exercise of stock options, subject to repurchase, to be participating securities because holders of such shares have non-forfeitable dividend rights in the event a cash dividend is declared on common stock.

Prior to conversion to common stock upon our IPO, the holders of the redeemable convertible preferred stock would have been entitled to dividends in preference to common shareholders, at specified rates, if declared. Then any remaining earnings would be distributed to the holders of common stock, restricted common stock, common stock issued upon early exercise of stock options, and the holders of the redeemable convertible preferred stock on a pro-rata basis assuming conversion of all redeemable convertible preferred stock into common stock. These participating securities did not contractually require the holders of such shares to participate in our losses.

### Insurance Reserves

We use a combination of third-party insurance and self-insurance mechanisms, including a wholly-owned captive insurance subsidiary, to provide for the potential liabilities for certain risks, including auto liability, uninsured and underinsured motorist, auto physical damage, general liability, and workers' compensation. The insurance reserves is the liability for unpaid losses and loss adjustment expenses, which represents the estimate of the ultimate unpaid obligation for risks retained by us and includes an amount for case reserves related to reported claims and an amount for losses incurred but not reported as of the balance sheet date. The estimate of the ultimate unpaid obligation utilizes generally accepted actuarial methods applied to historical claim and loss experience. In addition, we use assumptions based on actuarial judgment related to claim and loss development patterns and expected loss costs, which consider frequency trends, severity trends, and relevant industry data. These reserves are continually reviewed and adjusted as experience develops and new information becomes known. Adjustments, if any, relating to accidents that occurred in prior years are reflected in the current year results of operations. Reserve amounts estimated to be settled within one year are recorded in short-term insurance reserves, with longer term settlements recorded in long-term insurance reserves on the consolidated balance sheets.

While management believes that the insurance reserve amount is adequate, the ultimate liability may be in excess of, or less than, the amount provided. All estimates of ultimate losses and allocated loss adjustment expenses, and of resulting reserves, are subject to inherent variability caused by the nature of the insurance claim settlement process. Such variability is increased for us due to limited historical experience and the nature of the coverage provided. Actual results depend upon the outcome of future contingent events and can be affected by many factors, such as claims settlement processes and changes in the economic, legal, and social environments. As a result, the net amounts that will ultimately be paid to settle the liability and when these amounts will be paid may vary from the estimate provided on the consolidated balance sheets.

### Loss Contingencies

We are involved in legal proceedings, claims, and regulatory, indirect tax examinations or government inquiries and investigations that may arise in the ordinary course of business. Certain of these matters include speculative claims for substantial or indeterminate amounts of damages. We record a liability when we believe that it is both probable that a loss has been incurred and the amount can be reasonably estimated. If we determine that a loss is reasonably possible and the loss or range of loss can be reasonably estimated, we disclose the possible loss in the consolidated financial statements.

94

We review the developments in our contingencies that could affect the amount of the provisions that have been previously recorded, and the matters and related reasonably possible losses disclosed. We make adjustments to our provisions and changes to our disclosures accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information. Significant judgment is required to determine both the probability and the estimated amount of loss.

The outcomes of litigation, indirect tax examinations and investigations are inherently uncertain. Therefore, if one or more of these matters were resolved against us for amounts in excess of management's expectations, our results of operations, financial condition, or cash flows, including in a particular reporting period in which any such outcome becomes probable and estimable, could be materially adversely affected.

We recognize estimated losses from contingencies that relate to proceedings in which Drivers are the plaintiffs, or proceedings and regulatory penalties against Drivers for which we elect to either pay on behalf of or reimburse Drivers, as a reduction of revenue in the consolidated statements of operations. All other estimated losses from contingencies are recognized in general and administrative expenses.

Legal fees and other costs associated with such actions are expensed as incurred.

*Recently Adopted Accounting Pronouncements*

In January 2020, the FASB issued ASU 2020-01, "Investments-Equity Securities (Topic 321), Investments—Equity Method and Joint Ventures (Topic 323), and Derivatives and Hedging (Topic 815): Clarifying the Interactions between Topic 321, Topic 323, and Topic 815," which clarifies the interaction of the accounting for equity investments under Topic 321 and investments accounted for under the equity method of accounting in Topic 323 and the accounting for certain forward contracts and purchased options accounted for under Topic 815. We adopted the new standard on January 1, 2021 on a prospective basis. The adoption of the new standard did not have a material impact on our consolidated financial statements.

In August 2020, the FASB issued ASU 2020-06, "Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity," which reduced the number of models used to account for convertible instruments, amends the accounting for certain contracts in an entity's own equity that would have been previously been accounted for as derivatives and modifies the diluted earnings per share calculations for convertible instruments. We early adopted the new standard on January 1, 2021 on a modified retrospective basis. Refer to Note 8 – Long-Term Debt and Revolving Credit Arrangements for the impact of adoption on our 2025 Convertible Notes and Note 13 – Net Income (Loss) Per Share for the impact on our earnings per share calculation.

*Recently Issued Accounting Pronouncements Not Yet Adopted*

In October 2021, the FASB issued ASU 2021-08, "Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers," which requires entities to apply Topic 606 to recognize and measure contract assets and contract liabilities in a business combination as if it had originated the contracts. The standard is effective for public companies for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2022. Early adoption is permitted. We are currently evaluating the impact of this accounting standard update on our consolidated financial statements.

In November 2021, the FASB issued ASU 2021-10, "Government Assistance (Topic 832): Disclosures by Business Entities about Government Assistance," which requires disclosures about transactions with a government that are accounted for by applying a grant or contribution accounting model by analogy. The standard is effective for public companies for fiscal years beginning after December 15, 2021. Early adoption is permitted. We are currently evaluating the impact of this accounting standard update on our consolidated financial statements.

P-02346-0097

**Note 2 – Revenue**

The following tables present our revenues disaggregated by offering and geographical region. Revenue by geographical region is based on where the transaction occurred. This level of disaggregation takes into consideration how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors. Revenue is presented in the following tables for the years ended December 31, 2019, 2020 and 2021, respectively (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2020** | **2021** |
| Mobility revenue [1] | $ 10,707 | $ 6,089 | $ 6,953 |
| Delivery revenue [1] | 1,401 | 3,904 | 8,362 |
| Freight revenue | 731 | 1,011 | 2,132 |
| All Other revenue | 161 | 135 | 8 |
| **Total revenue** | $ 13,000 | $ 11,139 | $ 17,455 |

[1] We offer subscription memberships to end-users including Uber One, Uber Pass, Rides Pass, and Eats Pass ("Subscription"). We recognize Subscription fees ratably over the life of the pass. We allocate Subscription fees earned to Mobility and Delivery revenue on a proportional basis, based on usage for each offering during the respective period.

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2020** | **2021** |
| United States and Canada | $ 8,465 | $ 6,611 | $ 10,094 |
| Latin America ("LatAm") | 1,862 | 1,295 | 1,417 |
| Europe, Middle East and Africa ("EMEA") | 1,852 | 2,086 | 3,213 |
| Asia Pacific ("APAC") | 821 | 1,147 | 2,731 |
| **Total revenue** | $ 13,000 | $ 11,139 | $ 17,455 |

***Revenue***

*Mobility Revenue*

We derive revenue primarily from fees paid by Mobility Drivers for the use of our platform(s) and related services to facilitate and complete Mobility services and, in certain markets, revenue from fees paid by end-users for connection services obtained via the platform. Mobility revenue also includes immaterial revenue streams such as our financial partnerships products and Vehicle Solutions. Vehicle Solutions revenue is accounted for as an operating lease as defined under ASC 842.

*Delivery Revenue*

We derive revenue for Delivery from Merchants' and Couriers' use of the Delivery platform and related service to facilitate and complete Delivery transactions. Additionally, in certain markets where we are responsible for delivery services, delivery fees charged to end-users are also included in revenue, while payments to Couriers in exchange for delivery services are recognized in cost of revenue. Delivery also includes advertising revenue from sponsored listing fees paid by merchants and brands in exchange for advertising services.

*Freight Revenue*

Freight revenue consists of revenue from freight transportation services provided to shippers. During the fourth quarter of 2021, we completed the acquisition of Transplace, and our Freight revenue also includes revenue from transportation management. Refer to Note 18 – Business Combinations for further information on the Transplace acquisition.

*All Other Revenue*

All Other revenue primarily includes collaboration revenue related to our ATG business and revenue from our New Mobility offerings and products.

ATG collaboration revenue was related to a three-year joint collaboration agreement we entered into in 2019. During the first quarter of 2021, we completed the sale of Apparate USA LLC ("Apparate" or the "ATG Business") to Aurora Innovation, Inc. ("Aurora"). Refer to Note 19 – Divestitures for further information.

New Mobility offerings and products provided users access to rides through a variety of modes, including dockless e-bikes and e-scooters ("New Mobility"), platform incubator group offerings and other immaterial revenue streams. New Mobility revenue is accounted for as an operating lease as defined under ASC 842. After the JUMP divestiture during the second quarter of 2020, revenue from New Mobility products, including dockless e-bikes, was no longer material.

96

*Contract Balances and Remaining Performance Obligation*

Contract liabilities represent consideration collected prior to satisfying our performance obligations. As of December 31, 2021, we had $167 million of contract liabilities included in accrued and other current liabilities as well as other long-term liabilities on the consolidated balance sheet. Revenue recognized from these contract liabilities during 2019, 2020 and 2021 was not material.

Our remaining performance obligation for contracts with an original expected length of greater than one year is expected to be recognized as follows (in millions):

| | Less Than or Equal To 12 Months | Greater Than 12 Months | Total |
|---|---|---|---|
| As of December 31, 2021 | $ 26 | $ 131 | $ 157 |

## Note 3 – Investments and Fair Value Measurement

*Investments*

Our investments on the consolidated balance sheets consisted of the following as of December 31, 2020 and 2021 (in millions):

| | As of December 31, | |
|---|---|---|
| | 2020 | 2021 |
| Classified as short-term investments: | | |
| *Marketable debt securities* [1]*:* | | |
| Commercial paper | $ 457 | $ — |
| U.S. government and agency securities | 429 | — |
| Corporate bonds | 294 | — |
| Short-term investments | $ 1,180 | $ — |
| | | |
| Classified as investments: | | |
| *Non-marketable equity securities:* | | |
| Didi | $ 6,299 | $ — |
| Other [2] | 329 | 315 |
| *Non-marketable debt securities:* | | |
| Grab | 2,341 | — |
| *Marketable equity securities* | | |
| Didi | — | 2,838 |
| Grab | — | 3,821 |
| Aurora | — | 3,388 |
| Other | — | 1,312 |
| *Notes receivable from a related party* [2], [3] | 83 | 132 |
| Investments | $ 9,052 | $ 11,806 |

[1] Excluding marketable debt securities classified as cash equivalents and restricted cash equivalents.

[2] These balances include certain investments recorded at fair value with changes in fair value recorded in earnings due to the election of the fair value option of accounting for financial instruments.

[3] Consists of the Lime Convertible Note. Neutron Holdings, Inc. ("Lime") is considered a related party as a result of our investment in Lime Common Stock. For further information, see the section titled "2020 Lime Investments" below and Note 19 – Divestitures.

97

*Assets and Liabilities Measured at Fair Value on a Recurring Basis*

The following table presents our financial assets and liabilities measured at fair value on a recurring basis based on the three-tier fair value hierarchy (in millions):

| | As of December 31, 2020 | | | | As of December 31, 2021 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| **Financial Assets** | | | | | | | | |
| Money market funds | $ 2,386 | $ — | $ — | $ 2,386 | $ — | $ — | $ — | $ — |
| Commercial paper | — | 611 | — | 611 | — | — | — | — |
| U.S. government and agency securities | — | 542 | — | 542 | — | — | — | — |
| Corporate bonds | — | 323 | — | 323 | — | — | — | — |
| Non-marketable debt securities | — | — | 2,341 | 2,341 | — | — | — | — |
| Non-marketable equity securities | — | — | 52 | 52 | — | — | 32 | 32 |
| Marketable equity securities | — | — | — | — | 11,359 | — | — | 11,359 |
| Notes receivable from a related party | — | — | 83 | 83 | — | — | 132 | 132 |
| Total financial assets | $ 2,386 | $ 1,476 | $ 2,476 | $ 6,338 | $ 11,359 | $ — | $ 164 | $ 11,523 |
| **Financial Liabilities** | | | | | | | | |
| MLU B.V. Call Option [1] | $ — | $ — | $ — | $ — | $ — | $ — | $ 193 | $ 193 |
| Total financial liabilities | $ — | $ — | $ — | $ — | $ — | $ — | $ 193 | $ 193 |

[1] For further information, see Note 4 - Equity Method Investments.

The following table summarizes the amortized cost, unrealized gains and losses, allowance for credit loss, and fair value of our debt securities at fair value on a recurring basis (in millions):

| | As of December 31, 2020 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Amortized Cost | Unrealized Gains | Unrealized Losses | Allowance for Credit Loss | Fair Value |
| Commercial paper | $ 611 | $ — | $ — | $ — | $ 611 |
| U.S. government and agency securities | 542 | — | — | — | 542 |
| Corporate bonds | 322 | 1 | — | — | 323 |
| Non-marketable debt securities | 2,281 | 60 | — | — | 2,341 |
| Total | $ 3,756 | $ 61 | $ — | $ — | $ 3,817 |

The following table presents information about the allowance for credit losses on debt securities (in millions):

| | Non-marketable Debt Securities |
| --- | --- |
| **Balance as of January 1, 2020** | $ — |
| Impact due to adoption of ASU 2016-13 | — |
| Credit losses on securities for which credit losses were not previously recorded | (173) |
| Decrease to allowance for credit loss previously recorded | 173 |
| **Balance as of December 31, 2020** | $ — |

We measure our cash equivalents and certain investments at fair value. Level 1 instrument valuations are based on quoted market prices of the identical underlying security. Level 2 instrument valuations are obtained from readily available pricing sources for comparable instruments, identical instruments in less active markets, or models using market observable inputs. Level 3 instrument valuations are valued based on unobservable inputs and other estimation techniques due to the absence of quoted market prices, inherent lack of liquidity and the long-term nature of such financial instruments.

Our Level 3 non-marketable debt securities and non-marketable equity securities as of December 31, 2020 and 2021 primarily consist of common stock investments and redeemable preferred stock investments in privately held companies without readily determinable fair values.

Depending on the investee's financing activity in a reporting period, management's estimate of fair value may be primarily derived from the investee's financing transactions, such as the issuance of preferred stock to new investors. The price in these transactions generally provides the best indication of the enterprise value of the investee. Additionally, based on the timing, volume, and other characteristics of the transaction, we may supplement this information by using other valuation techniques, including the

98

guideline public company approach. The guideline public company approach relies on publicly available market data of comparable companies and uses comparative valuation multiples of the investee's revenue (actual and forecasted), and therefore, unobservable input used in this valuation technique primarily consists of short-term revenue projections.

Once the fair value of the investee is estimated, an option-pricing model ("OPM"), a common stock equivalent ("CSE") method or a hybrid approach is employed to allocate value to various classes of securities of the investee, including the class owned by us. The model involves making assumptions around the investees' expected time to liquidity and volatility.

An increase or decrease in any of the unobservable inputs in isolation, such as the security price in a significant financing transaction of the investee, could result in a material increase or decrease in our estimate of fair value. Other unobservable inputs, including short-term revenue projections, time to liquidity, and volatility are less sensitive to the valuation in the respective reporting periods, as a result of the primary weighting on the investee's financing transactions. In the future, depending on the weight of evidence and valuation approaches used, these or other inputs may have a more significant impact on our estimate of fair value.

We determine realized gains or losses on the sale of equity and debt securities on a specific identification method.

*Didi Investment*

On June 30, 2021, Didi started trading on the New York Stock Exchange. Accordingly, our investment in preferred shares of Didi, which was previously accounted for under the measurement alternative on a non-recurring basis, was converted to ordinary shares with a readily determinable fair value and therefore changed to an investment measured at fair value on a recurring basis. As of December 31, 2021, our Didi investment is classified as a marketable equity security with a readily determinable fair value (Level 1) in the table presenting our financial assets and liabilities measured at fair value on a recurring basis. For the year ended December 31, 2021, we recognized an unrealized loss of $3.0 billion on this investment in other income (expense), net in our consolidated statements of operations.

*Zomato Investment*

In July 2021, Zomato Media Private Limited ("Zomato"), in which we held preferred shares that were previously classified as non-marketable equity securities and accounted for under the measurement alternative on a non-recurring basis, completed its IPO in India. Accordingly, our Zomato investment has been converted to ordinary shares upon the completion of the IPO and is classified as a marketable equity security with a readily determinable fair value (Level 1) in the table presenting our financial assets and liabilities measured at fair value on a recurring basis at December 31, 2021. During the year ended December 31, 2021, we recognized an unrealized gain of $991 million on this investment in other income (expense), net in our consolidated statement of operations. As of December 31, 2021, the carrying value of the investment was $1.1 billion. Our investment is subject to a lock-up period in which our ability to sell is restricted until July 2022.

*Aurora Investment*

On January 19, 2021, we completed the sale of our ATG Business to Aurora. As consideration for the sale of our ATG Business to Aurora, we received common stock in Aurora. Concurrently, we invested in Aurora's preferred stock. For further information, refer to Note 19 – Divestitures.

We held one seat on Aurora's board of directors and had the ability to hold a second seat, which, along with our common and preferred stock ownership (our "Aurora Investments") generate significant influence. We elected to apply the fair value option to our Aurora common stock and preferred stock investments in order to provide consistency of accounting treatment to our Aurora Investments. The Aurora Investments are measured at fair value on a recurring basis with changes in fair value reflected in other income (expense), net, in the consolidated statements of operations.

On November 3, 2021, Aurora completed its planned special purpose acquisition company ("SPAC") merger with Reinvent Technology Partners Y, resulting in Aurora becoming a publicly traded company post combination. Upon the completion of the merger, all of our Aurora Investments converted into shares of the newly issued Class A common stock of the publicly traded company. In addition, our ownership was significantly diluted and we lost the ability to appoint a second seat on Aurora's board of directors. As a result, we no longer held significant influence over Aurora. As of December 31, 2021, our Aurora Investment has been classified as a marketable equity security with a readily determinable fair value (Level 1) in the table presenting our financial assets and liabilities measured at fair value on a recurring basis.

We recognized an unrealized gain of $1.6 billion on this investment in other income (expense), net in our consolidated statement of operations for the year ended December 31, 2021.

99

Summarized financial information for Aurora for the nine months ended September 30, 2021, the most recent period available, is as follows (in millions):

| Results of Operations Data | Nine Months Ended September 30, 2021 |
|---|---|
| Revenue | $ 55 |
| Total operating expenses | 557 |
| Loss from operations | (502) |
| Net loss | (504) |

| Balance Sheet Data | As of September 30, 2021 |
|---|---|
| Current assets | $ 665 |
| Total assets | 2,671 |
| Current liabilities | 75 |
| Total liabilities | 219 |
| Redeemable convertible preferred stock | 2,161 |

*Grab Investment*

On December 1, 2021, Grab completed its planned SPAC merger with Altimeter Growth Corporation, resulting in Grab becoming a publicly traded company post combination. Upon the completion of the merger, our investment in Series G preferred shares of Grab, which was previously accounted for as an investment in an available-for-sale debt security due to the redemption feature of the shares, converted into the newly issued Class A ordinary shares of the publicly traded company. We recorded the fair value of our investment with changes in the fair value recorded in other comprehensive income (loss), net of tax through the date of the conversion. Upon the conversion, we released the accumulative pre-tax unrealized gains on the investment of $2.8 billion recorded through other comprehensive income and recognized them as unrealized gains in other income (expense), net in our consolidated statement of operations for year ended December 31, 2021. Subsequent to the conversion, we recognized unrealized losses of $1.2 billion on the investment in other income (expense), net in our consolidated statement of operations for the year ended December 31, 2021 for the fair value change of the equity security.

As of December 31, 2021, our Grab investment has been classified as a marketable equity security with a readily determinable fair value (Level 1) in the table presenting our financial assets and liabilities measured at fair value on a recurring basis.

The following table summarizes information about the significant unobservable inputs used in the fair value measurement for our Grab investment as of December 31, 2020:

| Fair value method | Relative weighting | Key unobservable input | |
|---|---|---|---|
| Financing transactions | 100% | Transaction price per share | $6.16 |
| | | Volatility | 53% |
| | | Estimated time to liquidity | 1.75 years |

During the first quarter of 2020, we determined the fair value of our available-for-sale debt securities in Grab had declined below their amortized cost based on an analysis of the observed valuation declines of Grab's publicly-traded competitive peer group and representative stock market indices. These observed inputs were considered indicative of changes in the fair value of the Grab securities. Using the analysis, we computed a downward market adjustment of 10% that was applied to the valuation derived from Grab's latest financing transaction which occurred earlier in the first quarter of 2020 and prior to the announcement of COVID-19 as a global pandemic, impacting global demand for Mobility services. As a result, the carrying value of the investment in Grab was reduced by $230 million; $57 million reduced the previously recognized unrealized gain in other comprehensive income (loss), net of tax, and the remaining $173 million, representing the difference between the fair value and amortized cost of the securities, was recognized as an allowance for credit loss in the consolidated balance sheet and a corresponding credit-related impairment charge recorded to other income (expense), net in the consolidated statement of operations. Due to the significant uncertainty about Grab's ability to repay the redemption amount of the securities on the redemption date, the amount expected to be collected was considered to be less than the fair value of the securities. Therefore, during the first quarter of 2020, the entire decline in fair value below amortized cost was considered to reflect a credit-related impairment charge.

The fair value of our Grab investment recovered during the third quarter of 2020 as determined by referencing an equity financing transaction closed by the investee during that quarter. As a result, we recognized a reversal of the previously recorded allowance for

100

credit loss in the consolidated balance sheet and a corresponding reversal of the credit-related impairment charge to other income (expense), net in the consolidated statement of operations.

*Lime Investments*

Our ownership in Lime is comprised of Lime Common Stock, Lime 1-C Preferred Stock, Lime 1-C Preferred Stock Warrants, and the Lime Convertible Note (collectively, the "2020 Lime Investments"). The 2020 Lime Investments were received as part of the transaction by which we divested of our JUMP business. Refer to Note 19 – Divestitures for further information regarding the JUMP Divestiture and the 2020 Lime Investments. Our investment in Lime Common Stock and representation on Lime's board of directors gives us the ability to exercise significant influence over Lime. We elected to apply the fair value option to our Lime Common Stock investment and therefore we are applying fair value accounting to all of the 2020 Lime Investments which provides for consistency of accounting treatment. The 2020 Lime Investments are measured at fair value on a recurring basis with changes in fair value reflected in earnings. The fair value of the 2020 Lime Investments as of December 31, 2020 of $134 million was determined by referencing a transaction in a convertible note that is junior to the Lime Convertible Note and used as an input to an OPM. Other key inputs to the OPM were discount rates of 22% and 28%, volatility of 67% and time to liquidity of 2.0 years.

In December 2021, we contributed an additional $50 million of cash to Lime in exchange for a second convertible secured note that may be converted into common or preferred stock. The fair value of our Lime investments as of December 31, 2021 of $162 million was determined by referencing a financing transaction and used as an input to an OPM. Other key inputs to the OPM were discount rates of 22% and 28%, volatility of 70% and time to liquidity of 1.25 years.

*Financial Assets Measured at Fair Value Using Level 3 Inputs*

The following table presents a reconciliation of our financial assets measured and recorded at fair value on a recurring basis as of as of December 31, 2020 and 2021, using significant unobservable inputs (Level 3) (in millions):

| | Non-marketable Debt Securities | Non-marketable Equity Securities | Notes Receivable | MLU B.V. Call Option |
|---|---|---|---|---|
| **Balance as of December 31, 2019** | $ 2,370 | $ 98 | $ — | $ — |
| Total net gains (losses) | | | | |
|    Included in earnings | (28) | (89) | (8) | — |
|    Included in other comprehensive income (loss) | 2 | — | — | — |
| Purchases | 3 | 65 | 91 | — |
| Sales | (6) | (22) | — | — |
| **Balance as of December 31, 2020** | 2,341 | 52 | 83 | — |
| Total net gains (losses) | | | | |
|    Included in earnings | — | 553 | (1) | (37) |
|    Included in other comprehensive income (loss) | 2,724 | — | — | — |
| Purchases | — | 1,677 | 50 | — |
| Issuance | — | — | — | 230 |
| Transfers to Level 1 | (5,065) | (2,250) | — | — |
| **Balance as of December 31, 2021** | $ — | $ 32 | $ 132 | $ 193 |

Transfers to Level 1 were due to our strategic investments in Grab and Aurora that became publicly listed during the year ended December 31, 2021. As a result, our investments have been classified as marketable equity securities with a readily determinable fair value (Level 1) in the table presenting our financial assets and liabilities measured at fair value on a recurring basis. For further information, see the section titled "Aurora Investment" and "Grab Investment" above.

We did not make any transfers between the levels of the fair value hierarchy during the year ended December 31, 2020.

**Assets Measured at Fair Value on a Non-Recurring Basis**

*Non-Financial Assets*

Our non-financial assets, such as goodwill, intangible assets and property and equipment are adjusted to fair value when an impairment charge is recognized. Such fair value measurements are based predominately on Level 3 inputs.

*Non-Marketable Equity Securities*

Our non-marketable equity securities are investments in privately held companies without readily determinable fair values, and primarily related to Didi prior to Didi's IPO on June 30, 2021. The carrying value of our non-marketable equity securities are adjusted based on price changes from observable transactions of identical or similar securities of the same issuer (referred to as the measurement alternative) or for impairment. Any changes in carrying value are recorded within other income (expense), net in the

P-02346-0103

consolidated statements of operations. Non-marketable equity securities are classified within Level 3 in the fair value hierarchy because we estimate the fair value of these securities based on valuation methods, including the common stock equivalent ("CSE") and OPM methods, using the transaction price of similar securities issued by the investee adjusted for contractual rights and obligations of the securities we hold.

The following is a summary of unrealized gains and losses from remeasurement (referred to as upward or downward adjustments) recorded in other income (expense), net in the consolidated statements of operations, and included as adjustments to the carrying value of non-marketable equity securities held during the years ended December 31, 2019, 2020 and 2021 based on the observable price in an orderly transaction for the same or similar security of the same issuers (in millions):

| | Year Ended December 31, | | |
| | 2019 | 2020 | 2021 |
|---|---|---|---|
| Upward adjustments | $ — | $ — | $ 71 |
| Downward adjustments (including impairment) | — | (1,690) | — |
| Total unrealized gain (loss) for non-marketable equity securities | $ — | $ (1,690) | $ 71 |

We evaluate our non-marketable equity securities for impairment at each reporting period based on a qualitative assessment that considers various potential impairment indicators. This evaluation consists of several factors including, but not limited to, an assessment of a significant adverse change in the economic environment, significant adverse changes in the general market condition of the geographies and industries in which our investees operate, and other publicly available information that affect the value of our non-marketable equity securities. As a result of the deterioration in economic and market conditions arising from COVID-19, we determined an impairment indicator existed as of March 31, 2020 and the fair value of certain investments, primarily our investment in Didi, was less than their carrying value.

To determine the fair value of our investment in Didi as of March 31, 2020, we utilized a hybrid approach, incorporating a CSE method along with an OPM, weighted at 80% and 20%, respectively. The CSE method assumes an if-converted scenario, where the OPM approach allocates equity value to individual securities within the investees' capital structure based on contractual rights and preferences. We computed a range of market adjustments based on observed market valuation declines of Didi's representative stock market indices and publicly-traded competitive peer group since the latest transaction in similar securities occurred in the prior year and prior to the announcement of COVID-19 as a global pandemic, impacting global demand for ridesharing services. These inputs are considered indicative of changes in the fair value of Didi equity. Market adjustments within the range were applied to the Didi equity valuation derived from the latest financing transaction in similar securities which were then used in the CSE and OPM approaches to obtain the fair value of the Didi securities owned by us. A lower adjustment within the range was applied to the enterprise value used in the CSE allocation compared to a higher downward adjustment for purposes of allocating value in the OPM approach. The value adjustment differential was attributable to several factors including possible exit scenarios, as an IPO event would result in higher valuation (due to access to public markets and reduction in cost of capital), reduces valuation uncertainty, and generally assumes market and macro-economic conditions that are comparatively more favorable than an otherwise prolonged stay-private scenario. As a result of the valuation performed, we recorded an impairment charge of $1.7 billion in other income (expense), net in our consolidated statement of operations during the first quarter of 2020. There was no remeasurement event for our investment in Didi that occurred during the remainder of 2020.

The following table summarizes information about the significant unobservable inputs used in the valuation for our investment in Didi as of March 31, 2020:

| Fair value method | Key unobservable input | |
|---|---|---|
| CSE | Market adjustment | (20)% |
| | | |
| OPM | Volatility | 39% |
| | Estimated time to liquidity | 2.0 years |
| | Market adjustment | (40)% |

During the first quarter of 2021, we completed the sale of $500 million of our Didi shares and realized immaterial gains from this transaction. In addition, we recorded unrealized gains of $71 million from remeasurement of the carrying value of the remaining Didi shares under the measurement alternative during the three months ended March 31, 2021.

We did not record any realized gains or losses for our non-marketable equity securities measured at fair value on a non-recurring basis during the years ended December 31, 2019 and 2020.

The following table summarizes the total carrying value of our non-marketable equity securities measured at fair value on a non-recurring basis held as of December 31, 2020 and 2021 including cumulative unrealized upward and downward adjustments made to the initial cost basis of the securities (in millions):

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2021 | |
| Initial cost basis | $ | 6,282 | $ | 279 |
| Upward adjustments | | 1,984 | | 4 |
| Downward adjustments (including impairment) | | (1,690) | | — |
| Total carrying value at the end of the period | $ | 6,576 | $ | 283 |

## Note 4 - Equity Method Investments

The carrying value of our equity method investments as of December 31, 2020 and 2021 were as follows (in millions):

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2021 | |
| MLU B.V. | $ | 1,001 | $ | 751 |
| Mission Bay 3 & 4 [1] | | 41 | | 38 |
| Other | | 37 | | 11 |
| Equity method investments | $ | 1,079 | $ | 800 |

[1] Refer to Note 16 – Variable Interest Entities for further information.

### *MLU B.V. and Uber Russia/CIS Operations*

During 2018, we closed a transaction that contributed the net assets of our Uber Russia/CIS operations into a newly formed private limited liability company ("MLU B.V." or "Yandex.Taxi joint venture"), with Yandex and us holding ownership interests in MLU B.V. In exchange for consideration contributed, we received a seat on MLU B.V.'s board and an initial 38% equity ownership interest consisting of common stock in MLU B.V. Certain contingent equity issuances of MLU B.V. may dilute our equity ownership interest to approximately 33%. The investment was determined to be an equity method investment due to our ability to exercise significant influence over MLU B.V. The initial fair value of our equity method investment in MLU B.V. was estimated using discounted cash flows of MLU B.V. The equity ownership interest in MLU B.V. was 35% and 29% as of December 31, 2020 and 2021, respectively.

*2020*

During 2020, Yandex contributed its Yandex.Carsharing business ("Drive") into MLU B.V. in exchange for an additional equity interest. The contribution of Drive into MLU B.V. resulted in the dilution of our ownership in MLU B.V. from 38% to 35%. The gain recognized on the dilution of our interest was not material to our consolidated results of operations for the year ended December 31, 2020. As part of this transaction, MLU B.V. contributed the assets and liabilities of its autonomous driving unit into a new legal entity, Yandex Self Driving Group B.V. ("SDG"), in which Yandex contributed additional capital. The reduction of our ownership interest to 20% in SDG, initially valued at $42 million, did not result in a material dilution gain.

*2021*

On August 30, 2021, we entered into an agreement with Yandex (the "Framework Agreement") to restructure our joint ventures, MLU B.V. and SDG and we would sell to Yandex (i) our 4.5% equity interest in MLU B.V. and (ii) our entire equity interest in SDG (the "Initial Closing"). Subsequent to the Initial Closing, Yandex spun-off, by way of demerger from MLU B.V., its delivery businesses: Yandex.Eats, Yandex.Lavka and Yandex.Delivery (collectively, "Demerged Businesses"). Immediately following the demerger, Yandex acquired all of our equity interest in the Demerged Businesses ("Demerger Share Closing"). In connection with the Framework Agreement, we granted Yandex an option ("MLU B.V. Call Option") to acquire our remaining equity interest in MLU B.V. during the two-year period following the Initial Closing. The total consideration paid by Yandex to us for the transaction was $1.0 billion in cash allocated as follows: (i) $276 million for our 4.5% of equity interest in MLU B.V.; (ii) $412 million for our equity interest in the Demerged Businesses; (iii) $230 million for the MLU B.V. Call Option; and (iv) the remaining immaterial amounts to our interest in SDG.

#### *Initial Closing*

During the third quarter of 2021 and pursuant to the Framework Agreement, we completed the sale of our entire equity interest in SDG and 4.5% of equity interest in MLU B.V. to Yandex. At the initial closing, we derecognized 4.5% of equity interest in MLU B.V. and recognized a gain of $106 million in other income (expense), net on our consolidated statement of operations. The consideration

P-02346-0105

allocated and gains recognized for the sale of our entire equity interest in SDG were not material.

<u>*Demerger Share Closing*</u>

During the fourth quarter of 2021 and pursuant to the Framework Agreement, MLU B.V. completed the spin-off of the Demerger Businesses and Yandex acquired all of our equity interest in the Demerged Businesses. As a result, we derecognized our entire equity interest in the Demerged Businesses and recognized a gain of $242 million in other income (expense), net in our consolidated statement of operations.

<u>*MLU B.V. Call Option*</u>

The MLU B.V. Call Option is recorded as a liability in accrued and other current liabilities on our consolidated balance sheet, initially valued at $230 million and measured at fair value on a recurring basis with changes in fair value recorded in other income (expense), net in the consolidated statements of operations. The exercise price of the MLU B.V. Call Option is approximately $1.8 billion, subject to certain adjustments based on the timing of the option exercise. As of December 31, 2021, the fair value of the MLU B.V. Call Option is $193 million, including the recognition of an immaterial gain for the fair value change during the year ended December 31, 2021. To determine the fair value of the MLU B.V. Call Option as of December 31, 2021, we used a lattice model which simulated multiple scenarios of the exercise behaviors and the corresponding strike prices over the term of the call option. Key inputs to the lattice model were underlying business value, option term of 1.7 years, volatility of 50%, risk-free interest rates, and strike price (Level 3).

<u>*MLU B.V. Basis Difference*</u>

Included in the carrying value of MLU B.V. is the basis difference, net of amortization, between the original cost of the investment and our proportionate share of the net assets of MLU B.V. The carrying value of the equity method investment is primarily adjusted for our share in the income or losses of MLU B.V. and amortization of basis differences. Equity method goodwill and intangible assets, net of accumulated amortization are also adjusted for currency translation adjustments representing fluctuations between the functional currency of the investee, the Ruble and the U.S. Dollar.

The table below provides the composition of the basis difference as of December 31, 2021 (in millions):

|                                                       | As of December 31, 2021 |
|-------------------------------------------------------|------------------------:|
| Equity method goodwill                                | $ 545                   |
| Intangible assets, net of accumulated amortization    | 54                      |
| Deferred tax liabilities                              | (12)                    |
| Cumulative currency translation adjustments           | (107)                   |
| Basis difference                                      | $ 480                   |

We amortize the basis difference related to the intangible assets over the estimated useful lives of the assets that gave rise to the difference using the straight-line method. The weighted-average life of the intangible assets is approximately 4.0 years and 3.3 years as of December 31, 2020 and 2021, respectively. Equity method goodwill is not amortized. The investment balance is reviewed for impairment whenever factors indicate that the carrying value of the equity method investment may not be recoverable. As of December 31, 2020 and 2021, we determined that there was no impairment of our investment in MLU B.V. The future effect of the COVID-19 pandemic and related government actions as well as other factors will continue to be monitored.

***Mission Bay 3 & 4***

The Mission Bay 3 & 4 JV refers to Event Center Office Partners, LLC ("ECOP"), a joint venture entity established in 2018, by Uber and two companies ("LLC Partners") to manage the construction and operation of two office buildings owned by two ECOP wholly-owned subsidiaries. We contributed $136 million cash in exchange for a 45% interest in ECOP. The two LLC Partners own 45% and 10%, respectively. The equity ownership interest in ECOP remained at 45% as of December 31, 2020 and 2021.

In March 2020, the two ECOP wholly-owned subsidiaries took out new loans. Upon closing of the new financing, the proceeds were used to first pay off the existing construction loan, then to cover the required operation reserve as well as various financing costs, and last, the remaining proceeds were distributed back to Uber and the LLC Partners based on their ownership percentage. As a result, Uber received $91 million from the ECOP as a return of capital investment, and reduced the investment carrying value by the same amount.

We have significant influence over ECOP and we account for our investment in ECOP under the equity method. At each reporting period and a quarter in arrears, we adjust the carrying value of our investment to reflect our proportionate share of ECOP's income or loss, and any impairments, with a corresponding credit or debit, respectively, to income or loss from equity method investment, net of tax in the consolidated statements of operations. During 2019, the construction was completed and leasing activities commenced. and immaterial amounts of equity earnings were recognized during 2019, 2020 and 2021. During 2020 and 2021, we incurred an immaterial amount of lease payments with ECOP, which is a related party. As of December 31, 2020 and 2021, we determined that there was no impairment of our investment in ECOP.

104

**Note 5 – Property and Equipment, Net**

The components of property and equipment, net as of December 31, 2020 and 2021 were as follows (in millions):

| | As of December 31, | |
| --- | --- | --- |
| | 2020 | 2021 |
| Land | $ 66 | $ 65 |
| Building and site improvements | 711 | 737 |
| Leasehold improvements | 435 | 594 |
| Computer equipment | 560 | 468 |
| Leased computer equipment | 596 | 650 |
| Leased vehicles | 6 | 7 |
| Internal-use software | 203 | 258 |
| Furniture and fixtures | 83 | 99 |
| Dockless e-bikes | — | — |
| Construction in progress | 170 | 157 |
| Total | 2,830 | 3,035 |
| Less: Accumulated depreciation and amortization | (1,016) | (1,182) |
| Property and equipment, net | $ 1,814 | $ 1,853 |

We capitalized $76 million and $55 million in internal-use software costs during the years ended December 31, 2020 and 2021, respectively, which is included in property and equipment, net on the consolidated balance sheets. Amortization of capitalized software development costs was $22 million, $55 million, and $69 million for the years ended December 31, 2019, 2020 and 2021, respectively.

Amounts in construction in progress represent buildings, leasehold improvements, assets under construction, and other assets not placed in service.

Depreciation expense relating to property and equipment was $433 million, $364 million, and $393 million for the years ended December 31, 2019, 2020 and 2021, respectively. Included in these amounts were depreciation expense for leased computer equipment in the amount of $146 million, $198 million, and $217 million for the years ended December 31, 2019, 2020 and 2021, respectively. Accumulated depreciation and amortization included $303 million and $390 million of leased computer equipment depreciation as of December 31, 2020 and 2021, respectively.

P-02346-0107

**Note 6 - Leases**

Our leases primarily include corporate offices, data centers, and servers. The lease term of operating and finance leases vary from less than a year to 76 years. We have leases that include one or more options to extend the lease term for up to 14 years as well as options to terminate the lease within one year. Our lease terms may include options to extend or terminate the lease when it is reasonably certain that we will exercise such options. Our lease agreements generally do not contain any residual value guarantees or restrictive covenants.

The components of our lease expense were as follows (in millions):

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2019** | | **2020** | | **2021** |
| **Lease cost** | | | | | | |
| Finance lease cost: | | | | | | |
| Amortization of assets | $ | 150 | $ | 199 | $ | 217 |
| Interest of lease liabilities | | 15 | | 16 | | 12 |
| Operating lease cost [1] | | 321 | | 482 | | 299 |
| Short-term lease cost | | 28 | | 17 | | 7 |
| Variable lease cost | | 100 | | 109 | | 96 |
| Sublease income | | (2) | | (2) | | (5) |
| Total lease cost | $ | 612 | $ | 821 | $ | 626 |

[1] We exited certain leased offices, primarily due to the City of San Francisco's extended shelter-in-place orders and our restructuring activities, resulting in accelerated lease cost of $118 million for the year ended December 31, 2020.

Supplemental cash flow information related to leases was as follows (in millions):

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2019** | | **2020** | | **2021** |
| **Other information** | | | | | | |
| Cash paid for amounts included in the measurement of lease liabilities: | | | | | | |
| Operating cash flows from financing leases | $ | 12 | $ | 14 | $ | 11 |
| Operating cash flows from operating leases | | 275 | | 250 | | 297 |
| Financing cash flows from financing leases | | 138 | | 224 | | 226 |
| Right-of-use assets obtained in exchange for lease obligations: | | | | | | |
| Operating lease liabilities | $ | 918 | $ | 202 | $ | 273 |
| Finance lease liabilities | | 251 | | 196 | | 184 |

Supplemental balance sheet information related to leases was as follows (in millions, except lease term and discount rate):

| | | As of December 31, | | |
|---|---|---|---|---|
| | | **2020** | | **2021** |
| **Operating Leases** | | | | |
| Operating lease right-of-use assets | $ | 1,274 | $ | 1,388 |
| Operating lease liability, current | $ | 175 | $ | 185 |
| Operating lease liabilities, non-current | | 1,544 | | 1,644 |
| Total operating lease liabilities | $ | 1,719 | $ | 1,829 |

P-02346-0108

| | | As of December 31, | | |
|---|---|---|---|---|
| | | **2020** | | **2021** |
| **Finance Leases** | | | | |
| Property and equipment, at cost | $ | 596 | $ | 650 |
| Accumulated depreciation | | (303) | | (390) |
| Property and equipment, net | $ | 293 | $ | 260 |
| Other current liabilities | $ | 177 | $ | 191 |
| Other long-term liabilities | | 120 | | 43 |
| Total finance leases liabilities | $ | 297 | $ | 234 |

| | As of December 31, | |
|---|---|---|
| | **2020** | **2021** |
| **Weighted-average remaining lease term** | | |
| Operating leases | 16 years | 15 years |
| Finance leases | 2 years | 2 years |
| **Weighted-average discount rate** | | |
| Operating leases | 7.0 % | 6.7 % |
| Finance leases | 5.4 % | 4.2 % |

Maturities of lease liabilities were as follows (in millions):

| | As of December 31, 2021 | | | |
|---|---|---|---|---|
| | **Operating Leases** | | **Finance Leases** | |
| 2022 | $ | 280 | $ | 140 |
| 2023 | | 312 | | 60 |
| 2024 | | 264 | | 34 |
| 2025 | | 214 | | 9 |
| 2026 | | 198 | | — |
| Thereafter | | 2,067 | | 1 |
| Total undiscounted lease payments | | 3,335 | | 244 |
| Less: imputed interest | | (1,506) | | (10) |
| Total lease liabilities | $ | 1,829 | $ | 234 |

As of December 31, 2021, we had additional operating leases and finance leases, primarily for corporate offices and servers, that have not yet commenced of $421 million and $19 million, respectively. These operating and finance leases will commence between fiscal year 2022 and fiscal year 2023 with lease terms of 2 years to 13 years.

### Mission Bay 1 & 2

In 2015, we entered into a joint venture ("JV") agreement with a real estate developer ("JV Partner") to develop land ("the Land") in San Francisco to construct our new headquarters (the "Headquarters"). The Headquarters consists of two adjacent office buildings totaling approximately 423,000 rentable square feet. In connection with the JV arrangement, we acquired a 49% interest in the JV, the principal asset of which was the Land.

In 2016, we and the JV Partner agreed to dissolve the JV and terminate our commitment to the lease of the Headquarters (together "the real estate transaction") and we retained a 49% indirect interest in the Land ("Indirect Interest"). Under the terms of the real estate transaction, we obtained the rights and title to the partially constructed building, completed the development of the two office buildings and retained a 100% ownership in the buildings. In connection with the real estate transaction, we also executed two 75-year land lease agreements ("Land Leases"). As of December 31, 2021, commitments under the Land Leases total $141 million until February 2032. After 2032, the annual rent amount will adjust annually based on the prevailing consumer price index.

The real estate transaction is accounted for as a financing transaction of our 49% Indirect Interest due to our continuing involvement through a purchase option on the Indirect Interest. As a financing transaction, the cash and deferred sales proceeds received from the real estate transaction are recorded as a financing obligation. As of December 31, 2021, our Indirect Interest of $65 million is included in property and equipment, net and a corresponding financing obligation of $76 million is included in other long-

term liabilities. Future land lease payments of $1.7 billion is allocated 49% to the financing obligation of the Indirect Interest and 51% to the operating lease of land.

Future minimum payments related to the financing obligations as of December 31, 2021 are summarized below (in millions):

| Fiscal Year Ending December 31, | Future Minimum Payments |
|---|---|
| 2022 | $ 6 |
| 2023 | 6 |
| 2024 | 6 |
| 2025 | 7 |
| 2026 | 7 |
| Thereafter | 813 |
| Total | $ 845 |

**Note 7 – Goodwill and Intangible Assets**

*Goodwill*

On January 2, 2020, we completed the acquisition of substantially all of the assets of Careem Inc. ("Careem") and certain of its subsidiaries. The acquisition was accounted for as a business combination, resulting in the recognition of $2.5 billion in goodwill in our Mobility segment and $540 million in intangible assets.

On July 6, 2020, we closed on a purchase agreement to acquire Cornershop Global LLC ("CS-Global"), and its wholly owned subsidiaries operating in Brazil, Chile, Colombia, Costa Rica, Canada, U.S., and Peru. The agreement was accounted for as a business combination, resulting in the recognition of $384 million in goodwill in our Delivery segment and $122 million in intangible assets.

On July 14, 2020, we acquired 100% of the equity of Routematch Holdings, Inc. ("Routematch"). The acquisition was accounted for as a business combination, resulting in the recognition of $91 million in goodwill in our Mobility segment and $27 million in intangible assets.

On Dec 1, 2020, we acquired 100% of the equity of Postmates Inc. ("Postmates"). The acquisition was accounted for as a business combination, resulting in the recognition of $3.1 billion in goodwill in our Delivery segment and $1.0 billion in intangible assets.

On October 12, 2021, we completed the acquisition of The Drizly Group, Inc. ("Drizly"). The acquisition was accounted for as a business combination, resulting in the recognition of $619 million in goodwill in our Delivery segment and $395 million in intangible assets.

On November 12, 2021, we completed the acquisition of Transplace. The acquisition was accounted for as a business combination, resulting in the recognition of $1.4 billion in goodwill in our Freight segment and $902 million in intangible assets.

Refer to Note 18 – Business Combinations for further information of our acquisitions.

The following table presents the changes in the carrying value of goodwill by segment for the years ended December 31, 2020 and 2021 (in millions):

108

| | As Previously Reported [1] | | | | | |
| | ATG and Other Technology Programs | Mobility | Delivery | Freight | All Other | Total Goodwill |
|---|---|---|---|---|---|---|
| **Balance as of January 1, 2020** | $ 29 | $ 25 | $ 13 | $ — | $ 100 | $ 167 |
| Acquisitions | — | 2,574 | 3,533 | — | — | 6,107 |
| Goodwill impairment | — | — | — | — | (100) | (100) |
| Reclass to Assets held for sale | (29) | — | — | — | — | (29) |
| Foreign currency translation adjustment | — | (37) | 1 | — | — | (36) |
| **Balance as of December 31, 2020** | — | 2,562 | 3,547 | — | — | 6,109 |
| Acquisitions | — | 127 | 672 | 1,438 | — | 2,237 |
| Goodwill impairment | — | (73) | — | — | — | (73) |
| Measurement period adjustment [2] | — | (1) | 189 | — | — | 188 |
| Foreign currency translation adjustment | — | (34) | (7) | — | — | (41) |
| **Balance as of December 31, 2021** | $ — | $ 2,581 | $ 4,401 | $ 1,438 | $ — | $ 8,420 |

[1] Prior to the first quarter of 2021, we had four reportable segments, Mobility, Delivery, Freight, and ATG and Other Technology Programs. In the first quarter of 2021, we determined there are three operating and reportable segments: Mobility, Delivery, and Freight. Refer to Note 14 - Segment Information and Geographic Information for further information.

[2] Refer to Note 18 – Business Combinations.

*Goodwill Impairment*

We performed an annual test for goodwill impairment in the fourth quarter of the fiscal year ended December 31, 2019 and determined that goodwill was not impaired.

During the first quarter of 2020, prior to the JUMP Divestiture in May 2020, market, macroeconomic and business conditions resulting from the COVID-19 pandemic indicated that it was more likely than not that the carrying value of our New Mobility reporting unit within our previous Other Bets segment (subsequently renamed All Other after the JUMP Divestiture), exceeded its fair value. As a result, we performed an interim goodwill impairment test by comparing the fair value of the New Mobility reporting unit to its carrying value. Fair value was determined by referencing market valuation multiples implied by companies that have comparable businesses which is a Level 3 measurement. The carrying value of our New Mobility reporting unit exceeded its fair value, and as a result, a goodwill impairment charge of $100 million was recorded in general and administrative expenses in the consolidated statement of operations after consideration of impairments of long-lived and other assets of the reporting unit. Also, during the first quarter of 2020, we recognized impairment charges to intangible assets of $23 million, property and equipment of $47 million and other current assets of $23 million in general and administrative expenses in the consolidated statement of operations in our New Mobility reporting unit.

During the year ended December 31, 2021, we recognized an immaterial goodwill impairment charge.

*Intangible Assets*

The components of intangible assets, net as of December 31, 2020 and 2021 were as follows (in millions except years):

| | Gross Carrying Value | Accumulated Amortization | Net Carrying Value | Weighted Average Remaining Useful Life - Years |
|---|---|---|---|---|
| **December 31, 2020** | | | | |
| Consumer, Merchant and other relationships | $ 1,007 | $ (81) | $ 926 | 8 |
| Developed technology [1] | 529 | (69) | 460 | 2 |
| Trade names and trademarks | 183 | (16) | 167 | 7 |
| Patents | 15 | (6) | 9 | 8 |
| Other | 5 | (3) | 2 | 0 |
| Intangible assets | $ 1,739 | $ (175) | $ 1,564 | |

| | Gross Carrying Value | Accumulated Amortization | Net Carrying Value | Weighted Average Remaining Useful Life - Years |
|---|---|---|---|---|
| **December 31, 2021** | | | | |
| Consumer, Merchant and other relationships | $ 1,868 | $ (294) | $ 1,574 | 9 |
| Developed technology [1] | 922 | (269) | 653 | 5 |
| Trade names and trademarks | 222 | (47) | 175 | 6 |
| Patents | 15 | (7) | 8 | 7 |
| Other | 5 | (3) | 2 | 0 |
| Intangible assets | $ 3,032 | $ (620) | $ 2,412 | |

[1] Developed technology intangible assets include in-process research and development ("IPR&D"), which is not subject to amortization, of $55 million as of December 31, 2020. There was no IPR&D included in developed technology intangible assets as of December 31, 2021.

Amortization expense for intangible assets subject to amortization was $16 million, $155 million, and $439 million for the years ended December 31, 2019, 2020 and 2021, respectively.

The estimated aggregate future amortization expense for intangible assets subject to amortization as of December 31, 2021 is summarized below (in millions):

| Year Ending December 31, | Estimated Future Amortization Expense |
|---|---|
| 2022 | $ 524 |
| 2023 | 361 |
| 2024 | 303 |
| 2025 | 265 |
| 2026 | 202 |
| Thereafter | 757 |
| Total | $ 2,412 |

### *Impairment of Definite-Lived Intangible and Long-Lived Assets*

The following table presents the definite-lived intangible and long-lived asset impairment charges recorded in the consolidated statements of operations by asset class during the years ended December 31, 2020 and 2021 (in millions):

| | Year Ended December 31, | |
|---|---|---|
| | **2020** | **2021** |
| Intangible assets | $ 23 | $ 23 |
| Property and equipment | 154 | 17 |
| Operating lease right-of-use assets [1] | 94 | 3 |
| Total | $ 271 | $ 43 |

[1] During the year ended December 31, 2020, we exited, and made available for sublease, certain leased offices, primarily due to the City of San Francisco's extended shelter-in-place orders and our restructuring activities. These decisions resulted in operating lease right-of-use assets impairments of $52 million, $18 million, and $24 million recorded in general and administrative, operations and support, research and development, respectively, in the consolidated statements of operations.

We did not record any impairment charges related to definite-lived intangible and held and used long-lived asset during the year ended December 31, 2019.

110

**Note 8 – Long-Term Debt and Revolving Credit Arrangements**

Components of debt, including the associated effective interest rates were as follows (in millions, except for percentages):

| | As of December 31, | | Effective Interest Rates | Maturities |
|---|---|---|---|---|
| | 2020 | 2021 | | |
| 2016 Senior Secured Term Loan | $ 1,101 | $ — | — % | — |
| 2018 Senior Secured Term Loan | 1,463 | — | — % | — |
| 2025 Refinanced Term Loan | — | 1,448 | 3.8 % | April 4, 2025 |
| 2027 Refinanced Term Loan | — | 1,090 | 3.8 % | February 25, 2027 |
| 2025 Senior Note | 1,000 | 1,000 | 7.7 % | May 15, 2025 |
| 2026 Senior Note | 1,500 | 1,500 | 8.1 % | November 1, 2026 |
| 2027 Senior Note | 1,200 | 1,200 | 7.7 % | September 15, 2027 |
| 2028 Senior Note | 500 | 500 | 7.0 % | January 15, 2028 |
| 2029 Senior Note | — | 1,500 | 4.7 % | August 15, 2029 |
| 2025 Convertible Note | 1,150 | 1,150 | 0.2 % | December 15, 2025 |
| Total debt | 7,914 | 9,388 | | |
| Less: unamortized discount and issuance costs | (327) | (85) | | |
| Less: current portion of long-term debt | (27) | (27) | | |
| Total long-term debt | $ 7,560 | $ 9,276 | | |

*2016 and 2018 Senior Secured Term Loans Refinancing*

On February 25, 2021, we entered into a refinancing transaction under which we borrowed $2.6 billion pursuant to an amendment to the 2016 Senior Secured Term Loan agreement, of which all of the net proceeds were used to repay in full all previously outstanding loans under the 2016 Senior Secured Term Loan agreement and the 2018 Senior Secured Term Loan agreement. The $2.6 billion is comprised of (i) a $1.1 billion tranche with a maturity date of February 25, 2027, replacing the 2016 Senior Secured Term Loan as a Refinancing Term Loan (the "2027 Refinanced Term Loan"), and (ii) a $1.5 billion tranche with a maturity date of April 4, 2025, replacing the 2018 Senior Secured Term Loan as an Incremental Term Loan (the "2025 Refinanced Term Loan"). The refinancing transaction qualified as a debt modification that did not result in an extinguishment.

The 2025 Refinanced Term Loan and the 2027 Refinanced Term Loan are guaranteed by certain of our material domestic restricted subsidiaries. The 2025 Refinanced Term Loan and the 2027 Refinanced Term Loan agreements contain customary covenants restricting our and certain of our subsidiaries' ability to incur debt, incur liens and undergo certain fundamental changes. We were in compliance with all covenants as of December 31, 2021. The loan is secured by certain of our intellectual property and equity of certain material foreign subsidiaries.

The fair values of our 2025 Refinanced Term Loan and 2027 Refinanced Term Loan were $1.4 billion and $1.1 billion, respectively, as of December 31, 2021 and were determined based on quoted prices in markets that are not active, which is considered a Level 2 valuation input.

*2025 Convertible Note*

In December 2020, we issued $1.15 billion aggregate principal amount of 0% convertible senior notes due in 2025 (the "2025 Convertible Notes"), including the exercise in full by the initial purchasers of the 2025 Convertible Notes of their option to purchase up to an additional $150 million principal amount of the 2025 Convertible Notes. The 2025 Convertible Notes were issued in a private placement to qualified institutional buyers pursuant to Rule144A under the Securities Act. The 2025 Convertible Notes will mature on December 15, 2025, unless earlier converted, redeemed or repurchased.

Holders of the 2025 Convertible Notes may convert their notes at their option at any time prior to the close of business on the business day immediately preceding September 15, 2025 only under the following circumstances: (i) during any calendar quarter commencing after the calendar quarter ending on March 31, 2021 (and only during such calendar quarter), if the last reported sale price of our common stock for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (ii) during the five business day period after any ten consecutive trading day period (the "measurement period") in which the trading price (as defined below) per $1,000 principal amount of notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common stock and the conversion rate on each such trading day; (iii) if we call such notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the applicable redemption date; or (iv) upon the occurrence of specified corporate events. On or after

111

September 15, 2025 until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert all or any portion of their notes at any time, regardless of the foregoing circumstances.

As of December 31, 2021, none of the conditions permitting the holders of the 2025 Convertible Notes to convert their notes early had been met. Therefore, the 2025 Convertible Notes are classified as long-term.

The initial conversion rate is 12.3701 shares of common stock per $1,000 principal amount of notes, equivalent to an initial conversion price of approximately $80.84 per share of common stock. The conversion rate will be subject to adjustment in some events but will not be adjusted for any accrued and unpaid special interest.

Upon conversion of the 2025 Convertible Notes, we will pay or deliver, as the case may be, cash, shares of our common stock or a combination of cash and shares of our common stock, at our election. We may not redeem the notes prior to December 20, 2023. We may redeem for cash all or any portion of the notes, at our option, on or after December 20, 2023 if the last reported sale price of our common stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the notes to be redeemed, plus accrued and unpaid special interest, if any, to, but excluding, the redemption date.

The indenture governing the 2025 Convertible Notes does not contain any financial or operating covenants or restrictions on the payments of dividends, the incurrence of indebtedness or the issuance or repurchase of securities by us or any of our subsidiaries.

Prior to the adoption of ASU 2020-06, the proceeds from the issuance of the 2025 Convertible Notes were allocated between the conversion feature recorded as equity and the liability for the notes themselves. The difference of $243 million between the principal amount of the 2025 Convertible Notes and the liability component (the "debt discount") was amortized to interest expense using the effective interest method over the term of the 2025 Convertible Notes. The equity component of the 2025 Convertible Notes was included in additional paid-in capital in the consolidated balance sheet as of December 31, 2020 and was not remeasured as it continued to meet the conditions for equity classification. To determine the fair value of the liability component of the 2025 Convertible Notes as of the pricing date, we used the binomial model with inputs of time to maturity, conversion ratio, our stock price, risk free rate and volatility.

Effective January 1, 2021, we early adopted ASU 2020-06 using the modified retrospective approach. The adoption of this standard resulted in a decrease to additional paid-in capital of $243 million and an increase to our 2025 Convertible Notes by the same amount. At adoption, there was no adjustment recorded to the opening accumulated deficit. As a result of the adoption, starting on January 1, 2021 interest expense is reduced as a result of accounting for the 2025 Convertible Notes as a single liability measured at its amortized cost.

The fair value of our 2025 Convertible Notes was $1.1 billion as of December 31, 2021 and was determined based on quoted prices in markets that are not active, which is considered a Level 2 valuation input.

*Senior Notes*

In October 2018, we issued five-year notes with aggregate principal amount of $500 million due on November 1, 2023 (the "2023 Senior Notes") and eight-year notes with aggregate principal amount of $1.5 billion due on November 1, 2026 (the "2026 Senior Notes") in a private placement offering totaling $2.0 billion. We issued the 2023 and 2026 Senior Notes at par and paid approximately $9 million for debt issuance costs. The interest is payable semi-annually on May 1 and November 1 of each year at 7.5% per annum and 8.0% per annum, respectively, beginning on May 1, 2019, and the entire principal amount is due at the time of maturity.

In September 2019, we issued eight-year notes with aggregate principal amount of $1.2 billion due on September 15, 2027 (the "2027 Senior Notes") in a private placement to qualified institutional buyers pursuant to Rule 144A under the Securities Act. We issued the 2027 Senior Notes at par and paid approximately $11 million for debt issuance costs. The interest is payable semi-annually in arrears on March 15 and September 15 of each year at 7.5% per annum, beginning on March 15, 2020, and the entire principal amount is due at the time of maturity.

In May 2020, we issued five-year notes with an aggregate principal amount of $1.0 billion due on May 15, 2025 (the "2025 Senior Notes") in a private placement to qualified institutional buyers pursuant to Rule 144A under the Securities Act. We issued the 2025 Senior Notes at par and paid approximately $8 million for debt issuance costs. The interest is payable semi-annually in arrears on May 15 and November 15 of each year at 7.5% per annum, beginning on November 15, 2020, and the entire principal amount is due at the time of maturity.

In September 2020, we issued eight-year notes with an aggregate principal amount of $500 million due on January 15, 2028 (the "2028 Senior Notes") in a private placement to qualified institutional buyers pursuant to Rule 144A under the Securities Act. We issued the 2028 Senior Notes at par and paid approximately $5 million for debt issuance costs. The interest is payable semi-annually in arrears on January 15 and July 15 of each year at 6.25% per annum, beginning on July 15, 2021, and the entire principal amount is due at the time of maturity. In October 2020, we used the net proceeds from this offering, along with cash on hand, to redeem all of our outstanding 2023 Senior Notes. The redemption of the 2023 Senior Notes was for substantially identical 2028 Senior Notes. Following the redemption, there were no 2023 Senior Notes outstanding.

P-02346-0114

In August 2021, we issued eight-year notes with an aggregate principal amount of $1.5 billion due on August 15, 2029 (the "2029 Senior Notes") in a private placement to qualified institutional buyers pursuant to Rule 144A under the Securities Act. We issued the 2029 Senior Notes at par and paid approximately $16 million for debt issuance costs. The interest is payable semi-annually in arrears on February 15 and August 15 of each year at 4.50% per annum, beginning on February 15, 2022, and the entire principal amount is due at the time of maturity and therefore, the 2029 Senior Notes are classified as long-term. We used the net proceeds from this offering to finance a portion of the consideration payable in cash, and certain related fees and expenses incurred, in connection with the acquisition of Transplace, by our majority-owned subsidiary, Uber Freight Holding Corporation ("Freight Holding"). Refer to Note 18 – Business Combinations for additional information on the Transplace acquisition.

The 2025, 2026, 2027, 2028 and 2029 Senior Notes (collectively "Senior Notes") are guaranteed by certain of our material domestic restricted subsidiaries. The indentures governing the Senior Notes contain customary covenants restricting our and certain of our subsidiaries' ability to incur debt and incur liens, as well as certain financial covenants specified in the indentures. We were in compliance with all covenants as of December 31, 2021.

The following table presents the fair values of our Senior Notes as of December 31, 2021, and were determined based on quoted prices in markets that are not active, which is considered a Level 2 valuation input (in millions):

|  | As of December 31, 2021 |
| --- | --- |
| 2025 Senior Note | $ 1,052 |
| 2026 Senior Note | 1,602 |
| 2027 Senior Note | 1,305 |
| 2028 Senior Note | 537 |
| 2029 Senior Note | 1,533 |
| Total | $ 6,029 |

The future principal payments for our long-term debt as of December 31, 2021 is summarized as follows (in millions):

| Year Ending December 31, | Future Minimum Payments |
| --- | --- |
| 2022 | $ 27 |
| 2023 | 27 |
| 2024 | 27 |
| 2025 | 3,564 |
| 2026 | 1,512 |
| Thereafter | 4,231 |
| Total | $ 9,388 |

The following table presents the amount of interest expense recognized relating to the contractual interest coupon, amortization of the debt discount and issuance costs with respect to our long term debt, and an 8.0% internal rate of return ("IRR payout") which was accruing on our 2022 Convertible Notes that converted into shares of common stock upon the close of our IPO in 2019, for the years ended December 31, 2019, 2020 and 2021 (in millions):

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2019 | 2020 | 2021 |
| Contractual interest coupon | $ 439 | $ 449 | $ 464 |
| Amortization of debt discount and issuance costs | 82 | 14 | 16 |
| 8% IRR payout | 26 | — | — |
| Total interest expense from long-term debt | $ 547 | $ 463 | $ 480 |

**Revolving Credit Arrangements**

We have a revolving credit agreement initially entered in 2015 with certain lenders, which provides for $2.3 billion in credit maturing on June 13, 2023 ("Revolving Credit Facility"). The Revolving Credit Facility may be guaranteed by certain of our material domestic restricted subsidiaries based on certain conditions. The credit agreement contains customary covenants restricting our and certain of our subsidiaries' ability to incur debt, incur liens, and undergo certain fundamental changes, as well as maintain a certain

113

level of liquidity specified in the contractual agreement. The credit agreement also contains customary events of default. The Revolving Credit Facility also contains restrictions on the payment of dividends. As of December 31, 2021, there was no balance outstanding on the Revolving Credit Facility.

*Letters of Credit*

For purposes of securing obligations related to leases and other contractual obligations, we also maintain an agreement for letters of credit, which is collateralized by our Revolving Credit Facility and reduces the amount of credit available. As of December 31, 2020 and 2021, we had letters of credit outstanding of $649 million and $749 million, respectively, of which the letters of credit that reduced the available credit under the Revolving Credit Facility were $233 million and $247 million, respectively.

**Note 9 – Assets and Liabilities Held for Sale**

The following table summarizes the carrying values of the assets and liabilities classified as held for sale as of December 31, 2020 (in millions):

|  | December 31, 2020 ATG |
|---|---|
| **Assets held for sale** |  |
| Cash and cash equivalents | $ 349 |
| Prepaid expenses and other current assets | 2 |
| Investments | 2 |
| Operating lease right-of-use assets | 26 |
| Property and equipment, net | 78 |
| Intangibles | 31 |
| Goodwill | 29 |
| Total assets held for sale | 517 |
|  |  |
| **Liabilities held for sale** |  |
| Accounts payable | 8 |
| Accrued and other current liabilities | 66 |
| Operating lease liabilities, current | 6 |
| Operating lease liabilities, non-current | 20 |
| Total liabilities held for sale | 100 |
| Net assets held for sale | $ 417 |

*Sale of ATG Business*

On December 7, 2020, we announced the sale of our ATG Business, our subsidiary focused on the development and commercialization of autonomous vehicle technologies, to Aurora. Our ATG Business was included within our ATG and Other Technology Programs segment. The sale of our ATG Business did not represent a strategic shift that would have had a major effect on our operations and financial results, and therefore did not qualify for reporting as a discontinued operation for financial statement purposes. On January 19, 2021, we completed the sale of Apparate to Aurora. Refer to Note 19 – Divestitures for further information on the sale of our ATG Business.

**Note 10 – Supplemental Financial Statement Information**

*Prepaid Expenses and Other Current Assets*

Prepaid expenses and other current assets as of December 31, 2020 and 2021 were as follows (in millions):

|  | As of December 31, | |
|---|---|---|
|  | 2020 | 2021 |
| Prepaid expenses | $ 407 | $ 459 |
| Other receivables | 464 | 553 |
| Other | 344 | 442 |
| Prepaid expenses and other current assets | $ 1,215 | $ 1,454 |

114

*Accrued and Other Current Liabilities*

Accrued and other current liabilities as of December 31, 2020 and 2021 were as follows (in millions):

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2021** |
| Accrued legal, regulatory and non-income taxes | $ 1,811 | $ 2,187 |
| Accrued Drivers and Merchants liability | 651 | 1,187 |
| Income and other tax liabilities | 203 | 376 |
| Unsecured convertible notes in connection with Careem acquisition | 348 | — |
| Commitment to issue unsecured convertible notes in connection with Careem acquisition | 303 | 238 |
| Other | 1,796 | 2,549 |
| Accrued and other current liabilities | $ 5,112 | $ 6,537 |

*Other Long-Term Liabilities*

Other long-term liabilities as of December 31, 2020 and 2021 were as follows (in millions):

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2021** |
| Deferred tax liabilities | $ 818 | $ 365 |
| Other | 488 | 570 |
| Other long-term liabilities | $ 1,306 | $ 935 |

*Accumulated Other Comprehensive Income (Loss)*

The changes in composition of accumulated other comprehensive income (loss), net of tax, for the years ended December 31, 2019, 2020 and 2021 were as follows (in millions):

| | Foreign Currency Translation Adjustments | Unrealized Gains (Losses) on Available-for-Sale Securities, Net of Tax | Total |
| --- | --- | --- | --- |
| Balance as of December 31, 2018 | $ (228) | $ 40 | $ (188) |
| Other comprehensive income (loss) before reclassifications | (3) | 4 | 1 |
| Amounts reclassified from accumulated other comprehensive income (loss) | — | — | — |
| Other comprehensive income (loss) | (3) | 4 | 1 |
| Balance as of December 31, 2019 | $ (231) | $ 44 | $ (187) |

| | Foreign Currency Translation Adjustments | Unrealized Gains (Losses) on Available-for-Sale Securities, Net of Tax | Total |
| --- | --- | --- | --- |
| Balance as of December 31, 2019 | $ (231) | $ 44 | $ (187) |
| Other comprehensive income (loss) before reclassifications | (350) | 2 | (348) |
| Amounts reclassified from accumulated other comprehensive income (loss) | — | — | — |
| Other comprehensive income (loss) | (350) | 2 | (348) |
| Balance as of December 31, 2020 | $ (581) | $ 46 | $ (535) |

115

| | Foreign Currency Translation Adjustments | Unrealized Gains (Losses) on Available-for-Sale Securities, Net of Tax | Total |
|---|---|---|---|
| Balance as of December 31, 2020 | $ (581) | $ 46 | $ (535) |
| Other comprehensive income before reclassifications | 57 | 2,562 | 2,619 |
| Amounts reclassified from accumulated other comprehensive income [1] | — | (2,608) | (2,608) |
| Other comprehensive income (loss) | 57 | (46) | 11 |
| Balance as of December 31, 2021 | $ (524) | $ — | $ (524) |

[1] The amounts reclassified from accumulated other comprehensive income are recorded in other income (expense), net and the related tax impact of $176 million is recorded in provision for (benefit from) income taxes on the consolidated statement of operations.

### *Other Income (Expense), Net*

The components of other income (expense), net, for the years ended December 31, 2019, 2020 and 2021 were as follows (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| Interest income | $ 234 | $ 55 | $ 37 |
| Foreign currency exchange gains (losses), net | (40) | (128) | (67) |
| Gain on business divestitures, net [1] | — | 204 | 1,684 |
| Gain from sale of investments [2] | — | — | 413 |
| Unrealized gain (loss) on debt and equity securities, net [3] | 2 | (125) | 1,142 |
| Impairment of debt and equity securities [4] | — | (1,690) | — |
| Change in fair value of embedded derivatives | 58 | — | — |
| Gain on extinguishment of convertible notes and settlement of derivatives [5] | 444 | — | — |
| Other, net | 24 | 59 | 83 |
| Other income (expense), net | $ 722 | $ (1,625) | $ 3,292 |

[1] During the year ended December 31, 2020, gain on business divestitures, net represented a $154 million gain on the sale of our Uber Eats India operations to Zomato recognized in the first quarter of 2020 and a $77 million gain on the sale of our European Freight Business to sennder GmbH ("Sennder") recognized in the fourth quarter of 2020, partially offset by a $27 million loss on the sale of our JUMP operations to Lime recognized in the second quarter of 2020.

During the year ended December 31, 2021, gain on business divestitures, net represented a $1.6 billion gain on the sale of our ATG Business to Aurora recognized in the first quarter of 2021. Refer to Note 19 – Divestitures for further information on the sale of our ATG Business.

[2] During the year ended December 31, 2021, gain from sale of investments primarily represented a $348 million gain recognized from sale of our equity interests in MLU B.V. Refer to Note 4 - Equity Method Investments for further information.

[3] During the year ended December 31, 2021, unrealized gain (loss) on debt and equity securities, net primarily represented a $1.6 billion net unrealized gain on our Grab investment, a $1.6 billion unrealized gain on our Aurora Investments and a $991 million unrealized gain on our Zomato investment, partially offset by a $3.0 billion unrealized loss on our Didi investment. Refer to Note 3 – Investments and Fair Value Measurement for further information.

[4] During the year ended December 31, 2020, we recorded an impairment charge of $1.7 billion, primarily related to our investment in Didi recognized during the first quarter of 2020. Refer to Note 3 – Investments and Fair Value Measurement for further information.

[5] During the year ended December 31, 2019, we recognized a $444 million gain on extinguishment of our 2021 and 2022 Convertible Notes and settlement of derivatives in connection with our IPO, recognized during the second quarter of 2019. Refer to Note 11 – Stockholders' Equity for additional information regarding our IPO.

116

**Note 11 – Stockholders' Equity**

*Initial Public Offering*

On May 14, 2019, we closed our IPO, in which we issued and sold 180 million shares of our common stock. The price was $45.00 per share. We received net proceeds of approximately $8.0 billion from the IPO after deducting underwriting discounts and commissions of $106 million and offering expenses. Upon closing of the IPO: (i) all shares of our outstanding redeemable convertible preferred stock automatically converted into 905 million shares of common stock; (ii) holders of the 2021 and 2022 Convertible Notes elected to convert all outstanding notes into 94 million shares of common stock; and, (iii) an outstanding warrant which became exercisable upon the closing of the IPO was exercised to purchase 0.2 million shares of common stock. In addition, we recognized a net gain of $327 million in other income (expense), net in the consolidated statement of operations upon conversion of the 2021 and 2022 Convertible Notes during the second quarter of 2019, which consisted of $444 million gain on extinguishment of debt and settlement of derivatives, partially offset by $117 million loss from the change in fair value of embedded derivatives prior to settlement. The extinguishment of debt resulted in the derecognition of the carrying value of the debt balance and settlement of embedded derivatives.

We had granted RSAs, RSUs, SARs, and stock options that vest only upon the satisfaction of both time-based service and performance-based conditions. Through May 9, 2019, no stock-based compensation expense had been recognized for such awards with a performance condition based on the occurrence of a qualifying event (such as an IPO), as such qualifying event was not probable. Upon our IPO, we recognized $3.6 billion of stock-based compensation expense. Upon the IPO, shares were issued to satisfy the vesting of RSUs with a performance condition. To meet the related tax withholding requirements, we withheld 29 million of the 76 million shares of common stock issued. Based on the IPO public offering price of $45.00 per share, the tax withholding obligation was $1.3 billion.

As a result of stock-based compensation expense for vested and unvested RSUs upon the IPO, we recorded an additional deferred tax asset of approximately $1.1 billion that was offset by a full valuation allowance.

*PayPal, Inc. ("PayPal") Private Placement*

On May 16, 2019, we closed a private placement by PayPal, Inc. in which we issued and sold 11 million shares of our common stock at a purchase price of $45.00 per share and received aggregate proceeds of $500 million.

*Redeemable Convertible Preferred Stock*

Upon closing of the IPO, all shares of our outstanding redeemable convertible preferred stock automatically converted into 905 million shares of common stock.

During 2019, the warrant to purchase 922,655 Series G redeemable convertible preferred stock was exercised in full and the fair value of the warrant was reclassified to redeemable convertible preferred stock. Also during 2019, the warrant to purchase 150,071 Series E redeemable convertible preferred stock was exercised. As a result of the IPO, both the Series G and Series E warrants automatically converted to shares of common stock. For additional information related to our IPO, refer to section above titled "Initial Public Offering."

*Preferred Stock*

After conversion of the above mentioned redeemable convertible preferred stock into common stock upon closing of our IPO, our board of directors was granted the authority to issue up to 10 million shares of preferred stock and to determine the price, rights, preferences, privileges and restrictions, including voting rights, of those shares without any further vote or action by the stockholders. As of December 31, 2020 and 2021, there was no preferred stock issued and outstanding.

*Common Stock*

As of December 31, 2021, we have the authority to issue 5.0 billion shares of common stock with a par value of $0.00001 per share. Holders of common stock are entitled to dividends when and if declared by the board of directors, subject to the rights of the holders of all classes of stock outstanding having priority rights to dividends. As of December 31, 2021, no dividends have been declared and there were 1.9 billion shares of common stock issued and outstanding.

*Equity Compensation Plans*

We maintain four equity compensation plans that provide for the issuance of shares of our common stock to our officers and other employees, directors, and consultants: the 2010 Stock Plan (the "2010 Plan"), the 2013 Equity Incentive Plan (the "2013 Plan"), the 2019 Equity Incentive Plan (the "2019 Plan"), and the 2019 Employee Stock Purchase Plan (the "ESPP"), which have all been approved by stockholders. These plans provide for the issuance of incentive stock options ("ISOs"), nonqualified stock options ("NSOs"), SARs, restricted stock, RSUs, performance-based awards, and other awards (that are based in whole or in part by reference to our common stock). Following our IPO, we have only issued awards under the 2019 Plan and the ESPP, and no additional awards will be granted under the 2010 Plan and 2013 Plan.

The number of shares of our common stock available for issuance under the 2019 Plan automatically increases on January 1 of each year, for a period of not more than ten years, commencing on January 1, 2020 and ending on (and including) January 1, 2029 by the lesser of (a) 5% of the total number of the shares of common stock outstanding on December 31 of the immediately preceding calendar year, and (b) such number of shares determined by our board of directors. Pursuant to the automatic increase feature of the 2019 Plan, our board of directors approved an increase of 97 million shares reserved for issuance effective January 1, 2022, for a total of 377 million shares reserved.

### Stock Option and SAR Activity

A summary of stock option and SAR activity for the year ended December 31, 2021 is as follows (in millions, except share amounts which are reflected in thousands, per share amounts, and years):

| | SARs Outstanding Number of SARs | Options Outstanding Number of Shares | | Weighted-Average Exercise Price Per Share | Weighted-Average Remaining Contractual Life (in years) | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|---|
| **As of December 31, 2020** | 229 | 28,734 | $ | 12.87 | 4.97 | $ | 1,104 |
| Granted and assumed in connection with acquisitions | — | 5,457 | $ | 5.13 | | | |
| Exercised | (65) | (9,380) | $ | 10.81 | | | |
| Canceled and forfeited | (7) | (558) | $ | 17.14 | | | |
| **As of December 31, 2021** | 157 | 24,253 | $ | 11.84 | 4.35 | $ | 735 |
| Vested and expected to vest at December 31, 2021 | 134 | 17,411 | $ | 8.10 | 3.55 | $ | 593 |
| **Exercisable as of December 31, 2021** | 134 | 17,411 | $ | 8.10 | 3.55 | $ | 593 |

The total intrinsic value of stock options and SARs exercised for the years ended December 31, 2019, 2020 and 2021, was $202 million, $614 million and $382 million, respectively.

### RSU Activity

The following table summarizes the activity related to our RSUs for the year ended December 31, 2021 (in thousands, except per share amounts):

| | Number of Shares | | Weighted-Average Grant-Date Fair Value per Share |
|---|---|---|---|
| **Unvested and outstanding as of December 31, 2020** | 83,736 | $ | 34.17 |
| Granted | 50,308 | $ | 49.78 |
| Vested | (39,005) | $ | 37.98 |
| Canceled and forfeited | (23,578) | $ | 37.85 |
| **Unvested and outstanding as of December 31, 2021** | 71,461 | $ | 41.91 |

The total fair value of RSUs vested for the years ended December 31, 2019, 2020 and 2021 was $1.4 billion, $1.4 billion, and $1.5 billion, respectively.

### Restricted Common Stock

We have granted restricted common stock to certain continuing employees, primarily in connection with acquisitions. Vesting of this stock may be dependent on a combination of service and performance conditions that become satisfied upon the occurrence of a qualifying event. We have the right to repurchase shares for which the vesting conditions are not satisfied.

The following table summarizes the activity related to our restricted common stock for the year ended December 31, 2021 (in thousands, except per share amounts):

| | Number of Shares | | Weighted-Average Grant-Date Fair Value per Share |
|---|---|---|---|
| **Unvested restricted common stock as of December 31, 2020** | 28 | $ | 34.86 |
| Granted | 4,641 | $ | 43.50 |
| Vested | (516) | $ | 43.50 |
| Canceled and forfeited | — | $ | — |
| **Unvested restricted common stock as of December 31, 2021** | 4,153 | $ | 43.44 |

*Stock-Based Compensation Expense*

Stock-based compensation expense is allocated based on the cost center to which the award holder belongs. The following table summarizes total stock-based compensation expense by function for the years ended December 31, 2019, 2020 and 2021 (in millions):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2020** | **2021** |
| Operations and support | $ 454 | $ 72 | $ 139 |
| Sales and marketing | 243 | 48 | 83 |
| Research and development | 2,958 | 477 | 614 |
| General and administrative | 941 | 230 | 332 |
| Total | $ 4,596 | $ 827 | $ 1,168 |

Upon our IPO on May 14, 2019, the performance condition was met and $3.6 billion of stock-based compensation expense was recognized related to these awards. For additional information related to our IPO, refer to section above titled "Initial Public Offering."

During the years ended December 31, 2019, 2020 and 2021, we modified the terms of stock-based awards for certain employees upon their termination or change in employment status. Incremental stock-based compensation cost in relation to the modification of stock-based awards was not material for the years ended December 31, 2019, 2020 and 2021.

As of December 31, 2021, there was $3.0 billion of unamortized compensation costs related to all unvested awards. The unamortized compensation costs are expected to be recognized over a weighted-average period of approximately 2.70 years. Stock-based compensation expense capitalized as internally developed software costs was $61 million for the year ended December 31, 2019 and not material for the years ended December 31, 2020 and 2021.

The tax benefits recognized in the consolidated statements of operations for stock-based compensation arrangements were not material during the years ended December 31, 2019, 2020 and 2021, respectively.

No redeemable convertible preferred stock warrants were granted to non-employee service providers and others in 2019, 2020 and 2021. During 2019, 2020 and 2021, warrants vested to non-employee service providers and others were not material and no warrants were granted.

The weighted-average grant-date fair values of stock options and SARs granted to employees in the years ended December 31, 2019, 2020 and 2021 were $19.91, $35.77 and $39.43 per share, respectively. The fair value of stock options and SARs granted was determined using the Black-Scholes option-pricing model with the following weighted-average assumptions:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2020** | **2021** |
| Expected term (in years) | 6.0 | 4.0 | 5.1 |
| Risk-free interest rate | 2.2 % | 0.3 % | 0.9 % |
| Expected volatility | 33.9 % | 42.5 % | 40.3 % |
| Expected dividend yield | — % | — % | — % |

The weighted-average grant-date fair value of performance awards with market-based targets in the year ended December 31, 2019 was $18.20 per share. The weighted-average derived service period for performance awards with market-based targets in the year ended December 31, 2019 was 2.12 years. There were no performance awards with market-based targets granted in the years ended December 31, 2020 and 2021. The fair value of performance awards with market-based targets granted was determined using a Monte Carlo model with the following weighted-average assumptions:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2020** | **2021** |
| Risk-free interest rate | 2.7 % | — % | — % |
| Expected volatility | 39.0 % | — % | — % |
| Expected dividend yield | — % | — % | — % |

*2019 Employee Stock Purchase Plan*

On May 9, 2019, the date of the underwriting agreement between Uber and the underwriters for the IPO, our ESPP became effective. The number of shares of Uber common stock available for issuance under the ESPP automatically increases on January 1 of each year, beginning in 2020 and continuing through 2029, by the lesser of (a) 1.0% of the total number of shares of common stock

119

outstanding on December 31 of the immediately preceding calendar year, and (b) 25,000,000 shares. However, our board of directors or compensation committee may reduce the amount of the increase in any particular year. Pursuant to the automatic increase feature of the ESPP, effective January 1, 2022, a total of 70 million shares of common stock are reserved for issuance under the ESPP.

The stock-based compensation expense recognized for the ESPP was not material during the years ended December 31, 2019, 2020 and 2021. During the years ended December 31, 2019, 2020 and 2021, 2 million, 5 million and 3 million shares, respectively, of common stock were purchased under the ESPP at a weighted-average price of $23.83, $25.05 and $38.75 per share, respectively, resulting in cash proceeds of $49 million, $125 million and $107 million, respectively. We selected the Black-Scholes option-pricing model as the method for determining the estimated fair value for our ESPP. As of December 31, 2021, total unrecognized compensation cost related to the ESPP was $39 million, which will be amortized over a period of 0.4 years.

### Note 12 - Income Taxes

The U.S. and foreign components of income (loss) before provision for (benefit from) income taxes for the years ended December 31, 2019, 2020 and 2021 are as follows (in millions):

| | Year Ended December 31, | | |
| | 2019 | 2020 | 2021 |
|---|---|---|---|
| U.S. | $ (4,926) | $ (3,518) | $ (340) |
| Foreign | (3,507) | (3,428) | (685) |
| Loss before income taxes and loss from equity method investments | $ (8,433) | $ (6,946) | $ (1,025) |

The components of the provision for (benefit from) income taxes for the years ended December 31, 2019, 2020 and 2021 are as follows (in millions):

| | Year Ended December 31, | | |
| | 2019 | 2020 | 2021 |
|---|---|---|---|
| **Current** | | | |
| Federal | $ 1 | $ — | $ — |
| State | — | 11 | 4 |
| Foreign | 132 | 63 | 196 |
| Total current tax expense | $ 133 | $ 74 | $ 200 |
| **Deferred** | | | |
| Federal | (77) | (97) | (76) |
| State | 8 | (7) | 19 |
| Foreign | (19) | (162) | (635) |
| Total deferred tax expense (benefit) | (88) | (266) | (692) |
| Total provision for (benefit from) income taxes | $ 45 | $ (192) | $ (492) |

120

The following is a reconciliation of the statutory federal income tax rate to our effective tax rate for the years ended December 31, 2019, 2020 and 2021:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2021 |
| Federal statutory income tax rate | 21.0 % | 21.0 % | 21.0 % |
| State income tax expense | (0.1) | (0.1) | (2.3) |
| Foreign rate differential | (3.8) | 10.8 | 10.3 |
| Non-deductible expenses | (1.3) | (1.3) | (5.2) |
| Stock-based compensation | 1.2 | 1.3 | 4.5 |
| Interest on convertible notes | (0.3) | — | (0.1) |
| Gain on convertible notes | 1.1 | — | — |
| Federal research and development credits | 3.1 | 2.9 | 7.8 |
| Deferred tax on investments [1] | — | 0.9 | 48.7 |
| Entity restructuring [2] | 92.3 | (1.7) | (2.0) |
| Change in unrecognized tax benefits | (17.0) | (3.7) | (27.8) |
| Valuation allowance | (97.3) | (45.8) | (33.7) |
| US tax on foreign income | (1.6) | — | (10.8) |
| Tax rate change | — | 14.4 | 22.4 |
| Other interest | 1.8 | 3.2 | 16.8 |
| Other, net | 0.4 | 0.9 | (1.6) |
| Effective income tax rate | (0.5)% | 2.8 % | 48.0 % |

[1] The 2020 rate impact for "Deferred tax on investments" was primarily driven by the deferred U.S. tax impact and the deferred China tax impact of the impairment charge related to our investment in Didi.

The 2021 rate impact for "Deferred tax on investments" was primarily driven by the deferred China and U.S. tax impact related to our investment in Didi and the deferred U.S. tax impact related to our investments in Aurora, Grab, and Zomato.

[2] The 2019 rate impact for "Entity restructuring" is related to a series of transactions resulting in changes to our international legal structure, including a redomiciliation of a subsidiary to the Netherlands and a transfer of certain intellectual property rights among wholly owned subsidiaries, primarily to align its evolving operations. The redomiciliation resulted in a step-up in the tax basis of intellectual property rights and a correlated increase in foreign deferred tax assets in an amount of $6.4 billion, net of a reserve for uncertain tax positions of $1.4 billion (refer to the 2019 rate impact for "Change in unrecognized tax benefits"). Based on available objective evidence, management believed it was not more-likely-than-not that these additional foreign deferred tax assets will be realizable as of December 31, 2019 and, therefore, were offset by a full valuation allowance (refer to the 2019 rate impact for "Valuation allowance") to the extent not offset by reserves for uncertain tax positions. The corresponding deferred tax asset and valuation allowance balance were included in the "Fixed assets and intangible assets" and "Valuation allowance" lines, respectively, in the table below.

In the second quarter of 2020, we transferred certain intangible assets among our wholly-owned subsidiaries to align our structure to our evolving operations. The transaction resulted in the establishment of deferred tax assets of $354 million; however, there was no financial statement benefit recognized since the deferred tax asset was offset by a full valuation allowance.

To align our structure to our evolving operations, in the second and fourth quarters of 2021, we completed intercompany transfers of certain intangible assets. These intercompany transfers did not have a material impact to the financial statements.

121

The components of deferred tax assets and liabilities as of December 31, 2020 and 2021 are as follows (in millions):

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2021** |
| **Deferred tax assets** | | |
| Net operating loss carryforwards | $ 4,949 | $ 5,992 |
| Research and development credits | 857 | 1,020 |
| Stock-based compensation | 125 | 66 |
| Accruals and reserves | 227 | 290 |
| Accrued legal | 95 | 119 |
| Fixed assets and intangible assets | 6,936 | 6,753 |
| Investment in partnership | 254 | — |
| Lease liability | 460 | 455 |
| Interest limitation carryforwards | 562 | 629 |
| Other | 58 | 107 |
| Total deferred tax assets | 14,523 | 15,431 |
| Less: Valuation allowance | (13,410) | (13,920) |
| Total deferred tax assets, net of valuation allowance | 1,113 | 1,511 |
| **Deferred tax liabilities** | | |
| Indefinite lived deferred tax liability [1] | 1,502 | 1,451 |
| ROU assets | 322 | 334 |
| Other | 68 | 29 |
| Total deferred tax liabilities | 1,892 | 1,814 |
| Net deferred tax liabilities | $ 779 | $ 303 |

[1] The $1.5 billion indefinite-lived deferred tax liability represents the deferred U.S. income tax expense, which will be incurred upon the eventual disposition of the shares underlying our investments in Didi, Aurora, Grab, and Zomato. The current year tax expense and any subsequent changes in the recognition or measurement of this deferred tax liability will be recorded in continuing operations.

Based on available evidence, management believes it is not more-likely-than-not that the net U.S., Netherlands, and other non-material jurisdictions' deferred tax assets will be fully realizable. In these jurisdictions, we have recorded a valuation allowance against net deferred tax assets. We regularly review the deferred tax assets for recoverability based on historical taxable income, projected future taxable income, the expected timing of the reversals of existing taxable temporary differences and tax planning strategies by jurisdiction. Our judgment regarding future profitability may change due to many factors, including future market conditions and the ability to successfully execute our business plans and/or tax planning strategies. Should there be a change in the ability to recover deferred tax assets, our income tax provision would increase or decrease in the period in which the assessment is changed. We had a valuation allowance against net deferred tax assets of $13.4 billion and $13.9 billion as of December 31, 2020 and 2021, respectively. In 2021, the increase in the valuation allowance was primarily attributable to a tax rate increase in the Netherlands, an increase in U.S. federal, state and Netherlands deferred tax assets resulting from the loss from operations, and tax credits generated during the year, offset partially by the release of the valuation allowance due to deferred tax liabilities recorded as a result of the acquisitions providing an additional source of taxable income to support the realizability of pre-existing deferred tax assets.

The indefinite carryforward period for net operating losses ("NOLs") means that indefinite-lived deferred tax liabilities can be considered as support for realization of deferred tax assets, which can affect the need to record or maintain a valuation allowance for deferred tax assets. As of December 31, 2020 and 2021, we realized approximately $744 million and $1.2 billion, respectively, of our U.S. federal and state deferred tax assets as a result of our indefinite-lived deferred tax liabilities being used as a source of income.

As of December 31, 2021, we had U.S. federal NOL carryforwards of $3.2 billion that begin to expire in 2031 and $11.7 billion that have an unlimited carryover period. As of December 31, 2021, we had U.S. state NOL carryforwards of $10.2 billion that begin to expire in 2022 and $2.2 billion that have an unlimited carryover period. As of December 31, 2021, we had foreign NOL carryforwards of $507 million that begin to expire in 2023 and $10.1 billion that have an unlimited carryover period.

As of December 31, 2021, we had U.S. federal research tax credit carryforwards of $785 million that begin to expire in 2028. We had U.S. state research tax credit carryforwards of $13 million that begin to expire in 2032 and $521 million that have an unlimited carryover period.

P-02346-0124

In the event we experience an ownership change within the meaning of Section 382 of the Internal Revenue Code ("IRC"), our ability to utilize net operating losses, tax credits and other tax attributes may be limited. The most recent analysis of our historical ownership changes was completed through December 31, 2021. Based on the analysis, we do not anticipate a current limitation on the tax attributes.

The following table reflects changes in gross unrecognized tax benefits (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| Unrecognized tax benefits at beginning of year | $ 394 | $ 1,797 | $ 2,293 |
| Gross increases - current year tax positions | 1,566 | 353 | 239 |
| Gross increases - prior year tax positions | 16 | 191 | 134 |
| Gross decreases - prior year tax positions | (36) | (48) | (9) |
| Gross decreases - settlements with tax authorities | (143) | — | — |
| Unrecognized tax benefits at end of year | $ 1,797 | $ 2,293 | $ 2,657 |

As of December 31, 2021, approximately $204 million of unrecognized tax benefits, if recognized, would impact the effective tax rate. The remaining $2.5 billion of the unrecognized tax benefits would not impact the effective tax rate due to the valuation allowance against certain deferred tax assets.

We recognize accrued interest and penalties related to unrecognized tax benefits within the provision for income taxes in the consolidated statements of operations. The amount of interest and penalties accrued as of December 31, 2020 and 2021 was $12 million and $18 million, respectively.

Although the timing of the resolution and/or closure of audits is highly uncertain, it is reasonably possible that the balance of gross unrecognized tax benefits could significantly change in the next 12 months. Given the number of years remaining subject to examination and the number of matters being examined, we are unable to estimate the full range of possible adjustments to the balance of gross unrecognized tax benefits. Any changes to unrecognized tax benefits recorded as of December 31, 2021 that are reasonably possible to occur within the next 12 months are not expected to be material.

We are subject to taxation in the U.S. and various state and foreign jurisdictions. We are also under various state and other foreign income tax examinations. We believe that adequate amounts have been reserved in these jurisdictions. To the extent we have tax attribute carryforwards, the tax years in which the attribute was generated may still be adjusted upon examination by the federal, state or foreign tax authorities to the extent utilized in a future period.

As of December 31, 2021, the open tax years for our major tax jurisdictions are as follows:

| Jurisdiction | Tax Years |
|---|---|
| U.S. Federal | 2011 - 2021 |
| U.S. States | 2004 - 2021 |
| Brazil | 2016 - 2021 |
| Netherlands | 2018 - 2021 |
| Australia | 2017 - 2021 |

As of December 31, 2021, the amount of accumulated foreign earnings of certain foreign subsidiaries that we intend to indefinitely reinvest is not material.

**Note 13 – Net Income (Loss) Per Share**

Basic net income (loss) per share is computed by dividing net income (loss) by the weighted-average number of common shares outstanding for the periods presented. Diluted net income (loss) per share is computed by giving effect to all potential weighted average dilutive common stock. The dilutive effect of outstanding awards and convertible securities is reflected in diluted net income (loss) per share by application of the treasury stock method or if-converted method, as applicable.

We take into account the effect on consolidated net income (loss) per share of dilutive securities of entities in which we hold equity interests that are accounted for using the equity method.

123

The following table sets forth the computation of basic and diluted net loss per share attributable to common stockholders (in millions, except share amounts which are reflected in thousands, and per share amounts):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| **Basic net loss per share:** | | | |
| **Numerator** | | | |
| Net loss including non-controlling interests | $ (8,512) | $ (6,788) | $ (570) |
| Add: net loss attributable to non-controlling interests, net of tax | (6) | (20) | (74) |
| Net loss attributable to common stockholders | $ (8,506) | $ (6,768) | $ (496) |
| **Denominator** | | | |
| Basic weighted-average common stock outstanding | 1,248,353 | 1,752,960 | 1,892,546 |
| Basic net loss per share attributable to common stockholders [1] | $ (6.81) | $ (3.86) | $ (0.26) |
| **Diluted net loss per share:** | | | |
| **Numerator** | | | |
| Net loss attributable to common stockholders | $ (8,506) | $ (6,768) | $ (496) |
| Net loss attributable to Freight Holding convertible common shares non-controlling interest, net of tax | — | — | (44) |
| Diluted net loss attributable to common stockholders | $ (8,506) | $ (6,768) | $ (540) |
| **Denominator** | | | |
| Number of shares used in basic net loss per share computation | 1,248,353 | 1,752,960 | 1,892,546 |
| Weighted-average effect of potentially dilutive securities: | | | |
| Assumed redemption of Freight Holding convertible common shares, non-controlling interest | — | — | 2,973 |
| Diluted weighted-average common stock outstanding | 1,248,353 | 1,752,960 | 1,895,519 |
| Diluted net loss per share attributable to common stockholders [1] | $ (6.81) | $ (3.86) | $ (0.29) |

[1] Per share amounts are calculated using unrounded numbers and therefore may not recalculate.

Effective January 1, 2021, we early adopted ASU 2020-06 using the modified retrospective approach. Upon adoption, we use the if-converted method and presume share settlement for our 2025 Convertible Notes and our non-interest bearing unsecured convertible notes related to the acquisition of Careem ("Careem Notes") when calculating the dilutive effect of these notes.

The following potentially dilutive outstanding securities were excluded from the computation of diluted net loss per share because their effect would have been anti-dilutive for the periods presented, or issuance of such shares is contingent upon the satisfaction of certain conditions which were not satisfied by the end of the period (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2021 |
| Freight Holding contingently redeemable preferred stock | — | 14,339 | 10,070 |
| Convertible notes | — | 28,407 | 21,740 |
| RSUs | 85,058 | 83,736 | 71,461 |
| Stock options | 34,800 | 28,734 | 24,253 |
| Common stock subject to repurchase | 210 | 28 | 4,153 |
| RSUs to settle fixed monetary awards | 283 | 49 | — |
| Shares committed under ESPP | 5,490 | 2,451 | 3,226 |
| Warrants to purchase common stock | 123 | 126 | 73 |
| Total | 125,964 | 157,870 | 134,976 |

## Note 14 - Segment Information and Geographic Information

We determine our operating segments based on how the chief operating decision maker ("CODM") manages the business, allocates resources, makes operating decisions and evaluates operating performance.

During the second quarter of 2020, we changed the name of the Rides segment to Mobility and the name of the Eats segment to

124

Delivery. In addition, during the second quarter of 2020, we completed the divestiture of our JUMP business (the "JUMP Divestiture"), which comprised substantially all of the operations of our Other Bets reportable segment. Subsequent to the JUMP Divestiture, the Other Bets segment no longer exists and the continuing activities previously included in the Other Bets segment are immaterial for all periods presented. Certain of these other continuing business activities were migrated to our Mobility segment, whose prior period results were not restated because such business activities were immaterial. The other business activities that were not migrated represent an "all other category separate from other reconciling items" and are presented within the All Other caption. The historical results of the former Other Bets segment are included within the All Other caption. Refer to Note 19 – Divestitures for further information regarding the JUMP Divestiture.

In January 2021, we sold our ATG Business to Aurora. Our ATG Business was included in the ATG and Other Technology Programs segment prior to this transaction. As a result of the sale, ATG and Other Technology Programs segment was no longer a reportable segment. Beginning in the first quarter of 2021, results of ATG and Other Technology Programs are included within All Other. Refer to Note 19 – Divestitures for further information regarding the sale of our ATG Business.

As of December 31, 2021, our three operating and reportable segments are as follows:

| Segment | Description |
|---|---|
| **Mobility** | Mobility products connect consumers with Drivers who provide rides in a variety of vehicles, such as cars, auto rickshaws, motorbikes, minibuses, or taxis. Mobility also includes activity related to our Financial Partnerships and Transit offerings. |
| **Delivery** | Delivery offerings allow consumers to search for and discover local restaurants, order a meal, and either pick-up at the restaurant or have the meal delivered. In certain markets, Delivery also includes offerings for grocery, alcohol and convenience store delivery as well as select other goods. |
| **Freight** | Freight connects carriers with shippers on our platform, and gives carriers upfront, transparent pricing and the ability to book a shipment. Freight also includes transportation management and other logistics services offerings. |

125

For information about how our reportable segments derive revenue, refer to Note 2 – Revenue. Our segment operating performance measure is segment adjusted EBITDA. The CODM does not evaluate operating segments using asset information and, accordingly, we do not report asset information by segment. Segment adjusted EBITDA is defined as revenue less the following expenses: cost of revenue, operations and support, sales and marketing, and general and administrative and research and development expenses associated with our segments. Segment adjusted EBITDA also excludes non-cash items or items that management does not believe are reflective of our ongoing core operations (as shown in the table below). The following table provides information about our segments and a reconciliation of the total segment adjusted EBITDA to loss from operations (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2020** | **2021** |
| Segment adjusted EBITDA: | | | |
| Mobility | $ 2,071 | $ 1,169 | $ 1,596 |
| Delivery | (1,372) | (873) | (348) |
| Freight | (217) | (227) | (130) |
| All Other [1] | (750) | (461) | (11) |
| Total segment adjusted EBITDA | (268) | (392) | 1,107 |
| Reconciling items: | | | |
| Corporate G&A and Platform R&D [2], [3] | (2,457) | (2,136) | (1,881) |
| Depreciation and amortization | (472) | (575) | (902) |
| Stock-based compensation expense | (4,596) | (827) | (1,168) |
| Legal, tax, and regulatory reserve changes and settlements | (353) | 35 | (526) |
| Driver appreciation award | (299) | — | — |
| Payroll tax on IPO stock-based compensation | (86) | — | — |
| Goodwill and asset impairments/loss on sale of assets | (8) | (317) | (157) |
| Acquisition, financing and divestitures related expenses | — | (86) | (102) |
| Accelerated lease costs related to cease-use of ROU assets | — | (102) | (5) |
| COVID-19 response initiatives | — | (106) | (54) |
| Gain on lease arrangement, net | — | 5 | — |
| Restructuring and related charges, net | (57) | (362) | — |
| Legacy auto insurance transfer [4] | — | — | (103) |
| Mass arbitration fees | — | — | (43) |
| Loss from operations | $ (8,596) | $ (4,863) | $ (3,834) |

[1] Includes historical results of ATG and Other Technology Programs and New Mobility.

[2] Excluding stock-based compensation expense.

[3] Includes costs that are not directly attributable to our reportable segments. Corporate G&A also includes certain shared costs such as finance, accounting, tax, human resources, information technology and legal costs. Platform R&D also includes mapping and payment technologies and support and development of the internal technology infrastructure. Our allocation methodology is periodically evaluated and may change.

[4] Refer to Note 1 – Description of Business and Summary of Significant Accounting Policies for further information.

*Geographic Information*

Revenue by geography is based on where the trip or shipment was completed or meal delivered. Long-lived assets, net includes property and equipment, net and operating lease right-of-use assets as well as the same asset class included within assets held for sale on the consolidated balance sheets. The following tables set forth revenue and long-lived assets, net by geographic area as of and for the years ended December 31, 2019, 2020 and 2021 (in millions):

126

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2020** | **2021** |
| United States | $ 7,968 | $ 6,082 | $ 9,058 |
| All other countries | 5,032 | 5,057 | 8,397 |
| Total Revenue | $ 13,000 | $ 11,139 | $ 17,455 |

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2021** |
| United States | $ 2,940 | $ 2,991 |
| All other countries | 252 | 250 |
| Total long-lived assets, net | $ 3,192 | $ 3,241 |

Revenue grouped by offerings is included in Note 2 – Revenue.

**Note 15 – Commitments and Contingencies**

*Contingencies*

From time to time, we are a party to various claims, non-income tax audits and litigation in the normal course of business. As of December 31, 2020 and 2021, we had recorded aggregate liabilities of $1.8 billion and $2.2 billion, respectively, of which $1.3 billion and $1.3 billion relate to non-income tax matters, respectively, in accrued and other current liabilities on the consolidated balance sheets for all of our legal, regulatory and non-income tax matters that were probable and reasonably estimable.

We are currently party to various legal and regulatory matters that have arisen in the normal course of business and include, among others, alleged independent contractor misclassification claims, Fair Credit Reporting Act ("FCRA") claims, alleged background check violations, pricing and advertising claims, unfair competition claims, intellectual property claims, employment discrimination and other employment-related claims, Telephone Consumer Protection Act ("TCPA") claims, Americans with Disabilities Act ("ADA") claims, data and privacy claims, securities claims, antitrust claims, challenges to regulations, and other matters. We have existing litigation, including class actions, Private Attorney General Act lawsuits, arbitration claims, and governmental administrative and audit proceedings, asserting claims by or on behalf of Drivers that Drivers are misclassified as independent contractors. In connection with the enactment of California State Assembly Bill 5 ("AB5"), we have received and expect to continue to receive - in California and in other jurisdictions - an increased number of misclassification claims. With respect to our outstanding legal and regulatory matters, based on our current knowledge, we believe that the ultimate amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, financial position, results of operations, or cash flows. The outcome of such legal matters is inherently unpredictable and subject to significant uncertainties. If one or more of these matters were resolved against us for amounts in excess of management's expectations, our results of operations, financial condition or cash flows could be materially adversely affected.

*Driver Classification*

*California Attorney General Lawsuit*

In January 2020, AB5 went into effect. AB5 codifies a test to determine whether a worker is an employee under California law. The test is referred to as the "ABC" test, and was originally handed down by the California Supreme Court in Dynamex Operations v. Superior Court in 2018. Under the ABC test, workers performing services for a hiring entity are considered employees unless the hiring entity can demonstrate three things: the worker (A) is free from the hiring entity's control, (B) performs work that is outside the usual course of the hiring entity's business, and (C) customarily engages in the independent trade, work or type of business performed for the hiring entity.

On May 5, 2020, the California Attorney General, in conjunction with the city attorneys for San Francisco, Los Angeles and San Diego, filed a complaint in San Francisco Superior Court against Uber and Lyft, Inc. ("Lyft"). The complaint alleges drivers are misclassified, and seeks an injunction and monetary damages related to the alleged competitive advantage caused by the alleged misclassification of drivers.

On August 10, 2020, the Court issued a preliminary injunction order, prohibiting us from classifying drivers as independent contractors and from violating various wage and hour laws. The injunction was stayed pending appeal. On October 22, 2020, the Court of Appeal affirmed the lower court's ruling, and we filed a petition for review of the decision with the California Supreme Court. The petition was based upon the passage of Proposition 22 by California voters in November 2020, and requested that the Court of Appeal opinion be vacated because AB5's application to Uber was superseded by Proposition 22.

Proposition 22 was a state ballot initiative that provides a framework for drivers that use platforms like ours to qualify as independent workers. As a result of the passage of Proposition 22, Drivers are able to maintain their status as independent contractors

127

under California law, and we and our competitors are required to comply with the provisions of Proposition 22. Proposition 22 went into effect on December 16, 2020.

The California Supreme Court declined the petition for review on February 10, 2021. The lawsuit was returned to the trial court following the appellate proceedings on February 22, 2021. On April 12, 2021, the California Attorney General, Uber and Lyft filed a stipulation to dissolve the preliminary injunction with the trial court. On April 16, 2021, the trial court signed an order granting the stipulation. Although the preliminary injunction has been dissolved, the lawsuit remains ongoing relating to claims by the California Attorney General for periods prior to enactment of Proposition 22. We have petitioned to stay this matter pending coordination with other California employment related matters, which was granted and a coordination judge was assigned. We intend to continue to vigorously defend ourselves. Our chances of success on the merits are still uncertain and any reasonably possible loss or range of loss cannot be estimated.

In addition, in January 2021, a petition was filed with the California Supreme Court by several drivers and a labor union alleging that Proposition 22 is unconstitutional, which was denied. The same drivers and labor union have since filed a similar challenge in California Superior Court, and in August 2021, the Alameda County Superior Court ruled that Proposition 22 is unconstitutional. On September 21, 2021, the State of California filed an appeal of that decision with the California Court of Appeal, and the Protect App-Based Drivers and Services organization has also filed an appeal.

*Massachusetts Attorney General Lawsuit*

On July 9, 2020, the Massachusetts Attorney General filed a complaint in Suffolk County Superior Court against Uber and Lyft. The complaint alleges Drivers are employees, and are entitled to protections under the wage and labor laws. The complaint was served on July 20, 2020 and Uber filed a motion to dismiss the complaint on September 24, 2020, which was denied on March 25, 2021. A summary judgment motion was filed in September 2021, and we filed a motion in which we argue that the motion is premature. The court granted our motion to defer the summary judgment motion on January 12, 2022. Our chances of success on the merits are still uncertain and any reasonably possible loss or range of loss cannot be estimated.

*Swiss Social Security Reclassification*

Several Swiss administrative bodies have issued decisions in which they classify Drivers as employees of Uber Switzerland, Rasier Operations B.V. or of Uber B.V. for social security or regulatory purposes. We are challenging each of them before the Social Security and Administrative Tribunals. In April 2021, a ruling was made that Uber Switzerland could not be held liable for social security contributions. The litigations with regards to Uber B.V. and Raiser Operations B.V. are still pending for years 2014 to 2019. In January 2022, the Social Security Tribunal of Zurich reclassified drivers who have used the App in 2014 as dependent workers of Uber BV and Rasier Operations BV from a social security standpoint, but this ruling has been appealed before the Federal Tribunal and has no impact on our current operations. The ultimate resolution of the social security matters for the other two entities is uncertain and the amount accrued for this matter is recorded within accrued and other current liabilities on the consolidated balance sheets.

*Aslam, Farrar, Hoy and Mithu v. Uber B.V., Uber Britannia Ltd. and Uber London Ltd.*

On October 28, 2015, a claim by 25 Drivers, including Mr. Y. Aslam and Mr. J. Farrar, was brought in the UK Employment Tribunal against us asserting that they should be classified as "workers" (a separate category between independent contractors and employees) in the UK rather than independent contractors. The tribunal ruled on October 28, 2016 that Drivers were workers whenever our App is switched on and they are ready and able to take trips based on an assessment of the App in July 2016. The Court of Appeal rejected our appeal in a majority decision on December 19, 2018. We appealed to the Supreme Court and a hearing at the Supreme Court took place in July 2020.

On February 19, 2021, the Supreme Court of the UK upheld the tribunal ruling that the Drivers using the App in 2016 were workers for UK employment law purposes. Damages include back pay including holiday pay and minimum wage, which will be assessed and quantified at a future hearing in July 2022.

On March 16, 2021, we announced that more than 70,000 Mobility drivers in the UK will be treated as workers, earning at least the National Living Wage when driving with Uber. They will also be paid for holiday time and all those eligible will be automatically enrolled into a pension plan. We have also completed a settlement process with drivers in the UK to proactively resolve historical claims relating to their classification under UK law. Our portal for drivers to register for a settlement of historical holiday pay and national minimum wage liabilities closed on July 22, 2021 and we have extended offers to all drivers eligible for settlement who are not already represented by an attorney and have made payments to the drivers who accepted our offers. Compensation hearings will take place in 2022 for claimants who have not settled their historic claims, where the tribunal will assess our position on the correct approach to working time, expenses, and holiday pay.

On June 23, 2021, we received a compliance notice from the UK pension regulator to facilitate our auto-enrollment implementation. We have completed the enrollment of eligible drivers in the UK into a pension plan. While the ultimate resolution of these matters is uncertain, we have recorded an accrual for these matters within accrued and other current liabilities on the consolidated balance sheets as of December 31, 2021.

128

*Other Driver Classification Matters*

Additionally, we have received other lawsuits and governmental inquiries in other jurisdictions, and anticipate future claims, lawsuits, arbitration proceedings, administrative actions, and government investigations and audits challenging our classification of Drivers as independent contractors and not employees. We believe that our current and historical approach to classification is supported by the law and intend to continue to defend ourselves vigorously in these matters. However, the results of litigation and arbitration are inherently unpredictable and legal proceedings related to these claims, individually or in the aggregate, could have a material impact on our business, financial condition, results of operations and cash flows. Regardless of the outcome, litigation and arbitration of these matters can have an adverse impact on us because of defense and settlement costs individually and in the aggregate, diversion of management resources and other factors.

### State Unemployment Taxes

In 2018, the New Jersey Department of Labor ("NJDOL") opened an audit reviewing whether Drivers were independent contractors or employees for purposes of determining whether unemployment insurance regulations apply from 2014 through 2018. The NJDOL made an assessment on November 12, 2019, against both Rasier and Uber. Both assessments were calculated through November 15, 2019, but only calculated the alleged contributions, penalties, and interests owed from 2014 through 2018. The NJDOL has provided several assessments from February through October 2021. We have submitted payment for the principal revised amount of the assessment and are engaged in ongoing discussions with the NJDOL about the assessments. While the ultimate resolution of this matter is uncertain, we recorded for this matter within accrued and other current liabilities on the consolidated balance sheet as of December 31, 2021.

### Google v. Levandowski & Ron; Google v. Levandowski

On October 28, 2016, Google filed arbitration demands against each of Anthony Levandowski and Lior Ron, former employees of Google, alleging breach of their respective employment agreements with Google, fraud and other state law violations (due to soliciting Google employees and starting a new venture to compete with Google's business in contravention of their respective employment agreements). Google sought damages, injunctive relief, and restitution. On March 26, 2019, following a hearing, the arbitration panel issued an interim award, finding against each of Google's former employees and awarding $127 million against Anthony Levandowski and $1 million for which both Anthony Levandowski and Lior Ron are jointly and severally liable. In July 2019, Google submitted its request for interest, attorneys fees, and costs related to these claims. The Panel's Final Award was issued on December 6, 2019. On February 7, 2020, Ron and Google entered into a settlement agreement and mutual release to satisfy the corrected final award in the amount of approximately $10 million. Uber paid Google on behalf of Ron pursuant to an indemnification obligation. A dispute continues to exist with regard to Uber's alleged indemnification obligation to Levandowski. Whether Uber is ultimately responsible for indemnification of Levandowski depends on the exceptions and conditions set forth in the indemnification agreement. In March 2020, Levandowski pleaded guilty to criminal trade secret charges and filed for bankruptcy. Former President Trump pardoned Levandowski from the trade secret conviction. Uber filed a proof of claim in the bankruptcy court, and Levandowski additionally asserted a claim against Uber alleging that Uber failed to perform its obligations under an agreement with Otto Trucking, LLC. For these claims, Uber and Levandowski reached a confidential settlement in principle that is scheduled for an approval hearing with the court on March 3, 2022. While the ultimate resolution of this matter is uncertain, we have recorded for this matter within accrued and other current liabilities on the consolidated balance sheet as of December 31, 2021.

### Non-Income Tax Matters

We recorded an estimated liability for contingencies related to non-income tax matters and are under audit by various domestic and foreign tax authorities with regard to such matters. The subject matter of these contingent liabilities and non-income tax audits primarily arises from our transactions with Drivers, as well as the tax treatment of certain employee benefits and related employment taxes. In jurisdictions with disputes connected to transactions with Drivers, disputes involve the applicability of transactional taxes (such as sales, value added and similar taxes) to services provided, as well as the applicability of withholding tax on payments made to such Drivers.

We are involved in a proceeding in the UK involving HMRC, the tax regulator in the UK, which is seeking to classify us as a transportation provider. Being classified as a transportation provider would result in a VAT (20%) on Gross Bookings or on the service fee that we charge Drivers, both retroactively and prospectively. HMRC is considering a number of factors including our contractual Driver, Rider and intercompany arrangements, and HMRC is also expected to consider the U.K. Supreme Court's February 19, 2021 ruling on Drivers' worker classification, in determining whether we should be classified as a provider of transportation services. HMRC may update its assessment, which we would then review and discuss with HMRC. If we do not reach a satisfactory resolution after exhausting HMRC's review and appeals process, we would still be able to argue our case anew in the U.K. Tax Court, which may require the up-front payment to the Tax Court ("pay-to-play") of any final HMRC assessment to be held in escrow. We continue to believe that we have meritorious defense in these proceedings.

Our estimated liability is inherently subjective due to the complexity and uncertainty of these matters and the judicial processes in certain jurisdictions, therefore, the final outcome could be different from the estimated liability recorded.

129

*Other Legal and Regulatory Matters*

We have been subject to various government inquiries and investigations surrounding the legality of certain of our business practices, compliance with antitrust, Foreign Corrupt Practices Act and other global regulatory requirements, labor laws, securities laws, data protection and privacy laws, consumer protection laws, environmental laws, and the infringement of certain intellectual property rights. We have investigated many of these matters and we are implementing a number of recommendations to our managerial, operational and compliance practices, as well as strengthening our overall governance structure. In many cases, we are unable to predict the outcomes and implications of these inquiries and investigations on our business which could be time consuming, costly to investigate and require significant management attention. Furthermore, the outcome of these inquiries and investigations could negatively impact our business, reputation, financial condition and operating results, including possible fines and penalties and requiring changes to operational activities and procedures.

*Indemnifications*

In the ordinary course of business, we often include standard indemnification provisions in our arrangements with third parties. Pursuant to these provisions, we may be obligated to indemnify such parties for losses or claims suffered or incurred in connection with their activities or non-compliance with certain representations and warranties made by us. In addition, we have entered into indemnification agreements with our officers, directors, and certain current and former employees, and our certificate of incorporation and bylaws contain certain indemnification obligations. It is not possible to determine the maximum potential loss under these indemnification provisions / obligations because of the unique facts and circumstances involved in each particular situation.

## Note 16 – Variable Interest Entities

VIEs are legal entities that lack sufficient equity to finance their activities without future subordinated financial support.

*Consolidated VIEs*

We consolidate VIEs in which we hold a variable interest and are the primary beneficiary. We are the primary beneficiary because we have the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we consolidate the assets and liabilities of these consolidated VIEs.

Total assets included on the consolidated balance sheets for our consolidated VIEs as of December 31, 2020 and 2021 were $1.2 billion and $3.9 billion, respectively. Total liabilities included on the consolidated balance sheets for these VIEs as of December 31, 2020 were not material and $1.0 billion as of December 31, 2021.

*Freight Holding*

In July 2018, we created a new majority-owned subsidiary, Uber Freight Holding Corporation ("Freight Holding"). The purpose of Freight Holding is to perform the business activities of the Freight operating segment. The Freight Holding stock held by us was determined to be a variable interest.

In October 2020, Freight Holding entered into a Series A preferred stock purchase agreement ("2020 Freight Series A Preferred Stock Purchase Agreement") with outside investor ("2020 Freight Series A Investor") to sell shares of Series A Preferred Stock ("Freight Series A").

In July 2021, we entered into a Freight Series A preferred stock purchase agreement and sold shares of Freight Series A to The Public Investment Fund, which is an investor in Uber.

In November 2021, Freight Holding entered into a series A-1 stock purchase agreement ("2021 Series A-1 Preferred Stock Purchase Agreement") with outside investors ("Freight Series A-1 Investors") to sell shares of Series A-1 convertible preferred stock of Freight Holding ("Freight Series A-1"). Neither the Freight Series A or Freight Series A-1 investments changed the conclusion that Freight Holding is a consolidated VIE. As of December 31, 2020 and 2021, we continue to own the majority of the issued and outstanding capital stock of Freight Holding and report non-controlling interest as further described in Note 17 – Non-Controlling Interests.

*Divestiture of ATG Business and Aurora Investments*

In April 2019, we contributed certain of our subsidiaries and certain assets and liabilities related to our autonomous vehicle technologies (excluding liabilities arising from certain indemnification obligations related to the Levandowski arbitration and any remediation costs associated with certain obligations that may arise as a result of the Waymo settlement) to Apparate in exchange for common units representing 100% ownership interest in Apparate. Subsequent to the formation of Apparate, Apparate entered into a Class A Preferred Unit Purchase Agreement ("Preferred Unit Purchase Agreement") with SVF Yellow (USA) Corporation ("SoftBank"), Toyota Motor North America, Inc. ("Toyota"), and DENSO International America, Inc. ("DENSO"). Preferred units were issued in July 2019 to SoftBank, Toyota, and DENSO and provided the investors with an aggregate 13.8% initial ownership interest in Apparate on an as-converted basis. The common units held by us in Apparate were determined to be a variable interest. The purpose of Apparate was to develop and commercialize autonomous vehicle and ridesharing technologies and Apparate's results were part of All Other (formerly our ATG and Other Technology Programs segment, refer to Note 14 - Segment Information and Geographic Information for further information).

130

As of December 31, 2020, we consolidated the ATG Business' assets and liabilities and reported non-controlling interests. On January 19, 2021, we completed the sale of the ATG Business to Aurora. Refer to the section titled "Unconsolidated VIEs" below for additional information on Aurora. Refer to Note 19 – Divestitures for further information on the sale of the ATG Business.

*Careem Qatar and Morocco*

On January 2, 2020, we completed the acquisition of substantially all of the assets of Careem and certain of its subsidiaries pursuant to an asset purchase agreement (the "Asset Purchase Agreement") in countries where regulatory approval was obtained or which did not require regulatory approval. The assets and operations in Qatar and Morocco (collectively "Non-Transferred Countries") had not yet been transferred to us as of December 31, 2020. The purpose of the Careem Qatar and Morocco's operations is to provide primarily ridesharing services in each respective country. Although the assets and operations of the Non-Transferred Countries were not transferred as of December 31, 2020, we had rights to all residual interests in the entities comprising the Non-Transferred Countries which was considered a variable interest. We were exposed to losses and residual returns of the entities comprising the Non-Transferred Countries through the right to all of the proceeds from either the divestiture or the eventual legal transfer upon regulatory approval of the entities comprising the Non-Transferred Countries. We controlled Intellectual Properties ("IP") which are significant for the business of Non-Transferred Countries and sub-license those IP to the Non-Transferred Countries. Each entity that comprised the Non-Transferred Countries met the definition of a VIE and we were the primary beneficiary of each of the entities comprising the Non-Transferred Countries. As a result, we consolidated the entities comprising the Non-Transferred Countries as of December 31, 2020.

On September 21, 2021, ownership of Careem's operations in Morocco was fully transferred to us. Transfer of the assets and operations of Careem Qatar will be subject to a delayed closing pending timing of regulatory approval. We have rights to all residual interests in the Careem Qatar entity which is considered a variable interest. We are exposed to losses and residual returns of the Careem Qatar entity through the right to all of the proceeds from either the divestiture or the eventual legal transfer, upon regulatory approval, of the Careem Qatar entity. As a result, we consolidated Careem Qatar as of December 31, 2021.

### Unconsolidated VIEs

We do not consolidate VIEs in which we hold a variable interest but are not the primary beneficiary because we lack the power to direct the activities that most significantly impact the entities' economic performance. Our carrying amount of assets recognized on the consolidated balance sheets related to unconsolidated VIEs were $308 million and $598 million as of December 31, 2020 and 2021, respectively, and represents our maximum exposure to loss associated with the unconsolidated VIEs.

*Zomato*

Zomato is incorporated in India with the purposes of providing food delivery services. On January 21, 2020, we acquired compulsorily convertible cumulative preference shares ("CCPS Preferred Shares") of Zomato valued at $171 million in exchange for Uber's food delivery operations in India ("Uber Eats India"), and a note receivable valued at $35 million for reimbursement of goods and services tax. As of December 31, 2020, our investment in the CCPS Preferred Shares of Zomato represented 9.99% of the voting capital upon conversion to ordinary shares. Zomato was a VIE as it lacked sufficient equity to finance its activities without future subordinated financial support. We were exposed to Zomato's economic risks and rewards through our investment and note receivable which represent variable interests, and the carrying values of these variable interests reflect our maximum exposure to loss. However, we were not the primary beneficiary because neither the investment in CCPS Preferred Shares nor the note receivable provide us with the power to direct the activities that most significantly impact Zomato's economic performance. Refer to Note 19 – Divestitures for further information regarding Zomato and the divestiture of Uber Eats India.

During the second quarter of 2021, the outstanding note receivable was paid. During the third quarter of 2021, we determined Zomato is no longer a VIE as it is sufficiently capitalized as a result of its IPO in India during July 2021. Refer to Note 3 – Investments and Fair Value Measurement for further information.

*Lime*

On May 7, 2020, we entered into the JUMP Divestiture and received the 2020 Lime Investments. Refer to Note 19 – Divestitures for further information on the JUMP Divestiture and the 2020 Lime Investments. We are exposed to Lime's economic risks and rewards through our ownership of the 2020 Lime Investments, which represent variable interests.

*Cornershop: CS-Mexico*

As of December 31, 2020, Cornershop Cayman's ("Cornershop") business operations in Mexico ("CS-Mexico") were determined to be a variable interest. We were exposed to CS-Mexico's economic risks and rewards through: the CS-Mexico Put/Call; an immaterial unsecured note; the contractual rights to 35% of contingent sale proceeds from CS-Mexico under certain conditions; and a market-based fee related to the transition services agreement, all of which represented variable interests held by Uber. However, we were not the primary beneficiary and we did not consolidate CS-Mexico.

In December 2020, we received approval from Mexico's antitrust regulator to complete the CS-Mexico transaction. On January 11, 2021, Cornershop Global ("CS-Global"), an entity which held all of Cornershop business operations, except for those in Mexico,

131

exercised a call option and acquired 100% of the outstanding equity interest in CS-Mexico. We owned 55% of CS-Mexico through our ownership in CS-Global. The acquisition of CS-Mexico by CS-Global triggered a reconsideration event and we reevaluated if CS-Mexico still met the definition of a VIE. As of December 31, 2021, we determined that CS-Mexico was no longer a VIE when it was acquired by CS-Global, which has sufficient equity to operate without the need for subordinated financial support. Refer to Note 18 – Business Combinations for further information.

*Aurora*

In January 2021, we sold our ATG Business to Aurora. After the sale, we hold equity interests in Aurora through our Aurora Investments. As of December 31, 2021, our Aurora Investments had a fair value of $3.4 billion within investments on the consolidated balance sheet. Refer Note 3 – Investments and Fair Value Measurement for additional information regarding the accounting for our Aurora Investments and Note 19 – Divestitures for additional information regarding the sale of our ATG Business.

After the sale in January 2021, we initially determined Aurora was a VIE as it lacked sufficient equity to finance its activities without future subordinated financial support. We were exposed to Aurora's economic risks and rewards through our equity interests, which represented variable interests. On November 3, 2021, Aurora completed its planned SPAC merger with Reinvent Technology Partners Y, making Aurora a publicly traded company post combination, which triggered a reconsideration event. We reevaluated if Aurora still met the definition of a VIE and determined that Aurora was no longer a VIE when it completed its SPAC merger given it had sufficient equity to operate without the need for subordinated financial support.

*Moove*

On February 12, 2021 (the "Moove Closing Date"), we entered into and completed a series of agreements with Garment Investments S.L. dba Moove ("Moove"), a vehicle fleet operator in Spain, including (i) an equity investment, through preferred shares, in which Uber acquired a 30% minority interest in Moove from its current shareholders at closing and up to approximately $185 million contingent on future performance of Moove and certain other conditions through the eighth anniversary of the agreement, (ii) a term loan of $213 million to Moove, due February 2026, and (iii) a commercial partnership agreement. Also included in the agreements is an option for us to purchase common stock of Moove at fair value, beginning two years after the Moove Close Date. After this series of agreements, Moove is considered a related party.

Our equity investment in Moove, through preferred shares, is accounted for as an investment in non-marketable equity securities included in investments on the consolidated balance sheet. The term loan, $204 million as of December 31, 2021, is accounted for as a loan receivable, carried at amortized cost, and included in other assets on the consolidated balance sheet. Refer to Note 3 – Investments and Fair Value Measurement, Assets Measured at Fair Value on a Non-Recurring Basis, for additional information regarding our non-marketable equity securities.

Moove is a VIE as it lacks sufficient equity to finance its activities without future subordinated financial support. We are exposed to Moove's economic risks and rewards through our equity investment, the term loan and commercial partnership agreement, which represent variable interests.

132

**Note 17 – Non-Controlling Interests**

We have several consolidated subsidiaries that have issued common stock and preferred stock or preferred units to third party investors, representing non-controlling interests. As of December 31, 2020 and 2021, the amounts of non-controlling interests represented by subsidiaries' preferred units and preferred stock were $1.3 billion and $1.0 billion, respectively.

***ATG Investment: Preferred Unit Purchase Agreement***

In July 2019, we closed a Preferred Unit Purchase Agreement with SoftBank, Toyota, and DENSO (collectively "the Investors") for purchase by the Investors of Class A Preferred Units ("Preferred Units") in Apparate. Apparate, a subsidiary of ours, issued 1.0 million Preferred Units at $1,000 per unit to the Investors for an aggregate consideration of $1.0 billion ($400 million from Toyota, $333 million from SoftBank, and $267 million from DENSO). As of December 31, 2020, the Preferred Units represented an aggregate 14.2% ownership interest in Apparate on an as-converted basis. As of December 31, 2020, we retained the remaining 85.8% ownership interest. SoftBank and Toyota are our existing investors.

At the option of the Investors, the Preferred Units are convertible into common units of Apparate, initially on a one-for-one basis but subject to potential adjustment, as defined by the Preferred Unit Purchase Agreement at any time. The Preferred Units are entitled to certain distributions, including primarily dividends which are payable in cash or in-kind (at Apparate's discretion), and accrue quarterly, compounded on the last day of each quarter at a 4.5% annual rate. The Preferred Units are entitled to distributions upon the occurrence of a sale or liquidation of Apparate representing an amount that is equal to the greater of (i) the original investment plus any accrued but unpaid amounts, and (ii) their share of distributions assuming conversion to common units of Apparate immediately prior to the sale or liquidation event. The quarterly dividend, along with any attributed prorated share of Apparate's net income (if applicable), are included in net income (loss) attributable to non-controlling interests, net of tax in our consolidated statements of operations. The Preferred Units do not participate in net losses due to a liquidation preference.

*SoftBank's Preferred Units*

Beginning on July 2, 2026, SoftBank has the option to put to us all, but not less than all, of its initial investment in Preferred Units at a price equal to the number of SoftBank's Preferred Units multiplied by the greater of (i) the original investment plus any accrued but unpaid amounts per unit and (ii) the fair value of the Preferred Units at the time of conversion (the "Put/Call Price"). Beginning on July 2, 2026, we can call all, but not less than all, of the Preferred Units held by SoftBank at the Put/Call Price. We have the option to settle all, or a portion of, the Put/Call Price with its common stock and any remainder will be satisfied in cash. The put and call were determined to be embedded features within the SoftBank Preferred Units since they are not separately exercisable or legally detached from the SoftBank Preferred Units.

As of December 31, 2020, the SoftBank Preferred Units were classified as redeemable non-controlling interests in our consolidated financial statements and reported at the Put/Call Price which was determined as of the balance sheet date. The initial fair value of SoftBank's Preferred Units was determined based on a hybrid method with the option pricing model as the primary methodology. This method used Level 3 fair value measurement inputs as well as an assumed equal probability of the occurrence of a liquidation or exit event. The significant unobservable inputs used in the initial fair value measurement include: volatility of 42%, time to liquidity of 5 years, and a discount for lack of marketability of 17%. A market approach was also used to corroborate the valuation derived from the hybrid method at issuance to evidence that the issuance price of the Preferred Units approximated their fair value. There was no fair value adjustment to SoftBank's redeemable non-controlling interests during the year ended December 31, 2020.

*Toyota and DENSO's Preferred Units*

As of December 31, 2020, the Toyota and DENSO Preferred Units were classified as non-redeemable non-controlling interests as these units were not subject to any mandatory redemption rights or redemption rights that are outside our control.

***ATG Collaboration Agreement with Apparate, Toyota and DENSO***

In conjunction with the Preferred Unit Purchase Agreement discussed above, we entered into a three-year joint collaboration agreement among Toyota, DENSO, and Apparate to develop next-generation self-driving technology (the "ATG Collaboration Agreement"), which became effective as of the closing of the Preferred Unit Purchase Agreement in July 2019. Pursuant to the ATG Collaboration Agreement, Toyota would make cash payments to Apparate up to an aggregate of $300 million, payable in six semi-annual installments during the three-year term of the ATG Collaboration Agreement. The cash payments for each six-month period were contingent upon the mutual agreement between the parties on the development activities and milestones to be achieved in the next six months and the continuation of the ATG Collaboration Agreement. The ATG Collaboration Agreement was within the scope of ASC 808, Collaborative Arrangements. The development activities were considered ongoing and central to the activities of ATG. As a result, the amounts received from Toyota were recognized as collaboration revenue in the All other segment (formerly ATG and Other Technology Programs) ratably over the respective six-month service period to which each payment relates, as the related development activities are performed. During the years ended December 31, 2019 and 2020, we recognized $42 million and $100 million, respectively, as revenue under the ATG Collaboration Agreement.

***Divestiture of ATG Business to Aurora***

133

On January 19, 2021, we completed the previously announced sale of our ATG Business to Aurora. As a result, our controlling interest and the non-controlling interests in the ATG Business were settled and ownership of the ATG Business transferred to Aurora. We derecognized the carrying value of non-controlling interests in the ATG Business of $1.1 billion, which included Toyota and DENSO non-redeemable non-controlling interests of $701 million and Softbank's redeemable non-controlling interests of $356 million. Refer to Note 19 – Divestitures for further information.

### Freight Holding

As of December 31, 2020 and 2021, we owned 85% and 78%, respectively, of the issued and outstanding capital stock of our subsidiary Freight Holding, or 79% and 75%, respectively, on a fully-diluted basis if all common shares reserved for issuance under our Freight Holding employee incentive plan were issued and outstanding. As of December 31, 2020 and 2021, under the Freight Holding incentive plan, a total number of 99.8 million shares of Freight Holding are reserved. As of December 31, 2020 and 2021, 83.8 million and 85.0 million shares, respectively, were available for grant and issuance. The redeemable non-controlling interest of Freight Holding is not accreted to redemption value because it is currently not probable that the non-controlling interest will become redeemable.

#### Holders of Common Stock of Freight Holding

The minority common stockholders of our subsidiary Freight Holding, including any holders of common equity awards issued under the employee equity incentive plans and employees who hold fully vested shares, have put rights to sell certain of their equity interests at fair value to us at specified periods of time that terminates upon the earliest of the closing of a liquidation transaction or an IPO of the subsidiary. Should the put rights be exercised, they can be satisfied in either cash, Uber stock, or a combination of cash and Uber stock based upon our election. As of December 31, 2020 and 2021, the minority common stockholders ownership in Freight Holding is classified as a redeemable non-controlling interest, because it is redeemable on an event that is not solely in our control.

We attribute the pro rata share of the Freight Holding's net income or loss available to holders of common stock to the redeemable non-controlling interests generated from common shares of Freight Holding based on the outstanding ownership of the minority shareholders of common shares during the period.

#### Freight Series A Preferred Stock

In October 2020, Freight Holding entered into a 2020 Freight Series A Preferred Stock Purchase Agreement with a 2020 Freight Series A Investor. Pursuant to the 2020 Freight Series A Preferred Stock Purchase Agreement, the 2020 Freight Series A Investor agreed to invest an aggregate of $500 million in Freight Holding, which will occur over a number of closings, subject to customary closing conditions.

On October 6, 2020, the initial closing occurred pursuant to the 2020 Freight Series A Preferred Stock Purchase Agreement and 2020 Freight Series A Investor invested $250 million in exchange for 124.7 million shares of Freight Series A preferred stock, representing approximately 8% ownership interest on a fully diluted basis.

The 2020 Freight Series A Investor has the option to purchase additional shares in tranches of at least $50 million at a time at the initial purchase price for two years following initial closing up to an additional aggregate $250 million. This right to continue to invest at the initial price over two years is a forward obligation classified as a liability measured at fair value which was initially valued using a two-year discount rate and is immaterial. We will maintain majority ownership of the issued and outstanding capital stock of Freight Holding following such additional investment. Upon the passage of two years from initial close, the 2020 Freight Series A Investor must purchase and Freight Holding must issue any remaining unissued additional shares at the purchase price. The 2020 Freight Series A Investor holds two seats on the Freight Holding board of directors as of December 31, 2021.

We do not attribute the pro rata share of the Freight Holding's loss to the redeemable non-controlling interests in Series A Preferred shares of Freight Holding because these shares are entitled to a liquidation preference and therefore do not participate in losses that would cause their interest to be below the liquidation preference. Upon liquidation, these Freight Series A preferred stock are entitled to the greater of either (i) a 1.5x liquidation preference on their initial investment, as well as 6% continuously compounding cumulative dividends that will be paid before any distribution to common shareholders or (ii) the fair value of their investment (the "Freight Series A Liquidation Preference"). The dividend, along with any attributed prorated share of Freight Holding's net income (if applicable), are included in net income (loss) attributable to non-controlling interests, net of tax in our consolidated statements of operations.

The 2020 Freight Series A Investor's Freight Series A preferred stock may be called by us at our option after the passage of five years at the Freight Series A Liquidation Preference. Beginning after three years, if a series of events occur including Freight Holding not consummating an IPO, 2020 Freight Series A Investor's Freight Series A preferred stock could become redeemable at the Freight Series A Liquidation Preference upon the passage of five years. Upon redemption, the 2020 Freight Series A Investor's Freight Series A preferred stock would be settled in either cash or Uber common shares at our option.

134

In July 2021, we entered into a Series A preferred stock purchase agreement and sold shares of Freight Holding's Series A Preferred Stock to The Public Investment Fund, which is an investor in Uber, representing 4% ownership interest on a fully diluted basis at the time of the sale. As of December 31, 2021, the Freight Series A preferred stock held by the Public Investment Fund were classified as non-redeemable non-controlling interests as these shares of preferred stock are not subject to any mandatory redemption rights or redemption rights that are outside our control.

*Freight Series A-1 Preferred Stock*

In November 2021, Freight Holding entered into a 2021 Series A-1 Preferred Stock Purchase Agreement with Freight Series A-1 Investors. Pursuant to the 2021 Series A-1 Preferred Stock Purchase Agreement, the Freight Series A-1 Investors agreed to invest an aggregate of $550 million in Freight Holding in exchange for Freight Series A-1 preferred stock. The purchase and sale of the Freight Series A-1 preferred stock took place concurrently with the closing of the Transplace acquisition. Refer to Note 18 – Business Combinations for additional information on the Transplace acquisition.

Freight Series A-1 Investors have basic rights and preferences which primarily include: one vote per share; conversion rights to common shares; 6% cumulative dividend preference and liquidation preference (a 1.0x liquidation preference of original issuance price plus cumulative unpaid dividends). The accruing dividends are compounding annually, and are only payable when dividends are declared by Freight Holding's Board. The dividend, along with any attributed prorated share of Freight Holding's net income (if applicable), are included in net income (loss) attributable to non-controlling interests, net of tax in our consolidated statement of operations. As of December 31, 2021, the Freight Series A-1 preferred stock held by the Freight Series A-1 Investors were classified as non-redeemable non-controlling interests as these shares of preferred stock are not subject to any mandatory redemption rights or redemption rights that are outside our control.

### Cornershop

On July 6, 2020, we closed the acquisition of a 55% controlling ownership interest in CS-Global. Refer to Note 18 – Business Combinations for further information. As of December 31, 2020, the non-controlling interest in CS-Global was classified as redeemable non-controlling interest because it is subject to a put/call agreement which was not solely in our control to exercise. At each balance sheet date, the redeemable non-controlling interest was measured using a discounted cash flow methodology and the carrying value was adjusted if the fair value was higher than the carrying value. The initial fair value, as of the acquisition date of July 6, 2020, was $290 million. There were no fair value adjustments to CS-Global's redeemable non-controlling interest during the year ended December 31, 2020. As of December 31, 2020, Cornershop's financial results were consolidated in our consolidated financial statements given our majority ownership interest.

On January 11, 2021, CS-Global exercised a call option and acquired 100% of the outstanding equity interest in CS-Mexico, which increased the redeemable non-controlling interest. In August 2021, we acquired the minority shareholders' interests in CS-Global in an all-stock transaction and CS-Global became a wholly-owned subsidiary of ours. We derecognized the carrying value of redeemable non-controlling interests in CS-Global of $1.3 billion. Refer to Note 18 – Business Combinations for further information.

## Note 18 – Business Combinations

### Careem

On January 2, 2020, we completed the acquisition of substantially all of the assets of Careem. Dubai-based Careem was founded in 2012, and provides primarily ridesharing and to a lesser extent meal delivery, and payments services to millions of users in cities across the Middle East, North Africa, and Pakistan. The acquisition has been accounted for as a business combination and advances our strategy of having a leading ridesharing category position in every major region of the world in which we operate and effect cost and technology synergies for the rest of Uber's Mobility business. As of December 31, 2020, ownership of Careem's operations in Qatar and Morocco had not yet been transferred to us; however the results of operations and net assets were fully consolidated as variable interest entities.

On September 21, 2021, ownership of Careem's operations in Morocco was fully transferred to us. Transfer of the assets and operations of Careem Qatar will be subject to a delayed closing pending timing of regulatory approval. Refer to Note 16 – Variable Interest Entities for further information.

135

The acquisition date fair value of the consideration transferred for Careem was $3.0 billion, which consisted of the following (in millions):

| | Fair Value |
|---|---|
| Cash paid on January 2, 2020 | $ 1,326 |
| Non-interest bearing unsecured convertible notes | 1,634 |
| Transaction costs paid on January 2, 2020 on behalf of Careem | 39 |
| Contingent cash consideration | 1 |
| Stock-based compensation awards attributable to pre-combination services | 3 |
| Total consideration | $ 3,003 |

The fair value of the Careem Notes was determined as a sum of the discounted cash flow ("DCF") method (for the present value of the principal amount of the Careem Notes) and the Black-Scholes option pricing model (to value the conversion option). The significant unobservable inputs used in the fair value measurement include discount rates of 5.14% to 5.19% for the principal amount of the Careem Notes and for the conversion option an expected volatility of 42.1% to 44.1%, interest rates of 1.53% to 1.57%, and dividend yield of 0%. We issued the Careem Notes in different tranches with $880 million of the principal amount of the Careem Notes issued on January 2, 2020 and settled in cash on April 1, 2020. Each tranche of the Careem Notes is due and payable 90 days once issued. The holders of the Careem Notes may elect to convert the full outstanding principal balance to Class A common stock at a conversion price of $55 per share of Uber Technologies, Inc. at any time prior to maturity. The discount from the Careem Notes face value to fair value will be accreted through the respective repayment dates as interest expense.

During the year ended December 31, 2021, certain holders of the Careem Notes elected to convert their notes and as a result of such elections, $539 million of the principal amount of the Careem Notes matured, of which $307 million were settled in cash and $232 million were settled in equity.

The remaining amount of the Careem Notes is recognized as a commitment to issue unsecured convertible notes at fair value in accrued and other current liabilities of $238 million as of December 31, 2021. The amount of accretion for the years ended December 31, 2020 and 2021 was not material.

*Careem: Acquisition Date Fair Value*

The following table summarizes the fair value of assets acquired and liabilities assumed as of the date of acquisition (in millions):

| | Fair Value |
|---|---|
| Current assets | $ 43 |
| Goodwill | 2,483 |
| Intangible assets | 540 |
| Other long-term assets | 77 |
| Total assets acquired | 3,143 |
| Current liabilities | (108) |
| Deferred tax liability | (13) |
| Other long-term liabilities | (19) |
| Total liabilities assumed | (140) |
| Net assets acquired | $ 3,003 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill which is not deductible for tax purposes. Goodwill is primarily attributed to the assembled workforce of Careem and anticipated operational synergies. Goodwill was recorded in our Mobility segment. The fair values assigned to tangible and identifiable intangible assets acquired and liabilities assumed are based on management's estimates and assumptions at the time of acquisition.

136

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition (in millions, except years):

| | Fair Value | Weighted Average Remaining Useful Life - Years |
|---|---|---|
| Rider relationships | $ 270 | 15 |
| Captains network | 40 | 1 |
| Developed technology | 110 | 4 |
| Trade names | 120 | 10 |
| Total | $ 540 | |

Rider relationships represent the fair value of the underlying relationships with Careem riders. Captains network represents the fair value of the underlying network with Careem drivers (called "Captains"). Developed technology represents the fair value of Careem's technology. Trade names relate to the "Careem" trade name, trademarks, and domain names. The overall weighted average useful life of the identified amortizable intangible assets acquired is ten years.

Tangible net assets were valued at their respective carrying amounts as of the acquisition date, as we believe that these amounts approximate their current fair values. We believe the amounts of purchased intangible assets recorded above represent the fair values of, and approximate the amounts a market participant would pay for, these intangible assets as of January 2, 2020.

The Asset Purchase Agreement provides for specific indemnities to us in relation to value added tax obligations and other tax reserves of certain jurisdictions which reflect potential tax liabilities. We recognized $64 million of indemnification assets on the same basis as the tax reserves at January 2, 2020, which is recorded as other assets and other liabilities on our consolidated balance sheet. Settlements of these tax reserves, if any, will be funded by the indemnification asset.

The results of the acquired operations were included in our consolidated financial statements from the date of acquisition, January 2, 2020. For the period from January 2, 2020 through December 31, 2020, Careem contributed to a loss before income taxes of $218 million. Revenue for the period from January 2, 2020 through December 31, 2020 were not material.

*Cornershop*

In 2019, as a strategic move of entering into grocery delivery market, we agreed to purchase a controlling interest in Cornershop Cayman ("Cornershop"), operating an online grocery delivery platform primarily in Chile and Mexico. During 2019, we made an initial investment of $50 million (the "Initial Cornershop Investment"). The remaining investment was subject to antitrust approval of the countries where Cornershop operates.

During the second quarter of 2020, we received regulatory approvals, except for Mexico. As a result, we and Cornershop amended the terms of the agreement in order for Uber to acquire Cornershop's business operations, except for those in Mexico. Immediately prior to the transaction close, Cornershop was restructured such that the Mexico operations were held in Cornershop Technologies LLC and its wholly owned subsidiary (collectively referred to as "CS-Mexico"), while all of the remaining Cornershop operations were to be held in the newly created CS-Global entity.

On July 6, 2020, we acquired 55% controlling interest in CS-Global, an entity which held all of Cornershop's business operations, except for those in Mexico. This transaction resulted in an Uber direct capital contribution of $200 million, which included the Initial Cornershop Investment and notes receivable, to CS-Global and a payment of $179 million to tendering shareholders, paid in a combination of cash and 2,055,038 shares of our common stock. The Initial Cornershop Investment was remeasured immediately prior to the acquisition of CS-Global, and based on the Cornershop business value and Uber's pre-acquisition ownership percentage, the new value was not materially different from the previously recognized amount. Thus, the Initial Cornershop Investment was determined at the original $50 million. In exchange for the consideration transferred, we received 15,642,523 Preferred C Membership Interests in CS-Global, representing 55% of the outstanding membership interests. As a result, we obtained the controlling financial interest in CS-Global and accounted for the acquisition as a business combination. Concurrent with the CS-Global acquisition transaction, Uber, Cornershop and CS-Global entered into a put/call arrangement over the non-controlling interest in CS-Global, providing CS-Global with the right through the call option (and obligation through the put option held by Cornershop) to purchase all of the interests in CS-Mexico, contingent upon the receipt of regulatory approval in Mexico ("CS-Mexico Put/Call"). Upon either the exercise of the call option (by CS-Global) or the put option (by Cornershop), CS-Global would acquire 100% of the outstanding equity interests in CS-Mexico. Uber would make a direct capital contribution to CS-Global and a payment to the tendering shareholder, totaling $94 million, in exchange for 55% outstanding equity interest in CS-Mexico. The CS-Mexico Put/Call, which was exercisable in 5 years if there is no IPO or liquidation event, at a future negotiated price, was accounted for separately from the acquisition, and was included in other current assets on the consolidated balance sheet as of December 31, 2020.

137

The acquisition date fair value of the consideration transferred for CS-Global was $362 million, which consisted of the following (in millions):

|  | Fair Value |
|---|---|
| Initial Cornershop Investment | $ 50 |
| Notes receivable | 10 |
| Cash paid | 253 |
| Tender offer paid in Uber common stock | 67 |
| Total consideration transferred | 380 |
| Less: CS-Mexico Put/Call | (18) |
| Total consideration | $ 362 |

The following table summarizes the fair value of assets acquired and liabilities assumed as of the date of acquisition (in millions):

|  | Fair Value |
|---|---|
| Current assets | $ 204 |
| Goodwill | 384 |
| Intangible assets | 122 |
| Other long-term assets | 11 |
| Total assets acquired | 721 |
| Current liabilities | (34) |
| Deferred tax liability | (33) |
| Other long-term liabilities | (2) |
| Total liabilities assumed | (69) |
| Less: Redeemable non-controlling interests | (290) |
| Net assets acquired | $ 362 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill which is not deductible for tax purposes. Goodwill is primarily attributed to the anticipated operational synergies. Goodwill was recorded in our Delivery segment. The fair values assigned to tangible and identifiable intangible assets acquired and liabilities assumed are based on management's estimates and assumptions at the time of acquisition, and are updated to reflect the most recent changes.

The fair value of the redeemable non-controlling interests of $290 million was estimated based on the non-controlling interest's respective share of the CS-Global enterprise value.

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition (in millions, except years):

|  | Fair Value | Weighted Average Remaining Useful Life - Years |
|---|---|---|
| Vendor relationship | $ 20 | 15 |
| Shopper relationship | 1 | 1 |
| Customer relationship | 14 | 5 |
| Developed technology | 58 | 4 |
| Trade names | 29 | 5 |
| Total | $ 122 | |

Vendor, shopper and customer relationships represent the fair value of the underlying relationships with Cornershop vendors (such as grocery stores and supermarkets), shoppers and end-users. Developed technology represents the fair value of the technologies and systems behind CS-Global's grocery delivery application. Trade names relate to the "Cornershop" trade name, trademarks, and domain names. The overall weighted average useful life of the identified amortizable intangible assets acquired is six years.

Tangible net assets were valued at their respective carrying amounts as of the acquisition date, as we believe that these amounts approximate their current fair values. We believe the amounts of purchased intangible assets recorded above represent the fair values of, and approximate the amounts a market participant would pay for, these intangible assets as of July 6, 2020.

138

The results of CS-Global were included in our consolidated financial statements from the date of acquisition, July 6, 2020. For the period from July 6, 2020 through December 31, 2020, CS-Global contributed an immaterial amount of revenue and loss before taxes.

In December 2020, we received approval from Mexico's antitrust regulator to complete the CS-Mexico transaction. On January 11, 2021, CS-Global exercised the call option through the CS-Mexico Put/Call agreement and acquired 100% of the outstanding equity interest in CS-Mexico, and we owned 55% of CS-Mexico through our ownership in CS-Global. The acquisition of CS-Mexico was accounted for as a business combination. The acquisition date fair value of the consideration transferred for CS-Mexico was immaterial, and consisted of a combination of cash payment and equity payment in Uber common stock and the fair value of the CS-Mexico Put/Call remeasured at the acquisition date. As a result of remeasuring our prior CS-Mexico Put/Call held immediately prior to the business combination, we recognized an immaterial loss during the year ended December 31, 2021. The loss was included in other income (expense), net in the consolidated statement of operations.

In August 2021, we completed the acquisition of the remaining 45% ownership interest in Cornershop (or 47%, on a fully-diluted basis) in an all-stock transaction. As consideration for our acquisition of the remaining non-controlling interest, we issued 25 million shares of our common stock, including 4.6 million restricted shares issued to certain Cornershop employees. In addition, we issued 4 million stock options to replace assumed outstanding stock options. These replacement stock options attributable to post-acquisition service are included in our option activity and are recognized as stock-based compensation expense.

The acquisition was accounted for as an equity transaction, as we previously controlled and consolidated Cornershop. Accordingly, we did not recognize a gain or loss in our consolidated statement of operations during the year ended December 31, 2021. In connection with this acquisition, the previously recognized non-controlling interest was derecognized. Following this transaction, Cornershop became our wholly-owned subsidiary.

The total purchase price was determined to be $967 million, based on the number of shares issued and Uber's share price on the closing date. The fair value of the 4.6 million restricted shares issued to certain Cornershop employees was determined to be $202 million. These shares are restricted and contingent on the employees' continuing employment at the combined company for the next three years. These restricted shares are considered compensation for post-combination services and will be recognized as stock-based compensation expense ratably over the next three years.

### *Postmates*

On July 5, 2020, we entered into an Agreement and Plan of Merger to acquire 100% ownership interest in Postmates, an on-demand delivery platform in the U.S.

On December 1, 2020, we completed the acquisition of Postmates, bringing together our global Mobility and Delivery platform with Postmates' distinctive delivery business in the U.S. As a result of the transaction, we obtained ownership interest in Postmates through our voting rights, and the transaction was accounted for as a business combination. The acquisition date fair value of the consideration transferred for Postmates was approximately $3.9 billion, which consisted of the following (in millions):

|  | Fair Value |
|---|---|
| Uber common stock transferred | $ 3,494 |
| Note receivable | 100 |
| Stock-based compensation awards attributable to pre-combination services | 308 |
| Total consideration | $ 3,902 |

The fair value of the $3.5 billion common stock issued (70 million shares of our common stock), as consideration transferred was determined on the basis of the closing market price of our common stock on the acquisition date. We determined the fair value of the equity awards for stock options assumed using a Black-Scholes option pricing model with the applicable assumptions as of the acquisition date. The fair value of equity awards for RSUs was determined by using the closing market price of our common stock on the acquisition date adjusted by an exchange ratio.

139

The following table summarizes the fair value of assets acquired and liabilities assumed as of the date of acquisition (in millions):

|  | Fair Value |
|---|---|
| Cash and cash equivalents | $ 52 |
| Other current assets | 58 |
| Goodwill | 3,330 |
| Intangible assets | 1,015 |
| Other long-term assets | 57 |
| Total assets acquired | 4,512 |
| Accounts payable | (109) |
| Accrued and other current liabilities | (458) |
| Deferred tax liability | (9) |
| Other long-term liabilities | (34) |
| Total liabilities assumed | (610) |
| Net assets acquired | $ 3,902 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill, which is not deductible for tax purposes. Goodwill is primarily attributed to the assembled workforce of Postmates and anticipated operational synergies. Goodwill was assigned to our Delivery segment. The fair values assigned to tangible and identifiable intangible assets acquired and liabilities assumed are based on management's estimates and assumptions at the time of acquisition.

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition (in millions, except years):

|  | Fair Value | Weighted Average Remaining Useful Life - Years |
|---|---|---|
| Merchant relationship | $ 260 | 7 |
| Fleet relationship | 110 | 1.5 |
| Consumer relationship | 280 | 5 |
| Developed technology | 280 | 2 |
| Trade names | 30 | 3 |
| IPR&D | 55 | N/A |
| Total | $ 1,015 | |

Consumer, merchant and fleet relationships represent the fair value of the underlying relationships with merchants (such as restaurants), Postmates end-users, and Postmates couriers (referred to as "fleet"). Developed technology represents the fair value of Postmates' technology. Trade names relate to the "Postmates" trade name, trademarks, and domain names. The overall weighted average useful life of the identified amortizable intangible assets acquired is four years.

Tangible net assets were valued at their respective carrying amounts as of the acquisition date, as these amounts approximate their fair values.

The results of Postmates were included in our consolidated financial statements from the date of acquisition, December 1, 2020. For the period from December 1, 2020 through December 31, 2020, Postmates contributed an immaterial amount of revenue and loss before taxes.

During the fourth quarter of 2021, we finalized our estimate of the acquisition date fair values of the assets acquired and the liabilities assumed for Postmates. As a result, during the year ended December 31, 2021, we recorded measurement period adjustments of $181 million net, to accrued and other current liabilities and deferred tax liability, with a corresponding increase to goodwill.

### Routematch

On July 14, 2020 (the "Routematch Acquisition Date"), we acquired 100% of the equity of Routematch, a software company offering specialized software and solutions to transit agencies, serving customers in the United States and Australia. The acquisition is expected to accelerate our development in the transit space. The acquisition of Routematch was accounted for as a business combination. Total consideration transferred included $85 million in cash and $29 million in Uber shares (1 million shares of our common stock). The purchase price of $114 million was allocated to goodwill of $91 million and to certain identifiable intangible assets (comprised of customer relationships, developed technology and trademark) of $27 million.

140

Goodwill represents the excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired, which is not deductible for tax purposes. Goodwill is primarily attributed to the anticipated operational synergies and was recorded in our Mobility segment.

The overall weighted average useful life of the identified amortizable intangible assets acquired is eight years.

The results of Routematch were included in our consolidated financial statements from the date of acquisition, July 14, 2020. For the period from July 14, 2020 through December 31, 2020, Routematch contributed an immaterial amount of revenue and loss before taxes.

*Drizly*

On February 2, 2021, we entered into an Agreement and Plan of Reorganization to acquire 100% ownership interest in Drizly, an on-demand alcohol marketplace in North America.

On October 12, 2021, we completed the acquisition of Drizly, allowing us to expand alcohol offerings in our Delivery business. The acquisition of Drizly has been accounted for as a business combination. The acquisition date fair value of the consideration transferred for Drizly was approximately $943 million, which consisted of the following (in millions):

|  |  | Fair Value |
|---|---|---|
| Common stock issued | $ | 881 |
| Cash |  | 42 |
| Stock-based compensation awards attributable to pre-combination services |  | 20 |
| Total consideration | $ | 943 |

The fair value of the $881 million common stock issued (19 million shares of our common stock), as consideration transferred was determined on the basis of the closing market price of our common stock on the acquisition date.

The following table summarizes the preliminary fair value of assets acquired and liabilities assumed as of the date of acquisition (in millions):

|  |  | Fair Value |
|---|---|---|
| Current assets | $ | 50 |
| Goodwill |  | 619 |
| Intangible assets |  | 395 |
| Other long-term assets |  | 7 |
| Total assets acquired |  | 1,071 |
| Current liabilities |  | (44) |
| Deferred tax liability |  | (79) |
| Non-current liabilities |  | (5) |
| Total liabilities assumed |  | (128) |
| Net assets acquired | $ | 943 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill, which is not deductible for tax purposes. Goodwill is primarily attributed to the assembled workforce of Drizly and anticipated operational synergies. Goodwill was assigned to our Delivery segment. The fair values assigned to tangible and identifiable intangible assets acquired and liabilities assumed are based on management's estimates and assumptions at the time of acquisition. The purchase price allocation is preliminary and is subject to revision as more detailed analyses are completed and additional information about the fair value of assets acquired and liabilities assumed, including related deferred income taxes, become available. Tangible net assets were valued at their respective carrying amounts as of the acquisition date, as these amounts approximate their fair values.

141

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition (in millions, except years):

| | Fair Value | Weighted Average Remaining Useful Life - Years |
|---|---|---|
| Consumer relationship | $ 60 | 5 |
| Retailer relationship | 90 | 10 |
| Advertiser relationship | 140 | 12 |
| Developed technology | 75 | 3 |
| Trade names | 30 | 6 |
| Total | $ 395 | |

Consumer, retailer, and advertiser relationships represent the fair value of the underlying relationships with Drizly end-users, retailers (such as liquor stores), and advertisers. Developed technology represents the fair value of Drizly's advertising management platform. Trade names relate to the "Drizly" trade name, trademarks, and domain names. The overall weighted average useful life of the identified amortizable intangible assets acquired is eight years.

The results of Drizly were included in our consolidated financial statements from the date of acquisition, October 12, 2021. For the period from October 12, 2021 through December 31, 2021, Drizly contributed an immaterial amount of revenue and loss before taxes.

***Transplace***

On July 21, 2021, we entered into a Stock Purchase Agreement to acquire 100% ownership interest in Transplace, a leading transportation management and third-party logistics provider in North America.

On November 12, 2021, we completed the acquisition of Transplace in an all-cash transaction, allowing us to expand our Uber Freight business through Transplace's expertise in transportation management. The acquisition of Transplace has been accounted for as a business combination. The acquisition date fair value of the consideration transferred for Transplace was $2.3 billion.

The following table summarizes the preliminary fair value of assets acquired and liabilities assumed as of the date of acquisition (in millions):

| | Fair Value |
|---|---|
| Cash and cash equivalents | $ 29 |
| Accounts receivable, net | 899 |
| Prepaid expenses and other current assets | 23 |
| Property and equipment, net | 44 |
| Operating lease right-of-use assets | 57 |
| Intangible assets, net | 902 |
| Goodwill | 1,438 |
| Other assets | 3 |
| Total assets acquired | 3,395 |
| Accounts payable | (516) |
| Operating lease liabilities, current | (7) |
| Accrued and other current liabilities | (363) |
| Operating lease liabilities, non-current | (66) |
| Deferred tax liability | (163) |
| Other long-term liabilities | (1) |
| Total liabilities assumed | (1,116) |
| Net assets acquired | $ 2,279 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill. Goodwill is primarily attributed to the assembled workforce of Transplace and anticipated operational synergies. Goodwill was assigned to our Freight segment. The fair values assigned to tangible and identifiable intangible assets acquired and liabilities assumed are based on management's estimates and assumptions at the time of acquisition. The purchase price allocation is preliminary and is subject to revision as more detailed analyses are completed and additional information about the fair value of assets acquired and liabilities assumed, including related deferred income taxes, become available.

142

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition (in millions, except years):

| | Fair Value | Weighted Average Remaining Useful Life - Years |
|---|---|---|
| Consumer relationships | $ 530 | 12 |
| Developed technology | 363 | 7 |
| Trade names | 9 | 2 |
| Total | $ 902 | |

Customer relationships represent the fair value of the underlying relationships with Transplace customers who utilize their logistics services. Developed technology represents the fair value of Transplace's customer facing technology platforms. Trade names relate to the "Transplace" trade name, trademarks, and domain names. The overall weighted average useful life of the identified amortizable intangible assets acquired is ten years.

The results of Transplace were included in our consolidated financial statements from the date of acquisition, November 12, 2021. For the period from November 12, 2021 through December 31, 2021, Transplace contributed $684 million of revenue and an immaterial amount of loss before taxes.

### Certain Unaudited Pro Forma Information

The following unaudited pro forma financial information presents what our results would have been had we acquired Careem, CS-Global, Routematch, Postmates and Transplace in the beginning of the applicable comparable prior annual reporting period. The 2020 pro forma includes full year results for: our 2020 acquisitions (Careem, CS-Global, Routematch and Postmates) as well as Transplace. The 2021 pro forma includes full year results for Transplace. The unaudited pro forma information presented below is for informational purposes only and is not necessarily indicative of our consolidated results of operations of the consolidated business had the acquisitions actually occurred at the beginning of applicable comparable prior reporting period or of the results of our future operations of the consolidated business.

| | Year Ended December 31, | |
|---|---|---|
| (In millions) | 2020 | 2021 |
| | (Unaudited) | |
| Revenue | $ 15,158 | $ 21,764 |
| Net loss including non-controlling interests | (7,342) | (700) |

The pro forma financial information primarily includes adjustments to net loss including non-controlling interests to reflect the additional amortization that would have been recorded assuming the fair value adjustments to intangible assets had been applied from the beginning of applicable comparable prior reporting period, with the related tax effects.

### Note 19 – Divestitures

During the years ended December 31, 2019, 2020 and 2021, we completed the following divestitures:

- In 2019, divestitures consisted of the disposition of our LCR business operations.

- In 2020, divestitures consisted of the sale of our Uber Eats India operations, the disposition of all assets of our JUMP business, and the sale of our European Freight business to Sennder.

- In 2021, divestitures consisted of the sale of our ATG Business, a subsidiary focused on the development and commercialization of autonomous vehicle technology, to Aurora.

The gains (losses) associated with these divestitures were included in other income (expense), net in the consolidated statements of operations.

### Divestiture of LCR to Waydrive

In January 2019, an agreement was executed with Waydrive to purchase the LCR business, specifically 100% of the equity interests of LCR and its subsidiary LCRF Pte. Ltd. ("LCRF"). Fair value of consideration received included $310 million of cash for the assets and liabilities of LCR and LCRF and up to $33 million of contingent consideration receivable for certain VAT receivables and receivables from certain commercial counterparties. As of December 31, 2020, we collected substantially all of the contingent consideration receivable. The resulting gain on disposal was not material to us. The transaction closed on January 25, 2019. The LCR business was included within our Mobility segment.

143

### Divestiture of Uber Eats India to Zomato

On January 21, 2020, we entered into a definitive agreement and completed the divestiture of Uber Eats India to Zomato in exchange for (i) CCPS Preferred Shares of Zomato convertible into ordinary shares representing, when converted, 9.99% of the total voting capital of Zomato and (ii) a non-interest bearing note receivable to be repaid over the course of four years for reimbursement by Zomato of goods and services tax. The estimated fair value of the consideration received included the investment valued at $171 million and the $35 million of reimbursement of goods and services tax receivable from Zomato. As of December 31, 2021, we had collected substantially all of the receivable. The fair value of the CCPS Preferred Shares was based primarily on the observed transaction price for a similar security issued to new investors in close proximity to the time of our transaction with Zomato. The transaction resulted in a gain on disposal of $154 million recognized in other income (expense), net in the consolidated statements of operations during the first quarter of 2020. The income tax effect of the sale was not material. The divestiture of Uber Eats India did not represent a strategic shift that would have had a major effect on our operations and financial results, and therefore does not qualify for reporting as a discontinued operation for financial statement purposes.

### Divestiture of JUMP and Investment in Lime

On May 7, 2020, we entered into a series of transactions and agreements with Lime to divest our JUMP business (the "JUMP Divestiture"). Neutron Holdings, Inc. ("Lime") is incorporated in Delaware for the purpose of owning and operating a fleet of dockless e-bikes and e-scooters for short-term access use by consumers for personal transportation. We previously held Lime Series C preferred stock and fully vested warrants to purchase Lime Series C-1 preferred stock.

Uber contributed hardware, equipment, intellectual property rights, technology, licensed technology, and permits of our JUMP business (collectively, "JUMP Assets") in certain markets to Lime. JUMP Assets and previously held investments and warrants in Lime were exchanged for common stock (the "Lime Common Stock"), newly issued Lime Series 1-C preferred stock ("Lime 1-C Preferred Stock") and fully vested warrants to purchase Lime Series 1-C Preferred Stock ("Lime 1-C Preferred Stock Warrants"). Lime Common Stock represents approximately 10% of fully-diluted (22% undiluted) ownership interest in Lime as of December 31, 2021.

Concurrently, we contributed $85 million of cash to Lime in exchange for a secured note convertible into Lime Series 3 Preferred Stock (the "Lime Convertible Note"), which may be converted at any time at our election representing 20% initial ownership in Lime as converted on a fully-diluted basis. In addition, we entered into a call option agreement which gives us for a two-year period beginning May 7, 2022 the right to acquire all of the outstanding equity interests of Lime held by its shareholders at fair value on the date of exercise, subject to regulatory approval. We have one seat on Lime's five-person board of directors. We also amended our preexisting commercial agreement with Lime.

Our ownership in Lime is comprised of Lime Common Stock, Lime 1-C Preferred Stock, Lime 1-C Preferred Stock Warrants, and the Lime Convertible Note (collectively, the "2020 Lime Investments") and represents approximately 31% on an as converted and fully-diluted basis as of December 31, 2021. The 2020 Lime Investments are accounted for under the fair value option. Refer to Note 3 - Investments and Fair Value Measurement for additional information. Lime was assessed under the VIE model and considered an unconsolidated VIE. Refer to Note 16 – Variable Interest Entities for additional information.

The JUMP Divestiture did not represent a strategic shift that would cause a major effect on our operations and financial results, and therefore does not qualify for reporting as a discontinued operation for financial reporting purposes. The resulting loss on disposal was not material to us and was recorded in other income (expense), net, in the consolidated statements of operations during the second quarter of 2020.

### Divestiture of ATG Business to Aurora

On January 19, 2021, we completed the previously announced sale of our ATG Business, a subsidiary focused on the development and commercialization of autonomous vehicle technology, to Aurora. As a result, our controlling interest and the non-controlling interests in the ATG Business were settled, and ownership of the ATG Business transferred to Aurora.

As consideration for the sale, Aurora issued Series U-1 preferred shares to the third party investors of the ATG Business to settle their ATG Series A Stated Liquidation Preference of $1.1 billion, which had previously been recorded as redeemable and non-redeemable non-controlling interests on our consolidated balance sheet prior to this transaction. We received the residual consideration from the sale as the only common unit holder of the ATG Business in the form of Aurora common shares valued at $1.3 billion, representing 22% of fully-diluted (25% undiluted) ownership interest of Aurora. Concurrently, we invested $400 million in Aurora in exchange for Aurora Series U-2 convertible preferred shares, representing 4% of fully-diluted (5% undiluted) ownership interest of Aurora. Refer to Note 3 – Investments and Fair Value Measurement for additional information.

We do not consolidate Aurora under either the VIE or the voting interest model. For further information, refer to Note 16 – Variable Interest Entities.

We entered into a commercial agreement with Aurora pursuant to which the parties will collaborate with best efforts to launch and commercialize self-driving vehicles on our ridesharing network. We also allowed unvested RSUs for Uber stock held by

144

employees of the ATG Business that transferred to Aurora to continue to vest over the next 12 months contingent upon the employee remaining at Aurora. As a result, we recognized liabilities of $315 million as consideration for these future obligations to Aurora.

The sale of the ATG Business did not represent a strategic shift that would have had a major effect on our operations and financial results, and therefore does not qualify for reporting as a discontinued operation. The resulting gain on disposal was recorded in other income (expense), net in the consolidated statements of operations.

The following table presents the gain on sale of the ATG Business (in millions):

| | Year Ended December 31, 2021 |
|---|---|
| Fair value of common shares received | $ 1,277 |
| Derecognition of ATG Business' non-controlling interests | 1,057 |
| Liability recognized for future obligations | (315) |
| Net consideration received for sale of the ATG Business | 2,019 |
| Carrying value of net assets transferred | (375) |
| Gain on the sale of the ATG Business | $ 1,644 |

## Note 20 – Restructuring and Related Charges

During the second quarter of 2020, we initiated and completed certain restructuring activities in order to reduce our overall cost structure in response to the economic challenges and uncertainty resulting from the COVID-19 pandemic and its impact on our business. We also exited the JUMP business and incurred costs related to site closures, asset impairments and write-offs.

The following table presents the total restructuring and related charges associated with our segments as well as corporate charges (in millions):

| | Year Ended December 31, 2020 |
|---|---|
| Mobility | $ 67 |
| Delivery | 32 |
| Freight | 7 |
| All Other [1] | 175 |
| Total restructuring and related charges by segment | 281 |
| Corporate G&A and Platform R&D | 81 |
| Total restructuring and related charges | $ 362 |

[1] Includes restructuring and related charges associated with the exit of the JUMP business, including severance and other termination benefits of $30 million, site closure costs of $21 million and other costs of $65 million.

The following table presents the total restructuring and related charges, by function (in millions):

| | Year Ended December 31, 2020 |
|---|---|
| Operations and support | $ 172 |
| Sales and marketing | 21 |
| Research and development | 85 |
| General and administrative | 84 |
| Total | $ 362 |

145

The following table provides the components of and changes in our restructuring and related charges accrual during the years ended December 31, 2020 and 2021 (in millions):

| | Severance and Other Termination Benefits | | Site Closure Costs | | Other | | Total |
|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2019 | $ | — | $ | — | $ | — | $ — |
| Charges [1], [2] | | 199 | | 98 | | 65 | 362 |
| Cash payments | | (197) | | (3) | | (45) | (245) |
| Non-cash adjustments | | — | | (95) | | (19) | (114) |
| Balance as of December 31, 2020 | | 2 | | — | | 1 | 3 |
| Cash payments | | (2) | | — | | — | (2) |
| Balance as of December 31, 2021 | $ | — | $ | — | $ | 1 | $ 1 |

[1] Site closure costs primarily includes $50 million related to the impairment of operating lease right-of-use assets and $38 million for write-offs of leasehold improvements.

[2] Total restructuring and related charges included $248 million of cash settled charges, primarily for severance and other termination benefits and were substantially paid as of December 31, 2020.

### Schedule II - Valuation and Qualifying Accounts

The table below details the activity of the allowance for doubtful accounts, deferred tax asset valuation allowance, and insurance reserves (in millions):

| | Balance at Beginning of Period | | Additions [1], [2] | | Deductions [2] | | Balance at End of Period |
|---|---|---|---|---|---|---|---|
| Year Ended December 31, 2019 | | | | | | | |
| Allowance for doubtful accounts | $ | 34 | $ | 195 | $ | (195) | $ 34 |
| Deferred tax asset valuation allowance | $ | 1,294 | $ | 8,616 | $ | (55) | $ 9,855 |
| Insurance reserves | $ | 2,937 | $ | 1,451 | $ | (970) | $ 3,418 |
| Year Ended December 31, 2020 | | | | | | | |
| Allowance for doubtful accounts | $ | 34 | $ | 178 | $ | (157) | $ 55 |
| Deferred tax assets valuation allowance | $ | 9,855 | $ | 3,655 | $ | (100) | $ 13,410 |
| Insurance reserves | $ | 3,418 | $ | 950 | $ | (902) | $ 3,466 |
| Year Ended December 31, 2021 | | | | | | | |
| Allowance for doubtful accounts | $ | 55 | $ | 246 | $ | (250) | $ 51 |
| Deferred tax assets valuation allowance | $ | 13,410 | $ | 571 | $ | (61) | $ 13,920 |
| Insurance reserves | $ | 3,466 | $ | 1,696 | $ | (1,174) | $ 3,988 |

[1] Additions to insurance reserves include $9 million, $35 million and $69 million for the years ended December 31, 2019, 2020 and 2021 respectively, for changes in estimates resulting from new developments in prior period claims. Additions to insurance reserves also include $374 million for the year ended December 31, 2021 for reserves assumed in connection with a loss portfolio transfer reinsurance agreement. For additional information on the loss portfolio transfer reinsurance agreement, see Note 1 – Description of Business and Summary of Significant Accounting Policies.

[2] For the year ended December 31, 2019, the increase in the valuation allowance was primarily attributable to a step-up in the tax basis of intellectual property rights, an increase in U.S. federal, state and Netherlands deferred tax assets resulting from the loss from operations, and tax credits generated during the year.

For the year ended December 31, 2020, the increase in the valuation allowance was primarily attributable to an increase in tax rate in Netherlands, an increase in U.S. federal, state and Netherlands deferred tax assets resulting from the loss from operations, and tax credits generated during the year.

For the year ended December 31, 2021, the increase in the valuation allowance was primarily attributable to a tax rate increase in the Netherlands, an increase in U.S. federal, state and Netherlands deferred tax assets resulting from the loss from operations, and tax credits generated during the year, offset partially by the release of the valuation allowance due to deferred tax liabilities recorded as a result of the acquisitions providing an additional source of taxable income to support the realizability of pre-existing deferred tax assets.

### ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### *Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. As required by Rule 13a-15(b) under the Exchange Act, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Annual Report on Form 10-K, our disclosure controls and procedures are effective at a reasonable assurance level.

### *Changes in Internal Control over Financial Reporting*

There were no changes to our internal control over financial reporting that occurred during the quarter ended December 31, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *Inherent Limitations on Effectiveness of Controls*

Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving their objectives and are effective at the reasonable assurance level. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent or detect all error and fraud. Any control system, no matter how well designed and operated, is based upon certain assumptions and can provide only reasonable, not absolute, assurance that its objectives will be met. Further, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within our company have been detected.

### *Management's Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Our management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria established in "Internal Control - Integrated Framework" (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on that assessment, our management has concluded that our internal control over financial reporting was effective as of December 31, 2021. In addition, PricewaterhouseCoopers LLP, our independent registered public accounting firm, provided an attestation report on our internal control over financial reporting as of December 31, 2021. You can find the full text of PricewaterhouseCoopers LLP attestation report in Item 8 of this Annual Report on Form 10-K.

In accordance with guidance from the staff of the SEC, companies are permitted to exclude acquisitions from their final assessment of internal control over financial reporting for the first fiscal year in which the acquisition occurred. Our management's evaluation of internal control over financial reporting excluded the internal control activities of The Drizly Group, Inc. ("Drizly"), which we acquired in October 2021 and Tupelo Parent, Inc. ("Transplace"), which we acquired in November 2021, as discussed in Note 18 – Business Combinations, of the notes to the consolidated financial statements. We have included the financial results of these in the consolidated financial statements from the date of acquisition. Total assets (excluding goodwill and intangible assets) and total revenues related to Drizly and Transplace that were excluded from our assessment of internal control over financial reporting collectively represented approximately 3% and 4% of our consolidated total assets and total revenues as of and for the fiscal year ended December 31, 2021, respectively.

## ITEM 9B. OTHER INFORMATION

Not applicable.

## ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS

Not applicable.

**PART III**

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by this item is set forth under the headers "Proposal 1- Election of Directors," "Executive Officers," "Corporate Governance" and "Other Governance Matters" in our Proxy Statement for the 2022 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2021 ("2022 Proxy Statement") and is incorporated herein by reference.

## ITEM 11. EXECUTIVE COMPENSATION

147

The information required by this item is included under the headers "Director Compensation," "Executive Compensation" and "Compensation Committee Interlocks and Insider Participation" in the 2022 Proxy Statement and is incorporated herein by reference.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this item is included under the headers "Executive Officers-Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information" in the 2022 Proxy Statement and is incorporated herein by reference.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this item is included under the headers "Corporate Governance-Certain Relationships and Related Person Transactions" and "Corporate Governance-Director Independence Determination" in the 2022 Proxy Statement and is incorporated herein by reference.

## ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

The information required by this item is included under the header "Proposal 3: Ratification of Appointment of Independent Registered Public Accounting Firm" in the 2022 Proxy Statement and is incorporated herein by reference.

### PART IV

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES

(a) We have filed the following documents as part of this Annual Report on Form 10-K:

**1.    Consolidated Financial Statements**

Our consolidated financial statements are listed in the "Index to Consolidated Financial Statements and Schedule" under Part II, Item 8 of this Annual Report on Form 10-K.

**2.    Financial Statement Schedules**

All financial statement schedules have been omitted because they are not applicable, not material or the required information is shown in Part II, Item 8 of this Annual Report on Form 10-K.

**3.    Exhibits**

The documents listed in the Exhibit Index of this Annual Report on Form 10-K are incorporated by reference or are filed with this Annual Report on Form 10-K, in each case as indicated therein (numbered in accordance with Item 601 of Regulation S-K).

## ITEM 16. FORM 10-K SUMMARY

None.

148

## EXHIBIT INDEX

| Exhibit No. | Exhibit Description | Provided Herewith | Form | File Number | Exhibit | Filing Date |
|---|---|---|---|---|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant. | | 10-Q | 001-38902 | 3.1 | August 5, 2021 |
| 3.2 | Amended and Restated Bylaws of the Registrant. | | 10-Q | 001-38902 | 3.2 | August 5, 2021 |
| 4.1 | Description of Common Stock. | | 10-K | 001-38902 | 4.1 | March 2, 2020 |
| 4.2 | Form of common stock certificate of the Registrant. | | S-1/A | 333-230812 | 4.1 | April 26, 2019 |
| 4.5 | Indenture, relating to the Registrant's 8.00% Senior Notes due 2026, by and between the Registrant and U.S. Bank National Association, dated November 7, 2018. | | S-1 | 333-230812 | 4.5 | April 11, 2019 |
| 4.6 | Form of 8.00% Senior Note due 2026. | | S-1 | 333-230812 | 4.6 | April 11, 2019 |
| 4.7 | Indenture, dated as of September 17, 2019, by and between the Registrant, Rasier, LLC and U.S. Bank National Association as Trustee. | | 8-K | 001-38902 | 4.1 | September 17, 2019 |
| 4.8 | Form of Global Note, representing the Registrant's 7.500% Senior Notes due 2027 (included as Exhibit A to the Indenture filed as Exhibit 4.1). | | 8-K | 001-38902 | 4.2 | September 17, 2019 |
| 4.9 | Form of Unsecured Convertible Note. | | 10-Q | 001-38902 | 4.1 | May 8, 2020 |
| 4.10 | Indenture, dated as of May 15, 2020, by and between the Registrant, Rasier, LLC and U.S. Bank National Association, as Trustee. | | 8-K | 001-38902 | 4.1 | May 15, 2020 |
| 4.11 | Form of Global Note, representing the Registrant's 7.500% Senior Notes due 2025 (included as Exhibit A to the Indenture filed as Exhibit 4.1). | | 8-K | 001-38902 | 4.2 | May 15, 2020 |
| 4.12 | Indenture, dated as of September 16, 2020, by and between the Registrant, Rasier, LLC and U.S. Bank National Association, as Trustee. | | 8-K | 001-38902 | 4.1 | September 16, 2020 |
| 4.13 | Form of Global Note, representing the Registrant's 6.250% Senior Notes due 2028 (included as Exhibit A to the Indenture filed as Exhibit 4.1). | | 8-K | 001-38902 | 4.2 | September 16, 2020 |
| 4.14 | Indenture, dated as of December 11, 2020, by and between the Registrant and U.S. Bank National Association, as Trustee. | | 8-K | 001-38902 | 4.1 | December 11, 2020 |
| 4.15 | Form of Global Note, representing the Registrant's 0% Convertible Senior Notes due 2025 (included as Exhibit A to the Indenture filed as Exhibit 4.1). | | 8-K | 001-38902 | 4.2 | December 11, 2020 |
| 4.16 | Indenture, dated as of August 12, 2021, by and between the Registrant, Rasier, LLC and U.S. Bank National Association, as Trustee. | | 8-K | 001-38902 | 4.1 | August 12, 2021 |
| 4.17 | Form of Global Note, representing the Registrant's 4.50% Senior Notes due 2029 (included as Exhibit A to the Indenture filed as Exhibit 4.1). | | 8-K | 001-38902 | 4.2 | August 12, 2021 |
| 10.1 | Amended and Restated 2010 Stock Plan and related forms of award agreements. | | S-1 | 333-230812 | 10.1 | April 11, 2019 |
| 10.2 | Amended and Restated 2013 Equity Incentive Plan and related forms of award agreements. | | S-1/A | 333-230812 | 10.2 | April 26, 2019 |
| 10.3 | 2019 Equity Incentive Plan and related forms of award agreements. | | S-1 | 333-230812 | 10.3 | April 11, 2019 |
| 10.4 | 2019 Employee Stock Purchase Plan. | | S-1 | 333-230812 | 10.4 | April 11, 2019 |
| 10.5 | Form of Indemnification Agreement between the Registrant and each of its directors and executive officers. | | S-1 | 333-230812 | 10.5 | April 11, 2019 |
| 10.6 | 2019 Executive Severance Plan. | | S-1 | 333-230812 | 10.6 | April 11, 2019 |
| 10.7 | Executive Bonus Plan. | | S-1 | 333-230812 | 10.7 | April 11, 2019 |

149

| | | | | | | |
|---|---|---|---|---|---|---|
| 10.8 | Director Compensation Policy and Stock Ownership Guidelines | X | | | | |
| 10.9 | Revolving Credit Agreement, by and among the Registrant, the Lenders party thereto, the Issuing Banks party thereto, and Morgan Stanley Senior Funding, Inc., dated June 26, 2015. | | S-1 | 333-230812 | 10.14 | April 11, 2019 |
| 10.10 | Amendment No. 1 to Revolving Credit Agreement, by and among the Registrant, the Lenders party thereto, and Morgan Stanley Senior Funding, Inc., dated November 17, 2015. | | S-1 | 333-230812 | 10.15 | April 11, 2019 |
| 10.11 | Amendment No. 2 to Revolving Credit Agreement, by and between the Registrant, the Lenders party thereto, and Morgan Stanley Senior Funding, Inc., dated December 21, 2015. | | S-1 | 333-230812 | 10.16 | April 11, 2019 |
| 10.12 | Joinder Agreement to Revolving Credit Agreement, by and among the Registrant, the Lenders party thereto, and Morgan Stanley Senior Funding, Inc., dated March 21, 2016. | | S-1 | 333-230812 | 10.17 | April 11, 2019 |
| 10.13 | Amendment No. 4 to Revolving Credit Agreement, by and among the Registrant, the Lenders party thereto, and Morgan Stanley Senior Funding, Inc., dated July 13, 2016. | | S-1 | 333-230812 | 10.18 | April 11, 2019 |
| 10.14 | Amendment No. 5 to Revolving Credit Agreement, by and among the Registrant, the Lenders party thereto, and Morgan Stanley Senior Funding, Inc., dated June 13, 2018. | | S-1 | 333-230812 | 10.19 | April 11, 2019 |
| 10.15 | Amendment No. 6 to Revolving Credit Agreement, by and among the Registrant, the Lenders party thereto, each Issuing Bank party thereto, and Morgan Stanley Senior Funding, Inc., dated October 25, 2018. | | S-1 | 333-230812 | 10.20 | April 11, 2019 |
| 10.16 | Amendment No. 7 to Revolving Credit Agreement, by and among the Registrant, Rasier LLC, the Lenders party thereto, each Issuing Bank party thereto, and Morgan Stanley Senior Funding, Inc., dated June 5, 2020. | | 10-Q | 001-38902 | 10.1 | August 7, 2020 |
| 10.17 | Amendment No. 8 to Revolving Credit Agreement, by and among the Registrant, Rasier LLC, the Lenders party thereto, and Morgan Stanley Senior Funding, Inc., dated December 24, 2021. | X | | | | |
| 10.18 | Term Loan Agreement, by and among the Registrant, the Lenders party thereto, and Morgan Stanley Senior Funding, Inc., dated July 13, 2016. | | S-1 | 333-230812 | 10.21 | April 11, 2019 |
| 10.19 | Amendment No. 1 to Term Loan Agreement, by and among the Registrant, the Lenders party thereto, and Morgan Stanley Senior Funding, Inc., dated June 13, 2018. | | S-1 | 333-230812 | 10.22 | April 11, 2019 |
| 10.20 | Amendment No. 2 to Term Loan Agreement, dated February 25, 2021, by and among the Registrant as Borrower, Rasier LLC as subsidiary guarantor, the lenders party thereto, and Morgan Stanley Senior Funding, Inc., as administrative agent for the lenders. | | 8-K | 001-38902 | 10.1 | March 1, 2021 |
| 10.21 | Term Loan Agreement, by and among the Registrant, the Lenders party thereto, and Cortland Capital Market Services LLC, dated April 4, 2018. | | S-1 | 333-230812 | 10.23 | April 11, 2019 |
| 10.22+ | Google Maps Master Agreement, by and between the Registrant and Google LLC, dated July 13, 2020. | | 10-Q | 001-38902 | 10.1 | November 6, 2020 |
| 10.23 | Employment Agreement, by and between the Registrant and Dara Khosrowshahi, dated April 9, 2019. | | S-1 | 333-230812 | 10.28 | April 11, 2019 |
| 10.24 | Employment Agreement, by and between the Registrant and Nelson Chai, dated April 9, 2019. | | S-1 | 333-230812 | 10.30 | April 11, 2019 |
| 10.25 | Addendum to Employment Agreement, by and between the Registrant and Nelson Chai, dated September 1, 2019. | | 10-K | 001-38902 | 10.29 | March 2, 2020 |

| | | | | | |
|---|---|---|---|---|---|
| 10.26 | Addendum to Employment Agreement, by and between the Registrant and Nelson Chai, dated February 28, 2020. | 10-K | 001-38902 | 10.30 | March 2, 2020 |
| 10.27 | Employment Agreement, by and between the Registrant and Nikki Krishnamurthy, dated April 9, 2019. | S-1 | 333-230812 | 10.32 | April 11, 2019 |
| 10.28 | Addendum to Employment Agreement, by and between the Registrant and Nikki Krishnamurthy, dated December 18, 2020. | 10-K | 001-38902 | 10.29 | March 1, 2021 |
| 10.29‡ | Form of employment agreement between the Registrant and its executive officers. | 10-Q | 001-38902 | 10.2 | November 6, 2020 |
| 21.1 | List of Subsidiaries of the Registrant. | | | | X |
| 23.1 | Consent of PricewaterhouseCoopers LLP, independent registered public accounting firm. | | | | X |
| 24.1 | Power of Attorney (contained on signature page hereto). | | | | X |
| 31.1 | Certification of the Principal Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | X |
| 31.2 | Certification of the Principal Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | X |
| 32.1* | Certifications of the Principal Executive Officer and Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | X |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | | | | |
| 101.SCH | XBRL Taxonomy Extension Schema Document. | | | | |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. | | | | |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document. | | | | |
| 101.LAB | XBRL Taxonomy Extension Labels Linkbase Document. | | | | |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. | | | | |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101). | | | | |

+Portions of this exhibit have been omitted in accordance with Item 601(b)(10)(iv) of Regulation S-K.

‡This form of employment agreement will be used for all named executive officer employment agreements entered into and effective after July 1, 2020 unless otherwise noted.

* The certifications attached as Exhibit 32.1 that accompany this Annual Report on Form 10-K are deemed furnished and not filed with the Securities and Exchange Commission and are not to be incorporated by reference into any filing of Uber Technologies, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date of this Annual Report on Form 10-K, irrespective of any general incorporation language contained in such filing.

151

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

UBER TECHNOLOGIES, INC.

Date: February 24, 2022

By: /s/ Dara Khosrowshahi

Dara Khosrowshahi
Chief Executive Officer and Director
*(Principal Executive Officer)*

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoint Dara Khosrowshahi, Nelson Chai, and Tony West, and each one of them, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in their name, place and stead, in any and all capacities, to sign any amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Dara Khosrowshahi<br>Dara Khosrowshahi | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 24, 2022 |
| /s/ Nelson Chai<br>Nelson Chai | Chief Financial Officer<br>*(Principal Financial Officer)* | February 24, 2022 |
| /s/ Glen Ceremony<br>Glen Ceremony | Chief Accounting Officer and Global Corporate Controller<br>*(Principal Accounting Officer)* | February 24, 2022 |
| /s/ Ronald Sugar<br>Ronald Sugar | Chairperson of the Board of Directors | February 24, 2022 |
| /s/ Revathi Advaithi<br>Revathi Advaithi | Director | February 24, 2022 |
| /s/ Ursula Burns<br>Ursula Burns | Director | February 24, 2022 |
| /s/ Robert Eckert<br>Robert Eckert | Director | February 24, 2022 |

P-02346-0154

| /s/ Amanda Ginsberg | Director | February 24, 2022 |
| Amanda Ginsberg | | |
| /s/ Wan Ling Martello | Director | February 24, 2022 |
| Wan Ling Martello | | |
| | Director | February 24, 2022 |
| H.E. Yasir Al-Rumayyan | | |
| /s/ John Thain | Director | February 24, 2022 |
| John Thain | | |
| /s/ David Trujillo | Director | February 24, 2022 |
| David Trujillo | | |
| /s/ Alexander Wynaendts | Director | February 24, 2022 |
| Alexander Wynaendts | | |

153

**Exhibit 10.8**

# Uber

## DIRECTOR COMPENSATION POLICY AND STOCK OWNERSHIP GUIDELINES

**Purpose and Scope**

The Compensation Committee (the "**Compensation Committee**") of the Board of Directors (the "**Board**") of Uber Technologies, Inc. (the "**Company**") has adopted this Director Compensation Policy and Stock Ownership Guidelines (the "**Policy**"), pursuant to which any member of the Board who is not an employee of the Company or any of its affiliates (each, a "**Non-Employee Director**") will be compensated as set forth in this Policy.

**Compensation**

<u>Cash Compensation</u>

Effective January 1, 2022, each Non-Employee Director will be paid (1) an annual cash retainer of $50,000; and (2) annual cash retainers in the following amounts if such Non-Employee Director serves in one or more of the applicable roles:

|  |  |
|---|---|
| *Audit Committee* | <u>Chair</u>: $40,000 |
|  | <u>Member</u>: $20,000 |
| *Compensation Committee* | <u>Chair</u>: $30,000 |
|  | <u>Member</u>: $15,000 |
| *Nominating and Governance Committee* | <u>Chair</u>: $30,000 |
|  | <u>Member</u>: $15,000 |
| *Chairperson of the Board* | $200,000 |

A committee chair will receive the chair retainer for the applicable committee, but will not receive the committee member annual retainer. All cash compensation is earned on a daily basis, payable within the 60-day period following the end of each calendar quarter. The amount of quarterly cash compensation that each Non-Employee Director will be entitled to receive for service as a director, committee chair, or committee member, as the case may be, will be equal to: (1) a fraction, (a) the numerator of which is the annual cash retainer for the applicable role, and (b) the denominator of which is the number of days in the calendar year; multiplied by (2) the number of days the Non-Employee Director served as a director, committee member, or committee chair, as the case may be, during such quarter.

Compensation for service on any other special or standing committees of the Board, will be determined from time to time by the Compensation Committee.

Non-Employee Directors based in the United States may elect to convert the cash compensation described in this Policy into restricted stock unit awards ("**RSUs**") in accordance with the Uber Technologies, Inc. RSU Conversion and Deferral Program for Directors, as may be amended from time to time (the "**RSU Conversion & Deferral Program**").

1

<u>Equity Compensation</u>

*Transition Period*

Effective January 1, 2022 and prior to the date of the annual meeting of the stockholders of the Company on May 9, 2022 (the "**Transition Date**"), a transition RSU award (the "**Transition RSU Award**") will be granted to each Non-Employee Director within 30 days of January 1, 2022 (or, for newly appointed or elected Non-Employee Directors, within 30 days of the date of appointment) in accordance with the following:

- The Transition RSU Award will have a prorated target grant value of $97,192.

- If the Non-Employee Director is not serving as a Non-Employee Director on January 1, 2022 and is newly appointed or elected prior to the Transition Date, the grant value of the Transition RSU Award will be reduced on a pro rata basis, such that the grant value will be equal to the target grant value multiplied by a fraction, the numerator of which is the number of days from the date of election or appointment through May 8, 2022 (the "**Transition Period**") and the denominator of which is the number of days in the Transition Period.

- The grant value of the Transition RSU Award will be converted into the number of shares underlying the award based on the average daily closing price per share of the Company's Common Stock in the month prior to the grant date (rounded down to the nearest whole share).

- The Transition RSU Award will fully vest on May 8, 2022 if the Non-Employee Director is in service on that date. If the Non-Employee Director elects to retire from the Company prior to May 8, 2022, the Compensation Committee will have the authority to accelerate the vesting of a prorated portion of the Transition RSU Award, such that the amount payable will be equal to the grant value multiplied by a fraction, the numerator of which is the number of days the Non-Employee Director served as a director from January 1, 2022 through the date of the Non-Employee Director's retirement and the denominator of which is the number of days in the Transition Period. No Transitional RSU Award will be accelerated if a Non-Employee Director resigns from the Board or is otherwise disqualified or removed, with or without cause, from the Board.

*Post-Transition Period*

On or after the Transition Date, with respect to each Service Period, an annual RSU award (the "**Annual RSU Award**") will be granted to each Non-Employee Director within 30 days of the beginning of each Service Period in accordance with the following:

- The term "**Service Period**" means each period from the date of the annual meeting of the stockholders of the Company in one year through the date immediately preceding the date of the annual meeting of the stockholders of the Company in the following year; provided, however, that the first Service Period begins on the Transition Date.

- The Annual RSU Award will have a target grant value of $275,000.

- If the Non-Employee Director is not serving as a Non-Employee Director on the first day of the Service Period, the grant value of the RSU Award for the initial term that lasts from the date of election or appointment until the last day of the Service Period will be reduced on a pro rata basis, such that the grant value will be equal to the target grant value multiplied by a fraction, the numerator of which is the number of days from the date of election or appointment through the last day of the Service Period.

- The Annual RSU Award will fully vest on the last day of the Service Period, provided the Non-Employee Director is in service on that date. If the Non-Employee Director is no longer in service at the end of the Service Period due to (i) a Corporate Transaction (as defined in the RSU Conversion & Deferral Program), or (ii) solely in the discretion of the Compensation Committee, an election to retire, a prorated portion of the Non-Employee Director's Annual RSU Award will vest, such that the amount payable will be equal to the grant value multiplied by a fraction, the numerator of which is the number of days the Non-Employee Director served as a director during the Service Period and the denominator of which is the number of days in the Service Period. No Annual RSU Award will be accelerated if a

2

Non-Employee Director resigns from the Board or is otherwise disqualified or removed, with or without cause, from the Board.

- The actual grant value of the Annual RSU Award will be converted into the number of shares underlying the award based on the average daily closing price per share of the Company's Common Stock in the month prior to the grant date (rounded down to the nearest whole share).

All RSU Awards will be subject to the Company's standard form of RSU Award Agreement.

**Expense Reimbursement**

All members of the Board will be reimbursed for their reasonable out-of-pocket expenses, including travel and lodging, incurred in attending meetings of the Board and committees thereof, following submission by the Non-Employee Director of reasonable written substantiation for the expenses, consistent with the Company's reimbursement policy.

**Director Stock Ownership Guidelines**

The minimum share ownership level for each Non-Employee Director will be ten times the Non-Employee Director's annual cash retainer, not inclusive of any retainer for service on a committee of the Board or for service as Chairperson of the Board.

The minimum share ownership levels for each Non-Employee Director will be determined annually using the total Non-Employee Director's annual cash retainer as of March 31 of the applicable year and (i) the average daily closing price per share of the Company's Common Stock for the month ending on March 31 of the applicable year or (ii) any other price per share of the Company's Common Stock that the Compensation Committee deems appropriate.

The following may be used in determining stock ownership:

- Shares owned directly (including through open market purchases);

- Shares owned jointly with or separately by the individual's spouse; and

- Shares held in trust for the benefit of the individual, the individual's spouse, and/or the individual's children.

Any shares held prior to the Non-Employee Director's date of election or appointment will count towards the ownership requirement.

The applicable level of Company stock ownership is expected to be satisfied within five years after an individual first becomes subject to this Policy and maintained thereafter for as long as the individual remains a Non-Employee Director.

Each Non-Employee Director will be notified annually of such individual's minimum share ownership requirement, current holdings, and whether he or she must hold any additional shares to meet these stock ownership guidelines.

The Compensation Committee will evaluate whether exceptions should be made in the case of any Non-Employee Director who, due to his or her unique financial circumstances, would incur an undue hardship by complying with these stock ownership guidelines.

**Effective Date and Amendment**

The Policy became effective initially on January 1, 2020 (the "**Effective Date**"), with the exception of Dr. Ronald Sugar, the current Chairperson of the Board, who had an independent effective date of January 1, 2021. The Policy was last amended on November 1, 2021, to be effective January 1, 2022.

If an individual becomes a Non-Employee Director after the effective date of the Policy, the terms of the Policy then in effect will apply to such individual commencing on the date he or she becomes a Non-Employee Director.

3

This Policy will be reviewed periodically and may be amended from time to time by the Compensation Committee. Any changes to compensation set forth in this Policy will be approved by the Board, in consultation with the Compensation Committee.

\*\*\*

4

*Execution Version*

**Exhibit 10.17**

## AMENDMENT NO. 8 TO REVOLVING CREDIT AGREEMENT

THIS AMENDMENT NO. 8 TO REVOLVING CREDIT AGREEMENT, dated as of December 24, 2021 (this "<u>Agreement</u>"), is made by and among (i) UBER TECHNOLOGIES, INC., a Delaware corporation (the "<u>Borrower</u>"), (ii) Rasier, LLC, a Delaware limited liability company (the "<u>Guarantor</u>" and together with the Borrower, the "<u>Loan Parties</u>"), (iii) the Lenders party hereto and (iv) MORGAN STANLEY SENIOR FUNDING, INC., as administrative agent (in such capacity, the "<u>Administrative Agent</u>") for the Lenders (such capitalized term and all other capitalized terms used and not otherwise defined herein having the meanings set forth in the Existing Credit Agreement referred to below unless the context otherwise requires).

<u>W I T N E S S E T H</u>:

WHEREAS, the Borrower, the Guarantor, the Administrative Agent and the Lenders and Issuing Banks party thereto from time to time have heretofore entered into that certain Revolving Credit Agreement, dated as of June 26, 2015 (as amended, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>Existing Credit Agreement</u>" and the Existing Credit Agreement as so amended hereby, the "<u>Credit Agreement</u>");

WHEREAS, the Borrower has requested that the Lenders consent to certain amendments to the Existing Credit Agreement and the Lenders party hereto, subject to the conditions set forth below to consent to such amendments to the Existing Credit Agreement; and

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the Loan Parties and each Lender hereby agree as follows:

### ARTICLE I

### AMENDMENT OF EXISTING CREDIT AGREEMENT

SECTION 1.1.    Subject to the satisfaction (or waiver) of the conditions set forth in <u>Article II</u>, the Existing Credit Agreement is hereby amended to delete the stricken text (indicated in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated in the same manner as the following example: <u>double-underlined text</u>) as set forth in the copy of the Credit Agreement attached as <u>Annex I</u> hereto.

SECTION 1.2.    Each of the parties hereto acknowledges and agrees that the terms of this Agreement do not constitute a novation but, rather, an amendment of the terms of a pre-existing Indebtedness and related agreement, as evidenced by the Existing Credit Agreement.

### ARTICLE II

### CONDITIONS TO EFFECTIVENESS

The amendments referred to in <u>Article I</u> shall be effective on the date the Administrative Agent has confirmed the satisfaction or waiver of each of the conditions contained in this <u>Article II</u> (the "<u>Amendment Effective Date</u>").

SECTION 2.1.    <u>Execution of Counterparts</u>. The Administrative Agent shall have received counterparts of this Agreement duly executed and delivered by (i) each of the Loan Parties as of the Amendment Effective Date, (ii) the Administrative Agent and (iii) each Lender that has a Revolving Commitment outstanding as of the Amendment Effective Date.

SECTION 2.2.    <u>Fees and Expenses</u>. The Borrower shall have paid to the Administrative Agent all expenses (including legal fees of Davis Polk & Wardwell LLP) payable pursuant to Section 9.03 of the Credit Agreement which have accrued to the Amendment Effective Date to the extent invoices therefor have been provided at least one (1) Business Day prior to the Amendment Effective Date.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

SECTION 3.1.    <u>Representations and Warranties</u>. In order to induce the Lenders and the Administrative Agent to enter into this Agreement, each Loan Party hereby represents and warrants to the Administrative Agent and the Lenders, as of the date hereof, as follows:

(a)    this Agreement has been duly authorized, executed and delivered by each Loan Party and constitutes a legal, valid and binding obligation of each such Loan Party, enforceable against it in accordance with its terms, except to the extent the enforceability hereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law);

(b)    the execution, delivery and performance by each Loan Party of this Agreement will not (i) require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (1) such as have been obtained or made and are in full force and effect and (2) those approvals, consents, registrations, filings or other actions, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect, (ii) violate any charter, by-laws or other organizational document of the Borrower or any of its Restricted Subsidiaries, (iii) except as could not reasonably be expected to have a Material Adverse Effect, violate any applicable law or regulation or any order of any Governmental Authority; (iv) except as could not reasonably be expected to have a Material Adverse Effect, violate or result in a default under any indenture, agreement or other instrument (other than the agreements and instruments referred to in clause (ii)) binding upon the Borrower or any of its Restricted Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Restricted Subsidiaries or (v) result in the creation or imposition of any Lien on any asset of the Borrower or any of its Restricted Subsidiaries;

(c)    each of the representations and warranties contained in Article 3 of the Credit Agreement and the other Loan Documents is true and correct in all material respects as of the Amendment Effective Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties are true and correct in all material respects on and as of such earlier date (provided that representations and warranties that are qualified by materiality shall be true and correct in all respects); and

(d)    no Default or Event of Default exists, or will result from the execution of this Agreement and the transactions contemplated hereby, as of the Amendment Effective Date.

2

SECTION 3.2.    Reaffirmation of Obligations. Each of the Loan Parties hereby consents to this Agreement and hereby restates, ratifies and reaffirms each and every term and condition set forth in the Credit Agreement and the Loan Documents effective as of the Amendment Effective Date and as amended hereby and hereby reaffirms its obligations (including the Obligations) under each Loan Document to which it is a party.

ARTICLE IV

MISCELLANEOUS

SECTION 4.1.    Full Force and Effect; Amendment and Restatement. Except as expressly provided herein and in the Credit Agreement, this Agreement shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the Administrative Agent, the Arrangers or the Lenders under the Existing Credit Agreement or any other Loan Document, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement or any other Loan Document, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle any Loan Party to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Existing Credit Agreement or any other Loan Document in similar or different circumstances.

SECTION 4.2.    Loan Document Pursuant to Credit Agreement. This Agreement is a Loan Document executed pursuant to the Credit Agreement and shall be construed, administered and applied in accordance with all of the terms and provisions of the Credit Agreement, including, without limitation, the provisions relating to forum selection, consent to jurisdiction and waiver of jury trial included in Article 9 of the Credit Agreement, which provisions are hereby acknowledged and confirmed by each of the parties hereto.

SECTION 4.3.    Headings. The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions hereof.

SECTION 4.4.    Execution in Counterparts. This Agreement may be executed by the parties hereto in counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of electronic records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 4.5.    Cross-References. References in this Agreement to any Article or Section are, unless otherwise specified or otherwise required by the context, to such Article or Section of this Agreement.

SECTION 4.6.    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

3

SECTION 4.7.   <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

SECTION 4.8.   **<u>GOVERNING LAW</u>. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIM, CONTROVERSY OR DISPUTE UNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, WHETHER BASED IN CONTRACT (AT LAW OR IN EQUITY), TORT OR ANY OTHER THEORY, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

UBER TECHNOLOGIES, INC.,
as the Borrower

By: /s/ Nelson Chai
    Name: Nelson Chai
    Title: Chief Financial Officer

Rasier, LLC, as the Guarantor
By: /s/ Robert Wu
    Name: Robert Wu
    Title: Manager

MORGAN STANLEY SENIOR FUNDING, INC.,
as Administrative Agent and as a Lender

By: /s/ Phillip Magdaleno
    Name: Phillip Magdaleno
    Title: Authorized Signatory
    12/14/2021

BANK OF AMERICA, N.A., as Lender

By: /s/ Molly Daniello
    Name: Molly Daniello
    Title: Director

BANC OF AMERICA CREDIT PRODUCTS
INC, as Lender

By: /s/ Miles Hanes
    Name: Miles Hanes
    Title: AVP

JPMORGAN CHASE BANK, N.A, as Lender

By: /s/ Bruce S. Borden
    Name: Bruce S. Borden
    Title: Executive Director

[*Signature page to Amendment No. 8*]

CBAM Revolvers and CBAM Credit
Opportunities Master Fund, LP, as Lender

By: /s/ Don Young
    Name: Don Young
    Title: Partner


CITICORP NORTH AMERICA, INC., as Lender

By: /s/ Matthew Sutton
    Name: Matthew Sutton
    Title: Vice President

CITIBANK, N.A., INC., as an Issuing Bank

By: /s/ Matthew Sutton
    Name: Matthew Sutton
    Title: Vice President


DETUSCHE BANK AG CAYMAN ISLAND
BRANCH, as Lender

By: /s/ Ming K. Chu
    Name: Ming K. Chu
    Title: Director

By: /s/ Marko Lukin
    Name: Marko Lukin
    Title: Vice President


GOLDMAN SACHS LENDING PARTNERS
LLC, as Lender

By: /s/ Dan Martis
    Name: Dan Martis
    Title: Authorized Signatory

#95200094v3

BARCLAYS BANK PLC, as Lender

By: /s/ Manuel Rubiano
    Name: Manuel Rubiano
    Title: Authorized Signatory


ROYAL BANK OF CANADA, as Lender

By: /s/ Nicholas Heslip
    Name: Nicholas Heslip
    Title: Authorized Signatory


HSBC BANK USA, NATIONAL
ASSOCIATION, as Lender

By: /s/ Aleem Shamji
    Name: Aleem Shamji
    Title: Director


Sumitomo Mitsui Banking Corporation, as Lender

By: /s/ Gail Motonaga
    Name: Gail Motonaga
    Title: Executive Director

#95200094v3

**ANNEX I**

**AMENDED CREDIT AGREEMENT**

MARKED VERSION REFLECTING CHANGES
PURSUANT TO AMENDMENT NO. 8
ADDED TEXT SHOWN <u>UNDERSCORED</u>
DELETED TEXT SHOWN ~~STRIKETHROUGH~~

—

REVOLVING CREDIT AGREEMENT

dated as of

June 26, 2015

among

UBER TECHNOLOGIES, INC.,

as the Borrower,

the Lenders party hereto,

the Issuing Banks party hereto,

and

MORGAN STANLEY SENIOR FUNDING, INC.,
as the Administrative Agent

—

BARCLAYS BANK PLC,
CITIGROUP GLOBAL MARKETS INC.,
GOLDMAN SACHS LENDING PARTNERS LLC
and MORGAN STANLEY SENIOR FUNDING, INC.,
as Joint Lead Arrangers

BARCLAYS BANK PLC,
CITIGROUP GLOBAL MARKETS INC.,
GOLDMAN SACHS LENDING PARTNERS LLC,
J.P. MORGAN SECURITIES LLC,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, and
MORGAN STANLEY SENIOR FUNDING, INC.,
as Joint Bookrunners

Article 1 DEFINITIONS                                                                                     1

Section 1.01    Defined Terms                                                                             1

Section 1.02    Classification of Loans and Borrowings                                                    3640

Section 1.03    Terms Generally                                                                           3740

Section 1.04    Accounting Terms; GAAP                                                                    3741

Section 1.05    Permitted Holdco Transaction                                                              3741

Section 1.06    Exchange Rates; Currency Equivalents.                                                     3841

Section 1.07    Limited Conditionality Acquisitions                                                       3842

Section 1.08 Divisions                                                                                    38

Section 1.091.08    Basket Amounts and Application of Multiple Relevant Provisions                        3842

Section 1.101.09    Interest Rates                                                                        3942

Section 1.10    Divisions                                                                                 42

Article 2 THE CREDITS                                                                                     3943

Section 2.01    Revolving Commitments                                                                     3943

Section 2.02    Revolving Loans and Borrowings                                                            3943

Section 2.03    Requests for Borrowings                                                                   4044

Section 2.04    Funding of Borrowings                                                                     4145

Section 2.05    Interest Elections                                                                        4245

Section 2.06    Termination and Reduction of Revolving Commitments                                        4347

Section 2.07    Repayment of Revolving Loans; Evidence of Debt                                            4447

Section 2.08    Prepayment of Loans                                                                       4448

Section 2.09    Fees                                                                                      4549

Section 2.10    Interest                                                                                  4649

Section 2.11    Alternate Rate of Interest; Illegality                                                    4751

Section 2.12    Increased Costs                                                                           4852

Section 2.13    Break Funding Payments                                                                    4953

Section 2.14    Taxes                                                                                     5054

Section 2.15    Payments Generally; Pro Rata Treatment; Sharing of Set-Off                                5357

Section 2.16    Mitigation Obligations; Replacement of Lenders                                            5458

Section 2.17    Defaulting Lenders                                                                        5559

Section 2.18    LIBOR Successor Rate                                                                      57

Section 2.192.18    Incremental Facility                                                                  5861

Section 2.202.19    Extension of the Maturity Date                                                        6063

Section 2.212.20    Letters of Credit.                                                                    6164

Section 2.21    Effect of Benchmark Transition Event                                                      70

Article 3 REPRESENTATIONS AND WARRANTIES                                                                  6772

Section 3.01    Organization; Powers                                                                      6772

Section 3.02    Authorization; Enforceability                                                             6772

Section 3.03    Governmental Approvals; No Conflicts                                                      6772

Section 3.04    Financial Condition; No Material Adverse Change                                           6773

Section 3.05   Properties ........................................................................................................ 6873
Section 3.06   Litigation and Environmental Matters ........................................................... 6873
Section 3.07   Compliance with Laws and Agreements; No Default .................................... 6874
Section 3.08   Investment Company Status .................................................................... 6874
Section 3.09   Margin Stock ............................................................................................. 6874
Section 3.10   Taxes .......................................................................................................... 6974
Section 3.11   ERISA .......................................................................................................... 6974
Section 3.12   Disclosure .................................................................................................. 7075
Section 3.13   Subsidiaries ................................................................................................ 7176
Section 3.14   Solvency ..................................................................................................... 7176
Section 3.15   Anti-Terrorism Law .................................................................................... 7176
Section 3.16   FCPA; Sanctions ........................................................................................ 7277
Section 3.17   Collateral Matters ...................................................................................... 7277
Section 3.18   Beneficial Ownership Certification ........................................................... 7378
Article 4 CONDITIONS ......................................................................................................... 7378
Section 4.01   Effective Date ............................................................................................ 7378
Section 4.02   Each Credit Event ...................................................................................... 7480
Article 5 AFFIRMATIVE COVENANTS ................................................................................. 7580
Section 5.01   Financial Statements; Ratings Change and Other Information .................. 7580
Section 5.02   Notices of Material Events ......................................................................... 7782
Section 5.03   Existence; Conduct of Business ................................................................ 7783
Section 5.04   Payment of Taxes and Other Claims ......................................................... 7883
Section 5.05   Maintenance of Properties; Insurance ...................................................... 7883
Section 5.06   Books and Records; Inspection Rights ...................................................... 7883
Section 5.07   ERISA-Related Information ........................................................................ 7883
Section 5.08   Compliance with Laws and Agreements .................................................... 7984
Section 5.09   Use of Proceeds ......................................................................................... 7984
Section 5.10   Additional Guarantors ............................................................................... 7984
Section 5.11   Holdings ..................................................................................................... 8086
Section 5.12   Post-Closing ............................................................................................... 8186
Section 5.13   Beneficial Ownership Regulations ............................................................ 8186
Article 6 NEGATIVE COVENANTS ...................................................................................... 8186
Section 6.01   Indebtedness .............................................................................................. 8187
Section 6.02   Liens ........................................................................................................... 82 88
Section 6.03   Fundamental Changes ................................................................................ 84 90
Section 6.04   Use of Proceeds ......................................................................................... 86 91
Section 6.05   Minimum Liquidity .................................................................................... 86 91
Section 6.06   Restricted Repayments .............................................................................. 86 91

Section 6.07   Junior Debt Prepayments                                                            ~~87~~ 92
Article 7 EVENTS OF DEFAULT                                                                       ~~87~~ 93
Section 7.01   Events of Default.                                                                 ~~87~~ 93
Section 7.02   Application of Funds                                                               ~~90~~ 95
Article 8 THE AGENTS                                                                              ~~91~~ 96
Section 8.01   Appointment of the Administrative Agent                                            ~~91~~ 96
Section 8.02   Powers and Duties                                                                  ~~92~~ 97
Section 8.03   General Immunity                                                                   ~~92~~ 97
Section 8.04   Administrative Agent Entitled to Act as Lender                                     ~~93~~ 99
Section 8.05   Lenders' Representations, Warranties and Acknowledgment                            ~~94~~ 99
Section 8.06   Right to Indemnity                                                                 ~~94~~ 99
Section 8.07   Successor Administrative Agent.                                                    ~~95~~ 100
Section 8.08   Guaranty                                                                           ~~96~~ 101
Section 8.09   Actions in Concert                                                                 ~~96~~ 101
Section 8.10   Withholding Taxes                                                                  ~~96~~ 102
Section 8.11   Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim            ~~97~~ 102
Section 8.12   Intercreditor Agreements                                                           ~~97~~ 103
Section 8.13   Secured Cash Management Agreements and Secured Hedge Agreements                     ~~98~~ 103
Section 8.14   Certain ERISA Matters                                                              ~~98~~ 103
Article 9 MISCELLANEOUS                                                                           ~~100~~ 105
Section 9.01   Notices                                                                            ~~100~~ 105
Section 9.02   Waivers; Amendments                                                                ~~103~~ 108
Section 9.03   Expenses; Indemnity; Damage Waiver                                                 ~~105~~ 110
Section 9.04   Successors and Assigns                                                             ~~107~~ 112
Section 9.05   Survival                                                                           ~~111~~ 116

Section 9.06    Counterparts; Integration; Effectiveness                                                    ~~111~~ 116
Section 9.07    Severability                                                                                 ~~112~~ 117
Section 9.08    Right of Setoff                                                                              ~~112~~ 117
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.                                  ~~112~~ 117
Section 9.10    Waiver Of Jury Trial                                                                         ~~113~~ 118
Section 9.11    Headings                                                                                     ~~113~~ 118
Section 9.12    Confidentiality                                                                              ~~113~~118
Section 9.13    Interest Rate Limitation                                                                     ~~115~~ 120
Section 9.14    No Advisory or Fiduciary Responsibility                                                      ~~115~~ 120
Section 9.15    Electronic Execution of Assignments and Certain Other Documents                             ~~115~~ 121
Section 9.16    USA PATRIOT Act                                                                              ~~116~~121
Section 9.17    Release of Guarantors; Release of Collateral.                                                ~~116~~ 121
Section 9.18    Acknowledgement and Consent to Bail-In of EEA Financial Institutions                        ~~117~~ 122
Section 9.19    Acknowledgement Regarding Any Supported QFC's                                                ~~118~~ 123

Schedules

Schedule 2.01    Lenders, Revolving Commitments and Letter of Credit Issuer Sublimit

Schedules to the Disclosure Letter

Schedule 3.11    Plans
Schedule 3.13    Capitalization
Schedule 6.01    Specified Indebtedness
Schedule 6.02    Existing Liens

Exhibits

Exhibit A    Form of Assignment and Assumption
Exhibit B    Form of Borrowing Request
Exhibit C    Form of Interest Election Request
Exhibit D-1    Form of Revolving Note
Exhibit D-2    [Reserved]
Exhibit E-1    Form of Guaranty
Exhibit E-2    Form of Holdings Guaranty
Exhibit F    Form of Compliance Certificate
Exhibit G    [Reserved]
Exhibit H-1    Form of U.S. Tax Compliance Certificate
Exhibit H-2    Form of U.S. Tax Compliance Certificate
Exhibit H-3    Form of U.S. Tax Compliance Certificate
Exhibit H-4    Form of U.S. Tax Compliance Certificate

REVOLVING CREDIT AGREEMENT dated as of June 26, 2015 among UBER TECHNOLOGIES, INC., as the Borrower, the LENDERS party hereto and MORGAN STANLEY SENIOR FUNDING, INC., as the Administrative Agent.

The Borrower (such term and each other capitalized term used and not otherwise defined in these recitals having the meaning assigned to it in Article 1), has requested the Lenders to make Loans to the Borrower on a revolving credit basis on and after the date hereof and at any time and from time to time prior to the Maturity Date.

The proceeds of borrowings hereunder, together with the issuance of any letter of credit, are to be used for the purposes described in Section 5.09. The Lenders are willing to establish the credit facility referred to in the preceding paragraph upon the terms and subject to the conditions set forth herein. Accordingly, for valuable consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I
DEFINITIONS

Section 1.01    Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"**2018 Term Loan Agreement**" means the Term Loan Agreement, dated as of April 4, 2018 among the Borrower, as the borrower, the lenders party thereto and Cortland Capital Market Services LLC, as the Administrative Agent

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**Adjusted Daily Simple RFR**" means, (i) with respect to any RFR Borrowing denominated in British Pounds, an interest rate per annum equal to (a) the Daily Simple RFR for British Pounds, *plus* (b) 0.0326% and (ii) with respect to any RFR Borrowing denominated in Swiss Francs, an interest rate per annum equal to (a) the Daily Simple RFR for Swiss Francs, plus (b) -0.0571%; *provided* that in no event shall the Adjusted Daily Simple RFR be less than 0.00%.

"**Adjusted EURIBO Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a EURIBOR Borrowing, the rate *per annum* equal to the EURIBO Rate for such Interest Period; *provided* that in no event shall the Adjusted EURIBO Rate be less than 0.00%.

"**Adjusted LIBO Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period (or, solely for purposes of clause (iii) in the defined term "Alternate Base Rate," for purposes of determining the Alternate Base Rate as of any date) for a Eurodollar Borrowing, (a) for Borrowings denominated in dollars, the rate per annum obtained by dividing (i) the LIBO Rate for dollars for such Interest Period (or such date, as applicable) by (ii) an amount equal to (x) one minus (y) the Applicable Reserve Requirement or (b) for Borrowings denominated in a Permitted Foreign Currency (other than British Pounds, Euros, Australian Dollars, Canadian Dollars, Hong Kong Dollars, Japanese Yen and Singapore Dollars), the rate *per annum* equal to the LIBO Rate for such currency for such Interest Period; *provided* that in no event shall the Adjusted LIBO Rate be less than 0.00%.

1

"**Adjusted TIBOR Rate**" means, with respect to any TIBOR Borrowing denominated in Yen for any Interest Period, an interest rate per annum equal to (a) the TIBOR Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided* that in no event shall the Adjusted TIBOR Rate be less than 0.00%.

"**Administrative Agent**" means MSSF, in its capacity as administrative agent for the Lenders hereunder, or any successor administrative agent.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent from time to time.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agent Fee Letter**" means that certain Agent Fee Letter, dated as of June 18, 2015, by and among the Borrower and the Administrative Agent.

"**Agent Parties**" has the meaning set forth in Section 9.01(d).

"**Agents**" means, collectively, the Administrative Agent and the Arrangers.

"**Aggregate Total Exposure**" means, as at any date of determination, the sum of (i) the Dollar Equivalent of the aggregate principal amount of all outstanding Loans (excluding Loans made for the purpose of reimbursing the Issuing Banks for any amount drawn under any Letter of Credit, but not yet so applied) and (ii) the Letter of Credit Usage.

"**Agreed L/C Cash Collateral Amount**" means 102% of the total outstanding Letter of Credit Usage.

"**Agreement**" means this Revolving Credit Agreement, as the same may hereafter be modified, supplemented, extended, amended, restated or amended and restated from time to time.

"**Alternate Base Rate**" means, for any day, a rate *per annum* equal to the greatest of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Effective Rate in effect on such day *plus* ½ of 1% and (iii) the sum of (a) the Adjusted LIBO Rate that would be payable on such day for a Eurodollar Borrowing with a one-month interest period *plus* (b) 1.00%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (ii) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

2

"**Amendment No. 4**" means that certain Amendment No. 4 to Revolving Credit Agreement dated as of July 13, 2016 by and among the Borrower, the Lenders party thereto and the Administrative Agent.

"**Amendment No. 4 Effective Date**" means the "Amendment Effective Date" as defined in Amendment No. 4.

"**Amendment No. 5**" means that certain Amendment No. 5 to Revolving Credit Agreement dated as of June 13, 2018 by and among the Borrower, the Lenders party thereto and the Administrative Agent.

"**Amendment No. 5 Effective Date**" means the "Amendment Effective Date" as defined in Amendment No. 5.

"**Amendment No. 6**" means that certain Amendment No. 6 to Revolving Credit Agreement dated as of October 25, 2018 by and among the Borrower, the Lenders party thereto and the Administrative Agent.

"**Amendment No. 6 Effective Date**" means the "Amendment Effective Date" as defined in Amendment No. 6.

"**Amendment No. 8**" means that certain Amendment No. 8 to Revolving Credit Agreement dated as of December 24, 2021 by and among the Borrower, the Guarantor party thereto, the Lenders party thereto and the Administrative Agent.

"**Amendment No. 8 Effective Date**" means the "Amendment Effective Date" as defined in Amendment No. 8.

"**Anti-Corruption Laws**" means the FCPA, the U.K. Bribery Act 2010 to the extent applicable, all other applicable anti-corruption laws, the Bank Secrecy Act to the extent applicable, the USA PATRIOT Act, and the applicable anti-money laundering statutes of jurisdictions where the Borrower and its Subsidiaries conduct business, and the rules and regulations (if any) thereunder enforced by any governmental agency.

"**Anti-Terrorism Laws**" has the meaning set forth in Section 3.15(a).

"**Applicable Account Party**" has the meaning set forth in Section 2.20(a).

"**Applicable Foreign Jurisdiction**" has the meaning set forth in Section 5.10.

"**Applicable Percentage**" means, with respect to any Lender, the percentage of the total Revolving Commitments represented by such Lender's Revolving Commitment. If the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Revolving Commitments most recently in effect, giving effect to any assignments.

"**Applicable Rate**" means, for any day, (i) 1.00% per annum with respect to any Eurodollar Loan, EURIBOR Loan, HIBOR Loan, SIBOR Loan, Australian Bank Bill Rate Loan and, Canadian BA Rate Loan, TIBOR Loan or RFR Loan, (ii) 0.00% per annum with respect to any ABR Loan and (iii) 0.15% per annum with respect to the Commitment Fee.

"**Applicable Reserve Requirement**" means for any day as applied to a Eurodollar Borrowing, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve

3

requirements in effect on such day (including basic, supplemental, marginal and emergency reserves under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto) dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"**Application**" means a Letter of Credit application or agreement in the form approved by the applicable Issuing Bank, executed and delivered by the Borrower to the Administrative Agent and the applicable Issuing Bank requesting such Issuing Bank to issue a Letter of Credit.

"**Approved Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Arranger**" means each of Barclays, Citigroup, Goldman Sachs and MSSF, in its capacity as a joint lead arranger and a joint bookrunner.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, substantially in the form of Exhibit A or any other form approved by the Administrative Agent.

"**Australian Dollars**" means the lawful currency of Australia.

"**Australian Bank Bill Rate**" means, with respect to each Interest Period for an Australian Bank Bill Rate Loan, the rate per annum equal to the following:

(a) the average bid rate (the "**BBR Screen Rate**") displayed at or about 10:30 a.m. (Sydney, Australia time) on the first day of that Interest Period on the Reuters screen BBSY page for a term equivalent to such Interest Period; or

(b) to the extent:

(i)    the BBR Screen Rate is not displayed for a term equivalent to such Interest Period; or

(ii)    the basis on which the BBR Screen Rate is calculated or displayed is changed and the relevant Lenders' instruct the Administrative Agent (after consultation by the Administrative Agent with the Borrower) that in their opinion it ceases to reflect the relevant Lenders' cost of funding a new Australian Bank Bill Rate Loan to the same extent as at the date of this Agreement,

the Administrative Agent on instructions of the relevant Lenders may specify another page or service displaying the appropriate rate after consultation by the Administrative Agent with the Borrower; or

(c) if there are no buying rates, the Australian Bank Bill Rate for each Lender will be the rate notified by that Lender to the Administrative Agent to be that Lender's cost of funding its participation in the relevant Australian Bank Bill Rate Loans for that period. Rates will be

4

expressed as a percentage yield per annum to maturity being the arithmetic average, rounded up to the nearest four decimal places and in no event shall the Australian Bank Bill Rate be less than 0.00%.

"**Australian Bank BM Rate Borrowing**" refers to a Borrowing bearing interest at a rate determined by reference to the Australian Bank Bill Rate.

"**Australian Bank Bill Rate Loan**" refers to a Loan bearing interest at a rate determined by reference to the Australian Bank Bill Rate.

"**Availability Period**" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Revolving Commitments.

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and, for the avoidance of doubt, shall exclude any tenor for such Benchmark that is removed from the definition of "Interest Period" pursuant to clause (d) of Section 2.21.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Chapter 11 of Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"**Bankruptcy Event**" means an Event of Default of the type described in Section 7.01(h), (i) or (j).

"**Barclays**" means Barclays Bank PLC.

"**Benchmark**" means, initially, the Adjusted LIBO Rate; provided that, if a Benchmark Transition Event or, as the case may be, an Early Opt-in Election and the Benchmark Replacement Date with respect thereto have occurred with respect to the Adjusted LIBO Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (a) of Section 2.21.

"**Benchmark Replacement**" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

5

(1)    the sum of: (a) Term SOFR and (b) the Benchmark Replacement Adjustment with respect thereto;

(2)    the sum of: (a) Daily Simple SOFR and (b) the Benchmark Replacement Adjustment with respect thereto;

(3)    "Benchmark Replacement" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR or Compounded SOFR) that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate of interest as a replacement to LIBO Rate for the then-current Benchmark for U.S. dollar-denominated syndicated credit facilities at such time and (b) the Benchmark Replacement Adjustment ; provided that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for purposes of this Agreement. with respect thereto;

provided that, in the case of clause (1) of this definition, such Unadjusted Benchmark Replacement is displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion.

If at any time the Benchmark Replacement as determined pursuant to clause (1), (2) or (3) of this definition would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement:

(1)    for purposes of clauses (1) and (2) of the definition of "Benchmark Replacement," the first alternative set forth in the order below that can be determined by the Administrative Agent:

(a)    the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set that has been selected or recommended by the Relevant Governmental Body for the replacement of such Available Tenor of such Benchmark with the applicable Unadjusted Benchmark Replacement;

(b)    the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Available Tenor of such Benchmark; and

(2)    for purposes of clause (3) of the definition of "Benchmark Replacement Adjustment" means, with respect to any replacement of the Adjusted LIBO Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBO Rate such Available Tenor of such Benchmark with the

6

applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBO Rate such Available Tenor of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time;

provided that, (x) in the case of clause (1) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Administrative Agent in its reasonable discretion and (y) if the then-current Benchmark is a term rate, more than one tenor of such Benchmark is available as of the applicable Benchmark Replacement Date and the applicable Unadjusted Benchmark Replacement that will replace such Benchmark will not be a term rate, the Available Tenor of such Benchmark for purposes of this definition of "Benchmark Replacement Adjustment" shall be deemed to be the Available Tenor that has approximately the same length (disregarding business day adjustments) as the payment period for interest calculated with reference to such Unadjusted Benchmark Replacement.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR Alternate Base Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"**Benchmark Replacement Date**" means the earlier earliest to occur of the following events with respect to LIBO Rate the then-current Benchmark:

(1)   in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of LIBO Rate such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide LIBO Rate; or all Available Tenors of such Benchmark (or such component thereof);

(2)   in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein; or

(3)   in the case of an Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

7

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark LIBO Rate:

(1)     a public statement or publication of information by or on behalf of the administrator of LIBO Rate such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide LIBO Rate all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); LIBO Rate; (2) a public statement or publication of information by the regulatory supervisor for the administrator of LIBO Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for LIBO Rate, a resolution authority with jurisdiction over the administrator for LIBO Rate or a court or an entity with similar insolvency or resolution authority over the administrator for LIBO Rate, which states that the administrator of LIBO Rate has ceased or will cease to provide LIBO Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBO Rate; or (3) a public statement or publication of information by the regulatory supervisor for the administrator of LIBO Rate announcing that LIBO Rate is no longer representative.

"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified in the notice delivered by the Administrative Agent, Borrower or the Required Lenders, as applicable, pursuant to clause (2) of the definition of Early Opt-in Election.

(2)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

8

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" means ~~if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to LIBO Rate and solely to the extent that the Adjusted LIBO Rate has not been replaced with a Benchmark Replacement,~~ the period (if any) (x) beginning at the time that ~~such~~a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the ~~Adjusted LIBO Rate~~then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with ~~the~~ Section ~~titled "Effect of Benchmark Transition Event"~~2.21 and (y) ending at the time that a Benchmark Replacement has replaced the ~~Adjusted LIBO Rate~~then-current Benchmark for all purposes hereunder ~~pursuant to the~~ and under any Loan Document in accordance with Section ~~titled "Effect of Benchmark Transition Event."~~ 2.21.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Board**" means the Board of Governors of the Federal Reserve System of the United States of America (or any successor).

"**Borrower**" means Uber Technologies, Inc., a Delaware corporation.

"**Borrowing**" means Revolving Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans , EURIBOR Loans, HIBOR Loans, SIBOR Loans, Australian Bank Bill Rate Loans ~~and~~, Canadian BA Rate Loans and TIBOR Loans, as to which a single Interest Period is in effect.

"**Borrowing Minimum**" means (a) in the case of a Eurodollar Borrowing denominated in dollars, $5,000,000, (b) in the case of a Eurodollar Borrowing denominated in any Permitted Foreign Currency or a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing~~,~~ a Canadian BA Rate Borrowing or an RFR Borrowing, the smallest amount of such Permitted Foreign Currency that is an integral multiple of 100,000 units of such currency and that has a Dollar Equivalent in excess of $5,000,000 and (c) in the case of an ABR Borrowing, $5,000,000.

"**Borrowing Multiple**" means (a) in the case of a Eurodollar Borrowing denominated in dollars, $1,000,000, (b) in the case of a Eurodollar Borrowing denominated in any Permitted Foreign Currency or a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing~~or,~~ a Canadian BA Rate Borrowing, a TIBOR Borrowing or an RFR Borrowing, the smallest amount of such Permitted Foreign Currency that is an integral multiple of 100,000 units of such currency

9

and that has a Dollar Equivalent in excess of $1,000,000 and (c) in the case of an ABR Borrowing, $1,000,000.

"**Borrowing Request**" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"**Budget**" has the meaning set forth in Section 5.01(a).

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; *provided* that, (a) when used in connection with a Eurodollar Loan, the term "**Business Day**" shall also exclude any day on which banks are not open for dealings in deposits in the applicable currency in the London interbank market, (b) when used in connection with any EURIBOR Loan, the term "**Business Day**" shall also exclude any day which is not a TARGET Day or any day on which banks in London are not open for general business, (c) when used in connection with any HIBOR Loan, the term "**Business Day**" shall also exclude any day on which banks in Hong Kong are not open for general business, (d) when used in connection with any SIBOR Loan, the term "**Business Day**" shall also exclude any day on which banks in Singapore are not open for general business, (e) when used in connection with any Australian Bank Bill Rate Loan, the term "**Business Day**" shall also exclude any day on which banks in Sydney, Australia are not open for general business, ~~and~~ (f) when used in connection with any Canadian BA Rate Loan, the term "**Business Day**" shall also exclude a day on which banks in Toronto, Ontario, Canada are not open for general business, (g) when used in connection with any TIBOR Rate Loan, the term "Business Day" shall also exclude a day on which banks in Japan are not open for business and (h) when used in connection with any RFR Loan and any interest rate settings, fundings, disbursements, settlements or payments of any such RFR Loan, the term "Business Day" shall also exclude a day that is not an RFR Business Day.

"**Calculation Date**" means (a) the last Business Day of each calendar quarter, (b) each date (with such date to be reasonably determined by the Administrative Agent) that is on or about the date of (1) a Borrowing Request or an Interest Election Request with respect to any Revolving Loan or (ii) the issuance, amendment, renewal or extension of a Letter of Credit and (c) if an Event of Default has occurred and is continuing, any Business Day as determined by the Administrative Agent in its sole discretion.

"**Canadian BA Rate**" means, with respect to each Interest Period for a Canadian BA Rate Loan, the rate of interest per annum equal to the average rate applicable to Canadian Dollar Bankers' Acceptances having an identical or comparable term as the proposed Canadian BA Rate Loan displayed and identified as such on the display referred to as the "CDOR Page" (or any display substituted therefor) of Reuter Monitor Money Rates Service as at approximately 10:00 a.m. Toronto time on such day (or, if such day is not a Business Day, as of 10:00 a.m. Toronto time on the immediately preceding Business Day), *plus* five (5) basis points, *provided* that if such rate does not appear on the CDOR Page at such time on such date, the rate for such date will be the annual discount rate (rounded upward to the nearest whole multiple of 1/100 of 1%) as of 10:00 a.m. Eastern time on such day at which a Canadian chartered bank listed on Schedule 1 of the *Bank Act* (Canada) as selected by the Administrative Agent is then offering to purchase Canadian Dollar Bankers' Acceptances accepted by it having such specified term (or a term as closely as possible comparable to such specified term), *plus* five (5) basis points. In no event shall the Canadian BA Rate be less than 0.00%.

"**Canadian BA Rate Borrowing**" refers to a Borrowing bearing interest at a rate determined by reference to the Canadian BA Rate.

10

"**Canadian BA Rate Loan**" refers to a Loan bearing interest at a rate determined by reference to the Canadian BA Rate.

"**Canadian Dollars**" means the lawful currency of Canada.

"**Capital Lease Obligations**" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; *provided* that, for the avoidance of doubt, any obligations relating to a lease that was accounted for by such Person as an operating lease as of the Effective Date and any similar lease entered into after the Effective Date by such Person shall be accounted for as obligations relating to an operating lease and not as Capital Lease Obligations.

"**Cash Collateralize**" means, in respect of an Obligation, to provide and pledge (as a first priority perfected security interest) cash collateral in the applicable currency in an amount not to exceed 102% of such Obligations, at a location and pursuant to documentation in form and substance satisfactory to the Administrative Agent and the applicable Issuing Bank (and "**Cash Collateralization**" has a corresponding meaning). "**Cash Collateral**" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"**Cash Equivalents**" means:

(a)   direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(b)   investments in commercial paper maturing within 270 days from the date of issuance thereof and having, at such date of acquisition, a rating of at least "Prime 1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P;

(c)   investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that issues (or the parent of which issues) commercial paper rated at least "Prime 1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P;

(d)   fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (c) above;

(e)   investments in "money market funds" substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above;

(f)   in the case of any Foreign Subsidiary, other short-term investments that are analogous to the foregoing, are of comparable credit quality and are customarily used by companies in the jurisdiction of such Foreign Subsidiary for cash management purposes; and

11

(g)    investments permitted pursuant to Borrower's (or Holdings') investment policy as approved by the Board of Directors (or committee thereof) of the Borrower or Holdings, as applicable, from time to time.

"**Cash Management Agreement**" means any agreement entered into from time to time by the Borrower or any Restricted Subsidiaries in connection with cash management services for collections, other Cash Management Services or for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, information reporting services, lockbox services, stop payment services, wire transfer services and other related services.

"**Cash Management Bank**" means any Lender, any Agent or any Affiliate of the foregoing at the time it provides any Cash Management Services or any Person that shall have become a Lender or an Affiliate of a Lender at any time after it has provided any Cash Management Services.

"**Cash Management Obligations**" means obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in respect of Cash Management Services or pursuant to Cash Management Agreements.

"**Cash Management Services**" means any of (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft automatic clearing house fund transfer services, return items and interstate depository network services) and (c) any other demand deposit or operating account relationships or other cash management services, including pursuant to any Cash Management Agreements.

"**Central Bank Rate**" shall mean the Bank of England's Bank Rate as published by the Bank of England from time to time.

"**Central Bank Rate Adjustment**" shall mean, in relation to the Central Bank Rate prevailing at close of business on any RFR Business Day, the 20% trimmed arithmetic mean of the Central Bank Rate Spreads for the 5 most immediately preceding RFR Business Days for which the RFR is available.

"**Central Bank Rate Spread**" shall mean, in relation to any RFR Business Day, the difference (expressed as a percentage rate per annum) between (x) the RFR for such RFR Business Day and (y) the Central Bank Rate prevailing at close of business on such RFR Business Day.

"**Certain Specified Indebtedness Cap**" means, as of any date of determination with respect to any proposed creation, incurrence or assumption of Specified Indebtedness (subject to Section 1.07), the greater of (x) $5.0 billion and (y) 2.5 times the Consolidated Adjusted EBITDA (calculated on a pro forma basis to reflect the creation, incurrence or assumption of such Specified Indebtedness) for the period of four consecutive fiscal quarters of the Borrower ended on or prior to such time (taken as one accounting period) in which financial statements for each quarter or fiscal year in such period have been or were required to be delivered pursuant to Section 5.01(a) or (b) without giving effect to any grace period applicable thereto.

"**Change in Control**" means (a) prior to an IPO, (x) the transfer, directly or indirectly, of beneficial ownership of a majority of the aggregate ordinary voting power of the Borrower on a fully diluted basis or (y) the consummation of a merger, amalgamation, plan of arrangement or other transaction or series of related transactions resulting in the combination of the Borrower with or into

12

another entity, where the stockholders of the Borrower immediately prior to any such transaction(s) directly or indirectly do not continue to beneficially own at least 50% of the voting interest in the continuing or surviving entity on a fully diluted basis immediately following such transaction or series of related transactions; *provided* that a transaction of the type described in this clause (a) will not constitute a Change in Control if the principal purpose of the transaction is a bona fide equity financing transaction; *provided, further,* that a Permitted Holdco Transaction shall not constitute a Change in Control pursuant to this clause (a); (b) after an IPO, the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act and the rules of the SEC thereunder), of Equity Interests in the Public Company representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in the Public Company; *provided, further,* that a Permitted Holdco Transaction shall not constitute a Change in Control pursuant to this clause (b) so long as, if the Borrower was the Public Company immediately prior to such transaction, Holdings shall thereafter be the Public Company for purposes of this defined term; or (c) after the consummation of a Permitted Holdco Transaction, the failure of Holdings to own 100% of the aggregate ordinary voting power of the Borrower. The consummation of an IPO shall not constitute a Change in Control.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Charges**" has the meaning set forth in Section 9.13.

"**Citigroup**" means Citigroup Global Markets Inc.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means all "Pledged Collateral" as defined in the U.S. Security Agreement and all other property and assets that are or are required to be pledged or granted as collateral pursuant to a Security Document (a) on the Amendment No. 4 Effective Date or (b) thereafter pursuant to Section 5.10 or Section 5.11 or as otherwise required hereunder and, in each case, other than Excluded Collateral.

"**Commitment**" means the Revolving Commitment.

"**Commitment Fee**" has the meaning set forth in Section 2.09(a).

"**Communications**" has the meaning set forth in Section 9.01(d).

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Competitor**" has the meaning set forth in the definition of "Disqualified Institution."

13

~~"**Compounded SOFR**" means the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Administrative Agent in accordance with:~~

~~(1) the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; provided that:~~

~~(2) if, and to the extent that, the Administrative Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the rate, or methodology for this rate, and conventions for this rate that the Administrative Agent determines are substantially consistent with prevailing market convention for determining Compounded SOFR for U.S. dollar-denominated syndicated credit facilities at such time (as a result of amendment or as originally executed);~~

~~provided, further, that if the Administrative Agent decides that any such rate, methodology or convention determined in accordance with clause (1) or clause (2) is not administratively feasible for the Administrative Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement".~~

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income or gross profits (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Adjusted EBITDA**" means, for any period, Consolidated Net Income for such period *plus*, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) income tax expense, (b) interest expense, amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including the Loans and loans under the Term Loan Agreement), plus expenses associated with the equity component of, and any mark-to-market losses with respect to, Convertible Notes, (c) depreciation and amortization expense, (d) amortization of intangibles (including, but not limited to, goodwill), (e) any extraordinary charges or losses determined in accordance with GAAP, (f) non-cash stock option and other equity-based compensation expenses and payroll tax expense related to stock option and other equity-based compensation expenses, (g) any other non-cash charges, non-cash expenses or non-cash losses of the Borrower or any of its Restricted Subsidiaries for such period, including any write-down of intangibles (excluding any such charge, expense or loss incurred in the ordinary course of business that constitutes an accrual of, or a reserve for, cash charges for any future period), including, for the avoidance of doubt, non-cash foreign currency translation losses and any unrealized losses in respect of Swap Agreements (including non-cash losses related to currency remeasurement of Indebtedness); *provided, however* that cash payments made in such period or in any future period in respect of such non-cash charges, expenses or losses (excluding any such charge, expense or loss incurred in the ordinary course of business that constitutes an accrual of, or a reserve for, cash charges for any future period) shall be subtracted from Consolidated Net Income in calculating Consolidated Adjusted EBITDA in the period when such payments are made, (h) transition, integration and similar fees, charges and expenses related to acquisitions or dispositions, (i) restructuring charges or reserves including write-downs and write-offs, including any one-time costs incurred in connection with acquisitions or dispositions and costs related to the closure, consolidation and integration of facilities, information technology infrastructure and legal entities, and severance and retention bonuses; (j) the amount of cost savings and synergies projected by the Borrower in good faith to be realized as a result of an acquisition not prohibited hereunder, in each case within the four consecutive fiscal quarters following the consummation of such acquisition (or following the consummation of the squeeze-out merger in the case of an acquisition structured as a two-step transaction), calculated as though such cost savings and synergies had been realized on the first day of such period and net of the amount of actual benefits received during such period from such acquisition; *provided* that (i) a duly completed certificate signed

14

by a Responsible Officer shall be delivered to the Administrative Agent certifying that such cost savings and synergies are reasonably expected and factually supportable in the good faith judgment of the Borrower and (ii) no cost savings or synergies shall be added pursuant to this clause (j) to the extent duplicative of any expenses or charges otherwise added to Consolidated Adjusted EBITDA, whether through a pro forma adjustment or otherwise, for such period (*provided* that notwithstanding anything to the contrary, the amount that may be added back pursuant to clauses (h), (i), (j) and (l) may not in the aggregate for any four fiscal quarter period exceed the greater of (x) $25,000,000 and (y) 15% of Consolidated Adjusted EBITDA for such period (determined without giving effect to any such adjustment pursuant to such clauses (h), (i), (j) and (l))), (k) costs, expenses, settlements and charges related to, arising out of or made in connection with legal proceedings and regulatory matters (*provided* that the amount that may be added back pursuant to this clause (k) may not in the aggregate for any four fiscal quarter period exceed the greater of (x) $25,000,000 and (y) 15% of Consolidated Adjusted EBITDA for such period (determined without giving effect to any such adjustment pursuant to this clause (k)), (l) costs, fees, charges and losses in respect of discontinued operations, (m) adjustments relating to purchase price allocation accounting, and (n) fees and expenses directly related to the Transactions, the incurrence of any Specified Indebtedness permitted hereunder, the offering of any Equity Interests by the Borrower (or Holdings, as applicable) and any acquisition or disposition transactions, *minus*, to the extent included in the statement of such Consolidated Net Income for such period (and without duplication), the sum of (a) interest income, (b) any extraordinary income or gains determined in accordance with GAAP, and (c) any other non-cash income (excluding any items that represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period that are described in the parenthetical to clause (g) above), including for the avoidance of doubt non-cash foreign currency translation gains (including non-cash gains related to currency remeasurement of Indebtedness), mark-to-market gains in respect of Convertible Notes and unrealized gains in respect of Swap Agreements, all as determined on a consolidated basis.

"**Consolidated Net Income**" means, for any period, the net income or loss of the Borrower and its Restricted Subsidiaries for such period, determined on a consolidated basis in conformity with GAAP; *provided* that there shall be excluded (a) the income of any Person that is not a consolidated Restricted Subsidiary except to the extent of the amount of cash dividends or similar cash distributions actually paid by such Person to the Borrower or, subject to clauses (b) and (c) below, any consolidated Restricted Subsidiary during such period, (b) the income of, and any amounts referred to in clause (a) above paid to, any consolidated Restricted Subsidiary of the Borrower to the extent that, on the date of determination, the declaration or payment of cash dividends or similar cash distributions by such Restricted Subsidiary is not permitted without any prior approval of any Governmental Authority that has not been obtained or is not permitted by the operation of the terms of the organizational documents of such Restricted Subsidiary, any agreement or other instrument binding upon such Restricted Subsidiary or any law applicable to such Restricted Subsidiary, unless such restrictions with respect to the payment of cash dividends and other similar cash distributions have been legally and effectively waived, and (c) the income or loss of, and any amounts referred to in clause (a) above paid to, any consolidated Restricted Subsidiary that is not wholly-owned by the Borrower to the extent such income or loss or such amounts are attributable to the noncontrolling interest in such consolidated Restricted Subsidiary.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Convertible Notes**" means debt securities that are convertible into or exchangeable for any combination of Equity Interests and/or cash.

15

"**Corresponding Tenor**" with respect to ~~a Benchmark Replacement means~~any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as ~~the applicable tenor for the applicable Interest Period with respect to LIBO Rate~~ such Available Tenor.

"**Credit Parties**" has the meaning set forth in <u>Section 9.12</u>.

"<u>**Daily Simple RFR**</u>" means, for any day (an "<u>RFR Interest Day</u>"), an interest rate per annum equal to (i) for any RFR Loan denominated in Sterling, SONIA for the day that is 3 RFR Business Days prior to (A) if such RFR Interest Day is an RFR Business Day, such RFR Interest Day or (B) if such RFR Interest Day is not an RFR Business Day, the RFR Business Day immediately preceding such RFR Interest Day, (ii) for any RFR Loan denominated in Swiss Francs, SARON for the day that is 3 RFR Business Days prior to (A) if such RFR Interest Day is an RFR Business Day, such RFR Interest Day or (B) if such RFR Interest Day is not an RFR Business Day, the Business Day immediately preceding such RFR Interest Day (such RFR Business Day determined pursuant to subclauses (A) and (B) of each of clauses (i) and (ii) above, the "RFR LookBack Day"), (iii) if SONIA is not available for the RFR Lookback Day determined pursuant to clauses (i) and (ii) above, the Daily Simple RFR for such RFR Lookback Day shall be the percentage rate per annum which is the aggregate of (I) the Central Bank Rate for such RFR Lookback Day and (II) the applicable Central Bank Rate Adjustment or (iv) if clause (iii) applies but the Central Bank Rate for the applicable RFR Lookback Day is not available, the Daily Simple RFR for such RFR Lookback Day shall be the percentage rate per annum which is the aggregate of (I) the most recent Central Bank Rate for an RFR Business Day which is no more than 3 RFR Business Days before that RFR Lookback Day and (II) the applicable Central Bank Rate Adjustment .

"<u>**Daily Simple SOFR**</u>" means, for any day, SOFR, with the conventions for this rate (which may include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that, if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Declining Lender**" has the meaning set forth in <u>Section 2.19</u>.

"**Default**" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"**Defaulting Lender**" means, subject to <u>Section 2.17(b)</u>, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to such funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (ii) fund any portion of its participation in any Letter of Credit or (iii) pay to the Administrative Agent, any Issuing Bank or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, (b) has

16

notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-in Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to <u>Section 2.17(b)</u>) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Disclosure Letter**" means the disclosure letter, dated as of the date hereof, as amended or supplemented from time to time pursuant to the terms of this Agreement.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, or (iii) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date applicable at the time of issuance thereof, except, in the case of clauses (i) and (ii), if as a result of a change of control, fundamental change or asset sale, so long as any rights of the holders thereof upon the occurrence of such a change of control, fundamental change or asset sale event are subject to the prior expiration or termination of the Commitments, the payment in full of the principal of and interest on each Loan and all fees payable hereunder and the cancellation or expiration or Cash Collateralization of all Letters of Credit.

"**Disqualified Institution**" means (a) any Person that has been identified in writing to the Administrative Agent prior to the Amendment No. 5 Effective Date as a "Disqualified Institution", (b) any Person that is a competitor of the Borrower or any of its Subsidiaries that has been identified in writing to the Administrative Agent from time to time as a competitor and a "Disqualified Institution" by the Borrower (each, a "Competitor"), (c) any Person with a long term unsecured credit rating of less than BBB- by S&P or Fitch Ratings Ltd. (or any successor thereto) or less than Baa3 by Moody's, (d) any hedge fund that directly or indirectly holds any equity or debt instruments issued by any Competitor and

17

(e) any Person (including an Affiliate or Approved Fund of a Lender) whose primary activity is (i) the trading or acquisition of distressed debt or (ii) "loan to own" investment strategies; provided that (i) any Person that becomes a "Disqualified Institution" after the applicable Trade Date with respect to an assignment or participation shall not retroactively be deemed a "Disqualified Institution" for purposes of such assignment or participation or any previously acquired assignment or participation (but such Person shall not be able to increase its Commitments or participations hereunder), (ii) such assignment or participation and, in the case of an assignment, the execution by the Borrower of an Assignment and Assumption with respect to such assignee, will not by itself result in such assignee no longer being considered a "Disqualified Institution"; provided, however, that, in each case, the term "Disqualified Institution" shall not include any person that has been identified in writing to the Administrative Agent from time to time by the Borrower as no longer constituting a "Disqualified Institution" and (iii) clause (c) and (e) above shall not apply at any time that a Specified Event of Default has occurred and is continuing.

"**Dollar Equivalent**" means, at any time, (a) with respect to any amount denominated in dollars, such amount and (b) with respect to any amount denominated in any Permitted Foreign Currency, the equivalent amount thereof in dollars at such time as determined in accordance with Section 1.06(a) using the Exchange Rate with respect to such Permitted Foreign Currency at the time in effect under the provisions of such Section (except as otherwise expressly provided in Section 2.20(d)).

"**dollars**" or "**$**" refers to lawful money of the United States of America.

"**Domestic Restricted Subsidiary**" means any Domestic Subsidiary that is a Restricted Subsidiary.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the laws of any political subdivision of the United States, excluding (x) any such Subsidiary substantially all of the assets of which consist of Equity Interests in one or more Subsidiaries that are "controlled foreign corporations" within the meaning of Section 957 of the Code and whose liabilities are less than 50% of the value of such equity interests and (y) any such Subsidiary that is owned (directly or indirectly) by a Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**Early Opt-in Election**" means, if the then-current Benchmark is LIBO Rate, the occurrence of:

~~"Early Opt-in Election" means the occurrence of: (1)~~(i) a determination(1)    a notification by the Administrative Agent ~~and~~to (or the request by the Borrower ~~or (ii) a notification by the Required Lenders~~ to the Administrative Agent ~~(with a copy to the Borrower) that the Required Lenders have determined that~~to notify) each of the other parties hereto that at least ten currently outstanding U. S. dollar-denominated syndicated credit facilities ~~being executed~~ at such time ~~or that include language similar to that contained in this Section titled "Effect of Benchmark Transition Event," are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace LIBO Rate~~ contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and

(2)    the ~~election by (i) the Administrative Agent and the Borrower or (ii) the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable,~~ joint election by the Administrative Agent and the Borrower to trigger a fallback from LIBO Rate and the

18

provision by the Administrative Agent of written notice of such election to the Lenders ~~or by the Required Lenders of written notice of such election to the Administrative Agent~~.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the date on which the conditions specified in <u>Section 4.01</u> are satisfied (or waived in accordance with <u>Section 9.02</u>).

"**Engagement Letter**" means that certain Engagement Letter, dated as of June 18, 2015, by and among the Borrower and the Arrangers.

"**Environmental Laws**" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, use, handling, transportation, storage, treatment, disposal, management, release or threatened release of any Hazardous Material or to health and safety matters.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation, reclamation or remediation, fines, penalties or indemnities), of the Borrower or any Restricted Subsidiary directly or indirectly resulting from or based upon (a) any Environmental Law, including compliance or noncompliance therewith, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence, release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest; *provided* that Equity Interests shall not include any Convertible Notes.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with the Borrower or a Restricted Subsidiary under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

19

"**ERISA Event**" means any one or more of the following: (a) any reportable event, as defined in Section 4043 of ERISA, with respect to a Plan, as to which the PBGC has not waived under subsection .22, .23, .25, .26, .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Regulation Section 4043 the requirement of Section 4043(a) of ERISA that it be notified of such event; (b) the termination of any Plan under Section 4041(c) of ERISA; (c) the institution of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (d) the failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; (e) the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived; or a determination that any Plan is, or is expected to be, considered an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; (f) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to a Plan; (g) the complete or partial withdrawal of any Borrower, Restricted Subsidiary or any ERISA Affiliate from a Multiemployer Plan which results in the imposition of Withdrawal Liability or the reorganization or insolvency under Title IV of ERISA of any Multiemployer Plan or (h) a determination that any Multiemployer Plan is in endangered or critical status under Section 432 of the Code or Section 305 of ERISA.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor thereto), as in effect from time to time.

"**EURIBO Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a EURIBOR Borrowing, the rate *per annum* determined by the Administrative Agent on the basis of the rate for deposits in such currency for a period equal to such Interest Period commencing on the first day of such Interest Period as administered by the Banking Federation of the European Union (or any other Person that takes over the administration of such rate) appearing on Reuters Screen EURIBOR01 page (or any successor page) as of approximately 11:00 a.m., Brussels, Belgium time, on such Interest Rate Determination Date; *provided* that, in the event such rate does not appear on such page or service or if such page or service shall cease to be available, the EURIBO Rate shall be determined by the Administrative Agent by reference to such other comparable publicly available service for displaying EURIBO rates as may be selected by the Administrative Agent, or, in the absence of such availability, the arithmetic mean of the rates (rounded upward to the nearest 1/100th of 1%) as supplied to the Administrative Agent at its request and quoted by the reference banks appointed by the Administrative Agent in consultation with the Borrower to leading banks who consent to such appointment in the Euro interbank market for deposits in Euros of a duration equal to the duration of such Interest Period, on such Interest Rate Determination Date.

"**EURIBOR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted EURIBO Rate.

"**Euro**" or "**€**" means the single currency of the European Union as constituted by the Treaty on European Union and as referred to in the EMU Legislation.

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

P-02346-0192

"**Event of Default**" has the meaning set forth in <u>Article 7</u>.

"**Exchange Rate**" means, on any day, with respect to the applicable Permitted Foreign Currency, the rate at which such currency may be exchanged into dollars, as set forth at approximately 11:00 a.m., London time, on such day on the Reuters World Currency Page "FX=" for such currency. In the event that such rate does not appear on any Reuters World Currency Page, then the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower or, in the absence of such agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m., London time, on such date for the purchase of dollars for delivery two Business Days later; *provided* that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent, after consultation with the Borrower, may use any reasonable and customary method it deems appropriate to determine such rate, and such determination shall be presumed correct absent manifest error.

"**Excluded Collateral**" means (a) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law, (b) any commercial tort claims, (c) any Excluded IP, (d) any patent, trademark or copyright or license or application in respect thereof, in each case to the extent the grant of a security interest therein would violate or invalidate any license or other agreement with any person (other than the Borrower or any Guarantor) relating to such patent, trademark or copyright or license or application in respect thereof or create a right of termination in favor of any other party thereto (other than the Borrower or any Guarantor) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code (in each case to the extent the relevant limitation was in existence on the date hereof or, in the case of any patent, trademark or copyright or license or application in respect thereof that is created or acquired after the date hereof, on the date of creation or acquisition and not incurred in contemplation of the provisions of this paragraph) or other applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under applicable law notwithstanding such prohibition, (e) Equity Interests issued by (i) any Excluded Subsidiary, (ii) any Immaterial Subsidiary, (iii) any Foreign Subsidiary that is not a Material Foreign Subsidiary or (iv) an entity described in clause (iii) of the definition of "Pledged Equity" in the U.S. Security Agreement to the extent such entity shall have consummated any third party financing with respect to any real estate owned by such entity that does not permit the Equity Interests of such entity to be pledged on the terms set forth in the U.S. Security Agreement and (f) voting Equity Interests issued by any Foreign Subsidiary in excess of 66% (or, in the case of Uber International C.V., 64%) thereof (or, solely in the case of this clause (f), such lesser percentage as is required (i) by applicable law, (ii) by the organizational documents of such Foreign Subsidiary as in effect on the Effective Date (or, in the case of any Foreign Subsidiary created or acquired after the Effective Date, at the time of such creation or acquisition and so long as the relevant limitation was not entered into in contemplation of the provisions of this definition) or (iii) to not result in material adverse tax consequences to the Borrower and its Subsidiaries); *provided* that notwithstanding anything herein to the contrary, properties or assets of the Borrower or a Guarantor shall not constitute Excluded Collateral to the extent they are pledged as collateral to secure any other Secured Specified Indebtedness.

"**Excluded IP**" has the meaning assigned to such term in the U.S. Security Agreement.

21

"**Excluded Subsidiary**" means (a) any Unrestricted Subsidiary, (b) any Subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation to which such Subsidiary is a party or by which it or any of its property or assets is bound from guaranteeing the Obligations; *provided* that any such agreement, instrument or other undertaking (i) is in existence on the Effective Date (or, with respect to a Subsidiary created or acquired after the Effective Date, as of the date of such creation or acquisition) and (ii) in the case of a Subsidiary created or acquired after the Effective Date, was not entered into in connection with, or in contemplation of, such acquisition or the provisions of this definition) and (c) any Subsidiary with respect to which guaranteeing the Obligations would require consent, approval, license or authorization from any Governmental Authority, unless such consent, approval, license or authorization has been obtained.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest would have become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal or unlawful.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to the Administrative Agent or any Lender or required to be withheld or deducted from a payment to the Administrative Agent or any Lender: (a) Taxes imposed on (or measured by) its net income or gross profit, franchise Taxes, and branch profits Taxes, in each case (i) imposed by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or (ii) that otherwise are Other Connection Taxes, (b) in the case of a Lender, any United States withholding Tax that is imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which such Lender becomes a party to this Agreement (other than pursuant to an assignment request of the Borrower under <u>Section 2.16</u>) or designates a new lending office, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office or assignment, to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to <u>Section 2.14(a)</u>, (c) Taxes attributable to Administrative Agent's or such Lender's failure to comply with <u>Section 2.14(f)</u> and (d) any U.S. withholding Taxes imposed under FATCA.

"**Executive Order**" has the meaning set forth in <u>Section 3.15(a)</u>.

"**Extending Lender**" has the meaning set forth in <u>Section 2.19</u>.

"**Extension Agreement**" means an extension agreement entered into pursuant to <u>Section 2.19</u> in form and substance reasonably satisfactory to the Administrative Agent.

"**Extension Notice**" has the meaning set forth in <u>Section 2.19</u>.

22

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code or any published intergovernmental agreement and any fiscal or regulatory legislation, rules or official practices adopted pursuant to any published intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

"**FCPA**" means the Foreign Corrupt Practices Act of 1977, (15 U.S.C. §§ 78dd-1, et seq.) as amended.

"**Federal Funds Effective Rate**" means for any day, the rate *per annum* equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day or, if no such rate is so published on any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; *provided* that if the relevant screen rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Federal Reserve Bank of New York's Website**" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Financial Officer**" means the chief financial officer, principal accounting officer, vice president of finance or corporate controller or most senior financial officer of the Borrower.

"**First Lien Intercreditor Agreement**" means (a) the Term Loan Intercreditor Agreement and (b) any other First Lien Intercreditor Agreement among the Administrative Agent and one or more Senior Representatives for holders of Indebtedness secured by Liens on the Collateral that are pari passu with the Liens on the Collateral securing the Secured Obligations, in form and substance reasonably satisfactory to the Administrative Agent (it being agreed that the form attached as Exhibit A to Amendment No. 4 shall be reasonably satisfactory to the Administrative Agent).

"**Floor**" means, for the Loans or any tranche thereof, as applicable, the benchmark rate floor (which may be zero), if any, provided for in this Agreement with respect to the Adjusted LIBO Rate as determined for the Loans or such tranche thereof, as applicable; provided that the Floor as of the Amendment No. 8 Effective Date shall be 0%.

"**Foreign Lender**" means any Lender whose interest in any Obligation is treated for U.S. federal income tax purposes as owned by a Person that is not a U.S. Person.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender, with respect to any Issuing Bank, such Defaulting Lender's Applicable Percentage of the Letter of Credit Usage other than Letter of Credit Usage as to which such Defaulting Lender's participation obligation has been reallocated to other Non-Defaulting Lenders or Cash Collateralized in accordance with the terms hereof.

"**GAAP**" means generally accepted accounting principles in the United States of America.

"**Goldman Sachs**" means Goldman Sachs Lending Partners LLC.

23

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee**" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; *provided*, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business, or customary indemnification obligations entered into in connection with any acquisition or disposition of assets or of other entities (other than to the extent that the primary obligations that are the subject of such indemnification obligation would be considered Indebtedness hereunder).

"**Guarantor**" means (a) any Material Domestic Subsidiary of the Borrower that has delivered a Guaranty or a joinder agreement to a Guaranty pursuant to <u>Section 5.10</u> hereof and (b) upon the consummation of any Permitted Holdco Transaction and the delivery of a Holdings Guaranty pursuant to <u>Section 5.11</u> by Holdings, Holdings.

"**Guaranty**" means a guaranty agreement in substantially the form of <u>Exhibit E-1</u> hereto.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Hedge Bank**" means any Person that is a counterparty to a Secured Hedge Agreement with a Loan Party or any Restricted Subsidiary, in its capacity as such, and that either (i) is a Lender, the Administrative Agent or an Affiliate of any of the foregoing at the time it enters into such a Secured Hedge Agreement, in its capacity as a party thereto or (ii) becomes a Lender, the Administrative Agent or an Affiliate of the foregoing after it has entered into such a Secured Hedge Agreement; <u>provided</u> that no such Person (except the Administrative Agent) shall be considered a Hedge Bank until such time as it shall have delivered written notice to the Administrative Agent that such a transaction has been entered into and that such Person constitutes a Hedge Bank entitled to the benefits of the Security Documents.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person under Swap Agreements.

"**HIBOR**" means, in relation to any HIBOR Loan, the rate per annum equal to the Hong Kong Interbank Offered Rate (or a comparable or successor rate which rate is approved by the Administrative

24

Agent), as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at or about 11.00 a m (Hong Kong time) on the applicable Interest Rate Determination Date with a period comparable to the applicable Interest Period; *provided* that in no event shall HIBOR he less than 0.00%.

"**HIBOR Borrowing**" refers to a Borrowing hearing interest at a rate determined by reference to HIBOR

"**HIBOR Loan**" refers to a Loan bearing interest at a rate determined by reference to HIBOR.

"**Hong Kong Dollars**" means the lawful currency of the Hong Kong Special Administrative Region of the People's Republic of China.

"**Holdings**" shall have the meaning set forth in the definition of "Permitted Holdco Transaction".

"**Holdings Guaranty**" means a guaranty agreement in substantially the form of Exhibit E-2 hereto.

"**Immaterial Subsidiary**" means, at any date of determination, any direct or indirect Domestic Subsidiary of the Borrower or, after a Permitted Holdco Transaction, Holdings, other than (a) any Excluded Subsidiary and (b) any Domestic Subsidiary that has been designated by the Borrower by written notice to the Administrative Agent as being a "Material Domestic Subsidiary" from time to time, at any date of determination, (i) whose total assets as of the most recent available quarterly or year-end financial statements do not exceed 5% of the Total Assets at such date and (ii) whose revenues for the most recently ended four-quarter period for which financial statements are available do not exceed 5% of the consolidated revenues of the Borrower and its Subsidiaries for such period, in each case determined in accordance with GAAP; provided that (A) the total assets of all such Immaterial Subsidiaries as of the most recent available quarterly or year-end financial statements shall not exceed 30% of the Total Assets at such date and (B) the revenues of all such Immaterial Subsidiaries for the most recently ended four-quarter period for which financial statements are available shall not exceed 30% of the consolidated revenues of the Borrower and its Subsidiaries for such period, in each case determined in accordance with GAAP.

"**Increased Amount Date**" has the meaning set forth in Section 2.18(a).

"**Incremental Available Amount**" means, on any date of determination, (a) $1,000,000,000, plus, (b) any additional or other amount, so long as, solely in this case of this clause (b) and subject to Section 1.07, the Borrower has provided the financial statements described in Section 5.01(e) as of and for the most recently ended Measurement Period for which financial statements have been delivered pursuant to Section 5.01(a) or 5.01(b) and the Senior Secured Net Leverage Ratio does not exceed 2.50 to 1.00, determined on a pro forma basis after giving effect to such New Commitments as of such Measurement Period and treating any New Commitments or Specified Indebtedness consisting of a revolving credit facility incurred on such date (or, in the case, of a Limited Conditionality Acquisition, to be incurred in connection with such acquisition) as fully drawn; *provided* that Senior Secured Indebtedness shall be determined without taking into account any cash or Cash Equivalents constituting proceeds of any Loans made under any New Commitments or Specified Indebtedness to be provided on such date (or, in the case, of a Limited Conditionality Acquisition, to be incurred in connection with such acquisition) that may otherwise reduce the amount of Senior Secured Indebtedness for purposes of determining the Senior Secured Net Leverage Ratio; *provided, further,* that subject to Section 1.07, the

25

Incremental Available Amount shall not exceed an amount that would cause the principal amount of outstanding Secured Specified Indebtedness to exceed the amount permitted by Section 6.02(r).

"**Indebtedness**" of any Person at any date means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of bankers' acceptances, letters of credit, surety bonds or similar arrangements, (g) all Guarantees of such Person in respect of obligations of the kind referred to in clauses (a) through (f) above, and (h) all obligations of the kind referred to in clauses (a) through (g) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned or acquired by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" has the meaning set forth in Section 9.03(b).

"**Information**" has the meaning set forth in Section 9.12(a).

"**Intercreditor Agreement**" means the Term Loan Intercreditor Agreement, any First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement, and "Intercreditor Agreements" means each of the foregoing collectively.

"**Interest Election Request**" has the meaning set forth in Section 2.05(b).

"**Interest Payment Date**" means (a) with respect to any ABR Loan, the last Business Day of each March, June, September and December ~~and~~, (b) with respect to any Eurodollar Loan, EURIBOR Loan, HIBOR Loan, SIBOR Loan, Australian Bank Bill Rate Loan ~~or~~, Canadian BA Rate Loan or TIBOR Loan, the last Business Day of the Interest Period applicable to the Borrowing of which such Loan is a part~~and~~, in the case of a Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing~~or~~, Canadian BA Rate Borrowing or TIBOR Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period and (e) with respect to any RFR Loan, (1) the last Business Day of each calendar month and (2) the Maturity Date.

"**Interest Period**" means, with respect to any Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing~~or~~, Canadian BA Rate

26

Borrowing or TIBOR Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender, twelve months or less than one month) thereafter, as the Borrower may elect, in each case, to the extent such interest period is available for such Borrowing; *provided* that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period pertaining to a Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowingor, Canadian BA Rate Borrowing or TIBOR Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**IPO**" means a bona fide underwritten sale to the public of common stock of the Public Company pursuant to a registration statement (other than on Form S-8 or any other form relating to securities issuable under any benefit plan of the Borrower or any of its Subsidiaries, as the case may be) that is declared effective by the SEC.

"**IRS**" means the U.S. Internal Revenue Service.

"**ISDA Definitions**" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"**ISP 98**" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be acceptable to the applicable Issuing Bank and in effect at the time of issuance of such Letter of Credit).

"**Issuing Bank**" means each Lender (or affiliate thereof) with a Letter of Credit Issuer Sublimit on Schedule 2.01 hereof, as Issuing Bank hereunder, and any other Lender (or affiliate thereof) that shall agree in writing, at the request of the Borrower and with the consent of the Administrative Agent, to become an "Issuing Bank", in each case together with its permitted successors and assigns in such capacity.

"**Joinder Agreement**" means a joinder agreement to this Agreement in form and substance reasonably satisfactory to the Administrative Agent.

"**Junior Debt Prepayment**" means making (or giving any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Indebtedness (other than Indebtedness among the Borrower and its Subsidiaries) outstanding under any Convertible Notes or any Subordinated Indebtedness.

"**Lenders**" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"**Letter of Credit**" means a standby letter of credit issued or to be issued by an Issuing Bank pursuant to this Agreement in such form and substance as may be approved from time to time by the applicable Issuing Bank. Letters of Credit will only be issued in dollars or any other Permitted Foreign Currency.

"**Letter of Credit Disbursement**" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"**Letter of Credit Fee**" has the meaning set forth in Section 2.09.

"**Letter of Credit Issuer Sublimit**" means (i) with respect to each Issuing Bank as of the Effective Date, as set forth on Schedule 2.01, and (ii) with respect to any other Issuing Bank, an amount as shall be agreed to by the Administrative Agent, such Issuing Bank and the Borrower.

"**Letter of Credit Sublimit**" means the lesser of (i) $1,000,000,000 and (ii) the aggregate unused amount of the Revolving Commitments then in effect.

"**Letter of Credit Usage**" means, as at any date of determination, the sum of (i) the Dollar Equivalent of the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Letters of Credit then outstanding and (ii) the Dollar Equivalent of the aggregate amount of all drawings under Letters of Credit honored by an Issuing Bank and not theretofore reimbursed by or on behalf of the Borrower. The Letter of Credit Usage of any Lender at any time shall be such Lender's Applicable Percentage of the aggregate Letter of Credit Usage at such time.

"**LIBO Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period (or, solely for purposes of clause (iii) in the defined term "Alternate Base Rate," for purposes of determining the Alternate Base Rate as of any date) for a Eurodollar Borrowing in any currency, the rate per annum determined by the Administrative Agent on the basis of the rate for deposits in such currency for a period equal to such Interest Period commencing on the first day of such Interest Period as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate for the relevant currency) appearing on Reuters Screen LIBORO1 page (or any successor page) as of approximately 11:00 a.m., London, England time, on such Interest Rate Determination Date; *provided* that, in the event such rate does not appear on such page or service or if such page or service shall cease to be available, the LIBO Rate shall be determined by the Administrative Agent by reference to such other comparable publicly available service for displaying LIBO rates as may be selected by the Administrative Agent, or, in the absence of such availability, the arithmetic mean of the rates (rounded upward to the nearest 1/100th of 1%) as supplied to Administrative Agent at its request and quoted by the reference banks appointed by the Administrative Agent in consultation with the Borrower to leading banks who consent to such appointment in the London interbank market for deposits in such currency of a duration equal to the duration of such Interest Period, on such Interest Rate Determination Date.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any

28

financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"**Limited Conditionality Acquisition**" means any acquisition whose consummation is not conditioned on (a) the availability of, or on obtaining, third party financing , (b) the receipt of proceeds of any investment or (c) the redemption or repayment of indebtedness requiring irrevocable notice in advance of such redemption or repayment.

"**Liquidity**" means, as of any date of determination, the mean average of the sum of the following amounts as of the last Business Day of each calendar month (each, a "**Monthly Measurement Date**") during the preceding fiscal quarter of the Borrower: (x) consolidated cash and Cash Equivalents of Borrower and its Subsidiaries as of such Monthly Measurement Date (including cash and Cash Equivalents of Unrestricted Subsidiaries, but excluding cash or Cash Equivalents that (i) would appear (or would be required to appear) as "restricted" on the consolidated balance sheet of Borrower or (ii) are subject to any Lien as of such Monthly Measurement Date, other than non-consensual Liens arising by operation of law or Liens permitted under Section 6.02(k)), *plus* (y) the Revolving Commitments in effect as of such Monthly Measurement Date, *minus* (z) the Aggregate Total Exposure as of such Monthly Measurement Date.

"**Loan Documents**" means this Agreement (including any amendment hereto or waiver hereunder), the Notes (if any), the Security Documents, any First Lien Intercreditor Agreement, any Second Lien Intercreditor Agreements, any Joinder Agreement, any Extension Agreement, any Guaranty, any instrument of joinder to any Guaranty delivered pursuant to <u>Section 5.10</u>, any Holdings Guaranty, the Agent Fee Letter, any other agreement, instrument or document executed after the date hereof and designated by its terms as a Loan Document and any agreements, documents or certificates executed by the Borrower in favor of the applicable Issuing Bank relating to Letters of Credit.

"**Loan Parties**" means the Borrower and the Guarantors.

"**Loans**" means the Revolving Loans.

"**Local Time**" means (a) with respect to any Loan or Borrowing denominated in dollars or Canadian Dollars or any Letter of Credit denominated in dollars or Canadian Dollars, New York City time, (b) with respect to any Loan or Borrowing denominated in a Permitted Foreign Currency or any Letter of Credit denominated in a Permitted Foreign Currency (in each case other than Canadian Dollars, Hong Kong Dollars, Singapore Dollars or Australian Dollars), London time, (c) with respect to any Loan or Borrowing denominated in Australian Dollars or any Letter of Credit denominated in Australian Dollars, Sydney time, (d) with respect to any Loan or Borrowing denominated in Hong Kong Dollars or any Letter of Credit denominated in Hong Kong Dollars, Hong Kong time, and (e) with respect to any Loan or Borrowing denominated in Singapore Dollars or any Letter of Credit denominated in Singapore Dollars, Singapore time.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, property, financial condition or results of operations of the Borrower and the Restricted Subsidiaries taken as a whole, or (b) the rights of or remedies available to the Agents and the Lenders under this Agreement, any Guaranty, any Holdings Guaranty or any Security Document (other than due to the action or inaction of the Agents or the Lenders).

"**Material Domestic Subsidiary**" means a wholly-owned Domestic Subsidiary that is not an Immaterial Subsidiary or an Excluded Subsidiary.

29

"**Material Foreign Subsidiary**" means any Foreign Subsidiary that is a direct Subsidiary of the Borrower or any Guarantor (i) whose total assets (together with those of its consolidated subsidiaries) as of the most recent available quarterly or year-end financial statements exceed 5% of the Total Assets at such date and (ii) whose revenues (together with those of its consolidated subsidiaries) for the most recently ended four-quarter period for which financial statements are available exceed 5% of the consolidated revenues of the Borrower and its Subsidiaries for such period, in each case determined in accordance with GAAP.

"**Material Indebtedness**" means Indebtedness (other than any Indebtedness under the Loan Documents and other than Indebtedness among Holdings, the Borrower and their Subsidiaries), or obligations in respect of one or more Swap Agreements, of any one or more of Holdings, the Borrower and its Restricted Subsidiaries in a principal amount exceeding $150,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of Holdings, the Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Holdings, the Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"**Maturity Date**" means June 13, 2023, as such date may be extended pursuant to Section 2.19.

"**Maximum Rate**" has the meaning set forth in Section 9.13.

"**Measurement Period**" means, at any date of determination, the most recently completed four consecutive fiscal quarters of the Borrower ended on such date.

"**Monthly Measurement Date**" has the meaning set forth in the definition of "Liquidity".

"**Moody's**" means Moody's Investors Service, Inc., or any successor thereto.

"**MSSF**" means Morgan Stanley Senior Funding, Inc.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or could be an obligation to contribute of) the Borrower or a Restricted Subsidiary or an ERISA Affiliate, and each such plan for the five- year period immediately following the latest date on which the Borrower, or a Restricted Subsidiary or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

"**New Commitments**" has the meaning set forth in Section 2.18(a).

"**New Extending Lender**" has the meaning set forth in Section 2.19.

"**New Lender**" has the meaning set forth in Section 2.18(a).

"**New Loan**" has the meaning set forth in Section 2.18(b).

"**Non-Consenting Lender**" means any Lender that does not approve any consent, waiver or amendment that (i) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 9.02 and (ii) has been approved by the Required Lenders.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

30

"**Non-Public Information**" means information that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

"**Non-U.S. Plan**" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding) or maintained outside the United States by the Borrower or one or more Restricted Subsidiaries primarily for the benefit of employees of the Borrower or such Restricted Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"**Non-U.S. Pledge Agreement**" means any pledge agreement governed by the laws of a jurisdiction other than the United States in favor of the Administrative Agent, for the benefit of the Secured Parties, which shall provide for the grant of a first-priority security interest (subject to Permitted Liens) to the Administrative Agent, for the benefit of the Secured Parties, in the Collateral consisting of the Equity Interests of a Material Foreign Subsidiary (other than Excluded Collateral), which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"**Note**" has the meaning set forth in Section 2.07(e).

"**Obligations**" means all amounts owing by any Loan Party to the Administrative Agent, any Issuing Bank or any Lender pursuant to the terms of this Agreement or any other Loan Document (including all interest which accrues after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of the Borrower or any of its Subsidiaries, whether or not allowed in such case or proceeding) and any and all other amounts owed by any Loan Party under the Loan Documents, including in favor of and amounts owed to Indemnitees.

"**Other Connection Taxes**" means, with respect to the Administrative Agent or any Lender, Taxes imposed as a result of a present or former connection between such Administrative Agent, Lender or other recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Administrative Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means any and all present or future stamp, court or documentary taxes or any other excise, property, intangible, recording, filing or similar Taxes which arise from any payment made, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and the other Loan Documents; excluding, however, such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than such taxes imposed with respect to an assignment that occurs as a result of the Borrower's request pursuant to Section 2.16(b)).

"**Participant**" has the meaning set forth in Section 9.04(c)(i).

"**Participant Register**" has the meaning set forth in Section 9.04(c)(iii).

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

31

"**Pension Plan**" means any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA, other than a Multiemployer Plan, that is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA and is maintained in whole or in part by the Borrower, any Restricted Subsidiary or any ERISA Affiliate or with respect to which any of the Borrower, any Restricted Subsidiary or any ERISA Affiliate has actual or contingent liability.

"**Permitted Encumbrances**" means:

(a)   Liens imposed by law for taxes, assessments or governmental charges or levies that are not yet delinquent or are being contested in compliance with Section 5.04;

(b)   carriers', warehousemen's, mechanics' , materialmen's, landlord's, supplier's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in good faith;

(c)   pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations or employment laws or to secure other public, statutory or regulatory obligations and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of Holdings, Borrower or any Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (c)(i) above;

(d)   pledges and deposits (i) to secure the performance of bids, trade and commercial contracts (including insurance contracts), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of Holdings, Borrower or any Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (d)(i) above;

(e)   judgment liens in respect of judgments that do not constitute an Event of Default under Section 7.01(k) and Liens securing appeal or surety bonds related to such judgments;

(f)   easements, zoning restrictions, rights-of-way, building ordinances, encroachments, title defects and other irregularities, governmental restrictions on the use of property or conduct of business and Liens in favor of Governmental Authorities and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Restricted Subsidiary; and

(g)   Uniform Commercial Code financing statements filed (or similar filings under applicable law) solely as a precautionary measure in connection with operating leases.

"**Permitted Foreign Currency**" means, with respect to any Loans or Letter of Credit, Australian Dollars, British Pounds, Canadian Dollars, Euros, Hong Kong Dollars, Japanese Yen, Singapore Dollars, Swiss Francs and any other foreign currency reasonably requested by the Borrower from time to time and in which each Lender (in the case of Loans to be denominated in such other currency) and each applicable Issuing Bank (in the case of any Letters of Credit to be denominated in such other currency) has

32

reasonably agreed, in accordance with its policies and procedures in effect at such time, to lend Loans or issue Letters of Credit as applicable.

"**Permitted Holdco Transaction**" means a transaction or series of related transactions that cause 100% of the Equity Interests in Borrower to be held by a newly-formed entity ("**Holdings**"); provided that (a) Holdings shall be organized under the laws of any political subdivision of the United States and shall have complied with Section 5.11 and (b) but for such Permitted Holdco Transaction, no Change in Control shall have occurred under clauses (a)(y) of the definition thereof (based on the ownership of the Borrower prior to such transaction as compared to the ownership of Holdings after giving effect to such Transaction), clause (b) of the definition thereof (based on the Holdings being the Public Company) or clause (c) of the definition thereof.

"**Permitted Liens**" means any Liens permitted pursuant to Section 6.02.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA maintained or contributed to by the Borrower, a Restricted Subsidiary or any ERISA Affiliate or to which the Borrower, a Restricted Subsidiary or an ERISA Affiliate has or could have an obligation to contribute, and each such plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA for the five-year period immediately following the latest date on which the Borrower, a Restricted Subsidiary or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"**Platform**" has the meaning set forth in Section 9.01(d).

"**Prime Rate**" means the rate of interest the rate of interest published by the Wall Street Journal, from time to time, as the prime rate. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" for each of the Administrative Agent and any Issuing Bank, means the office of the Administrative Agent and such Issuing Bank as set forth in Section 9.01(a), or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate to Borrower and each Lender upon two Business Days' written notice.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Company**" means, after the IPO, the Person that shall have issued Equity Interests pursuant to such IPO (such person being either the Borrower or any direct parent company of the Borrower).

"**Public Lenders**" means Lenders that do not wish to receive material non-public information with respect to the Borrower, the Subsidiaries or its or their securities.

33

"**Purchase Money Indebtedness**" means Indebtedness incurred to finance the acquisition, construction or improvement of any fixed or capital asset to the extent incurred prior to or within 270 days following such acquisition, construction or improvement.

"**Qualified Equity Interests**" means Equity Interests other than Disqualified Equity Interests.

"**Reference Time**" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is the Adjusted LIBO Rate, 11:00 a.m. (London time) on the day that is two London banking days preceding the date of such setting, and (2) if such Benchmark is not the Adjusted LIBO Rate, the time determined by the Administrative Agent in its reasonable discretion.

"**Refinancing Indebtedness**" means refinancings, extensions, renewals, or replacements of Indebtedness so long as such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, other than by the amount equal to premium or other amount paid, and fees and expenses incurred, in connection with such refinancing, extensions, renewals or replacements and by the amount of unfunded commitments with respect thereto.

"**Register**" has the meaning set forth in <u>Section 9.04(b)(iv)</u>.

"**Reimbursement Date**" has the meaning set forth in <u>Section 2.20(d)</u>.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Removal Effective Date**" has the meaning set forth in <u>Section 8.07(b)</u>.

"**Representatives**" has the meaning set forth in <u>Section 9.12</u>.

"**Required Lenders**" means, at any time, Lenders having more than 50% of the aggregate amount of the Revolving Commitments or, if the Revolving Commitments shall have been terminated, holding more than 50% of the aggregate outstanding principal amount of the Revolving Loans at such time. The Revolving Commitment and Loans of any Defaulting Lender and any Disqualified Institution shall be disregarded in determining Required Lenders at any time.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means any of the President, Chief Executive Officer, Senior Vice President and the most senior financial officer from time to time of the applicable Loan Party, or any person designated by any such Loan Party in writing to the Administrative Agent from time to time, acting singly.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such

34

Equity Interests in the Borrower. For the avoidance of doubt, the receipt or acceptance by the Borrower or any Restricted Subsidiary of the return of Equity Interests issued by the Borrower or any Restricted Subsidiary to the seller of a Person, business or division as consideration for the purchase of such Person, business or division, which return is in settlement of indemnification claims owed by such seller in connection with such acquisition, shall not be deemed to be a Restricted Payment. For the avoidance of doubt, (a) the conversion of, or payment for (including, without limitation, payments of principal and payments upon redemption or repurchase), or paying any interest with respect to, any Convertible Notes, and (b) any intercompany investments, intercompany Indebtedness, intercompany accounts payable and receivable, transfer pricing arrangements and any other intercompany payments shall not constitute a Restricted Payment.

"**Restricted Subsidiary**" means any Subsidiary that is not an Unrestricted Subsidiary.

"**Revolving Commitment**" means, with respect to each Lender, the commitment of such Lender to make Revolving Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Loans hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.06, (b) increased from time to time pursuant to Section 2.18, or (c) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The initial amount of each Lender's Revolving Commitment as of the Effective Date is set forth on Schedule 2.01. The initial aggregate amount of the Lenders' Revolving Commitments as of the Amendment No. 5 Effective Date is $2,270,000,000.

"**RFR**" means, for any RFR Loan denominated in (a) British Pounds, SONIA and (b) Swiss Francs, SARON.

"**RFR Borrowing**" means, as to any Borrowing, the RFR Loans comprising such Borrowing.

"**RFR Business Day**" means, for any Loan denominated in (a) British Pounds, any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which banks are closed for general business in London and (b) Swiss Francs, any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which banks are closed for the settlement of payments and foreign exchange transactions in Zurich.

"**RFR Interest Day**" has the meaning specified in the definition of "Daily Simple RFR".

"**RFR Loan**" means a Loan that bears interest at a rate based on the Adjusted Daily Simple RFR. For the avoidance of doubt, only Loans denominated in British Pounds and Swiss Francs shall bear interest at a rate based on the Adjusted Daily Simple RFR.

"**Revolving Loans**" means the revolving loans made by the Lenders to the Borrower pursuant to this Agreement.

"**S&P**" means S&P Global Ratings, a division of S&P Global, Inc.

"**Sanctioned Country**" means, at any time, (a) a country, region or territory which is the subject or target of comprehensive Sanctions (including, without limitation, Cuba, Iran, North Korea, Sudan, Syria and the Crimea Region of the Ukraine), (b) an agency of the government of a country, region or territory described in clause (a), or (c) an organization directly or indirectly controlled by a country, region or territory described in clause (a) or its government.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, by the U.S. Department of State or by the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a country, region or territory which is the subject or target of comprehensive Sanctions, or (c) any Person owned 50% or more or controlled by any such Person or Persons described in the foregoing clauses (a) and (b).

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"**SARON**" means, with respect to any Business Day, a rate per annum equal to the Swiss Average Rate Overnight for such Business Day published by the SARON Administrator on the SARON Administrator's Website.

"**SARON Administrator**" means the SIX Swiss Exchange AG (or any successor administrator of the Swiss Average Rate Overnight).

"**SARON Administrator's Website**" means SIX Swiss Exchange AG's website, currently at https://www.six-group.com, or any successor source for the Swiss Average Rate Overnight identified as such by the SARON Administrator from time to time.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Second Lien Intercreditor Agreement**" means a Second Lien Intercreditor Agreement among the Administrative Agent and one or more Senior Representatives for holders of Indebtedness secured by Liens on the Collateral that are junior to the Liens on the Collateral securing the Secured Obligations, in form and substance reasonably satisfactory to the Administrative Agent and the Borrower.

"**Secured Cash Management Agreement**" means any agreement relating to Cash Management Services that is entered into by and between the Borrower or any Restricted Subsidiary and a Cash Management Bank which is specified in writing by the Borrower to the Administrative Agent as constituting a "Secured Cash Management Agreement" hereunder.

"**Secured Cash Management Obligations**" means the obligations owed by the Borrower or any Restricted Subsidiary to any Secured Cash Management Bank pursuant to Secured Cash Management Agreements.

"**Secured Hedge Agreement**" means any agreement in respect of any Swap Agreement specified by the Borrower that (a) is entered into by and between any Loan Party or any Restricted Subsidiary and any Hedge Bank and (b) is specified in writing by the Borrower to the Administrative Agent as constituting a "Secured Hedge Agreement" hereunder.

"**Secured Hedging Obligations**" means the obligations owed by the Borrower or any Restricted Subsidiary to any Hedge Bank pursuant to Secured Hedge Agreements.

36

"**Secured Obligations**" means (a) the Obligations, (b) the Secured Hedging Obligations and (c) the Secured Cash Management Obligations; provided that the term "Secured Obligations" shall not include any Excluded Swap Obligation. Notwithstanding the foregoing, (i) unless otherwise agreed to by the Borrower and any Hedge Bank or any Cash Management Bank, the obligations of the Borrower or any Restricted Subsidiary under any Secured Hedge Agreement or any Cash Management Obligations shall be secured and guaranteed pursuant to the Security Documents and the Guarantees only to the extent that, and for so long as, the Obligations are so secured and guaranteed and (ii) any release of Collateral or Guarantors effected in a manner permitted by this Agreement or any other Loan Document shall not require the consent of any counterparty to any Secured Hedge Agreement or of the holders of any Cash Management Obligations other than in their capacity as a Lender or as the Administrative Agent.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, each Issuing Bank, each Hedge Bank that is party to any Secured Hedge Agreement, each Cash Management Bank that is party to a Secured Cash Management Agreement, each co-agent, sub-agent or attorney-in-fact appointed by the Administrative Agent pursuant to Section 8.01 with respect to matters relating to any Security Document and any other holder of a Secured Obligation from time to time.

"**Secured Specified Indebtedness**" means Specified Indebtedness that is (i) incurred by the Borrower and/or one or more of the Guarantors and (ii) secured by Liens on the Collateral (and not on any other properties or assets of the Borrower or any Guarantor, unless such other properties or assets are substantially concurrently pledged to secure the Obligations on an equal and ratable basis and become "Collateral" as defined herein for so long as such Specified Indebtedness is so secured).

"**Security Agreements**" means the U.S. Security Agreement and any Non-U.S. Pledge Agreement, collectively.

"**Security Documents**" means the Security Agreements and each other agreement or writing pursuant to which any Loan Party pledges or grants or purports to pledge or grant a Lien in any property or asset to secure its Secured Obligations.

"**Senior Representative**" means, with respect to any series of Indebtedness, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Senior Secured Indebtedness**" means (a) the aggregate principal amount of Specified Indebtedness of the Borrower and its Restricted Subsidiaries that is secured by Liens on the properties or assets of the Borrower and/or one or more of its Restricted Subsidiaries (other than any such Specified Indebtedness that is expressly subordinated in right of payment to the Obligations pursuant to a written agreement), as determined on a consolidated basis, minus (b) up to $500,000,000 of Unrestricted cash and Cash Equivalents on the balance sheet of the Borrower and its Restricted Subsidiaries as of such date.

"**Senior Secured Net Leverage Ratio**" means, as of any date of determination, the ratio of (a) Senior Secured Indebtedness on such date to (b) Consolidated Adjusted EBITDA for the period of four consecutive fiscal quarters of the Borrower ended on or prior to such time (taken as one accounting period) in which financial statements for each quarter or fiscal year in such period have been or were required to be delivered pursuant to Section 5.01(a) or (b) without giving effect to any grace period applicable thereto.

37

"**SIBOR**" means in relation to any SIBOR Loan, the rate per annum designated as the Singapore Interbank Offered Rate by the Association of Banks in Singapore (or a comparable or successor rate which rate is approved by the Administrative Agent) as displayed on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at or about 11:00 a.m. (Singapore time) on the applicable Interest Rate Determination Date with a period comparable to the applicable Interest Period; *provided* that in no event shall SIBOR be less than 0 00%.

"**SIBOR Borrowing**" refers to a Borrowing hearing interest at a rate determined by reference to SIBOR.

"**SIBOR Loan**" refers to a Loan bearing interest at a rate determined by reference to SIBOR.

"**Singapore Dollars**" means the lawful currency of Singapore.

"**SOFR**" ~~means,~~ with respect to any ~~day means~~Business Day, a rate per annum equal to the secured overnight financing rate ~~published for such day by the Federal Reserve Bank of New York, as the~~~~administrator of the benchmark, (or a successor administrator) on the~~ ~~Federal Reserve Bank of New~~York's Website: for such Business Day published by the SOFR Administrator on the SOFR Administrator's Website at approximately 2:30 p.m. (New York City time) on the immediately succeeding Business Day.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Administrator's Website**" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"**Solvent**" means, with respect to the Borrower and its Restricted Subsidiaries on a particular date, that on such date (a) the fair value of the present assets of the Borrower and its Restricted Subsidiaries, taken as a whole, is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of the Borrower and its Restricted Subsidiaries, taken as a whole, (b) the present fair saleable value of the assets of the Borrower and its Restricted Subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liability of the Borrower and its Restricted Subsidiaries, taken as a whole, on their debts as they become absolute and matured, (c) the Borrower and its Restricted Subsidiaries, taken as a whole, do not intend to, and do not believe that they will, incur debts or liabilities (including current obligations and contingent liabilities) beyond their ability to pay such debts and liabilities as they mature in the ordinary course of business and (d) the Borrower and its Restricted Subsidiaries, taken as a whole, are not engaged in business or a transaction, and are not about to engage in business or a transaction, in relation to which their property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**SONIA**" means, with respect to any Business Day, a rate per annum equal to the British Pounds Overnight Index Average for such Business Day published by the SONIA Administrator on the SONIA Administrator's Website on the immediately succeeding Business Day.

38

"**SONIA Administrator**" means the Bank of England (or any successor administrator of the British Pounds Overnight Index Average).

"**SONIA Administrator's Website**" means the Bank of England's website, currently at http://www.bankofengland.co.uk, or any successor source for the British Pounds Overnight Index Average identified as such by the SONIA Administrator from time to time.

"**Specified Event of Default**" means an Event of Default of the type described in Section 7.01 (a) or (b) or, with respect to the Borrower or Holdings, a Bankruptcy Event.

"**Specified Indebtedness**" means (i) indebtedness for borrowed money (including, for the avoidance of doubt, the Loans and any outstanding Loans (as defined in the Term Loan Agreement) and any outstanding Loans (as defined in the 2018 Term Loan Agreement)), (ii) obligations for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of business and excluding payroll liabilities, deferred compensation obligations, purchase price adjustments, royalties and earn-outs and other contingent or deferred payments of a similar nature in connection with any strategic transaction), (iii) obligations evidenced by notes, bonds, debentures and similar instruments, (iv) all obligations, contingent or otherwise, as an account party or applicant under or in respect of bankers acceptances or letters of credit, (v) Capital Lease Obligations, (vi) Purchase Money Indebtedness and (vii) Guarantees of indebtedness of the type referred to in clauses (i) through (vi); *provided* that Specified Indebtedness shall exclude Indebtedness among the Borrower and its Subsidiaries.

"**Subordinated Indebtedness**" means Specified Indebtedness under clauses (i) and (iii) of the definition thereof of the Borrower or any Restricted Subsidiary that is by its terms subordinated in right of payment to the Obligations of the Borrower or such Restricted Subsidiary, secured by Liens that rank junior to the Liens securing the Obligations or is unsecured (but excluding any Indebtedness in respect of Cash Management Services or otherwise of a revolving nature).

"**Subsidiary**" means any subsidiary of the Borrower, or, after a Permitted Holdco Transaction, Holdings.

"**subsidiary**" means, with respect to any Person (the "**parent**") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent and which is required by GAAP to be consolidated in the consolidated financial statements of the parent.

"**Swap Agreement**" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

39

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to market value(s) for such Swap Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loan Agent**" means MSSF, as administrative agent under the Term Loan Agreement and any successors thereto pursuant to the terms of the Term Loan Agreement.

"**Term Loan Agreement**" means the Term Loan Agreement dated as of July 13, 2016 among the Borrower, the Lenders from time to time party thereto and the Term Loan Agent, as amended, supplemented or otherwise modified, refinanced or replaced from time to time.

"**Term Loan Intercreditor Agreement**" means that certain First Lien/First Lien Intercreditor Agreement, dated as of the Effective Date, among the Administrative Agent, the Term Loan Agent and the Loan Parties, substantially in the form of Exhibit A to Amendment No. 4, as the same may be amended, restated, supplemented or otherwise modified from time to time, or any other intercreditor agreement among the Term Loan Agent, the Administrative Agent, any other Senior Representatives for holders of Indebtedness, if applicable, and the Loan Parties on terms that are not less favorable in any material respect to the Secured Parties and the Borrower than those contained in the form attached as Exhibit A to Amendment No. 4.

"**Term SOFR**" means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**TIBOR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted TIBOR Rate.

"**TIBOR Rate**" means, with respect to any Borrowing denominated in Yen and for any Interest Period, the TIBOR Screen Rate two Business Days prior to the commencement of such Interest Period.

"**TIBOR Screen Rate**" means the Tokyo interbank offered rate administered by the Ippan Shadan Hojin JBA TIBOR Administration (or any other person which takes over the administration of that rate) for the relevant currency and period displayed on page DTIBOR01 of the Reuters screen (or, in the event such rate does not appear on such Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate as selected by the Administrative Agent from time to time in its reasonable discretion)

40

as published at approximately 1:00 p.m. Japan time two Business Days prior to the commencement of such Interest Period. If the TIBOR Screen Rate shall be less than 0%, the TIBOR Screen Rate shall be deemed to be 0% for purposes of this Agreement.

"**Total Assets**" means the total assets of the Borrower and its Subsidiaries on a consolidated basis, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 5.01(a) or (b).

"**Total Exposure**" means, for any Lender at any time, the sum of (i) the aggregate principal amount of all outstanding Loans of such Lender *plus* (ii) such Lender's Applicable Percentage of the Letter of Credit Usage.

"**Trade Date**" has the meaning set forth in Section 9.04(b)(ii)(G).

"**Transactions**" means the execution, delivery and performance by the Loan Parties of each Loan Document to which it is a party, the borrowing of Loans and the issuance of Letters of Credit.

"**Type**" means, when used in reference to any Revolving Loan or Borrowing, whether the rate of interest on such Revolving Loan, or on the Revolving Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate, the Adjusted EURIBO Rate, HIBOR, SIBOR, the Australian Bank Bill Rate, the Canadian BA Rate or, the Adjusted TIBOR Rate, the Alternate Base Rate or the Adjusted Simple RFR.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**Unreimbursed Amount**" has the meaning set forth in Section 2.20(d).

"**Unrestricted**" means, when referring to cash or Cash Equivalents, that such cash or Cash Equivalents (a) do not appear (or would be required to appear) as "restricted" on the consolidated balance sheet of the Borrower, (b) are not subject to any Lien, other than non-consensual Liens arising by operation of law or Liens permitted under Section 6.02(k) hereof and (c) are otherwise generally available for use by the Borrower or any Restricted Subsidiary.

41

"**Unrestricted Subsidiaries**" means, collectively, (a) Aleka Insurance, Inc., (b) Neben, LLC and its subsidiaries, (c) entities for which the primary purpose is to operate, commercialize or develop autonomous or self-driving vehicles, or technology related thereto (including Apparate International C.V., Apparate Canada, Inc., UATC, LLC and their respective subsidiaries), (d) entities for which the primary purpose is to operate, commercialize or develop class 6 or above trucking or freight brokerage services, or technology related thereto (including Uber Freight, LLC and its subsidiaries), (e) entities for which the primary purpose is to operate, commercialize or develop food delivery, and logistics services (including UberEATS and UberHealth), or technology related thereto (including Anderes, LLC and its subsidiaries), (f) entities for which the primary purpose is to operate, commercial or develop personal mobility devices (including bikes, scooters and hoverboards), or technology related thereto (including SMB Holding Corporation, Social Bicycles, LLC and Social Scooters, LLC and their respective subsidiaries), (g) Lion City Holdings Pte. Ltd. and its subsidiaries (including Lion City Rentals Pte. Ltd.), (h) captive financing entities and their respective subsidiaries, (i) any entities for which the primary purpose is to own or develop real estate, ~~and~~ (j) any entities for which the primary purpose is to operate, commercialize or develop aerial vehicles, or technology related thereto, (k) any entities for which the primary purpose is to operate, commercialize or develop a service that provides flexible earnings opportunities for workers by matching workers with staffing organizations that will employ the worker and with third-party customers that require temporary labor, or technology related thereto, (l) any entities for which the primary purpose is to operate, commercialize or develop public transit services and (m) each Subsidiary substantially all of the assets of which consist of Equity Interests in one or more Subsidiaries described in clauses (a) – (~~i~~l) of this definition; *provided* that, so long as no Default or Event of Default has occurred and is continuing or shall result therefrom, the Borrower shall be permitted to designate any such Unrestricted Subsidiary as a Restricted Subsidiary by written notice to the Administrative Agent specifying that such Unrestricted Subsidiary shall be deemed a Restricted Subsidiary effective as of the date of such written notice. The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time.

"**U.S.**" and "**United States**" means the United States of America.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Security Agreement**" means any pledge and security agreement governed by New York law executed by the Loan Parties party thereto in favor of the Administrative Agent, for the benefit of the Secured Parties, which shall provide for the grant of a first-priority security interest in the Collateral (subject to Permitted Liens) to the Administrative Agent for the benefit of the Secured Parties, which shall be substantially in the form attached as Exhibit B to Amendment No. 4.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended from time to time.

"**USCO**" means the United States Copyright Office.

"**USPTO**" means the United States Patent and Trademark Office.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the Benchmark Replacement Adjustment with respect thereto.

42

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"**Withholding Agent**" means any Loan Party and the Administrative Agent.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom,  any powers of the applicable Resolution Authority  under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution  or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    <u>Classification of Loans and Borrowings</u>. For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "**Eurodollar Loan**" or "**RFR Loan**"). Borrowings also may be classified and referred to by Type (e.g., a "**Eurodollar Borrowing**" or "**RFR Borrowing**").

Section 1.03    <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, amendments and restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) except as otherwise specified with respect to the schedules to the Disclosure Letter, all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (f) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

Section 1.04    <u>Accounting Terms; GAAP</u>. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and

43

applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision shall have been amended to account for any such change following good faith negotiations between the Borrower and the Administrative Agent. Notwithstanding the foregoing, all financial covenants contained herein shall be calculated (1) without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (ASC 825) (or any similar accounting principle) permitting or requiring a Person to value its financial liabilities or Indebtedness at the fair value thereof and (2) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

Section 1.05    Permitted Holdco Transaction. Upon the consummation of any Permitted Holdco Transaction, (a) the references in the definitions of "Certain Specified Indebtedness Cap", "Consolidated Adjusted EBITDA", "Consolidated Net Income", "Secured Specified Indebtedness", "Senior Secured Indebtedness", "Senior Secured Net Leverage Ratio" and "Total Assets" (and, in each case, the component definitions thereof) (i) to the Borrower shall be deemed to refer to Holdings (ii) to the Borrower and its Subsidiaries shall be deemed to refer to Holdings and its Subsidiaries and (iii) to the Borrower and its Restricted Subsidiaries and shall be deemed to refer to Holdings, the Borrower and its Restricted Subsidiaries, (b) the references to financial statements of the Borrower (including, without limitation, in the definitions referred to in clause (a) of this Section and in Section 5.01) shall be deemed to refer to the financial statements of Holdings, and (c) references to "Borrower" in Sections 6.01, 6.02 and 6.03 shall be deemed to refer to "Holdings".

Section 1.06    Exchange Rates; Currency Equivalents.

(a)    Not later than 1:00 p.m., New York City time, on each Calculation Date, the Administrative Agent shall (i) determine the Exchange Rate as of such Calculation Date with respect to the applicable Permitted Foreign Currency and (ii) give notice thereof to the applicable Issuing Bank and the Borrower. The Exchange Rates so determined shall become effective in the case of each subsequent Calculation Date, on the first Business Day immediately following such Calculation Date (a "**Reset Date**"), shall remain effective until the next succeeding Reset Date and shall for all purposes of this Agreement (other than any provision expressly requiring the use of a current exchange rate) be the Exchange Rates employed in converting any amounts between dollars and any Permitted Foreign Currency.

(b)    Solely for purposes of Article II and related definitional provisions to the extent used therein, the applicable amount of any currency (other than dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as determined by the Administrative Agent and notified to the applicable Issuing Bank and the Borrower in accordance with Section 1.06(a). Amounts denominated in a Permitted Foreign Currency will be converted to dollars for the purposes of calculating the Senior Secured Net Leverage Ratio at the Exchange Rate as of the date of calculation.

Section 1.07    Limited Conditionality Acquisitions. In the event that the Borrower has elected to treat any proposed acquisition as a Limited Conditionality Acquisition, any condition to incurring Liens and Indebtedness (including, for the avoidance of doubt, New Commitments and Loans made pursuant thereto) in connection with such Limited Conditionality Acquisition (including any condition relating to pro forma compliance with any financial covenants or the delivery of financial statements or no Default or Event of Default) shall be determined solely as of the date that the definitive documentation

44

relating to such Limited Conditionality Acquisition is entered into by Holdings, the Borrower or any Subsidiary; provided that if the Borrower has made such an election, in connection with the calculation of any ratio or basket with respect to the incurrence of any Indebtedness (including, for the avoidance of doubt, New Commitments and Loans made pursuant thereto) or Liens on or following such date and prior to the earlier of the date on which such Limited Conditionality Acquisition is consummated or the definitive agreement for such Limited Conditionality Acquisition is terminated, any such ratio shall be calculated on a pro forma basis assuming such Limited Conditionality Acquisition and other pro forma events in connection therewith (including any incurrence of Liens and Indebtedness) have been consummated.

The foregoing provisions shall apply with similar effect during the pendency of multiple Limited Conditionality Acquisitions such that each of the possible scenarios is separately tested.

Section 1.08    <u>Basket Amounts and Application of Multiple Relevant Provisions</u>. Notwithstanding anything to the contrary, (a) unless specifically stated otherwise herein, any dollar, number, percentage or other amount available under any carve-out, basket, exclusion or exception to any affirmative, negative or other covenant in this Agreement or the other Loan Documents may be accumulated, added, combined, aggregated or used together by any Loan Party and its Subsidiaries without limitation for any purpose not prohibited hereby, and (b) any action or event permitted by this Agreement or the other Loan Documents need not be permitted solely by reference to one provision permitting such action or event but may be permitted in part by one such provision and in part by one or more other provisions of this Agreement and the other Loan Documents. For purposes of determining compliance with <u>Sections 6.01</u> and <u>6.02</u> in the event that an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Indebtedness (or any portion thereof) described in <u>Section 6.01</u> or any Lien meets the criteria of one or more of the categories of Permitted Liens, the Borrower may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such item of Indebtedness (or any portion thereof) and/or Liens in any manner that complies with <u>Sections 6.01</u> and <u>6.02</u> and will be entitled to only include the amount and type of such item of Indebtedness (or any portion thereof) and/or Liens in one of the above clauses (or any portion thereof) and such item of Indebtedness (or any portion thereof) and/or Liens shall be treated as having been incurred or existing pursuant to only such clause or clauses (or any portion thereof) without giving pro forma effect to such item (or portion thereof) when calculating the amount of Indebtedness or Liens, as applicable, that may be incurred pursuant to any other clause.

Section 1.09    <u>Interest Rates</u>. The Administrative Agent does not warrant nor accept any responsibility nor shall the Administrative Agent have any liability with respect to (i) any Benchmark Replacement Conforming Changes, (ii) the administration, submission or any matter relating to the rates in the definition of ~~LIBO Rate~~Benchmark or with respect to any rate that is an alternative, comparable or successor rate thereto or (iii) the effect of any of the foregoing.

Section 1.10    <u>Divisions</u>. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

ARTICLE 2
THE CREDITS

Section 2.01   Revolving Commitments. Subject to the terms and conditions set forth herein, each Lender severally agrees to make Revolving Loans in dollars or in any Permitted Foreign Currency to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in (a) the aggregate outstanding principal amount of such Lender's Revolving Loans exceeding such Lender's Revolving Commitment, (b) the sum of the Aggregate Total Exposure exceeding the total Revolving Commitments or (c) any Lender's Total Exposure exceeding such Lender's Revolving Commitment; provided that the Borrower shall not request, and the Lenders shall not be required to fund, a Revolving Loan that is denominated in a Permitted Foreign Currency if after the making of such Revolving Loan, the Dollar Equivalent of the aggregate principal amount of all Revolving Loans then outstanding that are denominated in a Permitted Foreign Currency (including such requested Revolving Loan) would exceed $500,000,000. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.

Section 2.02   Revolving Loans and Borrowings. Each Loan shall be made as part of a Borrowing consisting of Revolving Loans made by the Lenders in accordance with their respective Applicable Percentages. The failure of any Lender to make any Revolving Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Revolving Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Revolving Loans as required.

(b)     Subject to Section 2.11, (i) each Borrowing denominated in dollars shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith, (ii) each Borrowing denominated in Euro shall be comprised entirely of EURIBOR Loans, (iii) each Borrowing denominated in Hong Kong Dollars shall be comprised entirely of 1-HIBOR Loans, (iv) each Borrowing denominated in Singapore Dollars shall be comprised entirely of SIBOR Loans, (v) each Borrowing denominated in Australian Dollars shall be comprised entirely of Australian Bank Bill Rate Loans, (vi) each Borrowing denominated in Canadian Dollars shall be comprised entirely of Canadian BA Rate Loans ~~and~~, (vii) each Borrowing denominated in Japanese Yen shall be comprised entirely of TIBOR Loans, (viii) each Borrowing denominated in British Pounds shall be comprised entirely of RFR Loans, (ix) each Borrowing denominated in Swiss Francs shall be comprised entirely of RFR Loans and (x) each Borrowing denominated in any Permitted Foreign Currency (other than Euros, Hong Kong Dollars, Singapore Dollars, Australian Dollars ~~or~~, Canadian Dollars, Japanese Yen, British Pounds and Swiss Francs) shall be comprised entirely of Eurodollar Loans. Each Lender at its option may make any Revolving Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Revolving Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Revolving Loan in accordance with the terms of this Agreement.

(c)     At the commencement of each Interest Period for any Eurodollar Borrowing, EURIBOR Borrowing, HIOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing ~~or~~, (vii) Canadian BA Rate Borrowing or TIBOR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. At the time that each ABR Borrowing and/or RFR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Revolving Commitments. Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of ten Eurodollar Borrowings,

46

EURIBOR Borrowings, HIBOR Borrowings, SIBOR Borrowings, Australian Bank Bill Rate Borrowings ~~or~~, TIBOR Borrowings, Canadian BA Rate Borrowings or RFR Borrowings outstanding.

(d)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03     <u>Requests for Borrowings</u>. To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone, telecopy or other electronic transmission (other than a request for any Borrowing denominated in a Permitted Foreign Currency, which request shall be made in writing (including by electronic transmission)) (a) in the case of a Eurodollar Borrowing denominated in dollars or a EURIBOR Borrowing or a Canadian BA Rate Borrowing or a TIBOR Borrowing, not later than 1:00 p.m. Local Time three Business Days before the date of the proposed Borrowing, (b) in the case of a Eurodollar Borrowing denominated in any Permitted Foreign Currency or a HIBOR Borrowing. SIBOR Borrowing or an Australian Bank Bill Rate Borrowing, not later than 1:00 p.m., Local Time, four Business Days before the date of the proposed Borrowing ~~or~~, (c) in the case of an RFR Borrowing denominated in British Pounds, not later than 1:00 p.m. (New York City time), three RFR Business Days before the date of the proposed Borrowing, (d) in the case of an RFR Borrowing denominated in Swiss Francs, not later than 1:00 p.m. (New York City time), three RFR Business Days before the date of the proposed Borrowing,, or (e) in the case of an ABR Borrowing, either (i) not later than 1:00 p.m. (New York City time), one Business Day prior to the date of the proposed Borrowing, or (ii) not later than 12:00 p.m. (New York City time) on the date of the proposed Borrowing; provided that the aggregate principal amount of Revolving Loans requested pursuant to this <u>Section 2.03(c)(ii)</u> on any one day shall not exceed $50,000,000. Each such telephonic Borrowing Request shall be confirmed promptly by delivery to the Administrative Agent of a written Borrowing Request in substantially the form of <u>Exhibit B</u> attached hereto and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information in compliance with <u>Section 2.02</u>:

(i)     the aggregate amount and currency of the requested Borrowing;

(ii)     the date of such Borrowing, which shall be a Business Day;

(iii)     whether such Borrowing is to be an ABR Borrowing, a Eurodollar Borrowing, a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing ~~or~~, a Canadian BA Rate Borrowing, a TIBOR Borrowing or an RFR Borrowing;

(iv)     in the case of a Eurodollar Borrowing, a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing ~~or~~,, a Canadian BA Rate Borrowing or a TIBOR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)     the location and number of the account or accounts to which funds are to be disbursed, which shall comply with the requirements of <u>Section 2.04</u>.

If no election as to the Type of Borrowing is specified other than Borrowings denominated in a Permitted Foreign Currency, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing ~~or~~, Canadian BA Rate Borrowing or TIBOR Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. If no currency is specified with respect to any requested Loan, the Borrower shall be deemed to

47

have selected dollars. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Revolving Loan to be made as part of the requested Borrowing. Except as otherwise provided herein, a Borrowing Request for a Eurodollar Borrowing, a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing or, a Canadian BA Rate Borrowing or a TIBOR Borrowing shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to make a borrowing in accordance therewith. As soon as practicable after 10:00 a.m., New York City time, on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing or, Canadian BA Rate Borrowing or TIBOR Borrowing for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrower and each Lender.

Section 2.04    Funding of Borrowings. Each Lender shall make each Revolving Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m. Local Time to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Revolving Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account or accounts designated by the Borrower in the applicable Borrowing Request.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's Applicable Percentage of such Borrowing, the Administrative Agent may assume that such Lender has made such Applicable Percentage available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its Applicable Percentage of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, (x) in the case of Loans denominated in dollars, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (y) in the case of Loans denominated in a Permitted Foreign Currency, the rate determined by the Administrative Agent to be the cost to it of funding such amount (which determination will be conclusive absent manifest error) or (ii) in the case of the Borrower, the interest rate applicable to (A) in the case of Loans denominated in dollars, ABR Loans and (B) in the case of Loans denominated in a Permitted Foreign Currency, the interest rate applicable to the subject Loan pursuant to Section 2.10. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Revolving Loan included in such Borrowing.

Section 2.05    Interest Elections. Each Borrowing of Revolving Loans initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing or, Canadian BA Rate Borrowing or TIBOR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing to a different Type (*provided* that Eurodollar Borrowings denominated in a Permitted Foreign Currency, EURIBOR Borrowings, HIBOR Borrowings, SIBOR Borrowings, Australian Bank Bill Rate Borrowings and,

48

Canadian BA Rate Borrowings and TIBOR Borrowings) may not be converted to ABR Borrowings) or to continue such Borrowing and, in the case of a Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing or, Canadian BA Rate Borrowing or TIBOR Borrowing, may elect Interest Periods therefor, all as provided in this Section. Subject to the limitation set forth in Section 2.02(c), the Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated among the Lenders holding the Revolving Loans comprising such Borrowing in accordance with their respective Applicable Percentages, and the Revolving Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone (other than a request pursuant to this Section with respect to a Borrowing denominated in a Permitted Foreign Currency, which request shall be made in writing (including by electronic transmission)) by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic request shall be irrevocable and shall be confirmed promptly by hand delivery, telecopy or other electronic transmission to the Administrative Agent of a written request (an "**Interest Election Request**") in substantially the form of Exhibit C attached hereto and signed by the Borrower.

(c)     Each written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing, a Eurodollar Borrowing, a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing or, a Canadian BA Rate Borrowing or a TIBOR Borrowing; and

(iv)     if the resulting Borrowing is a Eurodollar Borrowing, a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing or, a Canadian BA Rate Borrowing or a TIBOR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurodollar Borrowing, a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing or, a Canadian BA Rate Borrowing or a TIBOR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing. Except as otherwise provided herein, an Interest Election Request for conversion to, or continuation of, any Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing or, Canadian BA Rate Borrowing or TIBOR Borrowing shall be irrevocable on

49

and after the related Interest Rate Determination Date, and the Borrower shall be bound to effect a conversion or continuation in accordance therewith.

(e)      If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing, a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing ~~or~~, a Canadian BA Rate Borrowing or a TIBOR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing, a EURIBOR Borrowing, a HIBOR Borrowing, a SIBOR Borrowing, an Australian Bank Bill Rate Borrowing ~~or~~, a Canadian BA Rate Borrowing or a TIBOR Borrowing, as applicable, with an Interest Period of one month's duration. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing, (i) no outstanding Borrowing denominated in dollars may be converted to or continued as a Eurodollar Borrowing, (ii) unless repaid, each Eurodollar Borrowing denominated in dollars shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto and (iii) unless repaid, each Eurodollar Borrowing denominated in a Permitted Foreign Currency or EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing ~~or~~, Canadian BA Rate Borrowing or TIBOR Borrowing shall be continued as a Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing ~~or~~, Canadian BA Rate Borrowing or a TIBOR Borrowing, as applicable, with an Interest Period of one month's duration.

Section 2.06    <u>Termination and Reduction of Revolving Commitments</u>. Unless previously terminated, the Revolving Commitments shall terminate on the Maturity Date.

(b)      The Borrower may at any time terminate, or from time to time reduce, the Revolving Commitments; *provided* that (i) each partial reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and (ii) the Borrower shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with <u>Section 2.08</u>, the sum of the Aggregate Total Exposure would exceed the total Commitments.

(c)      The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; *provided* that a notice of termination of the Revolving Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities or another transaction, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Revolving Commitments shall be permanent. Each reduction of the Revolving Commitments shall be applied to the Lenders in accordance with their respective Applicable Percentages.

(d)      If, after giving effect to any reduction of the Revolving Commitments, the Letter of Credit Sublimit exceeds the amount of the Revolving Commitments, such Letter of Credit Sublimit shall be automatically reduced by the amount of such excess.

Section 2.07    <u>Repayment of Revolving Loans; Evidence of Debt</u>. The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Revolving Loan on the Maturity Date.

50

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Revolving Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Revolving Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein (absent manifest error); *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Revolving Loans in accordance with the terms of this Agreement.

(e)    Any Lender may request that Revolving Loans made by it be evidenced by a promissory note (each such promissory note being called a "**Note**" and all such promissory notes being collectively called the "**Notes**"). In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in substantially the form of <u>Exhibit D-1</u> attached hereto. Thereafter, the Revolving Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to <u>Section 9.04</u>) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.08    <u>Prepayment of Loans</u>. The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (subject to the requirements of <u>Section 2.13</u>), subject to prior notice in accordance with paragraph (b) of this Section.

(b)    The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy, other electronic transmission or delivery of written notice), telecopy or other electronic transmission of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, EURIBOR Borrowing ~~or,~~ Canadian BA Rate Borrowing <u>or TIBOR Borrowing</u>, not later than 1:00 p.m., Local Time, three Business Days before the date of prepayment, (ii) in the case of a Eurodollar Borrowing denominated in any Permitted Foreign Currency or a HIBOR Borrowing, a SIBOR Borrowing or an Australian Bank Bill Rate Borrowing, not later than 1:00 p.m., Local Time, four Business Days before the date of prepayment~~or,~~ (iii) in the case of prepayment <u>of an RFR Borrowing, not later than 1:00 p.m., Local Time, three RFR Business Days before the date of prepayment or (iv) in the case of prepayment</u> of an ABR Borrowing, not later than 1:00 p.m., New York City time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; *provided* that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitments as contemplated by <u>Section 2.06</u>, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with <u>Section 2.06</u>. Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in <u>Section 2.02</u>. Each prepayment of a Borrowing shall be applied ratably to the Revolving Loans of the Lenders in accordance with their respective

51

Applicable Percentages. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.10 and any costs incurred as contemplated by Section 2.13.

(c)    If at any time (1) the Aggregate Total Exposure exceeds the total Commitments then in effect (other than as a result of any revaluation of the Dollar Equivalent of Loans or Letter of Credit Usage on any Calculation Date in accordance with Section 1.06) or (ii) the Aggregate Total Exposure exceeds 105% of the total Commitments solely as a result of any revaluation of the Dollar Equivalent of Loans or Letter of Credit Usage on any Calculation Date in accordance with Section 1.06, the Borrower shall promptly prepay the Revolving Loans or Cash Collateralize the outstanding amount of Letter of Credit Usage at the Agreed L/C Cash Collateral Amount of all Letter of Credit Usage, as applicable, to the extent necessary so that the Aggregate Total Exposure shall not exceed (a) in the case of Section 2.08(c)(i), the Commitments; and (b) in the case of Section 2.08(c)(ii), 105% of the Commitments; in each case, then in effect (or, in the case of Letter of Credit Usage, such amounts are fully Cash Collateralized).

(d)    Any prepayment of any Loan pursuant to this Section 2.08 shall be applied as specified by the Borrower in the applicable notice of prepayment.

Section 2.09    Fees. The Borrower agrees to pay (or in the case of clause (ii), cause the Applicable Account Party to pay) to the Administrative Agent for the account of each Lender (other than any Defaulting Lender) in accordance with its Applicable Percentage (i) a commitment fee (the "**Commitment Fee**"), which shall accrue at the percentage set forth in the definition of "Applicable Rate" on the average daily difference between (x) the Revolving Commitments and (y) the aggregate principal amount of (1) all outstanding Revolving Loans *plus* (2) the Letter of Credit Usage during the period from and including the date hereof to but excluding the date on which such Revolving Commitment terminates and (ii) a Letter of Credit participation fee (the "**Letter of Credit Fee**") equal to the Applicable Rate with respect to Eurodollar Borrowings, multiplied by the average daily undrawn amount of the Letters of Credit (regardless of whether any conditions for drawing could then be met and determined as of the close of business on any date of determination). Accrued fees under this Section 2.09(a) shall be payable in arrears on the last day of March, June, September and December of each year and on the date on which the Commitments terminate, commencing on September 30, 2015; *provided* that any commitment fees accruing after the date on which the Commitments terminate shall be payable on demand. All fees under this Section 2.09(a) shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)    The Borrower agrees to pay (or cause the Applicable Account Party to pay) directly to each Issuing Bank, for its own account, the following fees:

(i)    a fronting fee equal to 0.125%, per annum based on the average daily undrawn amount on such Letters of Credit issued by such Issuing Bank; and

(ii)    such documentary and processing charges for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with such Issuing Bank's standard schedule for such charges and as in effect at the time of such issuance, amendment, transfer or payment, as the case may be.

(iii)    The fees in clause (b)(i) above shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year during the Availability Period, commencing on the first such date to occur after the Effective Date, and on the Maturity Date.

52

(c)     The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent in the Agent Fee Letter.

(d)     All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the parties specified herein. Fees paid shall not be refundable under any circumstances.

Section 2.10    Interest. The Revolving Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate *plus* the Applicable Rate.

(b)     The Revolving Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing *plus* the Applicable Rate.

(c)     The Revolving Loans comprising each EURIBOR Borrowing shall bear interest at the Adjusted EURIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(d)     The Revolving Loans comprising each HIBOR Borrowing shall bear interest at HIBOR for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(e)     The Revolving Loans comprising each SIBOR Borrowing shall bear interest at SIBOR for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(f)     The Revolving Loans comprising each Australian Bank Bill Rate Borrowing shall bear interest at the Australian Bank Bill Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(g)     The Revolving Loans comprising each Canadian BA Rate Borrowing shall bear interest at the Canadian BA Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(h)     The Revolving Loans comprising each TIBOR Borrowing shall bear interest at the Adjusted TIBOR Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(i)     Each RFR Loan shall bear interest at a rate per annum equal to the Adjusted Daily Simple RFR plus the Applicable Rate.

(j)     (h)Notwithstanding the foregoing, upon the occurrence and during the continuance of a Specified Event of Default and, at the request of Required Lenders, any other Event of Default, all overdue amounts outstanding hereunder shall bear interest, after as well as before judgment, at a rate *per annum* equal to (i) in the case of overdue principal of any Loan, 2% *plus* the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other overdue amount, 2% *plus* the rate applicable to ABR Loans as provided in paragraph (a) of this Section.

(k)     (i)Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitments; provided that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan, EURIBOR Loan, HIBOR Loan, SIBOR Loan, Australian Bank Bill Rate Loan or, Canadian BA Rate Loan or

53

TIBOR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(l)     (j)The Borrower agrees to pay to the applicable Issuing Bank, with respect to drawings honored under any Letter of Credit, interest on the amount paid by such Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of the Borrower at a rate equal to (i) for the period from the date such drawing is honored to but excluding the applicable Reimbursement Date, the rate of interest otherwise payable hereunder with respect to Loans that are ABR Loans, and (ii) thereafter, a rate which is 2% per annum in excess of the rate of interest otherwise payable hereunder with respect to Loans that are ABR Loans, Eurodollar Loans, EURIBOR Loans, HIBOR Loans, SIBOR Loans, Australian Bank Bill Rate Loans or, Canadian BA Rate Loans or TIBOR Loans (as applicable).

(m)     (k)All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the TIBOR Rate, the Daily Simple RFR with respect to Sterling or the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate, Adjusted LIBO Rate, Adjusted EURIBO Rate, HIBOR, SIBOR, Australian Bank Bill Rate or, Canadian BA Rate, Adjusted TIBOR Rate, Adjusted Daily Simple RFR or Daily Simple RFR shall be determined by the Administrative Agent or the applicable Issuing Bank, as the case may be, and such determination shall be conclusive absent manifest error.

Section 2.11    Alternate Rate of Interest; Illegality. (a) If prior to the commencement of any Interest Period for a Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing or Canadian BA Rate Borrowing:

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) (A) prior to the commencement of any Interest Period for the applicable Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate, the Adjusted EURIBO Rate, HIBOR, SIBOR, the Australian Bank Bill Rate or, the Canadian BA Rate or the Adjusted TIBOR Rate or the TIBOR Rate, as the case may be, for such Interest Period or (B) at any time, that adequate and reasonable means do not exist for ascertaining the applicable Adjusted Daily Simple RFR, Daily Simple RFR or RFR; or

(ii)     the Administrative Agent is advised by the Required Lenders that (A) prior to the commencement of any Interest Period for the applicable Borrowing, the Adjusted LIBO Rate, the Adjusted EURIBO Rate, HIBOR, SIBOR, the Australian Bank Bill Rate or the Canadian BA Rate or the Adjusted TIBOR Rate or the TIBOR Rate, as the case may be, for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period or (B) at any time, the applicable Adjusted Daily Simple RFR, Daily Simple RFR or RFR will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing; then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone, telecopy or other electronic transmission as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing or, Canadian BA Rate Borrowing or TIBOR Borrowing, as the case

54

may be, shall be ineffective and (y) if any Borrowing Request requests a Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing or, Canadian BA Rate Borrowing, TIBOR Borrowing or an RFR Borrowing, such Borrowing (x) if denominated in dollars, shall be made as an ABR Borrowing or (y) in all other cases, shall be ineffective (and no Lender shall be obligated to make a Loan on account thereof).

(b)     If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Effective Date that it is unlawful, for such Lender or its applicable lending office to make or maintain any Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing or, Canadian BA Rate Borrowing, TIBOR Borrowing or RFR Borrowing, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligations of such Lender to make or continue any Eurodollar Borrowing, EURIBOR Borrowing, HIBOR Borrowing, SIBOR Borrowing, Australian Bank Bill Rate Borrowing or, Canadian BA Rate Borrowing, TIBOR Borrowing or RFR Borrowing or to convert ABR Borrowings to Eurodollar Borrowings shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), (i) with respect to Eurodollar Loans of such Lender denominated in dollars, convert all such Eurodollar Loans of such Lender to ABR Loans, on the last of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans (in which case the Borrower shall not be required to make payments pursuant to Section 2.13 in connection with such payment) and (ii) with respect to Eurodollar Loans of such Lender denominated in a Permitted Foreign Currency, EURIBOR Loans, HIBOR Loans, SIBOR Loans, Australian Bank Bill Rate Loans and, Canadian BA Rate Loans or TIBOR Loans of such Lender, prepay all such Eurodollar Loans, EURIBOR Loans, HIBOR Loans, SIBOR Loans, Australian Bank Bill Rate Loans and/or Canadian BA Rate Loans and/or TIBOR Loans of such Lender, on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans, EURIBOR Loans, HIBOR Loans, SIBOR Loans, Australian Bank Bill Rate Loans or, Canadian BA Rate Loans or TIBOR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans (in which case the Borrower shall not be required to make payments pursuant to Section 2.13 in connection with such payment). Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted. Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the determination of such Lender, otherwise be disadvantageous to it.

Section 2.12     Increased Costs. If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or any Issuing Bank (except any such reserve requirement reflected in the Adjusted LIBO Rate or Adjusted TIBOR Rate, as applicable);

(ii)     subject the Administrative Agent, any Issuing Bank, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

55

(iii)   impose on any Lender, any Issuing Bank or the London interbank market any other condition, cost or expense (other than Taxes ~~Taxes~~) affecting this Agreement or Eurodollar Loans, EURIBOR Loans, HIBOR Loans, SIBOR Loans, Australian Bank Bill Rate Loans ~~or,~~ Canadian BA Rate Loans or TIBOR Loans made by such Lender or such Issuing Bank; and the result of any of the foregoing shall be to increase the cost to such Lender or such Issuing Bank of making, continuing, converting to or maintaining any Loan (or of maintaining its obligation to make any such Loan) or issue, amend, extend, increase or maintain in place a Letter of Credit, as the case may be, or to reduce the amount of any sum received or receivable by such Lender hereunder or such Issuing Bank (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or such Issuing Bank such additional amount or amounts as will compensate such Lender or such Issuing Bank for such additional costs incurred or reduction suffered.

(b)     If any Lender or any Issuing Bank determines that any Change in Law regarding capital adequacy or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or such Issuing Bank's capital or on the capital of such Lender's or such Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments hereunder or the Loans made by such Lender or the Letter of Credit issued by such Issuing Bank to a level below that which such Lender or such Lender's holding company or such Issuing Bank or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy or liquidity requirements), then from time to time the Borrower will pay to such Lender or such Issuing Bank such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender or an Issuing Bank setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its respective holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender or such Issuing Bank the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Failure or delay on the part of any Lender or any Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or such Issuing Bank's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or such Issuing Bank notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuing Bank's intention to claim compensation therefore; *provided, further,* that, if the Change in Law giving rise to such increased costs or reductions is retroactive (or has retroactive effect), then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.13   <u>Break Funding Payments</u>. ~~In~~ (a) With respect to Loans that are not RFR Loans, in the event of (a) the payment or prepayment of any principal of any Eurodollar Loan, EURIBOR Loan, HIBOR Loan, SIBOR Loan, Australian Bank Bill Rate Loan ~~or,~~ Canadian BA Rate Loan or TIBOR loan other than on the last day of an Interest Period applicable thereto (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise), (b) the conversion of any Eurodollar Loan, EURIBOR Loan, HIBOR Loan, SIBOR Loan, Australian Bank Bill Rate Loan~~or,~~ Canadian BA Rate Loan or TIBOR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan, EURIBOR Loan, HIBOR Loan, SIBOR Loan, Australian Bank Bill Rate Loan ~~or,~~ Canadian BA Rate Loan or TIBOR Loan on the date specified in any notice delivered

56

pursuant hereto (regardless of whether such notice may be revoked under <u>Section 2.08(b)</u> and is revoked in accordance therewith), or (d) the assignment of any Eurodollar Loan, EURIBOR Loan, HIBOR Loan, SIBOR Loan, Australian Bank Bill Rate Loan ~~or,~~ Canadian BA Rate Loan <u>or TIBOR Loan</u> other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to <u>Section 2.16</u>, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, EURIBOR Loan, HIBOR Loan, SIBOR Loan, Australian Bank Bill Rate Loan ~~or,~~ Canadian BA Rate Loan <u>or TIBOR Loan</u>, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate, the Adjusted EURIBO Rate, HIBOR, SIBOR, the Australian Bank Bill Rate ~~or,~~ the Canadian BA Rate <u>or the Adjusted TIBOR Rate</u>, as the case may be, that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

<u>(b)    With respect to RFR Loans, in the event of (i) the payment of any principal of any RFR Loan other than on the Interest Payment Date applicable thereto (including as a result of an Event of Default or an optional or mandatory prepayment of Loans), (ii) the failure to borrow or prepay any RFR Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.08(b) and is revoked in accordance therewith), (iii) the assignment of any RFR Loan other than on the Interest Payment Date applicable thereto as a result of a request by the Borrower pursuant to Section 2.16 or (iv) the failure by the Borrower to make any payment of any Loan or drawing under any Letter of Credit (or interest due thereof) denominated in a Permitted Foreign Currency on its scheduled due date or any payment thereof in a different currency, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.</u>

Section 2.14    <u>Taxes</u>. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall make such deduction or withholding and timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after making such deduction or withholding for Indemnified Taxes (including such deductions and withholdings for Indemnified Taxes applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deduction or withholding for Indemnified Taxes been made.

57

(b)    In addition, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law or, at the option of the Administrative Agent, timely reimburse it for the payment of any Other Taxes.

(c)    The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within 10 days after demand therefore, for the full amount of any Indemnified Taxes paid by the Administrative Agent or such Lender, as the case may be, or required to be withheld or deducted from any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Loan Parties have not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c)(iii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)    As soon as practicable after any payment of Indemnified Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.14(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such

58

completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, as long as the Borrower is a U.S. Person:

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender, if it is legally entitled to do so, shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be required by law or requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter as required by law or upon the reasonable request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(a) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(b) executed originals of IRS Form W-8ECI;

(c) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN-E or IRS Form W-8BEN, as applicable; or

(d) to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W8BEN-E or IRS Form W-8BEN, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or Exhibit H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of such direct or indirect partner or partners;

59

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "**FATCA**" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     If any Lender or the Administrative Agent determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party pursuant to this Section 2.14 (including the payment of additional amounts pursuant to this Section 2.14), it shall pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.14 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such applicable Loan Party, upon the request of such Lender or the Administrative Agent, as applicable, shall repay to such Lender or the Administrative Agent, as the case may be, the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Lender or the Administrative Agent, as applicable, is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will a Lender or the Administrative Agent be required to pay any amount to a Loan Party pursuant to this paragraph (g), the payment of which would place the Lender or the Administrative Agent, as applicable, in a less favorable net after-Tax position than the Lender or the Administrative Agent, as the case may be, would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph (g) shall not be construed to require any Lender or the Administrative Agent to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Loan Party or any other Person.

60

(h)    For all purposes of this Section 2.14, the term "Lender" includes and shall apply equally to the benefit of each Issuing Bank.

(i)    Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.15    Payments Generally; Pro Rata Treatment; Sharing of Set-Off. The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Sections 2.12, 2.13 or 2.14, or otherwise) prior to 1:00 p.m., New York City time, on the date when due, in immediately available funds, without set off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its Principal Office and except that payments pursuant to Sections 2.12, 2.13 or 2.14 and Section 9.03 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment or performance hereunder shall be due on a day that is not a Business Day, the date for payment or performance shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder of principal or interest in respect of any Loan or Letter of Credit shall, except as otherwise expressly provided herein, be made in the currency of such Loan or Letter of Credit; all other payments hereunder and under each other Loan Document shall be made in dollars.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)    If any Lender shall, by exercising any right of set off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with

61

respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender or any Issuing Bank shall fail to make any payment required to be made by it pursuant to Section 2.04(b) or paragraph (d) of this Section, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender or such Issuing Bank, as the case may be, to satisfy such Lender's or such Issuing Bank's, as applicable, obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.16    Mitigation Obligations; Replacement of Lenders. Before any Lender requests compensation under Section 2.12, or requires the Borrower to pay any Indemnified Tax or additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or Section 2.14, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If (i) any Lender requests compensation under Section 2.12, (ii) the Borrower is required to pay any Indemnified Tax or additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14 or (iii) any Lender gives notice pursuant to Section 2.11(b) or (iv) any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.12 or Section 2.14) and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld or delayed, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents, from the assignee (to the extent of such outstanding principal and accrued interest and fees so assigned) or the Borrower (in the case of all other amounts so assigned), (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.14, such assignment will result in a reduction in such compensation or payments or, in the case

62

of an assignment resulting from notice pursuant to Section 2.11(b), such assignment will eliminate the need for such notice, (iv) such assignment does not conflict with applicable law and (v) in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, (x) the applicable assignee shall have consented to, or shall consent to, the applicable amendment, waiver or consent and (y) the Borrower exercises its rights pursuant to this clause (b) with respect to all Non-Consenting Lenders relating to the applicable amendment, waiver or consent. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

(c)     Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender, as assignor, any Assignment and Assumption necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.16.

Section 2.17     Defaulting Lenders. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and in Section 9.02.

(ii)     Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 7 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Issuing Banks hereunder; *third*, to Cash Collateralize the Issuing Banks' Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.20(i); *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released pro rata in order to satisfy (x) such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize the Issuing Banks' future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with the procedures set forth in Section 2.20(i); *sixth*, to the payment of any amounts owing to the Lenders or the Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any Lender or any Issuing Bank against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or Letter of Credit Disbursements in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loans, and funded and unfunded participations in Letters of Credit, were made when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans and Letter of Credit

63

Disbursements to all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans or Letter of Credit Disbursements of such Defaulting Lender until such time as all Loans and funded and unfunded participations in Letter of Credit Obligations, without giving effect to Section 2.17(a)(iv), are held by the Lenders pro rata in accordance with the Revolving Commitments without giving effect to Section 2.17(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    No Defaulting Lender shall be entitled to receive any commitment fee pursuant to Section 2.09 for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)    With respect to any Commitment Fee or Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) above, the Borrower shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in Letters of Credit that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to each Issuing Bank the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such Issuing Bank's Fronting Exposure to such Defaulting Lender and (z) not be required to pay the remaining amount of any such fee.

(iii)    Reallocation of Participations to Reduce Fronting Exposure. So long as no Default or Event of Default has occurred and is continuing, all or any part of such Defaulting Lender's participation in Letters of Credit shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Revolving Commitment) but only to the extent that such reallocation does not cause the Total Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Revolving Commitment. Subject to Section 9.18, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(C)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, the Borrower shall within one Business Day following notice by the Administrative Agent, Cash Collateralize for the benefit of the applicable Issuing Bank only the Borrower's obligations corresponding to such Defaulting Lender's Letter of Credit Usage (after giving effect to any partial reallocation pursuant to clause (A) above) in accordance with the procedures set forth in Section 2.20 for so long as such Letter of Credit Usage is outstanding;

(D)    if the Borrower Cash Collateralizes any portion of such Defaulting Lender's Letter of Credit Usage pursuant to clause (B) above, the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 2.09(a)(ii) with respect to such Defaulting Lender's Letter of Credit Usage during the period such Defaulting Lender's Letter of Credit Usage is Cash Collateralized;

64

(E)     if the Letter of Credit Usage of the non-Defaulting Lenders is reallocated pursuant to clause (A) above, then the fees payable to the Lenders pursuant to <u>Section 2.09(a)(ii)</u> shall be adjusted in accordance with such non-Defaulting Lenders' Applicable Percentages; and

(F)     if all or any portion of such Defaulting Lender's Letter of Credit Usage is neither reallocated nor Cash Collateralized pursuant to clause (A) or (B) above, then, without prejudice to any rights or remedies of any Issuing Bank or any other Lender hereunder, all fees payable under <u>Section 2.09(a)(ii)</u> with respect to such Defaulting Lender's Letter of Credit Usage shall be payable to the applicable Issuing Bank until and to the extent that such Letter of Credit Usage is reallocated and/or Cash Collateralized.

(b)     If the Borrower, the Administrative Agent and the Issuing Banks agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their respective Applicable Percentages, without giving effect to <u>Section 2.17(a)(iv)</u>, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided, further,* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)     If a Bankruptcy Event with respect to a parent of any Lender shall occur following the date hereof and for so long as such event shall continue or any Issuing Bank has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, such Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless such Issuing Bank shall have entered into arrangements with the Borrower or such Lender, reasonably satisfactory to such Issuing Bank, to defease any risk to it in respect of such Lender hereunder.

Section 2.18    <u>Incremental Facility</u>. The Borrower may by written notice to the Administrative Agent elect to request, prior to the Maturity Date, one or more increases to the existing Revolving Commitments (any such increase, the "**New Commitments**"), by an aggregate amount for all New Commitments not in excess of the Incremental Available Amount (subject to <u>Section 1.07</u>, determined as of the date of effectiveness of such New Commitments) and not less than $25,000,000 individually (or such lesser amount which shall be approved by the Administrative Agent or that shall constitute the remaining amount of New Commitments permitted to be incurred pursuant to this <u>Section 2.18</u> at such time), and integral multiples of $25,000,000 in excess of that amount. Each such notice shall specify (A) the date (each, an "**Increased Amount Date**") on which Borrower proposes that the New Commitments shall be effective, which shall be a date not less than 10 Business Days (or such shorter period as the Administrative Agent may agree in its reasonable discretion) after the date on which such notice is delivered to the Administrative Agent and which may be contingent upon the closing of an acquisition or other transaction and (B) the identity of each Lender or other Person that is an eligible assignee under <u>Section 9.04(b)</u>, subject to approval thereof by the Administrative Agent and the Issuing Banks in the case of a Person that is not a Lender, to the extent such approval is required in the case of an assignment to such Person pursuant to such <u>Section 9.04(b)</u> (such approval not to be unreasonably withheld or delayed)

65

(each, a "**New Lender**"), to whom Borrower proposes any portion of such New Commitments be allocated and the amounts of such allocations (it being understood that the identity of such Lenders or other Persons may be amended after the date of such notice so long as the approval requirements, if any, are satisfied); *provided* that any Lender approached to provide all or a portion of the New Commitments may elect or decline, in its sole discretion, to provide a New Commitment. Such New Commitments shall become effective as of such Increased Amount Date; *provided* that, subject to Section 1.07 (except as set forth in the parenthetical proviso to clause (1) below), (1) on such Increased Amount Date, each of the conditions set forth in Section 4.02(a) and (b) (with references therein to the "Effective Date" being deemed to refer instead to such Increased Amount Date and, in the case of Section 4.02(b), before and after giving effect to such New Commitment) shall be satisfied (*provided* that if the proceeds of the Loans under such New Commitments are to be used to consummate a Limited Conditionality Acquisition, (x) no Specified Event of Default shall have occurred and be continuing as of the Increased Amount Date before and after giving effect to such New Commitments (it being understood that the requirements of Section 4.02(b) shall otherwise be complied with in accordance with Section 1.07) and (y) the requirements of Section 4.02(a) shall be subject to, if agreed to by the lenders providing such New Commitments, customary "SunGard" or other customary applicable "certain funds" conditionality provisions (including the accuracy of the representations and warranties contained in the applicable acquisition agreement as are material to the interests of the lenders providing such New Commitments, but only to the extent that the Borrower or any of its Affiliates has the right to terminate its obligations under such acquisition agreement as a result of the failure of such representation or warranty to be accurate)); (2) the New Commitments shall be effected pursuant to one or more Joinder Agreements executed and delivered by the Borrower, each Guarantor, if any, the New Lenders and the Administrative Agent, and each of which shall be recorded in the Register and each New Lender shall be subject to the requirements set forth in Section 2.14; (3) Borrower shall make any payments required pursuant to Sections 2.12 and 2.13 in connection with the New Commitments; and (4) Borrower shall deliver or cause to be delivered any legal opinions or other documents reasonably requested by the Administrative Agent, the New Lenders or the Issuing Banks in connection with any such transaction.

(b)     On any Increased Amount Date on which New Commitments are effective, subject to the satisfaction of the foregoing terms and conditions, (i) each of the Lenders shall assign to each of the New Lenders, and each of the New Lenders shall purchase from each of the Lenders, at the principal amount thereof (together with accrued interest), such interests in the Revolving Loans and Letter of Credit Usage outstanding on such Increased Amount Date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Revolving Loans and participation interests in Letter of Credit Usage will be held by existing Lenders and New Lenders ratably in accordance with their Revolving Commitments after giving effect to the addition of such New Commitments to the Revolving Commitments, (ii) each New Commitment shall be deemed for all purposes a Revolving Commitment and each Revolving Loan made thereunder (a "**New Loan**") shall be deemed, for all purposes, a Revolving Loan, and (iii) each New Lender shall become a Lender for all purposes hereunder.

(c)     The Administrative Agent shall notify the Lenders promptly upon receipt of the Borrower's notice of each Increased Amount Date and in respect thereof (i) the New Commitments and the New Lenders, and (ii) the respective interests in such Lender's Revolving Loans and participation interests in Letter of Credit Usage, in each case subject to the assignments contemplated by this Section 2.18.

(d)     The terms and provisions (including pricing) of the New Loans shall be identical to the existing Loans. For the avoidance of doubt, and without limiting the generality of the foregoing, (x) the New Loans will not be guaranteed by any Person other than (1) the Guarantors or (2) any Person that

66

shall, substantially concurrently with the incurrence of such New Loans, become a Guarantor and (y) the New Loans will not be secured by any assets not constituting the Collateral, unless such assets are substantially concurrently pledged to secure the Secured Obligations on an equal and ratable basis. Notwithstanding anything in Section 9.02 to the contrary, each Joinder Agreement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to effect the provisions of this Section 2.18.

Section 2.19    Extension of the Maturity Date. Not earlier than 60 days prior to, nor later than 10 Business Days prior to, the Maturity Date, the Borrower may, upon written notice (the "**Extension Notice**") to the Administrative Agent (which shall promptly notify the Lenders), request an extension of the Maturity Date for up to one year; *provided* that no more than two such extensions may be requested pursuant to this Section 2.19. If the conditions in this Section 2.19 are met, the Maturity Date shall be extended to the date specified in such Extension Notice (which in no event shall be later than one year following the Maturity Date) for all Extending Lenders. If a Lender agrees, in its individual and sole discretion, to so extend its Revolving Commitment (an "**Extending Lender**"), it shall deliver to the Administrative Agent a written notice of its agreement to do so no later than 15 days after the date the applicable Extension Notice is received by the Administrative Agent (or such later date to which the Borrower and the Administrative Agent shall agree), and the Administrative Agent shall promptly thereafter notify the Borrower of such Extending Lender's agreement to extend its Revolving Commitment (confirming the date of extension and the new Maturity Date (after giving effect to such extension) applicable to such Extending Lender). The Revolving Commitment of any Lender that fails to accept or respond to the Borrower's request for extension of the Maturity Date (a "**Declining Lender**") shall be terminated on the Maturity Date then in effect for such Lender (without regard to any extension by other Lenders) and on such Maturity Date the Borrower shall pay in full the unpaid principal amount of all Loans owing to such Declining Lender, together with all accrued and unpaid interest thereon and all fees accrued and unpaid under this Agreement to the date of such payment of principal and all other amounts due to such Declining Lender under this Agreement. The Administrative Agent shall promptly notify each Extending Lender of the aggregate Revolving Commitments of the Declining Lenders. Each Extending Lender may offer to increase its respective Revolving Commitment by an amount not to exceed the aggregate amount of the Declining Lenders' Revolving Commitments, and such Extending Lender shall deliver to the Administrative Agent a notice of its offer to so increase its Revolving Commitment no later than 30 days after the date the applicable Extension Notice is received by the Administrative Agent (or such later date to which the Borrower and the Administrative Agent shall agree). To the extent the aggregate amount of additional Revolving Commitments that the Extending Lenders offer pursuant to the preceding sentence exceeds the aggregate amount of the Declining Lenders' Revolving Commitments, such additional Revolving Commitments shall be reduced on a pro rata basis. To the extent the aggregate amount of Revolving Commitments that the Extending Lenders have so offered to extend is less than the aggregate amount of Revolving Commitments that the Borrower has so requested to be extended, the Borrower shall have the right but not the obligation to require any Declining Lender to (and any such Declining Lender shall) assign in full its rights and obligations under this Agreement to one or more banks or other financial institutions (which may be, but need not be, one or more of the Extending Lenders) which at the time agree to, in the case of any such Person that is an Extending Lender, increase its Revolving Commitment and in the case of any other such Person (a "**New Extending Lender**"), become a party to this Agreement; *provided* that (i) such assignment is otherwise in compliance with Section 9.04, (ii) such Declining Lender receives payment in full of the unpaid principal amount of all Revolving Loans owing to such Declining Lender, together with all accrued and unpaid interest thereon and all fees accrued and unpaid under this Agreement to the date of such payment of principal and all other amounts due to such Declining Lender under this Agreement and (iii) any such

67

assignment shall be effective on the date on or before the date the Maturity Date is so extended as may be specified by the Borrower and agreed to by the respective New Extending Lenders and Extending Lenders, as the case may be, and the Administrative Agent. As a condition precedent to such extension, the Borrower shall deliver to the Administrative Agent a certificate of the Borrower, dated as of the date of the Extension Notice, signed by a Responsible Officer of the Borrower (i) certifying and attaching the resolutions adopted by the Borrower and the Guarantors approving or consenting to such extension and (ii) certifying that, before and after giving effect to such extension, each of the conditions of Section 4.02 shall be satisfied as of the date of the Extension Notice. Any extension pursuant to this Section 2.19 shall be effected pursuant to an Extension Agreement executed and delivered by the Borrower, the Extending Lenders, any New Extending Lenders and the Administrative Agent. Each Extension Agreement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate in the opinion of the Administrative Agent to effect the provision of this Section 2.19.

Section 2.20    Letters of Credit.

(a)    Letters of Credit. During the Availability Period, subject to the terms and conditions hereof, the Issuing Banks agree to issue Letters of Credit (or amend, extend or increase an outstanding Letter of Credit) at the request and for the account of the Borrower or any Subsidiary (the "**Applicable Account Party**") in the aggregate Dollar Equivalent up to but not exceeding the Letter of Credit Sublimit and denominated in dollars or in a Permitted Foreign Currency; *provided* (i) the stated amount of each Letter of Credit shall not be less than $100,000 for Letters of Credit issued in dollars (or, in the case of a Letter of Credit issued in a Permitted Foreign Currency, the smallest amount of such Permitted Foreign Currency that is an integral of 100,000 units of such currency and that has a Dollar Equivalent in excess of $100,000) or, in each case, such lesser amount as is acceptable to the applicable Issuing Bank; (ii) after giving effect to such issuance or increase, in no event shall (x) the Aggregate Total Exposure exceed the Revolving Commitments then in effect or (y) any Lender's Total Exposure exceed such Lender's Revolving Commitment; (iii) after giving effect to such issuance or increase, in no event shall the Letter of Credit Usage exceed the Letter of Credit Sublimit then in effect, (iv) after giving effect to such issuance or increase, unless otherwise agreed to by the applicable Issuing Bank in writing, in no event shall the Letter of Credit Usage with respect to the Letters of Credit issued by such Issuing Bank exceed the Letter of Credit Issuer Sublimit of such Issuing Bank then in effect, and (v) in no event shall any Letter of Credit have an expiration date later than the earlier of (A) the fifth Business Day prior to the Maturity Date and (B) the date which is twelve months from the original date of issuance of such Letter of Credit. Subject to the foregoing, the applicable Issuing Bank may agree that a Letter of Credit will automatically be extended for one or more successive periods not to exceed one year each, unless the applicable Issuing Bank elects not to extend for any such additional period and provides notice to that effect to the Borrower and the Applicable Account Party; *provided* that such Issuing Bank shall not extend any such Letter of Credit if it has received written notice that an Event of Default has occurred and is continuing at the time such Issuing Bank must elect to allow such extension; *provided, further,* if any Lender is a Defaulting Lender, the Issuing Banks shall not be required to issue, amend, extend or increase any Letter of Credit unless the applicable Issuing Bank has entered into arrangements satisfactory to it and the Borrower to eliminate such Issuing Bank's risk with respect to the participation in Letters of Credit of such Defaulting Lender, including by Cash Collateralizing such Defaulting Lender's Applicable Percentage of the Letter of Credit Usage at such time on terms satisfactory to the applicable Issuing Bank. Unless otherwise expressly agreed by the applicable Issuing Bank, the Borrower and the Applicable Account Party when a Letter of Credit is issued, the rules of the ISP 98 shall apply to each Letter of Credit.

68

(b)    Notice of Issuance. Whenever an Applicable Account Party desires the issuance or amendment of a Letter of Credit, it shall deliver to each of the Administrative Agent and the applicable Issuing Bank an Application in use by the applicable Issuing Bank at that time no later than 1:00 p.m. (New York City time) at least five Business Days in advance of the proposed date of issuance or amendment or such shorter period as may be agreed to by the applicable Issuing Bank in any particular instance. Such Application shall be accompanied by documentary and other evidence of the proposed beneficiary's identity as may reasonably be requested by the applicable Issuing Bank to enable the applicable Issuing Bank to verify the beneficiary's identity or to comply with any applicable laws or regulations, including, without limitation, the USA PATRIOT Act or as otherwise customarily requested by the applicable Issuing Bank and shall specify the currency of such Letter of Credit. Upon satisfaction or waiver of the conditions set forth in Section 4.02 and subject to the terms and conditions set forth in this Section 2.20, the applicable Issuing Bank shall issue, amend, extend or increase the requested Letter of Credit subject to no violation of any of, and only in accordance with, the Issuing Bank's standard operating procedures as in effect from time to time. If a Letter of Credit is requested in a currency other than dollars, the Issuing Bank shall not be required to issue such Letter of Credit if it does not issue Letters of Credit in such currency as of the requested issuance date. Upon the issuance of any Letter of Credit or amendment, extension or increase thereof, the applicable Issuing Bank shall promptly notify the Administrative Agent, and the Administrative Agent shall promptly notify each Lender with a Revolving Commitment of such issuance, which notice from the Administrative Agent shall be accompanied by a copy of such Letter of Credit or amendment, extension or increase thereof and the amount of such Lender's respective participation in such Letter of Credit pursuant to Section 2.20(e).

(c)    Responsibility of the Issuing Banks With Respect to Requests for Drawings and Payments. In determining whether to honor any drawing under any Letter of Credit by the beneficiary(ies) thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the applicable Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit. As between the Borrower, the Applicable Account Party and the applicable Issuing Bank, the Borrower and the Applicable Account Party assume all risks of the acts and omissions of, or misuse of the Letters of Credit issued by the applicable Issuing Bank, by the respective beneficiaries of such Letters of Credit; provided, however, the foregoing does not limit any of the Borrower's or the Applicable Account Party's rights against any such beneficiary. In furtherance and not in limitation of the foregoing, an Issuing Bank shall not be responsible or have any liability for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by any beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; (viii) for any other action or inaction taken or suffered by such Issuing Bank under or in connection with any such Letter of Credit, if required or permitted under any applicable domestic or foreign law of letter of credit practice; or (ix) any

69

consequences arising from causes beyond the control of such Issuing Bank, including any Governmental Acts; none of the above shall affect or impair, or prevent the vesting of, any of such Issuing Bank's rights or powers hereunder or place such Issuing Bank under any liability to the Borrower. Without limiting the foregoing and in furtherance thereof, any action taken or omitted by an Issuing Bank under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in "good faith" (as such term is defined in Article 5 of the New York Uniform Commercial Code), shall not give rise to any liability on the part of the Issuing Bank to the Borrower or any party to this Agreement. Notwithstanding anything to the contrary contained in this <u>Section 2.20(c)</u>, the applicable Issuing Bank shall not be excused from liability to the Borrower or the Applicable Account Party to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower or the Applicable Account Party that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence, bad faith or willful misconduct on the part of the Issuing Bank (as determined by a final, non-appealable judgment of a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised care in each such determination.

(d)    <u>Reimbursement by the Borrower of Amounts Drawn or Paid Under Letters of Credit</u>. In the event the applicable Issuing Bank has determined to honor a drawing under a Letter of Credit, it shall promptly notify the Borrower, the Applicable Account Party and the Administrative Agent, and the Borrower shall reimburse (or cause the Applicable Account Party to reimburse) the applicable Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the "**Reimbursement Date**") in an amount in immediately available funds equal to the amount of such honored drawing, together with interest at the applicable rate provided in <u>Section 2.1(i)</u>. If the Borrower or the Applicable Account Party fails to timely reimburse the applicable Issuing Bank on the Reimbursement Date, then (A) if the Unreimbursed Amount relates to a Letter of Credit denominated in a currency other than dollars or Euros, automatically and with no further action, the obligation to reimburse such Unreimbursed Amount shall be permanently converted into an obligation to reimburse the Dollar Equivalent, determined using the Exchange Rate calculated as of the date when such payment was due, of such Unreimbursed Amount and (B) the Administrative Agent shall promptly notify each Lender of the Reimbursement Date, the currency and amount of the unreimbursed drawing (the "**Unreimbursed Amount**") (and the Dollar Equivalent thereof if the immediately preceding clause (A) is applicable), and the amount of such Lender's Applicable Percentage thereof. In such event, the Borrower shall be deemed to have requested ABR Loans to be disbursed on the Reimbursement Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in <u>Section 2.02</u> for the principal amount of ABR Loans, but subject to the amount of the unutilized portion of the Revolving Commitments and the conditions set forth in <u>Section 4.02</u> (other than the delivery of a Borrowing Request). Any notice given by an Issuing Bank or the Administrative Agent pursuant to this <u>Section 2.20(d)</u> may be given by telephone if immediately confirmed in writing (which confirmation may be by telecopy or other electronic transmission); *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice. Anything contained herein to the contrary notwithstanding, (i) unless the Borrower (or the Applicable Account Party) shall have notified the Administrative Agent and the applicable Issuing Bank prior to 1:00 p.m. (New York City time) on the date such drawing is honored that the Borrower (or the Applicable Account Party) intends to reimburse the applicable Issuing Bank on such date for the amount of such honored drawing with funds other than the proceeds of Revolving Loans, the Borrower shall be deemed to have given a timely Borrowing Request to the Administrative Agent requesting Lenders with Revolving Commitments to make Revolving Loans that are ABR Loans on the Reimbursement Date in an amount equal to the amount of

70

such honored drawing, and (ii) subject to satisfaction or waiver of the conditions specified in Section 4.02, Lenders with Revolving Commitments shall, on the Reimbursement Date, make Revolving Loans that are ABR Loans in the amount of the Dollar Equivalent (determined in accordance with Section 1.06) of such honored drawing, the proceeds of which shall be applied directly by the Administrative Agent to reimburse the applicable Issuing Bank for the amount of such honored drawing; and *provided, further,* if for any reason proceeds of Revolving Loans are not received by the applicable Issuing Bank on the Reimbursement Date in an amount equal to the amount of such honored drawing, the Borrower shall (or shall cause the Applicable Account Party to) reimburse the applicable Issuing Bank, on demand, in an amount in immediately available funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Revolving Loans, if any, which are so received. Nothing in this Section 2.20(d) shall be deemed to relieve any Lender with a Revolving Commitment from its obligation to make Revolving Loans on the terms and conditions set forth herein, and the Borrower shall retain any and all rights it may have against any such Lender resulting from the failure of such Lender to make such Revolving Loans under this Section 2.20(d).

(e)        Lenders' Purchase of Participations in Letters of Credit. Immediately upon the issuance or increase of each Letter of Credit, without any further action by any Person, the applicable Issuing Bank shall be deemed to have sold to each Lender and each Lender shall have been deemed to have purchased from such Issuing Bank a participation in such Letter of Credit and any drawings honored thereunder in an amount equal to such Lender's Applicable Percentage (with respect to the Revolving Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder (each such Lender purchasing a participation, a "**Participating Lender**"). In the event that the Borrower or the Applicable Account Party shall fail for any reason to reimburse the applicable Issuing Bank as provided in Section 2.20(d), the applicable Issuing Bank shall promptly notify the Administrative Agent who will notify each Participating Lender of the unreimbursed amount of such honored drawing and of such Lender's respective participation therein based on such Lender's Applicable Percentage of the Revolving Commitments. Each Participating Lender shall make available to the Administrative Agent, for the account of the applicable Issuing Bank, an amount equal to its respective participation, and in immediately available funds, no later than 1:00 p.m. (New York City time) on the first Business Day (under the laws of the jurisdiction in which the Principal Office of the Administrative Agent is located) after the date notified by the applicable Issuing Bank. In the event that any Participating Lender fails to make available to the Administrative Agent on such Business Day the amount of such Lender's participation in such Letter of Credit as provided in this Section 2.20(e), the applicable Issuing Bank shall be entitled to recover such amount on demand from such Lender together with interest thereon for three Business Days at the rate customarily used by such Issuing Bank for the correction of errors among banks and thereafter at the Alternate Base Rate. Nothing in this Section 2.20(e) shall be deemed to prejudice the right of any Participating Lender to recover from the applicable Issuing Bank any amounts made available by such Lender to the applicable Issuing Bank pursuant to this Section 2.20 in the event that the payment with respect to a Letter of Credit in respect of which payment was made by such Lender constituted gross negligence, bad faith or willful misconduct (as determined by a final, non-appealable judgment of a court of competent jurisdiction) on the part of such Issuing Bank. Each Lender acknowledges and agrees that its obligation to fund participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, extension, or increase of any Letter of Credit, the occurrence and continuance of a Default, any reduction or termination of the Commitments or any force majeure or other event that under any rule of law or uniform practices to which any Letter of Credit is subject (including Rule 3.13 and Rule 3.14 of ISP 98) permits a drawing to be made under such Letter of Credit after the expiration thereof or after the expiration or termination of the Commitments or any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including those set forth in the following paragraph (f), and

71

that each such payment shall be made without any defense, offset, abatement, withholding or reduction whatsoever. Each Lender further acknowledges and agrees that, in issuing, amending, extending, or increasing any Letter of Credit, the applicable Issuing Bank shall be entitled to rely, and shall not incur any liability for relying, upon the representations and warranties of the Borrower deemed made pursuant to Section 4.02, unless, at least one Business Day prior to the time such Letter of Credit is issued, amended, extended, or increased (or, in the case of an automatic extension permitted pursuant to paragraph (a) of this Section, at least one Business Day prior to the time by which the election not to extend must be made by the applicable Issuing Bank), the Required Lenders shall have notified the applicable Issuing Bank (with a copy to the Administrative Agent) in writing that, as a result of one or more events or circumstances described in such notice, one or more of the conditions precedent set forth in Section 4.02(a) or 4.02(b) would not be satisfied if such Letter of Credit were then issued, amended, extended, or increased (it being understood and agreed that, in the event any Issuing Bank shall have received any such notice, no Issuing Bank shall have any obligation to issue, amend, extend, or increase any Letter of Credit until and unless it shall be satisfied that the events and circumstances described in such notice shall have been cured or otherwise shall have ceased to exist). In the event the applicable Issuing Bank shall have been reimbursed by other Lenders pursuant to this Section 2.20(e) for all or any portion of any drawing honored by such Issuing Bank under a Letter of Credit, such Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under this Section 2.20(e) with respect to such honored drawing such Lender's Applicable Percentage of all payments subsequently received by such Issuing Bank from the Borrower or the Applicable Account Party in reimbursement of such honored drawing when such payments are received. Any such distribution shall be made to a Lender at its primary address set forth below its name on the Administrative Questionnaire or at such other address as such Lender may request.

(f)    Obligations Absolute. The obligation of the Borrower and each Applicable Account Party to reimburse each Issuing Bank for drawings honored under the Letters of Credit issued by it and to repay any Revolving Loans made by Lenders pursuant to Section 2.20(d) and the obligations of Lenders under Section 2.20(e) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (1) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set off, defense or other right which the Borrower, any Applicable Account Party or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), any Issuing Bank, any Lender or any other Person or, in the case of a Lender, against the Borrower, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between the Borrower or one of its Subsidiaries and the beneficiary(ies) for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by the applicable Issuing Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower, any Applicable Account Party or any Subsidiaries or any other Person; (vi) any breach hereof or any other Loan Document by any party hereto or thereto; (vii) any force majeure or other event that under any rule of law or uniform practices to which any Letter of Credit is subject (including Rule 3.13 and Rule 3.14 of ISP 98) permits a drawing to be made under such Letter of Credit after the expiration thereof or after the expiration or termination of the Commitments, (viii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (ix) the fact that an Event of Default or a Default shall have occurred and be continuing.

72

(g)     Indemnification. Without duplication of any obligation of the Borrower under Section 9.03, in addition to amounts payable as provided herein, the Borrower hereby agrees to protect, indemnify, pay and save and hold harmless the Issuing Banks from and against any and all claims, demands, liabilities, damages and losses, and all reasonable and documented costs, charges and out-of-pocket expenses (including reasonable fees, out-of-pocket expenses and disbursements of one primary counsel (with exceptions for conflicts of interest), one regulatory counsel and one local counsel in each relevant jurisdiction), which the Issuing Banks may incur or be subject to as a consequence, direct or indirect, of, or arising out of, in any way being connected with, or as a result of (A) any Letter of Credit, including without limitation, the use of the proceeds therefrom and any refusal by any Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, other than as a result of the gross negligence, bad faith or willful misconduct of such Issuing Bank as determined by a final, non-appealable judgment of a court of competent jurisdiction or (B) the failure of the applicable Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act. The Borrower will pay all amounts owing under this Section promptly after written demand therefor.

(h)     Resignation and Removal of an Issuing Bank. An Issuing Bank may resign as an Issuing Bank by providing at least 60 days prior written notice to the Administrative Agent, the Lenders and the Borrower. An Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank (provided that no consent will be required if the replaced Issuing Bank has no Letters of Credit or reimbursement obligations with respect thereto outstanding), the other Issuing Banks, if any, and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of such Issuing Bank. At the time any such replacement or resignation shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced or resigning Issuing Bank. From and after the effective date of any such replacement or resignation, (i) any successor Issuing Bank shall have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. At the time any such resignation or replacement shall become effective, (a) the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.09 and (b) the replaced Issuing Bank may at its option remain a party hereto to the extent that Letters of Credit issued by it remain outstanding and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement or resignation. After the replacement or resignation of an Issuing Bank hereunder, the replaced Issuing Bank shall not be required to issue, amend, extend or increase any Letters of Credit.

(i)     Cash Collateral. If any Event of Default shall occur and be continuing, on the Business Day that the Borrower receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Lenders with Letter of Credit Usage representing greater than 50% of the total Letter of Credit Usage) demanding the deposit of Cash Collateral pursuant to this paragraph, the Borrower shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders and the Issuing Banks, an amount in cash equal to the Agreed L/C Cash Collateral Amount plus any accrued and unpaid interest thereon; provided that (1) any such required Cash Collateral shall be made in dollars unless such Cash Collateral is attributable to undrawn Letters of Credit denominated in a Permitted Foreign Currency or outstanding Letter of Credit Disbursements made in a Permitted Foreign Currency (in which cash such Cash Collateral shall be deposited in the applicable Permitted Foreign Currency in an amount equal to the Agreed L/C Cash Collateral Amount of such undrawn Letters of Credit or outstanding Letter of Credit Disbursements) and

73

(ii) the obligation to deposit such Cash Collateral shall become effective immediately, and such Cash Collateral shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in Section 7.01(h), (i) or (j). Such Cash Collateral shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such Cash Collateral, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such Cash Collateral shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse each Issuing Bank for any disbursements under Letters of Credit made by it and for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the Letter of Credit Usage at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Lenders with Letter of Credit Usage representing greater than 50% of the total Letter of Credit Usage), be applied to satisfy other obligations of the Borrower under this Agreement. If the Borrower is required to provide an amount of Cash Collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower (or as otherwise ordered by a court of competent jurisdiction) within five Business Days after all Events of Default have been cured or waived.

(j)    Application. To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 2.20, the provisions of this Section 2.20 shall apply.

Section 2.21    ~~LIBOR Successor Rate~~ Effect of Benchmark Transition Event

(a)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document~~, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to~~ ~~replace the Adjusted LIBO Rate with a Benchmark Replacement. Any such amendment with respect to~~ if:

(i)    (A) a Benchmark Transition Event or, as the case may be, an Early Opt-in Election and (B) a Benchmark Replacement Date with respect thereto have occurred prior to the Reference Time in connection with any setting of the then-current Benchmark, then:

(1)    if a Benchmark Replacement is determined in accordance with clause (1) or (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace the then-current Benchmark for all purposes under this Agreement and under any other Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without requiring any amendment to, or requiring any further action by or consent of any other party to, this Agreement or any other Loan Document

(2)    if a Benchmark ~~Transition Event will become effective at 5:00 p.m.~~ Replacement is determined in accordance with clause (3) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace the then-current Benchmark for all purposes under this Agreement and under any other Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New

74

York City time) on the fifth (5th) Business Day after the ~~Administrative Agent has posted such proposed amendment to all Lenders and the Borrower~~ date notice of such Benchmark Replacement is provided to the Lenders without requiring any amendment to, or requiring any further action by or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such ~~amendment~~ Benchmark Replacement from Lenders comprising the Required Lenders ~~provided that, with respect to any such amendment to replace LIBO Rate with a Benchmark Replacement, Lenders shall (i) not be entitled to object to any Benchmark Replacement based on SOFR and (ii) if the Benchmark Replacement is based on SOFR, only be entitled to object to the Benchmark Replacement Adjustment with respect thereto. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of the Adjusted LIBO Rate with a Benchmark Replacement pursuant to this Section titled "Effect of Benchmark Transition Event" will occur prior to the applicable Benchmark Transition Start Date.~~ of each Class; or

(ii)    (A) a Benchmark Transition Event or, as the case may be, an Early Opt-in Election and the Benchmark Replacement Date with respect thereto has already occurred prior to the Reference Time for any setting of the then-current Benchmark and as a result the then-current Benchmark is being determined in accordance with clauses (2) or (3) of the definition of "Benchmark Replacement"; and

(B) the Administrative Agent subsequently determines, in its sole discretion, that (w) Term SOFR and a Benchmark Replacement Adjustment with respect thereto is or has becomes available and the Benchmark Replacement Date with respect thereto has occurred, (x) there is currently a market for U.S. dollar-denominated syndicated credit facilities utilizing Term SOFR as a Benchmark and for determining the Benchmark Replacement Adjustment with respect thereto, (y) Term SOFR is being recommended as the Benchmark for U.S. dollar-denominated syndicated credit facilities by the Relevant Government Authority and (z) in any event, Term SOFR, the Benchmark Replacement Adjustment with respect thereto and the application thereof is administratively feasible for the Administrative Agent (as determined by the Administrative Agent in its sole discretion),

then, upon the occurrence of the foregoing conditions and the delivery of a notice by the Administrative Agent to the parties hereto of the occurrence of such conditions, clause (1) of the definition of "Benchmark Replacement" will, without requiring any amendment to, or requiring any further action by or consent of any other party to, this Agreement or any other Loan Document, replace such then-current Benchmark for all purposes hereunder and under any other Loan Document in respect of such Benchmark setting and subsequent Benchmark settings on and from the beginning of the next Interest Period or, as the case may be, Available Tenor so long as the Administrative Agent notifies the Borrower and the Lenders prior to the commencement of such next Interest Period or, as the case may be, Available Tenor.

(b)    <u>Benchmark Replacement Conforming Changes</u>. In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without requiring any further action by or consent of any other party to this Agreement or any other Loan Document.

75

(c) <u>Notices; Standards for Decisions and Determinations</u>. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of <u>(A)</u> a Benchmark Transition Event or<u>, as the case may be,</u> an Early Opt-in Election<s>, as applicable.</s> and <s>its related</s><u>(B) the</u> Benchmark Replacement Date <s>and Benchmark Transition Start Date</s> <u>with respect thereto</u>, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes <s>and</s>, (iv) <u>the removal or reinstatement of any tenor of a Benchmark pursuant to clause (d) below and (v)</u> the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or<u>, if applicable, any Lender (or group of</u> Lenders<u>)</u> pursuant to this Section <s>titled "Effect of Benchmark Transition Event,</s> including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action <u>or any selection</u>, will be conclusive and binding absent manifest error and may be made in its <u>(</u>or their<u>)</u> sole discretion and without consent from any other party <s>hereto</s> <u>to this Agreement or any other Loan Document</u>, except, in each case, as expressly required pursuant to this Section<s> titled "Effect of Benchmark Transition Event."</s> <u>2.21</u>.

<u>(d)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or the Adjusted LIBO Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.</u>

(e) <s>(d)</s> <u>Benchmark Unavailability Period</u>. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Eurodollar Borrowing of, conversion to or continuation of Eurodollar Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans. During any Benchmark Unavailability Period <u>or at any time that a tenor for the then-current Benchmark is not an Available Tenor,</u> the component of ABR based upon the <s>Adjusted LIBO Rate</s> <u>then-current Benchmark or such tenor for such Benchmark, as applicable,</u> will not be used in any determination of ABR.

ARTICLE 3
<u>REPRESENTATIONS AND WARRANTIES</u>

The Borrower represents and warrants to the Lenders and the Issuing Banks that:

76

Section 3.01    <u>Organization; Powers</u>. Each of the Borrower and its Restricted Subsidiaries is duly organized and validly existing. Each of the Borrower and its Restricted Subsidiaries (other than any Immaterial Subsidiary) is (to the extent the concept is applicable in such jurisdiction) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required. None of the Borrower and its Restricted Subsidiaries is an EEA Financial Institution.

Section 3.02    <u>Authorization; Enforceability</u>. The Transactions are within the Borrower's and each Guarantor's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, equity holder action. Each of the Borrower and the Guarantors has duly executed and delivered each of the Loan Documents to which it is party, and each of such Loan Documents constitute its legal, valid and binding obligations, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    <u>Governmental Approvals; No Conflicts</u>. The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings of UCC financing statements, filings with the USPTO and the USCO and the taking of the other actions required to perfect the security interests granted pursuant to the Security Documents, and (iii) those approvals, consents, registrations, filings or other actions, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect, (b) except as could not reasonably be expected to have a Material Adverse Effect, will not violate any applicable law or regulation or any order of any Governmental Authority, (c) will not violate any charter, by-laws or other organizational document of the Borrower or any of its Restricted Subsidiaries, (d) except as could not reasonably be expected to have a Material Adverse Effect, will not violate or result in a default under any indenture, agreement or other instrument (other than the agreements and instruments referred to in clause (c)) binding upon the Borrower or any of its Restricted Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Restricted Subsidiaries and (e) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Restricted Subsidiaries.

Section 3.04    <u>Financial Condition; No Material Adverse Change</u>. The Borrower has heretofore furnished to the Administrative Agent its consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal years ended (x) December 31, 2014 and December 31, 2013, in each case, audited by PricewaterhouseCoopers, independent public accountants and (y) December 31, 2012 audited by Deloitte LLP, independent public accountants and (ii) as of and for the fiscal quarter ended March 31, 2015. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Restricted Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end adjustments in the case of the unaudited financial statements referred to in clause (ii) above and the absence of footnotes in the case of the unaudited and draft financial statements referred to in clauses (i) and (ii) above.

(b)    Since December 31, 2014, no event, development or circumstance exists or has occurred that has had or could reasonably be expected to have a material adverse effect on (x) the business, property, financial condition or results of operations of the Borrower and its Restricted Subsidiaries, taken

77

as a whole, (y) the rights of or remedies available to the Agents and the Lenders under this Agreement, any Guaranty, any Holdings Guaranty or, as of the Amendment No. 4 Effective Date, any Security Document or (z) on the ability of the Borrower to consummate the Transactions.

Section 3.05    Properties. Each of the Borrower and its Restricted Subsidiaries has good title to, or valid leasehold interests in or rights to use, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

(b)    Each of the Borrower and its Restricted Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents, software, domain names, trade secrets, know-how and other similar proprietary or intellectual property rights, including any registrations and applications for registration of, and all goodwill associated with, the foregoing, material to or necessary to its business as currently conducted, and the operation of such business or the use of any of the foregoing intellectual property rights by the Borrower and its Restricted Subsidiaries does not infringe upon, misappropriate, or otherwise violate the rights of any other Person, except for any such infringements, misappropriations, or violations that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.06    Litigation and Environmental Matters. There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any of its Restricted Subsidiaries (i) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement, any other Loan Document or the Transactions.

(b)    Except with respect to any matter that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither the Borrower nor any of its Restricted Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, or (iii) has received notice of any claim with respect to any Environmental Liability.

Section 3.07    Compliance with Laws and Agreements; No Default. Each of the Borrower and its Restricted Subsidiaries is in compliance with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

Section 3.08    Investment Company Status. None of the Borrower or any Restricted Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 3.09    Margin Stock. None of the Borrower or any Restricted Subsidiary is engaged in the business of purchasing or carrying, or extending credit for the purpose of purchasing or carrying, margin stock (within the meaning of Regulation U issued by the Board), and no proceeds of any Loan or any Letter of Credit will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock in violation of Regulation U or Regulation X issued by the Board and all official rulings and interpretations thereunder or thereof.

P-02346-0250

Section 3.10   Taxes. Except as could not reasonably be expected to result in a Material Adverse Effect, (i) each of the Borrower and its Restricted Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed with respect to income, properties or operations of the Borrower and its Restricted Subsidiaries, (ii) such returns accurately reflect in all material respects all liability for Taxes of the Borrower and its Subsidiaries as a whole for the periods covered thereby and (iii) each of the Borrower and its Restricted Subsidiaries has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and, to the extent required by GAAP, for which the Borrower or such Restricted Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP.

Section 3.11   ERISA. Schedule 3.11 to the Disclosure Letter sets forth each Plan as of the Effective Date. Each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply could not reasonably be expected to result in a Material Adverse Effect. Each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and, nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that would materially adversely affect the issuance of a favorable determination letter or otherwise materially adversely affect such qualification). No ERISA Event has occurred, or is reasonably expected to occur, other than as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)     There exists no Unfunded Pension Liability with respect to any Plan, except as could not reasonably be expected to result in a Material Adverse Effect.

(c)     None of the Borrower, any Restricted Subsidiary or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the five calendar years immediately preceding the date this assurance is given or deemed given, made or accrued an obligation to make contributions to any Multiemployer Plan.

(d)     There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Borrower, any Restricted Subsidiary or any ERISA Affiliate, threatened, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to result in a Material Adverse Effect.

(e)     The Borrower, its Restricted Subsidiaries and its ERISA Affiliates have made all contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a Plan or Multiemployer Plan save where any failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(f)     No Plan which is subject to Section 412 of the Code or Section 302 of ERISA has applied for or received an extension of any amortization period, within the meaning of Section 412 of the Code or Section 302 or 304 of ERISA. The Borrower, any Restricted Subsidiary, and any ERISA Affiliate have not ceased operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA,

withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions. None of the Borrower, any Restricted Subsidiary or any ERISA Affiliate have incurred or reasonably expect to incur any liability to PBGC except as could not reasonably be expected to result in material liability, save for any liability for premiums due in the ordinary course or other liability which could not reasonably be expected to result in material liability, and no lien imposed under the Code or ERISA on the assets of the Borrower or any Restricted Subsidiary or any ERISA Affiliate exists or, to the knowledge of the Borrower, is likely to arise on account of any Plan. None of the Borrower, any Restricted Subsidiary or any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(g)     Each Non-U.S. Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, except as could not reasonably be expected to result in a material liability. All contributions required to be made with respect to a Non-U.S. Plan have been timely made, except as could not reasonably be expected to result in a Material Adverse Effect. Neither the Borrower nor any of its Restricted Subsidiaries has incurred any material obligation in connection with the termination of, or withdrawal from, any Non-U.S. Plan. The present value of the accrued benefit liabilities (whether or not vested) under each Non-U.S. Plan, determined as of the end of the Borrower's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Non-U.S. Plan allocable to such benefit liabilities, except as could not reasonably be expected to result in a Material Adverse Effect.

(h)     The Borrower represents and warrants as of the Effective Date that the assets of Borrower involved in the transactions contemplated by this Agreement do not constitute "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans.

Section 3.12     Disclosure. All written information and data provided in formal presentations or in any meeting with Lenders, and oral information provided in scheduled diligence calls held on June 9, 2015 from 11:00 am to 12:00 pm (New York City time); June 10, 2015 from 2:30 pm to 3:30 pm (New York City time); June 15, 2015 from 3:30 pm to 4:00 pm (New York City time); and June 16, 2015 from 3:00 pm to 3:30 pm (New York City time) (other than any projected financial information and other forward-looking information and other than information of a general economic or industry specific nature) furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder, as modified or supplemented by other information so furnished and when taken as a whole does not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to any projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished (it being understood that such projected financial information is subject to significant uncertainties and contingencies, any of which are beyond the Borrower's control, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projected financial information may differ significantly from the projected results and such differences may be material).

Section 3.13     Subsidiaries. Schedule 3.13 to the Disclosure Letter sets forth as of the Effective Date a list of all Subsidiaries and the percentage ownership (directly or indirectly) of the Borrower therein. Except as could not, individually or in the aggregate, reasonably be expected to result in a

80

Material Adverse Effect, the shares of capital stock or other ownership interests of all Restricted Subsidiaries of the Borrower are fully paid and non-assessable, if applicable, and are owned by the Borrower, directly or indirectly, free and clear of all Liens other than Liens permitted under <u>Section 6.02</u>.

Section 3.14     <u>Solvency</u>. As of the Effective Date, the Borrower and the Restricted Subsidiaries, taken as a whole, are , and after giving effect to the incurrence of any Indebtedness and obligations being incurred in connection herewith will be, Solvent.

Section 3.15     <u>Anti-Terrorism Law</u>. To the extent applicable, neither the Borrower nor any of its Subsidiaries is in violation of any legal requirement relating to U.S. economic sanctions or any laws with respect to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "Executive Order"), the USA PATRIOT Act, the laws comprising or implementing the Bank Secrecy Act to the extent applicable and the laws administered by the United States Treasury Department's Office of Foreign Asset Control (each as from time to time in effect) (collectively, "Anti-Terrorism Laws").

(b)     None of (w) the Borrower, any of its Subsidiaries, or any of the Borrower's directors or officers, or (x) to the knowledge of the Borrower, any of the directors or officers of any of the Borrower's Subsidiaries, or (y) to the knowledge of the Borrower, any of the employees of the Borrower or its Subsidiaries, or (z) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a Sanctioned Country or a Sanctioned Person.

(c)     Neither the Borrower nor any of its Subsidiaries (i) conducts any business with, or engages in making or receiving any contribution of funds, goods or services to or for the benefit of, a Person described in <u>Section 3.15(b)(i)-(v)</u> above, except as permitted under U.S. law, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any applicable Anti-Terrorism Law. Neither the Borrower nor its Subsidiaries nor (x) any of the Borrower's directors or officers or (y) to the Borrower's knowledge, any of the directors or officers of any of the Borrower's Subsidiaries or any Affiliate, employee, agent or representative of the Borrower or any of its Subsidiaries has with respect to the business of the Borrower or its Subsidiaries taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any person while knowing that all or some portion of the money or value will be offered, given, or promised to anyone to

81

improperly influence official action, to obtain or retain business or otherwise to secure any improper advantage, in each case in violation in any material respect of any applicable Anti-Corruption Law.

(d)    The Borrower will not use, and will not permit any of its Subsidiaries to use, the proceeds of the Loans or any Letter of Credit or otherwise make available such proceeds or Letters of Credit to any Person described in Section 3.15(b)(i)-(v) above, for the purpose of financing the activities of any Person described in Section 3.15(b)(i)-(v) above or in any other manner that would violate any Anti-Terrorism Laws or applicable Sanctions.

(e)    The Borrower has implemented and maintains in effect policies and procedures designed to promote compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Terrorism Laws, applicable Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and the officers and directors of the Borrower and, to the knowledge of the Borrower, each of the officers and directors of any of the Borrower's Subsidiaries and each of the employees and agents of the Borrower and its Subsidiaries, are in compliance with applicable Anti-Terrorism Laws, applicable Anti-Corruption Laws and applicable Sanctions with respect to the business of the Borrower or its Subsidiaries.

(f)    No action, suit or proceeding is pending or, to the knowledge of the Borrower, threatened in writing, by or before any court or governmental or regulatory authorities or any arbitrator against the Borrower or any of its Subsidiaries for its or their violation in any material respect of applicable Anti-Corruption Laws.

Section 3.16    FCPA; Sanctions. No part of the proceeds of the Loans or any Letter of Credit will be used by the Borrower or any of its Subsidiaries, directly or, to the Borrower's or any Subsidiary's knowledge, indirectly, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any applicable Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Person, or in any country or territory that, at the time of such funding, financing or facilitating, is a Sanctioned Person or Sanctioned Country or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto. For the past five years, neither the Borrower nor any of its Subsidiaries has knowingly engaged in, is now knowingly engaged in, or will engage in, any unauthorized dealings or unauthorized transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of applicable Sanctions.

Section 3.17    Collateral Matters.

(a)    The U.S. Security Agreement, upon execution and delivery thereof by the parties thereto, is effective to create in favor of the Administrative Agent, for the benefit of the applicable Secured Parties, legal, valid and enforceable security interests in the Collateral subject thereto under U.S. state and federal law, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law and when (x) any certificated Equity Interests included in the Collateral are delivered to the Administrative Agent, together with instruments of transfer duly endorsed in blank and (y) financing statements and other filings specified on Schedule 3.17 of the Disclosure Letter to Amendment No. 4 in appropriate form are filed in the applicable filing offices set forth on such Schedule 3.17 of the Disclosure Letter, the Liens in the Collateral created by the U.S.

82

P-02346-0254

Security Agreement will constitute a fully perfected security interest in all right, title and interest of the Loan Parties in such Collateral subject to no Liens other than Permitted Liens.

(b)    Each Security Document, other than any Security Document referred to in the preceding paragraph of this Section, upon execution and delivery thereof by the parties thereto and the making of the filings and taking of the other actions provided for therein or as required by applicable law, will be effective under applicable law to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien in the Collateral subject thereto and such Liens will constitute perfected Liens on the Collateral, securing the Obligations, enforceable against the Loan Parties and all third parties, and in each case having priority over all other Liens on the Collateral except in the case of Permitted Liens to the extent required by applicable law.

Section 3.18    Beneficial Ownership Certification. As of the Effective Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all material respects.

ARTICLE 4
CONDITIONS

Section 4.01    Effective Date. The obligations of the Lenders to make Loans and of the Issuing Banks to issue Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy or electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    The Administrative Agent shall have received a Note executed by the Borrower in favor of each Lender requesting a Note in advance of the Effective Date.

(c)    The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent, the Issuing Banks and the Lenders and dated the Effective Date) of Cooley LLP, counsel for the Borrower in form and substance reasonably satisfactory to the Administrative Agent. The Borrower hereby requests such counsel to deliver such opinion.

(d)    The Administrative Agent shall have received (i) certified copies of the resolutions of the board of directors of the Borrower and the Guarantors approving the transactions contemplated by the Loan Documents to which each such Loan Party is a party and the execution and delivery of such Loan Documents to be delivered by such Loan Party on the Effective Date, and all documents evidencing other necessary organizational action and governmental approvals, if any, with respect to the Loan Documents and (ii) all other organizational documentation reasonably requested by the Administrative Agent relating to the formation, organization, existence and good standing of the Guarantors and the Borrower and authorization of the transactions contemplated hereby.

(e)    The Administrative Agent shall have received a certificate of the Secretary or an Assistant Secretary of the Borrower and each Guarantor certifying the names and true signatures of the officers of such entity authorized to sign the Loan Documents to which it is a party, to be delivered by such entity on the Effective Date and the other documents to be delivered hereunder on the Effective Date.

83

(f)    The Administrative Agent shall have received (i) a certificate, dated the Effective Date and signed on behalf of the Borrower by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions set forth in paragraphs (a) and (b) of Section 4.02 as of the Effective Date, and (ii) a solvency certificate, dated the Effective Date and signed on behalf of the Borrower by the most senior financial officer of the Borrower, certifying that, as of the Effective Date, the Borrower and the Restricted Subsidiaries, taken as a whole, are, and after giving effect to the incurrence of any Indebtedness and obligations being incurred in connection herewith will be, Solvent.

(g)    The Lenders, the Administrative Agent and the Arrangers shall have received all fees required to be paid by the Borrower on the Effective Date, and all expenses required to be reimbursed by the Borrower for which invoices have been presented at least three Business Days prior to the Effective Date, on or before the Effective Date.

(h)

(i)    Upon the reasonable request of any Lender made at least five Business Days prior to the Effective Date, the Borrower shall have provided to such Lender, and such Lender shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act, in each case at least two Business Days prior to the Effective Date.

(ii)    At least two Business Days prior to the Effective Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver, to each Lender that so requests, a Beneficial Ownership Certification in relation to such Borrower.

(i)    The Administrative Agent shall have received (i) audited consolidated financial statements of the Borrower for each of the annual periods ended December 31, 2012, December 31, 2013 and December 31, 2014 (*provided* that such financial statements may be provided in draft form with respect to the fiscal year ended December 31, 2014) and (ii) unaudited interim consolidated financial statements of the Borrower for the quarterly period ended March 31, 2015.

The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding. Without limiting the generality of the provisions of Article 8, for purposes of determining compliance with the conditions specified in this Section, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

Section 4.02    Each Credit Event. Except as expressly set forth in Section 2.18(a), the obligation of each Lender to make a Loan on the occasion of any Borrowing, and of the Issuing Banks to issue, amend, review or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)    The representations and warranties of the Borrower set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing, or the date of issuance, amendment, extension or increase of such Letter of Credit, as applicable, except that (i) for purposes of this Section, the representations and warranties contained in

84

Section 3.04(a) shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b) (subject, in the case of unaudited financial statements furnished pursuant to clause (b), to year-end audit adjustments and the absence of footnotes), respectively, of Section 5.01, (ii) to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date and (iii) to the extent that such representations and warranties are already qualified or modified by materiality or words of similar effect in the text thereof, they shall be true and correct in all respects.

(b)     At the time of and immediately after giving effect to such Borrowing, or issuance, amendment, extension or increase of a Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

(c)     The Administrative Agent shall have received a Borrowing Request.

(d)     The Issuing Banks shall have received all documentation and assurances required under Section 2.20 or otherwise as shall be reasonably required by it in connection therewith.

(e)     In the case of any Borrowing, or issuance, amendment, extension or increase of a Letter of Credit occurring on or after the Amendment No. 5 Effective Date, at the time of and immediately after giving effect to such Borrowing, or issuance, amendment, extension or increase of a Letter of Credit, as applicable, Liquidity shall not be less than $1,500,000,000.

Each Borrowing or issuance, amendment, extension or increase of a Letter of Credit, as applicable, shall be deemed to constitute a representation and warranty by the Borrower that the conditions specified in paragraphs (a) and (b) of this Section 4.02 have been satisfied as of the date thereof.

ARTICLE 5
AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full and the cancellation or expiration or Cash Collateralization of all Letters of Credit on terms reasonably satisfactory to the applicable Issuing Bank in an amount equal to the Agreed L/C Cash Collateral Amount of all Letter of Credit Usage, the Borrower covenants and agrees with the Lenders that:

Section 5.01     Financial Statements; Ratings Change and Other Information. The Borrower will furnish to the Administrative Agent (for distribution to each Lender):

(a)     (I) commencing with the fiscal year ending December 31, 2015, within (x) prior to an IPO, 180 days after each fiscal year end of the Borrower and (y) on and after an IPO, 90 days after each fiscal year end of the Public Company, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by PricewaterhouseCoopers, or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception (other than a qualification related to the maturity of the Commitments and the Loans at the Maturity Date) and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower (or, after an IPO, the Public Company) and its consolidated Subsidiaries on a consolidated basis in accordance with

85

GAAP consistently applied and (II) commencing with the fiscal year ending December 31, 2018, within 180 days after the beginning each fiscal year, a consolidated annual budget for such fiscal year consisting of a projected income statement (collectively, the "**Budget**"), which Budget shall in each case be accompanied by the statement of a Financial Officer of the Borrower to the effect that the Budget is based on assumptions believed by the Borrower to be reasonable as of the date of delivery thereof;

(b)       commencing with the fiscal quarter ended June 30, 2015, within (x) prior to an IPO, 90 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower and (y) on and after an IPO, 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Public Company, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower (or, after an IPO, the Public Company) and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)       concurrently with any delivery of financial statements under clause (a) or (b) above, a compliance certificate of a Financial Officer of the Borrower (or, after an IPO, the Public Company) in substantially the form of Exhibit F attached hereto (i) certifying as to whether a Default has occurred and is continuing as of the date thereof and, if a Default has occurred and is continuing as of the date thereof, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Sections 6.01(f) and (g) and 6.05 as of the last day of the applicable fiscal quarter or fiscal year for which such financial statements are being delivered, and (iii) if and to the extent that any change in GAAP that has occurred since the date of the audited financial statements referred to in Section 3.04 had an impact on such financial statements, specifying the effect of such change on the financial statements accompanying such certificate;

(d)       promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Holdings, the Borrower or any Restricted Subsidiary with the SEC, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, as the case may be, in each case that is not otherwise required to be delivered to the Administrative Agent pursuant hereto; *provided* that such information shall be deemed to have been delivered on the date on which such information has been posted on the Borrower's website on the Internet on any investor relations page at http://www.uber.com (or any successor page) or at http://www.sec.gov;

(e)       concurrently with any delivery of financial statements under clause (a) or (b) above, the Borrower shall provide unaudited financial statements of the character and for the dates and periods as in such clauses (a) and (b) covering the Unrestricted Subsidiaries (on a combined basis), together with a consolidating statement reflecting eliminations or adjustments required to reconcile the financial statements of such Unrestricted Subsidiaries to the financial statements delivered pursuant to such clauses (a) and (b); *provided* that the Borrower shall not be required to provide such financial statements unless (x) the Borrower compiles such combined financial statements as part of its regular internal reporting processes or is able to compile such combined financial statements without undue effort or expense or (y) delivery of such financial statements is required by clause (b) of the definition of "Incremental Available Amount" or Section 6.01(g) hereof;

86

(f)       concurrently with the delivery of quarterly unaudited financial statements pursuant to clause (b), the Borrower shall deliver to the Administrative Agent supplements to the exhibits to the U.S. Security Agreement relating to the Pledged IP Collateral (as defined in the U.S. Security Agreement and excluding Excluded IP) specifying any changes to such exhibits since the Amendment No. 4 Effective Date or since the previous updating required hereby, as applicable (*provided* that if there have been no changes to any such exhibits since the Amendment No. 4 Effective Date or since the previous updating required hereby, as applicable, the Borrower shall indicate that there has been "no change" to the applicable exhibits);

(g)       prior to the first filing of a registration statement on Form S-1 with respect to the common stock of the Public Company, concurrently with any delivery of financial statements under clause (a) above, an annual summary profit and loss forecast (in the form internally prepared by the Borrower in the ordinary course of business); and

(h)       promptly following any request in writing (including any electronic message) therefor, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Restricted Subsidiary, or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

Information required to be delivered pursuant to Section 5.01(a), Section 5.01(b) or Section 5.01(d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such information, or provides a link thereto on the Borrower's website on the Internet on any investor relations page at http://www.uber.com (or any successor page) or at http://www.sec.gov; or (ii) on which such information is posted on the Borrower's behalf on an Internet or intranet website, if any, to which the Lenders and the Administrative Agent have been granted access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

Section 5.02    Notices of Material Events. The Borrower will furnish to the Administrative Agent (for distribution to each Lender) prompt written notice of the following:

(a)       the occurrence of any Default;

(b)       the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Restricted Subsidiary thereof that could reasonably be expected to result in a Material Adverse Effect; and

(c)       any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03    Existence; Conduct of Business. The Borrower will, and will cause each of its Restricted Subsidiaries (other than any Immaterial Subsidiaries) to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that (i) the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03, and (ii) none of the Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiaries)

87

shall be required to preserve, renew or keep in full force and effect its rights, licenses, permits, privileges or franchises where failure to do so could not reasonably be expected to result in a Material Adverse Effect.

Section 5.04    Payment of Taxes and Other Claims. The Borrower will, and will cause each of its Restricted Subsidiaries to, pay all Tax liabilities, including all Taxes imposed upon it or each such Restricted Subsidiary, or its and their respective income, profits, properties or operations that, if unpaid, could reasonably be expected to result in a Material Adverse Effect, before the same shall become delinquent or in default, and all lawful claims other than Tax liabilities that, if unpaid, would become a Lien upon any properties of the Borrower or any of its Restricted Subsidiaries not otherwise permitted under Section 6.02, in both cases except where the validity or amount thereof is being contested in good faith by appropriate proceedings and to the extent required by GAAP, the Borrower or such Restricted Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

Section 5.05    Maintenance of Properties; Insurance. The Borrower will, and will cause each of its Restricted Subsidiaries to, (a) keep and maintain all property used in the conduct of its business in good working order and condition, ordinary wear and tear and casualty events excepted, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect and (b) maintain insurance with financially sound and reputable insurance companies in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

Section 5.06    Books and Records; Inspection Rights. The Borrower will, and will cause each of its Restricted Subsidiaries to, keep proper books of record and account in which entries full, true and correct in all material respects are made and are sufficient to prepare financial statements in accordance with GAAP. The Borrower will, and will cause each of its Restricted Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender (pursuant to the request made through the Administrative Agent), upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records to the extent reasonably necessary, and to discuss its affairs, finances and condition with its officers and independent accountants (provided that the Borrower or such Restricted Subsidiary shall be afforded the opportunity to participate in any discussions with such independent accountants), all at such reasonable times and as often as reasonably requested (but no more than once annually if no Event of Default exists). Notwithstanding anything to the contrary in this Section, none of the Borrower or any of its Restricted Subsidiaries shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by applicable law or any third party contract legally binding on Borrower or its Restricted Subsidiaries, or (iii) is subject to attorney, client or similar privilege or constitutes attorney work-product.

Section 5.07    ERISA-Related Information. The Borrower shall supply to the Administrative Agent (in sufficient copies for all the Lenders, if the Administrative Agent so requests): (a) promptly and in any event within fifteen (15) days after the Borrower, any Restricted Subsidiary or any ERISA Affiliate files a Schedule B (or such other schedule as contains actuarial information) to IRS Form 5500 in respect of a Plan with Unfunded Pension Liabilities, a copy of such IRS Form 5500 (including the Schedule B); (b) promptly and in any event within 30 days after the Borrower, any Restricted Subsidiary or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred, a certificate of the most senior financial officer of the Borrower describing such ERISA Event and the action, if any, proposed to be

88

taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by such Borrower, Restricted Subsidiary, or ERISA Affiliate from the PBGC or any other governmental agency with respect thereto; provided that, in the case of ERISA Events under paragraph (b) of the definition thereof, in no event shall notice be given later than the occurrence of the ERISA Event; (c) promptly, and in any event within 30 days, after becoming aware that there has been (i) a material increase in Unfunded Pension Liabilities (taking into account only Pension Plans with positive Unfunded Pension Liabilities) since the date the representations hereunder are given or deemed given, or from any prior notice, as applicable; (ii) the existence of potential withdrawal liability under Section 4201 of ERISA, if the Borrower, any Restricted Subsidiary and the ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans, (iii) the adoption of, or the commencement of contributions to, any Plan subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA by the Borrower, any Restricted Subsidiary or any ERISA Affiliate, or (iv) the adoption of any amendment to a Plan subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA which results in a material increase in contribution obligations of the Borrower, any Restricted Subsidiary or any ERISA Affiliate, a detailed written description thereof from the most senior financial officer of the Borrower; and (d) if, at any time after the Effective Date, the Borrower, any Restricted Subsidiary or any ERISA Affiliate maintains, or contributes to (or incurs an obligation to contribute to), a Pension Plan or Multiemployer Plan which is not set forth in Schedule 3.11 to the Disclosure Letter, then the Borrower shall deliver to the Administrative Agent an updated Schedule 3.11 to the Disclosure Letter as soon as practicable, and in any event within 20 days after the Borrower, such Restricted Subsidiary or such ERISA Affiliate maintains, or contributes to (or incurs an obligation to contribute to), thereto.

Section 5.08    Compliance with Laws and Agreements. The Borrower will, and will cause each of its Restricted Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The Borrower will maintain in effect and use reasonable measures to enforce policies and procedures designed to promote compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws, applicable Anti-Terrorism Laws and applicable Sanctions.

Section 5.09    Use of Proceeds. The proceeds of the Loans will be used only for working capital and general corporate purposes, including, without limitation, for stock repurchases under stock repurchase programs approved by the Borrower and for acquisitions not prohibited hereunder. No part of the proceeds of any Loan or Letter of Credit will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

Section 5.10    Additional Guarantors. If, as of the date of the most recently available financial statements delivered pursuant to Section 5.01(a) or (b), as the case may be, any Subsidiary shall have become a Material Domestic Subsidiary (or shall be otherwise designated as a Material Domestic Subsidiary by the Borrower hereunder or under the Term Loan Agreement) or any Person shall have become a Material Foreign Subsidiary (or shall be otherwise designated as a Material Foreign Subsidiary by the Borrower hereunder or under the Term Loan Agreement), then the Borrower shall:

(i)    In the case of any such Subsidiary that becomes (or is so designated as) a Material Domestic Subsidiary, within 30 days (or such longer period of time as the Administrative Agent may agree in its sole discretion) after delivery of such financial statements, (1) cause such Material Domestic Subsidiary to enter into a Guaranty, or, if a Guaranty has previously been entered into by a

89

Material Domestic Subsidiary (and remains in effect), a joinder agreement to such Guaranty in form and substance reasonably satisfactory to the Administrative Agent, (2) deliver to the Administrative Agent, each Issuing Bank and each Lender all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and (3) (x) deliver to the Administrative Agent any certificates representing the Collateral consisting of Equity Interests issued by such Material Domestic Subsidiary (to the extent such Equity Interests are certificated) and Equity Interests owned by such Material Domestic Subsidiary (to the extent such Equity Interests are certificated and other than Excluded Collateral), (y) deliver to the Administrative Agent such joinder agreements, amendments and supplements to the relevant Security Documents or such other documents as the Administrative Agent shall deem necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a Lien on the Collateral owned by such Material Domestic Subsidiary (other than Excluded Collateral) and (z) take all actions necessary to cause such Lien to be duly perfected to the extent required by the Security Documents in accordance with all applicable laws.

(ii)    In the case of any Person that becomes (or is so designated as) a Material Foreign Subsidiary, within 90 days (or such longer period of time as the Administrative Agent may agree in its sole discretion) after delivery of such financial statements, (i) deliver to the Administrative Agent such amendments and supplements to the relevant Security Documents or such additional Security Documents (including a Non-U.S. Pledge Agreement) as the Administrative Agent shall deem necessary or advisable to grant to the Administrative Agent, for the benefit of Secured Parties, a Lien on the Collateral consisting of the Equity Interests issued by such Material Foreign Subsidiary (other than Excluded Collateral) and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by the Security Documents in accordance with all applicable laws. For the avoidance of doubt, no Domestic Subsidiary shall be required to become a Guarantor merely due to its ownership of Equity Interests in any Domestic Subsidiary that owns real property.

(b)    If requested by the Administrative Agent, the Administrative Agent shall receive an opinion of counsel for the Borrower (or local counsel to the Administrative Agent to the extent customary in an Applicable Foreign Jurisdiction) in form and substance reasonably satisfactory to the Administrative Agent in respect of matters reasonably requested by the Administrative Agent relating to any Guaranty or joinder agreement or the amendments and supplements to the Security Documents or additional Security Documents delivered pursuant to this Section, dated as of the date of such Guaranty or joinder agreement, amendments and supplements or additional Security Documents.

(c)    Notwithstanding the foregoing, the Borrower and the Guarantors shall not be required, nor shall the Administrative Agent be authorized, (A) to take any additional steps to perfect the above described pledges and security interests by any means other than by (1) filings pursuant to the Uniform Commercial Code in the office of the secretary of state (or similar central filing office) of the relevant State(s) and filings with the USPTO and the USCO and (2) delivery to the Administrative Agent to be held in its possession of all Collateral consisting of stock certificates evidencing Equity Interests issued by the Guarantors (other than Holdings) and Material Foreign Subsidiaries, in each case as expressly required herein or by the Loan Documents, (B) to take any action with respect to any assets located outside of the United States other than, with respect to the pledge of the Equity Interests of any Material Foreign Subsidiary, the jurisdiction of organization of such Material Foreign Subsidiary (such jurisdiction, the "**Applicable Foreign Jurisdiction**") (it being understood that there shall be no security agreements, pledge agreements or other Security Documents that will be governed under the laws of any non-U.S. jurisdiction other than, with respect to the pledge of the Equity Interests of any Material Foreign Subsidiary, the Applicable Foreign Jurisdiction), (C) to make or authorize any filings with respect to

90

intellectual property other than filings with the USPTO and the USCO, (D) to enter into any control agreement with respect to any Collateral or (E) to require the amendment of any limited liability company agreements or other organizational documents for any Subsidiary of the Borrower, the certification of uncertificated securities or the delivery of any director resignation letters in respect of any Foreign Subsidiaries.

Section 5.11    <u>Holdings</u>. Substantially concurrently with any Permitted Holdco Transaction, (i) the Borrower shall cause Holdings to enter into a Holdings Guaranty in form and substance reasonably satisfactory to the Administrative Agent, (ii) the Administrative Agent shall receive the documentation required under <u>Section 4.01(e)</u> and <u>(f)</u> as if Holdings had been a Guarantor on the Effective Date (provided that references therein to the "Effective Date" shall be deemed references to the effective date of such Holdings Guaranty), (iii) the Administrative Agent and each Lender shall receive all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, (iv) the Borrower shall cause Holdings to deliver to the Administrative Agent any certificates representing the Collateral consisting of all Equity Interests owned by Holdings (other than any Excluded Collateral) and such joinder agreements, amendments and supplements to the relevant Security Documents or such other documents as the Administrative Agent shall deem necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a Lien on all Collateral owned by Holdings (other than Excluded Collateral) and take all actions necessary to cause such Lien to be duly perfected to the extent required by the Security Documents in accordance with all applicable laws and (v) the Administrative Agent shall receive an opinion of counsel for the Borrower (or local counsel to the Administrative Agent to the extent customary in an Applicable Foreign Jurisdiction) in form and substance reasonably satisfactory to the Administrative Agent in respect of matters reasonably requested by the Administrative Agent relating to any Holdings Guaranty or any such joinder agreements, amendments and supplements to the Security Documents or additional Security Documents delivered pursuant to this Section, dated as of the date of such Holdings Guaranty, joinder agreements, amendments and supplements or additional Security Documents.

Section 5.12    <u>Post-Closing</u>. The Administrative Agent shall have received audited consolidated financial statements of the Borrower with respect to the fiscal year ended December 31, 2014, by the date that is 45 days after the Effective Date; and the Borrower shall execute and deliver the documents and complete the tasks set forth on <u>Schedule 5.12</u> to Amendment No. 4, in each case within the time limits specified on such schedule subject to the extension by the Administrative Agent in its sole discretion.

Section 5.13    <u>Beneficial Ownership Regulations</u>. Promptly following any request therefor, the Borrower will provide information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation.

ARTICLE 6
<u>NEGATIVE COVENANTS</u>

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full and the cancellation or expiration or Cash Collateralization of all Letters of Credit on terms reasonably satisfactory to the applicable Issuing Bank in

91

an amount equal to the Agreed L/C Cash Collateral Amount of all Letter of Credit Usage, the Borrower covenants and agrees with the Lenders that:

Section 6.01    Indebtedness. The Borrower will not permit any Domestic Restricted Subsidiary that is not a Guarantor to create, incur or assume any Specified Indebtedness other than:

(a)    Specified Indebtedness existing on the Amendment No. 4 Effective Date and disclosed on Schedule 6.01 to the Disclosure Letter and any Refinancing Indebtedness with respect thereto;

(b)    to the extent constituting Specified Indebtedness, Specified Indebtedness consisting of cash management services, including treasury, depository, overdraft, credit or debit card, purchasing cards, electronic funds transfer and other cash management arrangements;

(c)    Specified Indebtedness in respect of bid bonds, performance bonds, surety bonds and similar obligations, including guarantees or obligations with respect to letters of credit supporting such bid bonds, performance bonds, surety bonds and similar obligations;

(d)    Specified Indebtedness representing the financing of insurance premiums in the ordinary course of business;

(e)    [reserved];

(f)    Specified Indebtedness constituting Capital Lease Obligations, equipment leases and Purchase Money Indebtedness of the Borrower or any Domestic Restricted Subsidiary and any Refinancing Indebtedness in respect thereof; provided that the aggregate principal amount of Indebtedness pursuant to this clause (f) secured by real property shall not exceed $500,000,000 at any time outstanding; and

(g)    additional Specified Indebtedness; provided that, after giving effect to any incurrence of Specified Indebtedness pursuant to this clause (g)(i) (and subject to Section 1.07), the aggregate principal amount of outstanding Specified Indebtedness of the Domestic Restricted Subsidiaries that are not Guarantors incurred pursuant to this clause (g)(i) and any Refinancing Indebtedness incurred pursuant to clause (g)(ii) below, together with, but without duplication, the aggregate principal amount of outstanding Secured Specified Indebtedness of the Borrower and the Guarantors incurred in reliance on Section 6.02(r), shall not exceed the Certain Specified Indebtedness Cap (for purposes of the foregoing calculation, treating the Commitments hereunder and any other revolving or delayed-draw commitments in respect of Specified Indebtedness as fully drawn); and  Refinancing Indebtedness in respect of Specified Indebtedness permitted pursuant to the foregoing clause (g)(i) (and any successive Refinancing Indebtedness in respect thereof); provided that such Refinancing Indebtedness shall be incurred within 12 months of the maturity, retirement or other repayment (including any such repayment pursuant to amortization obligations with respect thereto) or prepayment of the Specified Indebtedness being refinanced, renewed or extended.

For the avoidance of doubt, this Section 6.01 shall impose no limit on the incurrence of any Specified Indebtedness by any Loan Party. In addition, for purposes of calculating compliance with this Section 6.01 and Section 6.02, in no event will the amount of any Specified Indebtedness be required to be included more than once despite the fact more than one Person is or becomes liable with respect to any related Specified Indebtedness (or any credit support provided therefor). For example, and for avoidance of doubt, in the case where more than one Domestic Restricted Subsidiary incurs Specified Indebtedness or otherwise becomes liable for such Specified Indebtedness (including by virtue of

92

providing a guarantee or acting as account party for a letter of credit, banker's acceptance or similar arrangement to secure such Indebtedness), the amount of such Specified Indebtedness shall only be included once for purposes of such calculations.

Section 6.02   Liens. The Borrower will not, and will not permit any Domestic Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it except:

(a)    Permitted Encumbrances;

(b)    any Lien on any property or asset of the Borrower or any Restricted Subsidiary existing on the date hereof and set forth in Schedule 6.02 to the Disclosure Letter (other than, for the avoidance of doubt, Liens securing the Secured Obligations or the Obligations (as defined in the Term Loan Agreement)) and any modifications, renewals and extensions thereof and any Lien granted as a replacement or substitute therefor; provided that (i) such Lien shall not apply to any other property or asset of the Borrower or any Restricted Subsidiary other than improvements thereon or proceeds thereof, and (ii) such Lien shall secure only those obligations which it secures on the date hereof and any refinancing, extension, renewal or replacement thereof that does not increase the outstanding principal amount thereof except by an amount equal to a premium or other amount paid, and fees and expenses incurred, in connection with such refinancing, extensions, renewals or replacements;

(c)    any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Restricted Subsidiary or existing on any property or asset of any Person that becomes a Restricted Subsidiary after the date hereof prior to the time such Person becomes a Restricted Subsidiary; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Restricted Subsidiary, as the case may be, (ii) such Lien shall not apply to any other property or assets of the Borrower or any Restricted Subsidiary, and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Restricted Subsidiary, as the case may be, and any refinancing, extension, renewal or replacement thereof that does not increase the outstanding principal amount thereof except by an amount equal to a premium or other amount paid, and fees and expenses incurred, in connection with such refinancing, extensions, renewals or replacements;

(d)    Liens on fixed or capital assets acquired, constructed, financed or improved by the Borrower or any Restricted Subsidiary; *provided* that (i) such security interests secure Indebtedness that is permitted pursuant to Section 6.01(f), (ii) such security interests and the Indebtedness secured thereby are initially incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed 100% of the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such security interests shall not apply to any other property or assets of the Borrower or any Restricted Subsidiary other than additions, accessions, parts, attachments or improvements thereon or proceeds thereof; *provided* that clauses (ii) and (iii) shall not apply to any Refinancing Indebtedness pursuant to Section 6.01(f) hereof or any Lien securing such Refinancing Indebtedness;

(e)    licenses, sublicenses, leases or subleases granted to others not interfering in any material respect with the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

93

(f)        the interest and title of a lessor or licensor under any lease, license, sublease or sublicense entered into by the Borrower or any Restricted Subsidiary in the ordinary course of its business and other statutory and common law landlords' Liens under leases;

(g)        in connection with the sale or transfer of any assets in a transaction not prohibited hereunder, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof;

(h)        in the case of any joint venture or minority investment by the Borrower or any Subsidiary in any Person, any put and call arrangements related to its Equity Interests set forth in applicable joint venture's or other Person's organizational documents or any related joint venture, shareholders, investor rights or similar agreement;

(i)        Liens securing Indebtedness to finance insurance premiums owing in the ordinary course of business to the extent such financing is not prohibited hereunder;

(j)        Liens on earnest money deposits of cash or Cash Equivalents made in connection with any acquisition not prohibited hereunder;

(k)        bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents or other securities on deposit in one or more accounts maintained by the Borrower or any Restricted Subsidiary, in each case granted in the ordinary course of business in favor of the banks, securities intermediaries or other depository institutions with which such accounts are maintained, securing amounts owing to such institutions with respect to cash management and operating account arrangements;

(l)        Liens in the nature of the right of setoff in favor of counterparties to contractual agreements not otherwise prohibited hereunder with the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(m)        Liens on the Equity Interests of Excluded Subsidiaries;

(n)        Liens and deposits securing obligations under Swap Agreements entered to hedge or mitigate commercial risk and not for speculative purposes;

(o)        Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(p)        Liens in favor of the Loan Parties;

(q)        [reserved];

(r)        Liens securing Secured Specified Indebtedness (including, for the avoidance of doubt, any such Indebtedness pursuant to the Term Loan Agreement); *provided* that after giving effect to any incurrence of Liens pursuant to this clause (r)(i) (and subject to Section 1.07), the aggregate principal amount of outstanding Secured Specified Indebtedness secured by Liens incurred pursuant to this clause (r)(i) or clause (r)(ii) below, together with, but without duplication, the aggregate principal amount of outstanding Specified Indebtedness of the Domestic Restricted Subsidiaries that are not Guarantors incurred pursuant to Section 6.01(g), shall not exceed the Certain Specified Indebtedness Cap (for

94

purposes of the foregoing calculation, treating the Commitments hereunder and any other revolving or delayed-draw commitments in respect of Specified Indebtedness as fully drawn); and Liens that extend, renew, substitute or replace (including successive extensions, renewals, substitutions or replacements), in whole or in part, any Lien permitted pursuant to the foregoing clause (r)(i) or that secure any extension, renewal, replacement, refinancing or refunding (including any successive extensions, renewals, replacements, refinancings or refundings) of any Refinancing Indebtedness within 12 months of the maturity, retirement or other repayment or prepayment of the Specified Indebtedness (including any such repayment pursuant to amortization obligations with respect to such Indebtedness) being extended, renewed, substituted, replaced, refinanced or refunded, which Indebtedness is secured by a Lien permitted pursuant to this clause (r). Notwithstanding anything herein to the contrary, Liens securing Indebtedness outstanding on the Closing Date under this Agreement shall be treated as incurred on the Closing Date under this clause (r); and

(s)     other Liens securing obligations (other than Specified Indebtedness) in an aggregate principal amount at any time outstanding not to exceed $300,000,000.

Section 6.03   Fundamental Changes. (a) The Borrower will not, and will not permit any Restricted Subsidiary to, (x) merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, (y) sell, transfer, license, lease, enter into any sale-leaseback transactions with respect to, or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of, the Borrower and the Restricted Subsidiaries, taken as a whole, or all or substantially all of the stock of any of the Borrower's Restricted Subsidiaries (in each case, whether now owned or hereafter acquired) or (z) liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing:

(i)   any Restricted Subsidiary or any other Person may merge into or consolidate with the Borrower in a transaction in which the Borrower is the surviving corporation;

(ii)   any Person (other than the Borrower) may merge into or consolidate with any Restricted Subsidiary in a transaction in which the surviving entity is a Restricted Subsidiary (provided that any such merger or consolidation involving a Guarantor must result in a Guarantor as the surviving entity);

(iii)   any Restricted Subsidiary may sell, transfer, license, lease or otherwise dispose of its assets to the Borrower or to another Restricted Subsidiary; provided that any such disposition under this clause (iii) that is made to a Restricted Subsidiary that is not a Loan Party shall in no event be permitted if it would comprise all or substantially all of the assets of the Borrower and its Restricted Subsidiaries, taken as a whole;

(iv)   any Loan Party may sell, transfer, license, lease or otherwise dispose of its assets to any other Loan Party;

(v)   in connection with any acquisition, any Restricted Subsidiary may merge into or consolidate with any other Person, so long as the Person surviving such merger or consolidation shall be a Restricted Subsidiary (provided that any such merger or consolidation involving a Guarantor must result in a Guarantor as the surviving entity);

(vi)   any Restricted Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders;

95

(vii)   any Restricted Subsidiary may merge into or consolidate with any other Person in a transaction not otherwise prohibited hereunder and all or substantially all of the Equity Interests of any Restricted Subsidiary may be sold, transferred or otherwise disposed of, so long as the aggregate consideration received in respect of all such mergers or consolidations, sales, transfers or other disposals pursuant to this clause (vii) shall not exceed the greater of (a) $500,000,000 and (b) 10% of Total Assets as of the date of the definitive agreement for such merger, consolidation, sale, transfer or other disposal is executed;

(viii)   a Permitted Holdco Transaction may be consummated; and

(ix)   any Restricted Subsidiary may be dissolved, wound-up or liquidated or any Restricted Subsidiary may merge into or consolidate with any other Person and all or substantially all of the Equity Interests or assets of any Restricted Subsidiary may be sold, transferred or otherwise disposed of, in each case, if such dissolution, winding up, liquidation, sale, transfer or other disposition does not constitute a sale, transfer or other disposition of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries, taken as a whole, if such liquidation, winding up, dissolution, sale, transfer or other disposition is not materially disadvantageous to the Lenders (as determined by the Borrower in good faith) and would not be likely to have a Material Adverse Effect.

(b)   The Borrower will not, and will not permit any of its Restricted Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Borrower and its Restricted Subsidiaries on the date of execution of this Agreement and businesses reasonably related, complementary, ancillary or incidental thereto, which businesses, for the avoidance of doubt, may include or relate to, but not be limited to, the provision of data integration or analysis platforms and other software or technological solutions.

Section 6.04   Use of Proceeds. The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or issuance of any Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any applicable Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Person, or in any country or territory that, at the time of such funding, financing or facilitating, is a Sanctioned Person or Sanctioned Country or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 6.05   Minimum Liquidity. The Borrower shall not permit Liquidity to be less than $1,500,000,000 as of the last day of any fiscal quarter of the Borrower ending after the Amendment No. 5 Effective Date.

Section 6.06   Restricted Repayments. The Borrower will not, and will not permit any Restricted Subsidiary to declare, make or pay, directly or indirectly, any Restricted Payments with respect to the Borrower or any of its Restricted Subsidiaries, except:

(a)   any Restricted Subsidiary of the Borrower may make Restricted Payments to the Borrower or to any direct or indirect wholly-owned Restricted Subsidiary of the Borrower, and any non-wholly-owned Restricted Subsidiary may make Restricted Payments to the Borrower or any of its other Restricted Subsidiaries and to each other owner of Equity Interests of such Restricted Subsidiary ratably based on their relative ownership interests of the relevant class of Equity Interests;

96

(b)       the Borrower or any Restricted Subsidiary may declare and make dividends payable solely in additional shares of Qualified Equity Interests and may exchange Equity Interests for its Qualified Equity Interests;

(c)       the Borrower or any Restricted Subsidiary may (x) repurchase fractional shares of its Equity Interests arising out of stock dividends, splits or combinations, business combinations or conversions of convertible securities or exercises of warrants or options, (y) "net exercise" or "net share settle" warrants or options or (z) make cash settlement payments upon the exercise of warrants or options to purchase its Equity Interests;

(d)       the Borrower or any Restricted Subsidiary may redeem or otherwise cancel Equity Interests or rights in respect thereof granted to (or make payments on behalf of) directors, officers, management, employees or other providers of services to the Borrower and its Subsidiaries (i) in an amount required to satisfy tax withholding obligations relating to the vesting, settlement or exercise of such Equity Interests or rights or (ii) upon the death, disability, retirement or termination of employment or services;

(e)       the Borrower or any Restricted Subsidiary may make Restricted Payments pursuant to and in accordance with (i) stock incentive plans, (ii) stock option plans, (iii) stock buyback agreements, plans or programs, (iv) bonus plans, (v) compensation plans or (vi) other benefit plans or agreements for officers, directors, management, employees or other eligible service providers of the Borrower or its Subsidiaries;

(f)       Borrower or any Restricted Subsidiary may make Restricted Payments not otherwise permitted under this Section 6.06 using the proceeds of any issuance of Equity Interests; provided that the Restricted Payment and the issuance of Equity Interests (or following an IPO, in the case of a dividend or a Restricted Payment pursuant to an accelerated share repurchase agreement, forward purchase contract or similar agreement, the declaration date or the entry into such agreement, as applicable) are substantially concurrent;

(g)       Borrower or any Restricted Subsidiary may make additional Restricted Payments not otherwise permitted in clauses (a) through (f) above, so long as after giving effect to such Restricted Payment, Liquidity shall not be less than $1,500,000,000 on a pro forma basis; and

(h)       Borrower or any Restricted Subsidiary may make additional Restricted Payments not otherwise permitted in clauses (a) through (g) above, so long as the aggregate amount of Restricted Payments made pursuant to this clause (h) together with Junior Debt Prepayments made pursuant to Section 6.07(e) shall not exceed $1,000,000,000.

For purposes of clause (g), following an IPO, in the case of a dividend, Liquidity shall be measured on a pro forma basis as of the applicable declaration date for such dividend (and not the date of the applicable dividend) and in the case of a Restricted Payment pursuant to an accelerated share repurchase agreement, forward purchase contract or similar agreement, Liquidity shall be measured on a pro forma basis as of the date such agreement was entered into (and not the date of any payments or deliveries thereunder).

Section 6.07    Junior Debt Prepayments. The Borrower will not, and will not permit any Restricted Subsidiary to declare, make or pay, directly or indirectly, any Junior Debt Prepayments, except that the following shall be permitted:

97

(a)    Junior Debt Prepayments, so long as after giving effect to such Junior Debt Prepayment, as applicable, Liquidity shall not be less than $1,500,000,000 on a pro forma basis;

(b)    Junior Debt Prepayments, so long as such prepayments consist of Equity Interests (and cash in lieu of any fractional shares);

(c)    Junior Debt Prepayments using the proceeds of any issuance of Equity Interests; provided that such Junior Debt Prepayments and the issuance of Equity Interests are substantially concurrent;

(d)    Junior Debt Prepayments in connection with the incurrence of Refinancing Indebtedness or otherwise with the proceeds of Subordinated Indebtedness; and

(e)    additional Junior Debt Prepayments, so long as the aggregate amount of Junior Debt Prepayments, made pursuant to this clause (e) together with Restricted Payments made pursuant to Section 6.06(h) shall not exceed $1,000,000,000.

ARTICLE 7
EVENTS OF DEFAULT

Section 7.01    Events of Default.

If any of the following events (each, an "**Event of Default**") shall occur:

(a)    the Borrower shall fail to pay (i) any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise; or (ii) when due any amount payable to the applicable Issuing Bank in reimbursement of any drawing under any Letter of Credit;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 7.01(a)) payable under any of the Loan Documents, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of Holdings, the Borrower or any Restricted Subsidiary in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement, any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made or deemed made; *provided* that, in each case, to the extent that such representations and warranties are already qualified or modified by materiality or words of similar effect in the text thereof, they shall be true and correct in all respects;

(d)    the Borrower or Holdings, shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02, Section 5.03 (solely with respect to the Borrower's or, if applicable, Holding's existence), Section 5.09, Section 5.11 or Section 5.12 or in Article 6;

(e)    Holdings, the Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in any of the Loan Documents (other than those specified in clause (a), (b) or (d) of this Section 7.01), and such failure shall continue unremedied for a period of

98

30 days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

(f)     Holdings, the Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure shall have continued after the applicable grace period, if any;

(g)     any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both but with all applicable grace periods in respect of such event or condition under the documentation representing such Material Indebtedness having expired) the holder or holders of such Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; *provided* that this clause (g) shall not apply to (w) any requirement to, or any offer to, repurchase, prepay or redeem Indebtedness of a Person acquired in an acquisition permitted hereunder, to the extent such offer is required as a result of, or in connection with, such acquisition, (x) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (y) any event or condition giving rise to any redemption, repurchase, conversion or settlement (or right to redeem, require repurchase, convert or settle) with respect to any Convertible Notes or other convertible debt instrument (including any termination of any related Swap Agreement) pursuant to its terms unless such redemption, repurchase, conversion or settlement results from a default thereunder or an event of the type that constitutes an Event of Default or (z) an early payment requirement, unwinding or termination with respect to any Swap Agreement except an early payment, unwinding or termination that results from a default or non-compliance thereunder by the Borrower or any Restricted Subsidiary, or another event of the type that would constitute an Event of Default;

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Holdings, the Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary) or its debts, or of a substantial part of its assets, under any Debtor Relief Law or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary) or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     except as may otherwise be permitted under Section 6.03, Holdings, the Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary) shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Debtor Relief Law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary) or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

99

(j)        Holdings, the Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary) shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)        one or more judgments for the payment of money in excess of $150,000,000 in the aggregate shall be rendered against Holdings, the Borrower or any Restricted Subsidiary or any combination thereof (to the extent not paid or covered by a reputable and solvent independent third-party insurance company which has not disputed coverage) and the same shall remain undischarged or unpaid for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of Holdings, the Borrower or any Restricted Subsidiary to enforce any such judgment and such action shall not be stayed;

(l)        one or more ERISA Events shall have occurred, other than as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect;

(m)        a Change in Control shall occur;

(n)        any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder, solely as a result of acts or omissions by the Administrative Agent or any Lender, or satisfaction in full of all the obligations hereunder or thereunder, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or

(o)        any Security Document shall for any reason (other than pursuant to the terms hereof or thereof or solely as a result of acts or omissions by the Administrative Agent or any Lender) cease to create, or any Lien purported to be created by any Security Documents shall be asserted by any Loan Party not to be, a valid and perfected Lien with the priority required by the Security Document, on any material portion of the Collateral purported to be covered thereby;

then, and in every such event (other than an event with respect to the Borrower or Holdings, described in clause (h), (i) or (j) of this Section 7.01), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments and the obligations of the Issuing Banks to issue any Letter of Credit, and thereupon the Commitments and the obligations of the Issuing Banks to issue any Letter of Credit shall terminate immediately, and (ii) (A) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and (B) require that the Borrower Cash Collateralize the Letters of Credit in the amount of the Agreed L/C Cash Collateral Amount of the then Letter of Credit Usage; and, in the case of any event with respect to the Borrower or Holdings, described in clause (h), (i) or (j) of this Section 7.01, the Commitments and the obligations of the Issuing Banks to issue any Letter of Credit shall automatically terminate, and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

100

Section 7.02    Application of Funds. Subject to the terms of the Term Loan Intercreditor Agreement and any other applicable Intercreditor Agreement, after the exercise of remedies provided for in Section 7.01 (or after the Loans have automatically become immediately due and payable and the Letter of Credit Usage shall have automatically been required to be Cash Collateralized as set forth in Section 7.01), any amounts received on account of the Secured Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest but including fees, charges and disbursements of counsel to the Administrative Agent and the Issuing Banks and amounts payable pursuant to Sections 2.12 and 2.14) payable to the Administrative Agent and each Issuing Bank in their respective capacity as such; ratably among them in proportion to the respective amounts described in this clause First payable to them;

Second, to payment of that portion of the Secured Obligations constituting fees, indemnities and other amounts (other than principal, interest and fees payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable pursuant to Sections 2.12 and 2.14));

Third, to payment of that portion of the Secured Obligations constituting accrued and unpaid fees and interest on the Loans, Letter of Credit Usage and other Secured Obligations, ratably among the Lenders and the Issuing Bank in proportion to the respective amounts described in this clause Third held by them;

Fourth, to payment of that portion of the Secured Obligations constituting (x) unpaid principal of the Loans, (y) Letter of Credit Usage comprised of drawings under Letters of Credit honored by the applicable Issuing Bank and not theretofore reimbursed by or on behalf of the Borrower and (z) face amounts or Swap Termination Value under Secured Hedge Agreements or Cash Management Obligations, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the Administrative Agent for the account of the applicable Issuing Bank, to Cash Collateralize that portion of Letter of Credit Usage comprised of the aggregate undrawn amount of Letters of Credit at the Agreed L/C Cash Collateral Amount; and

Last, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by law.

Subject to Section 2.20(i), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fifth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Secured Obligations, if any, in the order set forth above, and thereafter applied as provided in clause "Last" above.

## ARTICLE 8
## THE AGENTS

Section 8.01    Appointment of the Administrative Agent. Each Lender (in its capacities as a Lender and a potential Hedge Bank or Cash Management Bank) and each Issuing Bank hereby irrevocably designates and appoints Morgan Stanley Senior Funding, Inc. as the Administrative Agent

101

hereunder and under the other Loan Documents, and each Lender and each Issuing Bank hereby authorizes Morgan Stanley Senior Funding, Inc. to act as the Administrative Agent in accordance with the terms hereof and the other Loan Documents. The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Secured Parties hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on the Collateral and any other collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto (including, without limitation, to enter into additional Loan Documents or supplements to existing Loan Documents on behalf of the Secured Parties). In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to this Article 8 for purposes of holding or enforcing any Lien on the Collateral or any other collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of Articles 8 and 9 (including Section 9.03, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. The Administrative Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Loan Documents, as applicable. Except for Section 8.12, the provisions of this Article 8 are solely for the benefit of the Agents and Lenders and no Loan Party shall have any rights as a third party beneficiary of any of the provisions thereof (except as expressly set forth in Section 8.07). In performing its functions and duties hereunder, the Administrative Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed, and the use of the term "agent" (or any similar term) herein or in any other Loan Documents is not intended to connote, any obligation towards or relationship of agency or trust with or for Borrower or any of its Subsidiaries. As of the Effective Date, no Arranger in such capacity shall have any obligations but shall be entitled to all benefits of this Article 8. Each Arranger may resign from such role at any time, with immediate effect, by giving prior written notice thereof to the Administrative Agent and the Borrower.

Section 8.02    Powers and Duties. Each Lender irrevocably authorizes the Administrative Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Loan Documents as are specifically delegated or granted to the Administrative Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. Anything herein to the contrary notwithstanding, the Administrative Agent shall have only those powers, duties and responsibilities under this Agreement or any of the other Loan Documents except in its capacity, as applicable, as the Administrative Agent, a Lender or an Issuing Bank hereunder. The Administrative Agent may exercise such powers, rights and remedies and perform such duties by or through its Related Parties. No Agent shall have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein.

Section 8.03    General Immunity. No Agent nor any of its Related Parties shall be (i) responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Loan Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of any Loan Party to any Agent or any Lender in connection with the Loan Documents and the transactions contemplated thereby or for the financial condition or business

P-02346-0274

affairs of any Loan Party or any other Person liable for the payment of any Secured Obligations, (ii) required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or (iii) required to make any disclosures with respect to the foregoing. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless such Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". No Agent nor any of its Related Parties shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity. Anything contained herein to the contrary notwithstanding, the Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof.

(b)    No Agent nor any of its Related Parties shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Loan Documents except to the extent caused by such Person's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Required Lenders (or such other Lenders as may be required to give such instructions under Section 9.02) and, upon receipt of such instructions from Required Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions, including for the avoidance of doubt refraining from any action that, in its opinion or the opinion of its counsel, may be in violation of any Loan Document or applicable law, including, for the avoidance of doubt, any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Borrower and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Loan Documents in accordance with the instructions of Required Lenders (or such other Lenders as may be required to give such instructions under Section 9.02).

Each Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Loan Document by or through any one or more sub-agents appointed by such Agent, provided that any such appointment of a sub-agent, other than to a Lender or an Affiliate of a Lender (other than any Disqualified Institution), shall require the express written consent of the Borrower and provided that, for the avoidance of doubt, each sub-agent shall become bound by, and subject to Section 9.12. Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through its respective Related Parties. The exculpatory, indemnification and other provisions of this Section 8.03 and of Section 8.06 shall apply to any the Related Parties of each Agent and shall apply to their respective activities in connection with the syndication of the credit

103

facilities provided for herein as well as activities as an Agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 8.03 and of Section 8.06 shall apply to any such sub-agent and to the Related Parties of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and its Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by an Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Loan Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to the Agent that appointed it and not to any Loan Party, Lender or any other Person and no Loan Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence, bad faith or willful misconduct in the selection of such sub-agent.

(c)      No Agent shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions. Without limiting the generality of the foregoing, no Agent shall (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Commitments or Loans, or disclosure of confidential information, to any Disqualified Institution.

Section 8.04    Administrative Agent Entitled to Act as Lender. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder. With respect to its participation in the Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Borrower or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Borrower for services in connection herewith and otherwise without having to account for the same to Lenders.

Section 8.05    Lenders' Representations, Warranties and Acknowledgment. Each Lender and each Issuing Bank expressly acknowledges that neither the Agents nor any of their respective Related Parties have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any of its Affiliates, shall be deemed to constitute any representation or warranty by any Agent to any Lender or any Issuing Bank. Each Lender and each Issuing Bank represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Borrower and its Subsidiaries in connection with Loans and/or Letters of Credit issued hereunder and that it has made and shall continue to make its own appraisal of, and investigation into, the business, operations, property, financial and other condition and the creditworthiness of the Borrower and its Affiliates. Each Lender and each Issuing Bank also represents

104

that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)    Each Lender, by delivering its signature page to this Agreement, an Assignment and Assumption, an Extension Agreement or a Joinder Agreement and funding its Loans, if applicable, on the Effective Date, or by the funding of any New Loans, as the case may be, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, any Issuing Bank or the Lenders, as applicable on the Effective Date, the effective date of such Assignment and Assumption or as of the date of funding of such New Loans.

Section 8.06    Right to Indemnity. Each Lender, in proportion to its Applicable Percentage, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by any Loan Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Loan Documents; provided no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction (it being understood and agreed that no action taken in accordance with the directions of the Required Lenders (or such other Lenders as may be required to give such instructions under Section 9.02) shall constitute gross negligence or willful misconduct). If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Applicable Percentage thereof; and provided, further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

Section 8.07    Successor Administrative Agent.

(a)    The Administrative Agent shall have the right to resign at any time by giving prior written notice thereof to Lenders and Borrower. The Administrative Agent shall have the right to appoint a financial institution to act as the Administrative Agent hereunder, subject to the written consent of the Borrower and the reasonable satisfaction of the Required Lenders, and Administrative Agent's resignation shall become effective on the earliest of (i) 30 days after delivery of the notice of resignation (regardless of whether a successor has been appointed or not), (ii) the acceptance of such successor

105

Administrative Agent by the Borrower and the Required Lenders and the acceptance of being Administrative Agent by such successor, or (iii) such other date, if any, agreed to by the Required Lenders. Upon any such notice of resignation, if a successor Administrative Agent has not already been appointed by the retiring Administrative Agent, the Required Lenders shall have the right, with the written consent of the Borrower, to appoint a successor Administrative Agent.

(b)      If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (c) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, with the prior written consent of the Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)      If neither the Required Lenders nor Administrative Agent have appointed a successor Administrative Agent or such successor has not accepted such appointment within 30 days after delivery of notice of resignation by the retiring Administrative Agent or the Removal Effective Date, the Required Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent until such time, if any, as the Required Lenders appoint a successor Administrative Agent and such successor accepts such appointment. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall promptly (i) transfer to such successor Administrative Agent all sums held under the Loan Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Loan Documents, and (ii) take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the Loan Documents, whereupon such retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Article 8). After any retiring or removed Administrative Agent's resignation or removal hereunder as Administrative Agent, the provisions of this Article 8 and Section 9.03 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.

Section 8.08    Guaranty. Each Lender and each Issuing Bank hereby further authorizes Administrative Agent, on behalf of and for the benefit of the Lenders and the Issuing Banks, to be the agent for and representative of the Lenders with respect to the Holdings Guaranty, the Guaranty and the other Loan Documents. Subject to Section 9.02, without further written consent or authorization from any Lender or any Issuing Bank, Administrative Agent may execute any documents or instruments necessary to release any Guarantor from the Guaranty pursuant to Section 9.17 or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 9.02) have otherwise consented.

(a)      Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, each Issuing Bank and each Lender hereby agree that none of the Lenders or the Issuing Banks shall have any right individually to enforce the Holdings Guaranty or the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of

106

the Loan Documents may be exercised solely by the Administrative Agent, for the benefit of the Lenders and the Issuing Bank in accordance with the terms hereof and thereof.

(b)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Secured Obligations (other than Hedging Obligations in respect of any Secured Hedge Agreements and Cash Management Obligations in respect of any Secured Cash Management Agreements and contingent indemnification obligations not yet accrued and payable) have been paid in full and all Commitments have terminated or expired, upon request of the Borrower, Administrative Agent shall take such actions as shall be required to release all guarantee obligations provided for in any Loan Document. Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Secured Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

Section 8.09     <u>Actions in Concert</u>. Notwithstanding anything in this Agreement to the contrary, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or the Notes (other than exercising any rights of setoff) or the Secured Hedge Agreements or the Secured Cash Management Agreements without first obtaining the prior written consent of the Administrative Agent and Required Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Notes shall be taken in concert and at the direction or with the consent of Administrative Agent or Required Lenders; provided, however, that, subject to the terms of any applicable Intercreditor Agreement, (i) each Lender shall be entitled to file a proof of claim in any proceeding under any insolvency law to the extent that such Lender disagrees with Agent's composite proof of claim filed on behalf of all Lenders, (ii) each Lender shall be entitled to vote its claim with respect to any plan of reorganization in any proceeding under any Debtor Relief Law and (iii) each Lender shall be entitled to pursue its deficiency claim after liquidation of all or substantially all of the Collateral and application of the proceeds therefrom.

Section 8.10     <u>Withholding Taxes</u>. To the extent required by any applicable law, Administrative Agent may withhold from any payment to any Lender or any Issuing Bank an amount equivalent to any applicable withholding Tax. If the IRS or any other Governmental Authority asserts a claim that Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender or any Issuing Bank because the appropriate form was not delivered or was not properly executed or because such Lender or such Issuing Bank failed to notify Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender or an Issuing Bank pursuant to this Agreement without deduction of applicable withholding Tax from such payment, such Lender or such Issuing Bank, as the case may be, shall indemnify Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

Section 8.11     <u>Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim</u>. In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Loan Party, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall

107

have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)      to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Banks and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Agents, the Lenders and the Issuing Banks and their respective agents and counsel and all other amounts due the Agents, the Lenders and the Issuing Banks under Sections 2.09 and 9.03 allowed in such judicial proceeding; and

(c)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and, in each case, any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each other Agent, each Lender and each Issuing Bank to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the other Agents, the Lenders and/or the Issuing Banks, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Sections 2.09 and 9.03. To the extent that the payment of any such compensation, expenses, disbursements and advances of Administrative Agent, its agents and counsel, and any other amounts due Administrative Agent under Sections 2.09 and 9.03 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the other Agents, the Lenders and/or the Issuing Banks may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any other Agent, any Lender or any Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Agent, any Lender or any Issuing Bank or to authorize Administrative Agent to vote in respect of the claim of any Agent, any Lender or the Issuing Bank in any such proceeding.

Section 8.12    Intercreditor Agreements. The Lenders and the other Secured Parties hereby irrevocably authorize and instruct the Administrative Agent to, without any further consent of any Lender or any other Secured Party, enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify (i) the Term Loan Intercreditor Agreement, (ii) any First Lien Intercreditor Agreement with the Senior Representative(s) of Indebtedness secured by a Lien permitted hereunder and intended to be pari passu with the Liens securing the Secured Obligations under this Agreement and (iii) any Second Lien Intercreditor Agreement with the Senior Representative(s) of the holders of Indebtedness secured by a Lien permitted hereunder and intended to be junior to the Liens securing the Secured Obligations under this Agreement. The Lenders and the other Secured Parties irrevocably agree that (x) the Administrative Agent may rely exclusively on a certificate of an Officer of the Borrower as to whether the Liens governed by such Intercreditor Agreement and the

108

priority of such Liens as contemplated thereby are not prohibited and (y) any Intercreditor Agreement entered into by the Administrative Agent shall be binding on the Secured Parties, and each Lender and the other Secured Parties hereby agrees that it will take no actions contrary to the provisions of, if entered into and if applicable, any Intercreditor Agreement. The foregoing provisions are intended as an inducement to any provider of any secured Specified Indebtedness not prohibited by Section 6.01 or Section 6.02 hereof to extend credit to the Loan Parties and such persons are intended third-party beneficiaries of such provisions. Further, upon request of the Borrower, the Administrative Agent shall enter into, or amend, any Intercreditor Agreement to permit the incurrence of any Specified Indebtedness permitted to be secured by the Collateral hereunder.

Section 8.13    Secured Cash Management Agreements and Secured Hedge Agreements. Except as otherwise expressly set forth herein or in any Guarantee or any Security Document, no Cash Management Bank or Hedge Bank that obtains the benefits of any Guarantee or any Collateral by virtue of the provisions hereof or of any Guarantee or any Security Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Section 8.13 to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Secured Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Secured Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

Section 8.14    Certain ERISA Matters.

(a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arrangers, and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i) such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii) (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into,

109

participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b) In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i) none of the Administrative Agent or the Arrangers or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Letters of Credit, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v) no fee or other compensation is being paid directly to the Administrative Agent or the Arrangers or any their respective Affiliates for investment advice (as opposed to other

110

services) in connection with the Loans, the Letters of Credit, the Commitments or this Agreement.

(c) The Administrative Agent and the Arrangers hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

ARTICLE 9
MISCELLANEOUS

Section 9.01    Notices. Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)        if to the Borrower, to it at:

Uber Technologies, Inc.
1455 Market Street, 4th floor
San Francisco, California 94103
Attention: Chief Financial Officer

with copies to:

Uber Technologies, Inc.
1455 Market Street. 4th floor
San Francisco, California 94103
Attention: General Counsel

Cooley LLP
101 California Street, 5th Floor
San Francisco, California 9411
Attention: Gian-Michele a Marca
Fax: (415) 693-2222

111

(ii)      if to the Administrative Agent with respect to the Security Documents or any of the Collateral, to it at:

Morgan Stanley Senior Funding, Inc.
1300 Thames Street, Thames Street Wharf, 4th Floor
Baltimore, Maryland 21231
Attention: Loan Documentation
Phone: (443) 627-4068

with copies to:

Morgan Stanley Senior Funding, Inc.
1 New York Plaza, 41st Floor
New York, New York, 10004
Attention: Agency Team
Fax: (212) 507-6680

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention: James A. Florack
Fax: 212-701-5165

(iii)     if to the Administrative Agent with respect to any other matter, to it at:

Morgan Stanley Senior Funding, Inc.
1 New York Plaza, 41st Floor
New York, New York, 10004
Attention: Agency Team
Fax: (212) 507-6680

with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention: James A. Florack
Fax: 212-701-5165

(iv)     if to MSSF, in its capacity as a Lender, to it at:

Morgan Stanley Senior Funding, Inc.
1 New York Plaza, 41st Floor
New York, New York, 10004
Attention: Agency Team
Fax: (212) 507-6680

(iv)    if to any other Lender or any other Issuing Bank, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

112

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)     Notices and other communications to the Lenders and the Issuing Banks hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender or the applicable Issuing Bank. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)     Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto (provided that any Lender may change its address or telecopy number by notice solely to the Administrative Agent and the Borrower).

(d)     The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders and the Issuing Banks by posting the Communications on, IntraLinks, or another similar electronic system (the "**Platform**"). THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") be responsible or liable for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) to the Borrower, any other Loan Party, any Lender, any Issuing Bank or any other Person arising from the unauthorized use by others of information or other materials obtained through internet, electronic, telecommunications or other information transmission, including, without limitation, the transmission of Communications through the Platform, except to the extent that such damages have resulted from the willful misconduct or gross negligence of such Agent Party (as determined in a final, non-appealable judgment by a court of competent jurisdiction). "**Communications**" means, collectively, any notice, demand, communication, information, document or other material that any Loan Party provides to the Administrative Agent pursuant to any Loan Document or the transactions contemplated

113

therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this <u>Section 9.01</u>, including through the Platform.

(e)    In the event the Borrower shall have any Equity Interests or other securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") or otherwise files or is required to file reports under Section 15(d) of the Exchange Act, the Borrower and each Lender acknowledges that certain of the Lenders may be Public Lenders and, if any document, notice or other information required to be delivered hereunder is being distributed through the Platform, any information that the Borrower has indicated contains Non-Public Information will not be posted on that portion of the Platform designated for such Public Lenders. If the Borrower has not indicated whether a document, notice or other information provided to the Administrative Agent by or on behalf of the Borrower or any Subsidiary contains Non-Public Information, the Administrative Agent reserves the right to post such information solely on the portion of the Platform designated for Lenders that wish to receive material Non-Public Information with respect to the Borrower, the Subsidiaries and its and their securities. Notwithstanding the foregoing, nothing in this Section 9.01(e) shall create any obligation on the Borrower to indicate whether any information contains Non-Public Information, it being further agreed that if any such indication is provided by the Borrower in its discretion, such indication shall create no obligation on the Borrower to provide any such indication in the future.

(f)    Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United State federal and state securities laws, to make reference to information that is not made available through the "Public Side Information" portion of the Platform and that may contain non-public information with respect to the Borrower, the Subsidiaries or its or their securities.

Section 9.02    <u>Waivers; Amendments</u>.

(a)    No failure or delay by the Administrative Agent, any Issuing Bank or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Issuing Banks and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent, the Issuing Banks or any Lender may have had notice or knowledge of such Default or Event of Default at the time. Notwithstanding the foregoing Borrower and Administrative Agent may, without the consent of the other Lenders, amend, modify or supplement this Agreement and any other Loan Document to cure any ambiguity, omission, typographical error, defect or inconsistency if such amendment, modification or supplement if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof.

114

(b)     None of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified (other than the Agent Fee Letter, which may be amended in accordance with its terms) except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders (and a copy thereof shall be provided to the Administrative Agent) or by the Borrower and the Administrative Agent with the consent of the Required Lenders; *provided, however,* that no such amendment, waiver or consent shall: (i) extend or increase the Commitment of any Lender or any Issuing Bank (including, without limitation, amending the definition of "Applicable Percentage") without the written consent of such Lender or such Issuing Bank, as applicable, (ii) reduce the principal amount of any Loan or Letter of Credit or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly affected thereby and, in the case of any Letter of Credit, the applicable Issuing bank, (iii) postpone the scheduled date of payment of the principal amount of any Loan or Letter of Credit, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby and, if applicable, the applicable Issuing Bank; *provided, however,* that notwithstanding clause (ii) or (iii) of this <u>Section 9.02(b)</u>, only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the default rate set forth in <u>Section 2.10(h)</u>, (iv) change <u>Section 2.15(b)</u>, <u>Section 2.15(c)</u> or any other Section hereof providing for the ratable treatment of the Lenders, in each case in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender, (v) release any Holdings Guaranty or all or substantially all of the value of the Guaranties provided by the Guarantors, without the written consent of each Lender, except to the extent the release of any Guarantor is permitted pursuant to <u>Article 8</u> or <u>Section 9.17</u> (in which case such release may be made by the Administrative Agent acting alone), (vi) release all or substantially all of the Collateral from the Liens of the Security Documents or alter the relative priorities of the Secured Obligations entitled to the Liens of the Security Documents, in each case without the written consent of each Lender (it being understood that additional Loans pursuant to Section 2.18 may be equally and ratably secured by the Collateral with the then existing Secured Obligations under the Security Documents), except to the extent the release of any Collateral is permitted pursuant to Section 9.17 (in which case such release may be made by the Administrative Agent acting alone), (vii) change any of the provisions of this Section or the percentage referred to in the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender or (viii) waive any condition set forth in <u>Section 4.01</u> (other than as it relates to the payment of fees and expenses of counsel), or, in the case of any Loans made on the Effective Date, <u>Section 4.02</u>, without the written consent of each Lender and each Issuing Bank. Notwithstanding anything to the contrary herein, no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Issuing Banks hereunder without the prior written consent of the Administrative Agent or the Issuing Banks, as the case may be (it being understood that any change to <u>Sections 2.17</u> and <u>2.20</u> shall require the consent of the Administrative Agent and the Issuing Banks).

(c)     Notwithstanding the foregoing, this Agreement may be amended as contemplated by (i) <u>Section 2.18</u> to effect New Commitments pursuant to a Joinder Agreement with only the consent of the Administrative Agent, the Borrower, the other Loan Parties and the New Lenders providing New Commitments, and (ii) <u>Section 2.19</u> to effect an extension pursuant to an Extension Agreement with only the consent of the Administrative Agent, the Borrower, the other Loan Parties and the Extending Lenders and the New Extending Lenders.

(d)        Notwithstanding anything herein or in any other Loan Document to the contrary, during such period as a Lender is a Defaulting Lender, to the fullest extent permitted by applicable law, such Lender will not be entitled to vote in respect of amendments and waivers hereunder and the Commitment and the outstanding Loans or other extensions of credit of such Lender hereunder will not be taken into account in determining whether the Required Lenders or all of the Lenders or each directly affected Lender, as required, have approved any such amendment or waiver; *provided, however,* that any such amendment or waiver that would increase or extend the term of the Revolving Commitment of such Defaulting Lender, extend the date fixed for the payment of principal or interest or fees owing to such Defaulting Lender hereunder, reduce the principal amount of any obligation owing to such Defaulting Lender, reduce the amount of the rate or amount of interest on any amount owing to such Defaulting Lender (other than in connection with the waiver of any obligation of the Borrower to pay interest at the default rate set forth in <u>Section 2.10(h)</u>) or of any fee payable to such Defaulting Lender hereunder, or alter the terms of this paragraph, will require the consent of such Defaulting Lender.

(e)        Notwithstanding the foregoing, no Lender's consent is required to enter into any Intercreditor Agreement, or to effect any amendment, modification or supplement to the Term Loan Intercreditor Agreement, any other Intercreditor Agreement permitted under this Agreement (i) that is for the purpose of adding the holders of Indebtedness permitted hereunder (or a Senior Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of the Term Loan Intercreditor Agreement or such other intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor or subordination agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing; provided that such other changes are not adverse, in any material respect, as determined in the good faith by the Administrative Agent, to the interests of the Lenders) or (ii) that is expressly contemplated by the Term Loan Intercreditor Agreement (or the comparable provisions, if any, of any other Intercreditor Agreement or arrangement permitted under this Agreement) or (iii) that is otherwise permitted by <u>Section 8.12</u> hereof; provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, as applicable.

Section 9.03    <u>Expenses; Indemnity; Damage Waiver</u>. The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Issuing Banks, the Lenders, the Arrangers and their respective Affiliates, including, without limitation, the reasonable and documented fees and disbursements of one primary firm of counsel for the Administrative Agent, the Issuing Banks, the Lenders and the Arrangers, taken as a whole in connection with the syndication of the credit facilities provided for herein, the preparation, execution, delivery and administration of this Agreement, any other Loan Document or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby shall be consummated); provided that the Borrower's obligations under this clause (a)(i) solely with respect to the preparation, execution and delivery of the Loan Documents on the Effective Date shall be subject to the limitations provided for in the Engagement Letter, and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Issuing Banks, the Arrangers or any Lender, including, without limitation, reasonable and documented fees, disbursements and other charges of one primary firm of counsel for the Administrative Agent, the Issuing Banks, the Lenders and the Arrangers, taken as a whole, (and if reasonably necessary (as determined by the Administrative Agent in consultation with the Borrower), of a single regulatory counsel and a single local counsel in each appropriate jurisdiction and, in the case of an actual or potential conflict of interest

116

where the Administrative Agent, the Issuing Banks, any Lender or any Arranger affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another primary firm of counsel for such affected person (and if reasonably necessary (as determined by such affected person in consultation with the Borrower), of a single regulatory counsel and a single local counsel in each appropriate jurisdiction)), in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this <u>Section 9.03</u>, or in connection with the Loans or Letters of Credit made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)      The Borrower shall indemnify the Administrative Agent, the Issuing Banks, the Arrangers and each Lender, and each Related Party, successor, partner, representative or assign of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented out-of-pocket expenses, including the reasonable and documented fees, charges and disbursements of any a primary firm of counsel for all such Indemnitees (and if reasonably necessary (as determined by such Indemnitees in consultation with the Borrower), of a single regulatory counsel and a single local counsel in each appropriate jurisdiction and, in the case of an actual or potential conflict of interest where the Indemnitee affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another primary firm of counsel for such affected Indemnitee (and if reasonably necessary (as determined by such affected Indemnitee in consultation with the Borrower), of a single regulatory counsel and a single local counsel in each appropriate jurisdiction)), incurred by or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned, leased or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective action, suit, inquiry, claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or the Borrower or any Affiliate of the Borrower); *provided* that such indemnity shall not, as to any Indemnitee, be available, (w) with respect to Taxes and amounts relating thereto (other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim), (x) to the extent that such losses, claims, damages, liabilities, costs or reasonable and documented out-of-pocket expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, (y) if resulting from a material breach by such Indemnitee or one of its controlled Affiliates of its obligations under this Agreement or any other Loan Document (as determined by a court of competent jurisdiction by final and non-appealable judgment), or (z) if arising from any dispute between and among Indemnitees, to the extent such dispute does not involve an act or omission by the Borrower or its Subsidiaries (as determined by a court of competent jurisdiction by final and non-appealable judgment) other than any proceeding against the Administrative Agent or any Arranger, in each case, acting in such capacity. The Borrower will not be required to indemnify any Indemnitee for any amount paid or payable by such Indemnitee in the settlement of any such indemnified losses, claims, damages, liabilities, costs or reasonable and documented expenses which is entered into by such Indemnitee without Borrower's written consent (such consent not to be unreasonably withheld,

117

conditioned or delayed) unless the Borrower was offered the ability to assume the defense of the action that was the subject matter of such settlement and elected not to so assume. In the case of any proceeding to which the indemnity in this paragraph applies, such indemnity and reimbursement obligations shall be effective, whether or not such proceeding is brought by the Borrower, any of its equityholders or creditors, an Indemnitee or any other Person, or an Indemnitee is otherwise a party thereto.

Without limiting in any way the indemnification obligations of the Borrower pursuant to Section 9.03(b) or of the Lenders pursuant to Section 8.06, to the extent permitted by applicable law, each party hereto shall not assert, and hereby waives, any claim against any Indemnitee and the Borrower and its Subsidiaries, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the Transactions or any Loan or Letter of Credit or the use of the proceeds thereof (other than, in the case of the Borrower, in respect of any such damages incurred or paid by an Indemnitee to a third party). No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence, bad faith or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(c)    All amounts due under this Section 9.03 shall be payable promptly after written demand therefor.

Section 9.04    Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in subsection (c) of this Section 9.04), Indemnitees (to the extent provided in Section 9.03) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Banks and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment and the Revolving Loans at the time owing to it) with the prior written consent of:

(A)    the Borrower (not to be unreasonably withheld or delayed); *provided* that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if a Specified Event of Default has occurred and is continuing; and *provided, further,* that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within fifteen (15) Business Days after having received notice thereof;

118

(B)      the Administrative Agent (such consent not to be unreasonably withheld or delayed); *provided* that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund; and

(C)      the Issuing Banks (such consent not to be unreasonably withheld or delayed); *provided* that no consent of the Issuing Banks shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)    Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment or Revolving Loans and subject to Section 2.16(c), the amount of the Revolving Commitment or Revolving Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $15,000,000 (or a greater amount that is an integral multiple of $1,000,000), unless each of the Borrower and the Administrative Agent otherwise consent; *provided* that no such consent of the Borrower shall be required if a Specified Event of Default has occurred and is continuing;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws;

(E)      no such assignment shall be made to (i) any Loan Party nor any Affiliate of a Loan Party, (ii) any Defaulting Lender or any of its subsidiaries, or any Person, who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (ii), or (iii) any natural person;

(F)      in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Revolving Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full

119

*pro rata* share of all Revolving Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs; and

(G)    No assignment or participation shall be made to any Person that was a Disqualified Institution as of the date (the "**Trade Date**") on which the assigning or participating Lender entered into a binding agreement to sell and assign or participate, as applicable, all or a portion of its rights and obligations under this Agreement to such Person (unless the Borrower has consented to such assignment or participation in writing in its sole and absolute discretion, in which case such Person will not be considered a Disqualified Institution for the purpose of such assignment or participation). For the avoidance of doubt, with respect to any assignee or Participant that becomes a Disqualified Institution after the applicable Trade Date (including as a result of the delivery of a supplement to the list of Competitors pursuant to clause (b) of the definition of "**Disqualified Institution**"), (x) such assignee or Participant shall not retroactively be disqualified from becoming a Lender or Participant (but such Person shall not be able to increase its Commitments or participations hereunder) and (y) such assignment or participation and, in the case of an assignment, the execution by the Borrower of an Assignment and Assumption with respect to such assignee will not by itself result in such assignee no longer being considered a Disqualified Institution. Any assignment or participation in violation of this clause (G)(a) shall not be void, but the other provisions of this clause (G)(a) shall apply.

(b)    The Administrative Agent shall have the right (but not the obligation), and the Borrower hereby expressly authorizes the Administrative Agent, to (A) post the list of Disqualified Institutions and any updates thereto from time to time on the Platform, including that portion of the Platform that is designated for "public side" Lenders and/or (B) provide the list of Disqualified Institutions and any updates thereto to each Lender or Participant requesting the same.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this <u>Section 9.04</u>, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Section 2.12</u>, <u>Section 2.13</u>, <u>Section 2.14</u> and <u>Section 9.03</u>); *provided* that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (c) of this <u>Section 9.04</u>.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof

120

from time to time (the "**Register**"). The entries in the Register shall be conclusive (absent manifest error), and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior written notice. The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 9.04(b)(iv), except to the extent that such losses, claims, damages or liabilities are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of the Administrative Agent. The Loans (including principal and interest) are registered obligations and the right, title, and interest of any Lender or its assigns in and to such Loans shall be transferable only upon notation of such transfer in the Register.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; *provided* that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.04, Section 2.15(d) or Section 8.06, the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     (i) Subject to Section 9.04(b)(ii)(G), any Lender may, (x) prior to an IPO, without the consent of, or notice to, the Administrative Agent or the Issuing Banks but with the consent of the Borrower (not to be unreasonably withheld or delayed); *provided* that no consent of the Borrower shall be required for a participation to a Lender, an Affiliate of a Lender, an Approved Fund or, if a Specified Event of Default has occurred and is continuing, any other Participant; and *provided, further,* that the Borrower shall be deemed to have consented to any such participation unless it shall object thereto by written notice to the Administrative Agent within 15 Business Days after having received notice thereof, and (y) after an IPO, without the consent of, or notice to, the Borrower, the Administrative Agent or the Issuing Banks, sell participations to one or more banks or other entities (but not to the Borrower or an Affiliate thereof) (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Revolving Commitment and the Revolving Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrower, the Administrative Agent, the Issuing Banks and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (D) prior to an IPO, unless consented to by the Borrower, no Participant (other than (x) a Participant that is a Lender, an Affiliate of a Lender or an Approved Fund or (y) if a Specified Event of Default has occurred and is continuing, any other Participant) shall receive information regarding the Borrower and its subsidiaries or this revolving credit facility provided pursuant to this Agreement (other than administrative notices delivered pursuant to Article 2). Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without

121

the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to <u>Section 9.02(b)</u> that affects such Participant. Subject to paragraph (c)(ii) of this Section 9.04, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.12</u>, <u>2.13</u> and <u>2.14</u> (subject to the requirements and limitations therein, including the requirements under <u>Section 2.14(f)</u> (it being understood that the documentation required under <u>Section 2.14(f)</u> shall be delivered to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; *provided* that such Participant agrees to be subject to the provisions of <u>Section 2.16</u> as if it were an assignee under paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 9.08</u> as though it were a Lender; *provided* such Participant agrees to be subject to <u>Section 2.15(c)</u> as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under <u>Sections 2.12</u> or <u>2.14</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant except to the extent such entitlement to receive a greater payment results from a Change in Law requiring a payment under <u>Section 2.12</u> that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.16(b) with respect to any Participant.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Revolving Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank having jurisdiction over such Lender, and this <u>Section 9.04</u> shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05    <u>Survival</u>. All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement, the making of any Loans and the issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default, Event of Default or incorrect representation or warranty at the time any credit is extended

122

hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Section 2.12, Section 2.13, Section 2.14, Section 2.20(g) and Section 9.03 and Article 8 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit, the expiration or termination of the Commitments, the resignation of the Administrative Agent, the replacement of any Lender or any Issuing Bank, the resignation of an Issuing Bank or the termination of this Agreement or any provision hereof.

Section 9.06     Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07     Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 9.07, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 9.08     Right of Setoff. If an Event of Default shall have occurred and be continuing, each Issuing Bank, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other obligations at any time owing by such Issuing Bank, such Lender or such Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Issuing Bank or such Lender, irrespective of whether or not such Issuing Bank or such Lender, as applicable, shall have made any demand under this Agreement and although such obligations may be unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Issuing Bank and each Lender under this Section 9.08 are in addition to other rights and remedies (including other rights of setoff) which

123

such Issuing Bank or such Lender may have. Each Issuing Bank and each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIM, CONTROVERSY OR DISPUTE UNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, WHETHER BASED IN CONTRACT (AT LAW OR IN EQUITY), TORT OR ANY OTHER THEORY, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW.

(b)    The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c)    The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in subsection (b) of this Section 9.09. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10    Waiver Of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT (AT LAW OR IN EQUITY), TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO

124

ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10. EACH PARTY HERETO FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES IT JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

Section 9.11    Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    Confidentiality. Each of the Administrative Agent, the Issuing Banks and the Lenders agrees to maintain the confidentiality of the Information (as defined below) and to not use the Information for any purpose except in connection with the Loan Documents and related matters, and to not disclose the Information; *provided* that nothing herein shall prevent the Administrative Agent, the Issuing Banks or the Lenders (collectively, the "**Credit Parties**") and their respective Affiliates from disclosing any Information (i) pursuant to the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law or compulsory legal process or to the extent requested or required by governmental and/or regulatory authorities, in each case based on the reasonable advice of their legal counsel (in which case such Credit Party agrees (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority (or any request by such a governmental bank regulatory authority)) to the extent practicable and not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (ii) upon the request or demand of any regulatory authority having or purporting to have jurisdiction over an Credit Party or any of its Affiliates (in which case such Credit Party agrees (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority (or any request by such a governmental bank regulatory authority)), to the extent practicable and not prohibited by applicable law, to inform you promptly thereof prior to disclosure), (iii) to the extent that such Information become publicly available other than by reason of improper disclosure by such Credit Party or any of its Affiliates in violation of any confidentiality obligations owing to you or any of your Affiliates (including those set forth in this Section), (iv) to the extent that such information is received by a Credit Party from a third party that is not, to such Credit Party's knowledge, subject to contractual or fiduciary confidentiality obligations owing to you, or any of your Affiliates, (v) to the extent that such information is independently developed by any Credit Party without use of the Information, (vi) to each Credit Party's Affiliates and to its and their respective employees, legal counsel, independent auditors and other experts or agents who need to know such Information in connection with this Agreement and the transactions contemplated hereby and who are informed of the confidential nature of such Information ("**Representatives**") and have agreed to be bound (or otherwise already bound by a written agreement) by confidentiality obligations at least as protective of Information as those set forth herein (it being understood that each Credit Party shall be responsible for any breach thereof by its Representatives), (vii) to potential Participants or assignees (which would be permitted Participants or assignees under Section 9.04 and other than Disqualified Institutions), in each case, who agree with or for the express benefit of the Borrower that they shall be bound by the terms of this Section (or language substantially similar and not less protective of the Information than this Section), including, without limitation, via a "click through" or other affirmative action on the part of the potential Participant or assignee to access such Information in accordance with the standard syndication processes of such Credit Party or customary market standards for dissemination of such Information; *provided* that prior to an IPO, no Information may be disclosed to any Participant or prospective Participant without the prior consent of the Borrower (provided that no consent of the Borrower shall be required for a participation to a Lender,

125

an Affiliate of a Lender, an Approved Fund or, if a Specified Event of Default has occurred and is continuing, any other Participant) and, with respect to any prospective assignee, the applicable Lender shall have confirmed with the Administrative Agent and the Borrower that such assignee is a permitted assignee pursuant to Section 9.04 hereof, prior to the disclosure of any Information to such assignee under this clause (vii), (viii) to the extent the Borrower shall have consented to such disclosure in writing, (ix) to the extent reasonably necessary or advisable in connection with the exercise of any remedy or enforcement of any right under the Loan Documents and (x) for purposes of establishing a "due diligence" defense. For the purposes of this Section 9.12, "Information" means all memoranda or other information received from or on behalf of the Borrower, in connection with the Loan Documents and the facilities under the Loan Documents, relating to the Borrower or its business; *provided* that, in the case of Information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    EACH ISSUING BANK AND EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 9.12(A) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER AND ITS RELATED PARTIES OR ITS SECURITIES. ACCORDINGLY, EACH ISSUING BANK AND EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 9.13    Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 9.13 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

126

Section 9.14    <u>No Advisory or Fiduciary Responsibility</u>. In connection with all aspects of each Transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that: (a) (i) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arrangers, the Issuing Banks and the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent, the Arrangers, the Issuing Banks and the Lenders, on the other hand, (ii) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the Transactions contemplated hereby and by the other Loan Documents; (b) (i) each of the Administrative Agent, the Issuing Banks, the Arrangers and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Subsidiaries, or any other Person and (ii) neither the Administrative Agent, any Issuing Bank, any Arranger nor any Lender has any obligation to the Borrower or any of its Affiliates with respect to the Transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent, the Issuing Banks, each Arranger and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent, any Issuing Bank, any Arranger or any Lender has any obligation to disclose any of such interests to the Borrower or its Affiliates. The Borrower, on behalf of itself and each of its Subsidiaries and Affiliates, agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Administrative Agent, any Issuing Bank, any Arranger or any Lender, on the one hand, and the Borrower, any of its Subsidiaries, or their respective equityholders or Affiliates, on the other.

Section 9.15    <u>Electronic Execution of Assignments and Certain Other Documents</u>. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 9.16    <u>USA PATRIOT Act</u>. Each Lender, each Issuing Bank and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower and each Guarantor that, pursuant to the requirements of the USA PATRIOT Act, it may be required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes the name and address of the Borrower and each Guarantor and other information that will allow such Lender, such Issuing Bank or the Administrative Agent, as applicable, to identify the Borrower and each Guarantor in accordance with the USA PATRIOT Act. The Borrower and each Guarantor shall, promptly following a request by the Administrative Agent, any Issuing Bank or any Lender, provide all documentation and other information that the Administrative Agent, any Issuing Bank or such Lender, as applicable, requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

127

Section 9.17    Release of Guarantors; Release of Collateral.

(a)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (and each such Lender hereby expressly consents) (without requirement of notice to or consent of any Lender except as expressly required by Section 9.02), and the Administrative Agent hereby agrees with the Borrower, to take any action reasonably requested by the Borrower to effect the release of any Collateral from the Lien created by the Security Documents or Guarantor from its Guaranty (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 9.02 including, in each case and without limitation, any sale, transfer or other disposition of any Collateral or Guarantor (other than to the Borrower or a Guarantor), (ii) to the extent any such release is permitted at such time pursuant to the Security Agreements (including in connection with the grant of a Permitted Lien), (iii) as required by the terms of any Intercreditor Agreement, (iv) to the extent any Collateral becomes Excluded Collateral (including, but not limited to, release of Pledged Equity upon (x) the consummation of any third party financing with respect to any real estate owned by any Domestic Subsidiary and (y) the transfer of such Pledged Equity that is permitted hereunder or by any Security Document (other than a transfer to a Loan Party) or (v) under the circumstances described in paragraphs (b) or (c) below (and, upon the consummation of any such transaction in preceding clause (i), (ii), (iii), (iv) or (v), such Collateral shall be transferred free and clear of all Liens under the Security Documents and/or such Guarantor shall be released from its obligations under its Guaranty); provided that in the case of any sale, transfer or other disposition (in a single transaction or in a series of related transactions) of all or substantially all of the Pledged IP Collateral (as defined in the U.S. Security Agreement) to any Subsidiary that is not a Guarantor, the Administrative Agent shall be required to take any action requested by the Borrower to effect the release of such Pledged IP Collateral if and only if each of the following additional conditions are satisfied: (x) no Default or Event of Default has occurred and is continuing immediately prior to or after giving effect to such transaction(s), and (y) the Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer certifying that (1) the Borrower has determined that such sale, transfer or other disposition is necessary or desirable in connection with a reorganization, restructuring, optimization or other similar event/action in furtherance of the business interests of the Borrower and its Restricted Subsidiaries, taken as a whole, (2) each transferee in such transaction or series of transactions is a Restricted Subsidiary (or will be designated as such concurrently with the consummation of such transaction or series of transactions), and (3) the Borrower has received or will receive consideration for such Pledged IP Collateral that constitutes fair market value of such Pledged IP Collateral as determined by the Borrower in a commercially reasonable manner (which consideration may be in the form of an intercompany note or Equity Interests issued by such Subsidiary).

(b)    At such time as the Obligations shall have been paid in full (other than contingent indemnification obligations not yet accrued and payable), each of the Guaranties and the Holdings Guaranty shall be terminated and the Collateral shall be released from the Liens created by the Security Documents with respect to the Loans, and the Security Documents and all obligations with respect to the Loans (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(c)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Lenders hereby agree, and the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender), to (i) take any action required by the Borrower having the effect of releasing a Guarantor (other than Holdings) from its Guaranty and as

128

a Grantor under the Security Documents if (A) all or substantially all of the assets of such Guarantor have been sold or otherwise disposed of (including by way of merger or consolidation) to a Person that is not a Borrower or a Guarantor, (B) such Guarantor has been liquidated or dissolved or (C) such Guarantor becomes an Immaterial Subsidiary (and the Borrower has provided notice thereof to the Administrative Agent), in each case to the extent not prohibited by any Loan Document and (ii) enter into non-disturbance and similar agreements in connection with the licensing of intellectual property not prohibited by this Agreement.

(d)    In connection with any release of Collateral of the type described above in <u>clause (a)</u> or <u>(c)</u> or any other transaction involving Collateral which transaction is not prohibited by the Loan Documents, notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (and each such Lender hereby expressly consents) (without requirement of notice to or consent of any Lender except as expressly required by <u>Section 9.02</u>) to take any action with respect to the Collateral requested by the Borrower to the extent necessary to evidence such release or other transaction, including without limitation, executing agreements (including, without limitation, with third parties) with respect to any Collateral, upon the delivery to the Administrative Agent of a certificate signed by an officer of the Borrower stating that such action and the release of the Collateral or other transaction, as applicable, is permitted by each Security Document applicable thereto.

Section 9.18    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Solely to the extent any Lender or Issuing Bank that is an Affected Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 9.19    <u>Acknowledgement Regarding Any Supported QFC's</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the

129

Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    in the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 9.19, the following terms have the following meanings:

**"BHC Act Affiliate"** of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

**"Covered Entity"** means any of the following:

(i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

**"Default Right"** has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

**"QFC"** has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

[Remainder of page intentionally left blank; signature pages omitted]

**Exhibit 21.1**

**Subsidiaries of the Registrant**

Aleka Insurance, Inc.

Neben Holdings, LLC

Portier, LLC

Postmates LLC

Rasier, LLC

Uber B.V.

Uber International C.V.

Uber NL Holdings 1 B.V.

Uber Singapore Technology Pte. Ltd.

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-235776, 333-231430, 333-260925, 333-258780, 333-253677) and Form S-3 (No. 333-239985) of Uber Technologies, Inc. of our report dated February 24, 2022 relating to the financial statements and financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
San Francisco, California
February 24, 2022

Exhibit 31.1

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a)**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Dara Khosrowshahi, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Uber Technologies, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  February 24, 2022

By:  /s/ Dara Khosrowshahi
_____
Dara Khosrowshahi
Chief Executive Officer and Director
*(Principal Executive Officer)*

Exhibit 31.2

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a)**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Nelson Chai, certify that:

1.    I have reviewed this Annual Report on Form 10-K of Uber Technologies, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  February 24, 2022

By:      /s/ Nelson Chai
_____
Nelson Chai
Chief Financial Officer
*(Principal Financial Officer)*

**Exhibit 32.1**

**CERTIFICATIONS OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER
PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Dara Khosrowshahi, the Chief Executive Officer of Uber Technologies Inc., certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of Uber Technologies, Inc. for the fiscal year ended December 31, 2021, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Uber Technologies, Inc.

Date:    February 24, 2022                                    By:    /s/ Dara Khosrowshahi
                                                                    Dara Khosrowshahi
                                                                    Chief Executive Officer and Director
                                                                    *(Principal Executive Officer)*


I, Nelson Chai, the Chief Financial Officer of Uber Technologies Inc., certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of Uber Technologies, Inc. for the fiscal year ended December 31, 2021, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and that information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Uber Technologies, Inc.

Date:    February 24, 2022                                    By:    /s/ Nelson Chai
                                                                    Nelson Chai
                                                                    Chief Financial Officer
                                                                    *(Principal Financial Officer)*