**UBER_JCCP_MDL_003895808-UBER_JCCP_MDL_003895812**



Message

| | |
|---|---|
| From: | Greg Brown [gbrown@uber.com] |
| Sent: | 6/24/2019 3:33:39 PM |
| To: | Sarah Schol [sarah.schol@uber.com]; Ruffin Chevaleau [ruffin@uber.com] |
| BCC: | roger@uber.com |
| Subject: | Fwd: Support Abuse and Urgent Investigations |

Hey Ruffin and Sarah,

I wanted to close the loop with you each on the analysis that Will and team put together for safety support abuse.

We sent the attached email to the Central Ops team, with the understanding that they own prioritizing and communicating next steps to Gus. We'll be sure to let you all know how those recommendations shake out. I did want to provide a further breakdown of our POV on each of the original recommendations laid out in Will's email so as to give some insight into why we did or did not include them in our communication to the Central Ops team (though we did link to the analysis in full, and they have seen the team's recommendations in the original email).

The intent here is very much not to shoot down or censor the team's recommendations, but to provide some open and honest feedback based on our team's additional context. I also think it represents a good feedback opportunity to the extent that you'd like to use all or part of this email in communicating how the analysis was used / what the program team's take on it was. Please let me know if you have any questions or comments - more than happy to discuss further.

For reference: Current US & Canada Support Abuse Standard

**Recommendations Review**

*1.*
*2.    Placing a yearly cap on adjustments and appeasements for riders (excluding Diamond Drivers)- this would address the largest category for both SD and SIU*

It could be argued that the current support abuse standard establishes a "cap" on refunds in that it blocks or bans users who file a significant number of safety complaints in a short period of time or relative to their total number of trips. Based on the audit analysis, it is not clear how establishing an annual cap on refunds would be preferable to the current system or whether a subset of users would be caught by this mechanism which are not already caught in today's system. A static annual cap may also disadvantage power users unless it incorporates sensitivity for trip-based thresholds, which means it would not be significantly different than the status quo. Further analysis would be required to determine whether this would have a meaningful impact. A suggestion to help size the impact of this recommendation might be to tie this back to the audit (i.e., evaluate how many of the users from the audit would have been denied R&A at various thresholds of yearly caps).

*2.*
*3.    Better parity between consequences for driver and rider claims.  As an example, Service Denial has a two-strike policy for drivers; no such policy exists for riders.  SIU has a policy for riders but the threshold is 12 claims in a two week period. The disparity in consequences is significant.*

CONFIDENTIAL

UBER_JCCP_MDL_003895808
UBER_JCCP_MDL_003895808

P-04534.00002

In the program team's view, this is not an apples-to-apples comparison. When it comes to serious safety incidents such as sexual or physical assault, there is parity between users -- deactivation thresholds are agnostic of user type. Service Denial is unique as riders by definition cannot deny service. The two-strike deactivation policy has also been established based on strict regulatory and legal guidelines. The same stipulations do not exist for banning support abusers.

Additionally, thresholds for serious safety or accessibility incidents should not be thought of in the same way as support abuse. These are wholly separate issues. It would not, for example, make sense to ban a rider for making two potentially false service denial claims, as the risk of getting it wrong is *significantly* greater than the loss of R&A and support costs on two trips. Conversely, overlooking a driver's second allegation of service denial could put Uber in breach of established legal obligations, potentially leading to serious financial penalties and brand risk.

3.

4.      ***Stricter rules for clear cases of Support Abuse (i.e. multiple banned accounts).  If a banned account is identified, the claim would be concluded by also banning the rider account. (see Note below)***

We believe that this is an opportunity worth exploring and used it in our recommendation to Central Ops. In the US & Canada, Uber has somewhat limited access controls or identification measures when a user creates an account. This means that once a support abuser is banned, they can create a new account with *relative* ease before getting banned again and repeating the process. Uber does have tools like uGraph at its disposal which can identify connections between accounts and could be used to root out this type of support abuse.

That being said, this approach comes with risks. Being connected to the account of a support abuser does not necessarily imply ill intent on the part of the reporter. Strict standards would need to be established to determine when the connection to a banned account is, in and of itself, representative of support abuse. The better option may be to work with the business and product to create stronger barriers to entry for riders, even if risks rider growth. There is some natural and inherent tension between these priorities, but efforts on this front are already underway. Latin America, for example, has stronger measures to control this behavior than in the US & Canada.

4.

5.      ***Eliminate the practice of refunding trips that were completed (Service Denial) or the claim is Invalidated by Data (SIU).  These findings are clear flags of support abuse and an attempt on the part of the rider to get a refund.***

This is also an option the program team believes is worth pursuing and we used it in our recommendation to Central Ops. If Uber is clearly able to demonstrate that a claim does not match its internal data, then it's reasonable to deny a refund to that user. However, these circumstances would need to be part of a clearly documented standard to avoid ambiguous and inconsistent decision-making. There is a significant difference between a claim being unlikely and a claim being totally unfounded and disprovable.

As a piece of feedback, the frequency of these instances of suspected support abuse is not clear based on the audit and analysis. As such, the size of the impact this change would have on R&A spend is unclear, which makes it difficult to establish the priority of this change.

CONFIDENTIAL

UBER_JCCP_MDL_003895809
UBER_JCCP_MDL_003895809

P-04534.00003

5.

**6.    Predominantly in SIU, establish a process for identifying and preempting claims that are trending towards escalation (increasing severity of claims from same/linked accounts)**

Our interpretation of this recommendation is that there should be a system in place to take some sort of action against users who make increasingly serious incident claims over time. For example, a user who made five verbal altercation claims deciding to "up the ante" and make a sexual assault claim. This is an interesting concept but requires further explanation. It's unclear what actions would be triggered when escalation is identified (Ban? Deny R&A? Invalidate report?).

It's also important to note that similar concepts have been discussed with Safety Legal in the past. It's been their consistent position that making false claims in one area does not mean that a user's safety claims should be dismissed. This is the reason why the 5 in 24 hours / 12 in 14 days rider ban standard only applies to safety contacts and not all contacts. It's likely that any effort to pursue this recommendation would face similar challenges.

6.

**7.    From a big picture, heavy lift perspective, establishing a method for preventing riders from creating duplicate accounts, or at least making it more difficult**

Agreed. The issue of rider access is a hot topic in the Safety and Insurance organization. There are several product proposals related to this need that are being discussed during H2 planning (rider safety locks, access controls experiments, among others).

Thanks!
Greg


---------- Forwarded message ---------
From: **Matthew Baker** <mbaker@uber.com>
Date: Mon, Jun 24, 2019 at 11:25 AM
Subject: Support Abuse and Urgent Investigations
To: Danielle Sheridan <dportugal@uber.com>, Brad Mora <bmora@uber.com>
Cc: Greg Brown <gbrown@uber.com>, Cory Freivogel <cory.freivogel@uber.com>, Catherine Gibbons <cgibbons@uber.com>, Sarah Schol <sarah.schol@uber.com>


Hi Danielle and Brad,

We have been looking into the recent conversation started by the Phoenix COE about support abuse as it relates to urgent safety incidents. Our team has spent some time reviewing the analysis completed by the COE and wanted to provide our own take on the issue.

**TL;DR**
- Urgent safety support abuse is relatively rare (approximately 2% of cases resolved in April show signs of potential support abuse according to the SIU audit)
- Inability to take alternate actions on reports that appear fraudulent is a large point of friction
- Investigators are unsure if they are empowered to manually ban someone for support abuse

SIU completed an audit of cases resolved in April in order to identify examples of potential fraud. Of the 6,693 cases resolved that month, only 127 cases (1.9%) showed signals of potential support

abuse. More than half of these potentially fraudulent claims were allegations of sexual misconduct or assault. The determination that these were potentially fraud was driven by the mega-regional threshold for safety support contacts (5-in-1 or 12-in-14). 47 cases were opened by users who were found to have violated the threshold. An additional 22 users were found to have excessive support contact submissions but were shy of broaching the established threshold. The remainder of the cases were flagged due to a variety of reasons, including:

- Users already in "Blocked" status at the time of their urgent safety contact being submitted
- Multiple contacts submitted for the same trip with different allegations
- Verbatim safety reports for multiple trips

Although this analysis shows that support abuse is relatively rare in urgent safety support, the Program team still believes there are some valid pain points that we can work with your team to address. You'll note that the email from our counterparts at the site included a series of recommendations; we have tried to distill these down into what we think are the most feasible for further action. We believe our biggest opportunity appears to be empowerment of SIU investigators to identify and take action against fraudulent users. Our recommendations are three-fold.

**Clearly Defining Abuse/Fraud**
As we understand it, Matt J. is currently running the regional support abuse ban process initially started by Jeff and Aash. This process is looking for users who submit 5 safety support contacts in a single day or 12 safety support contacts in a 14 day period. It would be helpful to understand if this is the full scope of what we consider safety support abuse regionally or if there are additional considerations, such as an account being linked to another account previously banned for support abuse, submitting differing reports about the same trip, refusing to speak by phone while demanding a refund via message, etc. Fleshing out the definition of abuse/fraud and sharing that definition more broadly with SIU would help them know what to look for when conducting an investigation.

**Alternative Actions**
Once we have aligned on a clearer definition of support abuse, it is important to understand whether or not safety support standards should be updated to prescribe alternate actions for reports that meet the outlined criteria. In current state we continue to waitlist drivers, refund riders, and complete a standard investigation (e.g. multiple call attempts spread across multiple days) despite indicators that might otherwise lead us to think the allegation is not credible. It would be helpful to understand the Standards & Safety Ops perspective on whether or not indicators of fraud should lead to us short-circuiting standard investigation protocol, leading to less wasted time and faster reactivation for accused partners.

**Banning Riders / Duplicate Accounts**
In reviewing a number of cases where riders are deemed support abusers, there seems to be a lack of consistency amongst investigators when it comes to banning the reporting rider. Some investigators appear to manually ban riders who meet the current 5/1 or 12/14 threshold, whereas others do not take any action and wait for the standards process to catch the user at a later date. We would like to formalize whether or not SIU *should* be empowered to ban bad actors, assuming that our teams are aligned on the definition of what constitutes support abuse.

In addition to permission to ban, we are also lacking details on *how* a rider should be properly banned. We currently ban the account as well as the associated device. Banning the device has had some technical glitches that have <u>lead to inadvertent bans of the associated partner device</u> or other users unrelated to an investigation, with the most egregious being an accidental ban on a device in a Greenlight location that caused a cascade ban on dozens of other users who had signed in on the

same device. We are unsure if we should also be banning the payment method linked on the rider account. We recognize that some of these issues are product limitations, but could still use some clarity on what actions should be completed absent a robust product solution. Having a standard for how rider accounts are to be banned would be helpful in addressing these gaps.

While 2% of cases may not sound like a lot, we are talking about over 1,500 investigations each year that are likely fraudulent. That is more than a single week's volume for serious IPC, indicating that we may be wasting a significant amount of resources that could otherwise be used to support issues that are more deserving of our attention. We see an opportunity to reduce friction for our investigators while staying cognizant of brand and legal sensitivity.

--
**Matthew Baker**
Program Manager, Safety Support

# UBER_JCCP_MDL_003895808

## Metadata

| Account | kaiser@uber.com; | SEMANTIC |
|---|---|---|
| All Custodians | Brown, Greg;Kaiser, Roger; | SEMANTIC |
| All Paths | Brown, Greg: \Multi Custodian Gmail\EDISCO-23472_Gmail-75.zip\EDISCO-23472_Gmail--gbrown@uber.com-dinm_O.mbox; Brown, Greg: \Multi Custodian Gmail\EDISCO-23472_Gmail-75.zip\EDISCO-23472_Gmail--gbrown@uber.com-dinm_O.mbox; Kaiser, Roger: \MassTort_Category2_GMAIL\MassTort_Category2_GMAIL-1.zip\MassTort_Category2_GMAIL--kaiser@uber.com_0.mbox.zip\MassTort_Category2_GMAIL--kaiser@uber.com_0.mbox; Kaiser, Roger: \MassTort_Category2_GMAIL\MassTort_Category2_GMAIL-1.zip\MassTort_Category2_GMAIL--kaiser@uber.com_0.mbox.zip\MassTort_Category2_GMAIL--kaiser@uber.com_0.mbox; Kaiser, Roger: \Multi Custodian Gmail\EDISCO-23472_Gmail-53.zip\EDISCO-23472_Gmail--kaiser@uber.com-712JXv.mbox; Kaiser, Roger: \Multi Custodian Gmail\EDISCO-23472_Gmail-53.zip\EDISCO-23472_Gmail--kaiser@uber.com-712JXv.mbox | SEMANTIC |
| Application | RFC822 Email Message | SEMANTIC |
| Bcc | roger@uber.com | SEMANTIC |
| Begin Family | UBER_JCCP_MDL_003895808 | SEMANTIC |
| Confidentiality | Confidential | SEMANTIC |
| Date Created | 06/24/2019 3:33 pm | SEMANTIC |
| Date Modified | 06/24/2019 3:33 pm | SEMANTIC |
| Date Received | 06/24/2019 3:33 pm | SEMANTIC |
| Date Sent | 06/24/2019 3:33 pm | SEMANTIC |
| End Family | UBER_JCCP_MDL_003895812 | SEMANTIC |
| File Path | \MassTort_Category2_GMAIL\MassTort_Category2_GMAIL-1.zip\MassTort_Category2_GMAIL--kaiser@uber.com_0.mbox.zip\MassTort_Category2_GMAIL--kaiser@uber.com_0.mbox | SEMANTIC |
| File Size | 55841 | SEMANTIC |
| From | Greg Brown <gbrown@uber.com> | SEMANTIC |
| GmailMessageId | 1637236536932466022 | SEMANTIC |
| Hidden Content | No; | SEMANTIC |
| ILS All Bates | UBER_JCCP_MDL_003895808;UBER_JCCP_MDL_003895809;UBER_JCCP_MDL_003895810;UBER_JCCP_MDL_003895811;UBER_JCCP_MDL_003895812 | SEMANTIC |
| ILS Document Date | 06/24/2019 | SEMANTIC |
| ILS Pg Count | 5 | SEMANTIC |
| ILS Prod Date | 03/28/2025 | SEMANTIC |
| ILS Prod Vol | JCCP_MDL112 | SEMANTIC |
| Labels | ^ARCHIVED; ^OPENED | SEMANTIC |
| LINKBEGBATES | UBER_JCCP_MDL_000324538 | SEMANTIC |
| LINKGOOGLEDRIVE DOCUMENTIDS | 1bqCgffj1PBUAT7lgdFpjoYR3dbGE2sYFHLiJ95XuNcY | SEMANTIC |
| MD5 Hash | fb4905ac9f9902f9d52ebe0c3b969f99 | SEMANTIC |
| Message Id | <CAPz0ee887c8YqgmskrnzKbWJvSukox5LNxovT4=r=PvFs3c=cQ@mail.gmail.com> | SEMANTIC |
| Non-Contemporaneous | N | SEMANTIC |
| Other Custodians | Brown, Greg;Kaiser, Roger; | SEMANTIC |
| Primary Date | 06/24/2019 3:33 pm | DOC_TYPE_ALIAS |
| Production Volume | JCCP_MDL112; | SEMANTIC |
| Redacted | No | SEMANTIC |
| Sort Date | 06/24/2019 3:33 pm | SEMANTIC |
| Subject | Fwd: Support Abuse and Urgent Investigations | SEMANTIC |
| To | Sarah Schol <sarah.schol@uber.com>; Ruffin Chevaleau <ruffin@uber.com> | SEMANTIC |