[Submitting counsel below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

This Document Relates to:

*WHB 823 v. Uber Techs., Inc., et al.*, No. 3:24-cv-04900

Case No. 3:23-md-03084-CRB

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

**REDACTED VERSION**

Judge: Hon. Charles R. Breyer
Courtroom: 6 – 17th Floor

Date Filed: March 9, 2026
Trial Date: April 14, 2026

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF NORTH CAROLINA**

**CHARLOTTE DIVISION**

WHB 823,

Plaintiff,

v.

UBER TECHNOLOGIES, INC., et al.,

Defendants

CASE NO. 3:25-cv-00737-CRB

Judge: Hon. Charles R. Breyer

**ORAL ARGUMENT REQUESTED**

LAURA VARTAIN HORN (SBN: 258485)
**KIRKLAND & ELLIS LLP**
laura.vartain@kirkland.com
555 California Street, 30th Floor
San Francisco, CA 94104
Telephone: (415) 439-1625

ALLISON M. BROWN (Pro Hac Vice admitted)
**KIRKLAND & ELLIS LLP**
alli.brown@kirkland.com
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000

JESSICA DAVIDSON (Pro Hac Vice admitted)
**KIRKLAND & ELLIS LLP**
jessica.davidson@kirkland.com
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4723

SABRINA H. STRONG (SBN: 200292)
sstrong@omm.com
JONATHAN SCHNELLER (SBN: 291288)
jschneller@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Bradley R. Kutrow
**MCGUIRE WOODS LLP**
bkutrow@mcguirewoods.com
201 N. Tryon St., Suite 3000
Charlotte, NC 28202
Telephone: (704) 343-2049

Counsel for Defendants
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

# TABLE OF CONTENTS


Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT ..... 1
II. STATEMENT OF RELEVANT FACTS ..... 3
A. Uber's Platform and Operations ..... 3
B. Platform Access and Pricing ..... 5
C. Regulatory Classification Under North Carolina Law ..... 6
D. Case-Specific Facts ..... 7
1. Plaintiff's Access to Uber's Platform ..... 7
2. Driver Screening and Access to Uber's Platform ..... 7
E. Alleged Incident ..... 8
F. Post-Incident ..... 8
G. Plaintiff's Psychological History. ..... 8
III. STATEMENT OF THE ISSUES TO BE DECIDED ..... 10
IV. ARGUMENT ..... 11
A. Uber is Not a Common Carrier. ..... 11
1. Uber Is Not a Carrier ..... 12
2. Uber Does Not Hold Itself Out to the Public Indifferently. ..... 17
B. Uber Cannot Be Held Vicariously Liable for the Acts of an Independent-Contractor Driver. ..... 20
1. Richardson Was an Independent Contractor ..... 21
2. Uber Owed No Nondelegable Duty and Therefore Cannot Be Held Vicariously Liable for an Independent Contractor's Torts. ..... 25
C. Plaintiff's Evidence Is Legally Insufficient to Establish Pain and Suffering and Mental-Anguish Damages. ..... 28
V. CONCLUSION ..... 30

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ademovic v. Taxi USA, LLC*,
767 S.E.2d 571 (N.C. App. 2014) .......... 22, 24

*Alford v. Victory Cab Co.*,
228 S.E.2d 43 (N.C. App. 1976) .......... 23, 24

*Anderson v. Chi. Transit Auth.*,
131 N.E.3d 1245 (Ill. App. Ct. 2019) .......... 15

*Beavers v. Fed. Ins. Co.*,
437 S.E.2d 881 (N.C. App. 1994) .......... 11, 12

*Click v. Pilot Freight Carriers, Inc.*,
265 S.E.2d 389 (N.C. 1980) .......... 29

*DeRose for Est. of DeRose v. DoorDash, Inc.*,
675 F. Supp. 3d 591 (E.D.N.C. 2023) .......... 2, 21, 25, 27

*Dobson v. Salvation Army*,
683 S.E.2d 467, 2009 WL 3174572 (N.C. App. 2009) .......... 29

*E.B. v. Uber Techs., Inc.*,
No. 2024-CP-46-2996 (Jun. 13, 2025 S.C. Court of Common Pleas) .......... 13

*Essex Ins. Co. v. Barrett Moving & Storage, Inc.*,
885 F.3d 1292 (11th Cir. 2018) .......... 14

*Ferrell v. City of Charlotte*,
2015 WL 13604391 (W.D.N.C. Mar. 31, 2015) .......... 27

*Franze v. Bimbo Bakeries USA, Inc.*,
826 F. App'x 74 (2d Cir. 2020) .......... 23

*Garrison v. S. Ry. Co.*,
64 S.E. 578 (N.C. 1909) .......... 18

*Godwin v. Carolina Tel. & Tel. Co.*,
48 S.E. 636 (N.C. 1904) .......... 17

*Gordon v. Garner*,
493 S.E.2d 58 (N.C. App. 1997) .......... 13, 26, 27

*Gray v. Cent. Warehouse Co.*,
106 S.E. 657 (N.C. 1921) .......... 17

*Hairston v. Atlantic Greyhound Corp.*,
18 S.E.2d 166 (N.C. 1942) .......... 3, 27, 28

*Harden v. N.C. R. Co.*,
40 S.E. 184 (N.C. 1901) .......... 26

*Hayes v. Bd. of Trs. of Elon Coll.*,
29 S.E.2d 137 (N.C. 1944) .......... 21, 23

*Home Ins. Co. v. Riddell*,
252 F.2d 1 (5th Cir. 1958) .......... 19, 20

*Jackson v. Stancil*,
116 S.E.2d 817 (N.C. 1960) .......... 11, 19, 20

*Lee v. City Cab of Tarboro*,
718 S.E.2d 737 (N.C. App. 2011) .......... 23, 24

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Little v. Poole*,
182 S.E.2d 206 (N.C. App. 1971) .......... 21, 24

*Mann v. Va. Dare Transp. Co.*,
198 S.E.2d 558 (N.C. 1973) .......... 16, 25

*Mays v. Uber Freight, LLC*,
2024 WL 332917 (W.D.N.C. Jan. 29, 2024) .......... 13, 14

*Medley v. N.C. Dep't of Correction*,
412 S.E.2d 654 (N.C. 1992) .......... 21, 25

*Motor Haulage Co. v. Maltbie*,
57 N.E.2d 41 (N.Y. 1944) .......... 18

*Nat'l Ass'n of Regul. Util. Comm'rs v. F.C.C.*,
525 F.2d 630 (D.C. Cir. 1976) .......... 20

*Neece v. Richmond Greyhound Lines, Inc.*,
99 S.E.2d 756 (N.C. 1957) .......... 16

*Newsome v. Surratt*,
74 S.E.2d 732 (N.C. 1953) .......... 25, 26

*Osborne v. Yadkin Valley Econ. Dev. Dist., Inc.*,
865 S.E.2d 307 (N.C. App. 2021) .......... 27

*Park v. Merrill Lynch*,
582 S.E.2d 375 (N.C. App. 2003) .......... 15

*Parker v. Erixon*,
473 S.E.2d 421 (N.C. App. 1996) .......... 26

*Patterson v. Duke Power Co.*,
36 S.E.2d 713 (N.C. 1946) .......... 15, 20

*Potts v. Howser*,
161 S.E.2d 737 (N.C. 1968) .......... 29

*Reco Transp., Inc. v. Emp. Sec. Comm'n of N. Carolina*,
344 S.E.2d 294 (N.C. App. 1986) .......... 24

*Rhoney v. Fele*,
518 S.E.2d 536 (N.C. App. 1999) .......... 23

*Saacke N. Am., LLC v. Landstar Carrier Servs., Inc.*,
2013 WL 7121197 (W.D.N.C. Dec. 19, 2013) .......... 14

*Smith v. Helpin*,
785 S.E.2d 743 (N.C. App. 2016) .......... 30

*Starr Indem. & Liab. Co. v. RXO Capacity Sols., LLC*,
2024 WL 2979728 (W.D.N.C. May 10, 2024) .......... 14

*State ex rel. Utilities Comm'n v. Am. Courier Corp.*,
174 S.E.2d 814 (N.C. 1970) .......... 17, 25, 26

*State ex rel. Utilities Comm'n v. Tar Heel Indus., Inc.*,
334 S.E.2d 396 (N.C. App. 1985) .......... 19

*State ex rel. Utils. Comm'n v. Bird Oil Co.*,
273 S.E.2d 232 (N.C. 1981) .......... 19

**TABLE OF AUTHORITIES**
**(continued)**


**Page(s)**

*State ex rel. Utils. Comm'n v. Gulf-Atl. Towing Corp.*, 110 S.E.2d 886 (N.C. 1959) ........ 11, 17, 18, 19

*State v. Bryant*, 614 S.E.2d 479 (N.C. 2005) ........ 13, 15

*State v. Phillips*, 905 S.E.2d 23 (N.C. 2024) ........ 12

*Taylor v. Shreeji Swami, Inc.*, 820 F. App'x 174 (4th Cir. 2020) ........ 29, 30

*Terminal Taxicab Co. v. Kutz*, 241 U.S. 252 (1916) ........ 18, 20

*Victory Cab Co. v. City of Charlotte*, 68 S.E.2d 433 (N.C. 1951) ........ 25

*Walker v. L.B. Price Mercantile Co.*, 166 S.E. 511 (N.C. 1932) ........ 30

*Ward v. Allied Van Lines, Inc.*, 231 F.3d 135 (4th Cir. 2000) ........ 14

*Weade v. Dichmann, Wright & Pugh*, 337 U.S. 801 (1949) ........ 13, 14

*White v. Norfolk & S.R. Co.*, 20 S.E. 191 (N.C. 1894) ........ 25, 28

*Williams v. Hines*, 29 S.E. 879 (N.C. 1898) ........ 28

*Woodson v. Rowland*, 407 S.E.2d 222 (N.C. 1991) ........ 25

**Statutes**

13 Am. Jur. 2d Carriers § 1 ........ 13

14 Am. Jur. 2d Carriers § 678 ........ 15

N.C. Gen. Stat. § 20-280.1 ........ 6

N.C. Gen. Stat. § 20-280.1(3) ........ 7, 19

N.C. Gen. Stat. § 20-280.1(4) ........ 7

N.C. Gen. Stat. § 20-280.1(5) ........ 3, 7, 13, 27

N.C. Gen. Stat. § 20-280.1(6) ........ passim

N.C. Gen. Stat. § 20-280.3 ........ 7

N.C. Gen. Stat. § 20-280.3(a) ........ 26

N.C. Gen. Stat. § 20-280.6 ........ 5

N.C. Gen. Stat. § 20-280.7 ........ 11

N.C. Gen. Stat. § 20-280.8 ........ passim

N.C. Gen. Stat. § 62-1 ........ 11

N.C. Gen. Stat. § 62-260 ........ 11

N.C. Gen. Stat. § 62-3(11) ........ 25

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

N.C. Gen. Stat. § 62-3(1a) .......... 12, 16

N.C. Gen. Stat. § 62-3(2) .......... 25

N.C. Gen. Stat. § 62-3(23)(a)(3) .......... 25

N.C. Gen. Stat. § 62-3(23)(a)(4) .......... 25

N.C. Gen. Stat. § 62-3(6) .......... 11

N.C. Gen. Stat. § 62-3(7) .......... 11

N.C. Gen. Stat. 62-262(a) .......... 25, 26

**Other Authorities**

Barry Smith, *Governor Signs Bill Barring Local Uber, Lyft Regulations*, THE CAROLINA JOURNAL (Sept. 4, 2015), https://perma.cc/MA2L-FLLG .......... 6

Drew DeSilver, *Q&A: How Pew Research Center studied gig workers in the U.S.*, PEW RSCH. CTR. (Dec. 8, 2021) https://perma.cc/9PXR-E4MC .......... 13

Ely Portillo, *McCrory signs bill to regulate Uber, other ride-hailing apps*, CHARLOTTE OBSERVER (Sept. 4, 2015), https://perma.cc/S6RA-6C5B .......... 6

**Treatises**

Restatement (Second) Torts § 428 .......... 26

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

Please take notice that on a date and time to be set by the Court, before the Honorable Charles R. Breyer in Courtroom No. 6 on the 17th Floor of the San Francisco Courthouse for the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Uber"), by and through their undersigned counsel, will and hereby do move the Court for summary judgment in favor of Uber and against Plaintiff WHB 823 on the claims and theories described herein.

Uber seeks summary judgment, pursuant to Federal Rule of Civil Procedure 56, based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, any oral argument the Court may permit, and all pleadings and papers on file in this action and on such other matters as may be presented to the Court at or before the hearing.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Uber is a technology company—not a transportation provider. Uber's software platform matches users seeking transportation services with independent third-party drivers willing to provide those services. As the company's contracts and operations make clear, Uber owns no vehicles, employs no drivers, and carries no passengers. Recognizing this, the North Carolina General Assembly declined to regulate Uber under the State's existing common-carrier laws, instead enacting a comprehensive statutory framework in 2015 classifying Uber as a Transportation Network Company ("TNC"). Under that statute, Uber's function as a TNC is to "connect passengers with TNC drivers." N.C. Gen. Stat. ("G.S.") § 20-280.1(6). The TNC statute establishes a presumption that those "TNC driver[s]" are independent contractors rather than Uber employees. *Id.*, § 20-280.8. And the statute makes clear that it is those presumptively independent-contractor drivers—not Uber—"who provide prearranged transportation services." *Id.* § 20-280.1(6). Uber's Terms of Use ("Terms" or "TOU") notify every user of this statutorily mandated division of responsibility, under which independent contractors, rather than Uber, provide transportation.

Plaintiff alleges that, in 2019, she used the Uber App to request a ride in Raleigh. Upon reaching her destination, her independent driver, Jeffrey Richardson, allegedly placed his hand on her thigh and made a suggestive comment. Plaintiff originally pleaded claims against Uber for negligence, breach of implied warranty, and negligent design defect. But Plaintiff has now disavowed all of those claims, including any contention that Uber was itself negligent. Dkt. 5264 at 2. Instead Plaintiff now asserts that Uber is a "common carrier"—despite the statutory, contractual, and practical realities that Uber itself did not itself transport Plaintiff (or anyone else)—allegedly subject to a "non-delegable duty" to safeguard passenger safety. Dkt. 2496-4 ("Am. Compl.") at ¶¶ 11-14. Therefore, according to Plaintiff, Uber is vicariously liable as a matter of law for ***any*** assault committed by any independent-contractor driver. *Id.*

Plaintiff's theory wrongly equates common carrier status with vicarious liability. But in any event, her theory fails under North Carolina law, and Uber is entitled to summary judgment, for two independent reasons.

***First*, Uber is not a common carrier.** The North Carolina legislature has recognized Uber as a distinct business that is fundamentally unlike traditional carriers. The legislature could have regulated Uber under the state's existing common or motor carrier statutes. It didn't. Instead, North Carolina chose to regulate Uber under a new TNC statute and as part of a distinct industry. That law, in turn, defines Uber's function as "connect[ing] passengers with TNC drivers," and expressly instructs that it is the "TNC drivers"—not Uber—"who provide prearranged transportation services." G.S. § 20-280.1(6). That limited, statutorily codified role connecting riders and drivers establishes, as a matter of North Carolina law, that Uber is not a carrier at all. Uber's Terms, which every user must accept, confirm the same: they specifically disclaim common carrier status, assign all transportation responsibilities to third-party drivers, and expressly notify users that Uber is not a "provider of transportation" or a "transportation carrier." The undisputed evidence further underscores that Uber is not a carrier: Uber owns no vehicles, employs no drivers, and maintains no depots, terminals, or garages. Uber does not guarantee transport to users and advises users that no transport may occur at all if a driver is not available on the platform. And even setting aside the threshold question whether Uber is a "carrier" at all, Uber lacks the defining hallmarks of a "common" carrier: apart from generally applicable antidiscrimination laws, it retains and exercises the substantial right to refuse service to members of the public (e.g., through account deactivations) for a wide variety of reasons, and it charges individualized dynamic prices rather than fixed tariffs. Those practices are totally incompatible with more than a century of unbroken North Carolina law defining common carrier status. For all of those reasons, Uber is not a common carrier—as state courts applying North Carolina have determined.

***Second*, even if Uber were a common carrier, Plaintiff could not hold Uber vicariously liable for the conduct of her independent-contractor driver.** In North Carolina, "one who employs an independent contractor is not liable for the independent contractor's acts." *DeRose for Est. of DeRose v. DoorDash, Inc.*, 675 F. Supp. 3d 591, 600 (E.D.N.C. 2023).[1] That rule applies here because, by statute and practice, Richardson was an independent contractor, and no exception to the rule applies. Plaintiff invokes a "nondelegable duty" exception, but North Carolina imposes nondelegable duties only on

[1] Unless otherwise noted, all emphases are added and internal citations and quotations are omitted.

*statutory* common carriers regulated under North Carolina's Public Utilities Act, reasoning that they cannot delegate duties they assume in exchange for state-issued franchises. Uber is indisputably not a franchised common carrier under the Public Utilities Act—the legislature regulated it exclusively as a TNC operating under a permit from the Division of Motor Vehicles ("DMV"). And far from imposing nondelegable duties, the TNC statute affirmatively authorizes—and in fact requires—Uber to delegate the transportation function to presumptively independent third-party drivers. *See* G.S. §§ 20-280.1.

In the alternative, Uber is entitled to partial summary judgment on Plaintiff's demand for pain and suffering or mental anguish damages, which seeks compensation for "PTSD" and "anxiety symptoms." Plaintiff's medical records make clear that she suffered serious preexisting trauma and anxiety symptoms related to her long and tragic history of severe traumas, [REDACTED] . North Carolina law requires that Plaintiff prove aggravation of such complex, pre-existing conditions through competent medical expert testimony. Plaintiff's withdrawal of her only psychological expert, Dr. Heleya Rad, leaves her with no legally sufficient evidence to carry that burden, entitling Uber, at minimum, to summary judgment on pain and suffering or mental anguish damages.

# I. STATEMENT OF RELEVANT FACTS

## A. Uber's Platform and Operations

Uber is a technology company that uses proprietary matching technology to develop and maintain digital multi-sided marketplace platforms. On one side of the marketplace, businesses and individuals use Uber's platforms to connect with customers and obtain payment processing services. On the other, users connect and obtain various services from businesses and individuals including drivers, restaurants, healthcare providers, rental car companies, and retailers. Uber connects those parties through an online-enabled smartphone application ("Uber App" or "App"). Uber's platforms include Rides (connecting people with transportation options—from micro mobility to car rentals to trips with independent drivers) and Eats (connecting people with merchants and delivery people for the delivery of meals, groceries, household items and other goods). Declaration of Erin O'Keefe ISO Defs.' Mot. for

Summ. J. ("O'Keefe Decl.") ¶¶ 3, 5.[2] For Uber's Rides marketplace platform, riders download a rider version of the Uber App ("Rider App") and drivers download a driver version ("Driver App"); together the Apps allow users to access the platform that facilitates the technology connection of individuals in need of a ride with individuals willing to provide transportation services. *Id.* ¶ 6.

Uber does not "dispatch" drivers or otherwise control the operational details of rides provided by independent drivers in North Carolina. O'Keefe Decl. ¶ 8. Nor does Uber employ drivers. *Id.* ¶ 9. Instead, transportation is provided "solely" by independent contractors. *See* Ex.1 at -3340.[3] Uber does not own, operate, or lease the passenger vehicles that independent drivers use to provide transportation. O'Keefe Decl. ¶ 13. And it maintains no central location where riders can access transportation services, such as a terminal, depot, or garage. *Id.* ¶ 10. Drivers are exclusively responsible for the registration, maintenance, and operation of their own vehicles, and must procure personal auto liability insurance. Ex. 1 at -3331, -3338; O'Keefe Decl. ¶¶ 11-12.

If no match is found between a rider and a willing third-party provider, no transportation or other service takes place. O'Keefe Decl. ¶ 14. Drivers retain the "sole right" to determine when, where, and if they use the App, and can use the platform as a casual or occasional undertaking, with no regular schedule or minimum-hours requirement, without penalty. Ex. 1 at -3331; O'Keefe Decl. ¶¶ 15, 17. In 2019, approximately 96.18% of drivers in North Carolina spent less than 20 hours per week in engaged time (en route to pick up riders and on trip)—including Plaintiff's driver, who averaged 17.72 hours per week.. *Id.* ¶ 18-19. And drivers are permitted to "multi-app"—offer their services on the Uber platform simultaneously with other rideshare or delivery platforms, such as Lyft or DoorDash. *Id.* ¶ 20. Nor do drivers operate on fixed routes: drivers may serve any area they choose, and if a driver elects to accept a ride, they may determine their own route, including by using the navigation technology of their choice. *Id.* ¶¶ 21-22.

---

[2] Citations to "O'Keefe Decl." refer to the concurrently filed Declaration of Erin O'Keefe in support of Defendants' Motion for Summary Judgment.

[3] Citations of the form "Ex. __" refer to exhibits to the concurrently filed Declaration of Jonathan Schneller.

**B. Platform Access and Pricing**

To request a ride through the Rider App, a user must download the App, register as a rider, and agree to the Terms of Use. O'Keefe Decl. ¶ 24. The Terms specify that drivers are independent third party providers. *Id*. The Rider App requires users to provide contact information and payment details before service and Uber does not permit drivers to accept street hails from unidentified members of the public. *Id.* ¶¶ 25, 29. By accepting Uber's Terms, Plaintiff expressly acknowledged the nature of Uber's services, agreeing that her "ability to obtain transportation . . . services through the use of [Uber's] services does not establish Uber as a provider of transportation . . . or as a transportation carrier." Ex. 3 at -478.

The Terms make clear, moreover, that access to Uber's platform is conditional. Under the Terms, Uber reserves the unqualified right to deny or revoke platform access "at any time for any reason," without regulatory review. O'Keefe Decl. ¶ 26; Ex. 3 at -475. Uber frequently exercises this right, banning users for a variety of discretionary reasons such as low user ratings, community guidelines violations (e.g., threatening or rude behavior), fraudulent activity, transportation of prohibited items, or other behaviors deemed inappropriate or unsafe in Uber's sole discretion. *Id.* Uber thus routinely screens, monitors, and excludes users based on standards it defines and enforces. *Id.* ¶ 27. As just one example, Uber blocks rider accounts with fake names, and has taken steps to make it easier for drivers to flag rider accounts with fake or inappropriate names. As of the time of publishing Uber's 2021-2022 U.S. Safety Report in 2024, Uber has banned over 15,000 rider accounts from the platform as a result of these checks. *Id.* ¶ 27; Ex. 4 at -3561532

Individuals who wish to offer their transportation services sign up electronically to gain access to the Driver App. O'Keefe Decl. ¶28. At the time of the alleged incident, North Carolina law mandated that drivers: (1) submit personal identifying information; (2) provide a copy of a valid state driver's license, proof of insurance, and vehicle registration for their vehicle and (3) consent to a third-party criminal background check and a third-party driving history check. *See id.*; G.S. § 20-280.6.

Uber collects a service fee for facilitating the connection between riders and drivers. Ex. 1 at -3334; O'Keefe Decl. ¶ 35. Independent drivers are separately "entitled to charge a fare" for providing

transportation services to riders, Ex. 1 at -3334; O'Keefe Decl. ¶ 36, and the fare is "owed directly" to the independent driver by the rider, Ex. 3 at -482; O'Keefe Decl. ¶ 36. Uber processes payment as the driver's "limited payment collection agent" and remits those fares to the driver. Ex. 1 at -3334; O'Keefe Decl. ¶ 36.

Uber does not use static rates or fixed tariffs in North Carolina. O'Keefe Decl. ¶ 35. Instead, it calculates a recommended fare through a dynamic pricing algorithm based on multiple real-time variables, including time of day, location, rider demand, and independent driver supply. *Id.* ¶ 37. Uber sends trip requests to multiple independent drivers, who independently decide whether to accept the request based on their assessments of the expected earnings, expected pick up location, rider rating, and other personal preferences. *Id.* ¶ 38. Drivers retain the "sole right" to determine when, where, and if they use the App, the option "to accept or to decline or ignore a User's request," and the option to cancel an accepted request via the App. *See* Ex. 1 at -3331; O'Keefe Decl. ¶¶ 15-16, 38. Drivers can decline or cancel ride requests for a variety of reasons, including but not limited to the requested destination, expected earnings, and rider ratings. O'Keefe Decl. ¶ 38. Riders likewise retain the right to reject drivers or cancel a trip after a request is submitted and before transportation begins. *Id.* ¶ 37.

If an independent driver accepts a rider request and the rider does not cancel before the trip begins, the rider and driver enter into a "direct business relationship," and the driver agrees and acknowledges that he has "sole responsibility for any obligations or liabilities to Users or third parties that arise from [the driver's] provision of Transportation services." Ex. 1 at -3330; O'Keefe Decl. ¶ 43. Independent drivers further "undertake not to hold [themselves] out as . . . employee[s], agent[s], or authorized representative[s]" of Uber. Ex. 1 at -3340. Riders are told that drivers are independent "third party providers providing transportation services," and that Uber makes no "guarantee regarding the . . . availability of the services." Ex. 3 at -483.

**C. Regulatory Classification Under North Carolina Law**

Recognizing the need for "independence and flexibility," in 2015 the North Carolina General Assembly enacted a comprehensive regulatory scheme governing Transportation Network Companies ("TNC") to "encourage[] competition, innovation, and open[] the door to individual entrepreneurship"

while "increasing safety." *See* G.S.§ 20-280.1 *et seq*.[4] Unlike traditional common carriers, which are regulated under the state's Public Utilities Act, North Carolina regulates Uber's local operating subsidiary, Rasier, LLC, as a TNC under a permit issued by the North Carolina Department of Motor Vehicles. *See* G.S. § 20-280.3; O'Keefe Decl. ¶ 23.

The TNC statute defines the respective functions of TNCs like Uber and "TNC drivers," and repeatedly makes clear that transportation is provided by drivers—not the TNC. The statute defines a TNC as a *connecting mechanism* that "uses an online-enabled application or platform to *connect passengers* with TNC drivers." G.S. § 20-280.1(6). By contrast, it is "TNC drivers who provide prearranged transportation services." *Id.* "TNC service" likewise means "[p]rearranged transportation service *provided by a TNC driver*," and a "TNC driver" is a person who "uses a passenger vehicle" and "connect[s] with passengers in exchange for payment of a fee to the [TNC]." *Id.* § 20-280.1(4), (5). There is a "rebuttable presumption" that a "TNC driver is an independent contractor and *not an employee*." *Id.* § 20-280.8. The design of the legislature was clear that the relationship between drivers and TNCs is presumably that of independent contractors. TNC services are limited to "prearranged" services by "advance request" and exclude "soliciting passengers for immediate transportation," e.g., by accepting street hails. *See id.* § 20-280.1(3); O'Keefe Decl. ¶ 29. The statute contains no service mandates and imposes no obligation to serve any particular route, community, or geographic area.

### D. Case-Specific Facts

#### 1. Plaintiff's Access to Uber's Platform

Plaintiff signed up for the Uber Rides platform on March 14, 2019. O'Keefe Decl. ¶ 31. Plaintiff assented to Uber's Terms the same day. *Id.* ¶ 32; *see also* Ex. 3; Dkt. 3484 (PTO 29) at 4 (concluding that Plaintiffs, including WHB 823, unambiguously "manifested their assent to the terms by checking a box and clicking 'Confirm'").

#### 2. Driver Screening and Access to Uber's Platform

Jeffrey Lamar Richardson applied to drive with the Uber platform on October 30, 2018 and

[4] Ely Portillo, *McCrory signs bill to regulate Uber, other ride-hailing apps*, CHARLOTTE OBSERVER (Sept. 4, 2015), https://perma.cc/S6RA-6C5B; Barry Smith, *Governor Signs Bill Barring Local Uber, Lyft Regulations*, THE CAROLINA JOURNAL (Sept. 4, 2015), https://perma.cc/MA2L-FLLG.

received platform access on November 9, 2018. Ex. 5 at 391:19-24. Richardson accepted the December 11, 2015 Technology Services Agreement ("TSA"), and related addenda, which were operative on the date of the alleged incident. O'Keefe Decl. ¶¶ 33-34. Uber, through third-party vendor Checkr, conducted a background check of Richardson that revealed no disqualifying criminal history. Ex. 6 at ¶ 56. Uber received no complaints about Richardson related to sexual misconduct before the alleged incident. *Id.* ¶ 59. Richardson maintained a 4.92 star rating from users; of the 694 rider ratings he received, only ten were below a 4 out of 5. Ex. 6 at ¶¶ 58-59.

**E. Alleged Incident**

On March 26, 2019, around 1:20 A.M., Plaintiff used the Uber App to request a ride from [redacted] home to her nearby residence in Raleigh. Ex. 7 at 24:19-25:3; 31:3-21. When Richardson arrived, Plaintiff accepted his invitation to sit in the front seat. *Id.* at 33:2-11. The trip took approximately 28 minutes and ended at about 1:53 A.M. *Id.* at 172:21-173:3. The ride itself was uneventful. *Id.* at 33:2-34:3. Plaintiff alleges that, upon arriving at her destination, Richardson grabbed her thigh and asked if he "could keep it with him," to which she responded "no" and immediately exited the vehicle. Am. Compl. at ¶ 9; Ex. 7 at 33:15-21.

**F. Post-Incident**

Plaintiff did not report the alleged incident to Uber or the police. Ex. 7 at 37:17-19. She continued to use Uber after the alleged incident and does not use other rideshare apps. *Id.* at 48:1-11. Uber first learned about Richardson's alleged misconduct from Plaintiff's counsel in February 2023, nearly four years after it allegedly occurred. Uber immediately placed a temporary safety lock on Richardson's account, removing his access to the Uber Platform. Ex. 5 at 471:17-472:3. On January 28, 2025, Uber permanently deactivated Richardson and banned him from the platform. *Id.* at 217:25-218:2.

**G. Plaintiff's Psychological History.**

Plaintiff seeks damages for [redacted] Ex. 8 at 8-9, and testified the March 2019 incident is "the sole contributing factor to" her [redacted]. Ex. 7 at 117:17-23. None of Plaintiff's medical records identifies the alleged incident as a source of her [redacted]. Instead, they document [redacted] diagnoses predating the incident and link her [redacted] to a host of pre-incident



events. *See* Ex. 9 at 5-6, 10-11 (summarizing Plaintiff's social and medical history); *see also* Ex. 10 at 208:8-209:2. Plaintiff "never discussed" the incident with her [REDACTED] who treated her from January 2023 until March 2024. Ex. 11 at 32:7-11, 33:18-34:4.

[redacted]

## II. STATEMENT OF THE ISSUES TO BE DECIDED

1. Whether Plaintiff's claim based on an asserted common-carrier nondelegable duty fails because (a) Uber is not a common carrier; or (b) Plaintiff has not established any exception to the rule that vicarious liability does not apply to the tortious conduct of an independent contractor.

2. Whether Plaintiff presented sufficient evidence that the alleged assault caused her to sustain the injuries for which she seeks pain and suffering damages.

## III. ARGUMENT

Plaintiff abandoned her claims that Uber was negligent. She now proceeds only on the theory that Uber is vicariously liable for any assault by a driver because Uber is purportedly a common carrier that owes a nondelegable duty to ensure passenger safety. That argument fails twice over. Uber is not a common carrier under North Carolina law. And even if it were, it would owe no nondelegable duties and therefore could not be held vicariously liable for assaults by an *independent-contractor* driver.

### A. Uber is Not a Common Carrier.

As a threshold matter, North Carolina's regulatory scheme forecloses Plaintiff's common-carrier theory. The North Carolina General Assembly chose not to designate Uber as a carrier but rather as a "transportation network company" that is subject to regulation by the Division of Motor Vehicles under Article 10a of Chapter 20 of its General Statutes. *See* G.S. §§ 20-280.1(6), 20-280.7. Uber is not classified as a common carrier subject to regulation by the North Carolina Utilities Commission under Chapter 62 of the General Statutes. *See id.* § 62-1, *et seq.* The legislature's decision to regulate Uber under a separate statutory framework—which defines a TNC's function as "connect[ing] passengers with TNC drivers" who are presumptively independent contractors—demonstrates that Uber does not satisfy the definition of common carrier as a matter of North Carolina law.

Under both common law and statute, a common carrier "is one who holds himself out to the public as engaged in the public business of transporting persons for compensation . . . offering his services to such of the public generally as choose to employ him and pay his charges." *Jackson v. Stancil*, 116 S.E.2d 817, 824 (N.C. 1960); G.S. § 62-3(6)-(7) (same). In North Carolina, the common law and statutory test are functionally identical.[5] *See Beavers v. Fed. Ins. Co.*, 437 S.E.2d 881, 883 (N.C. App. 1994) (applying both definitions); *State ex rel. Utils. Comm'n v. Gulf-Atl. Towing Corp.*, 110 S.E.2d 886, 889-91 (N.C. 1959) ("*GATCO*") (same). Uber does not satisfy that test for two independent reasons. ***First***, Uber has never engaged in transportation of persons—as the TNC statute mandates, it operates a technology network that connects riders with independent drivers. ***Second***, Uber does not

[5] A separate statutory provision exempts some carriers falling under this definition from statutory common-carrier treatment. *See* G.S. § 62-260.

hold itself out indifferently to the general public; rather, it reserves (and exercises) the right to refuse platform access, and it employs dynamic pricing that matches riders and drivers on a ride-by-ride basis.

**1. Uber Is Not a Carrier.**

Plaintiff's common-carrier theory fails because Uber is not a "carrier" at all.

Under both common law and statute, "the fundamental service which a common carrier renders is *transportation*." *Beavers*, 437 S.E.2d at 883 (emphasis in original). But Uber does not transport anyone, as North Carolina's TNC statute says on its face. *See State v. Phillips*, 905 S.E.2d 23, 33 (N.C. 2024) ("Where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give it its plain and definite meaning."). Uber operates a digital network that connects riders with independent third-party drivers who provide transportation. That makes Uber an arranger of transportation—not a carrier—as demonstrated by North Carolina's regulatory scheme, Uber's Terms, and the undisputed operational reality.

***Statutory Structure.*** North Carolina's statutory framework draws a clear line between entities that carry and entities that merely arrange carriage. Under North Carolina General Statutes section 62-3(7), a "common carrier by motor vehicle" is a person that "holds itself out to the general public to engage in transportation . . . of persons or household goods . . . for compensation." A "broker," by contrast, is a person who is not a motor carrier but who "holds himself . . . out by solicitation, advertisements, or otherwise, as one who sells, provides, furnishes, contracts, or arranges for such transportation for compensation, either directly or indirectly." G.S. § 62-3(1a). That latter definition makes clear that an entity can "hold itself out" as "providing" or "furnishing" transportation—by facilitating or arranging it—without becoming a "common carrier by motor vehicle." *Id.*

That is precisely what Uber does, and what the North Carolina TNC statute requires Uber to do. Under the TNC statute, a "transportation network company" is an entity that "uses an online-enabled application or platform to connect passengers with TNC drivers who provide prearranged transportation services." G.S. § 20-280.1(6). "TNC Service" is defined as "[p]rearranged transportation service *provided by a TNC driver*," *id.* § 20-280.1(5) (emphasis added), and the driver who "provide[s] . . . transportation" is presumptively "an independent contractor and not an employee," *id.* § 20-280.8.

The statute thus assigns Uber the function of connecting drivers and riders—not transporting them—while assigning the transportation function to independent third-party drivers.[6] North Carolina imputes "knowledge of [these] statutes" to the public. *State v. Bryant*, 614 S.E.2d 479, 488-89 (N.C. 2005). And there is no reason to question that the public broadly understands that statutorily mandated arrangement in which independent drivers, not Uber, provide transportation.[7]

An entity that does not itself provide transportation cannot be a carrier. In *Gordon v. Garner*, for example, the North Carolina Court of Appeals held that the defendant was "neither a common nor contract carrier" because it owned "no dump trucks or other transportation vehicles and is therefore incapable of transporting property for compensation." 493 S.E.2d 58, 60-62 (N.C. App. 1997). The same is true of Uber, which owns no passenger vehicles, employs no drivers, and is itself "incapable of transporting" anyone. *See id.* The Western District of North Carolina similarly found that Uber Freight was a broker, not provider, of transportation. *See Mays v. Uber Freight, LLC*, 2024 WL 332917, at *3 (W.D.N.C. Jan. 29, 2024) ("Plaintiffs have not plausibly alleged that Uber [Freight] is a motor carrier rather than a broker" under Federal Aviation Administration Authorization Act).

That conclusion tracks the common law rule that a "mere arranger of transportation does not incur the liability of a common carrier." *Weade v. Dichmann, Wright & Pugh*, 337 U.S. 801, 807 (1949); *see* 13 Am. Jur. 2d Carriers § 1 ("A . . . company that hires another company [to carry] . . . is not a 'carrier.'"). In *Weade*, a passenger sued the agent of a steamboat operator after being sexually assaulted by a cook onboard the ship. 337 U.S. at 803. Although the agent had responsibility "to issue tickets, maintain the vessel in the service directed by the United States, maintain terminals and offices, arrange for the loading and unloading of passengers, arrange for advertising, provisioning of the ship, and the procuring of officers and crew for hire by the master," the United States Supreme Court held that "[t]he

[6] Based on this statutory regulatory regime, state courts have already held that "Uber is not a 'common carrier' under North Carolina law," reasoning that "North Carolina classifies Uber as a 'transportation network company' ('TNC')," and "TNCs and common carriers are regulated under distinct statutory schemes . . . [s]o any attempt to treat Uber as a common carrier under North Carolina tort law would be contrary to the clear policy choice made by North Carolina's legislature." *E.B. v. Uber Techs., Inc.*, No. 2024-CP-46-2996 (Jun. 13, 2025 S.C. Court of Common Pleas), Ex. 17 at 8.

[7] *See* Drew DeSilver, *Q&A: How Pew Research Center studied gig workers in the U.S.*, PEW RSCH. CTR. (Dec. 8, 2021) https://perma.cc/9PXR-E4MC ("In our survey, 62% of Americans say [TNC] drivers are most appropriately described as contractors, while about a third say they're best described as employees.").

[agent's] duties ended at the shore line." *Id.* at 805, 807 & n.5. Because the agent "was not in any way engaged in the *carriage* of passengers . . . and had never held itself out to the public as ready to engage in such traffic," it was not a common carrier. *Id.* at 808.

Federal courts applying the Interstate Commerce Act—which "codified the common law of carriers," *Saacke N. Am., LLC v. Landstar Carrier Servs., Inc.*, 2013 WL 7121197, at *4 (W.D.N.C. Dec. 19, 2013) (citing *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 138 (4th Cir. 2000))—confirm the point. To distinguish brokers from carriers, the "key question" is contractual: whether "the entity accepted legal responsibility to transport" or instead "merely agreed to locate and hire a third party" to undertake the transportation. *Starr Indem. & Liab. Co. v. RXO Capacity Sols., LLC*, 2024 WL 2979728, at *5 (W.D.N.C. May 10, 2024); *see Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1301 (11th Cir. 2018) (courts "distinguish brokers from carriers" under "longstanding common-law rules" based on the "contractual understanding between parties" and reject carrier status where a party "makes clear in writing that it is merely acting as a go-between". In *Mays*, for example, the court held that Uber Freight was a broker, not a carrier, because its contract contained "a clause effectively identifying Uber as the broker" and another entity as the "carrier," and no countervailing "indication that Uber actually held itself out as a carrier or that it exercised control over [the driver]." 2024 WL 332917, at *3 (W.D.N.C. Jan. 29, 2024). Accordingly, the court gave effect to "the broker-motor carrier agreement." *Id.* Conversely, the company in *Saacke* was a carrier because its "Terms and Conditions" represented that it "may act as a carrier," it "retained the discretion to transport," and it physically handled and loaded the goods. 2013 WL 7121197, at *7.

***Uber's Terms.*** Every user must accept Uber's Terms of Use before requesting rides through the Uber App. Those Terms clearly communicate that independent drivers—not Uber—transport riders. The Terms define Uber's "Services" as "enabl[ing] users to *arrange and schedule* transportation . . . *with third party providers* of such services" subject "to acceptance by the respective Third Party Providers." Ex. 3 at -478. They further state that Uber's Services are made available "by or in connection with . . . independent Third Party Providers, including Transportation Network Company drivers." *Id.* at 479. And users must acknowledge conspicuous language affirming that the "ability to obtain transportation . .

. services through the use of [Uber's] services does not establish Uber as a provider of transportation . . . or as a transportation carrier," and that "services may be used to request and schedule transportation . . . with third party providers, but [users] agree that Uber has no responsibility to [users] related to any transportation . . . services provided to [users] by third party providers." *Id.* Drivers likewise acknowledge that Uber "provides lead generation to independent providers of . . . passenger transportation services," that Uber's services "enable an authorized transportation provider to seek, receive, and fulfill requests for transportation services from an authorized user," and that their "provision of Transportation Services" to users "create[s] a direct business relationship between [drivers] and [riders]." Ex. 1 at -3329, -3330.

Just as North Carolina law imputes "knowledge of [the TNC] statutes" to the public, *Bryant*, 614 S.E.2d at 488-89, it imputes knowledge of contractual terms to those who accept them, *Park v. Merrill Lynch*, 582 S.E.2d 375, 380 (N.C. App. 2003). And this Court has already concluded that Plaintiffs unambiguously "manifested their assent to the [Uber] terms by checking a box and clicking 'Confirm.'" Dkt. 3484 (PTO 29) at 4-5, 10-11. Taken together, both the statutory framework and the contractual terms put the public (including Plaintiff) on notice that Uber arranges transportation but does not provide it. Uber cannot be a carrier when North Carolina law and its contract provide ample notice that it does not engage in transportation.

***Operational Realities.*** The TNC statute and Uber's Terms correspond to the facts on the ground. A carrier-passenger relationship cannot exist unless a passenger is "in some substantial sense in the custody or under the control of [the] carrier." 14 Am. Jur. 2d Carriers § 678; *see Anderson v. Chi. Transit Auth.*, 131 N.E.3d 1245, 1256 (Ill. App. Ct. 2019) ("a person must have placed himself under the control of a carrier in order to be entitled to its care as a passenger"). North Carolina law ties the carrier-passenger relationship—and the heightened duties it creates—to the carrier's direct physical control over the passenger and the means of carriage. *See, e.g.*, *Patterson v. Duke Power Co.*, 36 S.E.2d 713, 714-16 (N.C. 1946) (carrier-passenger relationship exists because carrier maintains "complete control of its roadbeds, stations, platforms, and yards," and "at least a limited control over and direction of the passenger"; no relationship exists when the rider "is outside the direction and control of the carrier").

The duties North Carolina imposes on common carriers likewise presuppose physical control over the transportation: Carriers must "provid[e] adequate conveyances with sufficiently strong and serviceable equipment for the safe transportation of its passengers" including by inspecting "equipment at proper intervals and keeping them in good repair." *Mann v. Va. Dare Transp. Co.*, 198 S.E.2d 558, 565-66 (N.C. 1973).

Uber possesses none of the custody or control that carrier status presupposes. Uber does not own, operate, or lease the vehicles independent drivers use to provide transportation. O'Keefe Decl. ¶ 13. Uber does not "dispatch" drivers or control the operational details of the rides. *Id.* ¶ 8. Nor does it maintain any central location where riders may access services, such as a terminal, depot, or garage. *Id.* ¶ 10. Uber also does not employ the drivers who actually exercise physical control over the transportation. *Id.* ¶¶ 8-9. Instead, TNC drivers are independent contractors who bear exclusive responsibility for their vehicles' registration, maintenance, and operation; are responsible for procuring personal auto liability insurance; can serve the geographic area of their choice; and can simultaneously "multi-app" for competitors like Lyft. *Id.* ¶¶ 11-12, 20, 22.

*

The plaintiffs in the parallel JCCP proceedings argued that Uber is a common carrier in California because it "marketed the Uber App to provide rides to the public in 'Ubers.'" Pltfs.' Opp. to Mot. for Summ. J., JCCP No. 5188, at 14 (S.F. Super. May 23, 2025). But that is clearly not enough in North Carolina,[8] where a party can "hold himself . . . out by . . . advertisements . . . as one who . . . provides" or "furnishes . . . transportation for compensation" and qualify as a "broker," *not* a common carrier. G.S. § 62-3(1a). Here, the TNC statute, Uber's terms, and the undisputed facts on the ground furnish the critical context in which Uber holds out its services, and all point to the same conclusion: Uber arranges transportation but does not provide it. The law classifies Uber as a TNC whose function is to "connect" riders with independent drivers—not to carry them. Uber's Terms expressly inform every user that all transportation responsibilities are discharged by independent third-party drivers, not Uber.

[8] Judge Schulman held that Uber is a common carrier as a matter of California law. That ruling, which Uber intends to appeal at the earliest opportunity, has no bearing on Uber's status under North Carolina's well-developed legal regime for common-carrier liability.

And Uber in fact lacks the custody and control over the means of conveyance and riders that carrier status presupposes. No reasonable juror could conclude, in the face of the statutory commands and uncontroverted evidence, that Uber holds itself out as the party engaged in transportation.

**2. Uber Does Not Hold Itself Out to the Public Indifferently.**

Even if Uber were a carrier, it would not be a *common* carrier. The defining characteristic of a *common* carrier is that it serves the public indifferently: a "common carrier is one who holds himself out to the public as engaged in the public business of transporting persons or property for others for compensation from place to place, offering his services to such of the public generally as [they] choose to employ him and pay his charges." *GATCO*, 110 S.E.2d at 889. That obligation is mandatory: "The common carrier *must* provide service on call and demand to all of the public . . . and in return for the obligation and duty to provide such service the common carrier is granted certain franchise protection[.]" *State ex rel. Utilities Comm'n v. Am. Courier Corp.*, 174 S.E.2d 814, 816 (N.C. 1970). Uber fails this test in two dispositive respects: it retains and exercises a right to refuse service, and it charges individualized dynamic prices rather than fixed rates.

***Refusing Service.*** The fundamental dividing line between a common carrier and a private (or contract) carrier is the right to refuse service on a case-by-case basis. A common carrier "hold[s itself] out to the public as ready to accept and carry . . . all who offer," whereas "a private or contract carrier . . . *may refuse* to . . . contract for carriage" and "is not *bound to serve every person who may apply*." *GATCO*, 110 S.E.2d at 889-90. North Carolina applies this distinction strictly. A common carrier cannot refuse service even based on a passenger's past misconduct: while a carrier need not facilitate an ongoing crime, it "could not refuse to convey [a passenger] because he had done an illegal act." *Gray v. Cent. Warehouse Co.*, 106 S.E. 657, 663 (N.C. 1921); *see Godwin v. Carolina Tel. & Tel. Co.*, 48 S.E. 636, 637 (N.C. 1904) (a common carrier "would not be authorized to refuse to convey the plaintiff because she keeps a bawdyhouse" or based on a rider's "unlawful and disreputable purpose" or character).

Critically, a general willingness to serve the public does not amount to holding out indifferently if the entity retains the right to refuse service—even if it rarely exercises that right. The North Carolina

Supreme Court held that the barge operator in *GATCO* was not a common carrier even though its operator testified that he would haul for anyone willing to pay; ""It wouldn't make any difference who called me if they were going to pay me." 110 S.E.2d at 890-91. The fact that the company retained discretion to "choose not to contract with anyone" was determinative of private-carrier status as a matter of law. *Id.* at 890-91.[9] The United States Supreme Court has applied the same rule. In *Terminal Taxicab Co. v. Kutz*, the Court held that although the defendant "advertise[d] extensively" for its car service and "generally accepts any seemingly solvent customer," it was a private carrier because it reserved "the right to refuse the service." 241 U.S. 252, 255 (1916). Just as an "ordinary shopkeeper may refuse his wares arbitrarily," a service that maintains its discretion to decline "is not public as the word is used." *Id.* at 256.

Under this standard, Uber plainly is not a common carrier. Through the Terms, Uber reserves an unqualified contractual right to deny or revoke access to its services "at any time for any reason," without regulatory review. Ex. 3 at -475. Uber regularly exercises that discretion by banning users for a a variety of reasons, including issues like low ratings or community guidelines violations (e.g., threatening or rude behavior) that are not considered by traditional common carriers. O'Keefe Decl. ¶ 26. This is not anything like the occasional, reactive refusals sometimes imposed by public transit; thousands of users are prohibited from using the platform in any given year. *Id.* The record thus reflects a systematic, proactive gatekeeping function in which Uber screens, monitors, and excludes users on an ongoing basis pursuant to standards that Uber alone defines and enforces. That reservation and exercise of the right to refuse service on its own forecloses common carrier status. *See GATCO*, 110 S.E.2d at 890-91.

Other features of the platform reinforce that Uber does not serve the public indifferently. By statute, TNCs offer only "prearranged" services by "advance request," which expressly excludes "soliciting passengers for immediate transportation"—unlike traditional taxis, TNCs are statutorily prohibited from offering indiscriminate service to anonymous members of the public. *See* G.S. § 20-

[9] *See also, e.g.*, *Garrison v. S. Ry. Co.*, 64 S.E. 578, 582 (N.C. 1909) (a common carrier must "secure to every person constituting a part of the public an equal and impartial participation" in the service); *Motor Haulage Co. v. Maltbie*, 57 N.E.2d 41, 49 (N.Y. 1944) ("A common carrier is subject to an action at law for damages in case of refusal to perform its duties to the public for a reasonable compensation[.]").

280.1(3). And Uber's Terms limit those prearranged services to registered users, who must "agree that [they] may be denied access to or use of the Services if [they] refuse to provide proof of identity or other method of identity verification," and who "must maintain accurate, complete, and up-to-date Account" and "payment" information. Ex. 3 at -479-80. The Terms disclaim any obligation to serve: "Uber makes no . . . guarantee regarding the . . . availability of the services." *Id.* at -483.

Independent drivers, too, retain complete discretion to refuse service. Each driver has the right "to accept or to decline or ignore a User's request for Transportation Services via the Uber Services." Ex. 1 at -3331. To facilitate this choice, the App provides the independent driver with information about the rider and trip—including requested destination, estimated trip distance, rider ratings, and more. O'Keefe Decl. ¶ 41. Drivers are free to decline rides based on expected earnings or the rider's rating. O'Keefe Decl. ¶ 39. A digital marketplace in which both the platform and every individual driver retain discretion to refuse service for any lawful reason is the opposite of a common carrier.

***Individualized Pricing.*** The second hallmark of common carriage absent from Uber's platform is uniform pricing. In North Carolina, a common carrier must charge a "uniform tariff" that is "equally available, and on the same terms, to all." *State ex rel. Utils. Comm'n v. Bird Oil Co.*, 273 S.E.2d 232, 239 (N.C. 1981); *see Stancil*, 116 S.E.2d at 824 (a common carrier holds itself out "at a fixed rate"). "[C]ontract carriers, by contrast, are not subject to this requirement." *State ex rel. Utilities Comm'n v. Tar Heel Indus., Inc.*, 334 S.E.2d 396, 397 (N.C. App. 1985). Instead, private contract carriers form individualized agreements for transportation based on mutually agreed prices: "[e]ach act of transportation is a separate and individual" transaction and, rather than "for the public convenience and necessity." *GATCO*, 110 S.E.2d at 889. Such individually agreed-upon rates are not "compatible with public service as a common carrier." *Tar Heel Indus.*, 334 S.E.2d at 399. When a business "exercises the right to fix specific rates in each individual case" by "basing the charges . . . on [the] contemporary judgment of the moment," it undertakes transportation "differently, not indifferently." *Home Ins. Co. v. Riddell*, 252 F.2d 1, at 3-4 (5th Cir. 1958); *see GATCO*, 110 S.E.2d at 890 (citing *Riddell* approvingly).

Uber's pricing model looks nothing like the fixed tariffs characteristic of common carriers. Neither Uber nor independent drivers hold themselves out as "willing to carry at a fixed rate." *Stancil*,

116 S.E.2d at 824. Instead, Uber's platform is built entirely on individualized bargains. *See also*, *e.g.*, Ex. 1 at -3331 (drivers retain option "to accept or to decline or ignore a User's request for Transportation Services"). Consistent with its primary business as a multi-sided marketplace, Uber earns a service fee for facilitating digital connections, not a fare for physical transportation. O'Keefe Decl. ¶¶ 35-36; *see also* Ex. 1 at -3334. And rather than a uniform public tariff, Uber's algorithm generates dynamic recommended prices driven by supply and demand including independent drivers' willingness to carry, the requested route, and other real-time variables. O'Keefe Decl. ¶ 33. Both riders and drivers have discretion to accept or reject the recommended fares if the price is unsatisfactory. Ex. 1 at -3331. Because this platform model relies on the "contemporary judgment of the moment," *Riddell*, 252 F.2d at 4, and lacks the "mechanical fixity" of a public tariff, *Kutz*, 241 U.S. at 255, it facilitates "individualized decisions, in particular cases"—the defining attribute of private carriage. *Nat'l Ass'n of Regul. Util. Comm'rs v. F.C.C.*, 525 F.2d 630, 641 (D.C. Cir. 1976).[10]

**B. Uber Cannot Be Held Vicariously Liable for the Acts of an Independent-Contractor Driver.**

Plaintiff's action fails as a matter of law because Uber is not a common carrier for all the reasons shown above. But even were it otherwise, Plaintiff's legal claim against Uber still would not be viable under North Carolina law. Plaintiff has disclaimed any theory based on Uber's own conduct and has instead committed to pursue "only a vicarious liability theory" based on a common carrier's asserted "non-delegable duty to provide safe transportation." Dkt. 5264 at 2. Setting aside for the moment that Plaintiff conflates common carrier duties with vicarious liability, no such nondelegable duty exists here.

Under North Carolina's TNC statute, Richardson is presumptively an independent contractor, and, as shown below, the undisputed evidence furnishes no basis to overcome that presumption. The

[10] Uber likewise lacks the "established place of business" that indicates common carrier status. *Stancil*, 116 S.E.2d at 825 (N.C. 1960). Common carriers traditionally maintain depots, terminals, or garages from which vehicles are dispatched and passengers are received. *See Patterson v. Duke Power Co.*, 36 S.E.2d 713, 714 (N.C. 1946). Because it does not own passenger vehicles, Uber maintains no such central garage or depot. O'Keefe Decl. ¶¶ 10, 13. Moreover, many independent drivers do not undertake transportation "as a regular business," instead choosing to transport passengers "as a casual or occasional undertaking"—a telltale sign of contract carriage. *Stancil*, 116 S.E.2d at 824; O'Keefe Decl. ¶ 17. The complete absence of centralized transit infrastructure or scheduled service further confirms that Uber is not a common carrier.

baseline rule is that "one who employs an independent contractor is not liable for the independent contractor's acts." *DeRose*, 675 F. Supp. 3d at 600. The onus is thus on Plaintiff to prove an "exception to the rule of nonliability by a principal for the work of independent contractors" because Uber owed her a "nondelegable duty." *Medley v. N.C. Dep't of Correction*, 412 S.E.2d 654, 657 (N.C. 1992). But North Carolina has recognized a nondelegable duty only for *statutory* common carriers that have been granted a public franchise. Leaving aside that Uber is not a common carrier, there can be no claim that it operates under a public franchise—it operates under a TNC permit that affirmatively *requires it* to delegate the performance of transportation services to third parties. That statutory command forecloses Plaintiff's nondelegable duty theory.

**1. Richardson Was an Independent Contractor.**

Under North Carolina law, TNC drivers are presumptively independent contractors. G.S. § 20-280.8. While this "presumption may be rebutted by application of the common law test for determining employment status," *id.*, reflects the legislature's judgment that the relationship between rideshare platforms and drivers typically lacks the degree of control required for employment. North Carolina recognizes employment or agency only where the principal "has the right to control the worker with respect to the manner or method of doing work, as distinguished from the right merely to require certain definite results conforming to the contract." *Little v. Poole*, 182 S.E.2d 206, 209 (N.C. App. 1971). To evaluate control, courts consider the following non-exhaustive factors "which ordinarily earmark one as an independent contractor rather than an employee":

> The person employed (a) is engaged in an independent business, calling, or occupation; (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work; (c) is doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis; (d) is not subject to discharge because he adopts one method of doing the work rather than another; (e) is not in the regular employ of the other contracting party; (f) is free to use such assistants as he may think proper; (g) has full control over such assistants; and (h) selects his own time.

*Hayes v. Bd. of Trs. of Elon Coll.*, 29 S.E.2d 137, 140 (N.C. 1944).

The undisputed facts establish that Uber does not have the right to control independent drivers under the above factors. Accordingly, Plaintiff cannot overcome the statutory presumption that Richardson was an independent contractor.

a. *Independent calling*

As codified by statute, TNC drivers like Richardson are engaged in independent businesses, callings, or occupations. Uber's business is operating multi-sided platforms that connect, for example, riders with drivers (the Rides platform in this case), restaurants and retailers with customers (the Uber Eats platform), and shippers with freight carriers (the Uber Freight platform). North Carolina's TNC statute confirms that Uber's role as a TNC is the maintenance of "a *technology network*" that "uses an online-enabled application or platform to *connect passengers* with TNC drivers." G.S. § 20-280.1(6); O'Keefe Decl. ¶¶ 3, 5, 6. TNC drivers like Richardson, by contrast, provide "prearranged transportation services." G.S. § 20-280.1(6). There is no reasonable dispute that Uber's "technology network" is a distinct business from the transportation furnished by independent drivers.

This distinction is explicit not only by statute but in Richardson's agreement with Uber, in which he "expressly agree[d]" that the "Agreement is not an employment agreement," does not "create an employment relationship," and that the relationship "is solely that of independent contracting parties." Ex. 1 at -3340; O'Keefe Decl. ¶ 9. Richardson likewise agreed that he is an "independent provider[]" of passenger transportation, that his "provision of Transportation Services to Users create[s] a *direct business relationship* between" himself and riders, and that he "undertake[s] not to hold [himself] out as an employee, agent or authorized representative of [Uber]." Ex. 1 at -3328, 3330, 3340; O'Keefe Decl. ¶ 42. Such "express and explicit language indicating that plaintiff was not an employee . . . , but an independent contractor" likewise supports independent contractor status. *See Ademovic v. Taxi USA, LLC*, 767 S.E.2d 571, 579 (N.C. App. 2014).

Operational realities confirm this independence: Uber does not "dispatch" drivers or otherwise control operational details of rides provided by independent drivers. O'Keefe Decl. ¶ 8. Nor does Uber own, operate, or lease the passenger vehicles that independent drivers use to provide transportation. *Id.* Drivers alone determine whether and to what extent they wish to perform transportation services using

Uber's platform, and riders owe the fare for transportation services directly to drivers. *Id.* ¶¶ 36, 38. Nothing about Uber's relationship with Richardson justifies deviating from his binding agreement, the operational reality, or the TNC statute's independent contractor presumption.

b. *Contractors' knowledge, special skill, or training*

The TNC statute's presumption also reflects a judgment that TNC drivers make "independent use of [their] special skill, knowledge, or training in the execution of the work." *Hayes*, 29 S.E.2d at 140. Drivers use their independent knowledge to provide the services they want and to maximize profits. For example, Richardson decided when and where to use the Uber App to benefit from demand and higher prices. He was free to accept or reject trips as he saw fit, including based on expected earnings or the rider's star rating. If he accepted a request, he could use his knowledge of the area to complete rides as efficiently as possible and thus maximize his time and earnings. He was also free to use his knowledge about Uber's competitors to find the most desirable or profitable opportunities in real time. The profitability and success of Richardson's work thus turned in large part on his own "initiative, judgment, or foresight—all attributes of a typical independent contractor." *See e.g., Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 78 (2d Cir. 2020) (unpublished).

c. *Fixed contract payments*

"Payment of a fixed contract price or lump sum ordinarily indicates that the worker is an independent contractor, while payment by a unit of time, such as an hour, day, or week, is strong evidence that he is an employee." *Rhoney v. Fele*, 518 S.E.2d 536, 540 (N.C. App. 1999). Drivers are not paid by Uber based on a unit of time. Indeed, Uber does not pay drivers at all. Instead, riders owe a payment to drivers for each individual ride they complete, and drivers retain the fare (less Uber's service fee) and any gratuity. And Uber collects only a service fee for each ride. O'Keefe Decl ¶ 35; Ex. 1 at -3334. That compensation structure further confirms drivers' independent contractor status, *see, e.g.*, *Alford v. Victory Cab Co.*, 228 S.E.2d 43, 46 (N.C. App. 1976) (taxi driver an independent contractor where he "kept all the fares and tips he earned").

d. *Control over method of work*

Similarly, a TNC driver like Richardson "is not subject to discharge because he adopts one

method of doing the work rather than another." *Hayes*, 29 S.E.2d at 140. North Carolina courts have cited taxi drivers' "freedom to decline a fare" as "indicating [drivers are] not subject to discharge" under this factor. *Lee v. City Cab of Tarboro*, 718 S.E.2d 737, 737 (N.C. App. 2011) (unpublished). Here, too, Richardson was free to decline any trip request, or cancel a trip after initially accepting, for any lawful reason—including destination, expected earnings, and rider ratings. O'Keefe Decl. ¶¶ 38-39. As explained above, Richardson determined when to work, the vehicle he used, the geographic area in which to perform services, the route for accepted requests, and whether to "multi-app" simultaneously on other platforms, such as Lyft or DoorDash. O'Keefe Decl. ¶¶ 15, 20, 22. Richardson's far-reaching control demonstrates "a great deal of autonomy in performing [his] work" and further cements his independent contractor status. *See Lee*, 718 S.E.2d at 737.

e. *Remaining factors, including "regular employ," and time selection*

The remaining factors also favor independent contractor status. TNC drivers are not "in the regular employ" of Uber, "select[] [their] own time," *Little*, 182 S.E.2d at 209, and are free to provide rides through a competitor app at the same time they offer their services on the Uber App. O'Keefe Decl. ¶¶ 9, 15, 19; Ex. 1 at -3331. Richardson (like 96% of independent drivers in North Carolina) spent less than 20 hours per week, on average, in engaged time (en route to pick up riders and on trip) on the Uber App. O'Keefe Decl. ¶ 18-19. Based on Uber's internal database, Richardson's average weekly engaged time (en route to pick up riders and on trip) spent using the Uber App was 17.72 hours per week.

As North Carolina courts have held for analogous transportation providers, such "complete control over [their] work schedule" forecloses employee status. *Alford*, 228 S.E.2d at 46; *see Reco Transp., Inc. v. Emp. Sec. Comm'n of N. Carolina*, 344 S.E.2d 294, 297 (N.C. App. 1986) (no employment where trucker "could refuse requests by [company] to haul loads of freight and instead haul loads of freight that the driver arranged"); *Ademovic*, 767 S.E.2d at 579 (no employment where "[d]efendant Taxi did not determine the number of days or the number of hours plaintiff worked, instead allowing plaintiff to determine his own work schedule").

In short, North Carolina's statutory presumption correctly reflects that a typical TNC driver like

Richardson—with total autonomy over his personally-owned vehicle, rides, schedule, and routes—is "an independent contractor and not an employee." G.S. § 20-280.8. That presumption accords with decades of North Carolina caselaw holding that a driver's control over his work schedule and freedom to decline individual rides establish an independent contractor relationship, and there is no factual basis to upset it here. *See, e.g.*, *Alford*, 228 S.E.2d at 46 (finding driver to be independent contractor because he "had complete control over his work schedule while he used the cab" and "could disregard the radio dispatcher"); *Ademovic, LLC*, 764 S.E.2d at 507 (same where driver "determine[d] his own work schedule"). And nothing merits upsetting it here.

**2. Uber Owed No Nondelegable Duty and Therefore Cannot Be Held Vicariously Liable for an Independent Contractor's Torts.**

Because Richardson was an independent contractor, Uber cannot be held vicariously liable for Richardson's alleged tortious conduct unless Plaintiff can establish "an exception to [the] general rule" of nonliability for independent contractors' torts, such as a nondelegable duty. *Woodson v. Rowland*, 407 S.E.2d 222, 234 (N.C. 1991). Nondelegable duties exist only in "certain limited situations," *DeRose*, 675 F. Supp. 3d at 600, based on a "policy judgment that certain obligations are of such importance that employers should not be able to escape liability merely by hiring others to perform them," *Medley*, 412 S.E.2d at 841. Examples include where an "independent contractor engages in ultra-hazardous or inherently dangerous work," *DeRose*, 675 F. Supp. 3d at 600, or where a "public authority" grants a corporation a "franchise" to undertake activities posing a "danger to the public," *Newsome v. Surratt*, 74 S.E.2d 732, 735 (N.C. 1953). Plaintiff claims that North Carolina has recognized a nondelegable duty owed by common carriers, but she misses a critical distinction. North Carolina has imposed such duties only on *statutory* common carriers regulated under the state's Public Utilities Act, not common-law carriers exempt from such regulation. And the rationales for such duties are inapplicable to TNCs.

Start with North Carolina's justifications for imposing nondelegable duties on *statutory* common carriers "operating under a public franchise." *Mann*, 198 S.E.2d at 565. Statutory common carriers are "public utilities," G.S. § 62-3(23)(a)(3)-(4), and must obtain a "franchise" in the form of a certificate from the state's Public Utilities Commission, *id.*, at §§ 62-3(2), (11), 62-262(a). "The grant of a

franchise when accepted and acted on creates a contract which is binding on the grantor and the grantee," and "usually embraces[] express conditions and stipulations as to standards of service" that the "grantee or holder of the franchise must perform" and cannot delegate. *Victory Cab Co. v. City of Charlotte*, 68 S.E.2d 433, 437 (N.C. 1951). In exchange, recipients of a franchise are given protection from competition and other state-conferred benefits. *Am. Courier Corp.*, 174 S.E.2d at 816-17.

Nondelegable duties arise directly from the franchise and the benefits it confers, neither of which a common-law common carrier enjoys. When a person is a common carrier "*by virtue of its franchise*," it "ha[s] no power to relieve itself of liability passengers simply by delegating its privilege to others." *White v. Norfolk & S.R. Co.*, 20 S.E. 191, 191 (N.C. 1894); *see Harden v. N.C. R. Co.*, 40 S.E. 184, 187 (N.C. 1901) ("The question here is not the liability of lessees, which also exists, but of the right of the lessor [railroad] to put off the *liabilities incident to the franchise given it*, while continuing to enjoy its profits through the medium of a lease."). That rationale accords with the longstanding common-law principle that an entity is "subject to liability for physical harm caused . . . by the negligence of a contractor" when "carrying on an activity which *can be lawfully carried on only under a franchise granted by public authority* and which involves an unreasonable risk of harm to others." Restatement (Second) Torts § 428.

By contrast, North Carolina courts have rejected imposing nondelegable duties on non-franchised common carriers. For example, the defendant trucking company in *Gordon* was not a common carrier because it was statutorily exempt from North Carolina's common-carrier franchise requirement. 493 S.E.2d at 62-63. The North Carolina Court of Appeals thus analyzed its liability for the driver's negligence under ordinary vicarious liability principles, affirming summary judgment for the company because "at the time of the accident, [the driver] was an independent contractor." *Id.* at 64. Similarly in *Parker v. Erixon*, 473 S.E.2d 421 (N.C. App. 1996), the court analyzed a common carrier's liability for an accident occurring during a trucker's off-duty detour prior to delivery of his freight. *Id.* at 422. The carrier was exempt from North Carolina's franchise requirement because it engaged in interstate, rather than intrastate carriage. *Id.* at 425; *see* G.S. § 62-262(a). The court thus analyzed the carrier's vicarious liability not through the lens of nondelegable duties, but under the "North Carolina

law . . . principle of *respondeat superior*," holding that the carrier was "not liable for [the driver's] actions while [he] was acting outside the scope of his employment." *Parker*, 473 S.E.2d at 426-27.

Uber is not a "franchise holder[]" engaged in "franchise activities" under North Carolina's existing common-carrier framework. *Newsome*, 74 S.E.2d 732, 735 (1953). Uber operates its ridesharing platform pursuant to a ***permit*** issued by the Department of Motor Vehicles under North Carolina's TNC statute. *See* G.S. 20-280.3(a). But a permit is meaningfully different from a franchise. Whereas "common carriers operating under [franchises]" are "given certain protection in their franchise area" against competitors, "carriers holding permits" are "not provide[d] the same franchise protection," *Am. Courier Corp.*, 174 S.E.2d at 816-17, and hence may delegate their duties to independent contractors, *see, e.g.*, *Gordon*, 493 S.E.2d at 62-64. The line of cases creating nondelegable duties for statutory common carriers operating under a public franchise are simply inapplicable.

In fact, statutory considerations here *foreclose* nondelegability. Under North Carolina law, statutes may authorize actors to delegate the duty to safely transport passengers. *See Osborne v. Yadkin Valley Econ. Dev. Dist., Inc.*, 865 S.E.2d 307, 319 (N.C. App. 2021). In *Osborne*, the North Carolina Court of Appeals held that a school district was not liable for an independent-contractor driver's assault of a student because the district had permissibly delegated its duty to safely transport students under a "statute authorizing school districts to contract for student transportation." *Id.* at 319-320. With nondelegability off the table, liability for an independent contractor's torts would "ignore [North Carolina's] independent contractor rules." *Id.*

The TNC statute here goes even further than the statute in *Osborne*. It does not merely authorize TNCs to enlist independent contractors for transport; it *mandates* that they do so. Under North Carolina law, any "transportation service" through the Uber platform must be "provided by a TNC driver," G.S. § 20-280.1(5), who is presumptively "an independent contractor and not an employee," *id.*, 20-280.8. If statutory authority to contract for transportation makes a duty delegable, then a statute actively requiring such delegation certainly does as well.[11]

[11] Nor does any other recognized source of nondelegable duty apply. Rideshare services are not, for example, ultrahazardous activities "so dangerous that even the exercise of reasonable care cannot eliminate the risk of serious harm." *DeRose*, 675 F. Supp. 3d at 600; *see id.* ("In North Carolina, only blasting operations are considered ultrahazardous."). Nor are they "inherently dangerous." *Osborne*, 865

The Court's previous reference to *Hairston v. Atlantic Greyhound Corp.*, 18 S.E. 2d 166 (N.C. 1942), as supporting Plaintiff's claim, *see* PTO 28 at 24, is thus misplaced: *Hairston* does not address whether a common carrier can delegate its transportation duties to *independent contractors*. Instead, *Hairston* articulates a narrow rule governing a common carrier's liability for torts committed by its *employees*. The North Carolina Supreme Court explained that because a "carrier owes a high duty to a passenger to protect him from assault from any source, a malicious or wanton assault committed on a passenger *by an employee while on duty*, whether within the line of his employment or not, constitutes a breach of duty directly imposing liability." *Hairston*, 18 S.E.2d at 170. The same is true of the earlier North Carolina precedents on which *Hairston* relied. *See Williams v. Hines*, 29 S.E. 879, 879 (N.C. 1898) (holding carrier liable for "the conduct of an employee"); *White v. Norfolk & S.R. Co.*, 20 S.E. 191, 192-93 (N.C. 1894) (grounding carrier liability in the "obligation . . . to protect [passengers] from . . . employees"). This case presents the question of vicarious liability for alleged torts by an independent contractor, not an employee. *Hairston* says nothing about that question.

Because the nondelegable duty exception does not apply, the ordinary rule governs: Uber cannot be held vicariously liable for the alleged tortious conduct of its independent contractor.

**C. Plaintiff's Evidence Is Legally Insufficient to Establish Pain and Suffering and Mental-Anguish Damages.**

Alternatively, and at the very least, Uber is entitled to partial summary judgment on Plaintiff's claim for pain and suffering and mental anguish damages because Plaintiff lacks the expert evidence required to prove her allegation that Richardson's placement of his hand on her thigh exacerbated her [REDACTED].

Plaintiff seeks "pain and suffering" and "mental anguish" damages for [REDACTED] [REDACTED] Ex. 8 at 8-9. But Plaintiff's medical records make clear that those symptoms predate the incident. *See* Ex. 13 at -02 [REDACTED]

S.E.2d at 211, 216 ("transporting students" to school does not qualify as an "ultrahazardous or inherently dangerous activity").

[redacted]. And while Plaintiff's interrogatory responses state that "to the best of Plaintiff's recollection her [redacted] symptoms began after the incident," Ex. 8 at 9, her medical records belie that assertion, [redacted] Plaintiff's medical records attribute her trauma issues to those prior incidents, documenting, for example, that she suffers [redacted]

Under North Carolina law, Plaintiff cannot recover for [redacted] that predated the alleged incident—"only for such increased or augmented sufferings as are the natural and proximate result of the wrongful act." *Potts v. Howser*, 161 S.E.2d 737, 741-42 (N.C. 1968). And because the aggravation of pre-existing conditions "involves complicated medical questions far removed from the ordinary experience and knowledge of laymen," "only an expert can give competent opinion evidence" to establish its existence and cause. *Click v. Pilot Freight Carriers, Inc.*, 265 S.E.2d 389, 391 (N.C. 1980). The "necessity of expert evidence" is "especially true" where, as here, a Plaintiff alleges aggravation of "indisputably complex" psychological conditions such as "PTSD, depression, [or] anxiety." *Taylor v. Shreeji Swami, Inc.*, 820 F. App'x 174, 178 (4th Cir. 2020) (North Carolina law). Determining whether a new "traumatic event caused a particular exacerbation . . . involves complicated medical questions," and therefore requires "expert medical evidence." *Id.*; *see Dobson v. Salvation Army*, 683 S.E.2d 467, 2009 WL 3174572 at *4 (N.C. App. 2009) (unpublished) (expert testimony required to establish whether "plaintiff's injury aggravated his antecedent depression and anxiety").

Plaintiff fails to satisfy that burden here. Plaintiff's medical records include hundreds of pages of post-incident [redacted] treatment records, but do not once discuss the incident, let alone link it to exacerbation of Plaintiff's [redacted]. More fundamentally, Plaintiff has withdrawn her [redacted] expert, Dr. Rad. Before being withdrawn, Dr. Rad was unable to testify that the incident caused any specific aggravation of Plaintiff's symptoms, testifying only that the incident "contribut[ed] to [Plaintiff's] presentation," and that it is "not possible" to "separate out the different

in her life and the impact that it's had on her." Ex. 10 at 116:13-21, 118:5-19. Even if it had not been withdrawn, that testimony would not have sufficed to establish what "increased or augmented sufferings as are the natural and proximate result of the" incident. *Potts*, 161 S.E.2d at 741-42. And having withdrawn Dr. Rad, Plaintiff manifestly cannot offer the "evidence from a medical expert" that "is required" to prove that the incident "exacerbated [her] . . . *Taylor*, 820 F. App'x at 176, 178.

Plaintiff's counsel has represented that Plaintiff will rely on her own testimony, not Dr. Rad's "diagnoses, opinions, or conclusions," to establish damages. But Plaintiff cannot circumvent North Carolina's expert requirement by describing symptoms without reference to diagnoses. Omitting Dr. Rad's diagnostic conclusions does not change the substance of Plaintiff's demand for damages for Ex. 8 at 8-9. Regardless of whether Plaintiff labels those damages her medical records make clear that the relevant symptoms predate the incident and are the product of complex psychological conditions associated with a long history of serious traumas. Plaintiff's lay testimony that the incident exacerbated those pre-existing symptoms is manifestly unhelpful to a lay jury—indeed, before she was withdrawn, Dr. Rad "disagree[d]" with Plaintiff's testimony that the incident was "the sole contributing factor" for her present symptoms, attributing that assertion to Plaintiff's lack of "emotional awareness." Ex. 10 at 111:2-112:17. As *Taylor* makes clear, such unreliable "lay testimony is insufficient to establish causation" with respect to aggravation of Plaintiff's "indisputably complex" conditions. 820 F. App'x at 177. Accordingly, if the Court does not grant summary judgment on Plaintiff's sole remaining claim, her recovery should be limited to nominal damages.

## IV. CONCLUSION

For the foregoing reasons, Uber respectfully requests that the Court grant summary judgment in its favor on the relevant claims and theories asserted by WHB 823.

Dated: March 10, 2026

Respectfully submitted,

*/s/ Laura Vartain Horn*

Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

Sabrina H. Strong (SBN: 200292)
Jonathan Schneller (SBN: 291288)
**O'MELVENY & MYERS LLP**
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
sstrong@omm.com
jschneller@omm.com

Michael R. Huston
**PERKINS COIE LLP**
MHuston@perkinscoie.com
700 13th Street, NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200

Bradley R. Kutrow
**MCGUIRE WOODS LLP**
201 N. Tryon St., Suite 3000
Charlotte, NC 28202
Telephone: (704) 343-2049
bkutrow@mcguirewoods.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC., RASIER, LLC, and RASIER-CA, LLC