1  [Submitting counsel below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB<br><br>**DECLARATION OF ERIN O'KEEFE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| This Document Relates to:<br><br>*WHB 823 v. Uber Techs., Inc., et al.*, No. 3:24-cv-04900 | Judge:      Hon. Charles R. Breyer<br>Courtroom:  6 – 17th Floor<br><br>Date Filed: March 10, 2026<br>Trial Date: April 14, 2026 |

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF NORTH CAROLINA**

**CHARLOTTE DIVISION**

| | |
|---|---|
| WHB 823,<br><br>          Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>          Defendants | CASE NO. 3:25-cv-00737-CRB<br><br>Judge:      Hon. Charles R. Breyer |

DECLARATION OF ERIN O'KEEFE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:23-MD-03084-CRB/ 3:25-CV-00737-CRB

LAURA VARTAIN HORN (SBN: 258485)
**KIRKLAND & ELLIS LLP**
laura.vartain@kirkland.com
555 California Street, 30th Floor
San Francisco, CA 94104
Telephone: (415) 439-1625

ALLISON M. BROWN (Pro Hac Vice admitted)
**KIRKLAND & ELLIS LLP**
alli.brown@kirkland.com
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000

JESSICA DAVIDSON (Pro Hac Vice admitted)
**KIRKLAND & ELLIS LLP**
jessica.davidson@kirkland.com
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4723

SABRINA H. STRONG (SBN: 200292)
sstrong@omm.com
JONATHAN SCHNELLER (SBN: 291288)
jschneller@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

BRADLEY R. Kutrow
**MCGUIRE WOODS LLP**
bkutrow@mcguirewoods.com
201 N. Tryon St., Suite 3000
Charlotte, NC 28202
Telephone: (704) 343-2049

Counsel for Defendants
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

DECLARATION OF ERIN O'KEEFE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:23-MD-03084-CRB/ 3:25-CV-00737-CRB

# DECLARATION OF ERIN O'KEEFE

I, Erin O'Keefe, declare as follows:

1. I am over the age of 18 years and am a citizen of the United States. I am a resident of the State of Illinois. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. I have access to and am personally familiar with operative agreements discussed below, which are records maintained in the regular course of Uber's business and are records of regularly conducted activity on the Uber platform. If called as a witness, I could and would competently testify to the matters stated herein. I submit this declaration in support of Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC's Motion for Summary Judgment.

2. I am currently employed by Uber Technologies, Inc. as a Senior Manager for Corporate Business Operations. I have been employed by Uber from 2022 to the present.

**I.    Uber's Platform and Operations**

3. Uber Technologies, Inc. ("Uber") is a technology company that uses proprietary technology to develop and maintain digital multi-sided marketplace platforms. On one side of the marketplace, businesses and individuals use Uber's platforms in order to connect with customers and obtain payment processing services. On the other side of the marketplace, users connect and obtain various services from businesses and individuals including drivers, restaurants, healthcare providers, rental car companies, and retailers. Some examples of platforms that Uber has developed include Rides (connecting people with various transportation options — ranging from micro mobility to car rentals to trips with independent drivers) and Eats (connecting people with merchants and delivery people for the delivery of not only meals, but groceries, household items and other goods).

4. Rasier, LLC is a wholly owned subsidiary of Uber. Rasier-CA, LLC is a wholly owned subsidiary of Rasier, LLC.

5. Uber uses a proprietary matching algorithm to connect registered users with independent third parties willing to provide pre-arranged services—from rides, to meals, to scooters—through an online-enabled smartphone application ("Uber App" or "App").

1
DECLARATION OF ERIN O'KEEFE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:23-MD-03084-CRB/ 3:25-CV-00737-CRB

6. One of Uber's multi-sided marketplace platforms is the Rides platform. Riders download the rider version of the Uber App ("Rider App") and drivers download the driver version of the Uber App ("Driver App"); together the Apps allow users to access the platform that facilitates the technology connection of individuals in need of a ride with individuals willing to provide transportation services.

7. In general, users place a ride request through an online-enabled smartphone application ("Uber App") on a smartphone or device, which enables independent drivers, using their own smartphones or devices, to connect with and, at their own discretion, provide transportation to riders using the drivers' own personal vehicles.

8. Uber does not "dispatch" drivers or otherwise control the operational details of rides provided by independent drivers in North Carolina.

9. Uber does not employ drivers. The relationship between Uber and drivers is solely that of independent contracting parties.

10. Uber does not maintain a central location where riders may access transportation services, such as a terminal, depot, or garage.

11. Drivers are exclusively responsible for the registration, maintenance, and operation of their vehicles.

12. Drivers are responsible for procuring personal auto liability insurance for their vehicles.

13. Uber does not own, operate, or lease the passenger vehicles that independent drivers use to provide transportation.

14. Uber does not guarantee the availability of transportation or any other service. If no match is found between user-defined parameters (*e.g.*, destination) and a willing third-party provider, no transportation or other service takes place. Uber informs riders that there is no guarantee regarding the availability of services.

15. Drivers retain the sole right to determine when, where, and if they use the App at all.

16. Drivers have the right to decline and/or cancel any trip request they receive.

17. Independent drivers are permitted to use the platform as a casual or occasional undertaking, lacking a regular schedule or minimum hours-worked requirement, without penalty.

18. Based on Uber's internal database, in 2019, for example, approximately 96.18% of drivers in North Carolina spent less than 20 hours per week in engaged time (en route to pick up riders and on trip) on the Uber App.

19. Based on Uber's internal database, Richardson's average weekly engaged time (en route to pick up riders and on trip) spent using the Uber App was 17.72 hours per week.

20. Independent drivers are permitted to "multi-app"—*i.e.*, offer their services on the Uber platform simultaneously with other rideshare or delivery competitor platforms, such as Lyft or DoorDash.

21. Independent drivers do not operate on fixed routes. If a driver elects to accept a ride, they (or the rider) may determine their own route, including by using the navigation technology of their choice.

22. Uber does not mandate that independent drivers serve any particular geographic area.

## II. Uber's Regulatory Classification Under North Carolina Law

23. North Carolina regulates Uber as a Transportation Network Company ("TNC"). Uber operates under a TNC permit issued by the North Carolina Department of Motor Vehicles to Rasier LLC, a wholly owned subsidiary of Uber. *See* N.C. Gen. Stat. § 20-280.3.

## III. Access to Uber's Platform from the Rider App

24. To request a ride with a driver, an individual who wishes to use the Rider App, such as Plaintiff WHB 823, must download the Rider App on their personal device, register as a rider, and agree to the Terms of Use for utilizing the Rider App. The Terms of Use specify that drivers are independent third party providers and that transportation services are not guaranteed as drivers, have the option to accept or decline a particular request, and otherwise may not be available (no supply in the area).

25. Creating a user account on the Rider App requires users to provide contact information and payment details before receiving service.

26. Through its Terms of Use ("Terms"), Uber makes clear that access to the service is conditional. Uber reserves the unqualified right to "immediately terminate the[] Terms or any Services with respect to [riders], or generally cease offering or deny access to the Services or any portion thereof,

3
DECLARATION OF ERIN O'KEEFE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:23-MD-03084-CRB/ 3:25-CV-00737-CRB

at any time for any reason," without regulatory review. Ex. 3 (Dec. 13, 2017 TOU).[1] Uber frequently exercises this right, banning users for discretionary reasons such as low user ratings, community guidelines violations (e.g., threatening or rude behavior), transporting prohibited items, fraudulent activity, or other behaviors deemed inappropriate or unsafe in Uber's sole discretion.

27.  Uber routinely screens, monitors, and excludes users on an ongoing basis pursuant to the standards that it defines and enforces. As just one example, Uber blocks rider accounts with fake or inappropriate names, and has taken steps to make it easier for drivers to flag rider accounts with fake or inappropriate names. As of the time of publishing Uber's 2021-2022 U.S. Safety Report in 2024, Uber had banned over 15,000 rider accounts from the platform as a result of these checks. *See* Ex. 4 (2021-2022 Safety Report), at -3561532.

### IV.  Access to Uber's Platform from the Driver App

28.  Individuals who wish to use the Driver App to connect with ride requests as independent drivers electronically sign up to gain access to the Driver App. In order to gain access to the Rides platform at the time of the alleged incident, North Carolina law mandated drivers do the following: (1) submit personal identifying information; (2) provide a copy of a valid state driver's license, proof of insurance, and vehicle registration for their vehicle and (3) consent to a criminal background check (which is performed by a third-party) and a driving history check (performed by a third-party vendor). *See* N.C. Gen. Stat. § 20-280.6.

29.  Uber does not facilitate or permit drivers to accept "street hails" from unidentified members of the public. *See also* G.S. § 20-280.1(3) ("TNC services are limited to 'prearranged' services by "advance request," and exclude "soliciting passengers for immediate transportation").

### V.  Operative Agreements

30.  For the purposes of this declaration, I have reviewed the relevant Uber records, including those records related to the Terms of Service Plaintiff WHB 823 accepted before the alleged incident,

---

[1] Citations of the form Ex. __ refer to the Exhibits to the concurrently filed Declaration of Jonathan Schneller.

4
DECLARATION OF ERIN O'KEEFE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:23-MD-03084-CRB/ 3:25-CV-00737-CRB

along with the Technology Services Agreement ("TSA") the subject driver, Jeffrey Lamar Richardson, accepted.

31. Plaintiff signed up for the Uber Rides platform on March 14, 2019. Ex. 19 (WHB 823 Checkbox Consent History).

32. On March 14, 2019, Plaintiff assented to Uber's Terms of Use, updated December 13, 2017, which was the operative agreement on March 26, 2019, the date of the alleged incident. Ex. 3 (December 13, 2017 Terms of Service); *See* Dkt. 3484 (PTO 29) at 4.

33. Jeffrey Lamar Richardson applied to drive with the Uber platform on October 30, 2018, and was onboarded on November 9, 2018. Richardson accepted the TSA, updated December 11, 2015, which was the operative agreement on the date of the alleged incident. Ex. 18 (WHB 823 Driver Accepted Agreements); Ex. 1 (December 11, 2015 Technology Services Agreement).

34. Richardson accepted the terms of the May 22, 2017 Fare Addendum to the TSA, which was operative on the date of the alleged incident. Ex. 2 (May 22, 2017 Fare Addendum).

**VI.    Uber's Revenue and Pricing**

35. Uber does not use static rates or fixed tariffs in North Carolina. Uber collects a service fee for facilitating the connection between riders and drivers.

36. Independent drivers are separately entitled to receive a fare and optional gratuity for providing transportation services to riders. Under Uber's TSA, the fare is owed directly to the independent driver by the rider. Uber processes payment as the driver's limited payment collection agent and remits those fares to the driver.

37. Uber calculates a recommended fare for ride requests through the App. To calculate a recommended fare, Uber uses a dynamic pricing algorithm based on multiple real-time variables, including time of day, location, rider demand, and independent driver supply.

38. Uber sends trip requests to multiple independent drivers, who independently decide whether to accept the request based on factors including the expected earnings, expected pick up location, rider rating, and other personal preferences. Drivers retain the sole right to determine when,

1  where, and if they use the App, the option to accept or to decline or ignore a rider's request, and the
2  option to cancel an accepted request via the App.
3      39.    Drivers can decline or cancel ride requests for a variety of reasons, including but not
4  limited to the requested destination, expected earnings, and rider ratings.
5      40.    Riders retain the right to reject drivers or cancel a trip after a request is submitted.
6      41.    Before any transportation begins at the pick up location, the App provides the
7  independent driver with information about the rider and trip—including requested destination, estimated
8  trip distance, rider ratings, and more.
9      42.    If an independent driver accepts a rider request and agrees to undertake the
10 transportation, and the rider does not cancel before the trip begins, the rider and driver enter into a direct
11 business relationship. As noted above, under Uber's Terms the rider's payment obligation runs directly
12 to the driver and Uber collects payment only in its capacity as the driver's limited-purpose billing agent.
13     43.    Independent drivers have sole responsibility for any obligations or liabilities to users or
14 third parties that arise from the driver's provision of transportation services.
15    I declare under penalty of perjury that the foregoing is true and correct. Executed on March 10,
16 2026.

*Erin O'Keefe*

Erin O'Keefe