# EXHIBIT F

Page 1

1                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
2                  SAN FRANCISCO DIVISION
3              Case No. 3:23-md-03084-CRB (LJC)
4

5

6    IN RE: UBER TECHNOLOGIES, INC., )
     PASSENGER SEXUAL ASSAULT        )
7    LITIGATION,                     )
                                     )
8    _____)
                                     )
9    This Document Relates to:       )
     WHB 823 v. Uber Technologies,   )
10   Inc., et al.                    )
                                     )
11   _____)
12

13

14

15

              VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF:
16
                      DR. ████████ ███████
17
              Appearing Remotely from Raleigh, NC
18
                      (Taken by Defendants)
19
                      August 29, 2025
20
                   12:04 p.m. - 2:45 p.m.
21

22

23

24

25       ---Reporter:  Tina Sarcia-Maxwell, RPR, CRR
                        Job No. CS7554850

1      post-traumatic stress disorder or PTSD?

2            A.   Yes.

3            Q.   Is there kind of an established

4      professional practice or series of diagnostic

5      criteria that you apply when you screen someone

6      for PTSD?

7            A.   Yes, I use the DSM-5.

8            Q.   Could you describe in a little more

9      detail what those criteria entail for PTSD?

10           A.   Well, for one thing there has to be a

11     trauma and then there has to be a reaction to that

12     trauma.  So people often have the -- so they were

13     exposed to a trauma.  They have reexperiencing of

14     having -- they have distressing memories.  They

15     have dreams or nightmares.  They feel like it is

16     recurring.

17                Oftentimes people have triggers to

18     trauma.  The prison can be a hard place for people

19     with triggers because of sounds and noise and

20     yelling and being out of control.

21           Q.   Did you assess Ms. ████████ for

22     indications of PTSD?

23           A.   I did.

24           Q.   And do you recall what conclusions, if

25     any, you reached in that assessment?

1          A.   So the generally it was -- I didn't see

2     any -- she didn't mention any history of trauma to

3     me.  Her general issues seemed to be moodiness,

4     anxiety, stress, but none of the other diagnostic

5     criteria that I just mentioned, she did not -- she

6     did not bring up.

7          Q.   And specifically in terms of trauma,

8     Ms. ████████ never discussed with you a trauma from

9     a rideshare incident, did she?

10              MR. ROSEMOND:  Object to form.

11              THE WITNESS:  No.

12     BY MR. SAGALOWSKY:

13          Q.   Your answer was no, correct?

14          A.   No.

15          Q.   All right.  Why don't we go ahead and get

16     into the medical record that I have for

17     Ms. ████████ or specifically your treatment of her.

18              So, Mackenzie, can we put that up?  I

19     guess this will be Exhibit 3.

20              (Exhibit No. 3, Medical Records, so marked)

21     BY MR. SAGALOWSKY:

22          Q.   And this should have a Bates range of

23     ████████NCCIW-MD-00001 through 198, I believe.

24     All right, if we can turn to the second page of

25     the PDF please.

Page 33

```
 1              And, Dr. ████ I'll represent to you
 2      that these are the medical records that have been
 3      produced to us with respect to Ms. ████ care
 4      at the correctional facility.  As you can see,
 5      there is roughly 198 pages of records.
 6              Is that fairly consistent with the record
 7      that you have access to on your computer?  Or
 8      maybe your record is not maintained that way.
 9      This was produced to us as a single document.  Are
10      you able to tell how many pages of records you
11      have?
12         A.   No, I can't see that.
13         Q.   Why don't we start working through it and
14      later in the day I may ask you if you have some
15      additional records that we haven't gone through
16      yet during the exam.  Okay?
17         A.   Okay.
18         Q.   All right.  I asked you earlier today
19      when your first session with Ms. ████ was, and
20      you agreed it was around January 23, 2023,
21      correct?
22         A.   Correct.
23         Q.   And my review of the records suggest that
24      you saw Ms. ████ 12 times with the last visit
25      being in April 2024.  Does that sound right to
```

```
 1      you?
 2           A.   March of 2024.
 3           Q.   Is that March 21, 2024?
 4           A.   Correct.
 5           Q.   For the last session, okay.
 6                Yes, I have a record of a psychiatric
 7      evaluation on January 23, 2023, and then further
 8      sessions on February 10, 2023, February 21, 2023,
 9      March 21, 2023, April 14, 2023, May 12, 2023,
10      May 26, 2023, July 12, 2023, September 19, 2023,
11      November 20, 2023, January 19, 2024, and March 21,
12      2024.  Does that match your records, Dr. ██████
13           A.   Yes.
14           Q.   In your records, do you see any
15      indication of any additional sessions with
16      Ms. ███████
17           A.   There are therapy appointments with a
18      therapist, psychologist, and aftercare, social
19      work notes.
20           Q.   Are you able to see there what's the name
21      of the psychologist?
22           A.   It is Danielle Quiocho.
23           Q.   Okay great.  I think we have those
24      records in this document that we put up here.
25                Before we get into the written notes,
```

1     just as you sit here today, are you able to

2     specifically recall your first meeting with

3     Ms. ████

4         A.   So I recall -- I don't recall all the

5     details.  I do believe though that it was -- in

6     her case it was a telehealth.  It was a video

7     appointment, that first meeting.

8         Q.   Do you recall any of your personal

9     impressions of Ms. ████ from that initial

10    meeting?

11        A.   Kind of from the way I said in the mental

12    status exam, she was fidgety.  She was

13    cooperative.  She was well spoken.  She seemed

14    anxious which is where my focus was.  I think at

15    the time because she was anxious but she was also

16    fidgety, I wanted to think about looking at ADHD

17    as well.

18         So I do remember that she had the anxiety

19    talking about feeling like a lot of pressure on

20    her chest and kind of telling me about the

21    medications she had and what she didn't like and

22    what she liked.

23        Q.   Did you have any impression as to whether

24    Ms. ████ recall when it came to her

25    medication history was fairly accurate?

Page 96

1                    REPORTER'S CERTIFICATE

2

3          I, Tina Sarcia-Maxwell, a Notary Public in and

4      for the State of North Carolina, do hereby certify

5      that there came before me on August 29, 2025 the

6      person hereinbefore named, who was by me duly

7      sworn to testify to the truth and nothing but the

8      truth of their knowledge concerning the matters in

9      controversy in this cause; that the witness was

10     thereupon examined under oath, the examination

11     reduced to typewriting under my direction, and the

12     transcript is a true record of the testimony given

13     by the witness.

14          I further certify that I am neither attorney

15     nor counsel for, nor related to nor employed by

16     any attorney or counsel employed by the parties

17     hereto or financially interested in the action.

18          IN WITNESS WHEREOF, I have hereto set my hand,

19     this 2nd day of September, 2025.

20

21

22

23     _Tina Sarcia Maxwell_

24     Tina Sarcia-Maxwell, Notary Public

25