[Submitting counsel below]

UNITED STATES DISTRICT COURT

OF NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
| | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| This Document Relates to: | Judge: Honorable Charles R. Breyer<br>Date: April 2, 2026<br>Time: 2 P.M. PT<br>Ctrm.: 6-17th Floor |
| *WHB 823 v. Uber Techs., Inc.*,<br>N.D. Cal. No. 24-cv-4900<br>W.D.N.C. No. 25-cv-737 | **REDACTED** |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WHB 823, | No. 25-cv-737 |
| Plaintiff, | Judge: Honorable Charles R. Breyer |
| v. | |
| UBER TECHNOLOGIES, INC., et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.     Uber is a common carrier. .................................................................................. 2

       A.     Uber is a common carrier because it holds itself out to the public as offering transportation for money. ........................................................ 2

       B.     North Carolina's TNC statute does not preclude Uber from being a common carrier under North Carolina common law. ............................. 3

       C.     Uber's Terms of Use do not preclude a finding that Uber is a common carrier. ........................................................................................... 6

       D.     The "facts on the ground" show that Uber does not operate as a mere broker or intermediary, but instead offers and controls transportation services. ............................................................................................. 8

       E.     Uber has sufficient custody and control over passengers to assume common-carrier duties. ............................................................................. 9

       F.     Uber offers services to the public to a degree sufficient to be a common carrier. ......................................................................................... 10

           1.     Uber's stated right to refuse service does not preclude it from being a common carrier. ......................................................... 10

           2.     Uber's ride-specific fare calculations do not preclude it from being a common carrier. ......................................................... 13

II.    As a common carrier, Uber owes a non-delegable duty to transport passengers safely, a duty that is breached when a driver assaults a passenger. ................................. 15

III.   Plaintiff presents sufficient evidence of compensatory damages. ................................... 20

CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*5K Logistics, Inc. v. Daily Exp. Inc.*,
659 F.3d 331 (4th Cir. 2011).................................................................................... 6

*Ada Liss Grp. v. Sara Lee Corp.*,
2010 WL 3910433 (M.D.N.C. Apr. 27, 2010).......................................................... 7

*Air Evac EMS, Inc. v. Cheatham*,
910 F.3d 751 (4th Cir. 2018)............................................................................... 2, 13

*Am. Orient Exp. Ry. Co., LLC v. Surface Transp. Bd.*,
484 F.3d 554 (D.C. Cir. 2007) ............................................................................ 10, 14

*Ariz. Corp. Comm'n v. Reliable Transp. Co.*,
346 P.2d 1091 (Ariz. 1959) .................................................................................... 11

*Bank of Ky. v. Adams Express. Co.*,
93 U.S. 174 (1876) .................................................................................................... 7

*Beavers v. Fed. Ins. Co.*,
437 S.E.2d 881 (N.C. App. 1994) ............................................................................. 2

*Brill v. Indianapolis Life Ins. Co.*,
784 F.2d 1511 (11th Cir. 1986) ............................................................................... 13

*Circle Exp. Co. v. Iowa State Commerce Comm'n*,
86 N.W.2d 888 (Iowa 1957) ................................................................................... 10

*Clark v. Bland*,
106 S.E. 491 (N.C. 1921)......................................................................................... 17

*Claypool v. Lightning Delivery Co.*,
299 P. 126 (Ariz. 1931)............................................................................................. 7

*Click v. Pilot Freight Carriers, Inc.*,
265 S.E.2d 389 (N.C. 1980)................................................................................ 22, 23

*Connelly v. Family Inns of Am., Inc.*,
540 S.E.2d 38 (N.C. App. 2000)............................................................................. 21

*Daniel v. Petersburg R. Co.*,
23 S.E. 327 (N.C. 1896).......................................................................................... 16

*DeRose v. DoorDash, Inc.*,
675 F. Supp. 3d 591 (E.D.N.C. 2023)..................................................................... 19

*Dixie Stage Lines v. Anderson*,
134 So. 23 (Ala. 1931) ............................................................................................ 18

*Doe v. Uber Techs., Inc.*,
2019 WL 6251189 (N.D. Cal. Nov. 22, 2019)........................................................ 11

*Domestic Elec. Serv., Inc. v. City of Rocky Mount*,
203 S.E.2d 838 (N.C. 1974)...................................................................................... 5

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Equity Inv. Assocs., LLC v. United States*,
40 F.4th 156 (4th Cir. 2022) ......................................................................................... 5

*Essex Ins. Co. v. Barrett Moving & Storage, Inc.*,
885 F.3d 1292 (11th Cir. 2018) ..................................................................................... 6

*Fitzpatrick v. US West, Inc.*,
518 N.W.2d 107 (Neb. 1994) ....................................................................................... 20

*G.D. ex rel. S.G. v. Kannapolis City Schs. Bd. of Educ.*,
2024 WL 2832779 (M.D.N.C. June 4, 2024) ........................................................ 22, 23

*Garrison v. S. Ry. Co.*,
64 S.E. 578 (N.C. 1909) ............................................................................................... 11

*Godwin v. Carolina Tel. & Telegraph Co.*,
48 S.E. 636 (N.C. 1904) ............................................................................................... 11

*Gomez v. Super. Ct.*,
35 Cal. 4th 1125 (2005) ............................................................................................... 17

*Gordon v. Garner*,
493 S.E.2d 58 (N.C. App. 1997) ........................................................................... 5, 9, 18

*Gray v. Ctr. Warehouse Co.*,
106 S.E. 657 (N.C. 1921) ............................................................................................. 11

*Green v. Carlinville Cmty. Unit Sch. Dist. No. 1*,
887 N.E.2d 451 (Ill. App. 2008) .................................................................................. 19

*Hairston v. Atl. Greyhound Corp.*,
18 S.E.2d 166 (N.C. 1942) ........................................................................................... 16

*Harden v. N.C. R. Co.*,
40 S.E. 184 (N.C. 1901) ............................................................................................... 19

*Harrison v. Norfolk-S. R. Co.*,
113 S.E. 678 (N.C. 1922) ............................................................................................. 18

*Home Ins. Co. v. Riddell*,
252 F.2d 1 (5th Cir. 1958) ............................................................................................ 14

*Hussey v. King*,
3 S.E. 923 (N.C. 1887) ................................................................................................. 18

*Iadanza v. Harper*,
611 S.E.2d 217 (N.C. App. 2005) ................................................................................ 21

*Jackson v. Stancil*,
116 S.E.2d 817 (N.C. 1960) ......................................................................... 2, 7, 11, 13, 15

*Lambro v. United States*,
90 F.4th 1375 (Fed. Cir. 2024) ...................................................................................... 5

*Lanier v. Pullman Co.*,
105 S.E. 21 (N.C. 1920) ............................................................................................... 17

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Las Vegas Hacienda, Inc. v. C.A.B.*,
298 F.2d 430 (9th Cir. 1962).................................................................................. 2

*Mann v. Va. Dare Transp. Co.*,
198 S.E.2d 558 (N.C. 1973)...................................................................... 2, 17, 18

*Mays v. Uber Freight, LLC*,
2024 WL 332917 (W.D.N.C. Jan. 29, 2024) ............................................................. 6

*McCoy v. Pac. Spruce Corp.*,
1 F.2d 853 (9th Cir. 1924)........................................................................................ 2

*McNeill v. Durham & C.R. Co.*,
47 S.E. 765 (N.C. 1904).......................................................................................... 7

*Mid-America Apartments, L.P. v. Block at Church St. Owners Ass'n, Inc.*,
809 S.E.2d 22 (N.C. App. 2017)............................................................................. 3

*Motor Haulage Co. v. Maltbie*,
57 N.E.2d 41 (N.Y. 1944) .................................................................................... 11

*Mt. Pleasant Indep. Sch. Dist. v. Est. of Lindburg*,
766 S.W.2d 208 (Tex. 1989) ................................................................................ 19

*Murray v. Uber Techs., Inc.*,
486 F. Supp. 3d 468 (D. Mass. 2020) .................................................................. 12

*Namisnak v. Uber Techs., Inc.*,
444 F. Supp. 3d 1136 (N.D. Cal. 2020) ................................................................. 8

*Nat'l Ass'n of Regul. Util. Comm'rs v. F.C.C.*,
525 F.2d 630 (D.C. Cir. 1976) ....................................................................... 11, 17

*NetChoice, L.L.C. v. Paxton*,
49 F.4th 439 (5th Cir. 2022), *vacated and remanded on other grounds*, 603 U.S. 707
(2024) .................................................................................................................. 12

*Osborne v. Yadkin Valley Econ. Dev. Dist., Inc.*,
865 S.E.2d 307 (N.C. App. 2021) ................................................................... 19, 20

*Parker v. Erixon*,
473 S.E.2d 421 (N.C. App. 1996) ........................................................................ 19

*Patterson v. Duke Power Co.*,
36 S.E.2d 713 (N.C. 1946)...................................................................................... 9

*People v. Uber Techs., Inc.*,
56 Cal. App. 5th 266 (2020) ................................................................................... 8

*Riegelsberger v. Air Evac EMS, Inc.*,
970 F.3d 1061 (8th Cir. 2020)............................................................................... 11

*Saacke N. Am., LLC v. Landstar Carrier Servs., Inc.*,
2013 WL 7121197 (W.D.N.C. Dec. 19, 2013) ...................................................... 6

*Simpson v. Gray Line Co.*,
358 P.2d 516 (Or. 1961)........................................................................................ 18

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Squaw Valley Ski Corp. v. Superior Ct.*,
   2 Cal. App. 4th 1499 (1992) .......................................................................................... 4

*State ex rel. Utils. Comm'n v. Am. Courier Corp.*,
   174 S.E.2d 814 (N.C. 1970) ........................................................................................ 11

*State ex rel. Utils. Comm'n v. Gulf-Atl. Towing Corp.*,
   110 S.E.2d 886 (N.C. 1959) ................................................................................... 11, 12

*State ex rel. Utils. Comm'n v. Nello L. Teer Co.*,
   146 S.E.2d 511 (N.C. 1966) ........................................................................................ 13

*State ex rel. Utils. Comm'n v. Tar Heel Indus., Inc.*,
   334 S.E.2d 396 (N.C. App. 1985) ................................................................................ 14

*Stropes by Taylor v. Heritage House Childrens Ctr. of Shelbyville, Inc.*,
   547 N.E.2d 244 (Ind. 1989) ........................................................................................ 17

*Taylor v. Shreeji Swami, Inc.*,
   820 F. App'x 174 (4th Cir. 2020) ........................................................................... 22, 23

*Terminal Taxicab Co. v. Kutz*,
   241 U.S. 252 (1916) .................................................................................................... 12

*Terry v. Pub. Serv. Co. of N.C., Inc.*,
   898 S.E.2d 648 (N.C. 2024) .......................................................................................... 3

*U.S. Sec. Servs. Corp. v. Ramada Inn, Inc.*,
   665 So. 2d 268 (Fla. App. 1995) ........................................................................... 10, 20

*Victory Cab Co. v. City of Charlotte*,
   68 S.E.2d 433 (N.C. 1951) .......................................................................................... 19

*Ward v. Housatonic Area Reg'l Transit Distr.*,
   154 F. Supp. 2d 339 (D. Conn. 2001) .......................................................................... 12

*Weade v. Dichmann, Wright & Pugh*,
   337 U.S. 801 (1949) ...................................................................................................... 9

*White v. Norfolk & S.R. Co.*,
   20 S.E. 191 (N.C. 1894) .............................................................................................. 18

*Williams v. Gill*,
   29 S.E. 879 (N.C. 1898) .............................................................................................. 16

**Statutes**

49 U.S.C. § 13102 ............................................................................................................. 6

N.C.G.C. § 62-3 ................................................................................................................ 5

N.C.G.S. § 20-280.1(6) ................................................................................................ 4, 20

N.C.G.S. § 20-280.3(d)(4)-(5) ........................................................................................ 10

N.C.G.S. § 62-263(a) ........................................................................................................ 5

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

14 Am. Jur. 2d Carriers § 678 ............................................................................................... 9

Monica Anderson et al., *The State of Gig Work in 2021*, Pew Res. Ctr., (Dec. 8, 2021) ................ 5

*Regulated Brokers & Buses*, N.C. Util. Comm'n, (last visited Mar. 16, 2026) ............................. 5

Restatement (Second) of Agency (1958) ............................................................................ 15, 16

Restatement (Second) of Torts (1965) .......................................................................... 15, 16, 19

**INTRODUCTION**

In over 20+ pages of misdirection, Uber never asks or answers the simple question that determines liability in this case: Does Uber offer transportation services to the public? As court after court has determined, the answer is obviously yes. Uber markets and sells Uber rides on the same terms to anyone willing to pay. Uber is not a mere broker or arranger; rather, as the company acknowledges, "███████████████████████████████." Ex. CC (30(b)(6) Dep.) at 35:2-4; *see also* MPSJ, Ex. G ("█████████████████████████████████████").[1]

Under longstanding common law principles, that undertaking, in light of passenger vulnerability and the fundamental safety expectation of transportation,[2] assigns Uber a non-delegable duty to secure its passengers' safety. "If instead of exercising the utmost care and diligence for passengers' safe carriage, a driver assaults the passenger, then Uber's non-delegable duty has been breached." PTO 17 at 33. It does not matter whether that driver is an employee, an independent contractor, or something else. In that sense, "liability is 'vicarious.'" *Id.*

Plaintiff's Motion for Partial Summary Judgment set forth the undisputed evidence demonstrating that, because Uber holds itself out as offering transportation to the public, it is a common carrier under North Carolina common law. In its own summary judgment motion, Uber aims to discuss anything other than the common law standard applicable here and the facts satisfying it. Instead, the company asks the Court to look at various North Carolina and even federal regulatory regimes, none of which say anything about whether Uber is a common carrier with common-carrier tort duties in North Carolina. In considering motions to dismiss under the laws of several other states, the Court surveyed generally-applicable common law principles, and concluded, "[t]here seemingly can be no doubt that … Uber would meet the definition of a common carrier." PTO 18 at 6. That conclusion was right then and it is right now.

The Court also held that "[l]ike California and Illinois (and the majority of states), North Carolina assigns common carriers like Uber a non-delegable duty to transport passengers safely, a

---

[1] Exhibits A-BB are attached to Plaintiff's Motion for Partial Summary Judgment (MPSJ) (ECF 5468, 5466-2). Exhibits CC-EE are attached to this opposition. Numbered exhibits are attached to Uber's Motion for Summary Judgment (Mot.) (ECF 5474, 5475).

[2] *See* MPSJ, Ex. J ("████████████████████████████████ ████████")

duty that gives rise to vicarious liability whether or not the breach was done by an employee at all, let alone by one within the scope of employment." PTO 28 at 23 (quoting briefing); *accord*, *e.g.*, *Mann v. Va. Dare Transp. Co.*, 198 S.E.2d 558, 569 (N.C. 1973). Uber gives no reason for the Court to reconsider that determination. Instead, Uber conflates the duty at issue in this case with other kinds of non-delegable duties not specific to passengers.

Finally, Uber argues that, without expert testimony, Plaintiff may not prove emotional harm from being sexually touched by her Uber driver. She can.

Uber's motion for summary judgment should be denied.

## ARGUMENT

### I. Uber is a common carrier.

#### A. Uber is a common carrier because it holds itself out to the public as offering transportation for money.

As Plaintiff's MPSJ explained, under North Carolina common law:

> A common carrier is one who holds himself out to the public as engaged in the public business of transporting persons … for compensation from place to place, offering his services to such of the public generally as choose to employ him and pay his charges. The distinctive characteristic of a common carrier is that he undertakes as a business to carry for all people indifferently.

*Beavers v. Fed. Ins. Co.*, 437 S.E.2d 881, 883 (N.C. App. 1994) (quoting *Jackson v. Stancil*, 116 S.E.2d 817, 824 (N.C. 1960)). The "holding out is not a formal matter, but consists of conduct naturally inducing a belief in the minds of the public, … [including through] advertising [or] solicitation." *Jackson*, 116 S.E.2d at 825.[3]

As set out in Plaintiff's MPSJ, that is exactly what Uber is and does. Uber advertises itself as a transportation provider. *See* MPSJ at 3-5. "Ride with Uber." *Id.* at 3. "[W]e'll get you there." *Id.* "[L]et's take a trip together." *Id.* at 4. Uber does not make one-off private arrangements subject

---

[3] *See also McCoy v. Pac. Spruce Corp.*, 1 F.2d 853, 855 (9th Cir. 1924) ("A common carrier is generally defined as one who, by virtue of his calling and as a regular business, undertakes to transport persons or commodities from place to place, offering his services to such as may choose to employ him and pay his charges."); *Las Vegas Hacienda, Inc. v. C.A.B.*, 298 F.2d 430, 434 (9th Cir. 1962) ("[T]he dominant factor in fixing common carrier status at common law is the presence of a 'holding out' to transport the property or person of any member of the public who might choose to employ the proffered service."); *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 764 (4th Cir. 2018) ("A common carrier need not be available to every member of the public; it is enough that the service be available on open terms to even a segment of the population.").

to individual negotiation; rather, any person in the United States can download the Uber app, make an account, and order a ride. *See id.* at 4-5. And Uber expressly and ubiquitously vouches for the safety of its rides. *See id.* at 4.

### B. North Carolina's TNC statute does not preclude Uber from being a common carrier under North Carolina common law.

Implicitly acknowledging that the common law does not support its position, Uber argues that North Carolina's "regulatory scheme" precludes Uber from being found to be a common carrier under the common law of tort. It does not.

As the Court knows, in some states (like Florida and Texas), legislatures enacted TNC statutes that expressly state Uber is not a "common carrier[]." PTO 17 at 31 (quoting Texas statute); *see also* PTO 18 at 5 (Florida law). The Court read those statutes to preclude common law liability, refusing "to read limitations into the statute … that are just not there." PTO 17 at 31 n.11.

The Court contrasted those statutes with other cases in which "there was no suggestion that [the law] expressly addressed whether the defendant was or was not a common carrier." *Id.* Just so here: as Uber's regulatory expert Mr. Okpaku concedes, "the … North Carolina TNC bill [is] silent on the common carrier issue." MPSJ, Ex. Z at 32 n.83. That should be the end of the matter, particularly given that North Carolina courts do not interpret statutes to modify the common law unless such a "departure from common law is clearly expressed." *Terry v. Pub. Serv. Co. of N.C., Inc.*, 898 S.E.2d 648, 652 (N.C. 2024); *see also Mid-America Apartments, L.P. v. Block at Church St. Owners Ass'n, Inc.*, 809 S.E.2d 22, 29 (N.C. App. 2017) ("When statutes are in derogation of common law principles, they must be strictly construed. Strict construction of statutes requires only that their application be limited to their express terms.") (internal quotation marks omitted). Uber cites no North Carolina decisions relying on the TNC statute to limit tort liability at all, let alone common carrier liability in particular.[4]

The North Carolina legislature easily could have limited Uber's tort liability had it wanted

---

[4] The best Uber cites is a trial court order from a different state, in a case where the plaintiffs' common carrier claim failed for a host of reasons, most obviously that the driver did not assault anyone, but instead delivered the passengers to their requested destinations, and so no common-carrier duty was breached. *See* Mot., Ex. 17 at 2-3, 7 ("assuming (without deciding) that Uber is a common carrier, it did not breach any duty of care here").

to do so. Again, as Mr. Okpaku himself contends, "roughly half the states in the country have adopted a rule by legislation or regulation that TNCs are not … common carriers," but North Carolina did not. MPSJ, Ex. Z at 32 n.83. Indeed, Mr. Okpaku contends that North Carolina's TNC statute "was substantially modeled off of the regulatory framework that had been set forth by the [California Public Utilities Commission]." MPSJ, Ex. Z at 10. But, of course, in California, Uber is a common carrier. *See* MPSJ, Ex. A at 9-16 (*JCCP Order*); *see also Squaw Valley Ski Corp. v. Superior Ct.*, 2 Cal. App. 4th 1499, 1512 (1992) (explaining California regulators' view that "we do not believe the tort standard of duty is determinative of whether regulatory jurisdiction exists"). Uber argues (at p. 16, citing the JCCP plaintiffs' argument, not the actual order) that California applies a different standard for common-carrier status, but that is not true. *See JCCP Order* at 11 (applying same "holds itself out" test).

Uber says that North Carolina imputes to the public knowledge of its TNC statute, specifically the definitional part that refers to "TNC drivers who provide prearranged transportation services." Mot. at 12 (quoting N.C.G.S. § 20-280.1(6)). But that just begs the question: what does the statute say? If the statute does not say—as this statute does not—"Uber is not a common carrier" or "Uber is not responsible for passenger safety" or "Uber is not liable for the driver's conduct," then knowledge of those non-existent provisions cannot be imputed to anybody. The fact that the physical driving of the car is done by TNC drivers does not say, one way or the other, whether Uber is a common carrier with corresponding tort duties. One could just as easily impute to the public the knowledge of the general law that companies offering transportation for the public are responsible for the misconduct of their drivers, even if those drivers are independent contractors.

Uber cites a national Pew survey for the proposition that statutes like North Carolina's have led the public to "broadly understand[]" that "independent drivers, not Uber, provide transportation." *See* Mot. at 13. But Uber apparently did not read the survey before citing it. In fact, 62% of U.S. adults said that "the most appropriate way to describe drivers for companies that offer ride-hailing apps like Uber or Lyft is as … Independent Contractors *providing a service on behalf of the apps or websites.*" Monica Anderson et al., *The State of Gig Work in 2021*, Pew Res. Ctr.,

(Dec. 8, 2021) at 13 (emphasis added).[5] (The remaining respondents thought Uber drivers should be described as employees.) If this survey establishes anything, it is that the public "broadly understands" exactly what Uber's billions of dollars of marketing tell them: that Uber uses drivers to provide transportation on its behalf.

Moving beyond the TNC statute specifically, Uber relies on North Carolina statutory definitions of "carrier" and "broker" for the proposition that it is a "broker" and therefore not a "carrier." But Uber does not take its own argument seriously. It does not take the position that its passenger transportation business is actually subject to the broker regulations. For example, statutory brokers must "hold[] a broker's license issued by the Commission." N.C.G.S. § 62-263(a). Uber does not hold such a license. *See Regulated Brokers & Buses*, N.C. Util. Comm'n, (last visited Mar. 16, 2026) (listing licensees).[6] Outside the boundaries of that regulatory scheme, the statutory definitions are expressly irrelevant. Uber omits that the definitions apply only "[a]s used in this Chapter," meaning Chapter 62 (Public Utilities). N.C.G.C. § 62-3. They govern the regulatory reach of the Public Utilities Commission, not common law claims or tort liability at all.[7] This makes sense: there would be no reason for North Carolina courts to invoke the common-law definition of "common carrier" if the concept was controlled by statute.[8]

Even further afield is Uber's reliance on the Federal Carmack Amendment, which "creates a national scheme of carrier liability for goods damaged or lost during interstate shipment under a

---

[5] *Available at* https://www.pewresearch.org/internet/wp-content/uploads/sites/9/2021/12/PI_2021.12.08_Gig-Work_FINAL.pdf

[6] https://www.ncuc.gov/Industries/buscomp.aspx

[7] *See Domestic Elec. Serv., Inc. v. City of Rocky Mount*, 203 S.E.2d 838, 842 (N.C. 1974) (noting that the definition in § 62-3 applies only "as that term is used" elsewhere in chapter 62); *see also, e.g.*, *Equity Inv. Assocs., LLC v. United States*, 40 F.4th 156, 163 (4th Cir. 2022) (rejecting argument that a "definition" that applied only "as used in this chapter" also governed a provision in a different chapter); *Lambro v. United States*, 90 F.4th 1375, 1382 (Fed. Cir. 2024) ("[T]he FLSA, by defining employee '[a]s used in this chapter,' does not authorize the creation of an employment relationship for non-FLSA purposes.").

[8] Uber's reliance on *Gordon v. Garner*, 493 S.E.2d 58 (N.C. App. 1997), is therefore misplaced. *Garner* did not involve any common law duties. In that case, the plaintiff (not a passenger) sought to impose vicarious liability under the state statutory scheme itself, arguing that the defendant—a sand pit owner, not a passenger carrier—was a "public utility." *See id.* at 651 (explaining that the basis for liability was "various state and federal statutes, rules, and regulations governing the commercial dump truck industry"). No one here claims that Uber is even subject to public utility regulation (as a carrier, broker, or anything else), let alone that such regulation creates a basis for liability.

PL'S OPP'N TO DEFS.' MOT. FOR SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737

valid bill of lading." *5K Logistics, Inc. v. Daily Exp. Inc.*, 659 F.3d 331, 334-35 (4th Cir. 2011) (internal quotation marks omitted). The Carmack Amendment is irrelevant for a multitude of reasons, including that: (1) it is federal statutory law, not North Carolina common law; (2) Uber relies on statutory definitions that expressly apply only to one "part" of one subtitle of one title of the U.S. Code, 49 U.S.C. § 13102, and which, unlike the common law test, focuses on the agreement between the parties, *see Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1301 (11th Cir. 2018) ("[T]he key distinction is whether the disputed party accepted *legal* responsibility to transport the shipment."); and (3) Uber transports people, not goods. This case does not arise under federal law at all, let alone under Part B of Subtitle IV of Title 49 of the U.S. Code, and it does not involve any duties owed by carriers of goods. Here, Plaintiff asserts that Uber owes a non-delegable duty assigned to a common carrier of passengers. In contrast, traditionally and as reflected by the Carmack Amendment, common carriers of goods were strictly liable for any damage to the goods they carried. *See Essex*, 885 F.3d at 1300 (explaining that the Carmack Amendment preempts state-law claims and replaces them with a federal strict-liability claim); *see also* PTO 17 at 34 (explaining the distinction between a non-delegable duty and strict liability).[9] The comparison of Uber to Carmack carriers or brokers is apples and oranges all the way down.[10]

### C.    Uber's Terms of Use do not preclude a finding that Uber is a common carrier.

Next, Uber argues that its Terms of Use make it not a common carrier. But those same Terms did not prevent the JCCP court from finding Uber to be a common carrier as a matter of law, nor many other courts from suggesting the same on the pleadings. *See JCCP Order* at 9-16; MPSJ at 1 (listing cases). If a common carrier could void such status through contract, then every common carrier would do so. The reason why common carriers cannot do so is because the test of whether

---

[9] Uber says that the Carmack Amendment "codified the common law of carriers," Mot. at 14, but the cited case refers to the freight carrier *strict liability standard*, nothing else. *See Saacke N. Am., LLC v. Landstar Carrier Servs., Inc.*, 2013 WL 7121197, at *4 (W.D.N.C. Dec. 19, 2013).

[10] Uber's citation to *Mays v. Uber Freight, LLC*, 2024 WL 332917 (W.D.N.C. Jan. 29, 2024), which found claims against a different Uber business—one related to the transportation of goods, not people—preempted by federal law, is therefore inapposite. This case does not involve freight transportation or any claims even arguably preempted by federal law. And, consistent with the federal statutory scheme, *Mays* turned on (1) how Uber Freight was registered with the Department of Transportation and (2) the terms of the agreement between Uber Freight and the trucking company. *See id.* at *3.

a company is a common carrier is functional, not contractual: "The carrier's descriptive label is not determinative; it is not what the carrier declares himself to be but is what the facts and circumstances show him to be." *Jackson*, 116 S.E.2d at 824.[11]

More generally, North Carolina does not enforce contracts purporting to waive liability for intentional torts. *See Ada Liss Grp. v. Sara Lee Corp.*, 2010 WL 3910433, at *9 (M.D.N.C. Apr. 27, 2010) ("There is no support in the law for enforcement of clauses that exculpate parties for intentional wrongs."). Yet that is exactly what Uber claims that its Terms of Use accomplish: exculpating Uber from liability for intentional torts that breach its duty.

Finally, Uber argues that North Carolina "imputes knowledge of contractual terms to those who accept them" and that those "contractual terms put the public … on notice that Uber arranges transportation but does not provide it." Mot. at 15. This is just an end-around the rule that common-carrier status does not depend on the terms of a contract. In any event, as the Court has observed, Uber's Terms of Use are in no way designed to be read and processed by an ordinary individual using the Uber app. *See Dean* Trial Tr. at 2353:1-2354:4. The purported "notice" in the 2017 Terms of Use that Uber relies on here is no different. Here is the language, seven pages in, that Uber says makes clear that it does not provide transportation:

### 3. The Services

The Services comprise mobile applications and related services (each, an "Application"), which enable users to arrange and schedule transportation, logistics and/or delivery services and/or to purchase certain goods, including with third party providers of such services and goods under agreement with Uber or certain of Uber's affiliates ("Third Party Providers"). In certain instances the Services may also include an option to receive transportation, logistics and/or delivery services for an upfront price, subject to acceptance by the respective Third Party Providers. Unless otherwise agreed by Uber in a separate written agreement with you, the Services are made available solely for your personal, noncommercial use. YOU ACKNOWLEDGE THAT YOUR ABILITY TO OBTAIN TRANSPORTATION, LOGISTICS AND/OR DELIVERY SERVICES THROUGH THE USE OF THE SERVICES DOES NOT ESTABLISH UBER AS A PROVIDER OF TRANSPORTATION, LOGISTICS OR DELIVERY SERVICES OR AS A TRANSPORTATION CARRIER.

Mot., Ex. 3 at -478. Uber tells users that its "Services …. enable users to arrange and schedule

---

[11] *See also McNeill v. Durham & C.R. Co.*, 47 S.E. 765, 767 (N.C. 1904) ("Contracts may be made with the carrier, but into all such contracts certain conditions are written by the hand of the law. One such condition is the inherent liability of the carrier for all injuries proximately resulting from its own negligence or that of its servants."); *Claypool v. Lightning Delivery Co.*, 299 P. 126, 128 (Ariz. 1931) ("[I]t is the general conduct of the actual business, and not isolated acts or statements, public or private, which fix the character of a common carrier on a party. And no form of subterfuge or evasion will prevent the courts from going behind the form to the substance."); *Bank of Ky. v. Adams Express. Co.*, 93 U.S. 174, 177 (1876) ("A party engaged as a common carrier cannot, by declaring or stipulating that he shall not be so considered, divest himself of the liability attached to the fixed legal character of that occupation.").

transportation … including with third party providers of such services … under agreement with Uber or certain of Uber's affiliates." *Id.* No fact-finder could reasonably determine that this opaque language following six pages of an arbitration agreement negates the billions of dollars of advertising promoting transportation services, including messages directly on app stores—by definition seen by every single user—offering transportation "with Uber."

**D.     The "facts on the ground" show that Uber does not operate as a mere broker or intermediary, but instead offers and controls transportation services.**

Uber argues that "operational realities" show that it is a "mere arranger of transportation." Mot. at 13, 15. They do not. *See, e.g.*, *JCCP Order* at 12 ("[A] number of cases have considered contentions that ride-sharing companies such as Lyft and Uber are in the business solely of creating technological platforms, not of transporting passengers, and have dismissed them out of hand.") (quoting *People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 292 (2020)); *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020) ("Uber's claim that it is 'not a transportation company' strains credulity, given the company *advertises itself* as a 'transportation system.'").

As explained in the MPSJ, Uber does not act like a "mere arranger." A "mere arranger" does not spend billions of dollars vouching for the safety of the transportation it "arranges." *See* MPSJ at 4; *see also* Ex. CC (acknowledging that ███████████████████████). A "mere arranger" does not monitor rides through GPS and intervene when something unexpected happens in transit. *See* MPSJ at 6. A "mere arranger" does not limit communication between the driver and the passenger to its own channels. *See id*. And a "mere arranger" would afford the rider some freedom to choose among drivers.

Further, a "mere arranger" does not determine prices based on its own marketplace goals. As Uber's Head of Product testified in the *Dean* trial, when Uber was considering rolling out female matching, "the kinds of decisions we had to make was do we charge this female rider more because they're asking this female driver to drive much longer? … [W]e made a decision that 'no,' we were going to charge this female rider the exact same price as Uber X, so you see the same prices[.]" *Dean* Trial Tr. at 3312:19-23. Nor does a "mere arranger" determine in its own discretion when to issue refunds for rides, *see* MPSJ at 5-6, or offer passengers the option to "tip" their driver, *see*

*Dean* Trial Ex. 3237 at 99.

Uber (at pages 13-14) analogizes its transportation business to the companies at issue in *Weade v. Dichmann, Wright & Pugh*, 337 U.S. 801 (1949) and *Garner*, 493 S.E.2d 58. But neither of those entities ubiquitously advertised themselves as transportation services (let alone vouched for the safety of such services while exercising detailed control over them). As explained in the MPSJ, the company in *Weade* was a wartime government subcontractor providing discrete services on "nightly service of two steamboats" on a single route. 337 U.S. at 805-07. Accordingly, the company "never held itself out to the public as ready to engage in such traffic." *Id.* at 808. In *Garner* (the case asserting statute-based liability), the defendant "owned and operated" a "sand pit"— nothing more. 493 S.E.2d at 652. The only connection the company's business had with transportation was hiring another company to carry sand to customers. *Id.*

### E. Uber has sufficient custody and control over passengers to assume common-carrier duties.

Uber argues that it lacks sufficient "custody or control" over passengers to be a common carrier. Mot. at 15-16. But the authorities Uber cites concern *where* a person has to be in order for the carrier's duty to attach. *See* 14 Am. Jur. 2d Carriers § 678 ("[T]he common carrier relationship begins when one, intending in good faith to become a passenger, goes to the place designated as the site of departure and the carrier takes some action indicating acceptance of the passenger as a traveler."); *Patterson v. Duke Power Co.*, 36 S.E.2d 713, 714 (N.C. 1946) (duty remained while passenger was transferring from one bus to another).

Even so, those authorities require only "at least a limited control over and direction of the passenger." *Id.*; *see also* 14 Am. Jur. 2d Carriers § 678 ("in some substantial sense"). The undisputed facts show that passengers are under the control and in the custody of Uber in a least a "limited" way. Uber chooses a driver and a car (Uber's declarant Ms. O'Keefe's contention that Uber does not "dispatch" drivers is mere say-so).[12] Uber causes the passenger to be confined in that car and with that driver. Uber monitors the passenger's and driver's location and intervenes if it

---

[12] Ms. O'Keefe's claim that Uber does not "employ the drivers" is irrelevant. If using independent contractors weighed against finding a company to be a common carrier, then it would make no sense to make common carriers liable for the actions of independent contractors.

thinks something has gone wrong. Uber's Community Guidelines instruct passengers how to behave. And, Uber expects passengers to report safety incidents to it, even engaging a specialized team to respond to the most serious safety incidents. MPSJ at 6.

Uber argues that it cannot be a common carrier because common carrier duties "presuppose physical control over the transportation." Mot. at 16. But the existence of a non-delegable duty "presupposes" that the holder of the duty may (and will) delegate the tasks assigned to him: "[t]he term nondelegable does not preclude delegation of the actual *performance* of the nondelegable task." *U.S. Sec. Servs. Corp. v. Ramada Inn, Inc.*, 665 So. 2d 268, 271 (Fla. App. 1995) (citation and alteration omitted). Rather, "'[n]on-delegable' applies to the *liabilities* arising from the delegated duties if breached." *Id.* (emphasis added).

**F.      Uber offers services to the public to a degree sufficient to be a common carrier.**

Uber argues that it is not a common carrier because it (1) maintains the right to refuse service and (2) calculates distinct fares for each ride. Neither argument prevented the JCCP court from finding Uber a common carrier, and neither should prevent this Court from concluding the same.

**1.      Uber's stated right to refuse service does not preclude it from being a common carrier.**

As an initial matter, Uber suggests that it can be a common carrier with a non-delegable duty to protect passengers only if it also has the duty to provide services to the public on demand. *See* Mot. at 17. This gets things exactly backwards: relationships and actions create duties; duties do not create duties. *See Circle Exp. Co. v. Iowa State Commerce Comm'n*, 86 N.W.2d 888, 894 (Iowa 1957) (rejecting this same argument, and explaining that "[w]hatever the duties may be, they do not establish or determine the relation, but result from the relation.").[13] The "term 'common carrier' describes not the legal obligations of a company but how the company does business." *Am. Orient Exp. Ry. Co., LLC v. Surface Transp. Bd.*, 484 F.3d 554, 557 (D.C. Cir. 2007). As one of Uber's own cases states: "It is not necessary that a carrier be required to serve all indiscriminately; it is enough that its practice is, in fact, to do so." *Nat'l Ass'n of Regul. Util. Comm'rs v. F.C.C.*, 525

---

[13] In any event, North Carolina *does* assign Uber a broad duty of non-discrimination. *See* N.C.G.S. § 20-280.3(d)(4)-(5) ("nondiscrimination based on customers' geographic departure point or destination" and "race color, national origin, religious belief or affiliation, sex, disability, or age").

F.2d 630, 641 (D.C. Cir. 1976).[14]

Turning to the facts here, while "[t]he distinctive characteristic of a common carrier is that he undertakes as a business to carry for all people indifferently," *Jackson*, 116 S.E.2d at 824 (citation omitted), "'all' does not mean 'everybody all the time.'" *Riegelsberger v. Air Evac EMS, Inc.*, 970 F.3d 1061, 1064-65 (8th Cir. 2020) (citation omitted). "What matters is whether, within the definable segment, [Uber] offers its services indiscriminately." *Id.* (internal quotation marks omitted); *see also Doe v. Uber Techs., Inc.*, 2019 WL 6251189, at *6 (N.D. Cal. Nov. 22, 2019) (rejecting argument that "Uber … is not a common carrier because of conditions that are placed on who can use and be connected with drivers via the app"); *Ariz. Corp. Comm'n v. Reliable Transp. Co.*, 346 P.2d 1091, 1099-1100 (Ariz. 1959) ("Nor can a carrier which holds itself out to the public as being a common carrier divest itself of that character because it has a secret or private intention to reserve the right to refuse to serve such parties as it objects to, or because it may, even upon occasion, exercise such right …").

So, the question is not whether Uber reserves a right to refuse service, but rather, as a practical matter, whether it offers its service to the public indiscriminately. It does: there is zero evidence in the record that Uber makes case-by-case decisions on who to transport. *See* MPSJ, Ex. N at 145:24-146:3 ("████████████████████████████████████████ ████████████████████████████████████"). It would be impossible for a company that offers billions and billions of rides per year to conduct its business in any other way.

Uber misstates the leading case on which it relies. *State ex rel. Utils. Comm'n v. Gulf-Atl. Towing Corp.*, 110 S.E.2d 886 (N.C. 1959) did not set out any rule that "retained discretion to 'choose not to contract with anyone'" defeats common-carrier status. Mot. at 18. Rather, the problem in that case was that the petroleum carrier's service depended on specific, individualized

---

[14] No case requires that a common carrier have a duty to carry all comers in order to have a duty to carry them safely. None of the cases Uber cites involved a common carrier's non-delegable duty to its passengers. *See, e.g., State ex rel. Utils. Comm'n v. Am. Courier Corp.*, 174 S.E.2d 814, 816 (N.C. 1970) ("operating under certificates issued under the Public Utilities Act"); *Godwin v. Carolina Tel. & Telegraph Co.*, 48 S.E. 636, 637 (N.C. 1904) (telephone companies); *Garrison v. S. Ry. Co.*, 64 S.E. 578, 580 (N.C. 1909) (lumber shippers with duties imposed by "statute"); *Motor Haulage Co. v. Maltbie*, 57 N.E.2d 41, 44 (N.Y. 1944) (companies subject to New York's "Public Service Law"); *see also Gray v. Ctr. Warehouse Co.*, 106 S.E. 657, 659 (N.C. 1921) ("public warehousemen").

"bids," and so was not offered to the general public. *See Gulf-Atl. Towing Corp.*, 110 S.E.2d at 890 ("Gatco bids on contract work, and transports the commodities it is successful in getting. The mechanics of getting a contract for hauling are as follows: Usually the customer invites a number of contract carriers to bid on commodities the customer wants hauled, stating the terms and conditions, and the contract carriers submit bids. In most cases other people bid also. [The owner] does not know of any common carrier bidding on contracts for such hauling."). And the carrier did not merely "retain discretion" (words in Uber's motion that appear nowhere in the case), but actually "*would* choose not to contract with anyone that would interfere with its negotiating contracts for Esso," his biggest customer. *Id.* at 891 (emphasis added). His stated desire for more business (with the caveat that "not very many people have an oil terminal these days") did not translate into practice. *Id.*[15]

Uber does not and cannot maintain that it actually has a practice of making individualized decisions to whom to offer service. Instead, it argues only that it applies generally applicable "standards that Uber alone defines and enforces." Mot. at 18. But common carriers—even ones with a freestanding duty of nondiscrimination—are expected to do just that. *See, e.g., Ward v. Housatonic Area Reg'l Transit Distr.*, 154 F. Supp. 2d 339, 349 (D. Conn. 2001) ("[C]ommon carriers are able, by law, to enforce rules and regulations even if that means the deprivation of service to individual passengers."); *see also NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 494 n.42 (5th Cir. 2022) ("[M]ost or all common carriers have terms of service—for example, one must accept FedEx's terms to ship a package—and common carriers retain the right to remove unruly passengers or obscene transmissions."), *vacated and remanded on other grounds*, 603 U.S. 707 (2024). Buses, trains, and taxis all can and do enforce standards of conduct and ban users from their services, but can be common carriers nonetheless. *See* MPSJ at 8-9.

---

[15] Similarly, *Terminal Taxicab Co. v. Kutz*, 241 U.S. 252 (1916) found that part of a taxi company's business did not qualify as common carriage because the company's service was the subject of "individual" "bargains" and that the company "would" "refuse [] service" "if the pay was uncertain." *Id.* at 255. In any event, since *Terminal Taxi*, courts routinely recognize that standard taxi service qualifies as common carriage. *See, e.g., Murray v. Uber Techs., Inc.*, 486 F. Supp. 3d 468, 475 (D. Mass. 2020) ("[P]laintiff has stated a plausible claim that Uber should be held to a common carrier standard of liability because it operates in substantially the same manner as taxi cab companies.").

Uber argues that it is not permitted to serve "anonymous members of the public." Mot. at 18. No common-carrier case says that passengers must be anonymous. And Uber's argument that its Terms of Use do not guarantee "availability" of services, *id.* at 18-19, runs headlong into the fact that a company can be a common carrier despite lacking a "relatively unlimited carrying capacity." *Jackson*, 116 S.E.2d at 824.

### 2.   Uber's ride-specific fare calculations do not preclude it from being a common carrier.

Uber argues that its algorithmic pricing model, by taking into account supply and demand, means that it lacks a "uniform tariff" and so is not a common carrier. Mot. at 19. Uber misunderstands the relevant law. A "uniform tariff" does not mean "the same price for every service." Otherwise, it would make no sense to say that common carriers need not have a "regular schedule" or a "fixed route" or may be a common carrier despite offering only "charter" transportation. *Jackson*, 116 S.E.2d at 824; *see also Brill v. Indianapolis Life Ins. Co.*, 784 F.2d 1511, 1515 (11th Cir. 1986) ("Providing a public service that is customer-specific (a metropolitan taxi service) as opposed to route-specific (a metropolitan bus service) necessarily means that the common carrier will accommodate itself to the customer's particular needs in order to transport him. This does not negate the common carrier status.").

The phrase "uniform tariff" means only that the pricing terms must be "equally available, and on the same terms, to all." *State ex rel. Utils. Comm'n v. Bird Oil Co.*, 273 S.E.2d 232, 239 (N.C. 1981). Even for common carriers subject to public utility rate regulation, tariff uniformity "does not require an equality of rates where the shipments are from different points of origin to the same destination even though the distances be equal or approximately so." *State ex rel. Utils. Comm'n v. Nello L. Teer Co.*, 146 S.E.2d 511, 516 (N.C. 1966). Even where (unlike here) rates are filed with and approved by the utilities commission:

> Rate-making involves more than mileage. There are factors involved in rate-making which justify lower per-mile rates from some points than from others. The law does not contemplate that all rates shall be equal for like distances. Room is left for a rate structure which takes all factors of rate-making into account.

*Id.* at 516-17 (citation and alterations omitted).

The question is whether the prices are available to the public on equal terms, or whether

-13-

they are instead subject to individual negotiation. Here, while Uber takes into account "multiple real-time variables" when calculating fares, O'Keefe Decl. ¶ 37, those market-based fares are available to the public indiscriminately. *See JCCP Order* at 15 (finding Uber to be a common carrier in part because "it charges standard rates for its services"). A person cannot open the Uber app, see Uber's proposed fare, and make a counter-offer. *See* Ex. DD (Joyce Dep.) at 137:12-139:5 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

Contrast Uber with the companies in the cases Uber cites. In *State ex rel. Utils. Comm'n v. Tar Heel Indus., Inc.*, 334 S.E.2d 396 (N.C. App. 1985), for example, the company contracted with a single customer for a "shuttle operation" of an "individualized nature." *Id.* at 397. The "individually negotiated terms … extend[ed] far beyond rates and customary pick-up and delivery," but instead "require[d]" the company "dedicate equipment and drivers twenty-four hours a day, 365 days a year," including "customized trailers" compatible with the customer's "automatic loading system" and specially-trained drivers. *Id.* at 398. In *Gulf-Atl. Towing Corp.*, as explained above, the contracts at issue were the result of individualized "bids." 110 S.E.2d at 890. And in *Home Ins. Co. v. Riddell*, 252 F.2d 1 (5th Cir. 1958), "the factor deemed of decisive significance was the uncontradicted fact that Riddell conditioned his willingness to carry upon the *negotiation* of a satisfactory price." *Id.* at 3 (emphasis added). And "[i]n the exercise of this managerial judgment, he frequently turned down proffered business." *Id.* at 4. None of these cases is anything like Uber. *See also Am. Orient Exp.*, 484 F.3d at 557 ("To be a common carrier, a company need only, in practice, serve the public indiscriminately and not make individualized decisions, in particular cases, whether and on what terms to deal.") (internal quotation marks omitted).

Uber notes that "[b]oth riders and drivers have discretion to accept or reject" Uber's fares. Mot. at 20. This is doubly irrelevant. As to drivers, what matters is the relationship between Uber and its passengers, not between Uber and its drivers. And, as to riders, of course a passenger may decline the services of a common carrier if she finds the price unacceptable—no one is forced to

board the bus.[16]

## II.    <u>As a common carrier, Uber owes a non-delegable duty to transport passengers safely, a duty that is breached when a driver assaults a passenger.</u>

As explained in Plaintiff's MPSJ and in previous Court orders, common carriers like Uber owe their passengers a non-delegable duty of safety, one that is breached when a driver assaults a passenger, no matter whether the driver is an employee or an independent contractor. *See* MPSJ at 10-11.[17] The Court agreed this was the law in North Carolina (PTO 28 at 23), but Uber seeks to revisit that determination by mixing up distinct types of non-delegable duties.

The duty at issue in this case is the common carrier's non-delegable duty of protection owed exclusively to passengers. *See* PTO 17 at 32 (citing Restatement (Second) of Torts § 314A (1965)); *see also* Restatement (Second) of Agency § 214 (1958). Uber conflates this with other non-delegable duties owed to the public at large, including (1) a non-delegable duty of care that arises from the grant of an exclusive franchise, typically with respect to an ultrahazardous business operation (*see* Restatement (Second) of Torts § 428), and (2) statutory duties that, unless the statute permits delegation, are typically non-delegable (*see* Restatement (Second) Torts § 424). Uber relies on North Carolina cases addressing the latter two species of non-delegable duty to argue that the duty to protect passengers is non-delegable only where a common carrier operates under a public franchise granted pursuant to statute. However, Uber cites no authority for its claim that North Carolina *only* recognizes non-delegable duties that arise from statute or from the grant of an exclusive franchise. In fact, as the Court previously concluded, North Carolina recognizes a third type of non-delegable duty, that arises from the common law duty of protection that a carrier owes

---

[16] Uber notes that it lacks a "central garage or depot." Mot. at 20 n.10. But an "established place of business" is not a requirement of a common carrier, but merely one way of satisfying the "holding out" test. *Jackson*, 116 S.E.2d at 825 (This "may be done in various ways, as by advertising, solicitation, or the establishment … of a known place of business where requests for service will be received.") (citation omitted). Uber also argues that some of its drivers drive only "as a casual or occasional undertaking." Mot. at 20 n.10. But the question is the nature of *Uber's* "regular business," not that of its drivers'. *Jackson*, 116 S.E.2d at 824.

[17] The Court should disregard Uber's analysis of whether its drivers are employees or independent contractors as irrelevant and slanted. Plaintiff does not plead a respondeat superior claim and so will not challenge whether the driver was an independent contractor. But Uber's analysis of the common law test reflects a one-sided view of the facts and inferences (for example, Uber's claim that "[t]here is no reasonable dispute that Uber" operates "a distinct business from the transportation furnished by independent drivers," or its contention that Uber drivers have some "special skill, knowledge, or training in the execution of the work"). Mot. at 22-23.

its passengers.

Seminal North Carolina cases recognize a non-delegable duty that arises from a common carrier's duty to protect its passengers, rather than from the grant of franchise benefits, or from the imposition of a statutory duty. *See Hairston v. Atl. Greyhound Corp.*, 18 S.E.2d 166, 168-170 (N.C. 1942) (by virtue of "a duty directly owing from the master to the injured person [that] grows out of the relationship of carrier and passenger" the master is liable for assault "whether within the line of his employment or not"); *Williams v. Gill*, 29 S.E. 879, 879 (N.C. 1898) ("where the relation of carrier and passengers exists" the carrier is liable for the acts of the agent "though the act be outside the scope of his authority, or even willful and malicious"); *Daniel v. Petersburg R. Co.*, 23 S.E. 327, 328 (N.C. 1896) (Avery, J., concurring) (cited with approval in *Williams*) ("The correctness of the ruling in the court below depends … upon the nature, extent, and duration of the duty of protection which is implied in contracts for the carriage of passengers. … Though the conduct of the employé or officer in doing violence to the passenger may be wholly unauthorized, beyond the scope of his authority, and even willful and malicious, the obligation to respond in damages for any injury done still rests upon the principal just as fully as it would had the master commanded or encouraged the commission of the act.").

Uber's only response (at p. 28) to these cases is to dismiss them as inapposite because they refer to "employees" rather than "independent contractors," but that is a distinction without a difference: for purposes of vicarious liability, an employee's act outside the scope of his employment is the same as that of an independent contractor. Uber's argument seems to be that *any* common carrier is liable for "willful and malicious" acts done by employees, even though outside the scope of employment, but that *only* "public franchise" common carriers are liable for those same acts done by independent contractors. This gerrymandered theory finds no support in the relevant cases. It also contradicts the fundamental principle behind a non-delegable duty: that the task may be freely delegated, but that the liability may not be. *See* Restatement (Second) of Agency § 214 ("servant or other person"); Restatement (Second) of Torts § 409 (no liability for independent contractors "*except* as stated in" non-delegable duty sections); *see also Hairston*, 18 S.E.2d at 170 (noting the duty applies to an "assault from *any source*" and that it is not necessary that "the

relationship of master and servant be shown to exist at the time").

Uber's position contradicts the fundamental basis for a common carrier's duty, a basis that does not depend on the details of the employment relationship. Traditionally, a common carrier's nondelegable duty flowed from two related considerations: passenger vulnerability and expectations implicit in an agreement for transportation. As the California Supreme Court has explained, "common carriers are held to a high standard of care because passengers entrust common carriers with their personal safety, have little if any opportunity to protect themselves from harm caused by a common carrier, and pay the carrier for safe transportation." *Gomez v. Super. Ct.*, 35 Cal. 4th 1125, 1134 (2005) (internal quotation marks omitted).[18] Uber itself recognizes that its business of "███████████" creates a "██████████████████" of "███████," MPSJ, Ex. J, and that "█████████████████████████████████." Ex. CC at 35:2-4.

Unsurprisingly given that its cases routinely rely on decisions reached in other states, North Carolina law is exactly the same.[19] For example, in *Clark v. Bland*, 106 S.E. 491 (N.C. 1921), the court explained that "corporations may be held liable for the malicious and willful as well as negligent torts of their agents and employees, when committed in the course of and scope of their employment, and also for injuries inflicted in *breach of some duty owing directly from the company to the injured person growing out of the conditions existent between them*; an instance of this last rule of liability being not infrequently presented from *the relationship of carrier and passenger*." *Id.* at 492 (emphasis added). A year earlier, in *Lanier v. Pullman Co.*, 105 S.E. 21, 24 (N.C. 1920), the court grounded the duty in notions of implied contract: "[A]mong other implied obligations, is that of protecting a passenger from insults or assaults … by their own servants." *Id.* at 24. A "violation of this implied duty or contract is actionable in favor of the passenger injured by its

---

[18] *Accord, e.g., Stropes by Taylor v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 253 (Ind. 1989) ("Liability is predicated on the passenger's surrender and the carrier's assumption of the responsibility for the passenger's safety, the ability to control his environment, and his personal autonomy in terms of protecting himself from harm; therefore, the employer can be held responsible for any violation by its employee of the carrier's non-delegable duty to protect the passenger, regardless of whether the act is within the scope of employment."); *Nat'l Ass'n of Regul. Util. Comm'rs*, 525 F.2d at 640 (citing "the lack of control exercised by shippers or travelers over the safety of their carriage" as "seen to justify imposing upon the carrier the status of an insurer").

[19] *See Mann*, 198 S.E.2d at 565 (for the proposition that common carriers owe non-delegable duties, citing decisions from Pennsylvania, Alabama, Missouri, Oregon, Kentucky, and Maryland).

PL'S OPP'N TO DEFS.' MOT. FOR SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737

breach, although the act of the servant was willful and malicious, as in the case of a malicious assault upon a passenger, committed by any of the train hands, whether within the line of his employment or not." *Id.*; *see also Harrison v. Norfolk-S. R. Co.*, 113 S.E. 678, 679-80 (N.C. 1922) (similar).

There is no justification to conclude that North Carolina common-carrier law reflects a dramatic departure from that in other states. Although there are stray mentions of the word "franchise" in *Mann*, 198 S.E.2d at 565, and *White v. Norfolk & S.R. Co.*, 20 S.E. 191, 191 (N.C. 1894), the reasoning in both cases is grounded in the relationship of a carrier to its passengers, and is not contingent on a statutory "franchise." In *White*, for example, the court explained the "liability of defendant arises here, not for the negligence or wrongful acts of its servants within the scope of their employment, but upon the distinct principle of its obligation to protect its passengers from insult or harm." *Id.* at 192. And *Mann*, relied on cases from other states imposing non-delegable duties on common carriers, including with respect to breaches by independent contractors, with no mention of a franchise requirement. *See*, *e.g.*, *Dixie Stage Lines v. Anderson*, 134 So. 23 (Ala. 1931) (specifically involving an "independent contractor"); *Simpson v. Gray Line Co.*, 358 P.2d 516, 518 (Or. 1961).[20]

The remainder of Uber's cases involve injuries to third parties rather than passengers, and wrestle with the applicability of other types of non-delegable duties. In *Gordon, Parker*, and *Harden*, the plaintiffs, none of whom were passengers, asserted statutory liability under the laws governing freight carriers (*Parker*), public utilities (*Gordon*, the sand pit case), and interstate carriers (*Harden*). These cases discussed statutory duties, and have nothing to say regarding the duty of protection common carriers owe their passengers. *See Gordon*, 493 S.E.2d at 61 (plaintiffs,

---

[20] In fact, the two courts do not seem to use the word "franchise" in the way Uber interprets it. In *Mann*, the defendant was an ordinary bus company (one likely operating out of "Virginia," not even North Carolina authorized), not a company with a special exclusive charter. 198 S.E.2d at 561. And, the court, as mentioned, relied on cases mentioning no franchise requirement. In *White*, in the parlance of the time, "franchise" could well have meant merely the general corporate charter. *See White*, 20 S.E. at 191 ("[T]he defendant is a corporation duly chartered under the laws of North Carolina, and doing business as a common carrier of passengers …."). Notably, *White* relied heavily on *Hussey v. King*, 3 S.E. 923 (N.C. 1887), which overruled previous doctrine that corporations, having "no mouth with which to utter slander, or hand with which to write libels, or commit batteries, or mind to suggest malicious prosecutions or other wrongs," could never be "liable for any torts." *Id.* at 926.

PL'S OPP'N TO DEFS.' MOT. FOR SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737

third-party motorists, "contend that [defendants] are vicariously liable for [the agent's] actions under: (A) various state and federal statutes, rules, and regulations governing the commercial dump truck industry; and (B) the doctrine of *respondeat superior.*"); *Parker v. Erixon*, 473 S.E.2d 421, 422-23 (N.C. App. 1996) (in a case brought by a third-party motorist, analyzing motorist's claim that Interstate Commerce Commission regulations statutorily eliminated the default rule of non-liability for the acts of independent contractors); *Harden v. N.C. R. Co.*, 40 S.E. 184, 186 (N.C. 1901) (in a case brought by an injured "brakeman," discussing whether railroad company could "escape the performance of [a] duty or obligation imposed by its charter or the general laws of the state by a voluntary surrender of its road into the hands of lessees."). None of these three cases has anything to do with the duty at issue here: to protect passenger safety.

Uber's other authorities are similarly inapposite. The decision in *Victory Cab Co. v. City of Charlotte*, 68 S.E.2d 433 (N.C. 1951) concerned the legality of taxicab licensing fees imposed by Charlotte; it did not involve passengers, non-delegable duties, or tort liability at all. And the Restatement (Second) of Torts § 428, as well as *DeRose v. DoorDash, Inc.*, 675 F. Supp. 3d 591, 600-02 (E.D.N.C. 2023), pertain to non-delegable duties attending to the use of "instrumentalities which are peculiarly dangerous unless carefully operated"—not duties owed by a common carrier. (Uber attempted the same misdirection in moving to dismiss Plaintiffs' common-carrier claims, *see* ECF 384 at 11.) None of the cases Uber cites require that a carrier of persons enjoy an exclusive or semi-exclusive public franchise in order to owe its passengers a non-delegable duty of protection.

Finally, Uber argues that "statutory considerations here foreclose nondelegability," citing *Osborne v. Yadkin Valley Econ. Dev. Dist., Inc.*, 865 S.E.2d 307 (N.C. App. 2021). But in *Osborne*, there was no basis to assign the school district a non-delegable duty in the first place. Although there are references to a "common carrier" claim pleaded at one point, on appeal no one argued that the school district was a common carrier of passengers, and cases generally hold they are not (because they do not offer transportation to the public). *See, e.g.*, *Green v. Carlinville Cmty. Unit Sch. Dist. No. 1*, 887 N.E.2d 451, 454-55 (Ill. App. 2008); *Mt. Pleasant Indep. Sch. Dist. v. Est. of Lindburg*, 766 S.W.2d 208, 212 (Tex. 1989). Rather, the Court in *Osborne* considered and rejected several other potential bases for finding a school district liable for the acts of its transportation

provider—ultrahazardous activity, special relationship with a vulnerable disabled child, employee status of driver, and retained control. *Osborne*, 865 S.E.2d at 320-321. So, *Osborne* is irrelevant.[21]

Nevertheless, Uber seizes on language in *Osborne* explaining that the school district was permitted by statute "to delegate the transportation of its students" and analogizes to the TNC statute's description of Uber as "connect[ing] passengers with TNC drivers who provide prearranged transportation services," N.C.G.S. § 20-280.1(6). But this is just the same argument we started with: that the TNC statute, despite not saying so expressly, implicitly makes Uber not liable as a common carrier. Again, a non-delegable duty does not prohibit delegation of the task, only the liability. *See*, *e.g.*, *Fitzpatrick v. US West, Inc.*, 518 N.W.2d 107, 113 (Neb. 1994) ("As a result of a nondelegable duty, the responsibility or ultimate liability for proper performance of a duty cannot be delegated, although actual performance of the task required by a nondelegable duty may be done by another."); *U.S. Sec. Servs.*, 665 So. 2d at 271 (same). So, when the statute anticipates Uber drivers physically driving the cars, it says nothing one way or the other about whether Uber is liable for breaches of a common carrier's duty of safety.

## III.  Plaintiff presents sufficient evidence of compensatory damages.

Uber seeks to eliminate Plaintiff's damages claim entirely because it says she experienced Post-Traumatic Stress Disorder (PTSD) and generalized anxiety disorder that "predated the incident." Mot. at 28-29. In perhaps a preview of how it intends to defend this case, Uber parades, in gratuitous detail, the many previous misfortunes that Plaintiff has faced.[22] *See*, *e.g.*, *id.* at 3, 9-10. Uber asserts that because Plaintiff may have had PTSD and, for example, suffered violent incidents that predate the incident, her damages claim should be dismissed wholesale because she needs an expert witness to support her mental suffering claims in this sexual assault case.[23]

---

[21] More generally, *Osborne*'s analysis and holding is clearly and specifically limited to the school context, not transportation more generally: "The courts of the state must grant every reasonable deference to the legislative and executive branches when considering whether they have established and are administering a system that provides the children of the various school districts of the state a sound basic education." *Id.* at 319-20.

[22] Plaintiff has moved to exclude evidence of these irrelevant incidents under Rules 402 and 403. In any event, the notion that Plaintiff cannot testify to the mental suffering she experienced as a result of the Uber assault because of these past harms is simply unfounded.

[23] Contrary to Uber's insinuation (Mot. at 10, 29-30), Plaintiff's expert Dr. Rad was withdrawn for reasons having to do with trial strategy, not her selectively-cited deposition testimony.

In North Carolina, "pain and suffering damages are intended to redress a wide array of injuries ranging from physical pain to anxiety, depression, and the resulting adverse impact upon the injured party's lifestyle." *Iadanza v. Harper*, 611 S.E.2d 217, 221 (N.C. App. 2005) (citation omitted, quoted with approval in N.C.P.I.-Civil 810.08).[24] Uber cites no case requiring expert testimony to support a verdict for mental suffering, or establishing special heightened rules and expert requirements for people who have an unfortunate history of previous suffering, mental health issues or other. Indeed, the North Carolina Pattern Jury Charge directs the jury to apply "logic and common sense" in assessing mental suffering damages. N.C.P.I.-Civil. 810.08 ("There is no fixed formula for placing a value on physical pain and mental suffering. You will determine what is fair compensation by applying logic and common sense to the evidence.").

This case involves an incident that many lay people would find distressing and traumatic. At 1:53 a.m. on March 26, 2019, Plaintiff was sitting in the front seat during the Uber ride. When they arrived at Plaintiff's destination, Uber's driver, all alone with her in his car in the dark, reached over and "grabbed my inner thigh." Ex. EE (Plaintiff Dep.) at 33. While grabbing her thigh, the driver asked if he could "keep it with him." *Id*. Fortunately, Plaintiff was not more severely assaulted, as she was able to immediately exit the car, run inside and lock the door, checking the security camera to make sure he was not following her. *Id*. at 33-34.

The event was extremely distressing to Plaintiff and caused her mental suffering during and after the incident itself. Contrary to Uber's assertion, Plaintiff will not testify that the incident caused or exacerbated any PTSD or any other psychiatric diagnoses. It is true that she has expressed a personal belief that she has PTSD as a result of the incident. However, in this trial Plaintiff is not seeking damages for any psychiatric diagnosis of or exacerbation of PTSD, or that she has any other medical or psychiatric diagnosis specifically resulting from the incident.[25] Indeed, Plaintiff

---

[24] *See also Connelly v. Family Inns of Am., Inc.*, 540 S.E.2d 38, 46 (N.C. App. 2000) (Walker, J., concurring) (cited in *Iadanza*) ("[P]laintiffs described the traumatic events of gunmen breaking into their room in the middle of the night …. If plaintiffs prove their claim of negligence at trial, they would be entitled to all damages which proximately flow from this negligence including all physical and mental injuries and pain and suffering.").

[25] The fact that Plaintiff may testify that she experiences anxiety when recalling the incident does not equate to rendering a medical diagnosis; "anxiety" is a commonly used phrase laypersons use to describe their mental state. *Cf. Iadanza*, 611 S.E.2d at 222 ("pain and suffering damages are intended to redress a wide array of injuries [including] anxiety).

PL'S OPP'N TO DEFS.' MOT. FOR SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737

has filed a motion in limine to exclude any such PTSD evidence or reference to PTSD, among other reasons because she is not qualified to render such a diagnosis and is not offering any expert medical opinion that she has PTSD.

Uber's reliance on *Click v. Pilot Freight Carriers, Inc.*, 265 S.E.2d 389 (N.C. 1980), is misplaced. In *Click*, a case focused almost entirely on the medical aspects of spine injuries, the defendant challenged a worker's compensation award because the plaintiff presented no expert medical testimony to establish causation between a work-related accident and his herniated disc. *Id*. The court agreed that such testimony was necessary "[u]nder the circumstances of this case," calling the causal relationship between a specific trauma and the rupture of an intervertebral disc "one of the most difficult problems in legal medicine." *Id*. at 391. But the court expressly noted that "[t]here will be many instances in which the facts in evidence are such that any layman of average intelligence and experience would know what caused the injuries complained of." *Id*. (citation omitted).

More instructive here is *G.D. ex rel. S.G. v. Kannapolis City Schs. Bd. of Educ.*, 2024 WL 2832779, at *1 (M.D.N.C. June 4, 2024), in which a minor plaintiff was sexually assaulted. The court denied the school district defendant's motion for summary judgment, concluding that a reasonable jury could find, without expert testimony, that the plaintiff suffered an injury proximately caused by the defendant's negligence. *Id*. at *7. The court explained: "Expert testimony is not necessary for a jury to conclude that a physical sexual assault … would result in injury, such as emotional pain and mental suffering. …. That mental suffering would be the ordinary and proximate result of a sexual assault, even without evidence of physical trauma, is too plain to admit of argument." *Id*. (internal quotation marks omitted); *see also id*. ("The fact that G.D. cannot show causation for [specific mental health conditions] does not mean that he has suffered no injuries.").

Uber cites *Taylor v. Shreeji Swami, Inc.*, 820 F. App'x 174, 176 (4th Cir. 2020), where the plaintiff alleged that an elevator malfunction exacerbated his claustrophobia, posttraumatic stress disorder, depression, anxiety, and gastroesophageal reflux disease. The court held that lay testimony was insufficient to establish causation for such diagnoses "on the facts presented." *G.D.*,

2024 WL 2832779, at *11 n.8 (citing *Taylor*, 820 F. App'x at 177-78). But "being trapped in an elevator for 30 minutes on the first floor [] is significantly different from a forced sexual encounter." *Id*. (citation omitted). To try to drum up a "complicated medical question far removed from the ordinary experience and knowledge of laymen," *Click*, 265 S.E.2d at 391, Uber makes much of Plaintiff's prior "history of serious traumas." Mot. at 30. But in *G.D.*, the plaintiff had also been psychologically affected by multiple, significant traumatic events prior to the sexual assault. 2024 WL 2832779 at *2 (noting pre-existing diagnosis for PTSD, behavioral issues, and psychiatric treatment). This did not alter the court's conclusion that "a jury could find that G.D. experienced mental suffering from the physical sexual assault." *Id.* at *7. Just so here: Plaintiff will establish damages through her own testimony by explaining how the assault affected her. She will not usurp a medical expert's role by attempting to diagnose herself with "any specific mental health condition." *See id.*

## CONCLUSION

For these reasons, Uber's motion for summary judgment should be denied.

Dated: March 24, 2026

Respectfully submitted,

By: */s/ Sarah R. London*
Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: */s/ Rachel B. Abrams*
Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

### FILER'S ATTESTATION

I am the ECF User whose ID and password are being used to file this document. In compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: March 24, 2026          By:     */s/ Andrew R. Kaufman*
                                        Andrew R. Kaufman

PL'S OPP'N TO DEFS.' MOT. FOR SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737