# EXHIBIT 2

FILED

San Francisco County Superior Court

AUG 29 2025

CLERK OF THE COURT

BY: _____
Deputy Clerk

E-SERVICE
76970986
Aug 29 2025
01:53PM
File & ServeXpress

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.550] | Case No. CJC-21-005188 JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5188 |
| IN RE UBER RIDESHARE CASES | ORDER ON PARTIES' MOTIONS IN LIMINE AND MOTIONS TO EXCLUDE EXPERT OPINIONS |
| THIS DOCUMENT RELATES TO: | |

*Jane Doe LSA 78 v. Uber Tech., Inc., et al.*, San Francisco Superior Court, Case No. CGC-21-592427

*Jane Doe v. Uber Tech., Inc., et al.*, Los Angeles Superior Court, Case No. 20STCV12243

*Jane Doe CL1 v. Uber Tech., Inc., et al.*, San Francisco Superior Court, Case No. CGC-22-599546

*Jane Doe WHBE 6 v. Uber Tech., Inc.*, et al., San Francisco Superior Court, Case No. CGC-20-588388

The motions in limine and motions to exclude expert opinions filed by Plaintiffs and Defendant Uber Technologies, Inc. and Rasier, LLC (together, "Uber") came on for hearing at the pretrial conference on August 28, 2025. Having considered the pleadings and papers on file in the action, and the arguments of counsel presented at the hearing, the Court rules as follows.

- 1 -

## BACKGROUND

By order dated December 9, 2021, the Court (Hon. Andrew Y.S. Cheng) granted the petition for coordination with respect to 86 cases originally filed in San Francisco, Sacramento, Santa Clara, Kern, and Los Angeles counties. Since that time, over 1,200 additional cases were the subjects of add-on orders from this Court. On January 23, 2023, the Court granted Uber's motions to stay or dismiss based on *forum non conveniens*, a ruling that was affirmed by the Court of Appeal in *Doe WHBE 3 v. Uber Technologies, Inc.* (2024) 102 Cal.App.5th 1135. Over 500 California cases remain in this JCCP.

On March 7, 2023, Plaintiffs filed a Master Long-Form Complaint against Uber. By order filed June 22, 2023, the Court sustained Uber's demurrer to Plaintiffs' vicarious liability, fraud and misrepresentation, and strict products liability claims without leave to amend, and as to the negligent infliction of emotional distress claim with leave to amend.[1] On July 24, 2023, Plaintiffs filed the operative first amended long form complaint ("Complaint" or "Compl."), which contains claims for general negligence, common carrier negligence, negligence by misfeasance, and negligence by nonfeasance. Each of the remaining individual Plaintiffs adopted the long-form Complaint in their short-form complaints. Plaintiffs generally allege as follows.

Plaintiffs "are individuals who were raped, sexually assaulted, sexually battered, sexually harassed, falsely imprisoned, kidnapped, physically assaulted, and/or otherwise assaulted and/or harassed by their Uber driver." (*Id.* ¶ 6.) Uber is a transportation company that uses its app ("Uber App") to "connect riders looking for transportation to independent transportation providers…looking for riders." (*Id.* ¶¶ 1, 21-22.) Uber "drivers are largely nonprofessional, untrained individuals who use their own vehicles." (*Id.* ¶ 44.)

As early as 2014, Uber became aware that its drivers were engaging in sexual misconduct or sexual assault against its passengers. (*Id.* ¶¶ 3, 159; see *id.* ¶¶ 27, 159.) Uber has "publicly acknowledged this sexual assault crisis." (*Id.* ¶ 4; see *id.* ¶¶ 29, 121, 147; see, e.g., *id.* ¶ 122

---

[1] The Court issued a separate order granting in part Uber's motion to strike certain factual allegations in the Complaint, denying its motion to strike Plaintiffs' punitive damages allegations, and denying its motion to strike Plaintiffs' common carrier allegations.

- 2 -

[approximately 250 reported sexual assaults per month in 2017 and 2018].) However, Uber "has actively chosen not to report instances of sexual assault that occur on the UBER App to the authorities" or other ridesharing companies. (*Id.* ¶¶ 84-86, 88, 134.) In addition, Uber does not proactively cooperate with law enforcement investigating cases passenger victims report to the police or participate in transportation network company ("TNC") safety hearings. (*Id.* ¶¶ 89-94, 116-120, 172.) Moreover, after a victim reports a sexual assault, Uber often erases the victim's complaint and disables the victim's account, which precludes the victim from accessing pertinent information such as the driver's name, driver's photo, make and model of the vehicle, ride time, ride distance, and route. (*Id.* ¶¶ 94-95, 100, 102.)

Despite marketing itself as a safe and better alternative to other transportation methods, Uber continues to hire drivers without conducting adequate background checks and screening procedures, allows culpable drivers to keep driving for Uber, and has failed to adopt and implement reasonable driving monitoring procedures to protect the safety of its passengers. (*Id.* ¶ 4.) Among other things, Plaintiffs allege that Uber hires drivers without adequate screening, such as biometric fingerprinting or verification of social security numbers and other personal identification numbers submitted through the application process (e.g., *id.* ¶¶ 34, 73-78, 112, 133, 166); that Uber "fails to utilize its own technology, including in-car cameras and GPS tracking, to ensure that drivers keep the camera running during the entire ride and that the driver remains on course to the passenger's destination" (e.g., *id.* ¶¶ 35, 113-114, 144, 161); and that it "does nothing to warn its female passengers about the serious and real danger of being sexually assaulted" by an Uber driver (e.g., *id.* ¶¶ 38, 140, 147, 162, 191). Uber also "failed to provide an option" that would have "allowed female riders to select to be driven by female drivers. And it failed to adopt adequate training of its drivers on issues of sexual assault and sexual harassment. That is, it failed to provide adequately trained drivers." (*Id.* ¶¶ 144, 164.) Due to Uber's failure to implement adequate safety precautions, passengers continue to be victims of sexual assaults. (*Id.* ¶¶ 28, 189.)

By order filed July 31, 2025, the Court denied Uber's motion for summary judgment or, in the alternative, summary adjudication as to the claims asserted in two of the bellwether cases initially scheduled for trial, brought by Plaintiffs LSA 78 and WHBE 6. Plaintiff LSA 78's case is designated as

the first bellwether case to commence trial on September 8, 2025, with three other cases designated in the alternative. These rulings address the motions in limine and motions to exclude expert opinions filed by the parties, which except as noted apply to all four cases.

## LEGAL STANDARDS

"Trial judges enjoy broad authority over the admission and exclusion of evidence." (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1156, quoting *Peat, Marwick, Mitchell & Co. v. Superior Court* (1988) 200 Cal.App.3d 272, 288.) The scope of a motion in limine is "any kind of evidence which could be objected to at trial, either as irrelevant or subject to discretionary exclusion as unduly prejudicial." (*Id.* (cleaned up).) Thus, a motion in limine is properly employed "as a ruling in advance of an evidentiary objection that [is] bound to come up during the course of the trial." (*Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 530.) "The usual purpose of motions *in limine* is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party. . . . The advantage of such motions is to avoid the obviously futile attempt to 'unring the bill' in the event a motion to strike is granted in the proceedings before the jury." (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 669 (cleaned up).) They should not be granted if they do not raise proper subjects, are not adequately presented, or seek "rulings which would merely be declaratory of existing law or would not provide any meaningful guidance for the parties or witnesses." (*Id.* at 670.) "It is a misuse of a motion in limine to attempt to compel a witness or party to conform his or her trial testimony to a preconceived factual scenario based on testimony given during pretrial discovery." (*Id.* at 672.) "Nor can the trial court exclude evidence which is directly relevant to the primary issues of the litigation because the evidence is prejudicial to the opponent." (*Id.* at 674.)

In limine motions are "properly used to determine whether specific evidence should be admitted or precluded," not "to exclude all evidence pertaining to part or all of a cause of action based on an argument that plaintiff lacks evidence to support part or all of the cause of action"; such a motion is "but a disguised motion for summary adjudication." (*R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 371-372 (conc. opn. of Rylaarsdam, Acting P.J.).) Trial judges should "be wary

- 4 -

when choosing to decide an in limine motion that, no matter how captioned, functions as a nonstatutory motion for judgment on the pleadings, particularly when the motion is filed on the eve of trial." (*Tung v. Chicago Title Co.* (2021) 63 Cal.App.5th 734, 740.) "In limine motions are designed to facilitate the management of a case, generally by deciding difficult evidentiary issues in advance of trial. . . . What [they] are *not* designed to do is to replace the dispositive motions prescribed by the Code of Civil Procedure. It has become increasingly common, however, for litigants to utilize in limine motions for this purpose." (*Id.* at 758, quoting *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593.) "Appellate courts are becoming increasingly wary of this tactic. The disadvantages of such shortcuts are obvious. They circumvent procedural protections provided by the statutory motions or by trial on the merits; they risk blindsiding the nonmoving party; and, in some cases, they could infringe a litigant's right to a jury trial." (*Id.* (cleaned up).) "Trial judges . . . should not feel compelled to have to decide these types of ersatz in limine/dispositive motions just because trial counsel asks them to do so." (*Id.*; see also, e.g., *McMillin Cos., LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 529, 533; *Johnson v. Chiu* (2011) 199 Cal.App.4th 775, 780-781.)

Nevertheless, "it remains true that a motion in limine may be used to dispose of a cause of action or theory of recovery in the exercise of the court's inherent power to control litigation and conserve judicial resources." (*Wang v. Peletta* (2025) 112 Cal.App.5th 478, 485-486 cleaned up).) Where a trial court relies on the evidence before it rather than the mere allegations of the pleadings, however, a motion in limine "effectively acts as a motion for nonsuit." (*Id.* at 486.) In such a circumstance, the court may grant the motion in limine "only if, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor." (*Id.* (cleaned up).) These are "exacting standards." (*Id.* at *4; see also *County of Glenn v. Foley* (2012) 212 Cal.App.4th 393, 398 [when in limine motion "strays beyond its traditional confines and results in the entire elimination of a cause of action or a defense," court treats it as demurrer to evidence and reviews it de novo "lest it be used to evade the more exacting standards for such a motion"].)

- 5 -

"Motions *in limine*, to the extent that they rely upon a factual foundation, are no different than any other pretrial motion and must be accompanied by appropriate supporting documents. Absent an appropriate factual showing to support the motion, the court should not entertain the motion." (*Kelly*, 49 Cal.App.4th at 671 fn. 3; see also *id.* at 670 [motions should have been denied where "no factual support was presented in connection with the motions, meaning the court would have to rule in a vacuum"].)]

An expert opinion must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," and must be "[b]ased on matter that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code § 801(a),(b).) "The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion." (Evid. Code § 803.) Under these provisions, trial courts have "a substantial gatekeeping responsibility" regarding the admission of expert testimony. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769 (cleaned up).) In particular, under Evidence Code sections 801(b) and 802,[2] "the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. Other provisions of law, including decisional law, may also provide reasons for excluding expert opinion testimony." (*Id.* at 771-772 (cleaned up).) "The expert's opinion may not be based on assumptions of fact without evidentiary support, or on speculative or conjectural factors." (*Id.* at 770 (cleaned up); see *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1348-1349 [trial court properly granted motion in limine to exclude expert testimony by damages expert where proffering party offered no proof that opinion had any reasonable basis].) "But courts must also be cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions." (*Id.* at 772

---

[2] Evidence Code section 802 provides that an expert witness "may state on direct examination the reasons for his opinion and the matter (including in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion."

(cleaned up).) Rather, in making the preliminary determination whether the expert opinion is founded on sound logic,

> [t]he court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a circumscribed inquiry to determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid. The goal of trial court gatekeeping is simply to exclude clearly invalid and unreliable expert opinion. In short, the gatekeeper's role is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

(*Id.* at 772 (cleaned up); see also, e.g., *Onglyza Product Cases* (2023) 90 Cal.App.5th 776, 784-785; *Bader v. Johnson & Johnson* (2022) 86 Cal.App.5th 1094, 1104-1105.)

## DISCUSSION

### I.   Plaintiffs' Motions In Limine

#### A.   Plaintiffs' Omnibus Motions In Limine #1-17

##### 1.   Determine Uber Is A Common Carrier

Plaintiffs' motion in limine #1 asks the Court to determine as a matter of law that Uber is a common carrier with a heightened duty of care toward its passengers. (Omnibus Mot., 9-11.) As both parties recognize, the Court has already so ruled. (See July 31, 2025 Order, 8-18.)[3] The motion therefore is denied as moot.

##### 2.   Exclude that CPUC or Statutory Compliance Forecloses Negligence Or Reduces Uber's Duty As A Common Carrier

Plaintiffs' motion in limine #2 seeks to exclude evidence that, "because Uber has complied with California Public Utilities Commission (CPUC) or other regulations or statutory requirements: (1) the jury must find that Uber has not breached its duty of care. (2) Plaintiffs' negligence claims are barred,

---

[3] The Court has stricken Uber's belated "offer of proof" on the subject, which amounts to an untimely and improper motion for reconsideration of the Court's ruling. (Code Civ. Proc. § 1008.)

preempted, or otherwise foreclosed. (3) Uber's duty is less than the heightened, non-delegable duty prescribed by California law." (Omnibus Mot., 12.) Plaintiffs acknowledge that "CPUC regulations are admissible as *some* evidence of care," but contend that "they neither preempt Plaintiffs' claims nor create a statutory defense. The jury remains free to decide whether Uber should have implemented additional protections." (*Id.* at 13.)

Plaintiffs are correct that compliance with industry standards or safety regulations is treated as evidence that the defendant exercised due care, but it does not conclusively establish that the defendant was not negligent. "[A] defendant property owner's compliance with a law or safety regulation, in and of itself, does not establish that the owner has utilized due care. The owner's compliance with applicable safety regulations, while relevant to show due care, is not dispositive, if there are other circumstances requiring a higher degree of care." (*Lawrence v. La Jolla Beach & Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 31 (cleaned up) [trial court erred in finding that hotel owner owed no duty to take additional protective measures to prevent small child from falling from second story hotel window based in part on fact that window met applicable building code requirements]; *Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 421 ["In negligence and due care determinations, a manufacturer's compliance with regulations, directives or trade custom does not necessarily eliminate negligence but instead simply constitutes evidence for jury consideration with other facts and circumstances. For example, in a case in which the manufacturer or supplier knows of, or has reason to know of, greater dangers [above and despite its compliance with regulations], then the manufacturer may not be insulated from negligence liability." (cleaned up)]; *id.* at 425 ["Properly read, the rule that a manufacturer is not entitled to a complete defense that it complied with industry standards applies to negligence cases"]; *Perrine v. Pacific Gas & Elec. Co.* (1960) 186 Cal.App.2d 442, 448 ["even though [defendant] complied with all applicable governmental safety regulations, this would not serve to absolve it from a charge of negligence, but just negligence per se, for one may act in strict conformity with the terms of such enactments and yet not exercise the amount of care which is required under the circumstances."].)

These principles are particularly apt here. For example, as Plaintiffs observe, the CPUC's transportation network companies (TNC) statutes and regulations mandate that criminal background check must meet certain parameters, but specifically provide that requirement "shall not be interpreted to prevent a transportation network company from imposing additional standards." (Pub. Util. Code § 5445.2(a)(5).) Further, the TNC statutes and regulations do not address other potential safety measures, nor do they address the standard of care applicable to Uber and other ridesharing companies for purposes of tort liability under California law. Thus, even a showing that Uber fully complied with those regulatory requirements would not be dispositive of whether Uber complied with its duty of care.

Although the Court thus generally agrees with Plaintiffs' summary of the law, it will deny Plaintiffs' motion without prejudice because it does not actually seek to exclude any specific piece or body of evidence. (See *R & B Auto Center, Inc.*, 140 Cal.App.4th at 372 ["motions in limine deal with evidence. May this particular document be admitted? May an expert witness testify to certain facts or conclusions?"].) Moreover, Uber indicates that it "does not intend to argue that statutory or regulatory compliance 'forecloses' Plaintiffs' claims." (Opposition, 10.)

### 3. Exclude That Legal Barriers Prohibit or Constrain Uber From Implementing Certain Effective Safety Measures

Plaintiffs' motion in limine #3 seeks to "exclude Uber from introducing any evidence, testimony, or argument that Uber was legally prohibited or constrained from implementing certain effective safety measures—enhanced background checks, required dashcams, and a women-matching option." (Omnibus Mot., 14.) It argues that any such argument would be "legally incorrect" and would present a question of law for the Court; should be precluded by Uber's invocation of the attorney-client privilege and withholding of "thousands of documents"; and would "invite jury speculation, confuse the issues, and unfairly prejudice Plaintiffs." (*Id.*) The Court is unpersuaded.

While Plaintiffs assert summarily that "any argument that Uber was legally prohibited or constrained from implementing these [safety] measures is legally incorrect," it offers almost no authority or evidence in support of that assertion. The motion again is insufficiently specific, as it does not seek to exclude any specific piece of evidence or argument. Moreover, as Plaintiffs acknowledge, the jury will

- 9 -

be asked to determine "the reasonableness of Uber's refusal to implement [certain safety measures]." (*Id.*) In fairness, Uber must be allowed to meet Plaintiffs' contentions that it was negligent in failing to adopt more stringent safety measures with evidence as to why it declined to do so, which may well include both practical and, potentially, legal constraints on its ability to implement such measures.

To be sure, Plaintiffs are correct that Uber may not waive the attorney-client privilege or the work-product doctrine that it previously invoked in discovery in order to present its case, which would impermissibly allow it to wield the privilege as both sword and shield. (See *Xebec Development Partners, Ltd. v. National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501, 569 ["A party who asserts a privilege as to evidence essential to some element of his or her case will usually be obliged as a practical matter to forsake that element; his or her decision to do so will have been a necessary part of the decision to assert the privilege. But . . . the party cannot have it both ways:  He or she cannot assert the privilege in discovery and then (having as a practical matter denied the adversary's legitimate discovery rights) waive the privilege and offer the proof at trial without taking or suffering steps appropriate to cure the prejudice to the adversary."].) "Uber does not dispute that it cannot rely at trial on documents it withheld as privileged." (Opposition, 14.)[4]  However, Plaintiffs have made no showing that, as they contend without any citation to the record, "Uber has committed to keeping secret all advice it received purportedly advising it not to implement safety measures that would have protected the Plaintiffs." (Omnibus Mot., 16.) It follows that Plaintiffs' motion must be denied, without prejudice to evidentiary objections that may be raised to specific documents or testimony during trial. (See *Kelly*, 49 Cal.App.4th at 671 fn.3 ["Absent an appropriate factual showing to support the motion, the court should not entertain the motion."].)[5]

### 4. Partially Exclude Expert Testimony of Vida Thomas

Plaintiffs move to preclude Uber's expert Vida Thomas from testifying that "Uber was not on notice that the Uber drivers who assaulted Plaintiffs would sexually assault a passenger," arguing that such

---

[4] Uber also disclaims any intention to raise an advice-of-counsel defense at trial. (Opposition, 12-13.)
[5] For the same reason, the Court denies Plaintiffs' alternative motion under Evidence Code section 352. (Omnibus Mot., 16.)  Unless otherwise indicated, in ruling on the parties' in limine motions, the Court finds their reliance on section 352 as an alternative ground unpersuasive.

- 10 -

testimony invades the province of the jury because it is not related to a subject that is sufficiently beyond common experience such that it would assist the jury, and that it would confuse the issues, mislead the jury, or unduly prejudice Plaintiffs such that it should be excluded under section 352. (Omnibus Mot., 17-20.) The Court agrees in part.

Uber retained Ms. Thomas "to opine on standard human resources practices for investigating and responding to allegations of sexual assault of an employee or independent contractor in the workplace, and how this traditional workplace paradigm compares to Uber's policies and practices for investigating and responding to allegations of sexual assault involving riders or drivers on its platform." (Cubberly Decl. Ex. 4-1, 1.) Ms. Thomas opines that:

"a. Uber's background-check process meets generally accepted standards in the HR industry;

b. Uber was not on notice that WHBE 6's, LSA 78's and EB 25's drivers would sexually assault a rider;

c. Uber's Urgent Support Logic investigation methodology permits a sufficiently thorough investigation of sexual assault complaints; and

d. Uber's investigations of the alleged sexual assaults of WHBE 6, LSA 78 and EB 25 were consistent with generally accepted standards for conducting a workplace investigation."

(*Id.* at 4 ¶ 12.) Plaintiffs seek to exclude the second of these opinions. (See *id.* at 16-18 ¶¶ 40-47.)

Plaintiffs do not challenge Ms. Thomas's first opinion, *i.e.*, that Uber's background-check process meets generally accepted standards in the HR industry. (See *id.* at 14-16 ¶¶ 37-39.) Thus, the jury will hear testimony regarding the scope of that process, and necessarily will also hear testimony and see documentary evidence regarding the results of Uber's background checks on the individual drivers. The question posed by Plaintiffs' motion is whether Ms. Thomas may testify to the conclusions to be drawn from that evidence. She may not.

First, the Court agrees that the jury is perfectly capable of drawing its own conclusion from the evidence it will hear regarding Uber's background-check process and its results. As a general rule, the opinion of an expert is admissible when it is "[r]elated to a subject that is sufficiently beyond common

- 11 -

experience that the opinion of an expert would assist the trier of fact." (Evid. Code § 801(a).) As Plaintiffs correctly contend, the question of whether Uber was on notice that any of the drivers in question would sexually assault a passenger is "one of such common knowledge that [people] of ordinary education could reach a conclusion as intelligently as the witness." (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 291 (cleaned up) [holding that trial court committed prejudicial error in wrongful termination case by allowing a human resources management expert to opine that certain facts in evidence were "indicators" that defendant discharged plaintiff for retaliatory reasons, which "improperly invaded the province of the jury to draw conclusions from the evidence"].) As this Court previously reasoned, "whether Uber's alleged breaches of its duty of care proximately caused Plaintiffs' injuries presents disputed issues of material fact that must be resolved by a jury." (July 31, 2025 Order, 18.)

Second, Plaintiffs also correctly contend that Ms. Thomas's proffered opinion would not be relevant as to their common carrier claim. As the Court has already ruled, under controlling California law, a common carrier may be held liable for breaching its non-delegable duty to protect its passengers from assault, *whether or not* it was "on notice" that a driver might commit such misconduct. (July 31, 2025 Order, 23-24 ["*Berger* explicitly held that the railroad could be held liable for the sexual assault by its porter even though there was no evidence that it had negligently employed him or that he had any propensity to molest passengers."]; see also *In re Uber Technologies, Inc. Passenger Sexual Assault Litigation* (N.D. Cal. 2024) 745 F.Supp.3d 869, 897-900.)

Plaintiffs also argue that for their general negligence claim, they need not show that Uber had notice that its drivers would sexually assault riders, but only that they were or became "unfit," creating a risk to passengers. (Omnibus Mot., 19-20.) In support of that argument, Plaintiffs cite CACI No. 426, the jury instruction governing a claim for negligent hiring, supervision, or retention of an employee. (See, e.g., *Z.V. v. County of Riverside* (2015) 238 Cal.App.4th 889, 902 ["To establish negligent supervision, a plaintiff must show that a person in a supervisorial position over the actor had prior knowledge of the actor's propensity to do the bad act."]; *Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246

Cal.App.4th 566, 591 [same].)[6] While it is unclear to the Court how Uber could have discerned that a given driver was or had become "unfit," despite a "clean" criminal background check, that issue is one of fact for the jury, and is not a proper subject for expert testimony. (See *Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 843 ["Apparently, the [defendant] had no actual knowledge of [the employee's] past. But the evidence recounted above presents triable issues of material fact regarding whether the [defendant] had reason to believe [the employee] was unfit or whether the [defendant] failed to use reasonable care in investigating [the employee]."].)

### 5. Partially Exclude Expert Testimony of Joseph Okpaku

Plaintiffs seek to preclude Uber's expert Joseph Okpaku from testifying "that Uber has not been treated like a common carrier and that Uber lacks control over drivers," arguing that such opinions constitute impermissible testimony about legal issues and invades the province of the jury. (Omnibus Mot., 21-25.) Plaintiffs also argue that most of Mr. Okpaku's opinions about the history of regulating ridesharing, safety standards in the ridesharing and for-hire industries, and that Uber exceeds those standards, are irrelevant and/or would confuse the issues, misleading the jury, or necessitate an undue consumption of time. (*Id.* at 25.) The Court agrees in part.

Mr. Okpaku is the co-founder of a consulting firm that provides advice and strategic counseling for matters relating to government relations, public policy, and public affairs. (Ex. 5-1, 1.) He is an attorney who previously practiced law in New York before moving to California and ultimately becoming Lyft's VP of Governmental Relations. (*Id.* at 1-2.) Uber retained Mr. Okpaku to testify to a wide range of issues, including:

- "Industry standards regarding safety in for-hire transportation;
- The history and evolution of the rideshare industry;
- Uber's compliance with applicable legal requirements and industry standards;
- The evolving context for evaluating comparative safety;

---

[6] While Uber disclaims any employment relationship with its drivers, the Court need not address that issue here in light of its conclusion that Uber is a common carrier with a non-delegable duty of care to its passengers.

- 13 -

- Uber's safety policies and practices;
- The comparative safety of the rideshare industry versus other forms of transportation;
- The lack of Uber control over third-party drivers; and
- The characteristics of transportation network companies that differ from common carriers."

(*Id.*) In summary, he offers four opinions:

"1. The industry standard with respect to safety in the rideshare industry has been established by the statutory and regulatory requirements for companies like Uber;

2. Uber has always exceeded the industry standard of safety for the rideshare industry;

3. Companies like Uber maintain little to no significant control over third-party rideshare drivers because the drivers fundamentally control if, when, how much, and for how long they choose to make themselves available to provide rides through the Uber app; and

4. Transportation network companies have been treated by regulators as distinct from common carriers."

(*Id.* at 4-5.) Those opinions are conveyed in an extensive (31-page single-spaced) report addressing, among other subjects, the history of ridesharing legislation and regulation (*id.* at 5-8); the ridesharing industry standard for safety (*id.* at 9-10); safety standards for the broader for-hire transportation industry (*id.* at 10-12); that Uber's safety policies, procedures, and technology exceed standards for safety for rideshare or the for-hire transportation industry, including whether Uber should require the use of dashcams and the safety advantages of ridesharing relative to other transportation options (*id.* at 12-19); Uber's purported lack of control over its drivers, including the nature of ridesharing, the provisions of Uber's contracts with its drivers, and other aspects of Uber's relationship with its drivers, including procedures for booking rides, establishing or negotiating fares, the possibility of drivers not accepting rides, and the rating system for drivers and passengers (*id.* at 19-27); and, finally, the regulatory treatment of TNCs, as distinct from common carriers, under the CPUC regulations and subsequent legislation in California (*id.* at 27-30).

A motion in limine may be used to exclude expert opinion testimony pertaining to a question of

law. (*Amtower*, 158 Cal.App.4th at 1598.) "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code § 805.) "However, the admissibility of opinion evidence that embraces an ultimate issue in a case does not bestow upon an expert carte blanche to express any opinion he or she wishes. There are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law." (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178.) An expert is not authorized "to testify to legal conclusions in the guise of expert opinion. Such legal conclusions do not constitute substantial evidence. The manner in which the law should apply to particular facts is a legal question and is not subject to expert opinion." (*Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841.)

Here, Mr. Okpaku's fourth opinion—that TNCs have been treated by regulators as distinct from common carriers—is precluded by this principle. Mr. Okpaku opines that "TNCs have not been treated like common carriers under the CPUC regulations and subsequent legislation in California," and concludes that TNCs such as Uber "does not rise to the level of a common carrier, which traditionally has been subject to heightened standards of care and safety." (Ex. 5-1 at 27-28.) However, as noted, the Court has already reached the opposite conclusion: that Uber *is* a common carrier under California law which owes such a heightened duty of care. (See July 31, 2025 Order, 8-18.)[7] Mr. Okpaku may not testify to the contrary.

*Summers* is closely on point. There, in a wrongful death action arising out of a motor vehicle accident, the court held that the trial court erred in allowing plaintiffs' expert witness, a lawyer who specialized in the field of transportation, to testify that the defendant owner of corn transported by an independent contractor owed a nondelegable duty to plaintiffs' decedent, as well as to offer opinions as to defendant's negligent hiring of a contractor and "almost every imaginable subject related to the case."

---

[7] Indeed, Uber submits Mr. Okpaku's expert report in support of its "offer of proof," which as noted improperly seeks reconsideration of the Court's ruling in that regard. (Offer of Proof, 6-8 & Ex. F.) Moreover, Uber argues elsewhere that the CPUC's regulatory standards are "simply not probative of the negligence principles and standard of proof that apply in this litigation." (Omnibus Mot., 45-46.) The Court agrees.

(69 Cal.App.4th at 1160.) The court explained that the witness

> completely overstepped his legal bounds. He was a *witness*, not the judge. Both state and federal courts have held that expert testimony on issues of law is not admissible since it is the judge's responsibility to instruct the jurors on the law—not that of the witness. The reason is that the lawyer-expert who expounds on the law usurps the role of the trial court. This is a particular problem when, as in this case, the trial court's instructions fell far short of the opinions expressed by [the witness].

(*Id.*; see also *id.* at 1185 [reading witness's testimony in its entirety, "we conclude that he was advocating, not testifying. In essence, cloaked with the impressive mantle of 'expert,' [witness] made plaintiffs' closing argument from the witness stand. This is a misuse of expert witnesses, and renders his testimony inadmissible under Evidence Code section 801."].) If a plaintiff may not present an expert on such topics, neither may a defendant.

Not only is the proffered testimony improper as addressing a question of law, it is irrelevant. The Court has concluded that Uber is a common carrier under the Civil Code for the purpose of tort liability, not for purposes of regulation by the CPUC or the Legislature. The Public Utilities Code identifies businesses that are subject to "regulation and supervision by the [CPUC]," but it "say[s] nothing with respect to common carrier status in tort actions." (*Squaw Valley Ski Corp. v. Superior Court* (1992) 2 Cal.App.4th 1499, 1510-1511.) Thus, "a transportation company may be exempt from regulation by the PUC as a common carrier . . . but may occupy the status of common carrier for tort liability purposes under Civil Code section 2168." (*Id.* at 1513.) As Uber itself acknowledged in its motion for summary judgment, "the Public Utilities Code does not dictate whether Uber is a carrier for the purpose of deciding tort liability." (Opening Brief, 42.) Thus, even if Mr. Okpaku's opinion regarding Uber's regulatory treatment were otherwise admissible, it is irrelevant to Plaintiffs' tort claims. [8]

Plaintiffs also object to Mr. Okpaku's third opinion regarding Uber's lack of control over drivers, arguing it is an impermissible legal conclusion and should be excluded under section 352. (Omnibus Mot., 24-25.) The Court disagrees. The proffered testimony may bear, at least indirectly, on the

---

[8] For this reason, Uber's argument that Mr. Okpaku's opinions concerning the regulatory framework of the rideshare industry speak to whether Uber breached its heightened duty as a common carrier is unpersuasive. (Opposition, 18.)

- 16 -

feasibility of Uber implementing alternative safety measures and on proximate cause, among other issues. (See *Ortiz v. Daimler Truck North America LLC* (2025) 112 Cal.App.5th 608, 627 [general duty to install reasonable safety devices].)

Finally, the Court is unpersuaded by Plaintiffs' argument that certain of "Mr. Okpaku's opinions regarding the history of regulating ridesharing, safety standards in the ridesharing and for-hire industries, and that Uber exceeds those standards are irrelevant or should be excluded. (Omnibus Mot., 25.) In the first place, Plaintiffs' motion, which seeks to exclude "most" or "many" of those opinions, is insufficiently specific for the Court to issue an intelligible ruling. More generally, as discussed above, a qualified witness generally may properly offer expert testimony regarding the industry standard for safety. (*Howard*, 203 Cal.App.4th at 421; see CACI No. 413.) Such testimony may be relevant and admissible as to the standard of due care and whether Uber has satisfied that standard.

### 6. Exclude Unsubstantiated Or Speculative Matters About Uber's Safety Or The "Low" or "Rare" Prevalence Of Sexual Violence Compared To Society In General Or Other Forms Of Transportation

Plaintiffs seek to exclude testimony regarding a long list of topics relating to the prevalence of sexual violence in society and on the Uber platform and other forms of transportation, as well as to the benefits of utilizing ridesharing in reducing or preventing drunk driving or sexual violence. (Omnibus Mot., 26-34.) They argue, based on the testimony of Uber witnesses, that such statements are "unsubstantiated or speculative." (*Id.* at 26, 28-32.) They also contend that statements regarding the prevalence of sexual violence in society or other forms of transportation is irrelevant "because it sheds nothing on the material issues: what Uber knew about sexual violence on Uber, when it knew it, and what it did about it." (*Id.* at 33.) The Court disagrees. The prevalence of sexual violence in other forms of transportation and in society as a whole logically bears on the extent to which Uber knew, or should have known, of a foreseeable risk that such misconduct might occur on its platform. (See, e.g., *D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 229 ["a negligent supervision claim depends, in part, on a showing that the risk of harm was reasonably foreseeable"].) Provided that a witness who seeks to address these issues is competent and qualified to testify to them, and his or her

- 17 -

testimony is based on admissible evidence, the Court will allow such testimony.

### 7. Exclude Reporting Sexual Violence To Uber Is Easier And Results In A Higher Sexual Violence Reporting Rate

Plaintiffs seek to exclude evidence that reporting sexual violence incidents to Uber is easier than reporting such incidents to law enforcement, in society in general, or to other forms of transportation; and that the rate of reporting sexual violence incidents is higher than elsewhere. (Omnibus Mot., 35-38.) They argue that such statements are "pure conjecture and lack any substantiated basis." (*Id.* at 36.) Again, however, assuming that an expert or other witness can offer an opinion that is adequately supported, the Court will allow such testimony, which may bear on the reasonableness of Uber's response to complaints of sexual assault or sexual misconduct by passengers and the efficacy of various safety measures it has implemented to facilitate such complaints and/or deter misconduct.

### 8. Exclude No Arrest, Conviction, Or Charge For Uber Driver

Plaintiffs seek to exclude evidence that the Uber driver was not arrested, charged, prosecuted, or convicted, or that a criminal investigation was closed without charges, arguing that such outcomes have no tendency to prove or disprove Uber's negligence and could mislead a jury into assuming Uber lacks liability. (Omnibus Mot., 39-40.) The Court agrees. (See, e.g., *Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 257 ["a judgment of acquittal in a criminal case is not competent evidence in a subsequent civil action to prove the innocence of the accused" (cleaned up)]; *Beckner v. Sears, Roebuck & Co.* (1970) 4 Cal.App.3d 504, 509 [court erred in admitting evidence that plaintiff security officer in wrongful discharge case was acquitted of shoplifting: "A judgment of acquittal does not establish that the acts constituting the offense charged were not committed by the defendant; it means only that they were not proved beyond a reasonable doubt."].) Uber's opposition is unpersuasive. (Opposition, 25-28.) Uber seeks to offer evidence regarding why Plaintiff LSA 78 did not report the incident to Uber, arguing that her claim that she was advised not to do so by the police conflicts with the officer's denial that he gave her such advice, and that the police closed the investigation because of her failure to return their phone calls. (Opposition, 26.) At best, that evidence would support impeachment on collateral issues (why Plaintiff did not report the incident to Uber and why the police closed their criminal investigation, which are irrelevant

- 18 -

to the issues in the civil case); at worst, it would reinforce the myth that a victim of sexual assault who does not promptly report the attack is not to be believed. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [common stress reactions of rape victims may include a failure to report, or a delay in reporting, the sexual assault]; *People v. Bledsoe* (1984) 36 Cal.3d 236, 247-248 [expert testimony re "rape trauma syndrome" is admissible to "disabus[e] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths."].)[9] The Court therefore intends to exclude the officer's testimony and any related police files on the topic under § 352. As discussed below in the Court's ruling on Plaintiff LSA 78's broader motion to exclude the San Diego and Santa Clara County police reports and investigations, however, portions of the police file(s) and related testimony may be admissible for other purposes.

### 9. Exclude Plaintiffs' Post-Incident Rideshare Use

Plaintiffs seek to exclude evidence about "Plaintiffs' post-incident Uber, Lyft, and other rideshare use" on the grounds that it is "of minimal probative value" and potentially prejudicial. (Omnibus Mot., 41.) The Court cannot agree. Certain of the Plaintiffs claim emotional distress and other ongoing adverse effects from the alleged incident, one of which is their reluctance (or unwillingness) to utilize Uber or other rideshare platforms for fear that they will again be subjected to sexual harassment or misconduct. At least in an individual case where there is such a claim,[10] the Plaintiff's post-incident use of Uber or other rideshare services bears on the credibility and strength of her damages claims. As Uber argues, it may also bear on causation, since it allows the jury to assess whether Plaintiffs would have used the platform even if they had been provided a warning. (Opposition, 28-29.)

### 10. Exclude Witnesses Not Disclosed by Uber and Deposed by the JCCP Plaintiffs

Plaintiffs move to preclude Uber's counsel from calling witnesses to testify at trial not previously

---

[9] Uber misplaces its reliance on *Jane IL Doe v. Brightstar Residential Inc.* (2022) 76 Cal.App.5th 171. The court held that the police file was admissible because it contained an admission by the defendant owner of a residence for disabled persons that he knew that his handyman, who sexually assaulted the plaintiff, had a history of loitering around the home and harassing female employees, which bore on the foreseeability of the attack. (*Id.* at 180.) Uber's intended use of a police report or testimony here to address a collateral issue could not be more different.

[10] In her amended Plaintiff Fact Sheet, Plaintiff LSA 78 makes just such a claim. (Def. MSA Ex. 79 ["Plaintiff never uses Uber. If she absolutely must take rideshare, she will only take Lyft and always makes sure she has some sort of weapon on her."].)

- 19 -

disclosed by Uber in its discovery responses and not deposed by Plaintiffs' counsel. (Omnibus Mot., 42-43.) Uber asserts that the parties have now exchanged witness lists, and the only witnesses who would fall under this motion are the drivers at issue in the bellwether cases. (Opposition, 30.) Plaintiffs were well aware of the drivers' identities, and had the opportunity to interview or depose them. It seems apparent that they made a strategic decision not to do so. The motion is denied.

### 11. Exclude Attorney-Driven Litigation

Plaintiffs seek to exclude evidence or argument regarding contingency fees or how Plaintiffs' counsel are compensated; attorney advertising, including any attorney advertising Plaintiffs or others saw; or any suggestion that this litigation is "attorney driven." (Omnibus Mot., 44-47.) They premise the motion on jury arguments made by Uber's current counsel in unrelated cases in other jurisdictions. (*Id.* at 44-46.) The Court agrees that any such evidence or argument would be improper and should be excluded on relevance and § 352 grounds. (See *Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148 [counsel may not "properly make personally insulting or derogatory remarks directed at opposing counsel or impugn counsel's motives or character."].)[11] These cases are about Plaintiffs' claims on the merits, not about how they learned of counsel's willingness to represent them or the terms on which they agreed to do so. Nothing in this ruling or this order, however, should be understood to limit Uber from impeaching Plaintiffs on any proper grounds, such as their financial interest *as parties* in the outcome of the litigation, or from making any other proper arguments based on the evidence. (See *Calvert v. State Bar* (1991) 54 Cal.3d 765, 777 ["Generally, any fact or circumstance tending to show that a witness has a financial interest in the outcome of a legal proceeding is a proper ground for impeachment."]; *Ford v. City of Los Angeles* (2020) 47 Cal.App.5th 277, 288-289 ["In conducting closing argument, attorneys for both sides have wide latitude to discuss the case. The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom." (cleaned up)].)

### 12. Exclude Sympathy For Plaintiffs From Uber's Counsel

Plaintiffs seek to exclude any comments relating to "the sympathy that Uber's counsel has for

---

[11] The Court finds the federal authorities cited by Uber unpersuasive. (Opposition, 30-31.)

- 20 -

Plaintiffs or any party to this action," arguing that it would be improper and prejudicial. (Omnibus Mot., 48-49.) The jury will receive the standard instruction that it should "not let bias, sympathy, prejudice, or public opinion influence [its] verdict." (CACI No. 100.) Neither party may improperly appeal to sympathy as a basis for a jury verdict. That does not mean, however, that any arguable expression of sympathy by counsel would constitute misconduct. It is a natural human reaction to feel sympathy for the victim of a sexual assault or other tort, regardless of whether the defendant bears responsibility or liability for her injuries. The Court declines to preclude Uber's counsel in examination or closing argument from any expression of sympathy, which would not be prejudicial to Plaintiffs; conversely, such an order might well prejudice Uber in the eyes of the jury. (See *In re Aqueous Film-Forming Products Liability Litigation* (D.S.C. May 26, 2023) 2023 WL 3686120, *2 (cleaned up) [denying motion to preclude defendants' counsel from expressing any sympathy for plaintiff's alleged injuries, reasoning that "precluding defendant from expressing any sympathy regarding the accident could potentially inflame the jury" (cleaned up)].)[12]

### 13. Exclude Personal Experience With Sexual Violence By Uber's Counsel Or Witnesses

Plaintiffs also seek to exclude any reference to "Uber's counsel or witnesses, or their family or friends, having experienced sexual violence or been sexually assaulted" or "Uber's counsel or witnesses attempting to relate to jurors as women or as persons who experienced or survived sexual violence." (Omnibus Mot., 50-51.) They contend that such argument or references has no relevance and is "intended garner sympathy with jurors and bias them." (*Id.* at 50.)

Uber does not oppose the motion to the extent it seeks to preclude Uber's counsel from discussing any of their own experiences with sexual violence. (Opposition, 34; *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 862 ["it is misconduct to argue matters not in evidence or to assert as fact matters allegedly within counsel's personal knowledge."].) However, Plaintiffs' motion as phrased is overly broad. Certainly, in voir dire, Uber's counsel will have to "relate to jurors as women or as persons who experienced

---

[12] *Davis v. Franson* (1956) 141 Cal.App.2d 263 criticized a "Janus-faced plea," in which counsel "look[ed] in opposite directions at the same time" by urging that sympathy should not affect the jurors' decision, but if there was sympathy it should go to the defendant. (*Id.* at 272.) That is very different than the situation presented here.

or survived sexual violence" by inquiring into whether their experiences would render them unable to serve as fair and impartial jurors.

As to Uber's witnesses, the Court agrees with Uber's argument that if Plaintiffs attack their credibility on the grounds that they lack any personal experience with or knowledge of sexual assault, Uber should be permitted to rehabilitate their credibility by asking them about their or their family members' experiences with sexual violence. (Opposition, 34.) It also agrees that Uber's witnesses should be allowed to testify as to their motivations for addressing the problem of sexual violence at Uber, including if they were motivated by an incident of sexual violence experienced by them or a member of their family. (Id. at 35.)

### 14. Exclude Personal Use Of Uber Or Rideshares By Uber's Counsel Or Witnesses

Plaintiffs seek to preclude any evidence or argument about Uber's counsel, their family or friends, or witnesses having used Uber or other rideshares, or "attempting to relate to jurors' use of rideshares." (Omnibus Mot., 52.) Again, Uber does not oppose the motion to the extent it seeks to preclude Uber's counsel from discussing their personal experiences with Uber and other rideshare platforms. (Opposition, 36; *Brokopp*, 71 Cal.App.3d at 862.) The Court accordingly will grant the motion as to Uber's counsel, family and friends. That ruling does not extend, however, to Uber's witnesses, whose testimony that they (or their family members) use the platform may be relevant to their credibility.

### 15. Exclude Impact To Economy And San Francisco

Plaintiffs seek to exclude evidence or argument regarding the potential harm to the economy caused by a judgment in their favor; the number of individuals Uber employs or that depend on Uber for their livelihoods; or Uber's connections (including that of counsel or witnesses) to the City or people of San Francisco. (Omnibus Mot., 53-54.) Plaintiffs argue that such evidence is irrelevant and "its introduction is only intended to bias the jury and elicit sympathy from jurors." (*Id.* at 53.) The Court disagrees that it would be improper for Uber to briefly introduce itself to the jury as a company with its headquarters and a substantial number of employees in San Francisco, so long as Uber does not present argument that improperly invokes the jurors' economic self-interest. However, it agrees that reference to the potential economic impact of an adverse verdict on the company or its employees would be improper. (See *Martinez*

- 22 -

*v. Dept. of Transportation* (2015) 238 Cal.App.4th 559, 566 ["attorneys cannot make appeals based on irrelevant financial aspects of the case such as the hardship that would be visited on a defendant from a plaintiff's verdict"]; see also *Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174, 179 [misconduct to suggest that verdict for defendant city would result in reduced public services for all (including the jurors)].)[13]

### 16. Exclude Use Of Private Investigators And Jury Consultants

Plaintiffs seek to exclude evidence about "Plaintiffs' use or hiring of private investigators and jury consultants in connection to Plaintiffs' cases." (Omnibus Mot., 55.) They assert that they have not put any private investigators on the witness list and have no intention of calling them at trial, and that their use or hiring of private investigators has "no probative value" and would be unduly prejudicial if disclosed. (*Id.*) Uber does not oppose the motion as long as it applies to both parties. (Opposition, 38.) The motion is granted on that understanding.

### 17. Exclude Recovery Not Taxable

Plaintiffs move to exclude "evidence, argument, or testimony suggesting that any part of the recoveries to Plaintiffs is not taxable." (Omnibus Mot., 56.) The motion is not opposed and is granted. (*Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 664-668, disapproved on other grounds, *Coito v. Superior Court* (2012) 54 Cal.4th 480 ["income tax consequences are of no relevance in personal injury litigation"]; accord, *Franck v. Polaris E-Z Go Div. of Textron, Inc.* (1984) 157 Cal.App.3d 1107, 1117 ["If a plaintiff seeks damages to compensate for future lost income, the jury may not be instructed to account for the fact that a damages award is not taxable"]; *Canavin v. Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 538-541 [conc. opn. of Staniforth, J., collecting authority].)

---

[13] For the same reasons, the Court is granting Uber's corresponding motion to preclude Plaintiffs from making "reptile arguments." (See pg. 57, *infra*.)

- 23 -

**B.    Plaintiff Jane Doe LSA 78's Motions In Limine**

### 1.    Evidence Or Calculation That Reduces Lost-Earnings Or Earning-Capacity Damages on The Basis of Plaintiff's Race, Ethnicity, or Gender

Plaintiff moves to exclude any evidence or calculation that reduces lost-earnings or earning-capacity damages on the basis of her race, ethnicity, or gender, including reliance on wage tables or statistics that differentiate by those categories. (Mot., 2.) The motion is based on Civil Code section 3361, which states:

> Estimations, measures, or calculations of past, present, or future damages for lost earnings or impaired earning capacity resulting from personal injury or wrongful death shall not be reduced based on race, ethnicity, or gender.

(See also CACI No. 3906.) However, while Plaintiff briefly refers in its motion to questioning of her expert on her claimed economic loss, she does not attach the testimony in question or refer to any testimony proffered by Uber's witnesses that she contends would violate this statutory prohibition. "Absent an appropriate factual showing to support the motion, the court should not entertain the motion." (*Kelly*, 49 Cal.App.4th at 671 fn. 3.) Further, Uber represents that it "did not and does not intend to argue that Plaintiff's estimated earnings should be discounted in any way by virtue of her race or gender." (Opposition, 7.) Accordingly, the motion is granted.

### 2.    Plaintiff's Other Sexual Conduct

Plaintiff moves to exclude any evidence concerning her other sexual conduct, including any prior or subsequent sexual assaults, at any time during trial. (Mot., 2.) The Court granted the parties leave to submit additional briefs, and will issue a separate ruling on this motion.

### 3.    Alleged Medical History Of Plaintiff's Family Members

Plaintiff seeks to exclude any evidence or reference to the alleged medical history of her family members, specifically that her grandmother was "called schizophrenic" and her father suffered from PTSD. The motion is brought on the grounds that the medical or medical condition of Plaintiff's family members are irrelevant and should be excluded under § 352, and would violate her family members' rights of privacy. Uber opposes the motion, arguing that Plaintiff's father's history of PTSD is directly related to her pre-existing mental health history, and that she had a difficult time telling her family about the assault because mental health issues were stigmatized in her family. (Opposition, 11.) It also points to Plaintiff's testimony

- 24 -

that she is concerned that her own symptoms may cause her to follow in her grandmother's footsteps. (*Id.* at 12.)

The Court is dubious that Uber has shown that Plaintiff's family members' medical history meets the standards for relevance or, even if that history were minimally relevant, would be properly admitted under § 352. However, the Court lacks sufficient information to definitively resolve this motion. Uber has not indicated whether it intends to present expert testimony that would ascribe Plaintiff's claimed emotional distress damages, in whole or in part, to her "pre-existing mental health history" or to alleged abuse she may have suffered at her father's hands in her childhood. Uber should be prepared to present a written offer of proof on those topics.

### 4. Alleged Experiences Of Sexual Assault of Plaintiff's Family Members

Plaintiff seeks to exclude evidence of her family members' experience with sexual assault. Uber does not oppose the motion, which is granted.

### 5. San Diego and Santa Clara Police Reports and Police Investigation

Plaintiff seeks to exclude evidence regarding the police report and police investigation by the San Diego and Santa Clara police departments about her sexual assault. Specifically, she seeks to exclude all evidence regarding the contents of the two police reports, including that the Uber driver was not arrested or criminally charged. Plaintiff argues "it would be improper to argue that the Uber Driver was not arrested or otherwise criminally charged because it implicitly suggests that the Uber Driver did not commit the conduct Plaintiff alleges." (Mot., 2.)

The Court agrees, as it indicated in granting Plaintiffs' omnibus MIL #8, that evidence that the Uber driver was not arrested, charged, prosecuted, or convicted, or that a criminal investigation was closed without charges, should be excluded. The Court agreed to meet and confer in order to agree upon a limiting instruction that may be given to the jury to this effect. However, based on the limited record and briefing before it, which does not attach the police report(s) or indicate the specific purposes, if any, to which Uber intends to put it, the Court cannot grant the motion more broadly. For example, the police report(s) may contain admissions by Plaintiff that are relevant to the issues in the case, including descriptions of the incident, the driver, and her emotional state and actions immediately following the incident. (See *Jane IL*

- 25 -

*Doe,* 76 Cal.App.5th at 180.)

### 6. Childhood Physical Abuse

Plaintiff moves to exclude evidence that she suffered physical abuse (non-sexual in nature) from her father during her childhood on grounds of relevance and under § 352. Uber opposes the motion, arguing that Plaintiff's past abuse "has continued to affect her mental and emotional state throughout her adulthood, even after the alleged incident." (Opposition, 17.) Uber contends that this "longstanding pattern of trauma and its ongoing impact on Plaintiff are essential considerations in evaluating the nature, extent, and causation of her claimed psychological injuries in this case." (*Id.*) Again, Uber should be prepared to make a written offer of proof if it intends to present expert testimony to that effect.

### 7. Exclude The Testimony of Driver Farrukh Kazim Or, In The Alternative, To Compel Prompt Production Of All Post-Cut-Off Interview Materials

Plaintiff LSA 78 moves to exclude the live testimony of Uber driver Farrukh Kazim. In the alternative, she seeks an order compelling Uber to produce within five court days every recording, transcript, memorandum or note memorializing any interview, meeting or conversation with Mr. Kazim that occurred after the May 30, 2025 discovery cut-off, with opinion work-product redacted, and to make him available for deposition at Uber's expense before he may appear for trial. (LSA Mot. No. 7, 2.) Plaintiff asserts she never deposed Mr. Kazim because he resides in New York and is beyond the reach of a California subpoena. (Memo., 1.) For the reasons set forth in the Court's order denying Plaintiffs' omnibus motion #10, the motion is denied.

### 8. Exclude That Plaintiff Assented To Any Agreement That Uber Owes A Duty Below That Of A Common Carrier

Plaintiff seeks to exclude evidence or argument that she ever assented to any agreement that Uber owes a duty below that of a common carrier; that any provision in any contract with her curtails the common carrier duty that Uber owes to its passengers; and that Uber's alleged lack of ownership of vehicles, employment relationship with its drivers, or control over its drivers reduces its duty to Plaintiff. (LSA Mot. No. 8, 1.) In view of the Court's summary judgment ruling holding that Uber is a common carrier with a heightened duty of care, the motion is granted. However, this ruling will not preclude Uber from

introducing its Terms of Use or other agreements with its passengers (or drivers), if they are relevant to some other issue.

## II.    Uber's Motions

### A.    Motions To Exclude The Opinions Of Plaintiffs' Expert Witnesses

#### 1.  Dr. James Hopper

Uber moves to exclude the opinions of Plaintiffs' expert Dr. James Hopper on three grounds: that the opinions (1) invade the province of the jury; (2) are not generally accepted in the relevant scientific community, have no known error rate; and are not testable; and (3) are not relevant because they are not specifically applied to the case.  The Court grants the motion in part and defers ruling on the balance.

Dr. Hopper is a clinical psychologist who describes himself as "an independent consultant in clinical and forensic psychology, including as an expert witness on psychological trauma and its effects in cases involving child abuse, sexual assault, and capital murder." (Hopper Report, 2.)  He was retained by Plaintiffs' counsel to prepare a report covering several topics:

> (1) common impacts of sexual assault as the assault is occurring; (2) memory processes and characteristics, including for stressful and traumatic experiences such as sexual assault, specifically (a) which aspects of such experiences people commonly do and do not recall—at all or accurately—including years later, (b) the impacts of alcohol on memory storage and recall for directly experienced or witnessed events, (c) common impacts of investigators' questioning on memory retrieval and storage, and (d) why common patterns of recollection are not a valid basis for impeaching the credibility of those memories or the person reporting them, but are in fact consistent with scientific and clinical knowledge of how memories of traumatic experiences tend to be encoded, stored in long-term memory, and recalled.

(*Id.* at 3.)  Dr. Hopper "was not provided with any specific case information beyond the type of sexual assault committed," and does not "anticipate providing any case specific expert testimony." (*Id.* at 3-4; see also Ex. 4, 113.)  Indeed, he acknowledged in his deposition, "I don't know anything about this case." (Ex. 4, 88.)  He didn't examine anyone in connection with the opinions he's offering, didn't review any plaintiffs' deposition testimony, and is not opining that any individual's testimony is or is not credible. (*Id.* at 113.)  He summarizes his key opinions as follows:

- 27 -

When attempting to recall what happened, sexual assault survivors commonly get confused about peripheral and less-central details and/or the temporal sequence in which recalled details were originally experienced. It is common for victims to sometimes recall, other times not recall, and then later recall again the very same details—over the course of days, weeks, months, even years. Victims of sexual assault may accurately remember things, even years later, that conflict with what investigators have put in their reports. . . . *[N]one of that should ever be viewed as evidence that a victim and her memories are not basically accurate over time for their gist and central details, or as evidence that someone has fabricated any memories or is otherwise not credible.* Decades of well-established and utterly non-controversial research on human episodic memory functioning indicate that *recollections of the gist and the (most) central details of actual sexual assaults are likely to be true and consistent over time, even if they were not accessible to recall at any particular time.*

(Report, 19 (emphases added).)

First, Uber argues that Dr. Hopper's opinions invade the province of the jury to judge the credibility of witnesses. "Jurors are generally considered to be equipped to judge witness credibility without the need for expert testimony." (*People v. Wells* (2004) 118 Cal.App.4th 179, 189 [testimony of defense expert that one victim did not manifest "usual" demeanor of rape victim was inadmissible]; see also *People v. Anderson* (2001) 25 Cal.4th 543, 575-576 & fn. 10 ["the psychiatrist may not be in any better position to evaluate credibility than the juror" (cleaned up)].[14] Thus, when "the practical result" of expert testimony is "to suggest to the jury that there [is] an overwhelming likelihood [a witness's] testimony is truthful," such testimony "invade[s] the province of the jury, whose responsibility it is to draw the ultimate inferences from the evidence." (*People v. Wilson* (2019) 33 Cal.App.5th 559, 570 [statistical evidence that approximately 96% of children accusing a person of child molestation were telling the truth was not relevant, and its admission was more prejudicial than probative]; accord, *People v. Lapenias* (2021) 67 Cal.App.5th 162, 178-180 [the problem with such testimony is that "the expert is vouching for the veracity of the alleged victims" (cleaned up)].) Plaintiffs assert that Dr. Hopper "does not seek to (nor will he) opine on credibility of witnesses." (Opposition, 6.) Plaintiffs are mistaken. Dr. Hopper opines that *none* of a sexual abuse victim's inconsistent recollections or testimony over time "should *ever* be viewed as evidence that a victim and her memories are not *basically accurate* over time for their gist and central details, or as evidence that someone has fabricated any memories or is otherwise *not credible*" and that a victim's "recollections of the

---

[14] For this reason, as *Wells* explains, testimony about rape trauma syndrome and the child sexual abuse accommodation syndrome (CSAAS) is inadmissible to prove that a particular victim's report of alleged abuse is credible or that a rape or molestation actually occurred. (118 Cal.App.4th at 187-188.)

- 28 -

gist and the (most) central details of actual sexual assaults are *likely to be true.*" Those opinions, albeit couched in general rather than case-specific terms, squarely address the credibility of all sexual abuse victims as witnesses. The motion is granted as to these opinions. An expert may not instruct the jury that all victims are invariably credible and should be believed; that is a judgment for the jury to make.

Second, Plaintiffs do not establish that all of Dr. Hopper's opinions are "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code § 801(a).) As Dr. Hopper himself forthrightly acknowledges, much of his opinion is "common sense: Everyone knows that we pay the most attention to what it is significant to us, and that what we've already recalled if what we're more likely to remember over time." (Report, 8.)[15] Likewise, "everyone knows" that how a person reacts to and remembers the details of incidents varies widely from person to person, and that we all recall some things and forget others. Indeed, the jury will receive a general instruction that says just that.[16] Likewise, it is common knowledge that the use of alcohol can impair memory. Moreover, as Dr. Hopper readily admitted, his opinions are not case-specific. (See Opposition, 6 [admitting that witness "does not look at case-specific facts or examine any witnesses or parties," and was not provided case specific information beyond the type of sexual assault that was alleged to have been committed].) It follows that his expert testimony regarding "general principles for how memory tends to work under stress" (Depo. at 167) likely would be of limited, if any, value to the jury. (See *Cohen v. Cohen* (3d Cir. 2025) 125 F.4th 454, 461-464 [district court erred in admitting Dr. Hopper's expert testimony regarding purported accuracy of recovered memories where it lacked reliability and fit to the facts of the case].)[17]

[15] Uber relies on a Virginia trial court decision excluding Dr. Hopper's proffered opinion regarding repressed memory of childhood sexual abuse, which the court excluded under the *Daubert* standard. (Mot., 9, 12.) In that case, the court also concluded that Dr. Hopper's "general memory testimony would not be helpful to a jury. The jury can address general memories and the credibility issues attendant thereto. Such 'expert' testimony invades the province of the jury and may constitute improper bolstering/credibility testimony."

[16] See CACI No. 107 ["Sometimes a witness may say something that is not consistent with something else the witness said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony."].)

[17] Notably, some of that testimony was closely similar to opinions Dr. Hopper offers here. (See *Cohen*, 125 F.4th at 459 [opinion that "while memories generally fade, individuals typically remember the gist of what happened and some of the most central details" (cleaned up)].)

- 29 -

Plaintiffs insist that Uber "mischaracterizes the nature of Dr. Hopper's testimony and ignores and misinterprets the applicable legal authorities regarding what experts may testify to in this context under California law." (Opposition, 6.) In particular, they contend that the Supreme Court approved similar testimony in *People v. Bledsoe* (1984) 36 Cal.3d 236, which is "directly on point." (*Id.* at 5, 10.) *Bledsoe* held that "expert testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that the witness was raped," but suggested that in certain cases, it may be admissible to rebut an inference "that some conduct of the victim after the incident—for example, a delay in reporting the sexual assault—is inconsistent with her claim of being raped." (*Id.* at 247, 251.) "[I]n such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.* at 247-248; see also, e.g., *People v. McAlpin* (1991) 53 Cal.3d 1289 [similar holding regarding admissibility of expert testimony on "the common reactions of child molestation victims," known as child sexual abuse accommodation syndrome or CSAAS]; *People v. Flores* (2024) 101 Cal.App.5th 438, 456 ["When a victim's credibility is placed at issue due to paradoxical behavior, including a delay in reporting, CSAAS testimony is admissible to disabuse a jury of misconceptions about how a child reacts to molestation." (cleaned up)].)

Thus, as Plaintiffs observe, expert testimony may be admissible in a sexual abuse case to "explain[] to the jury why certain victims may act in a counterintuitive manner," such as by "freezing" or submitting rather than fighting back. (Opposition, 5, 11.) True enough. But as Plaintiffs admit, Dr. Hopper largely *does not offer such testimony*, but instead primarily seeks to present "testimony on how memory works." (*Id.* at 11; see also *id.* at 13 ["the fragmented nature of the memory of a trauma victim"].) He offers only one opinion that arguably falls squarely within *Bledsoe*: his first, denominated "Common Immediate Impacts of Sexual Assault." (Report, 4-7.) While a portion of that opinion does address certain habit- or reflex-based reactions to the stress and fear engendered by a sexual assault, however, it focuses primarily on the effects of such an event on memory—an entirely different subject.

In any event, the bulk of the motion is premature until and unless Plaintiff LSA 78 testifies and is

- 30 -

cross-examined. If Uber attacks her credibility because, for example, she did not fight back, or attempted to placate or distract her attacker, or because she did not promptly report the assault to her family members, Uber, or the police, then a portion of Dr. Hopper's testimony relating to the reasons that sexual abuse victims react the way they do may become relevant.[18] Likewise, if Uber attacks Plaintiff's credibility based on her inability to recall specific details, or inconsistencies in her accounts of the incident, certain of Dr. Hopper's opinions regarding how memory works may become pertinent. "The testimony is pertinent and admissible if an issue has been raised as to the victim's credibility." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1745; see *People v. Flores*, 101 Cal.App.5th at 457-458 [trial court did not err in admitting CSAAS expert testimony in child molestation because "the defense put the victims' credibility at issue in ways directly related to the CSAAS expert's testimony," including asking them on cross-examination "whether their mother was telling them what to say in court because they each said they had trouble remembering certain details."].) In such an event, "at a minimum the evidence must be targeted to a specific 'myth' or 'misconception' suggested by the evidence." (*People v. Bowker* (1988) 203 Cal.App.3d 386, 393-394.) "Where there is no danger of jury confusion, there is simply no need for the expert testimony." (*Id.* at 394; *Bledsoe*, 36 Cal.3d at 248 [rape trauma syndrome testimony not admissible where "the victim promptly reported the attack, immediately exhibited the type of severe emotional reaction that the normal lay juror would associate with rape and suffered bruises and other physical injuries that corroborated her claim that she had been violently assaulted," and "defendant made no claim that [victim's] conduct or demeanor after the incident provided any basis for the jury to infer that she had not been raped"].)

### 2. John Feldis

Uber moves to exclude the opinions of Plaintiffs' expert John ("Jay") Feldis[19] on three grounds: (1) Mr. Feldis is not qualified to testify about dashcam technology, the alleged deterrent impact of dashcams on crime, or Uber's alleged motivations for not adopting a dashcam policy; (2) his opinions are not based

---

[18] See *Cardin v. Olszewski* (E.D.Va. May 28, 2021) 2021 WL 2767301 at *6 [denying motion to exclude Dr. Hopper's report "discussing the effect of stressful and traumatic experiences on memory and the prevalence of extreme self-protective behaviors in trauma survivors," but stating that the court "will limit the breadth of Dr. Hopper's testimony depending on the facts adduced at trial"].)

[19] Mr. Feldis utilizes the first name "Jay" on his curriculum vitae, and was so identified in his deposition, but his report bears the name "John."

- 31 -

on a reasonable ground; and (3) his opinions are not helpful to a jury. (Mot., 2.) The motion is denied.

Mr. Feldis is an electric engineer by training who describes himself on his curriculum vitae as a founding member of the Video Division at Logitech, the dominant market leader in webcams, who helped to create and define webcams and video communication as consumer products from 1993 to 2006. He was retained to "[e]valuate the technical feasibility of using 'dashcam' video camera technologies in the cabin of Uber rideshare vehicles to improve driver and passenger safety." (Report, 1.) His report surveys the emergence and evolution over time of dashcam video recording for automobiles, describes the uses and capabilities of those devices, and summarizes the history of dashcam fleet management services. Mr. Feldis also summarizes his review of Uber internal emails and documents revealing that "Uber was aware of dashcam solutions as early as February 2016 and evaluated adding video cameras to driver vehicles in October 2017." (*Id.* at 6.) In his review of documents regarding Uber's feasibility analysis and pilot programs, he "did not encounter instances where technical feasibility was a blocking factor to webcam deployment." (*Id.*) Mr. Feldis summarizes his opinions as follows:

> It is my opinion that by 2017 i[t] was technically feasible to employ cabin-facing dashcam video recording into rideshare vehicles via either a) 3rd party camera suppliers, b) 3rd party telematics services, or c) by integration of camera technology into an[] Uber developed in-car device and/or driver app, or some combination of a, b and c.

> Dashcam technology was recognized at Uber in 2016 or earlier and evaluated inside Uber beginning in 2017, Pilot programs began in 2018 and continued into 2021. The solutions proposed and investigated inside Uber in this time period were technically feasible and could have been implemented according to internal estimates.

(*Id.* at 7.) Uber's counsel also elicited two additional opinions from Mr. Feldis in his deposition: (1) that the presence of cameras affects people's behavior and can deter crime (although Mr. Feldis readily conceded that he does not hold himself out as an expert on the impact of surveillance cameras on crime prevention); and (2) that it "would have been wise" for Uber to implement a dashcam program to deter misconduct by drivers. (Depo. at 60, 61, 65.) He explained the latter opinion as based both on his own opinion and on Uber's "own internal discussions," which revealed that Uber "believed it would improve safety and it would reduce conflicts." (*Id.* at 139-140, 210.) He also testified that based on his review of Uber documents, Uber "paused" its adoption of dashcam programs "because of legal concerns of some sort seemingly related

- 32 -

to employment law." (*Id.* at 137.)

The Court rejects Uber's first argument, that Mr. Feldis lacks the relevant qualifications to opine on the technological feasibility of dashcam technology in rideshare vehicles. (Mot., 9-10.) A trial court has "broad discretion to determine whether a witness is competent and qualified as an expert." (*Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 513514.) "Where a witness has disclosed sufficient knowledge, the question of the degree of knowledge goes more to the weight of the evidence than its admissibility." (*Id.* at 514, quoting *Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38.) Here, while Mr. Feldis may not have not worked directly with dashcams, his background and experience in the development of webcams, a closely similar device, and camera technology in other devices, and his expertise in electronics and product development are sufficient to qualify him to testify regarding the technical feasibility of such technology. (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 274 ["work in a particular field is not an absolute prerequisite to qualification as an expert in that field"].) Uber's further objection that Mr. Feldis's feasibility opinions are not based on a reliable methodology rings hollow in light of undisputed record evidence that Uber considered implementing dashcams and actually provided incentives for drivers to install them in their vehicles.[20]

Uber's second argument—that Mr. Feldis's opinions that Uber should have adopted a dashcam policy because dashcams deter crimes—is a straw man. (Mot. at 11-12.) Mr. Feldis expressed neither opinion in his report. Rather, Uber's counsel elicited those opinions at his deposition.[21] Mr. Feldis readily acknowledged that he is not an expert on the deterrent effect of surveillance cameras. Likewise, Mr. Feldis made clear that his response to the question whether Uber "should have" adopted a dashcam policy reflected his personal opinion, not an expert opinion. Those issues are properly for the jury.[22]

---

[20] See also *Drammeh v. Uber Technologies, Inc.* (9th Cir. 2025) 105 F.4th 1138, 1140 ["Uber had additional undertaken research for a number of years into the use of recording devices ('dashcams') in Uber cars. Uber allows its drivers to use dashcams but does not require or provide them. If a driver is using a dashcam in their car, a rider is notified in the app."].

[21] Plaintiffs state they intend at trial to ask Mr. Feldis "to address only the topics discussed in his expert report regarding the technical feasibility of dashcams *unless Uber opens the door* by asking him on cross-examination to offer new opinions regarding whether Uber should have mandated dashcams to deter crime." (Opposition, 1.)

[22] That surveillance cameras can play a role in deterring misconduct is a common sense conclusion that a jury can readily draw without the aid of expert testimony. (See, e.g., *Sharon P. v. Arman, Ltd.* (1999) 21

- 33 -

Finally, Uber's objection to Mr. Feldis's opinions regarding Uber's "intent" or "motivations" in deciding whether to implement a dashcam program lacks merit. (Mot. at 12-14.) Mr. Feldis may properly testify that, based on his technological expertise and his review of Uber's internal documents, it would have been technically feasible for Uber to implement a dashcam program. He may also testify that in light of that conclusion, Uber must have had some other reason for failing to do so.[23] That is not an impermissible conclusion regarding subjective "intent." Whether Mr. Feldis failed to review a sufficient number of internal documents, or the right documents, in reaching his conclusion goes to the weight to be given his testimony, not its admissibility, and is appropriately reserved for cross-examination.

### 3. Dr. Veronique Valliere

Uber moves to exclude certain opinions of Plaintiffs' expert Dr. Veronique Valliere that purportedly fall outside her area of expertise. Specifically, Uber argues that (1) Dr. Valliere is not qualified to testify about marketing, company ethics or safety measures; (2) her opinions on marketing, safety features, failure to warn, and ethics are not based on a reliable methodology; (3) her opinions on ethics, legal conclusions, and Uber's purported knowledge are not proper expert topics; and (4) her case-specific opinions regarding WHBE 6 are unsupported.

Dr. Valliere is a licensed clinical psychologist who has "worked in the field of interpersonal violence for over 30 years"; she is the owner/operator of two outpatient treatment centers, one for victims of violence and the other for offenders of violence. She has extensive experience as a consultant, trainer, and expert witness on sexual assault and a variety of related topics, and has authored books on the subject. She was retained by Plaintiffs' counsel "to provide an expert analysis of Uber ridesharing and the enhanced risk of sexual assault of women using Uber." In her lengthy written report, which is accompanied by a bibliography of references, Dr. Valliere reaches conclusions that she summarizes as follows:

Cal.4th 1181, 1198, 1199, disapproved on another ground, *Aguilar v. Atlantic Richfield Co.* (2006) 25 Cal.4th 826, 853 fn. 19 [although "surveillance cameras do not deter all crime," "[i]t is difficult to quarrel with the abstract proposition that the provision of . . . operational surveillance cameras . . . might have diminished the risk of criminal attacks"].)

[23] Again, Plaintiffs disclaim an intent to ask Mr. Feldis to offer opinions at trial regarding whether employment-law concerns would prevent Uber from mandating dashcams. (Opposition, 9.)

- 34 -

1. The rideshare (and Uber) environment is fundamentally suited for risk for sexual assault and maltreatment for its women passengers and drivers. By marketing to women using the promise of safety and trust, Uber has contributed to this risk without addressing the risk.

2. By branding itself as safe and trustworthy, Uber has attracted women through an explicit and implicit endorsement of its drivers and rides. Uber's endorsement and assurances have facilitated the women customer's [sic] trust and raised their expectations of safety, psychologically priming them to suspend their assessment of risk and feelings of "stranger danger." Victim response to sexual misconduct is impacted by an expectation of safety and perceived endorsement of the offender.

3. Uber has not disclosed the actual risk and incidence of sexual assaults and misconduct. Uber's response to incidents also serves to exacerbate the danger. Its failure to respond aggressively to complaints and adequately address sexual assault and misconduct, as well as to underreport the risk to women in their service, has contributed to emboldening the offenders' conduct.

4. Uber has failed to warn passengers, particularly women, of the risk of being sexually assaulted during an Uber ride, or of the factors Uber knows are associated with an increased risk of incidence of sexual assault. This is especially egregious as Uber's own investigations have revealed the high risk factors for sexual assault, factors that are clearly and consistently defined, one of which is being a women being with a male. Its research and technology, by its own estimates, are capable of preventing a large percentage of sexual assault, protecting the women who use it. Instead of aggressively using those features to prevent sexual assault, Uber chose to portray itself as a safe mode of transportation, in particular to women, intoxicated passengers, and passengers traveling on weekends, holidays, and during late night and early morning hours.

(Report at 23.)

Uber concedes, as it must, that Dr. Valliere is qualified to render opinions that fall within her area of expertise of sexual assault, including her general opinions on victim responses to sexual violence; offender pathology; sex offenders and stereotypes; the impact of fear during and after an incident; and internal and external factors influencing victim behavior. (Mot., 8 & n. 2.) However, Uber contends that the Court should exclude her opinions on "a broad range of topics that are outside her expertise and, in many cases, are not proper subjects for expert testimony." (*Id.* at 8.) The Court agrees in part.

The Court agrees that Dr. Valliere is not qualified to testify regarding Uber's marketing practices, including its "branding" and the purported impact of its advertisements on the general population. (*Id.* at 11-13.) Dr. Valliere is undeniably well qualified to testify regarding sexual assault and related topics. However, her report and c.v. do not reflect any relevant skill or expertise in marketing, and indeed Dr.

Valliere concedes that she did not conduct any survey of how Uber's advertisements affected the general public or women customers in particular, nor did she speak to a single plaintiff or driver who uses the Uber platform on that subject. "The qualifications of an expert must be related to the particular subject upon which [s]he is giving expert testimony. Consequently, the field of expertise must be carefully distinguished and limited, and qualifications on related subject matter are insufficient." (*Littlefield v. County of Humboldt* (2013) 218 Cal.App.4th 243, 256 (cleaned up) [expert witness who was experienced in medical cannabis cultivation, use, and advocacy, was not qualified to give an expert opinion as to specific medical marijuana patients' medical conditions and medical needs]; see also, e.g., *People v. DeHoyos* (2013) 57 Cal.4th 79, 128-129 [court appropriately allowed witness to testify to matters within the scope of her qualifications as a clinical psychologist who had performed a psychological evaluation of defendant, but precluded her from generalizing about how job loss may cause someone to commit a homicide because there was no basis shown for her to testify as an expert on such topic].) In short, an expert must stay in her lane, and not offer opinions about matters that are beyond the scope of her expertise.[24]

However, the Court disagrees with Uber's arguments that Dr. Valliere's opinions on other topics must be excluded. Her opinion regarding the enhanced risk of sexual assault for women using Uber is closely related to her area of expertise. That expertise necessarily encompasses the features of the environments in which victims may be subjected to sexual assault, whether they are vehicles or military bases, and how those features may affect victims' reactions. That her opinions were based on a review of documents selected by Plaintiffs' counsel, or that she supposedly "lacked information material" to those opinions (Mot. at 13-14), are proper subjects for cross-examination, but do not warrant exclusion of her opinions. (See *People v. Monterroso* (2004) 34 Cal.4th 743, 787 [no misconduct in counsel's "commonsense observation that the opinions of the defense experts were necessarily shaped by the

---

[24] Plaintiffs disclaim any intent on Dr. Valliere's part to offer opinions on marketing, safety features, warnings, or ethical conduct. (Opposition, 11.) However, they immediately contradict themselves, arguing that her opinions relating to marketing, the risks of rideshare services, and Uber's failure to warn are admissible. (*Id.* at 12-17.) If Plaintiffs can present case-specific evidence regarding Uber's marketing through another witness that supports their characterization, they may elicit Dr. Valliere's opinions on the potential psychological impact of such advertisements on female passengers. (See fn. 29, *infra* [discussing *People v. Sanchez*].)

- 36 -

information the defense chose to provide them"].)[25] The same is true of Uber's complaints that Dr. Valliere misread or misunderstood a chart created by Plaintiffs' counsel and that she made unsupported assumptions with respect to a single case report she chose to illustrate her conclusions. (*Id.* at 15-16.) "The scope of cross-examination of an expert witness permitted under Evidence Code section 721 is broad, and includes examination aimed at determining whether the expert sufficiently took into account matters arguably inconsistent with the expert's conclusion." (*People v. Townsel* (2016) 63 Cal.4th 25, 55 (cleaned up).) It is therefore permissible to "cross-examine an expert witness more extensively and searchingly than a lay witness and . . . to attempt to discredit the expert's opinion." (*People v. Nieves* (2021) 11 Cal.5th 404, 451 (cleaned up).) Likewise, the Court rejects Uber's arguments that Dr. Valliere may not offer an opinion that Uber has failed to warn female passengers of the risk of being sexually assaulted during an Uber ride, or of the factors Uber knows are associated with an increased risk of incidence of sexual assault. (Mot. at 16-17.) That Uber did not provide such warnings is not a "legal conclusion" that Uber violated the law; it is a factual inference drawn from Dr. Valliere's review of case materials, which Uber is free to attack on cross-examination if it is inaccurate.[26]

Finally, Uber argues that Dr. Valliere's case-specific opinions regarding WHBE 6 should be excluded. (Mot. at 21-22.) The Court agrees. The Court will exclude any facts (or assumed facts) regarding other pending cases on both relevance and § 352 grounds.

### 4. Dr. Minette Drumwright

Uber moves to exclude the opinions of Plaintiffs' expert Dr. Minette Drumwright on two grounds: (1) Dr. Drumwright is not qualified to testify about the rideshare industry, rideshare safety features, or consumer-facing warnings; (2) her opinions on Uber's marketing and its supposed impacts on Uber riders, Uber's ethical duties and "unethical" behavior, Uber's failure to warn Uber riders about sexual assault,

---

[25] In *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, in contrast, the court affirmed summary judgment for defendant where the plaintiff's expert witnesses lacked a sufficient foundation to testify that plaintiff suffered bystander exposure to asbestos because they were not provided with plaintiff's deposition testimony, and there was nothing but speculation to support plaintiff's claim of exposure and causation. (*Id.* at 253-254.)

[26] To the best of the Court's knowledge, it is undisputed that Uber did *not* specifically warn riders about the risks of sexual assault on its platform; what Uber primarily disputes is whether it had a duty to do so, and whether Plaintiffs can show that its failure to provide such a warning caused their injuries.

- 37 -

Uber's safety features, and Uber's knowledge of sexual assaults involving riders are not based on a reasonable methodology and/or are improper expert topics.

Dr. Drumwright is a professor at the University of Texas at Austin who holds a joint appointment in its schools of business and advertising and public relations, and has extensive academic experience researching and teaching those and other topics, as well as employment experience in advertising and public relations. (Report, ¶¶ 2-15.) She is offered as an expert in the areas of marketing, advertising, ethics, corporate social responsibility, and corporate governance as it pertains to marketing and advertising. (*Id.* ¶ 1.) She has issued a voluminous 165-page expert report. In an executive summary of her expert opinions in that report, she opines that Uber acted "unreasonably, recklessly, and irresponsibly" in numerous respects, thereby violating "its own professional norms, codes, and standards as well as those of numerous other organizations." (*Id.*; see also *id.* ¶ 133 [summary of opinions].)

In particular, Dr. Drumwright takes issue with Uber's conduct in the following respects: (1) "in focusing on the perception of Uber's safety and user safety sentiment" (*id.* ¶¶ 1, 59-70); (2) "by misleading passengers and the public regarding the safety of its rides and its background checks for drivers" (*id.* ¶¶ 1, 70-82); (3) "when it targeted vulnerable segments of passengers and the public" (*id.* ¶¶ 1, 82-111); (4) "in delaying and ultimately not implementing safety features such as a female-pairing option and mandatory dashcams" (*id.* ¶¶ 1, 111-129); (5) "by using soft power to 'kill' and 'squash and fog' media stories that would negatively impact perception of Uber's safety" (*id.* ¶¶ 1, 129-137); (6) "by using soft power to get its nonprofit partners and others to reinforce its brand image as a responsible company that provides safe rides" (*id.* ¶¶ 1, 137-145); and (7) "by failing to provide warnings or information to passengers and the public about the extent of sexual violence incidents during Uber rides." (*Id.* ¶¶ 1, 145-164.) The report contains, among other things, a lengthy discussion of various "standards of care for ethical business" (*id.* at 28-53), including Uber's various corporate ethics statements or codes (*id.* at 32-43); a discussion of "corporate social responsibility vs. pseudo corporate responsibility" (*id.* at 54-55); and an extended explanation of each of Dr. Drumwright's various opinions (*id.* at 55-145).

The Court readily rejects Uber's first argument, i.e., that Dr. Drumwright "does not have the

- 38 -

requisite expertise to opine on the rideshare industry, rideshare safety features, or consumer-facing warnings." (Mot. 10-11.) As indicated, Dr. Drumwright has unquestioned expertise in the areas of advertising, marketing, and corporate social responsibility, among other topics (see Opposition, 6-7, 9-10); she need not show industry-specific experience in order to offer expert testimony in those areas. Uber may, of course, cross-examine Dr. Drumwright on this subject, as well as regarding the documents and other materials she reviewed and how they were selected, which goes to the weight rather than the admissibility of her testimony. (Mot. at 12-13; Opposition, 11-12.)

However, the Court's view is that Dr. Drumwright's opinions are largely inadmissible on other grounds. The sole remaining claims in these cases are individual Plaintiffs' claims for negligence. Unlike some of the prior cases in which Dr. Drumwright has testified, this is not a broad-based class or other challenge to Uber's overall marketing and advertising practices. (Compare, e.g., *In Re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation* (N.D. Cal. June 22, 2022), at *20-*22 [generally denying motions to exclude Dr. Drumwright's opinions in nationwide multidistrict class action challenging defendant's false and deceptive marketing and sales practices].) Further, as discussed above, the Court previously sustained Uber's demurrer to Plaintiffs' fraud and misrepresentation claims in the master complaint, and no individual Plaintiff amended her complaint to allege reliance with the particularity required by California law.[27] Thus, *if* Dr. Drumwright's testimony has any relevance, it goes primarily to Uber's alleged failure to warn Plaintiffs of the risks of utilizing the platform.[28]

Dr. Drumwright's opinions, however, are based in large part on the "professional norms and standards" of numerous organizations—including the American Marketing Association, Direct Marketers Association, American Association of Advertising Agencies, International Chamber of Commerce, Institute for Advertising Ethics, Public Relations Society of America, and Digital Marketers Organization—of which Uber is concededly not even a member and by which it is not bound. Over and over again, Dr. Drumwright

---

[27] For this reason, to the extent that Dr. Drumwright is permitted to testify, she may not testify that any given Plaintiff relied on a specific advertisement or marketing practice, or speculate that she reasonably could have done so, in choosing to utilize Uber's platform.

[28] For the same reasons that the Court is excluding the opinions of Dr. Lageson, Dr. Drumwright's opinions that Uber misled passengers and the public regarding its background checks and screening of its drivers are excluded. (Drumwright Report ¶¶ 189-230.)

- 39 -

opines that those standards imposed certain obligations on Uber which it "violated" or "did not meet" by its conduct. But if Uber had a duty to warn Plaintiffs of the risks of sexual assault on its platform, that duty would not stem from the standards of marketing and advertising associations (much less from the code of the "Good Systems" initiative at the University of Texas at Austin or the "UN Guiding Principles"), but rather from California law. Dr. Drumwright's opinions that these disparate organizations' standards gave rise to duties or obligations on Uber's part in relation to its marketing, advertising, or corporate social responsibility practices are inadmissible. "A party cannot rely upon an expert's opinion to establish a duty, which is a question of law for the court." (*Harding v. Lifetime Financial, Inc.* (2025) 109 Cal.App.5th 753, 763 (cleaned up) [the fact that plaintiff's retained experts offered an opinion that defendant investment advisor had an affirmative duty under the FINRA Rules to warn a nonclient about a third party impersonator who was using plaintiff's name and identity to open accounts was "of no consequence"]; *Asplund v. Selected Investments in Financial Equities, Inc.* (2000) 86 Cal.App.4th 26, 49-50 [trial court properly excluded declaration of expert on securities regulation that broker-dealer breached duty to supervise registered representative].)

To be sure, California courts recognize that "[e]xpert testimony is often appropriate to determine the reasonableness of conduct in cases in which industry principles and practices are beyond the knowledge of a layperson." (*Janney v. CSAA Ins. Exchange* (2021) 70 Cal.App.5th 374, 391 (cleaned up).) However, "[t]here are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law." (*Id.* (cleaned up) [trial court did not err in sustaining objections to expert declaration, much of which amounted to legal conclusions about what expert believed was required of defendant insurer under the insurance policy].) Here, Dr. Drumwright's opinion that Uber "violated" its obligations under professional or trade organization standards appear to amount to just such an inadmissible opinion. (See *In re Juul Labs, Inc.*, 2022 WL 1814440, at *20 ["Plaintiffs' experts shall not opine on elements of claims or ultimate conclusions of law on causes of action at issue in particular cases that are the province of the jury. They may opine about whether conduct fell below standards in the industry as long as that testimony is relevant to the particular claims at issue."].) So, too, in the Court's view, are her

- 40 -

opinions that Uber had a duty to warn female passengers of the risk of sexual assault on its platform and that it breached that duty. (See Mot. at 17-18.) Again, duty is a question of law for the Court, while breach presents questions of fact for the jury. (See, e.g., *Hernandez v. Jensen* (2021) 61 Cal.App.5th 1056, 1064 ["The elements of breach of duty and causation are ordinarily questions of fact for the jury's determination."]; *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 323 ["The question whether there has been a breach of duty is usually a fact issue for the jury and may be resolved only as a matter of law if the circumstances do not permit a reasonable doubt as to whether the defendant's conduct violates the degree of care exacted of it. If there is room for honest difference of opinion as to whether there has been a breach of duty, the question becomes one of fact for the jury." (cleaned up)].)

Dr. Drumwright's opinions regarding Uber's alleged use of its "soft power" to "kill" and "squash and fog" media stories that would negatively impact public perceptions of Uber's safety (Report ¶¶ 1, 129-137) are irrelevant, or at best marginally relevant, to any issue properly in these cases. Again, each is a negligence case, not a case about how Uber interacts with the media. At a minimum, those opinions are barred under § 352, since they threaten an undue consumption of the jury's time entailing a mini-trial on such issues as the subject matter and accuracy of each proposed media story, the contents of Uber's communications, the reasons the individual reporter or media outlet decided not to publish the story, etc.

Finally, Dr. Drumwright also opines that Uber's conduct violated its *own* corporate ethics statements, including values statements, codes of conduct, employee handbooks, and community guidelines. (Report ¶¶ 57-85.) That appears to be a more appropriate subject for expert testimony, provided that Dr. Drumwright refrains from offering improper opinions regarding Uber's state of mind (e.g., what it intended or was motivated by). (See, e.g., *King v. DePuy Orthopaedics Incorporated* (D.Ariz. Aug. 31, 2023), at *6 ["What [defendant] purportedly knew, intended, or was motivated by falls outside the scope of expert testimony. These types of state of mind issues are squarely within the province of the jury."].)[29]

---

[29] Dr. Drumwright relies extensively on hearsay, such as third-party reports and media accounts. (See, e.g., Drumwright Report ¶¶ 59 [Holder Report], 208 [Giuliani Report], 457 [law firm report], 458 [blog post], 460 [Buzzfeed report], 461-463 [CNN news story].) Such reliance is improper, absent a showing that the materials fall within a recognized hearsay exception. (See, e.g., *People v. Sanchez* (2016) 63 Cal.4th 665, 686 ["What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay

- 41 -

### 5. Robert W. Johnson

Uber seeks to exclude the opinions of Robert W. Johnson, MBA, a forensic economist who was retained by Plaintiffs to evaluate Uber's financial condition and net worth for the purpose of offering testimony regarding a possible award of punitive damages.[30] Uber argues that Mr. Johnson's opinions are not based on any reliable methodology and are therefore inadmissible. The Court disagrees.

Mr. Johnson's report states that his primary task was "to frame, in economic terms, the financial condition" of Uber, including "the areas of financial health, wealth and economic status." (Report, 1.) His report consists of a two-page letter, accompanied by a number of charts reflecting a variety of financial data bearing on Uber's financial condition over the period 2020 to 2024, which were drawn from Uber's annual reports on Form 10-K, its 2025 proxy statements, and stock market data from the *Wall Street Journal*. It is accompanied by voluminous exhibits consisting principally of those public source materials.

Uber's principal objection to Mr. Johnson's opinions stems primarily not from his flawed approach or methodology, but from the fact that California law does not supply a rigid formula for determination of a defendant's ability to pay an award of punitive damages. "An award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition. A plaintiff who seeks to recover punitive damages must bear the burden of establishing the defendant's financial condition." (*Reliant Life Shares, LLC v. Cooper* (2023) 90 Cal.App.5th 14, 42, quoting *Adams v. Murakami* (1991) 54 Cal.3d 105, 109, 123.) "The Supreme Court has not prescribed any rigid standard for measuring a defendant's ability to pay." (*Id.*, quoting *Adams*, 54 Cal.3d at 116 fn. 7.) "Accordingly, there is no one particular type of financial evidence a plaintiff must obtain or introduce to satisfy its burden of demonstrating the defendant's financial condition. Evidence of the defendant's net worth is the most commonly used, but that metric is too susceptible to manipulation to be the sole standard for measuring a defendant's ability to pay." (*Id.*, quoting *Soto v.*

---

exception." (cleaned up)]; *In re Marriage of Lietz* (2024) 99 Cal.App.5th 664, 673 ["the *Sanchez* rule concerning state evidentiary rules for expert testimony applies in civil cases"]; *People ex rel. Reisig v. Acuna* (2017) [same].) The same rule, of course, applies to all of the parties' expert testimony.
[30] Uber expressly waived its right to seek to bifurcate the trial. (See Civ. Code § 3295(d).)

- 42 -

*BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 194.)[31] "Yet the 'net' concept of the net worth metric remains critical." (*Id.* (cleaned up).) "Thus, there should be some evidence of the defendant's actual wealth, but the precise character of that evidence may vary with the facts of each case." (*Id.* (cleaned up); see also *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 680 ["Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income."].)

Here, Mr. Johnson's analysis does reflect Uber's net worth, a key factor typically considered in determining a defendant's ability to pay.[32] It also addresses a variety of other aspects of Uber's financial condition, including such indices of financial health and ability to pay as its annual net income, cash on hand, net cash flows from operating activities, capital expenditures, free cash flow (net cash flow less capital expenditures), the amount it spent during 2024 on stock repurchases, and its borrowing capacity in the form of $5 billion in undrawn lines of credit. The last factor alone is almost certainly sufficient to support a punitive damages award in nearly any amount a jury is likely to award. (See *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 583 ["Perhaps the most compelling evidence" of defendant's ability to pay was testimony that "as of the time of trial, [defendant] had a credit line of $50 million of which $5.3 million dollars was unexpended . . . This line of credit indicates the lender made a determination [defendant] had the ability to pay amounts well in excess of the

---

[31] Uber asserts that *Soto* rejected Mr. Johnson's opinion "on grounds that apply with equal force here." (Mot., 10.) Not even close. The court held there that plaintiffs presented insufficient evidence of the defendant asbestos parts manufacturer's financial condition to support an award of punitive damages against it where the only publicly available financial information concerned the defendant's parent corporation and Mr. Johnson's opinion was limited to an estimation of the revenue of the defendant, which was one of many subsidiaries of the parent. (239 Cal.App.4th at 185-186.) Plaintiffs had argued incorrectly that the subsidiary and its parent were one and the same; thus, the initial report analyzed the wrong company. (*Id.* at 196.) While the opinion that Mr. Johnson ultimately offered regarding the subsidiary's revenue "constituted some evidence of [the subsidiary's] financial condition," it did not shed any light on its liabilities or expenses; "In other words, revenue alone provides little information about a defendant's ability to pay punitive damages." (*Id.* at 195.) Thus, the record lacked meaningful evidence of the subsidiary's financial condition and ability to pay a punitive damages award. (*Id.* at 195-196.) The instant case could not be more different.

[32] Uber's contention that Mr. Johnson's analysis is objectionable because it primarily consists of metrics from the assets side of its balance sheet and omits Uber's liabilities altogether (Mot., 6) is mistaken. By definition, net worth is the difference between the value of a company's assets and the value of its liabilities.

- 43 -

$300,000 punitive damages award."].)  The report also considers Uber's R&D expenditures, advertising expenses, audit and accounting fees, as well as its overall stock market valuation and the annual compensation paid to its CEO.  Thus, just as in *Reliant Life Shares, LLC*, "the record is not limited to only a narrow set of data points." (90 Cal.App.5th at 43 [holding that sufficient evidence supported jury's awards of punitive damages against defendants].)

This analysis readily supports Mr. Johnson's opinion that Uber has the ability to pay a punitive damages award in an amount to be assessed by the jury.  (See *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 74-75, 83 [affirming $4.5 million punitive damages award, despite defendant corporation's negative net worth, based on Mr. Johnson's uncontroverted testimony regarding defendant's financial condition, including cashflow profit, net profit, the CEO's annual compensation, the company's ability to borrow, and the amount of cash or cash equivalents on hand at the end of the year]; *Zaxis Wireless Communications, Inc.*, 89 Cal.App.4th at 581-583 [defendant corporation's net worth and "a variety of other factors" including evidence of its average annual revenues, net profit from residuals, and the ability to borrow under a line of credit, demonstrated defendant's ability to pay punitive damages award, despite reporting a negative net worth].)[33]

### 6.    Dr. Sarah Esther Lageson

Uber moves to exclude the opinions of Plaintiffs' expert Dr. Sarah Esther Lageson on the ground that her opinions concerning the adequacy of Uber's background check processes are irrelevant because they are not tied to any live issue in this case.  (Mot., 2.)  The Court agrees and grants the motion.[34]

Dr. Lageson is an associate professor at Northeastern University in the School of Law and the School of Criminology and Criminal Justice.  (Expert Decl., 1.)  She was retained by Plaintiffs to opine regarding "the quality of the name-based background checks used by Uber to screen drivers and the

---

[33] In the event that the jury returns a plaintiff's verdict together with a finding of malice, oppression, or fraud, the parties may wish to consider stipulating to certain financial data to streamline the trial.  (See, e.g., *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 450 [in bifurcated proceeding on punitive damages, the parties stipulated that the jury would receive certain information about defendant's financial condition].)

[34] The Court assumes that its ruling would also warrant excluding Uber's background check expert, Jason B. Morris.  (See Lageson Decl. ¶¶ 111-118.)

- 44 -

reasonableness of Uber's reliance on those background checks in their screening process." (*Id.* at 2 ¶ 9.) Her report was meant to provides "a synopsis of the scientific and policy literature regarding the development of and best practices for criminal background screening and the reliability and validity of criminal record information used in private sector background screening." (*Id.* ¶ 10; see also Dep., 142 ["to describe the research on the efficacy and validity of criminal background screening," and to determine "whether or not it was reasonable for a company to use that as the primary way to screen a potential . . . driver"].) She offers three opinions:

> Given the unreliability of commercial background screening, it is unreasonable for Uber to rely on a Checkr report alone to determine a driver's risk for interacting with passengers in a vulnerable, private situation.

> There is no practical reason Uber could not perform both name-based and fingerprint based background checks on drivers. Performing both would improve Uber's ability to detect disqualifying criminal histories of prospective drivers.

> Due to the known, documented data quality problems for both name-based and fingerprint-based background checks, it is unreasonable for Uber not to include additional screening protocols, such as an individualized assessment through a live interview process, as part of the driver onboarding and vetting process.

(*Id.* ¶¶ 12-14.) Dr. Lageson concludes that "it was unreasonable for Uber to rely on Checkr to adequately determine a driver's risk of harm to a passenger." (*Id.* ¶ 119.) She does not offer any opinion as to whether Uber's background check and screening processes deviate from other rideshare companies'. (Dep., 154.)

Uber argues that Dr. Lageson's opinions are "irrelevant because they are untethered to the facts of these cases." (Mot., 6.) In particular, Uber points out that Dr. Lageson does not opine how Uber's alleged failure to conduct sufficient background checks affected any of the Plaintiffs. (*Id.* at 7.) Indeed, in her deposition, Dr. Lageson acknowledged that she is not opining "that any of the individual drivers in the individual bellwether cases had a background check that missed something in their criminal history." (Dep., 141-142.) Nor is she offering any opinion that fingerprint-based background checks would have detected a criminal history in any of the bellwether individual plaintiff-specific drivers' backgrounds. (*Id.* at 248-249.) Indeed, Dr. Lageson did not do any individual assessment or analysis of whether the Checkr

- 45 -

reports as to the individual drivers in the plaintiff-specific bellwether cases improperly passed their Checkr background checks. (*Id.* at 154-155.) Nor did she do any assessment or analysis as to whether live interviews would have made a difference in the plaintiffs' specific bellwether cases. (*Id.* at 298.) Thus, as Plaintiffs concede, Dr. Lageson "does not opine on the precise causal chain between a flawed background check and a dangerous driver in a given plaintiff's case." (Opposition, 5.)

For these reasons, Dr. Lageson's opinions are irrelevant to any issue properly before the jury. On summary judgment, the Court found Uber had shown that "none of the background checks conducted on the accused drivers revealed any criminal history related to sexual assault or sexual misconduct." (July 31, 2025 Order, 20.) It observed further,

> While Plaintiffs suggest a number of ways in which Uber could have conducted more robust background checks, such as by utilizing fingerprints or searching for drivers' records in foreign countries, they point to no additional information that such additional background checks would have revealed. It follows that Plaintiffs cannot show that any alleged shortcomings in Uber's background check process proximately caused their injuries.

(*Id.*) Because Dr. Lageson's opinions admittedly cannot bridge that critical gap, and Plaintiffs evidently have no such evidence, her opinions are irrelevant.

In opposition, Plaintiffs attempt to reframe Dr. Lageson's opinion as pertinent to their failure to warn theory, arguing that "Uber's omissions and misrepresentations about its measures created a foreseeable and unreasonable risk that dangerous drivers would gain access to passengers, and that passengers would be misled into underestimating that risk." (Opposition, 3-5.) However, in sustaining Uber's demurrer to Plaintiffs' fraud and misrepresentation claims, the Court observed that Plaintiffs' general allegations of reliance were insufficient, and granted individual Plaintiffs leave to plead fraud and misrepresentation with particularity in their short-form complaints. (June 22, 2023 Order, 13-15.) None of the initial bellwether Plaintiffs did so. Those Plaintiffs therefore may not properly testify that they relied upon specific safety representations by Uber in deciding to utilize the platform.

Moreover, and even more importantly, "[a] trial centers on a specific incident, not the defendant's general behavior." (*Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 924.) "Actual causation is an entirely separate and independent element of the tort of negligence." (*Saelzler v. Advanced Group 400* (2001) 25

- 46 -

Cal.4th 763, 778.) Even "assuming the defendant owed and breached a duty of care to the plaintiff, she nonetheless cannot prevail unless she shows the breach bore a causal connection to her injury." (*Id.* at 773.) In particular, "the plaintiff must establish, by nonspeculative evidence, some actual causal link between the plaintiff's injury and the defendant's failure to provide adequate security measures." (*Id.* at 774.) "[P]roof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence, or on an expert's opinion based on inferences, speculation and conjecture." (*Id.* at 775.) Contrary to Plaintiffs' argument, they are not relieved of this burden merely because they are suing on a failure to warn theory. (See *Huitt v. Southern California Gas Co.* (2010) 188 Cal.App.4th 1586, 1595-1600 [reversing judgment for plaintiffs in negligence action on failure to warn theory, where plaintiffs did not establish that the defendant's failure to warn was a cause in fact of their injuries].)

Here, even if individual Plaintiffs were able to show that they relied upon Uber's marketing and advertising of its focus on safety, Plaintiffs cannot prove that Uber's failure to warn them of the risks posed by an allegedly inadequate driver screening process proximately *caused* their harm. (Cf. FAC ¶ 180 ["As a legal and direct result of UBER's aforementioned conduct and omissions, Plaintiffs were sexually assaulted . . . . ."]; Opposition to Omnibus Mot., 2 ["Plaintiffs' cases are about Uber's broader corporate misconduct, without which Plaintiffs would not have been sexually assaulted."].) Dr. Lageson admittedly cannot bridge that gap. At best, her opinions that Uber was unreasonable in failing to conduct better background checks "constitute what Cardozo famously characterized as 'negligence in the air.'" (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 169, quoting *Palsgraf v. Long Island Railroad Co.* (1928) 248 N.Y. 339, 341 [reversing judgment in legal malpractice action where there was no causal connection between the attorney's asserted negligence and the clients' claimed damages].) That is not enough. "[A]bstract negligence unconnected to an injury will not support liability." (*Nola M. v. University of Southern California* (1993) 16 Cal.App.4th 421, 424.)[35] "[A] trial in this type of case must

---

[35] As the *Nola M.* court explained, "If the court finds the defendant was under a duty to protect the plaintiff, the trier of fact must then decide whether the defendant's protective measures were reasonable under the circumstances—that is, whether there was a breach of the defendant's duty of care. If the jury determines there was a breach, there still remains the question whether that breach was the cause of the

- 47 -

do more than simply critique a defendant's security measures or compare them to some abstract standard espoused by the plaintiff's security expert." (*Id.* at 435.) "While expert criticism of the defendant's security measures may establish abstract negligence, an expert's speculative and conjectural conclusion that different measures might have prevented an injury cannot be relied upon to establish causation." (*Thompson v. Sacramento City Unified School Dist.* (2003) 107 Cal.App.4th 1352, 1373.) "No matter how inexcusable a defendant's act or omission might appear, the plaintiff must nonetheless show the act or omission caused, or substantially contributed to, her injury." (*Saelzler*, 25 Cal.4th at 780.)[36]

In short, because Dr. Lageson's opinions regarding Uber's screening process are irrelevant in the absence of any showing that its failure to warn of its supposed shortcomings caused Plaintiffs' injuries, they must be excluded. (See, e.g., *Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1614 ["If none of the County's experts could say that [plaintiff's] marijuana use was a substantial factor in causing his death, the jury could not speculate there was a causal connection between [his] use of marijuana and his death," and "the evidence of marijuana use was irrelevant and should have been excluded"]; *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1110, 1112-1113, 1115 [in action by customer who was allegedly sexually assaulted in restaurant's restroom, trial court sustained defendants' objections to declaration of security expert who opined that the premises could have been designed and maintained in a manner that would have made them safer]; *Thompson*, 107 Cal.App.4th at 1373 [trial court properly excluded declarations of plaintiff's experts criticizing defendant school district's security

plaintiff's injuries." (16 Cal.App.4th at 426-427 (cleaned up).)

[36] Plaintiffs' reliance on *v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655 is misplaced. (Opposition, 5-6.) That was an action "for fraud and products liability," not for negligence. (*Id.* at 667.) The section of the opinion from which Plaintiffs selectively quote discussed proof of reliance as an element of a fraud claim, not causation. It held that "[a] plaintiff need not prove that he or she directly heard a specific misrepresentation or false promise to establish actual reliance" if she shows that "the defendant made a misrepresentation to a third party, the defendant intended or had reason to expect that the substance of the communication would be repeated to the plaintiff and would induce the plaintiff's reliance, and the plaintiff was misled when the substance of the communication was repeated to the plaintiff." (*Id.* at 676.) Because Philip Morris did not address evidence tending to show that it had "for many years engaged in a broad-based public campaign to disseminate misleading information and create a false controversy concerning the adverse health effects of smoking," the substance of which "reached [plaintiff] indirectly through various means and media sources and caused her to begin and to continue smoking," it waived its challenge to the findings of liability for intentional misrepresentation and false promise. (*Id.* at 677.) Here, in contrast, there is no fraud claim.

- 48 -

measures and opining that plaintiff student would not have been attacked if there had been effective supervision or intervention; "While experts may be able to describe a better way of providing supervision, on this record they cannot establish causation. Thus, the trial court properly excluded the expert declarations from consideration."]; *Nola M.*, 16 Cal.App.4th at 426, 435-436 [in negligence action against university by plaintiff who was attacked and raped on university campus, where plaintiff's expert "found fault with all of [defendant university's] security efforts, including the physical plant, the number of guards, and the way they worked, and explained how he could have done it all better," but "did not, and could not, say that more security guards or guards on foot instead of in cars or lower hedges or more light would have prevented [plaintiff's] injuries," reversing judgment for plaintiff because there was "no proof of any causal connection between [university's] negligence and [plaintiff's] injury."].)[37]

### B.    Omnibus Motions In Limine

#### 1.    Settlement Negotiations (Agreed)

Uber's unopposed motion to exclude evidence of settlement negotiations engaged in by Uber with Plaintiffs is granted. (Omnibus Mot., 1; see Evid. Code § 1152; *Mangano v. Verity, Inc.* (2009) 179 Cal.App.4th 217, 222-223.)

#### 2.    References In Voir Dire To Specific Damages Amounts

Uber seeks to preclude Plaintiffs from "referring to, or asking questions about, the specific damages amounts they seek during voir dire or opening statements." (Omnibus Mot., 1-2.) Plaintiffs represent that they will not discuss a specific dollar amount during voir dire. (Opposition, 8.) On that understanding, the motion is granted. (See Cal. Rules of Court, Standards of Jud'cl Admin., Standard 3.25(f) [trial judge should not permit counsel to attempt to precondition the prospective jurors to a particular result]; *DD v. Pitcher* (2022) 79 Cal.App.5th 1047, 1055 ["It is not a function of the -

---

[37] *Nola M.* involved closely analogous issues. It determined first that the causation analysis was "unaffected by the fact that the assailant's conduct was criminal and not merely negligent," concluding that "the assailant's attack is not a superseding cause and it does not relieve [defendant] of liability." (16 Cal.App.4th at 427.) It went on at length to discuss proof of causation in third party cases, including numerous cases involving plaintiffs who sued third parties after they were sexually assaulted. (*Id.* at 429-435 & fn. 6.) The Supreme Court discussed *Nola M.* and similar cases with approval in *Saelzler*. (25 Cal.4th at 773-774, 777-779.)

- 49 -

examination of prospective jurors to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law. A trial court has discretion to limit the amount of case-specific facts the parties could put before the prospective jurors either through brief opening statements and/or their questioning." (cleaned up)].) Nothing in this ruling, however, will preclude either party, during voir dire, from questioning prospective jurors regarding their views about damages generally, such as their willingness to award damages for pain and suffering or any limits on the amount they would award a plaintiff who proved she sustained damages. (See, e.g., *id.*, Standard 3.25(c)(18)(A) [question regarding prospective juror's willingness to award damages for personal injury, pain, and suffering]; *Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 493-494 [not improper for counsel to tell the jury that plaintiffs may be asking for "hundreds of millions of dollars collectively for four of them" and to ask whether that shocked anyone, followed by general questions regarding jurors' willingness to award substantial damages if called for by the facts].)

### 3. Exclude Language Or Terminology Suggesting That Drivers Who Use The Uber Platform Are Employees Or Agents Of Uber

Uber seeks to exclude any evidence or argument that "independent third-party drivers who use Uber's platform are its employees or that they are agents of Uber." (Omnibus Mot., 2-3.) The motion is granted in part and denied in part. Plaintiffs agree that they do not intend to introduce evidence or argument that Uber's drivers are employees. (Opposition, 10.) However, the Court will not exclude such terms as "Uber cars," "Uber drivers," "Uber vehicles," or "Uber riders." Such terms are commonly used in everyday speech and in Uber's own terminology, as well as in reported legal opinions. (See, e.g., *Drammeh*, 105 F.4th at 1139 ["This case involves the 2020 murder of an Uber driver by two Uber riders."]; *Olson v. California* (9th Cir. 2024) 104 F.4th 66, 74 ["Uber offers the UberEats, Uber Rides, and Uber Drive mobile platforms. . . . The Uber Driver app connects app-based drivers to those requesting rides."]; *People v. Sherman* (2022) 86 Cal.App.5th 402, 405 [describing evidence that a witness "took an Uber back to their hotel"].) Likewise, the Court does not agree that it is "egregious" to say that Uber "hires" a driver, nor will it force counsel and witnesses instead to utilize the awkward term

- 50 -

("onboards") that Uber proposes to substitute in its stead. Contrary to Uber's argument, the word "hire" does not connote an employment relationship. As Plaintiffs point out, it is common for persons to speak of "hiring" a plumber or electrician. (See, e.g., *Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 37 ["There is a strong presumption under California law that a hirer of an independent contractor delegates to the contractor all responsibility for workplace safety."].) Indeed, AB 5, which codified the California Supreme Court's decision in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, specifically utilizes the term "hiring entity" to include a party that enters into contracts both with employees and with independent contractors. (Lab. Code § 2775(b)(1); see *People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266, 288 ["Reading the term 'hiring entity' in context, we think the phrase is used in *Dynamex* and in section 2775 for its neutrality, so that it covers both employment status and independent contractor status, and thus does not presuppose an answer one way or the other. This construction contrasts with defendants' insistence that the term 'hiring entity' has talismanic significance as a threshold indicator of employment status."].) These common terms are unlikely to be ascribed legal significance by a lay jury, and their use does not pose such a threat of prejudice to Uber that the Court will prohibit witnesses from using them.

### 4. Insurance

Uber seeks to exclude evidence or argument relating to Uber's insurance, including whether any such insurance covers litigation expenses and a potential verdict. (Omnibus Mot., 3-4.) The motion is granted. (Evid. Code § 1155; CACI No. 5001; *Catholic Mutual Relief Society v. Superior Court* (2007) 42 Cal.4th 358, 366 ["Evidence of a tort defendant's liability insurance is generally unrelated to a party's claims or defenses at trial; hence the common law rule has long been that such insurance coverage evidence is inadmissible at trial."]; *Schaefer/Karpf Productions v. CNA Ins. Co.* (1998) 64 Cal.App.4th 1306, 1313 ["Whether the plaintiff's loss is covered by the defendant's insurance is not germane to the action, and evidence on that issue would be excluded as irrelevant."].) "Evidence or statements by counsel suggesting that the defendant was insured against liability could cause the jury to find liability more readily or to inflate its award of damages in some circumstances." (*Bell v. Bayerische Motoren Werke Aktiengesellschaft*

(2010) 181 Cal.App.4th 1108, 1122.)

### 5. Media Reports Involving Uber

Uber seeks to exclude "any evidence or argument involving any and all media reports related to Uber," such as the recent *New York Times* story and a *USA Today* article, on grounds that such evidence is hearsay, irrelevant, and unduly prejudicial. (Omnibus Mot., 4-7.) Plaintiffs represent that they don't intend to introduce evidence of the *New York Times* story, but nevertheless oppose the motion. (Opposition, 13-16.) Newspaper articles and other media stories are quintessential hearsay if offered for their truth. (*Baker v. Beech Aircraft Corp.* (1974) 96 Cal.App.3d 321, 334-338 [trial court properly excluded *Wall Street Journal* article, which was "clearly hearsay," and also "contained information of a highly prejudicial nature"]; see also, e.g., *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1147 fn. 5 [newspaper articles "are not proper authorities to establish the truth of the matters asserted therein"]; *Malek Media Group, LLC v. AXQG Corp.* (2020) 58 Cal.App.5th 817, 824-827 [declining to take judicial notice of press releases and other exhibits for the truth of their contents]; *Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 194 [declining to take judicial notice of the truth of the contents of websites and blogs, including those of newspapers].) However, if either party offers such media reports for some legitimate non-hearsay purpose,[38] the Court will take up the issue at trial.

### 6. Inflammatory Evidence Regarding Uber's Media Strategy

Uber seeks to exclude "inflammatory evidence or argument relating to its media strategy or statements and chats by certain of its communications personnel," including so-called "Catch and Kill" media stories and certain internal chats. (Omnibus Mot., 7-10). It argues that such evidence is "wholly irrelevant," that media reports and internal communications regarding such reports are hearsay, and in any event that such evidence should be excluded under § 352. (*Id.*) The Court generally agrees. As discussed in the Court's ruling on the motion to exclude Dr. Drumwright's opinions,[39] Uber's media strategy is at best minimally relevant and in any event threatens to cause an undue consumption of time on collateral issues having to do with the accuracy of individual news stories, Uber's responses to those

---

[38] Plaintiffs assert broadly that "in general, experts may rely on hearsay when rendering opinions." (Opposition, 14.) The contention is not entirely accurate. (See fn. 29, *supra.*)
[39] See pg. 37-41, *supra.*

stories, etc. Thus, Uber contends its deponents testified that "the only stories Uber ever inquired into the publication of were those that Uber believed were demonstrably false." (Omnibus Mot., 9.) As a result, if its media strategy were attacked, it "would have no choice but to explain the circumstances of any individual Uber employee's decision to inquire about a particular news story, including why he or she believed the story was baseless." (*Id.* at 10.) The parties' debate in their papers regarding the accuracy and relevance of the so-called Crawford Story is exemplary of the problem. (Compare Omnibus Mot., 6-7 with Opposition, 13-14, 16.) The motion is granted, subject to individual proffers and evidentiary objections at trial.

### 7. Advertising Or Marketing

Uber seeks to exclude evidence of marketing or advertising materials, arguing that such evidence is irrelevant and should be excluded under § 352. (Omnibus Mot., 10-11.) The Court cannot agree. To be sure, in its demurrer ruling, the Court dismissed Plaintiffs' fraud and misrepresentation claims on the ground that Plaintiffs had not pled that they saw or relied upon such misrepresentations. (June 22, 2023 Order, 12-15.) If Uber's marketing and advertising materials are offered for the purpose of showing that individual Plaintiffs were influenced by Uber's marketing to utilize the platform, as Uber correctly observes, "Such an outcome would effectively resurrect Plaintiffs' fraud-based claims in derogation of the Court's prior ruling." (Omnibus Mot., 11.) However, as Plaintiffs point out, certain marketing and advertising materials may be relevant to Plaintiffs' failure to warn theory. (Opposition, 23-24.) In any event, as Plaintiffs correctly observe, Uber fails to identify the specific evidence it seeks to exclude. (See *Boeken v. Philip Morris* (2015) 127 Cal.App.4th 1640, 1675 ["A motion in limine to exclude evidence is not a sufficient objection unless it was directed to a particular, identifiable body of evidence and was made at a time when the trial court could determine the evidentiary question in its appropriate context."].) Accordingly, the Court will take up specific objections at trial.

### 8. Confidentiality Provisions And Harvey Weinstein

Uber seeks to exclude any evidence or argument related to its "historical policy," prior to May 15, 2018, of requiring sexual assault claimants settling claims with Uber to sign an agreement containing a confidentiality provision. (Omnibus Mot., 12-14.) It also seeks to exclude references to Harvey

- 53 -

Weinstein, his use of non-disclosure agreements, and the "Me Too" movement. (*Id.*) It argues that this evidence has no meaningful relevance to the issues in this litigation, since the confidentiality clause was not applied to Plaintiffs' cases, and Uber had no affiliation with Mr. Weinstein. (*Id.* at 12.) It also argues that any minimal probative value of such evidence would be substantially outweighed by undue prejudice and confusion under § 352. (*Id.* at 13-14.) The Court disagrees as to the confidentiality policy, which has some arguable relevance to Plaintiffs' failure to warn theory. The motion is granted as to references to Harvey Weinstein (who of course is notorious and has been convicted of numerous sex crimes) and the Me Too movement, which are at best minimally relevant and pose obvious risks of undue prejudice.

### 9. Other Lawsuits, Claims, Or Judicial Actions Involving Uber Or Its Employees

Uber seeks to exclude any evidence or argument related to "other lawsuits or claims involving Uber, including but not limited to claims asserted against Uber or its competitors, regardless of their subject matter." (Omnibus Mot., 14-19.) It lists a litany of such litigation, including (1) other sexual assault lawsuits against Uber and its competitors, (2) litigation surrounding Uber's IPO, (3) a class action settlement ("*McKnight*") regarding Uber's Safe Rides Fee, (4) the conviction of a former employee in relation to a 2014 data breach, and (5) trade secrets matters relating to self-driving vehicles. (*Id.* at 14-15.) Plaintiffs represent that they don't intend to introduce evidence relating to (2), (4), or (5), but may do so with respect to (3), and may offer "evidence relating to prior lawsuits against other companies, including Lyft, for the limited purpose of cross-examining Uber's experts about prior testimony and other attendant matters." (Opposition, 29.) With that understanding, the Court denies the motion as to (1) and grants as to (2), (4), and (5). The Court will not allow evidence of the specific allegations in any prior sexual assault lawsuits or the terms, if any, on which such lawsuits were resolved. As to the *McKnight* settlement, the Court understands that the plaintiff class brought breach of contract and consumer law claims against Uber "alleging Uber misrepresented its Safe Rides Fee and the safety measures, background checks, and other efforts it takes to provide safety for its customers," and that an initial settlement was reached in early 2016. (*McKnight v. Hinojosa* (9th Cir. 2022) 54 F.4th 1069, 1073 (cleaned up).) The settlement reached "prohibits Uber from charging a Safe Rides Fee and generally limits the representations Uber may make as to its driver

background check policies and the safety of its services." (*Id.* at 1074.) The parties represented that Plaintiff LSA 78 was not subject to and did not pay the Safe Rides Fee. Thus, the motion is granted as to (3) in this action.

### 10. References To Driver Masturbation, Inappropriate Photography Or Soliciting Prostitution

Uber seeks to exclude "any evidence or argument relating to alleged masturbation, inappropriate photography or soliciting prostitution because such evidence involves drivers who are not at issue in these cases." (Omnibus Mot., 19-20.) It argues that such evidence is not relevant and would be unduly prejudicial. (*Id.* at 19-21.) The motion is denied. Uber's knowledge of such categories of driver misconduct, their inclusion in or exclusion from the categories of sexual violence Uber tracks, and potential predictive value as to the likelihood of sexual assaults, all appear to be potentially relevant. While the Court intends to limit the amount of such evidence and will restrain counsel from engaging in unduly argumentative and inflammatory questioning ("So they got one free masturbation, right?"), it will deny the motion.

### 11. Uber's De-Activation And Re-Activation Decisions Concerning Other Drivers

Uber seeks to exclude evidence or argument relating to Uber's decisions concerning de-activation of drivers who were not involved in the incidents giving rise to Plaintiffs' claims. (Omnibus Mot., 21-23.) The Court grants the motion in part. It will not permit evidence regarding the allegations or facts of individual cases in which Uber did not de-activate, or delayed in de-activating, drivers accused of sexual assault, which again threatens an undue consumption of time and potential prejudice. However, it will not preclude Plaintiffs from presenting overall statistics, assuming they are admissible, regarding the number of Uber drivers who continued driving for Uber after it received a sexual violence report about the driver, or as to whom multiple such reports were made. (See Opposition, 38-39.)

### 12. Uber's Historical Policies

Uber seeks to exclude evidence and argument relating to "historical policies that were no longer in place at the time of the alleged incidents giving rise to the bellwether cases," such as Uber's former "three-strikes" policy for drivers that was in place in 2018, and its former practice of not re-running

- 55 -

annual background checks, which also changed in 2018. (Omnibus Mot., 23-24.) Uber argues that such evidence of former policies is not relevant, is excludable under § 352, and would constitute improper character evidence. It explains that "the question of liability must be evaluated based on what Uber allegedly did or knew at the time of Plaintiffs' claimed injuries." (*Id.* at 23.) The Court generally agrees that corporate policies to which an individual driver in question was not subject or was not evaluated are not relevant to Plaintiffs' claims, because they cannot have caused Plaintiffs' injuries (although they may be pertinent to claims for punitive damages).

### 13. Non-Sexual Incidents Or Allegations Or Poor Ratings Involving The Drivers At Issue In The Bellwether Cases And All Incidents After The Rides In Question

Uber seeks to exclude any evidence related to "driving infractions or interpersonal issues involving the drivers in the bellwether cases either before or after the incidents at issue," including claims that the driver at issue in LSA 78 had a "dirty car," called a rider a "faggot," and yelled at a rider's daughter for using her phone. (Omnibus Mot., 25-27.) The motion is granted as to the specific incidents in question. None has any relevance to the issues, and the driver's alleged use of a homophobic slur poses an obvious risk of undue prejudice. The Court will also exclude any evidence relating to non-sexual incidents involving the drivers that occurred after the Plaintiffs' assaults.[40]

### 14. Alleged Company Culture

Uber seeks to exclude evidence or argument regarding its alleged company culture, including "X to the X," "bro" culture, the "Super Pumped" book and series, Susan Fowler, and the Korean karaoke incident. (Omnibus Mot., 27-31.) It generally describes this evidence as stemming from new articles, blog posts, books, and a television series, some of which claim that Uber has a toxic company culture, including alleged incidents of sexual harassment and assault and drug use. (*Id.*) Uber asserts that the only "purpose of introducing inflammatory evidence about alleged internal discrimination or drug use would be to appeal to

---

[40] This ruling does not preclude Plaintiffs from introducing evidence of other sexual assaults that post-dated their incidents, which are potentially relevant to punitive damages. "The degree of reprehensibility of the defendant's conduct is the most important indicator of the reasonableness of a punitive damages award, and one relevant factor in this analysis is the extent to which the defendant's alleged wrongful conduct involved repeated actions, including conduct occurring after the incident in question." (*Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 592 (cleaned up).)

the passions of the jury by suggesting that Uber must be a reprehensible company." (*Id.* at 30.) Plaintiffs represent that they do not intend to introduce evidence on the specified incidents or articles. (Opposition, 45.) The motion is granted as unopposed.

### 15. Greyballing

Uber seeks to exclude any evidence or argument relating to so-called "greyballing." (Omnibus Mot., 31-33.) Plaintiffs do not oppose the motion. (Opposition, 46.) It is granted.

### 16. Conduct Outside The United States

Uber broadly seeks to exclude evidence related to "alleged incidents, regulatory actions, and initiatives that occurred outside of the United States and have no bearing on the issues in the case." (Omnibus Mot., 33-35.) In particular, it seeks to exclude evidence regarding (1) alleged incidents in foreign countries, including a December 2014 incident which led to Uber being temporarily banned in New Delhi, India; (2) certain unspecified issues concerning the renewal of Uber's license to operate, such as in London by Transport for London; and (3) Uber's initiatives in countries other than the United States, such as its initiative to allow female passengers to opt for only female drivers in certain countries such as Saudia Arabia. (*Id.* at 33.) It contends such evidence should be excluded on relevance and § 352 grounds.

Plaintiffs represent that they do not intend to introduce evidence relating to the renewal of Uber's license to operate in London. (Opposition, 47.) They argue, however, that Uber's handling of a 2014 incident in New Delhi, India in which a woman was raped by her Uber driver is relevant and not unduly prejudicial. (*Id.* at 48-49.) On the understanding that Plaintiffs will not "belabor" the incident (*id.* at 48), the Court will not preclude all reference to it, to the extent Plaintiffs can show it is relevant to other issues such as Uber's policies for handling sexual assault. Nor will it exclude evidence regarding Uber's adoption of a women-matching option in Saudi Arabia and multiple other countries, which goes to the feasibility of that asserted safety measure. (See *id.* at 49-50.)

### 17. Reptile Arguments

Uber seeks to exclude "reptile arguments," which it describes as attempts "to persuade jurors that they have the opportunity to improve the 'safety' of their community by rendering a verdict in favor of

- 57 -

Plaintiffs." (Omnibus Mot., 35-37.)  In response, Plaintiffs represent that they do not intend to make any "Golden Rule" arguments, which is a slightly different issue.  (Opposition, 52.)  Reptile arguments are improper appeals to a jury's emotions by "urging the jury to base its verdict on protecting the community." (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 598-599.)  A "golden rule" argument is one by which counsel "asks the jury to place themselves or their loved ones in Plaintiff's position, effectively urging them to becomes advocates for the Plaintiff" in determining damages. (*Janice H. v. 696 North Robertson* (2016) 1 Cal.App.5th 586, 603-604;[41] *Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 883 ["A 'golden rule' argument is one where counsel asks the jury to place itself in the victim's shoes and award such damages as they would charge to undergo equivalent pain and suffering.  Counsel's argument that the jury should send a message to railroad was an invitation to award punitive damages, or to base its calculation on sympathy for the plaintiff or prejudice against the defendant"].)  Neither will be permitted.  "The law, like boxing, prohibits hitting below the belt.  The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury." (*Martinez*, 238 Cal.App.4th at 566.)  For example, "[a]n attorney representing a public entity commits misconduct by appealing to the jurors' self-interest as taxpayers." (*Id.*)  "An attorney's appeal in closing argument to the jurors' self-interest is improper and thus is misconduct because such arguments tend to undermine the jury's impartiality." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 796.)

### 18. Lobbying Efforts (Including, But Not Limited To, AB 5 And Prop 22)

Uber seeks to exclude evidence and argument relating to "lobbying of government officials and law enforcement, including, but not limited to, financial contributions to pass/oppose Assembly Bill 5 and Proposition 22, both of which address whether rideshare drivers should be classified as independent contractors or employees," on the grounds that such evidence is irrelevant and unfairly prejudicial.

---

[41] In *Janice H.*, an action against a bar and dance club for negligence and sexual battery after a bus boy sexually assaulted the plaintiff in the club bathroom, the court saw "no evidence of such an argument" where plaintiff's counsel "told the jury that the security one expects at a public place varies depending on the environment, and urged the jury to 'discuss the manner in which you can look at somebody who has been very seriously hurt, very seriously emotionally damaged and having to deal with something over a period of time and how you can grapple with it." (*Id.* at 604.)  "Neither comment asked the jurors to become advocates for Plaintiff by placing themselves in her position or invited them to denigrate their oath to decide the issues based on the evidence." (*Id.*)

(Omnibus Mot., 37-38.) Plaintiffs aver that they don't intend to introduce evidence relating to Uber's financial contributions with respect to the passage of AB 5 or Prop. 22. (Opposition, 55.) However, they assert that they may introduce evidence or argument relating to Uber's efforts to lobby against specific safety measures. (*Id.* at 55-56.) They may not. The Court previously denied Plaintiffs' motion to compel Uber to produce marketing and lobbying documents, explaining that under the *Noerr-Pennington* doctrine, "Uber's lobbying activities, whether before the state Legislature, cities and counties, or the California Public Utilities Commission, cannot give rise to liability." (Feb. 6, 2024 Order, 9.) The Court found "entirely unpersuasive" Plaintiffs' request to compel discovery of Uber's lobbying efforts: "Whatever Uber may or may not have told regulators and politicians about its safety record or practices has no legitimate bearing on Plaintiffs' remaining negligence-related claims. It cannot be a violation of a party's duty of care to lobby for laws and regulations, which is absolutely protected by the First Amendment." (*Id.* at 8-9.) Plaintiffs do not address that order or the authority it discusses, which is dispositive of the issue. The motion is granted.

### 19. Any Actions By Uber To Sue, Cross-Claim, Dismiss A Cross-Claim, Or Assist A Driver Who Used The Uber Platform To Obtain Counsel

Uber moves to exclude any evidence or argument "suggesting that Uber has ever sued any driver at issue in these or other cases, dismissed a suit against any driver, or assisted any driver in obtaining counsel." (Omnibus Mot., 38-39.) The motion is granted. Whether or not a driver is or was a party, and Uber's litigation strategy in that regard, has no bearing on any issue legitimately before the jury. That includes apportionment of damages, which of course applies whether or not an alleged tortfeasor is a party. (See CACI No. 406; *Vollaro v. Lispi* (2014) 224 Cal.App.4th 93, 100 fn. 5; see also CACI No. 109 [instruction directing jury not to consider why a person is no longer a party].) In the event that Uber successfully subpoenas the driver in LSA 78 to appear for trial, the Court may revisit its ruling on this issue.

### 20. Supposed Inadequacy Of Background Checks

Uber moves to exclude evidence or argument relating to "any purported inadequacies of the background checks performed on drivers who use the Uber platform because there is no evidence that the drivers at issue in any of the four bellwether cases had a criminal record that was not identified on their background checks." (Omnibus Mot., 39-41.) The motion is granted.

- 59 -

## 21. Third-Party Reports (Including, But Not Limited to, Giuliani And Holder)

Uber seeks to exclude evidence or argument relating to reports by third parties, including reports by (1) Covington & Burling and former U.S. Attorney General Eric Holder and (2) Giuliani Partners LLC. (Omnibus Mot., 41-44.) Uber explains that in 2014, it retained the security consulting firm Giuliani Partners "to conduct an extensive audit of [its][ background check and other safety-related processes." (*Id.* at 41.) In 2017, in the wake of the Fowler blog post alleging sexual harassment, it retained Holder and Covington & Burling to "conduct an outside investigation of the company's workplace environment," which resulted in proposed remedial measures. (*Id.*) In light of its rulings excluding Dr. Lageson's expert opinions regarding the adequacy of Uber's background checks and, without opposition, excluding evidence of Uber's company culture, the motion is granted as to these two reports, which are hearsay. However, to the extent that Uber adopted the recommendations in the Holder Report and they are relevant to issues in the case, such as making safety perception a metric by which executive bonuses are determined, Plaintiffs may properly question Uber witnesses on those topics.

## 22. Government Investigations And Consent Decrees

Uber seeks to exclude evidence relating to investigations of Uber, including Congressional investigations; actions brought by federal executive agencies; and actions by the CPUC and any resulting settlements of fines paid to those regulatory bodies. (Omnibus Mot., 44-47.) It lists as examples a 2019 congressional subcommittee hearing concerning rideshare passenger safety in which Uber declined to participate; a 2018 consent order with the Federal Trade Commission to resolve claims regarding Uber's data security practices; and a 2021 settlement with the CPUC over Uber's alleged failure to respond to its requests for information relating to sexual assaults and harassments. (*Id.* at 44-45.) Plaintiffs indicate that they do not intend to introduce evidence regarding the 2019 subcommittee hearing or the 2018 FTC consent decree. (Opposition, 64.) Further, they do not oppose Uber's motion as to the CPUC settlement. (*Id.* at 65.) The motion is granted.

## 23. Attendance At Trial (Size Of Defense Team Or Absence Of Specific People)

Uber seeks to exclude evidence or argument relating to trial attendance, including (1) the size and makeup of the defense counsel team and (2) the presence, absence, or identity of Uber's corporate

- 60 -

representatives at trial. (Omnibus Mot., 47-48.) Plaintiffs indicate they do not intend to introduce evidence or argument regarding the size and makeup of the defense counsel team. (Opposition, 66.) The motion is granted, with the caveat that Plaintiffs may comment if appropriate on Uber's failure to call a specific witness. (See Evid. Code § 413; see also CACI No. 203.)

### 24. Discovery & Other Non-Trial Disputes

Uber seeks to exclude evidence or argument relating to any discovery disputes, including "any Court order regarding document productions, or alleged discovery deficiencies or privilege assertions." (Omnibus Mot., 48-49.) The Court generally agrees that these topics should not be the subject of examination or argument at trial. If specific issues arise (Uber identifies none), the Court will address them during trial.

### 25. Lay Medical Testimony

Uber moves to exclude any statements made by witnesses or attorneys regarding any diagnoses of the Plaintiff in the case at trial based on non-medical impressions. (Omnibus Mot., 49-50.) The motion is granted in part. While a lay witness may generally testify about her own mental and physical condition, she may not testify as to matters based on scientific or other specialized knowledge within the scope of an expert witness, such as a specific medical diagnosis. (*Pacific Employers Ins. Co. v. Industrial Acc. Comm.* (1941) 47 Cal.App.2d 494, 500.) Similarly, causation of injury is generally a subject matter within the exclusive knowledge of experts and not lay persons. (*Id.* ["the pathological cause of an ailment is a scientific question upon which it is necessary to obtain scientific knowledge."]; *Bennett v. Shahhal* (1999) 75 Cal.App.4th 384, 392 [a "lay opinion is insufficient to establish any mental disability"]; *Webster v. Claremont Yoga* (2018) 26 Cal.App.5th 284, 290 ["It would be beyond the ability of a lay juror to determine, in the absence of expert testimony, whether plaintiff's injuries were caused by [defendant's] actions, a chronic condition, or some other mechanism."].) However, a plaintiff *may* testify to her own physical and emotional state and symptoms, and may attribute the source of those symptoms to her alleged assault, which is a matter of common experience. Further, as Uber concedes, "lay witnesses may testify about their percipient observations of Plaintiffs" (Omnibus Mot. at 50), such as whether a given Plaintiff appeared, from her conduct and affect, to be suffering from anxiety, depression, etc. "A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and

- 61 -

describe behavior as being consistent with a state of mind." (*People v. Sanchez* (2016) 63 Cal.4th 411, 456; *People v. Guenther* (2024) 104 Cal.App.5th 483, 528 [testimony by sexual abuse victim regarding defendant]; see *Kline v. Santa Barbara Consolidated Ry. Co.* (1970) 150 Cal. 741, 750 ["It does not require an expert to tell whether a person suffers."].)

### 26. Screen Names Used By Driver In *WHBE 6*

The Court defers ruling on this case-specific motion until and unless the case is set for trial.

### 27. Remarks On Homosexuality By Driver In *WHBE 6* And Passenger Complaints About Alleged Prejudicial Statements By Driver In *LSA 78*

Uber seeks to exclude evidence of complaints against the driver who allegedly assaulted LSA 78 for using racial or gay slurs. (Omnibus Mot., 52-54.) The motion is granted. The slurs, which were not directed to Plaintiff, are irrelevant to the issues, and pose an obvious risk of undue prejudice. This ruling does not address *WHBE 6*.

### 28. Nationalities Of Drivers in *WHBE 6* And *LSA 78* (Or That Of Any Drivers)

Uber seeks to exclude evidence relating to the nationalities, ethnicities, and immigration status of the drivers in the LSA 78 and WHBE 6 cases on grounds of relevance and prejudice. (Omnibus Mot., 54-55.) The motion is granted as to LSA 78's driver. (Evid. Code § 351.2(a) ["In a civil action for personal injury or wrongful death, evidence of a person's immigration status shall not be admitted into evidence"]; see, e.g., *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 456-461, disapproved on other grounds, *People v. Freeman* (2010) 47 Cal.4th 993 [trial court erred in denying plaintiff's motion in limine to bar references to his residency status, ethnicity or country of origin]; see also *Vasquez v. Centrome* (2015) 233 Cal.App.4th 1191, 1211-1214 [trial judge erred when he disclosed plaintiff's undocumented immigrant status to venire of prospective jurors].)[42]

---

[42] Oddly, rather than cite controlling California statutory and case authority, Uber cites to unpublished federal cases from the Ninth Circuit and the Southern District of New York. Indeed, throughout its entire 61-page brief, Uber cites indiscriminately to scores of federal and state authorities, published and unpublished, from multiple jurisdictions. Uber's counsel should not need to be reminded of the elementary principle that this Court is bound by California law. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) It looks to decisions from other jurisdictions only where California law is silent on a given issue, and then only for their persuasive value.

### 29. Unaudited, Inaccurate, And Irrelevant Raw Data

Uber seeks to exclude evidence or argument related to "certain raw unaudited data provided to Plaintiffs and/or to Plaintiffs' purported summaries of that data." (Omnibus Mot., 55-60.)  The Court tentatively denied Uber's motion to seal the data in question, observing that the accuracy and reliability of the data reflected in the documents raised factual issues that could not properly be resolved on a motion to seal.[43]  Apart from citing its "caveats" regarding the data in its correspondence to Plaintiffs and Safety Reports, Uber fails to provide any *evidence*, such as declarations, to support its characterization of the data or why it should be inadmissible.  (Cf., e.g., *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1307-1308 [trial court properly excluded expert's environmental sampling data where it credited testimony by the owner of the laboratory that had analyzed the air samples collected by the expert that the expert's "pervasive chain of custody errors and deficiencies invalidate the integrity of sampling results" and that nothing in the expert's reports "could remotely associate mycotoxins" with plaintiffs' residence].)  On that ground alone, the motion must be denied.  "Motions *in limine*, to the extent that they rely upon a factual foundation, are no different than any other pretrial motion and must be accompanied by appropriate supporting documents.  Absent an appropriate factual showing to support the motion, the court should not entertain the motion." (*Kelly*, 49 Cal.App.4th at 671 fn. 3.)

### 30. Attendance At Trial Of Jane Doe's Newborn Baby Or References To Plaintiff's Status As A New Mother

The Court defers ruling on this case-specific motion until and unless the case is set for trial.

IT IS SO ORDERED.

Dated: August 29, 2025

Ethan P. Schulman
Judge of the Superior Court

---

[43] The Court also declined to give any weight to an unsigned letter from the No More Foundation, a third-party organization that has not appeared in this action in any capacity.  Uber nevertheless again repeats its reliance on that letter. (Omnibus Mot., 60.)

- 63 -

**CERTIFICATE OF ELECTRONIC SERVICE**

**(CCP 1010.6, and CRC 2.251)**

I, Edward Santos, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On August 29, 2025, I electronically served:

**ORDER ON PARTIES' MOTIONS IN LIMINE AND MOTIONS TO EXCLUDE EXPERT OPINIONS**

via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Date:    AUG 2 9 2025

Brandon E. Riley, Court Executive Officer

By: _Edward J. S4_

Edward Santos, Deputy Clerk