[Submitting counsel below]

UNITED STATES DISTRICT COURT

OF NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
| | **REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COMMON CARRIER STATUS AND LIABILITY** |
| This Document Relates to: | Judge: Honorable Charles R. Breyer |
| *WHB 823 v. Uber Techs., Inc.*, N.D. Cal. No. 24-cv-4900 W.D.N.C. No. 25-cv-737 | Date: April 2, 2026<br>Time: 2 PM PT<br>Ctrm.: 6-17th Floor |

UNITED STATES DISTRICT COURT
WESERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WHB 823, | No. 25-cv-737 |
| Plaintiff, | Judge: Honorable Charles R. Breyer |
| v. | |
| UBER TECHNOLOGIES, INC., et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.    Uber is a common carrier. ....................................................................................... 3

    A.    Uber offers transportation services. ............................................................. 3

    B.    The various statutory regimes on which Uber relies are irrelevant. ........... 5

    C.    Uber's Terms of Use do not create a genuine dispute of material fact as to whether Uber is a common carrier. ............................................................. 8

    D.    Uber offers its services to the public to a degree sufficient to be a common carrier. ........................................................................................................ 9

        1.    Uber's stated right to refuse service does not preclude it from being a common carrier. ............................................................................. 9

        2.    Uber's ride-specific fare calculations do not preclude it from being a common carrier. ........................................................................... 10

II.   As a common carrier, Uber owes a nondelegable duty that is breached when a driver assaults a passenger. ................................................................................... 10

CONCLUSION ................................................................................................................. 14

REPLY ISO PL'S MOT. FOR PARTIAL SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Beavers v. Fed. Ins. Co.*,
437 S.E.2d 881 (N.C. App. 1994).................................................................................... 7, 8

*Bordini v. Donald J. Trump for President, Inc.*,
822 S.E.2d 168 (N.C. App. 2019).......................................................................................... 12

*Briggs v. Durham Traction Co.*,
61 S.E. 373 (N.C. 1908)............................................................................................................ 8

*Cates v. Hall*,
88 S.E. 524 (N.C. 1916)............................................................................................................ 7

*Circle Exp. Co. v. Iowa State Commerce Comm'n*,
86 N.W.2d 888 (Iowa 1957) .................................................................................................... 9

*Clark v. Bland*,
106 S.E. 491 (N.C. 1921)......................................................................................................... 9

*Clott v. Greyhound Lines, Inc.*,
180 S.E.2d 102 (N.C. 1971)..................................................................................................... 5

*Collingwood v. Gen. Elec. Real Estate Equities, Inc.*,
376 S.E.2d 425 (N.C. 1989)..................................................................................................... 7

*Dixie Stage Lines v. Anderson*,
134 So. 23 (Ala. 1931) ........................................................................................................... 13

*Gordon v. Garner*,
493 S.E.2d 58 (N.C. App. 1997)......................................................................................... 5, 13

*Hairston v. Atl. Greyhound Corp.*,
18 S.E.2d 166 (N.C. 1942)................................................................................................ 11, 12

*Hussey v. King*,
3 S.E. 923 (N.C. 1887).......................................................................................................... 13

*Jackson v. Stancil.*,
116 S.E.2d 817 (N.C. 1960)................................................................................................. 1, 8

*Lanier v. Pullman Co.*,
105 S.E. 21 (N.C. 1920).......................................................................................................... 9

*Mann v. Va. Dare Transp. Co., Inc.*,
198 S.E.2d 558 (N.C. 1973).......................................................................................... 6, 12, 13

*Morton v. De Oliveira*,
984 F.2d 289 (9th Cir. 1993)................................................................................................... 6

*Namisnak v. Uber Techs., Inc.*,
444 F. Supp. 3d 1136 (N.D. Cal. 2020) ................................................................................... 3

*Nat'l Ass'n of Regul. Util. Comm'rs v. F.C.C.*,
525 F.2d 630 (D.C. Cir. 1976) .......................................................................................... 9, 13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Osborne ex rel. Powell v. Yadkin Valley Econ. Dev. Dis., Inc.*,
  865 S.E.2d 307 (N.C. App. 2021) ........................................................................ 5

*Park v. Merrill Lynch*,
  582 S.E.2d 375 (N.C. App. 2003) ........................................................................ 8

*Parker v. Erixon*,
  473 S.E.2d 421 (N.C. App. 1996) ...................................................................... 13

*Patterson v. Duke Power Co.*,
  36 S.E.2d 713 (N.C. 1946) ................................................................................... 4

*Rhyne v. K-Mart Corp.*,
  594 S.E.2d 1 (N.C. 2004) ..................................................................................... 6

*Smock for Smock v. Brantley*,
  331 S.E.2d 714 (N.C. 1985) ............................................................................... 12

*State ex rel. Utils. Comm'n v. Bird Oil Co.*,
  273 S.E.2d 232 (N.C. 1981) ............................................................................... 10

*State ex rel. Utils. Comm'n v. Gulf-Atl. Towing Corp.*,
  110 S.E.2d 886 (N.C. 1959) .......................................................................... 7, 10

*State v. McLymore*,
  868 S.E.2d 67 (N.C. 2022) ................................................................................... 6

*Weade v. Dichmann, Wright & Pugh*,
  337 U.S. 801 (1949) ............................................................................................. 5

*White v. Norfolk & S.R. Co.*,
  20 S.E. 191 (N.C. 1894) ................................................................................ 12, 13

*Williams v. Gill*,
  29 S.E. 879 (N.C. 1898) ................................................................................ 11, 12

*Woodson v. Rowland*,
  407 S.E.2d 222 (N.C. 1991) ............................................................................... 11

**STATUTES**

N.C.G.S. § 20-280.1(5) ................................................................................... 6, 13

N.C.G.S. § 20-4.01(27)(d) ..................................................................................... 8

N.C.G.S. § 62-1 ..................................................................................................... 7

N.C.G.S. § 62-151 ................................................................................................. 9

N.C.G.S. § 62-3 ..................................................................................................... 7

**OTHER AUTHORITIES**

Restatement (Second) of Agency § 214 (1958) ............................................... 6, 11

Restatement (Second) of Torts § 409 (1965) ................................................... 6, 11

## INTRODUCTION

Uber says that it does not offer transportation services. This would come as a surprise to anyone who downloads the Uber app and engages in the everyday activity of calling "an Uber" driven by an "Uber driver." *See* Ex. GG (Uber March 2026 social media posts).[1] In reality, transportation is exactly what Uber offers, as court after court has stated, and Uber's own witnesses confirm. At the *Dean* trial, Uber's head of U.S. City Operations (and 30(b)(6) designee) Chad Dobbs testified for Uber as follows:

Q:    Okay. And, again, apply to Uber, hail an Uber, Ubering, those are all terms that, as somebody in operations, you would push back if somebody said that, right?

A:    Yes.

Q:    Okay. And these type of terms matter in your world and in what you do on a daily basis, correct?

A:    They do.

*Dean* Trial Tr. at 2241:19-25.

But on cross examination, Mr. Dobbs conceded that, on the same day he testified, Uber published ads on its official Instagram account with the terms "Uber drivers" and "Me, I'll call an Uber." *Id.* at 2339:3-2343:14. Uber wants to have it both ways, profiting from the public perception that it is a transportation provider while escaping the attendant liability.

Uber creates a false dichotomy between the act of "hold[ing] itself out as" a transportation provider versus undertaking to "itself perform carriage" (Opp'n at 2) when, in fact, the former is the decisive test for the latter. Because the common carrier's duties are non-delegable, courts cannot determine who is the common carrier by merely looking at who is sitting behind the wheel, or who owns the vehicle. That person may well be the delegee. No, "[t]he crucial test as to whether one is a common carrier is whether he holds himself out as such, either expressly or by a course of conduct…." *Jackson v. Stancil.*, 116 S.E.2d 817, 825 (N.C. 1960).

Applying that test here, the undisputed factual record shows that Uber "holds itself out" as

---

[1] "MPSJ" means Plaintiff's Motion for Partial Summary Judgment. "MSJO" means Plaintiff's Opposition to Uber's Motion for Summary Judgment. "Opp'n" Means Uber's Opposition to Plaintiff's Motion for Partial Summary Judgment. Exhibits A-BB are attached to the MPSJ. Exhibit CC-EE are attached to the MSJO. Exhibits FF and GG are attached to this Reply.

a transportation provider, making it a common carrier. It advertises itself as a transportation provider. It sells Uber rides on the same terms to anyone willing to pay. The public comes to Uber to purchase those rides. The public relies on Uber, and its reputation for safety and quality, in opting to "Uber" (verb), "take an Uber," "ride with Uber," or "get in an Uber."

Uber says that North Carolina statutes state that Uber is not a common carrier. In reality, while some states enacted TNC statutes expressly exempting Uber from common-carrier tort liability, North Carolina did not. Indeed, Uber's own regulatory expert (whose opinions are conspicuously absent from Uber's brief) acknowledges that, unlike some other states' laws, North Carolina's TNC statute is "silent on the common carrier issue," and argues that North Carolina's TNC scheme was modeled off of the parallel scheme in California. Ex., Z at 10, 32 n.83. But the JCCP court found Uber is a common carrier in California as a matter of law; the same conclusion follows in North Carolina.

Uber says that North Carolina maintains a unique common-law regime where all common carriers are liable for breaches of their nondelegable duties by employees—no matter how outside the scope of employment those actions are—but only "public franchise" common carriers are liable for the same breaches of duty in form of actions by independent contractors. In reality, there is no basis for this distinction in either North Carolina cases or in the general common-law principles that the State incorporates. A nondelegable duty is owed regardless of the delegee—that's the point of the duty being nondelegable.

Finally, Uber portrays this as a case of first impression and repeatedly urges the Court to chart a (purportedly) conservative course by (conveniently) entering judgment for Uber. But, with rare exception, every case to have considered whether Uber is a common carrier has answered: "yes." Uber does not distinguish or even acknowledge the rulings, including the *JCCP Order* that found Uber to be a common carrier as a matter of law. And the legal standards applicable here under North Carolina law reflect the same rules applied in many other states under general common law.

The Court should grant partial summary judgment on common carrier status and the resulting vicarious liability.

# ARGUMENT

**I.**    **Uber is a common carrier.**

**A.**    **Uber offers transportation services.**

Fundamentally, Uber's claim is that it is "incapable of transporting anyone" (comparing itself to a sand pit), and so cannot be a "carrier," let alone a "common carrier." Opp'n at 9. The claim is ridiculous. Uber transports people—billions and billions of them—all the time in "Uber rides" driven by "Uber drivers." *See* Ex. GG; *JCCP Order* at 13 ("The Court finds that Uber is the 'operator' of a rideshare service, even if the vehicles it utilizes are owned and driven by individual drivers, because Uber has substantial control over its passengers' safety."); *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020) ("Uber's claim that it is 'not a transportation company' strains credulity, given the company *advertises itself* as a 'transportation system.'"). Uber's "business" is "providing rides to passengers." Ex. K. And it acknowledges that "riders do depend on Uber to provide them with a safe trip." Ex. CC.

In characterizing its business as anything other than transportation, Uber's opposition does not effectively dispute the following facts:

- Uber broadly advertises to the public: "Ride with Uber," "let's take a trip together," and "Wherever you are going we'll take you there." MPSJ at 4. This is not stray advertising, but Uber's own words on the app store that are displayed directly to anyone who interacts with the company. Uber labels its advertising "anodyne" and "colloquial[]," Opp'n at 2, 11, but those terms only underscore that Uber's advertising reflects the public understanding of the service Uber is offering.

- Uber spends billions of dollars vouching for the safety of its rides. MPSJ at 4.

- Uber's own documents and 30(b)(6) deponents acknowledge that "we argue everywhere that we are the safest ride on the road," Ex. G, and that "riders do depend on Uber to provide them with a safe trip," Ex. CC.

- Uber's most senior executives and 30(b)(6) deponents describe the company's "business" as "providing rides to passengers," Ex. K, and agree the company "offers transportation" and "takes people from place to place for money," Ex. L.

- Uber monitors rides through GPS and intervenes when the ride is not conducted according to its standards. MPSJ at 6.

- Uber tracks safety incidents and takes responsibility for responding to them. *Id.*

- Uber limits communication between the driver and the passenger to its own channels. *Id.*

- Uber chooses which driver to dispatch. *Id.* at 5. Uber's claim that it sends requests "to multiple independent drivers," Opp'n at 10, does not change the fact that it chooses which drivers receive the request. If a driver declines a ride, then Uber sends another driver. Ex. FF.

- Uber does not permit riders to choose among drivers. MPSJ at 5.

- Uber sets pricing. *Id.*; MSJO at 8-9 (citing *Dean* trial testimony).

- Uber controls the money, determining in its own discretion when to offer a refund. MPSJ at 5-6; MSJO at 8.

Every one of these facts constitutes evidence that Uber holds itself out, both expressly and by its course of conduct, as the provider of transportation.

Rather than addressing the factual record, Uber argues the wrong legal standard. Uber contends that a common carrier must "exercise[] 'complete control' over the 'management and operation of the whole instrumentalities of carriage.'" Opp'n at 4 (quoting *Patterson v. Duke Power Co.*, 36 S.E.2d 713, 714-16 (N.C. 1946)). If this were true, it would encourage would-be common carriers to exercise the lowest rather than highest level of care, in order to demonstrate, by their dereliction of duty, the absence of "complete control."

But, more to the point, the case cited for this proposition does not support it. The question before the court in *Patterson* was about the scope of the "carrier-passenger relationship," and whether it applies during a transfer "from one bus to the other." 36 S.E.2d at 714, 716. In explaining why it made sense to recognize a railroad-passenger relationship in analogous circumstances, the court noted that the railroad transfer occurred "on company property" over which the railroad has "complete control," giving it "at least a limited control over and direction of the passenger." *Id.* Conversely, "urban" bus "companies" by "necessity[] accept their passengers from and discharge them on the sidewalk and street corner over which they have no control." *Id.* at 715. The analogous question, with respect to Uber, is not how much control it exercises over its delegee drivers, but how much control it, through its delegee drivers, exercises over particular aspects of the journey— such as unloading luggage, or crossing the street after a drop-off.

On the law, there is no dispute in this case that the assault occurred while Plaintiff was in the Uber vehicle. And, on the facts, no jury could find that Uber had "no control" over the circumstances of the rides equivalent to a bus company's lack of control over a pedestrian on a

public street. *See* MPSJ at 5-6; MSJO at 8-10 (same); *JCCP Order* at 13 ("The Court finds that … Uber has substantial control over its passengers' safety."); *cf. Clott v. Greyhound Lines, Inc.*, 180 S.E.2d 102, 107 (N.C. 1971) (in baggage case relied on by Uber, no liability where defendant "had no custody or control or even knowledge concerning the baggage"). Uber (at p. 9) relies on its lack of "vehicle ownership" and "direct physical possession of the vehicles." But, as illustrated above, those facts do not prevent Uber, both through its delegees and independently from them, from exercising extensive control over the rides themselves.

Uber also analogizes itself to the businesses in several other cases, all of which were addressed in Plaintiff's MSJO. *See* MSJO at 5, 9, 18-20 (discussing *Gordon*, *Weade*, and *Osborne*). Uber's strained comparisons only underscore the lack of a genuine dispute of material fact here. In short: In *Gordon v. Garner*, 493 S.E.2d 58 (N.C. App. 1997), the defendant was a "sand pit" and the plaintiff a third-party motorist. *Id.* at 59-60. So, there was no argument that the defendant was a common carrier or that, even if it was, it owed the plaintiff any special duties. For that reason, the plaintiff tried (and failed) to assert a theory of statutory duty. In *Weade v. Dichmann, Wright & Pugh*, 337 U.S. 801 (1949), the company was a wartime government subcontractor providing discrete services on "nightly service of two steamboats" on a single route; accordingly, it "never held itself out to the public as ready to engage in such traffic." *Id.* at 805-08. And, in *Osborne ex rel. Powell v. Yadkin Valley Econ. Dev. Dis., Inc.*, 865 S.E.2d 307 (N.C. App. 2021), the defendant was a school district, which is not a common carrier (and no one argued otherwise). *Id.* at 313. So, the plaintiff tried (and failed) to assert other sources of duty. *Id.* at 320-21. Also, as explained in the MSJO, *Osborne*'s analysis was expressly informed by and limited to the special context of schools. *See* MSJO at 20 n.21.

**B.    The various statutory regimes on which Uber relies are irrelevant.**

Lacking any answer to the simple common-law question that decides this case, Uber points to (1) North Carolina's TNC statute; (2) North Carolina's public utility regulation; and (3) federal property transportation regulation. As explained in the MSJO, each of these regimes is irrelevant.

**TNC Statute**. Some states, in enacting TNC statutes, expressly provided that companies like Uber are not common carriers, are not vicariously liable for their drivers' conduct, or both. *See*

MPSJ at 9-10; MSJO at 3-4. North Carolina did none of that. That silence is dispositive given the clear statement North Carolina requires to preclude common law claims. *See* MSJO at 3. And Uber's own expert says that North Carolina's regime was modeled off of that in California, where tort liability and regulation are distinct from each other, and where Uber is a common carrier. *See JCCP Order* at 9-16; Ex., Z at 10.

To make something out of nothing, Uber (at p. 6) argues that the statute provides that "all TNC transportation services are 'provided by a TNC driver'" and therefore means that Uber does not hold itself out as providing transportation services. Opp'n at 6 (quoting N.C.G.S. § 20-280.1(5)). But Uber omits that the statute defines "TNC service" as "Prearranged transportation service provided by a TNC driver in connection with a transportation network company." N.C.G.S. § 20-280.1(5). So, the statute connects the "transportation service" to *both* the driver and the company, hardly the "unequivocal language" that Uber asserts as "dispositive." Opp'n at 7.

Uber relies (at p. 9) on the statute's presumption that Uber drivers are independent contractors. But Uber cannot say that using independent contractors make it not a common carrier, because an entire body of common law has developed concerning common carriers' liability for breaches of their duty by independent contractors. *See Mann v. Va. Dare Transp. Co., Inc.*, 198 S.E.2d 558, 569 (N.C. 1973); *see also* Restatement (Second) of Agency § 214 (1958) (liability for breach of nondelegable duty); Restatement (Second) of Torts § 409 (1965) (liability for breach of non-delegable duty includes acts of independent contractor); *Morton v. De Oliveira*, 984 F.2d 289, 291-92 (9th Cir. 1993) (common carriers have nondelegable duty).

Uber asks the Court to defer to the legislature's "policy choice," but the only "choice" evident here is to say exactly nothing about the duties Uber owes its passengers and the circumstances under which those duties can be breached. Uber cites lofty language from *Rhyne v. K-Mart Corp.*, 594 S.E.2d 1 (N.C. 2004), but in that case the legislature *expressly* limited common law remedies. *Id.* at 7. The Court must honor the legislature's choice *not* to address a given topic just as it would the opposite. *See State v. McLymore*, 868 S.E.2d 67, 72 n.2 (N.C. 2022) ("[T]o the extent the relevant statutory provisions do not address an aspect of the common law … the common law remains intact.").

**Public Utilities Act**. Uber argues that the legislature, by not placing Uber under the authority of the Utilities Commission via the Public Utilities Act (N.C.G.S. § 62-1)—what Uber calls the "common carrier statute"—precluded common-carrier tort liability. As Plaintiff's MSJO explained, that statutory scheme has no applicability here: its definitions exclusively apply "as used in this Chapter," meaning the Public Utilities Act. N.C.G.S. § 62-3. *See* MSJO at 5. Uber is not a "broker" under the statute, and nothing about the definition of "broker" prevents Uber from being a common carrier for common-law tort purposes. Indeed, the Act, being a regulatory statute, says nothing about personal-injury liability at all. *Cf. Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 376 S.E.2d 425, 428 (N.C. 1989) (compliance with "applicable housing codes and regulations … does not insulate landlords from liability for defects in building design and construction").

Nevertheless, Uber argues that the Utilities Commission's regulatory reach is determinative of whether an entity is a common-law common carrier because "North Carolina courts routinely rely on" the Public Utilities Act "to interpret tort duties." Opp'n at 4. Uber has zero authority for this proposition. In *Beavers v. Fed. Ins. Co.*, 437 S.E.2d 881 (N.C. App. 1994), the court interpreted an "insurance contract," not "tort duties." *Id.* at 883. And in *State ex rel. Utils. Comm'n v. Gulf-Atl. Towing Corp.*, 110 S.E.2d 886 (N.C. 1959), the court interpreted the reach of the "jurisdiction of the [Utilities] Commission," and so relied on tort law to inform the statute, not the other way around. *Id.* at 888.

Undeterred, Uber insists that the *only* entities in North Carolina with "common-carrier tort duties" are those "regulated" by the Utilities Commission or specifically "exemp[t] from" such "regulation." Opp'n at 7. This makes no sense—if common-carrier duties are dependent on Public Utility regulation, then why would they apply to an entity "exempt" from such regulation? And why would they *not* apply to Uber, which is also not subject to such regulation?

Regardless, there is no evidence in North Carolina cases to support Uber's position. Quite the opposite. Common carrier tort duties long pre-date the 1941 establishment of the Utilities Commission, as well as the 1963 enactment of the definitions in N.C.G.S. § 62-3, and have often been applied to entities outside the scope of the Commission's jurisdiction. *See Cates v. Hall*, 88 S.E. 524, 525-26 (N.C. 1916) (explaining that a "garage … letting out automobiles for hire to be

run by the partners or drivers supplied by them" was a "common carrier"); *Briggs v. Durham Traction Co.*, 61 S.E. 373, 374 (N.C. 1908) ("electric car[]" service was "common carrier[]"). In *Jackson*, 116 S.E.2d 817, for example, the court considered whether an airplane owner was a common carrier under the common law test, even though airplanes are not regulated by the Commission. And in *Beavers*, the court took it as a given that "an aircraft transporter of musicians" and "an operator of passenger elevators" are both common carriers and noted that whether an entity is a "common carrier[]" is "judicially determined." 437 S.E.2d at 883.

Last, Uber (for the first time, at pp. 6-7) argues for a *different*, more restrictive, definition, one limiting common carriers to "vehicles operated under a certificate of authority issued by the Utilities Commission." N.C.G.S. § 20-4.01(27)(d). This definition, which applies only to terms in one "Chapter," has never once been cited by any North Carolina court. Uber suggests the definition has some relevance to this case because it appears in a pattern jury instruction. It does not. The pattern jury instructions for cases involving "motor vehicle collision[s]" never once use this term. N.C.P.I.-Motor Vehicle 100.00. The definition appears only in an "Appendix" consisting of every definition in the Motor Vehicle Code. *See* N.C.P.I.—App'x A.

**Federal Law**. As explained in Plaintiff's MSJO, federal regulation of property carriers (cited by Uber at p. 5) is irrelevant because this case does not arise under federal law, the federal statute employs a different standard than the North Carolina common law test, and Uber transports people, not goods. *See* MSJO at 5-6.

### C.    Uber's Terms of Use do not create a genuine dispute of material fact as to whether Uber is a common carrier.

Plaintiff's MSJO explained that Uber's Terms of Use do not permit, let alone require, a finding that Uber is not a common carrier. *See* MSJO at 6-8. Common carriage turns on how the company "holds itself out to the public," not what it, "as a formal matter," includes in its contracts. *Jackson*, 116 S.E.2d at 825 (citation omitted); *see also* MSJO at 7 n.11 (collecting cases).[2] The only thing new here is Uber's reference (at p. 8) to its agreements with its drivers, but an agreement between Uber and a driver stating that the driver agreeing is an "independent provider[] of …

---

[2] Uber's reliance on *Park v. Merrill Lynch*, 582 S.E.2d 375, 380 (N.C. App. 2003), a case about contract formation, is therefore misplaced.

passenger transportation services" has nothing to do with the question of how Uber holds itself to the public.

### D. Uber offers its services to the public to a degree sufficient to be a common carrier.

Uber argues that it cannot be a common carrier because it (1) maintains the right to refuse service and (2) calculates distinct fares for each ride. Both arguments were addressed in Plaintiff's MSJO at pp. 10-15.

#### 1. Uber's stated right to refuse service does not preclude it from being a common carrier.

As explained in Plaintiff's MSJO, for Uber to have a duty to carry passengers safely does not require it to first have a duty to accept all comers. *See* MSJO at 10-11. Duties "do not establish or determine the relation, but result from the relation." *Circle Exp. Co. v. Iowa State Commerce Comm'n*, 86 N.W.2d 888, 894 (Iowa 1957); *see also Nat'l Ass'n of Regul. Util. Comm'rs v. F.C.C.*, 525 F.2d 630, 641 (D.C. Cir. 1976) ("It is not necessary that a carrier be required to serve all indiscriminately; it is enough that its practice is, in fact, to do so."). Like other states, North Carolina derives common-carrier duties from the relationship between those companies and their passengers, as well as the fundamental expectation of transportation, not from the existence of some other duty. *See* MSJO at 17-18 (discussing *Clark v. Bland*, 106 S.E. 491 (N.C. 1921) and *Lanier v. Pullman Co.*, 105 S.E. 21, 24 (N.C. 1920)). None of Uber's cited cases (*Gray*, *Godwin*, and *Am. Courier Corp.*) involved a common carrier's nondelegable duty to its passengers. *See* MSJO at 11 n.14. And Uber *does* have a broad duty of nondiscrimination. *Id.* at 10 n.13. (Uber's attempt to distinguish between a duty of non-discrimination and a duty "to maintain [] nondiscrimination policies," Opp'n at 13, is too clever by half.)

The question is not whether Uber reserves the right to refuse service, but rather whether, as a practical matter, it offers its service to the public indiscriminately. *See* MSJO at 11-12. It does. No evidence suggests Uber makes individualized decisions to whom to offer service. Its declarant shows only that the company bans passengers for violating its policies. But even statutory common carriers are entitled to expel passengers who "violate the rules of a common carrier." N.C.G.S. § 62-151.

REPLY ISO PL'S MOT. FOR PARTIAL SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737

Uber mis-states *Gulf-Atl. Towing Corp.*, 110 S.E.2d at 890, which did not state that mere "retained discretion" was sufficient to avoid common-carrier status. Rather, in that case, the petroleum carrier's service depended on specific, individualized "bids," and so was not offered to the general public. *Id.*; *see also* MSJO at 12.

The only new argument here is Uber's reliance on its *drivers*' "right of refusal." Opp'n at 14. This is irrelevant. If a driver refuses a ride, then, the undisputed evidence shows, Uber will find another driver. Ex. FF (Akamine Dep., Ex. 0885) at -6949. The question is not whether Uber's agents decide whether and when to work (that goes to respondeat superior, not common carrier), but the nature of Uber's business.

> **2.    Uber's ride-specific fare calculations do not preclude it from being a common carrier.**

As explained in Plaintiff's MSJO, Uber's pricing is "equally available, and on the same terms, to all," and so is sufficient to make Uber a common carrier. MSJO at 13-14 (quoting *State ex rel. Utils. Comm'n v. Bird Oil Co.*, 273 S.E.2d 232, 239 (N.C. 1981)). Nor can a person open the Uber app, see Uber's proposed fare, and make a counter-offer. *Id.* at 14; Ex. DD. Uber's cases reflect individualized bargains, not the "standard rates" at issue here. *JCCP Order* at 15; *see also* MSJO at 13-15 (discussing *Tar Heel*, *Gulf-Atl. Towing*, and *Riddell*). The fact that riders may refuse service says nothing—passengers are not forced to accept the price offered by a common carrier in order for the company to be a common carrier.

**II.    As a common carrier, Uber owes a nondelegable duty that is breached when a driver assaults a passenger.**

Uber concedes, as it must, that common carriers have a nondelegable duty of safety that is breached when their employees assault a passenger, even if that assault is grossly outside the scope of their employment. But Uber maintains that, unless a common carrier is a "franchised" common carrier benefitting from a "quid pro quo" in the form of reduced "protection from competition," it has no liability for those same breaches of duties when done through the acts of an independent contractor. Opp'n at 17. Uber's position is illogical: nondelegable duties are based on judicial policy judgments; what policy would assign liability for an employee gone amok, but deny liability for that same person working as an independent contractor? Beyond lacking any basis, Uber's

position contradicts the fundamental tenets of the law of nondelegable duties and finds no support in North Carolina cases.

Ordinarily, an employer is not responsible for the acts of their employees "acting outside the scope of their employment," Restatement (Second) of Agency § 219, or for any acts of "independent contractor[s]," who are not employees at all and so have no scope of employment, Restatement (Second) of Torts § 409. These two rules are really the same rule: no liability for acts outside the scope of employment.

Nondelegable duties are an exception: "It is axiomatic that, where a duty is nondelegable, one cannot avoid liability by claiming that discharge of the duty was somebody else's responsibility." PTO 17 at 32. The person assigned a nondelegable duty "may not delegate" that duty "to [an] independent contractor" and so escape liability for its breach. *Woodson v. Rowland*, 407 S.E.2d 222, 235 (N.C. 1991). That is because "[i]mposition of this nondelegable duty … reflects the policy judgment that certain obligations are of such importance that employers should not be able to escape liability merely by hiring others to perform them." *Id.* (internal quotation marks omitted); *see also* Restatement (Second) of Agency § 214 ("A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant *or other person* is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.") (emphasis added); Restatement (Second) of Torts § 409 (liability for breach of nondelegable duty includes acts of independent contractor); *id.* Div. Two, Ch. 15, Topic 2, Intro. Note ("Such a 'non-delegable duty' requires the person upon whom it is imposed to answer for it that care is exercised *by anyone, even though he be an independent contractor*, to whom the performance of the duty is entrusted.") (emphasis added).

As Uber acknowledges, North Carolina recognizes a common carrier's non-delegable duty. *See Hairston v. Atl. Greyhound Corp.*, 18 S.E.2d 166, 170 (N.C. 1942) (explaining that it is not necessary that "the relationship of master and servant be shown to exist at the time" and liability exists for assault "whether within the line of his employment or not"); *Williams v. Gill*, 29 S.E. 879, 879 (N.C. 1898) ("outside of the scope of his authority, or even willful and malicious"). And, as

REPLY ISO PL'S MOT. FOR PARTIAL SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737

Uber also acknowledges, North Carolina cases have found common carriers liable for breaches of duty by independent contractors. *See Mann*, 198 S.E.2d at 569 (applying duty to acts of an independent contractor).

Uber argues that the duty extends to employees and not independent contractors only by placing undue emphasis on certain words in the relevant cases. Uber argues that *Hairston* applies only to employees, but the case uses the phrase "servant or agent" and notes that it is not necessary that "the relationship of master and servant be shown to exist at the time." 18 S.E.2d at 168, 170; *see also Gill*, 29 S.E. at 879 (referring to both "employés" and "agents"). And *Hairston* explained that liability is premised not on "the relationship of master and servant," but on the nature "of some duty owed directly from the company to the injured person," a "rule of liability being not infrequently presented from the relationship of carrier and passenger." 18 S.E.2d at 169 (citation omitted).

Uber emphasizes the phrase "while on duty" in *Hairston*, but the phrase "on duty" can apply to an independent contractor just as it can an employee. *See Bordini v. Donald J. Trump for President, Inc.*, 822 S.E.2d 168, at *1, 3 (N.C. App. 2019) (table) ("independent contractor" was "on duty"); *Smock for Smock v. Brantley*, 331 S.E.2d 714, 715 (N.C. 1985) (independent-contractor physician was "on duty"). The better reading of "on duty" is that it refers to the "duty" of operating the transportation service, which can be done by anyone the principal selects.

Or consider *White v. Norfolk & S.R. Co.*, 20 S.E. 191 (N.C. 1894). Uber says that *White* applies only to "servants" (Uber can't seem to make up its mind whether *White* is an employee case or a franchise case). But *White* emphasized the irrelevance of the hiring arrangement: "Passengers do not contract merely for ship room and transport from one place to another; they also contract for good treatment and against personal rudeness and every wanton interference with their persons, either by the carrier or his agents employed in the management of the ship or other conveyance. In respect to such treatment of passengers, not merely officers, but the crew, are agents of the carriers." *Id.* at 192 (citation omitted). Uber relies on language in *White* explaining that passengers are entitled to expect that the "railway company … has employed suitable servants to run its trains." *Id.* at 192-93. But that is entirely consistent with (1) the company hiring independent contractors and (2) the

company being liable for those contractors' breach of the company's duty. What *White* is saying is that the passenger is entitled to rely on the carrier's delegees for her safety, no matter their employment status.

On the "franchise" point, Uber relies on stray references to the word "franchise" in *Mann* and *White*. But, as explained in Plaintiff's MSJO, Uber overreads those words. *See Nat'l Ass'n of Regul. Util. Com'rs*, 525 F.2d at 642 ("The original rationale for imposing a stricter duty of care on common carriers was that they had implicitly accepted a sort of public trust by availing themselves out of the business of the public at large."). *White* grounded the duty in the relationship of a carrier to its passengers, not on any statutory authorization. *See* MSJO at 18 n.20. And *Mann* relied on cases from other states imposing nondelegable duties, including with respect to independent contractors, with no mention of franchises. *Id.* (citing *Dixie Stage Lines v. Anderson*, 134 So. 23 (Ala. 1931)). And it is unlikely that either case used the word "franchise" in the way Uber does. *See* MSJO at 18 n. 29. In *Mann*, the defendant was an ordinary bus company (one likely operating out of "Virginia," not even North Carolina chartered), not a company with a special exclusive charter. 198 S.E.2d at 561. In *White*, in the parlance of the time, "franchise" could well have meant merely the general corporate charter. *See White*, 20 S.E. at 191 ("[T]he defendant is a corporation duly chartered under the laws of North Carolina, and doing business as a common carrier of passengers …."). Notably, *White* relied heavily on *Hussey v. King*, 3 S.E. 923 (N.C. 1887), which overruled previous doctrine that corporations could never be "liable for any torts." *Id.* at 926.[3]

Finally, Uber repeats its reliance on the TNC statute and *Osborne*. Opp'n at 18. This argument, as Plaintiff's MSJO explained, confuses the delegation of a task with the delegation of liability and reads immunity into a statute that does not provide it. MSJO at 20. The fact that the statute authorizes Uber drivers to provide transportation "in connection with" Uber, N.C.G.S. § 20-280.1(5), says nothing about who is liable when a driver assaults someone. Uber's reliance on

---

[3] Uber repeats its reliance in *Gordon*, 493 S.E.2d 58, and *Parker v. Erixon*, 473 S.E.2d 421 (N.C. App. 1996), but, as explained above and in the MSJO, those cases did not involve passenger transportation at all. *See Gordon*, 493 S.E.2d at 59-60 (defendant "sand pit," plaintiff third-party motorist); *Parker*, 473 S.E.2d at 422-23 (defendant freight carrier, plaintiff third-party motorist).

REPLY ISO PL'S MOT. FOR PARTIAL SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737

*Osborne*, as previously explained, is misplaced, as that case did not involve any common-law non-delegable duties at all. *See* MSJO at 20.

## CONCLUSION

For these reasons, the Court should grant Plaintiff partial summary judgment.

Dated: March 31, 2026                          Respectfully submitted,

By*: /s/ Sarah R. London*
    Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By*: /s/ Rachel B. Abrams*
    Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By*: /s/ Roopal P. Luhana*
    Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

## FILER'S ATTESTATION

I am the ECF User whose ID and password are being used to file this document. In compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: March 31, 2026                          By:    */s/ Andrew R. Kaufman*
    Andrew R. Kaufman

REPLY ISO PL'S MOT. FOR PARTIAL SUMM. J.
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737