# EXHIBIT 3

Walt Cubberly (SBN: 325163)
WILLIAMS HART BOUNDAS EASTERBY, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
E-MAIL: wcubberly@whlaw.com
PHONE: (713) 230-2200
FAX: (713) 643-6226

ATTORNEY FOR PLAINTIFFS

ELECTRONICALLY

**D**

*Superio  Cour  o  California,
Count  o  Sa  Francisco*

**03/18/2022
Cler  o  th  Court**
BY  KARE  VALDES
Deput  Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO — UNLIMITED CIVIL

| | |
|---|---|
| JANE DOE WHBE 823, JANE DOE WHBE 824, JANE DOE WHBE 825, JANE DOE WHBE 826, JANE DOE WHBE 827, JANE DOE WHBE 828, JANE DOE WHBE 829, JANE DOE WHBE 830, JANE DOE WHBE 831, JANE DOE WHBE 832, JANE DOE WHBE 833, JANE DOE WHBE 834, JANE DOE WHBE 835. JANE DOE WHBE 836, JANE DOE WHBE 837, JANE DOE WHBE 838, JANE DOE WHBE 839, JANE DOE WHBE 840, JANE DOE WHBE 841, JANE DOE WHBE 842, JANE DOE WHBE 843, JANE DOE WHBE 844, JANE DOE WHBE 845, JANE DOE WHBE 846, JANE DOE WHBE 847, JANE DOE WHBE 848, JANE DOE WHBE 849, JANE DOE WHBE 850, JANE DOE WHBE 851, and JANE DOE WHBE 852, Individuals, Inclusive,<br><br>                    *Plaintiffs,*<br>v.<br><br>UBER TECHNOLOGIES, INC., a Delaware Corporation; and RASIER, LLC, a Delaware Limited Liability Company,<br><br>                    *Defendants.* | CASE NO. _____    **CGC-22-598770**<br><br>COMPLAINT FOR DAMAGES<br><br>1. Common-carrier Negligence<br>2. Negligent Hiring, Supervision, & Retention<br>3. Negligence by Misfeasance<br>4. Negligence by Nonfeasance<br>5. Assault<br>6. Sexual Battery (Civ. Code § 1708.5)<br>7. False Imprisonment<br>8. Intentional Infliction of Emotional distress<br>9. Strict Products Liability — Failure to Warn<br>10. Products Liability - Negligent Failure to Warn<br><br>JURY TRIAL DEMANDED |

- 1 -
COMPLAINT FOR DAMAGES & JURY REQUEST

Plaintiffs, JANE DOE WHBE 823, JANE DOE WHBE 824, JANE DOE WHBE 825, JANE DOE WHBE 826, JANE DOE WHBE 827, JANE DOE WHBE 828, JANE DOE WHBE 829, JANE DOE WHBE 830, JANE DOE WHBE 831, JANE DOE WHBE 832, JANE DOE WHBE 833, JANE DOE WHBE 834, JANE DOE WHBE 835. JANE DOE WHBE 836, JANE DOE WHBE 837, JANE DOE WHBE 838, JANE DOE WHBE 839, JANE DOE WHBE 840, JANE DOE WHBE 841, JANE DOE WHBE 842, JANE DOE WHBE 843, JANE DOE WHBE 844, JANE DOE WHBE 845, JANE DOE WHBE 846, JANE DOE WHBE 847, JANE DOE WHBE 848, JANE DOE WHBE 849, JANE DOE WHBE 850, JANE DOE WHBE 851, and JANE DOE WHBE 852, Individuals, Inclusive, individually and through their attorney of record, Walt Cubberly of WILLIAMS HART BOUNDAS EASTERBY, LLP, allege the following:

## INTRODUCTION

1.    Over 3,000 women were sexually assaulted during Uber Rides in 2018 alone. Like so many other women, Plaintiffs JANE DOE WHBE 823, JANE DOE WHBE 824, JANE DOE WHBE 825, JANE DOE WHBE 826, JANE DOE WHBE 827, JANE DOE WHBE 828, JANE DOE WHBE 829, JANE DOE WHBE 830, JANE DOE WHBE 831, JANE DOE WHBE 832, JANE DOE WHBE 833, JANE DOE WHBE 834, JANE DOE WHBE 835. JANE DOE WHBE 836, JANE DOE WHBE 837, JANE DOE WHBE 838, JANE DOE WHBE 839, JANE DOE WHBE 840, JANE DOE WHBE 841, JANE DOE WHBE 842, JANE DOE WHBE 843, JANE DOE WHBE 844, JANE DOE WHBE 845, JANE DOE WHBE 846, JANE DOE WHBE 847, JANE DOE WHBE 848, JANE DOE WHBE 849, JANE DOE WHBE 850, JANE DOE WHBE 851, and JANE DOE WHBE 852,[1] were sexually assaulted by their Uber

---

[1] Because Uber drivers have sexually assaulted so many women — and these sexual assaults have spawned so much litigation — Plaintiffs adopt this numbered naming convention for the ease of the Court and to distinguish themselves from other Jane Doe Plaintiffs whom Uber drivers have sexually assaulted. The term WHBE is used before the number because other law firms also have many Jane Doe Plaintiffs who have been raped and sexually assaulted by Uber drivers, and the WHBE will distinguish these Plaintiffs from those firms' Jane Doe Plaintiffs.

COMPLAINT FOR DAMAGES & JURY REQUEST

drivers. This case is about those sexual assaults, but it is also about Uber's toxic-male culture and the decisions Uber's managing agents made — both before and after they knew that Uber's drivers were frequently sexually assaulting female passengers — to refuse to take simple steps to protect female passengers. Uber passengers frequently complained to Uber and to law enforcement that they had been raped and sexually assaulted during Uber rides by Uber drivers. Through these complaints, Travis Kalanick and Uber's other officers, directors, and managing agents, learned early on in the life of Uber that its female passengers were in danger. But — despite this knowledge, and in keeping with Uber's culture — these officers, directors, and managing agents, including Mr. Kalanick, refused to take simple steps, like putting cameras in cars, to protect female passengers. In this way, Mr. Kalanick and Uber's other officers, directors, and managing agents acted with a conscious disregard to the safety of female passengers, including these Plaintiffs, and took steps that proximately caused their assaults.

2. Uber's culture started at the very top of Uber. It prized growth above all else. Bigger! Faster! was its mantra. In its greed for growth, Uber exploited, endangered, and hurt women, including JANE DOE WHBE 823, JANE DOE WHBE 824, JANE DOE WHBE 825, JANE DOE WHBE 826, JANE DOE WHBE 827, JANE DOE WHBE 828, JANE DOE WHBE 829, JANE DOE WHBE 830, JANE DOE WHBE 831, JANE DOE WHBE 832, JANE DOE WHBE 833, JANE DOE WHBE 834, JANE DOE WHBE 835. JANE DOE WHBE 836, JANE DOE WHBE 837, JANE DOE WHBE 838, JANE DOE WHBE 839, JANE DOE WHBE 840, JANE DOE WHBE 841, JANE DOE WHBE 842, JANE DOE WHBE 843, JANE DOE WHBE 844, JANE DOE WHBE 845, JANE DOE WHBE 846, JANE DOE WHBE 847, JANE DOE WHBE 848, JANE DOE WHBE 849, JANE DOE WHBE 850, JANE DOE WHBE 851, and JANE DOE WHBE 852. This culture was put in place by Uber's officers, directors, and managing agents, including Travis Kalanick. It has been maintained by its current managing agents, including Dara

Khosrowshahi, who refuse to accept responsibility for the hurt Uber has inflicted on so many women, including these named Plaintiffs. This culture and the decisions it spawned were put in place with conscious disregard to the rights and safety of female Uber passengers.

## NATURE OF THE ACTION

3. This is a civil action to recover damages suffered because of sexual assaults. *See* CAL. CODE CIV. P. § 340.16.

4. Each Plaintiff arranged for a ride through the ride-sharing software application (*the Uber App*) developed, owned, operated, and controlled by Defendants Uber Technologies, Inc. and Rasier, LLC at all relevant times. While in the course and scope of his employment for Uber Technologies and Rasier, and while otherwise working on behalf of Uber, each of the Plaintiff's Uber drivers sexually assaulted the Plaintiff he was assigned to drive. The sexual assaults occurred during an Uber trip, when Uber's driver was in the course and scope of his employment with Uber. Uber is a common carrier under California law. Because of Defendants' acts and omissions, Plaintiffs have suffered damages that far exceed the jurisdictional floor of this Court.

5. This is an unlimited action. The amount in controversy exceeds $25,000.00.[2]

## PARTIES

6. Plaintiffs bring this action individually. Each Plaintiff suffered bodily injuries and other damages as a direct and proximate result of the wrongful acts and omissions of Defendants. Each Plaintiff files this action under a pseudonym because she is a sexual-assault victim who needs anonymity to protect her privacy in this sensitive and highly personal matter. Plaintiffs proceed in this manner to protect their legitimate privacy rights. Disclosure of their full names would expose them to stigmatization, it would invade their privacy, and it would make them vulnerable to retaliation. For these reasons, Plaintiffs JANE DOE WHBE 823, JANE DOE WHBE 824, JANE DOE WHBE 825, JANE DOE

---

[2] Cal. Code Civ. P. § 85.

WHBE 826, JANE DOE WHBE 827, JANE DOE WHBE 828, JANE DOE WHBE 829, JANE DOE WHBE 830, JANE DOE WHBE 831, JANE DOE WHBE 832, JANE DOE WHBE 833, JANE DOE WHBE 834, JANE DOE WHBE 835. JANE DOE WHBE 836, JANE DOE WHBE 837, JANE DOE WHBE 838, JANE DOE WHBE 839, JANE DOE WHBE 840, JANE DOE WHBE 841, JANE DOE WHBE 842, JANE DOE WHBE 843, JANE DOE WHBE 844, JANE DOE WHBE 845, JANE DOE WHBE 846, JANE DOE WHBE 847, JANE DOE WHBE 848, JANE DOE WHBE 849, JANE DOE WHBE 850, JANE DOE WHBE 851, and JANE DOE WHBE 852's need for anonymity outweigh both the prejudice to the Defendants and the public's interest in knowing their identity. Defendants are aware of the true names of Plaintiffs and the circumstances surrounding these causes of action. After service of the Complaint, Plaintiffs' counsel will provide Defendants with a separate notice of each Plaintiff's true identity. Plaintiffs further anticipate seeking concurrence from Defendants for entry into a protective order to prevent the unnecessary disclosure of Plaintiffs' real names in the public record.

7.    Defendant Uber Technologies, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1455 Market Street, Fourth Floor, San Francisco, San Francisco County, California, 94103. Defendant Uber Technologies, Inc. may be served with process through its registered agent, CT Corporation System. CT Corporation System is Uber's agent, and Uber has authorized it to accept service on its behalf within the State of California. CT Corporation System is located at 330 North Brand Boulevard, Suite 700, Glendale, California, 91203. Plaintiffs asks the Court to issue process for service.

8.    Defendant Rasier LLC (*Rasier*) is a Delaware limited liability company. Upon information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its corporate headquarters, principal office, and principal place of business at 1455 Market Street, Fourth Floor, San Francisco, San Francisco County, California, 94103. Defendant Rasier may be

COMPLAINT FOR DAMAGES & JURY REQUEST

served with process through its registered agent, CT Corporation System. CT Corporation System is Rasier's agent, and Rasier has authorized it to accept service on its behalf within California. CT Corporation System is located at 330 North Brand Boulevard, Suite 700, Glendale, California, 91203. Plaintiff asks the Court to issue process for service.

9. Unless otherwise specified, this Complaint refers to Defendant Uber and Rasier collectively as Uber. This Complaint also refers to Defendant Uber Technologies, Inc. and Defendant Rasier, LLC collectively as Defendants.

10. Through principles of *respondeat superior*, joint venture, partnership, ostensible partnership, agency, ostensible agency, alter ego, the employer–employee relationship, or other forms of vicarious liability, the Defendant and each of its drivers hold themselves out to the public, and held themselves out to each Plaintiff, as a single entity.

11. Each driver was an agent, servant, and employee of Uber. His duties as an Uber driver were directed to the comfort and protection of the passengers in his car, including each of the Plaintiffs. Uber charged each driver with safely and comfortably driving each Plaintiff to her destination.

12. Further, Uber is a common carrier. As such, under California law, the assaults of an Uber agent immediately engaged in the transportation of a passenger are deemed acts of Uber and Defendants' liability is not separable from the liability of its drivers.

13. For these reasons, Defendants are liable for the acts of each Uber driver.

### JURISDICTION & VENUE

14. The California Superior Court has subject-matter jurisdiction over this action, pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts."

15. Plaintiffs seek relief that is within the jurisdictional limits of this Court.

16. The California Superior Court has personal jurisdiction over the Defendants. It has general jurisdiction over Uber Technologies, Inc. and Rasier LLC because

COMPLAINT FOR DAMAGES & JURY REQUEST

both have their principal places of business is in California. Moreover, this Court has specific jurisdiction over Uber because acts and omissions of Uber that gave rise to Plaintiffs' causes of action occurred in California and arose out of Uber's contacts with California; that is, Uber's acts or omissions in California caused each Plaintiff's injuries.

17. This case is not removable. Defendants are citizens of the State of California for purposes of federal diversity jurisdiction and removal statutes.[3] Because Defendants are citizens of California, where this action is filed, Defendants cannot remove this action on the basis of diversity under 28 U.S.C. § 1441(b)(2).

18. Moreover, there is not complete diversity of the parties under 28 U.S.C. § 1332 because Plaintiffs, JANE DOE WHBE 836, JANE DOE WHBE 837, JANE DOE WHBE 839, JANE DOE WHBE 841, JANE DOE WHBE 845, JANE DOE WHBE 846, JANE DOE WHBE 847, JANE DOE WHBE 848, JANE DOE WHBE 849, JANE DOE WHBE 850, and JANE DOE WHBE 851, are Citizens of California. That is, they live in and are domiciled in California. They have their true, fixed, and permanent home in California and intend to return to California whenever absent from California. Defendants are also citizens of California because their principal places of business are in California. A federal court would, therefore, not have subject-matter jurisdiction over this case under 28 U.S.C. § 1332 because there is not complete diversity between the Plaintiffs and the Defendant.[4] The Defendants, therefore, cannot avail themselves of snap removal — alleging that they removed the case to federal court before a defendant was properly joined or served. Plaintiff is not relying on § 1441(b)(2) to oust federal-court jurisdiction. Federal-court jurisdiction never existed, and, by its terms, § 1441(b)(2) does not apply because there is no diversity jurisdiction under § 1332.

---

[3] See 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.").
[4] S*trawbridge v. Curtiss*, 7 U.S. 267 (1806); *Owens Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978).

COMPLAINT FOR DAMAGES & JURY REQUEST

19.   A federal court would also not have jurisdiction under 28 U.S.C. § 1331. Plaintiffs affirmatively disclaim any damages or actions arising under the Constitution, treaties, or laws of the United States. Federal law in no way forms an essential or potential ingredient of Plaintiffs' claims, and federal law does not create any of Plaintiffs' causes of action. Moreover, Plaintiffs' right to relief do not depend on resolution of a substantial question of federal law.

20.   Further, Plaintiffs raise no claim of admiralty or maritime law, so there is no federal jurisdiction under 28 U.S.C. § 1333. And Plaintiffs sue no foreign state or agency, so there is no federal jurisdiction under 28 U.S.C. § 1330. Nor is there federal jurisdiction under 28 U.S.C. § 1346 because the United States is not a defendant.

21.   Because a federal court does not have original jurisdiction over this matter, it is not removable under § 1441.

22.   Venue is proper in the Superior Court of the County of San Francisco, California, pursuant to California Code of Civil Procedure §§ 395(a) and 395.5. Uber Technologies Inc. is a corporation and Raiser is a corporation or association. Defendants have their principal places of business in San Francisco County. Venue is also proper in San Francisco County under California Code of Civil Procedure § 395(a) because San Francisco County is where Uber Technologies Inc. and Raiser LLC reside since they have their principal place of business here.

23.   The Plaintiffs are properly joined. They assert a right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences. All Plaintiffs' claim arise out of Uber's negligence in screening and training its drivers and its dereliction of duty as a common carrier. And questions of law and fact common to all Plaintiffs will arise in this action.

24.   All other jurisdictional prerequisites and conditions precedent to suit have been satisfied.

## FACTS
### Uber's Toxic-Male Culture &
### Disregard for Women's Safety

25. Uber is a transportation company. Uber gives rides to people for a fee, hiring drivers to provide these rides to Uber's passengers by splitting the fee with the drivers.

26. But getting into a car with someone you don't know is risky. Uber should have been aware of this from the beginning, in or about 2012, and it should have taken steps from the beginning to eliminate these risks. To the extent Uber's managing agents weren't aware of these risks at Uber's inception, they quickly became aware when passengers and law enforcement started complaining to Uber that Uber drivers were sexually assaulting female Uber passengers. Yet despite this knowledge, Uber did nothing to help make rides safer for women. Instead, it misled its customers.

27. In 2014, to make Uber seem less risky, Uber's managing agents started charging Uber passengers an extra $1 fee for each trip. Uber called this a *Safe Rides Fee*. When Uber announced the Safe Rides Fee, it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."[5] The Safe Rides Fee wasn't split with drivers.[6] So it was pure revenue for Uber. Uber gave hundreds of millions of rides with the Safe Ride Fee attached to them, and made hundreds of millions in revenue from the fee.[7] But it never earmarked the money for improving safety or spent it on safety.[8] Instead, it pocketed the money it told the world it

---

[5] Uber, *What is the Safe Rides Fee*, https://web.archive.org/web/20140420053019/http://support.uber.com/hc/en-us/articles/201950566. (last visited October 6, 2019).

[6] MIKE ISAAC, SUPER PUMPED: THE BATTLE FOR UBER 136 (2019) ("The drivers, of course, got no share of the extra buck.").

[7] *See id.*

[8] *Id.*

COMPLAINT FOR DAMAGES & JURY REQUEST

was putting toward safety. As a former Uber employee said "[w]e boosted our margins saying our rides were safer."[9] It "was obscene."[10] The idea for the Safe Rides Fee was crafted by an Uber managing agent. Discovery will reveal the identity of this managing agent.

28.    Rider safety was never Uber's concern. Growth was. One of its founders, Travis Kalanick, became Uber's second Chief Executive Officer and, at one time, its largest shareholder. Mr. Kalanick is a former officer, director, and managing agent of Uber. To increase growth, which required not only new riders, but new drivers, Travis Kalanick and the managing agents at Uber made it as easy as possible for Uber drivers to sign up. They used a background-check system designed to get drivers approved as quickly and conveniently as possible.[11] Uber hired Hirease, Inc. to do its background checks.[12] Hirease brags that it can vet drivers within 36 hours.[13] To have such a short turnaround, Uber eschewed industry standards used by other taxi companies and livery services. For example, it abandoned fingerprinting — which takes weeks — and running applicant drivers against private databases, such as FBI records.[14] These shortcuts might have led to growth for Uber, but they also put people, including Plaintiffs, in danger. Indeed, Uber was so fixated on growth that it began mailing cell phones to applicant drivers, so they could begin driving, before Uber's cursory background check was even complete.[15]

29.    Travis Kalanick made the decision that Uber was going to not fingerprint its drivers, that it was not going to scrub these drivers against FBI records, and

---

[9] *Id.*

[10] *Id.*

[11] Isaac, *supra* note 2, at 115 ("Uber made it as easy as possible for drivers to sign up.").

[12] Mike Isaac, *Uber's System for Screening Drivers Draws Scrutiny*, N.Y. TIMES, Dec. 9, 2014, at A1 (available at https://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html?searchResultPosition=1.)

[13] *Id.*

[14] *Id.*

[15] Isaac, *supra* note 2, at 218.

COMPLAINT FOR DAMAGES & JURY REQUEST

that it was going to use a fast and shallow background-check process. He had actual knowledge that these acts would put passengers in greater danger. As such, he acted with conscious disregard to the rights and safety of female passengers, including Plaintiffs. Travis Kalanick intentionally performed the act of hiring drivers without fingerprinting them, of not scrubbing drivers against FBI databases, and using fast and shallow background checks. When he took these actions, he knew or should have known that it was highly probable that harm would result.

30. Still today — despite its knowledge that so many women have been sexually assaulted by Uber drivers during Uber Rides — Uber does not fingerprint its drivers, and it does not do thorough background checks.

31. Uber's greed and complete disregard for rider safety or the rule of law is breathtaking. Uber's policy is that it won't report any criminal activity it learns of to law-enforcement authorities.[16] That includes allegations of sexual assault.[17] So Uber's policy is that if it learns from an Uber rider, such as one of the named Plaintiffs that she was sexually assaulted, Uber will not report this sexual assault to law enforcement.[18] Uber is proud of this policy and feels "very strongly" that it is not Uber's job to go to the police on behalf of customers when an Uber driver rapes an Uber passenger.[19] This policy has been supported by Uber's current Chief Executive Officer Dara Khosrowshahi. Mr. Khosrowshahi is an officer of Uber. When he took the action of intentionally embracing this policy, he knew or should have known that it was highly probable that harm would result. After all, drivers are more likely to commit sexual assault if they know it is less likely that law enforcement will be informed of the assault.

---

[16] *Uber Says Safety is its First Priority. Employees Aren't so Sure*, WASH. POST (Oct. 1, 2019) (available at https://www.washingtonpost.com/podcasts/post-reports/uber-says-safety-is-its-first-priority-employees-arent-so-sure/.)

[17] *Id.*

[18] *Id.*

[19] *Id.*

COMPLAINT FOR DAMAGES & JURY REQUEST

32.    Uber's greed, parochial focus on growth, and misogyny has had tragic consequences. In December 2014, a 26-year-old finance worker hailed an Uber to take her home from a work dinner near New Delhi, India.[20] When she fell asleep in the car, her Uber driver moved to the backseat and raped her.[21] The driver had previously been detained for rape.[22] The rape caused an international imbroglio, and New Delhi temporary banned Uber.[23] Uber dealt with the situation by attacking the victim.

33.    Eric Alexander was president of Uber in the Asia–Pacific region; he was Uber's "number three," Kalanick's fixer, and a managing agent of Uber.[24] He secured, possibly illegally, the New Delhi rape victim's medical records through a law firm.[25] The records contained the medical examination that doctors performed within hours of her rape.[26] Alexander shared these records with Mr. Kalanick and Uber's number two at the time, Emil Michael, a managing agent at Uber.[27] Many other Uber managing agents either saw the records or learned of them.[28] Mr. Kalanick latched on to the fact that the victim's hymen was still intact.[29] (This despite two people pointing out to him that the victim could have been anally raped.[30]) He began cultivating and sharing a bizarre conspiracy that the woman wasn't raped; the whole incident was a plot against Uber by Olga,

---

[20] Ellen Barry and Suhasini Raj, *Uber Banned in India's Capital After Rape Accusation*, N.Y. TIMES, Dec. 8, 2014, at A4 (available at https://www.nytimes.com/2014/12/09/world/asia/new-delhi-bans-uber-after-driver-is-accused-of-rape.html?_r=0&module=inline.); Isaac, *supra* note 2, at 149.

[21] Isaac, *supra* note 2, at 149.

[22] Barry and Raj, *supra* note 16.

[23] *See id.*

[24] Isaac, *supra* note 2, at 260.

[25] Kara Swisher and Johana Bhuiyan, *A Top Uber Executive, Who Obtained the Medical Records of a Customer Who was a Rape Victim, Has Been Fired*, VOX (June 7, 2017), https://www.vox.com/2017/6/7/15754316/uber-executive-india-assault-rape-medical-records.

[26] Isaac, *supra* note 2, at 261.

[27] Swisher and Bhuiyan, *supra* note 21.

[28] *Id.*

[29] Isaac, *supra* note 2, at 261.

[30] *Id.* at 262.

COMPLAINT FOR DAMAGES & JURY REQUEST

Uber's major ride-sharing competitor in India.[31] No matter that the Uber driver had a history of sexual assault and had confessed the assault to police.[32]

34. Mr. Kalanick and Uber's managing agents and board were the fountainhead of Uber's culture of reckless growth, misogyny, and lawlessness.[33] When Uber customers accused Uber drivers of sexual assault, something that happened with increasing frequency as Uber grew — given its lax supervision and shoddy background checks — Mr. Kalanick would pace around Uber headquarters, not considering how to make Uber's safer for women, but repeating the bromide, legally correct but a bromide nonetheless, "innocent until proven guilty."[34] When a sexual-assault victim decided not to endure the hardship of bringing a civil claim against Uber, or law enforcement decided the evidence was too inconclusive to bring criminal charges, "a round of cheers would ring out across the fifth floor of Uber HQ,"[35] as Uber's managing agents celebrated.

35. This culture spread throughout Uber. One female Uber employee in Malaysia left work one night and noticed a gang was following her.[36] She was worried someone would rape her and started texting her fears to her boss at Uber.[37] He wrote back, "Don't worry, Uber has great health care. We will pay for your medical bills."[38]

36. In Thailand, as they had done before, one night a group of Uber employees were up late at the Uber office snorting cocaine and drinking.[39] A female employee

---

[31] *Id.* at 261; Swisher and Bhuiyan, *supra* note 21.
[32] Barry and Raj, *supra* note 16.
[33] Isaac, *supra* note 2, at 194 ("The tone of Uber's culture was being set from the top. . . . The result was a workforce that largely reflected Kalanick.").
[34] Isaac, *supra* note 2, at 167.
[35] *Id.*
[36] Isaac, *supra* note 2, at 195.
[37] *Id.*
[38] *Id.*
[39] *Id.*

COMPLAINT FOR DAMAGES & JURY REQUEST

decided she didn't want to do drugs.[40] Her manager grabbed her head and shoved it into a mound of cocaine, forcing her to snort it.[41]

37.    One night in South Korea, Mr. Kalanick and Mr. Michael took a female Uber employee and some South Korean Uber employees to a brothel where they sang karaoke.[42] Almost immediately upon arriving, the female Uber employee left, visibly shaken.[43] Although Mr. Kalanick and Mr. Michael left after singing Sweet Child O' Mine, the South Korean Uber employees stayed at the bar with the escorts they had picked out.[44] Mr. Kalanick, Mr. Michael, and the others expensed the night at the brothel to Uber's corporate account.[45]

38.    Uber employees and managing agents started regularly throwing parties at topless bars, often expensing the trips to Uber's corporate account.[46] They called it "Tits on Travis" Kalanick.[47]

39.    At a cocktail and dinner party with journalists in New York City, Mr. Michael attacked journalists who criticized Uber.[48] He was particularly angry with Sarah Lacy who had, in a recent story, accused Uber of "sexism and misogyny" and had said she was going to delete her Uber App because she feared for her safety because of Uber's drivers.[49] Mr. Michael said that if any woman deleted her Uber app because of Ms. Lacy's story and was sexually assaulted, Ms. Lacy "should be held personally responsible."[50] He also floated the idea that Uber could spend a million dollars paying journalists and investigators to dig up dirt

---

[40] *Id.*

[41] Isaac, *supra* note 2, at 195.

[42] Isaac, *supra* note 2, at 250–51.

[43] Isaac, *supra* note 2, at 251.

[44] *Id.*

[45] Isaac, *supra* note 2, at 194.

[46] Isaac, *supra* note 2, at 194.

[47] *Id.*

[48] Ben Smith, *Uber Executive Suggests Digging Up Dirt On Journalists*, BUZZ FEED (Nov. 17, 2014) https://www.buzzfeednews.com/article/bensmith/uber-executive-suggests-digging-up-dirt-on-journalists.

[49] *Id.*

[50] *Id.*; Isaac, *supra* note 2, at 129.

COMPLAINT FOR DAMAGES & JURY REQUEST

on journalists who wrote ill of Uber.[51] He then attempted to shame Ms. Lacy by suggesting that his hack journalists and investigators could find lots of dirt regarding Ms. Lacy and her romantic relationship with her partner.[52] He said Uber could get away with this because "[n]o body would know it was us."[53]

40.    The actions of Uber's executives and board members demonstrate Uber's contempt for women and myopia. Uber only cares about growth. This culture oozes throughout the company and endangers Uber's female riders. Sarah Fowler wrote an explosive blog post, describing how pervasive this culture was at Uber.[54] Ms. Fowler was hired by Uber as a site-reliability engineer in 2015.[55] On her first day on the job, post-training, her manager sent her a message over the Uber chat system.[56] He said that he "was in an open relationship . . . and his girlfriend was having an easy time finding new partners but he wasn't. He was trying to stay out of trouble at work, he said, but he couldn't help getting in trouble, because he was looking for women to have sex with."[57] Ms. Fowler felt it "was clear that he was trying to get [her] to have sex with him, and it was so clearly out of line that [she] immediately took screenshots of [the] chat messages and reported him to" Human Resources.[58] Uber Human Resources and "upper management" told her that "even though this was clearly sexual harassment and he was propositioning [her], it was this man's first offense, and that they wouldn't feel comfortable giving him anything other than a warning and a stern talking-to."[59] Upper management told her that her manager "was a high performer," so "they wouldn't feel comfortable punishing him for what was

[51] Smith, *supra* note 44.
[52] *Id.*; Isaac *supra* note 2, at 129.
[53] Smith, *supra* note 44.
[54] Susan Fowler, *Reflecting on One Very, Very Strange Year at Uber*, SUSAN J. FOWLER, (Feb. 19, 2017), https://www.susanjfowler.com/blog/2017/2/19/reflecting-on-one-very-strange-year-at-uber.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] Fowler, *supra* note 50.

COMPLAINT FOR DAMAGES & JURY REQUEST

probably just an innocent mistake on his part."[60] Upper management told Ms. Fowler that she had two choices, join a new Uber team, or stay on her team, under the manager who propositioned her, but she "would have to understand that [the manager] would most likely give [her] a poor performance review when review time came around, and there was nothing [Human Resources] could do about that."[61] She was told by Human Resources that if she chose to stick with the team she was on, that a poor review by her then manger wouldn't be retaliation because she had "been given an option"[62] to switch teams. Because working under a harassing manager was untenable to Ms. Fowler, she chose to switch teams.[63] She eventually learned, by talking to other female employees at Uber, that many of them had similar sexual-harassment stories and that the manager who sexually harassed her had sexually harassed others before he sexually harassed her.[64] That is, she learned that Human Resources and Uber's managing agents had been mendacious with her. "Within a few months, [the harasser] was reported once again for inappropriate behavior, and those who reported him were told it was still his 'first offense.' The situation was escalated as far up the chain as it could be escalated, and still nothing was done" by Uber.[65] But Uber's misogyny spread beyond aiding and abetting sexual harassment. Uber bought leather jackets for some of its site-reliability engineers.[66] Male engineers were given free jackets, female engineers had to pay for them.[67] When Ms. Fowler complained, the director of engineering told her that if "women really wanted equality, then [they] should realize [they] were getting equality by not getting the [free] leather jackets. He said that because there were so many men in the org, they had gotten a significant

---

[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] Fowler, *supra* note 50.
[65] *Id.*
[66] *Id.*
[67] *Id.*

COMPLAINT FOR DAMAGES & JURY REQUEST

discount on the men's jackets but not on the women's jackets, and it wouldn't be equal or fair . . . to give the women leather jackets that cost a little more than the men's jackets."[68]

41. With the bad press Uber was getting because of the sexual assaults, Mr. Michael's comments, and the Sarah Fowler affair, Uber realized it needed to appear that it was making changes and trying to eradicate its toxic-male culture, so it held a company-wide meeting to announce changes. At the meeting, when Uber announced that it was going to increase its diversity and sensitivity by adding a female board member, David Bonderman, another Uber board member, chimed in, announcing to the company that the addition of a woman to the board meant "it's much likelier [there will] be more talking on the board."[69] Uber's "culture was poisoned from the very top."[70] Indeed, John William Gurley was a longtime board member of Uber and a close confidant of Mr. Kalanick. He sat on his hands and watched silently as Uber put in place a culture and policies that have hurt many innocent women, like the Plaintiffs.

42. To further try to repair its tattered reputation, Uber also hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.[71]

43. During his investigation, as detailed in the publicly released "Holder Report," Attorney General Holder uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."[72]

---

[68] *Id.*

[69] Mike Isaac and Susan Chira, *David Bonderman Resigns From Uber Board After Sexist Remark*, N.Y. TIMES, June 13, 2017, at A16 (available at https://www.nytimes.com/2017/06/13/technology/uber-sexual-harassment-huffington-bonderman.html?hp=&action=click&pgtype=Homepage&clickSource=story-heading&module=inline&region=top-news&WT.nav=top-news); Isaac, *supra* note 2, at 277.

[70] Isaac, *supra* note 2, at 280.

[71] Covington & Burling, LLP, *Covington Recommendations* (available at https://drive.google.com/file/d/0B1s08BdVqCgrUVM4UHBpTGROLXM/view.)

[72] Isaac, *supra* note 2, at 271.

COMPLAINT FOR DAMAGES & JURY REQUEST

44. Uber's sexual-assault and -harassment problems have become so big and so public that it has made pale and perfunctory attempts to act as though it is trying to confront them. In May 2018, Uber acknowledged its "deeply rooted problem" of sexual assault. It proclaimed it was committed to solving the problem, stating that "we're making some important changes today."[73] Included in these "important changes" was Uber's promise to publish a "safety transparency report that will include data on sexual assaults . . . that occur on the Uber platform."[74]

45. One change Uber did not make was warning passengers that Uber is a risky method of transportation for women because of the high number of women who are sexually assaulted by Uber drivers during Uber Rides. Uber, unlike the public, knew the risk to female Uber passengers because of all the complaints about Uber drivers that Uber received. But Uber does not and has never provided a warning about the high incident of sexual assaults that occur on the Uber platform to users of the Uber App.

46. When Uber finally released the safety report, it was forced to acknowledge that in 2018 alone there were 3,045 sexual assaults in the United States during Uber trips — 235 sexual assaults of the "most serious kind."

47. But Uber became aware of its sexual assault problem long before it released the Holder Report. Uber's operations team "dealt with thousands of misconduct cases every year, including instances of sexual assault."[75]

48. Uber "had so lowered the bar to become a driver that people who might have been prevented from driving in the official taxi industry could easily join Uber."[76] As described earlier, these decisions to lower the bar were made by Travis Kalanick and other officers, directors, and managing agents. And these decisions to so lower the bar were made with actual knowledge, on the part of

[73] Uber, *Turning the Lights On*, https://www.uber.com/newsroom/turning-the-lights-on/.
[74] *Id.*
[75] Issac, *supra* note 2 at 166,
[76] *Id.* at 177.

Uber's managing agents, that Uber passengers were being sexually assaulted at an alarming rate.

49. But it wasn't that Uber simply lowered the bar. It failed to take adequate steps to make its rides safe; it failed to provide everything necessary for safe transportation of its passengers. For example, Uber failed to install video cameras in the cars. Such a step would have chilled the wantonness of potential predators. It failed to provide an option in the Uber App that allowed female riders to select to be driven by female drivers. And it failed to adopt adequate training of its drivers on issues of sexual assault and sexual harassment. That is, it failed to provide adequately trained drivers. These policies to fail to make its rides safe were put in place by Travis Kalanick and other officers, directors, and managing agents of Uber. The policy to refuse to warn passengers that Uber is not safe for women was made by Mr. Kalanick, Mr. Khosrowshahi, and the other officers, directors, and managing agents. These managing agents at Uber knew that if they put cameras in cars fewer sexual assaults during Uber rides would occur. They knew that if they provided the option for females so that women could select to be driven by females, fewer sexual assaults during Uber rides would occur. They knew that if they better trained their drivers in sexual-assault prevention, fewer sexual assaults would occur during Uber rides. They intentionally refused to put these safety policies in place with actual and constructive knowledge that not putting these policies in place made it highly probable that harm to female Uber passengers would result.

50. As Uber became more popular, more people realized that Uber had so lowered that bar that people with checkered backgrounds could drive for Uber. People also realized that Uber hadn't provided everything necessary for safe rides, that is, everything that might make it more difficult to get away with sexual assaults, like video cameras in cars. And they realized that Uber was protecting drivers who had been accused of sexual assault by not reporting those assaults to law enforcement. They also realized that Uber was marketing itself to women as a safe mode of transportation, including after drinking. Because of these

factors, Uber became a magnet for sexual predators — men who knew that driving for Uber meant they would get to drive around intoxicated women late at night. These men started sexually assaulting women at alarming rates, as the Holder Report shows. And, as stated earlier, Uber and its officers, directors, and managing agents — including Travis Kalanick — had actual knowledge that these sexual assaults were going on because the victims of these assaults were reporting them to Uber. But Uber's officers, directors, and managing agents did nothing. They failed to start screening drivers better, or to place video cameras in cars. They failed to give Plaintiffs an adequate warning about the risks of driving in an Uber as a woman. Uber's managing agents intentionally refused to take these safety measures and precautions with actual knowledge of the problem, and these officers directors, and managing agents — including Travis Kalanick — had actual or constructive knowledge that refusing to implement these safety measures meant that there was a high probability that more harm would result to female passengers, including Plaintiffs.

51.    In short, before Plaintiffs were sexually assaulted, Uber's officers, directors, and managing agents — including Travis Kalanick — knew, that female passengers were frequently being sexually assaulted by Uber drivers. Uber's officers, directors, and managing agents also knew that Uber hadn't taken all the safety measures it could have or should have taken and that because of Uber's failure to do so, more women were likely to be sexually assaulted during Uber rides. In this way, Uber's officers, directors, and managing agents acted with conscious disregard to the safety of future female passengers, including Plaintiffs.

52.    Moreover, Uber, because its passengers were complaining to it about being sexually assaulted during Uber rides, knew it had a sexual assault problem. But it failed to warn its passengers of what was going on. Uber is an unsafe mode of transportation for women who are riding alone, and Uber knew this to be so. But it did not provide its passengers with any warning of how unsafe Uber is for women. In fact, it concealed this fact from the public — a fact its female passengers and the public were unaware of. If Uber would have warned women

COMPLAINT FOR DAMAGES & JURY REQUEST

that Uber was unsafe for women, fewer women would have been sexually assaulted.

### Uber

53. Uber is a transportation company. Its core business is providing transportation to the public at large through its network of drivers. It connects its drivers to the public through the Uber App. Anyone from the public may download the Uber App for free. And so, Uber's transportation services are available to the general public. Using the Uber App, a customer may request a ride from one of Uber's drivers for a standardized charge unilaterally set by Uber. Uber directs one of its drivers to pick up the passenger and transport her to her destination. Uber charges the person who orders the ride a fee, which it sets unilaterally. And so Uber transports passengers for profit.

54. Uber is a common carrier under California Civil Code § 2168 and the common law. Uber holds itself out to the public generally and indifferently to transport persons from place to place for profit. All that one needs to ride an Uber is to have access to the Uber App, or to have someone who has access to the Uber App order a ride for her. That is, Uber offers its transportation services to any members of the general public who wish to avail themselves of Uber's transportation services by complying with the Uber's mode of transportation — that is, by downloading the Uber App.

55. Moreover, Uber does not discriminate against riders based on race, religion, national origin, disability, sexual orientation, sex, marital status, gender identity, age or any other characteristic protected under applicable law.

56. As a common carrier, Uber owes its passengers, including Plaintiffs, a heightened duty of care under both the common law and California Civil Code § 2100. Uber has an affirmative duty to protect its passengers from assault — which includes the duty to protect its passengers from assaults by one of its employees or contractors. Uber is liable for its employees or agents' assaults, regardless of whether such acts were committed within the course and scope of employment for Uber.

57. As a common carrier, the liability of Uber is not separable from the liability of its driver. If the driver is liable for any torts, Uber is also liable for those torts.

58. Further, as a common carrier, under the common law, Uber has a non-delegable duty to safely transport its passengers from the place it picks them up to their destination. This duty cannot be delegated to Uber drivers. When Uber drivers assault passengers, Uber breaches this non-delegable duty.

59. As a common carrier, Uber has a special relationship with its passengers, and this special relationship gives rise to duties and a heightened duty of care.

60. Uber drivers are largely nonprofessional, untrained, and use their own vehicles. Uber employs its drivers in traditional at-will relationships, in which:

   a. Uber has the discretion to fire its drivers for any reason and at any time; that is, Uber maintains the right to discharge its drivers at will, and without cause;

   b. Drivers are not charged a fee by Uber to apply to become employees;

   c. Drivers are not charged a fee to download the app or to receive notifications from Uber that customers want rides;

   d. Fare prices for rides are set exclusively by Uber;

   e. Drivers have no input on fares charged to consumers;

   f. Drivers are not permitted to negotiate with consumers on fares charged;

   g. Uber can and does modify charges to consumers; for example, if Uber determines that a driver has taken a circuitous route to a destination;

   h. Uber takes a fee of every ride charged to a consumer;

   i. Uber retains control over customer-contact information;

   j. Uber controls its drivers' contacts with its consumer base and considers its consumer list to be proprietary information;

   k. Drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber App;

- 22 -

l.   Driving for Uber is not a specialized skill;

m.   Uber's business model depends on having a large pool of non-professional drivers;

n.   Drivers must abide by a list of regulations to drive for Uber;

o.   Uber requires its drivers to pick up Uber customers on the correct side of the street;

p.   Uber forbids its drivers from talking on their cell phones while the drivers are driving customers;

q.   Uber drivers are not allowed to ask Uber customers for their contact information;

r.   Drivers who reject too many ride requests risk facing discipline, including suspension or termination;

s.   Consumers give feedback on rides they have taken, and rate drivers on a scale from one to five stars. These ratings are used by Uber to discipline and terminate drivers; and

t.   Such other acts of control that discovery will show.

61.   Uber actively markets itself as a safe company that provides safe rides. Uber actively and aggressively marketed the supposed safety of its transportation services.

62.   Uber specifically markets its transportation services to young women who are too intoxicated to drive.

63.   Uber employs a vast network of drivers. But, at all relevant times, Uber provided its drivers with inadequate training regarding sexual assault, sexual relations, sensitivity, and customer relations.

64.   Uber has also provided inadequate background checks. Among other things, it doesn't fingerprint its drivers, it doesn't run the applicant drivers against public databases, and it doesn't do international background checks.

**The Sexual Assaults**

65.   This suit arises from the grave injuries suffered by Plaintiffs from the wrongful acts of the Defendant.

- 23 -

66. Plaintiffs JANE DOE WHBE 823, JANE DOE WHBE 824, JANE DOE WHBE 825, JANE DOE WHBE 826, JANE DOE WHBE 827, JANE DOE WHBE 828, JANE DOE WHBE 829, JANE DOE WHBE 830, JANE DOE WHBE 831, JANE DOE WHBE 832, JANE DOE WHBE 833, JANE DOE WHBE 834, JANE DOE WHBE 835. JANE DOE WHBE 836, JANE DOE WHBE 837, JANE DOE WHBE 838, JANE DOE WHBE 839, JANE DOE WHBE 840, JANE DOE WHBE 841, JANE DOE WHBE 842, JANE DOE WHBE 843, JANE DOE WHBE 844, JANE DOE WHBE 845, JANE DOE WHBE 846, JANE DOE WHBE 847, JANE DOE WHBE 848, JANE DOE WHBE 849, JANE DOE WHBE 850, JANE DOE WHBE 851, and JANE DOE WHBE 852 each hired an Uber ride to take her to a destination by using the Uber App. Through the Uber App, Uber assigned one of its drivers to drive to Plaintiff's location, pick her up, and then drive Plaintiff to her destination. After picking up Plaintiff, she was sexually assaulted by her Uber driver.

## DISCOVERY RULE

67. All Plaintiffs plead that the discovery rule tolled the statute of limitations, and their claims are, therefore, not time-barred. At the time of their injuries, Plaintiffs were not aware, and should not have been aware, of Uber's negligent or wrongful cause in bringing the sexual assault about. That is, they weren't aware of Uber's wrongdoing. Plaintiffs were not aware that Uber did not fingerprint its drivers. They were not aware that Uber did not scrub its drivers against an FBI database. They were not aware that Uber offered its drivers almost no training regarding sexual assaults. They were not aware that Uber drivers sexually assaulting women is a quotidian occurrence, that Uber knew and knows it was and is a quotidian occurrence, and that the sexual assault of Plaintiffs was, therefore, foreseeable to Uber.

68. Plaintiffs were not aware of the foreseeability of the sexual assault because Uber intentionally concealed the fact that Uber drivers regularly assault women by among other things, contending that Uber was a safe mode of transportation

- 24 -
COMPLAINT FOR DAMAGES & JURY REQUEST

for women. Plaintiffs, therefore, also rely on the doctrine of equitable estoppel to toll the statute of limitation.

69. A reasonable investigation by Plaintiffs at the time of their assaults would not have revealed the factual basis of their causes of action against Uber. This is because Uber, through marketing and more, took actions to conceal that its drivers regularly and frequently sexually assault women. This is also because Uber has publicly claimed that it does not control its drivers and that its drivers are not employees. In short, because Uber concealed that Uber drivers frequently sexually assault women and it controls them, Plaintiffs were unable to discover Uber's negligent or wrongful cause in bringing the sexual assault about despite reasonable diligence.

70. Plaintiffs did not learn of Uber's negligent or wrongful cause in bringing about the sexual assault until after they saw advertisements for legal help. Collectively, Plaintiffs saw advertisements in either 2020 or 2021 and so their claims are not time-barred.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### Common-Carrier Negligence

71. Plaintiffs incorporate here the earlier paragraphs.

72. Uber is a common carrier under California Civil Code § 2168 and the common law because it holds itself out to the public generally and indifferently to transport persons from place to place for profit.

73. Uber transported each Plaintiff for profit.

74. As a common carrier, under the common law and California Civil Code § 2100, Uber owes its passengers, including Plaintiffs, a heightened duty of care. As part of this heightened duty of care, Uber owed Plaintiffs the duty to provide everything necessary for their safe transportation. Uber failed to do this.

75. Uber owed Plaintiffs a heightened duty of care to ensure that they would not be exposed to foreseeable harms.

- 25 -

76. As a common carrier Uber cannot delegate this duty to its drivers.

77. Uber's drivers are employees or agents of Uber.

78. Uber breached the duty of care it owed Plaintiffs when its drivers sexually battered Plaintiffs.

79. These sexual batteries proximately caused harm to Plaintiffs.

80. As a common carrier, the liability of Uber is not separable the liability of Uber's drivers. The torts of its driver are attributable to Uber.

81. Uber acted negligently and with a reckless disregard of the probability that Plaintiffs would suffer emotional distress as a result of Uber's conduct. Uber acted in a manner that was extreme and outrageous from the perspective of Plaintiffs. A reasonable person would also consider Uber's conduct extreme and outrageous.

82. At the time each of these Plaintiffs were assaulted, Uber had objective and subjective knowledge that its policies and its business model were putting women in danger of sexual assault. In the face of this danger, Uber's negligence and recklessness was a "willful and conscious disregard" of the safety of others; it warrants punitive damages pursuant to California Civil Code § 3294.

**SECOND CAUSE OF ACTION:**
**Negligent Hiring, Supervision,**
**Training & Retention**

83. Plaintiffs incorporate here the earlier paragraphs. Uber hired each of Plaintiffs' drivers.

84. Uber knew or should have known that each of these drivers was unfit to be employed by it as transportation providers.

85. As a common carrier, Uber owed Plaintiffs, as passengers, a heightened duty of care in the hiring, training, and supervision of its drivers and is responsible for the negligent and tortious actions of its drivers.

86. Uber breached that duty of care in hiring, retaining, training, and supervising its drivers. Each of Plaintiffs' drivers is unskilled, unfit, and too incompetent to provide safe, reliable rides. It was reasonably foreseeable to Uber that each

- 26 -

COMPLAINT FOR DAMAGES & JURY REQUEST

Plaintiff's driver would expose riders, including Plaintiffs, to an unreasonable risk of harm. Further, Uber failed to supervise its drivers, which amounted to a further breach of the duty of care.

87. Uber's breach of its duty was a substantial factor in causing Plaintiffs' injuries.

88. As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Defendants, Plaintiffs sustained pain and suffering, serious emotional distress, mental anguish, embarrassment, and humiliation.

89. At the time each Plaintiff sustained her injuries, Uber had objective and subjective knowledge that its policies and its business model were putting women in danger of sexual assault. In the fact of this danger, Uber's negligence and recklessness was a "willful and conscious disregard" of the safety of others. It warrants punitive damages pursuant to California Civil Code § 3294.

90. Accordingly, Plaintiffs are entitled to recovery against Defendants in an amount to be determined at trial.

**THIRD CAUSE OF ACTION:**
**Negligence by Misfeasance**

91. Plaintiffs incorporates here the earlier paragraphs.

92. As a common carrier, Uber owed Plaintiffs, as Uber passengers, a heightened duty of care to ensure its passenger's safety.

93. Uber breached this duty by creating risks for Plaintiffs through its business practices. Uber's policies of prioritizing profits over safety while advertising its commitment to safety worsened the position of Plaintiffs as female commuters. By advertising and marketing itself as a safe alternative to driving and encouraging women to take Uber rides while knowing the widespread issue of sexual misconduct and assaults by Uber drivers, Uber placed Plaintiffs in foreseeable risk created by its own policies and business model.

94. Uber's breach of its duty was a substantial factor in causing Plaintiffs' injuries.

- 27 -

95. As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Uber, Plaintiffs sustained pain and suffering, serious emotional distress, mental anguish, embarrassment, and humiliation.

96. Accordingly, Plaintiffs are entitled to recovery against Uber in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION:
### Negligence by Nonfeasance

97. Plaintiffs incorporate here the earlier paragraphs.

98. As a common carrier, Uber owed its passengers, including Plaintiffs, a heightened duty of care to ensure its passengers' safety.

99. Uber breached this duty by failing to take steps that could have prevented the harm caused to Plaintiffs. By failing to institute policies and procedures to vet drivers, by failing to protect passengers from sexual assault, by failing to respond to sexual-assault victims' injuries and concerns, and by failing to institute true change in its in corporate philosophy by matching passenger safety with its advertising, Uber failed to provide the Plaintiffs the care owed them. Uber put Plaintiffs in foreseeable danger posed by its business model, through which its drivers repeatedly prey on riders. Uber also failed to deliver Plaintiffs from this foreseeable danger.

100. As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Uber, Plaintiffs sustained pain and suffering, serious emotional distress, mental anguish, embarrassment, and humiliation.

101. Accordingly, Plaintiffs are entitled to recovery against Uber in an amount to be determined at trial.

### Uber's Liability for the Torts of Its Drivers

102. Plaintiffs here incorporate the earlier paragraphs.

103. Uber retained the right to control the manner and means by which each driver drove for Uber. As such, Uber was an employer of its drivers. And so, under California law, Uber can be held vicariously liability for torts committed by the

- 28 -

COMPLAINT FOR DAMAGES & JURY REQUEST

driver that were within the scope of his employment and that proximately caused injury to each Plaintiff.

104. The sexual assault committed by Uber's drivers, and the torts which that sexual assault amounted to — assault, battery, false imprisonment, and intentional infliction of emotional distress — were not so unusual or startling that they were unforeseeable to Uber. And so, as described below, Uber is vicariously liable for the torts of assault, battery, false imprisonment, and intentional infliction of emotional distress.

105. Uber is a common carrier. As such, it can be liable for its employees and agents' intentional torts, whether or not those torts were committed within the scope of the agents or employees' employment and whether or not the torts were foreseeable.

106. Each of Uber's drivers was in the transportation business and his duties were directed to the safety and comfort of each Plaintiff. That is, each driver's job was to safely and comfortably transport Plaintiff to her destination.

107. And so, as described below, Uber is liable for the torts of assault, battery, false imprisonment, and intentional infliction of emotional distress.

**FIFTH CAUSE OF ACTION:**
**Assault**

108. Plaintiffs incorporate here the earlier paragraphs.

109. The sexually egregious conduct committed by each Uber driver while performing his job duties amounted to a series of events that created a reasonable apprehension in each Plaintiff of immediate harmful or offensive contact to her. All this was done intentionally and without Plaintiff's consent. Each Plaintiff reasonably believed she was in danger of imminent unwanted touching and offensive contact. Her Uber driver intended to take the actions that caused each Plaintiff to reasonably believe she was in danger of imminent harmful or offensive contact. That is, he intended to make Plaintiff believe she was about to be imminently contacted without her consent. These assaults injured Plaintiffs.

110. Uber is directly liable for the actions of its agents and employees. It is also vicariously liable under the doctrine of *respondeat superior*.

111. Uber is a common carrier who must carry passengers safely. As a common carrier Uber is liable for its employees and agents' assaults and intentional torts on passengers, whether or not such acts were committed within the scope of employment.

112. The assaults of Uber drivers are deemed assaults by Uber under California law.

113. Uber breached its duty of care in its actions toward Plaintiffs.

114. As a direct and proximate result of the above conduct Plaintiffs have sustained and will sustain pain and suffering and serious psychological and emotional distress, mental anguish, embarrassment, and humiliation.

115. The conduct Uber engaged in was fraudulent, oppressive, and/or malicious, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs. And so Uber's conduct warrants punitive damages under California Civil Code § 3294.

116. Accordingly, Plaintiffs are entitled to recovery against Uber in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION:
### Sexual Battery

117. Plaintiffs incorporate here the earlier paragraphs.

118. Plaintiffs' Uber drivers, while in the course and scope of their employment with Uber, intentionally engaged in sexual acts without Plaintiffs' consent. Each Uber driver's actions caused offensive contact with Plaintiff's "intimate parts" as defined by Civil Code § 1708.5(a) or they forced Plaintiffs to have offensive contact the drivers' "intimate parts."

119. This offensive contact harmed Plaintiffs.

120. Uber is directly liable for the actions of its agents and employees. It is also vicariously liable under the doctrine of *respondeat superior*.

121. Uber is a common carrier that must carry passengers safely. As a common carrier, Uber is liable for its employees and agents' assaults and intentional torts on passengers, whether such assaults were committed within the scope of employment.

122. Uber breached its duty of care in its actions toward Plaintiffs.

123. For the foregoing reasons, Uber committed sexual battery against Plaintiffs as defined in Civil Code § 1708.5.

124. As a direct and proximate result of the above conduct, Plaintiffs have sustained and will sustain pain and suffering and serious psychological and emotional distress, mental anguish, embarrassment, and humiliation.

125. The conduct Uber engaged in was fraudulent, oppressive, and/or malicious, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs. And so Uber warrants punitive damages under California Civil Code § 3294.

126. Accordingly, Plaintiffs are entitled to recovery against Defendants in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION:**
**False Imprisonment**

127. Plaintiffs incorporate here the earlier paragraphs.

128. Each of Plaintiffs' Uber's drivers, as employees of Uber, while performing his job duties, physically prevented each Plaintiff from exiting his car for a significant period. His actions of physically preventing Plaintiff from leaving his car were intentional.

129. During her confinement, each Plaintiff feared for her safety and was injured.

130. Uber is liable for the actions of its agents and employees directly under the *respondeat superior* doctrine.

131. Regardless, Uber is a common carrier that must carry passengers safely. As a common carrier, Uber is liable for its employees and agents' assaults and intentional torts on passengers, whether or not such acts were committed within the scope of employment.

132. Uber breached its duty of care in its actions toward Plaintiffs.

133. As a direct and proximate result of this conduct, Plaintiffs have sustained and will sustain pain and suffering and serious psychological and emotional distress, mental anguish, embarrassment, and humiliation.

134. The conduct Uber engaged in was fraudulent, oppressive, and malicious, and was done with conscious disregard toward Plaintiffs' rights and safety. And so Uber warrants punitive damages under California Civil Code § 3294.

135. Accordingly, Plaintiffs are entitled to recovery against Uber in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION:
### Intentional Infliction of Emotional Distress

136. Plaintiffs incorporates here the earlier paragraphs.

137. Each of Uber's drivers was an employee of Uber. While was performing his job duties, and in the course and scope of his employment, each driver engaged in conduct to each Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society. Namely, each driver caused Plaintiff to experience mental suffering by forcing unwanted sexual contact on her.

138. Uber is liable for the actions of its agents directly and under the doctrine of *respondeat superior*.

139. Regardless, Uber is a common carrier who must carry passengers safely. As a common carrier, Uber is liable for its employees and agents' assaults and intentional torts, whether or not such acts were committed within the scope of employment.

140. Uber breached its duty of care in its actions toward Plaintiffs.

141. As a direct and proximate result of Uber's conduct Plaintiffs have sustained and will sustain pain and suffering and serious psychological and emotional distress, mental anguish, embarrassment, and humiliation.

142. The conduct Uber engaged in was fraudulent, oppressive, and malicious, and was in conscious disregard of the rights and safety of others including, but not

limited to, Plaintiffs. Uber's conduct warrants punitive damages under California Civil Code § 3294.

143. Accordingly, Plaintiffs are entitled to recovery against Uber in an amount to be determined at trial.

### NINTH CAUSE OF ACTION:
### Strict Products Liability — Failure to Warn

144. Plaintiffs incorporate here the earlier paragraphs.

145. Uber designed, manufactured, and distributed the Uber App and placed the Uber App in the stream of commerce.

146. The Uber App is defective because the Uber App presented the potential risk of introducing a driver to each Plaintiff and placing her in a vulnerable position. Because of the nature of the ride-sharing arrangement — which was created and facilitated by the Uber App — Plaintiffs could neither escape from Uber's driver's car nor control the place where the driver took them. And there was also the potential risk that, given her vulnerability, each Uber driver could sexually assault each Plaintiff. Uber was well aware of these risks, in part, because it was aware of how many of its passengers were being sexually assaulted by Uber drivers. These risks were known and knowable to Uber at the time it designed, manufactured, and distributed the Uber App.

147. The potential risks presented a substantial danger when the Uber App was used or misused in an intended or reasonably foreseeable way.

148. Ordinary consumers and passengers, including Plaintiffs, would not have readily recognized the potential risks of riding in an Uber as a female. Part of the reason they wouldn't recognize the risks is that Uber advertised itself as safe for women, including intoxicated women. This was not true.

149. Uber failed to warn of the potential risks.

150. Plaintiffs did not know how many women were being sexually assaulted every year in Ubers. And so they did not know of the risk of riding in an Uber, and the risk was not obvious to them.

151. Plaintiffs used the Uber App in its intended manner or in a reasonably foreseeable manner.

152. Each Plaintiff was sexually assaulted by Uber's drivers.

153. Uber's failure to give a sufficient warning was the legal cause of each Plaintiff's harm or a substantial factor in causing the harm each Plaintiff suffered.

154. The conduct Uber engaged in was fraudulent, oppressive, and malicious, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs. Uber's conduct warrants punitive damages under California Civil Code § 3294.

## TENTH CAUSE OF ACTION:
### Products Liability — Negligent Failure to Warn

155. Plaintiffs incorporate here the earlier paragraphs.

156. Uber designed, manufactured, and distributed the Uber App. It put the Uber App into the stream of commerce.

157. Uber owed a duty to each Plaintiff as a passenger and user of the Uber App.

158. The Uber App poses the risk of sexual assault by Uber drivers.

159. Uber knew of this risk because so many victims were complaining to Uber that their Uber driver had sexually assaulted them. Law enforcement was also informing Uber that Uber drivers were sexually assaulting Uber passengers.

160. Uber knew or should have known that the Uber App was dangerous or likely to pose a danger to female users and passengers.

161. A reasonable manufacturer and a reasonable distributor under the same or similar circumstances would have known of the danger of sexual assault stemming from riding in an Uber.

162. A reasonable manufacturer and a reasonable distributor under the same or similar circumstances would have warned of the danger of sexual assault.

163. Uber failed to warn passengers, Plaintiffs, of this risk.

164. Each Plaintiff was sexually assaulted by her Uber driver.

165. Uber's failure to warn was a substantial factor in causing each Plaintiff's injuries.

166. The conduct Uber engaged in was fraudulent, oppressive, and malicious, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiffs. Uber's conduct warrants punitive damages under California Civil Code § 3294.

**CONCLUSION**

For these reasons, Plaintiffs JANE DOE WHBE 823, JANE DOE WHBE 824, JANE DOE WHBE 825, JANE DOE WHBE 826, JANE DOE WHBE 827, JANE DOE WHBE 828, JANE DOE WHBE 829, JANE DOE WHBE 830, JANE DOE WHBE 831, JANE DOE WHBE 832, JANE DOE WHBE 833, JANE DOE WHBE 834, JANE DOE WHBE 835. JANE DOE WHBE 836, JANE DOE WHBE 837, JANE DOE WHBE 838, JANE DOE WHBE 839, JANE DOE WHBE 840, JANE DOE WHBE 841, JANE DOE WHBE 842, JANE DOE WHBE 843, JANE DOE WHBE 844, JANE DOE WHBE 845, JANE DOE WHBE 846, JANE DOE WHBE 847, JANE DOE WHBE 848, JANE DOE WHBE 849, JANE DOE WHBE 850, JANE DOE WHBE 851, and JANE DOE WHBE 852, pray for judgment against Uber. Plaintiffs ask that Defendants be held liable, as follows:

a. For special damages, subject to proof;

b. For past and future general damages, including physical pain, mental anguish, disfigurement and physical impairment, subject to proof;

c. For past and future lost earnings and/or earning capacity, subject to proof;

d. For medical expenses, past and future, subject to proof;

e. For punitive and exemplary damages subject to proof;

f. For prejudgment interest from the date of the incident to the date of Judgment, as provided by law, subject to proof at the time of trial;

g. For costs of litigation incurred herein; and

- 35 -

h.   For such other and further relief as this Court may deem just and proper.

DATED: March 18, 2022

WILLIAMS HART BOUNDAS EASTERBY, LLP

Walt Cubberly

COUNSEL FOR PLAINTIFFS

COMPLAINT FOR DAMAGES & JURY REQUEST

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims in this action.

DATED: March 18, 2022

WILLIAMS HART BOUNDAS EASTERBY, LLP

Walt Cubberly

COUNSEL FOR PLAINTIFFS

COMPLAINT FOR DAMAGES & JURY REQUEST