[Submitting counsel below]

UNITED STATES DISTRICT COURT

OF NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
| | **PLAINTIFF'S TRIAL BRIEF RE: TESTIMONY OF DR. VALLIERE** |
| This Document Relates to: | Judge: Honorable Charles R. Breyer |
| *WHB 823 v. Uber Techs., Inc.*, N.D. Cal. No. 24-cv-4900 W.D.N.C. No. 25-cv-737 | |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WHB 823, | No. 25-cv-737 |
| Plaintiff, | Judge: Honorable Charles R. Breyer |
| v. | |
| UBER TECHNOLOGIES, INC., et al., | |
| Defendants. | |

## TRIAL BRIEF

As ordered by the Court, Plaintiff submit this offer of proof concerning the testimony of Dr. Veronique Valliere. If the trial in this matter proceeds on "Plan A"—that is, if the Court determines that Uber is a common carrier and accordingly is liable for the alleged assault in this case—then the Court should permit Dr. Valliere to testify. Her expert opinions concerning the characteristics and behavior of both sexual assault offenders and victims, and misinformation and stereotypes regarding same, will assist the jury in evaluating the testimony from both Plaintiff and the driver and deciding whether the assault alleged in this case did in fact occur. Dr. Valliere will reference Uber documents only as part of the basis for her opinions, subject to Uber opening the door on cross-examination to further inquiry.

Indeed, Dr. Valliere frequently testifies in criminal matters where the only issue is whether and how an assault occurred. *See United States v. Leroy*, 787 F. App'x 74, 79 (3d Cir. 2019) ("We agree with the District Court that Dr. Valliere's testimony was reliable and relevant. Dr. Valliere has extensive academic experience in the field of psychology, and her robust clinical and forensic practice involves a similar patient population of sexual offenders and child abuse victims, which we find to be sufficient for the purposes of Rule 702 in this case. Her testimony was relevant because it assisted the jury in learning about specialized topics" related to victim and offender behavior.) (footnote omitted); *United States v. Maurizio*, 2015 WL 5228031, at *3 (W.D. Pa. Sept. 8, 2015) (admitting Dr. Valliere's testimony regarding "[v]arious victim behaviors," "[c]ommon victim reactions," "[w]hy victims, particularly victims of sexual abuse and child victims of abuse, often refuse to disclose their abuse or wait long periods of time before disclosing their abuse," "[c]ommon victim characteristics and or reactions during incidents of sexual abuse," "[c]ertain victim/offender dynamics," "[c]ommon victim characteristics and experience," "[v]arious offender characteristics[] and [] methods," and "the various strategies, methods and tactics employed by abusers").[1]

---

[1] *See also United States v. Halamek*, 5 F.4th 1081, 1088-89 (9th Cir. 2021) (approving admission of "expert testimony about grooming for child sexual abuse"); *United States v. Batton*, 602 F.3d 1191, 1201 (10th Cir. 2010) (finding no abuse of discretion in admitting expert testimony "regarding criminal methods" of "sex offenders"); *United States v. Romero*, 189 F.3d 576, 585-87

## I.      Dr. Valliere will offer relevant testimony about victim characteristics and behavior.

Dr. Valliere also uses her expertise to explain and rebut myths about victim characteristics and behavior. The topics on which she may testify include:

- Victims may not recognize offender boundary pushing (such as encouraging a woman rider to sit in the front, as the driver did here), because studies and experience show that people assume that threats come from violent predators "who are going to jump out or follow us up to the parking lot or grab up on us somewhere" and not a "friendly person who's nice and sharing themselves." *Dean* Trial Tr. at 598:21-599:2.

- Victim behavior can be "counterintuitive." Victims "often act in ways that seem contrary to common sense." The public accepts "misinformation about how people respond to trauma or to assault" and judge victims based on "stereotypes." *Id.* at 586:23-587:4. In reality, "[e]veryone reacts individualistically, depending on who they are, what their experiences are, if they can perceive or define the sexual assault, their level of disbelief, confusion, terror, fear, [or] humiliation[.]" When "people are very afraid, they revert to ingrained behaviors," which can include "pleading," "submitting," or "placating to try to manage the situation." Others "have defense mechanisms like disassociating or checking out." *Id.* at 765:19-21; *see also* Valliere Rpt. at 43.[2]

- It is a common stereotype that "victims of sexual assault will immediately identify what's going on as a sexual assault and be so shocked and infuriated by it, they'll scream, they'll yell, they'll physically resist, they'll try to escape, they'll be hateful and angry at the perpetrator. They'll immediately want to report to law enforcement and get justice and go through the process[.]" *Dean* Trial Tr. at 766:11-18. In reality, those things often do not happen; victims will often not "yell and scream or run." *Id.*; *see also* Valliere Rpt. at 43-44 (discussing how "[v]ictims of sexual harassment and maltreatment often behave in unpredicted or unexpected ways, or, in layman's terms, ways that 'defy common sense' especially toward the perpetrator.").

---

(7th Cir. 1999) (permitting expert testimony regarding the practices of child sex abusers to dispel "from the jurors' minds the widely held stereotype of a child molester as a 'dirty old man in a wrinkled raincoat' who snatches children off the street"); *United States v. Hitt*, 473 F.3d 146, 150, 158 (5th Cir. 2006) (similar).

[2] Dr. Valliere's report was filed on the docket at ECF 4340.

- Sexual assault is widely underreported, as Uber knows. *Dean* Trial Tr. at 609:2-10 (discussing Ex. 1256). "Delay of disclosure or not telling at all is the most common response to sexual assault by victims." Valliere Rpt. at 41. There are many reasons people do not report, including shame, ignorance, or fear of not being believed or being judged, not being sure it was severe enough, or just wanting to move on. *Dean* Trial Tr. at 606:6-607:9, 769:18-770:8. Victims also fear retaliation. *Id.* at 609:17-21; *see also* Valliere Rpt. at 41 ("Many victims fear antagonizing the perpetrator. This fear is accentuated when the perpetrator has intimate knowledge of the victim. Very few 'strangers' know where victims live .... The Uber driver has access to the passenger's name and other information. When the driver takes the passenger home, he knows where she lives.").

- Uber itself recognized that "[i]t's important to understand that everyone responds to trauma differently. There is no 'right' or 'normal' response. Some people may cry. Some people may be calm. Some people may be confused. This is because trauma causes neurobiological changes in the body." *Id.* at 770:22-771:1 (discussing Ex. 1256). "This does not mean the survivor is lying or not affected by the assault. It's simply a neurobiological response to trauma." *Id.* at 773:1-3.

- "Injury and damage from a sexual assault cannot be determined through a formula based on the features of the assault or the abuse." Valliere Rpt. at 40. In particular, jurors should not assume that, just because a person continued to use Uber after an incident, they were not injured: Victims "may have significant practical reasons that drive them to continue to use Uber or may have independently attempted to engage in protective measures while using Uber." *Id.* at 2.

- After a traumatic sexual assault, memory is often impaired. Trauma can disorganize information. It doesn't make the information false, it's just disorganized. And when individuals are going through a traumatic event, they may be purposefully trying not to remember it. *Dean* Trial Tr. at 773:12-775:25. Inconsistencies, especially about small details, are very common. *Id.* at 775:6-14. As Uber itself found: "The survivor might have trouble remembering details about the assault. They may not remember what happened before or after an incident, or they may have trouble remembering the event in a sequential order. This phenomenon has often led to people thinking

sexual assault survivors are lying about the assault." *Id.* 776:15-23 (discussing Ex. 1256). "So if you're speaking with a survivor and they seem confused or having trouble remembering what happened, it does not mean they're lying. It is a natural response to trauma." *Id.* at 777:4-7 (discussing Ex. 1256).

- Certain "rape myths and misinformation about the victims and offenders … tend to confound cases and misinform people." *Id.* at 577:11-14. One myth is that "rape happens because there's a misunderstanding between the perpetrator and victim." *Id.* at 779:10-25 (discussing Ex. 1256). Another is that "false allegations or fabricated allegations of sexual assault are common and that they are commonly used to get out of trouble for victims or make excuses for bad behavior." *Id.* at 780:8-15 (discussing Ex. 1256); *see also* Valliere Rpt. at 40 ("People believe that false allegations of sexual abuse or maltreatment are common. In fact, sexual assault is significantly underreported, and false allegations are rare.").

- Sexual assault is not limited to the violent rape scenarios people may commonly think of or see in the media, and even lesser-seeming abuses can cause significant immediate distress. *Dean* Trial Tr. at 588:5-589:18. "One type of myth regarding sexual assault is that only a violent, penetrative sexual assault is a 'real' sexual assault can be the source of significant injury for victims. Trauma is highly individualized and can be caused by events that are not deemed 'egregious' by others. Sexual harassment and physical boundary violations can terrify a lone passenger, especially when the offending party may have access to that passenger's location, address, name, and other information. Violations seen or defined as 'low-level' can produce significant fear in victims." Valliere Rpt. at 42. Further, "failing to identify any type of sexual misconduct or maltreatment as serious is the type of belief regarding sexual maltreatment that perpetuates rape myths, emboldens offenders, and dismisses trauma and injury to victims." *Id.*

## II. Dr. Valliere will offer relevant testimony about offender characteristics and behavior.

Dr. Valliere uses her expertise to "explain sex offender behavior." *Dean* Trial Tr. at 577:3-6. "Generally, people do not understand people who commit sexual offenses or engage in sexual maltreatment of others. To cope with this lack of understanding, the public relies typically on myths, inaccurate assessments of risk, stereotypes, or ineffective protections to evaluate an

offender, level of risk, a claim of assault, or a victim's credibility." Valliere Rpt. at 11.

The topics on which she may testify include:

• A common stereotype of sex offenders is of the "crazy pedophile who can't keep [his] hands off of kids." In reality, that type of offender is "the minority." Most offenders are opportunistic people "who may not have gone out to rape that night or be compelled to rape somebody," but are "ready and primed when the opportunity presents itself to be sexually gratified at someone else's expense." *Dean* Trial Tr. at 591:16-18. These common offenders often have "problematic personality traits" like entitlement, misogyny, or "sexually distorted beliefs," but appear "different than the stereotype" people "have or [] see in the media of offenders who are driven by deviant sexual arousal like a pedophile." *Id.* at 592:10-593:2. Uber itself identified so-called "good intent" offenders. *Id.* at 655:7-21 (discussing Ex. 1528); *see also* Valliere Rpt. at 30 ("Offenders rely on presenting a façade that garners the perception of trust, harmlessness, friendliness, and prosociality.").

• Offenders seek out environments, like the Uber environment, that present opportunities for sexual misconduct. *Dean* Trial Tr. at 593:9-12. Uber itself found: "The majority of these drivers would most likely not have engaged in sexual misconduct had they not been in this specific situation with this opportunity for sexual misconduct." *Id.* at 620:4-621:20 (discussing Ex. 753); *see also* Valliere Rpt. at 12 ("Offenders are more likely to act on opportunity when the chances of success are greatest. Pairing an offender or potential offender with a woman in a vehicle creates a significant opportunity."); *id.* at 32 ("These are not offenders that are compelled to act upon strong deviant urges, but offenders who seek and take advantage of opportunities to gratify themselves. They lack the internal barriers to harming others, like empathy, respect for the rights of others, or commitment to safety or the rules of society.").

• By driving for Uber, offenders don't have to work to get access to potential victims. They are matched with victims. The victim is isolated with the offender. The offender has control over where the car is going and whether the doors are locked. They also control the evidence of any assault. *Dean* Trial Tr. at 594:23-595:20; *see also* Valliere Rpt. at 34 ("By its nature, ridesharing offers an offender ready access to victims. An Uber driver can place himself alone with

a potential victim without any effort other than being paired by Uber with a passenger. A sexual offender who has a sexual interest in post-pubescent targets does not need to insinuate himself into an unfamiliar or atypical environment. An offender who wishes to sexually assault an adult victim simply must pick her up.").[3]

- Offenders look for power differentials and target victims who are easily accessible, isolated, vulnerable, and who are unlikely to be believed. *Dean* Trial Tr. at 594:12-16, 600:5-601:25. Offenders look for victims who are young, lost, confused, compromised, passive, compliant, or meek. *Id.* at 596:8-16. Uber itself understood that sexual assault derives from "power and status differences …. including the victim's vulnerabilities," and that offenders take advantage of opportunistic scenarios, including late-night rides and single, female riders. *Id.* at 647:14-24, 651:20-653:4 (discussing Ex. 800); *see also* Valliere Rpt. at 34 ("The driver can select a potential victim easily. He can choose to drive at times that make access to a potentially vulnerable victim, like late at night, after bars close or around a college town or event. Drivers can choose to accept victims at times and in places that give greater opportunities to commit offenses.").

- Offenders do things to reassure potential victims, like asking friendly questions or expressing care or friendliness. *Dean* Trial Tr. at 596:17-18. Offenders gauge victim potential by pushing boundaries, like asking personal questions, or asking victims "[d]o you want to sit up front with me?" *Id.* at 697:5-12. Uber itself identified offender boundary-pushing methods. *Id.* at 654:9-655:4 (discussing Ex. 1528). *See also Romero*, 189 F.3d at 584 ("This court has recognized the value of expert testimony in explaining a complicated criminal methodology that may look innocent

---

[3] *See also id.* at 11 ("An offender driving an Uber can gain access to rides where he will gain close proximity to women, often alone, and in the confirmed circumstances of his car, a vehicle he, as the driver, has familiarity with and control over. The passenger is matched by Uber with the driver. Uber sends the driver to the passenger. The passenger will voluntarily get into his car, even alone and/or late at night or when intoxicated, because she called an 'Uber.' The Uber drivers are not supervised and can choose was times of day and what parts of town they want to work. Once in the car, alone with the victim, the driver has an opportunity to evaluate his potential victim, talk to her, find out personal details, and engage in escalating behavior. … [P]articularly in an isolated, confined environment such as a moving car at night, the potential victim will simply attempt to placate or appease the driver, to avoid confrontation or further escalation. After an assault by an Uber driver, many victims will experience fear of retaliation particularly because they fear the driver has acquired personal information about her (such as her name, where she lives, or where she was dropped off.").

on the surface but is not as innocent as it appears.").

- Offenders go in with a "plan on how to get away with it." They "organize information and situations so they have plausible deniability" and they "prep[] the battlefield for if a victim makes an accusation." *Id.* at 597:22-598:8. Offenders know and take advantage of the fact that most victims don't report. *Id.* at 598:11-14. And offenders are adept at controlling the narrative and getting ahead of the story, acting in ways that take advantage of stereotypes. *Id.* at 603:22-604:17. Offenders understand that they can challenge victim narratives by emphasizing things like "why didn't she scream." *Id.* at 768:13-769:10. *Cf. Dean* Ct. Ex. 10 (Turay) at 54:11-15 (Uber eliciting testimony from driver in *Dean* "she walked out of my Uber" and "She was fine.").

Dated: April 7, 2026

Respectfully submitted,

By*: /s/ Sarah R. London*
Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By*: /s/ Rachel B. Abrams*
Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By*: /s/ Roopal P. Luhana*
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: April 7, 2026

By:  */s/ Andrew R. Kaufman*
Andrew R. Kaufman

PLAINTIFF'S TRIAL BRIEF
RE: TESTIMONY OF DR. VALLIERE
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737