[Submitting counsel below]

UNITED STATES DISTRICT COURT

OF NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
| | **PLAINTIFF'S OFFER OF PROOF REGARDING UBER'S DEACTIVATION OF ITS DRIVER** |
| This Document Relates to: | Judge: Honorable Charles R. Breyer |
| *WHB 823 v. Uber Techs., Inc.*, N.D. Cal. No. 24-cv-4900 W.D.N.C. No. 25-cv-737 | **REDACTED** |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WHB 823, | No. 25-cv-737 |
|      Plaintiff, | Judge: Honorable Charles R. Breyer |
|    v. | |
| UBER TECHNOLOGIES, INC., et al., | |
|      Defendants. | |

On March 13, 2026, Plaintiff WHB filed her Motion in Limine to Exclude Argument or Evidence that Uber Deactivated the Subject Driver for Legal Reasons or on the Basis of Legal Advice. At the Pre-Trial Conference, the Court asked Plaintiff to explain why evidence of the driver's January 28, 2025 permanent deactivation is admissible at trial. Uber's defense rests entirely on the proposition that Plaintiff is not credible and that the assault never happened. Evidence that Uber's own safety investigators, acting under Uber's own written standards and with access to objective corroborating data, found Plaintiff's account credible enough to permanently remove Richardson from the platform is directly relevant to that question.

The jury is entitled to know that the party now asking it to disbelieve Plaintiff is the same party whose internal process found her report credible enough to take the most serious action available to it. That is the purpose of this evidence. It does not conclusively establish that the assault occurred, but it squarely supports Plaintiff's credibility. Thus, Uber's Third Supplemental Response to Special Interrogatory No. 12 ("ROG 12") is a party admission under Fed. R. Evid. 801(d)(2)(A) that admits precisely what the Court identified as potentially dispositive at the hearing.

**OFFER OF PROOF**

On March 28, 2025, Plaintiff WHB 823 served her Special Interrogatories on Uber asking in Interrogatory 12:

> For every status change in the Subject Driver's Account History, please identify the reasons for the status change including (1) identify the date and title of the status change, (2) identify the policy or program that governed the status change, if any (2) identify any events or deadlines that triggered the status change, (4) if the status was the result of any Information Uber learned about the Subject Driver, any report by anyone regarding the Subject Driver, or any action or inaction of the Subject Driver, describe such Information, actions, and/or events.

Uber originally responded on May 28, 2025 standing on its objections and refusing to answer the Interrogatory. Two months later on July 25, 2025, Uber amended its response:

> As shown in the Account Status Log produced at UBER- MDL3084-DFS00074479, the independent third-party driver referenced in this Interrogatory applied to accept Rides (flow type P2P) on the Uber platform on October 30, 2018. This individual's Account Status Log reflects one (1) additional Applied status on November 9, 2019,

which reflects this individual's re-consent to a background check renewal. This individual's status changed automatically from active to waitlisted one (1) time between November 9, 2018 and May 1, 2019. The automatic status changes between November 9, 2018 and May 1, 2019 related to automatic renewals of background checks and vehicle information. This individual was waitlisted on February 7, 2023 as a result of new information provided to the Responding Party. **This individual was deactivated on January 28, 2025, for safety reasons, as a result of new information provided to the Responding Party and subsequent investigations. Investigation and discovery are ongoing.**

**(emphasis added).**

Allison Cissna, Uber's trust and safety team leader, ███████████████

████████████████████████████████████████████████████████

██████████████████████████████████ *See* Ex. A*, Cissna Dep. at 169:20-170:14.

Jenny Luu, Uber's corporate witness on safety taxonomy, ███████████████

████████████████████████████████████████████████████████

███████████████ *See* Ex. B Luu Dep. at 180:9-15. And Valerie Shuping, Uber's employee responsible for safety standards for the United States, confirmed ███████████

████████████████████████████████████████████████████████

██████████████████████████████ *See* Ex. C, Shuping Dep. (Vol. 1) at 280:15-282:13.

### Uber Admits Deactivation Following a Credible Sexual Assault Report and an Uber Investigation.

Richardson drove for Uber from October 2018 until April 30, 2019. He stopped driving shortly after the March 26, 2019 incident. He has no other safety reports from any rider during his entire time on the platform. The sole Uber safety investigation of Richardson is about the incident Plaintiff alleges. When Uber received notice of this litigation in February 2023, it applied a temporary safety lock. On January 28, 2025, following what ROG 12 describes as "new information" and "subsequent investigations" over a *two-year period*, Uber permanently deactivated Richardson with a *permanent* safety lock.

Thus ROG 12 admits three things: (1) that the deactivation was "for safety reasons" rather than for litigation convenience; (2) that it resulted from "new information provided to the

Responding Party," meaning something specific and previously unknown came to Uber's attention; and (3) that "subsequent investigations" preceded the final determination. The Court asked at the hearing what it would take for this evidence to qualify as an admission. The answer requires working through what those three admissions mean under Uber's own documented standards. Under those standards, as Cissna, Luu, and Shuping confirmed,

Therefore, when Uber answered that it permanently deactivated Richardson for safety reasons following new information and subsequent investigations, it spoke in the precise language of its own internal standards. That language carries a specific meaning: its investigative process produced *credible* information sufficient to support its most serious consequence.

Uber's defense rests entirely on the proposition that Plaintiff's account is not credible and that the assault did not occur. But Uber's own safety team, acting independently and with access to objective corroborating data including GPS records and trip history, found Plaintiff's report credible enough to permanently remove Richardson from the platform under standards that required sufficient information to support that outcome. Uber cannot tell the jury that Plaintiff fabricated her account while concealing from that same jury that Uber's own investigators found her account credible enough to take the most serious action available to them. That is precisely the kind of institutional credibility assessment that the jury is entitled to weigh. Plaintiff will not argue that the deactivation conclusively establishes the assault occurred. Instead, Uber's own process, under its own standards, found enough to act. The jury can decide what to make of those facts.

Uber now attempts to neutralize the deactivation with Greg Brown's declaration, filed concurrently with its MIL opposition seven months after ROG 12. But the declaration is more notable for what it does not say than for what it does. The declaration carefully distinguishes between two events that Plaintiff likewise distinguishes: (1) the February 2023 temporary safety lock and (2) the January 2025 permanent deactivation.

On the February 2023 temporary safety lock, the declaration is clear: Uber applied it automatically, without any determination as to the veracity of Plaintiff's allegations, as a standard policy response when it learned Richardson's identity through litigation. ECF 5641-14, Brown

Decl. ¶¶ 3, 5. Plaintiff does not dispute this characterization of the 2023 waitlisting. That event is not the subject of this motion.

On the January 2025 permanent deactivation, however, the declaration conspicuously says nothing of the kind. Paragraph 4 states only that the permanent deactivation "does not mean that Uber determined or concluded that this incident actually occurred as alleged." This is a statement about what the deactivation did not mean, not what caused the deactivation. The declaration nowhere states that the **permanent** deactivation was the product of the same automatic policy that governed the 2023 safety lock. Indeed, paragraph 7 acknowledges that when Uber receives a report solely through litigation, it "**may** deviate from its standard investigative procedures" -- not that it always does, and not that it did so here. *Id.* ¶7 (emphasis added). Uber's own witnesses, including Cissna, Luu, and Shuping, have described a system in which permanent deactivation with a safety lock is the output of a resolved investigation, not a default triggered by the mere filing of a lawsuit.

The declaration thus leaves an unbridged gap. Nearly two years elapsed between the automatic 2023 waitlisting and the January 2025 permanent deactivation. ROG 12 explains what filled that gap: new information and subsequent investigations. The Brown declaration does not challenge that account, retract it, or offer any sworn alternative explanation for why the permanent deactivation occurred when it did and not at the time of the original automatic safety lock. Uber is asking the Court to import the automatic character of the 2023 waitlisting into the 2025 permanent deactivation by implication, without any sworn representation that the two events had the same cause -- and in the face of its own verified interrogatory response saying otherwise. That inference is precisely what the jury, not Uber's litigation counsel, is entitled to resolve.

. Ex. D.

Brown's declaration rests entirely on the proposition that Uber "may deviate" from standard

investigative procedures for litigation-sourced reports. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████. Uber thus asks this Court to adopt a litigation-formality explanation whose only visible support in the documentary record is the content Uber has withheld from Plaintiff. The unredacted portions of the ticket speak the language of a standard safety determination; the litigation-formality narrative exists, if at all, only behind Uber's privilege assertions.

Uber may point to testimony from Allison Cissna, its trust and safety team leader, ███ ████████████████████████████████████████████ ██████████ That testimony, read with care, supports Plaintiff's position rather than undermining it. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████. Those are not the same process, and Uber's attempt to collapse them into one cannot survive scrutiny. ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████. Uber cannot use Cissna's description of the former to explain away the latter.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ That is not the language of automatic processing. It is the language of a completed investigation that traversed the substantive protocol Uber's own written guidelines require.

The jury's sole task in this case is to determine whether the assault occurred. Uber's own internal safety process, conducted under its own written standards by its own investigators, concluded that Richardson should never drive for Uber again. That determination was reached, in Uber's own words, for safety reasons, following new information and subsequent investigations. Excluding it from the jury's consideration withholds from the factfinder highly probative evidence bearing on the only disputed question in the case: whether Plaintiff is telling the truth. Uber can argue to the jury that the deactivation reflected an automatic litigation policy rather than a safety determination. But the jury should be able to weigh Uber's trial-time explanation against the sworn account Uber provided in discovery.

## CONCLUSION

For all these reasons, the Court should admit Uber's answer to ROG 12 at trial and allow evidence of the driver's permanent deactivation from the Uber platform.

Dated: April 9, 2026

Respectfully submitted,

By*: /s/ Sarah R. London*
Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By*: /s/ Rachel B. Abrams*
Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By*: /s/ Roopal P. Luhana*
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

## FILER'S ATTESTATION

I am the ECF User whose ID and password are being used to file this document. In compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: April 9, 2026

By:    */s/ Andrew R. Kaufman*
Andrew R. Kaufman

PLAINTIFF'S OFFER OF PROOF
N.D. CAL. NO. 24-CV-4900; W.D.N.C. NO. 25-CV-737