# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
Case No. 3:23-md-03084-CRB (LJC)


IN RE: UBER TECHNOLOGIES, INC., )
PASSENGER SEXUAL ASSAULT          )
LITIGATION,                       )
                                  )
_____)
                                  )
This Document Relates to:         )
WHB 823 v. Uber Technologies,     )
Inc., et al.                      )
                                  )
_____)




VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF:

DR. JENNY SMITH

Appearing Remotely from Raleigh, NC

(Taken by Defendants)

August 29, 2025

12:04 p.m. - 2:45 p.m.




---Reporter:  Tina Sarcia-Maxwell, RPR, CRR
Job No. CS7554850

Page 32

A.   So the generally it was -- I didn't see any -- she didn't mention any history of trauma to me.  Her general issues seemed to be moodiness, anxiety, stress, but none of the other diagnostic criteria that I just mentioned, she did not -- she did not bring up.

Q.   And specifically in terms of trauma, Ms. Mensing never discussed with you a trauma from a rideshare incident, did she?

MR. ROSEMOND:  Object to form.

THE WITNESS:  No.

BY MR. SAGALOWSKY:

Q.   Your answer was no, correct?

A.   No.

Q.   All right.  Why don't we go ahead and get into the medical record that I have for Ms. Mensing or specifically your treatment of her.

So, Mackenzie, can we put that up?  I guess this will be Exhibit 3.

(Exhibit No. 3, Medical Records, so marked)

BY MR. SAGALOWSKY:

Q.   And this should have a Bates range of BMENSING-NCCIW-MD-00001 through 198, I believe. All right, if we can turn to the second page of the PDF please.

Page 35

just as you sit here today, are you able to specifically recall your first meeting with Ms. Mensing?

A.   So I recall -- I don't recall all the details.  I do believe though that it was -- in her case it was a telehealth.  It was a video appointment, that first meeting.

Q.   Do you recall any of your personal impressions of Ms. Mensing from that initial meeting?

A.   Kind of from the way I said in the mental status exam, she was fidgety.  She was cooperative.  She was well spoken.  She seemed anxious which is where my focus was.  I think at the time because she was anxious but she was also fidgety, I wanted to think about looking at ADHD as well.

So I do remember that she had the anxiety talking about feeling like a lot of pressure on her chest and kind of telling me about the medications she had and what she didn't like and what she liked.

Q.   Did you have any impression as to whether Ms. Mensing's recall when it came to her medication history was fairly accurate?

MR. ROSEMOND:  Object to form.

THE WITNESS:  I felt like it was accurate.

BY MR. SAGALOWSKY:

Q.   Do you recall whether you asked Ms. Mensing to go through her personal medical history with you during that first session?

A.   So we did go through the psychiatric history, and also there was psychiatric history from the mental health assessment as well from a social worker.  But I mean, sort of briefly we talked about the ADHD as a child, not getting the treatment, her substance abuse as a child, basically the social history that she had a child who was 6 years old, she wasn't married, she had her GED, her parents were adopted and her work history.

Q.   At any point whether during that first session or later sessions, did you specifically ask Ms. Mensing to identify any traumatic incidents from her past?

A.   She said that she did have PTSD even though I'm not sure because I didn't record it. So I know she had told the social worker that she had had -- there were four separate rapes, but we

Page 37

never discussed those incidences, and they did not seem important to her.

Q.   In terms of -- in terms of recording your written notes from a session.

MR. ROSEMOND:  Move to strike as nonresponsive.  Go ahead.

BY MR. SAGALOWSKY:

Q.   I'll start that question over.  In terms of your general practice for making written notes of your sessions, Dr. Smith, is it your practice to record in the notes any significant traumatic incident that a patient does identify during the session?

A.   Yes.

MR. ROSEMOND:  Object to form.

MR. SAGALOWSKY:  We've been going right about an hour.  Can we take a short break and then come back and work through this record, and then I'm not sure we'll have a lot to do after we work through this record.

MR. ROSEMOND:  Okay.

THE VIDEOGRAPHER:  We are going off record.  The time is 1:01 p.m.

(Recess)

THE VIDEOGRAPHER:  We are going back on

Page 40

just to make sure there are no physical conditions that are -- that she needs treatment for.  It is also a -- with the -- the history and physical, the first history and physical done in case the patient has come in on medications from jail, then those medications are written for 28 days until she can be seen.  Let's say, if there are psychiatric meds by a psychiatrist or whatever other medications the person is on, they will be followed up by a primary care physician afterwards.

Q.   Okay.  If we go to the second page of report that's the Bates ending in 048, about a quarter of the way down the page do you see there is a header for infectious disease risk factors?

A.   Uh-huh.

Q.   Just below that it says:

"IV drug use?  Yes.

IV drug use needles?  Shared."

Do you see that?

A.   Yes.

Q.   Did Ms. Mensing discuss her history of IV drug use with you during any of your sessions?

A.   No, not that I recall.

Q.   I'm sorry.  Go on.

Page 42

any, mental health conditions Ms. Mensing suffered at the time of that suicide attempt?

A.  Well, she was depressed at age 15.  You begin wondering about other conditions, so because it was so early, I was beginning to think about mood disorders and ADHD as well since she told me she was 15 in that first attempt and first hospitalization.

MR. ROSEMOND:  Move to strike as nonresponsive.

BY MR. SAGALOWSKY:

Q.  You referred to that as a first hospitalization, correct?

MR. ROSEMOND:  Object to form.

THE WITNESS:  Yes.

BY MR. SAGALOWSKY:

Q.  If we could skip ahead -- just a moment please.  I'm sorry.  Stay in the same section we were just discussing but a few lines up there's a line that reads HX.  Is that history?

A.  Yes.

Q.  History of mental health treatment, inpatient one to three times.  Do you see that?

A.  Yes.

Q.  Okay.  Do you have an understanding as to

Page 43

what that refers to?

A.    Inpatient psychiatric treatment.

Q.    So does this indicate that prior to your treatment of Ms. Mensing she received inpatient treatment between one and three times for psychiatric issues?

A.    Yes.

Q.    Okay.  And do you know specifically how old she was for any of that treatment?

A.    So, like I said, she told me she was 15. That would have been the first one.  And then she told me that in 2018 she was admitted but that was associated with alcohol use.

Q.    Okay.  Why don't we move on to the Bates number that ends in 166.  That's page 167 in the PDF.  Okay.  At the very top of the page there is a header for North Carolina Department of Public Safety, mental health services, referral, correct?

A.    Correct.

Q.    And at the bottom it is signed by Ms. Mensing, and it is dated January 5, 2023, correct?

A.    Correct.

Q.    And is this one of the documents that you would have received before your first telehealth

Page 73

A.    No.   I mean, there is also supportive psychotherapy.   That was the role of psychology.

Q.    So when you cared for Brianna, did you provide her -- specifically provide her psychotherapy?

A.    No.

Q.    And did you provide her counseling?

A.    Yes.

Q.    For what?

A.    So I was concerned about her getting better, and so, you know, I saw her actually fairly frequently because it -- because of her problems with anxiety, irritability, difficulties, and it was -- I wanted to see her, you know, more frequently that I see some patients that are seen every three months.

Q.    So having said that, what was the nature -- you said you provided her counseling. What did you understand the term "counseling" to mean?

A.    I mean it is supportive, just being supportive counseling, supportive therapy, but again, that's why she has both her therapy appointments and her doctor's appointments so we're working in tandem.

Page 75

psychiatric issues?

A.   She would, yes, and that was part of the initial assessment.  So, you know, my expertise is in diagnostics and treatment, and it takes a while to do that sometimes, and I felt like I developed a relationship with her over time as her treating provider to have a clear picture about what was driving her symptoms.

Q.   Okay.  Now, at some point you had learned that Brianna had reported -- of sexual trauma, right?

A.   So, yes, which is not uncommon in our population of women.

Q.   But she never specifically reported it to you personally; is that right?

A.   She never did.  She would say that she had prior histories of PTSD.  She had PTSD, bipolar disorder, and ADHD.

Q.   Okay.  In your -- would it be fair to say the focus of your treatment as a medical doctor was to treat her symptoms as opposed to the underlying cause of the symptoms?

MR. SAGALOWSKY:  Object to form.

THE WITNESS:  Yes.

BY MR. ROSEMOND:

REPORTER'S CERTIFICATE

I, Tina Sarcia-Maxwell, a Notary Public in and for the State of North Carolina, do hereby certify that there came before me on August 29, 2025 the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of their knowledge concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination reduced to typewriting under my direction, and the transcript is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to nor employed by any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereto set my hand, this 2nd day of September, 2025.

Tina Sarcia-Maxwell, Notary Public