[Submitting Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | CASE NO. 3:23-MD-03084-CRB<br><br>JOINT SUBMISSION REGARDING THE PARTIES' POSITION STATEMENTS ON AMENDMENT OF PRETRIAL ORDER NO. 10 |
| This Document Relates To:<br><br>ALL ACTIONS | JUDGE: Hon. Charles R. Breyer<br>CTRM: 6, 17TH FLOOR |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**PLAINTIFFS' POSITION STATEMENT**

Since the Court entered PTO 10 on March 19, 2024, both Plaintiffs and the Court, through bellwether discovery and the *Dean* trial, have learned much about the kinds of data Uber keeps and the importance of that data in understanding the universe of cases pending before the Court. Some of this information, which is not already included in the DFS disclosures, is essential for core MDL-wide functions such as strategic planning, global resolution, bellwether selection, and identification of viable liability theories across thousands of cases.

Experience from the *Dean* trial and Wave 1 Bellwether discovery has also revealed Uber's practice of delaying and fragmenting production of responsive materials, which impedes identification of deficiencies and pursuit of appropriate remedies. For example, as the Court saw in the *Dean* case, despite Plaintiffs' ongoing efforts to obtain discovery about S-RAD data on alternative rider/driver pairings, Uber did not clearly admit destruction of this evidence until a trial deposition five days before the *Dean* trial.

The lessons learned warrant amendment of the DFS to ensure that the same deficiencies will not impede case assessments and orderly administration of future trials.

Plaintiffs seek to amend the DFS to add the following:[1]

- Information and production related to S-RAD scores and alternative supply plans for each Subject Trip.
- Information as to whether an Uber-affiliated rental car was being used by the Subject Driver.
- Mean/median rate of 1-star driver ratings for the City at the time of incident.
- Identification of every Uber account the Subject Driver has held, whether U.S. based or not, and corresponding data for each of those accounts.
- Production of Safety Lens and Workbench, which provide dashboard-level overviews of Uber's safety-related knowledge about a driver.
- Trip Logs, including feedback tags and negative feedback regarding drivers.
- RideCheck logs.

Uber argues that the proposed amendments exceed the purpose of facts sheets which is to promote the bellwether process and advance the broader litigation. But this is precisely what Plaintiffs'

---

[1] Plaintiffs therefore propose amendment of DFS as set forth in **Exhibit A**.

amendments seek to achieve. Indeed, Uber's drumbeat at the *Dean* trial was "This Rider. This Driver. This Ride." The requested DFS amendments go directly to each of these points and will be integral to Plaintiffs' ability to evaluate legal theories applicable to each case, the MDL at large, and any future resolution efforts. *See* ECF 4287, Amended Pretrial Order No. 10 (information requested in the DFS is appropriate where it ensures production of key documents early in each case, thereby facilitating more effective coordination; for example, potential division of cases into sub-categories).

It is also appropriate to implement a streamlined certification and deficiency process (as set forth below), where the parties will be assured that DFS productions are timely, verified, and complete. This aligns with a similar procedure that was put in place for PFSs (ECF 4274) and will ensure that both sides are held to compliance with Court orders. While Uber argues that the existing DFS deficiency processes are sufficient, the "rolling" (late) production of DFS documents during Wave 1 Bellwether discovery sowed chaos and highlighted the need for a DFS deficiency process with similar strength to that which has been established for Plaintiffs' PFSs. To the extent Uber is prepared to truly produce DFS documents timely going forward, and has a team dedicated to this process as outlined in the Brown declaration, the proposed enforcement mechanisms should be a non-issue. The resistance to a process that Uber apparently does not even believe will be needed does not make sense. A streamlined deficiency process ensures that Uber is actually producing everything due under the DFS, when it is due, and not on a rolling basis.

## I.    THE COURT SHOULD AMEND THE DFS

As an initial matter, Uber refers to Plaintiffs' stipulation to language in Amended PTO 10 as dispositive. It is not. "[I]t is well established that federal courts ... possess certain inherent powers, 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases[.]" *In re Bard IVC Filters Products Liab. Litig.,* 603 F. Supp. 3d 822, 831 (D. Ariz. 2022), *aff'd sub nom. In re Bard IVC Filters Prod. Liab. Litig.,* 81 F.4th 897 (9th Cir. 2023) (internal quotation and citations omitted); Fed. Jud. Ctr., *Manual for Complex Litigation, Fourth* § 10.1 (2004) ( "the court's express and inherent powers enable the judge to exercise extensive supervision and control of the litigation"). This is true even

where an order is entered on consent. *See, e.g., Kelly v. Wengler,* 822 F.3d 1085, 1098 (addressing inherent authority to modify a settlement agreement); *see also See United States v. Swift & Co.,* 286 U.S. 106, 114–15 (1932) (authority to modify a consent decree). The authority to do so should hold particularly true for fact sheets, as they are important case-management tools. Where changed circumstances demonstrate that the current DFS is inefficient (through Uber's concealment of information at the time it was originally negotiated), its contents and deadlines should be altered to better serve the efficiencies and management of this multi-district ligation. *See generally Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607 (9th Cir.1992) (noting the district court's broad discretion in supervising the pre-trial phase of litigation); Fed. R. Civ. P. 16, Advisory Committee Notes, 2025 Amendment (noting with respect to Rule 16.1(c), "[b]ecause active judicial management of MDL proceedings must be flexible, the court should be opens to modifying its initial management order in light of developments in the MDL proceedings").

The parties always intended the DFS to disclose relevant safety information in Uber's possession sufficient to enable Plaintiffs to identify which legal theories would apply to the various cases, manage MDL-wide strategy, categorize cases for bellwether evaluation, and discuss potential resolution of cases. Through Wave I Bellwether discovery, however, it became apparent that Uber was selectively interpreting the DFS to limit the amount of information disclosed, then using this selective disclosure to create proof problems at trial. Plaintiffs seek to amend the DFS to include the following information to ensure that all necessary and readily available information is disclosed, such that it will facilitate the more effective coordination of these proceedings.

### A. Information related to S-RAD scores and alternative supply plans for each Subject Trip.

One theory of liability is that Uber assigned unreasonably dangerous driver pairings for a Subject Trip. In its initial disclosures, Uber failed to disclose a data source essential to this question – its S-RAD safety score data. In the rush of Wave 1 Bellwether discovery, Plaintiffs learned that Uber had score sheets reflecting the risk of sexual assault that it had predicted for many of Subject Trips before selecting which driver to pair. The DFS should include disclosure of: (1) whether Uber used S-RAD to predict the risk of sexual assault for the Subject Trip, (2) if so, what score Uber assigned

(including the score sheet showing the inputs for that calculation), and (3) whether Uber attempted to avoid high-risk pairings for the Subject Trip, or intentionally did not do so because the trip was in a "holdout group" for experimental purposes.

In addition, to assess the dangerous pairing theory, it is necessary to know what other driver pairings (which Uber calls "supply plans") were available. During the *Dean* trial deposition of Sunny Wong (taken five days before that trial), Uber confirmed that, after it knew of Ms. Dean's rape allegation, it destroyed supply plans related to the Subject Trip. The absence of this data severely prejudiced Plaintiffs.

Which claims Plaintiffs can pursue in a given case hinges on whether Uber used S-RAD for the Subject Trip, the S-RAD Score Uber assigned, the availability (or lack) of alternative safe rides, and whether the trip was in a holdout group experiment. The parties are on an uneven playing field regarding global strategy, bellwether selection, and resolution if Uber has this data, but Plaintiffs do not. It has already been demonstrated that this information exists and is available to Uber. Thus, production should not be overly burdensome. Further, the *Dean* case shows that early collection of this information is necessary to ensure that evidence is not destroyed or otherwise spoliated prior to more in-depth case-specific discovery. If evidence has been destroyed, DFS disclosures could facilitate determination of appropriate sanctions.

**B.     Information as to whether an Uber-affiliated rental car was being used by the Subject Driver and identification of vehicles used.**

Immediately prior to the *Dean* trial, Uber revealed that (contrary to prior sworn representations) the *Dean* driver had been using an Uber-contracted rental car. The rental contract, produced *during* trial, showed that, under the terms of the rental contract, Uber maintained broad control over the vehicle, and could have equipped the vehicle with cameras.

In light of these developments, Plaintiffs seek to add a "yes" or "no" question to the DFS to determine whether the rides at issue took place in Uber-affiliated rental cars. This information will allow the parties to bucket cases where Uber's defense regarding its inability to require in-vehicle camera use is undermined by contractual terms that grant Uber control over the vehicle environment.

Rental car cases are therefore categorically different, and a "yes" or "no" answer will facilitate sorting of cases. At this stage, Plaintiffs are not seeking more specific information about the rental agreements at issue. This more fulsome production can be reserved for bellwether discovery.

In addition, in some cases, the Subject Driver used more than one registered vehicle, some of which had cameras installed and others of which did not. The identification of what vehicles were used by the Subject Driver is readily available to Uber through its driver trip logs (a driver trip log was produced in one of the Wave 1 Bellwether cases and contained a column, not produced in the other cases, showing which vehicle was used for each trip). It is impossible for Plaintiffs to understand whether cameras were present, and to properly bucket cases according to liability theories, without having the complete version of the Trip Log that includes vehicle identification.

**C.      Mean/median rate of 1-star driver ratings for the relevant City and time period.**

Uber's internal documents, which Plaintiffs' security expert, Mr. Tremblay, testified about at the *Dean* trial, describe drivers' 1-star ratings as a top predictor of drivers' risk for future interpersonal incidents, including sexual assault. An Uber document affirms that drivers with 1-star ratings above the mean (for their City) have a statistically significant 3X higher risk of committing future sexual assault. One of Plaintiffs' theories of liability is that Uber should not pair drivers it knows to be high risk (by virtue of, e.g., short tenure, above-average 1-star ratings, prior incidents, male gender, not using a camera) with trips it knows to be high-risk (e.g., late night, near a bar, female gender, new rider). To identify which cases have viable negligence theories (again, for bellwether selection, strategy, and resolution), it is important for Plaintiffs to know which salient risk factors were present. The key risk factor, identified by Uber in its own studies, is a rate of 1-star ratings higher than the mean or median rate for other drivers in that geographic location. Uber has this information and produced it (at least, it produced the median rate) for the Wave 1 Bellwethers.

Plaintiffs are simply asking that Uber identify the mean/median rate of 1-star ratings in the City where the Subject Trip originated, for the time period when the Subject Trip occurred. This information is uniquely held by Uber and should be produced. Without it, Plaintiffs cannot reasonably evaluate whether the number of 1-star reviews a driver had at the time of the Subject Trip was above

average or well above average, such that the driver should have been flagged as high risk.

**D.      Identification of every Uber account the Subject Driver held, whether U.S. based or not, and corresponding data for each account.**

During the Wave 1 discovery process, multiple Account Status Logs were produced for each Subject Driver, with information that sometimes overlapped and sometimes diverged. This was confusing, to say the least. Eventually, Plaintiffs learned that Uber allows drivers to maintain more than one driver account at the same time. And when a driver is banned in one country, that does not necessarily mean he will be banned from driving for Uber in another country. In fact, a case-specific 30(b)(6) deposition had to be suspended due to errors in Uber's production for the B.L. case. When the dust settled, it turned out that *even though Uber knew B.L.'s driver had (and still has) a warrant pending for his arrest for rape, it had onboarded him in Colombia and he was actively driving for Uber there.*

The DFS has always required Uber to produce responsive information about the Subject Driver (UUIDs, background checks, account timelines, or other safety-related data) regardless of how many accounts the Subject Driver has with Uber. But it appears that Uber has been limiting its productions to only include one account for each driver – namely, the account used during the Subject Trip. Plaintiffs' proposed amendments to the DFS clarify that Uber must produce responsive information for the Subject Driver across all accounts. This information is relevant and necessary for identifying whether Uber had additional sources of safety data (e.g., additional background checks or reports of other safety-related and IPC event logs) regarding the Subject Driver. In addition, for many drivers who only recently moved to the U.S., this additional data is crucial to assessing Uber's advance or constructive knowledge regarding a driver's risk profile. It is also relevant to determining whether there are potential ratification theories available for a given case. For other drivers, who have no extraterritorial history with the company, a simple search should yield that information and it is not overly burdensome for Uber to simply disclaim any other non-U.S. accounts.

**E.      Production of Safety Lens and Workbench, which provide dashboard-level overviews of Uber's safety-related knowledge about a Subject Driver.**

The DFS process was meant to provide Plaintiffs with the relevant data Uber has for each

Subject Driver and Trip. Over the course of bellwether discovery, however, it became clear that Uber had withheld certain types of information and reports that it could have readily produced at the DFS stage. This includes tools, like Safety Lens and Workbench, that allow Uber investigators to see organized dashboards synthesizing driver history, driver safety incidents, other accounts that may be associated with the same driver, and other relevant safety information. Although in its ordinary course of business, Uber provides its employees with a single, organized place to review this information, Uber has only produced this information in piecemeal form, making it nearly impossible to connect the dots.

The existing DFS requires that, for cases where Uber opened a ticket to investigate the driver (e.g., a "JIRA ticket"), Uber must produce all data "linked" to that ticket. Once bellwether discovery was underway, Plaintiffs discovered this information (in violation of the Court order) was missing. Finally, on May 16, 2025, after meet and confer discussions, Uber belatedly produced the Safety Lens and Workbench snapshots for all the bellwether cases. Now, based on the Wave 1 trial workups,[2] it has become clear that these investigator-level dashboards provide the full picture needed to piece together how other information about driver history fits together (and to identify other potential DFS deficiencies, by comparing the piecemeal production to the birds-eye view provided by Workbench and Safety Lens).

Plaintiffs seek to amend the DFS to clarify that they are seeking production of the main landing pages of Safety Lens and Workbench—*regardless of whether a JIRA was created for the Subject Trip*. In addition, Uber must comply with the existing court order to produce linked information that appears in the JIRA tickets. Uber can produce these dashboard-style tools with a few screen captures. The production is not overly burdensome. Moreover, Uber claims that it has now produced this information for 40% of all cases, which proves feasibility. Any minimal burden is far outweighed by relevance.

---

[2] Safety Lens identifies other accounts that Uber has already flagged as belonging to the same driver. It also lists past safety incidents for the driver, and the disposition of each incident (whether it resulted in a strike, deactivation, or a finding that it was invalid or fraudulent). Workbench summarizes, among other things, total trips a driver has taken, current status of the driver's account (banned, for example) what other accounts are linked with the drivers' account, and whether the driver is "fleet active," which Plaintiffs now suspect may refer to rental car arrangements. (Uber has never given a clear answer explaining what "fleet active" means).

This information is equally essential in the 60% of cases for which it has been produced, as for the 40% of cases that have not been produced. Production will level the playing field between the parties and allow Plaintiffs to evaluate which legal theories apply to each claim.

**F.     Trip Log, including feedback tags and negative feedback regarding drivers.**

A Trip Log is a spreadsheet reflecting the driver's trip history (the date and time of each trip, whether each trip was completed or cancelled, and the rating and feedback received). The Court previously denied Plaintiffs' request to include a trip log in the DFS production, but that was at a time before Plaintiffs knew that the complete Trip Log would contain feedback tags, and other negative feedback Uber had received regarding drivers. Wave 1 Bellwether discovery revealed that Uber has data showing negative feedback and feedback tags, which it concealed from Plaintiffs (initially producing Trip Logs that only showed "compliments" and no negative feedback tags) until late in the Wave 1 discovery process. Uber's internal documents show Uber's longstanding knowledge that negative feedback and certain feedback tags are associated with increased risk of future safety incidents. These were prominently featured at the *Dean* trial.

Uber should be required to produce complete and accurate Trip Logs, in local time, with both positive and negative feedback received. This is clearly relevant to identifying whether Uber was on notice of problematic behavior, and whether Uber was negligent in each case.

**G.     RideCheck Log.**

Despite the Court's orders to disclose relevant data sources by early 2024, Uber failed to disclose a highly relevant data source: its log of route anomalies for each driver. These logs exist and were eventually produced in Wave 1 Bellwether discovery. What Plaintiffs now know is this: Uber tracks every trip in real time with GPS. An alert triggers if there is a significant route anomaly. Uber maintains, for every driver, a log of these alerts (the "RideCheck log"). The logged anomalies include significant route deviations, early drop-offs (also known as midway dropoffs), long stops, and destination lingering. Uber's 30(b)(6) witness, Greg Brown, admitted that Uber knows these anomalies can be a sign that sexual assault is occurring. Indeed, the rape incident involving Ms. Dean was, from Uber's perspective, a "midway dropoff" and the rape incident involving Wave 1 Bellwether Plaintiff

B.L. was, from Uber's perspective, a "long stop."

Uber contends that production is overly burdensome but concedes that the data pipelines already exist; indeed, they were used to facilitate the production of this same information in Wave 1 Bellwether cases. *See* Brown Decl. at ¶ 22. Production of these logs should not wait until bellwether trial workup. They reflect core evidence of knowledge and negligence, and are important to issue-spotting, liability categories, and case management.

## II.    PROPOSED DEFICIENCY PROCESS FOR THE DFS

With respect to process and procedure for identifying and addressing deficiencies, Plaintiffs propose the following: Uber will have 60 days to complete the amended DFS. Thereafter, Plaintiffs may provide notice of deficiencies and Uber will have 30 days to cure. If Uber fails to do so within that 30-day period, Plaintiffs may move for relief as appropriate, including for entry of default judgment on liability.

Wave 1 Bellwether discovery revealed that Uber had been engaging in rolling productions of some documents that should have been produced with the DFS. Uber must be required to timely comply with the DFS deadlines and not cherry-pick which discovery to produce and when. An enhanced and streamlined DFS deficiency process as proposed by Plaintiffs appropriately addresses this issue. This process also restores symmetry with the deficiency process that applies only to Plaintiffs currently. If Uber fails to timely and substantially comply with this Order (i.e. if a DFS is not submitted by the required deadline or a submitted DFS is materially deficient), Plaintiffs may serve on Uber's counsel a "Notice of Overdue Discovery" identifying the discovery that is overdue and stating that, unless Uber complies with this Order, the case may be subject to a finding of default judgment on liability. Such Notice of Overdue Discovery shall be served via MDL Centrality.

If Uber fails to submit a DFS or submits a DFS that fails to substantially comply with Amended PTO 10 within thirty (30) days after service of the "Notice of Overdue Discovery" Plaintiffs may move the Court for an Order to Grant Default Judgment on Liability. With respect to material deficiencies in a submitted DFS, the parties shall meet and confer during this 30-day period regarding the deficiencies. Uber shall have 14 days from the date of Plaintiffs' motion to file a response either

(a) certifying that Uber submitted the information required under the Court's Order; or (b) opposing Plaintiffs' motion for other reasons. Plaintiffs shall file a reply no later than 7 days following the deadline for certification or opposition to Plaintiffs' motion.

If Uber certifies that it has submitted the information required under this Order, the Motion to Grant Default Judgment on Liability will not be granted at that time (unless the Court finds that the certification is false or incorrect).

If the Court grants Plaintiffs' Motion to Grant Default Judgment on Liability under the previous paragraph, the Order will be converted to a Default Judgment on Liability upon Plaintiffs' motion—to be filed no earlier than 30 days after the Court's entry of the Order to Grant Default Judgment on Liability—unless (1) Uber submits the information required under this Order; or (2) moves to vacate the Order without prejudice within that same time period.

If Uber files a motion to vacate the Court's Order to Grant Default Judgment on Liability, Plaintiffs shall file a consolidated opposition to any motions arising out of the same Order 14 days after Uber's deadline for submitting such motions, 30 days after the Court granted the Motion to Grant Default Judgment on Liability. Each of Uber's reply, if any, shall be due 7 days thereafter. If the Court denies any of Uber's motions, a Default Judgment on Liability will be issued.

If Uber serves a completed DFS before the filing of Plaintiffs' Motion for Default Judgment on Liability, the parties shall submit a stipulated motion to vacate the Order.

Uber agrees that the process should be streamlined but seeks to impose an additional requirement on Plaintiffs that is not currently in place for either party: a 60-day requirement for Plaintiffs to begin this process. Such requirement is unnecessary and, given the piecemeal and complex nature of Uber's discovery (as well as the information disparities), unreasonable. A 60-day countdown serves no purpose other than to restrict the time in which Plaintiffs may carefully and thoroughly review DFS responses to ascertain deficiencies. Uber's proposed 60-day requirement should be seen for exactly what it is: a shield to adequate review and potential revelation of discovery deficiencies. Plaintiffs' counsel should be permitted adequate time with the DFS productions (which often span large groups of Plaintiffs at one time), to piece together that information with everything that has been

produced thus far, so that they can identify deficiencies and meaningfully engage in the process identified above. The use-it-or-lose it proposal by Uber is unnecessary and not reciprocal, as it continues to serve deficiency notices on Plaintiffs on a rolling basis whenever it pleases.

It is ironic that Uber labels Plaintiffs' remedy as "draconian." Plaintiffs seek nothing more than equal treatment. If a plaintiff can be penalized with the most drastic remedy (dismissal, ultimately with prejudice) for failing to produce an authorization or a medical record, then it necessarily follows that the same rules should apply across the board, where much more substantial documents are conceivably being withheld by Uber.

Uber's additional position that the deficiency process is meant to facilitate Bellwethers is equally ironic. If this were true, then only Bellwether plaintiffs should be producing PFSs. Instead, the fact sheet process on *both* sides is instrumental in categorizing the cases according to their fundamental strengths and weaknesses. Discovery is not a one-way street. Uber's position that a one-sided process is appropriate is simply indefensible.

## III.    UBER'S RETALIATORY REQUESTS FOR PFS AMENDMENTS SHOULD BE DENIED

Uber argues, in the alternative, that before considering any DFS amendment, the Court should first amend the PFS. Uber's requests, which are transparently retaliatory, are improper.[3] Plaintiffs' proposed amendments, driven by lessons learned during Wave 1 (including revelation of key, undisclosed data sources), seek information essential to global case assessment. Uber, on the other hand, seeks discovery it tacitly concedes is improper.[4] It asks the Court to authorize intrusive discovery (including expansive social media productions) that are not based on any new need for information,

---

[3] "[D]iscovery is not conducted on a 'tit-for-tat' basis." *Nat'l Acad. of Recording Arts & Sci., Inc.*, 256 F.R.D. 678, 680 (C.D. Cal. 2009). Indeed, Uber's counsel implicitly acknowledged in email correspondence that it is only requesting to amend the PFS because of Plaintiffs' request to amend the DFS, stating "Uber does not think any amendments to Amended PTO 10 are warranted. That being said, if the Court disagrees with Uber's position and determines that revisions to Amended PTO 10 may be made without the parties' agreement, Uber's position is that the focus should first be on amendments to the PFS requirements."

[4] Uber accurately describes the proper scope of PFS/DFS discovery, and argues (in essence) that if Plaintiff is allowed to violate this scope, Uber should be allowed to as well. Uber has the standard right, and its own proposed amendments are, as it suggests, improper. It is only wrong regarding the purpose, intent, and needfulness of Plaintiffs' proposed amendments.

nor any revelation of previously undisclosed data sources, but which are rather directed toward the adversarial work-up of particular cases for trial. Uber's amendments seek to make each and every Plaintiff produce a custom selection of private information from social media. And to impose needless procedural burdens on Plaintiffs, e.g., wet signatures. All of which have nothing to do with preliminary issue identification. The intent is clear: to chill sexual assault survivors from participating in the MDL.

Wet Signatures and Certifications. Uber demands Plaintiff wet signatures and certifications on *each and every* PFS in order to address the purported issue of non-participating plaintiffs. The request should be denied. Fact sheets are intended to promote efficiencies. Yet Uber seeks to wield them as tools of harassment, while broadly – and baselessly – accusing all counsel of misconduct.[5] The springboard for Uber's request is the Court's Order at ECF 4442, which recognized that, among a selection of cases, 79% of Plaintiffs had not read the PFS submitted on their behalf. However, *those were precisely a selection of cases in which each Plaintiff had not verified her PFS and was thus being considered for dismissal.* In other words, the existing process worked to identify and address a problematic situation. Likewise, WHB823 was subject to cross-examination regarding her verification of fact sheets, portions of which she did not recall reading, and were later amended. This was testimony properly considered and weighed by the jury. WHB823's trial testimony underscores the logical fallacy to Uber's requests. That typographical errors may exist, and that a Plaintiff may amend fact sheets, is in no way indicative of a "non-participating" plaintiff. Indeed, WHB823 participated in every facet of her case—including providing trial testimony and maintaining her case through a successful jury verdict. Uber's accusation of "materially false, attorney-authored statements" is widely improper and misplaced, given that Uber's own expert, Dr. Reminick, provided similar testimony, during the same trial, regarding errors in her report; specifically, an attachment that erroneously identified her materials considered. Dr. Reminick disavowed what was stated in that document and claimed that she did not know who wrote it. Uber seeks to minimize this error, but this merely highlights the hypocrisy

---

[5] Uber accuses attorneys MDL-wide of misconduct but its own calculations confirm that this is a case-specific issue in a very limited number of cases, *e.g.,* calculations based on a subset of cases that were subject to a specific court order, referencing two cases that were deposed out of all non-bellwether cases, and attaching a declaration that selectively cites to small number of cases.

of its position.

In short, Uber selects (from thousands of cases in which there has been no issue) a small handful of cases in which problematic PFS submissions were already appropriately surfaced and addressed, and asks the Court to impose inefficiencies on all counsel across all cases in consequence. Uber ignores the fact that there is already a multilayered procedure in place to ensure timely and verified PFS responses. This includes PTO 5 and stipulated PTO 31, which sets forth procedures for production of bona fide ride receipts; the existing PFS challenge process under PTO 10, and certifications on records. Contrary to Uber's innuendo, Plaintiffs' leadership takes compliance with the Court orders seriously, which is why they have always been open to negotiating amendments to existing processes, as needed, to address problems.

Uber's request for wet signatures on each and every PFS would add nothing of value to the existing processes other than to add unnecessary hurdles and inefficiencies.[6] The request should be denied.

<u>Social Media, Photos, and Communications</u>. Uber also requests a broad amendment to the PFS for production of "social media, communications, and photos relating to the incident (48 before and after the alleged incident)." Unlike Plaintiffs' requested DFS amendments—which are narrowly tailored to identification and production of information that will assist in the objective sorting and categorization of cases—Uber's request for social media posts is just trial workup on a mass scale. No photograph or social media deep dive will answer the questions: (1) Did the driver assault the Plaintiff? (2) Was Uber negligent in its handling of this driver or trip? (3) Was Uber's negligence a cause of the assault? People do not post on social media "I had such a great Uber ride yesterday." And the notion that a social media post about the incident would be dispositive (or even meaningful) in Uber's determination of credibility is, frankly, laughable. The Court just oversaw a bellwether trial in which Uber denied a rape occurred, and insisted it was consensual, even when the Plaintiff (half the driver's age) immediately reported to (1) a hotel clerk; (2) her friends; (3) her family; (4) Uber, and (5) the

---

[6] Uber's request is particularly vexatious given that it has failed to provide verifications to interrogatory responses, as mandated by Fed. R. Civ. P. 33(b)(5); yet now demands a wet signature from every Plaintiff for every PFS.

police.[7]

And what Uber seeks is not just any discovery, but a category of discovery that has required (and would require) individual rulings from Magistrate Judge Cisneros. *See*, *e.g.*, ECF 3209, Order Resolving Case-Specific Discovery Disputes Regarding Social Media (rulings regarding scope of social media production varying across each case depending on the specific facts and claims at issue). Uber's mass request for social media is therefore not an appropriate PFS inquiry. To require sweeping compliance with an inherently case-specific discovery is, much like Uber's other demands herein, a tactic to delay and deter participation, rather than promote efficiency. Notably, the Court has already denied Uber's prior request for this information. *See Compare* ECF 236-2 (proposed PFS request for production No. 48 seeking production of social media posts) *with* ECF 348-1 (approved PFS removing Uber's proposed request for production No. 48). There is no basis to change that ruling now.

Whereas Plaintiffs' request for DFS amendments are cabined to easily identifiable and accessible information, for which individualized inquiry on scope and scale is not required,[8] Uber's counter demands on the PFS seek discovery that will yield countless disputes (literally thousands) that would need to be litigated before Magistrate Judge Cisneros on manner of search, scope, and scale.

A 60-Day Deadline for DFS Deficiency Notices. As noted above, Uber's 60-day requirement is entirely unnecessary. Given the piecemeal and complex nature of Uber's discovery (as well as the information disparities), a 60-day countdown serves no purpose other than to restrict the time in which Plaintiffs may carefully and thoroughly review DFS responses to ascertain deficiencies. The use-it-or-lose it proposal is unnecessary and entirely one-sided.

---

[7] In footnote 23, Uber disingenuously argues that it "never denied that Ms. Dean was assaulted by an independent driver." Throughout the *Dean* trial, Uber repeatedly argued that that Ms. Dean was not credible, i.e., lying about the events on the night she was raped by the Uber driver.

[8] Uber complains about the number of amendments and that the proposed DFS will yield many documents. But this is not a numbers game, and the fact that the DFS may require production of more documents reflects only that Uber, with its technological capabilities and various databases, has retained and can easily produce more documents that do not vary from one Plaintiff to another. It also reflects that Uber controls all influx of information from all sides (rider, driver, trip, and platform), such that Uber holds practically all of the information about the rider, the driver, and the ride.

### IV.    CONCLUSION

Plaintiffs respectfully request that the Court amend the DFS as proposed in **Exhibit A**, order a procedure and timeline for DFS compliance as set forth above, and deny Uber's counter request for PFS amendments.

### DEFENDANTS' POSITION STATEMENT

After two years of discovery and two completed bellwether trials, Plaintiffs are seeking to upend PTO 10 and the overall MDL by: (1) dramatically expanding the Defendant Fact Sheet (DFS) with more than a dozen new questions (by itself an increase of approximately 25% over the existing DFS) and increasing the scope of many of the original questions beyond what is authorized by PTO 10; and (2) reinventing the DFS deficiencies process outlined in PTO 10. Plaintiffs have no need for the new information they are demanding, which pertains to case-specific issues that will not advance the resolution of this litigation. Nor have they articulated any legitimate reason for throwing out a process used by the parties for more than two years to resolve any issues pertaining to the DFS. Instead, Plaintiffs' requests are a transparent attempt to circumvent PTO 10, unfairly burden Uber and elide the significant and recurring discovery problems by Plaintiffs.

*First*, Plaintiffs' requests to alter the content of the DFS are expressly barred by PTO 10, as well as the parties' prior agreements and stipulations.[9] Plaintiffs stipulated in October 2025 that the *only* way either PTO 10 or the fact sheets could be amended was by stipulation, submitting an agreed order stating that the Court "***will not revise either this Order [PTO 10] or the fact sheets unless the parties agree on a given change***." *Id.* In order to provide the parties predictability and streamline the litigation,  PTO 10 definitively "resolve[d] the parties' numerous disputes over the form and content

---

[9] Plaintiffs misstate Uber's argument above. Of course the Court is "allowed" to amend its PTO. Uber does not contest that. However, the parties should also abide by the terms of the Court's PTOs, and this PTO states that modifications require agreement of the Parties followed by approval of the Court.

of the PFS and DFS" and precludes any changes absent agreement of the parties. Because Uber strongly opposes Plaintiffs' requests, Plaintiffs' requests are improper.

*Second*, Plaintiffs' proposed expansion of the content of the DFS misunderstands the purpose of defense fact sheets in multidistrict litigation, which is to promote the bellwether process and advance the broader litigation. Moreover, Plaintiffs' requests are grossly disproportionate under Rule 26 because they encompass broad new categories of information regarding Trip Logs, S-RAD data, driver 1-star ratings, and many other topics that are of marginal relevance to the global litigation and cannot be easily searched for, assembled, and produced without an enormous expenditure of Uber's time and resources.

*Third*, Plaintiffs' request to rewrite the process for adjudicating any "deficiencies" in the DFS also fails. Like Plaintiffs' proposed content-based changes, their proposal for creating a new resolution process that Uber has not agreed to is barred by PTO 10. Moreover, Plaintiffs' resort to misstatements, innuendo, and misdirection to justify their proposal confirms there is no substantive basis for changing a process that has worked efficiently for the last two years. Plaintiffs' claim to the contrary is simply an attempt to distract the Court from the rampant *PFS* compliance issues that have generated significant motion practice and undermined the MDL.

*Fourth*, if the Court chooses to reopen the scope of party fact sheets, the Court should adopt modifications to the PFS before entertaining any changes to the DFS. It is Plaintiffs who bear the burden of proof, yet overwhelming numbers of them have failed to produce basic information required by PFS. Plaintiffs PFS are critical for resolution and bellwether selection, but they are unreliable because Plaintiffs' counsel are permitted to submit them with an electronic signature (not wet ink) and without Plaintiffs' review. Moreover, many Plaintiffs have been drawn to this litigation by click-bait mass advertising and lead generators. And an alarming proportion of these advertising-and-lead-generated Plaintiffs have, predictably, lost contact with their counsel and now failed to meet basic

discovery requirements, to the point that Plaintiffs' counsel have repeatedly submitted purportedly client-verified discovery without client review. The lack of client review significantly diminishes the reliability of the PFS as a tool for resolution, bellwether selection, and global strategy. To safeguard the usefulness of the PFS and the integrity of these proceedings, and to reduce costly and time-consuming motion practice, the Court should, first, require wet signatures from Plaintiffs for PFS and Ride Information Forms. Second, the Court should also set a deadline for Plaintiffs to raise DFS deficiencies, which is necessary when some notices have come in over a year-and-a-half after service of a given DFS. Third, to facilitate resolution and bellwether selection, the Court should adopt a modest change to the PFS requiring Plaintiffs to produce the underlying documents for any social media, communications and photos relating to the alleged incident giving rise to their lawsuit, targeted to the forty-eight hour period before and after the incident.

## I.     By Its Terms, PTO 10 Bars Changes Absent Agreement

Plaintiffs' request to massively overhaul DFS-related content and processes over Uber's objection is expressly barred by PTO 10. That order "resolve[d] the parties' numerous disputes over the form and content of the PFS and DFS," PTO 10 at 1, and issued the final approved versions of those forms, *id.*, Exs. 1 and 2. In the Order's "Stipulated Revisions" section, the Court made clear that it would not entertain further disputes regarding the contents of the fact sheets, specifying that if "the parties wish to stipulate to limited amendments of the fact sheets … they may do so by filing a stipulation on the docket." *Id.* at 11. Even if agreed upon, however, any such revisions would still be "subject to the Court's approval." *Id.* The Court was unequivocal that this was the only way the fact sheets could be amended, stating that it "will not revise either this Order or the fact sheets unless the parties agree on a given change."[10] *Id.*. Plaintiffs' and Defendants' counsel agreed to this stipulated

---

[10] The Court first entered that language in March 2024, and it went unamended during the parties' last round of stipulated amendments to PTO 10. *See* ECF 348; ECF 4287.

language in writing in October 2025, and the parties submitted the agreed language to the Court. Thus, the Court's approach outlined in PTO 10 is wholly consistent with the Fed. R. Civ. P. 16.1 Advisory Committee Notes cited by Plaintiffs above, because the Court expressly provided  flexibility to amend the order, through a carefully and deliberately calibrated process that  provides predictability and stability to the parties. Indeed, the parties used this process over a period of months and eventually filed stipulated amendments in November 2025, which the Court granted. *See* ECF 4286; ECF 4287. The amendments now at issue are different. Uber does not agree to the extensive DFS additions and expansions, or the  retaliatory new processes, that Plaintiffs propose, and in fact strongly objects to them. That fact alone is dispositive and forecloses Plaintiffs' proposed amendments.

**II.    Plaintiffs' Proposed Expansion of the DFS Content is Contrary to the Purpose of a DFS, Disproportional to the Needs of the Case, and Unduly Burdensome to Uber.**

Even if Plaintiffs' proposed DFS expansion were not barred by PTO 10, the Court should reject their proposal because it lacks any substantive merit. As explained below, Plaintiffs' requests—which encompass broad new categories of information that are of marginal relevance at this stage of the litigation—(1) misapprehend the purpose of defense fact sheets in mass tort litigation; and (2) violate Rule 26's express proportionality requirement.

**A.    Plaintiffs' Proposals Exceed The Purpose of Fact-Sheet Discovery.**

*First*, Plaintiffs' proposed amendments to the DFS far exceed the relatively narrow purpose fact sheets are intended to serve in an MDL proceeding. Centralization is designed to "streamline ***overlapping*** discovery[.]" *In re Uber Techs., Inc.*, 699 F. Supp. 3d 1396, 1399 (J.P.M.L. 2023) (emphasis added). Accordingly, fact sheets are not meant to mimic the usual discovery process by providing the parties with all the information they need in order to try the case. Rather, as other MDL courts have recognized, "the purpose of the fact sheets is to provide counsel for both sides with the basic information necessary to move th[e] consolidated proceeding through the process and toward a

resolution." *In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig.*, No. 219MD02921BRMESK, 2022 WL 3211421, at *4 (D.N.J. Aug. 9, 2022) (quoting *In re Intercontinental Terminals. Co. LLC Deer Park Fire Litig.*, Civ. A. No. 19-1460, 2022 WL 1493795, 2022 U.S. Dist. LEXIS 87156, at *24 (S.D. Tex. Apr. 29, 2022)). The Advisory Committee notes to the recently adopted Rule 16.1 similarly recognize this narrow purpose of fact sheets to serve as "a management method for planning and organizing the proceedings." Fed. R. Civ. P. 16.1 advisory committee notes. Because only a handful of cases are likely to go to trial, enormous resources would be wasted (and the potential for global resolution would be undermined) if the parties were required to provide all potentially relevant (*i.e.*, case-specific) information in their fact sheets.

The Court's reasoning in adjudicating PTO 10 two years ago reflects the limited purpose of fact sheets. Specifically, the Court recognized that "much" of the information sought by the competing proposals "may ultimately be discoverable, but the appropriate question—for the PFS and DFS alike— is whether including a given question in a fact sheet will efficiently advance these coordinated proceedings, or whether that information might be better sought later, when individual cases are being worked up for trial." PTO 10 at 2. Moreover, the Court noted that it "regarded requests going to common issues, or issues that might otherwise help the parties and the Court to manage the litigation at this relatively early stage, as more appropriate for inclusion in the fact sheets." *Id*. For this very reason, the Court **denied** several of Plaintiffs' requests on the basis that their "relevance to a given case will likely depend on the specific counts or the alleged incident," or "are simply too broad for inclusion in the fact sheets, given their potential utility." *Id.* at 2.[11]

---

[11] Even if the parties had reached some sort of agreement, the Court indicated it would only entertain "limited amendments" to the fact sheets. PTO 10 at 11. Plaintiffs' proposed amendments, in contrast, are extensive, numbering more than a dozen new questions covering broad new categories of information and further expansions to existing questions, as well as a rewrite of the Court's DFS deficiency process.

The same is true with respect to the voluminous new information sought by Plaintiffs. Although some of this information may ultimately be discoverable in an individual case, it is not necessary to inform the parties' selection of bellwether cases and facilitate potential resolution of the broader litigation. For example, the detailed information sought pertaining to the "median/mean 1-star ratings" in the geographic area and time of the subject rides does not inform bellwether selection, does not go to "common issues," and its relevance (if any) will depend on the specifics of a particular case. None of this information is necessary to evaluate the strengths and weaknesses of the broader claims pool, which is presumably why Plaintiffs have never previously requested this information in the two years during which Uber has produced thousands of DFS.[12] Instead, expanding the DFS in the manner pushed by Plaintiffs now over Uber's objection will merely protract the proceedings, bog Uber down in burdensome discovery, and frustrate global settlement efforts. In short, Plaintiffs' requests fundamentally misunderstand the purpose of MDL fact sheets and the very objective of multidistrict litigation.

## B.    Plaintiffs' Proposals Are Not Proportional.

**Second**, Plaintiffs' request is also improper under general discovery principles. "Information, even if relevant, must be 'proportional to the needs of the case' to fall within the scope of permissible discovery." *See Watson v. Nat'l Gypsum Co.*, No. 24-cv-02142-JST (PHK), 2025 U.S. Dist. LEXIS 232914, *3 (N.D. Cal. Nov. 26, 2025) ("The 2015 amendments to Rule 26(b)(1) emphasize the need to impose reasonable limits on discovery through increased reliance on the commonsense concept of

---

[12] Permitting such a drastic expansion after the original form has been in place for more than two years would produce inequity between plaintiffs who are proceeding under the current DFS and those that would receive the benefit of the expanded DFS. *See In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1230 (9th Cir. 2006) (MDL procedure meant to "assure uniform and expeditious treatment in the pretrial procedures in multidistrict litigation." (citations and quotation omitted)).

proportionality[.]") (citing Fed. R. Civ. P. 26(b)(1)). As explained in the Declaration of Jamie Brown, providing the specific information now requested by Plaintiffs in the DFS for thousands of cases, shortly after cases are filed would create undue burdens for Uber that are grossly disproportional to any marginal benefit that would be obtained at this advanced stage. The DFS already includes 53 requests or subparts, which require 42 narrative responses and 11 document productions. J. Brown Dec. ¶ 10. When Defendants produce a DFS, they provide extensive information regarding a Plaintiff, Plaintiff's subject trip, the independent driver (including information regarding reports of other alleged incidents by the driver), and Plaintiff's alleged incident. *Id.* This information is more than sufficient for the initial case assessment that a fact sheet is intended to facilitate. Indeed, Uber's current document production in connection with DFS is already at least 20-fold higher than the average fact sheet hosted by MDL Centrality, the hosting platform that the Court ordered the parties to use in PTO 10. J. Brown Dec. ¶ 9. Plaintiffs do not provide any support that their requests are proportional—and indeed do not even reference Rule 26—beyond cursory assertions (*e.g.* "should not be overly burdensome") despite declaration evidence to the contrary, or claims that these new requests are "feasible" solely because Uber produced similar documents in one or more bellwether cases. However, making the same production for multiple Plaintiffs at scale would entail far greater efforts. J. Brown Dec. ¶¶ 13-32.

Plaintiffs' proposal would radically expand the already-extensive DFS in several key respects. For starters, Plaintiffs are demanding 13 new requests, seeking detailed narrative responses and document productions regarding S-RAD, the independent driver's history on the Uber app, manual snapshots and logging from Uber's proprietary internal user interfaces, additional data regarding the Subject Trip, and even data related to other trips.[13] J. Brown Dec. ¶¶ 13-32.

---

[13] One log Plaintiffs seek related to other trips relates to Uber's "Ridecheck" safety feature. Plaintiffs' claim that RideCheck is a "data source" is not accurate. As Uber explained to Plaintiffs starting in January, 2024, and multiple times subsequently, Uber maintains over 850 petabytes (850,000 terabytes) of structured data. The RideCheck logs produced for Plaintiffs in bellwether discovery

As explained by Ms. Brown, these requests would substantially increase the burdens involved in preparing the DFS. To illustrate, Plaintiffs seek production of an S-RAD "Score Sheet"—which (unlike the S-RAD score alone) is not a document created or stored in the ordinary course of business and would require the collection and integration of available data across multiple, disparate sources. *Id.* ¶ 17. Plaintiffs also seek new document productions regarding the independent driver. And Plaintiffs also seek to expand the DFS to include information related to trips that do not even involve the independent driver, including the "median 1-star ratings for the City." Putting aside the vagueness of this request (Plaintiffs do not specify the time period on which the median would be based), Uber does not keep these data points in particular cities or states in the ordinary course of business. *Id.* ¶ 28. As a result, Uber would need to undertake significant efforts to develop custom programming and then process the data and create a new query to manufacture new documents and information that currently do not exist, then integrate the new query into Uber's DFS data pipeline, and ultimately conduct the search for each specific case in a process that would add approximately 30 additional minutes per DFS just to respond to this single new request, when the burden of creating the DFS is already so high that Uber has spent over 6,000 hours collecting the nearly 155,000 documents and preparing  narrative responses for the 2,852 DFS produced thus far related to trips Uber was able to confirm occurred. *Id.* ¶¶ 9, 12.

Notably, Plaintiffs are also seeking to re-litigate and *expand* a request for trip logs that was previously rejected by this Court in the DFS, based on documents produced in bellwether discovery.[14]

___

resulted from a custom query developed for this litigation to pull Plaintiffs' requested data from tables. J. Brown Dec. ¶ 23.

[14] Plaintiffs also claim above that, when the Court rejected their then-narrower request for Trip Logs in 2024 they did not know "that the complete Trip Log would contain feedback tags, and other negative feedback."  Yet the *definition* Plaintiffs proposed for the rejected trip logs in 2024 included "all tags and any feedback given by the rider via the App." ECF 234-4 at 3 (defining "Trip History Report"). So regardless of Plaintiffs' knowledge or purported lack thereof, these data points were part of the request already rejected by the Court.

*Id.* ¶ 20; ECF 4287 at 3. Plaintiffs also minimize, without basis, the burden on Uber of manually collecting snapshots of user interfaces *not* linked in Jira, without considering *why* those DFS may not have Jira tickets[15] or the burden of adding yet another new process to Uber's already expansive DFS workflows. *Id.* ¶ 24  Plaintiffs also do not seek to *remove* the requirement to produce these snapshots when linked despite seeking separate productions, so they presumably request duplicative productions of these interfaces, through wholly separate processes.

Plaintiffs' proposal would also drastically expand the scope of many existing requests, creating additional, substantial burdens. J. Brown Dec. ¶¶ 30-34. As explained by Ms. Brown, responding to the increased scope of Plaintiffs' requests related to information about accounts not associated with Plaintiffs' alleged trips for multiple questions, including customer support tickets, would require engaging in multiple, time-consuming manual processes to provide information that in some cases will be entirely irrelevant to the claims and defenses. *Id.*

Plaintiffs have no legitimate need for their requested information in preparing to try bellwether cases, let alone in every non-bellwether case. Indeed, two Plaintiffs have already tried their claims under the existing (and plainly adequate) DFS. The notion that the massive new discovery requested by Plaintiff at the fact sheet stage will break some new ground in resolving this litigation is simply not credible. As a result, the information Plaintiffs seek is of little utility in "efficiently advancing" these proceedings, while the costs to Uber in providing it will be enormous. *See In re Fluoroquinolone Prods. Liab. Litig.*, No. MDL 15-2642 (JRT), 2016 WL 4045414, at *1 (D. Minn. July 20, 2016) (rejecting more expansive DFS because of the "significant burden [it] would impose on Defendants, and the less-than-certain benefits of such searches"). Imposing such burdens on Uber would be

---

[15] For example, Uber can only investigate alleged incidents reported to it. In almost 60% of active cases, the Plaintiff *did not report the alleged incident to Uber* prior to filing a case. J. Brown Dec. ¶ 7.

especially unfair given the amount of meritless (in some cases, outright fraudulent) claims in this proceeding. Uber should not be required to undertake these herculean discovery efforts while Plaintiffs are permitted to continue filing baseless claims with impunity. In short, the discovery demanded by Plaintiffs would not be proportionate to the needs of the litigation and further warrants the denial of Plaintiffs' requests.

### III. Plaintiffs' Proposed Rewrite of the DFS Deficiency Process Outlined in PTO 10 is Improper and Solution-Searching for a Problem that Does Not Exist.

In addition to the new DFS document requests made over Uber's objection, Plaintiffs now seek a wholesale rewrite of the deficiency resolution process in PTO 10, without any conferral with Uber on the topic, and propose draconian remedies that stray far from the purpose of an MDL. As discussed above, Plaintiffs' proposed rewrite should be barred because Plaintiffs flout the plain language of PTO 10 requiring the parties' agreement as a threshold for any modification of PTO 10. Plaintiffs' proposed additions are also meritless. Plaintiffs draw a false equivalency between the manifold issues with Plaintiffs' submissions and failures to timely serve PFS in the first place that have clogged the Court with motion practice and the smoothly functioning DFS deficiency process outlined in PTO 10.

Plaintiffs baselessly insinuate above that there is an issue with Uber serving DFS "timely" or "when [they] are due." In fact, Uber has **zero** overdue DFS. J. Brown Decl. ¶ 10. By contrast, on April 23, 2026, **90** Plaintiffs have outstanding past-due PFS, and just a week ago there were **168** such Plaintiffs. Cotton Decl. ¶ 6. Plaintiffs also falsely claim above that Uber is "engaging in rolling productions of some documents that should have been produced with the DFS" and is not producing documents "that should have been produced with the DFS." Even if that were true—it is not—PTO 10 already offers Plaintiffs a process to address perceived gaps in Uber's DFS production, which was left unchanged in Amended PTO 10: "If a Party considers a PFS or DFS to be materially deficient, a deficiency notice outlining the purported deficiency(ies) shall be served on the deficient Party's

attorney of record via MDL Centrality. The deficient party will have thirty (30) days to correct the alleged deficiency(ies)." Amended PTO 10 at 8.

To date, Uber has served 2,852 DFS in which Uber was able to confirm the Plaintiff's alleged trip occurred. J. Brown Decl. ¶ 8. Yet to date Plaintiffs have alleged deficiencies in only 126 of those DFS productions. *Id.* To put that number in context, on April 22, 2026 *alone*, the Court dismissed **127** cases for failure to comply with PTO 10. ECF 5953, 5958. Only 9 firms of the 49 firms with cases in the MDL have served a notice purporting deficiencies at all, and more than 60% of those notices were served on Uber by one firm within the last four months, related to DFS served between May *2024* and July 2025. *Id.* Uber has investigated all of these purported deficiencies and timely responded to all of these notices, including by curing when Plaintiffs identified a genuine deficiency. *Id.* Further, Plaintiffs have generally not responded in any way to Uber's response to their claimed DFS deficiencies—not even to confirm receipt. *Id.* Plaintiffs also level the serious accusation that Uber produced Safety Lens information "in violation of the Court order." That is false.[16] Plaintiffs are recharacterizing Uber's cooperative efforts as a "violation" which underscores the weakness of their position.  Tellingly, *there has been no other motion practice related to Uber's DFS productions.*

While the DFS deficiency notice-and-resolution process is working without Court intervention and needs no changes, it was clear to the parties last year that ***Plaintiffs'*** processes to timely provide ***Uber*** accurate information about their clients' claims and Uber's defenses were not. Prior to Amended PTO 10, Uber filed 13 motions with the Court related to Plaintiffs' submissions. C. Cotton Decl. ¶ 8.

---

[16]Safety Lens snapshots linked in Jiras for bellwether plaintiffs were timely produced. J. Brown Decl. ¶ 24. Uber has and is continuing to produce Safety Lens snapshots when linked in Jiras in the DFS. *Id.* Uber's March 16 production that Plaintiffs reference above was not a DFS production, "belated" or otherwise, but rather included a bellwether production of Safety Lens snapshots *not* linked in DFS documents. Contrary to Plaintiffs' false assertion of violation, Uber's response to Judge Cisneros's Safety Lens DFS order demonstrates Uber's *willingness to accommodate Plaintiffs' reasonable requests*. Uber not only began producing Safety Lens snapshots in compliance with the order, but also, upon Plaintiffs' request, agreed in the spirit of cooperation and to conserve the resources of the Court and parties alike to additionally produce Workbench and other user interface landing page snapshots, when linked in DFS documents, as a standard part of Uber's DFS productions, and are doing so. *Id.* ¶ 10(i)

Once apprised of some of these persistent issues, the Court entered PTO 31. And the parties, following the actual process outlined in PTO 10, met and conferred, agreed on the exact language of proposed revisions to PTO 10, and submitted them to the Court, which approved them without edits as Amended PTO 10. Uber has been judicious in motion practice arising from Plaintiffs' delinquent or deficient submissions and this Court has granted *all* of Uber's 27 motions that have been decided to date. *Id*. 9. By contrast, here at the eleventh hour, Plaintiffs seek to ramrod through substantial changes to PTO 10 that are unnecessary, that the parties have not agreed to, and that could have enormous downstream consequences.

In efforts to address the non-issue of DFS deficiencies, Plaintiffs propose adding additional layers of motion practice, despite previously seeking a stay on non-bellwether discovery because of the purported burden of motion practice. Plaintiffs also sidestep entirely the issue of *when* a Plaintiff must notify Uber about alleged DFS deficiencies and thus begin the process—which is the real key to achieving Plaintiffs' stated goals of "timely" and "complete" DFS. Moreover, Plaintiffs misstate the process for dismissal related to delinquent or deficient Plaintiff submissions. First, Uber may only seek dismissal without prejudice in the first instance and then dismissal with prejudice following a conversion process outlined in Amended PTO 10. Plaintiffs often belatedly submit documents after the entry of a motion dismissing their respective cases, and Uber, in the spirit of cooperation and good faith, files a revised proposed Order removing those Plaintiffs who untimely cure. By contrast, Plaintiffs here seek the extraordinary remedy of "default judgment on liability" for uncured DFS deficiencies, which is not only extreme but wholly contrary to an MDL's purpose: to resolve common issues of fact and not liability in an individual Plaintiff's case. By comparison, Uber's remedy for PFS non-compliance is proportionate and reversible. Plaintiffs' proposed remedy is neither. Because the proposed process is inequitable, not needed, and not in line with the existing PFS deficiency process, the Court should reject Plaintiffs' unilateral attempt to rewrite the DFS deficiencies resolution process.

## IV.    If Any Changes Are Made To PTO 10, Changes To The PFS Should Be Prioritized

In the alternative, if the Court decides to reopen the scope of the parties' fact sheets, it should adopt changes to the Plaintiff Fact Sheets first. After all, Plaintiffs bear the burden of proof, and the sequencing of party fact sheets should reflect that reality. Any such PFS amendments should address (1) the problem of Plaintiffs not reviewing their PFS for accuracy because no wet signature is required; and (2) the problem of Plaintiffs who were added to this litigation through mass advertising or lead generators and who have since failed to participate in the litigation or communicate with their attorneys.

Plaintiffs wrongly suggest that, while the discovery they seek is justified, "Uber, on the other hand, seeks discovery it tacitly concedes is improper." In fact, as Plaintiffs agree, "Uber accurately describes the proper scope of PFS/DFS discovery." And, as Plaintiffs further point out above, the proper scope of PFS/DFS scope expressly includes "[1] manag[ing] MDL-wide strategy, [2] categorizing cases for bellwether evaluation, and [3] discuss[ing] potential resolution of cases." While Plaintiffs' DFS proposals meet none of those three objectives, Defendants' proposals—including the wet signature requirement for PFSs and production of Plaintiffs' social media for a narrowly targeted 96-hour window—meet all three of the purposes that Plaintiffs concede are appropriate for PFS.

Plaintiffs' counsel also incorrectly contend that Uber's proposed PFS amendments are "transparently retaliatory." Plaintiffs' Stmt. at III, *supra*. But in October 2025, the parties agreed in writing to a stipulation including PTO 10's language that the Court "will not revise either this Order or the fact sheets unless the parties agree on a given change." *Id.* Plaintiffs have now gone back on that agreement, unilaterally proposing changes to the fact sheets. If the Court does not enforce the parties' prior agreement, then Uber has every right to propose its own changes. That is the minimum that fairness requires; it is not "retaliatory."

There is mounting evidence that this MDL involves a large number of non-participating, non-communicative Plaintiffs who are not meeting basic requirements under the federal rules. In fact, on April 22, 2026, another 127 Plaintiffs were dismissed for failure to comply with Amended PTO 10 and submit a PFS or records certification form. ECF 5953; ECF 5958. Uber and the Court, not Plaintiffs' counsel, are required to spend inordinate time managing the docket—monitoring for non-participation (and, even worse, fraud)—while Plaintiffs' counsel continue to file cases nearly daily without even the most basic vetting procedures. Uber has filed 17 motions to dismiss— including at least one each month since November 2025—for failure to comply with Amended PTO 10 just to remove these non-participating Plaintiffs. C. Cotton Decl. ¶ 8. Every motion decided thus far has been granted. *Id.* 9. Plaintiffs' counsel have done nothing to address this systemic issue.

Many Plaintiffs were invited to this litigation by click-bait internet advertisements like the one below ("Qualify Now For Large Settlement!"):



These and similar ads promised "no paperwork" and "no hassle" (neither of which is possible in litigation) and dangled a "$9 million settlement." ECF 4456 at 12.

Lead generation firms like Blue Sky, meanwhile, boast they have "help[ed] law firms acquire Uber and Lyft sexual assault plaintiffs at a performance-based cost of $3,600 to $4,800," and "deliver signed retainers at a targeted price range, helping law firms enter or scale into this litigation." Uber

and Lyft Sexual Assault Litigation: MDL and State Court Landscape (last visited Feb. 27, 2026), https://blueskylegal.com/case-types/uber-and-lyft-sexual-assault/.

## BLUE SKY LEGAL: YOUR STRATEGIC PARTNER IN RIDESHARE ASSAULT LITIGATION

Blue Sky Legal is already helping law firms acquire Uber and Lyft sexual assault plaintiffs at a performance-based cost of **$3,600 to $4,800**, depending on the complexity of the criteria. We deliver signed retainers at a targeted price range, helping law firms enter or scale into this litigation with predictable, high-quality case acquisition.

Whether your strategy is MDL, state court, or both, we can align targeting and screening to your needs. Our campaigns are compliance-ready, high-performing, and built with transparency. For litigation funders and law firms looking to participate in a landmark mass tort, we offer the volume and vetting needed to build value from day one.

Contact us to learn more: https://blueskylegal.com/contact-us/

Given the manner in which many Plaintiffs were recruited, it was predictable that Plaintiffs' counsel would lose contact with their clients. Plaintiffs' counsel have repeatedly argued that "Uber faces no risk from those cases where the plaintiff never resurfaces," because "no case can go to trial nor settle without the involvement of the plaintiff." ECF 3771 at 4. But when such Plaintiffs click on internet ads, enter this MDL, and then choose not to participate (other than awaiting a settlement check), all too often their counsel ghost-write court-ordered submissions on their clients' behalf without their input. Plaintiffs' approach also violates the mandatory "reasonable inquiry" requirements of Rule 26(g).

PFS serve several critical functions in this MDL. These include all three of the functions that Plaintiffs concede are legitimate for PFS and DFS alike: "manag[ing] MDL-wide strategy, categoriz[ing] cases for bellwether evaluation, and discuss[ing] potential resolution of cases." Plaintiffs' Stmt. at I, *supra*. If PFS are materially inaccurate, including because Plaintiffs have not reviewed and signed them as required, both resolution discussions and bellwether discussions become

far more difficult. As Plaintiffs assert above, the "fact sheet process on *both* sides is instrumental in understanding the strengths and weaknesses of every case." Uber agrees.

The PFS ordered by the Court requires "complet[ion]" by the Plaintiff - not by Plaintiff's counsel:

Accuracy and Supplementation

The Plaintiff completing this Plaintiff Fact Sheet is under oath and must provide information that is true and correct to the best of her or his knowledge, information, and belief. Plaintiff is under an obligation to supplement these responses consistent with the Federal Rules of Civil Procedure.

ECF 4287 at 15.

Ninety-nine percent of the Plaintiffs in this litigation are non-bellwether Plaintiffs. Of that 99%, two non-bellwether Plaintiffs have been deposed. █████████████████████

███████████████████████████████████████

████████ C. Cotton Decl. ¶ 12. █████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████.

This pattern continued in the most recent trial. Bellwether Plaintiff WHB 823 testified on cross-examination that although her electronic signature appeared on multiple verified PFS, she did not review these signed and verified PFS. She further testified that material sworn statements in her PFS (such as an allegation that the driver told Plaintiff he wanted to "lick" her "thigh") were inaccurate, and she could not explain how those inaccuracies happened. This testimony demonstrates that even

this Plaintiff—who is a bellwether Plaintiff on the stand at trial—disavows statements in her electronically signed PFS. WHB 823's trial testimony is below:

Q.   Okay. And once again we're looking at a document with your electronic signature certifying truthful and accurate statements, and you believe these statements to be false?
A.   Yes.
Q.   Okay. At some point you changed a number of things in the description of the incident, correct?
A.   I never changed anything that I said. What that says is not ever what I said.
Q.   Okay. Well, do you have any idea how it would have gotten into a document with your electronic signature?
A.   I would imagine it was through a computer. I don't know.

       ***

Q.   And in terms of the earlier versions that we saw with different information that were certified under your signature, you believe those not to be accurate, correct?
       A.   Correct.

       ***

Q.   Do you understand that that electronic signature was provided to us as yours? Did anyone tell you that?
A.   I -- no. I don't know. I don't know. How did I get this many of these? When did this even -- like, this is insanity. I wouldn't have signed the same thing so many times.
Q.   All right, ma'am.
A.   Especially the first two that were not correct.

Trial Tr. vol. 1, 134:6-17; 142:20-23; 143:6-13.

On redirect examination, Plaintiff testified that an allegation in her PFS about the driver telling Plaintiff he wanted to "lick" her "thigh" had never "come out of [her] mouth" but nonetheless was typed by a Plaintiff's attorney into her PFS and then submitted under her electronic signature and without her review:

Q. Okay. But I want to talk to you about it because it came up, right? So remember they showed you what were called discovery responses?
A. Yes.
Q. And that one of them said -- two of them said something about licking the thigh, right?
A. Yes.
Q. First of all, have those words ever come out of your mouth about this incident?
A. No.
Q. Okay. Did you type up those discovery responses?
A. No.

Q. Did you write them?
A. No.
Q. When you -- this was something that was actually typed up by somebody in our office, right?
A. That was like over the phone, I'm assuming, because that's the first time I said anything to anybody.
Q. Now, you read it, it's a mistake, right?
A. Yes.

*Id.* at 197:8-198:2.

Notwithstanding counsel's alleged "mistake," Plaintiff's electronic signature was applied to multiple versions of her PFS, even though they contained material false statements. *Id.* at 127:15-140:18. These errors were not corrected (according to Plaintiffs' counsel) until after Plaintiff submitted a third PFS—in connection with her bellwether deposition—*containing her wet signature.*[17] *Id.* at 141:8-143:13; 199:8-201:5. Uber selected WHB 823's case as a bellwether on February 21, 2025 (ECF 2375) and proposed it be a Wave 1 bellwether on June 11, 2025 (ECF 3228)—both before WHB 823 actually reviewed and provided a handwritten signature in her July 2025 PFS. Unfortunately, such a wet signature is not required of Plaintiffs—in fact, as part of preparing this statement, Uber sampled approximately a third of active MDL claims with a verification provided for the most recent PFS and found that over 90% of these verifications contain only an electronic signature and not a handwritten, or wet, one.

The WHB 823 trial *confirmed that wet signatures are important*. Plaintiff WHB 823 agreed with her counsel during trial that it wasn't until she was "getting ready" for her deposition that she "actually did a detailed review" of her PFS, "actually correct[ed] mistakes," and *verified her*

---

[17] On redirect, Plaintiff's counsel elicited testimony from Plaintiff that she finally "actually" reviewed her PFS before her deposition, which was taken in July 2025. Trial Tr. vol. 1 at 198:3-19 ("And when you got – when you were getting ready for your deposition because, you know, Uber's lawyers were going to question you. Do you remember that? A: Yes. Q: And you actually did then, at that point, look through these discovery responses [PFS] more carefully, right? A: Yes. Q. All right. [. . .] It's the July 2025. So – so this was right before your deposition, right? A: Yeah. Q: Okay. And when you – at that point you actually did a detailed review of this document, right? A: Yes. Q: Okay. And let me show you. Did you correct mistakes in them? A: I sure did.").

*allegations with a wet signature*—nearly nine months after supposedly verifying her first PFS in this MDL. *Id.* at 197:5-200:3; Tr. Ex. D-4038.0022. But over 99% of Plaintiffs in this MDL (those who are not bellwethers and who are not subjected to fraudulent-receipts orders for depositions) are not deposed and do not provide a wet signature, leading to multiple known incidents of attorney-authored, false PFS in contravention of this Court's orders.

Plaintiffs dismiss these admissions as "typographical errors" and Plaintiffs "changing certain facts," Plaintiffs' Stmt. at III, *supra*, but that characterization is not accurate. Plaintiff WHB 823's testimony was clear that she was not "changing" facts; she testified that any PFS allegations about "licking the thigh," which appeared in her first two verified PFS, were never made by her. This material allegation includes words that never came out of her mouth. Trial Tr. vol. 1, 197:8-198:2. Similarly, ███████████████████████████████████████████████████████████████████████████████████████████████████████████. C. Cotton Dec. 12. Plaintiffs also attempt to recast WHB 823's testimony as unremarkable because she "participated in every facet of her case – including providing trial testimony and maintaining her case through a successful jury verdict." But this argument misses the point entirely. This issue is not whether WHB 823 participated in her trial – it is that materially false, attorney-authored statements persisted in multiple versions of her electronically signed PFS until she was finally required to provide a wet signature in connection with her deposition. That she ultimately prevailed at trial does not validate the process that produced false sworn statements bearing her electronic signature.[18]

---

[18] Counsel signing PFS under penalty of perjury for absent Plaintiffs and/or Plaintiffs who were not afforded the opportunity to review their PFS by their counsel is different from a reliance list prepared with the assistance of counsel–not an expert report–that was promptly supplemented. Any comparison to Dr. Reminick's level of "participation" in the most recent bellwether trial misses the mark.

Plaintiffs incorrectly argue that "Uber selects (from thousands of cases in which there has been no issue) a small handful of cases in which problematic PFS submissions were already appropriately surfaced and addressed." But the problem impacts an unacceptably high percentage of the docket. On November 19, 2025, the Court entered an order applicable to 92 Plaintiffs, requiring Plaintiffs' counsel to "serve a Rule 26(g) certification within 14 days of the date of this Order identifying on separate lists: (i) which Plaintiffs reviewed the amended PFS before it was served, and (b) which Plaintiffs did not review the amended PFS before it was served." ECF 4442. The Court did so in light of its "questions about whether Plaintiffs' counsel consulted the individual Plaintiffs before amending their PFS prior to service." *Id.* at 15. Of the 92 Plaintiffs subject to that order, Plaintiffs' counsel disclosed (when ordered by the Court) that *79% of Plaintiffs had not reviewed their Amended PFS before they were served. See* ECF 4522 (Nachawati Law Group stating 48 Plaintiffs did not review); ECF 4512 (Williams Hart & Boundas, LLP stating 24 Plaintiffs did not review); ECF 4508 (Kherkher Garcia LLP stating one Plaintiff did not review). This non-review rate was only revealed when the Court ordered Plaintiffs' counsel to certify which Plaintiffs had actually reviewed their PFS. In other words, Plaintiffs' counsel are writing discovery responses for Plaintiffs—who signed up for the litigation but have now gone missing—without their input and on a widespread basis.

Plaintiffs argue that the 73 Plaintiffs who counsel admitted it submitted PFS for without their input should be disregarded, because "those were precisely a selection of cases in which each Plaintiff had not verified her PFS and was thus being considered for dismissal." Plaintiffs' Stmt. at III, *supra*. But the problem is not limited to Plaintiffs with unverified PFS. ████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████. C. Cotton Dec. 12; *see also* Trial Tr. vol. 1, 134:6-17; 142:20-23; 143:6-13. The PFS-review issue can only be corrected—as

Plaintiff WHB 823 herself ultimately did—when a Plaintiff reviews the document and provides a wet signature to show that she did conduct such a review.

PFS also play a central role in bellwether selection, making Plaintiff WHB 823's testimony at trial particularly troubling because it evidences an undermining of the bellwether process. WHB 823 was selected as a bellwether in part as a result of the materially inaccurate statements in her electronically-signed PFS, which were not confirmed by Plaintiff to be false until trial. If counsel can provide allegations in verified PFS that a bellwether Plaintiff then testifies never came out of her mouth, then the PFS need handwritten, wet signatures.

A wet-signature requirement would not only safeguard the reliability of PFS but also address the problem of incommunicado Plaintiffs. Indeed, Plaintiffs' counsel have filed several briefs describing situations where Plaintiffs' counsel filed a complaint long after their clients had gone missing:

- One Plaintiff's firm admitted that one Plaintiff "has not responded to any efforts to reach her made by myself or [counsel's] staff since May 9, 2023" but it *still* "filed in the MDL" over a year later "[o]n August 21, 2024." ECF 4103-1 ¶¶ 2, 5e; ECF 4168.

- Another Plaintiff's firm submitted a show-cause response following this Court's order stating that it "reached out to Plaintiff numerous times from December 31, 2024 to present [October 17, 2025]," ECF 4175-1 ¶ 2, but "[t]o date, Counsel's repeated efforts to contact MDL 2774 have been unsuccessful." ECF 4175 at 2. That counsel *still* filed Plaintiff's case on December 31, 2024. *Id.* at 2.

In addition to these examples, the Declaration of Christopher V. Cotton accompanying this submission details numerous "instances in this litigation in which Plaintiffs or Plaintiffs' counsel have explicitly or tacitly acknowledged that Plaintiffs have not reviewed or even seen their PFS before they were submitted." C. Cotton Dec. 12 (████████████████████████████████████████████ ████████████████████████████████████████ and declarations and certifications from Plaintiffs' counsel detailing lack of contact with Plaintiffs but counsel's decision to nonetheless file PFS on those Plaintiffs' behalf).

Many other Plaintiffs claimed that they could not find their ride receipts. On September 9, 2025, the Court entered PTO 31, which required 303 missing-receipt Plaintiffs to provide certain basic information about the alleged ride and their Uber accounts, including the earliest and latest dates that receipts are available in their email and Uber app associated with the ride. Tellingly, 181 Plaintiffs (60% of those subject to the order) entirely failed to respond to the Court's order and were subject to Uber's Motion to Dismiss filed before Judge Breyer on November 21, 2025. ECF 4456.

Plaintiffs' counsel now baselessly claim that Uber has accused *all* Plaintiffs' counsel of "ghostwriting" PFS. That claim misstates the facts. But the facts show that (1) 79% of the Plaintiffs subject to the Court's November 19, 2025 order had not reviewed the PFS submitted by counsel on their behalf; (2) ████████████████████████████████████████████████ ████████████████; (3) the most recent bellwether Plaintiff testified that her electronically signed PFS was inaccurate, but that the issue was fixed in her wet-signed PFS; and (4) as demonstrated by the examples above, hundreds of other Plaintiffs have gone missing during the discovery process.

While Plaintiffs claim PTOs 5, 10, and 31 are sufficient to address all issues with bona fide ride receipts, PFS deficiencies, and certifications, Plaintiffs' counsel is still (i) filling out court-ordered submissions on behalf of missing clients and (ii) submitting inaccurate electronically signed PFSs on behalf of Plaintiffs like WHB 823 who are not even missing. Until Uber sounded the alarm about 92 Plaintiffs' missing verifications, Plaintiffs' counsel, without saying a word, completed and submitted PFS on behalf of Plaintiffs who have never seen those sworn submissions. *See* ECF 4522 (Nachawati Law Group); ECF 4512 (Williams Hart & Boundas, LLP); ECF 4508 (Kherkher Garcia LLP). Beyond that, hundreds of other non-bellwether Plaintiffs have gone missing.

Plaintiffs' counsel have long attempted to justify the non-participation of non-bellwether Plaintiffs by arguing that "Uber faces no risk from those cases where the plaintiff never resurfaces." ECF 3771 at 4. But there is no federal rule permitting someone to (i) click on an internet ad; (ii) remain

below the surface as a non-bellwether Plaintiff (while triggering Uber's requirement to serve a DFS); and (iii) "resurface" at settlement time. Moreover, in addition to the "reasonable inquiry" requirement of Rule 26(g)(1), Rule 26(g)(3) states that a court "***must*** (emphasis added) impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." The Federal Rules of Civil Procedure impose certification requirements throughout the filing process to discourage litigants who refuse or fail to participate in the advocacy of their case. These certification requirements act as guardrails to prevent meritless cases from continuing. An overwhelming inventory of unvetted and uncertified claims burdens and prejudices a defendant because that defendant must deploy significant resources to defend each claim, regardless of any trial setting. As illustrated through Uber's motion practice, many Plaintiffs are not meeting basic requirements under the federal rules and existing pretrial orders, including tasks as simple as having their clients review and sign discovery responses.

In light of the demonstrated issues with the accuracy of electronically signed PFS and the non-participation of advertising-generated and lead-generated Plaintiffs, and to safeguard the integrity of the MDL, Uber requests the following modifications to PTO 10:

1. *Wet signatures for PFS, Ride Information Forms, and Records Certifications.*[19] Inaccurate electronically signed PFS and non-participation by advertisement-generated and lead-generated Plaintiffs have not only necessitated burdensome and time-consuming motion practice; these problems have diverted Uber's and the Court's attention to the fundamental cross-cutting issues before them. A wet-signature requirement would help to safeguard the accuracy of PFS and to resolve the Court's lingering "questions about whether Plaintiffs' counsel consulted the individual Plaintiffs before amending their PFS prior to service." ECF 4442 at 15. Requiring Plaintiffs to sign the PFS, ride information form, and records certification(s) and attest that the information provided is true would help to address the significant issues discussed above.

---

[19] Plaintiffs misinterpret this request above as a request for a wet signature from Plaintiffs' *counsel.* To be clear, Uber seeks wet signatures from *Plaintiffs themselves* and not their counsel.

Plaintiffs incorrectly argue that there is "no authority" for a wet signature requirement. In fact, courts in other large MDLs like this one have repeatedly required signatures from Plaintiffs themselves. *See, e.g.*, *In re: Bard Implanted Port Catheter Prods. Liab. Litig.*, Case No. 2:23-md-03081-DGC, ECF No. 476-1, at 1 (D. Ariz. Mar. 11, 2024) ("Each Plaintiff Fact Sheet shall be signed by the Plaintiff under penalty of perjury at the time of submission. If a Plaintiff is suing in a representative capacity, the Plaintiff Fact Sheet shall be completed and signed by the person with legal authority to represent the estate or the person under legal disability. A Plaintiff's spouse with a claim for loss of consortium shall also sign the Plaintiff Fact Sheet under penalty of perjury. **Electronic signatures are not permitted**.") (emphasis in original); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, Case No. 2:10-md-02179-CJB-SS, ECF No. 16050-1 (E.D. La. Mar. 29, 2016) (Pretrial Order No. 60 requiring "Signature of Plaintiff (Plaintiff's Attorney Cannot Sign on Plaintiff's Behalf)"); *see also In re Deepwater Horizon*, 907 F.3d 232, 234 (5th Cir. 2018) ("Significantly, PTO 60 required individual lawsuits to have a wet-ink signature from each plaintiff, to be received by the court by May 2, 2016. PTO 60 warned that non-compliance would result in 'dismissal of their claims with prejudice without further notice.'"); *In re: Paraquat Prods. Liab. Litig.*, Case No. 2022-559, Case Management Order No. 11 (Pa. Ct. Common Pleas Sept. 4, 2024). A wet-signature requirement is especially crucial here, where significant, well-documented issues persist with materially inaccurate PFS and missing Plaintiffs.

2. *Social media, communications, and photos relating to the incident (48 hours before and after the alleged incident).* Plaintiffs are currently required to produce communications with the driver in written form outside of the Uber app, including text messages, social media messages or email. *See* PFS, Question 15 (if answered 'Yes', a production is required). And Plaintiffs are also required to respond to Question 29, which asks whether they have posted information regarding the incident on a website or on social media. If they answer 'Yes', they must list the websites and specify the username/account handle. Plaintiffs are also currently required to disclose who they communicated with about the incident (including but not limited to a spouse, romantic partner, family member, friend). *See* PFS, Question 30. Plaintiffs should also be required to produce the underlying

communications and photos, narrowly tailored to (1) *communications and photos relating to the incident*; and (2) *the 48 hours before and after the incident*. Such productions are a necessary and logical extension of Plaintiffs' existing obligations under the PFS and would ensure that Uber has information necessary to prepare a proper defense. Document production requirements also serve to distinguish participating Plaintiffs from the high number of non-participating Plaintiffs in this MDL who clicked a social-media ad, then parked their claim—which they never detailed or substantiated—in this proceeding. Indeed, these materials shed light on whether the alleged incident occurred—which can be one of the most disputed issues in a case. Such highly probative information far outweighs any minimal burden on Plaintiffs, who are obviously in the best (if not the exclusive) position to produce it.

Like the wet-signature requirement for PFS, the production of a targeted window of electronic communications are important for all three purposes that Plaintiffs concede above to be proper for PFS discovery: "manag[ing] MDL-wide strategy, categoriz[ing] cases for bellwether evaluation, and discuss[sing] potential resolution of cases." Indeed, Plaintiffs continue to insist that *Uber* produce electronic communications as part of the *DFS* process, in furtherance of these same objectives. In fact, in response to Plaintiffs' DFS requests (see, *e.g.*, DFS Question 31(d)), Uber has produced almost 5,800 communications between Uber and the Plaintiff and Uber and the alleged driver, including 1,730 audio recordings. Just as Plaintiffs claim that these communications produced by *Defendants* are important to resolution and bellwether selection, a narrowly tailored set of electronic communications should also be produced by *Plaintiffs. These communications* will equally further resolution and bellwether selection.

Plaintiffs incorrectly contend that Uber's PFS proposals are "just trial workup on a mass scale" and argue "the notion that a social media post about the incident would be dispositive (or even meaningful) in Uber's determination of credibility is, frankly, laughable." Plaintiffs' Stmt. at III, *supra*. As an initial matter, these Plaintiffs are seeking upwards of millions of dollars from Uber. And Uber's proposed PFS additions are narrowly tailored to the time period 48 hours before and 48 hours after the alleged assault, and to only photos and communications relating to the incident—not a "sweeping scope to make each and every Plaintiff produce a custom selection of private information

from social media," as Plaintiffs state. By contrast, Plaintiffs' proposed DFS additions have no temporal restrictions whatsoever.

Plaintiffs incorrectly assert that "No photograph or social media deep dive will answer the questions: (1) Did the driver assault the Plaintiff? (2) Was Uber negligent in its handling of this driver or trip? (3) Was Uber's negligence a cause of the assault?"[20] But there can be no dispute that Plaintiffs' text or chat messages with friends or family about the alleged incidents are incredibly relevant. At what time did Plaintiffs send those texts or chats? What did Plaintiffs say about the alleged incident at that time? That evidence can have a significant impact on determining whether a Plaintiff has a claim and, if so, what the value of that claim might be. For example, PFS have claimed that a driver touched a sexual body part of Plaintiff. However, the DFS-produced text communications and audio recording of the call (produced via Section V of the DFS) between Uber and the Plaintiff includes the Plaintiff specifically stating that the driver did not physically touch her but made inappropriate comments. If these Uber-produced electronic communications can be so useful, there is no reason why Plaintiff-produced electronic communications would not be equally helpful, if not more so. There is no reason why Uber should be required to produce electronic communications for non-bellwether Plaintiffs (as it has been required to do for thousands of Plaintiffs), but non-bellwether Plaintiffs should not be required to produce a single electronic communication. Including communications and social media—in a time-limited, tailored fashion, as Uber proposes—is entirely consistent with the fact sheet process. And it would certainly aid in the process of evaluating each case for resolution purposes.

Plaintiffs' counsel incorrectly contend that Uber's social-media requests seek "a category of discovery that has required (and would require) individual rulings from Magistrate Judge Cisneros."

---

[20] In their proposal, Plaintiffs argue that Uber would never admit that an assault happened even with the requested PFS amendments and document-production requirements. This argument–one Plaintiffs have made to this Court and in the media since the first bellwether trial in this MDL–remains incorrect. At the Dean trial, Uber never denied that Ms. Dean was assaulted by an independent driver but instead argued that the assault was not foreseeable to Uber, given the driver's 12 clear background checks, lack of prior history, and high ratings from other riders, among other things.

Plaintiffs cite ECF 3209, a bellwether discovery order discussing different social-media discovery rulings in multiple bellwether cases, but fail to note that Judge Cisneros's order required each Plaintiff at issue to produce social-media discovery (and all of those cases contemplated *far more* discovery than Uber is now seeking in the PFS context).

Plaintiffs also incorrectly claim that "the Court has already denied Uber's prior request for this information," Plaintiffs' Stmt. at III, *supra* (citing ECF 236-2 and ECF 348-1), and argue that "there is no basis to change that ruling now." *Id.* But the previous social media and communications requests addressed by the Court were far broader than those Uber now proposes. For example, in March 2024 Uber proposed including "any and all posts You [the Plaintiff] have made on any social media *from five years* before the date of the Incident to the present, regardless of whether the information is publicly available or requires a password and login to access" and "any and all documents and communications exchanged between You and any other person or entity about the Incident." Here, instead of encompassing "five years," the requests encompass four days and, despite Plaintiffs' claims, there is nothing private about this content as it is by its terms posted on social media and directly relates to the alleged incident included in Plaintiff's *publicly* filed lawsuit seeking millions of dollars in compensation.

3. *A deadline of 60 days following DFS service for a Plaintiff to serve Uber a DFS Deficiency Notice.* Uber agrees with Plaintiffs that the parties should be assured that DFS (and PFS) productions are timely, verified, and complete. Plaintiffs' proposed rewrite of the DFS deficiency process will not achieve that goal, but ensuring that any perceived gaps in DFS production are timely identified and thus able to be resolved is a concrete and modest step to do so. PTO 10 currently has no deadline for a Plaintiff to serve a DFS deficiency notice on Uber. To date, across 2,816 Plaintiffs represented by 49 firms who have been served with DFS indicating Uber was able to confirm the Subject Trip occurred, only 9 firms have even raised a deficiency in Uber's DFS production pursuant to PTO 10. J. Brown Decl. ¶ 11. Uber has received, and timely responded to in compliance with PTO 10, 126[21] notices of purported DFS deficiencies, comprising just 4% of the DFS served. *Id.* However, Plaintiffs have often taken months or even years to serve these notices. Adding a deadline to serve a DFS deficiency notice

_____

[21] This tally includes the notices served for each bellwether Plaintiff. *Id.*

will ensure timely and complete information related to the parties' claims and defenses in a way that serving a notice in December 2025 purporting deficiencies in a DFS Uber served in May 2024 (as one firm did) does not. This DFS deficiency notice deadline will also prevent discovery abuse such as timing a wave of notices purporting DFS deficiencies to coincide with a trial date.

In short, while Plaintiffs are demanding a sweeping (and unduly burdensome) expansion of the DFS that will not help advance this MDL, Uber is proposing narrow and modest changes that "will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation." *In re Uber*, 699 F. Supp. 3d at 1398. Accordingly, given the overarching purpose of this MDL and basic fairness, if this Court chooses to revisit the scope of fact sheets, it should, at a minimum, implement the much narrower amendments outlined above first.

Uber maintains that PTO 10 requires the agreement of both parties to amend it. Because that process was not followed here, the Court could—and should—simply hold the parties to the operative language of PTO 10 and decline to impose any amendments without the parties' stipulated agreement. Such agreement is not present here for any of Plaintiffs' DFS proposals.

By: */s/ Roopal Luhana*
ROOPAL P. LUHANA *(Pro Hac Vice)*
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com

SARAH R. LONDON (SBN 267083)
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Email: slondon@girardsharp.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111

By: */s/ Christopher Cox*

**KIRKLAND & ELLIS LLP**
ALLISON M. BROWN
JESSICA DAVIDSON
LAURA VARTAIN

**SHOOK, HARDY & BACON L.L.P**.
MICHAEL B. SHORTNACY
PATRICK L. OOT, JR.
CHRISTOPHER V. COTTON
ALYCIA A. DEGEN

**O'MELVENY AND MYERS LLP**
SABRINA H. STRONG
JONATHAN SCHNELLER

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,

Telephone: (415) 426-5641          RASIER, LLC, and RASIER-CA, LLC
Email: rabrams@peifferwolf.com

*Co-Lead Counsel for Plaintiffs*

### ATTESTATION

Pursuant to Civil Local Rule 5-1(h)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's consent and have authorized the filing.

Dated: April 24, 2026

By: /s/ *Ellyn Hurd*
Ellyn Hurd