Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
Christopher D. Cox (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC., RASIER, LLC,
and RASIER-CA, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br>All Cases | Case No. 3:23-md-03084-CRB<br><br>**DECLARATION OF JAMIE A. BROWN IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026**<br><br>Judge: Hon. Charles R. Breyer<br>Courtroom: Courtroom 6 – 17th Floor |

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026
Case No. 3:23-md-03084-CRB

I, Jamie A. Brown, declare the following:

1. I am over the age of 18 and am a resident of New York.

2. I am a partner at the law firm of Shook, Hardy & Bacon LLP, attorneys of record for Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC ("Defendants" or "Uber"). I am a member in good standing of the Bars of the State of Arizona and the District of Columbia. Prior to joining Shook, Hardy & Bacon LLP, I was a Vice President of Strategic Consulting Services at Lighthouse, which provides eDiscovery services to, *inter alia*, Uber. I previously set forth my qualifications in a declaration provided in support of Uber's ESI protocol on April 12, 2024, ECF 499-6, which are incorporated herein. I know the following facts to be true of my own knowledge, except those matters stated to be based on information and belief, and if called to testify, I could competently do so. I submit this declaration in support of Defendants' position in the Parties' Joint Letter Regarding Non-Agreed Proposed Modifications to PTO 10 (ECF 4287).

3. The Defendant Fact Sheet (DFS) in this litigation is already broader in scope than the typical DFS in mass tort litigation. Yet, Plaintiffs' proposal would further expand Uber's production obligations for current requests, add multiple new requests, and reintroduce a request that the Court already rejected in PTO 10. Plaintiffs' proposal would radically expand the scope of the DFS, and, upon information and belief, would impose extraordinary new burdens on Uber, as well as imposing new burdens on MDL Centrality and even many Plaintiffs' counsel, which are detailed below.

4. Plaintiffs' DFS requests have been a moving target. Plaintiffs unilaterally changed their requests markedly in the week preceding this joint letter, with both expansions and narrowing. Plaintiffs' vacillation rendered it difficult, if not impossible, to ascertain their position. Plaintiffs originally provided Uber a DFS proposal on March 18, 2026, that added new requests related to the independent driver and subject trip data, but deleted both the entire "Incident" section of the DFS, and the defined term "Incident" in the "Definitions" section.[1] That proposal was superseded on April 7,

---

[1] Upon information and belief, Plaintiffs claimed in conferrals that the pinpoint deletion of the defined term "incident" in the Definitions section at the top of their March 18 DFS proposal, as well as all requests related to the Plaintiff's alleged incident at the bottom of that DFS proposal, were inadvertent.

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

2026, with a new DFS proposal from Plaintiffs that restored all of the PTO 10 DFS questions as well as the defined term "Incident," while adding new requests over and above those in the March 18 proposal. On April 8, 2026, Plaintiffs provided Uber a position that included additional new requests beyond the proposed DFS provided the previous day and, for the first time, proposed rewriting the DFS deficiencies process. On April 10 and April 14, 2026, Plaintiffs provided position statements that further changed their requests without updating their proposed DFS template, which they represented as operative until April 21. Upon information and belief, on April 21, 2026, the Parties met-and-conferred to align Plaintiffs' proposed DFS template with their requests as of April 14, 2026. On the evening of April 21, 2026, Plaintiffs provided Uber the DFS template they attach as Exhibit A.

**Background**

5.    PTO 10 (ECF 348) was originally entered by the Court on March 19, 2024, to resolve the Parties' competing proposals for the DFS (and PFS). *See* PTO 5 (ECF 175), ECF 198, ECF 234, ECF 236. In the fall of 2025, as provided by the Order,[2] the Parties jointly filed a proposed amended PTO 10, which the Court approved and entered on November 3, 2025. ECF 4287. The agreed upon revisions did not alter the DFS in any way.

6.    Initially, the MDL and JCCP had very different fact sheets and processes. On December 16, 2025, the JCCP adopted the DFS (and PFS) templates, per the Parties' agreement. Amended Fact Sheet Implementation and Ride Receipt Discovery Order, *In re: Uber Rideshare Cases*, Case No. CJC-21-005188 (Cal. Super. Ct.). As a result, the JCCP DFS and MDL DFS now align. This agreement was made by Uber in the spirit of cooperation, because the nexus of operative facts in both litigations is essentially the same, and to create efficiencies for all Parties. While the agreement substantially increased Uber's JCCP DFS narrative response and document production obligations, harmonizing MDL and JCCP DFS allows Uber to maintain a single DFS collection and review process.

7.    Pursuant to PTO 10, the DFS must be served on a Plaintiff 30 days after Plaintiff serves Uber, via MDL Centrality, a bona fide ride receipt or the ride information outlined in PTO 5. Amended

---

[2] "The Court will not revise either this Order or the fact sheets unless the parties agree on a given change." PTO 10 (ECF 348) at 9; Amended PTO 10, (ECF 4287) at 11.

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                Case No. 3:23-md-03084-CRB

2

PTO 10 at 3-4. During these 30 days, Uber must, first, investigate to confirm the trip identified by a Plaintiff as connected with its alleged incident (the "Subject Trip") occurred[3] using readily available information, which is complicated by the fact that, in almost 60% of active cases, Plaintiffs did not report the alleged incident to Uber prior to the lawsuit.[4]

8.     Once the Subject Trip is confirmed, Uber must then collect, review, and serve a DFS with the narrative responses and supporting documents to Plaintiffs.[5]

9.     To date, Uber has already served 2,852 Defendant Fact Sheets (DFS) for which Uber was able to confirm the ride at issue occurred, and produced almost 155,000 documents in connection with those DFS. That is an average of more than 54 documents produced per DFS. According to the statistics MDL Centrality provides on their home page[6], the average Fact Sheet hosted by MDL Centrality, by contrast, includes fewer than 3 documents and the average PFS produced by a Plaintiff in this litigation includes fewer than 2 documents. Using these averages, Uber's current document production in connection with DFS is already at least 20-times higher than the average Fact Sheet hosted by MDL Centrality and more than 36-times higher than the average PFS in this litigation. In

---

[3] Upon information and belief, Uber has significantly less than 30 days to collect, process, and review the documents for each DFS. The process of confirming the Subject Trip occurred itself requires a time-intensive and burdensome investigation by Uber. See Harrison Decl., ECF 3855-17 at 4 (estimating that Uber spent at least 10 hours attempting to confirm the trips for 21 altered receipts). As the Court is aware, some Plaintiffs have served non-bona-fide ride receipts on Uber. See, e.g., ECF 3876, 3972, 4440, 5483, 5648, 5721. Additionally, Plaintiffs' ride receipts may be incomplete as served, and ride information provided by Plaintiffs may be overly broad or inaccurate. As PTO 10 recognizes, Uber cannot collect any documents or information about a trip or the independent driver who provided that ride without first confirming that Plaintiff's alleged ride occurred and can be identified in Uber's systems. See DFS Request No. 5., ECF 4287 at 5.

[4] Note that this represents over *1,600* Plaintiffs for whom Uber has confirmed the alleged trip occurred and served a DFS who did not report the alleged incident to Uber prior to the lawsuit.

[5] If Uber is unable to confirm the Subject Trip occurred, Uber serves an abbreviated DFS indicating such. See DFS Request No. 5. Amended PTO 10 added a meet-and-confer requirement to determine whether Plaintiff can provide additional information to assist Uber's investigation. Amended PTO 10 at 5-6.

[6] *See* https://www.mdlcentrality.com/Home/Login (last accessed April 23, 2026) (identifying "1.69M Fact Sheets Processed," and "4.76M Documents Processed,." and "25+ Active Ligitations.") Note also that, upon information and belief, MDL Centrality's tally of "documents processed" includes documents other than fact sheet attachments, e.g. authorizations, certifications, deficiency notices, letters to counsel, and others.

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

fact, while Uber's DFS represent only 0.16% of the Fact Sheets processed by MDL Centrality, Uber's DFS document production over the last two years comprises over 3% of *all* the documents processed by MDL Centrality to date for the 25+ active litigations they currently serve as well as the many inactive litigations they have hosted since their inception in 2015, and the sustained volume and size of Uber's current DFS productions have at times caused processing delays.

10. In compliance with PTO 10, Uber timely provides a robust DFS for each Plaintiff that provides detailed information about the Plaintiff, the Subject Trip, the independent driver who provided the Subject Trip, and Plaintiff's alleged incident. Uber has no overdue DFS. The DFS requirements in PTO 10 are extensive, comprising 53 Requests (or subparts thereof), 42 of which require narrative responses and 11 of which require document productions. Amended PTO 10 at 44-49.

    a. <u>Plaintiff</u>. When Uber is able to identify an account for the Plaintiff, Uber provides a number of narrative responses relating to that account, including the Plaintiff's unique internal identifier (UUID) and, if applicable, information about that Plaintiff's use of the Uber platform to provide rides as an independent driver. DFS Section II.

    b. <u>Plaintiff's Subject Trip</u>. When Uber is able to confirm Plaintiff's Subject Trip occurred, Uber provides substantial narrative information and document production related to that trip. This information includes a production of Plaintiff's own ride receipt (if Plaintiff served ride information pursuant to PTO 5 instead of a ride receipt), Uber's internal identifier ("UUID") for the trip, the GPS coordinates and speed for each second of the trip, a snapshot from Uber's internal Chronicle Trip user interface containing specific trip information and mapping, and other narrative information. DFS Section III.

    c. <u>Independent driver who provided Plaintiff's alleged trip</u>. Uber provides identifying information and account information in a narrative response, which includes the independent driver's name, known addresses, number of trips completed on the Uber app, and average star rating on the Uber app. Uber also makes a substantial document

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                Case No. 3:23-md-03084-CRB

4

production that includes available background checks, an account status history log, an agreement log, and tax summaries for the independent driver. Additionally, Uber produces customer support tickets (see below) and any communications with law enforcement related to alleged misconduct by that independent driver. DFS Section IV.

   i. Customer Support tickets. Uber produces customer support tickets reported against the independent driver by a rider or third party related to essentially any allegation of misconduct by that independent driver reported to Uber other than speeding or dangerous driving. DFS Request Nos. 26, 27. Additionally, Uber searches for and produces information attached or linked to every produced ticket. Following clarification by Judge Cisneros, Uber's DFS production also includes a snapshot of Uber's "Safety Lens" user interface landing page, when that page is hyperlinked in a responsive Ticket. ECF 2825. In cooperation and compliance with the spirit as well as the letter of the Safety Lens DFS order, Uber further agreed to Plaintiffs' request to produce snapshots of the landing page for *all* Uber user interfaces hyperlinked in responsive Tickets without Court intervention, including the user interface identified by Plaintiffs as "Workbench," and are doing so. This is a burdensome undertaking that requires an Uber employee to access each link and manually take a screenshot of each landing page.

   d. Plaintiff's alleged incident. Uber provides narrative responses identifying whether (and if so, when and by whom) the alleged incident was reported to Uber (other than through the lawsuit), the taxonomy category assigned to the report, and whether there were any communications with law enforcement or legal process submitted related to the alleged incident. Uber also produces all communications related to Plaintiffs' alleged incident and with Plaintiff, independent driver, and any other witness to the alleged incident, as well as documents or information attached or linked to those communications as described for customer support tickets above. DFS Section V. This production of

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

5

attached or linked documents varies from ticket to ticket, but may include photos or videos provided by a witness, information from Uber's internal systems captured by the investigators, and snapshots of any user interface landing pages, including Safety Lens or Workbench, that are hyperlinked in responsive documents.

11.    PTO 10 also includes a process for identifying and curing any deficiencies in the Fact Sheet production, if the Receiving Party considers a Fact Sheet materially deficient. PTO 10 at 8. To date, only 9 Plaintiffs' firms (of the 49 firms that have filed cases in this litigation) have served notices purporting deficiencies in the DFS of 126 Plaintiffs (including the Bellwether Plaintiffs), or approximately 4% of the 2,852 DFS served in which Uber could confirm the Subject Trip occurred. None of Plaintiffs' 126 notices purporting deficiencies were served between March 30, 2025, and October 9, 2025. Seventy-six (over 60% of the total) were served on Uber between December 15, 2025, and February 2, 2026, by one firm. Those 76 notices purported deficiencies in DFS Uber served between May 29, *2024*, and July 16, 2025. Uber has investigated each DFS deficiency alleged, and has timely responded to these letters, including by curing deficiencies when necessary—though many deficiencies alleged by Plaintiffs were not in fact deficiencies in Uber's production—and providing context to explain when Uber's productions were not deficient.

12.    Upon information and belief, Uber employees tasked with, among other things, coordinating DFS-related investigations and collecting DFS data and documents, are already under constant pressure to collect documents and information responsive to the existing DFS for review and production within the short turnaround period allotted by PTO 10. They have met over 450 unique production deadlines in the preceding 720 days. To accomplish that, these Uber employees have spent hundreds of hours of engineering effort to develop, peer review, test, and refine a bespoke data pipeline to complete various tasks required to provide narrative information and collect and sort responsive documents. This includes the development of software agents, Python-code scripts, bespoke scripts for specific platforms, and database queries. Notwithstanding this automation, additional extensive manual effort is required to collect information for a number of the Requests. In total, Uber employees across multiple teams have spent well over 6,000 hours preparing narrative responses and collecting

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                                Case No. 3:23-md-03084-CRB

6

supporting MDL DFS documents through March 2026.

13.     Plaintiffs' proposal adds 13 new requests, including one already rejected by the Court in PTO 10, and significantly expands the scope of 8 current DFS requests. These new requests fall into four broad categories: (1) requests for substantial new narrative responses and document productions related to S-RAD,[7] (2) requests for the independent driver's history on the Uber app, which involve intrusive additional snapshots and logging derived from Uber's proprietary systems, (3) requests for additional data regarding the Subject Trip, and (4) requests for data related to *other trips*.

**New Request Category #1: S-RAD.**

14.     Common and Bellwether discovery regarding S-RAD was extensive, and has already been extensively litigated. *See* ECF 4060 at 5-9 (denying all of Plaintiffs' additional late requests for S-RAD-related discovery and finding that "Uber has already produced extensive data regarding the S-RAD system (particularly with respect to the particular rides at issue in the bellwether cases)"); *see also,* ECF 3746 at 5, ECF 4009 at 5-9. Plaintiffs seek to add four brand new requests related to S-RAD to the DFS: two requests requiring narrative responses and two requests requiring document productions.

Narrative Responses.

15.     For the requests involving narrative responses, Plaintiffs seek (1) the S-RAD score for the Subject Trip, and (2) whether the Subject Trip was part of a "Holdout Group."[8] Uber provided this information as part of a custom report for each of the Bellwether Plaintiffs' trips in discovery and in a 30(b)(6) deposition. *See* ECF 4060 at 6-7 (listing out what S-RAD data Uber has already produced). Upon information and belief, adding these narrative responses to the DFS is burdensome because Uber would need to expend engineering efforts to develop a custom query, and undertake further

---

[7]Safety Risk Assessed Dispatch, which is a machine learning model Uber has developed and used to inform its trip-matching algorithm in an attempt to make better matches between drivers and riders.

[8] Plaintiffs defined this term as "a subset of trips for which Uber did not take action (e.g., downranking, blocking, soft-filtering, hard-filtering or otherwise) based on S-RAD scores." A "holdout group" is a control group of trips that allows Uber to continuously evaluate and train its S-RAD model.

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

7

engineering efforts to integrate this new custom query into Uber's DFS data pipeline as well as into Uber's processes for completing narrative DFS responses.

Document Productions.

16.     For the requests involving document productions, Plaintiffs seek the addition of (1) an "S-RAD score sheet", and (2) information about "alternative supply plans for each Subject Trip."

17.     The "S-RAD score sheet" would include not only information about the trip's S-RAD score and applicable thresholds, but also the many different variables comprising the S-RAD score and the numerical value assigned to each variable. Uber created and produced such a custom "score sheet" for the respective Subject Trips in Bellwether cases. Upon information and belief, this score sheet is not a document created or stored in the ordinary course of business, and creating this custom report for each Plaintiff is a manual, burdensome process. The location and scope of available data is date-dependent, and identifying relevant data for a given trip requires a manual review to collect, compile, and integrate the available data across multiple, disparate sources. Creating Plaintiffs' desired custom report would also require considerable engineering efforts to join and compile the identified data. Given the bespoke data curation required and volume of data involved, it is simply not possible to automate this process at scale.

18.     Regarding "alternative supply plans," for each Subject Trip, Plaintiffs are seeking extensive information regarding potentially available alternative rider-independent driver pairings that *did not occur. See* ECF 4009 at 7. Uber refers to these hypothetical alternative pairings as "supply plans." Plaintiffs are already aware from discovery and corporate deposition testimony, and the Court is aware from briefing, that Uber does not retain data about supply plans longer than 30 days given their very limited business value and the extraordinary volume of data at stake that Uber must manage in the ordinary course of business. *See* ECF 5152 at 7; ECF 4009-8 at 6. Even the available supply plan data is voluminous and cumbersome to search, and, upon information and belief, does not reflect Plaintiff's requested data points such as a hypothetical driver's "inferred gender" or "calculated distance from the rider." To the extent this information may be discernable outside of supply plan data, it would require extensive engineering efforts to query and combine with the supply plan data, and it

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

may not be feasible to generate this custom report on an automated basis at scale.

**New Request #2: Independent Driver History.**

19.     Plaintiffs  seek four new document productions regarding the independent driver: (1) Trip Logs, including feedback tags and negative feedback regarding drivers,'[9] vehicle used, and local times," and (2) a "Ridecheck log," (3) a snapshot from Uber's "Safety Lens" user interface landing page for the independent driver, and (4) a snapshot from Uber's "Workbench" user interface landing page for the independent driver.

Trip Logs.

20.     Plaintiffs recycle their request for Trip Logs from the DFS they proposed in 2024, which was already rejected by the Court in PTO 10. However, Plaintiffs *expand upon* the previously-rejected request by adding information related to "the vehicle used" and specifying the format of the time-stamp to be different from how Uber stores timestamps in the ordinary course of business; the only other difference in the present request is a change in nomenclature from "Trip History Report" to "Trip Log." *See* ECF 234-4 at 3 (defining "Trip History Report"); Plaintiffs' Exhibit A at 5 (defining "Trip Log").   Uber produced some of this information in Bellwether discovery, but the production requested here far exceeds the scope of Bellwether discovery.

21.     Upon information and belief, a "Trip Log" to Plaintiffs' specifications is not created or stored by Uber in the ordinary course of business. It would be burdensome for Uber to produce this custom report. Doing so would require Uber to engage in extensive engineering efforts to develop, peer review, test, and refine an automated process to collect, transform, and join data from multiple sources to create this custom report. Uber would then need to undertake further engineering efforts to integrate this new custom process into Uber's DFS data pipeline. Upon information and belief, Uber's substantial burden in collecting and compiling the request production is exponentially compounded by Plaintiffs' request for these reports for Uber accounts in the U.S. and abroad other than the account that provided the Subject Trip. *See infra* at ¶¶ 30-34.

Ridecheck Logs.

---

[9] Presumably, "trip tools link" refers to the trip UUID.

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

9

22.      In Bellwether discovery, Uber produced Ridecheck logs requested by Plaintiffs for the 20 independent drivers (by UUID) who provided the respective Subject Trips in those cases. Ridecheck is a safety feature publicly disclosed by Uber on or before September 5, 2018[10] and additionally discussed in Uber's 2017-2018, 2019-2020, and 2021-2022 U.S. Safety Reports. Upon information and belief, RideCheck is not a data source. The reports produced to Plaintiffs related to RideCheck were created via a custom query that Uber developed for Bellwether discovery in this litigation, to pull Plaintiffs' requested data from tables. Upon information and belief, adding these reports to the DFS is burdensome to Uber because doing so would require Uber to undertake further engineering efforts to integrate this custom process into Uber's DFS data pipeline. Upon information and belief, Uber's substantial burden in collecting and compiling the request production is exponentially compounded by Plaintiffs' request for these reports for Uber accounts in the U.S. and abroad other than the account that provided the Subject Trip, which goes beyond Bellwether discovery. *See infra* at ¶¶ 30-34.

Safety Lens and Workbench Data.

23.      When a responsive ticket or communication contains a hyperlink to Safety Lens,[11] Uber *already* produces a snapshot of the linked Safety Lens landing page in compliance with Judge Cisneros's Order. ECF 2825. This Order also required Uber to produce Safety Lens snapshots linked in responsive tickets for the Bellwether Plaintiffs by April 25, 2025. Uber did so, in compliance with the Order, and specifically characterized this production to Plaintiffs in the transmittal letter as "Safety Lens snapshots for Jira Tickets produced as supporting documents for Bellwether plaintiff Defendant Fact Sheets, pursuant to ECF 2825." Additionally, to date Uber has produced 1,643 Safety Lens snapshots for independent drivers or Plaintiffs[12] in 1,192 DFS in response to Request No. 31(d), or

---

[10] "Rasing the Bar on Safety," September 5, 2018. https://www.uber.com/us/en/newsroom/raisingthebar (last accessed April 23, 2026).

[11] As discussed above, upon Plaintiffs' request Uber agreed to produce snapshots of *all* hyperlinked user interfaces in DFS documents, including Workbench.

[12] I.e., in response to DFS Request 31(d), "Please produce all Communications, regarding the Incident, between Uber and Plaintiff, Uber and the Driver, or Uber and any other witness to the Incident."

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

over 40% of all DFS, including 19 of the 20 Bellwether Plaintiffs. Additionally, to date Uber has produced 2,630 Workbench snapshots for independent drivers or Plaintiffs, as well as 1,423 Safety Lens snapshots and 3,150 Workbench snapshots related to responsive customer service communications in response to Request Nos. 26 and 27. However, as Uber Plaintiffs now request these Safety Lens and Workbench snapshots added to the DFS for all cases.

24.    Upon information and belief, these two proprietary tools are web-based user interfaces, not queryable data sets, and cannot be exported at scale. In fact, Plaintiffs' desired production can only be effected by an Uber employee with appropriate access manually capturing screenshots of these user interfaces. *See* ECF 2796-4 at ¶¶ 8-10. This is additionally burdensome to Uber because these landing pages are identified for production from hyperlinks in responsive documents. Uber would have to create a separate collections workflow to capture these user interface landing pages absent those links, and then either develop a de-duplication process and discard some of the collected documents or produce multiple identical copies of these snapshots for a DFS with links to these interfaces. Further, the responsive content these user interfaces may provide is already captured in other forms through Uber's production of tickets related to prior reports against the independent driver, Uber's production of account status logs, and Uber's narrative responses related to the independent driver.

25.    Plaintiffs reference a March 16, 2025 production in their position, and assert this production consisted of belatedly produced Safety Lens snapshots linked in responsive DFS tickets. In fact, Uber's March 16, 2025 production consisted of, and was characterized in Uber's transmittal as, *inter alia*, "Safety Lens (*not linked in Jiras*)...related to Bellwether Plaintiffs." (emph. added). As these snapshots were not linked in responsive DFS documents, they were outside the scope of the DFS dispute Judge Cisneros resolved in ECF 2825. As noted above, Uber produced Safety Lens snapshots linked in responsive DFS documents to Plaintiffs, in compliance with ECF 2825, on April 25, 2025.

**New Request Category #3: Additional Data Regarding the Vehicle Related to the Subject Trip**.

26.    Plaintiffs seek Uber to answer whether the independent driver was using a vehicle rented through one of Uber's vehicle rental partners when providing the Subject Trip. Upon information and belief, this information is not readily available in Uber's systems, and obtaining this

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

information for every DFS would be burdensome to Uber because doing so would require Uber to conduct a multi-step investigation across multiple data sources, and then undertake further engineering efforts to integrate the results of this investigation into Uber's DFS data pipeline.

27.    Plaintiffs also seek Uber to identify the vehicle used in the Subject Trip.[13] This request is redundant. The DFS already asks Uber if the vehicle used was the same vehicle used during the Subject Trip (Request No. 21) and, if not, for the license plate number of the vehicle used (Request No. 21(a)). There are a number of third parties, *e.g.* AutoCheck or J.D. Power, that advertise the ability to provide a vehicle's make, model, and trim based on the license plate number.

**New Request Category #4: Data Related to Other Trips.**

28.    Plaintiffs also seek to expand the DFS to include information related to trips that involve neither the independent driver nor Plaintiff. Plaintiffs seek the median and mean "1-star driver ratings for the City at the time of incident." Aside from the ambiguity of these requests—*e.g.*, over what time period the median or mean is sought—upon information and belief, Uber does not keep data points about median or mean 1-star rates in particular cities in the ordinary course of business.

29.    Upon information and belief, it is burdensome for Uber to generate either of these data points for every single case, because Uber would need to expend engineering efforts to develop, peer review, refine, and validate new queries to obtain this information, and then undertake further engineering efforts to integrate these new queries into Uber's DFS data pipeline. Excluding the burden of providing data by state, this process may require 16 to 20 person-hours to complete a generalized query, and then additional time to customize the query for each specific DFS based on the City ID and date range relevant to a Plaintiff's specific trip request. This individualized investigation alone would require approximately 30 additional minutes of Uber employees' time per DFS.

**Expanding Multiple New and Existing Requests to Include Data from "Every Account the Subject Driver has Held, Whether U.S.-Based or Not"**

30.    Uber prohibits an independent driver from having multiple accounts and has tools to

---

[13] Plaintiffs first provided this request to Uber on April 10, 2026, in a draft of their joint statement.

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

detect and deactivate duplicate accounts.[14] Upon information and belief, Uber proactively tracks multiple streams of information to evaluate whether an account is a duplicate for an individual.

31.    PTO 10 requires Uber to produce information and documents related to the independent driver who provided the Subject Trip, who is identified internally by a unique identifier ("UUID"). Plaintiffs now seek to expand multiple current Requests to include production of information related to independent driver UUIDs *other than* the driver UUID[15] that provided the Subject Trip, and information related to independent drivers outside the United States.[16]

32.    Upon information and belief, Plaintiffs' new requests for information related to prospective additional accounts located within the United States present two high burdens for Uber. First, determining if any other accounts are actually the same individual who provided Plaintiff's Subject Trip would require a fact-intensive manual review by Uber personnel authorized to access sensitive private user data. Second, if any such accounts were found in that manual review, Uber would need to undertake engineering efforts to design, peer review, validate, and implement new scripts to collect all the requested information and documents for UUIDs other than the UUID related to the Subject Trip, and undertake further engineering efforts to integrate these new scripts into Uber's DFS data pipeline.

33.    Upon information and belief, Uber would have a further heightened burden for identifying and collecting law enforcement-related information related to "associated" accounts. This expansion would require Uber's team responsible for responding to law enforcement requests to undertake extensive manual review to not only identify any potentially relevant accounts, but also to confirm whether the conduct resulting in a request from law enforcement was in fact related to misconduct *by that account holder*, or if that user was a victim, a witness, or referenced for some other reason.

34.    Upon information and belief, Uber could not reliably comply with Plaintiffs' new

---

[14] "Drivers and delivery people can only have one account." https://help.uber.com/driving-and-delivering/article/weve-detected-a-duplicate-account (last accessed: April 23, 2026)

[15] Upon information and belief, an individual's UUID corresponds to 1 unique account on the Uber platform, which is used for that individual as an independent driver, rider, and other functions.

[16]

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

request for information related to accounts outside the United States. First, Uber would have to search in every country Uber operates in, without regard to those countries' data privacy laws or other legal, regulatory, or procedural barriers to Uber accessing and producing such information. Second, Uber would necessarily need to base those searches on information available in the independent driver's U.S. account. Yet, many identifiers available for U.S. persons would necessarily be different outside the U.S., such as driver's licenses or other identification. Names are often spelled differently, and may be written in entirely different alphabets. An individual may also use different contact information. While it is possible that some small fraction of independent drivers who provided Subject Trips may have or at one time had Uber accounts outside the U.S., and Uber may be able to locate *some* linkages (but not necessarily confirmed matches) between U.S. and non-U.S. accounts, upon information and belief, requiring Uber to confirm matches between U.S. accounts and accounts outside the U.S. would send Uber on employees on an expensive wild goose chase for every DFS, and will likely not surface responsive information.

**Burdens on MDL Centrality, and Plaintiffs' Firms**

35.     In addition to greatly expanding the scope of narrative responses and document productions in the DFS, Plaintiffs' proposal includes gratuitous, and, upon information and belief, uncommon changes that would needlessly burden *MDL Centrality*—as well as Uber and many Plaintiffs—with no conceivable benefit to any Party. For example, Plaintiffs' Exhibit A re-numbers the DFS, starting with Request No. 10. Uber and MDL Centrality have aligned on processes to streamline the creation of DFS, as well as a file naming convention for produced documents that allows MDL Centrality, on an automated basis, to sort documents by Plaintiff and identify the Request to which each document is responsive. Upon information and belief, Plaintiffs' proposed changes would require both Uber and MDL Centrality to revamp those workflows. Additionally, MDL Centrality provides the Parties reporting on the DFS. Upon information and belief, if the Court adopts Plaintiffs' proposed changes, at minimum MDL Centrality would need to undertake efforts to remap narrative responses in DFS already produced under PTO 10 the renumbered requests, validate the remapping, and incorporate this remapping into all the reports they generate for the Parties. Lastly, upon

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB

14

information and belief, MDL Centrality cannot change the file names of previously-produced documents. Therefore, documents already produced will keep their association with the original Request No.

36.     Lastly, upon information and belief, many individual Plaintiffs' counsel access DFS productions for their clients through MDL Centrality. Those counsel would be presented with inconsistent and confusing document labeling if a new DFS were implemented.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2026, in New York, New York.


                                                    /s/ *Jamie A. Brown*

                                                    Jamie A. Brown

DECLARATION OF JAMIE A. BROWN  IN SUPPORT OF DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S POSITION SUBMITTED TO THE COURT ON APRIL 23, 2026                    Case No. 3:23-md-03084-CRB