**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION, | Case No. 3:23-md-03084-CRB |
| | **SUPPLEMENTAL BRIEFING ON ISSUES RELATED TO PRESERVATION OF SUPPLY PLAN DATA** |
| This Document Relates to: | |
| *All Actions* | Judge:      Hon. Charles R. Breyer<br>Courtroom:  Courtroom 6 – 17th Floor |

**INTRODUCTION**

Plaintiffs seek an extraordinary order requiring Uber to preserve, for two years, voluminous "supply plan" data generated from hypothetical rider-driver pairings that never occurred for billions of trips nationwide. That request is far broader than necessary or proportional to the needs of this litigation. Supply plan data encompasses 1200 to 1450 terabytes of data every month (which can amount to 100 billion rows of data for 30 days alone) and would be enormously burdensome and expensive to retain. Uber does not retain this data for any safety-related analytical, training, or operational purpose; preserving it for years would serve no real business function and would instead require Uber to warehouse massive quantities of data solely to accommodate Plaintiffs' speculative and far-fetched legal theory. Moreover, most of that data will never be relevant to any claim against Uber because more than 99.9% of trips on Uber's platform do not result in any reported sexual assault or misconduct. The limited and speculative value of this data simply does not justify the extraordinary burden and expense of preserving it for years.

Uber proposes a more reasonable compromise: (1) preserving S-RAD supply plan data for 90 days from the date of a trip; and (2) preserving S-RAD supply plan data associated with trips that become the subject of a report of sexual assault or misconduct pursuant to this Court's Order on the Preservation of Information That May Be Relevant to This Litigation, Dkt. 65 ("PTO 2"). Uber's proposed preservation framework appropriately balances the goal of preserving information that Plaintiffs claim is relevant against the substantial burden of preserving massive quantities of data that will almost never be sought by a Plaintiff in litigation. Not only are claims of sexual misconduct exceedingly rare on the Uber platform, *more than 97% of such complaints are reported within 90 days of the trip* at issue. Uber's proposed approach would thus preserve supply plan data for nearly all trips that might later be the subject of litigation, while avoiding the unnecessary expense and burden of preserving, for two years, trillions of rows of hypothetical matching data that nobody will ever request.

**BACKGROUND**

**Supply Plan Data.** As Uber has detailed in previous filings, when a rider requests a trip on the Uber app, Uber's matching algorithm scans for all drivers in the area who might be available to

provide a trip matching the rider's criteria and preferences. *See* Defs.' Opp'n to Pls.' Mot. for ESI Spoliation Sanctions at 6, Dkt. 5152 (incorporated herein by reference). For any single trip request, there are usually multiple—sometimes hundreds—of potential driver matches. *Id.*; *see also* Decl. of Jake Atlas ("Atlas Decl.") ¶ 12. Scans for potential matches occur every 5-10 seconds, often capturing information about the same unique drivers (and potential driver-rider matches) many times in the data. Atlas Decl. ¶ 13.

Safety Risk Assessed Dispatch ("S-RAD") is a proprietary machine learning model that is trained on historical data from extremely rare reports of both driver-on-rider and rider-on-driver sexual assault and misconduct. Atlas Decl. ¶ 3. S-RAD utilizes historical data about reported incidents of alleged sexual assault or misconduct to assess each potential rider-driver match, considering dozens of factors about the rider, the driver, the environment, and the geographic location where the trip is requested. *Id.* ¶¶ 3-4; *see also* Dkt. 5152 at 6. S-RAD generates a score for all potential trip pairings, including those that were never dispatched. The data on hypothetical trip pairings that were never dispatched are known as "supply plan" data. Atlas Decl. ¶ 4; *see also* Dkt. 5152 at 7. Once a supply plan has been assigned a score, S-RAD assesses whether that score is above the applicable threshold, which varies city-by-city and differs based on whether the trip is requested during the daytime or nighttime. Atlas Decl. ¶ 5; *see also* Dkt. 5152 at 7. If so, S-RAD intervenes to reduce the likelihood of the match; if not, the supply plan proceeds to Uber's matching processes based on the lowest estimated time of arrival and other optimization factors. Atlas Decl. ¶¶ 5-6; *see also* Dkt. 5152 at 7.

The distinction between trips that actually occur and hypothetical trips that never occur is critical. S-RAD data for trips that ***actually occur*** can be used to train the S-RAD model; supply plan data cannot. Atlas Decl. ¶¶ 7-8; *see also* Dkt. 5152 at 7. The S-RAD model is trained by reviewing the characteristics of the small number of trips that result in reported incidents of sexual assault or misconduct to determine whether factors related to the driver, the rider, the environment, and the geographic location have some correlation with such reported incidents. Atlas Decl. ¶ 7; *see also* Dkt. 5152 at 7. By contrast, supply plan data reflect potential driver-rider matches that were never dispatched—meaning the trip never occurred. Atlas Decl. ¶ 8. Because these matches

were never dispatched, there is no way to know whether they would have resulted in a reported incident. *Id.* As a result, the S-RAD model cannot derive any meaning from supply plan data because there is no outcome to correlate with the trip characteristics, and thus no way to determine whether any given undispatched match would have resulted in a report of a serious sexual assault or misconduct. *Id.*; *see also* Dkt. 5152 at 7.

For any given trip request, there could be dozens, hundreds, or even more than a thousand potential supply plans. Atlas Decl. ¶ 12. The volume of supply plan data generated for a single trip request varies based on various factors, including location and time of day. *Id*. ¶ 11. For example, on a single recent day in San Francisco, there were an average of 110 unique drivers available for a single trip request, and at times, there were as many as 1,836 available unique drivers. *Id*. ¶ 12. Because the matching algorithm scans for potential drivers every 5 to 10 seconds (often capturing the same driver multiple times), the number of supply plan records (i.e., rows of data) produced by *a single trip request* in San Francisco on that day exceeded 475,000 rows. *Id*. ¶¶ 15-16.

**Prevalence and Timing of Reports to Uber.** Available data demonstrate that 99.9% of trips arranged on Uber's platform do not involve a safety incident and will not result in a reported incident, much less a lawsuit. Uber, *U.S. Safety Report, 2021-2022* ("Uber Safety Report") at 3, https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=79c10aee-2b7f-447e-95bf-dfe62de09172. Of the tiny fraction of a percentage of trips that do result in a report of alleged sexual assault or misconduct, approximately 96% are reported to Uber within 30 days of the trip. Decl. of Todd Gaddis ("Gaddis Decl.") ¶ 4. The relevant data demonstrate that *more than 97% of such complaints are reported within 90 days of the trip* at issue. *Id*. ¶¶ 4-5.

**Burden and Cost of Supply Plan Data Retention.** Because supply plan data is generated for every possible driver-rider pairing for every single trip request, it is exceedingly voluminous. Atlas Decl. ¶¶ 11-17. The supply plan data collected for trips across the U.S., for 30 days alone, contain approximately 100 *billion* rows of information. Dkt. 5152 at 7. Given that volume, and the limited utility of supply plan data, the retention of supply plan data for 90 days requires 1434 terabytes of storage consumption, and the storage cost is approximately $275,100 per year. Atlas

Decl. ¶ 22.[1] If the Court were to require Uber to retain supply plan data for a longer period, the costs would increase exponentially, with Plaintiffs' proposal of preserving supply plan data for two years estimated to cost more than $2.2 million per year. *Id.* ¶ 22. Uber's proposal also provides for the preservation of supply plan data related to trips that are the subject of reports of sexual misconduct consistent with PTO 2. Because it is impossible to predict how many such reports Uber will receive in a given year, Uber cannot estimate the additional costs that will be associated with this extended preservation, but it will inevitably further increase Uber's data storage costs.

## LEGAL STANDARD

The key factors considered in evaluating a party's preservation obligations are "whether the information at issue is relevant to the parties' claims and defenses, and whether the ability and effort necessary to preserve the information is proportional to the needs of the case." *Al Otro Lado, Inc. v. Nielsen*, 328 F.R.D. 408, 416 (S.D. Cal. 2018) (rejecting preservation request as disproportionate because plaintiffs failed to clearly articulate why broad preservation of border surveillance data was relevant and it was not clear whether the defendant "could reasonably meet plaintiffs' request without incurring substantial burden"). In determining the appropriate scope of a preservation order, courts consider: (1) concerns "for the continuing existence and maintenance of the integrity of the evidence in question"; (2) "any irreparable harm likely to result to the party seeking the preservation of the evidence"; and (3) "the capability of an individual, entity, or party to maintain the evidence sought to be preserved." *Jardin v. Datallegro, Inc.*, No. 08-CV-1462-IEG-RBB, 2008 WL 4104473, at *1 (S.D. Cal. Sept. 3, 2008) (citation omitted). At bottom, "[p]reservation is evaluated on a standard of *reasonableness*, which is in turn informed by proportionality." *Al Otro Lado*, 328 F.R.D. at 416.

A request that attempts to force preservation of "sources of ESI regardless of their connection to the claims and defenses in the case," is not proportionate to the needs of the case. *Doe LS 340 v. Uber Techs., Inc.*, 710 F. Supp. 3d 794, 804 (N.D. Cal. 2024). Thus, courts do not

---

[1] In addition, the size and volume of supply plan data makes it difficult to analyze more than a week's worth of data at a time due to the compute limitations of Uber's query engines. Excess data overloads Uber's query engines and renders analysis impossible because attempted analysis that incorporates more data than the analytics servers have capacity for results in auto-cancellation of the requested analysis and errors. Atlas Decl. ¶ 21.

order preservation merely because information could be imagined to have some theoretical relevance; rather, they weigh the actual cost and burden of preservation against the demonstrated need for the information. *Griffith v. TikTok, Inc.*, No. 5:23-cv-00964-SB-E, 2024 WL 4875339, at *3 (C.D. Cal. 2024) (explaining that the Magistrate Judge did not err in declining to enter an ESI preservation order against TikTok where "the data preservation Plaintiffs sought would have cost millions of dollars" and "the cost of preserving the data is vastly disproportionate to the value of their claims"); *Rodriguez v. Google LLC*, No. 20-cv-04688-RS (AGT), 2021 WL 8085492, at *1-2 (N.D. Cal. Dec. 1, 2021) (finding that Google's 56-day retention policy for Firebase-powered app data was reasonable where: (i) Google "collects an immense amount of data from Firebase-powered apps;" and (ii) it would cost millions of dollars to store that data for two or more years).

## ARGUMENT

The Court should reject Plaintiffs' request that Uber retain all supply plan data for two years because the burden and cost of such retention is not proportional to the extremely limited potential relevance of information about hypothetical, alternative driver-rider matches for the many trips taking place across the country every day. By contrast, Uber's 90-day retention proposal fairly balances any theoretical need for this evidence in future cases against the enormous burden of storing billions of rows of data, and ensures the preservation of supply plan data for nearly all trips that may result in a complaint related to sexual misconduct.

### A.    The Burden Of Preserving Supply Plan Data For Two Years Would Be Enormous And Disproportionate.

The extraordinary burden of preserving all supply plan data for two years vastly outweighs the limited relevance of hypothetical matching data. This is particularly so because Uber's alternative 90-day proposal would preserve the overwhelming majority of information that may have some potential relevance to the claims of theoretical future litigants. Because S-RAD scans for potential matches every 5-10 seconds, and generates multiple (and often duplicative) supply plans per trip on billions of trips per year, supply plan data already constitute the largest set of data in Uber's safety storage infrastructure by a factor of 10. Atlas Decl. ¶ 20. This data occupies over one-third of all of the storage space on Uber's safety and insurance servers. *Id.* If the Court were to

order Uber to extend the preservation period for all supply plan data to two years, the costs to Uber would increase to more than $2.2 million per year. *Id.* ¶ 22.

Moreover, requiring Uber to store, for two years, massive amounts of data from trips that never occurred because a tiny fraction may someday be sought in future cases is neither reasonable nor proportional to the needs of this litigation. *See Griffith*, 2024 WL 4875339, at *3 (finding the cost to TikTok "of preserving the data is vastly disproportionate to the value of [the plaintiffs'] claims"); *Rodriguez*, 2021 WL 8085492, at *2 (preserving Google's 56-day retention policy because it would cost millions of dollars to store the data for two or more years). The mismatch between the burden and potential relevance is stark: 99.9% of trips arranged on the Uber platform do not result in a report of sexual assault or misconduct. Uber Safety Report at 3. As a result, ***almost all*** of Uber's supply plan data—which is recorded for every trip request across the country—will never be requested in any case in this litigation.

Importantly, supply plan data would have only marginal relevance, at best, even with respect to trips that ***do*** become the subject of litigation. Plaintiffs incorrectly assume that differences in S-RAD scores between hypothetical rider-driver pairings may be used to demonstrate that one pairing would have been "safer" than another. But S-RAD scores are not predictive of whether misconduct will occur on any particular trip. *See* Dkt. 5152 at 5. A comparatively higher S-RAD score does not mean misconduct was likely to occur; nor does a lower score establish that misconduct would not occur. *Id.* Indeed, the chance of misconduct occurring on any trip arranged on the Uber platform, regardless of S-RAD score, is incredibly small; S-RAD aims to make that chance even smaller. *Id.* But the S-RAD model is very low-precision. Even among the trips that are scored higher than the S-RAD threshold, the vast majority (more than 99%) still result in no incident when dispatched. *Id.* Supply plan data therefore reflect only hypothetical matching scenarios, not evidence that a different driver assignment would have prevented an alleged incident. As a result, the evidentiary value of supply plan data to theoretical future cases is limited and speculative.

In the past, Plaintiffs have taken the position that Uber has "conceded" the relevancy of S-RAD data by preserving S-RAD information for trips that actually occurred (and producing that information in connection with particular cases). Pls.' Mot. for ESI Spoliation Sanctions at 5, Dkt.

**SUPPLEMENTAL BRIEFING ON ISSUES RELATED TO PRESERVATION OF SUPPLY PLAN DATA**
CASE NO. 3:23-md-03084-CRB

5100. But, as explained above, S-RAD data for trips that actually occur are preserved because the data are used to train and continuously improve the S-RAD model. *See* Atlas Decl. ¶ 7. By contrast, supply plan S-RAD score data for **hypothetical trips** that never occurred cannot be used for this purpose. *Id.* ¶ 8. Thus, Uber's preservation of S-RAD data related to actual trips is not a concession about the legal relevance of supply plan data generally and does not translate into a duty to preserve all supply plan data for a period of years. *See Nyerges v. Hillstone Rest. Grp. Inc.*, No. CV-02376-PHX-DWL, 2021 WL 3299625, at *7 (D. Ariz. Aug. 2, 2021) (holding that the "duty to preserve *some* evidence from the night in question" does not establish that a defendant "should have preserved the specific piece of ESI at issue here").

## B.      Potential Plaintiffs Are Not Likely To Be Irreparably Harmed Under Uber's Proposal.

Plaintiffs cannot show that "any irreparable harm [is] likely to result" to theoretical future litigants from approving Uber's more reasonable proposal: 90-day preservation of all supply plan data, plus preservation pursuant to PTO 2 for supply plan data related to any trip that becomes the subject of a complaint related to alleged sexual assault or misconduct. *Jardin*, 2008 WL 4104473, at *1. As the objective evidence demonstrates, **more than 97% of reports** of alleged sexual assault or misconduct are received by Uber **within 90 days** of a trip. *See* Gaddis Decl. ¶ 4. And the benefit of increasing the preservation period is minimal; even doubling it from 90 to 180 days would only result in about half a percent more reports (e.g., moving from 97.34% to 97.9%). *Id.* This objective evidence refutes Plaintiffs' contention that Uber should be required to retain supply plan data for all trips for two years because "two years later is not unusual for Uber to receive a report of a sexual assault or [] misconduct." 4/29/2026 Hr'g Tr. 15:10-16. And given the prevalence of lawyer advertising and other publicity related to this litigation, it is highly likely that the average time between a trip and any allegation of misconduct will decrease as the litigation progresses.

In short, Uber's proposal strikes an appropriate and proportional balance between preserving information potentially relevant to future cases and avoiding the extraordinary burden of retaining for an extended period massive quantities of hypothetical matching data that will rarely, if ever, become relevant to any claim.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' request for two-year preservation of all supply plan data and adopt Uber's proposed preservation framework providing for: (1) 90-day preservation of supply plan data generally; and (2) preservation pursuant to PTO 2 for trips that become the subject of reports of sexual assault or misconduct.

DATED: May 15, 2026                          Respectfully submitted,


                                             /s/ *Laura Vartain Horn*
                                             Laura Vartain Horn (SBN 258485)
                                             **KIRKLAND & ELLIS LLP**
                                             555 California Street, Suite 2700
                                             San Francisco, CA 94104
                                             Telephone: (415) 439-1625
                                             laura.vartain@kirkland.com

                                             Allison M. Brown (Admitted *Pro Hac Vice*)
                                             **KIRKLAND & ELLIS LLP**
                                             2005 Market Street, Suite 1000
                                             Philadelphia, PA 19103
                                             Telephone: (215) 268-5000
                                             alli.brown@kirkland.com

                                             Jessica Davidson (Admitted *Pro Hac Vice*)
                                             **KIRKLAND & ELLIS LLP**
                                             601 Lexington Avenue
                                             New York, NY 10022
                                             Telephone: (212) 446-4800
                                             jessica.davidson@kirkland.com


                                             *Counsel for Defendants*
                                             UBER TECHNOLOGIES, INC.,
                                             RASIER, LLC, and RASIER-CA, LLC

**SUPPLEMENTAL BRIEFING ON ISSUES RELATED TO PRESERVATION OF SUPPLY PLAN DATA**
CASE NO. 3:23-md-03084-CRB