# C.1

LAURA VARTAIN HORN (SBN: 258485)
    laura.vartain@kirkland.com
**KIRKLAND & ELLIS LLP**
555 California Street, 30th Floor
San Francisco, CA 94104
Telephone: (415) 439-1625

ALLISON M. BROWN (Pro Hac Vice admitted)
    allison.brown@kirkland.com
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

JESSICA DAVIDSON (Pro Hac Vice admitted)
    jessica.davidson@kirkland.com
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4723

Counsel for Defendants
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC
*[Additional Counsel Listed on Following Pages]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION, <br><br> This Document Relates to: <br><br> *Jaylynn Dean v. Uber Technologies, Inc., et al.*, No. 3:23-cv-06708 | Case No. 3:23-md-03084-CRB <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Judge:　　　Hon. Charles R. Breyer <br> Courtroom:　Courtroom 6 – 17th Floor |

SABRINA H. STRONG (SBN: 200292)
    sstrong@omm.com
JONATHAN SCHNELLER (SBN: 291288)
    jschneller@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 19th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

PATRICK L. OOT, JR. (*Pro Hac Vice* admitted)
    oot@shb.com
**SHOOK, HARDY & BACON, LLP**
1800 K Street NW, 10th Floor
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211

ALYCIA A. DEGEN (SBN: 211350)
    adegen@shb.com
MICHAEL B. SHORTNACY (SBN: 277035)
    mshortnacy@shb.com
2121 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093

CHRISTOPHER V. COTTON (*Pro Hac Vice* admitted)
    ccotton@shb.com
255 Grand Boulevard
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.     RELEVANT PROCEDURAL HISTORY .......................................................................... 2

III.    STATEMENT OF RELEVANT FACTS .......................................................................... 3

    A.    Uber's Operations, Safety Features, and Regulatory Compliance ......................... 3

        1.    Uber's Business Model ................................................................................ 3

        2.    Regulatory Status and Permits .................................................................... 3

        3.    Contractual Agreements and the Independent Contractor Relationship ...... 4

        4.    Uber's Background Check and Screening Process ....................................... 5

        5.    Gender Match ............................................................................................... 6

    B.    Case-Specific Information ...................................................................................... 7

        1.    Driver Screening and Access to Uber Platform .......................................... 7

        2.    Alleged Assault ........................................................................................... 7

        3.    Post-Incident ............................................................................................... 9

IV.     STATEMENT OF THE ISSUES TO BE DECIDED ....................................................... 9

V.      ARGUMENT .................................................................................................................. 10

    A.    Plaintiff's Vicarious Liability Claim Fails .......................................................... 10

        1.    Arizona's Qualified Marketplace Rule Bars Plaintiff's Arizona Vicarious
            Liability Claim ........................................................................................... 10

        2.    Plaintiff's Apparent Agency Theory Fails as a Matter of Law. ................. 13

        3.    Even If an Employment or Agency Relationship Existed, Plaintiff's
            Vicarious Liability Claim Would Fail Because Sexual Assaults Fall
            Outside the Scope of Employment Under Arizona Law ............................ 15

    B.    Plaintiff's Gender Match and GPS Alert Product-Liability Theories Fail Because
        They Challenge Services ...................................................................................... 17

        1.    Plaintiff's Gender Match Product-Liability Theory Necessarily Targets the
            Absence of Backend Services to Match Riders Based on Gender............. 18

        2.    The GPS Alert Product-Liability Theory Targets the Absence of Live
            Monitoring Services ................................................................................... 19

    C.    Plaintiff's Fraud Claim Fails Because There Is No Evidence of Reliance ........... 20

    D.    Uber's Regulatory Compliance Precludes Punitive Damages As A Matter of
        Arizona Law ......................................................................................................... 22

VI.     CONCLUSION ............................................................................................................... 24

Page(s)

**Cases**

*Coleman-Anacleto v. Samsung Electr. Am., Inc.*,
  2016 WL 4729302 (N.D. Cal. Sept. 12, 2016) ..................................................................21-22

*Coslett v. Uber Techs., Inc., et al.*,
  No. CV 2018-005515 (Ariz. Super. Ct. Mar. 14, 2023) ....................................................... 13

*Craten v. Foster Poultry Farms Inc.*,
  2018 WL 834937 (D. Ariz. Feb. 13, 2018) ........................................................................22-23

*D'Ambrosia v. Rajala*,
  783 F. Supp. 3d 1077 (N.D. Ill. 2025) ................................................................................... 19

*Davis et al. v. DoorDash, Inc. et al.*,
  No. C20222745 (Ariz. Super. Ct. Aug. 22, 2025) .................................................................. 13

*Doe v. Roman Catholic Church of Diocese of Phoenix*,
  533 P.3d 214 (Ariz. Ct. App. 2023) ................................................................................. 16, 17

*Engler v. Gulf Interstate Eng'g, Inc.*,
  280 P.3d 599 (Ariz. 2012) ...................................................................................................... 16

*Fadely v. Encompass Health Valley of the Sun Rahb. Hosp.*,
  515 P.3d 701 (Ariz. Ct. App. 2022) ................................................................................. 14, 15

*Ft. Lowell-NSS Ltd. P'ship v. Kelly*,
  800 P.2d 962 (Ariz. 1990) ...................................................................................................... 10

*Gulf Ins. Co. v. Grisham*,
  613 P.2d 283 (Ariz. 1980) ...................................................................................................... 14

*Hale v. Norcold Inc.*,
  2020 WL 1911214 (D. Ariz. Apr. 20, 2020) .......................................................................... 22

*Hambleton Bros. Lumber Co. v. Balkin Enter, Inc.*,
  397 F.3d 1217 (9th Cir. 2005) ................................................................................................ 22

*Hoffman v. 162 N. Wolfe LLC*,
  228 Cal. App. 4th 1178 (2014) ..........................................................................................20-21

*Isgro v. Wells Fargo Bank, N.A.*,
  2019 WL 273373 (Ariz. Ct. App. Jan. 22, 2019) ................................................................... 21

*Klosa v. Uber Techs., Inc., et al.*,
  No. CV2019-000428 (Ariz. Super. Ct. Aug. 23, 2022) .......................................................... 13

*Markow v. Rosner*,
  3 Cal. App. 5th 1027 (2016) ..............................................................................................14-15

*Matter of Adoption of Hadtrath*,
  592 P.2d 1262 (Ariz. 1979) .................................................................................................... 21

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) .................................................................................................. 22

*McBroom v. Ethicon, Inc.*,
  2022 WL 604889 (D. Ariz. Mar. 1, 2022) .............................................................................. 22

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

Page(s)

*Menendez v. Paddock Pool Const. Co.*,
836 P.2d 968 (Ariz. Ct. App. 1991) ..................................................................... 17

*Miller v. Westcor Ltd. P'ship*,
831 P.2d 386 (Ariz. Ct. App. 1991) ..................................................................... 13

*Nunez v. Pro. Transit Mgmt. of Tucson, Inc.*,
271 P.3d 1104 (Ariz. 2012) ................................................................................. 13

*Oddo v. Arcoaire Air Conditioning & Heating*,
2019 WL 1460627 (C.D. Cal. Mar. 22, 2019) ............................................... 21, 22

*Pride of San Juan, Inc. v. Pratt*,
212 P.3d 29 (Ariz. Ct. App. 2009) ....................................................................... 13

*Radobenko v. Automated Equip. Corp.*,
520 F.2d 540 (9th Cir. 1975) ............................................................................... 20

*Rause v. Paperchine, Inc.*,
743 F. Supp. 2d 1114 (D. Ariz. 2010) ............................................................ 10, 13

*Rodgers v. Christie*,
795 F. App'x 878 (3d Cir. 2020) .......................................................................... 19

*Smith v. Am. Express Travel Related Servs. Co.*,
876 P.2d 1166 (Ariz. Ct. App. 1994) .............................................................. 16, 17

*SPUS8 Dakota LP v. KNR Contractors LLC*,
641 F. Supp. 3d 682 (D. Ariz. 2022) ................................................................... 15

*State Farm Fire & Cas. Co. v. Amazon.com. Inc.*,
407 F.Supp.3d 848 (D. Ariz. 2019) ..................................................................... 18

*Stencel v. Lyft, Inc.*,
2024 WL 4008752 (N.D. Cal. Aug. 29, 2024) ...................................................... 17

*Sud v. Costco Wholesale Corp.*,
229 F. Supp. 3d 1075 (N.D. Cal. 2017) ............................................................... 21

*Sw. Non-Profit Hous. Corp. v. Nowak*,
322 P.3d 204 (Az. Ct. App. 2014) ....................................................................... 15

*Wiggs v. City of Phoenix*,
10 P.3d 625 (Ariz. 2000) ...................................................................................... 10

**Statutes**

A.R.S. § 12-689 ................................................................................. 2, 10, 22, 23

A.R.S. § 13-706 ......................................................................................................... 6

A.R.S. § 23-1603 ........................................................................................ 10, 11, 13

A.R.S. § 28-9507 .................................................................................................... 24

A.R.S. § 28-9551 ............................................................................................. passim

A.R.S. § 28-9552 .................................................................................................... 23

A.R.S. § 28-9553 .................................................................................................... 24

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

A.R.S. § 28-9554 ............................................................................................................. 24

A.R.S. § 28-9555 ........................................................................................................ 6, 24

Cal. Civ. Code § 51 ........................................................................................................... 7

**Other Authorities**

Ariz. Admin. Code § R17-5-905 ..................................................................................... 23

*Compliance Overview*,
    Checkr (Aug. 19, 2025), *available at* https://perma.cc/YN8G-AESK ..................................... 5

Restatement (Third) of Torts: Prods. Liab. § 19 ...................................................... 17-18

Steven Totten,
    *Governor Ducey signs Airbnb bill, other sharing economy bills*, Phoenix
    Business Journal (May 12, 2016) (quoting Ariz. Gov. Doug Ducey), *available
    at* https://perma.cc/Z9W3-X7NE ..................................................................................... 4

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

### TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

Please take notice that on a date and time to be set by the Court, before the Honorable Charles R. Breyer in Courtroom No. 6 on the 17th Floor of the San Francisco Courthouse for the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, Uber) by and through their undersigned counsel, will and hereby do move the Court for partial summary judgment in favor of Uber and against Plaintiff Jaylynn Dean on the claims and theories described herein.

Uber seeks partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, any oral argument the Court may permit, and all pleadings and papers on file in this action and on such other matters as may be presented to the Court at or before the hearing.

Dated:  November 10, 2025

**O'MELVENY AND MYERS LLP**

By:  /s/  Jonathan Schneller

JONATHAN SCHNELLER

**KIRKLAND & ELLIS LLP**
LAURA VARTAIN HORN
ALLISON M. BROWN
JESSICA DAVIDSON

**SHOOK, HARDY & BACON, LLP**
PATRICK LEO OOT, JR.
ALYCIA A. DEGEN
MICHAEL B. SHORTNACY
CHRISTOPHER V. COTTON

*Counsel for Defendants*

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

At the motion to dismiss stage of these bellwether proceedings, the Court systematically narrowed Plaintiffs' sprawling legal and factual theories, dismissing legally unsupported claims and establishing evidentiary goalposts for others. *See* Dkt Nos. 1044, 1719, 3441. Discovery is now complete and Plaintiff Jaylynn Dean's trial is set to begin on January 14, 2026. To ensure that the trial is manageable and avoid squandering valuable bellwether resources on unsupported legal and factual theories, Uber respectfully moves for partial summary judgment on various remaining claims and theories asserted by Plaintiff.

1.      **Arizona Law Bars Vicarious Liability**. Plaintiff's attempt to hold Uber liable for her driver's alleged intentional torts fails three times over under Arizona law. First, Arizona courts enforce a strong rule of nonliability for an independent contractor's torts. That rule squarely precludes Plaintiff's vicarious liability claims, since Arizona's Qualified Marketplace statute, A.R.S. § 23-1603, classifies drivers on the Uber platform as independent contractors for all purposes, and no exception to Arizona's nonliability rule applies. Second, as a matter of Arizona law, Plaintiff's apparent agency theory fails because she assented to Terms of Service that repeatedly and unequivocally informed her that drivers who offer their services on Uber's platform are not Uber's agents. Third, even if Plaintiff's driver were deemed an employee or agent, controlling Arizona Supreme Court precedent holds that sexual torts fall outside the scope of employment because they further the employee's own purposes, not the employer's. All three rules warrant entry of summary judgment on Plaintiff's vicarious liability claim.

2.      **Product-Liability Theories Impermissibly Targeting Services**. As described by Plaintiff's own experts, Plaintiff's Gender Match and GPS Alert theories target Uber's alleged failure to provide services—algorithmic gender inference and gender verification (for Gender Match) and monitoring and intervention services (for GPS Alert). Under the product/service distinction this Court endorsed at the pleadings stage, such theories cannot support Plaintiff's strict product-liability claim.

3.    **Plaintiff's Fraud Claim Fails for Lack of Reliance**.  Plaintiff's fraudulent omission claim fails because there is no evidence she viewed, let alone relied on, the driver profiles and star ratings she alleges were fraudulently incomplete.  Indeed, the undisputed evidence establishes the opposite: Plaintiff's testimony is that she did not look at the Uber App prior to the ride at issue.  As a matter of law, Plaintiff could not have relied on allegedly fraudulent statements she did not see.

4.    **Arizona Law Bars Punitive Damages**.  Finally, Plaintiff's demand for punitive damages fails because the undisputed facts establish that Uber complied with all relevant state regulations, such as Arizona's Transportation Network Company regulations, including its background check requirements for rideshare companies.  That undisputed compliance triggers Arizona's statutory safe harbor for service providers that comply with applicable statutory and legal requirements.  A.R.S. § 12-689.

## II.    RELEVANT PROCEDURAL HISTORY

Plaintiff, one of six Wave 1 Bellwether claimants, asserts Arizona-law negligence, product-liability, fraud, and vicarious liability claims against Uber in connection with the alleged assault.  *See* Dkt. 269 (Master MDL Long-Form Complaint ("MC")); Dkt. 2959-4 (Plaintiff Jaylynn Dean's Amended Bellwether Complaint and Demand for Jury Trial ("Dean Am. Compl.")).

**Negligence**.  Plaintiff asserts various negligence theories, including that Uber failed to implement certain security measures (e.g., mandatory dashcams, a Gender Match feature, and enhanced GPS Alerts), failed to adequately warn her of dangers associated with use of Uber's platform, and negligently hired and retained Turay.[1]

**Product-Liability**.  Plaintiff asserts a product-liability claim alleging Uber's App is defectively designed because it lacks certain features that would have prevented her alleged assault, namely: (1) App-Based Ride Recording, (2) Gender Match, and (3) GPS Alert.[2]

**Fraud**.  Plaintiff brings a fraudulent omission claim alleging that Uber's "star ratings" and

---

[1]  *See* MC ¶¶ 362-67; Dean Am. Compl. ¶ 30.
[2]  Dean Am. Compl. ¶¶ 30, 62-81.

driver profile information omitted rider complaints.[3]

**Vicarious Liability**.  Plaintiff separately asserts an Arizona-law vicarious liability claim seeking to hold Uber liable for Turay's alleged intentional torts on respondent superior and apparent agency theories.[4]

Uber now moves for partial summary judgment on: (1) Plaintiff's vicarious liability claim (2) certain theories asserted in support of Plaintiff's product-liability claim; (3) Plaintiff's fraud claim; and (4) Plaintiff's demand for punitive damages.[5]

### III.    STATEMENT OF RELEVANT FACTS

#### A.    Uber's Operations, Safety Features, and Regulatory Compliance

##### 1.    Uber's Business Model

Uber operates a technology platform that uses a proprietary matching algorithm to connect independent third-party drivers with riders seeking transportation.  Declaration of Hannah Nilles ISO Defs.' Mot. for Partial Summ. J. ("Nilles Decl.") ¶ 3.  Riders and drivers access Uber's services through a smartphone application ("Uber App" or "App").  A rider uses the Uber App to request a ride.  MC ¶¶ 49, 60.  If an independent driver accepts the request, the App provides the rider with information about the driver and vehicle, including the driver's name, photograph, vehicle details, and star rating ("Driver Notifications").  *Id*. ¶¶ 66, 289.  Uber does not own, lease, or maintain the vehicles used by drivers on the platform; drivers use their own private vehicles to provide transportation services.  Nilles Decl. ¶ 3.  Over one billion trips are facilitated using the Uber App in the U.S. each year—over 2.5 million trips per day, almost 30 rides per second.  *Id.*

##### 2.    Regulatory Status and Permits

Arizona regulates Uber as a Transportation Network Company ("TNC") under a permit issued by the Arizona Department of Transportation ("DOT").  *See* A.R.S. § 28-9551 *et seq*.; Ex. 1 (Ariz. DOT Permit #43646).[6]  Recognizing "it's time for our laws to get with the times," in

---

[3]  Dean Am. Compl. ¶¶ 30, 35-44.  Plaintiff also alleged a "Designated Driver Marketing" claim, which the Court dismissed.  *See* PTO 28 at 5-9, 10 n.11.
[4]  Dean Am. Compl. ¶¶ 30-34.
[5]  MC ¶¶ 340-49 (punitive damages).
[6]  Citations of the form "Ex. __" refer to the concurrently filed declaration of Jonathan Schneller.

2016 Arizona implemented a comprehensive regulatory scheme governing TNCs to "advance the way [the state does] business and improve the way [its citizens] live."[7] Arizona implemented a comprehensive regulatory scheme governing TNCs.  *See* A.R.S. § 28-9551 *et seq*.  At all times relevant to the alleged incident, Uber has complied with all of Arizona's TNC regulations.  Nilles Decl. ¶¶ 24-25.

> **3.    Contractual Agreements and the Independent Contractor Relationship**

When prospective drivers choose to sign up to use the Uber App, they are prompted to review and agree to a written contract.  If they do not agree to the terms, they can decline to move forward with platform access.  Turay agreed to various contracts, including the January 1, 2022 Platform Access Agreement ("PAA"), which was the operative agreement on the date of the subject incident. Nilles Decl. ¶¶ 26-28.  The Agreement defines Uber's Services as "lead generation and other technology-based services that enable those operating independent business enterprises like [independent drivers] to provide [peer-to-peer services] requested by Riders."  Ex. 2 (1/1/2022, PAA) at § 2.1.  Turay agreed that his provision of transportation services "creates a direct business relationship between [the independent driver] and the [rider]."  *Id.* at § 2.6.

The Agreement expressly defines the relationship between Uber and Turay as "that of independent business enterprise[]," stipulating that Turay is "not an employee," is not Uber's "agent," and has "no authority to act on behalf of Uber."  *Id.* at § 1.1.  The Agreement further provides that Uber "does not . . . direct or control" Turay, that Turay retains discretion to "accept, decline, ignore, or cancel" rides, and that Turay is responsible for maintaining his own vehicle.  *Id.* at §§ 1.2, 2.5(c).[8]

To access the Uber App, all riders must also agree to Uber's Terms of Use ("TOU" or "Terms").  Nilles Decl. ¶ 4.  Plaintiff assented to Uber's TOU before accessing the Uber App.  *Id.* ¶ 29; *see also* Dkt. 3484 (PTO 29) at 4-5, 12-13 (concluding Uber's TOU "constitutes a valid and

---

[7] Steven Totten, *Governor Ducey signs Airbnb bill, other sharing economy bills*, Phoenix Business Journal (May 12, 2016) (quoting Ariz. Gov. Doug Ducey), *available at* https://perma.cc/Z9W3-X7NE.

[8] Turay separately agreed to an April 4, 2022 Fare Addendum containing additional payment terms, which was operative on the date of the subject incident.  *See* Ex. 3 ("Fare Addendum"); Nilles Decl. ¶ 28.

enforceable contract" and that Plaintiffs, including Dean, unambiguously "manifested their assent to the terms by checking a box and clicking 'Confirm'").  When accepting the Terms, Plaintiff contractually acknowledged that Uber's services enable her to "find, request, or receive" services from "third party service providers" including "independent drivers," that independent drivers are "not actual agents, apparent agents, ostensible agents, or employees of Uber in any way," and that Uber "does not transport [Plaintiff]." Ex. 4 (1/17/2023, TOU) § 3.  Plaintiff also acknowledged that "Uber does not guarantee the quality, suitability, safety or ability of third-party providers" and that "the entire risk arising out of [her] use of the services . . . remains solely with [her], to the maximum extent permitted under applicable law." *Id.* at § 7.

### 4.     Uber's Background Check and Screening Process

In compliance with Arizona law, third-party drivers must clear certain screening criteria to access the Uber App.  As such, third-party drivers undergo a comprehensive screening process before permitting them to access the Uber App.  Nilles Decl. ¶ 7.  Uber uses a nationally accredited background check company called Checkr, Inc. ("Checkr") to conduct criminal and civil background checks in Arizona.[9]  Checkr is an independently audited Consumer Reporting Agency ("CRA") that is recognized as the industry standard for rideshare companies.  *Id.* at ¶ 9.

Uber's background checks, in full compliance with Arizona ridesharing laws, include identity verification, a Motor Vehicle Record (MVR) review, a Social Security Number (SSN) Trace, and multi-jurisdictional searches of criminal records, sex offender registries, and global watchlists.  *Id.* at ¶¶ 8, 10-17.  If the background check process identifies any criminal record, no matter how minor, a team of Uber employees manually reviews it.  *Id.* ¶ 18.

Under Arizona law, third-party drivers must meet certain eligibility criteria to gain access to the Uber platform.  *See* A.R.S. § 28-9555.  While Uber complies with Arizona's screening requirements, its internal safety standards go **beyond** what Arizona law requires.  Nilles Decl.

---

[9]  Checkr is an accredited member of the Professional Background Screening Association (PBSA), the industry trade association for consumer reporting agencies.  PBSA accreditation recognizes a rigorous and independently validated commitment to compliance with regulations governing background checks, including the Fair Credit Reporting Act (FCRA).  *See* Nilles Decl. ¶ 9; *see also Compliance Overview*, Checkr (Aug. 19, 2025), *available at* https://perma.cc/YN8G-AESK.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

¶ 19. Arizona mandates that TNCs bar drivers if they have been convicted of certain serious crimes, including sexual assault, within the preceding seven years. *See* A.R.S. § 28-9555(B)(2); *id.* § 13-706(F). Uber **exceeds** that statutory minimum and permanently bars drivers with convictions or pending charges for sexual assault, murder, manslaughter, kidnapping, or sex crimes against children, regardless of when the charge or conviction was entered. Nilles Decl. ¶ 19. Uber also bars drivers with pending charges or convictions within the last seven years for aggravated assault, burglary, or armed robbery. *Id.* In compliance with Arizona Revised Statute Section 28-9555(B)(3), Uber likewise bars any prospective third-party driver who is listed in a national sex offender registry database. Nilles Decl. ¶ 19.

In addition to initial background checks, and without a legal requirement to do so, Uber partnered with Checkr to innovate a first-of-its-kind continuous driver safety screening system. Nilles Decl. ¶¶ 20-22. Uber uses its continuous criminal monitoring technology to identify new offenses in real-time. *Id.* If new reportable information indicates a driver no longer meets Arizona's TNC driver-eligibility criteria, then Uber restricts or deactivates the driver's access to the platform, as they no longer are in compliance with the regulations. *Id.* Also without a legal requirement to do so, Uber reruns background and driving record checks for every driver annually for as long as a driver uses the platform. *Id.*

Uber conducted multiple background screenings of Turay between 2016 and 2023 and all checks were clear of criminal history. *Id.* ¶ 30. Plaintiff has no evidence, nor does she allege, that Uber failed to discover disqualifying criminal convictions or other records. *See* Dean Am. Compl. ¶¶ 5-29.

### 5.   Gender Match

Consistent with industry practice, Uber does not ordinarily collect gender information from riders when they create an account, nor is it under any legal obligation to do so. Ex. 5 (7/23/2025, Nilles Dep.) at 217:4-14, 308:4-6); Declaration of Mariana Esteves ISO Defs.' Mot. for Partial Summary J. ("Esteves Decl.") ¶ 10. Offering a feature that would permit female riders the option of matching exclusively with female drivers (Gender Match) requires the implementation of a machine learning algorithm (a "Gender Inference Framework") designed to

infer the gender of riders using their first name and other information.  Ex. 6 (Weiner Rep.) at ¶¶ 221-22; Esteves Decl. ¶ 11.  Any Gender Match feature also requires the implementation of additional verification services to ensure drivers do not misrepresent their gender to gain access to the program.  Esteves Decl. ¶ 12.

In September 2023, a competing rideshare platform, Lyft, offered a Gender Match service ("Women+ Connect") in certain markets.  Esteves Decl. ¶ 8.  In evaluating whether to launch such a service prior to 2025, Uber considered the many serious challenges inherent in such an offering, including complex issues related to the spectrum of gender identities, including how to account for transgender or non-binary individuals, and risks relating to allegations of discrimination.[10]  *Id.* ¶ 13.  Ultimately, in August of 2025, Uber launched gender matching pilot programs in three U.S. cities (San Francisco, Los Angeles, and Detroit) to test and optimize the feature.  Esteves Decl. ¶ 9.

### B.    Case-Specific Information

#### 1.    Driver Screening and Access to Uber Platform

Exceeding the requirements of Arizona's Transportation Network Company regulations, Uber conducted *thirteen* background and motor vehicle checks of Turay between 2016 and 2023.  Nilles Decl. ¶ 30.  None revealed disqualifying criminal history.  *Id.* ¶ 31.  Prior to the incident, Turay met all the regulatory requirements to gain access and maintain access to the Uber platform.  *Id.*

#### 2.    Alleged Assault

On the evening of November 14, 2023, Plaintiff spent several hours at the Tempe, Arizona apartment of Scott McLaughlin, a physician she met on the dating app Bumble.  Ex. 8 (Dean Dep.) at 175:17-177:18, 202:23-204:19); Ex. 9 (McLaughlin Dep.) at 9:20-10:11.  As the evening

---

[10]  Confirming the concern's validity, Uber's July 2025 announcement of a gender-matching pilot program has already prompted an antidiscrimination class action pending in California state court. *See Almond, et al. v. Uber Techs., Inc.*, Case No. _____, Class Action Compl. ¶¶ 3-4 (Cal. Sup. Ct. Nov. 3, 2025) (alleging that Uber's 2025 gender match pilot program violates the Unruh Act's prohibition on gender discrimination and is "sexually discriminatory" because it "prioritizes women drivers" over men); *see* Cal. Civ. Code § 51 (Unruh Civil Rights Act); *see also, e.g.*, Ex. 7 (*Uber's New "Women Preferences" Program Violates Civil Rights Law*, The Heritage Foundation (Aug. 8, 2025)).

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

progressed, Plaintiff consumed a number of alcoholic drinks, leading McLaughlin to let her nap and order food "to try to sober her up." *Id.* at 40:2-46:21; *see also* Ex. 8 (Dean Dep.) at 203:10-204:19.

At about 12:20 A.M. the morning of November 15, McLaughlin used the Uber App on Plaintiff's phone to request a ride for her to the hotel where she was staying, "tracking" the car on its way to the pickup location (his apartment) and "watch[ing] it until it got there on the app to see when it . . . arrived." Ex. 9 (McLaughlin Dep.) at 45:24-46:24; Ex. 8 (Dean Dep.) at 189:5-10, 193:1-14, 260:17-261:4. Plaintiff, who was later described as "going in and out of consciousness" and "really sick," Ex. 10 (Tempe Police Dept. Rep.) at -00009; Ex. 8 (Dean Dep.) at 214:2-5, did not "recall looking at the app at all before the car pulled up that night," Ex. 8 (Dean Dep.) at 205:24-206:1.

Turay picked Plaintiff up at approximately 12:33 A.M. Ex. 11 (Trip Receipt) at -27901. Five minutes later, at about 12:38 A.M., Turay ended the ride on the App and went offline. *See* Ex. 12 (Mobile Event Log) at -6299; Ex. 13 (7/15/2025, Brown Dep.) at 210:1-211:9; Ex. 14 (Turay Dep.) at 57:25-58:11. At this point, Turay was not online and able to receive any trip requests.

Turay stopped the car at a parking lot near Plaintiff's hotel, where Plaintiff alleges that Turay raped her. Ex. 10 (Tempe Police Dept. Rep.) at -0011. (Turay maintains that the encounter was consensual.) Ex. 14 (Turay Dep.) at 46:18-47:2, 88:25-89:5. Turay dropped Plaintiff off at the SpringHill Suites at approximately 1:08 A.M., thirty minutes after he ended the trip on the App at 12:38 A.M. Ex. 15 (Kelkar Rep. (Dean)) at 6; Ex. 8 (Dean Dep.) at 260:6-261:9.

The ride's early termination was detected by Uber's RideCheck feature, which analyzes GPS data in real-time to detect unexpectedly long stops, unexpected route deviations, and trips that end prior to arrival at the rider's requested destination. Esteves Decl. ¶¶ 5-6. When a GPS anomaly is detected, the Uber App triggers a notification to the rider and the driver to confirm that neither has any concerns about the trip. Ex. 16 (7/15/2025, Esteves Dep.) at 14:8-15, 16:8-16, 50:6-19. The vast majority of the time that RideCheck is triggered there is no safety incident

associated with the trigger. *Id.* at 50:13-51:2; Esteves Decl. ¶ 6.

When the subject trip ended at 12:38 A.M., Uber immediately sent a midway drop-off RideCheck notification to Plaintiff stating "Your ride ended earlier than expected" and asking "Is everything ok?" Ex. 17 (11/15/23, RideCheck Notification) at -0084; Ex. 15 (Kelkar Rep. (Dean)) at 4-5. Plaintiff first testified that she "didn't get [a RideCheck notification] until [she] was at the hotel," and the notification was "delayed" and should have "com[e] earlier." Ex. 8 (Dean Dep.) at 241:4-242:2, 257:1-15. After viewing a screenshot of her phone indicating the approximate time of the RideCheck notification, Plaintiff ultimately agreed that she received the notification before arriving at the hotel and while she was still in the car. Ex. 8 (Dean Dep.) at 262:3-24, 286:19-287:4.

### 3. Post-Incident

Later that day, Plaintiff reported the incident to the Tempe Police Department and to Uber. Ex. 10 (Tempe Police Dept. Rep.) at -0003; Ex. 18 (Uber Communications to Turay) at -3701. Uber immediately placed a safety hold on Turay's account, which suspended his access to the platform. *Id.* at -3701. Two days later, and in the course of its continued investigation into the incident, Uber permanently deactivated Turay and banned him from the platform with a safety lock. *Id.*; Ex. 19 (Turay Status and Flow) at -7772; Ex. 13 (7/15/2025, Brown Dep.) at 215:2-10.

## IV.    STATEMENT OF THE ISSUES TO BE DECIDED

1.    Whether Plaintiff's vicarious liability claim fails because (a) Arizona law bars vicarious liability for the torts of independent contractors subject to exceptions not applicable here; (b) Uber's Terms of Service unambiguously informed Plaintiff that Turay was not its agent; and (c) the alleged sexual assault falls outside the scope of any alleged employment or agency relationship as a matter of Arizona law.

2.    Whether Plaintiff's product-liability theories alleging Gender Match and GPS Alert design defects fail as a matter of law because the summary judgment record confirms they challenge Uber's provision of services (algorithmic matching, gender verification, real-time monitoring, and live intervention) rather than any feature of the Uber App.

3.      Whether Plaintiff's fraud claim fail for lack of reliance because there is no evidence that Plaintiff viewed the Driver Notifications, including star ratings, before her ride.

4.      Whether Plaintiff's request for punitive damages is barred by A.R.S. § 12-689 because Uber is a service provider that complied with all relevant and material state regulations.

## V.      ARGUMENT

### A.      Plaintiff's Vicarious Liability Claim Fails

#### 1.      Arizona's Qualified Marketplace Rule Bars Plaintiff's Arizona Vicarious Liability Claim

Uber cannot be vicariously liable for Turay's alleged intentional torts because Arizona law explicitly classifies drivers on the Uber platform as independent contractors and holds that an "employer is not liable for the negligence of an independent contractor." *Wiggs v. City of Phoenix*, 10 P.3d 625, 627 (Ariz. 2000); *accord Ft. Lowell-NSS Ltd. P'ship v. Kelly*, 800 P.2d 962, 967 (Ariz. 1990) (en banc); *Rause v. Paperchine, Inc.*, 743 F. Supp. 2d 1114, 1118 (D. Ariz. 2010).[11]

Under Arizona law, drivers like Turay are "qualified marketplace contractors." A.R.S. § 23-1603. Section 1603 establishes a framework under which a "qualified marketplace contractor" (the driver) working with a "qualified marketplace platform" (Uber) "shall be treated as an independent contractor for all purposes" under Arizona law so long as three conditions are satisfied. A.R.S. § 23-1603(A). First, "[a]ll or substantially all of the payment for the services performed by the qualified marketplace contractor [must be] related to the performance of services or other output." *Id.* § 23-1603(A)(1). Second, the services must be "governed by a written contract executed between the qualified marketplace contractor and a qualified marketplace platform." *Id.* § 23-1603(A)(2). Third, the written contract must contain various provisions affirming the independent nature of the relationship. *Id.* § 23-1603(A)(3).

It is undisputed that Turay satisfies the statutory requirements for independent contractor status. Uber plainly meets the statute's definition of a "qualified marketplace platform" as an

---

[11] Plaintiff does not assert common carrier or nondelegable duty theories of liability against Uber. *See* Dean Am. Compl. ¶ 30.

entity that (a) "[o]perates a digital website or digital smartphone application that facilitates the provision of services" by contractors to third parties, and (b) accepts service requests only through its "digital website or digital smartphone application." *Id.* § 23-1603(E)(2).[12] Similarly, Turay is a "qualified marketplace contractor," defined by the statute as a person that "enters into an agreement with a qualified marketplace platform to use the qualified marketplace platform's digital platform to provide services to third-party individuals . . . ." *Id.* § 23-1603(E)(1). Turay entered into an agreement to use the Uber platform to provide transportation services to riders. *See* Ex. 2 (1/1/2022, PAA).

Finally, Uber's relationship with Turay satisfies all three statutory requirements for independent contractor status. There is no dispute that "substantially all" of Turay's payments "related to the performance of services" offered on Uber's platform (in this case, rides). A.R.S. § 23-1603(A)(1); *see* Ex. 2 (1/1/2022, PAA) ¶ 4.2; Ex. 3 (4/4/2022, Fare Addendum) at -5514-15. There is likewise no question that Turay's services on the Uber platform are "governed by a written contract executed between" Turay and Uber. A.R.S. § 23-1603(A)(2); *see also* Ex. 2 (1/1/2022, PAA); Ex. 3 (4/4/2022, Fare Addendum). Finally, there is no dispute that the PAA and Fare Addendum Turay executed each contain the provisions required by A.R.S. § 23-1603(A)(3):

| Requirement of A.R.S. § 23-1603(A)(3) | Provision |
|---|---|
| **(a)** That the qualified marketplace contractor is providing services as an independent contractor and not as an employee. | **PAA ¶ 1.1:** "The relationship between the parties is solely as independent business enterprises, each of whom operates a separate and distinct business enterprise that provides a service outside the usual course of business of the other. This is not an employment agreement and you are not an employee." |
| **(b)** That . . . all or substantially all of the payment paid to the contractor shall be based on the performance of services or other output. | **Fare Addendum at 1-2:** "Uber enables you, through the Driver App, to charge your Rider(s) a 'Fare' for each Ride. The Fare may be calculated using a base amount and amounts that are based on the estimated or actual distance and/or time of the Ride." |

---

[12] The definition of a "qualified marketplace platform" under A.R.S. § 23-1603(E)(2) is substantively identical to Arizona's definition of a "Transportation Network Company" (TNC). *See* A.R.S. § 28-9551(3) (defining a TNC as an entity that "uses a digital network or software application to connect passengers to transportation network services" provided by independent drivers).

| | |
|---|---|
| | **Fare Addendum at 3:** "Unless we indicate to you otherwise, for each Ride, the Rider will pay an amount that includes the Fare, applicable estimated taxes, tolls and surcharges, Direct Fees, and other fees retained by us, as well as an amount that corresponds to the Service Fee, and if they choose, any gratuity (collectively, the "Rider Payment")." |
| **(c)** That the qualified marketplace contractor is allowed to work any hours or schedules the qualified marketplace contractor chooses. | **PAA ¶ 1.2:** "[Y]ou decide when, where and whether [] you want to offer [peer-to-peer transportation services] facilitated by our Platform." |
| **(d)** That the qualified marketplace contract does not restrict the contractor's ability to perform services for other parties. | **PAA ¶ 1.2:** "[I]t is entirely your choice whether to provide [peer-to-peer transportation services] to Riders directly, using our Platform, or using any other method to connect with Riders, including, but not limited to other platforms and applications in addition to, or instead of, ours." |
| **(e)** That the qualified marketplace contractor bears all or substantially all of the qualified marketplace contractor's own expenses ... incurred ... in performing the services. | **PAA ¶ 2.3:** "You are responsible for, and bear all costs of, providing all equipment, tools and other materials that you deem necessary or advisable and are solely responsible for any obligations or liabilities arising from the Rides you provide." |
| **(f)** That the qualified marketplace contractor is responsible for the taxes on the qualified marketplace contractor's own income. | **Fare Addendum at 4:** "You are responsible for taxes on your own income." |
| **(g)** That the contract . . . may be terminated without cause by either party . . . at any time on reasonable notice . . . . | **PAA ¶¶ 5.1-5.3:** Providing that the Agreement "will continue until terminated by [the driver] or [Uber]," explicitly authorizing drivers to "terminate this Agreement . . . without cause at any time upon seven (7) days' prior written notice," limiting Uber's ability to terminate without notice to a "Material Breach or Violation" in the contract, and putting no limit on Uber's ability to terminate without cause upon reasonable notice. |

Turay therefore qualifies as an independent contractor "for all purposes under . . . state law[]." A.R.S. § 23-1603(A). And it follows that Uber cannot be held vicariously liable for his alleged intentional torts. *E.g.*, *Rause*, 743 F. Supp. 2d at 1118-19.[13]

---

[13] *See also, e.g.*, *Coslett v. Uber Techs., Inc., et al.*, No. CV 2018-005515 (Ariz. Super. Ct. Mar. 14, 2023) (Arizona court granted summary judgment to Uber, finding Uber to be a qualified marketplace platform and the independent driver to be an independent contractor, holding Uber could not be held vicariously liable for the independent driver's alleged negligence under statutory and common law, and expressly finding no joint venture and no non-delegable duty obligation owed by Uber); *Klosa v. Uber Techs., Inc., et al.,* No. CV2019-000428 (Ariz. Super.

Arizona courts have recognized "three categories" of exceptions to the "general rule of nonliability" for an independent contractor's torts: "the inherently dangerous work exception, the non-delegable duty exception, and exception for torts caused by the direct negligence of the employer in selecting, instructing, or supervising the contractor." *Id.* at 1118.  None of the exceptions apply to Plaintiff's vicarious liability claim.  First, providing rides is nothing like the activities that Arizona courts have treated as "inherently dangerous." *See, e.g.*, *Pride of San Juan, Inc. v. Pratt*, 212 P.3d 29, 34 (Ariz. Ct. App. 2009) ("crop dusting" is inherently dangerous based on "the drift of poisonous chemicals"); *Miller v. Westcor Ltd. P'ship*, 831 P.2d 386, 392 (Ariz. Ct. App. 1991) (public fireworks display).  Second, Plaintiff does not allege common carrier status, nor could she, as Arizona has abolished the common carrier doctrine, or any other relevant source of a nondelegable duty.[14]  Third, any liability for negligent selection, instruction, or supervision would sound in direct liability, not vicarious liability.  The absence of any applicable exception precludes Plaintiff's attempts to hold Uber vicariously liable for Turay's torts under any theory.

### 2.    Plaintiff's Apparent Agency Theory Fails as a Matter of Law

Plaintiff's attempt to hold Uber vicariously liable on an apparent agency theory likewise fails because the Terms to which Plaintiff contractually agreed unambiguously informed her that Turay was not Uber's agent. *See* MC ¶¶ 427-435; Dean Am. Compl. ¶ 30.[15]  Further, the record confirms that Plaintiff did not request the subject trip, and as such did not, and indeed could not, rely on any alleged representation that Turay acted as Uber's agent.

In Arizona, the party asserting "apparent agency" has "the burden of proving the agency."

---

Ct. Aug. 23, 2022) (Arizona court granted summary judgment to Uber, expressly finding the driver to be an independent contractor with no agency relationship and no competent evidence to establish negligent hiring, training, or retention); *Davis et al. v. DoorDash, Inc. et al.*, No. C20222745 (Ariz. Super. Ct. Aug. 22, 2025) (granting summary judgment to DoorDash, finding the driver had no actual or apparent authority to act on behalf of DoorDash beyond his role as an independent contractor, and no evidence to establish negligent hiring or retention).

[14]  Arizona "has expressly rejected the common carrier doctrine, instead adopting the general standard of reasonable care under the circumstances" for carriers. *See Nunez v. Pro. Transit Mgmt. of Tucson, Inc.*, 271 P.3d 1104, 1109 (Ariz. 2012) (en banc) (citing *Bethel v. N.Y.C. Transit Auth.*, 92 N.Y.2d 348, 355 (1998), and adopting same rule).

[15]  Plaintiff does not allege an actual agency claim. *See* MC ¶¶ 418-444; Dean Am. Compl. ¶ 30.

-13-
DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

*Gulf Ins. Co. v. Grisham*, 613 P.2d 283, 286 (Ariz. 1980).  To do so, Plaintiff must establish both (1) that Uber "intentionally or inadvertently" led her "to believe an agency exists," and (2) that she "justifiably relie[d] on [Uber's] representations."  *Fadely v. Encompass Health Valley of the Sun Rahb. Hosp.*, 515 P.3d 701, 706 (Ariz. Ct. App. 2022).  Plaintiff's agreement to a clear contractual disclaimer of any agency relationship precludes her from carrying that burden.

In *Fadely*, the plaintiff alleged an apparent agency relationship between an in-patient rehabilitation center and the doctors it assigned to treat her, who held medical staff privileges and leased space at its facility.  *Id.* at 704-05.  The Arizona Court of Appeals found apparent agency lacking as a matter of law because, upon admission, plaintiff signed a form that "advised her that [the center] did not control the 'medical services' of independent practitioners who 'practice independently' under their state license and privileges granted by the hospital,' 'maintain sole responsibility for their medical judgment and professionalism' and 'bill and collect for their services independently from the hospital.'"  *Id.* at 706.  The agreement also "drew a proverbial line," describing certain categories of providers (e.g., nurses and therapists) as employees and others, including physicians, as "[i]ndependent practitioners."  *Id.*  Because the center "did not represent [the doctors] as its employees or agents to Plaintiff, instead informing her of the independent relationship between them, Plaintiff cannot show either the representation or justifiable reliance needed for an apparent agency."  *Id.*; *see also Markow v. Rosner*, 3 Cal. App. 5th 1027, 1041-42 (2016) (plaintiff's "actual notice" of physician's independent contractor relationship with hospital "negated" apparent agency as a matter of law despite title as director of hospital's pain clinic and use of hospital's logo and badge).

The same is true here.  The Court has already determined that Plaintiff accepted Uber's TOU.  *See* PTO 29 at 4-5, 12-13.  Those Terms disclaimed an agency relationship even more explicitly than the agreement in *Fadely*, informing Plaintiff that Uber provides "third-party services" enabling her to request rides from "independent drivers" who are "***not actual agents, apparent agents, ostensible agents, or employees of Uber in any way***."  Ex. 4 (1/17/2023, TOU) § 3 (emphasis added).  The agreement further advised Plaintiff that "any effort, feature, process, policy, standard or other effort undertaken by Uber to facilitate [Plaintiff's] receipt of third party

services or in the interest of safety or security . . . is not an indicia of an employment, actual agency, apparent agency, or ostensible agency relationship with a third-party provider." *Id.* In short, Uber clearly communicated to Plaintiff that Turay was not its agent. Under *Fadely*, that disclaimer is conclusive both on whether Uber led Plaintiff to believe an agency relationship existed and on whether any reliance on that representation was justifiable.

Leaving aside the dispositive disclaimer, Plaintiff's apparent agency theory separately fails because she cannot establish justifiable reliance on any alleged Uber representation. *Fadely*, 515 P.3d at 706. To prove reliance, a party "must act or refrain from acting based on the [defendant's] representation." *SPUS8 Dakota LP v. KNR Contractors LLC*, 641 F. Supp. 3d 682, 697 (D. Ariz. 2022). Here, the undisputed facts preclude any finding of reliance. Plaintiff did not request the ride herself. Ex. 8 (Dean Dep.) at 189:5-10, 193:1-14. By her own admission, she was so "drunk" that she "going in and out of consciousness" at the time of the ride. *See id.* at 214:17-22; Ex. 10 (Tempe Police Dept. Rep.) at -00009. Unsurprisingly, Plaintiff admitted she did not "recall looking at the app at all before the car pulled up that night," Ex. 8 (Dean Dep.) at 205:24-206:1, and only viewed the driver's profile "after the . . . ride" had concluded, *id.* at 215:2-216:2 (emphasis added). Having perceived nothing from which she could infer agency, Plaintiff cannot establish that she "acted or refrained from acting" based on any alleged representations by Uber. *See Sw. Non-Profit Hous. Corp. v. Nowak*, 322 P.3d 204, 212 (Az. Ct. App. 2014) (rejecting justifiable reliance where there was "no indication" the plaintiff acted or refrained from acting based on defendant's representation). Absent evidence of justifiable reliance, Plaintiff's apparent agency theory independently fails as a matter of law.

### 3. Even If an Employment or Agency Relationship Existed, Plaintiff's Vicarious Liability Claim Would Fail Because Sexual Assaults Fall Outside the Scope of Employment Under Arizona Law

The Court should enter summary judgment on Plaintiff's vicarious liability claim for the independent reason that, as a matter of Arizona law, the torts she alleges fell outside of any alleged employment or agency relationship with Uber.

Under Arizona law an employer can be vicariously liable for an employee's or agent's tortious acts under the doctrine of respondeat superior "only if the employee is acting within the

scope of employment" when committing the tortious conduct. *Engler v. Gulf Interstate Eng'g, Inc.*, 280 P.3d 599, 601 (Ariz. 2012) (en banc). Whether an employee's conduct is within the scope of employment "is a question of law . . . if the undisputed facts indicate that the conduct was clearly outside the scope of employment." *Smith v. Am. Express Travel Related Servs. Co.*, 876 P.2d 1166, 1171 (Ariz. Ct. App. 1994). "An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." *Engler*, 280 P.3d at 602 n.1 (quoting Restatement (Third) of Agency § 7.07). So, for example, an employer is not vicariously liable for an accident occurring when an employee was engaging in social activities because such conduct was "not intended to serve his employer's work purposes." *Id.* at 603.

Arizona courts have consistently refused to impose vicarious liability for sexual misconduct, reasoning that such conduct is outside the scope of employment because it does not further an employer's business. *Doe v. Roman Catholic Church of Diocese of Phoenix*, 533 P.3d 214 (Ariz. Ct. App. 2023), is instructive. In that case, the plaintiff sought to hold the Diocese of Phoenix liable for sexual torts allegedly committed by its employee. *Doe*, 533 P.3d at 217-18. In affirming the trial court's dismissal of the vicarious liability claims, the Court of Appeals explained that Arizona's scope-of-employment test is ***not*** based on "whether the employer could have expected or foreseen" the alleged misconduct, but rather whether the misconduct furthers the employer's business. *Id.* at 222. Thus, "an employer will not be vicariously liable . . . for an employee's tortious act undertaken solely for the ***employee's own purposes***." *Id.* (emphasis added). Because the employee's sexual misconduct was not "expressly or impliedly authorized as part of his job duties or incidental to his employment," and the acts were committed "solely to gratify [the employee's] personal, apparently sexual desires," the Diocese could not "as a matter of law, be vicariously liable." *Id.*

Other cases are in accord. *See, e.g.*, *Smith*, 876 P.2d at 1171 ("Clearly, [the employee] did not perform a service in furtherance of [defendant's] business when he harassed and assaulted [plaintiff]. His alleged tortious actions were committed solely to further his own personal interests.") (affirming grant of summary judgment for defendant employer); *Stencel v. Lyft, Inc.*,

2024 WL 4008752, at *4-5 (N.D. Cal. Aug. 29, 2024) (applying Arizona law and dismissing vicarious liability claim seeking to hold Lyft liable for driver's alleged sexual assault of Lyft rider).

That principle controls here. Turay's alleged assault would, if proven, indisputably constitute an independent course of action undertaken to gratify his own personal desire. There is no evidence from which a jury could infer that his alleged sexual misconduct was meant to serve Uber's interests as opposed to his "own purposes." *Doe*, 533 P.3d at 222. Therefore, as a matter of law, Turay's alleged misconduct was outside the scope of any alleged employment, and Plaintiff's vicarious liability claim under a respondeat superior theory must be dismissed. That conclusion forecloses both Plaintiff's employment and agency theories of vicarious liability. *See* Dkt. 1932 ¶ 12 ("The Court's ruling that the scope of liability under an apparent agency theory is limited by the usual scope-of-employment rules' . . . applies to Plaintiffs' apparent agency claims (G.2) under the laws of Arizona.") (quoting PTO 17 at 25).

### B.    Plaintiff's Gender Match and GPS Alert Product-Liability Theories Fail Because They Challenge Services

Plaintiff's Gender Match and GPS Alert product-liability theories fail as a matter of law because they challenge Uber's services, not the Uber App as a purported "product." *See Menendez v. Paddock Pool Const. Co.*, 836 P.2d 968, 972 (Ariz. Ct. App. 1991) ("[A]n implicit condition precedent [of a product-liability claim] requires the plaintiff to show that the object or instrumentality claimed to be defective is a 'product . . . .'"). A "product" is "tangible personal property" or an item whose "distribution and use is sufficiently analogous" to it. Restatement (Third) of Torts: Prods. Liab. § 19(a). "Services, even when provided commercially, are not products" subject to product-liability law. *Id.* § 19(b); *see State Farm Fire & Cas. Co. v. Amazon.com. Inc.*, 407 F.Supp.3d 848, 855 (D. Ariz. 2019) (granting summary judgment to Amazon based on contention that the company "merely provides services that connect[] consumers to vendors . . . and therefore cannot be . . . subject to strict [product] liability under Arizona law").

Uber respectfully disagrees with the Court's ruling that individual features of its platform

are subject to product liability law if they involve "defects in the Uber App" as opposed to "just problems with Uber's services (or with some other aspect of its business model)."  PTO 28 at 15 (quoting PTO 17 at 46).[16]  But even under that test, the summary judgment record leaves no room for dispute that Plaintiff's Gender Match and GPS Alert product-liability theories impermissibly target Uber's services.

### 1. Plaintiff's Gender Match Product-Liability Theory Necessarily Targets the Absence of Backend Services to Match Riders Based on Gender

The record is undisputed that Plaintiff's Gender Match theory seeks to revamp Uber's core services, including backend gender-inference algorithms, gender verification processes, and rider-driver matching.  The Court previously dismissed Plaintiff's "Safe Ride Matching" claim because it targeted "Uber's algorithm for matching riders and drivers," which the Court found "inextricably linked" with Uber's service.  PTO 28 at 16.  By contrast, the Court understood Gender Match, as pleaded by Plaintiff, as similar to app-based "parental controls"—a front-end toggle akin to a real-world parental lock.  *Id.* at 17.  The Gender Match claim thus proceeded on the premise that the feature is a "user-directed process" involving an "optional filter" of the algorithm's "end results" that would not "fundamentally alter the inner workings of Uber's algorithm."  *Id.*  at 18 (internal quotations omitted).

The record now negates that premise.  The absence of an "'algorithm' or 'formula' using various factors to estimate" a characteristic like gender is not a product subject to strict liability.  *Rodgers v. Christie*, 795 F. App'x 878, 880 (3d Cir. 2020); *see also D'Ambrosia v. Rajala*, 783 F. Supp. 3d 1077, 1099 (N.D. Ill. 2025) (dismissing product-liability allegations challenging "problems with Meta's app and algorithm").  But, as Plaintiff's own expert acknowledges, since Uber does not typically collect riders' gender data, Gender Match cannot function as a simple filter; the "core" of any feasible Gender Match function would be a "Gender Inference Framework"—a "matching and . . . machine learning gender identification model" to infer gender

---

[16]  Consistent with understanding Uber as a service, Arizona's TNC statute describes the TNC's role as "connect[ing] passengers" with independent drivers, A.R.S. § 28-9551(4), and third party drivers as individuals who receive "connections to potential passengers and related **services**" from TNCs "in exchange for payment of a fee," A.R.S. § 28-9551(3) (emphasis added).

-18-
DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

from names and an "extensive database" of documents using an "in-house" "Machine Learning/Large Language Model." Ex. 6 (Weiner Rep.) at ¶¶ 221-22; *see* Ex. 5 (7/23/2025, Nilles Dep.) at 217:4-14, 308:4-6. This backend machine learning framework would then be "used to support matching/dispatch," which the Court's dismissal ruling on "Safe Ride Matching" recognized to be a service function as a matter of law. Ex. 6 (Weiner Rep.) at ¶ 232. So too here: a gender-matched ride "cannot exist" without this backend framework and is "inextricably linked" to it, so Plaintiff's Gender Match theory necessarily targets the "inner workings" of Uber's algorithm, not anything akin to a product. PTO 28 at 16, 18.

Just as it turns on complex machine-learning frameworks to identify rider gender, Plaintiff's Gender Match theory necessarily depends on Uber's backend driver gender verification, which is a service. Plaintiff's expert acknowledges that a toggle based on "[s]elf-reporting of gender alone would be insufficient" because, "[w]ithout verification," predatory drivers could "misrepresent" their gender. Ex. 6 (Weiner Rep.) at 108 n.306. There is thus no dispute that any Gender Match feature turns on Uber's continuing services to provide "guardrails such as document-based gender confirmation" of driver gender. *Id.* The Court has already held that "appropriate background checks" and related verification processes concern Uber's provision of services, not the app itself. *See* PTO 17 at 46. A theory that fundamentally depends on Uber's provision of a service cannot, as a matter of law, support a product-liability claim. *See id.*

### 2. The GPS Alert Product-Liability Theory Targets the Absence of Live Monitoring Services

Plaintiff's GPS Alert product theory likewise targets Uber's GPS tracking and customer support services, not the functionality of the Uber App. It is undisputed that Uber's RideCheck feature uses GPS data collected by the smartphone to detect unexpected stops or route deviations. *See* Ex. 20 (Valliere Rep.) at 28. And there is no dispute that this feature functioned as designed by triggering an alert during Plaintiff's ride. *See* Ex. 21 (Keller Rep. Appx. D) at 8; *see supra* at 9. As now clarified in discovery, Plaintiff's "defect" theory is that the feature lacks "[r]eal time monitoring and intervention by Uber with outreach to law enforcement" alongside the alerts. Ex. 20 (Valliere Rep.) at 28. But "[f]ailing to appropriately monitor rides . . . including by using

Uber's GPS technology, is . . . a question of Uber's level of care with respect to its services, not with the design or functionality of its app." PTO 17 at 46 (internal quotation omitted). Complaints about the failure to provide immediate live support also go straight to "Uber's own customer support . . . practices." *Id.* (holding Uber's alleged "[f]ail[ure] to offer timely support during unsafe rides" cannot constitute a product defect). Summary judgment is therefore warranted on Plaintiff's GPS Alert product-liability theory.

### C.     Plaintiff's Fraud Claim Fails Because There Is No Evidence of Reliance

Plaintiff alleges Uber fraudulently omitted information about its drivers from its "Driver Notifications."[17] "Reliance is a necessary element to support a common law fraud claim." PTO 28 at 11 (internal quotation and edits omitted); s*ee Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543 (9th Cir. 1975) ("Mere allegations . . . that a fraud was committed . . . do not alone establish the existence of a genuine dispute of material fact."). Plaintiff lacks any evidence from which a reasonable juror could conclude that she relied on allegedly incomplete Driver Notifications.

To establish reliance in the omission context, a plaintiff must prove that "had the omitted information been disclosed," the plaintiff (i) "would have been aware of it" and (ii) would have "behaved differently." *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1193-94 (2014) (emphasis added); *see also Matter of Adoption of Hadtrath*, 592 P.2d 1262, 1266 (Ariz. 1979) (en banc) (no "reliance upon alleged fraud" where same action would have been taken in absence of "allegedly false" document). To satisfy that test, Plaintiff therefore must, at minimum, offer evidence that she "saw the Driver Notifications" she alleges omitted material information, "including the star rating, before beginning [her] ride[]." PTO No. 28 at 13; *see Oddo v. Arcoaire Air Conditioning & Heating*, 2019 WL 1460627, at *11 (C.D. Cal. Mar. 22, 2019) (the "focus in an omissions case" is the "channel[] of information customers depend on").

Plaintiff has offered no such proof. To the contrary, Plaintiff admitted she did not "recall

---

[17] *See* Dean Am. Compl. ¶¶ 35-44.

looking at the app at all before the car pulled up that night." Ex. 8 (Dean Dep.) at 205:24-206:1.[18] This is unsurprising because: (i) she did not request the ride herself, *id*. at 189:5-10, 193:1-14 (explaining that Scott ordered the ride from her phone, and that he likely chose Uber because "it's more well-known than the others"), and (ii) she was, in her words, so "[t]ired, out of it," and "drunk" that she "couldn't even walk straight to the car" when it arrived, *id.*at 214:17-22.

There is no evidence that Plaintiff saw the in-app Driver Notifications before commencing her ride. Plaintiff never testified that she looked at, much less relied on, Turay's allegedly incomplete profile or star rating. In fact, the record indicates the opposite.

Courts have repeatedly rejected fraud claims for lack of reliance where, as here, there is no evidence that plaintiff relied on an allegedly incomplete statement and would not have been aware of the omitted information if it had been disclosed. *See, e.g.*, *Isgro v. Wells Fargo Bank, N.A.*, 2019 WL 273373, at *4 (Ariz. Ct. App. Jan. 22, 2019) (plaintiff's own "conclusory testimony" insufficient to support fraudulent concealment claim); *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1084 (N.D. Cal. 2017) (no reliance when plaintiff identified an online Disclosure as "plausible method of disclosing [omitted] fact" but did not "read or rel[y] on" that disclosure prior to purchase); *Coleman-Anacleto v. Samsung Electr. Am., Inc.*, 2016 WL 4729302, at *11 (N.D. Cal. Sept. 12, 2016) (rejecting omission claim when plaintiff failed to allege she "relied upon, or even saw, any representations" on packaging); *Oddo*, 2019 WL 1460627, at *11 n.5 (no reliance because plaintiffs could not "explain how [purchasers] would have seen [purported omission in] marketing materials prior to purchas[e]"); *cf. Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (holding that "to have been exposed to the omissions" it is necessary for the class members "to have ***viewed the allegedly misleading advertising***") (emphasis added); *Hambleton Bros. Lumber Co. v. Balkin Enter, Inc.*, 397 F.3d 1217, 1234 (9th Cir. 2005) (affirming summary judgment where there was no evidence that plaintiff "relied on any representation" by party that engaged in alleged fraudulent concealment).

[18] Plaintiff appeared to qualify this testimony, suggesting that she saw "the driver picture" before the car pulled up. Ex. 8 (Dean Dep.) at 209:14-20. But she later confirmed that she looked at the driver's profile only "after the Uber ride," once she had arrived at her destination (a hotel). *Id.* at 215:2-216:2.

Plaintiff's failure to present prima facie evidence that she relied on the statements they allege were fraudulently incomplete entitles Uber to summary judgment on her claim.

**D.    Uber's Regulatory Compliance Precludes Punitive Damages As A Matter of Arizona Law**

Under A.R.S. § 12-689, Uber's compliance with all relevant Arizona regulations entitles it to summary judgment on Plaintiff's demand for punitive damages.

A "service provider . . . is not liable for exemplary or punitive damages if" it "complied with all statutes of this state or the United States or standards, rules, regulations, orders or other actions of a government agency pursuant to statutory authority that are relevant and material to the event or risk allegedly causing the harm." A.R.S. § 12-689(A), (A)(2). This statute reflects the Arizona Legislature's determination that "punitive damages are an excessive penalty when assessed against a [service provider] that adheres to government specifications." *Hale v. Norcold Inc.*, 2020 WL 1911214, at *2-3 (D. Ariz. Apr. 20, 2020) (granting summary judgment to defendant on punitive damages where refrigerator components complied with regulatory standards); *see also, e.g.*, *McBroom v. Ethicon, Inc.*, 2022 WL 604889, at *6 (D. Ariz. Mar. 1, 2022) (precluding evidence and argument on punitive damages because the FDA cleared the design for plaintiff's pelvic mesh implant); *Craten v. Foster Poultry Farms Inc.*, 2018 WL 834937, at *3-4 (D. Ariz. Feb. 13, 2018) (punitive damages not available against farm that obtained USDA approval for sale of raw chicken).[19]

The safe harbor applies here. First, Uber's operation of a technology platform connecting riders and drivers plainly falls within the statute's definition of a service, which encompasses "all actions that are engaged in for other persons for a consideration, which actions involve

---

[19] Arizona's punitive damages safe harbor is subject to four narrow exceptions that largely require an affirmative finding of misconduct by a government regulator. *See* A.R.S. § 12-689(B). The exemption is inapplicable only if the plaintiff establishes the service provider: (i) continued its service after a "final order of a government agency" to withdraw the service or alter the terms of its approval in a manner that would have avoided plaintiff's injury, *id.* § 12-689(B)(1); (ii) intentionally withheld or misrepresented material information to the government agency, "as determined by final action of the government agency," *id.* § 12-689(B)(2); (iii) made an illegal payment to an official of the government agency to secure approval, *id.* § 12-689(B)(3); or (iv) knowingly violated risk-reporting requirements, which "a government agency found" to have occurred, *id.* § 12-689(B)(4). None of those exceptions apply here.

-22-
DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:23-md-03084-CRB

predominantly the performance of a service." A.R.S. § 12-689(D)(6).[20]

Second, Uber complied with Arizona's comprehensive regulatory scheme governing TNCs. *See id.* § 28-9551 *et seq.*; Nilles Decl. ¶¶ 24-25. Uber is required to certify that it meets the requirements of A.R.S. Title 28, Chapter 30, Article 3 (i.e., the TNC regulations) to receive its permit in Arizona. By law, the Arizona Department of Transportation's issuance and renewal of Uber's TNC permit reflects the agency's determination that Uber "meets the requirements" of the TNC statute. A.R.S. § 28-9552(B).[21] Those requirements include obligations "relevant and material" to the risks Plaintiff alleges, as they directly address the risks underlying her theories, and Uber's compliance therefore triggers Arizona's punitive damages safe harbor. *Id.* § 12-689(A)(2).

***Driver screening and background checks.*** Arizona law imposes specific requirements for driver eligibility, mandating that TNCs conduct local and national criminal background checks, search the national sex offender registry database, and review driving history reports. *See id.* §§ 28-9507(A), 28-9555. These requirements are plainly relevant and material to Plaintiffs' negligence theories alleging deficiencies in Uber's screening processes. And Uber complied with them, conducting the statutorily required background checks, which revealed no offenses or driver-history issues that disqualified driver Turay under Arizona's regulations. *See* Nilles Decl. ¶¶ 30-31.

***Driver conduct and complaints.*** Arizona requires TNCs to implement a zero-tolerance policy regarding driver alcohol or drug use occurring while the driver is logged in to a rideshare app or providing rideshare services. A.R.S. §§ 28-9507(C), 28-9554(A). It further requires procedures for passenger complaints about violations of those policies, including permanent

---

[20] Arizona's TNC statute confirms this characterization. The statute defines third-party TNC drivers as individuals who "receive[] . . . **services** from a transportation network company **in exchange for payment of a fee**," A.R.S. § 28-9551(4) (emphases added), and defines the TNC itself as an entity that "uses a digital network . . . to connect passengers" with TNC drivers, A.R.S. § 28-9551(3).

[21] The Arizona Department of Transportation (ADOT) has the authority to police TNC compliance, including the power to audit all statutorily required records "with or without cause." *See* Ariz. Admin. Code § R17-5-905(A); *id.* § R17-5-905(D) (ADOT required to report any "violations found" to TNC).

deactivation for violations. *Id.* §§ 28-9507(D)-(E), 28-9554(B)-(C) . Regulations governing the management of driver conduct are relevant and material to Plaintiff's negligence theories. And Uber fully complied with them, providing notice of its zero-tolerance drug and alcohol policy on its website and procedures for riders to report independent drivers who engage in drug or alcohol use. *See* Nilles Decl. ¶ 25. Of note, Turay did not have any reports of drug or alcohol use while utilizing the Uber platform. *Id.* ¶ 31.

*Required disclosures.* Arizona law specifies the information TNCs must disclose to passengers before a ride begins, mandating that the digital application "shall display a picture of the transportation network company driver and the license plate number." A.R.S. § 28-9553(C). These disclosure requirements are relevant and material to Plaintiff's fraudulent omission theories concerning the adequacy of information in driver profiles. And Uber fully complied with them. *See* Nilles Decl. ¶¶ 24-25. Uber's indisputable compliance with all applicable Arizona rider-safety regulations entitles it to summary judgment on Plaintiff's requests for punitive damages.

## VI.    CONCLUSION

For the foregoing reasons, Uber respectfully requests that the Court grant summary judgment in its favor on the relevant claims and theories asserted by Jaylynn Dean.

Dated:  November 10, 2025

**O'MELVENY AND MYERS LLP**


By:  /s/  Jonathan Schneller

SABRINA H. STRONG
JONATHAN P. SCHNELLER

**KIRKLAND & ELLIS LLP**
LAURA VARTAIN HORN
ALLISON M. BROWN
JESSICA DAVIDSON

**SHOOK, HARDY & BACON, LLP**
PATRICK LEO OOT, JR.
ALYCIA A. DEGEN
MICHAEL B. SHORTNACY
CHRISTOPHER V. COTTON

*Counsel for Defendants*