**C.3**

# EXHIBIT 6

## FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

---

**IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT**
**LITIGATION**

**Case No. 3:23-md-03084-CRB**

---

**REPORT OF BRUCE WEINER**

**This Report relates to the following Wave 1 Cases:**
**Case No. 24-cv-7940 (B.L.)**
**Case No. 24-cv-7821 (A.R.2)**
**Case No. 24-cv-7019 (LCHB128)**
**Case No. 23-cv-6708 (Dean)**
**Case No. 24-cv-4900 (WHB 832)**

**SEPTEMBER 26, 2025**

219.    One of the earliest Uber documents I reviewed that addressed pairing W2W was a 2015 presentation titled *"Project XX."* The document emphasized that women are the future of Uber's growth, both as riders and as drivers,[302] and acknowledged that "our current state is not true to Uber's mission or culture. It is our obligation to fix our current issues and build the road towards a fully inclusive, trusted, and empowering product."

220.    One of the first internal studies I identified was a ride option called "UberWOMEN," which was created for admin/employees only in Mexico City in December 2017. The goal of the test was to assess the impact on the marketplace and rider experience. During the test, 89 employees made 501 ride requests, which were received by 201 unique women drivers. The test reported poor marketplace results with high cancellation rates and long wait times. Focus groups found women riders did not feel safer with women drivers because of concerns about women drivers being less skillful and a sentiment that it is more dangerous for two women to be alone, making them a target by a third party.[303]

221.    Women Rider Preference (Women+ preferred) was initially launched in Saudi Arabia in 2018 as an option for women to drive in Uber's transportation network when the country ended a ban on women driving. Research conducted in February 2018 revealed that 56% of women would be interested in driving for Uber; however, this number increases to 67% when they are asked about driving with a female-only rider option.  In a subsequent study, 74% of women prospects said they would only be interested in transporting women. As the feature was rolled out, incident rates between Uber drivers and riders were measured, as was safety perception measured

---

[302] Deposition of Danielle Sheridan (May 16, 2025), Exhibit 3811 (Bates No. UBER_JCCP_MDL_000434414, at 00434415)
[303] Deposition of Rebecca Payne (Apr 2, 2025), Exhibit 2532 (Bates No. UBER_JCCP_MDL_002627669, at 002627679)

**Confidential – Subject to Protective Order**                 Report of Bruce Weiner
*Uber Technologies, Inc., Passenger Sexual Assault Litigation*

in the driver in-app survey, along with marketplace and ratings metrics. The technology to enable the feature, including matching and the machine learning gender identification model, was all developed in a matter of months.[304]

222.    Core to all internal studies involving matching women riders with women drivers was Uber's "Gender Inference Framework."[305] The framework starts with gender mapping data derived from the extensive database of driver gender documents.[306] Across the world, drivers submitted documents that disclose their legal gender, and the relationship between the country, name, and gender is established. According to the Gender Inference Framework, that data identifies approximately 85% of US rider genders by which "Prevalent names will all be identifiable in pre-existing documentation" and "Compare P(male | name) to P(female | name) to understand the degree to which a name is more likely to be male or female."[307] After evaluating this extensive data, a Machine Learning/Large Language Model is used to identify the approximately 15% remaining names for US riders. "ML can distinguish whether a name is inherently male or female versus unisex, even if the name is uncommon in driver documentation" and "No high-latency requirements enables use of LMM or in-house model."[308] Uber's documents describe the benefits of this approach as "Inclusive, Defensible, Measurable, and Scalable."[309]

---

[304] UBER_JCCP_MDL_002737362

[305] Deposition of Sachin Kansal (May 28, 2025), Exhibit 923 (Bates No. UBER_JCCP_MDL_003040649, at 003040842)

[306] Self-reporting of gender alone would be insufficient to protect the integrity of a W2W matching system. Without verification, a predatory male driver could misrepresent himself as female to gain access to women riders. Uber had greater control over driver onboarding than rider onboarding, and industry-standard risk practices would call for guardrails such as document-based gender confirmation or other verification methods before granting W2W access.

[307] Deposition of Sachin Kansal (May 28, 2025), Exhibit 923 (Bates No. UBER_JCCP_MDL_003040649, at 003040842)

[308] Deposition of Sachin Kansal (May 28, 2025), Exhibit 923 (Bates No. UBER_JCCP_MDL_003040649, at 003040842)

[309] *Id.*



232.   In my opinion, Esteves's characterization understates Uber's earlier technical readiness to operate a women-to-women matching feature in the United States. Uber's own materials since 2017 describe (i) a production-oriented gender inference framework used to support matching/dispatch, (ii) multiple international pilots demonstrating feasibility, and (iii) statistically significant reductions in incidents where Uber drivers sexually assault or commit sexual misconduct against riders when women riders are matched with women drivers. Concerns about rider experience and match rates were design and supply-management problems—solvable with standard levers (e.g., transparent wait-time disclosures, opt-in fallback preferences, time-of-day scoping, targeted recruitment/retention of women drivers, and city-by-city coverage rules)—rather than blockers to deployment. Given the years of documented feasibility and results abroad, the documented internal studies of W2W activity, and the screenshots from the US pilot, it is my opinion that the decision to limit U.S. availability until 2025 reflects a prioritization choice, not a lack of technical capability.

272.    My opinions are limited to Uber's governance and prioritization processes and do not extend to independent conclusions about the causation of individual incidents.

273.    As noted at the outset, I reserve the right to supplement and amend this report based on additional materials and/or information made available to me, to respond to Uber's experts, and to use demonstratives at trial.

*        *        *

Executed this 26th day of September 2025.

Bruce Weiner