# C.4

# EXHIBIT 8

## FILED UNDER SEAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE: UBER TECHNOLOGIES, INC.,   |

PASSENGER SEXUAL ASSAULT         |Case No.

LITIGATION,                   |3:23-md-03084-CRB

_____|

                                   |

This Document Relates to:      |

Jaylynn Dean v. Uber Technologies,|

Inc., et al., 3:23-cv-06708     |

_____|

VIDEOTAPED DEPOSITION OF JAYLYNN DEAN

TAKEN ON BEHALF OF THE DEFENDANTS

ON JUNE 27, 2025, BEGINNING AT 9:21 A.M. CST

IN TULSA, OKLAHOMA

VIDEOTAPED BY:  Lauren Kinnebrew

REPORTED BY:  D. Luke Epps, CSR, RPR

Job No. CS7360417

Page 2

APPEARANCES

On behalf of the PLAINTIFF:

Rachel Abrams, Esq.
PEIFFER WOLF CARR KANE CONWAY & WISE
555 Montgomery Street, Suite 820
San Francisco, California 94111
(415) 766-3545
rabrams@peifferwolf.com

Ms. Tiffany Ellis, Esq. (Via Zoom)
PEIFFER WOLF CARR KANE CONWAY & WISE
15 East Baltimore Avenue
Detroit, Michigan 48202
(313) 572-4727
tellis@peifferwolf.com

Ms. Cristine Farah, Esq. (Via Zoom)
PEIFFER WOLF CARR KANE CONWAY & WISE
935 Gravier Street, Suite 1600
New Orleans, Louisiana 70112
(504) 523-2434
cfarah@peifferwolf.com


On behalf of the DEFENDANTS:

Ms. Tara Blake, Esq.
KIRKLAND & ELLIS
609 Main Street
Houston, Texas, 77002
(713) 836-3600
tara.blake@kirkland.com

Ms. Anitra Clement, Esq. (Via Zoom)
SHOOK, HARDY & BACON
100 North Tampa Street, Suite 2900
Tampa, Florida 33602
(813) 202-7100
aclement@shb.com


ALSO PRESENT:  Shivani Kavuluru (Via Zoom)

Page 174

on me on my birthday, it was, like, I don't know, I kind of felt done at that point until we got back together, but we weren't broken up.  It was just we weren't really talking and things just weren't the same.

Q    You were living with him at the time?

A    No.  I was with my grandparents at the time in '23, in July.

Q    Okay.  My understanding is from earlier that he cheated on you in July of 2022?

A    And '23.

Q    He cheated on you on your birthday both years?

A    Yes.

Q    And so when he cheated on you the second time or you indicated multiple, but that time on your birthday, you stopped talking for a period of time?

A    Yeah.  We hadn't really officially broken up, but we weren't -- like I said, things just weren't the same, and we didn't really, you know, say we're going to stop talking, but we didn't talk at that time.

Q    How long did you not talk?

A    I don't remember.  It was, like, a week,

Page 175

week or so.

Q    Okay.  And that's when you got on the dating app?

A    Yes.

Q    And what dating apps did you get on?

MS. ABRAMS:  Object to form.

Q    (BY MS. BLAKE)  Strike that.  Did you get on more than one dating app?

A    No.

Q    Which dating app did you get on?

A    Tinder.

Q    And did you meet anyone when you signed up on Tinder during that July 2023 period?

A    No.

MS. ABRAMS:  Give me two seconds.

THE WITNESS:  Okay.

Q    (BY MS. ABRAMS)  So when you got to Arizona for your Mesa Airlines training, did you get on any dating apps?

A    Yes.

Q    That was Tinder?

A    Yes.

Q    Did you get on any others?

A    Yes.

Q    What others?

Page 176

A    Bumble and Hinge.

Q    Okay.  And which one did you meet Scott McLaughlin on?

A    Bumble.

Q    Okay.  Did you meet anyone else on either Tinder, Bumble, or Hinge while you were in Arizona?

MS. ABRAMS:  Object to form.

THE WITNESS:  I had met up with a few people, but none of them were sexual.

Q    (BY MS. BLAKE)  How many different people did you meet up with during your time in Arizona from Tinder, Bumble, or Hinge, if you can recall?

A    It was, like, three, I think, including Scott.

Q    And the other two were not sexual?

A    No.

Q    Did you -- strike that.  How often did you see the other two individuals?

A    Just once.

Q    Just once each?

A    (Witness nods head.)

Q    Okay.  Did you meet them somewhere?

A    Yeah.

Q    Okay.  Did you meet those individuals before or after you met Scott?

A    Before.

Q    Before.  Okay.  Do you recall about when you first -- is it called matched, matched with Scott McLaughlin?

A    It was pretty -- pretty early in the training.

Q    Okay.  And tell me about your relationship with Scott McLaughlin.

A    We had matched, and he was constantly asking me if I wanted to hang out or come over, but I was so busy with training and stuff, we never really did.  We only hung out a couple of times, but one night he was, like, "Just come over," and I did, but, yeah, it was very casual.

Q    Okay.  So how -- can you estimate how many times during your stay in Arizona did you physically see Scott McLaughlin?

A    Three.

Q    So three times.  Do you recall the first time, about?

A    Yes.

Q    And when was that approximately?

A    I don't remember the day, but, like I said, it was pretty early --

Q    Okay.

A    -- in the training.

Q    And did you have a sexual relationship with Scott?

A    Yes.

Q    Okay.  And did -- strike that.  When did the sexual relationship first start?

A    I don't know if it was the first or second time we hung out, but, yeah.

Q    And when you saw him three times, were those three times all at the same location?

A    Yes.

Q    Which was where?

A    His apartment.

Q    Did he live by himself or have a roommate?

A    He lived by himself.

Q    Okay.  So we'll get to the night that's the subject of this lawsuit, but the two prior times you saw him both were at his apartment?

A    Uh-huh.

Q    And to the best of your recollection, you can't recall if it was the first or second time when you started the sexual relationship with him?

A    Yeah.

MS. ABRAMS:  Object to form.

Q    (BY MS. BLAKE)  Apart from Ryan, was this

Page 188

and Waymos more?

A    Waymo you didn't have a driver.  It was self-driving.  And then Lyft had the woman-only option.

Q    Prior to November 15th, 2023, it's my understanding that you had seen or gone to Scott McLaughlin's apartment two prior times; is that right?

A    Yes.

Q    How -- strike that.  Do you recall how you got to and from Scott McLaughlin's apartment prior to the November 15th, 2023, incident?

A    He came and got me one of the times, I believe, and then I used Lyft and Waymo.

Q    Okay.  On the prior times that you took Uber prior to November 15th, 2023, do you recall anything about those experiences one way or the other?

A    I actually think the night of the assault, that was the first time I took Uber now that I'm thinking about it.  I don't think I took any prior ones.

Q    And do you recall -- strike that.  Do you recall how you got to Scott McLaughlin's house that night?

A    Lyft.

Q    And then you ordered an Uber to get back to your hotel?

A    Yes.

Q    Do you recall why you chose to use Uber that night?

A    I wasn't the one who ordered it.

Q    That was from Scott McLaughlin; is that right?

A    Yes.

Q    Okay.  Have you used Uber since November 15th, 2023?

A    Yes.

Q    Do you have any estimation as to how many times?

A    Two or three.

Q    Okay.  And can you describe -- strike that.  How would you characterize your experience with those drivers?

A    The Uber rides after the assault?

Q    Yeah.

A    I was with my friends.  It was two times.  The first time was at OSU -- after an OSU football game, and I was with a big group of my friends, and we just didn't want to walk because it was so hot.

Page 190

So it was really quick.  Same thing, the second time was a hockey game in Dallas, and I was with my friend, and it was really quick, but both times were female drivers.

Q    And those were when you used the Uber app to call those Ubers?

A    Yes.

Q    And was there a reason that you used Uber in those instances as opposed to Lyft or Waymo?

A    Because there weren't any Lyft drivers in -- weren't any Lyft drivers in Stillwater that I saw, and then Elisa, my friend, she was who I was with at the hockey game, and she just ordered the Uber off my phone because she didn't have the app.

Q    When you downloaded -- first downloaded the app in November of 2023, do you recall whether or not you did any research about Uber?

MS. ABRAMS:  Object to form.

THE WITNESS:  No.  I just -- I heard things about it.  Like I said, I downloaded three ride shape apps.  It was kind of just if I didn't have one, it's like I wanted a backup option, you know, and feel like Uber is a pretty big one, so I just downloaded it.  That's the first one that popped up.

A    No.

Q    Were you aware of the Trusted Contacts feature that allowed riders to automatically use Share My Trip with friends or family members?

A    No.

Q    Were you aware of the driver profile feature which permits a rider to evaluate the driver before taking the ride?

A    Yes.

Q    One thing I want to clarify, you stated that Scott McLaughlin is who called the Uber for you; correct?

MS. ABRAMS:  Object to form.

THE WITNESS:  Yes.

MS. BLAKE:  Okay.  I want to go ahead and mark these.  Am I on Exhibit 10?

THE COURT REPORTER:  Yes.

Q    (BY MS. BLAKE)  These are a series of documents.  I'm not going to ask you about each one, but we can go ahead and just pass them all to you, and these are documents that you produced?

(Exhibit 10 marked for identification.)

A    Yes.

Q    If you turn to page 3, is this a screen image of your phone?

A    Yes, and I want to clarify whenever I say he ordered it, he did it off of my phone.  It was my account.

Q    Okay.

A    But he called it.  It was on my phone.

Q    Okay.  So he -- just you opened up your phone and then he selected the ride share app?

A    Yes.

Q    Okay.  Did you tell him to select Uber?

A    No.

Q    Do you know one way or the other why he selected Uber?

A    I think just because it's more well-known than the others and he did it.

Q    Okay.  Do you know that for sure or are you just guessing?

A    Just guessing.

Q    Okay.  I'll come back to that, but you can set it down for now.  I just wanted to clarify that question.

A    Okay.

Q    Were you aware, prior to taking Uber, of the Real-Time ID Check feature that Uber had that regularly verifies a driver's identity by matching a selfie to the profile picture?

Page 194

A    No.

Q    Were you aware of the emergency assistant feature that allows a rider to call or, where available, text 911 straight from the app?

A    No.

Q    Were you aware of the on-trip reporting feature that allows riders to discreetly report a non-emergency safety issue during the ride?

A    No.

Q    How often since 2023 in a given month do you use a ride share app, if you can estimate?

A    Just in the past year alone, I've -- while I've been home, I've used it twice.  Before that, it was a little more frequent.  I finished training the second round in January, and then I only used it for one or two months because I moved in with roommates who had cars, but in the past year I've only used it twice.

Q    Okay.  Prior to the incident at issue in the lawsuit on November 15, 2023, had you seen any advertisements for Uber?

A    Yes.

Q    Can you tell me about those?

A    I had seen Instagram posts, Facebook pop-ups, just even like on my app store, I remember

Page 201

taking -- taking drinks.

Q    What do you mean by a little bit?

A    It was bottles.  I remember it was, like, liters of, like, liquor and stuff, and I was just taking sips.  We didn't have really have shot glasses or cups.

Q    Okay.  So you took sips?

A    Yes.

Q    Okay.  And you said you only stayed at the pool for 15 minutes or so?

A    Yes.

Q    Do you recall how many sips you had at the pool?

A    No.

Q    Okay.  And you texted Scott --

A    Yes.

Q    -- at that time?

A    Yes.

Q    Did you leave straight from the pool to go see Scott?

A    Yes.

Q    Do you know whether or not any of your friends or flight attendant fellow trainees knew that you were leaving to go see Scott?

A    Yes.  People at the pool knew.

Page 202

Q    Okay.  Do you recall who knew?

A    It was a big group of my class.  I don't know specific names, but, yeah, they all knew.

Q    Okay.  So is it fair to say that by November 14th, 2023, they -- strike that.  Do you recall telling -- or who do you recall telling about your relationship with Scott in the flight attendant training class?

A    The only person who really knew was Jade, Danny, Lydia.  Lydia wasn't in our class.  She was a class below us, but they were the only ones who really, like, knew.  The rest of my classmates just knew I was going to go see a guy, but, yeah.

Q    And is Jade, was she your roommate at the time?

A    She wasn't my roommate.

Q    Who was your roommate when you were in flight attendant training school?

A    Her name was Brooke.

Q    Brooke.  Okay.  So you texted Scott at the hotel pool and did he tell you to come over?

A    Yes.

Q    Okay.  And how did you get from the SpringHill Suites to Scott's place?

A    With the Lyft.

Page 203

Q   And that was the third time you had been to Scott's apartment?

A   Yes.

Q   Okay.  And do you recall about what time you got to Scott's?

A   No.

Q   Okay.  Do you recall about how long you stayed at his house?

A   No.  A couple hours.

Q   Okay.  Once you got there that night, what did you and Scott do?

A   Watched a movie, you know, we talked, had wine, and then, you know, had sexual intercourse.

Q   Okay.  Was anyone else there?

A   No.  He lived alone.

Q   So you watched a movie, had intercourse, and drank some wine?

A   (Witness nods head.)

Q   Do you recall how much wine you had?

A   It was quite a bit.

Q   Okay.  Can you elaborate?  What do you mean by quite a bit?

A   I know we finished the bottle.  We also had liquor, and we were drinking that, too.

Q   What kind of liquor?

Page 204

A    I believe whiskey.

Q    Okay.  Do you know how much whiskey you had?

A    No.

Q    Okay.  At some point, you ultimately left Scott's.  Why did you decide to leave Scott's?

A    Because I could feel myself, like, feeling woozy and dozing off.  I didn't want to embarrass myself in front of him.  I was tired.  I had been up for a really long time.

Q    So you were feeling tired and woozy and just wanted to go back to your hotel?

A    Yeah.  I could -- I had thrown up, and I could feel myself, like, on the verge of, like, going to sleep, and it's like I didn't -- I didn't want to be around him when I was like that.

Q    You mentioned you had thrown up.  When did you throw up?

A    Right before I left.

Q    Okay.  Had you -- strike that.  Did you have an understanding as to why you were throwing up?

MS. ABRAMS:  Object to form.

THE WITNESS:  No.

Q    (BY MS. BLAKE)  Did you think it was

Page 205

alcohol-related?  Did you think it was food-related?

A    Alcohol-related.

Q    Had you thrown up from alcohol before?

A    Yes.

Q    Okay.  And when do you recall doing that?

A    I think when I was with Ryan.

Q    Okay.  Had you thrown up, I mean, multiple times?  Just kind of an estimate.

A    I think that was the second time.  It wasn't common for me because I don't really drink a whole lot, so I didn't know my limits either, and I was on Lexapro, so -- and I had been mixing stuff all night, too.

Q    So you had taken your Lexapro that day?

A    Yes.

Q    And what was the milligram as you recall?

A    I told you I don't remember.

Q    Okay.  And when you said mixing, you mean mixing alcohols?

A    Yes.

Q    Okay.  You said that Scott is the one that got on your phone and called the Uber?

A    Yes.

Q    Do you recall looking at the app at all before the car pulled up that night?

Page 206

A    No.

Q    Okay.  I want to hand you what I'm marking --

MS. ABRAMS:  Can we take a five-minute break --

MS. BLAKE:  Absolutely.

MS. ABRAMS:  -- when you get a second? I've been stockpiling water.

MS. BLAKE:  Now is a good time.

THE VIDEOGRAPHER:  We're off the record. The time is 2:54 p.m.

(Break taken at 2:54 p.m., resumed at 3:04 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:04 p.m.

Q    (BY MS. BLAKE)  We are back after a brief break and still talking about the events and what you did prior to the incident on November 15th, 2023.

A    Yes.

Q    I want to back up for just a moment, still on your supplemental responses to the interrogatories.  You stated that you were in contact with the following individuals in the 24 hours before the alleged incident.  You list several people, but the first one is Kenyaun Bagby.  Am I

saying that name correctly?

A    Yes.

Q    And who is Kenyaun Bagby?

A    He's the receptionist at the hotel I was staying at.

Q    Okay.  And what was the nature -- can you describe the nature of your relationship with Kenyaun Bagby?

A    It was very casual.  He was the front desk guy.  We had been there for a month, and it was kind of like, hi, have a good day at class, just very basic.

Q    Okay.  Were you friends outside of just the meet and greet basic receptionist greeting that you just talked about?

A    No, we weren't friends.  I was friends with a group of girls, and I know one of them kind of had a crush on him, so we would talk to him a lot, but it was mainly just us going with her so she could talk to him, but we weren't really friends.

Q    Okay.  And then you said that you're in contact with Jade Petersen you've spoken to and Danny Smith.  They were in your class --

A    Yes.

Q    -- for flight attendant training?  Natasha

Page 208

Ramos, which is your mom, and then your dad, OJ Ramos, and Brooklyn Filtz; is that right?

A    Yes.

Q    Do you recall anyone else that you would have been in contact with?

A    My classmates.  Is Elisa Gregg on there, too?  Because I spoke to her as well.

Q    No.

A    She should be on there.  I could have sworn I included her.

Q    Okay.  I'm happy for you to -- if you want to take a look.  She may have been added in the second supplemental.

A    Is this 24 hours before or after?

Q    Before.

A    Okay.  So she was after.  Sorry.

Q    That's fine.  And then your classmates of approximately 30 people, I believe; is that right?

A    Uh-huh.

Q    Anyone else that you recall being in contact with the day before?

A    No.  I mean, I saw Scott.  Hope, but we weren't really friends.  She was more friends with Jade and just tagged along with us to the mall, but --

Page 209

Q    Okay.  Had you ever spent the night at Scott McLaughlin's residence or apartment?

A    No.

Q    Okay.  So going back now to the night of the incident, which was early in the morning of November 15th, 2023; is that right?

A    Yes.

Q    And I believe we were talking about just before we took the break that Scott pulled up your phone and called the Uber; correct?

A    Yes.

Q    And --

MS. ABRAMS:  Object to form.

Q    (BY MS. BLAKE)  -- I believe you testified that you hadn't seen anything on the Uber app before the car pulled up; is that right?

A    He handed me my phone and I -- it was open, like, on the ride that was ordered, but all I saw was, like, the driver picture, but I didn't really scroll too much on it.

Q    Okay.  Can we scroll -- can we pause for a moment?

THE COURT REPORTER:  Do you want to go off?

MS. BLAKE:  Yes.

Page 210

THE VIDEOGRAPHER:  We're off the record.
The time is 3:08 p.m.

    (Break taken at 3:08 p.m., resumed at 3:09 p.m.)

THE VIDEOGRAPHER:  We're back on the
record.  The time is 3:09 p.m.

Q    (BY MS. BLAKE)  Prior to the longer break
that we just took a few moments ago, I asked you
this question:

    "Do you recall looking at the app at all
before the car pulled up that night?"

    "Answer:  No."

    Do you recall giving that answer?

A    Yes.

Q    Okay.  And is that correct?

A    I did give that, but I do remember just
having the phone in my hand.  I wasn't really
scrolling on it, but the driver profile was pulled
up.

Q    Okay.  And after taking the break, you've
now changed that answer, right, because you didn't
mention anything about looking at the driver profile
when I asked you that question to begin with?

MS. ABRAMS:  Object to form.

THE WITNESS:  Okay.  Yes.

Q    (BY MS. BLAKE)  Okay.  Do you have any

Page 211

explanation as to why your answer has changed after the break?

MS. ABRAMS:  Object to form.

THE WITNESS:  I just had to think about it, I guess.  I'm not giving enough time to think about my questions.

Q   (BY MS. BLAKE)  That's a very different answer.  You'd agree with me on that; right?

MS. ABRAMS:  Object to form.

THE WITNESS:  Yes.

Q   (BY MS. BLAKE)  Okay.  I'm not asking you what was talked about with your counsel, but when we took that break, did you meet with your counsel in a closed room?

A   We went to the kitchen and got a drink. It was more of a pep talk.  I'm tired.  It's a long day, but, yeah, in the kitchen.

Q   Okay.  And then after the break, you changed your answer to that question?

MS. ABRAMS:  Object to form.

THE WITNESS:  Okay.

Q   (BY MS. BLAKE)  Is that right?

A   Yes.

Q   What do you remember about the driver profile now that was pulled up on your phone?

Page 212

A    He was a father.  He worked at a domestic violence shelter.

Q    Okay.  And you just remembered that just now after the break for the first time?

MS. ABRAMS:  Object to form.

THE WITNESS:  You also gave me these that also have that information, but --

Q    (BY MS. BLAKE)  I haven't given you anything that has that information.

A    It has pictures of my driver and stuff and it came back to me, yes.

Q    Okay.  Let's look at that then.  Let's look at the pictures that your Uber driver had.  If you can pull up -- I can't remember what -- actually, I think it's a different one that I need to give you because I didn't give you that one yet, even though that's apparently what refreshed your recollection.  Handing you what I'll mark as Exhibit 13 -- 12.  Have you seen this before?

(Exhibit 12 marked for identification.)

A    Yes.

Q    Okay.  And is this the Uber profile of your driver on November 15th, 2023?

A    Yes.

Q    And you mentioned that the profile said he

Page 213

had previously worked at a domestic violence shelter for women?

A    Yes.

Q    Do you recall just remembering that?  Can you show me where it says that on his Uber profile?

A    It's not in this screenshot, but it was on there.

Q    Okay.  Well, this is his Uber profile; right?

A    Yes.

Q    So where on the screenshot of the Uber profile that you saw does it say that he was --

MS. ABRAMS:  Object to form.

THE WITNESS:  There -- there was more on his profile and it did say that.

Q    (BY MS. BLAKE)  Okay.  How long did you spend looking at his profile after Scott McLaughlin handed it to you after he called the ride?

A    Just briefly.

Q    Okay.  And are these -- these screenshots of the Uber driver ones that you took?

A    No.  The hotel lobby person took them.

Q    Okay.  Why did the hotel lobby person take them?

MS. ABRAMS:  Object to form.

Page 214

THE WITNESS:  Because I couldn't.

Q    (BY MS. BLAKE)  Why couldn't you?

A    Because I was drunk and I had just been raped and was shaking.  I couldn't even hold my phone.

Q    Okay.  Have you seen these documents since then, since that night?

A    Yes.

Q    Okay.  And when you realized that there's no screenshot indicating that his profile said he previously worked at a domestic violence shelter for women, did you try and add that screenshot or find that screenshot?

A    No.  This was just the main one.  I didn't know I needed every little thing on his profile, but, like I said, it did say that.

Q    Okay.  So when Scott called the Uber on November 15th -- or the early morning of November 15th, 2023, how were you feeling at that time?

A    Tired, out of it.  I was drunk.  I remember I couldn't even walk straight to the car.

Q    Okay.  You were tired and out of it and couldn't walk straight to the car, but you scrolled through his Uber profile?

MS. ABRAMS:  Object to form.

THE WITNESS:  I scrolled through it whenever I got to the hotel.  Like I said, he ordered it.  I had it on my phone.  I looked at it.  That was it.  I wasn't really scrolling, but, you know, after the fact whenever it happened, I took screenshots and stuff.  It did say that because I did look over his profile.

Q    (BY MS. BLAKE)  So you saw that after the Uber ride?

MS. ABRAMS:  Object to form.

THE WITNESS:  Yes.

Q    (BY MS. BLAKE)  Okay.  Not before?

A    Yes, but --

MS. ABRAMS:  Object to form.

THE WITNESS:  -- but, like I said, I did see his picture and I saw this right here.  I wasn't --

Q    (BY MS. BLAKE)  I -- I understand.  Sorry. I didn't mean to cut you off.

A    It's okay.

Q    But just to clarify, you saw that after you got to the hotel?

MS. ABRAMS:  Object to form.

THE WITNESS:  I didn't really look too

Page 216

much into it until I was at the hotel, but I did, like, a glance.

Q   (BY MS. BLAKE)  Okay.  And you considered yourself I think you said drunk or intoxicated when you got into the Uber?

A   Yes.

Q   Okay.  Do you remember, like, what happened just logistically when the Uber pulled up?  Was Scott waiting with you outside of his apartment?

A   He had to walk me to the Uber.

Q   Okay.  He had to walk -- what do you mean he had to walk you to the Uber?

A   Because I couldn't walk.  I was stumbling over.

Q   Okay.  Did -- do you recall what kind of car he was driving, the Uber driver?

A   No.  It was a sedan, I believe.

Q   Okay.  Do you remember what side of the car you got in on?

A   On the right side.

Q   What do you mean right side?  Was that behind the driver's seat or the passenger side of the backseat?

A   Passenger side.

Q   So you got in the backseat on the

Page 217

passenger side?

    A    Yes.

    Q    Okay.  Do you recall if -- I mean, did Scott open the door for you?  Did the Uber driver? Did you, if you can remember?

    A    Scott.

    Q    Okay.  Do you remember anything about the interior of the car?

    A    Not really.  It was nighttime.  I didn't see anything.

    Q    Do you know if there was music playing or --

    A    No.

    Q    Do you remember putting your -- strike that.  Do you remember whether or not you put your seat belt on?

    A    I didn't.

    Q    You did not put your seat belt on?

    A    I didn't.

    Q    Do you recall whether anything stood out from the beginning of the ride as making you feel uncomfortable in one way or the other?

    A    Yes.

    Q    And what was that?

    A    He was on the phone for a little bit

Page 221

them a little bit for me?

A    Just a plain white shirt and a green -- it was a white shirt and a green skirt.

Q    A plain white shirt and a green skirt?

A    Yes.

Q    Was it a -- what was the length of the skirt?

A    It was an athletic skirt, so pretty, like, middy, mid thigh.

Q    Okay.  What do you recall -- so after the Uber driver got off the phone, then what do you recall?

A    He started driving and he asked me if that was my boyfriend.  Started making comments, asking if we had sex, making comments about my body, and that was the first time he had talked to me or, like, acknowledged me.

Q    What kind of comments about your body do you recall?

A    Saying I had a good body.  He asked if that was my boyfriend.  Asked if we had sex, and if we did, he was so lucky, like, that happened.  It was just constant, and I remember at that point, like I said, I was so tired.  I kind of, like, laid in the backseat.  Like, it was like a bed because I

Page 222

didn't have my seat belt on, and I started, like, dozing off, and he just kept asking me those questions, like, waking me up and getting my attention while I was dozing off.

Q    So when you're saying you laid down, where -- on what side of the car was your head, if you recall?

A    The passenger.

Q    So your head was on the passenger side and then your feet were, like, on the driver's side in the backseat?

A    Yes.

Q    Okay.  And apart from telling him you were tired, do you recall saying anything else to him?

A    Just that I was tired and wanted to go back to the hotel.  He kept asking me all these questions and he just kept repeating, "Did y'all have sex?  Did y'all have sex?"  And I just said yes just to shut him up, but that was it.  Just him making comments.

Q    And then what do you recall happening?

A    He started driving.  I could feel him kind of circling the car a little bit, and then I remember him just stopping and he hadn't looked at me the whole time, and then he had just said, "I

Page 223

need to stop the car and Uber is going to charge you for this."  I didn't know what he meant by that, and I just remember the car stopping, and he opened the back door of the car, and just got on top of me and held me down and then he started to rape me.  But it was -- it was pretty -- pretty fast.  It's like I didn't have enough time to process what was happening.

Q   Are you okay?  Do you need to stop?

A   I'm okay.

Q   When you say he was raping you, was it vaginal?

A   Yes.

Q   And do you recall, did he penetrate you with his fingers?  Do you recall one way or the other?

A   I don't remember.  I didn't know what was happening, but, yeah.  I know he tried to perform oral sex on me and I tried to push his head away, and he, like, was just holding me down, but I know he penetrated me with his penis.  I don't know about his fingers, though.

Q   So when he -- you said he did perform oral sex?

A   Yes.  He was trying to.  I remember I kept

Page 224

closing my legs and he just pried them open and held my legs down, but it's like I tried to fight him off. I just couldn't, but he did.

Q When -- do you recall where you were when he stopped and got into the backseat?

A No.

Q You said he got into the backseat and laid on top of you?

A Yes.

Q Do you know whether or not the door was shut?

A I think he shut it because, like I said, I hadn't seen his face, but whenever he opened the back door, I remember it lit up like cars do, and that's whenever I saw his face, but then the lights turned off, so I think he closed the door, but I'm not 100 percent sure.

Q When he was attempting to perform oral sex, was that before or after he penetrated you with his penis, if you can recall?

A I think after.

Q After?

A (Witness nods head.)

Q And was the back door still shut to the car?

Page 240

should still have it in your stack.

A    Yes, I do.

Q    Okay.  After you met with the officers on the morning of November 15th, 2023, what happened?  What do you recall happening next?

A    I went to the hotel.  I don't really remember timeline-wise, but -- sorry.  I know the first thing I did was shower and I took a nap.

Q    And you said Jade was with you?  She took you for the examination?

A    She wasn't the one who took me, but she was there with me.

Q    Who took you?

A    It was a transport service in Arizona.

Q    A transport service?

A    Yeah.  Whenever we called the cops, they came and they took me to the same exam.

Q    And she came just along with you?

A    Yes.

Q    Okay.  If you could turn to the page which ends in 003, do you see that?  And this is a screenshot of your phone?

A    Yes.

Q    I believe you said -- or strike that.  Who took this screenshot, if you can recall?

Page 241

A    I believe -- I don't remember.  I know --
I know some of them Kenny took.  This might have
been whenever I was with the police officers.

Q    Okay.  And at the top left, it says 1:49.
Is that 1:49 a.m.?

A    Yes.

Q    So this screenshot was taken at 1:49
a.m. on November 15th, 2023?

A    Yes.

Q    And that middle section that says the
"Uber RideCheck," do you see that?

A    Yes.

Q    It says "Your ride ended earlier than
expected.  Is everything ok?"  And that was received
one hour prior.  Do you recall receiving that when
you were in the Uber?

A    No.  I didn't get that until I was at the
hotel.

Q    Okay.  Do you recall where your phone was
when the Uber driver got in the backseat?

A    No, ma'am.

Q    Okay.  Do you have any indication or
recollection as to, like, when he pulled over into
the parking lot, parked the car, and then got --
like, how long that took to then get into the

Page 242

backseat?

A    It was very fast.

Q    Okay.  On the document ending in 5, which is like a couple of pages back, do you see that?

A    Yes.

Q    And is this a screenshot from your phone?

A    Yes.

Q    And it says 7:30 at the top.  Was that -- do you recall, was that 7:30 in the morning of November 15th?

A    Yes.

Q    Okay.  And do you see that it says "Need help?" question mark, "RideCheck" with a badge.  It says "Your ride ended away from your destination." Do you recall whether or not you saw that on November 15th, 2023?

A    Whenever I took this screenshot.

Q    Okay.  And so when you got back to the hotel, you said you went to sleep, and was graduation day for your flight attendant training supposed to be the 15th?

A    No.  It was customer service day and graduation was the next day.

Q    So it was supposed to be the 16th?

A    Yes.

Page 243

Q    Okay.  And on -- if you could flip to page 6 of this document, and this looks to be -- is this a text communication with you and Jade?

A    Yes.

Q    Okay.  And this is at 1:22?

A    Yes.

Q    Do you recall, was this 1:22 a.m. or was this p.m.?  Do you recall one way or the other on November 15th, 2023?

A    I don't know if that is an accurate time stamp.  I think that was me going and searching for it later, but this wasn't in the moment.

Q    So the time stamp up here, that would be the time that it was when you took the screenshot.  That's what I'm looking at.

A    Yes.

Q    And that's what I'm asking.  Was this, when you took this screenshot, do you recall if it was 1:22 a.m. or 1:22 p.m.?

A    P.m., but this screenshot was way later, I believe.

Q    Okay.  And do you recall what this communication was in reference to?

A    Whenever I was getting questioned and getting my kit done, I was tired.

Page 256

response to you was when you reached out through the app?

A    I don't remember.

Q    Okay.  Did you have a particular response that you wanted from Uber?

MS. ABRAMS:  Object to form.

THE WITNESS:  I don't remember what was said, but I knew my intentions of reporting it was to get the driver removed.

Q    (BY MS. BLAKE)  I asked you earlier about whether or not you were aware of the different safety features that Uber has.  Do you recall those?

A    (Witness nods head.)

Q    And I believe you testified you didn't -- you weren't aware of those?

A    Yes.

MS. ABRAMS:  Object to form.

Q    (BY MS. BLAKE)  In your opinion, should Uber have had different safety features available when you rode in the Uber on November 15th, 2023?

A    Yes.

Q    And which safety features?

A    Cameras, microphones.

Q    Any other safety features you think should have been implemented?

Page 257

A     No.  I think -- I know whenever I got that alert, whenever it told me my ride stopped, that was once I was at the hotel talking to the police officers, so I think if that would have come in earlier, or, yeah, because I didn't really know much about the app and the features, but I think mainly cameras, microphones, and that alert coming earlier.

Q     So is it that the alert didn't come until you were talking with the police officers or you didn't see it until then?

A     It was delayed because it popped up whenever I was talking to them.

Q     Okay.  Do you recall what time you met with the police officers?

A     No.

MS. BLAKE:  Can we go off the record for just -- take a quick break and I'll shuffle through my notes?

MS. ABRAMS:  Sure.

MS. BLAKE:  Thanks.

THE VIDEOGRAPHER:  We're off the record. The time is 4:11 p.m.

(Break taken at 4:11 p.m., resumed at 4:26 p.m.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 4:26 p.m.

Q    (BY MS. BLAKE)  We just took a brief break, and before we were -- we took a break, we were discussing what safety features that you think Uber should have implemented.

A    Yes.

Q    And one of them is that you said that the alert saying that your ride stopped should have come earlier?

A    Yes.

Q    Because you said it didn't come at all to your phone until you were meeting with the police?

A    Yes.

Q    If you would please -- I apologize.  I don't remember the exhibit number.  This is -- it's the exhibit that has the Uber receipt at the beginning of it.

A    Sorry.

Q    I should have written them down.  That's my fault.  I think it's that one.  And that's Exhibit --

A    12.

Q    12.  Okay.  Great.  If you could turn to the -- this page.

A    Yes.

Q    Do you see that?  I think it says the

Page 259

Bates -- the bottom has a 4.

A    Sorry.

Q    It's towards the beginning.  So that one.

A    Yes.

Q    Yes.  Do you see that?  And is it your understanding that this is a depiction of the route that was taken by the Uber driver --

A    Yes.

Q    -- on November 15th, 2023?

A    Yes.

Q    Okay.  And I'm just asking you about this particular document.  So if you see the drive details, it says that you were picked up at 12:33 a.m.?

A    Yes.  Uh-huh.

Q    And that was at 2100 North Scottsdale Road; is that right?

A    Yes.

Q    And is that where Scott McLaughlin lived?

A    I don't remember his address.

Q    Okay.  Does that sound accurate to you?

A    I don't want to say yes or no because I'm not 100 percent sure.

Q    Sure.  We can look at your plaintiff fact sheet if that would be helpful.

A    Okay.

Q    Or I'm sorry.  Your interrogatory responses.  Apologies.  I just lost my place.  We'll get there.

A    Okay.

Q    I think this may be it.  Here we go.  I will represent to you that one of the exhibits we looked at was your supplemental responses to your interrogatories, and in response to Interrogatory Number 9, you provided -- we went over earlier what you did the 24 hours leading up to the incident, and you have, beginning at line 21 -- I'm sorry, line 23, "Spending time with Plaintiff friend Scott at 2100 North Scottsdale Road."  Does that refresh your recollection that that's where he lived?

A    Yes.

Q    Okay.  Great.  So then going back to this exhibit, it says you were picked up, and that would have been at Scott's house at 12:33 a.m. on November 15th?

A    Yes, ma'am.

Q    And then you were dropped off at 1:08 a.m.?

A    Yes.

Q    And is that the address of the SpringHill

Page 261

Suites?

A    Yes, ma'am.

Q    Okay.  So you -- your total was -- drive was about 34 minutes based on the Uber log?

A    Okay.

Q    And so you'll agree that you were dropped off at 1:08 a.m.?

A    If that's what it says, but I don't remember.

Q    Okay.  And then if you could go to the exhibit that had some of your screenshot and texts that we were looking at earlier.  I apologize.

A    That's okay.

Q    I don't have the number.

A    I think it's 11.

Q    Yes.

A    No.  Or is it this one?

Q    It's not that one.  It's a different exhibit.  I believe it might be the one with the gold paper clip.

A    No.

Q    That one, yes.  Thank you.  What exhibit number is that one?

A    10.

Q    10.  Thank you so much.  And if you'll

look at the fourth page on that exhibit.

A    Uh-huh.

Q    I think it has Wednesday, November 15th, 1:51.  Do you see that?

A    Yes, ma'am.

Q    Okay.  And do you see that the RideCheck came up in the middle of that screenshot?

A    Yes.

Q    And it says one hour ago.  Do you see?

A    Yes.

Q    And so one hour ago from 1:51 would have been about 12:51?

A    Yes.

Q    So that would have been before you got back to the SpringHill Suites at 1:08 a.m.; right?

A    Yes.

Q    Okay.  And so the data, the screenshots would indicate that this RideCheck notification about your ride ending earlier came up while you were still in the Uber?

MS. ABRAMS:  Object to form.

THE WITNESS:  Okay.

Q    (BY MS. BLAKE)  Do you agree?

A    Yes.

Q    Okay.  You can put those down.

Page 263

A    Okay.

Q    Do you believe -- and we talked about what you believe that Uber should have done with respect to safety features.  Do you believe that Uber should have given you some warning of some kind?

MS. ABRAMS:  Object to form.

THE WITNESS:  Yes.

Q    (BY MS. BLAKE)  Okay.  And what do you believe they should have given you a warning about?

A    I think -- I mean, I -- I've never used Uber, so I can't say anything -- well, prior to this, I hadn't used Uber, but like I said, I've used it other times, and I think just kind of warning you.  You know, it's not 100 percent safe.  I've always seen pictures and posts and ads about how it's a safe option, but, I mean, what I went through shows that's not always the case.

Q    Have you ever seen an ad that said it was 100 percent safe?  You just referenced that, so I wanted to make sure.

A    No.  Just saying that it was safe.

Q    Okay.

A    But I've never seen anything about the potential risks.

Q    And do you have any understanding of what

Page 285

Q    And it says "Surveillance video was obtained from the SpringHill by Marriott."  That was where you were staying; correct?

A    Yes.

Q    During your flight attendant school; correct?

A    Yes.

Q    Okay.  "Review of the video at the SpringHill by Marriott showed Hassan driving the aforementioned vehicle and dropping Jaylynn off at the front entrance of the hotel.  He waits for her to exit the vehicle and then he drives away. Jaylynn can be seen slowly walking through the lobby after being dropped off.  Hassan could be seen pulling over near the front of the driveway entrance to the hotel, exit the vehicle and then crouching down while bringing his hands towards his face."  Do you see that?

A    Yes.

Q    Did the police officers ever tell you about this video?

A    No.

Q    Okay.  And just for the record, Hassan is the driver, the Uber driver that raped you; correct?

A    Yes.

Page 286

MS. BLAKE:  Objection.

Q    (BY MS. ABRAMS)  Now, Uber's counsel asked you some questions about safety features.  Remember that?

A    Yes.

Q    And one of those safety features that was discussed on Exhibit 10 -- can you pull that up for me so we can talk about it?

A    Yes.

Q    I'll start my question over.  Okay. Uber's counsel asked you a series of questions about safety features on the Uber platform.  Do you remember that?

A    Yes.

Q    And one of those features that were talked about was the RideCheck pop-up that is referenced in Exhibit 14 [sic].  Do you see that?

A    Yes.

Q    Okay.  And I know there were some questions about whether you received that at a later date or during the ride.  Do you remember that -- those questions?

MS. BLAKE:  Objection.  Form.

THE WITNESS:  Yes.

Q    (BY MS. ABRAMS)  And you had stated that

you may have received it while in the vehicle; correct?

MS. BLAKE:  Objection.

THE WITNESS:  Yes.

Q    (BY MS. ABRAMS)  Okay.  And you don't recall seeing this RideCheck pop-up during the Uber ride while you were being assaulted by the driver; correct?

MS. BLAKE:  Objection.  Form.

THE WITNESS:  No.

Q    (BY MS. ABRAMS)  Okay.  And to your recollection, this RideCheck feature was of no help to you that night that you were assaulted by the Uber driver; correct?

MS. BLAKE:  Objection.  Form.

THE WITNESS:  That's correct.

Q    (BY MS. ABRAMS)  Okay.  In fact, you didn't even see the RideCheck pop-up until much later after you had already been raped; correct?

MS. BLAKE:  Objection.  Form.

THE WITNESS:  Yes, ma'am.

MS. ABRAMS:  I'm going to now play two exhibits that the first -- what exhibit number are we on?

THE COURT REPORTER:  16.

Page 288

Q    (BY MS. ABRAMS)  I'm going to mark as Exhibit 16 your 911 call; okay?

(Exhibit 16 marked for identification.)

A    Okay.

Q    I have to make sure my tech skills work here.

(Exhibit 16 audio played.)

Q    (BY MS. ABRAMS)  That was your reporting to 911 following being raped by an Uber driver?

MS. BLAKE:  Objection.  Form.

THE WITNESS:  Yes.

Q    (BY MS. ABRAMS)  Do you remember making that call?

A    A little bit.

Q    And who was the other voice on the 911 recording?

A    Kenny.

Q    And Kenny was the hotel clerk; correct?

A    Yes.

Q    Okay.  Was this the only 911 reporting that you made regarding the sexual assault by the Uber driver?

MS. BLAKE:  Objection.  Form.

THE WITNESS:  Yes.

MS. ABRAMS:  That was Exhibit 16, correct,

                              CERTIFICATE

STATE OF OKLAHOMA    )
                     )   SS:                    Page 301
COUNTY OF OKLAHOMA   )

          I, D. Luke Epps, Certified Shorthand

Reporter within and for the State of Oklahoma, do

hereby certify that the witness, Jaylynn Dean, was

by me first duly sworn to testify the truth, the

whole truth, and nothing but the truth, in the case

aforesaid; that the above and foregoing deposition

was by me taken in shorthand and thereafter

transcribed; and that I am not an attorney for nor

relative of any of said parties or otherwise

interested in the event of said action.

          IN WITNESS WHEREOF, I have hereunto set my

hand and official seal this 1st day of

July, 2025.

                    _____
                    D. Luke Epps, CSR, RPR