# C.5

# EXHIBIT 9

## FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE:  UBER TECHNOLOGIES, INC.,       )

PASSENGER SEXUAL ASSAULT               )

LITIGATION,                            )

_____      )

                                       )  No.

This Document Relates to:              )  3:23-md-03084-

Jaylynn Dean v. Uber Technologies,     )  CRB

Inc, et al., 3:23-cv-06708,            )

                                       )

The videotaped deposition of SCOTT McLAUGHLIN, called by Uber Technologies, Inc., for examination taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before Debra Lynn Schultz, CSR, taken via Veritext Videoconference, on July 22, 2025, at 5:30 p.m. CST.

Job No. CS7491568

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 2

APPEARANCES:

PEIFFER WOLF CARR KANE CONWAY & WISE
BY:  MS. RACHEL ADAMS, ESQ. and
     MS. CHRISTINE FARAH, ESQ.
     935 Gravier St., Ste. 1600
     New Orleans, Louisiana  70112
     (504) 523-2434
     rabrams@peifferwolf.com
          appeared on behalf of the Plaintiff;

KIRKLAND & ELLIS
BY:  MS. TARA BLAKE, ESQ.
     609 Main Street
     Houston, Texas  77002
     (713) 836-3600
     tara.blake@kirkland.com
          appeared on behalf of Uber
          Technologies, Inc., et al.;

SHOOK HARDY & BACON LLP
BY:  MR. RICKY BROWN, ESQ.
     2555 Grand Blvd.
     Kansas City, Missouri  64108
     (816) 474-6550
     rlbrown@shb.com

          appeared on behalf of Uber
          Technologies, Inc., et al.;

ACUNA LAW OFFICES
BY:  MR. MEMED NURCESKI
     1 North State Street, Ste. 1500
     Chicago, Illinois  60602
     (312) 300-4055
     mnurceski@acunalaw.com
          appeared on behalf of Scott
          McLaughlin.

                    * * * * *

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 3

VIDEOGRAPHER:

Mr. Justin Henricksen

ALSO PRESENT:

Shivani Kavuluru

* * * * *

INDEX

WITNESS                                                    PAGES

SCOTT McLAUGHLIN

Direct Exam by Ms. Blake                    5-62

Cross-Exam by Ms. Abrams                    63-65

Redirect Exam by Ms. Blake                  65-66

Recross-Exam by Ms. Abrams                  66-67

* * * * *

EXHIBITS

IDENTIFIED

Exhibit 1 - Notice of Deposition              19

Exhibit 2 - Video 000002                      59

* * * * *

Reported By:  Debra Lynn Schultz, CSR

License No.:  084-001307

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 8

Q.    Have you ever testified in court?

A.    I did whatever we're doing right now.

Q.    Okay.  So the only other time that you've had to give testimony was in that deposition?

A.    Yes.

Q.    I want to go over, even though you've had your deposition before, I'll give you just a few ground rules to reorient you on the process, especially because this is online.

You are doing a great job so far, but please make sure that you give an audible answer when I ask a question instead of shaking your head or saying uh-uh or uh-huh, just so that our great court reporter can make sure and get a clear record of what you are saying.

Also, make sure you allow me to get my full question out before answering, and I'll do the same for you as well.

I notice that you're kind of playing around on your phone.  Are you having any issues?

A.    No.  I was just getting the screen right. Here we go.  I just fixed it.

Q.    And if you don't understand my question,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 9

please just let me know.  I'm happy to rephrase, but if you don't ask me to rephrase, I'll assume that you understood my question; is that fair?

A.  Yes.

Q.  Is there anyone in the room with you right now where you are?

A.  No.

Q.  Apart from having your phone up, do you have any other technology or any other computers that are open?

A.  No.

Q.  Do you have any notes or documents that are around you right now pertaining to this deposition?

A.  No.  I only have stuff from work.

Q.  And are you currently taking any medications or any drugs that would impact your ability to testify truthfully today?

A.  No.

Q.  What do you do for work?

A.  I'm a resident physician.

Q.  And is that what brought you to Chicago?

A.  Yes.

Q.  How long have you been in Chicago?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 10

A.   I grew up here, and I just moved back about a year ago.

Q.   And were you -- strike that.

Where were you previously before moving to Chicago?

A.   Arizona.

Q.   And how long did you live in Arizona?

A.   Roughly two years.

Q.   And what brought you to Arizona for those two years?

A.   Medical school.

Q.   Who are -- strike that.

Are you represented by lawyers here for this deposition?

A.   Yes.

Q.   And who are your lawyers?

A.   Memed Kurceski, and I'm forgetting the last name of the other one.  I'm sorry.  Rachel Abrams.

Q.   And when did you hire Memed Nurceski?  Am I saying that correctly?

A.   Yes.

Q.   When did you hire him related to your participation in this deposition?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 11

A.    When you guys started harassing me.

Q.    And what do you mean "you guys" and "harassing" you?  Can you explain what you mean by that?

A.    The Uber attorneys.

Q.    And which Uber attorneys are you referencing?

A.    I don't remember off the top of my head. If I pulled up my text messages, I could tell you.

Q.    When you say harassing you, what do you mean by that?

A.    Repeated phone calls and text messages.

Q.    And do you recall approximately how many phone calls or text messages?

A.    Probably four, five calls.  Probably five, six text messages.

Q.    Okay.  And were these, sorry, the calls, the four or five calls, did you ever speak to any of the attorneys for Uber?

A.    Yes.  I spoke to one.  I don't remember his name.

Q.    And do you recall how long that conversation was?

A.    No.  But it was brief because I was at

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 39

BY MS. BLAKE:

Q.   And how would you describe her when she arrived to your home?

A.   Truthfully, I don't remember.

Q.   When you had been with her the other previous time, had she consumed alcohol in your presence then?

A.   Truthfully, I don't remember.

Q.   Do you recall drinking wine at your apartment the evening of November 14th, 2023?

A.   Was that the second time or the first time?

Q.   I'm now talking about the second time.  Do you recall drinking wine, which would have been the second time, November 14th, 2023.

A.   Honestly, no.  I just remember drinking beer.

Q.   Do you remember drinking wine with Jaylynn either time you were with her?

A.   Truthfully, I don't remember.

Q.   Do you remember whether or not whether you finished a bottle of liquor during the evening she was with you on November 14th, 2023?

A.   I didn't drink any liquor.  I remember

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 40

that.

Q.   Do you recall whether or not Jaylynn drank whiskey when she was at your house the evening of November 14th, 2023?

A.   I don't remember anything about whiskey, no.  I'm fairly certain she came over just with vodka and with canned drinks of some sort.  I only had beer as far as I can remember, and I remember drinking my own beer.  I didn't give her any alcohol of any kind.

Q.   If Jaylynn had testified that she drank quite a bit of wine while she was at your house on the evening of November 14th, 2023, does that sound accurate based on the best of your recollection?

MS. ABRAMS:  Objection to form.  Lacks foundation.

BY THE WITNESS:

A.   Truthfully, I really don't remember.

BY MS. BLAKE:

Q.   And you recall -- strike that.

Do you recall whether or not Jaylynn was falling asleep while she was at your house the evening of November 14th, 2023?

A.   I remember after we had sex, she started

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 41

getting a little bit sick, so I let her take a nap and gave her water and ordered food.

Q.   And ordered to what?

A.   Food.

Q.   Oh, and food.  Do you recall how long she slept for at your house that evening?

A.   I think roughly an hour, hour and a half.

Q.   Do you recall how long she was at your house the evening of November 14th, 2023?

A.   No.  Any attempt would be a guess.

Q.   You said that you had sex that evening with Jaylynn; correct?

A.   Yes.

Q.   Do you recall how many times that you had sex with Jaylynn that evening on November 14th, 2023?

A.   Two or three times.

Q.   And the two or three times, was that vaginal intercourse?

A.   Yes.  And oral.

Q.   Did you perform oral sex on Jaylynn on November 14th, 2023?

A.   No, not that I remember.

Q.   Sorry.  I didn't mean to interrupt you.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 42

Did she perform oral sex on you on the evening of November 14th, 2023?

A.   Yes.

Q.   I apologize and just to be clear, the two or three times that you had intercourse that evening, was that sexual vaginal intercourse?

MS. ABRAMS:  Object to form.

BY THE WITNESS:

A.   Yes.

BY MS. BLAKE:

Q.   Did you have anal intercourse with Jaylynn that evening on November 14th?

A.   No.

Q.   How would you describe Jaylynn's demeanor, if you can recall, when she arrived at your home that evening?

A.   What do you mean?

MS. ABRAMS:  Object to form.

MS. BLAKE:  Fair.  Thank you for asking me to clarify.

BY MS. BLAKE:

Q.   Based on your observation of Miss Dean when she arrived, would you have described her as intoxicated when she arrived at your home?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 43

A.   When she first came over, no.

Q.   During the course of the time that she was at your home and drinking alcohol, did her demeanor change in any way?

A.   Yes.

Q.   And how did it change?

A.   I remember at one point after we had sex, she started drinking the vodka semi-aggressively, and I told her she should slow down and that she was going to get sick.

Q.   When you mean semi-aggressively, what do you mean by that?

A.   I guess aggressive isn't the right word. More so she just was drinking straight from the vodka bottle for, like, some bigger sips.

Q.   And how large was this vodka bottle that you're referencing?

A.   It's not a fifth.  It's whatever the size down is.

Q.   And do you recall how much of that bottle was left when she first arrived to your house that evening?

A.   I remember she came over, and I think it was half drank.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 44

Q.   And by the time she left your home that evening, do you recall how much of the vodka she had drank from that bottle?

A.   I don't remember.  All I remember is it wasn't finished, and I threw it out like a week later.

Q.   By the time that she left your apartment that evening, would you describe her as intoxicated?

A.   I remember before the nap, yes.  I don't really remember after too well because, keep in mind, I was drinking myself.

Q.   Do you recall whether or not she threw up while she was at your apartment?

A.   I don't remember her throwing up, no.  But keep in mind, once again, I was drinking beer before she even came over.

Q.   Would you describe -- strike that.

Were you intoxicated when Jaylynn first came over to your home that evening?

A.   I had a buzz going, but I wasn't drunk.

Q.   Were you drunk by the time that Jaylynn left your apartment that evening?

A.   Truthfully, I don't remember, but my

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 45

memory was foggier, but I didn't black out or anything.

Q.   We talked about the number of times that you recall having vaginal intercourse with Jaylynn that evening.  Do you recall about how long you had sex with Jaylynn each time?

A.   I don't remember.

Q.   Do you recall anything about the positions that you had sex with Jaylynn that evening on November 14th, 2023?

MS. ABRAMS:  Object to form.

BY THE WITNESS:

A.   I remember missionary and having sex from the back.  I don't remember anything else, though, other than, I guess, oral sex.

BY MS. BLAKE:

Q.   What, if anything, do you remember about why Jaylynn left your apartment that evening?

A.   It was -- I don't remember exactly why.  I just remember it was getting late and, I mean, I'm always busy, you know, so I'd be guessing.  I just remember it was getting late.  That's all I could tell you.

Q.   Do you recall whether it was you or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 46

Jaylynn that decided to call an Uber to pick her up at your apartment?

A.   I don't remember.

Q.   Do you recall using the Uber app on Jaylynn's phone to call an Uber that evening?

A.   Yes.

Q.   Tell me what you remember about that.

A.   I don't remember who actually ordered it. I just remember later under her nap, someone ordered it, and then I watched it until it got there on the app to see when it, like, arrived.

Q.   Let me ask you to rephrase that. You said during her nap someone ordered it?

A.   Well, at some point in the nap, she woke up. No. No. This is what it was. At some point during the nap, we had ordered Chick-fil-A to try and sober her up. And when the Chick-fil-A came, we ate the Chick-fil-A, and then afterwards at some point, someone called an Uber off of her phone. And then I remember watching said Uber, tracking it to my apartment.

Q.   And when you say someone called the Uber, do you mean either yourself or Jaylynn?

A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 47

Q.   You mentioned ordering Chick-fil-A to help sober her up.  Did you notice any difference in her demeanor after eating Chick-fil-A?

A.   Yes.  I remember she was better.  I don't remember, like, details, though.  I just remember, like, it did help her.

Q.   Do you recall seeing anything about the Uber driver's profile when you were looking at the Uber app on her phone?

A.   No.

Q.   Did Jaylynn ever share with you whether or not she was taking any medication prior to --

A.   No.

Q.   You said no?

A.   No.

Q.   Do you have any information as to whether or not Jaylynn took any medication prior to coming to your house on November 14th, 2023?

A.   Zero knowledge.

Q.   You said that you followed the Uber driver on the app to see when he would arrive at your apartment; is that right?

A.   Yes.

Q.   Do you recall whether or not you had a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES

Page 70

RACHEL ADAMS

rabrams@peifferwolf.com

July 25, 2025

RE:    Dean, Jaylynn v. Uber Technologies, Inc Et Al
7/22/2025, Scott McLaughlin (#7491568)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (erratas-cs@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions