# C.17

# EXHIBIT 11

## EXHIBIT FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

_____
IN RE: UBER TECHNOLOGIES,          )
INC., PASSENGER SEXUAL ASSAULT     ) MDL No. 3084 CRB
LITIGATION                         )
_____)


_____/
LCHB128 v. Uber Technologies, Inc., et al.
Case No. 3:24-cv-07019-CRB
A.R. v. Uber Technologies, Inc., et al.
Case No. 3:24-cv-07821
B.L. v. Uber Technologies, Inc., et al.,
Case No. No. 24-cv-7940
Jaylynn Dean v. Uber Technologies, Inc., et al.,
3:23-cv-06708
WHB 832 v. Uber Technologies, Inc., et al.,
3:24-cv-04900
_____/


HIGHLY CONFIDENTIAL
UNDER PROTECTIVE ORDER


VIDEOTAPED DEPOSITION OF GREG BROWN -
WAVE 1 PLAINTIFFS' 30(b)(6) DEPOSITION OF UBER
TECHNOLOGIES, INC., RASIER LLC, AND RASIER-CA, LLC,
(TOPICS 4A-D, 6A-G, 7A-D, 8A-N, 9A-E, 10A, B, C, E,
AND F)

August 25, 2025
9:10 a.m. Pacific Standard Time


_____/




Reported by:  Renee J. Ogden, RPR California CSR #14485

right?

A. I'm not familiar with the parameters for what constitutes a long stop in this case.

Q. As an investigator, you are certainly familiar with occasions where something was classified as a long stop by RideCheck and it turned out that it was where somebody was being sexually assaulted or raped, right?

A. Yes, I have seen examples of that.

Q. Did Uber investigate the 120 midway drop-off anomalies or the 62 long stop anomalies for Mr. Perez Rodriguez?

A. Unless there was an associate report either made as part of the RideCheck notification or subsequently through one of our other channels, it would not have conducted an investigation without that report.

Q. So the GPS anomaly alone without some other report through a different reporting channel to Uber was not enough to trigger an investigation, right?

A. Yes, I believe that's accurate.

Q. And the anomaly for long stop or midway drop-off, together with a low rating or a feedback tag, would not be enough to trigger an investigation unless there were a longer form report made to Uber,

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

IN RE: UBER TECHNOLOGIES,          )
INC., PASSENGER SEXUAL ASSAULT     ) MDL No. 3084 CRB
LITIGATION                         )
_____)

_____/

LCHB128 v. Uber Technologies, Inc., et al.
Case No. 3:24-cv-07019-CRB
A.R. v. Uber Technologies, Inc., et al.
Case No. 3:24-cv-07821
B.L. v. Uber Technologies, Inc., et al.,
Case No. No. 24-cv-7940
Jaylynn Dean v. Uber Technologies, Inc., et al.,
3:23-cv-06708
WHB 832 v. Uber Technologies, Inc., et al.,
3:24-cv-04900

_____/

HIGHLY CONFIDENTIAL
UNDER PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF GREG BROWN, VOL. II -
WAVE 1 PLAINTIFFS' 30(b)(6) DEPOSITION OF UBER
TECHNOLOGIES, INC., RASIER LLC, AND RASIER-CA, LLC,
(TOPICS 4A-D, 6A-G, 7A-D, 8A-N, 9A-E, 10A, B, C, E,
AND F)

August 26, 2025
7:40 a.m. Pacific Standard Time

Reported by:  Renee Ogden, RPR, California CSR #14485

Column I, would you --

ATTORNEY PETERS:  Dianne, would you please search for -- unselect all and then search for the word "professionalism"?

BY ATTORNEY PETERS:

Q.  Do you see there were ten occasions where riders made -- give negative ratings to Mr. Turay, along with a tag that had the word "professionalism" in it?

A.  I can see these ten rider ratings associated with a professionalism feedback tag right here.

Q.  Okay.  Let's now clear that filter from Column I and filter for the word "comfort."

Could you see there are two additional times that somebody gave a rating tag with the word "comfort" in it?  The one at the bottom had the word "professionalism" as well.  That would be a duplicate.

A.  Yes, I see that.

Q.  Let's now filter Column I, ratings tags, for the word "conversation."

Do you see there were three additional occasions where a rider removed at least one star from the rating and tabbed the feedback tag "conversation"?

A.  Yes, I see three less than five-star ratings with the feedback tag conversation.

Q.  All right.

ATTORNEY PETERS:  We can take that exhibit down now.

BY ATTORNEY PETERS:

Q.  When Uber received feedback tags with the words professionalism, comfort, and conversation about Mr. Turay, it knew that those tags were associated more than other tags with sexual assault and sexual misconduct, right?

ATTORNEY LEVY:  Object to form. Foundation.

A.  I'm not sure I've seen evidence that supports that.

BY ATTORNEY PETERS:

Q.  Well, we looked yesterday at some evidence that supports that.

ATTORNEY PETERS:  Let's go to Tab 252, please, which is Exhibit 1932.

BY ATTORNEY PETERS:

Q.  This is again the U.S. and Canada safety product monthly PowerPoint or presentation, which we looked yesterday at the metadata.  This was created in 2019.

Let's just go right to the Bates number

down and go back to Tab 249B, which is
Exhibit 1964.

BY ATTORNEY PETERS:

Q. So we still have our filter applied in Column G
just to see all the five-star ratings.

Leave that filter and go to the Column I
for the rating tags, and clear the filter, please,
and then put the word "polite" in there.  The word
"polite."

So there were seven occasions before
Uber sent Mr. Turay to pick up Ms. Dean where a
rider gave feedback that Mr. Turay was not polite.

Do you see that?

A. I do see these trips with a "driver not polite" tag
associated with them, yes.

Q. They were -- all of those were one-star ratings,
right?

A. Yes, they do appear to be.

Q. One-star ratings represent terrible, right?

ATTORNEY LEVY:  Object to form.

You can answer.

A. I'm not sure that they represent terrible per se.
I have seen that in previous versions of the rating
scene.  I don't believe that it is currently
described, as far as I'm aware, as terrible as you

put it.

BY ATTORNEY PETERS:

Q. There were some times where when a rider selected one star, the word that would show on the screen to go with one star in the Uber app was the word "terrible," right?

A. I'm not sure if that was ever in production or not. I have seen mock-ups with that language in it, but I can't speak as to whether or not that was ever actually in the rider app screen.

Q. Are you saying you don't know one way or the other whether the word "terrible" popped up with the one-star rating?

A. I don't know one way or the other.

Q. What we can know is one star was the lowest rating that a rider could give at the end of a trip, right?

A. Yes.

Q. When Uber received these one-star ratings that had the words not polite -- first these were between 2022 and 2023, right?

A. Yes. This particular seven, I think, were between 2022 and 2023.

Q. It looks like they were all within a single year, right?

Greg Brown Volume II Highly Confidential
August 26, 2025

A.   They appear to be.

Q.   Uber did not follow up on these ratings or feedback tags, right?

A.   It wouldn't have been Uber's process to follow up with the rider in relation to these feedback tags unless there had been a supplemental help contact in addition to the feedback tag and rating.

Q.   So unless the rider reached out by another channel in their report to Uber about a safety incident, for example, Uber did not follow up on the ratings and the rating tags themselves, right?

A.   That is correct.  There is no, as far as I'm aware, supplemental follow-up just on the basis of the rating and feedback tag.

Q.   Just on the basis of the one-star ratings and the feedback tags about the driver not being polite, Uber did not look at the GPS data that it had for these trips, right?

A.   No.  It would not have been part of the process to review GPS data on the basis of the feedback tag and rating.

Q.   These trips were mostly late night trips.

          Do you see that?

          Actually, let's go through them.  Strike that.

it's -- A will be with the logo, because we just discussed it; and then we'll apply a permanent redaction to create 1966B.

Is that -- is there any problem with doing it that way?

ATTORNEY LEVY:  Not with me, assuming that we take out what I'm reading because it has been highlighted.

ATTORNEY PETERS:  Yeah.  I think the highlight is just like an overlay that we're doing in real time.

And, Dianne, can you do that?  Can you apply that redaction, and then we can mark that one as 1966B?

EXHIBIT TECHNICIAN:  Yes, I can do that.

BY ATTORNEY PETERS:

Q.  All right.  So we are now looking at what will be Exhibit 1966B.  Can you confirm that Exhibit 1966B is a accurate depiction of what the driver en route card on the day of the subject incident looked like?

A.  To the best of my understanding, yes, this would have been what the driver en route card would have looked like on the day of the subject incident.

Q.  Specifically, the 4.95 star rating, that is the

rating that Uber displayed when it was sending Mr. Turay to Ms. Dean, right?

A. Yes, that's my understanding.

Q. That had a star symbol next to it, right?

A. I believe it would have, yes.

Q. The language "top-rated driver" displayed, that was something Uber displayed in the driver en route card when it was sending Mr. Turay to the pickup location, right?

A. At the time of the subject trip, yes.

Q. When Uber displayed this information on the screen, Uber did not include any information about Mr. Turay's background check, right?

A. I don't believe any information pertaining to the background check of Mr. Turay would have been included in the driver en route card.

Q. The information Uber displayed to Ms. Dean did not tell her that it had not been able to do a criminal background check related to the first 39 years of Mr. Turay's life, right?

A. As I mentioned, I don't think any information pertaining to the background check of Mr. Turay would have been displayed on the driver en route card. I can't speak to any specifics you just mentioned about the screening process for

Let's go to the first -- do you see the date created on this Uber document is 2018?

A. I do.

Q. Let's go to the first -- the next page, please, the first page of the exhibit itself.

Do you see that this is a 2018 analysis by Uber on changes in the power of ratings over time?

A. I do.

Q. Going to Page 9 of the PowerPoint presentation, bottom right-hand corner states, "The predictive power of ratings has been greatly diluted by a five-star junk rating.  Driver ratings become inflated."

Do you see that?

A. I do see that terminology here, yes.

ATTORNEY LEVY:  Sara, given that there's a privilege stamp on here, I would like the no waiver stipulation, please.

ATTORNEY PETERS:  Sure.  I think this is -- it's fine.  I mean, it was used before.

ATTORNEY LEVY:  I think that too.  I just want to be careful.

ATTORNEY PETERS:  Okay.

BY ATTORNEY PETERS:

Q. A long stop is a stop where it's over five minutes, such that Uber is flagging it as being unusual, right?

A. I believe that the parameters are five minutes, as you noted. And that's what invokes the RideCheck notification to users.

Q. Uber knew when it received the July 16, 2022, RideCheck flag for Mr. Castaneda Orozco, it knew that those long stop RideCheck flags sometimes represent a sexual assault or sexual misconduct occurring, right?

A. I think there has certainly been, unfortunately, evidence of RideCheck notifications also coinciding with reports of sexual assault or sexual misconduct.

I have also heard that, particularly for long stops, many of those would be for things like stops in traffic, et cetera.

ATTORNEY PETERS: I'm going to object as nonresponsive and direct you back to my question.

BY ATTORNEY PETERS:

Q. When Uber received the July 16, 2022, RideCheck flag, it knew that RideCheck flags sometimes represented sexual assault or sexual misconduct occurring, right?

A.    As far as I know, there would have likely been examples at this time to fit that description, yes.

Q.    That was known to Uber, right?

A.    As general matter, yes, I believe so.

Q.    Then Column N gives us midway drop-off GPS anomalies that Uber learned about for Mr. Castaneda Orozco, right?

A.    Yes, I believe these would have pertained to midway drop-off RideCheck alerts.

Q.    On July 10th, July 16th, July 19th, and August 5, 2022, Uber received four occasions where it learned that Mr. Castaneda Orozco had a midway drop-off anomaly, right?

A.    Yes, I believe, as you noted, there were four instances where a midway RideCheck drop-off alert occurred.

              ATTORNEY PETERS:  Dianne, just for the sake of clarity, let's green highlight Row 3, not Row 4.  I think Row 4 is the yellow highlighted long stop anomaly.  Just looking -- the green highlighted one should be the August 5.  Then Row 3, July 16th; Row 5 -- yeah, those two; Row 5 and Row 6.

BY ATTORNEY PETERS:

Q.    Those are the four midway drop-off anomalies,

A.   Would not have been a subsequent follow-up.

Q.   So in real time when the anomaly is occurring, when the long stop is occurring or the midway -- so-called midway drop-off is occurring, at that time there is some sort of notification that goes out to both the rider and the driver, saying, we want to check in and make sure everything is okay, right?

A.   Yeah, I'm not sure exactly how the notification is worded, but I think that's the broad spirit of it.

Q.   Then if Uber doesn't hear anything in response to the notifications that go out in real time, it doesn't follow up later to find out more detail about what happened, right?

A.   Unless there was a report, I don't believe that there would be a follow-up for each RideCheck notification.

Q.   Here for Mr. Castaneda Orozco, for the five different RideCheck anomalies that were flagged for him before the subject incident, none of those resulted in a follow-up investigation, right?

A.   That's my understanding.  I don't believe there were any safety reports associated with these RideCheck anomalies.

          ATTORNEY PETERS:  Let's take that down.

JIRA, driver arrived to destination at 4:02 a.m. Trip completed at 4:10 a.m.

Do you see that?

A. I do.

Q. That was something that Uber was collecting GPS data that showed when he got to that location, he was stationery there for eight minutes?

A. Yes, that's correct.

Q. That's what Uber classified in the chart we looked at earlier as a long stop anomaly, right?

A. That is my understanding is that would have pertained to a long stop we saw in that chart earlier, yes.

Q. And Uber learned in the course of its investigation that this long stop was the time period when Mr. Castaneda Orozco was allegedly raping BL, right?

ATTORNEY LEVY:  Object to form.

You can answer.

A. That is consistent with what I believe Uber learned in the course of the investigation.

Q. Let's take that down and go to Tab 200.  This is already marked as Exhibit 1844.

Do you recognize this document?

A. I do believe I have seen this document in the