# C.22

# EXHIBIT 17

## EXHIBIT FILED UNDER SEAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


IN RE: UBER TECHNOLOGIES, INC.)
PASSENGER SEXUAL ASSAULT       )
LITIGATION                     )
_____)
                               )
This Document Relates to:      )No. 3:23-md-03084-CRB
All Cases                      )
_____)


*** HIGHLY CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF SUNNY WONG

AS 30(b)(6) WITNESS OF UBER

June 25, 2025

9:13 a.m.


555 California Street, Suite 2700

San Francisco, California  94104


Reported by:

Natalie Y. Botelho

CSR No. 9897

A.        Its goal is, again, to reduce the rate of sexual assault reports on the Uber platform, correct.

Q.        Well, this doesn't say "to reduce the rate of sexual assault reports on the Uber platform." This says, "reduce sexual assaults on the Uber platform."  And my question for you is, is it still Uber's goal to reduce sexual assaults on the Uber platform using S-RAD?

A.        It is.

Q.        And the way that S-RAD does that is by identifying and preventing driver-rider matches with elevated risk, right?

A.        Correct.

Q.        That's what S-RAD aims to do, in a nutshell, right?

A.        That's what it aims to do.

Q.        Other than S-RAD, is there anything else -- are there any other safety programs that Uber uses to try to reduce the risk of sexual assault with respect to its dispatch or driver-rider matches?

A.        I'm not aware of any.

Q.        S-RAD is a data-driven -- it's -- well, first, S-RAD is intended to be a data-driven

Uber uses a machine learning model?

A.        It is.

Q.        And Uber uses that machine learning model to help identify -- I'm going to call them rider-driver pairings -- that would reduce the probability of sexual assault; is that true?

A.        The model helps scores those particular plans for given trip requests, and then the second stage of S-RAD is the looking at potentially downranking and reducing the probability of specific plans.

Q.        Okay.  In order to score each rider-driver pairing, does S-RAD look at risk signals or predictors?

A.        The model leverages, you know, numerous features or inputs to come up with a score for a particular driver-rider supply plan.

Q.        Are those inputs or features also known as risk signals or predictors?

A.        We refer to them as features.

Q.        Okay.  Let's go to -- back to 1240.

          MR. PREMO-HOPKINS:  And just for the record and for later, because you've got a different number on here, would you mind putting the Bates number on when we start with a document?

THE WITNESS:  Again, Sunny Jeon's called it "predictors."  We particularly called it more "features."  It's information that's fed into the model to help, again, improve or produce a score for a driver-rider supply plan.

BY MS. PETERS:

Q.        **Is it your understanding that the predictors what Sunny Jeon was calling predictors are helpful for trying to predict risk?**

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  Looking at the document, it seems like he has identified potential variables or factors to help feed into the S-RAD model.

BY MS. PETERS:

Q.        **So that's not my question.  I'm asking you, as the person who was designated to speak on behalf of Uber about its risk-sensitive matching of riders and drivers, as well as risk factors, are the predictors that the S-RAD model was leveraging factors that are supposed to help it predict something?**

A.        That's the goal of having the features into the model, to help produce a model score.

Q.        **Does that remain true today, that the inputs or features that the model uses are intended**

to try to help predict something?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  Yes.

BY MS. PETERS:

Q.        Uber also refers to the predictors as risk signals, right?

A.        We typically refer to them as, again, features into the model.

Q.        But if you could go back, please, to Exhibit 1239, Page 9.  So -- sorry.  Strike that.

So just for the record, Exhibit 1239 is Bates number ending in 2266899.  And Mr. Wong, if you would please turn to Page 9, which is the one ending in .9.  Are you there?

A.        I am.

Q.        The title of this slide is "Prevention Strategy:  Risk Signals."  Do you see that?

A.        I do see it.

Q.        The first bullet point says, "Sexual assaults are rare and appear unpredictable, but many have risk signals."  Do you see that?

A.        I do see that.

Q.        Is that referring to the same thing as the other document was calling predictors?

A.        I can't say for sure if they're referring

see that?

A.          I do see that.

Q.          The question is, "Can these risk signals be leveraged to better anticipate and prevent sexual assaults?"  Do you see where I'm reading from?

A.          I am able to see that.  Yes, I see that Sunny Jeon's posed that question.

Q.          And the answer to that question turned out to be "yes," right?

A.          Well, this was early work in S-RAD.  And again, this team worked on the development of S-RAD, and it seems like early work in understanding what are possible signals.

Q.          The answer to that question turned out to be "yes," right?

          MR. PREMO-HOPKINS:  Object to form.

          THE WITNESS:  Well, led into the development of S-RAD.

          BY MS. PETERS:

Q.          Right.  And once S-RAD was developed, the answer to the question here turned out to be "yes," right?

          MR. PREMO-HOPKINS:  Same objection.

          THE WITNESS:  Correct.

BY MS. PETERS:

Q.      Right.  So I think you're getting into the explanation.  I'm just asking, you are aware that when Uber runs S-RAD, there are trips that it identifies -- S-RAD identifies as risky that Uber ends up dispatching anyway and an incident occurs, right?

A.      There are trips where -- there were plans that were flagged and those plans got dispatched.

Q.      And when you say "plans," you're talking about particular pairings of particular drivers with particular riders, right?

A.      Correct.

Q.      And so there are some of those plans, those pairings of riders and drivers, that S-RAD is flagging as risky but dispatching anyway and then an incident occurs, right?

        MR. PREMO-HOPKINS:  Object to form.

        THE WITNESS:  Right.  So the plans were flagged, and then for whatever reason, the -- that plan was dispatched.

        BY MS. PETERS:

Q.      And an incident occurred?

A.      That's what they're referring to here.

Q.      That's something you know that that

happens, right?

A.          Potentially.  Again, S-RAD is not there to block specific trips, right.  Our goal is to see if we can identify the plans that we might want to reduce the probability of dispatching.

Q.          Right.  But my question is, you're aware that the way that S-RAD is set up and designed, some of the trips that are flagged as risky are dispatched and an incident occurs; true?

A.          Correct.

Q.          And if we go to the page ending in 708 -- no.  Just kidding.  Wrong one.  711, please.  Uber was concerned about how it could explain or justify dispatching trips that it knew were high risk, right?

A.          I see someone has put that on Slide -- I see that someone has put that on the slides there. I don't know who wrote that.

Q.          This -- whoever put this comment in the notes on this slide says, "Policy view:  Concern is that if in the future, we have to disclose information on this, how we explain or justify we had the information that it was a high-risk trip but we still match it and we even send a nudge to those involved, and a very bad incident happened.  From my

Sunny Wong  Highly Confidential
June 25, 2025

**perspective, it will be" -- I think that means "hard to explain that to the public, government officials, et cetera."  Do you see where I'm reading from?**

A.          I do see where you're reading from.

**Q.          Did you -- do you share that concern about how Uber will explain or justify dispatching trips that it knows are high risk?**

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  I have not been involved with what information to disclose to the public about S-RAD.

BY MS. PETERS:

**Q.          Have you been concerned about running S-RAD that way, where trips are dispatched that Uber knows are high risk?**

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  I don't have that concern, but again, to clarify, the sexual -- report of sexual assaults and sexual misconduct on the platform are extremely rare.  We're talking about one in over a million trips.  We don't have -- we're not able to identify with reasonable confidence that something potentially might happen on a trip.  That's why we don't directly block a trip.

MS. PETERS:  And object to everything

sexual assaults?

A.     I didn't.  I didn't have time to look at that during lunch.

Q.     Okay.  Okay.

A.     Maybe they were able to pull it.  If we need to take another break later on, we can be -- we can focus on that, yeah.

Q.     Sounds good.

A.     Yeah.

Q.     Sounds good.  Okay.

All right.  I want to talk about the words "safety risk assessed dispatch" or "S-RAD" a little bit more.  So the last word in that title for the program is the word "dispatch," right?

A.     Correct.

Q.     And that's something that Uber does, is it when it receives a ride request, it pairs a particular driver to that ride request, and it dispatches that driver, right?

A.     That's correct.

MS. PETERS:  Can we go to Document 68, please.  This has been previously marked as Exhibit 546 to the Silver deposition.  For the record, this is a document starting with Bates No. UBER_JCCP_MDL_541461.  And for the record, it's

vehicles.  And it says, "Every time a rider requests a ride, there are multiple potential drivers that they can be matched with."  Right?

A.       I'm able to see that, yes, it refers to the driver-rider supply plans we talked about earlier, yep.

Q.       Right.  So what you've been referring to, "driver-rider supply plans," you're talking about the same thing that this slide is talking about, that there are multiple potential matches with potential drivers, right?

A.       That's correct.

Q.       And next page.  Uber looks for the right or best match for a ride request, right?

        MR. PREMO-HOPKINS:  Object to form.

        THE WITNESS:  Yeah, as -- are you referring to what's on the doc, or are you just asking?

        BY MS. PETERS:

Q.       I'm just asking for now.  So when -- Uber looks for the best driver pairing for a given ride request, right?

A.       And it's looking for the available drivers that meet the criteria, and then it will find the driver that they feel like it's the best match for

Sunny Wong  Highly Confidential
June 25, 2025

that request.

Q.       Right?

A.       Right.

Q.       And when searching for the right match for a given rider, Uber looks at, among other things, safety, right?

A.       Well, S-RAD -- you know, we talked about earlier that it scores driver-rider pairings and then tries to reduce the probability of those pairings from being dispatched at the end of the request.

Q.       Yeah, but I'm not getting into the weeds of S-RAD yet.  I'm just saying, one of the things that Uber is looking at at the -- when it's making the pairing decisions is safety, right?

A.       It's considering S-RAD.

Q.       My question is, is Uber, when it makes pairing decisions, taking safety into account?

A.       As far as leveraging S-RAD as that safety component, correct, yes.

Q.       So don't even look at the document.

A.       Okay.

Q.       Just asking -- I'm just asking the simple question.  When Uber makes a pairing decision, does it take safety into account?

Sunny Wong   Highly Confidential
June 25, 2025

A.          Yes, it does.

Q.          **Okay.  And then once Uber has paired a driver with a rider, it then dispatches that driver, right?**

A.          That's correct.

Q.          **And "dispatching" means that it sends prompts to that driver about that -- that pickup, right?**

A.          The offer is being -- has been sent to that driver, and the driver has accepted it if the matching has occurred, correct.

Q.          **The rider does not select from the available different drivers which driver to choose, right?**

A.          That's correct, because there's -- there are multiple drivers that might be available that will fit that criteria for that particular trip request.

Q.          **And that's -- so the choice of which driver to match is a choice Uber makes, right?**

A.          Correct.

Q.          **And Uber knows that the riders are trusting Uber to make safe decisions about which driver to pair them with, right?**

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  I don't know what riders are expecting for a given trip request.

BY MS. PETERS:

Q.        As the person that Uber has designated to speak on its behalf about risk-sensitive matching of riders and drivers or S-RAD, is it Uber's understanding that riders are trusting Uber to make safe decisions about which driver to send to the rider?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  I'm not aware of that information in terms of what research has been done in terms of understanding what riders are expecting or wanting in terms of for a bigger particular trip request.

BY MS. PETERS:

Q.        As somebody who works in the safety area at Uber and works on -- you worked on S-RAD, right?

A.        Correct.

Q.        And S-RAD is a program that relates to how Uber makes pairings, right?

A.        Correct.

Q.        Do you have any understanding as to whether riders are relying on Uber to make safe pairing decisions?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  Again, I don't -- I haven't seen any data in terms of research that was done, in terms of what riders are expecting on a given trip request.  So I don't have data to answer that question.

BY MS. PETERS:

Q.        Is that your assumption, that riders are expecting Uber to make safe pairing decisions?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  I don't -- I don't have a view in particular either way.  Again, I don't have any information what riders are expecting.

BY MS. PETERS:

Q.        You know that the riders have little control over who they are paired with, right?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  They are not able to choose which driver of all the different plans that are available.

BY MS. PETERS:

Q.        Right.  And they don't control who Uber pairs them with, right?

A.        Correct.

Q.        And so would you agree that Uber has a

**responsibility to do everything that it can not to dispatch drivers who are going to sexually assault riders?**

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  Again, as part of the Uber platform, our goal was to provide, again, safe, reliable transportation options for our users through our matching platform.

BY MS. PETERS:

**Q.        Going to object as nonresponsive, and direct you back to my question.  My question is, would you agree that Uber has a responsibility to do everything that it can not to dispatch drivers who are going to sexually assault riders?**

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  I mentioned earlier that reports of sexual assaults on the platform are extremely rare, one in over a million, and we continuously try to improve safety on the Uber platform, and again, with the overall goal of also still providing, again, reliable matching services on our platform.  So we're not leaving anyone out in the middle of the night so we can provide that trip.

MS. PETERS:  Counsel, I'd ask that you instruct the witness to respond to the question.

Sunny Wong  Highly Confidential
June 25, 2025

MR. PREMO-HOPKINS:  You can ask.  That's fine.  I think it's a completely improper question.  That's why I'm objecting to the form.

THE WITNESS:  Can you repeat the question?

MS. PETERS:  No, but I'm asking you to please --

MR. PREMO-HOPKINS:  I'm not going to instruct my -- the witness to answer the question.  I think the witness has answered the question fairly as asked.

MS. PETERS:  Okay.  I'm going to ask it again because he's not been answering it.

BY MS. PETERS:

Q.      **Would you agree that Uber has a responsibility to do everything that it can to not dispatch drivers who are going to sexually assault riders?**

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  S-RAD does not have -- S-RAD assesses risks at the pair- -- rider-driver pairing level.  It does not have -- it doesn't score user-level risks.  So we don't have that visibility in terms of, at the user level, which driver is what you define as risky, right.

Sunny Wong  Highly Confidential
June 25, 2025

BY MS. PETERS:

Q.      Yeah, I'm not -- I'm not saying that the drivers are known to be risky drivers.

MR. PREMO-HOPKINS:  That's exactly what you're asking him.

BY MS. PETERS:

Q.      I'm asking, you would agree that Uber has a responsibility to do everything it can to not -- and I'll ask it a little bit differently -- to not make a driver trip pairing that is going to result in a sexual assault of a rider?

MR. PREMO-HOPKINS:  Object to form.

BY MS. PETERS:

Q.      Do you agree?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  Again, there's no way for us with reasonable confidence to know or identify what's going to happen on a particular trip.  These sexual assaults are extremely rare that are reported on the Uber platform.  I mentioned it earlier.

So -- sorry.  So, again, there's no way for us to know with reasonable confidence.  Again, we try our best.  We have investing in things like S-RAD.  We're going to invest in it to continue to improve safety, but again, these events are

extremely rare, and we continuously try to improve S-RAD and other safety programs at Uber.

BY MS. PETERS:

**Q.          I think you're answering about what Uber can do.  I'm asking, to the extent it's able to, would you agree that Uber has a responsibility to do everything it can to not make pairings of drivers with trips that are likely to result in sexual assault?**

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  The report rates of sexual assaults are extremely rare, and there's no way for us to with reasonable confidence say which pairings are going to -- will be deemed to be -- maybe have a higher risk, right.  So that's why, again, we've done other -- we continue to invest in improving our ability to improve safety via S-RAD.  So...

MS. PETERS:  So Counsel, we're going to have to take a break and --

MR. PREMO-HOPKINS:  I mean, do you want me to read the question back to you?

MS. PETERS:  No, I don't.

MR. PREMO-HOPKINS:  The question was -- I just want this to be on the record.  He's explained to you --

Sunny Wong   Highly Confidential
June 25, 2025

MS. PETERS:  It is on the record.

MR. PREMO-HOPKINS:  He's explained to you multiple times that, given the rarity of these events and the technology they have, there is no way to determine whether any particular driver or pairing or trip is likely to result in sexual assault.  Every time you ask the question, you ask the question of whether or not Uber has a responsibility to do something that he's told you is impossible.  It's a completely unfair and improper question, and he's answered it.

So I'm happy to go to the judge and read the judge that question and read the answer that he gave if you think that's what we need to do.

MS. PETERS:  Yeah, I do think we need to because, like I said to Mr. Wong, my question is about whether Uber should do everything that it can do.  He's explaining what he thinks are the limits of what it can do, and we'll get to that, but I'm asking for a basic principle, should it do what is within its power?  That's the question.

MR. PREMO-HOPKINS:  That's a legal question also.

MS. PETERS:  No.  I mean --

MR. PREMO-HOPKINS:  There's so many

problems with the question.  I'm happy -- if you want to ask a clean question, have him answer it again so that you can have it on the record and decide what you want to do in terms of going to the judge, we can do that, but he's certainly fairly and accurately answering the question that you've asked so far.

BY MS. PETERS:

Q.         I'll try one more time.  And first, Mr. Wong, I understand you're saying there are limits to what Uber maybe can do.  My question is, to the extent that it's within Uber's ability, do you agree that Uber should -- strike that.  Let me get my wording.

           Do you agree that, to the extent that it's within Uber's ability, Uber should do whatever it can not to make driver trip pairings that are likely to result in sexual assault?

           MR. PREMO-HOPKINS:  Object to form.  The last part of your question there is completely improper and unfair.  And I'm saying it because you've threatened to call the judge.  There are many ways you could ask this question that would be proper.  When you put that in there and you know what he's told you and testified to, you're making a

using that data.  So the goal is to reduce the probability of reports of sexual assaults reported on the platform.

BY MS. PETERS:

Q.        I still don't think you're answering the question.  Let me see if I can try to incorporate your language.  So my question is, is it true that S-RAD scores potential pairings based on the risk of sexual assault or sexual misconduct for each pairing?

A.        Yes.

Q.        And it assigns each pairing a number between 0 and 1 to reflect that risk, right?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  That's the range of the scores that come out of S-RAD.

BY MS. PETERS:

Q.        Is that a "yes"?

A.        Correct.

Q.        Is 1 reflecting higher risk, and 0 is lower risk?

A.        Correct.

Q.        And then within that, when Uber has a trip trigger rate of 1.25%, that means it's potentially, in the aggregate, actioning the -- within that score

A.        How do you mean -- define "rare"?

Q.        Does it know the frequency?

A.        Again, we -- I'm not aware of anything that's been done previously.  And my team hasn't worked on specifically analyzing, say, the control side of the 1.25%.  Again, theoretically, it could, but again, I mentioned earlier I'd probably have a lot of concerns with whether or not we have enough data to the draw any conclusions from doing such analysis.

Q.        To your knowledge, that analysis has not been done; true?

A.        I'm not aware of it.  It's possible that someone has conducted it.  I'm not aware of any.

Q.        When you've referred to "rare," because you've brought that up, what did you mean by "rare"?

A.        Well, when I think about the report rates of sexual assaults on the platform, again, one in over a million trips, again, that's just my view.  That seems like a very rare event.  But again, that doesn't deter us from continuing to invest in safety and trying to make those rare events even rarer.

Q.        And what -- when Uber's deciding where to set the trip trigger rate, what risk level is acceptable to Uber?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  We don't think about it in that context, right.  So we establish -- you know, through the development life cycle of S-RAD, they came up with a target 1% -- or trigger rate of 1.25%, and sometimes it's higher, sometimes lower. We talked about how there's a pretty big difference between day and night trigger rates.  But again, we continue to reevaluate whether there are opportunities to update the trigger rate as well.

BY MS. PETERS:

Q.      Right, but in terms of actual rates of sexual assault, what -- what rate of sexual assault is acceptable to Uber?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  There's nothing like that that's been established, right.

BY MS. PETERS:

Q.      If the risk for the -- for sexual assault for a given plan or pairing of particular rider with a particular driver is ten times average, is that acceptable to Uber?

MR. PREMO-HOPKINS:  Object to form, beyond the scope of the notice.

THE WITNESS:  Again, we haven't discussed

Q.          Okay.  And so in deciding where to put the trigger rate, did Uber make a decision about what level of risk for sexual assault was acceptable to Uber?

A.          Not that I know -- sorry.

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  Yeah, not that I know of.

BY MS. PETERS:

Q.          And do you know whether for the top 1.25% of trips, whether the risk is, you know, five times the average, ten times average, 100 times average, 1,000 times average?  Do you have any idea?

MR. PREMO-HOPKINS:  Or the same.  Could be the same, right?

THE WITNESS:  I don't know.

MS. PETERS:  Please, no coaching.

THE WITNESS:  I do not know.  I don't have that data in front of me.

BY MS. PETERS:

Q.          I want to talk about Uber's knowledge.  So one of the topics you've been designated on is Uber's knowledge from 2012 to the present that certain risk factors are associated with an elevated risk or rate of sexual assault and/or sexual misconduct.  We talked about these at a really high

**speak on behalf of Uber about the Uber's knowledge that risk factors are associated with an elevated rate or risk of sexual assault and/or sexual misconduct, do you agree that late-night rides are associated with an elevated rate or risk of sexual assault and/or sexual misconduct?**

A.          From analysis that Sunny and others have done from a -- again, they've conducted correlation analysis that show higher rates.  Again, we're not talking about causality or anything like that, but these are early analysis that they've been able to draw some findings of different factors.

**Q.          And so is that a "yes," that as the person designated to speak on Uber's behalf about its knowledge that certain risk factors are associated with an elevated rate or risk of sexual assault and/or sexual misconduct, late-night trips are, yes, associated with an elevated risk?**

A.          They've -- their findings is that there's higher rate of reports of sexual assaults when they looked at daytime versus nighttime.

**Q.          Higher for nighttime, right?**

A.          Correct, yeah.  But whether it's 5X or whatever level, I -- you know, it depends on the circumstances, the time period and other factors.

MS. PETERS:  Could we put that slide back up, please, Dianne?  Sorry about that.

BY MS. PETERS:

Q.        All right.  So this is that same Sunny Jeon PowerPoint, and he says, "High-risk trips originate from a bar area."  Do you know what he meant by that, "from a" -- by "a bar area"?

A.        Can you give me a second?  Let me see if it's referenced in there somewhere.

(Pause.)

THE WITNESS:  Yeah, it's not in the deck. It might have been in the other write-up that we -- that he produced before.  I do see that on the slide, though.

BY MS. PETERS:

Q.        So at least in 2018 -- we don't know exactly what a bar area is, but at that point, based on whatever study Uber had done, it was aware that high-risk trips tend to originate from a bar area, right?

A.        Yeah, without pulling the details of his analysis, that seems to be what Sunny Jeon found to be one of the insights.

Q.        Right.  And he worked for Uber at the time, right?

MR. PREMO-HOPKINS:  Just let's go off the record for one second.

THE VIDEOGRAPHER:  Going off the record at 2:49 p.m.

(Discussion off the record from 2:49 p.m. to 2:50 p.m.)

THE VIDEOGRAPHER:  Now we're back on the record at 2:50 p.m.

BY MS. PETERS:

Q.      Do you agree that Uber should do whatever it can to not make driver trip pairings that carry an increased risk of sexual assault?

A.      Yes.

Q.      Let's go back to risk factors and knowledge, which was what we were talking about earlier.  Uber knows that reports of sexual assault occur more commonly for trips on holidays, right?

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  Is there a specific document you're referring to?

BY MS. PETERS:

Q.      Actually, strike that.  I forgot I wanted to ask you a follow-up question on the surge -- surge point that we were on.  Do you still have that page open, the 2.5 times more likely report of

Q.        You said you see that in the document?

A.        Yes.

Q.        Do you have any updated data on that?

A.        Not that I'm aware of.

Q.        And then going to Exhibit 1240.  That's the Sunny Jeon July 2018 S-RAD Model Overview, page 10.  Do you see this Table 2 titled "Predictors of Sexual Assaults"?

A.        Yep, I see the table broken out by trip level, driver level, and rider level.

Q.        Right.  We've talked about a number of these, but I wanted to look at something under the driver-level predictors of sexual assaults.  Third row from the bottom is "Telematics."  Do you see that?

A.        I do see that.

Q.        And it says, "e.g., speed, hard brakes, accelerations, phone handling, jerking."  Do you see where I'm reading from?

A.        I'm able to see that.

Q.        What are telematics?

A.        That typically means the sensors on someone's phone, like accelerometers and other related sensors.

Q.        And does Uber receive data from the

Sunny Wong   Highly Confidential
June 25, 2025

sensors on riders' and drivers' phones?

A.         My understanding, we have that data for the driver's side.  The rider's side, I'm not as aware of that.

Q.         So Uber found that some telematics data was a potential predictor of risk for sexual assault, right?

A.         Could you give me a moment to read the doc real quick?

Q.         Sure.

A.         I want to see what references they have on the telematic side.

(Pause.)

THE WITNESS:  I had a chance to go through it.  I'm not seeing any analysis related to telematics and any correlation with driver, at least not in this document, and so that would be news to me.  So -- but it's possible that he connected this somewhere else, yeah.

BY MS. PETERS:

Q.         Have you looked at -- has your team looked at the correlation or potential correlation between telematics and risk for sexual assault?

A.         We have not.

Q.         Is that something that's in the S-RAD

I want to ask just about big-picture timeline for S-RAD.  Uber first started looking into something like S-RAD in 2018, right?

A.   Looks to be the case.

Q.   And it started by deploying S-RAD in shadow mode in Los Angeles in 2018, right?

A.   I believe that was the case.

Q.   And that was -- just to be clear -- and you talked about this earlier -- they didn't actually do any intervention.  They just looked at sort of theoretically how many trips could be identified that would involve a heightened risk of sexual assault, right?

A.   They were gathering --

MR. PREMO-HOPKINS:  Object to form.

THE WITNESS:  Sorry.  They were gathering data without intervening at that point, yeah.

BY MS. PETERS:

Q.   Right.  And we already looked at those documents that they were able to identify by a 1% trigger rate about 20% of sexual assault/sexual misconduct incidents, right?

A.   I don't recall the specific recall, but I recall Sunny doing some analysis around the trigger rate recall from that what are referred to as shadow