# C.23

# EXHIBIT 18

## EXHIBIT FILED UNDER SEAL

```
                   UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
                     SAN FRANCISCO DIVISION



                      ***CONFIDENTIAL***

              VIDEOTAPED 30(b)(6) DEPOSITION OF
              UBER TECHNOLOGIES, INC.,
              RASIER, LLC, and RASIER-CA, LLC
              GREG BROWN

        IN RE: UBER TECHNOLOGIES, INC.,
        PASSENGER SEXUAL ASSAULT LITIGATION

                            MDL No. 3084 CRB


        _____


        DEPONENT:        GREG BROWN

        DATE:            July 15, 2025

        TIME:            9:43 a.m.

        LOCATION:        NELSON MULLINS
                         CHARLESTON, SC

        REPORTED BY:     JESSICA BOLANOS
```

understanding, yes.

Q.   And there were times when Uber was responding or following up to one of these reports by a rider, it would say something in its Bliss communication to Mr. Turay about, you know, please make sure you follow such and such rules, that sort of thing, right?

A.   Generally, I think that's right.

Q.   But to confirm, there was no training modules that Uber required Mr. Turay to complete as a result of the reported incidents against him, right?

A.   No, I don't believe so.

Q.   I did a double negative.  Am I correct?

A.   Yes, I believe you're correct.

Q.   Did Uber ever require Mr. Turay to start using a camera?

A.   Not to my knowledge.

Q.   Did it ever require him to start using audio-recording in his car for all rides?

A.   Not to my knowledge.

Q.   He never registered a dash cam, right?

A.   I didn't review that in preparation, so I'm not sure.

MS. PETERS:  I think this is a good

Q.  Some of these trips, if we look at the very top row, are nighttime trips.  For example, this is a 2:26 a.m. trip.  That's the first one.

Do you see that?

A.  I do.

Q.  Did Uber do anything to investigate -- let's start with, did it do anything to investigate the 1-star ratings that came in to it for Mr. Turay?

A.  Unless there were an associated safety report associated with one of these trips, to the best of my knowledge, Uber did not investigate any of these subject trips.

Q.  When -- and when you say when there's an associated safety report, that would mean the rider or the driver voluntarily making a report to Uber regarding a safety situation; is that right?

A.  Yes, or any number of other channels that a user could choose to contact us about a report associated with a trip.

Q.  Does Uber know what these 1-star reviews were for?

A.  When you say what these 1-star reviews were for, can you clarify what you mean by that?

A.  No, not to the best of my knowledge.

Q.  Did Uber correlate the 1-star reviews of Mr. Turay with data it had about whether there were GPS signs of long stops or the driver stopping a trip midway?

A.  I'm not sure how to answer that question.  When you say correlate the 1-star reviews with those factors, I'm not sure what that means.

Q.  Are you familiar with Uber's GPS tracking of things it calls long stops and midway drop-offs?

A.  I have a general working knowledge of those factors, which I believe are part of the RideCheck product.

Q.  Right.  And sometimes that comes up in investigations, right?

A.  Yes.

Q.  Sometimes Uber learns that a -- what was -- what looks like from GPS a midway drop-off is actually a driver pushing a button to end the trip so he can then sexually assault the rider rather than go to their destination, right?

MS. LEVY:  Object to the form as asked.

A.   I've seen reports that align with that fact pattern.

Q.   And sometimes the long stops are not just long stops, they're sexual assaults that are occurring.  That's come up in investigations, right?

A.   I've seen long stops come up in the context of a sexual assault allegation and investigation.

Q.   And so Uber knows in the context of its investigations that long stops and, quote/unquote, midway drop-offs can be signs of potential sexual assault occurring, right?

A.   I think, as I mentioned, there can be reports of a sexual assault associated with those product features of RideCheck.  My understanding is that's why those features exist, in addition to other problematic types of reports, sexual assault being one of them.

Q.   Did Uber investigate the 62 or any of the 62 1-star reviews of Mr. Turay by looking at the GPS data to see if there was a, quote/unquote, midway drop-off or long stop associated with it?

A.   Unless there were a safety report or the

would look like in terms of feasibility specifically.

MS. PETERS:  I'm going to object as nonresponsive.

Q.  My question was:  If -- Uber could have, if it wanted to, reached out to the riders who rated Mr. Turay 1 star to find out what had happened, right?

A.  I'm not sure of the implications of that sort of suggestion and whether or not that would actually be helpful or useful.

Q.  It could have done so, right?

A.  Again, I'm not sure exactly how it would have accomplished that.  So I don't know that I can say that.

Q.  Uber could have sent a Bliss communication to those riders to ask them for more information?

A.  About the 1-star review specifically?

Q.  Right.

A.  I suppose that could be feasible.

Q.  Uber could have looked at the inferred gender for those riders who gave the 1-star reviews, right?

A.  Yes, though I'm not the expert on the

limitations of inferred gender.

Q.  Uber could have, if it wanted to, looked at whether the GPS data showed midway drop-offs or long stops for the 1-star reviews of Mr. Turay, right?

A.  I'm very much not the expert on the safety products that you just mentioned and the feasibility associated with those.

Q.  Well, I did it last night.  So for example, if we go to -- we just got the timestamps from the RideCheck data last night.  And let's confirm that in this list of 1-star reviews --

MS. PETERS:  Are they in chronological order?

MS. HAZEN:  Yeah.

Q.  There's a June 3rd, 2022, 9:16 p.m. or around that time.  It's a 9:12 p.m. ride.

Do you see that?

A.  Yes.

Q.  Let's look at March 7, 2023, around 10:40 p.m.?

MS. HAZEN:  Yeah.

Q.  Do you see that there's around 10:40 p.m. a trip?

Q.  -- and they could give more information, right?

A.  Yes.  That's my understanding of how the product works.

Q.  Did you see that from Ms. Dean -- and we'll get to her ride later -- do you see that she was sent a prompt like that, but she didn't respond to her prompt?

A.  I don't know that I reviewed that prompt in the course of preparation, but I'll take your representation that that happened.

Q.  Well, and Uber knows that if somebody is being sexually assaulted or if they're blacked out drunk or heavily intoxicated, that may be the very reason they can't respond about why they're having a long stop?

A.  I think it is fair to conclude that there may be reasons that users are not able to engage with that notification in the moment, including instances of sexual assault.

MS. PETERS:  All right.  Then let's go to the next one, please, April 7, 2023.

Q.  It's a 10 -- what we were looking at before is there was a 1-star review at 10:40 p.m. And once again, we're pushing to the next day.

right?

A.   I'm -- I'm not the expert on what actually triggers a midway drop-off, underlaying data for what constitutes midway drop-off.

Q.   Did you see for the subject trip that Mr. Turay, when he was with Ms. Dean, received a note -- he ended the trip early before reaching the destination, he got an alert for midway drop-off, and he dismissed it?

A.   I believe I did review that in the course of preparation.

Q.   And he had not actually dropped off Ms. Dean, right, at that point?

A.   My understanding, based on the allegation, is that the trip was ended early at that time.

Q.   Right.   And it's your understanding, based on the allegation, that the trip didn't end early for him to drop Ms. Dean off on the side of the freeway.   The trip ended early for him to assault Ms. Dean on the side of the freeway, right?

A.   That's consistent with my understanding of the allegation.

Q.   The last one we are looking at is a

Q.   Okay.   When Uber received that ride request from Ms. Dean, it was a little bit after midnight, right?

A.   That sounds right.

Q.   That's a time that Uber knows is a time when more people drink than in the middle of the day, right?

A.   I think that's generally understood, yes.

Q.   And did Uber infer the plaintiff's gender from her name?  Like, did it know that it was sending a driver to a female rider?

A.   I don't know whether it would have inferred that gender.

Q.   Did Uber, when it sent Mr. Turay to Ms. Dean, appreciate that given the hour there was a higher risk of sexual assault?

A.   I'm not the expert on the relative sexual assault risk of given times of day, and it would be tough for me to qualify that statement.

Q.   When Ms. Dean requested that trip, she had been drinking, right?

A.   I believe that is what she had mentioned in her report to Uber.

Q.   That's something that Uber later learned

MS. LEVY:  Object to form and foundation.

A.  I'm not aware of data that suggests that new riders are at higher risk of sexual assault. I've not seen such an analysis.

Q.  It's not come up in the investigative work that you have done?

A.  No, ma'am.

Q.  At 12:20 a.m., Uber chose to pair Ms. Dean and her trip request with Mr. Turay, right?

A.  Yes, my understanding is that Mr. Turay was offered and accepted the subject ride.

Q.  Okay.  And when Uber chose Mr. Turay as the driver for this trip with Ms. Dean, it knew that she was a new -- new rider, that she was -- it was after midnight, and that that was a time at which there was a higher chance that she would -- might be drunk, right?

MS. LEVY:  Object to the form in the way you're asking it.

A.  I think it's fair to surmise that Uber would have known the time of the trip and the total number of trips that a rider would have had at the time of the trip.  And I think, as we

established earlier, generally it is understood that users may be more likely to be intoxicated during nighttime trips.

Q.   And this wasn't a pool request, right?

A.   Not to my knowledge.

Q.   So Uber knew that this was a -- a rider who would be alone with Mr. Turay, right?

A.   To the best of my knowledge, I don't know that Uber knew one way or another when the -- when the trip request was made whether or not a rider would be alone.

Q.   It knew it would probably be a rider alone given that it wasn't a pool.  Most of those are not group rides?

A.   I'm not familiar with the data behind that.

Q.   Ms. Dean did not select Mr. Turay off a driver menu, right?

A.   No.  That's not how the Uber app works for riders, as I understand.

Q.   Right.  Uber -- Uber pairs, they choose the driver, and they dispatch the driver, sending him to the rider, right?

A.   My understanding is that Uber will offer the trip and the driver has the opportunity to

accept that trip, and that appears to be what happened in this case.

Q.  Right.  And if the driver accepts the trip, then Uber dispatches that driver to the rider?

A.  Yes.

Q.  Ms. Dean didn't have any -- any say in which driver Uber chose for her, right?

A.  No.  There -- yeah, the rider would not have any input, so to speak, into the driver that ultimately chose to accept the trip offer.

Q.  And when Uber sent Mr. Turay -- when it chose Mr. Turay to pair him with Ms. Dean's trip, it knew that Mr. Turay had been accused of sexual assault once, right?  Thought it was invalid, but you knew he had been accused?

A.  Yes, we would have had those records in our systems.

Q.  It knew at that time when it sent Mr. Turay to Ms. Dean that he had been accused of sexual misconduct another time?  Again, I know you have caveats, but it knew there was an accusation, right?

A.  Yes, that data would have been part of Uber systems.