# C.27

# EXHIBIT 28

## EXHIBIT FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

_____

IN RE: UBER TECHNOLOGIES,        ) Case No.
INC., PASSENGER SEXUAL ASSAULT   ) 3:23-md-03084-CRB
LITIGATION                       )
_____

*** HIGHLY CONFIDENTIAL ***

Volume II

HIGHLY CONFIDENTIAL
UNDER PROTECTIVE ORDER
VIDEOTAPED DEPOSITION OF HANNAH NILLES 30(b)(6)

August 7, 2025
7:45 p.m. Eastern Standard Time

_____/

Reported by:  Renee J. Ogden, RPR California CSR #14485

BY ATTORNEY WALSH:

Q. It says, "The percentage of one-star ratings is the only meaningful predictor of the total number of sexual misconduct tickets a truck driver has."

Did I read that correctly?

A. That's what that says, yes.

Q. That's what this Uber document says, correct?

A. That's what this Uber document says.

Q. This confidential internal Uber document, that's what it says, right?

A. Yes.

Q. And goes on to say, "The percentage of trips taken on weekend nights and cancellation rates are the only variables predicting a higher level (L3, L4) incident versus a lower level sexual misconduct incident?"

Do you see that?

A. I see that.

ATTORNEY WALSH:  And, MJ, could you please underline "predicting" in red?

BY ATTORNEY WALSH:

Q. And, Ms. Nilles, remind the jury what L3 and L4 stand for?

ATTORNEY PREMO-HOPKINS:  Object to form.

A. Level 3 or Level 4.

platform have patterns and precursors, correct?

A. Potentially. Not --

Q. Sorry, I cut you off. You said potentially what?

A. Not all.

ATTORNEY WALSH: Let's take a look at Exhibit 112, please. Sorry, it's AW 112, which we're going to mark as Exhibit 1884.

EXHIBIT TECHNICIAN: 1884.

ATTORNEY WALSH: Thanks, Sly.

MARKED FOR IDENTIFICATION:

DEPOSITION EXHIBIT 1884

Bouncer Version 3

8:09 p.m.

ATTORNEY WALSH: And can we put this in the Box, please?

ATTORNEY PREMO-HOPKINS: Also, just going to object to questioning. Uber has already been questioned on this in detail on Mr. Wong's deposition.

ATTORNEY WALSH: Yeah. This is a deposition of Uber, so.

ATTORNEY PREMO-HOPKINS: And Mr. Wong was testifying on behalf of Uber.

Go ahead.

BY ATTORNEY WALSH:

Hannah Nilles Volume II Highly Confidential
August 07, 2025

Q. Ms. Nilles, is the document available in Box?

A. I don't see it yet. Hold on. What's the number? Oh, wait. 1882, is that the number?

Q. 1884.

ATTORNEY PREMO-HOPKINS: 1884.

A. Oh, I don't see it yet.

EXHIBIT TECHNICIAN: If you refresh your browser, it should be in there.

THE WITNESS: I just refreshed. It's not there. Is there a different link I should be using? I'm just still on the same Box.

EXHIBIT TECHNICIAN: Oh, yes. There is a new link in the chat.

THE WITNESS: Okay. Hold on.

A. Okay. I see it.

BY ATTORNEY WALSH:

Q. Ms. Nilles, do you see that this is a document -- if you look at the metadata, do you see that this is a -- sorry. One second. This is an Uber document that was created in March of 2016?

A. Yes, I do see that.

Q. Okay. And you see that the title of it is "Bouncer Version 3"?

A. Yes.

Q. And if you scroll forward to the first page that

has the title, "Bouncer Version 3," are you familiar with Bouncer?

A. Not really, just at a very high level.

Q. Can you give us your high-level understanding of what Bouncer is?

A. That it was a sort of early model that we used to try to identify patterns related to sexual assault and sexual misconduct.

Q. And what this document says under -- it says it was created on March 28, 2016.

Do you see that?

A. Yes.

Q. By Sunny Jeon, a data scientist for Uber, correct?

A. Yes.

Q. And what it says is, "This document provides an overview of Bouncer, an intelligent decision system for anticipating and preventing safety incidents on the Uber platform (e.g., accidents, interpersonal conflicts)."

Do you see that?

A. Yes.

Q. And if you go forward to the next page, you can see the document discusses the motivation for a tool like Bouncer.

Do you see that?

A.  Yes.

ATTORNEY PREMO-HOPKINS:  Object to form, scope.

BY ATTORNEY WALSH:

Q.  And what it says is, "As Uber usage continues to grow, the company may encounter a greater number and variety of safety risks, including fatal automobile accidents and interpersonal conflicts like physical altercations and sexual misconduct."

Do you see that?

A.  Yes.

Q.  And it says --

ATTORNEY PREMO-HOPKINS:  Same objection.

BY ATTORNEY WALSH:

Q.  And it says, "Although safety incidents are rare and may appear random, many safety incidents are predictable."

Do you see that?

A.  I see that.

Q.  And that part of this Uber document is bolded, correct?

A.  It's bolded.

ATTORNEY WALSH:  So if you could underline that in red as well, please, MJ.

BY ATTORNEY WALSH:

Q.  And what it says is, "That is, safety incidents follow patterns and have precursors that can be leveraged to forecast them before they happen."

Do you see that?

A.  Yes, I see that.

Q.  So that's what Uber is saying back in 2016 in this document, right?

A.  That's what this document says.

Q.  And, again, this isn't a document that was meant for public consumption, right?

ATTORNEY PREMO-HOPKINS:  Object to form, scope.

A.  No.

BY ATTORNEY WALSH:

Q.  It says, "Attorney-client privileged and confidential - Under supervision of counsel."

Do you see that up above?

ATTORNEY PREMO-HOPKINS:  Same objection.

A.  Yes.

BY ATTORNEY WALSH:

Q.  And as one example of the patterns and precursors that can be leveraged to forecast safety incidents, this document says that "Safety incident rates increase dramatically between 1:00 and 3:00 a.m. and Saturday nights/Sunday mornings and on holidays

Hannah Nilles Volume II Highly Confidential
August 07, 2025

and other days of major social gatherings."

Do you see that?

A.  Yes.

Q.  So Uber is stating its knowledge and its understanding back in 2016 that the risk of a safety incident goes up dramatically late at night, on the weekends, and on particular days when there are social gatherings, right?

A.  That's essentially what this document says.

Q.  And when did Uber disclose to the public its understanding that rides taking place late at night, on the weekends, or on days of major social gatherings, that those rides had a higher risk of safety incidents?

ATTORNEY PREMO-HOPKINS:  Object to form, scope.

A.  We have not made public disclosures.

BY ATTORNEY WALSH:

Q.  Okay.  And do you see where this bullet links to "Safety hot times/days analysis"?

A.  Yes.

Q.  Are you familiar with that document?  Have you looked at that in your role as the head of safety for the Americas?

ATTORNEY PREMO-HOPKINS:  Same objection,

Ms. Nilles, if you went on to conduct these additional interviews that are noted under "Upcoming Interviews" on this slide?

A. Some of them, yes.  Some of this Scott Binnings conducted without me.

Q. Do you recall whether or not you conducted the interview of Roger Kaiser?

A. I don't recall.

Q. Let's look at the next slide.  And, again, you created this document, correct, Ms. Nilles?

A. Yes.

Q. And this slide includes quotes from the interviews that you conducted, correct?

A. Yes.

Q. And the first quote is, "I will get fired if I don't hit EBITDA.  I'm not going to get fired if I don't hit a safety KPI."

Do you see that?

A. Yes.

Q. Do you see where it says, "Stand For Safety is a sham"?

A. Yes.

Q. Do you see where it says, "If the mandate doesn't come from Mac, it's not going to happen"?

A. Yes.