# A.20

United States District Court Northern District of California
San Francisco Division

IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

Case No. 3:23-md-03084

**This Report relates to the following Wave 1 Cases:**
**Case No. 24-cv-7940 (B.L.)**
**Case No. 24-cv-7821 (A.R.2)**
**Case No. 24-cv-7019 (LCHB128)**
**Case No. 23-cv-6708 (Dean)**
**Case No. 24-cv-4900 (WHB 832)**

**REPORT OF DAVID C. SAWYER**

**Confidential and Subject to Protective Order**

1

## Introduction

My name is David C. Sawyer, and I am the founder/CEO of Safer Places, Inc., a Massachusetts corporation offering background checks, drug testing and other related service to employers throughout the country. Prior to starting Safer Places in 2004, I worked as Sr. Vice President at a Boston based security firm where my responsibilities included overseeing the background screening and drug testing services, contract guard services and security consulting services offered to our clients. Prior to that, I spent 22 years working for a national property management company, rising to the position of Vice President, Security when I left in 1998.

Currently, Safer Places provides background screening, drug testing and other related services to over 250 clients. Our clients are located throughout the U.S. and represent a large variety of industries, organizations and non-profits. A sampling of these includes property management, medical services, city/town government, religious organizations, food delivery services, contractors, staffing agencies, security companies, software, and children's camp.

I am also the managing partner of a security consulting company, SPI Consulting, LLC which is marketed under the Safer Places name. SPI Consulting provides services which include creating security systems design specifications and Request for Proposals (RFP) as well as procurement/installation oversight. We also offer security guard contract procurement and oversight services as well as general security and risk assessments.

Part of onboarding a new client at Safer Places, Inc. includes advising them about their options when it comes to creating one or more screening packages. I also make recommendations to my clients about which of the available screening options I recommend. We also review with our clients their responsibilities regarding compliance with the Fair Credit Reporting Act (FCRA) and any applicable state or local requirements in the states where they hire.

Safer Places is a member of the Professional Background Screeners Association (PBSA). PBSA exists to assist the background screening profession as they serve several critical functions:

- Protecting the rights of consumers

- Promoting safe homes and workplaces

- Helping employers and property managers comply with state and federal screening regulations

- Helping public and private employers make informed placement decisions

- Providing risk mitigation tools for employers and property managers.

"With our common goal of safe communities in which we live, work and play, screening companies and the PBSA will continue to work together to advance excellence in the screening profession. Promoting an awareness of the importance

2

of screening to organizations, government entities, legislators, and consumers will always be one of our primary goals."[1]

I, as well as members of my management team have received an advanced FCRA certification from PBSA, having completed the basic and advanced certification courses and passed the required tests.

The FCRA Advanced Certificate Program is intended for US background screening professionals looking to demonstrate a commitment to compliance within their organization. The Advanced Certificate Program is ideal for individuals in compliance or legal roles as well as anyone who regularly deals with compliance issues within their organization such as operations, leadership, and customer service. The content and exam focus on complex and cutting-edge Fair Credit Reporting Act (FCRA) compliance issues.[2]

PBSA is the primary source for me and members of my team to stay current on matters pertaining to available resources for providing comprehensive screening options to our clients and to remain compliant with federal and state regulations pertaining to background checks for employment purposes. PBSA also publishes materials that address various screening issues which are relied upon by professionals in the field. I have cited to some of those materials in this report if I considered them to be reliable authorities and helpful for understanding the issues.

## Scope of this Report

Plaintiffs' counsel asked me: (a) to provide an overview of options available to Uber for obtaining information about drivers and driver/applicants, the costs for obtaining this information, and the strengths and limitations of the various available methods for obtaining this information; (b) to review documents and deposition testimony regarding Uber's policies, practices and experience in connection with what information it does and does not obtain about driver/applicants; (c) to do my own search and review of Uber documents and testimony using the Everlaw platform and to do my own research of publicly available information; (d) to do background checks and social media searches on five Uber drivers based on identifying information about those drivers that the attorneys were able to provide to me; and (e) to provide my recommendations for Uber consistent with how I would have advised my own clients.

## My Methodology:

The information in this report on topic (a) through (e) above is based on my years of experience in security and screening, and the knowledge that I have developed over the years from reading specialized literature, attending conferences, working with the various methods for obtaining information about individuals, and interpreting that information and advising my clients on those

---

[1] *About Screening,* Professional Background Screeners Association (PBSA), https://www.thepbsa.org/resources/about-screening/ (last visited Sept. 7, 2025).

[2] *About Our Program,* Professional Background Screeners Association, https://www.pathlms.com/pbsa/courses/70393 (last visited Sept. 7, 2025).

3

subjects. I used the same methodology for obtaining information and reaching my opinions in this case that I use daily in my work advising and serving clients. For my review of documents and other materials relating to Uber, I did my own research of publicly available information and considered Uber's internal documents obtained through discovery. I also reviewed testimony of certain Uber witnesses. My search topics included use of fingerprinting, scope of background check options, Uber's internal assessments of limitations with Uber's background checks, adjudication criteria, drug testing, driver history, background checks outside of the U.S., wants and warrants, and social media.[3] A list of materials that I considered is attached as Appendix C.

In performing the background checks for the bellwether drivers, I conducted my search the same way I would in my everyday work. I began with running a Social Trace, using the identifying information provided to me by the Plaintiffs' attorneys (name, date of birth (DOB), social security number (SSN), and the driver's place of residence at the time of their application to Uber). In my everyday work for clients, I also obtain this sort of information from the client in order to begin the background check. I ran the bellwether drivers' information through a Social Trace to identify other locations the subjects have lived and when, various alternative spellings of their names and/or aliases, as well as an indication of whether the SSNs are valid or not. I then used this information to run criminal background searches in the locations where the subjects have resided. To run a criminal background check, I utilized Affirm, a company that conducts criminal record searches throughout the country. I also utilized InstaCrim for real-time electronic searches of court data, where available and Equifax, a company that maintains a national database of criminal records compiled from various courts and other sources including the National Sex Offender Registry. For federal criminal record searches, we use our own PACER account or, during busy times, will sometimes outsource this search to one of our trusted partners mentioned above. For social media searches we contract with Ferretly. These companies provided the results of the background checks to me through an API with our software at Safer Places, which I then reviewed. Where I needed to clarify a potential discrepancy in the records, I directed a researcher to obtain additional information. Lastly, I summarized the information gathered through this process in my report below.

I did not perform motor vehicle searches for the bellwether drivers as I did not have an authorization from them, which is required, as driving records are not considered to be public information.

In performing social media searches, I did not have access to any of the driver's social media handles, so I was not able to determine whether all of their social media profiles were returned.

**My Billing Rate:**

$250 per hour

---

[3] I reserve the right to add or amend my opinions should additional discovery responses from Uber become available.

4

**My Prior Expert Witness Testimony:**

None.

**Summary of Opinions**

Below is a summary of my opinions which I hold to a reasonable degree of certainty in the background check/screening field.

1. Criminal background checks are a useful tool for obtaining criminal history information about individuals, but they have a number of limitations and do not provide assurance that the subject of a criminal background check has no criminal history or does not otherwise pose safety risks.

2. Uber's safety personnel observed that Uber's criminal background checks had limitations and were error prone, and that background checks alone cannot ensure that a driver does not present safety risks.

3. Each background check requires individualized attention to properly interpret and follow up on the information that comes back from the criminal records search. Uber's exponential growth to over a million drivers in the U.S. in a short period of time would require a very large workforce at Uber, with specialized training, to properly review the background check information.

4. The position of an Uber driver is a safety-sensitive position because an Uber driver is often alone in a car with a passenger who may be vulnerable, creating a foreseeable safety risk to passengers. Screenings for safety-sensitive positions require more rigor than positions that are not safety-sensitive.

5. Uber has represented that it does a "thorough criminal history background check," that "exceeds [state and city] requirements" and is "very rigorous."[4] I disagree. Uber could make its screening process appropriately " rigorous" and "thorough," by including more complete criminal background checks, such as a more extensive look-back period, fingerprinting, a National Wants and Warrants search, a SSN and DOB verification with the Social Security Administration (SSA), a foreign country criminal background check and Uber should obtain from the applicant all prior addresses and information about the applicant's use of social media to enable a more thorough criminal record search and to allow Uber to conduct a social media search. For drivers where Uber did not perform a criminal background check in the country in which the driver resided, Uber should not onboard the driver at all, or the very least, should factor this lack of criminal background check in its matching decision.

6. In addition to criminal and motor vehicle checks, a rigorous and thorough screening process would also include drug testing, a personal interview, personal and employment

---

[4] UBER TECHNOLOGIES, INC., U.S. SAFETY REPORT 2017-2018 ("Uber's Safety Report"), at 11 (Dec. 5, 2019), https://www.uber-assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullReport.pdf?uclick_id=02a9dfbc-01d9-46c9-9a2a-fe64c5610474.

5

reference checks, and a social media search. These screenings are utilized by many organizations.

7. The background checks of the drivers in the five bellwether cases described below were not "very rigorous," and "thorough" in that they did not include interviews, routine drug testing, personal and employment reference checks, a social media search, foreign background checks, a more extensive look back period, fingerprinting, a national warrants search, or a SSN and DOB verification with the SSA. Uber should obtain more information from each applicant.

8. Uber's background checks of the drivers in the bellwether cases were incomplete in a number of respects. Based on the information that I was able to review, several of the drivers should not have been allowed to drive for Uber based on Uber's own driver qualification criteria and certainly should not have been matched with young women passengers.

I reserve the right to supplement my opinions to the extent new information, data or testimony become available.

## Background Checks Options and Descriptions

At Safer Places, we take the time to educate our clients about the various components that may be a part of a screening package and assist them in customizing the service to mitigate the risks inherent in the jobs they seek to fill. There is no one-size-fits-all standard for what constitutes a "good" or "comprehensive" background check, so it is vital that the employer[5] understands what is available and what the benefits and limitations are for each available component of the screening package.

There are two primary methods for conducting a criminal background check on individuals for employment purposes. Submitting fingerprints to state authorities and/or the FBI for the purpose of searching their database is often thought of as the gold standard for background checks. The primary benefit of a fingerprint-based background check is the employer being assured of searching for records belonging to the applicant (applicants cannot lie about their fingerprints) and the comprehensive nature of the search. While no database contains every criminal record in the country, the FBI database does have records from all states that can be discovered with this single search.

Employers using the fingerprint method are limited to those who are authorized by state or federal authorities to utilize this method of screening.[6] "The FBI, to the extent authorized by section 552a

---

[5] Throughout this report I refer to employers in connection with background checks of employees. I understand that Uber describes its drivers as independent contractors, not employees. For purposes of screening and background checks, the options available for screening are identical, and I am not aware of any statutes or regulations that would treat Uber's screening options, obligations, or restrictions differently if Uber and its drivers were treated as employer/employee.

[6] *Fingerprint Background Checks*, OFF. OF ATT'Y GEN., https://oag.ca.gov/fingerprints (last visited Sept. 7, 2025).

of Title 5, [United States Code] (commonly known as the 'Privacy Act of 1974'), and State criminal history record repositories shall provide criminal history records (excluding sealed records) to criminal justice agencies and other governmental or nongovernmental agencies for noncriminal justice purposes allowed by Federal statute, Federal Executive order, or a State statute that has been approved by the Attorney General, that authorizes national indices checks."[7]

According to a Government Accountability Office report dated September 2024 and titled, *Ridesharing and Taxi Safety - Information on Background Checks and Safety Features*, Colorado, Connecticut, Georgia, and New Jersey have enacted statutes that reference a fingerprint-based background check using FBI criminal history records for some background checks. Based on the statutes, the FBI allows companies in these states to access FBI criminal history records for the purpose of ride sourcing driver licensing.[8]

> Colorado provides two mutually exclusive paths for satisfying its background check requirement. An individual who wants to be a driver can either pursue a fingerprint-based check via state officials or acquire a privately administered criminal history check. The scopes and requirements for these checks vary.[9]

> Connecticut law requires companies to obtain a background check and provides the option to conduct a background check one of two ways—via a name-based check or by submitting fingerprints to the State Bureau of Investigation and the FBI.[10]

> Georgia provides two mutually exclusive paths for satisfying its background check requirement and requires companies to ensure an individual has met these requirements. An individual who wants to be a driver can either pursue a for-hire license endorsement, which requires a fingerprint-based check, or acquire a privately administered criminal history check, which is conducted by the ride sourcing company.[11]

> New Jersey requires ride sourcing companies to submit their background check processes to the state for approval.[12] If the ride sourcing company's process has not

---

[7] 42 U.S.C.A. §14616, art. IV(b), https://ucr.fbi.gov/cc/the-compact/the-compact (last visited Sept. 7, 2025).

[8] GAO, RIDESHARING AND TAXI SAFETY - INFORMATION ON BACKGROUND CHECKS AND SAFETY FEATURES (Sept. 2024), https://www.gao.gov/assets/gao-24-107093.pdf.

[9] See COLO. REV. STAT. § 40-10.1-605.

[10] CONN. GEN. STAT. § 13b-119(a)(2).

[11] GA. CODE ANN. §§ 40-1-193(c)(2); 40-5-39(a)-(b), (e)(1).

[12] N.J. Rev. Stat. § 39:5H-17(a).

been approved, as an alternative, the driver may submit fingerprints for a check by the state.[13]

A June 2006 Attorney General report noted that the criminal history background check system was a "patchwork of state and federal statutes" that had resulted in "inconsistencies in access to [FBI criminal record checks] across industries and states."[14] But more recently a 2015 Government Accountability Office (GAO) report on criminal history records indicated that states had "improved the completeness of criminal history records used for FBI checks." "Twenty states reported that more than 75% of their arrest records had dispositions in 2012, up from 16 states in 2006."[15]

The second method for criminal record searches is done using personal identifiers such as a name, SSN and DOB. This method is available to all employers. It relies on using personal identifiers provided by the subject of the background check, so employers need to take care in checking the identity of applicants prior to submitting their information for a background check.

Using the SSN, private databases can provide names and addresses associated with the SSN. This report, often referred to as a Social Tracker or Social Trace, is generally the first step in conducting a name-based criminal background check. The report shows:

- all names associated with the SSN provided (used while residing in the U.S.)
- all addresses associated with the SSN provided (within the U.S.)
- the year the SSN was issued
- whether the SSN is valid
- whether the SSN was issued to a person reported to be deceased

If the subject of the background check has used an alias or changed his or her name in the past, this will be indicated in the report. The background screening company should conduct a name-based search using all names that are associated with the SSN. These searches should be conducted in jurisdictions where the Social Trace report shows that the subject resides currently and has resided in the past.

Based on my experience, most employers use a ***minimum*** of a seven-year lookback period, and many of our clients use a ten-year lookback period, conducting searches in all counties where the subject has resided during that period. Court files should be searched for records pertaining to the

---

[13] N.J. Rev. Stat. § 39:5H-17(e).

[14] U.S. Dep't of Just., The Attorney General's Report on Criminal History Background Checks 4-5 (June 2006), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/ag_bgchecks_report.pdf.

[15] GAO, Criminal History Records – Additional Actions Could Enhance the Completeness of Records Used for Employment-Related Background Checks (Feb. 2015), https://www.gao.gov/assets/gao-15-162.pdf.

subject using any names associated with him or her according to the Social Trace report. Some states have a central repository for criminal records, and employers will sometimes search the repository in addition to or instead of individual counties.

Private companies also compile criminal records obtained from public sources. Some courts permit private companies to upload criminal court cases in bulk into a database while others do not. Therefore, these private databases, like the FBI database, do not contain every record from every state across the country, but they do contain millions of court records as well as arrest records from some police departments and incarceration records from some jails and prisons. Employers who use the Social Trace to determine where to do criminal court record searches will often add a private database search as a "safety net" search.[16] The private database or safety net search is a reasonable method for determining if a criminal record exists in a jurisdiction where there is no record of the subject ever residing. A fingerprint-based background check is another way of finding records in jurisdictions where a subject may never have resided.

Background screening companies should not provide raw data from a database search to an employer. The screening company should first take steps to be sure the record pertains to the subject of the investigation and not someone else with a similar name. The screening company should then verify the information at the original source (usually a court) since the database may not have the most recent information on the case.

The federal courts maintain their own records separate from local, county courts. If the subject has a criminal record due to federal charges, those records will only be uncovered if a federal court search is added to the mix. While the vast majority of criminal cases are heard in state courts, skipping a federal court search could result in missing convictions for serious crimes such as kidnapping and human trafficking.[17]

Background check companies may employ a variety of methods to conduct searches for criminal records. Options include hiring companies that send court researchers who go to the courthouse or use the internet to conduct electronic searches. Some screening companies may use in-house staff to conduct these searches, and some may use a combination of in-house staff and outsourcing.

### Costs and Turn-Around Times

Costs and turnaround times (TAT) can vary greatly for criminal record searches. The time it takes to complete searches for criminal records depends on the number of jurisdictions in which an applicant has resided and whether the court records in those areas are available to search remotely or require a visit to the courthouse or if a court clerk needs to be involved. TAT for these searches can vary from same day to two or three days with the occasional outlier taking several days to a week or more.

---

[16] PBSA, Criminal Records – United States (February 2024).

[17] *Id.*

Costs for searching for criminal records can range from as little as $1.00 to $4.00 for remote electronic searches to $4.00 to $15.00 per county for onsite searches. Some courts charge a fee to access their records or for the court clerk to conduct the search, and this can add $5.00 to $40.00 per search to the cost.

Some states offer searches of a state repository of all criminal records within that state. Where county searches are available electronically, this will sometimes provide for a search of all counties within a state simultaneously. Turnaround time can be just minutes to twenty-four hours and costs range from $3.00 to $45.00 with New York being the outlier at $95.00.

The following estimates are based on my experience on the cost of providing the requested information to a client. I have never worked with a client that required the volume of requests that Uber requires so my "high volume estimates" are truly estimates.

| SERVICE | HIGH VOL COST EST. | LOW VOL COST EST. | Searches Uber Performs |
|---|---|---|---|
| Social trace | $0.50 | $5.00 | ☑ |
| Nat'l criminal database / sex offender search* | $3.00 | $16.00 | ☑ |
| County criminal search** | $2.00 | $15.00 | ☑ |
| Federal criminal search | $4.00 | $20.00 | ☑ |
| National wants & warrants | $5.00 | $12.00 | ☐ |
| MVR (driving records)*** | $3.00 | $12.00 | ☑ |
| Social media search | $12.00 | $26.00 | ☐ |
| Verification of Employment**** | $6.00 | $15.00 | ☐ |
| Verification of Education**** | $6.00 | $15.00 | ☐ |
| SSN verify w/ SSA | $4.00 | $8.00 | ☐ |
| References | $6.00 | $15.00 | ☐ |
| Drug Test | $25.00 | $45.00 | ☐ |
| Criminal record searches in foreign countries***** | $25 - $125 | $55 - $200 | ☐ |
| Global Watchlist Database | $1.00 | $10.00 | ☑ |
| Fingerprint-based criminal record search | $30.00 | $50.00 | ☐ |
| Interviews (I assume these would be done by Uber) | | | ☐ |

This chart depicts my estimates of the costs screening companies charge for various components of a background check, based on my experience in the industry. Of course, background check companies are free to charge as much or as little as they deem prudent. Therefore, it is possible

that examples could be found where companies charge more or less than what I've shown in the chart. The last column shows whether Uber includes a particular component in their screening of drivers. This is based on my reading of many documents produced by Uber where its screening packages are discussed. In doing so, I have not seen any references to the screening components that I have not checked off as being included. I reserve the right to update my opinions if such documents are later brought to my attention.

*Records found in a database such as this need to be verified at the source to ensure that they are accurate and up to date. Most CRAs would charge an additional fee for this or will build the cost in by charging a higher fee for each database search.

**Some courts charge a fee to access their records. When these fees are encountered, most screening companies will add the cost imposed by the court to the fees they charge for obtaining the record(s). These fees can range from $2.00 to $40.00. Most are in the $10.00 to $15.00 range. I would estimate about 20–25% of courts nationwide charge a fee.

***Each state charges a fee to access their MVR records. These fees range from about $2.00 to $27.00 per record. As with court record fees, most screening companies add this cost to the fee they charge to obtain the record for the client.

****Some employers outsource the verification of employment and/or education to companies that offer this service. The outsource company charges a fee to the company that needs to verify the employment (a new employer, a bank, mortgage company, etc.) so there is little or no cost to the current/former employer. These services charge fees ranging from $25.00 to $100.00 or more. As a result of these high fees, the screening industry has been exploring alternatives. One option is to have the applicant sign off on the prospective new employer accessing the subject's IRS records. While this does not provide a job title or exact dates of employment, it does verify that the subject reported income from that employer in a given year. The cost would likely run between $9.00 and $16.00 for one year and between $1.00 and $2.50 for each additional year.

*****When employers hire someone who has not been residing in the U.S. for as long as their look back period goes, they often will request a search for criminal records in the country(ies) where the applicant resided. Owens Online is one company that specializes in this area, offering criminal record searches, civil record searches, credit and driving records in "over 250 countries and territories," according to their website.[18]

According to information obtained from the Hannah Nilles deposition dated June 30, 2025, (30)(b)(6) corporate representative witness, Uber spends an average of $27.00 to $30.00 per background check.[19] This includes the searches with check marks listed above, but does not include social media search, verification of employment, verification of education, reference check, foreign country search, drug test, or finger-print based FBI search. Typically, Uber selects drivers

[18] Owens OnLine, https://www.owens.com/ (last visited Sept. 7, 2025).

[19] Nilles (June 30, 2025) Dep. 151:15–18.

11

and allows them to drive passengers on the Uber platform without an Uber representative ever meeting them or interviewing them, without obtaining or checking their references, without checking their social media footprint, without drug testing, and without requiring fingerprints.[20] For Uber drivers that came to the U.S. from another country, Uber does not ask drivers to provide their addresses in those countries and does not perform background checks outside of the U.S..[21]

Uber's cost would be consistent with my estimates in the table above for high volume clients after considering state fees added for MVRs. Some subjects would require more than one county criminal search, and some courts charge a fee which is likely passed on to Uber.

## Background Checks Outside the U.S.

According to Checkr's website, they offer screening for criminal records in 200+ foreign countries.[22] As noted above, Uber does not utilize this option.[23] Checkr does not post pricing on their website so my estimate on costs is based on other vendors with whom Safer Places has done business, currently, Straightline International.[24] Like the U.S., searches vary in terms of their scope and lookback periods. The price ranges I listed in the chart above are based on most countries. There are a few outliers where costs may exceed $300.00.

According to Straightline International's website, a background check in Sierra Leone, which I understand is the country of origin for the driver in the Jaylynn Dean bellwether case,[25] would cost $75.99 in Freetown with a two-to-four-day turnaround time and $132.00 in other parts of Sierra Leone with a three-to-ten-day turnaround time.[26]

According to their website, Straightline offers background screening in 230 countries and territories around the world.

If an applicant has moved to the U.S. from another country, this may be evidenced by a recently issued SSN or a lack of address history on the Social Trace report. Uber claims to do a seven-year

---

[20] Fuldner (Mar. 27, 2025) Dep. 400:8–10, 440:9–22; Fogg (Feb. 5, 2025) Dep. 234:15–21.

[21] Fuldner (Mar. 27, 2025) Dep. 440:9–22; Hazelbaker (June 17, 2025) Dep. Ex 1186 (UBER-MDL-3084-000126221).

[22] *International Background Checks*, CHECKR, https://checkr.com/international-background-checks (last visited Sept. 7, 2025).

[23] Fuldner (Mar. 27, 2025) Dep. 400:8–10.

[24] STRAIGHTLINE INT'L, https://straightlineinternational.com (last visited Sept. 7, 2025).

[25] Turay (July 23, 2025) Dep. 14:8–10, 103:15 (noting he was born in Sierra Leone and immigrated to the U.S. in 2013) and (prior to coming to the U.S., he had lived in Sierra Lione, Guinea, and Ghana).

[26] *Country Inquiry*, STRAIGHTLINE INT'L, https://straightlineinternational.com/country/?continent=Africa (last visited Sept. 7, 2025).

lookback period and to search for criminal records where the applicant has resided during that seven-year period. However, if Uber selects a driver who has resided outside the U.S. in the past seven years, this is not an accurate claim.

The Social Trace report will not show prior addresses outside of the U.S. This is another reason why Uber should require appropriate questions on an application (like address and employment history). Uber should perform background checks outside of the U.S. for drivers who have lived outside the U.S. such that they undergo a background check with the same look back period as driver applicants who have resided in the U.S. for a long time.

## Sex Offender Registries

A search of the state sex offender registry in each state where the subject has resided and/or the National Sex Offender registry will determine if the subject is currently registered as a sex offender.

Caution is advised as some states, such as Nevada and California, have adopted laws that limit sex offender registry searches for employment purposes.

Nevada employers are not allowed to use information from the state's sex offender registry to make hiring decisions. However, employers can receive a criminal history report that includes sex offender status.

In California, section 290.46 of the California Penal Code prohibits employers from using sex offender registry information to make employment decisions, unless there is an exception. Employers can use sex offender registry information if they are required to by law or to protect a person at risk. The law does not define who is at risk, so employers must use common sense to evaluate if an applicant will have access to or work with someone at risk. If asked by Uber's management for my recommendations concerning Uber's criminal background checks for the position of Uber driver in California, given the safety sensitive position of an Uber driver, I would recommend that Uber use sex offender registry information as one criteria in making decisions on whether to onboard a driver in California, as well as in all other states where permitted.

When my company first begins working with a new client, we research the laws pertaining to background checks for use in making employment decisions and provide general information to assist our clients while also advising them to consult legal counsel. While it is important for all employers to conduct all aspects of their business in a legally compliant manner, it is equally vital that they use all legally available means to keep their patrons and employees safe.

At Safer Places, our practice is to search the National Sex Offender Registry which is a compilation of registrations from across the country. If we get a "hit" at the national level, we verify that it is still an active registration at the state registry where the applicant is required to register. Both national and state sex offender registries may be searched at no cost so the amount a screening company may charge an employer is reflective of the time it takes to do the search using inhouse staff. The screening company may also subscribe to a service that uploads data from the national registry which makes conducting the search easier and quicker. Unless further investigation is

needed to determine if a "hit" is a match to the subject of the investigation, results are virtually instant and the cost to an employer is generally in the $2.00 to $8.00 range, depending upon volume.

### Additional Screening to Round Out the Background Check

In addition to criminal record searches, background checks should and often do include many other components. Certainly, any job that involves driving a motor vehicle should require a verification of a valid driver's license and a review of the driving record. Not all states include DUI charges on criminal records and so a review of an individual's driving record may be the only way to determine if the subject has a recent history of one or more DUIs. Multiple speeding violations and/or other moving violations can also be red flags that should be considered prior to an individual being permitted to drive a motor vehicle and especially if they are driving with passengers.

A background check may be compared to putting together a jigsaw puzzle. As previously mentioned, there is no standard background check but the more pieces of the puzzle that are included in the screening package, the more comprehensive picture the completed report will provide. For example, a person trying to hide a criminal record may provide their correct name but falsify their DOB. In some instances, this could lead to missing records that belong to the subject of the report. But, if a driver's license verification was included, that report would most likely provide the correct DOB. The discrepancy between the reported DOB and the DOB listed on the driver's license could then be further investigated prior to completing the criminal history search.

Other common components of a background check/applicant screening may include:

### Verification of Current/Past Employment

Someone falsely claiming to have worked for an employer may be attempting to cover up large gaps in employment. This is especially relevant if the gap in employment was due to the subject being incarcerated. Someone whose employment history shows multiple employers in a short period of time may be having difficulty due to poor job performance, but this could also be caused by serious misconduct on the job, including sexual harassment and/or assaults. Therefore, obtaining employment history and verification provides important information that can then be followed up when warranted, by, for example, questioning in a personal interview.

Verification of employment is generally obtained by contacting the Human Resources Department, Payroll Department, or in smaller companies, the owner or a direct supervisor. The difficulty in verifying past employment is often that employers are reluctant to share information beyond dates of employment and the position held. However, some will provide additional information such as the subject's eligibility for rehire. As discussed above, any information provided by a previous employer can and often does help to round out the picture being provided about the subject of the

background check. At least five years of employment or the most recent three employers, is often recommended but some employers will go back seven to ten years.[27]

The cost of employment verifications ranges from the cost of paying someone to make telephone calls or send email requests to the cost of accessing databases, including the IRS, who will, with the consent of the individual, provide tax return information showing employment history. Other options include asking the applicant to provide copies of forms such as a W2/1099 or copies of tax returns.[28]

Some screening companies handle these verifications with in-house staff while others outsource the task to companies who specialize in this area. Paying a screening company for verifications of employment would cost about $10.00 to $12.00 each but based on high volume, that cost could be reduced by 40–50%.

Uber does not ask its driver applicants for any employment history. If asked by Uber's management for my recommendations, I would recommend that Uber should require its driver applicants to provide this information and then verify it so that it can utilize the results of the verification process when making driver onboarding decisions.

## Verification of Education

Education verification is typically obtained by contacting the registrar's office or student record's department at colleges and universities or guidance counselors or administrative assistants at high schools, although some schools outsource this service and require inquirers to go through a third-party such as the National Student Clearinghouse. These verifications will provide dates of attendance, course of study, graduation dates, and degree, diploma or certificate.[29]

For positions that do not require a certain level of education, they are primarily used to verify that an applicant has been truthful on their application (goes to character) and to determine where an applicant may have been residing during the time they were in school so that criminal record checks can be performed in those jurisdictions.[30]

Uber does not ask its driver applicants for any education history. If asked by Uber's management for my recommendations, I would recommend that Uber should require its driver applicants to

---

[27] Lisa Worgull, Organizational Head of Knowledge, Truview BSI, LLC, Presentation at PBSA: Employment Verifications United States (Oct. 2024).

[28] *Id.*

[29] Sarah Foster, Compliance Manager, Verisk, Presentation at PBSA: Education & Professional Credential Verifications – U.S. (Dec. 2024).

[30] *Id.*

15

provide this information and then verify it so that it can utilize the results of the verification process when making driver onboarding decisions.

## Personal References

If the right questions are asked, personal references can also help to add a few more pieces to the jigsaw puzzle. Unlike an employment reference, a personal reference can often provide insight into a candidate's character, personality traits and personal life. Personal references are free to provide whatever insight they may have and are not constrained by company policies that may prohibit releasing certain information. Asking open-ended questions and requesting examples of how the candidate has handled certain situations can provide valuable insight. For example, the answer to, "Please tell me why you would or would not trust this individual to be alone in a car with your 14-year-old daughter," could be revealing of the individual's character.

The cost of obtaining a personal reference is minimal, requiring only the time it takes to connect with someone on the phone and have a brief conversation. Paying a screening company to perform this task would be similar to the cost of employment verifications.

Uber does not ask its driver applicants for any personal references. If asked by Uber's management for my recommendations, I would recommend that Uber should require its driver applicants to provide this information and then check the references so that it can utilize the results when making driver onboarding decisions.

## Social Media Searches

A search of a candidate's social media accounts as well as a general internet search is easy to do and using available technology can be accomplished quickly and inexpensively. What an individual posts, reposts, likes, etc. on Facebook, Instagram, X, TikTok and similar platforms can provide valuable insight into a person's values and character because it often reflects who they are and how they think when their guard is down. Unlike during an interview for a job, social media screening can provide insights into behaviors or tendencies that might indicate a propensity for violence, aggression or sexually deviant behavior.

Social media screening goes beyond traditional background checks by analyzing an individual's digital footprint across various social media platforms. This thorough analysis, dating back in many instances up to ten years, can uncover signs of potentially violent behavior, speech that may incite violence, or affiliations with groups known for violent activities. Such comprehensive checks are invaluable for employers looking to create a safe workplace environment. A candidate's social media history may provide insights beyond what a search for criminal convictions may offer by helping employers to detect potential issues early on.

According to a survey conducted by Career Builder, 70% of employers are using social media searches as a screening tool when hiring and 54% have used the results of such a search to make an adverse hiring decision.[31]

---

[31] *70% of Employees are Snooping Candidates' Social Medial Profiles*, CAREER BUILDER, https://www.careerbuilder.com/advice/blog/social-media-survey-2017 (last visited Sept. 7, 2025).

Caution is advised when using a social media search as a screening tool for employment purposes. Recruiters and hiring managers who engage in performing this type of search are likely to see details that companies may be legally prohibited from considering when making a hiring decision such as gender, race, ethnicity, disabilities, pregnancy status, sexual orientation, political views and religious affiliation. A social media report generated by a professional background screener will redact such information and only provide insight using legally actionable items, thus protecting the employer from claims of illegal discrimination.

Social media searches report only on what posts, reposts, likes, etc. are public facing. Subjects should never be asked for passwords to their accounts as many states prohibit this. However, it is permissible to ask an applicant for employment what social media platforms they are on and what personal identifiers ("handles") they use on each. A social media search would only provide information on accounts in the name of the subject of the investigation. If someone posted under an assumed name, this information would likely not be discovered. Despite these limitations, there is still significant value in these reports. The statistic cited above the pervasive use of social media searches by employers and that 54% of companies that use social media searches as a screening tool have used the results of such a search to make an adverse hiring decision, is a substantial indication of their value.

Most screening companies will outsource this task to a company that specializes in this area and uses artificial intelligence as well as a human review to compile information and verify that it pertains to the subject of the report. A screening company would likely charge $20.00 to $30.00 for these reports with discounts of 40–50% for high volume accounts.

Uber does not ask its driver applicants for any social media information, nor does it do a social media search. If asked by Uber's management for my recommendations, I would recommend that Uber should do both so it can utilize the results when making driver onboarding decisions.

### National Wants & Warrants Search

A search for criminal records in state or federal courts will only provide results if charges have been filed. Prior to this, no court record would have been created. If a law enforcement agency has obtained an arrest warrant, a specific search for this type of record is required for the employer to become aware. Safer Places uses a police department who will include a national search for wants & warrants. A special form must be signed by the applicant authorizing the search (as required by the source we use). Uber could ask applicants to provide consent for such a search during the application process.

This is an inexpensive search and is generally completed in about 24–48 hours. A screening company is likely to charge $7.00 to $12.00 for such a search with discounts of 40–50% for high volume accounts.

I conducted a search in Everlaw regarding national wants and warrant searches but was unable to find evidence that Uber uses this important tool as part of its screening package. An email from Cathy Zhou to Derek Selbery, Nicholas Zabriskie, and Meghan Verna Joyce dated April 13, 2015,

17

discussed adding this to Uber's BGCs in Massachusetts. However, I've been unable to find any evidence that Uber added this to their BGCs in Massachusetts or any other state.[32]

If asked by Uber's management for my recommendations, I would recommend that Uber should add a National Wants and Warrants search to its screening protocol.

## Global Watchlists and Sanctions

There are various watchlists in the U.S. and around the world which includes terrorist watchlists, Interpol wanted persons, Ice – Human Trafficking Most Wanted and many others. It is inexpensive to do a database search of these watchlists, and results are virtually instantaneous. Background screening companies may subscribe to services that compile this information from multiple sources and will charge a per search fee to their clients in the range of $5.00 to $10.00, with discounts of 40–50% for high volume accounts. Search of global watchlists is not equivalent to conducting a criminal records search in the country where the subject lived.[33] These watchlists can include some serious crimes, but they are unlikely to include as many crimes as can be identified in a criminal background check.

The Global Watchlist is a worthwhile component to any background check. According to Checkr's website:

> Checkr's global watchlist search identifies whether a candidate name appears on domestic or international watchlists. This search includes government and regulatory databases that list individuals who are either prohibited from certain industries, such as healthcare and finance, or who are on "most wanted" criminal lists.
>
> A global watchlist search also can identify suspected terrorists, money launderers, and drug traffickers from federal databases that are unrelated to court records. Conversely, the federal, state, and county searches rarely return results from the global watchlist search sources.
>
> During a global watchlist search, Checkr sends the candidate's name to a vendor who searches several databases for the name. For the initial global watchlist search, Checkr doesn't require an exact match for the candidate's name. Checkr does additional manual and automated work to ensure that records match the candidate-provided name.[34]

---

[32] UBER_JCCP_MDL_004918642.

[33] *See Guide to Global Watchlist Searches,* CHECKR (June 16, 2025), https://checkr.com/resources/articles/global-watchlist.

[34] *Global Watchlist Search,* CHECKR (Mar. 13, 2025), https://help.checkr.com/s/article/360001951208-Global-watchlist-search#:~:text=Checkr's%20global%20watchlist%20search%20identifies,Interpol's%20Most%20Wanted.

18

For additional clarification, I would add that a "global watch list" consolidates numerous U.S. and international lists of individuals and entities deemed a risk by governments, regulatory bodies, and law enforcement agencies. While these lists do identify people involved in criminal activity, terrorism, or companies subject to economic sanctions, a global watchlist is not the same as doing a criminal background check. It does not include a search of a specific court(s) where a subject may have resided.[35]

## Drug Tests

A pre-employment drug test has been used by many companies to detect the use of illegal drugs in individuals under the assumption that users of illegal drugs may pose a safety hazard in the workplace. Drug test results can show drug use for up to a few days after consumption and even longer for marijuana use. Since marijuana has become legal in many states, some employers have modified or discontinued their drug testing practices. Drug tests can be cumbersome to administer and can take two to three days to complete and get results but companies particularly concerned with safety in the workplace would likely want to continue with some level of drug testing.

Drug testing can be performed by an employer using a urine or oral fluid test kit. These kits provide results within minutes and cost around $3.00 to $9.00 each for urine-based tests and a dollar or two more for oral fluid tests. There is an additional charge of around $65.00 (urine) to $80.00 (oral fluid) to send the sample to a lab for verification when the initial test is positive.

Drug testing can also be done by sending an applicant to a collection site run by a third-party such as LabCorp or Quest Diagnostics or a local hospital or doctor's office to collect a sample under controlled conditions (to prevent cheating). The sample is then sent to a certified lab for testing and the results are delivered electronically to the employer or to a background screening company who bundles the results with the background screening report. The cost for this type of test would range from $30.00 to $45.00 with discounts being available for high volume, likely in the range of 20–30%.

Certainly, there is value in knowing if an employee, especially one in a safety sensitive position is a user of illegal drugs. However, since the legalization of marijuana, some employers have begun to focus more on testing for impairment in the workplace vs. using a drug on personal time.

Impairment testing can detect symptoms that are posing a safety risk in the current moment. Products are available as an app for a smartphone that can administer tests in real time at the start of each shift. One example of this is an app called DRUID by Impairment Science, Inc. On their website, Impairment Science, Inc. claims their mobile app tests for cognitive and motor impairment from any cause. DRUID provides a means for businesses and other organizations to

---

[35] Anton Vedsin, *Understanding Global Watch Lists*, VESPIA (June 26, 2024) https://vespia.io/blog/global-watch-lists; Matthew J. Rodgers, *Global Watchlist Search: A Complete Guide for Employers [2025]*, IPROSPECTCHECK (Apr. 8, 2025) https://iprospectcheck.com/global-watchlist-search/.

assess the impairment of their employees. This website cites peer-reviewed, published, scientific studies backing their claims that was the most sensitive measure of impairment when compared to the other cognitive performance tasks administered as well as several common field sobriety tests.[36]

The DRUID app can be easily downloaded from The App Store[37] or Google Play[38]. The app makes the following claims: "38% of adults battle an illicit drug disorder, 90% of employers are concerned about alcohol, drugs, mental health, and stress in the workplace (NSC), 13% of workplace injuries are attributable to fatigue (NSC), 41 U.S. states have legalized medical marijuana, and 21 allow for recreational use."[39]

"Developed over seven years of research, the DRUID app is the only technology that has three published, peer-reviewed scientific studies validating its accuracy. It has been field-tested for accuracy and calibrated to standards for impairment associated with measured levels of blood alcohol. Researchers around the world are using DRUID as a quick and accurate impairment testing device."[40]

If asked by Uber's management for my recommendations, I would recommend that Uber should add a drug test to its screening protocol, especially because Uber's Community Guidelines states that Uber has a "zero tolerance" policy for "the use of drugs or alcohol by Uber's drivers."[41]

### Praesidium Report

"Praesidium is a leading innovator of scientifically based solutions designed to transform the way organizations approach the prevention of sexual abuse."[42] In their white paper, *Understanding*

---

[36] *Research on Cognitive and Motor Impairment Testing*, IMPAIRMENT SCI., INC., https://www.impairmentscience.com/research (last visited Sept. 7, 2025).

[37] *DRUID*, APP STORE, https://apps.apple.com/us/app/druidapp/id1107595146 (last visited Sept. 7, 2025).

[38] *DRUID*, GOOGLE PLAY, https://play.google.com/store/apps/details?id=com.owl.druid&hl=en&pli=1 (last visited Sept. 7, 2025).

[39] *DRUID*, IMPAIRMENT SCI., INC., https://www.impairmentscience.com/ (last visited Sept. 7, 2025).

[40] *Id.*

[41] *Uber's Community Guidelines*, UBER, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Sept. 25, 2025).

[42] *Praesidium*, LINKEDIN, https://www.linkedin.com/company/praesidium-inc-/ (last visited Sept. 7, 2025).

*Negligent Hiring: Preventing Sexual Abuse Through Comprehensive Screening Packages,* Praesidium states, "While there is no standard or universal background check, the best practice is a background check that covers at least the most recent seven years and includes most, if not all, of the following components:

☐ Social Security Number trace

☐ Federal/County criminal record search

☐ National criminal database check

☐ National sex offender registry search

☐ Motor vehicle report

☐ Education verification

☐ Employment verification"[43]

In addition to thorough background checks, Praesidium advocates for interviews that include behavioral questions, and reference checks.

The report states, "Interviews, when done well, are your primary and best opportunity to assess how the applicant will perform in their potential new role at your organization. They are a chance to understand the applicant's background, motivation, and interests. The interview is also the applicant's best opportunity to learn more about your organization and expectations."[44]

"Interviews should be face to face whenever possible. Even in today's evolving workplace, in person is still preferred if available, particularly if appropriate for the role (for example, if the individual's role will be in-person with consumers). If in-person interviews are not possible, virtual interviews with cameras are the next best alternative."[45]

"Ensure more than one interviewer meets with the candidate in a panel setting or individual interviews. This ensures more perspectives, opportunities for questions that touch on different priorities, and multiple impressions of the candidate. Using multiple interviewers also reduces the opportunities for favoritism or bias if an applicant has a connection to the organization."[46]

---

[43] PRAESIDIUM, UNDERSTANDING NEGLIGENT HIRING: PREVENTING SEXUAL ASSAULT THROUGH COMPREHENSIVE SCREENING PACKAGES 11, https://resig.org/wp-content/uploads/2024/11/5634b482f2.pdf (last visited Sept. 7, 2025).

[44] *Id.* at 14.

[45] *Id.*

[46] *Id.*

21

"Most importantly, interviews should include behaviorally based questions. Behaviorally based questions require the applicant to reflect on situations they have faced in prior settings, as past behavior is the best indicator of how a candidate will perform in the future. Behaviorally based questions should be designed to assess employee and volunteer applicants for potential abuse risks and to determine whether this applicant is appropriate and safe to work with your consumers. You should also ask about their interest in the role, career goals, and what drew them to apply."[47]

Regarding reference checks, the report goes on to state, "At a minimum, you should complete three reference checks per applicant. References should include two professional references and at least one personal or family reference for organizations that directly serve children, patients, older adults, or vulnerable populations."[48]

"Why interview a personal or family reference? Won't they all say glowing things? These references likely provide the fullest picture of the applicant in all facets of their life and may have more information than others about how the applicant might respond in certain situations. Your questions for personal references may include things like, 'Would you have any concerns about this individual working with children/having access to financial or personal information?' 'How does the applicant handle stress or conflict?' or even something as simple as, 'Is there anything in that job description that gives you pause for this applicant?' after briefly explaining the role. Personal references can be valuable for screening applicants out, even if they are less valuable as a data point to screen someone in".[49]

Praesidium emphasizes the importance and value of an employment interview. Uber does not interview driver applicants.

### Rand Corporation/Department of Air Force Reports

Rand Corporation was retained by the US Dept of Air Force to conduct research and make recommendations pertaining to preventing sexual assaults, several of which are also applicable to Uber.

Rand issued several research reports that were "sponsored by the Director of Air Force Sexual Assault Prevention and Response, Office of the Vice Chief of Staff, and the commander of Air Force Recruiting Service." The research was "conducted within the Manpower, Personnel, and Training Program of RAND Project Air Force."[50] The Rand reports "present research findings

---

[47] *Id.*

[48] *Id.* at 15.

[49] *Id.*

[50] Miriam Mathews, *Assessing the Use of Employment Screening for Sexual Assault Prevention*, RAND CORP. (Mar. 9, 2017), https://www.rand.org/pubs/research_reports/RR1250.html.

and objective analysis" that "undergo rigorous peer review to ensure high standards for research quality and objectivity."[51]

The Rand report, *Assessing the Use of Employment Screening for Sexual Assault Prevention,* contains multiple citations to published prevention science literature, and made several recommendations to address sexual assault prevention in the Air Force, including the importance of the screening interview:

1. "[T]he Air Force should provide thorough information about its intolerance of sexual assault. By presenting information early in the application process, the service can quickly begin a sustained prevention effort that clearly communicates the service's attitude and response toward sexual assault[52]

2. "During the prescreening . . . of applicants, the Air Force should ask applicants about whether they have a history of sexual assault perpetration" noting that "Previous sexual assault behavior is the best available predictor of future such behavior."

3. Recognizing that "individuals may omit information from self-reports," "the Air Force may consider more-thorough background checks that specifically assess an individual's history of sexual assault," which either "would require coordination with federal entities," or "alternatively, the Air Force could arrange for its own additional background check."[53]

4. During the interview information can be requested "about the applicant's education, marital status, birthplace, birthdate . . . criminal history, specifically whether they have ever had problems with a law-enforcement agency, have ever been arrested, have ever been to court, have court cases pending, have traffic tickets or fines, have fines for drug or alcohol incidents, are currently on parole or probation . . . [and] about their drug use." [54]

5. Other information that can be obtained during "a thorough interview" include "previous interactions or relationships with employers, relationships with friends and family . . ." and "[f]or current employees identified as potentially at risk for displaying aggression or violence,

---

[51] *Id.* Rand Project Air Force, *RAND Research on Harmful Interpersonal Behaviors*, RAND CORP. 2 (Nov. 16, 2023), https://www.rand.org/pubs/corporate_pubs/CPA2660-1.html. Rand Corp provided the following information about its research methodology: "RAND staff include more than 600 doctoral-level researchers with diverse areas of expertise. RAND Project AIR FORCE (PAF) . . . also maintains a core set of researchers who have . . . experience conducting research on harmful interpersonal behaviors, and methodological expertise. . . ."

[52] Mathews, *supra* note 50 at x.

[53] *Id.* at xi.

[54] *Id.* at 18.

a review of previous work history, more-recent work incidents, and situational factors (e.g., marital conflict . . .)" can be explored. [55]

6. The Rand report cited to Fletcher, Brakel, and Cavenaugh, noting that in their review of workplace violence in the United States, the authors proposed several measures that employers may take to assess an individual's likelihood to engage in workplace violence. In describing the profile of a violent person, noting that "one of the best predictors of future violence is a history of violence, with an increase in potential with each prior act of aggression." They identified factors that can increase that likelihood of aggression include "recent termination or lay-off . . . alcohol or drug misuse and the availability of guns. Alcohol misuse has been linked to an increased likelihood that the user will "misread" situations and has been shown to increase impulsivity."[56]

7. Noting that the current practice was to not ask about history of perpetrating sexual assault, Rand suggested that "[t]he Air Force may wish to ask about these behaviors explicitly during prescreening interviews."[57]

8. Rand also suggested that the screening interview with the applicant should take the opportunity to inform applicants "of behaviors considered to be professional and unprofessional between applicants and recruiters, which begins the process of conveying . . . norms for appropriate behavior."[58] Rand stated by "conveying norms for appropriate behavior . . . to applicants . . . individuals who would not appreciate the Air Force's intolerance for sexual assault can self-select out of the process," and that conveying at this early stage that the organization is not "lenient toward sexual assault," could have a deterrent effect."[59]

9. Rand also addressed the importance of obtaining confirmation that the applicant understood that sexual assault was not tolerated:

> Further, individuals provided this information should be required to review and demonstrate understanding of it. Individuals may demonstrate knowledge, or understanding, by responding to a variety of questions following information presentation. These questions can ask individuals to explain the difference between sexual assault and consensual sex and how they should report sexual assault if they see or experience it. To demonstrate immediate knowledge, these questions may be

---

[55] *Id.* at 42.

[56] *Id.* at 42 (internal citations omitted).

[57] *Id.* at 47.

[58] *Id.* at 47.

[59] *Id.* at 48 (internal citations omitted).

24

asked immediately after the presentation. To demonstrate retention of information, questions may be asked two to three weeks following the presentation.[60]

10. Rand suggested the type of question that would be potentially useful to address whether the applicant understood what it means to have consensual sex: "one example question that draws from recommended measures for soliciting self-reports of sexual aggression and the definition of rape that Air Force recruiting uses is: "Did you ever have sex with someone when they didn't want to, or when they were asleep, unconscious, or too out of it to stop it? By sex, we are including oral, anal, and vaginal sex.""[61]

11. Recognizing that applicants may not be truthful or forthcoming in responding to interview questions, Rand suggests that a "more thorough background check" is an option. [62]

I agree with Praesidium and Rand on the importance of the interview as part of screening. Criminal background checks focus on criminal records. They do not focus on domestic violence that does not result in legal proceedings. Criminal background checks do not necessarily identify persons with anger management issues, character flaws, violent tendencies, history of violence, history of sexual misconduct or sexual violence, personality disorders, emotional disorders, addiction disorders, dangerous weapon possession, relationship problems, financial problems, illicit drug use, alcoholism, sexual predator propensity, unhealthy attitudes about women or sex, or who lack an understanding of consensual sex. These problems could reflect on fitness to drive for Uber—especially rides at night, alone with young women who may be intoxicated.

While the interview is not a perfect solution, a trained interviewer can ask questions and follow-up questions that allow for a more complete and accurate assessment of the driver/applicant and can be designed to assess an Uber drivers' fitness for being paired alone in a car with vulnerable passengers. The interview can also be useful for making assessments of the type of driver assignments for the driver, and any specialized or focused training or education that the driver will require, or the need for more extensive monitoring of the driver. The interview also presents an excellent opportunity for the interviewer to emphasize to the applicant that sexual misconduct will not be tolerated, to explain Uber's policies about sexual misconduct, to make it clear that Uber monitors all rides, and that Uber will deactivate any driver who engages in sexual misconduct and cooperate with law enforcement.

### **Consumer Reporting Agencies**

Background screening companies who compile reports for the purpose of screening applicants for employment are considered Consumer Reporting Agencies (CRA). Most CRAs use a combination

---

[60] *Id.* at 49 (internal citations omitted).

[61] *Id.* at 50 (internal citations omitted).

[62] *Id.* at 51.

of in-house and outsourced efforts to compile the information an employer needs to make an informed hiring decision.

For example, many criminal court records can be searched electronically using the internet. Examples of this are the CORI system in Massachusetts and the New York State Office of Court Administration (OCA). These systems allow the user to enter names and other identifiers at their websites to search for potential criminal records throughout their respective states. A CRA may assign an employee to order these searches and to record the results as part of a report that will be delivered to the client/employer. These reports are considered Consumer Reports and are subject to regulations imposed by the Fair Credit Reporting Act (FCRA). Among the many requirements of the FCRA is that CRAs follow procedures that ensure maximum possible accuracy in the reports they compile.

Other jurisdictions may necessitate that someone physically goes to the courthouse and use the public access terminal (PAT) to search records at that courthouse. Still others require that a search request be entered by a clerk at the court and courthouse staff conduct the search. In these instances, it is common for a CRA to contract with a research company who has employees or subcontractors throughout the country.

Verification of employment and personal references are sometimes conducted by CRAs using in-house staff and are sometimes outsourced. Some CRAs use a combination of both, choosing to have staff members make calls most of the time and to outsource during times of higher volume.

Other services, such as drug testing, social media searches and national wants and warrants are almost always outsourced to companies who specialize in these areas or with law enforcement agencies who are willing to work with the private sector. For example, a common method for drug testing includes urine being collected by trained staff at a clinic or collection site under controlled conditions and the urine sample is sent to a SAMHSA certified lab for testing. Results are communicated electronically to the CRA who includes them in their report to the employer.

Whether a CRA uses in-house staff or outsources the task to others, their primary purpose is to compile the desired information and include it in one, easy to read report which an employer can use to assist them with their approval process.

As previously mentioned, there is no standard for what should be included in a background check report. At Safer Places, we advise our clients to consider the inherent risks for each position for which they hire and to design their respective screening packages with mitigating those risks in mind. Because of the heightened security sensitive role of Uber drivers, if I were advising Uber on what to include in their background screening package I would recommend a more extensive level of screening, with the following as the minimum:

- A Social Trace report used to determine names and addresses associated with the potential driver's SSN.
- A search for criminal records in each jurisdiction where the Social Trace report shows the applicant had an address for the past ten years. These searches should also be conducted under any other names associated with the SSN.

26

- A search of a database containing criminal records from multiple sources.
- A search of the federal court system for criminal records.
- A search of the National Sex Offender Registry.
- A social media search.
- A driver's license verification and driving record.
- If there were any issues identified from the Social Trace report (SSN shows a different name or DOB, SSN is on the Death Master File or the SSN was issued prior to the subject's DOB) then an inquiry should be made directly to the SSA to determine if the SSN provided belongs to the subject being investigated.
- An interview by a trained interviewer.
- A verification of employment.
- A checking of personal references.
- A drug test.
- A wants and warrants search.
- A global watch lists search.
- A foreign country BGC.
- An FBI fingerprint BGC.

### In-House vs. Outsourcing

In my experience, most employers, even very large employers such as Uber who conduct background checks on applicants and/or existing employees, utilize the services of a CRA to conduct those background checks for them. It is a simple process to engage the services of a CRA. Once a screening package and pricing is agreed upon, it's generally a matter of signing a contract. Depending upon how much negotiating regarding price and contract terms are required, this can take just a couple of days.

A company such as Uber should take care to use a CRA who will provide reliable and thorough results. Using an accredited CRA and aligning with PBSA guidelines is a bare minimum. While the choice of CRA is important, it is the client (in this case Uber) who controls the breadth and depth of the screening required. Uber could instruct its CRA (in this case Checkr) to perform the most expansive criminal record search legally allowed. Uber could instruct Checkr to research in all counties where the subject has resided for the past ten years. They may also instruct the CRA to add a social media search, employment verification, and a personal reference check. Uber could instruct the CRA to use the CBSV system to verify with the SSA a name and DOB match to the SSN for all applicants[63], or they could instruct the CRA to only use it to verify a match when the Social Trace report shows discrepancies or is inconclusive. Uber does not have a ten-year lookback period, does not require drug or alcohol testing at any time, unless mandated by law or TNC regulations, and does not make use of the CBSV system.

---

[63] See below for description of the CBSV system.

27

When Uber receives the results of a BGC, the information must be reviewed and interpreted. This requires training and attention to detail, as well as policy guidelines for what information gleaned from a background check report will constitute a pass or a failure. Uber depends upon Checkr to flag potential adverse information in a background check report that may make them ineligible to use the Uber platform. However, Checkr has been sued numerous times for relying on digital technology and artificial intelligence, rather than humans.[64] The lack of human oversight of the artificial intelligence used by background screening provider Checkr has resulted in errors. "More than 40 people have sued Checkr for violating the Fair Credit Reporting Act in recent years" and the company "in December settled a class-action lawsuit that alleged it illegally included information about low-level offenses like traffic infractions on background checks for more than 96,000 people. Checkr agreed to pay out $4.46 million in damages plus attorneys' fees."[65] For a company like Uber, which claims to have "very rigorous background checks," the choice of a CRA is critical, and the performance of the CRA is necessary to ensure that CRA's performance.

Background check companies or CRAs exist in a variety of sizes and a company the size of Uber would need to engage the services of a CRA that has the capacity to handle potentially thousands of screenings per day. Alternatively, a large company such as Uber could also contract with more than one CRA. Work could be assigned geographically or split some other way. The challenge here would be to make sure there is consistency in the screenings provided by two or more different companies.

The advantages of outsourcing background checks include:

- CRAs are experts in their field and can advise clients regarding various options available for background checks. The CRA may make suggestion regarding what is included in the background check report and can help to navigate both federal and state laws pertaining to background checks for employment purposes.
- The CRA is responsible for the hiring, training, and supervising of the staff that will conduct the background checks.
- CRAs generally have the ability to handle fluctuations in volume, relieving the employer from having to hire and train staff and potentially lay them off during slower times.
- CRAs can review background check results, compare them to the client's hiring criteria and flag reports that clearly pass vs. reports that may need further scrutiny.

CRAs, regardless of their size or location, can generally handle clients who hire employees in multiple states. Even if a client hires in only one state, applicants may have previously resided in multiple states. Therefore, the CRA needs to be able to conduct criminal history and other research anywhere in the country. My company, Safer Places, Inc., is a relatively small CRA. However, we

---

[64] Todd Feathers, *Lawsuits Allege Gig-Economy Workers Fall Victim to Checkr's Artificial Intelligence*, UNION LEADER (Mar. 3, 2019), https://www.unionleader.com/news/business/lawsuits-allege-gig-economy-workers-fall-victim-to-checkr-s/article_37df2830-df83-5b19-b090-31556804d8d4.html.

[65] *Id.*

can provide services to much larger companies because, like most CRAs, we outsource some of our criminal history research to companies that employ court researchers around the country. While it would not be cost effective for even a large CRA to employee a court researcher within a driving distance to every courthouse in the country, companies that service multiple CRAs can offer these services, anywhere in the country. The researcher can conduct searches for several companies at the same time and the CRA will only be invoiced a few dollars (generally, $2.00 to $5.00) for each search.

This is true for specialized services as well. Very large CRAs may have the resources to develop sophisticated algorithms to assist with social media searches. But small to medium sized CRAs depend on companies that specialize in this and other types of research when their clients desire this information to be included in a background check. My company, like most of my competitors, depends on outside companies to provide us with access to various components of a background check report.

For example, each state has a mechanism for electronically accessing driving records and verifying whether an applicant's driver's license is current and active. However, the means for accessing each state's motor vehicle records varies. Therefore, most CRAs and employers who check driving records on their own utilize the services of companies that specialize in this area. Samba Safety is a company that we use as a clearinghouse of sorts for driving records throughout the country. Their software translates our requests for driving records into the correct format for the state in question and almost instantly returns the desired information in a format that is compatible with our software so that it can easily be incorporated into the report that we provide to our clients.

The software we and other CRAs use to compile information and produce background screening reports for our clients could also be used by a large employer who wanted to conduct background checks on their own. The same is true for the companies that we use to help us do court research, conduct social media searches and other research such as driving histories. It is possible that a company could decide to perform their own background checks using in-house staff, and the same resources utilized by CRAs. This would require that the company hire and train employees specifically for these tasks. They would still likely need to engage the services of outside specialists such as court researchers, drug testing labs, etc. as it would not be cost-effective to operate specialized services such as drug testing labs or to have in-house court researchers that could be in a courthouse, anywhere in the country, within a day.

So, even if a large employer made the business decision to operate an in-house background screening service, they would likely operate similarly to a CRA that offers their services to multiple clients and outsource various pieces of the screening process. The in-house screening department, like a CRA would then be responsible for collecting the various pieces of the puzzle and compiling the information into a single report.

## Adjudicating Results

Companies looking to hire should examine the inherent risks involved in the positions for which they hire. The background check should be designed to mitigate those risks. Not everyone with a

29

criminal record should be banned from all employment. However, recent convictions for some crimes, poor driving records and/or a suspended license may make it inappropriate for an individual to work in a job with little or no direct supervision, to work with vulnerable members of the public or to be in a position of trust. Also, information derived from a BGC may not be a disqualifier, but can be the basis for further inquiry, or could be the basis for limiting the type of assignments, additional training, and/or additional monitoring.

States can and do mandate that people with certain criminal records are banned from working in some jobs, but ultimately, it's up to the companies that utilize drivers (whether employee or independent contractor) to maintain a safe workplace and to protect the people who patronize their company. Guidelines should be created to assist company decision makers with what background check results constitute cause for denial of employment. Someone convicted of a sexual assault a year ago is likely not a good candidate for a position offering a service that puts a vulnerable woman, alone in a vehicle with the convicted felon. Other convictions may be less obvious and still others may have little to no relevance to the job that the subject of the background check will be performing.

Companies should create written guidelines for the purpose of evaluating background check results. They should then create a committee of trained individuals to apply the guidelines to individual cases. Based on Uber's exponential growth in drivers (adding hundreds of thousands in recent years[66] and the complexity of some of the driver BGC's (based on missing information, possible misspellings of names, aliases, etc.), Uber would require a very substantial workforce with appropriate training to adequately review and adjudicate BGC information. A mechanism for an appeal by the applicant should also be in place where he/she can present evidence of rehabilitation and other reasons why he/she should not be denied.

The primary document from Uber that I reviewed regarding their adjudication criteria indicates many changes from 2017 to 2024.[67] Examples of changes:



---

[66] *An Analysis of the Labor Market for Uber's Driver-Partners in the United States*, NAT'L BUREAU OF ECON. RSCH (Nov. 2016), https://www.nber.org/system/files/working_papers/w22843/w22843.pdf.

[67] UBER_JCCP_MDL_003363350 (Data Changes tab).



The spreadsheet that lists these changes has 1601 of them. This is a small sample of the changes made over the seven-year period covered. I selected these to show that changes have made Uber's adjudication criteria stricter in some cases and less in others and that the criteria are complex and challenging to administer (which, as noted above) warrants a substantial human infrastructure to administer to manage the massive number (over 1 million in the U.S.) of Uber drivers.[68]



It is good practice to list offenses that require further scrutiny before approving or disapproving of a candidate. This is what Uber refers to as "Escalate". In the document referenced above, a conviction for aggravated assault—deadly weapon with intent/knife, is now adjudicated as "Unacceptable—seven-years." This means that if that conviction occurred seven years and one day prior to a new driver being considered, he/she would pass the background check without further scrutiny.

The convictions Uber lists on their indefinite lookback list (felony sexual assault, felony sex crimes against children, felony murder/manslaughter, felony terrorism and felony kidnapping) are good reason to exclude a driver indefinitely. However, if charges for one of these crimes are reduced in

---

[68] Fuldner (Mar. 26, 2025) Dep. 78:21–79:8; *Only on Uber: Helping to Make Driving and Delivering Safer, Fairer, and Easier,* UBER (Sep. 17, 2024), https://www.uber.com/newsroom/onlyonuber24/.

a plea arrangement, which is not uncommon, the underlying behavior is what is important. The adjudication criteria listed in the Uber document should be used as a guide, but a committee should review all convictions for serious offenses and make an individual decision based on the particular circumstances of the case and the individual. That committee should be supported by a large, support workforce dedicated to BGC review, with appropriate training.

When deciding on the suitability of an applicant based on the results of a background check, the Equal Employment Opportunity Commission (EEOC) recommends considering:

- The facts or circumstances surrounding the offense or conduct;

- The number of offenses for which the individual was convicted;

- Older age at the time of conviction, or release from prison;

- Evidence that the individual performed the same type of work, post-conviction, with the same or a different employer, with no known incidents of criminal conduct;

- The length and consistency of employment history before and after the offense or conduct;

- Rehabilitation efforts, e.g., education/training;

- Employment or character references and any other information regarding fitness for the particular position; and

- Whether the individual is bonded under a federal, state, or local bonding program.[69]

The EEOC is primarily concerned with applicants being treated fairly and not being automatically excluded from employment due to a criminal record. However, this is a two-way street and the criteria they suggest could be an indicator that an individual is *not* suited for a particular position just as easily as it could be an indicator that they are suited for that position. The point is that lists and categories of crime are prudent as a first step when making a hiring/selection decision based on the results of a background check, but in most cases, further scrutiny is required.

Uber's spreadsheet[70] has a tab labeled "Dispositions" that lists thousands of dispositions that indicate whether to consider the charge lodged against an individual when deciding that individual will pass or fail the BGC. For example, it states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (line 10,267 on the spreadsheet) ▮▮▮▮▮▮▮▮▮▮▮▮ Whereas a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (line 8474) is a ▮▮▮▮▮▮▮▮ " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (line 724) is also listed as ▮▮▮▮▮▮▮▮ In my experience providing background screening

---

[69] EEOC Decision No. 915.002, Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act (2012), https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions#sdendnote122sym (last visited Sept. 7, 2025).

[70] UBER_JCCP_MDL_003363350.

services, some employers tell us not to report any criminal charge that did not result in a conviction. A conviction tells them that a judge or jury deemed that the prosecution provided proof beyond a reasonable doubt that the person on trial did engage in the behavior for which they were accused. However, the EEOC has stated in an informal discussion letter (not legal opinion) the following:

> In some circumstances, knowledge of an arrest may trigger an inquiry into the underlying conduct. An employer may make an employment decision based on conduct underlying the arrest if this conduct makes the individual unfit for the position in question. The conduct, not the arrest, is relevant for employment purposes. Employers should provide an opportunity for the individual to correct mistaken facts or provide an explanation before making a final employment decision.[71]

Without a conviction to confirm that the underlying conduct that led to the arrest did in fact take place, the employer, or background check company would need to do further investigation. Did the individual engage in a sexual assault as charged, but the prosecution was unable to provide enough evidence? Or, perhaps a busy, overworked prosecutor was unsure how a jury would decide based on the available evidence, so they agreed to a plea arrangement where the defendant was found guilty of a lesser charge.

When the original charge indicates behavior that if repeated would endanger patrons of the service being provided and where the provider is in a position where there is little or no supervision and they are serving vulnerable people, I would advise Uber that charges that resulted in dispositions other than 'guilty' should at least be considered before placing someone in a safety sensitive position.

Yes, additional research is needed to determine if the individual engaged in the behavior for which they were accused but not convicted. However, that additional research may be as simple as interviewing the subject of the BGC. In my experience, asking the subject about the circumstances that led to the arrest will often prove to be worth the effort. Uber advertises "We put safety at the heart of everything we do."[72] Passengers expecting Uber to elevate safety as Uber states, would reasonably expect Uber to take this additional step to protect their vulnerable patrons.

In the "Standard Criteria" tab of UBER_JCCP_MDL_003363350, Uber lists crimes and the length of time for which a conviction for that crime excludes an individual from becoming a driver. Examples include sexual assaults, sex crimes against children, and kidnapping that are in the indefinite exclusion category. Any felony, DUI, and violent crimes are in the seven-year exclusion category. Driving without a license or while license is suspended or revoked is in the three-year exclusion category. There is no mention of anyone giving further consideration beyond what is

---

[71] *EEOC Informal Discussion Letter,* EEOC, https://www.eeoc.gov/foia/eeoc-informal-discussion-letter-281 (last modified May 7, 2013).

[72] *Uber – Safety Never Stops, Innovative Safety Video,* CAMPAIGNS OF THE WORLD (Apr. 6, 2019) https://campaignsoftheworld.com/digital-campaigns/uber-safety-never-stops/.

listed on the sheet. Therefore, someone convicted of a violent crime seven years and one day ago, would pass the BGC and be eligible to drive without someone at least speaking with them to determine what led to the conviction and what if any rehabilitation has taken place.

## Transportation Network Company Regulations

Some states have enacted legislation requiring TNCs such as Uber to conduct background checks and ban individuals from participating in a ride share service if the background checks show convictions for specific crimes within specified time limits. These are minimum standards set by various states. Companies such as Uber are not prohibited from adopting more stringent criteria in the evaluation of background check results where allowed by law.[73]

I researched such regulations in Arizona, California, Louisiana, North Carolina, Texas and Utah—all states where the drivers in the bellwether cases have resided, according to the social trace search. *See* Appendix A.

## On-going Background Checks

A background check is a snapshot in time. An individual with a valid license and no criminal record may be deemed suitable for employment now but circumstances can and sometimes do change quickly. Many employers who have recognized the risks involved with the positions for which they hire have taken steps to minimize those risks and assure that people working in those positions remain suitable to do so. There are three primary methods to achieve this:

1. Periodic re-checks
   - Criminal: While a criminal record search in all jurisdictions where the subject has resided for the past seven to ten years may have been appropriate the first time, a re-check every six or twelve months may focus solely on the jurisdiction where the subject has resided since the last time a background check was run. A recheck of the private database and the sex offender registry may also make sense.
   - Driving: Is the license still valid? Have there been any serious moving violations and/or multiple minor violations?
   - Social media searches can also be conducted periodically and provide insight into an individual's character. Are they posting hate speech? Violent images or threatening language? Explicit photos? Racist images or language?

2. Continuous Monitoring
   - Many background screening companies offer services that monitor for arrests. Employers who become aware of criminal charges early on can take appropriate action and/or follow a case to see if it results in a conviction.
   - Some states allow driving records to be monitored in real time and can make an employer aware of a violation or suspension immediately. Others update their information weekly

---

[73] *See e.g.,* California's TNC regulations in Appendix A expressly noting that transportation network companies may impose additional standards.

or monthly. The earlier an employer becomes aware of a suspension, expiration or serious violation, the earlier they can take appropriate action.

- Social Media accounts can also be monitored and the same criteria that may be a red flag in the beginning of an employment relationship may pop up later. As with driving and criminal records, the sooner there is awareness, the sooner appropriate action can be taken.

3. Random and/or with Cause
   - This generally applies to drug testing but could also apply to other areas of a background check. Periodic, random drug tests, where drivers are given twenty-four hours' notice to submit to a drug test, can be an effective deterrent to drug abuse.
   - Similarly, a new background check could be triggered upon the company receiving a complaint about the employee as part of the incident investigation.

**Limitations of Criminal Background Checks**

Background checks have important limitations, which in my experience are not understood by many consumers. As detailed in an article published in 2024 in the peer-reviewed journal *Criminology:*

> Criminal records are routinely used by employers and other institutional decision-makers who rely on their presumed fidelity to evaluate applicants. We analyze criminal records for a sample of 101 people, comparing official state reports, two sources of private-sector background checks (one regulated and one unregulated by federal law), and qualitative interviews. Based on our analysis, private-sector background checks are laden with false positive and false-negative errors: 60% and 50% of participants had at least one false-positive error on their regulated and unregulated background checks, and nearly all (90% and 92% of participants, respectively) had at least one false-negative error. We define specific problems with private-sector criminal records: mismatched data that create false negatives, missing case dispositions that create incomplete and misleading criminal records, and incorrect data that create false positives. . . .[74]

It is because of these limitations that Uber should utilize the additional screening methods discussed above, in addition to the name-based background checks. Additionally, Uber's public messaging about its safety routinely mentions its background checks, which has the effect of reassuring potential riders, who are often not aware of the limitations of background checks, or the limited scope of background checks. [75] For example: Uber's Safety Report stated:

---

[74] Sarah Lageson & Robert Stewart, *The Problem With Criminal Records: Discrepancies Between State Reports and Private-Sector Background Checks*, CRIMINOLOGY, Vol. 62, Issue 1, 5 (2024).

[75] *What Background Checks Look For,* UBER, https://help.uber.com/driving-and-delivering/article/what-background-checks-look-for?nodeId=ee210269-89bf-4bd9-87f6-

35

Driver background checks and screenings

Every US driver undergoes an annual Motor Vehicle Record (MVR) review and a thorough criminal history background check before their first trip. The ridesharing industry is subject to a diverse array of laws and regulations specifying how potential drivers must be screened and/or whether those drivers are qualified to drive on the Uber platform. While background check requirements and other driver eligibility limitations in the US vary considerably by state and even by city, Uber's own process exceeds these requirements in several important ways.

Uber's background-check process is very rigorous. During 2017 and 2018, more than one million prospective drivers did not make it through Uber's screening process. The majority (76%) of the drivers who failed Uber's screening process were disqualified during the MVR check and did not advance to the criminal background check portion of our screening.

Uber will disqualify individuals with any felony convictions in the last 7 years. If we identify a report for certain serious criminal convictions—including sexual assault, sex crimes against children, murder/homicide, terrorism, and kidnapping"—at any time in the person's history, the potential driver will be disqualified according to our standards.

Beyond performing annual background check reruns, we were the first US ridesharing company to implement continuous driver screening technology, which monitors and flags new criminal offenses through a number of data sources and then notifies us so we can take action to ensure that every driver continues to meet our high standards. Since we launched this technology, more than 40,000 drivers have been removed from the app due to continuous screening.[76]

I have not seen any public messaging by Uber that also informs the public that Uber selects drivers and allows them to drive passengers on the Uber platform without an Uber representative ever meeting them in person or interviewing them, without obtaining or checking their personal or employment references, without checking their social media footprint, without drug testing, without requiring fingerprints, and without performing background checks outside of the U.S.. Uber's public-facing statements also do not explain the limitations (as acknowledged by Uber's own personnel as detailed below) of the criminal background checks they do perform.

Conducting a name-based background check, if done correctly, is helpful for identifying unqualified candidates and those who may be a safety risk. However, it has limitations, including those identified in the *Criminology* article cited above. For example:

---

43471300ebf2 (last visited Sept. 7, 2025); *Driver Screening,* UBER, https://www.uber.com/us/en/ride/safety/driver-screening/ (last visited Sept. 7, 2025).

[76] Uber's Safety Report, *supra* note 4, at 11.

- Name variances—spelling errors, typos, last name entered as first name or first entered as last, names from other countries may be in a format not compatible with U.S. systems.
- Some searches are limited due to records being archived or older records not being converted to an electronic format.
- Some states have limited a screening company's ability to report criminal convictions older than seven years and/or an employer's ability to consider these records when making an employment decision.
- An individual may have a criminal conviction record in another country. An employer could instruct their BGC company to search for conviction records in a country where the subject previously resided, but many do not due to the added expense. Search criteria vary by country and employers may need to rely on the subject of the BGC to voluntarily disclose prior residence in a foreign country.
- An individual may have a conviction record in a U.S. jurisdiction where they have never resided. Therefore, that city would likely not show on the Social Trace report and a search for criminal records would not be carried out. If so, that record may be found by searching a multi-jurisdictional criminal database, but it also may not.
- Systems that criminal record researchers rely upon to find records may be down, sometimes for extensive periods of time due to cyber-attacks, ransomware demands, malfunctioning servers, etc.
- Many cities and states have enacted second chance laws, sometimes called clean slate laws. The purpose of these laws is to reduce barriers to employment and housing. Some states with second chance laws automatically seal records after a specified period of time and no further criminal activity. In other states with second chance laws, the person with the criminal record must apply for expungement.
- Personal identifiers such as DOBs and SSNs are being redacted from court records in many jurisdictions to protect individuals from identity theft or fraud. However, this makes it difficult for researchers to match records to subjects they are researching.
- Many jurisdictions report convictions or guilty pleas but not arrests.

Even when the information is complete and accurate, I inform my clients that BGC's can miss important information.

- Was the SSN reported by the subject accurate?
- Was the DOB and current address reported by the subject accurate?
- BGC only searches jurisdictions based on known addresses or prior addresses.
- Has the subject of the BGC ever used a different name? Even a minor error or a typo in the name (or different spellings for the name) can lead to missed criminal records. Some names, especially some names from foreign countries that are very different from names in the U.S. may be recorded incorrectly on a driver's license or in arrest records.
- Does the employer take appropriate measures to ensure the information provided to the BGC company is accurate?

37

- Has the employer selected a BGC "screening package" that:
  - searches far enough back in time? (beyond seven years when allowed by law)
  - includes searches of maiden names, aliases, other name changes, etc.?
  - includes all relevant searches including a CBSV?

Even when the employer has seemingly established a robust criminal background check, takes steps to verify identity, has systems in place to catch typos and misspellings, there is still plenty of room for mistakes and missed criminal records. This is why additional screening methods, such as fingerprinting and interviewing, among others, are useful parts of the screening process.

### Uber's Background Check Processes, Practices, and Problems

With over a million U.S. drivers, Uber claims to be safe in large part because it does criminal background checks. In the "Safety Investments" section of Uber's Safety Report, Uber claims to put its U.S. drivers through a "thorough criminal history background check," that "exceeds [state and city] requirements."[77] It describes its background check process as "very rigorous."[78] This provides a false reassurance of safety because as detailed below, Uber's personnel knew about important problems and limitations in its background checks, that they were "error prone and insufficient"[79] ████████████████████████████████████████ ██████████[80] but Uber did not disclose these limitations to its passengers. Uber also did not disclose that Uber does not interview drivers, check their references, require fingerprinting or drug tests, etc.

The following is based on Uber's internal documents and testimony from Uber's employees and former employees.

In 2014 Uber's documents indicate that Uber was relying primarily on private databases to search for potential criminal records. Uber noted that "[t]he background check conducted of UberX partners currently pull from the multi-state criminal database" which was problematic because some counties inconsistently reported records into the database.[81] Uber later added "county and federal criminal searches on top of the existing multi-state criminal searches, sex offender search and motor vehicle record check."[82] This new procedure was a step forward in addressing a major flaw in the Uber background check policy. Prior to this, Uber relied on the database search and did

---

[77] *Id.*

[78] *Id.*

[79] Fuldner (Mar. 27, 2025) Dep. 439:1–8; *see also* UBER_JCCP_MDL_001113654 (Fuldner (Mar. 27, 2025) Dep. Ex 425).

[80] UBER_JCCP_MDL_002341375 (Luu (Feb. 27, 2025) Dep. Ex 240).

[81] See UBER_JCCP_MDL_001866326.

[82] *Id.*

38

not do a county court search in jurisdictions where the applicant resided. It is highly likely that this resulted in many missed criminal records.

Multi-state databases contain roughly 50% of U.S. court information and can be out of date. These private databases are not comprehensive enough to be relied on as a primary search (thus the county court and/or statewide repository searches) but often are used as a supplementary or "safety net" search. The most reliable records are found at the original source, which is generally the county or federal court where the case was heard. Some counties provide their records to state repositories and some to private multi-jurisdictional databases. Multi-jurisdictional databases should never be relied upon as a primary source for a records search and any records found in such a database should be verified at the original source to confirm the record is accurate and up to date. Uber eventually added county court searches in the jurisdictions where the applicant was shown to have resided in addition to the database search.

As is common in the BGC industry, Uber also started using the driver applicant's SSN to generate a Social Trace report which shows names and addresses associated with the SSN. Uber's BGC company would then use this information to determine in what counties to search for criminal records. If the SSN entered is correct, most often the Social Trace report provides a list of counties where court records should be searched. Since Social Trace reports use credit header information and other sources (not the SSA) they sometimes come up empty, such as may be the case for a young person with no credit history or for a recent immigrant to the U.S.

Because there is no "one-size-fits-all" method for conducting criminal BGC's, a company that relies on people in safety sensitive positions (like Uber) should employ overlapping and complimentary methods when searching for potential criminal records. Examples:

- Name based searches at the county level based on searching the names and jurisdictions found in the Social Trace report. Uber currently does this.
- Name based searches in statewide repositories (where available). In states where repositories are considered reliable, this is a good way to locate potential records in neighboring counties where the applicant may not have resided but could have a criminal record. In my review of Uber documents, I have seen only limited mentions of Uber using statewide repositories and no indication that Uber has instructed Checkr to search them, other than in a state where it is required, such as Massachusetts. In many instances, these repositories, when searched, could reveal a conviction in a neighboring county that would otherwise be missed.
- Name based searches of federal criminal court records. Uber currently does this.
- Name based searches in private databases. Uber currently does this.
- Fingerprint based searches. Applicants report to a place where they show identification, and their fingerprints are captured and then submitted to the FBI and compared with

39

fingerprints in the FBI database. Uber does not do this (except in areas where required such as New York City).[83]

Early on, Uber's searches for criminal records apparently did not include the federal court system and have never included fingerprinting (possibly some limited, local exceptions due to local requirements).[84]

Hire Ease, Uber's BGC company at the time, claims superiority of fingerprint-based BGCs stating, "Fingerprinting helps uncover criminal history not discovered through traditional methods, offers extra protection to aid in meeting industry guidelines and helps prevent fraud."[85]

A 2015 Uber document explained Uber's position on fingerprinting: Uber took the position that its BGC process was "more comprehensive than LiveScan Fingerprinting. We get a fuller picture: Fingerprinting is based on arrest records. We look at court records: conviction, disposition, dismissal, and sentencing data. Half of all records in the FBI database are inaccurate or incomplete."[86]

I agree with the 2017 editorial in the *Washington Post*, which concluded:

> Uber and Lyft say their own biographic background checks, performed by private contractors, are just as efficient in weeding out applicants with criminal backgrounds. Not many law enforcement agencies buy that. Fingerprinting isn't a foolproof tool for background checks, but neither are the biographic databases used by the ride-booking services now. The best way to protect the public is to insist on both.[87]

The advantages of fingerprint background checks are that they effectively address the issue of identity fraud, which, as noted below, has been a problem for Uber. If the subject was fingerprinted in the past during an arrest, the record should still be discovered, even if the subject provides a

---

[83] *TLC License*, UBER, https://www.uber.com/us/en/drive/requirements/get-a-license/tlc-license/ (last visited Sept. 7, 2025).

[84] UBER_JCCP_MDL_002085137 ("While we are addressing BGCs we should take a second look at fingerprinting BGCs. It's more costly but also more reliable") and ("[w]e need to decide if we will be doing federal going forward.").

[85] Hourdajain (Feb. 7, 2025) Dep. Ex. 89.

[86] UBER_JCCP_MDL_000192595 at 192599–600.

[87] Opinion, *Uber and Lyft's Arguments Against Fingerprinting Make Little Sense,* WASH. POST, (Jan. 2, 2017), https://www.washingtonpost.com/opinions/uber-and-lyfts-arguments-against-fingerprinting-make-little-sense/2017/01/02/a0926aae-ce1b-11e6-b8a2-8c2a61b0436f_story.html.

false name to Uber. Fingerprint based BGCs include a search of the FBI database, which includes records from all fifty states. However, not all arrests involve fingerprinting, and not all records get uploaded to the FBI database. Because no BGC method is foolproof, employing overlapping methods is the best way to avoid missing criminal records. The best way to ensure criminal records are found, if they exist for a particular individual, is to do both what Uber is currently doing (name-based searches) *and* fingerprint-based searches. This would improve Uber's ability to find criminal records and avoid issues associated with applicants providing false information.

In a letter written by Justin Kintz, Vice President, Global Public Policy Uber Technologies, Inc., Mr. Kintz responds to a series of questions by Senator Richard Blumenthal. Question # 4 asks in part, "Will you commit to conducting fingerprint based, as opposed to name-based background checks?" Excerpts from Mr. Kintz' response to this question include, "Regarding finger-print-based background checks, Uber does not believe these should be a requirement for a number of reasons. First, the FBI and state databases that are utilized for fingerprint-based background checks have significant gaps that reduce their efficacy and lead to discriminatory outcomes for communities of color. Second, as explained above, the process that Uber currently uses is thorough, fair, and relevant to the work in question."[88]

The letter goes on to claim that the repositories are often missing final dispositions. It then states that, "while licensing agencies have different processes for evaluating applicants with an incomplete criminal history report, we are aware of at least some for-hire driver licensure bodies that put the onus on the applicant with the incomplete rap sheet to obtain certified court records or other evidence showing they were not convicted."[89]

"Obtaining a record to show that an arrest did not lead to a conviction—in other words, to prove their innocence—often requires traveling to a courthouse or arresting agency in another county or state."[90]

Other inconveniences to the applicant are mentioned and the report goes on to state, "However, they are particularly problematic for minority communities—especially the African-American community—whose members are arrested at rates far greater than their respective representation in the general population."[91]

While this may be true, it is also true that Uber could easily overcome these issues by having their background screening company, Checkr, use the arrest information found from the fingerprint-based background check to find the case in the appropriate court and check for a final disposition

---

[88] UBER_JCCP_MDL_000005377 at 5383.

[89] *Id.* at 000005384.

[90] *Id.* at 000005385.

[91] *Id.*

without inconveniencing the applicant. Checkr's website states, "AI powered screenings with first class candidate experience. Get results in minutes, not days."[92]

In this letter to Sen. Blumenthal, Uber points out some problems associated with fingerprint-based background checks. Uber is not wrong, fingerprint-based background checks are not perfect. However, name-based background checks are far from perfect. Combining the two methods would identify more people that should not be allowed to drive a vulnerable woman, who may have had a few drinks, late at night with very little, if any supervision.

Uber explored a new product called ▇▇▇▇▇▇▇ Uber describes their mission with this product is to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ [93] Under Policy Concerns, Uber states, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ [94] The reason for this was, ▇▇▇▇▇▇▇▇▇▇▇▇▇ Uber further discusses how ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ [95] They go on to state that would make ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ They cite the cost in California as being ▇▇▇▇▇▇▇▇▇ and also mentioned that being ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The document also mentions ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

The above cited document clearly shows that Uber understands that fingerprinting could discover a criminal record that was otherwise missed. It also demonstrates that even when ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, they are still not willing to add the added layer of protection that fingerprinting would accomplish.

Screening involves more than criminal background checks and motor vehicle record checks. For example, while Uber started out interviewing at least some driver applicants in the early years, it stopped conducting interviews as part of the selection process.[97] By not conducting an interview

---

[92] CHECKR, https://checkr.com/ (last visited Sept. 7, 2025).

[93] UBER_MDL_002304885 at 4886.

[94] *Id.* at 4898.

[95] *Id.* at 4916.

[96] *Id.*

[97] Fuldner (Mar. 27, 2025) Dep. 400:8–10; Nilles (June 30, 2025) Dep. 24:4–6; Joyce (Feb. 26, 2025, Vol. I) Dep. 81:15–22 (driver interviews were discontinued in 2013); "In the very early days, when we launched in new markets, Uber staffers would occasionally sign drivers up in person in addition to signing up online. As the company grew, we moved to an in-app/online onboarding process."; UBER_JCCP_MDL_003601373.

it makes it easier for drivers to provide false information, either purposely or inadvertently. At a minimum, Uber should interview applicants in person or at least via an online platform such as Teams or Zoom and require identification documents to be uploaded to allow Uber to compare ID photos with the applicant's appearance and to verify that license numbers, DOBs, name spelling, etc. are entered into the BGC platform correctly.

In its screening work for Uber, Checkr apparently did not always verify that the name on the driver's license is the same that the driver provided for background check.[98] Two different people could be cleared through one background check since the searches are run off driver license number and SSN separately. According to this document, someone "on risk" was able to do this. The MVR is apparently run separately from the criminal background check so an applicant with a good driving record may present a copy of his/her driver's license and pass this part of the BGC. If this applicant has a criminal conviction record, he/she could provide the SSN of someone he/she knows to have a clean criminal record. Apparently, no one verified that the names from these two parts of the BGC match.

Ms. Luu testified that "they used their own driver's license and someone else's Social Security number and was able to pass the check," and she agreed that this was "a huge problem," although she didn't know the scale of the problem.[99] Uber also learned that Checkr's processes relating to this problem were not documented anywhere and that the "Checkr team . . . weren't able to provide clear responses at this point or give us any documentation."[100]

Uber personnel viewed this problem as a safety risk and a threat to the business:

> As a result of the abovementioned onboarding process, a prospective partner's information is not verified against government databases. As a result, Uber may face heightened safety risks as well as increased exposure related to claims litigation, regulatory compliance, public perception, and financial losses.[101]

Uber also does not routinely require drug testing.[102] Uber searches for drug related criminal convictions and may not allow an applicant to drive if one is found. However, a simple drug test can show that someone is using illegal substances even if they haven't been caught/prosecuted. If it were known that Uber drug tests prior to allowing an individual to drive and did so during a

---

[98] UBER_JCCP_MDL_001981496.

[99] Luu (Feb. 27, 2025) Dep. 156:14–17.

[100] UBER_JCCP_MDL_000877307; Luu (Feb. 27, 2025) Dep. 158:14–17.

[101] UBER_JCCP_MDL_000562385.

[102] Fogg (Feb. 5, 2025) Dep. 234:15–21; UBER_JCCP_MDL_000868150. This document describes the screening package Checkr provides for Uber as of May 2, 2019.

driver's time on the platform on a random basis, individuals with a substance abuse problem are likely to eliminate themselves from consideration as a driver.

The New York Taxi and Limousine Commission (TLC) which regulates "for-hire dispatch bases," which is what New York City considers Uber to be, requires that drivers for Uber get drug tested and fingerprinted.[103] However, Uber does not do this in any other cities/states in which they operate.

Uber also does not perform a search of social media.[104] Publicly available posts, likes, re-posts, etc. can reveal illegal activity, violent behavior, demonstrations of intolerance, and/or sexually explicit material.

Uber also does not do reference checks (or even a simple "Google search").[105]

And although Uber's handbook says that checking a person's employment history, educational background and other relevant information is one way we help keep a safe working environment, Uber does not check driver employment references (claiming it is not allowed to).[106]

Prior to 2018, there were no re-checks for criminal charges or driving records. Also, there was no monitoring for criminal charges or driving infractions in between re-checks.[107] Re-running a BGC and/or continuous monitoring are essential in safety sensitive positions, such as Uber drivers. A driver may not have a criminal record simply because he/she has not yet been caught in the criminal activity in which he/she is already engaged. Or a driver's personal circumstances may change over time causing him/her to make some poor choices. A BGC is a snapshot in time and passing an initial BGC is no guarantee that a driver won't engage in behavior that would be a red flag in the future.

---

[103] *Get a TLC Drivers License,* NYC TAXI & LIMOUSINE COMM'N, https://www.nyc.gov/site/tlc/drivers/get-a-tlc-drivers-license.page (last visited Sept. 7, 2025).

[104] Nilles (June 30, 2025) Dep. 126:1–17; Kaiser (Apr. 22, 2025) Dep. 269:5–11; UBER_JCCP_MDL_000868150 (describes the screening package Checkr provides for Uber as of May 2, 2019, and it does not include any mention of a social media search).

[105] Nilles (June 30, 2025) Dep. 124:10–125:25; Fuldner (Mar. 27, 2025) Dep. 400:12–13; UBER_JCCP_MDL 000868150 (this document describes the screening package Checkr provides for Uber as of May 2, 2019, and it does not include any mention of a checking references).

[106] Nilles (June 30, 2025) Dep. 135:10–19; UBER_JCCP_MDL_000868150 (this document describes the screening package Checkr provides for Uber as of May 2, 2019, and it does not include any mention of a verifying current or previous employment).

[107] UBER_JCCP_MDL_000868150. This document describes the screening package Checkr provides for Uber as of May 2, 2019.

Uber's background checks were sometimes less strict than the background checks required of taxi companies. Many taxi companies are required to do fingerprinting and Uber does not.[108] Uber's BGC goes back seven years. However, federal law as well as most states allow unlimited searching for criminal convictions. Only charges that did not result in a conviction are limited to seven years by federal law. Likewise, TNC regulations typically set out the minimum BGC that must be done, they do not limit more fulsome BGCs.

News reports and internal Uber documents reference BGCs that failed to identify previous convictions, drivers who somehow missed being BGC'd, and registered sex offenders currently driving. Reasons for these failures were not provided.

- News report from NBC5 that ran BGCs and found drivers with bad driving records (one had twenty-six tickets) yet still passed Uber's BGC. One person with a "three-page rap sheet" including burglary, drugs & assault (Beverly Locke) was hired by Uber. Another example was a driver with two convictions for burglary and disorderly conduct. Another driver (Syed Muzzafar) hit and killed a six-year-old girl while driving for Uber; he had prior conviction for reckless driving ten years prior.[109]

- Another example: a Houston driver was accused of rape. Uber said he passed the BGC but news reports claim the driver served fourteen years in federal prison on a drug related charge.[110]

- In November 2015 a probation officer in California sent Uber the following correspondence:

   > I am a United States Probation Officer who is seeking guidance and clarification as to your company's general hiring practices. I have a Federal sex offender on my caseload that is currently working as an "Uber" driver through Rasier LLC. It is my understanding that all Uber drivers must clear a background check, no felony or sex offender convictions. Therefore, I am inquiring as to how someone as stated above can be/is employed in the capacity of an "Uber" driver."[111]

---

[108] *See e.g.* Adam Vaccaro, *Boston Police Begin Fingerprinting Cab Drivers,* BOSTON GLOBE (Feb. 22, 2016), https://www.boston.com/news/business/2016/02/22/boston-police-begin-fingerprinting-cab-drivers/.

[109] UBER_MDL3084_000122023.

[110] Hourdajain (Feb. 7, 2025) Dep. Ex. 93.

[111] UBER_JCCP_MDL_000515098.

Uber's internal documents (see excerpts below) identify limitations with its BGC's, including when criminal histories were missed by restricting the BGC to the driver's county of residence or by limiting the lookback period to seven years:

On Sun, Nov 13, 2016 at 8:49 PM, Tracey Breeden <tbreeden@uber.com> wrote:
http://www.latimes.com/socal/daily-pilot/news/tn-dpt-me-0819-uber-driver-20160818-story.html

==This one got a lot of attention. He had a warrant out for his arrest related to a 2015 domestic violence charge and conviction. He had an arrest history for elderly abuse, child abuse and domestic violence. The arrests occurred in a neighboring county from his residence. His residential address was used for screening. He passed our BGC.==



Tracey Breeden
Senior Corporate Communications, Safety (West)
602.600.2806 | tbreeden@uber.com | uber.com

Source[112]

### BACKGROUND CHECKS AND THE PRESS

**TOP CHALLENGES**
- **Reruns:**
  - CNN poised to highlight inconsistencies, lawsuits, and questionable judgement (allowing accused sexual predators to drive) in the screening process. Re-run frequency will be discussed in the story.
  - Re-runs in Chicago caught 3 convicted murderers active on the platform

- **County outside county of residence misses/ not caught by Nat Crim:** California TV station is working on a story about a man who murdered a San Diego doctor who is now a driver.

- **Lifetime lookback for heinous crimes:** When reporters specifically ask if we screen beyond 7 years for heinous crimes, we've only been able to say that we screen against the National Sex Offender Registry and note such crimes should show up with our National Criminal database search. While we have an "internal policy" to disqualify if we do learn about such crimes, we don't take much action to seek such information out.

Source[113]

---

[112] Anderson (May 6, 2025) Dep. Ex. 700 (UBER_JCCP_MDL_000242286 at 242287).

[113] Anderson (May 6, 2025) Dep. Ex. 699 (UBER_JCCP_MDL_000423401).

In 2015, when Uber was contemplating rolling out ████████████████████ ████████████████████████████, it recognized the limits of its existing screening process: "[b]ackground checks can only do so much, and must be supplemented by other measures of a driver's character."[114] Recognizing the need to ████████████████████ ████████████████ Uber planned to "restrict ████████████████ to a filtered subset of UberX and Black drivers who will have to undergo additional screening, meet higher performance standards, and pass security steps."[115] One additional screening element was an interview—"we will screen drivers with an interview to make sure they 'feel right' to a human being."[116] They also considered implanting an "online reputation evaluation" vendor to "monitor negative news and to scan criminal databases for drivers based on name, DOB, and address."[117] One option they considered was "Trooly," which "is a more sophisticated solution that can look out for anti-social behavior online that can predict criminality—they can track everything from using frequent vulgarity in social media to visiting illicit website (e.[g]. child pornography)."[118] Uber considered monthly re-checks of criminal records for ████████████████[119] And when considering fingerprinting ████████████████████ Uber acknowledged that fingerprinting "provide a small increase in safety vs. our existing process," and "[b]iometric matching to crime data" is "harder to fake than a name and SSN. This is a legitimate improvement to security."[120] However, it concluded that it would only do fingerprinting in states which require it, because "[t]he extra in-person effort required for drivers to go to a physical location to get a Live Scan done would cause a big drop-off in the normal supply pool . . ."[121] Despite this early knowledge as to how to do a rigorous and thorough screening of drivers, Uber did not implement these screening options for its driver pool.

In March 2015, Uber considered using a video evaluation produce called HireVue that uses "audio, biometric and text analysis to predict driver performance" as a way to supplement the background checks.[122] Uber described HireVue as using "visual and audio indicators gleaned from a video questionnaire to predict drivers with the highest probability of causing an IPC safety incident on

---

[114] UBER_JCCP_MDL_002304885 at 002304916.

[115] *Id.* at 002304914.

[116] *Id.* at 002304915.

[117] *Id.*

[118] *Id.*

[119] *Id.* at 002304916.

[120] *Id.* at 002304916–17.

[121] *Id.* at 002304916.

[122] UBER_JCCP_MDL_001665531.

the platform."[123] Uber's stated reasons for testing out HireVue was to bolster their existing background checks because "there is not any proven evidence which shows that a criminal history leads to a higher likelihood that a driver will be involved in an incident," and secondly it was to address the need for a screening alternative in areas where "traditional background checks are unavailable or unreliable."[124] In addition to hiring, Uber considered using the HireVue results to also inform their driver/rider matching decisions.[125] After the pilot, HireVue presented Uber with its findings, in particular, it found that "if the bottom 33% of the applicant pool (lowest scoring [] candidates) were never hired or contracted, then Uber would have avoided 50% of the Safety Violations."[126] Uber has never rolled out this screening option in the U.S.

A 2016 internal Uber document stated that "we currently have a limited understanding of whether we have the right screening procedures and database access across the U.S., or if there are additional processes that would further improve screening effectiveness."[127]

A June 2016 internal document discusses a pilot Uber ran in DC and Detroit to "[e]xpand our data pipeline regarding signals that may predict for unwanted behavior (e.g. interpersonal conflict). Rep'n Up has the ability to, with driver's permission, utilize Facebook content (written posts, photo content, likes, etc.) to build a risk profile and score."[128] Despite this early consideration, Uber never implemented mandatory social media checks as part of its onboarding process.

A September 2016 internal Uber presentation discussed alternative screening options to prevent interpersonal conflicts, including sexual assault and sexual misconduct.[129] In addition to HireVue and Rep'n Up (discussed above), Uber also discussed Cerebro, Uber's "internally-developed psychometric test" and "Toggle," which "applied cognitive neuroscience" to "make predictions of latent human behavior." However, none of these tools were ultimately implemented in the U.S..

---

[123] UBER_JCCP_MDL_002473691; UBER_JCCP_MDL_000163016.

[124] UBER_JCCP_MDL_000163016.

[125] UBER_JCCP_MDL_001103192 at 1103192.0006, .0022–23, .0055.

[126] UBER_JCCP_MDL_001072320.

[127] Fuldner (Mar. 27, 2025) Dep. 367:21–369:3-8; UBER_JCCP_MDL_000573350–352.

[128] UBER_JCCP_MDL_001527211 at 001527214.

[129] UBER_JCCP_MDL_002473691.

████████████████████████████████████████████████

████████████████████████████████████████ [130]

In December 2017, Uber safety personnel internally viewed its driver screening process as "critical but error prone and insufficient."[131]

Uber documents acknowledge that background checks provide no assurance that the driver has not engaged in criminal conduct because they will miss criminal behavior that does not result in a conviction or guilty plea. In a May 11, 2021 Safety Advisory Board presentation, Uber noted it had received information from RAINN, a leading anti-sexual assault organization, that "less than 1% of all sexual assaults result in conviction, meaning that a traditional criminal background check misses a significant amount of serious sexual assault incidents."[132]

The current Uber website is misleading regarding background checks.[133] It suggests that the screening may extend to someone's entire adult life but does not disclose that the screening may be limited to only one year if that person was in the U.S. for only one year. There is no disclosure that Uber does not meet or interview driver applicants, does not check references, does not check social media, does not require drug tests, and limits the background check to seven years for many offenses, even where there is no such restriction imposed by law.

Two years after Uber personnel described in BGC's as "error prone and insufficient," Uber still was critical of its own background check process for screening of drivers in 2019. For example, Uber's Safety Policy & Standards H1 2019 Planning report admits:

- Acceptable screening methods have not been well defined or understood
- No standard global disqualification or criteria for sign-off
- No internal viewpoint on standards for adjudicating BGC results
- No mechanism to audit quality/accuracy of BGCs
- Fraudulent documents have been a persistent problem[134]

Uber's Safety & Policy Standards report also states "We lack a policy that clearly defines that fraudulent documents are not acceptable on the platform and the lengths we must go as a company to prevent such documents from getting accepted on the platform."[135] This same document also

---

[130] UBER_JCCP_MDL_000157415 at 000157415.0053.

[131] *Id.*

[132] UBER_JCCP_MDL_002059181.

[133] *Driver Screening, supra* note 75.

[134] UBER_JCCP_MDL_000907613.

[135] *Id.* at 000907613.0006.

states, "Neither Eats nor Rides has defined policies on screening principles to apply when implementing screening programs, this project seeks to define and establish those."[136]

SSN Trace provides a driver's previous addresses and is currently used by Uber's BGC company to determine where to search for criminal records. However, about 10% of SSN Traces run by Checkr result in no information or a name mismatch. In some instances, the driver provides a copy of his or her driver's license to confirm identity and clear the flag but the "SSN remains incorrect in the vault." Uber acknowledged that "[t]his group of partners represent a relatively significant level of risk as they have acknowledged that their SSNs are incorrect and therefore their BGC did not include criminal record searches for all their historical address history."[137] Uber also acknowledged that if the applicant "is a recent immigrant" or just has a "thin file" for other reasons, including providing a fraudulent SSN, this private database (SSN Trace) may provide little to no useful information. Checkr does not provide a service to verify whether the SSN belongs to the applicant but will flag instances where it is unable to validate the SSN.[138]

There are two methods for verifying that a SSN has been issued to the person using it, prior to being hired as an employee or independent contractor.

1.  The first method involves using a service provided by the SSA known as the Consent Based Social Security Number Verification Service (CBSV).[139] This fee-based SSN verification service is available to enrolled private companies, state and local government agencies to provide instant automated verification and can handle large volume requests. The CBSV returns a match or no match response to SSNs submitted based on the name, SSN and DOB. If the records show that the SSN holder is deceased, CBSV returns a death indicator.

2.  The second method involves using a service provided by the IRS. This method may not be utilized to verify SSNs for potential employees, but only independent contractors. According to Ms. Nilles, Uber uses this method to verify SSNs of drivers.[140] While this method may be effective for verifying that a name and SSN match, it does not provide the same level of verification as the CBSV described above, which also includes the DOB in its matching criteria. When conducting a background check, knowing that you have the correct name, SSN and DOB is crucial to conducting a name-based background check. The

---

[136] *Id.* at 000907613.0008.

[137] UBER_JCCP_MDL_000877328.

[138] UBER_JCCP_MDL_000868150.

[139] *Social Security Number Verifications*, SSA, https://www.ssa.gov/employer/verifySSN.htm (last visited Sept. 7, 2025).

[140] Nilles (June 30, 2025) Dep. 127:7–20.

method used by Uber leaves out the DOB component which could lead to a missed record. The CBSV will also report if the SSN is linked to a deceased person.

The IRS method, although less effective, is free to use and the CBSV method costs $2.25 per person.

An Uber Audit Analysis Report for May–June 2023 found the overall accuracy rate for BGCs was ███████ meaning this is the percentage of BGCs with no adjudication or process errors.[141] If we conclude from this that there are errors in ████ of BGCs conducted by Uber, this represents a highly significant number of drivers that could represent a danger to riders. In addition to Uber needing to improve procedures to make sure BGCs are completed and adjudicated accurately, this also underscores the need to add overlapping methods for uncovering potential criminal records (fingerprinting) and adding other components not currently included in Uber's BGC screening package such as employment verifications, references, interviews, drug tests and social media searches.

The conclusion from the audit was that ███████████████████████████████



[142]

Uber's background screening components as of 2019:

- **Social Security Number (SSN) Trace:** Uses various data sources (credit bureaus, voter registration, etc.) to verify addresses and aliases but does **not** verify identity. In cases where results appear to not match candidate, Checkr requires they re-enter SSN to be sure they have the correct number. If discrepancies remain after re-entry, BGC is flagged. Exception to this is when results show "thin file," in which case BGC proceeds. This started in summer 2018 and was to be phased in.
- **Multi-Jurisdictional Database Search:** Searches over *1,800* databases to find criminal records and law enforcement contacts.
- **Federal Criminal Search:** Checks *PACER* (Public Access to Court Electronic Records) for federal offenses.
- **Sex Offender Search:** Uses the *National Sex Offender Public Website (NSOPW)* to retrieve sex offender records.
- **Global Watchlist Search:** Checks various U.S. and international government watchlists (FBI, Interpol, DEA, etc.).
- **County Criminal Searches:** Professional researchers verify records at their sources.
- **Motor Vehicle Record (MVR) Search:** Verifies a driver's license, driving history, violations, and suspensions.

---

[141] UBER_JCCP_MDL_000572919.

[142] *Id.* at 000572924.

51

- **MVR Verification Process:**
  - Uber has a ***minimum licensing history requirement***.
  - Checkr retrieves ***driving history records*** and manually reviews them when necessary.[143]

Because Uber drivers are safety sensitive positions, I would recommend that Uber add fingerprint-based searches for criminal records and other components not currently included in Uber's BGC screening package such as employment verifications, references, interviews, drug tests, searches for criminal records in other countries where applicants may have resided, and social media searches. Including these additional screening tools would go a long way towards improving the quality of drivers and the safety of riders by screening out drivers that are high risk for sexual assault.

When the safety of vulnerable people is at stake and Uber is advertising that they consider the safety of their riders a top priority, it makes sense that they should use both methods, so they are taking advantage of the strengths associated with each and compensating for the weaknesses associated with each.

A federal or state statute must authorize the FBI to process fingerprint-based background checks for private employers. However, several states have legislation to authorize/compel Uber and other rideshare companies to perform fingerprint-based background checks. Uber has consistently lobbied government officials and fought against this and even threatened to cease doing business in areas where a requirement to conduct fingerprint based BGCs may become law. In an article by NJ State Sen. Troy Singleton, he talks about Uber's opposition to fingerprinting and states Uber's position is that "fingerprinting will force the company to leave the state."[144]

Fingerprinting makes it much more difficult for applicants to falsely identify themselves and potentially hide criminal records by submitting a false name, DOB or other personal identifier which name-based searches heavily rely on.

Uber now has Checkr provide a "Continuous Check" service that runs once a month to update criminal record information. This includes searches across its platform, criminal databases, and arrest records. This is an important feature but was not a part of the Uber BGC process until July 2018.[145]

---

[143] UBER_JCCP_MDL_000868150.

[144] *Uber, Lyft Resist Plan to Fingerprint,* SEN. TROY SINGLETON (July 7, 2025), https://www.troysingleton.com/uber_lyft_resist_plan_to_fingerprint.

[145] UBER_JCCP_MDL_000006602 at 000006607.

Uber focuses on screening/BGC issues globally, including in the U.S., and includes an internal critical assessment and evaluation.[146] Uber's Screenings 2021 Plan outlines current requirements to pass the MVR and BGC.

- MVR: Drivers must be 21+. If 21–23 years old, three years licensing history is required, if 23+ one year licensing history is required. Must have valid license, with no unacceptable restrictions.
- No more than three minor violations (speeding, stoplight, non-fatal accident) in last three years
- No major violations (driving without a license or insurance) in last three years
- No unacceptable violations in seven years (DUI, reckless driving, hit/run, evading police, speeding 100+ mph, street racing, evading police
- No unacceptable indefinites (vehicular manslaughter)[147]

I question requiring only a one-year history for 23+ year olds. Even a three-year history (21–23-year-olds) seems limiting. Some states may only provide three-year history, but others provide much more.

As for the criminal check, Uber's Screening 2021 Plan outlines:

- "Indefinite lookback" (fail if on record at any time)—murder/manslaughter, sexual assault, sex crimes involving children, terrorism, kidnapping, active warrant.
- "Seven-year lookback" fail if on record in last 7 years—any felony, violent crimes, sexual offenses, child/elder abuse, theft, gun/weapons offenses, property damage, harassment, fraud, violation of protective order, stalking, prostitution. [148]

The slide noted that this was not an exhaustive list

As I examine the above criteria, it seems to me that having a list of offenses that are the cause for an "indefinite lookback" fail is undermined if Checkr is instructed to search only in counties where the subject has resided, per the Social Trace, *for seven years*. The same would be true for crimes that are listed as cause for denial for seven years. If a conviction for sexual assault took place eight years ago, in a county where the applicant resided then but hasn't for the past seven years, Checkr would not be doing a search for criminal records in that county.

A 2021 Uber document, *Global Screenings Defensibility Strategy*, identified the rationale for the screenings was to:

---

[146] UBER_JCCP_MDL_000548326.

[147] *Id.* at 000548370.

[148] *Id.*

(1) defend Uber's screenings processes to regulators in key markets with data;

(2) improve safety perceptions by providing key data to our marketing team;

(3) improve our ability to influence new and existing regulations with data.[149]

Notably absent is a rationale for selecting drivers to keep riders safe. In addition, the document acknowledges that Uber does not assess the extent to which their safety is affected by BGCs/screenings. "The analytical link between screenings and platform safety outcomes is tenuous at best."[150] This is not the message Uber conveys to the public as noted above. Uber also noted ███████████████████████████████████████████████████ ███████████████████████"[151] Also, Uber was considering making it easier to pass its BGC's. Specifically, Uber acknowledged that it was investigating the defensibility of reducing look back periods, lowering thresholds, or removal of certain classes of offenses altogether.[152]

Mr. Henry (Gus) Fuldner (Senior Vice President of Safety & Core Services)[153] testified: "we have to make sure the screening program we put in place works."[154]

However, Jenny Luu, Uber's Director of Safety Access and Identity[155] testified at her deposition:

Q. Does Uber know whether its background checks that it performs on drivers work to prevent sexual assaults on its platform?

A. No. We don't know with clear data correlation about -- the background correlation about -- we don't have clear data correlation between background check processes and whether they contribute to sexual assault on the platform.

She also testified "we have implemented the screening processes, but . . . we don't know if they work."[156]

---

[149] Luu (Feb. 27, 2025) Dep. Ex. 240 (UBER_JCCP_MDL_002341375).

[150] *Id.* at 002341376; Luu (Feb. 27, 2025) Dep. 317:12–320:5.

[151] *Id.* at 002341378.

[152] *Id.* at 002341379.

[153] *Leadership, Gus Fuldner,* UBER, https://www.uber.com/us/en/about/leadership/gus-fuldner/ (last visited Sept. 7, 2025).

[154] Fuldner (Mar. 27, 2025) Dep. 358:23–25.

[155] Luu (Feb. 27, 2025) Dep. 28:17–18.

[156] Luu (Feb. 27, 2025) Dep. 190:23–25.

## FCRA and State Limits on BGC

The Fair Credit Reporting Act (FCRA) directly affects areas as diverse as what information can be contained in a Consumer Reporting Agency's report of a background check, to what notifications must be made to the subject of the background check prior to the criminal record inquiry. See Appendix B for a description of the FCRA.

Many states have adopted regulations that are more restrictive and/or that require additional procedures to follow, beyond the federal FCRA. The FCRA states that it preempts (1) state consumer reporting statutes if the state law took effect after September 30, 1996, and (2) when the state statute regulates the disclosure of convictions in consumer reports.[157] However, even when the above applies, many CRAs will still follow the state statute to avoid any potential legal action by state authorities.

*See* Appendix B for a summary of such regulations in Arizona, California, North Carolina, Louisiana and Texas.


### Fingerprinting

No states ban the use of fingerprinting for background checks by private employers. Some states may allow this method of screening and then use fingerprints to compare to prints on file within the state. However, when discussing fingerprint-based background checks, most often, people assume the prints are being compared to prints on file with the FBI. The FBI will only process fingerprint-based searches of their database if a state legislature authorizes or mandates that a private employer conducts this type of background check for some or all positions for which that employer hires.

Public Law 92-544 authorizes the FBI to share information for purposes of employment, licensing, and other noncriminal justice purposes, provided the FBI is authorized to do so by a state statute approved by the U.S. attorney general.[158] Identification information is retained in the Interstate Identification Index (III), which includes the National Fingerprint File. Criminal justice agencies nationwide maintain repositories that can interact with the III system via automated requests to provide information about a person from every agency that has had contact with them. The information in the III and the National Fingerprint File is submitted by federal, state, and local law enforcement agencies. The FBI is a repository.[159]

---

[157] 15 U.S.C. § 1681t.

[158] Pub. L. 92-544.

[159] U.S. DEP'T OF JUST., BUREAU OF JUST. STATS., SURVEY OF STATE CRIMINAL HISTORY INFORMATION SYSTEMS, 2014 (Dec. 2015), https://www.ojp.gov/pdffiles1/bjs/grants/249799.pdf.

### Limited BGC and Social Media Searches of Five Uber Drivers

My company, Safer Places, Inc. conducted a limited BGC on five Uber drivers. The BGCs were limited for several reasons:

- I did not have authorization from the subjects to research driving and other non-public records.
- I did not have the ability to request from the subjects what social media platforms they use and what "handles" they are known by. Current and former addresses as well as aliases from the Social Trace report are also helpful in determining if the correct profiles are found.
- I did not have fingerprints, drug testing, reference checks, or BGC outside of the US.
- There was no personal interview where questions about where the subject had previously worked or attended schools could have been asked. An interview would also have provided the opportunity to ask what other countries, if any, the subject resided in prior to the U.S., and to ask questions to help clarify information in the criminal background check.
- I did not have the ability to request that the subjects of these searches sign the special release required for us to run a national wants & warrants search.

In each of the background checks conducted below, I relied on a SSN and DOB provided to me. In some cases, previous addresses and aliases were also provided.

- The name and SSN were used to order a Social Trace report which provides names and addresses associated with the SSN. Often, this report will also provide a DOB and the year that the SSN was issued and whether it is a valid SSN.
- A search for criminal records was ordered in each county where the subject was reported to have resided. Some of these counties were provided to me and confirmed by the Social Trace. In the case of ███████████ no addresses were provided. The Social Trace showed an address in North Carolina, and we got a hit on the multi-jurisdictional database search in Texas so a county search was ordered there to verify the database hit.
- A multi-jurisdiction database of criminal records was requested as a means of potentially discovering a criminal record in a jurisdiction that we did not search.
- A search of the National Sex Offender Registry was conducted.
- A search for criminal records in the federal courts was conducted.
- A social media search was conducted.

I personally spent a considerable amount of time reviewing and interpreting the various pieces of information that I obtained from the Social Trace and criminal records searches in the various states and counties. This was for only five drivers. Given the extremely high volume of drivers being screened (and rescreened) by Uber, I question whether Uber had a sufficient number of trained personnel reviewing the information that Uber received from Checkr to carefully review and follow-up on the information it was receiving about potential drivers.

56

Ms. Nilles testified that had this felony been found on a background check, Uber would not have onboarded this driver.[198]

Additionally, name variations found in the Social Trace report, all with DOB matches were numerous and included ███████████████████████████████████, and ███████ ████ This is a good example of why a fingerprint-based background check would be a valuable supplement to a name-based search, as it would avoid the issue of name variations. Failing to search under one of these names or misspelling a name when entering it for a background check could easily result in missing a serious criminal conviction. Uber should but does not make use of fingerprint-based background checks, nor does it use the CBSV system to match a name, DOB and SSN to the applicant.

### Hassan Turay (Dean)

Criminal record searches were conducted in the counties of Maricopa, Arizona and Fulton, Georgia based on the results of the Social Trace. Federal district court searches were run in the District of Arizona and Northern Atlanta Division. No criminal records were discovered. A social media search found four profiles with no derogatory information reported. However, I did not have sufficient information to conduct a more reliable social media search.

It is important to note here that based on Mr. Turay's testimony, his first address in the U.S. was in 2013.[199] So, it is also possible that he has a criminal record in another country.

**Uber's Background Check of Hassan Turay**

Driver Hassan Turay first applied to be an Uber driver (P2P/Mobility) on July 24, 2014.[200] On that day, AccurateNow completed an 11-minute Social Security Trace search and a 32-minute National Criminal Database/National Sex Offender Search, as well as a 21-minute MVR report.[201] The MVR portion of the report observed "[inability] to confirm one year licensing based on current MVR," as the license was issued only on March 7, 2014, and there was "no prior license information on record."[202]

Turay was rejected on August 18, 2014.[203]

---

[198] Nilles (Aug. 7, 2025) Dep. 357:19–359:2.

[199] Turay (July 23, 2025) Dep. 14:8–10, 103:15 (noting he was born in Sierra Leone and immigrated to the U.S. in 2013) and (prior to coming to the U.S., he had lived in Sierra Lione, Guinea, and Ghana).

[200] UBER-MDL3084-BW-00012965; ACCURATE001.

[201] ACCURATE001.

[202] *Id.* at 002.

[203] UBER-MDL3084-BW-00012965.

On September 13, 2016, Turay applied again, this time for both Uber P2P/Mobility and Uber Eats.[204] On December 22, 2016, a Checkr MVR report requested by Uber Eats came back as "suspended" for "insufficient driving history," as the "first issued date" for Turay's driver's license was from October 25, 2016.[205]

However, on that same day (December 22, 2016), a similar Checkr MVR report, this time requested by Uber (as opposed to Uber Eats), came back as "clear" despite the same underlying information (i.e., "first issued date" for Turay's license cited as October 25, 2016).[206] Turay acquired an "active" driver status for Uber P2P on or after December 23, 2016.[207]

In addition, the rest of Checkr's December 22, 2016 searches came as "clear" as well; on a county level, Uber requested/Checkr ran criminal searches for Fulton, Georgia and Maricopa, Arizona only.[208] Those two counties remained the only ones for which Checkr performed criminal background check re-runs all the way until June 3, 2021, when Fairfax, Virgina was added as an additional third county.[209]

Given Uber had knowledge that Mr. Turay did not have an active driver's license prior to 2014 due to the Social Trace information and the MVR records from 2014 and 2016, his ability to pass the MVR test in 2016 is inconsistent with Uber's policy requiring three years driving history in the U.S.

Uber should apply its policies consistently. Two MVR's, one for Uber and one for Uber Eats were requested on the same day. Since this information is collected directly from the state's Department of Motor Vehicles by SAMBA Safety, it is not surprising that both reports provided the same information. What is surprising is that Uber made two very different decisions based on the same results.

Given Uber had previously rejected Turay in August 2014 for having insufficient driving history due to a license issued on March 7. 2014, according to its own policies it should have also rejected Turay's 2016 application as having insufficient driving history.

---

[204] *Id.*

[205] UBER-MDL3085-BW-00012056.

[206] UBER-MDL3084-DFS00003621.

[207] UBER-MDL3084-DFS00003652.

[208] UBER-MDL3084-DFS00003621.

[209] CHECKR000746; CHECKR000748; CHECKR000752; CHECKR000756; CHECKR000760.

## General Limitations of Name-Based Background Checks

It should be noted that name-based background checks depend heavily on starting with as many *verified* personal identifiers as possible. At a minimum, searches should start with a full name, DOB, SSN, and a current as well as previous addresses. If a background check is to go beyond searching for criminal records, additional information will be required. Examples include, driver's license number and state of issue, previous states where a license was held, names and dates of previous employers, names and dates of colleges/universities attended.

For a reliable social media search, the following information is needed: All names used by the subject currently and in the past, platforms they are on (Tik Tok, Facebook, etc.) and handles they may use of various platforms. Addresses where subjects have resided and companies where they have worked may help to confirm the search is relevant to the subject being investigated once a profile is found. Social media searches may be performed without this information but having it makes it more likely that existing profiles will be found and matched to the subject of the investigation correctly.

The information provided by the subject of the BGC should be verified initially by comparing it to documents such as a driver's license, social security card, passport, etc.

I was not privy to all this information which limits my confidence in the results of the BGCs social media information. I did not have any information regarding what platforms the subjects of the five BGCs we performed are on and what handles they may go by.

According to CareerBuilder.com, 70% of employers include a social media search as part of their background screening process.[210] Perhaps even more revealing is this same article reports that 54% of employers that do use social media reports have found content that caused them not to hire. Examples of such content include:

- Candidate posted provocative or inappropriate photographs, videos or information.
- Candidate posted information about them drinking or using drugs.
- Candidate had discriminatory comments related to race, gender or religion.
- Candidate lied about qualifications.
- Candidate was linked to criminal behavior.

After initially verifying personal identifying information and comparing it to government issued photo IDs (license or passport), it should then be verified again once the BGC is initiated. This should include using the Social Trace report and comparing names, DOB and addresses provided by the subject. The Social Trace will often show whether the SSN is a valid number, the year it was issued, and whether it is in the SSA's Death Master File. The MVR (driver's license report) will show a DOB and an address.

It is important to exercise caution prior to initiating a BGC as well as afterwards, when the reports start to come in. If the SSN provided was issued prior to the subject of the BGC being born or it shows a different name, it requires further attention. If that is the case, the Social Trace report will

---

[210] CareerBuilder, *supra* note 31.

not provide correct information regarding names and address needed to be sure criminal record searches are conducted in the correct location(s) and under the correct name(s).

Steps would include:

- Asking each subject to provide identification that shows their correct name, DOB, SSN, driver's license number & state of issue and current address.
- Asking each subject to provide a list of social media platforms on which they participate.
- Asking each subject to provide the addresses and dates where they have resided for the past ten years, including other countries. For people that have come to the U.S. within the last ten years, this is particularly important as the Social Trace report will not include prior addresses in other countries.
- In states that do not have a "ban the box" law which prohibits this, ask each subject if they have any criminal convictions and if so, for what crime, the date and the location.
- Once the BGC is started, begin with the Social Trace and MVR reports and compare the information provided by the subject to what these documents indicate.
- If any substantial differences are found, ask the applicant to explain. If the Social Trace shows that the SSN may not be valid, may be issued to someone with a different name, was issued to someone prior to the subject's DOB or is listed in the SSA Death Master File, ask the subject to sign an SSA-89 form and verify the SSN with the SSA.
- Carefully review each report as it comes in as it may provide information that warrants additional research. For example, an MVR report may show a different DOB from what the subject reported. It may provide an address not reported by the subject or the Social Trace report. It may show a previous license, issued in another state that was surrendered when the subject obtained the current license.

Whenever a Social Trace gives any indication that the number provided may not be a match to the subject, the subject should be asked to complete the SSA-89 form, and the background screening company should submit the signed form to the SSA. The SSA will return a "match" or "no match" response using the name, SSN and DOB. All three must match their files for a "match response to be returned. Some institutions use CBSV in every transaction. For example, it is common for financial institutions to use the CBSV system to prevent fraud when providing mortgage services or other financial transactions.

A good example where a CBSV may have been helpful involves Safer Places' search for criminal records for ███████████████ His name was originally reported to us with his last name of ███████████ (spelling ██████ with a Q) but the Social Trace report shows the spelling of ██████ with a G. The Social Trace also showed two different dates of birth: August 12, 1975 and August 12, 1985. This could be the result of a typo from one of the sources where the Social Trace report pulls information from, or it could be an attempt by the subject to prevent criminal conviction data about him from being discovered. Misspellings of names and incorrect dates of birth can prevent criminal records from being matched to the subject. If a CBSV was ordered as

71

part of this BGC, the SSA would have reported a "no match" if the name (spelled correctly) and DOB did not match SSA records for the SSN provided.

It is also worth noting that fingerprint-based BGC may have avoided this issue. When applicants provide fingerprints, they are also requested to show proper identification. But even if the name on the arrest record differs from that on the ID, the fingerprints will still match.

Employers and background screening companies use the CBSV system to prevent fraud in the background screening process. Some do it with every BGC and others do it only when there is an indication from the Social Trace report or other source that there is a possibility of fraud occurring. The cost to use the CBSV system currently involves a one-time enrollment fee of $5,000.00 and a $2.50 per transaction fee. Background screening companies may elect to pay the enrollment fee and then offer this service to their clients, charging them a slightly higher transaction fee to recoup the enrollment fee and make a profit with the service.

I have seen no indication that Uber uses this easy to use and inexpensive service to prevent fraud during the BGC process. Because Uber drivers are currently considered independent contractors and not employees, Uber may be able to verify SSNs with the IRS. However, this method only matches the name and tax ID number (SSN for individuals) and does not provide a match or no match concerning the DOB.

When an employer engages the services of a background screening company, they work together to select one or more screening packages. Some screening companies offer suggested "screening packages." But it is the employer who ultimately decides what will be included in the package. CBSV is a simple solution and would go a long way toward preventing fraud in the screening process. However, it appears that Uber has not requested that their screening company include this in the screening process or perhaps their screening company does not offer this service.

Background checks have important limitations identified in the *Criminology* publication cited above and noted throughout this report. Subjects may attempt to provide false information or provide fraudulent documents. Companies providing BGC services may make mistakes. Courts often redact important information such as a DOB which makes it more difficult to match records to subjects. Sometimes record systems are not available, and when court clerks are required or need to get involved, there can be long delays due to heavy workloads.

Employers working with BGC companies can put procedures in place to reduce the number of mistakes or fraudulent information that may be provided by an applicant and then relied upon by the BGC company. Based on my experience in this industry, the best way to overcome the pitfalls I've described is to utilize as many different searches as possible and review the final report in its entirety. As stated earlier, it is like putting a puzzle together. The more pieces you fit together, the more complete the final picture will be.

I have provided all these opinions to a reasonable degree of professional certainty.

David C. Sawyer.

Dated: September 25, 2025

## APPENDICES

Appendix A – Transportation Network Company Regulations

Appendix B – Summary of FCRA and State Limits on BGC

Appendix C – Materials Considered

## APPENDIX A

### ARIZONA

Arizona's TNC statute prohibits a TNC from allowing a person to act as a TNC driver who:

1. Has committed more than 3 moving violations or one major violation in the last 3 years.

2. Has been convicted of a serious felony or DUI violation in the last 7 years.

3. Is listed on a national sex offender registry database.

4. Does not possess a valid driver license, proof of vehicle registration or proof of vehicle insurance that meets the requirements under this law.

5. Is not at least 19 years of age.[1]

### CALIFORNIA

California Public Utilities Section 5445.2 states:

(a) (1) A transportation network company shall conduct, or have a third party conduct, a local and national criminal background check for each participating driver that shall include both of the following:

> (A) The use of a multistate and multijurisdictional criminal records locator or other similar commercial nationwide database with validation.

> (B) A search of the United States Department of Justice National Sex Offender Public website.

(2) A transportation network company shall not contract with, employ, or retain a driver if the driver meets either of the following criteria:

> (A) Is currently registered on the United States Department of Justice National Sex Offender Public website.

> (B) Has been convicted of any of the following offenses:

>> (i) A violent felony, as defined in Section 667.5 of the Penal Code.

---

[1] *FAQ, "Transportation Network Company" Information,* ARIZ. DEP'T. OF TRANSP., https://azdot.gov/mvd/services/professional-services/vehicle-hire-licensing/faq#:~:text=%22Transportation%20Network%20Company%22%20Information&text=Requires%20a%20TNC%20to%20obtain,the%20permit%20in%20the%20vehicle (last visited Sept. 7, 2025). *See also* ARIZ. REV. STAT.§ 28-9555.

1

(ii) A violation of Section 236.1, 11413, 11418, 11418.5, or 11419 of the Penal Code.

(3) A transportation network company shall not contract with, employ, or retain a driver if the driver has been convicted of any of the following offenses within the previous seven years:

(A) Misdemeanor assault or battery.

(B) A domestic violence offense.

(C) Driving under the influence of alcohol or drugs.

(D) A felony violation of Section 18540 of the Elections Code, or of Section 67, 68, 85, 86, 92, 93, 137, 138, 165, 518, or 530 of, subdivision (a) of Section 484 of, or subdivision (a) of Section 487 of, the Penal Code.

(4) Paragraphs (2) and (3) apply with respect to a conviction of any offense committed in another jurisdiction that includes all of the elements of any of the offenses described or defined in those paragraphs.

(5) This section shall not be interpreted to prevent a transportation network company from imposing additional standards.[2]

## LOUISIANA

La. Admin. Code tit. 70, § IX-5013 states:

"B.  Before an individual is authorized to accept trip requests through a transportation network company's digital network, the company shall require the driver and the driver's vehicle to comply with all laws of the state of Louisiana including all motor vehicle laws pertaining to vehicles, inspections, and criminal laws.

1. The individual shall submit an application to the company, which includes information regarding his:

a. address;

b. age;

c. driver's license;

d. motor vehicle registration;

---

[2] CAL. PUB. UTIL. § 5445.2, (effective Jan. 1, 2019)
https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=PUC&division=2.&title=&part=&chapter=8.&article=7.

2

e. insurance;

f. state vehicle inspection; and

g. any other information required by the company or imposed by the department.

2. The company or a third party shall conduct a local and national criminal background check for each applicant that includes the following:

a. a multi-state and multi-jurisdiction criminal records locator or other similar commercial nationwide database with validation of any records through a primary source search;

b. a search of the national sex offender public website maintained by the United States Department of Justice.

3. The company or a third party shall obtain and review a driving history research report for each applicant.

C. The company or a third party shall conduct the background check and driving history research report set forth in Paragraphs A.2 and 3 of this Section at least once every two years.

D. The company shall not authorize an individual to act as a driver if the individual's initial driving report reveals the individual received more than three moving violations within the three-year period prior to applying to the company; or any subsequent annual driving history reveals more than three moving violations within a three-year period.

E. The company shall not authorize an individual to act as a driver if the individual's initial background check or any subsequent background check reveals the individual:

1. has had more than one of the following violations within the three-year period prior to applying to the company:

a. flight from an officer or aggravated flight from an officer as provided for in R.S. 14:108.1;

b. reckless operation of a vehicle as provided for in R.S. 14:99;

c. operating a vehicle while under suspension for certain prior offenses as provided for in R.S. 14:98.8;

2. has been convicted, within the past seven years, of:

a. any enumerated felony as provided for in Title 14 of the Louisiana Revised Statutes of 1950, comprised of R.S. 14:1 through 601;

b. operating a vehicle while intoxicated as provided for in R.S. 14:98 through 98.4;

3

c. hit and run driving as provided for in R.S. 14:100;

d. any crime of violence as defined in R.S. 14:2(B);

3. is listed as an offender in the national sex offender public website maintained by the United States Department of Justice.[3]

## NORTH CAROLINA

§ 20-280.6. Background checks.

(a) Prior to permitting an individual to act as a TNC driver, the transportation network company must do all of the following:

(1) Require the individual to submit an application to the transportation network company, including, at a minimum, the following:
   a. Address.

   b. Age.

   c. Driver's license number.

   d. Driving history.

   e. Motor vehicle registration.

   f. Automobile liability insurance information.

(2) Conduct, or have a third party conduct, a local and national criminal background check for each applicant, including, at a minimum, the following:
   a. Multi-State/Multi-Jurisdiction Criminal Records Locator or other similar commercial nationwide database with validation (primary source search).

   b. National Sex Offender Registry.

(3) Review, or have a third-party review, a driving history research report for such individual.

(b) The transportation network company must confirm that every TNC driver continues to meet all the requirements of this section every five years starting from the date the TNC driver met all the requirements of this section.

---

[3] LA. ADMIN. CODE tit. 70, pt. IX, § 5013 (2025).

4

(c) The transportation network company must not permit an individual to act as a TNC driver if any of the following apply:

(1) Has had more than three moving violations in the prior three-year period or one major violation in the prior three-year period, including attempting to evade the police, reckless driving, or driving on a suspended or revoked license.

(2) Has been convicted within the past seven years of driving under the influence of drugs or alcohol, fraud, sexual offenses, use of a motor vehicle to commit a felony, or a crime involving property damage, theft, acts of violence, or acts of terror.

(3) Is a match in the National Sex Offender Registry.

(4) Does not possess a valid driver's license.

(5) Does not possess proof of registration for the motor vehicle to be used to provide TNC services.

(6) Does not possess proof of automobile liability insurance for the motor vehicle to be used to provide TNC services.

(7) Is not at least 19 years of age.[4]


## TEXAS

Section 2402.107 states, "(a) Before permitting an individual to log in as a driver on the company's digital network, a transportation network company must:

(1) confirm that the individual:
    a.  is at least 18 years of age,
    b.  maintains a valid driver 's license issued by this state, another state, or the District of Columbia; and,
    c.  possesses proof of registration and automobile financial responsibility for each motor vehicle to be used to provide digitally prearranged rides.

(2) conduct, or cause to be conducted, a local, state, and national criminal background check for the individual that includes the use of:

    (A) a commercial multistate and multi-jurisdiction criminal records locator or other similar commercial nationwide database; and

    (B) the national sex offender public website maintained by the United States Department of Justice or a successor agency.

---

[4] N.C. GEN. STAT. § 20.280.6, https://www.ncleg.net/EnactedLegislation/Statutes/PDF/ByArticle/Chapter_20/Article_10A.pdf.

5

(2)   obtain and review the individual 's driving record.

(b) A transportation network company may not permit an individual to log in as a driver on the company's digital network if the individual:

(1) has been convicted in the three-year period preceding the issue date of the driving record obtained under Subsection (a) (3) of:

(A) more than three offenses classified by the Department of Public Safety as moving violations; or license under Section 521.025, Transportation Code; or

(B) one or more of the following offenses:

(i) fleeing or attempting to elude a police officer under Section 545.421, Transportation Code;

(ii) reckless driving under Section 545.401, Transportation Code; (iii) driving without a valid driver 's 7 license under Section 521.025, Transportation Code; or

(iv) driving with an invalid driver 's license under Section 521.457, Transportation Code;

(2) has been convicted in the preceding seven-year period of any of the following:

(A) driving while intoxicated under Section 49.04 or 49.045, Penal Code;

(B) use of a motor vehicle to commit a felony;

(C) a felony crime involving property damage;

(D) fraud;

(E) theft;

(F) an act of violence; or

(G) an act of terrorism; or

(3) is found to be registered in the national sex offender public website maintained by the United States Department of Justice or a successor agency.[5]

---

[5]  TEX. OCC. CODE ANN. § 2402.107,
https://statutes.capitol.texas.gov/Docs/OC/htm/OC.2402.htm (last visited Sept. 7, 2025).

6

**UTAH**

13-51-107 Driver requirements.

(1) Before a transportation network company allows an individual to use the transportation network company's software application as a transportation network driver, the transportation network company shall:

    (a) require the individual to submit to the transportation network company:

        (i) the individual's name, address, and age;

        (ii) a copy of the individual's driver license, including the driver license number; and

        (iii) proof that the vehicle that the individual will use to provide transportation network services is registered with the Division of Motor Vehicles;

    (b) require the individual to consent to a criminal background check of the individual by the transportation network company or the transportation network company's designee; and

    (c) obtain and review a report that lists the individual's driving history.

(2) A transportation company may not allow an individual to provide transportation network services as a transportation network driver if the individual:

    (a) has committed more than three moving violations in the three years before the day on which the individual applies to become a transportation network driver;

    (b) has been convicted, in the seven years before the day on which the individual applies to become a transportation network driver, of:

        (i) driving under the influence of alcohol or drugs;

        (ii) fraud;

        (iii) a sexual offense;

        (iv) a felony involving a motor vehicle;

        (v) a crime involving property damage;

        (vi) a crime involving theft;

        (vii) a crime of violence; or

        (viii) an act of terror;

7

(c) is required to register as a sex offender, kidnap offender, or child abuse offender in accordance with Title 53, Chapter 29, Sex, Kidnap, and Child Abuse Offender Registry;

(d) does not have a valid Utah driver license; or

(e) is not at least 18 years old.[6]

---

[6] UTAH CODE ANN. § 13-51-107 (effective May 7, 2025),
https://le.utah.gov/xcode/Title13/Chapter51/13-51-S107.html.

<u>**APPENDIX B**</u>

**<u>Overview of The Fair Credit Reporting Act (FCRA)</u>**

Perhaps the "Fair Credit Reporting Act" is really misnamed. Perhaps it should be called the "Fair Credit and Employment Reporting Act." The lack of "employment" in the title has contributed to the lack of understanding and knowledge of this law in employment screening. In general, the FCRA manages the relationship between the parties who are involved in informational transactions that fall under the Act. Usually, there are at least three parties affected:

- The provider of the information

- The subject of the information

- The user of the information

**<u>Important Definitions Within the Act</u>**

**A Consumer Reporting Agency (CRA)** is "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."[1]

**A Consumer Report** is "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for: (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b, §1681a(d)(1)."[2]

**Employment purposes** when used in connection with a consumer report means "a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee."[3]

**The Purpose of the FCRA**[4]

---

[1] 15 U.S.C. § 1681a(f).

[2] 15 U.S.C. § 1681a(d).

[3] 15 U.S.C. § 1681a(h).

[4] Three helpful links for FCRA are Fair and Accurate Credit Transactions Act of 2003, 15 U.S.C. § 1681, https://www.govinfo.gov/content/pkg/PLAW-108publ159/html/PLAW-108publ159.htm

1

The purpose of the FCRA is to facilitate the flow of essential information concerning an individual's background, while at the same time protecting that individual's privacy rights and minimizing the risks of inaccurate reports. This is accomplished through the imposition of statutory and regulatory safeguards imposed on CRAs and the users and providers of the information. The regulations are designed to ensure the accuracy of the information being provided.

A failure to comply with the FCRA's requirements exposes the CRA as well as the CRA customer, to civil liability.[5] Unlawfully obtaining of information may result in criminal penalties.

The following are a summary of the essential elements of the FCRA as it pertains to background screening for employment purposes:

- A CRA can only compile and report information on a subject if the reason for the report is for a permissible purpose, of which "employment" is one. **§ 604. Permissible purposes of consumer reports [15 U.S.C. § 1681b]**

- Prior to requesting a report from a CRA, the employer must provide the subject of the report with a Summary of Rights Under the FCRA and must obtain a signed Disclosure and a signed Authorization. **§ 604. Permissible purposes of consumer reports [15 U.S.C. § 1681b]**

- Under the FCRA, criminal convictions may be reported indefinitely. Criminal charges that did not result in a conviction may only be reported for seven years from the date the charges were originally filed. Other adverse information, such as paid tax liens, and collections accounts may only be reported for seven years. Bankruptcies may be reported for ten years. **§ 605. Requirements relating to information contained in consumer reports [15 U.S.C. § 1681c]**

- A CRA, if reporting potentially adverse information must either:
    - Provide a copy of the report to the subject at the same time it provides the report to the employer OR
    - Maintain strict procedures to ensure the reported information is accurate and up to date.

    **§ 613. Public record information for employment purposes [15 U.S.C. § 1681k]**

---

(last visited Sept. 7, 2024); *Fair Credit Reporting Act,* 15 U.S.C § 1681 (Sept. 2018), https://www.ftc.gov/system/files/documents/statutes/fair-credit-reporting-act/545a_fair-credit-reporting-act-0918.pdf; *Legal Library: Advisory Opinions*, FTC, https://www.ftc.gov/legal-library/browse/advisory-opinions (last visited Sept. 7, 2025).

[5] 15 U.S.C. §1681o.

2

- If the report may be used in whole or in part to make an adverse employment decision, the employer is required to:
  - o send a pre-adverse action notice, a copy of the report and a summary of rights under the FCRA to the subject prior to making an adverse decision
  - o provide a "reasonable amount of time" (most interpret one week to satisfy this requirement) for the subject to review the report and dispute directly with the CRA or with the employer any information the subject believes to be inaccurate, out of date or does not pertain to him/her.
  - o after waiting a reasonable amount of time, and if there is no dispute from the subject of the report, if the employer makes an adverse decision, send an adverse action notice and a summary of rights.

**§ 615. Requirements on users of consumer reports [15 U.S.C. § 1681m]**

- CRAs are obligated to reinvestigate disputes, unless deemed to be frivolous, and report their findings within thirty days. **§ 611. Procedure in case of disputed accuracy [15 U.S.C. § 1681i]**

Many states have adopted regulations that are more restrictive and/or that require additional procedures to follow, beyond the federal FCRA.

The FCRA states that it preempts (1) state consumer reporting statutes if the state law took effect after September 30, 1996, and (2) when the state statute regulates the disclosure of convictions in consumer reports. However, even when the above applies, many CRAs will still follow the state statute to avoid any potential legal action by state authorities. **§ 625. Relation to State laws [15 U.S.C. § 1681t]**

The following is a summary of such regulations in Arizona, California, North Carolina, Louisiana and Texas

**ARIZONA**

There are no restrictions beyond the FCRA on users (the employer). This means that employers are free to research and consider convictions indefinitely. The only additional law pertaining to CRAs is about safeguarding personal data and is likely already covered by the FCRA. It involves the disclosure of personal or privileged information requiring the consent of the subject.

The relevant Arizona TNC regulations, as described more fully above, prohibit a TNC from allowing someone to act as a driver if they have: (1) committed more than three moving violations or one major violation in the last three years; (2) been convicted of a serious felony or DUI in the last seven years; or (3) is listed on a national sex offender registry database. They do not restrict a

3

TNC from looking back beyond seven years or from making a hiring decision based on records that are older than seven years.[6]

## CALIFORNIA

There are several California laws that apply to the users (employer) of background checks for employment purposes. Pertinent provisions are listed below:

- Cannot consider (or inquire in some cities, including Los Angeles and San Francisco) about criminal records until after a conditional offer of employment has been made.[7]
- In San Francisco, employers with more than five employees may not consider arrests without a conviction, participation in a diversion or deferral program, any conviction that has been expunged, dismissed, voided or invalidated, juvenile records, or a conviction older than seven years.[8]
- Employers may not ask or consider certain convictions relating to the possession of small amounts of marijuana or if the marijuana conviction is older than two years.[9]
- Employers may not consider any case where a conviction did not occur (except pending matters) or any participation in any pre-trial or post-trial diversion programs. This includes a deferred sentence or adjudication withheld.[10]
- For most positions, employers may not use a credit report in an employment decision.
- Employers may not ask about or consider sex offender information unless the employer has "people at risk." Employers may not ask applicants for passwords to their social media accounts.[11]

California laws that apply to the CRA compiling information for a background check report include the following:

---

[6] ARIZ. REV. STAT. § 28-9555.

[7] CAL. GOV'T CODE § 12952.

[8] *Id.*

[9] CAL. CODE REGS. tit. 2 § 11017.1(b)(5).

[10] CAL. GOV'T CODE § 12952.

[11] CAL. PENAL CODE § 290.46; Cal. Assembly Bill AB 1844 (2012), http://www.leginfo.ca.gov/pub/11-12/bill/asm/ab_1801-1850/ab_1844_bill_20120927_chaptered.html (last visited Sept. 7, 2025).

4

- Convictions may be reported for seven years. Non-convictions, except for pending charges, cannot be reported.[12]
- Criminal record information reported must be current and up to date. This means CRA cannot report information found in a database without first verifying its status at the original source.[13]

As noted above, the TNC statutes[14] in California require TNCs to conduct backgrounds for drivers that include: the use of multistate and multijurisdictional criminal records or other similar commercial nationwide database with validation; a search of the United States Department of Justice National Sex Offender Public website. The TNC statute prohibits a TNC from contracting with a driver if they are currently registered with the United States Department of Justice National Sex Offender Public website <u>or</u> have been convicted of a violent felony as defined in Section 667.5 of the Penal Code or a violation of Section 236.1, 11413, 11418, 11418.5, or 11419 of the Penal Code.  The TNC regulation prohibits a TNC from contracting a driver if they have been convicted of misdemeanor assault or battery; a domestic violence offense; driving under the influence of alcohol or drugs; or (D) a felony violation of Section 18540 of the Elections Code, or of Section 67, 68, 85, 86, 92, 93, 137, 138, 165, 518, or 530 of, subdivision (a) of Section 484 of, or subdivision (a) of Section 487 of, the Penal Code in the prior seven years.

The TNC statute also explicitly states that "[t]his section shall not be interpreted to prevent a transportation network company from imposing additional standards."

## NORTH CAROLINA

The only regulation pertaining to employers beyond the FCRA was adopted in December 2013. **Section 15A-153** states that an employer is prohibited from knowingly asking about an arrest, criminal charge or conviction that has been expunged. An applicant/employee may state they have no such arrest or conviction record in this instance. There are no additional restrictions on CRAs. Employers and their CRAs are free to research and consider convictions indefinitely.[15]

**Section 20-280.6** regulates TNCs in North Carolina on background checks and states:

---

[12] CAL. CIV. CODE § 1786 et seq.

[13] CAL. CIV. CODE §1786.28.

[14] CAL. PUB. UTIL. § 5430 *et seq.*,
https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=PUC&division=2.&title=&part=&chapter=8.&article=7 (last visited Sept. 7, 2025).

[15]  N.C. GEN. STAT. § 15A-153,
https://www.ncleg.gov/EnactedLegislation/Statutes/HTML/BySection/Chapter_15a/GS_15a-153.html (last visited Sept.7, 2025).

5

(a) Prior to permitting an individual to act as a TNC driver, the transportation network company must do all the following: (1) Require the individual to submit an application to the transportation network company, including, at a minimum, the following: a. Address. b. Age. c. Driver's license number. d. Driving history. e. Motor vehicle registration. f. Automobile liability insurance information. (2) Conduct, or have a third-party conduct, a local and national criminal background check for each applicant, including, at a minimum, the following: a. Multi-State/Multi-Jurisdiction Criminal Records Locator or other similar commercial nationwide database with validation (primary source search). b. National Sex Offender Registry. (3) Review, or have a third-party review, a driving history research report for such individual.

(b) The transportation network company must confirm that every TNC driver continues to meet all the requirements of this section every five years starting from the date the TNC driver met all the requirements of this section.

(c) The transportation network company must not permit an individual to act as a TNC driver if any of the following apply: (1) Has had more than three moving violations in the prior three-year period or one major violation in the prior three-year period, including attempting to evade the police, reckless driving, or driving on a suspended or revoked license. (2) Has been convicted within the past seven years of driving under the influence of drugs or alcohol, fraud, sexual offenses, use of a motor vehicle to commit a felony, or a crime involving property damage, theft, acts of violence, or acts of terror. (3) Is a match in the National Sex Offender Registry. (4) Does not possess a valid driver's license. (5) Does not possess proof of registration for the motor vehicle to be used to provide TNC services. (6) Does not possess proof of automobile liability insurance for the motor vehicle to be used to provide TNC services. (7) Is not at least 19 years of age.[16]

I did not see anything that would prohibit a TNC in North Carolina to impose additional standards.

## LOUISIANA

There are no restrictions beyond the FCRA on Consumer Reporting Agencies (CRA). This means that CRAs are free to research and report convictions indefinitely.[17]

Regulations affecting employers include a ban on requiring an applicant to pay for fingerprinting or the cost of any records required as a condition of employment. This includes medical exams and drug tests.[18]

Employers may not request or require an employee or applicant for employment to disclose any username, password, or other authentication information that allows access to the employee's or

---

[16] N.C. GEN. STAT. § 20-280.6, https://www.ncleg.gov/EnactedLegislation/Statutes/HTML/BySection/Chapter_20/GS_20-280.6.html.

[17] LA. R.S. 9:3571.1, https://www.legis.la.gov/Legis/Law.aspx?d=107688 (last visited Sept.7, 2025).

[18] LA. R.S. 23:897, https://legis.la.gov/Legis/Law.aspx?d=84006 (last visited Sept. 7, 2025).

6

applicant's personal online account not on an employer's computer.  However, an "employer shall not be prohibited" or restricted from "viewing, accessing, or utilizing information about an employee or applicant that can be obtained without the information specified[above] that is available in the public domain."[19]

## TEXAS

The Texas version of the FCRA statute was passed in 1997 after the September 30, 1996 cut off for state regulation of the content of consumer reports, thus FCRA standards should apply.

However, if it is assumed that the state law is not pre-empted by the FCRA, then the state law provides that conviction and non-conviction records are reportable by CRAs for only 7 years.[20] There is a salary exemption which states that if the salary is $75,000 or above, this restriction does not apply.[21]

There are no restrictions on users (employers) beyond the FCRA.

---

[19] LA. R.S. 51:1953, https://legis.la.gov/Legis/Law.aspx?d=919877 (last visited Sept. 7, 2025).

[20] TEX. BUS. & COM. CODE ANN. § 20.05, https://statutes.capitol.texas.gov/Docs/BC/htm/BC.20.HTM (last visited Sept. 7, 2025).

[21] *Id.*

7

**APPENDIX C**

**Bates/Control # Documents**

AB_00000001
ACCURATE001
CHECKR000746
CHECKR000748
CHECKR000752
CHECKR000756
CHECKR000760
CHECKR000859
CHECKR000861
CHECKR000865
CHECKR000868
CHECKR000876
UBER000138654
UBER000023755 (Matthew Baker, November 13, 2024 Dep. Ex. 0320)
UBER000203774
UBER000024576 (Matthew Baker, November 13, 2024 Dep. Ex. 0321)
UBER000232946 (Andi Pimentel, October 15, 2024 Dep. Ex. 0126)
Uber_DOE_0001025
Uber_DOE_0004472
Uber_DOE_0004545
Uber_DOE_0004544
Uber_DOE_0004976
Uber_DOE_0005092
Uber_DOE_0005093
Uber_DOE_0005138
Uber_DOE_0005775
Uber_DOE_0007526
Uber_DOE_0007578
Uber_DOE_0007566
Uber_DOE_0007980
Uber_DOE_0008056
Uber_DOE_0009055
Uber_DOE_0008056
Uber_DOE_0012124
Uber_DOE_0012121
Uber_DOE_0012162
Uber_DOE_0012131
Uber_DOE_0012138
Uber_DOE_0012240
Uber_DOE_0012278

1

Uber_DOE_0012335
Uber_DOE_0012246
Uber_DOE_0012227
Uber_DOE_0012194
Uber_DOE_0012300
Uber_DOE_0012210
Uber_DOE_0012341
Uber_DOE_0012181
Uber_DOE_0012385
Uber_DOE_0015426
Uber_DOE_0015514
Uber_DOE_0016670
Uber_DOE_0017830
Uber_DOE_0017832
UBER-MDL3084-000122023
UBER-MDL3084-000126221 (Jill Hazelbaker, June 17, 2025 Dep. Ex. 1186)
UBER-MDL3084-BW-00006406
UBER-MDL3084-BW-00007767
UBER-MDL3084-BW-00007778
UBER-MDL3084-BW-00012056
UBER-MDL3084-BW-00012371
UBER-MDL3084-BW-00012961
UBER-MDL3084-BW-00012965
UBER-MDL3084-BW-00028008
UBER-MDL3084-BW-00028164
UBER-MDL3084-BW-00028186
UBER-MDL3084-BW-00048915
UBER-MDL3084-BW-00048946
UBER-MDL3084-BW-00049263
UBER-MDL3084-BW-00049293
UBER-MDL3084-BW-00049303
UBER-MDL3084-DFS00003621
UBER-MDL3084-DFS00003652
UBER-MDL3084-DFS00049170
UBER-MDL3804-DFS00054679
UBER-MDL3084-DFS00061337
UBER-MDL3084-DFS00061339
UBER-MDL3084-DFS00061342
UBER-MDL3084-DFS00074473
UBER_JCCP_MDL_000005377
UBER_JCCP_MDL_000006602
UBER_JCCP_MDL_000031164 (Jordan Burke, March 20, 2025 Dep. Ex. 1904)
UBER_JCCP_MDL_000044279 (Cory Freivogel, February 6, 2025 Dep. Ex. 0045)

UBER_JCCP_MDL_000052715
UBER_JCCP_MDL_000066018
UBER_JCCP_MDL_000116180
UBER_JCCP_MDL_000118138
UBER_JCCP_MDL_000120466 (Rebecca Payne, April 2, 2025 Dep. Ex. 2513)
UBER_JCCP_MDL_000157415
UBER_JCCP_MDL_000163016
UBER_JCCP_MDL_000187586
UBER_JCCP_MDL_000192595
UBER_JCCP_MDL_000215613
UBER_JCCP_MDL_000223826 (Cory Freivogel, February 5, 2025 Dep. Ex. 0048 and Ex 0726)
UBER_JCCP_MDL_000242286 (Brooke Anderson, May 6, 2025 Dep. Ex. 0700)
UBER_JCCP_MDL_000334417
UBER_JCCP_MDL_000334436
UBER_JCCP_MDL_000334444
UBER_JCCP_MDL_000334445
UBER_JCCP_MDL_000334446
UBER_JCCP_MDL_000334447
UBER_JCCP_MDL_000355544
UBER_JCCP_MDL_000355848
UBER_JCCP_MDL_000366451
UBER_JCCP_MDL_000366465
UBER_JCCP_MDL_000366473
UBER_JCCP_MDL_000366477
UBER_JCCP_MDL_000386776
UBER_JCCP_MDL_000386909
UBER_JCCP_MDL_000388386
UBER_JCCP_MDL_000414420 (Gregory Brown, March 14, 2025 Dep. Ex. 1747)
UBER_JCCP_MDL_000414756 (Andi Pimentel, October 15, 2025 Dep. Ex. 0113)
UBER_JCCP_MDL_000423401 (Brooke Anderson, May 6, 2025 Dep. Ex. 0699)
UBER_JCCP_MDL_000479616
UBER_JCCP_MDL_000479709 (Chad Fogg, February 5, 2025 Dep. Ex. 0034)
UBER_JCCP_MDL_000515098
UBER_JCCP_MDL_000528326 (Jenny Lu, February 27, 2025 Dep. Ex. 0236)
UBER_JCCP_MDL_000536892
UBER_JCCP_MDL_000548326
UBER_JCCP_MDL_000551407 Cory Freivogel, February 6, 2025 Dep. Ex. 0044)
UBER_JCCP_MDL_000562385
UBER_JCCP_MDL_000572919
UBER_JCCP_MDL_000573350
UBER_JCCP_MDL_000868150

3

UBER_JCCP_MDL_000869101 (Chad Fogg, February 5, 2025 Dep. Ex. 0037)
UBER_JCCP_MDL_000873911 (Jenny Lu, February 27, 2025 Dep. Ex. 0226)
UBER_JCCP_MDL_000877307
UBER_JCCP_MDL_000877328
UBER_JCCP_MDL_000878710
UBER_JCCP_MDL_000878901 (Henry (Gus) Fuldner, March 27, 2025 Dep. Ex. 0401)
UBER_JCCP_MDL_000907613
UBER_JCCP_MDL_001072320
UBER_JCCP_MDL_001103192
UBER_JCCP_MDL_001113654 (Henry (Gus) Fuldner, March 27, 2025 Dep. Ex. 0425)
UBER_JCCP_MDL_001114139
UBER_JCCP_MDL_001164066 (Emilie Bowman, March 5, 2025 Dep. Ex. 1504)
UBER_JCCP_MDL_001284776 (Roger Kaiser, April 22, 2025 Dep. Ex. 0648)
UBER_JCCP_MDL_001430512
UBER_JCCP_MDL_001467724
UBER_JCCP_MDL_001467726
UBER_JCCP_MDL_001467727
UBER_JCCP_MDL_001467730
UBER_JCCP_MDL_001467732
UBER_JCCP_MDL_001467735
UBER_JCCP_MDL_001467800
UBER_JCCP_MDL_001468678
UBER_JCCP_MDL_001468692
UBER_JCCP_MDL_001527211
UBER_JCCP_MDL_001532561
UBER_JCCP_MDL_001533746
UBER_JCCP_MDL_001533756
UBER_JCCP_MDL_001534775 (Chad Fogg, February 5, 2025 Dep. Ex. 0030)
UBER_JCCP_MDL_001564637 (David Richter, February 24, 2025 Dep. Ex. 0163)
UBER_JCCP_MDL_001597777
UBER_JCCP_MDL_001598072
UBER_JCCP_MDL_001607725
UBER_JCCP_MDL_001611978
UBER_JCCP_MDL_001614047
UBER_JCCP_MDL_001614960
UBER_JCCP_MDL_001614962
UBER_JCCP_MDL_001614964
UBER_JCCP_MDL_001614966
UBER_JCCP_MDL_001614968
UBER_JCCP_MDL_001621312
UBER_JCCP_MDL_001621314
UBER_JCCP_MDL_001621316

4

UBER_JCCP_MDL_001624411 (David Richter, February 24, 2025 Dep. Ex. 0164)
UBER_JCCP_MDL_001665531
UBER_JCCP_MDL_001779666
UBER_JCCP_MDL_001779668
UBER_JCCP_MDL_001779670
UBER_JCCP_MDL_001779678
UBER_JCCP_MDL_001805515
UBER_JCCP_MDL_001805806
UBER_JCCP_MDL_001806482
UBER_JCCP_MDL_001822794
UBER_JCCP_MDL_001863426
UBER_JCCP_MDL_001866326
UBER_JCCP_MDL_001872228 (Nairi Hourdajain, February 7, 2025 Dep. Ex. 0074)
UBER_JCCP_MDL_001951309 (Meghan Joyce, February 26, 2025 Dep. Ex. 0192)
UBER_JCCP_MDL_001973995
UBER_JCCP_MDL_001981496
UBER_JCCP_MDL_001985812
UBER_JCCP_MDL_001987102 (David Richter, February 24, 2025 Dep. Ex. 1106)
UBER_JCCP_MDL_002001013
UBER_JCCP_MDL_002002324
UBER_JCCP_MDL_002002352
UBER_JCCP_MDL_002059181
UBER_JCCP_MDL_002071361
UBER_JCCP_MDL_002085137
UBER_JCCP_MDL_002086422 (David Richter, February 24, 2025 Dep. Ex. 0145)
UBER_JCCP_MDL_002092166 (David Richter, February 24, 2025 Dep. Ex. 0144)
UBER_JCCP_MDL_002304885
UBER_JCCP_MDL_002341375 (Jenny Lu, February 27, 2025 Dep. Ex. 0240)
UBER_JCCP_MDL_002341382
UBER_JCCP_MDL_002384912
UBER_JCCP_MDL_002388171
UBER_JCCP_MDL_002415315
UBER_JCCP_MDL_002448325
UBER_JCCP_MDL_002452295
UBER_JCCP_MDL_002455977
UBER_JCCP_MDL_002465242
UBER_JCCP_MDL_002468154
UBER_JCCP_MDL_002473691
UBER_JCCP_MDL_002490244
UBER_JCCP_MDL_002561823
UBER_JCCP_MDL_002571683

UBER_JCCP_MDL_002985023 (Meghan Joyce, February 26, 2025 Dep. Ex. 0194)
UBER_JCCP_MDL_002996150 (David Richter, February 24, 2025 Dep. Ex. 0141)
UBER_JCCP_MDL_003302202
UBER_JCCP_MDL_003363350
UBER_JCCP_MDL_003366437
UBER_JCCP_MDL_003668295
UBER_JCCP_MDL_003601373
UBER_JCCP_MDL_004918642
UBER_JCCP_MDL_004528841
UBER_JCCP_MDL_004528848
UBER_JCCP_MDL_004652999
UBER_JCCP_MDL_004918630
UBER_JCCP_MDL_004918640
UBER_JCCP_MDL_004918642
UBER_JCCP_MDL_004980852
UBER_JCCP_MDL_005060062
UBER_JCCP_MDL_005166820
UBER_JCCP_MDL_005179023
UBER_JCCP_MDL_005184539
UBER_JCCP_MDL_005184891
UBER_JCCP_MDL_005415073
#10539.1 (In re Uber - Accurate Document Production 4.24.24)
#12690.1 (David Richter, February 24, 2025 Dep. Ex. 0159)

**Depositions & Exhibits**

Deposition of Brooke Anderson, May 6, 2025
Deposition of Matthew Baker, June 24, 2022
Deposition of Matthew Baker, November 13, 2024
Deposition of Emilie Boman, March 5, 2025
Deposition of Gregory Brown, March 14, 2025
Deposition of Gregory Brown, May 7, 2025
Deposition of Jordan Burke, March 20, 2025
Deposition of Phillip Cardenas, April 26, 2025
Deposition of Chad Fogg, February 5, 2025
Deposition of Cory Freivogel, February 6, 2025 (Vol. II)
Deposition of Henry (Gus) Fuldner, March 26, 2025
Deposition of Henry (Gus) Fuldner, March 27, 2025
Deposition of Jill Hazelbaker, June 17, 2025
Deposition of Nairi Hourdajain, February 7, 2025
Deposition of Meghan Joyce, February 26, 2025 (Vol. I)
Deposition of Roger Kaiser, April 22, 2025
Deposition of Jenny Luu, February 27, 2025

6

Deposition of Hannah Nilles, May 5, 2025
Deposition of Hannah Nilles, May 14, 2025 (Vol. II)
Deposition of Hannah Nilles, May 29, 2025 (Vol. III)
Deposition of Hannah Nilles, June 30, 2025
Deposition of Hannah Nilles, July 10, 2025
Deposition of Hannah Nilles, August 7, 2025 (Vol. II)
Deposition of Hannah Nilles, August 7, 2025 (Vol. III)
Deposition of Katie Parker, December 3, 2024
Deposition of Rebecca Payne, April 2, 2025
Deposition of Andi Pimentel, October 15, 2024 (Vol. I)
Deposition of David Richter, February 24, 2025
Deposition of Nicholas Silver, November 21, 2024
Deposition of Hassan Turay, July 23, 2025
Deposition of Sunny Wong, April 16, 2025
Deposition of Sunny Wong, July 23, 2025

**Statutes**

15 U.S.C. § 1681a(d)
15 U.S.C. § 1681a(f)
15 U.S.C. § 1681a(h)
15 U.S.C. § 1681o
15 U.S.C. § 1681t
42 U.S.C.A. §14616, art. IV(b)
ARIZ. REV. STAT. § 28-9555
Cal. Assembly Bill AB 1844 (2012)
CAL. CIV. CODE § 1786 et seq
CAL. CIV. CODE § 1786.28
CAL. CODE REGS. tit. 2 § 11017.1(b)(5)
CAL. GOV'T CODE § 12952
CAL. PENAL CODE § 290.46
CAL. PUB. UTIL. § 5430 *et seq*.
CAL. PUB. UTIL. § 5445.2
COLO. REV. STAT. § 40-10.1-605
CONN. GEN. STAT. § 13b-119(a)(2)
GA. CODE ANN. §§ 40-1-193(c)(2); 40-5-39(a)-(b), (e)(1)
LA. ADMIN. CODE tit. 70, pt. IX, § 5013 (2025)
LA. R.S. 9:3571.1
LA. R.S. 23:897
LA. R.S. 51:1953
N.C. GEN. STAT. § 15A-153
N.C. GEN. STAT. § 20-280.6
N.J. Rev. Stat. § 39:5H-17(a)
N.J. REV. STAT. § 39:5H-17(e)
Pub. L. 92-544
TEX. BUS. & COM. CODE ANN. § 20.05

TEX. OCC. CODE ANN. § 2402.107
UTAH CODE ANN. § 13-51-107

**Publicly Available Sources**

*70% of Employees are Snooping Candidates' Social Medial Profiles,* CAREER BUILDER,
https://www.careerbuilder.com/advice/blog/social-media-survey-2017.

*About Our Program,* Professional Background Screeners Association,
https://www.pathlms.com/pbsa/courses/70393.

*About Screening,* Professional Background Screeners Association (PBSA),
https://www.thepbsa.org/resources/about-screening/.

Adam Vaccaro, *Boston Police Begin Fingerprinting Cab Drivers,* BOSTON GLOBE (Feb. 22,
2016), https://www.boston.com/news/business/2016/02/22/boston-police-begin-fingerprinting-
cab-drivers/.

*An Analysis of the Labor Market for Uber's Driver-Partners in the United States,* NAT'L BUREAU
OF ECON. RSCH (Nov. 2016),
https://www.nber.org/system/files/working_papers/w22843/w22843.pdf.

Anton Vedsin, *Understanding Global Watch Lists,* VESPIA (June 26, 2024)
https://vespia.io/blog/global-watch-lists.

CHECKR, https://checkr.com/.

*Country Inquiry,* STRAIGHTLINE INT'L,
https://straightlineinternational.com/country/?continent=Africa.

*Driver Screening,* UBER, https://www.uber.com/us/en/ride/safety/driver-screening/.

*DRUID,* APP STORE, https://apps.apple.com/us/app/druidapp/id1107595146.

*DRUID,* GOOGLE PLAY,
https://play.google.com/store/apps/details?id=com.owl.druid&hl=en&pli=1.

*DRUID, Impairment Sci., Inc.*, https://www.impairmentscience.com/.

EEOC Decision No. 915.002, Enforcement Guidance on the Consideration of Arrest and
Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act (2012),
https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-
records-employment-decisions#sdendnote122sym.

*EEOC Informal Discussion Letter,* EEOC, https://www.eeoc.gov/foia/eeoc-informal-discussion-
letter-281 (last modified May 7, 2013).

8

Fair and Accurate Credit Transactions Act of 2003, 15 U.S.C. § 1681,
https://www.govinfo.gov/content/pkg/PLAW-108publ159/html/PLAW-108publ159.htm.

*Fair Credit Reporting Act,* 15 U.S.C § 1681 (Sept. 2018),
https://www.ftc.gov/system/files/documents/statutes/fair-credit-reporting-act/545a_fair-credit-reporting-act-0918.pdf.

*FAQ, "Transportation Network Company" Information,* ARIZ. DEP'T. OF TRANSP.,
https://azdot.gov/mvd/services/professional-services/vehicle-hire-licensing/faq#:~:text=%22Transportation%20Network%20Company%22%20Information&text=Requires%20a%20TNC%20to%20obtain,the%20permit%20in%20the%20vehicle.

*Fingerprint Background Checks*, OFF. OF ATT'Y GEN., https://oag.ca.gov/fingerprints.

*Francisco Covarrubias Sentenced to 35 Years for Horrific Abuse of 3-year-old Girl,* MARCICOPA CNTY ATT'Y'S OFF. (Oct. 23, 2018),
https://maricopacountyattorney.org/CivicAlerts.aspx?AID=520.

GAO, CRIMINAL HISTORY RECORDS – ADDITIONAL ACTIONS COULD ENHANCE THE COMPLETENESS OF RECORDS USED FOR EMPLOYMENT-RELATED BACKGROUND CHECKS (Feb. 2015), https://www.gao.gov/assets/gao-15-162.pdf.

GAO, RIDESHARING AND TAXI SAFETY - INFORMATION ON BACKGROUND CHECKS AND SAFETY FEATURES (Sept. 2024), https://www.gao.gov/assets/gao-24-107093.pdf.

*Get a TLC Drivers License,* NYC TAXI & LIMOUSINE COMM'N,
https://www.nyc.gov/site/tlc/drivers/get-a-tlc-drivers-license.page.

*Global Watchlist Search,* CHECKR (Mar. 13, 2025),
https://help.checkr.com/s/article/360001951208-Global-watchlist-search#:~:text=Checkr's%20global%20watchlist%20search%20identifies,Interpol's%20Most%20Wanted.

*Guide to Global Watchlist Searches,* CHECKR (June 16, 2025),
https://checkr.com/resources/articles/global-watchlist.

*International Background Checks*, CHECKR, https://checkr.com/international-background-checks.

*Leadership, Gus Fuldner,* UBER, https://www.uber.com/us/en/about/leadership/gus-fuldner/.

*Legal Library: Advisory Opinions*, FTC, https://www.ftc.gov/legal-library/browse/advisory-opinions.

Matthew J. Rodgers, *Global Watchlist Search: A Complete Guide for Employers [2025],*
IPROSPECTCHECK (Apr. 8, 2025) https://iprospectcheck.com/global-watchlist-search/.

9

Miriam Mathews, *Assessing the Use of Employment Screening for Sexual Assault Prevention*, RAND CORP. (Mar. 9, 2017), https://www.rand.org/pubs/research_reports/RR1250.html.

*Only on Uber: Helping to Make Driving and Delivering Safer, Fairer, and Easier,* UBER (Sep. 17, 2024), https://www.uber.com/newsroom/onlyonuber24/.

Owens OnLine, https://www.owens.com/.

*Praesidium*, LINKEDIN, https://www.linkedin.com/company/praesidium-inc-/.

PRAESIDIUM, UNDERSTANDING NEGLIGENT HIRING: PREVENTING SEXUAL ASSAULT THROUGH COMPREHENSIVE SCREENING PACKAGES 11, https://resig.org/wp-content/uploads/2024/11/5634b482f2.pdf.

Rand Project Air Force, *RAND Research on Harmful Interpersonal Behaviors*, RAND CORP. 2 (Nov. 16, 2023), https://www.rand.org/pubs/corporate_pubs/CPA2660-1.html.

*Research on Cognitive and Motor Impairment Testing*, IMPAIRMENT SCI., INC., https://www.impairmentscience.com/research.

*Social Security Number Verifications*, SSA, https://www.ssa.gov/employer/verifySSN.htm.

STRAIGHTLINE INT'L, https://straightlineinternational.com.

*TLC License*, UBER, https://www.uber.com/us/en/drive/requirements/get-a-license/tlc-license/.

Todd Feathers, *Lawsuits Allege Gig-Economy Workers Fall Victim to Checkr's Artificial Intelligence*, UNION LEADER (Mar. 3, 2019), https://www.unionleader.com/news/business/lawsuits-allege-gig-economy-workers-fall-victim-to-checkr-s/article_37df2830-df83-5b19-b090-31556804d8d4.html.

*Uber and Lyft's Arguments Against Fingerprinting Make Little Sense,* WASH. POST, (Jan. 2, 2017), https://www.washingtonpost.com/opinions/uber-and-lyfts-arguments-against-fingerprinting-make-little-sense/2017/01/02/a0926aae-ce1b-11e6-b8a2-8c2a61b0436f_story.html.

*Uber Driver Accused of Sex Assault*, ABC13 (Apr. 7, 2013), https://abc13.com/post/uber-driver-accused-of-sex-assault/638344/ (Nairi Hourdajain, February 7, 2025 Dep. Ex. 0093).

*Uber, Lyft Resist Plan to Fingerprint,* SEN. TROY SINGLETON (July 7, 2025), https://www.troysingleton.com/uber_lyft_resist_plan_to_fingerprint.

*Uber – Safety Never Stops, Innovative Safety Video,* CAMPAIGNS OF THE WORLD (Apr. 6, 2019) https://campaignsoftheworld.com/digital-campaigns/uber-safety-never-stops/.

UBER TECHNOLOGIES, INC., U.S. SAFETY REPORT 2017-2018 ("Uber's Safety Report"), at 11 (Dec. 5, 2019), https://www.uber-

10

assets.com/image/upload/v1575580686/Documents/Safety/UberUSSafetyReport_201718_FullR
eport.pdf?uclick_id=02a9dfbc-01d9-46c9-9a2a-fe64c5610474.

U.S. Dep't of Just., The Attorney General's Report on Criminal History Background
Checks 4-5 (June 2006),
https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/ag_bgchecks_report.pdf.

U.S. Dep't of Just., Bureau of Just. Stats., Survey of State Criminal History
Information Systems, 2014 (Dec. 2015), https://www.ojp.gov/pdffiles1/bjs/grants/249799.pdf.

*What Background Checks Look For,* Uber, https://help.uber.com/driving-and-
delivering/article/what-background-checks-look-for?nodeId=ee210269-89bf-4bd9-87f6-
43471300ebf2.

**Other**

Lisa Worgull, Organizational Head of Knowledge, Truview BSI, LLC, Presentation at PBSA:
Employment Verifications United States (Oct. 2024).

PBSA, Criminal Records – United States (February 2024).

Sarah Foster, Compliance Manager, Verisk, Presentation at PBSA: Education & Professional
Credential Verifications – U.S. (Dec. 2024).

Sarah Lageson & Robert Stewart, *The Problem With Criminal Records: Discrepancies Between
State Reports and Private-Sector Background Checks,* Criminology, Vol. 62, Issue 1, 5 (2024).

*Philliben et al. v. Uber Technologies, Inc. et al.,* N.D. Cal. Case No. 4:14-cv-05615-JST, Dkt. 1
(Nairi Hourdajain, February 7, 2025 Dep. Ex. 0089).

11