# C.4

# EXHIBIT 8

## EXHIBIT FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION


***CONFIDENTIAL***

VIDEOTAPED 30(b)(6) DEPOSITION OF
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC
GREG BROWN

IN RE: UBER TECHNOLOGIES, INC.,
PASSENGER SEXUAL ASSAULT LITIGATION

MDL No. 3084 CRB

---

DEPONENT:        GREG BROWN

DATE:            July 15, 2025

TIME:            9:43 a.m.

LOCATION:        NELSON MULLINS
                 CHARLESTON, SC

REPORTED BY:     JESSICA BOLANOS

A.  I understand you want a yes/no answer, I think it just merits a bit more context around that --

Q.  Why can't --

A.  -- particular circumstance.

Q.  Sorry.  Why can't you answer that with a yes?

A.  I don't think I can speak for the expectations of all users on the platform.

Q.  With respect to the topic that you're designated on, which is Uber's training of Mr. Turay, did Uber tell Mr. Turay that he would be trusted by riders not to take advantage of them sexually?

A.  Yeah, my understanding is that would have been conveyed in the community guidelines that I believe would have been furnished to him.

Q.  You believe the community guidelines explain the reason behind the no-sex rule or the no-contact rule, that it's because of that trust that riders have in drivers?

A.  I -- I don't know whether the community guidelines opine upon the reason as you mentioned.

Q.  Do they -- did Uber ever communicate to

Mr. Turay that when he transports people who are intoxicated, that they may be less able to respond to voice their nonconsent, they may be too scared, they may be too surprised to run, scream, or say something?  Did they teach him that?

A.  I would have to re-review the educational content to be able to answer confidently as to whether or not that specific phrasing or circumstantial scenario was opined upon, but I'm not sure whether or not the educational content specifically would have included that type of language.

Q.  As you sit here today as the person speaking for Uber about its training of Mr. Turay, you can't point the jury to a specific communication where Mr. Turay said -- where Uber said to Mr. Turay that intoxicated riders may not be able to voice their nonconsent; is that correct?

A.  As I mentioned, they're -- I would have to re-review the content available in the Learning Center for Mr. Turay.

Q.  Right.  But my question is:  As you sit here today as the person speaking for Uber about

its training of Mr. Turay, you can't at this time point to a specific communication where Mr. -- or Uber said to Mr. Turay that intoxicated riders might not be able to voice their nonconsent; is that correct?

A.    Yeah, as I sit here, I -- I'm not sure.

Q.    You can't, right?

A.    I can't.

Q.    What did Uber do when it onboarded Mr. Turay to make sure that he understood and appreciated the no-sex, no-contact rule in the community guidelines?

A.    As I mentioned, in the course of preparation, I understand that over time Uber would have sent via email links to those community guidelines, et cetera.  I believe circa 2021, Uber would have rolled out an affirmative assent process or confirmation process associated with its community guidelines as a mechanism to help build better awareness, which I believe also would have included the, I think as you said, no-sex rule on Uber.

MS. PETERS:  Let's go ahead and mark Tab 116 as Exhibit 1680.

the nature of it.



Q.   So here we have a line in the data from

And if you look at the date and time, it's 11-15-23 at 12:38 a.m.  So that's during the subject trip, right?

A.   Yeah, that's my understanding.

Q.   Is it possible that Uber actually is in possession of audio-recording of the subject trip up until the point that the driver pushed the

Greg Brown  Confidential
July 15, 2025

button to end the trip?

          MS. LEVY:  Object to form and
foundation.  You can answer.

     A.  I'm not sure.

          MS. LEVY:  I will state for the
record this is the question you specifically
asked us to look into, and we are looking into
it.

          MS. PETERS:  Okay.  I'm putting it
on my follow-up list.

          MS. LEVY:  Great.

          MS. PETERS:  Continued follow-up.

     Q.  And just because you're the person
officially speaking for Uber on investigations,
have you looked to see whether there is any
audio-recording data?

     A.  I have not.