# C.8

# EXHIBIT 59

## EXHIBIT FILED UNDER SEAL

**Brief for Ron Sugar and Tony West**
**Stockholder Engagement with Columbia Threadneedle**
**Friday, November 6th, 10 am to 11 pm PT**

**Logistics:**

| Dial-in | • **Zoom:** Link<br>• **Dial-in:** (669) 900-6833; **Meeting ID:** 968 9280 9232; **Password:** 685743 |
|---|---|
| **Reference Materials:** | • *Appendix A*: Investor Profile<br>• *Appendix B*: Off-season Investor Engagement Deck<br>• *Appendix C*: Q3 Earnings Q&A Prep (ESG version)<br>• *Appendix D*: Written Responses to Investor<br>• *Appendix E*: Sample Response and IR Cheat Sheet on Worker Earnings<br>• *Appendix F*: Policy/Comms Plan and Q&A for ▬▬▬▬ |
| **Attendees** | Uber:<br>• **Ron Sugar**, Independent Chair<br>• **Tony West,** CLO and Corporate Secretary (optional)<br>• **Keir Gumbs**, AGC, Corporate and Deputy Corporate Secretary<br>• **Marian Macindoe**, Head of ESG Engagement & Strategy<br>• **Bobby Wu**, Legal Director, Capital Markets, Governance & Securities<br>• **Terra Castaldi**, Legal Director, Global Executive Compensation & Benefits<br>• **Edwin Linares**, Director of Executive Compensation<br><br>Columbia Threadneedle:<br>• **Malcolm (Mac) Ryerse**, Head of Stewardship & Resp. Investing<br>• **Ben Kelly,** Senior Thematic Analyst & Behavioural Economist<br>• **Christopher Vandergrift**, US Analyst |

**Background:**

| **Engagement to Date** |
|---|
| • Owns ~7.4m shares, and is Uber's 32nd largest stockholder.<br><br>• ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬ (see Appendix A for notes from engagement)<br><br>• Several written follow-up questions focused on ▬▬▬▬▬ following initial meeting<br>    ○ See Appendix D for reference on written responses provided by engagement team to date<br><br>• ▬▬▬▬▬▬▬▬<br><br>• ▬▬▬▬▬▬▬▬▬▬▬▬▬▬<br>  ▬▬▬▬▬▬▬▬▬▬▬<br><br>• ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬<br>  ▬▬▬▬▬▬▬ |
| **Agenda** |

CONFIDENTIAL

UBER_JCCP_MDL_005579342

The agenda items Columbia Threadneedle intends to cover on the call are listed below, including sample responses and background prep materials on each topic:

- ███████████████████████████████████████████████████████████
  ██████████████████ ██ ██████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ████████████████████████

  - Prep Material: See Appendix E for sample response and additional resources on ██████████

  - May defer detailed/statistical questions from Columbia Threadneedle economist or other questions that cannot be immediately answered to follow-ups for the engagement team

- ██████████████████████

  - Prep Material: See Appendix F for Policy/Comms internal plan and sample Q&A ███████████████ ██

- ██████████████████████

  - ████████████████████████████████████████████████

  - ████████████████████████████████████████████████
    ████████████████████████████████s

  - Prep Material: See Slides 7 and 8 of Investor Engagement Deck for ██████████████████████

2

CONFIDENTIAL

UBER_JCCP_MDL_005579343

## Appendix D

*Do you have any external benchmark to compare the safety to? When I discuss the safety record with PMs, my view without supporting evidence has been that Uber is just as safe as other forms of transit if not perhaps safer given the authenticate mechanism.*

It's rather difficult to compare with other forms of transportation as there simply isn't as much transparency about safety records. As you know, Uber released its US Safety Report in December 2019. The report is the first (and still the only) comprehensive publication of its kind to be voluntarily issued by any company. Hopefully, other forms of transit will follow Uber's lead on this. We believe that keeping information secret doesn't help make anyone safer.

There are a few external benchmarks for these issues that can provide some external context, but given drastically different methodologies, data standards, user populations, and differing standards and policies in safety, it's always difficult to make apples-to-apples comparisons.

· For motor vehicle fatalities, the Uber-related motor vehicle fatality rate for 2017 and 2018 was about half the national average. (See pg 51-52 in Uber's US Safety Report for more detail on this comparison).

· For sexual assault, as you can imagine, we are one of very few companies involved in transportation that share any data related to sexual assault in relation to it's business, so external benchmarks in taxis, other rideshare, buses, airlines, etc. are largely unknown. But for example, in 2017 and 2018 Uber reported 5,981 incidents of critical sexual assault related to Uber (ranging from sexual touching/kissing to non-consensual sexual penetration) from riders and drivers *nationally, across all of Uber's US market*. For one comparison, the NYPD received 1,125 complaints of sex offenses in NYC's transit system during the same time period (2017 & 2018). But that's just *one city*. And again, due to reporting differences, methodologies, criminal complaints vs. non-criminal complaints, a direct comparison is incredibly difficult. Please see the US Safety Report for more detail on the Uber metrics. Since roughly 44% of US women and nearly 25% of US men will be the victim of contact sexual violence in their lifetimes, we know these are societal issues that manifest in virtually every form of transportation and public space.

*You have teamed up with a number of external organizations to develop/enhance safety standards and Uber has made significant public commitments. But what is the single most important internal change needed to improve and assure driver and rider safety?*

We think the single most important change that was needed to improve safety on our platform was setting the tone and reforming the culture from the top. This started in 2017 when Dara came on board as CEO and declared safety as a top company priority, and reformulated our cultural values making "Do The Right Thing. Period." our new North Star. This signalled to all teams that safety was a non-negotiable part of all our work moving forward.

Making safety a priority also meant that we needed to put more resources toward it including growing our safety infrastructure and tripling the size of our safety team, creating a dedicated safety product team that focuses solely on improving safety in the app, hiring people with backgrounds in advocacy and education, having dedicated people focused on safety in each cross-functional team, etc. All of this ensured that we were building safety into our policies, products, and processes.

Working with external groups makes us more accountable because in order to build trust we need to follow through on our commitments and incorporate their feedback consistently. In our view, the best way to be accountable is to be transparent about our safety record and our plans to improve on that. In order to continue improving platform safety going forward, we have to continue this commitment to accountability and transparency, continuing to push the envelope and innovate quickly as safety needs evolve (e.g. health safety in

3

UBER_JCCP_MDL_005579344

the era of COVID), continue listening to stakeholder and expert feedback, and continuing to be data-driven in our approaches.

4

CONFIDENTIAL

UBER_JCCP_MDL_005579345

**Appendix E**

*Question from Investor (Agenda Item #1): My biggest remaining outstanding question remains are drivers receiving fair/reasonable wages under an independent contractor model.* ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ *The more that your team could do to really explain what drivers earn and why it's a fair wage with reasonable benefits would be extremely helpful for us and investors as well as all stakeholders including riders, communities, the media, and politicians.*

Earnings with Uber vary depending on whether workers are active at times and in places when and where demand is highest. For example, those that use the Uber app to earn in peak times of the week, in areas of high demand or in the busiest months of the year, earn more than the average. Independent workers using apps like Uber's have total autonomy and decide when and where to drive and for how long, including on other apps. As a result, with Uber there is no concept of a fixed hourly wage, like with more traditional jobs.

- Drawing on a few recent driver studies:

    - A recent Cornell University study on rideshare drivers in Seattle found that 92% of drivers using Uber and Lyft earn more than the City's $16.39 minimum wage after expenses, with the median driver earning $23.25 per hour after expenses.

    - A recent Maastricht University study found drivers using the Uber app in Amsterdam made €24.48 per hour on average in 2019, after deduction of Uber's service fee and VAT. When online 40 hours per week, a driver would make €4,240 per month. Earnings per hour have increased by 8% over the past 3 years (corrected for inflation).

- However, most platform work is not a high-wage option.

- To this end, we have developed and are testing a digital tool called the Earnings Estimator that will enable drivers to estimate their potential earnings. This tool, which we are currently piloting in cities across the U.S., uses historical earnings data along with a few simple user inputs to estimate weekly earnings, allowing drivers to make more informed decisions about whether, when, and where to drive. Where data is available and reliable, we will provide transparency to drivers on what they can expect to earn. By the end of 2020, we have committed to making the Earnings Estimator available to more than 40% of active U.S. drivers in more than 30 cities.

- In thinking about earnings on our platform, we believe that the median earnings compares favorably to hours-based employment models, including food service and transportation services.

From Cornell study:

5

CONFIDENTIAL

UBER_JCCP_MDL_005579346



Chart 1.14: Seattle hourly earnings among benchmark jobs

CONFIDENTIAL

UBER_JCCP_MDL_005579347

**Cheat Sheet for Investor Relations on Work/Earnings**

| | |
|---|---|
| Miriam Chaum (Work Policy)<br>Nick Zabriskie (Work Policy)<br>Libby Mishkin (Policy Research) | Purpose<br>Earnings Studies<br>Driver Studies/Surveys<br>Other Helpful Resources |

## PURPOSE

This note includes a number of publicly available studies, statistics, and talking points which may be useful to the Investor Relations team in their engagements with investors who have questions on work-related issues.

## EARNINGS STUDIES

- A recent Cornell University study on rideshare drivers in Seattle found that 92% of drivers using Uber and Lyft earn more than the City's $16.39 minimum wage after expenses, with the median driver earning $23.25 per hour worked, after expenses.
- A recent Maastricht University study found drivers using the Uber app in Amsterdam made €24.48 per hour online on average in 2019, after deduction of Uber's service fee and VAT. When online 40 hours per week, a driver would make €4,240 per month. Earnings per hour have increased by 8% over the past 3 years (corrected for inflation).

## DRIVER STUDIES/SURVEYS

Driver research synopsis

- This May 2020 survey of U.S. drivers found that 71% of drivers want to be independent contractors.
- This May 2020 survey of California drivers and delivery people found that:
    - More than 7 in 10 workers supported measures that would protect their right to be independent contractors
    - 2 in 3 workers said they would stop driving if their flexibility was compromised.
- This July 2020 survey of U.S. drivers and delivery people found that:
    - 69% of all drivers and 66% of drivers identifying as full-time prefer to be classified as an independent contractor rather than an employee
    - 86% of drivers say a reason they chose app-based driving was to have flexibility in their schedule
    - 86% of drivers agree that they would no longer be able to drive if it didn't offer a flexible schedule.
    - When asked whether or not they would continue to drive if drivers were reclassified as traditional employees, 70% of drivers said they would not want to continue driving.
- This October 2020 survey of U.S. drivers found that:
    - Out of California respondents, 68.8% said they wanted to remain independent contractors. Only 11.5% wanted to become employees, and 19.5% are undecided or said they didn't know which classification they preferred.
    - Nationwide, 79% of respondents want to remain independent contractors, with 13% expressing the desire to become employees and 8% responding they weren't sure/didn't know.

7

CONFIDENTIAL

UBER_JCCP_MDL_005579348

## OTHER HELPFUL RESOURCES

- Uber blog post showing that the 9% of "full-time" California drivers who averaged at least 40 hours online on Uber completed 25% of trips. The Cornell study found that the top 5% of drivers in Seattle (according to active hours on Uber + Lyft) were responsible for 17% of passenger hours.
- Uber blog post explaining why flexibility and employment status for gig workers are incompatible.
- Uber blog post showing impact of reclassification on Uber prices and work opportunities in California.
- Uber blog post showing impact of reclassification of couriers in Geneva.
- Uber blog post showing impact of reclassification on Uber prices and work opportunities in the U.S.
- Metrics in a Box
- Approved Public Metrics

## BROADER CONTEXT

**Access - Independent work vs traditional work:** Opportunities to earn money are limited in most economies. Independent options like platform work (rideshare driving, delivery, etc) tend to have lower barriers to entry, making them easier to access than most other earnings opportunities. Every hurdle a worker must clear in order to begin earning money decreases access - from extra click-throughs to extra documentation needed to government training, licensing, and other requirements. Traditional work typically has high barriers to entry/low access to earnings. Increasing barriers to entry/decreasing access can benefit incumbent workers because lowering the labor supply enables them to command higher wages. However this reduced access harms job-seekers as employers become more choosy about the employment offers they extend, often disproportionately impacting vulnerable/historically disadvantaged communities.

**Flexibility - Independent work vs traditional work:** Independent work offers workers *Flexibility* that is not common in traditional work. The independent worker has the *choice* to work: 1) if they want; 2) when they want; and 3) for as many entities willing to contract them as they want. This flexibility is one of the primary reasons workers say they choose to engage in platform work. It allows them to fit work around their schedules and personal needs instead of having to show up for a specific shift. Flexibility is valuable both to those who work very little on any given platform and those who work for a single platform the equivalent of a traditional full time job or more because there are no penalties if the worker has to stay home to take care of children or elderly parents for the day, for example, or if they decide to work for a direct competitor within the same hour. This is not the norm with traditional work, where you are expected to give your time to employers in exclusive increments like shifts and where taking the same kinds of liberties whenever you like could end up costing you your job.

**Earnings protections ("minimum wage," "pay standards," "earnings regulations," etc):** Traditional shift workers over the past few centuries banded together and collectively bargained with employers for higher, more certain wages in exchange for their exclusive time. Governments codified these gains as hourly minimum wage requirements across numerous industries. Today, the virtues of hourly minimum wage protections are broadly accepted. However that does not mean that it is appropriate to apply earnings protections from traditional shift work to independent platform work. Who should pay a platform worker for their time if in a given hour they were logged into multiple platforms and provided rides and deliveries for competitors while simultaneously offering their skills at Ikea assembly on another platform? While perhaps not a representative example, it does illustrate

8

CONFIDENTIAL

UBER_JCCP_MDL_005579349

the clear complexities inherent in policy interventions designed to increase platform worker earnings. Interventions can quickly lead to unintended harm to independent platform workers in the form of reduced flexibility in the work and possibly even the loss of access to the earnings opportunity altogether.

**The challenges of applying traditional earnings protections to independent platform work:**
- The concept of dividing earnings by the number of hours worked, or earnings-per-hour (EPH), comes from traditional work. It is easy to calculate and then compare against minimum wage requirements. Evaluating hourly earnings from platform work *feels* like it should make sense, but it is actually complex and often misleading.
- On the practical level, it is difficult to agree how EPH should be measured for platform workers.
  - *Should gross earnings include tips, incentives, or simply just base fares?*
  - *How much of the worker's time logged into a platform should really count as work?* In other words, how many hours are you dividing by? Is it all time online, or only the time spent working? The larger the number of hours in the denominator, the lower a worker's EPH will seem to be);
  - Similarly, while there are certainly costs associated with earning on a platform, *what is a fair and reasonable estimation of those costs?* The higher the costs a worker is estimated to incur, the lower their EPH will seem to be.
- That's because comparing traditional work to independent work is "apples to oranges," they are fundamentally not the same thing:
  - Independent workers generally *are paid by the job* not the hour.
  - Independent workers who have flexibility do not give their time exclusively to one company. They can choose to work or not work and can combine multiple jobs into any given hour, so it's not clear *who should be responsible for paying for their time.*
  - As such, they have flexibility, which has a quantifiable value ($150/week for Uber drivers in 2017).[1] Platform workers take advantage of flexibility to respond to outside income shocks.[2][3][4] Women, young people, and low-income people tend to value flexibility most.[5] Flexibility, not earnings maximization, is the main draw of platform work for most workers. While workers may want to see their earnings increase or to receive additional benefits and protections, a majority say they *do not want to trade away their flexibility to get those things.*[6]
  - While workers may benefit from understanding the upper bounds of their EPH for making informed decisions about whether platform work makes sense for them, there is limited public policy benefit in measuring a) how much someone made in a given hour on one platform if they retain flexibility to pick and choose which jobs to complete while possibly earning money from other sources, and then comparing that to b) how much they could have made per hour under minimum wage.

**Reclassification and NYC and Seattle Earnings Standards:**

---

[1] Chen et al. (2017)

[2] Farrell et al., 2019

[3] Koustas (2018)

[4] Abraham and Houseman, 2019

[5] Chen, Chevalier, Rossi, Currier

[6] 71% of drivers prefer to remain independent, according to a poll conducted by the Rideshare Guy in May 2020 (supported by numerous public surveys over the years). 72% of drivers support Prop. 22, see this survey for the results and more data showing why flexibility is so valued by drivers. More than 92,200 California drivers (and counting) have joined the Prop 22 coalition. July 2020 polling of US drivers: 77% of Drivers say flexibility is more important than receiving benefits; 86% of Drivers say a reason they chose app-based driving was to have flexibility in their schedule (71% say this was a major reason) and 86% of Drivers agree that they would no longer be able to drive if it didn't offer a flexible schedule; 70% of Drivers said they would not want to continue driving if reclassified as employees.

9

UBER_JCCP_MDL_005579350

- CA AB5: Today independent platform workers can come and go as they please because they are paid per job. Reclassifying ICs as employees fundamentally restructures the current business, replacing payment by job with payment by time. Where driver and company incentives were previously aligned, now companies become incentivized to avoid allowing anyone who does not intend to complete trips to log on. That shift makes platform work unappealing to the large majority who seek it out because of the flexibility it currently offers, and in many cases it may become inaccessible.
- NYC and Seattle: These are two nascent examples of efforts to create minimum wage equivalents while preserving the IC status of drivers. Functionally, these pay standards too seek to compensate ICs for time they are not working. They set a net earnings per hour target, then use formulas to set time and distance rates that factor in how busy average drivers are on a platform so that on average drivers meet or exceed the target amount regardless of how many trips they complete. This leads companies to minimize the amount of time drivers are on the road without requests or passengers. As a result, drivers have lost access to the platform.

10

CONFIDENTIAL

UBER_JCCP_MDL_005579351