UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates To:<br><br>ALL CASES. | Case No.  23-md-03084-CRB   (LJC)<br><br>**ORDER RESOLVING JOINT LETTER REGARDING INCIDENT REPORTS**<br><br>Re: Dkt. No. 6251 |

The parties filed a joint letter in which Plaintiffs seek several categories of additional sexual misconduct incident report data.  Dkt. No. 6251.[1]  The Court heard argument on June 1, 2026 and now resolves the disputes presented therein as follows.

**A.    Updated Data Through 2025**

Plaintiffs seek updated data from Uber's Flack, Jira, and Bliss systems through 2025:

> 1. For each month of the year 2025, provide the number of sexual assault and sexual misconduct incidents in the United States that Uber categorized into each category of its Sexual Misconduct and Violence Taxonomy or categorized as "Insufficient Information," "Parent Category Usage Tracking," or any other categorization.

> 2. For each month of the year 2025, provide the number of sexual assault and sexual misconduct incidents in the United States that Uber categorized into each category of its Sexual Misconduct and Violence Taxonomy or categorized as "Insufficient Information," "Parent Category Usage Tracking," or any other categorization despite determining the incident to be "invalid."

> 3. For each sexual assault and sexual misconduct incident in the United States associated with a trip that took place between January 1, 2025 and December 31, 2025 that Uber categorized into each category of its Sexual Misconduct and Violence Taxonomy or

---

[1] This letter exceeds the five-page limit for substantive argument set by Pretrial Order No. 8. Future letters that exceed that limit may be stricken sua sponte.

categorized as "Insufficient Information," "Parent Category Usage Tracking," or any other categorization, produce the raw data from Flack, Bliss, and Jira that Uber collected for each sexual assault or sexual misconduct incident in the format and scope which the Court has previously ordered Uber to produce. If Uber used a different system or tool to collect and/or store that data, identify that system or tool so that the parties can meet and confer regarding scope and format of production.

Dkt. No. 6251 at 4, ¶¶ 1–3.

As discussed at the June 1, 2026 hearing, updated data is relevant at least to member cases that continue to be filed based on more recent alleged conduct. Uber has agreed to produce Flack data but argues that Jira and Bliss data would be redundant and unnecessary. *Id.* at 6.

Excerpts from the *Dean* bellwether trial that the parties filed at the Court's request show that Uber repeatedly advanced arguments that a significant portion of incident reports represent fraudulent "support abuse":

> Q. And you know that some of the reports that are included in that 546,000 are not valid, they are something called support abuse, correct?

Dkt. No. 6390-1 at 3, *Dean* Trial Tr. at 2160:8–10 (defense counsel questioning Plaintiff's expert witness Lacey Keller).

> Q. And you know that Mr. Chang has said that 10 to 20 percent of the reports that come into Uber are something called support abuse, correct?
>
> A. I've seen that, but other documents that say it's far less.
>
> Q. Okay. You are not quibbling that Mr. Chang, who is the VP of Applied Science has given that testimony under oath, that 10 to 20 percent of all complaints that Uber gets are support abuse, correct?

*Id.* at 8, *Dean* Trial Tr. at 2161:10–17 (same).

> THE WITNESS: Yes. So known instances of support abuse, we do our best to remove them. There might be instances of support abuse that we haven't been able to detect, or that we find years later, and so for those they would have been included in the count or the data that was published when we put out our safety report.

Dkt. No. 6390-2 at 4–5, *Dean* Trial Tr. at 2663:23–2664:3 (testimony of Uber witness Emilie Boman).

> And you heard about this concept of support abuse throughout the trial, both Jennifer and Kevin, where they tried to get a refund. And you heard that 10 to 20 percent of all reports against Uber are these

United States District Court
Northern District of California

2

kind of fake fraudulent support abuse. Where somebody says something to try to get their money back, and that's a big number, but unfortunately it's the correct one. So it brings us back to foreseeability.

Dkt. No. 6390-3 at 3, *Dean* Trial Tr. at 3494:5–12 (defense counsel's closing argument).

A. Sure. Support abuse comes in a variety of different kind of shapes and sizes, but the general principle is a user of one of Uber's platforms writes in and falsifies some sort of story in hopes that they get a refund or a credit, or, you know, some sort of kind of monetary appeasement. And oftentimes folks will make things up, or they'll report the same incident 20 times in hopes to get a bunch of refunds or whatever it might be.

And we have to kind of sort through those and figure out kind of what's real and what's not.

Q. . . . Frank Chang . . . testified . . . that anywhere between 10 and 20 percent of all complaints that Uber gets is support abuse.

Do those numbers sound right to you?

A. Yeah. Frank would know best, but that certainly sounds accurate.

Dkt. No 6390-4 at 4, *Dean* Trial Tr. at 2258:4–23 (testimony of Uber witness Chad Dobbs).

Emilie Boman testified that Uber attempts to ensure that its Safety Reports reflect valid reports, and that it excludes identified instances of support abuse from those statistics. *See* Dkt. No. 6390-6 at 3, 4, *Dean* Trial Tr. at 2455:6–10, 2456:6–12. As noted above, however, Boman also testified that Uber is likely unable to screen out all invalid reports from its Safety Reports. Dkt. No. 6390-2 at 4–5, *Dean* Trial Tr. at 2663:23–2664:3. Uber's overall testimony, questioning, and argument at trial paint a picture of a relatively pervasive minority of fraudulent reports, potentially casting suspicion on any given report that might be at issue in a member case, or on the overall frequency of sexual misconduct incidents as stated in the Safety Reports.

The Court's task here is not to assess whether such testimony or conclusions are accurate. But Plaintiffs have a significant interest in testing, validating, or challenging that premise in other cases. That interest warrants production of Uber's Bliss and Jira data, in addition to Flack, to allow Plaintiffs' expert witnesses more of the same data that is available to Uber to assess the frequency of "support abuse" and other invalid reports.

Uber is ORDERED to produce the documents and information requested in items 1 through 3 of Plaintiff's list. Dkt. No. 6251 at 4. Uber shall produce this data by June 18, 2026,

unless the parties stipulate to a different production date.[2]

### B.    Instances of Invalid or Re-Categorized Reports

Plaintiffs ask Uber to identify reports that it has reassessed since its previous production, as follows:

> 4. If Uber has re-categorized any sexual assault or sexual misconduct incidents in its Incident Report Classifications of Dominant Tickets for 2017-2024, as served to Plaintiffs on October 13, 2025, supplement that discovery accordingly.
>
> 5. If Uber has determined that any of the sexual assault or sexual misconduct incidents in its Incident Report Classifications of Dominant Tickets for 2017-2024, as served to Plaintiffs on October 13, 2025, are "invalid," provide the number of incidents in each month that Uber determined to be "invalid."

Dkt. No. 6251 at 4.

As discussed above, Uber presented arguments and testimony at the *Dean* trial that a meaningful portion of reported incidents of sexual misconduct are not valid.  Emilie Boman also testified that "[t]here might be instances of support abuse . . . that we find years later."  Dkt. No. 6390-2 at 4–5, *Dean* Trial Tr. at 2263:24–2264:1.  Plaintiffs have a significant interest in reviewing the same updated data that is available to Uber, and which Uber might rely on in future trials.  That said, it does not appear to be feasible for Uber to produce real-time updates of each recategorized or invalidated report, and Plaintiffs' request for a supplemental production now—seven and a half months after the previous production—raises the question of how frequently such updates will need to be provided going forward.  Uber is directed to provide the updates that Plaintiffs seek here no later than June 30, 2026, and by the same date each following year so long as this MDL remains active.

### C.    Global Incident Data

Plaintiffs seek global incident data from countries beyond the United States:

---

[2] To the extent the "raw data" called for by paragraph 3 of Plaintiffs' list might include internal communications requiring a manual privilege review that cannot be completed by this deadline, the parties are instructed to meet and confer as to a feasible prompt deadline for production of those communications.  Any delay in producing those communications should not delay production of other responsive data beyond the deadline stated above, unless the parties stipulate to a later deadline.

6. For each month of the years 2022 through 2025, provide the number of sexual assault and sexual misconduct incidents in each country globally that Uber categorized into each category of its Sexual Misconduct and Violence Taxonomy or categorized as "Insufficient Information," "Parent Category Usage Tracking," or any other categorization.

7. For each month of the years 2022 through 2025, provide the number of sexual assault and sexual misconduct incidents in each country globally that Uber categorized into each category of its Sexual Misconduct and Violence Taxonomy or categorized as "Insufficient Information," "Parent Category Usage Tracking," or any other categorization despite determining the incident to be "invalid."

Dkt. No. 6251 at 4.

These requests are based on Uber's representations in a proxy statement that it has seen reduced[3] instances of "critical sexual assault" globally, aggregated across its Mobility and Delivery businesses, from 2023 through 2025.  Uber, 2025 Proxy Statement and Notice of Annual Meeting of Stockholders, https://perma.cc/7K6Y-LN68, at 62 & n.3.

This Court has generally limited discovery in this MDL to incidents in the United States. The proxy statement is not a sufficient reason to depart from that approach.  There is no indication that Uber intends to rely on it in this litigation, and Uber represented at the June 1, 2026 hearing that it will not make claims about trends beyond the United States at trial.[4]

Plaintiffs suggested at hearing that global data would allow them to better understand how Uber categorizes incident reports.  Perhaps so, but Plaintiffs already have access to a wealth of data from the United States from which to draw such conclusions, which is more likely to be relevant to the incidents in question in this litigation.  If global data is generally categorized the

---

[3] Both sides frame this as a "150%" reduction.  Dkt. No. 6251 at 3, 5, 7.  A reduction of more than 100% is generally understood to result in a negative number, and thus seems unlikely to be what this report claims.  In context, the 150% value appears to refer to the degree to which Uber achieved its goal of a 10% reduction, which would indicate a 15% reduction in global instances of critical sexual assault across Uber's platforms.  This distinction of exactly what degree of reduction Uber claimed is immaterial to the outcome of the present dispute.

[4] In other contexts of this same joint letter, Uber argued that it was inappropriate for Plaintiffs to ask Uber to consider agreements to limit matters presented at trial in order to cabin the scope of discovery.  Dkt. No. 6251 at 6.  Though this Court, which is responsible in this MDL only for discovery, generally lacks authority to limit the scope of evidence at trial, such negotiations among the parties are not inappropriate.  As illustrated by Uber's representation at the hearing that it would not rely on global trends, such agreements can be a pragmatic tool to avoid the need for burdensome discovery.

same way, then for the purpose of understanding Uber's categorization methods, it would be largely redundant to the domestic data Uber has already produced.  If it is not, then it would be of at most limited use.

Plaintiffs also argued that global data could help them understand the effectiveness and feasibility of safety measures that Uber implemented in other countries but has not used, or only later implemented, in the United States.  The current requests are overbroad for that purpose.

Plaintiffs' requests for international incident data are therefore DENIED as disproportionate to the needs of this litigation.  This Order is without prejudice to Plaintiffs pursuing narrowly tailored requests related to specific foreign safety initiatives upon a showing of sufficient relevance, or to any arguments that Uber might raise in response to such requests.

**IT IS SO ORDERED.**

Dated: June 11, 2026

LISA J. CISNEROS
United States Magistrate Judge

United States District Court
Northern District of California