Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC., RASIER, LLC,
and RASIER-CA, LLC

UNITED STATES DISTRICT COURT

OF NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
| | **UBER STATEMENT RE: BELLWETHER TRIAL SELECTION AND SCHEDULING** |
| | **REDACTED VERSION** |
| This Document Relates to: | |
| ALL CASES | |

Plaintiffs' proposal seeks to capitalize on their discovery misconduct in *B.L.* by jamming Defendants with a Fall trial in an idiosyncratic, non-representative case, *QLF 001*, that is still in the early stages of discovery. That trial would then be followed by *A.R.*, which, like *B.L.*, has been

tainted by discovery misconduct. It comes as no surprise that Plaintiffs would like to run from the mess they created and pivot to one of the least representative cases in the bellwether pool, but Plaintiffs' proposal would undermine efforts at resolution, not advance them.

Plaintiffs appear to have forgotten the origin of the term bellwether and the purpose of bellwether trials: to "lead the way" to resolution by acting as an indicator of how other, similar cases should be valued. Indeed, Plaintiffs' arguments about why the Court should try *QLF 001* all demonstrate precisely why it is ***not*** a proper bellwether. Most revealing is Plaintiffs' complaint about Uber's supposedly "incessant focus on its taxonomy as a lodestar for bellwether selection." Plaintiffs suggest that there is something sinister about Uber's attempts to do precisely what a bellwether process is intended to achieve: to try different categories of claims so that the parties better understand the value of different cases. Trying an outlier case may be appealing to Plaintiffs because they think it is more likely to produce the sort of mega-verdict that has eluded them thus far in the litigation, but it would do nothing to advance resolution. For the same reason, Plaintiffs' complaint that Uber has "hyper-focus[ed] on plaintiff-specific issues" in prior trials or that issues related to a Plaintiff's "credibility" are "side shows" is misguided. A trial that does not focus on actual facts—and on both sides of the "v."—is essentially a referendum on a company, not an evaluation of a Plaintiff's allegations, let alone an effort to understand the value of Plaintiffs' case pool more generally. In short, Plaintiffs do not seek to try a true bellwether case; instead, they are asking the Court to try a unicorn, on short notice. By contrast, Uber's proposal is directly focused on the goals of bellwether trials. Under Uber's proposal, the next two trials should be:

(1) ***LCHB 128.*** This case, selected by Plaintiffs, is the only Wave 1 case that can realistically be trial-ready in September 2026. It involves allegations of Touching of a Sexual Body Part (Over Clothing), which is the largest category of cases in the overall MDL pool (almost 25 percent); and

(2) ***C.L. 68.*** This case, selected by Uber, involves allegations of Touching of a Sexual Body Part (Direct Contact), a category that comprises approximately 11 percent of the overall

MDL pool.[1]

*LCHB 128* and *C.L. 68* both represent two large categories of cases that have not yet been tested in bellwether trials. Because these two categories together account for more than **one-third** of the overall MDL pool, it is critical to the bellwether process to obtain information about how juries value these claims (if at all). Accordingly, this proposal will provide the Court and the parties with the most meaningful information about the larger MDL pool and best advance resolution of the litigation.

Plaintiffs' counter-proposal, by contrast, presents practical challenges and would not meaningfully advance the MDL proceeding. *QLF 001* is not remotely trial-ready; nor is it representative because it involves very atypical facts and a very uncommon category of allegations—forced oral sex (approximately five percent of the case pool). *A.R.* similarly comes from one of the smallest categories of cases in the MDL—kissing (approximately two percent)—and, like *B.L.* involves very serious discovery irregularities.

Finally, Plaintiffs complain that Uber has previously settled cases that were set for trial, but that is no reason to advance the *QLF 001* case from Wave 4. The Queenan firm has just two cases in the MDL proceeding. Thus, if this case settles, it would not meaningfully advance resolution of the overall case pool.

## I. *LCHB 128* SHOULD BE THE NEXT BELLWETHER TRIAL, FOLLOWED BY *C.L. 68.*

The Court should try *LCHB 128*, the only Wave 1 case that does not involve significant discovery issues, followed by *C.L. 68*, the only bellwether case that involves Touching of a Sexual Body Part (Direct Contact).

### A. *LCHB 128*

The Court has indicated that it intends to try a case in September, and *LCHB 128*, a bellwether selected by Plaintiffs, is the only case in the bellwether pool that can realistically be ready for trial at that time. This is so because *A.R.*, the other remaining Wave 1 case, has been

---

[1] Plaintiffs mistakenly refer to *C.L. 68* as a proposed "backup," but that is not Uber's proposal. Rather, Uber proposes trying both cases.

stymied by Plaintiffs' discovery misconduct, and the cases that remain in subsequent bellwether Waves have not undergone significant discovery. This alone supports selection of *LCHB 128* for the next trial.

Trying *LCHB 128* in the Fall makes sense for other reasons too. As depicted in the table below, this case involves allegations of Touching of a Sexual Body Part (Over Clothing), the ***largest*** category of cases in the overall MDL pool, comprising 24.42% of the entire MDL docket.

| Taxonomy/Category | Percentage of Overall MDL Case Pool[2] | Percentage of MDL Case Pool If Penetration and Touching Of Non-Sexual Body Part Are Removed |
|---|---|---|
| Attempted Sexual Penetration (Digital / Oral / Intercourse) | 4.01% | 5.22% |
| Digital Penetration | 4.83% | 6.29% |
| Inappropriate Sexual Comments (Flirting / Soliciting / Threats) | 1.14% | 1.49% |
| Indecent Exposure | 5.10% | 6.64% |
| Kidnapping | 5.01% | 6.53% |
| Kissing | 2.46% | 3.20% |
| Masturbation | 13.67% | 17.81% |
| Oral Sex | 5.19% | 6.76% |
| Touching of a Sexual Body Part (Direct Contact) | 10.93% | 14.24% |
| Touching of a Sexual Body Part (Over Clothing) | 24.42% | 31.81% |
| Touching of a Non-Sexual Body Part | 13.62% | n/a |
| Vaginal Penetration | 9.61% | n/a |
| **TOTALS** | **100%** | **100%** |

[2] This table includes cases in which a Plaintiff Fact Sheet ("PFS") has been submitted. As of this writing, there are 301 cases pending in the MDL that do not have a completed PFS.

That means a trial of *LCHB 128* will provide the Court and the parties with meaningful information about the largest segment of cases in the MDL. Moreover, *LCHB 128* was selected as a bellwether case by Plaintiffs, meaning they cannot credibly complain that the case is somehow skewed in Uber's favor. Plaintiffs nonetheless seek to run from this case too, arguing that Uber will introduce case-specific facts (which a defendant would, of course, do in any trial) and that Uber is too focused on categories of cases (which is the very point of bellwether cases).

Plaintiffs' argument that *LCHB 128* is not a proper bellwether because Uber may question the credibility of the Plaintiff's allegations at trial misses the point. Credibility will be at issue in virtually any trial. And Plaintiffs' suggestion that *LCHB 128* is an outlier because of the Plaintiff's history of sexual trauma and past drug addiction is similarly baseless. Every case in the litigation will require the jury to determine whether a particular Plaintiff's alleged injuries were caused by the alleged incident, as opposed to other pre-incident causes, and discovery to date in both federal and state court cases suggests that a large number of plaintiffs in this litigation have unfortunately experienced prior trauma. In any event, Plaintiffs are the ones who affirmatively chose this case as a representative bellwether, further undermining their self-serving arguments that it no longer is.

Plaintiffs also argue that *LCHB 128* involves Arizona law, which was previously addressed in the *Dean* trial, but that is not a reason to bypass this case either. As discussed above, the fundamental purpose of bellwether trials is to determine the value (if any) of different types of claims based on the incident alleged, not the technicalities of state law. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) (noting that bellwether trials best "achieve [their] value ascertainment function for settlement purposes" when they are selected "to answer troubling causation or liability issues common to the universe of claimants"); *see also In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1008 (9th Cir. 2008) (noting that the "purpose of [a] bellwether trial [is] to establish the relative strengths and weakness of the parties . . . mainly for settlement purposes" and that a "bellwether trial [is] meant to be a learning process") (citation and internal quotation marks omitted). Plaintiffs make much of the fact that there are many Texas cases in the MDL but they do not point to any particular features of Texas law that would be more relevant to the value

-5-

UBER STATEMENT RE: BELLWETHER TRIAL
SELECTION AND SCHEDULING.
CASE NO. 3:23-MD-03084

of those cases than the category of injury.

Contrary to Plaintiffs' arguments, trying *LCHB 128* would provide the Court and the parties with important information about how juries view cases involving this type of alleged touching—the most common category of claims in the entire litigation. An undue focus on state law would lead the MDL bellwether process astray. After all, it simply is not realistic to expect the Court to conduct 50 bellwether trials to address each state's law. Moreover, *LCHB 128* has the benefit of being in the Ninth Circuit and convenient for travel. And, as noted above, abandoning *LCHB 128* simply because it involves Arizona law would make a September trial virtually impossible.

B.  *C.L. 68*

The trial of *LCHB 128* should be followed by the trial of *C.L. 68*, which involves a different type of touching claim (Touching of a Sexual Body Part (Direct Contact)) that is also at issue in a significant portion of the MDL cases (approximately 11% of MDL cases overall).

*C.L. 68* is one of only three defense pick cases remaining in Waves 1-5 and therefore will provide a counter-balance to the trial of *LCHB 128*, which was selected by Plaintiffs.[3] Further, *C.L. 68* involves Texas law. While Uber disputes that the applicable state law should be a predominant consideration in picking bellwethers, Plaintiffs make much of the fact that there are nearly 400 Texas cases pending in the MDL and therefore are pushing to try Texas cases. *C.L. 68* would satisfy that preference.

Plaintiffs' arguments against this case boil down to two points: (1) the Plaintiff worked as an exotic dancer; and (2) the injury was too insubstantial to merit the Court's time. But as Uber noted above, similar alleged injuries account for more than twice as many cases as "oral sex" cases, and it is Plaintiffs who are suggesting that C.L. 68's job somehow diminishes her claims, not Uber. In any event, if Plaintiffs do not think this case is worth the Court's time, they should dismiss it.

In short, Uber's proposal would move this litigation forward by allowing the Court to try a case in September in nearby Arizona, followed by another trial early next year, in Texas. It would address claims that fall within two categories that have not yet been the subject of an MDL trial

---

[3] The other two remaining cases selected by Uber are *K.E.*, a Texas case, and *Lazio*, an Iowa case, both of which involve Touching of a Non-Sexual Body Part—like *WHB 823*.

and together make up over a third of cases in the MDL pool. And it would mean that the Court tries a case selected by Plaintiffs, followed by a case selected by Uber, as it has done in the two bellwether trials held to date. This is a fair and logical approach to moving the bellwether process forward that will provide meaningful information regarding the broader MDL pool.

## II.   PLAINTIFFS' PROPOSAL TO TRY *QLF 001* FOLLOWED BY *A.R.* WOULD NOT ADVANCE THE GOALS OF BELLWETHER PROCEEDINGS AND WOULD PREJUDICE UBER.

Plaintiffs propose that the Court try the Wave 4 case *QLF 001* next (in October), followed by *A.R.* But Plaintiffs' proposed solution to a problem **they created** would not advance this litigation, would severely prejudice Uber, and diminishes the scope of Plaintiffs' disturbing discovery violations in *A.R.* For all of these reasons, discussed further below, it should be rejected by the Court.

### A.   QLF 001 Is Not An Appropriate Bellwether And Cannot Be Trial-Ready By September.

Plaintiffs' pivot to *QLF 001* seeks to turn their discovery violations into a windfall by proposing that, in lieu of *B.L.*, the Court accelerate a Wave 4 case that is both an outlier and would be nowhere near trial-ready in the Fall.

*QLF 001* is an extreme outlier that was strategically selected by Plaintiffs following the collapse of *B.L.*, and will not provide any meaningful information about the overall MDL pool. *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 1441804, at *9 (S.D.N.Y. Apr. 12, 2016) ("[B]ecause the primary purpose of bellwether trials is to provide data points for settlement discussions with respect to the universe of cases, the goal is to select the 'best' representatives of the universe of cases, not outliers likely to result in victory for one side or the other.").

As an initial matter, the case involves allegations of forced oral penetration, which are at issue in only five percent of all cases currently pending in the MDL proceeding. In addition, as Plaintiffs' own recitation of the facts related to this case makes clear, it is precisely the type of "outlier" case that this Court cautioned against at the May 22, 2026 Case Management Conference. Most notably, the driver in this case is currently in prison for the alleged assault. Plaintiffs argue

that the driver being in jail renders this case more appropriate as a bellwether because the trial will focus entirely on "Uber's liability as much as any of these cases can." This is nonsensical. Given that most of the cases in the MDL involve much less severe allegations (that would ordinarily not result in a prison sentence), a case involving an incident that resulted in a conviction and imprisonment is, by definition, unrepresentative.[4]

Plaintiffs' suggestion that *QLF 001* does not implicate any credibility issues is, in any event, wrong. One of the key fact witnesses at the driver's criminal trial was a woman who claimed that, prior to the *QLF 001* alleged assault, the same driver, whom the witness personally knew through professional connections, also posed as a driver on the Uber platform, offered her a ride after a baseball game and then sexually assaulted her. At the trial, the woman testified under oath that she informed Uber about the incident via her Uber account; however, Uber has not, thus far, located a record of an account belonging to this witness at the time of that alleged incident, or any such communication. Nor has it, thus far, located a record of any contemporaneous law enforcement outreach regarding this alleged prior incident. This second alleged incident threatens to create a distracting trial-within-a-trial, further undermining Plaintiffs' claim that the case is somehow representative.

*QLF 001* is also an outlier because the rider in question was a "guest ride"—meaning that a third party (in this case, a bartender) requested the ride in question, rather than the Plaintiff herself. This posture dramatically alters the legal issues, claims, and facts at issue in the case. For example, the case raises the unique issue of whether there can be an alleged failure to warn if the Plaintiff did not request the ride in question. Plaintiffs' own proposal appears to acknowledge that, because the case involves a guest ride, the trial will focus on issues such as "Uber's [alleged] failure to implement adequate safety features for 'guest rides.'" But that issue is likely irrelevant to the overwhelming majority of cases filed in this MDL, again underscoring the lack of utility in setting

---

[4] Prior to the *Dean* trial, Plaintiff moved in limine to exclude all evidence that the driver in that case was not criminally charged for the incident at issue. Plaintiff argued that this evidence was prejudicial because the jury might assume that the lack of a criminal conviction meant the incident did not happen. It is difficult to reconcile that motion with Plaintiffs' position here, which seems to suggest that the jury should not only hear what happened in the criminal trial, but that Uber should concede the incident happened because the driver was convicted in a criminal case.

this case next for trial. Plaintiffs respond in a footnote that cases involving guest rides may constitute up to 12 percent of the pool (which they admit is really a "guess-timate"), but even if they are correct, that leaves 88 percent of the bellwether pool, i.e., the overwhelming majority of cases, in which the Plaintiff used her own account. Plaintiffs' sudden interest in trying a guest ride case highlights that their goal is not representativeness, but rather finding a case that they think will be their pot of gold.

Plaintiffs' proposal is also unworkable from a timing perspective. Wave 1 cases were identified on April 14, 2025, *see* PTO No. 24 (Dkt. 2775), and the initial fact discovery period, which was extended several times, lasted until October 6, 2025 for most cases, PTO No. 30 (Dkt. 3674). In addition, certain later-disclosed Wave 1 cases had longer discovery periods. For example, initial fact discovery in *WHB 318* did not close until roughly ***seven months*** after the case was identified as a Wave 1 bellwether. *See* Dkt. 3997. And fact discovery has recently re-opened, adding several more months of fact discovery for the Wave 1 cases. As a result, Wave 1 cases will ultimately undergo at least 8 months of fact discovery. By contrast, Plaintiffs are now proposing that *QLF 001*, a case involving potentially *dozens* of non-party and expert witnesses, be worked up and set for trial in a little over three months.

Plaintiffs argue that the case can be prepared quickly for trial because substantial discovery occurred before the case was transferred to the MDL. That is patently false. The only discovery that has occurred to date is document discovery (and a third-party deposition), and even the document production remains incomplete. For example, despite indications that the Plaintiff had pre-existing mental health issues, very few medical records have been produced. Plaintiffs state that Uber's concerns around the limited medical records produced to date is a red herring because Plaintiff "apparently complied" with PTO 10. But PTO 10 only requires Plaintiffs to provide medical records for treaters "who treated [them] in connection with the incident." *See* Dkt. 4274-1 at 4-5. Here, Plaintiff appears to have large numbers of relevant pre-incident medical records, none of which have been produced pursuant to PTO 10 or any other process.

Plaintiffs also reference the parallel criminal proceeding against the driver in the case and

suggest that it somehow minimizes the need for discovery in this civil action. But even if the roughly 1,300 pages of documents from the criminal prosecution help inform decisions to be made in discovery, they certainly cannot replace the work that needs to be done to prepare this case for trial. Rushing a new case to trial without providing Uber sufficient time to conduct discovery and prepare properly, simply because Plaintiffs have buyer's remorse regarding Wave 1 and believe this case will be more favorable to them, would be enormously prejudicial to Uber, and is not the way to generate helpful and informative bellwethers.

> **B.** **Trying *A.R.* Would Not Be "Meaningful" Because It Is Atypical Of The MDL Case Pool And, Like *B.L.*, Is Sullied By Discovery Misconduct.**

*A.R.* would be a similarly unhelpful bellwether for multiple reasons.

As an initial matter, the *A.R.* case involves allegations of non-consensual kissing, and such cases constitute *less than three percent* of the overall MDL pool. As a result, *A.R.* will not provide information that aids the parties in gauging the overall value of cases.

Moreover, like *B.L.*, the *A.R.* case is also riddled with discovery problems that will prevent it from being trial-ready by September 2026. After most fact witness depositions were complete, one of Plaintiff's witnesses, I.E., drafted an email to Plaintiff's counsel stating that Plaintiff's counsel had told her not to search for documents requested in her deposition notice. *See* Dkt. 3669, Joint Discovery Letter Regarding Sanctions for Discovery Misconduct by Plaintiffs and Counsel, Dkt. 3786, Order Resolving Joint Discovery Letter Regarding Conduct By Peiffer Wolf. A copy of that email is excerpted below:

Hi Sara,

I wanted to follow up regarding my recent deposition in the A.R. v. Uber Technologies matter. After some reflection, I'm feeling increasingly uncomfortable with how my involvement in the case was handled.

To be candid, I don't feel I was fully informed about the implications of participating, and I now have serious concerns about the way my deposition was managed. Specifically, yesterday I was asked not to provide / search for certain documents (the text messages I showed you regarding the text ███ sent to me regarding the litigation) that were directly requested in the deposition notice, which in hindsight feels inappropriate and misleading. That doesn't sit right with me.

Although I've already provided testimony, I no longer wish to be involved in this matter or to have my deposition used in any capacity. Please let me know what steps can be taken to formally communicate that objection or limit further use of my statements.

In light of this evidence, Uber was permitted to re-depose I.E. about, *inter alia*, relevant materials that she was previously instructed by Plaintiffs' counsel not to disclose. *See, e.g.*, Ex. 1, October 13, 2025 I.E. Dep. 21:18-23:14 (I.E. testifying " █████████████████████████████████████████████████████████████████████████████████████ ""); *id*. 28:16-29:6 (" █████████████████████████████████ ."). Uber was also permitted to re-depose Plaintiff and to seek production of supplemental communications in Plaintiff's possession. Through that effort, Uber learned that other, previously-deposed fact witnesses, including Plaintiff herself, possessed materials responsive to their deposition notices that they had not previously produced.

Plaintiff's counsel agreed to re-collect and produce these materials. While Uber received an initial production of these materials on June 6, 2026, that production appears facially incomplete because it includes no documents from one of the witnesses from whom Plaintiff's counsel agreed to re-collect documents. Further, the information that the production *does* include is highly troubling. The production comprises dozens of communications, including materials in the possession of Plaintiff herself, that are clearly responsive to prior discovery requests, but that were not previously produced. For example, the June 6 production includes: (1) a text message exchange between Plaintiff and her friend O.K. in which ████████████████████████ , Ex. 2, BW-A_R-000765-000770 ; (2) a text message exchange between Plaintiff and her friend M.M. regarding ████████████████████████████ *see* Ex. 3, BW-A_R-001373-001389; and (3) another exchange with M.M. in which Plaintiff ████████████ , *see* Ex. 4, BW-A_R-000636-000650.

As with *B.L.*, these late-breaking productions not only demonstrate the high degree of

UBER STATEMENT RE: BELLWETHER TRIAL
SELECTION AND SCHEDULING.
CASE NO. 3:23-MD-03084

relevance of the materials that Plaintiff previously failed to produce, but also underscore the amount of work that remains to be done before *A.R.* will be trial-ready. Uber now intends to re-depose at least three witnesses to understand whether they were instructed by Plaintiff's counsel to withhold responsive materials. Moreover, as Plaintiff's counsel acknowledged in their correspondence accompanying the supplemental production, these late-produced documents identify at least five additional fact witnesses who were actively communicating with Plaintiff during the original discovery period, but who were not timely identified. Plaintiff has also stated an intent to supplement her Rule 26 disclosure, PFS, and discovery responses, but has not yet done so, further hindering Uber's ability to efficiently and effectively complete discovery in this case.

For all of these reasons, *A.R.* presents the same problems as *B.L.* and should not be tried as a bellwether.

DATED: June 15, 2026

By: */s/ Laura Vartain Horn*
Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC