# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB (LJC) |
| This Document Relates to: <br><br> ALL MATTERS | **JOINT PTO 8 LETTER REGARDING NONPROFIT DEPOSITIONS** <br><br> Judge:  Hon. Lisa J. Cisneros <br> Courtroom:  G - 15th Floor |

Dear Judge Cisneros:

Per the Court's May 15, 2026 Order, ECF 6208, the Parties respectfully submit this joint letter concerning the status of discovery related to Uber's relationships with nonprofits and its Safety Advisory Board ("SAB"). On June 4, 2026, Plaintiffs conducted a 30(b)(6) deposition of Emilie Boman concerning these topics. Plaintiffs now seek to depose five third-parties regarding these same issues: (1) National Alliance to End Sexual Violence (NAESV); (2) National Network to End Domestic Violence (NNEDV); (3) Indira Henard, CEO of D.C. Rape Crisis Center and Uber SAB member; (4) Karen Baker, former CEO of National Sexual Violence Resource Center; and (5) Max Bazerman, Professor, Harvard Business School. Uber objects.

Dated: June 17, 2026

By: */s/ Marlene J. Goldenberg*
Marlene J. Goldenberg
**NIGH GOLDENBERG RASO & VAUGHN PLLC**
14 Ridge Square NW, Third Floor
Washington, D.C. 20016
Telephone: (202) 978-2228
Facsimile: (202) 792-7927
mgoldenberg@nighgoldenberg.com

Sarah R. London (SBN 267093)
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: */s/ Rachel B. Abrams*
Rachel B. Abrams (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel for Plaintiffs*

Respectfully submitted,

*/s/ Laura Vartain Horn*
Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Christopher D. Cox (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
christopher.cox@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

Attorneys for Defendants UBER TECHNOLOGIES, INC., RASIER, LLC, and RASIER-CA, LLC

**PLAINTIFFS' POSITION**

During the *Dean* trial, Uber repeatedly asserted that advocacy groups had "endorsed," "approved," "advise[d] on" and helped "develop" Uber's purported safety features, processes, and policies.[1] Plaintiffs' attempts to probe these assertions at the 30(b)(6) deposition of Ms. Boman revealed that depositions of Uber's nonprofit advocacy groups are necessary.

At trial, Ms. Boman testified: "I think so many of our safety features and some of our safety processes that we've now built, we just wouldn't have had the ideas. They really came – came from the advocates directly." *Dean* Tr. 2478:16–2479:06. But in her deposition, she said "[W]hen I first started working on safety, I was told that many of our features and processes were developed from specific instances or from feedback from survivor groups' nonprofits. I don't have specific organizations that I could name today for that either." **Ex. A,** 6/4/26 Boman 30(b)(6) Tr. 148:1–7. Ms. Boman could not specify which nonprofits were involved in which of Uber's features/processes. **Ex. A,** at 158:24–159:2 (RideCheck); 159:3–9 (Share My Trip) 168:5–9 (Real Time ID); 168:16–22 (911 Button); 168:23–169:6. (In-App Recording); 159:22–24 (Record My Ride); 169:7–14 (Help from a Safety Agent); *id.* at 146:3–16 (ISSP).

At trial, Ms. Boman testified that "[t]hese [advocates] are organizations with high integrity, they want to work with companies who they think they're doing the right thing, showing up, tackling the hard issues day in day out." *Id.* at 2478:16–2479:06. In the 30(b)(6) deposition, Ms. Boman was not able to tell Plaintiffs what these nonprofits knew about Uber and upon which they based their opinions. **Ex. A,** at 94:16-95:1. Ms. Boman was able to confirm ███████████████████████████████████████████████████████████████████ **Ex. A,** at 22:1-4, 135:13-22.

At trial, Ms. Boman testified, "my team holds regular sessions with safety advocates where we explain how Uber's processes work, how we are designing a feature, and we get feedback from them as we do that." *Id.* at 2525:08–24. But in her recent 30(b)(6) deposition, she testified that "it's challenging for me to make sure I answer that answer fully because I wasn't in the room at that time."; **Ex. A,** at 66:11-17 and she ████████████████████████ *Id.* at 67:18–21.

At trial, Uber claimed that its Safety Advisory Board ("SAB") is "essentially pulling together a group of experts with really longstanding careers and deep subject matter expertise to help us do the right thing when it comes to safety." *Tr. Transcript* at 2461:04–2461:11. Unfortunately, Ms. Boman's deposition made clear that testing Uber's claims with respect to its relationship with nonprofits must be done by going directly to the nonprofits; it cannot be accomplished by asking Uber. *See, e.g., id.* at 148:1–7, 66:11-17, 67:18–21 (quoted *supra*).

If Uber intends to keep invoking third parties to vouch for its safety efforts, Plaintiffs—and the jury—deserve to hear from these third parties directly, including what safety information Uber did, and did not, share with them; what advice Uber did, and did not, receive from them; and what "safety" efforts these third parties did or did not endorse. The third parties are the best source for this information—as shown by the fact that Ms. Boman was unable to answer many of Plaintiffs' questions.[2] Uber cannot testify to the state of mind of these third parties.

***Burden.*** Uber cannot assert burden on behalf of third parties. *Doe v. Kaiser Found. Health Plan. Inc.,* 2023 WL 8174480, at *3 (N.D. Cal. Dec. 17, 2023).

---

[1] *Dean* Tr. 272:22–23 ("they have things on their website where they endorse and advocate for Uber. That's the evidence"); *see also id.* at 2469:22–2470:12; 2452:7–2453:4; 2456:18–2457:12; 2478:16-2479:06.

[2] Plaintiffs incorporate by reference their statement in the last PTO 8 Letter, ECF 5893.

*Service.* Before the Parties' first PTO 8 Letter, Plaintiffs served Uber with notice of intent to serve nine subpoenas. Plaintiffs served a subpoena on one third party, which Plaintiff no longer seeks to depose. Plaintiffs informed Uber and the third party that in light of the Court's Order, the subpoenas were served to ensure the third party had sufficient notice and that the deposition would only occur pursuant to an agreement or court order.

*There is Good Cause for Nonprofit Depositions.* At trial, Uber broadly asserted that many of Uber's purported safety features and some processes "came from the advocates directly." *Dean* Tr. 2478:16–2479:06. Plaintiffs deserve an opportunity to explore whether any of the non-profits prominently invoked by Uber at trial recall being involved in these features/processes—or of what information Uber shared (and did not share) about them. Boman's 30(b)(6) testimony (described above) didn't clarify this. Nor do the vague bullet points in the Deposition Aid, **Ex. B.**, and nonanswers in Uber's interrogatories, **Ex. C**, fill in the gaps. For example, most of the 18 sources listed on the Depo Aid regarding S-RAD are *internal* documents identifying advocates Uber wanted to "target" to support S-RAD; they do not reveal information conveyed to these advocates about S-RAD or otherwise indicate whether or to what extent the advocates understood that Uber declined to increase the threshold due to marketplace concerns. The few documents actually shown to the safety advocates Plaintiffs anticipate Uber will lean on at trial (NNEDV, NAESV, Indira Henard, Karen Baker) omit issues central to S-RAD (e.g., holdout groups, the 1.25% threshold).

Second, Uber relied on statements by nonprofits to bolster its reputation at trial.[3] *Dean* Tr. 2461:12–23; 2478:21–2479:6. Plaintiffs need to be able to test the basis for these statements by nonprofits. Ms. Boman ██████████████████████████████████████████████████████████████████ . In terms of S-RAD, Ms. Boman was aware of "broad insights" from a group of nonprofits but ████████████████████████████████.[4] Ms. Boman confirmed in her deposition that ████████████████████████████████████████████████████████████████████████ **Ex. A** at 22:23-22:4. Since Ms. Boman confirmed Uber did not provide certain information to the nonprofits, Plaintiffs are entitled to ask them if this information would have changed their view of Uber or its safety features. For example, do these nonprofits still believe Uber's efforts are "bold" or "courageous," and further, was it Uber or the nonprofits who originally suggested that they were? These are, by definition, questions that Uber cannot answer.

Plaintiffs therefore seek depositions of certain third parties Ms. Boman identified were involved with safety features so Plaintiffs can ask them questions Ms. Boman could not answer. Depositions of these third parties are warranted because Uber relied on these third parties to prop up its reputation or safety features as described below:

- **NAESV** attended S-RAD sessions, Ex. B, but Ms. Boman's testimony and Uber's documents are silent on whether NAESV had information about the S-RAD threshold/trigger rate or the use of hold-out groups. NAESV also provided public relations support for Uber.[5] Plaintiffs want to explore NAESV's knowledge regarding Uber's sexual assault rate, the efficacy of Uber's safety features, the S-RAD threshold, and the use of holdout groups, if any.

---

[3] Ms. Boman's testimony calls this, too, into question. She testified Uber's oft-touted messaging that sexual assault is a "societal issue" came from nonprofit advocates, not Uber. *Id.* at 26:21–6. However, Uber's own documents show that Uber developed that messaging and directed nonprofit partners to use it. *Id.* at 27:21–28:20; 31:14–25

[4] Ex. A, at 67:18–21; *see also id.* at 173:19–22.

[5] *Id.*

- **NNEDV** made public statements of support of Uber and was an S-RAD "target." Ex. B. At trial, Uber flaunted the membership of NNEDV's CEO Erica Olsen on its SAB. *Dean* Tr. 2461:12–23. Plaintiffs want to explore what NNEDV knew about Uber's sexual assault rate, safety feature efficacy, the S-RAD threshold, and the use of holdout groups.

- ***Indira Henard*** is a Safety Advisory Board member whose role Uber emphasized at trial. *Dean* Tr. 2461:12–23. DCRCC also provided statements for Uber. Ex. B. Plaintiffs want to explore Ms. Henard's knowledge of Uber's sexual assault rate and efficacy of its safety features.

- ***Karen Baker*** wrote the Safety Report introduction, and Uber touted its relationship with Ms. Baker at trial. *Dean* Tr. 2456:18–2457:12. Plaintiffs want to ask how much she knew about Uber's sexual assault rates and the efficacy of Uber's safety features.[6]

- ***Max Bazerman*** provided an ethics opinion about S-RAD, including the use of holdout groups. The opinion addresses the risk of increased costs and wait times, but not sexual assault; or whether it is ethical to place women in a holdout group to test a sexual assault prevention feature without their knowledge. Since this information is absent from Mr. Bazerman's opinion and Ms. Boman's testimony,[7] Plaintiffs intend to ask him these questions directly.

## **DEFENDANTS' POSITION**

**1. Plaintiffs' Request Is Disproportionate To The Needs Of The Litigation.**

Plaintiffs' request for five non-profit depositions should be denied because the burdens of such discovery on the third-party nonprofits and on Uber would be grossly disproportionate to the needs of the litigation.[8] Ms. Boman's deposition provided Plaintiffs with substantial information about Uber's relationships with nonprofits. Moreover, Uber provided Plaintiffs a 12-page "Deposition Aid" that addressed each of the 22 noticed topics, identified relevant nonprofit organizations and points of contact, and cited key documents reflecting the nonprofit engagement and information presented at various meetings and in other contexts. (*See* **Ex. B**, June 4, 2026 E. Boman Deposition Aid).[9] While Ms. Boman was unable to answer certain highly specific questions about conversations and meetings that occurred years ago, that does not justify five additional nonparty depositions. The record already provides Plaintiffs with the information necessary to test Uber's evidence through documents, corporate testimony, cross-examination, and appropriate trial motions.

The Court's May 15, 2026 Order [Dkt 6208] established a deliberate sequence under which Plaintiffs were permitted to proceed first with the supplemental Rule 30(b)(6) deposition of Ms. Boman, followed by a meet and confer "regarding the extent to which third-party depositions are relevant and proportional to the needs of the case." Nonetheless, Plaintiffs jumped the gun, by serving some third-party subpoenas without informing Uber and before completing the Boman deposition and the Court-ordered meet-and-confer process.

Plaintiffs' proposed depositions would be highly burdensome and would intrude on the important work being done by nonprofits. Moreover, Plaintiffs are unable to identify any

---

[6] *Id.* at 91:22–92:11.

[7] *Id.* at 181:14–182:14, 184:24–185:5

[8] Plaintiffs assert that Uber cannot argue burden on the non-parties' behalf. But the case Plaintiffs cite, *Kaiser*, addresses motions to quash. *See* 2023 WL 8714880, at *3. Uber is not moving to quash on behalf of these non-parties, but is instead, per the Court's order, arguing over the proper scope of discovery as set forth in Federal Rule of Civil Procedure 26(b)(1) (proportionate to the needs of the case and not unduly burdensome.)

[9] Uber has also provided information regarding Uber's engagement with nonprofit organizations in its June 11, 2026 responses to Plaintiff's fourth set of interrogatories.

corresponding benefits that would justify their onerous demands. At no point have they explained what unique, material, non-cumulative information each proposed deponent possesses, why that information is unavailable from Uber's documents, written responses, and corporate testimony, or why a deposition is the least burdensome means of obtaining it.

To the contrary, Plaintiffs have more than sufficient information about the subjects they seek to "explore" with the targeted deponents:

- **S-RAD trigger rates and holdout groups**: Plaintiffs claim they need to know what information NAESV and NNEDV had about the S-RAD trigger rate and holdout groups. But Ms. Boman already testified about information shared with third parties regarding S-RAD, including the anticipated trigger rate, the estimated safety impact, who developed the trigger rate, whether any third parties endorsed it, and information about the use of holdout groups.[10] With respect to Mr. Bazerman, Ms. Boman testified about his consultation regarding the ethics of a holdout group, the amount paid to him, and the general opinions he provided, and cited his written report in the Deposition Aid.[11] Plaintiffs have also long had extensive additional documentation regarding Uber's engagement and communication with these groups.

- **Safety feature efficacy**: Plaintiffs say they need to explore what NAESV, NNEDV, Ms. Henard, and Ms. Baker knew about safety feature efficacy. But Ms. Boman already testified ██████████████████████████████████████████████████████████████████████████████████████████████████████████.[12]

- **Sexual assault rate**: Plaintiffs say they want to explore what NAESV, NNEDV, Ms. Henard, and Ms. Baker knew about Uber's "sexual assault rates." But they already asked Ms. Boman about this, and Ms. Boman testified ████████████████████████████████████████████████████████████.[13]

In short, Plaintiffs' questions have been answered. They should not be allowed to take five depositions of non-profit organizations just to obtain information they already have. Plaintiffs' remaining questions are speculative, cumulative, and not proportional to the needs of the case.

### 2. Plaintiffs' Position Statement Mischaracterizes Ms. Boman's Testimony.

Plaintiffs argue that Ms. Boman "could not specify which nonprofits were involved in which of Uber's features/processes." That is false. As Ms. Boman repeatedly explained, the Company engaged in collaborative, years-long discussions, not single-author events in which one person or one organization necessarily "originated" each feature. For example, Ms. Boman testified that the Industry Sharing Safety Program was developed through cross-industry collaboration with safety advocates (*see* **Ex. A** at 143:19-144:1; 145:22-146:12; 171:21-172:6); that cross-street location sharing and phone number anonymization arose from conversations with advocates about rider safety (*id.* at 143:19-144:20; 171:21-172:6); that Record My Ride and in-app audio recordings involved discussions with NNEDV, RALIANCE, and the D.C. Rape Crisis Center regarding implementation, privacy, data retention, and survivor considerations (*id.* at 105:25-106:17, 153:1-154:10, 160:3-162:11); that PIN verification was developed with consultation of the Center for Democracy and Technology, UnidosUS, Future of Privacy Forum,

---

[10] *See* **Ex. A** at 53:1-6; 54:25-55:8; 57:6-24; 64:15-65:5; 66:10-67:17; 70:19-71:10; 159:13-21; 172:12-15; 179:22-180:8.

[11] *Id.* at 181:7-9; 181:21-182:14; 182:16-183:13.

[12] *Id.* at 14:12-15:15; 122:4-20; 134:2-136:9; 198:7-199:19.

[13] *Id.* at 21:3-22:-4.

and the NAACP (*id.* at 112:22-114:2; 170:17-25), and that driver education was provided by RAINN (*id.* at 38:19-22; 45:19-24). In addition, the Deposition Aid (**Ex. B**) lists the specific nonprofits involved for every topic, including driver education, S-RAD, safety features, and more, as well as the individual point of contact at each organization. It also provides the Bates numbers of key documents reflecting nonprofits' engagement, information presented to them, and input received.

Plaintiffs also complain that Ms. Boman could not, for every single feature, name the *first person who spoke the idea aloud* in conversations that occurred up to a decade ago. Plaintiffs have not shown that more depositions will reveal someone with a superhuman memory of these long-ago meetings, and in any event, who said what first has zero relevance to Plaintiffs' claims. The relevant issue is whether Uber engaged with safety advocates and incorporated their input into safety features, processes, and communications—not whether Uber can reconstruct the first speaker or first moment of ideation for every feature years later.

Plaintiffs suggest that Ms. Boman's testimony contradicted produced documents because she said that the concept of sexual assault being a "societal issue" came from nonprofits, even though certain documents show that Uber drafted messaging about it. There was no contradiction. As she explained, the concept "is well understood among advocates, and indeed, that is something that in our conversations with them early on, they shared with us."[14] The fact that Uber later drafted public-facing language reflecting a concept shared by advocates does not mean Uber invented the concept, and it certainly is no basis to depose the nonprofits themselves.

Plaintiffs are free to try to impeach witnesses at trial, but that is a far cry from allowing them to take five more burdensome and intrusive depositions of non-parties on peripheral issues and minutiae that will have, at best, minimal and highly tangential relevance to any actual trial.

### 3. Plaintiffs' Request Reflects A Pattern Of Harassing Discovery.

The breadth and timing of Plaintiffs' subpoenas are particularly concerning because they suggest that the purpose is not to obtain relevant information for future MDL trials, but rather to create pressure on Uber, to harass nonprofits and thereby punish them for having relationships with Uber, and to attempt to strain or undermine those relationships. Needless to say, discovery should not be used to embarrass a party, to damage its relationships with third-party advisors, or to otherwise create collateral pressure unrelated to the merits of the claims.

Unfortunately, this conduct is consistent with a broader pattern of aggressive and improper discovery tactics: pressing discovery beyond the scope authorized by the Court, using document requests and depositions as leverage to burden and pressure Uber, and forcing Uber to constantly seek judicial relief for unreasonable discovery demands. That is the antithesis of how discovery should be conducted and of Rule 26, which makes clear that discovery should be proportionate to the needs of the case.

For all of these reasons, Uber respectfully submits that the Court should not allow Plaintiffs to engage in a disproportionate and highly burdensome campaign against Uber and its non-profit partners under the guise of third-party discovery.

---

[14] *See* **Ex. A** at 26:17–27:6.

5

## FILER'S ATTESTATION

I, Marlene Goldenberg, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

Dated: June 17, 2026

By: /s/ *Marlene Goldenberg*
Marlene Goldenberg

6