SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION


COORDINATION PROCEEDING          |   No. CJC-21-005188
SPECIAL TITLE (Rule 3.550)       |
                                 |
In Re:  Uber Rideshare Cases     |
_____|
                                 |
This document relates to:        |
                                 |
ALL ACTIONS                      |
_____|


C O N F I D E N T I A L

UNDER PROTECTIVE ORDER

VIDEO DEPOSITION OF ANDI PIMENTEL

VOLUME I - PAGES 1-284

TUESDAY, OCTOBER 15, 2024

SAN FRANCISCO, CALIFORNIA


Reported by:   Marilynn Hoover, RPR

California CSR No. 8841

Andi Pimentel Volume I Confidential
October 15, 2024

BE IT REMEMBERED THAT, pursuant to the California Rules of Civil Procedure, Volume I of the video deposition of ANDI PIMENTEL was taken before Marilynn Hoover, California CSR No. 8841; on Tuesday, October 15, 2024, at 9:42 a.m.; located at 555 Mission Street, 23rd Floor, in San Francisco, California.

APPEARANCES

ESTEY & BOMBERGER, LLP
    BY MR. STEPHEN J. ESTEY, ESQ.
       MS. ANGELA NEHMENS, ESQ.
    2869 India Street
    San Diego, California 92103
    Telephone:  619-295-0035
    E-mail:  Steve@estey-bomberger.com
             Angela@estey-bomberger.com
    On behalf of the JCCP Plaintiffs

LEVIN SIMES, LLP
    BY MR. WILLIAM LEVIN, ESQ.
       MR. DAVID GRIMES, ESQ.
    1700 Montgomery Street, Suite 250
    San Francisco, California 94111
    Telephone:  415-426-3000
    E-mail:  WLevin@levinsimes.com
             DGrimes@levinsimes.com
    On behalf of the JCCP Plaintiffs

WILLIAMS HART & BOUNDAS, LLP
    BY MR. MYLES SHAW, ESQ.
       MS. BATAMI E. BASKIN, ESQ.
    8441 Gulf Freeway, Suite 600
    Houston, Texas 77017
    Telephone:  713-230-2200
    E-mail:  MShaw@whlaw.com
             BBaskin@whlaw.com
    On behalf of the JCCP Plaintiffs

Andi Pimentel Volume I Confidential
October 15, 2024

APPEARANCES (CONT.)

PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
     BY MR. ROBERT ATKINS, ESQ.
        MS. ANDREA M.L. KELLER, ESQ.
     1285 Avenue of the Americas
     New York, New York 10019
     Telephone:  212-373-3192
     E-mail:  RAtkins@paulweiss.com
              AKeller@paulweiss.com
     On behalf of Defendants and the Witness


ALSO PRESENT:   Yasi Sedghani, Esq.
                Joanne Moon, Esq.
                Miguel Concepcion, videographer
                Daniel Lawlor, concierge
                Kelsey Neuman, paralegal
                Bela Veksler, paralegal
                Tina Vaughns, paralegal

Andi Pimentel Volume I Confidential
October 15, 2024

                       EXAMINATION INDEX

                                                          PAGE

Examination by Mr. Levin                                    10



                         *   *   *



                       EXHIBIT INDEX

EXHIBIT NO.   DESCRIPTION                                  PAGE

Exhibit 101   E-mail string (confidential); Bates

              numbers UBER000161988 to 000161989     14

Exhibit 102   E-mail string (confidential); Bates

              number UBER000104517                        46

Exhibit 103   E-mail string (confidential); Bates

              number UBER000036983                        47

Exhibit 104   E-mail string (confidential); Bates

              numbers UBER000055558 to 000055559     51

Exhibit 105   Concept feedback master table;

              (confidential); Bates numbers

              UBER_JCCP_MDL_000322925 TO

              0000322935                                  53

Exhibit 106   Composite document (confidential);

              Bates numbers UBER000024353 to

              000024359                                   58

Andi Pimentel Volume I Confidential
October 15, 2024

EXHIBIT INDEX (CONT.)

EXHIBIT NO.   DESCRIPTION                                    PAGE

Exhibit 107   E-mail string (confidential); Bates
              numbers UBER00016093 to 0000165096         59

Exhibit 108   Uber safety device (confidential);
              Bates numbers UBER000192968 to
              0000193020                                 64

Exhibit 109   E-mail string (confidential); Bates
              numbers UBER000021118 to 000021119        78

Exhibit 110   Women's safety challenges
              (confidential); Bates numbers
              UBER000024375 to 000024385                79

Exhibit 111   03/05/2018 e-mail with redactions
              (confidential); Bates numbers
              UBER_JCCP_MDL_000448421 to
              000448422                                  85

Exhibit 112   Safety media platform dashcam
              overview (confidential); Bates
              numbers UBER000181602 to
              000181641                                  89

Exhibit 113   Policy positions (confidential);
              Bates numbers UBER_JCCP_MDL_
              000414756 to 000414798                     94

Andi Pimentel Volume I Confidential
October 15, 2024

EXHIBIT INDEX (CONT.)

EXHIBIT NO.   DESCRIPTION                                    PAGE

Exhibit 114   Dashcam strategy (confidential);

              Bates numbers UBER_JCCP_MDL_

              000505173 to 000505260                           99

Exhibit 115   10/19/2021 e-mail (confidential);

              Bates number UBER000161050                      102

Exhibit 116   Dashcam update (confidential);

              Bates numbers UBER000169470 to

              000169540                                       104

Exhibit 117   Scratch pad notes (confidential);

              Bates numbers UBER_JCCP_MDL_

              000476343 to 000476348                          112

Exhibit 118   Safety media MTD - list of possible

              questions (confidential); Bates

              numbers UBER000178156 to 0000178159   114

Exhibit 119   12/11/2014 e-mail (confidential);

              Bates number UBER000057147                      183

Exhibit 120   12/01/2016 e-mail (confidential);

              Bates numbers UBER0000250080 to

              000035081                                       193

Exhibit 121   2017 Trust & Safety product vision

              (confidential); Bates numbers

              UBER000179554 to 000179592                      195

Andi Pimentel Volume I Confidential
October 15, 2024

EXHIBIT INDEX (CONT.)

EXHIBIT NO.   DESCRIPTION                                    PAGE

Exhibit 122   NorCal Ops - weekly all-hands
              (confidential); Bates numbers
              UBER000219250 to 000219259                     199

Exhibit 123   E-mail string (confidential); Bates
              numbers UBER000128630 to 000128633             203

Exhibit 124   WIP ELT safety support overview
              (confidential); Bates numbers
              UBER_JCCP_MDL_000257902 to
              000257906                                      204

Exhibit 125   E-mail string (confidential); Bates
              numbers UBER000062197 to 000062198             214

Exhibit 126   Personal safety MBR review outline
              (confidential); Bates numbers
              UBER000232946 to 000232949                     218

Exhibit 127   2017-2018 U.S. safety report                  275

Exhibit 128   Chat log (confidential); Bates
              numbers UBER000074783 to 00074785              162

Exhibit 129   2019-2020 U.S. safety report                  276

Exhibit 130   2021-2022 U.S. safety report                  278

Exhibit 131   Abstract:  In-app video recording
              (confidential); Bates numbers
              UBER000179763 to 000179765                     148

Andi Pimentel Volume I Confidential
October 15, 2024

EXHIBIT INDEX (CONT.)

EXHIBIT NO.   DESCRIPTION                                    PAGE

Exhibit 132   In-app video recording - maps team
              check-in (confidential); Bates
              numbers UBER000178168 to 000178180     150


                *** BREAK IN SEQUENCE ***


Exhibit 138   E-mail string (confidential); Bates
              numbers UBER_JCCP_MDL_000448334 to
              000448366                               180

TUESDAY, OCTOBER 15, 2024; SAN FRANCISCO, CALIFORNIA

THE VIDEOGRAPHER:  Good morning.

We are now on the record at 9:42 a.m. Pacific time on October 15th, 2024.

Audio and video recording will continue to take place unless all parties agree to go off the record.  Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Andi Pimentel, volume 1, taken by counsel for plaintiff in the matter In Re Uber Rideshare Cases, filed in the Superior Court of the State of California, County of San Francisco, Unlimited Jurisdiction.

This proceeding is being held at Shook Hardy & Bacon, located at 555 Mission Street, San Francisco, California.

My name is Miguel Concepcion; I'm the videographer on behalf of U.S. Legal Support.  I'm not related to any party in this action, nor am I financially interested in the outcome.  The court reporter is Marilynn Hoover on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which the court reporter will swear in

the witness.

MR. LEVIN:  Good morning, everyone.  Bill Levin for the plaintiffs.

MR. ATKINS:  Robert Atkins for Uber.

MS. KELLER:  Andrea Keller for Uber.

MR. LEVIN:  Okay.  Now we need the Zoom people.

MS. NEHMENS:  Angela Nehmens for the plaintiffs.

MR. LEVIN:  Come on, Myles.

MS. BASKIN:  Batami Baskin for the plaintiffs.

MR. GRIMES:  David Grimes --

MR. SHAW:  Sorry.  Myles Shaw for the plaintiffs.

MR. LEVIN:  Okay.  Are we good?

MR. ATKINS:  Yeah, that's enough.

ANDI PIMENTEL,

called as a witness, being duly sworn on oath, was examined and did testify as follows:

THE VIDEOGRAPHER:  Counsel, you may proceed.

EXAMINATION

BY MR. LEVIN:

Q.  Good morning, Ms. Pimentel.  My name is Bill Levin and I represent a number of women who have been

sexually assaulted by Uber drivers, and I'm also here on behalf of JCCP leadership.

Okay. Good morning.

A. Good morning.

Q. Have you ever had a deposition taken before?

A. No.

Q. Have you had a chance to have counsel explain to you "don't get into the content," what the process is like?

A. Yes.

Q. Okay. So my main -- my main ask, so to speak, is just listen to the question, answer it as best you can.

If you don't understand the question, let me know and I'll try and rephrase it, because it's important that we be talking about the same subject and be on the same page. Okay?

A. Okay.

Q. Okay. What is your current position at Uber?

A. My current position is a product manager on the safety team.

Q. Okay. And what products?

A. I work on recording.

Q. Video and audio recording?

Andi Pimentel Volume I Confidential
October 15, 2024

A.   Yes.

Q.   Are you any longer chief of staff to the CEO?

A.   No.

Q.   Okay.  And when did that stop?

A.   That stopped fall of 2021.

Q.   Okay.  And what caused it to stop?  Is it the new position that caused it to stop?

A.   You know, Dara and I always understood the chief-of-staff role to be temporary; so when I reached my two-and-a-half, three-year mark with him, I began looking at other roles.  And product was an organization that really interested me, and I applied to a few roles, one of them being the recording role.

Q.   Okay.  And what attracted you to the recording role?

A.   The leadership.  There are some really intelligent, capable, wonderful, innovative leaders on that team, and working with them was very appealing.

Q.   Okay.  Was there somebody within safety and within products within safety, that was a product manager of media recording, audiovisual recording, before you?

A.   Yes.

Q.   And who was that?

A.   Rebecca Payne.

Q.   And how long had she been in that role?

A.   I don't know.  She was in that role when I interviewed.

Q.   Okay.  As I understand it, you began at Uber in 2012?

A.   Yes.

Q.   So you've been there 12 years?

A.   Um-hum.  Yes.

Q.   Are you a shareholder?

A.   Yes.

Q.   How many shares?

A.   I don't know.

Q.   Okay.  Is shares of the nature of sort ███ bonus that's been awarded to you over time?  Do you have a right to buy into shares?  How does that w███

A.   My understanding is that employees are███ shares through grants when you join the company. ███ you stay there a certain amount of time, as a -- ███ performance -- at the end of a performance ████████ get shares.

Q.   Okay.  So you've been accumulating sh███ over time in connection with your work?

A.   Yes.

Q.   As a function of your work?

Q.   I'd like to show you what's been marked as Exhibit 101 --

A.   Okay.

Q.   -- which is an e-mail --

A.   Okay.

Q.   -- welcoming you to the product team, just to orientate you.

MR. ATKINS:  Just so -- Rules of the road, just for rules of the road:  You know, when Bill gives you a document, take your time to read it and whatever you need to do to respond to Bill's questions.

THE WITNESS:  Okay.

(Exhibit 101 marked.)



Q.   Okay.  So I'm going to get to the chief-of-staff role in a second; but tell us sort of generally what you did in ops, marketing, and business development prior to 2016.

A.   Okay.

Q.   Just like an overview.

A.   Sure.  Sure.  So when I joined in October of 2012, I joined the San Francisco operations team.  My role was a community manager.  I was one of multiple community managers, and my role was to essentially do three things:  One was to help grow our rider base; another one was to help with social media, local social media in San Francisco; and another part of my role was to respond to rider inbound.

Then I moved on to the business development team in -- I believe it was 2014, perhaps.  And my role on the business development team was to -- I worked on partnerships; and I worked on brand partnerships, I worked on product partnerships, and I worked on driver-facing partnerships.

Q.   Okay.  And then after that?

A.   And then after that, there came a time, when I was on the business development team, that I became

chief of staff to the leader of that team.







Q.   Yeah.   In your LinkedIn, if I'm remembering correctly, it says you became a chief of staff to the CEO in December 2018.

Does that sound right?

A.   It's --

Q.   It's okay.

A.   These years all blend together; but that sounds about right, yeah.

Q.   Okay.   And you were working with him before you were exclusively his chief of staff for some period of time in a chief-of-staff type role?

A.   By "him," you mean Dara?

Q.    Dara.

A.    Yes.

Q.    And how long were you working for Dara in a chief-of-staff like role before you became exclusively his chief of staff?

A.    Maybe eight months, six months.

Q.    Okay.  So a number of months in 2018?

A.    I believe so.





















████████████████████████████████████████████████████

████████████████████

████████████████████████

Q.    When you became product manager for dashcams, did you endeavor to learn what the company had done and not done prior -- with respect to cameras prior to you having that new job?

A.    Yes.  As with any new job, I tried to learn as much as possible to be able to do well in my new role.

Q.    You tried to learn as much as possible about the history of dashcam programs at Uber, so you could do the new job of being a dashcam product manager?

A.    Yeah.

████████████████████████████████████████████████████



















MR. ATKINS:  Bill, I could use five.

MR. LEVIN:  Oh, sure.

MR. ATKINS:  Thank you.

MR. LEVIN:  I can always use five.

And, by the way, anyone need to take a break, just say it.

THE WITNESS:  Okay.  Awesome.

MR. LEVIN:  Okay.

THE VIDEOGRAPHER:  Going off the record at 10:30 a.m.

(Recess.)

THE VIDEOGRAPHER:  And we are back on the record at 10:39 a.m.

MR. LEVIN:  Okay.  Are we okay, Bob?

MR. ATKINS:  Yeah, go ahead.  I'm just getting a cup of coffee.  I'm here.











































MR. LEVIN:  What's the next exhibit?

MR. ATKINS:  Bill, let me give you yours back.

MR. LEVIN:  Okay.

MR. ATKINS:  May we get a copy, though?

UNIDENTIFIED SPEAKER:  Yes.  We're going to print one.

MR. ATKINS:  Thank you.

MR. LEVIN:  Thank you.

(Exhibit 108 marked.)

























MR. LEVIN:  Okay.  Let's go to Exhibit 110.

MR. ATKINS:  Let's take a two-minute break, literally two, if it's okay.

MR. LEVIN:  Yeah.  If you keep it to two, I can't accomplish very much.

Can we make it five?  Four?

MR. ATKINS:  Yeah, five.

THE VIDEOGRAPHER:  Okay.  Going off the record.

MR. LEVIN:  Yeah, we're going to have a break soon.

MR. ATKINS:  All right.  We'll be right back.

MR. LEVIN:  Okay.  Then we'll stay.

MR. ATKINS:  You got my hopes up.

MR. LEVIN:  Well, we're going to have a subject change.

MR. ATKINS:  Okay.  Thanks.  Stretch your legs.

MR. LEVIN:  Okay.  Good.

THE VIDEOGRAPHER:  Going off the record at 11:40 a.m.

(Recess.)

(Exhibit 107 re-marked.)

THE VIDEOGRAPHER:  And we are back on the record at 11:47 a.m.

Q.  BY MR. LEVIN:  I want to come back to just -- to 107 just for a moment, now that everybody has their own copy.

A.  Okay.











MR. LEVIN:  Let's move to -- Do you want to break?

UNIDENTIFIED SPEAKER:  Yeah.

MR. LEVIN:  Okay.  What -- What can we do about a short break to eat?

MR. ATKINS:  Dining?

(Off the record discussion.)

THE VIDEOGRAPHER:  Going off the record at 11:58 a.m.

(Lunch recess.)

THE VIDEOGRAPHER:  And we are back on the record at 12:34 p.m.





































Q.   As a safety feature?

A.   As a safety feature.

MR. LEVIN:  Okay.  Let's go to Exhibit 115.

(Exhibit 115 marked.)



















MR. LEVIN:  Okay.  Let's go to 117.

(Exhibit 117 marked.)

(Sotto voce remarks.)

THE WITNESS:  Okay.















Q.    Okay.  Now, recently, when -- we talked about this when we met -- I recently saw your video "Behind the Wheel" and where you discuss the different dashcam projects that you've been involved in.

Do you -- Do you recall making that video? I think it's 2023.

A.    I vaguely remember making that video.

Andi Pimentel Volume I Confidential
October 15, 2024

Q.   Okay.  Well, what I got from watching that video and also reading documents is that there's been three basic different approaches that you talk about in the video and that the documents talk about, and the three are in shorthand referred to as BYOD, VIP, and IAVR.

A.   Yes.

Q.   Have I got that right?

A.   Yes.

Q.   Okay.  So let's talk about BYOD, which is one of the dashcam projects, and I want to just ask you a couple of questions about it.

One is just -- can you just describe generally the program.

A.   Sure.  When I came onboard the recording team, the dashcam -- the BYOD program was essentially given to me to expand.  And my understanding of that program is one where we encourage drivers who have dashcams or who go out and procure a dashcam to enroll it with Uber.  And the reasons we let them know that they should enroll it with Uber or that they can enroll it with Uber are, one, so that we can help them follow surveillance laws by sending their rider, any rider they match with, a notification in-app that the ride could be recorded; and, second, so that they can

easily send footage to Uber support in the case of a safety incident.

Q. Okay. So BYOD, bring your own dashcam, is a program where the buyer -- the driver either goes out to buy their own dashcam or already has one; but whether they already have one and go out and buy it, the BYOD program is they're registering their dashcam with Uber so that the passenger can be notified and so that the system is set up so it's easy to download the footage to Uber. Correct?

A. To upload the footage to Uber.

Q. To upload the footage.

A. Yes.





A.    Okay.

Q.    And tell me what VIP stands for, what the initials stand for, so everyone knows?

A.    Sure.

Q.    But also what the program's about.

A.    Sure.  So when I came onboard recording, VIP was already launched -- designed, launched; and my job was essentially to keep it going and, you know, bring it to further fruition.

VIP stands for "vendor-integrated product," or some people call it "vendor-integrated program." But, essentially, my understanding is that the idea -- the idea is that we, meaning Uber, would build technology to connect the app to a vendor's dashcam, and therefore we would be able to be more connected and involved with the activity of the dashcam.

Q.    I understand.  So this is -- BYI -- BYOD

involves whatever camera the driver chooses to go out and buy; correct?

A.   Correct.











Q.    Let's go to IAVR.  And I'm understanding IAVR somewhat; but since it's your work, why don't you tell us what it is.  Describe it and how it works.

A.    Sure.  So, in that video recording, also known as Record My Ride, is the ability for drivers to record their Uber trips, using their selfie camera, at least for now.  And the recordings are encrypted and stored on the device.

And just like with BYOD and just like with VIP, we send a notification to the rider when they match with the driver who has in-app video recording on.  And just like with BYOD and VIP, drivers can send footage to Uber support if there's a safety incident that they experience.

Q.    If they want to?

A.    If they want to.









████████████████████

MR. LEVIN:  Okay.

MR. ATKINS:  Bill, is this a good time for five minutes?  It's 2:00.

MR. LEVIN:  It is.  It's a perfect time.

THE VIDEOGRAPHER:  Okay.  Going off the record at 1:59 p.m.

(Recess.)

THE VIDEOGRAPHER:  And we are back on the record at 2:12 p.m.

Q.  BY MR. LEVIN:  So your position as a product manager of safety media is within the safety team; right?

A.  Yes.













Q. But under the video programs BYOD and IAVR and VIP, the driver has the protection of the visual record of the ride. If somebody claims that the driver did something wrong and misbehaved or sexually assaulted a passenger, the driver has the record of what happened in the ride. Correct?



Q.    Okay.  Providing the option to drivers to get a camera under one of these system -- under one of these programs provides a source of protection to the driver if something goes wrong, because the driver has video footage of the ride; correct?

A.    I would say that it provides -- What was the word you used?

Q.    Protection.

Andi Pimentel Volume I Confidential
October 15, 2024

A.    I would say it provides possible protection to everybody involved in the trip.

Q.    Okay.  But that same possible protection is not being provided to passengers who get in Ubers where the driver has elected not to have a camera?

A.    We are providing that protection, in the way you mentioned it, to riders, as riders can record audio if they wish.

Q.    How long has that been true?

A.    Of the rider recording for audio?

Q.    Yeah.

A.    I believe 2019.

Q.    Okay.  So if I go to the home page on the Uber app, on the home page I don't see safety features at all.  I have to go -- I go to "services," there's stuff about groceries and all kinds of things but nothing about safety.  I have to go to the "account" button to see safety; correct?

A.    On your home page, you should be able to see a blue safety toolkit, which is where all of the safety features are housed.

Q.    Yeah.  And it's -- it's on not on the home page, but on the account page?

A.    I believe it should be on your home page.

Q.    I agree, it should be; but it's not.

A.   Are you sure?

Q.   I'm pretty sure -- I mean, unless I have a strange Uber app.

MR. ATKINS:  Maybe we could have some questions.

MR. LEVIN:  Yeah.  Okay.

THE WITNESS:  Yeah.

(Exhibit 131 marked.)

THE WITNESS:  Thank you.

MR. ATKINS:  What number did you say?

MR. LEVIN:  131.

MR. ATKINS:  He skipped.  He's allowed make this 2017 if he wanted to.

MR. LEVIN:  I tried to go in order for you, but I've failed.

(Sotto voce remarks.)





MR. LEVIN:  Okay.  Let's go to 132.

(Exhibit 132 marked.)

THE WITNESS:  Thank you.









Q.  Well, a company that manufactures a camera

that can function as a safety feature, even in cars where they're not -- the cameras are not there, it's going to be an interesting product.

MR. ATKINS:  That's not a question.

MR. LEVIN:  That's not a question; that's just an observation.

MR. ATKINS:  That's a -- He's being facetious.

THE WITNESS:  Okay.

Q.  BY MR. LEVIN:  Let's look again -- Sorry. Let's look again at 174.

A.  Okay.











████████████

████████████████████

MR. LEVIN:  Well, we can -- let's go on to the next exhibit --

MR. ATKINS:  Okay.

MR. LEVIN:  -- and then I think things will -- clarity will emerge here.  Which is...

(Sotto voce remarks.)

THE WITNESS:  Can we take a two-minute break?

MR. ATKINS:  Pardon me?

THE WITNESS:  Can we take a two-minute break?

MR. ATKINS:  You want a two-minute break?

THE WITNESS:  Yeah.

MR. ATKINS:  Sure.

MR. LEVIN:  That will be helpful for us too.

MR. ATKINS:  Okay.  Great.

THE VIDEOGRAPHER:  Going off the record at 2:53 p.m.

(Recess.)

THE VIDEOGRAPHER:  And we're back on the record at 3:03 p.m.

MR. LEVIN:  Okay.  Let's turn to Exhibit 128.

THE VIDEOGRAPHER:  Microphone, counsel.

MR. LEVIN:  Oh, thank you.  128.

(Exhibit 128 marked.)

THE WITNESS:  Thank you.

MR. ATKINS:  Sorry.

MR. LEVIN:  It's the entertainment part -- section of the deposition.

MR. ATKINS:  Go ahead.

THE WITNESS:  Okay.









Q.   Okay.   Have you deleted any written communications, e-mails, any other form of -- any

Andi Pimentel Volume I Confidential
October 15, 2024

other channel of communication, as a -- as a sort of routine operating part of your job?

A.   You mean like, in general, do I delete e-mails?

Q.   Yeah.

A.   I mean, when I get an e-mail, I read it, I interact with it as I should, and then I -- I archive it.

Q.   So you don't delete; you save them?

A.   I don't know.

Q.   Okay.  Do you know that this litigation has been operating under a litigation hold since the earlier cases were filed years ago?

A.   Since the earlier cases?

Q.   Do you know what a litigation hold is?

A.   Not in detail.

Q.   Okay.  Have you been -- Were you instructed inside Uber not to delete any of your communications having to do with cameras and safety and sexual assaults?

Were you instructed by Uber to preserve and not delete e-mails and other forms of written communication because this litigation is ongoing?

A.   I could have gotten an e-mail about that, but I can tell you that I have not deleted any

documentation of any kind.

Q.   Okay.  So whether you were told or not, you don't remember being told about a litigation hold?

A.   I could have gotten an e-mail about it.

Q.   Okay.  But whether you got it or not, you save everything?

A.   So I don't actively go to "File, Save"; but, no, I have not deleted any documentation.



































Q.    BY MR. LEVIN:    Okay.    Do you know that, at a certain point in time, Uber rolled out what it called Ride Check?

A.    I do know that.

Q.    Okay.    And what is Ride Check?

A.    I know, generally, Ride Check to be a product that, whenever certain things happen on a trip, like a long wait time or a deviation from a predetermined route, the rider and the driver, I

believe, get an in-app notification asking if everything is okay.

Q.    Right.

A.    That's generally what I know.

Q.    Okay.  So what Ride Check does is it sends an alert to driver and passenger when something seems off, in terms of the ride's off course, and it sends an alert saying, "Is everything okay?"

A.    I mean, I don't work on Ride Check.  That's my general understanding.

█████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████

Q.    Okay.  Ride Check doesn't come into play until 2019.  Is that how you recall it?

A.    I don't recall the year.  I just know it's a feature today.

Q.    Okay.  So let's just imagine a ride goes off course and the passenger and driver get an alert, "Is everything okay?"

A.    Um-hum.

Q.    Right?  Things could be okay, and maybe they're not okay; correct?  You don't know.

A.   Right.

Q.   Okay.  What happens when you send the alert, the ride's off course, and you hear nothing back?

MR. ATKINS:  All right.  Objection.  If you know.

THE WITNESS:  I mean, yeah, that's -- that's a question for the Ride Check team.

Q.   BY MR. LEVIN:  Okay.  Can we agree, because there's a camera part of this, that if a ride goes off course and the alert goes out, "Is everything okay?" and you had a real-time video feed, you would be able to see what's going on in the car when the ride goes off course?

A.   Real-time video feed, as in streaming?

Q.   Yeah.

A.   And are you saying, is that possible?

Q.   Yes.

A.   I'm not --

MR. ATKINS:  Don't guess.

THE WITNESS:  I'm not an engineer.  I don't even know if streaming within the Uber app is a thing.











MR. LEVIN:  All right.  Let's look at Exhibit 120.

(Exhibit 120 marked.)

THE WITNESS:  Thank you.

THE STENOGRAPHIC REPORTER:  You're welcome.





(Exhibit 121 marked.)













MR. LEVIN:  Okay.

(Sotto voce remarks.)

MR. ATKINS:  You're in charge.  I'll be right back.

(Sotto voce remarks.)

MR. LEVIN:  Are we losing Bob?

THE WITNESS:  I think he stepped out for a second.

MR. LEVIN:  Maybe we'll just go in order.

I see what you're saying.  Are we waiting?

MS. KELLER:  No.

MR. LEVIN:  We're not waiting.  Okay.

MS. KELLER:  Stuck with me for a few

minutes.

MR. LEVIN:  Well, I don't view it that way.
It's an upgrade.

Let's -- Let's look at Exhibit 123.

(Exhibit 123 marked.)

THE WITNESS:  Thank you.

THE STENOGRAPHIC REPORTER:  You're welcome.



























Q.   BY MR. LEVIN:   The first U.S. safety report was published on December 5th, 2019, if you recall?

A.    I don't recall the exact date --

Q.    Sound about right?

A.    -- but it sounds about right.









MR. ATKINS:  If you know.  Okay.

MR. LEVIN:  All right.

MR. ATKINS:  Let's take a break.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Okay.  Going off the record at 4:35 p.m.

(Recess.)

THE VIDEOGRAPHER:  And we're back on the record at 5:03 p.m.









Q.   Your LinkedIn profile's is a little -- I don't think it's completely accurate, the one that was presented to us.  So can you just take a crack at -- because it, for example, has you still chief of staff to the CEO.  It says "January 2019 to present."

A.   Yes, I have not updated my LinkedIn.  I'm not active on LinkedIn.

Q.   I'm not being critical, but I'm not going to rely on it either, since you haven't updated it. Right?

Okay.  So can you do your best to try and estimate when you began working with Emil Michael in the way that you described it.

A.   Sure.

Q.   And then move on to Richter, Hartford, and Dara.

A.   Yeah.

Q.   So we get the time frames sorted.

A.   Okay.  Of course.  Let's try it.

So I know I joined the business development team in January of 2014.  Or I believe I do; I don't -- I recall that I do.

Q.   Okay.

A.   I must have worked on partnerships for about a year before I officially became Emil's chief of

staff, so that takes us into January of 2015.

Q.   Okay.

A.   Now, that doesn't mean that I wasn't working in the chief-of-staff capacity before that.  As we mentioned, there was a time where I was doing both roles, or it felt I was doing both roles, before it was formalized.  So let's say January 2015 for Emil as his chief of staff.

When Emil left -- so that's a date that we can find out -- but when Emil left, David took the team; so that's when I became David's chief of staff.

Q.   And do you know about when that was?

A.   I don't.  I don't.

Q.   Okay.  But you were essentially chief of staff, even though you might not have had that title yet, with Emil Michael from about January 2015 until he left?

A.   Yes.  Yes.

Q.   Whatever that is?

A.   Yes.  Yes.

Q.   And whenever he -- whenever Emil Michael left, you became chief of staff to David Richter?

A.   Correct.

Q.   Okay.  And then approximately how long were you a chief of staff from the time that Emil Michael

Andi Pimentel Volume I Confidential
October 15, 2024

left to David Richter?

A.   Until the day David Richter left.  So I think it was a year, which puts us into January of 2016.

But when David left, I -- I took a -- I took a break; I went on a three- or four-month sabbatical. And when I came back, I interviewed for the role for chief of staff to Barney and Dara.

So let's see.  That takes us into -- So let's say January 2016, starting to be David's chief of staff; maybe 2017, starting to be Barney and Dara's; and then whenever Barney left -- So these transitions are marked by departures, essentially. Whenever Barney left, I was Dara's sole chief of staff, meaning I did not report to Barney anymore; I reported to Dara.

Q.   But there was that period of time, while Barney was still there, that you were -- after Richter left, that you were chief of staff to both?

A.   To Barney and Dara?

Q.   Yeah.

A.   Yes.

Q.   Okay.  And then when did you cease becoming chief of staff to Dara?

A.   In the fall of 2021, when I joined the

product team.

Q.   Okay.  So is it true, then, that between January 2015 when you were working in this quasi chief-of-staff role for Emil Michael, until the fall of 2021 when you -- when you left to become a product manager, that you were always chief of staff to one of these four executives, consecutively?

A.   Yes.  And I say, "but" I took that four month sabbatical.

Q.   Okay.  Did you --

A.   So, yes.

Q.   And when was that, about?

A.   It was when -- when David left.

Q.   For another four months?

A.   When David left, I took a four-month sabbatical, came back, interviewed for the COO -- chief of staff to the COO and CEO role.

Q.   Other than that four-month sabbatical, it'd be true, from the beginning of 2015 until the fall of '21, you were always in a chief-of-staff role to one of these four executives at the company?

A.   Yes.















Q.    Okay.  And so does that mean it says that or it doesn't say that, that the words appear on the page?

MR. ATKINS:  You don't have to -- Excuse me.

MR. LEVIN:  Wait a second.

MR. ATKINS:  You can be angry at me, but not the witness.

MR. LEVIN:  I am not angry -- I am not angry at anyone.

MR. ATKINS:  Okay.  Then tone it down.

MR. LEVIN:  I want -- The words appear on the page, we've been hearing all day long.  It's very cute.  Okay?

MR. ATKINS:  Excuse me.  No, don't --

MR. LEVIN:  Yeah.  No, I want an honest --

MR. ATKINS:  I'm fair game; she's not.

MR. LEVIN:  Okay.  I want an honest answer to this question.

MR. ATKINS:  She already answered the question.

MR. LEVIN:  No.

MR. ATKINS:  Yes.

MR. LEVIN:  I'm going to ask it again because I don't think I got an answer.

MR. ATKINS:  Okay.











MR. ATKINS:  Objection.

Q.  BY MR. LEVIN:  Have you --

MR. ATKINS:  Oh, I'm sorry, Bill. Objection.

MR. LEVIN:  Okay.

MR. ATKINS:  Are you done?

Q.  BY MR. LEVIN:  Do you know that -- Okay.  Do you know there are cameras mandated in taxicabs?

A.  I don't know the specifics around that.

Q.  Okay.  Do you know there are cameras on San Francisco municipal transit?

A.  I don't know the specifics around that.

Q.  Do you know that there are cameras on

trains?

A.    There could be.  I don't know specifics about that.































Q.   BY MR. LEVIN:   The reality that you're functioning within now is that you are not requiring Uber drivers to have cameras; correct?

A.   Correct.  It's opt-in.

Q.   BY MR. LEVIN:   To increase adoption, meaning to get more drivers to just agree to have cameras?

A.   To get more recording to happen on the platform.

Q.   But that's only going to happen if drivers opt in?

MR. ATKINS:   Objection to form.

Q.   BY MR. LEVIN:   Correct?

A.   What do you mean?

Q.   You're only going to get more recording on the platform if more drivers opt in?

A.   Yes.   Or if riders record as well.



Q.   Do you remember the proposition where the California voters were asked whether Uber drivers and Lyft drivers should be classified as employees or contractors, independent contractors?

Do you -- Do you remember that -- that being on the ballot in 2020?

A.   I generally remember that being on the ballot in 2020.

Q.   Okay.  And do you remember that Uber and Lyft and others spent somewhere in the neighborhood of $200 million trying to get that passed?

A.   I don't know how much money was spent trying to get that passed.



THE WITNESS:  I can't say.

MR. ATKINS:  Bill, I need five.

MR. LEVIN:  Okay.  Yeah.

MR. ATKINS:  We're good now?

Andi Pimentel Volume I Confidential
October 15, 2024

MR. LEVIN:  Now is fine.

MR. ATKINS:  Okay.

THE VIDEOGRAPHER:  Okay.  Going off the record at 6:09 p.m.

(Recess.)

THE VIDEOGRAPHER:  And we're back on the record at 6:17 p.m.

Q.   BY MR. LEVIN:  If --

THE STENOGRAPHIC REPORTER:  Your microphone, please.

Q.   BY MR. LEVIN:  Oh.  If -- If you were to think about who at Uber would be the best person to answer the question that I've been asking, which is "Where did this edict come from that we can't require Uber drivers to have cameras?  Where did that come from?" who would you ask?

MR. ATKINS:  Objection.  Lack of foundation.

You can skip the edict part and answer his question, because we know what he wants.

THE WITNESS:  Okay.  I don't know.

Q.   BY MR. LEVIN:  If you were going to -- If your reward was going to be that you would get a lot of money if you figured out who the right person to answer that question at Uber would be, who would be at the top of your list?



Go ahead.





Q.  Okay.  Now, if I am a woman passenger and an Uber customer, do you think I have a right to know about the fact that there have been reports of sexual misconduct and sexual assault on the platform?

A.  Yes.  And I believe that's what the safety report is about.

Q.  Okay.  So the first safety report was published in December 5, 2019.  Okay?

A.   Again, I don't know the exact date --

Q.   Okay.

A.   -- but that sounds about right.

Q.   Were you involved as chief of staff in preparing any of these safety reports?

A.   No.

Q.   Do you know whether the executive leadership team had the final say in terms of the content of the U.S. safety report?

A.   I don't know who had the final say.

Q.   Do you -- Do you have -- Having been chief of staff to four executives, do you think it was at the executive decision-making level, "it" being the U.S. safety report and its contents; or do you think people could just work on something like this and put it out there in the world without consulting the executives?

A.   No.  With something that important, executives had to be involved.

Q.   Okay.  So you're agreeing that the executives were involved at some level in the -- in the preparation and publication of the U.S. safety reports?

A.   Yes.

Q.   Okay.  And prior to December 5th, 2019, are

Andi Pimentel Volume I Confidential
October 15, 2024

you aware of anything that was out there in the world that would have alerted a female passenger to the fact that there have been reports of sexual misconduct and sexual assault on the platform?

A.   I don't know.

Q.   Okay.  Now, the U.S. safety report, it was released by Uber towards the end of 2019.

Do you know how it was released?

A.   I don't.

Q.   Okay.  You don't know how it was sort of published and circulated?

A.   I don't.

Q.   Do you know how many riders know that there actually is a U.S. safety report?

A.   I don't.

Q.   Okay.  There have been three.

Do you know how they would actually come to the attention of a passenger who was making a decision at night, let's say, after they've been drinking, as to whether or not to get into an Uber?

Do you know how passengers would come to learn that there even was such a thing as a U.S. safety report?

A.   I don't know.

Q.   Okay.  Now, you can communicate with every

Andi Pimentel Volume I Confidential
October 15, 2024

single -- "you" being Uber -- passenger via the app;

correct?

A.   Yes.

Q.   And I get alerts from Uber.  Promotions and

things come to me as an Uber -- someone that, you

know, is a customer, from time to time.  Correct?

A.   I mean --

Q.   Regularly.

A.   -- that's more a question for you.

Q.   Okay.  Well, this is a pretty good -- the

phone and the app is a pretty good way of reaching all

the Uber customers, isn't it?

A.   The app, yes.

Q.   Yeah.  And so if I go on the home page of

the app or anywhere else in the app, do I find

anything mentioning any of the U.S. safety reports?

A.   I'm not sure.  I don't work on that.

Q.   Okay.  Do you know whether there's a link

provided to the passengers through the app, saying,

"We've just published this U.S. safety report

reporting on sexual misconduct and sexual assaults,"

you know, "Click here"?

Do you know whether there's a link that says

that within the app?

A.   I don't know if there's a link that says

that.

Q.   In the earliest one, if you recall, there was a section on new safety technology.

Do you recall seeing that?

A.   I would need to see it to see if I recall.

Q.   Okay.  I'm going to loan you my copy here. It's on page 11.

UNIDENTIFIED SPEAKER:  We can put it in as an exhibit.

MR. LEVIN:  Oh, you want to put it in? Okay.

UNIDENTIFIED SPEAKER:  Well, if you want to use it.

(Sotto voce remarks.)

MR. LEVIN:  These are quick questions, and I know Bob's hungry and it's past his bedtime.

MR. ATKINS:  Here.

MR. LEVIN:  Okay.

MR. ATKINS:  All right.  Whatever you want to do.

Q.   BY MR. LEVIN:  At page 10...

A.   Oh, thank you.  Okay.

(Sotto voce remarks.)

MR. ATKINS:  Yeah, the court reporter has to mark it.

MR. LEVIN:  Yeah, safety product experience.

MR. ATKINS:  Do you want the court reporter to mark it as an exhibit?

MR. LEVIN:  Sure, whatever our next is.

MR. ATKINS:  And what page?

MR. LEVIN:  Page 10.  And it goes on to page -- that's it, just page 10.

(Reporter request.)

(Exhibit 127 marked.)

THE WITNESS:  What page?  Sorry.

MR. LEVIN:  Ten.  I think it's ten.

THE WITNESS:  Okay.

MR. LEVIN:  And this one -- I'm sorry.  It's 11 and 12.

(Sotto voce remarks.)

UNIDENTIFIED SPEAKER:  Do you have the 2017 one?

MR. LEVIN:  You mean first one?

UNIDENTIFIED SPEAKER:  Oh, no.  Sorry.  We passed out the wrong one.

MR. LEVIN:  Oh, you did?

THE WITNESS:  I think we might need to correct this.

MR. LEVIN:  Well, keep it.  We're going to get to it.

THE WITNESS:  Okay.

MR. ATKINS:  You're running out of time.

MR. LEVIN:  I know.

THE WITNESS:  Okay.

MR. LEVIN:  Thankfully, for everyone.

Thankfully.

(Exhibit 129 marked.)

(Discussion off record.)

MR. ATKINS:  All right.  Come on.

Q.   BY MR. LEVIN:  Okay.  So do you see on
page 11 and 12 they discuss safety technology?

A.   I do see that written here.

Q.   And there's no mention in that section of
cameras?

A.   I don't see that.

Q.   Okay.  Then let's go to the next safety
report --

MR. ATKINS:  129.

Q.   BY MR. LEVIN:  -- which is 2019 to 2020.

MR. ATKINS:  I don't have that either.  I
got the '22 one.

MR. LEVIN:  Okay.  We'll give it to you.

THE WITNESS:  Which page?  Sorry.

Q.   BY MR. LEVIN:  We are now on page 10.

A.   Okay.

Q.   And, for context, this is the 2019 to 2020 U.S. safety report, but it's published June 30th, 2022; and there's a section on page 10 about safety products.

Do you see that?

A.   I do see that.

Q.   Okay.  And "cameras" is not mentioned; correct?

A.   Cameras are --

MR. ATKINS:  Read it.  I trust Bill, but you're testifying under oath.

THE WITNESS:  Correct, cameras are not mentioned.

Q.   BY MR. LEVIN:  Okay.  But audio recording is appearing?

A.   I do see audio recording appearing.

Q.   Okay.  And you're now -- At the time this was published, you were already product manager of cameras.

Do you know why cameras was not included as part of the safety product experience?

A.   So this was published when?  Can you remind me, please.

Q.   It's published June 30th, 2022.

A.   So I was not on recording yet --

Q.   Okay.

A.   -- officially.

Q.   Okay.  But, anyway, do you know why it wasn't published, why -- why cameras were not included?

A.   I do not.

MR. LEVIN:  All right.  Then let's go to the last one.

MR. ATKINS:  Thank you.

THE WITNESS:  Thank you.

(Exhibit 130 marked.)

THE WITNESS:  130.

MR. ATKINS:  Um-hum.

Q.   BY MR. LEVIN:  The U.S. safety report, 2021 to 2022 --

A.   Yes.

Q.   -- which just was published this summer, I believe.

Does that sound about right to you?

A.   That sounds about right.  I don't remember the specific date.

Q.   Okay.  And do you see on page 7 it says: "Technology to drive accountability and deter bad behavior" at the top of the page?

A.   You see that.

Andi Pimentel Volume I Confidential
October 15, 2024

Q.   Okay.  And, actually, now, for the first time, there is a section on dashcams; correct?

A.   That's what it looks like, yeah.

Q.   And, in this section, it says:  "We're investing in recording technology to promote accountability and deter bad behavior.  Our aim is to reduce safety incidents and help provide better support to riders and drivers.  We've worked to expand awareness and usage of existing features while designing new features that incorporate driver feedback, in line with the commitments that we made in our last safety report."

Do you see that?

A.   I do see that.

Q.   Okay.  And then it says:  "Dashcam registration.  Drivers with dashcams can register them in the driver app and more easily share video footage with Uber.  Uber can only view footage if drivers choose to share it when an incident is reported.  Uber will also notify riders that their trip might be recorded if they're paired with a driver who has registered their dashcam."

Do you see that?  I read it correctly?

A.   I do see that, yes.

Q.   Okay.  And do you know why it is that the

dashcam registration program is appearing for the first time in the 2021 to 2022 U.S. safety report?

A.   I don't know why.

Q.   Okay.  And it also talks about Record My Ride, further down.

A.   I see that.

Q.   And that's describing the in-app video-recording product; correct?

A.   Yes.

Q.   "Drivers can use the front-facing camera of their smartphone to record video without the added expense of a separate dashcam."

Right?

A.   Right.

MR. LEVIN:  I think, since we're going to have to resume anyway and we're coming close to the end of what we agreed today, and because we're not going tomorrow and because we don't know when we're going again, I think it makes sense for us to stop here --

THE WITNESS:  Okay.

MR. LEVIN:  -- so that people get to do whatever it is they need to do tonight as people, and we'll just resume when -- whenever we resume.

Okay?

MR. ATKINS:  Okay.

MR. LEVIN:  All right.

MR. ATKINS:  Okay.

THE VIDEOGRAPHER:  This concludes volume 1 of the deposition of Andi Pimentel.

Going off the record at 6:38 p.m. Pacific time.  Thank you.

(DEPOSITION ADJOURNED AT 6:38 P.M.)

Andi Pimentel Volume I Confidential
October 15, 2024

STATE OF CALIFORNIA      )
                         )  SS.
COUNTY OF SAN FRANCISCO  )

I, MARILYNN HOOVER, CSR No. 8841 for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced by me to typewritten form; and that the same is a true, correct, and complete transcript of the said proceedings.

Before completion of the deposition, review of the transcript [X] was [ ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed shall be appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 18th day of October 2024.

_____

Marilynn Hoover, RPR

California CSR No. 8841

Andi Pimentel Volume I Confidential
October 15, 2024

Page  Line        Change                Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Andi Pimentel Volume I Confidential
October 15, 2024

CERTIFICATE OF WITNESS

I, ANDI PIMENTEL, do hereby certify that I have read the foregoing portion of the transcript of my deposition taken on Tuesday, the 15th day of October 2024, and that the said transcript is true and correct except for such corrections as I may have noted.

_____

ANDI PIMENTEL

Subscribed and sworn to before me

this _____ day of _____, _____.

_____

Notary Public, State of _____

My Commission Expires:  _____

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024

Andi Pimentel Volume I Confidential
October 15, 2024