# GZJ KDKV 66

Message

| | |
|---|---|
| **From**: | Joe Sullivan [        ]@uber.com] |
| **Sent**: | 2/23/2016 4:43:34 AM |
| **To**: | undisclosed-recipients: |
| **Subject**: | Kalamazoo update |

Hi everyone,

I want to follow up on my note from last night with a brief update related to the tragic situation in Michigan last weekend.  Today, a number of us at Uber - along with Uber Safety Advisory Board members Ed Davis and Margaret Richardson - continued spending time understanding the events in Kalamazoo, working closely with law enforcement, and engaging with media.

As part of that work, we held a conference call with over 100 national and regional reporters this afternoon. You may be interested to listen to the audio, which can be found on our Newsroom here. The transcript (internal) is also below.

A member of my team remains on the ground in Kalamazoo so that we can be as helpful as possible to law enforcement as they continue their investigation.

I will also be available at Weekly Q&A tomorrow to give a short in-person update and answer any questions.

Thanks,
Joe
................

**UBER, INC.**
**Moderator: Rachel Whetstone**
**February 22, 2016**
**4:00 p.m. ET**

Rachel Whetstone:   Good afternoon, everyone.  Thank you all so much for joining this call.  My name is Rachel Whetstone, and I'm responsible for Uber's public policy and communications.
Our company has been heartbroken by this senseless violence, and our thoughts are with of the families of the victims and the people who have been injured.
As we said in our statement yesterday, we've been working closely with the police to ensure they have all the information they need to conduct their investigation.
I'm joined on this call by Uber's chief security officer, Joe Sullivan.  Joe is a former federal prosecutor at the Department of Justice, and has been working on security and safety issues at U.S. technology companies for the past 15 years.
We also have two experts from our safety advisory board:   Margaret Richardson, counsel at Covington & Burling and former chief of staff to Attorney General Eric Holder; and Ed Davis, a former Boston police commissioner.
Joe will start by addressing some of the questions the media has asked, and we will then open the call up.  When we get to live questions, please introduce yourself and your news outlet.
If you need to fact-check anything during or after the call, please e-mail press@uber.com -- press@uber.com -- and we will get back to you immediately.  This call is on the record, and we are recording the entire conversation.
I'll now turn it over to Joe.
Joe Sullivan:      Thanks, Rachel, and good afternoon, everyone.  I want to reiterate how devastated we are by these murders, and that our thoughts are with the victims' families and the broader community in Kalamazoo.
As Rachel said, we have been working round-the-clock with law enforcement since Saturday night to help with their investigation.  Given all the media interest, we also want to help answer your questions, too.

So first and foremost, you've asked about background checks.  As the local police have made clear, the perpetrator had no criminal record, and if there's nothing on someone's record, then no background check is going to raise a flag.

As this case has shown, past behavior may not accurately predict how people will behave in the future.  This is where technology can help ensure safety before, during and after a ride in ways that was not possible a decade ago.

For example, passengers can see the details of their driver and his or her rating before getting into a car.  And all Uber rides are GPS-enabled, and passengers can share their journey with family or friends in real time.

And at the end of each trip, we ask passengers and drivers to rate each other, which brings me to the second question you've asked:    what were this driver's ratings, and did passengers contact Uber to complain?

Overall, his rating was good.  Before the events, it was a 4.73.  On Saturday, we were contacted by several passengers, including one gentleman complaining about dangerous and erratic driving.  That passenger had already contact -- called 911, who responded later in the evening.

In terms of how we handle feedback, when we do receive complaints about violence, we will suspend the driver immediately while we investigate the allegations.

If the complaint is about bad driving, we'll typically talk to the driver first, before suspending his or her account.  That's because we get a lot of complaints about bad driving, not all of which turn out to be 100% fair or accurate, and it's important we hear both sides.

Finally, you've asked about our firearms policy.  We're deeply committed to the safety of everyone on our platform, as well as the communities we serve, and we have a clear policy that prohibits having firearms in the vehicle.

So with that, I'll turn it over to questions.

Rachel Whetstone:   Thank you very much.  We'll now start taking questions.

Operator:        If you'd like to ask a question, please press star-one on your telephone keypad.

Your first question comes from the line of Dan Mangan from CNBC.  Your line is open.

Dan Mangan:     Hi.  Thanks for taking this call.  I had two questions.  One, are you contemplating any changes in policy, given what happened in Kalamazoo?

And secondly, last year, it was indicated -- or it was reported that you were going to roll out a panic button on the app worldwide, and you had already done it in India.

Why hasn't that happened yet, and couldn't that have helped alert Uber, at least, quicker than was done Saturday in Kalamazoo, and prevented the -- or the passenger wouldn't have had to call 911 -- they could have just alerted you in addition to that.

Rachel Whetstone:   I'll hand that over to Joe.

Joe Sullivan:      So to take your first question, I don't think that we will change our screening processes for onboarding new driver partners as a result of this incident.

As I mentioned earlier, no background check process would have flagged and anticipated this situation.  And so I -- I don't think that we will be contemplating a change there.

With regard to the -- the version of our app that operates in India, where we have a way for people to interact with police directly through the app, we developed that and implemented that for good reason -- because it provides something that we hope can be as good at someday -- the 911 service that's available already in the United States.

Anyone who has a smartphone here knows that you can very easily engage 911, and will know the number to call and everything like that.  And there's a federal system behind it that we can't hope to compete with in terms of quality of emergency services.

So in this case when we have the example of the rider who did call 911, that's exactly the behavior we want to encourage, rather than trying to build something into our app in the United States.

In India, and in the markets where we built that out -- that feature for our app, they did not have that same type of system that we could leverage.

Rachel Whetstone:   Thank you.  Next question?

Operator:        The next question comes from the line of (Yolanda Fruit) from NPR.  Your line is open.

(Elina Slate):      Hi.  This is (Elina Slate) with NPR.  I have two questions as well.  One is, are you considering adding a human layer to your screening process to kind of meet and vet potential drivers face to face?

And the other one's a bit logistical.  At what point did the investigators find out that the suspect was an Uber driver?  When did Uber get notified of that?

Joe Sullivan:    So, on your first question, whenever you build a screening process, you look at what objective features could you put into that screening process, and -- and what would -- what would the value that would be added from that.

We believe that the screening process that we have, focusing on -- on criminal history, motor vehicle checks and the like, combined with the technology that's built into the app that I mentioned earlier, brings us the ability to, in real time, monitor rides on GPS, collect feedback after the rides and empower people before a ride to make decisions about whether to get into the car with the driver by presenting them with information about the driver, and so on.

Those kind of features are what we think the best path forward in terms of investing in screening process is. We do have ongoing efforts from a technology standpoint where we hope to continue to improve safety through the use of technology and leveraging the GPS data even further, like we've talked about in some other contexts.

Rachel Whetstone:   I know Ed has some views on this too, so I'm just going to ask Ed to chime in.

Ed Davis:    Certainly. You know, we've -- I've worked in law enforcement for 35 years, and we have done hundreds of interviews, myself, and thousands of background checks.

I think that, as -- as it stands right now, the system the Uber has is extremely safe, and the idea that -- that, simply by having someone look at someone, that they could determine if they were were about to have a psychotic episode, is a faulty theory.

I think that -- you know, there have been many times when we have had some employees who have been under the care of a psychiatrist, and the psychiatrist has okayed them coming back to work, and they still acted out.

So these are not things that can be foreseen. And it's actually -- you know, bias can play an enormous role in it, if one person gets to say whether someone can be hired or not. It doesn't -- it's not a fair process. You really need a fair process in place.

(Elina Slate):    Thanks. And about the logistics? Kind of the timing of when you guys got notified, or at what point investigators found out that the suspect was an Uber driver.

Joe Sullivan:    So in terms of the timeline of the actual investigation and chronology of events, at this point, I'm going to defer to law enforcement and their decisions around what they want to make public, when they want to make it public, due to the nature of the pending investigation.

(Elina Slate):    Thank you.

Rachel Whetstone:   Next question, please.

Operator:    The next question comes from the line of Dee-Ann Durbin from the Associated Press. Your line is open.

Dee-Ann Durbin:  Hi. Thanks for taking the call. You said several people called you about the suspect's driving. I'm wondering if you can say how many? And was at all before the shootings began?

And what did Uber do when you received those calls? Did you contact the suspect? Because, like you said, you would call somebody after you get calls about erratic driving.

I have one final question -- why does Uber not have fingerprint checks? By many accounts, according to people we're speaking to today, they're more sophisticated, they can catch people who may be using aliases -- why aren't those standard across the board? Thank you.

Joe Sullivan:    Sure. So on your first question about interaction with riders during the course of that evening and subsequent, I'm going to go back to what I said a minute ago. I'm going to defer to law enforcement on releasing the details of the chronology and what any of the witnesses might've said, when.

The -- the one context I will provide is that we do have two dedicated teams at Uber that focus on responding to customer reports, and we have a dedicated team responsible for responding to law enforcement data requests and inquiries, so those teams are always standing by to receive requests or -- or feedback.

Turning to the background check question, as I -- as I said earlier, no background check process would've made a difference in this case, because the person had no criminal history.

When it -- when it comes to the background check -- and I disagree with the assertion that fingerprint-based background check process is necessarily or could even be better than the process that we have adopted.

We've put up some detailed kind of posts on our -- on our website in the past, to explain some of the challenges with fingerprint-based background check processes, and we have adopted a background check process that we think is quite thorough.

Rachel Whetstone:   Margaret, I don't know if you had anything you wanted to add or (inaudible) because you were obviously looking at this from the perspective of the safety advisory board.

Confidential

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES-ONLY

Margaret Richardson: Sure, I think that it is a false premise to say that finger print checks are more accurate or would provide better screening. The law enforcement data bases to which they link are law enforcement tools and they often include false positives in terms of when people are elected but no charges are filed or charges are dropped against someone, they can come up in a law enforcement database, which would be inappropriate to screen someone from driving.

It can also lead to incredibly discriminatory results. And so the background checks and the background screening that Uber has in place prevent those sorts of exclusionary and discriminatory results from happening. And I think that that's a key piece of --- of Uber's background check process.

I don't know, Ed if you want to add to that.

Ed Davis: Thank you, Margaret, I agree completely. There's nothing more sophisticated about law enforcement checks. It's simply a different pool of information, and when we use our -- our background check people we find that they come up with very sophisticated and accurate responses to the queries. And so, it's simply a different -- a different database and quite frankly, the database as Margaret said is -- full of problems on the finger print side as well.

Margaret Richardson: Okay. Thank you.

Rachel Whetstone: Okay, next question please.

Operator: Your next question comes from the line of (Mary Wilsky) (inaudible). Your line is open.

(Mary Wilsky): Hello. Thanks for taking the call. We had heard that there were accounts that this driver had engaged in erratic and problematic driving in days and weeks before this happened. Could you tell us if you have any record of that. And also, you know, what does the company do when you hear a repeated accounts (sic) of erratic driving. You know, whether or not, you know, can you stop someone from being on the road?

Joe Sullivan: Yes, absolutely. Before the day in question this driver had a rating of 4.73 and generally speaking, had received very favorable feedback from passengers who's ridden with him.

There were no red flags, if you will that we could anticipate something like this. That said, when we do receive feedback from riders we do act on it. The rating system and our -- and our recording mechanisms in the app are important signals for us and we objectively use that information to remove a rider -- excuse me, to remove a driver if the driver is repeatedly performing badly.

Rachel Whetstone: Okay, thank you. Next question.

Operator: Your next question comes from the line of (Dan Simon) from CNN. Your line is open.

(Dan Simon): Hey Joe, thanks very much. You talked a little bit about the mechanisms that you have in place. In this case, the driver did have a 4.73 rating. How quickly can you act upon information to get a driver off the road. I would assume it would take a little bit of time, you know, with the staff there to do an investigation. Can this occur within minutes, seconds? What's the timeline to get a driver off the road? Thanks.

Joe Sullivan: As I mentioned earlier, they're a number of factors that contribute to how quickly we would respond to remove a driver from the platform. For example, if a complaint -- if we received complaints about violence we'll suspend the driver immediately while we investigate. But in the case of bad driving, we'll typically wait to try and talk to the driver or collect more information. Especially if they're receiving favorable feedback rides around -- in context to that bad rating.

The reality is when -- when drivers drive for hundreds of rides, they will sometimes receive negative feedback, and we don't want to overreact to one piece of feedback.

Rachel Whetstone: Thank you, next question.

Operator: Your next questions comes from the line of (Desmond Fome) from Wall Street Journal. Your line is open.

(Desmond Fome): Hi, thanks for taking my question. Two quick ones, are there any plans to introduce any kind of panic button feature beyond India? I think that someone at Uber at one point had told journalists to release that in cities across the U.S. Second question is, you've been developing technology to track driver behavior and to track when there is erratic behavior. I know that you recently said that you're doing that in Houston.

Could this -- this technology have alerted you to this driver? And is this event kind of catalyzing you to roll that technology out more broadly or develop it more quickly?

Joe Sullivan: To take your first question, first, in the United States 9-1-1 is the panic button and it's the panic button that we want people to use. It's the panic button that law enforcement wants people to use. And we don't want to try and replace that. We may experiment with -- excuse me, we may consider rolling out a version of that in other markets around the world as we customize our products for the (inaudible) we serve. But it would be a -- it would be a stretch to try and do better than the 9-1-1 system and we don't want to do that.

Confidential

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES-ONLY

UBER24979

UBER-MDL3084-000125721

On the second question of implementing technology to try and help make rides safer -- you're correct.  We are doing a pilot in Houston now where we leverage GPS data transmitted from the app to us that helps us validate feedback that we get from riders after rides.

This is a type of technology that's been discussed in the world of technology quite a bit in the last few years and of course, at Uber we're very interested in it and have a number of engineers working on it.

I think that we will be able to make progress through that type of technology in the future.  It's very much early days.  When you read the research you'll see that companies that have tried to use technology alone, they've fallen short.

We have the unique opportunity of being able to combine the technology with the -- engagement with the community that we have that I think will allow us to -- to make really strong progress in the future.  But as I said, I think it's really (inaudible).

Rachel Whetstone:   And I think Ed, you might want to say something about 9-1-1 because I know you have strong views on it from your days with law enforcement.

Ed Davis:        Right.  When there is a criminal -- when there's report of criminal activity, when there's an ongoing crime, especially a violent crime, you don't want to confuse people about who they should be notifying and you particularly don't want to notify a corporation that's some distance away from the incident occurring.

You need to get police who are on the ground, close to the incident directly involved in it.  We -- we -- when the police are responding, they can call in for the company and -- and -- Uber can help them in getting all of the background information, but you don't want to set up a second system that will not only confuse people, but may delay help when it's -- when it's desperately needed.

Rachel Whetstone:   Okay, thank you, next question.

Operator:        Your next comes from the line of (Andrea Peterson) from the Washington Post.  Your line is open.

(Andrea Peterson):   Hi there. (Same).  So one sort of a followup on the panic button issue -- my understanding of the way that the way (indiant) and panic button works is that it will send over the rider, diver and trip location in an automatic way to -- a partnered law enforcement,

Is that not a feature that would assist someone attempting to make a 9-1-1 call about an emergency situation?

And another question is, you know, how large is the team of incident -- employees Uber has in the U.S. and typically, how many incidents are they responding to on a daily basis?

Joe Sullivan:      So the -- the button that we have available for riders in India is probably -- it's hard for me to generalize about because it's a -- it is a pilot product where we have been iterating on the product and engaged with law enforcement in the community there.

And -- and the huge city, law enforcement's, you know, technical capabilities and needs is very different, and so it is not something that you can easily roll out over night in the manner you described which sounds really cool.

We're continuing to invest in learning about the best ways to work with law enforcement.  And as you probably know, if you're very familiar with our app, we do have the ability for a passenger to share their ride information in real time.  Including the GPS tracking information.  So that is a technology that we can continue to build on in the future.

In the United States where we focused on in terms of being responsive to law enforcement is having a dedicated pupil who's available to support them standing by 24/7 and making sure that they know how to get in touch with us.  And that -- that has worked well, and we're continue to get feedback and try to improve on it.

And as I mentioned, we have been engaged with law enforcement, in this case, in trying to support (inaudible) to the best of our capability.

Rachel Whetstone:   Okay, thank you.

Next question..

(CROSSTALK)

(Andrea Peterson):  ... my second question about the size of the incident response team in the U.S. and how many incidents they usually handle daily?

Joe Sullivan:      I don't have concrete numbers off the top of my head, but we have what we call centers of excellence for support staff who are specially trained incident response, and so we make sure that we have people on call and available 24/7.  And we staff people around the world and at -- every shift of the day and night so we can be responsive.  And we're supporting, you know, over a million rides a day -- over three million rides a day, excuse me, you can imagine that we get a number of reports on a daily basis and they can range from small things to very large things.

Confidential
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES-ONLY

UBER24980
UBER-MDL3084-000125722

And we want to respond to all of them.

Rachel Whetstone:   Okay.  Next question please.

Operator:            Your next question comes from the line of (Sandra Hawkings) from (The Bridge). Your line is open.

(Sandra Hawkins):   Yeah hi.  thanks for taking me call.  I was -- I have two questions as well, one was the suspect Jason Dalton. How long had he been an Uber driver and how many trips had he completed? And my second question was apparently he was also an insurance adjustor in (redeem) and I'm just wondering what you think it says about Uber that you guys have to do this conference call in the wake of this tragedy, but apparently the insurance adjustor industry does not.

Joe Sullivan:       Mr. Dalton had cleared his background check and been approved to be a driver I think on January 25th. In the course of the following month or so he had slightly over 100 rides.

In terms of your second question, I think as someone who works with a technology company, used to facing those kinds of questions more than a traditional company would. And it comes with the territory and - but I think that we're prepared to answer the questions and to be there and help the community as much as we can.

Rachel Whetstone:   Margaret I don't know if you want to add anything, you've obviously been working closely with (Uber) the last three months, and just how you see those kinds of differences.

Margaret Richardson: So I do think the fact that Uber is a technology company and a company that has expanded so rapidly and so familiar to people has made the media attention frankly more directed at Uber than on his other job. There certainly could be any corporation and it's every corporation's worst nightmare as I think people described at the beginning. This has just shocked, devastated, everyone at Uber and I do think that in many ways this focus on Uber is a distraction from the availability of guns perhaps in the hands of people who shouldn't be able to have such easy access to them.

This question of background checks is not relevant because a background check wouldn't have affected this person's ability to drive anyways. I think that this is - I do think that the industry - that Uber has to do this is - doesn't strike me as quite equitable.

Rachel Whetstone:   OK, thank you, next question. We've got time for three more questions and then we'll be closing up so we'll take the next three.

Operator:            Your next question comes from the line of Mike Isaac from the New York Times, your line is open.

Mike Isaac:        A more general thought for you, is how do you feel about how Uber reacted here?  Is there anything you would have had the response teams do differently or do you guys feel that everyone followed things according to plan and did their jobs well?

Joe Sullivan:       It's my job to always look critically at our practices and try and make sure we do better the next time than we did the last time, but overall I'm really happy that we had a dedicated law enforcement response team in place. That we were able to send someone immediately to help support law enforcement. That we have the tools that we have to support an investigation from a GPS tracking standpoint and everything else that you would hope a company would be able to do to help manage transportation safely.

Mike Isaac:        Thanks so much.

Rachel Whetstone:   Next question.

Operator:            The next question comes from the line of (Kate) from USA Today. Your line is open.

(Kate):              Hi, thanks for taking my question. I realize that this shooter did not have a criminal record and so any background check would have passed and would not have picked anything up but have you guys assessed whether or not your process for background check would have been sufficient to find any sort of - any type of criminal record if he did have one? And have you determined - is there anything fingerprinting would tell you about somebody who has a disqualifying history that your current background check does not tell you?

Rachel Whetstone:   I think we've been through that in quite a lot of detail but I'll just let Joe reiterate it and then let Ed and Margaret weigh in, but I think it's important to stress that the perpetrator had no criminal record and so it didn't really matter what sort of background check that you were using. You weren't going to find something because there wasn't something there to find.

(CROSSTALK)

(Kate):                  Obviously this is a situation that I would imagine would make any company think, "OK, so going forward what if he did, and would our background check have been sufficient to catch it, just to make sure that something like this if it happens again, that you're not taking these questions and answering these interviews in a very different way.

Rachel Whetstone:   Obviously we have invested a lot in our background checks, we've invested a lot in our technology and while no system of background checks is ever going to be perfect, whether you're using what we use, or fingerprinting. We think that all our background checks are incredibly robust, and then I'm just going to pass over to Joe, and to Ed and to Margaret if they want to add anything.

                  Over to you, Joe.

Joe Sullivan:       Maybe I should go a little deeper to give you some context of the background check actually works. If you're not familiar with it it might sound - well fingerprinting is  a material difference - but it actually isn't - before someone becomes a driver with Uber they need to give us information like their name, their address, their driver's license, their Social Security number, their insurance information, their bank account information. And then we initiate a background check process. The background check progress has three levels to it when it comes to criminal history.

                  We check local databases, we check county courthouses, and then we check federal databases. The county courthouse database is really interesting to me because if you go deep and you try and understand how criminal records are stored in this country, you'll realize that there is only one source of truth that is most valid and that is actually going to the county courthouses where the person has lived and looking in the records.

                  Because a lot of those records get lost on their way to the federal databases. So our process includes as part of that check, identifying all of the residences where the person has lived for the last seven years, and each county courthouse that's supported - that has online records we'll check the county courthouses online records but if they don't have online records we actually send someone to the courthouse to manually review the records.

                  It's a very comprehensive process. The fingerprint process is another way of identifying the name of the person, and still doing a digital check against those databases. So ultimately when it comes to understanding what criminal record someone has, we think that we do - and just to reiterate, none of those things we did do in this case, if we had done them any better would have made a difference.

Rachel Whetstone:   Margaret - I don't know if you want to add anything about this?

Margaret Richardson: Sure. I think that Joe's point about records getting lost on the way to the federal databases is very important because at each level of review, at the state department of justice, and ultimately at the federal database, there are often records that are forwarded but then dispositions are not included. So for example arrest data gets exempt but the fact that charges were dropped or somebody was found not guilty or that there were other extenuating circumstances and the person does not have a conviction, are never forwarded either to the state or to the FBI's fingerprint database.

                  So there is a lot of information in there that is not appropriate for consideration for work purposes. I think that that is a misunderstanding about how - I think people have an impression that something happens in court and it is magically in every relevant law enforcement database, and that just isn't the case.

                  These county courthouse checks are by far the best way to make sure you have the most up-to-date information about somebody's criminal history, and that that is a significant investment that Uber has made in their background screening process that I think is quite reliable and one that should inspire a lot of confidence.

Ed Davis:           I won't reiterate anything that's already been said but I'll just say that a background check is just that. It's a background check. It does not foresee the future and if there's nothing in the background then you have what you have. After an incident like this we all struggle for answers and ways to stop it from occurring again, but if there was some magic out there that would allow that to happen, we wouldn't be having increases in active shooter situations, which have been going up every year.

                  There's a lot of people struggling with this. There's no golden bullet, if you will.

Rachel Whetstone:   Thank you Ed. We've got the last question and then we'll wrap up.

Operator:           Your next question comes from the line of Molly Reilly from the Huffington Post. Your line is open.

Molly Reilly:     Hi, I have two questions. One, I wanted to clarify on the panic button feature. Was that ever rolled out in Chicago as it was said it would be last February, and, going back to (Matt Mellon) and other reports of erratic driving, how did these passengers contact Uber and what was Uber's immediate response?

Joe Sullivan:      We haven't rolled out the feature that you mentioned in the United States. As I mentioned earlier, from my perspective 911 is the panic button for the United States. All the feedback I've gotten from law enforcement and all the feedback I've gotten from everyone else I've talked to who's a safety expert is that we should do what we can to help support 911, not redirect people from it.

As I mentioned earlier, in terms of the chronology of communication and statements from witnesses, I'm going to avoid going on the record about those out of deference to law enforcement and their pending case.

Rachel Whetstone:   Thank you and I think it's just important to reiterate that when we do get feedback and complaints from passengers as Joe said at the beginning, about those feedback and complaints which is about violence where we will suspend within minutes, as quickly as we can, while we investigate. Where there's questions about bad driving, which obviously come up quite a bit, we believe it's important to, if we can, hear both sides of the story because one person's point of view may be different from another person's point of view.

We think it's important before suspending someone, (you could be apt) in those circumstances in their ability to earn money, that we have spoken to them first. So that's from a point of principle how we tend to think about those two things.

I'd just like to wrap up by thanking you all for joining us on what is a very sad day. Our hearts go out to the families of the victims and the whole community in Kalamazoo, and thank you for joining us and we will - obviously the police will keep you updated of their investigations and if you have questions you can email us at (pressapp) and we will come back to you as quickly as we can. And thank you so much.

END

Confidential
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES-ONLY

UBER24983
UBER-MDL3084-000125725