# EXHIBIT 1

## *[Proposed Sealed Version]*

*(May Not Be Examined Without Court Order – Contains Material from Conditionally Sealed Record)*

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL     1

UNCERTIFIED ROUGH DRAFT - DO NOT CITE

HENRY FULDNER - HIGHLY CONFIDENTIAL

March 26, 2025

PLEASE BE INFORMED OF THE FOLLOWING:

This unedited Rough Draft is produced in realtime (instant) form and is NOT certified.  The Rough Draft transcript may not be cited in any way nor used to rebut or contradict the certified transcription of proceedings.

There will be discrepancies in this form and the final form because this realtime (instant) form has NOT been edited, proofread, corrected, or certified.  There will also be a discrepancy in page numbers compared to the final.

Also, please be aware that the text may contain an occasional ((REPORTER NOTE)) or a ((CHECK)) to myself and/or "nonsensical" English word combinations due to software limitations.  (All such entries will be corrected on the final transcript.)

Debbie Leonard

Certified Realtime Reporter

A    Dara Khosrowshahi, the chief executive officer.

Q    Have you held any other titles at Uber?

A    Yes.

Q    What was the title you held before senior VP of safety and core services?

A    Vice president of the same.

Q    Vice president of the same?

A    Yes.

Q    All right.

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL      7

A    Of safety and core services.

Q    All right.  How long did you hold that title?

A    Approximately a year.

Q    Same or similar duties?

A    Yes.

Q    Same boss?

A    Yes.

Q    All right.  And prior to being the VP, what was your -- what was your title?

A    I was the VP of safety and insurance.

Q    And what years were you the VP of safety and



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL     23



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    24









UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL      27



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    28



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL     29



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    30



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    31

          MS. FRANGOPOULOS:  I would like to take a break right now.  I need to use the restroom again.  Let's pause.

          MR. LUSKEY:  Off the record.

MR. ESTEY:  Okay.

THE VIDEOGRAPHER:  The time is 10:07 a.m. Pacific time.  We're going off the record.

(Recess taken from 10:07 a.m. to 10:17 a.m. )

THE VIDEOGRAPHER:  The time is 10:17 a.m. Pacific time.  We're back on the record.

BY MR. ESTEY:



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    33



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL     34



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    35



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    36



A    Okay.

Q    So Uber calls it a safety report.  How many safety reports has it released?

A    We released three safety reports.  One covering 2017 to 2018, one covering 2019 to 2020, and one covering 2021 to 2022.

BY MR. ESTEY:

Q    Do you agree that Uber should be doing everything in its power to safely transport passengers and keep them safe from sexual violence?

MR. LUSKEY:  Object to form.

THE WITNESS:  Myself and my team are focused on that every day to reduce the number of incidents on the platform and try to make our platform as safe as possible.

BY MR. ESTEY:

Q    And Uber advertises itself as a safe ride, right?

MR. LUSKEY:  Object to form.  Lacks foundation.

THE WITNESS:  I -- is there a specific advertisement you're referring to or --

BY MR. ESTEY:

Q    No.  Has Uber, to your knowledge -- you've been there for over a decade, right?

A    I have, yes.

Q    Okay.  Have you ever seen an ad in which Uber advertises itself as a safe ride?

A    With that specific phrasing, I'm not -- I don't





UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL      55

BY MR. ESTEY:

Q    Do you agree that women have a right to know the risks of being sexually assaulted by their driver before they get into a Uber?

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    56

MR. LUSKEY:  Object to form.  Calls for a legal conclusion as to rights.

THE WITNESS:  I don't know -- I guess, given counsel's objection, I don't -- I think we've provided the consumers with the -- with quite a lot of disclosure about safety on our platform.  I don't know that they have a specific right.  I'll leave that for lawyers to figure out.  I'm not aware of any, you know, statutory obligation.  We make this report voluntarily.

BY MR. ESTEY:



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    57



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL     67



MR. LUSKEY:  Could we take a break when you get a chance?

MR. ESTEY:  Sure.  Let me -- let me ask a couple more questions, and then we'll take a break.

MR. LUSKEY:  Sounds good.

BY MR. ESTEY:



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    68



Q    All right.  We can take a break?

MR. LUSKEY:  Off the record.

MR. ESTEY:  Ten minutes?

MR. LUSKEY:  Sounds good.

THE VIDEOGRAPHER:  The time 11:13 a.m. Pacific time.  We're going off the record.

(Recess taken from 11:13 a.m. to 11:26 a.m.)
UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    69

THE VIDEOGRAPHER:  The time is 11:26 a.m. Pacific time.  We're back on the record.

BY MR. ESTEY:







Q    And does Uber have a program called women preferred?

A    We have a program called women -- women rider preferred.

Q    Okay.  And what is women rider preferred?

A    That is a program for drivers to request that they are dispatched to trips where the requesting user is a woman.

Q    Does it give female passengers the same option, in other words, to request a female driver?

A    No.  It is also not a product that is available in the United States.

Q    Why not?

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    87







UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL      89



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    90



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    90



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    91



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL      92



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL     93



          Q    All right.  Travis Kalanick or -- that was the
CEO for a while, right?



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    98

MR. LUSKEY:  I'll just note on the record the only documents I'm familiar with that we produced related to Mr. Fuldner were those documents that were responsive to your document request that you served on us Friday. We make production last night.  The 10,000 documents that you just referred to I'm not sure familiar with and I don't have any reason to believe they're connected to Mr. Fuldner but we'll take a look at the issue and meet and confer about it.

MR. ESTEY:  Fair enough.  I appreciate that.

BY MR. ESTEY:

Q   Sir, we're going to take a look at what we marked as exhibit it 2200.

(Exhibit 2200 marked for identification.)

BY MR. ESTEY:

Q   You recognize that document?

A   Yes.

Q   What is that document?

A   This is -- appears to be a printed copy of the -- our first US safety report published in 2019.

Q   All right.  And that is -- it looks like it's a Bates -- beginning with Bates five zeros and then 1302. Does that look right?  To the top.

A    Yes.  It says Uber five zeros 1302.

Q    Yeah.  Okay.  Good.  All right.  And this is the report we talked about earlier in the deposition, right?

A    Yes.

Q    And this is the first one that Uber put out to the public, right?

A    Yes.

Q    All right.  And then if you look at page 59, which is Bates 1360.

A    Yes.  Page 1360.

Q    All right.  And that shows the five categories that Uber chose to report upon, right?

A    Yes, it does.

Q    All right.  And it shows the years 2017 and 2018 and gives data for that, right?

A    Yes.

Q    And it gives the actual number of incident reports, right?

A    Yes, it does.

Q    But this does not factor in the fact that as we discussed, many allegations or reports of sexual assaults are -- go unreported, right?

MR. LUSKEY:  Object to form.

THE WITNESS:  That's correct.  And it's discussed further in the -- in the report.

BY MR. ESTEY:



BY MR. ESTEY:

Q    Okay.  And then as far as the percentage of total trips, what does that -- what does that mean?

A    So this is -- column would be the personal of trips occurring in the United States.  So passenger

transportation trips, excluding our food delivery business. So the percentage of trips that involved a

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL   102

report of an incident in that category reported by someone against someone in that trip or in connection to that trip.

Q    And these trips include single male passenger trips, correct?

A    They include all permutations of trips, as long as they're trips that were requested of people. It would exclude our delivery business.

Q    So that's a yes?

A    Yes.

MR. ESTEY:  Okay.  All right.  Let's look at 2201.

(Exhibit 2201 marked for identification.)

Q    Okay.  So the safety report that you're referring to as Exhibit 2200 shows 2,936 incidents of sexual assault in the five categories you talked about, right?

A    What period are we talking about?

Q    If you add up all of the five categories, it's 2,936, right?

A    For which year?

Q    For 2017.

A    (Reviewing.)

MR. LUSKEY:  Page 59.

THE WITNESS:  Pardon?

MR. LUSKEY:  Page 59.

THE WITNESS:  I don't know that it has the sum
UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL   127

total added.  There's another page that has the sum,
but -- why don't we just -- what was the number you
provided?

MR. LUSKEY:  It's not a math test but if you're
adding up the five rows here, I assume on page 59 to
get -- what number did you --

MR. ESTEY:  2017 I got 2936 and 2018 I got
3,045.

THE WITNESS:  Okay.  Why don't we take that
as --

MR. LUSKEY:  So stipulated.

THE WITNESS:  Yes.

BY MR. ESTEY:



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    128







UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL   131



UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    132

sexual assault incidents per 1 million trip.  And it says 12.48, right?

A    Yes.

Q    That's a different rate that's identified -- strike that.

That is a different rate than what is identified in the Uber's safety report, right?

A    Uber's safety report is not specific to Los Angeles and as we've discussed in the last few questions this report is reporting on five categories.  This is reporting on a broader set of categories.

Q    Well --

A    And is also supporting data that has not been audited.

Q    My question, though, is more direct.  This rate is different than the one that's reported in the Uber safety report, correct?

A    It is different for reasons that I've explained already.

Q    Okay.  And it's much higher, right?

A    It is higher.

Q    Okay.  And can you tell how much higher it is than what's identified in the Uber safety report?

A    Not immediately.  If you want -- are you asking me to do math?

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    133

Q    Well, it's, like, almost 60 times higher, right?

A    No, I don't think so.  No.

Q    How much higher do you think it is?

A    12 per million would be roughly 1 per 80,000, whereas the rate for the whole country -- again, we're comparing apples and oranges here -- would be -- what did he say was the sum of 2017?

MR. LUSKEY:  The sum for 2017 was the number you provided earlier.  We don't have it in front of us.

MR. ESTEY:  Okay.  Next is 2211.

(Exhibit 2211 marked for identification.)

BY MR. ESTEY:

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    165

Q    And this is Bates 1 -- 000136439.  And it looks like an e-mail from Justin Kintz to you and a number of other people regarding background checks.  Do you see this?

A    Yes.

Q    Do you recall this e-mail?

A    It was ten years ago.

Q    Right.

A    No, I do not.

Q    All right.  It looks like a representative from Connecticut had stated or sent you some sort of communication, a letter, stating your company should implement fingerprint based background checks right now. This would match screening standards for taxicab services that are already required by many of the largest state regulators across the US.  Do you see that?

A    Yes.

Q    All right.  Do you recall receiving this letter from Rosa DeLauro?

A    The letter was not addressed to me, so I

wouldn't have been the recipient, but it was apparently addressed to Travis, our CEO. I don't remember specific letter, but these types of letters or questions from policymakers are not uncommon on a variety of topics. I'm not saying they're specific to this particular topic.

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    166

Q    All right.  When she says this would match screening standards for taxicab services that are already required by many of the largest state regulators across the US, do you agree with that statement?

A    No.

Q    Why not?

A    So it is -- well, I find it somewhat interesting.  I was -- Rosa DeLauro was the representative in New Haven, Connecticut, when I lived in New Haven, and part of my initial interest in -- in Uber when I first heard about it was the very poor taxi service in New Haven that was largely unusable.

And that -- at least -- so the thing I find interesting about this letter is I subsequently dug into the regulation of taxis in Connecticut, and it is one of the weakest states in the country in terms of its regime in regulating taxis, so that's what I find -- find interesting about this.

But just generally, the regulation of taxicabs are often done at the city level, very rarely at the state level, and they're quite varied across the country.

Q    All right.  Well, did Uber implement fingerprint based background checks after the -- DeLauro sent this letter to Kalanick?

A    No, we did not.

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    167

Q    Do you know why not?

A    We -- it's -- I think we have implemented a system of name based background checks that for a variety of reasons I think are substantially more complete and effective.  Ms. DeLauro does not specify how we would implement fingerprint based -- based background checks, but there are various barriers to private companies doing that independently as well.

Q    What barriers are you referring to?

A    The fingerprint based background checks, while I don't have the specific letter, are often referring to background check database made available by the -- by the FBI.  That database is not made available to private companies directly, with the exception of certain banks and financial institutions.

Q    Well, live scan did it, right?

A    Pardon?

Q    Live scan has access to it?

A    Live scan is a technology and it's a technology that a private company, other than a bank or, I believe, a -- something in the nuclear industry, cannot directly take a live scan to the FBI.  The way background checks work in the United States -- sorry -- particularly the FBI database for fingerprints works in the United States is it's made available to states for states to create

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    168

specific programs.

And so private companies -- only banks and some other exception about something related to nuclear fuel industry I think but the process is that individual states create processes for those states to request information from the -- from the FBI.  We cannot just go buy a fingerprint machine and say, hey, FBI here's someone's fingerprints.  Can you give them their -- their background.

Q    Well, but live scan has access to those FBI databases, correct?

A    By live scan has access, what exactly do you mean?

Q    Well, I know that when I went to coach my

daughter's YMCA that I did the live scan and they -- they did the -- I was told that it has access to a much broader database regarding crimes, including the FBI database.

A    So the -- without knowing the specifics of the particular process that you pursued and what state that was and all that kind of detail, a typical process for getting fingerprinted in a school to do something is a state providing a process for schools in that state or for caregivers or nurses or something like that and that specific state, Justice Department or its equivalent,

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    169

whatever it's called in that state, can -- I don't remember the exact mechanics but there's something in federal law that says states can create programs that are then state run programs for specific -- specific industries.

MR. ESTEY:  All right.  Let's go to 2212.

(Exhibit 2212 marked for identification.)

BY MR. ESTEY:

Q    And this is Bates 000564803.  And it looks like some sort of message from Akankshu Dhawan to you from August of 2019.  And under action items it says SRAD phase 2 key results, optimizing the match for 1% of trips

MR. ESTEY:  Probably talking about your suit or something.

THE WITNESS:  (Reviewing.)

Okay.  Great.

MR. LUSKEY:  Thanks.

BY MR. ESTEY:

Q    All right.  Let me know when you're ready to talk about this.

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    180

A    (Reviewing.)

Could I have the metadata page again?

Q    Yeah, yeah.

A    Thank you.

Q    Uh-huh.

A    Okay.

Q    Do you know what this document is?

A    Yes.

Q    What is this document?

A    This was a memo drafted to -- sent to the ELT, along with the draft copy of the safety report that was given to the ELT to review for the rest of the ELT to provide their own comments.  I would have had ample opportunity to give comments, along with legal, at this point.  And this was the first point at which the broader

ELT group, the executives that were not as close to safety every day, would have received an e-mail with a draft copy of the report, along with this memo. This memo is to help them understand, kind of summarize the report and to help them navigate what they might be -- might want to look at in their -- in their own review. The report itself is 80 pages long, so this is a three-page "Here's what's in there, and how did we get to these specific choices."

Q   All right. And under the safety investments,

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    181

under the tone, safety investments, is that -- was that -- strike that.

Under tone, this section of the report is intended to be consumer centric as if segments could be lifted and placed directly in consumer marketing. Do you see that?

A   Yes, I do.

Q   And the tone is accessible, relatable, and humble yet intended to be compelling and persuasive. It aims to convey how seriously we take these investments in user safety.

Who advised Uber that the tone in this part of the report was intended to be consumer centric and could

be lifted and placed directly into consumer marketing?

MR. LUSKEY:  Lacks foundation.  Calls for speculation.

If you know.

THE WITNESS:  I don't know, but in reading the document, I don't think anyone specifically advised Uber. This is the team that, you know, drafted summarizing what was drafted.  So they're explaining what the -- each -- this document goes sort of chapter by chest or section by section through the safety report and summarizes what's covered and why, what's not covered, and what the tone of each section is.

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    182

BY MR. ESTEY:

Q    All right.  Well, what's covered and why under the second bullet point it says content is very detailed. Frank Luntz's research suggests that details on our investments will help offset the published data which some might other criticize for not being transparent enough by almost overwhelming the reader with all we're doing.

Do you see that?

A    Yes.

Q    So Luntz had some input in this regard, right?

A    Appears that way, yes.

Q    All right.  And do you know why Uber was concerned by offsetting the published data?

MR. LUSKEY:  Object to form.

THE WITNESS:  I think Uber -- I think it's fairly obvious that if we just put data without context out there, we would -- that would be doing a disservice to, you know, the work and investments we have in this -- in this area, and so the safety report is not just about numbers.  I think the focus and a lot -- a lot of the focus of our conversation today and all the documents you've put in front of me has been about numbers, but it is also a report that explains what we do, both what we have been doing and the investments -- you know, another

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    183

important part of the first safety report was committing to new investments in the future that we then followed up with two years -- two years later.

So I think it's important to communicate what we're -- what we do and what we're going to do going forward.

BY MR. ESTEY:

Q    Was Uber criticized for not being transparent enough in its safety report?

A    I think there was -- I think the response after we published it was quite positive from -- from, you know, advocates in this space, from third parties, from non-profits.  We had policymakers saying thank you for doing this.  This is a bold move, that type of thing.  We talked about the responsibility.org thing several documents ago.

I think we were -- when we -- leading up to publishing it, we didn't know what the consumer -- what the reaction would be, and it's appropriate for us to think about different reactions that might exist and contemplate that in our drafting of the report.

Q    All right.  And the sixth bullet point down, providing why statements it says Frank Luntz recommended we tie statements back to why we created each feature.

Do you see that?
UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    184

A    Yes.

Q    So Luntz is again making recommendations, correct?

A    Yes.

Q    And did Uber use Mr. Luntz' recommendations?

A    This document certainly suggests that was part of the input into what the marketing team ultimately

wrote here.  I don't find it terribly surprising feedback.

Q    The last bullet point under content, it says actioning sexual misconduct reports, because sexual misconduct incidents are not going to be published in the report, we must be incredibly clear that we will still take action on all sexual misconduct.  Addressing this will preempt questions from advocates.

Was Uber concerned about its advocates having issues with it not reporting on sexual misconduct numbers?

MR. LUSKEY:  Object to form.

THE WITNESS:  Look, we were -- putting out this safety report was something that I think was a first of its kind in this industry and much more broadly to proactively put something out on this sort of thing.

We -- we engaged with a bunch of advocates, a lot of over advocates that -- out there on this -- on

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    185

this and related topics, and it's totally appropriate for us to say we don't know what all of them will think.  We talked to some.  Got their perspective.  They were, you know, closer, call it in the tent in -- in giving us feedback going through this process.

And I think this is describing advocates who were not involved in that process would have this question that probably the advocates that were, uh-uh, involved in the process have.

So it's important for us to preempt those questions by answering those questions in advance.

BY MR. ESTEY:

Q   All right.  The next page, under tone, it says the tone of this section was agreed by the stakeholder group to remain sophisticated, technical, rigorous, academic-leaning, and straightforward.

What group is this document referring to here?

MR. LUSKEY:  Foundation.

THE WITNESS:  Pardon?  What --

BY MR. ESTEY:

Q   The stakeholder group.

A   The stakeholder group here is internal stakeholders drafting the section.

Q   All right.  If you go to the next page, the first bullet point is SA categories.  That's sexual

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL   186

assault categories, right?

A   Yes.

Q   And it says as outlined in Gus's e-mail on

October 7th we've included the five most serious categories of sexual assault.

Do you see that?

A    Yes.

Q    All right.  And so what e-mail are they referring to that you wrote on October 7th?

A    I don't know.

Q    Did you -- are you the one who made the decision to only include five categories of -- out of the 21 sexual assault and sexual misconduct?

MR. LUSKEY:  Object to form.

THE WITNESS:  I was heavily involved in the decision.  There were others involved, but it would be not at all surprising to me that I would be the one communicating that decision because I was leading the process of creating the report.

BY MR. ESTEY:

Q    All right.  And it says this decision was already communicated to select advocates, including the safety advisory board and the NSVRC/Urban Institute and changing this would undermine NSVRC/Urban Institute's statement of validation.

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    187

What does that refer to?

A    To -- the statement of validation is the appendix of the report.  It has an appendix number, but -- it was Appendix Number 2 of document 2200, examining Uber's use of the sexual misconduct and violence taxonomy and the development of Uber's United States safety report.

And so they had already -- you know, at this point we are a few weeks away from publishing the report, and so they had already completed their review and were finalizing their review.  This basically says we had communicated to them these categories, and I think this statement is in here to basically communicate to the recipients of this memo, so the rest of the executive team, that there's -- we're not changing this so don't come back with -- if the purpose of this e-mail is to be sort of a cover letter for reviewing a draft, to basically say we're not -- you know, don't come back with a suggestion to change the list of categories, which would likely be reducing the list of categories further and instead that this decision is not going to change.

Q    All right.  And under the third bullet point, it says absolute numbers and rates.  We publicly pledged to release absolute counts of incidents but market research showed that providing them in context with Uber's scale

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    188

is crucial.  What's that referring to?

A   Some research done by the marketing team.

Q   Told Uber that it couldn't just give the absolute numbers?

A   I expect they showed users different versions. I recall some -- some discussion of us showing different data related to car accidents and saying here's one format showing car accidents with counts.  Here is another format showing car accidents per, you know, X million miles.  Here's another, you know, car accidents per trip, that kind of thing.

So I think it's fairly intuitive that particularly different consumers would understand different versions of that differently.

Q   It says three different formats, rape, percentage, and frequency, are used to illustrate rarity as research indicated no one format is best understood.

Is that what Uber's goal was issuing this report, is try to convince the public that the incidence of sexual violence on its platform are rare?

MR. LUSKEY:  Object to form.

THE WITNESS:  I think the goal is -- and I think it's clear here -- to -- that the public or consumers think about numbers in different ways, so showing it in

different formats helps that context.  For some people --

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    189

go back to document 2200, you know, we show for the same set of incidents we show it in .0000X percent and, you know, one in X million.  And then for auto accidents, you know, also per, you know, trips or per miles traveled or, you know, those different formats, different people think about those differently, and so providing multiple formats helps people see the format that they would understand best.

BY MR. ESTEY:

Q    All right.  Under the section what's not covered and why, under the fourth bullet point, it says time of day/day of week.

Do you see that?

A    Yes.

Q    There may be negative business impact by discouraging users from using the app during weekend evenings.

Do you see that?

A    Yes.

Q    And this was less of a concern for car crashes since there are external environmental factors at play (i.e., more drunk drivers on the road).

Is this the reason why Uber does not warn passengers of the risk of sexual assault during weekend evenings, is that it may have a negative business impact?

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    190

MR. LUSKEY:  Object to form.

THE WITNESS:  I think it's the reason provided by the author of this.  I think it's certainly a consideration.  There's other challenges with providing context around this type of -- type of information, but it's noted here as a factor.

BY MR. ESTEY:

Q   Well, when you read this, did you go to Uber and ELT and say, "Hey, wait a minute guys.  We shouldn't be worried about the negative business impact.  We should be worried about the safety of our passengers"?

A   I mean, I'm worried about the safety of the passengers by preventing the incidents in the first place.  That's my primary focus.

Q   Understood.  But when you read this did you think to go talk to someone on the ELT about the fact that maybe Uber should discourage or warn users about the risk of sexual assault during weekend evenings, even though it may have a negative business impact?

A   I don't specifically remember taking that

action.

Q   Do you know if anyone took that action at Uber?

A   Yeah, I think we had -- I think there's a bunch of content in the safety report about nights and weekends and, you know, I feel comfortable that we've taken a

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL   191

bunch of actions related to safety of users on nights and weekends.  Whether it was that specific discussion about this detail of the safety report, I don't recall.

MR. ESTEY:  All right.  Let's go to 2217, please.

(Exhibit 2217 marked for identification.)

BY MR. ESTEY:

Q   It is 003222591.  It looks like a message from Brooke Anderson to you from 2020.  Let me know when you're ready to talk about it.

A   (Reviewing.)

Yeah.

Q   All right.  Who's Brooke?

A   Brooke Anderson is a member of the communications team.

Q   All right.  And this is a communication about the safety report, right?

A   Not clearly, no.

right?

A    Correct.

Q    All right.  And you -- the reason dashcams, in your opinion, would potentially reduce SAC, SIC, or sexual assaults was that it would discourage bad actors, you know, from sexually assaulting the passengers, right?

A    As I said earlier, today, us dashcams is not for us lack of trying on my part and this is an activity we were exploring then.  We continue to work -- we continue to work on.  And the question is finding the right kind of dashcam, and we built this software dashcam that we call record my ride, and, you know, one of the purposes of that is to try to make incidents -- make trips safe and reduce the SAC and SIC as discussed in this e-mail.

MR. ESTEY:  All right.  Let's go to 2220.

(Exhibit 2220 marked for identification.)

BY MR. ESTEY:

Q    And this is -- looks like a Slack communication.

A    It's a thick document.

Q    What's that?

A    It's thick.

Q    Yeah, this is not -- this is -- I want to focus -- let's look at -- and this starts with Uber, the

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    200

THE WITNESS:  Could I have the metadata?

BY MR. ESTEY:

Q    Yeah.  And then -- let me see.  347, 355.

A    (Reviewing.)

Okay.  Thank you.

Q    No worries.  And the first question is, do you recognize this document?

A    Not specifically, but -- I don't recall it but I understand what it is.

Q    And under the fifth paragraph, it says top 15 safety questions for today show.  Apparent Dara was going on The Today Show; is that right?

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    232

A    That seems to be the case.

Q    And was this document intended to prep him for that?

A    That appears to be what it is.

Q    All right.  And so under the fifth question is Uber safe?  It says, yes, Uber enables millions of people to move safely around the world every day, typically without any issues.  Do you know who came up with that response?

A    I don't.  The metadata page says the author of the document is Brooke, so that would be it, but I don't

know.

Q    Do you believe Uber is safe?

A    Yes, I do.

Q    You paused.  Why did you pause?

A    I was just looking at the document.

Q    Okay.  Under page 9, which is Bates 355, a question from a previous page.  It says how many sexual assaults take place in Ubers?  Do you track it.  He says I don't have any data to share at this moment but we do know from experts is that sexual assault is not only a serious crime but a significantly underreported one.

Can you tell from the date of this document -- it's from 2018.  So --

A    Could you provide the date in --

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    233

Q    Yeah, yeah, no worries.  It's right there.

A    Okay.

Q    When Dara says, I don't have any data to share regarding sexual assaults, Uber did have data on sexual assaults at that point, right?

MR. LUSKEY:  Object to form.  Assumes facts.

THE WITNESS:  We had data internally that was going through a very active process of trying to get it produced in a consistent format.

A    Yes.

Q    And then under background and problem statement it says when safety instances occur on the Uber platform we sometimes find there are two conflicting sides of the story reported to Uber and drivers often feel that Uber takes the rider's side.  We see major promise in the ability for dashcams to prevent or deescalate safety incidents.

You agree with that, right?

A    We certainly see promise in it.  Achieving that promise has been a challenge but we certainly see promise.

Q    Uber saw promise of dashcams as of August 2021, right?

MR. LUSKEY:  Object to form.

THE WITNESS:  I think we've seen promise in it for a long time.  I'm not sure of the significance of the specific date you just provided.

BY MR. ESTEY:

Q    All right.  Well, that's the date of this e-mail.

A    No, this e-mail is dated 2021.

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    237

Q    What did I say?

A    Oh, I'm sorry.  Sorry.  I apologize.

Q    That's all right.  All right.  And the third paragraph, second sentence says the primary goal of the program is to understand the impact on safety incidents and insurance costs in order to determine if dashcams are an overall ROI positive investment for Uber to make at scale.

A    Yes.

Q    ROI is return on investment?

A    Yes.

Q    And so apparently Uber is considering whether or not it will get a return on its investment if it requires dashcams, right?

MR. LUSKEY:  Object to form.

THE WITNESS:  This document is not about requiring dashcams.  This document is about making dashcams available and sponsoring dashcams and getting drivers to adopt dashcams, and I think it makes very clear the challenges of getting drivers to adopt these cameras.

BY MR. ESTEY:

Q    Do you know why she's talking about whether or not -- strike that.

Do you know why she's saying in order to

determine if dashcams are an overall ROI positive investment for Uber to make at scale?  Do you know why she's saying that?

MR. LUSKEY:  Calls for speculation.

THE WITNESS:  The dashcam -- this is a program for us to subsidize dashcams.  It covers us looking at trying to distribute dashcams with three different dashcam vendors, which reinforces that we've been trying with a bunch of different vendors and we're measuring things like do we get useful videos.  Do drivers adopt it.  And basically sort of comparing these vendors against each other.  And it's not productive to send out a dashcam that drivers don't install or doesn't stay on or doesn't give us quality -- quality video, and so we need to figure out if any of these vendors had a dashcam that drivers would adopt and use.

MR. ESTEY:  All right.  Let's go to 2228.

(Exhibit 2228 marked for identification.)

BY MR. ESTEY:

Q   I don't have any metadata for this.

A   That's fine.

Q   And I'm not sure you're on here.

A   I don't appear to be.

Q   Let me ask you this.  At some point did Uber

exciting here.

MR. ESTEY:  Let's move on to 2231.

THE WITNESS:  Okay.

(Exhibit 2231 marked for identification.)

BY MR. ESTEY:

Q   And this is -- you're cc'd on this.  It's from Darlene Ordonez to Eric Schroeder from September 2019.

A   Yeah.

Q   And then regarding external validator safety report, do you know what that's referring to?

A   Yes.

Q   All right.  What is that referring to?

A   We had -- concurrently with us producing the safety report, we had tried to identify external parties that could validate the safety report and our application

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL   246

of the taxonomy to the safety report.

In the safety report itself, it has -- it's document 2200.  There are two appendices, Appendix II and Appendix III.  One is a report from NSVRC, Raliance, and the Urban Institute that validates the application of the sexual assault and sexual misconduct taxonomy.

And then the second is an evaluation of our --

it's titled An Evaluation of Safety Incident

Categorization Capabilities for Uber by The Chertoff Group that validated our sort of broader -- as well as the broader sexual assault and sexual misconduct portions of the report.

Q    If you look at the second page, you're writing something to Dominique, and the second sentence says, one of the concerns especially from Comms is Uber's poor credibility on this sort of topic among many audiences.

And the topic is safety.  Do you know why you're writing that, that Uber has poor credibility on safety?

A    So I think the overall goal or one of the goals of the safety report was to put data out there and that -- and to -- I'll start over.

One of the -- one of the goals of the safety report was to put clear data out there about safety incidents on the Uber platform and we wouldn't be achieving those goals if people didn't believe the

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL    247

numbers that we published so we had invested quite significant resources in creating that taxonomy, auditing all our data, all that kind of stuff and we when we put it out there we want people to say, you know, this is credible.  And so one way of doing that is to engage outside validators to look at the -- effective the -- our

process of creating the -- the report, to validate that the process by which we came up with the numbers are robust.

So this e-mail is me connecting with Dominique, who is -- who is the head of internal audit, seeking her advice on auditing, given her expertise as an internal auditor, that she would be a logical person to talk to with expertise in auditing and would have ideas as to, you know, other -- other approaches to auditing, including from an external accounting firm -- accounting firm, which we pursued.

THE WITNESS:  All right.  We can go to 2232, please.

(Exhibit 2232 marked for identification.)

BY MR. ESTEY:

Q   And this is from Dara to the team at Uber. You're Bcc'd regarding 2018 priorities.

A   Yes.  So that would be an e-mail to the entire company.  Team@Uber.com [indiscernible] --

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL   248

(Court reporter clarification.)

THE WITNESS:  That would be an e-mail to the entire team.  Team@Uber.com is the e-mail address for the entire company.

report or we consolidate it with something else is something that was under discussion.  I don't know the date of this but we did at one point discuss --

MR. LUSKEY:  Not if those discussions were

UNCERTIFIED ROUGH DRAFT - HIGHLY CONFIDENTIAL   253

discussions about counsel.

THE WITNESS:  Yes.  Fine.

There's no change to my earlier comment that we intend to continue to report safety data.

BY MR. ESTEY:

Q   Do you know what?  I'm done.  So I'm going to -- the exhibits are going to end there for me and then you can pick up on the exhibits tomorrow.  We can go off the record.

MR. LUSKEY:  Before we go off just a note to please mark the transcript as highly confidential under the terms of the protective order.

THE VIDEOGRAPHER:  This concludes the volume 1 testimony of Gus Fuldner.  Going off the record at 5:56 p.m. Pacific time.