# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB |
| This Document Relates to:<br>ALL CASES | **ALL PLAINTIFFS' NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC REGARDING 2026 BACKGROUND CHECK POLICY CHANGE.**<br><br>Judge: Honorable Charles R. Breyer |

Pursuant to Federal Rules of Civil Procedure Rules 30(b)(6) and 45, all Plaintiffs will take the deposition by oral examination of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber") through one or more of their designees on the topics listed below. This deposition will be taken before a duly qualified Notary Public, at the time and place specified, and continued from day to day thereafter, Sundays and holidays excepted, until completed, on behalf of all Plaintiffs. Pursuant to Federal Rules of Civil Procedure Rules 30(b)(3)(A) and 45(a)(1)(B), notice is given that the deposing party intends to record the testimony by audio and video technology in addition to the stenographic method. Notice is hereby given that the video is intended for use at trial.

Plaintiffs request that Uber identify in writing at least ten (10) business days in advance of the deposition the name(s) of the person(s) who will testify on their behalf and the subject(s) on which each person will testify. And if Uber intends to have a custodian whose deposition is already scheduled (in his or her personal capacity) testify on its behalf on any of these categories, Plaintiffs request that Uber provide notice of the same at least ten (10) business days in advance of that witness' deposition.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is directed to produce and permit inspection and copying of the documents and/or tangible things specified in Attachment A to this notice at the time and place of deposition.

## INSTRUCTIONS

1. For purposes of interpreting or construing the scope of this Notice, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the

language of an individual topic or request. This includes, without limitation, the following:

    a.  The terms "each," "every," "any," and "all" are synonymous with one another and with "each and every" and "any and all;"

    b.  The connectives "and" and "or" are used inclusively and not exclusively and shall be construed either disjunctively or conjunctively as to require the broadest possible response;

    c.  Construing the singular form of the word to include the plural and the plural form to include the singular;

    d.  Construing the masculine to include the feminine, and vice-versa;

    e.  The use of any tense of any verb shall also include all other tenses of that verb;

    f.  A term or word defined herein is meant to include both the lower and uppercase reference to such term or word;

    g.  Any Bates number referenced herein shall be construed to refer not only to the specific age number identified but to the entirety of the document associated with that Bates number, including any family members;

    h.  Construing the term "including" to mean including but not limited to.

2.      Unless otherwise indicated, the name of any Person, party or business organization shall specifically include all past and present employees, officers, directors, agents, representatives, general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

3.      In construing this Notice, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning.

4.      Unless otherwise indicated, the relevant time period for the topics in this Notice is from January 1, 2009, through the present time.

**DEFINITIONS**

1.      "ADJUDICATION CRITERIA" are criteria for deciding based on BACKGROUND CHECK, whether or not a person is eligible to be or continue to be a DRIVER. ADJUDICATION CRITERIA include all standards, rules, policies, cutoffs, thresholds, categories that Uber applied or considered in making decisions.

2.      "BACKGROUND CHECK" means any search, survey, review, evaluation, downloading, and/or summarizing of databases and/or court records, police records, law enforcement records, arrest records, department of motor vehicle records, and/or other official records, performed at any time and for any reason, to learn about a person's background and/or determine whether that person meets the minimum criteria to be a DRIVER.

3.      "BACKGROUND CHECK CONTRACTOR" means any business entity that Uber paid or engaged to conduct BACKGROUND CHECKS, including but not limited to any nationally accredited Professional Background Screening Association (PBSA) vendor, Checkr, or any other third-party screening vendor.

4.      "BACKGROUND CHECK POLICY CHANGE" means the changes to Uber's background check standards, ADJUDICATION CRITERIA, SSN TRACE scope, PERMANENT DISQUALIFICATION CATEGORIES, and related policies and procedures that Uber announced on or about June 2026, as described in the UBER NEWSROOM ANNOUNCEMENTS, and all related internal policies, procedures, decisions, and communications.

5.      "BACKGROUND CHECK PROCESS" means all the steps taken related to conducting a BACKGROUND CHECK, including information gathered from the DRIVER, information provided to the BACKGROUND CHECK CONTRACTOR, instructions to the BACKGROUND CHECK CONTRACTOR, information provided to UBER by the BACKGROUND CHECK CONTRACTOR, the geographic and temporal scope of the BACKGROUND CHECKS, the databases queried as part of the BACKGROUND CHECKS, the ADJUDICATION CRITERIA used, and the SCREENING decisions made and the process by which they were made.

6.      "BELLWETHER REGIONS" shall mean the states, cities, counties, and surrounding areas in which Bellwether incidents occurred.

7.      "CRIMINAL HISTORY" means any history of infractions, violations, misdemeanors, felonies, or crimes, including but not limited to tickets, arrests, prosecutions, convictions and plea deals.

Case No. 3:23-md-03084-CRB

8. "DEACTIVATE," "DEACTIVATION," or "DEACTIVATED" includes any actions that prevents someone from using either the DRIVER APP or UBER APP to offer rides or request rides, and includes waitlisting, applying a safety lock, blocking, and deactivating, whether permanent or temporary.

9. DISQUALIFY" "DISQUALIFIED," or "DISQUALIFYING" mean determining that a person does not meet the minimum criteria to be or continue to be a DRIVER, whether at initial application, at annual rescreening, or following any other review.

10. "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone so long as it is in the responding party's possession, custody, or control. Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communication; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form. The term "DOCUMENT" includes all drafts of a "DOCUMENT" and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the original. The term also includes information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), together with instructions and all

4

other materials necessary to use or interpret such data compilations

11. "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier who uses or at any time has used the Uber Application to be connected with RIDERS for the purpose of providing rides to RIDERS. Where appropriated, "Driver" shall be interpreted to also include potential or prospective Drivers.

12. "DRIVER SUPPLY" means the number of drivers available and willing to accept ride requests in a specific area at a particular time.

13. "EXECUTIVE LEADERSHIP TEAM" shall mean and refer to those officers/agents of the UBER whom occupy or occupied the roles of Chief Executive Officer, Chief Financial Officer, Chief Marketing Officer, Chief People Officer, Chief Legal Officer, Chief Architect Officer, Chief Product Officer, Chief Technology Officer, Senior Vice President for Safety & Core Services, Senior Vice President for Delivery, and Senior Vice President for Mobility & Business Operations.

14. "HIGH TENURE DRIVER EXCEPTION" means the policy announced by Uber in June 2026 under which certain existing DRIVERS with a felony conviction more than fifteen (15) years old that was not sexual in nature may continue earning with Uber if they have no serious interpersonal safety-related complaints of any kind, as described in the UBER NEWSROOM ANNOUNCEMENTS.

15. "KPI" shall mean and refer to Key Performance Indicators or Key Performance Metrics when applied to executive compensation as outlined and described in the 2024 UBER Proxy Statement.

16. "LIFETIME SSN TRACE" means the expanded Social Security Number residence history trace that Uber announced in June 2026, under which UBER's BACKGROUND CHECK CONTRACTORS search county-level criminal records for any address in a prospective or existing DRIVER'S entire residence history (described by Uber as a "99-year SSN trace", as distinguished from the prior practice of using a 7-year SSN trace.

17. "LOOKBACK PERIOD" means the duration of time over which criminal records,

5

charges, or convictions are searched for, considered, or used in evaluating a DRIVER's eligibility to drive for Uber, including but not limited to the 7-year lookback period historically applied by Uber and the changes to that period announced in June 2026.

18.    "MARKETING" refers to the efforts to promote and/or sell something, including RESEARCH regarding customer/client/Rider preferences, behavior, and trends; relationship-building with potential or actual customers/clients/Riders; product development and design aimed at fulfilling customer/client/Rider preferences; and/or COMMUNICATIONS with a target audience through various COMMUNICATIONS CHANNELS to promote and/or sell something.

19.    "PERMANENT DISQUALIIFICATION" means a determination that a person is categorically ineligible to be or remain a DRIVER, regardless of when the relevant offense occurred.

20.    "PERMANENT DISQUALIFICATION CATEGORIES" means the categories of offenses or conduct that Uber treats as permanently disqualifying a person from serving as a DRIVER, including but not limited to: (a) the categories that were in effect prior to June 2026, including sexual assault, sex crimes involving minors, murder, homicide, kidnapping, and terrorism; and (b) the expanded categories announced in June 2026, including all violent felonies, all crimes that may be sexual in nature, and stalking and strangulation-related offenses whether charged as misdemeanors or felonies.

21.    "PRSU" shall mean and refer to Performance-Based Restricted Stock Unit as applied to executive compensation as outlined and described in the 2022 UBER Proxy Statement.

22.    "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a taxi or Charter Party Carrier.

23.    "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride was coordinated through the Uber Application and regardless of whether the Rider was the person who ordered the ride or owner of the account used to order the ride.

24.    "RIDER APP," "UBER APP," "UBER APPLICATION," "UBER APP," or "APP" means Uber's mobile device application that is used by Drivers and Riders to coordinate, provide, or order Uber Rides, including apps used by both DRIVER or RIDER, and including the Uber Driver Application.

6

25. "RISK SENSITIVE MATHCING" means Uber's matching of RIDERS and/or particular RIDES with DRIVERS, where the risk of a SAFETY INCIDENT is a factor in determining who is matched with whom and/or whether the match occurs. This includes S-RAD (aka Safety Risk Assessed Dispatch), Geo Fencing, and all other prior, subsequent, and/or alternative versions of S-RAD.

26. "SAFETY" means bodily or physical safety, freedom from harm, freedom from bodily injury, including the freedom from unwanted touching, penetration, threats, imprisonment, harassment, and freedom from fear, terror, and other forms of emotional distress.

27. "SAFETY IMPACT" means the effect and/or impact on Riders' actual SAFETY, e.g. through reducing the incidence or severity of SEXUAL ASSAULT, SEXUAL MISCONDUCT, or other harm to Riders.

28. "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is sexual in nature and without the consent of the Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

29. "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Misconduct taxonomy.

30. "SSN TRACE" means a Social Security Number trace used to identify the counties or jurisdictions where a DRIVER or prospective DRIVER has lived or potentially had contact with law enforcement, for the purpose of directing county-level criminal record searches, including both the prior 7-year SSN TRACE and LIFETIME SSN TRACE.

31. "STALKING AND STRANGULATION OFFENSES" means any offense related to stalking or strangulation, whether charged as a misdemeanor or felony, that Uber announced in June 2026 would be treated as permanently disqualifying for DRIVERS because such offenses are predictors of future violence.

32. "SUBJECT DRIVERS" shall mean the drivers at issue during the SUBJECT INCIDENTS for Bellweather cases.

7

33. "SUBJECT INCIDENTS" shall mean the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT that Bellweather plaintiffs allege they experienced in connection with a RIDE, and includes the immediate circumstances of that SEXUAL ASSAULT and/or SEXUAL MISCONDUCT.

34. "SURGE PRICING" shall mean the specific method and process by which Uber increases pricing for matching drivers in times of increased demand.

35. "TRANSPORTATION SYSTEM" or "TRANSPORTATION NETWORK" refers to the entire system for providing and/or facilitating Rides, which may include but is not limited to Driver recruitment, Driver screening, Driver training, instructions for Drivers, policies and guidelines that apply to Drivers, Rider recruitment, Rider screening, Rider training, instructions for Riders, policies and guidelines that apply to Riders, the way in which a Rider requests a Ride, or someone else may request a Ride on behalf of a Rider, the way in which Drivers are matched with Riders via the Uber App, the way in which a Driver accepts a Ride, where and how Drivers and Riders are instructed to meet one another, the way in which Drivers and Riders and directed to identify one another and confirm that identity, the trade dress or other markings used to help identify Drivers' vehicles, maps and driving instructions, ways in which destinations can be changed, stops can be added, additional Riders can be added, where and how a Driver drops a Rider off, what components of the Ride are supported by technology, devices, or services external to the Uber App, what Fares are charged, the amount of the Fares, the way in which Fares are charged, how much of the Fare is shared with the Driver, what the Driver and Rider each are told about the Fare(s), discounts if any provided, customer support or other services provided before during and after a Ride, devices hardware and software that supports the Ride, safety buttons, features to share a Ride with a third party, GPS and/or other monitoring by Uber of a Ride, automation to detect unusual or unwanted activity during a Ride, video and/or audio recording during a Ride, and/or the lack of any of these things or features.

36. "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their parents, divisions, departments, subsidiaries, affiliates, predecessors, successors, present or former officers,

8

directors, owners, members, partners, principals, agents, employees, contractors, subcontractors, administrators, attorneys, experts, investigators, consultants, joint venturers, licensers, and all other Persons acting or purporting to act on its behalf that have Documents and information in their possession, custody, or control responsive to the request herein.

37.    "UBER NEWSROOM ANNOUNCEMENTS" means the articles published by Uber on or about June 2026 titled "A New Standard for Background Checks" and "How We Keep Our Platform Safe: Understanding Uber's Background Checks and Safety Incident Response," available at https://www.uber.com/us/en/newsroom/uber-backgroundchecks/ and https://www.uber.com/us/en/newsroom/background-checks/, and all related or linked content, including all prior drafts, versions, and edits.

### DEPOSITION TOPICS

1.  The decision- making process that led to the BACKGROUND CHECK POLICY CHANGE announced in June 2026. As part of this topic, the deponent(s) should be prepared to discuss:

   a.  The identity of each PERSON (including employees, officers, executives, and consultants) who participated in, contributed to, or had decision-making authority over the BACKGROUND CHECK POLICY CHANGE, including their titles, roles, and responsibilities in connection with that decision.

   b.  The identity of each PERSON(S) who had financial authority to approve and implement the BACKGROUND CHECK POLICY CHANGE.

   c.  The organizational structure of the team(s) or department(s) at Uber that worked on the BACKGROUND CHECK POLICY CHANGE, including any working groups, task forces, or cross-functional teams convened for this purpose.

   d.  The timeline of the BACKGROUND CHECK POLICY CHANGE, including when the process of evaluating or developing the changes began, when internal decisions were made, when any approvals were given, and when implementation began.

9

2. The reasons, motivations, goals, and objectives underlying the BACKGROUND CHECK POLICY CHANGE. As part of this topic, the deponent(s) should be prepared to discuss:

    a. All reasons why Uber decided to expand the PERMANENT DISQUALIFICATION CATEGORIES, including the categories of all violent felonies, crimes that may be sexual in nature, and STALKING AND STRANGULATION OFFENSES.

    b. All reasons why Uber decided to expand the SSN TRACE from a 7-year to a LIFETIME SSN TRACE.

    c. All reasons why Uber decided to adopt the HIGH TENURE DRIVER EXCEPTION, and what criteria were used to define and implement that exception.

    d. Any data, studies, research, analyses, data, or reports that informed or supported the BACKGROUND CHECK POLICY CHANGE, including any internal research and any external research provided by CIVIL RIGHTS AND SAFETY ORGANIZATIONS or other third parties.

    e. Any events, lawsuits, regulatory actions, media coverage, or other external factors that preceded, prompted, or contributed to Uber's decision to implement the BACKGROUND CHECK POLICY CHANGE.

    f. Whether the BACKGROUND CHECK POLICY CHANGE was considered or discussed before or after October 4, 2023, February 5, 2026, or April 20, 2026.

3. Uber's knowledge prior to the BACKGROUND CHECK POLICY CHANGE, of any limitations, gaps, deficiencies, or shortcomings in its prior BACKGROUND CHECK PROCESS. ADJUDICATION CRITERIA, SSN TRACE scope, LOOKBACK PERIOD, or PERMANENT DISQUALIFICATION CATEGORIES. As part of this topic, the deponent(s) should be prepared to discuss:

    a. All INFORMATION Uber possessed, prior to June 2026, indicating that its 7-year SSN TRACE may have failed to identify relevant criminal records for DRIVERS, including any DRIVERS who were approved despite criminal

10

records that would have been discovered under the LIFETIME SSN TRACE.

b. All INFORMATION Uber possessed, prior to June 2026, indicating that its prior PERMANENT DISQUALIFICATION CATERGORIES may have been insufficient to protect RIDERS from SEXUAL ASSAULT or SEXUAL MISCONDUCT.

c. Any research, analyses, audits or reviews Uber conducted or CONSIDERED conducting, at any time, to evaluate whether its BACKGROUND CHECK PROCESS was adequate to prevent DRIVERS with relevant criminal histories from being approved.

d. Any complaints, concerns, or recommendations raised internally or externally, including by CIVIL RIGHTS AND SAFETY ORGANIZATIONS or Uber's SAFETY ADVISORY BOARD, prior to June 2026 regarding the adequacy of Uber's prior BACKGROUND CHECK PROCESS.

4.   Uber's consultation with CIVIL RIGHTS AND SAFETY ORGANIZAYIONS and other external advisors in connection with the BACKGROUND CHECK POLICY CHANGE. As part of this topic, the deponent(s) should be prepared to discuss:

a. The identity of each external organization or individual Uber consulted with in connection with the BACKGROUND CHECK POLICY CHANGE, including the National Action Network, Alliance for HOPE International, the National Network to End Domestic Violence (NNEDV), the DC Rape Crisis Center, and any other organizations or individuals

b. The nature, substance, and outcome of each consultation, including what made recommendations Uber adopted or rejected, and the reason for any rejection of a recommendation that was made by these CIVIL RIGHTS AND SAFETY ORGANIZATIONS.

c. Whether any CIVIL RIGHTS AND SAFETY ORGANIZATIONS or SAFETY ADVISORY BOARD members recommended policy changes prior to June 2026, and if so, the reasons for any delay.

11

   d.   The identity of each Uber employee or officer who participated in each consultation.

   e.   Whether any of the external organizations or individuals consulted were paid by Uber for their participation, and if so, the amounts paid and the nature of any financial relationship.

5.   The implementation of the BACKGROUND CHECK POLICY CHANGE. As part of this topic, the deponent(s) should be prepared to discuss:

   a.   The specific date(s) on which Uber began applying the expanded PERMANENT DISQUALIFICATION CATEGORIES to new driver applicants and to existing drivers at annual rescreening.

   b.   The specific date(s) on which Uber began applying the LIFETIME SSN TRACE to new driver applicants and to existing drivers at annual rescreening.

   c.   The specific date(s) on which Uber began utilizing the HIGH TENURE DRIVER EXCEPTION.

   d.   The timeline by which DRIVERS onboarded before June 2026 were or are expected to be screened under the BACKGROUND CHECK POLICY CHANGE.

   e.   How Uber communicated the BACKGROUND CHECK POLICY CHANGE to its BACKGROUND CHECK CONTRACTORS, and any instructions or directives Uber provided to its BACKGROUND CHECK CONTRACTORS in connection with implementation.

   f.   The timeline by which DRIVERS onboarded before June 2026 were or are expected to be screened under the BACKGROUND CHECK POLICY CHANGE.

   g.   The process by which the approximately 2,000 DRIVERS qualifying for the HIGH TENURE DRIVER EXCEPTION were identified, evaluated, and allowed to continue driving.

   e.   Uber's prior BACKGROUND CHECK PROCESS.

6.   The specific decision to add stalking and strangulation-related offenses, regardless of whether charged as misdemeanor or felonies, to the PERMANENT DISQUALIFICATION CATEGORIES under the BACKGROUND CHECK POLICY CHANGE. As part of this

12

topic, the deponent(s) should be prepared to discuss:

    a. The identity of the individuals and organizations who recommended that STALKING AND STRANGULATION OFFENSES are predictors of future violence.

    b. The data, research, expert guidance, or incident reports that supported the determination that STALKING AND STRANGULATION OFFENSES are predictors of future violence.

    c. Whether Uber CONSIDERED treating STALKING AND STRANGULATION OFFENSES as permanently disqualifying prior to June 2026, and if so, when such consideration occurred and why it was not implemented earlier.

    d. Whether any active DRIVERS at the time of the BACKGROUND CHECK POLICY CHANGE had convictions for STALKING AND STRANGULATION OFFENSES, and if so, how many, and whether and how those DRIVERS were DEACTIVATED.

7. The HIGH TENURE DRIVER EXCEPTION announced as part of the BACKGROUND CHECK POLICY CHANGE. As part of this topic, the deponent(s) should be prepared to discuss:

    a. The criteria Uber used to define "high tenure," including minimum years of service, minimum trip count, safety record requirements, and any other relevant criteria.

    b. The categories of offenses that are eligible for the HIGH TENURE DRIVER EXCEPTION and those that are not, including the categorical exclusion of offenses that are sexual in nature.

    c. The process by which the approximately 2,000 DRIVERS identified as qualifying for the HIGH TENURE DRIVER EXCEPTION were reviewed and allowed to continue, and the identity of the individuals at Uber responsible for those decisions.

    d. Whether any feedback or concerns from CIVIL RIGHTS AND SAFETY

ORGANIZATIONS opposed to the HIGH TENTURE DRIVER EXCEPTION and how Uber resolved any such concern.

8. Uber's prior policy of using a 7-year SSN TRACE and the decision to expand it to a LIFETIME SSN TRACE. As part of this topic, the deponent(s) should be prepared to discuss:

    a. When and why Uber adopted the 7-year SSN trace as its standard practice.

    b. Whether Uber, at any point prior to June 2026, evaluated whether a longer SSN TRACE period would yield additional relevant criminal records not otherwise identified.

    c. The estimated number of DRIVERS who, upon rescreening under the LIFETIME SSN TRACE, were found to have criminal records not identified under the prior 7-year SSN TRACE, and the nature of those records.

    d. Whether the LIFETIME SSN TRACE was previously CONSIDERED but not adopted by Uber, and if so, the reasons it was not adopted earlier.

9. The role of Uber's SAFETY ADVISORY BOARD in connection with the BACKGROUND CHECK POLICY CHANGE. As part of this topic, the deponent(s) should be prepared to discuss:

    a. The membership of Uber's SAFETY ADVISORY BOARD at the time of the BACKGROUND CHECK POLICY CHANGE, including the identities, titles, and qualifications of all members who participated in or were consulted regarding the changes.

    b. All COMMUNICATIONS between Uber and the SAFETY ADVISORY BOARD regarding the BACKGROUND CHECK POLICY CHANGE, including any recommendations made and whether and how those recommendations were incorporated.

    c. Whether the SAFETY ADVISORY BOARD made any prior recommendations regarding Uber's BACKGROUND CHECK PROCESS, ADJUDICATION

14

Case No. 3:23-md-03084-CRB

CRITERIA, or LOOKBACK periods that were not adopted before June 2026, and if so, the reasons for any delay in implementation.

10. Research or analysis of whether the BACKGROUND CHECK POLICY CHANGE, if applied retroactively or at the time of the initial screening, would have DISQUALIFIED any current or previously active DRIVERS and the identity of those drivers if they were the driver for any plaintiff in this litigation.

## ATTACHMENT A

### DOCUMENTS AND THINGS TO BE PRODUCED

1. Current curriculum vitae or resume for the witness(es) or, alternatively, a printed and completed copy of his or her LinkedIn profile or similar.

2. All DOCUMENTS the deponent reviewed, referred to, CONSIDERED, or relied upon in responding to the deposition topics described herein.

3. All DOCUMENTS reflecting the decision-making process that led to the BACKGROUND CHECK POLICY CHANGE, including but not limited to internal memoranda, presentations, project plans, meeting minutes, proposals, and approval records.

4. All DOCUMENTS identifying the PERSONS who participated in, contributed to, or had decision-making authority over the BACKGROUND CHECK POLICY CHANGE, including organizational charts, team rosters, working group membership lists, and project team records.

5. All DOCUMENTS identifying the PERSON(S) who had final authority to approve the BACKGROUND CHECK POLICY CHANGE, and all DOCUMENTS reflecting the exercise of that authority.

6. All COMMUNICATIONS among Uber employees, officers, or executives regarding the BACKGROUND CHECK POLICY CHANGE, including but not limited to emails, text messages, Slack messages, meeting minutes, and memoranda, from January 1, 2023, through the present.

7. All COMMUNICATIONS between Uber and its BACKGROUND CHECK CONTRACTORS regarding the BACKGROUND CHECK POLICY CHANGE, including instructions, directives, contracts, amendments, and agreements governing the new screening requirements.

8. All COMMUNICATIONS between Uber and any CIVIL RIGHTS AND SAFETY

15

ORGANIZATIONS consulted in connection with the BACKGROUND CHECK POLICY CHANGE, including but not limited to the National Action Network, Alliance for HOPE International, NNEDV, and the DC Rape Crisis Center.

9.      All COMMUNICATIONS between Uber and any member of its SAFETY ADVISORY BOARD regarding the BACKGROUND CHECK POLICY CHANGE, including any recommendations made and Uber's response thereto.

10.      All DOCUMENTS reflecting any data, research, analyses, studies, reports, or recommendations that informed or supported the BACKGROUND CHECK POLICY CHANGE, including any internal research and any research provided by external organizations.

11.      All DOCUMENTS reflecting any analysis Uber conducted regarding whether its prior 7-year SSN TRACE was adequate to identify relevant criminal records for DRIVERS, including any DOCUMENTS identifying the number or percentage of DRIVERS whose records were missed under the prior 7-year SSN TRACE but identified under the LIFETIME SSN TRACE.

12.      All DOCUMENTS reflecting any analysis, evaluation, or discussion of the HIGH TENURE DRIVER EXCEPTION, including criteria for eligibility, the identity of DRIVERS identified as qualifying for the exception, and the process by which those DRIVERS were evaluated and approved.

13.      All DOCUMENTS reflecting the identity, offense histories, tenure records, and safety complaint records of the approximately 2,000 DRIVERS identified by Uber as qualifying for the HIGH TENURE DRIVER EXCEPTION.

14.      All DOCUMENTS reflecting any analysis of whether the expanded PERMANENT DISQUALIFICATION CATEGORIES, if applied retroactively or at the time of initial screening, would have DISQUALIFIED any current or previously active DRIVERS and the identity of those drivers if they were the driver for any plaintiff in this litigation.

15.      All DOCUMENTS reflecting any analysis of whether the LIFETIME SSN TRACE, if applied at the time of initial or annual screening, would have identified additional criminal records for any current or previously active DRIVERS and the identity of those drivers if they were the driver for any plaintiff in this litigation.

16. All DOCUMENTS reflecting any connection between the BACKGROUND CHECK POLICY CHANGE and claims or litigation arising from SAFETY INCIDENTS, including but not limited to MDL 3084.

17. All DOCUMENTS discussing any involvement of Uber's legal department, outside counsel, or claims and risk management personnel in the development, timing, or approval of the BACKGROUND CHECK POLICY CHANGE.

18. All DOCUMENTS containing any COMMUNICATIONS between Uber and any legislators, regulators, government officials, or industry groups regarding the BACKGROUND CHECK POLICY CHANGE.

19. All versions, drafts, and final text of the UBER NEWSROOM ANNOUNCEMENTS, including all COMMUNICATIONS related to their preparation, review, and publication.

20. All DOCUMENTS identifying the specific date(s) on which the expanded PERMANENT DISQUALIFICATION CATEGORIES took effect for new driver applicants and for existing DRIVERS undergoing annual rescreening.

21. All DOCUMENTS identifying the specific date(s) on which the LIFETIME SSN TRACE took effect for new driver applicants and for existing DRIVERS undergoing annual rescreening.

22. All DOCUMENTS discussing any prior CONSIDERATION of expanding the SSN TRACE beyond 7 years, including any DOCUMENTS reflecting why such expansion was not implemented prior to June 2026.

23. All DOCUMENTS discussing any prior CONSIDERATION of adding STALKING AND STRANGULATION OFFENSES or other violent felonies to the PERMANENT DISQUALIFICATION CATEGORIES, including any DOCUMENTS reflecting why such changes were not implemented prior to June 2026.

24. All contracts, agreements, statements of work, or engagement letters between Uber and any CIVIL RIGHTS AND SAFETY ORGANIZATIONS or other external advisors consulted in connection with the BACKGROUND CHECK POLICY CHANGE.

25. All DOCUMENTS reflecting any payments, compensation, grants, or donations made by Uber to any CIVIL RIGHTS AND SAFETY ORGANIZATIONS or other external advisors consulted in

17

connection with the BACKGROUND CHECK POLICY CHANGE.

26.    All DOCUMENTS illustrating the role and recommendations of Uber's SAFETY ADVISORY BOARD with respect to Uber's BACKGROUND CHECK PROCESS at any time from January 1, 2018, through the present.

27.    All DOCUMENTS reflecting the total number of DRIVERS rescreened under the new BACKGROUND CHECK PROCESS following the BACKGROUND CHECK POLICY CHANGE, the outcomes of those re-screenings, and the number and offense categories of DRIVERS DEACTIVATED as a result.

28.    All DOCUMENTS containing any public statements, press releases, investor communications, regulatory filings, government reports, or congressional testimony referencing the BACKGROUND CHECK POLICY CHANGE.

29.    All DOCUMENTS discussing Uber's internal policies, procedures, and guidelines regarding the BACKGROUND CHECK POLICY CHANGE, including any updated ADJUDICATION CRITERIA guidelines, BACKGROUND CHECK CONTRACTOR instructions, and onboarding or rescreening protocols.

30.    The number of Uber personnel tasked with implementing Uber's BACKGROUND CHECK PROCESS prior to and after June 2026, and any organizational charts for personnel tasked with implementing Uber's BACKGROUND CHECK PROCESS.

Dated: July 9, 2026

By:  /s/Sarah R. London
Sarah R. London
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: slondon@girardsharp.com

18

**PROOF OF SERVICE**

I, Rupashree Gangopadhyay, hereby declare as follows:

I am employed by Chaffin Luhana LLP.  I am over the age of eighteen years and am not a party to this action.  On July 9, 2026, I caused a copy of the foregoing document to be served via electronic mail on the following:

**NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC REGARDING 2026 BACKGROUND CHECK POLICY CHANGE.**

on:

**Kirkland & Ellis LLP**
Alli Brown
alli.brown@kirkland.com
Chris Cox
christopher.cox@kirkland.com
Jessica Davidson:
jessica.davidson@kirkland.com
Jennifer Levy
jlevy@kirkland.com
Geoffrey Wyatt
geoffrey.wyatt@kirkland.com

**O'Melveny and Meyers LLP**
Sabrina Strong
sstrong@omm.com
Jonathan Schneller
jschneller@omm.com
Joshua Revesz
jrevesz@omm.com
Louis Fisher:
lfisher@omm.com

**Shook, Hardy & Bacon LLP**
Michael B. Shortnacy
mshortnacy@shb.com
Patrick L. Oot, Jr.
oot@shb.com
Christopher V. Cotton
ccotton@shb.com
Alycia A. Degen
adegen@shb.com

*Counsel for Defendants Uber Technologies, Inc.,
Raiser, LLC, and Raiser-CA, LLC*

19

I declare under penalty of perjury that the above is true and correct.  Executed on July 9, 2026 in Saint Louis, Missouri.

 */s/ Rupashree Gangopadhyay*

Rupashree Gangopadhyay

20