# EXHIBIT 1

Sarah R. London (State Bar No. 267083)
Simon Grille (State Bar No. 294914)
Maya Kalonia (State Bar No. 359755)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: slondon@girardsharp.com
Email: sgrille@girardsharp.com
Email: mkalonia@girardsharp.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC. PASSENGER SEXUAL ASSAULT LITIGATION | **MDL No. 3084 CRB** |
| | **PLAINTIFF JANE DOE QLF 001'S FIRST AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC REGARDING REGIONAL DISCOVERY** |
| This Document Relates to: | |
| *Jane Doe QLF 001 v. Uber Technologies, Inc., et al.*, 3:24-cv-08783 | |

Pursuant to Federal Rules of Civil Procedure Rules 30(b)(6) and 45, Plaintiff Jane Doe QLF 001 will take the deposition by oral examination of Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber") through one or more of their designees on the topics listed below. This deposition will be taken before a duly qualified Notary Public, at the time and place specified, and continued from day to day thereafter, Sundays and holidays excepted, until completed, on behalf of Plaintiff. Pursuant to Federal Rules of Civil Procedure Rules 30(b)(3)(A) and 45(a)(1)(B), notice is given that the deposing party intends to record the testimony by audio and video technology in addition to the stenographic method.  Notice is hereby given that the video is intended for use at trial.

| Witness | Date | Time | Location |
|---|---|---|---|
| Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC | TBD | TBD | TBD |

Plaintiff requests that Uber identify in writing at least ten (10) business days in advance of the deposition the name(s) of the person(s) who will testify on their behalf and the subject(s) on which each person will testify. And if Uber intends to have a custodian whose deposition is already scheduled (in his or her personal capacity) testify on its behalf on any of these categories, Plaintiffs request that Uber provide notice of the same at least ten (10) business days in advance of that witness' deposition.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is directed to produce and permit inspection and copying of the documents and/or tangible things specified in Attachment A to this notice at the time and place of deposition.

## INSTRUCTIONS

1.     For purposes of interpreting or construing the scope of this Notice, the terms shall be given their most expansive and inclusive interpretation unless otherwise specifically limited by the language of an individual topic or request. This includes, without limitation, the following:

    a.     The terms "each," "every," "any," and "all" are synonymous with one another and with "each and every" and "any and all;"

    b.     The connectives "and" and "or" are used inclusively and not exclusively and shall be construed either disjunctively or conjunctively as to require the broadest possible response;

1

c.   Construing the singular form of the word to include the plural and the plural form to include the singular;

d.   Construing the masculine to include the feminine, and vice-versa;

e.   The use of any tense of any verb shall also include all other tenses of that verb;

f.   A term or word defined herein is meant to include both the lower and uppercase reference to such term or word;

g.   Any Bates number referenced herein shall be construed to refer not only to the specific page number identified but to the entirety of the document associated with that Bates number, including any family members;

h.   Construing the term "including" to mean including but not limited to.

2.   Unless otherwise indicated, the name of any Person, party or business organization shall specifically include all past and present employees, officers, directors, agents, representatives, general partners, limited partners, successors, predecessors, and attorneys of the Person, party, or business organization.

3.   In construing this Notice, You should give effect to the Definitions set forth below. Undefined words and terms shall be given their common meaning.

4.   Unless otherwise indicated, the relevant time period for the topics in this Notice is from January 1, 2009, through the present time.

**DEFINITIONS**

For the purposes of this Notice, the following words and terms shall bear the meanings as identified below. For any undefined term, the standard dictionary definition of the term applies.

1.   "ACCOUNT HISTORY" means the INFORMATION that UBER maintains about a DRIVER's account status, including but not limited to the Driver's name, status, status note, whether the status is current, the date and time the status began, the date and time the status ended, and the flow type.

2.   "ACTIVE" with respect to the DRIVER APP or UBER APP means that a person has an active account on that App and is authorized to use the App to either offer or request RIDES.

3.   "ACTIVE DRIVER" means someone with an active DRIVER APP account who is authorized to use the DRIVER APP to offer RIDES.

4.    "ACTIVE RIDER" means someone with an active UBER APP account who is authorized to use the UBER APP to request RIDES.

5.    "ADJUDICATION CRITERIA" are criteria for deciding, based on a Background Check, whether or not a person is eligible to be or continue to be a Driver.

6.    "ADVERTISING" and "ADVERTISEMENT" refer to COMMUNICATIONS via any COMMUNICATIONS CHANNELS aimed at promoting a product, service, or idea to a target audience.

7.    "AGREEMENT" means any Document that states the commitments, expectations, agreements, contracts, terms, and/or conditions between two or more entities and/or people. It includes but is not limited to Terms of Use and Community Guidelines.

8.    "ALL ACCOUNTS" means all Uber accounts and what Uber calls "flow types" associated with or linked to, a given Rider or Driver at any time, including but not limited to Uber Black accounts, Eat accounts, Freight accounts, Rider accounts, Driver accounts, or any other flow types or accounts possessed by, linked to, or affiliated with the Driver.

9.    "BACKGROUND CHECK" means any search, survey, review, evaluation, downloading, and/or summarizing, of databases and/or court records, police records, law enforcement records, arrest records, department of motor vehicle records, and/or other official records, performed at any time and for any reason, to learn about a person's background and/or determine whether that person meets the minimum criteria to be a DRIVER.

10.    "BACKGROUND CHECK CONTRACTOR" means any business entity that Uber paid to conduct BACKGROUND CHECKS.

11.    "BACKGROUND CHECK FINDINGS" means information related to potential infractions, violations, and/or crimes, including but not limited to tickets, arrests, prosecutions, convictions, and plea deals.

12.    "BACKGROUND CHECK PROCESS" means all the steps taken related to conducting a BACKGROUND CHECK, including information gathered from the DRIVER, information provided to the BACKGROUND CHECK CONTRACTOR, instructions to the BACKGROUND CHECK CONTRACTOR; information provided to UBER by the BACKGROUND CHECK CONTRACTOR, the geographic and temporal scope of the BACKGROUND CHECKS, the databases queried as part of

3

the BACKGROUND CHECKS, the ADJUDICATION CRITERIA used as part of the BACKGROUND CHECKS, and the SCREENING decisions made and the process by which they were made).

13.   "BIOMETRICS" means biological data, including but not limited to fingerprints and face recognition.

14.   "PSYCHOLOGICAL SCREENING" means use of psychological and/or personality testing and/or questionnaires in its SCREENING of APPLICANTS. It includes but is not limited to the programs called "Cerebral," "Cerebro," and "Usights," and any former, subsequent, or alternative versions of those programs.

15.   "CANCELLATION RATE" means the percentage of ride requests that a DRIVER cancels compared to the total number of RIDE requests the DRIVER receives.

16.   "COMMUNICATION(S)," "COMMUNICATING," and "COMMUNICATED" are intended it their broadest sense and shall mean the transmittal of information or request for information, and shall include any oral, written, spoken, or electronic transmission of information (in the form of facts, ideas, thoughts, opinions, data, inquiries, or otherwise).

17.   "CHECKING REFERENCES" means contacting prior employers and/or other acquaintances of an APPLICANT to gather information from them about an APPLICANT.

18.   "CONSIDERED" means discussed, analyzed, presented on, RESEARCHED, did cost projections, solicited quotes and/or bids, ran a pilot program.

19.   "CONTRACTOR(S)" refers to any entities UBER paid to perform services or provide products.

20.   "CRIMINAL HISTORY" means any history of infractions, violations, misdemeanors, felonies, or crimes, including but not limited to tickets, arrests, prosecutions, convictions, and plea deals.

21.   "DATE OF UBER'S SAFETY TAXONOMY IMPLEMENTATION" as used herein shall refer to the date by which UBER had fully implemented its Sexual Misconduct and Violence Taxonomy (which implementation is described in Uber's 2018 Safety Report as occurring sometime in late 2018).

4

22.     "DEACTIVATE" or "DEACTIVATION" includes any action that prevents someone from using either the DRIVER APP or UBER APP to offer RIDES or request RIDES and includes waitlisting, applying a safety lock, blocking, and deactivating, whether permanent or temporary.

23.     "DISPLAYED STAR RATING" means the numerical rating, out of a maximum rating of 5, that UBER displayed as a RIDER or DRIVER's rating, usually next to an icon of a star.

24.     "DISQUALIFY" "DISQUALIFIED" or "DISQUALIFYING" mean determining that a person does not meet the minimum criteria to be or continue to be a DRIVER.

25.     "DOCUMENT(S)" shall mean and include "writings" as defined in Federal Rules of Civil Procedure Rule 34(a) and include any written, recorded, or graphic material of any kind, prepared by anyone, so long as it is in the responding party's possession, custody, or control.  Without limitation of the foregoing, a document is deemed to be in a person or entity's control if that person or entity has the right to secure the document or a copy thereof from another person. The term "DOCUMENT" includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs. The term "DOCUMENT" also includes electronically stored data from which information can be obtained either directly or by translation through detection devices or readers; any such document or writing is to be produced in a reasonably legible and usable form.  The term "DOCUMENT" includes all drafts of a "DOCUMENT" and all copies that differ in any respect from the original, including any notation, underlining, marking, or information not on the original.  The term also includes information stored in, or accessible through, computer or other information retrieval systems (including any computer archives or back-up systems), together with instructions and all other materials necessary to use or interpret such data compilations.

26. "DRINKING-RELATED COMMUNICATIONS" are COMMUNICATIONS regarding alcohol, alcoholic beverages, the holidays, parties, celebrations, "Celebrate responsibly," "Celebrate safely," the "Safe Rides Pledge," "Stand Up, Don't Stand By," becoming a "Designated Rider," joint advertising by UBER and Mothers Against Drunk Driving (MADD), joint advertising by UBER and any alcohol-related brand, and any other COMMUNICATIONS that relate to the concept of getting home safely after drinking, whether that concept is conveyed through words, hashtags, or images.

27. "DRIVER" means anyone other than a taxi driver, limo driver, or charter party carrier who uses or at any time has used the Uber Application to be connected with RIDERs for the purpose of providing rides to RIDERs. Where appropriate, "Driver" shall be interpreted to also include potential or prospective Drivers.

28. "DRIVER APP" means Uber's mobile phone application that is used by Drivers to offer Rides.

29. "DRIVER SUPPLY" means the number of drivers available and willing to accept ride requests in a specific area and at a particular time.

30. "FAILURE MODE" means a way in which something may fail to function as designed or intended.

31. "HIGH RISK DRIVER" means someone who, if they are allowed to become a Driver, poses an elevated risk of committing SEXUAL ASSAULT, SEXUAL MISCONDUCT, or causing an INTERPERSONAL CONFLICT connected with a RIDE.

32. "INCIDENT" means the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT that Plaintiff alleges she experienced in connection with a RIDE, and includes the immediate circumstances of that SEXUAL ASSAULT and/or SEXUAL MISCONDUCT.

33. "INDUSTRY INFORMATION SHARING" means any program, plan, policy, agreement, contract, or practice of sharing information, and/or asking that information be shared, by and between Uber, Lyft, and other TRANSPORTATION NETWORK COMPANIES.

34. "INFORMATION" means data, information, DOCUMENTS, and facts, that exist and/or are transmitted in any form whatsoever including text, images, audio, video, electronic, or otherwise.

35. "INTERPERSONAL CONFLICT" means any event or incident that UBER classifies or classified as an "IPC" or "interpersonal conflict," including but not limited to SEXUAL ASSAULT, SEXUAL MISCONDUCT, arguments, altercations, rude behavior or words, and/or discriminatory behavior or words.

36. "INVESTIGATION" means all actions UBER and/or its CONTRACTORS take in response to events or conduct reported to UBER involving one or more RIDER and/or DRIVER. Investigation includes but is not limited to COMMUNICATIONS, interviews, internal discussions, classifications, DEACTIVATION, reactivation, and review of INFORMATION.

37. "INVESTIGATION DOCUMENTS" refer to all DOCUMENTS and INFORMATION related to UBER's INVESTIGATION of conduct, misconduct, an accident, incident, SEXUAL MISCONDUCT, SEXUAL ASSAULT, collision, or something else reported against a RIDER or a DRIVER. INVESTIGATION DOCUMENTS include TICKETS (or if another project management and/or issue tracking software was used, the equivalent tracking-related DOCUMENTS), and the entire set of tabs, views, menus, summaries, animations, diagrams, popups, pulldowns, dropdowns, and buttons, data, INFORMATION, and DOCUMENTS linked together within, and accessible from the TICKET (or if another project management and/or issue tracking software was used, the equivalent tracking-related DOCUMENTS).

38. "LAW ENFORCEMENT" means police departments, sheriff's departments, other law enforcement agencies, officers, detectives, sheriffs, FBI agents, federal, state, or other law enforcement officials, and/or District Attorneys or other prosecutors, and their staff.

39. "LOCATION DATA" means coordinates, GPS data, satellite data, and/or latitude-longitude data.

40. "LOCATION TRACKING" means monitoring the location and movement of cellular devices, other devices, people, and/or vehicles.

41. "LOW CREDIBILITY" refers to a determination that a particular RIDER or DRIVER lacks or may lack credibility. This includes but is not limited to a determination that a RIDER and/or DRIVER gives an unusual number of low ratings, engages in "over escalation," copies and pastes the same complaints repeatedly, or is otherwise flagged as showing abnormal patterns of reporting.

7

42. "MARKETING" refers to the efforts to promote and/or sell something, including RESEARCH regarding customer/client/Rider preferences, behavior, and trends; relationship-building with potential or actual customers/clients/Riders; product development and design aimed at fulfilling customer/client/Rider preferences; and/or COMMUNICATIONS with a target audience through various COMMUNICATIONS CHANNELS to promote and/or sell something.

43. "MATERIALS" mean any DOCUMENT, DATA, physical object, audio recording, video recording, or other item or material of any nature whatsoever.

44. "METRIC" means a quantifiable measure.

45. "MISCONDUCT" means, for TICKETS that post-date the DATE OF UBER's SAFETY TAXONOMY IMPLEMENTATION, conduct that relates to any of the following categories from Uber's Safety Taxonomy: (1) Sexual Assault, (2) Vehicle Crash or Claim, (3) Theft or Robbery, (4) Sexual Misconduct, (5) Physical Altercation, (6) Verbal Altercation, (7) Substance Abuse, (8) Inappropriate Post-Trip Contact, (9) Law Enforcement / Regulatory, (10) Potential Safety Concern. "MISCONDUCT" means, for TICKETS that pre-date the DATE OF UBER's SAFETY TAXONOMY IMPLEMENTATION, TICKETS initiated by a RIDER or by a third party on the RIDER's behalf, that relate to any form of misconduct or inappropriate behavior involving the Driver, including driving under the influence and complaints of interpersonal conflict (e.g., verbal altercations, theft, sexual misconduct, sexual assault, etc.), as well as speeding and other forms of unsafe driving.

46. "OFFER CARD" means the complete INFORMATION presented to a RIDER about a DRIVER who is matched with the RIDER, including the complete USER EXPERIENCE that a RIDER viewing that INFORMATION would see. The OFFER CARD includes but is not limited to the DRIVER's name displayed, photograph displayed, the DRIVER's tier within the Uber Pro rewards program such as Uber Pro Diamond, the DISPLAYED STAR RATING, badges, compliments, biographical information, the DRIVER's number of trips, number of months or years spent as a DRIVER, and any other INFORMATION displayed (or which might be displayed if the RIDER clicks on a link).

47. "PERSONAL TRANSPORTATION" means transportation of people in passenger vehicles.

48.    "NORTHERN TEXAS REGION" means the cities of Arlington, Texas, Fort Worth, Texas, Cresson, Texas, Tarrant County, Texas, and Parker County, Texas, and their surrounding areas.

49.    "PLAINTIFF" means the specific Plaintiff propounding these requests or, in the case of a minor, on whose behalf these requests are propounded.

50.    "PUBLIC INFORMATION" means information that is available to the public, including but not limited to online search results, news stories, blogs, websites, and social media.

51.    "RATE" refers to all of the following: the absolute number, frequency, incidence, as well as the number as a percentage, fraction, or proportion of Rides (either total Rides or, if a particularly category of Ride is specified, for that category of Ride).

52.    "RESEARCH" means observation, focus groups, testing, reliability testing, usability testing, analyses, root cause analyses, hazard assessments, failure mode and effects analyses, surveys, studies, experimentation, pilot programs, and the collection, interpretation, and evaluation of data, including data from use of Uber's Transportation Network in particular regions or countries.

53.    "REPORTS" or "RIDER REPORTS" mean COMMUNICATIONS from RIDERS to UBER.

54.    "RIDE" or "RIDES" refer to rides arranged via the Uber App, which do not involve a taxi or Charter Party Carrier.

55.    "RIDECHECK" means any program for using LOCATION DATA to identify and/or act on UNPLANNED STOPS, ROUTE DEVIATIONS, and/or UNPLANNED RIDER-DRIVER PROXIMITY. RIDECHECK includes the programs Uber calls "RideCheck" and "RideCheck+" as well as any former, subsequent, or alternative versions of those programs, including GPS anomaly detection and any other such programs, whether those programs were merely CONSIDERED or implemented.

56.    "RIDER" means any individual taking an Uber Ride, regardless of whether the Ride was coordinated through the Uber Application and regardless of whether the Rider was the person who ordered the ride or owner of the account used to order the ride.

57.    "UBER APP," "UBER APPLICATION," "RIDER APP," or "APP" means Uber's mobile device application that is used by Riders to coordinate, or order Uber Rides.

9

58.    "RIDE LOG" means the INFORMATION UBER maintains about each RIDE a DRIVER provides, which includes but is not limited to the following information: Driver Name, Request Time/Date, Begin Trip Time/Date, Drop Off Time/Date, Status, Rating, and Feedback, for the whole time period when the Subject Driver was Active.

59.    "RISK FACTORS" means factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride (e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

60.    "RISK SENSITIVE MATCHING" means Uber's matching of RIDERS and/or particular RIDES with DRIVERS, where the risk of a SAFETY INCIDENT is a factor in determining who is matched with whom and/or whether the match occurs. This includes S-RAD (aka Safety Risk Assessed Dispatch), Geo Fencing, and all other prior, subsequent, and/or alternative versions of S-RAD.

61.    "RISK FACTORS" mean factors that are associated, in the data available to UBER, with an increased risk of a SAFETY INCIDENT. RISK FACTORS may include but are not limited to attributes of the Driver (e.g., new driver, prior incidents, inability to conduct a thorough background check, gender, age, driving patterns, patterns of aggressive driving, patterns of inappropriate in-app messaging, patterns of prior UNPLANNED RIDER-DRIVER PROXIMITY, patterns of prior UNPLANNED STOPS, patterns of ROUTE DEVIATIONs, preference for driving at nights and/or weekends, preference for driving in areas frequented by bars and/or restaurants, one-star ratings), attributes of the Rider (e.g., new rider, age, gender), attributes of a specific Ride request (e.g., weekend, late night, rural area, long trip, from an area frequented by bars and restaurants), attributes of the Ride

(e.g., inappropriate messaging, live LOCATION DATA indicating UNPLANNED RIDER-DRIVER PROXIMITY, UNPLANNED STOP(S), ROUTE DEVIATION(S)).

62.    "ROUTE DEVIATIONS" means any deviation or detour from a planned route for a RIDE, which is for an abnormal period of time (i.e. a period of time that is not consistent with a reasonable alternative route to the intended destination).

63.    "SAFETY" means bodily or physical safety, freedom from harm, freedom from bodily injury, including the freedom from unwanted touching, penetration, threats, imprisonment, harassment, and freedom from fear, terror, and other forms of emotional distress.

64.    "SAFETY IMPACT" means the effect and/or impact on Riders' actual SAFETY, e.g. through reducing the incidence or severity of SEXUAL ASSAULT, SEXUAL MISCONDUCT, or other harm to Riders.

65.    "SAFETY INCIDENT" means a SEXUAL ASSAULT, SEXUAL MISCONDUCT, INTERPERSONAL CONFLICT, IPC, or other harm connected with a RIDE.

66.    "SAFETY INTERVENTION" means anything Uber did in an attempt to prevent or reduce the risk, duration, and/or severity of SEXUAL ASSAULT OR SEXUAL MISCONDUCT in connection with a specific RIDE, including but not limited to sending push notifications, otherwise communicating with the DRIVER and/or RIDER, contacting Law Enforcement, and/or contacting a security company or other third party.

67.    "SAFETY REPORT" or "SAFETY REPORTS" means Uber's "US Safety Reports," the first of which covered the years 2017 and 2018, the second of which covered 2019 and 2020, and the third of which covered 2021 and 2022.

68.    "SAFETY LENS" means the software, program, and/or set of DOCUMENTS that UBER calls the "safety lens." It includes the entire family or universe of tabs, views, menus, popups, pulldowns, dropdowns, and buttons, and all the data, INFORMATION, DOCUMENTS and views that are linked together within, and accessible from Safety Lens.

69.    "SAFETY TOOLKIT" means the set of features and resources that are part of the Uber App and/or Driver App and relate to safety during RIDES. The SAFETY TOOLKIT includes but is not

11

limited to the "Share My Trip," "Emergency Assistance," In-App Reporting, live Help, and text 911 features.

70.    "SCREEN" or "SCREENING" refers to interactions, actions, and information gathering in order to decide whether or not to allow an applicant to become a Driver.

71.    "SCREEN OUT" or "SCREENING OUT" means to determine that a person is DISQUALIFIED for a position or job.

72.    "SCREENING MEASURES" refers to ways, means, tools, resources, and/or actions (potential or actual) for SCREENING an applicant. They include but are not limited to gathering resumes, use of application forms, conducting interviews, CHECKING REFERENCES, googling someone or otherwise reviewing PUBLIC INFORMATION, BACKGROUND CHECKS, using psychometrics like CEREBRAL, using CJIS, and using biometrics.

73.    "SEXUAL ASSAULT" shall mean physical or attempted physical conduct that is sexual in nature and without the consent of the Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Assault taxonomy.

74.    "SEXUAL MISCONDUCT" shall mean any and all non-physical conduct (such as verbal or staring) of a sexual nature that is without consent or has the effect of threatening or intimidating a Rider, including but not limited to all acts addressed in Defendants' taxonomy and RALIANCE's Sexual Misconduct taxonomy.

75.    "STAR RATING" means the number of stars a RIDER assigns to a DRIVER, out of maximum of five, when leaving feedback after a RIDE.

76.    "SUBJECT DRIVER" means the DRIVER who is alleged to have committed the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT in this matter.

77.    "SUBJECT RIDE" means the RIDE that PLAINTIFF alleges was connected with the SEXUAL ASSAULT and/or SEXUAL MISCONDUCT she experienced.

78.    "TELEMATICS" means LOCATION TRACKING; LOCATION DATA; collecting, monitoring, transmissions, and/or analysis of LOCATION DATA and patterns within LOCATION DATA; including the use of TRIGGERS, and notifications regarding LOCATION DATA and patterns.

79.     "TELEMATICS TRIGGER" means a specific event or condition detected by a TELEMATICS system that prompts a notification, response, alert, or action. A TELEMATICS TRIGGER may include speed alerts, harsh braking alerts, geofencing alerts, and/or alerts based on proximity.

80.     "THIRD PARTIES" are entities or people other than the SUBJECT DRIVER and UBER.

81.     "TICKET" means a customer support interaction or series of related customer support interactions, as well as DOCUMENTS used by UBER to track and/or manage those interactions and resulting investigations and/or dispositions. TICKET includes but is not limited to TICKETS sent, received, tracked, or organized via Uber's Zendesk software, JIRA software, Bliss software, or another software program.

82.     TICKET-RELATED DOCUMENTS means all INFORMATION and DOCUMENTS attached or linked to the Ticket, including without limitation the Chronicle map snapshot, Chronicle animation, Voyager data, Voyager animation, comments, names of Uber personnel reflected in the tickets, and all Communications connected with the ticket, including the entire set of COMMUNICATIONS, tabs, views, menus, summaries, animations, diagrams, popups, pulldowns, dropdowns, and buttons, data, evidence, LOCATION DATA, INFORMATION, and DOCUMENTS linked together within, and accessible from the TICKET. TICKET-RELATED DOCUMENTS include the entire USER EXPERIENCE that an agent and/or investigator who works for UBER would be able to see and/or access with regard to a specific investigation.

83.     "UBER," "YOU," "YOUR," or "YOURSELF" shall mean and refer to Uber Technologies, Inc., Rasier LLC, and Rasier-CA, LLC, including each of their  parents, divisions, departments, subsidiaries, affiliates, predecessors, successors, present or former officers, directors, owners, members, partners, principals, agents, employees, contractors, subcontractors, administrators, attorneys, experts, investigators, consultants, joint venturers, licensors, and all other Persons acting or purporting to act on its behalf that have Documents and information in their possession, custody, or control responsive to the request herein.

84.     "UBER PRO" refers to UBER's "Uber Pro" rewards program for DRIVERS.

85.    "UNPLANNED RIDER-DRIVER PROXIMITY" refers to LOCATION DATA indicating that a RIDER and a DRIVER are still in proximity to one another, for an abnormal period of time, when a Ride is no longer in progress.

86.    "UNPLANNED STOPS" refers to LOCATION DATA indicating that a RIDER and a DRIVER have stopped at a location other than the intended destination, for an abnormal period of time (i.e. a period of time that is not consistent with a typical stoplight, stop sign).

87.    "USER EXPERIENCE" means UX, UX flow, user flow, flow, navigation flow, state machine, decision tree, information architecture, interaction model, UI state map, and user interface, including the menus, screens, buttons, options, visuals, and words, and options that a user may interact with.

88.    "USER INTERACTIONS" mean all forms of engagement with an application's interface, including clicking buttons, swiping, tapping, scrolling, and any other actions that involve manipulating the app's elements.

89.    "VOYAGER DATA" means INFORMATION from UBER's Voyager software, including both the raw LOCATION DATA, and the analyses and presentations of that INFORMATION conducted by the Voyager software.

90.    "WOMAN" as used herein should be interpreted broadly to include anyone who identified herself as having a female (or nonbinary) gender, and also anyone whose inferred gender (based on, e.g., name) is female and who did not otherwise identify their gender.

91.    "WOMAN TO WOMAN MATCHING" means any product, software, or program for matching women (and/or nonbinary, transgender individuals, and/or those with inferred female gender) with other women (and/or nonbinary, transgender individuals, and/or those with inferred female gender). This includes what Uber refers to as Women2Women or W2W and any former, subsequent, or alternative versions of that program.

## DEPOSITION TOPICS

1. Uber's policies, practices, and procedures for recruiting Drivers in the Northern Texas Region. As part of this topic, the deponent(s) should be prepared to discuss:

14

a.  Incentives, campaigns, policies, or directives related to Driver recruitment in the two years prior to when the Subject Driver was recruited.

b.  Campaigns or Marketing targeted at the Northern Texas Region in the two years prior to when the Subject Driver was recruited.

c.  Uber's target quantity of Drivers for the Northern Texas Region in the two years prior to when the Subject Driver was recruited.

2.  Uber's policies, practices, and procedures for Screening and onboarding Drivers in the Northern Texas Region. As part of this topic, the deponent(s) should be prepared to discuss:

a.  Uber's policies, protocols, and/or instructions to its Background Check Contractor(s), interactions between Uber and its Background Check Contractor(s), and Information the Background Check Contractor(s) made available to Uber.

b.  Uber's policies, practices, and procedures for having the Drivers fill out an application and interviewing Drivers.

3.  Uber's policies, practices, and procedures related to retention or Deactivation of Active Drivers in the Northern Texas Region. As part of this topic, the deponent(s) should be prepared to discuss:

a.  Incentives, campaigns, policies, or directives related to Driver Supply when the Subject Driver was onboarded.

b.  The Star Rating threshold for Deactivation of Active Drivers in the Northern Texas Region for up to two years before the Incident and at the time of the Incident.

4.  Sexual Assault and/or Sexual Misconduct in the Northern Texas Region. As part of this topic, the deponent(s) should be prepared to discuss:

a.  Statistics concerning the frequency of Sexual Assault and/or Sexual Misconduct to Uber in the Northern Texas Region and as compared to national rates of Sexual Assault and/or Sexual Misconduct in Ubers.

b.  Statistics concerning the frequency of Sexual Assault and/or Sexual Misconduct relating to Uber in the Northern Texas Region compared to Driver demand and growth in the region.

15

c. How complaints of Sexual Assault and/or Sexual Misconduct in the Northern Texas Region were handled at the time of the Subject Incident.

5. Uber's compliance with Texas state and local statutes and regulations, including but not limited to:

a. Uber's opposition to and efforts to oppose fingerprint-based background checks and vehicle identification efforts in Texas.

b. Uber's support of and efforts to support Proposition 1 in Austin, Texas in and around 2016.

c. Uber's shut down of Uber operations in Austin, Texas in and around 2016.

d. Ubber's support of and efforts to support Texas House Bill 100 in or around 2016 and 2017.

e. Uber's re-opening of operations in Austin, Texas following the passage of Texas House Bill 100 in 2017.

f. Uber's communications with Texas legislators and government leaders regarding Texas House Bill 100 in 2017, including but not limited to Governor Greg Abbott.

g. The Ridesharing Works political action committee and any other political action committees or formal or informal groups that Uber organized or supported the organization of for the purposes in this section.

h. All events, promotions, marketing, and/or on-the-ground activities Uber conducted in or around Austin, Texas with respect to the efforts addressed in this section, including but not limited to mailers, television, radio, social media, and ads in any other format, free rides to polls, celebrity engagements, and "Kitchen's Uber" carriage rides.

i. The amount of money Uber spent on the efforts addressed in this section.

## ATTACHMENT A

### DOCUMENTS AND THINGS TO BE PRODUCED

1. Current curriculum vitae or resume for the witness(es) or, alternatively, if one of the foregoing items is not available, a printed and complete copy of his or her LinkedIn profile or similar.

16

2. All documents the deponent reviewed, referred to, considered, or relied upon in responding to the deposition topics described herein.

3. The custodial file of the deponent, to the extent s/he is not already a custodian.

4. The witness must bring to the deposition a laptop or other computer capable of logging into the platform(s) that Uber's investigators use when they are investigating a reported Safety Incident, such that the witness is able to demonstrate the architecture of the platform(s), and the way in which the investigator's resources, including but not limited to Chronicle, Fractal, Voyager, Background Check Portal, Safety Lens, JIRA, Bliss, etc., are organized, linked, accessed, viewed, and interacted with.

5. Copies of all marketing and advertising materials or communications Uber sent or directed to the Plaintiff, by any channel (including but not limited to through the Uber app, email, or social media).

6. Copies of all marketing and advertising materials or communications Uber sent or directed to H██████ D██ aka H██████ M██████, by any channel (including but not limited to through the Uber app, email, or social media).

7. Copies of all Drinking-Related Communications and Safety Communications Uber sent or directed to the Northern Texas Region at any time prior to the Incident, by any channel (including but not limited to through the Uber app, email, or social media).

Dated: July 16, 2026

By: */s/Sarah R. London*
Sarah R. London
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: slondon@girardsharp.com

**PROOF OF SERVICE**

I, Rupashree Gangopadhyay, hereby declare as follows:

I am employed by Chaffin Luhana LLP.  I am over the age of eighteen years and am not a party to this action.  On July 16, 2026 I caused a copy of the foregoing document to be served *via electronic mail* on the following:

**WAVE 1 PLAINTIFFS' FIRST AMENDED NOTICE OF 30(b)(6) DEPOSITION OF UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC REGARDING REGIONAL DISCOVERY**

on:

**Kirkland & Ellis LLP**
Alli Brown
alli.brown@kirkland.com
Chris Cox
christopher.cox@kirkland.com
Jessica Davidson:
jessica.davidson@kirkland.com
Jennifer Levy
jlevy@kirkland.com
Geoffrey Wyatt
geoffrey.wyatt@kirkland.com

**O'Melveny and Meyers LLP**
Sabrina Strong
sstrong@omm.com
Jonathan Schneller
jschneller@omm.com
Joshua Revesz
jrevesz@omm.com
Louis Fisher:
lfisher@omm.com

**Shook, Hardy & Bacon LLP**
Michael B. Shortnacy
mshortnacy@shb.com
Patrick L. Oot, Jr.
oot@shb.com
Christopher V. Cotton
ccotton@shb.com
Alycia A. Degen
adegen@shb.com

*Counsel for Defendants Uber Technologies, Inc., Raiser, LLC, and Raiser-CA, LLC*

18

I declare under penalty of perjury that the above is true and correct.  Executed on July 16, 2026 in Saint Louis, Missouri.

<u>  /s/ Rupashree Gangopadhyay    </u>
Rupashree Gangopadhyay
