[*Submitting counsel below*]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB |
| | **JOINT CASE MANAGEMENT STATEMENT** |
| This Document Relates To: | Judge:         Hon. Charles R. Breyer |
| | Courtroom:  6 – 17th Floor (videoconference) |
| ALL ACTIONS | Date:          August 14, 2026 |
| | Time:         10:00 a.m. |

### JOINT CASE MANAGEMENT STATEMENT

Defendants Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC (collectively, "Uber"), and Plaintiffs' Co-Lead Counsel (collectively referred to herein as "the Parties"), respectfully provide this Joint Case Management Conference Statement and Proposed Agenda in advance of the Case Management Conference scheduled for August 14, 2026.

### Proposed Agenda

    **I.**    **Status of Case Filings**

    **II.**    **Replenishing the Bellwether Pool and Setting More Trials**

    **III.**    **Report on Hate Mail To Uber Attorneys after recent *New York Times* Article**

    **IV.**    **Uber's Subpoenas to Non Party Attorney Advertising, Marketing, Advocacy Groups and Client Services Companies**

    **V.**    ***Jane Doe QLF 0001* Discovery**

    **VI.**    ***Jane Doe QLF 0001* Expert Deadlines**

    **VII.**    **Improving Procedures for Joint Filings**

    **VIII.**    **Resolution/Mediation**

    **IX.**    **Next Case Management Conference**

## I.  STATUS OF CASE FILINGS

### A.    Number of MDL Case Filings

As of August 12, 2026, there are 3,955 cases in this MDL, with more than 247 new filings and 15 dismissals since the last case management conference. Of these 3,955 filed claims, a substantial percentage are subject to dismissal motions (*see* Section I(A)) or are otherwise alleged by Uber to be fundamentally deficient (e.g., they are not connected to a trip arranged on the Uber app).

The following chart provides further detail on the status of the case docket:

| No. of Active MDL Cases | 3,955 |
|---|---|
| *Includes cases pending dismissal or resolution but that remain on the docket* | |

| | |
|---|---|
| **No. of Active MDL Cases in which Uber has Requested Dismissal Without Prejudice**<br><br>*Includes cases subject to pending dismissal motions before the Court*<br><br>*\*ECF Nos. 5891, 5914, 5915, 5989, 6192, 6350, 6420, 6468, 6586, 6785, 6979* | 133\* |
| **No. of Active MDL Cases Dismissed Without Prejudice and in which Uber has Requested Conversion to Dismissal With Prejudice**<br><br>*Includes cases subject to pending conversion motions before the Court*<br><br>*\*\*ECF Nos. 5567, 6340* | 315\*\* |
| **No. of Active MDL Cases Dismissed With Prejudice on Any Grounds**<br><br>*MDL cases dismissed with prejudice to date* | 274 |
| **No. of Active MDL Cases Pending Resolution**<br><br>*MDL cases pending resolution but that remain on the docket* | 839 |

**B.      Status of JCCP**

Approximately 791 cases are pending in the JCCP. The next trial, which was set for September 14, 2026, has been vacated.

**C.      Other Cases and Proceedings**

Uber has provided a current list of civil actions arising from allegations of sexual assault on the Uber platform in which Uber is a defendant, attached as Exhibit A.

**II. REPLENISHING THE BELLWETHER POOL AND SETTING MORE TRIALS**

**Plaintiffs' Position:**

Years of Uber sexual assault litigation have taught that the biggest factors in motivating the parties to resolution are firm trial dates in significant cases. After nearly four years of MDL proceedings, only a small portion of the MDL docket has resolved. The litigation has progressed

through bellwether proceedings, common discovery, and substantial motion practice, yet thousands of individual cases remain pending (with thousands more unfiled cases waiting in the wings).[1] Given the significant and growing number of cases in this MDL, it appears that setting more trials, and doing so in the right cases, is the optimal way to advance all parties' interest in obtaining prompt relief, whether by final judgment or settlement. At the same time, the Court should act to advance the ball in the many MDL cases that, while not meriting bellwether status (and the attendant Court and leadership resources), deserve trial dates and meaningful progress in their cases.

### A. Parallel Bellwether and Remand Processes Will Move the Litigation Forward Most Effectively.

Plaintiffs propose to continue Bellwether Trial Waves 2 through 4 while simultaneously creating a "Remand Track" that prepares large cohorts of non-bellwether MDL cases for trial in their home districts or transferee courts. While additional bellwether trials are important, continuing to move only a handful of cases at a time through successive bellwether trials does not provide a practical path forward for the entire docket. Bellwether proceedings remain useful, but they should operate alongside—not instead of—a process for advancing the remaining cases.

After Uber earlier proposed "random" selection of bellwether cases and no remand process, the company now appears to agree on parallel bellwether and remand tracks. But the parties disagree on how each track works.

### B. The Court should adopt Plaintiff's bellwether track proposal rather than Uber's.

Plaintiffs propose a new bellwether pool designed to simultaneously (1) test allegations of Uber's negligence (based on a variety of challenged practices and procedures over time) and (2) allow litigation of vicarious liability theories in states not yet adjudicated. In addition, Plaintiffs have identified bellwether selections that focus on cases with law enforcement involvement to avoid

---

[1] Many plaintiffs filed their cases over 5 years ago, as they were originally filed in the JCCP and then refiled in the MDL after dismissal based on *forum non conveniens.*

ancillary disputes over whether the incident actually happened. Plaintiffs anticipate providing the Court a summary of each proposed case for the Court's consideration.

Uber's approach, in contrast, focuses on factors that are, at best, irrelevant, and at worst, affirmatively counter-productive. *First*, Uber asks the Court to pick cases based on Uber's "taxonomy," exclusively selecting cases involving "masturbation/indecent exposure," "sexual touching over clothing," and "sexual touching under clothing." Uber has no argument for why it's worth the Court's and the PSC's time to litigate whether "sexual touching over clothing" in one case is "worse" than "sexual touching under clothing" in a different case. Uber's myopic focus on its taxonomy doesn't make sense. For example, Uber opposed selecting Jane Doe QLF 0001 as a bellwether because the assault in her case—oral penetration—wasn't the "right kind" of penetration to adequately reflect other cases. Ultimately, Uber will likely defend all of these cases the way it defended *Dean* and *WHB 823*, by minimizing the severity of the assault and attacking the victim's credibility. Doing so is its right. But it does not justify designing a bellwether pool to maximize the prominence of that strategy. *Second*, Uber asks the Court to rule out any vicarious liability theories from the bellwether pool. While Plaintiffs agree that bellwethers should be selected to evaluate Plaintiffs' negligence theories, it makes no sense to preclude also litigating the hotly contested issues of vicarious liability. We can do both. *Third*, Uber proposes that, in each wave, the parties "flip a coin" to pick trial orders. This proposal makes light of the Court's and the parties' resources. The Court should try the right cases, not random ones.

### C. The Court should adopt Plaintiff's remand track proposal.

Plaintiffs' Remand Track proposal is thoughtfully constructed and the Court should adopt it. The Remand Track Plaintiffs propose is deliberately incremental. Rather than attempting to process the entire docket at once, Plaintiffs propose graduated cohorts beginning with 50 cases and increasing through successive waves, followed by a rolling process for the remaining cases. That structure permits the Court to maintain control over the pace of the litigation, evaluate the process as it develops, and make adjustments where appropriate.

Plaintiffs seek to prioritize cases based on criteria designed to advance the litigation efficiently. Under their approach, cases would be organized into tiers principally according to the nature of the alleged assault and relevant state-law issues, with additional priority within each tier given to cases that have been pending longest and involve earlier alleged incidents. The result is an orderly cohort process rather than indiscriminate remand.

Plaintiff's proposal also ensures sufficient case-specific preparation—standard in MDL remands—before any case is remanded. Under Plaintiffs' proposal, the Court would apply a structured process for determining whether individual cases are sufficiently developed to leave the MDL. For example, a PTO 10 compliant Plaintiff Fact Sheet and Defense Fact Sheet would be a prerequisite for inclusion in a Remand Wave. And any deficiencies identified would not need to be addressed within fourteen days of assignment.

Because the Defense Fact Sheet is the mechanism by which Uber's own case-specific knowledge enters the record, Plaintiffs further propose that inclusion in a Remand Wave require Uber to certify that its Defense Fact Sheet production for that case is complete—including production of all reports, complaints, and safety-incident records concerning the driver at issue, and the driver's background-check and qualification file. Recent experience confirms the need for that requirement: in *QLF 0001*, Uber's January 15, 2025 Defense Fact Sheet omitted all three categories, and its June 12, 2026 amended Defense Fact Sheet omitted them again. Cases should not be included in a Remand Wave with the defendant's own core discovery still missing.

Once a case enters a wave, the Order would provide for targeted case-specific discovery, including interrogatories, requests for admission, requests for production concerning medical records, incident records, and Uber platform data relating to the driver, passenger, pairing, and the ride at issue. It also permits case-specific depositions.

Those requirements ensure that the cases reaching remand have undergone meaningful individualized development. They also provide Uber with an opportunity to investigate the factual basis of each claim and identify any genuine case-specific proof deficiency before the case leaves the MDL. These procedures also address any lingering concerns Uber may have regarding suspected

fraudulent ride receipt documentation, to the extent other case management orders have not resolved the issue.

Plaintiffs' proposal also makes good use of the work already performed in the MDL. For the bellwether track, expert reports, Rule 702 rulings, and motion in limine decisions from earlier waves may become part of the common MDL record and may be used in subsequent trials without unnecessary re-briefing, subject to case-specific issues. Likewise, common expert reports from the MDL record may be used in Remand Track cases without re-retention, subject to the receiving court's evidentiary rules.

### D. The Court should reject Uber's unprecedented proposal for appointment of a "guardian at litem" in bellwether cases.

Uber proposes that every bellwether plaintiff be deprived of their choice of counsel through Court appointment of a "guardian ad litem" to settle cases with Uber. This proposal appears to be unprecedented and is likely unconstitutional. Rule 17(c) authorizes appointment of a guardian ad litem to protect "a minor or an incompetent person who is unrepresented in an action." Uber does not contend that any bellwether plaintiff is either. Each is a competent adult who has retained counsel of her own choosing, and Uber identifies no case—in this MDL or any other—in which a court stripped competent adult plaintiffs of their chosen counsel's settlement authority over their objection, at the request of the defendant. Uber's proposal would also manufacture the very conflict it professes to fear, by installing a Court-appointed intermediary whose sole stated function is to "settle cases with Uber." To the extent Uber's actual concern is informed consent, that subject is already governed by counsel's fiduciary and ethical obligations to each individual client—including Rule 1.8(g) in the aggregate-settlement context—and by this Court's supervisory authority. And there is no reason or basis to suggest that Plaintiffs' counsel are not complying with ethics rules. Uber's accusations that individual plaintiffs must be protected from Plaintiff's leadership's purported strategic interest are baseless and offensive.

A defendant does not get to select who advises the plaintiffs suing it. If the Court were to proceed down this path, and it should not, Plaintiffs would propose parallel obligations on Uber in

this MDL, including appointing an independent settlement counsel (as opposed to the same law firms that are profiting from litigation) and a board member representative at each mediation.

### E. The Court should reject Uber's proposal to hamstring the bellwether and remand processes with inventory-wide "Fraud Investigations."

Uber argues the Court should not permit cases to proceed toward bellwether trial or remand until particular Plaintiffs' firms have had their entire client list vetted for "fraud," with a special master being appointed to conduct that review. Uber's proposal is problematic in numerous regards, and the concerns it purports to address are much more appropriately resolved through the structured, case-specific process that Plaintiffs propose.

As an initial matter, Uber is wrong that the MDL docket has a systematic problem warranting the draconian relief it seeks. Out of approximately 3,188 pending cases, Uber has identified only 27 Plaintiffs with allegedly non-bona-fide ride receipts—0.85% of the docket. The record further reflects no finding that any Plaintiffs' firm knowingly submitted fraudulent receipts and no determination that the challenged submissions resulted from systemic fraud. Uber suggests that its forthcoming motion, by shrinking the denominator, will yield a larger percentage of supposedly "fraudulent" cases. The fact remains that identified "fraud" is a vanishingly small problem in the MDL as a whole.

That distinction is important. Issues concerning a particular Plaintiff or document are being raised and addressed already as the Court has implemented procedures for addressing such issues. But the existence of disputed receipts in less than 1% of cases does not establish that unrelated cases handled by the same counsel should be presumed deficient or prevented from progressing until counsel's entire list of clients—*even those still under investigation and who have not yet decided to file a claim*—has undergone some kind of extrajudicial scrutiny.

More fundamentally, the Court already has procedures addressing this issue. PTO 31 governs unsubstantiated Uber rides and requires either production of a bona fide receipt verified under penalty of perjury or a detailed sworn statement describing the Plaintiff's search efforts and identifying available Uber receipts. PTO 31 also provides for dismissal for noncompliance.

Plaintiffs' proposal adds another level of individualized scrutiny before remand. Fact-sheet compliance is required; deficiencies must be cured; case-specific written discovery is permitted; Uber

platform data concerning the particular driver, passenger, pairing, and the subject ride is discoverable; limited depositions may be taken; and only after that process is completed does the Court enter an individual remand or transfer order.

The combination of those procedures is sufficient to address any issues Uber may raise without delaying unrelated cases. If Uber identifies evidence that calls a particular Plaintiff's claim or supporting documentation into question, nothing prevents Uber from raising that issue or seeking appropriate case-specific relief, as it has done. An additional firm-wide investigation would therefore duplicate existing safeguards while introducing an unjustified additional prerequisite and substantial burden to case progression for the vast majority of cases. It would also shift the focus away from the appropriate inquiry—whether the individual case is sufficiently developed and compliant with the Court's orders to proceed—and toward the conduct of unrelated—and even *unfiled*—plaintiffs represented by the same counsel.

For the same reason, the limited issues identified to date do not establish a need for a separate fraud special master, with the associated costs and delays. The Court already has a framework for ride substantiation, discovery, deficiency resolution, and individualized case management.[2] And, what Uber is describing—adjudicating inconsistencies in the record—is squarely the province of the jury— not an extrajudicial process. There is no demonstrated need to add another layer of review before the bellwether or remand tracks can begin. Especially so given that, every time the PSC has offered to meet with Uber periodically to discuss and address any potential ride receipt issues, Uber has declined to engage.

Finally, Uber states that it will address the bellwether and remand process and fraud issues in separate briefing "this week". While Plaintiffs had anticipated these issues would be fully fleshed out before the Court at this CMC with both sides' positions clearly laid out together, Plaintiffs respectfully

---

[2] The asymmetry of Uber's request is difficult to overlook. Uber asks the Court to impose extraordinary verification requirements on Plaintiffs while Uber's own Defense Fact Sheet obligations in individual cases remain unmet—including in *QLF 0001*, where Uber served its Defense Fact Sheet on January 15, 2025 and an amended one on June 12, 2026, yet did not produce a prior passenger's assault report against the driver until August 4, 2026, says it cannot locate a second such report, and never produced the compete driver's background-check file.

request a reasonable opportunity to respond to such briefing—and can do so quickly so this issue will get resolved.

**Uber's Position:**

As the parties have discussed in meet and confers, Uber's position on these issues will be set forth in two briefs to be filed this week. Uber agrees that Plaintiffs should have an opportunity to respond to Uber's separately filed position on bellwethers replenishment and remand, as well as the separate filing concerning fraud.

***First,*** consistent with Uber's statements during meet and confers, issues pertaining to **Sections A-D** in Plaintiff's position above concerning bellwether replenishment and the future of this MDL proceeding warrant stand-alone briefing and require more space than is appropriate for a CMC statement. Accordingly, and as Uber discussed with Plaintiffs, Uber is concurrently filing a separate brief on this topic, which it incorporates herein by reference. As set forth in the motion, Plaintiffs' proposal does not solve the MDL's core problems; it largely shifts control of the litigation to Plaintiffs. Their bellwether plan would prioritize severe, largely penetration cases rather than a representative cross-section of the inventory, while Uber's proposal would test categories and negligence theories that remain unresolved. Their remand proposal likewise prioritizes selected categories rather than using the neutral criterion of incident date and, although Plaintiffs characterize their proposed discovery as sufficient, it would substantially restrict the case-specific discovery Uber needs to investigate and defend thousands of factually distinct claims. And Plaintiffs mischaracterize Uber's GAL and fraud proposals: as explained more fully in Uber's briefing, the GAL proposal is intended to protect individual plaintiffs' ability to make informed settlement decisions notwithstanding Leadership's strategic interests, while a Fraud Special Master would address evidence of fraud rates ***exceeding 30%*** efficiently and protect legitimate claimants rather than delay them. Overall, Uber's proposal provides a more neutral path toward representative trials, meaningful case-specific discovery, and efficient resolution.

***Second***, Uber is responding to Section E, above, its Motion for Fraud Special Master, which Uber will file separately.  As set forth in that Motion, to safeguard the integrity of this MDL, the Court

should appoint a Special Master to assist the Court in (1) investigating suspected fraudulent claims, fabricated evidence, material inconsistencies and related misconduct; (2) determining which claims or submissions are fraudulent; (3) ruling on fraud-related motions arising from that investigation; and (4) recommending appropriate sanctions and remedial measures. Fraud is a direct obstacle to resolution. "[E]very meritless claim that is settled takes money away from Plaintiffs whose claims have merit." *In re Silica Prods.*, 398 F. Supp. 2d at 636. A Special Master is therefore necessary not only to address suspected fraud, but also to protect the parties' ability to identify, value, and resolve claims brought by non-fraudulent plaintiffs.

Recently, this Court asked what would facilitate resolution of the MDL, a question that has thus far centered discussion on the bellwether trial process. However, bellwether trials are only part of the answer. Equally critical is addressing fraud in the case inventory. Fraudulent claims prevent the parties from reaching any potential portfolio-wide resolution. Appointment is especially important in advance of the remand process because this Court's centralized authority provides the most efficient mechanism for investigating suspected fraud before claims are returned to the transferor courts.

Plaintiffs' argument that "Uber has identified only 27 Plaintiffs with allegedly non-bona-fide ride receipts—0.85% of the docket"—is false. Uber has identified (and filed motions with respect to) additional fraudulent receipts, and continues to identify new ones. But the issues go far beyond fraudulent receipts. Uber has not reviewed all 3,900-plus MDL claims for fraud. However, as Uber's Motion will set forth in more detail, Uber has conducted targeted reviews of multiple categories of plaintiff data (including ride receipts, claims involving rides ordered for others, plaintiffs who allege the ride did not arrive at the requested destination, and plaintiffs who allege the wrong gender of the driver), and has found fraud rates *exceeding 30%*. These issues, which will be addressed in Uber's Motion for Fraud Special Master, cannot be solved efficiently through serial, claim-by-claim motion practice. That approach consumes party and judicial resources, delays legitimate trial preparation, and hinders resolution of the non-fraudulent claims this MDL exists to address. Appointment is especially warranted because this Court and Magistrate Judge Cisneros carry substantial competing obligations in this case.  A Special Master to investigate fraud is needed.

Recent experience in the Los Angeles County sex-abuse settlement underscores the need to uncover fraud early, before it jeopardizes recoveries for genuine plaintiffs. There, Los Angeles County halted settlement payments amid a fraud investigation. *See* https://www.latimes.com/california/story/2026-01-29/la-sex-abuse-lawsuit-investigations-payouts ("Los Angeles County will halt some payments from its $4-billion sex abuse settlement, leaving many plaintiffs on edge as prosecutors ramp up an investigation into allegations of fraud. . . . The uncertainty has sparked a sense of despair among those who spent the last few years wading through the darkest memories of their lives in hopes of a life-changing sum."). The District Attorney estimated that fraudulent claims could account for 81% of those seeking compensation. *See* https://da.lacounty.gov/media/news/district-attorney-hochman-files-application-intervene-la-county-child-sex-abuse. The analyses set forth in Uber's Motion for Fraud Special Master will reveal similar issues, but confirming and adjudicating the full scope of the problem will require significant time and resources that only a Special Master can provide.

Plaintiffs' counsel have themselves recognized the importance of rooting out fraudulent claims in this MDL. In response to an earlier motion addressing fraudulent ride receipts, Plaintiffs' Leadership represented to this Court that "fraud has no place in this MDL" and that "[p]articularized allegations of fraud must be taken seriously, investigated, and resolved." ECF No. 3768 at 2. A Special Master would give effect to the principles espoused by Plaintiffs' Leadership by conserving the Court's resources, reducing the burden on the parties, and, most importantly, advancing the resolution of claims brought by non-fraudulent plaintiffs.

Finally, Plaintiffs incorrectly argue that "every time the PSC has offered to meet with Uber periodically to discuss and address any potential ride receipt issues, Uber has declined to engage." Uber has sought well over 10 meet-and-confers on receipt issues, and Plaintiffs' counsel have failed to appear for many of them. Uber met and conferred last week with Plaintiffs' leadership regarding a fraud special master, but Plaintiffs' leadership objected to Uber's proposed relief.

**III. REPORT ON HATE MAIL TO UBER ATTORNEYS AFTER *NEW YORK TIMES***

ARTICLE

**Uber's Position**

Last week, the *New York Times* published an incendiary article purporting to characterize Uber's litigation strategy as hostile to victims.[3] Plaintiffs' counsel have conceded that they communicated with the author of the recent story. Moreover, the timing of the article—coming at the same time that Plaintiffs are trying to avoid proper discovery of *QLF 0001*'s communications and medical records, limit depositions, and deny Uber basic discovery—is no coincidence.

Notably, the *New York Times* account is in sharp contrast to this Court's observation at the *Dean* trial that Uber has not engaged in "shaming a victim."

> The Court:… I don't think Uber has engaged in the slightest bit of shaming or dealing with this case with any insensitivity. I want nothing -- that we're trying to work this out is not a reflection whatsoever of Uber's approach to the litigation.
>
> I've said a lot about Uber's approach to the litigation, but in this area I want it clear that Uber has not engaged in anything that would be viewed as shaming a victim. So that's clear -- I mean, that's clear on the record. Anybody in here has seen it, but I want it in the record.

Ex. 1 (2/2/2026 Dean Trial Tr.) 3241:3-12.

Unfortunately, events that have ensued since publication of the article attacking Uber's lawyers have demonstrated that Plaintiffs' counsel's media strategy is not simply unprofessional; it is also reckless and dangerous. Since the article's release, attorneys on Uber's litigation team have received threats to their personal safety and lives based on the article's unfounded assertions. Ms. Bueno received threatening emails impugning her professional conduct and attacking her personal values, accusing her of seeking to "humiliate, demean, and abuse a plaintiff" and expressing "utter disbelief and disgust" at Ms. Bueno's conduct in defending Uber's legal rights. Ex. 2 (Emails to Ms. Bueno). These emails specifically reference the *New York Times* article's characterization of Ms. Bueno's work at the *Dean* trial, Ex. 2—the same trial in which this Court expressly stated: "I don't think Uber has engaged in the slightest bit of shaming or dealing with this case with any insensitivity." Ex. 1 (Hr'g Tr.).

---

[3] "Uber's Strategy for Fighting Sexual Assault Suits: 'What Were You Wearing?'", N.Y. Times (Aug. 4, 2026), https://www.nytimes.com/2026/08/04/business/uber-sexual-assault-lawsuits.html?unlocked_article_code=1.21A.0cbU.By_C8Akdg9cS&smid=url-share.

Another lawyer mentioned in the article has been attacked in even more dangerous ways. Not only her work email, but also family members' names, family members' places of work, and instructions on how to locate her place of residence were publicly listed on social media by individuals seeking to "dox" her, a form of harassment.[4] Ex. 3 (Social Media). That attorney has been forced to work remotely, and leave her home due to the ongoing safety concerns. One post responded to the article with this image, directed at Uber and its attorneys:



As seen above, the graphic has been reposted at least 205 times as of this writing. Ex. 4.

The public response to the *New York Times* article does not end at death threats. Uber's female lawyers have been personally named in sinister, misogynistic social media rants referring to them in terms that include "fucking cunt" and "this bitch," commenting on their personal appearance, and listing contact details so others can harass them in retribution for their legal work for their client Uber. Ex. 5 (Social Media). The threats and harassment directed at Uber's attorneys are ongoing (and Uber employees are receiving harassing emails as well). These concerns implicate not only the physical safety of counsel, but also the foundational principles of professional courtesy and civility that govern the conduct of all members of the Bar.

---

[4] Merriam-Webster Dictionary defines "Dox" as "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge."

There can be little doubt that the article is a tool in Plaintiffs' counsel's litigation and messaging arsenal: as noted above, the article discusses deposition testimony to which only the Parties have access, and the same reporter previously obtained and used confidential documents in another article about the Uber litigation. *See* ECF 3695. Plaintiffs' counsel have also taken to social media to praise and promote the article on-line, increase views, and attempt to tarnish Uber's public image further. For example, Ms. Walsh posted a series of statements on LinkedIn, with links to the article, asserting that "[i]n each and every trial brought by a woman sexually assaulted by an Uber driver, Uber's lawyers have sought to undermine the survivor's credibility—to disbelieve her account of her assault." Ex. 6 at 4. The posts demand that "Uber … stop the blame game and start respecting the brave women who have come forward." *Id*.

Publication of the article appears to be one aspect of a coordinated effort to undermine Uber's ability to develop and present its defense by withholding discovery and urging third parties not to comply with subpoenas, a strategy that has already led some Uber employees and third-party witnesses to express concern about testifying in this litigation, in part because of safety concerns. Uber is certainly not seeking to gag Plaintiffs' counsel or suggest they cannot speak to the media. But, as a matter of professional conduct, Plaintiffs' counsel should not be egging on media articles that include personal attacks on Uber's lawyers, leading to violent posts and hate mail threatening the women who have defended Uber in Court. Instead of condemning these articles—all of which paint a picture that is flatly inconsistent with the Court's own statements at the prior bellwether trials—Plaintiffs' leadership is cheering them on approvingly. For everyone's safety, that needs to end.

In addition to the safety concerns, Plaintiffs' media tactic will impede settlement and resolution of the inventory—to the detriment of Plaintiffs. The Court inquired as to what bellwether strategy was needed to foster resolution, and while Uber agrees this is an important component to further resolution, it is not the sole consideration. What will foster resolution is the parties being able to engage in a productive and meaningful dialogue without fear of media extortion or personal safety risks. These types of personal attacks have no place in the civil justice system.

**Plaintiffs' Position:**

Plaintiffs condemn any threats that have been made against any lawyers in these proceedings. The type of communications Uber describes have no place in public discourse and are unacceptable.

But Uber's suggestion that Plaintiffs' counsel are somehow responsible for these threats to safety is baseless and offensive. Contrary to Uber's accusation, the New York Times article that purportedly triggered these threats is not a "media tactic" by Plaintiff's counsel. It is an investigative news piece written by a veteran journalist and published in one of the world's most respected media outlets. The article quotes, verbatim, arguments Uber's lawyers have made and lines of inquiry they have pursued as part of Uber's litigation strategy. Notably, the article also faithfully reports on Uber's perspective on that strategy, providing lengthy quotes from both outside counsel and Uber's general counsel. Uber of course has every right to disagree with the New York Times's reporting—but to claim that an independent and highly credible newspaper is engaged in a "coordinated effort" with Plaintiffs' lawyers or being used as a "tool in Plaintiffs' counsel's litigation and messaging arsenal" strains credulity.[5]

In raising its concerns Uber also revives its repeated—and still utterly unsupported— accusation that counsel in this MDL has shared protected information with the New York Times. As before, those accusations are baseless. The New York Times article Uber complains about does not appear to be based on *any* MDL depositions (or any confidential material in the non-MDL depositions discussed). Indeed, Uber has already sought relief in the Florida state court action from which many of the facts in the article appear to derive.

 Moreover, the only "support" Uber offers for its claim Plaintiffs have improperly disclosed information is the motion Uber itself filed months ago accusing Plaintiffs counsel of leaking confidential information that appeared in a different article. What Uber omits is that following due consideration of Uber's claims, Judge Cisneros found zero evidence that any lawyer from the MDL was involved in any leak. ECF 3822 at 2. Likewise, in connection with the JCCP proceedings, lead

---

[5] To reiterate, Plaintiffs and their counsel condemn the dangerous and offensive communications that Uber describes. But just as Uber has every right to criticize the New York Times reporting, Plaintiffs and their lawyers have every right to express their own views on that reporting. These concepts are at the core of our free speech tradition and in no way inconsistent with principles of professional courtesy and civility. Uber's insinuation that, by expressing such views, Plaintiff's counsel somehow condone, foment, or facilitate dangerous or offensive communications to Uber's counsel is baseless and unfair.

counsel certified that they had no role in providing information to the New York Times.

Uber's insistence on continuing with its tired accusation that Plaintiffs' counsel has acted in violation of court orders has no merit, no grounding in fact, and as such is grossly improper. Plaintiffs reserve the right to seek sanctions if this conduct continues.

## IV. UBER'S SUBPOENAS TO NON PARTY ATTORNEY ADVERTISING, MARKETING, ADVOCACY GROUPS AND CLIENT SERVICES COMPANIES

### Plaintiff's Position

Uber has served or noticed an intent to serve subpoenas that target dozens of advocacy groups, advertising and marketing firms, legal intake service providers, referral organizations, and legal technology and operations vendors, seeking production of a wide range of documents regarding these companies' relationships with law firms and communications with and efforts related to potential plaintiffs in this litigation. Though many subpoenas were noticed in the JCCP, the information sought encompasses information and work product generated in connection with the MDL. Plaintiffs have asked to meet and confer with Uber regarding these Subpoenas.

### Uber's Position

The Subpoenas concerning lead generation have been issued in the JCCP. The Parties in the JCCP are set to meet and confer later this week and will address any issues with the appropriate Court—which is Judge Schulman—if necessary.

## V. JANE DOE QLF 0001 TRIAL DISCOVERY

### Uber's Position

Although Plaintiffs represented to the Court on June 1 that they were "ready to go," *see* 6/16/2026 CMC Tr. 29:21-23, significant work remains before the case is trial-ready (as Uber forecasted), including completion of fact and expert discovery and scheduling of Plaintiff's IME. Uber is increasingly concerned that Plaintiff and her counsel are purposely delaying their discovery obligations, hoping to run out the clock and avoid producing highly relevant discovery while simultaneously demanding aggressive and accelerated compliance deadlines from Uber.

***Discovery Interference.*** Since this case was selected for trial on June 16, 2026, Plaintiff's

counsel has engaged in an apparently strategic effort to delay and suppress Uber's ability to conduct meaningful discovery. As part of that effort, Plaintiffs' counsel have slow-rolled productions, failed to produce communications, social media, and medical records, and interfered with third-party discovery, including by intimidating potential witnesses. Issues that should be non-controversial, including provision of relevant medical records, production of social media, and production of relevant, contemporaneous communications have required extensive briefing and motion practice and *are still not completed.* While Uber is seeking relief on a variety of issues before Judge Cisneros, Uber highlights below several examples of discovery misconduct that are seriously compromising Uber's due process right to defend itself at trial.

### A.    Witness Intimidation

Plaintiffs' counsel have recently engaged in harassment of witnesses whom they perceive as adverse and sought to extort agreements not to testify favorably to Uber at trial.

These targeted witnesses include non-profit organizations and their representatives, who collaborate with Uber to provide support and publicly advocate on behalf of sexual assault victims, as well as offering other vital survivor resources. The non-profit organizations at issue are dedicated to the well-being of assault survivors and the prevention of sexual assault in our society. These groups partner with Uber to create and implement policy strategies for Uber driver training and education— and leverage Uber's support more broadly to help the people whose interests Plaintiffs' counsel purport to represent.

Plaintiffs' counsel subpoenaed five of these non-profits, seeking documents and 30(b)(6) depositions, several of which are scheduled for later this month. Uber has recently learned, however, that Plaintiffs' counsel are using these looming depositions as leverage to tamper with the witnesses' substantive testimony—telling the prospective deponents that Plaintiffs will "drop" the depositions if the witnesses commit not to provide testimony supportive of Uber at trial. *See* Ex. 11. In short, Plaintiffs are using discovery as a tool to extort and intimidate potential witnesses and obstruct the search for truth.

When the non-profits did not respond, Plaintiffs' counsel resorted to even more devious

intimidation tactics—apparently enlisting media reporters like the *New York Times* journalist whose article is discussed above—to pressure these witnesses into silence. Just two days after the *New York Times* article attacking Uber's women lawyers was published, the same reporter contacted one of the non-profit groups that Plaintiffs' counsel has subpoenaed for a deposition later this month. In her email, the reporter demanded answers to questions suggesting that the organization accepts money from Uber even though "Uber's legal approach" is not "consistent with the values [the] organization promotes." The reporter demanded responses within two to three days. That timing is particularly suspect, given the recipient's forthcoming deposition—strongly suggesting an intent to chill the witness's testimony. It is readily apparent from this chain of events that Plaintiffs' counsel aim to use media manipulation to publicly shame the non-profits. Again, such tactics constitute classic witness tampering.

Plaintiffs have also sought to silence other third-party witnesses. In July, Uber served subpoenas seeking testimony and documents from (1) Plaintiff QLF 0001's medical and mental health professionals; (2) friends of QLF 0001 who are likely to have messages and social media content Plaintiff failed to produce herself; (3) two people who submitted reports to Uber about the driver in this case; and (4) the individual who ordered the ride for Plaintiff QLF 0001. The subpoenas seek medical/treatment records; communications, and social media posts about the incident and Plaintiff's pre- and post-incident medical and mental health; and documents relating to investigations of the incident and this litigation.

Importantly, the reason why Uber was forced to send these subpoenas to third parties (most of whom were identified by Plaintiff herself as persons with direct knowledge) was because Plaintiff QLF 0001 has systematically failed to comply with her discovery obligations. This Court very clearly told Plaintiffs at the June CMC conference that it expected them to expedite fact discovery in the *QLF 0001* case.

> [Y]ou want this trial, you want this trial, you better -- you better get off of this call and get on the ball and you work seven days a week getting all of this information out quickly.

6/16/2026 Hr'g Tr. 29. Plaintiffs' counsel reassured the Court that they would do just that:

> We have turned over -- we understand the Plaintiff has

turned over many of the medical records and treatment records, and we will go get off the phone right now and get on the phone with any missing record providers and get those over to Uber right away. We have secured dates for the providers to be prepared for their depositions. We have fact witness dates to provide to Uber. We are ready to go, Your Honor.

*Id.* ***None of that happened.*** Today, nearly two months later, Plaintiff has still not produced: (1) the vast majority of Plaintiff's relevant communications; (2) Plaintiff's social media production; (3) the identities of Plaintiff's mental health providers; and (4) any of Plaintiff's prior medical records.

Plaintiffs' counsel are now trying to prevent Uber from obtaining this discovery from third parties, even though they have no standing to do so. Bypassing meet-and-confer procedures,[6] counsel contacted the third parties directly, encouraging them not to respond to the requests. *See* Ex. 7 (Objection Cover Letters). In their letters, Plaintiffs' counsel characterize the subpoenas as "overbroad, encompassing documents that are not relevant …., and disproportionate to the needs of the case," *id.* at 1 and assert that the requests are burdensome, even though Plaintiff will obviously bear no burden if a third party complies with a subpoena. *Id.* at 3-9. The letters also instruct recipients to delay producing in response to document requests, *id.* at 1 ("We request that you hold off on making an early production of documents") and seek to hinder deposition scheduling, by telling subpoena recipients that their "deposition date on the subpoena … is a placeholder date and is not moving forward on that date," *id*.

In addition to the Objection Cover Letters, Plaintiffs' counsel included copies of "Responses and Objections" to the subpoenas. Ex. 8 (Barnett R&O). Rule 45 limits a party's objections to a third-party subpoena to those grounded in the parties' privacy and privilege interests. *See Price v. Trans Union, L.L.C.*, 847 F. Supp. 2d 788, 794 (E.D. Pa. 2012) (citing 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2463.1 (3d ed. 2008) (collecting cases discussing right to

---

[6] Plaintiffs' counsel have falsely claimed that Uber has refused to meet and confer on their objections to the subpoenas. *See* ECF 7011 ("Plaintiff tried to meet and confer with Uber on the scope of the requests, but Uber declined to do so, in violation of the local discovery rules and this Court's orders"). Not so. Uber attorneys have been available to meet and confer at any hour or day Plaintiffs' counsel requests—indeed, the parties confer almost constantly in relation to various aspects of this litigation. Plaintiffs' counsel ***chose*** to rush to court without availing themselves of ordinary meet-and-confer procedures, in an effort to frame the narrative regarding their improper reach-outs.

quash only when party has a personal right or privilege to information sought)). A party does not have standing to object to a nonparty subpoena on the basis that the subpoena "seeks irrelevant information, or that it would impose an undue burden … when the nonparty has not objected.'" ECF 695 at 4 (citation omitted). Indeed, a party *only* has standing to raise issues with a subpoena regarding "claims of privilege or personal rights." *Openevidence, Inc. v. Doximity, Inc.*, 2026 U.S. Dist. LEXIS 58398, at *3 (N.D. Cal. Mar. 19, 2026); *see also Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 973-74 (C.D. Cal. 2010) (collecting cases). Here, however, Plaintiffs' responses went far beyond assertions of privacy or privilege and purported to oppose compliance with the subpoenas based on a variety of non-privacy-related objections, including relevance objections and claims that the documents sought are not "proportional to the needs of this action." Ex. 8 (Barnett R&O) at 2.[7] Plaintiffs' objections are invalid because Plaintiffs lack standing to assert them. Instead, they are a mere pretext to discourage compliance with validly served subpoenas and further obstruct Uber's ability to complete necessary discovery through delay and misdirection.

Plaintiffs' counsel's letters and attached objections had their intended effect. Within days of Plaintiffs' counsel's service of the Objection Cover Letters and pretextual objections to Uber's discovery requests, at least two subpoena recipients indicated that they would refuse to sit for deposition or produce documents, at least for the time being. One recipient sent Uber's counsel the following note:

> I haven't heard back from my malpractice folks as to what I should do Kim. It looks like my patient does not want me to testify. I will try and contact them again tomorrow morning.

Ex. 9 (Correspondence with Dr. Grant). This is a significant concern, because even if the third parties

---

[7] While Plaintiffs' Responses and Objections also assert objections based on privacy as to treating providers' medical and mental health records for Plaintiff, those are invalid because a plaintiff "waive[s] his privacy rights with respect to his medical and mental health records" by seeking related damages. *Alcon v. Adams*, No. C 14-1927, 2015 U.S. Dist. LEXIS 52355, at *3-4 (N.D. Cal. Apr. 21, 2015); *see also Gaspard v. Hedgpeth*, No. 12-1058, 2013 U.S. Dist. LEXIS 61830, at *12 (N.D. Cal. Apr. 30, 2013) (medical records).

ultimately comply, any delay will be highly prejudicial to Uber. Moreover, it is obviously highly inappropriate for Plaintiff QLF 0001 or her counsel to suggest to mental health providers that they should refuse to comply with properly served subpoenas. Again, this is part of an ongoing pattern of delay that Plaintiffs have continued throughout this litigation.

### B.     *Independent Medical Exam of Plaintiff.*

Uber is entitled to an independent medical examination ("IME") of Plaintiff QLF 0001 under Federal Rule of Civil Procedure 35, and shortly after this case was selected for trial, Uber notified Plaintiff that it intended to seek an IME in this case. For weeks, Plaintiff's counsel told Uber that she was willing to sit for an IME and the parties engaged in discussions around scheduling that IME and negotiating a stipulation pursuant to which the IME could be performed. On Friday, August 8, Plaintiff's counsel informed Uber for the first time that they may object to the IME (even though they intend to have a psychologist examine her on August 23) based on the apparent mental state of Plaintiff, as conveyed by her sister in a recent deposition. Uber has offered reasonable accommodations by carefully limiting the scope of the examination and confirming that the expert Uber retained, Dr. Sarah Baker, associate dean of the UT Southwestern Medical School, is a trauma-informed, Yale University-trained psychiatrist, with substantial experience treating women with sexual trauma. (In fact, she has a master's degree focused on cultivating empathy in medical training.) In response, Plaintiff issued a long list of conditions on Monday evening that would make it impossible for Uber's expert to conduct a proper IME, including the following: (1) Uber's expert would not administer any psychological testing; (2) Uber's expert cannot ask Plaintiff about her sexual history or the details of her alleged assault; and (3) Plaintiff would have both a lawyer and a "support person" in the room (which would chill any meaningful conversation between Plaintiff and the psychiatrist). Notably, Plaintiff does not intend to impose these restrictions on her own expert. Plaintiff's counsel's suggestion that all of these requirements are necessitated by a "triggering" deposition further reflects their coordination with the *New York Times* in an attempt to depict Uber's lawyers as inappropriate,

both in this Court and the court of public opinion.[8]  None of these conditions were in place for prior MDL IMEs, and there has been no claim of improper conduct by Uber's highly trained and empathetic experts.

In an effort to justify their unreasonable conditions, Plaintiffs use bolded language to, once again, attack Uber's attorneys for their deposition questioning. As demonstrated by the transcript, which Uber encourages the Court to read, Ms. Bueno appropriately questioned Plaintiff about social media messages she produced in this litigation. Ms. Bueno will attend the conference on August 14 and be prepared to discuss her conduct (and the context of her questioning) at Plaintiff's deposition. In short, Ms. Bueno's questioning was appropriate and necessary fact-gathering, regarding Plaintiff's social media posts, including how these posts may pertain to her damages claims.

Plaintiff's attempt to characterize legitimate discovery as improper does not alter the analysis. Uber does not minimize the difficulty of participating in litigation concerning deeply personal and traumatic allegations. But where a plaintiff places her mental and emotional condition directly at issue and seeks damages based on that condition, the discovery process will necessarily require inquiry into sensitive and, at times, uncomfortable subjects. That reality does not render appropriate discovery improper, nor does it permit Plaintiff to dictate conditions that would prevent Uber from meaningfully evaluating the claims and damages she has chosen to pursue. Uber has taken reasonable steps to minimize unnecessary distress, including retaining a highly qualified, trauma-informed psychiatrist and agreeing to appropriate limitations on the examination to address reasonable concerns.

Uber will meet and confer with Plaintiff's counsel, but expects that this issue will likely have to be briefed. Without a proper IME by the end of August, there is no conceivable way this case can be tried in October.

D. Checkr Documents

Below, Plaintiffs address a concern regarding Chekr, which they raised at 10am Thursday, August 13. It appears Plaintiffs are referring to a document produced by Checkr on Tuesday afternoon,

---

[8] Plaintiff herself confirmed at the end of her deposition that the questions had been respectful and she did not have any concerns with Ms. Bueno's conduct at the deposition. *See* 7/22/2026 Pl. Dep. 283.7-283:17 (Ex. 10).

which involves a non-custodian in-house attorney at Uber and which Uber is evaluating.  Uber is not aware of Plaintiffs' other "number of problems," but will meet and confer with Plaintiffs and raise any remaining issues with Judge Cisneros, consistent with the Court's instruction.

**Plaintiff's Position:**

Unfortunately, contrary to the Court's direction, Uber insisted on presenting this long list of unsubstantiated and unripe discovery grievances in this Statement, and now Plaintiff must respond. At the last Case Management Conference, the Court instructed the parties that "with respect to all of the discovery disputes, Judge Cisneros is prepared to handle them. And so I just think you take them to her, whatever they are." 7/21/26 CMC Tr. at 4:12-14. The Court continued, "I'm not getting involved in 'they didn't' tell us this,' or 'they did tell us that,' or 'now the document's destroyed,' or 'now we can't go back,' and whose fault it is, and on, and on, and on, and on." *Id.* 4:14-18. Uber ignores that advice and raises discovery disputes that have either (a) been briefed and submitted to Judge Cisneros or (b) are the subject of ongoing conferral and will be promptly briefed if the parties reach impasse. Uber's recitation is also materially incomplete. It omits that the most significant discovery still outstanding in this case is Uber's own—documents concerning the driver, Victor Le, that Uber has possessed throughout, was obligated to produce with its Defense Fact Sheet on January 15, 2025, failed to produce again when it amended that Defense Fact Sheet on June 12, 2026, and has since produced nineteen months late, not at all, or only through Plaintiff's subpoena to Uber's own vendor.

Contrary to Uber's unsupported accusations, Plaintiff has made every effort to advance discovery expeditiously and prepare her case for trial in line with the Court's schedule. Plaintiff has produced over 8,500 pages of documents, including relevant communications and social media posts. She has sat for five hours of deposition testimony and agreed to provide additional testimony. She has provided authorizations for medical, insurance, and pharmaceutical records, which has led to the production of hundreds of additional pages of documents. She has identified a comprehensive list of nonparty witnesses and worked cooperatively with Uber to schedule depositions. The parties are continuing to negotiate the appropriate guardrails for an examination conducted by Uber's chosen

psychiatrist, and will submit any remaining disputes to the Magistrate Judge. While these discovery obligations have taken a significant toll on Plaintiff, she remains engaged and committed.

**Nonparty Witnesses Depositions**

There is no merit to Uber's claim that Plaintiffs' counsel have engaged in "harassment of witnesses." Quite the opposite, Plaintiff was forced to seek a protective order after Uber issued subpoenas to nonparties seeking documents that encompass materials protracted by the attorney work-product doctrine, contain no limit as to relevant time period, and exceed the scope of the parties' agreements and the Court's orders regarding discoverable documents and communications. ECF No. 7011. This dispute is pending before Judge Cisneros.

Uber's document subpoenas seek four categories of documents that exceed the scope of permissible discovery: (1) medical records that are not relevant to the claims and defenses at issue in this case; (2) non-parties' communications with Uber that are not relevant or proportional to the needs of this case; (3) communications regarding Plaintiff's health that contain no limitation as to time or subject matter; and (4) communications with *anybody* regarding Plaintiff's assault or this lawsuit. Only after Uber refused to meet and confer on Plaintiff's objections was she forced to notify the third parties to avoid production of the documents in dispute. When Uber objected to Plaintiff's proposed course of action, Plaintiff offered various alternatives to Uber and provided Uber with ample time and opportunity to negotiate before the letters went out and Plaintiff sought relief with the Court. For example, Plaintiff offered to send a joint letter to the non-parties to simply alert them to Plaintiff's objections. Uber declined to engage at each turn.

While Uber claims Plaintiff is attempting to obstruct third-party discovery, the text of Plaintiff's letters reveals otherwise. First, the letter makes clear that Plaintiff's objections are only to Uber's document requests, not to the deposition itself. Further, Plaintiff does not categorically ask the third parties to never produce responsive documents, only to "hold off on making an *early* production of documents" (emphasis added) to allow Plaintiff time to reach agreement with Uber or for the Court to rule on Plaintiff's objections. Uber claims that one treating doctor's reaction is evidence of

interference, but upon learning of that doctor's concerns, Plaintiff contacted the treater and confirmed that she does not object to his deposition moving forward.

Uber's legal arguments are unavailing. Plaintiff has standing to challenge the subpoenas on relevance and proportionality grounds because the subpoenas seek her personal medical records and communications. *See* ECF 695 at 4 (finding Uber had standing to move to quash "where the subpoena calls for the production of Uber's confidential and proprietary information"). Uber argues that Plaintiff waived any privacy interest in her medical records by filing a lawsuit, but any such waiver extends only to "reasonable discovery," as Uber's own case states. *Gaspard v. Hedgpeth*, 2013 WL 1819335, at *4 (N.D. Cal. Apr. 30, 2013). Alternatively, Plaintiff has standing to move for a protective order under Rule 26(c). *See* ECF 695 at 4.

Uber's complaints regarding Plaintiffs' interactions with nonprofit organizations also lack merit. After deposing Emilie Boman, Plaintiffs' counsel requested the Court's permission to depose third parties who Uber repeatedly referenced during preceding trials as having endorsed Uber's safety efforts. ECF No. 6510. In accordance with the Court's Order, Plaintiffs served subpoenas on the five of those third parties. Three of them informed Plaintiffs that they would be substantially prejudiced if they were forced to set aside time to produce documents and sit for a deposition.

These third parties asked Plaintiffs to consider if there was any circumstance in which a deposition could be avoided. To that end, plaintiffs informed each of the third parties that the need for these depositions arose from *Uber's* use of their names and reputations. Plaintiffs do not otherwise seek to involve these groups, but so long as Uber continues to point to them at trials, Plaintiffs need to depose them and explore what Uber told them. Plaintiffs thus informed the third parties that if they were willing to ask Uber not to invoke their names at trial, Plaintiffs would be amenable to taking down the depositions. Plaintiffs further stated that if the third parties were not interested in sending such a request to Uber, then they would need to be available for the deposition on the dates agreed upon between the parties. Nothing about this exchange tampers with testimony. To the contrary, it became evident to Plaintiffs during the meet and confers that Uber is likely paying for the attorneys representing these third parties.

The ultimate resolution of the conversation with the three third parties at issue—NNEDV, NAESV, and Indira Henard—is that they refused to hold deposition dates if Plaintiffs did not agree to their proposal for a 3.5-hour deposition and limited document productions. Plaintiffs sent counsel for the parties a PTO 8 letter and anticipate filing a completed version by Friday of this week. Counsel for the third parties further indicated their intention to file separate motions in the District of Columbia. Plaintiffs intend to tag these as related actions and ask for them to be transferred to the MDL for resolution.

**Independent Medical Exam**

As Plaintiff recently informed Uber, she is prepared to be examined by Uber's chosen psychiatrist subject to several conditions that will ensure the examination will not inflict unnecessary trauma. Indeed, the parties have agreed that Uber's Rule 35 Examination will occur on August 21 (so Uber's stated need to complete a Rule 35 Examination "by the end of August" is satisfied). The parties last conferred on August 7, and Plaintiff provided her proposed conditions and edits to Uber's proposed stipulation on August 10. Plaintiff then offered to meet and confer or brief the issue under PTO 8 if the parties remain at impasse.

As Uber knows, Plaintiff's deposition severely re-traumatized her. In addition to requiring Plaintiff to revisit her rape in minute detail, and despite having her testimony from the criminal trial, Uber also demanded that Plaintiff read aloud highly explicit, and personal communications regarding consensual sexual activity that took place before the Uber assault and had zero connection to or bearing on that assault. There was no conceivably proper purpose for forcing Plaintiff to undergo that humiliating and traumatic experience. Uber should not get credit for its clever tactic of forcing victims to affirm how "respectful" Uber lawyers were in the deposition. It is not a victim's job to explain to Uber's lawyers how they are to conduct depositions. Uber's question puts victims in an impossible position: answer "yes" and the hours of deposition are over and they get to go home. Say anything else and the questioning continues.

Not surprisingly, later testimony from Plaintiff's family members confirmed that the impact of the deposition on Plaintiff was severe. Her sister testified that it put her on "suicide watch".

Accordingly, while Plaintiff intends to comply with Rule 35, she has proposed several guardrails to ensure that any mental examination does not unnecessarily re-traumatize her.

Each of Plaintiff's proposed conditions is well-reasoned. For example, Dr. Baker's CV indicates that she is not qualified to conduct psychological testing, so Plaintiff proposes to limit the examination to a psychiatric evaluation. Plaintiff covered the details of her rape extensively at her deposition, and Dr. Baker can both read the transcript and view the video recording. There is no reason to force Plaintiff to re-open the same wound, particularly given the traumatizing effect of the deposition. And Uber offers no basis to inquire into Plaintiff's general sexual history, including explicit private messages regarding consensual activity, which is irrelevant and unduly harassing. Finally, given Plaintiff's mental state and the recent burden and stress of her deposition, she should be permitted to bring a support person with her, who will not interfere unless the questioning becomes harassing. Uber has agreed to allow this in the past.

**Checkr Documents**

Consistent with the Court's instructions at the last CMC, Plaintiffs do not in this document raise their concerns with Uber's compliance with its discovery obligations and Court orders. Plaintiffs will raise those concerns with Judge Cisneros or through appropriate trial motions. But it bears emphasis that Plaintiffs have a number of problems with Uber's production of information. For example, recent productions from Checkr (Uber's background check vendor) reveal that Uber has improperly withheld critical materials communications regarding the drivers in bellwether cases. Plaintiffs will follow up on this issue, and others, with Uber and with Judge Cisneros.

## VI.    NEW PROCEDURES FOR CASE MANAGEMENT STATEMENTS

The parties intend to propose a schedule for future joint CMC filings to ensure that each party has adequate time to present its position and the Court receives a concise and helpful CMC statement. The parties will meet and confer on a schedule within the next week so that future CMC statements are timely filed.

## VII.    EXPERT DEADLINES

**Plaintiff's Position**

On August 12, Plaintiffs filed an administrative motion to (1) extend the expert-report deadline from August 24 to August 31, 2026; (2) extend the September 2 close of expert discovery only as necessary to complete expert depositions after that date; and (3) permit experts to supplement their opinions, no later than October 2, 2026, to address new testimony obtained in any depositions conducted, by agreement or by Court order, after August 29, 2026. ECF No. 7017. Plaintiffs conferred with Uber prior to filing but were unable to reach agreement regarding the relief sought.

Uber's position is unreasonable and this modest extension is necessary, appropriate and this trial remains well on track.

**Uber's Position**

Uber's response to the administrative motion is due shortly, and Uber will set out its position more fully there.

Plaintiff's proposed extension provides no meaningful time to conduct pre-trial depositions of experts. The current close of expert discovery is September 2. With expert reports not due until August 31 under Plaintiff's proposed extension, Uber would have at most two days before the discovery cutoff to depose all of Plaintiff's experts—an obvious impossibility. Expert depositions are not optional: they are essential to effective cross-examination at trial and to preparing Rule 702 motions. This is particularly problematic because Plaintiff's counsel have made clear they intend to rely upon new experts in this case who were not subjected to any of the prior Rule 702 challenges filed in connection with the *Dean* or *Mensing* trials. And to make matters worse, Plaintiff's counsel seek to allow the parties up to October 2 to supplement opinions that Uber has never seen in the first place.

Once again, having pushed hard to try *QLF 0001* at breakneck speed, Plaintiff's counsel are now trying to delay key pretrial milestones for their own selected case, making it difficult to understand how this case could possibly be ready for an October trial.

## VIII.   RESOLUTION

On July 15, 2026, the Court ordered the parties to "submit proposals for managing settlement discussions." ECF No. 6799. The Parties continue to meet and confer regarding this topic and a

potential replacement for Judge Andler as MDL Settlement Master, as well as any necessary briefing schedule

## IX. NEXT CASE MANAGEMENT CONFERENCE

The Parties request that the Court set the next monthly Case Management Conference.

JOINT CASE MANAGEMENT STATEMENT
Case No. 3:23-md-03084-CRB

Dated: August 13, 2026

By: */s/ Sarah R. London*

Sarah R. London (SBN 267083)
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: */s/ Rachel B. Abrams*

Rachel B. Abrams (SBN 209316)
**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*

Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, Floor 12
New York, NY 10016
Telephone: (888) 480-1123
luhana@chaffinluhana.com

*Co-Lead Counsel for Plaintiffs*

Dated:  August 13, 2026

**KIRKLAND & ELLIS LLP**

By: */s/ Laura Vartain*
**KIRKLAND & ELLIS LLP**
ALLISON M. BROWN
JESSICA DAVIDSON
LAURA VARTAIN

**SHOOK, HARDY & BACON L.L.P**.
MICHAEL B. SHORTNACY
PATRICK L. OOT, JR.
CHRISTOPHER V. COTTON
ALYCIA A. DEGEN

**O'MELVENY & MYERS LLP**
SABRINA H. STRONG
JONATHAN SCHNELLER

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

**FILER'S ATTESTATION**

I, Andrew R. Kaufman, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

Dated: August 13, 2026                                    /s/  *Andrew R. Kaufman*
                                                                              Andrew R. Kaufman