Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Kim Bueno (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
401 W. 4th Street
Austin, TX 78701
Telephone: (512) 678-9050
kim.bueno@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC., RASIER, LLC,
and RASIER-CA, LLC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB (LJC) |
| | **STATEMENT REGARDING BELLWETHER SELECTION AND REMAND** |
| This Document Relates to:<br><br>ALL CASES | Judge:     Hon. Charles R. Breyer<br>Courtroom: 6 – 17th Floor |

## INTRODUCTION[1]

Plaintiffs' proposal would move this MDL backward, not forward, by replacing a representative bellwether process with one dominated by a narrow category of uninformative cases, all selected by Plaintiffs' Leadership. Plaintiffs also propose that Uber should be hamstrung in its effort to resolve claims with individual plaintiffs; forced to blindly forfeit disputed factual defenses; and required to try cases without adequate discovery. None of that will help the parties and the Court answer unresolved legal and factual questions, determine the value of the thousands of cases remaining in this MDL proceeding, or move those cases efficiently toward resolution.

The Court should take a different path: one guided by representativeness, plaintiff autonomy, neutrality, fairness, and due process.

In stark contrast to Plaintiffs' one-sided proposal, Uber's plan would both advance the objectives of this MDL and safeguard judicial integrity. As to bellwethers, Uber proposes an evenhanded selection process that prioritizes representative cases involving allegations that have yet to be tried and legal theories that this Court recently indicated should be the focus of future trials. Bellwethers should generate information useful to resolving the remaining inventory, not merely produce verdicts.

Uber also proposes that (at least until the appointment of a settlement special master), the Court should designate a guardian ad litem ("GAL") or similar representative to protect the bellwether Plaintiffs' interests and safeguard their ability to receive appropriate information about resolution opportunities and resolve their cases if desired—or to otherwise ensure that they have a neutral party to convey their concerns as they advance towards trial.

Recently, this Court asked what would facilitate resolution of the MDL, a question that

---

[1] As explained in Uber's portion of the CMC Statement, Uber's position has always been that the parties' bellwether submissions would be filed as separate briefs (just as they have been in the past).

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

has thus far centered discussion on the bellwether trial process. However, bellwether trials are only part of the answer. Equally critical is addressing fraud and false Plaintiff Fact Sheets in the case inventory. Fraudulent claims prevent the parties from reaching any potential portfolio-wide resolution. Such claims "hamper the resolution of meritorious claims by real plaintiffs," *In re Deepwater Horizon*, 907 F.3d 232, 236 (5th Cir. 2018), and ultimately harm non-fraudulent claimants by diverting resources from them, *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 636 (S.D. Tex. 2005). Appointing a Fraud Special Master is a proactive, court-aligned mechanism for facilitating resolution. Such an appointment is especially important before remand because this Court's centralized authority provides the most efficient mechanism for investigating suspected fraud before claims are returned to the transferor courts. By contrast, continued efforts to litigate these cases in the *New York Times* will hinder resolution efforts by chilling witnesses, creating safety concerns for the attorneys handling the defense, and undermining Uber's trust in the litigation process.

Finally, with respect to remands, Uber's proposal logically and fairly sequences remand based on an objective metric—the date of the alleged incident—with preliminary discovery occurring before remand in order to determine whether the case has merit and a mediation process to determine whether each case can be resolved before being sent to another court.

In short, Plaintiffs' proposal would pervert the goals of multidistrict litigation and gut Uber's due process rights. Uber's proposal, on the other hand, would do precisely what the Judicial Panel on Multidistrict Litigation ("Panel") instructed in creating this MDL: "serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation." *In re Uber Techs., Inc.*, 699 F. Supp. 3d 1396, 1398 (J.P.M.L. 2023).

I.    **UBER'S PROPOSAL WOULD FURTHER THE PURPOSE OF THIS MDL.**

To effectuate both the purpose of this MDL and the Court's recent guidance, Uber respectfully submits that the path forward in this proceeding should have three components, as set forth in the accompanying proposed order:

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

1. ***Bellwether trials***. The Court should replace the existing bellwether paradigm with a new one that accounts for the lessons learned from the *Dean* and *Mensing* trials and maximizes the likelihood of gaining insight into types of cases that have not previously been tested in this MDL. Specifically, each party should now choose: (a) two cases involving alleged sexual touching over clothing; (b) two cases involving alleged sexual touching under clothing; and (c) two cases involving alleged masturbation/indecent exposure. At least one case in each category should be from a state that does not recognize any of the three vicarious liability claims asserted by Plaintiffs: (i) common carrier; (ii) respondeat superior; and (iii) apparent agency. If a case is settled before the start of trial, the party that proposed the case should be allowed to replace it. And to promote the integrity of the bellwether process, the Court (at least until the appointment of a settlement special master) should appoint a GAL to ensure that bellwether Plaintiffs' interests are protected, and that they are able to make informed decisions, during any settlement discussions or as their case otherwise proceeds to trial.

2. ***Fraud investigations***. The Court should appoint a Fraud Special Master to help advance resolution by ensuring that only non-fraudulent claims remain in the inventory. The Fraud Special Master would assist the Court in (1) investigating fraudulent claims, material inconsistencies, fabricated evidence, and related misconduct; (2) determining which claims or submissions are fraudulent; (3) ruling on fraud-related motions arising from that investigation; and (4) recommending appropriate sanctions and remedial measures. Before any case is tried or remanded, Plaintiffs' counsel would be required to certify they have vetted their entire inventory and dismissed fraudulent cases.

3. ***Remands***. Beginning in 2027, the Court should implement an orderly process for remanding cases in tranches based on the date of the alleged injury. Before any case is recommended for remand or directly transferred by this Court, Plaintiffs should be required to provide preliminary written and oral discovery, followed by an effort at mediation (with full discovery and workup to take place post-remand in the court where the case will be tried).

Below, Uber addresses each component of its proposal in more detail.

## A. <u>Bellwether Trials</u>

***Structure***. To ensure that the next waves of bellwether trials meaningfully advance resolution of this litigation, the Court should replace the existing bellwether process with a new one that prioritizes categories of alleged misconduct and theories of liability that have not yet been tried. The *Dean* and *Mensing* trials have given the parties insight into the strengths and weaknesses of cases alleging penetration and non-sexual touching and involving theories of

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

vicarious liability and non-delegable common carrier liability. As a result, the focus of the next phase of the bellwether process should be on trying cases involving other categories, which constitute the bulk of the case pool. In addition, at least half of those cases should involve state laws that do not recognize vicarious liability so that the parties are required to test, and jurors to address, whether Uber's alleged conduct (what this MDL was supposed to be focused on)[2] constituted negligence. Pivoting to additional categories and direct negligence theories will ensure that the bellwether process generates representative verdicts that will inform the parties' assessment of the broader claims pool.

Specifically, the parties should select two cases from each of the following three categories, which together comprise more than ***40 percent*** of the MDL case pool: (a) sexual touching under clothing; (b) sexual touching over clothing; and (c) masturbation/indecent exposure. Contrary to Plaintiffs' claim, this categorization is not based on ***Uber's*** taxonomy; rather, it is based on the categories on the PFS.[3] And tying bellwether selection to those categories would comport with MDL practice of trying cases that reflect a representative cross-section of the broader claims pool.

In addition, each party should select at least one case in each category from a state that does not recognize any theory of vicarious liability in these circumstances. Plaintiffs' assertion that Uber is seeking to "rule out" any vicarious liability theories is simply not true. All that Uber is proposing is that at least half of the cases come from states that do not recognize vicarious liability, which would further the Court's expressed desire to test direct negligence claims (and focus on the issues that are left with more uncertainty—namely, Uber's alleged direct negligence). Uber's approach makes perfect sense, particularly given that many of those states

---

[2] *See In re Uber Techs., Inc.*, 699 F. Supp. 3d at 1398 ("We find there are sufficient common issues present to warrant centralized treatment, including, for example, Uber's knowledge of the prevalence of sexual assault, representations regarding safety, and policies and practices for handling complaints about drivers.").

[3] The PFS check-the-box categories largely (but not completely) align with Uber's taxonomy for allegations of sexual assault and harassment.

have large numbers of claimants in this MDL. If any of the selected cases are dismissed or settled, the party that chose that case should be allowed to replace it with another case.

Trial Wave 2 would begin April 1, 2027, drawing from the pool of cases involving allegations of masturbation/indecent exposure. Trial Wave 3 would begin August 1, 2027, drawing from the pool of cases involving allegations of sexual touching over clothing. And Trial Wave 4 would begin on December 1, 2027, drawing from the pool of cases involving allegations of sexual touching under clothing. The Court or parties should flip a coin to determine who picks the first trial within each wave of four cases. While Plaintiffs criticize that approach as making "light of the Court's and the parties' resources," it will actually conserve resources by avoiding a dispute over trial staging. Courts often use a coin toss or similar random method to avoid favoring one party or another on issues like trial staging. *See, e.g.*, PTO No. 48 at 1, ECF No. 5178, *In re E.I. Du Pont de Nemours and Co. C-8 Pers. Injury Litig.*, No. 2:13-MD-02433-EAS-EPD (S.D. Ohio Nov. 6, 2018) ("Through a random selection process (to be precise, a coin toss), DuPont was permitted to choose the first case for trial"); Amended CMO No. 15 Bellwether Protocol at 11, ECF No. 228, *In re Suboxone (Buprenorphine/Naloxone) Film Prods. Liab. Litig.*, No. 1:24-MD-03092-JPC (N.D. Ohio May 19, 2025) ("To the extent that the parties select the same case for Core Discovery, a coin flip will determine which party gets to select the replacement of that case.").

"[T]he whole purpose of bellwether litigation . . . is to enable other litigants to learn from the experience and reassess their tactics and strategy (and, hopefully, settle)." *In re Cox Enters.*, *Inc. Set-Top Cable TV Box Antitrust Litig.*, 835 F.3d 1195, 1208 (10th Cir. 2016); *see also* Eldon E. Fallon, Jeremy T. Grabill, & Robert Pitard Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2338 (2008) ("[M]o[st] importantly, bellwether trials can precipitate and inform settlement negotiations by indicating future trends, that is, by providing guidance on how similar claims may fare before subsequent juries.").

"For bellwether trials to fulfill their purpose, the selected plaintiffs and their claims

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

'should be representative of the range of cases' in the mass tort." *Adams v. Deva Concepts, LLC*, No. 1:20-CV-9056-GHW, 2023 WL 6518771, at *3 (S.D.N.Y. Oct. 4, 2023) (citation omitted). In addition, bellwether litigation "should produce a sufficient number of representative verdicts . . . to enable the parties and the court to determine the nature and strength of the claims . . . and what range of values the cases may have if resolution is attempted on a group basis." Manual for Complex Litigation (Fourth) § 22.315, at 360 (2004).

To date, the parties have conducted just two bellwether trials (though there are learnings as well from the JCCP), the first of which (*Dean*) involved an alleged rape, and the second of which (*Mensing*) involved an alleged grabbing of a woman's thigh. The vicarious liability verdict in *Dean* and the verdict involving a plaintiff with prior traumas in *Mensing* have begun to inform the settlement value of these cases, but given the sheer number and diversity of pending cases, it is important to know how other types of cases would fare at trial, such as those involving alleged sexual touching over clothing; lawsuits alleging sexual touching under clothing; and cases involving alleged masturbation/indecent exposure, which together account for more than ***40 percent*** of cases in the MDL proceeding.

Moreover, the only jury findings in *Dean* and *Mensing* were that Uber was vicariously liable for the actions of independent drivers. As a result, they did not fully address the "common factual questions" that led the Panel to create this MDL in the first place, including "Uber's knowledge about the prevalence of sexual assault by" independent third-party drivers, and "whether Uber failed to conduct adequate background checks" of those drivers. *In re Uber Techs., Inc.*, 699 F. Supp. 3d at 1398. Notably, in creating this MDL proceeding, the Panel distinguished its decision to deny consolidation in *In re Uber Techs., Inc., Wage & Hour Emp. Pracs. Litig.*, 158 F. Supp. 3d 1372, 1373 (J.P.M.L. 2016), on the ground that here, pretrial proceedings would not focus on the varying state laws governing employment/agency, but rather on common issues, such as Uber's conduct. *In re Uber Techs., Inc.*, 699 F. Supp. 3d at 1398.

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

The Court indicated at a July hearing that the question of alleged negligence "is a big issue here," and that "it's not been satisfactorily established one way or the other" in the first two trials. *See* 7/21/2026 Hr'g Tr. 13:24-14:1. As a result "[w]e don't have an answer to" the fundamental question of negligence, and "it's worth another one or two cases to be tried" on that specific question. *Id.* 15:1-10; *see also id.* 14:21-23 ("Does that mean there's no negligence given what Uber has done and what the evidence in the record is? And the answer is: I don't know."). As such, the next bellwether trials should focus on that question.

Uber thus proposes that at least half the cases in the new bellwether pool should involve state laws that do not recognize vicarious liability in these circumstances. As the Court has recognized, Uber already has some data points on the implications of vicarious liability to factor into resolution conversations (which have already led to the settlement of large numbers of cases). Selecting some cases in which vicarious liability is not available would ensure that negligence claims are fairly tested, which this Court recently made clear is critical since "there are a lot of cases out there that hang on that determination[.]" *Id.* 15:12-13.

In addition, in order to ensure that future verdicts are true bellwethers (and, thus, informative for the broader claims pool), Uber proposes that each party choose: (a) two cases with sexual touching over clothing (~20% of pending MDL cases); (b) two cases with sexual touching under clothing (11%); and (c) two cases involving masturbation/indecent exposure (~10%). These three categories are the most common allegation types that have not been tried in the MDL.

***Settlement/mediation***. Uber anticipates that, as is common in MDLs, some cases initially selected as bellwether candidates will settle in advance of any trial. To ensure that parties are not penalized for settling cases before trial, a party whose chosen case resolves should be allowed to replace it.

***Appointment of GAL***. MDL leadership represents aggregate interests, but an individual Plaintiff owns her individual claim. Moreover, MDL leadership does not represent many

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

bellwether Plaintiffs (they are represented by non-leadership counsel), and leadership does not have the same ethical obligations to those bellwether Plaintiffs as their attorneys do. Leadership's desire to preserve a strategically valuable trial, or potentially to earn additional common benefit fees, cannot supersede an individual claimant's informed decision to resolve his or her case, particularly when leadership does not represent the Plaintiff at issue. At least until the appointment of a settlement special master, the Court should appoint a GAL to protect the interests of bellwether Plaintiffs and ensure they receive appropriate information about resolution opportunities or otherwise have a neutral representative who can convey their interests as they move through the trial process.

These circumstances (and related issues that would only be appropriate to discuss *in camera*) strongly suggest that appointment of a GAL is "necessary to represent [each] Plaintiff's interests for the limited purpose of approving or disapproving any settlement offer which has or may be proposed." *See Burress v. Blak*e, No. 4:14-cv-35, 2016 U.S. Dist. LEXIS 195710, at *2, *8-9 (E.D. Tex. Dec. 1, 2016) (granting motion for the appointment of a guardian ad litem to represent "Plaintiff's interest in light of the potential conflict arising from the fact that Plaintiff's attorneys have a contingency fee contract with Plaintiff and, therefore, have a pecuniary interest in the outcome of this case"); *see also In re World Trade Ctr. Disaster Site Litig.*, 769 F. Supp. 2d 650, 657 (S.D.N.Y. 2011) (appointing special counsel to advise a group of plaintiffs who "needed an independent lawyer to consult with them and, if need be, to represent their interests in a way that would not be influenced by the interests of any other Plaintiffs").

*Pretrial deadlines*. The following deadlines would apply to each individual bellwether trial slot, measured from the scheduled trial date. Uber's proposal both ensures ample time for pretrial briefing and promotes judicial economy by eliminating reply briefs for Rule 702 motions and motions in limine, which will not be necessary given the parties' experience in trying Wave 1 bellwether cases.

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

| Event / Deadline | Timing Relative to Trial |
|---|---|
| Deadline to Amend Complaint | 150 days before trial |
| Fact Discovery Cutoff | 91 days before trial |
| Plaintiff Expert Reports | 70 days before trial |
| Defendant Expert Reports | 49 days before trial |
| Expert Depositions Complete | 35 days before trial |
| Dispositive Motions and Rule 702 Motions | 42 days before trial |
| Oppositions to Dispositive and Rule 702 Motions | 28 days before trial |
| Reply Briefs for Dispositive Motions | 21 days before trial |
| Pretrial Memoranda, Witness Lists, Exhibit Lists, Deposition Designations | 28 days before trial |
| Objections to Witness/Exhibit Lists and Deposition Designations | 21 days before trial |
| Counter-Designations; Objections to Counter-Designations | 14 days before trial |
| Motions in Limine | 21 days before trial |
| Oppositions to Motions in Limine | 14 days before trial |
| Proposed Jury Instructions, Verdict Form, and Voir Dire Questions | 21 days before trial |
| Final Pretrial Conference | 7 days before trial |
| Jury Selection | 1 business day before trial |

*Trial time and allocation*. Each bellwether trial should be presumptively allotted 45 hours of trial time, including closing arguments. Trial time should be allocated 50% to Plaintiffs and 50% to Defendants. Before each trial, the parties should meet and confer to identify: (a) the facts that may be stipulated to; (b) agreed deposition clips; and (c) whether any expert testimony from a prior wave trial may be adopted by stipulation, reducing the need for live re-presentation.

### B.  Fraud Investigations

To safeguard the integrity of this MDL, the Court should appoint a Fraud Special Master to assist the Court in (1) investigating fraudulent claims, material inconsistencies, fabricated

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

evidence, and related misconduct; (2) determining which claims or submissions are fraudulent; (3) ruling on fraud-related motions arising from that investigation; and (4) recommending appropriate sanctions and remedial measures. Fraud is not a side issue; it is a direct obstacle to resolution. "[E]very meritless claim that is settled takes money away from Plaintiffs whose claims have merit." *In re Silica Prods.*, 398 F. Supp. 2d at 636. A Fraud Special Master is therefore necessary not only to address suspected fraud and any misconduct, but also to protect the parties' ability to identify, value, and resolve claims brought by non-fraudulent Plaintiffs.

Recently, this Court asked what would facilitate resolution of the MDL, a question that has thus far centered discussion on the bellwether trial process. However, bellwether trials are only part of the answer. Equally critical is addressing fraud in the case inventory. Fraudulent claims prevent the parties from reaching any potential portfolio-wide resolution. Appointing a Special Master would establish a proactive, parallel path to resolution by "separating the wheat from the chaff." Appointment is especially important before remand because this Court's centralized authority provides the most efficient mechanism for investigating suspected fraud before claims are returned to the transferor courts.

There is mounting evidence of fraud throughout the MDL case pool. The number of Plaintiffs in this MDL has grown rapidly, fueled by aggressive, clickbait-style online advertising by Plaintiffs' counsel and the lead-generation firms and websites that support them. This advertising has resulted in a rapid increase in the number of Plaintiffs—a substantial number of whom are non-responsive or non-participating once their cases are filed. *See, e.g.*, ECF No. 3718 at 4-5. The record, based on Uber's targeted review to date, already includes confirmed fraud, serious indicia of possible fraud, and material misrepresentations across a significant proportion of those 3,900 plaintiffs. The Court has granted all five fraudulent-receipt motions Uber has filed. Plaintiffs' counsel continue to file fraudulent receipts, and Uber will file additional motions soon. Another issue is Plaintiffs' firms' submission of PFSs falsely indicating that they were "completed" by Plaintiffs, when in fact the Plaintiffs never saw them.

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND

E.g., ECF No. 4522 at 5-6. Objective records reveal additional red flags. For example, based on review of certain sample sets, over 30% of certain plaintiff categories have indicia of fraud. This evidence of fraud establishes why such a Special Master is needed.

These examples are illustrative, not exhaustive. Uber has not reviewed all 3,900-plus MDL claims for fraud. But even Uber's narrow and targeted review to date has revealed substantial indicia of fraud. This problem cannot be solved efficiently through serial, claim-by-claim motion practice. That approach consumes party and judicial resources, delays legitimate trial preparation, and hinders resolution of the non-fraudulent claims this MDL exists to address.

Plaintiffs' counsel have themselves recognized the importance of rooting out fraudulent claims in this MDL. In response to an earlier motion addressing fraudulent ride receipts, Plaintiffs' leadership represented to this Court that "fraud has no place in this MDL" and that "[p]articularized allegations of fraud must be taken seriously, investigated, and resolved." ECF No. 3768 at 2. A Fraud Special Master to investigate fraud would give effect to the principles espoused by Plaintiffs' leadership by conserving the Court's resources, reducing the burden on the parties, and, most importantly, advancing the resolution of claims brought by non-fraudulent plaintiffs.

## C. <u>Remand</u>

The Court should begin the remand process in March 2027, with the goal of transferring or suggesting remanding for the first set of cases in July 2027. The remand process should include: (1) preliminary discovery in the transferor court; and (2) an attempt at mediation before a case is sent to a trial court. As cases are dismissed or settled, Uber proposes that each case be immediately replaced with the next eligible case such that cases are continually entering the remand process. After repeating this process three times, Uber proposes that the time periods be shortened and the number of cases per tranche be increased, since the parties will develop a rhythm that should enable them to work up cases even more quickly, supporting a faster pace of 50 cases every three months in 2028.

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

| Remand Wave | No. of Cases | Begin Preparation of Remand Package | Deadline for Completion of Remand Package | Joint Venue Proposals Due |
|---|---|---|---|---|
| R-Wave 1 | 25 cases | March 1, 2027 | June 30, 2027 | July 9, 2027 |
| R-Wave 2 | 25 cases | July 1, 2027 | October 31, 2027 | November 12, 2027 |
| R-Wave 3 | 25 cases | November 1, 2027 | February 26, 2028 | March 12, 2028 |
| R-Wave 4 | 50 cases | March 1, 2028 | May 31, 2028 | June 9, 2028 |
| R-Wave 5 | 50 cases | June 2, 2028 | August 31, 2028 | September 8, 2028 |
| R-Wave 6+ | Discuss Process for Remaining | | Rolling schedule | Rolling schedule |

The MDL statute authorizes "*coordinated or consolidated pretrial proceedings*." 28 U.S.C. § 1407(a) (emphasis added). "The Panel has made it clear that it will 'remand an action . . . prior to completed pretrial proceedings only upon a showing of good cause.'" *In re Integrated Res., Inc. Real Est. Ltd. P'ships Sec. Litig.*, 851 F. Supp. 556, 562 (S.D.N.Y. 1994) (citing *In re S. Cent. States Bakery Prods. Antitrust Litig.*, 462 F. Supp. 388, 390 (J.P.M.L. 1978)). Such cause is lacking "if continued consolidation will . . . conserve the resources of the parties, their counsel and the judiciary.'" *In re Express Scripts, Inc.*, No. 4:05-MD-1672 HEA, 2010 U.S. Dist. LEXIS 131444, at *12 (E.D. Mo. Dec. 13, 2010). Here, there is still much to be gained from the ongoing bellwether process, including, most notably, trials involving different sorts of sexual misconduct and negligence cases. Thus, Plaintiffs' proposal that the Court begin transferring cases of suggesting remand immediately should be rejected. The Court should instead plan to begin the remand process following the completion of the *QLF 001* and *A.R.* trials.

Basic fairness dictates that cases based on the earliest alleged incident should be sent to trial courts first. Practical considerations also support this approach: as cases sit for longer, witnesses are more likely to become unavailable and evidence is more likely to be lost, making it important to address the oldest incident cases first. While Plaintiffs purport to seek the same

12

result, their proposal, discussed below, instead seeks to remand the cases they see as the biggest threat to Uber first as part of their concerted effort to control the public narrative over this litigation and pressure Uber.

Prior to any case being remanded or transferred, Plaintiffs should be required to provide a package of basic discovery, including: (1) a completed PFS; (2) communications and social media about the incident, their lawsuit, and their alleged damages; (3) relevant pre- and post-incident mental health records and associated authorizations; and (4) any law enforcement records. In addition, Uber should be permitted to take three depositions (e.g., Plaintiff, a fact witness, and a mental health provider). This initial, limited discovery would help the parties assess whether the case has merit and whether it can be resolved prior to remand. However, *it would not be a substitute for full case workup, which would occur post-remand*. Undertaking pre-remand discovery in fraudulent cases would be a waste of time and resources and would therefore not be appropriate.

In sum, Uber's proposal would maximize the likelihood that bellwether trials address the "complex factual questions" that underlie the cases pending in this MDL, create a path towards fair resolution, and ultimately "conserve the resources of the parties, their counsel, and the judiciary." *In re Uber*, 699 F. Supp. 3d at 1398.

## II. PLAINTIFFS' PROPOSAL WOULD UNDERMINE THE PURPOSE OF THIS MDL.

Plaintiffs' proposal invites the Court to put its thumb on the scale, strip Uber of any input into the manner in which bellwether cases are selected, hamper Uber's ability to settle cases, and deprive Uber of the ability to properly prepare remanded cases for trial, in derogation of its due process rights.

Plaintiffs seek a do-over on the bellwether process, arguing that they (and only they) should be allowed to select 16 new cases that would comprise the entirety of the next pool of bellwether cases. Unsurprisingly, the cases Plaintiffs have preliminarily proposed to Uber are nearly all penetration cases, which comprise a tiny portion of the claims pool.

13

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

Plaintiffs have also suggested during meet-and-confers that the Court should only try cases in which Uber will not challenge whether the alleged incident even occurred in the first place, which would be tantamount to directing a verdict in Plaintiffs' favor on one of the most hotly contested issues.

Plaintiffs have further suggested that Uber should be barred from negotiating any settlements with an individual Plaintiff's own lawyers and should instead be required to include Plaintiffs' Lead Counsel in all settlement discussions (even if they do not represent the Plaintiff[s] at issue). And the remainder of Plaintiffs' proposal is no less self-serving, allocating the bulk of trial time to Plaintiffs, allowing them to circumvent the remand process by "assigning" cases for trial to other judges in the Northern District of California in contravention of binding law, and barring Uber from obtaining adequate case-specific discovery in cases slated for remand.

Rather than punish parties for settling resolvable cases, the Court should adopt measures that *encourage* the parties to achieve that fundamental goal. That would further the Court's stated priority of resolving cases. *See* 7/21/2026 Hr'g Tr. 7:12-15 ("You know, that's the way I have run my MDLs for 26 years. Not just in terms of settlement, but in terms of, I'll use the term 'resolution.' I know that that's a sort of a one of those words, oh, oh, he means he's talking about settlement here."); *id.* 7:16-19 ("So I'm talking about you're not going to have 4000 trials and, you know, that would be – that's not good. That's not a good thing to have. It's good to have some, but it's not good to have 4000.").

Plaintiffs' self-serving proposal would not move this MDL toward the fair and just resolution this Court envisions; instead, it is an attempt to exact as much pain as possible from Uber in a misguided effort to enrich Plaintiffs' leadership counsel at the expense of the actual Plaintiffs.

### A. Plaintiffs' Bellwether Proposal Is Designed To Try Non-Representative Cases.

Plaintiffs request that they be given carte blanche to replace the existing pool of bellwether cases with their own 16 hand-picked selections, while Uber would have no corresponding right to make any selections.

There is no legitimate justification for allowing Plaintiffs to unilaterally select *all future bellwether cases* in this MDL. Not only are Plaintiffs unfairly attempting to erase Uber from any involvement in the bellwether selection; they are all but dooming the bellwether process to fail as a legitimate information-gathering exercise. As Plaintiffs' case selections to date have made clear, giving them full control over bellwether selection would result in a bellwether pool made up almost entirely of extreme (and rare) penetration cases that constitute approximately 1/10 of the entire case pool and would do nothing to advance resolution of the remaining claims. *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2016 WL 1441804, at *9 (S.D.N.Y. Apr. 12, 2016) ("[T]he goal is to select the 'best' representatives of the universe of cases, not outliers likely to result in victory for one side or the other.").

Late Friday afternoon, Plaintiffs shared with Uber 16 proposed bellwether cases, with no explanation of how these cases were selected or why they are worthwhile bellwethers. Uber's initial review of these cases confirms Uber's concerns about Plaintiffs' proposal. Nearly every case involves claims of penetration, and nearly all the Plaintiffs are represented by one of the firms in Plaintiffs' leadership, consistent with their effort to control the litigation, including all resolution discussions.

As noted above, Uber's proposal would give the parties equal say in selecting new bellwether cases while also prioritizing cases involving categories of sexual assault and theories of liability that have not yet been evaluated. This is a much more fair and representative—and ultimately, more informative—approach than allowing Plaintiffs to continue to select and try outlier cases that they believe will garner the most jury sympathy and biggest verdicts. Uber has been unable to identify any recent MDL proceeding in which the plaintiffs were allowed to

15

select the entire bellwether pool, and Plaintiffs have not pointed to any such precedent.

In an effort to justify their one-sided bellwether selection proposal, Plaintiffs made two demands during the parties' meet-and-confers that highlight the coercive nature of their litigation tactics.

***First***, Plaintiffs' counsel argued that Uber should not have any say in the bellwether selection process ***unless*** it agrees that its counsel will ***not*** reach out to any individual bellwether Plaintiff's counsel to settle any bellwether cases. (Plaintiffs also noted that they will not select any bellwether cases unless the Plaintiff's lawyers in that case agree not to mediate with Uber directly.) Any attempt by Plaintiffs to restrict settlement counsel from engaging with Plaintiffs as part of the replenishment process would be improper for multiple reasons. For starters, it would unfairly force Uber to choose between participating in the bellwether selection process and retaining its right to settle cases. In other words, Plaintiffs essentially are trying to punish Uber if it settles cases, which is antithetical to the Court's goals for this MDL proceeding.

Moreover, Plaintiffs' unprecedented proposal (if accepted) would also create a clear conflict of interest on the part of Plaintiffs' leadership counsel and individual counsel that is highly unethical. Many bellwether Plaintiffs are represented by non-leadership counsel. These non-leadership counsel have ethical obligations to bellwether Plaintiffs, including obligations to pursue settlements that are in their clients' interests, that leadership counsel do not share. Plaintiffs' leadership counsel may have an interest in driving cases to trial to increase common benefit fees, but that incentive does not trump the individual rights of bellwether Plaintiffs who (in consultation with their individual attorneys) must remain free to settle their cases rather than proceed to trial. *See In re Snowflake, Inc., Data Sec. Breach Litig.*, No. 2:24-MD-03126-BMM, 2025 WL 788661, at *3 (D. Mont. Mar. 12, 2025) (observing "a conflict of interest due to [plaintiff's counsel's] role in leadership in *AT&T II* and her firm's concurrent representation of individual arbitration claimants in *AT&T I*"). There are any number of reasons why a claimant may wish to resolve her claims outside a public trial, yet the proposal by Plaintiffs' leadership

16

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

counsel would hinder such an individual's ability to meaningfully explore those reasons on an informed basis.

**Second**, Plaintiffs have also argued during the meet-and-confer process that Uber should only have a role in selecting cases if it agrees to **concede** that an alleged sexual assault occurred **before** discovery has even occurred. A defendant cannot reasonably be required to concede an element of any claim before case-specific discovery simply as the price of participating in bellwether selection. Plaintiffs have not cited any precedent for their demand that Uber blindly forfeit its ability to challenge the very predicate for why a Plaintiff commenced suit in the first place. As the Supreme Court has made clear, "[d]ue process requires that there be an opportunity to present every available defense." *Lindsey v. Normet*, 405 U.S. 56, 66-67 (1972) (internal quotation marks and citation omitted). That necessarily includes Uber's right to challenge and test the credibility of any party or witness. *Cf. Thompson v. Henderson*, 143 S. Ct. 2412, 2413 (2023) (Alito, J., concurring in denial of certiorari) (lower court's "decision raises serious and troubling issues of due process" to the extent "it will have the practical effect of inhibiting an attorney from engaging in standard and long-accepted trial practices," including "attempting to undermine the credibility of adverse witnesses"). Plaintiffs' attempt to strip Uber of this right is particularly galling given the proof of substantial fraud in this litigation, as detailed above.

"The rule of law applies in multidistrict litigation under 28 U.S.C. § 1407 just as it does in any individual case." *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841 (6th Cir. 2020) (granting mandamus petition to correct erroneous grant of untimely motion to amend complaint). As the Sixth Circuit put it, "MDLs are not some kind of judicial border country, where the rules are few and the law rarely makes an appearance." *Id.* at 844; *see also In re Korean Air Lines Co. Ltd., Antitrust Litig.*, 642 F.3d 685, 700-701 (9th Cir. 2011) ("A total disregard for the normal standards of assessing these critical motions would improperly subject MDL cases to different and ad hoc substantive rules."). The fact that Plaintiffs are seeking to impose a fundamental limitation on Uber's defense that would be unthinkable in an ordinary

17

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

case outside an MDL proceeding confirms that Plaintiffs have no serious interest in trying representative cases and ascertaining the true value of the claims pool. Rather, they are just looking for ways to gain an advantage because they apparently do not have confidence in their ability to try ordinary cases.

### B. Uber's Schedule Makes More Sense Than Plaintiffs'.

There are three fundamental differences between Uber's schedule and Plaintiffs'.

*First*, Plaintiffs are proposing an overly aggressive, unrealistic schedule for the first trial. Under Plaintiffs' proposal, the parties will not even know which cases will be tried in the first wave of new bellwethers until late September or October. That would leave just four months for full workup before the first Wave 2 trial. As the parties have seen in *QLF 001*, case workup inevitably takes far more time than Plaintiffs predict. Despite their claims that much discovery had been produced in that case, the parties are now six weeks from trial, and Uber is still missing medical records, communications, and social media productions. No IME has taken place, Plaintiffs are attempting to block treater discovery, and Plaintiffs themselves are now indicating that they need more time for expert reports. Under Plaintiffs' proposal, the parties would be starting from scratch with 16 cases. Under Uber's proposal, there would be three trial pools with four cases each. There is no realistic way to have an entire pool of trial candidates ready, under either proposal, before April 1, 2027.

*Second*, Plaintiffs are proposing that Rule 702 motions be due 56 days before trial, a mere 14 days after Plaintiffs disclose their experts—and *before* Uber discloses its experts. This compressed schedule is inadequate because Uber will necessarily seek input from its own experts in identifying the flaws in Plaintiffs' experts' opinions. To remedy this problem, the Court should adopt Uber's proposal, which would extend the due dates for Rule 702 and dispositive motions by two weeks, with corresponding adjustments to the opposition deadlines and replies for dispositive motions. Uber's schedule would afford both parties sufficient time to brief—and the Court to decide—expert and dispositive motions weeks before the scheduled

start of trial.

***Third***, Plaintiffs' proposal also contemplates reply briefs for Rule 702 motions and motions in limine. However, by the time the parties try the next set of cases, the parties will have extensively briefed most of the expert and evidentiary issues that would be raised in any future Rule 702 motions and motions in limine. As a result, having the parties file reply briefs on these recurring issues would deluge the Court with more filings, unnecessarily burdening both the parties and the Court. Instead, if a reply brief is needed on a particular motion, the movant should seek leave to file a five-page reply with good cause shown.

### C.   Plaintiffs' Proposed Trial Time And Allocation Are Also One-Sided.

Plaintiffs propose 65 hours of trial time, allocating 60% (39 hours) to themselves and 40% (26 hours) to Uber. While the Court previously approved this time and allocation protocol in *Dean*, Uber respectfully requests that the time be divided equally between the parties. As other courts have recognized, an equal division of time between the parties is critical to ensuring "a fair trial to both parties." *Jensen v. Pratt*, No. CV-12-00601-PHX-ROS, 2021 U.S. Dist. LEXIS 273115, at *10-11 (D. Ariz. Sept. 2, 2021) ("The parties will be given equal time to present their claims and defenses."); *see also Benjamin v. Sparks*, 986 F.3d 332, 344-345 (4th Cir. 2021) (affirming district court's "imposition of a fourteen-hour time limit for each side's presentation of its case at trial" and concluding that "the district court's denial of [Plaintiff's] request for more time in order to ensure that both parties were bound by the same rules does not constitute an abuse of discretion"). In addition, given the parties' and the Court's experience in *Dean*, there is no reason why these cases should take more than two weeks. Thus, each bellwether trial should be allotted 45 hours of trial time, with 50% allocated to Plaintiffs and 50% to Uber.

### D.   Plaintiffs' Proposal To Engage In Forum Shopping By Assigning Cases To Other Judges For Trial In Lieu Of Remand Is Contrary To Law.

Plaintiffs also vaguely propose that the Court "assign" certain cases to "any other judge within this District for trial, in lieu of remand to the transferor court." But the Court is not

empowered to "assign" any pending cases in such a manner, and it should reject Plaintiffs' blatant attempt at forum shopping. With respect to cases transferred by the Panel, the Supreme Court has made clear that such cases "**shall** be remanded . . . **to the district from which it was transferred** unless it shall have been previously terminated." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (citing 28 U.S.C. § 1407(a)) (emphasis added). And as to cases directly filed in the Northern District of California, this Court has previously ruled that such cases must ultimately be transferred to the jurisdiction in which the alleged incidents occurred under Uber's "Forum Selection Clause." ECF No. 3184 at 10-16.[4] These decisions foreclose Plaintiffs' attempt to evade proper remand/transfer in favor of a more Plaintiff-friendly jury pool.

### E. Plaintiffs' Remand Proposal Unfairly Prioritizes Outlier Cases.

Plaintiffs' remand proposal doubles down on their preoccupation with penetration cases and virtual disregard for the overwhelming majority of cases that comprise the case pool. Specifically, Plaintiffs propose four tiers of remand cohorts: (1) cases involving alleged penetration and governed by laws that recognize common carrier liability for transportation network companies; (2) cases involving alleged penetration and governed by laws that do not recognize common carrier liability for transportation network companies; (3) cases involving alleged touching of a sexual body part, kissing of a sexual body part, or other sexual misconduct; and (4) "[a]ll remaining non-bellwether cases." Based on this tiered system, cases involving penetration and governed by laws that recognize common carrier liability for rideshare companies would be promptly remanded, apparently because Plaintiffs' counsel misguidedly

---

[4] The one exception was Plaintiff A.R.1, who agreed to Uber's Terms of Use as a minor and "effectively disaffirmed the TOU and forum-selection clause" by filing her case in the Northern District "while she was still a minor, rather than in Pennsylvania where the alleged incident occurred." *Id.* at 13. But even as to any other similarly situated Plaintiffs, it would be far more efficient and convenient for their claims to be tried in the forum where the alleged incident occurred. *See In re Bard IVC Filters Prods. Liab. Litig.*, MDL 15-02641-PHX-DGC, 2019 U.S. Dist. LEXIS 141175, at *367 n.2 (D. Ariz. Aug. 20, 2019) (transferring direct-filed case to the Eastern District of Pennsylvania, "the venue where the filter implant and alleged injuries occurred").

STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

believe that this is the most effective way to coerce Uber and hurt the company.

Notably, Plaintiffs' self-serving proposal stands in stark contrast to what Plaintiffs were proposing earlier this year. Their initial proposal was that the cases that have been pending the longest should be remanded first. That is because nothing about an allegation category tells the Court which individual Plaintiff has waited longest, whose evidence is deteriorating, or whose claim most urgently needs adjudication. Chronology is transparent, administrable, neutral, and difficult for either side to manipulate after the fact. But Plaintiffs apparently no longer care about giving claimants whose cases have been pending longest their day in court. Now, they are insisting that the Court should prioritize for remand cases involving penetration and that address the laws of states that recognize "common carrier" liability because they "are most likely to drive meaningful resolution discussions." That is highly disingenuous. The *obvious* reason Plaintiffs have abandoned their prior position is that Plaintiffs believe these cases are more likely to result in Plaintiff verdicts and generate downstream negative publicity against Uber. As already discussed, the overwhelming majority of cases in the MDL have nothing to do with alleged penetration, including those involving alleged sexual touching over clothing (~20%); alleged sexual touching under clothing (11%); and alleged masturbation/indecent exposure (~10%). Plaintiffs' proposal essentially treats these cases as an afterthought, relegating them to the bottom of the remand hierarchy, regardless of when they were filed and when the alleged incident occurred. Accordingly, just like Plaintiffs' approach to bellwether selection, their remand proposal is designed to elevate the "worst" cases for Uber in the hopes that Uber will cry uncle and agree to an inflated and grossly disproportionate global settlement. The Court should not reward extortion by remand and instead implement an orderly remand process, based on the date the alleged incident occurred.

F. **Plaintiffs' Proposal Would Deprive Uber Of Critical Discovery Upon Remand.**

Plaintiffs' proposal would arbitrarily cap Uber's case-specific discovery in a clear violation of Uber's due process rights. Most egregiously, Plaintiffs propose that Uber take only

*four* depositions total in each case (while allowing Plaintiffs, who already have access to scores of company witness depositions, to take four more in each action, as well). With respect to written discovery, Plaintiffs propose that Uber be allowed to serve 10 interrogatories and 10 requests for admission, and obtain medical records. This is far less than the default limits and far less than Uber has received in discovery in prior cases. There is no legitimate basis for limiting Uber's ability to take *case-specific* discovery in future cases, and doing so would be a due process violation. While Plaintiffs have the benefit of voluminous discovery *from Uber* regarding its alleged conduct, Uber does not possess any comparable case-specific discovery from the Plaintiffs who may be selected as bellwethers. Each time a case is selected, Uber is essentially starting from scratch, because each case in this MDL is unique, turning on disparate facts, including a particular rider, a different driver, and varying theories of liability. Uber must be able to ferret out these unique facts in plenary discovery in each case.

While Uber agrees that the parties should exchange preliminary written and oral discovery prior to remand in order to determine whether a case can be resolved, *full* discovery and workup must take place post-remand in the court where the case will be tried. Indeed, when "parties [have] not conduct[ed] case-specific fact discovery … during the MDL proceedings, other than exchanging abbreviated profile forms[,]" "case-specific issues [would] be resolved after remand or transfer[,]" along with other "issues that may be unique and relevant in a remanded or transferred case." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX-DGC, 2020 WL 5441292, at *4-5, 16 (D. Ariz. Sept. 10, 2020); *see also, e.g.*, *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *15, *17-18 (N.D. Ohio June 4, 2010) (envisioning full "case-specific discovery to learn information relevant to the particular claims and defenses made by an individual plaintiff[]" upon remand); *Bayes v. Biomet, Inc.*, 500 F. Supp. 3d 810, 811 (E.D. Mo. 2020) ("Since remand from the MDL, the parties have conducted two more years of case-specific discovery."); *Mayse v. Ethicon, Inc.*, No. 2:20-CV-125, 2021 WL 6425952, at *3 (E.D. Tenn. May 26, 2021),

22
STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

*objections overruled*, No. 2:20-CV-125-KAC-CRW, 2022 WL 495238 (E.D. Tenn. Feb. 17, 2022) ("[C]ase-specific review of Plaintiffs' expert … is the type of review other Courts in this Circuit at times have undertaken following remand of a case from the MDL.").

Finally, Plaintiffs propose that parties in remanded cases would be permitted to use expert reports from the MDL without re-retention of the experts. This would sow chaos by allowing hundreds of individual Plaintiffs to disclose opinions from experts who have never agreed to participate in their cases and are not prepared to testify in countless trials across the country, some of which may be occurring simultaneously. Plaintiffs should not be allowed to short-circuit the Federal Rules of Civil Procedure, which require proper retention, designation, and disclosure of experts expected to testify at trial. *See* Fed. R. Civ. P. 26(a)(2).

In sum, Plaintiffs' extreme proposal boils down to a wish list of self-serving, irregular, and unprecedented demands that would ultimately move this MDL backward, while Uber's proposal would actually promote the fair and efficient resolution of the litigation.

DATED: August 13, 2026                    Respectfully submitted,

*/s/ Laura Vartain Horn*
Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Kim Bueno (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
401 W. 4th Street
Austin, TX 78701
Telephone: (512) 678-9050
kim.bueno@kirkland.com

23
STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

24
STATEMENT REGARDING BELLWETHER SELECTION AND REMAND
Case No. 3:23-md-03084-CRB