# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

------------------------------------------X

IN RE: UBER TECHNOLOGIES, INC.,

PASSENGER SEXUAL ASSAULT LITIGATION

Case no. 3:23-md-03084-CRB

------------------------------------------X

*** HIGHLY CONFIDENTIAL ***

VIDEOTAPED DEPOSITION

OF

HANNAH NILLES

Monday, June 30, 2025

10:35 a.m.

Reported by:

ROBERTA CAIOLA

Stenographic Reporter

about pairing and dispatch, and then we've talked about education and accountability.

Can you think of any other components, just the kind of big picture, of Uber's sexual assault prevention strategy?

A.    Besides --

MR. PREMO-HOPKINS:  Object to form.

A.    -- what's listed here you mean?

Q.    Yeah, just those topics that I just said.

A.    Can you say them again?

Q.    Sure.

We've discussed, you know, kind of four big picture components to Uber's strategy for preventing sexual assault and misconduct by Uber drivers against passengers.  That includes screening, monitoring and intervention, pairing and dispatch, education and accountability.

Are there any other components, kind of on a big picture level, that is part of Uber's kind of multi-level safety?

A.    Yeah.  Let me think about this. Because you're kind of putting it in a framework that is foreign to me.

So -- so, yes, we start at the

the platform.

Q.   Okay.  Thank you.  That was really helpful.

And just so that I understand the -- you talked, I think, a little bit about some of the things that would be in the safety toolkit, like, you know, 911 calls and those things.

Those are tools that Uber uses to prevent sexual assault or are those more, like, ways to assist riders in responding to something that happens?

MR. PREMO-HOPKINS:  Object to form.

A.   I think it could be either.  If somebody feels uncomfortable, they can call 911 from the app prior to anything happening, and we would share GPS information with the police on the spot.

So if somebody is, like, I don't feel right, you can immediately connect with the police and have somebody intervene.

Q.   Okay.  All right.

So all of the components of the plan that you describe, these things, it's Uber's understanding that they all are necessary to work together.  Uber can't just do one of these

components.  It needs to encompass multiple layers to prevent sexual assault, right?

MR. PREMO-HOPKINS:  Object to form.

A.    I would say over time, though, technology has changed.  What we have been able to do over the years has changed.  As technology has become available, we have become a first adopter for that.

So the place that we are in now is after years of research, study and really, like, continuing to improve and continuing to monitor our systems.

But, yes, I would say all these things kind of work in concert together, but, from the very beginning, we have always had robust screening, on-trip GPS, and tracking tools, and then reporting.

Q.    Okay.  Great.  All right.  We're going to shift over now and talk about screening.

MS. LONDON:  If we can just pull up tab 51 and we'll mark it as the next numbered exhibit.  1303.

(Exhibit 1303, All Plaintiffs' Amended Notice of 30(B)(6) Deposition of

tests.  I said we don't have a psychometric test in the United States.

Q.    Right.  Okay.

But just so that we are all clear about Uber's efforts to prevent sexual assault by drivers against passengers, I want to make sure I have down on the -- with respect to screening, other than running criminal background checks, is there any other component of Uber's screening that is what Uber does to screen out potential sexual predators from the platform?

MR. PREMO-HOPKINS:  Object to form.

A.    Motor vehicle records.

Q.    Okay.  Anything else?

A.    Well, we have -- I mean, we have the screening process, which is looking at criminal and motor vehicle record background checks.

So, as far as screening goes, those are the two main components.

Q.    Okay.  Now, Uber knows that background checks alone will not screen out potential sexual predators, right?

MR. PREMO-HOPKINS:  Object to form.

A.    I mean, screening can look for past

MR. MOORE:  Do you have a tab number, counsel?

MS. LONDON:  4A.

A.  Could I have a couple of minutes on this?

**Q.  All I want to do, Ms. Nilles, is draw your attention under -- the page under "Acknowledgments," which is page 4 of the document.**

A.  One second.

Um-hum.

**Q.  Under "Acknowledgments," it says: "This report was funded by Uber Technologies, Inc."**

**Right?**

A.  Yes.  As referred to in the document that we've just looked at.

**Q.  Okay.**

A.  Is that it?

**Q.  You can set that aside.**

**Uber, in fact, has continued to commission other studies to support its position on screening and fight any new requirements, right?**

MR. PREMO-HOPKINS:  Object to form.

Hannah Nilles  Highly Confidential
June 30, 2025

A.   I wouldn't say it's to support our position.  I think we care about safety, and we're investigating what the best options are to do that.

What's the fairest, what's the best, what's the safest, what's the most operational.

There's a lot of considerations, but I don't like the way that you categorized that.

Q.   Understood.

Ms. Nilles, Uber has commissioned studies from third parties to -- that will validate the position that Uber has taken publicly, right?

MR. PREMO-HOPKINS:  Object to form.

A.   I think you're suggesting that we pay people to give a specific opinion, which I don't agree with.

And, secondly, there are plenty of studies that support the position that were not paid for by Uber.

Q.   So what are those?

A.   I would have to pull up the documents.  I don't have them on the top of my head.

Q.   So --

situation and before I close the record --

MS. LONDON:  Understood.  That's fine.

MR. PREMO-HOPKINS:  -- with regard to Exhibit Number 1317.

Q.    Ms. Nilles, ████████████████████

A.    ████████████████████
████████████████████████
████████████████████
████████████████████████████
████████████████████

Q.    Got it.  Okay.

MS. LONDON:  Let's go ahead and pull up tab 42.  This is the next numbered exhibit, which is 1318.

(Exhibit 1318, Document UBER_JCCP_MDL_003616333 to UBER_JCCP_MDL_003616339, marked for identification.)

Q.    Exhibit 1318, this is a document from July of 2024, and the Bates number is 003616333.

And the title is "Proposal: Screening Operations As A Global Function."

You see that?

A.    Yes.

Q.    **And you've seen this document, right?**

A.    Maybe.  Let me just read it real quick.

I don't know if I have seen this.  I probably did look at it at one point.

We did have a global screenings org and function for years.  This is one person who's now on my team's attempt to consolidate and basically get more resourcing under her team; but, yeah, I am familiar with the general request here.

Q.    **Understood.  Okay.**

**So then, if we go up, please, to look at "Screenings program."**

**Do you see that at the top?**

A.    Yes.

Q.    **And then, if you can go to the fourth paragraph down, can you read that?**

A.    Yes.  "Even" --

MR. PREMO-HOPKINS:  Object to form.

A.    ███████████████████████████████

████████████████████████████████████

███████████████████████████████



I would comment --

Q.    Well, hold on.  I'll let you -- you'll get a chance.

A.    Okay.

Q.    It goes on to say:

Do you see that?

A.    Yes.

Q.    And if you go to number 1,

You see that?

A.    Yes.

Q.    Can you go ahead and read that?

MR. PREMO-HOPKINS:  Object to form.

A.



Q.    Okay.  Thank you.

I just --

A.    May I comment --

Q.    No.

A.    I just wanted to comment, this is a global; this is not to the U.S.

Q.    Understood.  Well, it says global -- it says global, right?

A.    Yes.  But this doesn't apply to the U.S.

Q.    This entire document does not apply to the U.S.?

A.    Most of it doesn't apply to the U.S.

Q.    So

A.



So I have specific involvement in this, so I know what she's referring to.

Q.   Understood.  Okay.

And is it your testimony, Ms. Nilles, that there are --

MR. PREMO-HOPKINS:  Object to form.

A.

Q.   Okay.  Noted.  Thank you.  You can set that aside.

Oh, and by the way, who is "she" that you're referring to that --

A.    Shyrose Razwani.

MS. LONDON:  If we can go off for just a moment, I'm just about to wrap up.

THE VIDEOGRAPHER:  We are off the record.  The time is 5:17.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 5:29 p.m.

BY MS. LONDON:

Q.    All right.  Ms. Nilles, is it your testimony, on behalf of the company, that Uber's screening process is the best that it can do to keep bad actors off the platform?

A.    Yes.

Q.    Now, Uber -- let me ask you just a quick question about how long the process takes.

From the time that a driver applies to be -- on the Uber application, or app, to the time they can become active and begin transporting passengers, that whole entire process, including running the background checks, that can take a matter of minutes; is

So I'm just assuming here there was a deactivation, and that's consistent with the incident rate of sexual assault; otherwise, it wouldn't be counted in sexual assault.

**Q. Understood. Okay. So Uber does look at the number and the rate of sexual assaults and misconducts on the platform in evaluating and assessing its screening process for potential improvements?**

A. In a general sense, yes, because we're always looking to improve, and just sort of like understanding what's happening on the platform is an important part of that, including screening.

**Q. Can you identify for me any changes that Uber made to its screening process based on an evaluation of the number or rate of drivers that had been removed for -- due to reports of sexual assault or misconduct?**

A. I mean, we've made a number of changes to our screening process, but it was due to a number of factors.

So, doing annual reruns, doing continuous monitoring; all of that stuff would be related to that, too.

**Are you aware of any plans in the future that Uber has to make any changes to its screening policies or practices to protect against sexual assault and misconduct?**

A.    We are rolling out continuous MVR monitoring, which will give real-time MVR results, which is another aspect of safety. I'm trying to think what else answers your question directly.  We have some in-app plans to make our safety tools more visible and evergreen.

Some of the other stuff is -- would be attorney-client privilege.

MR. PREMO-HOPKINS:  And I think she was simply asking about screening.  Right? The question was related to screening?

MS. LONDON:  Yeah.  I can ask it again.  We can just focus.

Q.    **I just want --**

A.    I don't think so.  I don't think so.

Q.    **Yeah, I'll just ask it, and we can get a clean answer this way.**

**Ms. Nilles, are you aware of any plans that Uber has in the future to make any changes to its screening process to prevent**

Hannah Nilles  Highly Confidential
June 30, 2025

sexual assault or misconduct?

MR. PREMO-HOPKINS:  Object to form.

A.   I'm not aware of any plans to change any of our screening practices at this time, beyond what I've already mentioned.

**Q.   All right.  Now, you, of course, are aware of many individual instances that have been reported, where a driver has passed Uber's screening process and gone on to commit horrendous violence against a passenger, right?**

MR. PREMO-HOPKINS:  Object to form.

A.   I am, yes.

MS. LONDON:  All right.  So why don't we go ahead -- I'm going to show you Exhibit 113A, and this one is a video, so I'm going to play it.

I'm going to mark it as the next numbered exhibit, which is 1319, and then I'll just ask you a few questions afterwards.

(Exhibit 1319, Video, marked for identification.)

(Video playing.)

MR. PREMO-HOPKINS:  I object to the projection of that news video.

MR. PREMO-HOPKINS:  Object to form.

A.    Yes.

Q.    I will represent to you that Exhibit 1321, this is from March 10th of this year, 2025.

Based on what you saw, this is a driver that passed Uber's screening, correct?

MR. PREMO-HOPKINS:  Object to form.

A.    Again, I don't have any context on these drivers.  The way I would typically investigate it would be to access all of our internal tools.

So I am relying on what you are showing me here.  And, yes, I would assume that that's true.

Q.    As part of onboarding drivers, Uber -- scratch that.

MR. PREMO-HOPKINS:  Do you have any more questions to ask?

MS. LONDON:  I think I'm just about done.  I'm looking at my notes.

Q.    After hearing -- or after this incident in March of 2025, you're not aware of Uber having gone back and looked at its screening processes to see if there were any

Hannah Nilles  Highly Confidential
June 30, 2025

improvements it could make to protect passengers against drivers from sexually assaulting them?

MR. PREMO-HOPKINS:  Object to form.

A.    I'm constantly looking for ways to reduce sexual assault, and I don't agree with the way that you're connecting screenings to the incidents, when I have very little information on them.

Q.    In this instance, Uber -- an Uber spokesman did provide a statement that the driver had been removed from the application, right?

A.    That's what the TV said, yes.

Q.    And you have no basis, sitting here, to dispute that, right?

A.    No.

MS. LONDON:  I believe those are all of the questions that I have for you, Ms. Nilles, today.

I do have a couple of things I would like your help with tracking down.  I know you've mentioned a few things were findable or knowable.  And I will just follow up with your counsel on tracking down some of

CERTIFICATE

STATE OF NEW YORK  )

: ss

COUNTY OF BRONX    )

I, ROBERTA CAIOLA, a Certified Shorthand Reporter, do hereby certify:

That HANNAH NILLES, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand on July 1, 2025.

*Roberta Caiola*

ROBERTA CAIOLA