Laura Vartain Horn (SBN: 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, 27th Floor
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4723
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION, | Case No. 3:23-md-03084-CRB |
| This Document Relates to:<br><br>*All Cases* | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO APPOINT A SPECIAL MASTER TO INVESTIGATE FRAUD; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge: Hon. Charles R. Breyer<br>Date: September 25, 2026<br>Time: 10:00 a.m.<br>Courtroom: 6 – 17th Floor |

**NOTICE OF MOTION AND MOTION TO APPOINT A SPECIAL MASTER**

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

Please take notice that on September 25, 2026 at 10:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Charles R. Breyer in Courtroom No. 6 on the 17th Floor of the San Francisco Courthouse for the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Uber") by and through their undersigned counsel, will and hereby do move the Court for an order, pursuant to Federal Rule of Civil Procedure 53 and the Court's inherent authority, to appoint a Special Master to investigate indicia of fraud, material inconsistencies, and other irregularities in this litigation, and to determine which claims or submissions are fraudulent. The Special Master should also have the authority to rule, in the first instance, on motions related to that investigation.

Uber files this Motion because fraud and serious indicia of fraud across the case inventory prevent the parties from reaching any potential portfolio-wide resolution. Suspicious claims impede resolution for plaintiffs with non-fraudulent claims. The present record establishes the need for a Court-supervised investigation. Confirmed fraudulent ride receipts, Plaintiff Fact Sheets submitted without plaintiff review, and Plaintiff Fact Sheets with statements contradicting objective data reveal serious recurring indicia of fraud that require extensive document review and claims-data analysis. Those issues cannot be effectively and timely addressed by the Court in the ordinary course of this MDL proceeding, warranting appointment of a Special Master pursuant to Rule 53(a)(1)(C). In addition, fraud-related motions arising from that investigation are best resolved by the Special Master conducting it.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Michael Shortnacy and Michael Vives, the Proposed Order filed concurrently herewith, and all papers and records on file in this action, and on such oral argument as may be presented at the hearing.

Dated: August 20, 2026

KIRKLAND & ELLIS LLP

By: /s/ *Laura Vartain Horn*

*Counsel for Uber*

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. STATEMENT OF THE ISSUES TO BE DECIDED ..... 3

III. BACKGROUND ..... 3

- A. The Nature of This MDL Proceeding. ..... 3
- B. Sampling Method for Suspected Fraud and Material Misrepresentations. ..... 5
- C. Motion Practice to Date Confirms the Recurring Nature of This Problem. ..... 10
- D. The Need for a Comprehensive Investigation. ..... 11

IV. LEGAL STANDARD ..... 12

V. ARGUMENT ..... 12

- A. Appointing a Special Master to Investigate Fraud Is Appropriate Here. ..... 13
  1. Appointment Is Necessary to Enable Resolution of This MDL. ..... 13
  2. A Dedicated Investigator Is Required. ..... 13
  3. Additional Bellwether Trials Would Not Address the Fraud at Issue. ..... 14
  4. The Special Master Should Also Resolve Fraud-Related Motions. ..... 14
  5. Appointment Is Necessary to Determine the Full Scope of Fraud, Identify Culpable Parties, and Protect the Court's Docket. ..... 14
- B. The Proposed Special Master's Authority and Scope of Work. ..... 15

VI. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Deepwater Horizon*,
907 F.3d 232 (5th Cir. 2018) ..........1, 13

*In re Engle Cases*,
No. 3:09-CV-10000-J-WGY-JBT, 2015 WL 12843860 (M.D. Fla. Dec. 22, 2015).........12, 13, 15

*Johnson v. SmithKline Beecham Corp.*,
No. 11-cv-5782, Order (E.D. Pa. Aug. 11, 2014), ECF No. 316..........12

*In re Nat'l Football League Players' Concussion Injury Litig.*,
MDL No. 2323, ECF No. 10355 (E.D. Pa. Dec. 10, 2018)..........12, 15

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010*,
MDL No. 2179, ECF No. 10564 (E.D. La. July 2, 2013)..........12, 13

*In re Silica Prods. Liab. Litig.*,
398 F. Supp. 2d 563 (S.D. Tex. 2005)..........1, 11

*Trentadue v. U.S. Cent. Intel. Agency*,
No. 2:08-CV-0788, 2015 WL 1968263 (D. Utah Apr. 30, 2015)..........14, 15

**Rules**

Federal Rule of Civil Procedure 53 Advisory Committee Notes (2003)..........14

Federal Rule of Civil Procedure 53(a)(1)(C)..........1, 12, 13

Federal Rule of Civil Procedure 53(c)..........12

Federal Rule of Civil Procedure 53(f)..........12, 14

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant Uber respectfully moves, under Federal Rule of Civil Procedure 53(a)(1)(C), for the appointment of a Special Master to assist the Court in (1) investigating serious indicia of fraudulent claims, fabricated evidence, material inconsistencies, and related irregularities; (2) determining which claims or submissions are fraudulent; (3) ruling on fraud-related motions; and (4) recommending sanctions and remedial measures. The record makes this relief necessary. Such relief is neither novel nor extraordinary. In the parallel JCCP proceeding, Judge Schulman appointed Ellen Reisman, Esq. to assist with fraud and related issues. Ms. Reisman has since found Uber's evidence of JCCP plaintiffs' fraudulent submissions "compelling and concerning," because "a Plaintiff's knowingly submitting false documents in support of a claim goes to the heart of the integrity of the judicial system." Ex. 1 (Compilation of JCCP Special Master Orders), Special Master's July 7, 2026 Memorandum and Order at 7, 11. As she also recognized, "[t]his Court . . . has the authority to take necessary steps to prevent the perpetration of fraud on the Court." Ex. 1, Special Master's May 8, 2026 Report and Recommendation at 5. This Court likewise has such authority and should take the necessary steps to protect the integrity of these proceedings.

This Court recently asked what would facilitate resolution of the MDL, prompting discussion that has largely focused on the bellwether trial process. Bellwether trials are only part of the answer. Fraudulent claims impede any potential global resolution, "hamper the resolution of meritorious claims by real plaintiffs," *In re Deepwater Horizon*, 907 F.3d 232, 236 (5th Cir. 2018), and divert resources from non-fraudulent claimants, *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 636 (S.D. Tex. 2005) ("[E]very meritless claim that is settled takes money away from Plaintiffs whose claims have merit."). Inventory-wide fraud erodes public trust in the justice system and makes it harder to distinguish genuine claims from fabricated ones. Non-fraudulent claimants deserve a proceeding free from fraudulent claims that cast doubt on their experiences. A Special Master would provide a proactive, Court-supervised mechanism to investigate serious indicia of fraud.

And the record already includes confirmed fraud. Uber has filed five fraudulent-receipt motions, and the Court has granted all five. Yet new fraudulent receipts continue to surface: Uber has

identified more than 50 fraudulent receipts and other documents and expects to find more. The Court has ordered fraudulent-receipt plaintiffs to appear for depositions, but more than two-thirds have refused. This continuing influx demonstrates that case-by-case motion practice cannot contain the problem and consumes the resources needed to address meritorious claims.

The record also shows that plaintiffs' firms have submitted at least 73 Plaintiff Fact Sheets ("PFS") falsely indicating that they were "completed" by plaintiffs. As one plaintiff wrote to her law firm: "**[Y]ou all committed fraud by sending in my fact sheet with someone else's statements and trying to get me to sign them**. . . . You are frauds, complete crooks, unprofessional, and have taken no accountability; **I can bet my life that other clients are probably being robbed as well**." Ex. 2, Jane Doe TD's July 3, 2026 Email to Nachawati Law Group (emphasis added). Again, this is not a harmless paperwork error. False submissions force claimants to litigate in a proceeding clouded by distrust, while diverting resources from claims that deserve careful evaluation, particularly given the highly sensitive subject matter underpinning this MDL.

The examples described above and throughout this Motion are illustrative, not exhaustive. Uber has not reviewed all 3,900-plus MDL claims for potential fraud; the resources required to conduct such a claim-by-claim investigation are beyond the scope of this Motion.[1] Instead, Uber has used targeted reviews and, where feasible, sampling to test selected claims against objective data equally available to plaintiffs, including PFSs, receipts, GPS data produced through the DFS process, and data available to plaintiffs in the Uber app. The results are alarming. Among 116 PFSs alleging that a trip did not reach its destination, produced GPS data showed that at least 40 trips (34.4%) did reach the destination. In 96 MDL trips for which Uber app data shows that the ride was ordered for someone else, 31 plaintiffs (32.2%) nevertheless allege that they took the ride. Of 67 MDL trips involving female drivers, at least 24 plaintiffs (35.8%) allege assault by a male driver, even though the records—often plaintiff's own receipts—identify the driver as female. And of 17 PFSs alleging travel to a "dead-end," 6 (approximately 35%) are contradicted by GPS data produced to plaintiffs' counsel showing no such travel. These targeted results do not establish the full extent of potential fraud, but they

[1] Nor should Uber have to vet every claim, which is the responsibility of plaintiffs' counsel.

demonstrate a pervasive pattern of serious discrepancies and the need for a Court-appointed Special Master to conduct a more comprehensive investigation. Fraudulent claims should not further delay global resolution.

Recent experience in the Los Angeles County sex-abuse settlement underscores the need to uncover fraud early, before it jeopardizes recoveries for other plaintiffs. There, Los Angeles County halted settlement payments amid a fraud investigation, with the District Attorney estimating that fraudulent claims could account for 81% of those seeking compensation.[2] Sampling analyses here already reveal that the fraud rate in this case is also likely high and not limited to just a handful of plaintiffs' firms. The lesson is clear: A dedicated, Court-supervised investigation will protect the integrity of the proceeding and ensure settlement and other resources do not go to fraudulent claims.

Resolving this MDL requires distinguishing fraudulent claims from non-fraudulent claims, so the remaining inventory is assessed on a reliable record. This Court and Judge Cisneros already have substantial competing obligations. A Special Master is the most efficient way to conduct the necessary investigation, protect the Court's docket, and advance this MDL toward resolution.

## II. STATEMENT OF THE ISSUES TO BE DECIDED

Whether the Court should appoint a Special Master to investigate confirmed fraud and serious indicia of fraud in this MDL and to rule on matters related to that investigation, subject to this Court's review.

## III. BACKGROUND

### A. The Nature of This MDL Proceeding.

The MDL now exceeds 3,900 plaintiffs. Its rapid growth has been fueled in substantial part by aggressive, clickbait-style online advertising and third-party lead generation. Those circumstances heighten the need for meaningful pre-suit vetting. And plaintiffs' counsel have the tools to do so. They

[2] Ex. 3, https://www.latimes.com/california/story/2026-01-29/la-sex-abuse-lawsuit-investigations-payouts ("Los Angeles County will halt some payments from its $4-billion sex abuse settlement, leaving many plaintiffs on edge as prosecutors ramp up an investigation into allegations of fraud. . . . The uncertainty has sparked a sense of despair among those who spent the last few years wading through the darkest memories of their lives in hopes of a life-changing sum."); Ex. 4, https://da.lacounty.gov/media/news/district-attorney-hochman-files-application-intervene-la-county-child-sex-abuse.

can access much of the information needed to verify their allegations via the Uber app and Uber's DFS productions. When counsel file claims without doing that basic work, they inject unreliable allegations into the proceeding that harm their other clients.

Plaintiffs' counsel and third-party marketers have solicited claimants through ads promising a "Free Compensation Check!" and "Significant Compensation," while assuring prospective claimants of "No Paperwork," "No Hassle," and "No Upfront Cost." *See* ECF No. 3604 at 12. This advertising has produced a rapid increase in plaintiffs, many of whom are non-responsive "plaintiffs in name only." *See*, *e.g.*, ECF No. 3855 at 10. Third-party lead-generation firms, which are often paid on a per-claimant basis (incentivizing volume, not meaningful pre-suit investigation), place many of these ads, offering to help "acquire Uber and Lyft sexual assault plaintiffs at a performance-based cost of **$3,600 to $4,800**." *Id.* at 2 (reproducing public ad from a lead generator). This volume-driven model prioritizes acquisition over meaningful investigation.

Inadequate vetting of client submissions compounds the issue. Many PFSs appear to have been auto-populated by law firms, with little to no verification. For example, one plaintiff's PFS included employment and education information that was contradicted by NPI information and attached a Lyft receipt. ECF No. 3855 at 4. Such readily detectable errors expose a claims-acquisition process that prioritizes volume over accuracy, where many PFS submissions are filed without meaningful review by counsel or claimant before filing. When the same failures recur across firms and referral sources, it indicates systemic breakdown rather than mere negligence. Third-party websites such as Makereceipt.com enable users to generate phony receipts designed to mimic authentic Uber receipts. *See* ECF No. 3604 at 2-3. Uber's forensic review has identified receipts bearing the hallmarks of fabrication, including Makereceipt.com watermarks, math errors, timestamp inconsistencies, formatting irregularities, and alterations from authentic receipts, including instances in which a female driver's name was replaced with a male name. *Id.* at 3-10. Subscribers to Makereceipt.com have historically made it significantly harder for Uber to detect fraud by paying for a more expensive fraud program that eliminates telltale watermarks. *Id.* at 3-4. The deliberate use of tools designed to mimic authentic receipts strikes at the integrity of the evidence on which this MDL depends and cannot be

dismissed as an innocent clerical error.[3]

**B. Sampling Method for Suspected Fraud and Material Misrepresentations.**

In support of this Motion, Uber identified categories of claims that could be tested against objective information (and that a Fraud Special Master could review further). Because fraud review is individualized and resource-intensive, Uber used sampling to assess whether the identified issues reflected broader patterns warranting further investigation. The method was targeted because the problem is too large for piecemeal treatment, not because it is isolated. The resulting patterns support a comprehensive, Court-supervised inquiry that protects plaintiffs from having their claims diluted by fraudulent submissions.

Uber's targeted review vetted over 265 claims across 24 plaintiffs' law firms, in addition to identifying more than 50 claims involving fraudulent ride receipts and documents and 73 PFSs that counsel falsely represented had been completed by plaintiffs. The review uncovered significant discrepancies across the claims examined: GPS data (produced in the DFS process) shows that 40 of 116 (34.4%) plaintiffs alleged their trips never reached the destination when they in fact did; at least 31 of 96 (32.2%) plaintiffs who requested a trip for another person alleged that they ordered the ride for themselves; 6 of 17 (35.3%) plaintiffs alleged travel to a "dead end" not shown in produced GPS data; and at least 24 of 67 (35.8%) plaintiffs with female drivers—often as reflected in their ride receipts—alleged that they were assaulted by male drivers. These are not anomalies, but are recurring, objective discrepancies across all categories and firms. The examples below reflect serious indicia of fraud that require further investigation and are not exhaustive. As in the case of Uber's Motions to Show Cause Relating to Fraudulent Receipts, Uber does not seek dismissal of these claims at this stage of the process, but these issues show why a Special Master is needed to conduct a comprehensive, Court-supervised investigation. That process will separate meritorious claims from fraudulent ones before fraud further erodes confidence in this proceeding.

**Fabricated or Falsified Documentation.** Uber continues to identify cases involving forged

[3] Unvetted mass litigation is not unique to this MDL. Unsupported, exaggerated, and fraudulent allegations are frequent in mass torts, as discussed in an October 2025 American Tort Reform Association Report. *See* Ex. 5, https://atra.org/wp-content/uploads/2025/10/ATRA-Report-Sanctionable.pdf. That risk has materialized here.

or fabricated ride receipts, emails, or screenshots. Uber has identified more than 50 such claims to date, and the Court has already dismissed most of them. *See, e.g.*, ECF Nos. 3604, 3784, 4137, 4933, 5216, 5483. As the Court found in granting one of Uber's prior motions, multiple plaintiffs "submitted non-bona-fide receipts. Some of these receipts show on their face that they were generated using websites designed for creating receipts, such as Makereceipt.com. Other of these receipts contain math errors, formatting inconsistencies, and other errors. Other receipts submitted by these plaintiffs were altered from actual receipts." ECF No. 3876. Also pending are two Motions for Findings of Contempt and to Enforce Prior Court Orders that involve nine plaintiffs who disobeyed the Court's orders that they appear for deposition to testify about their submission or contribution to submitting non-bona-fide receipts. ECF Nos. 5520, 6366.

Plaintiffs, including those represented by firms not already subject to the five previous MDL fraudulent receipts motions, continue to submit new fraudulent receipts on a regular basis. Six new fraudulent receipts—which have not yet been the subject of motion practice—are listed in Exhibit 6. *See also* Ex. 7, Declaration of Brett D. Harrison and FTI Consulting, Inc. The continued submission of such evidence after five prior fraudulent-receipt motions once again confirms that the problem is active and ongoing:




Ex. 8 (new receipt with inconsistent formatting and math error); *see also* Ex. 9. These receipts, *submitted by plaintiffs' counsel in 2026—months after the Court granted the first fraudulent-receipt motions*—contain obvious computational errors that should have been identified on a cursory review by plaintiffs' counsel. A centralized fraud-review process is necessary in this MDL.

**Fraudulent Plaintiff Fact Sheets Submitted Without Plaintiff Review.** Following Uber's motion practice and only after this Court-ordered disclosure, plaintiffs' counsel from various firms revealed that at least 73 plaintiffs never even reviewed their PFSs before they were served, even though the PFSs falsely represented that they were "completed" by plaintiffs. *See*, *e.g.*, ECF No. 4522 at 5-6 (Nachawati Law Group). The Nachawati Law Group, which fraudulently submitted 48 PFSs without client review, Ex. 10, used clickbait ads to solicit plaintiffs:




ECF No. 4456 at 5. The firm's conduct shows how this sort of solicitation plays out. As deadlines approached for 48 unreachable "clients," counsel did not disclose the problem, but instead served discovery responses representing that the PFSs had been "complet[ed]" by the plaintiffs, without disclosing that the firm had lost contact with them. Only after the Court ordered disclosure did Nachawati admit the plaintiffs did not review the PFSs before submission. ECF No. 4522 at 5-6.

In addition to prejudicing Uber as to non-responsive "plaintiffs in name only," this conduct harms plaintiffs who want to pursue their claims. After Uber's motion practice, one Nachawati plaintiff emailed Uber's counsel, ethics authorities, and law enforcement agencies:

> To Nachawati Law Firm who sabotaged a Uber sexual misconduct case involving myself AND minor child!!!
>
> I will be contacting the people you sent this email to, and **I will show them that you all committed fraud by sending in my fact sheet with someone else's statements and trying to get me to sign them. . . You claimed to be sending one thing and sent something else entirely. You are frauds, complete crooks, unprofessional, and have taken no accountability; I can bet my life that other clients are probably being robbed as well….**
>
> **This includes you … falsifying documents, and trying to force signatures on fraudulent fact reports with threats to harm my case and more. . . .**

> **There are so many mistakes that I am certain these are not simple intern errors, but an organized effort to defraud the clients you were hired to protect, which has caused me further damage.**
>
> In a case like this, **if it were your own daughter, sister, mother, or anyone else in your family, you would never have represented them with fraudulent fact sheets. . . .**

Ex. 2 (emphasis added).[4] A Special Master could investigate these PFS issues, implement methods for enforcing client review, and recommend sanctions for egregious or continued non-compliance. As the Special Master observed in the parallel JCCP proceeding: "While I am sympathetic to the trauma suffered by abuse survivors, if such Plaintiffs choose to avail themselves of the court system through litigation, they are required to comply with Court orders. Fundamental to pursuing a case is providing the Defendant with the basic facts underlying their claims. The Amended CMO is a recognition of the necessity to implement orderly procedures to ensure that such information is provided, and it specifically contemplates terminating sanctions for failure to comply." Ex. 1, Special Master's July 7, 2026 Memorandum and Order at 10.

**Plaintiff Fact Sheets Falsely Alleging That Plaintiffs Ordered Rides For Themselves, When In Fact They Ordered Them For Others**. As discussed above, given the volume of unvetted claims in the MDL, Uber limited its targeted review to select categories. One such category was trips plaintiffs ordered for someone other than themselves. Uber reviewed data for 96 such trips and found that at least 31 of the plaintiffs sampled (approximately 32%) falsely alleged that they ordered the rides for themselves, when in fact data available at the time of plaintiffs' ordering the ride would have shown that they ordered the trip for someone else. Exhibit 11 identifies these plaintiffs by MDL ID, along with the (redacted) name of the non-plaintiff for whom the ride was actually ordered.

Illustrative examples include the following:

- MDL 3528: Slater Slater Schulman LLP filed this claim on behalf of a female named [redacted]. MDL 3528's PFS states [redacted] *See* MDL Doc ID 209033. However, on June 17, 2022 (3 days after the alleged

---

[4] PFS authentication also arose as an issue during the April 2026 bellwether trial, raising additional questions about who is reviewing and authenticating Court-ordered discovery. *E.g.*, Trial Tr. Vol. 1 134:6-17; 142:20-23; 143:6-13; 197:5-200:3.

incident), plaintiff contacted Uber conceding the trip was for a guest rider and claiming, in part, that "the driver accepted the trip abut [sic] **never picked up the passenger** …." Ex. 12 (emphasis added).

- MDL 2609: Peiffer Wolf filed this claim on behalf of a male named [redacted]. The data shows that the alleged incident occurred on a ride for "My Wife [redacted] but plaintiff claims *he* was assaulted.

**Plaintiff Fact Sheets Making Allegations Contradicted by GPS Data Produced to Plaintiffs.** Uber's targeted review identified a significant percentage (34.4% to 35.3%) of PFSs with allegations that are facially inconsistent with the GPS data produced to plaintiffs' counsel:

- Uber analyzed 116 claims in which plaintiffs allege that the trip did not reach the requested destination. GPS data shows that the trip reached the destination for at least 40 of those claims (34.4%). These claims are listed in Exhibit 13. A centralized investigation by a Special Master can evaluate any claimed explanations and determine which claims are fraudulent or materially unreliable without requiring the Court to adjudicate each claim in the first instance. The point is not to prejudge any individual response; it is to prevent objective contradictions from being treated as immaterial while other claimants bear the consequences of unreliable submissions.
- Uber analyzed 17 PFSs that allege the driver traveled to a "dead end." Of those 17, 6 (35.3%) are inconsistent with the GPS data, which shows no travel into or even near a "dead end" consistent with the PFS allegations. These claims are listed in Exhibit 14.

**Plaintiff Fact Sheets Identifying Male Drivers Despite Receipts Identifying Female Drivers.** Of 67 MDL plaintiffs who rode with female drivers, 43 claim to have been assaulted by male drivers. At least 24 of those 43 do not make any "wrong driver" claims. The produced receipts often identify the driver as female. An illustrative example includes MDL 3299, who describes in her PFS (MDL Doc ID 96159) that the Uber driver's name was [redacted] Yet, the plaintiff refers to the driver as "he" throughout the description of the incident (Q 20). UBER-MDL3084-DFS00402248 (produced via the MDL DFS process to plaintiff and plaintiff's counsel on July 7, 2026) provides an image of the *female* driver at issue in connection with plaintiff's claim.

Investigations Workbench

[redacted]

A Special Master is needed to investigate the discrepancies with respect to these claims. Exhibit 15 identifies these plaintiffs by MDL ID.

* * *

Most issues in this Section III.B could have been detected by basic vetting: confirming that allegations matched information in the claimant's or counsel's possession and checking receipts for math errors or obvious signs of manipulation. The failure to do so across multiple firms and referral sources shows a systemic problem requiring centralized investigation.

Plaintiffs' counsel do not dispute that fraud warrants prompt attention. In response to a fraudulent-receipt motion, Plaintiffs' Leadership represented that "fraud has no place in this MDL" and that "[p]articularized allegations of fraud must be taken seriously, investigated, and resolved." ECF No. 3768 at 2. They likewise stated that "[p]laintiffs take allegations of fraud seriously" and agreed that "[s]uch claims should be promptly and fully investigated." *Id.* That is precisely the point of this Motion. A Special Master would provide the dedicated mechanism to investigate the recurring indicia of fraud, inconsistencies, and irregularities, without requiring the Court to resolve each suspicious claim through piecemeal motion practice.

**C. Motion Practice to Date Confirms the Recurring Nature of This Problem.**

Fraud-related motion practice in this MDL to date confirms both the scale of the problem and its resistance to case-by-case adjudication. Uber has filed five fraudulent-receipt motions, all of which the Court granted. ECF Nos. 3876, 3972, 4440, 5454, 5970. Uber also has filed two pending contempt motions to enforce orders regarding the depositions of fraudulent-receipt plaintiffs. ECF Nos. 5520, 6366. The Court has separately granted more than 20 motions addressing PTO-related deficiencies, including three motions converting dismissals into dismissals with prejudice and one motion

addressing duplicate filings. ECF Nos. 5216, 5229, 5954. Hundreds of claims have been dismissed, and 14 additional motions, involving hundreds more, remain pending. ECF Nos. 4580, 5567, 5891, 5914, 5915, 5989, 6192, 6340, 6350, 6420, 6468, 6785, 6856, 6979.

Despite this record, suspect claims continue to enter the MDL through fraudulent receipts and other channels, requiring Uber to identify and investigate them. As the attached FTI declaration explains, that investigation is time-consuming and onerous. Ex. 7, Harrison Decl. at 3. The burden falls disproportionately on Uber. The recurring examples described above—including those with readily detectable math errors—show that plaintiff-driven vetting is insufficient.

Case-by-case motion practice cannot efficiently address this portfolio-wide problem. Nor can Uber prevent fraudulent claims from entering this proceeding or slow the rate of fraudulent claims in unfiled portfolios (brought forward for resolution by firms with filed claims). Uber's only current recourse is to identify suspected fraud, notify plaintiffs' counsel, and seek Court intervention when the issue is not corrected. That cycle consumes significant resources and delays resolution of non-fraudulent claims, but a dedicated Special Master could investigate these recurring issues systematically and efficiently.

**D. The Need for a Comprehensive Investigation.**

Confirmed fraud and pervasive indicia of fraud prejudice Uber and every plaintiff with a non-fraudulent claim, burden the Court, delay bellwether development, and complicate settlement negotiations. A reliable assessment of claim validity is essential to any global resolution. Without a comprehensive investigation, Uber cannot reliably evaluate exposure, and fraudulent claims risk being compensated at the expense of non-fraudulent claims. *See In re Silica*, 398 F. Supp. 2d at 636. Survivors deserve to move forward in a docket cleansed of actual fraud, where suspicious claims have been investigated and resources are not diverted to fraudulent claims. A Special Master will benefit survivors by identifying and addressing fraudulent claims expeditiously.

Besides hurting non-fraudulent plaintiffs, unresolved fraud also harms independent drivers; allegations of this kind can lead Uber to deactivate their accounts pending review. This can significantly harm falsely accused independent drivers who rely on Uber to make a living, particularly where the only way to vet the mass tort filings is a painstaking, claim-by-claim review.

The confirmed fraud and broader indicia of fraud raise serious concerns about this proceeding's integrity. The categories of suspected fraud and irregularities are interrelated; forged documents, false claims, and unexplained inconsistencies may lead to common referral networks or lead-generation schemes. Determining the full scope of misconduct requires a comprehensive investigation that is beyond any single party's capacity and too burdensome for ordinary case management. These are precisely the circumstances in which a Special Master is appropriate.

## IV. LEGAL STANDARD

Rule 53(a)(1)(C) authorizes a court to appoint a special master for pretrial and post-trial matters that "cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). A special master may regulate proceedings, take testimony under oath, and issue necessary orders. Fed. R. Civ. P. 53(c)(1)-(2). The master's findings are subject to *de novo* review by the district court. Fed. R. Civ. P. 53(f)(1), (3)-(4). Rule 53 therefore supplies a direct, supervised mechanism for addressing a complex investigation without displacing the Court's ultimate authority.

Courts in mass tort, MDL, and other complex litigation have appointed special masters to investigate suspected fraud. *See, e.g.*, Ex. 16, *In re Nat'l Football League Players' Concussion Injury Litig.*, MDL No. 2323, ECF No. 10355 at 3 (E.D. Pa. Dec. 10, 2018) ("*NFL* Order") (appointing special investigator to investigate involvement of attorneys and others in submitting potentially fraudulent claims); Ex. 17, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010*, MDL No. 2179, ECF No. 10564 at 2 (E.D. La. July 2, 2013) ("*DWH* Order") (appointing Special Master to conduct an independent investigation into settlement program).[5]

## V. ARGUMENT

The record requires the appointment of a Special Master to investigate and address confirmed fraud, serious indicia of fraud, material misrepresentations, inconsistencies, and other irregularities,

---

[5] *See also* Ex. 18, *Johnson v. SmithKline Beecham Corp.*, No. 11-cv-5782, Order (E.D. Pa. Aug. 11, 2014), ECF No. 316 (authorizing special master to consider sanctions including due to failure to conduct pre-suit investigations); *In re Engle Cases*, No. 3:09-CV-10000-J-WGY-JBT, 2015 WL 12843860, at *1, *3 (M.D. Fla. Dec. 22, 2015) (appointing special master to investigate potential settlement misconduct, including whether "counsel made any material misrepresentations to the Court").

thereby creating a parallel path to resolution, alongside the bellwether trial process. Bellwether trials cannot address inventory-wide fraud; a dedicated investigation is necessary to determine which claims are meritorious and which are not.

### A. Appointing a Special Master to Investigate Fraud Is Appropriate Here.

The circumstances presented here satisfy Rule 53(a)(1)(C)'s standard for the independently sufficient reasons set forth below.

#### 1. Appointment Is Necessary to Enable Resolution of This MDL.

This MDL cannot be meaningfully resolved without a reliable mechanism to identify and address fraud. A Special Master can investigate and identify patterns of fraud and report findings that the parties can rely on, thereby restoring confidence in claim validity. Fraud is not merely a housekeeping matter to be resolved claim-by-claim; it "hamper[s] the resolution of meritorious claims by real plaintiffs" and forces Uber to corroborate each claim individually rather than negotiate toward a global resolution. *In re Deepwater Horizon*, 907 F.3d at 236. Appointing a Special Master will allow the parties to negotiate on a more reliable and complete record.

Appointment is time-sensitive because unresolved MDL cases will eventually be remanded or transferred to their home districts. After remand, a centralized fraud investigation becomes far less efficient. Resolving suspected fraud now will eliminate fraudulent claims before they are scattered across dozens of transferee courts that lack the benefit of the common evidentiary record developed here. Acting now, before settlements are reached, should be an utmost priority.

#### 2. A Dedicated Investigator Is Required.

Confirmed fraud and related indicia of fraud span interrelated categories of misconduct—from document fabrication to potential attorney-coordinated schemes—across what is likely to be a significant proportion of claims involving numerous parties, counsel, and third parties. Determining the full extent of fraud in the docket requires forensic document review, sworn testimony, analysis of referral patterns and financial relationships, and cross-referencing claims data across the litigation. That resource-intensive investigation cannot be "effectively and timely addressed" through ordinary case management. Ex. 17, *DWH* Order at 2; *In re Engle Cases*, 2015 WL 12843860, at *1 ("'duties that might not be suitable for a judge' or 'that a judge might not feel free to undertake,' like conducting

an investigation, are particularly ripe for reference to a special master") (citing Fed. R. Civ. P. 53 2003 Advisory Committee Note); *Trentadue v. U.S. Cent. Intel. Agency*, No. 2:08-CV-0788, 2015 WL 1968263, at *5 (D. Utah Apr. 30, 2015) (similar).

Uber's targeted review has revealed fraudulent claims that have already required motion practice, as well as additional indicia of fraud warranting further investigation. A Special Master could use document review, sworn testimony, claims-data analysis, and inquiry into referral sources and related actors to determine which claims or submissions are fraudulent. That focused inquiry would free the Court to decide the merits of the MDL.

**3. Additional Bellwether Trials Would Not Address the Fraud at Issue.**

Additional bellwether trials would not address this problem. Bellwethers test representative cases so the parties can gather information, value claims, test legal theories, and reach settlement. They are not designed to detect or address docket-wide fraud. A Special Master can investigate fraud in parallel with bellwethers, directly advancing resolution.

**4. The Special Master Should Also Resolve Fraud-Related Motions.**

The volume of fraud-related motion practice reflects a structural problem likely to persist. Because of the lack of meaningful vetting of many claims, *see* supra Section III.A, fraud is often discoverable to Uber only after filing. Uber's only recourse at that point is to seek relief through batched or individual motions. Each cycle, from discovery to motion to ruling, takes months, while new instances of fraud continue to surface. Case-by-case motion practice defers the problem.

The appointment will be most efficient if the Special Master is empowered to rule, subject to this Court's review under Rule 53(f), on fraud-related motions, including motions concerning non-bona-fide evidence and compliance with fraud-related orders. The Special Master will develop the factual record and subject-matter expertise necessary to resolve these disputes efficiently.

**5. Appointment Is Necessary to Determine the Full Scope of Fraud, Identify Culpable Parties, and Protect the Court's Docket.**

The evidence to date reveals confirmed fraud and serious patterns of suspicious submissions, but without a comprehensive investigation by a Special Master vested with subpoena and other powers, it is impossible to determine the full extent of any fraud, trace its sources, or identify all culpable parties. As in *NFL Concussion*, where the court found that the Claims Administrator's audits

alone were insufficient to address the scope of the fraud, Ex. 16, *NFL* Order at 1-2 (special investigator appointed at special master's request), here too the parties' own investigative efforts cannot substitute for a Court-appointed investigator with authority to compel documents and sworn testimony.

Thus, the record of fraud here "warrants an inquiry." *In re Engle Cases*, 2015 WL 12843860, at *1. But appointment of a Special Master "represents the start of an investigation, not the end of it." *Id.* As in *Engle*, the Special Master would investigate and make recommendations to the Court; affected parties and counsel would have an opportunity to respond; and the Court would retain ultimate authority to determine whether dismissal, sanctions, or other relief is warranted. Appointment will allow the fraud investigation to proceed in parallel with the MDL, without requiring the Court to devote substantial judicial resources to overseeing the investigation directly. It will also deter future fraudulent submissions, help maintain the integrity of the proceedings, and "insulate the court and preserve its ability to maintain its objective role in adjudicating this matter between the parties." *Trentadue*, 2015 WL 1968263, at *5.

### B. The Proposed Special Master's Authority and Scope of Work.

Uber respectfully requests that the Court appoint the Special Master in accordance with the provisions of the Proposed Order filed concurrently with this Motion. The Proposed Order describes the scope of the investigation, the Special Master's powers, and the appointment's other terms.

## VI. CONCLUSION

For these reasons, the Court should appoint a Special Master to investigate serious indicia of fraud by plaintiffs and/or their counsel; determine which claims or submissions are actually fraudulent; and rule, in the first instance, on fraud-related motions arising from that investigation. Doing so will provide an independent path toward resolution by ensuring that the inventory excludes fraudulent claims. The appointment is also a necessary act of survivor protection. Claimants deserve a proceeding free from fraudulent claims that cast doubt on their experiences. Eliminating fraudulent claims protects the credibility of non-fraudulent claimants, preserves resources for non-fraudulent claimants, and restores public trust in the justice system. The Special Master will help ensure that only meritorious claims proceed to resolution and that this MDL moves forward on a record the Court and the parties can trust.

DATED: August 20, 2026

Respectfully submitted,

*/s/ Laura Vartain Horn*

Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, 27th Floor
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4723
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC