# EXHIBIT 5



ATRA

# Sanctionable

## The unsupported, exaggerated, and suspicious claims plaguing our nation's courts

October 2025

Copyright© by the American Tort Reform Association

# TABLE OF CONTENTS

**Introduction and Executive Summary** .......... 1
**Staged Accidents and Exaggerated Injuries** .......... 2
Criminal Prosecutions .......... 2
Fighting Back Through RICO Actions .......... 4
**Mass Torts or Mass Deception?** .......... 10
The Rise of Mass Tort Litigation .......... 10
The Problem of Unsupported Claims .......... 11
RICO and False Claims Actions .......... 13
"Outright Fabrication of Evidence" Alleged in MDL .......... 14
When Junk Science Sparks a Mass Tort .......... 15
**Solutions** .......... 19
Government Enforcement .......... 19
Accountability and Disciplinary Action .......... 19
MDL Reform .......... 19
Strengthen Rules Against Frivolous Claims .......... 20
Collaboration Amount Businesses, Insurers, and Authorities .......... 22
Fight Fire with Fire .......... 22
**Endnotes** .......... 23

# INTRODUCTION AND EXECUTIVE SUMMARY

There is growing concern that many lawsuits filed in our nation's courts are unsupported, involve manufactured or exaggerated injuries, or stem from outright fraud. These concerns arise primarily in two contexts: personal injury claims alleging injuries from automobile accidents or falls and mass tort litigation. Both are examined in this report. Unwarranted lawsuits reduce the public's faith in the civil justice system while also causing concrete harm to litigants, businesses, and everyday people. As a result, drivers, homeowners, and businesses face higher insurance costs. And individuals who may have legitimate cases may see their compensation delayed or depleted when settlement money is siphoned by unsupported mass tort claims.

Personal injury claims alleging injuries from automobile accidents or falls often seek recovery for difficult-to-verify soft-tissue injuries. Some allegedly involve staged accidents. In both instances, claimants (sometimes at the direction of attorneys or with the participation of healthcare providers) reportedly ran up medical bills through unnecessary testing, physical therapy, and even surgeries, then demanded that businesses and insurers pay inflated amounts.

> The information presented in this report is drawn from public sources, including court documents, press releases from law enforcement agencies, and media reports. The use of terms such as "fraudulent" or "misconduct" reflect allegations made or restate the findings of those sources and should not be viewed as a determination of guilt, liability (civil or criminal), or other misconduct.

Evidence also suggests that mass tort litigation, in which many people claim injuries from the same product or practice, is beset with thousands of unsupported claims. That occurs because plaintiffs' attorneys have an incentive to stockpile as many claims as quickly as possible. Doing so maximizes pressure on a defendant to settle the cases *en masse*—regardless of whether individual cases have merit—rather than litigate a never-ending number of trials, which is a costly and risky proposition. "Lead generating" companies and the plaintiffs' bar spend hundreds of millions of dollars on television ads and social media to recruit plaintiffs. There is little screening, however, to verify that the person responding to an invitation to "call right now" for "substantial compensation" has a valid claim. Overwhelmed defendants and courts are incapable of examining the individual merits of each case.

This report highlights recent examples of such cases. Extreme cases, such as those involving staged accidents, have resulted in criminal prosecutions. An increasing number of companies are taking matters into their own hands, bringing civil racketeering actions against those who have allegedly colluded to bring fraudulent claims. In other instances, defendants are using the tools available to them in litigation to expose suspicious claims and seek sanctions or other judicial action.

More needs to be done. Legislatures and courts should strengthen rules that are intended to stop unsupported and frivolous claims, but are ineffective. Stronger safeguards are needed in mass tort litigation to ensure that when thousands of claims are filed, they have evidentiary support. And federal and local law enforcement should be more aggressive about investigating and prosecuting those who participate in making fraudulent claims.

# STAGED ACCIDENTS AND EXAGGERATED INJURIES

Claims alleging soft-tissue injuries or musculoskeletal conditions (e.g., sprains, strains, back pain, muscle spasms, or bruises) "are particularly beset" by fraud.[1] Fraudulent claims may occur in fender benders, trip or slip and falls, or workplace accidents. These cases present challenges in verifying the injury and determining whether it was caused by the defendant's conduct.[2] Such hard-to-discern injuries may be pre-existing, substantially exaggerated, or wholly fabricated.[3] As discussed below, some individuals have gone so far as to stage accidents, while certain healthcare providers have administered unnecessary treatment and submitted inflated medical bills to run up insurance claims, settlement demands, and damage awards.

## CRIMINAL PROSECUTIONS

### Louisiana: Operation Sideswipe

Beginning in 2016, insurance companies flagged a steep rise in commercial vehicle accidents, primarily on a particular stretch of highway in New Orleans. The individuals in the car always claimed that a tractor-trailer sideswiped their car and they received treatment from the same doctors and surgeons.[4] That suspicious trend sparked a federal investigation, dubbed "Operation Sideswipe."[5]

According to prosecutors, drivers ("slammers") would intentionally collide with a tractor trailer or other commercial vehicle. Slammers would flee the scene with "spotters," who drove getaway cars. A passenger would then falsely claim to have been driving at the time and the passengers would feign injury. Spotters sometimes would pretend to be eyewitnesses, claiming the commercial vehicle was at fault. The participants would demand compensation for the bogus accident, filing fraudulent lawsuits and insurance claims.[6]

At least 49 defendants have been convicted for staging collisions in this widespread scheme, according to the U.S. Attorney's Office for the Eastern District of Louisiana.[7] These guilty pleas not only included slammers and passengers who filed false claims, but also an individual who admitted to aiding and abetting in the murder of a cooperating federal witness, a fellow slammer who was covertly cooperating with the FBI when he was shot outside his New Orleans home in September 2020.[8]

At least 49 defendants have been convicted for staging collisions in Operation Sideswipe, according to the U.S. Attorney's Office for the Eastern District of Louisiana.

In late 2024, prosecutors charged attorneys and two law firms with conspiracy to commit mail and wire fraud, mail fraud, obstruction of justice, and witness tampering.[9] In April 2025, prosecutors announced a superseding indictment, adding new allegations against two defendants for their participation in the murder of the federal witness.[10] A lawyer for one the indicted attorneys, who was "barely a year out of law school" and pleaded not guilty, claims that "if these accidents were in fact staged, my client was also a victim and taken advantage by others."[11] Her fiancé, a disbarred attorney, is accused of conspiring to kill the witness.[12] Her trial is scheduled for March 2026.

"Accident fraud's prevalence in Louisiana is estimated to add at least $600 annually in car

insurance costs for every driver in the state," *The Guardian* reported.[13]

## Florida: Personal Injury Protection Schemes

Staged accidents are also a longstanding problem in Florida, especially in the Miami area, where prosecutors say individuals have exploited the state's Personal Injury Protection (PIP) benefit system.

For example, in 2018, three individuals, including an attorney, pled guilty to their roles in a $23 million auto insurance fraud scheme that involved paying illegal kickbacks to tow truck drivers and other "runners" to refer accident victims to them.[14] Those victims were referred to corrupt chiropractic clinics that documented exaggerated pain levels, provided unnecessary and excessive treatment, and quickly billed insurance providers for the $10,000 maximum permitted under Florida law, investigators said.

More recently, authorities announced a string of arrests of individuals who allegedly staged a crash, then went to physical therapy clinics to rack up bills to treat injuries they never sustained in the accident.[15] In one instance, prosecutors alleged that the scheme involved not only those who participated in staging the accidents, but also several Miami physical therapy clinics and therapists. According to Florida's Department of Financial Services, an undercover operation revealed that the clinics would allegedly pay runners and organizers to find and recruit people to pose as vehicle accident victims. After the fake accident, "victims" were allegedly taken to the physical therapy clinics and paid between $1,000 and $2,000 to register as patients. At the clinics, these individuals were purportedly instructed by the therapist to complain of fabricated injuries resulting from the vehicle accident, for which the clinics billed insurers.[16] Similar PIP schemes have also occurred elsewhere in the Sunshine State.[17]

As Florida Chief Financial Officer Jimmy Patronis recognized, this type of fraud "not only undermines the integrity of our insurance markets but also imposes an undue financial burden on every Florida resident in the form of inflated insurance premiums."[18]

## Other Prosecutions

Fraudulent or exaggerated claims for soft-tissue injuries occur not only in auto accident claims, but also in healthcare reimbursements sought from employer health plans or workers' compensation systems. For example, in 2024, a court sentenced a New Jersey doctor to 26 months in prison after he pled guilty to charges related to his participation in a scheme to defraud Amtrak.[19] According to federal prosecutors, over a five-year period, the doctor and his co-conspirators would recruit and pay Amtrak employees to use their patient and insurance information to submit false claims for medical care that was never provided or was unnecessary.[20]

Two years earlier, in California, a court sentenced the CEO of several medical imaging companies to five years in prison, and ordered him to pay $29.9 million in restitution to insurers, after a jury convicted him of mail and healthcare fraud.[21] According to federal prosecutors, the medical imaging companies paid physicians bribes and kickbacks in exchange for the referral of workers' compensation patients, then charged the state's workers' compensation system for hundreds of millions of dollars of medically unnecessary

> *"PIP fraud not only undermines the integrity of our insurance markets but also imposes an undue financial burden on every Florida resident in the form of inflated insurance premiums."*
>
> *- Florida Chief Financial Officer (CFO) Jimmy Patronis*

MRIs.[22] The scheme reportedly grew to include $250 million in claims.[23] Three others involved in the scheme, including a chiropractor, had already pled guilty.[24]

## FIGHTING BACK THROUGH RICO ACTIONS

In recent years, businesses have used civil actions under the Racketeer Influenced and Corrupt Organizations Act (RICO), a law developed to go after organized crime, to respond to suspicions of fraudulent lawsuits. The first successful use of RICO to attack lawsuit abuse likely occurred in West Virginia in 2013, when a jury returned a $429,000 damage award, which the court tripled to $1.3 million under the Act, against two attorneys and a doctor, finding they conspired to fabricate asbestos claims.[25]

*"RICO has become an increasingly common tool for responding to sham lawsuits in auto accident cases, slip or trip and fall claims, and beyond."*

Since that time, RICO has become an increasingly common tool for responding to sham lawsuits in auto accident cases, slip or trip and fall claims, and beyond.[26] This summer, businesses and insurance companies filed RICO actions in California, Florida, and New York alleging that attorneys, healthcare providers, and others participated in schemes involving staged accidents. And, as discussed later in this report, businesses also recently filed RICO actions alleging fraud in mass tort litigation in Illinois and Kentucky.

### Fake Construction Accidents

There is ongoing concern about exaggerated and potentially fraudulent claims brought under New York's unique "Scaffold Law."[27] This 1885 law, predating workers' compensation, imposes "absolute liability" on property owners and contractors when a worker experiences a height-related injury, such as a fall on a construction site.[28] The Scaffold Law applies not only to falls from "scaffolds," as its name might suggest, but also ladders, steps, and even instances that most people would not consider an elevation-related construction risk.[29] These claims are lucrative. Plaintiffs may seek past and future lost wages and medical expenses as well as unlimited pain and suffering awards. Since it is nearly impossible to get such claims dismissed, even when the fall resulted from the workers' own carelessness, insurers routinely settle them. An average Scaffold Law claim will reportedly settle for above $1 million, however, if there is a neck or back surgery alleged, the claim value averages between $2 million to $3 million, or more.[30]

In this environment, the risk of fraud is high. A 2024 *ABC 7 Eyewitness News* investigation analyzed hundreds of construction site injury lawsuits and found that dozens of them were filed by people living in the same apartment building or home,[31] a highly suspicious trend. One Bronx apartment building was tied to 31 people who claimed to be injured on constructions sites.[32] A two-story home, across the street, was the listed addressed for 21 more lawsuits.[33] As an expert on fraud observed, "when you are seeing large numbers of individuals living in the same area and living in the same building all having a claim that sends up a very big red flag."[34] About half of the lawsuits analyzed in the investigation were filed by two law firms.[35]

Earlier that year, a *New York Post* expose reported that "Russian gangsters, MS-13 members, and a cadre of corrupt surgeons, lawyers and lenders" are involved in filing "bogus personal-injury lawsuits" in which immigrants and other desperate New Yorkers are pressured into faking falls, including on construction sites, and getting unnecessary surgeries to boost the case's settlement value.[36]

In June 2025, an insurance company, Roosevelt Road Re, and a workers'

> "According to the 158-page complaint, runners groomed and recruited construction workers to stage fake construction accidents or transform minor injuries into 'lucrative full-body claims.'"

compensation carrier, Tradesman Program Managers, filed a civil RICO action that includes allegations detailing one such scheme.[37] The complaint names as defendants a law firm and two attorneys, several doctors and medical facilities, individuals who operated as "runners," and litigation funders.[38] According to the 158-page complaint, runners groomed and recruited construction workers to stage fake construction accidents or transform minor injuries into "lucrative full-body claims."[39] Attorneys allegedly submitted false workers' compensation claims and personal injury lawsuits on behalf of the workers.[40] Meanwhile, the healthcare providers involved allegedly provided unnecessary and excessive healthcare treatment to the construction workers to inflate the settlement value.[41] The funders allegedly provided money to the medical providers, claimants, or others involved.[42] The complaint says that this scheme was carried out from at least 2018 to the present "with a marked escalation since 2020."[43]

This litigation remains in its early stages. According to the docket, certain defendants will file an answer in late September, while the litigation funders involved plan to file a motion to dismiss in late October. The same insurance company and workers' compensation carrier have filed four similar RICO lawsuits against others since 2024.[44]

## Vulnerable Individuals Recruited for Fake Claims

An insurer filed a similar RICO action in New York in May 2025 and amended its complaint this August.[45] In its amended complaint, Union Mutual Fire Insurance Company claims that runners recruited vulnerable people, often undocumented non-English speaking immigrants, homeless people, and drug addicts, to fake injuries and receive healthcare services that were unnecessary, excessive, and unrelated to the alleged accident.[46] The lawsuits initially focused on Scaffold Law claims, but shifted toward non-construction slip and falls and motor vehicle accidents, the complaint says.[47]

To inflate the settlement value of claims, those recruited were allegedly directed to a network of medical providers that were in on the scheme, which provided the same imaging services, months of physical therapy, and "virtually identical surgeries" in every case.[48]

The complaint alleges that the claimants were incentivized to cooperate, as they received cash advances in installments contingent on their submitting to needless surgery.[49] Since those advances were loans subject to high interest rates that would be repaid out of the settlement, however, little money would be left for them, according to the complaint.[50]

The complaint details the claims of eight vulnerable individuals, which the insurer alleges are fraudulent. In every case, the claimants were represented by the same law firm, received rehabilitation from the same provider, had Medicare or Medicaid but were instructed not to use it, and ultimately underwent surgery.[51]

Perhaps most damning is that the amended complaint shows a power of attorney form related to the lawsuit dated May 25, 2021, nearly a month before the purported date of the accident, and meta data for an agreement for a cash advance provided to that claimant indicates that the document was created on June 12, 2021, eleven days before the claimed date of the June 23 accident.[52] From this information, the complaint alleges that "all of the paperwork was in place well prior to his

'fall,'" demonstrating this was a staged accident.[53]

The complaint alleges that the law firm that filed the lawsuits knew or should have known that the claims were not legitimate.[54] When the insurers notified the law firm that they suspected a particular claim was fraudulent, the firm would blame the issue on a questionable referral source and drop the case, according to the complaint.[55] The court apparently allowed the firm to repeatedly drop these cases without consequence.

The defendants' answers to the amended complaint are due in mid to late September 2025, according to the court docket.

## Targeting Rideshare Companies

This summer, Uber filed RICO actions in Florida and California, and an amended complaint in New York, claiming that personal injury lawyers, healthcare providers, and others have conspired to file false or exaggerated automobile accident claims against the rideshare company. And, in September 2025, Uber filed a similar action against a well-known personal injury firm in Philadelphia, as well as a network of medical providers. Rideshare companies are attractive targets for these types of schemes because they often have higher insurance policy limits than ordinary drivers.

In the **Florida** action, filed in June 2025, Uber alleged that drivers, passengers, attorneys, and healthcare providers in the Miami-Dade area conspired to stage accidents, filed "sham litigation," and then demanded compensation from the company and its insurer.[56] According to Uber's complaint, "[t]he scheme involved a pattern of substantially similar staged accidents, manufactured after-the-fact vehicle damage, and unnecessary medical procedures all designed to create false evidence of injury and to fabricate frivolous personal injury claims."[57]

While the particulars of the scheme varied from case to case, the complaint alleges that they generally involved individuals who agreed to serve as drivers and passengers in a "lead car" and others who agreed to serve as the driver of the "colliding car," which would gently strike the lead car from behind.[58] The driver of the colliding car would use the driver version of the Uber App to trigger the company's commercial auto insurance liability policy.[59] The two cars would then pull over, alert the police, and file a report.[60] In most cases, drivers of the colliding cars would falsely tell the police that they caused the collisions because they were distracted by their phones or looking at the Uber App before impact, the complaint says.[61] Then, the complaint alleges, the driver of the lead car would take the vehicle to one of two body shops, which would make the damage to the staged accidents look worse than what had actually resulted.[62]

> "The scheme involved a pattern of substantially similar staged accidents, manufactured after-the-fact vehicle damage, and unnecessary medical procedures all designed to create false evidence of injury and to fabricate frivolous personal injury claims."
>
> -Uber RICO Complaint, June 11, 2025

Following the accidents, "the drivers and passengers of the lead cars began a series of unnecessary cookie-cutter medical treatments for the purpose of fabricating false claims for payment based on supposed injuries to the lead car drivers and passengers," with the healthcare providers allegedly receiving kickbacks.[63] The complaint includes evidence from five accidents, such as before and after photos of vehicles taken to body shops, in support of its allegations.[64]

Uber's California RICO suit, filed in July 2025, does not allege that accidents were staged, but that lawyers directed clients in the Los Angeles area to "pre-selected medical providers" to treat negligible or non-existent injuries from minor collisions between 2019 and 2024.[65] This Los Angeles network allegedly included healthcare providers who allegedly provided unnecessary treatment and "artificially inflated bills."[66] Defendants named in the RICO complaint include two law firms, two attorneys associated with those firms, an orthopedics practice, a surgery center, and a spinal surgeon, who, the complaint alleges, would falsely diagnose patients and recommend costly, unnecessary surgeries.[67] Rather than use the patients' own medical insurance for treatment, the medical providers took liens entitling them to payment of the inflated bills from their patients' lawsuit recoveries, according to the complaint.[68] If the recovery fell short of the amount needed to fully pay the attorneys and medical providers, and leave at least some money for the client/patient, there was allegedly an understanding that the medical providers would discount their bills.[69]

The complaint alleges that those involved took advantage of a state-mandated $1 million rideshare insurance policy limit, which made accident claims highly lucrative and provided an incentive to exaggerate injuries and artificially inflate medical expenses.[70] The complaint includes four examples of cases in which these practices allegedly occurred.[71] The clients may not have known what was occurring and were not named as defendants in the lawsuit. In one instance, evidence in the complaint indicates that a client was confused about why he was scheduled for so many doctor's appointments and the need for treatment. [72] In that case, the complaint alleges that the charges were ten times more than the norm.[73]

According to the complaint, in Los Angeles County, "approximately 45% of the fare of every Uber ride goes to mandated insurance costs, driving up prices for riders and pushing down earnings for drivers." [74]

One of the personal injury law firms involved has "strongly denied the baseless allegations" and called the lawsuit an attempt to "suppress legitimate injury claims brought by rideshare passengers."[75]

The amended complaint filed in the Eastern District of **New York** in July 2025 alleges that "Defendants—personal injury attorneys and doctors who specialize in treating personal injury plaintiffs—are conspiring to exploit passengers in purported or actual minor vehicle collisions and provide them with medically unnecessary and/or causally unconnected 'treatments,' up to and including invasive and painful surgeries such as spinal fusions, for conditions that are fictitious, exaggerated, or that preexisted the purported accident."[76] Uber further alleges that "[l]awyers, directly or indirectly, regularly pay for the treatments with the understanding that such payments will corruptly influence those providers into creating false medical documentation and supplying false testimony" supporting the need for the treatment and linking the purported injuries to the accident.[77] The amended complaint names as defendants three law firms, certain individuals associated with those firms, two medical clinics, and a surgeon and a physician specializing in pain management associated with those clinics.[78]

Patients were most commonly subjected to spinal fusion surgeries, the complaint alleges, a major procedure reserved for severe injuries that can have long term health consequences for patients, including lifelong pain.[79] These surgeries, according the complaint, were medically unnecessary and performed on personal injury claimants "to artificially inflate damages and, therefore, potential settlement amounts."[80] Patients did not pay for these surgeries through their insurance or out of pocket. Rather, the complaint claims that litigation funders advanced money to cover the unnecessary surgery or other treatment with an

agreement that they would be repaid from the settlement.[81] According to the complaint, "This pattern of falsehoods results in the manufacture of false liability and damages evidence designed to induce Uber and other deep-pocketed defendants into settling cases for far more than they would be worth absent the fraud."[82] The complaint includes evidence from five claims against Uber involving minor accidents in which Uber claims this fraud occurred,[83] as well as more than a dozen lawsuits against other defendants in which the lawyers and doctors involved allegedly used "the same illicit playbook."[84]

Uber filed its latest RICO action against a well-known personal injury law firm, medical clinics, and doctors in the **Philadelphia** area.[85] Similarly to other cases, the complaint alleges that lawyers accepted clients with low-value claims and then "funnel[ed] them through a conveyor belt of unnecessary medical treatment."[86] A document included in the complaint shows that the law firm scheduled clients in bulk to see a specific doctor, instructing him to perform specific procedures on certain patients.[87] Clients were then allegedly directed to another doctor, who would issue a report indicating a need for lifelong expensive care, though the patients are not even told of this dire prognosis, according to the complaint.[88] The law firm uses the records generated by the medical providers to "transform low-dollar cases in to multi-mission-plus personal injury lawsuits," the complaint says.[89] According to the complaint, after Uber sought discovery into one provider's underlying treatment, the law firm involved dismissed Uber from each of the nearly 30 cases involving that provider, apparently to avoid further scrutiny.[90]

*"The allegations describe a web of interconnected relationships among the various Defendants, illegal financial arrangements tying many of the Defendants together, medically unnecessary treatment and services provided to patients, and unauthorized ownership or operation of medical facilities by some Defendants."*

-U.S. Court of Appeals
for the Second Circuit (2024)

As this latest RICO action observes, "the fabrication of personal injury claims is a serious and growing problem in Philadelphia and nationwide," which "increases insurance rates and transportation costs" for the public.[91]

The defendants in the New York action have filed a motion to dismiss, which is expected to be fully briefed by December 12, 2025, according to the court docket. Meanwhile, the Southern District of Florida has stayed the Florida RICO claim, finding it would be helpful to consider the outcome of the New York motion.[92] The California and Pennsylvania actions remain in the early stages.

## No-Fault Auto Insurance Claims

The RICO claims discussed above have just begun. However, a federal appellate court has ruled, in an earlier case alleging misuse of New York's no-fault insurance law, that these types of claims are viable.

The Second Circuit's 2024 ruling stemmed from a RICO action State Farm filed in 2021 alleging that healthcare providers submitted fraudulent claims for reimbursement from auto insurers under New York's no-fault program, which covers "necessary" health expenses up to $50,000 per person.[93] The lawsuit alleges "a massive scheme to fraudulently obtain No-Fault benefits by providing medically unnecessary treatment and services pursuant to illegal 'pay-to-play' financial arrangements, seeking reimbursement of such claims from State Farm, and then bringing thousands of baseless arbitrations and state-court proceedings when State Farm denied the claims."[94] The clinics

involved, according to the complaint, would conduct examinations that are "not intended to diagnose and treat patients' conditions, but rather are predetermined to find various injuries requiring extensive treatment."[95] If the insurer denied a claim, those involved would file lawsuits in state court and arbitration actions, the complaint says—at the time, they had filed nearly 500 lawsuits and 2,500 arbitrations.[96]

In its suit, State Farm asked a federal district court to stay (stop) the pending arbitrations and state court proceedings while its RICO suit moved forward. The district court stayed the arbitrations, but declined to stay the litigation in state courts. State Farm appealed. [97]

The Second Circuit concluded that State Farm was entitled to an injunction stopping both the arbitrations and state court proceedings.[98] In so doing, the court noted the substantial detail State Farm provided in support of its RICO claim, spanning years, that "describe a web of interconnected relationships among the various Defendants, illegal financial arrangements tying many of the Defendants together, medically unnecessary treatment and services provided to patients, and unauthorized ownership or operation of medical facilities by some Defendants."[99] The court ruled that RICO is an appropriate tool to respond to a pattern of baseless and fraudulent claims. This is true even when it requires a federal court to intervene in state litigation because "state courts are unlikely to even recognize the alleged massive RICO scheme because those proceedings often concern individual claims."[100]

Building on this precedent, in March 2025, a federal court in Brooklyn awarded GEICO an injunction against a doctor, physical therapist, chiropractor, and acupuncturist who, the insurer alleged, collected millions of dollars for allegedly fraudulent treatments under New York's no-fault motorist insurance program.[101] In that case, GEICO said the defendants had filed 200 lawsuits and 750 arbitrations before the court issued the injunction.[102] As of September 2025, certain parties informed the court that they had reached or were nearing a settlement.[103] For others, discovery is ongoing.

# MASS TORTS OR MASS DECEPTION?

Mass torts are unlike other litigation. Advertisements on television and social media recruit individuals to file lawsuits, often directing them to call centers or dedicated websites. In this environment, illegitimate cases may be hidden among viable claims. In most of these instances, there is no allegation of fraud. Rather, what typically occurs is that some plaintiffs' attorneys do not fulfill their obligation to adequately investigate whether each claim has an adequate factual basis—for instance, that the person used a product at issue and experienced the injury asserted—before filing the claim.

Separately, in some mass tort litigation, there have been allegations, like those discussed in the preceding section, that lawyers, healthcare providers, or others conspired to manufacture claims or inflate damages. There have been allegations that plaintiffs in medical device product liability cases have been subject to unnecessary surgeries to boost the settlement value of their cases.[104] There was even a recent *Los Angeles Times* exposé reporting that recruiters have paid people to sue, told them to make up claims, and coached them on what to say, confident that fraudulent lawsuits would just get paid or, at worst, dropped.[105]

## THE RISE OF MASS TORT LITIGATION

Mass tort litigation has surged in recent years. Cases in federal multidistrict litigation (MDL) once were a relatively small part of the federal docket. They now make up about two thirds of civil cases in federal courts.[106]

Mass tort litigation is "fueled" through "an onslaught of lawyer television solicitations."[107] Not coincidentally, there has been a significant rise in lawsuit advertising, which has doubled since 2017.[108] In 2024 alone, lawyers and companies that specialize in generating mass tort claims spent more than $2.5 billion on 26.9 million ads for legal services or soliciting legal claims across the United States, according to an ATRA analysis.[109]

A substantial portion of this spending is for ads targeting pharmaceuticals, medical devices, and consumer products. In several instances, lawyers and aggregators have invested over $100 million dollars into television advertising and social media to gather claims for a *single* litigation.[110] As one mass tort litigation approached a global settlement, more than 4,600 television ads ran in one month at a cost of about $778,000 in a quest to add to the tens of thousands of people who had already sued.[111]

Unlike ordinary litigation, in mass tort litigation, a plaintiff may never even meet or speak directly with his or her attorney. And the lawyer representing that plaintiff may never question the client or view the evidence demonstrating that the person is qualified to file a claim (i.e., indicating that the plaintiff used the product at issue, experienced the injury that is the subject of the MDL, has a claim is within the statute of limitations, etc.).

> "A federal judge in Georgia has observed that some attorneys in mass tort litigation file cases *en masse* 'with little regard' for whether they have a viable claim and 'no idea' how they will prove their cases."

A federal judge in Georgia has observed that some attorneys in mass tort litigation file cases *en masse* "with little regard" for whether they have a viable claim and "no idea" how they will prove their cases.[112] Rather, their expectation is that "their case will be swept into the MDL where a global settlement will be reached, allowing them to obtain a recovery without the individual merit of their case being scrutinized as closely as it would if it proceeded as a separate individual action," Chief Judge Clay D. Land observed.[113] Likewise, Judge M. Casey Rogers of the Northern District of Florida has expressed concern that "Left unchecked, high volumes of unsupportable claims can wreak havoc on an MDL."[114] "They clog the docket, interfere with a court's ability to establish a fair and informative bellwether process, frustrate efforts to assess the strengths and weaknesses of the MDL as a whole, and hamper settlement discussions."[115]

Cases are stockpiled in federal MDLs or similar state mass tort dockets. These claims can overwhelm defendants and courts, avoiding a careful look at whether the individual claims have merit. In some instances, plaintiffs' attorneys have "warehoused" thousands of cases without actually filing them to gain a strategic advantage or to avoid scrutiny of whether these claims have any validity for as long as possible.[116] In one recent instance, a federal judge, recognizing that thousands of unvetted claims remained unfiled, allowed lawyers, in each complaint, to bundle the claims of up to 150 individual plaintiffs alleging that PFAS in groundwater caused any of six medical conditions.[117]

Due to the sheer volume of cases, the challenge of examining individual cases, and the costly and risky prospect of never-ending trials, defendants are pressured to enter a global settlement. Well-intentioned judges facing an overwhelming docket often push the attorneys in this direction, making settlement negotiations paramount from the get-go. Once a court establishes a settlement committee, lawsuit advertising ramps up again, suggesting that anyone who used the product is entitled "substantial compensation," leading to even more claims.[118]

## THE PROBLEM OF UNSUPPORTED CLAIMS

A Federal Advisory Committee on Civil Rules report estimated that 20% to 30% of claims in MDLs are "unsupportable" and that, in some litigation, the figure "may be as high as 40% or 50%."[119] That means there is no documentation confirming that the plaintiff used the product at issue or developed the medical condition or other injury that is the subject of the litigation. Sometimes, it is only during the process of distributing settlement funds that it is revealed that many of the plaintiffs do not have valid claims.

In 2023, the Federal Rules Advisory Committee on Civil Procedure held a hearing to consider public comment on a proposal to establish a new rule governing MDLs, Rule 16.1. According to testimony at that hearing:

- In the MDL involving Ethicon's pelvic mesh devices, 53% of the 46,511 cases filed—24,695 claims—were ultimately dismissed

> "Left unchecked, high volumes of unsupportable claims can wreak havoc on an MDL. They clog the docket, interfere with a court's ability to establish a fair and informative bellwether process, frustrate efforts to assess the strengths and weaknesses of the MDL as a whole, and hamper settlement discussions. . . .
> To be sure, dealing with unsupportable claims . . . drains the time and resources of the parties, counsel, and the courts."
>
> - Judge M. Casey Rodgers

"A Federal Advisory Committee on Civil Rules report estimated that 20% to 30% of claims in MDLs are 'unsupportable' and that, in some litigation, the figure 'may be as high as 40% or 50%.'"

for basic factual shortcomings or inability to establish a cognizable injury.[120]

- When a random sample of claimants in the 3M Combat Arms earplug litigation was ordered to produce evidence to substantiate the claims, the vast majority could not. One out of four plaintiffs (126 out of 500) reportedly produced no evidence and dropped out of the case, and nearly three quarters of them had no record of ever using the product at issue.[121]

- In the Xarelto blood thinner MDL, about 4,000 lawsuits were dismissed for lacking factual support, including about 40% of the cases chosen to be worked up for trial.[122]

- Eight years into an MDL alleging that Taxotere (docetaxel), a chemotherapy drug, causes permanent hair loss, 80% of about 16,000 claimants had never been diagnosed with the alleged injury (permanent chemotherapy-induced alopecia), or sought treatment for the condition.[123] More than half the cases selected for a bellwether trial were removed or disqualified as lacking support.[124]

Additional examples include:

- The Mentor Corp. Transobturator Sling Products MDL, in which 75% of the 850 cases filed against the manufacturer of a medical device used to treat women with stress urinary incontinence were dismissed by stipulation of parties (458 cases), dismissed voluntarily (74 cases), or decided against plaintiffs on summary judgment (100 cases).[125] As a result, "the Court had to waste judicial resources deciding motions in cases . . . that probably should never have been brought in the first place."[126] "Enough is enough," declared an exasperated federal judge.[127]

- The Vioxx MDL, in which about one in three claims failed. Out of 30,499 claims alleging heart attacks from the pain medication that went through the claims process, 9,888 (32.4%) were unable to satisfy basic requirements established by the court to verify that they had a qualifying injury, used a minimum amount of Vioxx, and took the drug at the time of the event.[128] For those claiming strokes from the drug, 5,399 (30.2%) of the 17,863 claimants alleging that the drug caused a stroke failed to provide required documentation.[129] In total, out of 48,362 claims, 15,287 failed because they could not or did not demonstrate the basic facts necessary to recover.[130]

- An MDL alleging that use of hair relaxer products caused plaintiffs to develop uterine cancer, in which the court, thus far, has dismissed about 1,500 claims filed for failing to submit a fact sheet or supplement a deficient or incomplete fact sheet supporting the claim. About 2,000 other cases have been dismissed for other reasons, making the total dismissal rate 25%.[131]

Judicial resources are wasted when plaintiffs' lawyers file thousands of lawsuits, then withdraw many of them due to a lack of factual support. Businesses and their law firms spend millions of dollars attempting to review these cases and prepare for bellwether trials. Settlements are delayed by the need to weed out unsupported claims.

Unfortunately, the outcome of a multi-year effort to adopt a new federal rule responding to the flood of unsupported claims in MDLs has been described, accurately, as "better than nothing, but not by a lot."[132] As discussed in the

Solutions section of this paper, stronger safeguards are needed as well as action by individual judges overseeing mass tort litigation to address lawsuit abuse.

## RICO AND FALSE CLAIMS ACTIONS

While the greatest concern with mass tort litigation may be the high volume of unvetted claims, the number of lawsuits, and the difficulty in investigating individual cases, also presents an opportunity for fraudulent claims. Businesses have made such allegations through RICO and False Claims Act suits in asbestos and black lung litigation.

### Asbestos Litigation

The use of RICO as a tool for businesses to respond to fraudulent litigation may have first proved successful in 2012, when CSX Transportation obtained a $429,240 RICO verdict in a federal court in West Virginia against two attorneys and a doctor, finding they conspired to fabricate asbestos claims.[133] The court subsequently tripled that award to $1.3 million, pursuant to the statute.[134] While the case was on appeal, the attorneys and estate of the radiologist agreed to pay CSX $7.3 million, satisfying the judgment and paying the railroad's attorneys' fees and costs.[135]

More recently, BNSF Railway sued under the False Claims Act after it allegedly found that a single physician, working with a small, federally-funded clinic in Montana, certified hundreds of residents as having contracted asbestos-related diseases.[136] In that instance, a doctor—a pediatrician—allegedly certified more than 3,400 people with asbestos-related disease, according to court documents.[137] At trial, the doctor reportedly claimed to "perceive early signs of asbestosis disease that others missed."[138] In June 2024, a jury found that the clinic had filed 337 false medical claims, totaling over $1 million.[139] The court then entered a $5.8 million judgment against the clinic, including treble damages and penalties.[140] The Ninth Circuit affirmed the judgment in September 2024,[141] and the trial court added an additional $98,280 to the judgment to cover BNSF's attorneys' fees incurred on the appeal.[142]

Not all such lawsuits have been successful. In March 2025, a federal court dismissed a RICO action by PVC pipe maker JM Eagle alleging that "one of the most prolific asbestos litigation law firms in the country" had filed "sham lawsuits" against it.[143] After many other defendants in asbestos litigation declared bankruptcy, the pipe maker alleged that it suddenly became a target and was named as a defendant in more than 6,000 asbestos cases since 2000, typically by people with mesothelioma.[144] The manufacturer contended that the law firm's "playbook" included perjured testimony, suppression of evidence of their client's exposure to asbestos from bankrupt companies, and baseless claims to extract settlements.[145] The court, however, dismissed the RICO and related state-law claims, finding that JM Eagle failed to sufficiently allege an illicit enterprise beyond the law firm and its employees.[146]

### Black Lung Litigation in Kentucky

This summer, a respirator manufacturer filed a 114-page RICO action against three attorneys from separate firms in three different states stemming from asbestos claims they filed in Kentucky state courts.[147] According to the amended complaint, the attorneys filed "cookie-cutter complaints" on behalf of miners blaming the company for black lung disease diagnoses and injuries.[148] Ultimately, they filed more than 850 claims against 3M, over half of which were filed during just eighteen months, and which, the complaint alleges, included "claims Defendants knew were fraudulent."[149] According to the complaint, the attorneys named as defendants filed and litigated these 850 claims in "at least 22 separate complaints containing nearly identical allegations, language, and structure."[150]

3M's complaint alleges that, in many cases, the claimants did not suffer from black lung disease

or had not submitted evidence confirming their diagnoses.[151] Also inconsistent with the influx of claims is historic Department of Labor survey data, which indicates that "[v]ery few coal workers ever wore dust masks while working in the mines," according to 3M.[152] The lawsuits were designed, the complaint alleges, "to exert maximum power on 3M to settle the entire inventory of cases—including claims Defendants knew were fraudulent—at a huge sum."[153] The RICO lawsuit claims that the attorneys targeted 3M, not because faulty dust masks caused their clients' injuries, but because compensation from mine operators and other sources dried up.[154] The attorneys could recover contingency-fees on fraudulent claims that settled, or, if suspicions arose, use those claims as "bargaining chips" to be dismissed in settlement negotiations, the complaint alleges.[155]

One of the law firms involved responded by calling the RICO action a "transparent and desperate attempt to intimidate our firm and silence legitimate legal advocacy on behalf of individuals harmed by 3M's conduct."[156] Meanwhile, 3M has claimed that one of the lawyers involved may have moved and hidden the original case files in a storage unit to avoid discovery and sought a protective order.[157] The court granted that motion, finding "real danger" of evidence destruction.[158] The litigation remains in its early stages.

## "OUTRIGHT FABRICATION OF EVIDENCE" ALLEGED IN MDL

An MDL pending in the Northern District of California includes lawsuits alleging that Uber failed to prevent drivers from sexually assaulting passengers. This summer, Uber filed a motion alleging that nearly 100 plaintiffs submitted phony or altered receipts in support of their claims.[159] Three hundred more had failed to provide any ride receipts whatsoever.[160]

Since the federal judiciary established the MDL in October 2023,[161] the docket has grown to about 2,600 lawsuits. Early in the litigation, the court ordered each plaintiff to meet a minimal requirement: provide "a bona fide ride receipt from an Uber trip connected to the alleged incident."[162] In a July 30, 2025 motion, Uber submitted evidence indicating that certain plaintiffs generated phony and altered receipts.[163] Some receipts included math errors, such as itemized charges that did not add up to the total.[164] Others included glaring errors, such as a ride time of "23 hour 45 minutes" for an 8.1 mile trip,[165] or did not match the format of Uber's receipts.[166] Uber also showed receipts in which the gender of the driver on the original receipt in its records did not reflect the gender on the receipt submitted in the litigation.[167] There were even receipts submitted with a watermark indicating they were generated using websites such as makereceipt.com.[168] The following month, Uber submitted another motion, providing additional examples of altered receipts and noting that there are likely other altered receipts that are difficult to detect.[169] The law firms representing the plaintiffs are not alleged to have engaged in any misconduct.

Both motions asked the court to require these plaintiffs to show why their claims should not be dismissed with prejudice. One plaintiffs' counsel declared that "fraud has no place in this MDL" and instead asked the court to require the parties to "meet and confer" about the disputed receipts to attempt to resolve the issues before the court rules.[170] Another plaintiffs' counsel requested more time to discuss the issues raised with clients, who they had not been able to get in touch with despite multiple attempts.[171]

On September 9, 2025, the court granted the first of Uber's motions. Judge Charles Breyer ruled that "21 Plaintiffs . . . have submitted non-bona-fide receipts. Some of these receipts show on their face that they were generated using websites designed for creating receipts, such as Makereceipt.com. Other of these receipts contain math errors, formatting inconsistencies, and other errors. Other

receipts submitted by these Plaintiffs were altered from actual receipts."[172] The court ordered these plaintiffs to demonstrate why their claims should not be dismissed with prejudice. Of these 21 plaintiffs, just two had suggested that their receipts may be authentic. The court ordered those two plaintiffs to produce "native versions of their receipts," provide any documents or communications related to their generation of ride receipts, and sit for a deposition regarding the authenticity of their receipts.[173]

With respect to an additional 303 plaintiffs who had not submitted receipts, the court ruled that each plaintiff must either produce a bona fide ride receipt or provide a statement explaining why the plaintiff has not been unable to locate it. These documents, the court ruled, must be verified under penalty of perjury by the plaintiff.[174]

> "Some of these receipts show on their face that they were generated using websites designed for creating receipts, such as Makereceipt.com. Other of these receipts contain math errors, formatting inconsistencies, and other errors. Other receipts submitted by these Plaintiffs were altered from actual receipts."
>
> -Judge Charles Beyer, U.S. District Court for the Northern District of California, Sept. 9, 2025 Order.

On September 22, 2025, the court, ruling on Uber's second motion, found an additional six plaintiffs had submitted "non-bona fide receipts" and ordered them to show why their claims should not be dismissed with prejudice.[175]

Judge Breyer also denied motions, filed by the plaintiffs' attorneys, to withdraw from their representation of individuals who had apparently filed receipts that they apparently either created or altered.[176] The court explained that "the plaintiffs in these cases are alleged to have submitted fraudulent ride receipts; such action could potentially result in a variety of penalties, including but not limited to dismissal of plaintiffs' claims with prejudice and sanctions against plaintiffs' counsel."[177] Given the "seriousness of the potential repercussions" of the motion, the court observed that "it would be prejudicial both to both the plaintiffs as well as the defendant "to allow counsel to withdraw so soon before that dispute can be resolved."[178] This approach helps provide needed oversight and accountability.

## WHEN JUNK SCIENCE SPARKS A MASS TORT

In recent years, some mass tort litigation seems to have been sparked by highly questionable studies that were made for litigation, rather than a result of objective science.

### Zantac Litigation

For over 35 years, brand and generic pharmaceutical manufacturers sold ranitidine (Zantac) to treat heartburn. In September 2019, Valisure, a private company and online pharmacy, filed a citizen petition with the FDA based on its own testing[179]—as well as a later-retracted study[180]—finding that Zantac can degrade to form Nitrosodimethylamine (NDMA), a likely carcinogen. Valisure's petition indicated that its testing detected NDMA levels exceeding three million nanograms (ng) per tablet, far above the 96 ng limit the FDA set for NDMA ingestion in an unrelated class of medications.

Lawsuits began immediately.[181] Although Valisure holds itself out as an independent testing laboratory,[182] emails unearthed in litigation indicate that the lab received funding from and collaborated with plaintiffs' lawyers.[183] Emails also indicated that Gregory Frank, a prominent plaintiffs' class action attorney, coordinated Valisure's testing of ranitidine and its petition to the FDA.[184] Yitzhak Levin, the brother-in-law of Valisure

CEO David Light, reportedly filed lawsuits relying upon Valisure's research on the same day the lab filed its petition with the FDA.[185] As the *Wall Street Journal* found after reviewing the documents, they show "Valisure worked hand-in-glove with the plaintiffs in the Zantac case."[186]

Within months, the federal judiciary established an MDL in the Southern District of Florida.[187] Fueled by an onslaught of lawsuit advertising,[188] the federal docket grew to include tens of thousands of claims plus a court-created registry of tens of thousands more.[189]

The FDA raised concerns about Valisure's methodology and findings after its own tests "did not produce the same results."[190] The FDA found levels of NDMA "you would expect to be exposed to if you ate common foods like grilled or smoked meats."[191] The Director of the FDA's Division of Complex Drug Analysis criticized Valisure for not using proper scientific techniques in its study.[192] And, the Senior Director of Chemical Medicines at U.S. Pharmacopeia (USP), an independent scientific nonprofit organization, noted "the method Valisure used 'may not have been appropriate" for NMDA.[193]

Some batches of Zantac, however, did show NDMA above the 96 ng threshold (though "a tiny fraction of the level reported by Valisure").[194] In April 2020, the FDA asked manufacturers to recall the products due to concern that, if stored at higher than room temperatures, the impurity could increase over time.[195]

While early mass tort litigation targeting the medication "relied heavily upon Valisure's science," after the FDA questioned the validity of the lab's results, plaintiffs' lawyers were forced to seek other support to continue the litigation.[196]

In December 2022, the MDL court found major flaws in the plaintiffs' experts' testimony, excluded their general causation opinions, and granted summary judgment for defendants.[197] It turns out, the federal court observed that, for Valisure to detect NDMA, the lab heated ranitidine to 266 degrees Fahrenheit, a temperature far higher than the human body.[198] In addition, the lab conducted testing with a level of salt in an artificial stomach that was so high that, if consumed, it would cause death.[199] Yet, the initial complaint referred to the heat level as "modest" and the salt levels as "biologically relevant."[200]

> *"[T]here is no scientist outside this litigation who concluded ranitidine causes cancer, and the Plaintiffs' scientists within this litigation systemically utilized unreliable methodologies with a lack of documentation on how experiments were conducted, a lack of substantiation for analytical leaps, a lack of statistically significant data, and a lack of internally consistent, objective, science-based standards for the evenhanded evaluation of data."*
>
> -Judge Robin L. Rosenberg,
> U.S. District Court for the Southern District of Florida, Dec. 6, 2022 Order

The court concluded, "there is no scientist outside this litigation who concluded ranitidine causes cancer, and the Plaintiffs' scientists within this litigation systemically utilized unreliable methodologies with a lack of documentation on how experiments were conducted, a lack of substantiation for analytical leaps, a lack of statistically significant data, and a lack of internally consistent, objective, science-based standards for the evenhanded evaluation of data."[201]

After this massive setback in federal court (which is on appeal to the Eleventh Circuit), plaintiffs' lawyers shifted their Zantac cases to state courts, attempting to avoid judicial scrutiny of their questionable science.[202] In July 2025, the Delaware Supreme Court unanimously rejected an attempt to pursue about 75,000 Zantac lawsuits in its state courts, about 80% of which were originally registered in the federal MDL.[203] This litigation seems to be on its last legs, with plaintiffs prevailing in none of the eight cases that have gone to trial.[204] Yet, the cost of five years of litigating thousands of claims prompted by junk science must be staggering.

## Roundup Litigation

The Zantac cases are not the only instance of dubious science, influenced by the plaintiffs' bar, generating mass tort litigation. Another example is the Roundup litigation, which is fueled by a 2015 International Agency for Research on Cancer's (IARC) monograph characterizing the active ingredient in the pesticide, glyphosate, as "probably carcinogenic."[205] (IARC is part of the United Nations' World Health Organization.) As courts have recognized, this finding is contrary to the conclusions of the U.S. Environmental Protection Agency and other regulatory bodies.[206] The IARC assessment and World Health Organization logo have featured prominently in television commercials seeking plaintiffs for the litigation as well as in the litigation itself.[207]

Generally, IARC has faced criticism for lacking scientific rigor and doing consumers a disservice by finding that numerous products and substances cause cancer, from bacon to hot drinks.[208] IARC monographs identify "hazards" not "risks," meaning that they identify substances that are theoretically *capable* of causing cancer, even if the risk is exceptionally low.[209] Members of its workgroups, which classify substances as carcinogenic, have preestablished views and are sometimes linked to advocacy groups with political agendas.[210]

*"IARC has faced criticism for lacking scientific rigor and doing consumers a disservice by finding that numerous products and substances cause cancer, from bacon to hot drinks."*

Yet, as the *National Law Review* reported, "IARC's findings with respect to carcinogenicity are oftentimes very influential on the course of litigation in the United States."[211]

With respect to the glyphosate monograph, a contributor to the assessment,[212] Dr. Christopher Portier, served as an "invited specialist" for IARC's working group despite receiving consulting fees from the Environmental Defense Fund,[213] which was founded to oppose pesticide use.[214] He also admitted in a deposition that he received "a substantial amount of money" from plaintiffs' lawyers claiming glyphosate exposure causes cancer.[215] Meanwhile, before IARC published its glyphosate assessment, a draft of the paper was significantly altered. "In each case, a negative conclusion about glyphosate leading to tumours was either deleted or replaced with a neutral or positive one," a *Reuters* investigation found.[216] These changes included removing multiple scientists' conclusions that their studies had found no link between glyphosate and cancer.[217]

## Talc Litigation

A final example is a study relied upon in thousands of lawsuits alleging that traces of asbestos in baby powder caused mesothelioma.[218] Dr. Theresa Emory, a pathologist at Peninsula Pathology Associates, co-authored a 2020 article with two other experts, Dr. John Maddox, also at Peninsula, and Dr. Richard Kradin, a pulmonologist and pathologist. In the study, the authors represented that 75 anonymous individuals developed mesothelioma and their only potential exposure to asbestos came from

cosmetic talc.[219] A talc defendant, American International Industries, however, claimed it had "discovered reasons to believe that many of the individuals in the article were, in reality, exposed to non-talc sources of asbestos."[220] It attempted to investigate the validity of the study by seeking the names of the subjects from Peninsula Pathology Associates. The organization refused to disclose the information, claiming "confidentiality," and a magistrate judge quashed the subpoena.[221] In June 2025, the Fourth Circuit dismissed an appeal of that order as moot after the plaintiff voluntarily dismissed the underlying case with prejudice.[222]

Meanwhile, another talc defendant sued the authors, alleging that all of the individuals included in the study are plaintiffs in asbestos litigation and included evidence in the complaint indicating that at least six of them had other known exposures to asbestos.[223] The complaint, filed in federal court in Virginia, alleges that the study's authors knew or ignored that their study included, for example, someone who had asbestos pipes in the basement of his house and another whose parents both worked with asbestos that may have come home on their clothes.[224] Each of the study's authors, the lawsuit claims, devotes significant time to consulting on asbestos litigation, always for plaintiffs' counsel, and have made "small fortunes" from this work.[225] The complaint alleges that the authors of the study knowingly misled the public about the safety of cosmetic talc products to advance their goal of manufacturing "a body of literature" that could be presented to judges and juries to fill a gap in scientific evidence of causation.[226]

In February 2025, the district court found that while the complaint's fraud claim was barred by the statute of limitations and the company lacked standing to bring a false advertising claim, its trade libel claim could proceed.[227] The company then filed a motion to compel disclosure of the identities of the article's subjects.[228] The court granted the motion this summer, finding the company was entitled to the names and ordering the parties to develop a protective order to ensure that any medical information or other personally identifiable information is not publicly disclosed.[229] The litigation is ongoing.[230]

# SOLUTIONS

As the many examples in this paper demonstrate, there are significant concerns that lawsuits filed in our nation's courts increasingly are unsupported or allege injuries that are exaggerated or even fabricated. Such unwarranted litigation not only imposes an extraordinary cost on businesses named as defendants, it also hurts the public because these expenses are reflected in the prices of products, services, and insurance. Under these conditions, even the best case scenario for defendants imposes an unfair choice between shouldering the cost of years of attorneys' fees or settling meritless—even suspicious—claims. More can and should be done.

## GOVERNMENT ENFORCEMENT

U.S. Attorneys should investigate and, where warranted, prosecute those who participate in fraudulent litigation schemes, such as staging accidents or providing medically unnecessary treatment to bilk businesses and insurers. As this paper shows, in some instances, such as "Operation Sideswipe," federal prosecutors have taken such action. An increased focus on preventing frivolous and abusive lawsuits is consistent with the Trump Administration's priorities.[231] State attorneys general and law enforcement agencies, as well as the National Insurance Crime Bureau, likewise have important roles to play in investigating suspicions that individuals have manufactured claims, paid people to file or join lawsuits, or engaged in improper recruitment or funding arrangements.[232]

## ACCOUNTABILITY AND DISCIPLINARY ACTION

Judges should not repeatedly allow those who file suspicious lawsuits, when called out, to voluntarily dismiss cases or withdraw from representing individuals with questionable claims and simply walk away, as has apparently occurred in some courts. Rather, they should follow the example of Judge Breyer in the Northern District of California, who has denied motions to withdraw until allegations of fraud are fully resolved. Judges can also refer attorneys to bar authorities for investigation and potential disciplinary action when they identify fraudulent lawsuits, wholly unsupported claims, or other misconduct.

Similarly, medical professionals who knowingly participate in fraudulent litigation schemes or run "medical mills" that provide unnecessary or excessive testing, treatment, or rehabilitation services to accident victims to inflate bills should be referred to licensing authorities and, when warranted, law enforcement.

## MDL REFORM

As the amount of mass tort litigation has grown as a percentage of civil cases pending in federal courts, there is an urgent need for safeguards to prevent, or at least quickly root out, unsupported lawsuits. Simply stated, the basic procedural requirements that courts apply to other civil actions are not followed in MDLs. As mentioned earlier in this paper, a multi-year effort to put a rule governing MDLs in place ended with a Rule 16.1 that is "better than no rule at all, albeit not by a lot."[233]

The sole provision of the new rule touching upon unsupported lawsuits provides that in an initial MDL case management conference, one of the topics on which the parties must provide their views is on "how and when the parties will exchange information about the factual bases for their claims and defenses."[234] Comments that accompany the rule emphasize that this exchange is expected to occur "early" in the litigation, and may be accomplished through

plaintiffs individually completing fact sheets substantiating their claims.[235]

The new rule, however, lacks mandatory procedures to address unvetted claims in MDLs, leaving the door open to abuse and relying on individual judges to develop and implement needed protections in each mass tort docket.

Judges overseeing MDLs should adopt case management orders that provide clear instructions for the early vetting of cases to ensure claims in an MDL have, at minimum, a factual basis. That is what Rule 11 already requires. As discussed earlier, Rule 11 states, that by filing a pleading, an attorney certifies that "the factual contentions have evidentiary support or, if specially so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."[236] Commentary to the new Rule 16.1 recognizes that the early exchange of information about the factual basis of claims is one way to address concerns that some claims have been "asserted without the inquiry called for by Rule 11(b)."[237]

Accordingly, MDL case management orders should require that within 30 or 60 days of a case being filed in or transferred to an MDL, a plaintiff must produce evidence—such as medical records—identifying the product used and documenting that they have the medical condition alleged to have been caused by that product. If a plaintiff fails to produce this evidence, the MDL court should (1) dismiss the case with prejudice; (2) impose sanctions on the party or plaintiff's attorney for filing a case that lacks evidentiary support; and (3) allow the defendant to recover its costs and attorney's fees incurred in defending that claim. State courts that host significant mass tort dockets, such as those in California and Pennsylvania, should adopt similar safeguards.

> "MDL case management orders should require that within 30 or 60 days of a case being filed in or transferred to an MDL, a plaintiff must produce evidence—such as medical records—identifying the product used and documenting that they have the medical condition alleged to have been caused by that product."

The goal is to require due diligence before a claim is asserted on behalf of a client—just as if the person was pursuing their claim individually. With digital records and patient portals being commonplace, access to this information should not pose a challenge for mass tort lawyers—just like it does not for individual cases.

## STRENGTHEN RULES AGAINST FRIVOLOUS CLAIMS

The federal rule that provides the mechanism for responding to frivolous litigation and unsupported claims, and state counterparts, are ineffective and should be strengthened to address the practices discussed in this paper.

Federal Rule of Civil Procedure 11, known as Rule 11, requires attorneys to conduct a reasonable investigation into both the facts and applicable law before filing a lawsuit. When an attorney signs a complaint, he or she certifies that the factual contentions have evidentiary support (or are likely to have support after a reasonable opportunity for further investigation) and that the claims are warranted by existing law or a nonfrivolous argument for extending, modifying, or reversing existing law.[238] In addition, the rule prohibits attorneys from filing lawsuits "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."[239] Most state courts have a similar or identical rule.

Given the language of this rule, it would seem that businesses repeatedly hit with unsupported or even outright fraudulent claims could ask the court to order the attorneys or

law firm that engaged in the misconduct to reimburse, at minimum, the legal fees and costs incurred as a direct result of the lawsuit. But it does not work that way in practice. Rule 11 is a paper tiger.

As the late U.S. Supreme Court Justice Antonin Scalia recognized, Rule 11 was rendered "toothless" when the judiciary amended it in 1993, allowing parties "to file thoughtless, reckless, and harassing pleadings, secure in the knowledge that they have nothing to lose."[240] The rule requires those who are hit with frivolous claims to jump through several hoops for a small hope of obtaining any compensation. As a result, seeking Rule 11 sanctions means incurring thousands of dollars of added legal expenses with a low likelihood of receiving any relief.

Under the current rule, a party hit with a frivolous lawsuit must not only seek dismissal, but also prepare a separate motion for sanctions.[241] Rather than filing the sanctions motion with the court, Rule 11 requires the movant to give it to the other side first.[242] Then, the plaintiffs' attorney has what is known as a "safe harbor," 21 days to choose whether to amend the complaint to address the problem (restarting the process) or walk away by withdrawing the claim.[243] If the plaintiffs' attorney takes advantage of the safe harbor, the court does not even see the motion and, therefore, the party seeking sanctions gets nothing.

Even if the plaintiffs' attorney presses on, there is little likelihood of recovery. Why? Even if the court finds a violation of the rule, it does not have to impose any sanction. The 1993 amendments changed sanctions from being mandatory to discretionary. When the court does find a sanction necessary, the rule prioritizes nonmonetary sanctions. And, a monetary sanction, when imposed, may simply direct the offending party to pay a fine (usually a relatively small amount, like $5,000) to the court, rather than to reimburse a party's expenses. Courts can and occasionally do impose sanctions requiring an offending party to pay "part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."[244] When this occurs, however, the purpose is not to make the injured party whole, but the amount must be "limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."[245]

On September 15, 2025, Representative Mike Collins reintroduced the Lawsuit Abuse Reduction Act (H.R. 5258). This legislation has twice passed the House of Representatives, but was not taken up by the Senate. It would make Rule 11 an effective mechanism for addressing frivolous lawsuits. The legislation eliminates Rule 11's "safe harbor," provides that once a judge finds that a claim is frivolous under existing legal principles, the court must impose a sanction, and restores the ability of federal judges to use sanctions to compensate an injured party for costs incurred because of a frivolous claim.

## OTHER LEGISLATIVE ACTION

Legislators should also be commended for seeking to directly address some of the types of litigation abuse discussed in this report.

For example, Representatives Mike Collins and Brandon Gill have introduced the Staged Accident Fraud Prevention Act.[246] This bill makes it a federal crime, punishable by up to twenty years in prison, to intentionally cause a collision with a commercial motor vehicle or arrange for another person to cause a collision. If a staged accident results in a serious injury or

On September 15, 2025, Representative Mike Collins reintroduced the Lawsuit Abuse Reduction Act (H.R. 5258), which would make Rule 11 an effective mechanism for addressing frivolous lawsuits.

> "RICO actions, false claims actions, and other civil claims brought by businesses against attorneys, law firms, and healthcare providers are a form of self-help that is a last resort. These actions indicate a complete system failure—one in which the rules of civil procedure, attorney disciplinary system, and even law enforcement have failed."

death, the penalty rises to at least twenty years imprisonment. As Representative Collins observed when announcing the bill's introduction, "Staged accidents take advantage of truckers' high insurance coverage and make them prime targets for criminals looking for a quick payday, saddling truckers with millions of dollars in inflated damages, increasing insurance premiums for all Americans, and driving up the costs for every transported good."[247]

Another federal bill introduced this session by Representative Nick Langworthy, joined by Representatives Claudia Tenney and Elise Stefanik, indirectly addresses the "absolute liability" that makes it easy to seek compensation for fake or exaggerated construction injuries under New York's Scaffold Law. The Infrastructure Expansion Act provides that lawsuits related to construction projects that receive federal financial assistance, federal tax incentives, or are subject to federal permitting requirements cannot be subject to absolute liability for elevation or gravity-related risks and that a comparative negligence standard must apply to claims brought against a property owner or contractor associated with such an injury.[248] As Congressman Langworthy noted, not only does this antiquated law increase construction costs for building roads, bridges, schools, hospitals and affordable housing in his state, it has also "also resulted in significant fraud as staged accident suits have flooded the courts."[249]

## COLLABORATION AMONG BUSINESSES, INSURERS, AND AUTHORITIES

Employers and their insurers are keenly aware of the potential for fraud and must be vigilant in reviewing submitted claims. As is true in other contexts, the best way to prevent wrongdoing is to follow the maxim: If you see something, say something. Fraud can be detected and prevented only if those who see a suspicious pattern are free—indeed, encouraged—to report what they see to those with the ability to investigate.

In response to the types of fraudulent soft-tissue claims discussed above, insurers, employers, and defense counsel recently established an organization, the iFraud Foundation, because "[s]takeholder collaboration is the key to success in the fight against insurance fraud."[250] The organization observes that "critical information and intelligence-sharing among insurers, regulatory agencies, and law enforcement" is limited due to fragmentation, "enabl[ing] bad actors to operate across multiple carriers, jurisdictions, and lines of business with little fear of detection or consequence."[251] The solution: information sharing among stakeholders with a common interest in preventing fraud.[252]

## FIGHTING FIRE WITH FIRE

RICO actions, false claims actions, and other civil claims brought by businesses against attorneys, law firms, and healthcare providers are a form of self-help that is a last resort. These actions indicate a complete system failure—one in which the rules of civil procedure, attorney disciplinary system, and even law enforcement have failed. Unless these deficiencies are corrected and businesses have a meaningful way to address concerns about unsupported, suspicious, or fraudulent claims in the litigation itself, ironically, they may need to file their own lawsuits to recover the substantial costs they incurred from the wrongful conduct of others.

# ENDNOTES

1 *See* Nora Freeman Engstrom, *Retaliatory RICO and the Puzzle of Fraudulent Claiming*, 115 Mich. L. Rev. 639, 660 (2017).

2 *See id.* at 661-62.

3 *Id.* at 652-53.

4 *See* John Simerman, *In Scheme to Crash Cars Into Big Rigs, New Orleans Lawyer Danny Keating Jr. Pleads Guilty*, Times-Picayune, June 17, 2021.

5 *See id.*

6 U.S. Attorney's Office, Eastern District of Louisiana, Press Release, Ten Count Indictment Unsealed Charging Eight Individuals and Two Law Firms with Offenses in Connection with Staged Automobile Collisions in the New Orleans Area, Dec. 9, 2024; *see also* John Simerman, *Killing of Staged-Accident 'Slammer' Puts Spotlight on 'Crazy' Louisiana Fraud Scheme*, Nola.com, Oct. 9, 2020.

7 *See* U.S. Attorney's Office, Eastern District of Louisiana, Press Release, *New Orleans Man Guilty of Staged Automobile Accident Conspiracy*, Oct. 31, 2024.

8 *See* U.S. Attorney's Office, Eastern District of Louisiana, Press Release*, New Orleans Man Guilty of Murder in Connection with Staged Automobile Collisions in the New Orleans Area*, Jan. 16, 2025; *see also* John Simerman*, Staged-Crash 'Slammer' Pleads Guilty in Murder of New Orleans Witness, Implicates, Lawyers*, nola.com, Jan. 16, 2025.

9 *See* U.S. Attorney's Office, Eastern District of Louisiana, Press Release, Ten Count Indictment Unsealed Charging Eight Individuals and Two Law Firms with Offenses in Connection with Staged Automobile Collisions in the New Orleans Area, Dec. 9, 2024; *see also* Michael Perlstein, *Two New Orleans Firms Charged with Staging Accidents for Settlements*, The Guardian, Dec. 9, 2024.

10 U.S. Attorney's Office, Eastern District of Louisiana, Press Release, *Nine Charged in Staged Automobile Collision Scheme, Including Two Men Charged with the Murder of a Federal Witness*, Apr. 28, 2025.

11 Erin Lowrey, *New Orleans Attorney Indicted in Staged Wrecks Scheme Asks to Go to Trial Next Month, Court Documents Show*, WDSU News, Feb. 27, 2025.

12 Erin Lowrey, *New Orleans Attorney Indicted in Staged Wrecks Scheme Will Remain Out of Jail Until Trial*, WDSU News, Aug. 13, 2025; *see also* U.S. Attorney's Office, Eastern District of Louisiana, Press Release, *Nine Charged in Staged Automobile Collision Scheme, Including Two Men Charged with the Murder of a Federal Witness*, Apr. 28, 2025.

13 Michael Perlstein, *Two New Orleans Firms Charged with Staging Accidents for Settlements*, The Guardian, Dec. 9, 2024.

14 *See* Paula McMahon, *Greed Drove $23M Auto Insurance Fraud at Chiropractic Clinics, Feds Say*, Sun Sentinel, Dec. 14, 2018; *see also* Paula McMahon, *Attorney Faces Federal Prison After Admitting Role in $23M Auto Insurance Fraud*, Sun Sentinel, Dec. 15, 2018; Paula McMahon, *Attorney Owes $1.8 Million for Role in Auto Insurance Fraud at Chiropractor Clinics*, Sun Sentinel, Dec. 14, 2018.

15 *See, e.g.*, Chief Financial Officer, State of Florida, Press Release, CFO Jimmy Patronis Announces Four Arrests in Miami Staged Accident Scheme, May 24, 2024; Chief Financial Officer, State of Florida, Press Release, CFO Jimmy Patronis Announces Four Arrests in Miami Staged Accident Scheme, Apr. 15, 2024; Chief Financial Officer, State of Florida, Press Release, CFO Jimmy Patronis Announces Five Arrests in Miami Staged Accident Scheme, Jan. 13, 2023; Chief Financial Officer, State of Florida, Press Release, CFO Jimmy Patronis Announces Five Arrests in $58,000 Miami PIP Fraud Scheme, Aug. 30, 2022.

16 *See* Florida Chief Financial Officer, Press Release, *CFO Jimmy Patronis Announces Seven Arrests in $161,000 Miami PIP Fraud Scheme*, Apr. 15, 2022; *see also Physical Therapists, Others Charged in Miami PIP Fraud Scheme*, Ins. J., Apr. 18, 2022.

17 *See* Florida Chief Financial Officer, Press Release, CFO Patronis Announces Arrest of Tampa Clinic Owner in $970,000 Staged Auto Accident Scheme, July 5, 2022.

18 Chief Financial Officer, State of Florida, Press Release, CFO Jimmy Patronis Announces Four Arrests in Miami Staged Accident Scheme, May 24, 2024.

19 *See* U.S. Attorney's Office, District of New Jersey, Press Release, *New Jersey Doctor Sentenced to 26 Months in Prison for Health Care Fraud Targeting Amtrak*, May 7, 2024.

20 *See id.*

21 *See* Hailey Konnath, *Medical Imaging CEO Gets 5 Years in Prison for $250M Fraud*, Law360, Jan. 28, 2022.

22 *See id.*

23 *See id.*

24 *See id.*

25 *See CSX Transp. Inc. v. Peirce*, No. 5:05-cv-202, 2013 WL 5375950 (N.D. W. Va. Sept. 25, 2013). While the case was on appeal, the attorneys and estate of the radiologist agreed to pay CSX $7.3 million, satisfying the judgment and paying the railroad's attorneys' fees and costs. *See* Emily Field, *CSX Asbestos Attys End 4th Circ. RICO Fight With $7.3M Deal*, Law360, Nov. 6, 2014.

26 RICO claims alleging sham litigation have also occurred outside the areas discussed by this report.

For example, in 2020, a vitamin and supplement manufacture alleged that a nonprofit organization, and organizations that purport to grade and test consumer products, engaged in a scheme in which a manufacturer either would pay for a "certification" or "award" for their products or get sued by the lead defendant "on phony claims" *See* Amended Complaint, *Phamavite LLC v. Clean Label Project Found.*, No. 2:20-cv-8001 (C.D. Cal. filed Oct. 14, 2020) (Doc. #20). According to the docket, the case settled after mediation.

27 N.Y. Labor Law § 240.

28 *See Rocovich v. Consolidated Edison Co.*, 583 N.E.2d 932, 934 (N.Y. 1991); *Zimmer v. Chemung County Performing Arts, Inc.*, 482 N.E.2d 898, 899 (N.Y. 1985).

29 *See, e.g.*, *Amo v. Little Rapids Corp.*, 301 A.D.2d 698, 701, 754 N.Y.S.2d 685, 687 (3d Dep't 2003) (fall from a sixteen-inch tall boulder on a *basement* floor); *Myiow v. City of New York*, 143 A.D.3d 433, 436, 39 N.Y.S.3d 1 (1st Dep't 2016) (fall from a flatbed truck).

30 Willis Towers Watson, The State of the New York Insurance Market: The Impact of Labor Law 240 (July 10, 2023); *see also* Daniel Fisher, *'Pincushion': When Immigrants Sliced, U.S. Lawyers and Doctors Cash In*, Legal Newsline, Sept. 10, 2025 (reporting that insurers say a case involving spine surgery is worth as much as $5 million, compared with $250,000 for a simple broken wrist).

31 *7OYS Investigation Finds Dozens of Injury Lawsuits from People Living in Same Apartment Buildings*, ABC 7, Oct. 7, 2024.

32 *Id.*

33 *Id.*

34 *Id.* (quoting Michelle Rafeld, executive director of the Coalition Against Insurance Fraud).

35 *Id.*

36 Brad Hamilton & Georgia Worrell, *MS-13, Russian Mobsters Use Migrants in Elaborate Injury Scam — Even Getting Spinal Surgery to Pull It Off: Sources*, N.Y. Post, June 16, 2024.

37 *See* Complaint, *Roosevelt* Road *Re, Ltd. v. William Schwitzer & Assocs., P.C.*, No. 1:25-cv-03386 (E.D.N.Y. filed June 16, 2025).

38 *See id.* at 2-12.

39 *See id.* at 12.

40 *See id.*

41 *See id.*

42 *See id.*

43 *See id.*

44 *Racketeering Suit Alleges NY Insurance Fraud Scheme by Lawyers, Medical Providers*, Ins. J., June 19, 2025.

45 *See* First Amended Complaint, *Union Mut. Fire Ins. Co. v. Subin Assoc., LLP*, No. 1:25-cv-02652 (filed Aug. 13, 2025) (Doc. #1496).

46 *Id.* ¶¶ 99, 228, 234.

47 *Id.* ¶ 210.

48 *Id.* ¶¶ 216-217.

49 *Id.* ¶¶ 99-100.

50 *Id.* ¶ 230.

51 *Id.* ¶ 234.

52 *Id.*

53 *Id.* ¶ 166.

54 *Id.* ¶ 228.

55 *Id.* ¶¶ 194-204.

56 *See* Elizabeth Daley, *Uber Says Fla. Firm, Drivers Staged Wrecks for Profit*, Law360, June 11, 2025.

57 *See* Complaint, *Uber Techs., Inc. v. Law Group of S. Fla., LLC*, No. 1:25-cv-22635, ¶ 28 (S.D. Fla. filed June 11, 2025).

58 *Id.* at ¶ 29.

59 *Id.* at ¶ 30.

60 *Id.*

61 *Id.* at ¶ 31.

62 *Id.* at ¶ 32.

63 *Id.* at ¶ 39.

64 *See id.* at 11-54.

65 *See* Complaint, *Uber Techs., Inc. v. Downtown Law Group*, No. 2:25-cv-06612, ¶ 2 (C.D. Cal. filed July 1, 2025).

66 *Id.* ¶ 2, 31, 32.

67 *Id.* ¶¶ 8, 11-18.

68 *Id.* ¶¶ 2, 25.

69 *Id.* ¶¶ 26, 28.

70 *Id.* ¶¶ 6, 23.

71 *Id.* ¶¶ 37-118.

72 *Id.* ¶¶ 42-43.

73 *Id.* ¶ 52.

74 *Id.* ¶ 1.

75 Natalie Lung, *Uber Alleges Inflated Injury Bills in Los Angeles Insurance Fraud Lawsuit*, Ins. J., July 21, 2025 (quoting statement of the Downtown LA Law Group).

76 Amended Complaint, ¶ 1, *Uber Technologies, Inc. v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP*, No. 1:25-cv-00522 (E.D.N.Y. filed July 23, 2025). The action was originally filed in January 2025. *See* Complaint, *Uber Technologies, Inc. v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP*, No. 1:25-cv-00522 (E.D.N.Y. filed Jan. 30, 2025).

77 Amended Complaint, ¶¶ 1, 20.

78 *Id.* ¶¶ 4-15.

79 *Id.* ¶¶ 22-25.

80 *Id.* ¶ 25.

81 *See id.* ¶¶ 148, 157, 196, 285, 294.

82 *Id.* ¶ 20.

83 *See id.* ¶¶ 35-139.

84 *Id.* ¶ 140; *see also id.* ¶¶ 141-276.

85 *See* Riley Brennan, *Uber Accuses Prominent Phila. Firm of Inflating Injuries, Medical Treatments in Alleged Scheme*, The Legal Intelligencer, Sept. 18, 2025; James Boyle, *Uber Says Philly Law Firm, Doctors Fabricated Injuries*, Law360, Sept. 18, 2025.

86 Complaint, ¶ 135, *Uber Technologies, Inc. v. Simon & Simon P.C.*, No. 2:25-cv-05365 (E.D. Pa. filed Sept. 18, 2025).

87 *Id.* ¶ 4.

88 *Id.* ¶¶ 7, 9.

89 *Id.* ¶¶ 135, 145.

90 *Id.* ¶ 11.

91 *Id.* ¶ 1.

92 Order Administratively Closing Case, *Uber Techs., Inc. v. Law Group of S. Fla., LLC*, No. 1:25-cv-22635 (S.D. Fla. June 11, 2025).

93 *See State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 73 (2d Cir. 2024).

94 *Id. at* 69.

95 *Id.*

96 *Id.* at 74.

97 *Id.* at 76.

98 *Id.* at 99.

99 *Id.* at 84.

100 *Id.* at 98.

101 Memorandum & Order, *Government Employees Ins. Co. v. Innovation Anesthesia & Pain Servs.*, at 5-7, 40, No. 1:24-cv-02220 (E.D.N.Y. Mar. 25, 2025) (Doc. #35).

102 *Id.* at 36.

103 *See* Order on Motion for Extension of Time to Complete Discovery, *Government Employees Ins. Co. v. Innovation Anesthesia & Pain Servs.*, No. 1:24-cv-02220 (E.D.N.Y. Sept. 5, 2025).

104 *See* Matthew Goldstein & Jessica Silver-Greenberg, *How Profiteers Lure Women Into Often-Unneeded Surgery*, N.Y. Times, Apr. 14, 2018; *see also* Alison Frankel & Jessica Dye, *The Lien Machine: New Breed of Investor Profits by Financing Surgeries for Desperate Women Patients*, Reuters, Aug. 15, 2015 (reporting that medical device manufacturers had launched investigations into a suspected "scheme to recruit doctors willing to overstate women's injuries from implants, thereby driving up awards").

105 *See* Rebecca Ellis, *In the Biggest Sex Abuse Settlement in U.S. History, Some Claim They Were Paid to Sue*, L.A. Times, Oct. 2, 2025.

106 *See* Amanda Bronstad, *MDLs Make Up More Than Half of U.S. Cases, Whether It's 65% or 71%*, Law.com, June 25, 2024 (reporting that the percentage of civil actions in federal courts in multidistrict litigation, which are primarily mass tort claims, rose from 38% in 2014 to 65% in 2023); *see also* Rules4MDLs, Press Release, *First MDL-Specific Rule Set for December Implementation*, Apr. 25, 2025 (reporting that the percentage of the federal civil caseload in MDLs increased from 29% in FY 2012 to 67.8% in FY 2024).

107 *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 2016 WL 4705827, at *2 n.2 (M.D. Ga. Sept. 7, 2016).

108 Am. Tort Reform Ass'n, Legal Services Advertising in the United States 2020-2024, at 5-6 (Mar. 2025).

109 *Id.* at 4.

110 *See* Roy Strom, *Camp Lejeune Ads Surge Amid 'Wild West' of Legal Finance, Tech*, Bloomberg L., Jan. 30, 2023.

111 Diana Novak Jones, *Lawyers Increase Talc Ad Spending After J&J's $9 Billion Settlement Offer*, Reuters, Nov. 5, 2024.

112 *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 2016 WL 4705827, at *1, *2 n.2 (M.D. Ga. Sept. 7, 2016).

113 *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 2016 WL 4705827, at *1, *2 n.2 (M.D. Ga. Sept. 7, 2016).

114 Judge M. Casey Rodgers, *Vetting the Wether: One Shepherd's View*, 89 UMKC L. Rev. 873, 873 (2021).

115 *Id.*

116 *See* Amanda Bronstad, *Two MDL Judges in High-Profile Cases, Alarmed by Unfiled Claims, Order Plaintiffs' Firms to File Lawsuits*, Law.com, Aug. 21, 2025.

117 Case Management Order No. 35, *In re: Aqueous Film-Forming Foams Prods. Liab. Litig.*, MDL No. 2:18-mn-2873 (D. S.C. Aug. 15, 2025) (Doc. #7823).

118 *See* Cary Silverman, Gaming the System: How Lawsuit Advertising Drives the Litigation Lifecycle (U.S. Chamber Ins. For Legal Reform, Apr. 2020) (examining key dates in several mass torts and finding that lawsuit advertising rises following a triggering event sparking the lawsuits, a favorable ruling in court, a blockbuster verdict, or an approaching global settlement).

119 Advisory Committee on Civil Rules, MDL Subcommittee Report–Agenda Book, Nov. 1, 2018, at 142.

120 Transcript of Proceedings, at 238, *In the Matter of: Proposed Amendments to the Federal Rules of Civil Procedure* (Oct. 16, 2023) (testimony of Deirdre

Kole, Assistant General Counsel of Johnson and Johnson).

121 *Id.*

122 *Id.* at 135-36 (testimony of Chris Guth, Assistant General Counsel of Bayer).

123 Order and Reasons, *In re: Taxotere (Docetaxel) Prods. Liab. Litig.*, MDL No. 2740, at 3 (E.D. La. Feb. 21, 2024) (Doc. #16778).

124 *Id.* at 2; *see also* Transcript of Proceedings, *supra*, at 205-06 (testimony of Harvey Ratliffe, partner, Shook, Hardy & Bacon LLP).

125 *In re Mentor Corp. Transobturator Sling Prods. Liab. Litig.*, No. 4:08-MD-2004 (CDL), 2016 WL 4705827, at *1 n.2 (M.D. Ga. Sept. 7, 2016); *see also* Hon. Clay D. Land, *Multi-District Litigation after 50 Years: A Minority Perspective from the Trenches*, 53 Ga. L. Rev. 1237, 1242 (2019).

126 *In re Mentor Corp. Transobturator Sling Prods.*, 2016 WL 4705827, at *1.

127 *Id.*

128 *See* Rules4MDLs, Case Study: Vioxx MDL and Settlement, https://www.rules4mdls.com/case-study-vioxx-mdl.

129 *Id.*

130 *Id.*

131 *See In re: Hair Relaxer Marketing, Sales Practices, and Prods. Liab. Litig.*, MDL No. 3060 (N.D. Ill.).

132 *New Rule 16.1 – Better Than Nothing, But Not by a Lot*, Drug & Device Law Blog, July 15, 2025.

133 *See CSX Transp. Inc. v. Peirce*, No. 5:05CV202, 2013 WL 5375950, at *1 (N.D. W. Va. Sept. 25, 2013).

134 *Id.*; *see also* Daniel Fisher, *Law Firm Hit With $429,000 Verdict Over Faked Asbestos Suits*, Forbes, Dec. 21, 2012.

135 *See* Peter Vieth, *$7.3M Asbestos Fraud Settlement Ends 4th Circuit Appeal*, Va. Lawyers Weekly, Nov. 6, 2014.

136 *See* Matthew Brown & Amy Beth Hanson, *Health Clinic in Montana Superfund Town Faces Penalties for False Asbestos Claims*, Assoc. Press, June 29, 2023.

137 *See id.*

138 *Id.*

139 *See BNSF Ry. Co. v. Center for Asbestos Related Disease, Inc.*, No. CV 19-40-M-DLC, 2025 WL 2029914, at *1 (D. Mont. July 21, 2025).

140 *Id.*

141 *BNSF Ry. Co. v. Center for Asbestos Related Disease, Inc.*, No. 23-35507, 2024 WL 4273814 (9th Cir. Sept. 24, 2024).

142 2025 WL 2029914, at *5; *see also* Mara Silvers, *Federal Judge Considers Fate of Shuttered Asbestos-Screening Clinic*, Montana Free Press, June 12, 2025 (discussing BNSF's attempt to collect the judgment).

143 Memorandum Opinion and Order, *J-M Manufacturing Co. v. Simmons Hanly Conroy, LLP*, No. 1:24-cv-03853, at 3, 6 (N.D. Ill. Mar. 18, 2025) (Doc. #48).

144 *Id.* at 2.

145 *Id.* at 3.

146 *See id.* at 10-19; *see also* David Thomas, *US Asbestos Law Firm Defeats Racketeering Lawsuit by PVC Pipe Maker JM Eagle*, Reuters, Mar. 21, 2025.

147 *See* Amended Complaint, *3M Co. v. Hammond*, No. 7:25-cv-00037, ¶¶ 2, 7, 11- 19 (E.D. Ky. Aug. 6, 2025). The action was initially filed in June. *See* Complaint, *3M Co. v. Hammond*, No. 7:25-cv-00037 (E.D. Ky. filed June 13, 2025).

148 *Amended Complaint, 3M Co. v. Hammond, at* ¶ 3.

149 *Id.* ¶ 4.

150 *Id.* ¶ 34.

151 *Id.* ¶¶ 93-94.

152 *Id.* ¶ 29.

153 *Id.* ¶ 4.

154 *Id.* ¶¶ 27-28.

155 *Id.* ¶ 47.

156 Ralph Davis, *Pikeville Attorney One of Three Lawyers Accused of Filing Frivolous Black Lung Lawsuits, Mountain Top Media*, June 16, 2025 (quoting statement of the Glenn Martin Hammond Law Office).

157 3M Company's Emergency Motion, *3M Co. v. Hammon*, No. 7:25-cv-00037 (E.D. Ky. filed July 21, 2025) (Doc. #18); *see also* Ralph Davis, *3M Files Motion to Protect Evidence in Lawsuit Against Hammond, Two Other Attorneys*, Mountain Top Media, July 22, 2025.

158 Order, *3M Co. v. Hammon*, No. 7:25-cv-00037 (E.D. Ky. July 25, 2025) (Doc. #32).

159 *See* Motion for Entry of (1) An Order to Show Cause Why Plaintiffs Who Have Submitted Non-Bona Fide Receipts Should Not Be Dismissed With Prejudice and (2) A Case Management Order Addressing Certain Plaintiffs Who Have Not Submitted Receipts, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-0384 (N.D. Cal. filed July 30, 2025) (Doc. #3604) ("July 2025 Receipts Motion"); *see also* Motion for Entry of an Order to Show Cause Why 6 Plaintiffs Who Have Submitted Non-Bona Fide Receipts Should Not be Dismissed With Prejudice, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-0384 (N.D. Cal. filed Aug. 28, 2025) (Doc. #3784) ("August 2025 Receipts Motion").

160 July 2025 Receipts Motion at 1.

161 Transfer Order, *In re: Uber Technologies, Inc. Passenger Sexual Assault Litig.*, MDL No. 3084 (J.P.M.L. Oct. 4, 2023).

162 Pretrial Order No. 5: Discovery Schedule and Initial Motions, at 2 (N.D. Cal. Dec. 28, 2023) (Doc. 175); *see also* Pretrial Order No. 10: Fact Sheet Implementation Order, at 3 (N.D. Cal. Mar. 19, 2024) (Doc. #348).

163 July 2025 Receipts Motion at 1.

164 *Id.* at 5-6.

165 *Id.* at 4.

166 *Id.* at 7-8.

167 *Id.* at 9-10.

168 *Id.* at 2-4; *see also* Jonathan Stempel, *Uber Says Some Sexual Assault Accusers Submitted Fake Receipts*, Reuters, July 31, 2025.

169 August 2025 Receipts Motion at 1.

170 *See, e.g.*, Plaintiffs' Response to Defendants' Motion for Entry of (1) An Order to Show Cause Why Plaintiffs Who Have Submitted Non-Bona Fide Receipts Should Not Be Dismissed With Prejudice and (2) A Case Management Order Addressing Certain Plaintiffs Who Have Not Submitted Receipts, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-0384 (N.D. Cal. filed Aug. 27, 2025) (Doc. #3768).

171 *See, e.g.*, Chaffin Luhana LLP's Opposition to Uber's Motion for Entry to Show Cause, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. filed Aug. 27, 2025) (Doc. #3769).

172 Revised Order to Show Cause Why Plaintiffs in Exhibit A Who Have Submitted Non-Bona-Fide Receipts Should Not Be Dismissed with Prejudice, at 1, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. filed Sept. 9, 2025) (Doc. #3876).

173 *Id.* at 2.

174 Order No. 31: Modifying Pretrial Order No. 5 Regarding Additional Discovery Related to Receipts, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. filed Sept. 9, 2025) (Doc. #3877).

175 Order to Show Cause Why Plaintiffs in Exhibit A1 Who Have Submitted Non-Bona Fide Ride Receipts Should Not Be Dismissed with Prejudice, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. filed Sept. 22, 2025) (Doc. #3972).

176 Order Denying Motions to Withdraw as Attorney, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. filed Sept. 22, 2025) (Doc. #3974); Order Denying Motions to Withdraw as Counsel, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. filed Aug. 26, 2025) (Doc. #3759).

177 Order Denying Motions to Withdraw as Counsel, *Uber Technologies, Inc. Passenger Sexual Assault Litig.*, No. 3:23-md-03084 (N.D. Cal. filed Aug. 26, 2025) (Doc. #3759).

178 *Id.*

179 Valisure Citizen Petition on Ranitidine, Sept. 9, 2019 (citing Teng Zeng & William A. Mitch, *Oral Intake of Ranitidine Increases Urinary Excretion of N-nitrosodimethylamine*, Carcinogenesis, Vol. 37, at 625-634).

180 Adam Marcus, *Widely Covered Paper on Ranitidine-Cancer Link Retracted*, Retraction Watch, June 15, 2021.

181 Editorial, *The Zantac Scare and Junk Science*, Wall St. J., Dec. 8, 2022.

182 Valisure, *About Us* (last visited Sept. 5, 2025).

183 *See* Brand Defendants' Opposition to Valisure LLC's Motion to Quash and for Protective Order and Cross-Motion to Compel Subpoena Compliance, and Incorporated Memorandum of Law, at 6, *In re: Zantac (Ranitidine) Prods. Liab. Litig.*, No. 9:20-md-02924 (S.D. Fla. filed Feb. 18, 2022) (Doc. #5272) (citing Exh. 11).

184 *Id.* at 8 (citing emails attached as Exhibits 11, 16, and 17).

185 Editorial, *A Legal Shakedown Exposed*, Wall St. J., Feb. 16, 2023.

186 *Id.*

187 Transfer Order, *In re: Zantac (Ranitidine) Prods. Liab. Litig.*, MDL No. 2924 (J.P.M.L. Feb. 6, 2020).

188 *Zantac Remains Dominant Mass Tort Ad Target*, X-Ante, June 9, 2021.

189 Bonnie Eslinger, *Zantac Plaintiffs Must File Separate Complaints, Judge Says*, Law360, Feb. 7, 2023.

190 *Id.* at *2.

191 FDA, Laboratory Test | Ranitidine, Nov. 1, 2019.

192 Joanne S. Eglovitch, *Nitrosamine Detection Tests Should Be 'Fit For Purpose,' Says FDA*, Regulatory Affairs Professionals Society, Nov. 1, 2021.

193 Joanne S. Eglovitch, *USP Proposes Analytical Methods for Drug Makers to Detect Nitrosamine Impurities*, Pink Sheet, Sept. 8, 2020.

194 *Id.*

195 FDA, News Release, *FDA Requests Removal of All Ranitidine Products (Zantac) from the Market*, Apr. 1, 2020.

196 *In re Zantac Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1093 (S.D. Fla. 2022).

197 *See id. at* 1075.

198 *Id.* at 1092.

199 *Id.*

200 *Id.* at 1093.

201 *Id.* at 1094.

202 *See* Amanda Bronstad, *After Federal Judge's Dismissal, Zantac Legal Fight Reignites in State Courts*, Law.com, June 14, 2024.

203 *In re Zantac (Ranitidine) Litig.*, No. 255, 2024, 2025 WL 1903760, at *4 (Del. July 10, 2025).

204 Amanda Bronstad, *With Damaging Delaware Decision and No Plaintiff Verdicts, What's the Future for Zantac Lawsuits?*, Law.com, July 18, 2025.

205 International Agency for Research on Cancer, IARC Monographs Volume 112: Evaluation of Five Organophosphate Insecticides and Herbicides, Mar. 2015.

206 *National Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1270 (9th Cir. 2023) ("[W]hile IARC deems glyphosate 'probably carcinogenic to humans,' as the district court observed, 'apparently all other regulatory and governmental bodies have found the opposite.'").

207 *See, e.g.*, Roundup Legal Helpline TV Spot, 'Roundup Exposure', iSpot.tv, Mar. 29, 2019; Fears Nachawati TV Spot, 'Roundup Lawsuit', iSpot.tv, Mar. 27, 2019; Roundup Advocates TV Spot, 'Alert', iSpot.tv, Dec. 18, 2018; Weitz and Luxenberg TV Spot, 'Monsanto Roundup Legal Helpline', iSpot.tv, June 14, 2017.

208 *See* Kate Kelland, *How The World Health Organization's Cancer Agency Confuses Consumers*, *Reuters*, Apr. 18, 2016.

209 *See* IARC Monographs on the Identification of Carcinogenic Hazards to Humans: Preamble at 2 (Amended Jan. 2019).

210 *See id.; see also* Kate Kelland, *Can Coffee Cause Cancer? Only If It's Very Hot, Says WHO Agency*, Reuters, June 15, 2016.

211 John Gardella, *IARC PFAS Findings Will Influence Litigation and EPA Challenges*, Nat'l L. Rev., Dec. 4, 2023.

212 Simon Marks, *The Man Who Haunts Europe's Food Safety Watchdog*, Politico, July 9, 2018.

213 Transcript, Deposition of Chrisopher Jude Portier, at 25-33, 39, *In re: Roundup Prods. Liab. Litig.*, 16-md-02741 (N.D. Cal. Sept. 5, 2017) (Doc. #546-2).

214 *See* Environmental Defense Fund, *Our Story: How EDF Got Started*, https://www.edf.org/about/our-history (last visited Sept. 5, 2025).

215 Transcript, *supra*, at 90-96; *see also* Tiger Joyce, Op-ed, *When Plaintiffs' Attorneys Mislead the Public*, Bloomberg Law, Sept. 28, 2022.

216 Kate Kelland, *In Glyphosate Review, WHO Cancer Agency Edited Out 'Non-carcinogenic' Findings*, Reuters, Oct. 19, 2017.

217 *Id.*

218 Amanda Bronstad, *Johnson & Johnson Sues Plaintiffs' Talc Experts Accused of 'Widespread Deception'*, Law.com, May 10, 2024.

219 Theresa S. Emory et al., *Malignant Mesothelioma Following Repeated Exposures to Cosmetic Talc: A Case Series of 75 Patients*, Am. J. Indus. Med. 63(6): 484-89 (2020).

220 Appellant American International Industries' Response to Appellee's Motion to Dismiss Appeal, *Peninsula Pathology Assocs. v. American Int'l Indus.*, No. 23-1972 (filed 4th Cir. Apr. 17, 2025).

221 Mike Curley, *4th Circ. Asked to Reveal Names of Talc Study's 75 Patients*, Law360, Dec. 14, 2023.

222 Order, *Peninsula Pathology Assocs. v. American Int'l Indus.*, No. 23-1972 (4th Cir. June 18, 2025). ATRA filed an *amicus* brief in the case supporting the defendant's request for the information. *See* Brief of *Amicus Curiae* The American Tort Reform Association in Support of Appellant American International Industries, *Peninsula Pathology Assocs. v. American Int'l Indus.*, No. 23-1972 (4th Cir. filed Dec. 20, 2023).

223 Complaint and Demand for Jury Trial, *LLT Mgm't LLC v. Emory*, No. 4:24-cv-00075, ¶¶ 32, 71 (E.D. Va. filed May 9, 2024).

224 *Id.* ¶¶ 83, 96.

225 *Id.* ¶¶ 3, 20-27.

226 *Id.* ¶¶ 8.

227 Memorandum Opinion & Order, *LLT Mgm't LLC v. Emory*, No. 4:24-cv-00075 (E.D. Va. Feb. 7, 2025).

228 Pecos River Talc LLC's Motion to Compel the Identities of the Article's Subjects and for an Amended Answer, *Pecos River Talc LLC v. Emory*, No. 4:24-cv-00075 (E.D. Va. Apr. 22, 2025).

229 Memorandum Opinion & Order, *Pecos River Talc LLC v. Emory*, No. 4:24-cv-00075 (E.D. Va. July 8, 2025).

230 Most recently, the defendants filed an amended answer to the complaint. *See* Defendants' Amended Answer and Affirmative Defenses as to Count I, *Pecos River Talc LLC v. Emory*, No. 4:24-cv-00075 (E.D. Va. Filed July 23, 2025).

231 The White House, Memorandum for the Attorney General and The Secretary of Homeland Security, Preventing Abuses of the Legal System and the Federal Court, Mar. 22, 2025.

232 *See* Rebecca Ellis, *In the Biggest Sex Abuse Settlement in U.S. History, Some Claim They Were Paid to Sue*, L.A. Times, Oct. 2, 2025.

233 *New Rule 16.1 – Better Than Nothing, But Not by a Lot*, Drug & Device Law Blog, July 15, 2025.

234 Fed. R. Civ. P. 16.1(b)(3)(B).

235 *Id.* Committee Note, Rule 16.1(b)(3)(B).

236 Fed. R. Civ. P. 11(b)(3).

237 *Id.* Committee Note, Rule 16.1(b)(3)(B).

238 Fed. R. Civ. P. 11(b)(2), (3).

239 Fed. R. Civ. P. 11(b)(1).

240 Amendments to Federal Rules of Civil Procedure and Forms, 146 F.R.D. 401, 507-08 (1993) (Scalia, joined by Thomas, J.J., dissenting)).

241 Fed. R. Civ. P. 11(c)(2).

242 *Id.*

243 *Id.*

[244] Fed. R. Civ. P. 11(c)(4).

[245] *Id.*

[246] H.R. 2662, 119th Cong. (introduced Apr. 7, 2025).

[247] Press Release, *Reps. Mike Collins, Brandon Gill Introduce the Staged Accident Fraud Prevention Act*, Apr. 8, 2025.

[248] H.R. 3548, 119th Cong. (introduced May 21, 2025).

[249] Press Release, *Congressman Nick Langworthy Introduces Bill to Save Taxpayers, Promote Infrastructure Development, and Increase Jobs*, May 21, 2025.

[250] iFraud Foundation, The iFraud Defense Database, https://www.ifraud.org/defense-database (last visited Sept. 12, 2025).

[251] iFraud Foundation, Industry Collaboration, https://www.ifraud.org/industry-collaboration (last visited Sept. 12, 2025).

[252] *See id.*