**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

This Document Relates to:

ALL MATTERS

Case No.: 3:23-MD-03084-CRB (LJC)

**JOINT LETTER BRIEF REGARDING SAFETY DATA**

Judge: Hon. Lisa J. Cisneros
Courtroom: G – 15th Floor

Dear Judge Cisneros:

Pursuant to PTO No. 8 (ECF No. 323), the Parties respectfully submit this joint letter regarding Plaintiffs' request that Uber supplement its production of data, documents, and interrogatory responses regarding sexual assault and misconduct incident reports.

**Plaintiffs' Portion**: The Court is abundantly aware of the tortured history surrounding Plaintiffs' efforts to obtain Uber's safety incident data. Plaintiffs again seek the Court's assistance in compelling Uber to comply with its discovery obligations under Federal Rule 26(e) and this Court's numerous orders directing Uber to produce that data. Once again, Uber has changed its representations concerning the number of safety incidents but refuses to produce the underlying raw data it used to generate its new numbers. That data is necessary not only to validate Uber's new numbers, but also to test argument Uber may introduce at trial. Uber's continually shifting factual record, coupled with its refusal to produce underlying data, prevents Plaintiffs from trying this case on a fair, equal record.

1. **<u>Bliss, Jira, and Flack Raw Data for 2017 through 2024.</u>**

Over two years ago, the Court ordered Uber to produce "the data and documents related to incidents occurring in the United States associated with any of the twenty-one categories of sexual assault and sexual misconduct from the Sexual Misconduct and Violence Taxonomy," including "all underlying trip data[.]" ECF No. 683 at 11-12. Since then, the parties have negotiated, and the Court has resolved, over a dozen discovery disputes concerning the scope of safety data discovery, including the relevant systems from which the data should be produced. *See, e.g.,* ECF Nos. 684, 706, 1068, 1996, 2016, 2647, 2855, 3059, 3129, 3848, 4060, 6251, 6652, 6988. In October 2025, Uber completed production of raw Bliss, Jira, and Flack data from 2017 through 2024 as well as interrogatory responses that identified the number of incidents Uber categorized into each category of its SA/SM Taxonomy for each month With the raw data, Plaintiffs could not only confirm that number of incidents in the raw data matched Uber's interrogatory responses both in total number and for each category for each month. That validation was significant repeated errors and omissions in prior productions over the course of a year required multiple rounds of corrected productions before the production was complete and accurate. Moreover, the raw data allowed Plaintiffs to identify each incident counted in the interrogatory responses and obtain trip-level information, as well as information about Uber's investigations and communications with the involved parties. Plaintiffs and their experts could therefore analyze trends, such as the proportion of incidents reported against drivers (rather than riders), day of week and time of day, prior incident reports and a host of other patterns and trends—many of which took center stage at the *Dean* trial.

However, although the raw data specifically indicated that Uber had determined every incident was a "valid." during the *Dean* trial, Uber repeatedly claimed that some unidentified number of incidents were "invalid." *See* ECF No. 6251 at 3, ECF 6390. To avoid similar sandbagging in future trials, Plaintiffs asked Uber to supplement its interrogatory responses *and* the underlying data so that Plaintiffs could understand how Uber's data and discovery responses had changed since October 2025. (ECF No. 6251). Uber refused. Therefore, nearly three months ago, after weeks of failed conferrals, Plaintiffs sought "an order requiring Uber to supplement its production of sexual assault and sexual misconduct incident **data *and* related interrogatory responses** to include incidents through 2025 in the United States…" and specifically, "[i]f Uber has re-categorized any [SA/SM] incidents in its Incident Report Classifications of Dominant Tickets…supplement that discovery accordingly." ECF No. 6251 at 3, 4 (emphasis added).

The Court granted Plaintiffs' request, noting "Plaintiffs have a significant interest in reviewing the same **updated data** that is available to Uber, and which Uber might rely on in future trials." ECF No. 6452 at 4. Uber has not complied with the Order. Worse than noncompliance, Uber has strategically partially complied in a way that leaves Plaintiffs without reliable information about the number and categorization of SA/SM incidents on Uber's platform: Uber

produced updated interrogatory responses for 2017-2024. However, Uber refuses to produce updated raw data—the exact data that it used to prepare its interrogatory responses and that is necessary to understand Uber's changes and updates. Without the raw data, Plaintiffs are forced to trust that Uber got these numbers right. But this is a significant concern given the numerous rounds of errors and omissions in Uber's prior productions before Uber got it right. And in fact, the numbers do not add up—there are nearly 1,700 fewer incidents in the updated responses than in the October responses, which Uber has not fully explained.[1] More importantly, because Uber changed the raw data since it produced it in 2025, Plaintiffs' experts cannot update their analyses of trends and patterns derived from the data. This leaves Plaintiffs particularly disadvantaged if Uber is permitted to challenge experts' analyses of the previously produced raw data on the basis that it is no longer valid (because Uber changed it yet refuses to supplement its prior production).

This Court and Judge Breyer have repeatedly confirmed that Uber must provide Plaintiffs the same raw data that Uber has access to regarding sexual assault and sexual misconduct incidents on the Uber platform. *See* ECF No. 6452 at 4 ("Plaintiffs have a significant interest in reviewing ***the same updated data that is available to Uber***, and which Uber might rely on in future trials."); ECF No. 6652 at 5 ("discovery is warranted to ensure that plaintiffs have a ***mirror view of the incident information that Uber has in the form of its Flack, Jira, and Bliss data.***"); ECF No. 6988 ("Plaintiffs' interest in testing Uber's assertions that a significant percentage of reported sexual assaults are fraudulent ***using the same data that Uber has access to*** outweighs Uber's burden of production.") (emphases added). But Uber claims that it does not have to produce updated raw data for 2017 through 2024 because it claims Plaintiffs did not seek and the Court did not order Uber to produce. This is a classic "gotcha" tactic. Plaintiffs clearly requested the data (and not just Uber's tallies of it) be supplemented. But even if Plaintiffs had not specifically requested the raw data, Uber is nonetheless obligated to produce it under the Court's numerous orders and the duty to supplement under Rule 26(e).

Uber's noncompliance affects all plaintiffs in this litigation but is particularly prejudicial to QLF given her upcoming trial. Even if Uber were to fully comply now, it is too late with respect to QLF. QLF's experts are left without sufficient time to analyze any updated data or discovery and incorporate it into their opinions before the QLF trial. Moreover, because Uber has not updated its Bliss and Jira data production, Uber has never produced the data it collected from QLF's.

Therefore, Plaintiffs respectfully request that the Court: (1) order Uber Produce raw data from its Bliss, Jira, and Flack databases as of the date of its most recent safety data interrogatory responses and (2) find that Uber violated the Court order requiring production of updated safety data and that Uber's violations prejudiced Plaintiffs, and (3) recommend to Judge Breyer that he limit Uber from relying on such data that it has not produced and from attacking Plaintiff's experts for using Uber's previously-produced but now outdated data at the upcoming *QLF* and *A.R.* trials.

## 2. Nonresponsive Report Regarding Purported "Invalid" Tickets for 2025

Plaintiffs requested, and the Court ordered, that Uber provide the number of SA/SM incidents that Uber categorized into its taxonomy in 2025 despite determining the incident to be invalid (ECF No. 6452 at 1-2). This was necessary to address Uber's continued narrative that some unidentified number of reports in its own data and interrogatory responses are actually "invalid."

[1] On August 21, Uber provided Mr. Gaddis' declaration, which provides a partial explanation. But without the underlying raw data, Plaintiffs have no insight into which incidents were determined to be invalid or why, or which incidents were recategorized or why.

Uber understood what Plaintiffs sought: the number of incidents in its interrogatory responses that Uber would later claim were invalid. And Uber produced that— specifically, a chart of the number of incidents within each category for 2025, all of which Uber has confirmed were valid as of the date Uber served it. That should have completed the inquiry. But, Uber also produced a second document purporting to show thousands "invalid" incident reports in 2025. Uber refuses to explain why it produced this nonresponsive document, whether or how Uber intends to use it in this litigation, or what data underlies it. Nor will Uber produce the data necessary to understand this information in context of prior years, 2017-2024. Instead, Uber plays coy, offering only the evasive explanation that it contains information Plaintiffs requested and the Court ordered.

Uber's late introduction of an apparently new category of information is significantly concerning in light of Uber's ongoing arguments that incidents within its own data and interrogatory responses are or may be "invalid." To illustrate one problem: Uber claims less than 0.2% of the 2017—2024 reports as "invalid," but per this nonresponsive chart, "invalid" incidents equal more than 8% of valid 2025 reports—suggesting either Uber is using two entirely different definitions of "invalid" reports, or there has been a massive change between 2025 and prior years. While Plaintiffs will, given time, pursue discovery on this late-breaking development, Uber's sandbagging comes too late to be fairly included in the fact record for the upcoming bellwether trials.

Therefore, Plaintiffs respectfully request that the Court find that Uber's refusal to produce the data underlying the nonresponsive document prejudiced Plaintiffs and recommend to Judge Breyer that he limit Uber from relying on the document or the information it contains at the upcoming *QLF* and *A.R.* trials.

**Uber's Position**:

Plaintiffs ask the Court to punish Uber for doing precisely what the Court ordered: producing (1) an updated chart showing, for the period 2017-2024, incidents that had been re-classified or determined to be invalid since the time the chart had last been produced 9 months earlier; and (2) a chart showing, for 2025, incidents that had been classified according to Uber's taxonomy but had been determined to be invalid. Dissatisfied with the discovery they requested and received, Plaintiffs now complain that they are entitled to an entirely new production of raw data spanning eight years—and that the Court should impose trial restrictions because Uber did not produce discovery ***that was never ordered.*** The Court should deny this relief. An additional production of raw data would be both disproportionate and unnecessary because Plaintiffs can rely at trial on the raw Flack, Jira, and Bliss data already produced, to the extent relevant. Moreover, Uber agrees that both parties may rely at trial on the previously produced raw dataset so they are working off the same data.

**Uber's June 30, 2026 Updated Chart Of Reported Incident Data For 2017-2024 Satisfied The Court's Order.** Plaintiffs' argument that the Court's order required production of millions of rows of "raw data" covering an 8-year period—rather than the updated chart of incident counts Uber produced—is contrary to the plain language of the order, the purpose of the ordered supplementation, and the Parties' extensive discussions with the Court.

***First***, the plain language of the order specifically requires supplementation of the chart previously provided by Uber on October 13, 2025, which the order identifies by name. ECF 6452, at 4 (ordering that "[i]f Uber has re-categorized any sexual assault or sexual misconduct incidents

in its ***Incident Report Classifications of Dominant Tickets for 2017-2024, as served to Plaintiffs on October 13, 2025***, [it should] supplement that discovery accordingly" and that "[i]f Uber has determined that any of the sexual assault or sexual misconduct incidents in its ***Incident Report Classifications of Dominant Tickets for 2017-2024, as served to Plaintiffs on October 13, 2025***, are 'invalid,' provide the number of incidents in each month that Uber determined to be 'invalid'") (emphasis added). The order does not require production of "raw data" for these requests. By contrast, where the Court required raw data elsewhere in the same order, it expressly said so. *Id.* at 4 n.2.

***Second***, the Court's order makes clear that the purpose of the ordered supplementation was to provide Plaintiffs with information regarding Uber's position that a "meaningful portion of reported incidents of sexual misconduct are not valid." *Id.* at 4. The updated chart provides exactly the information necessary for Plaintiffs to assess and challenge that position.

***Third***, Plaintiffs' contention that the Court's order called for re-production of millions of rows of raw data is inconsistent with the Parties' discussions with the Court. At the June 25, 2026 discovery conference, Uber indicated that it could provide updated information regarding the "number of invalid reports" by June 30, 2026, *see* Tr. at 37-38, but would require significantly more time to produce the "raw data" for 2025, *id*. at 28-37. The Declaration of Michael B. Shortnacy submitted in support of Uber's Motion for Reconsideration confirms this understanding. ECF 6540-2. After describing the complicated and time-consuming nature of the 2025 raw data production, Mr. Shortnacy stated that the yearly updates to "the data tables requested by Plaintiffs in their PTO 8 letter would take Uber several hours," with no reference to raw data. *Id.* ¶ 13.

The Court's recognition of Plaintiffs' interest in the "same updated data" available to Uber does not transform its specific directive to supplement identified charts into an obligation to continuously re-produce eight years of dynamic raw data. Indeed, such an obligation would be impossible to meet: Uber's incident data is dynamic, not static, meaning that classifications change as Uber receives additional information and corrects trip information. Gaddis Decl. ¶¶ 5–6. This is evidenced in the less than 0.2% difference Plaintiffs identify between snapshots taken nine months apart. In sum, any newly produced snapshot could change a moment after production. Plaintiffs' position would therefore impose an obligation with no logical end. A refreshed production today could differ from an extraction tomorrow, triggering yet another demand to re-run and re-produce years of raw data. Rule 26 does not require that perpetual cycle.

Expanding the Court's order to require re-production of Flack, Jira, and Bliss "raw data" would be grossly disproportionate to the needs of the case even if the data were not constantly changing. *See* Fed. R. Civ. P. 26(b)(1) (mandating that "the scope of discovery" must be "proportional to the needs of the case"); *Id.* at § (b)(2)(C) ("limit[ing] the frequency or extent of discovery" where the discovery sought is "burdensome"). Plaintiffs would have Uber spend thousands of hours to re-produce millions of rows of raw data that were produced just last year, all to enable Plaintiffs to fly-speck minor changes to classifications regarding incident reports of individuals that are not directly at issue in the upcoming trials. While Plaintiffs may have an interest in understanding the ***degree to which*** Uber has reclassified incident reports or determined them to be invalid (as the Court recognized), Plaintiffs do not have a similar need to continually re-examine every detail underlying eight years of incident reports.

More raw data is particularly unnecessary because the differences Plaintiffs identify are not unexplained discrepancies—they are the expected result of comparing two snapshots of Uber's dynamic safety data taken nine months apart. The March 2017 data illustrates the point: the updated chart contains only five fewer incidents—a difference of just 0.06%. And all five are

accounted for: one was determined to be invalid, as reflected in the updated chart, and four were reclassified outside the sexual assault/sexual misconduct taxonomy based on updated information. Such ordinary and fully explainable changes do not justify re-running and re-producing eight years of raw data.

The same is true of the data as a whole. Plaintiffs argue that "the numbers do not add up," because there were nearly 1,700 fewer reported incidents categorized according to the Sexual Violence and Sexual Misconduct Taxonomy in the June 2026 Flack summary compared to October 2025. But Plaintiffs' calculation includes the 904 incidents that the updated chart expressly identifies as invalid. Once those incidents are removed, the remaining difference is only 766 incidents—less than 0.2% of the total—and each of those 766 differences is explained. The dynamic nature of the data – including that reported incidents may be reclassified or determined to be invalid over time – has long been known to Plaintiffs through the charts themselves and prior testimony. And as Mr. Gaddis describes, 726 were reclassified outside Uber's sexual assault and misconduct taxonomy, and the remaining 40 were properly excluded based on corrected trip information. Gaddis Decl. ¶¶ 5–6. Nothing "disappeared." Rather, the modest difference between the two charts is the expected result of comparing snapshots of dynamic data taken nine months apart.

In short, Plaintiffs would require Uber to re-run and re-produce millions of rows of raw Flack, Jira, and Bliss data spanning 2017–2024, even though Plaintiffs already possess the raw data previously produced and the differences they identify are minor, fully explained, and the expected result of comparing snapshots of dynamic data taken months apart. Worse, Plaintiffs' theory has no logical stopping point: because incident information continues to be updated, any refreshed production could itself change, potentially triggering yet another demand to re-run and re-produce eight years of data. Rule 26 does not impose this sort of perpetual and unworkable obligation—all the more so because Uber has agreed that both sides would rely on the prior raw data at trial.

**Uber's Incident Report Classification of Invalid Dominant Tickets for 2025 Satisfied The Court's Order.** Plaintiffs characterize Uber's 2025 chart as "nonresponsive," a "late-breaking development," and "sandbagging," but the chart provides precisely the information Plaintiffs requested and the Court ordered Uber to produce: a monthly count by taxonomical category of incident reports from 2025 that were determined to be invalid, tracking the language of the Court's order: "For each month of the year 2025, provide the number of sexual assault and sexual misconduct incidents in the United States that Uber categorized into each category of its Sexual Misconduct and Violence Taxonomy or categorized as 'Insufficient Information,' 'Parent Category Usage Tracking,' or any other categorization despite determining the incident to be 'invalid.'" ECF 6452, at 1, 5. Uber's repeated explanations of the data are neither "coy" nor "evasive": this chart provides exactly what the Court ordered to be produced, and Uber timely provided it. Plaintiffs claim that the percentage of "invalid" incidents is higher in 2025 (8%) than in 2017-24 (0.2%) and therefore there is a "problem" with the data. Not so. Plaintiffs made different requests for these time periods. As explained by Mr. Gaddis, for 2017-2024, per the Court's order, Uber identified the number of reported incidents determined to be invalid ***during the period between October 2025 and June 2026*** (the times when the two charts were prepared), *see* Gaddis Decl. ¶¶ 4-5, whereas for 2025, per the Court's order, he identified the total number of reported incidents that had been determined to be "invalid," *see id.* ¶ 7. Plaintiffs' apparent surprise about what the chart for 2025 "invalid" reported incidents shows does not provide a basis to limit its use by either party at trial.

DATED: August 24, 2026

Respectfully Submitted,

By: */s/ Beth Wilkins*
Alexandra Walsh (*Pro Hac Vice*)
Beth Wilkins (*Pro Hac Vice*)
**ANAPOL WEISS**
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
Telephone: (215) 735-1130
awalsh@anapolweiss.com
bwilkins@anapolweiss.com

ROOPAL P. LUHANA (*Pro Hac Vice*)
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com

SARAH R. LONDON (SBN 267083)
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Email: slondon@girardsharp.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

By: */s/ Christopher D. Cox*
CHRISTOPHER D. COX (*Pro Hac Vice*)
Jessica Davidson (*Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
christopher.cox@kirkland.com
jessica.davidson@kirkland.com

Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (*Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Attorneys for Defendants
UBER TECHNOLOGIES, INC., RASIER, LLC, And RASIER-CA, LLC

**FILER'S ATTESTATION**

I, Beth Wilkins, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

Dated: August 24, 2026

By: /s/ *Beth Wilkins*
Beth Wilkins

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2026 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

Dated: August 24, 2026

By: /s/ *Beth Wilkins*
Beth Wilkins