Laura Vartain Horn (SBN: 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.;
RASIER, LLC; and RASIER-CA, LLC
*[Additional Counsel Listed on Signature Page]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB |
| This Document Relates to:<br><br>ALL ACTIONS | **DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, RASIER-CA, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY PROTECTIVE ORDER**<br><br>Judge: Hon. Charles R. Breyer<br>Date: September 25, 2025<br>Time: 10:00 a.m.<br>Courtroom: 6 – 17th Floor |

## Table of Contents

I. INTRODUCTION ....................1

II. BACKGROUND ....................4

A. Plaintiffs' Solicitation of Claims in This MDL Proceeding Have Invited Fraud. ....................4

B. Motion Practice to Date Confirms the Recurring Nature of This Problem. ....................4

C. The Third Party Subpoenas at Issue Are Aiding in the Detection of Fraud. ....................5

III. LEGAL STANDARD....................9

IV. ARGUMENT....................9

A. The Motion Should Be Denied Outright Because Plaintiffs Failed to Meet and Confer Before Filing It....................9

B. Plaintiffs' Procedural Arguments Do Not Support a Protective Order....................10

1. PTO 5 Does Not Bar This Third Party Discovery. ....................10

2. Plaintiffs Had Notice of Subpoenas to Lead Generators Since July 2025, Without Objection....................10

C. The Subpoenaed Documents Are Squarely Relevant to Uber's Fraud Defense....................11

D. Plaintiffs Do Not—and Cannot—Demonstrate that All of the Produced Documents Are Subject to the Attorney-Client Privilege or the Work-Product Doctrine....................16

E. Lead Generator Discovery Concerning Claim Legitimacy, Fraud, and Uber's Defenses Does Not Impact the Privacy Interests Asserted by Leadership Because of the Court's Protective Order and Prior Rulings. ....................20

V. CONCLUSION....................21

**Cases**

*Barton v. U.S. Dist. Ct. for the Central Dist. of Cal.*, 410 F.3d 1104, 1107-10 (9th Cir. 2005) ........ 19

*Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) ........ 9

*Big City Dynasty v. FP Holdings, L.P.*, 336 F.R.D. 507, 511–12 (D. Nev. 2020) ........ 12

*Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1147 (9th Cir. 2005) ........ 17

*Clarke v. Am. Commerce Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992) ........ 17

*Cooper v. Cnty. of San Luis Obispo*, 350 F.R.D. 625, 630 (C.D. Cal. 2025) ........ 12

*Doe v. Doe 1*, 2026 WL 1370113, at *1 (C.D. Cal. Mar. 25, 2026) ........ 16

*Dragos v. Cornea*, No. 2:19-cv-013380JCC-TLF, 2020 WL 13480834, at *2 (W.D. Wash. July 24, 2020) ........ 15

*Drummond Co. v. Collingsworth*, No. 13-mc-80169-JST(JCS), 2013 WL 6074157, at *9 (N.D. Cal. Nov. 18, 2013) ........ 9

*Flynn v. Nevada*, 345 F.R.D. 338, 350 n.21 (D. Nev. 2024) ........ 12

*Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) ........ 9, 11

*Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) ........ 18

*Sanmina Corp.*, 968 F.3d at 1110, 1116 ........ 17

*Snipes v. United States*, 334 F.R.D. 548, 550 (N.D. Cal. 2020) ........ 9, 12

*Ulrich v. General Motors, LLC*, 2026 WL 183676 (S.D.N.Y. Jan. 23, 2026) ........ 19

*United States v. Martin*, 278 F.3d 988, 1000 (9th Cir. 2002) ........ 17

*Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939-WHA(JSC), 2017 WL 2929439, at *2 (N.D. Cal. July 7, 2017) ........ 9

**Statutes**

Cal. Evid. Code § 952 .................................................. 20

**Other Authorities**

8 Wright, Miller, & Marcus, Federal Practice and Procedure, § 2011 at p. 274 (2010).................... 12

**Rules**

Fed. R. Civ. P. 26(b) .................................................. 9, 15
Fed. R. Civ. P. 26(c)(1).................................................. 9
Fed. R. Civ. P. 45 .................................................. 9, 11
Rule 26(b)(1).................................................. 12, 15

## I. INTRODUCTION

This MDL, which now includes more than 3,900 active Plaintiffs, cannot be meaningfully resolved without a reliable mechanism to identify and root out fraudulent claims at the source. The integrity of this MDL depends on the Court's ability to distinguish legitimate claims from fraudulent ones. That task is impossible if the parties most likely to possess evidence of how fraud entered this litigation are shielded from discovery. As the Court recently recognized: "[O]bviously when you have 4800 cases you're not going to try them all …. We all know that."[1] Granting Plaintiffs' Motion for Temporary Protective Order would reward a year of silence: Plaintiffs raised no objection to any subpoena or any production for over a year and now, at the eleventh hour, without so much as a meet and confer, demand to sequester evidence that is already revealing how fraud infected this docket. The problem is concrete and recurring: The Court has dismissed fraudulent submissions, and objective indicia of fraud across the case inventory continue to surface. In addition to prejudicing Uber, those suspicious claims impede resolution by clouding settlement negotiations and burden the Court. But most importantly, false submissions force claimants with non-fraudulent claims to litigate in a proceeding clouded by distrust, while diverting resources from claims that deserve careful evaluation, particularly given the highly sensitive subject matter. A comprehensive investigation of claim validity is therefore essential to any fair and efficient resolution of this MDL.

Since July 31, 2025, Uber has filed five fraudulent-receipt motions,[2] and the Court has granted all five, including ordering 13 depositions of Plaintiffs who submitted fraudulent receipts in the MDL.[3] Yet, new fraudulent receipts continue to surface. In filing these motions, and putting Plaintiffs' counsel on notice of pervasive fraud in their inventories time and time again, Uber has identified more than 40 fraudulent receipts and continues to find more. In addition, Uber also filed a fraudulent Plaintiff Fact Sheet ("PFS") motion, ECF No. 4580, and the Nachawati Law Firm admitted that it fraudulently submitted 48 PFSs without client review. ECF No. 4522 at 6. A Nachawati Plaintiff even emailed

---

[1] Ex. 1 to the Declaration of Christopher V. Cotton ("Cotton Decl.") (8/25/26 Transcript) at 15.
[2] *See* ECF Nos. 3604, 3784, 4137, 4933, and 5483.
[3] *See* ECF Nos. 3876, 3972, 4440, 5454, and 5970. Of the 13 depositions ordered by this Court, only four Plaintiffs appeared. There are two pending contempt motions before this Court. ECF Nos. 5520 and 6366.

Uber's counsel, ethics authorities, and law enforcement agencies accusing the firm of "falsifying documents, and trying to force signatures on fraudulent fact reports."[4] However, Plaintiffs' Counsel in this MDL continue to shift the significant burden of claim vetting to Uber, even when faced with facial indicia of fraud over and over again.

In light of the objective fraud infecting this litigation, Uber has served 16 third party subpoenas in this MDL to marketing companies and lead generators, among other entities, since July 2025. The subpoenas are narrowly tailored to investigate the role of third-party entities in sourcing and submitting fraudulent claims *in this litigation only*. The resulting discovery continues to inform Uber's evaluation of claims, claim-resolution efforts, and the integrity of this litigation given counsel's repeated lack of assistance.

Plaintiffs *did not object* to a single subpoena issued by Uber over the past year. Moreover, Plaintiffs *did not object* when Uber began forwarding documents produced by third parties in response to subpoenas beginning in November 2025. At issue in Plaintiffs' Motion for Temporary Protective Order (the "Motion"), Plaintiffs did not object to subpoenas for Blue Sky Legal LLC ("BSL"), Isla Marketing, LLC d/b/a LegalCove.com ("Isla Marketing"), Publisher First, Inc. d/b/a Freestar ("Freestar"), and Meta Platforms, Inc. ("Meta")–*all of which were served four to eight months ago*.[5] *See* ECF Nos. 7059-2, 7059-3, 7059-4, 7059-5, 7059-9, 7059-10. The time to challenge these subpoenas has long since passed, and Plaintiffs have made no effort to comply with any of the requirements under the Court's long-standing pretrial orders.

Plaintiff's Motion is really about a production made by one lead generator, Mass Tort Ad Agency ("MTAA"), which Uber provided to Plaintiffs on August 7, 2026. MTAA's founder and CEO, Jacob Malherbe, acknowledges that "case sellers are selling frOaud [sic] cases in most mass torts" and that in 2025 he "learned of major fraud schemes in the Uber/Lyft and Roblox litigation."[6] Instead of

[4] Ex. 2 to Cotton Decl. at 1.

[5] NexLevel Direct LLC ("NexLevel") is also subject to Plaintiffs' motion, but it produced no documents, claiming none exist.

[6] Jacob Malherbe, *Mass Tort Fraud Exposed: Billion Dollar Scams and the Fight to Save Our Industry*, Mass Tort Ad Agency (Oct. 11, 2025), https://masstortadagency.com/mass-tort-fraud-exposed/ (last visited Aug. 28, 2026).

trying to hide these documents from Uber and the public, the lead parties should be working together to identify how these "major fraud schemes" have impacted the integrity of this litigation and contributed to the continued submission of fraudulent claims. Why now would Plaintiffs' counsel try to oppose such a revelation, given their incessant proclamation that "fraud has no place in this MDL"? ECF No. 3768 at 2.

Regarding MTAA's production, Uber does not dispute that MTAA produced *certain* documents that are non-responsive to Uber's narrowly tailored requests, and Uber has no interest in these documents. However, MTAA produced hundreds of relevant documents concerning claim acquisition, lead quality, and fraud related-risks in the mass-tort industry and particular to Uber. For example, in an April 2026 email exchange, MTAA's founder and CEO, Jacob Malherbe, discussed [redacted] (Cotton Decl. ¶ 13; *see* Ex. 3 to the Cotton Decl. [MTAA_00006903]). Plaintiffs' sudden focus on one company's over-production provides no basis to preclude Uber's investigation involving non-privileged documents that relate to MTAA's marketing and lead generation activities relevant to this litigation, let alone prohibit Uber from "accessing, using, or disseminating any documents or materials produced, or produced in the future, by" any of the listed subpoena recipients.

To the extent Plaintiffs belatedly purport to have a privilege or work product claim to any document in MTAA's production, they have patently failed to comply with any applicable (and well-established in this MDL) legal requirements to perfect such a claim, such as preparing a privilege log or making document specific claims of privilege. Absent a privilege log, none of Plaintiffs' purported privilege claims can be assessed, let alone adjudicated, by the Special Master appointed by this Court to "conduct a review of privilege logs and documents relating to the assertion of attorney client and work product privileges in this MDL." ECF No. 2204.

Plaintiffs' incorrect procedural arguments are a transparent effort to deflect from their own

failure to timely object to the subpoenas at issue. To the extent Plaintiffs purport to assert a privacy interest in details of the alleged assaults and corresponding medical care as a basis to preclude discovery, the argument is unavailing. Plaintiffs placed their own private information directly at issue by filing suit, and Judge Cisneros resolved a prior discovery dispute to permit production of the identities and contact information of riders who reported sexual assault or misconduct. Uber has a need for the requested documents to root out fraud that both Uber and the lead generators know is being infused into the MDL, and any remaining confidentiality, privacy, or privilege concerns can be addressed through the existing Protective Order and targeted procedures – all of which Plaintiffs have refused to follow here. For all of these reasons and others outlined below, Plaintiffs' Motion should be denied.

## II. BACKGROUND

### A. Plaintiffs' Solicitation of Claims in This MDL Proceeding Have Invited Fraud.

The MDL now exceeds 3,900 Plaintiffs. Its rapid growth has been fueled in substantial part by aggressive, clickbait-style online advertising and third-party lead generation. Plaintiffs' counsel and third-party marketers have solicited claimants through ads promising a "Free Compensation Check!" and "Significant Compensation," while assuring prospective claimants of "No Paperwork," "No Hassle," and "No Upfront Cost." *See* Ex. 4 to Cotton Decl.. This advertising has produced a rapid increase in plaintiffs, many of whom are non-responsive "plaintiffs in name only." *See id.* at 4. Third party lead-generation firms, which are often paid on a per-claimant basis (incentivizing volume rather than meaningful pre-suit investigation), place many of these ads, offering to help "acquire Uber and Lyft sexual assault plaintiffs at a performance-based cost of $3,600 to $4,800." *See* Ex. 5 to Cotton Decl.. This volume-driven model prioritizes acquisition over meaningful vetting.

### B. Motion Practice to Date Confirms the Recurring Nature of This Problem.

Fraud-related motion practice in this MDL to date confirms the fraud problem is significant. Although Plaintiffs claim that Uber is merely acting on a "hunch," the Court has already granted all five of Uber's fraudulent-receipt motions, finding that more than 40 Plaintiffs have submitted fraudulent or apparently fraudulent "non-bona fide receipts" in their PFS submissions. *See* ECF Nos.

3876, 4440, 5454, 5970.

Nor are the fraudulent-receipt motions isolated incidents. Uber's investigation has uncovered broader indicia of unreliability in claims submitted throughout the MDL. As detailed in Uber's August 20 Motion to Appoint a Special Master, Uber has identified more than 50 claims involving fraudulent receipts or other documents, at least 73 Plaintiff Fact Sheets that have not been reviewed by the Plaintiffs on whose behalf they were submitted, and numerous objective discrepancies between Plaintiff Fact Sheets and available ride data that go beyond any asserted lack of recollection or memory concerns related to trauma. *See* ECF No. 7070 at 2, 5-10. Those issues span multiple firms, referral sources, and categories of misconduct, underscoring that claim legitimacy concerns in this MDL extend beyond the fraudulent-receipt motions already adjudicated by the Court.

Despite the Court's repeated rulings against "non-bona fide" claims, suspect claims continue to enter the MDL with fraudulent receipts and other discrepancies to this day, requiring Uber to identify and investigate them without any assistance from Plaintiffs' Counsel or any follow-up when presented with inconsistencies via the Defendant Fact Sheet productions. As explained in the previously filed Declaration of Brett D. Harrison, such investigation is time-consuming and onerous. *See* ECF No. 7070-8 at 4. And the burden of investigation falls squarely on Uber. *See* ECF No. 7070 at 11.

**C. The Third-Party Subpoenas at Issue Are Aiding in the Detection of Fraud.**

Between July 2025 and April 2026, Uber served 16 Rule 45 subpoenas on 12 third party entities involved in legal marketing, claim acquisition, advertising, and lead-generation activities relating to the Uber sexual assault litigation to investigate how claims were sourced, screened (for fraud), and introduced into this litigation. At issue here are the subpoenas served on BSL on December 16, 2025, Isla Marketing on April 2, 2026, Freestar on April 8, 2026, and Meta on April 3, 2026. *See* ECF Nos. 7059-2, 7059-3, 7059-4, 7059-10. Despite being timely served with these subpoenas, Plaintiffs did not object. Uber also served subpoenas on NexLevel on February 16, 2026 and MTAA on December 18, 2025, Cotton Decl., ¶ 10, the latter of which Uber later sought to enforce through separate proceedings in the Middle District of Florida.

Although tailored slightly to each recipient, the subpoenas sought specific categories of non-privileged documents concerning: (1) the generation, screening, and referral of potential Uber claimants; (2) relationships and agreements between the subpoena recipients and law firms involved in the litigation; (3) marketing campaigns, advertisements, targeting criteria, budgets, and performance metrics; (4) lead-generation data, including tracking information, IP-address information, and platform analytics; and (5) communications and records relating to fraud, ride receipts, PFS, claim screening, alterations or forgeries of evidence, and fraud-detection efforts. Uber also sought information concerning communications with prospective claimants, intake materials, questionnaires, retainer agreements, and the methods used to qualify and route leads to participating law firms. These requests are intended to aid Uber's investigation into fraud and claim legitimacy by identifying how claims entered into this litigation, what screening and verification processes were used, and whether lead generators, referral entities, or other third parties played a role in the submission of fraudulent claims or evidence. Each of these categories relates to non-privileged business operations of the subpoena recipients and not to any communications between an attorney and client.

The Meta subpoena focused on identifying and investigating the operator, activities, advertising efforts, and communications of a specific Facebook account associated with claimant acquisition and lead-generation efforts in this MDL. *See* ECF No. 7059-5. It sought information concerning account ownership, subscriber records, advertising campaigns, account activity, communications, and related records—material that even Plaintiffs concede is not privileged (ECF No. 7059 at 9 n.4)—to understand how potential claimants were being solicited, referred, and connected to the litigation.

/

/

/

/

/

/

The relevance of this discovery is not hypothetical. Information obtained through this third party discovery revealed that Isla Marketing utilized Facebook advertising in connection with claimant-acquisition efforts, including a deceptive advertisement featuring an AI-generated "deepfake" actor portrayed as a sexual-assault survivor. The individual depicted was not a real person and was not disclosed as an actor.[7] Ex. 8 to Cotton Decl.. This is far from the only example of such AI-generated ads, pairing emotionally charged "survivor" narratives with compensation-focused messaging. An X Ante investigation report identified ten such Uber/rideshare sexual assault advertisements associated with the Melanie Doran Facebook account and found that they exhibited substantial uniformity in creative format, messaging, and structure, consistent with the use of automated or AI-assisted tools to rapidly generate multiple versions of the same advertisement. *See id.* The ads paired emotionally charged survivor narratives with compensation-focused messaging, emphasized that no police report was required, and directed prospective claimants into Isla Marketing's broader lead-generation and claimant-acquisition ecosystem through litigation-focused intake platforms designed to connect potential claimants with legal representation. *See id*. Discovery concerning the creation, dissemination, targeting, and operation of such advertising campaigns is directly relevant to understanding how claimants were solicited and routed into this litigation and to Uber's investigation of claimant sourcing, claim legitimacy, and fraud-related concerns.




Uber has been sharing materials produced in response to its subpoenas since November 2025, *without any objection from Plaintiffs*. For nearly a year, Plaintiffs received and reviewed these documents without raising a single privilege claim, work-product objection, or privacy concern, a

[7] Following service of Uber's cease-and-desist letter on May 5, 2026, *see* Ex. 6 to Cotton Decl., Isla Marketing responded by letter dated May 16, 2026, disputing Uber's allegations but representing that the challenged advertisement had already been removed before Uber's demand letter and before service of the MDL subpoena, and further stating that it "will not get put back up." Ex. 7 to Cotton Decl.. Isla Marketing did not deny that the advertisement featured an AI-generated persona associated with a real individual's image, nor did it address Uber's inquiries regarding other Uber-related advertising featuring AI-generated testimonials or related communications with law firms. *See id.*

silence that speaks volumes about the legitimacy of their belated objections to the fraud revelations found in recent lead generator productions. Until this Motion, Plaintiffs did not raise *any* objection to the subpoenas to BSL, Isla Marketing, Freestar, or Meta, all of which Uber subpoenaed months ago, or to the documents these entities produced.

With respect to MTAA, as with other subpoenas, Uber provided the company's entire production to Plaintiffs on August 7, 2026. On August 19, 2026, Plaintiffs filed the instant Motion. ECF No. 7059. The parties did not meet and confer until August 27, **more than a week later**. *See* Cotton Decl., ¶¶ 12, 20, 23.[8]

While Plaintiffs now assert a disallowed general privilege claim over the entire MTAA production, there is no question that the production contains a host of non-privileged, relevant documents. *See* Sections IV.C and IV.D, *infra*. These include, for example: (1) a public-facing blog post about [redacted] (Cotton Decl., ¶ 14; *see* Ex. 3 to Cotton Decl. [MTAA_000002935]); (2) an email with a potential customer describing [redacted] (Cotton Decl., ¶ 15; *see* Ex. 3 to Cotton Decl. [MTAA_00008194]); and (3) correspondence with another non-lawyer, lead generator about low-price lead generation in Uber litigation as [redacted] (Cotton Decl., ¶ 13; *see* Ex. 3 to Cotton Decl. [MTAA_00006903]). There can be no plausible claim of privilege over such material, which shines a light on fraud in this litigation. In any event, despite over three weeks having passed since Uber transmitted the MTAA documents to Plaintiffs, Plaintiffs have not provided any privilege log as required to assert a privilege claim, *see* Cotton Decl., ¶ 23, and MTAA's purported "production-wide" clawback letter is insufficient on its face.

[8] MTAA produced *all* of its documents as "Attorneys Eyes Only" under the Protective Order (ECF 176). The Protective Order defines what can be designated "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY" and clearly reads: "Nothing herein shall be construed to allow for a global designation of all documents as 'HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.'" *Id.* ¶ 2.8. Here, MTAA designated its entire production, including public-facing newsletters and other materials AEO. Uber is challenging MTAA's baseless AEO designations and improper global clawback attempt. *See* Cotton Decl., ¶ 12.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 45 governs discovery of non-parties by subpoena. "The scope of discovery under Rule 45 is the same as under Rule 26(b)." *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939-WHA(JSC), 2017 WL 2929439, at *2 (N.D. Cal. July 7, 2017). Rule 26(b) permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case …." Fed. R. Civ. P. 26(b). The scope of discovery under Rule 26 is broad and should be liberally construed. *See Snipes v. United States*, 334 F.R.D. 548, 550 (N.D. Cal. 2020).

A court may, for good cause, issue a protective order limiting discovery in order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). To establish good cause, the moving party must make a particularized showing of specific prejudice or harm; broad allegations of harm, unsupported by specific examples or articulated reasoning, are insufficient. *See Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003); *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992). The party seeking a protective order bears the burden of demonstrating that such relief is warranted and must certify that a good-faith meet and confer took place. *See id.*; *Drummond Co. v. Collingsworth*, No. 13-mc-80169-JST(JCS), 2013 WL 6074157, at *9 (N.D. Cal. Nov. 18, 2013).

## IV. ARGUMENT

### A. The Motion Should Be Denied Outright Because Plaintiffs Failed to Meet and Confer Before Filing It.

Rule 26(c)(1) states that a party may move for a protective order *only after* certifying that it has "in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." *See also Drummond*, 2013 WL 6074157, at *9 (recognizing that compliance with Rule 26(c)(1)'s meet-and-confer requirement is a prerequisite to obtaining a protective order). Plaintiffs filed their Motion on August 19, ECF No. 7059, without any certification regarding the meet-and-confer requirement; the parties did not meet and confer until August 27, **more than a week later**. Cotton Decl., ¶ 22. There is no question that Plaintiffs failed to comply with the threshold requirement of Rule 26(c)(1), and Plaintiffs' Motion should be denied on that basis alone.

**B. Plaintiffs' Procedural Arguments Do Not Support a Protective Order.**

**1. PTO 5 Does Not Bar This Third-Party Discovery.**

PTO 5 provides that, with the exception of Plaintiffs' obligations to produce a bona fide ride receipt, "all discovery on Plaintiffs remains stayed." ECF No. 175, ¶ 4(B). Uber served Rule 45 subpoenas on non-parties, not on Plaintiffs, seeking information concerning those entities' own records, business practices, communications, advertising activities, referral relationships, and claimant-acquisition efforts in this litigation. The subpoenas, therefore, do not constitute "discovery on Plaintiffs" within the meaning of PTO 5. Moreover, the Court has continued to oversee claim-validation proceedings requiring the development of evidence concerning the legitimacy of claims. These subpoenas are part of that same process.

**2. Plaintiffs Had Notice of Subpoenas to Lead Generators Since July 2025, Without Objection.**

Plaintiffs cannot plausibly suggest they were unaware of Uber's fraud investigation. Uber served Rule 45 fraud investigation subpoenas concerning lead generation and marketing to twelve entities between July 2025 and April 2026. Since November 2025, Uber also has been providing Plaintiffs with documents produced by those entities (to the extent they produced anything at all; some claimed to have no responsive documents). *See* Cotton Decl., ¶ 8. For a year, Plaintiffs raised no objection whatsoever to any of the subpoenas or the resulting productions—including the subpoenas to Isla, Blue Sky, Meta, and Freestar at issue here—that is, until Uber forwarded MTAA's much larger production in August of this year. *Id.* ¶ 3; *see id.* ¶¶ 12, 19-21.

Plaintiffs argue that Plaintiffs' leadership was not timely served with the Notice of Intent to serve the MTAA and NexLevel subpoenas.[9] As explained to Plaintiffs' counsel, and outlined in Mr. Cotton's Declaration, Uber routinely prepared and served Notices of Intent in connection with its third-party subpoenas. *See id.* ¶ 7. Because of a clerical oversight on the same day during the December holidays, the prepared Notices of Intent to serve the MTAA and NexLevel subpoenas were not served

---

[9] Notably, MTAA—the only entity of the two at issue that produced documents—contacted at least one MDL firm just four days after service of the subpoena. (Ex. 3 to Cotton Decl. [MTAA_00008294]).

on Plaintiffs. *See id.* ¶ 18. Such oversight does not provide any basis for a protective order as to these two entities, let alone the sweeping relief Plaintiffs belatedly seek with respect to subpoenas to other entities that were timely served and never challenged.

The party seeking a protective order bears the burden of demonstrating that specific prejudice or harm will result absent the requested order. *See Foltz*, 331 F.3d at 1130. Having failed to object to any subpoena for a year, Plaintiffs cannot satisfy their burden based on a clerical oversight that has already been cured. Indeed, NexLevel produced no documents to Uber at all, and MTAA's production was provided to Plaintiffs over three weeks ago. Plaintiffs thus have already had the very relief Rule 45's notice requirement was intended to provide: notice and an opportunity to object. *See* Fed. R. Civ. P. 45 advisory committee's note to 2013 amendment. In any event, Plaintiffs' argument is beside the point as to materials already produced by Isla, Blue Sky, Meta, and Freestar pursuant to subpoenas of which Plaintiffs had notice many months ago.

**C. The Subpoenaed Documents Are Squarely Relevant to Uber's Fraud Defense.**

The documents requested through the subpoenas relate to Uber trip receipts, fraud and fraud-screening, intake and verification procedures, advertising and targeted outreach, Plaintiff Fact Sheet information, and materials bearing on the lead generators' role in identifying, screening, and referring claimants to this litigation.[10] Plaintiffs' claim, without any standing to do so at the outset, that every request in every subpoena seeks information "wholly irrelevant" to this case is both baffling and dubious. ECF No. 7059 at 4.[11] Plaintiffs' Motion places inordinate focus on documents Uber *received*,

[10] To be clear, Uber did not request documents concerning OBGYN abuse, clergy abuse, human trafficking, opioids, Camp Lejeune, hair relaxer, talc powder, Roundup, social media harms, etc. *See* ECF 7059 at 5.

[11] Plaintiffs lack standing to argue that the subpoenas to third parties impose an undue burden or seek irrelevant information. *See, e.g.*, *Doe v. Kaiser Found. Health Plan, Inc.*, No. 23CV02865EMCPHK, 2023 WL 8714880, at *3 (N.D. Cal. Dec. 17, 2023) ("[T]o the extent that Kaiser objects to the subpoenas directed to third parties based on relevance or burden, the Court agrees that Kaiser lacks standing to do so."); *Handloser v. HCL Am., Inc.*, No. 19-cv-01242-LHK (VKD), 2020 WL 4700989, at *4 (N.D. Cal. Aug. 13, 2020) ("[A]s a general matter, a party has no standing to move to quash or for a protective order on the grounds that a subpoena seeks irrelevant information or would impose an undue burden on the non-party ...."). But even assuming Plaintiffs have standing to advance certain relevance arguments on the basis that their "own interest is jeopardized by the discovery sought from the nonparty," their arguments go far beyond that, reaching business documents that on their face do

as opposed to documents Uber *requested*. For purposes of relevance and proportionality, Plaintiffs' focus is misplaced. Uber cannot control what documents a third party ultimately produces. Rather, Uber can draft requests for non-privileged, relevant, and proportional documents, which is exactly what it did here.

Rule 26(b)(1) broadly allows a party to obtain discovery pertaining to its defenses. *See, e.g.*, *Snipes*, 334 F.R.D. at 550; *Cooper v. Cnty. of San Luis Obispo*, 350 F.R.D. 625, 630 (C.D. Cal. 2025); ECF No. 321 (recognizing the "broad scope of discovery … contemplated by Rule 26(b)(1)"). Indeed, discovery "should proceed" on a party's defense unless the defense is "truly baseless." *Flynn v. Nevada*, 345 F.R.D. 338, 350 n.21 (D. Nev. 2024); *see also Big City Dynasty v. FP Holdings, L.P.*, 336 F.R.D. 507, 511–12 (D. Nev. 2020) (explaining that because the requested discovery related to a "live defense in this case," it "clearly" fit within the scope of discovery authorized by Rule 26(b)(1)). At bottom, a party is broadly "entitled to seek discovery on its theory of the facts and the law, and is not limited in discovery by the opponent's theory." 8 Wright, Miller, & Marcus, Federal Practice and Procedure, § 2011 at p. 274 (2010). That principle works both ways, as the Court has recognized. For example, in connection with Plaintiff Jane Doe QLF 001's Rule 30(b)(6) deposition notice, the Court recently permitted discovery pertaining to S-RAD, even though S-RAD was not implemented until July 2022 and the alleged incident occurred in 2019. ECF No. 7033.

In this action, one of Uber's core defenses is that certain Plaintiffs have filed fraudulent claims and more enter the MDL on nearly a monthly basis. Far from a mere "hunch," ECF No. 7059 at 12, the Court has already granted all five of Uber's fraudulent-receipt motions, finding that more than 40 Plaintiffs have submitted fraudulent or apparently fraudulent "non-bona fide receipts" in their PFS submissions. *See* Section II.B, *supra*. Fraudulent claims, however, continue to enter the litigation, including through third party lead generators and marketers. Moreover, MTAA itself has publicly acknowledged that fraud, coached claimants, manipulated intake procedures, and fraudulent case

---

not implicate the interests of any Plaintiff. *Glass Egg Digital Media v. Gameloft, Inc.*, No. 17-cv-04165-MMC (RMI), 2019 WL 2499710, at *5 (N.D. Cal. June 17, 2019).

acquisition are recognized risks within the mass-tort claimant-acquisition industry.[12] Uber's investigation and discovery obtained through the subpoenas shows that the lead-generation industry itself recognized and discussed fraud risks in the claimant-acquisition process. *See* Ex. 3 to Cotton Decl. [MTAA_00006903]. The third-party productions have also uncovered misleading solicitation practices, such as Isla Marketing's use of social media ads featuring AI-generated individuals portrayed as sexual-assault survivors. *See* Section II.C, *supra*. Discovery has linked a fraudulent receipt to a third-party referral firm (Advocate Rights Center) (Ex. 9 to Cotton Decl.; ECF No. 7070-8) and revealed relationships among several entities that are the subject of the subpoenas.[13] *See* Ex. 3 to Cotton Decl. [MTAA_00006903, MTAA_00001120, MTAA_00002974]. That evidence is significant because it suggests that the fraudulent-receipt issues before the Court may not be isolated to individual claimants, but may instead involve broader referral, lead-generation, or claimant-acquisition networks. Discovery concerning those entities is therefore relevant to determining how claims entered the litigation, whether third parties played a role in the generation or submission of fraudulent evidence, and whether common sources of practices contributed to the fraud concerns already identified by the Court. Together with marketing practices, advertising expenditures, ROI metrics, and claimant-engagement data, these materials are directly relevant to tracing how claims were sourced, screened, and entered this litigation. This is tantamount to Uber's theory of defense as it relates to the MDL overall, a concept that has been accepted and applied to Plaintiffs' broad sweeping

---

[12] Jacob Malherbe, *Mass Tort Fraud Exposed: Billion Dollar Scams and the Fight to Save Our Industry*, Mass Tort Ad Agency (Oct. 11, 2025), https://masstortadagency.com/mass-tort-fraud-exposed/ (last visited Aug. 28, 2026).

[13] Pursuant to this Court's Order, ECF No. 5454, a deposition was conducted to investigate how the authentic Uber ride receipt associated with Plaintiff MDL ID 4232 came to be associated with three other plaintiffs in this litigation. A deposition of Plaintiff MDL ID 4232, was duly noticed and taken on May 7, 2026. During her testimony, Plaintiff MDL ID 4232 denied knowing or having any contact with the three plaintiffs whose claims were associated with altered versions of her receipt. Ex. 10 to Cotton Decl. at 70:17-24, 71:12-20, 72:5-9. She testified that she had never met or communicated with those individuals. *Id.* at 70:20-24, 71:15-20. She likewise testified that neither those individuals nor their counsel had ever contacted her. *Id.* at 71:6-25, 72:1-19, 106:4-8. Plaintiff MDL ID 4323 further testified that she sent her receipt to Torticity, which she testified she understood to be working with or as part of her counsel's intake process. *Id.* at 69:17-70:7, 76:8-25, 77:1-2. Plaintiff MDL ID 4323 further testified that, based on her review of her emails, she had not sent the receipt to any law firm other than her counsel and Torticity. *Id.* at 69:17-70:12.

theories even when not targeted to a particular Plaintiff's case. Certain Plaintiffs' Counsel, whose firms have been found to be tied to these lead generators as it relates to claims in *this* litigation, should certainly support any efforts to reduce fraud entering the MDL through these entities.

As lead generators, the subpoena recipients may—and likely do—possess documents related to: (a) how Plaintiffs without colorable claims came to be represented by Plaintiffs' firms in the MDL; (b) whether Plaintiffs were recruited to participate in the MDL through assurances of limited vetting of their claims; and (c) whether the lead generators or any of the Plaintiffs' firms with which they conduct business had knowledge of fraudulent claims being submitted.[14] Industry participants have publicly recognized that fraudulent lead-generation practices have infiltrated the mass-tort acquisition process and that reputable marketers and lead generators are aware of, and actively attempting to combat, those practices.[15] Simply put, lead generators appear to have been involved in, or had knowledge of, conduct facilitating fraudulent claims and/or Rule 11 violations (*i.e.*, failure to conduct an adequate pre-suit investigation) by, for example, offering misleading statements about the process of filing claims, the evidentiary support needed, and obtaining compensation.[16]

Indeed, lead generators such as Blue Sky Legal have advertised that they employ fraud filters, presumably to prevent potential fraud. *See* Ex. 11 to Cotton Decl.. Evidence of fraud or insufficient pre-suit investigation is relevant because it goes directly to the veracity of the allegations underlying each Plaintiff's claim, and directly bears upon that Plaintiff's credibility. Courts routinely recognize

---

[14] Plaintiffs spill much ink in arguing the relevance of documents related to individuals who contacted lead generators but have not filed suit to date. Plaintiffs do not have standing to advance this argument. *See supra*. In any event, documents reflecting the process by which leads are generated, vetted (if they are), and sold to a law firm that may or may not file a claim can reveal where and how fraud enters the system, whether or not a particular individual files suit.

[15] *See* Katherine Hoffman, CEO of Smart Reviews, interview on Law, AI, and Money Podcast (YouTube), available at https://www.youtube.com/watch?v=5aoNG7w6Olk, last visited on August 29, 2026 (explaining that fraudulent leads have infiltrated marketers, lead generators, and case-acquisition companies, and stating that the industry participants she works with recognize the problem and engage her company to combat it).

[16] Plaintiffs criticize Uber's assertion that the lead generators "'may'" have been involved in or had knowledge of fraud. ECF No. 7059 at 12. But Plaintiffs cite no law that requires a party to be absolutely certain that information exists in order to request discovery pertaining to it. Furthermore, the production obtained thus far *has* shown that these entities do, in fact, have knowledge of fraud in *this* MDL. *See* Section I, *supra*.

that discovery regarding a plaintiff's credibility, such as could be used to impeach a witness, is relevant under the scope of Rule 26(b). *See Dragos v. Cornea*, No. 2:19-cv-013380JCC-TLF, 2020 WL 13480834, at *2 (W.D. Wash. July 24, 2020) ("The Court denies defendant's request for a protective order, because credibility and other impeachment information is discoverable."). Discovery into those purported safeguards is particularly relevant where evidence shows that a ride receipt transmitted through one referral company was later identified in altered form in multiple unrelated claims. *See* Ex. 10 to Cotton Decl. at Tr. 69:21-70:12, 76:8-16. That evidence, coupled with documents connecting that referral company to other subpoenaed entities, provides a concrete basis to examine the adequacy of referral entities' screening and fraud-prevention practices.

Moreover, documents related to the lead generators' relationships with law firms that maintain cases in the MDL are relevant. Formal agreements between lead generators and their law firm customers are relevant because they will likely reveal the scope of the lead generator's contractual obligations regarding claimant vetting, quality representations, and the economic terms governing lead generation. Such information bears directly on claimant sourcing, claim legitimacy, and fraud-related issues in this litigation and therefore falls comfortably within Rule 26(b)(1)'s broad relevance standard—and is no more privileged than the third-party contracts and communications with safety groups and consultants that Uber has been ordered to produce because they were deemed relevant following this Court's broad application of Rule 26(b).[17] Indeed, Uber has discovered that certain lead generators provide leads to law firms for "good" claims at a more expensive rate than leads for "bad" or questionable claims. *See* Ex. 3 to Cotton Decl.. This kind of information is highly relevant to rooting out potential fraud in this particular matter.

Aside from information regarding fraud, the lead generators are likely to have other relevant information simply because they had non-privileged communications with potential claimants (many of whom were successfully converted to MDL Plaintiffs) about their potential claims. For example, Blue Sky Legal advertised itself to Plaintiffs' firms as a resource for law-firm growth, stating: "From

[17] For example, on November 10, 2025, Special Master Jones ruled that Uber must produce certain communications with safety advocate organizations related to mass tort litigation.

attracting new clients to ensuring every lead is qualified and signed, our turn-key client acquisition [services] are designed to help your firm scale effectively." Ex. 5 to Cotton Decl.. This representation demonstrates that lead generators likely possess communications, claimant-acquisition data, and other records bearing directly on the merits of claimants' allegations.

Plaintiffs' reliance on *Doe v. Doe 1*, 2026 WL 1370113, at *1 (C.D. Cal. Mar. 25, 2026), is misplaced. ECF No. 7059 at 12. First, the court explicitly explained that its ruling was guided by the well-established principle that requesting discovery "from opposing counsel is a practice prone to abuse, and courts are traditionally hesitant to authorize such discovery." *Id.* at *2. Unlike in *Doe*, Uber did not request any documents from Plaintiffs' counsel. Second, the defendant in *Doe* sought the subpoenaed information because it was allegedly aware of fraud committed by law firms representing claimants in other litigation. *Id.* at *3. Here, Uber is aware of fraudulent claims by Plaintiffs in **this litigation**. Uber's fraud-related motion practice has involved Plaintiffs represented by multiple firms. For example, Uber's Special Master Motion discusses at least 73 PFSs submitted by Nachawati Law Group, and the Court's fraudulent-receipt proceedings have involved Plaintiffs represented by Pulaski Law Firm, Reich & Binstock, and Wagstaff Law Firm. *See* ECF No. 7070 at 7-9. Third, the *Doe* court explained that the subpoena was burdensome. 2026 WL 1370113, at *2. No such burden is imposed here; Uber merely requested the subpoena recipients to produce responsive documents in their custody or control. And unlike in *Doe*, which featured a single plaintiff, this case involves thousands of Plaintiffs in a coordinated proceeding with systemic fraud concerns. The proportionality analysis from *Doe*, therefore, cannot save the day here. Put simply, *Doe* involved a defendant with no evidence of fraud fishing for advertising records in a single-plaintiff case. This MDL involves a defendant with documented, proven fraud across multiple firms tracing the source of that fraud through the entities that channeled claims into this litigation. In sum, Uber's requests ask for production of squarely relevant documents, and Plaintiffs' arguments to the contrary are unavailing.

### D. Plaintiffs Do Not—and Cannot—Demonstrate that All of the Produced Documents Are Subject to the Attorney-Client Privilege or the Work-Product Doctrine.

First, Plaintiffs have not identified any specific documents they contend are privileged, provided the information as required, or established the factual basis for any privilege claim, despite

bearing the burden of establishing the applicability of any asserted privilege. *See Clarke v. Am. Commerce Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992). Instead, they seek blanket protection for entire productions based on the unsupported premise that *all* communications involving lead generators are privileged. That position is unsustainable and Plaintiffs know it. They concede that at least some productions, including Meta's, contain no privileged material whatsoever. ECF No. 7059 at 9 n.4. Their demand for blanket protocol collapses under the weight of their own admissions. Plaintiffs' burden requires a document-specific showing; generalized assertions of privilege are insufficient. *See United States v. Martin*, 278 F.3d 988, 1000 (9th Cir. 2002); *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1147 (9th Cir. 2005). To the extent Plaintiffs contend that specific documents are protected by the attorney-client privilege or work product doctrine, those claims should be presented through the established procedures before the Special Master, who has handled more than 3,000 privilege challenges to date in this litigation.

A specific showing under those established procedures is especially important here because many of the subpoena requests seek facially non-privileged business records, including advertising campaigns, lead-generation metrics, marketing strategies, fraud-screening procedures, verification protocols, and other claimant-acquisition records. *See* ECF Nos. 7059-2, 7059-3, 7059-4, 7059-10. These categories do not call for confidential attorney-client communications made for the purpose of obtaining legal advice. Nor have Plaintiffs demonstrated that they constitute attorney work product; there is no showing that such business documents were prepared in anticipation of litigation or show counsel's mental impression regarding the specific litigation as opposed to the company's approach to the well-recognized problem of fraud in the mass tort industry. *See Sanmina Corp.*, 968 F.3d at 1110, 1116. Notably, not all subpoena recipients produced documents, and all but one of the remaining recipients produced a modest number of documents (well under 100), which Plaintiffs should have been able to review and log by now.[18] The failure to do so here is fatal to Plaintiffs' privilege objections.

---

[18] Aside from MTAA, the most documents produced by any of the entities at issue was 76. *See* Cotton Decl., ¶ 16. Notably, MTAA does not assert any attorney-client privilege, work product, or other protections of its own in its August 22, 2026 letter seeking to clawback the entire production. *Id.* ¶ 21.

Second, Plaintiffs have not met their burden to show that any of the subpoenaed lead generators are "agents" of any specific counsel, let alone for purposes of seeking or providing legal advice. Plaintiffs' privilege theory depends on the assertion that MTAA, Blue Sky, Isla, and similar entities functioned as agents of counsel; however, Plaintiffs offer no evidence establishing the essential elements of an agency relationship, including authority to act on behalf of a law firm or a firm's right to control the entity's conduct. *See Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017).

Indeed, the lead generators were not agents of any law firm because they marketed and sold prospective-client leads to multiple law firms through a competitive bidding process, a business model fundamentally inconsistent with an agency relationship requiring the agent to act on behalf of, and subject to the control of, a particular principal. MTAA, Blue Sky, and Isla are plainly independent marketing businesses. They designed advertisements (including AI-generated content), ran marketing campaigns, collected leads, and sold or forwarded those leads to law firms. MTAA's own court filing, attached to Plaintiffs' Motion, states that it ran advertising campaigns, was not an intake company, was not a case-management service, and had no involvement in claim documentation. *See* ECF Nos. 7059-5, 7059-7 at 2-4, 6. Plaintiffs identify no evidence showing that any law firm authorized these entities to act on its behalf or exercised the type of control necessary to create an agency relationship. To the contrary, the evidence shows that these entities simultaneously marketed to and sold leads to multiple competing law firms – a commercial dynamic that is the antithesis of the fiduciary, single-principle agency relationship required to extend privilege.

The Blue Sky productions further confirm the commercial nature of these relationships. In one communication, Blue Sky proposed a business arrangement with Majed Nachawati under which it would generate Uber sexual-assault claimants, deliver signed retainers, and receive compensation tied to case outcomes, including a proposed 12.5% share of contingency-fee recoveries, while discussing retainer ownership, intake metrics, payment structures, and revenue allocation. *See* Ex. 12 to Cotton Decl.. In another, Blue Sky employees discussed modifying intake procedures to create a "billable event" before claimant transfer, ensuring compensation for referrals, and avoiding losses when

claimants could not later be contacted. *See* Ex. 13 to Cotton Decl.. The communications further show Blue Sky managing claimant information and transfers among participants in the referral network, including moving one claimant from the Nachawati channel to Carlson and considering routing future matters away from Nachawati altogether based on business considerations. *Id*. Far from demonstrating that Blue Sky acted as an extension of any particular law firm, these documents depict Blue Sky as an independent lead-generation enterprise that acquired, managed, monetized, and directed claimant leads among competing law firms and vendors.

Nor have Plaintiffs established that the communications at issue were confidential communications made in the course of an attorney-client relationship. The questionnaires in *Barton* were posted by a law firm and submitted directly to that law firm by individuals seeking legal representation. *Barton v. U.S. Dist. Ct. for the Central Dist. of Cal.*, 410 F.3d 1104, 1107-10 (9th Cir. 2005). Here, Plaintiffs have not shown that lead generator websites identified specific law firms, prospective claimants believed they were communicating directly with counsel, or the communications were subject to representations of confidentiality comparable to those in *Ulrich v. General Motors, LLC*, 2026 WL 183676 (S.D.N.Y. Jan. 23, 2026).

Indeed, the lead generators appear to have performed an antecedent commercial function: advertising for, identifying, screening, and referring prospective claimants. Once a lead was generated and routed to a law firm, the lead generator generally exited the relationship. That role is materially different from the intermediary role contemplated by *Barton*, and does not justify extending privilege to entire categories of business records held by independent marketing entities.

Plaintiffs also cannot establish that the lead generators were the type of third parties whose involvement is necessary to preserve privilege. Their role was to generate prospective clients before any attorney-client relationship existed, not to facilitate confidential communications between attorneys and clients. Under California law, for example, a third party's participation preserves privilege only where the document is not shared beyond third persons "who are present to further the interest of the client in the consultation or … to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is

consulted." *See* Cal. Evid. Code § 952. Plaintiffs have made no showing that the lead generators could meet this narrow extension when the lead generators' involvement predates any consultation that would have created an attorney-client relationship. Instead, the record shows that they functioned as independent commercial entities engaged in claimant acquisition and referral services.

These business arrangements cannot be sheltered beneath a blanket assertion of privilege, just because one party happens to be a lawyer. The relationship between a lead generator and law firm is no more privileged than Uber's contracts with third-parties like safety groups, or board discussions or discussions with safety consultant experts (SRAD) that Uber has been required to produce. Plaintiffs bear the same burden to support a privilege claim as Uber has repeatedly carried in this litigation. Plaintiffs cannot satisfy their burden of showing that communications involving these entities fall within any extension of the attorney-client privilege.

### E. Lead Generator Discovery Concerning Claim Legitimacy, Fraud, and Uber's Defenses Does Not Impact the Privacy Interests Asserted by Leadership Because of the Court's Protective Order and Prior Rulings.

Uber recognizes the profound sensitivity of the subject matter in this litigation and takes seriously the privacy interests of sexual assault claimants. Those interests are real and deserve protection. But privacy interests do not create an absolute bar to otherwise relevant discovery, particularly where the discovery is needed to protect the integrity of the very proceedings brought on behalf of those claimants. As the Court has previously advised: "[T]here are several measures available to protect the very serious privacy concerns of the **non-party plaintiffs** and acknowledge the sensitivities which may arise for them as to their case information. The Protective Order in this case allows discovery materials to be designated 'Confidential' or 'Highly Confidential – Attorneys' Eyes Only,' including any personal identifying information of a non-party, or any other non-party information not otherwise available to the public. ECF No. 176 at 2–3." ECF No. 321 (emphasis added).

Plaintiffs themselves previously argued that sensitive information should be produced notwithstanding privacy concerns because the confidentiality framework already established in this litigation provided adequate protection to address the privacy concerns of parties and nonparties alike.

ECF No. 3074 at 2-4. In resolving a prior discovery dispute concerning the identities and contact information of riders who reported sexual assault or misconduct, Judge Cisneros held that "the relevance of their potential testimony outweighs the limited imposition on their privacy," notwithstanding the sensitive nature of the information sought. ECF No. 3346 at 4. And while recognizing that disclosure could constitute "a meaningful privacy intrusion," the Court explained that "the degree of that intrusion can be mitigated with sufficient protection against undue exposure or harassment." *Id*. at 5. Having taken that position when seeking disclosure of non-party complainants' identities and contact information, Plaintiffs cannot now use that same sword as a shield to contend that privacy interests categorically bar discovery concerning claimant acquisition, referral practices, lead generation, and fraud-related issues.

The Court has already entered a comprehensive Protective Order governing confidential and highly confidential information. ECF No. 176. To the extent any production contains personally identifying information that Uber did not request concerning individuals in unrelated matters, Uber remains willing to meet and confer regarding reasonable measures such as targeted redactions. That reasonable approach, however, bears no resemblance to the sweeping relief Plaintiffs seek (*i.e*., an order preventing Uber from reviewing and using otherwise relevant third-party discovery). If the Court has any remaining concerns about the scope of individual documents, an *in camera* review of a representative sample would allow the Court to evaluate the materials directly, an approach far more proportionate than the blanket sequestration Plaintiffs demand. Asserted privacy interests do not outweigh Uber's need for the information, the Court's interest in protecting the integrity of these proceedings, and the existing confidentiality protections already in place, and they certainly do not support the blanket protective order Plaintiffs seek.

## V. CONCLUSION

Granting Plaintiffs' Motion would effectively immunize from scrutiny the very entities whose practices have already been linked to documented fraud in this litigation. Plaintiffs failed to comply with any applicable order and/or rule regarding privilege assertions and now seek the extraordinary remedy of sequestering evidence that is actively aiding the Court's ability to ensure the integrity of its

docket and allow resolution measures to timely progress. The existing Protective Order already provides a framework for handling sensitive materials, and Uber remains willing to work with the Court on targeted accommodations for genuinely unrelated personal information. Because denying the Motion serves the interest of every legitimate Plaintiff whose claims are undermined by the fraud that remains uninvestigated, the Court should deny Plaintiffs' Motion.

DATED: September 2, 2026

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

By: *_/s/ Patrick L. Oot, Jr._*
Patrick L. Oot, Jr. (Admitted *Pro Hac Vice*)
**SHOOK, HARDY & BACON L.L.P.**
1800 K St. NW Ste. 1000
Washington, DC 20006
Telephone: (202) 783-8400
Facsimile: (202) 783-4211
oot@shb.com

Christopher V. Cotton (Admitted *Pro Hac Vice*)
**SHOOK, HARDY & BACON L.L.P.**
2555 Grand Blvd.
Kansas City, Missouri 64108
Telephone: (816) 559-2393
Facsimile: (816) 421-5547
ccotton@shb.com

Michael B. Shortnacy (SBN: 277035)
**SHOOK, HARDY & BACON L.L.P.**
2121 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (424) 285-8330
Facsimile: (424) 204-9093
mshortnacy@shb.com

Alycia A. Degen (SBN: 211350)
**SHOOK, HARDY & BACON L.L.P.**
2121 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067

Telephone: (424) 324-3496
Facsimile: (424) 204-9093
adegen@shb.com

Sabrina H. Strong (SBN: 200292)
**O'MELVENY & MYERS LLP**
400 South Hope St, Ste. 1900
Los Angeles, CA 90071
Telephone: (213) 430-6113
Facsimile: (213) 430-6407
sstrong@omm.com

Jonathan P. Schneller (SBN: 291288)
**O'MELVENY & MYERS LLP**
400 South Hope St, Ste. 1900
Los Angeles, CA 90071
Telephone: (213) 430-8115
Facsimile: (213) 430-6407
jschneller@omm.com

Michael Huston (Admitted *Pro Hac Vice*)
**ASHURST PERKINS COIE LLP**
700 13th St. NW, Ste. 800
Washington, DC
Telephone: (202) 434-1630
michael.huston@ashurstperkins.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC