# EXHIBIT 1

**Pages 1 - 27**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

**NO. 3:23-MD-03084-CRB**

San Francisco, California
Monday, August 24, 2026

**TRANSCRIPT OF REMOTE ZOOM PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
**BY: SARAH R. LONDON, ATTORNEY AT LAW**

PEIFFER, WOLF, CARR, KANE, CONWAY & WISE
555 Montgomery Street, Suite 820
San Francisco, CA 94111
**BY: RACHEL B. ABRAMS, ATTORNEY AT LAW**

CHAFFIN LUHANA, LLP
600 Third Avenue, 12th Floor
New York, NY 10016
**BY: ROOPAL P. LUHANA, ATTORNEY AT LAW**

ANAPOL WEISS
14 Ridge Square Northwest, Suite 342
Washington, DC 20016
**BY: ALEXANDRA M. WALSH, ATTORNEY AT LAW**

GIRARD SHARP, LLP
601 California Street, Suite 1400
San Francisco, CA 94134
**BY: ANDREW KAUFMAN, ATTORNEY AT LAW**

(Appearances continued on following page.)

**APPEARANCES (CONT.'D):**

For Plaintiffs:

QUEENAN LAW FIRM, P.C.
731 Station Drive
Arlington, TX 76015
**BY: KEVIN QUEENAN, ATTORNEY AT LAW**

For Defendants:

KIRKLAND & ELLIS, LLP
555 California Street, 30th Floor
San Francisco, CA 94104
**BY: LAURA E. VARTAIN HORN, ATTORNEY AT LAW**

KIRKLAND & ELLIS, LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
**BY: ALLISON M. BROWN, ATTORNEY AT LAW**

KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, NY 10022
**BY: MICHAEL VIVAS, ATTORNEY AT LAW**

KIRKLAND & ELLIS, LLP
333 West Wolf Point Plaza
Chicago, IL 60654
**BY: MARK J. NOMELLINI, ATTORNEY AT LAW**

KIRKLAND & ELLIS, LLP
400 Congress Avenue
Austin, TX 78701
**BY: KIMBERLY G. BUENO, ATTORNEY AT LAW**

KIRKLAND & ELLIS, LLP
1301 Pennsylvania Avenue, Northwest
Washington, DC 20004
**BY: GEOFFREY M. WYATT, ATTORNEY AT LAW**

Page 3

**Monday - August 25, 2026** **11:06 a.m.**

**P R O C E E D I N G S**

**---o0o---**

**THE COURTROOM DEPUTY:** Calling civil action C 23-3084, In Re: Uber Technologies, Inc., Passenger Sexual Assault Litigation. Counsel please state your appearances for the record.

**MS. LONDON:** Good morning, Your Honor. Sarah London on behalf of the plaintiffs.

**MS. ABRAMS:** Good morning, Your Honor. Rachel Abrams on behalf of the plaintiffs.

**MS. LUHANA:** Good morning, Your Honor. Roopal Luhana on behalf of the plaintiffs.

**MS. WALSH:** Good morning, Your Honor. Alexandra Walsh on behalf of the plaintiffs.

**MS. VARTAIN:** Good morning, Your Honor. Laura Vartain on behalf of the Uber defendants.

**MS. BROWN:** Good morning, Your Honor. Alli Brown for the Uber defendants.

**MS. BUENO:** Good morning. Kim Bueno for the Uber defendants.

**MR. WYATT:** Good morning. Geoff Wyatt for the Uber defendants.

**MR. NOMELLINI:** Good morning. Mark Nomellini for the Uber defendants.

Page 4

**MR. OOT:** Good morning. Patrick Oot for the Uber defendants.

**MR. VIVES:** Good morning, Your Honor. Michael Vives for the Uber defendants.

**THE COURT:** Okay. Good morning, everybody.

So there are a couple things that I want to talk about. This is the time that we wanted to discuss the bellwether selection process. In addition, I think there's another issue dealing with the settlement master and that process. Let me talk about the bellwether first.

It was my understanding, and maybe I'm, maybe my understanding is incorrect, was that after the adjudication of the case presently set for trial in Texas, the next case to be tried as a bellwether was a case in California, is that correct? Is that still the case?

**MS. LONDON:** Yes, Your Honor.

**THE COURT:** And do we have a trial date on that?

**MS. LONDON:** We do not yet, Your Honor, no.

**THE COURT:** All right. Well, let's get a trial date. Let's start with that. And my suggestion is that that case be tried in January at the beginning, relatively soon in January. Let me look at a calendar. We could adjust dates, but I think let's set the trial for January 11th, 2027, with a pretrial on January 7th. And there may be some adjustment there depending on people's calendar and so forth, but I'd like to get that

Page 5

set.
So then the question is what follows, and is it that there are designated cases to, at that point, so we're now looking at further bellwether process selections, or is there another case that is sitting out there that ought to be tried right after the California case?
**MS. LONDON:** Your Honor, our view is that we have provided Your Honor with the list of cases we believe should be the pool from which one should be chosen to try next, and I believe we've proposed that that be tried to follow the --
(Simultaneous crosstalk.)
**THE COURT:** Okay. And Uber has filed an objection to those cases on a number of bases, and I think that we have to have, and I don't know that I'm prepared to do it today, a discussion about what should follow.
The concern I have in a way -- and maybe it's a concern in my head, so it's not a real concern -- is like what do you need to know that will advance the resolution of cases. So it's sort of detached from the importance of the case, the unimportance of the case; the typicality of the case, the lack of typicality of the case; it's my case, no, it's your case; it's your choice, no, it's my choice. All of those things are subsumed or maybe discarded in the bellwether -- I mean, this is, you know, okay, I'm sort of making things up as I go along, I understand, but that's what bellwethers are designed to do.

Page 6

They are designed to be as flexible as possible and as informative as possible. So the flexibility's in the process. The informational virtues are case by case, state by state. So I don't know, you know. I've got, like, two to go to determine really where do we go from there.
On the other hand, to sit back and wait 'til the two cases are adjudicated is not wise, because things just stop.
So as long as I'm sitting here and thinking in my mind, well, guess what, we'll try a Texas case next and that's going to tell us something about Texas, and then we'll try a California case, which is really the second California case but the first federal California case. That will tell us something about California. It seems appropriate to look outside of California for the next series of cases. So I understand that and I think that that's the approach that I should take.
Now, the plaintiffs come in with, have come in with I don't know how many, eight, nine, 10 suggested cases. I think I have to look at them or at least invite Uber to give me their views if you haven't already, and maybe you have, I don't know, give me your views as to those eight cases or nine cases as to what you think would be more typical or nontypical of those particular cases, because I'm willing to look at that and make a judgment. I don't know how quickly I can make the judgment. I may want to wait until after October. I sorta feel that the Texas case is pretty important and we oughta learn something

Page 7

from that.
And so I don't want to, I don't like, you know, the old concrete. I don't want to box myself in and basically box you people in. I mean, it's not like whatever I do doesn't have consequences for you; it does. Box yourself into a particular path to follow. So I may wait on that.
And having said all that, then I think Ms. Bueno or Ms. Vartain or whoever's going to do it, probably Ms. Vartain, you will get back to me with some -- or, I mean, I'm not picking anybody, but Uber to get back with some analysis as to those cases, and then we'll go from there.
**MS. BUENO:** Yes, Your Honor. This is Kim Bueno.
**THE COURT:** Yes, go right ahead. Yes.
**MS. BUENO:** Thank you.
We have indeed proposed a rubric of how we think the Court should proceed, and we think it makes sense to look at the top three categories of cases and claims in this litigation as the way forward. And let me explain that this all comes from the court-approved plaintiff fact sheet where plaintiffs were actually asked to check a box about what the allegations were, and we have an analysis that we've provided you in our briefing that chooses the top three categories of cases, and what Uber has suggested is that both sides pick two cases in each category, which would give us a pool of 12, and we believe that's the best path forward as opposed to what plaintiffs have

Page 8

provided in their set, which are all penetration cases, they are all cases with the plaintiff leadership, and they are all cases with law enforcement involvement. And so they make up a very, very, very small portion of the global litigation.
So you asked at the beginning what we could be doing to get the information, and that's what we have put forward. Uber would like information about the value or lack of value of other categories of cases.
So, for example, we had Ms. Dean's case, which was a penetration case, in Phoenix, we had Ms. Mensing's case which was a touch on a thigh, and what we are putting forward are other categories that are demonstrative of a large group, up to 40 percent of the inventory.
So that's why we think Uber's proposal, which has a few more details in our brief, but that makes sense because that's going to give us information about other types of cases that we can then analyze the litigation and the inventories of different plaintiff groups to figure out whether or not they can be resolved.
And another very important component which I don't want to forget is our proposal to have a fraud special master involved, because we did file a motion on August 20th that I'll draw Your Honor's attention to. I don't believe plaintiffs have responded yet, so it's not ripe for Your Honor's decision, but we have identified up to 30 percent of cases in certain

categories that have indicia of fraud, and that's really concerning, and we have outlined details for Your Honor. Your Honor may be aware that there have already been fraudulent receipts uncovered. We've uncovered plaintiffs who have not signed or verified plaintiff fact sheets that had been given to us. We have plaintiffs who are making claims that are contrary to the data, GPS and other allegations. So we know there's fraud.

So what Uber has proposed is a different, two different prongs. Let's get the fraud out of the inventory, and then let's do bellwethers that give us information about the bulk of the claims. We think we can get to resolution that way, Your Honor.

**THE COURT:** Let me give you my reaction to that, because first of all, I don't, I am not saying, nor do I believe that there's no fraud involved. My experience in 28 years is that there's some percentage of fraud in all class action cases or in all mass tort cases. It goes with the territory. It's not the lawyers' fault, by the way. Frequently it is people who are opportunists who see that or read the newspaper, have discussions, hear news reports and so forth, and they think this is an opportunity for them to make some money.

So, yes, that's a problem, but it's not, it's not limited to this action. It's widespread throughout the entirety of



mass tort litigation.

Okay. Having said that, the question is: How do you address it.

Now, you assert that it's up to 30 percent or something. Well, that'd be a substantial number. I don't know how you have come to that figure, and I'm not asking you right this minute, but obviously if it's a, if it's a number that is a -- and I would guess 30 percent would be a number of, that is the magnitude of one-third of all claims are bogus or fraudulent, have no merit, then that is of some concern. It would be some concern to the Court.

I would also guess, by the way, that it may very well be the type of situation. Well, first of all, what is really the magnitude? Secondly, how do you address the magnitude? Is there a way to address it, as an example, ab initio, right now? Let's address it right now. Because that's really what you're telling me. You're saying let's appoint a special master who can spend time and address all of these claims. That certainly is a possibility, but it has a downside to it for the rest of the litigation.

If 30 percent are fraudulent, that means 70 percent are not, and what are you doing about the 70 percent that are not? How are they moving ahead? How are they close to resolved? Because it would be -- you would concede that those claims have merit, have some merit. Although that is to say, they weren't



made up. They weren't fraudulent. Whether they have merit or not is a function of the law, is a function of any number of things, but they're not fraudulent. So what do you do about that 70 percent? And, you know, I'm not in favor of just letting that hang out there while I'm trying to figure out what to do with the 30 percent fraudulent.

Nevertheless, as I've said, there are different procedures that by could employ, and we might be able to do it simultaneously for ferreting out the, I'll call them the fraudulent claims from the non-fraudulent claims. Maybe that's a better way of putting it rather than saying the merit claims. The non-fraudulent from the fraudulent, and it can be done, maybe we can have a process now, maybe we should have a process set up as a collateral process that almost a settlement master would engineer, you know.

Which, I rather like that idea. I mean, just coming into my mind, I rather like that idea because it -- there's nothing wrong with a sideshow as long as it's a sideshow, you know, if it doesn't interfere with the adjudication of non-fraudulent claims. When I say interfere, doesn't delay, doesn't in any way impact the progress of the non-fraudulent claims. Then I think there's some merit to it, or there's maybe a lot of merit to it, and then we have to sort of design it.

All I'm saying with this wealth of legal talent here is, you know, you guys can think of something. You know, you can



come up with some -- I understand that each of you has the perfect solution, but I'm trying to figure out why you can't sort of get together and figure out a way to address these things without impacting the whole rest of the process. You see? That's what bothers me about, you know, why I -- you know me. I mean, I see something and I immediately like it or dislike it. And that's not good for a judge, I'll concede that, but I'm willing to talk it out and try to figure out where we are.

I mean, you guys could create a process, you know, especially if you don't look at this as a tactical maneuver to sort of move Piece A and hold back Piece B, or move C and watch D and all of these things. If you just treat it as, well, here we have this little, you know, we've got this blip. It may be a large blip, may be a small blip. We've got to sort of figure out how to do it and not disturb the entire process.

So I'm not asking you today to come up with anything because I'm not going to make a decision today, but I think maybe you could have some conversations along those lines and figure out. I mean, you see what I want to do, and I don't think it's different from what you want to do, but that's the way sort of I would like to approach it.

Now, I got this rather interesting issue about the settlement master. I guess there are a couple things I could say in general about it.

Number one, I'm going to stick to it. I'm not going to get involved in the settlement process; that is, the merits of any type of approach to settlement, as well as the details. But I think we're at a point where there seems to be some serious sticking points that we have to sorta work our way through, you know. How much interaction, you know, the whole process to what extent is there sort of -- it's a confidential process, so what, to what extent must it be disclosed, and to whom, and under what circumstances and when.

All of those are maybe complicated issues. And I think, while I would like to say I should stay out of it, I don't know that I can stay out of it at this point. I think that both sides would tell me that I sorta have to get involved in the procedure going forward. I think that's right. I think I want to think about it. I was -- sort of got both of these things. I got the Uber's concerns. I got the plaintiffs' concerns. I think I have to sort of think about it a bit and try to work it out and then have a further conversation with you people about it.

You know, I guess I'd say in terms of individuals to be appointed, a special master, it just, unless -- you know, unless both sides agree to the individual, I just don't know why it's going to be productive. You know, maybe my experience is wrong. You know, I've always thought, well, both sides have to agree who the settlement person is, because otherwise they



just won't really deal in good faith with the settlement person, but maybe that's not true. Maybe I have to put somebody in there. But, you know, I don't want to spend time, effort, appointment and a special master's time and efforts if that person isn't going to be effective in the process. So I don't want to -- I want to think about that a bit more.

Obviously if you have any suggestions, you can certainly make them. I don't know that I need testimonials from other lawyers about how it's worked or how it hasn't worked. You know, you get to points where it's so idiosyncratic that it doesn't tell you enough about where you go from here. It's sort of you look back and you say, well, that worked in that case because of this or that, or this was an impediment, I don't know.

I know that -- I don't know. Have the parties agreed that I should talk to Randy Ellis?

**MS. LONDON:** Not necessarily. No, Your Honor.

**THE COURT:** Okay. All right.

**MS. LONDON:** We have not agreed quite yet, Your Honor.

**THE COURT:** So if there's not an agreement, I don't want to, if there's just not an agreement. And that doesn't mean that I wouldn't appoint Randy Ellis. I'm just saying at this point I don't want to do anything without both sides saying it's a good -- okay, Judge, you can do that, because



it's too sensitive. It's too explosive. It's too determinative. It has all of the hallmarks of -- yeah, I just don't want to put my hand on that settlement scale. I'm trying to stay out of it.

Certainly in my experience it has backfired in other MDL litigation, and that's why I have stayed so far out of talking about settlement. I mean, I do have to talk about settlement, because that is, obviously when you have 4800 cases you're not going to try them all, though I'm willing to try as many as I can. But you're not going to. We all know that. And so they've got to be resolved one way or the other, and, but I don't want the Court to resolve them, I want the parties to resolve them. And that I feel very, very strongly about, especially in this case, interestingly enough. This case, this case is one of those cases where the consequences of a settlement impact each and every plaintiff and the company as a whole.

So I just don't think it should be, well, the Court did this or the Court did that. The Court does a lot of things anyway that could impact settlement, but that's sort of my job. I mean, that's the way I, that's what we're supposed to do. But in terms of settlement, I've got to try to keep my distance in balancing things.

So anyway, that was my present thinking, which is, one, see if you can get some agreement on the fraud issue; two, if



you want to stick with your positions on the bellwethers I'll take a look at them with that in mind, and three, in terms of a settlement, I will, I need to do some work. I need to think about it, and if I have, and I'll have questions, I assume. I just don't today, having just received this information.

**MR. NOMELLINI:** Your Honor.

**THE COURT:** Yes, Mr. Nomellini.

**MR. NOMELLINI:** Yes, Your Honor.

With respect to settlement, I mean, may we also have an in-camera discussion with the Court when it's convenient for Your Honor to discuss certain settlement matters?

**THE COURT:** Well, I think we should. I think I'll have to. I think I indicated I will.

So what is the, let's talk about a timetable on that. Any thoughts? I mean, I guess the parties would like it as early as possible, is that right, or ...

**MR. NOMELLINI:** Your Honor, we're available.

**MS. LONDON:** Us, too, Your Honor.

**THE COURT:** I, of course, wanted to dodge it.

All right. Well, I think I have to do it. I think I have to. I guess we could do it on Friday.

**MR. NOMELLINI:** Very good, Your Honor.

**MS. LONDON:** That sounds good to us, Your Honor.

**THE COURT:** Yeah, Friday morning sometime. What do you think, Lashanda?

Page 17

THE COURTROOM DEPUTY: Maybe 11:30, after our civil law and motion calendar.
THE COURT: Yeah. 11:30 Friday?
MS. LONDON: Well, that works for us, Your Honor.
THE COURT: So everything is going along swimmingly with Texas?
MS. LONDON: Yes, Your Honor. We are moving along swimmingly.
THE COURT: Great.
So Ms. Bueno, I wanted to find out. You haven't identified a member of your team who will be the counter at the trial. Do you have someone in mind?
MS. BUENO: Your Honor, tell me what you mean by "counter."
THE COURT: Well, he or she is the person who counts the number of times I rule in favor of Uber and the number of times I rule in favor of the plaintiff, and then on a daily rolling basis, at the end of the day we'll simply say it's this and that.
MS. BUENO: Your Honor, I'm happy to take that mantle and to run with it. I will be the counter for us.
THE COURT: You will be the counter. I couldn't have a better, a more trustworthy counter than you, Ms. Bueno. It's fine. That's fine.
Well, okay. I will see you all on~--

Page 18

MS. LONDON: Your Honor, just very briefly --
THE COURT: Yes, Ms. London.
MS. LONDON: -- just to address just a few quick things, Your Honor.
First of all, I appreciate the Court's views on the issue around Uber's motion for the fraud special master. You know, we would really much likely appreciate the opportunity to confer with Uber about this. You know, we received all of this for the first time, as you can imagine, last week, and we really do need some time to digest it and look into the details. Some of our early investigations indicate that what we're looking at is just discrepancy in the evidence, which seems to be a lot of what's going on here.
But nevertheless, one of the concerns we have is the timing of this process coincides exactly with our most significant amount of trial prep, and we want to make sure that leadership has sufficient time to look into this, that we actually confer with Uber. We want to look at what they're looking at. We take this seriously. We want to look at it. We want to understand it.
And so what we would ask is to put out the briefing on this issue until after the trial.
THE COURT: Yeah, that's fine.
MS. LONDON: Okay. Thank you.
And then as far as, you know, in terms of the bellwether

Page 19

cases, Your Honor, we had asked Uber to provide us with a list of proposed cases. We had invited that. We had asked to exchange those. We had invited a conversation to see if we could align on cases that would try to fit that Venn diagram between what both sides want, and they've not provided additional cases.
THE COURT: Well, here, here, Ms. London is that they're stuck in a difficult place, because I've indicated that I'm not sort of going back and forth and back and forth, and it's not that -- I don't know what the defense would say is the perfect case or is the case that must be tried. They're in a difficult situation in that any case that has really minimal, or nonexistent or what they being are nonexistent damages, you know, what is that going to tell us? Is it going to really educate anybody? If the damages are very slight, you know, you'll know it just as they'll know it, and there's no purpose served in doing it. So they've got that information. Everybody's got that information.
The question really is -- and that's why I'm not if completely sympathetic to Uber -- is what are we really looking for here? And that's -- you know, Uber suggests we're looking for the cross-section. I think the plaintiffs would say, yes, but we're also looking for caps. We're looking for the egregious cases and finding out what they are, what their value is, and then working down from that, because that's like the

Page 20

maximum exposure, and so everything else is less.
Now, the truth is somewhere in between. You need to know enough about the substance, but you also need to know what the maximum you exposures are, like as Ms. Bueno points out, or someone pointed out, I don't know. Yeah, Uber, or plaintiffs come up with 20, or eight or 12 penetration cases. You know, well, of course they're going to be -- they are the -- I don't know whether they're absolutely the max, but they're pretty egregious, and, you know, why are we trying all of those? I think you need enough of those to know is there -- what is a fair cap on it and then go down from there. But you might need something in the middle to tell you what it's about.
We certainly know something at -- I don't know whether it's, I don't want to characterize her damages as nominal, but the way the case was tried, it actually became a nominal damage case in a way, because she was only seeking -- this is the North Carolina litigation. She was only seeking the damages, like the 24-hour damages. So by virtue of agreement or whatever it was at the trial, they became in a sense the nominal damages.
I don't know if that's true, by the way. I'm just talking. You know, I haven't lived these cases as you people have lived it. But I'm trying to figure out where we go, because the fact is, and maybe it's the problem, we oughta try one case at a trial. Now, I know the suggestion has been to

Page 21

get a number of other judges to try cases, and I will tell you that the only way to do that is essentially remanding some of these cases, but I don't know -- but I know with a remand sometimes there's a, we are missing an opportunity to try to resolve other issues. But maybe not. Maybe a remand looks sense. Again, I want to look at that.

But again, I go back to the fact that I've got now into January of next year sort of planned in terms of cases to be tried, and I'm ever hopeful that everybody will look at it and say, well, here's the way that we can get through all of these cases. I don't know whether that's accurate or not, but I have to sort of move one or two steps at a time.

**MS. LONDON:** We understand, Your Honor.

And certainly we did not put forward cases just to max out damages. We were looking at the big picture and what the Court has said, as well, in terms of different theories and liability and the like. So we'll see that in our papers, Your Honor, and we trust you'll get to the right spot looking at the parties' respective positions.

So thank you for that.

**MR. NOMELLINI:** Your Honor, Mark Nomellini. May I be heard briefly with respect to the timing of the fraud special master issue?

**THE COURT:** Of course.

**MR. NOMELLINI:** Agree with Your Honor in terms of the

Page 22

importance of the non-fraudulent claims, and the fraud special master motion is really about the non-fraudulent claims, because the fraudulent claims interfere with the resolution of the non-fraudulent claims. And from a timing standpoint, the recent experience in the Los Angeles County sex abuse settlement really underscores the need to address the fraud sooner rather than later so that it doesn't jeopardize the recoveries for other plaintiffs.

There, the parties actually did the settlement first before the full investigation could be conducted, and in that circumstance the Los Angeles County actually had to halt the settlement payments to the non-fraudulent plaintiffs amid the fraud investigation.

So that's what we're trying to get ahead of here.

**THE COURT:** Actually, I thought actually that wasn't my understanding. My understanding is that the judge, while he temporarily, maybe for two or three days halted the settlement process, then stepped out of it and said, go ahead.

**MR. NOMELLINI:** Yes. We're trying to avoid an issue where there's any --

**THE COURT:** Well, don't worry about that. We can avoid that. Don't worry about that. I guarantee we're not going to do it ...

The LA thing is the LA thing. I mean, they got the DA involved, they got the board of supervisors involved, three

Page 23

judges involved, and there were a lot of claims out there, and settlements have been approved, and so forth and so on. I understand that. I don't think that's this problem, as I say. I -- it's in my mind, I know about it, I read about it, I was interested in it. I don't think that's this process. We won't have that process.

I'm not saying that a fraudulent claim can't be made or a fraudulent claim can't be, won't ultimately be paid. I don't know. But I think the smart people who have control of this litigation will be able, will be able to work their way through it in some conversation with a meaningful thing.

I don't think, for example, if the fraud, if the so-called fraud is that dates were wrong or misrecollections occurred and so forth in fact sheets, I don't know that that's fraud. I mean, people's recollections are varied, especially, especially in cases involving sexual harassment and sexual conduct. You know, that's not fraud. That is, that's a recognition of the nature of the trauma in legitimate claims, the nature of the trauma as to what happens. So I got that.

You guys understand that. I don't have to put that out for you. And just simply have some conversations where you're going to see if there's a way to separate this out.

I'm not a big special master person. I don't love these special masters for a variety of reasons. And my apologies to all the special masters out there in America. But you know,

Page 24

it's almost like outsourcing outcomes. I don't do that. I don't outsource the outcome. On the other hand, people have a right to resolve claims, and it's not the Courts, it's the parties. So I recognize that, and a settlement master can be useful in that regard.

But I'm not there to have somebody adjudicate. I'll do the adjudication. I'll do it, because I'll either be right or eight be wrong. And it's subject to appeal, which is really a great safeguard. You know, I make decisions all the time. I assume they're all absolutely correct, but if they're not, we have three very wise people in, they're just two blocks away or several miles away, but they're away. They're there and they will correct my mistakes.

So that's part of the process. We've lived with it for a couple of hundred years. I like that process. You people are dedicated to that process, you provide information to that process and your skills to that process.

So I'm not about to outsource, but there we are. I think everybody's got their clear eyes.

**MR. NOMELLINI:** Your Honor?

**THE COURT:** Yes.

**MR. NOMELLINI:** Can I just be heard briefly on that?

**THE COURT:** Of course.

**MR. NOMELLINI:** Understood, Your Honor, on the points you're raising.

Page 25

Just wanted to illustrate that they are serious, these are serious issues. They're not minor. And the fact that in other litigation it's been used successfully. For example, the JCCP court has appointed Ellen Reisman, whose role has included addressing fraud. There's been a number of other cases where it's been done successfully.

And as Your Honor said, we are going to differentiate ourselves from the LA County litigation, and that's part of the reason to, that's part of the way to get there. It has been done. It's not them ruling finally. It's them -- for example, in the JCCP court, Ellen Reisman will make a recommendation and the Court will adopt them. So that's worked.

And it's important because this Court --

**THE COURT:** Well, they weren't there.

I'm not saying it doesn't work, Mr. Nomellini. I'm not saying it doesn't work. I'm saying it's not going to work here, that's all. That's all. That's the end of that discussion.

Okay. Thank you very much. I'll see you on Friday.

**MS. LONDON:** Thank you, Your Honor.

**MR. NOMELLINI:** Thank you, Judge.

**THE COURTROOM DEPUTY:** And is the hearing on Friday nonpublic, in-camera review?

**THE COURT:** Oh, I think it is. So let me explain why it's not public.

Page 26

It is not public because we are going to discuss mechanics, not merits at all of the positions of the parties. We're going to -- and not legal issues. We're going to discuss the mechanics of how to form this litigation to coincide with whatever a special master would do in terms of settlement or whatever the parties would do in terms of settlement. So it's a mechanics type of discussion which I think need not -- settlement discussion need not be public.

If anyone disagrees with me, they can file something in connection with it. Okay?

**THE COURTROOM DEPUTY:** Okay. And we'll use the nonpublic Zoom.

**THE COURT:** Yes.

**THE COURTROOM DEPUTY:** I'll send a link to the parties.

Thank you.

**THE COURT:** That's right. Any member of the public who objects obviously can file an objection or let the Court know of its concerns. Okay?

**MS. LONDON:** And then, Your Honor, as far as the next public CMC, would you like, Your Honor, to push that over to right before the next trial, or after?

**THE COURT:** Well, no, no. It has to be before.

**MS. LONDON:** Yes, I agree.

Yes, we still have plenty of time.

Page 27

**THE COURT:** Okay. Well, give me a date. Give Lashanda a date.

Okay. Thank you.

**THE COURTROOM DEPUTY:** September 10th?

**MS. LONDON:** Yes, September 10th works for plaintiffs.

Your Honor, I will note, Your Honor, I'm sorry to keep -- one more thing, scheduling.

I believe the deadlines the Court set on some things land on Yom Kippur, and we --

**THE COURT:** Put it over a day.

**MS. LONDON:** -- would request the day.

Thank you, Your Honor.

**THE COURT:** Okay. Thank you.

(Proceedings concluded at 11:48 a.m.)

**---o0o---**

**<u>CERTIFICATE OF REPORTER</u>**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, August 25, 2026

Stephen W. Franklin, RMR, CRR
Official Reporter, U.S. District Court