[Submitting counsel below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

This Document Relates to:

*JANE DOE QLF 001 v. Uber Technologies, Inc. et al.,*
*N.D. Cal. No. 3:24-cv-08783*
*W.D. Tex. No. 1:26-cv-01694*

CASE NO. 3:23-MD-03084-CRB

**DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S MOTIONS IN LIMINE AND MEMORANDUM IN SUPPORT**

Judge: Hon. Charles R. Breyer

Courtroom: 6 – 17th Floor

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

JANE DOE QLF 001,

Plaintiff,

v.

UBER TECHNOLOGIES, INC., et al.,

Defendants.

CASE NO. 26-CV-01694-CRB

Judge: Hon. Charles R. Breyer

# TABLE OF CONTENTS


**Page**

**I. UBER'S 2026 BACKGROUND CHECK POLICY CHANGES ........................................1**

**II. AUSTIN, TEXAS FINGERPRINT REQUIREMENT FROM 2016-2017.........................7**

**III. MR. LE'S CRIMINAL TRIAL AND APPEAL AND THE POLICE INVESTIGATION..........................................................................................................9**

**IV. UBER'S WOMEN DRIVER PREFERRED OPTION .....................................................12**

**V. SAFETY RISK ASSESSED DISPATCH ("S-RAD") PROGRAM. .................................14**

**VI. UBER'S ADVERTISING OR MARKETING...................................................................16**

**VII. DRIVER'S ALLEGED "PROPENSITY" TO COMMIT SEXUAL ASSAULT.............18**

**VIII. DRIVER'S UNRELATED ALLEGED MISCONDUCT..................................................19**

**IX. MEDIA REPORTS INVOLVING UBER THAT POST-DATE THE *DEAN* TRIAL....20**

**X. INFLAMMATORY REMARKS ABOUT UBER'S DEFENSE .......................................22**

**XI. EXECUTIVE COMPENSATION.........................................................................23**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Avondale Mills, Inc. v. Norfolk S. Corp.*,
No. 1:05-2817-MBS, 2008 WL 6953958 (D.S.C. Jan. 16, 2008) ....................24

*Becker v. PaineWebber, Inc.*,
962 F.2d 524 (5th Cir. 1992) ....................16

*Bedford Internet Off. Space, LLC v. Travelers Cas. Ins. Co.*,
41 F. Supp. 3d 535 (N.D. Tex. 2014) ....................12

*Bryant v. S.A.S.*,
416 S.W.3d 52 (Tex. App.–Houston [1st Dist.] 2013, pet. denied)....................17

*Call Delivery Sys., LLC v. Morgan*,
No. 2:20-cv-04637-CBM-PDx, 2022 WL 18143363 (C.D. Cal. Sept. 20, 2022) ....................22

*Cano v. Bexar Cnty.*,
280 F. App'x 404 (5th Cir. 2008) ....................21

*Cardona v. Cnty. of Los Angeles*,
No. 2:23-cv-06225-MWC-AGR, 2025 WL 4227217 (C.D. Cal. Dec. 16, 2025)....................21

*Chaudhry v. Smith*,
No. 1:16-cv-1243-SAB, 2020 WL 869115 (E.D. Cal. Feb. 21, 2020) ....................21

*Clapper v. Am. Realty Invs., Inc.*,
95 F.4th 309 (5th Cir. 2024) ....................22

*Cotton v. City of Eureka*,
No. C 08-04386 SBA, 2010 WL 5154945 (N.D. Cal. Dec. 14, 2010), *on recons.*, 2011 WL 4047490 (N.D. Cal. Sept. 8, 2011) ....................6

*Doe v. Boys Clubs of Greater Dallas, Inc.*,
907 S.W.2d 472 (Tex. 1995)....................17

*Drewry v. Cnty. of Riverside*,
No. EDCV 20-2554 JGB (SHKx), 2024 WL 1136328 (C.D. Cal. Jan. 24, 2024) ....................21

*Ellsworth v. Prison Health Servs., Inc.*,
No. CIV 11-8070 PCT RCB, 2013 WL 6587876 (D. Ariz. Dec. 12, 2013)....................10

*Farah Mfg. Co. v. Alvarado*,
763 S.W.2d 529 (Tex. App.—El Paso 1988), *aff'd*, 830 S.W.2d 911 (Tex. 1992) ....................23, 24

*Freyer v. Lyft, Inc.*,
639 S.W.3d 772 (Tex. App.—Dallas 2021)....................2, 3

*Galland v. Harvey Gulf Int'l Marine, LLC*,
No. CV 23-3392, 2025 WL 2845135 (E.D. La. Oct. 7, 2025) ....................4, 15

*Gauthier v. AMF, Inc.*,
805 F.2d 337 (9th Cir. 1986) ....................15

*Gen. Motors Corp. v. Saenz ex rel. Saenz*,
873 S.W.2d 353 (Tex. 1993)....................16

*Gilead Tenofovir Cases*,
20 Cal. 5th 390, 2026 WL 2223748 (Cal. Aug. 3, 2026)....................3, 6

*Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*,
No. 2:16-CV-00134-JRG, 2017 WL 2844646 (E.D. Tex. May 19, 2017) ....................24, 25

*Graef v. Chem. Leaman Corp.*,
106 F.3d 112 (5th Cir. 1997) ....................24

*Grenada Steel Indus., Inc. v. Alabama Oxygen Co.*,
695 F.2d 883 (5th Cir. 1983) ....................15

*Gulbranson v. Duluth, Missabe & Iron Range Ry. Co.*,
921 F.2d 139 (8th Cir. 1990) ....................10, 21

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
No. 3:11-CV-268, 2016 WL 10706086 (N.D. Ind. Oct. 28, 2016) ....................25

*Henderson v. Ford Motor Co.*,
519 S.W.2d 87 (Tex. 1974), *overruled on other grounds, Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984)....................3

*In re Bella Corp.*,
648 S.W.3d 373 (Tex. App.—Tyler 2021, orig. proceeding)....................24

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*,
888 F.3d 753 (5th Cir. 2018) ....................11, 19

*In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*,
MDL No. 2592, 2017 WL 11718344 (E.D. La. Apr. 18, 2017) ....................17

*Johnson v. Wyeth LLC*,
No. CV 10-02690-PHX-FJM, 2012 WL 1150857 (D. Ariz. Apr. 5, 2012)....................16, 18

*Larez v. City of Los Angeles*,
946 F.2d 630 (9th Cir. 1991) ....................21

*Lindsey v. Normet*,
405 U.S. 56 (1972)....................23

*Manis v. Lawson*,
585 F.3d 839 (5th Cir. 2009)....................12

*Manuel v. City of Chicago*,
335 F.3d 592 (7th Cir. 2003)....................22

*Massage Heights Franchising, LLC v. Hagman*,
679 S.W.3d 298 (Tex. App.—Houston [14th Dist.] 2023), *rev'd in part on other grounds*, 712 S.W.3d 615 (Tex. 2025)....................23

*McKiver v. Murphy-Brown, LLC*,
980 F.3d 937 (4th Cir. 2020)....................24

*Miciotto v. Hobby Lobby Stores, Inc.*,
514 F. Supp. 3d 877 (W.D. La. 2021)....................6, 14

*Minton v. Intercontinental Terminals Co.*,
697 F. Supp. 3d 690 (S.D. Tex. 2023)....................8

*J.S. ex rel. N.S. v. Child. of Am., Inc.*,
696 F. App'x 39 (2d Cir. 2017)....................18

*NeSmith v. Cnty. of San Diego*,
No. 15-CV-629 JLS (AGS), 2022 WL 272011 (S.D. Cal. Jan. 28, 2022)....................21

*O'Neal v. City of San Antonio*,
344 F. App'x 885 (5th Cir. 2009)....................5

*Old Chief v. United States*,
519 U.S. 172 (1997)....................10

*Phillips v. Super Servs. Holdings, LLC*,
189 F. Supp. 3d 640 (S.D. Tex. 2016)....................20

*Pooshs v. Philip Morris USA, Inc.*,
287 F.R.D. 543 (N.D. Cal. 2012)....................24

*Rabin v. Cook Cnty.*,
No. 09 C 8049, 2015 WL 13879970 (N.D. Ill. Apr. 22, 2015)....................21

*Randle v. Tregre*,
147 F. Supp. 3d 581 (E.D. La. 2015), *aff'd*, 670 F. App'x 285 (5th Cir. 2016)....................12

*Tennison v. Circus Circus Enters., Inc.*,
244 F.3d 684 (9th Cir. 2001)....................13

*Trepagnier v. Alimak Hek, Inc.*,
784 F. App'x 195 (5th Cir. 2019) ....................6, 14

*Unigestion Holding, S.A. v. UPM Tech., Inc.*,
No. 3:15-cv-185-SI, 2022 WL 15792838 (D. Or. Oct. 28, 2022) ....................8, 9

*United States v. Spletzer*,
535 F.2d 950 (5th Cir. 1976) ....................10

*United States v. Williams*,
30 F.4th 263 (5th Cir. 2022) ....................13, 16

*Wal-Mart Stores, Inc. v. Cordova*,
856 S.W.2d 768 (Tex. App.—El Paso 1993, writ denied)....................24

*Williams v. J.B. Hunt Transp., Inc.*,
151 F.4th 1020 (9th Cir. 2025) ....................5, 14, 15

*Young v. Wolfe*,
No. 07-03190 RSWL (AJWx), 2017 WL 985632 (C.D. Cal. Mar. 14, 2017)....................21

**Statutes**

Tex. Civ. Prac. & Rem. Code § 41.005(a) ....................23

Tex. Civ. Prac. & Rem. Code § 41.011(a)(6) ....................23

**Rules**

Fed. R. Evid. 401 ....................1, 8, 13, 21

Fed. R. Evid. 403 .................... passim

Fed. R. Evid. 404 ....................18

Fed. R. Evid. 404(b)(1) ....................11, 18, 19

Fed. R. Evid. 407 .................... passim

Fed. R. Evid. 415 ....................18

Fed. R. Evid. 613 ....................10

Fed. R. Evid. 702 ....................1

Fed. R. Evid. 801 ....................11

Fed. R. Evid. 803(8)....................12

**Other Authorities**

23 Wright & Miller's Fed. Prac. & Proc. Evid. § 5403 (2d ed. 2026)....................................................18

Calily Bien, Millions of Dollars Being Spent on Ridesharing Vote, KXAN News Austin, (Apr. 29, 2016), https://www.kxan.com/news/millions-of-dollars-being-spent-on-ridesharing-vote/ ..............9

Madlin Mekelburg, Austin's Proposition 1 Defeated, The Texas Trib. (May 7, 2016), https://www.texastribune.org/2016/05/07/early-voting-austin-proposition-against/......................7, 9

Tyler Whitson, Council Sets Background Check Penalties for TNCs, KUT 90.5 News (Dec. 18, 2015), https://www.kut.org/austin/2015-12-18/council-sets-background-check-penalties-for-tncs .............7

Uber Newsroom, A New Standard for Background Checks (June 26, 2026), https://www.uber.com/us/en/newsroom/uber-backgroundchecks/ ....................................................1

## DEFENDANTS MOTIONS IN LIMINE AND MEMORANDUM IN SUPPORT

Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber") respectfully submit this motion to exclude certain evidence or argument at trial.[1] If the Court grants Uber's motion for summary judgment on Plaintiff's claim for punitive damages, filed concurrently, Uber reserves the right to submit a bench brief seeking to exclude evidence relevant only to punitive damages.

## MOTIONS

### I. UBER'S 2026 BACKGROUND CHECK POLICY CHANGES

The Court should exclude evidence or argument related to Uber's 2026 background check policy changes, including the Stipulation Uber submitted pursuant to the Magistrate Judge's July 30 Order, *see* Order Resolving Joint Letters Regarding Texas Lobbying and June 2026 Background Check Policy (Dkt. 6935) at 5, because: (1) the changes are utterly irrelevant to Plaintiff's claims under Rule 401; (2) any marginal probative value would be substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and wasted time under Rule 403; (3) Rule 407 independently bars their use to prove negligence or culpable conduct; and (4) their introduction at trial would be contrary to public policy.

**Background.** On June 26, 2026, approximately ***six years*** after the alleged sexual assault at issue in this case, Uber announced that, after consulting with subject-matter experts, it would update its U.S. criminal background check process to better align with today's expectations. Under the new requirements, Uber is: (1) broadening the criteria for convictions that permanently disqualify an individual from driving or delivering on the Uber platform; and (2) expanding the Social Security Number ("SSN") trace from seven years to a 99-year, or lifetime, SSN trace nationwide.[2]

The driver in this case, Victor Le, was subject to the background check policy in place in 2020. That policy was executed by Checkr—a third-party background check company used by Uber—which found no disqualifying history in his background. The same conclusion would have been reached if Le

---

[1] Pursuant to the Parties' Stipulation Re: Rule 702 Motions and Motions *In Limine* agreed to by the Parties, and the related Order from the Court granting that stipulation, Uber incorporates herein the motions *in limine* previously filed by Uber in connection with the *Dean* and *Mensing* cases. *See* Dkt. No. 7313 (Sept. 10, 2026). The additional motions *in limine* below address issues specific to the *QLF 001* action and therefore were not included in prior submissions.

[2] Uber Newsroom, A New Standard for Background Checks (June 26, 2026), https://www.uber.com/us/en/newsroom/uber-backgroundchecks/.

had been subject to the policy announced in 2026. A corporate representative for Checkr expressly testified that there is no indication that a 99-year or lifetime SSN trace would have yielded different results. Ex. 1, 8/13/2026 Hubbard Dep. 302:7-303:4.[3]

Judge Cisneros has stated that there is no "reason to expect that all of the details of the new 2026 policy will be relevant to the two upcoming bellwether cases concerning events multiple years earlier." Dkt. 6935 at 4. Nevertheless, Judge Cisneros ordered Uber either to "stipulate[] for the purpose of the next two bellwether trials that the expanded background check policy it adopted in 2026 would have been feasible at the time of the incidents in question for those trials," or produce 30(b)(6) deposition testimony and documents as to "the reasons why that would not have been feasible." Dkt. 6935 at 5. Solely in response to that Order, Uber produced a stipulation (hereinafter the "Stipulation") on August 26, 2026, stipulating that "it was technologically feasible at the time of the alleged incident in *QLF 001* to instruct its background-check provider to conduct a 99-year Social Security Number trace."

In affirming Judge Cisneros's Order, the Court noted that it was doing so "without prejudice to Uber's ability to challenge the admissibility of any such evidence at a later stage." Dkt. 7052 at 2.

### A. Evidence Of The 2026 Background Check Policy Changes Is Irrelevant.

Evidence regarding Uber's 2026 background check policy change (including the Stipulation itself) is irrelevant because application of the 2026 policy in 2020 would not have affected the outcome of the driver's background check, and it has no other conceivable relevance to the issues in this case.

***First***, even if the 2026 background check policy changes could have been implemented earlier, the new policy would not have changed the results of Checkr's search with respect to Mr. Le. That suffices to establish the irrelevance of the 2026 policy change as a matter of Texas law. In *Freyer v. Lyft, Inc.*, 639 S.W.3d 772 (Tex. App.—Dallas 2021), the plaintiff argued that Lyft should have employed a different background check procedure—specifically, that it should have conducted the search itself rather than "outsourcing background screenings to a third-party," *id.* at 789. The Texas Court of Appeals rejected this argument as a matter of law because there was "no evidence that Lyft would have discovered additional,

---

[3] To the extent Plaintiff contends that Checkr should have identified a citation for a Class C misdemeanor assault as part of the background check it ***did*** conduct, that argument has no bearing on this motion because the testimony of Checkr's representative establishes that application of the new provisions of the 2026 policy would not have changed the results, including as to this citation. *See* Hubbard Dep. 302:7-303:4.

unknown information if it had conducted the background check itself" and that such information would have shown the driver to be incompetent to drive. *Id.*

The same logic applies here. As in *Freyer*, Uber's pursuit of one policy versus another could only be relevant to liability if adoption of the different policy would have led to the "discover[y] [of] additional, unknown information." *Id.* But the record contains no indication that any aspect of the 2026 policy would have changed the outcome of Checkr's search in 2020. To the contrary, the only evidence on this point—the testimony of Checkr's representative—confirms the opposite: that the policy would have made no difference. 8/13/2026 Hubbard Dep. 245:13-252:5.

***Second***, the policy change and the Stipulation regarding technological feasibility are also irrelevant because liability cannot lie on the ground that a defendant should have adopted a different policy earlier in time. The recent decision in the *Gilead Tenofovir Cases*, 20 Cal. 5th 390, 2026 WL 2223748 (Cal. Aug. 3, 2026), is instructive. There, the California Supreme Court held in the context of a prescription drug that a product that is not otherwise defective cannot give rise to liability on the ground that the manufacturer "unreasonably delayed bringing to market another drug it had invented that was equally effective and less toxic than the nondefective drug that allegedly caused plaintiffs' injuries." *Id.* at *1. As the Court explained, "holding that manufacturers owe a broader duty to not unduly delay developing and commercializing an allegedly safer product" would be problematic for several reasons, including that such a duty "lacks a clear limiting principle and raises serious questions about whether a workable standard for assessing the reasonableness of such decisions could ever be established." *Id.* It would also risk "inviting fact finders to second-guess complex resource-allocation decisions about whether and when to pursue potential alternative products while a concededly nondefective product remains on the market." *Id.*[4] This holding is consistent with Texas law, which has long recognized that a "manufacturer is not charged by the law nor expected by the purchasing public to design every part to be the best that science can produce or to guarantee that no harm will befall the user." *Henderson v. Ford Motor Co.*, 519 S.W.2d 87, 93 (Tex. 1974), *overruled on other grounds*, *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984).

[4] The California Supreme Court did not squarely decide whether such a duty could ever exist, but rejected the application of such a duty in the case before it based on the highly attenuated and unforeseeable nature of any relationship between an innovated product and any specific plaintiff's alleged injuries—concerns that are equally present here. *See Gilead*, 2026 WL 2223748, at *10-11.

Under these principles, liability could not rest on the argument that Uber's background check policy should have or could have been updated sooner than June 2026, at least absent some relevant defect in the prior policy that has relevance to this case. For this reason, too, the fact of the 2026 policy change and Uber's subsequent Stipulation are both irrelevant and should be excluded from trial.

**B. Evidence Of The 2026 Background Check Policy Is Unduly Prejudicial.**

Even if the 2026 background check policy change or the Stipulation regarding feasibility had some minimal probative value, any such value would be substantially outweighed by the danger of undue prejudice, waste of time, and jury confusion. *See* Fed. R. Evid. 403.

The most likely effect of telling the jury about Uber's 2026 background check policy changes would be to confuse jurors and detract from the central issues in this case by improperly suggesting that Uber's screening practices at the time of the alleged assault were unsafe, unreasonable, or deficient, when the record does not support this inference. If Plaintiff were permitted to present evidence related to the 2026 policy changes and related arguments, jurors might improperly infer that the new background check policy would have prevented the alleged assault had it been in place at that time. *See Galland v. Harvey Gulf Int'l Marine, LLC*, No. CV 23-3392, 2025 WL 2845135, at *6 (E.D. La. Oct. 7, 2025) (excluding evidence of subsequent actuator valve repair under Rule 403 because "[a]llowing Plaintiffs to introduce evidence of this subsequent remedial measure would . . . unfairly prejudice the Defendants, as the jury would likely imply culpability upon Defendants from such evidence"). The same would be true if the Stipulation were introduced to jurors—in that case, they might wrongly infer that Uber had some duty to implement the new background check policy earlier merely because the Stipulation states that "it was technologically feasible as of 2020 for Uber to instruct its background-check provider to conduct a 99-year Social Security Number trace." All this would unfairly relieve Plaintiff of her burden of proof on a critical element of her claims.

In addition, if Plaintiff were allowed to introduce the Stipulation, or to otherwise insinuate that Uber's adoption of a new background check policy shows that the Uber application is defective, Uber would then be forced to defend against that claim in the form of a mini-trial about the operational, technological, and regulatory limitations affecting earlier implementation. Uber would also need to

present evidence that it develops its screening criteria in consultation with lawmakers, screening experts, and civil rights advocates, and works to balance rider safety with fair access to economic opportunity across more than 60 different background-check adjudication standards nationwide. Uber would further need to explain that decisions about whether and when to implement a particular screening configuration involve assessment of numerous factors, including, but not limited to, expert feedback on recidivism data, as well as legal, policy, and regulatory considerations across multiple jurisdictions, operational readiness and adjudication accuracy, false-positive rates and their impact on driver access, and the interaction of any screening change with Uber's broader multilayered safety system. There may also be additional experts who need to be called to testify at trial. Such lines of inquiry would require substantial trial time and resources, despite the tenuous connection to the real issues in this case. Thus, any minimal probative value of admission of this evidence would be dwarfed by the real and substantial danger of undue consumption of time, confusing the issues, misleading the jury, and unfair prejudice to Uber.

### C. Evidence Of The 2026 Background Check Policy Change Is Inadmissible Under Rule 407.

Finally, Uber's 2026 background check policy changes do not constitute a subsequent remedial measure within the scope of Rule 407 because they would not "have made an earlier injury or harm less likely to occur[.]" Fed. R. Evid. 407. But even if the changes were construed as subsequent remedial measures, they would also be inadmissible under Rule 407 because the only conceivable use of the evidence would be for one of the purposes proscribed by the rule.

It is well established that a subsequent remedial measure cannot be used as an admission by a defendant that its product is defective or as a finding that a defendant was negligent or liable for the alleged conduct. *See* Fed. R. Evid. 407. Consistent with this rule, federal courts have excluded evidence related to policy changes when offered to show that a defendant was at fault. *See O'Neal v. City of San Antonio*, 344 F. App'x 885, 888 (5th Cir. 2009) (district court did not abuse its discretion by refusing to consider evidence of changes to city's policy that was implemented after the incident giving rise to the plaintiffs' injuries); *Williams v. J.B. Hunt Transp., Inc.*, 151 F.4th 1020, 1037-38 (9th Cir. 2025) ("the district court did not abuse its discretion by refusing to allow evidence that, after this lawsuit was filed, [the defendant] changed its reimbursement policy to provide a stipend to drivers for their cell phones" because Rule 407

bars "us[ing] the evidence of [the defendant's] change in policy to prove the allegedly culpable conduct at the heart of" Plaintiffs' claim); *Cotton v. City of Eureka*, No. C 08-04386 SBA, 2010 WL 5154945, at *16 (N.D. Cal. Dec. 14, 2010), *on recons.*, 2011 WL 4047490 (N.D. Cal. Sept. 8, 2011) (granting defendant's motion i*n limine* to exclude policy change instituted after the incident at issue because "it is plain that Plaintiffs are seeking to utilize evidence of the Police Chief's policy change for the very purpose proscribed by FRE 407, i.e., to establish Defendants' liability").

Rule 407 carves out limited grounds for admission of subsequent remedial measures for other purposes—including impeachment or, "***if disputed***," proof of "ownership, control, or the feasibility of precautionary measures. Fed. R. Evid. 407 (emphasis added). However, courts have recognized that the feasibility exception does not apply where a party's true purpose is to prove culpable conduct rather than to demonstrate that a precautionary measure was technically achievable. *See Trepagnier v. Alimak Hek, Inc.*, 784 F. App'x 195, 199 (5th Cir. 2019) (rejecting plaintiff's argument that evidence of defendant's service on the elevator three days post-incident is admissible to "impeach and to establish the feasibility of precautionary measures [because] regardless of the exceptions to Rule 407, she still seeks to use this evidence to prove [defendant's] negligence and that is prohibited under Rule 407").

The same reasoning applies here. The only reason Plaintiff would seek to introduce evidence related to the feasibility of the June 2026 policy is to invite jurors to evaluate the reasonableness of Uber's alleged conduct based on the new policy rather than on the information and circumstances existing at the time of the alleged incident. Introduction of the Stipulation would similarly, and wrongly, suggest that Uber had some duty to implement the June 2026 policy as soon as it was technologically feasible to do so. For this reason, too, the Court should exclude the evidence.

Exclusion of the policy change and the Stipulation is also consistent with the goals of Rule 407, which are to ensure that companies like Uber can continue updating policies to better align with today's expectations, without fear that later policy updates will be used against them to prove liability in litigation. *See Miciotto v. Hobby Lobby Stores, Inc.*, 514 F. Supp. 3d 877, 878-79 (W.D. La. 2021) (explaining that Rule 407's purpose is to "encourag[e] people to take . . . steps in furtherance of added safety"); *accord Gilead*, 2026 WL 2223748, at *18 (turning every corporate change into a litigation issue would "threaten[]

to skew innovation priorities in a manner that does not advance—and may ultimately undermine—public health and safety"). As explained above, Uber continually consults with experts, regulators, lawmakers, and its community, and evolves its practices as expectations and the world change. Allowing Plaintiff to use a safety policy update as proof of past liability would discourage companies like Uber from making updates like those embodied in the 2026 changes. The Court should not countenance such a result.

## II. AUSTIN, TEXAS FINGERPRINT REQUIREMENT FROM 2016-2017

Uber anticipates that Plaintiff will seek to introduce evidence at trial about a short-lived local ordinance that was effective in Austin, Texas in 2016 and early 2017, requiring fingerprint-based background checks for drivers using rideshare platforms. The Court should exclude all evidence and argument about this ordinance, or its impact on Uber's operations, as irrelevant to Plaintiff's claims, which stem from an incident that allegedly occurred nearly four years ***after*** the ordinance ceased to be in effect, more than ***200 miles away*** in Arlington, Texas.[5] There is no evidence that the ordinance, even if it had been adopted in other regions, would have affected the outcome of Uber's screening of the driver at issue in this case. And even if the evidence had some probative value, it would be outweighed by the substantial risk of unfair prejudice and jury confusion, particularly because an Austin jury may remember the highly-publicized local debate and hold strong personal views relative to the ordinance.

In December 2015, the Austin City Council passed a local ordinance requiring fingerprint background checks for independent drivers using rideshare applications.[6] In May 2016, an election was held on Proposition 1, a separate proposed local ordinance that would have overturned the fingerprint-based background check requirement. Austin voters defeated Proposition 1.[7] One year later, in May 2017, Texas House Bill 100 was signed into law, establishing a uniform, ***statewide*** regulatory framework for transportation network companies like Uber and Lyft, which superseded Austin's local ordinance.

Plaintiff has signaled her intention to focus trial time and attention in this case on the brief period—

---

[5] This Court has already recognized that Uber's lobbying activities related to Proposition 1 in Austin and Texas House Bill 100 are irrelevant and inadmissible. 1/6/2026 *Dean* Pretrial Hearing 28:4-7; *see also* 1/8/2026 *Dean* Mot. In Limine Order, Dkt. 4941, at 2.

[6] Tyler Whitson, *Council Sets Background Check Penalties for TNCs*, KUT 90.5 News (Dec. 18, 2015), https://www.kut.org/austin/2015-12-18/council-sets-background-check-penalties-for-tncs.

[7] Madlin Mekelburg, *Austin's Proposition 1 Defeated*, The Texas Trib. (May 7, 2016), https://www.texastribune.org/2016/05/07/early-voting-austin-proposition-against/.

almost four years before the alleged assault—in which the Austin ordinance required fingerprint-based background checks, affecting Uber's operations in that specific area. *See* 7/30/2026 E-mail from B. Wilkins to Defense Counsel (Ex. 2) (seeking information related to "the time that Texas required stricter background check requirements than Uber"). Such evidence is inadmissible under Rules 401 and 403.

***First***, evidence that the city of Austin briefly required fingerprint-based background checks in 2016 and 2017 is irrelevant to Plaintiff's claims. Although this trial will take place in Austin, none of the events at issue took place anywhere near there. Rather, Plaintiff claims that Uber negligently failed to prevent an incident that allegedly occurred in Arlington, Texas—about 200 miles away from Austin—in 2020. A background-check requirement applicable only in Austin nearly four years earlier has no bearing on whether Uber appropriately screened the driver at issue in this case. *See Minton v. Intercontinental Terminals Co.*, 697 F. Supp. 3d 690, 696 (S.D. Tex. 2023) (excluding testimony on inapplicable OSHA regulation because it was "an irrelevant standard of care" in suit for damages arising from exposure to toxic chemicals); *Unigestion Holding, S.A. v. UPM Tech., Inc.*, No. 3:15-cv-185-SI, 2022 WL 15792838, at *11 (D. Or. Oct. 28, 2022) (excluding evidence of defendant's activities in jurisdictions other than the one at issue as irrelevant). The same is true with respect to evidence or argument about the effect that the Austin city ordinance may have had on Uber or its operations in that specific municipality in 2016-early 2017, because Uber's operations in Austin in 2016-17 are not at issue.

Nor does evidence related to the Austin 2016-17 ordinance have any bearing on what Uber knew or should have known about Mr. Le, the driver involved in the June 2020 incident. To the extent Plaintiff intends to speculate at trial that if Uber had adopted the fingerprint background check briefly required in Austin, it would have learned additional information about Mr. Le that would have affected the decision to allow him to use the Uber platform, there is simply no evidence to support such a theory. While Mr. Le had a 2017 citation for a Class C misdemeanor, there is no record that he was fingerprinted in connection with this offense and a representative for the relevant court has indicated that fingerprinting is not performed for that type of citation. *See* 9/8/2026 Expert Report of Kevin Phelan at 33 (Ex. 3). As a result, a fingerprint background check requirement would not have made any difference in the outcome of Mr. Le's screening. For this reason, too, evidence of the Austin ordinance is irrelevant and should be excluded.

***Second***, evidence related to the Austin ordinance should also be excluded under Rule 403 because it would confuse the issues, mislead the jury, waste time, and create a substantial risk of unfair prejudice. Austin jurors may remember the political arguments and public campaigns regarding Proposition 1, which included inflammatory rhetoric about Uber.[8] Because the 2016 Austin ordinance has no bearing on a 2020 incident in Arlington, introducing it would invite the jury to evaluate Uber against the backdrop of a politically charged local controversy rather than the facts and legal standards governing Plaintiff's claims. Further, allowing evidence related to an inapplicable ordinance would create a needless trial-within-a-trial, requiring Uber to explain its political and regulatory history, its limited geographic and temporal scope, and the statewide law that superseded it. Any minimal probative value would therefore be substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, and wasting time. Fed. R. Evid. 403; *Unigestion Holding*, 2022 WL 15792838, at *11 (excluding evidence of defendant's activities in jurisdictions other than the one at issue because any nominal probative value was "substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time").

For all of these reasons, the Court should exclude any evidence or argument concerning Austin's 2016-17 fingerprint ordinance.

## III. MR. LE'S CRIMINAL TRIAL AND APPEAL AND THE POLICE INVESTIGATION

Uber does not seek to exclude from trial the fact that driver Victor Le was criminally convicted of assaulting Plaintiff during a guest ride arranged through the Uber platform on June 9, 2020. However, the Court should exclude all additional evidence about Mr. Le's criminal case and trial, including proposed nonretained expert testimony by Phillip Jeremy Reinhardt, the police sergeant involved in the criminal investigation, as well as the police investigative files, criminal trial transcripts, references to testimony provided during trial, and the fact and outcome of Mr. Le's appeal. As explained below, (1) this evidence is irrelevant to Plaintiff's claims against Uber; (2) any tenuous marginal probative value is substantially outweighed by its highly prejudicial, confusing, and cumulative nature; and (3) statements in the police

[8] *See* Calily Bien, *Millions of Dollars Being Spent on Ridesharing Vote*, KXAN News Austin, (Apr. 29, 2016) ("If you live in the City of Austin, you've probably received at least one flyer, email (or both) regarding Prop 1."), https://www.kxan.com/news/millions-of-dollars-being-spent-on-ridesharing-vote/; Madlin Mekelburg, *Austin's Proposition 1 Defeated*, The Texas Trib. (May 7, 2016) (quoting Austin Mayor Pro-Tem Kathie Tovo as accusing Uber and Lyft of "running a deceptive campaign in a blatant attempt to confuse the voters and allow corporations to write their own rules").

investigative file constitute inadmissible hearsay.[9]

***First***, evidence related to Mr. Le's criminal case, including proposed expert testimony from Sergeant Reinhardt, is irrelevant because Uber will not contest that Mr. Le was criminally convicted of the alleged assault at issue. Simply put: Mr. Le's criminal and appellate proceedings ***after*** the assault occurred say nothing about what Uber did, said, knew, or should have known ***before*** the assault.[10] Plaintiff herself concedes that "a sexual assault is not an element of Plaintiff's negligence claim[.]" *See* Pl.'s Mot. to Admit Evidence of Driver's Criminal Conviction, Dkt. 7041 at 2-3. That concession underscores that the criminal investigation and proceedings are not probative of any claim or defense in this case. *See Gulbranson v. Duluth, Missabe & Iron Range Ry. Co.*, 921 F.2d 139, 142 (8th Cir. 1990) (the "fact that the [defendant] may have been aware of a continuing problem" after the injury is "not probative of its knowledge" at or before the time of injury). Rather, the criminal investigation and trial record are a sideshow that would do nothing to make any material fact more or less probable.

***Second***, the dangers of unfair prejudice, waste of time, and needless presentation of cumulative evidence far outweigh any probative value of the criminal investigation and case. *See* Fed. R. Evid. 403; *Ellsworth v. Prison Health Servs., Inc.*, No. CIV 11-8070 PCT RCB, 2013 WL 6587876, at *5 (D. Ariz. Dec. 12, 2013) (admitting evidence of plaintiff's felony conviction but excluding any details or facts underlying the conviction due to the risk of prejudice and the potential to confuse the issues). Indeed, the Fifth Circuit has held that it was ***reversible error*** to admit the details of a prior criminal conviction where there was no dispute regarding the fact of the conviction, because any tenuous probative value was "substantially outweighed by its danger of creating prejudice." *See United States v. Spletzer*, 535 F.2d 950, 956 (5th Cir. 1976) (admission of the full record of the defendant's prior conviction at subsequent trial on charge of federal escape was reversible error where defendant had stipulated to his conviction and incarceration); *see also Old Chief v. United States*, 519 U.S. 172, 191 (1997) (district court abused its

[9] Nothing in this motion seeks to preclude otherwise admissible statements made by Plaintiff during the investigation, whether offered as a party-opponent statement or for impeachment under FRE 613.

[10] Mr. Le was arrested on July 13, 2020. *See* DOE QLF 000001 (Ex. 4). Upon receiving notice of Mr. Le's arrest warrant through Uber's standard background check alert process, Uber immediately waitlisted him and then blocked Mr. Le from the platform on July 25, 2020, long before his criminal trial. *See* UBER-MDL3084-DFS0064887-88 (Ex. 5); UBER-MDL3084-BW-00054576 (Ex. 6).

discretion under Rule 403 by spurning defendant's offer to admit to the prior conviction element of an offense and instead allowing in the full record of the prior judgment of conviction).

So too here. There is no need for the jury to waste time poring over the details of the police investigation of Mr. Le, including hearing testimony from Sergeant Reinhardt regarding the specifics of the investigation, as well as transcripts and arguments from the criminal trial proceedings that led to Mr. Le's conviction and sentencing, when Uber concedes that Mr. Le was criminally convicted for assaulting Plaintiff. Moreover, there is an enormous potential for confusion and prejudice if such evidence were admitted. The criminal trial involved multiple witnesses testifying specifically as to Mr. Le's character and propensity for misconduct, testimony that (if introduced in this case) would "taint" any verdict "by inviting the jury to infer guilt based on no more than prior bad acts, in direct contravention of Rule 404(b)(1)." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 784-85 (5th Cir. 2018) (holding that admission of evidence of bribes paid by third-party subsidiaries was reversible error due to the prejudicial effect of inviting the jury to infer guilt based on no more than prior bad acts). Admitting evidence pertaining to the police investigation and the criminal trial record would force Uber to defend against the circumstances of Mr. Le's arrest and criminal trial—including his abscondment, the quality of the criminal investigation, and the procedural history of his appeal—resulting in a series of mini-trials about collateral issues that have nothing to do with Uber's conduct. Simply put: the jury's task is to evaluate Plaintiff's asserted claims against Uber, not to relitigate the details of a criminal case that has already been resolved. Allowing the criminal investigation and trial record into evidence would divert the jury's attention from the claims at issue to collateral matters that would only confuse, delay, and prejudice these proceedings.

***Finally***, the statements and conclusions in the police investigative file are separately inadmissible because they are hearsay. *See* Fed. R. Evid. 801. As the Court previously recognized in *Dean*, police investigative files are laden with inadmissible hearsay, including the opinions and conclusions reached by investigators. 1/6/2026 *Dean* Pretrial Hr'g Tr. 53:14-21, 54:21-23, 55:12-14 (Ex. 7). Plaintiff here should be similarly barred from introducing the police file and from presenting Sergeant Reinhardt's testimony about the same details contained in the file. *See* Pl.'s 9/3/2026 Disclosure of Non-retained Expert Witness: Sergeant Phillip Jeremy Reinhardt (Ex. 23) (disclosing Sergeant Reinhardt's proposed testimony about,

inter alia, the police's "investigative findings [and] the basis for referring or supporting criminal charges"). While Rule 803(8) carves out a narrow exception for public records, "the investigator's conclusions" fall squarely outside the scope of that exception because they are "based entirely on the investigator's credibility determinations," rather than "reliable, objective factual matters"—which are the basis for this exception. *Randle v. Tregre*, 147 F. Supp. 3d 581, 598 (E.D. La. 2015) (excluding an internal report prepared by law enforcement), *aff'd*, 670 F. App'x 285 (5th Cir. 2016); *Bedford Internet Off. Space, LLC v. Travelers Cas. Ins. Co.*, 41 F. Supp. 3d 535, 544 (N.D. Tex. 2014) ("[P]ortions of the [police] reports containing the officers' mere opinions are not admissible."); *Manis v. Lawson*, 585 F.3d 839, 844 n.3 (5th Cir. 2009) ("Third party statements included in a police report are not admissible under the public records exception to the hearsay rule."). For this reason as well, the Court should exclude the police investigation findings, opinions, and conclusions, including Reinhardt's testimony and the investigative file.

For the foregoing reasons, the Court should exclude all additional evidence about Mr. Le's criminal case and trial, including proposed nonretained expert testimony by Phillip Jeremy Reinhardt, the police sergeant involved in the criminal investigation—as well as the police investigative files, criminal trial transcripts and testimony, and the fact and outcome of Mr. Le's appeal.

## IV. UBER'S WOMEN DRIVER PREFERRED OPTION

The Court should exclude all evidence related to Uber's Women Driver Preferred option, which was launched in 2025, because it is both irrelevant and unduly prejudicial. The Court previously declined in *Dean* to exclude evidence that a similar gender-matching option was available in foreign countries prior to being launched in the United States, finding that such evidence is relevant to whether it would have been feasible to adopt the option earlier in the U.S. 1/6/2026 *Dean* Pretrial Hr'g Tr. 24:15-22. But evidence regarding the Women Driver Preferred option (including feasibility) is irrelevant to this case because there is no evidence that it would have been selected for the ride at issue.

The Uber account holder who requested Plaintiff's ride in the early morning of June 9, 2020, 7/22/2026 Pl. Dep. 210:7-11 (Ex. 8), was H.M., the partner of the manager at the [redacted] Bar—and she, not Plaintiff, decided what platform to use. *Id*. Plaintiff nevertheless alleges that, "[h]ad a gender-matching functionality been available, the venue owner who ordered the ride for Plaintiff late at night would have toggled it on for the ride in question." QLF 001 Am. Compl. ¶ 36 (Dkt. 2712-5). The record refutes that

allegation. H.M. testified that, although Women Driver Preferred has been available in the United States for some time, she does not believe she has ever enabled it on her Uber account. 8/20/2026 H.M. Dep. 31:3-9, 32:12-16 (Ex. 9).

Further, there is no evidence in the record to suggest that Plaintiff would have asked H.M. to select a female driver even if the Women Driver Preferred option had been available in June 2020. Plaintiff testified that she only "recently" enabled that option. 7/22/2026 Pl. Dep. 238:2-4. In addition, records of the 129 trips Plaintiff requested on Lyft between June 28, 2020 and July 8, 2026, show that at least 100 were with male drivers. *See* DOE QLF 001980-002004 (Ex. 10); Exhibit 24 to Pl. Dep., *QLF 001 Lyft History* (Ex. 11). Plaintiff's actual rideshare history thus provides no basis to infer that she would have requested a female driver for the June 9, 2020 guest ride. Because the record does not support a finding that a "gender-matching functionality," QLF 001 Am. Compl. ¶ 36, would have been used for the ride at issue, the absence of such an option in June 2020 has no tendency to make any fact of consequence more or less probable. *See* Fed. R. Evid. 401.

In addition, any minimal probative value of evidence related to the Women Driver Preferred option would be substantially outweighed by the risk of confusing the issues, undue delay, and wasting time. *See* Fed. R. Evid. 403. Uber is continuously working to identify and implement improvements, particularly in the context of safety, as technology, information, and circumstances evolve. If Plaintiff is permitted to use later safety innovations to support liability for actions taken years earlier, Uber would be required to put on multiple time-consuming and distracting mini-trials about the operational, technological, and regulatory considerations bearing on when those innovations could be implemented. That would invite a lengthy and confusing mini-trial about the legal concerns posed by Women Driver Preferred under U.S. employment and discrimination laws and the broader litigation environment in the country, all of which are collateral to Plaintiff's claims. *See United States v. Williams*, 30 F.4th 263, 268 (5th Cir. 2022) (affirming exclusion of evidence because the "risks of confusion and delay abound . . . raising the strong possibility of minitrials [that] might distract the jury from the charged conduct"); *Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 690 (9th Cir. 2001) (affirming exclusion where disputed evidence risked "an inefficient allocation of trial time" that "might have resulted in a 'mini trial'").

***Third***, evidence related to the Women Driver Preferred option is also inadmissible to prove negligence because it is a subsequent remedial measure. *See* Fed. R. Evid. 407; *Trepagnier v. Alimak Hek, Inc.*, 784 F. App'x 195, 199 (5th Cir. 2019); *Williams v. J.B. Hunt Transp., Inc.*, 151 F.4th 1020, 1038 (9th Cir. 2025). Allowing litigants to point to subsequent safety developments as evidence that the defendant's prior conduct was negligent would disincentivize corporate litigants from instituting safety advancements out of fear that the advancements will be used against the company in litigation. *See Miciotto v. Hobby Lobby Stores, Inc.*, 514 F. Supp. 3d 877, 878-79 (W.D. La. 2021) (explaining that Rule 407's purpose is to "encourag[e] people to take . . . steps in furtherance of added safety" and that the Rule "also seeks to ensure that negligence is properly determined according to what the defendant knew or should have known prior to the accident, not what the defendant knew as a result of the accident"). The same is true here. Allowing Plaintiff to use Uber's later adoption of Women Driver Preferred to suggest that Uber should have adopted it earlier would do precisely what Rule 407 prohibits. It would discourage companies like Uber from improving their policies and practices, which would ultimately hurt both riders and drivers. That concern is particularly pronounced in the safety context, where policies and practices are necessarily iterative. Public policy should encourage—not punish—safety innovations.

For all of these reasons, Plaintiff should be precluded from offering evidence related to Uber's Women Driver Preferred option at trial.

## V. SAFETY RISK ASSESSED DISPATCH ("S-RAD") PROGRAM.

The Court should also exclude any evidence or argument related to Uber's Safety Risk Assessed Dispatch ("S-RAD") program, a highly complex, proprietary machine learning model developed several years after the alleged incident. S-RAD technology attempts to reduce the relative risk of reported instances of serious sexual assault or misconduct either by independent drivers or riders. Evidence regarding this safety initiative, which was developed well after the events at issue and was not operational when the incident occurred, is inadmissible for multiple reasons.

***First***, S-RAD evidence is irrelevant to the guest ride taken by Plaintiff on June 9, 2020. S-RAD is a program that aims to improve the safety of ride pairings by measuring variables specific to the trip environment, the driver, and ***the rider associated with the account used to order the ride***. For example, S-RAD considers, among other factors, the rider account holder's own previous star ratings, incident

reports, tenure on the platform, late night and weekend trip request rates, and trip cancellation history—and then uses that information to assess the relative risk of an incident if that rider is paired with a specific driver, in a specific place, at a specific time. The ride at issue here, however, was arranged by a third party on her own account, not Plaintiff's. Because Plaintiff was a guest rider and not the rider account holder, none of Plaintiff's own data was, or could have been, factored into any S-RAD risk assessment. Instead, S-RAD would have assessed risk based on the third-party account holder's profile, not Plaintiff's.

***Second***, as noted above, S-RAD was not deployed until 2022, approximately two years after the June 9, 2020 incident. Evidence of subsequent remedial measures is inadmissible under Fed. R. Evid. 407 for purposes of liability. *See Williams v. J.B. Hunt Transp., Inc.*, 151 F.4th 1020, 1038 (9th Cir. 2025) (affirming exclusion of evidence of changed reimbursement policy to prove liability under Rule 407); *Galland v. Harvey Gulf Int'l Marine, LLC*, No. CV 23-3392, 2025 WL 2845135, at *6 (E.D. La. Oct. 7, 2025) (holding that evidence of subsequent repair and posting of signs was inadmissible to prove causation or negligence under Rule 407); *Gauthier v. AMF, Inc.*, 805 F.2d 337, 338 (9th Cir. 1986) ("We fail to see how an alternative design, developed by another person years after the product in question was manufactured, is relevant to whether the product was reasonably safe at the time it was made.") (quoting *Grenada Steel Indus., Inc. v. Alabama Oxygen Co.*, 695 F.2d 883, 889 (5th Cir. 1983)).

***Third***, evidence related to S-RAD is also inadmissible because it would lead to significant jury confusion and a needless delay of the trial. *See* Fed. R. Evid. 403; *Galland*, 2025 WL 2845135, at *6 (excluding evidence of repair after the alleged incident under Rule 403 because "[a]llowing Plaintiffs to introduce evidence of this subsequent remedial measure would . . . unfairly prejudice the Defendants, as the jury would likely imply culpability upon Defendants from such evidence"). As already discussed, the central questions at trial will be whether Uber breached a purported duty to Plaintiff and, if so, whether such alleged conduct caused Plaintiff's alleged damages. In assessing the first question, jurors will be asked to consider whether Uber acted reasonably in ***2020***—i.e., the time of the assault. The technology in existence at that time differed markedly from what was available when Uber launched S-RAD years later, in 2022. As a result, there is a substantial risk that introducing evidence about S-RAD would mislead jurors into thinking that it would have been feasible for Uber to deploy that technology prior to the alleged

incident in this case. To guard against that risk, Uber would have no choice but to present substantial technical evidence about the state of machine learning and data analytics in 2020 versus 2022 to correct any misimpression that S-RAD technology could have existed earlier and to educate jurors as to why S-RAD would ***not*** have reflected the state of the art at the relevant time. The result would be a series of "mini-trials" that risk jury confusion and protracting an already complex trial. *See United States v. Williams*, 30 F.4th 263, 268 (5th Cir. 2022) (affirming exclusion of collateral evidence due to the distracting risk of confusion, delay, and mini-trials).

## VI. UBER'S ADVERTISING OR MARKETING

Uber anticipates that Plaintiff will seek to introduce evidence at trial related to Uber's marketing and/or advertising activities. Such evidence should be excluded as irrelevant because Plaintiff cannot connect Uber's marketing to her alleged injury. "Without a link between [Uber's] marketing and plaintiff's" decision to use Uber's services, any evidence about the impact of that marketing is "irrelevant." *Johnson v. Wyeth LLC*, No. CV 10-02690-PHX-FJM, 2012 WL 1150857, at *3 (D. Ariz. Apr. 5, 2012); *see also Becker v. PaineWebber, Inc.*, 962 F.2d 524, 527 (5th Cir. 1992) (affirming directed verdict where plaintiff failed to claim his losses were in reliance on the alleged negligent representation). Similarly, to the extent Plaintiff alleges failure to warn, Texas law requires her to show that the alleged omission was a cause-in-fact of her injury—i.e., that, but for the omission, the injury would not have occurred. *Gen. Motors Corp. v. Saenz ex rel. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993).

Plaintiff cannot make that showing. As a threshold matter, Plaintiff did not choose to use the Uber platform. Instead, a different Uber account holder, H.M., ordered the ride on Plaintiff's behalf, because Plaintiff was inebriated. 7/22/2026 Pl. Dep. 210:7-11 (Ex. 11). DOE QLF 000002-4 (Ex. 4); Pl. Dep. 210:7-11. Plaintiff was not involved in deciding which rideshare app to use, and did not even know what rideshare platform H.M. selected until after the ride at issue. Pl. Dep. 210:4-6. In her initial statements to the police following the alleged incident, Plaintiff ***repeatedly stated that she had been in "a Lyft."*** [redacted]-PCSO-000007 (Ex. 12) ([redacted]); SEXUAL_ASSA Body Cam Night of Incident (1).mp4 at 02:18, 06:30, 07:18, 08:18 (Ex. 13); DOE QLF 000002. Plaintiff therefore could not have relied on Uber's marketing in

deciding to take the subject ride.

H.M.'s involvement similarly fails to bridge the causation gap. For one thing, the chain of causation is too attenuated because Plaintiff made the choice to enter the vehicle; thus, H.M.'s exposure to marketing cannot constitute the proximate cause of Plaintiff's alleged injury. *See Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479-81 (Tex. 1995) (statements by defendant organization that it "thoroughly investigated volunteers" not the proximate cause of sexual assault committed by volunteer against plaintiff where the "causal connection" between statements and injury was "broken"); *Bryant v. S.A.S.*, 416 S.W.3d 52, 58-60 (Tex. App.–Houston [1st Dist.] 2013, pet. denied) (babysitter's marketing flyer to parents not the proximate cause of babysitter's molestation of children two months later).

In any event, H.M. testified at her deposition that she did not remember why she requested Plaintiff's ride through Uber as opposed to another platform, and that it may have been because Uber was cheaper than Lyft. H.M. Dep. 44:12-22. Although Plaintiff's counsel subsequently elicited testimony that H.M. generally recalls seeing advertisements from 2018-2020 portraying Uber as safe, *see generally id.* 89:17-98:22, H.M. could not identify Uber's safety-related marketing—or any representation by Uber—as a reason she selected Uber for the subject ride.[11] Thus, even crediting evidence that H.M. was exposed to Uber safety advertising, there is no basis to conclude that any particular representation or omission caused H.M. to select Uber for this ride, much less that it caused Plaintiff to agree to get in the car.

Marketing-related evidence should also be excluded under Rule 403 because it would confuse the jury and unfairly suggest that Uber may be held liable for marketing statements that have no connection to Plaintiff or the ride at issue. *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2017 WL 11718344, at *4 (E.D. La. Apr. 18, 2017) (excluding evidence regarding marketing and advertising that plaintiff did not see or rely upon due to undue prejudice and lack of relevance). The Court should not permit Plaintiff to create a distracting and highly prejudicial sideshow about marketing campaigns and ads that have no bearing on the incident or issues in question.

At a minimum, evidence of marketing that Plaintiff ***could not*** have relied on in June 2020 is irrelevant and inadmissible. The evidence demonstrates that neither Plaintiff nor H.M. would have been

[11] Moreover, both H.M. and Plaintiff testified that they did not recall any particular advertisement that induced them to download the Uber app. H.M. Dep. 24:12-16; Pl. Dep. 227:3-18.

exposed to some of the Uber marketing on which Plaintiff focuses, including ads that were never circulated in the Dallas City region, ads not made available until after the incident, and ads that ran years before the incident. None of those ads could have influenced H.M. or Plaintiff to use the Uber app on the date of the incident. *See* Defs.' Responses Obj. to Pl.'s 4th Set of Interrogatories at 7, 10, 14-18 (Sept. 2, 2026) (Ex. 14); *see also Johnson*, 2012 WL 1150857, at *3 ("A person cannot be affected by marketing, even subliminally, unless he was exposed.").

## VII. DRIVER'S ALLEGED "PROPENSITY" TO COMMIT SEXUAL ASSAULT

Uber anticipates that Plaintiff will attempt to introduce evidence related to other allegations of sexual assault or misconduct against Mr. Le to show that Mr. Le had a "propensity" to commit sexual assault (and that Uber knew or should have known of that propensity prior to the June 2020 ride at issue). This includes a sexual encounter in 2019 that did not result in any questioning or arrest. *See* QLF 001-FWPD-000353-355 (Ex. 15). It also includes testimony by Mr. Le's ex-wife that he was "very pushy" in their sexual relationship, which began ***after*** the ride at issue. 9/2/2022 Criminal Trial Tr. 48:9-19 (Ex. 16).

***First***, such evidence would run afoul of Rule 404, which prohibits evidence of "any other crime, wrong, or act" to prove "a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

While Rule 415 provides an exception to the Rule 404 prohibition on "propensity" evidence in cases involving sexual assault, that exception applies only to parties. *See* 23 Wright & Miller's Fed. Prac. & Proc. Evid. § 5403 (2d ed. 2026); *J.S. ex rel. N.S. v. Child. of Am., Inc.*, 696 F. App'x 39, 40 (2d Cir. 2017) ("The text of Rule 415 speaks only about admission of evidence of sexual assault or child molestation committed by a 'party.' . . . Cabrera was not a party, and Rule 415 does not address evidence of his subsequent abuse of another child."). Plaintiff has previously argued that courts in other circuits have applied Rule 415 to admit evidence of other sexual assault incidents committed by a non-party. *See* 8/24/2026 Joint Letter re: Pl.'s Not. of Subpoenas Directed to Non-Parties, Dkt. 7094, at 4. But the cases on which Plaintiff relied are factually inapposite because there was evidence in those cases that the Defendant was ***aware*** of a third party's prior acts of sexual assault. As set forth in detail below, however, there is no evidence Uber was aware of (or could have reasonably learned about) the other allegations of sexual assault against Mr. Le at the time of the alleged incident at issue in this case.

***Second***, there is no evidence that Uber was, or should have been, aware of these allegations prior to the alleged assault. The 2019 incident did not result in any arrest or other legal consequences and may well have been consensual. Indeed, the police report confirms that "[redacted]" *See* QLF 001-FWPD-000353-55 (Ex. 15). And Mr. Le's ex-wife's allegations about experiences with him during their marriage are doubly irrelevant because she did not meet Mr. Le until Fall 2020, months after both the incident in question and the date on which Mr. Le was removed from the Uber platform. 9/2/2022 Criminal Trial Tr. 39:20-23 (Ex. 16).

***Finally***, evidence related to these alleged incidents should be excluded under Rule 403 because it is highly inflammatory and would serve no purpose other than further prejudicing jurors against Mr. Le and, by extension, Uber.

## VIII. DRIVER'S UNRELATED ALLEGED MISCONDUCT

Uber anticipates that Plaintiff may seek to introduce evidence or argument concerning unproven allegations that Mr. Le engaged in misconduct entirely unrelated to the sexual assault allegations at issue. Such evidence includes: (1) a 2021 social media post alleging that Mr. Le failed to return borrowed DJ equipment, *see* State's Ex. 36, 9/2/2022 Criminal Trial (Ex. 17); (2) Mr. Le's sister's allegation that he borrowed her laptop and never returned it, *see* 9/2/2022 Criminal Trial Tr. 27:1-8; (3) allegations by Mr. Le's ex-wife that he failed to pay child support, had credit card debt, and exhibited PTSD and aggression, *see* 9/2/2022 Criminal Trial Tr. 41:17-19, 45:18-19, 46:2-5; and (4) a 2016 allegation that Mr. Le overcharged a man who received a ride from him before Mr. Le had an account on the Uber platform, UBER-MDL3084-BW-00054417 (Ex. 18).

***First***, Rule 404(b)(1) bars this evidence because it would invite the jury to infer that Mr. Le had a propensity to engage in bad conduct. *See, e.g.*, *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 784-85 (5th Cir. 2018) (Plaintiff's counsel "tainted the result by inviting the jury to infer guilt based on no more than prior bad acts, in direct contravention of Rule 404(b)(1). That alone provides grounds for a new trial.").

***Second***, the evidence is irrelevant because: (1) the alleged misconduct has nothing to do with the allegations in this case; and (2) there is no evidence that Uber knew or should have known of any of these incidents at the time it allowed Mr. Le on the Uber platform. *See Phillips v. Super Servs. Holdings, LLC*,

189 F. Supp. 3d 640, 646 n.4 (S.D. Tex. 2016) (defendant's employee's post-incident conviction for traffic offense was irrelevant in negligent hiring/entrustment case).

***Third***, even assuming these unrelated allegations have any probative value, Rule 403 requires their exclusion because that value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. Evidence of Mr. Le's unrelated alleged misconduct would require mini-trials on collateral issues, waste time, and distract the jury from the facts and issues properly before it.

## IX. MEDIA REPORTS INVOLVING UBER THAT POST-DATE THE *DEAN* TRIAL

The Court should exclude evidence and argument regarding media reports related to Uber that were published ***after*** the June 9, 2020 incident at issue. This includes, but is not limited to, an August 4, 2026 *New York Times* story entitled "Uber's Strategy for Fighting Sexual Assault Suits: 'What Were You Wearing?'" (Ex. 19), which quoted portions of deposition and court transcripts out of context to portray Uber's counsel in an unflattering light. As the Court knows, Uber's lawyers have received death threats in the wake of this inflammatory article.[12] The JCCP excluded media reports, JCCP Order at 52 (Ex. 20), and while this Court denied a similar motion in the *Dean* trial, it recognized that there are "a number of hearsay problems" with introduction of such evidence, 1/6/2026 *Dean* Pretrial Hr'g Tr. 10:8-16 (Ex. 7). As such, the Court held that evidence of media reports would "come in with limiting instructions" that they are only admissible to the extent relevant to Uber's "state of mind," and not for the truth of the reports. *Id.* 12:4-11. Because the reports Uber seeks to exclude here post-date the alleged incident, they cannot be relevant even for that that limited purpose and should therefore be excluded.

***First***, media reports are "quintessential hearsay" and cannot be admitted for their truth. JCCP Order at 52; *see also Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991); *Cano v. Bexar Cnty.*, 280 F. App'x 404, 406 (5th Cir. 2008) ("Newspaper articles, however, are hearsay . . . ."); *Young v. Wolfe*, No. 07-03190 RSWL (AJWx), 2017 WL 985632, at *4 (C.D. Cal. Mar. 14, 2017) ("Where a party seeks

[12] Other media reports post-dating the incident at issue should also be excluded. Examples include: a January 21, 2026 *New York Times* story titled "Uber Faces Growing Pressure Over Sexual Assault Record"; articles discussing an investor lawsuit against Uber (*e.g.*, a June 23, 2026 *Business Insider* article titled "Uber Investor's Suit Alleges Rider Safety Took a Back Seat to the Gig-Work Model"; a July 23, 2026 *Forbes* article titled "New Lawsuit Claims Uber Covered Up Sexual Assault Stats, Board 'Ignored Red Flags'"); a December 22, 2025 *New York Times* story titled "Uber Cleared Violent Felons to Drive. Passengers Accused Them of Rape"; and the August 6, 2025 *New York Times* story titled "Uber's Festering Sexual Assault Problem."

to introduce a newspaper article, television program or other media reports 'for the truth of the matter asserted, they clearly constitute hearsay.'") (citation omitted). Moreover, as noted above, articles are not relevant to state of mind if they were published after the underlying incident. *See NeSmith v. Cnty. of San Diego*, No. 15-CV-629 JLS (AGS), 2022 WL 272011, at *13 (S.D. Cal. Jan. 28, 2022) (granting motion to exclude "post-incident articles generally, as the articles are hearsay without an exception"); *Gulbranson v. Duluth, Missabe & Iron Range Ry. Co.*, 921 F.2d 139, 142 (8th Cir. 1990) (the "fact that the [defendant] may have been aware of a continuing problem" after the injury is "not probative of its knowledge" at or before the time of injury).

***Second***, evidence related to media reports should be excluded as irrelevant and unduly prejudicial. *See* Fed. R. Evid. 401, 403. Plaintiff's claims will turn on whether Uber breached an alleged duty to Plaintiff, and whether such a breach caused the incident. Post-incident media reports about Uber or the safety of its platform have no tendency to answer either question. *See Drewry v. Cnty. of Riverside*, No. EDCV 20-2554 JGB (SHKx), 2024 WL 1136328, at *3 (C.D. Cal. Jan. 24, 2024) ("The Court agrees that evidence such as press releases and media articles that are unrelated to the incident at issue are irrelevant."). Rather, injecting such incendiary media reports into this trial would serve only one purpose: to unfairly "stigmatize" Uber "before the jurors," denying its right to a fair trial. *See Cardona v. Cnty. of Los Angeles*, No. 2:23-cv-06225-MWC-AGR, 2025 WL 4227217, at *4 (C.D. Cal. Dec. 16, 2025) (excluding media article under Rule 403; "introducing the *LA Times* article may unfairly stigmatize Defendants before the jurors"); *Rabin v. Cook Cnty.*, No. 09 C 8049, 2015 WL 13879970, at *3 (N.D. Ill. Apr. 22, 2015) (granting defendant's motion *in limine* to exclude newspaper articles about police misconduct where the articles' "minimal probative value" was "substantially outweighed by the unfair prejudice" and "would have the tendency to confuse jurors"); *Young*, 2017 WL 985632, at *4 (newspaper articles "have the likelihood of confusing the jury"); *Chaudhry v. Smith*, No. 1:16-cv-1243-SAB, 2020 WL 869115, at *17 (E.D. Cal. Feb. 21, 2020) (excluding news articles under Fed. R. Evid. 403). Finally, Uber would have no choice but to respond to the substance of those media allegations, necessitating mini-trials on collateral issues and compounding the confusion and delay. *See Manuel v. City of Chicago*, 335 F.3d 592, 597 (7th Cir. 2003) (affirming exclusion of evidence of other accusations because the "potential for confusing or even misleading the jury by engaging in a series of mini-trials over the other accusations"

"was significant" and carried a risk of "unfair prejudice, confusion of the jury, and undue delay").

## X. INFLAMMATORY REMARKS ABOUT UBER'S DEFENSE

Plaintiff has submitted an expert report from Thomas Tremblay that accuses Uber's attorneys of "[redacted]" "[redacted]" and intimidation for seeking discovery on Plaintiff's state of mind and mental health records. *See* 9/3/2026 Report of Thomas Tremblay, Schedule A.6, at 28 (Ex. 21). These accusations continue Plaintiff's counsel's campaign against Uber's counsel that has played out in *The New York Times* and on social media. Contrary to these accusations, the Court has recognized that Uber's counsel has acted in a professional and respectful manner throughout this litigation and rejected the suggestion that Uber's counsel "would be responsible for any type of conduct that would give rise to . . . accusations" about litigation misconduct. 8/14/2026 CMC Tr. 14:21-15:7. The Court should bar Plaintiff from making such baseless accusations regarding Uber's (or its legal team's) litigation conduct.

Plaintiff's gratuitous accusations are not proper legal arguments. Rather, they are a transparent attempt by counsel to improperly influence the jury and prejudice Uber in the eyes of jurors in violation of Rule 403. As the Fifth Circuit has recognized, such "attacks against opposing counsel" contravene "dignity, order, and decorum[,]" and can themselves be grounds for a new trial. *See Clapper v. Am. Realty Invs., Inc.*, 95 F.4th 309, 317 (5th Cir. 2024) ("[R]epeated improper statements including attacks against opposing counsel, references to [plaintiff's] wealth, matters not in the record, appeals to local bias, and suggestions of [plaintiff's] bad motives . . . affected [plaintiff's] 'substantial rights' and warrant a new trial.") (citation omitted); *see also Call Delivery Sys., LLC v. Morgan*, No. 2:20-cv-04637-CBM-PDx, 2022 WL 18143363, at *3 (C.D. Cal. Sept. 20, 2022) (granting motion for new trial where, among other things, counsel's closing argument "did not simply discuss the facts and legal theories applicable to this case, but rather attacked the [opposing party] and its management" in a way that was "designed to raise prejudice and inflame the jury") (citation omitted).

The same is true here. There is nothing improper about Uber subpoenaing Plaintiff's records, hiring experts, creating jury demonstratives, leveling objections, and otherwise defending itself at trial. That is not victim mistreatment; it is Uber exercising its due-process right to have the "opportunity to present every available defense." *See Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (citation omitted). Moreover, any such argument would be enormously prejudicial; the death threats received by Uber's

lawyers in the wake of *The New York Times* article speak for themselves. Because any attempt by Plaintiff to characterize Uber's defense as designed to shame Plaintiff or prevent sexual assault victims from coming forward would be highly improper and enormously prejudicial, it should be excluded from trial.

## XI. EXECUTIVE COMPENSATION

Uber anticipates that Plaintiff will attempt to introduce evidence regarding the compensation of Uber's Chief Executive Officer, Dara Khosrowshahi (or other Uber executives), at trial. Indeed, Plaintiff's punitive damages expert devotes an entire page to Mr. Khosrowshahi's compensation in his expert report. *See* 9/3/2026 Report of Robert W. Johnson, Exhibit A at Slide 16 (Ex. 22). Such evidence is wholly irrelevant to any issue in this case, and its introduction would serve no purpose other than to inflame the jury against Uber. This evidence should be excluded for at least four reasons.

***First***, as explained in Uber's Motion for Summary Judgment, filed contemporaneously and incorporated herein by reference, Texas law bars punitive damages in cases where, as here, a plaintiff's injuries arise out of the criminal acts of a third party. *See* Tex. Civ. Prac. & Rem. Code § 41.005(a); *Massage Heights Franchising, LLC v. Hagman*, 679 S.W.3d 298, 310 (Tex. App.—Houston [14th Dist.] 2023), *rev'd in part on other grounds*, 712 S.W.3d 615 (Tex. 2025) (reversing award of punitive damages against massage parlor in case involving alleged sexual assault by masseuse).

***Second***, even if Texas law did not proscribe punitive damages in this case, the ***compensation*** that a corporate defendant provides to executive employees is irrelevant to such a claim. In Texas, evidence of a ***corporate defendant's net worth*** is admissible "when punitive or exemplary damages are properly in issue" to "provide the jury with a rational guide for determining the amount of punitive damages necessary to deter similar conduct." *Farah Mfg. Co. v. Alvarado*, 763 S.W.2d 529, 534-35 (Tex. App.—El Paso 1988), *aff'd*, 830 S.W.2d 911 (Tex. 1992). Indeed, Section 41.011(a) directs the trier of fact to consider, among other factors, "the net worth of a defendant." Tex. Civ. Prac. & Rem. Code § 41.011(a)(6). Critically, Section 41.011(a)(6) refers to the net worth of the defendant, not the personal compensation of any individual executive. Mr. Khosrowshahi's annual salary is not Uber's net worth. It is not even a component or proxy of Uber's net worth.

The Fifth Circuit has similarly recognized that information regarding corporate "officer salaries provided no such information" relevant to guide the imposition of punitive damages, and therefore

"admitting it constitutes an abuse of discretion." *Graef v. Chem. Leaman Corp*., 106 F.3d 112, 119 (5th Cir. 1997); *see also McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 976 (4th Cir. 2020) (holding that evidence of the defendant's parent companies' "executive compensation" was irrelevant to the amount of punitive damages necessary to punish defendant and, therefore, the introduction of such evidence at trial was prejudicial error); *Avondale Mills, Inc. v. Norfolk S. Corp.*, No. 1:05-2817-MBS, 2008 WL 6953958, at *1 (D.S.C. Jan. 16, 2008) (granting defendants' motion to exclude evidence of executive compensation, because it "is not relevant to show [d]efendants' ability to pay any punitive damages award"); *cf. Farah Mfg.*, 763 S.W.2d at 534-35 (finding evidence of amounts paid by a corporate defendant to executive board member in connection with a dispute irrelevant to the company's "net worth" and therefore inadmissible in determining the proper level of punitive damages).[13]

***Third***, absent a viable claim for punitive damages, financial information related to Uber or its executives has no possible relevance to Plaintiff's claims. *See, e.g.*, *Wal-Mart Stores, Inc. v. Cordova*, 856 S.W.2d 768, 774 (Tex. App.—El Paso 1993, writ denied) (trial court committed reversible error by admitting net worth testimony that was irrelevant because plaintiff did not establish a claim that was eligible for punitive damages); *In re Bella Corp.*, 648 S.W.3d 373, 378 (Tex. App.—Tyler 2021, orig. proceeding) (because plaintiffs failed to demonstrate a likelihood of success on the merits of any claim eligible for exemplary damages, it was an abuse of discretion to authorize net worth discovery related only to exemplary damages); *Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, No. 2:16-CV-00134-JRG, 2017 WL 2844646, at *3 (E.D. Tex. May 19, 2017) (excluding expert "testimony regarding the compensation of [defendant]'s employees, including officers and directors" as "wholly irrelevant").

***Finally***, even if evidence regarding executive compensation had some probative value, any such value is dwarfed by the highly prejudicial nature of such evidence, the clear purpose of which is to embarrass Uber, its CEO and its executive leadership—and to prejudice the jury against Uber by "appealing to the jury's sympathies given the wealth and compensation of the defendant and its

[13] As discussed in Uber's forthcoming motion to exclude Mr. Johnson's testimony, Mr. Johnson has been barred from addressing executive compensation in other litigation. *See Pooshs v. Philip Morris USA, Inc*., 287 F.R.D. 543, 549-50 (N.D. Cal. 2012) (limiting Mr. Johnson "to testify only as to the 'default' measure of defendants' financial condition—current net worth" and holding that his remaining financial analysis "(based on a wide variety of financial statistics [including executive compensation]) is unreliable, and is not clearly based on any generally accepted criteria or methodology.").

employees." *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, No. 3:11-CV-268, 2016 WL 10706086, at *3 (N.D. Ind. Oct. 28, 2016) (excluding evidence of employees' compensation as "irrelevant and unfairly prejudicial"); *see also Godo Kaisha IP Bridge*, 2017 WL 2844646, at *3 (agreeing that the "discussion of executive salary" should be excluded because any "probative value is substantially outweighed by dangers of unfair prejudice, confusing the issues, and misleading the jury"). For this reason, too, any evidence regarding executive compensation should be excluded.

## CONCLUSION

For the foregoing reasons, the Court should exclude the matters discussed herein from trial.

DATED: September 11, 2026

Respectfully submitted,

*/s/ Kim Bueno*

Kim Bueno (Admitted *Pro Hac Vice* in N.D. Cal.)
TX SBN 24065345
**KIRKLAND & ELLIS LLP**
401 W. 4th Street
Austin, TX 78701
Telephone: (512) 678-9050
kim.bueno@kirkland.com

Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice* in N.D. Cal. and W.D. Tex.)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Michael Vives (Admitted *Pro Hac Vice* in N.D. Cal. and W.D. Tex.)
Jessica Davidson (Admitted *Pro Hac Vice* in N.D. Cal. and W.D. Tex.)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
michael.vives@kirkland.com

jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2026, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will automatically send Notification of the filing to all counsel of record.

*/s/ Kim Bueno*
Kim Bueno