# EXHIBIT 19

TIMES INVESTIGATION

# *Uber's Strategy for Fighting Sexual Assault Suits: 'What Were You Wearing?'*

The ride-hailing giant promised to handle legal claims "in a way that is best for the survivor." Its lawyers are pursuing a far more aggressive strategy.

Listen · 20:02 min



**By Emily Steel**
You can send the reporter tips at nytimes.com/tips.

Aug. 4, 2026

A 24-year-old woman logged onto a videoconference from her bedroom in Florida on a Friday morning in April 2025 to face a deposition in her lawsuit against Uber.

Her driver had already pleaded guilty in criminal court to raping her vaginally, anally and orally while she was unconscious during a ride in Tampa one night in 2021. He was in prison, serving a 10-year sentence. The woman, identified as Jane Doe in court documents, was suing Uber in civil court for negligence, arguing that the company should have done more to screen and supervise the driver, a man with prior violent felony convictions.

Publicly, Uber proclaims itself to be a company devoted to handling sexual violence in a "survivor-centric" and "trauma-informed" way, supporting survivors and treating them with dignity. After years of fielding reports of sexual misconduct, the company developed instructional videos for drivers that stated, "Sexual violence is never the survivor's fault."

But in court filings, Uber argued that Ms. Doe had "conducted herself in a negligent and careless manner" and "contributed to causing her own injuries." And it said Ms. Doe's claims of pain and suffering were "unrelated to the at-issue accident."

Now, during her deposition, Uber's lawyer Taylor Silverberg zeroed in on Ms. Doe's behavior on the night she was raped. Ms. Silverberg asked Ms. Doe exactly how much Tito's vodka she had drunk, how many milligrams of Adderall she had taken and whether she had "felt regret" about mixing the two. And she asked Ms. Doe what she had been wearing. "Can you describe the dress?" Ms. Silverberg said. "Were you wearing heels or boots or flats?"

Ms. Silverberg also probed Ms. Doe's childhood, asking if she had felt abandoned by her father or degraded by her mother.

She pushed Ms. Doe for details about consensual sex and asked whether she had previously been sexually abused or had sex in exchange for money. That is when her lawyer ended the deposition.

"I am not anywhere near done," Ms. Silverberg protested. "It's her lawsuit, and I have an obligation to defend my client to the best of my ability," she added.

Later, she offered an apology: "I know this is hard for you, Ms. Doe. I am sorry. I really am. But ——"

"I'm grateful it is ending," Ms. Doe said, interrupting. "This kills me," she added.



The woman in Florida, identified as Jane Doe, who sued Uber for negligence after she was raped by her driver. Erin Schaff/The New York Times

Uber's approach in Ms. Doe's case is part of its defense strategy as it battles thousands of lawsuits from passengers accusing the company of failing to protect them from sexual violence they said they had suffered during rides, according to thousands of pages of court records, including deposition and trial transcripts.

More than 4,000 lawsuits have been filed, so many that thousands were combined to streamline procedural matters. Most remain in the early stages. The New York Times reviewed documents from the three cases that reached trial and about a dozen others that have advanced to the stage when the parties start exchanging documents and conducting depositions.

The litigation has revealed a clear pattern: Uber's lawyers scour women's private communications, medical records, therapy notes and other sources for sensitive details, including other sexual assaults, childhood abuse and domestic violence. They grill the women about those issues, their sex lives and their behavior on the night of the incident.

In one case, Uber petitioned a judge to force a woman to turn over details about sexual abuse she experienced as a child by a family member and family friend. In another, Uber compelled a woman to undergo a psychiatric exam to investigate other sexual assaults she had reported. And in another, a lawyer for Uber asked a woman whether she had been wearing underwear on the night in question and if she had become "extra sexually active" after the Uber incident.

At trial, the company has put a spotlight on the women, their choices and their credibility. Uber's lawyers have argued that the women's past traumas or use of drugs or alcohol made them unreliable narrators. They have suggested that the women consented to the encounters, or that they never happened. And they have asserted that even if an assault occurred, something else was the true cause of her pain.

Uber's strategy contradicts its own stance as a champion in the fight against sexual violence and reflects the business calculations of a $145 billion publicly traded company facing an avalanche of litigation.

Uber has long said it treats all survivors with respect and compassion, including when they sue. The company has struck partnerships with leading anti-sexual assault groups, and it has committed more than $15 million to organizations fighting gender-based violence.

And a training guide for Uber's customer service agents who handled reports of sexual violence instructed them to "recognize and interrupt victim blaming attitudes," stating that people rarely lie about sexual assault and that victims do not provoke attacks by what they wore or how much they drank, according to a copy.

### How Uber's lawyers question women about their outfits

Examples from depositions in four different cases:

CALIFORNIA
AUGUST 27, 2024

Q: Do you know if you had the bikini on at that time?

FLORIDA
DECEMBER 16, 2024

Q: And what were you wearing?

A: Um, the planned outfit was joggers. But I don't remember the top. I do remember the sneakers because the police took them away, and I really liked them.

FLORIDA
APRIL 4, 2025

Q: Do you have a recollection of what you were wearing that evening: your outfit, your shoes, your bag?

MISSOURI
JANUARY 17, 2026

Q: And what were you wearing that night of the incident?

```
A: I don't know what I was wearing on the top half of my body,
but I know I was wearing a skirt.

Q: Do you remember which skirt you were wearing?

A: No, I don't. Before this incident and there's a lot of
picture proof of this, I wore almost only skirts. Afterwards I
started wearing pants.

Q: Do you remember if you were wearing a long skirt or a short
skirt?

A: It was probably short.

Q: Do you remember if you were wearing underwear?
```

"I'll be the first to say that our adversarial legal system can be particularly tough for survivors," Uber's chief legal officer, Tony West, said in a statement.

"I've made clear to my legal team that they must always treat survivors with respect, compassion, courtesy and dignity, and that's exactly what I've seen them do," he added. "Defending the company in a lawsuit and treating survivors with humanity are not mutually exclusive; we must do both." Mr. West declined to be interviewed.

Katie Waitzman, Uber's chief deputy general counsel, said in a statement that Uber had a "right and responsibility" to defend itself against lawsuits, which vary widely in severity and validity and included about 30 cases dismissed for fraud.

In multiple statements, lawyers for Uber said their questions about women's past trauma as well as what they were wearing, drinking or how they acted had been intended to gather and evaluate specific facts — not to blame, shame or suggest they had done anything wrong. Ms. Silverberg acted "with skilled, ethical and professional representation consistent with the law," her law firm, Bowman and Brooke, said.

The Times previously found that Uber received a report of sexual violence in the United States almost every eight minutes, on average, from 2017 to 2022, a rate far higher than what the company had disclosed. Uber maintains that a vast majority of rides are safe, with 99.9 percent occurring without an incident of any kind.

Legal and sexual violence experts said Uber's tactics go beyond simple fact-gathering and force the women to relive not just the incident in question but also the most painful moments of their lives. This is likely to re-traumatize the women, they said, and intimidate many into settling their claims, or to avoid suing the company at all.

The approach also has "a deep irony at its core," because the company has long marketed itself as one of the safest ways to get around — especially after a night out, said Nora Freeman Engstrom, a legal ethics professor at Stanford Law School.

"Uber's strategy recycles an old and ugly script: If a woman drank, if she rode alone, if it was late, if her memory is imperfect, then maybe she is to blame," Ms. Engstrom said. "But those are precisely the circumstances when Uber told consumers its service was supposed to protect them."

For decades, defense lawyers routinely questioned sexual assault accusers about their sex lives, mental health and alcohol consumption to characterize them as promiscuous and unstable. That started to change in the 1970s, as state and federal lawmakers began passing rape shield laws that restricted evidence about an accuser's sexual history at trial.

The lawsuits against Uber are civil disputes, seeking to hold the company accountable for corporate safety issues.

While some involve drivers who were criminally convicted, many do not. Criminal cases require prosecutors to prove guilt beyond a reasonable doubt, which can be difficult with sexual assault cases when defendants argue the encounter was consensual. The standard of proof in civil court is lower, requiring juries find that the plaintiff's claim is more likely true than not.

Most of the women suing Uber are seeking compensation for pain and suffering, which means that a key legal question is how much the incident caused their distress compared with other events in their lives. That line of inquiry is common in personal injury cases. In the Uber suits, it has opened the door to an expansive investigation into past trauma, including sexual assault.

## Interrogating drinking

CALIFORNIA
AUGUST 12, 2024

Q: Got it. Did you want to take an Uber because you thought maybe there was some chance you were over the blood alcohol limit to drive?

FLORIDA
APRIL 4, 2025

Q: Were you taking shots and chasing, or were you doing mixed drinks?

A: Just straight up pulling.

Q: And what was your chase?

A: I think we had Sprite or something. I can't remember the exact. But I'm assuming it was some bottle of soda or something. I don't know. I don't recall.

Q: Did you have a sip of any other type of liquor, wine, beer, any other type of alcoholic beverage?

A: No, not that I recall.

CALIFORNIA
JULY 18, 2024

Q: OK. And do you remember how much you had to drink?

FLORIDA
DECEMBER 16, 2024

Q: Do you know how many High Noons you had that night?

MISSOURI
JANUARY 17, 2026

Q: Do you recall how many drinks you had?

```
A: No.
```

## 'Turning the Lights On'

When Mr. West joined Uber as chief legal officer in 2017, the company was plagued by scandal, including for how it dealt with sexual violence. One case involving a rape by a driver in India made global headlines after revelations that executives had obtained and mishandled the victim's medical records, thinking the assault may have been a conspiracy hatched by a rival.

Mr. West, a former Justice Department official and brother-in-law of Kamala Harris, painted himself as a champion of women who had fought sex crimes as a federal prosecutor and worked on legislation aimed at protecting women from violence.

The same month that Mr. West started at Uber, in November, two passengers sued the company, claiming they were raped by their drivers. Uber tried to force the claims into arbitration.

Several more women joined the suit, and in April 2018, they wrote an open letter, pleading that the company allow them to sue in open court. It was the height of #MeToo, and the use of forced arbitration in sexual misconduct cases was a central issue, with critics decrying it as a tool to silence victims and protect abusers.

The next month, in a blog post titled "Turning the Lights On," Mr. West said Uber would no longer require arbitration for individual sexual assault or misconduct claims.

"We always want to try to resolve these, these claims in a way that is best for the survivor," Mr. West told "CBS This Morning" in 2018. "If you can't do that then we want to make sure that we try to litigate these as fairly as possible," he added.

For years, Uber settled sexual assault lawsuits long before trial. Some executives worried that the company could be perceived as attacking victims if it fought lawsuits in court, according to three people briefed on the conversations, who

spoke on the condition of anonymity because they were not authorized to comment publicly.

But it soon became clear that the move to end forced arbitration had unleashed a wave of lawsuits. Litigation costs mounted as cases increased, the people said. That coincided with a collapse of revenues during the Covid-19 pandemic.

Internal discussions shifted: Uber could save millions of dollars if it fought back, the people said.

The company did not respond to questions about when or how the strategy changed.



Tony West at the Uber headquarters in 2018. Months after joining the company, Mr. West announced that it would no longer require arbitration for individual sexual assault or sexual misconduct claims. Carlos Chavarría for The New York Times

## Sex, Drugs and Trauma

Uber's defense kicks into gear long before a case goes to trial. The company uses the discovery process to delve into the plaintiff's most painful moments.

Uber has sought documents about past sexual assault, medical records about diagnoses in the five years before the incident, as well as anything that detailed instances of depression, anxiety or trauma. It also has asked for social media communications related to the women's mental or emotional state.

In one case, Uber combed through years of a woman's gynecological records, psychiatric intake forms, therapy notes and other documents, finding references to her birth control, heavy menstrual periods and bowel movements — as well as to childhood abuse, concussions, suicide attempts and other sexual assaults.

Depositions allow the company to investigate these issues further.

"Other than the deaths of your four family members that we spoke about earlier, was there any other traumatic event that happened to you in high school?" a lawyer for Uber asked one woman.

"When you say you ended up with a black eye — and I'm sorry, this is unfortunately questions I have to ask — are you saying," a lawyer for Uber asked one woman about her spouse, that he "hit you in the eye?"

Uber also has deposed the women's friends, parents, spouses, exes and therapists, according to transcripts reviewed by The Times.

**When friends, family and therapists are deposed**

NOVEMBER 21, 2024

Q: And in the years that you and your wife were either dating or married, has your wife ever been unfaithful?

Q: Had you known Ms. Doe to invite strangers up to her

apartment when she was drinking?

JULY 23, 2025

Q: Has Ms. [redacted] ever told you about the instances in which she was physically beaten?

MAY 28, 2025

Q: Did you suspect that the plaintiff may only know how to interact with men in a sexual way? I mean, she's got sexual assault starting junior high, high school, college.

During some of those depositions, Uber's lawyers have revealed sensitive information. In one, a woman's father, from whom she is estranged, learned that she had been sexually abused as a child and had an abortion, her lawyer said in court filings.

"What discovery in these cases entails is brutal for someone who is contemplating coming forward, especially against a defendant with resources and lawyers who will comb through everything, ask for everything," said Deborah Tuerkheimer, a law professor at Northwestern University who focuses on sexual violence.

Ms. Waitzman, Uber's chief deputy general counsel, said that it was "standard practice" to dig into pre-existing trauma. "When plaintiffs claim damages for emotional injuries, and assign 100 percent of those injuries to the Uber-related incident despite evidence to the contrary, we have to pursue that line of inquiry, albeit reluctantly," she said.

## On Trial

Uber tested out its defense in front of jurors during the first three sexual assault lawsuits that went to trial.

In all three, Uber sought to include evidence about other sexual assaults the women had reported. Judges limited how much could be discussed, to varying degrees.

The first, in California last September, involved a woman identified as Jessica C. who testified that during a ride in 2016 her driver pinned her down, kissed her, groped her and tried to take off her pants.

Alli Brown, a lawyer representing Uber, put a spotlight on Jessica's choices, including that she did not report the incident to Uber at the time. Ms. Brown also excavated painful moments from Jessica's past, detailing childhood abuse, suicide attempts and other trauma.

"Having a history of trauma like that can affect the way you perceive the world," Ms. Brown told jurors during closing arguments, citing testimony from Jessica's psychiatrist.

The second trial started in Arizona in January. Jaylynn Dean testified that her driver raped her during a ride in November 2023, while she was "dozing in and out of consciousness."

Kim Bueno, another lawyer representing Uber, called attention to the driver's side of the story, telling the jury that "in his heart" he believed that the encounter was consensual.

"He said she was wanting to do it and was encouraging this situation," she said.



Jaylynn Dean, in Phoenix, Ariz., in February. Uber's lawyers homed in on her actions on the night she claimed to have been raped. Caitlin O'Hara for The New York Times

Ms. Bueno challenged Ms. Dean's claims that she had been too intoxicated to consent to sex, arguing that Ms. Dean appeared "lucid" in video footage shortly after the ride. In graphic detail, she went through Ms. Dean's history of sexual assault and other traumas.

Ms. Dean's lawyers urged jurors to focus on other testimony from the driver, who said during his deposition that Ms. Dean had told him that she was "very drunk" when she entered his car. In his deposition, the driver said that he "had a responsibility to make sure that she is in a right frame of mind to give consent, and I didn't do that."

In the third trial, in North Carolina in April, Brianna Mensing testified that her Uber driver grabbed her upper, inner thigh and asked if he could "keep it with him" during a ride in March 2019.

Uber's lawyer, Ms. Brown, described the allegation as a brief leg touch and said the driver denied it. Ms. Brown focused on Ms. Mensing's history of substance abuse, saying the ride occurred "during the height of her drug addiction."

During each trial, lawyers for the women accused Uber of shaming and blaming them.

"What kind of evidence does Uber need to actually believe a woman?" William Smith, a lawyer for Ms. Mensing, said during closing arguments. At trial, Ms. Brown and Ms. Bueno said that they did not intend to shame the women.

Uber won the first case but lost the next two. All are being appealed. After both defeats, a company spokesman said the plaintiff won far less money than she could have. The jury awarded Ms. Dean $8.5 million, for example. She had been seeking $144 million.

In an interview, Ms. Dean said that she was proud to hold Uber to account but that its courtroom tactics added trauma — beyond the pain of reliving the Uber incident.

"Focus was shifted away from the actual assault and on to my choices," she said. "It just made me feel like coming forward was a mistake." When she returned home to Oklahoma, she said she needed to take a break from nursing school.

In a statement, Ms. Bueno and Ms. Brown, partners at the prominent law firm Kirkland & Ellis, said that they have an "ethical and professional obligation" to examine the credibility of each claim.




Uber headquarters in San Francisco. The company is battling thousands of lawsuits accusing it of failing to protect passengers from sexual violence. Lucas Foglia for The New York Times

"We believe we performed our jobs as defense lawyers, and perhaps more significantly, our responsibility as women lawyers in these trials with a deep regard and appropriate deference not just to the seriousness of the allegations but also the impact of the trial on both these plaintiffs and women more generally," they said.

Uber recently agreed to settle hundreds of lawsuits, including some nearing trial.

With others, it continues to fight — even in cases when drivers have been criminally convicted.

A woman in Texas claims that Uber was negligent after a driver forced her to perform oral sex while driving down the highway. In a criminal trial, a jury found the driver guilty, sentencing him to 11 years in prison. The conviction was affirmed on appeal.

The woman's lawsuit is scheduled for trial in October. Uber has referred to the assault as an "alleged incident" in court documents. During a hearing in June, a judge asked Uber's lawyers whether the company would contest that the sexual assault happened.

"We certainly don't know enough at this stage," responded Geoffrey Wyatt, a Kirkland & Ellis partner representing Uber. "Having a criminal trial transcript is a nice start to understanding the factual allegations in the case," he added. "That's all it is. It's just a start."

Kirsten Noyes contributed research.

**Have you been a victim of sexual assault or sexual misconduct during an Uber or Lyft ride?**

We know these experiences can be traumatic, but we'd like to hear your story if you are comfortable sharing it.

What is your name? *

Where do you live?

Search places

If you feel comfortable, can you tell me briefly about what happened?

0 words

Did you report the incident to the ride-hailing company, law enforcement or someone else?

- Yes, to Uber or Lyft
- Yes, to law enforcement
- No
- Other

What is the best way to contact you? Select all that apply

- Phone
- Signal
- WhatsApp
- Email

What is your phone number?

What is your email address? *

- I am open to a New York Times journalist contacting me about other reporting projects.

By clicking the submit button, you agree that you have read, understand and accept the Reader Submission Terms in relation to all of the content and other information you send to us ("Your Content"). If you do not accept these terms, do not submit any content. Of note:

- Your Content must not be false, defamatory, misleading or hateful, or infringe any copyright or any other third party rights or otherwise be unlawful.
- We may use the contact details that you provide to verify your identity and answers to the questionnaire, as well as to contact you for further information on this story and future stories.

Submit

**Emily Steel** is an investigative reporter covering business for The Times. She has uncovered sexual misconduct at major companies and recently has focused on the ride-hailing industry.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Pressing Victims In Courtroom