# EXHIBIT 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | ) Case No. 3:23-md-03084-CRB(LJC) |
| ______________________________ | ) |
| This Document Relates to: ALL ACTIONS | ) |
| ______________________________ | ) |

REMOTE VIDEOTAPED DEPOSITION OF
LACEY KELLER
Denver, Colorado
Monday, October 27, 2025

Reported By:
CATHI IRISH, RPR, CRR, CLVS

Job No. CS7684484

October 27, 2025

11:32 a.m.

Remote videotaped deposition of LACEY KELLER, with all participants appearing via videoconference, before Cathi Irish, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New York.

A P P E A R A N C E S:

CHAFFIN LUHANA LLP
Attorneys for Plaintiffs and the Witness
615 Iron City Drive
Pittsburgh, Pennsylvania 15205
BY: BETH WILKINS, ESQ.
MICHAEL SWEET, ESQ.

KIRKLAND & ELLIS LLP
Attorneys for Defendant
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
BY: JENNIFER LEVY, ESQ.
KATIE O'NEILL, ESQ.

WILLIAMS HART & BOUNDAS
Attorneys for Plaintiffs
8441 Gulf Freeway
Suite 600
Houston, Texas 77017
BY: MYLES SHAW, ESQ.
STASJA DRECUN, ESQ.

A P P E A R A N C E S: (continued)

PEIFFER WOLF CARR KANE CONWAY
& WISE LLP
Attorneys for MDL Plaintiffs
1519 Robert C. Blakes Sr. Drive
New Orleans, Louisiana 70130
BY: CRISTINE FARAH, ESQ.
SARA CRAIG, ESQ.
TIFFANY ELLIS, ESQ.

HAUSFELD LLP
Attorneys for Plaintiffs
1 Marina Park Drive
Suite 1410
Boston, Massachusetts 02210
BY: STEVEN ROTMAN, ESQ.

ALSO PRESENT:
LEE BOWRY, videographer
BILL CRADDOCK, concierge

THE VIDEOGRAPHER: Good morning. We are going on the record at 11:32 a.m. Eastern time on October 27, 2025.

Please note that this deposition is being conducted remotely using virtual technology. Quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continuing to take place unless all parties agree to go off the record.

This is media unit 1 of the video recorded deposition of Lacey Keller taken by counsel for defendants in the matter of In Re Uber Technologies Passenger Sexual Assault litigation, filed in the United States District Court, Northern District of California, San Francisco Division, case number 3:23-md-03084-CRB (LJC).

My name is Lee Bowry representing Veritext Corporate Services and I am the videographer. The court reporter is Cathi Irish and the concierge is Bill Craddock, also both with Veritext.

I am not related to any party in this action, nor am I financially interested in the outcome. If there are any objections to proceeding, please state them at this time.

Hearing none, counsel attending remotely will be noted on the stenographic record. Will the court reporter please swear in the witness and then counsel may proceed.

L A C E Y K E L L E R, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION

BY MS. LEVY:

Q. Good morning, Ms. Keller. I am Jenny Levy. I'm an attorney for Uber. I

KELLER

work with Kirkland & Ellis. I am currently in Washington, D.C. It is nice to see you today.

A. Same, it's been several years.

Q. You and I have met in other litigation; correct?

A. Yes.

Q. But it has been a number of years. And it is nice to see you again this morning. You understand that you are here testifying under oath today?

A. I do.

Q. And I know that you've been deposed multiple times in the past. We've done that together in the past so I know that you understand generally how depositions work, but I will ask you when was the last time you had your deposition taken?

A. It was a few months ago. The date's in my report in my qualifications, the specific date but it's been a few months.

Q. There is -- is there anything

that is preventing you from giving true and accurate testimony today?

A. Nothing is preventing me.

Q. Can we agree that if you do not understand a question I ask, you will ask me to clarify the question?

A. Yes, of course.

Q. And if you do answer a question, I can assume that you understood the question or are not able to answer it?

A. That makes sense.

Q. Okay. At any point in time if you would like to take a break, we are -- I'm entitled to seven hours on the record but you are the boss here. So if you need to take a break, I ask you to let's finish my pending question and you give your answer, but then if you need a break, I certainly would be happy to do that at any time. It is my practice to try to take breaks about every hour, but if you need to get food or to check your e-mail or run to the restroom, let me know and we can take a break at your leisure.

MS. LEVY: I'd like to go ahead and mark your expert report in this case as Exhibit 1. And I think Bill can pull that up.

(Exhibit 1, expert report, marked for identification.)

BY MS. LEVY:

Q. Ms. Keller, where are you sitting today?

A. I'm in Denver, Colorado.

Q. And where in Denver?

A. In Wagstaff Law Firm. I don't know exactly the address.

Q. And who is with you today?

A. Beth Wilkins.

Q. Is anybody else with the two of you in the room where you are?

A. No.

Q. Do you have any documents or exhibits that you brought with you today?

A. Yes.

Q. What did you bring with you to the deposition?

A. I brought a complete copy of my

report, as well as the appendices that could be printed out. The ones that were produced in S3 I did not print out just because they were voluminous. And then I brought a few of the materials from my -- printed out versions of my materials considered, specifically the interrogatory responses, the Bliss/Jira field list and my code as to the best it could be printed out.

Q. And do you have notes and personal markings on the copies of the exhibits that you brought with you today?

A. The only thing I've done is add tabs just for easier access to my report but no notes.

Q. There are no notes or markings, if we were to Xerox the exhibits you have with you they would be the same as the ones we have in our possession minus your sticky tabs?

A. Precisely.

MS. LEVY: Thank you. Bill, the exhibit is showing on the -- I can't

see the witness when the exhibit is up. Is that how it's supposed to be?

THE CONCIERGE: You may be able to adjust your view in your screen.

MS. LEVY: Let me try to pin Lacey.

BY MS. LEVY:

Q. So we've marked as Exhibit 1 to your deposition your expert report in this case, page 55, or actually more accurately, yes, 55 contains an electronic signature. That's your signature; correct?

A. Correct.

Q. Is Exhibit 1 a true and accurate and up-to-date copy of your expert report in this case?

A. This appears to be the main report. Of course there's other appendices but this is a true and accurate copy of the main report.

I also have copies with me of the Uber safety reports. I just wanted to make sure that that was also part of my

KELLER

answer of documents that I have in front of me.

Q. Do you have any notes or markings or highlighting on the Uber safety reports --

A. No.

Q. -- that you have with you? Okay. Is Exhibit 1 dated September 26, 2025 the most accurate and complete version of your expert report?

A. Yes, this is the most up-to-date copy of my report.

Q. As you sit here today, have you identified any errors in Exhibit 1?

A. Not that I'm aware of, no.

Q. And there's nothing as you sit here today that you've identified that you need to amend or correct in your expert report, Exhibit 1?

A. Not that I'm aware of, no.

Q. Are the opinions that you plan to give at trial in this matter contained in your expert report?

A. Trial is some time away. I do

know that there's been a production of Flack data and we are awaiting a deposition so I reserve my right to issue some opinions based off of that data.

Q. Have you prepared additional opinions already that are not included in this expert report?

A. That data has just recently been produced so I have not had time to review it fully so I do not have opinions formally at this time but I do --

Q. So as you sit here today, all of the opinions that you currently intend to offer subject to that reservation of right are contained in Exhibit 1?

MS. WILKINS: Object to form.

THE WITNESS: Everything that I have an opinion on as far as today is included in Exhibit 1 as well as the appendices that go with Exhibit 1.

BY MS. LEVY:

Q. Thank you. Let's turn to Exhibit C, or Appendix C to Exhibit 1. And can you tell us what Appendix C is?

KELLER

A. I think it's a new exhibit.

MS. LEVY: I'm sorry, Bill, we've marked that as tab 2.

THE WITNESS: Do we have toe refresh each time? There it goes.

(Exhibit 2, Appendix C, marked for identification.)

BY MS. LEVY:

Q. Do you have Exhibit 2 in front of you?

A. Yes, but I forgot the question. I'm sorry.

Q. What is Exhibit 2?

A. This is a copy of my qualifications and remuneration.

Q. Did you prepare Exhibit 2 yourself?

A. Yes.

Q. Is Exhibit 2 accurate and up to date?

A. Yes.

Q. Is it a complete history of your education and your work experience to date?

KELLER

A. Yes, it is.

Q. Is there anything missing from your qualifications and experience that you're aware of as you sit here today?

A. Nothing. This is accurate and complete.

Q. Let's start by just turning to page 11. Is this your CV?

A. It's a résumé, not a CV. CVs are typically longer but this is my résumé.

Q. If you combine the document, your résumé and the rest of Exhibit C, would you refer to that as your CV?

A. That's a fair representation.

Q. You don't have something different that you use as your CV than what we see here in this Exhibit 2?

A. You broke up. I think you asked if I have anything different than this, this is what I use, this document and this qualification, this résumé and then the qualifications document.

Q. Okay. Starting with your education, you got your BA in economics

KELLER

from Washburn University in 2008; is that correct?

A. That's correct.

Q. And Washburn University is in Topeka, Kansas?

A. That's right.

Q. Are you from Kansas?

A. I am.

Q. I think I knew that. And after you graduated from Washburn, what did you do, if anything, between Washburn University and going to The New School in New York?

A. I went straight to graduate school so graduated in May and then started immediately in the fall at The New School.

Q. And how long was the master of arts in economics at The New School, the program you participated in?

A. I completed my master's there. It was a two-year program and I finished in two years.

Q. And The New School is in

KELLER

New York City; correct?
A. That's right.
Q. And did you attend the campus in New York City?
A. Yeah, campus is a generous word. It's like many office buildings separated from one another.
Q. There's been a recent like really fancy update to The New School, air quote, campus or main building in New York City; is that correct?
A. It's been some time since I've been there but yeah, that main student center was undergoing renovations when I was there.
Q. The New School is now called The New School but at the time you went there it was called The New School for Social Research; is that correct?
A. It's a division. That's how The New School defines like the college of X, Y and Z, so under The New School is The New School for Social Research, so that's like a division within The New School.

KELLER

Just like Parsons, The New School is the fashion area that everybody knows from that television show that was big in 2010.

Q. Project Runway?

A. Yes, that's it, Project Runway.

Q. Just so the record is clear I think Project Runway is still big. Is the economics program of The New School -- is economics under NSSR?

A. Exactly. So economics is under NSSR, alongside NSSR. NSSR is like philosophy, political science, economics. Those were kind of the three main areas that were on our floor.

Q. When I was doing research on The New School, my Internet searches indicated that NSSR is widely recognized as a center for heterodox left wing thought. Does that sound familiar to you, have you heard The New School described like that before?

MS. WILKINS: Form.

THE WITNESS: There's different divisions within The New School and some are more left wing than others I

KELLER

would say, but I went to that program because it took -- it allowed me to take a critical view of all economic theories that I was learning, not just orthodox theories which would be like the neoclassical approaches to economics, what's known as the rational man theory but also other approaches to economics that from Keynesian economics to -- to economic theory from including Keynesian or Marxist economics and many others. So that's the reason I went to that school was because of its critical approach to all forms.

BY MS. LEVY:

Q. What does heterodox left wing thought mean, what does that term mean?

A. I don't know. That's The New School's term.

Q. Okay. I read on the Internet that The New School has a long history of challenging mainstream intellectual and economic orthodoxies and providing a home

for left wing scholars. Is that true based on your own experience?

MS. WILKINS: Objection to form.

THE WITNESS: That might be true for other programs, maybe in the political science program, but I was in the masters program for economics and so most of my peers were working at institutions like The World Bank and other pretty established entities. I don't know that I would describe the vast majority of them as left wing. I think a lot of them were just there because of the rigor and the critical approaches to all economic theories.

BY MS. LEVY:

Q. Do you agree that the school has a long history of challenging mainstream intellectual and economic orthodoxies; is that true based on your experience?

MS. WILKINS: Object to form.

THE WITNESS: I don't know. Again there's a lot of divisions there. Some of the professors may

KELLER

hold themselves out to be more radical than others. I mean I went there because of the rigor of the program. I'm also a kid from Kansas so the Washburn University is an excellent institution and as pretty straitlaced as you get, so in my experience, I learned how to think critically and evaluate all theories. Beyond that I can't really speak to that.

BY MS. LEVY:

Q. Is The New School accredited?

A. Yes.

Q. Has it had problems with its accreditation status that you're aware of?

MS. WILKINS: Object to form.

THE WITNESS: I don't know. I haven't kept up on that. It hasn't come up.

BY MS. LEVY:

Q. Are you aware that The New School's current status is a noncompliance warning status?

MS. WILKINS: Object to form.

THE WITNESS: I was not aware of that.

BY MS. LEVY:

Q. Did you get a communication indicating that there was an accreditation warning status for The New School?

MS. WILKINS: Object to form.

THE WITNESS: No.

BY MS. LEVY:

Q. Okay. Turning to your professional experience, when you graduated from The New School, you went immediately to work at the SEIU; is that correct?

A. That's correct. I was -- I immediately started there as an intern and then worked through several positions, ultimately being a lead researcher at that institution.

Q. And you were there for about three and a half years, from June of 2010 to October 2013?

A. That's correct.

Q. Here on your résumé, you list

KELLER

some of the areas that you worked on. Is this a comprehensive list of all of the things you worked on or just a sample?

A. I would say it's maybe the most notable things that I worked on while at the union, such as the two reports that I published while working there and some of the work that I did at the Walter Reed Medical Center, but it's by no means every single thing that I did over the three and a half years.

Q. The second bullet in this section of your résumé indicates that you developed and executed strategic corporate campaigns by identifying appropriate tactics, relevant research, and necessary resources.

What does it mean when you say you developed and executed strategic corporate campaigns, what is that?

A. Kind of a term of art within the industry. So many times my primary role in that job was to deeply research the history of a company that we were in

KELLER

bargaining for so that we would understand its financial position. So many of these real estate companies would have LLC corporations that owned each building so the main company would have several subsidiaries, and so I'd have to trace all of those subsidiary companies back to the main company as well as review their 10-Ks, their DEF-14s for the -- DEF-14s for the executive compensation, review news history as well as any other public filings that I could find about the company to just identify what our strategic position was. Working in that real estate industry in 2010 following the economic crisis was a particularly difficult time for bargaining, and so understanding the true financial situation of our counterparts to see where they would be able to -- where they would be able to negotiate or maybe they wouldn't, maybe they were hemorrhaging cash and didn't have and we'd have to work together to mitigate costs.

KELLER

Q. Work you were doing that you just described was to help the union be able to better bargain for its union members; fair?

A. I would say having more informed bargaining position. Whether it was better or worse it just helped them know as much as they could know.

Q. You mentioned in the next bullet that you authored and managed the release of two papers about the conditions of the New York City public school facilities. What was that about? Just briefly. I don't need a lot of detail but why was the union interested in condition of school facilities?

A. During that time, it was the era of Michael Bloomberg who said that he would not negotiate with any union and no union would get a contract. And so it was my directive from the union to identify issues that students and parents would care about alongside the workers. And so the first report that I authored was about

KELLER

the state of the physical plant of the schools, so did they have appropriate electrical backgrounds, did they have -- or electrical infrastructure. Was the walls like in good physical condition, were there leaks? The New York City School Construction Authority publishes a number of different data points that I pulled down and analyzed and so I could put together a little report that identified which schools had the lowest scores and highest scores, that sort of thing, and did a comparative analysis.

My second report then looked at the racial makeup of the school building that had better or worse conditions based off of those scores and identified patterns that I saw city wide.

Q. I notice that you mention in this bullet about those reports that the second report was widely covered by the local news.

Was that -- did you make an effort to get your report covered by the

KELLER

local news?

A. The union has a communications department. I'm not sure what their approach is. I was 20 something at the time so it was the first report that I had written but I do recall testifying at the City Council as a result of my report.

Q. Did you send your report to the local news?

A. Not me personally, no.

Q. Okay. When you talk about appropriate tactics in the -- in developing appropriate tactics for strategic corporate campaigns, is the work you just described like an example of what you mean by that?

A. Yeah, I think that when people think about labor unions, they think about that ugly rat that they put out in front of buildings when there's a dispute. And my job was to try to avoid using that rat at any point in time, to use something that was more compelling to the general public, and so those reports are an

example of that. So -- and another example was identifying potential fraud at the National Naval Medical Center and I had done that through open source intelligence research.

Q. Did any of your work at the SEIU involve sexual assault or sexual misconduct?

A. My role is primarily in the corporate side of things so working on reviewing the corporate documents and data around those -- the companies that we were working with.

Q. You don't recall doing any work on the issue of sexual assault or sexual misconduct while you were at the SEIU?

A. Not as a specific -- not as a specific issue area or research area. Again, most of my work was focused on the financials and background of the company.

Q. Did you as -- you're caveating it. Did you do any work at all, even if it wasn't a specific research area on sexual assault or sexual misconduct while

KELLER

you were at SEIU?

MS. WILKINS: Object to form.

THE WITNESS: I'm trying not to caveat, I'm just clarifying that the work that I did was predominantly in those issue areas. I'm not saying completely because there's three and a half years of work history but as far as that issue specifically, none of our corporate research that I have identified or that I am remembering called upon that specifically. Is it possible that one executive was accused of malfeasance somewhere and it was in a report? Possibly but I don't -- I don't recall.

BY MS. LEVY:

Q. You actually anticipated my next question. Did SEIU have a sexual misconduct problem to your knowledge while you were there?

MS. WILKINS: Object to form.

THE WITNESS: I wasn't aware of one. There wasn't anything that I'm

KELLER

aware of, no.

MS. LEVY: Can we mark tab 39?

THE WITNESS: Will we know when it's ready or do I have to refresh?

MS. LEVY: I think it will come up on your screen. Do you see it now because I can see it on mine.

THE WITNESS: I see it now.

(Exhibit 3, article titled SEIU Has A Sexual Predator Problem, marked for identification.)

BY MS. LEVY:

Q. Can you see it?

A. Yes.

Q. You can or cannot?

A. I can see it.

Q. This is an article from 2021 that postdates your time at SEIU but the writer is writing about -- the title of the article is SEIU Has A Sexual Predator Problem. Do you see that?

A. Yes, I see that that's what it says on this document. I've never seen this document before so --

KELLER

Q. Yeah, I wouldn't -- question number 1 was going to be have you seen this document before and I understand that you have not.

The article references a number of sexual misconduct allegations that occurred previously at SEIU. My question to you is: Were you aware during your time at SEIU that SEIU had a sexual misconduct problem?

MS. WILKINS: Asked and answered.

THE WITNESS: Let me just read this.

(Witness perusing document.)

So this is an article talking about -- hang on a second.

So again, I've not read this before so this is the first time I'm seeing this. It appears that most -- so when we're talking about SEIU you have to remember there's multiple local unions. There's SEIU the parent organization which at the time was led by Mary Kay Henry. I'm not sure if

KELLER

she's still in charge over there. And then there was the division so there's different locals. So I was part of local 32 VJ and our president was -- oh my gosh, I'm forgetting his name but he passed away suddenly. And so the individuals that are -- the only individual that I see here from that union is Pedro Malave. I don't know who that is. I never worked with that person. He appears to be a staff member and not a member of executive leadership so I don't know who that is, where they were in that organization and so really a large organization. But yeah, that's all I have to say about that. I was not aware of anything, nor do I know any of the people cited in this article.

BY MS. LEVY:

Q. Do you have a reason to deny that what this headline says, SEIU has a sexual predator problem, or you just have never heard of this one way or the other?

MS. WILKINS: Object to form.
THE WITNESS: I have not heard of it one way or the other.
BY MS. LEVY:
Q. Okay.
A. I don't know even what the Freedom Foundation is. It's not a publication that I'm familiar with so I can't really say.
Q. We can pull that one down. During your three and a half-ish years at SEIU you were never asked to study data or look into and specifically research anything to do with sexual misconduct or allegations of sexual assault; is that correct?
MS. WILKINS: Asked and answered.
THE WITNESS: Are you asking with regard to the union itself and its own practices or with regard just generally as a topic?
BY MS. LEVY:
Q. Both.
A. The answer is the same for both.

My directive was to review corporate documents and financials as well as the types of work that I did for the school system, especially in the last year to two years of my time being at the union.

MS. LEVY: Can we mark Exhibit 38, please? Sorry, tab 38. It should be Exhibit 4.

(Exhibit 4, article titled Student Sues University Over Response to Sexual Misconduct, marked for identification.)

BY MS. LEVY:

Q. Have you ever heard of The New School Free Press?

A. Yeah, I am somewhat familiar with them.

Q. Was The New School Free Press a publication that existed during your time there?

A. I don't remember. There was an active publication at the time. I don't know if it was The New School Free Press or something else.

KELLER

Q. This article which was posted during your time at New School is dated April 17, 2018. It refers to a lawsuit brought by a student over the school's response to sexual misconduct claims. Are you familiar with that situation?

MS. WILKINS: Object to form.

THE WITNESS: Not at all. This is the first that I'm seeing this.

BY MS. LEVY:

Q. Do you -- have you heard of or do you remember at NSSR psychology department co-chair Emanuele Castano, is that somebody you ever encountered?

A. No. I don't know who that is.

Q. And before today, in this article, you have not heard about any sexual misconduct that happened between this professor and a student or multiple students at The New School?

MS. WILKINS: Object to form.

THE WITNESS: Let me read because you're asking about the background of it but --

KELLER

BY MS. LEVY:
Q. I'm just asking if you ever heard of this issue.
A. This --
MS. WILKINS: Object to form.
THE WITNESS: The issue being the lawsuit or the issue being the allegations?
BY MS. LEVY:
Q. Either one.
A. I am not aware of either. I have not heard of this until today so I couldn't say but again, I've not heard of any lawsuit being filed as far as the faculty at The New School while I was there.
Q. When you were at The New School, did the school have a problem with sexual misconduct?
MS. WILKINS: Object to form.
THE WITNESS: Not that I'm aware of. Again, I went to school, I did my studies, I didn't have any problems and my classmates as far as I was

aware didn't have any problems but I really don't know.

BY MS. LEVY:

Q. Okay. And you don't know whether the allegations that are referred to in this article which refers to a lawsuit, you have no idea anything about the allegations, whether they are true or false?

MS. WILKINS: Asked and answered.

THE WITNESS: Yeah, this is years after. When is this dated, April 2018, that's eight years after I graduated so I have no idea what this is about. This is the first time I'm seeing it.

BY MS. LEVY:

Q. And do you believe that The New School is immune from sexual misconduct?

MS. WILKINS: Asked and answered, outside the scope of her report. She's not here to talk about The New School and any potential allegations that have been made about it.

KELLER

THE WITNESS: I haven't given it any thought, to be honest. So this is the first that these issues have been brought to me so this is -- I haven't given it thought before this.

BY MS. LEVY:

Q. When you left the SEIU, did you -- while you were at SEIU, did you study any participant in the transportation industry?

MS. WILKINS: Object to form.

THE WITNESS: Boy, you're making me think back almost 20 years. Most of our studies were on theoretical economics, econometrics and statistics and then my thesis which was based off of pensions. To the extent that I mean the pensioners that I was studying worked in the transportation. Because that industry is often unionized or sometimes unionized, I should say, I might have overlap there but that's kind of the major areas of study while I was there.

KELLER

BY MS. LEVY:

Q. Okay. To ask you a more specific question, you've never studied safety of taxis, for example?

MS. WILKINS: Object to form.

THE WITNESS: I have looked at some public datasets a long time ago relating to public safety for the data availability even of that data, the availability of that data, but I am not offering any opinions on that in my report.

MS. LEVY: And Bill, you can pull down that exhibit.

BY MS. LEVY:

Q. Let me make sure I understand your answer. For purposes of work in this case are you saying you looked for the availability of safety information about taxis?

A. So I'm saying in the past while I was at the AG's office, even for my -- not my graduate, my senior level students that I teach, I think they look at some bike

KELLER

share data. We've looked at transportation data specifically. I know that when I'm at the AG's office I've looked at a number of datasets that are publicly available. So I'm not offering opinions on that. That's not the purpose of my report, so I don't have anything more to say. But generally, have I ever looked at data? It's possible. I looked at a lot of data when I was in previous positions.

Q. For purposes of this report, you haven't made any comparison of the safety of Uber to any other alternative; correct?

A. The purpose of my report was in some ways similar to the purposes of reports that I've done before, and I think you're very familiar with them where showing the data that in the past I would have said known or could have known because we were working with different datasets. In this litigation the purpose of my report is to show what Uber -- what data Uber had in its possession and the

knowledge that it had about that data compared to what it was showing the public. So making comparisons to the taxi industry was not necessary to do to carry out my primary purpose of the report.

Q. So the answer is no, you have not looked at safety data for alternatives to Uber, you've only looked at Uber's data; correct?

MS. WILKINS: Asked and answered.

THE WITNESS: The answer is it was not necessary to carry out my goal which was to show the data that Uber had in its possession, the knowledge that it had about that data and what it was doing with it compared to what it was telling the public.

BY MS. LEVY:

Q. Okay. And given that you have not looked at or studied or provided opinions on the alternatives, I can assume that you don't intend to give opinions in this case about Uber's relative safety compared to other things; is that correct?

MS. WILKINS: Object to form. Also asked and answered.

THE WITNESS: You're breaking up a tiny bit for me but I think you asked whether I intended to offer any opinions. Again, the Flack data was just produced a week ago I would say, so I have reserved my right to review that data. I'm not sure of my opinions that I will offer at this time.

BY MS. LEVY:

Q. You are not intending to offer any opinions on the relative safety between Uber and other alternatives to Uber, true or false?

MS. WILKINS: Object to form.

THE WITNESS: Again, the data is still -- has just been produced and I reserve my right to analyze that data so I can't say one way or another. I don't know.

BY MS. LEVY:

Q. Do you think the Flack data has

KELLER

information about other alternatives to Uber?

A. You're asking me if I intend to offer any opinions about the relative risk, and to do such a thing would require analyzing Uber data and I haven't analyzed that dataset yet and so it is -- I just don't want to theorize what I might be doing because I haven't given that dataset a full review.

Q. As you sit here today, you have done no research and no looking at other data that's not Uber, alternatives to Uber; is that true?

MS. WILKINS: Asked and answered.

THE WITNESS: My report shows what data Uber has in its possession, what it knows about that data and how it has used that data. And I compare those facts to what Uber tells the public. That's what's in my report and that's the opinions that I am currently offering.

///

KELLER

BY MS. LEVY:

Q. When you left the SEIU you went to work at the New York State Attorney General's office?

A. That's correct.

Q. And you were there for just over four years from 2013 in October to 2017 November; correct?

A. Yes.

Q. Who was the AG at the time you worked for the AG's office?

A. Eric Schneiderman.

Q. Did you know Attorney General Schneiderman?

A. Yes.

Q. And the work that is listed on your résumé under New York State AG's office, is that a true and accurate summary of the work, the highlights of the work you did during your four years there?

A. Can I pull that back up?

Q. Sure.

A. This is definitely the highest of highlights but there are other cases that

KELLER

I discuss in my qualifications document in text form that also highlight some of my work at that office.

Q. While you were in the New York State AG's office, did you ever study or research sexual assault and sexual misconduct specifically?

MS. WILKINS: Object to form.

THE WITNESS: I'm not sure how you are defining sexual misconduct and here's what else I did work on. We worked on -- what can I say without violating confidentiality -- I would say I worked on a potential human trafficking case using public datasets and I don't think anything has been disclosed publicly about that case so I think that's about the extent to which I can talk about that.

BY MS. LEVY:

Q. Understood. At a very general level, was that work an investigation of a potential defendant or like a -- let me back up and ask it a different way.

KELLER

In the past you've described the gun trafficking dashboard that you developed while at the AG's office in New York, and my understanding at a high level of that work was you took large sets of data and were attempting to pinpoint where illegal activity was. Is that a fair summary?

A. The gun trafficking dashboard unit was paired with additional investigative work and leads but that dashboard was to provide the public with -- realtime wasn't available, but with the most up-to-date data that we had from ATF on the state of gun trafficking to allow the public to identify the trends and patterns that they found to be of interest. Many of the reports that ATF, the Bureau of Alcohol, Tobacco and Firearms were putting out at the time were very high level. They would give overall totals for the whole state which means New York City would be dwarfing the rest of the trends for like Buffalo and

KELLER

Rochester and smaller cities Upstate. So the tool that we created allowed users, whether it was local leaders or the general public, to drill into specific use cases -- or I'm sorry, specific patterns that they wanted to see.

Q. Was the goal to try to reduce or eliminate illegal gun trafficking?

A. I think the goal was to give -- give leaders and decision-makers more information than they ever had previously because that information just was made available in these very aggregated reports. The specific investigative pieces of those and specific leads, it was public data so I don't think that that -- you couldn't go creating leads out of that dataset, that public dashboard, because it was scrubbed public data. There's a number of other dashboard that we created that was for trafficking investigations, that were law enforcement sensitive.

Q. Has the State of New York been able to eliminate illegal gun trafficking?

KELLER

MS. WILKINS: Object to form, outside the scope of her report and the opinions that she's here to talk about today as she's offering information.

THE WITNESS: I haven't been in contact with leaders at New York AG's office about this issue and so I wouldn't be able to say one way or the other. I know that dashboard is still live and that we continue to work with law enforcement officials nationwide on another gun trafficking platform.

BY MS. LEVY:

Q. The New York -- studying an issue and applying data analytics and learning everything you can learn about it, you've done a lot of that in your career. In fact, you've been on the forefront of some efforts on that in various areas that we see in your résumé; true?

A. The New York Attorney General's office was the first AG's office to hire a data scientist nationwide so I would say

western at the forefront in that division and that division is really large now. I think it's well over 10 people, if I recall.

Q. And I assume you would agree with me that when it comes to safety and trying to reduce illegal activity, it's a good thing to hire data scientists and study the issues and try to use data to that end; correct?

MS. WILKINS: Object to form.

THE WITNESS: Our role was revolutionary to the office because we were able to -- and I remember vividly my first report at the office was on Airbnb and they came into New York City and we had received data from that company and I was able to identify where that company was operating -- or not the company, where people were renting out their apartments on that platform and doing so illegally. The illegality part of that, of course, I needed the

assistance of a lawyer for, but my department was able to do things like that which would have primarily been through anecdotes or surveys prior to my arrival. And after my arrival they were able to look at the whole picture, analyze all of the data that was obtained through subpoena or through public records.

BY MS. LEVY:

Q. And you applied that kind of work to gun trafficking, illegal Airbnb rentals and other issues; right?

MS. WILKINS: Object to form, vague.

THE WITNESS: Because I was the head of the data team we used data to support the investigative or litigation efforts -- I would say investigative would be the -- the investigative, the pre-investigative efforts of the office no matter what the topic was. So I would work with the Internet Protection Bureau to the

KELLER

Consumer Protection Bureau all the way to the Labor Bureau. We would see just a myriad of different cases throughout my time there.

BY MS. LEVY:

Q. Were you ever asked to perform research, data analytics, data mining on sets of data relating to sexual assault or sexual misconduct while you worked at the New York State AG's office?

A. So when you say relating to, I'm still thinking of that prostitution/human trafficking case because we did mine a number of data sets including a dataset that was basically a clearinghouse for reviews. But that's --

Q. Without saying anything at all confidential, we're getting close to it, was that an effort to find a single perpetrator or to identify trends of misconduct or multiple perpetrators?

A. Both. It was to identify -- if there was a trend, I would say if there were red flags, to borrow from previous

work, red flags within an industry that we were reviewing and then identify actors worthy of investigation as a next step in that work.

Q. As a result of that effort, did you expect to eliminate all prostitution or eliminate all human trafficking?

MS. WILKINS: Object to form.

THE WITNESS: That was -- I don't want to say too much about the industry but we were focused on a particular industry, not human trafficking at large, it was a particular industry.

BY MS. LEVY:

Q. Was the State of New York able to fully eliminate prostitution and human trafficking in that industry?

MS. WILKINS: Object to form and again it's outside the scope of the opinions Ms. Keller is offering in her report in this litigation.

THE WITNESS: I cannot say what the outcome of the investigative work

KELLER

is because it is under confidentiality. I don't think that anything has been released publicly about that work, unfortunately, so I can't say what the result of that work is.

BY MS. LEVY:

Q. Let me ask you more generally as a data scientist who's worked at assisting law enforcement. Do you agree or disagree that even if you apply the best study and the best research, that does not necessarily mean you can completely eradicate illegal activity, do you agree with that or do you disagree with that?

MS. WILKINS: Object, overbroad, vague.

THE WITNESS: I agree that data provides us with information and we can use data such as how we did at the AG's office to do data-driven law enforcement or policing or another phrase is like evidence-based policing. Those are key phrases in

that industry. Data can help you prioritize resources and that was a really effective use of data for us is when you have limited resources at the AG's office, being able to prioritize your investigative efforts, data allows you to do that. So it allows you to make informed decisions and use your resources wisely.

BY MS. LEVY:

Q. Can data stop criminals from committing crimes?

MS. WILKINS: Object to form. We're really outside of the scope of Ms. Keller's opinions in this litigation.

MS. LEVY: This is like the -- I've been trying to be patient with speaking objections. You can object to form. We are -- as you know, from the court order you are not allowed to say them.

MS. WILKINS: That is not accurate for expert witnesses. I'll

KELLER

restart.

Ms. Levy, what you said is not accurate. I believe what you are referencing is a court order that was in place for witnesses, custodial witnesses, but doesn't apply to expert witnesses. I have not made speaking objections. Objecting to form as being vague or overbroad is proper. Objecting to questions being outside of the scope of the expert's report is also proper.

MS. LEVY: I'm referring to the federal rules. We can agree to disagree. If I need more time, we will address that at the back end. You do that at your own risk.

BY MS. LEVY:

Q. Ms. Keller, do you know -- let me make sure I got an answer to my last question. Do you believe, yes or no, that data, reviewing data and studying data can prevent criminals from committing crimes?

MS. WILKINS: Same objections.

KELLER

THE WITNESS: Data allows law enforcement officers, advocates, never studying that area, to make informed decisions about what that criminal behavior might be. If you're looking for as exemplified in the Airbnb report, repeat offenders or large operators of operations within New York City, if you're looking for in the trafficking data those individuals who have purchased a number of guns that did not -- that they did not keep themselves and that they had passed on to others and someone else was in possession of those guns, data allows law enforcement officers or the people who are studying that to make informed decisions, potentially policies, potentially laws about that data.

BY MS. LEVY:

Q. And from your observations and what you've seen in the materials you've reviewed for this case, you're aware that

Uber has, in fact, taken -- employed data scientists and data teams to do exactly that, to study the issue of sexual assault and misconduct, you're aware of that; right?

MS. WILKINS: Object to form.

THE WITNESS: I have a number of opinions in my report about the information that Uber has, what it knew about that information and ways that it has chose to employ that. One example that comes to mind is the S-RAD program that Uber used and created to, quote, prevent sexual assaults and I offer a number of opinions in my report on that program specifically.

BY MS. LEVY:

Q. And S-RAD is a technology that Uber invented from scratch, it doesn't exist before Uber developed it; correct?

A. Like I said, S-RAD was a program that Uber created to, quote, prevent sexual assaults. They did so starting in

KELLER

2017 using the data that it had been collecting for a number of years. And at the time, I think they looked at over 200 different metrics to include in the model.

Q. And you don't know of any other model that's anything like S-RAD to study this issue, do you?

MS. WILKINS: Object to form.

THE WITNESS: So S-RAD has a very specific role in Uber. It's a tool that Uber has at its disposal to -- as part of its pairing algorithm. I would not describe it fully as a study. It's something beyond a study.

BY MS. LEVY:

Q. Can you point me to any other corporation or any other model that's been developed that you're aware of to study sexual assault and misconduct that's like S-RAD or that's better than S-RAD, have you ever seen anything else like that?

MS. WILKINS: Object to form.

THE WITNESS: So at its core, Uber is a machine-learning algorithm.

KELLER

Companies and corporations have made their millions and billions off of machine-learning algorithms. Netflix recommends movies to you. That is a machine-learning algorithm. Machine-learning algorithms can be used wherever Uber has chosen to use machine learning -- this machine-learning algorithm to prevent sexual -- or in their words to prevent sexual assaults. And only Uber has the data to do that because it is their own data that they have been collecting on users, trips, drivers, user's phones for a number of years.

BY MS. LEVY:

Q. Do you remember my question?

A. I do and I just answered it.

Q. What was the question?

A. Am I aware of any other company that developed -- I can't get the wording exactly right -- a program like S-RAD to study sexual assault.

Q. Let me be more specific because I

don't think you were understanding me.

Can you identify for me any other company that has developed a complex model to study sexual assault?

MS. WILKINS: Object to form, also asked and answered at least twice.

THE WITNESS: S-RAD at its core is a machine-learning algorithm. Companies use them all the time to study -- or not even to study -- to identify and predict a particular outcome. It would be impossible for me to study every company's algorithms and they probably wouldn't even let me because those are proprietary. And even Uber was very specific about how I had to access their data due to the sensitive and proprietary natures of such things. So S-RAD is not unique in that it uses at its core machine learning. That is something that's available to all companies.

MS. LEVY: I'm going to move to

KELLER

strike as nonresponsive and if we can't get a straight answer to various straightforward questions we're going to have to get another day of time. So just letting you guys know.

BY MS. LEVY:

Q. My question is: Can you identify any other corporation that has developed a tool to study sexual assault and sexual misconduct, can you identify one, name one?

MS. WILKINS: I'm going to object to the improper motion to strike. You know it's not allowed in this case and also again to the question as having been asked and answered and it's vague. You can ask her a more specific question. I won't object to it.

BY MS. LEVY:

Q. Identify the company that has done something like this.

MS. WILKINS: And that's vague.

THE WITNESS: I would be

theorizing if I were to try to identify a company because all -- companies have at their disposal machine learning. And especially with the advent of AI, machine learning is becoming more and more democratized to corporations. So I would be guessing if any company had or had not done this exact same thing. I don't know. And it is not particularly -- and at its core it's machine learning. That's it.

BY MS. LEVY:

Q. You can't identify any company that's put more resources and effort to studying the issue than Uber, can you?

MS. WILKINS: Asked and answered. I object to form.

THE WITNESS: That would require me to give an informed response on that, would require me to have done and had access to the same amounts of documents that was produced in this litigation for other companies. And

KELLER

we know that that's not how companies operate. They don't just open up every document, every database unless they are forced to. So that is just an impossible thing for me to know.

BY MS. LEVY:

Q. Thank you. When you worked at the New York State Office of Attorney General, you were not asked to analyze other than what you've already testified to about prostitution and human trafficking, you were not asked to analyze datasets about sexual assault and misconduct relating to transportation other than what you've already told us; is that correct?

MS. WILKINS: Object to form.

THE WITNESS: I'm just thinking. I worked on so many issues while I was there and was asked often to research potential areas of investigations. It is entirely possible that I researched something related to transportation or sexual assault, but I had a number of

KELLER

cases that I was balancing and that my team was balancing at the time. So I guess that's the best that I can answer that question.

BY MS. LEVY:

Q. As part of your work in this case, did you look at or research prevalence of sexual assault and misconduct outside of Uber in places that are not Uber?

A. So my opinions in this case and in my report discuss the information that Uber had, that it knew about, how it used it and what it told the public. That is my opinion in this matter and that was not a necessary exercise to form the opinions about what Uber knew versus what they told the public.

Q. So no, you did not do that?

MS. WILKINS: Asked and answered.

THE WITNESS: My answer is it was not necessary because that was not part of my opinion. My opinion was what did Uber know and what did it do

KELLER

with that information and what did it tell the public.

BY MS. LEVY:

Q. And because it wasn't necessary, you didn't look at that; correct?

MS. WILKINS: Asked and answered.

THE WITNESS: Again, same answer. My report similar to the reports that I have offered in the past shows the information that the entity, in this case Uber, had in its possession and what they did with that information and then in this case what they told the public.

BY MS. LEVY:

Q. Did someone instruction you that you can't say yes or no to questions?

A. I'm explaining my answer because a yes or no is not comprehensive of the work that I've done here. A yes or no is your phrasing of it and so I'm trying to explain where I'm coming from. I'm a thorough person and I want to give thorough answers.

KELLER

Q. So when I ask you if you studied the rate of sexual misconduct outside of Uber you can't answer that with a yes or no?

A. Because it's not necessary for my assignment and I'm telling you what my assignment is to give a complete and honest answer.

Q. There is no institution that you're aware of, no place unfortunately that is immune from sexual assault and misconduct; do you agree with that?

MS. WILKINS: Object to form.

THE WITNESS: I don't know what this phrase immune to sexual assault means. What are you asking me?

BY MS. LEVY:

Q. Sexual misconduct and sexual assault is a reality in our society; do you agree with that?

A. These are -- I know that Uber says that in its safety reports and it says that to the public. I don't really have -- yeah, I know that Uber says that

in its safety reports. I know that it's aware of the underreporting that occurs on the platform and beyond that, I don't often opinions on that.

Q. You can't answer whether Uber -- whether -- excuse me, strike that.

You can't answer the question whether sexual misconduct is a societal problem in New York, for example, it's a problem in New York?

MS. WILKINS: Object to form.

THE WITNESS: I don't know how you're defining problem, whether what that value term means to you. What I do know is Uber's own partner says that it's an issue nationwide, that underreporting especially is an issue nationwide and that Uber's internal documents show that underreporting is especially a problem at the company. That's the extent of my opinions on that.

BY MS. LEVY:

Q. We'll get to underreporting in a

few minutes but you don't have any reason to disagree with Uber's statement that sexual assault, sexual misconduct is a societal problem, you don't disagree with that?

MS. WILKINS: Asked and answered.

THE WITNESS: The opinions that I offer in my report, I don't -- if I am talking about that Uber statements specifically, it is in regard to underreporting nationally and with regard to the platform. I don't have opinions on societal influences or societal problems. I'm here to talk about the data that Uber had, what it did with that and what it told the public.

BY MS. LEVY:

Q. Before we move on from that, you do not have an opinion on whether sexual assault and sexual misconduct is a problem in our society?

A. I'm offering opinions on the data that Uber had, what it knew about that

data, what it did with that data, all S-RAD and other programs, or S-RAD I should say, and how underreporting occurred not only nationwide but in the platform. That's -- that is examples of my opinions on this.

Q. The New York State Office of Attorney General had a problem with sexual misconduct while you were working there; correct?

MS. WILKINS: Object to form, misstates prior testimony.

THE WITNESS: I don't think we've discussed this. What are you specifically talking about?

BY MS. LEVY:

Q. Did the New York AG's office have a problem with sexual assault and misconduct when you were employed there?

MS. WILKINS: Object to form.

THE WITNESS: Not that I was aware of.

MS. LEVY: Mark tab 41.

(Exhibit 5, article from The

KELLER

New Yorker, marked for identification.)

THE VIDEOGRAPHER: And Counsel, just while we're waiting for that document, this is the videographer, we're about 12 minutes away from needing to take a short break and change the media.

MS. LEVY: Thank you, perfect. I'll ask about this document and then we can take a break.

THE VIDEOGRAPHER: Thanks.

BY MS. LEVY:

Q. We're marking as Exhibit 5 an article from May of 2018 that is titled Four Women Accuse New York Attorneys General of Physical Abuse, with the subheading, Eric Schneiderman has raised his profile of a voice against sexual misconduct. Now after suing Harvey Weinstein, he faces a #MeToo reckoning of his own. Have you read this article before?

A. I believe I read it when it came

KELLER

out but I haven't reviewed it since then.

Q. Can you turn to the next page of this article? Do you recognize the person pictured here?

A. Yes.

Q. And who is that?

A. That's Eric Schneiderman.

Q. And he was the Attorney General of New York; correct?

A. Yes.

Q. And he resigned as the Attorney General of New York after being accused of sexual misconduct by multiple women; correct?

MS. WILKINS: Object to form.

THE WITNESS: That's my understanding from reading from the news media. I wasn't at the office at that time.

BY MS. LEVY:

Q. You were at the office between 2013 and 2017 while he was the Attorney General; correct?

A. That's correct but I wasn't at

the office on the day that he resigned or when this article was published.

Q. Okay. And as you sit here today, you are unable to say whether even the New York Attorney General's office has a problem with sexual assault, had a problem with sexual assault and misconduct?

MS. WILKINS: Object to form.

THE WITNESS: I was -- I was not aware of any of these allegations while working there, nor did my interactions with him ever make me think that there was anything going on to what was brought up in these articles. So to say that it was a shock when this article came out would be an understatement.

BY MS. LEVY:

Q. Do you agree or disagree that even the New York AG's office, highest law enforcement office in the State, is not immune from sexual misconduct?

MS. WILKINS: Object to form.

///

KELLER

BY MS. LEVY:

Q. We know that today; correct?

MS. WILKINS: Object to form.

THE WITNESS: That office -- I don't know exactly what there is to say about that. This is not something I really planned on discussing because it's not part of my report so I just -- yeah, I wasn't really prepared to discuss this.

MS. LEVY: You can pull that down, Bill.

BY MS. LEVY:

Q. The next attorney general after Eric Schneiderman was Letitia James. She's still the Attorney General today. Did you know that?

A. Yes.

Q. Even her office is not immune from sexual misconduct; correct?

A. Is there an example that you're referencing?

Q. Are you aware of sexual misconduct that has occurred in the last

few years in the current New York Attorney General's office?

A. I don't know what you're talking about.

MS. LEVY: Let's mark tab 42.

(Exhibit 6, statement from Attorney General James, marked for identification.)

BY MS. LEVY:

Q. This is a statement from December of 2022 from the current New York Attorney General Letitia James, and this is a statement I'll represent to you that she made publicly in December of 2022 after dismissing her chief of staff, Ibrahim Khan.

A. This is the first that I'm seeing this.

Q. Okay. And my question for you is even today, even in Letitia James' office, that office is not immune itself from sexual misconduct?

MS. WILKINS: Object to form.

Again, these questions are well

KELLER

outside of the scope of Ms. Keller's opinion and her expertise and the reason that she's here to provide her deposition testimony today.

BY MS. LEVY:

Q. Do you agree, disagree or have no opinion?

A. I'm not offering any opinions on other industries. I think I said probably to ad nauseam what I am doing in my report, which is showing what data Uber had, what it did with it and what it told the public.

Q. Just to be very clear, as we sat here this morning and looked at reports of sexual misconduct from all the places on your résumé through 2017, The New School, the SEIU, the New York Attorney General's office --

THE VIDEOGRAPHER: We lost the witness's video. I think we should go off the record.

MS. WILKINS: Can you hear me, guys?

KELLER

MS. LEVY: I can hear you. I have one more question and then we can take a break but I don't want to go off the record until we finish this last question.

THE VIDEOGRAPHER: We just -- okay.

MS. LEVY: You can pull down this exhibit and let's see if we can get through it --

MS. WILKINS: We just lost audio and actually Lacey lost her connection all together. So would now be a good time for a break while get reset?

MS. LEVY: Yes, we can take a break. Will we take 10?

MS. WILKINS: 10 should hopefully do it. We'll check in at least in 10.

THE VIDEOGRAPHER: Going off the record. The time is 12:59 p.m. Eastern. This is the end of media unit 1.

(Recess taken from 12:59 p.m. to 1:13 p.m.)

KELLER

THE VIDEOGRAPHER: We're back on the record. The time is 1:13 p.m. Eastern time. This is the beginning of media unit 2.

BY MS. LEVY:

Q. Ms. Keller, my question to you is after being shown reports this morning of sexual misconduct at The New School, at SEIU, at the New York AG's office, all places where you have spent time in your career, are you unable to say to the jury that you agree that sexual misconduct is a societal problem?

MS. WILKINS: Object to form.

THE WITNESS: I'm not here to talk about that as a societal problem. I'm here to talk about what data Uber had in its possession, what it did with that data and what it told the public. That's my opinions in this matter. I'm not offering opinions on society. I didn't come to -- I didn't come prepared to offer opinions on societal issues. I've come to talk

KELLER

about Uber's data and how they used it.

BY MS. LEVY:

Q. And how sexual misconduct related to the Uber platform compares to the outside world is not something that you've looked at or thought about in your work for this case?

A. That analysis was not necessary to do my analysis which was compare and contrast what Uber had, the volumes of incidents that it had in its possession, what it knew about that data, what it did a with that data and what it told the public. I was not --

Q. I'm sorry, I didn't mean to cut you off. You were asked to look at Uber only, not asked to look at Uber in the context of a larger society?

MS. WILKINS: Object to form.

THE WITNESS: I looked at Uber's data in that it collected and it knew it had underreporting issues.

///

KELLER

BY MS. LEVY:

Q. You mentioned underreporting a few times. All you know about underreporting is Uber's own statement about it; correct?

MS. WILKINS: Object to form.

THE WITNESS: I know of documents that discuss it as well as Uber's statements to the public about underreporting.

BY MS. LEVY:

Q. So you personally were not asked to study the issue of underreporting. You don't know and you didn't tabulate any rate of underreporting. Is it true or false? Did you tabulate a rate of underreporting?

MS. WILKINS: Object to form and object to interrupting the witness.

THE WITNESS: That would be a different analysis. My analysis was that of what Uber had knowing that there was -- so that this is a floor, this is of the data that is

KELLER

potentially or of -- this is a floor of the potential issue on the platform, that is my opinions and where my opinions center around is that data.

BY MS. LEVY:

Q. Today in the five and a half hours I have left I'm going to ask you a lot of questions about did you do a particular analysis, yes or no, and I need to understand if you did or didn't do it and I really need you to answer that question. If I can't get you to tell me directly whether you did an analysis or didn't do an analysis. I'm not asking whether it was necessary, whether it would be different. I just mean did you do it, that's all I want to know. And so I'm hopeful that we don't have to waste a lot of time. But if I can't get you to tell me whether you did it or not did it, we're going to have to get the court to come and listen in because I am entitled to a straight answer to that question. So let

KELLER

me try it one more time because this isn't even controversial. Did you, Lacey Keller, tabulate a rate of sexual assault on Uber, yes or no?

A. And I'm saying why I didn't do that because it was not necessary for my analysis. My analysis compares the data Uber had versus what it told the public.

Q. No, you didn't do that analysis; is that correct?

MS. WILKINS: Asked and answered.

THE WITNESS: Because it was not a necessary step in my analysis.

BY MS. LEVY:

Q. Did you look at the rate of sexual assault on the Uber platform versus taxis?

A. I guess this is the same variation of your previous question which I thought I've answered is it's not necessary to do my analysis when my analysis is looking at the data that Uber had versus what it told the public versus what it did with that data internally.

KELLER

Q. Did you compare the rate of reported sexual misconduct on the Uber platform to any other alternative a person would have?

MS. WILKINS: Object to form.

THE WITNESS: Same answer as before.

BY MS. LEVY:

Q. The answer is that you did not do that?

A. The answer is that it was not necessary because I did something different and I looked at what Uber knew versus what they told the public versus what they did with that data.

Q. And in connection with your opinions in this case, you are not intending to offer any opinions about safer alternatives to Uber; correct?

MS. WILKINS: Object to form.

THE WITNESS: As I said before today -- as I said before in this deposition today, I reserve my right to offer additional opinions. I do

not hold those opinions sitting here today. I do not have or offer those opinions sitting here today.

BY MS. LEVY:

Q. You are not -- you don't intend to tell the jury a rider could do X, Y or Z and that would be safer than taking an Uber?

MS. WILKINS: Object to form.

THE WITNESS: Again, I don't know. I have reserved my right to offer additional opinions. I know there was data that was just produced last week. Sitting here today, I don't know what those opinions are. I don't offer those opinions in my report as filed today.

BY MS. LEVY:

Q. Okay. You have no opinion on whether Uber is safer than taxis, correct, no opinion on that?

MS. WILKINS: Asked and answered.

THE WITNESS: It's the same answer that I've given dozens of times

KELLER

before so I don't know how else to say it differently. This was not necessary for my analysis.

BY MS. LEVY:

Q. You have no opinion on whether it's safer to take an Uber home or drive drunk, no opinions on that?

A. Same answer as the previous one, it's not necessary to my analysis.

Q. You have no opinion on whether it's safer to take an Uber than to walk home from a bar, for example, no opinions on that either; correct?

A. Same answer as my previous answer, it was not necessary for my analysis.

Q. And the answer would be the same if I asked you have no opinion as to whether Uber is safer than any other alternative, that is not something you've looked into for your opinions in this case; correct?

MS. WILKINS: Object to form.

THE WITNESS: I've looked at

KELLER

what's been reported to Uber, what they categorized, what they did with that data and what they told the public about it. That's my opinions.

BY MS. LEVY:

Q. How did you come to be retained in this case?

A. Are you asking about like the specific letter? What are you specifically referring to?

Q. How did you come to be retained in this case?

A. How did I find out about the case?

Q. Yes.

A. I think it was -- most of my work is referral-based work. I have worked with some of the attorneys on this matter before -- or with an attorney on this matter before.

Q. Which attorney?

A. Tiffany Ellis.

Q. What matter did you and Ms. Ellis have together previously, or matters?

KELLER

A. She and I actually were working together on a matter in front of this exact court in the opioids litigation, CT4.

Q. And who retained you to do work in this case?

A. The co-leads of the litigation signed the retention letter.

Q. And that was in June of 2024?

A. The retention letter was before that but it's very likely that work didn't start for some time. The retention I think was in April of 2024.

Q. When I look at MK Analytics' website, I notice that when you go to MK Analytics' website, can we pull that up? It's a tab --

MS. LEVY: Hang on one minute. Just give me a second. When you go to MK Analytic's website, can we pull up tab 4, please, Bill?

(Exhibit 7, MK Analytics website page, marked for identification.)

///

KELLER

BY MS. LEVY:

Q. Under focus areas, there are seven different segments listed as focus areas. Are you familiar with the website?

A. It's been awhile.

Q. I will represent to you that the last of the seven issues that come up when we go to MK Analytics website is this page. This is the 7th of seven and it says Damages For Sexual Assault Victims.

Do you see that?

A. Yes, I see that.

Q. Is that one of the areas of focus that has been added to your website?

A. That is an area of focus on our website but refers to different experts' area of expertise.

Q. And is this -- this is like valuing cases for a different purpose. This is not the type of work that you have done in preparation for your report in this case; is that correct?

A. That's a completely different expert -- I'm not particularly versed in

KELLER

her methodology but that is not my area of expertise. If I under -- if I understand it correctly it involves more person-to-person and interview-based work but I'm not really sure. I always butcher it every time I try to explain what she does.

Q. What expert does this?

A. That would be Cathryn Jones.

Q. And this is not MK Analytics work that you participate in personally; correct?

A. No, I don't oversee that work and, in fact, draw a very clear line that that's not my work to oversee or be involved with.

Q. And do you know what it means to leverage available data and demonstrate the severity of each case by comparing it to previously awarded damages among cases with similar characteristics, do you know what that work is?

A. That's not my area of expertise. That's Cat's area so I don't know what she

means by that.

Q. You do know that there are differing levels of severity of conduct that come under the umbrella of sexual misconduct; can we agree on that?

MS. WILKINS: Object to form.

THE WITNESS: I don't know what you're defining as severity. I know how Uber defines it and that's what I have studied for this matter.

BY MS. LEVY:

Q. What I really want to know is how MK Analytics defines it. When MK Analytics says different levels of severity or refers to severity, I'd like to know what your business means by that.

A. You're asking about another area of expertise and I'm not this expert, so I would be theorizing. This is not my area.

MS. LEVY: So you can bring that down, Bill.

Q. You have looked at the taxonomy that Uber developed in conjunction with outside experts in advance of its original

U.S. safety report, that is something THAT you looked at and studied; correct?

A. I'm aware of THE I think the 26 categories, 27 if we look at the Flack interrogatory response that has data that Uber uses to categorize its incidences.

Q. And you believe there's 26 or 27 categories?

A. I say 26 or 27 because there's one category that has all 0s in the Flack interrogatory response but the Bliss and Jira interrogatory response have non-0s. So depending on which interrogatory response you review, you'll see either 26 or 27 with data in them.

Q. And those categories include things like flirting, comments on appearance, staring and they also include things like rape; correct?

A. That's correct.

Q. And those different categories have different levels of severity; correct?

MS. WILKINS: Object to form.

KELLER

THE WITNESS: Uber in its safety report puts those categories in order of a severity with the exception of insufficient information and parent category use tracking.

BY MS. LEVY:

Q. And you're not offering any opinion that Uber did that wrong, you have no opinion on that; correct?

A. I am showing the data how Uber filed it into that filing system. I'm not offering an opinion on how many different -- taking a step back, I'm offering an opinion on what volume of incidents Uber filed into that taxonomy or into that filing system, if you will, that's the extent of my opinion on those.

Q. You are not offering a better taxonomy or better taxonomy that you developed, that's not part of your opinions; correct?

A. That's not an opinion that I offer. I offer an opinion just on the volumes within that taxonomy and what was

reported to Uber and how it categorized incidents into those taxonomies versus the categories that it told the public about.

Q. And have you -- as part of your work in this case have you looked at any other taxonomies other than Uber's?

A. What kind of taxonomies are we talking about? I work with a lot of law enforcement data.

Q. Sexual assault or sexual misconduct taxonomies.

A. Just generally, like the uniform crime reporting like has a rape category. I don't know what you are talking about here.

Q. As part of your work in this case, did you compare Uber's taxonomy to any other taxonomy?

A. I'm offering opinions on the volume of reports within Uber's taxonomy, not comparing and contrasting how to re-categorize them or anything to that matter. I'm solely looking at what was put into those categories and then what

KELLER

categories Uber told the public about.

Q. Do you know as you sit here today as an expert whether there exists any superior taxonomy for sexual assault and sexual misconduct than the one that Uber has utilized?

MS. WILKINS: Object to form.

THE WITNESS: I'm not offering an opinion on that so...

BY MS. LEVY:

Q. You're not offering any marketing opinions in this case; correct?

MS. WILKINS: Object to form.

THE WITNESS: I don't know what you mean by marketing.

BY MS. LEVY:

Q. You're not an expert in marketing, are you?

MS. WILKINS: Object to form.

THE WITNESS: To the extent that marketing is reflected in the number of Uber trips that people take, I offer opinions on that but outside of that context, I don't offer opinions

KELLER

on marketing.

BY MS. LEVY:

Q. Do you consider yourself an expert in marketing? Simple question.

A. I offer opinions on the data that Uber had in its reports. That's my area of expertise and more broadly I define that as data mining and analytics or just data analytics.

MS. LEVY: What I want is a yes or no to this question and if we can't one, Beth, we're going to have to unfortunately take a break and get Cisneros on the line. If I can't get an answer on whether she is an expert or isn't an expert in a particular area, we're going to need to get some help from the court. I want to know if you're able to say --

MS. WILKINS: (Inaudible) the answers the best she can give it. I don't know how you define marketing so she's trying to guess at what you mean by marketing and she's giving you the

KELLER

best answer that she can.

BY MS. LEVY:

Q. Do you consider yourself to be an expert in marketing, that's all I want to know?

A. I'm an expert in data mining and analytics and to the extent that there's data reflecting marketing, I hold myself out as an expert in that context.

Q. Is there data reflecting marketing that you've reviewed?

A. I mean Uber advertises. One would assume -- I analyze the trip volume, for example, and Uber does marketing. So if marketing influences, and I'm not saying that it does or doesn't, but in the event that that influences trip volume, then I offer opinions on trip volumes because I calculate data in that data -- those data points.

Q. Have you reviewed Uber's advertising?

MS. WILKINS: Object to form.

THE WITNESS: I've reviewed a lot

KELLER

of internal documents, especially in part of my S-RAD review.

BY MS. LEVY:

Q. Are you going to offer any opinions that there's anything wrong with Uber's advertising?

MS. WILKINS: Object to form.

THE WITNESS: I think it's very clear at this point that my report talks about the data that Uber has, what it did with it and what it told the public. That's the extent of my opinions at this time.

BY MS. LEVY:

Q. Okay. You do not intend to offer any opinions about safer alternatives to Uber; correct?

A. We've talked about that before. That's not part of my analysis in this report.

Q. You do not intend to offer any opinions about additional technology that Uber could have or should have utilized, that's not opinions or work that you've

prepared for this case; correct?

MS. WILKINS: Object to form.

THE WITNESS: I don't know what you mean by additional technology they could have used. What are you talking about?

BY MS. LEVY:

Q. That was a bad question. Let me ask a better question. You offer no opinions on dash cams, for example?

A. To the effect -- I would say this is similar to the marketing answer. To the extent that those dash cams may impact the safety report numbers that I analyze, I offer opinions in that context.

Q. What have you studied about how dash cams impact the numbers in the safety report? Tell me what you know about that.

A. I'm saying if it is reflected in that data, that's what I'm analyzing.

Q. Is it reflected in that data?

A. That's not -- I haven't looked at the causal part of that but if it is reflected in the data, then that's what

KELLER

I'm analyzing. Uber has a number of safety policies that is enacted. Whether or not those are reflected in the volumes of the safety data reports, that's the contours of my analysis.

Q. You don't intend to offer any opinions about Uber's safety policies and their content or what Uber should have done, you are limiting your opinions to the data, if I understand you correctly.

A. I think talking about what Uber knew, what it did with that data and what it told the public is core to my opinions. What they should have done I would say is very similar to other cases that we've been in depositions before is not something that I'm offering an opinion on at this time.

Q. You also are not offering an opinion on any kind of standard of care or legal duties; correct?

MS. WILKINS: Object to form, calls for legal opinions.

THE WITNESS: I don't know what

KELLER

you mean by standard of care. Are we talking about medicine, are we talking about --

BY MS. LEVY:

Q. Standard of care that may or may not apply to Uber, you're not offering my opinions on that topic; correct?

MS. WILKINS: Same objections.

THE WITNESS: It's the same answer as the others. I'm offering opinions on what Uber -- what data Uber had, what it did with that data and what it told the public with that data. There's a number of contours in my report that discuss that. That's my opinions.

BY MS. LEVY:

Q. In your work prior to today, you have never developed a tool to study sexual assault and sexual misconduct, have you?

MS. WILKINS: Object to form.

THE WITNESS: In many of my cases, in the work that I do, the

KELLER

thing that is core is the data that I'm analyzing. That's the consistent piece. I often, whether it's Airbnb to gun trafficking to opioids, the subject matter is part of the data but the data itself is my expertise. How to -- my methodology to analyze it and that's -- and the tools that I use to analyze it, that's the expertise that I bring.

BY MS. LEVY:

Q. The invoices that were produced to us, I don't know if it was last night or this morning, go through I think October of this year. The last one -- the first one that we have starts in July of 2024 and the last invoice that we have is dated October 13, 2025. Is that the complete set of invoices, if there are monthly invoices in between there?

A. That as far as I'm aware are the complete set. We bill monthly so the October invoice would reflect time up until the end of September.

KELLER

Q. And there are other individuals besides you that worked on this matter at your directions at MK Analytics; correct?

A. They worked exclusively under my direction.

Q. And how many other individuals do that?

A. We have a large staff that some staff that will come in and out depending on the case.

Q. So what is -- how many individuals have worked on the Uber matter with you?

A. There's probably two to four people that worked on the litigation -- that worked on the litigation under my direction for a number of months. I also asked one or two individuals to review some of the -- some of my code just as a check but that was very limited.

Q. Is all the work done by those individuals reflected in the invoices? That's what I'm getting at.

A. Yes.

KELLER

Q. Okay. Our totals show that MK Analytics has -- these invoices when you add them up reflect roughly 2600 hours and 1.1 million dollars. Does that sound about right to you?

A. That sounds right. We spent a long time going through the numerous productions from Uber on the safety data and the various interrogatory responses. And so going through those productions and noting the inconsistencies that have happened, the incompleteness of some, they are missing fields, that has taken a considerable amount of time.

Q. Is the work reflected in these invoices that is being done at your direction, is that the only work that MK Analytics has been hired to do in connection with the Uber litigation? Do you understand the question?

A. I do and I'm not sure if I can answer it because I'm not sure if it's -- if consulting witnesses count or --

Q. I don't want you -- I don't want

you to tell me any information beyond a yes or no, but has MK Analytics been hired to do consulting work in addition to the work you are doing as a testifying expert in the litigation? It's just a yes or no.

A. So the invoices you see reflect my time as the consulting expert and testifying expert on the case. They don't reflect any other division's work that I don't oversee.

Q. Okay.

MS. WILKINS: I don't think you guys are understanding each other. I don't want to coach but I think there's a disconnect here.

MS. LEVY: I think you're saying --

MS. WILKINS: I'm not trying to coach Lacey, I really think that you two are having a disconnect on what you're talking about.

MS. LEVY: Yeah, I think (inaudible).

MS. WILKINS: I think you're

KELLER

asking Lacey is there any work in this litigation that's not reflected in these invoice.

MS. LEVY: Yes, that's what I'm trying to decipher.

THE WITNESS: My team's work is reflected in the invoices you have.

BY MS. LEVY:

Q. Is there any other work done in this litigation by MK Analytics outside of you and your team?

A. That's the part I don't know if there is consulting.

MS. WILKINS: This is MK Analytics.

THE WITNESS: Yes. Do the invoices all say data mining and analytics? What are the headers on them? My admin sent them so I haven't seen them.

BY MS. LEVY:

Q. MK Analytics billed to Peiffer Wolf Carr, project Uber Lacey Keller, it has all different descriptions of people,

KELLER

so owner is one type of person, engineer data scientist is another type of person, and I can see that there are different levels of employees being billed. But my question is: Is there more work by other people like MK Analytics that is not on your team, it's a separate engagement related to this litigation?

A. And this is the part I'm not sure if I can talk about but I do know that another person was retained for a brief period of time but I don't think those -- I don't know -- if you put the invoices up, I can tell you if they are my divisions or hers, but you'll probably see two invoices for the same month if it's her division. Does that make sense because we bill them separately.

Q. Has the person who does images for sexual assault victims that we were talking about earlier in Exhibit 5, is that person maybe engaged to do a separate analysis for this litigation?

A. I was not privy to that

KELLER

engagement because we draw a clear line so I don't know.

Q. Okay. And is there -- I assume if I have a set of invoices from July of 2024 up through mid October, that that would be a complete set of invoices minus the last couple of weeks which is not reflected here; is that right?

A. Of my group's, yes, and my directed time.

Q. Okay. Let's see. Have you ever published any publication with your name on it that relates to sexual assault or misconduct?

A. I have made a number of contributions to the field of data mining and analytics or just data analytics through publications and those are all reflected in my qualifications document.

Q. I don't see anything listed in your qualifications document that includes in the titles anything that says sexual assault or sexual misconduct. So there was nothing that I saw that appeared to be

addressing that specific issue. Is there something that I'm missing?

A. You have a complete list of my publications in my qualifications document.

Q. Okay. And as you sit here today, can you think of any publication that I could pull that talks about sexual assault and sexual misconduct?

A. I have a number of publications to my name in the field of data analytics. Some of the subject matters are varied from cannabis research all the way to gun research to generally using data in litigation. That's the publications that I've offered or that I've published.

Q. And are there -- I think the answer is no, but are there any that you published that address the specific issue of sexual assault and sexual misconduct?

A. The list of publications is in my Appendix C and they -- the core feature of them is data and the subject matters are there. So it's from data generally in

KELLER

litigation and how do use it to cannabis to I think there was even one on drugs on Instagram.

Q. Is the answer to whether there's one that specifically addresses sexual assault, is the answer to that no?

A. I would say the answer is I have a number of publications on data analytics which is my area of expertise and that's what my publications reflect.

MS. LEVY: Can you mark that in the transcript?

BY MS. LEVY:

Q. Let's go to -- back to your report, tab 1 for Exhibit 1.

If you can in -- I know we're very short on time and so I want to try to be efficient here. Can you give me an overall description of how you prepared the data, like what work did your team do in this, you know, 2600 hours with the actual date? Can you just describe in lay person's terms briefly what that looked like?

KELLER

A. Yeah, so are you wanting me about all the data that was produced? Because of the numerous reproductions of data that might be a fairly lengthy answer.

Q. Good point. Let me ask a better question. Backing one step, when I look at Appendix A to your report, we don't need to pull it up but as I'm just going to ask you a general question, we can pull it up if we need to. But you make a statement there that says, "In my opinion, data mining and analytics often overlaps with data science."

That I just want to know what you meant by that sentence. Is data mining and analytics a subset of data science or are they different areas of expertise that are overlapping, which is what I think the sentence suggests?

A. I view them as areas of expertise that overlap like two concentric circles.

Q. Are you a data scientist?

A. Sometimes, yes, I am a data scientist and sometimes I'm a data

KELLER

analyst.

Q. And this might not be the way that you say it in your business but and sometimes you're a data miner?

A. Data mining is more for like, especially when I was at the New York Attorney General's office, when I am doing investigative leads for something, helping to prioritize the agency's resources.

Q. In this case, is it fair to describe the work that you and your team have done as data analytics?

A. Correct. Data analytics is the work that I've done in this case and very similar to what I've done in other cases where I've been admitted as an expert in data analytics.

Q. And is it -- would you also say that you have done data science in this case or is that a different thing in your mind?

A. This is more descriptive analytics or data analytics. I am not building machine-learning algorithms in

this case which would be I would say similar to the work of a data scientist, but data scientists will often do analytics as part of their job. So you see how they can be intertwined with one another. But I have been offered and admitted as an expert in data analytics before and that's similar to the role that I'm playing here.

Q. Thank you, I appreciate that clarification. And whether you've done data science in this case, maybe, it just depends on how you describe that, is that right, or would you say no to that?

A. It's -- the fields are related. Like data science tools, so I would say people in the world may think of an analyst using Excel spreadsheets. I employed some of that in my work here but I also used the tools that one might consider to be under a data scientist, which is Python and some high-powered coding so they are related.

Q. But you haven't done data mining

in connection with your work for this case?

A. Correct, I am not looking for particular actors. I'm doing descriptive analytics of the data Uber had in its possession and produced in this litigation.

Q. Moving to your report, do you have it in front of you?

A. Yes.

Q. You describe on page 10 in section IV of your report materials considered and you also list in Appendix G of your report documents and materials considered; correct?

A. Yes, these are -- both are the comprehensive list of materials considered in my report.

Q. And Appendix G of your report is 160 pages, a single space list of materials considered; right?

A. Mine must be formatted slightly differently so I don't know the page count.

KELLER

Q. Okay. My question about that is: Did you review every single document on this list?

A. I did -- I reviewed many documents, probably just a number of documents in this litigation from the defendants -- I'm sorry, not the defendants. From the plaintiffs' trips and the data that was produced around those drivers and those trips, some of the sampling documents. I know those were pretty voluminous as well as documents related to S-RAD just to name few. I know I did a lot of searches on the software that was holding the production because I did have complete access to it. But just like any search, like some of the documents that I reviewed, I reviewed quickly. I opened them, it was not relevant and I moved on, but all documents that I considered and reviewed are in that list.

Q. So if a document appears on Appendix G, you've at least looked at it?

KELLER

A. Me or someone from my team, yes.
Q. Thank you.
Okay. And you reviewed all three U.S. safety reports as well; is that correct?
A. Yes, and I have copies of them with me.
Q. Did you review those cover to cover or did you just do keyword searches in those?
A. I've reviewed them a few times. When I first read them and a few times I've read them pretty much cover to cover, especially I would say I was reviewing most closely the sections on sexual assault or the information that Uber produces on sexual assault and the appendices that are relevant to that analysis.
Q. I want to turn to page 17 of your report, paragraph 19.6. Tell me when you're with me.
A. Okay.
Q. 19.6 says, "There are additional

analyses pertinent to my opinions that I would like to perform using the SA/SM incident data, however, the data as produced appears incomplete and contains inconsistencies."

And then the next sentence says that in order to run those additional analyses, you would have to use your professional judgment to address gaps and inconsistencies.

And you go on to say, "It is more appropriate to conduct my analyses on data that is as complete and accurate as possible."

What does that -- do those sentences mean?

A. So what I'm referring to there is Uber's production of the Bliss and Jira datasets. There were fields in that data that were -- that had inconsistencies is the right word, they differed from what they purported to be. They had some missingness or reflected something other than what Uber had reported that dataset

to contain. And what I wanted to -- what I am reserving the right to here is relating for the Flack data which based on my review of the field list had fields that would remedy some of those assumptions that I would have to make otherwise.

Q. Why is it more appropriate to conduct an analysis on data that's as complete and accurate as possible, why is that?

A. It was clear to me at the point of filing this report that Uber had in its possession data that -- sorry. It was clear to me at the point in filing this report that based off the field list that there may be something in the Flack data that may assist me in my review of the Bliss and Jira data or replace the Bliss and Jira data. I'm not sure at this time what methodology I might use or which datasets I might use, but what I'm saying here is there was additional data that it appeared that Uber had in its possession

that it had not provided that would fill in those places where I may need to have made assumptions.

Q. In doing any data analytics, it's just common sense that you want the dataset to be as complete and accurate as possible, that's like a fundamental premise of data analytics; correct?

A. When you're working with data you have to understand what's included in the data and what's not included in the data.

Q. And it's better to conduct an analysis on data that's as complete and accurate as possible; right?

A. When you're working with data you have to understand its limitations. And at the point of filing this report and saying this statement, I'm talking about knowing that there are other fields that Uber had in its possession that may inform my opinions with regard to the data that it had already produced.

Q. I've heard and I think we talked about this in a different litigation,

KELLER

sometimes in data science or data analytics, you hear garbage in, garbage out. The quality of the output, what I assume in lay person's terms that means is that the better quality of the data you put into a dataset, the higher quality of the output of the study of that data. Do you agree with that?

MS. WILKINS: Object to form.

THE WITNESS: So are you talking about a general principle here or are you talking --

BY MS. LEVY:

Q. Just generally.

A. So generally you can say different things about data. Some datasets come with limitations. Some datasets don't come with limitations. Some datasets are -- it really is case specific when you're talking about data. So that is a phrase I've heard before but I don't know how you're applying it specifically in this litigation.

Q. Paragraph 26 of your report you

KELLER

say that "The procedures I used are based on direct and verifiable calculations. As such, a potential error rate or confidence interval is not applicable."

Can you explain to me what you mean by that?

A. I mean that I'm doing that and like addition, subtraction averages, I'm not making estimations, I'm not doing sampling. That is the type of analysis. I'm not -- that would require confidence intervals. So when you're doing simple addition or descriptive statistics, that's not applicable here.

Q. Okay. I appreciate it. So you tabulated numbers, you averaged numbers that you got out of these different datasets but you haven't done extrapolations or other kind of modeling on the data; is that fair?

A. Similar to the work that I've done in other litigation where I've been deemed an expert, I'm doing the same thing here, is I'm summing, averaging, showing

descriptive analytics, a longitudinal study -- not longitudinal studies -- time based analysis, that's a better way to say that, of the data that was produced specifically from the Flack interrogatory response.

Q. And that takes me back to the topic of underreporting that we talked about earlier. This is an example of you did not attempt to extrapolate an actual number of potential assaults from the data that exists, you merely looked at the data that exists; true?

A. I showed the data that Uber had in its possession, how it categorized it and what it produced in this litigation.

Q. If you had attempted to calculate a different number, extrapolated a different number, then you would have needed to do what you said in 26, which is calculate an error rate or a confidence interval; right?

MS. WILKINS: Object to form.

THE WITNESS: That's a

theoretical different analysis that I didn't do, so I don't know what I would need to do to support an analysis that I haven't done, so I would just be guessing of what that would even look like.

BY MS. LEVY:

Q. In reading or reviewing the materials that are listed in the Appendix G, did you run across the concept of support abuse or fraud in reporting?

MS. WILKINS: Object to form.

THE WITNESS: Again, I've read a lot of documents as evidenced there. So you're asking me if I read any documents that talk about false reports or --

BY MS. LEVY:

Q. Yeah.

A. So based on the documents I've reviewed, I've seen Uber's statements and this is a statement that they made to the public about that not being an issue because they view -- they treat or they --

I think what's the phrase that they use, we believe victims. And so to the extent that I've read that, I'm not sure if that's what you're trying to get at here.

Q. That's part of it. If you were to calculate -- let me back up.

In the Flack data that you reviewed that you talk about in your opinions, those are reports that came in from complainants; correct?

A. So we're talking about the Flack interrogatory response?

Q. The data that was provided in response to that, yeah.

A. So that, yeah, the data in that response is totaled by month and by category that Uber had put that report into, whatever category it had decided it was appropriate to put into.

Q. And you didn't look at any qualitative analysis of the underlying reports, you didn't look at the individual reports themselves, you just looked at the data compilation; true?

KELLER

MS. WILKINS: Object to form.

THE WITNESS: In filing the charts and figures in this report I had to tabulate the volumes that were in that interrogatory response. However, in my driver response -- driver profiles which discuss the bellwether plaintiffs trips, as well as some work that I had done preliminarily to review the safety data for its -- in its various productions before, I also did review specific Jira tickets and Bliss messages.

BY MS. LEVY:

Q. In order if you were going to -- I understand you did not calculate the extent to which sexual assault might have been underreported on Uber, you're taking Uber's statement on that and I understand that. But if you were to calculate it, you would have to consider underreporting and overreporting or false reporting, you would have to consider both things, would

you not?

MS. WILKINS: Object to form.

THE WITNESS: I'm not offering an opinion on that so I haven't come prepared to discuss that so I don't want to theorize on an opinion that I'm not offering.

BY MS. LEVY:

Q. But you do understand from that Flack data you looked at are allegations, they are not necessarily litigated or fully investigated or the outcome of investigations, that much you know from the review of the data and the information provided by Uber; true?

MS. WILKINS: Object to form.

THE WITNESS: I'm taking Uber at its word a few times here. One is that they believe victims and they count every report and that's what they say in the safety report, and two, I'm taking Uber at its representation when I'm calculating using the Flack rog response that

KELLER

these are complete tabulations of the data that it has received.

BY MS. LEVY:

Q. Let's flip to opinion 1 on page 19. This is -- I'm now looking at the summary of opinion 1 starting with paragraph 28 -- sorry, 27. 27 A you note --

A. Sorry, I thought you meant the summary like on page 8.

Q. No, I'm sorry, I meant the heading and the subheading. Tell me when you're with me.

A. I am there now.

Q. From the Flack data, your subheading A says "From 2017 through 2024, Uber tracked 546,196 incidents of sexual assault and sexual misconduct."

You arrived at that number from tabulating individual numbers of incidents from the Flack data; correct?

A. This is from the Flack interrogatory responses, not the Flack data that was produced last week. That

KELLER

would have not been possible since it was produced last week. So this is a summary of the Flack interrogatory response that Uber provided prior to filing my report.

Q. And that data according to paragraph 27 covers a time period from 2017 through 2024; correct?

A. Uber produced that data broken down by month and by taxonomy like the subcategories what we can refer to that as by month for those years, 2017, so January 2017 through December 2024.

Q. And when you use that time period, you're referring to a mix of audited and unaudited data; right?

A. Do you have the interrogatory response so I can review how Uber refers to the audit process?

Q. I do have that and we can pull it up in a minute but the question is: Do you know as you're sitting here for what period of time that is reflected in paragraph 27, 2017 through 2024, has the data been audited by Uber's auditors, do

KELLER

you know that?

A. The data came with a number of caveats so I would like to refresh my recollection on that response because I remember one dataset had one set of caveats and when they produced the Bliss and Jira data I think related to a certain set of facts and the Flack data related to others. What the auditing doesn't change the volume of reports that Uber produced in those records. This is merely -- this is just showing what's in those records, totaled up across all months across all taxonomies.

Q. (Inaudible)?

THE WITNESS: I think you muted yourself somehow.

BY MS. LEVY:

Q. Data through 2022 has been subject to an Uber U.S. safety report. Are you aware of that?

A. Yes, I'm aware that Uber has released reports from 2017 to 2018, '19 and '20, '21 and '22.

KELLER

Q. But Uber has not released a report for the later data, '23 and '24, at this time; correct?

A. I have not seen a report from Uber yet, and so that is actually the analysis -- part of the analysis that I show in my report is to show what numbers exist since the filing of the last safety report, what has been shown in '23 and '24.

Q. Do you know as you sit here today whether the last two years have been audited in the same way that the 2017 through 2022 data was?

A. So again, I know that the Flack data comes with some I would say however caveats that Uber wanted to put on that data, but what doesn't change is the volume of reports that Uber categorized into those categories. The audit process is Uber holds out as a reason for why it only produces and publishes, I should say, data on a subset of categories, but in reading the appendices of the reports, it

KELLER

appears that there are a larger volume of categories that are audited than what are disclosed in the safety reports.

Q. The Flack data that is reflected in your opinion 1 is all of the categories, it's not a limited set but it's every single category of every single incident that Uber classifies under sexual assault and sexual misconduct; is that right? Do you agree?

A. It reflects all of those that are under sexual assault and sexual misconduct. There are other categories that I know that Uber has taxonomies on but these are the ones that I understand to be complete for those two categories, sexual assault and sexual misconduct.

Q. And that includes varying levels of severity. Do you agree?

MS. WILKINS: Object to form.

THE WITNESS: So in the safety reports, Uber lists in order of severity what it thinks are most severe to least severe, with respect

to two categories, insufficient information and paired category use tracking.

BY MS. LEVY:

Q. Do you disagree that some of these categories are more severe than other categories?

MS. WILKINS: Object to form, asked and answered.

THE WITNESS: I don't offer any opinions on -- I don't offer an opinion on the severity order. I offer opinions on the data that Uber classified into those categories and what each category shows if shown together, broken out, et cetera as I've demonstrated in my report.

BY MS. LEVY:

Q. Did you read any of the underlying incidents that make up these 546,000 incidents?

MS. WILKINS: Asked and answered.

THE WITNESS: Again, I think I've said that in reviewing the documents

KELLER

in this litigation specifically, the plaintiffs' trips as well as some of the sampling attachments and other documents, I have read Jira tickets as well as the documents themselves -- I'm sorry, the Jira tickets, then the Bliss tickets and documents of those Bliss and Jira tickets.

BY MS. LEVY:

Q. But you didn't do any systematic review to categorize them yourself; right?

MS. WILKINS: Object to form.

THE WITNESS: I think we've talked about this before. I'm using the categories that Uber has applied to this data and specifically in the Flack data, Uber's tabulations and de-duplications of those categories, those incidents under each of those subcategories.

BY MS. LEVY:

Q. And you're not offering any opinion that Uber did that incorrectly or got it wrong; correct?

KELLER

A. What do you mean by got it wrong, like that they misclassified them or that they did the math wrong?

Q. Either.

A. I'm showing what Uber put into those documents or into that interrogatory response, the numbers within those, so I'm taking Uber at its word that they had done that correctly when showing my analysis.

Q. And you understand that some of the incidents that are covered here, in fact, many of the incidents covered here include things like staring, looking at me, giving me a dirty look or making comments or gestures, you're aware of that; right?

MS. WILKINS: Object to form.

THE WITNESS: I'm aware of those incidents being potential precursors which is a word that Uber uses to sexual assault. And so I have looked at those, all of the incidents because some of those Uber has in its own documents determined to be precursors

KELLER

of additional misconduct later on.

BY MS. LEVY:

Q. When you talk about precursor, you are relying on a single document that has -- that contains that word that you cite in footnote 85 of this report, correct, paragraph 51? Heading B?

A. Yes, so the word precursor is from that e-mail but then a number of the inputs that are in that section come directly from Uber internal documents and there's a number of documents that discuss proximity to bars, whether intoxication, the time of day as all potential indicators of sexual assault. And those, many of those, if not all, are a part of the S-RAD model that it does use to, quote, prevent sexual assaults.

MS. LEVY: Let's pull up tab 45, please.

BY MS. LEVY:

Q. And if we go to paragraph 51, you're talking about precursor. I just want to make sure we're clear about what

we're talking about here. Let's go to 51 on page 36 of your report but we can -- let me pull that up first. If you can zoom in a little bit, in the heading you say, Uber identified male drivers and female riders as well as a proximity to the pick-up of a bar as, quote, precursors to sexual assault, and there you cite footnote 85. Are you with me?

A. Yes.

Q. And for that you cite JCCP_MDL_000356814.

A. Okay.

MR. LEVY: And let's pull that document up. It's tab 45.

(Exhibit 8, document Bates labeled UBER_JCCP_MDL_000356814, marked for identification.)

BY MS. LEVY:

Q. And this is the document that is your source for Uber referring to male drivers, female riders and proximity of bars as precursor. This is where the word precursor comes from, is that correct,

KELLER

this is what you cite?
A. These inputs -- hang on one second. Sorry.
MS. LEVY: Can you go to the next page, Bill?
Q. My first question is: Is this the document you're referring to when you refer to precursor?
A. This is the document where that phrase is utilized by Uber and so that's why it's cited specifically on that word, but these inputs are a number -- these inputs are used in the S-RAD model as well which is the machine-learning algorithm that Uber uses to, quote, prevent sexual assaults.
Q. What does precursor mean to you?
A. Again, if I'm using their term to describe this set of inputs, but these are indicators that Uber have found to be indicative of potential sexual assault as evidenced by even using it in the S-RAD model and well, in other documents in its production.

KELLER

Q. And just to make sure that we're on the same page, it certainly doesn't mean that if a male driver has a female rider in the car, that there's going to be a sexual assault, that's not what it means that it's a precursor?

A. This document shows that they have found patterns, they call it patterns and precursors, among the data Uber has been collecting and this is how Uber -- I can't even remember, one of the engineers or data scientists or analysts, whatever their job title is, what they have found to be in their own sexual assault data, what patterns and precursors is the words that they use.

Q. In the documents that you reviewed, you've seen a lot of documents where Uber data teams are studying the issue of sexual assault; true? You've looked at many, many, many documents. In fact, there -- would you guess hundreds or thousands of documents that you've seen that relate to Uber's study of this issue?

KELLER

MS. WILKINS: Object to form.

THE WITNESS: I've seen a lot of documents where Uber has discussed this internally but I haven't seen them disclose the types of knowledge that they know or the types of information that they have gleaned from this publicly. They have chosen to produce that information in just one metric or two metrics if you look at total and per trip volume.

BY MS. LEVY:

Q. Do you -- do you understand from your review of all of the documents that you list in Exhibit G what in terms of magnitude, period of time has Uber been studying the issue of sexual assault, for what period of time, how many years?

MS. WILKINS: Object to form.

THE WITNESS: I have seen documents -- I've seen a lot of documents. I think that earliest ones that I've seen are in reference to these patterns specifically are around

KELLER

late 2016, 2017, somewhere around there. I would have to look at specific -- all the specific documents to be sure but about those years.

BY MS. LEVY:

Q. And you understand from your review of the documents in this case that Uber has devoted many, many scientists and researchers to the effort to study patterns related to sexual assault and sexual misconduct --

MS. WILKINS: Object to form.

BY MS. LEVY:

Q. -- that you learned in your review of this case, yes?

A. Many of the documents that I have reviewed tend to focus on the -- tend to be authored or have the same set of individuals. I don't recall their job titles but what my point in drawing the connections with those data points are is Uber has this knowledge internally and they even use it to put and build S-RAD inputs and then they don't tell the public

KELLER

about any of these particular indicators. The safety report reflects only one subset of that knowledge.

Q. My question to you is not about safety reports -- about the public disclosure. We're going to talk about that separately. My question to you is: Do you know how much time, how much resources Uber has devoted to studying the issue of sexual assault and sexual misconduct?

MS. WILKINS: Object to form.

BY MS. LEVY:

Q. Is that something you know?

A. The documents that I reviewed talked about the results of those studies and what Uber knew about its own data and that's my opinion about -- and I bring those opinions because I'm contrasting that to what it's telling the public. I don't recall reading documents that totaled machine-learning hours spent or data scientists, you know, time sheets.

Q. You don't know how much effort

Uber does put into developing the S-RAD technology, that's not something you were asked to look into; correct?

A. I know Uber has been developing S-RAD for a number of years and only recently released it.

Q. And you also haven't studied the effectiveness of S-RAD, that's not something that you are asked to do as part of your analysis in this case; correct?

MS. WILKINS: Object to form.

THE WITNESS: I offer several opinions on S-RAD and including the volumes of trips that it excludes through holdup backs, which is the groups that it uses and doesn't do any interventions or doesn't do any sorting. And I also offer opinions on data -- well, offer opinions on what Uber has tabulated to be [redacted] which are when the program has not -- has dispatched a trip that had a sexual assault -- I'm sorry, I misspoke -- [redacted]

KELLER

[redacted], so
I offer those opinions on the program.

BY MS. LEVY:

Q. So you have not studied how effective the tool is, what incidents S-RAD may be preventing or not preventing, that's outside the scope of the work you've done for this case; correct?

MS. WILKINS: Object to form.

THE WITNESS: I think you might be misunderstanding me. I'm offering opinions that Uber excludes [redacted] of trips from its algorithm because it holds them in a hold back group. I'm offering opinions that Uber excludes on the whole or on average, whatever term we want to use, of [redacted] of trips because they are not above the self-inflicted threshold. And I'm offering opinions that [redacted]. They are above the threshold that Uber set in S-RAD within its, quote, guardrail metrics,

KELLER

so I do offer those opinions.

BY MS. LEVY:

Q. And your opinions are limited just to the numbers that fall in those categories, that's what's in your report, as opposed to what Uber should do that or what a better way to do it would be, that is not part of your opinions; am I correct about that?

A. A better way to build the model? I'm sorry, I just don't quite understand.

Q. Yes. You are not offering any better way to build the S-RAD model; correct?

MS. WILKINS: Object to form.

THE WITNESS: I'm offering opinions describing the S-RAD model much like I would teach my students that I teach college -- in college classes. I'm describing the S-RAD model to the court in a way that it is understandable and that we can understand how it functions. I am not offering a critique of the model or in

KELLER

a way that it should be built in a different machine-learning algorithm, for example. I'm not offering that opinion. I'm offering opinions on what data points were included and you can see those in one of my appendices, but I -- and I'm offering opinions on what wasn't included but I'm not offering opinions on what Uber should have done, I'm just offering opinions on what could have been the case given the data that was available to Uber.

BY MS. LEVY:

Q. Okay. So it is not part of your opinion -- I need to know what you intend to say at trial. You're not offering an opinion that Uber should not have holdouts or should set thresholds in a different way. That's outside of what you're doing in this case; correct?

A. I'm offering opinions on what those holdouts are and what the thresholds were and the implications on trips and some exemplars of what that looks like so

that the court can understand those concepts.

Q. And you have not formulated opinions and you are not intending to present them at this trial at better thresholds or a better way to operate the model, that's not what you're offering opinions on in this case; true?

A. I'm offering opinions that Uber had knowledge that setting -- they use the term trigger rates which correspond to a threshold, what volume of sexual assaults they would predict, kind of paraphrasing from documents there, I do offer those opinions in my report and that's based off of the knowledge that Uber had.

Q. But again, I want to be very, very clear on this, your analysis of what the data says and what Uber saw, not what it should have done or not the way Lacey Keller believes it should be done different. The second part is not part of your opinions in this case? I think you may have said that but I want to be very

clear about that.

MS. WILKINS: Object to form.

THE WITNESS: I'm offering opinions on the inputs that are in S-RAD as well as datasets that they have or data points that they have that they haven't included in S-RAD as a descriptive, but not offering an opinion on what they should have included in that model or -- I think that's a way to say it is. I'm describing what they have done, what options were available to them, what they knew about and that's my opinion.

BY MS. LEVY:

Q. Now, going back to the heading on page 36 and paragraph 51, just to finish up our discussion on precursor.

A. Yes.

Q. It is certainly not the case that pairing a male driver with a female rider predicts a sexual assault, that's not what it means to be a precursor, do you agree?

A. I think especially in earlier

KELLER

versions of the model and I'd have -- I need to look at the global features which I don't have in front of me, gender, I know it was in the earlier models but I need the global features in front of me, were indicators that Uber found to be indicative of potential sexual assaults when developing S-RAD.

Q. So let me just ask some simple questions.

Is it your understanding that gender is one of the metrics in S-RAD?

A. Do you have the global feature list in front of you? I just can't -- I remember some features that come in and out.

Q. It's fine if you don't remember. If you don't remember, you can just say that. I just want to know if you -- if it's your understanding and if you don't know you can say that, that gender is a metric in S-RAD?

A. I have my appendix here. I can look it up. But at one point in time it

absolutely was and I think it still is a feature in the model. But again, I would want to look at the global features list that was just -- that is in my materials considered list or the global features list, either of them.

Q. There are dozens and dozens of inputs into the S-RAD model; correct?

A. Yeah, I think it's somewhere around 40-ish inputs.

Q. And if a supply plan or a match had one of those features, that definitely does not mean that a sexual assault or an incident of sexual misconduct will take place, that's not what it means; correct?

MS. WILKINS: Object to form.

THE WITNESS: The features combined create an S-RAD score using machine learning. And so that machine learning is based on previous incident data as well as S-RAD scores that have been run in shadow mode so that -- or not shadow -- some were done in shadow mode and some were done historically

KELLER

looking at the data. All of those combined create an S-RAD score for each and every individual trip. So it's one piece of all of the features that Uber uses to categorize a trip.

BY MS. LEVY:

Q. And there's not anywhere in this report or in your opinions that tell us what is the S-RAD score that means there's going to be a sexual assault, that's not an analysis that you've done or that even could be done; right?

A. Uber has -- so Uber sets the [redacted] and with the purpose of the program being to prevent sexual assaults. And so that's what I understand that score to mean, is it's a risk score created by Uber based off of its own data.

Q. And what you've done for purposes of this report is look at Uber's work in this area, but you yourself have not come

to an opinion about what a risk, a risky ride is or isn't. Like what S-RAD score is a risky ride, what S-RAD score is not a risky ride, those aren't opinions you have formed independently; correct?

MS. WILKINS: Object to form.

THE WITNESS: Uber has not produced much of the data even for some of the indicators that it has identified itself as potential risk factors or precursors or whatever term we want to use. The supply plan data, for example, which is all of the trips that are available and scored by the S-RAD program Uber deletes. And so those data points would be relevant to look at those risk factors independent of one another in connection with the S-RAD score, but that data has not been produced.

BY MS. LEVY:

Q. And we'll talk a little bit more about that, about S-RAD and its inputs in a minute but we can agree, I hope, that

KELLER

what we see in Exhibit B, male drivers paired with female riders. Despite the fact that this heading calls that a precursor to sexual assault, you certainly would not tell the jury that male drivers should not be paired with female riders. In fact, you know that male drivers drive female riders safely hundreds of millions, in fact, billions of times on the Uber platform with no incident at all, you're aware of that; correct?

MS. WILKINS: Object to form and foundation.

THE WITNESS: So I'm aware that Uber's produced data that only tells parts of this story. Uber's only produced data that shows the total -- the sex of the driver or gender of the driver I should say on a yearly basis. I don't and they have not produced which means I don't have data of the gender for each and every safety incident in the data. They have not produced that data. And I think I say

that very clearly in my report. So I can't do that analysis because Uber hasn't produced that data, so the next best thing is for me to identify from documents the types of analysis that Uber has done because internally they have that data.

BY MS. LEVY:

Q. And it's a great thing that Uber is studying this issue and trying to develop tools like S-RAD to enhance the safety of the platform, that's a great thing that it's doing that; right?

MS. WILKINS: Object to form.

THE WITNESS: Uber has chosen to do a number of things behind closed doors, including developing the S-RAD program and studying these things, but they have told the public nothing about that and so that is why I'm bringing those up in my report. The value judgment can be your own. I leave that to the court to decide. I'm just here to tell the facts.

KELLER

BY MS. LEVY:

Q. You don't think it's wrong or problematic that Uber is studying this issue and attempting to use data as a tool to reduce these incidents, that's exactly the kind of thing that you've done in your prior work as a data scientist; right?

A. I think Uber has been misleading to the public in producing data in the way that it has in the safety reports. It has not shown the public the risk of sexual assault at night. It hasn't shown the risk of sexual assault for women versus men, especially at night or even levels of intoxication, even though it has that data internally and has done that analysis.

Q. Do you intend to offer an opinion to the court that Uber has misled the public?

A. I am drawing a distinction between what Uber has told the public versus what they know internally and that's -- you can see that in my report clearly.

KELLER

Q. And have you looked at other participants in the transportation industry and how what they tell the public about incidents on their platforms or in their businesses?

MS. WILKINS: Asked and answered.

THE WITNESS: Again, that's not part of my analysis that I've done here. That was not necessary for my analysis to show the distinction between what Uber has done versus what -- what Uber has told the public versus what Uber knows internally and what kinds of programs it's operating internally. Just before we move on to the next question, I think we've been going like an hour and a half and I'm getting pretty hungry. Can we take a break?

MS. LEVY: Absolutely. How long do you want to take?

THE WITNESS: I think lunch was delivered a little while ago so maybe we can do 20, 30 minutes?

KELLER

MS. LEVY: Sure, why don't we come back at -- I'm in a different time zone. So do you want to come back at 3:30?

THE WITNESS: That works.

MS. LEVY: Okay.

THE VIDEOGRAPHER: Going off the record. The time is 2:42 p.m. Eastern. This is the end of media unit 2.

(Lunch recess taken at 2:42 p.m.)

KELLER
A F T E R N O O N   S E S S I O N
(Time noted: 3:20 p.m.)
L A C E Y   K E L L E R, resumed and testified as follows:
THE VIDEOGRAPHER: We're back on the record. The time is 3:20 p.m. Eastern. This is the beginning of media unit 3.
CONTINUED EXAMINATION
BY MS. LEVY:
Q. Welcome back, Ms. Keller. Going back, before we dive into opinion 1 in your report, I want to go back for one minute to the question that we were talking about about your qualifications and testifying history.
Your Appendix C which we've marked as Exhibit 2 to the case, do you have that handy?
A. Yes.
Q. That was 22 depositions that you have given as of the time of this report. I believe that all 22 of those depositions were given in conjunction with the opioid

litigation; is that correct?

A. That's not correct.

Q. Which ones were nonopioid?

A. So -- I don't know if it's easier to do it by number, number 19, that's the Red Hill trial.

Q. Did you work with the plaintiff or defendant in that case?

A. Plaintiff.

Q. Are there any others that were not opioid litigation in your depositions?

A. Yes.

Q. Which one?

A. 20, I was a rebuttal witness.

Q. And were you for the plaintiff or defendant in that case?

A. Plaintiff.

Q. Any others?

A. Yes. 22.

Q. Did you work with the plaintiff or defendant in that case?

A. I worked for plaintiff in that case.

Q. Any others that are nonopioid?

KELLER

A. That's as far as depositions concerned, the extent to those. You know, I'm looking through this and I thought my biography included -- I also was retained by the -- by federal court and it was a district court in the Lackawanna case. It's like Burrell v. Lackawanna County and I was -- my firm was appointed by the court to work with defendants in the defense counsel in that matter to help arrive at a list of individuals at issue in that litigation. So that I should actually add. I thought it was on here and I apologize for that not being --

Q. Have you given a deposition in a that matter?

A. I filed a declaration and I thought that that was here but I don't see it so I filed a declaration prior to being retained in that matter.

Q. Got it. So let me just see if I can blaze through this in a summary fashion. Of the 22 exhibits -- depositions listed in Exhibit 2, Appendix

KELLER

C, three of those were nonopioid, 19 of them were in the opioid case; is that correct?

A. That's correct, opioids litigation, as you probably know, was pretty all-consuming for several years.

Q. Yes, it was and all of those depositions were provided on behalf of plaintiffs in that litigation; correct?

A. Yes, I was working for plaintiffs because it would have been a conflict otherwise.

Q. And with your trial testimony, six of the seven cases were opioid cases and the seventh one was a nonopioid case, the Feindt v. USA case; correct?

A. That's correct.

Q. And all seven of those were on the plaintiff side?

A. That's correct.

Q. And then in the declarations, there are five declarations listed here, were all five of those on the plaintiff's side?

KELLER

A. All five listed there and then the addition for the declaration that I was -- that I filed in the Lackawanna case, I -- I'm actually not sure how you would define who I filed that on behalf of. I just filed it with the court and then the court appointed me to be -- to work with the defendants.

Q. And in 30 seconds or less, what was the nature of your opinion in that case?

A. I didn't -- I wasn't an expert witness where I would have a final report. I had -- I was -- my task was to combine and aggregate datasets to assist them with identifying effective members. I think that's a pretty good summary of the work.

Q. Understood. Okay, turning back to page 19 of your report, opinion number 1, tell me when you're with me.

A. I'm getting there. Okay.

Q. Opinion number 1 states that -- and I'm reading subheading A, "From 2017 through 2024, Uber tracked 546,196

KELLER

incidents of sexual assault and sexual misconduct."

Are you with me?

A. Yes.

Q. And that number I believe you told us you tabulated from the Flack data you received in this case?

A. I'll be very clear that it's the Flack interrogatory response since now there's another production of Flack data separate from that.

Q. In the second production of Flack data you have not fully analyzed and do not address in this report?

A. Because that data was produced just last week or fairly recently, I have not yet analyzed that data and reserve my right.

Q. You've created table 1 on the next page of your report and that is the subcategories from the Flack incident data classified between 2017 and 2024; is that correct?

A. Yes, these are the categories

KELLER

that are in that dataset. You'll see that there are 27 of them that were produced by Uber. This aggregates to the year and Uber's production had the same categories but at the month and year level.

Q. And this data reflected in table 1 on page 20 of your report, it includes all incidents reported against riders, drivers and third parties; correct?

A. That's my understanding of the dataset. Uber did not break it out in any way that would allow me to separate it by the reporting party or the entity it was reported against. Uber reported all those values together so that's how I'm showing it here.

Q. And there are documents and there's witness testimony that addresses the percentage of the reports of sexual assault and sexual misconduct that are made by riders versus drivers. Are you aware of that?

MS. WILKINS: Object to form.

THE WITNESS: I am -- I think I

KELLER

even have an image in my report that shows the breakdown of rape incidents. I know it's from 2016 to 2017 data that shows the breakdown of riders versus drivers. I know Uber also produces information on its safety reports about that breakdown but I believe at an aggregated level, not at the incident level.

BY MS. LEVY:

Q. You did not attempt to understand in table 1 which of the incident reports reflected here were reported by drivers versus riders; right? That was not part of your analysis?

MS. WILKINS: Misstates her prior testimony.

THE WITNESS: Two parts to that. One, the Flack data that was recently produced that I have not had a chance to consider has fields that I think may be relevant to such an opinion, but I have not had the time given that it was most recently produced to

review that data. Secondly, Uber did not produce this data, the Flack interrogatory response in a way that would allow me to aggregate or disaggregate those incidents. So with that said, that's the analysis that I was able to do with the data that was produced.

BY MS. LEVY:

Q. And you acknowledge in your report, page 27, that the table includes all of these reports regardless of who lodged it, whether it was the driver or the rider, this is the total?

A. This is the total volume of reports, driver or rider, third-party that's included here.

Q. And it's fair to assume that if we were to isolate only reports made by riders of incidents perpetrated by drivers, these numbers would look very different?

A. I'm not going to theorize about the data I haven't fully reviewed yet

KELLER

because there's, and as you can see in the screenshot in my report, there are differences at the category level -- I'm sorry, at the subcategory level and I would be theorizing and I wouldn't want to estimate one way or another what those numbers might be. What I can tell you here is this is an accurate representation Uber produced to me in that interrogatory response.

Q. And you can agree that the total number of incidents would go down if you isolated just riders reporting; correct?

A. Again, that would be theorizing. I have not considered what the Flack data shows. The Flack data specifically, that was produced recently, and so I don't want to theorize which way the numbers -- what the numbers might show because I have not yet had a chance to review that data.

Q. In section B below, you take this data and convert it to an average frequency per minute; correct?

A. Yes, it's a time-based analysis

KELLER

normalizing the data for time.

Q. But what you don't do is include the number of rides that happen every minute. Is that something you calculated also?

A. That -- I analyzed the number of rides and the incident rate per ride in a different part of my report.

Q. And so as you sit here today, can you tell us the average number of rides out of every 7.7 minutes for the same time frame?

MS. WILKINS: Object to form.

THE WITNESS: That's an analysis that if you want me to do math on the record, I would be happy to do. I do a trip-based analysis elsewhere in my report but this analysis focuses on a way to -- focuses on the reported incidents using time as a normalization -- as a normalization method. This is similar to the type of analysis that other nonprofits in the industry do -- not the industry.

KELLER

That's an unfair statement. That I have seen other nonprofits do with this kind of information.

BY MS. LEVY:

Q. In order to know -- for like an individual to know the risk that something is going to happen to them, it would be the denominator in addition to knowing the absolute number of incidents, they would need to know out of how many in order to understand that; correct?

A. I don't know how you're defining risk. Risk is defined in a number of different ways in this litigation. If you're speaking to something like what is the rate that something happens, then you need a numerator and a denominator but when you're talking about risk I don't know specifically what you're referring to.

Q. Did you do any analysis to compare this incident by number of minutes to the outside world, did you compare this number to the number of SA/SM incidents

that occur elsewhere in the world?

A. I understand how this question is different than what you've asked me before. We've talked about I think at pretty great lengths that my analysis talks about or discusses and I offer opinion what data Uber has, what it did with that data, the knowledge that it had and compares that to what it told the public.

Q. What you haven't done is compared how frequently misconduct of a sexual nature that occurs on Uber, how that compares to other means of transportation, other alternatives to taking Uber or just society in general, that was not part of your analysis, if I understand you correctly?

MS. WILKINS: Asked and answered.

THE WITNESS: You can keep asking me different versions but I think it's the same question here, my report focuses on the Uber platform and what it knew internally versus what it

KELLER

disclosed externally and what it did with the data it had internally versus what it disclosed to the public.

BY MS. LEVY:

Q. This data in table 1 goes years beyond the data that was published in the first report?

A. Are you talking about the 2017 and 2018 safety report?

Q. Yes.

A. This data includes data from 2017 to 2024 which matches the dates that Uber produced in its interrogatory response.

Q. And I don't see anywhere in your report where you have taken the first U.S. safety report that covers the time period 2017-2018 and identified any numbers in that report that are wrong or incorrect. You haven't done that, have you?

A. I have in my report drawn a few comparisons to the safety reports. Two that stand out right now that may be relevant to our discussion is a figure, let me get to it -- Figure 7 that draws

KELLER

the distinction between the safety report disclosed number and the total number of incidents in the interrogatory response, and there's a footnote somewhere where I talk about -- maybe it's not even a footnote, it's a paragraph, where I talk about the safety report data being smaller than what was in the interrogatory responses for the exact same five categories.

Q. Let's look at Figure 7 since you pointed our attention. That's page 28 of your report.

A. Okay.

Q. And here in Figure 7, 28, you've charted number of incidents in Flack data, in Flack incident report classification in what I call purple, as the tall part of the bar graph. Are you with me?

A. Yes.

Q. And you've put in blue the number of incidents in safety reports. Do you see that?

A. Yes, I'm following.

KELLER

Q. And that is the number of incidents in blue represents the five most serious categories of sexual assault; true?

A. The five in blue show what Uber disclosed in its safety report and the ones in purple, aubergine, whatever, sorry to the court reporter for aubergine, are the ones in the interrogatory response and for clarity, they should not be stacked, they should be created independent. So 2936 plus 71080 in 2017 does not reflect the total number of incidents. 71080 is the total volume of incidents so this is drawing a direct comparison between the two.

Q. I understand and the number of incidents reported in the safety report, how did you get that number, how do you know?

A. I read the safety reports and inputted the numbers.

Q. In fact, the safety report itself very clearly states what categories it is

KELLER

putting numbers to and what categories it is not; true?

A. The safety report says that it is including five categories and then in an appendix lists the additional other subcategories.

Q. And that's your source for understanding which categories were included; is that right?

A. So my source for understanding what was included is in Uber's appendix, especially I'm recalling appendix from the 2021 to 2022 report that has a historical look back of all the incidents from all the previous reports.

Q. So let's look -- let's go to --

MS. LEVY: Let's mark as an exhibit 11, tab 11, which I think is going to be Exhibit 6.

MS. WILKINS: I think you're on 9.

MS. LEVY: All right. Goodness.

(Exhibit 9, 2017-2018 Safety Report, marked for identification.)

KELLER

BY MS. LEVY:

Q. My question, while we're pulling it up, Ms. Keller, not only does Uber disclose in the safety report itself what the categories are that it's reporting on but it also says why; right?

A. Uber -- so where are you talking specifically in the safety report because Uber says a lot of things in its safety report.

Q. You've read the safety report or at least looked at the safety report cover to cover, have you not?

A. Yes.

Q. And do you recall Uber describing what specific categories it had included in its numbers? Do you recall that being in its first U.S. safety report?

A. Yeah, let me just get there, sorry.

Q. To shortcut, one place we're going to go and talk about is page 33 of Exhibit 9.

A. Okay.

KELLER

Q. Did you read the methodology section of this safety report?

A. Yes.

Q. And so you understand that the third paragraph that leads into the bullets states, "This report includes categories that represent serious safety incidents reported by riders, drivers, and third parties" and it lists those categories. Do you see that?

A. Yes, I see the page states that.

Q. To the right of that, Uber has in bold, "Why these categories?" And explains why it chose these categories. Do you see where I am?

A. Yes, in that kind of blue box?

Q. Yes, and Uber explains that it strives to provide a clear and accurate reflection of the most serious incidents reported in connection with the U.S. ridesharing platform while recognizing that these incidents can pose unique classification challenges.

Do you see that?

KELLER

A. I see that's what the page says.

Q. Do you disagree that the five categories listed on the left are the most serious categories of incidents in the taxonomy or do you have no opinion on that?

A. So what I would say in my report I draw a distinction between the categories that Uber internally in its own KPIs or uses as part of its own KPIs refers to as serious SA/SM incidents, so I draw a few comparisons between what is disclosed in those categories compared to that of the safety report. I'm not offering an independent judgment call on what might be serious or not serious for those categories but drive the contrast between what Uber internally discloses as serious. And furthermore, Uber says it takes all reports, I don't know if they use the word seriously or if that's just a word in my head right now because we're saying the word serious, but Uber takes all reports and records them. So

KELLER

additionally, I show from Uber's own analyses the volume of reports that Uber has tabulated from its internal Flack system through those tables and figures.

Q. Back to my question here, I believe I understand you correctly. You are saying there are other serious categories that Uber recognizes as serious that are not included in the list to the left; correct?

A. Again, I said something slightly different than that, was I'm using Uber's designations of those categories as serious SA/SM, not my own personal judgment and that Uber takes every report in -- I don't know if I want to use the word serious. I can't remember the word they used on the safety report, but they believe victims so I'm also analyzing those.

Q. But there's nowhere in this safety report that Uber represents we are disclosing all incidents or that we are disclosing all serious incidents, it

doesn't say that, it is saying we're providing a clear and accurate reflection of the most serious and it says which ones those are. Do you agree with that?

MS. WILKINS: Object to form.

THE WITNESS: Are you asking me if I can read or are you asking me something different from that?

BY MS. LEVY:

Q. I'm asking you if I read that correctly, is that we strive to provide a clear and accurate reflection of the most serious incidents, that's what Uber said; right?

A. Uber said publicly that these are the five that it's showing you. It also shows a list of 20 some categories. It doesn't show insufficient information or parent category use tracking, and it doesn't tell that Uber tracks internally a different set that it views to be serious, a set of subcategories that it views to be serious.

Q. It also doesn't say these are the

only serious categories there are. It doesn't say that anywhere. You haven't seen that anywhere in the safety report, have you?

MS. WILKINS: Object to form.

THE WITNESS: It puts these out as what it views as the most serious but it doesn't show -- it doesn't tell the public there's another set of eight more that we view internally as serious or there's 20 some other categories that we collect data on and here's the volumes of those datas.

BY MS. LEVY:

Q. There's a difference between serious and the most serious, isn't there?

A. These are the terms of art but what I'm telling you is what I've seen in the documents and the list of subcategories that Uber has designated as serious SA/SM and what the numbers would show if it had chosen to show those or what the numbers would show if it had chosen to show to the public all the

KELLER

categories that it collects data on.

Q. You're switching up the terms, serious and most serious, and that's the thing I want to drill down on.

Do you agree saying something is serious, these categories are serious is different than saying these categories are the most serious?

MS. WILKINS: Form.

THE WITNESS: What I'm saying is that there are categories that Uber shows in its report, how it classifies or characterizes those is how it characterizes them and what I'm drawing in comparison is there's another set of eight categories that Uber internally designates as serious SA/SM and I put that in quotes, and then there's all of the categories of data that it collects data on because it says that it believes victims and reports on that data. So what I'm showing is all three, what Uber shows the public, what they track internally

as serious and all the incidents that are reported to Uber.

BY MS. LEVY:

Q. Can you point me to anywhere in the safety report that Uber represents in the safety report we are going to give numbers for all categories, it doesn't say that, does it?

A. I think that's the -- my report is critiquing that is that it doesn't say that so this is what it is not telling the public about and this is the volume of reports that it's not telling the public about. And, in fact --

Q. Sorry, I didn't mean to interrupt you.

A. That's okay. And, in fact, in a block post on its website and I believe one of the first figures in my report, Uber says they are only disclosing 3 percent of the reports that it receives on the platform.

Q. Uber is quite clear, quite transparent about the fact that it is not

KELLER

disclosing all of the incidents; right?

MS. WILKINS: Object to form.

THE WITNESS: In this report, Uber and other reports Uber says what five it's reporting on. It also cites other reasons for not disclosing them, such as auditing and audit aligner and we can discuss that methodology at another time but what I'm saying is Uber has admitted to the public that it's only showing 3 percent, that they are showing the tip of the iceberg and knowing when they know that there is an underreporting not only nationwide but on their platform specifically because drivers know where riders live and because of the kind of knowledge that the two parties have of one another in the platform.

BY MS. LEVY:

Q. Can you point me to a sentence in the methodology that is not true or is false?

A. What Uber is saying in its

KELLER

methodology, and I'm looking at a different document than the 2017. I'm referring to the methodology in the 2019-2020 report, if I recall, and in that document it's talking about auditor alignment and in that document, Uber discusses auditor alignment being one of the reasons why they disclose only a subset of incidents. And in that methodology, the auditor alignment says that within the subset -- within the incidents that they reviewed, which was a random sample and also a targeted sample, that they had piled the alignment within those samples. I want to say something like 87 percent but I would like to have that in front of me to be more specific.

Q. Can you remember my question?

A. Yes. And so what I'm saying is Uber cites a number of reasons as why it's choosing these and those appear to be red herrings in a way, I would say red herrings in their process. They are choosing a set of incidents to report on

when there's auditor alignment in the methodology that says there's high level of agreement and even I think there's one category that they report on that doesn't meet the threshold they talk about, and two, I'm saying that Uber doesn't talk about what it has internally. What it knows also about what they consider internally as serious SA/SM reports and what internally they know to be true about different risk patterns, and that's from them, not from me, about incidents on the platform, whether it's at night or trips near a bar, et cetera.

Q. So we're going to go back to Exhibit 9 and I'm just going to ask you a very simple question. Can you point me to any statement in this Exhibit 9 that is false, that is not true?

MS. WILKINS: Overbroad.

THE WITNESS: What I'm saying is this is part of the picture.

BY MS. LEVY:

Q. It's just a yes or no question,

KELLER

can you point me to a statement that is untrue?

A. But it's not a yes or no question. This is a much more comprehensive issue than what you're making it out to be right now. There are 27 categories of data that Uber produced in the Flack interrogatory response. This talks about five. What's the reason -- you point me to a place on this page where Uber says why it doesn't include the other incidents in its report.

Q. Where does it says we're including all 27?

A. Just by not saying something is not the same as having a correct or incorrect statement. Just because they don't say it doesn't make it true. I may have flipped my words on that. But they are saying they are reporting five. They are not saying anything about the other 20 some categories that they are not disclosing. They say they exist but they let the public wonder to themselves what's

in those categories and so it's my role in this litigation to show the volumes in those categories that they have excluded from this report.

Q. You don't have any problem with categorizing the five on the left as the most serious, you don't have a different list of most serious do you?

MS. WILKINS: This has been asked and answered a number of times.

THE WITNESS: We have a definition for those fives, I think it's the reportable five in my report. That set of entities or subcategories is identified in my report as that reportable five or something to that effect which I specify in contrast to the serious SA/SM incidents that it internally identified.

BY MS. LEVY:

Q. Now when Uber published the safety report, this one we're looking at in Exhibit 9, were there other safety reports like this that it was copying or

was this the first of its kind?

MS. WILKINS: Object to form.

THE WITNESS: I mean what do you call a safety report? I wrote a report on gun trafficking in the New York Attorney General's office that was the first of its kind so you tell me.

BY MS. LEVY:

Q. You're proud of that. In your résumé you say it was the first of its kind and that's something you're really proud of?

A. Of course.

Q. The safety report was the first of its kind studying sexual assault and sexual misconduct, the first one you've seen?

MS. WILKINS: Object to form.

THE WITNESS: I don't know what you're referring to as safety report. There's other reports that nonprofits have been putting out in the world forever so if Uber wants to call it

the first of its kind, Uber can call it that. I'm not opining or giving it any opinion on whether it is the first of its kind and what that means. I'm opining on what's in it and comparing it to -- what's in it versus what Uber has in its own documents.

BY MS. LEVY:

Q. Can you identify any corporation who's ever published a report about sexual assault or sexual misconduct that's done a better job at it than Uber has?

A. That's such a value judgment. I am not prepared to offer an opinion on pitting one company's report against another. I'm here to offer an opinion what Uber put in its safety report versus what it knew in its own data.

Q. You've never seen anybody else do it more comprehensively than Uber has done in the safety report and certainly not in that time frame, have you?

MS. WILKINS: Object to form.

THE WITNESS: I don't know how

KELLER

that's a different question than the one you just asked me. It's the same response. I'm not here to evaluate two different reports against one another. My role here is to talk about the data that's in one report, that's in one -- in the Uber safety reports compared to the data that it has internally.

BY MS. LEVY:

Q. If I understand your testimony correctly, your problem to the extent you have -- do you intend to offer characterizations about the safety report or do the opinions that you have offered in this case and intend to offer in this case, will they be limited to the data? In other words, like what is in and what is not in?

A. The second part is what I intend to do. What numbers are in, what categories are in, what data is included in the data, that's my opinions referring specifically to the volumes of data in the

safety report as compared to what Uber had internally.

Q. To retreat to our first dance with each other and vernacular in the litigation where we talked about you're not giving the opinion about what someone should have done but what they could have done, do I understand you to be saying that same kind of opinion you're going to be offering here, what Uber could have reported but you will stop short of offering what they should have reported and leave that for others to decide; is that fair?

A. I think that's a fair characterization of my testimony here. It's very similar to that where I've been admitted in other cases.

Q. And I want to be clear because before our lunch break you used the term misleading and that seems like a value judgment to me. We looked at the lunch break to see if your report says anything about misleading. We don't see it in

KELLER

there. I think that's outside of the scope of what you intend to offer to the jury, that you're sticking to here are the numbers they had, here are the numbers in the safety report, here are the underlying numbers that appeared. Do you intend to go further than that and tell the jury the numbers are misleading?

A. So I did not intend for that word to have such value attributed to it. What I was trying to convey and maybe with a little hungry brain going on there was the volumes of the incidents reported in the safety report are different and less considerably, if we say 97 percent less than what the volume of reports that it has internally. That's the scope of that opinion.

Q. Okay. And I appreciate the clarification. I think that can make our day together more efficient if that will be the limit and that you do not intend to go further and say things like what Uber should have reported, what a duty to

report, opining that it is negligent not to report, opining on the standard of care or that it was misleading not to do that. I understood from the four corners of your report that you would be limiting to the data and I just want to make sure we're clear on that.

A. My report draws the comparisons between internal datasets, whether that's the Bliss and Jira data or the Flack interrogatory responses, the S-RAD systems and the other documents I reviewed in comparison to what is in the safety reports and I draw parallels or contrast those two points from a data perspective.

Q. And you will stop short of offering an opinion that doing that is misleading, violative of law, negligent, unfair, irresponsible, those types of value judgments are outside the scope of your report, you are sticking to the numbers, am I right about that?

MS. WILKINS: Object to form.

THE WITNESS: I will let the

court or maybe it's another expert, I'm not aware of the others, I will let them attribute the value judgments as necessary to the information and facts that I provide in my reports.

BY MS. LEVY:

Q. Okay, I appreciate that clarification.

Going back to page 28, opinion 1, the Figure 7 is intended to show the blue numbers that are included in the safety report and the purple or chartreuse numbers that are in the Flack data; correct?

A. Yes, I think I heard you correctly, it is to draw a comparison to the two, it should not be added together but compared separate from one another.

Q. You're not offering the opinion that the blue numbers that are listed as appearing in the safety report are wrong numbers, they are not, in fact, the five most serious, in that I don't see that anywhere?

KELLER

MS. WILKINS: Object to form.

BY MS. LEVY:

Q. Do you understand the question? That was a little worded.

A. I think I do and I'll say that I'm taking the safety report numbers here and showing them as they appear in the safety reports and in another paragraph, I offer an opinion that there are -- and if you let me -- I can search this. One second.

I offer the opinion that there are additional reports that are within those categories that Uber tabulated in its interrogatory responses that aren't disclosed in those safety reports. Does that make sense?

Q. Yes.

A. So for the years 2017 through 2022 there are additional reports that Uber has not disclosed in its safety reports.

Q. And you have not -- we'll get there. Tell me what paragraph

specifically you're referring to to make sure we're talking about -- I think I know what you're talking about but I want to make sure we're on the same page.

A. Sure thing. There are two footnotes, 63, 64 that reference those.

Q. So 63, can we go to it on page 31, just call that up.

A. And just to be fully comprehensive is there's paragraph 49.

Q. Let's go to 63 first. Here you say that your tabulation of Flack incident classification includes 68 additional incidents in the five categories not included in the safety report. In other words, 68 additional on top of the 12,522; right?

A. That's correct, that's what -- that's what's in the Flack incident classification data produced by Uber.

Q. Did you do any investigation about why that is?

A. That's not possible, hang on, strike that. So the Flack incident

classification was just produced so at the time of this report I couldn't do that comparison because I had Bliss and Jira data and I had Flack interrogatory responses but I didn't have the link between the two. Now that I have the Flack data that was just produced like from the raw data we'll call it, I have to evaluate whether that's possible to do but I have not been able to do that analysis yet.

Q. And as part of putting the statement in this footnote, did you look at the timing of when the reports were made?

A. It's the same answer because the timing of the reports I would need the Flack data to do that to understand which incidents Uber was categorizing into these five categories and then trace back to the timing that those were submitted. The interrogatory responses themselves did not provide the time that those reports were made. They are just totals so at the

point of filing this report, that analysis was not possible so I reserve my right to do such analysis with the recently produced Flack data.

Q. So I don't know today based on the work you have done whether those reports came in later, whether they represented duplication, whether there was an error in calculation, you just don't know what accounts for the 68?

A. I don't want to theorize about work I haven't been able to do yet. I want to be able to fully consider that Flack data before making any assessments. What this does is notes the discrepancy between the two sources originating from Uber.

Q. Is there a statistically significant discrepancy if you include these numbers, did you look at that?

A. Include what numbers?

Q. The additional reports, is the discrepancy substantial, is it statistically significant?

KELLER

A. The reports are I'm noting just like I do in any of my footnotes when there is a discrepancy. The reports are there. Whether or not they're statistically significant is not necessary for that footnote. I'm pointing out that there is a discrepancy.

Q. That's not something you looked at or calculated?

A. I'm noting the discrepancy between what Uber produced in litigation versus what it's showing to the public.

Q. And again when we go through section B, you've noted here and quantified other serious categories other than the five that Uber calls the most serious and you've attached numbers to those in paragraphs 42 and 43. Are you with me? Page 30 and 31?

A. So I think you're talking about the analysis that I did of the Uber safety reports as compared to the categories that they internally review, they refer to as serious SA/SM.

KELLER

Q. Correct.

A. Okay, I'm there.

Q. Nowhere in any of the safety reports does Uber say hey, we're reporting all of the serious reports, not just a small portion of them, they don't say that anywhere; correct?

MS. WILKINS: Form.

THE WITNESS: Uber says in its safety reports that it reports the five. It doesn't say hey, internally we look at another eight and that we build our KPIs off of an additional eight. They don't say that in the safety report.

BY MS. LEVY:

Q. You agree Uber does disclose every category in the taxonomy so it is clear that there are other categories. It's not hiding the fact that there are other categories that exist?

A. I kind of disagree with that. Uber doesn't disclose all of the subcategories. It doesn't leave in -- it

doesn't disclose insufficient information and it doesn't disclose parent category use tracking in the safety reports.

Q. And other categories that you think are excluded, information and parent category, anything else?

A. Those account for four categories because there are two within sexual assault, sexual misconduct, so parent category, use tracking and sexual misconduct, and the same for insufficient information. So those account for four that it doesn't disclose in the safety report but then it produced data on in this litigation.

Q. And what's your understanding for why Uber doesn't disclose or put those categories in the taxonomy, a separate taxonomy category, what do you know about that?

A. Uber does have them in its taxonomy and the category it produced in the interrogatory response. That's the distinction I'm trying to draw here.

KELLER

Q. So it's your testimony that Uber could have put those additional categories in its master taxonomy that it includes in the appendix to the safety report?

A. It's my testimony that Uber has those categories and disclosed data that was in those categories in its interrogatory responses and those categories are not listed in the safety report.

Q. So let's go to Appendix 6 of Exhibit 9. I'm sorry, Appendix 4, which is for our tech all the way at the very end of Exhibit 9, the last two pages, second to last page. You're familiar with the page we have on the screen, are you not, Ms. Keller?

A. Yes, very familiar.

Q. And that is what we refer to as the taxonomy; right?

A. I think that's what you're referring to, yes, and I think that's maybe why we're having some tension is I'm referring to the categories that I see in

KELLER

the Flack interrogatory response.

Q. So when you say taxonomy, you mean the category that you've isolated in table 1 of your report that's your taxonomy?

MS. WILKINS: Object to form.

THE WITNESS: That's Uber's taxonomy, it's under their taxonomy, so some of it overlaps with this but I'm noting like there are 68 categories, 68 reports that are not in this actual -- in the safety report. I'm also noting that there are four categories just as a data scientist, not as a value judgment, just as a data person, this list is different than this list and I'm noting that difference.

BY MS. LEVY:

Q. And you have anticipated my next question which is your report and your anticipated testimony is limited to it's not there. You don't intend to go further and say it should be there, there was a

KELLER

duty to put it there, Uber did something wrong by excluding it. Those things are beyond your report, you are limiting yourself in this report to the fact that you are noting that those categories are not there. Do I have that correct?

MS. WILKINS: Object to form.

THE WITNESS: With one addition, I would say I'm noting the volumes that occur in those categories but that they are not reported in the safety report.

BY MS. LEVY:

Q. Understood. Let's go -- let me -- before we leave this appendix, have you reviewed any of the underlying actual reports in any of the categories listed on this page we're looking at here, starting with steering or leering, have you looked at the content of the reports?

A. I think you have asked me this before. I was like have I looked at any of the tickets. Is that the same question or am I misunderstanding?

KELLER

Q. Yeah, have you looked at and you've seen some of the underlying tickets but you did not do a comprehensive analysis of those; right?

MS. WILKINS: Asked and answered.

THE WITNESS: So I've done a comprehensive analysis of all the tickets insofar as they are and I've looked at a number of tickets in the Bliss and Jira data but I'm not offering opinions on that dataset at this point in time and reserve the right to do so depending on my review of the Flack data.

BY MS. LEVY:

Q. Percentage of the incidents in the Flack data are complaints that someone stared at me or looked at me?

A. I'm sorry, the first part of your question broke up. Can you ask it again, please?

Q. Have you analyzed what percentage of the reports fall into complaints that the reporter was stared at our looked at

or leered at or given a dirty look as in the top category we're seeing here?

A. I've done a similar analysis to that and we're already on that table where I show the volume of reports by subcategory and year.

Q. By that you're referring to table -- I think it's 10.

A. Table 1, first one.

Q. I'm sorry. And have you looked at -- I don't see any percentages here. Have you done an analysis of what percent of the reports fall in each of these categories?

A. This table shows the numbers. One could create percentages using these numbers. I show the raw numbers because it's -- what percentage you can't back out to the raw numbers but raw numbers you can always do percentages if you wanted to, so that's the data I've shown here in this figure, or this table I should say.

Q. You could do that but you've chosen to express it this way because it's

easier to convert?

A. This allows the reader to have the numerator and the denominator so that's what's shown in this table or a denominator if you're comparing it to a total, but it also gives you the breakdown of each particular category in the volume, in a volume expression as opposed to percentage.

Q. And for purposes of your analysis in this whole report, you're using Uber's own definitions of each of these categories, you didn't create new definitions, did you?

A. I'm using Uber's definitions when I'm showing the table. When I am showing the tables and this is not only their definitions but their categorization of the data. So I'm taking what they have produced in the litigation through that interrogatory response and aggregating it to the year, for example, in this table.

Q. And you know in your work in this case that Uber worked in experts in the

field of sexual violence to come up with the taxonomy, the categories and the definitions of each category, right, that's something you're aware of?

MS. WILKINS: Object to form.

THE WITNESS: I know that Uber puts itself out that way but however they have chosen to file these reports doesn't change the facts of my report. I'm reporting on what's in that filing system.

BY MS. LEVY:

Q. So you aren't making any judgments on how the categories are defined or offering any better definitions; right?

MS. WILKINS: Asked and answered.

THE WITNESS: Yeah, I think the same answer as before is I'm showing the data, how Uber produced it to me, or not produced it but produced in this litigation.

BY MS. LEVY:

Q. Is that with the exception of the

most serious category sexual assault, nonconsensual sexual penetration, for that one you sometimes change the term to rape; right?

A. Yes, I use that term rape because that's what the industry and what I'm used to seeing -- not the industry, the sexual assault nonprofit data when I look at their websites and also what the FBI's Uniform Crime Reporting, CompStat, all of those refer to that as rape and so that's what I'm used to reading in my prior work with -- I'm sorry, what I'm used to reading on those sources.

Q. Okay, let me slow down on that. Which -- what are the third-party experts that use the term rape instead of nonconsensual sexual penetration, do you remember?

A. So an example is the FBI uniform crime reporting, I messed up the phrase of that, but that is referred to as rape. New York City's CompStat uses the term rape so that's what I'm used to and in my

KELLER

previous work, especially when it overlaps with gun trafficking work, I'm used to looking at datasets in that work so I've seen it referred to that incident as that.

Q. Now, your familiarity with the criminal regulations that you've described from your prior work, you recognize that not all of these categories that are listed in the Flack data or in Uber's taxonomy in Appendix 4 of its safety report, not all of these categories constitute criminal activity, of course; right?

MS. WILKINS: Object to form.

THE WITNESS: I haven't done that specific analysis but for all the categories but that's the -- what I'm drawing here for -- I haven't done that analysis for all categories.

BY MS. LEVY:

Q. So like a report, for example, that he stared at me in the mirror, that's not something that somebody could report to the police and have somebody arrested

for; right?

MS. WILKINS: Calls for speculation, outside the scope of Ms. Keller's opinion.

BY MS. LEVY:

Q. You can answer.

A. That is not something I provided an opinion on. Each case would have to be considered independently and that's not something that I've done or am going to -- that I've done so far.

Q. Flirting is one of the categories, sexual misconduct, comments or gestures, category flirting. Flirting is not something that's a crime in any place you've ever been; right?

MS. WILKINS: Calling for legal opinion, outside the scope of what Ms. Keller is offering opinions on in this litigation.

THE WITNESS: I'm not offering that opinion. I'm offering an opinion on how many incidents were reported in flirting and I also offer the opinion

that some of these misconduct incidents are -- according to Uber's own analysis are -- make -- they don't make. The phrase that Uber uses is a driver is [redacted] and so I'm reporting -- I have both of those pieces of analysis in my report.

BY MS. LEVY:

Q. The categories for which Uber collects data are extremely comprehensive and they are overinclusive of what a criminal code would consider criminal activity. Uber's taxonomy is much more than that, it collects much more than that; right?

MS. WILKINS: Object to the form as vague, also calls for a legal conclusion and is outside the scope of the opinions that Ms. Keller is offering in this litigation.

THE WITNESS: My -- I would just

KELLER

say my role here is calculating the volumes of reports that are in these categories and showing them in contrast to what Uber has produced in its public reports and also analyzing the documents because the data hasn't been produced for some of these that have been identified as precursors or other indicia of subsequent sexual assault.

I'm needing a break, if that's possible.

MS. LEVY: Certainly. Do you want to take 10?

MS. WILKINS: Yes.

THE VIDEOGRAPHER: Going off the record. The time is 4:25 p.m. Eastern. This is the end of media unit 3.

(Recess taken from 4:25 p.m. to 4:48 p.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:48 p.m. Eastern. This is the beginning of

media unit 4.

BY MS. LEVY:

Q. If we could go back to Ms. Keller's report, Exhibit 1. And we are still looking at Exhibit 1 of your report which I think you have in front of you. I want to turn to page 21 of the report.

A. Okay.

Q. Are you with me?

A. Yes.

Q. Figure 21 shows your calculation and depiction of the average frequency of SA/SM incidents on an annual basis by number of minutes, and that is based on the incident count in the Flack report; correct?

A. Yes, that's a brief representation of what's in Figure 1.

Q. And what we're now seeing here is what number of rides that happen each -- per minute as a denominator for this, that's not reflected in this chart; correct?

KELLER

A. That would be a different analysis. I analyze rides in a different part of the report. This is a time-based analysis, I think we've talked about this figure already today, is that this is a way to normalize the data based off of time. The trip analysis is elsewhere.

Q. So if I wanted to know, for example, what is the chance that someone could experience a sexual assault or sexual misconduct incident as Uber categorizes it on a ride, I don't know the chance of that happening by looking at this chart because I don't know the denominator of the number of rides per minute; right?

MS. WILKINS: Object to form.

THE WITNESS: I don't know what you're -- are you defining chance, can you define chance specifically because I want to make sure.

BY MS. LEVY:

Q. I think you said risk. What is the risk per minute of this happening to a

particular individual? We would need to know the number of rides to know that; right?

A. I think I used the word rape. If I said risk, I misspoke. Rape, and that's a specific type of rape, so if you're wanting to do that type of analysis, that's in a different part of my report.

Q. We don't see that in Figure 1 on page 21; right?

MS. WILKINS: Object to form.

THE WITNESS: That analysis is in Figure 3.

BY MS. LEVY:

Q. We'll get to that in just a minute. We also -- I think you told me earlier that this frequency, you limited the frequency analysis solely to Uber. You have not compared it with the frequency of sexual assault and misconduct in any other context, only Uber; correct?

A. Sorry, I'm feeling a little déjá vu. I think the same answer applies about the questions or similarly the same

KELLER

question as before, this is an analysis of what's in Uber and what's in Uber's own data and specifically to the Flack interrogatory responses that Uber compiled for this litigation.

Q. And the incidents that are reflected in this chart, they include flirting, comments, staring, leering, all the incidents, not just the serious or most serious ones; correct?

A. This is of all incidents, all the ones that Uber classified into its 27 categories that -- I'm sorry, 26 categories that it produced in its interrogatory response.

Q. And I think -- I do think we're on the same page on this but we don't know whether in the outside world in any other context sexual assault and sexual misconduct in these categories happen more frequently or less frequently than they happened on Uber, we don't know that because that's not an analysis you've done; correct?

KELLER

A. That would be a different analysis. The analysis that I do is looking at what Uber's data, what is contained in Uber's data, what Uber did with that data and what it told the public.

Q. The next page 22 of your report in Figure 2, here you plot the average frequency of rape or attempted rape in hours; correct?

A. Yes, this is the -- in hours so -- (froze).

THE VIDEOGRAPHER: Going off the record. The time is 4:54 p.m.

(Discussion off the record.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:56 p.m.

THE WITNESS: So I think it's my turn.

BY MS. LEVY:

Q. If you don't mind, thanks.

A. The image shows -- I think you were just reading the title, the average frequency of rape or attempted rape in

KELLER

hours using the Flack interrogatory responses.

Q. This is the average frequency but not the rate that what Uber calls nonconsensual sexual penetration and what you've put in the heading here as rape occurs or is reported to occur on the platform; right?

MS. WILKINS: Object to form.

THE WITNESS: I think you're asking a similar question to what you did before?

BY MS. LEVY:

Q. Yes.

A. Okay. So with that, I think you're referring to a different chart or different type of analyses. This takes the rape -- the number I should say of rape or attempted rape in Uber's taxonomy, nonconsensual penetration or attempted nonconsensual penetration and normalizes them to the hour.

Q. And it's not on this chart how many rides occur every hour. That doesn't

appear on this chart; correct?

A. That would be a different analysis.

Q. The lowest numbers we see on this chart occur in 2024; correct?

A. The lowest numbers you're saying -- you're referring to 14.3 so there we're seeing one incident every 14 hours on average.

Q. And that is lower than any other time that is plotted here; correct?

A. Yes.

Q. I notice in 2020 and 2021 we see higher spikes and you grayed out two and a half years for COVID. What is the significance of COVID to your analysis and why did you delineate that?

A. So COVID is delineated there by the time in which COVID was present. I determined that period as Uber's mask policy and that provides context for those numbers. The world at that time we know that bars weren't as open, we know that people were staying home more so that's

just providing some context to the numbers during that period of time.

Q. Did you do any investigation or look behind like why the numbers rose in COVID and why they are falling or are you just reporting the numbers as you see them in the data?

A. This is what is reported in the data and I want to make sure that you're understanding this image correctly. A rise and a fall of this image, lower is more frequent and higher is less frequent. Unlike other images in the report, higher is more incidents or more reports and so this is in some ways kind of the inverse, if that makes sense.

Q. I understand and I understand why you're confused by my question. The dotted line in Figure 2, what does that represent?

A. That's the average across all years.

Q. And that average includes every year plotted here, including the COVID

averages where there's a greater number of hours per each alleged nonconsensual sexual penetration?

A. I would say this is an average of all the years included in this chart taking into account 2017 where one incident on average and I determined -- I define the term in my report how I calculate this but we'll just use the simple terms in our definition here, every 16.3 hours and then during the COVID years, 38.4 hours between incidents on average, if you're normalizing to time. So that bottom line includes all the years that are shown on the graph.

Q. And to make sure I'm clear, I think you've answered this but you didn't do a look behind to try to account for any confounding factors or any reasons why these numbers might be changing; is that right?

MS. WILKINS: Form.

THE WITNESS: So these are -- I'm not quite sure what you mean by that

because these are off the total volume from Uber so those are reporting the total volume from Uber.

BY MS. LEVY:

Q. In other words, it's math. You looked at the total volume divided by the number of hours in a year?

A. Other way around. Hours in the year divided by the total incident rate. But yes, math.

Q. You did not, for example, look at the impact of news media or this litigation or attorney advertising on the numbers, on drivers to the numbers, you didn't do any look at those kind of factors, did you?

A. That would be a different analysis. I did not need to do that for this analysis that I've included here.

Q. Okay. And you didn't -- you didn't do it for this chart but you didn't do it -- you didn't need to do it and you didn't do it; correct?

A. It being -- so it being the look

behind or some sort of informed reason, is that what you're asking me?

Q. Yes, I am.

A. So I took the numbers --

Q. Let me make sure we're clear. What I want to understand is when you say it's not necessary, I want to make sure that's a clean no, like I didn't do it. You said it wasn't necessary for this. I want to know if you did it for a different purpose. That's what I'm trying to get to.

A. I see. So in my report, to do that type of analysis was not necessary because my report looks at the data that Uber had in its possession as opposed to what it disclosed to the public, draw those comparisons and we can also talk about the other things they did with that data, S-RAD, but I think I've been very clear that that's what I'm doing here.

Q. You were not trying to figure out why this was happening, you were simply looking at the numbers that Uber had and

KELLER

the numbers that it put out; is that fair?

MS. WILKINS: Object to form, it mischaracterizes her prior testimony.

THE WITNESS: I'm a data analyst. I'm looking at the data.

BY MS. LEVY:

Q. Okay. Let's -- I'm sorry.

A. And showing the calculations of that data, I should say.

Q. Now, how you display the bar chart -- let's turn to the next page -- strike that.

Turn to page 23, please. Figure 3. Figure 3 shows the rate of sexual assault and misconduct incidents per year; correct?

A. Using the same methodologies that Uber -- methodology but the same type of rate that Uber uses in its safety reports, the per 100 million trips.

Q. And so that -- you've honed in on one of the things I want to ask you about is you actually took the numbers for 2017 and you multiplied them by 100 million;

KELLER

right?

A. Yes, because I wanted to replicate what Uber, the same representation that Uber does in its safety reports.

Q. And so when we look at these numbers at the top of the bar charts, for example, 2017, 6,869, that is a much smaller number but multiplied by a hundred million. That's what we're looking at here?

MS. WILKINS: Object to form.

THE WITNESS: It is a representation following the same methodology that Uber uses or the same representation. I won't say methodology because that means much broader things. It follows the same characterization of the numbers that Uber does so I'm trying to show an apples -- if Uber had shown what they had internally in the same way that it presents the numbers in its safety reports in this per 100 million, what

that data would show.
BY MS. LEVY:
Q. If you looked at how often these incidents occur per every 10 million trips, the numbers would shrink; right?
A. But that's not what Uber shows in its safety reports so I'm replicating that.
Q. If you looked at how often these incidents occur per every one million trip, they would shrink even further; right?
MS. WILKINS: Object to form.
THE WITNESS: Again, my -- my intention here was to show the data in the way that Uber shows it in its safety reports but with all the data it had available to it.
BY MS. LEVY:
Q. And the incidents that are plotted here in Figure 3, that includes every single incident of every report that Uber collected that you saw in the Flack data including the least serious like

flirting and staring and making a comment, this is all the incidents; right?

MS. WILKINS: Object to form.

THE WITNESS: Uber -- so a few things. Uber says it believes victims so I'm calculating all of the incidents that are reported to Uber and I'm doing so on the Uber -- on the calculations that Uber made itself on its own data via the interrogatory responses.

BY MS. LEVY:

Q. And it also -- in addition to including every type of incident no matter how serious, it also includes all the reports made by people who weren't riders, this is every report whether it's made by a driver, a rider or a third party; right?

MS. WILKINS: Object to form.

THE WITNESS: My understanding is they are all the reports that are made on the Uber platform but Uber has verified that -- I can't remember the terminology specifically that they use

KELLER

that it was, for example, a trip that wasn't on the platform. This includes all of the reports that were made on the Uber platform by riders, drivers and third parties. That's what Uber has reported the data to be. Uber has not provided a field in the interrogatory response to break that out by driver or rider. I will say that, and this is the same answer that or similar answer to what I've given before, the Flack data that was just produced contains additional fields that I am -- will review, haven't had a chance to review, that may shed some light on that breakdown but I have not had a chance to review that yet.

BY MS. LEVY:

Q. So the bar graph we're looking at in Figure 3, some of those were reports of driver misconducts, others of these incidents reflected in this figure are reports of rider misconduct and others are reports of third-party misconducts; true?

KELLER

A. It reflects all of the reports made to the platform.

Q. If you isolated only the reports of drivers engaging in sexual assault and misconduct against riders, you would expect those numbers to be smaller than these; correct?

MS. WILKINS: Object to form.

THE WITNESS: I have not analyzed that yet so similar to that on table 1, I don't want to theorize on something that I haven't analyzed yet.

BY MS. LEVY:

Q. If you isolate just one of the three categories you would expect them to go down; true?

MS. WILKINS: Asked and answered.

THE WITNESS: This figure we're talking about is by year so it's not by particular categories, it's all the categories combined.

BY MS. LEVY:

Q. And you have not done that analysis; correct?

KELLER

A. At the time of filing my report, Uber had not produced data that would allow me to do so. I'm reviewing -- Uber had either -- Uber had not produced data that allowed me to do so, all the interrogatory responses, or I was awaiting data from the Flack system that I was anticipating being -- having fields that might shed light on such an issue.

Q. Let's turn the page and look at Figure 4 on page 24. This figure illustrates your calculated rate of rape incidents per year; correct?

A. This is what I have calculated using the data that Uber has provided to me using the nonconsensual penetration, also known as rape, divided by the volume of trips that Uber produced in its interrogatory responses.

Q. And the numbers that we're seeing here, the total numbers of reports where the reported incident was nonconsensual sexual penetration, that's the white numbers we see at the top of the bar

graphs; correct?

A. Those are the reports per 100 million trips. To be clear it's not the raw numbers, it's a rate.

Q. It's [redacted] out of every hundred million trips; correct?

A. [redacted]

Q. In 2017?

A. In 2017, the rates [redacted] per 100 million trips, we see some fluctuations in the interim years and the final year you see [redacted] per hundred million trips.

Q. In 2017, for example, I haven't seen the conversion. That's one out of how many million rides?

A. I haven't done that math. We would have to move decimal points over to do that analysis and to be honest it's late in the afternoon and I don't want to mess up. Every time someone asks me to do math on the record I get nervous. If you want to give me a calculator I'm happy to do it.

Q. You would have to move the

KELLER

decimal point over by two decimal places to do one out of a million; right?

MS. WILKINS: Asked and answered.

THE WITNESS: We would have to move the decimal place, yes, but this image is reflecting the rates that Uber puts in its safety report which is why I chose that per hundred million trips.

BY MS. LEVY:

Q. And for this metric, just like the other metrics we've talked about previously, you were not asked to and did not compare the rate of allegations of nonconsensual sexual penetration on Uber to anything outside of Uber, to how often that happens in the real world or other methods of transportation, you didn't do that analysis; correct?

A. This is the real world. I love this term. You and I have got this term in opioids and here it is again.

The real world is this data. These are real incidents. A Jaylynn Dean

incident is a real allegation of rape. So that is an incident that's in this data. So to the extent that I'm analyzing real reports that happened to Uber or happened on the Uber platform that Uber recorded and is in their dataset, that's what's reflected in my report.

Q. I take your point and I completely agree with you. I don't disagree with that characterization. Let me ask it a better way. You did not compare the rates or the risk of rape occurring on an Uber platform to the risk of it occurring anywhere else in the real world, anywhere else in the world, let's say, take out real?

A. The same answer as previously today. I did not need to do that analysis to do my analysis which was to compare the data that Uber had in its possession, that it tabulated from these interrogatory responses, that it studied internally, that it made the S-RAD program off of versus what it told the public.

Q. And nobody asked you to look and compare these rates to taxis, to walking down the street, to other situations somebody might be in, that is not something that you were asked to do for this case?

MS. WILKINS: This has been asked and answered many times.

THE WITNESS: My assignment was the same answer that I've given before, is to look at the data that Uber had in its possession, what it did with that data and how it presented that data to the public.

BY MS. LEVY:

Q. On the next page, 25, paragraph 36, here we see the same thing. We see display of the data per 100 million trips; is that correct?

A. So this, I think you just said the data so just to be clear, this is the rate of the publicly disclosed five so these are the Uber five disclosed categories using per 100 million trips

which is the metric that Uber also utilizes in its safety reports.

Q. And Uber refers to this as the five most serious categories as we discussed before; correct?

A. That is one characterization of those five but they are the same five.

Q. Okay. And in order to get -- in order to understand how frequently those most five serious incidents occur out of every three million trips, you would have to move the decimal two places over; correct?

A. That would be a different denominator. I'm using the denominator Uber uses in its safety reports.

Q. Right, but in order to show how frequently those top five events are reported to occur on Uber, you would have to move the decimal place two places?

A. If -- let me make sure I'm understanding. So if you wanted to show it per one million trips versus 100 million trips, you're asking if you move

KELLER

the decimal place correctly?

Q. Yes.

A. Yes, to do that you've done your math correctly but I'm saying I've shown the method in which Uber shows this data in its safety reports.

Q. Now, we've talked a little bit today about your views on underreporting and I think I understand you to say you have not calculated or estimated what might be the rate of underreporting. That is not something that you've done a calculation of; correct?

A. I've noted that both Uber -- that Uber is aware of underreporting internally and in its statements in safety reports but that's the extent to my opinion on that at this time.

Q. Paragraph 37 of your report cites to a U.S. Department of Justice study about the rate of reporting. You're not aware of any analysis of internally at Uber or that you've done yourself that compares whether individuals report more

KELLER

frequently to Uber through its reporting channels than they do outside of the Uber platform, you're not aware of any analysis comparing on Uber rates of reporting versus outside of Uber rates of reporting; correct?

A. What I am aware of is that Uber has internal documents that are aware of the underreporting due to the -- I don't know if I want to use the intimate, the closeness of the rider/driver pairings because that driver may know where the rider lives. I know I've reviewed thousands of tickets that had a keyword phrase similar to that of he knows where I live, they know where I live. I've done that analysis but that's -- that's what comes to mind sitting here today.

Q. Have you made it part of your work in this case to study whether individuals reporting sexual misconduct are more likely to report strangers or people that they know?

A. That would be a different

analysis than what I've done. What I do know is what Uber has said internally and to the public on the issue, as well as the tickets that I've seen highlighting their fear of retaliation due to the driver knowing where they live.

Q. So I think when you say this has been a different analysis, you mean you didn't look into whether generally in the world reporting of strangers is higher reporting rates or lower reporting rates than reporting sexual misconduct against individuals that someone knows, that's not something that you did as part of your study here?

MS. WILKINS: Asked and answered.

THE WITNESS: I don't know how you're defining the driver someone knows or they are considered a stranger, I don't know how you define that. My opinions are shown pretty clearly in my report here and those are my opinions.

///

BY MS. LEVY:

Q. Your assumption just as a matter of common sense is riders and drivers are almost always strangers; right?

A. I don't know. Yes or no I don't -- Uber operates in small towns, big towns. I would be totally guessing. I know personal experience, I know two Uber drivers. I would be totally guessing what percentage are strangers versus acquaintances.

Q. Moving on to opinion 2 on page 26, this opinion is encapsulated in Figure 6 on page 27 and here this is actually not something that you created but this is a screenshot from Uber's own blog post in earlier this year; correct?

A. I would say that's not quite a correct representation of my report. That figure is one basis but there are -- so Figure 6, let's be very specific, is one part of that opinion but opinion 2 spans a number of paragraphs that have that analysis that support it.

KELLER

Q. Okay. So let's look at Figure 6. Did you recalculate the percentages of most serious and by that I mean the five categories that Uber calls most serious, versus all other categories, did you run a different analysis and get different numbers than Uber has illustrated here in this pie chart?

A. That's discussed in paragraph 39, that comparison.

Q. And what do you think are -- do you agree that the topmost serious as disclosed in Uber's safety reports constitutes 3 percent --

A. That's wrong -- I'm sorry, I talked over you.

Q. I'm sorry, I didn't finish my question. I was in the middle of a cough. In Figure 6, when Uber represents that the most serious categories, meaning the five most serious categories represent 3 percent of its reports in Uber safety reports, do you believe that number is correct or incorrect?

KELLER

A. So I'm saying that my analysis of that image, so I'm putting that image in here, is below in paragraph 39 and so that -- to look at 2017 to 2022, that number would be 12522 divided by the 392828 and put that percentage in there, but that's the analysis that I would do. I don't have my calculator in front of me. I have a feeling it's very close to 3 percent.

Q. As you sit here today, you're not saying that 3 percent is wrong, it's a miscalculation?

A. I'm saying my clarification of that figure in paragraph 39. Sorry, I like to be very specific when I respond. If I haven't done the math and can't check myself I don't want to be certain, but what I'm telling you that if you take 12522 divided by 392828 that will arrive at my calculation of that number which based off of the subsequent sentence I assume to be very close to 3 percent.

Q. Okay. And you further state in paragraph 39 that -- in the bottom of

KELLER

paragraph 39, in the last sentence it says, "Considering the SA/SM incidents from 2023 to 2024, Uber has currently disclosed 2.3 percent of all SA/SM incidents from 2017 through '24."

Do you see where I'm reading from?

A. Yes, ma'am.

Q. Here's one weird question. Right before the 2.3 it says OBJ. What is that error message?

A. Honestly, I was a little like distracted when I was looking at that. That comes from -- we use Google Docs and when the document gets converted to pdfs, if something doesn't know to look for those, they appear. They are like from like track changes or something like that so it means nothing other than just something from the computer system, so it doesn't have any special meaning that I'm attributing to. It's a leftover from that process and I apologize for that.

Q. And so I think is it fair to say

KELLER

that your point here is if Uber extrapolated to what you see in the Flack data all the way through 2024, then the number it has currently disclosed would be 2.3 percent of SA/SM incidents in that time frame?

A. I wouldn't use the word extrapolated but what this 2.3 percent is showing the 12,522 it's compared to the total incidents we have at the top of the report that appear in the Flack data that Uber produced and tabulated in this litigation and specifically the interrogatory data, I should say.

Q. There isn't anywhere that Uber has publicly given the wrong number from 2023 and 2024, you're just saying it hasn't disclosed the percentage that goes all the way through that time frame?

MS. WILKINS: Mischaracterizes prior testimony.

THE WITNESS: So I answer; right? So what I'm saying is it's 2025, nearing the end of 2025. To date Uber

KELLER

has disclosed 12,522 incidents to the public but it knows of -- I can't recall the 500,000 incidents that it disclosed in the Flack data as part of this litigation.

BY MS. LEVY:

Q. So the number, the 2.3 percent is the number actually disclosed as the numerator and the denominator if it had disclosed the number of every single incident; is that fair?

A. That's a little strange because if it had disclosed those incidents it would have disclosed them. So I think the correct or the way that I'm thinking about this is it's disclosed 12,522 incidents and then I'm looking up in the exhibit here to earlier in my report, there's 546,196 incidents in the data that it tabulated from the Flack system from 2017 to 2024. So it has not disclosed -- it's disclosed some of those but not all of those incidents so that's what that number represents.

KELLER

Q. And you do not dispute that Uber never said these are all the categories, it never misrepresented that it is disclosing all the categories, that's not your complaint, your complaint is it could have but did not do that; correct?

MS. WILKINS: Asked and answered.

THE WITNESS: I'm showing the difference between what Uber has disclosed for those five plus the 68 that were in those five as -- sorry, that messes up that calculation but what I'm saying is what Uber disclosed as part of the safety reports, 12,522 as the numerator and the denominator is the total number of incidents that it received on the platform and that it tabulated in its interrogatory response in this litigation.

BY MS. LEVY:

Q. And again, I believe that -- I think I understand your prior testimony to apply here as well, that you do not intend to offer any opinions other than what the

KELLER

numbers were disclosed here or the numbers you saw in the Flack, for example, you do not intend to offer the opinion that they should have disclosed more information or that it would have been good or better or helped people or hurt people to disclose more information, you don't intend to go further and offer value judgments, you intend to stick with what we see here, here is the number that was disclosed and here is the number that was not?

MS. WILKINS: Objection, compound nature of the question and also this has been asked and answered.

THE WITNESS: So similarly that I've answered before, what I'm showing here is the data that Uber had in its possession, what it did with that data, program that it created called S-RAD and what it disclosed to the public about that.

BY MS. LEVY:

Q. Similar question in Figure 7, the blue that we talked about before, the blue

lines are number of incidents in the safety report that contain reporting on the numbers and the purple or chartreuse are numbers that Uber did not include, they represent incidents in categories that Uber did not put numbers to in its safety reports; is that true?

A. Not quite. So that's why I want to be very clear about what this figure is because I don't want it to be --

Q. I'm still listening. I'm getting a cough drop.

A. The 71,080, for example, in 2017 is inclusive of the five categories that Uber disclosed in its safety report so it's not in addition to the categories that it hasn't disclosed, it's all of the categories so it's a comparison. Does that make sense?

Q. It absolutely does and I appreciate the clarification. And again as we discussed earlier, this is an illustration of if Uber had chosen to put numbers in every category it would have

KELLER

looked like the purple numbers as opposed to the categories it chose which is reflected in the blue numbers; is that fair?

A. If Uber had reported all of the incidents it received and categorized it would be the volume in purple.

Q. And there isn't anywhere and, in fact, Uber didn't ever say we are reporting in every single category, it didn't do that. It never represented every single one of the numbers, agree?

MS. WILKINS: This has been asked and answered a number of times.

THE WITNESS: I think that's the whole point of this chart is Uber says that it discloses five categories of data. That's the blue. Uber acknowledges another set of categories in existence but doesn't disclose the volume in those and with the exception of the insufficient information and pair category use tracking we discussed earlier, the purple shows

those volumes of reports.

BY MS. LEVY:

Q. Table 2 on page 29, that is just the underlying numbers that are illustrated in Figure 7 beside it; correct?

A. Yes, it's the underlying numbers. They should line up exactly. The blues are the second column, the purple column is the third column. The totals are reflected in the total rows and you'll see there's two totals, one to reflect the safety time period and one to reflect the final years.

Q. Just like Uber has never said hey, we're going to put -- we're going to give numbers for every single category, it also has not ever said our safety reports include numbers from every single serious category, it never said that either; correct?

MS. WILKINS: Object to form.

THE WITNESS: Can you ask that again because I think that's

contradicting something that --
BY MS. LEVY:
Q. I think we've covered this and maybe you're misunderstanding me. The safety report describes that it is reporting for the five most serious categories in Uber's terms; correct?
A. Yes.
Q. It does not say we are reporting numbers for all categories; right?
A. The same answer as what we just went over for the corresponding figure.
Q. Nor does it say we're reporting numbers for all categories that we consider to be serious, it doesn't say those words either?
MS. WILKINS: Object to form.
THE WITNESS: I'm getting -- are you -- I don't understand because the first part of your question just says Uber's safety reports talks about the five categories it considers to be the most serious, and you're talking about serious again so I think that's maybe

the problem.

BY MS. LEVY:

Q. Let me clarify because I asked the question poorly. I don't want you to be confused.

Uber never promised that it is going to report every single category, the numbers in those, nor did it ever promise that it would be reporting every single serious category, it didn't do those, it didn't say that that's what it would do; right?

MS. WILKINS: Object to form.

THE WITNESS: I don't quite understand how you're defining serious. I have what Uber refers to as the reportable five and the internal designation of serious SA/SM and then all of the categories. Uber in its safety reports says that it bullies victims and I just don't understand what you're defining as serious and I don't want to guess because those are three different

KELLER

characterizations of what could be considered serious.

BY MS. LEVY:

Q. Yeah, let me see if I can do it in baby steps. You have agreed that the safety report does not represent itself as reporting on all of the categories, we agree on that?

A. The safety report reports the five that it claims to report.

Q. And nor does the safety report represent that it is reporting on all serious categories, it simply says the five most serious. Do you agree?

A. So that is the word serious, I really am not trying to be difficult. Are you trying to compare -- when I use the term serious, I'm using either the reportable five that Uber has said are the most serious or the internal categorization of serious SA/SM. So anything outside of that is a new definition to me and I just don't know how to define that and so that's where I'm

struggling.

Q. I think we've answered this but I don't see anywhere in your report where you say hey, the safety report promised that it was going to give us numbers for things that it never gave us. I don't believe that is one of your opinions. Am I right?

A. I'm talking about the numbers that the safety report disclosed. I'm not talking about safety report promises.

Q. Because you don't see anywhere any safety report promises to disclose numbers for more categories than it does disclose, you have not pointed us to that?

MS. WILKINS: Object to form.

THE WITNESS: So the promise -- the safety report does say a lot of forward-looking things and in its statements, I would say, they talk about transparency and make really broad statements about what they -- how they are viewing the problem internally. I am mostly concerned in

my report about what Uber has disclosed numbers wise to the public.

BY MS. LEVY:

Q. Okay. In 45 you list some of the subcategories that Uber has not put -- attached numbers to and you've picked up nine of them. Are you with me?

A. I think there's eight. Are we talking about the same thing, the eight that are in --

Q. Paragraph 45. I see 45.1 through 45.9 in your list. Are you with me?

A. I sure am but why does -- hang on one second. Sorry, I was in paragraph 42 and I was looking at a different list. Okay.

Q. Some of these categories, flirting, there could be conduct in flirting that is not sexual misconduct or sexual assault to a law enforcement offer, for example. Do you agree with that?

MS. WILKINS: Calls for a legal opinion.

THE WITNESS: I don't know how a

law enforcement officer would categorize those. What I am calculating is how Uber categorized those incidents in its own taxonomy.

BY MS. LEVY:

Q. And have you looked at the -- for each of these categories listed in 45, have you looked at underlying reports to see for yourself whether it's clear from the reported information and how they categorize these things or whether it's difficult and requires subjectivity, was that anything you did for your analysis?

A. So you're asking it was very clear from the data that Uber produced how they categorized the reports because those -- it was either in that category or not, Uber in its interrogatory response made it very clear what category they were putting the tickets into.

Q. And many of the reports in these categories report incidents that aren't typically viewed as sexual assault or sexual misconduct, for example, staring at

someone in a mirror, is that something that you thought of before this case as sexual misconduct, looking in a rear-view mirror?

MS. WILKINS: Object to form.

THE WITNESS: That's not part of my opinion, what I personally thought. What my opinion is is what Uber thought that category was and how they categorized that data so my results show that categorization.

BY MS. LEVY:

Q. And things like saying someone is pretty or I like your dress or commenting on appearance, you haven't done any look behind to analyze whether the reports that make up these categories involve subjectivity or the severity of the allegation, that's something you did as part of your analysis, right, you're just counting the numbers?

A. For this report because there was -- because there was forthcoming Flack data that is tied to the number of

incidents, I had not been able to do that analysis at the time of my report and I don't know what I'm going to opine on given that new data. Given the interrogatory responses from the Flack data that Uber provided, that type of analysis would not be possible because they produced aggregated numbers off of that dataset.

Q. I think you talked about earlier you've seen in the course of your work a lot of tickets. You've seen Bliss tickets, you've seen Jira tickets, you've certainly seen tickets that include very innocuous behavior that wouldn't traditionally be considered sexual assault or sexual misconduct. You've seen tickets like that that are included in these numbers?

A. That's not what I said. I said I looked at numerous tickets. I did not put the characterization on them that they were not part of sexual assault or sexual misconduct so I have reviewed tickets to

see the types of information that were contained in those tickets. What the Flack data in my understanding of it will provide is some aggregation to a dominant ticket if there is duplication among tickets. So that dominant ticket may be categorized in a different way by Uber than the other tickets that are part of it. So the reason why I am hesitant to make any statements about this is I have not done that analysis to look at those aggregated tickets to the dominant ticket. I've looked at tons of tickets but because that dominant ticket categorization is still outstanding or was outstanding until recently, I'm not offering any opinions on that at this time because I have not done so.

Q. In the ticket you've looked at have you run across tickets that are included in Uber's definition of sexual misconduct in the way that it has constructed its taxonomy that aren't things that you would traditionally

KELLER

consider sexual misconduct, have you run across tickets that fall under that category?

A. So I think I've answered this before. I'm not making my own taxonomy. I'm following the way that Uber has categorized these, which is why the Flack interrogatory response and ultimately the new Flack fields are important to that analysis because it's how Uber categorizes that. I'm not independently categorizing them.

Q. You understand that the majority of the incidents that appear in the Flack data involve nonphysical incidents, not touching, is that something you know?

A. That's not an analysis that I've done. I do know that a number of the comments and misconduct incidents are potential indicators of later assaults. Uber has done that analysis and that's where I'm getting that understanding but that's the extent to the analysis that I've done on the comparison of the two.

KELLER

Q. And you haven't made an attempt to look at the way Uber collects this data is underinclusive or overinclusive compared to what other incidents of sexual assault might be, that's not something you've done in your work in this case?

MS. WILKINS: Object to form.

THE WITNESS: Is this a different question than -- how is this a different question than am I making my own taxonomy or is it a similar?

BY MS. LEVY:

Q. I'm not asking if you made a separate Lacey Keller taxonomy. I'm asking in addition to not doing that, you haven't looked at the things that fall in flirting to see if those kinds of complaints would be considered sexual misconduct or sexual assault in other taxonomies by law enforcement or like a normal vernacular, that's not what you looked at; right?

A. Uber already did that. Uber already categorized the incidents and they

KELLER

have a field for that and especially in the Flack data there's the dominant ticket which I have not yet considered because that data has just been produced so Uber has done that work for me to categorize them. I don't need to do that myself.

Q. If Uber took the very, very broad approach in what it included in its taxonomy including things like dirty looks, flirting, comments on appearance, Uber took a broad approach to that, do you agree?

MS. WILKINS: Object to form.

THE WITNESS: I don't offer an opinion on whether it was broad or comprehensive. What I offer an opinion on is the number of incidents that are in those categories and what Uber -- and the volume of that compared to the incidents that it reported to the public.

BY MS. LEVY:

Q. And you didn't look to see if the stuff, the incidents that Uber included

are things that are normally outside an Uber context considered to be sexual assault, you didn't compare it to anything outside an Uber context; is that true?

MS. WILKINS: Asked and answered.

THE WITNESS: I don't understand how that -- I don't understand that question and how that's different from before. I did not need to do that because I'm looking at information in Uber, what they did with that data and what they told to the public. And Uber already does the categorization so I don't need to do that. And those categories are the categories that Uber has, that Uber has produced data on.

BY MS. LEVY:

Q. Looking at heading C on 33 where you note that Uber has categorized more than [redacted] sexual assault or sexual misconduct incidents as insufficient information, a subcategory that Uber did not disclose in Uber's U.S. safety

KELLER

reports, have you gone to look at the reports that make up the insufficient information category?

A. So I have looked at a number of reports. I am sure that some of them include insufficient information but my report looks at the volume that is in that category and I am not recategorizing the data that Uber has already categorized. I take the data as Uber has presented it in this litigation and furthermore -- sorry, just one more thing, the Flack data also I think -- I hate to repeat myself -- has fields that also would be part of potential analysis and I reserve the right to do so.

Q. It's not your opinion in this case for those [redacted] category of insufficient information that that was not true, that Uber really did have sufficient information, that you have not done the analysis to look at that and you're not offering that opinion; am I right?

A. So to do that next level, I would

need data that is at the ticket level and then also I need data that looks at the final categorization. That missing link is the Flack data that was just produced. I'm not sure my opinion of that data because it was just produced, it was actually reproduced so I don't want to say one way or the other at this time if I'm not planning to offer any opinions. The report that I currently have filed discusses the volume that's been categorized into that field by Uber and that's -- that's the basis of that opinion.

Q. And similarly, with respect to the category of parent category usage tracking that is referenced in paragraph 48 of your report, you haven't at this point in time offered any opinions that Uber is wrong about those tickets and that they belong somewhere else, you don't have an opinion as to whether you agree or disagree that this category is made up of tickets and don't have enough detail to

KELLER

classify in one of the subcategories, that's not work you've done; correct?

A. I would say the same answer as insufficient information with all the caveats I gave about Flack data and the fields within it might provide some insight. But at this point in time, my report focuses on the volume because that's the data that was available to me at the time of filing this report.

Q. One last question before we take a break and I'm going to try to address my coughing situation. I want to talk about one last paragraph rather. 49, I think we talked about earlier that as a result of your analysis of the Flack data, you've identified 68 reports of the 564,000 plus that you identify were not in publicly disclosed in the five most serious categories but that were found in the Flack data; is that correct?

A. Yeah, just a few points. So the 68 are, if you look at the five reportable five categories as I define them which is

the same as the publicly disclosed five -- I'm sorry, reportable five was what I've using today. We've used publicly disclosed five in my report, my apologies. The publicly disclosed five categories, if you look at those five categories of data in the Flack interrogatory response, tally those up and compare it to the safety reports, you get [redacted] specifically are in that rape or -- that rape category.

Q. And that, what we see about those reports in paragraph 49 is the extent of your analysis. You have not done further analysis on when those were reported, why they might be missing, what we see written here in 49 is the extent of your opinions as you sit here today on that issue?

MS. WILKINS: This has been asked and answered.

THE WITNESS: For the same reasons as insufficient information, I think we covered this earlier, I reserve the right because of the Flack

production that was just recently made, I have not reviewed that data in its entirety so at the time of filing this report, that is the extent of my opinion on this because the data was not produced in a way to do any additional research or analysis, I should say.

MS. LEVY: Let's take a break. If you guys are amenable to go off the record.

MS. WILKINS: Fine.

THE VIDEOGRAPHER: Going off the record. The time is 5:55 p.m. This is the end of media unit 4.

(Recess taken from 5:55 p.m. to 6:10 p.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 6:10 p.m. Eastern. This is the beginning of media unit 5.

BY MS. LEVY:

Q. Ms. Keller, before the break we were -- and before we go on to opinion 3,

KELLER

I want to circle back to something we talked about before the break. We had talked about a category of data in the Flack data that was called insufficient information and that was -- and you talk about that some in your report in the ways we've discussed earlier; correct?

A. We talked about insufficient information.

Q. You also talk in your report about missingness, the concept of missingness.

A. Where do you talk about that?

Q. Is that a term that you use and think of and have thought about with respect to these reports, missingness?

A. I don't see that I use that term. Can you point me to my report where I use that term?

Q. Yes. I will do that in just a minute. And while we're finding that, let me ask you about insufficient information. The incidents that we're talking about that form the basis of the Flack data,

KELLER

these reports of sexual misconduct and sexual assault, those are reports that Uber receives from a reporter; correct?

MS. WILKINS: Object to form.

THE WITNESS: The reports that it -- that is in the Flack data is -- are representative of the reports that it has received.

BY MS. LEVY:

Q. And they are self reports, meaning they were reports by individuals who are making them and they contain whatever information they contain, nothing more, nothing less. Do you agree with that?

MS. WILKINS: Object to form.

THE WITNESS: So are you -- I'm not quite sure what you mean by like report, if that's the first report. I know that I've seen in my review of the Bliss and Jira data that there are a number of back and forth messages, communications. I think we even -- in my report I show this in the driver

KELLER

profiles, communications with drivers and the writers as part of that investigation so there's a lot of components to those tickets, so I'm not sure what specifically you're referring to.

BY MS. LEVY:

Q. So I'm not trying to be tricky. When Uber receives these reports, it's limited by the information that it receives, it can't analyze or classify information it doesn't have, do you agree with that?

A. That Uber begins an investigation when it gets those reports so it responds, it contacts the driver. If there's footage to review, it looks at that footage, it looks at data, the GPS data that it collects on the trip, it reviews a number of data sources it has at its disposal.

Q. You raise a very good point. Uber could have chosen to categorize and count incidents only that were

corroborated or only that were investigated and determined to be consistent with the reporter, but it didn't do that. It classified every incident taking it at face value. You understand that; correct?

MS. WILKINS: Object to form.

THE WITNESS: I understand that Uber makes those categorizations and there are many steps along the way where it makes those categorizations. What I'm analyzing is at the time that Uber pulled this data what those characterizations were and what Uber deemed them to be at that point in time.

BY MS. LEVY:

Q. In it Uber illustrates, provides an illustration of how the numbers would go down if it only counted corroborated reports or it only counted reports that later were deemed to be true on their faces. It didn't do that though; right? It included in the Flack data, provided

KELLER

all of the incidents whether they were corroborated or not, it classified and included all of those; true?

MS. WILKINS: Object to form.

THE WITNESS: So you're asking me to say did Uber say -- what is the question, did Uber do what they said they were going to do, did they produce the data that they said they produced or...

BY MS. LEVY:

Q. Yeah, let's answer that question. Did Uber categorize all the incidents based on face value as opposed to excluding incidents that were not corroborated or that were later determined to have conflicting responses by the other party, it just includes all of them, not only a portion of them; correct?

MS. WILKINS: Objection to the compound nature of the question and it's vagueness.

THE WITNESS: So I think what I'm struggling with is the term face value

KELLER

because what the Flack data interrogatory responses is the tabulation and I can pull the rog open if you would let me here because I have it in cite Uber's words, but if I recall, it reflects two data pulls and two dates of data pulls. It reflects the data at the time of those pulls. And so it reflects how Uber categorized those, whether an investigation had happened, if they contacted the driver, they received information or if they couldn't make any contacts, it contains all of those, that information. And so I think I've answered your question. I think it's the term face value that I'm having trouble with because face value seems much more simplistic than what I know to be in the Bliss and Jira data. Now I have not independently discussed earlier because the Flack data has the dominant ticket categorization, which

KELLER

now corresponds to this Flack production and then that will correspond to the Bliss and Jira data or other tickets that are part of it, so that analysis I haven't had a chance to do because that data was just produced. So I don't know if that is --

BY MS. LEVY:

Q. Let me take a specific example that I think it's -- that I think will make it easier. If a rider writes in or calls in or makes a complaint, my driver said and does not complete the sentence, Uber is limited in its ability to classify that by a lack of information, do you agree with me?

MS. WILKINS: Objection to the improper hypothetical.

THE WITNESS: So I think it's a little bit more than that because if I recall from the safety reports, Uber classifies reports as sexual assault or sexual misconduct that the reporter

views as they classify them into those categories if the reporter views them as sexual in some nature; right? So that report, if that's the initial report, I've seen follow-up. So is there follow-up in your hypothetical? I don't know.

BY MS. LEVY:

Q. Is it your understanding, I want to make sure I understand your last answer. Is it your understanding that Uber -- I think you said Uber categorizes them based how the reporter feels about it. Is that your understanding of how Uber conducts the classification, trying to understand how the reporter felt, whether it was sexual assault or misconduct?

A. Let me get to the safety report because it's late in the day. I want to make sure I have a clear recollection of the safety reports here. If you want I can review that, but what I'm trying to say is that the first report is not always

the last piece of information that Uber has and so the Flack data represents the data at the time that it pulled it. So for some reports that might have been the very first report but a lot of this data is from 2024. It's 2025. There's been a year for follow-up. Maybe they were able to obtain follow-up with individuals, maybe they didn't even correspond with drivers or riders, I don't know. What I'm showing in my analysis in this report because I haven't had the data to do it from the Flack data is the volumes that are in those categories.

Q. I'm asking you a much simpler question. If no one ever, no one ever, not a question of timing, but if no one provides ever the information to Uber that I was raped, Uber doesn't have that information and therefore can't classify it. Do you agree with that?

MS. WILKINS: Object to form.

THE WITNESS: So if someone doesn't say I was raped, they can't

KELLER

make that report, is that your question?

BY MS. LEVY:

Q. Yeah, I'm trying to -- this seems to be a pretty easy proposition. Uber cannot classify something as one particular type or the other unless it is provided with information about the incident. That's all I'm trying to make sure that we agree on.

A. Well, I think it's more than that because based off of the data that I've seen in the driver profiles that I've put together, so for the plaintiffs' trips and their drivers, as well as from the attachments, the sampling attachments, there's data that Uber doesn't just receive that's part of its investigation. And I think that's where I'm getting hung up is there's GPS data, there's the Voyager system, there's lots of datasets that Uber is looking, did you get dropped off near your house, were you at the right pickup location, how much time elapsed,

KELLER

did the driver go off line after the trip, these are all things Uber uses in an investigation. So that's what -- there's a lot of data that Uber has and so the report is one piece of that when they are doing their investigations from what I've seen from those attachments.

Q. If Uber receives a report that contains insufficient information, in your view how should it categorize that?

MS. WILKINS: Object to form.

THE WITNESS: I'm not offering that opinion on how it should categorize it. I'm offering the opinion that incidents are categorized by Uber in that category and this paragraph where we were earlier today isn't the total of those incidents in that category, both in insufficient information and parent category use tracking.

(Exhibit 10, Appendix A, marked for identification.)

///

KELLER

BY MS. LEVY:

Q. If we turn to Appendix A, I'm going to move back to this in here, Appendix A of your report which we had marked previously as tab -- or Exhibit 5 -- I'm sorry, tab 5, I don't think we used it yet today so I failed to pull up tab 5. Appendix A is your -- is described by you as your methodology?

A. Yes.

Q. That includes data validation, includes what data you received and how -- what you have done as part of your methodology in this case; is that fair?

A. Yes, to process the data, the steps that I took, et cetera.

Q. And for paragraph 41 on Exhibit 10, which is your methodology, it's on page 15 of the document?

A. Yes.

Q. And that's where I got the phrase missingness and no value, what I understand that to be from paragraph 41 is just where there was data missing, where

KELLER

the data did not exist. Is that right or is there something different about missingness that you meant to capture here?

A. So this is about the -- it's defined as the SA/SM incident data. Today I've been referring to that as the Bliss and Jira data. This is my identification of the various pieces of information that are missing or incomplete in those datasets but on the next page, on page 17, I talk about the Flack data and that there are fields in the Flack data that were not produced at the time that I filed this report that potentially may provide insight to some of these missing field in the Bliss and Jira data.

Q. Okay, and that is not an analysis you've yet done; correct?

A. Because the data, the Flack data was just produced and reproduced within the most recent few days.

Q. Back to tab 1, Exhibit 1, your report and opinion 3, we've talked earlier

KELLER

today about precursors to sexual assault and sexual misconduct incidents. You agree with me that a trip that has what you're referring to here as a precursor does not necessarily mean that a sexual misconduct incident is going to take place; right?

MS. WILKINS: This has been asked and answered a number of times.

THE WITNESS: So the precursors are data points that Uber has identified itself and also many of which it's included in its S-RAD algorithm that are potential indicators of sexual assault on a trip and so --

BY MS. LEVY:

Q. Excuse me, I thought you were finished. Keep going.

A. Go ahead.

Q. Even if one or more indicators are present, that doesn't mean an incident of sexual misconduct is going to take place; right?

KELLER

A. Those indicators, Uber developed the S-RAD model, for example, off of previous trip data and trained it off of incidents where sexual assaults did occur and so it created that machine-learning algorithm off those incidents. So in some cases incidents did occur that had those inputs and in other cases it didn't. That was part of the training methodology.

Q. You agree with me that just because there's a pickup near a bar, that doesn't mean a sexual assault is going to occur, certainly you agree with that?

A. I have the opinion that Uber knows that to be an indicator of a potential sexual assault in both its internal documents and also as an input to its S-RAD score which scores the riskiness of the trip.

Q. You understand that S-RAD is a tool that Uber has developed to try to use its safety data to reduce the number of sexual misconduct, sexual assault on its platform, that's the purpose of S-RAD;

KELLER

correct?
A. I think I say a similar thing in my report.
Q. These incidents, you've quantified the numbers here but you read the depositions of the data scientists and the tech developers who developed these products, you read those depositions as parts of your work in this case and reflected in Appendix G; correct?
A. Yes.
Q. You read Frank Chang's deposition, you read Sunny Wong's deposition?
A. Yes.
Q. You understand that S-RAD, the point of S-RAD is to take -- to study events that are very, very, very rare on the Uber platform and make them even more rare, that's what they are trying to do with S-RAD?
MS. WILKINS: Object to form.
BY MS. LEVY:
Q. Do you agree with that?

KELLER

A. So I characterize the S-RAD program the way Uber did in those documents which is it's developing S-RAD as a way to, quote, prevent sexual assaults.

Q. When matches are rated as higher risk in S-RAD, that can still be extraordinarily rare, less likely than being hit by lightning; true?

MS. WILKINS: Object to form.

THE WITNESS: You're saying when matches are above -- say that one more time. I got distracted.

BY MS. LEVY:

Q. What is a risky ride in your Lacey Keller opinion?

A. I don't have that opinion. Uber determines what it determines to be a risky ride because it exceeds a threshold it sets and that threshold is only on the whole [redacted] of trips it has viewed and scored to be more risky. It has scored every single supply plan and how many nights are coming up. You've got

KELLER

everybody out, they are taking trips home on that night, they score every single plan, but Uber only intervenes in that matching for a small percentage, [redacted] of trips on the whole.

Q. And you don't have any opinion on what a better percentage would be, that's not what you've done in preparation of this report?

A. Uber itself has calculated percentages, what percentage of sexual assaults it could accurately predict I think is the word from their document. I don't want to mischaracterize those but it has a chart and this was used in Wong's deposition, he brought this as part of his binder, if I recall, a chart that showed if that threshold was -- that trigger rate, that percentage was -- if S-RAD was applied to more trips it would be applied to more sexual assaults or correctly predict more sexual assaults. And so I'm not offering that opinion independently. I'm offering it based off of what Uber's

own documents showed.

Q. What you know about S-RAD you've only learned from Uber's own documents and its own witnesses, you haven't done any independent analysis or study or modeling of the S-RAD algorithm; is that true?

MS. WILKINS: Object to form, lacks foundation and assumes facts not in evidence.

THE WITNESS: Uber has not produced the inputs necessary to do that analysis, nor has it produced all supply plans that even for the plaintiffs' trips because it says it deletes those. So that data was not produced and so that analysis I would love to do some type of analysis but I can't because that data has not been produced.

BY MS. LEVY:

Q. How frequently does sexual misconduct in terms of one out of blank rides occur on this Uber platform as a big picture globally, based on all the data

KELLER

you've looked at?

A. What is that like? I think we've already covered those images in my report.

Q. It occurs in what percentage of the rides?

A. I've only shown the numbers in the per 100 million so -- go ahead.

Q. Can you agree with me that sexual misconduct is rare on the Uber platform?

MS. WILKINS: Object to form.

THE WITNESS: If you have a percentage, I would be happy to verify that math but rare is kind of a judgment term on those percentages so if you want to do some math together, I'm happy to do that.

BY MS. LEVY:

Q. You don't -- do you have -- what is your definition of rare, do you have one? Have you looked at that in the context of sexual assault and sexual misconduct?

MS. WILKINS: Object to form, object to the compound nature of the

question and object to the extent that it's outside of the scope of the opinions that Ms. Keller offers in her report.

BY MS. LEVY:

Q. You have not compared the rate of sexual misconduct on Uber to other platforms so you will not be offering any opinions about whether sexual assault and sexual misconduct happens more frequently on the Uber platform compared to other places, we've established that; correct?

MS. WILKINS: Object to this having been asked and answered at least 10 times in this deposition.

THE WITNESS: It's the same -- go ahead, I'm sorry.

BY MS. LEVY:

Q. I just said am I correct?

A. It's the same answer that I provided before. I did not need to do that analysis to show what I was intending to show which is the volume of reports that Uber had in its own data, what it did

KELLER

with those reports, how it analyzed them internally and compared it to what it disclosed to the public.

Q. When you use the term high risk on page 35 in subheading A, high risk for sexual assault and misconduct, you have that in quotes because you're quoting from an Uber document; correct?

A. That's correct.

Q. And you, Lacey Keller, do not have an opinion as to what is high risk or not high risk, you're simply parroting information you found in the Uber documents; is that right?

MS. WILKINS: Object to form.

THE WITNESS: I am using the term that Uber uses in those documents when describing data inputs. I would have loved to study the data inputs independent of these documents but Uber did not produce data on the gender of the driver and rider, for example, for every safety incident, nor did they produce the proximity to

KELLER

a bar for every incident, so that analysis would not be possible with the data that was produced at the time of filing my report.

BY MS. LEVY:

Q. And is it your understanding that S-RAD acts for gender of driver, rider or both?

MS. WILKINS: This has already been asked and answered so I object on that account.

THE WITNESS: So I have a timeline in my report of all the inputs in S-RAD. I know that they have changed over time. I would need to conduct that timeline or the current global features or U.S. features inputs from the Wong deposition to note the specifics, but I know at some point in time rider and driver gender were included. How that has been included in the model in its current form, I would need those sources. So if you have them, I would

KELLER

be happy to look at them but I know that I address that in my report in Appendix F.

BY MS. LEVY:

Q. S-RAD in the U.S., in the United States has always been gender agnostic. You're aware of that; right?

A. I don't know how you're defining the U.S. global model. I have this timeline in my report that looks at the different inputs to the S-RAD model over time that was considered by Uber and I know at one point in time gender was included in a version of the model, if not multiple versions of the model.

Q. As you're sitting here today, can you tell us whether it is your understanding that S-RAD in the United States has always been gender agnostic? Do you agree or disagree without looking at more information?

MS. WILKINS: Objection, asked and answered. She just answered it and your question is misstating her

KELLER

testimony. If you would like her to look at her documents she had offered to do that.

BY MS. LEVY:

Q. I want you to quickly tell me if S-RAD has ever considered gender in the United States, that's all I want to know.

MS. WILKINS: Same objection.

THE WITNESS: This is not meant to be a memory test. I have produced an entire appendix dedicated to the features of S-RAD and I'm happy to consult that.

BY MS. LEVY:

Q. I agree with you it's not meant to be a memory test. If you don't remember and can't tell me without looking in your report, that's fine. That's all I want to know. I don't remember sitting here is a fine answer.

MS. WILKINS: You are misstating her testimony. She has told you what she remembers.

///

KELLER

BY MS. LEVY:

Q. So you agree, I believe, that based on what your testimony is earlier, that Uber's attempt to use data to attack the sexual assault and sexual misconduct problem, you agree that that's a good thing for Uber to do; correct?

MS. WILKINS: Object to form.

THE WITNESS: I think we've answered or I've answered a number of questions about these judgment type calls. I'm answering what the Uber is doing with the vast amount of data it collects, the GPS data as to whether or not your phone's got low battery, how it uses that information. I offer those opinions in my report. I let the court decide what it will do with that information.

BY MS. LEVY:

Q. You understand that when individuals working on S-RAD use the term risk or high risk with respect to S-RAD, that's specific to the S-RAD context, you

KELLER

understand that? Like something that's high risk in the S-RAD model does not equate to high risk in absolute terms, it doesn't mean that the ride is a high risk to the rider, you agree with that, don't you?

MS. WILKINS: Object to form.

THE WITNESS: So S-RAD is a program that Uber has created to prevent sexual assaults. And in that program it scores trips according to the risk that its machine algorithm has calculated about that trip for sexual assault.

BY MS. LEVY:

Q. And you understand, do you not, that even pairings that are scored as having high risk cannot predict whether a sexual assault will actually occur on an individual trip, you understand that, don't you?

MS. WILKINS: Object, asked and answered.

THE WITNESS: Uber trained this

model and continues to train this model because it [redacted] of the trips that it is running the model on. It trains the model on real world incidents, whether a sexual assault did occur or a sexual misconduct incident did occur or whether it didn't occur. They trained it on all of that data. And on top of that its documents talk about incidents that were above the threshold that were dispatched by the program that slipped through and ultimately resulted in a sexual assault and I -- or a sexual misconduct report. And I record those volumes in my report as well.

BY MS. LEVY:

Q. When Uber uses the term high risk with respect to S-RAD, it doesn't mean that it is more likely than not that a pairing is going to result in a sexual assault, that's not what it means, can we agree on at least that?

KELLER

A. So the S-RAD score, which is what it creates for every single rider driver pairing, and I'm reading this directly from my report, is it -- a computed numerical score between [redacted] for each potential driver/rider pairing, and that's the risk of a sexual assault occurring on that trip.

Q. And you understand from the testimony you've read on the data and the S-RAD model that even pairings with a higher S-RAD score are very likely to result in sexual misconduct in actuality?

MS. WILKINS: Object to form.

THE WITNESS: So I'm aware, and this is from paragraph 70 in my report, that from 2021, September 2021 through April 30 of 2022, [redacted] And just for context during that same time period,

there were -- I'm sorry, in addition between July 1, 2022 and December 31, 2022, [redacted] So these are plans that Uber knew were above the threshold, that the S-RAD program identified were above the threshold and remember the threshold is just [redacted] of trips and it was above those thresholds and they still slipped through and an incident occurred.

BY MS. LEVY:

Q. And no model can predict human behavior with precision; correct?

MS. WILKINS: Object to the questioning, outside the scope that Ms. Keller's opinions offered in her report and this litigation.

BY MS. LEVY:

Q. Let me clarify the question.

No model that you've ever seen or heard of can predict whether someone's going to assault somebody else with

accuracy, that's not possible to do in your knowledge and experience, is it?

MS. WILKINS: Same objections, outside the scope.

THE WITNESS: So when -- if we're talking generally, when one builds a model, a machine-learning algorithm, you develop a confusion matrix which is the term that I'm attributing to it. It sounds like kind of a crazy term but confusion matrix is what it's called to identify the true positives, the false negatives, the true negatives, et cetera. It's how you identify the accuracy of your model.

BY MS. LEVY:

Q. So, for example, one of the metrics that S-RAD considers is pickups near bars; correct?

A. Specifically I think the proximity to the bars or the number of bars within 50 meters, it's changed a few times but I think it's the proximity within 50 meters or something like that.

There's like a geo fence that they apply around the pickup that they review.

Q. And we can agree that not every pickup within 50 meters of of a bar is going to result in sexual misconduct, that's common sense; correct?

MS. WILKINS: Object to form.

THE WITNESS: It's -- Uber knows that pickups near a bar are more likely to result in a sexual assault.

BY MS. LEVY:

Q. That wasn't my question. Not every pickup near a bar is going to result in a sexual misconduct incident, correct, that is a matter of common sense?

A. But Uber knows that it's more likely to happen which is why it's both in the documents that I cite and in the S-RAD model.

Q. And that's why it's studying it and trying to analyze things like pickups near a bar that it can use to combat those incidents; right?

MS. WILKINS: Object to form.

THE WITNESS: Uber has built the S-RAD model using proximity to a bar as one of the inputs.

BY MS. LEVY:

Q. And that's a good thing?

MS. WILKINS: Object to form.

THE WITNESS: It is a thing that Uber does. Whether it's good or bad I leave that value judgment to the court.

BY MS. LEVY:

Q. And just because someone gets picked up within 50 meters of a bar doesn't mean they've been to the bar, does it?

MS. WILKINS: Object, outside the scope.

THE WITNESS: Proximity to a bar is one of the inputs to the S-RAD model. Intoxication which I think is a different input that you're talking about is yet another input that Uber knows to be a precursor or risk factor in sexual assault.

BY MS. LEVY:

Q. And the proximity to a bar input is going to trigger very differently depending on what geography you're in in the United States; right?

MS. WILKINS: Object to form.

THE WITNESS: I don't know what geo fence that Uber puts in. I know this was discussed at the Wong deposition. I know exactly what tab I would like to consult to refresh my memory because the tab discloses the distance that they consider. So without consulting that I wouldn't be able to say one way or the other.

BY MS. LEVY:

Q. You would assume as a matter of common sense that more pickups in New York City would be within 50 meters of a bar than a rural place in North Dakota, for example?

MS. WILKINS: Object to form, improper hypothetical.

THE WITNESS: The S-RAD program

is also scored and the thresholds are set in each city which would normalize such discrepancies such as that and I think that's discussed at length in the Wong deposition.

BY MS. LEVY:

Q. And you don't have any dispute or quibble with Uber for normalizing the thresholds by city, that's not a problem with S-RAD in your view, is it?

MS. WILKINS: Object to form.

THE WITNESS: I'm describing why we see different thresholds for the plaintiffs, that's the only dataset that we have on -- the only S-RAD data we have from Uber that was produced in this litigation from Uber about S-RAD. And so from those datasets, we are able to see, I'm able to see that there are different thresholds in different cities and because there are different dates and times, that is opinions that I do offer.

///

KELLER

BY MS. LEVY:

Q. When you calculated dates and times, I think you mention in paragraph 28 of your methodology, Appendix A that you added some categories for times. Do you know what I'm referring to there?

I'm looking at some in Appendix A which I think we marked as Exhibit -- there we go. Paragraph 28 you said I've added five fields to the driver trip data. Are you with me?

A. Sorry, just one second.

Yes.

Q. Okay. And in 28.5 when you're discussing daytime category, you have subcategories 1 through 4 of weekend late night hours, weekday late night hours, weekend non-late night hours and weekday non-late night hours. Where did you come up with these definitions, did you use them from Uber or did you create these yourself?

A. That's cited in footnote 55. Those are Uber's definitions as late night

as it pertains to the S-RAD program.
Q. And for the weekend hours, non-late night hours, you've used the same definition that Uber uses as set forth in Sunny Wong's deposition?
A. Correct.
Q. And that includes Monday, Tuesday, Wednesday, Thursday from 12 a.m. to 4:59 a.m. for weekday late night hours and Monday through Thursday, 5 a.m. through 11:59 a.m. for weekday non-late night hours; correct?
A. Sorry, you talked so fast and I was trying to follow along. The definitions that I use are defined in paragraphs 28.5.1 through 28.5.4.
Q. And you don't impose any different definitions or have any problems with the way that Uber's S-RAD model categorizes the time; is that correct?
MS. WILKINS: Object to form.
THE WITNESS: I'm using the categorization that Uber uses.
///

KELLER

BY MS. LEVY:

Q. And same with the inputs in the metrics to the model. You have not proposed or generated or modeled your own alternative metrics; is that true?

MS. WILKINS: Objection, form, asked and answered.

BY MS. LEVY:

Q. Do you need me to restate the question?

A. I'm just reviewing a piece of my report. I apologize. I may need a refresh on the question, too, but one second. Can you please -- please state the question?

Q. You haven't done any data or analysis to suggest that the inputs that Uber uses to S-RAD shouldn't be used in S-RAD, that's not an opinion you're offering in this case; right?

A. My Appendix F which I've referenced a number of times -- let me make sure it's Appendix F so I'm not confusing. Appendix F discusses the

opinions that I found in Uber's documents that it considered as part of the program over time. I have -- I don't say whether those inputs are good or bad, I just describe Uber's process based off of the data I've seen.

Q. Are you going to offer any opinions in this case that Uber should have changed its inputs or used different inputs, that is not part of your opinions in this case?

MS. WILKINS: Object to form and object to the extent it misstates her prior testimony.

THE WITNESS: I offer opinions what could have been used by Uber or at least could have been done by Uber, whether it's through reporting or setting the trigger rate at a different threshold but I don't offer the opinion that Uber should have done that.

BY MS. LEVY:

Q. And you haven't yourself come up

KELLER

with an alternative better way to set up S-RAD, that's again you're stopping short of your opinions of just showing what the data shows but not building an alternative yourself or suggesting alternatives yourself, am I right about that?

MS. WILKINS: Object to form, object as asked and answered and object to the extent it mischaracterizes the prior testimony.

THE WITNESS: Uber has not produced data that would be -- that would even allow me to do such an analysis so I would be prohibited from doing that analysis.

BY MS. LEVY:

Q. You don't intend to offer an opinion that Uber should not have had a holdout group for S-RAD, that's not part of your opinion in this case that Uber should not have done that?

MS. WILKINS: Object to form.

THE WITNESS: I offer the opinion that Uber does do that and has done

that. The extent to my opinion is encapsulated in my report.

BY MS. LEVY:

Q. Okay, we see that in paragraph 62.9, Uber [redacted] of all potential driver/rider pairings as a control group to study the effectiveness of SA/SM on an ongoing basis. Is that what you're talking about?

A. Yes.

Q. Okay. And you're not going to offer an opinion that Uber should not do that and should not continue to study the effectiveness of SA/SM on an ongoing basis that's beyond what you plan to offer in this case; true?

MS. WILKINS: Object to form.

THE WITNESS: The opinions that I have on that are currently in my report.

BY MS. LEVY:

Q. And you quote in 64, paragraph 64 of your report a quote from Sunny Jeon saying that S-RAD may represent Uber's

KELLER

most effective intervention for preventing sexual assault.

Do you see that quote?

A. Yes.

Q. Are you suggesting that that's not true?

A. I'm not saying it's true or not true. I'm saying what Uber said about its own program, just like I said that -- just like I quoted that it would be used to prevent sexual assaults, this is how Uber characterizes its own program.

Q. You note several places in your report that Uber began developing S-RAD in 2017 and deployed it in 2022; right? You note that in your report.

A. Yes.

Q. I do not see anywhere in your report any opinion that Uber could have or should have deployed S-RAD earlier. You are not offering the opinion in this case that Uber could have or should have deployed S-RAD earlier than it did, am I right?

KELLER

MS. WILKINS: Objection to the extent it mischaracterizes what is in Ms. Keller's report.

THE WITNESS: I'm offering the opinion that Uber began development in 2017 and spent several years developing the program and I timeline that to some extent in my report, and then Appendix F chronicles all of the inputs that were along that -- along that journey for Uber as they were testing and deploying the model in various cities around the United States. And so I don't offer the opinion that Uber should have done that earlier. I offer the opinion that Uber was testing that program in numerous cities, whether it was in shadow mode or in full semi rollout throughout that time period.

BY MS. LEVY:

Q. And just to make sure I'm understanding you, you don't intend to offer any opinion that it should have

rolled it out in any different way than it did?

MS. WILKINS: Object to form.

THE WITNESS: I offer the opinion on what they were doing when they were doing those things and in what cities they were rolling out the program and in what ways. I don't offer an opinion on what they should have done differently but I do chronicle that timeline in my report.

BY MS. LEVY:

Q. Paragraph 66 of your report on page 45 under heading C, heading C states S-RAD dispatches some trips above the flagging threshold. Are you with me?

A. Yes.

Q. And you do not -- the opinions you intend to offer about S-RAD's dispatching trips above the flagging threshold are contained in the following paragraphs of your report in 76 through 71; correct? Sorry, through 73.

MS. WILKINS: Object to form.

THE WITNESS: So that section, those are all the paragraphs within that heading for that section. Those paragraphs as well as the images within those paragraphs are my opinions that support that statement.

BY MS. LEVY:

Q. And you're not offering the opinion that Uber should never dispatch trips above a flagging threshold, you're not offering that opinion in this case?

A. I'm offering the opinion that [redacted] and hasn't but I'm not offering the opinion that they should [redacted] I'm offering the opinion that that's how the model works, that they [redacted]

Q. And you have not analyzed flagging thresholds in any particular jurisdiction or across the United States and done any study of whether dispatching trips above the flagging threshold puts riders who call for an Uber in more danger

KELLER

or less danger than if Uber did not dispatch trips above a flagging threshold, that's not part of your analysis in this case; right?

MS. WILKINS: Object to form.

THE WITNESS: I do have the opinion because I am limited by the data that Uber has produced to the totals that I have seen in documents. And what I have obtained through documents is that there are incidents that have occurred that Uber calls them a [redacted] or -- Jesus.

MS. WILKINS: Sorry guys, we just had a huge unexpected thunder boom.

MS. LEVY: Is everything okay?

THE WITNESS: Yeah, it was extremely loud. It's like really strange weather.

///

KELLER

BY MS. LEVY:

Q. You're also aware, are you not, Ms. Keller, that [redacted]

A. I'm aware that there are I think [redacted]. I have asked for that data but it has not been produced so that I can determine how many of those do result in a sexual assault or misconduct report.

Q. And again, you know there are not [redacted] of sexual misconduct; right?

A. We know that there are the reports that Uber has produced in this litigation.

Q. And I think I'm clear on where you're drawing the lines here. But if the judge or the jury wanted to understand what should Uber do with flagged trips above a threshold, should Uber just never send drivers or should it send drivers and would that be better or worse for what

KELLER

would ultimately happen to people who call those trips, you would need a lot more data than you have or than you looked at to understand and answer that question; right?

MS. WILKINS: Object to form.

THE WITNESS: So I think that's a pretty multipart question. Do you want to ask me something specific?

BY MS. LEVY:

Q. You don't understand the way I ask it?

A. No, because it's -- should it consider data, should it be better --

Q. Fair point. Let me ask you this. A trip above a flagging threshold you agree doesn't necessarily mean that anything bad is going to happen, agree? It might or it might not?

A. I disagree. There are incidents that I show in my report that have resulted in a sexual assault or sexual misconduct and I highlight those from the documents that I've reviewed. I would

love to do the analysis of the safety data but Uber has not produced the data that would allow me to do that.

Q. And again, you don't know what alternatives to taking an Uber ride under any particular circumstances would be for a rider calling a driver, and you would need to know that to compare the risk of an Uber trip to the risk of a rider's alternatives, wouldn't you?

MS. WILKINS: Object to form, and object that it's outside the scope of Ms. Keller's opinions in this case.

THE WITNESS: So if I wanted to do an analysis of the risk -- I just don't understand your question. What if I wanted to run my own version of S-RAD, are you asking if I wanted to compare the risk factors like you were talking about earlier? I'm a little confused of what type of study I would hypothetically be running here.

BY MS. LEVY:

Q. If you were trying to analyze

whether a rider would be safer taking Uber with a particular S-RAD score or doing something different, you would need to know a lot about what that rider's alternatives were, wouldn't you?

A. Well, first I would need to know the data that's in Uber's own S-RAD score and Uber has refused to produce that data and says it deletes that data.

Q. You can't form any opinion about the relative safety of a mode of transportation, you can't compare the relative safety of Uber versus any other mode of transportation because you don't have that data, can we agree on that?

MS. WILKINS: Object to form.

THE WITNESS: I'm saying I can't even compare the relative risk of the supply plans on the Uber platform because Uber has refused to produce that data.

BY MS. LEVY:

Q. And even when S-RAD scores are elevated or high risk, the incidents of

KELLER

sexual misconduct are still very rare, they happen infrequently, even with elevated S-RAD scores, you understand that from the review you've done in this case; correct?

MS. WILKINS: Object to form, object that this has been asked and answered.

THE WITNESS: So I'm aware of incidents and I discuss them only because I found them in documents, not because Uber has produced data, that allows me to do this analysis that have resulted in sexual assaults and sexual misconducts that have occurred because after the fact, after Uber has allowed that trip to dispatch knowing that it had a risk support above its threshold.

BY MS. LEVY:

Q. And how often did that happen, how often do above threshold flags result in sexual assault and misconduct, one out of how many trips?

A. I would love to do that analysis. Uber has refused to produce that data that would allow me to do that.

Q. Now looking at paragraph 76 of your report where you talk about S-RAD scores for other plaintiffs, are you with me, table 3?

A. Yes.

Q. There you list the S-RAD score in the first row of data under the heading for the trips for the four plaintiffs listed in the chart; correct?

A. So the first row shows the S-RAD score that Uber gave to those trips for those four individuals.

Q. There's no -- well, you do not intend to offer any opinion about the S-RAD score for these particular drivers other than that which is contained in paragraph 76 and Appendix D; correct?

MS. WILKINS: Object to form, object to the mischaracterization of Ms. Keller's report.

THE WITNESS: The opinions that I

can offer about the drivers and the plaintiffs' trips are included in this paragraph and in Appendix D. I am -- because Uber has not produced the supply plan data or all of the driver star rating data or the number of trips that are near a bar, anything like that, I am unable to produce or to put into context these trips and the information contained within the S-RAD scores.

BY MS. LEVY:

Q. You don't -- you have not calculated an S-RAD score that you believe Uber should not dispatch rides above, that's not what you've done in this case and not an opinion you intend to offer?

A. I have asked for all the thresholds that Uber has maintained nationwide and continues to maintain. Those have not been produced in this litigation so what I am left with is the information that's in this chart.

Q. And is it your opinion that Uber

KELLER

should not pick up -- should not have drivers allow -- let me strike that and say this in a better way.

Is it your opinion that Uber's platform should not allow drivers to pick up riders within 50 meters of a bar?

A. It's my opinion Uber knows that to be a risk factor because it includes that in its S-RAD scoring. It is my opinion that Uber sometimes dispatches those trips despite knowing that that trip is above a threshold that it has set to only apply to less than about [redacted] of data on average, just to name a few opinions from my report.

Q. And you don't intend to tell the jury or the court that Uber should not dispatch rides or allow pairings when the pickup is near a bar, that is beyond what the opinions are that you're offering in the case, that Uber should not do that?

MS. WILKINS: (Inaudible).

THE WITNESS: I offer the opinion that sometimes they do, whether it's a

[redacted] or whether it's one of these plaintiffs' trips where they were near bars. Those trips were dispatched.

BY MS. LEVY:

Q. And you're not offering the opinion that by doing a dispatch that is near a bar, Uber is making the rider less safe than the rider would have been in other circumstances, that's not an analysis you have done or an opinion you're going to offer?

MS. WILKINS: Object to form, object to the misstatement of the prior testimony.

THE WITNESS: I offer the opinion that Uber did know that these were indicators of risk for a ride and I offer the opinion that Uber did not disclose such indicators as proximity to a bar or the rate of incidents when the pickup was near a bar in its safety reports, to name a few examples.

KELLER

BY MS. LEVY:

Q. And is that -- you are not offering again in this area of allowing dispatches, you're not offering opinions what Uber should have done, other thresholds it should have used or whether the provision of rides put the rider in a safer or less safe situation, that's all beyond the scope of what you're going to testify in this case; right?

MS. WILKINS: Object to the compound nature of the question, object that this has been asked and answered.

THE WITNESS: So I offer -- I kind of lost track of your list there. I offer the opinion that that there is information that Uber knows about the risk of a trip through its own internal analyses or from its scoring of the -- through the S-RAD program. I offer the opinion that it doesn't tell the public about those factors and whether or not that would make

someone safer or less safe, I leave that open to interpretation but I am discussing the pieces of information and the lack of disclosure around that information.

BY MS. LEVY:

Q. Have you done any analysis or comparison of what Uber does and doesn't disclose to the public with other forms of public transportation, that's beyond the scope of what you've done; right?

MS. WILKINS: Object, asked and answered many, many, many, many times today.

THE WITNESS: So does Uber disclose in its safety reports its relative risk? I don't understand the question.

BY MS. LEVY:

Q. Does Uber disclose more or less information about sexual assault on its platform than taxi companies disclose?

MS. WILKINS: Same objection.

THE WITNESS: That is not an

KELLER

analysis that I needed to do to understand what Uber was saying about its own platform as compared to what it knew internally about the number of reports occurring on the platform and how it was using that data.

BY MS. LEVY:

Q. And the same -- you're not offering any opinions about Uber's duty or requirements or regulations about disclosure obligations, that's beyond the scope of opinions you intend to offer in this case; right?

MS. WILKINS: Asked and answered.

THE WITNESS: The same answer that I've given throughout the deposition today, I am offering opinions on what Uber knew internally, what they did with that data and what they told the public.

BY MS. LEVY:

Q. Looking at table 76, you have listed S-RAD scores and select feature values for individual plaintiff trips. On

KELLER

the S-RAD score, you are offering no opinions in this case about what is a safe or appropriate S-RAD score; true?

MS. WILKINS: Asked and answered.

THE WITNESS: I'm offering the opinion of what the score was, what the thresholds that Uber set at that time were because that was the data provided to me and that is what is limiting my opinion on this. Uber did not produce all the supply plans because it says it deletes that data. Uber did not produce the bar count or other input values for all of the trips, for example, so I am limited to the data it produced for the bellwethers in this spreadsheet.

BY MS. LEVY:

Q. And you don't have an opinion on what a safe or a dangerous S-RAD score is, that's beyond the scope of what you've done?

MS. WILKINS: Asked and answered, misstates prior testimony.

KELLER

THE WITNESS: I'm offering the opinions on what the inputs were to that trip, what Uber knew those inputs to be.

BY MS. LEVY:

Q. And the same -- I'm sorry, I didn't mean to cut you off.

A. Go ahead.

Q. The same answer would be true for all the other feature values that are listed in the table 3 of your paragraph 76, same answer for each of the feature values?

MS. WILKINS: Object to form.

THE WITNESS: So I am not able to contextualize those feature values.
[redacted] because Uber has only produced this data for these plaintiffs. I do not have this data for every trip, I don't have this data for every driver, I don't have this data for every rider because Uber did

not produce it.

BY MS. LEVY:

Q. You do not have and have not formulated any opinions about whether Uber should or should not have dispatched these trips?

MS. WILKINS: Object to form.

THE WITNESS: I offer the opinion that [redacted]. I offer the opinion that trips that are above a flagging threshold do [redacted] and that I'm able to calculate just from Uber's documents the volume of those trips. Those are two opinions, for example, that I offer related to that topic.

BY MS. LEVY:

Q. My question is a little bit different. You have not stated anywhere in this 55 pages of your report or anywhere I can find in any of your appendices an opinion that Uber should not have dispatched or allowed a pairing between any one of the four plaintiffs

listed in table 3 under paragraph 76; is that correct?

A. I offer the opinion that those trips were dispatched and these are the inputs that Uber had about those trips when it dispatched those plaintiff trips.

Q. And again, my question was: You do not intend to go further and say Uber should have blocked any one of these four pairings, that's beyond what you've looked at?

A. I offer the opinion that they [redacted] when operating S-RAD and that's the extent to my opinion on -- that's one opinion on [redacted]. I also discuss [redacted] but I think we've discussed that a number of times in my deposition today.

MS. LEVY: Let's turn to -- are you doing okay, do you need a break?

THE WITNESS: I could use a quick.

MS. LEVY: Let's go off the

KELLER

record. Take a quick break.

THE VIDEOGRAPHER: Going off the record. The time is 7:24 p.m. This is the end of media unit 5.

(Recess taken from 7:24 p.m. to 7:43 p.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 7:43 p.m. Eastern time. This is the beginning of media unit 6.

BY MS. LEVY:

Q. Ms. Keller, is it your opinion that Uber should report data even if the data is unreliable?

MS. WILKINS: Object to form.

THE WITNESS: I don't offer an opinion what Uber should report. I offer opinions on the discrepancy of the hundreds of thousands of tickets that Uber had in its possession and knew about and categorized versus the five categories that it reported on its safety reports.

///

KELLER

BY MS. LEVY:
Q. And you have no opinion on whether Uber should have reported numbers of incidents in categories that are unreliable, offering no opinion on that?
A. What are categories that you are defining as unreliable?
Q. My question isn't that. My question is: Are you going to offer the opinion that Uber should release data even if it didn't have reliable data?
MS. WILKINS: Object to form.
THE WITNESS: I'm offering the opinion that Uber did not produce and disclose the reports that it had and categorized in its possession through the -- which I know about through the Flack interrogatory responses and it only disclosed the 15 -- I'm forgetting the number now that it's late in the day but the reports it had in the five reportable categories.
BY MS. LEVY:
Q. Are you offering any opinion of

KELLER

which of the 21 or 27 categories -- I think we've got some background noise. Let me start that question over.

Have you done any analysis or formed any opinions yourself as to which of the 21 or 27, depending how you count categories in the taxonomy, that Uber did and did not have reliable data on?

MS. WILKINS: Object to form.

THE WITNESS: Are you suggesting that Uber produced unreliable data in this litigation?

BY MS. LEVY:

Q. I am asking you -- have you read testimony from Uber's witnesses to the effect that Uber did not release data in other categories because it did not believe that data to be reliable, have you seen that testimony from Uber's witnesses?

A. I don't know if I would characterize that as reliable. I've seen testimony that I'm recalling about auditing alignment but I don't know if that's the same thing that you're

KELLER

referring to as reliable.

Q. And I think what we're referring to generally is there are categories in the taxonomy according to Uber's witnesses that have lower alignment among competing auditors looking at the same data than other categories; is that fair?

A. That is -- what I have in my mind is what I was reviewing this morning which is in the safety reports and in the appendix to the 2019 and 2020 safety report. I would be happy to pull that up if you don't mind discussing the alignment process.

Q. Yeah, I think I'm going to be really precise in my question.

Do you intend to offer any opinion in this case that, in fact, Uber witnesses are wrong and Uber -- that the data that it had in other categories in the taxonomy was just as reliable as the data that it provided incident numbers for?

MS. WILKINS: Object to form,

vague, overbroad.

THE WITNESS: So I'm offering opinions based off of data that Uber has produced in this litigation, that it has represented as accurate in this litigation as far as how I understand interrogatory responses go so my analysis is based off of those representations from the company. If you are suggesting in some way that Uber has not provided accurate data, I would be interested in knowing specifically what you are talking about.

BY MS. LEVY:

Q. You understand that there are categories in the taxonomy that are easier to classify than other categories, do you that, do you agree with that or you don't know?

MS. WILKINS: Object to form.

THE WITNESS: I don't have an opinion because I have not categorized the data itself. I don't need to

KELLER

because Uber has already done that categorization for me through the plaque interrogatory response.

BY MS. LEVY:

Q. And if hypothetically Uber's witnesses were to say to you some of the categorizations that we use and provide we have a great deal of reliability and others we have less so, would you have any reason to disagree with that statement?

A. Uber has not produced a line-by-line documentation of which categories are reliable in this hypothetical that you have so I would be theorizing what types of things Uber would be saying about its data. I am making the assumption that Uber has produced reliable data in this litigation when it comes to the Flack interrogatory response and the Flack data that it just recently produced.

Q. Are you making the assumption that the categorization of each of those incident types is equally reliable, is that your assumption?

KELLER

A. I'm using the categorization that Uber has put forth in that data itself.

Q. And you are assuming that Uber's categorization is equally reliable in each level of the taxonomy, is that your assumption?

A. I'm assuming something different. I'm assuming that Uber has produced in a truthful manner the data that it has in its possession and I am taking Uber's representation of that data.

An example of that not being complete as its previous productions was Uber's production and reproduction of the Flack data where Uber did not produce fields that it used internally to classify data so I need and have reserved my right to analyze data from that data system because Uber did not produce that data previously.

Q. Have you reviewed Katie McDonald's deposition transcripts in this case?

A. Yes.

KELLER

Q. Both the April 24th and April 25th transcripts?

A. Yes.

Q. And do you have any different information than Ms. McDonald about Uber's confidence in the reliability of how it classified the incidents in the Flack data?

MS. WILKINS: Object to form.

THE WITNESS: So I am not sure what you are referring to when you say reliability or confidence. What I'm thinking about is what I read in the safety reports this morning about the auditor process and their reason, their process there. I would be happy to look at other deposition testimony.

Regardless of that, what I do know is the data that I have is how Uber classified it at the time of two data pulls when they produced the data to me.

BY MS. LEVY:

Q. I want to turn in our last few

minutes to your Appendix D. The information that you've provided in the appendix to your report, additional information that we haven't already talked about about driver profiles. Do you have that in front of you?

A. Have we marked that as an exhibit yet?

MS. LEVY: We haven't marked it as an exhibit yet. I'm trying to figure out what tab it is and pull it up for you. Give us a minute.

We're going to take a minute and e-mail it. We don't have it in our tabs. While we're doing that, circling back on some other questions that we discussed earlier.

BY MS. LEVY:

Q. S-RAD you agree is a proprietary software that Uber developed, we've discussed that at length today; correct?

A. At its base, Uber is a machine-learning model, but it is using data that only Uber has access to.

Q. And is it your opinion that Uber has some duty or obligation to disclose to the public its proprietary technology tool?

A. I'm not offering the opinion that Uber should disclose that tool. I am offering the opinion that Uber has not disclosed that tool and I'm offering opinions to the court describing how that tool was created and what are the inputs that went into it and the broad strokes of how it works and how Uber utilizes that tool to, quote, prevent sexual assaults on the platform.

Q. But you don't intend to offer any opinion in this case that Uber has a duty, obligation or should have disclosed S-RAD publicly?

MS. WILKINS: Asked and answered.

THE WITNESS: Same answer as just before. I thought the questions were the same.

BY MS. LEVY:

Q. And the same would be true for

KELLER

other studies or metrics that it looks at in an attempt to combat incidents of sexual assault and misconduct, you're not intending to offer opinions in this case that Uber should have or had any duty or obligation to disclose to the public anything about its study of this issue that it didn't disclose, that's beyond the scope of what you've been asked to do here; correct?

A. I'm offering opinions that Uber has studied those inputs, whether they are the differences in rider driver, gender, proximity to bars or time of day but none of that is disclosed in its safety reports. Uber chooses to show the rate of assaults on its platform by looking at five categories of data and comparing them to all trips that occur on the platform, as opposed to looking at the volume of incidents that occur in late night trips or near bars similar to the analysis that it has done internally.

Q. And to be very specific, and

let's see if you can answer this with a yes or no, you don't intend to offer any opinions about any disclosure, duties or obligations; true?

MS. WILKINS: Asked and answered.

THE WITNESS: I offer opinions on disclosures that have happened but I don't offer opinions on what they should have done differently. I offer opinions on what they could have shown with the data that they had in their possession as well as the analyses that they were doing internally.

BY MS. LEVY:

Q. And I don't see anywhere in your report that you talk about duties or obligations. That's beyond the opinions you're offering; correct?

MS. WILKINS: Asked and answered.

THE WITNESS: The same answer to disclosures is I offer opinions on what has -- and describe what has occurred and what has been disclosed. I don't offer opinions on what should

KELLER

be disclosed, but instead offer opinions on what they could have disclosed to the public based off of the information that they had studied and held within their possession.

(Exhibit 11, Appendix D, marked for identification.)

BY MS. LEVY:

Q. Let's pull up the document that we just marked. I think it's going to be Exhibit 11, which is Appendix D to your expert report. Tell me when you've got it.

A. Okay.

Q. This appendix is the -- contains your analysis of the individual rides or trips that you've studied that are encompassed by this expert report; correct?

MS. WILKINS: Object to form.

THE WITNESS: So these, the data that's contained in these, this appendix is slightly different than the data that's in the remainder of

KELLER

the report or the main report, I should clarify. As part of the litigation, Uber produced data only for some of the plaintiffs' drivers and trips. This data was not available for all drivers in their database, nor was it available for all trips in their database so this is only a limited subset of the data that Uber has in its possession but only what it produced as part of the litigation.

BY MS. LEVY:

Q. Let's turn to the next page, table of contents here. For each of the five drivers that are listed in II through VI, you've conducted four different types of analysis, correct, a driver trip profile, an analysis of driver ratings, idle ride notifications and sexual assault and sexual misconduct incident history; true?

A. Yes.

Q. Those four analyses you did using

KELLER

the same methodology for each of the drivers that are listed here; is that right?

A. For each of the drivers that are listed here, yes.

Q. Okay, and you are offering no opinion again as to Uber's conduct -- let me ask it in a different way -- strike that.

You are not offering the opinion and have not put in Appendix D any opinion that Uber should not have allowed any of these trips to go forward. That is beyond the scope of what you are going to testify about in this case; correct?

A. I'm offering opinions on what Uber knew about that trip, the types of information that it reviewed as part of its incident review. I'm offering opinions on what Uber knew about that driver prior to that trip, whether it's through their previous trip incident history or their ratings or their S-RAD score, but I'm not offering opinions on

KELLER

what Uber should have done with that information. I'm just offering opinions about what Uber knew at the time of that trip and before that trip.

Q. And if we skip over --

A. I'm sorry, I should clarify. At the time of the trip and its investigation of the trip because I believe there are some investigative documents that Uber produced so that would occur, just to be most clear.

Q. Let's turn to page 4 of 43. Looking at table 1, this is your summary of the bellwether driver profiles; correct?

A. Yes.

Q. And in this summary, you list the metrics that you evaluated for each of the five drivers and then analysis or the output of what you looked at is contained in this report; fair?

MS. WILKINS: Object to form.

THE WITNESS: So this table is kind of a summary table of the

KELLER

information that is -- of the types of information that's contained in each of the subsequent driver profiles.

BY MS. LEVY:

Q. If we look at page 5 of 5 of 43 where it addresses 1 star ratings, are you with me?

A. Yes.

Q. And here you've tabulated the number of 1 star ratings that you see in this data; is that correct?

MS. WILKINS: Object to form.

THE WITNESS: So for each driver Uber produced all of the rating history for that drivers, no other driver, so just for those five drivers, and using that information I calculated how many were 1 star.

BY MS. LEVY:

Q. And did you do any other analysis on 1 star rating; for example, have you formed any opinions on an appropriate absolute number or threshold of a percentage for 1 star ratings or is that

KELLER

beyond the work that you've done in this case?

MS. WILKINS: Object to form.

THE WITNESS: I would have loved to do an analysis of all of the drivers' 1 star -- or all of the drivers on the platform, their ratings, all of the drivers on the platform that had sexual assault or misconduct incidents. Uber did not produce that information in this litigation. They only processed the files here so the opinions that I am able to offer are limited to counting the number of 1 star ratings that are produced in these five documents.

BY MS. LEVY:

Q. You're not intending to offer an opinion, for example, that if a driver receives a 1 star rating, they should be deactivated solely because of the 1 star rating; that's beyond anything that you would offer in this case as an example; correct?

MS. WILKINS: Object to form, object to the extent it misstates Ms. Keller's opinions that are offered in her report.

THE WITNESS: I'm offering the opinion that -- the analysis of these five drivers' 1 star ratings is the extent of the opinions that I am able to offer with that data as it stands right now because Uber has not produced data about all drivers. I am not able to say if six or 160 or 12 1 star ratings is a lot, a little, they are in the first -- in the 1 percentile, the 99 percentile. Because Uber has not produced that data, I'm not able to contextualize what that means.

BY MS. LEVY:

Q. Can you look at page 10 which is the start of your analysis of Hassan Turay? Are you with me?

A. Yes.

Q. The next page in paragraph 9 you

KELLER

have charted out a graphic depiction of time of day reflected on the trips that were driven by Mr. Turay; is that correct?

A. This image shows when Hassan Turay is driving. You can see that the dark bars are when they're a late night weekend. The super dark blue bars are late night weekend, the light lighter blue bars are weekday late night, and then the weekdays are also shades of orange. So this is plotting how many trips, not incidents but how many trips he is taking or driving over the course of his time on the platform.

Q. And this analysis and the similar analysis that you did for the other drivers in Appendix D, this is the limit of the late night -- I'm sorry, this is the limit of the analysis that you've done on this issue; in other words, you don't intend to offer any opinions about whether this pattern is good or bad or problematic, that's not work that you've done in this case; correct?

MS. WILKINS: Object to form.

THE WITNESS: The Uber has only produced data for these drivers. They have not produced trip level data for all of the drivers on its platform, nor have they produced trip level data that would allow me to do a similar analysis for any driver that had a sexual misconduct or sexual assault report. I am unable to do that analysis because Uber has not produced that data so I am limited by those productions to analyzing the data in this way in my report.

BY MS. LEVY:

Q. And you're not suggesting that Uber shouldn't allow drivers to drive during late night hours?

MS. WILKINS: Object to form.

THE WITNESS: I am showing the data in the way, especially on the next image, I believe it's a heat map of the data, how Uber has even analyzed that data internally to the

KELLER

extent that I have been given this type of data for these five drivers by Uber.

BY MS. LEVY:

Q. For none of the five drivers do you intend to offer value judgments about whether the patterns you see are good or bad or problematic, you don't intend to do that in this case; correct?

A. I offer opinions on what that data show. I am unable to draw comparisons to other data because Uber did not produce that data and I cannot provide any value judgments to that data.

Q. In paragraph 10 and Figure 3, this is a visual depiction of the percent of Mr. Turay's trips by hour on various days of the week; correct?

A. Correct, it's another way of looking at the same data that we were looking at just recently in Figure 2 but as a percentage and in a heat map. This image is one that Uber has internally that I've seen in documents.

KELLER

Q. And again, the darker images represent a higher percentage of trips; correct?

A. The darker squares I think you mean represent a higher percentage of trips, yes.

Q. So at its highest level for Mr. Turay, it looks like his highest percentage of trips by hour occur Saturdays and Sundays and a little bit on Friday night; correct?

A. It looks like from this we see the red images start or the red shading start Friday at what would be 2100 hours local time so that would be 9 p.m. Again a similar time frame on Saturday as well extending into the early morning hours -- it would be Friday into the early morning hours and then again on Saturday into the early hours of Sunday. So you can see that carry over from basically 9 p.m. on Friday into nearly 3 a.m. on Saturday and so on and so forth.

Q. Is there anything wrong with a

driver choosing to drive more on the weekend?

MS. WILKINS: Object to form.

THE WITNESS: I'm not providing a value judgment. I'm showing the data in a way that I've seen Uber internally look at this data specifically in this way and so that's why I'm presenting this information in this fashion in this table for this figure I should say.

BY MS. LEVY:

Q. And that would be for all the drivers, not just Mr. Turay, but you're not providing any value judgment about their patterns for any of these drivers in Appendix D; correct?

A. I am describing the patterns that I am able to see in their data and those are contained in Appendix D.

Q. And table 2 for Mr. Turay breaks down his ratings in four different time slots; correct?

A. This table shows the breakdown of

KELLER

ratings, whether it was 1 star rating by time of day and those times of day are defined in the same way that we described earlier using the S-RAD definitions as put forward in the Wong deposition.

Q. And if I'm reading this correctly, and making sure I understand what you've done here, for 1 star ratings for Mr. Turay, it looks like he had a higher percentage of 1 star rating on non-late night hours than on late night hours during the weekday; is that true?

A. So it looks like in this table, 46.77 percent of Turay's 1 star ratings occurred on weekend non-late night hour trips.

Q. And another 29 percent occurred on weekday non-late night trips; correct?

A. You're reading the chart correctly.

Q. Okay. And so if you add those together, if we round up the 29 to 30, it's roughly 36 -- I'm sorry, 76 or 75 percent of his trips that are 1 star

KELLER

rated, 75 percent of those occurred not during late night hours. Do you agree?

A. That is the -- that's how that table adds up but I would urge you to remember that late night hours are a small percentage of the hours in the day so keeping that in mind when reviewing this chart is important.

Q. Late night hours are a large percent of Mr. Turay's trips however; right?

MS. WILKINS: Object to form.

THE WITNESS: They are a larger percentage of his trip volume.

BY MS. LEVY:

Q. Turning to page 14, idle ride notifications, what you've depicted here is a graphic depiction of idle ride notifications based on the Bates number described in this Exhibit 1605 from the Mariana Esteves deposition; correct?

A. This is another spreadsheet of communications data that Uber maintains and in this dataset, when it detects a

KELLER

ride that has been idle for I believe five minutes or longer will send a nudge to the driver and rider to ask basically if everything's okay. They do that in a number of different messages but that's what the idle notification is so I was asked to identify the volume of those using a few phrases as provided by counsel and the results of that analysis is shown in this figure.

Q. By idle ride notifications, you mean RideCheck; right? That's the same as what is sometimes referred to as RideCheck?

A. Yes, I think they are the same. It's when someone's -- I know them when you're sitting in the car and there's something -- that car has not moved in a time -- in some time, I think it's five minutes, that Uber sends out a notification to both rider and driver.

Q. And there can be many, many reasons why a RideCheck notification or an idle ride notification would go out that

KELLER

would have nothing whatsoever to do with sexual assault or sexual misconduct; true?

MS. WILKINS: Object to form.

THE WITNESS: Those notifications are sent out by the platform due to the car not moving. Whether that sexual assault is occurring, which I know that has been the case for some. In others I understand that sometimes there's just traffic and that car hasn't moved in five minutes, but I do know that those notifications are sent a number of times if the car continues not to move.

BY MS. LEVY:

Q. And have you done any other analysis of idle ride notification to RideCheck other than that as reflected in -- for Mr. Turay other than that reflected in paragraph 12?

MS. WILKINS: Object to form.

THE WITNESS: I think I state this in my main report. I asked for the RideCheck notification data,

KELLER

especially as it pertains to the sexual assault incident data or the sexual safety report data. That has not been provided to me so I am limited by the data that was produced by Uber to being able to analyze the data for these profiles for these drivers.

BY MS. LEVY:

Q. And the last paragraph that you included in Exhibit D with respect to Mr. Turay is the figure that we see on page 15 of 43, Figure 5, that is a -- is a screenshot, I believe, of Mr. Turay's safety incident history, sometimes referred to as safety lens.

A. Yes, this is a screenshot from an internal document from Uber. I have not changed it in any way.

Q. Okay. And you do not intend to offer any analysis of the safety lens, you do not intend to offer any value judgments about the safety lens, the extent of what you intend to say about Mr. Turay's safety

incident history is contained within this report; correct?

MS. WILKINS: Object to the compound and vague nature of the question.

THE WITNESS: I would say I'm not offering any value judgments about the safety lens image or the document that's cited here. It is possible that I'm asked to analyze the numbers that are in that screenshot, the number of incidents that were reported for this individual, and being able to calculate how many those total up to be because that is in my area of expertise.

BY MS. LEVY:

Q. And you've calculated that, you've calculated the number of incidents already and provided that in your report; correct?

MS. WILKINS: Object to form.

THE WITNESS: Yes, that's in the table that I think we discussed

KELLER

earlier, the number of prior incidents of specifically sexual assault and misconduct incidents are in that table. The resolution is pretty bad on my end here so I don't know if you can see any better, but I understand that there's other types of data that is reflected here so I don't want to rule out that I would be asked at some point to count these things at some point in time, but I'm not offering value judgments about that similar to the ways I've analyzed the data elsewhere in my report.

BY MS. LEVY:

Q. And you're not going to say, for example, that Uber should have taken action against Mr. Turay at a different point in time or Uber didn't act responsibly with respect to a particular actioning of something in the safety lens; that's beyond what you intend to offer with respect to your opinions about these individual drivers; correct?

MS. WILKINS: Object to form.

THE WITNESS: So I offer opinions on the types of data that Uber had in its possession and the types of information Uber was aggregating itself about these data including through these screenshots. Since I didn't have the underlying data for the screenshot, for example, here, this is other data that Uber had in its possession that it did not produce so I'm analyzing the data that it did have in a few ways. I've also produced a comprehensive timeline of all of the data that -- or of all the time based data that Uber -- that I had for these drivers and trips so I produced that in my report as well.

BY MS. LEVY:

Q. I want to make sure I understood your last point which is: Is it your testimony that Uber did not produce data, any additional data underlying these incidents?

KELLER

A. So there's reports in this screenshot that I don't have, or not in this screenshot but for other drivers that I don't have. Uber did not produce that data. It's outside the time frame that Uber produced data.

Q. Okay. I understand. But for the -- do you understand that Uber did, in fact, produce Bliss and Jira tickets about these drivers that appear in the safety lens, you understand that that data was produced?

MS. WILKINS: Object to form.

THE WITNESS: I understand that Uber produced pdf copies of those but what I'm saying is in the safety data that's in the secured BDO environment, that's outside of -- because that data ends in 2022, many of the incidents that are discussed in the tickets that are pdf copies are not in that data as well as some of the pre -- the events that happened prior to the incidents affecting the plaintiffs.

KELLER

BY MS. LEVY:

Q. The analysis that we've been through with Mr. Turay that we've just talked about, you did the same for the other drivers that are in Appendix B, Edwin Castaneda, Jeffrey Richardson, Felix Perez Rodriguez and Michael Le -- apologies, let me ask it in a more simple way.

Your analysis with respect to the other drivers in Appendix B follows the same methodology with the same limitations that we just discussed with Mr. Turay; correct?

A. A point of clarification, I think we're talking about Appendix D as in dog. I thought I heard you say B as in boy.

Q. Sorry, I meant to say D.

A. For D as in dog Appendix, I wrote a script that generated the same image for all of the drivers in the exact same way so it ran as a loop and so for each driver it generated the same analyses. And if there was data available, it was displayed

KELLER

in their section of the report.

Q. We talked about at the beginning of this deposition some of the work you've done in other -- before MK Analytics in other career -- points in your career, and my question is: In any of the work that you've done in other cases, have you done any of these same analyses that we talked about for Mr. Turay? Have you ever done these analyses in any other litigation or any other job besides this case?

MS. WILKINS: Object to form.

THE WITNESS: I write profiles all the time. I think we were talking when I was first at the -- when we were talking about my time at the union, I would write profiles of the companies that were on the other side of the bargaining table analyzing the information that I could find on them. When I was at the Attorney General's office, I would write profiles up on the investigative leads that I had for the office, including recently we've

KELLER

written -- MK Analytics has written profiles on potential gun trafficking leads.

I in the opioids litigation wrote profiles on the prescribers to show the richness of the data and exemplify that to the court. So writing profiles is something that I've done a number of times throughout my career.

BY MS. LEVY:

Q. And is this the first time that you've analyzed individual drivers and their history with respect to sexual assault and sexual misconduct?

MS. WILKINS: Object to form.

THE WITNESS: So throughout my career, I've worked with various types of data. The methodology that I use throughout my work remains the same. The tool sets will often be similar but the subject matter will change and so in this case I may be using the same methodology as a data analyst but applying it to that of drivers, to

that of rides, to that of sexual assaults, but the methodology where I've been admitted as an expert a number of times including in federal court remains the same.

BY MS. LEVY:

Q. Have you provided your data or your analysis to anybody else other than the attorneys that you are working on in this case?

A. Have I provided the data to anybody else?

Q. Yes.

A. Absolutely not.

Q. And have you had any contact with any press or media about the work that you've done in this case?

A. Absolutely not.

Q. Have you or anybody on your staff had any contact with The New York Times about the work that you have done in this case or the data that you've looked at?

A. Absolutely not.

MS. LEVY: I believe that we're

KELLER

close to time. I would like to go off the record and check and see if I have any other questions that we're going to do today and I'll ask your indulgence for like 30 seconds to do that but don't go away.

THE VIDEOGRAPHER: Going off the record. The time is 8:25 p.m. Eastern time.

(Discussion off the record.)

THE VIDEOGRAPHER: We're back on the record. The time is 8:26 p.m.

MS. LEVY: I am going to leave the deposition open for purposes of evaluating whether there are additional questions we need to ask and whether we would like to go to the court and get clearer answers to some of the questions but subject to that, I thank you for your time today, Ms. Keller, and Counsel. I know it's late wherever you are. It's even later where we are and we appreciate your time.

MS. WILKINS: We are just slightly over time. If you have additional questions right now that you feel have not been answered, I invite you to ask them now and am willing to indulge you in a bit more time. Otherwise we will object to any efforts to reopen this.

MS. LEVY: I understand we are going to have to agree to disagree about that.

MS. WILKINS: I have a few additional questions. I should hopefully be very, very quick. Do you need a break before that?

MS. LEVY: No.

EXAMINATION

BY MS. WILKINS:

Q. Ms. Keller, did your political views affect your opinions in this case in any way?

A. Absolutely not. That is not a factor in any of the cases that I have been a part of, especially not this case.

KELLER

Q. Does your political views affect your judgment in conducting your research to reach your opinions in this case in any way?

A. The same answer that my methodology is that of a data scientist or data analyst.

Q. Earlier today, quite awhile ago, you were asked to look at some documents about allegations that were made against certain individuals who have relationships with The New School, with the Service Employees International Union and with the New York Attorney General's office. Do you recall that questioning generally?

A. Yes.

Q. Do you recall that you were shown three documents about that topic?

A. I recall being shown some documents. I don't remember how many.

Q. Do you have any personal knowledge as to whether the allegations against any of the individuals identified in those documents were true or not?

KELLER

A. Many of the -- I think all of the allegations occurred after I had left my position in those organizations, whether I was a student or working at the union or working at the Attorney General's office so the allegations were after my time there, and I also was not aware of any of the allegations personally.

Q. Do you know whether the allegations that were made against those individuals would be defined as sexual misconduct, sexual assault, sexual harassment or anything else?

A. I'm not aware of the specifics of the allegations so I would be theorizing one way or the other.

Q. Earlier today you were asked a series of questions about whether you have authored any publications related to sexual assault or sexual misconduct. Do you recall those questions?

A. Yes.

Q. Was there something unclear to you about the question that was being

KELLER

asked of you?

A. So that was early in our deposition. I was not sure what Ms. Levy meant by sexual assault and misconduct, if she was using the terms defined by Uber or some other term. Because I had authored a number of reports specifically about using data in investigations, I wasn't sure what the truthful answer would be. If asking about have I authored a study specific to sexual assault in the way that or misconduct that Uber defines it, I have not authored publications in that context.

Q. We've talked a lot about S-RAD scores and the data that Uber uses to evaluate S-RAD scores and the data that has been produced in this litigation with respect to S-RAD scores.

Has Uber produced in this litigation data that allows you to determine how a particular S-RAD score equates to an estimated increased risk of sexual assault occurring on that ride?

A. So hopefully I understand what

KELLER

you're asking. Uber has not produced data that I need to contextualize that S-RAD score. Was it -- and that would be in the supply plans and I think I spoke about this earlier. The supply plans would show the volume of S-RAD -- I'm sorry. I thought I saw somebody at the door and it's late here. Let me start over.

So Uber had -- has not produced data that would allow me to contextualize a particular S-RAD score and I think I discussed this a little bit earlier is that would be in the supply plan data. So every trip that was requested, whether it was the plaintiffs' trips or any trip that resulted in a sexual assault or misconduct in the safety data, Uber has not produced the supply plans for those trips, so I am unable to see if that was the highest S-RAD score available or if it was the lowest, I don't have an ability to determine where that S-RAD score fell. Nor has Uber produced the inputs to that score other than what it's produced for

KELLER

the plaintiff trips. I don't have those inputs for other trips that were scored on the platform. I don't have those inputs, those scores of those inputs, the values like I have for the plaintiffs for other trips that occurred on the platform. Uber has not produced that data, just to name a few examples of datasets that I know Uber has in its possession but has not produced.

Q. You mentioned today a few times supply plans or supply plan data. What does that mean?

A. So when you request or anybody on the platform requests a trip, Uber calls that a supply plan or a driver rider pairing, so that supply plan looks at all trips that are available to service that ride. And it -- when so far as S-RAD it then scores those supply plans for their risk of assault according to the S-RAD model.

Q. If Uber had produced its supply plan data, is there additional analysis

that you would have done using that data?

A. So I think I talked about this a little bit. I would be able to analyze if there were trips with lower S-RAD scores that could have been dispatched or trips with higher S-RAD scores, that's the type of analysis I could run for the plaintiffs' trips. I could run that same type of analysis if there was a link to the safety data through trip UUID, which is a unique identifier assigned to a trip. If that identifier plus the S-RAD score was produced, I would be able to -- I would want to analyze what the supply plans were for a trip in the safety data. I would want to look at were there trips available with higher scores, with lower scores as compared to the trip in the safety data that was ultimately dispatched. I could probably name a few other examples but I know it's getting late but there's a number of analyses that I would like to run and I know I had said this in my report, I reserve the right to

KELLER

run said analyses if that data had been produced.

Q. Talking about reserving the right, are you reserving the right to supplement your opinion with respect to what metrics Uber could have included or considered in S-RAD model based on the review that you intend to do of the Flack raw data that was just recently produced?

A. Because the Flack data was just produced, I have not had a chance to fully review it for its contents and how it relates to the other datasets that I analyzed in this report. So yes, I would like to reserve that right and have the time to adequately analyze the dataset that I've been waiting for.

Q. Are you also reserving the right to supplement your opinions with respect to Uber's dispatch of trips above Uber's S-RAD flagging thresholds based on a review of the Flack raw data that was recently produced after you served your current report?

A. Because the Flack data includes years including years that were not produced in the Bliss and Jira data, I'm interested in reviewing that data for a number of things including how it relates to the plaintiffs' trips, so in short I reserve my right to make additional analyses from that data.

MS. WILKINS: That's all I have, thank you.

MS. LEVY: I just in my bonus 12 or 14 minutes that you've given me, just a couple more follow-ups.

FURTHER EXAMINATION

BY MS. LEVY:

Q. Is a woman more likely to be assaulted in her own home or while taking an Uber ride?

MS. WILKINS: Object to form, object to this being outside the scope of Ms. Keller's opinions as she has talked about many, many times today.

THE WITNESS: So the answer is the same answer to the other questions

KELLER

related to this. My analysis centers on the data Uber had in its possession and what it did with that data, how it analyzed that data, how it built S-RAD using some of that data versus what it told the public in its safety reports.

BY MS. LEVY:

Q. You don't know if a woman is more likely to be assaulted in her own home or while taking an Uber, you don't know the answer to that, do you?

MS. WILKINS: Same objection.

THE WITNESS: That would be a different analysis than what I've done. That's not necessary for me to do because my analysis centers on the information that Uber has in its possession.

BY MS. LEVY:

Q. Is a rider more likely to be sexually assaulted in an Uber or struck by lightning?

MS. WILKINS: Same objections. This is outside the scope of

Ms. Keller's opinions and I believe you asked that identical or a nearly identical question earlier so it's been asked and answered.

BY MS. LEVY:

Q. You don't know the answer to that question either, do you?

MS. WILKINS: Same objection.

THE WITNESS: The same answers I gave to the previous question and the number of -- the numerous questions related to this that you've asked me before, it's not necessary for my analysis because what I set forth to do is analyze what Uber had in its possession, the data it had in its possession, how it analyzed that data, how it built a machine algorithm using that data and what it told the public about that data.

BY MS. LEVY:

Q. And you've looked at no data and done no comparison of the frequency or rate of sexual assault on Uber compared to

anywhere else; correct?

MS. WILKINS: I am going to object to that question as asked and answered at least probably 20 times in this deposition. And I'm going to instruct the witness not to answer. Ms. Levy, I'm glad to afford you a few additional minutes of time here. Now it will be beyond the seven hours. The questions you're asking are outside the scope of the redirect and they have been asked and answered many times. If you have new questions or questions that fall within the scope of redirect, I'm happy to allow the witness to answer them, but we're not going to recover testimony we have covered numerous times today.

MS. LEVY: You're instructing the witness not to answer that question?

MS. WILKINS: I am.

BY MS. LEVY:

Q. Are you going to follow your counsel's instruction?

KELLER

A. Yes.

Q. With the skills you have and from your education and experience, it would be possible, even though you haven't done it, to study the rate and frequency of sexual assault elsewhere, outside of Uber, that would be something that is doable; correct?

MS. WILKINS: Object to form.

THE WITNESS: I don't know how you're defining rate. I don't know how you're defining study. I have my skill set as a data analyst. If there are datasets that I can analyze, I will take that into consideration. I don't know what datasets exist nationwide or that would be -- that would allow me to do such an analysis. I haven't considered that so I would be theorizing beyond what I've already included in my report.

BY MS. LEVY:

Q. Looking at the prevalence of sexual assault or sexual misconduct

incidents anywhere else besides Uber is outside the scope of what you were asked to do and what you did in this case?

MS. WILKINS: Object again, and I'm again going to again instruct the witness not to answer. This is the same question that's been asked many, many, many times today, Ms. Levy. If you have questions about Ms. Keller's opinions that are in her report, I will allow her to answer those questions. She has told you many, many, many times that she is not comparing Uber's incident rates to anything other than what Uber has told the public. So if you're asking questions about comparisons to anything other than what Uber has told the public, I'm going to instruct Ms. Keller not to answer those questions and we're going to close the deposition.

MS. LEVY: With Ms. Wilkins' fervent representation on the record

KELLER

that your opinions are contained in the report, I am satisfied that we can conclude for the day. I am leaving the deposition open, as I mentioned before, reserving rights to petition the court or seek additional time with Ms. Keller. We can conclude for today.

MS. WILKINS: I'm going to object with the misrepresentation of what I just said, but with that said we can move on and close the deposition.

MS. LEVY: Thank you very much. It's nice to see you again, Ms. Keller. Have a great rest of your evening.

THE VIDEOGRAPHER: We are off the record at 8:42 p.m. Eastern time and this concludes today's testimony given by Lacey Keller. The total must be of media used was 6 and will be retained by Veritext.

(Time noted: 8:43 p.m.)

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NASSAU )

I, CATHI IRISH, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New York, do hereby certify:

That LACEY KELLER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of October, 2025.

CATHI IRISH, RPR, CRR, CLVS

---------------- I N D E X ---------------


| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| LACEY KELLER | MS. LEVY | 6, 374 |
| | MS. WILKINS | 366 |


----------------- EXHIBITS ---------------


| EXHIBIT NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1, expert report | | 9 |
| Exhibit 2, Appendix C | | 14 |
| Exhibit 3, article titled SEIU Has A Sexual Predator Problem | | 30 |
| Exhibit 4, article titled Student Sues University Over Response to Sexual Misconduct | | 34 |
| Exhibit 5, article from The New Yorker | | 69 |
| Exhibit 6, statement from Attorney General James | | 74 |
| Exhibit 7, MK Analytics website page | | 86 |
| Exhibit 8, document Bates labeled UBER_JCCP_MDL_000356814 | | 134 |

Exhibit 9, 2017-2018 Safety Report 171
Exhibit 10, Appendix A 276
Exhibit 11, Appendix D 340

*** ERRATA SHEET ***

NAME OF CASE: In Re: Uber Technologies, Inc., Passenger Sexual Assault Litigation

DATE OF DEPOSITION: October 27, 2025

WITNESS: Lacey Keller

| PAGE | LINE | FROM | TO |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

________________________

LACEY KELLER

Witness and sworn to before me

this ____ day of ____________, 2025.

____________________ ________________________

(Notary Public) My Commission Expires:

10/27/2025 - In Re: Uber Technologies, Inc., Passenger Sexual Assault Litigation

ACKNOWLEDGEMENT OF DEPONENT

I, Lacey Keller, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

________________________ _______________

LACEY KELLER DATE

*IF NOTARY IS REQUIRED

SUBSCRIBED AND SWORN TO BEFORE ME

THIS______ DAY OF_______________, 20___.

__________________________

NOTARY PUBLIC

JENNIFER LEVY, ESQ.
jlevy@kirkland.com

October 28, 2025

RE: In Re: Uber Rideshare Cases v.
10/27/2025, Lacey Keller (#7684484)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (Erratas-CS@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions