[Submitting counsel below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION

This Document Relates to:

*JANE DOE QLF 001 v. Uber Technologies, Inc. et al.,*
N.D. Cal. No. 3:24-cv-08783
W.D. Tex. No. 1:26-cv-01694

CASE NO. 3:23-MD-03084-CRB

**DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S OPPOSITION TO PLAINTIFF QLF 001's OMNIBUS MOTION TO EXCLUDE EXPERT TESTIMONY**

Judge: Hon. Charles R. Breyer

Courtroom: 6 – 17th Floor

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

JANE DOE QLF 001,

*Plaintiff,*

v.

UBER TECHNOLOGIES, INC., et al.,

*Defendants.*

CASE NO. 26-CV-01694-CRB

Judge: Hon. Charles R. Breyer

# TABLE OF CONTENTS


**Page**

**I. DR. SARAH BAKER ........ 1**

**II. KEVIN PHELAN ........ 4**

A. Mr. Phelan Does Not Improperly Opine On Plaintiff's Credibility ........ 4

B. Mr. Phelan's Opinions Regarding The Police Investigation Of Mr. Le Are Relevant. ........ 6

C. Mr. Phelan's Opinion Regarding The Tarrant County Court Records Search Is Relevant And Reliable. ........ 8

**III. DR. KRISTEN ZGOBA ........ 9**

A. Dr. Zgoba's Comparative Safety Risk Opinions Are Admissible. ........ 9

B. Dr. Zgoba's Harm-Reduction Opinions Are Admissible. ........ 10

C. Dr. Zgoba's Opinions On The Efficacy And Impact Of Uber's Reporting Systems Are Reliable. ........ 12

D. Dr. Zgoba Does Not Offer Impermissible Opinions On Uber's Motives. ........ 14

E. Dr. Zgoba's Citation To Surveillance And Crime Prevention In Prisons Is Proper. ........ 16

F. Dr. Zgoba's Comparative Risk Opinions Are Reliable. ........ 16

G. Dr. Zgoba's "Zero Risk" Opinions Are Highly Relevant And Directly Rebut Plaintiff's Expert Opinions. ........ 18

H. Dr. Zgoba's Background Check Opinions Are Reliable And Admissible. ........ 19

**IV. LINDSAY ORCHOWSKI ........ 21**

A. Dr. Orchowski's Opinions On Alcohol-Related Risk Are Plainly Relevant. ........ 21

B. Dr. Orchowski's Opinions Explaining The Inaccuracy Of Predicting Sexual Misconduct Are Proper. ........ 22

**V. BETSY BARTKO ........ 22**

**VI. ERIC PIZA ........ 24**

**VII. CHRISTOPHER WILSON. ........ 25**

**VIII. JASON MORRIS ........ 26**

**IX. JOSEPH OKPAKU ........ 29**

A. Mr. Okpaku's Opinions Regarding Industry Standards And The Texas TNC Statute Are Not Improper Legal Conclusions. ........ 30

B. Mr. Okpaku's Opinions Regarding The Safety Of Ridesharing Compared To Other For-Hire Transportation Measures Are Admissible And Reliable. ........ 31

**TABLE OF CONTENTS (CONT'D)**

**Page**


C. Mr. Okpaku's Opinions Regarding The Efficacy Of Uber's Safety Measures And Dashcams Are Admissible And Reliable. ....32

D. Mr. Okpaku's Opinion Regarding The Disparate Impact Of Fingerprinting Is Admissible And Reliable. ....34

E. Mr. Okpaku's Opinions Regarding Uber's Lack Of Control Over Drivers Are Admissible And Reliable. ....34

**X. VIDA THOMAS....35**

A. Ms. Thomas Is Qualified To Opine That Uber's Background Check Process Meets Generally Accepted HR-Industry Standards. ....35

B. Ms. Thomas's Opinion That Information Ascertainable By Uber Did Not Indicate Mr. Le Had A History Or Posed A Threat Of Sexual Assault Is Relevant And Admissible. ....36

C. Ms. Thomas's Opinion That Uber's Investigation Was Consistent With Generally Accepted HR Standards Is Reliable. ....37

D. Ms. Thomas Does Not Opine On Legal Requirements ....38

**XI. EXPERT TESTIMONY REGARDING LEGAL BARRIERS ....38**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Martin*,
No. 2:08CV400, 2010 WL 11530629 (E.D. Tex. June 7, 2010) ....................21

*Am. Can! v. Arch Ins. Co.*,
597 F. Supp. 3d 1038 (N.D. Tex. 2022) ....................27, 31, 34, 39

*Berman v. Freedom Fin. Network, LLC*,
400 F. Supp. 3d 964 (N.D. Cal. 2019) ....................22

*Cason v. C.R. Bard, Inc.*,
No. 1:12-CV-1288-MHS, 2015 WL 9913809 (N.D. Ga. Feb. 9, 2015) ....................28

*Doe (E.M.B.) v. G6 Hospitality, LLC*,
No. 9:23-CV-00173-MJT-CLS, 2025 WL 2556106 (E.D. Tex. Apr. 23, 2025) ....................37

*Equal Emp. Opportunity Comm'n v. Mod. Grp., Ltd.*,
725 F. Supp. 3d 644 (E.D. Tex. 2024) ....................10, 11, 14

*Ervin v. Kroger*,
No. 4:14-CV-262, 2015 WL 11089475 (E.D. Tex. June 3, 2015) ....................15

*Fetty v. City of Baton Rouge*,
518 F. Supp. 3d 923 (M.D. La. 2021) ....................5

*Freeny v. Murphy Oil Corp.*,
No. 2:13-CV-791-RSP, 2015 WL 11089599 (E.D. Tex. June 4, 2015) ....................15

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ....................13

*Gree, Inc. v. Supercell Oy*,
No. 2:19-CV-00071-JRG-RSP, 2020 WL 4059550 (E.D. Tex. July 20, 2020) ....................14

*Hangarter v. Provident Life & Accident Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .................... *passim*

*Holcombe v. United States*,
516 F. Supp. 3d 660 (W.D. Tex. 2021) ....................22

*Hunter v. Elanco Animal Health Inc.*,
No. 1:20-cv-01460-SEB-MG, 2022 WL 3445173 (S.D. Ind. Aug. 17, 2022) ....................17

*In re Flint Water Cases*,
No. 16-10444, 2023 WL 6279521 (E.D. Mich. Sept. 26, 2023) ....................18

*In re Harley-Davidson, Inc., Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wis. 2009)....17

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
No. 3:09-MD-02100-DRH, 2011 WL 6301625 (S.D. Ill. Dec. 16, 2011)....12

*Kakeh v. United Plan. Org., Inc.*,
587 F. Supp. 2d 125 (D.D.C. 2008)....3

*Kim v. Am. Honda Motor Co.*,
86 F.4th 150 (5th Cir. 2023)....21

*Kruszka v. Novartis Pharms. Corp.*,
28 F. Supp. 3d 920 (D. Minn. 2014)....28

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....15, 29

*Lamar Advert. Co. v. Zurich Am. Ins. Co.*,
533 F. Supp. 3d 332 (M.D. La. 2021)....33, 34

*Lambert v. Certain Underwriters at Lloyds of London*,
No. 1:19-CV-01080, 2021 WL 6973856 (W.D. La. Dec. 17, 2021)....19

*Leyman v. Amazon Logistics, Inc.*,
No. 2:24-CV-129-BR, 2026 WL 2283610 (N.D. Tex. Aug. 7, 2026)....27, 29

*Lord Abbett Municipal Income Fund, Inc. v. Asami*,
No. C-12-03694 DMR, 2014 WL 3417941 (N.D. Cal. July 11, 2014)....37

*McReynolds v. Sodexho Marriott Servs., Inc.*,
349 F. Supp. 2d 30 (D.D.C. 2004)....34

*Monroe v. Zimmer U.S. Inc.*,
766 F. Supp. 2d 1012 (E.D. Cal. 2011)....12, 13

*Munoz v. PHH Mortg. Corp.*,
478 F. Supp. 3d 945 (E.D. Cal. 2020)....23

*Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*,
68 F.4th 206 (5th Cir. 2023)....22

*Navarro v. Hamilton*,
No. 5:16-CV-1856-CAS, 2019 WL 351873 (C.D. Cal. Jan. 28, 2019)....31

*Newton v. Roche Laboratories, Inc.*,
243 F. Supp. 2d 672 (W.D. Tex. 2002)....11

*Perez v. City of Austin*,
No. A-07-CA-044 AWA, 2008 WL 1990670 (W.D. Tex. May 5, 2008)....................................32, 33

*Petrosyan v. Hustedt*,
No. CV 14-4145 DMG, 2015 WL 13917735 (C.D. Cal. Sept. 24, 2015) ..........................................2

*Pipitone v. Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) ....................................................................................................13

*Ponds v. Force Corp.*,
No. CV 16-1935, 2016 WL 7178483 (E.D. La. Dec. 8, 2016)........................................................27

*Price v. Colvin*,
794 F.3d 836 (7th Cir. 2015) ......................................................................................................3

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010), *as amended* (Apr. 27, 2010)............................................................13

*Query v. Costco Wholesale Corp.*,
No. CV 24-2082, 2026 WL 1212219 (E.D. La. May 4, 2026) ........................................................19

*Roman v. W. Mfg., Inc.*,
691 F.3d 686 (5th Cir. 2012) ................................................................................................11, 14

*Rushing v. Kansas City S. Ry. Co.*,
185 F.3d 496 (5th Cir. 1999), *superseded by statute on other grounds by Burkle v. Patrick,* No. 20-50221, 2025 WL 943225 (5th Cir. Mar. 28, 2025)..................................................35

*SA Music LLC v. Apple, Inc.*,
592 F. Supp. 3d 869 (N.D. Cal. 2022) ........................................................................................28

*San Francisco Baykeeper v. City of Sunnyvale*,
627 F. Supp. 3d 1085 (N.D. Cal. 2022) ......................................................................................28

*SEC v. Life Partners Holdings, Inc.*,
No. 1-12-CV-00033-JRN, 2013 WL 12076933 (W.D. Tex. Oct. 23, 2013) .......................................9

*Skidmore v. Precision Printing & Packaging, Inc.*,
188 F.3d 606 (5th Cir. 1999) ................................................................................................2, 5

*Stewart v. Quality Carriers, Inc.*,
No. CV 19-00606-BAJ-SDJ, 2021 WL 2708924 (M.D. La. June 30, 2021) ....................................12

*Stiner v. Brookdale Senior Living, Inc.*,
665 F. Supp. 3d 1150 (N.D. Cal. 2023), *opinion clarified by* No. 17-CV-03962-HSG, 2024 WL 3498492 (N.D. Cal. July 22, 2024)..........................................................................28

*Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*,
No. 13-0366, 2016 WL 9414347 (E.D. La. May 13, 2016).........................................................38

*United States ex rel. Taylor v. Healthcare Assocs. of Texas, LLC*, No. 3:19-CV-02486-N, 2024 WL 4508961 (N.D. Tex. Oct. 15, 2024) ....................................14, 15

*United States v. Diaz*, 876 F.3d 1194 (9th Cir. 2017) ....................................37

*United States v. Hall*, 653 F.2d 1002 (5th Cir. 1981) ....................................7

*United States v. Holguin*, 51 F.4th 841 (9th Cir. 2022) ....................................29

*United States v. Lopez*, No. H-09-342, 2012 WL 4663530 (S.D. Tex. Oct. 1, 2012), *aff'd sub nom. United States v. Kuhrt*, 788 F.3d 403 (5th Cir. 2015)....................................8

*United States v. Sims*, 514 F.2d 147 (9th Cir. 1975) ....................................3

*Van Winkle v. Rogers*, 82 F.4th 370 (5th Cir. 2023) ....................................38

*Vazquez v. Aguilera*, No. 5:19-CV-117, 2022 WL 2292888 (S.D. Tex. Mar. 25, 2022) ....................................28

*Villegas v. City of El Paso*, No. EP-15-CV-00386-DCG, 2026 WL 301073 (W.D. Tex. Jan. 28, 2026)....................................5

*Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771 (E.D. La. 2011)....................................11, 20

*Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, No. SA-16-CA-00485-FB-ESC, 2017 WL 1133506 (W.D. Tex. Mar. 24, 2017)....................................27, 29

*Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607 (5th Cir. 2018) ....................................35, 36

*Woodall v. Cycle Gear, Inc.*, No. 4:23-CV-870, 2025 WL 2323913 (E.D. Tex. Aug. 12, 2025)....................................12

**Statute**

Tex. Civ. Prac. & Rem. Code § 41.005(a)....................................35

**Rules**

Fed. R. Evid. 403 ....................................12, 16

Fed. R. Evid. 702 .................................... *passim*

Fed. R. Evid. 704 ....................22

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Uber") respectfully submit the following responses to Plaintiff's omnibus motion to exclude expert testimony.

## I. DR. SARAH BAKER

Dr. Sarah Baker, a board-certified clinical and forensic psychiatrist and associate dean at UT Southwestern Medical School, conducted an exam of QLF 001, reviewed copious medical records and testimony, and offers an opinion on Plaintiff's mental health and the causes of her alleged distress. Plaintiff does not challenge most of Dr. Baker's opinions. Instead, she focuses on the part of Dr. Baker's independent examination in which she assessed inconsistencies in Plaintiff's self-reported symptoms and recollections. In so arguing, however, Plaintiff misrepresents Dr. Baker's opinion. Dr. Baker does not intend to testify that "Plaintiff has a propensity for dishonesty and attention-seeking." And consistent with the Court's prior ruling concerning credibility testimony, Dr. Baker does not intend to tell the jury that Plaintiff is lying, generally dishonest, or fabricated the alleged assault.

Rather, Dr. Baker opines that inconsistencies in Plaintiff's self-report make it "[redacted]." In Dr. Baker's words:

> [redacted]

Baker Rep. ¶ 6(c) (Mot. Ex. A).

There is nothing wrong with Dr. Baker's opinions on these topics. Indeed, courts have recognized that such opinions reflect standard psychiatric methodology. Moreover, Dr. Baker reached her opinions by applying widely accepted psychiatric methods informed by her knowledge, experience, and thorough analysis of relevant facts and data.

Plaintiff's contention that Dr. Baker is offering improper "personal judgments as to Plaintiff's credibility, motives, and character," Mot. at 7, mischaracterizes Dr. Baker's opinion and the purpose for which she considered inconsistencies in Plaintiff's self-report. The Fifth Circuit recognizes that a psychiatrist is "in no way testif[ying]" about whether a plaintiff "was undoubtedly telling the truth" when she "merely opine[s] that [plaintiff's] symptoms and recollections appeared genuine and that [the psychiatrist] felt that [s]he had not been 'duped[.]'" *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999).[1] Other courts agree. "Psychiatrists are sometimes permitted to testify as to their assessment of whether a witness is being truthful. Juries need not believe these assessments . . . ." *Petrosyan v. Hustedt*, No. CV 14-4145 DMG, 2015 WL 13917735, at *11-12 (C.D. Cal. Sept. 24, 2015) (citing cases). Moreover, assessing a patient's psychological character and motivation is standard methodology—employed even by Plaintiff's own experts. *See, e.g.*, Lebowitz Rep. at 42 (Ex. 1) ("[redacted][.]") (emphasis added); *id.* at 12 ("[redacted]") (emphasis added); Feltoon Rep. at 11 (ECF 7358-1) ("[redacted]") (emphasis added).[2] Dr. Baker should not be forced to compromise the well-established methods of her field simply because she is deploying them in litigation.

---

[1] Accordingly, none of Plaintiff's cited cases or filings in the MDL that prohibit expert testimony on a witness's credibility are relevant to the opinions she seeks to exclude. Mot. at 8. Unlike Dr. Feltoon's improper bolstering of Plaintiff's version of the disputed facts (ECF 7358 at 5), Dr. Baker identifies factual inconsistencies she uncovered through her record review and independent examination.

[2] Augustus E. Floyd & Vikas Gupta, *Minnesota Multiphasic Personality Inventory*, NIH (last updated Apr. 24, 2023), https://www.ncbi.nlm.nih.gov/books/NBK557525/, (MMPI "data can be used to draw conclusions about the test taker's psychopathic tendencies or to interpret ***psychological characteristics*** relative to the norm.") (emphasis added).

Dr. Baker is also allowed—and expected—to identify and explain inconsistencies and inaccurate statements made by a patient. *Kakeh v. United Plan. Org., Inc.*, 587 F. Supp. 2d 125, 130 (D.D.C. 2008) (forensic psychiatrist was "allowed to testify that he concluded that Plaintiff was not telling him the truth" without improperly "usurp[ing] the jury's function by opining on the general credibility or honesty of a person" because "it is certainly within the expertise of a forensic psychiatrist to opine on whether the individual he is evaluating is telling him the truth during his examination"). This is especially true for a forensic psychiatrist, whose "[y]ears of experience teach [her] to separate the wheat from the chaff and to use only those sources and kinds of information which are of a type reasonably relied upon by similar experts . . . ." *United States v. Sims*, 514 F.2d 147, 149 (9th Cir. 1975); *see also, e.g.*, *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) (psychiatrist's "professional training and experience would have taught him how to discount exaggerated statements by his patients"). That is precisely the analysis Dr. Baker performed. She identified conflicts between Plaintiff's current self-report and contemporaneous treatment records, and explained why those conflicts bear on the ability to attribute Plaintiff's present symptoms to a particular cause. Baker Rep. ¶ 6(c).

Plaintiff likewise misstates Dr. Baker's discussion of potential [redacted] and Plaintiff's interest [redacted]. Dr. Baker does not opine that Plaintiff's status as a [redacted] in this litigation establishes that she is dishonest. Instead, Dr. Baker explains that "[redacted]" because of her demonstrated "[redacted]" which Dr. Baker notes may be influenced—***unconsciously or not***—by the fact that Plaintiff describes herself as a [redacted] and indicated an "[redacted]" *Id.* ¶¶ 146-47. Dr. Baker similarly explains that Plaintiff's reported "[redacted]" could be affecting her reporting of symptoms and treatment progress, which Dr. Baker makes clear "[redacted]" *Id.* ¶ 149. Thus, Dr. Baker merely identifies various factors that may explain Plaintiff's inconsistent descriptions of the assault and her alleged injuries, which make it difficult to attribute those alleged injuries to the assault as opposed to some other cause; she does ***not*** opine that Plaintiff has bad character or is dishonest. Dr. Baker must be permitted to explain what Plaintiff told her and whether, and to what extent, she believes

the assault contributed to Plaintiff's reported symptoms. Because that opinion necessarily includes a discussion of Plaintiff's own inconsistent statements regarding the assault and her alleged injuries, there is no basis to exclude Dr. Baker's testimony.

## II. KEVIN PHELAN

Mr. Phelan is a former FBI Special Agent and an expert in criminal investigations. He opines that the police investigations regarding Plaintiff's accusations against Mr. Le departed from investigatory best practices because, among other reasons, they placed too much weight on Plaintiff's [redacted] statements regarding the events at issue, and because they missed opportunities to collect objective, forensic evidence that might have been available.[3] Plaintiff now seeks to exclude Mr. Phelan's opinions on the ground that they are improper opinions about Plaintiff's credibility. But that is not correct. Mr. Phelan does not opine whether Plaintiff was truthful or whether the assault occurred. Rather, Mr. Phelan's opinions are about the police investigations themselves—which Plaintiff has put at issue through the nonretained expert disclosure of Sergeant PJ Reinhardt, which is essentially a defense of his investigation—and those opinions are admissible. Plaintiff provides no persuasive arguments to the contrary.

### A. Mr. Phelan Does Not Improperly Opine On Plaintiff's Credibility.

Plaintiff's main argument for excluding Mr. Phelan's testimony is that Mr. Phelan's opinions all amount to "nothing more than calling Plaintiff a liar[.]" Mot. at 11. Specifically, Plaintiff argues that Mr. Phelan's "first two conclusions are credibility opinions on their face," and that his third and fourth opinions "continue his vilification of Plaintiff's credibility." *Id.* at 10. But that assertion mischaracterizes Mr. Phelan's report. Mr. Phelan is not opining about Plaintiff's credibility. Nor is he opining that Mr. Le was wrongfully convicted of the sexual assault charge. Rather, Mr. Phelan is opining that the investigations of Mr. Le by the Parker County Sheriff's Office ("PCSO") and the Fort Worth Police Department ("FWPD") departed from best investigative practices because, among other reasons, they put too much weight on Plaintiff's [redacted] statements and missed opportunities to collect objective, forensic evidence that might have been available. Mr. Phelan's report is clear on this point

[3] This opinion would not be offered if the Court grants Uber's motion in limine to exclude all references to the criminal investigation of Mr. Le. *See* ECF 7327.

because it focuses on the investigations, not on Plaintiff. *See* Phelan Rep. at 10 (Mot. Ex. B) ("PCSO's investigation began to depart from best investigative practices almost immediately."); *id.* at 13 ("FWPD . . . further deviated from best investigative practices."). And in any event, Mr. Phelan further clarified all this during his deposition. 9/14/2026 Phelan Dep. 66:3-14 (Ex. 11) (Q. "You're not offering an opinion that Victor Le did not sexually assault [Plaintiff], are you?" A. "No. I am simply looking at the investigation that was done and what we might learn of it in terms of what was the truth of what actually happened, and how does the investigation shed a light on the truth? Or, . . . where is the investigation . . . 'deficient' in terms of shedding a light in different areas of what we don't know?").

It is perfectly legitimate for an expert to opine on whether a police investigation met or fell short of professional standards. *See, e.g.*, *Villegas v. City of El Paso*, No. EP-15-CV-00386-DCG, 2026 WL 301073, at *6 (W.D. Tex. Jan. 28, 2026) (admitting expert opinion "critiqu[ing] the quality and content of [a police investigation] against accepted police practices," including because of "inconsistencies in the investigative process, a significant lack of physical evidence, deficiency in teamwork, leadership and supervision, along with deviations from standard and generally accepted police practices") (citation and internal quotation marks omitted). That is so even though an expert generally may not opine as to whether Plaintiff is telling the truth about her assault or otherwise purport to make credibility determinations that are within the province of the jury. *Skidmore*, 188 F.3d at 618.[4] The crucial distinction here, as articulated by another district court within the Fifth Circuit, is that an expert may opine about whether particular police practices "would be inconsistent with applicable policies or standards," but may not "pass judgment on the alleged victim's truthfulness[.]" *Fetty v. City of Baton Rouge*, 518 F. Supp. 3d 923, 933-34 (M.D. La. 2021) (citation omitted).

Each of Mr. Phelan's opinions is cabined accordingly. Contrary to Plaintiff's assertions, three of the four principal conclusions that Mr. Phelan offers in his report are expressly about the investigation itself, and not about Plaintiff's credibility. Phelan Rep. at 24 (Conclusion 1: "The investigation produced insufficient evidence and/or testimony to reasonably determine the credibility and veracity of Plaintiff's allegations"; Conclusion 3: "The affidavit submitted to obtain the arrest warrant for Victor Le lacked

[4] Indeed, Uber has sought to exclude certain expert opinions offered by Plaintiff on this precise ground. *See* Uber's Mot. to Exclude Pl.'s Expert David Feltoon, Ph.D. (ECF 7357).

physical evidence and relied too heavily on uncorroborated singular source Plaintiff testimony"; Conclusion 4: "Jurisdiction and venue issues derailed the investigation and prosecution from the beginning.").

Only one of Mr. Phelan's conclusions is couched in terms of Plaintiff's credibility. *Id.* (Conclusion 2: "[redacted]."). But Mr. Phelan clarified at his deposition that he is ***not*** "offering the opinion in this case that [Plaintiff] is not telling the truth[.]" Phelan Dep. 86:22-87:21. Instead, he is opining that "some of the things that [Plaintiff] has said [redacted]," and that things "could have been done" by the police to account for that in their investigations and to "get to the truth of the matter." *Id.*; *see also id.* 87:22-89:5 ("Let's say, you're [the investigating officer] and you sit down with [Plaintiff] and she says something that [redacted] what you just watched of the officers' video cameras from two weeks earlier. All I'm saying is, from an investigative point of view, [redacted], you need to be prepared to investigate that further . . . ."). Mr. Phelan further clarified that he "***wouldn't*** dismiss what [Plaintiff] was saying" based on the fact that some of her statements to the police were [redacted], *id.* 92:13-14 (emphasis added); rather, his opinion is that the police departed from best practices for criminal investigations by failing to "do an especially aggressive job" in vetting the content of these statements because of the fact that they were [redacted]. *Id.* 92:6-17; *see generally id.* 90:9-92:17. This opinion, accordingly, is about the quality of the police investigation, and not about Plaintiff's credibility. It should therefore not be excluded on the ground Plaintiff urges.

**B. Mr. Phelan's Opinions Regarding The Police Investigation Of Mr. Le Are Relevant.**

Tacitly conceding the prior point, Plaintiff next argues that even if Mr. Phelan's opinions are properly viewed as being about the quality of the police investigations, rather than about Plaintiff's credibility, those opinions are in any event inadmissible because "critiques of the investigation and prosecution of Victor Le" are irrelevant. Mot. at 12.[5] For two reasons, however, the Court should reject that argument at this stage.

---

[5] Plaintiff dedicates two sections of her brief to this topic—Section B ("Phelan's Critiques of the Underlying Criminal Investigation and Prosecution are Irrelevant") and Section C ("Phelan's Testimony Would Create Collateral Mini-Trials and Unfair Prejudice")—but both offer essentially the same argument.

First, the investigation and prosecution of Mr. Le are relevant to this case. Of course, Uber does not contest the fact that Mr. Le was investigated, charged, and eventually found guilty beyond a reasonable doubt of sexually assaulting Plaintiff. But Uber does dispute Plaintiff's account regarding the extent of her injuries. Uber further anticipates that Plaintiff will use the fact that Mr. Le was criminally prosecuted and convicted of sexual assault to bolster her account regarding the severity of the events and the extent of her damages; in other words, Plaintiff will ask the jury to infer that the assault here must have been particularly serious in its impacts on Plaintiff because this assault resulted in criminal prosecution and conviction, while many other such assaults do not. Uber is entitled to rebut that argument by disputing the investigatory tactics that ultimately led to the prosecution and conviction of Mr. Le.

Second, even if the Court would not find the investigation relevant on its own, Plaintiff has opened the door to such testimony by noticing Sergeant PJ Reinhardt, one of the FWPD officers involved in the investigation of Mr. Le, as a non-retained expert whom Plaintiff may call to testify at trial. *United States v. Hall*, 653 F.2d 1002, 1007 (5th Cir. 1981) ("[O]ne who induces a trial court to let down the bars to a field of inquiry that is not competent or relevant to the issues cannot complain if his adversary is also allowed to avail himself of the opening."). Plaintiff expects Sergeant Reinhardt "to testify regarding the investigation of the sexual assault involving Plaintiff and Le, including the steps taken by law enforcement, the collection and review of evidence, witness and collateral source interviews, communications with Uber . . . , investigative findings, basis for referring or supporting criminal charges, and the relationship between the investigation and the later criminal proceedings." 9/3/2026 Pl.'s Disclosure of Non-Retained Expert Witness: Sergeant Phillip Jeremy (PJ) Reinhardt at 2 (Ex. 12). If Sergeant Reinhardt testifies concerning the investigative steps, evidence, findings, or charging decision, his testimony will necessarily place the quality of that investigation before the jury. Moreover, were Sergeant Reinhardt to testify about the investigation of Mr. Le, then Uber would need to introduce Mr. Phelan's opinions about the investigation to rebut Sergeant Reinhardt's testimony. Accordingly, at the very least, the Court should defer ruling on the relevance of Mr. Phelan's opinions about the investigation until it is determined whether Plaintiff will call Sergeant Reinhardt.

### C. Mr. Phelan's Opinion Regarding The Tarrant County Court Records Search Is Relevant And Reliable.

At the conclusion of his report, Mr. Phelan offers an additional opinion: that a qualified investigator conducting a background check through the Tarrant County, Texas online criminal records database would reasonably believe that a search of that database would return records of both misdemeanor and felony convictions in the entire Fort Worth area. Phelan Rep. at 24-25. Plaintiff argues this opinion is irrelevant and unreliable, but both of those arguments are meritless.

First, the relevance of this opinion is obvious: Plaintiff will argue at trial that Uber was negligent because Checkr's 2020 background check of Mr. Le purportedly missed a misdemeanor citation issued against Mr. Le. Mr. Phelan's opinion rebuts that argument by explaining that an investigator searching the Tarrant County database would reasonably understand that search to pull both felony and misdemeanor convictions.

Second, this opinion is the product of a reliable expert methodology based on Mr. Phelan's experience, and Plaintiff is incorrect to characterize it as "speculation." Mot. at 13-14. Mr. Phelan independently searched the Tarrant County online portal, including its Class C misdemeanor search, and considered its "language and presentation" in light of his experience in criminal investigations to opine about what a typical investigator would understand the database to contain. Phelan Rep. at 24-25. That Mr. Phelan does not know how Checkr actually conducted its background investigation of Mr. Le in 2020 is beside the point, Mot. at 14, because Mr. Phelan offers no opinions about Checkr's investigation. Rather, Mr. Phelan's opinion is more limited—he opines that an investigator who hypothetically accessed the Tarrant County online database would reasonably believe a search of that database to return both felony and misdemeanor convictions in the Fort Worth area. Phelan Rep. at 24-25. That is an admissible opinion based on Mr. Phelan's experience. *See United States v. Lopez*, No. H-09-342, 2012 WL 4663530, at *3 (S.D. Tex. Oct. 1, 2012) (admitting expert opinion regarding "the general knowledge and beliefs of professionals in similar positions . . . within the industry" and the "reasonableness" of such beliefs), *aff'd sub nom. United States v. Kuhrt*, 788 F.3d 403 (5th Cir. 2015).[6] The Court should accordingly deny Plaintiff's motion.

[6] Plaintiff cites *SEC v. Life Partners Holdings, Inc.*, No. 1-12-CV-00033-JRN, 2013 WL 12076933, at *3 (W.D. Tex. Oct. 23, 2013), presumably for the statement that "a trial court may strike expert testimony

## III. DR. KRISTEN ZGOBA

Dr. Kristen Zgoba received her Doctor of Philosophy in Criminology, specializing in "understanding the characteristics of sexual offending behavior, sexual assault recidivism, and the effects of policy interventions and prevention strategies for sexual violence." Zgoba Rep. at 4 (Mot. Ex. C). Dr. Zgoba has authored more than 70 peer-reviewed publications and numerous other reports and book chapters "address[ing] sexual abuse, offender rehabilitation, and policy outcomes." *Id*. Her work in this field has resulted in the award of numerous grants, awards, and global recognition. *Id*. at 4-5.

Plaintiff does not challenge the admissibility of the majority of Dr. Zgoba's opinions. Instead, Plaintiff seeks to exclude limited opinions pertaining to: (1) comparative safety risks (such as drunk driving); (2) the efficacy of Uber's reporting systems; (3) factual statements about Uber's corporate actions; (4) citation to crime prevention data in prisons; (5) use of comparator sexual assault data; (6) the inability to create a "zero risk" environment; and (7) background check opinions. Plaintiff's arguments all lack merit.

### A. Dr. Zgoba's Comparative Safety Risk Opinions Are Admissible.

Plaintiff alleges that "the Uber platform 'increases risk.'" Zgoba Rep. at 17. Plaintiff's expert, Dr. Lacey Keller, further seeks to opine that sexual assault incidents "were disproportionately more likely to occur at night" and "if the pickup location was within 150 feet of a bar," Lacey Keller Rep. at 77 (ECF 7354-1)—i.e., the risk of sexual assault increases at night or near bars. In direct response to Plaintiff's allegations and her expert's risk opinions, Dr. Zgoba provides information pertaining to Uber "alternatives" that also "carr[y] well-documented risks," such as drunk driving, late-night walking, waiting outdoors, or public transportation. Zgoba Rep. at 17. For example, Dr. Zgoba cites to data provided by the Centers for Disease Control and Prevention and explains that "[a]lcohol-impaired driving remains a leading cause of injury and death, accounting for approximately 30% of traffic fatalities in the United States." *Id*.

---

that evaluates a party's state of mind" (citation omitted). But that case is completely inapposite. There, the excluded testimony went to whether a defendant had the *mens rea* for fraud. Here, in contrast, Mr. Phelan is opining about how a hypothetical person experienced in his industry would understand certain language. That is a totally different proposition.

Plaintiff does not dispute Dr. Zgoba's facts or data pertaining to comparative safety risks. Instead, Plaintiff seeks to exclude Dr. Zgoba's "discussion of safety risks and harms that are not at issue in ***this*** case," Mot. at 15 (emphasis added)—citing this Court's ruling in ***Dean***. But [redacted] ***is*** squarely at issue in ***this*** case because the evidence shows that Plaintiff [redacted]. *See* Pl. Dep. 183:16-184:16 (Ex. 2); H.M. Dep. 38:20-22 (Ex. 3) ("I [redacted]."); *id.* 42:23-43:6 (similar). Plaintiff does not (and cannot) dispute that [redacted] would have presented significant safety risks. Dr. Zgoba thus should be allowed to contextualize Plaintiff's experts' opinions regarding the safety risk of arranging a ride on the Uber platform (and doing so at night and near a bar). This case-specific evidence is precisely what was absent in *Dean*, where the Court noted that the plaintiff did not have access to a car. Dr. Zgoba therefore is not invoking [redacted] as an abstract social benefit of ridesharing; she is addressing a realistic transportation alternative presented by the facts of this case.

Dr. Zgoba's opinions concerning other transportation alternatives are equally relevant and important. As she explains, "any assertion that use of the Uber platform 'increases risk' is analytically empty unless it specifies, increased relative to what?" Zgoba Rep. at 17. Thus, Dr. Zgoba identifies documented risks associated with realistic alternatives and explains why a comparative-risk assertion requires a defined counterfactual. These comparisons thus help do what Plaintiff's experts fail to do: contextualize Uber's relative risks, which is relevant to the reasonableness inquiry. Moreover, Plaintiff is free to cross-examine Dr. Zgoba on the factual bases for her opinions. *Equal Emp. Opportunity Comm'n v. Mod. Grp., Ltd.*, 725 F. Supp. 3d 644, 671 (E.D. Tex. 2024) (declining to exclude expert because plaintiff "will have an opportunity to illuminate [the expert's] purported flaws through cross-examination").

**B. Dr. Zgoba's Harm-Reduction Opinions Are Admissible.**

Dr. Zgoba cites multiple empirical studies showing that the option to arrange a ride on the Uber platform can reduce particular transportation-related risks. For example, Dr. Zgoba cites to a study that concluded "Uber's market entry was associated with lower rates of driving-under-the-influence offenses and fatal motor-vehicle crashes." Zgoba Rep. at 20. She also reports that "[s]urveys of female riders show that many women perceive Uber as safer than taxis, public transit, or professional car services." *Id*. at 19.

And she cites a study that "found that a 10% increase in ridesharing trips was associated with expected reductions of 0.12% in roadway crashes, 0.25% in roadway injuries, and 0.36% in driving-while-intoxicated offenses." *Id*. at 20.

Plaintiff does not dispute the validity of any of these studies or data. Instead, Plaintiff seeks to exclude Dr. Zgoba's opinion "that Uber is safer for riders at large because it displaces unsafe alternatives" on the supposed grounds that Dr. Zgoba is unqualified to render the opinion, her reliance on empirical studies is not methodologically sound, and the opinions are prejudicial to Plaintiff's case. Mot. at 16-17. All of these arguments fail.

***First***, Dr. Zgoba's extensive qualifications as a criminologist render her uniquely qualified to opine on safety risks, and her experience authoring over 70 publications endows her with relevant perspective in assessing the empirical research with respect to safety risks, including evaluating policy interventions, deterrence, and prevention strategies. Zgoba Rep. at 4-5. In light of Rule 702's "liberal policy towards qualification as an expert," *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 800 (E.D. La. 2011), Dr. Zgoba is not required to have specific experience "in transportation safety or impaired-driving prevention" to assess the empirical studies on safety risks as Plaintiff suggests, Mot. at 16. *See, e.g.*, *Equal Emp. Opportunity Comm'n*, 725 F. Supp. 3d at 663 ("reject[ing] the notion that Dr. Chen must have specific experience and training matched precisely to the circumstances at issue"); *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 693 (5th Cir. 2012) ("conclud[ing] both men were well-qualified as experts" and rejecting "[t]he conception of expertise urged by Western, by which [the experts] could not testify about a stucco pump because stucco [wa]s not their trade").[7] Dr. Zgoba is thus sufficiently qualified.

***Second***, Plaintiff claims that Dr. Zgoba's reliance on empirical "studies comparing traffic and crime data before and after Uber entered various markets" is improper because "she did not validate, test, or apply [the studies] to the facts of this case." Mot. at 16. But the reason Plaintiff wants these studies excluded is clear: they are irreconcilable with Plaintiff's core theory that the Uber platform is unsafe. That

[7] Plaintiff cites to *Newton v. Roche Laboratories, Inc.*, 243 F. Supp. 2d 672 (W.D. Tex. 2002) (cited in Mot. at 16), which supports Uber's position. In that case, the court held that an expert who "h[eld] himself out as a 'doctor' and a pharmacologist," but "never earned an M.D., a Ph.D., or any degree in pharmacology," was not qualified to opine that Accutane could cause schizophrenia. *Id*. at 677. But the court also held that an expert with expertise as a clinical psychiatrist was sufficiently qualified, despite having "no specialized experience" with Accutane. *Id*. at 681.

is ground for ***admission***, not exclusion. Plaintiff's attempt to dress this objection up in the garb of reliability goes nowhere. An expert's reliance on empirical studies and peer-reviewed studies is methodologically sound. *E.g.*, *Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012, 1028 (E.D. Cal. 2011) ("testimony that is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions expressed were 'derived by the scientific method'") (citation omitted); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 WL 6301625, at *7 (S.D. Ill. Dec. 16, 2011) (holding expert's "method of forming her opinions is reliable as based on epidemiologically based journal articles published in reputable sources"). Notably, Plaintiff makes no argument that Dr. Zgoba has misinterpreted the studies on which she relies. To the extent Plaintiff quarrels with the content or generalizability of the studies, "[t]he reliability of data underlying an expert's opinion . . . goes to the weight of the evidence, and is subject to cross-examination, but should not serve as basis for its exclusion." *Stewart v. Quality Carriers, Inc.*, No. CV 19-00606-BAJ-SDJ, 2021 WL 2708924, at *3 (M.D. La. June 30, 2021).

***Lastly***, Plaintiff argues Dr. Zgoba's citation to Uber's "generalized public-safety benefits" would "distract from the core issues at trial" and should thus be excluded under Rule 403. Mot. at 16-17. But "[t]he fact that the topic may have prejudicial implications does not render it inadmissible, particularly where the [expert] testimony is grounded in scientific methodology and offered by a qualified expert." *Woodall v. Cycle Gear, Inc.*, No. 4:23-CV-870, 2025 WL 2323913, at *4 (E.D. Tex. Aug. 12, 2025); *Al-Dahwa v. Am. Multi-Cinema, Inc.*, No. 4:23-CV-02010, 2024 WL 3375500, at *5 (S.D. Tex. July 11, 2024) ("Rarely, if ever, should an expert witness be precluded from testifying at trial under Rule 403").

### C. Dr. Zgoba's Opinions On The Efficacy And Impact Of Uber's Reporting Systems Are Reliable.

Dr. Zgoba opines that "Uber provides riders with multiple reporting mechanisms, including in-app reporting, real-time safety assistance, post-trip complaint channels, and access to external survivor-support resources." Zgoba Rep. at 17-19. She cites to five empirical studies that demonstrate that "[i]ncreased reporting is a known and expected outcome of improved reporting systems," and based on these findings, concludes that "Uber's data reflect a higher level of detection and documentation, not necessarily a higher level of underlying incidents." *Id.* at 18; *see also* Zgoba Dep. 64:24-65:10 (Ex. 4)

(drawing from "a great deal of research that speaks to "reporting channels reduc[ing] practical and psychological barriers to reporting misconduct" to conclude that Uber "simply make[s] it easier to report").

Plaintiff argues that Dr. Zgoba's "opinions about the supposed efficacy of Uber's reporting system should be excluded as unreliable" because Dr. Zgoba did not conduct her own "empirical study that would confirm whether Uber's reporting channels reduce barriers to reporting." Mot. at 17-18; Zgoba Dep. 65:11-19. But as courts have repeatedly recognized, a methodology that is based on existing empirical research and her own extensive experience is sound. *See, e.g.*, *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010), *as amended* (Apr. 27, 2010) ("Dr. Weiss's background and experience, and his explanation of his opinion, leave room for only one conclusion regarding its admissibility. It had to be admitted."); *Monroe*, 766 F. Supp. 2d at 1028 ("testimony that is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions expressed were 'derived by the scientific method'") (citation omitted). Nothing supports the assertion that Dr. Zgoba had to conduct her own study to reproduce the results of the studies on which she relies. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 246, 250 (5th Cir. 2002) (reversing exclusion of expert and finding "[t]he fact-finder is entitled to hear [the expert's] testimony" where expert "did not conduct an epidemiological study" but properly "conduct[ed] a literature search"). Nor does Dr. Zgoba use the general literature to make bare conclusions about Uber. And Dr. Zgoba reliably applied the existing published literature to the facts in this case. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data."). She identified the particular structural features of Uber's system to which that literature applies: identifiable participants, preserved trip records, multiple reporting pathways, standardized classification procedures, and the ability to submit reports without an immediate face-to-face interaction. Zgoba Rep. at 18. She then compared those characteristics to research showing that reducing practical barriers, standardizing reporting, and improving administrative capture can increase recorded reports. *Id.* This analysis is more than sufficient to connect the literature on which Dr. Zgoba relies to the facts of this case.

Plaintiff also argues that Dr. Zgoba cannot rely on her "expertise" to support her reporting system opinions. Mot. at 18. Plaintiff does not dispute that Dr. Zgoba's professional experience and research

center around analyzing "the effects of policy interventions and prevention strategies for sexual violence." Zgoba Rep. at 4. Instead, Plaintiff claims Dr. Zgoba is somehow unqualified to opine on reporting systems because "[s]he identifies no expertise in how sexual-assault survivors (or riders in general) interact with digital reporting tools, how platform design affects reporting behavior" or "how to measure underreporting in a rideshare environment." Mot. at 18. But Rule 702 does not require that Dr. Zgoba's expertise be so narrowly specialized to the rideshare industry. *Equal Emp. Opportunity Comm'n*, 725 F. Supp. at 663 ("reject[ing] the notion that Dr. Chen must have specific experience and training matched precisely to the circumstances at issue"); *Roman*, 691 F.3d at 693 ("conclud[ing] both men were well-qualified as experts" and rejecting "[t]he conception of expertise urged by Western, by which [the experts] could not testify about a stucco pump because stucco [wa]s not their trade"). And such specialized expertise is not necessary because Dr. Zgoba's opinions do not even touch on "platform design" or a user's ability to use the Uber app. *See* Zgoba Rep. at 17-19.

**D. Dr. Zgoba Does Not Offer Impermissible Opinions On Uber's Motives.**

Plaintiff's assertion that Dr. Zgoba improperly addresses Uber's conduct, Mot. at 18, also lacks merit.[8] While an expert may not "opine as to the subjective belief or intent of a corporate entity," "[e]xperts can opine . . . on the underlying facts that may show a party's state of mind." *Gree, Inc. v. Supercell Oy*, No. 2:19-CV-00071-JRG-RSP, 2020 WL 4059550, at *2 (E.D. Tex. July 20, 2020). Further, "an expert is permitted to testify that certain practices or behaviors are consistent with a certain state of mind." *United States ex rel. Taylor v. Healthcare Assocs. of Texas, LLC*, No. 3:19-CV-02486-N, 2024 WL 4508961, at *18 (N.D. Tex. Oct. 15, 2024).

[8] Notably, Plaintiffs' paid experts in this litigation (none of whom are Uber employees), have been permitted to offer similar testimony pertaining to Uber's conduct. Indeed, they have gone further, offering opinions about what that conduct implies about Uber's knowledge, motive, and state of mind. *E.g.*, ECF 4941 (denying motion to exclude Drumwright's motive opinions); ECF 4351 (arguing that Drumwright's report was "littered with references to what Uber 'knew' and when it knew it"). And Plaintiff's experts in this case seek to opine on the same. *E.g.*, Drumwright Rep. ¶ 421 (Ex. 5) (opining that "Uber PR[] [had an] ulterior motive in working with RAINN"); Sniderman Rep. at 6 (ECF 7347-1) (opining that "Uber has long been aware it has a 'sexual assault problem' on its platform"); Tremblay Rep. at 27 (ECF 7349-1) (opining on what "Uber believed" in 2016). Uber maintains its objections to this type of mind-reading testimony, but if this testimony is admissible, it should follow perforce that Dr. Zgoba may testify about what certain conduct indicates about the quality of Uber's safety-related efforts.

Dr. Zgoba testifies as to "underlying facts" pertaining to Uber's "practices"—which is proper expert testimony—and does not purport to opine on Uber's subjective intent. For example, Dr. Zgoba lays out (based on her experience and review of materials) factual instances where Uber's background check "approach reflects a commitment to dynamic risk management," Zgoba Rep. at 28, or where Uber initiated "proactive measure[s] to . . . establish accountability standards across the rideshare industry," *id*. at 25. In short, she properly explains whether Uber's observable practices are consistent with risk-management, prevention, or transparency principles within her field. Plaintiff may disagree with Dr. Zgoba's opinions, but that is no basis to exclude them. *See Freeny v. Murphy Oil Corp.*, No. 2:13-CV-791-RSP, 2015 WL 11089599, at *3 (E.D. Tex. June 4, 2015) (denying motion to exclude expert because "[a]lthough [d]efendant and its experts may disagree with . . . [the expert's] ultimate conclusions . . ., such disagreements may be adequately explored through the introduction of [d]efendant's own expert and [] cross-examination"); *Ervin v. Kroger*, No. 4:14-CV-262, 2015 WL 11089475, at *4 (E.D. Tex. June 3, 2015) ("While it is apparent that [d]efendants disagree with the conclusions reached by Laughlin, this alone does not make his conclusions unreliable.").

There is also no basis for Plaintiff's claim that Dr. Zgoba cannot opine on the facts of Uber's actions because she "is not an Uber employee" and "was not present for any of the decisions she characterizes[.]" Mot. at 18. There is no requirement that an expert must be employed by the party or have personal knowledge of the facts to offer an opinion; indeed, Plaintiff cites none (and such a rule would presumably require exclusion of any of Plaintiff's own experts who opine on Uber's actions, such as Dr. Drumwright, Mr. Sniderman, and Mr. Tremblay). And Plaintiff entirely ignores that Dr. Zgoba's report lists ***over 200*** internal Uber documents (in addition to a plethora of public sources and articles) that she collectively relied on to form her opinions. *See* Zgoba Rep., Appendix B. This is sufficiently reliable data. *See Taylor*, 2024 WL 4508961, at *9 (permitting expert opinion where expert "cite[d] to multiple exhibits which he believes states these motives as fact"). Further, courts universally recognize that an expert like Dr. Zgoba may "draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). Dr. Zgoba's opinions are rooted in decades of experience in crime prevention, providing her the requisite expertise to reliably opine on Uber's practices.

**E. Dr. Zgoba's Citation To Surveillance And Crime Prevention In Prisons Is Proper.**

Despite Plaintiff's bald assertions, Dr. Zgoba does not "compar[e] Uber to prison environments." Mot. at 19. Rather, Dr. Zgoba cites to different contexts, including statistics from the National Crime Victimization Survey, to demonstrate the pervasiveness of sexual assault incidents across different contexts. Zgoba Rep. at 11. As one part of that effort, Dr. Zgoba references the Prison Rape Elimination Act solely as ***empirical evidence*** to demonstrate that even "in environments characterized by constant surveillance" like prisons, "sexual violence cannot be eradicated." *Id*. at 16. Dr. Zgoba's use of prison sexual assault data is thus not used as a direct comparator to Uber; instead, the data helps illustrate the limitations of the theme pressed by Plaintiff and her experts that sexual assaults can be prevented by implementing harsher background checks and more surveillance. It is therefore highly relevant.

Dr. Zgoba's citation to empirical evidence compiled in the prison environment is also not unduly prejudicial. Mot. at 19. "Rarely, if ever, should an expert witness be precluded from testifying at trial under Rule 403 . . . ." *Al-Dahwa*, 2024 WL 3375500, at *5. The jury is more than capable of evaluating certain available data (which so happens to be compiled in prisons) and understand that Uber and prisons are not synonymous, and Plaintiff presents no basis to find otherwise.

**F. Dr. Zgoba's Comparative Risk Opinions Are Reliable.**

Plaintiff seeks to bar Dr. Zgoba from making factually accurate references to national, state, and county crime surveys, which report "victimizations across all contexts, including private residences, public spaces, workplaces, and social environments." Zgoba Rep. at 9-11. For example, Dr. Zgoba reports that the National Crime Victimization Survey ("NCVS") found "an estimated 560,890 rape and sexual assault victimizations among persons aged 12 or older in 2024," which "is roughly 10,000 times greater than the per-trip rate of non-consensual sexual penetration reported in Uber's Safety Report." *Id*. at 11. As this example makes clear, the sexual assault figures included in Dr. Zgoba's report are "not [] directly equivalent measures" to instances of sexual assault allegedly taking place in rides arranged on the Uber platform, *id.* at 10—i.e., she is ***not*** saying that "sexual assault is 10,000 times more likely in society than in an Uber" (as Plaintiff argues). Mot. at 19-20. Rather, Dr. Zgoba "illustrate[s] the orders-of-magnitude difference in scale between Uber-specific reported incidents and the broader societal burden of sexual violence." Zgoba Rep. at 9-10; *see also id.* at 12 ("[I]t is important to emphasize that these statistics arise

from different data systems and should not be interpreted as directly equivalent measures of risk exposure."). She expressly identifies the principal differences Plaintiff emphasizes—i.e., that Uber's denominator is trips, while the NCVS denominator is persons; that Uber measures reported platform incidents, while the NCVS captures annual victimization across settings; and that the definitions and reporting systems differ. *Id.* at 9-12. Far from concealing those limitations, Dr. Zgoba acknowledges them and builds them into her analysis. Plaintiff variously contends that these comparisons will "confuse and mislead the jury," will not assist the jury, and lack a sufficient methodology. Mot. at 19-21. But it is really one argument: Plaintiff thinks the comparisons are not perfect. That is fodder for cross-examination, not grounds for exclusion.[9]

Indeed, the context Dr. Zgoba provides is particularly relevant in light of Plaintiff's own expert testimony. For example, Plaintiff's expert, Dr. Lacey Keller, purports "to calculate the number of, rates of, and trends related to [reports of Rape] between 2017 and 2025[.]" Keller Rep. ¶ 3 (ECF 7354-1). She concludes that "[f]rom 2017 through 2025, an SA/SM Incident was reported to Uber the equivalent of every eight (7.6) minutes," *id.* ¶ 46, and that such incidents were likely underreported, *id.* ¶ 55. That number—without context—seems large, so Dr. Zgoba does what Dr. Keller does not: contextualize certain reported incident rates on the Uber platform. Indeed, presenting figures and rates ***without*** comparing them to some sort of context or baseline—as Dr. Keller does—renders those figures irrelevant or, at minimum, unfairly prejudicial. *See, e.g.*, *Hunter v. Elanco Animal Health Inc.*, No. 1:20-cv-01460-SEB-MG, 2022 WL 3445173, at *18 (S.D. Ind. Aug. 17, 2022) ("The First Amended Complaint also lacks any statistics or data to place the allegations of 'excess demand' or 'excess inventory' in context—an omission that hinders a finding that the defendants issued false and misleading statements."); *In re Harley-Davidson, Inc., Sec. Litig.*, 660 F. Supp. 2d 969, 986 (E.D. Wis. 2009) (allegation that certain dealerships had between 3,000 and 5,000 units per day of excess inventory "is not very helpful" in the absence of "comparisons to historical inventory levels" or "'normal' inventory levels"). Dr. Zgoba's comparisons help contextualize the scale of the Uber-specific figures on which Plaintiff's experts rely and explain why raw incident counts alone do not measure risk. *See* Zgoba Rep. at 6 (explaining that "[s]exual-misconduct

---

[9] Notably, the plaintiff made similar objections to opinions offered by Victoria Stodden in the *Dean* trial, ECF 4358, at 7-10, 15-19, 21-22, which the Court did not sustain, *see* ECF 4941, at 2.

risk on Uber must be evaluated using exposure-based denominators and broader societal baselines rather than raw incident counts alone"). Likewise, Dr. Zgoba does not opine that Uber's safety efforts ***caused*** the 2024–2025 decline, as Plaintiff argues, *see* Mot. at 21; instead, she describes the observed trends as "consistent with" those efforts.

Further, although Plaintiff complains that Dr. Zgoba did not identify a "methodology to account for th[e] differences" between the comparator data, Plaintiff has no valid objection to the source of the data, which are derived from reputable institutions (such as a survey conducted by the U.S. Census Bureau for the Bureau of Justice Statistics). And to the extent Plaintiff's argument is that the comparison itself is imperfect, she "can certainly challenge the comparison between these datasets in cross-examination . . . but [her] attacks on this comparison do not support excluding [Dr. Zgoba's] testimony." *In re Flint Water Cases*, No. 16-10444, 2023 WL 6279521, at *5-6 (E.D. Mich. Sept. 26, 2023) (rejecting argument "that it is unreliable to compare . . . data based on clinical interviews with data . . . based on survey responses").[10]

### G. Dr. Zgoba's "Zero Risk" Opinions Are Highly Relevant And Directly Rebut Plaintiff's Expert Opinions.

Plaintiff claims that "[n]o one contends that Uber must eliminate all crime on its platform." Mot. at 21. That is beside the point. The jury may incorrectly ***believe*** that is a proper goal, and Uber has the right to argue what is ***reasonable*** based on what is actually feasible. For that reason alone, this argument should be rejected.

The argument is also inaccurate. Plaintiff's own expert, Dr. Valliere, ***repeatedly*** criticizes Uber for failing to implement measures to "eliminate" sexual assault on rides arranged using the Uber platform. *E.g.*, Valliere Rep. at 24 (Ex. 6) (claiming "Uber itself has . . . developed [but never implemented] an effective means to eliminate some risky drivers"); *id.* at 39 (asserting "Uber brought in experts and

[10] Dr. Zgoba states "that Uber's reported rate declined at a greater relative rate than the national decline in reported rape"—a fact that Plaintiff does not dispute. Instead, Plaintiff argues that Dr. Zgoba "provides zero explanation for [her] causal conclusion." Mot. at 21. But Plaintiff entirely misconstrues Dr. Zgoba's point, which is that Uber's declining rates "provide[] additional context [to the reported data]. . . and is consistent with Uber's ongoing safety efforts." Zgoba Rep. at 13. Dr. Zgoba stopped short of attributing the decline to any specific cause because doing so "would take an entire evaluation of potential historic effects, national trends" that was "outside the scope of [her] assignment." Zgoba Dep. 50:12-51:4. This testimony highlights that Dr. Zgoba uses comparator data responsibly, which underscores the reliability of her opinions.

researched how it could eliminate sexual assault from its platform").[11] Those opinions make Dr. Zgoba's distinction between reducing and eliminating risk directly responsive, in addition to being independently relevant for purposes of framing the issues properly for the jury. Dr. Valliere's anticipated testimony makes it all the more critical that Dr. Zgoba be able to explain that the elimination of sexual assault incidents is "an unattainable standard." Zgoba Rep. at 14.

To the extent Plaintiff argues it is "common sense" that "no system prevents all crimes," Mot. at 21-22, Dr. Valliere's opinions that are directly in conflict with "common sense" are appropriately challenged. In any event, expert testimony should not be excluded where—as here—"[t]he common juror would not possess the sort of specialized safety knowledge that Dr. [Zgoba] brings to the table" regarding the empirical limits of prevention, deterrence, and prediction. *Query v. Costco Wholesale Corp.*, No. CV 24-2082, 2026 WL 1212219, at *4 (E.D. La. May 4, 2026).

**H. Dr. Zgoba's Background Check Opinions Are Reliable And Admissible.**

Dr. Zgoba's report "reviews Uber's criminal background check process in light of current research and professional practice in employment screening." Zgoba Rep. at 26. Plaintiff argues that Dr. Zgoba is unqualified and lacks sufficient data to support her background check opinions. These arguments are meritless.

***First***, Plaintiff's argument that Dr. Zgoba "is not an expert in background checks or screening," Mot. at 22, is grasping. Dr. Zgoba's opinion addresses the empirical strengths and limitations of screening methods—not the technical operation of Checkr's system. And as set forth above, Dr. Zgoba is eminently qualified and recognized internationally for her experience and research regarding "the effects of policy interventions and prevention strategies for sexual violence." Zgoba Rep. at 4-5. Although Dr. Zgoba indicated that she was not the "expert in background screening" in this case, Dr. Zgoba also expressly testified that she has expertise in "commercial background screening systems" because she "utilize[s] the[ systems] in [her] private research," including Dr. Zgoba's ongoing research project in which she analyzed

[11] It is thus Dr. Valliere that "invite[s] the jury to apply an erroneous legal standard," Mot. at 21, by implying that Uber could do the impossible, and Uber should be able to present expert testimony to rebut such claims. *See Lambert v. Certain Underwriters at Lloyds of London*, No. 1:19-CV-01080, 2021 WL 6973856, at *1 (W.D. La. Dec. 17, 2021) (declining to exclude expert testimony because "Defendants are entitled to rebut [plaintiff's expert] testimony").

"fingerprint background checks from Texas Department of Public Safety as well as purchased commercial background checks for those 600" registered sex offenders. Zgoba Dep. 93:13-94:13. In fact, Dr. Zgoba has a "publication[] related to background checks" that she is currently "working on." *Id*. 34:23-36:23. Dr. Zgoba also "personally ran fingerprint background checks for 15 years while [she] was employed at the New Jersey Department of Corrections[.]" *Id*. 94:14-21; *id*. 100:6-7 ("working at the Department of Corrections, [Dr. Zgoba] routinely saw fingerprint data, dispositions"). And in her report, Dr. Zgoba directly cites to and analyzes the "growing body of empirical research documents" pertaining to background checks. Zgoba Rep. at 26-28; Zgoba Dep. 95:18-25 (describing "studies" that she "cited in the report" pertaining to background checks). Dr. Zgoba is amply qualified—through research projects, extensive employment, and review of empirical studies—to opine on background checks, particularly in light of Rule 702's "liberal policy towards qualification as an expert." *Wagoner*, 813 F. Supp. 2d at 800 (noting an expert "can have the requisite qualifications to provide expert testimony by virtue of 'knowledge, skill, experience, training or education'") (citation omitted).

***Second***, Plaintiff's argument that Dr. Zgoba's "opinions rest on insufficient facts and data," Mot. at 22-23, is baseless. Dr. Zgoba made clear that her role was to opine "on empirical research as it pertains to this case." Zgoba Dep. 21:21-23. Her report and deposition describe the "empirical research documents" that support Dr. Zgoba's background check opinions. Zgoba Rep. at 26-28; Zgoba Dep. 95:18-25. Dr. Zgoba also reviewed internal documents and deposition testimony, including the deposition of the Checkr corporate representative, to inform her knowledge of the background check process that took place with respect to Mr. Le's onboarding process. Zgoba Dep. 12:5-24; *id.* 28:13-18 (Dr. Zgoba testifying that she "review[ed] [] testimony about Uber's driver screening policies that were applicable in 2020" "in Mr. Brown, Mr. Hubbard, and Mr. Freivogel's depositions"); *id.* 98:18-24 (Dr. Zgoba testifying about "identifiers Uber's vendor used for the background check of Victor Le"). Dr. Zgoba's thorough review of available studies, documents, and depositions is plainly sufficient to inform her expert opinion. Any "criticisms" Plaintiff has "relate to the weight of [Dr. Zgoba's] testimony" and do not serve as a basis for exclusion. *Alexander v. Martin*, No. 2:08CV400, 2010 WL 11530629, at *3 (E.D. Tex. June 7, 2010) (declining to exclude expert "opinion [that wa]s based on sufficient facts and data, including" an analysis, "party depositions, business records, etc.").

## IV. LINDSAY ORCHOWSKI

Dr. Lindsay Orchowski is a psychologist and Professor at Brown University, where she focuses on the development and evaluation of sexual assault prevention programs. A portion of her report explains that Uber's guest rider policies "align with public health practices to reduce the risk of drunk driving[.]" Orchowski Rep. at 3 (Mot. Ex. D). Plaintiff moves to exclude this as irrelevant, even though Plaintiff's decision to take a guest ride [redacted], is central to the case. Another portion of Dr. Orchowski's report explains why experts in her field cannot predict with any scientific accuracy which individuals will commit sexual violence. *Id.* Plaintiff mischaracterizes that portion as improperly instructing the jury. Mot. at 23-24. Plaintiff's arguments are meritless.

### A. Dr. Orchowski's Opinions On Alcohol-Related Risk Are Plainly Relevant.

Plaintiff moves to exclude as irrelevant the portion of Dr. Orchowski's report that finds that Uber's guest ride policies reduce alcohol-related risks. Mot. at 23. But this fact is highly relevant because [redacted] until she was persuaded to accept a guest ride. *See* Pl. Dep. 183:22-24 (Ex. 2); H.M. Dep. 38:19-22, 41:20-42:5 (Ex. 3). Indeed, the [redacted] H.M. arranged a ride for Plaintiff was so she [redacted] H.M. Dep. 52:16-23. Those facts bear directly on the legal standard, which "requires plaintiffs [to] demonstrate that the 'safety benefits from [the] proposed design are foreseeably greater than the resulting costs, including any . . . diminished safety.'" *Kim v. Am. Honda Motor Co.*, 86 F.4th 150, 164 (5th Cir. 2023) (citation omitted). Dr. Orchowski's report addresses the documented public-health benefits of using rideshare as an alternative to [redacted], which is directly relevant to the transportation alternative actually presented by the facts of this case.

The parties' stipulation and this Court's prior ruling in *Dean* do not change that conclusion. The stipulation excluded "previously decided issues" resting on "case-specific facts." ECF 7302. *Dean* "[wa]sn't a case about drunk driving" because the plaintiff did not have access to a car. Mot. at 23 (quoting 1/6/2026 *Dean* Pretrial Hr'g Tr. 78:20-22); *see* 1/26/2026 *Dean* Trial Tr. 1868:12-1869:2 (Ex. 10). [redacted]. Therefore, Dr. Orchowski is not offering an abstract comparison, but rather speaks to the evidence-based role of rideshare as an alternative in a case where [redacted] was an actual alternative.

**B. Dr. Orchowski's Opinions Explaining The Inaccuracy Of Predicting Sexual Misconduct Are Proper.**

Dr. Orchowski's opinions regarding the limits of predicting sexual misconduct are relevant and admissible because they address a scientific question distinct from the ultimate legal question of foreseeability. Mot. at 23. The report expressly defines "foreseeable" to mean an "outcome [that] could have been predicted with scientific reliability at the time the relevant decisions were made." Orchowski Rep. at 8. Plaintiff's mischaracterization (that by "foreseeable" Dr. Orchowski means "guaranteed to happen," Mot. at 23) reads "foreseeable" out of context and cobbles it together with stray lines from Dr. Orchowski's deposition. *See* Mot. at 23-24 (citing Orchowski Dep. 101:13-24, 116:13-17, 136:23-25).

Nor does Dr. Orchowski's report invade the jury's role. Mot. at 24. Dr. Orchowski opines that "no tool or screening process [is] available to accurately predict who will engage in . . . sexual violence[.]" Orchowski Rep. at 3. She supports this conclusion with over five pages of analysis, incorporating data and citations to scientific literature. *See* Orchowski Rep. at 3-8. While her report "embraces an ultimate issue"—i.e., foreseeability, that is not a basis for exclusion. Fed. R. Evid. 704(a); *see Holcombe v. United States*, 516 F. Supp. 3d 660, 684 (W.D. Tex. 2021) (explaining "foreseeability" may be established "through any probative evidence," including "testimony by . . . expert witnesses"). Although expert opinions may not "***merely*** tell[] the jury what result to reach," *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 971 (N.D. Cal. 2019) (emphasis added and citation omitted), they may analyze "facts which would tend to support a jury finding on the ultimate issue," *Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*, 68 F.4th 206, 221 (5th Cir. 2023) (citation omitted). Dr. Orchowski's opinion analyzes facts beyond a lay person's knowledge, which supports (but does not mandate) a particular conclusion. For instance, it explains why no single factor "forecasts whether a particular person will offend" because even "among men with a documented history of sexual aggression, a substantial proportion do not re-offend." Orchowski Rep. at 6-7. Excluding her opinion would be inappropriate and a disservice to the jury.

**V. BETSY BARTKO**

Betsy A. Bartko, an expert in cyber investigations and digital forensic analysis, reconstructs the route of Plaintiff's June 9, 2020 ride and properly opines that the average speed was consistent with posted speed limits and was continuous with no sudden deviations from the plotted route. Bartko Rep. at 4 (Mot.

Ex. G). Ms. Bartko's opinion is appropriately based on her review and analysis of the Global Positioning System ("GPS") data captured by the Uber application for Plaintiff's ride, as well as her extensive experience in forensic processing and the extraction and analysis of data derived from mobile devices and other GPS units. Plaintiff seeks to exclude that part of her opinion that concludes there were "no erratic movements" during Plaintiff's June 9, 2020 ride. Mot. at 24. The Court should deny Plaintiff's motion because Ms. Bartko's GPS analysis is based on reliable methodology and Plaintiff's argument attributes a level of precision to her opinion that she does not claim.

***First***, Plaintiff's attacks on Ms. Bartko's use of the word "erratic" on the ground that she did not identify a "scientific method" in defining the term, *id.*, are misplaced. Ms. Bartko defined the term at her deposition, explaining that "erratic would mean veering off course suddenly," Bartko Dep. 124:16-17 (Ex. 7), and further explained that she applied "common sense that the route, when plotted, is very smooth and there was nothing outside of the route that looked unusual," *id.* 125:13-16. That testimony is consistent with her usage of the term in her report, in which she opined that the "average speed of the ride was 55 MPH, with speeds consistent within posted speed limits along the route. The GPS data indicates the drive was continuous with no erratic movements and followed an expeditious route to the destination." Bartko Rep. at 4. Thus, "erratic," as Ms. Bartko uses the term, refers to sudden deviations apparent from the plotted route; she does not purport to determine whether the vehicle moved within its lane or experienced isolated acceleration or deceleration.

This use of the word "erratic" as commonly understood is entirely proper. "To exclude an expert report simply because it also employs common sense—in addition to expertise—is not supported by the caselaw." *Munoz v. PHH Mortg. Corp.*, 478 F. Supp. 3d 945, 970 (E.D. Cal. 2020) (holding "an expert may couch his or her analysis in logical or common-sense terms when the methodology supporting that analysis is firmly grounded in technical knowledge[.]"). It is not disputed that Ms. Bartko applied reliable methodology (by plotting GPS data recorded approximately every second using QGIS and validated the route using Google Earth, Bartko Rep. at 3) to analyze the GPS data for the June 9, 2020 ride to determine the route, speed, and consistency of the ride. For example, while Plaintiff critiques the fact that Ms. Bartko calculated only "the *average* pace for the trip," Mot. at 25, she does not challenge that 55 MPH is an accurate average. Nor can she challenge Ms. Bartko's narrow opinion that the plotted route shows no

sudden route-level deviation. At bottom, Ms. Bartko's analysis of the GPS data is sound, and it supports her characterization of the continuous drive at a steady speed and without major aberrations as having "no erratic movements."

***Second***, Plaintiff criticizes Ms. Bartko's report for a "faulty premise" (that the assault did not occur), but the report does not include any such opinion. Mot. at 25. Ms. Bartko was clear as to the scope of her opinion: "to analyze and prepare a route of a GPS ride that took place on that particular evening." Bartko Dep. 15:11-13. Despite Ms. Bartko's repeated testimony about the scope of her assignment and opinion being confined to GPS analysis, *id.* 13:8-12, 33:13-16, 153:2-4, Plaintiff's counsel spent significant time at her deposition inquiring about her "exper[ience] involving cases that deal with forced oral copulation in a moving vehicle," *id.* 19:10-13; *see also id.* 15:15-19, 20:15-19, 22:23-23:5, 27:17-22, 29:7-11, 30:19-25, 128:17-24. Plaintiff's motion to exclude Ms. Bartko's opinion does the same. Mot. at 25 ("[S]he consulted no literature or studies concerning what GPS patterns are and are not consistent with a driver committing forced oral copulation or any sexual assault, in a moving vehicle."). But Ms. Bartko offers no opinion on this topic, express or implied. She does not and will not opine that the GPS data establishes whether the assault occurred or could have occurred.

## VI. ERIC PIZA

Dr. Eric Piza is a professor of criminology and criminal justice at Northeastern University who opines that the use of dashcams would be unlikely to deter criminal behavior in light of the driver's control of the dashcam's use and because Uber's other safety features already provide deterrence. He appropriately based his opinions on his vast experience, empirical research, and literature review. Plaintiff does not address most of his opinions, including his opinion that effectively monitoring every ride on the Uber platform each day would require more than 33,000 operators. Piza Rep. ¶ 49 & nn.76-79 (Mot. Ex. E). That opinion entails a straightforward calculation based on: (i) the approximately 2.5 million rides that occur via the Uber platform each day and (ii) research indicating that one operator can only proactively monitor between 50 and 75 cameras effectively at once. *Id*. This opinion provides accurate and fair color to the problems of scale inherent in Plaintiff's allegations about mandatory video monitoring on the entire Uber platform. And it does not opine on Uber's financial resources or the technological feasibility of live-

streaming; rather, it quantifies the scale of active monitoring using surveillance research within Dr. Piza's expertise.

Plaintiff does seek to exclude Mr. Piza's opinion that "complementary policies and safeguards needed for video cameras to prevent violent crime cannot realistically be implemented for the millions of rides on the Uber platform" largely for the reasons that Plaintiff previously set forth in *Dean*. Piza Rep. ¶¶ 46(C)-50; *see also* ECF 4941, at 2 (excluding this opinion). Uber disagrees for the reasons it has previously argued, *see* ECF 4632 (Defs.' Opp. to Pls.' Motion To Exclude Expert Testimony) at 30-31, but the prior ruling does not require exclusion of Dr. Piza's narrower monitoring calculation. Dr. Piza expressly leaves the feasibility of live-streaming to other experts and witnesses, and his calculation rests on research concerning effective human monitoring—not technological or corporate feasibility.

## VII. CHRISTOPHER WILSON

Christopher Wilson is an expert in vehicle telematics and the technologies supporting telematics who opines on the technological challenges that would have prevented platform-wide mandatory video recording in 2020. Plaintiff seeks to exclude two narrow aspects of Wilson's opinions: (i) his opinions concerning the "logistical" challenges to implementation of mandatory in-car video recording at Uber's scale, and (ii) his identification of regulatory obstacles relevant to implementing such a system. Mot. at 26. Both arguments lack merit. Mr. Wilson's reference to "logistics" refers to technical deployment constraints such as connectivity, installation, vehicle configurations, and camera placement—not the allocation of "Uber's corporate resources and capabilities," as Plaintiff contends. And Mr. Wilson's brief mention of legal requirements associated with dashcam technology properly identifies additional barriers that Mr. Wilson knows from his experience in the field that anyone intent on adopting a nationwide mandatory recording system would have to navigate.

***First***, Mr. Wilson's opinions about the feasibility of implementing Plaintiff's proposed dashcam technology at Uber's scale fall squarely within his expertise in telematics and the technologies supporting telematics. His report details the technological barriers to implementing a dashcam system, including limitations in cellular bandwidth and connectivity, upload speeds for moving vehicles, and certain hardware and operating-system constraints. *See* Wilson Rep. (Mot. Ex. F) ¶¶ 39-46, 48-66. Plaintiff nevertheless suggests that these opinions require expertise regarding "Uber's corporate resources and

capabilities," based ***entirely*** on Wilson's two uses of the word "logistical" in his lengthy report. Mot. at 26. But Plaintiff is imposing a definition of that term that Mr. Wilson does not endorse. His opinion assesses whether the state-of-the-art ***technology*** can function at Uber's scale; not whether Uber has sufficient resources to implement it. Indeed, Plaintiff effectively concedes as much, stating that "[a]bsent from the report is any review, consideration, or discussion of data specific to Uber's resources and capabilities[.]" *Id.* Wilson's expertise in telematics therefore qualifies him to offer the opinions that he actually gives, rather than the ones that Plaintiff misattributes to him.[12]

***Second***, Plaintiff's argument that Mr. Wilson offers an impermissible "legal opinion" by noting that it is "important to consider legal requirements surrounding required use across all jurisdictions," Mot. at 27 (citing Wilson Rep. ¶ 47), lacks merit. Mr. Wilson properly identifies certain legal obstacles with which he has become familiar through his years of experience in the field of vehicle telematics—specifically, state laws that relate to camera placement and occupant consent to recording—simply to make the point that adoption of a mandatory recording requirement would have to account for such requirements. *See* Wilson Rep. ¶ 47. Beyond this general description, Mr. Wilson does not intend to offer opinions as to specific requirements or whether Plaintiff's proposal of mandatory video recording would comply with any specific law. This sort of testimony is plainly within his expertise and is permissible; an expert "witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

## VIII. JASON MORRIS

Jason Morris is an expert who has worked in the background screening industry for over three decades. He properly opines (among other things) that Uber's background check practices met and exceeded industry standards. Morris Rep. at 2 (Mot. Ex. H). Mr. Morris's opinion is appropriately based on his extensive and specialized experience, as well as his review of Uber's policies and procedures. Plaintiff does not seek to exclude Mr. Morris's opinions about the industry standards applicable to

---

[12] To the extent Plaintiff's argument is that Uber could somehow overcome technical barriers such as limitations on upload speeds that apply to everyone else, for example, Plaintiff is welcome to argue that at trial if she has admissible evidence to support it. But Mr. Wilson is not offering an opinion on that topic, so Plaintiff's motion is misdirected.

background checks generally, or his evaluation of the background check conducted as to Victor Le specifically. But she does move on two issues. First, Plaintiff seeks to exclude Mr. Morris's testimony that Uber's "screening practices meet and exceed Texas statute and industry standards," Morris Rep. at 1, and that "the FCRA prohibits name-only matching," *id.* at 9, arguing that these opinions are legal conclusions. Mot. at 27-28. And second, Plaintiff also seeks to exclude Mr. Morris's opinion that "the sheer scale of rideshare operations makes individualized live interviews" of prospective drivers "logistically impracticable," Morris Rep. at 11-12, on the basis that such opinion is not supported by facts or data, Mot. at 29. Plaintiff's arguments both fail.

***First***, Mr. Morris's opinions regarding Uber's compliance with industry standards and regulations do not amount to impermissible legal conclusions.

"Qualified experts are permitted to offer opinion testimony as to industry standards or norms and whether or not they were followed in a particular case, as long as such opinions involve questions of fact rather than purely legal matters." *Am. Can! v. Arch Ins. Co.*, 597 F. Supp. 3d 1038, 1047 (N.D. Tex. 2022) (citation omitted). This is so because "[expert] testimony analyzing the conduct of the various parties with respect to various applicable rules and regulations may assist the trier of fact without crossing the line into impermissible legal conclusions." *Ponds v. Force Corp.*, No. CV 16-1935, 2016 WL 7178483, at *4 (E.D. La. Dec. 8, 2016). In accordance with these standards, courts within the Fifth Circuit routinely admit expert testimony pertaining to compliance with industry standards. *See, e.g.*, *Leyman v. Amazon Logistics, Inc.*, No. 2:24-CV-129-BR, 2026 WL 2283610, at *5 (N.D. Tex. Aug. 7, 2026) (holding expert's "testimony that the accident was preventable as defined by industry standards, and that compliance with industry standards by the Defendants would have in fact prevented it, constitutes admissible expert opinions, even if it embraces ultimate issues that the jury must determine"); *Ponds*, 2016 WL 7178483, at *5 (rejecting "argument that experts can never testify about the applicability of industry standards and regulations to a particular situation"); *Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, No. SA-16-CA-00485-FB-ESC, 2017 WL 1133506, at *4 (W.D. Tex. Mar. 24, 2017) (holding expert's "conclusion—that Wealthmark did not comply with industry standards . . . is admissible").[13]

[13] Plaintiff's cited cases are inapposite because they prohibit an expert from opining on "an ultimate issue of law." *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1165, 1171 (N.D. Cal. 2023), *opinion clarified by* No. 17-CV-03962-HSG, 2024 WL 3498492 (N.D. Cal. July 22, 2024) (cited in Mot.

Similarly, an expert like Mr. Morris may opine on "compliance with [] regulations" because such testimony does "not infringe on the jury's role in determining the ultimate issue in this case[.]" *Cason v. C.R. Bard, Inc.*, No. 1:12-CV-1288-MHS, 2015 WL 9913809, at *12-13 (N.D. Ga. Feb. 9, 2015) (holding expert may "testify regarding the regulatory process . . . and he may express his opinion as to whether Bard complied with all FDA regulatory requirements"); *Kruszka v. Novartis Pharms. Corp.*, 28 F. Supp. 3d 920, 931 (D. Minn. 2014) (permitting expert testimony on "compliance with FDA regulations, including with respect to labeling and warnings" because "such testimony would be helpful to the trier of fact from a regulatory perspective"); *Vazquez v. Aguilera*, No. 5:19-CV-117, 2022 WL 2292888, at *7 (S.D. Tex. Mar. 25, 2022) (permitting expert to "opine on whether [d]efendants have complied with federal motor carrier safety regulations").

Here, Mr. Morris's expert report describes the applicable industry standards informed by the regulatory framework and Professional Background Screening Association ("PBSA") guidelines. Morris. Rep. at 6-8; *see also* Morris Dep. 110:14-16 (Ex. 8) ("Q. You gave opinions in your report about industry standards, right? A. Correct."); Romero Rep. at 25 (ECF 7351-2) ("Background investigations are conducted in accordance with the" FCRA). He details the requirements of the standards and regulations, explaining, *inter alia*, that "PBSA ha[s] explicit guidelines identifying name-only matching as unreliable" and "prohibit[s] members from using it." Morris Rep. at 9.[14] He also opines, based on his extensive experience with background check procedures and regulations, that "Uber's screening infrastructure is more advanced than what is commonly seen in similarly situated companies[.]" *Id.* at 8. Mr. Morris need not instruct the jury on what the FCRA or Texas law legally requires to explain the screening practices

at 28) (prohibiting expert from opining that defendant was out of compliance "with the ADA" in case alleging that defendant "violated the ADA"); *San Francisco Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1085, 1096-97 (N.D. Cal. 2022) (cited in Mot. 27-28) (prohibiting expert from concluding that defendant was subject to the Clean Water Act in case alleging violation of the Clean Water Act, but allowing expert to testify as to "the facts underpinning those conclusions"); *SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869, 902 (N.D. Cal. 2022) (cited in Mot. at 28) (in copyright lawsuit, excluding expert testimony that "the plaintiffs have shown that their chains of title would entitle them to ownership under the copyright laws") (emphasis omitted). Here, there is no allegation that Uber violated any industry standard for rideshare companies. Thus, Mr. Morris's reference to compliance with industry standards is not a legal conclusion.

[14] Plaintiff's experts seek to proffer similar regulatory opinions. *E.g.*, Romero Rep. at 8 (stating that "[u]nder Texas law, a Transportation Network Company (TNC) must perform a background check on all of its drivers" and opining that Uber's background check procedure "is a significant departure from standard practice").

recognized in his industry, including PBSA matching standards. Testimony that Uber was in "compliance with [these] industry standards" and regulations—which does not amount to conclusions on Uber's ultimate liability in this case—is plainly permissible. *Leyman*, 2026 WL 2283610, at *5.[15]

***Second***, there is no basis for Plaintiff's argument that Mr. Morris's opinion regarding the "impractica[lity]" of live interviews of drivers who use the Uber platform, Morris Rep. at 11-12, is "ipse dixit," Mot. at 28-29. Courts universally recognize that an expert like Mr. Morris may "draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire*, 526 U.S. at 156; *see also United States v. Holguin*, 51 F.4th 841, 856 (9th Cir. 2022) (noting that "[e]xperience alone" may be "a reliable basis for . . . expert testimony"). Here, Mr. Morris's industry standard opinions are rooted in three decades of specialized experience in the background screening industry, which includes, among other things: (a) co-founding and serving as president of a consumer reporting agency; (b) serving as the Chair of the PBSA and the PBSA Background Screening Credentialing Council; and (c) consulting with various organizations in the public and private sectors about their background check processes. *See* Morris Rep. at 1 & Ex. C (CV). His reference to the scale of rideshare operations explains that industry-practice opinion; it is not an opinion about Uber's financial resources or corporate capacity.

For the foregoing reasons, the Court should deny Plaintiff's motion to exclude certain of Mr. Morris's opinions.

## IX. JOSEPH OKPAKU

Joseph Okpaku, an expert in the history, characteristics, and safety standards of the rideshare industry, properly opines that Uber has always exceeded the industry standard for safety in the rideshare industry; that rideshare companies have little control over drivers; and that the safety measures Uber employs enhance safety and are consistent with industry standards. Okpaku Rep. at 5 (Mot. Ex. I). Plaintiff seeks to preclude him from testifying to his proper opinions that: (1) the industry standards with respect to safety in the rideshare industry have been established by the statutory and regulatory requirements for

---

[15] Plaintiff also argues that Mr. Morris's opinion that "Uber is not permitted to use fingerprint background checks" is "an incorrect interpretation of the law." Mot. at 28 (citing Morris Rep. at 10). But any "dispute[]" regarding "the accuracy or applicability of the industry standards described by" Mr. Morris may be addressed "through cross-examination or rebut[tal]" by another expert, it is not grounds for exclusion. *Wealthmark Advisors*, 2017 WL 1133506, at *4.

companies like Uber; (2) Uber exceeds the industry standard for safety in the rideshare and for-hire industries by employing appropriate and effective safety measures; and (3) Uber lacks control over independent third-party drivers. Plaintiff argues that Mr. Okpaku's opinions are legal opinions, irrelevant, or unreliable. As explained below, Mr. Okpaku's opinions are not legal opinions. Rather, they are relevant to key factual issues for the jury—the degree of care and diligence owed by rideshare companies and whether Uber breached that duty of care—and they are well-supported by Mr. Okpaku's knowledge, research, and experience working in the rideshare industry since its infancy. Drawing on this same experience, Mr. Okpaku testified at trial in the *Dean* case, after the Plaintiff's motion to exclude him in *Dean* was denied except as to the issue of control, because it was not at issue in that case.[16]

### A. Mr. Okpaku's Opinions Regarding Industry Standards And The Texas TNC Statute Are Not Improper Legal Conclusions.

As the JCCP court recognized, Mr. Okpaku's opinions regarding rideshare industry standards are "relevant and admissible as to the standard of due care and whether Uber has satisfied that standard." JCCP Order, at 17 (Ex. 13). Mr. Okpaku also offered industry-standard opinions over the Plaintiff's objections in the *Dean* case. *See* ECF 4358, at 38-39. Plaintiff nevertheless claims that Mr. Okpaku's opinions regarding rideshare industry standards and the Texas TNC statute are unreliable because they amount to legal conclusions. That is incorrect.

An expert's "understanding of the requirements of state law" is admissible even where it "support[s] a finding" on an ultimate issue, provided the expert does not "testif[y] that he had reached a legal conclusion[.]" *Hangarter*, 373 F.3d at 1016-17. While Plaintiff cites caselaw excluding testimony where the expert "has not articulated relevant industry standards," Mot. at 30, Mr. Okpaku's opinions cite and explain the specific regulatory and statutory requirements that provide the framework for rideshare industry standards as a whole, and that apply directly to Plaintiff's claims in Texas. Okpaku Rep. at 6-16; *Am. Can!*, 597 F. Supp. 3d at 1047 ("Qualified experts are permitted to offer opinion testimony as to industry standards or norms and whether or not they were followed in a particular case[.]"). Mr. Okpaku's opinions on Uber's compliance with industry standards are permissible because he does not attempt to resolve an ultimate legal question in this case—as Plaintiff is not alleging a lack of compliance with

[16] The Court granted the Plaintiff's Motion to Exclude Mr. Okpaku's expert testimony in the *Mensing* case on the grounds that it was rendered irrelevant by the Court's summary judgment ruling in that case.

statutory or rideshare industry requirements as an ultimate question the jury must decide on liability. *Navarro v. Hamilton*, No. 5:16-CV-1856-CAS (SPx), 2019 WL 351873, at *3 (C.D. Cal. Jan. 28, 2019) (allowing expert testimony "regarding the standards that ordinarily apply to commercial trucks, as the standards are relevant to this case" and "his professional opinion as to whether [defendant's] conduct complied with the applicable standard").

Regarding the application of the Texas TNC statute, Mr. Okpaku's knowledge and experience provide a permissible "understanding of the requirements of state law" from the perspective of one working within a rideshare company to implement local requirements within its business model. *Hangarter*, 373 F.3d at 1017-18 (holding that "the district court did not abuse its discretion in finding [expert's] testimony reliable based on his knowledge and experience"). Mr. Okpaku's opinions on the Texas TNC statute do not improperly rest on legal analysis, but on his extensive personal involvement in developing and implementing TNC regulatory frameworks and his comparison of those frameworks to industry practices, which makes them relevant as well as admissible.

### B. Mr. Okpaku's Opinions Regarding The Safety Of Ridesharing Compared To Other For-Hire Transportation Measures Are Admissible And Reliable.

Even though Plaintiff offers expert testimony claiming generally that there are "unique features to the Uber rideshare environment that allow sexual offenders to sexually assault and maltreat female passengers," Valliere Rep. at 11 (Ex. 6), she asserts that Mr. Okpaku's comparative analysis of the safety of ridesharing and taxis is irrelevant. Mr. Okpaku's opinion as to the safety of the Uber platform as demonstrated through a comparison to the safety of other for-hire transportation, such as taxis, is not only directly relevant to Plaintiff's claims, but it will be helpful to the trier of fact in assessing Uber's safety and is supported by his specialized knowledge of the rideshare industry. Fed. R. Evid. 702.

Plaintiff further objects to Mr. Okpaku's opinions that ridesharing is safer than taxis because he does not cite empirical research or data in support of that opinion—repeating the same objection that this Court did not sustain in *Dean*. *See* ECF 4358, at 39. Plaintiff's argument ignores the fact that no such studies have been attempted and no such data exist. And it does not follow that there is no foundation for Mr. Okpaku's opinion. To the contrary, Mr. Okpaku cites a range of safety-focused features adopted by Uber that are rare or nonexistent in the taxi industry. *See* Okpaku Rep. at 19-22. And although the safety

benefits of these features are largely self-evident, Mr. Okpaku nevertheless explains how they enhance rider safety in a manner that other transportation options do not. *See id.* at 20 (explaining that sharing driver information with riders provides a "significant safety advantage over taxis" because "riders are able to verify the identity of the driver and confirm that the approved vehicle is being used before entering the vehicle"); *id*. (GPS tracking provides "a significant deterrent against aberrant behavior while transporting a passenger, as it provides a digital record of where that driver was at any point that the driver was active on the app."); *id*. at 21 (driver ratings are "not only a significant safety enhancer but also a significant deterrent against aberrant behavior during a ride"); *id.* at 21 (listing numerous additional safety features). That easily satisfies the requirements of Rule 702, particularly where (as here) Mr. Okpaku's expertise lies in his knowledge and experience rather than science. *See Hangarter*, 373 F.3d at 1018 ("Given that, unlike scientific or technical testimony, the reliability of [expert's] testimony was not contingent upon a particular methodology or technical framework, the district court did not abuse its discretion in finding [expert's] testimony reliable based on his knowledge and experience."); *Perez v. City of Austin*, No. A-07-CA-044 AWA, 2008 WL 1990670, at *10 (W.D. Tex. May 5, 2008) (holding that expert's experience and education, combined with a review of the relevant materials, can provide a reliable basis for expert testimony). Mr. Okpaku's report supplies substantial evidence supporting his comparative opinions and there is no basis to exclude them.

### C. Mr. Okpaku's Opinions Regarding The Efficacy Of Uber's Safety Measures And Dashcams Are Admissible And Reliable.

As discussed above, Mr. Okpaku provides detailed analysis of numerous safety features offered through the Uber platform. Okpaku Rep. at 19-22. Because several of these features have existed since Uber's inception and none is required by law, Mr. Okpaku concludes that "[t]he existence of these features alone leads me to conclude that Uber has met or exceeded the industry standard for safety since its inception." *Id.* at 20. Plaintiff argues that Mr. Okpaku's opinions about Uber's safety features should be excluded because no empirical studies exist demonstrating how these features increase sexual safety—again repeating an objection raised but not sustained in *Dean*. ECF 4358, at 39. The Court should reject this argument again. "[I]f the expert's testimony does not rest on traditional scientific methods, the court may permit the testimony where the proposed expert witness bases her testimony on practical experience

rather than scientific analysis." *Lamar Advert. Co. v. Zurich Am. Ins. Co.*, 533 F. Supp. 3d 332, 343 (M.D. La. 2021) (citation and internal quotations omitted). Mr. Okpaku does not purport to offer an empirical or quantitative efficacy opinion; he explains, based on his industry experience, how features such as driver identification, GPS tracking, and trip sharing provide safety and accountability mechanisms generally absent from taxis. *See* Okpaku Rep. at 17 ("For historical and technology-based reasons, the rideshare industry has been subjected to higher safety requirements, and Uber has always met or exceeded that rigorous bar."). Because they are based on Mr. Okpaku's experience and expertise, the lack of empirical studies does not render such opinions unreliable. *Hangarter*, 373 F.3d at 1018.

In addition, Plaintiff seeks exclusion of Mr. Okpaku's opinion "that Uber met industry standards despite failing to utilize dashcams because they were not required by Texas law[,]" which Plaintiff claims "simply equates legal compliance with reasonable care," Mot. at 32-33, once again re-urging an argument that was not accepted in *Dean*, ECF 4358, at 41. Plaintiff misrepresents Mr. Okpaku's opinion. Mr. Okpaku is responding to Plaintiff's argument that Uber should have required the use of dashcams in drivers' cars and concludes that Uber did not "f[a]ll below industry safety standards for ridesharing platforms by not requiring that drivers install a dashcam when no legislative or regulatory body throughout the United States has ever issued such a mandate for the ridesharing industry." Okpaku Rep. at 22. He expresses no conclusion regarding "reasonable care." And his opinion does not rest on legal compliance alone: Mr. Okpaku's report details his research into industry requirements nationwide and cites statutory authority to demonstrate that neither the State of Texas nor any regulatory or legislative body in the United States has required ridesharing companies to have drivers install cameras in their cars. *Id.* As discussed above, there is no requirement under Rule 702 or *Daubert* that an expert opinion be supported by empirical data or any particular methodology. Here, Mr. Okpaku's knowledge, experience, and research provide sufficient support for his opinion as to Uber's compliance with industry standards. *Am. Can!*, 597 F. Supp. 3d at 1047 (holding that it is permissible for qualified experts "to offer opinion testimony as to industry standards or norms and whether or not they were followed"). Accordingly, there is no basis to exclude his opinion regarding dashcams.

**D. Mr. Okpaku's Opinion Regarding The Disparate Impact Of Fingerprinting Is Admissible And Reliable.**

Citing multiple studies, the Bureau of Justice Statistics, and his experience as a prosecutor, Mr. Okpaku opines that fingerprint-based background checks carry the "very real potential for disparate impacts on communities of color." Okpaku Rep. at 29. Mr. Okpaku provides support for his opinion that fingerprint-based background checks are likely to reflect instances in which a person was arrested and fingerprinted, but never charged, which could have a disproportionate impact on people of color, who are more likely to experience an arrest. *Id.* at 29-30. Yet Plaintiff discounts this opinion about the potential impacts of fingerprint-based checks on "communities of color" on the basis that it would not have specifically impacted Mr. Le because there is no allegation that he was the victim of "some unjust law-enforcement action." Mot. at 33. But no such linkage is needed; Mr. Okpaku's opinion is relevant to the systemic tradeoffs of the fingerprint-screening policy Plaintiff proposes, rather than the specific impact on one driver.

Plaintiff also argues that Mr. Okpaku's opinion is unreliable because he did not perform a study or formal literature review of the potential disparate impact of fingerprint-based checks, but an expert need not personally conduct a statistical analysis when relying on his experience and appropriate sources to inform his opinion. *Lamar Advert.*, 533 F. Supp. 3d at 343; *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 36 (D.D.C. 2004) (allowing expert to opine on disparate impact statistical analysis that he did not personally conduct).

**E. Mr. Okpaku's Opinions Regarding Uber's Lack Of Control Over Drivers Are Admissible And Reliable.**

Finally, Plaintiff objects to Mr. Okpaku's discussion of the lack of control exerted over drivers by Uber and other rideshare companies because the "right to control" is an element of a vicarious liability claim in Texas, and Plaintiff brings no such claim. Uber does not dispute that this case presents no issue of vicarious liability. It also provides no opportunity for punitive damages, which Texas law prohibits in cases where a plaintiff's injuries arise out of the criminal acts of a third party. Tex. Civ. Prac. & Rem. Code § 41.005(a); *see* Uber's Mot. for Summ. J., ECF 7328 at 4-6. If, however, the Court allows Plaintiff to present this claim to the jury, Mr. Okpaku's opinion "that drivers have significant control over the amount of their participation on the Uber app, and that Uber does not exercise control over drivers,"

Okpaku Rep. at 29, is relevant to rebut Plaintiff's attempt to hold Uber grossly negligent for the criminal actions of an independent driver.

## X. VIDA THOMAS

Vida Thomas, an expert in standard human resources ("HR") practices for investigating and responding to allegations of sexual assault involving an employee or independent contractor in the workplace, seeks to opine that: (1) Uber's background-check process meets generally accepted standards in the HR industry; (2) information ascertainable by Uber through diligent HR processes as of June 9, 2020 did not indicate that Mr. Le had a history or posed a threat of sexual assault; and (3) Uber's investigative practices and response to information concerning Mr. Le were consistent with generally accepted HR industry standards. Contrary to Plaintiff's arguments, each of these opinions is admissible.

### A. Ms. Thomas Is Qualified To Opine That Uber's Background Check Process Meets Generally Accepted HR-Industry Standards.

Plaintiff contends that Ms. Thomas is not qualified to opine that Uber's background check process meets generally accepted HR industry standards. But this argument mischaracterizes the legal standard for expert qualification and the substance of Ms. Thomas's opinion. Rule 702 requires a prospective expert to show only "reasonable indication of qualifications[.]" *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded by statute on other grounds by Burkle v. Patrick,* No. 20-50221, 2025 WL 943225 (5th Cir. Mar. 28, 2025). Even where there is an "imprecise match between the expert's qualifications and the issue she plan[s] to testify about," the opinion is still admissible. *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 625 (5th Cir. 2018). Indeed, the U.S. Court of Appeals for the Fifth Circuit has specifically cautioned trial courts against "turn[ing] the expert-qualification process into a 'battle of labels' where expertise is defined so narrowly that qualified experts are irrationally excluded from testifying." *Id.*

Here, the substance of Ms. Thomas's opinion is about HR-industry standards, something that she is qualified to opine about. 9/11/2026 Thomas Dep. 59:8-21 (Ex. 9) (noting that Ms. Thomas's opinion on what constitutes "the generally accepted standard with regard to criminal background checks," "based on [her] 30 years practicing employment law and advising employers"). Plaintiff's argument that Ms. Thomas is not an expert on background checks *per se*—i.e., "[s]he has never run a background check,"

and "has never worked with a vendor that conducts background checks," Mot. at 35—is a non-sequitur because Ms. Thomas does not purport to opine on the technical mechanics of Checkr's searches. Rather, she opines that the policies and processes that Uber has adopted are consistent with HR-industry standards. *See* Thomas Dep. 60:11-12 ("I am comparing Uber's practices and policies to those in the HR industry."). Accordingly, Plaintiff's argument is nothing more than an attempt to define Ms. Thomas's expertise "so narrowly" that she would "irrationally" be excluded from testifying on a topic plainly within her expertise, thereby improperly elevating "labels" over substance. *Williams*, 898 F.3d at 625. The Court should therefore reject Plaintiff's argument regarding Ms. Thomas's qualifications.

**B. Ms. Thomas's Opinion That Information Ascertainable By Uber Did Not Indicate Mr. Le Had A History Or Posed A Threat Of Sexual Assault Is Relevant And Admissible.**

Plaintiff also argues that Ms. Thomas's opinion about what information was available to Uber regarding Mr. Le is irrelevant and is a rehashing of Ms. Thomas's excluded opinion from the *Dean* case that Uber "was not on notice" that the driver there "would sexually assault a rider." Mot. at 36. Again, however, Plaintiff misconstrues Ms. Thomas's opinion, which is different from the prior "notice" opinion and is admissible under Rule 702. Here, Ms. Thomas's opinion is not merely that Uber lacked information indicating that Mr. Le had a history or posed a threat of sexual assault, but ***also*** that Uber could not have "uncovered facts through diligent HR processes that suggested that [Mr. Le] had a history of sexual assault or [that] otherwise suggested that he would sexually assault a rider." Thomas Rep. ¶ 38 (Mot. Ex. J). The latter portion of the opinion in particular draws on Ms. Thomas's expertise in HR industry standards and applies that expertise to evaluate the information that ordinary human resources diligence would have identified as of the time of the assault. *See* Thomas Dep. 99:16-23 ("I am using my expertise in the types of information if in the employer's possession that would put – that would give that employer reason to believe a candidate might pose a threat of sexual assault."). In other words, far from "regurtitat[ing] facts," or "instruct[ing] the jury on what conclusion to reach," as Plaintiff erroneously suggests, Mot. at 36, Ms. Thomas appropriately applies her expertise in HR standards to the factual record to generate an expert conclusion—a conclusion, moreover, that is plainly probative of whether Uber acted with ordinary care.

For these reasons, the cases Plaintiff cites are inapposite. Plaintiff cites both *United States v. Diaz*, 876 F.3d 1194 (9th Cir. 2017), and *Doe (E.M.B.) v. G6 Hospitality, LLC*, No. 9:23-CV-00173-MJT-CLS,

2025 WL 2556106, at *15 (E.D. Tex. Apr. 23, 2025), for the proposition that an expert may not opine as to a legal conclusion, but that is not what Ms. Thomas does or purports to do here. And Plaintiff's reliance on *Lord Abbett Municipal Income Fund, Inc. v. Asami*, No. C-12-03694 DMR, 2014 WL 3417941 (N.D. Cal. July 11, 2014), is equally misplaced. There, the challenged expert "opinion merely summarize[d] the record evidence and gratuitously interpret[ed] it." *Id.* at *13 n.8. But that is not what Ms. Thomas does here either. Here, unlike the experts in Plaintiff's cited cases, Ms. Thomas takes the record evidence of what information Uber had in its possession at the time of the assault and applies her expertise in HR industry standards to offer an opinion about what Uber reasonably could have ascertained about Mr. Le through the application of diligent HR processes. That is the prototype of an admissible expert opinion, contrary to Plaintiff's mischaracterizations.

**C. Ms. Thomas's Opinion That Uber's Investigation Was Consistent With Generally Accepted HR Standards Is Reliable.**

Plaintiff also seeks to exclude Ms. Thomas's third opinion on the ground that she fails to identify the standards underpinning her conclusion that Uber's investigation of the assault was "consistent with generally accepted standards." Mot. at 37. But this argument is similarly meritless. Both the report itself and Ms. Thomas's deposition testimony make clear that her opinion is that Uber's investigation of the subject incident was consistent with generally accepted standards in the HR industry (the same standards underpinning her prior opinions), which in turn draw on employment law, standard business practices, and guidelines promulgated by professional organizations such as the Association of Workplace Investigators. *See* Thomas Rep. ¶¶ 23-31 ("Applicable Standards"); *id.* ¶¶ 56, 58 (comparing Uber's investigation practices to "the accepted standards for conducting workplace investigations"); Thomas Dep. 45:12-16 ("[W]hat I was asked here was to determine whether Uber's actions met the well-accepted standards in [the] HR industry."). Accordingly, Ms. Thomas conducted her expert analysis by comparing Uber's investigation practices with generally accepted industry standards for workplace investigations, a methodology that is inarguably reliable and admissible. *See Van Winkle v. Rogers*, 82 F.4th 370, 380 n.2 (5th Cir. 2023) (observing that the district court permitted an expert to opine on "general (non-regulatory) industry . . . standards" and "whether Defendants complied with industry standards and practices"). And Plaintiff is equally off-base to reduce Ms. Thomas's opinion to the assertion that Uber afforded Mr. Le

with due process; in fact, as Ms. Thomas explained in her deposition, she considered numerous aspects of Uber's investigation, including not only due process for both Mr. Le and Plaintiff, but also that Uber used a trained investigator, that the investigator was unbiased, and that Uber issued a reasoned, fair, and timely decision based on the investigator's findings. *See* Thomas Dep. 55:22-56:17.

**D. Ms. Thomas Does Not Opine On Legal Requirements.**

Finally, Plaintiff's argument that Ms. Thomas improperly "opine[s] on legal requirements under the Texas TNC and the FCRA" does not warrant exclusion of her HR-industry opinions. Mot. at 38. Although her report references the Texas TNC statute and FCRA as part of the regulatory context informing HR practices, Ms. Thomas need not—and will not—interpret those statutes or instruct the jury on their legal requirements. Ms. Thomas's ultimate conclusion is that Uber complied with HR industry standards, not that Uber complied with the law. The former is plainly admissible. *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. 13-0366, 2016 WL 9414347, at *12 (E.D. La. May 13, 2016) (holding that expert "may and in fact must" discuss legal authorities in opining on what constituted objective industry standard, so long as expert stopped short of "instruct[ing] the jury as to what law applies").

## XI. EXPERT TESTIMONY REGARDING LEGAL BARRIERS

Plaintiff seeks to exclude testimony from Uber's experts "to the extent any expert seeks to opine that legal barriers prevented Uber from implementing any safety measure" on the grounds that: (i) such testimony would improperly present "a position through an expert that [Uber] has represented it otherwise would not" in the *Dean* pretrial conference; and (ii) the testimony constitutes improper legal opinion. Mot. at 38-39. As a threshold matter, at least the first of these objections is in the nature of a motion in limine, not a Rule 702 motion, and it should have been raised in Plaintiff's in limine motion (which was already at its page limitation). But regardless of any procedural default, both of Plaintiff's arguments lack merit.

***First***, Plaintiff's position that the testimony would be inconsistent with Uber's position at the *Dean* pretrial conference lacks support. The Court there asked whether Uber intended to argue that "[w]e didn't [take a particular action] ***because our lawyers told us not to***." 1/6/2026 *Dean* Pretrial Conf. Tr. 76:6-8 (Ex. 14) (emphasis added). Uber expressly explained that it would not make that argument, but noted that it ***did*** intend to present "nonprivileged evidence about potential legal considerations" bearing on its

decision-making. *Id*. 76:8-13. That exchange only confirms that Uber ***expressly preserved*** its right to present precisely what Plaintiff is challenging: nonprivileged expert testimony concerning legal or regulatory constraints relevant to the measures that Plaintiff proposes Uber should implement. And the opinions challenged here do not relate to advice to Uber from its own lawyers, but rather commonplace legal requirements and considerations that affect entire industries.

***Second***, Plaintiff's contention that any of Uber's experts offered improper legal conclusions fails for the reasons already set forth with respect to each of them. For example, as Uber explained with respect to Mr. Wilson, in considering the feasibility of implementing a dashcam system, he nowhere opines that any law prohibits Uber from doing so. Instead, he merely explains that "[i]t is . . . important to consider legal requirements surrounding required use" of a dashcam system and identifies certain state laws that Uber would have to contend with in implementing that system—such as laws concerning camera placement, size, and privacy. Wilson Rep. ¶ 47 (Mot. Ex. F). Similarly, as explained, Mr. Morris opines that Uber's screening infrastructure complied with—and indeed is more advanced than—industry standards, which is plainly permissible. *See Am. Can!*, 597 F. Supp. 3d at 1047. As shown above, all of this is permissible testimony, and it should not be excluded.

**CONCLUSION**

For all the reasons set forth above, Plaintiff's omnibus motion to exclude expert testimony should be denied.

DATED: September 22, 2026

Respectfully submitted,

*/s/ Kim Bueno*

Kim Bueno (Admitted *Pro Hac Vice* in N.D. Cal.)
TX SBN 24065345
**KIRKLAND & ELLIS LLP**
401 W. 4th Street
Austin, TX 78701
Telephone: (512) 678-9050
kim.bueno@kirkland.com

Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice* in N.D. Cal. and W.D. Tex.)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Michael Vives (Admitted *Pro Hac Vice* in N.D. Cal. and W.D. Tex.)
Jessica Davidson (Admitted *Pro Hac Vice* in N.D. Cal. and W.D. Tex.)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
michael.vives@kirkland.com
jessica.davidson@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2026, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

*/s/ Kim Bueno*
Kim Bueno