# EXHIBIT 20

## PERSONAL INFORMATION REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | ) | |
| This Document Relates to: | ) | CASE NO. 3:23-MD-03084-CRB |
| Jane Doe QLF 001 v. Uber Technologies, Inc., et al., N.D. Cal. No. -cv-08783 W.D. Tex. No. -cv-01694 | ) | |

ORAL AND VIDEOTAPED DEPOSITION OF [redacted]
AUGUST 20, 2026

ORAL AND VIDEOTAPED DEPOSITION OF [redacted] produced as a witness at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on Thursday, August 20, 2026, from 9:00 a.m. to 12:47 p.m., before Janalyn Elkins, CSR, in and for the State of Texas, reported by computerized stenotype machine, via Zoom, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Job No. CS8368846

A. Oh, goodness. No. It's probably --
Q. Do you happen to remember -- I'm sorry. Say again?
A. I said it's probably been at least ten years.
Q. Right. I think if somebody asked me that question, I would struggle, too.
A. Yeah.
Q. But let me ask you this; do you remember whether or not it was Uber or Lyft that you downloaded first?
A. I would think it was probably Lyft -- or, sorry, Uber, because I -- I definitely heard about Lyft after Uber.
Q. Okay. So tell me to the best of your memory what you heard about Uber that encouraged you to download the app back ten years ago?
A. Yeah. So I was living in Arlington at that time where, you know, rideshare, especially due to the -- the stadiums and all of that was very popular. And I would go out with friends at -- at times and wanted a safe option to get home, mostly.
Q. Do you recall learning about Uber by word of mouth or some other way?
A. I'm -- I'm -- I'm not positive, to be honest.
Q. Do you recall any specific advertisement or

marketing campaign that you saw before you downloaded the Uber app ten years ago?

A. I do remember seeing commercials advertising the, you know, that this is the safe route to take. And me, living in Arlington, a busy city, thought that it was neat and a very good idea at the time.

Q. Do you remember when you say commercials, do you -- do you remember seeing TV ads or commercials online? Where did you see those?

A. It probably would have been social media, possibly TV, but I can't say for sure.

Q. And do you remember any specific advertisement that you can describe for me that you have in your mind that you would have seen before you downloaded the Uber app?

A. No.

Q. Okay. And you said that was about ten years ago, best -- best of your knowledge?

A. Give or take, yes.

Q. Okay. So now same questions, but I want to ask about Lyft.

A. Uh-huh.

Q. Do you remember how long ago you first downloaded the Lyft app on your phone?

A. I don't. I -- it would have been after Uber,

test you. But are you aware as you sit here of any safety options that Uber gives riders such as yourself?
A. I believe now that there's an option to select women-only drivers, which is great.
Q. And you have not selected that for Uber, am I correct?
A. I don't believe so, because I -- I don't really gravitate towards Uber, and any time that I am using it, my husband is with me, so, yeah.
Q. Do you have that option of women preferred selected on your Lyft account? Do you know?
A. I do believe so.
Q. Okay. When did you install that?
A. Oh, gosh. As far as selecting the option?
Q. Yes. Yes.
A. I'm not sure exactly. I want to say sometime last year when I heard about it. I just thought it was a good -- a good idea.
Q. What is your understanding of how that option, the women preferences, works on the Lyft platform?
A. To be honest, I don't have a super clear understanding. That -- I -- I believe it's, you know, they will try to match with a woman driver if possible.
Q. And what about on Uber, do you know how that works on Uber if you select the women preferences?

A. No, I don't.
Q. Okay. And Lyft, as you just said, has the system where if they can get you a woman, they will send it.
A. Right.
Q. Are you aware that Uber has a -- a policy were if you want a woman only, that is the only person they'll send you?
MS. CHANG: Yeah, just object to the form.
You can answer.
THE WITNESS: No, I'm not aware.
Q. (BY MS. BUENO) Okay. And as of today, you do not have the women preferences for Uber on your app, correct?
A. I -- I can't say 100 percent. I don't think I do.
Q. Okay. All right. So you mentioned Sunshine Bar. Tell me about the Sunshine Bar, because we have heard about it, but nobody has really described it to me.
A. Yeah. I mean, it's an old little hole in the wall bar, very dive-y. There's no windows in there, it's just very much like a -- kind of a Cheers environment. It's been there since the '60s, I believe. It's got its own charm if you're into that type of

Ms. [redacted] that you ordered her a ride on Uber or Lyft?
A. I don't recall.
Q. Okay. So now let's talk about you actually ordering the ride. That night on, I guess it was June 9th, then, it was past midnight, June 9th of 2020, you opened your phone and you decided to order a ride for Ms. [redacted] correct?
A. Correct.
Q. And you had on your phone both Uber and Lyft at that time, correct?
A. I'm sure I did, but I can't say 100 percent.
Q. Do you remember as you sit here why you decided in that moment on June 9th, 2020 to open the Uber app?
A. It might have been the app that I was using predominantly at that time. I'm -- I can't say for certain.
Q. Do you recall whether you looked at Lyft and Uber and compared prices that night about which one to choose?
A. I don't recall.
Q. Is it possible that you did look at both?
A. It's possible.
MS. CHANG: I'm so sorry. I don't mean to interrupt. Just calls for speculation. But -- just object to form. But she answered, no problem.

it's your spreadsheet. You know, this is a --

MS. BUENO: I can do that, Ms. Chang, yes.

MS. CHANG: Okay. Go ahead.

Q. (BY MS. BUENO) So what I've marked as Exhibit 5 is one line of a spreadsheet for this particular driver, Victor Le, that has all of the feedback and ratings for the trips that he had, Ms. [redacted]

A. Okay.

Q. Do you understand that?

A. Yes.

Q. And so we see on the left-hand side of this line, "Request At Local" and it says that it was requested at 1:32 a.m. Do you see that?

A. I do.

Q. And then, "Begin Trip", this is the time we looked at, 1:56:13, that was the time that that trip actually began, correct?

A. That's what it said. I'm not sure.

Q. Okay. And then it says drop off at 2:37. And that matches what we saw in your trip receipt, correct?

A. Correct.

Q. And then it was a completed ride. The rating that you gave was five. The feedback says, (Reading:) Thank you for your patience and getting her home safe!

2015; is that correct?
A. Yes.
Q. Okay. And this, again, is Exhibit 11. And then you first rode with Uber on September 6, 2016. You have no reason to doubt that if Uber has produced that, true?
A. True.
Q. Okay. So you have, like, a -- a decade experience with Uber. Fair to say?
A. Yes.
Q. And your rider rating is 4.94. Were you aware of that?
A. I had no idea.
Q. Okay. All right. Okay. So with respect to Uber, you had indicated before that you believed that Uber was safe. And in fact, the very purpose of Uber was to get people home safely. Was that --
MS. BUENO: Objection to form.
Q. (BY MS. CHANG) -- what you said? That's what you said, is --
A. Yes.
Q. Okay. And you had indicated to Ms. Bueno that you had seen some Uber advertising, social media, maybe on TV, you couldn't remember. But generally, you know that Uber had sent out ads with respect to their

services. Would that be fair to say?
MS. BUENO: Objection, form.
THE WITNESS: Yes.
Q. (BY MS. CHANG) Okay. I am going to just show you certain social media ads and information that was put out by Uber before the subject incident just to see if any of this refreshes your recollection of the kind of general information that was put out by Uber. So the first one I'm going to show is Exhibit 12.
MS. BUENO: I will object to showing the witness any marketing after she's testified she doesn't recall anything specifically. So object to form and object to the -- the exhibits.
(Exhibit No. 12 was marked.)
Q. (BY MS. CHANG) All right. No problem. Let me show you this next one real quick.
Okay. And this is -- I'm going to pull it down here so you can see it. This is dated October 13, 2018. I'm just going to play it real quick.
(Video playing.)
Q. (BY MS. CHANG) All right. Now, let me ask you, Ms. [redacted], with respect to the kind of information that Uber put out that you had seen before the incident, do you recall seeing ads similar to this in which Uber put out the message that when you go out and even though

you drove doesn't mean you need to drive and get a safe ride home through Uber.

MS. BUENO: Objection, form.

THE WITNESS: Yes. Those are generally, like I said, I couldn't remember a specific ad. But generally, this is what I remember and this is why at the time I was excited about it, and my friends were excited about it, too.

Q. (BY MS. CHANG) You said you thought it was a good idea that -- that there were carefully screened drivers, that Uber was the safest, and you saw ads with young people going out and having a good time and that they would get home safely like this ad. Would that be fair to say?

MS. BUENO: Objection, form.

THE WITNESS: Yes. Yes, that would be fair to say.

Q. (BY MS. CHANG) Okay. This shows a group of young women going out, obviously having a good time drinking. Would that be consistent with the type of ads that you saw before the incident?

A. Yes, that's what I remember, the type of ad.

Q. Okay. I'm going to show the next one, which it would be Exhibit 13.

(Exhibit No. 13 was marked.)

Q. (BY MS. CHANG) This is dated December 19, 2018. It is, (Reading:) End the night the same way you started it: together. Stand up, don't stand by. If your friend has a few too many -- be a stand up friend. Request a ride and make sure you ride home together.

Do you remember seeing messages like this that, you know, if someone has too many, be a stand up friend, request a ride?

MS. BUENO: Objection to form. Objection to the exhibit.

THE WITNESS: Am I okay to answer?

MS. BUENO: You are, yes.

MS. CHANG: Yes.

MS. BUENO: And Ms. [redacted], let me just tell you, we're doing this for the record, so feel free to answer.

THE WITNESS: Okay. Yes. That would be similar to what I remember seeing maybe on social media around that time. Just kind of that general message of, you know, here's an option for you, a safe option.

Q. (BY MS. CHANG) And again -- and again, this shows a group of young women going out and having fun and indicating be a stand up friend if a friend has had too many, true?

A. True.

Q. And this is similar to [redacted] and her friends that night and you were someone, even though not a friend, you were a stand up person in requesting a -- requesting a ride, true?

MS. BUENO: Objection, form.

THE WITNESS: I was trying to be. That was my intention, yes.

Q. (BY MS. CHANG) Kind of doing the exact thing that this ad is kind of trying to show, true?

A. True.

Q. Okay. And then the next one is Exhibit 14.

(Exhibit No. 14 was marked.)

Q. (BY MS. CHANG) And let me ask you this, this is kind of different. This came out in December of 2019. And Uber had put out what's called a safety report. And all of its users were notified that this safety report, the US safety report was coming out, that they're committed to safety.

Do you recall ever seeing a safety report or hearing about a safety report from Uber?

A. I remember hearing about it. I -- I -- to be completely honest, it's -- it's not something I opened and read in detail by any means.

Q. Okay.

A. But it kind of gave me more confidence and

reassurance in choosing them for a safe ride.

Q. And I think you may have heard representations by Uber that we're the first company to do this. We take safety seriously. And as we see here, as the biggest ridesharing platform, we have the biggest responsibility.

Do you recall hearing things like that that gave you peace of mind and security when you were using Uber or ordering Ubers for others?

MS. BUENO: Objection, form.

THE WITNESS: Yes, it -- it just kind of reassured that this was the safest option, and oftentimes, more convenient than a cab or anything like that. It -- it seemed like this is the way to go.

Q. (BY MS. CHANG) And did you believe, in fact, that as the biggest platform, they were the safest?

A. Yes. I felt if anyone was going to be a safe option, it would have been Uber.

Q. Okay. And going to the next exhibit, which is Exhibit 15.

(Exhibit No. 15 was marked.)

Q. (BY MS. CHANG) This is from the US Safety Report, and I'm just going to show you a portion of it here that they do driver background checks and screenings, a thorough criminal history background

check, a very rigorous background check process. I think it's there twice.

Were you familiar with that claim that Uber said of the very rigorous background checks that they put each driver through?

MS. BUENO: Objection, form. Objection, exhibit.

THE WITNESS: I remember hearing that they would go through extensive background checks. I think because also I had known acquaintances at the time that were interested in becoming drivers themselves. But that would be the extent of my knowledge on that.

Q. (BY MS. CHANG) Okay. And as a woman and as, you know, you are probably taught don't get into cars with strangers. Would that be fair to say?

A. Yes.

Q. I think all women are. But with respect to Uber, was it the fact that you believe that they did thorough background checks and a very rigorous process as the biggest platform, was that something that you believed prior to 2020?

A. Yes, very much so. That is why I felt safe and kind of put my mom's advice that I had been hearing since I was a kid aside. And I think she would have agreed, too, that this was a safe option. They're --

they're, you know, checking the backgrounds on everybody that you're getting in the vehicle with.

Q. Okay. I'm going to go -- go the next exhibit which is Exhibit 17. And this is -- came out on -- in December of 2019 from Uber. It's "Why Drive When there are a Million Reasons to Ride This Holiday Season".

(Exhibit No. 17 was marked.)

Q. (BY MS. CHANG) And again, just asking you, is this consistent with the type of information that you saw, beautiful women going out on the town and there's a million reasons to ride with Uber when you are having fun?

MS. BUENO: Objection, form. Objection, exhibit.

THE WITNESS: Yes, that -- that would be consistent with what I remember.

Q. (BY MS. CHANG) Okay. And then I'm going to show you the next exhibit, which is Exhibit 18?

(Exhibit No. 18 was marked.)

Q. (BY MS. CHANG) And this is from December 20th, 2019, and it is posted on Uber's site that is basically "I'm the least drunk of my friends". And it says, (Reading:) Don't look for a reason to drive when there are so many reasons to ride.

Is this consistent with the type of ads

that you saw prior to the incident which kind of enforced the fact that Uber is a reliable option when people go out and they drink?

MS. BUENO: Objection, form. Objection, exhibit.

THE WITNESS: Yes, that was consistent --

Q. (BY MS. CHANG) Oh, I'm sorry. I couldn't hear you.

A. Yes, that sounds consistent with what I remember.

Q. Okay. And then going to the next exhibit which is, I think, the last one I'm going to show is Exhibit 19, which is dated before the incident April 23rd, 2020. I'm going to play it.

(Exhibit No. 19 was marked.)

(Video playing.)

Q. (BY MS. CHANG) All right. Again, is this consistent with the type of information that you received both as an Uber user and account holder for over a decade and seeing in social media a message of we do background screening on drivers?

MS. BUENO: Objection, form. Objection, exhibit.

THE WITNESS: Yes.

Q. (BY MS. CHANG) And would it be fair to say

that you saw these dates from 2018 up to 2020, you were an account holder and user of Uber throughout that whole time period; is that right?

A. Yes.

Q. Okay. And -- and during that time period and in the ten years that you've been an Uber user, would you say that the typical type of ads and information that you have been both emailed and messaged and texted and shown in social media included go out, have fun, take an Uber home when you drink?

MS. BUENO: Objection, form.

THE WITNESS: Yes.

Q. (BY MS. CHANG) Did it include go out and drink; if you're a woman, we will get you home safe?

MS. BUENO: Objection, form.

THE WITNESS: That's the message that I remember hearing pretty strongly.

Q. (BY MS. CHANG) And did it include during that entire time period, we do rigorous background checks and we do everything to keep you safe?

A. Yes.

Q. And you believed it?

A. Yes.

Q. And would -- would it be fair to say that based on this belief and as a result of everything that you

had heard and received from Uber that you, when you encountered a situation, when you saw a young girl at the bar that you loved want to go home while intoxicated, you did exactly what we saw in those ads, would that be fair to say?

MS. BUENO: Objection, form.

THE WITNESS: Yes, that was my intention.

Q. (BY MS. CHANG) You saw a young woman who obviously had been drinking, true?

A. True.

Q. You saw a young woman who you did not believe should drive herself home, true?

A. True.

Q. And you saw a young woman who you wanted to get home safe, true?

A. True.

Q. And you believed that Uber was exactly what they told you it was, someone who really vetted their drivers and who did rigorous checks and they had -- and that they would get a rider home safe, true?

MS. BUENO: Objection, form.

THE WITNESS: Yes.

Q. (BY MS. CHANG) Okay. I am going to go to an exhibit that Ms. Bueno showed you today, I believe it was Exhibit 6. And I am going to show you what I will

mark as Exhibit 21.

(Exhibit No. 21 was marked.)

MS. BUENO: I think we have some background noise from the court reporter. We might want to just make sure that's muted.

MS. CHANG: Is -- yeah, I think -- yeah. There -- oh, that noise went away. Thank you so much. I didn't know what that was. I -- okay.

Q. (BY MS. CHANG) So I'm showing you what I have, this is from Exhibit 6. I think Ms. Bueno asked you about different things that you may have seen that assured you that the driver was safe and reliable. And I have marked here the first one was, I think you mentioned it said he passed a multi step safety screen. Was that one of the factors, Ms. [redacted] that you mentioned?

MS. BUENO: Objection, form.

THE WITNESS: Yes.

Q. (BY MS. CHANG) All right. The other was his very high rating, 4.94 out of 5 stars, true?

A. Yes. I've come to find out, I've had the same rating. So.

Q. Both of you had very high ratings. Okay. And then it also shows here that he was, in very big writing, a US Army drone operator, 3rd Ranger Battalion,

true?

A. Yes.

Q. Okay. And based on what was shown to you, and it also shows -- actually, I should have also included that, is he is Uber Pro Platinum. Do you see that?

A. I see that.

Q. Okay. That also -- it sounds very safe. Would you -- would you agree?

MS. BUENO: Objection, form.

THE WITNESS: Yes, it sounds to me like he has been very vetted.

Q. (BY MS. CHANG) The best of the best. Would that be fair to say?

A. Yes.

Q. Platinum sounds very fancy, doesn't it?

A. It does.

Q. Okay. Now, we also have here, I'm going to mark this as the next exhibit, 22.

(Exhibit No. 22 was marked.)

Q. (BY MS. CHANG) This is what is sent, it shows his picture of his vehicle and it shows the vehicle, which is an Altima, which I think you said it was a sedan, and with his 4.94 and it also says top rated driver. Do you see that?

A. Yes.

MS. BUENO: Objection to the exhibit.

Q. (BY MS. CHANG) Okay. All right. And again, Ms. [redacted] these are all things that Uber was sending you about this driver that made you feel that it was safe to put this young girl who was intoxicated late at night and all alone in the vehicle, true?

MS. BUENO: Objection, form.

THE WITNESS: Yes, I had no concerns about -- on -- on -- his part.

Q. (BY MS. CHANG) Okay. So let me ask you, and I will mark the next exhibit as Exhibit 23.

(Exhibit No. 23 was marked.)

Q. (BY MS. CHANG) If, instead, you had gotten a notification that indicated to you that this driver has been reported for fraud, would that have given you pause?

MS. BUENO: Objection to the exhibit and objection to the form.

THE WITNESS: Absolutely. I would not have felt safe putting anyone else in a vehicle with someone like that.

Q. (BY MS. CHANG) Okay. If this notification or warning had sent to you that said this driver has been reported for being an impostor driver, would that have given you pause and would you have not put [redacted]

[redacted] in that vehicle?

MS. BUENO: Objection, form.

THE WITNESS: Definitely would have given me pause and, no, I would not have putten her -- put her in that vehicle.

Q. (BY MS. CHANG) If it had indicated that this driver had been reported for sexual assault by another guest rider, would that have given you pause?

MS. BUENO: Objection, form.

THE WITNESS: 100 percent would have given me pause.

Q. (BY MS. CHANG) If you knew or were warned that this driver had been reported for sexual misconduct that had been investigated by Uber, would you have put [redacted] in that vehicle?

MS. BUENO: Objection, form.

THE WITNESS: No. And it makes me angry that -- no, I wouldn't -- I wouldn't have.

Q. (BY MS. CHANG) All right. And when you say it makes you angry, do you wish you had been fully informed of everything Uber knew or should have known about Victor Le?

MS. BUENO: Objection, form.

THE WITNESS: Yes, I -- I would have obviously questioned why he's still employed with them

in the first place.
Q. (BY MS. CHANG) All right. When you first heard about what happened when the police came and asked you, were you shocked?
A. Yeah, yes, I was shocked and heartbroken, honestly, to hear that somebody had been hurt and angry for trusting this company that I had trusted many times before with my own safety.
Q. Did you feel betrayed?
A. Yes, because, like I said, I had used Uber before. I felt very betrayed. I trusted this company, you know. I -- but my whole reasoning why this whole incident happened was because I was trying to make sure a young woman made it home safely and nobody was hurt. Either her nor anyone else on the road. And as we all know, that didn't happen.
Q. And again, because you -- you look out for each other at that bar, you were a good Samaritan doing the right thing, you never wanted to put this young girl in danger, would that be fair to say?
A. Yeah, very fair to say.
Q. Ms. Bueno asked you about at the bar, which goes back to the decision to put cameras on the exterior of the bar, was that because the manager and the owner were told that there -- a crime had been committed and

a -- a female passenger, you would not have let [redacted] get in the car. Would that be fair to say?

MS. BUENO: Objection, form, lack of foundation.

THE WITNESS: Yes, that's -- that's correct. I would not have put her in that car.

Q. (BY MS. CHANG) The type of bar that Sunshine Bar was, she could have stayed at the bar either the patio area or in the bar until other arrangements could be made, true?

A. Yes. Yes, absolutely.

Q. She was safe there, true?

A. Yes.

Q. Your ex-husband, as the manager, he would not have let something bad happen to her if she had to stay there a little longer for another driver, for example?

MS. BUENO: Objection, form.

THE WITNESS: Correct. And, we, you know, just to add another measure of safety, we were right down the street from the police station, so...

Q. (BY MS. CHANG) You would have found other -- you would have found other options?

A. Yes.

Q. Okay. And with respect to other options, had Uber at that time, on the night of the incident, had the

option of a female driver at that time and at that location, would you have chosen that option?

MS. BUENO: Objection, form.

THE WITNESS: 100 -- 100 percent, yes, I would have chosen that option.

Q. (BY MS. CHANG) Why do you say that?

A. Well, I would have chosen that option for myself if I was riding by myself, especially at that time of night and after having some alcohol. And especially with [redacted] not -- not knowing her, not -- I didn't have her phone number or anything, any way to get in contact with her to make sure that she did make it home safely. She was a young woman, yeah, I -- just -- I feel like that would have been an extra measure that I absolutely I would have taken advantage of.

Q. Because as you said, she's young, first of all, true?

A. Right.

Q. She's a woman, true?

A. Uh-huh.

Q. She's all alone -- she's all alone?

A. Yes.

Q. And she was intoxicated, true?

A. Yes.

Q. It was late, in the early morning hours, true?
A. Yes.
Q. And she was going a long distance, 37 miles by herself, true?
A. Yes.
Q. All of those, you would have wanted a female driver. Would that have been fair to say?
MS. BUENO: Objection, form.
THE WITNESS: Yes.
Q. (BY MS. CHANG) All right. And even if you had to wait longer for a female driver, you would have been willing to have her wait there, true?
A. Yes.
Q. She could have sat in that little patio area that you talked about?
A. Sure. She -- she wouldn't have been alone. But yes, she -- she would have been safe.
Q. Okay. Okay. And staff would have remained with her even if they had closed, true?
MS. CHANG: Objection, form.
THE WITNESS: Yes.
Q. (BY MS. CHANG) Would you have stayed with her if necessary to make sure she was safe?
A. Absolutely, yes.
Q. Okay. And if -- if it -- if a female driver

would have take an extra 20 minutes or an hour, you would have waited as a safer alternative, would that be fair to say?

MS. BUENO: Objection, form.

THE WITNESS: Yes.

Q. (BY MS. CHANG) Okay. Just to wrap up, Ms. [redacted] because I think I -- that's all the questions I have, I just -- I just wanted to wrap up that -- that entire night. You, [redacted] friends, and ultimately [redacted] all of you were trying to do the responsible right thing by ordering an Uber vehicle, true?

A. Yes.

Q. And you wanted to prevent something bad from happening, true?

A. Yes.

Q. You, as the orderer of this car, you trusted Uber?

A. I did.

Q. You trusted Uber to send you a safe driver when you and [redacted] needed it the most, true?

A. Yes.

Q. And if you had known information that we've discussed or that I've been showing you or insinuated with my little red flags meaning fraud, impostor, sexual