[Submitting counsel below]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION** | No. 3:23-md-03084-CRB<br><br>**PLAINTIFF QLF 001'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY** |
| This Document Relates to:<br><br>*Jane Doe QLF 001 v. Uber Techs., Inc., et al.*,<br>N.D. Cal. No. 3:24-cv-08783<br>W.D. Tex. No. 1:26-cv-01694 | Judge: Honorable Charles R. Breyer<br>Date: September 25, 2026<br>Time: 10:30 A.M. PT<br>Ctrm: 6, 17th Floor (zoom)<br><br>**PROVISIONALLY FILED UNDER SEAL PURSUANT TO ECF 7312** |

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| JANE DOE QLF 001,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>Defendants. | No. 1:26-cv-01694-CRB<br><br>Judge: Honorable Charles R. Breyer |

# TABLE OF CONTENTS

INTRODUCTION ..... 1
LEGAL STANDARD ..... 2
ARGUMENT ..... 3
I. THOMAS TREMBLAY'S TESTIMONY IS ADMISSIBLE. ..... 3
A. Tremblay's opinions regarding audio and video recordings, gender-matching, identified risk factors, and background screenings are relevant and reliable. ..... 4
B. Tremblay's opinions regarding rape myths are relevant to dispelling harmful misconceptions. ..... 9
II. JOHN ROMERO'S TESTIMONY IS ADMISSIBLE. ..... 10
A. Romero is qualified to offer his opinions on background screening. ..... 10
B. Romero's methodology, based on decades of experience and industry standards, is reliable. ..... 12
C. Romero's opinions are relevant to Plaintiff's claims. ..... 15
D. Romero does not opine on ultimate legal issues. ..... 15
E. Romero does not opine on state of mind or knowledge. ..... 17
F. Uber's repackaged merits argument provide no basis to exclude opinions. ..... 18
III. DR. ROBERT SNIDERMAN'S TESTIMONY IS ADMISSIBLE. ..... 18
A. Sniderman identified industry standards with sufficient specificity. ..... 19
B. Sniderman used a reliable experience-based methodology. ..... 20
C. Sniderman's opinions are consistent with Texas law. ..... 21
D. Sniderman did not need to review materials related to Uber's "civil rights priorities." ..... 21
E. Sniderman does not offer improper legal conclusions. ..... 22
IV. LACEY KELLER'S TESTIMONY IS ADMISSIBLE. ..... 23
A. Uber's recycled attacks on Keller's analysis of SA/SM incident frequency on Uber's platform should be denied, again. ..... 23
B. Uber mischaracterizes Keller's expert analysis as lay opinion. ..... 24
C. Keller's opinions are relevant. ..... 27
V. DR. DAVID FELTOON'S TESTIMONY IS ADMISSIBLE. ..... 27
A. Pursuant to Fed. R. Civ. P. 26(a)(2)(B)(v), a list of prior cases was provided with the expert report. ..... 28
B. Feltoon does not provide credibility opinions. ..... 29
C. Feltoon may testify to his evaluation of Plaintiff, including interview statements, testing, and observations, that form the basis of his opinions and medical diagnoses. ..... 30
VI. LEIGH LEVY'S TESTIMONY IS ADMISSIBLE. ..... 32
A. Levy's opinions are supported by medical records, diagnoses, and treatment plans of Plaintiff's medical providers and independent medical evaluators. ..... 32

B. Uber's criticisms of testing variability and apportionment go to weight, not admissibility. .......... 36

C. Levy should be permitted to explain the basis for her opinions to the jury. .......... 37

VII. ROBERT JOHNSON'S TESTIMONY IS ADMISSIBLE. .......... 38

A. Johnson's methodology, based on 40 years' experience and standard forensic economist standards, is reliable. .......... 39

B. Johnson does not "inflate" Uber's own financial figures. .......... 42

C. Johnson properly provides the basis for his opinions. .......... 43

D. Texas law does not confine evidence of financial condition to net worth. .......... 44

E. Johnson's opinions about Uber's own figures are not "unsubstantiated anchoring." .......... 46

CONCLUSION .......... 46

## TABLE OF AUTHORITIES

### CASES

*Allstate Ins. Co. v. Gen. Elec. Co.*, 2002 WL 34373485 (W.D. La. Feb. 4, 2002) ........ 13, 20

*Arnold v. City of San Antonio*, 2009 WL 780671 (W.D. Tex. Mar. 24, 2009) ........ 29

*Arthur v. Liberty Mut. Personal Ins. Co.*, 2022 WL 14225368 (W.D. Tex. Oct. 24, 2022) ........ 29

*Ball v. River Oaks Hosp., LLC*, 2026 WL 2676530 (S.D. Miss. Sept. 11, 2026) ........ 1

*Bankhead v. ArvinMeritor, Inc.,* 139 Cal. Rptr. 3d 849 (Cal. Ct. App. 2012), *as modified* (Apr. 25, 2012) ........ 39, 41, 45

*Barnes v. Rd. Carriers, Inc.*, 2025 WL 959519 (E.D. Tex. Mar. 31, 2025) ........ 37

*Bauta v. Greyhound Lines, Inc.*, 2019 WL 8060183 (E.D.N.Y. Jan. 4, 2019) ........ 35

*Baxter v. Peterson*, 150 Cal. App. 4th 673 (2007) ........ 43

*Bibbs v. Molson Coors Beverage Co. USA, LLC*, 699 F. Supp. 3d 509 (N.D. Tex. 2023) ........ 41

*Blue Bottle Coffee, LLC v. Liao*, 2023 WL 9502073 (N.D. Cal. Nov. 30, 2023) ........ 2

*Bradley v. Cooper Tire & Rubber Co.*, 2007 WL 4624613 (S.D. Miss. Aug. 3, 2007) ........ 17

*Bryant v. 3M Co.*, 78 F. Supp. 3d 626 (S.D. Miss. 2015) ........ 11

*CCM Touring LLC v. Moonbug Ent. Ltd.*, 2026 WL 848392 (S.D.N.Y. Mar. 27, 2026) ........ 5

*Chandler Gas & Store Inc. v. Treasure Franchise Co. LLC*, 2025 WL 3018829 (D. Ariz. Oct. 29, 2025) ........ 11

*Citizens State Bank v. Leslie*, 2020 WL 3579898 (W.D. Tex. Mar. 20, 2020) ........ 16, 22

*Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 132 S.W.3d 671 (Tex. App. 2004), *rev'd in part on other grounds*, 271 S.W.3d 238 (Tex. 2008) ........ 44

*Coordination Proceeding Special Title (Rule 3.550)*, 2025 WL 2631568 (Cal. Super. Ct. Aug. 29, 2025) ........ *passim*

*Cover v. Windsor Surry Co.*, 2017 WL 9837932 (N.D. Cal. July 24, 2017) ........ 17

*Csikos v. S.M. Construction & Contracting, Inc.*, 2022 WL 3211462 (S.D.N.Y. Aug. 9, 2022) ........ 36

*Cuevas v. E.I. DuPont*, 956 F. Supp. 1306 (S.D. Miss. 1997) ........ 24

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ........ *passim*

*DeWolff, Boberg & Assocs., Inc. v. Pethick*, 2024 WL 1396267 (N.D. Tex. Mar. 31, 2024), *aff'd on other grounds*, 133 F.4th 448 (5th Cir. 2025) ........ 41

*DiSalvatore v. Foretravel, Inc.*, 2016 WL 7742824 (E.D. Tex. July 20, 2016) ........ 28

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609 (7th Cir. 2002) ........ 38

*Ellis Cnty. State Bank v. Keever*, 936 S.W.2d 683 (Tex. App. 1996) ........ 44

*Engilis v. Monsanto Co.,* 151 F.4th 1040 (9th Cir. 2025) ........ 3

*Farah Mfg. Co. v. Alvarado*, 763 S.W.2d 529 (Tex. App. 1988),

*aff'd*, 830 S.W.2d 911 (Tex. 1992) .......... 45
*Fed. Trade Comm'n v. Qualcomm Inc.*, 2018 WL 6460573 (N.D. Cal. Dec. 10, 2018) .......... 20
*Gerald v. R.J. Reynolds Tobacco Co.*, 2018 WL 4062154 (V.I. Super. Ct. June 12, 2018) .......... 42
*Glob. Weather Prods., LLC v. Joe Pags Media, LLC*, 2026 WL 951847 (W.D. Tex. Feb. 27, 2026) .......... 3
*Gregory v. Chohan*, 670 S.W.3d 546 (Tex. 2023) .......... 46
*Gunn v. McCoy*, 554 S.W.3d 645 (Tex. 2018) .......... 36
*Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) .......... 11, 21
*Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021) .......... 22
*Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007) .......... 13, 21, 41
*Hayes v. Wal-Mart Stores, Inc.*, 294 F. Supp. 2d 1249 (E.D. Okla. 2003) .......... 43
*Hood v. Time Warner Cable LLC*, 2009 WL 1202561 (C.D. Cal. Apr. 30, 2009) .......... 22
*Huss v. Gayden*, 571 F.3d 442 (5th Cir. 2009) .......... 11
*In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 830309 (N.D. Fla. Mar. 4, 2021) .......... 39, 41, 44
*In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) .......... 3
*In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334 (N.D. Cal. 2018) .......... 18
*In re Depakote v. Abbott Lab'ys, Inc.*, 2017 WL 11438794 (S.D. Ill. May 24, 2017) .......... 36
*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753 (5th Cir. 2018) .......... 6
*In re Garth*, 214 S.W.3d 190 (Tex. App. 2007) .......... 45
*In re Glumetza Antitrust Litig.*, 2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) .......... 17
*In re House of Yahweh*, 266 S.W.3d 668 (Tex. App. 2008) .......... 43, 45
*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020) .......... 14
*In re JUUL Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1814440 (N.D. Cal. June 2, 2022) .......... 17
*In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 788 (N.D. Cal. 2021) .......... 22, 37, 42
*In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956 (N.D. Cal. 2019) .......... 22
*In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 WL 2995897 (E.D. La. July 9, 2019) .......... 6
*In re Yasmin and YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2011 WL 6732819 (S.D. Ill. Dec. 16, 2011) .......... 39, 44
*Irving v. Meridian Sec. Ins. Co.*, 2023 WL 2068472 (N.D. Tex. Jan. 4, 2023) .......... 29

*J.H. Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295 (N.D. Cal. 2022) .................. 16, 22
*Jones v. L.F. Grp., Inc.*, 559 F. Supp. 3d 550 (N.D. Miss. 2021) .................. 16
*King v. GEICO Indem. Co.*, 712 Fed. App'x 649 (9th Cir. 2017) .................. 16, 22
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................. 9
*Leyman v. Amazon Logistics, Inc.*, 2026 WL 2243781 (N.D. Tex. Aug. 4, 2026) .................. 5
*Lopez v. Am. Honda Motor Co.,* 2025 WL 2246617 (S.D. Tex. July 14, 2025) .................. 41
*Matthews v. Hewlett-Packard Co.,* 2017 WL 6804075 (S.D.N.Y. Dec. 22, 2017) .................. 31
*McBroom v. Payne*, 2010 WL 11561450 (S.D. Miss. Sept. 16, 2010) .................. 28
*McCoy v. DePuy Orthopaedics, Inc.*, 2024 WL 1705952 (S.D. Cal. Apr. 19, 2024) .................. 17
*McCray v. Westrock Servs., LLC*, 2023 WL 4681371 (C.D. Cal. July 12, 2023) .................. 22, 23
*Monsanto Co. v. Durnell*, 609 U.S. ___, 146 S. Ct. 2001 (2026) .................. 22
*Moore v. Ashland Chem. Inc.*, 151 F.3d 269 (5th Cir. 1998) .................. 13, 20, 41
*Morris v. JTM Materials, Inc.,* 78 S.W.3d 28 (Tex. App. 2002) .................. 9, 21
*MS Amlin Marine NV v. Delta Marine Indus. Inc.*, 348 F.R.D. 658 (W.D. Wash. 2025) .................. 16
*Open Cheer & Dance Championship Series LLC v. Varsity Spirit, LLC*, 2026 WL 1485212 (N.D. Tex. May 27, 2026) .................. 13, 20
*Pooshs v. Philip Morris USA, Inc.*, 287 F.R.D. 543 (N.D. Cal. 2012) .................. 42, 45
*Porter v. Whitehall,* 9 F.3d 607 (7th Cir. 1993) .................. 24
*Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546 (5th Cir. 2004) .................. 7, 22, 37, 42
*Richardson v. U.S.*, 2026 WL 579508 (W.D. Mo. Mar. 2, 2026) .................. 41
*Rivers v. B. Braun Interventional Sys., Inc.*, 2023 WL 7166520 (E.D. Wis. Oct. 31, 2023) .................. 32, 36
*Robroy Industries-Texas, LLC v. Thomas & Betts Corp.*, 2017 WL 1319553 (E.D. Tex. Apr. 10, 2017) .................. 37
*Schmidt v. U.S.,* 2020 WL 13199268 (W.D. Tex. Mar. 20, 2020) .................. 37
*Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606 (5th Cir. 1999) .................. 30
*Soto v. BrogWarner Morse TEC Inc.*, 191 Cal. Rptr. 3d 263 (Cal. Ct. App. 2015) .................. 43
*Spearman Corp. Marysville Div. v. Boeing Co.*, 2022 WL 6751797 (W.D. Wash. 2022) .................. 19
*Sullivan v. City of Buena Park*, 2022 WL 2965664 (C.D. Cal. Apr. 11, 2022) .................. 41
*Sullivan v. Costco Wholesale Corp.*, 2018 WL 4057447 (E.D. Cal. Aug. 23, 2018) .................. 12
*Tardif v. City of New York*, 344 F. Supp. 3d 579 (S.D.N.Y. 2018) .................. 31
*Thomas v. City of Port Arthur, Texas*, 2025 WL 474902 (E.D. Tex. Feb. 12, 2025) .................. 13
*U.S. All. Grp., Inc. v. Cardtronics USA, Inc.*, 645 F. Supp. 3d 554 (E.D. La. 2022) .................. 13
*U.S. ex rel. Mitchell v. CIT Bank, N.A.*, 2022 WL 1233651 (E.D. Tex Apr. 26, 2022) .................. 26

*U.S. v. Bighead*, 128 F.3d 1329 (9th Cir. 1997) ........ 9
*U.S. v. Burlington Res. Oil & Gas Co.*, 2000 WL 1058972 (S.D. Tex. May 18, 2000) ........ 6
*U.S. v. Garcia*, 7 F.3d 885 (9th Cir. 1993) ........ 12
*U.S. v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ........ 20
*U.S. v. Simmons*, 470 F.3d 1115 (5th Cir. 2006) ........ 12, 40
*U.S. v. Wertis*, 505 F.2d 683 (5th Cir. 1974) ........ 30
*U.S. v. Young*, 316 F.3d 649 (7th Cir. 2002) ........ 9
*USA Truck, Inc. v. West*, 189 S.W.3d 904 (Tex. App. 2006) ........ 44
*Van Winkle v. Rogers*, 82 F.4th 370 (5th Cir. 2023) ........ 5
*Viterbo v. Dow Chem. Co.*, 826 F.2d 420 (5th Cir. 1987) ........ 13, 21, 41
*Washington v. Dep't of Transp.*, 8 F.3d 296 (5th Cir. 1993) ........ 6
*Watkins v. Telsmith, Inc.*, 121 F.3d 984 (5th Cir. 1997) ........ 13, 20, 41
*Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, 2017 WL 1133506 (W.D. Tex. Mar. 24, 2017) ........ 19, 21
*Williams v. First Advantage LNS Screening Sols. Inc*, 2015 WL 9690018 (N.D. Fla. Mar. 31, 2015) ........ 16
*Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607 (5th Cir. 2018) ........ 6
*Wright v. HireRight LLC*, 2025 WL 928852 (D. Ariz. Mar. 27, 2025) ........ 14
*Ybay v. RSUI Grp., Inc.*, 2015 WL 1756068 (Cal. Super. Ct. Feb. 3, 2015) ........ 22, 23

**STATUTES**

Tex. Civ. Prac. & Rem. Code § 41.001 ........ 42
Tex. Civ. Prac. & Rem. Code § 41.011 ........ 44, 45, 46
Tex. Occ. Code § 2402.107 ........ 9, 21

**RULES**

Fed. R. Civ. P. 26 ........ 28, 29
Fed. R. Civ. P. 37 ........ 29
Fed. R. Evid. 403 ........ 24, 45
Fed. R. Evid. 702 ........ *passim*
Fed. R. Evid. 703 ........ 13, 31, 37

## PREVIOUSLY FILED EXHIBITS

| Document | ECF No. |
|---|---|
| Uber's Motion to Exclude Robert Sniderman | ECF 7346 |
| Ex. 1: Expert Report of Robert Sniderman 09.08.2026 | ECF 7347 (Sealed) |
| | |
| Uber's Motion to Exclude Thomas Tremblay | ECF 7349 (Sealed); ECF 7348 (Public) |
| Ex. 1: Expert Report of Thomas Tremblay 09.03.2026 | ECF 7349-1 (Sealed) |
| Ex. 2: Plaintiff Deposition Excerpts 07.22.2026 | ECF 7349-2 (Sealed) |
| Ex. 3: H.M. Deposition Excerpts 08.20.2026 | ECF 7349-3 (Sealed) |
| Ex. 4: CHECKR Consumer Report for Victor Huynh Le (UBER-MDL-DFS00064890) | ECF 7349-4 (Sealed) |
| Ex. 5: Background Check Summary (UBER-MDL-DFS00064891) | ECF 7349-5 (Sealed) |
| Ex. 6: Brad Hubbard 30(b)(6) 08.13.2026 Deposition Excerpts | ECF 7349-6 (Sealed) |
| Ex. 7: CHECKR001641 | ECF 7349-7 (Sealed) |
| | |
| Uber's Motion to Exclude John Romero | ECF 7351 |
| Ex. 1: Expert Report of John Romero 09.03.2026 | ECF 7352 (Sealed) |
| Ex. 2: 190 Intel Website Pt. 1 | ECF 7351-3 |
| Ex. 3: 190 Intel Website Pt. 2 | ECF 7351-4 |
| Ex. 4: John Romero LinkedIn | ECF 7351-5 |
| Ex. 5: John Romero Deposition 09.13.2026 | ECF 7352-1 (Sealed) |
| Ex. 6: Expert Report of Jason Morris 09.03.2026 | ECF 7352-2 (Sealed) |
| Ex. 7: Brad Hubbard 30(b)(6) 09.13.2026 Deposition Excerpts | ECF 7352-3 (Sealed) |
| Ex. 8: Expert Report of Kevin Phelan 09.08.2026 | ECF 7352-4 (Sealed) |
| Ex. 9: Expert Report of Kristen Zgoba 09.03.2026 | ECF 7352-5 (Sealed) |
| | |
| Uber's Motion to Exclude Lacey Keller | ECF 7354 (Sealed); ECF 7353 (Public) |
| Ex. 1: Expert Report of Lacey Keller 09.03.2026 | ECF 7354-1 (Sealed) |
| Ex. 2: Lacey Keller Deposition 09.14.2026 | ECF 7354-2 (Sealed) |
| Ex. 3: Lacey Keller Deposition 10.27.2025 | ECF 7354-3 (Sealed) |
| | |
| Uber's Motion to Exclude Leigh Levy | ECF 7356 (Sealed); ECF 7355 (Public) |
| Ex. 1: Expert Report of Leigh Levy 09.03.2026 | ECF 7356-1 (Sealed) |
| Ex. 2: Jane Doe QLF 001-SCHS000060 | ECF 7356-2 (Sealed) |
| Ex. 3: Jane Doe QLF 001-SCHS000079 | ECF 7356-3 (Sealed) |
| Ex. 4: David Feltoon Expert Report 09.03.2026 | ECF 7356-4 (Sealed) |

| | |
|---|---|
| Ex. 5: "Pharmacology for Depression and Anxiety in the Primary Care Setting" Journal for Nurse Practitioners. | ECF 7355-6 |
| Ex. 6: *Wright v. C.R. Bard, Inc.*, 3:19-cv-2176-S, ECF 132 (N.D. Tex. Oct. 20, 2020) | ECF 7355-7 |
| | |
| Uber's Motion to Exclude David Feltoon | ECF 7358 (Sealed); ECF 7357 (Public) |
| Ex. 1: Expert Report of David Feltoon 09.03.2026 | ECF 7358-1 (Sealed) |
| Ex. 2: QLF001 Plaintiff Expert Testing Materials | ECF 7357-3 |
| Ex. 3: David Feltoon Deposition 09.10.2026 | ECF 7358-2 (Sealed) |
| | |
| Uber's Motion to Exclude Robert Johnson | ECF 7362 (Sealed); ECF 7360 (Public) |
| Ex. 1: Robert Johnson Full Deposition 02.27.2026 | ECF 7360-2 |
| Ex. 2: Robert Johnson Deposition 10.29.2025 | ECF 7362-1 (Sealed) |
| Ex. 3: Expert Report of Robert Johnson 09.03.2026 | ECF 7362-2 (Sealed) |
| Ex. 4: Robert Johnson Full Deposition 06.20.2025 | ECF 7362-3 (Sealed) |
| Ex. 5: *Dean* Day 16 Trial Transcript Excerpts at p. 3470 | ECF 7360-6 |
| | |
| Plaintiff's Omnibus Motion to Exclude Expert Testimony | ECF 7363 (Sealed), ECF 7364 (Public) |
| Ex. A: Sarah Baker Expert Report 09.08.2026 | ECF 7363-1 (Sealed) |
| Ex. B: Kevin Phelan Expert Report 09.08.2026 | ECF 7363-2 (Sealed) |
| Ex. C: Kristen Zgoba Expert Report 09.03.2026 | ECF 7363-3 (Sealed) |
| Ex. D: Lindsay Orchowski Expert Report 09.03.2026 | ECF 7363-4 (Sealed) |
| Ex. E: Eric Piza Expert Report 09.03.2026 | ECF 7363-5 (Sealed) |
| Ex. F: Christopher Wilson Expert Report 09.03.2026 | ECF 7363-6 (Sealed) |
| Ex. G: Betsy Bartko Expert Report 09.03.2026 | ECF 7363-7 (Sealed) |
| Ex. H: Jason Morris Expert Report 09.03.2026 | ECF 7363-8 (Sealed) |
| Ex. I: Joseph Okpaku Expert Report 09.03.2026 | ECF 7363-9 (Sealed) |
| Ex. J: Vida Thomas Expert Report 09.03.2026 | ECF 7363-10 (Sealed) |
| Ex. K: Kristen Zgoba Full Deposition 09.11.2026 | ECF 7363-11 (Sealed) |
| Ex. L: Lindsay Orchowski Full Deposition 09.08.2026 | ECF 7363-12 (Sealed) |
| Ex. M: Betsy Bartko Full Deposition 09.11.2026 | ECF 7363-13 (Sealed) |
| Ex. N: Joseph Okpaku Full Deposition 09.10.2026 | ECF 7363-14 (Sealed) |
| Ex. O: Vida Thomas Full Deposition 09.11.2026 | ECF 7363-15 (Sealed) |
| Ex. P: Kevin Phelan Full Deposition 09.14.2026 | ECF 7363-16 (Sealed) |

**INTRODUCTION**

Uber's motions to exclude Plaintiff's experts reduce to a core proposition: no expert opinion is admissible unless the expert subscribes to Uber's theory of the case and focuses on evidence favorable to Uber. For example, Uber moves to exclude opinions regarding the inadequacies of its background screening on the basis that any valid opinion must consider the Texas TNC statute and then conclude that Uber had complied with the statute. *See*, *e.g.,* ECF 7349 at 7, 7346 at 4, 7351 at 7 (moving to exclude the background check opinions of Tremblay, Sniderman, and Romero on this basis). This is legally and factually incorrect. Compliance with a law is not dispositive of whether Uber was or was not negligent and, in any event, Uber did not comply with the Texas TNC statute—it did not conduct state and local background checks as required. With respect to Plaintiff's data science expert, Lacey Keller, Uber criticizes her for using Uber internal data and Uber's own identification of risk factors and precursors to sexual assault and sexual misconduct ("SA/SM") to determine what Uber knew or should have known of the prevalence of SA/SM during Uber rides. *See* ECF 7354 at 5-6. Uber argues that this opinion is excludable because the expert should have looked at outside data sources, e.g., the data regarding *other* transportation industries and then compared Uber's actions against those rates. *See id.* Uber's reasoning is inherently flawed. The issue is what *Uber* knew or should have known. The evidence that will help the jury resolve that question is Uber's own data and own acknowledgments as to SA/SM precursors on its platform. Uber raises similarly flawed arguments as to damages expert Robert Johnson. Uber does not dispute the accuracy of Johnson's figures but argues that he should have emphasized other expense categories more favorable to Uber. Fifth Circuit law is clear, however, that, so long as an expert's analysis is reliable, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration[.]" *Ball v. River Oaks Hosp., LLC*, 2026 WL 2676530, at *4 (S.D. Miss. Sept. 11, 2026) (citation omitted).

Uber's motions also mischaracterize expert opinions and make conclusory arguments as to reliability without considering (and at times intentionally ignoring) the identified support. For example, Uber argues that psychologist David Feltoon's report contains a credibility determination and improper narrative. It does not. When read in context, the statement at issue pertains to clinical observations and

symptoms that were the data points for medical diagnostic tests and medical opinions. They are not vouching or irrelevant narrative. With respect to Plaintiff's life care planner, Leigh Levy, Uber argues both that her recommendations lack medical support *and* that she cannot testify to the basis of her opinion because that would be a narrative. The argument is incorrect (and inherently contradictory). Levy provided substantial support for her recommendation (the majority of which Uber's briefing ignores) and Uber cannot preclude testimony providing the basis for her opinions that would dispel the very challenge it raises. It is proper expert testimony to establish the requisite support and foundational grounds for well-reasoned and reliable opinions.

The motions are otherwise replete with the sort of "nitpick[ing]" Rule 702 does not condone (Fed. R. Evid. 702, advisory committee notes to 2023 amendment), and arguments that go to weight not admissibility.

Uber's motions to exclude should be denied.[1]

## LEGAL STANDARD

The proponent of expert testimony must establish, by the preponderance of the evidence, that: (1) the expert has scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The "reliability inquiry is a flexible one; courts have 'broad latitude to determine' what factors, if any, are relevant to the reliability determination." *Blue Bottle Coffee, LLC v. Liao*, 2023 WL 9502073, at *6 (N.D. Cal. Nov. 30, 2023) (quoting *Daubert*, 509 U.S. at 150, 153).

While the Court must ensure "proposed testimony meets the thresholds of relevance and reliability," it remains true that "Rule 702 is concerned with the soundness of the expert's methodology,

[1] Uber incorporates by reference its Rule 702 arguments from prior cases. *See*, *e.g.*, ECF 7350 (incorporating prior arguments to exclude experts Drumwright and Valliere), ECF 7349 (incorporating prior arguments to exclude expert Tremblay); ECF 7354 (incorporating prior arguments to exclude expert Keller). The Parties have already stipulated that, to the extent relevant, and without waiver of any appellate rights, prior Rule 702 and motion *in limine* rulings will apply. *See* ECF 7302. To the extent the Court is inclined to reconsider any of those rulings, Plaintiff incorporates by reference all bellwether plaintiffs' prior opposition briefings.

rather than the correctness of the expert's conclusions." *Engilis v. Monsanto Co.,* 151 F.4th 1040, 1050 (9th Cir. 2025) (internal quotation marks omitted); *see also In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *2 (N.D. Cal. Sept. 30, 2025) ("expert testimony does not fail *Daubert* just because a court thinks it is 'shaky'") (quoting *Engilis*, 151 F.4th at 1050). So, for example, "if the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility." Fed. R. Evid. 702 advisory committee's note to 2023 amendment; *see also Glob. Weather Prods., LLC v. Joe Pags Media, LLC*, 2026 WL 951847, at *2 (W.D. Tex. Feb. 27, 2026). And "nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

## ARGUMENT

## I. THOMAS TREMBLAY'S TESTIMONY IS ADMISSIBLE.

Thomas Tremblay, who testified in *Dean*, is a nationally recognized public-safety and sexual-assault-prevention expert with a thirty-year law-enforcement career, including service as Vermont's Public Safety Commissioner and Burlington's Chief of Police. He has advised, trained, and served as a subject matter expert for law enforcement agencies, prosecutors, victim-service providers, higher-education and Title IX programs, the U.S. Military, government entities, and private-sector employers, and has served as a subject-matter expert for national non-profit organizations. His expertise focuses on trauma-informed, victim-centered, and offender-focused approaches to sexual-assault prevention, response, accountability, leadership, and institutional reform. Tremblay's opinions in this case are well-supported by his wealth of experience and expertise in these fields, and his review of case documents.

Uber nonetheless moves to exclude his opinions with respect to audio and video recordings, gender-matching, identified risk factors, and background screenings on the grounds that they are unreliable and lack "fit" to the facts of this case. Uber further argues that Tremblay should be precluded from testifying about rape myths, victim blaming, and victim shaming as such testimony is irrelevant. As set forth below, Uber is wrong on all counts.

### A. Tremblay's opinions regarding audio and video recordings, gender-matching, identified risk factors, and background screenings are relevant and reliable.

Uber argues that Tremblay's opinions on audio and video recording, gender-matching, identification of risk-factors and interventions, and background screenings are unreliable and do not "fit" the case. These arguments largely repackage challenges to Tremblay's methodology that the Court rejected in *Dean*, and remain baseless.

On reliability, Tremblay's report easily disposes of Uber's *ipse dixit* challenges, setting out a detailed and robust discussion of his methodology (the same methodology he applied in *Dean*), supporting data and analysis, and applying those to his discussion of each challenged feature, both in general and case-specific. This includes reliance on Uber's internal documents, depositions, and data. *See* ECF 7349-1 ("Tremblay Rep.") at 2-7 (qualifications and methodology), Exs. B, B-1, B-2, B-3 (materials considered), Schedule A.6 (case-specific materials considered). Tremblay starts by explaining well-established analytical frameworks for crime prevention: (1) the Crime Prevention Problem Analysis Triangle, wherein the three core conditions are opportunity, ability, and desire (or offender, location, target/victim); and (2) accepted Crime Prevention strategies and tools, such as Scanning Analysis Response Assessment (SARA). *See* Tremblay Rep. at 10-20. He then applied the frameworks to this case, explaining where and how each of the challenged features fall within the core conditions and prevention strategies, and how Uber's own documents, depositions, and data support the opinions that Uber was: aware of crime prevention dynamics; aware of its ability to influence and control these dynamics generally and in particular through each feature; aware of the value and effectiveness of the features to reduce the risk of sexual assault crimes on Uber's platform; but chose not to implement these risk-reduction strategies at or around the time that Le sexually assaulted Plaintiff. *See id.* at 20-23 (background investigations and screening); *id.* at 25-28 (Uber's identification of, but failure to appropriately act on, known risk factors); *id.* at 26-27 (gender-matching); *id.* at 28-30 (audio and video recording). Tremblay uses his experience and expertise in sexual assault prevention and response to apply his general opinions to the case-specific facts. *See id.* at Schedule A.6.

An expert opinion formed from the expert's specialized knowledge, experience, and expertise, together with review of documentary evidence meets the "reliability" requirement of Rule 702 and

*Daubert*. *See, e.g.*, *Van Winkle v. Rogers*, 82 F.4th 370, 379 (5th Cir. 2023) ("Experience alone can provide a sufficient foundation for expert testimony."); *Leyman v. Amazon Logistics, Inc.*, 2026 WL 2243781, at *3 (N.D. Tex. Aug. 4, 2026) ("[T]he Court has reviewed French's expert report and does not agree that French's opinion is simply *ipse dixit*. His report reflects that his opinion is based on an analysis of the Amazon Relay contracts, policies, and terms of service, as compared to federal safety regulations and commercial practices. French's extensive experience in the commercial trucking industry allows him to draw conclusions from the factual data in this case. This does not make the opinions mere ipse dixit.") (citation omitted); *CCM Touring LLC v. Moonbug Ent. Ltd.*, 2026 WL 848392, at *22 (S.D.N.Y. Mar. 27, 2026) (holding "[a]n opinion based on an expert's industry experience and review of relevant documents is not *ipse dixit*") (collecting cases). Tremblay's opinions are reliable.

Uber's arguments as to "fit" are similarly unavailing.

Audio and Video Recordings. Uber contends audio and video recording opinions do not fit the case because "there is no evidence anywhere else in the record" to support the inference that recordings "would have deterred Le from assaulting Plaintiff." ECF 7349 at 3 (emphasis omitted). But Tremblay is an expert in sexual assault prevention, and he opines that cameras deter. *See Dean* Tr. at 1360-61. And, the fact record is replete with corroborating evidence from Uber that cameras deter Uber drivers from sexually assaulting Uber passengers. Indeed, Tremblay's report highlights various Uber documents supporting the opinion that audio and camera recordings are effective at reducing safety risks for Uber rides. *See, e.g.* Tremblay Rep. at 29 (citing UBER_JCCP_MDL_001739175, an Uber document discussing the [redacted]); *id.* (citing UBER_JCCP_MDL_000323152, an Uber document regarding [redacted]") (emphasis omitted); *id.* (citing UBER000074783, an internal chat between Uber employees, who noted "[redacted]

[redacted]"); *id.* (citing UBER_JCCP_MDL_000157026, Uber's review of a [redacted]") (emphasis added). The evidence adduced at the *Dean* trial also supports this opinion. *See, e.g. Dean* Ex. 1316 (stating "[w]e know that recording tools, such as dashcams and audio recording, act as significant deterrents to misconduct and unsafe behavior") (emphasis omitted); *Dean* Ex. 1528 (finding "evidence that dashcams work as a deterrent for inappropriate behavior"); *see also Dean* Tr. at 653:15-654:2, 752:19-757:21, 863:16-865:19; *Dean* Ex. 22. Tremblay's opinion that Uber did not take reasonable steps to meaningfully reduce the risk of sexual assaults vis-à-vis mandatory audio or video recording is therefore relevant to the facts of the case.

Gender-matching. Uber argues that gender-matching opinions are irrelevant because there is no evidence that the feature would have been used in Plaintiff's case. Uber's own motion concedes the falsity of this claim, acknowledging that H.M., who requested the Uber ride for Plaintiff, testified she would have used gender-matching had it been available. *See* ECF 7349 at 4. Specifically, H.M. testified that if Uber had the option to choose a female driver, she would have "100 percent" chosen that option for Plaintiff's ride, especially given that Plaintiff was young, alone, and intoxicated. *See* Ex. A, H.M. Deposition dated Aug. 20, 2026 (full transcript) ("H.M. Dep."), at 113:24-114:25. Uber seeks to dismiss this testimony on the basis that it is "speculative opinion by a lay witness" regarding what she "would have done." ECF 7349 at 4 (internal quotation marks omitted). As explained in Plaintiff's opposition to Uber's motion for summary judgment (filed concurrently with this briefing), this is a remarkable claim that would mean no failure-to-warn claim could ever succeed.[2] The argument should be rejected.

[2] *See, e.g.*, *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 621-22 (5th Cir. 2018) (finding sufficient evidence on the proximate cause element of the failure-to-warn claim where plaintiff's co-worker "testified that had he seen the warning, he would know that he should flee the cab as quickly as possible during a tip-over"); *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 775-77 (5th Cir. 2018) (applying learned intermediary doctrine by examining physician testimony regarding what they would have done); *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2019 WL 2995897, at *7 (E.D. La. July 9, 2019) (finding triable question of fact based on plaintiff's doctor's testimony on what she "would have decided" if she "had been adequately warned by Defendants"). Uber cites *U.S. v. Burlington Res. Oil & Gas Co.*, 2000 WL 1058972 (S.D. Tex. May 18, 2000), but in that case the court rejected expert testimony in the guise of fact affidavits concerning how IRS procedures were supposed to work. *Id.* at *6-7. And *Washington v. Dep't of Transp.*, 8 F.3d 296 (5th Cir. 1993) is a dated outlier opinion inconsistent with decades of failure-to-warn cases.

Uber next contends that Tremblay's opinions regarding gender-matching are contradicted by other statements from H.M., i.e., she was uncertain about what features were available on Uber and whether she had selected any of them, and she does not remember when she began using women-only drivers on Lyft but does recall having that feature selected in her Lyft app. *See* H.M. Dep. at 29:8-32:16. There is no contradiction here. H.M. testified that she does not currently use Uber's women-preferred feature because she rarely uses Uber and, when she does, it was always with her husband; and that she enabled gender-matching on Lyft, the service she most commonly uses. *See* H.M. Dep. at 30:22-31:18. This does not contradict the testimony that she "100 percent" would have used gender-matching for Plaintiff's ride had Uber made it available, because Plaintiff was a young woman who was intoxicated and alone. In any event, Uber's argument that Tremblay should have relied on its preferred evidence over any other is not a basis for exclusion—it is a matter for cross-examination. *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (noting "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration") (emphasis in original) (internal quotation marks omitted).

Uber's final argument on gender-matching is that there is no factual basis to support the opinion that a gender-matching option would have prevented the assault because nothing establishes that a female driver would have been available and matched with Plaintiff. *See* ECF 7349 at 5. But Uber explained in *Dean* that the women-preferred feature, once launched, informed users of the different wait times for a woman driver. *See Dean* Tr. at 3052:7-3053:7. The idea that there were *no* women drivers nearby is contradicted by Uber's statement that "[e]very time a rider requests a ride, there are multiple potential drivers." Ex. B, 30(b)(6) Deposition of Cory Freivogel dated Aug. 28, 2026, at 348:7-14.

<u>Uber's Identification of High-Risk Factors and Failure to Intervene</u>. Uber argues that opinions regarding its identification of high-risk factors and its failure to intervene based on those factors should be excluded because Tremblay "fails to specify what should have occurred differently or why." ECF 7349 at 6. Tremblay identifies the following risk factors present in Plaintiff's case: [redacted]. *See* Tremblay Rep., Schedule A.6 at 18. He then states, point blank,

what Uber failed to do in this situation: "Uber did not intervene and [instead] dispatched Driver V.L." *Id.* There is no merit to Uber's claimed confusion as to what "particular action Uber should have therefore taken." ECF 7349 at 6. Nor is there any merit to the claim that Tremblay must be excluded because he did not specify the "threshold of risk factors that should have triggered action." *Id.* Each enumerated risk factor was known to Uber prior to Plaintiff's ride. Tremblay's opinion is not about a "threshold" for action, it is about the failure to act on the totality of the circumstances and on known information. *See* Tremblay Rep., Schedule A.6, at 2 (Uber should have "interven[ed] on present and known risk factors"). Uber cannot move to exclude because Tremblay did not give an unnecessary "threshold" opinion.

Equally unavailing is Uber's argument that Tremblay cannot opine that "Uber should have disclosed" the risk factors because he failed to identify "what information Uber should have disclosed, under what circumstance…, or in what manner." ECF 7349 at 6. This argument is unraveled by a simple read of the opinion, which clearly lays out the what, where, and how. *See* Tremblay Rep., Schedule A.6, at 2 (Uber should have "*disclos[ed] these warning signs and risk factors to [H.M.] and/or Plaintiff [] prior to the Incident Ride*") (emphasis added). Uber's demands for more specificity are not grounds for exclusion, they are matters for cross-examination.

<u>Background Screening</u>. Tremblay's opinion that Uber's background screening of driver Victor Le was inadequate and deficient is reliable and relevant. His opinions in this regard are not, as characterized by Uber, just a "catalog" of facts. Tremblay is an expert on crime prevention. He properly considered both the information Uber possessed concerning the driver pre-approval and the information that a reasonable pre-approval investigation would have uncovered. Tremblay then applied his knowledge and expertise in crime prevention to those facts and explained how Uber's failure to account for certain information contributed to the occurrence of the sexual assault. *See* Tremblay Rep., Schedule A.6 at 7-18. This is entirely proper.

Uber also argues that Tremblay's background screening opinion is flawed because he did not discuss whether Uber had complied with the Texas TNC statute (and conclude that it did). According to Uber, the Texas TNC statute governs background checks, Uber complied with the Texas TNC statute, and anyone who disagrees cannot testify at trial. *See* ECF 7349 at 7; *see also, e.g.,* ECF 7347 at 4 (similar argument made in motion to exclude Sniderman). Incorrect at every step. Uber cannot force Plaintiff's

expert to validate its theory of the case, let alone force a theory that misapprehends the very statute it claims to abide by. It is black letter law that compliance with a statute is not dispositive of negligence. *See Morris v. JTM Materials, Inc.,* 78 S.W.3d 28, 50 (Tex. App. 2002) (noting "[c]ompliance with industry and statutory standards is evidence of the use of reasonable care, but it is not dispositive of that issue") (collecting cases). Accordingly, whether Uber complied with the Texas TNC statute does not foreclose expert opinions as to the adequacy of that conduct in terms of negligence liability. In any event, Uber *did not comply* with the Texas TNC statute—it did not run a state or local search as required. *See* Tremblay Rep., Schedule A.6 at 9 (Uber did not check records for the state of Texas or local municipal court records for Fort Worth) (citing Uber's corporate representative and UBER-MDL3084-BW-00048852); Tex. Occ. Code § 2402.107(a)(2) ("[b]efore permitting an individual to log in as a driver on the company's digital network, [Uber] must:…(2) conduct, or cause to be conducted, a local, state, and national criminal background check for the individual…").

**B. Tremblay's opinions regarding rape myths are relevant to dispelling harmful misconceptions.**

Expert testimony regarding victim behavior patterns is admissible to counter defense strategies that rely on victim-blaming tropes or exploit typical trauma responses as evidence of fabrication. *See U.S. v. Young*, 316 F.3d 649, 655, 658-659 (7th Cir. 2002) (affirming the admission of expert testimony to explain counterintuitive responses in victims of domestic violence, e.g., commonly recant their accusations and have limited ability to perceive means of escape; the testimony was helpful to the jury in determining how to credit witnesses); *U.S. v. Bighead*, 128 F.3d 1329, 1330 (9th Cir. 1997) (affirming the admission of rebuttal testimony regarding typical characteristics of abuse victims, e.g., delayed disclosure and scripted memory, after defense had challenged the victim's ability to recall and recount incidents of sexual abuse), *abrogated in part on other grounds by Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Here, as a national advisor, trainer, and subject matter expert on leadership and reforms for trauma-informed sexual assault services, Tremblay is well positioned to address outdated rape myths, victim blaming, and shaming tactics and how they undermine, rather than assist, in risk-reduction and reform efforts—an issue that is central to determining the reasonableness of Uber's conduct. *See*

Tremblay Rep., Schedule A.6 at 28. The testimony is also relevant to explain to the jury how these preconceived myths can infect a person's or an organization's assessment of a claim of sexual assault. This issue is particularly relevant given that Uber seeks to present the expert testimony of Kevin Phelan, a former FBI agent, to critique Plaintiff's behavior on the night she was sexually assaulted and throughout the course of the underlying criminal investigation, thereby suggesting that she acted inconsistently with that of a "true" sexual assault victim. *See, e.g.* Phelan Rep. at 8-10, 16 (noting that Plaintiff spent "[redacted]" (as if consent is assumed—it is not)); *id.* at 18-22, 24 ([redacted]). Even if Phelan does not testify (Plaintiff has moved to exclude his inadmissible opinions, *see* ECF 7363), Tremblay's opinions on this issue still stand, as Plaintiff should be permitted to counter any attack on her credibility that is based on misleading sexual assault myths.

## II. <u>JOHN ROMERO'S TESTIMONY IS ADMISSIBLE.</u>

John Romero is a former police captain and licensed private investigator with four decades of experience in screening, criminal history checks, and identity verification. *See* ECF 7352 ("Romero Rep.") at 1-3. He is currently the Director of Investigations at 190 Intel, Inc., a protective-intelligence and private investigation company. *See id.* Romero opines on Uber's background-check process for Le, including that Uber failed to meet minimum screening standards that would have revealed a disqualifying offense and kept Le off the platform. *Id.* at 1-5. Uber moves to exclude his report and testimony in full.

### A. Romero is qualified to offer his opinions on background screening.

Contrary to Uber's contentions, Romero is qualified to opine on background checks. Romero has thirty years of experience in law enforcement, rising to Captain of the Los Angeles Police Department, where his "responsibilities included screening, hiring standards, personnel-misconduct investigation, and the adjudication of misconduct." Romero Rep., App. A at 1. Since retiring in 2017, he has advised organizations and individuals on screening, criminal history checks, and identity verification for safety-sensitive roles, including drivers for vulnerable individuals, and he is currently a licensed California Private Investigator and affiliated with California Licensed Investigators. *Id.* at 1, 3; Ex. C, John Romero

Deposition (Final Transcript) dated Sept. 13, 2026 ("Romero Dep.") at 120:20-24; 122:7-22. Romero's investigator license required him to become further familiar with background checks and, over the last four years alone, he has personally conducted, reviewed, or approved approximately 500 background investigations. *See* Romero Dep. at 118:18-23. These checks require "verifying identity and residential history, searching and pulling from the primary and secondary sources, evaluating potentially inconsistent or incomplete information, investigating red flags, and ultimately advising the client whether the information discovered presents a risk." Romero Rep. at 1.

Uber acknowledges none of this. It instead argues Romero is unqualified because two of his prior employers do not explicitly advertise "background check" services on their websites (which is inaccurate, *see* Romero Dep. at 373:5-374:10), Romero's dormant LinkedIn page does not mention background checks, Romero is not a member of the Professional Background Screeners Association, and Romero has not conducted background checks in the rideshare industry or at scale. *See* ECF 7351 at 4-5. None of these is the measure of an expert's qualifications.

Rule 702 "contemplates a *broad conception* of expert qualifications." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (emphasis in original); *see also Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (noting "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility") (citing *Daubert,* 509 U.S. at 596). "An expert is qualified to offer opinions so long as he does not go beyond his knowledge and experience." *See Chandler Gas & Store Inc. v. Treasure Franchise Co. LLC*, 2025 WL 3018829, at *7 (D. Ariz. Oct. 29, 2025). And any challenge as to "lack of specialized industry experience for [an expert] merely go[es] to the weight—not admissibility—of his testimony." *Id.* at *7; *see also Huss,* 571 F.3d at 452.

Romero easily clears this standard. His qualifications are well-established and well-suited to the facts of the case. Uber's authority does not suggest otherwise. Romero's qualifications are nothing like the expert in *Bryant v. 3M Co.*, 78 F. Supp. 3d 626, 631-32 (S.D. Miss. 2015), who only had a high school education, possessed no certifications or design experience, and claimed that all records of his research and training had been destroyed. Yet even in *Bryant*, the Court found the expert qualified to testify about the proper use of respirators (rather than their design) because of his experience consulting and training on that topic. *Id.*

Uber also attacks Romero for not being a member of Professional Background Screener's Association ("PBSA"), which it calls the "gold standard." ECF 7351 at n.1. Uber's own screening expert is the past chair. *See* ECF 7363-8 (Morris Rep.) at 1. In reality, PBSA is an unregulated organization that accredits companies rather than individuals and operates under a standard less rigorous than the one governing Romero's private investigator license. *See* Romero Dep. at 152:11-154:25. In any event, to be qualified, "[a]n expert does not need to possess official credentials or particularized expertise in the specific area of the dispute." *Sullivan v. Costco Wholesale Corp.*, 2018 WL 4057447, at *3 (E.D. Cal. Aug. 23, 2018) (citing *U.S. v. Garcia*, 7 F.3d 885, 889-90 (9th Cir. 1993)). Romero is qualified to provide his opinions.

**B. Romero's methodology, based on decades of experience and industry standards, is reliable.**

Uber argues Romero's methodology is unreliable because he does not use a codified industry standard, did not test his framework, and did not identify a known error rate. *See* ECF 7351 at 6-9. These criteria have no application to Romero's experience-based testimony. The Fifth Circuit and Rule 702 both recognize that *Daubert*'s scientific factors do not apply in every case, and that other indicia of reliability like professional experience, education, training, and observation suffice, so long as the expert reliably explains how and why that experience leads to his conclusions. *See U.S. v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006); Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

Here, Romero's decades of training, education, and experience in screening and background checks provide this foundation. *See* Romero Rep. at 4. He applied the same methods he uses when screening applicants for safety-sensitive roles. *See id*. This includes identifying specific sources where criminal records can be found, differences in how jurisdictions store these records, and best practices within the industry for ensuring relevant criminal records are not overlooked. *See id.* at 14-18. He also identified benchmarks, industry standards, and practices that are typical in the field. *See*, *e.g., id.* at 10 ("use of applications and data sheets is typical in the field"); *id.* at 11 (citing the FBI's guidance and federal legislation concerning the use of fingerprint-based checks); *id.* at 15 (citing actual searches and official Texas Department of Public Safety reports to demonstrate the limitations of searching only statewide or national databases).

Romero applied this methodology to the case record. He reviewed documents and 30(b)(6) deposition testimony "regarding Uber's driver screening, background checks and driver history" for Le specifically as well as law enforcement and court records relating to Le's criminal trial and Le's prior sexual assault of another woman. *See* Romero Rep. at 4. He then scrutinized Uber's processes against the identified benchmarks to assess if Le's disqualifying criminal history would have been detected and personally conducted searches of Fort Worth Municipal Court's online records and recorded the results of those searches to demonstrate the ease with which Uber (or anyone else) could have identified Le's pending charge and outstanding arrest warrant. *See* Romero Rep. at 4, 16-24.

Uber's authority fails to cast any doubt on the reliability of Romero's methods. To begin, in *Thomas v. City of Port Arthur, Texas*, 2025 WL 474902, at *6 (E.D. Tex. Feb. 12, 2025), the court *denied* the motion to exclude, finding the expert's report "reflects a thorough and methodical evaluation of the present case from the perspective of a civil engineer." Like Romero, the expert in that case "rel[ied] on the facts of the present case, the data provided, and his own expertise." *Id.* In *Open Cheer & Dance Championship Series LLC v. Varsity Spirit, LLC*, 2026 WL 1485212, at *5 (N.D. Tex. May 27, 2026), the court found that "anyone could reach the same conclusions, expert or not." Here, as described above, Romero's conclusions are the product of his specialized expertise and knowledge in background investigations. *See id.* at *4 (*upholding* separate opinion that was the product of expert's "robust experience"). And in *Allstate Ins. Co. v. Gen. Elec. Co.*, 2002 WL 34373485, at *5, *9 (W.D. La. Feb. 4, 2002), the excluded engineering expert opined about the cause of a dryer fire without examining any of the equipment at issue, performing any testing, inspecting the scene of the fire, or even reading the deposition of the dryer's owner. Uber's other authority fares no better, as Romero's methodology suffers none of the same deficiencies that prompted exclusion of expert opinions in those cases.[3]

[3] *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997) (excluding engineer's opinions regarding alternative designs where the engineer had not tested any of the proposed alternatives, had no evidence of investigating other designs, and did not make any drawings or perform any calculations to support his theory); *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (expert opinion was "not based on any discernable training" and instead relied "on a host of unsupported conjectures"); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (expert "could cite no scientific support for his conclusion that exposure to any irritant at unknown levels triggers this asthmatic-type condition"); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423-24 (5th Cir. 1987) (excluding opinion under Rule 703 where physician relied on incomplete oral history of patient, inconclusive testing, and an incomparable study performed on rats); *U.S. All. Grp., Inc. v. Cardtronics USA, Inc.*, 645 F. Supp. 3d 554, 561 (E.D. La. 2022) (expert testified

Uber's remaining objections to Romero's methodology are equally flawed. Uber accuses Romero of developing opinions exclusively for litigation (*see* ECF 7351 at 8-9), which is answered directly by his own testimony: "I did not invent anything. I used the standard methodology that I would use every day for a safety-sensitive position." Romero Dep. at 331:2-11. Nor is there any merit to Uber's strained accusation that Romero updated his CV specifically for this litigation. *See* ECF 7351 at n.2. He testified that there were not many differences, and he primarily updated things he has done in the last four or five years, which includes being more involved in background investigations. *See* Romero Dep. at 86:2-17. Moreover, Uber's argument that Romero did not review every document produced by Uber or every transcript of every deposition is no reason to exclude his testimony as it was not necessary for his opinions. *See Wright v. HireRight LLC*, 2025 WL 928852, at *4 (D. Ariz. Mar. 27, 2025) ("there is no requirement that an expert review all potentially relevant material so long as his opinions are based on sufficient facts"). Romero's scope was to assess Uber's background checks and screening for onboarding Le in January 2020, opine on what he does to conduct a complete background check for a safety-sensitive role which includes searching local municipal courts for disqualifying criminal history and assess if Uber had done a complete background check would it have identified Le's 2017 citation for assault by contact and 2018 live warrant for his arrest. *See* Romero Rep. at 3; Romero Dep. at 162:19-163:22. And Uber's argument that stricter screening measures Romero proposes "are not recognized practices in the background screening industry," ECF 7351 at 6, based only on Uber's own expert's differing conclusions, is "a classic battle of the experts scenario." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 144 (D.N.J. 2020). Finally, Uber's hindsight-bias argument fails because Romero is not purporting to predict sexual violence after the fact; he evaluates the screening process Uber used when Le was onboarded and explains that a complete safety-sensitive background check would have revealed an existing charge and warrant that Uber's own criteria treated as disqualifying. *See* Romero Rep. at 19-24. That is a case-specific screening analysis, not hindsight speculation.

---

that counsel gave him "a draft report that already included all the opinions written in it and that he was not familiar with several of the terms used and laws referenced in his report").

**C. Romero's opinions are relevant to Plaintiff's claims.**

Uber contends that Romero's opinions about the additional measures Uber should have included in its screening—an employment-history check, fingerprinting, an interview, reference checks, and military records review—are irrelevant because Romero does not conclude that each measure would, standing alone, have uncovered disqualifying information about Le. *See* ECF 7351 at 10-11. Uber misses the point. In defense of the negligence claim, Uber's position at trial will be that its screening process not only satisfied industry standards of care, but in fact exceeded them. Romero's testimony directly rebuts that defense, explaining what a standard screening process requires and identifying the basic steps Uber omitted, *i.e.*, these additional screening measures. Romero further opines that if Uber is not taking these other steps (it is not), then a background check that requires searching local databases is even more important to overcome the pre-screening gaps. Romero's testimony thus goes directly to the issue of whether Uber was negligent and grossly negligent in its screening practices across the board.

Uber also parrots one of its experts (Zgoba) to argue that "no validated tools or screening process can accurately predict whether an individual without a criminal history of sexual offenses will commit sexual violence in the future." ECF 7351 at 12. This argument misses the point. Romero is not opining on whether and how one predicts future sexual assault; he is drawing on his experience and expertise regarding background investigations to identify industry-standard measures that a reasonable company would use in a pre-hire process to identify potentially disqualifying offenses. Indeed, there is no dispute that Uber should do background screenings (and that this is in fact an important safety measure to screen out risky drivers). Uber claims that it met and exceeded the standard of care in this regard. Plaintiff's expert disagrees and provides his basis to do so. There is no "fit" issue.

**D. Romero does not opine on ultimate legal issues.**

Romero's statements regarding Uber's compliance with the Texas TNC statute are not improper legal conclusions. As an initial matter, Uber does not explain how its own experts Joseph Okpaku and Jason Morris may opine that Uber did comply with Texas law, and so satisfied industry standards, while Romero may not dispute those conclusions. *Daubert* is not designed to pick winners and losers of expert disputes.

Romero identifies how Uber's conduct deviates from the plain text requirements of the statute,

which requires local and state searches that Uber did not run. *See* Romero Dep. at 337:21-339:1. He draws on his law enforcement and background screening experience to opine that this failure was consequential and inconsistent with industry standards. *See* Romero Dep. at 328:5-329:15. As Uber itself has successfully argued to the Court: "[T]rial courts often allow experts to testify about regulations that support their standard-of-care opinions." ECF 4632 at 33 (quoting *MS Amlin Marine NV v. Delta Marine Indus. Inc.*, 348 F.R.D. 658, 674 (W.D. Wash. 2025)).

Similarly, Romero's opinion that a hiring party is responsible for ensuring that background checks are completed is not a legal conclusion. It is a factual conclusion based on his application of his expertise to the facts of this case. Romero reviewed testimony from Uber's 30(b)(6) witness confirming Uber's understanding that it is responsible for screening its drivers. *See* Romero Rep. at 8. Romero offers no legal opinions about whether that responsibility can be delegated to agents or the division of liability between the hiring party and its agent—those are matters for the Court.

Finally, Romero's use of the word "reasonable" in evaluating Uber's practices against industry standards does not transform his opinions into improper legal conclusions. *See* ECF 7351 at 13; *see also King v. GEICO Indem. Co.*, 712 Fed. App'x 649, 651 (9th Cir. 2017) (affirming admission of expert testimony on "reasonableness" of insurance company's claims handling process where expert testified about reasonableness "in relation to industry standards"); *Citizens State Bank v. Leslie*, 2020 WL 3579898, *2 (W.D. Tex. Mar. 20, 2020) (admitting expert testimony on "reasonableness" of defendant's process). Uber's authority is in accord. *See Williams v. First Advantage LNS Screening Sols. Inc*, 2015 WL 9690018, at *3 (N.D. Fla. Mar. 31, 2015) (expert could "offer[] a factual benchmark against which to measure Defendant's procedures" and explain "what industry standards were and *why* Defendant's procedures failed to meet them."). While "experts cannot offer conclusions of law, an opinion is not objectionable just because it embraces an ultimate issue." *Jones v. L.F. Grp., Inc.*, 559 F. Supp. 3d 550, 554 (N.D. Miss. 2021) ("The Court is confident that it can protect against the possibility of objectionable expert testimony at trial…") (internal quotation marks and alterations omitted); *J.H. Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295, 1306 (N.D. Cal. 2022) (holding "[expert's] opinion…goes to factual causation, and it is admissible").

**E. Romero does not opine on state of mind or knowledge.**

Romero's statements identifying information known to Uber do not invade the province of the jury. To start, experts are permitted—indeed, required—to explain the "facts apropos to [their] opinions." *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, at *20 (N.D. Cal. Aug. 25, 2021). And, experts may testify as to what a defendant "knew or should have known." *See Bradley v. Cooper Tire & Rubber Co.*, 2007 WL 4624613, at *3 (S.D. Miss. Aug. 3, 2007) (reasoning "[a]lthough Ford is correct that witnesses may not speculate as to its state of mind, a witness may be allowed to testify about conclusions Ford reached or what Ford should have known based on its own documents and data"); *Cover v. Windsor Surry Co.*, 2017 WL 9837932, at *17 (N.D. Cal. July 24, 2017) (holding "expert may testify to an ultimate issue of fact if that testimony would assist the trier of fact"); *see also McCoy v. DePuy Orthopaedics, Inc.*, 2024 WL 1705952, at *17 (S.D. Cal. Apr. 19, 2024) ("Expert testimony regarding information available to a defendant is helpful and relevant to determining whether the defendant acted reasonably, and does not improperly comment on the defendant's state of mind") (internal quotation marks and alterations omitted).

Each of the statements Uber excerpts in its motion reflects objective conclusions drawn by Romero based on his review of Uber's internal documents and testimony. ECF 7351 at 14. And in each excerpt, to the extent Romero refers to Uber's knowledge, he refers not to Uber's corporate state of mind, but rather to corporate documents and depositions detailing information available to Uber. *See*, *e.g.*, Romero Rep. at 8 (citing Brown's 30(b)(6) testimony regarding Uber's understanding of background check requirements); *id.* at 16 ("Uber's internal documents reflect its knowledge that municipal courts house the very records that are most relevant to safety."); *id.* at 19 ("Uber's own 2020 audit recognized the danger of not providing explicit instructions"); *id.* at 20 (citing Uber and Checkr 30(b)(6) testimony regarding cost incentives). He then compares the information Uber had with what in his experience a reasonable investigation would have revealed and then used that to assess the sufficiency of Uber's background investigation. There is nothing improper about this. *See In re JUUL Labs, Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2022 WL 1814440, at *14 (N.D. Cal. June 2, 2022) (holding "knowledge of various defendants and witnesses about the topics identified above is likely relevant and admissible if there is a basis in the record for those experts to testify, e.g., from their review of defendants' documents

or deposition testimony”).

**F. Uber’s repackaged merits argument provide no basis to exclude opinions.**

Uber’s remaining objections are merits arguments from its summary-judgment motion, repackaged as improper Rule 702 objections. It argues Romero’s methodology is unreliable or his opinions irrelevant because Uber disagrees with his conclusions about the Texas TNC statute, FCRA reportability, whether Fort Worth Municipal Court records would have been found and reported, and whether Uber’s screening choices were reasonable in light of its asserted policy tradeoffs. *See* ECF 7351 at 7, 11 (Romero’s conclusions “inconsistent with Texas law” and FCRA); *id.* at 9 (Romero should have considered tradeoffs between stricter background checks and “economic opportunity”). None of those disputes is a Rule 702 defect. They are merits issues for summary judgment, trial, competing evidence, and cross-examination, not grounds to exclude an otherwise qualified background-screening expert. *See In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 364 (N.D. Cal. 2018) (challenging the expert’s conclusions should occur through competing evidence and cross-examination, not exclusion). In any event, as explained in Plaintiff’s summary judgment opposition, Uber is wrong on the merits of each of these issues (TNC statute, FCRA, etc.).

## III. DR. ROBERT SNIDERMAN’S TESTIMONY IS ADMISSIBLE.

Robert Sniderman is a human resource management and workplace investigation consultant who offers the following opinions about the adequacy of Uber’s screening policies:

- A reasonable company that has identified a sexual assault problem in its business model designs its screening measures to identify and rule out bad actors from gaining (or regaining) access to vulnerable targets. Uber’s screening measures, including its background checks of Le, did not sufficiently do so. Uber conducted an incomplete and inadequate background check when it failed to search municipal court records in the city where Uber knew Le lived, as Checkr had recommended, and failed to identify Le’s 2017 sexual assault and 2018 live warrant for his arrest.
- It is not reasonable or consistent with standards of practice and care for Uber to defer its responsibility to provide “rigorous” background checks on potential drivers, to a commercial third-party company, Checkr.
- Uber’s policies and practices regarding investigations of reports of sexual assault, misconduct, and imposter drivers were grossly inadequate and if investigated even cursorily could have prevented Plaintiff’s rape.
- Uber failed to use its own records to identify and address red flags that should have prevented Le from being onboarded. Uber had records about Le’s disqualifying misconduct that should have kept him off the platform, but it failed to reasonably and adequately access the records and act on them.

ECF 7346-2 (“Sniderman Rep.”) at 4.

### A. Sniderman identified industry standards with sufficient specificity.

Uber challenges the reliability of Sniderman’s opinions, asserting that he did not identify any “applicable standard” or “benchmark” against which he evaluated Uber’s screening process. ECF 7347 at 3. Not so. Sniderman identified the following benchmarks: industry standards for human resource management and workplace investigations derived from the Human Resource Certification Institute (HRCI), the Society of Human Resource Management (SHRM), and Association of Workplace Investigators (AWI), as well as his three decades of experience in human resource management and workplace investigations. *See* Sniderman Rep. at 1-5, 12-13, 15.[4]

This is a sufficiently specific identification of applicable industry standards under *Daubert*. *See Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, 2017 WL 1133506, *4 (W.D. Tex. Mar. 24, 2017) (rejecting argument that expert failed to identify industry standards where expert identified standards such as “IMOs are responsible for determining the suitability of client sales” based on “his personal experiences in the financial services industry”); *Spearman Corp. Marysville Div. v. Boeing Co.*, 2022 WL 6751797, *4 (W.D. Wash. 2022) (admitting expert testimony based on industry standards, despite alleged lack of textual authority, where testimony was based on expert’s experience in the industry).

Here, Sniderman’s identification of industry standards, including that “a background check must be more than a fast database screen; it must be designed to identify qualifying criminal history in the courts where that criminal history is likely to be found,” that companies should “conduct[] a reference check and interview” as well as search the internet and Department of Motor Vehicles; and that “business[es] cannot transfer responsibility for compliance…to a third party,” among others, *see* Sniderman Rep. at 7, 10, 12-13, 15, is analogous to the identification of industry standards in *Wealthmark*. He further identified the source of those standards as being his robust industry experience, which spans decades in human resource management and workplace investigations, as well as formal industry standards from the AWI, SHRM, and HRCI. This is sufficient.

---

[4] The Court previously declined to exclude expert testimony based on the failure to specifically identify the industry standards at issue in *Dean*. *See* ECF 4357, Pl.’s Omnibus *Daubert* Mot. at 24-25 (Nov. 10, 2025); ECF 4941, PTO 39 re *Dean* Pretrial Mots. at 2 (“Plaintiff’s Motions to Exclude are otherwise DENIED”).

**B. Sniderman used a reliable experience-based methodology.**

Non-scientific expert testimony "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *U.S. v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000). For experts like Sniderman, experience-based expert testimony is reliable if the expert "'explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Fed. Trade Comm'n v. Qualcomm Inc.*, 2018 WL 6460573, at *4 (N.D. Cal. Dec. 10, 2018) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Indeed, in *Open Cheer* (cited by Uber), the court admitted expert testimony based on the expert's "robust experience" and only excluded conclusions based on "no methodology" where the conclusions could be reached by "anyone," expert or not. 2026 WL 1485212, at *4-5.

Here, Sniderman utilized a systematic methodology grounded in his decades of experience. *See* Sniderman Rep. at 4-5. Following the same process he uses when conducting workplace investigations, Sniderman first gathered and analyzed evidence produced by Uber, Plaintiffs, and third parties; identified relevant themes; tested and re-tested themes for validity against the evidence; and compared the practices shown in the evidence to industry standards derived from AWI, HRCI, and SHRM standards as well as the standards learned through decades in the industry. *See id.* at 4-5. For each conclusion, Sniderman explained why Uber's practices were "deficient," *see*, *e.g.*, Sniderman Rep. at 6, by carefully comparing Uber's practices to the standard of practice in human resources and workplace investigations as based on industry standards and his three decades of experience in the field. *See id.* at 7, 10-13.

This is not a case like *Allstate*, 2002 WL 34373485, *Watkins*, 121 F.3d 984, or *Moore v. Ashland Chem. Inc.*, 151 F.3d 269 (5th Cir. 1998). In *Allstate*, an expert planned to testify about whether defects in a dryer's heating elements caused a fire, despite having no experience working with dryers and no methodology to reach his conclusions. 2002 WL 34373485, at *9-10. In *Watkins*, the expert's experience with hydraulic cylinders consisted of "the fact that [he] had 'seen'" such conveyors and had "'looked around'" for similar products. 121 F.3d at 992. Similarly, in *Moore*, the proposed expert sought to offer scientific testimony that was based on neither experience (plaintiff was his "first RADS patient with a history of exposure to Toluene") nor any research. 151 F.3d at 273. Here, by contrast, Sniderman has three decades of experience in workplace investigations and human resource management and conducted

research on Uber's practices and Texas-specific regulations, *see* Sniderman Rep. at 3-5. Uber's reliance on *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) and *Hathaway*, 507 F.3d at 318-19 is similarly misplaced. In both cases, the proffered experts relied on unsupported assumptions about physical evidence.

**C. Sniderman's opinions are consistent with Texas law.**

Uber argues that the industry standards Sniderman applies are "inconsistent with Texas law," because the Texas TNC statute does not require additional steps beyond what Uber had already done. ECF 7347 at 4. As noted above, Uber did not comply with the Texas TNC statute. And even if Uber did comply with the statute, compliance with a statute is not dispositive of reasonableness. *See Morris,* 78 S.W.3d at 50. Moreover, industry standards are not limited to regulations. *See*, *e.g.*, *Hangarter*, 373 F.3d at 1017-18 (affirming admission of expert's testimony on industry standards "based on his knowledge and experience"); *Wealthmark*, 2017 WL 1133506, at *4 (recognizing that industry experience may be the source of industry standards). Nor does the TNC statute preclude TNCs from incorporating additional steps into their screening processes. The TNC statute establishes baseline requirements that a TNC must meet to operate in the state of Texas and allow drivers to pick up passengers. *See* Tex. Occ. Code § 2402.107. It does not prohibit TNCs from taking additional measures to screen drivers. *Id.* Nor does it purport to create or codify any "industry standard." *Id.* Since the TNC statute operates as a floor, not a ceiling, industry standards requiring additional measures are consistent with the TNC statute.

**D. Sniderman did not need to review materials related to Uber's "civil rights priorities."**

Uber faults Sniderman for not considering what it terms the "tradeoffs" between stricter background checks and its "civil rights priorities." ECF 7347 at 5. While Uber suggests that Sniderman "ignore[ed]" relevant evidence, *id.*, this is not true. Uber fails to identify any documents, beyond a self-serving blog post, that it claims Sniderman should have reviewed. *Id.*[5] Nor does Uber establish that this material, which post-dates the incidents in every bellwether case, has any relevance to the industry standards for background checks when Uber driver Le was onboarded in 2020. Regardless, "deficiencies as to the selection of the documents…reviewed goes to the weight to be given to his opinions, not their

---

[5] *See* Uber Newsroom, *A New Standard for Background Checks* (June 26, 2026), https://www.uber.com/us/en/newsroom/uber-backgroundchecks/ (cited at ECF 7347 at 5).

admissibility." *In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 788, 800 (N.D. Cal. 2021); *see also Primrose Operating Co.*, 382 F.3d at 562. Uber's attempt to exclude Sniderman's opinions because he did not review unspecified materials related to vague "civil rights priorities" should be rejected.

**E. Sniderman does not offer improper legal conclusions.**

Uber characterizes Sniderman's opinions as improper legal conclusions. *See* ECF 7347 at 5. They are not. Sniderman identifies specific failures in Uber's conduct and measures them against industry standards. His characterization of a particular failure as unreasonable describes the gap between Uber's conduct and industry practice; it does not tell the jury what the legal standard is or that Uber breached it. *See King*, 712 Fed. App'x at 651 (affirming admission of expert testimony where expert "testified to GEICO's handling of the claim in relation to industry standards," rather than to "an ultimate issue of law"); *Citizens State*, 2020 WL 3579898, *2 (declining to strike expert testimony that a bank's underwriting process was "deficient," reasoning that it would be "incongruent" to admit the bank's own expert testimony that the same conduct was "reasonable" while striking the rebuttal); *J.H. Kelly*, 605 F. Supp. 3d at 1306 (holding "[expert's] opinion…goes to factual causation, and it is admissible"); *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 960 (N.D. Cal. 2019) (admitting expert's opinion that exposure to glyphosate was a "substantial factor" in causing plaintiffs' injuries), *aff'd sub nom. Hardeman v. Monsanto Co.,* 997 F.3d 941 (9th Cir. 2021), *abrogated on other grounds by Monsanto Co. v. Durnell*, 609 U.S. ___, 146 S. Ct. 2001 (2026).

Uber's cases draw a consistent line, and Sniderman stays on the permitted side of it. In *McCray v. Westrock Servs., LLC*, the court allowed Sniderman to opine on standard human resources practices and whether defendant conformed to or deviated from those practices and its own policies, barring only opinions on ultimate legal issues and characterizations of defendant's motives. 2023 WL 4681371, at *5-6 (C.D. Cal. July 12, 2023). Similarly, in *Ybay v. RSUI Grp., Inc.*, a California state court allowed Sniderman "to testify as to standards in the community (profession), but not [the] ultimate issue" or to the law. 2015 WL 1756068, at *1 (Cal. Super. Ct. Feb. 3, 2015). Although *Hood v. Time Warner Cable LLC* excluded as legal conclusions the opinions that defendant employer in a disability case did not engage in an "interactive process" or "accommodate" plaintiff's disability, those opinions were phrased in the statutory elements themselves. 2009 WL 1202561, at *4 (C.D. Cal. Apr. 30, 2009). Here,

Sniderman offers no opinion phrased in the elements of Plaintiff's claims. He identifies the applicable industry standards and opines on whether Uber's conduct conformed to them—precisely what *McCray* and *Ybay* permit.

## IV. LACEY KELLER'S TESTIMONY IS ADMISSIBLE.

Uber moves to exclude the entire report and testimony of data scientist Lacey Keller. ECF 7354. Keller has more than 15 years of practical experience in data science, data mining, and analytics. As she did in *Dean*, Keller has analyzed and will offer opinions on Uber's internal SA/SM incident data and risk-factor analyses, along with opinions on data concerning Le's accounts and driving history. Uber's previous attempt to exclude this very opinion was rejected by the Court. *See* ECF 4337, *Dean* Mot. to Exclude Lacey Keller; ECF 4941. Yet, Uber repeats those same arguments here, without explaining why a different outcome is warranted. Uber's attempt to re-litigate the Court's prior *Daubert* rulings should be denied. *See* ECF 7302, Stipulation re Rule 702 Mots. and Mots. *in Limine*.

Uber's new arguments—that Keller merely recites record evidence and offers unhelpful opinions because they do not reach ultimate conclusions—are also deficient. *First,* Keller reviewed and analyzed voluminous and distinct internal Uber data sources to link [redacted] separate accounts across four years by matching overlapping identifiers buried in [redacted] of documents. Keller also reviewed and analyzed Uber's internal data and its internal averages regarding the prevalence of risk factors generally across drivers and compared those averages against the data Uber had about Le. These are not lay summaries or bare conclusions; they are derived from the application of Keller's training and experience as a data scientist to the facts of the case. *Second*, Uber's argument that Keller must offer ultimate conclusions is inconsistent with Rule 702, which contemplates letting the trier of fact connect the dots.

### A. Uber's recycled attacks on Keller's analysis of SA/SM incident frequency on Uber's platform should be denied, again.

Keller's Opinion Nos. 1-3 analyze the frequency of SA/SM incidents on Uber's platform. ECF 7354-1 ("Keller Rep.") at §§ VII-IX. These are the same opinions Uber moved to exclude in *Dean*, just with updated underlying data. *See* ECF 4337. The Court denied Uber's motion to exclude. *See* ECF 4941. There has been no change in Keller's methodology and Uber argues that the record itself has not changed.

Yet Uber repeats the same losing arguments from before. *See* ECF 4941; ECF 7354 at 1, 6.[6] Uber's attempt to re-litigate its prior attacks on Keller's SA/SM analysis should be rejected.

In short, Uber argues that Keller cannot tell the jury what Uber's own data showed unless she compares Uber to taxis, public transit, or society at large. *See* ECF 7354 at 5. This is wrong. Keller's analysis of Uber's data goes directly to Uber's knowledge of SA/SM on its platform and the reasonableness of its response. A non-Uber baseline would not make Uber's knowledge of its own data or what portion of that data Uber shared with the public any more or less probative. Uber's cited case does not move the needle. In *Cuevas v. E.I. DuPont*, 956 F. Supp. 1306 (S.D. Miss. 1997), the court excluded a medical causation opinion because there was no research, study, or other scientific basis supporting causation and thus the opinion did not compare the data at hand with a "*known scientific conclusion[]*" or relationship. *Id.* at 1310 (quoting *Porter v. Whitehall,* 9 F.3d 607, 614 (7th Cir. 1993) (emphasis added). Keller's opinions do not require this causal leap because the conclusions flow directly from Uber's own data and documents. *Cuevas* does not impose a general rule that data is irrelevant unless compared against an outside source.

Uber also contends that Opinion Nos. 1 through 3 should be excluded under Rule 403. *See* ECF 7354 at 5-6. This argument fails for the same reason it failed in *Dean*. Keller's testimony may be prejudicial to Uber, as relevant evidence often is, but it is not unfairly prejudicial. *See* ECF 4618 at 42. She analyzes Uber's own SA/SM data and Uber's own internal risk-factor work. Any dispute about how the jury should weigh those figures is proper cross-examination, not a basis to exclude probative evidence about Uber's knowledge and response.

**B. Uber mischaracterizes Keller's expert analysis as lay opinion.**

Uber argues that Keller's Opinion Nos. 4 and 5 are lay summaries of data. *See* ECF 7354 at 6-8. They are not.

In Opinion No. 4, Keller opines that at the time of Le's onboarding in January 2020, Uber possessed data sufficient to link him to each of his four prior accounts, including the one Uber rejected and banned in 2016, at which time Uber intended that Le never be permitted to drive for Uber in the

[6] Plaintiff incorporates the prior opposition. *See* ECF 4618, Pl.'s Omnibus Opp. to Mots. to Exclude Expert Test., at 40-42.

future. *See* Keller Rep. at § X. Opinion No. 4 required linking records across Uber's internal systems, not the mere recitation of documents or "subjective" impression. Keller reviewed hundreds of documents reflecting data drawn from Uber's systems, isolated [redacted] separate accounts spanning a four-year period, and matched them across a set of overlapping identifiers, including [redacted]. *See* Keller Rep. at ¶¶ 73-74, App. H. Keller also offers data-structure analysis. In connection with the prior SA/SM report against Le, Keller applied her expertise regarding "structured fields" and explained that "creating structured fields that are specific as possible to available data are helpful for data storage, maintenance, and review"; that Uber's system [redacted]; that capturing first, middle, and last names in structured fields was a standard and technically feasible practice in relational database design as of 2016; and had a [redacted] been captured, a search for the names "Victor" and "Huynh" would have matched a recording containing the name "Victor Huynh Le." *Id.* ¶ 81.1.1. This opinion is reliably based on her scientific expertise in data systems combined with the knowledge of Uber's systems she gathered from Uber's documents, data, and deposition testimony.

In Opinion No. 5, Keller opines that before Plaintiff's trip, Uber identified risk factors, predictors, or precursors of SA/SM and Uber maintained data on Le's driving history and on Plaintiff's trip corresponding to these factors. *Id.* at § XI. For Opinion No. 5, Keller applied Uber's own risk variables to Le's Uber trip data—an analysis that Uber could have done itself but did not do before Plaintiff's trip. *Id.* at p. 53-78, § XI. That work required review, analysis, and performing calculations on nearly [redacted] trip-event records, including segmenting the records into Uber's late-night and weekend categories. *See* Keller Rep., App. A at ¶¶ 8-9. Keller's analysis of this data allowed her to calculate Le's cancellation rates over multiple denominators and time periods, including weekly cancellation rates, late-night/weekend cancellation rates, and cancellation rates in the weeks and 100 trips immediately preceding Plaintiff's trip. *See* Keller Rep. at ¶¶ 84-86. Keller also calculated weekend night trips rate over multiple denominators and timeframes, and generated a heat map of Le's completed-trip volume by hour and day of week. *See id.* at ¶ 90. Keller then compared Le's activity to Uber's own internal averages, including Uber's data on cancellation rates and weekend-night driving for drivers associated with [redacted] reports. *See id.* at 60, Figure 17; *id.* at 92, Figure 21.

These are plainly not lay summaries or analyses within lay competence. *U.S. ex rel. Mitchell v. CIT Bank, N.A.*, 2022 WL 1233651, at *6 (E.D. Tex Apr. 26, 2022) ("expert's compilation and synthesis of information is helpful to the trier of fact"). Uber's argument that jurors can understand, synthesize, and analyze this vast amount of data (across multiple data systems) on their own is simply incorrect. Uber may very well desire an outcome where jurors are left mystified by its information (and thus unable to determine what precisely Uber knew or should have known), but this desire cannot preclude relevant and reliable expert testimony. The fact is that without Keller's testimony, jurors will have no way of interpreting or understanding the relevance of Uber's data and systems, and how it is or is not relevant to the issues of foreseeability, reasonable care, negligence, and damages. Uber's arguments as to "lay summaries" and "lay opinions" are simply wrong.

Uber next argues that Opinion No. 5 is "not based on independent data analysis" but instead on Uber's internal studies. *See* ECF 7354 at 7 (quoting ECF 7354-2 ("Keller Dep.") at 77:2-14). But Uber mischaracterizes Keller's testimony, which concerns the *source* of the risk criteria, not the *analysis* performed. That is, Keller did not conduct her own study to identify which variables predict SA/SM because she took Uber's own definitions and measured Le's record against them. *See* Keller Dep. at 77:5-15 (testifying that she did not conduct an independent data analysis because Uber did not produce the required data to do so, and so she instead relied upon the studies that Uber did internally on these predictors). The subsequent analysis, however, is her own. In any event, using a defendant's own criteria is not disqualifying, it is methodologically sound and predicated on the facts of the case.

In a footnote, Uber attacks Keller's Opinion No. 1(D): that Uber classified Plaintiff's assault under at least three different categories at three points in time. *See* Keller Rep. at ¶¶ 35-38. Uber contends this is improper recitation of the record and is irrelevant after-the-fact classifications. *See* ECF 7354 at 6, n.3. But Keller did not simply recite that Uber used different labels for Plaintiff's incident. She traced Plaintiff's incident through Uber's changing classifications over time and through different datasets and sources. *See* Keller Rep. at ¶¶ 35-38. This includes review of raw, unprocessed data held in a secure system that only the parties and their experts can access. Without Keller's testimony, there is no way for the jury to learn of this data or understand it. Nor is this analysis offered to prove that Uber acted negligently *after* the fact. Rather, it shows inconsistencies in the very SA/SM classification system on

which Uber asks the jury to rely. This is directly relevant to the reasonableness of Uber's conduct, its public disclosures, and its internal incident counts.

### C. Keller's opinions are relevant.

Uber argues that Opinion No. 5 does not fit this case because Keller has not "connect[ed] the identified factors to scientifically reliable inference that Uber could have foreseen the assault and acted differently." ECF 7354 at 8-9. It is unclear what Uber is arguing here. To the extent Uber contends that Keller should have connected the dots and opined on the ultimate issue of foreseeability and causation, that is clearly wrong. *See* Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules (expressly contemplating expert testimony that educates the jury while "leaving the trier of fact to apply them to the facts"). To the extent that Uber contends Keller's opinions are not helpful to the jury, that is also clearly wrong. Keller's analysis of, among other things: Uber's data (general and case-specific) regarding incidents of SA/SM on its platform; Uber's identified precursors and risk factors for SA/SM; and, Uber's internal systems and data storage for driver information, applications and onboarding, all go directly to the issue of what Uber knew or should have known. Keller supplied the data analysis that will assist the jury in evaluating the question of what Uber knew or should have known and the reasonableness of Uber's conduct. This is sufficient and relevant. None of the cases cited by Uber demand more from an expert than what Keller has provided.

## V. <u>DR. DAVID FELTOON'S TESTIMONY IS ADMISSIBLE.</u>

Uber moves to exclude Dr. David Feltoon, a clinical, neuro, and forensic psychologist who evaluated Plaintiff and diagnosed her with [redacted] Its principal ground is that the list of prior testimony accompanying Feltoon's report does not specify "all" cases and does not provide additional details that Uber demands it should. On this basis, Uber seeks full exclusion. But Uber ignores that during deposition Feltoon confirmed that this was an accurate list of cases for which he had provided deposition or trial testimony for the past four years. In any event, if necessary Feltoon can work on providing a supplement to the disclosure with additional information prior to his second deposition that all Parties have agreed to.

Uber's remaining arguments for exclusion rest on what Uber incorrectly calls "credibility" testimony and "repeating Plaintiff's factual narrative." In truth, the referenced "credibility" testimony (a

single sentence) and the challenged "narrative" is part of Feltoon's clinical observations and descriptions of symptoms that were the data points for medical diagnostic tests and medical opinions. They are not vouching nor irrelevant narrative. It is proper expert testimony to establish the requisite support and foundational grounds for well-reasoned and reliable opinions.

**A. Pursuant to Fed. R. Civ. P. 26(a)(2)(B)(v), a list of prior cases was provided with the expert report.**

Uber's first attack is not a *Daubert* challenge at all. It is a discovery-sanction request based on the format of Feltoon's prior-testimony list. In his report, Feltoon disclosed a list of cases in which he served as an expert witness either by deposition or trial testimony. *See* ECF 7358-1 ("Feltoon Rep.") at 28-30. This list encompassed 65 matters, identified by the name of the party he evaluated, the attorney who retained him, and an indication of whether it was deposition testimony, trial testimony, or both. *See id.* At deposition, he confirmed that the list was accurate, that it encompassed his work from the past four years, and that he had compiled it by "go[ing] back and research[ing] [] [his] depositions and court testimony appearances." ECF 7358-2 ("Feltoon Dep.") at 22:22-23:23. This testimony confirms that his disclosures comport with the requirements of Fed. R. Civ. P. 26(a)(2)(B)(v) (expert report must contain "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition").

Uber nonetheless seeks to exclude Feltoon's testimony *in full* because the report did not specify "all…cases," it instead used the phrase "currently recall[s][.]'" ECF 7358 at 4 (internal quotation marks omitted). This argument ignores that Uber questioned Feltoon on this very issue during deposition and Feltoon confirmed the disclosure was an accurate list of cases for the past four years. *See* Feltoon Dep. at 22:25-23:23. Uber does not identify a single case that it contends is missing (much less what Uber could possibly do with such information). It merely speculates as to incompleteness by parsing words.[7]

What remains is Uber's complaint about form: that the entries do not include "defendant names,

[7] Even if a case had been inadvertently omitted (it has not), exclusion is not the remedy. *See DiSalvatore v. Foretravel, Inc.*, 2016 WL 7742824, at *7 (E.D. Tex. July 20, 2016) (finding it "improper" to strike expert's testimony "in total" based on the "technicality" of failing to include a "list of all other cases he has testified in or the amount of his compensation"); *McBroom v. Payne*, 2010 WL 11561450, at *2 (S.D. Miss. Sept. 16, 2010) (declining to impose "the severe sanction of striking" experts who provided "partial lists of the publications and trial testimonies," which "indicate[d] an attempt to comply" and that the "incompleteness…was perhaps inadvertent").

jurisdictions, docket numbers, or dates." ECF 7358 at 3. But Uber cites no authority for the particulars it demands, let alone that this warrants full exclusion of expert testimony. In any event, Uber's request for additional information can be resolved through supplementation, not exclusion. As was the resolution in *Arnold v. City of San Antonio*, the case on which Uber's arguments rests. *See* 2009 WL 780671, at *3 (W.D. Tex. Mar. 24, 2009) (refusing to strike expert report and ordering, instead, supplementation by a date certain); *Arthur v. Liberty Mut. Personal Ins. Co.*, 2022 WL 14225368, at *4 (W.D. Tex. Oct. 24, 2022) (finding delayed disclosure of the expert's prior testimony list "harmless" and not a basis for striking the expert's testimony where defendant did not identify any harm flowing from the failure to previously disclose the list).[8]

For the same reasons as stated above, Uber's argument for exclusion as a discovery sanction under Fed. R. Civ. P. 26 and 37(c)(1) should be rejected. There has been no discovery violation. Even if there was, any error was harmless when considering: (1) the importance of Feltoon's expert testimony to central issues in this case, e.g., causation and damages; (2) the non-existent prejudice to Uber;[9] (3) the available curative measure of supplementation; and (4) the explanation by Feltoon of his good faith efforts to compile the list by going through his records to catalogue his prior depositions and trial testimonies. *See Irving v. Meridian Sec. Ins. Co.*, 2023 WL 2068472, at *2-4 (N.D. Tex. Jan. 4, 2023) (setting forth the factors for consideration on harmless error and finding harmless error where testimony was crucial to plaintiffs' claims, prejudice was minimal (if any) because defendant had a list from which to prepare cross and had the opportunity to depose the experts, and omissions were not deliberate).

**B. Feltoon does not provide credibility opinions.**

Uber's fallback request rests on a single phrase in Feltoon's report—that Plaintiff [redacted] [.]" ECF 7358 at 5

---

[8] *Arnold* does not support Uber's characterization that Feltoon has been "on notice for 17 years" regarding this issue. ECF 7357 at 4. The disclosure Uber challenges is not the disclosure *Arnold* addressed. Here, the list was served with the original report, it was signed, it was compiled by researching his files rather than from memory, and Feltoon has provided sworn testimony to its accuracy for the full four-year period. *Compare* Feltoon Rep. at 28-30; Feltoon Dep. at 22:22-23:23, *with Arnold*, 2009 WL 780671, at *2.

[9] Uber's asserted prejudice is entirely abstract. Uber does not identify a single case it believes to be missing from the list of 65 cases, a single matter from the disclosure that it sought to investigate but could not, or a single transcript it requested from identified retaining attorneys. Uber deposed Feltoon and will have the opportunity to depose him again after supplementation.

(emphasis added by Uber) (quoting Feltoon Rep. at 12). According to Uber, this one sentence is an improper credibility opinion. It is not. Read in context, the entire statement is: "[redacted]" Feltoon Rep. at 12. The sentence is the diagnostic predicate for the findings that follow it: "[redacted]" *Id.* The context of the report and opinion makes clear that what is "apparent" is not the fact of a sexual assault nor the credibility of any statements by Plaintiff, but rather the correlation between observed symptomology and diagnostic conclusion. That is, from the psychology testing and interview, Feltoon observed results and symptoms consistent with causation by a traumatic event. Whether the assault occurred as Plaintiff described it is a matter for the jury, and Feltoon offers no opinion on it. But he can properly opine that in his experience and expertise certain events are "life altering" so as to support a diagnosis that the event caused a mental health condition. And he does so not on Plaintiff's say-so but on his medical review, testing, observations, and expertise. *See, e.g., id.* (noting that his opinion is further supported by the fact that Plaintiff's "[redacted]").

Uber's cases are distinguishable because they deal with instances where expert testimony, on its face, pertained to credibility. *See Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) (psychiatrist "testified that he did not think [plaintiff] had lied to him or fabricated her psychiatric symptoms"); *U.S. v. Wertis*, 505 F.2d 683, 685 (5th Cir. 1974) (defendant there sought to have a psychiatrist opine whether a prosecution witness "would have a tendency to be reliable as a witness in distinguishing the truth from non-truth, realities from fantasies") (cleaned up). Feltoon offers no opinions of this kind and will not testify as to credibility. But he does, and should be able to, testify as to the basis for his medical opinions and diagnoses, including reported and observed symptoms, historical context and interview responses.

**C. Feltoon may testify to his evaluation of Plaintiff, including interview statements, testing, and observations, that form the basis of his opinions and medical diagnoses.**

Uber's final request is to bar Feltoon from "repeating Plaintiff's factual narrative." ECF 7358 at

5-6. This misdescribes the report and misapprehends what a psychological assessment is.

Uber claims that "the bulk of the 'Conclusions' section of Dr. Feltoon's report consists of what Plaintiff supposedly reported to him." *Id.* at 5. In fact, this section contains no account of the assault at all. Instead, it summarizes the basis for his conclusions, including Plaintiff's *symptoms,* which are the clinical data points on which his psychological assessments and ultimate diagnoses rest. *See* Feltoon Rep. at 12. That is the opposite of the report in *Tardif v. City of New York*, which narrated a plaintiff's "life up until the 2012 [Occupy Wall Street] protests, and…recount[ed] [her] account of her participation in the Occupy protests[.]" 344 F. Supp. 3d 579, 596-97 (S.D.N.Y. 2018); *see also Matthews v. Hewlett-Packard Co.,* 2017 WL 6804075, at *4 (S.D.N.Y. Dec. 22, 2017) (cited by Uber) (excluding psychologist's "bald repetition of [a plaintiff's] beliefs as to the cause of his condition," which "simply does not reflect a methodology reliant upon [his] specialized knowledge or experience").

Nor is the identification of relevant symptoms a detour from Feltoon's testing; it is part of it. The test data for the instruments he administered consist of Plaintiff's responses to standardized items about her symptoms. The Minnesota Multiphasic Personality Inventory-2, Beck Depression Inventory-2, Beck Anxiety Inventory, Incomplete Sentence Blank, together with the mental status examination and clinical interview, are standard components of a psychological assessment, and the reported symptoms are the context in which the instruments are evaluated. *See* Feltoon Rep. at 11-12; Feltoon Dep. at 68:13-20, 74:11-14. Fed. R. Evid. 703 permits an expert to base an opinion on facts "the expert has been made aware of," and the Advisory Committee's paradigm example is: "a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including *statements by patients* and relatives[.]" Fed. R. Evid. 703 advisory committee's note to 1972 proposed rules (emphasis added). Accordingly, it is proper for Feltoon to testify as to the components of his evaluation, testing, and assessments, which includes "clinical observations and descriptions of symptoms," that form the basis for his opinions.

Uber's briefing effectively concedes this point, agreeing that foundational testimony as to the basis for medical diagnoses and opinions should be admitted. *See* ECF 7358 at 6. But then Uber demands an unnecessary order limiting the testimony to: "describe [Plaintiff's] responses to specific test questions only to the extent necessary to provide a foundation for [his] findings [of what] the test results

[supposedly] showed[.]" *Id.* (internal quotation marks omitted; alterations in original). It is unclear what Uber intends with this order, other than to later weaponize such ruling at trial to unduly limit and disrupt testimony. There is no basis or need to restrict testimony that Uber concedes is permissible.

## VI. LEIGH LEVY'S TESTIMONY IS ADMISSIBLE.

Leigh Levy is a registered nurse and certified life care planner. Based on her experience and expertise, and her review of Plaintiff's medical, social, psychological, vocational, and educational history, expert reports of medical evaluators, consultations with treating providers and evaluators, and interviews with Plaintiff and collateral sources, Levy developed a life care plan for Plaintiff, which details the medical and medically related goods and services, and projected costs, that can be reasonably expected due to the injuries sustained as a result of the sexual assault.

### A. Levy's opinions are supported by medical records, diagnoses, and treatment plans of Plaintiff's medical providers and independent medical evaluators.

Uber attacks the following aspects of Levy's report—[redacted][10]—on the basis that they lack underlying supporting medical diagnoses. But Levy's report in fact identifies substantial sources of medical support for her opinions, including review of Plaintiff's history and medical records, the expert reports and medical evaluations conducted by Dr. Feltoon (a licensed clinical, neuro, and forensic psychologist) and Dr. Leslie Lebowitz (a licensed clinical psychologist), interviews with collateral sources, and consultations with treating medical professionals. *See* ECF 7356-1 ("Levy Rep.") at 2-4 (materials considered). This is recognized and accepted methodology for developing a life care plan. *See Rivers v. B. Braun Interventional Sys., Inc.*, 2023 WL 7166520, at *19 (E.D. Wis. Oct. 31, 2023).[11]

Uber ignores the bulk of these supporting sources, selectively addressing only those facts that further its narrative. There is no merit to this type of argument. Uber cannot preclude Levy's testimony

[10] Plaintiff does not intend to seek damages for [redacted]. Accordingly, Uber's arguments on that point should be moot.

[11] Uber cites to *Rivers* because portions of Levy's life care plan were excluded in that case, on factually distinguishable grounds. There, a plan for psychological services was excluded because there was no admissible underlying medical opinion to support it, whereas here Plaintiff intends to present the testimonies of Drs. Feltoon and Lebowitz. *See Rivers*, 2023 WL 7166520 at *21. The remaining criticisms do not apply because Plaintiff is not pursuing damages for [redacted]. *Rivers* otherwise supports the general admissibility of Levy's methodology and opinions.

by completely bypassing the data which explicitly disproves its criticisms. For example, Uber's motion ignores the supporting evidence from eight different providers, and Uber claims that Levy "contradicts" Lebowitz but then fails to discuss and include Lebowitz's report for the Court's review (and in fact never even identifies the purported contradiction). *See* ECF 7356 at 5 n.4 (addressing only one treating provider source while ignoring eight others listed out in the report); *see also id.* at 1 (arguing that Levy contradicts Lebowitz but never explaining how). An accusation that ignores the evidence and provides no analytical framing is meritless. Plaintiff addresses the specific flaws in Uber's criticisms below.

[redacted]. The recommendation for [redacted] is well-supported by, among other things, the expert opinions of Feltoon and Lebowitz, both of whom conducted independent evaluations of Plaintiff. *See* ECF 7358-1 ("Feltoon Rep.") at 1, 11-14; Ex. D, Expert Report of Leslie Lebowitz dated Sept. 3, 2026 ("Lebowitz Rep."), at 1, 3, 11-48. Based on these expert opinions, Levy noted that Plaintiff currently suffers from "[redacted]" Levy Rep. at 12 (citing, *inter alia*, Lebowitz Rep. at 32, 42-48); *see also id.* at 16-17 ([redacted]) (citing conversation with Feltoon); Feltoon Rep. at 13 ([redacted]"); *id.* at 12, 14 ([redacted]); Lebowitz Rep. at 13, 31-32, 40-41, 46-47 ([redacted]).[12]

Notably, Lebowitz explained that the diagnoses are [redacted] and [redacted], and confer "[redacted]." Lebowitz Rep. at 13, 31-32, 46-47. "[redacted]." *Id.* at 47. Given the "[redacted]

[12] Uber's expert for the most part agrees with the diagnoses but disputes the cause. *See* Baker Rep. at ¶ 6(a)-(b) (Plaintiff "currently meets criteria for" [redacted]").

[redacted]." *Id.*

Feltoon agrees: [redacted]." Feltoon Rep. at 14. Uber argues that the term "possibly" renders this opinion deficient as it does not meet a reasonable probability standard. But Levy personally consulted with Feltoon, and during this conversation he made clear that his opinion was not so equivocal: [redacted]." Levy Rep. at 17.

In addition to Lebowitz and Feltoon, Levy's opinions are supported by her review of Plaintiff's medical records and the recommendations and diagnoses from Plaintiff's treating providers. She specifically identifies these sources in her report (but Uber conveniently omits them from its arguments):

- [redacted].
- [redacted].
- [redacted].

*See id.* at 20-21. Levy also cites to [redacted]. *See id.* at 20. Uber argues that [redacted] undermines Levy's [redacted] plan because "[redacted]." ECF 7356 at 5 n.4. This ignores, however, that [redacted]

[redacted].

[redacted]. Uber asserts that "neither Plaintiff's treaters nor her hired expert recommend [redacted]." ECF 7356 at 5. Not true. Lebowitz, on whom Levy relies, expressly opined that, [redacted]" Lebowitz Rep. at 47 (emphasis added). Moreover, Plaintiff's medical history demonstrates a prior instance [redacted]. *See* Levy Rep. at 7 (citing [redacted]). This is sufficient to support Levy's consideration of future [redacted] in her life care plan for Plaintiff. *See, e.g., Bauta v. Greyhound Lines, Inc.*, 2019 WL 8060183, at *4 (E.D.N.Y. Jan. 4, 2019) (affirming jury award of future treatment where, *inter alia,* there was evidence that plaintiff received similar treatment and care in the past for the same injury).

Medications. Levy's plan for medications ([redacted]) is also well-supported. As noted above, a range of medical treaters and experts, including Uber's own expert, agree that [redacted]. As to medication, Levy specifically refers to the following sources of support:

- [redacted]
- [redacted]

*See* Levy Rep. at 20-21; *see also id.* at 11 ([redacted]).

To the extent Uber argues that projections for future medical care and treatment across Plaintiff's lifetime should be precluded because Plaintiff is not currently prescribed or undergoing the recommended treatment, that argument fails. The fact that treating physicians have not recommended certain care does not necessarily "preclude Plaintiff's need for [such care] in the future." *Bauta*, 2019 WL 8060183, at *4 (finding plaintiff not taking Percocet at time of trial did not preclude "need for it in the future" when assessing future cost of care; there was testimony that Plaintiff took Percocet leading up to and

immediately after first lumbar surgery and it was therefore reasonable for the jury to believe Plaintiff would need Percocet in connection with future surgeries); *see Rivers*, 2023 WL 7166520, at *20-21 (stating "[n]or is it necessary that Levy's opinions neatly coincide with a specific recommendation from one of [plaintiff's] treating physicians…one aspect of a life care planner's expertise is to extrapolate from present diagnoses and recommendations to likely future needs") (citations omitted); *Csikos v. S.M. Construction & Contracting, Inc.*, 2022 WL 3211462, at *9 (S.D.N.Y. Aug. 9, 2022) (noting, in context of life care plan, "costs of future assistive devices and prescription medications that Plaintiff may require—irrespective of whether Plaintiff currently requires such care—are not so speculative that a physician cannot opine on the likelihood Plaintiff will need such treatment in the future"; "jury could reasonably find that Plaintiff will likely require psychotherapy, medication, or assistive devices in the future, despite not needing such care currently"). Here, the likelihood that Plaintiff will require [redacted]), is spelled out in the opinions of Lebowitz and Feltoon, and supported by treating-provider records as to treatments, prescriptions, and care previously recommended.[13]

Levy's opinions with respect to [redacted] are well supported.[14]

### B. Uber's criticisms of testing variability and apportionment go to weight, not admissibility.

Uber's arguments regarding data variability in BDI-II and BAI tests (which were administered at different times across a period of four years), and Levy's decision to rely on the most recent result (2026)

---

[13] Uber argues that Levy is required to specifically identify which medications will be prescribed, i.e. "which [redacted] costs $7,770.85 per year." ECF 7356 at 6. Such precision is not required. "An award of future medical expenses is, by its very nature, not a matter of certainty." *Gunn v. McCoy*, 554 S.W.3d 645, 670-71 (Tex. 2018). "The evidence should show that there is a reasonable probability of the occurrence of future ill effects of the injury, and it need show no more in order to justify the jury in considering future consequences in estimating the damages." *Id.* (cleaned up).

[14] Should there be any lingering concerns, Plaintiff submits that the proper course of action is to reserve decision until trial, and after hearing testimony from underlying medical experts, to resolve any issues as to foundation. *See, e.g., In re Depakote v. Abbott Lab'ys, Inc.*, 2017 WL 11438794, at *8-9 (S.D. Ill. May 24, 2017) (reserving ruling on admissibility of certain elements of nurse life care planner's testimony until after trial testimony of underlying medical expert, when the court will be better able to determine if adequate foundation exists).

over historical data (2023, 2024, 2025), go to weight, not admissibility. *See Primrose Operating Co.*, 382 F.3d at 562; *In re PFA*, 696 F.Supp.3d at 800. Indeed, Uber does not dispute that it is appropriate for a life care planning expert to rely on BDI-II and BAI scores but takes issue with the fact that Levy did not pick the version more favorable to Uber's cause. This is not a basis for exclusion. Uber can make its case through cross-examination and proffer of its own expert.

Uber next argues that Levy "fails to apportion costs arising from the assault versus costs arising from Plaintiff's other prior and subsequent traumas." ECF 7356 at 7. This argument conflates the roles of Levy, Lebowitz, and Feltoon, and it misstates Texas law. *First,* Levy is a damages expert, not a causation expert (she properly relies on Feltoon and Lebowitz for those opinions).[15] She can therefore assume liability and causation and address only the issue of damages. *See Barnes v. Rd. Carriers, Inc.*, 2025 WL 959519, at *7 (E.D. Tex. Mar. 31, 2025) (holding that life care planner was a damages expert who could properly assume causation); *Robroy Industries-Texas, LLC v. Thomas & Betts Corp.*, 2017 WL 1319553, at *5 (E.D. Tex. Apr. 10, 2017) (noting "it is perfectly permissible for an expert to assume liability (of which causation is an element) and simply focus on the issue of damages"). *Second*, under Texas law, the burden falls on defendant to prove the extent of damages the preexisting condition would inevitably have caused, i.e., it is Uber's burden to prove apportionment. *See Schmidt v. U.S.,* 2020 WL 13199268, at *1-2 (W.D. Tex. Mar. 20, 2020) (holding "[d]efendant must show that the damages claimed by Plaintiff should be offset or discounted due to a preexisting condition").

### C. Levy should be permitted to explain the basis for her opinions to the jury.

Levy does not intend to provide an "assessment, diagnosis, or treatment of psychological conditions." Any argument by Uber to the contrary is merely a red herring that confuses source support with independent medical opinion. Levy should be permitted to explain to the jury the basis for her opinions. This includes providing context and background to the jury as to her methodology, the medical records reviewed, the interviews conducted, and the assessments, diagnoses, and treatments from providers and independent evaluators that form the basis for the life care plan. Such foundational testimony should not be controversial. Yet, Uber seeks to preclude it under the pretense of arguing that it is improper "assessment, diagnosis, or treatment opinion." Uber cannot undermine the weight and

[15] *See, e.g.,* Lebowitz Rep. at 13, 46; Feltoon Rep. at 12, 14.

credibility of Levy's testimony by cutting it off from its context and support; in effect, decontextualizing the testimony to create the false impression of an unsupported and unreliable opinion.

Providing such context and support is not, as Uber argues, improper vouching. There is nothing inappropriate about an expert relying on opinions of another expert and explaining why they did so to the jury. *See* Fed. R. Evid. 703; *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (noting "it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert"). Nor is it improper cherry-picking. Levy identified the foundational sources for her opinions and should be permitted to testify to those sources at trial to provide helpful context and background for the jury. This includes testifying to portions of her interview with Feltoon (which Uber specifically seeks to exclude). Uber's briefing makes clear that there is a dispute as to whether the jury should credit Levy's opinions (e.g., [redacted]), which relied in part on this Feltoon interview. Uber cannot assert that Levy's opinions lack sufficient support while simultaneously arguing that Levy cannot tell the jury about the very support that would dispel Uber's challenge.

## VII. ROBERT JOHNSON'S TESTIMONY IS ADMISSIBLE.

Uber seeks to exclude the testimony and report of Robert W. Johnson, a forensic economist with 40 years of experience assessing the financial condition of companies. *See* ECF 7362. Johnson offers opinions on Uber's financial condition and ability to pay punitive damages, as he did in the *Dean* trial. *See* ECF 7362-2 ("Johnson Rep."). Johnson applies standard methods of economic analysis used by forensic economists to Uber's own financial figures and explains how each metric bears on Uber's capacity to satisfy an award. Uber does not dispute the accuracy of any figure. Its objection is that Johnson did not present the additional expense categories Uber would prefer be emphasized. Uber also incorrectly argues that Texas law confines the punitive damages inquiry to a bottom-line net worth figure. Finally, Uber attacks Johnson's methodology because he relies on decades of experience and Uber's own financial documents instead of a mechanical method that is not required under Rule 702. The JCCP Court rejected these same arguments as to this same expert, and courts around the country have found Johnson's

opinions admissible. Uber's motion should be denied.[16]

**A. Johnson's methodology, based on 40 years' experience and standard forensic economist standards, is reliable.**

Uber attacks Johnson's methodology because he did not apply a rigid formula, instead utilizing 40 years of experience and standard analyses commonly relied upon by forensic economists. See ECF 7362 at 6-8. Contrary to Uber's position, Rule 702 does not require a mechanical or fixed methodology. It requires a reliable one, which Johnson plainly employs.

To start, Johnson "use[d] standard methods of economic analysis used and relied upon by forensic economists to talk about Uber's financial condition and their ability to pay [] punitive damages." *Dean* Tr. at 880:24-881:2.[17] This involved review of Uber's own financial representations in its Form 10-Ks, Form 10-Qs, and 2026 proxy statement, along with stock-market data from *The Wall Street Journal*. *See* Johnson Rep. at 1. "These are generally accepted financial documents used and relied upon by economists or experts in finance to evaluate a company." *Bankhead v. ArvinMeritor, Inc.,* 139 Cal. Rptr. 3d 849, 854 (Cal. Ct. App. 2012), *as modified* (Apr. 25, 2012) (cleaned up) (affirming damages award based on Johnson's analysis of similar documents); *In re 3M Combat Arms Earplug Prods. Liab. Litig.,* 2021 WL 830309, at *7 (N.D. Fla. Mar. 4, 2021) (denying motion to exclude Johnson's opinions based on same documents relied on here); *In re Yasmin and YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.,* 2011 WL 6732819, at *7 n.7 (S.D. Ill. Dec. 16, 2011) (Johnson's reliance on annual reports and other documents reliable).

Johnson then applied decades of training, education, experience and standard methods of economic analysis to identify financial metrics relevant to Uber's ability to pay, including revenue, net income, cash flow, and market valuation. *See* ECF 7362-3 ("JCCP Dep.") at 87:3-9; 100:1-10; Dean Tr. at 880:24-881:2. Johnson did not select these metrics at random. He chose ones that indicate financial health, wealth, and economic status and explained how they inform ability to pay. *See, e.g.,* JCCP Dep. at 73:9-12; *id.* at 108:18-109:5, 148:3-17, 153:15-154:6; *Dean* Tr. at 882:19-883:10 (revenue, net income,

---

[16] Uber's threshold assertion that Texas law forecloses punitive damages, *id.* at 5, is wrong for the reasons set forth in Plaintiff's contemporaneously filed opposition to Uber's motion for summary judgment.

[17] Johnson provided substantially the same opinions across the MDL and JCCP and the parties agreed that his deposition testimonies would be coordinated across these cases. In addition, he testified to these same opinions during the *Dean* trial, where he provided additional context for his underlying methodology and analysis of Uber's financial data.

and operating cash flow show growth and profitability); JCCP Dep. at 196:24-197:6, 199:7-18, 223:3-25 (R&D, advertising expenses, and undrawn credit line show resources and spending capacity). These metrics, as Johnson testified, are traditionally used by forensic economists to look at and assess the financial condition of a company. *See Dean* Tr. at 887:13-16.

Uber ignores this analysis and instead mischaracterizes quotes from Johnson's deposition testimony as *ipse dixit*. But in each instance, the surrounding testimony provides the explanation Uber contends is missing. Uber says Johnson "offered no reasoned explanation" as to why he did not separately list out all of Uber's costs and expenses in his analysis. ECF 7362 at 7. Johnson explained: he provided Uber's net income, *which already takes into account all costs and expenses*. *See* JCCP Dep. at 135:11-18 ("that's what net income is"). Uber faults Johnson for using advertising expenses instead of marketing expenses. Johnson explained: "advertising is always seen as one of the more discretionary items" and thus in the finance community viewed through the lens of: "How much can we afford?" *Id.* at 138:13-25. Finally, Uber criticizes Johnson's explanation that he pulled out the CEO's compensation to demonstrate Uber's willingness to commit tens of millions of dollars in compensation and severance as another measure of Uber's financial wealth. *Id.* at 205:24-206:6, 209:22-211:2. Again, Johnson explained, this time, repeatedly: he chose the most relevant metrics, as opposed to all metrics, to "cut to the chase" and avoid "bury[ing] the jury in numbers." *See id.* at 134:18-23; 203:21; 210:17-19.

These are not *ipse dixit* explanations. "This analysis readily supports []Johnson's opinion that Uber has the ability to pay a punitive damages award in an amount to be assessed by the jury." *Coordination Proceeding Special Title (Rule 3.550)*, 2025 WL 2631568, at *25 (Cal. Super. Ct. Aug. 29, 2025) ("JCCP Order") (denying Uber's motion to exclude, finding Johnson's methodology reliable). Indeed, Johnson clearly explains how his experience and analysis led to the metrics he chose. Uber's real critique is that Johnson relies on his experience, education, and training. But this is appropriate, so long as the expert explains (as Johnson did) how his experience or observations support his opinions. *See Simmons*, 470 F.3d at 1123 (where *Daubert* factors are not apt "other indicia of reliability are considered under *Daubert*, including *professional experience, education, training, and observations*") (emphasis added); Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill,

training or education—may not provide a sufficient foundation for expert testimony" so long as the expert "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). In the same flawed line of attack, Uber mocks Johnson's use of terms like "cash flow profit," "financial health," and "financial wealth." ECF 7362 at 3-4. Courts have specifically credited this framework. *See e.g. Bankhead,* 139 Cal. Rptr. 3d at 854 & n.6.

Uber's cases do not support its position. The majority of Uber's authorities involve experts who offered conclusions with no identifiable basis or method, and typically where the relevant discipline required testing the expert never performed. *See*, *e.g., Lopez v. Am. Honda Motor Co.,* 2025 WL 2246617, at *4-6 (S.D. Tex. July 14, 2025) ("classic" *ipse dixit* where no information supported the opinion); *Hathaway*, 507 F.3d at 318-19 (opinion that officer "must have been behind the car when [the officer] fired his shot" excluded for lack of any underlying data or explainable methodology, e.g., accident reconstruction, shooter location, or bullet trajectory); *Watkins*, 121 F.3d at 992 (excluding alternative design opinion for conveyor belt where expert did not conduct required testing); *Moore*, 151 F.3d at 279 (excluding medical causation opinion where expert "could cite no scientific support" for conclusion); *see also Viterbo*, 826 F.2d at 424; *Bibbs v. Molson Coors Beverage Co. USA, LLC*, 699 F. Supp. 3d 509, 512-13 (N.D. Tex. 2023); *DeWolff, Boberg & Assocs., Inc. v. Pethick*, 2024 WL 1396267, at *10-14 (N.D. Tex. Mar. 31, 2024), *aff'd on other grounds*, 133 F.4th 448 (5th Cir. 2025). And Uber's reliance on *Sullivan* and *Richardson* fares no better. Neither addressed a financial-condition analysis of the kind at issue here, but instead, concerned Johnson's valuation of a decedent's life using a "willingness-to-pay" methodology. *Richardson v. U.S.*, 2026 WL 579508, at *2-6 (W.D. Mo. Mar. 2, 2026); *Sullivan v. City of Buena Park*, 2022 WL 2965664, at *6-7 (C.D. Cal. Apr. 11, 2022). The admissibility of Johnson's prior opinions in inapposite cases and circumstances has no bearing on the admissibility of his opinions here.

In contrast to Uber's inapposite cases, courts routinely admit Johnson's opinions based on his experience and analysis of a defendant's own financial data. *See* JCCP Order, 2025 WL 2631568, at *23-25; *Bankhead*, 139 Cal. Rptr. 3d at 854-55, 867 (affirming punitive damages award based on Johnson's opinions derived from same methodology here); *In re 3M*, 2021 WL 830309, at *7 (holding "[d]efendants

criticize Johnson for not utilizing statistical analysis, computer modeling, scientific analysis, or scientific principles in developing his opinion that 3M is a growing entity; however, none of these are required bases for the sort of expert testimony that will be provided by Johnson") (internal quotation marks omitted); *Gerald v. R.J. Reynolds Tobacco Co.*, 2018 WL 4062154, at *8 (V.I. Super. Ct. June 12, 2018) (finding "unpersuasive Defendant's argument that the use of publicly available data reported to the SEC, the accuracy of which Defendant does not challenge, in assessing the financial condition of Defendant is not a reliable methodology").[18]

**B. Johnson does not "inflate" Uber's own financial figures.**

Uber argues Johnson's analysis intentionally inflates Uber's ability to pay because he supposedly ignored expenses and losses. *See* ECF 7362 at 8-9. The JCCP court already explained this argument "is mistaken" because Johnson analyzes Uber's net worth and "[b]y definition, net worth is the difference between the value of a company's assets and the value of its liabilities." JCCP Order, 2025 WL 2631568, at 25 n.32; *see also* Tex. Civ. Prac. & Rem. Code § 41.001 (defining "net worth" as "total assets of a person minus the total liabilities of the person…").

Uber next criticizes Johnson for using data from different time periods, suggesting that he curated the dataset to inflate Uber's ability to pay. *See* ECF 7362 at 8-9. The record again says otherwise. For example, Johnson testified that he based his report on the financial information available to him and otherwise explained when trends versus the most current figures were relevant. *See, e.g.,* JCCP Dep. at 175:18-176:9; *id.* at 185:5-18, 192:14-19. In sum, Uber makes empty accusations as to inflated analysis, without actually explaining why that is the case. At most, Uber's complaints boil down to the argument that Johnson did not emphasize the expense categories or data points that Uber would have preferred. *See Primrose Operating Co.*, 382 F.3d at 562; *In re PFA*, 696 F.Supp.3d at 800. The analysis is not flawed merely because it does not align with Uber's desired outcome, or because Uber would prefer to minimize how much money it makes.

Uber's cited cases present inapplicable scenarios. None stand for the proposition that Johnson

[18] *Pooshs* does not compel a different result. There, the court limited Johnson to current net worth because plaintiff "ha[d] not provided any reason" to measure defendant's financial condition any other way. *Pooshs v. Philip Morris USA, Inc.*, 287 F.R.D. 543, 550 (N.D. Cal. 2012). Although the court questioned the methodology, *id.* at 549, the reasons it articulated were related to scope and relevance, ultimately limiting, not excluding Johnson's opinions.

must list all liabilities, costs, and expenses, or all data from all years for his opinion to be admissible. *See Hayes v. Wal-Mart Stores, Inc.*, 294 F. Supp. 2d 1249, 1250-51 (E.D. Okla. 2003) (excluding opinions speculating on financial impact of a punitive damages award); *Baxter v. Peterson*, 150 Cal. App. 4th 673, 680 (2007) (punitive damages, on remand, must be assessed against "some evidence" of defendant's wealth and that liabilities should accompany evidence of assets, and expenses should accompany income); *In re House of Yahweh*, 266 S.W.3d 668, 673-674 (Tex. App. 2008) (under Texas discovery standards, documents relevant to net worth were discoverable but plaintiff made no record establishing relevance of documents reflecting only assets). At most, Uber's cases state that evidence of a defendant's wealth should reflect both liability and assets, expenses and income. Johnson's analysis does so on its face, supplying net worth and net income. *See* JCCP Order, 2025 WL 2631568, at *25 n.32.

Uber otherwise incorrectly invokes *Soto v. BorgWarner Morse TEC Inc.*, 191 Cal. Rptr. 3d 263 (Cal. Ct. App. 2015). The court did not "exclude" Johnson's testimony as Uber contends. *See* ECF 7362 at 8. In *Soto*, the court overturned a punitive damages award based on Johnson's testimony because the only available financial information concerned defendant's parent corporation, and Johnson's ultimate opinion was limited to estimating defendant-subsidiary's revenue. See 191 Cal. Rptr. 3d at 278-79. The JCCP said it best: *Soto* is "[n]ot even close" to and, in fact, "could not be more different" than this case. JCCP Order, 2025 WL 2631568, at *24 n.31. Here, Johnson analyzes Uber's own public financial disclosures and considers multiple financial-condition metrics on both sides of the balance sheet. *Soto* does not support exclusion.

At bottom, Uber's rhetoric does not identify a Rule 702 defect. Uber does not explain how using additional years for some figures, current-year data for others, or net figures that already incorporate expenses somehow inflates Uber's ability to pay. That is especially so because the underlying numbers come from Uber's own SEC filings. Uber may dislike that Johnson translated its reported revenue into a one-day figure of $142.5 million, but Uber does not dispute that number or its relevance. Uber's objection is instead that Uber itself does not use that phrasing and would prefer to counterbalance the presentation with selected expense figures. That is not grounds for exclusion.

**C. Johnson properly provides the basis for his opinions.**

Uber, alternatively, argues that Johnson's opinions do not consist of expert analysis at all but

merely parrot Uber's financial data. *See* ECF 7362 at 10 n.8. As this Court saw in the *Dean* trial, Johnson applied his economic training and experience to organize Uber's financial data, identified the metrics bearing on ability to pay, and explained their significance to the jury. He explained that five blindfolded folks can grab a part of an elephant and correctly identify the part before them, and none be able to describe the animal; Johnson's analysis looks "at the whole elephant." Dean Tr. at 889:8-21; *see also In re 3M,* 2021 WL 830309, at *7 (Johnson's "report is much more than a mere regurgitation of factual information and that the information contained in it would not be easily understood by the average citizen."); *In re Yasmin*, 2011 WL 6732819, at *7 (Johnson's analysis is helpful to jury because "it converts currency forms of various documents" to determine defendant's wealth, "a task not within the general ability of a layperson"). He should be able to tell the jury what that full analysis consisted of, in order to support his opinions.

**D. Texas law does not confine evidence of financial condition to net worth.**

Uber contends that under Texas law, Johnson may testify, at most, to Uber's net worth. *See* ECF 7362 at 10-11. Texas law is not so rigid. Section 41.011 of the Texas Civil Practice and Remedies Code codifies the factors a trier of fact shall consider in determining punitive damages, including evidence "relating to" the "net worth of the defendant," *in addition to* "the situation and sensibilities of the parties." Tex. Civ. Prac. & Rem. Code § 41.011(a)(4), (6). Texas courts construe the latter to encompass evidence of the defendant's "ability to pay the punitive damages," of which net worth is "just one consideration[.]" *Ellis Cnty. State Bank v. Keever*, 936 S.W.2d 683, 689 (Tex. App. 1996); *USA Truck, Inc. v. West*, 189 S.W.3d 904, 910 (Tex. App. 2006); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 132 S.W.3d 671, 686-87 (Tex. App. 2004), *rev'd in part on other grounds*, 271 S.W.3d 238 (Tex. 2008).

*Keever* demonstrates why a bare net worth figure cannot be the only financial figure relevant to the inquiry. There, defendant bank's principal testified its total capital of $770,000 correctly stated the net worth of the bank's assets. *See* 936 S.W.2d at 689. However, the evidence of the bank's cash on hand, federal funds sold, certificates of deposits, Treasury securities, and other assets demonstrated $7,933,000 in total assets. *See id.* The *Keever* court held that a rational jury could find that the bank's ability to pay was greater than the net worth figure assigned by the bank, because "*net worth is just one consideration for the jury*." *Id*. (emphasis added).

Uber's authorities are distinguishable. *In re Garth* and *In re House of Yahweh* concerned what kinds of documents are discoverable to show net worth, not what kinds of evidence are ultimately admissible at trial to show an appropriate amount of punitive damages. *In re Garth*, 214 S.W.3d 190 (Tex. App. 2007); *In re Yahweh*, 266 S.W.3d at 673. And both cases turned on a failure to make any record of relevance. *Pooshs* is likewise inapposite. There, the court, applying California law, limited Johnson's financial-condition testimony where the court found "no reason to conclude that defendants' financial condition in this case should be measured by some other value apart from net worth." *See* 287 F.R.D. at 550. Here, Johnson explains why other measures are relevant to Uber's ability to pay. In comparison, the JCCP Court rejected Uber's "net worth only argument" when addressing the facts of this litigation. *See* JCCP Order, 2025 WL 2631568, at *24 ("The [California] Supreme Court has not prescribed any rigid standard for measuring a defendant's ability to pay" and thus net worth is not "the sole standard for" measurement) (internal quotation marks omitted). Moreover, Uber's position would collapse Section 41.011's "net worth" and "situation and sensibilities of the parties" factors, rendering the latter's ability-to-pay component out of the statute.

Finally, Uber attacks the admissibility of CEO compensation as not related to net worth and because the evidence is "highly prejudicial." ECF 7362 at 10 n.9. As noted above, Texas law does not limit financial consideration to net worth. And Uber's authority does not support exclusion. In *Farah Mfg. Co. v. Alvarado*, the challenged evidence was that a board member had personally received a substantial judgment in separate litigation. 763 S.W.2d 529, 534-35 (Tex. App. 1988), *aff'd*, 830 S.W.2d 911 (Tex. 1992). The court held that admitting this evidence would "mislead[] the jury into believing that the amount of punitive damages should be assessed upon the financial ability of a person not obligated to pay any award in the suit before the jury." *Id.* at 535. Here, Johnson does not offer evidence of what a non-party possesses but identifies what Uber itself committed to pay as a reflection of Uber's own financial condition. This relevance is not substantially outweighed by unfair prejudice and this precise testimony has been admitted by other courts. *See Bankhead*, 139 Cal. Rptr. 3d at 854 (affirming punitive damages award where Johnson testified that "a company's willingness and ability to pay sums of this magnitude to its chief executive is an indicator of financial strength"); *see also* JCCP Order, 2025 WL 2631568, at *25. For the reasons set out more fully in Plaintiff's opposition to Uber's MIL No. XI, the

independent relevance of executive compensation to show Uber's negligence dispels any Rule 403 argument.

**E. Johnson's opinions about Uber's own figures are not "unsubstantiated anchoring."**

Uber's remaining objection is that testimony about its own reported financials would constitute "unsubstantiated anchoring," *i.e.*, the suggestion of "damages amounts by reference to objects or values with no rational connection to the facts of the case." *Gregory v. Chohan*, 670 S.W.3d 546, 557 (Tex. 2023) (internal quotation marks omitted). That argument fails. Uber's financial figures are directly connected to punitive damages. In fact, Section 41.011 requires the trier of fact to consider financial circumstances, including net worth and ability to pay. In Uber's cited case, *Gregory*, the "anchoring" came from a comparison of the value of a human life to a fighter jet and artwork. More to the point, *Gregory* expressly noted that counsel's improper anchoring argument suggested defendant "can afford a large award" and "should be punished," which were inappropriate *because punitive damages were not at issue*. *Id.* at 558. But punitive damages *are* at issue here and any testimony indicating Uber's ability to pay or need for punishment are precisely the considerations Section 41.011 requires the jury to consider.

## CONCLUSION

For these reasons, Uber's motions to exclude should be denied.

Dated: September 22, 2026

Respectfully submitted,

By: */s/ Sarah R. London*
Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: */s/ Rachel B. Abrams*
Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: September 22, 2026 By: */s/ Ellyn Hurd*
Ellyn Hurd