# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

___________________

| | |
|---|---|
| Jaylynn Dean, an individual,<br><br>Plaintiff,<br>v.<br><br>UBER TECHNOLOGIES, INC., a, Delaware Corporation; RASIER, LLC, a Delaware Limited Liability Company; and DOES 1 through 50, inclusive,<br><br>Defendants. | 2:25-cv-04276-CRB<br><br>Phoenix, Arizona<br>January 28, 2026<br>1:03 p.m. |

**BEFORE: THE HONORABLE CHARLES R. BREYER, SENIOR JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 12 PM SESSION**
**(Pages 2442-2626)**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

It's a -- it's a -- you know, big goal but it's something that's absolutely worth fighting for.

Q. And you mentioned that Uber has published three safety reports. Do you know whether or not there's a -- Uber's planning to publish a fourth safety report?

A. We are, yes.

Q. And I want to talk a little bit about kind of your response as -- based on your experience and your time at Uber.

How would you generally respond to a suggestion that Uber isn't being honest or telling the truth about the risks of sexual assault or sexual misconduct on the platform?

A. I mean, I think it's fair to say that we do more than any company to be transparent about this issue. It's a responsibility that we take really, really seriously.

As I said already, we were the first ones to do this and that's why we worked closely with women's safety advocates to help us understand how do you even go about this? What does -- what does good look like?

So we worked with some of the organizations that you can see here on the screen today to both advise on how we put out the report, but also to develop the sexual assault and sexual misconduct taxonomy because what we quickly learned -- we made a commitment to put out a report in 2017, and we quickly learned there was no common language to even talk about these types of incidents.

There were different definitions across the board, and that's why we partnered with NSVRC and Urban Institute, and they created a taxonomy that we then used, and that was really the foundation of our reporting.

Q. You kind of hit on it. The jury's heard "taxonomy," but I'm not quite sure it's been described. What do you mean by that? What is a taxonomy as used in the safety report?

A. Sure. I'll be totally honest, when I first started in this role, I didn't know what a taxonomy was either. So I'm happy to explain it.

It's essentially a way of defining something, and we worked with NSVRC and Urban Institute to create a list of definitions or categories of sexual assault and sexual misconduct.

They are really, really detailed and well explained; and the reason for it is that when Uber or, frankly, any company or any institution receives a report of sexual misconduct or sexual assault, that particular agent that's receiving the report should be able to put it into the right category so that then over time, as we put out our reports and as other companies put out reports, you can compare apples-to-apples rather than Uber having one definition of sexual assault and then another company having an entirely different one.

So you can think of it as, like, a common language or common definitions that are used.

Q. In kind of reaching these definitions or categories, do you have an understanding as to whether or not Uber took a broad approach in defining those taxonomy categories?

A. Yes, I would say our -- this is why it was so important for us to work with advocate organizations because we did take an incredibly broad approach. There are some categories in the taxonomy that we just don't really see in other, like, modes of life as even being described as sexual -- sexual assault or sexual misconduct.

So to give you an example, within our taxonomy we have things like staring or leering, which is, you know, if somebody's staring at you or looking at you in a weird way, we would classify that as sexual misconduct, and we would take that report and make sure that Uber is documenting it and taking appropriate action.

Q. And you mention that in developing the definitions or the taxonomy that Uber worked with advocates. Why is that something that Uber wanted to do, to work with advocates instead of just defining the categories on their own?

A. Well, I think we knew we weren't the experts; and there are organizations that have spent, you know, decades working on these issues, and we felt like it was important to listen and learn from them and really put them front and center and say help us -- help us design this.

The other thing that was really important was that we

didn't want it to be an Uber taxonomy because we wanted this to be open source. We wanted other companies to use it.

So that's why the taxonomy today is available, it's on the RALIANCE website, and we do see a small number of other companies using it.

Q. And in the data that's in the safety report that's been published, do you know whether or not the reported incidents of sexual assault and sexual misconduct that are in the safety reports, do those include any support abuse complaints?

A. No. So what's really important about our safety reports is that we go through a really rigorous auditing process of all of the data. And if you've had a chance to look at the reports, you will see that we have a really extensive methodology section where we explain all of that; but I will give you the very short summary, which is, for the reports of sexual assault that are included in our safety reports, we partner with RALIANCE to go through what we call a third-party validation process.

And it's basically where our agents look at the reports, make sure we are classifying them in the appropriate category, and then we share a random sample of those reports with RALIANCE. They go through the reports and do the exact same thing to make sure that we are putting them in the right bucket and that the numbers we are putting out are -- are accurate.

Q. And -- I'm sorry, I apologize.
A. No, I was going to say it takes a lot of time, but it's really important because we think data integrity here is just -- is really key because we are -- we were the first ones to do it and we want to hold a high bar.
Q. And the jury has heard some about support abuse complaints. If someone makes a complaint for sexual assault or sexual misconduct that's later deemed to be support abuse, is that still counted and included in the number in the safety report?
A. No, so it's something that would be excluded from the data in the safety report.
Q. And when you were working -- kind of go back to what's here on the screen. The advocates that Uber worked with that are listed here, are these non-profit or for-profit organizations just to be clear?
A. They're non-profits.
Q. And I wanted to go to this slide. I know that you wanted to show the jury this slide. Can you tell us what's being depicted here?
A. Sure. So this is a picture of Karen Baker, who's the CEO of the National Sexual Violence Resource Center. I've been referring to them as NSVRC, but that's the full title.
Karen is somebody that we worked closely with, both in the development of the taxonomy, but also who advised us on

our safety report; and as such, we asked her to write a foreword for the safety report. So we've included some sections of what -- what you'll see. I think it's the, like, the second or third page of the -- of the safety report.

Q. And she calls this report unprecedented, as highlighted here, and a bold step that sets a new bar for transparency -- or corporate responsibility and transparency.

I think you testified a little bit about that, but do you agree with that statement by Ms. Baker?

A. Yes. I mean, she's -- she's saying the same thing, much more eloquently; but, yeah, this report was really the first of its kind. It's not something that had happened before.

I -- I do agree that it was a bold step. It was something that was absolutely bold for Uber to do as a company, and I think there the point that I already touched on was we did so voluntarily. This was not something where Uber was required to put out this type of information. We chose to disclose it pro-actively.

MS. WALSH: And, Your Honor, we would ask for the limiting instruction given the fact this is -- I'm sure this is not being offered for the truth of the matter asserted.

MS. BLAKE: This is from the safety report, Your Honor, that's in evidence.

THE COURT: Well, but it's being offered. It's in evidence demonstrating the state of mind -- demonstrating

certain actions that were taken by Uber, certain actions that were taken by -- I mean, it's not being offered for the truth of the matter that -- that what she says in the introduction being shown to the jury is accurate.

MS. BLAKE: Understood, Your Honor. This is her statement and as it was included an impression within the safety report.

THE COURT: All right, thank you.

BY MS. BLAKE:

Q. And do you know whether or not Ms. Baker is still the CEO of the National Sexual Violence Resource Center?

A. Yes, I believe she's still there.

Q. And was the National Sexual Violence Resource Center, were they compensated for work on the taxonomy in the safety report?

A. Yes, we -- we paid NSVRC and Urban Institute to create the sexual assault and sexual assault taxonomy, and then we also paid Karen Baker and NSVRC a fund to basically consult with Uber as we developed the safety report.

Q. And why is that something that Uber was wanting to pay or compensate advocacy groups and their work with respect to the taxonomy development and the safety report?

A. I think it's really, really important. As I said earlier, these groups are all non-profits, right. They -- they don't have massive budgets.

They often have pretty small teams of staff, and this work takes a lot of time and a lot of expertise; and as a company I think it's absolutely appropriate and important that we compensate them for -- for the work that they do.

So that's why we made the decision to -- to both work with advocates, but also pay them for their time.

Q. The jury has seen this slide. This is in one of the plaintiff's opening slides in an internal document. "Love the quid pro quo from these non-profits."

Is your experience in your role and time at Uber that it was an expectation of just a quid pro quo in your interactions with these non-profit organizations?

A. Absolutely not. It's -- these are organizations that I've been working really closely with for the last six years, and they are organizations led by men and women with incredibly high integrity that have spent their entire careers dedicated to ending gender-based violence; and to suggest that they would compromise on that integrity or what they stand for just because Uber is paying them an amount is just -- is just ridiculous. So, no, I disagree entirely with the statement.

Q. And just to clarify for the jury, I know you've been at Uber for ten years, but how long have you been working closely with various non-profit organizations that are dedicated to victim rights and victim right advocacy?

A. Honestly, probably since our inception but I -- I can't

really remember back to, you know, 2013, 2014. I do know for a fact that Uber started working with advocate organizations in 2015.

That's when we set up our Safety Advisory Board, and we included two advocate organizations on -- on that board, but I know we also worked with many of them beyond just the Safety Advisory Board.

Q. You've referenced the Safety Advisory Board, and I want to talk about that a little bit with this -- the jury.

What do we have called out here first? If you could just walk the jury through what this is.

A. Sure. So this is the cover of our second safety report covering the years 2019 and 2020, and it includes a forward from our Safety Advisory Board members.

Q. Whoops, apologize. Got a little trigger happy again.

A. No, don't worry.

So we have a board, I believe it's currently nine or ten members, but these are two of the board members. Dr. Indira Henard, she leads the DC Rape Crisis Center. It's the oldest rape crisis center in the country. She's phenomenal to work with, and then we also have Dr. T. Bella Dinh-Zarr who is a public safety professional. She's led multiple governmental organizations that focus on transportation safety.

So we asked both of them to collaborate and draft a foreword for our second report.

Q. So these are two members of the Safety Advisory Board; is that right?
A. Yes, that's right.
Q. And can you just generally describe what is the Safety Advisory Board?
A. Sure. So many companies create boards to advise their organizations on important issues. So Uber created our Safety Advisory Board back in 2015. It's essentially pulling together a group of experts with really longstanding careers and deep subject matter expertise to help us do the right thing when it comes to safety.

So this is our current Safety Advisory Board. It's chaired by Secretary Jeh Johnson, who was the former Secretary of Homeland Security.

We have three women safety experts on the board. We have Erica Olsen who -- she works at the National Network to End Domestic Violence and leads a really interesting part of that organization. It's called Safety Net, and it basically is only focused on advising tech companies on how they should think about survivor privacy and survivor safety.

We also have Indira Henard, who I mentioned earlier; and then we have Pamela Zaballa, who is the Chief Executive of NO MORE, which is a global organization working to end -- end gender-based violence.

We also have other members, including former Deputy

Director of the FBI, a former Assistant Secretary of Labor, and the Director of Occupational Health and Safety, John Henshaw, and a couple others.

Q. And so this has been around, you said, since 2015?

A. That's right. And the membership has evolved over time; but, yes, the board has existed since 2015.

Q. And do you have an understanding as to why Uber thought it was important to have this Safety Advisory Board and continues to have it?

A. It's -- it's something I feel really strongly about, that -- Uber is not, you know, an expert in safety. It is a tech company, and it's really important that we don't have blind spots, that we work with experts with different perspectives, different experiences, different backgrounds, and they can help us understand, "Okay, here's some gaps in your thinking today," or, "Why don't you do" -- you know, "Invest in this project," or "Invest in this initiative."

And I think it really helps us continue growing as a company and making sure we're doing the right thing and what's expected of us. So it's something we work with our Safety Advisory Board on, but also something I spend the vast majority of my days at Uber having conversations externally and listening and learning from experts in this space.

Q. And as you've listened and learned and the Safety Advisory Board has been around since 2015, have you seen any

change or evolution within the company culture at Uber?

MS. WALSH: Objection, Your Honor, given the Court's pretrial rulings regarding culture.

THE COURT: I'll allow it.

Go ahead.

THE WITNESS: Yeah, I -- I think I -- there have certainly been a lot of changes. I think, as I shared, I've been at the company for ten years.

When I first joined, Uber was -- still felt like a bit of a small start-up honestly, and now we've grown significantly over time.

When I first joined, Uber -- it was clear to me that Uber was prioritizing and investing in safety, but I really noticed a change when we had our new CEO -- or he's not really new anymore, but our new CEO at the time, Dara Khosrowshahi, joined Uber and he really set such an incredible tone for the company.

He really pushed us and was absolute that we should be standing for safety, we should be doing the right thing as a company, and I think that really shifted things internally.

We did things like tripling the size of our safety team. We launched a whole slew of new safety features and really deepened our work in this space.

BY MS. BLAKE:

Q. And you mentioned Uber CEO, Mr. Khosrowshahi. Last week

the jury was shown a clip of Mr. Khosrowshahi's deposition, and he was asked some questions about whether or not he was aware of certain safety incidents.

Have you seen that clip now?

A. Yeah, I have.

Q. And -- again, based on your experience and knowing and working with Mr. Khosrowshahi, what did you think or what was your response to seeing that video deposition of him?

MS. WALSH: Objection, your Honor.

THE COURT: Sustained.

BY MS. BLAKE:

Q. How would you describe Mr. Khosrowshahi's leadership based on your experience and working alongside him on the Safety Advisory Board?

MS. WALSH: Objection, your Honor.

THE COURT: Well, I'll allow this.

THE WITNESS: I personally love working for a company where Dara is the CEO. Especially if you kind of look across broader tech companies, we kind of think of him as like the dad. He's just like -- he's really kind, really committed to his work. I'm obviously not in every meeting with him. I'm much more junior, but I've been in multiple rooms with him where we're talking about safety investments or what we should do on a safety issue.

He also regularly attends executive meetings with

the Safety Advisory Board members. So he hears directly from them what their thoughts are and what they want to see him do, and he's really committed. He's really passionate about safety. So I feel really proud to work for him and I -- I'm yeah, just really grateful to be at a company where he's -- he's at the helm.

BY MS. BLAKE:

Q. And based on your experience and time at Uber and your work with victim advocacy groups and Head of Central Public Policy, what has been your observation as to whether or not Uber prioritizes safety?

A. It's something that's really clear to me. I mean, I -- I am so proud and so impressed by the work that we do. It's something that I speak regularly to women's safety advocates about and they say, "Uber is doing the most on this issue out of any company or any organization that we work with. You are often the first to do something. You're often the ones to kind of push the boundaries and say, 'Okay, this might be a little bit risky, but we're going to go ahead and do it anyways.'"

So we absolutely prioritize it, and I think for me what's exciting is the work is never done. There's always something else that we could be building or investing in, and I'm really proud of that.

Q. And why was this -- apologies. I think I got -- went a

little too fast. Hold on one second, I apologize.

With respect to the safety that you were just discussing at Uber, you've been specifically involved in efforts around women's safety, true?

A. Yes.

Q. And do you have any insight in your role as Head of Central Public Policy as to the different types of resources that Uber has committed to safety since 2019?

A. Yes, I do.

Q. And what is reflective on this slide here?

A. This slide essentially provides a -- a overview of -- and, honestly, a conservative estimate of the money we've spent on safety since 2019 to present, but it provides a bit of a breakdown for our safety spend.

So all of the background check processes that are run, all of our consumer -- sorry, customer support agents, both paying them to do their job, but also helping them go through trainings, et cetera, and make sure that they're -- they're top class.

We also pay a number of vendors to do additional services for Uber. So one example is checking identity documents and making sure that they're valid when drivers are onboarding to the platform.

We have safety employees, so all of the people like me that work on safety at Uber. We have a bunch of different

safety education, and this is very broad. It's education internally for staff, for safety agents, but also education that we provide to drivers and to riders; and then we also have the RAINN Survivor Fund and Hotline, and this is also an industry first where we partnered with RAINN to set up this hotline and fund where if a survivor reports a safety incident to Uber, we're actually able to pass them off to a RAINN agent where they can provide even more support and they have access to a survivor fund that they can get funding from if they want additional financial support.
Q. Apologize.
A. No. And then just the Safety Advisory Board and, also, our work with advocates, which I know we'll come on to later.
Q. Yes, yes, that's what I was going to say.
And so on this slide you have about 1.3 billion dollars. Is that billion in safety funds with respect to these particular categories or areas?
A. Yes, it's a -- it's a conservative estimate across these categories. There's obviously so much work that we do day in, day out on safety; but it's sometimes pretty difficult to find a particular line item and a budget and say that is specific to safety. So this is our best effort attempt.
Q. So this -- what you have here is information -- or dollars that were spent directly on safety?
A. Yes, that's right.

***REPORTER'S CERTIFICATION***

I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 29th of January, 2026.

s/Teri Veres
TERI VERES, RMR, CRR