# EXHIBIT 1

Pages 1 - 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION. ) NO. 3:23-md-03084-CRB

San Francisco, California
Friday, August 14, 2026

**TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

PEIFFER WOLF CARR KANE CONWAY & WISE
555 Montgomery Street, Suite 820
San Francisco, CA 94111
BY: **RACHEL B. ABRAMS, ATTORNEY AT LAW**

GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
BY: **SARAH R. LONDON, ATTORNEY AT LAW**
**ANDREW KAUFMAN, ATTORNEY AT LAW**

ANAPOL WEISS
14 Ridge Square, NW, Suite 328
Washington, DC 20016
BY: **ALEXANDRA M. WALSH, ATTORNEY AT LAW**

CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY 10016
BY: **ROOPAL P. LUHANA, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY: Kendra A. Steppler, RPR, CRR
Official United States Reporter

over discovery. And I just have a sense that maybe everybody isn't quite getting along on discovery. What I did is the following: I sort of looked through very, very quickly, without really understanding what the disputes are, to see whether or not Judge Cisneros has these matters. And lo and behold, she does. So I decided, since she does, I'm not going to read any of it. It's up to her. It's up to her. She's aware of the trial date. You're all aware of the trial date. You're all aware that we're moving forward. And she's going to resolve these disputes, not me.

Though, she resolves the dispute and you're unhappy with the resolution, of course you have the right to come to me. And you have in the past and you presently have. And I'll decide those. I'll decide them quickly. And that's the process. We have a process.

I would suggest -- number three, I would suggest that this -- you can devote an enormous amount of time -- though, again, I didn't read it, in any detail, about things like The New York Times editorial or who's doing this or who's writing this article and who's saying that. It's all -- and I understand. I understand. Number one, it seems to be newsworthy. Number two, it seems to be very contentious. Number three, it's filled with mutual allegations of distrust, wrongdoing, improper behavior, on and on and on and on.

And it's hard not to be consumed by this or overwhelmed by

this. But guess what? I'm not. You guys may be. Maybe you are. You know, maybe this is what you think about 24/7. I don't know. You all know each other. I assume you're all very, very good friends with each other. And you all have a lot of respect for one another.

But say you all -- that you're in this battle. And the battle is now being consumed in your mind, on paper by all of these other -- I don't know -- I could describe them as collateral. That's probably a good term for it. Because it's not the issue. It's not the issue that the jury will have to decide.

You've gone through two trials together -- maybe more, for that matter -- and so you know each other. You know the issues. You know how you deal with it in front of a jury and in front of me. And now you're facing a third case. So I would just tell you to park all that stuff to the side and get on with this case. Get ready. Because -- because these bellwethers have some significance.

Okay. Number --

**MS. BROWN:** Your Honor, could I be heard?

**THE COURT:** Yes. Go right ahead.

**MS. BROWN:** Could I just be heard on that point for one second?

**THE COURT:** You sure can. Go ahead. As long as we don't get into any accusations.

**MS. BROWN:** I don't want to get into any accusations, Your Honor. And I hear you loud and clear that there's a process for discovery issues. And we, of course, will follow that.

I think what I did just feel compelled -- and why we put it in the CMC statement -- is to address what is extremely unusual and concerning, which are death threats that my colleagues and my clients are getting, Your Honor, as a result of this New York Times article. And I have been defending companies in mass tort litigation for more than 20 years. And I have never feared for the safety of my colleagues doing their jobs the way I have come to be afraid in the last week.

And so, Your Honor, we raise this not in any way to point fingers or call names, but to raise the seriousness of what has happened as a result of this article that is being promoted and praised in a way that is somewhat disappointing from my colleagues on the other side.

And Your Honor had asked us last time sort of what is needed to get to resolution. And I can tell you what is not needed is what the Court is describing as something that is very distracting, it's also inaccurate, and it's also become quite dangerous. And so we put that in there, Your Honor, to just raise with the Court reporting that completely contravenes conclusions the Court itself has made about the way Uber's lawyers have approached this litigation and conducted

themselves in front of you in these prior trials.

And so I hear the Court that we should not be distracted by this. But I do raise it just based on the seriousness of this, Your Honor. I mean, my colleagues are getting death threats. Like, they can't be at their homes. This is really serious.

**THE COURT:** Well, let me say a couple things about this. Because, first of all, I don't, for a moment, question the seriousness of the threats, nor do I question what may be the origin of these threats. Articles come out all the time. I'm no stranger to it, nor is any member of the federal judiciary a stranger to death threats based upon opinions. That is a sad commentary on litigation today. And maybe it's historically been that, but, today, it's -- even more so -- is that there are -- parties take positions. And they then -- as a result of taking positions, which may be legitimate positions -- they then are subject to threats of violence. That is unfortunate.

I think that -- now, I don't -- I am convinced, knowing all of you that are in front of me, you in no way condone any type of threat that would be -- that has been issued in connection with this litigation or reports of this litigation. I also want to point out a very practical thing that I've learned over time is you really can't control the press. You just can't.

You may think that the press -- first of all, they have a First Amendment obligation and duty and see it that they don't choose to be neutral. That they want to be able to say what they want to say. And I think they can. I think that obviously there are some limits. But those limits are not limits that -- or suggested course of conduct -- that the Court would impose for a variety of reasons.

Number one, I respect the First Amendment. And, number two, I also think that there are a lot of things that would simply be futile, you know, and then develop itself into a side show or a collateral matter of -- and impediment -- a serious impediment -- to resolving the litigation.

Now, I think -- so I choose basically not to get involved in these things, just because I don't think it will work. And I think I can make it worse, so I don't. On the other hand, I think it is important. And you're right, Ms. Brown, to communicate to everybody in a public forum that there is no -- no place for any threats of violence as a result of the litigation.

The lawyers -- I will also say, if it's helpful -- it may not be -- is that the lawyers that I have before me in -- I would say in the entire -- my entire experience in the Uber litigation, which now is over five years -- I've thought they were lawyers of the greatest integrity on both sides. Excellent lawyers. And I've said that. I've said that

continually. And it still is my view.

I'm not commenting on questions that are asked at the depositions. I don't know. I generally stay out of that. And I think for pretty good reason. If there are problems that develop as a result of it, you do have the opportunity of going to the Magistrate Judge and seeing if they can be addressed -- if they should be addressed or can be addressed.

But after saying all of that, I want to assure the parties that, in the voir dire process, I will take into account that there's been adverse publicity. And I will take into account that articles have come out. It's very important, when we select a jury, that a jury -- that a jury is fair. I don't know how else to put it. And if they've read things or seen things that would call into question their ability to be fair, I think we have to ferret that out. I don't have a problem with that.

**MS. BROWN:** Thank you, Your Honor.

**THE COURT:** Now, is that -- is that satisfactory? I don't know.

**MS. BROWN:** I --

**THE COURT:** I don't know that it gets any better or any worse. But it's not like -- it's not like the Court is putting its ostrich head in the sand. I understand that these things happen, and therefore, it is fair to address them. But I don't want to -- I don't want to suggest that one side or the

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, August 14, 2026

Kendra Steppler

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court