[Submitting counsel below]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION**

This Document Relates to:

*A.R.2 v. Uber Techs., Inc.*, No. 24-cv-7821

No. 3:23-md-03084-CRB

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COMMON CARRIER STATUS AND LIABILITY**

Judge: Honorable Charles R. Breyer
Date: December 17, 2026
Time: 9:00 A.M.
Ctrm.: 6-17th Floor

**REDACTED**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1
LEGAL STANDARD ........ 2
ARGUMENT ........ 3
I. Uber is a common carrier. ........ 3
A. A common carrier is a company that offers transportation to the public for money. ........ 3
B. Undisputed facts establish that Uber offers transportation to the public for money. ........ 4
1. Uber holds itself out as a transportation provider and vouches for the safety of its rides. ........ 4
2. Uber is, in fact, in the business of providing transportation. ........ 5
3. Uber's transportation services are on offer to the general public. ........ 5
4. Uber is not a mere broker for services offered by independent transportation providers, but rather exercises control over matching, fare setting, payment processing, route setting, ride monitoring, and incident response. ........ 5
C. Uber's counter-arguments do not show a genuine issue of material fact. ........ 7
1. California's CPUC regulation and TNC statute do not preclude Uber from being a common carrier. ........ 8
2. Uber may not avoid common-carrier duties by claiming status as a "broker," "arranger," "intermediary," or "platform." ........ 9
3. Uber's stated right to refuse service does not preclude it from being a common carrier. ........ 10
4. Uber's ride-specific fare calculations do not preclude it from being a common carrier. ........ 11
II. As a common carrier, Uber owes a non-delegable duty to transport passengers safely, a duty that is breached when a driver assaults a passenger. ........ 12
CONCLUSION ........ 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Air Evac EMS, Inc. v. Cheatham*,
910 F.3d 751 (4th Cir. 2018)........ 3

*Ariz. Corp. Comm'n v. Reliable Transp. Co.*,
346 P.2d 1091 (Ariz. 1959)........ 11

*Arpin v. Santa Clara Valley Transp. Agency*,
261 F.3d 912 (9th Cir. 2001)........ 2

*Berger v. S. Pac. Co.*,
144 Cal. App. 2d 1 (1956)........ 14

*Brill v. Indianapolis Life Ins. Co.*,
784 F.2d 1511 (11th Cir. 1986)........ 12

*Brown v. USA Taekwondo*,
11 Cal. 5th 204 (2021)........ 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........ 2

*Connell v. Call-A-Cab, Inc.*,
937 So.2d 71 (Ala. 2006)........ 15

*Doe v. Celebrity Cruises, Inc.*,
394 F.3d 891 (11th Cir. 2004)........ 14

*Doe v. Uber Techs.*,
2021 WL 2382837 (D. Md. June 9, 2021)........ 2

*Doe v. Uber Techs., Inc.*,
184 F. Supp. 3d 774 (N.D. Cal. 2016)........ 2, 3, 8, 12

*Doe v. Uber Techs., Inc.*,
2019 WL 6251189 (N.D. Cal. Nov. 22, 2019)........ 2, 11

*Equal Rts. Ctr. v. Uber Techs., Inc.*,
525 F. Supp. 3d 62 (D.D.C. 2021)........ 7

*Flytenow, Inc. v. F.A.A.*,
808 F.3d 882 (D.C. Cir. 2015)........ 11

*Gomez v. Super. Ct.*,
35 Cal. 4th 1125 (2005)........ 3, 4, 13

*Grotheer v. Escape Adventures, Inc.*,
14 Cal. App. 5th 1283 (2017)........ 7

*Hoffman v. Silverio-Delrosar*,
2021 WL 2434064 (D.N.J. June 15, 2021)........ 2

*Huang v. The Bicycle Casino, Inc.*,
4 Cal. App. 5th 329 (2016)........ 4, 12

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Grice*,
974 F.3d 950 (9th Cir. 2020) .... 4

*Interstate Com. Comm'n v. Baltimore & O.R. Co.*,
145 U.S. 263 (1892) .... 12

*Las Vegas Hacienda, Inc. v. C. A. B.*,
298 F.2d 430 (9th Cir. 1962) .... 3

*McCoy v. Pac. Spruce Corp.*,
1 F.2d 853 (9th Cir. 1924) .... 3

*McGettigan v. Bay Area Transit Dist.*,
57 Cal. App. 4th 1011 (1997) .... 13

*Morton v. De Oliveira*,
984 F.2d 289 (9th Cir. 1993) .... 14

*Murray v. Uber Techs., Inc.*,
486 F. Supp. 3d 468 (D. Mass. 2020) .... 2

*Namisnak v. Uber Techs., Inc.*,
444 F. Supp. 3d 1136 (N.D. Cal. 2020) .... 10

*Pennsylvania Co. v. Roy*,
102 U.S. 451 (1880) .... 15

*People v. Super. Ct.*,
81 Cal. App. 5th 851 (2022) .... 9

*People v. Uber Techs., Inc.*,
56 Cal. App. 5th 266 (2020) .... 5

*SeaBright Ins. Co. v. US Airways, Inc.*,
52 Cal. 4th 590 (2011) .... 13, 14

*Smith v. Magic Mountain LLC*,
106 Cal. App. 5th 1128 (2024) .... 3

*Smith v. O'Donnell*,
215 Cal. 714 (1932) .... 12

*Snyder v. S. Cal. Edison Co.*,
44 Cal. 2d 793 (1955) .... 13, 14

*Squaw Valley Ski Corp. v. Super. Ct.*,
2 Cal. App. 4th 1499 (1992) .... 3, 4, 9, 10

*State ex rel. Utils. Comm'n v. Bird Oil Co.*,
273 S.E.2d 232 (N.C. 1981) .... 12

*Triton Ener. Corp. v. Square D. Co.*,
68 F.3d 1216 (9th Cir. 1995) .... 2

*Van Arsdale v. Hollinger*,
68 Cal. 2d 245 (1968) .... 13

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Statutes**

Cal. Civ. Code § 2100 .......... 13

Cal. Civ. Code § 2168 .......... 3, 8

Cal. Pub. Util. Code § 5430 .......... 8

**Other Authorities**

13 Am. Jur. 2d *Carriers* .......... 10

Black's Law Dictionary, *Carrier* (12 ed. 2024) .......... 3

Mark Walker, N.Y. Times, *Travel Math: When Flying Costs as Much as the Train, Who Wins?* (Jan. 24, 2026) .......... 12

Melissa Kravitz Hoeffner, Forbes, *How Does Dynamic Pricing for Airlines Affect Your Travels?* (Mar. 11, 2024) .......... 12

Restatement (Second) of Agency .......... 13

## INTRODUCTION

Plaintiff A.R.2 moves for summary judgment on two issues under California law: (1) whether Uber is a common carrier; and (2) whether, as a result, Uber owed Plaintiff a non-delegable duty of care, a duty that was breached when an Uber driver assaulted her.

If the Court grants this motion, here is how the trial will work. For the common-carrier vicarious-liability claim, the only questions the jury will decide are whether the driver assaulted Plaintiff and the existence and amount of compensatory damages. Plaintiff will also try her direct negligence claim (under which, as a common carrier, Uber has a heightened and affirmative duty of care), as well as potentially other vicarious liability claims. Trying multiple claims will yield as much information as possible from this bellwether trial, including the availability and amount of punitive damages.

Turning back to the two questions at issue in this motion, the answer to both questions is "yes." *First*, under California law, just like that of many other states, a common carrier is one who holds itself out as offering transportation to the public for money. Undisputed facts show that to be exactly what Uber is and what Uber does. That is what the JCCP concluded last year. *In re Uber Rideshare Cases*, JCCP No. 5188, at 9-16 (July 31, 2025) (*JCCP Order*) (**Ex. A**). It is what this Court found in North Carolina, PTO 43 at 1-2 ("The undisputed factual record in this litigation demonstrates that Uber holds itself out to the public as a transportation provider through its ubiquitous advertising as well as the control it exerts over Uber rides and the safety of its passengers."), *appeal pending* (4th Cir. No. 26-1640).[1] It is what an arbitrator applying California law recently found in *Normandin v. Tran*, No. BWNKD, at 8 (Sig. Res. Arb. 2026) (**Ex. BB**) (finding Uber to be a common carrier because "it is undisputed, and beyond reasonable dispute, that Uber is an app-based transportation company which provides services to the general public for standardized fees"). And it is what many courts have determined at the motion-to-dismiss stage based on allegations that, here, are substantiated by undisputed evidence. *See* PTO 18 at 6 (under Florida and Illinois law: "There seemingly can be no doubt that … Uber would meet the definition

[1] Indeed, Uber has argued that the California definition of a common carrier is *more* expansive than the North Carolina definition. *See* ECF 5707 at 6 n.6. It follows that if Uber is a common carrier in North Carolina, then it is one in California as well.

of a common carrier.”).[2]

*Second*, as the Court explained in PTO 17, a common carrier’s duty to its passengers in California is non-delegable, such that the duty is breached when a driver assaults a passenger—“essentially a form of vicarious liability.” PTO 17 at 30-35; *see also* PTO 43 at 3 (same, North Carolina law); PTO 18 at 6-7 (applying same “longstanding principles of common law” under Illinois and Florida law); *Normandin* (Ex. BB) at 14 (finding Uber to be “a vicariously liable common carrier” liable for the negligence and intentional torts of its driver).

Partial summary judgment should be granted.

## LEGAL STANDARD

Summary judgment “should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor.” *Triton Ener. Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The moving party “bears the initial responsibility of” identifying the evidence that shows “the absence of a genuine issue of material fact.” *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies its burden, it is entitled to summary judgment if the non-moving party fails to designate “specific facts showing that there is a genuine issue for trial.” *Id.* at 324. The “mere existence of a scintilla of evidence in support of the non-moving party’s position is not sufficient” and “[f]actual disputes whose resolution would not affect the outcome of the suit are irrelevant.” *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (citation omitted).

---

[2] *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 786-787 (N.D. Cal. 2016) (finding allegations sufficient to establish “Uber is a common carrier” because “Uber’s services are available to the general public and [] Uber charges customers standardized fees for car rides”); *Doe v. Uber Techs, Inc.*, 2019 WL 6251189, at *6 (N.D. Cal. 2019) (holding that “Uber’s status as an app-based transportation network does not preclude it as a matter of law from being held liable as a common carrier”); *Murray v. Uber Techs., Inc.*, 486 F. Supp. 3d 468, 475-76 (D. Mass. 2020) (finding allegations sufficient to plead that Uber’s “ride-sharing service is available to the general public”); *Doe v. Uber Techs.*, 2021 WL 2382837, at 5* n.5 (D. Md. June 9, 2021) (“Uber offers no plausible reason to believe that it is not a common carrier[.]”); *Hoffman v. Silverio-Delrosar*, 2021 WL 2434064, at *5 (D.N.J. June 15, 2021) (“[Uber] Defendants are a common carrier because they employ drivers who transport passengers for a fee.”).

## ARGUMENT

### I. Uber is a common carrier.

#### A. A common carrier is a company that offers transportation to the public for money.

A "common carrier is generally defined as one who, by virtue of his calling and as a regular business, undertakes to transport persons or commodities from place to place, offering his services to such as may choose to employ him and pay his charges." *McCoy v. Pac. Spruce Corp.*, 1 F.2d 853, 855 (9th Cir. 1924); *see also Las Vegas Hacienda, Inc. v. C. A. B.*, 298 F.2d 430, 434 (9th Cir. 1962) ("[T]he dominant factor in fixing common carrier status at common law is the presence of a 'holding out' to transport the property or person of any member of the public who might choose to employ the proffered service."); *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 764 (4th Cir. 2018) ("A common carrier need not be available to every member of the public; it is enough that the service be available on open terms to even a segment of the population."); Black's Law Dictionary, *Carrier* (12 ed. 2024) (defining "common carrier" as "[a] commercial enterprise that holds itself out to the public as offering to transport freight or passengers for a fee").

California applies the same definition. For "the purposes of tort claims, California law defines 'common carrier' as follows: Every one who offers to the public to carry persons, property, or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." *Doe*, 184 F. Supp. 3d at 786 (quoting Cal. Civ. Code § 2168). Therefore, "a common carrier within the meaning of § 2168 is any entity which holds itself out to the public generally and indifferently to transport goods or persons from place to place for profit." *Id.* (quoting *Squaw Valley Ski Corp. v. Super. Ct.*, 2 Cal. App. 4th 1499, 1508 (1992)). The "expansive" statutory definition, which essentially codifies the common law standard, encompasses all types of transportation services. *See Gomez v. Super. Ct.*, 35 Cal. 4th 1125, 1131-32 (2005). As "technology evolved, the universe of common carriers evolved to encompass operators of streetcars, airplanes, buses, taxicabs, and rideshares like Uber." *Smith v. Magic Mountain LLC*, 106 Cal. App. 5th 1128, 1136 (2024); *see also Gomez*, 35 Cal. 4th at 1131-32 (escalators, elevators, sightseeing flights, ski lifts, roller coasters).

To be a common carrier, a "party need not have a regular schedule or a fixed route … nor … a transportation license." *Huang v. The Bicycle Casino, Inc.*, 4 Cal. App. 5th 329, 339 (2016). It is also not necessary that a carrier "maintain an established place of business solely for purposes of transporting … passengers," as "'commercial operators of elevators and escalators' may be common carriers for reward." *Id.* (quoting *Gomez*, 35 Cal. 4th at 1131). Finally, "the 'public' does not mean everyone all of the time; naturally, passengers are restricted by the type of transportation the carrier affords. One may be a common carrier though the nature of the service rendered is sufficiently specialized as to be of possible use to only a fraction of the total population. To be a common carrier, the entity must merely be of the character that members of the general public may, if they choose, avail themselves of it." *Squaw Valley*, 2 Cal. App. 4th at 1509-10 (citations omitted). An entity can be a common carrier even if certain "statutes pertaining to carriers of persons for reward" do not "apply" to that particular "form of transportation." *Gomez*, 35 Cal. 4th at 1141.

### B. **Undisputed facts establish that Uber offers transportation to the public for money.**

#### 1. **Uber holds itself out as a transportation provider and vouches for the safety of its rides.**

Uber holds itself out as a transportation provider. For example, Uber advertises to the public: "Ride with Uber," Ex. B at 560:6-19 & Ex. C; "Let us take you where you need to go," Ex. B at 563:17-564:7, Ex. C; Ex. D; and "we'll also get you to and from the airport … we'll get you there," Ex. B at 564:8-568:4 & Ex. E. "Uber describes itself as providing rides to people" and "offers to sell rides to people." Ex. B at 556:6-22. From the public's perspective, Uber's service is materially indistinguishable from "a technologically advanced taxicab company." *See In re Grice*, 974 F.3d 950, 957 (9th Cir. 2020).

When Uber holds itself out as a transportation provider, it also vouches for the safety of the rides themselves. In 2015, Uber acknowledged, "we argue everywhere that we are the safest ride on the road …." *See* Ex. F at 99:11-103:8; Ex. G at 1739181. Uber advertises: "Safe, reliable pickups within minutes." Ex. B at 561:21-562:3 & Ex. C. In doing so, it is "holding out these rides that it is providing as safe and reliable." Ex. B at 561:21-562:3. Anybody downloading the Uber App from the Android store in December 2017 would have seen this representation: "4 Reasons to

Ride with Uber … Safety is our priority." Ex. H at 136:17-138:13; Ex. I at 5757329. Anybody downloading the Uber App from the Apple store in December 2024 would have seen Uber's tagline: "Ride safely with Uber." Ex. H at 142:24-143:20; Ex. I at 5757356. Uber vouches for the safety of its rides because: "Safety is a necessary condition for our industry. It's a fundamental expectation in transportation." Ex. J at 67473. Indeed, Uber held itself out to provide transportation services directly to the Plaintiff in this case: *See*, *e.g.*, Ex. AA (to A.R.: "… ride with Uber.").

**2. <u>Uber is, in fact, in the business of providing transportation.</u>**

Uber does not merely hold itself out as a transportation provider; it is in fact a transportation provider. *See People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 298 (2020) (noting the "basic fact that providing transportation is part of Uber's usual course of business"). Uber "offers to sell rides to people," and "does, in fact, sell rides to people." *See* Ex. B at 556:20-557:1. Uber's customers call "an Uber" driven by an "Uber driver." Ex. GG (social media posts). Travis Kalanick, Uber's founder and former CEO, attests that Uber's "business is providing rides to passengers." *See* Ex. K at 104:1-3, 17-19. Kate Parker, Uber's Former Global Director of Product Marketing, Brand Management, & Strategic Initiatives, affirmed that Uber "offers transportation as a part of its business service" and "takes people from place to place for money." Ex. L at 390:5-13. Indeed, "Uber exists to provide rides for people." *See* Ex. M at 69:1-4.

**3. <u>Uber's transportation services are on offer to the general public.</u>**

Uber does not just provide rides to a select group, but rather offers its rides to the general public. *See* Ex. N at 145:24-146:3 ("I would say when it comes to passengers, Uber is mindful of not discriminating and making sure that Uber is available to everyone everywhere."). Any teenager or adult in the United States can sign up for an Uber account. *See* Ex. B at 557:2-13. Uber would ideally like everyone in the United States who falls within the permitted age range to buy rides from Uber. *Id.* at 557:14-22.

**4. <u>Uber is not a mere broker for services offered by independent transportation providers, but rather exercises control over matching, fare setting, payment processing, route setting, ride monitoring, and incident response.</u>**

Uber does not broker the services of professional drivers who own independent

transportation businesses. Rather, Uber works with drivers who are not required to, and may not, have any professional driving experience. *See* Ex. M at 12:10-21. To be an Uber driver, someone need only have an active driver's license for one year. *Id.* at 12:22-13:13. Uber drivers need not even own a car. Uber partners with rental agencies where potential Uber drivers can rent vehicles. *See* Ex. O at 274:4-8.

Uber's transportation business does not function like Airbnb or other platforms that allow the customer to browse and then select from among independent providers whose goods or services are offered via the platform. Instead, when an Uber passenger wants a ride, she uses the Uber App to send the request to Uber. *See* Ex. P at 84:9-15. When Uber receives a ride request, it pairs and dispatches a particular driver. *See* Ex. Q at 131:16-20. Uber chooses which driver to dispatch. *See id.* at 133:20-134:3; *see also* Ex. R at 157:9-13 & 158:21-159:6; *WHB 823* Ct. Ex. 2 at 102:07-15 (agreeing that "Uber dispatched" the driver). Uber does not give riders a menu of drivers to choose from. *See* Ex. S at 359:4-14; *WHB 823* Ct. Ex. 2 at 102:13-15. "Uber does not let the passenger choose their driver." Ex. T at 321:16-19; *see also id.* at 320:13-321:15. Indeed, a rider does not have any input into which driver is dispatched to her. *See* Ex. R at 159:7-11; *WHB 823* Ct. Ex. 2 at 102:13-15. If a driver declines a ride, then Uber sends another driver. *See* Ex. FF.

Uber does not let drivers set their own prices. Rather, Uber sets the fare. *See* Ex. U at 346:12-15. Uber also handles and controls the money, collecting the fare for a given trip from the passenger, and disbursing some of that fare to the driver. *See* Ex. T at 323:14-324:4. Uber does not assess a flat fee for discreet services performed, but rather keeps a portion of the fare (the payment for the trip itself). *See* Ex. V at 232:12-23; *see also* Ex. P at 84:20-23. Uber determines in its own discretion when to issue refunds for rides, *see Dean* Trial Ex. P-03435, and offers passengers the option to "tip" their driver, *see Dean* Trial Ex. P-03237 at 99. Uber even manipulates fares based on its own marketplace goals. As Uber's Head of Product testified in the *Dean* trial, when Uber was considering rolling out female matching, "the kinds of decisions we had to make was do we charge this female rider more because they're asking this female driver to drive much longer? … [W]e made a decision that 'no,' we were going to charge this female rider the exact same price as Uber X, so you see the same prices[.]" *Dean* Trial Tr. at 3312:19-23.

Uber is involved in the details of rides. It requires vehicle inspection documents to ensure each vehicle is fit for purpose and roadworthy. *See* Ex. W at 556:20-557:5. Through its "RideCheck" program, Uber monitors each ride in real time for anomalies, including long stops, midway drop-offs, route deviations, and crashes. *See* Ex. X at 14:8-15, 16:5-16, 49:24-50:5. If Uber detects an anomaly, it messages the driver or passenger: "Hey, it looks like something is going out of the normal, based on the original program of this trip. Is everything okay? Do you need any help?" *Id.* at 50:6-19; *see also id.* at 14:8-15.

Uber is also responsible for responding to on-trip safety incidents. It tracks safety incidents that occur during rides. *See* Ex. M at 269:10-16. It does not give passengers or drivers a way to contact each other after a ride ends. *See* Ex. T at 324:13-16. Rather, it intends for riders to report safety incidents directly to Uber. *See* Ex. Y at 15, 28, 34. Uber has a specialized team that provides customer support to riders and drivers reporting the most serious safety incidents, including sexual assault. *Id.* at 12. Uber publicizes the numbers of on-trip sexual assault incidents in its Safety Report. *See id.* at 58-59.

The "key inquiry in the common carrier analysis is whether passengers expect the transportation to be safe because the operator is reasonably capable of controlling the risk of injury." *Grotheer v. Escape Adventures, Inc.*, 14 Cal. App. 5th 1283, 1295 (2017). Just so here. *See* PTO 43 at 1-2 (finding dispositive "the control [Uber] exerts over Uber rides and the safety of its passengers"); *JCCP Order* at 13 ("The Court finds that Uber is the 'operator' of a rideshare service, even if the vehicles it utilizes are owned and driven by individual drivers, because Uber has substantial control over its passengers' safety.").

More broadly, Uber lacks additional control only because it has chosen not to exercise it. Uber drivers "operate within a market that Uber itself created; Uber drivers do not exist independent of Uber's app." *Equal Rts. Ctr. v. Uber Techs., Inc.*, 525 F. Supp. 3d 62, 84 (D.D.C. 2021). "Uber is much more than a mere 'conduit' between riders and drivers," and its decision to delegate some aspects of Uber rides to Uber drivers does not mean Uber is no longer a "carrier" at all. *Id.* at 85.

**C. <u>Uber's counter-arguments do not show a genuine issue of material fact.</u>**

Uber has advanced various arguments as to why it is not a common carrier. Those arguments

should be rejected.

**1. California's CPUC regulation and TNC statute do not preclude Uber from being a common carrier.**

As in other states, Uber's principal argument for why it is not a common carrier is that state TNC regulation makes it not one, no matter what that regulation says (or does not say) on the subject. The Court rejected this argument in North Carolina and should do so again in California. *See* PTO 43 at 2 ("Had the North Carolina legislature so desired, it could have modeled its TNC statute after states like Florida and Texas that explicitly exempted Uber and other rideshare providers from common carrier liability … But the legislature did not do so, and therefore Uber cannot use its strained explanation of the TNC regulatory environment to manufacture a statutory limitation on Uber's common law tort liability where one does not actually exist.").

Uber, through its lobbyist expert Joseph Okpaku, asserts that it "has been treated by regulators" in California "as distinct from common carriers." *See* Ex. Z at 29-36. But Mr. Okpaku does not cite any statute or regulation in California stating that Uber is not a common carrier. To reiterate, in California, a statute defines common carriers for tort purposes. *See Doe*, 184 F. Supp. 3d at 786 (quoting Cal. Civ Code § 2168). Mr. Okpaku discusses the history of the California Public Utilities Commission's regulation of Uber, but never cites any statement by the CPUC seeking to modify § 2168 (or discussing tort liability at all). Nor does Mr. Okpaku cite any evidence that the CPUC had the authority to exempt Uber from common-carrier liability even if it had tried.

Next, Mr. Okpaku insinuates that California's 2014 TNC statute (Cal. Pub. Util. Code § 5430, et seq.) impliedly modified § 2168 based on two snippets of legislative findings describing "transportation network companies" as a "new category of charter-party carriers" and referencing "the rapidly evolving transportation network company service." Ex. Z at 31. But, as Judge Schulman in the JCCP noted:

> [I]t is significant that the Legislature enacted the TNC statutes in 2014 without amending Civil Code section 2168. Had the legislature intended to exempt rideshare companies from common carrier status for the purpose of tort liability, it easily could have amended Civil Code section 2168 to accomplish this objection. Likewise, Proposition 22, enacted by the voters in the November 2020 election, is silent on the subject of rideshare companies' status as common carrier.

*JCCP Order* at 15 n.10.

Mr. Okpaku essentially argues that the TNC statute impliedly repealed § 2168 as applied to Uber. But, in California, "all presumptions are against a repeal by implication," presumptions that apply in full force to "partial repeals that occur when one statute implicitly limits another statute's scope of operation." *People v. Super. Ct.*, 81 Cal. App. 5th 851, 863, 870 (2022) (citation omitted). Courts find implied repeal "only when there is no rational basis for harmonizing the two potentially conflicting statutes, [] the statutes are irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operations," and "the later provision gives *undebatable evidence* of an intent to supersede the earlier." *Id.* at 863 (internal quotation marked omitted; alteration in original).

Section 2168 and the 2014 TNC statute can be easily harmonized: one concerns the tort duties transportation providers owe to their passengers; the other deals with how transportation network companies are regulated by the CPUC. In *Squaw Valley*, for example, the court assigned common-carrier tort liability against a ski lift even though the Public Utilities Code "exempts ski lift facilities from the definition of 'common carrier' as used for the purpose of regulation and supervision by the Public Utilities Commission." 2 Cal. App. 4th at 1510. The court explained why the Public Utilities Code did not impliedly modify § 2168: "[T]hese sections are in separate codes encompassing separate statutory schemes with distinct and different purposes, and [the Public Utilities Code] says nothing with respect to common carrier status in tort actions.'" *Id.* at 1510-11. Therefore, "a transportation company may be exempt from regulation by the PUC as a common carrier … but may occupy the status of common carrier for tort liability purposes under Civil Code section 2168." *Id.* at 1513. Accordingly, the 2014 amendments to the Public Utilities Code did not modify § 2168 because "full effect can be given to all of their provisions." *People*, 81 Cal. App. 5th at 873. And the "evidence" Mr. Okpaku cites establishes nothing, let alone undebatable proof of "intent to repeal" § 2168 in part. *Id.* at 884.

### 2. <u>Uber may not avoid common-carrier duties by claiming status as a "broker," "arranger," "intermediary," or "platform."</u>

In North Carolina, Uber argued that, rather than being a carrier, "operational realities" show that it is a "mere arranger of transportation." ECF 5475 at 13, 15. They do not. *See* PTO 43 at 1-1 ("The undisputed factual record in this litigation demonstrates that Uber holds itself out to the

public as a transportation provider through its ubiquitous advertising as well as the control it exerts over Uber rides and the safety of its passengers.”). It does not matter that Uber does not physically operate the vehicles: A company “can qualify as a carrier … regardless of who actually transports them.” 13 Am. Jur. 2d *Carriers* § 1 (2026). What matters is “how [the company] represents itself to the world.” *Id.*

A “mere arranger” does not spend billions of dollars vouching for the safety of the transportation it “arranges.” *See* Ex. CC (30(b)(6) Dep.) at 35:2-4 (acknowledging that “[redacted]”); Ex. G (“we argue everywhere that we are the safest ride on the road”). A “mere arranger” does not monitor rides through GPS and intervene when something unexpected happens in transit or limit communication between the driver and the passenger to its own channels. A “mere arranger” does not determine prices based on its own marketplace goals. And a “mere arranger” would afford the rider some freedom to choose among drivers.

For these reasons, in California, a “number of cases have considered contentions that ride-sharing companies such as Lyft and Uber are in the business solely of creating technological platforms, not of transporting passengers, and have dismissed them out of hand.” *JCCP Order* at 12 (quoting *Uber Techs.*, 56 Cal. App. 5th at 292); *see also, e.g.*, *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020) (“Uber’s claim that it is ‘not a transportation company’ strains credulity, given the company *advertises itself* as a ‘transportation system.’”).

**3. <u>Uber’s stated right to refuse service does not preclude it from being a common carrier.</u>**

Uber has argued that it is not a common carrier because its Terms of Use reserve the right to refuse service, a right that it exercises. But “[t]o be a common carrier, the entity merely must be of the character that members of the general public may, if they choose, avail themselves of it.” *Squaw Valley*, 2 Cal. App. 4th at 1509-10. That is exactly Uber’s character: Uber provides rides to “anybody with an account,” Ex. B at 557:2-3, and “make[s] sure that Uber is available to everyone everywhere,” Ex. N at 146:1-9. And “common carrier liability can attach even for transportation services that are of possible use to only a fraction of the population.” *JCCP Order*, at 14 (quoting

*Doe*, 2019 WL 6251189, at *6).

Uber "undoubtedly 'undertakes as a business to carry for all people indifferently' even if it can and occasionally does bar unruly passengers, just as any bus driver is empowered to do." PTO 43 at 2 (citation omitted); *see also Doe*, 2019 WL 6251189, at *6 (rejecting argument that "Uber … is not a common carrier because of conditions that are placed on who can use and be connected with drivers via the app"); *Flytenow, Inc. v. F.A.A.*, 808 F.3d 882, 885 (D.C. Cir. 2015) (common carrier despite fine print saying carrier could reject passenger "for any or no reason"). *Ariz. Corp. Comm'n v. Reliable Transp. Co.*, 346 P.2d 1091, 1099-1100 (Ariz. 1959) ("Nor can a carrier which holds itself out to the public as being a common carrier divest itself of that character because it has a secret or private intention to reserve the right to refuse to serve such parties as it objects to, or because it may, even upon occasion, exercise such right …").

**4. <u>Uber's ride-specific fare calculations do not preclude it from being a common carrier.</u>**

Finally, Uber has argued that its algorithmic pricing model, by taking into account supply and demand, means that it lacks a "uniform tariff" and so is not a common carrier. ECF 5475 at 19. This Court rejected the same argument in North Carolina, finding that "[w]hile the pricing of each Uber ride does hinge on a variety of variables specific to that ride, the terms still ultimately qualify as a uniform tariff because they are 'equally available, and on the same terms, to all' as opposed to the product of individualized bargains between each passenger and Uber." PTO 43 at 2. The JCCP similarly concluded that Uber "charges standard rates for its services." *JCCP Order* at 15. The conclusions were correct: A person cannot open the Uber app, see Uber's proposed fare, and make a counter-offer. *See* Ex. DD (Joyce Dep.) at 137:12-139:5 ("[redacted]").

Dynamic pricing is wholly consistent with being a common carrier. Common carriers have long adjusted their rates with market conditions. Railroad companies in the 1800s, for example, would vary their prices as market factors changed, offering "reduced rates to passengers making

frequent trips" or "trips for long distances." *Interstate Com. Comm'n v. Baltimore & O.R. Co.*, 145 U.S. 263, 279 (1892). Today, many common carriers, including Amtrak and airlines, use algorithms to automatically adjust their fares as market conditions fluctuate. *See*, *e.g.*, Mark Walker, N.Y. Times, *Travel Math: When Flying Costs as Much as the Train, Who Wins?* (Jan. 24, 2026); Melissa Kravitz Hoeffner, Forbes, *How Does Dynamic Pricing for Airlines Affect Your Travels?* (Mar. 11, 2024). They are still common carriers. Nothing prevents them from charging "different rates for service rendered under varying conditions." *State ex rel. Utils. Comm'n v. Bird Oil Co.*, 273 S.E.2d 232, 237 (N.C. 1981); *see also Brill v. Indianapolis Life Ins. Co.*, 784 F.2d 1511, 1515 (11th Cir. 1986) (explaining that a company was a common carrier even though it "was particularly focused on meeting the" particular passenger's "needs," and explaining that "accomodat[ing] itself to the customer's particular needs in order to transport him … does not negate common carrier status").

In any event, whether a carrier charges "standard rates" is merely one factor "bearing on a party's common carrier status." *Huang*, 4 Cal. App. 5th at 339. "It is not necessary for one to be classified as a common carrier that [its] rate[s] be fixed." 13 Am. Jur. 2d *Carriers* § 6. The ultimate question, the "real test," is "whether [the party] holds out, either expressly or by course of conduct, that he will carry for hire, so long as he had room … all persons indifferently …." *Smith v. O'Donnell*, 215 Cal. 714, 718-19 (1932) (citation omitted). Uber does.

## II. <u>As a common carrier, Uber owes a non-delegable duty to transport passengers safely, a duty that is breached when a driver assaults a passenger.</u>

"Uber's status as a common carrier gives rise to an independent basis for vicarious liability," since its duty to transport passengers safely is non-delegable. PTO 17 at 32; *see also Doe*, 184 F. Supp. 3d at 787 (same); *Normandin* (Ex. BB) at 14 (same). Uber "must use the utmost care and diligence for passengers' safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill. If, instead of exercising the utmost care and diligence for passengers' safe carriage, a driver assaults the passenger, then Uber's non-delegable duty has been breached." PTO 17 at 33 (citation and quotation marks omitted). This conclusion, which the Court reached in PTO 17, was correct and controls here.

The "nondelegable duties doctrine prevents a party that owes a duty to others from evading

responsibility by claiming to have delegated that duty to an independent contractor hired to do the necessary work. The [nondelegable duties] doctrine applies when the duty preexists and does not arise from the contract with the independent contractor." *SeaBright Ins. Co. v. US Airways, Inc.*, 52 Cal. 4th 590, 600-01 (2011). In other words, a non-delegable duty attaches where "the law imposes a definite, affirmative duty upon one by reason of his relationship with others." *Snyder v. S. Cal. Edison Co.*, 44 Cal. 2d 793, 800 (1955); Restatement (Second) of Agency § 214 (1958) ("A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty."). It "is immaterial whether the duty thus regarded as 'nondelegable' be imposed by statute, charter or by common law." *Van Arsdale v. Hollinger*, 68 Cal. 2d 245, 251 (1968) (giving as examples duty owed by an "owner of land … toward invitees" and duties imposed by statute).

In California, common carriers owe their passengers an affirmative duty of protection; they must use the "utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." Cal. Civ. Code § 2100. This "affirmative duty to protect" arises from the "[r]elationships between … common carriers and passengers." *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 216 (2021); *see also Gomez*, 35 Cal. 4th at 1134 (explaining that "common carriers are held to a high standard of care because passengers entrust common carriers with their personal safety, have little if any opportunity to protect themselves from harm caused by a common carrier, and pay the carrier for safe transportation") (internal quotation marks omitted); *McGettigan v. Bay Area Transit Dist.*, 57 Cal. App. 4th 1011, 1016-17 (1997) (explaining that where "the defendant stands in a special relationship to the plaintiff," he has an "affirmative duty to render assistance," and the "special relationship of common carrier and passenger gives rise to the highest duty of care"); Restatement (Second) of Torts § 314A (1965) ("A common carrier is under a duty to its passengers to take reasonable action … to protect them against unreasonable risk of physical harm."). Uber itself recognizes that its business of "transportation" creates a "fundamental expectation" of "[s]afety," Ex. J, and that "[redacted]" Ex. CC at 35:2-4.

Accordingly, the duty "preexists and does not arise from the contract with the independent contractor," *SeaBright*, 52 Cal. 4th at 600-01, is an "affirmative duty upon one by reason of his relationship with others," *Snyder*, 44 Cal. 2d at 800, and therefore is non-delegable. *See also* Restatement (Second) of Agency § 214, cmt. e (citing the "relation of carrier and passenger" as a prototypical example of one that creates a nondelegable duty to protect; *Morton v. De Oliveira*, 984 F.2d 289, 290-92 (9th Cir. 1993) (explaining that a common carrier's nondelegable duty is a "widely adopted rule" that has a "meaningful basis" grounded in the "relationship" giving rise to a "duty of protective care that he may not delegate") (citation omitted).

The consequence of this non-delegable duty is that, if "instead of exercising the utmost care and diligence for a passenger's safe carriage, a driver assaults the passenger, then Uber's non-delegable duty has been breached." PTO 17 at 33; *see also Berger v. S. Pac. Co.*, 144 Cal. App. 2d 1, 6-7 (1956) (common carrier liable for sexual assault by porter); *Morton*, 984 F.2d at 290-92 (cruise line liable for crew member's rape of a passenger based on the "general rule" that "a carrier is liable to its passengers for assaults by employees prompted by purely personal motives") (citation omitted); *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 913 (11th Cir. 2004) (cruise line "defendants owe a non-delegable duty to protect their passengers from crew member assaults and thereby safely transport their cruise passengers … and thus [] the district court did not err in concluding that the defendants are strictly likely for crew member assaults on their passengers during the cruise"); Restatement (Second) of Torts § 409 (1965) (employer not responsible for acts of independent contractor except where under a non-delegable duty).

As the Court explained in PTO 17, this conclusion follows from *Berger*. There, the plaintiff, a passenger in a Southern Pacific train's sleeping car, was sexually assaulted by a porter working for the defendant while she slept under the influence of a sedative medication. 144 Cal. App. 2d at 5. The court affirmed liability for the passenger against the train company, even though there was no evidence that the company had been negligent, and no evidence that the violent assault was within the scope of the porter's employment:

> A contract of transportation implies protection to the passenger against acts of personal violence by the agents or employees of the carrier. Accordingly, a carrier is liable for acts of assault and battery upon the part of its employees resulting in injury to those it has agreed to transport upon its facilities. This liability extends not only to cases where the assault was in the line of the employee's duty, but also to those instances where the act was merely that of an individual and entirely disconnected with the performance of the agent's duties, as where the conductor of a train kisses a female passenger against her will. … The liability of a common carrier for an assault by one if its employees on a passenger is not dependent on the question as to whether the employee was acting within the scope of his authority or in the line of his duty, but is based upon its broad duty as a common carrier to protect its passengers from assault.

*Id.* at 6-7 (citation omitted). As determined in PTO 17, *Berger* remains good law in California and controls here. PTO 17 at 33-34. In California, as in other jurisdictions, a common carrier may not "evade [its] duty" of safe transport "through any device or arrangement," *Pennsylvania Co. v. Roy*, 102 U.S. 451, 457 (1880), including the "use of independent contractors," *Connell v. Call-A-Cab, Inc.*, 937 So.2d 71, 75-76 (Ala. 2006).

## CONCLUSION

For these reasons, the Court should grant Plaintiff partial summary judgment.

Dated: November 13, 2026

Respectfully submitted,

By: */s/ Sarah R. London*
Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: */s/ Rachel B. Abrams*
Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: November 13, 2026 By: */s/ Andrew R. Kaufman*
Andrew R. Kaufman