# EXHIBIT Z

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:23-md-03084-CRB |
| This Document Relates to:<br><br>ALL ACTIONS | Judge: Hon. Lisa J. Cisneros<br>Courtroom: G – 15th Floor |

# EXPERT REPORT OF JOSEPH O. OKPAKU

**JOSEPH O. OKPAKU**
**696 Athol Avenue**
**Oakland, CA 94610**

***September 26, 2025***

**INTRODUCTION**

My name is Joseph Okpaku. I am the co-founder of The Forest Consulting, LLC, a consulting firm that provides advice and strategic counseling matters relating to government relations, public policy, and public affairs. I have been retained by Kirkland & Ellis LLP to provide my expert opinion in the litigation captioned *Uber Technologies, Inc., Passenger Sexual Assault Litigation*, Case No. 3:23-md-03084-CRB, United States District Court, Northern District of California[1], regarding the following:

- Industry standards regarding safety in for-hire transportation;
- The history and evolution of the rideshare industry;
- Uber's compliance with applicable legal requirements and industry standards;
- The evolving context for evaluating comparative safety;
- Uber's safety policies and practices;
- The comparative safety of the rideshare industry versus other forms of transportation;
- The lack of Uber control over third-party drivers; and
- The characteristics of transportation network companies that differ from common carriers.

**Qualifications**

I received my BA in Communications Studies from UCLA in 1994, and my JD from Georgetown University Law Center in 1997. I received my license to practice law in the state of New York in 1997[2] and worked as an Assistant District Attorney in the New York County (Manhattan) District Attorney's Office from 1997 until early 2002. During my time at the District Attorney's office, I prosecuted hundreds of misdemeanor and felony cases involving crimes ranging from domestic violence cases to drug possession and sale cases. I tried over a dozen cases to verdict and presented numerous cases to grand juries.

From 2002 until 2004, I worked as an associate for a firm then known as Edwards & Angell LLP, where I handled matters involving toxic torts, insurance and reinsurance issues, attorney discipline, as well as pro bono cases on behalf of victims of 9/11. From 2005 until early 2010, I worked for the New York Stock Exchange's Division of Enforcement, where I investigated, prepared, and brought disciplinary cases against member firms and member firm employees.

---

[1] I understand that Wave 1 Bellwether Plaintiffs allege incidents in three states: California, Arizona, and North Carolina. Because of this, this report addresses the regulatory framework in those three states.
[2] I officially retired from the practice of law in 2017.

In 2010, I moved to San Jose, California, where I served as Chief of Staff for then-councilmember Ash Kalra, District 2, San Jose. I worked in this capacity until October 2013, at which point I was hired at Lyft as a Policy Manager. At this time, cities and states were just beginning to determine how to regulate the ridesharing industry, and there were only two jurisdictions that had enacted any form of regulation for ridesharing: the District of Columbia (by way of a temporary ordinance in September of 2013, followed by a permanent ordinance in 2014) and California (by way of rulemaking undertaken by the California Public Utilities Commission in September 2013[3]).

Lyft promoted me to Director of the Lyft Government Relations team in 2014. At this time, many cities and states had begun considering legislation for the ridesharing industry. My official responsibilities were to oversee all legislation for the eastern half of the United States; however, during this time I was also the de facto Legislative Counsel for the Government Relations team, which meant that I read and reviewed every piece of city, county or state legislation being considered for the ridesharing industry, and frequently reviewed the corresponding laws and regulations for the taxi industry in those jurisdictions.

In November 2015, I was promoted to VP of Government Relations, taking over responsibility for the entire team and all policy matters for the company. By this time, ridesharing legislation was being adopted at the state level more often than at the city level due to the inter-jurisdictional nature of ridesharing. By the end of the year, a majority of states had either already enacted ridesharing legislation or were considering enacting such legislation. I worked for Lyft in this VP capacity until I left Lyft in February 2019. At the time of my departure from Lyft, over 40 states had enacted legislation enabling and regulating the ridesharing industry.

During my time at Lyft, I reviewed every piece of legislation being considered for the ridesharing industry in the United States and Canada. I also became very familiar with the regulations and requirements for the taxi industry in numerous jurisdictions, including background check processes and procedures as well as other requirements for the taxi industry. In general, I became well-versed on safety-related practices, procedures and requirements for the for-hire vehicle industry as a whole and the rideshare industry specifically.

While employed at Lyft, I testified numerous times at city or state legislative hearings and regulatory proceedings. I testified twice before Congress primarily on the topic of autonomous vehicles. I also "published" two articles on Medium during my tenure with Lyft.[4] In addition, during my time at Lyft, the conversation regarding the "gig economy" and its broader societal impacts began to become an issue of local, state and national interest, both within the rideshare context and beyond. These discussions often focused on the economic costs and benefits of the gig economy, the intersection of the gig economy and long-standing employment-related classifications, and the impact of the gig economy on certain segments of society (for example,

---

[3] The California PUC had previously issued what became known as a "temporary operating agreement" to regulate ridesharing while the commission conducted a lengthy inquiry into the nascent industry.
[4] https://medium.com/@joe_o_65233/our-commitment-to-our-community-7cd62ce3ec29; https://medium.com/@joseph_1168/new-rules-will-take-us-backwards-efc79f81f4da

the impact on people of color, immigrants, people of lower income levels, etc.). Since Lyft was one of the higher profile gig-economy companies during the 2010s, it frequently was asked to participate in these discussions in several different contexts: legislative, think tank, symposia, conferences, etc. As the head of Lyft's Government Relations team, I frequently represented Lyft in these discussions. For example, I participated in the following:

- White House Frontiers Conference
- The Aspen Institute's Future of Work Initiative
- Shift: The Commission on Work, Workers and Technology
- The Atlantic's Future of Work Conference
- Sharing Economy-Sharing City: Urban Law and the New Economy (Fordham Urban Law Center)
- Stanford Law School's Directors' College (twice)
- Harvard University's Charles Hamilton Houston Institute for Race and Justice: "Whose Fair Share: Opportunity and Inclusion in the Sharing Economy"
- The New Partners for Smart Growth Conference
- Rail-volution Conference
- Nevada Governor's Conference on Business

During my time at Lyft, it was my responsibility to review academic or other studies regarding the gig economy, and to maintain a high level of knowledge and awareness about the public debate regarding the gig economy, and as a result I would regularly engage with leaders at other gig-economy companies, including Uber, DoorDash, airBnB, Sidecar, Honor, Handy, and others, on these issues. I also frequently engaged with representatives of U.S. labor unions, and other organizations such as the Freelancers Union on issues pertaining to the gig economy.

After leaving Lyft in early 2019, I was the Chief Policy Officer for Booster Fuels, Inc., a mobile fueling company based in San Mateo, CA, from April 2019 until July 2022. Since then, I have been self-employed as a consultant and launched a practice known as The Forest Consulting Group.

My experience as an expert witness is set forth in Attachment A. My hourly rate for this engagement is $650 for review and analysis and $750 for deposition, arbitration or trial testimony.

**METHODOLOGY AND MATERIALS REVIEWED**

In preparing this report, I asked for and received documents and information that I believed would be pertinent to this matter. Broadly speaking, these documents and information fell into the following categories:

- Court filings, including complaints, answers, discovery demands and responses;
- Agreements between Uber and drivers;
- Uber external-facing policies and procedures relating to safety;

- Uber internal policies procedures regarding responding to safety incidents; and
- Deposition transcripts.

In addition to the materials provided to me, I requested other materials to review and consider that I thought would be helpful for me to provide relevant input and opinions. I also identified relevant literature, which represents materials with which I was already familiar as well as materials I identified through online research.

My opinions are based on my review and consideration of the materials referenced in Attachment B, as well as my experience with the ridesharing industry, and specifically my experience with the development of legislative and regulatory frameworks for the industry since its inception. While today ridesharing is ubiquitous throughout the United States, in 2013, when I began working for Lyft, it was a very new and novel idea. My job was to engage with legislators, regulators, and safety officials to explain how ridesharing worked, and specifically to explain the safety and accountability measures that rideshare companies had enacted. A common question I would receive during the early days of ridesharing was "why would I get into a car with a stranger?" My typical response was "you do that every time you get into a taxi, but we're conditioned to not think about it because the taxi has a particular color or a dome light." It was at this point during the conversations with legislators, regulators and safety officials that the focus of the discussion would turn to how rideshare companies could help increase the safety of the rideshare experience, and how rideshare companies could meet or exceed the safety processes for the taxi industry, albeit in different ways, often with the use of technology.

I mention this because safety was easily the top concern during my years of engaging with legislators, regulators and safety officials. In order to get legislation for the rideshare industry passed, not only did I have to satisfy questions about the safety of ridesharing, but I also had to become extremely knowledgeable about the comparative safety of the taxi industry and explain why rideshare met or exceeded taxi safety standards.

It is this perspective that I bring to this report and the issues at hand. I rely on my experience in the rideshare field since the industry's infancy, as well as my deep and consistent engagement in pursuing the optimal legislation and regulation for the rideshare industry. Throughout this report, I will explain how this experience supports the opinions I set forth.

**SUMMARY OF OPINION**

Based on my education, training, experience in the rideshare industry, and me review, consideration, and/or reliance on the materials in Attachment B, I hold and offer the following opinions:

1. The industry standard with respect to safety in the rideshare industry has been established by the statutory and regulatory requirements for companies like Uber.
2. Uber has always exceeded the industry standard of safety for the rideshare industry.

3. Companies like Uber maintain little to no significant control over third-party rideshare drivers because the drivers fundamentally control if, when, how much, and for how long they choose to make themselves available to provide rides through the Uber app.
4. Transportation network companies have been treated by regulators as distinct from common carriers.

## THE RIDESHARING INDUSTRY STANDARD FOR SAFETY

### History of Ridesharing Legislation and Regulation

Overview

The ridesharing industry began in the United States when Lyft launched in 2012. While Uber had existed prior to Lyft's debut, Lyft was the first company to launch a platform that was wholly based on people using their personal vehicles, as opposed to using commercially licensed vehicles. Uber introduced UberX shortly after Lyft launched, and like Lyft, UberX was a platform that allowed people to use their personal vehicles to transport other people.[5]

Ridesharing quickly became very popular with both drivers and riders, and both companies began to expand into new markets across the country. As a result, lawmakers and regulators in numerous cities and states were suddenly confronted with the question of whether and how to regulate an industry that resembled the taxi industry in some ways but also differed from it in several key respects.

The first and perhaps most significant difference between ridesharing and the taxi industry is the fact that ridesharing is based upon the concept of people using their personal vehicles to provide rides to others, whereas the taxi industry has typically involved commercially licensed vehicles and has almost always required drivers to procure a special type of driver's license, endorsement or permit. As different jurisdictions began to consider how to regulate this new industry, legislators recognized a unique aspect of ridesharing: that people who wished to become rideshare drivers would not choose to do so if they had to pay the higher cost of commercial insurance, obtain specialized licenses or permits, or convert their vehicles in a significant way, such as adding a partition, a dome light, or permanent signage. This was particularly true given that many, if not most, rideshare drivers choose to provide rides on a part-time or infrequent basis.[6] Legislators, therefore, sought to enact a regulatory framework that

---

[5] For the purposes of this report, all references to services provided by "Uber" are intended to include all forms of ridesharing services on its platform.

[6] See Monthly Labor Review, Bureau of Labor Statistics (May 2017) (https://www.bls.gov/opub/mlr/2017/beyond-bls/flexible-jobs-give-workers-choices.htm#:~:text=The%20study%20also%20finds%20that,value%20for%20employees%20and%20employers.) (The study also finds that the "overwhelming majority of Uber drivers are working part-time hours. . . [and are] active fewer than 12 hours per week, suggesting that driving is complementary to other economic activities such as school attendance, caregiving, or employment."); see also Uber and the Labor Market, Economic Policy Institute (L. Mischel May 15, 2018) ("Uber drivers have high turnover and, on average, work only part of the year (an average of three months) and part time (an average of 17

would make ridesharing at least as safe and responsible as taxis, if not safer and more responsible, without erecting unnecessary barriers that would make it too difficult or too costly for responsible individuals to provide rides using their personal vehicles.

California

California was the first state to implement a wholly new regulatory framework for the ridesharing industry. This was done by way of a rulemaking conducted by the California Public Utilities Commission ("CPUC") in late 2013. As part of that rulemaking, the term "Transportation Network Company" ("TNC") was created, and as noted above, the CPUC chose to treat ridesharing as a new mode of transportation that was distinct from taxis, limousines, and other pre-existing forms of for-hire transportation. The CPUC rulemaking essentially became the model legislation that other states followed over the next few years.

The CPUC first began its inquiry into the rideshare industry in December 2012 by way of an order titled "Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services."[7] This inquiry involved numerous hearings, input from numerous third parties including governmental and regulatory entities, non-profits, industry associations and private businesses, as well as testimony and submissions by both Uber and Lyft. In this Order, the CPUC noted its purpose for conducting the rulemaking:

> *We initiate this proceeding to protect public safety and encourage innovators to use technology to improve the lives of Californians. The purpose of this Rulemaking is not to stifle innovation and the provision of new services that consumers want, but rather to assess public safety risks, and to ensure that the safety of the public is not compromised in the operation of these business models.*[8]

The CPUC's nine-month rulemaking process resulted in the CPUC issuing Decision 13-09-045, titled "Decision Adopting Rules and Regulations to Protect Public Safety while Allowing New Entrants to the Transportation Industry," which, as noted above, created the new TNC category for companies like Uber and Lyft.[9] This Decision also set forth regulatory requirements for TNCs that were significantly different from any prior regulatory framework, state or local, for other transportation providers such as taxis and limousines.

The relevant regulatory requirements set forth by the CPUC were as follows:

*Safety Requirements*

---

hours per week). This means that an Uber driver provides roughly 12.5 percent as much 'employment,' or total hours of work in a year, as a full-time, full-year worker.").

[7] https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M040/K862/40862944.PDF.

[8] Id., p. 1.

[9] https://docs.cpuc.ca.gov/publisheddocs/published/g000/m077/k192/77192335.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*a) TNCs shall maintain commercial liability insurance policies providing not less than $1,000,000 (one million dollars) per-incident coverage for incidents involving vehicles and drivers while they are providing TNC services. The insurance coverage shall be available to cover claims regardless of whether a TNC driver maintains insurance adequate to cover any portion of the claim.*
*b) TNC drivers shall be required to provide proof of both their personal insurance and the commercial insurance in the case of an accident.*
*c) TNCs shall perform criminal background checks on each TNC driver before the driver begins offering service. In order to protect public safety, any person who has been convicted, within the past seven years, of driving under the influence of drugs or alcohol, fraud, sexual offenses, use of a motor vehicle to commit a felony, a crime involving property damage, and/or theft, acts of violence, or acts of terror shall not be permitted to provide TNC services.*
*d) TNCs shall institute a zero-tolerance intoxicating substance policy with respect to drivers as follows:*

> *1. The TNC shall include on its website, mobile application and riders' receipts, notice/information on the TNC's zero-tolerance policy and the methods to report a driver whom the rider reasonably suspects was under the influence of drugs or alcohol during the course of the ride.*
> *2. The website and mobile application must include a phone number or in-app call function and email address to contact to report the zero-tolerance complaint.*
> *3. Promptly after a zero-tolerance complaint is filed, the TNC shall suspend the driver for further investigation.*
> *4. The website and mobile application must also include the phone number and email address of the Commission's Passenger Section: 1-800-894-9444 and CIU_intake@cpuc.ca.gov.*
> *e) TNCs shall obtain each TNC driver's driving record before the driver begins providing service and quarterly thereafter. Drivers with convictions for reckless driving, driving under the influence, hit and run, or driving with a suspended or revoked license shall not be permitted to be a TNC driver. Drivers may have a maximum of two points on their driving records for lesser offenses, e.g., equipment problems, speeding, or child safety seat violations.*
> *f) TNCs shall establish a driver training program to ensure that all drivers are safely operating the vehicle prior to the driver being able to offer service. This program must be filed with the Commission within 45 days of the adoption of this decision. TNCs must report to the Commission on an annual basis the number of drivers that became eligible and completed the course.*
> *g) TNC drivers must possess a valid California driver's license, be at least 21 years of age, and must provide at least one year of driving history before providing TNC services.*
> *h) TNCs may only use street-legal coupes, sedans, or light-duty vehicles including vans, minivans, sport utility vehicles (SUVs) and pickup trucks. Hatchbacks and convertibles are acceptable.*

*i) TNC drivers are prohibited from transporting more than 7 passengers on any given ride.*

*j) The app used by a TNC to connect drivers and passengers must display for the passenger:*

*1) a picture of the driver, and*

*2) a picture of the vehicle the driver is approved to use, including the license plate number to identify the vehicle.*

*k) TNC vehicles shall not be significantly modified from factory specifications, e.g., no "stretch" vehicles.*

*l) Prior to allowing each TNC driver to operate a vehicle, and annually thereafter, a TNC must inspect the driver's vehicle, or have the vehicle inspected at a facility licensed by the California Bureau of Automotive Repair, and maintain complete documentation of such inspections. A TNC driver's vehicle must, at a minimum, pass a 19 point inspection prior to allowing the driver to operate the vehicle under the TNC's platform:*

1. *Foot brakes;*
2. *Emergency brakes;*
3. *Steering mechanism;*
4. *Windshield;*
5. *Rear window and other glass;*
6. *Windshield wipers;*
7. *Headlights;*
8. *Tail lights;*
9. *Turn indicator lights;*
10. *Stop lights;*
11. *Front seat adjustment mechanism;*
12. *Doors (open, close, lock);*
13. *Horn;*
14. *Speedometer;*
15. *Bumpers;*
16. *Muffler and exhaust system;*
17. *Condition of tires, including tread depth;*
18. *Interior and exterior rear view mirrors; and*
19. *Safety belts for driver and passenger(s).*[10]

While there have been some legislative amendments since this original regulatory framework was enacted, the above standards still represent the basic requirements for TNCs and TNC drivers.[11]

---

[10] Id. at 26-9. These requirements have been enacted into the California Public Utilities Code, §§5430 *et. seq.*

[11] For example, Decision 13-09-045 included a requirement that TNCs participate in the California Department of Motor Vehicle's Employer Pull Notice Program. Id. at 30. However, in 2013, only governmental entities were allowed to participate in the Pull Notice Program. This issue was solved by way of AB 1422 (Cooper) in 2015. See http://www.leginfo.ca.gov/pub/15-16/bill/asm/ab_1401-1450/ab_1422_bill_20151011_chaptered.html.

Arizona

In 2014, House Bill (HB) 2262 was introduced in the Arizona legislature.[12] This bill was modeled off of the regulatory framework that had been decided upon by the CPUC, as described above. Despite making it through the legislature, HB 2262 was vetoed by then-Governor Jan Brewer in its entirety.

In 2015, HB 2135 was introduced in the Arizona legislature.[13] This bill was substantially similar to HB 2262 from the year prior. This time the bill was signed into law by then-Governor Doug Ducey, who had replaced Jan Brewer as Governor of Arizona.

Similar to the CPUC regulatory framework, the Arizona TNC bill required the following:

- That the TNC conduct, or have a third-party conduct, a criminal and driving record background check on prospective drivers;
- That the TNC disallow any prospective driver who has three or more moving violations in the prior three years, or any conviction for a serious offense in the prior seven years;
- That TNC drivers could not accept street hails; and
- That TNCs maintain a zero-tolerance policy for the use of drugs or alcohol by TNC drivers.

North Carolina

In 2015, the North Carolina legislature passed Senate Bill (SB) 541, a bill that established North Carolina's first ever regulatory framework for ridesharing, and this bill was signed into law by then-Governor Pat McCrory.[14] SB 541 was substantially modeled off of the regulatory framework that had been set forth by the CPUC. Specifically, SB 541 required the following:

- That the TNC conduct, or have a third-party conduct, a criminal and driving record background check on prospective drivers;
- That the TNC disallow any prospective driver who has three or more moving violations in the prior three years, or any conviction for a serious offense in the prior seven years;
- That TNC drivers could not accept street hails;
- That TNCs maintain a zero-tolerance policy for the use of drugs or alcohol by TNC drivers; and
- That TNC vehicles be inspected annually.

Furthermore, SB 541 set forth a "rebuttable presumption" that TNC drivers were to be deemed as independent contractors.[15]

---

[12] https://legiscan.com/AZ/text/HB2262/2014.
[13] https://legiscan.com/AZ/text/HB2135/2015.
[14] https://ncleg.net/Sessions/2015/Bills/Senate/PDF/S541v3.pdf.
[15] Id.

**The Ridesharing Industry Standard for Safety**

The California regulatory and statutory framework for TNCs became the model that the rest of the United States, including Arizona and North Carolina, followed in enacting their own TNC legislation (with state-specific nuances). One reason this model represents the industry standard for safety in ridesharing is the breadth and depth of consideration given to safety issues during its development. During the months-long intensive process that led to the development of the regulatory framework for TNCs, the CPUC's primary focus was safety. The very first sentence of the CPUC's 2012 Order Instituting Rulemaking stated: "We initiate this proceeding to protect public safety and encourage innovators to use technology to improve the lives of Californians."[16]

The CPUC made several comments to this effect in its both its 2012 Order and 2013 Decision:

> *The purpose of this Rulemaking is not to stifle innovation and the provision of new services that consumers want, but rather to assess public safety risks, and to ensure that the safety of the public is not compromised in the operation of these business models. The Commission invited all interested parties to participate in this proceeding to ensure that regulation is not a hindrance, but continues to be the safety net that the public can rely on for its protection.*[17]
>
> ***
>
> *The effects of this new business model and level of activity on public safety are unknown. The Commission has an obligation to determine whether and how public safety might be affected by this new business model.*[18]
>
> ***
>
> *The Commission is familiar with and confident in its ability to protect public safety in the face of rapid technological change. Consequently, while the Commission adopts these rules and regulations, it will also look for further guidance from the legislature should it decide that there is a need for legislation to provide guidance in regulating this new industry.*[19]
>
> ***

[16] https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M040/K862/40862944.PDF, p. 1.
[17] Id. at 2.
[18] Id. at 5.
[19] https://docs.cpuc.ca.gov/publisheddocs/published/g000/m077/k192/77192335.pdf, pp. 3-4.

> *We agree that protecting and enhancing public safety is the paramount purpose behind regulating this industry. We initiated this Rulemaking for the sole purpose of determining how TNCs affect public safety.*[20]
>
> ***
>
> *The Commission's goal in this Rulemaking is to strike the proper balance between safety and innovation, so that regulation provides a safety net that the public can rely on for its protection while new businesses innovate and use technology to better the lives of Californians.*[21]

The CPUC's self-described "paramount purpose" was to ensure public safety by way of this rulemaking, and to essentially set the standard by which TNCs had to abide to ensure such safety. As someone who has been deeply involved in legislative processes in numerous states on ridesharing issues as well as other issues, I can say that the depth of the CPUC inquiry and rulemaking was different and distinct from the typical legislative process. The CPUC process was conducted by CPUC board members and staff who had significant experience and expertise in transportation policy and standards.[22] The rulemaking itself is a 75-page document, which demonstrates the depth and intricacy of the CPUC rulemaking process. Furthermore, the CPUC has continued to inquire into the TNC industry since this original rulemaking. The length and attention on the TNC industry by the CPUC differs from the typical process in which a bill might be enacted from just one legislative session. The CPUC has conducted a years-long inquiry into and assessment of the TNC industry that is predicated, in the CPUC's own words, on ensuring safety. In my opinion, this level of attention to safety represents the industry standard for safety in ridesharing and exceeds what I have seen in other regulatory contexts.

**Safety Standards for the Broader For-Hire Transportation Industry**

In the 2013 Decision, the CPUC noted the following in comparing the CPUC's regulatory framework for TNCs and previously existing standards for other forms of for-hire transportation:

> *Therefore, in this decision we adopt strict safety regulations and guidelines that are similar in nature and in some cases more stringent than current and past practice in the transportation industry as a whole.*[23]
>
> ***

---

[20] Id. at 39.
[21] Id. at 62.
[22] In the 2012 Order Instituting Rulemaking, the CPUC lists six members of the CPUC's Consumer Protection and Safety Division as staffers involved in the rulemaking. See https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M040/K862/40862944.PDF, Attachment A.
[23] https://docs.cpuc.ca.gov/publisheddocs/published/g000/m077/k192/77192335.pdf, p. 41.

> *The regulations that we are adopting for TNCs are similar to what the SFMTA requires of taxicab drivers.*[24]

While the CPUC's stated intent to impose a regulatory standard for TNCs that was "similar" to the standard for taxis (but more stringent in many respects because of the uniqueness of ridesharing) is clear, there is no clearly defined standard of care for the for-hire transportation industry either in California or throughout the nation. The reality is that, since taxis are almost always regulated at the local level, including in California, the requirements for taxi drivers and taxi operations can and do vary significantly from jurisdiction to jurisdiction. For example, regarding the issue of background checks, it is worth noting that standards set forth by the SFMTA (San Francisco Municipal Transportation Agency) for taxi drivers have no bright-line disqualifying factors for a prospective taxi driver:

> *To be a qualified driver, you must have no prior convictions of a crime that would, in the judgment of the SFMTA, present a risk to public safety if the permit is granted, including but not limited to convictions involving sexual assault, the use of a vehicle in the commission of a felony, fraud, violence against a person, reckless disregard for public safety, two or more recent convictions of drug-related offenses, or two or more recent convictions of driving under the influence, whether or not such convictions occurred while driving a Motor Vehicle for Hire. <u>The SFMTA may, in its discretion, issue a permit notwithstanding prior convictions if, following review of an individual case, it determines that the applicant or Permit Holder does not pose a current risk to public safety</u>.*[25]

The above excerpt demonstrates that there is a certain level of discretion when it comes to the potentially disqualifying crimes for a prospective San Francisco taxi driver, whereas no such discretion exists under California's rideshare statute. Similarly, in San Jose, the laws regarding taxi driver background checks only require a lookback of five years, compared to the seven-year lookback period for TNCs, and the issue of disqualification is in any event discretionary, as in San Francisco:

> *The chief of police, or the board on appeal, may deny an application for a taxicab driver's permit filed by any person:*
>
> *[A-H omitted]*
> *I. Who, within five years prior to the date of application, has been convicted of any offense involving the use, possession, sale or transportation of narcotics, and the commission of such offense involved the use of a motor vehicle;*
> *J. Who, within five years prior to the date of application, has been convicted of reckless driving or driving under the influence of any drug or intoxicating liquor, regardless of whether the incident resulted in bodily injury or death;*

---

[24] <u>Id</u>. at 62.
[25] https://www.sfmta.com/getting-around/taxi/become-taxi-driver (emphasis added).

*K. Who, within five years prior to the date of application, has been convicted of a crime, and the crime is substantially related to the qualifications, functions or duties of the taxicab business;*
*L. Who is on parole or probation for a crime, and the crime is substantially related to the qualifications, functions or duties of the taxicab business;*
*M. Who, within five years prior to the date of application, has done any act involving violence, dishonesty or fraud with the intent to substantially injure another, or substantially benefit the applicant or another.*[26]

The above examples demonstrate that there is no universal safety standard for the for-hire transportation industry as a whole because of the important and unavoidable differences between the taxi industry and ridesharing. For historical and technology-based reasons, the rideshare industry has been subjected to higher safety requirements, and Uber has always met or exceeded that rigorous bar.[27]

**UBER HAS ALWAYS EXCEEDED THE RIDESHARE INDUSTRY STANDARD FOR SAFETY**

**Uber's Safety Policies, Procedures, and Technology Demonstrates that Uber Exceeds Standards for Safety for Rideshare or the For-Hire Transportation Industry**

Uber has a strong, consistent, and evolving history of implementing safety and deterrence features on its platform that at all times have gone beyond what the law requires and exceeded or set industry standards with respect to safety. In this section I detail some of its efforts and innovations to explain the basis for this opinion.

Uber's Community Guidelines

The Uber Community Guidelines are a useful starting point for assessing whether Uber has enacted policies and mechanisms that are consistent with industry standards for ensuring rider safety.[28] The Community Guidelines not only set forth what type of activity is improper on the Uber Platform, but also empower riders to give specific feedback on drivers, which serves as a

[26] San Jose Mun. Code §6.64.500; see also San Mateo Mun. Code §5.75.210 ("No driver's permit shall be issued to any person who has tested positive for alcohol or controlled substances or has been convicted of any criminal offense involving moral turpitude, unless mitigating circumstances exist, and in no event to any person who has been convicted of any alcohol or drug-related driving offense within the one (1) year immediately preceding the date of the application." (emphasis added)); see also NRS §706.8841 ("the Administrator "may refuse to issue a driver's permit" if the individual has been convicted of certain crimes) (emphasis added); see also ARS §41-2097(A) (the state statute requires that a background check be conducted on a prospective taxi driver, but there are no disqualifying crimes listed in the statute).
[27] To be clear, I am not saying that the broader for-hire transportation standards apply to this matter, and the fact that most jurisdictions have classified ridesharing as an industry distinct from prior for-hire transportation industries supports the argument that they do not apply, but I believe that a comparison is useful to demonstrate the lengths that Uber goes to in order to ensure safety and accountability.
[28] Uber Community Guidelines, Bates # UBER_JCCP_MDL_001534606-620. While there have been different iterations of the Community Guidelines, the language that I cite or allude to in this report or has remained relatively unchanged over the different versions.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

deterrent to aberrant behavior.[29] For example, in the section titled "Star Rating," the following is stated:

> *After every trip, drivers and riders are able to rate each other on a scale of one to five stars, as well as give feedback on how the trip went. This two-way system holds everyone accountable for their behavior. Accountability helps create a respectful, safe environment for both drivers and riders.*[30]

The Community Guidelines also specify the types of actions by drivers that are clearly prohibited:

> *Actions that threaten the safety of drivers and riders will be investigated and, if confirmed, lead to permanent deactivation of your account. For example:*
>
> - *Physical contact with riders. As our community guidelines make clear, you shouldn't touch or flirt with other people in the car. As a reminder, Uber has a no sex rule. That's no sexual conduct with riders, no matter what. And you should never hit or otherwise hurt a rider.*
> - *Use of inappropriate and abusive language or gestures. For example, asking overly personal questions, using verbal threats, and making comments or gestures that are aggressive, sexual, discriminatory, or disrespectful.*
> - *Unwanted contact with riders after a trip is over. For example, texting, calling, or visiting someone in person after a ride has been completed.*
> - *Breaking the local law while using Uber. For example, texting while driving; speeding or otherwise breaking local traffic laws; and using Uber to commit a crime, including drug and human trafficking or the sexual exploitation of children.*[31]

The Technology Services Agreement,[32] which drivers must agree to abide by in order to accept ride requests through the Uber app, also clearly states that riders have the ability to submit feedback about drivers:

> *You acknowledge and agree that: (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of you and such Transportation Services and, optionally, to provide comments or feedback about you and such Transportation Services; and (b) after providing Transportation Services, you will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User.*[33]

---

[29] I address this issue in more detail, below.
[30] Uber's Community Guidelines, Bates # UBER_JCCP_MDL_001534609.
[31] Id. at Bates # UBER_JCCP_MDL_001534611.
[32] 2015 Technology Services Agreement (Bates # UBER000003852-56). As with the Community Guidelines, while there have been different versions of the TSA, the language that I cite or allude to has remained consistent over the different iterations of the TSA.
[33] 2015 Technology Services Agreement (Bates # UBER000003852).

In summary, drivers are informed of what type of behavior is unacceptable while providing rides routed through the Uber app. It is also clear to any third-party driver that riders will have the ability to easily identify their driver and submit a complaint about any misconduct.

Uber's Safety Mechanisms

One of the primary reasons that Uber not only meets the TNC industry standard for safety but in fact exceeds it is rooted in Uber's use of technology. As a starting point, in the taxi industry, the "anonymous" ride has always been the norm, meaning that historically and still to this day, a taxi passenger is typically unable to get any information about the driver prior to entering the taxi. Furthermore, if there is a need to ascertain the identity of the driver, doing so requires that the rider take the active step of capturing the driver's taxi permit or the license plate of the vehicle prior to the end of the ride. Even if a driver's taxi permit is visible to the rider, it can often be difficult to confirm that the person pictured in the permit is the actual driver of the vehicle from the back seat of the vehicle. In short, unless a rider goes through the active steps of noting the name of the taxi company and writing down or otherwise recording the name of the driver and/or the license plate of the taxi, the rider will likely have no information regarding the identity of the person who provided the ride. It is unfortunately a common experience that a taxi passenger often realizes during the ride that the person driving the taxi is not the person pictured in the taxi permit. This has always been a safety and accountability issue within the taxi industry.

Companies like Uber have helped to solve this issue of driver anonymity, as noted in a 2016 report:

> *TNCs provide a passenger with information about his or her driver (name, vehicle type, license plate, and anonymized contact information) as soon as the match between rider and driver is made. This information is also included on the emailed receipt so the passenger can access the information after the trip is complete. Most taxi regulations require that the name, photo, and license number of the driver be posted in the cab, but such postings are sometimes difficult to read and quickly forgotten unless the passenger writes down or photographs them, which itself could be perceived as a hostile act by a passenger. In contrast, the sharing of information about driver and passenger occurs automatically with TNCs once a transaction has been agreed upon, and this information is available to the TNC, the passenger, and ultimately law enforcement if required.*[34]

In my expert opinion, this is an Uber feature that is a significant safety advantage over taxis. With Uber and other TNCs, riders are able to verify the identity of the driver and confirm that the approved vehicle is being used before entering the vehicle without having to take any active steps other than looking at their app.

[34] *Between Public and Private Mobility: Examining the Rise of Technology-Enabled Transportation Services*. National Academies of Sciences, Engineering, and Medicine (2016). Washington, DC: The National Academies Press. https://doi.org/10.17226/21875.

GPS tracking of Uber rides is also a clear safety advantage when compared to taxis.[35] The fact that the Uber App uses the GPS data collected by smartphones–and that this is known by all TNC drivers–is a significant deterrent against aberrant behavior while transporting a passenger, as it provides a digital record of where that driver was at any point that the driver was active on the app. This is a rarity in the taxi industry.

The above mechanisms have existed since the inception of Uber, even in Uber's early years, and they represent a level of transparency, safety and accountability that had never existed in the taxi industry and for the most part still does not exist today. The existence of these features alone leads me to conclude that Uber has met or exceeded the industry standard for safety since its inception.

Importantly, since its launch, Uber has continued to iterate and improve upon safety and accountability features. In so doing, Uber has made even greater strides with respect to the safety and accountability of the rideshare process in a little over a decade, far more than the taxi industry has ever made during its entire existence. For example, Uber introduced a "share your trip" feature to the Uber app in 2016.[36] This feature allows riders to provide a link to third parties like friends or family that allows the third party to track, in real time, the location, route, and progress of the ride. In 2018, Uber also added a feature within the app that automatically connects riders to 911 by pressing one button on the Uber App.[37] This feature also gives riders their real-time location in the app—both on a map and as an address—so it can be shared with the 911 operator.[38]

Additionally, in 2018, Uber introduced RideCheck, a feature that detects abnormal long stops or significant deviations from the expected route and sends messages to the parties in the vehicle to inquire about their well-being.[39] I am not aware of any such feature in the taxi industry.

Additional safety and accountability measures implemented by Uber over the years include the following:

- RealTime ID Check: a system by which third party drivers take a "selfie" to confirm that they are the approved driver[40]
- A 24/7 Incident Response Team[41]

---

[35] https://www.uber.com/br/en/ride/safety/?uclick_id=536c40cb-6f5e-4074-a5e4-3ad05039f9d2.
[36] See Uber Safety & Insurance All Hands Deck, April 4, 2018, Bates # UBER_JCCP_MDL 000501781.
[37] https://www.uber.com/blog/ubers-emergency-button-and-the-technologies-behind-it/; see also Uber Safety & Insurance All Hands Deck, April 4, 2018, Bates # UBER_JCCP_MDL 000501782.
[38] https://www.uber.com/newsroom/emergencybutton/.
[39] https://www.uber.com/newsroom/raisingthebar/.
[40] See Uber Trust and Safety Strategy Update, Sept. 2016, Bates # UBER_JCCP_MDL 001102327-8; see also https://www.uber.com/br/en/ride/safety/?uclick_id=536c40cb-6f5e-4074-a5e4-3ad05039f9d2.
[41] https://www.uber.com/us/en/drive/driver-app/phone-support/?uclick_id=536c40cb-6f5e-4074-a5e4-3ad05039f9d2.

- A "Verify Your Ride" feature: a feature in which a code is sent to both the driver and the rider, allowing the rider to confirm the code with the driver before entering the vehicle[42]
- PIN verification[43]
- Phone anonymization[44]
- Inappropriate Message Detection[45]
- Trusted Contacts: a feature which makes it easy to share information about an in-progress ride with friends or family members[46]
- Continuous alert monitoring and annual re-runs for background checks[47]
- Uber and Lyft Industry Sharing Safety Program (ISSP): a program by which Lyft and Uber share information regarding disqualified third-party drivers with each other[48]

Lastly, as noted above, the Uber app allows for two-way ratings and feedback, which provides drivers and riders the opportunity to report issues that occur during a ride. In my expert opinion, this feature is not only a significant safety enhancer but also a significant deterrent against aberrant behavior during a ride. If a safety issue is reported via the feedback feature, Uber can quickly review a driver's or rider's access to the app and may remove a person's access to the app if a serious safety issue has been identified. This means that if there is a complaint of unsafe behavior by a driver or rider, it is possible for that person's access to be removed. In addition, if there is a complaint by a rider that does not necessarily involve a significant safety concern, Uber will ensure that the driver is never connected with the rider in any later trips using the Uber app. In a parallel scenario with a taxi, the passenger would have to have taken down the driver's name, permit number, or license plate, and then figure out how to contact the taxi company in question to report a safety incident. And in no scenario would a rider ever be banned from a taxi, nor could a rider ever be sure to avoid that same taxi driver in later trips, as rider information is not collected. That reality is inherent in the fact that taxis transport members of the public, whereas only registered users can use Uber.

All of the above measures are rarities in the taxi industry, if they exist at all. Furthermore, with the exception of providing riders with a receipt detailing the ride, none of the above features are required by law in California or elsewhere. For that reason, it is my opinion that Uber has always met or exceeded, and continues to meet or exceed, the standard of care for the industry.

Dashcams

---

[42] https://help.uber.com/riders/article/whats-verify-my-ride/?nodeId=2ddbb5e8-0dd3-4048-b9ee-f6b5e5311e25.
[43] https://www.uber.com/en-PL/blog/pin-number/
[44] https://www.uber.com/br/en/ride/safety/?uclick_id=536c40cb-6f5e-4074-a5e4-3ad05039f9d2.
[45] Id.
[46] See Uber Safety & Insurance All Hands Deck, April 4, 2018, Bates # UBER_JCCP_MDL 000501783.
[47] https://www.uber.com/us/en/ride/safety/driver-screening/
[48] https://thehill.com/policy/technology/542826-uber-lyft-to-share-information-drivers-banned-for-most-serious-safety/.

Plaintiffs argue that Uber should have required the use of dashcams in the vehicles of third-party drivers. But that is not an expected practice based on industry standards for safety. To begin with, even though TNCs are extensively regulated in California, California does not require the use of dashcams in TNC vehicles, and in fact, nowhere throughout the country are dashcams required for TNC vehicles. This is noteworthy because, as noted above, the regulatory framework for TNCs in California has existed since late 2013, and since then the California legislature and the CPUC have had numerous opportunities to expand upon the regulations for the TNC industry. The CPUC has issued several rulemakings, and dozens of bills have been introduced in the years since 2013 regarding the ridesharing industry, yet neither the legislature nor the CPUC has enacted any dashcam requirement. During my time at Lyft, and subsequently during my time serving as an expert witness, I have conducted research to determine if dashcams have been required for ridesharing platforms anywhere in the United States, and my research found no such requirement. It therefore cannot be argued that Uber fell below industry safety standards for ridesharing platforms by not requiring that drivers install a dashcam when no legislative or regulatory body throughout the United States has ever issued such a mandate for the ridesharing industry.[49]

<u>The Safety Advantages of Ridesharing Relative to Alternative Transportation Options</u>

Any assessment of safety on ridesharing platforms has to be understood in the broader context of safety as compared to the for-hire industry at large, most notably the taxi industry. Although a direct comparison is difficult–largely because, unlike ridesharing companies like Uber, taxi companies generally do not report aggregated safety data, meaning there are no national-level data about taxi safety–there is strong support for the conclusion that ridesharing is far safer than taxis with respect to the risk of sexual assault and sexual misconduct.

While there are some statistics that show the occupations of crime victims, there are few statistics that show the occupations of the <u>perpetrators</u> of crime. In other words, there is no definitive way to search to determine how often taxi drivers nationwide are charged with a crime. In comparison, both Uber and Lyft have publicly provided nationwide information about the number of alleged criminal incidents that have occurred on their platform. But without similar information regarding the nationwide rate of criminal incidents during taxi rides, this information regarding ridesharing has no comparative context.

A recent report by the U.S. Government Accountability Office ("GAO") highlights this issue:

> *Several factors limit the extent to which information in the six federal databases describe assaults in the ridesourcing and taxi industries. As discussed below, the data are not directly comparable, as the databases use different coding methods. Further, the data are not complete, as estimates from databases may be unreliable due to their low relative frequency;*

---

[49] Plaintiffs also allege that Uber does not utilize GPS to track whether the third-party is staying on the intended course. <u>See</u> <u>Master Long Form Complaint</u>, p. 9. As noted above, however, Uber implemented its RideCheck program in 2018.

*assault data are generally underreported; and some databases do not contain data on self-employed workers.*[50]

***

*We found that six federal databases collect some information on assaults in the ridesourcing and taxi industries. These federal databases more often collect data on assaults against drivers of ridesourcing and taxi vehicles than passengers. Limitations exist with these data, and not all databases have data available to be publicly reported. However, three federal databases collect some data that can be used to report on assaults against drivers in 2019 and 2020. These available data do not provide a complete count of assaults against ridesourcing and taxi drivers.*[51]

***

*To date, there is no federal requirement to collect data specifically on ridesourcing and taxi assaults, and none of these databases has the intended use of collecting such data (see table 2). Specifically, four of the databases are intended to collect information about injuries or fatalities that occurred at work or were work-related. Therefore, data about passenger injuries or fatalities are outside the scope of these databases. For example, according to database documentation, CFOI data is intended to raise awareness of work hazards and help prevent fatal work injuries; its users include legislators, public health officials, and researchers. As such, CFOI only collects data on workers, including drivers of ridesourcing vehicles and taxis, and not on passengers.*[52]

Despite the lack of data to support a direct statistical comparison, it is my expert opinion that ridesharing is a substantially safer mode of transportation than taxis. First, as noted above, many if not most taxi rides are "anonymous," meaning it is far more difficult to identify an alleged taxi driver perpetrator than it is an alleged ridesharing driver perpetrator. Second, as noted in depth above, riders using an app to connect with a driver are able to obtain key information about the driver and the vehicle that will be transporting them before the ride begins, due to the requirements that were promulgated by the CPUC and other regulators that TNCs provide riders with the name and picture of the driver, a picture of the car, and the license plate number. Information about the driver is also emailed to the passenger at the end of each ride; therefore, no action needs to be taken by a passenger to figure out which driver he or she took a ride with after the fact. And, as noted above, the GPS functionality, the "share your trip" feature, the 911 button, and the RideCheck feature are very well-known safety aspects of the rideshare process that have not been historically present in the taxi industry. It follows that there are fewer deterrents to a person who otherwise might be disposed to commit a crime while providing for-hire transportation services to do so while driving for a taxi than while driving on a ridesharing platform. Each of the interventions described above make it

---

[50] RIDESHARING AND TAXI SAFETY: Information on Assaults against Drivers and Passengers, United States Government Accountability Office Report to Congressional Addressees, Feb. 2024, p. 11 (https://www.gao.gov/products/gao-24-106742).
[51] Id. at 8.
[52] Id, at 10.

less likely to get away with a crime while driving on a ridesharing platform than in a taxi. As a result, the measures unique to ridesharing platforms serve to enhance safety relative to taxis.[53]

In short, it is my expert opinion that even in its earliest days, Uber instituted more robust safety and deterrence protocols than had ever previously existed in the taxi industry, and Uber has consistently continued to iterate and expand its suite of safety and accountability measures. Again, it is worth noting that most of these features are not required by law, nor have they ever been common in the taxi industry. For these reasons, it is my expert opinion that Uber has exceeded the standard of care for the TNC industry and, to the extent that it is relevant, has far exceeded the standard of care for the broader for-hire industry.

## LACK OF CONTROL OVER DRIVERS

### Nature of Ridesharing

Ridesharing companies like Uber do not exercise the same degree of control over drivers that a company exercises over employees or agents, because of how significantly and fundamentally rideshare platforms differ from taxi and other for-hire modes of transportation. The nature and rise of the gig economy and the reasons that people choose to avail themselves of income-earning platforms like Uber, Lyft, DoorDash, Instacart, or others is because they want independence and to be their own "bosses."[54]

A key appeal of ridesharing for drivers has always been the fact that ridesharing allows drivers to completely control when they work (i.e., are available to provide rides). Drivers approved to accept rides through a ridesharing platform have total control over if, when, or how much they want to work. Ridesharing drivers have no boss other than themselves. There is no schedule to which they have to adhere. There are no minimum shifts that a driver must fill. A rideshare driver never has to call in sick or seek approval to take a day off. A rideshare driver does not have to spend a minimum number of hours being available to provide rides. Furthermore, even once a rideshare driver has chosen to make himself or herself available to accept ride requests, drivers are free to accept or reject any ride request, and drivers who have already accepted a ride request can still cancel the ride at any time. Lastly, and significantly, rideshare drivers are free to provide rides through a competitor app, and in fact a high percentage of rideshare drivers provide rides through both the Uber and Lyft apps -- often even at the same time.

---

[53] In comparison, during my time as a prosecutor in New York City, I became aware of cases involving assaults during a taxi ride where the taxi driver was never able to be identified.

[54] It is also relevant to consider that even the taxi industry often characterizes its drivers as independent contractors. "The fact that the incumbent taxi industry often classifies its drivers as independent contractors tends to be overlooked in the debate about whether Uber drivers are legally independent contractors, and whether they should be classified in this way." Taxi Regulation in the Age of Uber, Katrina M. Wyman, 20 N.Y.U. J. Legis. & Pub. Pol'y 1, p. 62 (2017). In this section, I do not focus on whether drivers on the Uber platform are employees or contractors–an issue addressed in California by Proposition 22. Instead, I focus on the characteristics of the driver role that indicate the overall independence of drivers and the limitations on Uber's ability to control them in the conduct of their business or behavior.

Numerous studies demonstrate that flexibility and control over one's schedule are key motivators for people who choose to be rideshare drivers. In fact, a recent study including a survey of 3,000 gig-economy participants confirms this motivation regarding gig work:

> *While financial gain is a primary motivator for freelancing, flexibility and seeking a better sense of purpose in their careers were other driving factors. When asked about the reasons for freelancing, 'to earn extra money' (83%) and 'to have flexibility in my schedule' (73%) top the list.*



[55]

Another study, conducted by the Harvard Business School, noted that "[i]n a recent survey among meal delivery workers, 76% of the 808 respondents said that flexibility was extremely important to them, and 69% highly valued the opportunity to earn extra income."[56] The study goes on to state the following:

> *An important benefit of gig work is its flexibility. Many individuals combine gig work with other jobs. For instance, about two thirds of Uber drivers work either full-time or part-time on another job (Hall and Krueger, 2018). Similarly, 39% of DoorDash drivers hold a full-time job, 14% work part-time, and 20% are students. 14% report being self-employed. For only 16% of drivers is gig work their only occupation (Mellman, 2020). The ability to choose work hours provides two types of benefits. Drivers can select hours that are particularly attractive, for instance times that are compatible with their main job or hours when meal-delivery compensation is particularly attractive. Like many on-demand platforms, DoorDash balances supply and demand by offering drivers "peak pay" during busy hours. Of the 100 million deliveries that we observe in our data, roughly 30% profited from peak pay. Conversely, drivers benefit from flexibility by not having to work*

---

[55] https://www.upwork.com/research/freelance-forward-2022; see also https://growingscience.com/ijds/Vol2/ijdns_2018_12.pdf, pp. 90-1, ("On the aggregate level, the result shows that job flexibility, the balance between life and work, and the ability of meeting new people are the main factors that attract drivers") and ("They observe that flexibility and sociability are the main advantages of the working in the ridesharing platform from the drivers' perspective.")
[56] L. Katsnelson and F. Oberholzer-Gee (2021): Being the Boss: Gig Workers' Value of Flexible Work, Harvard Business School, p. 2.

> *when it is inconvenient for them. 11% of DoorDash drivers are stay-at-home parents, many of whom want to be back home when the children return from school. Similarly, students will want to schedule dashing around class schedules.*[57]

Rideshare drivers often provide rides for just a few hours a week, or only for a brief period of time. It is not uncommon for rideshare drivers to provide rides as a way to earn money between jobs, and then not to provide rides for months. It is also common for drivers to use the earning opportunity that apps like Uber and Lyft provide to supplement their income. During my time at Lyft, I met teachers who choose to provide rides during their summer break, then return to their teaching job during the school year. I met aspiring actors and musicians who utilize rideshare apps as drivers in order to earn money because it provides the flexibility to attend auditions or rehearsals without the fear of losing a job because they couldn't show up for a pre-scheduled shift. In the early days of Lyft, I remember learning that many government workers in Washington, D.C. turned to ridesharing as an alternative source of income during the 2013 shutdown of the Federal Government. In short, based on my direct experience with hundreds if not thousands of rideshare drivers since 2013, as well as my review of numerous studies and reports including but not limited to the ones described above, it is apparent that people tend to utilize apps like Uber as a way of making supplemental income and/or a way of finding a short-term, seasonal, or intermittent source of income.

**Driver Contracts**

During the relevant timeframe for this matter, prospective TNC drivers were required to agree to either Uber's Technology Services Agreement ("TSA") or Uber's Platform Access Agreement ("PAA"), which replaced the TSA. Both agreements contain clear, unambiguous language denoting the nature of the relationship between Uber and third-party drivers.

<u>Technology Services Agreement</u>
The Technology Services Agreement ("TSA") states the following with respect to the relationship between Uber and third-party drivers:

> *Your Relationship with Company. You acknowledge and agree that Company's provision to you of the Driver App and the Uber Services creates a direct business relationship between Company and you. Company does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Transportation Services, your acts or omissions, or your operation and maintenance of your Vehicle. You retain the sole right to determine when, where, and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies. With the exception of any signage required by local law or*

[57] <u>Id</u>. at 7.

> *permit/license requirements, Company shall have no right to require you to: (a) display Company's or any of its Affiliates' names, logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying Company's or any of its Affiliates' names, logos or colors. You acknowledge and agree that you have complete discretion to provide services or otherwise engage in other business or employment activities. For the sake of clarity, you understand that you retain the complete right to; (i) use other software application services in addition to the Uber Services; and (ii) engage in any other occupation or business.*[58]

The TSA goes on to state:

> *13. Relationship of the Parties*
>
>> *13.1 Except as otherwise expressly provided herein with respect to Company acting as the limited payment collection agent solely for the purpose of collecting payment from Users on your behalf, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Company and you; and (b) no joint venture, partnership, or agency relationship exists between Company and you.*
>>
>> *13.2 You have no authority to bind Company or its Affiliates and you undertake not to hold yourself out as an employee, agent or authorized representative of Company or its Affiliates. Where, by implication of mandatory law or otherwise, you may be deemed an agent or representative of Company, you undertake and agree to indemnify, defend (at Company's option) and hold Company and its Affiliates harmless from and against any claims by any person or entity based on such implied agency or representative relationship.*[59]

Platform Access Agreement

The following provisions from the PAA clearly define Uber's relationship with drivers and denotes the various aspects of their independence with respect to Uber:

> *1. Relationship with Uber*
>
> *1.1. Contracting Parties. The relationship between the parties is solely as independent business enterprises, each of whom operates a separate and distinct business enterprise that provides a service outside the usual course of business of the other. This is not an employment agreement and you are not an employee. You confirm the existence and nature of that contractual relationship each time you access our Platform. We are not hiring or engaging you to provide any service; you are engaging us to provide you access to our Platform.*

---

[58] 2015 Technology Services Agreement (Bates # UBER000003852).

[59] Id. at Bates # UBER000003861.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

> *Nothing in this Agreement creates, will create, or is intended to create, any employment, partnership, joint venture, franchise or sales representative relationship between you and us. You have no authority to make or accept any offers or representations on our behalf.*[60]

The PAA is also quite clear about the level of control that third-party drivers have over whether, when and how often they choose to use the Uber app to provide rides:

> *1.2. Your Choice to Provide P2P Service to Riders. We do not, and have no right to, direct or control you. Subject to Platform availability, you decide when, where and whether (a) you want to offer P2P Service facilitated by our Platform and (b) you want to accept, decline, ignore or cancel a Ride (defined below) request; provided, in each case, that you agree not to discriminate against any potential Rider in violation of the Requirements (defined below). Subject to your compliance with this Agreement, you are not required to accept any minimum number of Rides in order to access our Platform and it is entirely your choice whether to provide P2P Service to Riders directly, using our Platform, or using any other method to connect with Riders, including, but not limited to other platforms and applications in addition to, or instead of, ours. You understand, however, that your Riders' experiences with your Rides, as determined by Rider input, may affect your ability to access our Platform or provide Rides.*[61]

**The Elements Highlighted by Plaintiffs Do Not Establish Uber's Control over Drivers**

In Plaintiffs' long-form complaint, Plaintiffs allege several facts or factors in support of an argument that Uber exercises control over third-party drivers. For the reasons set forth below, I disagree.

Booking Rides

Plaintiffs allege that Uber controls third-party drivers because the third-party drivers "must use the Uber App to access, accept, and complete Uber-facilitated rides."[62]

To begin with, as noted above, the CPUC's rulemaking included the restriction that "TNC drivers are strictly prohibited from accepting street hails."[63] Thus, to the extent that Plaintiffs are alleging that the inability to accept street hails is evidence of Uber control, this element of control is exercised by regulators, not Uber.

Furthermore, it should be noted that in the taxi industry, the notion that taxi drivers can book their own rides is misleading. Aside from the fact that Uber uses app-based technology to

---

[60] Platform Access Agreement, §1.1.
[61] Id. at §1.2.
[62] Master Long Form Complaint, p. 15.
[63] https://docs.cpuc.ca.gov/publisheddocs/published/g000/m077/k192/77192335.pdf, p. 30.

connect potential riders with drivers, there is little difference between a taxi driver's control (or lack thereof) over who requests a ride in the taxi and a rideshare driver's control (or lack thereof) over who requests a ride in his or her vehicle. In either case, the driver does not control who is requesting a ride, whether via street hail or app hail. This is not evidence of control by Uber; rather, this is the nature of being a for-hire transportation driver.

Lastly, even though it is not explicit in the CPUC rulemaking or subsequent rideshare legislation, there is a critically important reason why rides cannot be booked outside of the Uber app. The development of the ridesharing industry led to the development of a unique type of insurance for TNCs. This insurance framework requires TNCs to provide insurance during the ride process, but, naturally, provides no coverage if a ride has not been requested through the TNC app. As a result, any rides booked outside of the app would not be related to the TNC and therefore would not trigger coverage by the TNC insurance if there were an accident.

Establishing or Negotiating Fares

Plaintiffs also allege that because "Uber unilaterally sets the base fare, time fare, distance fare, wait-time fare, and all surge fares" and "forbids drivers from negotiating a different fare with riders," that third-party drivers are subject to Uber's control.[64] Again, I disagree.

In the taxi industry, drivers cannot typically negotiate their own fares either, because in the vast majority of U.S. jurisdictions, the regulating authority imposes a set fare schedule that is based upon a time and distance calculation. The following graph demonstrates this fact:[65]

[64] Master Long Form Complaint, p. 16.
[65] http://www.schallerconsult.com/taxi/fares1.htm.

| | Fares for typical trips | | | Components of the fare | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Area costs ...City | Avg. U.S. trip | Short trip | Long trip | Initial charge | Initial distance | Mileage charge | Mileage distance | Wait time per hour | Last change |
| ** Honolulu | $ 19.75 | $ 13.04 | $ 40.75 | 3.00 | 1/4 | 0.75 | 1/4 | 30.00 | Nov-05 |
| ** San Diego | 16.17 | 10.59 | 33.67 | 2.25 | 1/10 | 0.25 | 1/10 | 20.00 | |
| * Miami | 16.10 | 10.73 | 32.90 | 2.50 | 1/6 | 0.40 | 1/6 | 24.00 | Oct-05 |
| ** San Francisco | 15.90 | 10.85 | 31.65 | 2.85 | 1/5 | 0.45 | 1/5 | 27.00 | Sep-03 |
| ** Boston | 15.45 | 10.08 | 32.25 | 1.75 | 1/8 | 0.30 | 1/8 | 24.00 | Sep-02 |
| ** Los Angeles | 15.00 | 10.07 | 30.40 | 2.20 | 1/11 | 0.20 | 1/11 | 24.00 | Nov-05 |
| * Seattle | 14.80 | 10.29 | 28.80 | 2.50 | 1/10 | 0.20 | 1/10 | 30.00 | Apr-05 |
| Las Vegas | 14.75 | 10.27 | 28.75 | 3.20 | 1/8 | 0.25 | 1/8 | 22.00 | Apr-05 |
| St. Louis | 14.30 | 9.81 | 28.30 | 2.50 | 1/10 | 0.20 | 1/10 | 24.00 | Jul-03 |
| * Philadelphia | 14.17 | 9.47 | 28.87 | 2.30 | 1/7 | 0.30 | 1/7 | 20.00 | Jul-05 |
| Atlanta | 14.00 | 9.52 | 28.00 | 2.50 | 1/8 | 0.25 | 1/8 | 21.00 | Oct-05 |
| Orlando | 13.38 | 8.89 | 27.38 | 2.00 | 1/4 | 0.25 | 1/8 | 22.50 | |
| Minneapolis | 13.37 | 9.11 | 26.67 | 2.50 | 1/5 | 0.38 | 1/5 | 21.00 | Sep-05 |
| Denver | 13.23 | 8.74 | 27.23 | 1.60 | 1/8 | 0.25 | 1/8 | 22.50 | |
| ** New York | 13.10 | 8.65 | 27.10 | 2.50 | 1/5 | 0.40 | 1/5 | 12.00 | May-04 |
| Phoenix | 12.87 | 8.83 | 27.10 | 2.50 | 1/6 | 0.30 | 1/6 | 20.00 | |
| Houston | 12.85 | 8.81 | 25.45 | 2.50 | 1/6 | 0.30 | 1/6 | 20.00 | Aug-05 |
| ** Chicago | 12.70 | 8.66 | 25.30 | 2.25 | 1/9 | 0.20 | 1/9 | 20.00 | May-05 |
| ** DC suburbs | 12.08 | 8.35 | 23.70 | | | | | | |
| Dallas | 12.55 | 8.52 | 25.15 | 2.25 | 1/9 | 0.20 | 1/9 | 18.00 | Nov-05 |
| New Orleans | 11.80 | 8.21 | 23.00 | 2.50 | 1/8 | 0.20 | 1/8 | 18.00 | |
| Detroit | 11.65 | 8.07 | 22.85 | 2.50 | 1/8 | 0.20 | 1/8 | 16.00 | Aug-01 |
| Baltimore | 11.60 | 7.99 | 22.80 | 1.80 | 1/8 | 0.20 | 1/8 | 24.00 | Jul-05 |
| Cleveland | 10.78 | 7.21 | 21.98 | 1.80 | 1/6 | 0.40 | 1/4 | 15.00 | |
| Washington | zones | | | | | | | | |

In any jurisdiction in which taxi rates are regulated, which is the vast majority of jurisdictions, taxi drivers have no authority to establish or negotiate fares, but this arrangement has not generally been understood to negate the independence of taxi drivers in these jurisdictions. In addition, the fact that Uber employes dynamic, or "surge" pricing, in times of high demand does not alter my conclusion. In fact, I view dynamic pricing as a factor that gives more control to TNC drivers when compared to taxi drivers, as TNC drivers can choose to drive only when it is likely to be even more profitable.

The argument that "Uber alone decides what percentage of each fare to keep and what percentage to pay to the driver" also does not support the conclusion that Uber controls its drivers.[66] Fee sharing between a driver and a company is a generally accepted process for revenue generation and has nothing to do with "control" on either side of the relationship. It is simply a mutually agreed-upon arrangement between two parties.  Similarly, it is common in the taxi industry that the taxi company takes a fee for rides, with the balance going to the driver. Expanding the analogy even further, e-commerce apps like Etsy, eBay and Airbnb also collect a percentage of the payment from the seller or service provider, and yet that fact would not lead to a conclusion that an Etsy or eBay seller, or an Airbnb host, would be under the control of those platforms.

---

[66] Master Long Form Complaint, p. 17.

Possibility of Deactivation/Not Accepting Rides

Plaintiffs also assert that control is evidenced by the fact that Uber "unilaterally sets the percentage of trips a driver can cancel."[67] But that is not consistent with Uber's cancellation policies. The Uber TSA refutes this directly:

> *You retain the sole right to determine when, where, and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies.*[68]

It is therefore clear that third-party drivers are free to decline as many rides as they so choose. With respect to the issue of cancellations, there is no strict policy against cancelling rides by drivers. For example, the current policy expressly permits drivers "to cancel an allocated booking." The policy considers some cancellation activity to be a breach of its agreements with drivers, but such activity is generally limited to types or patterns of activity that are illegal or detrimental to the proper function of the rideshare platform for all users, such as discriminatory conduct or fraud.[69]

Customer Complaints

Plaintiffs argue that Uber exercises control over third-party drivers because Uber "handles and decides the outcome of all complaints, issues, and grievances regarding the Uber ride."[70] I disagree.

While it is true that the Uber app contains functionality that allows passengers and drivers to leave feedback and rate each other, the actual "control" over the customer complaints is maintained by the drivers and passengers themselves. Uber does not evaluate or rate drivers at all, as it is wholly up to the passenger whether or not to provide feedback or rate his or her driver, and if so, what feedback to give. Thus, if anyone actually controls the complaints or ratings that drivers receive, it is the passenger that wields that control, not Uber.

Furthermore, a complaint system, including a rating system, in and of itself does not equate with control. Rating systems have become commonplace in today's smart-app enabled world. Ratings are used to evaluate barbers, hair stylists, manicurists, tattoo artists via apps like Yelp, yet it is highly unlikely that anyone would argue that the ability to rate these workers through the Yelp app makes them subject to the control of Yelp. Similarly, platforms like Airbnb, Etsy, and eBay all offer the ability for customers to rate providers, but it would be a significant stretch to

---

[67] Master Long Form Complaint, p. 18.
[68] 2015 Technology Services Agreement (Bates # UBER DOE 0000391).
[69] Uber, Cancellation Policy, https://help.uber.com/en/driving-and-delivering/article/cancellation-policy?nodeId=2f1bec45-b436-4272-a766-9f5b2cf757b8.
[70] Master Long Form Complaint, p. 14.

claim that providing ratings on an apartment rental procured through Airbnb, a piece of jewelry purchased through Etsy, or a second-hand article of clothing bought through eBay would make the seller subject to the control of any of those three platforms.

The above point regarding platforms like Airbnb, Etsy and eBay are also instructive with respect to Plaintiffs' argument about Uber dealing with customer complaints. Almost all e-commerce platforms have the ability to respond to complaints made by any party to a transaction or service, and again, it is clear in those contexts that the seller or service provider would not be considered to be under the control of the platform.

Plaintiffs' argument also overlooks the degree of true control that regulators exert over drivers. As noted above, TNC rules in Arizona, California and North Carolina all set forth certain conditions under which a driver cannot be allowed on a TNC platform. In my opinion, this is quite appropriate from a public policy perspective: TNCs like Uber should respond to safety or other incidents that occur on the Uber platform by suspending or even deactivating a driver (or passenger). Ultimately, though, as stated above, it is the legislatures and regulatory authorities across the nation that have set the standard for which drivers should be allowed access to the Uber app, and which should not. Additionally, some states have provided for appeal boards that deactivated drivers can utilize to be reinstated, even further reducing the degree to which TNCs can exert control over drivers.

For all of the above reasons, it is my opinion that drivers have significant control over the amount of their participation on the Uber app, and that Uber does not exercise control over drivers.

**COMMON CARRIER**

California

Based upon my experience with the CPUC's initial rulemaking and its subsequent, consistent inquiries into the TNC industry, it is my opinion that TNCs have not been treated like common carriers under the CPUC regulations and subsequent legislation in California. Rather, TNCs have been treated as distinct businesses – separate and distinct from all categories of "carriers" that the CPUC traditionally regulated.

The CPUC, in creating the TNC category of transportation services, began by revisiting the definition of Charter Party Carriers,[71] which means "every person engaged in the transportation of persons by motor vehicle for compensation, whether in common or contract carriage, over any public highway in this state."[72] In other words, prior to the advent of the TNC category, the CPUC traditionally recognized two types of Charter Party Carriers (also called Transportation

[71] CPUC Decision 13-09-045, Sept. 19, 2013, pp. 66-7. (https://docs.cpuc.ca.gov/publisheddocs/published/g000/m077/k192/77192335.pdf).
[72] California Public Utilities Code §5360.

Charter Parties, or "TCPs")[73]: (1) contract carriers and (2) common carriers. The CPUC did not categorize TNCs as common carriers or contract carriers.

Also of note is the basis of authority asserted by the CPUC over TNCs in its rulemaking, which suggested that it viewed TNCs as a new, distinct category from TCPs:

> *In this Decision, under the broad grant of authority pursuant to PU Code §§ 5381 and 701, we create the category of Transportation Network Company (TNC) to accompany the existing category of TCP.*[74]
>
> ***
>
> *It is reasonable to exercise this Commission's broad grant of authority pursuant to PU Codes §§ 5381 and 701 to create the category of TNC to accompany the existing category of TCP."*[75]

This conceptualization of TNCs as something distinct from TCPs is borne out by other considerations. For example, there are numerous statutory and regulatory requirements for TCPs that clearly do not apply to TNCs. For example, in the CPUC's "Application: Instructions and Information for Charter Party Carriers of Passengers" form, the following requirements are noted for TCPs:

- Drug testing;
- Applying for and receiving a Charter Party permit or certificate;
- Registering the vehicle as "commercial" or as a "limousine";
- Filing a financial responsibility form;
- Procuring a CPUC "file number"; and
- Providing the CPUC with the driver's mailing address.[76]

None of the above requirements apply to individuals who provide rides matched on TNC platforms, which further supports the conclusion that TNCs were never intended to be treated as equivalent to TCPs. These omissions from TNC oversight are notable because they leave drivers utilizing TNC platforms with less restrictive oversight, which is consistent with a determination that such a platform does not rise to the level of a common carrier, which traditionally has been subject to heightened standards of care and safety.

[73] https://www.cpuc.ca.gov/regulatory-services/licensing/transportation-licensing-and-analysis-branch/charter-party-carriers#:~:text=Charter%2DParty%20Carrier%20(TCP),passenger%20transportation%20under%20Commission%20authority.
[74] CPUC Decision 13-09-045, Sept. 19, 2013, pp. 23-4 (emphasis added).
[75] Id. at 67 (emphasis added).
[76] https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/consumer-protection-and-enforcement-division/documents/tlab/tcp-forms/basicinfofortcp.pdf, pp. 4-17.

Another key distinction between TCPs and TNCs is the insurance framework. Prior to the advent of ridesharing, there was no such thing as a commercially available insurance policy that could provide personal insurance part of the time and provide commercial insurance at other times. Such a concept was difficult for insurers to write policies for, in large part because TNCs were seeking to insure vehicles that they did not own or lease, and because the policy would have to cover a non-static number of vehicles. In other words, the typical commercial insurance policy was written for a known, finite number of vehicles, such as a fleet of taxis, and such policies typically contemplated that the vehicle would be used strictly for commercial purposes. With a rideshare platform such as Uber or Lyft, however, the number of vehicles associated through the app would always be constantly in flux. Accordingly, Lyft and Uber worked with insurers to create a new type of policy that would address the ridesharing insurance issue. This insurance was already in effect when the CPUC began its rulemaking and the CPUC essentially incorporated what Uber and Lyft were already doing with respect to insurance into their rulemaking.[77] Also fundamental to this insurance framework is a recognition that TNCs involve the use of vehicles for commercial purposes at some times, and for personal purposes at other times. This arrangement marks a significant difference from the concept of a common carrier, which historically has involved modes of transportation (taxis, buses, commuter trains, and the like) that are primarily or entirely limited to commercial use.

Notably, the Assembly adopted the CPUC's basic regulatory framework (including its insurance requirements) by way of Assembly Bill 2293 (Bonilla) in 2014.[78] In the entirety of this bill, it is never mentioned that TNCs were intended to be treated as common carriers. In fact, there is language that indicates an intent to treat TNCs distinctly given the novelty of the industry:

> *5440. The Legislature makes the following findings:*
> *(a) The commission has initiated regulation of transportation network companies as a new category of charter-party carriers and continues to develop appropriate regulations for this new service.*
> *(b) Given the rapidly evolving transportation network company service, it is the intent of the Legislature to continue ongoing oversight of the commission' s regulation of these services in order to enact legislation to adjust commission authority and impose specific requirements or prohibitions as deemed necessary as these services evolve.*[79]

These legislative findings expressly note the novelty and uniqueness of the TNC industry. This language is consistent with the CPUC's clear statement of intent when it first began the rulemaking process. In the CPUC 2012 "Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, and New Online-Enabled Transportation Services," the CPUC noted the following:

---

[77] The specific insurance requirements are set forth in CA P.U. Code § 5433.
[78] http://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_2251-2300/ab_2293_bill_20140917_chaptered.html,
[79] CA Pub Util Code § 5440 (2024) (emphasis added).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

> *Businesses like Sidecar and Lyft have presented the Commission with a situation not encountered before: the use of mobile communications and social networks to connect individuals wishing to offer and receive low cost and convenient, sometimes shared, transportation. Uber likewise uses smartphones to present a different business model from traditional limousine service, by allowing passengers to use a GPS-enabled smartphone app to hail a limousine or other passenger carrier.*[80]
>
> ***
>
> *The purpose of this Rulemaking is not to stifle innovation and the provision of new services that consumers want, but rather to assess public safety risks, and to ensure that the safety of the public is not compromised in the operation of these new business models.*[81]

The CPUC's reference to the role of TNCs that it had "not encountered before" and their "different business model" underscores the unique role TNCs play as intermediaries rather than providers of transportation itself, further differentiating TNCs from the separate category of common carriers historically subject to CPUC regulation. Instead, as the CPUC order recognizes, the role of TNCs is to "connect individuals wishing to offer and receive" transportation.

Lastly, it is important to note that the CPUC began its rulemaking process in 2012, and since then has continued to conduct investigations into numerous aspects of the TNC industry. The CPUC has issued numerous decisions regarding TNCs, as recently as 2023.[82] In short, the CPUC has issued hundreds of pages of rulemaking and guidance regarding the TNC industry. In all of these rulemaking decisions and reports, not once has the CPUC stated that TNCs are common carriers, or that TNCs should be treated as common carriers.

North Carolina

Similarly, it is my opinion that TNCs have not been treated like common carriers under the North Carolina TNC bill.[83] The North Carolina Utilities Commission regulates common carriers under

---

[80] https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M040/K862/40862944.PDF (emphasis added). The distinction made by the CPUC regarding Uber is due to the fact that Uber and UberX were two different business models.
[81] Id. at 2 (emphasis added).
[82] See, e.g., CPUC Decision 14-04-022 (2014); CPUC Decision 14-11-043 (2014); CPUC Decision 16-04-041 (2016); CPUC Decision 19-06-033 (2019); CPUC Decision 20-03-007 (2020); CPUC Decision 20-03-014 (2020); CPUC Decision 21-03-005 (2021); CPUC Decision 21-06-023 (2021); CPUC Decision 21-11-004 (2021); CPUC Decision 23-02-024 (2023).
[83] Both the Arizona TNC bill and North Carolina TNC bill are silent on the common carrier issue, but I provide an analysis of how North Carolina has generally approached common-carrier issues here. Of note, roughly half the states in the country have adopted a rule by legislation or regulation that TNCs are not (or presumptively are not) common carriers.

Chapter 62 of the General Statutes (N.C.G.S.A. § 62-2). Chapter 62-3 of the North Carolina General Statutes provides the following two definitions relating to common carriers:

> *(6) "Common carrier" means any person, other than a carrier by rail, which holds itself out to the general public to engage in transportation of persons or household goods for compensation, including transportation by bus, truck, boat or other conveyance, except as exempted in G.S. 62-260.*
> *(7) "Common carrier by motor vehicle" means any person which holds itself out to the general public to engage in the transportation by motor vehicle in intrastate commerce of persons or household goods or any class or classes thereof for compensation, whether over regular or irregular routes, or in charter operations, except as exempted in G.S. 62-260.*[84]

Chapter 62-2 goes on to state that common carriers are considered public utilities:

> *(23) a. "Public utility" means a person, whether organized under the laws of this State or under the laws of any other state or country, now or hereafter owning or operating in this State equipment or facilities for:*
>
> *[omitted]*
>
>> *3. Transporting persons or household goods by street, suburban or interurban bus for the public for compensation;*
>> *4. Transporting persons or household goods by motor vehicles or any other form of transportation for the public for compensation, except motor carriers exempted in G.S. 62-260, carriers by rail, and carriers by air.*[85]

Next, Chapter 62-2 clearly sets forth that the North Carolina Utilities Commission holds full regulatory authority over public utilities:

> *To these ends, therefore, authority shall be vested in the North Carolina Utilities Commission to regulate public utilities generally, their rates, services and operations, and their expansion in relation to long-term energy conservation and management policies and statewide development requirements, and in the manner and in accordance with the policies set forth in this Chapter. Nothing in this Chapter shall be construed to imply any extension of Utilities Commission regulatory jurisdiction over any industry or enterprise that is not subject to the regulatory jurisdiction of said Commission.*[86]

Lastly, Chapter 62-260 lists out several categories of "persons and vehicles engaged in one or more of the following services by motor vehicle" that are exempt from common carrier regulation:

---

[84] N.C.G.S.A. § 62-3 (6) & (7).
[85] N.C.G.S.A. § 62-3 (23).
[86] N.C.G.S.A. § 62-2(b).

*(1) Transportation of passengers or household goods for or under the control of the State of North Carolina, or any political subdivision thereof, or any board, department or commission of the State, or any institution owned and supported by the State;*

*(2) Transportation of passengers by taxicabs when not carrying more than fifteen passengers or transportation by other motor vehicles performing bona fide taxicab service and not carrying more than fifteen passengers in a single vehicle at the same time when such taxicab or other vehicle performing bona fide taxicab service is not operated on a regular route or between termini; provided, no taxicab while operating over the regular route of a common carrier outside of a municipality and a residential and commercial zone adjacent thereto, as such zone may be determined by the Commission as provided in subdivision (8) of this subsection, shall solicit passengers along such route, but nothing herein shall be construed to prohibit a taxicab operator from picking up passengers along such route upon call, sign or signal from prospective passengers;*

*(3) Transportation by motor vehicles owned or operated by or on behalf of hotels while used exclusively for the transportation of hotel patronage between hotels and local railroad or other common carrier stations;*

*(4) Transportation of passengers to and from airports and passenger airline terminals when such transportation is incidental to transportation by aircraft;*

*(5) Transportation of passengers by trolley buses operated by electric power derived from a fixed overhead wire, furnishing local passenger transportation similar to street railway service;*

*(6) Transportation by motor vehicles used exclusively for the transportation of passengers to or from religious services or transportation of pupils and employees to and from private or parochial schools or transportation to and from functions for students and employees of private or parochial schools;*

*(7) Transportation of any bona fide employees to and from their place(s) of regular employment;*

*(8) Transportation of passengers when the movement is within a municipality exclusively, or within contiguous municipalities and within a residential and commercial zone adjacent to and a part of such municipality or contiguous municipalities; provided, the Commission shall have power in its discretion, in any particular case, to fix the limits of any such zone;*

*(9) through (17) Repealed by Session Laws 1995, c. 523, s. 16.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

> *(18) Charter parties, as defined by this subdivision when such charter party is sponsored or organized by, and used by, any organized senior citizen group whose members are sixty (60) years of age or older. Such charter party shall be subject to subsections (f) and (g) of this section. "Charter party", for the purpose of this subdivision, means a group of persons who, pursuant to a common purpose and under a single contract, and at a fixed charge for the vehicle, have acquired the exclusive use of a passenger-carrying motor vehicle to travel together as a group from a point of origin to a specified destination or for a particular itinerary, either agreed upon in advance or modified by the chartering group after having left the place of origin.*[87]

I will explain the relevance of this above excerpt below, but it is clear that none of the exemptions apply to TNCs.

Turning to the North Carolina TNC statute, which was enacted in 2015, it is worth noting first that in enacting the statute, the North Carolina legislature chose to codify the statute in Chapter 20 of the General Statutes, which refers to the Division of Motor Vehicles, a subset of the Department of Transportation.[88] This alone indicated the clear intention to treat TNCs as something wholly distinct from common carriers. This is confirmed by additional language in the statute, which requires TNCs to receive a permit from the Division of Motor Vehicles and to pay fees to the Division of Motor Vehicles, and authorizes the Division of Motor Vehicles to issue regulations for the TNC industry.[89] It is therefore clear that there was no intent for the North Carolina Utilities Commission, which as demonstrated above is the agency which regulates common carriers, to be the regulator for the TNC industry.

The only reference within the TNC statute to North Carolina's common carrier statute is in relation to the definition of a <u>brokering</u> transportation network company:

> *A transportation network company, as defined by this section, that exclusively dispatches TNC drivers that operate either of the following:*
>
> *a. For-hire passenger vehicles regulated under G.S. 160A-304.*
> *b. For-hire passenger vehicles regulated under G.S. 62-260(f) and subject to the requirements for security for protection of the public and safety of operation established for regulated motor common carriers.*[90]

The reference to G.S. 160A-304 is a specific reference to North Carolina's taxi statute. As for the reference to G.S. 62-260(f), as noted above, none of the exemptions apply to TNCs; as a result, a typical TNC like Uber is not a <u>brokering</u> TNC. This is why there is a separate definition for "typical" TNCs within the statute:

---

[87] N.C.G.S.A. § 62-260(a).
[88] <u>See</u> N.C.G.S.A. § 20-1.
[89] N.C.G.S.A. § 20-280(3) & § 20-280(7).
[90] N.C.G.S.A. § 20-280-1(2).

> *Transportation network company (TNC). – Any person that uses an online-enabled application or platform to connect passengers with TNC drivers who provide prearranged transportation services.*[91]

For these reasons, it is my opinion that the North Carolina legislature did not intend to treat TNCs as common carriers.

**CONCLUSION**

Based on my knowledge and extensive experience in the rideshare industry, as well as the materials listed in Attachment B, it is my opinion that Uber has always met and exceeded industry standards for safety in the TNC industry, and it far exceeds standards for safety practiced by the broader for-hire transportation industry. This is due to the fact that since its inception, Uber has implemented safety and accountability policies and processes that never previously existed in the for-hire transportation industry, and has continued to iterate on these processes, despite the lack of any regulatory or legislative requirement to do so. In addition, due to the fact that TNC drivers maintain a fundamental level of control over if, when, and how much they choose to use the Uber app to connect with potential riders, Uber does not maintain any significant control over drivers. Finally, California regulators have treated TNCs in a manner that is unique and distinct from treatment of common carriers historically.

These opinions are based on the material I reviewed in this matter and based upon my experience with the TNC industry specifically, the broader for-hire transportation industry, my experience handling dozens of TNC cases as an expert, as well as my former experience as a prosecutor in New York City.

**DECLARATION**

I declare under penalty of perjury that the foregoing facts are true and correct, and that the foregoing opinions are stated to a reasonable degree of probability.

Executed on the 26th day of September, 2025, at Oakland, CA.

________________________
Joseph Okpaku

[91] N.C.G.S.A. § 20-280-1(6).