# EXHIBIT BB

Honorable Richard A. Stone (Ret.)
SIGNATURE RESOLUTION
633 West 5th Street, Suite 1000
Los Angeles, California 90071
(213) 622-1002
Arbitrator

**SIGNATURE RESOLUTION**

**IN RE THE MATTER OF THE ARBITRATION BETWEEN**

| | |
|---|---|
| CAROL NORMANDIN, et al.,<br><br>Claimants,<br><br>vs.<br><br>VU TRAN, et al.,<br><br>Respondents. | CASE NO. BWNKD<br><br>**ARBITRATION AWARD**<br><br>Arb. Dates: March 23-29, 2026 |

This arbitration came for hearing before the undersigned Arbitrator on March 23, 2026. Rahul Ravipudi and Ian Samson (primarily), Panish Shea Ravipudi LLP, appeared on behalf of claimants Carol Normandin and Ken Parker ("the Normandin Claimants"). Elizabeth McNulty, Kelly A. Evans, and Christoper J.C. Waldon, Evans Fears, appeared on behalf of respondent Uber Technologies, Inc. ("Uber"). Baker O. Terry, Jr., Law Offices of Tim D. Wright, appeared on behalf of claimant Luna Moore ("Moore"). Daniel A. Eisenberg, Michelle Balady, Joseph Kang, and Eric Tran, Reisz Siderman Eisenberg, appeared on behalf of respondent Vu Tran ("Tran").

Each of the four sides submitted pre-arbitration briefs and made an opening statement as an overview of the evidence it anticipated being received in the matter. After the presentation of evidence, all four sides gave their respective closing arguments and later submitted closing briefs and proposed statements of decision. In addition, the Normandin Claimants and Uber submitted reply briefs. The matter was taken under submission.

The following Award is based upon the evidence admitted at the arbitration, the applicable legal principles, and any applicable stipulations between the parties. This Award addresses only the determinative arguments and issues and not every fact, argument, or issue raised at the hearing or in the pre- and post-hearing briefs submitted by the parties. However, the Arbitrator has carefully considered all arguments advanced in the briefs and during closing arguments.

## BACKGROUND

This case arises from the unfortunate death of Emily Normandin-Parker ("Normandin-Parker"). She was struck and killed when she wandered into traffic on the 73 Freeway in Orange County in an inebriated state after her Uber driver (Vu "Tran") pulled over into a gore point and got in an argument with her friend and fellow passenger, Luna "Moore."

Normandin-Parker's parents (i.e., the Normandin Claimants) presented a claim against Tran for negligence and claims against Uber for negligence (vicarious and direct liability theories) and negligent training, retention, and supervision.[1]

Moore presented claims against Tran for negligence/common carrier liability and intentional infliction of emotional distress (IIED), and a negligence/common carrier liability claim against Uber.[2]

The Arbitrator appreciates the professionalism, knowledge of the subject matter, and good cheer shown by all counsel at the evidentiary hearing. This is particularly true considering the tragic nature of the case.

## A THRESHOLD MATTER: THE DISAGREEMENTS REGARDING JUDICAL NOTICE

[1] The undersigned previously granted summary adjudication as to the negligent hiring claim.

[2] The undersigned previously granted summary adjudication as to Moore's negligent infliction of emotional distress (NIED) claim against Tran and as to her breach of implied covenant claim against Uber. Moore agreed, prior to the evidentiary hearing, that she had not directed her implied covenant claim against Tran.

At the evidentiary hearing, the Normandin Claimants and Uber disagreed as to whether four exhibits were subject to judicial notice. They briefed those disputes after the evidentiary hearing. Having reviewed the briefs, the undersigned rules as follows:

Exhs. 1481 and 1520 (October 2025 motion in limine and July 2023 POS re S & C in the *Hunter* action, respectively) – This request is DENIED as moot for reasons stated below but nevertheless merits discussion. Uber mischaracterizes a statement of the *Joslin* court. The court did ***not*** hold that: "It is improper for a court to take judicial notice of a document from another court unless the document is an order, statement of decision, or judgment." (Uber's Judicial Notice Brief, at 2:21-22.) Rather, summarizing one of several views on the scope of judicial notice, it stated: "When the court takes judicial notice of a document in its own files, or in those of another court, it has been said the court *will not consider the truth of the document's contents* unless it is an order, statement of decision, or judgment." (*Joslin v. H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 374, emphasis added.) In other words, judicial notice of a document's *filing and existence* may be appropriate even if judicial notice of the (*truth* of) facts stated within the document is not appropriate. That is a distinction with a material difference. I have no doubt that the inaccuracy was unintentional.[3]

Exh. 1428 (Uber 10-K excerpt) – DENIED as moot for the reasons stated below.

Ex. 1489 (PUC Decision 13-09-045, which is referred to in Uber's TNC Permit) - GRANTED in full.

## TRAN BREACHED A DUTY OF CARE OWED TO MOORE AND NORMANDIN-PARKER

The undersigned concludes that even assuming arguendo that Tran did not owe the heightened duty of a common carrier (a matter discussed *infra*), his conduct still fell below the

---

[3] Notably, the fact that the *Hunter* plaintiffs served the lawsuit on Uber *just one month* prior to Normandin-Parker's death does not necessarily mean that anyone at Uber with any ability to influence (let alone change) training policies and the like was "[]aware of Mr. Hunter's death before Emily was killed." (Normandin Claimants' Judicial Notice Brief, at 2:3.) However, Uber cannot escape from the fact that in the motion in limine it asserted that the driver in *Hunter* "safely stopped his vehicle on the freeway shoulder."

(ordinary) standard of care, viz., to act as a reasonably prudent person would under the same circumstances.

The parties' post-arbitration briefs run the gamut on this issue. The Normandin-Claimants rely heavily on Tran's own admission that he was the "captain of the ship" who had an obligation to keep Moore and Normandin-Parker ("the Passengers") safe and obey traffic laws after picking them up at a bar in the early morning weekend hours. Moore offers no direct argument on the point but appears to imply breach of duty in that Tran knew that she and Normandin-Parker were inebriated (a fact he admitted, but he testified he was uncertain as to their level of intoxication) but he nevertheless abandoned them. Uber's briefs focus on its alleged vicarious and direct liability and omit any discussion of the point. Tran offers that he responded reasonably to a perceived "sudden emergency" caused by the passengers' prior excessive drinking of which he was unaware and that he could not anticipate that Normandin-Parker would leave his vehicle and wander out into traffic.

The question of whether Tran breached his duty of care hinges on what happened: (1) in the moments before Tran stopped his car in the gore point, because Tran claims his actions were reasonable under the sudden emergency doctrine; and (2) from the time Tran pulled into the gore point until the time his car re-entered freeway traffic.

The Arbitrator cannot confidently make factual determinations as to everything that happened in those crucial moments, because no one presented entirely credible testimony. At the time, Moore was intoxicated to the point of vomiting on herself and her surroundings. Despite her claim of having an excellent recollection of the pertinent events, the Arbitrator found her testimony as to what happened during critical time periods to be untrustworthy as to certain aspects, i.e., whether she asked Tran to pull over or stop the ride or neither or both. With Normandin-Parker having passed away, only one other person really knows what happened, and that is Tran.[4] Unfortunately, the Arbitrator found his testimony on these critical matters to be

---

[4] It is the undersigned's experience and knowledge that many app-based drivers utilize cameras which capture not just the vehicle's front and rear views, but audio and video of the passenger compartment. For reasons not explained at the hearing, Tran apparently did not do so.

largely - in fact, almost entirely – incredible and unbelievable. This is particularly true regarding his testimony that Moore yelled "emergency!" and demanded that he immediately stop the car. This critical point was patently dishonest as if he learned of the "sudden emergency" defense and tailored his language to contemplate it. In addition, he testified that he knew it was his obligation to find a safe place to stop, and he believed the gore point was the safest place under the circumstances … he was wrong and he admitted as much on the stand, especially in light of the offramp. In addition, he also testified that he was unaware of the extent of the passengers' excessive drinking.[5] As to this latter point, he testified that he picked up the "twenty-something" passengers from a bar at 12:48 a.m. on a Saturday morning (i.e., after a Friday night of drinking).

As for his claim that he could not anticipate that Normandin-Parker would leave the vehicle and wander out into traffic: Tran admitted he knew the two passengers were intoxicated and had no reasonable ability to claim that he was unaware of how inebriated once Moore vomited which he must have heard, despite his testimony to the contrary, in the quiet vehicle, even with the window open. He testified that he was unaware she had vomited when he pulled into the gore point, again, not believable due to smell and sound. He testified that he realized that there was no "emergency" once he understood their request to stop was only about the vomiting. Yet, he didn't ensure the two passengers in his charge remained in the vehicle until he got them all to a place of safety.

Unfortunately, the undersigned agrees with Moore's characterization of Tran's testimony: "[Tran] … constructed a shell of sorts which left him, at least to appearances, virtually emotionless. His testimony, admittedly through translation, seemed vapid and stilted. His statements concerning safety of his passengers – and his own concern for the subject – were … palpably unconvincing, not only textually, but more so in all aspects of [his] body language and *aspect*." (Moore's Closing Brief, at 5:20-25, emphasis in original.)

---

[5] Tran and Moore both testified that Normandin-Parker screamed before Tran pulled over (apparently, in a panic that Moore was about to vomit in the car, with nothing to contain the vomit).

Notwithstanding the holes in Moore's and Tran's respective versions of the events and bearing in mind the utter lack of credibility in Tran's sudden emergency doctrine testimony, the evidence showed that in pulling into the gore point – an unsafe and illegal (Veh. C. sec. 21718) area, as Tran himself admitted at the hearing - and then exiting the car to argue with Moore for minutes about the cleaning fee and showing no concern for Normandin-Parker's whereabouts despite knowing she had exited the vehicle and was intoxicated, Tran showed far more worry for his new car than he did for his passengers. In a fit of anger, he needlessly placed them (and himself) in danger by illegally stopping in the gore point when he could have easily used the MacArthur Boulevard exit/offramp and stopped in a safe place instead alongside an active freeway at night. And, as previously outlined, he could have ensured they stayed in the car once he realized there was no "emergency" and driven them to a lawful place of safety. To make matters worse, Tran then abandoned those two young women, whom he knew to be intoxicated and whom he had kicked out of his car in his anger over what had transpired, in that spot.[6]

This is not a matter of disregarding the sudden emergency doctrine and "judg[ing] Mr. Tran's split-second decisions through the lens of hindsight." (Tran's Closing Brief, at 2:4-5.) Rather, the Arbitrator finds that Tran concocted his version of the events to avoid legal (and possibly moral) responsibility.

Tran argues that "[b]ut for Ms. Normandin-Parker's decision to enter into the lanes of traffic, the incident wouldn't have occurred." (Tran Closing brief, at 8:22-23). He testified that intoxicated people exercise poor judgment, but he asserts that Ms. Normandin-Parker doing just that negates his culpability. Assuming that Tran is seeking to assert that this is a superseding or intervening cause which absolves him of liability, or that she is comparatively at fault, that premise is rejected.

//

---

[6] In addition, GPS data showed (notwithstanding the modest margin of error of several meters) that when Tran departed the scene he unavoidably drove close to in the near vicinity of Normandin-Parker's body on the freeway before pulling off at the very next exit to call Uber to insist on immediately recovering the cleaning fee he had just argued about with Moore at the gore point.

**UBER IS VICARIOUSLY LIABLE AS A COMMON CARRIER**

The undersigned previously addressed this issue in his March 8, 2026, Ruling and Order on Uber's motions for summary judgment ("the SJ Order").

Civil Code section 2168 defines a common carrier broadly as: "Everyone who offers to the public to carry persons, property, or messages…." This language has been broadly applied.

In *Squaw Valley Ski Corp. v. Superior Court* (1992) 2 Cal.App.4th 1499, the court held that a ski resort chair lift facility was a common carrier even though it was only accessible to fee-paying members of the public who had ski equipment and chose to avail themselves of the chair lift as a mode of transportation. The *Squaw Valley* court interpreted section 2168 to mean "any entity which holds itself out to the public generally and indifferently to transport goods or persons from place to place for profit."

In *Doe v. Uber Techs., Inc.*, No. 19-CV-03310-JSC, 2019 WL 6251189, at *6 (N.D. Cal. Nov. 22, 2019), the district court, citing (*inter alia*) *Squaw Valley*, held that "Uber's status as an app-based transportation network does not preclude it as a matter of law from being held liable as a common carrier." (See also *id.* ["Uber first insists that it is not a common carrier because of conditions that are placed on who can use and be connected with drivers via the app; it argues that this process is not the 'general' and 'indifferent' treatment necessary to support a finding that Uber is a common carrier. The Court disagrees. Common carrier liability can attach even for transportation services that are 'of possible use to only a fraction of the population'"].)

The court in *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016) similarly held that the plaintiffs "alleged sufficient facts to plausibly claim that Uber is a common carrier" because "Uber's services are available to the general public and … Uber charges customers standardized fees for car rides." (*Id.*, at 787.) The court noted that while drivers may lose driving privileges, customers do not typically lose riding privileges, supporting the conclusion that Uber "offers to the public to carry persons" within the Civil Code definition. (*Id.*) It expressly rejected Uber's argument that "it is not a common carrier but that it is a 'broker' of transportation services." (*Id.* at 786)

The evidence adduced at the hearing, including the testimony of Erin O'Keefe (Uber's senior manager for corporate business operations), was (not surprisingly) consistent with that in

both *Doe v. Uber Techs*. cases. To be sure, it is undisputed, and beyond reasonable dispute, that Uber is an app-based transportation company which provides services to the general public for standardized fees.

It is true that rideshare companies are regulated as Transportation Network Companies (TNCs) under the Public Utilities Code's charter-party carrier framework rather than traditional common carrier provisions. But the PUC's regulatory classification for licensing purposes (i.e., TNC) does not necessarily preclude tort law common carrier duties, as these different legal frameworks could apply simultaneously. Uber is reasonably subject to *both* TNC-specific regulations under the Public Utilities Code *and* potential common carrier duties under tort law.

To be clear, the undersigned rejects Uber's assertion that it is merely "a technology company that provides a software platform connecting riders with independent third-party drivers who perform the transportation." (Uber's Closing Brief, at 8:3-4; see also, Uber's Reply Brief, at 3:1-9.) True, Uber does not control routes, provide cars, have a centralized dispatch system, guarantee transportation, or maintain other hallmarks of the prototypical common carrier. But neither did the ski lift in *Squaw Valley*. "Uber effectively offers transportation services to the public through its app, controls key aspects of the rider experience, sets prices, and profits directly from providing rides. The fact that Uber uses a digital interface rather than street hails does not change the fundamental nature of the service being offered. Nor does requiring an individual to register on Uber's app mean that Uber's services are not available to the general public." (Normandin-Parker Claimants' Reply Brief, at 3:20-4:4.)

Because the Arbitrator finds that Uber is vicariously liable for Tran's negligence as a common carrier (with a non-delegable safety duty), and Moore and the Normandin Claimants each urged this theory of liability against Uber, the undersigned need not and does not proceed to determine the other theories of negligence liability asserted against it by Moore and/or the Normandin Claimants (actual agent/employee, ostensible agent, and negligent retention, supervision, and training). Determination of those issues would not change the amount of damages awarded *infra*.[7]

---

[7] For the benefit of the parties: even if the undersigned did not conclude that Uber is a common

In this regard, Proposition 51 (Cal. Civ. Code § 1431.2), which generally limits each defendant's liability for noneconomic damages to that defendant's own proportionate share of fault, *does not apply* to reduce or eliminate a common carrier's vicarious liability for its driver's negligence. The carrier and the driver are treated as a single tortfeasor for Proposition 51 purposes, meaning the carrier is responsible for 100% of the noneconomic damages attributable to the driver's fault percentage. (See, e.g., *Miller v. Stouffer* (1992) 9 Cal.App.4th 70, 85 [noting that there are numerous "examples where, for deliberate reasons of public policy, a defendant who is without fault is subject to vicarious liability for the negligence of another, pursuant to statute or case law" and that if "Proposition 51 shields every defendant from liability for noneconomic damages beyond that attributable to that defendant's own fault, it largely would abrogate the vicarious tort liability of persons for the acts of others"; "Nothing in the language or intent of Proposition 51 conveyed to the voters in June 1986 dictates such a drastic change in California tort law"]; *Schreiber v. Lee* (2020) 47 Cal.App.5th 745, 753 [discussing, *inter alia*, *Miller*, *supra*; "A number of courts have held Proposition 51 inapplicable where liability is imposed on a defendant solely because of his or her relationship with a cotortfeasorsor [sic.], or because of statutory mandate or legal principle, and not because the defendant acted in a manner that caused or contributed to the plaintiff's injury—that is, when liability is "'imputed,'" rather than based on actual fault or culpable conduct"].) Thus, there is no need to explore other theories which may lead to joint and several liability.

**PROPOSITION 22 DOES NOT SHIELD UBER FROM VICARIOUS LIABILITY**

Curiously, in its post-arbitration briefs, Uber forwards that it is protected from vicarious liability by virtue of Business & Professions Code section 7451, enacted as part of the California electorate's approval of Proposition 22. The SJ Order rejected that very argument at length after a thorough analysis of both sides' exhaustive arguments. Nothing adduced at arbitration bore on this issue, which issue the undersigned decided as a matter of law. The

---

carrier, it would have been subject to joint and several liability for Tran's tortious conduct under *at least* one (and likely more than one) of those other theories.

ruling that Prop. 22 does not immunize Uber from vicarious liability for the torts of its drivers stands.

**NORMANDIN-PARKER DID NOT ENDURE PRE-DEATH PAIN AND SUFFERING**

In the SJ Order, in denying Uber's request for adjudication of the Normandin Claimants' Code of Civil Procedure sec. 377.34 survival claim, the undersigned stated: "One would hope that Normandin-Parker passed as quickly and painlessly as possible." (*Ibid*., at 17:20.) Thankfully, the evidence showed just that.

Defense accident reconstruction expert Dr. Jarrod Carter and defense biomechanical engineer Dr. Michael Carhart each proved to be outstanding and very credible expert witnesses. Because of his checkered past, defense pathologist Dr. Thomas Bennett's testimony was scrutinized. He offered sufficient testimony on all material points related to this issue. On the other hand, the Normandin-Parker Claimants' sole witness on this issue, pathologist Dr. Bennett Omalu, offered testimony on key points which were highly questionable, notwithstanding his impressive credentials.

At 16:13-20:23 of its Closing Brief, Uber clearly explains why Normandin-Parker suffered instantaneous legal death upon impact with a vehicle weighing approximately 3700 pounds and traveling at some 70 miles an hour. There is no need to repeat those assertions here. Suffice to say that the undersigned strongly agrees with the first two reasons and does not dispute the third:

> Claimants' survival claim is not viable for three reasons. First, Claimants have not proven that Normandin-Parker's circulatory function and respiratory functions continued after the impact. Second, to the contrary, the evidence shows that Normandin-Parker did not survive the subject accident for an amount of time sufficient for her to experience conscious pain and suffering. Third, the opinions of Claimants' expert, Dr. Bennett Omalu, are not credible and thus can form no basis for pre-death pain and suffering.
>
> Uber's Closing Brief, at 16:7-12.

According to Dr. Omalu, the only time a decedent experiences instantaneous death is by being vaporized in a nuclear conflagration. (Day 2 Tr., at 166:2-7.) Under this theory, a decedent would *always* endure pre-death pain and suffering - no matter how instantaneous the death. Dr. Omalu's testimony that Normandin-Parker may have lived for *up to three minutes* after impact is rejected; his opinion was without substantial support. On a related note, Dr. Omalu, by his own admission, is not an accident reconstructionist. In this regard, his damage pattern comparison in support of his claim that Normandin-Parker was standing at the time of impact and hit Ms. Marrone's windshield (i.e., pedestrian wrap trajectory) was not only contradicted by Drs. Carter and Carhart, but it also defied common sense based on the front bumper, windshield, and hood impact pictures presented.

To be sure, regarding the second of the three reasons advanced by Uber, as Uber quite convincingly points out in discussing how the manner and speed in which Normandin-Parker was overrun negates any reasonable finding of conscious pain and suffering:

> Uncontroverted evidence from Dr. Carhart established that Normandin-Parker was rendered unconscious at most 43 milliseconds after the initial impact with her [posterior] thighs when her head was violently and fatally impacted with the car bumper traveling 70 mph. Claimants' own expert, Dr. Omalu, conceded that it takes 100 milliseconds for the pain impulse to even reach the brain. Because 43 milliseconds are fewer than 100 milliseconds, basic math and physiology defeat Claimants' assertion that Normandin-Parker experienced any pain or suffering.

Uber's Reply Brief, at 6:4-9, bracketed material added.

*That alone is sufficient for Uber to prevail on this issue*.

As Uber correctly notes: "Without a viable survival claim, a plaintiff is not entitled to punitive damages on a wrongful death claim. See *Boeken v. Philip Morris USA, Inc*., 48 Cal. 4th 788, 796, 230 P.3d 342, 347 (2010)." Accordingly, the issue of punitive damages is moot.

It is not that the undersigned is not troubled and does not question the manner in which Uber approaches the issue of rider safety – in *numerous* respects, including driver training, the handling and investigation of customer complaints (the need for greater specificity for "dangerous driving" and its application and consideration by Uber), and its general approach to passenger safety. Hopefully, it will learn from this tragic incident (and that in *Hunter*) and change the pertinent policies and procedures accordingly. Should it fail to do so, it no doubt engages in that approach at its own substantial risk.

## THE NORMANDIN-PARKER CLAIMANTS' DAMAGES

It is undisputed, and beyond reasonable dispute based on the evidence presented at the hearing, that the Normandin Claimants have, as they put it, "suffered immense loss." Normandin-Parker was a wonderful young woman, a shining star with her whole life ahead of her, who obviously deeply loved her parents, just as they deeply loved her. "The evidence is undisputed concerning the profound loss of her love, companionship, comfort, care, assistance, protection, affection, society, and moral support both have and will endure." (Normandin Claimants' Closing Brief, at 1:13-15.) Money of course cannot replace what the Normandin Claimants lost, but it falls on the undersigned to attach a monetary value to the vast, life-altering, uniquely special loss that defies the natural order of things.

The undersigned has carefully considered all the evidence and arguments on this issue. The Arbitrator respectfully declines to award the amounts requested by the Normandin Claimants. Each of the Normandin Claimants is awarded $20,000,000.00 for past and future noneconomic damages.

## MOORE PREVAILS ON HER IIED CLAIM AGAINST TRAN

The elements of the tort of intentional infliction of emotional distress are: "(1) *outrageous conduct* by the defendant; (2) the defendant's intention of causing *or reckless*

*disregard* of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." (*Trerice v. Blue Cross of Cal.* (1989) 209 Cal.App.3d 878, 883, emphases added.) There is no requirement of a familial relationship.

In evaluating the extreme and outrageous conduct element of Claimant's IIED claim, "it is 'not ... enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' [Citation.]" (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496, italics omitted.)

Indeed, "[t]he alleged conduct must be so extreme as to exceed all bounds of that usually tolerated in a civilized community. Generally, conduct will be found to be actionable where the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'." (*Id.* at 494, internal citations and quotations omitted.) "On the spectrum of offensive conduct, outrageous conduct is that which is the most extremely offensive." (*Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1129.)

This claim is obliquely touched on in Tran's Closing Brief. In any event:

The Arbitrator finds credible Moore's testimony that an enraged Tran kicked her and Normandin-Parker out of his car, that he yelled at her continuously, and that he sought to physically intimidate her and even block her from leaving – all while she was in an extremely vulnerable position (intoxicated and on a freeway gore point at about 1:00 a.m.)[8] Thus, Tran is properly found liable on this claim:

[8] That Tran is 5'7" and not 6'1" (as described by Moore who is quite diminutive in stature) is immaterial. The fact that Moore had the presence of mind to properly "note" Tran's information to send him the desired funds the following day using a method Tran desired was quite noteworthy and persuasive.

> Belief in Ms. Moore's testimony necessarily encapsulates the outrageousness of his imperious screaming at his passengers, ordering them out of his car in the dark of night at the dangerous gore point, and his continued shouting and arguing with Luna Moore as he physically blocked her from following her best friend Emily as she walked away, all of which, Luna testified – in evident distress more than 30 months later – was terrifying and distressful in a way that she will never forget. Believing Moore's account means believing Tran intentionally inflicted emotional distress on her. Just the two of them survived the encounter. Moore testified that Tran never showed a whit of interest in the safety of Emily or of her. Cementing the proof of Tran's single-minded fixation on recovering a cleaning fee is the evidence that, minutes later, Tran called into Uber for a "safety" concern and then requested that Emily's account be charged a cleaning fee, which Uber promptly did.

Moore's Closing Brief, at 12:5-16.

As a vicariously liable common carrier, Uber is jointly and severally liable with Tran on this claim, notwithstanding its intentional nature and notwithstanding that Moore did not allege it directly against Uber. (See, e.g., *Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1423; *In re Uber Techs., Inc., Passenger Sexual Assault Litig*., 745 F. Supp. 3d 869, 900 (N.D. Cal. 2024) [Uber could be held vicariously liable for sexual assaults by drivers; because "common carriers have non-delegable duties," "the scope of a common carrier's liability for its agents' intentional torts could be broader than that of, say, a hospital"].) Put differently: the vicarious liability exception to Proposition 51 still applies because Uber's liability is derivative, not based on its own fault.[9]

[9] Uber appears to acknowledge this at 2:10-14 of its Closing Brief re Moore.

## MOORE'S DAMAGES

Moore requests damages of $8.5M. Thus, it seems that in her Closing Brief she only pays lip service to that part of the SJ Ruling which stated that she would not be permitted to use the negligence claim as a vehicle to seek damages for grief, survivor's guilt, and other emotional harms resulting from Normandin-Parker's death. In other words, the amount requested is patently excessive considering the narrowed scope of the negligence claim and that her only other claim is the IIED claim.[10]

Moore is awarded the total amount of $300,000.00 for past and future noneconomic damages on both claims: $100,000.00 on the negligence claim and $200,000.00 on the IIED claim.

## AWARD

The Arbitrator finds in favor of claimant Carol Normandin and against Uber and Tran, jointly and severally, in the total amount of $20,000,000.00.

The Arbitrator finds in favor of claimant Ken Parker and against Uber and Tran, jointly and severally, in the total amount of $20,000,000.00.

The Arbitrator finds in favor of claimant Luna Moore and against Uber and Tran, jointly and severally, in the total amount of $300,000.00.

No punitive damages are awarded.

DATED: 7/20/2026

DocuSigned by:
Hon. Richard Stone (Ret.)
0CD93BEF43BC415...

Hon. Richard A. Stone (Ret.)
Arbitrator

[10] Moore did not press a claim for punitive damages against Tran.