UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION | MDL No. 3084 CRB |
| This Document Relates to:<br><br>*ALL MATTERS* | **JOINT LETTER BRIEF REGARDING UBER'S THIRD-PARTY SUBPOENAS TO LEGAL MARKETING AND CLIENT ACQUISITION SERVICES**<br><br>Judge: Hon. Lisa J. Cisneros<br>Courtroom: G - 15th Floor |

Dear Judge Cisneros:

The Parties respectfully submit this joint letter regarding Uber's third-party subpoenas to legal marketing and client acquisition services.

By: */s/Roopal Luhana*
ROOPAL P. LUHANA *(Pro Hac Vice)*
**CHAFFIN LUHANA LLP**
600 Third Avenue, Fl. 12
New York, NY 10016
Telephone: (888) 480-1123
Email: luhana@chaffinluhana.com

SARAH R. LONDON (SBN 267083)
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Email: slondon@girardsharp.com

RACHEL B. ABRAMS (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Email: rabrams@peifferwolf.com

*Co-Lead Counsel for Plaintiffs*

By: */s/ Christopher V. Cotton*
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
PATRICK OOT (*pro hac vice*)
patrick.oot@nelsonmullins.com
CHRISTOPHER V. COTTON (*pro hac vice*)
chris.cotton@nelsonmullins.com
KIMBERLY PRIEST JOHNSON (*pro hac vice*)
kimberly.priestjohnson@nelsonmullins.com
JAY SCHLEPPENBACH (*pro hac vice)*
jay.schleppenbach@nelsonmullins.com

**KIRKLAND & ELLIS LLP**
ALLISON M. BROWN (*pro hac vice*)
Alli.brown@kirkland.com
JESSICA DAVIDSON (*pro hac vice*)
Jessica.davidson@kirkland.com
LAURA VARTAIN HORN
Laura.vartain@kirkland.com

*Counsel for Defendants Uber Technologies, Inc., Raiser LLC, and Raiser-CA, LLC*

**<u>Plaintiffs' Portion</u>**:

## I. Introduction

The Court should issue a permanent protective order barring Uber's subpoenas to Mass Tort Ad Agency ("MTAA"), Blue Sky Legal ("Blue Sky"), Isla Marketing ("Isla"), NexLevel, and Publisher First d/b/a Freestar ("Freestar"), and ordering the resulting productions destroyed.[1]

These subpoenas are improper. They seek privileged and work product materials of parties and nonparties along with irrelevant material. The productions span roughly 18,000 documents and 90,000 pages, including completed intake questionnaires from tens of thousands of individuals seeking representation, along with work product regarding individual claims and vetting criteria for nearly 150 law firms. Most relate to litigations unrelated to Uber. This is an unprecedented intrusion into sexual assault survivors and their counsel and an abuse of the discovery process. It also raises serious ethical questions about Uber's counsel's pursuit and review of these materials.

Uber has not identified a single document from the productions tying a subpoenaed entity, law firm, or Plaintiff to fraud. Yet Uber claims entitlement to the information as part of its "fraud" inquisition unless privilege and irrelevance are proven document by document. To do so, Uber proposes the Court order the subpoenaed parties (nonlawyers) to conduct a privilege review and prepare logs. These privileges belong overwhelmingly to individuals who never received notice or an opportunity to defend their rights. This task should not be left to anyone else, let alone the entities who exposed the information in the first place. And even if nonparties intervened, they cannot assert their rights without wading through others' privileged materials. The productions consist of spreadsheets commingling litigations and law firms, across tens of millions of rows of intake information. And still, Uber argues the privileged information is discoverable, returning the parties to a document-level dispute where Plaintiffs must defend, and the Special Master adjudicate, the privilege of absent holders.

If Uber genuinely wants to address fraud, it can use its own trip data, Plaintiff Fact Sheets, procedures already in place in this litigation, and tailored discovery—***including re-serving proper subpoenas to these entities***. Instead, Uber chose to subpoena the confidential files of individuals who never even filed a lawsuit against it, and now asks to keep those files while Plaintiffs and the Court sort out the damage.

## II. Argument

The Court may issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" Fed. R. Civ. P. 26(c)(1). The Court also has the inherent authority "to correct that which has been wrongfully done by virtue of its process," including by ordering parties to return or destroy documents. *Cahill v. Insider Inc.*, 131 F.4th 933, 938 (9th Cir. 2025); *see In re Broiler Chicken Antitrust Litig.*, 2026 WL 1724399, at *8-9 (N.D. Ill. June 15, 2026) (ordering destruction of documents produced under subpoena that violated Rule 45's notice requirements and scheduling orders); *NRA Grp., LLC v. Durenleau*, 340 F.R.D. 94, 98-99 (M.D. Pa. 2021) (ordering destruction of documents produced under procedurally and substantively improper subpoena); *Koh v. S.C. Johnson & Son, Inc.*, 2011 WL 940227, at *4-6 (N.D. Cal. Feb. 18, 2011) (ordering destruction of documents produced under irrelevant,

[1] The parties agreed to address any remaining disputes regarding Meta in separate briefing. That subpoena implicates unique issues including the Stored Communications Act.

harassing and "wildly overbroad" subpoenas).

**A. The Productions Are Saturated with Privileged and Work-Product Materials.**

Judge Breyer held that "communications and questionnaire responses by prospective plaintiffs," are "squarely protected by the attorney-client privilege"; the privilege extends to litigation support acting as counsel's agents; and attorney correspondence with those entities is protected work product. ECF 7297 at 3. That material is the substance of these productions.

MTAA produced 17,659 documents, comprising more than 90,000 pages and more than 800 spreadsheets. The spreadsheets include intake forms from numerous litigations, each row linking a person's full name, contact information, and narrative description of the injuries and harms suffered if provided. Others catalog MTAA's global client list across every litigation for which it was retained. They identify prospective clients by name and contact information, litigation, law firm, and often the reason for disqualification. Together, these intake and disposition spreadsheets exceed 42 million rows. The production also includes attorney communications regarding statute-of-limitations criteria, screening questions, and declined clients. The Blue Sky production consists of 1,135 pages, 993 of which are intake spreadsheets. These spreadsheets contain over 3,000 rows, pairing a client's name and contact information with the nature of the assault, the client's disposition, and a narrative of the assault if provided. Some individuals sought representation against Lyft, not Uber. The remaining pages include screening criteria, reflecting counsel's judgments about qualifying injuries and disqualifying facts. The Isla production is 129 pages and contains a spreadsheet of intake information for over 8,000 individuals seeking representation for sexual assaults during Uber and Lyft rides. Each row includes the person's name, phone number, email address, and narrative descriptions if provided.

Uber argues against privilege, speculating these entities may not be law firms' agents because they assist multiple law firms in connecting with plaintiffs. Uber cites a Blue Sky marketing paper that offers to "align targeting and screening to [a firm's] needs," to "deliver signed retainers," and to ensure "every lead is qualified and signed." ECF 7204-6 at 8-9. A vendor that screens prospective clients against a law firm's criteria and delivers them under signed retainers is acting on that firm's behalf. Even if not acting for counsel, these entities were acting for individuals seeking representation. A communication "is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and it is immaterial whether the agent is the agent of the attorney, the client, or both." *City & Cnty. of S.F. v. Super. Ct.*, 231 P.2d 26, 31 (Cal. 1951); *see* Cal. Evid. Code § 951. Uber concedes these entities discussed litigation with potential claimants, helped them to complete PFS, assisted them in collecting evidence, and vetted claims, i.e., acting as agents facilitating legal services. *See infra*, p. 13. And even material that falls short of strict privilege remains highly confidential and implicates sexual, medical, and other serious privacy interests, requiring those interests to be balanced against Uber's "need" for the material. *See Laub v. Horbaczewski*, 331 F.R.D. 516, 521-22 (C.D. Cal. 2019). Uber cannot make that showing, and in fact it disclaims interest in much of the material produced. *See* ECF 7204 at 3 ("no interest" in materials related to other litigations).[2]

[2] While Uber contends it has no interest in documents from other litigations, Uber held these productions for months, never alerting any of the subpoenaed entities that they had produced materials implicating other litigations. Uber then refused Plaintiffs' request to voluntarily sequester

### B. Uber Has Not Demonstrated Relevance or Need.

Uber must establish at the threshold that the discovery it seeks is relevant. *See Sanders v. Transamerica Life Ins. Co.*, 2026 WL 2395234, at *3 (N.D. Cal. Aug. 17, 2026). And because serious privacy interests are at stake, those interests must be balanced against Uber's "need" for it. *Laub*, 331 F.R.D. at 522; *Ali v. eBay, Inc.*, 2018 WL 11702217, at *2 (N.D. Cal. Aug. 29, 2018). Uber cannot demonstrate relevance or need.

The subpoenas to Isla, MTAA, and NexLevel contain a dozen or more requests for two broad categories: (1) "ANY AND ALL DOCUMENTS" related to "LEADS," defined as "potential plaintiffs" in this litigation; (2) "ANY AND ALL DOCUMENTS" related to "creative content" for this litigation, geographic targeting, ROI reports, and budgets. ECF 7059-2, 7059-8, 7059-10. Blue Sky's subpoena adds a dozen more requests, including "ANY AND ALL retainer agreements" and intake scripts and lead criteria. ECF 7059-4. Freestar's demands "ANY AND ALL DOCUMENTS" on litigation advertising and marketing strategies. ECF 7059-3.

Requests for "any and all documents" are overbroad on their face. *See In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 2024 WL 3416644 at *6. Moreover, the subpoenas infringe on information Judge Breyer found protected (e.g., intake materials, vetting criteria). ECF 7297. The remaining requests have no relevance (e.g., advertising strategies and potential plaintiffs who never filed suit). *See* Uber JCCP Aug. 27, 2026 Hr'g Tr. at 26:15-17 (non-plaintiffs are "not relevant to Uber defending itself[.]"); *id.* at 27:2-6 ( "advertising practices" may be "encouraging people to file claims or to seek counsel," which is "very different" from saying "they are responsible for the fraud or that it can be tied to them[.]"); *Doe v. Doe 1*, 2026 WL 1370113, at *1 (C.D. Cal. Mar. 25, 2026) (quashing subpoena for ads plaintiff saw, all public advertising in the preceding 90 days, and "any lead-generating service that led to Plaintiff retaining the firm").

Uber conceded it has no basis to believe these entities were involved with fraud or whether they had a relationship with counsel involved in this litigation. *See* Aug. 27, 2026 Hr'g Tr. at 27:8-10, 28:3-6 ("We don't know what we don't know" and do not "know the arrangements between the specific firms that we have subpoenaed and any of the law firms in this litigation."). Uber's relevancy arguments prove this. Uber cites a public blog post by MTAA's founder condemning fraud in the lead-generation industry, which says nothing about a particular instance of fraud. Next, Uber points to two altered ride receipts, one linked to Torticity and one to Advocate Rights Center, ***neither a subpoena recipient***. Uber made this same argument to Judge Schulman (JCCP), who asked: "Are you suggesting that the lead generator then altered the receipt? Or are you guessing at that?" Aug. 27, 2026 Hr'g Tr. at 24:23-25. Uber had no answer then and offers none now. Two receipts do not justify a sweeping search of five *other* companies, innocent parties, and nonparties.

Uber then generally attacks litigation advertising, criticizing "click-bait" from Total Injury Help, ***also not a subpoena recipient***, for promising "Significant Compensation" with "No Paperwork." The same site limits compensation to those who "can provide proof of an incident of sexual or physical assault while using a ride-hailing organization." https://www.rideshareassaultjustice.com/. Uber points to an Isla advertisement purportedly featuring an AI actor. ECF 7204-9. This is a public advertisement Uber located on its own and it does not show fraud. Finally, Uber says many receipts bear "indicators of third-party vendor

---

the documents, forcing Plaintiffs to file for emergency relief, which it opposed. And now, Uber insists on a document-by-document review to prove privilege.

involvement." Cotton Decl. ¶¶ 4-5. Uber does not claim these claims are fraudulent or even passed through these entities. No one disputes some Plaintiffs found counsel through vendors. Nor is the number of these individuals suspect. Uber's own data reflects hundreds of thousands of reports of sexual violence each year. If anything, the filing rates are surprisingly low given these figures.

Uber also argues these entities' fee arrangements with firms are relevant to financial motives but fails to explain how this reflects on *Plaintiffs'* motives. Uber's authorities concern the financial interests of witnesses, not their counsel. The inquiry is irrelevant. *See* ECF 3625 at 2 (denying discovery into litigation funding where there was no indication it was relevant or admissible). Regardless, there is nothing wrong about a survivor seeking compensation from the party responsible for her injuries. Plaintiffs could equally probe Uber's choice of counsel and financial motives. Finally, Uber argues intake narratives could serve as prior inconsistent statements. This cannot override privilege.

The subpoenas' fraud-specific requests fare no better. They demand "ANY AND ALL DOCUMENTS RELATED TO" fraud, untied to any Plaintiff, claim, or receipt, and they would sweep in the very communications with prospective plaintiffs and law firms that Judge Breyer held protected. They also invite marketing companies to make judgments about the veracity of claims. And they yielded nothing. Uber has not identified a single document identifying fraud, despite possessing these productions for *months* before the Court's temporary protective order.

Nor does Uber's "need" outweigh privacy interests. Uber has its own ride data, PFS, depositions, and ride receipt procedures already put in place. If Uber questions a particular claim, it can test it through the Plaintiff who brought it, as it has thus far. *See* Sept. 8, 2026 Hr'g Tr. at 21:6-10 (Judge Breyer explaining fraud verification should proceed "in connection with any particular plaintiff," not through claims about "rampant fraud"). Uber argues because 9 Plaintiffs failed to appear for depositions, these subpoenas are the remaining path to discovery. But Uber has not served a subpoena regarding *those* Plaintiffs' ride receipts.

Judge Schulman and Judge Breyer have seen Uber's pursuit for what it is. Judge Schulman described it as "a fishing expedition without any really clear indication of what [Uber] hope[s] to find and how it's going to help solve the problem." Aug. 27, 2026 Hr'g at 25:8-11. Judge Breyer described Uber's efforts as a "campfire" that diverted attention from the "forest fire" of this litigation and made Uber look "disingenuous about [its] goals and…statements." Sept. 8, 2026 Hr'g Tr. at 11:22-12:7. These subpoenas would let that campfire spread, drawing the Court, the parties, and thousands of nonparties into a conspiracy theory without resolving a single claim.

### C. No Review Process Can Cure the Intrusion

Uber proposes subpoena recipients serve privilege logs, redact nonparties' "identifying information," and return materials unrelated to "rideshare litigation," with the Special Master resolving any disputes. This is unworkable.

*First,* this information belongs overwhelmingly to nonparties, including law firms with their own engagement terms with these entities. While much of the information is facially privileged, the privilege holders are entitled to defend their rights, given the seriousness of what is at stake. No one else should be left with this task, especially not marketing entities, who Uber stresses are "not attorneys," and who exposed the information in the first place. *See* Cotton Decl. Ex. B at 1 (MTAA admits uploading 17,000 documents without a privilege review, including mistakenly sweeping in another vendor's email, and not consulting law firms whose

communications it disclosed). Also, no entity has even agreed to such a review. MTAA only offers a "categorical" log.

Nor is there a way for all impacted nonparties to intervene. Plaintiffs would have to identify and notify every nonparty, each of whom would then be handed a production full of the others' privileged information. Much of the information is in massive spreadsheets, containing intake and client information for tens of thousands of individuals spanning litigations, firms, and collectively exceeding 42 million rows. *Second*, Uber says it does not seek materials "properly shown to be privileged," but that disclaimer is illusory. Uber disputes privilege over the very categories Judge Breyer found protected, including "claimant information, narratives of alleged assaults, descriptions of alleged injuries, and claim dispositions." *See infra* p. 10. Thus, any log is only the beginning of an inevitable document-level dispute, with Plaintiffs defending, and the Special Master adjudicating, privilege, including for absent holders. *Finally*, redacting nonparty names leaves privileged intake narratives, attorney communications, and screening criteria fully intact, and cannot be squared with Uber's stated need for nonparty identities to trace who allegedly altered receipts. Uber's proposal is infeasible, deepens the harm, and imposes a disproportionate burden on Plaintiffs[3] and nonparties, all for irrelevant information.

Ultimately, Uber's demands are misplaced. These productions are riddled with privileged and private material that cannot practicably be segregated, causing substantial harm to parties and nonparties. Nothing entitles Uber to a log or whatever non-privileged remainder might be extracted. *See Cahill*, 131 F.4th at 938 (Court can order documents destroyed to correct a wrong); *Broiler Chicken*, 2026 WL 1724399, at *6, 8–9 (destruction even though documents "likely relevant"); *NRA*, 340 F.R.D. at 98 ("no reason to conduct such a review of documents obtained in clear violation of the Federal Rules"); *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1328 n.3 (11th Cir. 2020) (affirming quashing subpoena without privilege log, where the only relevant information was protected and the rest marginally relevant); *Hall v. Baltimore Police Dep't*, 2025 WL 509130, at *12 (D. Md. Feb. 13, 2025) ("requiring a privilege log first would impose the burden of 'laborious privilege review' that would 'far exceed any likely benefit, in terms of relevant documents that for some reason escape privilege or work product protection'").

**D. The Cutter Declaration Should be Disregarded**

Uber relies on a declaration from Brooks Cutter of Cutter Law P.C. to support its overbroad discovery. Mr. Cutter is an interested witness whose position on these subpoenas has shifted with his own interests. On August 12, 2026, Cutter Law wrote to Uber on behalf of the JCCP Plaintiffs demanding that Uber withdraw the subpoenas, which it called "a transparent attempt to weaponize discovery as a tool of harassment rather than a means of obtaining relevant evidence." London Decl. ¶ 7 & Ex. A; *see also id.* ("[t]here is no scenario where the inner workings of litigation support would shed light on matters at issue in this litigation"; discovery into individuals who never sued "bears no relationship to this case while imposing a severe intrusion into one of the most private domains of these individuals' lives."). But then Cutter reversed course. In a stunning turn, the Cutter firm sat on its hands during the hearing before Judge Shulman and abdicated to the

[3] Uber incorrectly argues Plaintiffs have no standing to raise burden. A party may challenge a third-party subpoena that implicates its own rights or privileges. *In re Uber*, 2024 WL 3416644, at *2. Plaintiffs have already spent months investigating productions Uber improperly obtained and briefing emergency relief. Uber now demands review of more than 90,000 pages and 42 million rows of others' privileged data document by document. That burden falls squarely on Plaintiffs.

MDL lawyers to argue the issue. When asked why, Ms. Celine Cutter admitted to Plaintiffs' Co-Lead Counsel that she had been told to stand down on the subpoena issue in connection with getting a mediation scheduled to resolve her firm's cases. London Decl. ¶¶ 9-10. Cutter also has a stake in the fraud allegations themselves. By Mr. Cutter's own account, Uber identified two Cutter Law plaintiffs as having submitted fraudulent trip receipts, one connected to the same Torticity receipt Uber relies on in its portion of this brief. Cutter Decl. ¶ 5 & n.1. Moreover, Cutter does not mention the entities at issue here, claim to have used them, seen their productions, or know what they hold. The declaration offers only "understanding[s]" and paraphrases of Uber's own briefing, which Uber now cites back to this Court. The Court should disregard the declaration or permit Plaintiffs to depose Mr. and Ms. Cutter regarding its preparation and any arrangement with Uber.[4]

### E. Procedural Defects Compound the Harm and Independently Warrant Relief

Plaintiffs' request is also warranted due to procedural defects. The subpoenas were served in violation of this Court's order staying "all discovery on Plaintiffs." PTO No. 5, ECF 175, ¶ 4(B). While Uber contends nonparty discovery falls outside PTO No. 5, the subpoenas seek information about Plaintiffs. Also, Uber served the MTAA, NexLevel, and Isla subpoenas without prior notice to Plaintiffs, in violation of Rule 45. Plaintiffs had no opportunity to object before service, and no opportunity to intervene in the Florida enforcement proceeding where Uber's counsel secured compliance from an unrepresented MTAA. *See Broiler Chicken*, 2026 WL 1724399, at *8-9 (quashing subpoena that violated scheduling order and Rule 45 notice requirement); *NRA Grp.*, 340 F.R.D. at 98-99 (granting protective order for procedurally improper subpoena).

## III. Conclusion

The Court should issue a permanent protective order barring the subpoenas to MTAA, Blue Sky, Isla, NexLevel, and Freestar, and ordering the destruction of resulting productions.

[4] Uber previously settled with JCCP leadership firms and obtained agreements from those firms that served Uber's interests.

**<u>Defendants' Portion:</u>**

Plaintiffs ask the Court to permanently bar all discovery from the very entities through which fraudulent claims are likely to have entered this MDL and to destroy what has already been produced. The Court should instead adopt the process subpoena recipient MTAA's own counsel proposed after Plaintiffs objected: (1) the subpoena recipients serve privilege logs, (2) identifying information of nonparties who never filed suit is redacted, (3) materials unrelated to rideshare litigation are returned or destroyed, and (4) Special Master Jones resolves any specific disputes that remain. Cotton Decl. ¶ 6 & Ex. B.

The fraud in this MDL is documented, not hypothetical. To date, Uber has identified over 450 instances of fraud in the MDL and JCCP within the categories of non-bona-fide receipts, fraudulent fact sheets, and discrepancies between objective data and verified fact sheets. Cotton Decl. ¶ 4. More than 50 MDL Plaintiffs submitted non-bona-fide ride receipts. ECFs 3876, 3972, 4440, 5454, 5970. When the Court ordered 13 of them to explain where those receipts came from, 9 did not appear, and 5 were held in contempt. ECF 8106. With those Plaintiffs silent, the trail runs through the vendors that collected and handled the receipts. Uber has identified more than 300 active MDL claims with evidence of third-party vendor involvement, and approximately 44% of the 261 receipts Plaintiffs produced in October 2026 alone bear facial indicators of vendor involvement, such as forwarding email headers or intake-firm email addresses. Cotton Decl. ¶ 4-5. Uber has reason to believe many more claimants came through these same vendors but cannot identify them without the discovery sought here. At a minimum, Uber is entitled to discover the requested information because it is relevant to the parties' claims and defenses, including claim vetting, PFS completion, and fraud detection.

### A. Plaintiffs Have Not Met Their Burden.

The party asserting attorney-client privilege bears the burden of establishing it. That a document relates to a claimant, law firm, or litigation does not, by itself, establish that it is privileged. *See In re Social Media Adolescent Addiction Litig.,* No. 22-md-3047, 2025 WL 325970, at *5 (N.D. Cal. Jan. 29, 2025). Plaintiffs must make a particularized showing as to the specific documents or categories being withheld by each third party (which Uber can challenge as appropriate), yet they have not logged a single document in a privilege log. This Court's September 10 Order granted only temporary relief "while Plaintiffs review the productions" and directed the third parties to "preserve any responsive documents." ECF 7297 at 1. Two months later, Plaintiffs have (tellingly) not asserted privilege over a single document and now call review "infeasible." While Plaintiffs generally describe some categories of documents, such as "client intake forms" and "questionnaire responses," they do not identify which documents, if any, fall within those categories, and they acknowledge that any privilege would not belong to them. Despite this, they seek to withhold or destroy the **entire** productions. This "blanket assertion" of privilege "is improper." *See Bluestone Inv. Inc. v. Hu,* No. 25-cv-5396, 2026 WL 2971795, at *5 (N.D. Cal. Oct. 3, 2026).

Lead generators are not attorneys, *see, e.g., About MTAA,* https://masstortadagency.com/about/ (last reviewed Oct. 7, 2026), so privilege generally does not attach to their communications. Privilege may sometimes extend to a third-party agent, but not based on "remarkably unspecific" assertions. *United States v. Christensen,* 828 F.3d 763, 803 (9th Cir. 2015). Plaintiffs identify no facts establishing any alleged agency relationship, let alone for each category of documents requested. *See Matrix Photographs, LLC v. Livejournal, Inc.,* 873 F.3d 1045, 1054 (9th Cir. 2017)

(elements of agency include agent's authority to act on behalf of principal and principal's right to control). Plaintiffs' arguments about agency betray their lack of facts, as they state, "[i]f not acting for counsel, these entities were acting for the individuals seeking representation." Privilege requires facts, not "in the alternative" hypotheticals. *S.F. Bay Conserv. & Dev. Comm'n v. U.S. Army Corps of Eng'rs*, No. 16-cv-5420, 2018 WL 3846002, at *7 (N.D. Cal. Aug. 13, 2018).

Regardless, the record affirmatively refutes any agency theory. Lead generators are "paid on a per-lead basis and shop those leads to multiple law firms," frequently through competitive bidding. *See* Cutter Decl. ¶ 7; ECF 7204-6. That is inconsistent with the requirement that an agent act on behalf of and subject to the control of a particular principal. A vendor that sells its product to whichever firm buys it, on that buyer's specifications, is a seller, not an agent subject to any one principal's control. *See Matrix Photographs*, 873 F.3d at 1054. And Plaintiffs still identify no agreement establishing control for any subpoena recipient. Moreover, the subpoena recipients are independent marketing businesses that designed advertisements, collected leads, and sold those leads to multiple firms. The lead generators' involvement typically predates any attorney-client relationship. That some vendors also performed intake tasks for firms does not make every record they hold privileged; it is precisely why a document-by-document showing is required.

Additionally, work product protection extends only to "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). Only "opinion work product" that "contains mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation" is entitled to heightened protection. *Tremblay v. OpenAI, Inc.,* No. 23-cv-03223, 2024 WL 3159292, at *2 (N.D. Cal. June 24, 2024). Plaintiffs make no showing that any subpoenaed records reveal such thought processes or were created by or at the direction of counsel. *See* ECF 2168 at 7 (rejecting privilege and work product claims without "a sufficient evidentiary foundation"). The subpoenas here concern advertising, lead-generation, referral, compensation, and other operational records of the subpoena recipients. Independently created business records do not become work product simply because attorneys later receive them. *See S.T. v. L.A. Unified Sch. Dist.,* No. 2:19-cv-6693, 2020 WL 6114904, at *2 (N.D. Cal. Aug. 25, 2020).

Nor do privacy concerns foreclose discovery. *See Albert D. Seeno Constr. Co. v. Aspen Ins. UK Ltd.,* No. 17-cv-3765, 2019 WL 13439001, at *2 (N.D. Cal. Jan. 17, 2019). The party asserting privacy interests must make document-specific showings. *See DeArmand E. v. City of Antioch,* No. 08-cv-1709, 2009 WL 941760, at *2 (N.D. Cal. April 6, 2009). Even if those showings are made, courts must balance privacy against the need for information and consider less restrictive alternatives. As the Court recognized, "there are several measures available to protect the very serious privacy concerns of the non-party plaintiffs," including the existing Protective Order. ECF 321. Indeed, the Court struck the balance previously by imposing conditions on sensitive discovery sought by Plaintiffs rather than barring it. *See, e.g.,* ECF 3346 at 6-7. Redaction of nonparty names and contact information, which MTAA has proposed, together with the Protective Order, addresses Plaintiffs' privacy concern.

### B. The Materials the Subpoenas Seek are Relevant.

Plaintiffs concede that the productions already made include, among other things, claimant information, narratives of alleged assaults, descriptions of alleged injuries, and claim dispositions. Plaintiffs further concede that relevant, nonprivileged information exists, suggesting Uber "may serve proper subpoenas" for it. That concession defeats destruction: the efficient path is to identify

material in the existing productions, not to destroy them and start over. Further, an attorney whose firm represents hundreds of Plaintiffs in this MDL and serves as a court-appointed Liaison Counsel for Plaintiffs in the JCCP, stated that "[a]dditional information about lead generators will only further benefit… plaintiffs' firms in the JCCP and MDL." Cutter Decl. ¶¶ 2, 8. Nonetheless, Plaintiffs ignore the discovery standard and dispute relevance. The correct test is whether the materials sought are "relevant to any party's claim or defense and proportional to the needs of the case… and whether the burden or expense of the proposed discovery outweighs its likely benefit."[5] Fed. R. Civ. P. 26(b)(1). "[D]oubts about the permissible scope of discovery are to be resolved in favor of disclosure." *EchoSpan, Inc. v. Medallia, Inc.,* No. 22-cv-01732, 2022 WL 22855051, at *1 (N.D. Cal. July 25, 2022). The party opposing discovery bears a "heavy burden." *Blankenship v. Hearst Corp.,* 519 F.2d 419, 429 (9th Cir. 1975). Plaintiffs invoked this standard to obtain sweeping third-party discovery over Uber's relevance and privacy objections. They cannot now demand a narrower rule when discovery turns to the entities that generated leads for this litigation.

The subpoenas seek information relevant to (1) Plaintiffs' claims, (2) Uber's defenses, and (3) third-party financial interests bearing on the credibility of Plaintiffs' claims.

Many of the requests seek materials gathered to support claims in this litigation, including documents related to ride receipts, communications with claimants, and documents related to PFS. Documents reflecting Plaintiffs' statements about their claims and their supporting evidence are clearly discoverable. *See Fresnius Med. Care Hldg. Inc. v. Baxter Int'l, Inc.,* 224 F.R.D. 644, 654 (N.D. Cal. Feb. 5, 2004).

The requests also seek discoverable information regarding Uber's potential defenses. *See Flynn v. Nevada,* 345 F.R.D. 338, 350 n.21 (D. Nev. 2024) (discovery "should proceed" on a party's defense unless that defense is "truly baseless"). For example, the requests seek information about "alterations, fabrications, or forgeries… of trip receipts" and "screening for fraud." That information is relevant as to both Plaintiffs and potential plaintiffs who never filed, because it shows how claims were (or were not) vetted. Uber has a right to investigate its defenses related to the veracity of Plaintiffs' (and potential plaintiffs') claims, particularly when the potential legitimacy of those claims is tied to the amount paid to a lead generator and the "complexity of the criteria" considered in developing that lead. *See* ECF 7204-6. And although the Plaintiffs who have been caught committing fraud in this action have appropriately been dismissed, the evidence suggests that the fraud is more extensive. To defend itself, Uber needs to investigate fraud beyond that which it has already caught. Discovery into how the subpoena recipients identified and screened leads will shed light on how fraudulent claims continue to be asserted against Uber and how to identify them.

These requests also seek discoverable information related to various, and perhaps competing, economic interests driving these claims. One of the requests seeks information regarding agreements between the third-parties and law firms, including revenue-sharing, profit-sharing, or referral-fee agreements. Potential "financial interest" in a matter is not just relevant but indeed "critical to the jury's assessment of witness testimony and ubiquitous in trials." *Applied*

[5] To the extent Plaintiffs claim undue burden, they lack standing to do so. *See Doe v. Kaiser Found. Health Plan, Inc.,* No. 23-cv-2865, 2023 WL 8714880, at *3 (N.D. Cal. Dec. 17, 2023). Any potential burden is on the subpoena recipients—some of which have not even responded—not Plaintiffs. In any event, a burden objection "must provide objective and specific evidence[.]" *QueerDoc, PLLC v. DOJ,* 187 F.4th 1112, 1147 (9th Cir. 2026). No such evidence has been offered.

*Materials, Inc. v. Demaray LLC,* No. 5:20-cv-09341, 2026 WL 1430723, at *6 (N.D. Cal. Jan. 5, 2026). Indeed, this Court's Local Rules require disclosure of any non-governmental "persons, associations of persons, firms, partnerships, corporations… or any other entities… [with] either: (i) a financial interest of any kind in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding." L.R. 3-15. And evidence that bears on possible financial motive to participate in a fraudulent scheme is relevant and discoverable. *See Transamerica Life Ins. Co. v. Arutyunyan,* 93 F.4th 1136, 1147 (9th Cir. 2024). Plaintiffs say these authorities concern witnesses, not counsel. But Plaintiffs are the witnesses, and the incentive at issue is the one lead generators offered to them. Nor is this litigation funding. *Cf.* ECF 3625 at 2. It is evidence of how the claims and their supporting documents were generated.

**C. Third-Party Discovery Cannot Be Barred on Procedural Grounds.**

Plaintiffs argue that alleged procedural defects with the subpoenas somehow warrant a complete bar on any discovery from the subpoena recipients. Their out-of-circuit authority does not support that extraordinary relief. *NRA Grp., LLC v. Durenleau* quashed a subpoena issued before the Rule 26(f) conference, 340 F.R.D. 94, 97 (M.D. Penn. 2021), and *In re Broiler Chicken Antitrust Litigation* quashed subpoenas issued several months after the Court's deadline for third-party subpoenas, No. 16-cv-8637, 2026 WL 1724399, at *5 (N.D. Ill. June 15, 2026). Plaintiffs do not claim either circumstance is present here. They argue that PTO 5 barred the subpoenas, but its plain language stays only "all discovery on Plaintiffs." ECF 175. The subpoenas instead seek information from third parties. See ECF 7059 at Exs. 1-5.

As for notice, a clerical oversight during the December holidays caused Uber to inadvertently miss serving two Notices of Intent. However, Plaintiffs have been on notice since July 2025 that Uber was serving third parties with subpoenas and did not object all that time. *See* Cotton Decl. ¶ 3. And they have now been heard on the merits. "Courts in this circuit thus generally deny motions to quash subpoenas for failure to serve another party where the unserved party ultimately received notice of and was able to object to the subpoena." *In re Born Korea, Co.,* 839 F. Supp. 3d 1208, 1211 (N.D. Cal. 2026).

**D. The Subpoenas Are Important to Help Detect and Prevent Fraud.**

Fraud is a well-documented problem in this MDL and related JCCP, not a hypothetical one.[6] *See* Order, *In re: Uber Rideshare Cases,* No. CJC-21-005188, at 8 (Oct. 27, 2026) ("The parties are urged to consider ways to prevent submission of fraudulent and/or unverified information by claimants in these lawsuits."). Plaintiffs argue that Uber can rely on its own ride data and PFS, but the history of this litigation has shown that information in a PFS can oftentimes not be independently verified. And ride data can only show that a receipt is false; it cannot show who altered it, how it entered the claim, or how many other claims came through the same channel. That evidence sits with the vendors that collected and processed the receipts. Plaintiffs' own counsel agrees: a single firm "may not know whether the same supporting document has been presented by other claimants to other firms," and information about "the vendor's role in obtaining,

---

[6] Plaintiffs complain that "Uber has not identified a single document from these requests identifying any fraudulent claim," but this ignores the Court's order (sought by Plaintiffs) barring Uber from accessing or using these documents. ECF 7297. Uber cannot be faulted for not mining productions it is prohibited from reviewing.

verifying, or transmitting it" is "generally held by the vendors rather than individual plaintiffs' firms." Cutter Decl. ¶ 6.

Lead generators did far more than locate potential claimants; they appear to have discussed litigation with potential claimants, helped them to complete PFSs, assisted them in collecting purported evidence, and they claim to have vetted claims. *See* Cutter Decl. ¶ 3. Beyond that, lead generators are often paid on a per-claimant basis, incentivizing volume without meaningful pre-suit investigation. *See id.* ¶ 7; ECF 7204-6, ("acquire Uber and Lyft sexual assault plaintiffs at a performance-based cost of $3,600 to $4,800"). Aggressive click-bait style online advertising from some lead generators has promised "**Significant Compensation**" with "**No Paperwork**" for filing trip-related sexual assault claims. *See, e.g., Total Injury Help, Rideshare Assault,* www.rideshareassaultjustice.com. Subpoena recipient Isla Marketing used AI-generated content with a "deepfake" actor portrayed as a sexual-assault survivor in ads soliciting claimants. *See* ECF 7204-9. This advertising produced a rapid increase in plaintiffs, many of whom are non-responsive "plaintiffs in name only." Indeed, the founder/CEO of one subpoena recipient, MTAA, acknowledged on a public website that lead generators have been selling fraudulent cases in most mass torts and that he was aware of major fraud schemes in the Uber/Lyft litigation. Jacob Malherbe, *Mass Tort Fraud Exposed*, MTAA (Oct. 11, 2025), https://masstortadagency.com/mass-tort-fraud-exposed/ (last visited Oct. 19, 2026). When a subpoena recipient itself admits that fraud has infiltrated Uber mass tort claims, Plaintiffs cannot credibly call discovery into how those claims were sourced irrelevant.

Discovery has already uncovered multiple examples suggesting that subpoenaed claimant-acquisition, referral, and intake entities possess information concerning the origin and handling of claim materials. For example, Uber identified an altered ride receipt submitted in support of a claim that facially identified lead generator Advocate Rights Center. *See* ECF 7204 at 8. Unlike generalized concerns regarding claimant-acquisition practices, this constitutes direct evidence connecting fraudulent claim-submission materials to a referral or intake entity. Separately, Uber's investigation revealed that an authentic ride receipt associated with one Plaintiff was later altered and submitted by three unrelated Plaintiffs. During a Court-ordered deposition, the original Plaintiff testified that she had never communicated with any of those individuals and did not know how they obtained her receipt. ECF 7204-11. She further testified that, aside from her attorneys, the only entity to which she provided the receipt was Torticity, another lead generator, which she specifically identified as part of her intake process. *Id.* Plaintiffs respond that neither entity is a subpoena recipient here, but they miss the point. Uber learned of these vendors only because a receipt happened to bear a vendor's name or a cooperative Plaintiff testified. Uber has no way to know which vendor handled a given receipt without discovery from the vendors themselves.

Uber does not seek materials properly shown to be privileged, and there is a practical way to protect privilege while balancing Uber's legitimate interest in obtaining discovery. In fact, subpoena recipient MTAA's own counsel proposed a path forward to Uber's counsel.[7] Cotton Decl. ¶ 6 & Ex. B. MTAA proposed the parties meet and confer to resolve any disputes before going to the Court, including on a process for Uber to return or destroy any MTAA documents

---

[7] Plaintiffs complain Uber did not disclose the MTAA letter earlier, but Uber previously informed Plaintiffs that MTAA's counsel had reached out, provided MTAA's counsel's contact information, and shared MTAA's offer to meet and confer. Cotton Decl. ¶ 6. Plaintiffs declined to participate and insisted that the parties instead brief the issue. *Id.*

unrelated to the rideshare assault litigation. *Id.* MTAA also agreed to provide a privilege log identifying the documents in each category, the protection claimed, the holder, the law firm involved, and the basis for any claim. *Id.* For privacy concerns, MTAA recommended pinpoint redactions of names, contact information, and accounts of people who answered an ad but never filed suit. *Id.* MTAA estimated that the log, the unrelated documents, and a redaction protocol could be resolved within just a few weeks. *Id.* Special Master Jones could then resolve any remaining and specific privilege disputes.

Plaintiffs' objections to that process do not hold up. They say a log "does nothing other than confirm the privilege." But a log is how privilege is claimed; it will also separate what is privileged from what is not, which Plaintiffs concede exists. They say MTAA cannot be trusted because it produced documents without a privilege review. But logging is not deciding: MTAA—now represented by counsel—would identify the holder and basis for each claimed protection, the holders could assert their rights, and Special Master Jones would decide any dispute. Plaintiffs' authorities excusing a log involved productions where the only relevant information was protected. *See Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1328 n.3 (11th Cir. 2020). Here, Plaintiffs concede the opposite, all while proposing an outcome that would deny Uber any discovery from the very entities through which fraudulent claims are likely to flow.

**E. The Cutter Declaration Is Properly Before the Court.**

Plaintiffs do not dispute a single fact in the Cutter Declaration. Mr. Cutter speaks from experience working with "numerous" vendors, Cutter Decl. ¶ 3, and his testimony that vendor-held information is needed to determine whether a problem "is confined to an individual claim or reflects a practice affecting additional claims" stands unrebutted. *Id.* ¶ 6. That his firm's own clients were among those who submitted non-bona-fide receipts, *id.* ¶ 5, makes his testimony more credible, not less. A lawyer who reevaluates his view as the fraud record develops is not thereby disqualified. Nor should the Court permit depositions of opposing counsel, which "compromise[] the standards of the legal profession," *Serenity Investments LLC v. Sun Hung Kai,* No. 22-cv-1623, 2024 WL 517870, at *5 (N.D. Cal. Feb. 8, 2024)—particularly from parties who simultaneously argue that the underlying discovery is irrelevant. [8]

**Conclusion**

There is no reasonable dispute that these third-party lead generators have produced relevant information. While MTAA appears to have produced some number of irrelevant documents, the solution to that is not the destruction of all documents that have been produced and the service of new subpoenas as Plaintiffs suggest. Instead, the path forward has already been suggested by MTAA's own counsel: (1) the subpoena recipients serve privilege logs, (2) identifying information of nonparties who never filed suit is redacted, (3) materials unrelated to rideshare litigation are returned or destroyed, and (4) Special Master Jones resolves any specific disputes that remain.

---

[8] *See also* Cutter Decl. ¶ 8 ("[F]raudulent claims must be removed promptly because they stand in the way of legitimate claimants receiving fair compensation for their injuries. As long as fraudulent claims persist in this litigation, it will be difficult for Uber and the legitimate plaintiffs to fairly value their claims and reach a negotiated resolution efficiently.").

## ATTESTATION

Pursuant to Civil Local Rule 5-1(h)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's consent and have authorized the filing.

Dated: November 13, 2026

By: /s/ *Ellyn Hurd*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2026 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

By: /s/ *Ellyn Hurd*