# Exhibit A

E-SERVICE
80315350
Aug 12 2026
10:47AM
File & ServeXpress™

CUTTER LAW P.C.

**Via Electronic Mail**

SHOOK, HARDY & BACON LLP
Alycia A. Degen
adegen@shb.com
Michael B. Shortnacy
mshortnacy@shb.com
Christopher V. Cotton
ccotton@shb.com
Veronica G. Gromada
vgromada@shb.com

KIRKLAND & ELLIS LLP
Laura Vartain
laura.vartain@kirkland.com

August 12, 2026

***Re: In re: Uber Rideshare Cases, Case No. CJC-21-005188 - Third-Party Subpoenas***

Dear Counsel:

I write with respect to 17 third-party subpoenas Uber either intends to or has served on litigation support providers, communications specialists, and consultants[1] across the country. As you know, on August 10, 2026, I sent letters to the targets of these subpoenas noting our objections and intent to move to quash.

Uber's subpoenas are an abuse of the discovery system. They are procedurally defective, demand irrelevant materials and, on their face, seek privileged work product and attorney-client communications. Moreover, the subpoenas attempt to compel the details of the sexual assaults and identities of survivors who did not file suit against Uber, and who have not received any notice of Uber's invasive fishing expedition. As to individuals who *are* plaintiffs to this litigation or the related MDL, Uber's subpoenas attempt to circumvent the courts' carefully drawn discovery limits by obtaining from nonparties virtually all information relating to plaintiffs.

As set out below, the subpoenas have no legitimate purpose and reflect a transparent attempt to

[1] A Case For Women; A4D; Advocate Rights Center; Consumer Awareness Group; ConsumerNotice.org; LegalClaimAssistant Inc.; Mass Tort Intake Center; Torticity; United Tort Group; Bridge Legal Ventures; Case Connect; HaveALawyer; Michaels & Sterling Consulting; Smart Reviews LLC; The Legal Link; Tort Experts; and Total Injury Help.

weaponize discovery as a tool of harassment rather than a means of obtaining relevant evidence.

Please provide your availability to meet and confer this week.

**I. The Subpoenas are Procedurally Defective**

First, discovery in the JCCP closed long ago, on May 30, 2025. There are currently no bellwether cases set for trial to which these subpoenas could conceivably relate. (*See Fairmont Ins. Co. v. Superior Court* (2000) 22 Cal.4th 245, 250.) Uber's decision to serve subpoenas more than one year after discovery has closed renders them untimely on their face.

Second, because Uber served the subpoenas after the close of discovery, it did so without authority to serve them, making this a misuse of the power. (Code Civ. Proc. § 2023.010.) In order to exercise the subpoena power, Uber would have had to, at minimum, obtain leave of court to re-open discovery pursuant to Code of Civil Procedure section 2024.050.[2]

Third, the subpoenas attempt to evade the consumer notice requirements of section 1985.3. The subpoenas clearly call for "personal records" as defined under the statute: documents pertaining to a consumer who has used the services of an attorney. Serving subpoenas to litigation support providers in order to obtain law firm records is an end-run around this requirement.

**II. The Subpoenas Seek Irrelevant Information**

At a minimum, discovery must "appear[] reasonably calculated to lead to the discovery of admissible evidence." (§ 2017.010.) Although broad, this standard is not limitless. (*Calcor Space Facility, Inc. v. Super. Ct.* (1997) 53 Cal. App. 4th 216, 223.) The scope of discovery must be limited if the burden, expense, or intrusiveness of the discovery clearly outweighs the likelihood the discovery will lead to the discovery of admissible evidence. (§ 2017.020(a).) These principles are particularly important when the target of discovery is a nonparty who has not subjected itself to the burdens of litigation. (*Bd. of Registered Nursing v. Super. Ct*. (2021) 59 Cal. App. 5th 1011, 1033 (nonparties "should be somewhat protected from the burdensome demands of litigation") (emphasis omitted); *Calcor Space Facility, Inc.*, 53 Cal. App. 4th at 222 (discovery should be structured to be the "least burdensome" to nonparties).)

*i. The Subpoenas Expressly Seek Information Regarding Individuals and Business Relationships Untethered to This Litigation*

Uber's nonparty subpoenas explicitly sweep in individuals who are not plaintiffs in this action, services not performed in connection with this litigation, and matters unrelated to any issue in dispute. The subpoenas, for instance, demand "[a]ny and all documents" concerning "leads" related to the "litigation," while defining "litigation" to include any "potential" sexual assault or misconduct claim

[2] All further unspecified statutory references are to the Code of Civil Procedure.

against Uber in a mass action and defining "lead" to include individuals "regardless of whether a 'lead' ultimately resulted in an individual claim being filed[.]" (*See* Attachment A, "Definitions" (emphasis omitted).) This overreach is particularly egregious, where Uber seeks to compel the identity of sexual assault survivors, the details of their trauma, and highly identifiable information including any and all documents about their "intake information," "contact information," "Plaintiff Fact Sheets,"[3] trip receipts, and their "IP addresses, MAC address, and platform-based user accounts"—all without providing any notice to these individuals. *See infra* § 1.

The overbreadth does not stop there. Uber further seeks "[a]ny and all documents" identifying law firms, entities, and persons for whom these nonparties generated or collected leads, including leads "related but not limited to" this litigation, from January 1, 2018 to the present. (*See* Attachment A, Request No. 1 (emphasis omitted).) This request amounts to a demand for entire client lists and contact information for more than 8 years.

Uber's seeking of this information is inconsistent with the standard set out in section 2017.010. There is no credible justification for discovery that, by its own terms, targets nonparties who never filed suit, unrelated litigations, and business relationships wholly untethered to this case.

*ii. The Inner Workings of Litigation Support Providers is Irrelevant*

Even if directed at actual Plaintiffs, the information Uber seeks has absolutely no bearing on the claims or defenses in this litigation. This case concerns, among other things, whether Uber was negligent in hiring, screening, and monitoring its drivers. The subpoenas, by contrast, are directed at how these companies identified, marketed to, and screened potential plaintiffs. They go as far as demanding "[a]ny and all documents" related to their use of tracking tools like the Meta Pixel, AI usage logs, all retention and preservation policies for efforts to generate leads, performance metrics for advertisements, all platforms used, including email platforms and data storage systems, and "agreements" between the litigation support staff and counsel from 2018 to present. There is no scenario where the inner workings of litigation support would shed light on matters at issue in this litigation. Courts have quashed far narrower subpoenas aimed at plaintiff-acquisition. (*See, e.g., Doe v. Doe 1* (C.D. Cal. Mar. 25, 2026) 2026 WL 1370113, at *1 (quashing on relevance and proportionality grounds subpoena requesting "a copy of the Facebook advertisement [seen] by Plaintiff, all public advertising approved or displayed in the 90 days before the firm's contact with Plaintiff, and any lead-generating service that led to Plaintiff retaining the firm."); *In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Products Liab. Litig*. (D.N.J. 2019) 405 F. Supp. 3d 612, 615 (litigation funding irrelevant and not discoverable).)[4]

---

[3] The PFS requests sensitive information including, but not limited to: "Please describe the Alleged Incident in Your own words"; "After the Alleged Incident, did you undergo a medical exam to determine any physical injuries or the presence of any evidence (*e.g.*, a Sexual Assault Response Team "SART" exam, a Sexual Assault Forensic Exam ("SAFE"), or a Sexual Assault Nurse Exam ("SANE"))?"; "Describe in Your own words, the injuries You sustained as a result of the Alleged Incident (attach additional sheets as needed); include a statement of each physical, emotional, psychological, or other injury You allegedly sustained as a result of the Alleged Incident".

[4] Uber has served similar subpoenas to A Case for Women in other jurisdictions, including two Texas state court cases in

This is not the first time Uber has attempted an end-run around party discovery to obtain additional information about plaintiffs and their counsel that had no relationship to the underlying claims in Uber sexual assault litigation. In the MDL, Uber subpoenaed Plaintiffs' counsel for information about alleged litigation funding. (*In re: Uber Technologies, Inc. Passenger Sexual Assault Litig*., N.D. Cal. Case No. 3:23-md-03084-CRB, Dkt. No. 3402.) The MDL Court properly denied the motion. (*See In re: Uber Technologies, Inc. Passenger Sexual Assault Litig*., N.D. Cal. Case No. 3:23-md-03084-CRB, Dkt. No. 3625 at 2. ("There is no indication that discovery into the source or nature of litigation funding could lead in any way, directly or indirectly, to evidence that would be relevant or admissible at the trials on the merits of these cases.").) That decision is instructive here, too. As with the litigation funding subpoenas in the MDL, there is no indication that discovery into advertising, lead generation (including as pertaining to sexual assault survivors who never filed cases), or litigation support could "lead in any way, directly or indirectly," to evidence related to any party's claims or defenses.

*iii. The Burdens, Expenses, and Intrusiveness Outweigh the Likelihood of Discovering Admissible Evidence*

Despite having no meaningful likelihood of uncovering admissible evidence, the subpoenas impose a staggering burden, expense, and privacy invasion on both nonparty organizations and nonparty sexual assault survivors. The subpoenas contain dozens of document requests, most of which demand "[a]ny and all documents," and reach across more than eight years of activity, without defining the documents with any reasonable particularity. (*See, e.g.*, Attachment A, Request No. 8 ("Any and all documents related to efforts to generate leads in connection with the litigation[.]") (emphasis omitted)). Taken together, the subpoenas amount to a generalized request for all information regarding this litigation, the recipients' business operations, and any individual who reported a sexual assault by an Uber driver. The subpoenas clearly fall outside any permissible bounds of discovery. (*See* § 2017.020(a) (discovery "shall" be limited if burden, expense, intrusiveness clearly outweighs likelihood of discovering admissible evidence); *Calcor*, 53 Cal. App. 4th at 218 ("Generalized demands, insupportable by evidence showing at least the potential evidentiary value of the information sought, are not permitted."); *In re: Uber Technologies, Inc. Passenger Sexual Assault Litig*., N.D. Cal. Case No. 3:23-md-03084-CRB, Dkt. No. 695 at 10-11 (barring enforcement of subpoenas seeking production of "all communications" and "all documents" as "so broad that, on their face," relevancy could not be demonstrated and the requests were unduly burdensome).)

**III. The Subpoenas Demand Materials Protected by the Attorney-Client Privilege and Work Product Doctrine**

Uber's subpoenas blatantly attempt to penetrate attorney-client communications and attorney work product regarding counsel's mental impressions, litigation strategy, and case development efforts.

---

which neither plaintiff had any affiliation with that organization. Motions to quash as to those subpoenas are currently pending.

The subpoenas seek, for instance, "[a]ny and all documents related to" claim vetting; plaintiffs and potential plaintiffs; and instructions, guidelines, and directions relating to leads, ride receipts, and Plaintiff Fact Sheets. (*See* Attachment A, Request No. 4 ("Any and all document related to leads you have generated related to the litigation") (emphasis omitted); Request No. 5 ("Any and all documents related to instructions, guidelines, Statements of Principles…or creative content related to leads…related to the litigation") (emphasis omitted); Request No. 8 ("Any and all documents related to efforts to generate leads in connection with the litigation") (emphasis omitted); Request No. 9 ("Any and all documents related to instructions, guidelines, or other direction provided by you to leads relating to ride receipts or Plaintiff Fact Sheets") (emphasis omitted); Request No. 14 ("Any and all documents related to screening for fraud and claim vetting in this litigation, including but not limited to communications with leads and law firms") (emphasis omitted).)

*i. Communications Between Litigation Support Staff or Communications Specialists and Plaintiffs or Potential Plaintiffs Are Privileged*

The attorney-client privilege attaches to confidential communications between an attorney and her client or prospective client. (Evid. Code § 954; *Costco Wholesale Corp. v. Super. Ct.* (2009) 47 Cal.4th 725, 734; *Kerner v. Super. Ct.* (2012) 206 Cal. App.4th 84, 117) (privilege attaches "even if the attorney is never hired").) The privilege also extends to communications transmitted through a third party acting as an agent of the attorney, the client, or both. (*See State Farm Fire & Cas. Co. v. Super. Ct.* (1997) 54 Cal. App.4th 625, 639 ("It is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and it is immaterial whether the agent is the agent of the attorney, the client, or both.") (internal quotation marks and citations omitted).)

Uber has subpoenaed organizations that acted as agents for attorneys, clients, and prospective clients in facilitating communications concerning potential claims against Uber, and it seeks production of all related communications. (*See, e.g.*, Attachment A, Request No. 14 ("Any and all documents related to…claim vetting in this litigation, including but not limited to communications with leads and law firms") (emphasis omitted). Such communications fall squarely within the scope of the attorney-client privilege. Courts addressing materially similar circumstances have reached the same conclusion. *(See, e.g.*, *Berger Montague PC v. Robinhood Fin., LLC*, S.D.N.Y. Case No. 23-mc-00075, Dkt. 31 at 39:2-43:11 (responses to class action advertisements facilitated by third-party attorney-client privileged); *Ulrich v. Gen. Motors LLC* (S.D.N.Y. Jan. 23, 2026) 2026 WL 183676, at *9 (same).)

*ii. Communications Between Counsel and Litigation Support Staff are Work Product*

Under California law, "[a] writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances." (§ 2018.030(a).) Other types of attorney work product are "not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (*Id.* at (b).)

Uber's subpoenas plainly seek attorney work product. They effectively demand the entire universe of communications and documents exchanged among counsel and their litigation support or communications specialists concerning this litigation, plaintiffs, and potential plaintiffs. This inevitably includes vetting instructions and criteria, counsel's assessments of potential claims, decisions regarding representation, investigation efforts, and other materials that necessarily reflect attorney impressions, opinions, and theories of the case.

The California Supreme Court has recognized that material generated through counsel's investigative efforts receives work-product protection for precisely this reason. In *Coito v. Superior Court* (2012) 54 Cal.4th 480, the court held that witness statements obtained through interviews conducted by an attorney's investigator are entitled to at least qualified work-product protection and may be absolutely protected where disclosure would reveal counsel's impressions, conclusions, opinions, or theories. The court explained that "the questions that the attorney has chosen to ask (or not ask) provide a window into the attorney's theory of the case or the attorney's evaluation of what issues are most important." (*Id*. at 495.)

The same reasoning applies here. Documents concerning screening, vetting, intake procedures, and communications regarding potential claims inevitably reflect counsel's judgments about what facts matter, what claims are viable, what evidence should be developed, and which individuals should be represented. Indeed, federal courts applying the narrower federal work-product doctrine have likewise recognized protection for communications between lead generators and law firms. (*See Berger Montague PC*, Dkt. 31 at 43:12-46:17; *Ulrich*, 2026 WL 183676, at *10–11.)

## IV. The Subpoenas Unlawfully Intrude on the Fundamental Right to Sexual Privacy

The right of sexual privacy is a fundamental liberty under both the California and United States Constitution. (*Boler v. Super. Ct*. (1987) 201 Cal.App.3d 467, 473.) When discovery implicates sexual privacy, the requesting party bears a heavy burden of showing "practical necessity" and that the discovery is "narrowly drawn." (*Id*.)

Uber's subpoenas unnecessarily and indiscriminately intrude on the sexual privacy of both Plaintiffs and nonparties, seeking "any and all documents" related to sexual assault survivor "leads," their intake information, and Plaintiff Fact Sheets, including communications, IP addresses, MAC addresses, platform-based user accounts, trip receipts, and contact information. (*See* Attachment A, Request Nos. 4, 10, 11, 18 (emphasis omitted).)

Uber cannot establish that this sweeping discovery is either necessary or narrowly tailored. With respect to "leads" who have filed suit against Uber, both this Court and the MDL Court have already struck a careful balance regarding the scope of discoverable information concerning plaintiffs' sexual assaults and other highly personal matters. Now, Uber seeks to circumvent those discovery rulings vis-à-vis the subpoenas by obtaining, from nonparties, virtually all information relating to plaintiffs regardless of whether it falls within the courts' established limits.

For "leads" who did not file suit and are not parties to this litigation, the requested discovery bears no relationship to this case while imposing a severe intrusion into one of the most private domains of these individuals' lives. Moreover, these individuals have not received notice of the intrusion. (*See Boler*, 247 Cal.App.3d at 472 n.1 ("where third-party privacy interests are involved, the target of discovery has an affirmative duty to notify the third parties of the discovery request and give them an opportunity to appear and object") (emphasis omitted).)

Absent agreement by Uber to withdraw the challenged subpoenas, Plaintiffs intend to request an informal discovery conference, and, if the matter is not resolved at the conference, move to quash all 17 on or before August 29, 2026, pursuant to section 1987.1.

Sincerely,

Celine E. Cutter
Plaintiffs' Liaison

cc: William Levin
Sarah London
Rachel Abrams
Roopal Luhana