Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
Michael Vives (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com
michael.vives@kirkland.com

Geoffrey M. Wyatt, P.C. (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Telephone: (202) 389-3393
geoffrey.wyatt@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>*A.R. v. Uber Technologies, Inc., et al.*, No. 3:24-cv-07821 | CASE NO. 3:23-MD-03084-CRB<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S EXPERT ROBERT W. JOHNSON; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>Judge: Hon. Charles R. Breyer<br><br>Courtroom: 6 – 17th Floor |

## NOTICE OF MOTION AND MOTION TO EXCLUDE

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

Please take notice that on a date and time to be set by the Court, before the Honorable Charles R. Breyer in Courtroom No. 6 on the 17th Floor of the San Francisco Courthouse for the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Uber"), by and through their undersigned counsel, will and hereby do move the Court for an order, pursuant to Federal Rule of Evidence 702, excluding the opinions of Plaintiff's expert Robert W. Johnson.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the pleadings, papers, and records filed in this action, and such further arguments and matters as may be offered at the time of the hearing of this Motion.

DATED: November 13, 2026

**KIRKLAND & ELLIS LLP**

*/s/ Geoffrey M. Wyatt*
*Counsel for Uber*

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff has retained Robert W. Johnson, an economist-turned-professional litigation expert, for a single purpose: to mislead jurors about Uber's financial condition in the hopes of prompting the jury to return an inflated punitive damages award. The core of Mr. Johnson's opinion—based on his subjective and selective weighing of certain positive financial metrics (e.g., revenue), while disregarding negative metrics (e.g., expenses and losses)—is that Uber can afford to pay an exorbitant punitive damages award. As the California Court of Appeal previously recognized in overturning a punitive damages award based on Mr. Johnson's subjective and one-sided approach to a defendant's financial condition, consideration of "half of [the defendant's] balance sheet" is inherently unreliable and does not constitute "meaningful evidence[.]" *Soto v. BorgWarner Morse TEC Inc.*, 239 Cal. App. 4th 165, 194-95 (2015), *as modified* (Aug. 20, 2015). This case is no different. Mr. Johnson's opinions are not "based on sufficient facts or data," are not "the product of reliable principles and methods," and do not align with the relevant inquiry for punitive damages; instead, they are grounded in results-oriented methods and thus inadmissible. *See* Fed. R. Evid. 702(b)-(d).

As Mr. Johnson has repeatedly made clear, his so-called "methodology" for touting the "positive" half of Uber's balance sheet and omitting Uber's liabilities (the "negative" half of the balance sheet) was his "experience" working as a paid litigation consultant. 2/27/2026 R. Johnson Dep., *WHBE 303 v. Uber*, No. 2322-CC-01288 ("Johnson WHBE 303 Dep.") 118:9-12 (Ex. 1); 10/29/2025 R. Johnson *Dean* Dep. 28:10-29:5 (Ex. 2). But an expert's "experience" does not relieve a party of Rule 702's requirement to demonstrate that his opinion is "the product of reliable principles" and explain how that experience reliably leads to the conclusions offered. *See, e.g.*, *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1053-54 (9th Cir. 2025) (holding that expert's opinion based on "decades of education, training, and clinical experience" was not sufficient where it was not also grounded in supporting literature or studies). That longstanding principle was strengthened by the 2023 amendments to Federal Rule of Evidence 702, which "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* at 1049 (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment).

Here, Mr. Johnson has failed to explain how his experience reliably supports or informs his

selective calculations, and he performed no econometric analysis, developed no models, and performed only basic arithmetic to arrive at his conclusions. Accordingly, his opinions should be excluded as irrelevant, unreliable, and unhelpful to jurors.[1]

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Has Plaintiff failed to demonstrate by a preponderance of the evidence that Mr. Johnson's proffered testimony is admissible pursuant to Federal Rule of Evidence 702, where his opinions are irrelevant, unreliable, and unhelpful?

## I. BACKGROUND

Robert W. Johnson is the owner and founder of the litigation economics consulting firm Robert W. Johnson and Associates. 6/20/2025 Johnson Dep. ("Johnson JCCP Dep.") 33:14-34:9 (Ex. 3). Mr. Johnson's role in this case is "to frame, in economic terms, the financial condition of Uber" and "opine as to Uber's ability to pay a punitive damages award." 10/26/2026 Supp. Report of Robert W. Johnson ("Johnson Rep."), Ex. A at 1 (Ex. 4).

Mr. Johnson divided his report into three separate sections, focusing on Uber's economic "health," economic "wealth," and economic "status." *See generally* Johnson Rep. Mr. Johnson admitted that he is not aware of any standard or generally accepted definitions of the terms "economic health," "economic wealth," and/or "economic status"; nor is he aware of any standard or generally accepted way of assessing them. Johnson WHBE 303 Dep. 51:11-20; Johnson JCCP Dep. 122:6-123:1, 123:14-18, 124:21-25, 125:6-11, 160:9-25, 219:25-220:12; 11/11/2026 Johnson A.R. Dep. 25:20-26:15 (Ex. 5). Mr. Johnson also does not know whether Uber or any other company even uses terms like "economic health" or "economic wealth" to discuss its financial condition. Johnson WHBE 303 Dep. 51:21-52:5.

Mr. Johnson has no objective methodology for assessing Uber's financial condition. Mr. Johnson took financial metrics of interest to him from public filings—namely, Uber's 10-K reports from 2023-2025 and its 2026 10-Q report and proxy statement. Johnson Rep., Ex. A at 1; Johnson WHBE 303 Dep. 38:3-10. But while his report contains positive financial metrics, such as Uber's revenue, net income, net

[1] The Court did not rule on Uber's motion to exclude Mr. Johnson in *QLF 001*. While the court overseeing the California JCCP refused to exclude Mr. Johnson's opinions, that ruling is at odds with both *Soto* and Federal Rule of Evidence 702. Mr. Johnson ultimately did not testify in the JCCP proceeding because the parties stipulated to certain financial information, rendering his testimony unnecessary.

worth, cash on hand, "cash flow profit" (a term he made up but never defines), and stock market data from the *Wall Street Journal*,[2] it omits many metrics on the other side of Uber's balance sheet, such as total costs and expenses, cost of revenue, sales and marketing expenses, and executive compensation for all executives other than Uber's CEO. *See generally* Johnson Rep.; *see also* Johnson WHBE 303 Dep. 60:21-25; Johnson JCCP Dep. 131:23-135:24, 137:3-138:12, 205:21-206:6. Indeed, Johnson even casts ***expenditures*** as measures of favorable financial condition, specifically identifying capital expenditures, research and development costs, and payments made to executives as indicators of positive financial condition. *See generally* Johnson Rep. When asked how he decided what metrics to include in his report, Mr. Johnson repeatedly testified that he selected metrics based on his "40 years of training expertise" and included data that he "felt was relevant"—without elaborating on how his oft-invoked "experience" informed his choice of metrics. Johnson WHBE 303 Dep. 43:7-8; Johnson JCCP Dep. 86:20-87:21, 88:4-7, 113:15-114:3, 130:10-22, 138:13-21.[3] Mr. Johnson acknowledged during a prior deposition that he is not aware of any training manual or peer-reviewed articles or reports that provide the appropriate metrics to use when performing a punitive damages analysis like the one he performed here. Johnson JCCP Dep. 88:4-21. In this case, he added a page to his standard report that confirms his belief that "there is currently no academic peer-reviewed learned treatise on a specific generally agreed upon methodology for determining a company's financial condition for the purpose of determining a punitive damages award," but claims he used "standard methods of economic analysis generally used and relied upon by forensic economists." Johnson Rep. at Ex. A, *Financial Condition.*

Mr. Johnson selectively included data in his report for varying timeframes. While reference to

---

[2] *See* Johnson WHBE 303 Dep. 73:23-74:2 ("Q. But the words 'cash flow profit' is not a term that you pulled from Uber's financial statements, right? A. They didn't call it cash flow profit. I'm calling it cash flow profit.").

[3] When asked why he included audit and accounting fees as a metric for evaluating Uber's economic state, for example, Mr. Johnson testified that, "to me, it says how serious Uber is about getting the numbers in the 10-Ks, 10-Qs[,] proxies. Their financial statements, correct, valid, accurate and truthful . . . [Uber] is serious enough to pay $30 million to make sure their books are correct, accurate and valid." Johnson JCCP Dep. 230:2-231:9. When asked if he was familiar with any other economists or financial professionals who consider audit and accounting fees as a reflection of a company's economic status, he testified that he has not checked and is not familiar with any other person doing so. *Id.* 231:15-21. In response to questioning about whether a company could be considered financially healthy and spend less than $30 million on auditing and accounting, he testified that he did not know. Johnson WHBE 303 Dep. 84:17-20.

different reporting periods is not inherently improper, Mr. Johnson does not explain how he reconciles those measures in assessing ability to pay. Certain financial metrics reflect fiscal years 2021-2025 (revenue, net income, cash flow, capital expenditures, "free cash flow," R&D expenditures, and advertising expenses) or 2022-2026 (net worth, "cash on hand"), while other financial metrics reflect anywhere from one to three years of information: auditing and accounting fees (2024-2025), undrawn lines of credit (2026), stock repurchases (2024-2026), stock market valuation (2026), and CEO compensation and severance package (2025). *See generally* Johnson Rep. When asked why he used different time periods for different data categories in his Uber reports, Mr. Johnson responded that certain data were "irrelevant" based on his subjective "standard" and that "[i]n [his] business . . . [that's] [t]he way we do it[.]" Johnson JCCP Dep. 232:10-233:5; Johnson WHBE 303 Dep. 83:14-18.[4] He also testified that he was waiting for Uber's own expert's opinion about the company's financial condition to provide him with further "enlightenment" about Uber's ability to pay and additional information or metrics that he may have missed in his analysis. Johnson JCCP Dep. 73:13-22, 87:22-88:3, 137:23-138:12.[5]

Mr. Johnson's analysis is also misleading. Mr. Johnson intends to tell the jury that Uber's "[r]evenue per day" in 2025 was $142.5 million—a number that Mr. Johnson obtained by dividing Uber's total 2025 revenue by 365. Johnson Rep. at Ex. A, Slide 3; *see also* Johnson WHBE 303 Dep. 69:15-18. But Mr. Johnson did not separately report or calculate Uber's total costs and expenses per day, despite having been able to do so. Johnson WHBE 303 Dep. 68:11-19, 69:1-14, 69:19-70:6. When asked why he did not include Uber's daily costs and expenses as well as "revenue per day," Mr. Johnson responded that it is "[n]ot necessary" to do so. Johnson WHBE 303 Dep. 68:15-19.[6]

---

[4] For example, when asked the basis for his decision to include only two years of auditing statements, Mr. Johnson said, "As for audit fees, we don't care . . . I'm not interested in the trend of audit fees. I'm just interested in what happened in the last two years. How much did they spend? Because companies may have changed. But that's just the way we operate. Other economists or forensic experts may do it differently. There's no set standard. ***Whatever the economist feels is appropriate***." Johnson JCCP Dep. 232:21-233:5 (emphasis added).

[5] Uber does not intend to disclose an expert regarding its ability to pay.

[6] Mr. Johnson's report is also sloppy and internally inconsistent. For example, in his conclusion on page 2, he references a "$1.1 Billion profit" that is not found in his report. The same paragraph references a "($0.4) Billion loss in 2020," but his accompanying presentation attributes that figure to 2021. And the narrative's story of steady growth leaves out the ($9.1) billion net loss that his own slide reports for 2022.

## II. LEGAL STANDARD

The Rule 702 standard is addressed in more detail in Uber's Motion to Exclude Julie Moore (filed concurrently), and Uber incorporates that discussion herein by reference. The Court should exclude Mr. Johnson's opinions in their entirety under this standard because they are irrelevant, unreliable, and unhelpful.

## III. ARGUMENT

Mr. Johnson's opinions should be excluded from trial because: (1) the opinions are not grounded in any discernible methodology; (2) Mr. Johnson cherry-picks data favorable to Plaintiff's litigation position, ignores critical information, and wildly inflates Uber's purported financial ability to pay a punitive damages verdict; and (3) the opinions will not be helpful to the jury because Mr. Johnson simply parrots (select) information from Uber's public filings.

### A. Mr. Johnson's Opinions Are Not Based On Any Discernible Methodology.

"It is well settled that bare qualifications alone cannot establish the admissibility of scientific expert testimony." *United States v. Hermanek*, 289 F.3d 1076, 1093-94 (9th Cir. 2002) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (holding that expert testimony was inadmissible based on unreliable methodology notwithstanding "the impressive qualifications of plaintiffs' experts")). Even the most qualified expert must apply a reliable methodology.

Mr. Johnson effectively admitted that he did not do so. When asked whether there is any "rule or test that [Mr. Johnson] can describe in order to determine which metric should be used in order to assess Uber's economic health," Mr. Johnson responded: "No. ***There is no generally accepted methodology or exclusivity check that says you only need to use these or you must use more or less***. Nobody has written that." Johnson JCCP Dep. 128:19-129:7 (emphasis added). Mr. Johnson's inability to identify any objective criteria that another economist could apply to determine which financial metrics belong in the analysis, which may be omitted, what time periods should be used, or what conclusions follow from those selections requires that his opinions be excluded. *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422 (9th Cir. 1998) (affirming exclusion of expert who provided no explanation of how he reached his conclusions and could not identify any objective source to demonstrate a reliable method "practiced by (at least) a recognized minority of scientists in [his] field"); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d

843, 860 (9th Cir. 2014) (affirming exclusion of expert where the district court could not "discern what, if any, method he employed in arriving at his opinions"). The defect is not the accuracy of the underlying financial data; it is Mr. Johnson's lack of any reliable method for deciding which data to include and what expert conclusions follow from those choices.

Other courts have recognized as much in excluding or limiting Mr. Johnson's opinions due to similar deficiencies. *See Sullivan v. City of Buena Park*, No. SACV 20-01732-CJC (ADSx), 2022 WL 2965664, at *6 (C.D. Cal. Apr. 11, 2022) (excluding Mr. Johnson's opinions; "The Court questions the reliability of a methodology when experts cannot seem to agree what inputs or variables to use in deriving a result"); *Pooshs v. Philip Morris USA, Inc.*, 287 F.R.D. 543, 549-50 (N.D. Cal. 2012) (limiting Mr. Johnson "to testify only as to the 'default' measure of defendants' financial condition—current net worth" and holding that his remaining financial analysis "(based on a wide variety of financial statistics) is unreliable, and is not clearly based on any generally accepted criteria or methodology."). This Court should do the same.

When pressed on why he omitted certain metrics or years of data, Mr. Johnson repeatedly cited his own "standard." Johnson JCCP Dep. 111:10-112:2, 128:19-130:1, 183:25-184:9, 232:19-233:5. For example, when asked why he did not include certain liabilities, such as total costs and expenses, in his report, he simply responded that he likes to "cut to the chase" and he thinks the "rest is . . . not necessary." *Id.* 134:18-135:10. And in response to questioning about why he only included the executive compensation of Uber's CEO (even though Uber's public filings identify the compensation packages of other Uber executives), Mr. Johnson stated in a circular manner: "Because he's the chief executive officer. And that's – that's why." *Id.* 205:21-206:6.[7] Each of these statements is inadmissible *ipse dixit*. *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 965 (N.D. Cal. 2025) ("Expert opinion cannot be deemed reliable under FRE 702 if it is 'connected to existing data only by the *ipse dixit* of the expert.'") (citations

[7] Mr. Johnson's focus on the compensation of Uber's CEO also seeks to inject improper, irrelevant, and prejudicial information into the jury's calculation of damages. *See Graef v. Chem. Leaman Corp.*, 106 F.3d 112, 119 (5th Cir. 1997) (holding that information regarding corporate "officer salaries" was not relevant to guide the imposition of punitive damages, and therefore "admitting it constitutes an abuse of discretion"); *Avondale Mills, Inc. v. Norfolk S. Corp.*, No. 1:05-2817-MBS, 2008 WL 6953958, at *1 (D.S.C. Jan. 16, 2008) (granting defendants' motion to exclude evidence of executive compensation, because it "is not relevant to show [d]efendants' ability to pay any punitive damages award").

omitted). Although in this case Mr. Johnson added a page to his standard Uber report that attempts to explain his methods, his "explanation" suffers from the same *ipse dixit* failings by proclaiming that he "reached [his] opinions using standard methods of economic analysis generally used and relied upon by forensic economists[,]" without explaining the significance of his experience or citing any standards, and claiming that there is "no academic peer-reviewed learned treatise on a specific generally agreed upon methodology for determining a company's financial condition." Johnson Rep. at Ex. A, *Financial Condition*. This after-the-fact addition, however, is merely a Band-Aid; it does not cure the fundamental defect in Mr. Johnson's opinions. Describing his experience and source documents does not explain how the selected metrics establish the conclusion offered.

Mr. Johnson's new explanatory page also references *Bankhead v. ArvinMeritor, Inc.*, 205 Cal. App. 4th 68 (2012), where the court cited to Mr. Johnson's opinion in upholding a punitive damages award. The holding of that case focused on whether a punitive damages claim was excessive given the defendant's negative net worth and a constitutional due process challenge, and did not include any assessment of the reliability of Mr. Johnson's methodology under Rule 702 or any inquiry into his focus on the positive side of the balance sheet. *Id.* at 84, 90. In any event, this case does not involve negative net worth; thus, *Bankhead*'s analysis of what other metrics might be relevant in such a case is inapposite.

"An expert who relies solely or primarily on his experience 'must explain how that experience leads to the conclusions reached, *why that experience is a sufficient basis for the opinion*, and how that experience is reliably applied to the facts.'" *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1067 (C.D. Cal. 2013) (quoting Fed. R. Evid. 702 advisory committee's note (2000)); *see also Hermanek*, 289 F.3d at 1094 (rejecting expert's explanation of his methodology as "too vague and generalized to satisfy the requirements of Rule 702" where it was based only on his qualifications, knowledge, and prior investigation of the defendants, and evidence seized in the case). Indeed, the Ninth Circuit has been clear "that reliability becomes more, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony." *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (holding that "sufficient experience and knowledge to qualify as an expert" did not equate to reliability). "A district court must distinguish an expert's *qualifications* from the

*reliability* of the expert's principles and methods." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (citing *Daubert*, 43 F.3d at 1315-16). Mr. Johnson's "qualifications and experience are relevant, and indeed necessary. But they cannot establish the reliability and thus the admissibility of the expert testimony at issue." *Valencia-Lopez*, 971 F.3d at 900.

**B. Mr. Johnson's Purported Methodology Is Designed To Inflate Uber's "Ability To Pay."**

To the extent Mr. Johnson employs any kind of method, his opinions are not "based on sufficient facts or data," and do not "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d); *see also Ollier*, 768 F.3d at 860 (affirming exclusion of expert where the district court found that the expert's "conclusions appear to be based on his personal opinions and speculation rather than on a systematic assessment" of the issues at hand). Instead, Mr. Johnson's one-sided approach to a defendant's financial condition systematically inflates Uber's purported "ability to pay"—for example, by highlighting gross revenue without considering the impact of expenses and losses.

Other courts have recognized the same flaw and excluded Mr. Johnson's opinions on similar grounds. In *Soto*, 239 Cal. App. 4th 165, a California appellate court overturned a punitive damages award based on Mr. Johnson's testimony, holding that he failed to provide sufficiently reliable information about the defendant's financial condition to support such an award. Among other things, the court considered the fact that Mr. Johnson only analyzed "half of [the defendant's] balance sheet," and failed to sufficiently opine on the defendant's profits, losses, debts, and available credit. *Id.* at 195. According to the court, "[e]vidence of a defendant's income, standing alone, [was] not meaningful evidence." *Id.* at 194 (citation and quotations omitted); *see also Hayes v. Wal-Mart Stores, Inc.*, 294 F. Supp. 2d 1249, 1250-51 (E.D. Okla. 2003) (excluding opinion that defendant could afford a punitive damages award "equal to or less than dividends paid" because it "has not been tested or subjected to peer review, has no known error rate and has not been accepted in the community of economists").

Here, Mr. Johnson similarly references various financial metrics without explaining how Uber's outstanding obligations and operating needs affect the resources available to satisfy a punitive damages judgment. For example, Mr. Johnson includes cash on hand as a metric, but does not address the significance of the year-on-year decline in cash on hand from 2025 to 2026. And while Mr. Johnson does reference net worth, which supplies an aggregate figure that accounts for liabilities, he does not explain

why gross daily revenue supplies an additional measure of payment capacity. *Skye Orthobiologics, LLC v. CTM Biomedical, LLC*, 350 F.R.D. 641, 645 (C.D. Cal. 2025) (ordering new trial on punitive damages where the punitive damages award was insufficiently supported by evidence of defendant's financial condition because there was no evidence of defendant's liabilities in the record); *Baxter v. Peterson*, 150 Cal. App. 4th 673, 680 (2007) ("Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income."). To amplify the impact of this misleading figure, Mr. Johnson went further, constructing an arbitrary metric of "revenue per day" that does not exist anywhere in any of Uber's publicly filed financial documents, and without identifying any reliable basis for treating this figure as a relevant benchmark. The effect of this one-sided metric is to present an artificially inflated, highly prejudicial picture of Uber's financial condition, as illustrated by Plaintiff's use of Mr. Johnson's "revenue per day" figure in the January 2026 *Dean* trial. 2/3/2026 *Dean* Trial AM Session (Closing Arguments) 3470:10-12 ("One rape a day, gambling with our lives is one day of pay. We will dock you one day of pay. And that's why the amount we are asking for is $120,200,000.") (Ex. 6).

Mr. Johnson has not provided any reasoned explanation based on any established methodology for the metrics he chose and excluded. Without a baseline against which Mr. Johnson's opinions can be tested, his opinions cannot satisfy the analytical rigor required by Rule 702. *See Richardson v. United States*, No. 6:23-CV-03337-RK, 2026 WL 579508, at *6 (W.D. Mo. Mar. 2, 2026) (excluding Mr. Johnson's opinion because "Mr. Johnson's report in particular lacks sufficient explanation and support for his conclusions"). For this reason, too, Mr. Johnson's opinions in this case do not provide any reliable basis from which a jury can reasonably evaluate Uber's financial condition and should be excluded from trial.

**C. Mr. Johnson's Opinions Will Not Help The Jury.**

Even if Mr. Johnson had utilized a reliable methodology (which he did not), his opinions would still be inadmissible because they simply parrot financial data contained in Uber's public filings. "Where expert testimony simply rehashes otherwise admissible evidence about which the expert has no personal knowledge, such evidence—taken on its own—is inadmissible." *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-CV-03587-WHO, 2015 WL 757575, at *27 (N.D. Cal. Feb. 20, 2015) (citation and internal

quotations omitted) (excluding expert testimony "replete with observations and inferences that jurors are perfectly capable of making for themselves without the assistance of [the expert's] technical expertise"); *see also Picciano v. Clark Cnty.*, No. 3:20-CV-06106-DGE, 2024 WL 1049967, at *21 (W.D. Wash. Mar. 11, 2024) (excluding expert testimony reporting factual information because the "jury does not require expert testimony on the presence or absence of evidence in the record"); *Ningbo Bonny Decorative Material Co. v. E. Sys., Inc.*, No. 1:17-CV-114-DMB-DAS, 2020 WL 1333164, at *5 (N.D. Miss. Mar. 23, 2020) (excluding expert testimony related to invoices that were "self-explanatory such that [the expert's] characterization of their contents would add nothing to a jury's understanding of the case"). For example, Mr. Johnson opined that Uber has been "growing" because Uber's revenue, as shown by a single line item in each of its 10-K reports from 2020 to 2024, has increased from 2020 to 2024. Johnson JCCP Dep. 110:20-111:15, 142:13-16. A jury would be capable of reviewing Uber's 10-Ks and coming to the same conclusion. *Orgain, Inc. v. N. Innovations Holding Corp.*, No. 8:18-CV-01253-JLS-ADS, 2022 WL 2189648, at *9 (C.D. Cal. Jan. 28, 2022) (rejecting expert opinion that described documents because "the jury can read" the documents "and make the relevant deductions and inferences themselves"). Indeed, at his most recent deposition, Mr. Johnson explained that he "look[s] at the company's health, wealth, what we call economic status" and, apparently to emphasize the obviousness of these metrics, noted that these "words are what [he] learned back in high school." 11/11/2026 Johnson A.R. Dep. 27:12-15. This perceived virtue in Mr. Johnson's approach is in fact a vice under Rule 702, because an expert must be able to "help" jurors understand things they cannot understand for themselves. Fed. R. Evid. 702(a) (proponent of expert evidence must prove that expert's "knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"). Mr. Johnson's approach will not do that, so it must be excluded on this ground as well.

## IV. CONCLUSION

For the foregoing reasons, the Court should exclude the opinions of Plaintiff's expert Robert W. Johnson.

DATED: November 13, 2026

Respectfully submitted,

*/s/ Geoffrey M. Wyatt*

Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
Michael Vives (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com
michael.vives@kirkland.com

Geoffrey M. Wyatt, P.C. (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Telephone: (202) 389-3393
geoffrey.wyatt@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2026, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will automatically send Notification of the filing to all counsel of record.

*/s/ Geoffrey M. Wyatt*
Geoffrey M. Wyatt, P.C.