Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
Michael Vives (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com
michael.vives@kirkland.com

Geoffrey M. Wyatt, P.C. (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Telephone: (202) 389-3393
geoffrey.wyatt@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION<br><br>This Document Relates to:<br><br>*A.R. v. Uber Technologies, Inc., et al.*, No. 3:24-cv-07821 | CASE NO. 3:23-MD-03084-CRB<br><br>**DEFENDANTS UBER TECHNOLOGIES, INC., RASIER, LLC, AND RASIER-CA, LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S EXPERT ROBERT SNIDERMAN; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>Judge: Hon. Charles R. Breyer<br><br>Courtroom: 6 – 17th Floor |

## NOTICE OF MOTION AND MOTION TO EXCLUDE

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

Please take notice that on a date and time to be set by the Court, before the Honorable Charles R. Breyer in Courtroom No. 6 on the 17th Floor of the San Francisco Courthouse for the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively, "Uber") by and through their undersigned counsel, will and hereby do move the Court for an order, pursuant to Federal Rule of Evidence 702, excluding the opinions of Plaintiff's expert Robert Sniderman.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the pleadings, papers, and records filed in this action, and such further arguments and matters as may be offered at the time of the hearing of this Motion.

Dated: November 13, 2026

KIRKLAND & ELLIS LLP

By: *<u>/s/ Geoffrey M. Wyatt</u>*
*Counsel for Uber*

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff's expert, Robert Sniderman, seeks to testify at trial on an ultimate issue of law: that, in his personal opinion, Uber's background check policy for independent third-party drivers and investigation practices with respect to reports of driver behavior were "unreasonable." He further seeks to tell the jury that, if Uber had employed different, more "reasonable" background check and investigation processes, the third-party driver at issue (Hung Quang Le) would have never been onboarded to the Uber platform (and therefore would not have caused Plaintiff's alleged injuries). But Sniderman does not cite any objective source or accepted methodology supporting these assertions, which are instead based entirely on Sniderman's own personal beliefs, speculation, and say-so. Such "opinions" should be excluded from trial because they are untethered to any objective authority or evidence, and would also improperly instruct the jury on an ultimate issue in this case.

### I. BACKGROUND

Robert Sniderman is a self-professed "Human Resources Consultant" and repeat testifier. 10/26/2026 Sniderman Rep. at 1 ("Sniderman Rep.") (Ex. 1). He seeks to opine "on the reasonableness and adequacy of [Uber]'s written policies and practices . . . ." *Id.* Specifically, Sniderman seeks to testify that "Uber has not adequately designed its background checks and screening policies to identify driver misconduct in its own records or a driver's criminal history." *Id.* at 6. According to Sniderman, Uber, through its background check provider Checkr, "should conduct the most complete background check that is reasonably available," *id.*, including "alias name searches," *id.* at 7-9, and report "dismissed" criminal charges, *id.* at 9, and civil court records, *id.* at 9-10. Sniderman also seeks to opine on what "[a] reasonable company with a recognized sexual assault problem should" do when "investigat[ing] reports of sexual assault and sexual misconduct," *id.* at 12, and determines that Uber's investigations of reports made by third-party rider "Ming" and Plaintiff were "inadequa[te]," *id.* Sniderman believes that, if Uber had applied what Sniderman subjectively considers "reasonable screening and investigation practices," Uber "would not have onboarded [Mr. Le as an Uber Driver] in 2022" and "could have prevented [Plaintiff's] sexual assault." *Id.* at 1, 4.

## II. STATEMENT OF THE ISSUES TO BE DECIDED

1. Has Plaintiff failed to demonstrate by a preponderance of the evidence that Sniderman's proffered testimony is admissible pursuant to Federal Rule of Evidence 702, where Sniderman's background check opinions are based solely on his *ipse dixit*?

2. Has Plaintiff failed to demonstrate by a preponderance of the evidence that Sniderman's proffered testimony is admissible pursuant to Federal Rule of Evidence 702, where Sniderman's investigation opinions are based solely on his *ipse dixit*?

3. Has Plaintiff failed to demonstrate by a preponderance of the evidence that Sniderman's proffered testimony is admissible where Sniderman's proffered opinions contain ultimate conclusions of law?

## III. LEGAL STANDARD

The Rule 702 standard is addressed in Uber's Motion to Exclude Julie Moore (filed concurrently), and Uber incorporates that discussion herein by reference.

## IV. ARGUMENT

### A. Sniderman's Beliefs About Uber's Background Check Policies Are Inadmissible.

Sniderman recognizes that there are limits to a company's ability to "screen[] applicants" and that a company should therefore "conduct the most complete background check that is ***reasonably available***." Sniderman Rep. at 6 (emphasis added). Sniderman further acknowledges that "[i]t is not uncommon for a company like Uber to contract with a third party company" (here, Checkr) "to perform background checks." *Id.* at 7. And Sniderman admits that in Mr. Le's case, Checkr "completed a criminal background check" that included "Social Security Trace, Global Watchlist Search, Sex Offender Search, Federal, National and County searches." *Id.* at 9. These background checks identified no reportable criminal history apart from non-disqualifying traffic offenses. *See* Uber's Motion for Summ. J., Statement Of Relevant Facts And Procedural History.

Despite these admissions, Sniderman believes that Uber, through Checkr, should have undertaken a ***much*** more rigorous background check process prior to onboarding Mr. Le. 9/23/2026 Sniderman Dep. 187:14-16 (Ex. 2) (Sniderman explaining he is "an advocate for going the extra yard whenever possible"). Specifically, Sniderman believes that Checkr should have searched for: (1) "alias name[s]," Sniderman

Rep. at 7-9; (2) "dismissed" criminal charges, *id.* at 9; and (3) civil court records, *id.* at 9-10. These mere beliefs are not supported by any objective authority or methodology; rather, they are based on his own "point of view," developed after speaking with Plaintiff's counsel. *E.g.*, 9/23/2026 Sniderman Dep. 114:4-115:6, 133:10-134:3 (Sniderman testifying that his methodology included "ask[ing Plaintiff's counsel] questions" and "get[ting] answers from [his] point of view"); *id.* 151:1-6 (Sniderman explaining that his "point of view is that Uber spends a lot of time in their marketing materials, in their data collection, . . . on their Website . . . that if you ride with us, you are safe. And so a company that believes that, it would be reasonable to do [different background check processes]."); *id.* 138:9-15 ("Was there a specific state, federal, or local regulation that you considered when writing your report? A. No.").

***Aliases.*** Sniderman seeks to tell the jury that it was unreasonable for Checkr to "only search[] for the stated name 'Hung Le' without a middle initial or name," and that Uber should have searched for Mr. Le's aliases prior to onboarding. Sniderman Rep. at 8. But Sniderman has acknowledged that this subjective belief is based on a false factual premise. After all, Sniderman admits that "Checkr searched for aliases related to Driver Le and did not identify any." *Id.* He further concedes that, far from relying on a single name in its background search, Checkr performed a "social security number trace . . . for Hung Quang Le in 2022," *id.* at 8, and that Social Security number traces "utilize[] various names, various aliases that people go by," 9/23/2026 Sniderman Dep. 186:14-187:1; *see also* 11/12/2026 Sniderman Dep. 73:21-74:2 (Ex. 6) ("So are you -- you're aware that Checkr generates aliases when a background search is conducted, right? . . . . [A] Well, yeah, if they do social security checks, yes, they're looking for aliases, yes."); *id.* 85:1-6 (Sniderman admitting that "aliases that were generated as part of the SSN trace" for Mr. Le). Checkr's background check process thus complies with what even Sniderman considers "reasonable," and there is no basis for Sniderman's opinion that Uber, through Checkr, should have done more with respect to alias name searches.

Sniderman's opinion would impose limitless duties on companies to search for every possible name variation, including foreign names, before onboarding a driver. *E.g.*, 11/12/2026 Sniderman Dep. 65:2-3 (Sniderman opining that Checkr should consider "any kind of name" when conducting background searches); *id.* 90:22-25 (Sniderman stating that he "think[s] Checkr should be doing everything they can

that they physically need to do or intelligently need to do to look at combinations of people's names as they're used in the world"). Such an approach would not be feasible. Sniderman should not be allowed to tell jurors that Uber's actions were "unreasonable" simply because the Company did not do the impossible. In any event, the 1998 weapon-related conviction that Sniderman believes would have been flagged if different aliases had been searched in connection with Checkr's background check for Mr. Le, Sniderman Rep. at 9, did not involve sexual misconduct. Because this charge could not be considered predictive conduct for sexual offenses, there is no basis for Sniderman to believe that searching for different aliases would have generated a different result in Plaintiff's case. *Cf. Evans v. Lyft, Inc.*, No. A26A1152, 2026 WL 3213599, at *4 (Ga. Ct. App. Oct. 27, 2026) ("[E]ven assuming that [an independent driver's] traffic violation warranted his disqualification from the Lyft platform, and further assuming that Lyft's failure to disqualify [the driver] based on this offense constituted a breach of duty, there is no evidence of a causal connection between [the driver's] driving record and the [violent assault the plaintiff] sustained here.").

***Dismissed Criminal Charges.*** Sniderman also opines that "Uber's background-check process was not sufficiently rigorous" because it did not require Checkr to search for and report dismissed criminal charges. Sniderman Rep. at 9. But Sniderman acknowledges that Checkr is a "consumer reporting agency" that is governed by the Fair Credit Reporting Act. 11/12/2026 Sniderman Dep. 48:23-25 ("So Checkr you agree would be governed by the fair credit reporting act? . . . [A] I believe so."). He further admits that a "consumer reporting agency" like Checkr "may not report a non-conviction arrest or charge that fell outside the seven-year window that governed Driver Le's July 2022 screening." Sniderman Rep. at 9; *see also* 11/12/2026 Sniderman Dep. 51:2-7 (Sniderman testifying that "the fair credit reporting act does not allow" a consumer reporting company to consider dismissed charges); *id.* 93:20-25; *see also* 15 U.S.C. § 1681c(a)(5) (mandating that "no consumer reporting agency" may make any consumer report containing an "adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years").[1] In other words, Checkr's background check process with respect to criminal charges complied with applicable legal and industry standards.

[1] Mr. Le's 2012 Texas charges were dismissed in August 2012, more than seven years before he signed up to drive on the Uber platform.

Sniderman did not even consider whether Checkr complied with the Fair Credit Reporting Act in forming his opinions. 11/12/2026 Sniderman Dep. 49:11-19, 54:5-6, 114:5-8. Instead, he opines that "[a] reasonable company . . . does not limit its screening to what a vendor is legally compelled to report." Sniderman Rep. at 9; 11/12/2026 Sniderman Dep. 51:2-7 (Sniderman testifying that "the fair credit reporting act does not allow" a consumer reporting company to consider dismissed charges, but ***he*** would "want to know how to . . . get around that"); *id.* 49:20-50:9 (Sniderman basing his background check opinion on the fact that ***he*** would "want to know everything about Mr. Le"); *id.* 50:24-25 (Sniderman testifying that ***he*** "would want to consider" what "happened ten years ago"). But Sniderman cites no basis (beyond his mere subjective belief) that Uber, through Checkr, was required to do more than what the law requires (or indeed permits). This is unsurprising because criminal charges that are dismissed do not result in a finding of guilt and thus cannot provide reliable or relevant information for a background check. Indeed, it would be inappropriate for Uber to base its onboarding decisions on the ***absence*** of a finding of wrongdoing. *See* 15 U.S.C. § 1681c(a)(5). Accordingly, it is not accepted industry standard practice to require a background check process to rely on dismissed charges.

***Civil Court Records.*** Sniderman also seeks to testify as to his personal belief that Uber's "fail[ure] to search civil court records . . . was unreasonable[.]" Sniderman Rep. at 9; *id.* at 10 ("A reasonable company . . . should consider whether a potential driver transporting vulnerable riders has a history of domestic violence."). But such civil records—which include, for example, temporary restraining orders—can be granted without a finding of guilt or wrongdoing, and thus do not carry the same evidentiary significance as a criminal adjudication. *See* 11/6/2026 Zgoba Rebuttal Rep. at 9-10 (Ex. 3); *see also* 11/12/2026 Sniderman Dep. 117:2-13 (Sniderman conceding that Mr. Le's temporary restraining orders did not result in a "permanent restraining order" and admitting that he has not looked into the burden associated with obtaining a temporary restraining order). As such, and as Sniderman was forced to concede, it is not accepted industry standard practice to require a background check process to include civil court records. 11/12/2026 Sniderman Dep. 120:23-121:2 ("Q. Are you aware of any industry regulations that require [Checkr] to search for civil records when conducting a background check? . . . . [A] I'm not aware of any."); *id.* 122:13-18 ("Are you able to identify for me any document that indicates

that conducting searches for civil records is industry standard? . . . . A. No. No, I'm not."). Indeed, Dr. Sniderman admits that the third-party company that ***he*** employs to run background searches does not search for civil records. *Id*. 118:2-7.

In sum, Sniderman fails to identify any applicable industry standard or other objective measure requiring any of the background check measures that he subjectively (and with the benefit of hindsight) believes should have been employed by Checkr on Uber's behalf. *See, e.g.*, *Magallon v. Robert Half Int'l, Inc.*, 743 F. Supp. 3d 1237, 1250 (D. Or. 2024) (excluding expert opinion about party's compliance with industry standard where expert "did not identify any specific 'industry standards' in her expert report"); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 830 (C.D. Cal. 2010) (holding that an expert "cannot purport to testify as to a custom and practice without first establishing that such a practice existed"), *aff'd*, 438 F. App'x 587 (9th Cir. 2011). He also cites no evidence demonstrating that a different or more rigorous background check process would have had any impact on any onboarded driver, let alone Mr. Le. Sniderman's opinions thus amount to "speculation [and] conjecture," which are "inadmissible[.]" *Valentine v. Pioneer Chlor Alkali Co.*, 921 F. Supp. 666, 672 (D. Nev. 1996) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993)); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (trial court properly excluded expert where "there was nothing but [expert]'s ipse dixit linking" the alleged conduct to the plaintiff's injury).

Sniderman's reliance on his litigation and HR experience cannot salvage his opinions. For starters, Sniderman has no relevant experience on background screening in the rideshare industry, *see* 9/23/2026 Sniderman Dep. 84:15-86:5, 117:4-7; 11/12/2026 Sniderman Dep. 48:25-49:1, and he has never conducted a background check, 9/23/2026 Sniderman Dep. 100:7-18; 11/12/2026 Sniderman Dep. 46:22-27, 56:1-2. Further, courts, including the Ninth Circuit, have repeatedly excluded testimony of even well-qualified experts who fail to identify a reliable methodological basis for their opinions. *E.g.*, *United States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020) (district court abused its discretion in admitting expert testimony where "[h]is qualifications and experience are relevant, and indeed necessary," "[b]ut they cannot establish the reliability and thus the admissibility of the expert testimony at issue"); *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (excluding testimony of experience-based expert who had

"neither the sufficient facts nor the reliable methodology that would warrant its inclusion as evidence"). This is so because "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (excluding expert opinion that "simply lacks the foundation and reliability necessary to support expert testimony"). Such is the case here.

Sniderman's opinions are also unreliable because he fails to consider the tradeoffs, which Uber has publicly acknowledged, between stricter background checks and competing civil rights priorities.[2] Sniderman does not address the fact that Uber develops its screening criteria in consultation with lawmakers, screening experts, and civil rights advocates, and works to balance rider safety with fair access to economic opportunity across more than 60 different background-check adjudication standards nationwide. Sniderman similarly fails to consider that Uber's decisions about whether and when to implement a particular screening configuration involve assessment of numerous factors, including, but not limited to, expert feedback on recidivism data, as well as legal, policy, and regulatory considerations across multiple jurisdictions, operational readiness and adjudication accuracy, false-positive rates and their impact on driver access, and the interaction of any screening change with Uber's broader multilayered safety system. The fact that Sniderman ignores these considerations highlights that he has no methodology and that his background check opinions are instead based on his mere say-so.[3]

In short, Sniderman's belief that Uber should have obtained a scorched-earth background check is pure *ipse dixit*, unsupported by any objective authority, and should be excluded.[4]

---

[2] *See, e.g.*, Uber Newsroom, *A New Standard for Background Checks* (June 26, 2026), https://www.uber.com/us/en/newsroom/uber-backgroundchecks/ ("During our consultations with civil rights and safety organizations, many advocates emphasized that years of safe participation on the Uber platform should be weighed alongside past offenses when evaluating existing drivers. Others noted that removing access to a stable source of income could actually increase the risk of recidivism.").

[3] Similarly, Sniderman fails to consider—much less factor into his analysis—the "big number[]" of driver applicants Uber hires annually. 9/23/2026 Sniderman Dep. 203:7-18.

[4] The same is true for Sniderman's opinion that it "is not reasonable or consistent with standards of practice and care for Uber to defer its responsibility to provide 'rigorous' background checks on potential drivers, to . . . Checkr." Sniderman Rep. at 4. In the same breath, and as noted above, Sniderman acknowledges that "[i]t is not uncommon for a company like Uber to contract with a third party company" (here, Checkr) "to perform background checks." *Id.* at 7. Notably, Sniderman has never conducted a background check, but rather, "like Uber," has only "work[ed] [with] a third-party background check company . . . ." 9/23/2026 Sniderman Dep. 100:7-23; *id.* 113:9-14 (Sniderman stating it is his personal

**B. Sniderman's Beliefs About Uber's Investigation Of Sexual Assault Reports Are Inadmissible.**

Sniderman also seeks to share at trial his subjective belief that "[a] reasonable company with a recognized sexual assault problem should thoroughly investigate reports of sexual assault and sexual misconduct." Sniderman Rep. at 12. He further states that Uber's investigation of reports made by Ming and Plaintiff were "inadequa[te]." *Id.* But, like Sniderman's proffered background check opinions, Sniderman has no objective basis to reach or support these opinions.[5] Sniderman should not be permitted to tell a jury that he subjectively believes Uber's investigation of two sexual assault reports was "unreasonable." *See Valentine*, 921 F. Supp. at 672 ("speculation [and] conjecture [are] inadmissible").

This is particularly true with respect to Sniderman's opinions about the Ming report because: (1) the facts surrounding the Ming report are ambiguous; and (2) Uber did attempt to obtain additional information from Ming about the report but Ming failed to respond. Sniderman takes issue with Uber's investigation of a "mechanical issue" report submitted by Ming that included the word "rapist" without any context. But Sniderman ignores that this report was submitted by Ming following two other simultaneously submitted lost item reports. UBER-MDL3084-DFS00144587 (Ex. 4) In the mechanical report, Ming selected the answer "true" in response to every question about every possible vehicle mechanical issue on the form, and, in response to a final question asking why Ming felt the vehicle to be unsafe, wrote the word "rapist" without any further explanation. UBER-MDL3084-DFS00054771 (Ex. 5). As Sniderman acknowledges, Ming "used the Uber app in Chinese," Sniderman Rep. at 14, but Ming's report included the word "rapist" in English. Thus, it is unclear what Ming's mechanical report, in the context of his other reports, intended to communicate.

Sniderman himself acknowledges that the details surrounding the Ming report are unclear. *See* Sniderman Rep. at 14-15 (recognizing "the alleged ambiguity" of the Ming report); *see also* 11/12/2026

"preference" "to use a third-party vendor" for "background screening"); *id*. 218:8-13. Sniderman provides no basis for his belief that Uber should be held to a different "reasonable[ness]" standard than he applies to himself (and other companies).

[5] Sniderman generally claims that the Association of Workplace Investigators ("AWI") governs "[b]asic human resource management principles of workplace investigation[.]" Sniderman Rep. at 12. But he does not cite any rule, statement, or standard by the AWI mandating that Uber should have reacted differently to the Ming and Plaintiff reports. *E.g.*, 9/23/2026 Sniderman Dep. 124:8-10 ("Q. Was there any specific standard of AWI that you referred to when writing your report? A. No[t] specific, no.").

Sniderman Dep. 15:3-6 (Dr. Sniderman admitting he never spoke with Ming about his report). After all, there are a number of realistic scenarios that could account for the Ming report—including, most plausibly, a language barrier issue. Sniderman thus has no factual basis to believe that Ming's use of the word "rapist" meant that Mr. Le was a rapist or that he assaulted Ming, as he admitted. *Id.* 128:15-20 (Sniderman stating he did not assume "the driver raped [Ming]"); *see Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2001) (affirming exclusion of expert where "there was no factual basis for the assumption" made by the expert and thus, the expert's opinion "was not sufficiently founded on facts").

In any event, Uber ***did*** investigate these various reports. Specifically, Uber affirmatively reached out to Ming and requested "more details about what happened on this trip." Sniderman Rep. at 14 (citation omitted). Ming never responded. *Id.* at 15. As Sniderman has previously acknowledged, "Uber [does not] have authority to compel witnesses" to speak to the company about complaints, 9/23/2026 Sniderman Dep. 289:25-290:12, and if someone refused to speak (as Ming did here), Uber could not be "fault[ed]" for not pursuing the investigation further, *id*. 297:20-298:4 (Sniderman explaining that if someone would not speak to Uber, he would "expect Uber to document the investigation, and it ended with the -- the woman who we were attempting to interview refused to participate with us."). Thus, according to Sniderman's ***own prior testimony***, Uber's investigation of the Ming complaint was reasonable and appropriate.

Sniderman's claim that, if Uber had completed a more thorough investigation of Ming's report, it would have prevented Plaintiff's sexual assault, *see* Sniderman Rep. at 15 ("[h]ad Uber done [a different investigation], Uber would not have dispatched Driver Le to transport A.R."), is thus highly speculative. As noted above: (1) Ming's communication was ambiguous, but he did not report or provide any details describing an assault; and (2) even if Uber had continued to reach out to gather more information, Ming could have simply continued to not respond, which would not have led to a different result. These speculative opinions should be excluded. *See Domingo*, 289 F.3d at 607 (trial court properly excluded expert where "there was nothing but [expert]'s *ipse dixit* linking" the alleged conduct to the plaintiff's injury); *Loverdi v. Medifast, Inc.*, 385 F. Supp. 3d 399, 406 (E.D. Pa. 2019) (excluding expert opinion

attempting to "link[] Ms. Loverdi's hypothyroidism to her ingestion of Medifast products" as "unsupported speculation").[6]

**C. Sniderman's Opinions On Ultimate Legal Issues Are Improper.**

Sniderman's opinions should also be excluded because he improperly seeks to usurp the role of the jury to decide ultimate legal issues.

Sniderman's report is rife with opinions that Uber's actions with respect to its background check and investigation procedures were "unreasonable." Sniderman Rep. at 9 ("Uber also failed to search civil court records, which was unreasonable"); *id.* at 15 ("Uber's complaint reporting system is flawed and unreasonable"); *id.* at 18 ("Uber's failure to . . . investigate the reports of Ming and A.R. w[as] unreasonable"); *id.* at 4 (it "is not reasonable or consistent with standards of practice and care for Uber to defer its responsibility to provide 'rigorous' background checks on potential drivers, to . . . Checkr"). He also seeks to tell the jury that if Uber had applied more stringent background check and investigative procedures, it "could have prevented [Plaintiff's] sexual assault." *Id.* at 4; *id.* at 1 ("Had Uber applied reasonable screening and investigation practices . . . it would have revealed Le's disqualifying misconduct."); *id.* at 6 ("Had Uber properly screened Driver Le, . . . it is more likely than not that Driver Le would not have driven Plaintiff A.R. on the night of the sexual assault.").

It is black letter law that "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("district court did not err in excluding [the expert]'s legal conclusions"); *Martinez v. Cnty. of Alameda*, No. 20-CV-06570-TSH, 2024 WL 1117952, at *1 (N.D. Cal. Mar. 13, 2024) (excluding expert opinions that "amount[ed] to a legal conclusion about ultimate factual issues in this case"); *Holman Enters. v. Fid. & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008) (citations omitted) ("prohibition on experts testifying as to their own legal conclusions is 'so well established that it

---

[6] Sniderman's opinion should separately be excluded because there is no reason to believe that a different investigation by Uber would have led to Mr. Le's deactivation from the platform. Thus, his opinion does not fit the facts of the case. *See, e.g.*, *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1169 (D. Nev. 2014) (in slip-and-fall case, excluding expert testimony about defendant's adherence to its own policies where question of adherence was irrelevant to whether defendant's negligence caused plaintiff's injury).

is often deemed a basic premise or assumption of evidence law'" that has been adopted by "every circuit"; striking expert report that was "replete with legal conclusions and speculations that ultimately render [expert's] entire report deficient"); *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) (citation omitted) ("Experts cannot 'render conclusions of law' or provide opinions on legal issues.").

Applying these principles, courts have recognized Sniderman's tendency to improperly "offer [] opinions on the ultimate legal issues in this case" and have repeatedly excluded his opinions on this basis. *E.g.*, *McCray v. Westrock Servs., LLC*, No. CV 21-9853-DMG (RAOx), 2023 WL 4681371, at *6 (C.D. Cal. July 12, 2023) (stating Sniderman could not "opin[e] on the ultimate legal issues in this case, nor any factual characterizations or conclusions"); *Ybay v. RSUI Grp., Inc.*, No. BC486287, 2015 WL 1756068, at *1 (Cal. Super. Ct. L.A. Cnty. Feb. 3, 2015) ("the Court allows Mr. Robert Sniderman to testify as to standards in the community (profession), but not ultimate issue, i.e. failed to do so"); *Hood v. Time Warner Cable LLC*, No. SACV 08-0583 AG (JWJx), 2009 WL 1202561, at *4 (C.D. Cal. Apr. 30, 2009) (excluding "[t]he Sniderman Declaration" on the basis that it "offers improper legal conclusions, including findings that TWC failed to engage in an interactive process with [p]laintiff").

The same result is appropriate here. Sniderman should not be allowed to offer opinions on legal issues that are squarely within the jury's purview to decide—including whether Uber's background screening and report investigation procedures were "reasonable" and whether different practices would have prevented Plaintiff's alleged sexual assault. *E.g.*, *Holley v. Gilead Scis., Inc.*, No. 18-CV-06972-JST, 2023 WL 2469632, at *4-5 (N.D. Cal. Feb. 27, 2023) ("allowing an expert to opine on how a 'reasonable' company would have acted would impermissibly intrude on the province of the jury"; "the Court will not allow [the expert] to use 'reasonable' or any version of that term when presenting his opinions to the jury"); *M.H. v. Cnty. of Alameda*, No. 11-CV-02868-JST, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015) ("courts preclude expert testimony as to what is '[r]easonable'") (citation omitted).

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court should exclude the opinions of Plaintiff's expert Robert Sniderman in their entirety.

DATED: November 13, 2026

Respectfully submitted,

*/s/ Geoffrey M. Wyatt*

Laura Vartain Horn (SBN 258485)
**KIRKLAND & ELLIS LLP**
555 California Street, Suite 2700
San Francisco, CA 94104
Telephone: (415) 439-1625
laura.vartain@kirkland.com

Allison M. Brown (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Jessica Davidson (Admitted *Pro Hac Vice*)
Michael Vives (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
jessica.davidson@kirkland.com
michael.vives@kirkland.com

Geoffrey M. Wyatt, P.C. (Admitted *Pro Hac Vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Telephone: (202) 389-3393
geoffrey.wyatt@kirkland.com

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC.,
RASIER, LLC, and RASIER-CA, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2026, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will automatically send Notification of the filing to all counsel of record.

*/s/ Geoffrey M. Wyatt*
Geoffrey M. Wyatt, P.C.