[Submitting counsel below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

**IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION**

This Document Relates to:

*A.R.2 v. Uber Technologies, Inc.,* N.D. Cal. No. 24-cv-07821

No. 3:23-md-03084-CRB

**PLAINTIFF A.R.2'S OMNIBUS MOTION TO EXCLUDE EXPERT TESTIMONY**

Judge: Honorable Charles R. Breyer
Date: December 17, 2026
Time: 9AM PT
Ctrm.: 6, 17th Floor

**Provisionally Filed Under Seal Pursuant to ECF No. 8273.**

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1
II. LEGAL STANDARD ........ 4
III. ARGUMENT ........ 5
A. Expert Testimony of Sara West Should Be Excluded in Part. ........ 5
1. Dr. West is not qualified to opine on the “irregularity” of meetings with counsel and consultants, and those opinions would not assist the jury. ........ 5
2. Dr. West’s opinions on what she “suspects” and “cannot rule out” are speculation, not expert opinion. ........ 6
3. Dr. West’s opinions are an improper attack on Plaintiff’s credibility. ........ 7
B. Expert Rebuttal Testimony of Betsy Bartko Should Be Excluded. ........ 8
1. Ms. Bartko’s opinions as to assault-feasibility based on GPS data are unreliable. ........ 8
2. Ms. Bartko’s post-incident investigation of prior complaints made against the Uber driver who assaulted Plaintiff is irrelevant. ........ 9
C. Expert Testimony of Kristen Zgoba Should Be Excluded in Part. ........ 10
1. Dr. Zgoba’s opinions on erroneous standards of care are improper. ........ 10
2. Dr. Zgoba’s opinions regarding unrelated safety risks and Uber’s efficacy in risk reduction across the board are irrelevant and unreliable. ........ 11
3. Dr. Zgoba’s opinions on the efficacy and impact of Uber’s reporting systems are unreliable. ........ 13
4. Dr. Zgoba’s opinions on surveillance and crime prevention in prisons are irrelevant. ........ 14
5. Dr. Zgoba’s opinions on Uber’s corporate motives and character are irrelevant and unreliable. ........ 15
6. Dr. Zgoba’s opinions on “zero-risk” are irrelevant. ........ 15
7. Dr. Zgoba’s opinions regarding efficacy and reliability of background checks are unreliable and outside her expertise. ........ 16
8. Dr. Zgoba’s opinions regarding the efficacy of Uber’s safety features are unreliable *ipse dixit*. ........ 16
D. Expert Testimony of Lindsay Orchowski Should Be Excluded in Part. ........ 17
1. Dr. Orchowski’s opinions regarding “alcohol-related risk” are irrelevant. ........ 17
2. Dr. Orchowski’s opinions instructing the jury on the “foreseeability” standard are improper. ........ 17
E. Expert Testimony of Jason Morris Should Be Excluded in Part. ........ 18
1. Mr. Morris’s opinions on the reportability of criminal records are improper legal conclusions and unreliable. ........ 18

2. Mr. Morris is unqualified to opine on restraining orders, and his opinions on them are improper legal conclusions. ....... 21

3. Mr. Morris's fingerprint opinions are improper legal conclusions. ....... 21

F. Expert Testimony of Vida Thomas Should Be Excluded in Part. ....... 22

1. Ms. Thomas is unqualified to opine on background checks, and her opinions on this issue are unhelpful factual summaries. ....... 23

2. Ms. Thomas's revived "notice" opinion is unhelpful and was previously excluded by the Court. ....... 23

3. Ms. Thomas's opinions interpreting statutes and regulations are improper legal conclusions. ....... 24

4. Ms. Thomas's opinions on "reasonable" care overstep the bounds of expert testimony ....... 25

G. Expert Testimony of Joseph Okpaku Should Be Excluded in Part. ....... 25

IV. CONCLUSION ....... 27

## TABLE OF AUTHORITIES

**Cases**

*Brown v. TG Auto. Sealing Ky., LLC*, 2024 WL 3656218 (W.D. Ky. Aug. 2, 2024) ........................................6

*Bruce v. Terhune,* 376 F.3d 950 (9th Cir. 2004)........................................7

*Chamberlin v. Hartog, Baer & Hand, APC*, 2022 WL 526157 (N.D. Cal. Feb. 22, 2022) ........................................25

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995)........................................9, 14

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ........................................passim

*Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600 (9th Cir. 2002)........................................27

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2021 WL 5407316 (N.D. Cal. Nov. 18, 2021) ........................................20, 23, 24

*Ellis v. Navarro*, 2012 WL 3580284 (N.D. Cal. Aug. 17, 2012)........................................7

*Finn v. Warren Cnty.,* 768 F.3d 441 (6th Cir. 2014) ........................................6

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................5, 9

*Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280 (N.D. Cal. 2017)........................................15

*Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825 (9th Cir. 2001)........................................26

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998 (9th Cir. 2004)........................................18

*In re Uber Rideshare Cases*, 2025 WL 2631568 (Cal. Super. Ct. Aug. 29, 2025) ........................................23

*Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (9th Cir. 2001), *reh'g denied and amended by* 272 F.3d 1289 (9th Cir. 2001)........................................14

*Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025) ........................................6, 13, 26

*Kumho Tire v. Carmichael*, 526 U.S. 137 (1999)........................................4

*Lord Abbett Mun. Income Fund, Inc. v. Asami*, 2014 WL 3417941 (N.D. Cal. July 11, 2014), *aff'd mem.*, 653 F. App'x 553 (9th Cir. 2016)........................................17, 24

*Lukov v. Schindler Elevator Corp.*, 2012 WL 2428251 (N.D. Cal. June 26, 2012)........................................20, 21, 22, 25

*Magallon v. Robert Half Int'l, Inc.*, 743 F. Supp. 3d 1237 (D. Or. 2024)........................................18, 19

*Mathias v. Michael Eaves Shoemaker,* 2017 WL 3592457 (D. Md. Aug. 21, 2017)........................................6

*Morton & Bassett, LLC v. Organic Spices, Inc.*, 2017 WL 3838097 (N.D. Cal. Sept. 1, 2017)........................................18

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051 (9th Cir. 2008) ........................................11

*Rosen v. Ciba-Geigy Corp*., 78 F.3d 316 (7th Cir. 1996)........................................6

*SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869 (N.D. Cal. 2022) ........................................18, 22

*Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150 (N.D. Cal. 2023) ........................................18

*United States ex rel. Miller v. ManPow, LLC*, 2023 WL 9005796 (C.D. Cal. Nov. 22, 2023)........................................22, 25

*United States v. Binder*, 769 F.2d 595 (9th Cir. 1985) ........................................7

*United States v. Diaz*, 876 F.3d 1194 (9th Cir. 2017) ........................................24

*United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002) .......... 5
*United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) .......... 7
*United States v. Santini*, 656 F.3d 1075 (9th Cir. 2011) .......... 12
*Willard v. Foremost Ins. Co.*, 2014 WL 12589331 (C.D. Cal. May 9, 2014) .......... 19, 21, 22
*Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 2016 WL 3653512 (D. Ariz. Apr. 22, 2016) .......... 19

**Statutes**

15 U.S.C. § 1681c(a)(5) .......... 19
15 U.S.C. § 1681e(b) .......... 20
28 C.F.R. § 0.85(j) .......... 22
28 C.F.R. § 50.12(a) .......... 22
28 U.S.C. § 534 .......... 22
Cal. Civ. Code § 1786.18(a)(7) .......... 19, 20
Cal. Civ. Code § 2100 .......... 11
Cal. Pub. Util. Code § 5445.2(c)(2) .......... 19
Pub. L. No. 92-544 .......... 22

**Rules**

Fed. R. Evid. 403 .......... 10, 13, 15, 16
Fed. R. Evid. 702 .......... passim

## I. INTRODUCTION

Plaintiff moves to exclude the expert testimony, or portions thereof, of Uber's experts Sara West, Betsy Bartko, Kristen Zgoba, Lindsay Orchowski, Jason Morris, Vida Thomas, and Joseph Okpaku, for failing to meet the requirements of Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

**Sara West.** Sara West is a psychiatrist retained by Uber to conduct an independent medical examination of Plaintiff A.R. In a supplemental report dated October 26, 2026, Dr. West exceeds the boundaries of her qualifications and expertise by opining on what she deems "irregular" meetings between Plaintiff, her lawyers, and consultants, as part of counsel's trial preparation. *See* Ex. A, Supplemental Report of Sara West dated October 26, 2026 ("West Supp. Rep."), at 2 (opining that it is "[redacted]"). She has no basis for such opinions, and her insinuations that legal preparations and meetings with counsel are in any way inappropriate create a significant risk of unfair prejudice and threaten to turn this trial into a sideshow about Plaintiff's lawyers.[1]

Dr. West's supplemental report should also be excluded insofar as she engages in rank speculation and conjecture about Plaintiff's credibility. According to Dr. West, because she does not have access to certain privileged communications with counsel and consultants, she cannot "[redacted]" West Supp. Rep. at 3. In effect, Dr. West suggests to the jury that Plaintiff was coached to exaggerate or misrepresent her case. This is entirely improper. Offering an expert to pass judgment on Plaintiff's credibility improperly invades the province of the jury and should be excluded. *See* ECF No. 5809, PTO No. 43 re *WHB 823* Pretrial Motions, at 4 (excluding Uber's expert testimony "to the extent she seeks to offer opinions about Plaintiff's credibility as a witness"). Her opinion also seeks to penalize Plaintiff for asserting privilege over her communications with counsel.

Dr. West's medical credentials cannot transform speculation and credibility judgments into valid medical opinions. By her own account, she lacks the information needed to reach any conclusion about what occurred in the sessions or how they affected Plaintiff. Her opinions reflect that lack of foundation. Each is

[1] The evidence on which Dr. West relies is also privileged and protected. The majority of the discovery on which Dr. West predicates her supplemental report is the subject of a privilege dispute currently pending before Special Master Jones. Should that dispute resolve in Plaintiff's favor, any reference to them would be subject to the same privilege ruling and claw back.

framed as something Dr. West "cannot rule out" or "suspect[s]," not something she can say with a reasonable degree of medical certainty. West Supp. Rep. at 3-4.

**Betsy Bartko.** Betsy Bartko is a GPS expert who was retained by Uber to opine on a June 2023 "[redacted]" report made by a rider against Uber driver Michael Le (seven weeks prior to Plaintiff's assault). *See* Ex. B, Rebuttal Report of Betsy Bartko dated November 5, 2026 ("Bartko Rebuttal Rep."), at 2. Plaintiff moves to exclude Ms. Bartko's testimony insofar as she opines on the validity of the June 2023 report, specifically, that based on her review of GPS records, there were "no irregularities in LE's GPS data that would suggest anything unusual occurred during the ride."[2] *Id.* at 6. *First,* the opinion is unreliable. There is no valid methodology to extrapolate from any GPS data—which deals only with location—whether "anything unusual occurred during the ride," e.g., *within* the car. And yet that is precisely what Ms. Bartko attempts to do, effectively opining that GPS data proves that no misconduct could have occurred. *Second*, the opinion is irrelevant. The issue for trial is whether Uber, upon receiving a concerning report against one of its drivers, adequately responded to and investigated the report *at the time of receipt*. The record demonstrates that Uber did not. Ms. Bartko's review of GPS data three years after the fact to try to invalidate that report has no bearing on Uber's conduct or knowledge at the time the report was received. The testimony should be excluded.

**Kristen Zgoba.** Kristen Zgoba is a criminologist who was retained by Uber to opine on its policies and procedures with respect to sexual assault and sexual misconduct risk management. Plaintiff moves to exclude her testimony in part. *See* Ex. C, Expert Report of Kristen Zgoba dated October 26, 2026 ("Zgoba Rep."); Ex. D, Rebuttal Report of Kristen Zgoba dated November 6, 2026 ("Zgoba Rebuttal Rep."). *First*, Dr. Zgoba purports to opine on erroneous standards of care, repeatedly stating that the "appropriate benchmark" in this case is whether Uber was safer than other transportation alternatives, that risk factors cannot support "that a specific ride presented a foreseeable risk of sexual assault." *Second,* she opines that Uber reduces drunk driving and other unrelated "safety" risks (e.g., walking alone at night, riding with intoxicated individuals), comparisons this Court has already excluded as irrelevant. *See* Jan. 6, 2026 Pretrial Conf. Tr. at 78:20-22 ("this isn't a case about drunk-driving. It's out."). *Third*, she opines that Uber's reporting systems

[2] Ms. Bartko asserts that her opinions are to rebut those made by Plaintiff's experts Julie Moore and Robert Sniderman. But neither Ms. Moore nor Mr. Sniderman opine on the validity of the June 2023 report, let alone review the GPS data of that prior ride. To the contrary, their opinions are strictly focused on *Uber's* response to the report and Uber's failure to comply with standard HR practices (and its own policies) in investigating and responding to the report. Consistent with prior practice, Plaintiff will move to strike the testimony as improper rebuttal before Judge Cisneros, but even if not stricken, the opinions should still be excluded.

reduce barriers to reporting sexual assault but conceded at deposition that the opinion rests on no data or methodology. *Fourth*, she analogizes Uber to prisons, an environment this Court has stated is too dissimilar to assist the jury. *Fifth*, she repeatedly comments on Uber's motives and character, which is outside the bounds of expert testimony. *Sixth*, she opines that Uber cannot be judged against a "zero-risk" benchmark, a standard no party has advanced. *Seventh*, she pronounces Uber's screening "sound and defensible" though she conceded she is not a screening expert. *Finally*, she opines that Uber's safety features offer more deterrence measures than other transportation modes but conceded she has not seen or conducted any study on the features' effectiveness.

**Lindsay Orchowski.** Lindsay Orchowski is a psychologist retained by Uber to comment on sexual assault risk prevetion. Plaintiff moves to exclude portions of her report insofar as she seeks to (1) opine on rideshares' reduction of drunk-driving, and (2) instruct the jury on "foreseeability." *See, e.g.,* Ex. E, Expert Report of Lindsay Orchowski dated Sept. 3, 2026 ("Orchowski Rep."), at 8, 11-12. As to the former, this Court has held that such opinions are irrelevant to the issues in this case and should therefore be excluded. *See* Jan. 6, 2026 Pretrial Conf. Tr. at 78:20-22. As to the latter, it is improper for an expert to opine on a legal conclusion, *i.e.,* instruct the jury on the applicable "foreseeability" standard.

**Jason Morris.** Jason Morris is a background-screening expert retained by Uber to opine on the background checks its vendor Checkr performed on Le. *See* Ex. F, Supplemental Report of Jason Morris dated Oct. 26, 2026 ("Morris Supp. Rep."); Ex. G, Rebuttal Report of Jason Morris dated Nov. 6, 2026 ("Morris Rebuttal Rep."). Plaintiff moves to exclude portions of his testimony which seek to offer improper legal conclusions and unreliable opinions. This includes improper conclusions as to whether the Fair Credit Reporting Act ("FCRA") and California law permitted Checkr to report to Uber certain criminal convictions in Le's criminal record, whether federal law permitted Uber to obtain FBI fingerprint checks, and his subjective characterization of California law's "low bar" to obtaining temporary restraining orders. What the law requires is for the Court to decide, not Mr. Morris.

**Vida Thomas.** Vida Thomas is an employment lawyer and HR consultant retained by Uber to opine on the adequacy of Uber's HR practices. *See* Ex. H, Supplemental Report of Vida Thomas dated Oct. 26, 2026 ("Thomas Supp. Rep."); Ex. I, Rebuttal Report of Vida Thomas dated Nov. 6, 2026 ("Thomas Rebuttal Rep."). Plaintiff moves to exclude the following portions of her testimony that go beyond the scope of her qualifications, that recast previously excluded opinions, and that instruct the jury on the law and ultimate

issues of fact. *First,* Ms. Thomas opines on the adequacy of Uber's background screening, and that of its vendor Checkr, but she has no experience or expertise on that issue. Indeed, the opinion itself is devoid of the application of any expertise; it is merely a factual summary with the ultimate conclusion that Uber was "reasonable." *Second*, Ms. Thomas tries to revive a "notice" opinion that this Court already excluded. *Third,* Ms. Thomas seeks to improperly instruct the jury on state and federal laws. *Fourth*, Ms. Thomas presents an opinion on a matter to be decided by the jury: reviewing facts and then declaring Uber's conduct to be "reasonable" in all respects. These opinions are improper, unhelpful, and should be excluded.

**Joseph Okpaku.** Joseph Okpaku is a former lobbyist for Lyft retained by Uber to opine on a range of issues, including that fingerprint-based background checks could have a "potential" disparate impact on communities of color. Ex. J, Rebuttal Report of Joseph Okpaku dated Nov. 6, 2026 ("Okpaku Rebuttal Rep."). This opinion is irrelevant, rests on speculation rather than any reliable methodology, and should be excluded.

## II. LEGAL STANDARD

Admissibility of expert testimony is governed by Fed. R. Evid. 702, as elucidated by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Expert testimony is admissible only if the proponent demonstrates to the court that it is more likely than not that (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. *See* Fed. R. Evid. 702; *see also Daubert,* 509 U.S. at 593-94.

The Supreme Court in *Daubert* charged trial judges with the responsibility of acting as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The Court set out a two-step inquiry to determine whether expert testimony is admissible. *See id.* at 592-93. *First*, the trial court must assess reliability by making a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* Reliability requires that the testimony be rooted in "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotation marks, alteration, and citation omitted). This includes the requirement that the opinion be grounded in "sufficient facts or data." Fed. R. Evid. 702 (b).

*Second*, expert testimony must be relevant and serve to assist the trier of fact. *See Daubert*, 509 U.S. at 591-92. Expert testimony helps the trier of fact "when it provides information beyond…common knowledge." *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002).

## III. ARGUMENT

Plaintiff moves to exclude the following expert opinions.

### A. Expert Testimony of Sara West Should Be Excluded in Part.

Dr. West's supplemental report strays beyond her field of psychiatry to criticize Plaintiff's meetings with counsel as "irregular," speculates that those meetings may have altered what Plaintiff told examiners, and invites the jury to doubt Plaintiff's credibility. The opinions are unqualified, speculative, and improper commentary on credibility.

#### 1. Dr. West is not qualified to opine on the "irregularity" of meetings with counsel and consultants, and those opinions would not assist the jury.

An expert may testify only within the bounds of her expertise. *See* Fed. R. Evid. 702. Dr. West is a forensic psychiatrist retained to evaluate Plaintiff's mental health. Her supplemental report goes well beyond that role. It opines that it is "[redacted]" and that such sessions "should be disclosed" to retained experts. West Supp. Rep. at 2. Those are opinions about the conduct of litigation and the norms of attorney-client preparation. They are not opinions about psychiatric diagnosis, causation, or treatment.

Nothing in Dr. West's training or experience in forensic psychiatry qualifies her to say what is "irregular" about how a represented plaintiff prepares for litigation, or what a plaintiff's counsel must disclose to Uber's examiners. The report identifies no literature, no professional standard, and no data supporting the premise that the preparation she describes is unusual. Nor does Dr. West claim any experience in these matters to support her conclusions. The opinion rests on her say-so alone. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Her opinions are also not helpful to the jury. Whether and how Plaintiff prepared with her lawyers is not a matter requiring specialized psychiatric knowledge. To the extent any of this information is deemed admissible following the pending privilege review, such evidence should be addressed through fact witnesses

and cross-examination, not through a retained psychiatrist characterizing counsel's conduct as "irregular." Indeed, Dr. West's discussion of certain telephone calls, *see* West Supp. Rep. at 2-3, is merely a summary of Plaintiff's own deposition testimony. Expert testimony that narrates the record in this way does not "help the trier of fact." Fed. R. Evid. 702(a).

Finally, Dr. West's criticism that these sessions were not fully disclosed is improper and inflammatory. They are discovery challenges made under the veil of expert opinion and are intended to penalize Plaintiff for her counsel's litigation decisions. *See, e.g.,* West Supp. Rep. at 2 (faulting the absence of "[redacted]" about an [redacted] after noting that Plaintiff "[redacted]" it). Admitting an expert opinion that punishes Plaintiff for exercising privilege over protected communications is unfairly prejudicial.

**2. Dr. West's opinions on what she "suspects" and "cannot rule out" are speculation, not expert opinion.**

Dr. West's supplemental opinions are predicated on the premise that because Plaintiff has asserted privilege over certain communications, Dr. West "[redacted]" West Supp. Rep. at 3; *see also id.* at 4 (Dr. West "*suspect[s]*" that Plaintiff's symptoms "[redacted]") (emphasis added). These types of opinions are, on their face, statements of suspicion and possibility, as opposed to the required reasonable degree of medical certainty. *See, e.g., Brown v. TG Auto. Sealing Ky., LLC*, 2024 WL 3656218, at *4 (W.D. Ky. Aug. 2, 2024) (in context of motions *in limine*, granting motion to exclude medical opinions grounded in "possibilit[ies]" and holding that "opinions expressed within a reasonable degree of medical certainty is the 'correct standard for expert witness testimony[,]' and mere possibility is insufficient") (quoting *Finn v. Warren Cnty.,* 768 F.3d 441, 452 (6th Cir. 2014)); *Mathias v. Michael Eaves Shoemaker,* 2017 WL 3592457, at *2 (D. Md. Aug. 21, 2017) (excluding opinions regarding what "could have occurred" because they were "not based on facts, but only possibilities"); *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) ("Under the regime of *Daubert*...a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."); *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Cal. 2025)

("purpose of the Court's inquiry under FRE 702 is to ensure that proposed expert testimony imparts scientific knowledge rather than guesswork") (internal quotation marks omitted).[3] Indeed, Dr. West does not say that the sessions *did* alter Plaintiff's presentation, or that any specific statement by Plaintiff was shaped by them. She cannot say so because by her own account she has no information about the content, credentials, or purpose of these sessions. An opinion that depends on facts the expert admits she lacks is not "based on sufficient facts or data." Fed. R. Evid. 702(b).

**3. Dr. West's opinions are an improper attack on Plaintiff's credibility.**

Whatever label Dr. West attaches, the evident purpose of her opinions is to suggest to the jury that Plaintiff was coached by lawyers and psychologists into modifying how she "presented information" and "responded to questions." West Supp. Rep. at 3. That is a credibility opinion. The Ninth Circuit has long held that expert testimony may not bolster or undermine another witness's credibility because doing so usurps the jury's fact-finding function. *See, e.g., United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) (en banc); *see also Ellis v. Navarro*, 2012 WL 3580284, at *6 (N.D. Cal. Aug. 17, 2012) (noting expert may not opine on the credibility of another witness; "it is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts") (cleaned up) (quoting *Bruce v. Terhune,* 376 F.3d 950, 957 (9th Cir. 2004)). This Court has already applied that rule in this MDL. *See* ECF No. 5809, PTO No. 43, at 4 (In *WHB 823,* excluding Uber's expert testimony "to the extent she seeks to offer opinions about Plaintiff's credibility as a witness"). The same result should follow here.

Dr. West's suggestion that Plaintiff's statements to examiners may have been shaped by undisclosed sessions, and that her reported symptoms are a product of litigation rather than the alleged assault, tells the jury that Plaintiff's account is unreliable. *See, e.g.,* West Supp. Rep. at 2 (opining that meetings with counsel and consultants "[redacted]"). Any attempt to defend these opinions as valid medical opinions should be rejected. On their face, they are not diagnostic or medical opinions. There is no analysis on response validity,

[3] Dr. West states that her supplemental opinions are held "to a reasonable degree of medical certainty," West Supp. Rep. at 2, but merely parroting the standard cannot correct the fallacies of her report. Her true opinions are ones based on what she "suspects" and "cannot rule out," rather than medical certainty.

testing, or evaluation, and no attempt to identify any accepted medical metric, data, or standard to support the claim that Plaintiff was unreliable. Instead, Dr. West leaps from her *lack of knowledge* regarding the details of privileged sessions with counsel to suggest to the jury that Plaintiff may have told examiners something other than the truth.

Finally, Dr. West's testimony carries a high risk of unfair prejudice, confusion, and wasted time. It invites jurors to infer, without evidence, that lawyers shaped Plaintiff's testimony, and to treat the ordinary work of preparing for litigation as suspect, all under the imprimatur of a physician. There is no probative value in allowing Dr. West to present assumptions about meetings she has no information about, and to do so would cause confusion and mini-trials on communications that are the subject of a privilege dispute before the Special Master. *See supra* n.1. The Court should not permit Uber to use an expert as a vehicle to put attorney-client matters before the jury.

**B. Expert Rebuttal Testimony of Betsy Bartko Should Be Excluded.**

Betsy Bartko is a digital forensic analyst engaged by Uber to review GPS data related to a prior June 2023 report of misconduct against driver Michael Le. By way of background, in June 2023, Uber received an in-app report from a rider (the "June 2023 Report") about Le, consisting of the word "[redacted]" Ex. K, Supplemental Report of Julie Moore dated October 13, 2026 ("Moore Supp. Rep.") at 98. Plaintiff's experts address the June 2023 Report in the context of how Uber responded to and investigated the complaint, including whether Uber followed standard HR practices, as well as its own internal policies, with regard to safety investigation and response. *See, e.g., id.* at 98-99. Those opinions go directly to whether Uber was negligent.

In contrast, Ms. Bartko opines not on Uber's conduct or anything relevant to the case, but rather on whether, in her opinion, anything "unusual occurred during the [June 2023] ride." Bartko Rebuttal Rep. at 6. This opinion is unsupported by any methodology, let alone a reliable one, and it is irrelevant to any issue in this case; it says nothing about whether Uber's conduct was reasonable at the time Uber received the report three years ago.

**1. Ms. Bartko's opinions as to assault-feasibility based on GPS data are unreliable.**

Ms. Bartko's opinion is not grounded in any methodology. She reviewed GPS data to note whether the ride was "continuous" and whether "stops were made other than stops at traffic lights or intersections."

Bartko Rebuttal Rep. at 5. But she then goes far afield of this review when she extrapolates from basic GPS data the conclusion that the driver's conduct *within* the vehicle was not "unusual." *Id.* By her own words, GPS data is used to "plot location and visualize routes," *id.* at 5, not evidence of an individual's conduct or the occurrences within the vehicle, let alone that it may or may not conform to her subjective views of what is "unusual." Indeed, she provides no definition or meaning for what she deems "unusual," or any supporting literature, published standard, or industry protocol setting objective criteria for its measurement. Her opinion is pure conjecture. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 n.11 (9th Cir. 1995) ("*Daubert II*") (offering party "must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully"); *Joiner*, 522 U.S. at 146 (court need not admit opinion "connected to existing data only by the *ipse dixit* of the expert").

**2. Ms. Bartko's post-incident investigation of prior complaints made against the Uber driver who assaulted Plaintiff is irrelevant.**

The opinion is also irrelevant. A post-mortem conducted three years later of whether there was evidence to support a June 2023 report of "[redacted]" is not relevant to any issue in this case. For purposes of this trial, the significance of the June 2023 report is whether Uber adequately responded to, investigated, and took appropriate action with respect to the report and the driver. The record shows that Uber did not, and seven weeks later Plaintiff was assaulted by the same driver. Ms. Bartko's opinion, offered three years later, as to whether anything "unusual" occurred during the ride is irrelevant. Had Uber reviewed the GPS data when it received the report, or at any time up through the time of Plaintiff's assault, it would be able to introduce those facts at trial. But it cannot seek to mislead and confuse the jury by suggesting that it had done so through the testimony of Ms. Bartko. Uber cannot use a post-assault investigation to justify its past misdeeds. *See* Jan. 6, 2026 Pretrial Conf. Tr. at 68:19-69:17 (the point is "[w]hat was brought to Uber's attention about the driver up until – at least this point, up until the purported assault?").

The opinion is also misleading. *See Daubert*, 509 U.S. at 595 (courts should also consider Rule 403 prejudice in determining exclusion, including risk of confusion of the issues or misleading the jury). It invites the jury to accept the faulty premise that because Ms. Bartko could not discern anything "unusual" the jury should therefore discredit the June 2023 "[redacted]" report (and absolve Uber of its failure to act at the time of receipt and up through Plaintiff's assault). Uber is effectively shoehorning an assault-feasibility and standard

of care opinion through a GPS expert. Ms. Bartko concedes she has no expertise in, or any frame of reference for, these subjects. She also consulted no literature or studies concerning what GPS patterns are and are not consistent with driver misconduct in a moving vehicle. *See, e.g.,* Ex. L, Betsy Bartko Sept. 11, 2026 Deposition, at 128:17-24, 129:14-130:5. The testimony should be excluded.

**C. Expert Testimony of Kristen Zgoba Should Be Excluded in Part.**

Zgoba is a criminologist offered by Uber to provide nearly thirty opinions spanning topics from the Prison Rape Elimination Act, drunk-driving reduction, purported efficacy of Uber's reporting systems, to Uber's "commitment" to safety and transparency. Much of the report contains no opinion at all. Instead, it is an ode to Uber's character, presenting unsupported commentary on how great Uber and its safety features are. To establish a veneer of "expertise," Zgoba cites to a range of literature, but none support her bald conclusions. By and large, she identifies no testable methodology, leaping from generalized data to *ipse dixit* conclusions. At bottom, the report is a collection of hypotheticals, corporate character testimony, and prepackaged attorney litigation themes presented under the guise of expertise. Plaintiff moves to exclude the following opinions.

**1. Dr. Zgoba's opinions on erroneous standards of care are improper.**

Dr. Zgoba purports to instruct the jury on an erroneous standard of care, stating, "[t]he appropriate benchmark is whether risk [of sexual assault in an Uber] is meaningfully reduced relative to realistic alternatives" and that an "evaluation of Uber's safety systems must therefore assess whether those systems meaningfully reduce risk relative to realistic alternatives." Zgoba Rep. at 12, 13; *see also id.* at 12 (the "appropriate benchmark" is "whether risk is continuously and meaningfully reduced relative to realistic alternatives"); *id.* at 35 ("the appropriate benchmark is meaningful risk mitigation"). In doing so, Dr. Zgoba instructs the jury to evaluate Plaintiff's claims against an incorrect "better than the alternatives" standard. Under her framework, the question is not whether Uber exercised reasonable care toward Plaintiff (or the highest standard of care owed by common carriers) but whether the Uber platform is, on the whole, safer than drunk driving, walking alone at night, or late-night public transit. This is not the standard.

Dr. Zgoba's rebuttal report also communicates incorrect standards of foreseeability. She asserts that the risk factors identified by Plaintiff's experts cannot support a conclusion "that a specific ride presented a foreseeable risk of sexual assault," declares that "[t]he central issue is whether sufficient information was available before the incident to justify excluding Le from the platform," and concludes that Plaintiff's experts

"overstate[]...the foreseeability of sexual misconduct in this particular case." Zgoba Rebuttal Rep. at 5, 17; *see also id.* at 10 ("The key issues in this case, then, are whether specific data existed at the time the screening was performed, whether there was a law or regulation governing the use of such data and whether the records can be reasonably matched with the applicant.").

Dr. Zgoba's opinions would be inadmissible even in an ordinary negligence case. Here, as explained in Plaintiff's motion for partial summary judgment, Uber is a common carrier and so must use the "utmost care and diligence for [passengers'] safe carriage[.]" Cal. Civ. Code § 2100. Dr. Zgoba's "sufficient information available to justify" standard is not the correct legal test. An expert may not tell the jury what the legal standard is—let alone an erroneous one. *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1063 (9th Cir. 2008) ("[A] party is not entitled to present evidence on an erroneous or inapplicable legal theory to the jury, even if the evidence might have been relevant in some conceivable manner.").

**2. Dr. Zgoba's opinions regarding unrelated safety risks and Uber's efficacy in risk reduction across the board are irrelevant and unreliable.**

Plaintiff moves to exclude testimony related to "comparative transportation risk and realistic counterfactuals" and "empirical evidence of risk substitution and harm reduction." Zgoba Rep. at 13-15, 18-20. Despite the camouflage of scientific terminology, the testimony is, in truth, an irrelevant discussion of safety risks and harms that are not at issue in this case, e.g., alcohol consumption, drunk driving, walking alone, waiting outdoors for transportation, or "using late-night public transit systems with limited staffing, surveillance, and guardianship." *Id.* at 13. Her discussion on these issues is irrelevant, and unreliable for lack of data and methodology.

*First,* the Court has already ruled that these types of comparisons are irrelevant to this case. *See, e.g.,* Jan. 6, 2026 Pretrial Conf. Tr. at 78:20-22 (explaining that "this isn't a case about drunk-driving" and excluding evidence or argument that Uber reduced impaired driving). Dr. Zgoba nevertheless repeatedly returns to drunk driving, walking alone at night, late-night public transit use, and other irrelevant scenarios. *See* Zgoba Rep. at 13-15, 29.

*Second,* Dr. Zgoba attempts to legitimize these irrelevant opinions by asserting that any discussion of Uber's risk is "analytically empty" unless it is compared against one of these "counterfactual[s.]" *Id.* at 15. Not so. Plaintiff was sexually assaulted by the driver Uber sent to pick her up. Whether rideshare reduces

drunk driving or walking alone at night tells the jury nothing about whether Uber was negligent here. Uber cannot discharge its duty of care to Plaintiff by speculating that her alternatives were worse. *See* Fed. R. Evid. 702 (a) (expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue"). The only relevant comparison is the ride Plaintiff received against the ride Uber should have provided—not a hypothetical comparison with a speculative "counterfactual." The supposed "analytical" gap is nothing more than a sham argument to present irrelevant and misleading "counterfactuals" to the jury. In fact, Dr. Zgoba admits a "counterfactual" analysis is "scientifically and methodologically *impossible*" to conduct. *See* Ex. M, Kristen Zgoba Sept. 11, 2026 Deposition ("Zgoba Dep."), at 67:3-8 (emphasis added).

*Third*, under the umbrella of "counterfactuals" and "harm reduction," Dr. Zgoba opines that Uber is safer for riders in general because it displaces unsafe alternatives, and because Uber is an effective "harm-reduction tool." Zgoba Rep. at 13-15, 18. These opinions are unreliable and outside her expertise. Dr. Zgoba is a criminologist; she has no expertise in transportation safety or impaired-driving prevention. *See* Zgoba Dep. at 72:10-23. Moreover, her support for these opinions consists of only studies comparing traffic and crime data before and after Uber entered various markets, studies that she did not validate, test, or apply to the facts of this case, and which concern matters outside her expertise. *See United States v. Santini*, 656 F.3d 1075, 1078-79 (9th Cir. 2011) ("An expert in one field…cannot express an opinion relying on data that requires expertise in another field[.]"). More fundamentally, Dr. Zgoba's analysis employs the logical fallacy of equating correlation (safety statistics before and after Uber's market entry) with causation (Uber's entry was the cause of the change in statistics). She has no qualification, data, or reliable methodology to support the opinion that Uber is *safer* and that it is an *effective* "harm-reduction" tool.

Finally, these opinions should be excluded under Fed. R. Evid. 403. Dr. Zgoba's counterfactuals invite the jury to speculate that Plaintiff was in even greater danger without Uber, while her harm-reduction opinions ask the jury to credit Uber with generalized public-safety benefits unrelated to the assault. This will distract from the core issues at trial, as Plaintiff will be forced to disprove the safety risks of every conceivable alternative way home. Any marginal probative value is substantially outweighed by the danger of unfair prejudice, confusion, and misleading the jury.

**3. Dr. Zgoba's opinions on the efficacy and impact of Uber's reporting systems are unreliable.**

Dr. Zgoba's opinions about the supposed efficacy of Uber's reporting system should be excluded as unreliable. The opinions assert that Uber's reporting mechanisms reduce "practical and psychological barriers" to reporting sexual assault/sexual misconduct ("SA/SM") and therefore *may* reduce underreporting and are "*likely* to document a greater proportion of incidents." Zgoba Rep. at 15-18; *see also id.* at 6, 32 (Uber's systems "increase the likelihood that misconduct will be detected and documented"; "the Uber platform reduce[s] the traditional barriers to reporting"). This testimony lacks reliable data and methodology.

Dr. Zgoba conceded at deposition she has no data supporting these opinions, instead drawing an "empirical inference" from literature that reporting channels reduce barriers to reporting, and concluding that because Uber has reporting channels, Uber's channels reduce barriers. *See* Zgoba Dep. at 64:6-65:18. The studies she purportedly relied on did not evaluate the efficacy of apps or online reporting systems. They addressed advances in sexual-assault prevention, e.g., services allowing a woman to call for a ride home late at night. *See id.* at 125:19-126:10. Her report is no more forthcoming, citing only studies showing that accessible reporting systems, such as those in prisons, produce increased reporting. But Dr. Zgoba's opinion depends on the proposition that Uber's systems actually reduce barriers to reporting and she conceded at deposition that she cannot conclude Uber's systems increased reporting, emphasizing her intentional use of "may" throughout her report. Zgoba Dep. at 69:15-70:10; *see e.g.,* Zgoba Rep. at 16, 23, 32 (Uber's infrastructure "arguably" reduces underreporting; its reporting rate "may in fact" exceed that of other settings; and Uber's data "may consequently reflect" detection rather than incidence). These concessions are dispositive. Rule 702 requires reliable facts, data, and methodology, not a series of untested "maybes" relying entirely on *ipse dixit*. An opinion the expert declines to state is not one the jury can be asked to accept. *See Klein*, 766 F. Supp. 3d at 963 ("purpose of the Court's inquiry under FRE 702 is to ensure that proposed expert testimony imparts scientific knowledge rather than guesswork") (internal quotation marks and citation omitted).

Dr. Zgoba's "expertise" alone cannot clear this analytical void. She has no expertise in the efficacy of a reporting system's design, implementation, and "ease" of use. She is *not* a psychologist, trauma expert, human-factors expert, or product-design expert. She identifies no expertise in how sexual-assault survivors

(or riders in general) interact with digital reporting tools, how platform design affects reporting behavior, how to overcome social and psychological barriers to reporting, or how to measure underreporting in a rideshare environment. She cannot opine on what does or does not remove "psychological barriers" to reporting sexual assaults. *See Jinro Am. Inc. v. Secure Invs., Inc*., 266 F.3d 993, 1004 (9th Cir. 2001) (before an expert may come "before the jury cloaked with the mantle of an expert...care must be taken to assure that a proffered witness truly qualifies as an expert" through "knowledge, skill, experience, training, or education"), *reh'g denied and amended by* 272 F.3d 1289 (9th Cir. 2001).

**4. Dr. Zgoba's opinions on surveillance and crime prevention in prisons are irrelevant.**

Dr. Zgoba invokes the Prison Rape Elimination Act ("PREA") as an analogue for Uber's reporting data, stating reported allegations in prisons rose after the PREA, while substantiated incidents remained stable. *See* Zgoba Rep. at 16-17; *see also* Zgoba Rebuttal Rep. at 15 ("even highly controlled institutional environments with extensive surveillance continue to experience sexual victimization, demonstrating the limitations of monitoring as a preventive measure").

As the Court explained in *Dean*, prisons are "microcosms of a concentration of people who have a high...and proven degree of antisocial behavior and illegal behavior," whose "behavior in those settings is so different from the general population" that prison evidence is "so remote from the issues in this particular case" that it has "almost no probative value[.]" *Dean* Trial Tr. at 2689:18-23, 2690:21-2691:3. The Court accordingly excluded Dr. Zgoba's PREA testimony under Rule 403. *See id.* at 2691:12-17. The same reasoning applies here. Whether the prison data is offered to show the limits of surveillance or the dynamics of reporting, it rests on a population and setting the Court has already found too dissimilar to assist the jury. Whether prisoners' allegations rose under a federally mandated, audited reporting regime, or were substantiated by the facility (which has its own unique investigations, resources, and incentives), says nothing about whether Uber used reasonable care to address known and foreseeable risks on its platform. Expert testimony must bear "a valid scientific connection to the pertinent inquiry[.]" *Daubert II*, 43 F.3d at 1320. Dr. Zgoba's prison comparison bears none. It instead invites the jury to evaluate Uber against an extreme and inflammatory institutional setting rather than the facts of this case, posing a substantial risk of unfair prejudice and confusion that independently warrants exclusion under Rule 403.

### 5. Dr. Zgoba's opinions on Uber's corporate motives and character are irrelevant and unreliable.

Dr. Zgoba repeatedly and improperly opines on Uber's corporate motives and character, citing, for instance, Uber's supposed "commitment" to transparency and reducing SA/SM, and speculating that Uber published SA/SM data as "a proactive measure to enhance transparency, encourage public scrutiny, and establish accountability standards." Zgoba Rep. at 11, 22, 23; *see also, e.g., id.* at 22, 26 ("Uber continually evaluates, refines, and expands its safety features" to "mitigat[e] risk and enhanc[e] accountability"; reporting taxonomy reflects Uber's "commitment to a transparent…approach to documenting misconduct."). This testimony should be excluded. A corporation's state of mind lies outside the bounds of expert opinion. *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 294 (N.D. Cal. 2017) ("Courts routinely exclude expert testimony as to intent, motive, or state of mind as issues better left to a jury.").

Even if proper, there is no reliable data or methodology to support her conclusions. Dr. Zgoba is not an Uber employee, was not present for any of the decisions she characterizes, and identifies no documents, testimony, or method supporting her account of Uber's character, motives, and reasons. Rule 702's requirement of "knowledge" "connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

### 6. Dr. Zgoba's opinions on "zero-risk" are irrelevant.

Dr. Zgoba opines that "[n]o transportation or institutional system can reasonably be judged against a zero-incident benchmark" and that "[e]xpecting Uber...to create an assault-free or zero-risk environment therefore imposes an unattainable standard[.]" Zgoba Rep. at 12. Dr. Zgoba's rebuttal report repeats the theme, stating "no company can fully control individual human behavior." Zgoba Rebuttal Rep. at 18. These opinions are irrelevant, purport to instruct the jury on matters of common sense, are not responsive to any opinion offered by Plaintiff's experts, and invite the jury to apply an erroneous legal standard—that Uber can avoid liability only if it eliminates sexual assault. *Cf.* ECF No. 4701 at 8-9 (Judge Cisneros striking this same opinion from an earlier rebuttal report, and explaining that Plaintiff's experts "did not offer an opinion that Uber could entirely eliminate sexual assault").

No one contends that Uber must eliminate all crime on its platform. And whether Uber could possibly do so is not pertinent to whether Uber breached its standard of care. The "zero-risk" opinion merely sets up the

"unattainable standard" so that Uber can measure itself in a more favorable light. But it is a false baseline—one that is not advanced in this litigation—and which misleads the jury into thinking that unless Uber can prevent all crime, it cannot be liable for any crime. That is not what this case is about and not what the law requires. Further, the proposition that no system prevents all crimes lies well within the common sense of any juror and is therefore not proper expert opinion. This opinion should be excluded.

**7. Dr. Zgoba's opinions regarding efficacy and reliability of background checks are unreliable and outside her expertise.**

Dr. Zgoba opines that Uber's screening and background-check methods are "sound and defensible," and concludes that periodic screening "adds protection." Zgoba Rep. at 7, 24. She describes how Uber uses commercial background-screening systems that match identifiers to "achieve a high level of accuracy" and "offer greater breadth and timeliness than traditional background screenings," and she purports to explain the circumstances under which civil-record searches should be conducted. Zgoba Rebuttal Rep. at 9.

Dr. Zgoba is not qualified to offer these opinions. She conceded she is not an expert in background checks or screening, did not review Uber's internal screening policies, and conducted no research into whether Uber's screening works. *See* Zgoba Dep. at 28:4-12, 60:1-4, 93:15-18. She agreed that background screening and recidivism prediction—her actual field—are different disciplines, and that screening must cast a considerably wider net than prediction in assessing an individual. *See id.* at 107:9-19. Her experience bears that out. Her exposure to fingerprint-based screening comes from her time in corrections and her experience with name-based screening consists of a single study still in progress, on which she has recently changed her theory. *See id.* at 34:23-35:6, 35:11-36:13, 93:19-94:21. Rule 702 permits opinion testimony only from a witness qualified in the relevant field, and Dr. Zgoba has disclaimed qualification in the only field to which these opinions pertain. *See* Fed. R. Evid. 702.

**8. Dr. Zgoba's opinions regarding the efficacy of Uber's safety features are unreliable *ipse dixit*.**

Dr. Zgoba devotes a section of her reports to listing Uber's in-app safety features and concluding, without analysis or methodology, that they reflect Uber's "substantial and ongoing investment in safety governance with more deterrence measures than taxis, public transportation, walking home alone, driving drunk, or riding with a drunk driver." Zgoba Rep. at 26-29; *see also id.* at 13, 21 (features "increas[e] visibility, documentation, and real-time oversight"); Zgoba Rebuttal Rep. at 11-12 (Opinion 3) (mapping Uber safety

features onto a table of CDC prevention strategies). Beyond injecting irrelevant and prejudicial comparisons to drunk driving and other modes of transportation, Dr. Zgoba conducted no testing, data, study, or analysis of the deterrence effects of these measures on sexual assault or compared to alternative modes of transportation. Rather, she conceded this opinion rests entirely on Uber's public explanations of these features and does not reflect any evaluation of whether the features actually work. *See* Zgoba Dep. at 84:10-13 ("I've seen no effectiveness studies"), 109:10-110:12. In fact, Dr. Zgoba testified that "[y]ou can't measure deterrents" or whether an assault "was prevented" at all. *Id.* at 110:2-4. Expert testimony that "merely summarizes the record evidence and gratuitously interprets it" is inadmissible. *Lord Abbett Mun. Income Fund, Inc. v. Asami*, 2014 WL 3417941, at *13 n.8 (N.D. Cal. July 11, 2014), *aff'd mem.*, 653 F. App'x 553 (9th Cir. 2016). These opinions should be excluded.

### D. Expert Testimony of Lindsay Orchowski Should Be Excluded in Part.

#### 1. Dr. Orchowski's opinions regarding "alcohol-related risk" are irrelevant.

Plaintiff moves to exclude Dr. Orchowski's testimony insofar as she opines on rideshares' reduction of "alcohol-related risk." Orchowski Rep. at 11-12. This topic is irrelevant to this case, devolving into opinions regarding individual preferences for rideshares as a strategy to reduce alcohol-related risks, how individuals may be "unaware when they have hit a level of alcohol consumption that makes it unsafe for them to drive," that guest rider policies (i.e., calling a rideshare for someone else) are a "more effective intervention strateg[y] to stop someone from drunk driving than suggesting someone not drive," and that rideshares are a better countermeasure to drunk driving than public transportation. *Id.* at 11. None of this is relevant, and it serves only to confuse the issues. As noted above, the Court has already instructed that these issues are irrelevant to the MDL cases. *See* Jan. 6, 2026 Pretrial Conf. Tr. at 78:20-22. The same should apply here.

#### 2. Dr. Orchowski's opinions instructing the jury on the "foreseeability" standard are improper.

Plaintiff further moves to exclude Dr. Orchowski's testimony insofar as she seeks to opine on "foreseeability," which Orchowski equates to mean "guaranteed to happen." Orchowski Rep. at 8; Ex. N, Lindsay Orchowski Sept. 8, 2026 Deposition ("Orchowski Dep."), at 101:13-24. Dr. Orchowski acknowledges that this "guaranteed to happen" standard is shared by *no one else* in the scientific community, and could not conceive of any scenario in which her impossible standard could even be met. *See* Orchowski

Dep. at 116:13-17, 136:23-25. More importantly, Dr. Orchowski's standard is not the appropriate legal standard applicable to Plaintiff's negligence claim. These opinions should be excluded.

### E. Expert Testimony of Jason Morris Should Be Excluded in Part.

Uber offers Jason Morris as an expert in background screening procedures. Several of his opinions, however, improperly instruct the jury on what the law requires and prohibits. *First*, he opines that Le's criminal records were "not reportable" under the FCRA and California law, and that searching Le's middle name as a surname—a search that would have revealed his conviction for illegal use of a weapon—would violate the FCRA. These are improper legal conclusions, and they are unreliable. *Second*, he opines on the legal standards for obtaining restraining orders in California, a subject on which he has no expertise and for which his only sources are law firm websites. *Third*, he opines that federal and state law prohibit Uber from conducting FBI fingerprint background checks and that biometric privacy laws restrict the collection of fingerprints. These, too, are improper legal conclusions. All of these opinions should be excluded.

#### 1. Mr. Morris's opinions on the reportability of criminal records are improper legal conclusions and unreliable.

"[A]n expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (internal quotation marks omitted; emphasis in original); *see also Morton & Bassett, LLC v. Organic Spices, Inc.*, 2017 WL 3838097, at *8 (N.D. Cal. Sept. 1, 2017) (excluding expert who stated "legal conclusions about ultimate issues of law, which is impermissible under longstanding Ninth Circuit precedent").

Mr. Morris seeks to do exactly that. He opines that the FCRA and California law prohibited Checkr from reporting Le's criminal history to Uber, including a 1998 [redacted] conviction. *See* Morris Supp. Rep. § II.B. But whether or not this is true turns solely on interpretation of the law, which invades the Court's province of "instructing the jury as to the applicable law[.]" *SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869, 902 (N.D. Cal. 2022) (internal quotation marks omitted). "District courts routinely exclude expert testimony that purports to apply the law to the facts of the case." *Magallon v. Robert Half Int'l, Inc.*, 743 F. Supp. 3d 1237, 1250 (D. Or. 2024) (collecting cases); *see also Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1171 (N.D. Cal. 2023) (excluding as "improper legal conclusions" expert testimony that certain "policies or practices are out of compliance with the ADA and its regulations"); *Zabriskie v. Fed. Nat'l*

*Mortg. Ass'n*, 2016 WL 3653512, at *2 (D. Ariz. Apr. 22, 2016) (cautioning that expert may not opine "as to whether [a defendant's] procedures should be considered 'unreasonable' under the FCRA, because this is an ultimate issue that will be decided by the jury").

Mr. Morris's reportability opinions also extend to how Checkr searched for Le's records. He asserts that Checkr did not search "Hung Quang," which is Le's middle name used as a surname, "because a search of one's middle name as their last name has the possibility to link records to wrong individuals and runs afoul of the FCRA's requirement for maximum possible accuracy." Morris Rebuttal Rep. at 9. This is pure statutory interpretation as to what is required for "maximum possible accuracy." Mr. Morris cannot cure these improper opinions by vaguely asserting that the legal conclusions are based on some unidentified industry "experience" or "standard." *See Magallon*, 743 F. Supp. 3d at 1250 (excluding expert who opined that the industry standard was compliance with the FCRA, because her testimony merely restated a legal conclusion). He provides no actual basis for his legal interpretations. Vague "experience" alone does not give him license to comment across the board on any and all matters, let alone permit him to interpret the law. *See Willard v. Foremost Ins. Co.*, 2014 WL 12589331, at *3 (C.D. Cal. May 9, 2014) (excluding as legal conclusions expert's "interpretation of statutes and regulations and whether Defendant's conduct ran afoul of those laws").

Even if Mr. Morris's legal conclusions were appropriate, they would still need to be excluded as unreliable. To start, his reportability opinion reflects an incorrect interpretation of the FCRA. A criminal conviction is reportable under the FCRA regardless of its age. *See* 15 U.S.C. § 1681c(a)(5) (excluding adverse items more than seven years old "other than records of convictions of crimes").[4]

Next, Mr. Morris's conclusion that Le's 1998 conviction was not reportable depends on treating the related 1998 records in isolation. The District Attorney's screening action form lists three charges, [redacted], under the name "Hung Quang," with Le's correct date of birth and address. Ex. O, BW-A_R-DRIVER-000303; *see* Morris Supp. Rep. § II.B.iv; Morris Rebuttal Rep. at 13. Mr. Morris acknowledges that the police report for two of those charges, [redacted], identifies "Hung Q. Le," with his correct date of birth, address, and Social Security number. Morris Rebuttal Rep. at 13; *see*

---

[4] California law does not change the analysis. Although Cal. Civ. Code § 1786.18(a)(7) limits the reporting of convictions to the preceding seven years, that limit does not apply to reports furnished to TNCs. *See* Cal. Pub. Util. Code § 5445.2(c)(2).

Morris Supp. Rep. § II.B.v. The third charge is the one that became the conviction. The FCRA requires a consumer reporting agency to follow "*reasonable procedures* to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b) (emphasis added). Nothing in that provision bars an agency from searching under a known alias and verifying any resulting matches before reporting them, or from reporting the information with appropriate clarifications. Mr. Morris's opinion bypasses all of this and seeks to instruct the jury on an inaccurate view of the law.

That is not a reliable basis for an expert opinion. An opinion must rest on sufficient facts or data and reflect a reliable application of the expert's method to the facts of the case. Fed. R. Evid. 702(b), (d). Mr. Morris leaps from the alias on the conviction record to the conclusion that the conviction was not reportable, without accounting for the records that connected that alias directly to Le, and Mr. Morris relies on an alias exception the FCRA does not contain. Where an expert's data and reasoning are inadequate to support the conclusion reached, Rule 702 requires exclusion. *See Lukov v. Schindler Elevator Corp.*, 2012 WL 2428251, at *3 n.4 (N.D. Cal. June 26, 2012).

Mr. Morris's reportability opinions are also unreliable because they are not the result of independent analysis. His interpretation of the FCRA merely a parroting of Checkr's justifications for what it claims it "could not" do. *See* Morris Supp. Rep. § II.B. Indeed, he adopts the entirety of the excuses proffered by Checkr's corporate designee as to why it may have failed to report prior disqualifying charges and convictions to Uber. *See, e.g., id.* § II.B.i-ii ([redacted] charges were "not reportable on a background check under the FCRA" and were barred by Cal. Civ. Code § 1786.18(a)(7)); *id.* § II.B.iii-iv ([redacted] charges required a "disposition of guilt" before Checkr could "report the record under the FCRA"); *id.* § II.B.v ([redacted] conviction could not be reported because "police reports do not contain dispositions of guilt that would allow Checkr to report the charge on a consumer background check").

In effect, Mr. Morris does nothing more than bolster Checkr's testimony and Checkr's view of the law under the veneer of expertise. An expert may not put "the imprimatur of his expertise on the statements of other witnesses." *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2021 WL 5407316, at *3 (N.D. Cal. Nov. 18, 2021) (cleaned up). The Court should exclude these opinions.

**2. Mr. Morris is unqualified to opine on restraining orders, and his opinions on them are improper legal conclusions.**

Le's civil records consist of restraining orders. Mr. Morris opines on the legal standards for obtaining restraining orders in California. Those opinions fail for two independent reasons.

*First*, Mr. Morris is not qualified to give them. His report identifies no experience, training, or education relating to restraining orders. His claimed expertise lies in the "field of background screening procedures." Morris Rebuttal Rep. at 2. That expertise provides no basis for opining on how courts issue restraining orders. *See Lukov*, 2012 WL 2428251, at *2 (excluding expert's opinion on an "important legal question" because he was "not qualified to opine on that subject").

*Second*, the opinions are legal conclusions. Mr. Morris tells the jury that "there is a low bar for obtaining a TRO in the state of California." Morris Rebuttal Rep. at 11-12. He then describes the standards for temporary and permanent restraining orders, opining that California requires "a reasonable amount of proof" for a TRO and that a permanent domestic-violence restraining order requires proof by a "preponderance of the evidence." *Id.* at 12 (internal quotation marks omitted). What the law requires to obtain a restraining order is a question for the Court, not for a background-screening consultant. *See Willard*, 2014 WL 12589331, at *3; *Lukov*, 2012 WL 2428251, at *2.

Tellingly, Mr. Morris's only sources for these standards are law firm websites. *See* Morris Rebuttal Rep. at 12 nn.47-49 (citing Power Trial Lawyers, *Permanent Restraining Order Hearing in California: Court Process, Evidence, and Defense Strategy* (last visited Nov. 3, 2026), https://www.powertriallawyers.com/practice-areas/restrainingorders/permanent-restraining-order-hearing/; Gedulin Law, *How Much Proof Does a Temporary Restraining Order Require?* (last updated Sept. 30, 2016), https://www.gedulinlaw.com/blog/what-proof-is-needed-for-a-restraining-order/). An expert who must rely on law firm websites to state the law is operating outside his expertise, and his opinion is not the product of reliable principles and methods. *See* Fed. R. Evid. 702(c).

**3. Mr. Morris's fingerprint opinions are improper legal conclusions.**

Mr. Morris opines that "Uber is prohibited from conducting fingerprint-based background checks through the FBI given its status as a TNC." Morris Rebuttal Rep. at 15. That opinion should be excluded because it is a legal conclusion. Mr. Morris derives the supposed prohibition from federal law, namely 28

U.S.C. § 534 and Pub. L. No. 92-544, and from unidentified "state statute[s]." *Id.* Whether those authorities permit or bar a particular entity from obtaining FBI fingerprint records is a question of statutory interpretation reserved to the Court. *See Willard*, 2014 WL 12589331, at *3; *SA Music*, 592 F. Supp. 3d at 902.

The framework Mr. Morris invokes underscores the point. Under Pub. L. No. 92-544, access for state and local employment and licensing purposes depends on whether a state statute authorizes the check and whether the FBI, exercising authority delegated by the Attorney General, has approved that statute. *See* 28 C.F.R. §§ 0.85(j), 50.12(a). Mr. Morris never identifies the state statute he relies on, or explains the absence of one, much less how it applies to Uber. His opinions are merely assumptions that he then improperly presents as legal fact.

Mr. Morris's discussion of biometric privacy laws fares no better. He asserts that "Illinois's Biometric Information Privacy Act (BIPA), similar statutes in California, Texas, and Washington, and a growing patchwork of other state laws now impose requirements on companies that collect biometric identifiers like fingerprints." Morris Rebuttal Rep. at 17. Illinois law has no bearing on this California bellwether trial, and Mr. Morris never identifies the "similar statute[]" in California. More fundamentally, the opinion is misleading. That a law imposes requirements on collecting fingerprints says nothing about whether Uber or any other TNC could collect them. Yet, Mr. Morris seeks to conflate the two. And the opinion is, once again, a characterization of statutes that Mr. Morris has no expertise or business interpreting. *See United States ex rel. Miller v. ManPow, LLC*, 2023 WL 9005796, at *8-9 (C.D. Cal. Nov. 22, 2023) (excluding expert report "rife with impermissible statutory and regulatory interpretations"); *Lukov*, 2012 WL 2428251, at *2 (excluding expert's "legal conclusion" that was "based on what appears to be his own survey of state laws").

**F. Expert Testimony of Vida Thomas Should Be Excluded in Part.**

Uber offers Vida Thomas, an employment lawyer and consultant, to opine on Uber's background check of Le, on what information Uber had about Le before the incident, on the laws governing background checks and fingerprinting, and on Uber's responses to reports about Le. None of these challenged opinions is admissible. Ms. Thomas has no expertise in background checks, and her background-check opinions merely parrot Uber's facts as to what Uber and Checkr did. Her supplemental "notice" opinion extends an opinion this Court has already excluded and thus fails for the same reasons. Her opinions on the FCRA, California's TNC statute, and federal and state regulations are improper legal conclusions. And her opinions that Uber

acted "reasonably" simply label the conduct the jury must evaluate.

**1. Ms. Thomas is unqualified to opine on background checks, and her opinions on this issue are unhelpful factual summaries.**

Ms. Thomas is an employment lawyer and consultant who "advise[s] businesses and human resource professionals on *responding to* complaints of sexual assaults." Ex. P, Expert Report of Vida Thomas dated Sept. 26, 2025 ("Thomas Rep."), ¶¶ 1-8 (emphasis added). She has no expertise or experience with respect to background checks. She has never run a background check, has never worked with a vendor that conducts background checks, and has no experience or knowledge with respect to the background checks performed by Checkr, Uber's vendor. *See* Ex. Q, Vida Thomas Sept. 11, 2026 Deposition ("Thomas Dep."), at 15:16-16:14, 61:9-11. She is therefore unqualified to testify about the adequacy of Uber's and Checkr's background checks and whether they "met generally accepted standards in the HR industry." Thomas Supp. Rep. § III.A; *see also Thomas* Rebuttal Rep. ¶¶ 26-27, 33-34.

Qualifications aside, her opinions are not helpful to a jury. She merely recites favorable facts about what Uber and Checkr did and then deems them adequate. *See* Thomas Supp. Rep. ¶¶ 7-9; Thomas Rebuttal Rep. ¶¶ 26-27, 33-34. This requires no expertise at all. An expert may not "simply summarize evidence produced in the pretrial process" and thereby "mislead the jury by putting the imprimatur of her expertise on the statements of other witnesses." *Edwards Lifesciences*, 2021 WL 5407316, at *2-3 (internal quotation marks omitted). These opinions should be excluded.

**2. Ms. Thomas's revived "notice" opinion is unhelpful and was previously excluded by the Court.**

In her opening report (served last year), Ms. Thomas sought to opine that Uber "was not on notice" that drivers in each bellwether case "would sexually assault a rider." Thomas Rep. § VI.B. Prior to the *Dean* trial, Plaintiffs moved to exclude that opinion because it merely recited facts and told the jury what conclusion to reach on a commonsense question that jurors are fully capable of deciding. *See* ECF No. 4358 at 22-23. The Court agreed and excluded the opinion. *See* ECF No. 4941 at 2; *see also In re Uber Rideshare Cases*, 2025 WL 2631568, at *6 (Cal. Super. Ct. Aug. 29, 2025) (JCCP court also excluding Ms. Thomas's "notice" opinion because the "jury is perfectly capable of drawing its own conclusion from the evidence" and "the question of whether Uber was on notice that any of the drivers in question would sexually assault a passenger is 'one of such common knowledge that [people] of ordinary education could reach a conclusion as

intelligently as the witness'") (internal quotation marks omitted).

Ms. Thomas's supplemental report attempts to revive that excluded opinion. *See* Thomas Supp. Rep. § III.B. While she has eliminated the word "notice," her opinion remains the same: based on her view of facts and Le's criminal history, she concludes that "Uber had no information through its background-check process suggesting Le posed a risk of sexual assault or was otherwise likely to sexually assault a rider." *Id.* ¶ 18. That conclusion suffers from the same flaws as before. *See United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) ("[w]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision but rather attempts to substitute the expert's judgment for the jury's") (internal quotation marks and citation omitted) (emphasis in original); *Lord Abbett*, 2014 WL 3417941, at *13 n.8 (excluding expert opinion that "merely summarize[d] the record evidence and gratuitously interpret[ed] it").

The opinion should be excluded for an additional, independent reason as well. It is merely a summary of Checkr's explanation for why it failed to find and report Le's criminal records. *See* Thomas Supp. Rep. ¶¶ 12-17. Ms. Thomas cannot be a conduit to introduce facts from a third party. As with her background-check opinion, Ms. Thomas seeks to improperly lend "the imprimatur of [her] expertise" to another witness's account. *Edwards Lifesciences*, 2021 WL 5407316, at *3 (internal quotation marks omitted).

**3. Ms. Thomas's opinions interpreting statutes and regulations are improper legal conclusions.**

Ms. Thomas's opinions interpreting and applying the FCRA, California's TNC statute, Department of Transportation regulations, and biometric laws are improper legal opinions.

Ms. Thomas opines that Le's 2012 aggravated assault and invasive visual recording charges, along with the associated emergency protective order, "fell outside the FCRA's seven-year reporting window for non-conviction records." Thomas Rebuttal Rep. ¶ 36. She also opines on what California's TNC statute requires, including the type of background check it prescribes and the events that disqualify a driver. *See id.* ¶¶ 14, 31. She interprets "safety-sensitive" under regulations of the U.S. Department of Transportation and the California Department of Human Resources, concluding they do not apply to TNCs. *Id.* ¶ 6. And she opines that Uber cannot access the FBI fingerprint database without statutory authorization. *Id.* ¶ 22. Finally, like Mr. Morris, Ms. Thomas relies on the Illinois Biometric Information Privacy Act, which has no bearing on this California bellwether trial, and the California Consumer Privacy Act to opine that fingerprinting poses

"significant legal exposures and significant potential liabilities for companies." *Id.* ¶ 23.

What these laws mean, their implications, and how they apply to Uber are questions of law for the Court, not an expert, to explain to the jury. *See Miller*, 2023 WL 9005796, at *8-9; *Lukov*, 2012 WL 2428251, at *2 (holding that expert's "statement as to the state of the law in this state and across the country…does not aid either the court or the jury"). These opinions should be excluded.

**4. Ms. Thomas's opinions on "reasonable" care overstep the bounds of expert testimony.**

Ms. Thomas proffers numerous opinions that go to the heart of a matter at trial, i.e., opining that Uber's conduct was ultimately "reasonable." *See, e.g.,* Thomas Rebuttal Rep. § V (opining that "it was not reasonable for Uber to collect fingerprints from applicant drivers"); *id.* § VIII (opining that "Uber's investigation and steps taken concerning the report of rider…were reasonable"); *id* § IX (opining that "Uber's response to Plaintiff A.R.'s August 11, 2023 report was reasonable based on the information available at the time").

"Generally, courts have held that expert opinions as to whether a party's conduct was 'reasonable' oversteps even the broad latitude afforded to experts under Rule 704(a)." *Chamberlin v. Hartog, Baer & Hand, APC*, 2022 WL 526157, at *12 (N.D. Cal. Feb. 22, 2022). An expert may opine on whether a party acted in accordance with the standard of care the expert describes, but "the expert cannot simply label a party's conduct as 'reasonable.'" *Id.* Ms. Thomas's conclusions that Uber acted reasonably fall squarely within this prohibition and should be excluded.

**G. Expert Testimony of Joseph Okpaku Should Be Excluded in Part.**

Uber offers Mr. Okpaku as an expert on TNC regulation and background checks, among other subjects. Plaintiff moves to exclude his opinion that fingerprint-based background checks could have a disparate impact on communities of color. *See* Okpaku Rebuttal Rep. at 7-8. This opinion does not fit the facts of this case, and it rests on speculation rather than any reliable methodology.

*First,* this opinion does not fit the facts of this case. It is therefore unhelpful and should be excluded. *See Daubert*, 509 U.S. at 591-92. Mr. Okpaku asserts that fingerprint-based background checks could have a disparate impact on people of color, who may be more frequently stopped, searched, arrested, or convicted, even when they are innocent. *See* Okpaku Rebuttal Rep. at 7. But neither Uber nor Mr. Okpaku claims that any part of Le's criminal history resulted from a wrongful stop, search, arrest, or conviction. *See id.* Nothing

suggests that fingerprint-based background checks would have kept Le off the platform because of some unjust law-enforcement action. In any event, Mr. Okpaku concedes that fingerprint-based and name-based background checks can complement each other to mitigate any disparate impact stemming from unjust law-enforcement actions. *See* Ex. R, Joseph Okpaku Sept. 10, 2026 Deposition ("Okpaku Dep."), at 59:25-62:22.

*Second*, the opinion is unreliable. On its face, the opinion is nothing more than guesswork. *See* Okpaku Rebuttal Rep. at 7 (describing "*potential* for disparate impacts") (emphasis added); *id.* (suggesting an unjust encounter with the criminal justice system "could somehow lead to further complications"). Expert opinions that are based on speculation or guesswork are unreliable and therefore inadmissible. *See Klein*, 766 F. Supp. 3d at 963. Moreover, the opinion lacks any reliable methodology. *See* Okpaku Rebuttal Rep. at 7-8. Mr. Okpaku did not perform any study, survey, or formal literature review. *See id.* at 2. Instead, he predicates his musings on a hypothetical: "[i]f one accepts the premise that a person of color is more likely to have an unjust encounter with the criminal justice system…then it begs the question of whether that unjust encounter could somehow lead to further complications." *Id.* at 7.[5] The opinion is unreliable and should be excluded. *See, e.g., Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (expert testimony may not rest on "unsupported speculation and subjective beliefs").

Mr. Okpaku cites five articles he claims "demonstrate the very real *possibility* that the use of fingerprint background checks can have a disparate impact on people of color." Okpaku Rebuttal Rep. at 8 (emphasis added). However, the articles cited *do not* stand for this proposition. Four of the five articles do not

[5] While Mr. Okpaku asserts that his "research, work as a prosecutor, and [his] life experience" bear out this hypothesis, as noted above the five cited articles do not support his conclusion. *Id.* All that remains is common experience regarding racism, for which the jury needs no expert opinion.

address the disparate impact of fingerprint background checks at all.[6] The sole article[7] that references the disparate impact does not relate to the actual substance of his opinion, i.e., discussing data on the disparate impact of fingerprint background checks compared to name-based background checks. Accordingly, these articles cannot cure the deficiencies in his opinion. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002) (affirming exclusion of expert testimony as unreliable where the studies the expert cited "do not provide support" for the proposition advanced).

## IV. CONCLUSION

For these reasons, the above testimony should be excluded in whole or in part.

[6] *See* Samuel R. Gross et al., *Race and Wrongful Convictions in the United States*, Mar. 7, 2017 (discussing rate of wrongful convictions amongst African Americans); Nat'l Sci. & Tech. Council, Comm. on Sci. Subcomm. on Forensic Sci., *Achieving Interoperability for Latent Fingerprint Identification in the United States*, Apr. 2015 (discussing background check technology without reference to "disparate impact"); Becki R. Goggins & Dennis A. DeBacco, *Survey of State Criminal History Information Systems, 2018*, Nov. 5, 2020 (discussing background check technology without reference to "disparate impact"); U.S. Gov't Accountability Off., *Criminal History Records: Additional Actions Could Enhance the Completeness of Records Used for Employment-Related Background Checks*, Feb. 2015 (discussing background check completeness without reference to "disparate impact").

[7] *See* Maurice Emsellem & Madeline Neighly, *Wanted: Accurate FBI Background Checks for Employment*, July 30, 2013.

Dated: November 13, 2026

Respectfully submitted,

By: */s/ Sarah R. London*
Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: */s/ Rachel B. Abrams*
Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435
rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: November 13, 2026 By: */s/ Ellyn Hurd*
Ellyn Hurd