[*Submitting counsel below*]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

**IN RE: UBER TECHNOLOGIES, INC., PASSENGER SEXUAL ASSAULT LITIGATION**

This Document Relates to:

All Cases

No. 3:23-md-03084-CRB

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO APPOINT A SPECIAL MASTER TO INVESTIGATE FRAUD**

Judge: Honorable Charles R. Breyer
Date: December 18, 2026
Time: 10:00 A.M.
Ctrm.: 6-17th Floor (zoom)

# TABLE OF CONTENTS


INTRODUCTION ........ 1

LEGAL STANDARD ........ 2

ARGUMENT ........ 2

I. This motion is not about "fraud" because there is vanishingly little evidence of "fraud." ........ 2

II. Concerns about ride receipts or fact sheets, if substantial, should be addressed through additional modifications to PTOs 5, 10, and 31. ........ 5

III. A special master is likely to produce unreasonable time and expense. ........ 8

CONCLUSION ........ 9

## INTRODUCTION

Uber's motion to appoint a special master to investigate "fraud" should be denied. Uber seeks a new decisionmaker to weigh evidence and decide whether the incidents Plaintiffs allege actually occurred before those cases are permitted adjudication before the Court and a jury. As the Court has observed, these cases involve three questions: (1) did the incident occur, (2) what are the plaintiff's damages, and (3) is Uber responsible? Uber's defense in virtually every case involves question two: whether the incident occurred. So, this motion seeks a Special Master to resolve in the first instance a key issue that otherwise would be decided in discovery and trial. Uber cites no precedent for a district court sidelining itself in this manner. Rule 53 neither anticipates nor authorizes a shadow MDL.

The factual predicate for the motion—that this MDL is beset by widespread "fraud"—is unproven. Uber identifies a tiny percentage of cases involving allegedly inauthentic ride receipts, but does not demonstrate that the existing process for investigating and moving against such cases is insufficient or has revealed any evidence of a systemic issue. Indeed, the master appointed by stipulation in the JCCP already found that "fraudulent ride receipts … appear to be unique individualized efforts to modify legitimate ride receipts, as opposed to part of a larger scale, organized effort to perpetrate fraud on the Court" and that "there has not been evidence to suggest that Plaintiffs' Counsel are involved in, or somehow facilitated, the creation of such fraudulent evidence." Ex. A at 4.

Uber's suspicions of "fraud" appear to be overblown and misrepresented merits disputes—predictable given that the company's first defense in any sexual assault cause is to deny it happened (even where the driver has been convicted of the crime). To the extent common problems exist, they may be addressed by modifications to the PTO 5 and PTO 31 ride-receipt and Amended PTO 10 fact-sheet processes. But Uber has never brought those greater concerns to Plaintiffs' leadership, so those discussions have not happened, even though Plaintiffs have always been willing to discuss modifications of pretrial orders to address real issues, if there are any. So, Uber does not meet its burden to show that the matters in its motion "cannot be effectively and timely addressed by" the Court and that "the need" for a Master "is clear." Fed. R. Civ. P. 53(a)(1)(C) & advisory committee

notes. Rather, the amorphous and nearly boundless scope of the proposed appointment will only result in expense and procedure for their own sake, the "unreasonable expense or delay" that the Rule warns against. Fed. R. Civ. P. 53(a)(3).

Uber presumes that if the company says the word "fraud" enough times, then the Court and the media will assume that this MDL is rife with fraud. *Cf.* ECF 7813 at 6 n.1 (falsely asserting that the Court endorsed Uber's contentions "that fraudulent claims could make up as much as 30% of the MDL docket"). But reification through repetition is not proof. We've seen this movie before. *See* ECF 7020 (falsely accusing Plaintiffs of witness tampering); ECF 7011 (same); ECF 7098 (same); ECF 7184 (same). Rule 53 demands more.

## LEGAL STANDARD

Under Rule 53, the Court may appoint a special master in certain limited circumstances: "[A]ppointment of a master must be the exception and not the rule." Fed. R. Civ. P. 53, advisory committee notes. As relevant here, the Court may appoint a master to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). In "appointing a master, the court must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay." Fed. R. Civ. P. 53(a)(3). A "pretrial master should be appointed only when the need is clear." Fed. R. Civ. P. 53, advisory committee notes. And, "[i]t is generally preferable to appoint special masters" only "with the parties' consent." Fed. Jud. Ctr., *Manual for Complex Litig.* § 11.52 (4th ed. 2004).

## ARGUMENT

### I. This motion is not about "fraud" because there is vanishingly little evidence of "fraud."

Uber asks the Court to appoint a special master to investigate "fraud." But the mission creep is immediately apparent: the master's purview will cover not just "fraud," but "material misrepresentations, inconsistencies, and other irregularities." Mot. at 12. And not just to identify "fraudulent" claims, but rather "to determine which claims are meritorious and which are not," including investigations of "referral patterns and financial relationships." *Id.* at 13. But

determination of merit belongs in discovery (including "forensic document review" and "sworn testimony," *id.* at 13), summary judgment, and trial before a jury, not hidden away under the auspices of a special master. *Cf.* Fed. R. Civ. P. 53, advisory committee notes (warning that "[a]t the extreme, a broad delegation of pretrial responsibilities … can run afoul of Article III").

Uber's theory of "fraud" is so capacious as to swallow the entire litigation. The Court has seen how Uber defends these cases. No doubt, Uber would find in Ms. Dean's, Ms. Mensing's, and Jane Doe QLF's cases alleged "inconsistencies" and "irregularities" or maybe even asserted "material misrepresentations." Uber suggested that Ms. Dean's account was disproven by video of her "walking like a normal person," rather than running from the rapist's vehicle. *Dean* Trial Tr. at 264:19-265:8, 14991:11-1500:3, 3507:18-3509:4. Is walking an "inconsistency"? An "irregularity"? Or a harmful rape myth? *See id.* at 767:22-768:16. Uber's defense in *Mensing* turned on the fact that the plaintiff's fact sheet was amended over time. Is that "indicia of fraud?" Or an "irregularity?" Or simply a fact dispute going to the merits of the claim? Who is to say? The only thing certain is that Uber will find *something* in every plaintiff's account to question; even in *QLF*, where the driver was convicted of the crime, Uber conceded the assault only days before trial.

The asymmetry of Uber's accusations is difficult to overlook. In one bellwether, Uber identified the *wrong driver* and concealed that the real driver was *still* on the platform, leading Plaintiff down a rabbit hole of discovery and preparation of amended pleadings before Uber belatedly corrected the issue. *See* ECF 3557, 3569. Then, in *QLF*, Uber did not identify a prior assault report against the driver until July and August 2026, *seventeen months* after first serving a DFS in the case. If allegations of "misstatements" and "irregularities" require a special master, then perhaps Uber's motion is directed at the wrong side.

Uber's motion goes well beyond fraud because the case that there is widespread fraud in this MDL has not been made. In a tiny percentage of cases, Uber alleges that the plaintiff provided an inauthentic ride receipt. Plaintiffs of course agree that a colorable contention that a ride receipt is unauthentic should be addressed. And those contentions, in the small number of cases in which they have arisen, *have* been addressed. Plaintiffs' leadership acquiesced to case-specific discovery in those matters, as well as third-party discovery of companies Uber alleges allow for the generation

of ride receipts. Where the allegations supported relief, Uber has filed motions and the Court has granted them. Despite those efforts, Uber presents no evidence that any firm knowingly submitted inauthentic receipts or that such receipts present any sort of "inventory-wide" issue.

Uber relies on the fact that the JCCP appointed Ms. Reisman (ignoring that her appointment was stipulated). But in denying Uber's request to depose plaintiffs who Uber asserted "submitted fraudulent ride receipts," Ms. Reisman found that "fraudulent ride receipts … appear to be unique individualized efforts to modify legitimate ride receipts, as opposed to part of a larger scale, organized effort to perpetrate fraud on the court." Ex. A at 4. After conducting the investigation that Uber says is necessary, she made clear: "[T]here has not been evidence to suggest that Plaintiffs' Counsel are involved in, or somehow facilitated, the creation of such fraudulent evidence." *Id.* In other words: no widespread fraud.

Having failed to prove widespread fraud, Uber seeks to avoid doing so. Uber argues that there *must* be widespread fraud because the MDL "exceeds 3,900" plaintiffs" and Uber has been able to locate third-party advertising. But Uber receives on average more than 78,000 sexual assault reports each year, so 3,900 plaintiffs is, if anything, surprisingly low. *See Dean* Trial Tr. at 2116. And any connection between Uber can draw between a challenged ride receipts and "lead generators" does not change the fact that the number of challenged ride receipts reflects only a tiny portion of filed cases. In other words, assuming, as Uber does, that lead-generation has resulted in many MDL cases, it follows that the vast majority of lead-generated cases have nothing to do with alleged "fake ride receipts." Uber also complains about "errors" in PFS submissions. But "errors" in a PFS do not suggest, let alone prove, that the claim is "fraudulent." *See* 8/24/26 H'rg Tr. at 23:12-19 (explaining that "people's recollections are varied, especially, especially in cases involving sexual harassment and sexual conduct. … [T]hat's not fraud."). Uber says that PFS problems may indicate a plaintiff is "non-responsive." Mot. at 4. A non-responsive plaintiff is a problem, to be sure, and one that the parties and the Court have readily available tools to address. But it does not constitute "fraud" and Uber does not identify a single case, anywhere, that appointed

a special master to determine which plaintiffs were "non-responsive."[1]

More generally, Uber does not cite precedent appointing a special master in similar circumstances at all. Most of the cited examples made appointments in the context of uncapped global class action settlements, where the potential incentive for fraud is inherent, and where many participating plaintiffs never even filed lawsuits before seeking compensation. The orders also included specific limitations to ensure that the investigation did not become litigation itself. In *NFL*, for example, the settlement required a "Qualifying Diagnosis" and created a process for class members to receive such diagnoses. *See NFL Order*, Uber Ex. 16 at 3. One recurring problem there was people coming forward with diagnoses that predated the settlement (and so outside the court-ordered process). In appointing an investigator, the court expressly limited the investigation to that category of claims, and permitted investigation of particular claimants *only* upon authorization by the other masters overseeing the settlement. *Id.* Similarly, in *Deepwater Horizon*, Uber Ex. 17, the master was appointed to investigate documented and apparently widespread problems in a class action settlement program and was limited to a specified "external investigation" and "examining and evaluating the internal compliance program and anti-corruption controls within the" program. *Id.* at 2. Here, Uber does not identify any similar circumstances or propose any such limitations.[2]

## II. <u>Concerns about ride receipts or fact sheets, if substantial, should be addressed through additional modifications to PTOs 5, 10, and 31.</u>

Lacking evidence of a problem requiring the services of a special master, Uber presents a "targeted review" of plaintiff fact sheets, the parameters of which are not disclosed. This "review" identified cases where Uber disagrees with parts of the Plaintiff's account of the ride at issue. Such disagreements hardly evince "fraud" and are far more likely to bleed into the merits of the claim,

---

[1] Uber makes much of one law firm's statement that some of their clients could not be reached to review fact sheet amendments or execute verifications. Mot. at 7-8; *see also* ECF 4522. But that statement was filed nearly eleven months ago, and Uber has not asked the Court to take any action since. It is unclear what Uber would ask a master to do with respect to those Plaintiffs that it has not asked of the Court in nearly a year.

[2] Uber's footnoted cases do not provide any more apt a comparison. *Johnson v. SmithKline Beecham Corp.*, Uber Ex. 18, merely expanded an existing special master's authority to encompass a request for sanctions against one law firm for a discrete practice relating to 52 plaintiffs. And in *Engle*, the court initiated an investigation "to ensure the appropriateness of the attorney's fees and costs under" a global "Settlement Agreement." *In re Engle Cases*, 2015 WL 13903838, at *2 (M.D. Fla. Nov. 6, 2015).

to the extent they do not reflect of simple misunderstandings or mistakes.

Plaintiffs' review of some of the cases flagged in Uber's "targeted review" illustrates that the company's claims of "fraud" are overblown, misleading, and, at minimum, should be raised with counsel rather than used to justify a witch-hunt into "referral patterns," "financial relationships," and "potential attorney-coordinated schemes." Mot. at 2, 13.

Start with Uber's Exhibit 11, which purports to identify cases where Plaintiffs claim they ordered rides for themselves, but Uber's data show the ride was ordered for someone else. In reality:

- Case 3299: the PFS states that the account holder was either the Plaintiff or someone else, and that the Plaintiff does not recall who ordered the ride. Abrams Decl. ¶ 3
- Cases 2567 and 2609: The ride receipts include the Plaintiff's first names, and nothing in the DFSs indicates the rides were ordered for someone else. *Id.* ¶ 4.
- Case 3361: Uber's own investigative files identify Plaintiff as the rider, and the ride receipt includes her first name. Nothing in the DFS indicates that the ride was ordered for anyone else. The name Uber now identifies is Plaintiff's husband. *Id.* ¶ 5.
- Case 3419: Uber itself produced a ride receipt with the Plaintiff's first name on it. *Id.* ¶ 6.
- Case 4556: It is possible the Plaintiff was using someone else's app to order a ride for herself. The rider name that Uber says the ride was ordered for does not appear in the DFS productions. *Id.* ¶ 7.
- Case 5492: Uber's own investigation identifies Plaintiff as the rider, though much of the investigation is redacted as privileged. The rider name Uber now identifies does not appear in the DFS. *Id.* ¶ 8.

In other cases, Uber says the plaintiff identified the wrong driver gender (Exhibit 15). But in Case 3430, for example, the plaintiff reported the driver to Uber and repeatedly referred to the driver as a woman. *Id.* ¶ 12. So, whatever mistake may have been made in the PFS, there's no "fraud." In Case 4079, the evidence shows that Uber received a "different driver" report around the same time that the driver assaulted the plaintiff. *Id.* ¶ 13. And in Case 3299, Uber's records show the company referring to the driver as "he." *Id.* ¶ 14. We don't know whether another person was using the driver's account or something else happened.

Finally, Uber argues that some plaintiffs' accounts are "contradicted" by Uber's GPS data.

This claim, too, is suspect. In Case 1071, for example, it appears Uber produced GPS data for the wrong ride. *Id.* ¶ 9. In Case 3046, Plaintiff's counsel reviewed the GPS data and confirmed it is consistent with the plaintiff's account. *Id.* ¶ 10. In Case 5495, the map included on Plaintiff's produced ride receipt depicts a straight-line route between the pick-up and drop-off addresses—as the crow flies—despite no such route existing between those locations. *Id.* ¶ 11. This discrepancy suggests errors in Uber's data.

More generally, GPS data is not necessarily susceptible to simple conclusions. In multiple bellwethers, both sides have served expert reports concerning GPS data. For example, Uber just settled the *QLF* bellwether even though its own GPS expert opined that the ride was not "erratic," apparently because Uber believes that QLF's account of the ride required it to be "erratic." Uber never explains how a special master is supposed to evaluate alleged GPS contradictions and decide whether they are "indicia of fraud." Mot. at 10. Presumably, any master will have no special expertise in GPS data, and will need to retain his or her own expert to evaluate Uber's claims. At which point the "investigation" will have morphed into full-blown merits fact and expert discovery. *See* Elizabeth Chamblee Burch & Margaret S. Williams, *Judicial Adjuncts in Multidistrict Litigation*, 120 Colum. L. Rev. 2129, 2136 (2020) ("We found that appointing a judicial adjunct of any kind made [MDL] proceedings continue longer than they otherwise would, all else being equal.").

Plaintiffs here do not address every example Uber identified, and do not suggest that every detail provided in every PFS is correct. Just that the "irregularities" that Uber identifies do not suggest any systemic pattern of "fraud" justifying an expensive, time-consuming, and protracted investigation. Indeed, it seems that Uber has already successfully resolved a number of disputes without the need for a special master. *See* ECF 8237 (Uber stipulating to dismiss four cases it had previously moved against under PTO 5 or Amended PTO 10).

More to the point, Uber cannot demonstrate a "clear need" for a special master to address disputes over the details of a PFS when PTO 10 is the obvious vehicle for doing so. If Uber can identify a category of PFS issues that merit further inquiry and formal process, then it should propose amendments to PTO 10 to address that category. Earlier, when Uber raised concerns about

deficient PFSs and about cases with missing medical records, Plaintiffs worked with Uber to propose a modified PTO 10 that addressed both concerns. *See* ECF 4274 (stipulated modified order). If a plaintiff does not serve a substantially complete PFS, PTO 10 provides a process for a deficiency notice followed by dismissal if the deficiencies are not rectified. Am. PTO 10 at 8-9. That same avenue remains open to Uber now, but Uber has never approached Plaintiffs with any of the categories of PFS-related problems that it raises in its motion or proposed modifications to the PTO to accommodate those concerns.

The same is true of inauthentic ride receipts. When Uber raised concerns with compliance with PTO 5 and proposed modifying that order, Plaintiffs' leadership agreed that a modification was warranted. *See* ECF 3768 (partial opposition). The Court then entered PTO 31 requiring that ride receipts be verified under penalty of perjury and providing a mechanism for dismissal for non-compliance. PTO 31 at 2-3. If Uber's discovery efforts into alleged inauthentic receipts reveal additional concerns, then Uber should propose further modifications to PTO 5, which Plaintiffs will consider in good faith.

## III. <u>A special master is likely to produce unreasonable time and expense.</u>

Even if there is a "clear" "need" for a special master, which has not been demonstrated, Rule 53 instructs that the Court must evaluate the risk of "unreasonable expense or delay." Fed. R. Civ. P. 53(a)(3). Here, Uber's requested master appointment would create a never-ending and boundless sideshow imposing great and pointless cost. *Cf.* Ex. A at 4 (JCCP master chiding Uber for seeking "punishment" of plaintiffs); Burch & Williams, 120 Colum. L. Rev.at 2136 ("If judges rely on adjuncts primarily to ease their caseload and speed proceedings along, then they ought to reconsider").

*First*, the scope of the appointment is so amorphous as to be unlimited. Starting with "inconsistencies" and "irregularities," Uber's "dedicated investigator" will embark on an "analysis of referral patterns and financial relationships," investigate "related actors" and look for "potential attorney-coordinated schemes." Mot. at 1, 13-14. The master's assignment would encompass "unfiled portfolios," never mind that every fact about an "unfiled portfolio" is privileged. *Id.* at 11. Uber's third-party subpoenas to marketing firms have already constituted an unprecedented

invasion of privacy into the sensitive communications of sexual assault victims, work product, and attorney-client privilege. This motion, if granted, will make those efforts just the beginning.

Uber has no explanation for why there is anything unusual or wrong about a party suing Uber for compensation when they have been harmed. If referral sources are legitimate grounds for discovery, then Plaintiffs should be able to probe equally into the decisions of the board regarding its choice of counsel and the financial motives for its decisions and strategies.

*Second*, Uber has revealed that it will leverage any special-master investigation to delay rather than promote resolution of cases in this Court. Uber earlier proposed that no case be eligible for bellwether or remand pools until the master has vetted the entire inventory—filed and unfiled—of the firm representing the plaintiff. *See* ECF 7020 at 7-11. In other words, upon identifying an "irregularity," Uber can trigger an inventory-wide investigation that must be completed before a case can proceed to case-specific discovery. This is just process for the sake of process, would essentially create an unprecedented administrative exhaustion requirement in this MDL, and is incompatible with Rules 1 and 16.1. The Court should not authorize even the initial step of this misadventure.

## CONCLUSION

For these reasons, Uber's motion to appoint a special master should be denied.

Dated: November 20, 2026

Respectfully submitted,

By: */s/ Sarah R. London*

Sarah R. London (SBN 267083)

**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
slondon@girardsharp.com

By: */s/ Rachel B. Abrams*

Rachel B. Abrams (SBN 209316)

**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
Facsimile: (415) 840-9435

rabrams@peifferwolf.com

By: */s/ Roopal P. Luhana*
Roopal P. Luhana

**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
Facsimile: (888) 499-1123
luhana@chaffinluhana.com

*Co-Lead Counsel*

**FILER'S ATTESTATION**

I am the ECF User whose ID and password are being used to file this document. In compliance with N.D. Cal. L.R. 5-1(i)(3), I attest that the signatories above concurred in this filing.

Dated: November 20, 2026 By: */s/ Andrew R. Kaufman*
Andrew R. Kaufman